No. 24-1447

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

---

### JOINT APPENDIX VOLUME 4 OF 9

---

Jared E. Knicley
Nanding Chen
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org
nchen@nrdc.org

*Counsel for Appellants*

Andrew M. Bernie
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

*Counsel for Federal Appellees*

Fred R. Wagner
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
frwagner@venable.com

*Counsel for State Appellees*

September 30, 2024

# TABLE OF CONTENTS

## Volume 1

**Document**                                                    **Page No.**

District Court Docket Report as of September 24, 2024 ...................... JA0001

Complaint, October 11, 2022................................................................ JA0014

Federal Defs.' Summ. J. Reply, October 4, 2023 (excerpt)................... JA0060

Memorandum Opinion, March 20, 2024............................................ JA0062

Order on Summary Judgment, March 20, 2024 .................................. JA0130

Notice of Appeal, May 14, 2024 ......................................................... JA0132

Record of Decision (ROD), August 25, 2022...................................... JA0134

## Volume 2

**Document**                                                    **Page No.**

Final Environmental Impact Statement (FEIS), June 2022................... JA0354

## Volume 3

**Document**                                                    **Page No.**

Final Environmental Impact Statement (FEIS),
    June 2022 (continued) ................................................................. JA0699

FEIS Appendix A - Final Traffic Analysis Technical
    Report, June 2022 (excerpt) ......................................................... JA0835

VISSIM Calibration Memo (Appendix D to Final
    Traffic Analysis Technical Report), June 2022 ...................................JA0850

FEIS Appendix B – Draft Application for Interstate Access
    Point Approval, June 2022 (excerpts) ............................................. JA0857

i

**Volume 4**

**Document**                                                    Page No.

FEIS Appendix B – Draft Application for Interstate Access
    Point Approval, June 2022 (excerpts) (continued) .......................... JA1072

FEIS Appendix F - Final Community Effects Assessment and
    EJ Analysis Technical Report, June 2022 (excerpts)........................ JA1099

FEIS Appendix G - Final Section 4(f) Evaluation, June 2022 ............... JA1254

Cultural Resources Technical Report, vol. 1, June 2022 ....................... JA1339

Consultation letter with Maryland Historical Trust and Virginia
    Department of Historic Resources, September 8, 2021 .................... JA1365

Maryland Sierra Club Section 106 Comments, April 12, 2021 ............. JA1380

Washington Biologists' Field Club (WBFC) Comments,
    April 9, 2021 ................................................................... JA1389

WBFC Letter, October 8, 2021 .......................................................... JA1411

WBFC Comments on Programmatic Agreement,
    February 3, 2022 ............................................................... JA1432

FEIS Appendix K - Final Air Quality Technical Report,
    June 2022.......................................................................... JA1474

FEIS Appendix M - Final Natural Resources Technical
    Report, June 2022 (excerpts) ............................................. JA1510

FEIS Appendix N - Final Avoidance, Minimization, and
    Impacts Report, June 2022 ................................................. JA1521

## Volume 5

| Document | Page No. |
|---|---|

FEIS Appendix Q - Final Indirect and Cumulative Effects
Technical Report, June 2022 (excerpts) .......................................... JA1577

FEIS Appendix T – MDOT Response to WBFC DEIS Comments
and Testimony (Robert Soreng), June 2022 .................................... JA1581

FEIS Appendix T - MDOT Response to Maryland Sierra Club
DEIS Comments, June 2022 .......................................................... JA1628

FEIS Appendix T – MDOT Response to WBFC SDEIS Comments,
June 2022 ..................................................................................... JA1743

Supplemental Draft Environmental Impact Statement (SDEIS),
October 2021 (excerpts) ................................................................ JA1767

Draft Environmental Impact Statement (DEIS),
June 2020 (excerpt) ...................................................................... JA1868

DEIS Appendix A - Purpose and Need Technical Report,
November 2018 (excerpt) .............................................................. JA1909

## Volume 6

| Document | Page No. |
|---|---|

DEIS Appendix F - Draft Section 4(f) Evaluation,
May 2020 (excerpts) ...................................................................... JA1911

DEIS Appendix I - Air Quality Technical Report,
May 2020 (excerpt) ....................................................................... JA2046

iii

**Volume 7**

| Document | Page No. |
|---|---|
| DEIS Appendix I - Air Quality Technical Report, May 2020 (excerpt) (continued) | JA2131 |
| Agency Coordination Plan, May 2018 | JA2163 |
| EPA Technical Support Document for Ozone Conformity, May 5, 2020 | JA2176 |
| Maryland Sierra Club DEIS comments, November 6, 2020 | JA2186 |
| Internal FHWA email re: AQ conformity, May 17, 2021 | JA2399 |
| Internal FHWA email re: AQ conformity, May 19, 2021 | JA2402 |
| Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution, April 27, 1979 | JA2404 |
| SDEIS Comment Review Meeting re: Traffic Analysis, September 1, 2021 | JA2408 |

**Volume 8**

| Document | Page No. |
|---|---|
| Maryland Sierra Club SDEIS Comments, November 30, 2021 | JA2415 |
| State Treasurer Review of P3, July 9, 2021 | JA2598 |
| Maryland National Capital Park and Planning Commission Comments re Planned Alternative, November 30, 2021 | JA2610 |
| Managed Lanes Study IAPA Comments (IAPA Technical Report Errata Sheet), February 4, 2022 | JA2628 |

**Volume 9**

| Document | Page No. |
|---|---|

Maryland Historical Trust Determination of Eligibility
Form for Plummers Island, August 20, 2021 (excerpt).................... JA2635

Roselie Ann Bright Comments on FEIS, July 14, 2022 ...........................JA2647

Zamurs and Associates Comments on FEIS, June 2022 ..........................JA2657

Maryland Sierra Club FEIS Comments, July 18, 2022 ...........................JA2668

CEEJH Lab Meeting Summary, October 20, 2021 ...................................JA2738

American Legion Bridge Strike Team Power Point,
February 2, 2021 ............................................................... JA2740

Administrative Draft SDEIS Comment Errata Sheet,
July 14, 2021 .....................................................................JA2748

Internal FHWA email re: Update on air quality modeling,
July 7, 2021 .................................................................... JA2750

Influence of Roadway Emissions on PM$_{2.5}$, July 20, 2020 .......................JA2751

The New England Journal of Medicine, "The Need for a Tighter
Particulate-Matter Air-Quality Standard," August 13, 2020 ...............JA2767

Monitoring Study of Near-Road PM$_{2.5}$ Concentrations in
Maryland, August 14, 2015 ..................................................JA2771

EPA, Integrated Science Assessment for Particulate Matter,
December 2019 (excerpt) ............................................... JA2782

American Legion Bridge Strike Team Report, November 2021 ...............JA2988

OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

## Table 6-22: AM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative

| Ramp Location | Available Storage (feet) | 2045 No-Build | | | | | | | | Available Storage (feet) | 2045 Preferred Alternative | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 6-7 AM | | 7-8 AM | | 8-9 AM | | 9-10 AM | | | 6-7 AM | | 7-8 AM | | 8-9 AM | | 9-10 AM | |
| | | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) |
| **I-270 at MD 117** | | | | | | | | | | | | | | | | | | |
| MD 117 EB On-Ramp to I-270 SB | 1,920 | 88 | 752 | 1,238 | 2,152 | 1,745 | 2,397 | 477 | 1,997 | 1,920 | 69 | 734 | 816 | 1,994 | 866 | 1,954 | 52 | 911 |
| MD 117 WB On-Ramp to I-270 SB | 1,490 | 88 | 752 | 1,006 | 1,472 | 1,243 | 1,472 | 393 | 1,314 | 1,490 | 69 | 721 | 698 | 1,379 | 824 | 1,423 | 52 | 911 |
| I-270 GP Off-Ramp to MD 117 | 1,300 | 25 | 184 | 38 | 254 | 251 | 715 | 106 | 486 | 1,300 | 29 | 189 | 61 | 297 | 155 | 571 | 126 | 529 |
| **I-270 at I-370** | | | | | | | | | | | | | | | | | | |
| MD 370 EB On-Ramp to I-270 SB GP | 2,340 | 0 | 0 | 0 | 119 | 0 | 40 | 0 | 0 | 2,280 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 370 WB On-Ramp to I-270 SB GP | 3,000 | 3 | 134 | 241 | 1,920 | 133 | 1,298 | 0 | 0 | 2,940 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB Off-Ramp to I-370 EB | 6,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to I-370 EB | 2,300 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,220 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-370 EB On-Ramp to I-270 NB GP | 2,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-370 WB On-Ramp to I-270 NB GP | 2,780 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB Off-Ramp to I-370 WB | 2,750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,900 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to I-370 WB | 3,320 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 370 EB On-Ramp to I-270 SB ML | - | - | - | - | - | - | - | - | - | 2,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 370 WB On-Ramp to I-270 SB ML | - | - | - | - | - | - | - | - | - | 1,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB ML Off-Ramp to I-370 EB GP | - | - | - | - | - | - | - | - | - | 3,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-370 WB at I-270 NB ML off-ramp | - | - | - | - | - | - | - | - | - | 5,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Shady Grove Road** | | | | | | | | | | | | | | | | | | |
| Shady Grove Rd EB On-Ramp to I-270 SB GP | 1,120 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 920 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shady Grove Rd EB On-Ramp to I-270 NB GP | 1,650 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,650 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to Shady Grove Rd EB | 1,750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,850 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to Shady Grove Rd WB | 1,600 | 39 | 197 | 66 | 273 | 118 | 411 | 95 | 380 | 1,700 | 28 | 156 | 56 | 248 | 109 | 404 | 79 | 309 |
| Shady Grove Rd WB On-Ramp to I-270 NB GP | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shady Grove Rd WB On-Ramp to I-270 SB | 1,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB GP Off-Ramp to Shady Grove Rd | 1,250 | 64 | 240 | 98 | 424 | 103 | 465 | 99 | 426 | 1,250 | 60 | 232 | 99 | 419 | 100 | 427 | 95 | 408 |
| **I-270 at Gude Drive** | | | | | | | | | | | | | | | | | | |
| I-270 SB ML Off-Ramp to Gude Dr | - | - | - | - | - | - | - | - | - | 1,860 | 31 | 228 | 33 | 210 | 34 | 211 | 33 | 195 |
| I-270 NB ML Off-Ramp to Gude Dr | - | - | - | - | - | - | - | - | - | 1,400 | 65 | 350 | 70 | 366 | 87 | 404 | 88 | 401 |
| Gude Dr On-Ramp to I-270 ML NB | - | - | - | - | - | - | - | - | - | 1,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gude Dr On-Ramp to I-270 ML SB | - | - | - | - | - | - | - | - | - | 1,780 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

00001748

OP LANES™ MARYLAND   |   I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

## Table 6-22: AM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative (Continued)

| Ramp Location | 2045 No-Build Available Storage (feet) | NB 6-7 AM Avg (ft) | NB 6-7 AM Max (ft) | NB 7-8 AM Avg (ft) | NB 7-8 AM Max (ft) | NB 8-9 AM Avg (ft) | NB 8-9 AM Max (ft) | NB 9-10 AM Avg (ft) | NB 9-10 AM Max (ft) | 2045 Preferred Alt Available Storage (feet) | Pref 6-7 AM Avg (ft) | Pref 6-7 AM Max (ft) | Pref 7-8 AM Avg (ft) | Pref 7-8 AM Max (ft) | Pref 8-9 AM Avg (ft) | Pref 8-9 AM Max (ft) | Pref 9-10 AM Avg (ft) | Pref 9-10 AM Max (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-270 at MD 28** | | | | | | | | | | | | | | | | | | |
| MD 28 EB On-Ramp to I-270 SB GP | 1,950 | 1 | 92 | 4 | 182 | 0 | 0 | 0 | 0 | 1,950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 28 EB On-Ramp to I-270 NB GP | 1,050 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to MD 28 | 1,040 | 2 | 59 | 22 | 169 | 34 | 204 | 28 | 201 | 900 | 1 | 53 | 15 | 130 | 21 | 162 | 21 | 136 |
| MD 28 WB On-Ramp to I-270 NB GP | 1,370 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,370 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to MD 28 WB | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 2 | 263 | 1 | 194 |
| MD 28 WB On-Ramp to I-270 SB GP | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB GP Off-Ramp to MD 28 | 900 | 10 | 151 | 10 | 132 | 12 | 124 | 26 | 198 | 1,400 | 0 | 31 | 0 | 51 | 1 | 64 | 2 | 74 |
| **I-270 at MD 189** | | | | | | | | | | | | | | | | | | |
| MD 189 WB On-Ramp to I-270 NB | 1,080 | 5 | 60 | 21 | 109 | 5 | 78 | 7 | 63 | 1,140 | 1 | 50 | 3 | 61 | 5 | 61 | 4 | 58 |
| MD 189 EB On-Ramp to I-270 NB | 910 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 910 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to MD 189 WB | 720 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 630 | 2 | 70 | 9 | 130 | 18 | 221 | 15 | 210 |
| MD 189 NB GP Off-Ramp to MD 189 EB | 920 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 760 | 0 | 0 | 1 | 145 | 0 | 0 | 0 | 0 |
| MD 189 WB On-Ramp to I-270 SB GP | 1,910 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 | 0 | 0 | 1 | 119 | 8 | 0 | 0 | 0 |
| MD 189 EB On-Ramp to I-270 SB GP | 2,060 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,070 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB Off-Ramp to MD 189 EB | 900 | 33 | 191 | 43 | 204 | 43 | 211 | 38 | 231 | 870 | 6 | 91 | 10 | 92 | 9 | 86 | 9 | 81 |
| I-270 SB GP Off-Ramp to MD 189 WB | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,120 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Wootton Parkway** | | | | | | | | | | | | | | | | | | |
| I-270 NB ML Off-Ramp to Wootton Pkwy | – | – | – | – | – | – | – | – | – | 1,800 | 4 | 96 | 8 | 151 | 17 | 194 | 17 | 213 |
| I-270 SB ML Off-Ramp to Wootton Pkwy | – | – | – | – | – | – | – | – | – | 1,570 | 28 | 220 | 23 | 177 | 18 | 164 | 23 | 201 |
| Wootton Pkwy On-Ramp to I-270 NB ML | – | – | – | – | – | – | – | – | – | 3,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wootton Pkwy On-Ramp to I-270 SB ML | – | – | – | – | – | – | – | – | – | 1,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Montrose Road** | | | | | | | | | | | | | | | | | | |
| Montrose Rd EB On-Ramp to I-270 SB GP | 1,960 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,910 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB GP Off-Ramp to Montrose Rd EB | 1,340 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,220 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montrose Rd EB On-Ramp to I-270 NB GP | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp Montrose Rd EB | 1,980 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,870 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montrose Rd WB On-Ramp to I-270 NB GP | 1,950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,870 | 0 | 0 | 0 | 0 | 6 | 456 | 2 | 261 |
| I-270 NB Off-Ramp to Montrose Rd WB | 1,520 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,320 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montrose Rd WB On-Ramp to I-270 SB GP | 1,200 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 0 | 1,100 | 0 | 117 | 2 | 164 | 1 | 144 | 2 | 161 |
| I-270 SB GP Off-Ramp to Montrose Rd WB | 1,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

JA1073

00001749

Draft Application for Interstate Access Point Approval

## Table 6-22: AM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative (Continued)

| Ramp Location | Available Storage (feet) | 2045 No-Build 6-7 AM Avg. (ft) | Max. (ft) | 7-8 AM Avg. (ft) | Max. (ft) | 8-9 AM Avg. (ft) | Max. (ft) | 9-10 AM Avg. (ft) | Max. (ft) | Available Storage (feet) | 2045 Preferred Alternative 6-7 AM Avg. (ft) | Max. (ft) | 7-8 AM Avg. (ft) | Max. (ft) | 8-9 AM Avg. (ft) | Max. (ft) | 9-10 AM Avg. (ft) | Max. (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-270 at MD 187 / Rockledge Drive** | | | | | | | | | | | | | | | | | | |
| I-270 SB East Spur Off-Ramp to Rockledge Dr / MD 187 | 1,700 | 2 | 83 | 4 | 114 | 12 | 248 | 6 | 141 | 1,400 | 1 | 84 | 10 | 164 | 21 | 256 | 12 | 208 |
| I-270 NB East Spur Off-Ramp to MD 187 SB | 915 | 28 | 206 | 58 | 334 | 28 | 209 | 43 | 296 | 720 | 5 | 70 | 48 | 227 | 37 | 181 | 36 | 177 |
| I-270 NB East Spur Off-Ramp to MD 187 NB | 1,050 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 900 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 East Spur NB Off-Ramp to Rockledge Dr | 960 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 890 | 0 | 16 | 0 | 75 | 0 | 85 | 0 | 60 |
| MD 187 On-Ramp to I-270 East Spur SB | 780 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 580 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rockledge Dr / MD 187 On-Ramp to I-270 NB East Spur | 1,300 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,050 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Westlake Terrace** | | | | | | | | | | | | | | | | | | |
| I-270 SB ML Off-Ramp to Westlake Terrace | 1,550 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,440 | 30 | 292 | 36 | 299 | 72 | 432 | 121 | 572 |
| Westlake Terrace On-Ramp to I-270 NB ML | 1,350 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,470 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB ML Off-Ramp to Westlake Terrace | - | - | - | - | - | - | - | - | - | 1,850 | 8 | 168 | 13 | 181 | 12 | 163 | 23 | 226 |
| Westlake Terrace On-Ramp to I-270 SB ML | - | - | - | - | - | - | - | - | - | 1,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Democracy Boulevard** | | | | | | | | | | | | | | | | | | |
| I-270 NB GP Off-Ramp to Democracy Blvd WB | 1,330 | 8 | 76 | 15 | 97 | 15 | 112 | 18 | 127 | 1,270 | 11 | 91 | 22 | 133 | 20 | 141 | 25 | 160 |
| I-270 NB GP Off-Ramp to Democracy Blvd EB | 1,550 | 57 | 245 | 74 | 299 | 90 | 385 | 86 | 361 | 1,450 | 46 | 219 | 74 | 304 | 103 | 583 | 89 | 370 |
| Democracy Blvd EB On-Ramp to I-270 West Spur GP NB | 1,215 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Democracy Blvd WB On-Ramp to I-270 West Spur GP NB | 1,680 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 West Spur SB Off-Ramp to Democracy Blvd GP EB | 1,300 | 29 | 138 | 53 | 221 | 57 | 236 | 50 | 196 | 1,140 | 26 | 131 | 34 | 150 | 57 | 241 | 49 | 208 |
| I-270 West Spur GP SB Off-Ramp to Democracy Blvd WB | 1,430 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,280 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Democracy Blvd On-Ramp to I-495 Outer Loop GP | 1,130 | 0 | 0 | 0 | 0 | 45 | 159 | 0 | 0 | 2,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at MD 355** | | | | | | | | | | | | | | | | | | |
| I-270 East Spur SB Off-Ramp to MD 355 SB | 1,940 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,940 | 0 | 0 | 0 | 0 | 0 | 12 | 0 | 0 |
| I-495 Inner Loop Off-Ramp to MD 355 SB | 2,300 | 31 | 178 | 33 | 179 | 26 | 148 | 25 | 131 | 2,300 | 32 | 180 | 32 | 186 | 27 | 163 | 26 | 168 |
| MD 355 NB On-Ramp to I-495 Inner Loop | 875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 355 SB On-Ramp to I-495 Inner Loop | 2,160 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,160 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop Off-Ramp to MD 355 NB | 1,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 355 NB On-Ramp to I-495 Outer Loop | 1,360 | 0 | 0 | 0 | 0 | 278 | 731 | 1 | 68 | 1,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 355 NB ramp to I-270 East Spur NB | 1,450 | 0 | 0 | 0 | 0 | 1 | 68 | 0 | 0 | 1,450 | 0 | 0 | 0 | 0 | 2 | 81 | 0 | 0 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

JA1074

00001750

OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

## Table 6-22: AM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative (Continued)

| Ramp Location | Available Storage (feet) | 2045 No-Build 6-7 AM Avg. (ft) | 6-7 AM Max. (ft) | 7-8 AM Avg. (ft) | 7-8 AM Max. (ft) | 8-9 AM Avg. (ft) | 8-9 AM Max. (ft) | 9-10 AM Avg. (ft) | 9-10 AM Max. (ft) | Available Storage (feet) | 2045 Preferred Alternative 6-7 AM Avg. (ft) | 6-7 AM Max. (ft) | 7-8 AM Avg. (ft) | 7-8 AM Max. (ft) | 8-9 AM Avg. (ft) | 8-9 AM Max. (ft) | 9-10 AM Avg. (ft) | 9-10 AM Max. (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-495 at MD 187** | | | | | | | | | | | | | | | | | | |
| I-495 Inner Loop GP Off-Ramp to MD 187 NB | 950 | 7 | 62 | 10 | 158 | 14 | 145 | 13 | 103 | 950 | 9 | 91 | 14 | 189 | 11 | 288 | 6 | 75 |
| I-495 Inner Loop GP Off-Ramp to MD 187 SB | 1,030 | 4 | 151 | 28 | 347 | 24 | 347 | 8 | 275 | 1,030 | 6 | 232 | 34 | 514 | 61 | 564 | 9 | 323 |
| MD 187 On-Ramp to I-495 Inner Loop GP | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop GP Off-Ramp to MD 187 | 1,015 | 58 | 366 | 77 | 439 | 171 | 1,199 | 2,117 | 3,429 | 1,015 | 26 | 232 | 41 | 291 | 74 | 513 | 28 | 269 |
| I-495 Outer Loop GP Off-Ramp to MD 187 NB | 1,250 | 7 | 180 | 20 | 355 | 131 | 813 | 66 | 552 | 1,250 | 0 | 11 | 3 | 68 | 3 | 158 | 3 | 140 |
| MD 187 On-Ramp to I-495 Outer Loop GP | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at MD 190/Cabin John Parkway** | | | | | | | | | | | | | | | | | | |
| Cabin John Pkwy GP ramp to MD-190 | 770 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cabin John Pkwy On-Ramp to I-495 Inner Loop GP | 1,230 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop GP Off-Ramp to Cabin John Pkwy | 1,140 | 0 | 0 | 1 | 66 | 3 | 155 | 8 | 191 | 850 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 190 EB On-Ramp to I-495 Outer Loop GP | 1,180 | 0 | 0 | 102 | 1,166 | 1,342 | 1,737 | 1,462 | 1,736 | 2,450 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 190 WB On-Ramp to I-495 Outer Loop GP | 990 | 0 | 0 | 160 | 885 | 280 | 1,369 | 165 | 958 | 2,450 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop GP Off-Ramp to MD 190 | 850 | 31 | 109 | 131 | 1,049 | 81 | 918 | 59 | 741 | 1,040 | 29 | 131 | 38 | 191 | 28 | 125 | 29 | 130 |
| I-495 Inner Loop GP Off-Ramp to MD 190 | 1,675 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 590 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 190 EB On-Ramp to I-495 Inner Loop GP | 1,750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,100 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 96 |
| MD-190 WB On-Ramp to I-495 Inner Loop GP | 2,100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,480 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 175 |
| I-495 Outer Loop ML Off-Ramp to MD 190 | – | – | – | – | – | – | – | – | – | 1,320 | 13 | 85 | 15 | 106 | 8 | 85 | – | 79 |
| I-495 Inner Loop ML Off-Ramp to MD 190 | – | – | – | – | – | – | – | – | – | 1,700 | 2 | 66 | 3 | 68 | 1 | 47 | 1 | 50 |
| MD 190 On-Ramp to I-495 Outer Loop ML | – | – | – | – | – | – | – | – | – | 1,230 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 190 On-Ramp to I-495 Inner Loop ML | – | – | – | – | – | – | – | – | – | 1,130 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop ML Off-Ramp to Cabin John Pkwy | – | – | – | – | – | – | – | – | – | 1,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cabin John Pkwy On-Ramp to I-495 Inner Loop ML | – | – | – | – | – | – | – | – | – | 800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at Clara Barton Parkway** | | | | | | | | | | | | | | | | | | |
| I-495 IL Off-Ramp to Clara Barton Pkwy EB | 2,670 | 0 | 0 | 0 | 35 | 0 | 15 | 0 | 9 | 2,350 | 0 | 0 | 0 | 42 | 0 | 53 | 0 | 0 |
| I-495 IL GP Off-Ramp to Clara Barton Pkwy WB | 1,750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,240 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Clara Barton Pkwy EB On-Ramp to I-495 IL GP | 2,950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,870 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 OL GP Off-Ramp to Clara Barton Pkwy WB | 1,500 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Clara Barton EB On-Ramp to I-495 OL GP | 1,550 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 120 | 1,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Clara Barton WB On-Ramp to I-495 OL GP | 2,160 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 2,110 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

**Table 6-22: AM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative (Continued)**

| Ramp Location | 2045 No-Build | | | | | | | | | 2045 Preferred Alternative | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Available Storage (feet) | 6-7 AM | | 7-8 AM | | 8-9 AM | | 9-10 AM | | Available Storage (feet) | 6-7 AM | | 7-8 AM | | 8-9 AM | | 9-10 AM | |
| | | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) |
| **I-495 at George Washington Parkway** | | | | | | | | | | | | | | | | | | |
| I-495 Inner Loop GP Off-Ramp to GWMP | 1,230 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,810 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Inner Loop GP | 2,200 | 0 | 118 | 2,433 | 4,041 | 2,883 | 4,555 | 4,049 | 4,556 | 2,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop GP Off-Ramp to GWMP | 3,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop ML Off-Ramp to GWMP | 1,740 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,510 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Outer Loop ML | 2,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop ML Off-Ramp to GWMP | - | - | - | - | - | - | - | - | - | 750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Outer Loop C-D | - | - | - | - | - | - | - | - | - | 1,580 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop ML ramp to I-495 Outer Loop C-D | - | - | - | - | - | - | - | - | - | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop ML Off-Ramp to GWMP | - | - | - | - | - | - | - | - | - | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop GP ramp to I-495 Inner Loop ML | - | - | - | - | - | - | - | - | - | 840 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Inner Loop ML | - | - | - | - | - | - | - | - | - | 400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at VA 193** | | | | | | | | | | | | | | | | | | |
| I-495 Inner Loop GP Off-Ramp to VA 193 | 1,130 | 17 | 154 | 202 | 868 | 65 | 571 | 50 | 429 | 1,130 | 10 | 128 | 72 | 521 | 35 | 285 | 32 | 178 |
| VA 193 NB On-Ramp to I-495 Inner Loop GP | 1,050 | 0 | 57 | 6 | 236 | 124 | 620 | 28 | 433 | 1,050 | 0 | 15 | 2 | 83 | 2 | 181 | 0 | 48 |
| I-495 Outer Loop GP slip ramp to VA 193 | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VA 193 On-Ramp to I-495 Outer Loop GP | 1,170 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,170 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VA 193 On-Ramp to I-495 Outer Loop GP | 900 | 46 | 315 | 60 | 337 | 46 | 311 | 57 | 295 | 900 | 45 | 277 | 77 | 381 | 57 | 337 | 56 | 324 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

USCA4 Appeal: 24-1447    Doc: 30-4    Filed: 09/30/2024    Pg: 12 of 511

## Table 6-23: PM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative

| Ramp Location | Available Storage (feet) | 2045 No-Build 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) | Available Storage (feet) | 2045 Preferred Alternative 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-270 at MD 117** | | | | | | | | | | | | | | | | | | |
| MD 117 EB On-Ramp to I-270 SB | 1,920 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 49 | 1,920 | 0 | 0 | 0 | 31 | 0 | 0 | 0 | 0 |
| MD 117 WB On-Ramp to I-270 SB | 1,490 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 49 | 1,490 | 0 | 0 | 0 | 31 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to MD 117 | 1,300 | 111 | 408 | 97 | 427 | 48 | 314 | 163 | 502 | 1,300 | 128 | 427 | 195 | 536 | 77 | 386 | 96 | 397 |
| **I-270 at I-370** | | | | | | | | | | | | | | | | | | |
| MD 370 EB On-Ramp to I-270 SB GP | 2,340 | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 473 | 2,280 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 370 WB On-Ramp to I-270 SB GP | 3,000 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 238 | 2,940 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB Off-Ramp to I-370 EB | 6,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to I-370 EB | 2,300 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,220 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-370 EB On-Ramp to I-270 NB GP | 2,400 | 29 | 411 | 1,950 | 5,064 | 6,007 | 6,084 | 5,801 | 6,084 | 1,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-370 WB On-Ramp to I-270 NB GP | 2,780 | 313 | 1,915 | 3,347 | 4,651 | 4,395 | 4,652 | 2,213 | 4,598 | 2,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB Off-Ramp to I-370 WB | 2,750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,900 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to I-370 WB | 3,320 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 370 EB On-Ramp to I-270 SB ML | – | – | – | – | – | – | – | – | – | 2,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 370 WB On-Ramp to I-270 SB ML | – | – | – | – | – | – | – | – | – | 1,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB ML Off-Ramp to I-370 EB GP | – | – | – | – | – | – | – | – | – | 3,700 | 0 | 0 | 0 | 0 | 69 | 752 | 5 | 253 |
| I-370 NB at I-270 ML off-ramp | – | – | – | – | – | – | – | – | – | 5,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Shady Grove Road** | | | | | | | | | | | | | | | | | | |
| Shady Grove Rd EB On-Ramp to I-270 SB GP | 1,120 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 920 | 2 | 158 | 4 | 191 | 7 | 284 | 2 | 161 |
| Shady Grove Rd EB On-Ramp to I-270 NB GP | 1,650 | 0 | 0 | 1,402 | 3,974 | 3,929 | 3,979 | 1,512 | 3,971 | 1,650 | 0 | 0 | 0 | 0 | 31 | 392 | 0 | 0 |
| I-270 NB GP Off-Ramp to Shady Grove Rd EB | 1,750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,850 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB GP Off-Ramp to Shady Grove Rd WB | 1,600 | 64 | 212 | 48 | 208 | 16 | 140 | 33 | 181 | 1,700 | 39 | 161 | 29 | 138 | 23 | 126 | 13 | 99 |
| Shady Grove Rd WB On-Ramp to I-270 NB GP | 1,150 | 0 | 0 | 1,013 | 1,867 | 1,764 | 1,868 | 941 | 1,864 | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB GP Off-Ramp to Shady Grove Rd | 1,250 | 69 | 261 | 63 | 281 | 50 | 192 | 65 | 256 | 1,250 | 66 | 223 | 63 | 210 | 66 | 229 | 56 | 190 |
| **I-270 at Gude Drive** | | | | | | | | | | | | | | | | | | |
| I-270 SB ML Off-Ramp to Gude Dr | – | – | – | – | – | – | – | – | – | 1,860 | 63 | 291 | 54 | 312 | 54 | 293 | 58 | 293 |
| I-270 NB ML Off-Ramp to Gude Dr | – | – | – | – | – | – | – | – | – | 1,400 | 95 | 420 | 90 | 448 | 77 | 392 | 71 | 377 |
| Gude Dr On-Ramp to I-270 ML NB | – | – | – | – | – | – | – | – | – | 1,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gude Dr On-Ramp to I-270 ML SB | – | – | – | – | – | – | – | – | – | 1,780 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

 Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

USCA4 Appeal: 24-1447    Doc: 30-4    Filed: 09/30/2024    Pg: 13 of 511

OP LANES™ MARYLAND · I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

00001754

## Table 6-23: PM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative (Continued)

| Ramp Location | NB Queue counter | BD Queue counter | Available Storage (feet) | 2045 No-Build 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) | Available Storage (feet) | 2045 Preferred Alternative 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-270 at MD 28** | | | | | | | | | | | | | | | | | | | | |
| MD 28 EB On-Ramp to I-270 SB GP | 28 | 28 | 1,950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 28 EB On-Ramp to I-270 NB GP | 72 | 72 | 1,050 | 0 | 0 | 0 | 0 | 8 | 136 | 4 | 103 | 950 | 0 | 0 | 0 | 0 | 6 | 123 | 0 | 15 |
| I-270 NB GP Off-Ramp to MD 28 | 158 | 158 | 1,040 | 86 | 354 | 76 | 323 | 36 | 264 | 85 | 458 | 900 | 59 | 291 | 51 | 228 | 36 | 239 | 39 | 241 |
| MD 28 WB On-Ramp to I-270 NB GP | 73 | 73 | 1,370 | 1,124 | 1,869 | 1,687 | 2,405 | 2,125 | 2,404 | 1,222 | 2,397 | 1,370 | 0 | 0 | 0 | 5 | 1,392 | 2,253 | 1,355 | 2,166 |
| I-270 NB GP Off-Ramp to MD 28 WB | 159 | 159 | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 101 | 856 | 1,000 | 0 | 0 | 0 | 7 | 0 | 0 | 894 | 219 |
| MD 28 WB On-Ramp to I-270 SB GP | 27 | 27 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB GP Off-Ramp to MD 28 | 117 | 117 | 900 | 27 | 186 | 29 | 215 | 14 | 159 | 42 | 266 | 1,400 | 16 | 170 | 15 | 146 | 24 | 214 | 17 | 185 |
| **I-270 at MD 189** | | | | | | | | | | | | | | | | | | | | |
| MD 189 WB On-Ramp to I-270 NB | 418 | 418 | 1,080 | 226 | 753 | 468 | 1,103 | 1,026 | 1,481 | 787 | 1,460 | 1,140 | 6 | 144 | 39 | 308 | 560 | 1,522 | 1,231 | 1,532 |
| MD 189 EB On-Ramp to I-270 NB | 417 | 417 | 910 | 220 | 663 | 420 | 1,064 | 935 | 1,823 | 934 | 2,111 | 910 | 4 | 17 | 4 | 151 | 649 | 2,506 | 1,409 | 2,399 |
| I-270 NB GP Off-Ramp to MD 189 WB | 156 | 156 | 720 | 23 | 126 | 24 | 117 | 16 | 131 | 13 | 118 | 680 | 8 | 67 | 12 | 75 | 10 | 122 | 15 | 178 |
| I-270 NB GP Off-Ramp to MD 189 EB | 157 | 157 | 920 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 760 | 10 | 157 | 10 | 133 | 7 | 181 | 12 | 313 |
| MD 189 WB On-Ramp to I-270 SB GP | 415 | 415 | 1,910 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 189 EB On-Ramp to I-270 SB GP | 416 | 416 | 2,060 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,070 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB GP Off-Ramp to MD 189 EB | 118 | 118 | 900 | 58 | 286 | 56 | 310 | 63 | 315 | 85 | 375 | 870 | 3 | 72 | 4 | 81 | 12 | 226 | 26 | 407 |
| I-270 SB GP Off-Ramp to MD 189 WB | 119 | 119 | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,120 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Wootton Parkway** | | | | | | | | | | | | | | | | | | | | |
| I-270 NB ML Off-Ramp to Wootton Pkwy | 1023 | 1023 | - | - | - | - | - | - | - | - | - | 1,800 | 26 | 197 | 37 | 253 | 31 | 210 | 16 | 133 |
| I-270 SB ML Off-Ramp to Wootton Pkwy | 1024 | 1024 | - | - | - | - | - | - | - | - | - | 1,570 | 23 | 172 | 26 | 166 | 27 | 202 | 30 | 201 |
| Wootton Pkwy On-Ramp to I-270 NB ML | 1025 | 1025 | - | - | - | - | - | - | - | - | - | 3,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wootton Pkwy On-Ramp to I-270 SB ML | 1026 | 1026 | - | - | - | - | - | - | - | - | - | 1,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Montrose Road** | | | | | | | | | | | | | | | | | | | | |
| Montrose Rd EB On-Ramp to I-270 SB GP | 32 | 32 | 1,960 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,910 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 SB GP Off-Ramp to Montrose Rd EB | 121 | 121 | 1,340 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 304 | 1,220 | 0 | 0 | 0 | 0 | 0 | 0 | 69 | 569 |
| Montrose Rd EB On-Ramp to I-270 NB GP | 67 | 67 | 1,150 | 0 | 0 | 0 | 0 | 423 | 1,007 | 830 | 1,277 | 1,000 | 0 | 0 | 0 | 0 | 307 | 1,219 | 1,186 | 1,350 |
| I-270 NB GP Off-Ramp Montrose Rd EB | 154 | 154 | 1,980 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,870 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montrose Rd WB On-Ramp to I-270 NB GP | 414 | 414 | 1,950 | 14 | 179 | 61 | 595 | 2,548 | 3,605 | 3,387 | 3,606 | 1,870 | 32 | 643 | 628 | 2,515 | 3,115 | 3,868 | 3,811 | 3,916 |
| I-270 NB Off-Ramp to Montrose Rd WB | 155 | 155 | 1,520 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,320 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montrose Rd WB On-Ramp to I-270 SB GP | 31 | 31 | 1,200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,100 | 0 | 20 | 0 | 38 | 0 | 4 | 0 | 8 |
| I-270 SB GP Off-Ramp to Montrose Rd WB | 131 | 131 | 1,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

JA1078

OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

00001755

**Table 6-23: PM Peak Period Ramp Queues – 2045 No-Build and Preferred Alternative (Continued)**

| Ramp Location | Available Storage (feet) | No-Build 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) | Available Storage (feet) | PA 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-270 at MD 187 / Rockledge Drive** | | | | | | | | | | | | | | | | | | |
| I-270 SB East Spur Off-Ramp to Rockledge Dr / MD 187 | 1,700 | 3 | 127 | 2 | 110 | 5 | 157 | 4 | 139 | 1,400 | 2 | 101 | 2 | 110 | 69 | 387 | 3 | 109 |
| I-270 NB East Spur Off-Ramp to MD 187 SB | 915 | 63 | 312 | 115 | 400 | 31 | 247 | 8 | 144 | 720 | 42 | 188 | 39 | 161 | 24 | 121 | 10 | 77 |
| I-270 NB East Spur Off-Ramp to MD 187 NB | 1,050 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 900 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 East Spur NB Off-Ramp to Rockledge Dr | 960 | 0 | 0 | 0 | 0 | 416 | 667 | 547 | 556 | 890 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 187 On-Ramp to I-270 East Spur SB | 780 | 0 | 0 | 1 | 54 | 118 | 488 | 2 | 79 | 580 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rockledge Dr / MD 187 On-Ramp to I-270 NB East Spur | 1,300 | 0 | 44 | 4 | 306 | 471 | 1,793 | 1,864 | 1,945 | 1,050 | 8 | 398 | 14 | 488 | 25 | 734 | 1,416 | 1,713 |
| **I-270 at Westlake Terrace** | | | | | | | | | | | | | | | | | | |
| I-270 SB ML Off-Ramp to Westlake Terrace | 1,550 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,440 | 31 | 297 | 37 | 311 | 24 | 236 | 34 | 265 |
| Westlake Terrace On-Ramp to I-270 NB ML | 1,350 | 0 | 0 | 0 | 0 | 9 | 299 | 292 | 305 | 1,470 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 NB ML Off-Ramp to Westlake Terrace | – | – | – | – | – | – | – | – | – | 1,850 | 8 | 148 | 12 | 170 | 8 | 139 | 8 | 160 |
| Westlake Terrace On-Ramp to I-270 SB ML | – | – | – | – | – | – | – | – | – | 1,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-270 at Democracy Boulevard** | | | | | | | | | | | | | | | | | | |
| I-270 NB GP Off-Ramp to Democracy Blvd WB | 1,330 | 19 | 116 | 18 | 112 | 6 | 76 | 7 | 74 | 1,270 | 45 | 221 | 29 | 155 | 25 | 169 | 41 | 221 |
| I-270 NB GP Off-Ramp to Democracy Blvd EB | 1,550 | 39 | 155 | 39 | 191 | 22 | 137 | 22 | 167 | 1,450 | 44 | 195 | 23 | 143 | 32 | 223 | 43 | 234 |
| Democracy Blvd EB On-Ramp to I-270 West Spur GP NB | 1,215 | 0 | 0 | 0 | 0 | 1 | 39 | 248 | 884 | 1,150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Democracy Blvd WB On-Ramp to I-270 West Spur GP NB | 1,680 | 0 | 0 | 0 | 78 | 78 | 509 | 1,590 | 2,544 | 1,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-270 West Spur SB Off-Ramp to Democracy Blvd GP EB | 1,300 | 33 | 138 | 43 | 171 | 49 | 207 | 36 | 161 | 1,140 | 39 | 167 | 51 | 232 | 58 | 223 | 44 | 189 |
| I-270 West Spur GP SB Off-Ramp to Democracy Blvd WB | 1,430 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,280 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Democracy Blvd On-Ramp to I-495 Outer Loop GP | 1,130 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at MD 355** | | | | | | | | | | | | | | | | | | |
| I-270 East Spur SB Off-Ramp to MD 355 SB | 1,940 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 1,940 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop Off-Ramp to MD 355 SB | 2,300 | 73 | 249 | 47 | 202 | 30 | 169 | 75 | 402 | 2,300 | 94 | 395 | 69 | 266 | 62 | 273 | 117 | 526 |
| MD 355 NB On-Ramp to I-495 Inner Loop | 875 | 0 | 0 | 0 | 0 | 5 | 10 | 0 | 0 | 875 | 0 | 4 | 1 | 47 | 9 | 213 | 0 | 0 |
| MD 355 SB On-Ramp to I-495 Inner Loop | 2,160 | 0 | 0 | 0 | 0 | 5 | 201 | 0 | 0 | 2,160 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop Off-Ramp to MD 355 NB | 1,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 355 NB On-Ramp to I-495 Outer Loop | 1,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 355 NB ramp to I-270 East Spur NB | 1,450 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,450 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | | 0 | 86 | 0 | 1,621 | 0 | 3,458 | 4,207 | 4,327 | | 0 | 0 | 0 | 0 | 0 | 2,514 | 0 | 4,325 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

OP|LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

## Table 6-23: PM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative (Continued)

| Ramp Location | NB Queue counter | BD Queue counter | Available Storage (feet) | 2045 No Build 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) | Available Storage (feet) | 2045 Preferred Alternative 3-4 PM Avg (ft) | Max (ft) | 4-5 PM Avg (ft) | Max (ft) | 5-6 PM Avg (ft) | Max (ft) | 6-7 PM Avg (ft) | Max (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I-495 at MD 187** | | | | | | | | | | | | | | | | | | | | |
| I-495 Inner Loop GP Off-Ramp to MD 187 NB | 521 | 521 | 950 | 28 | 210 | 18 | 118 | 12 | 170 | 197 | 1,701 | 950 | 29 | 244 | 24 | 225 | 30 | 349 | 668 | 784 |
| I-495 Inner Loop GP Off-Ramp to MD 187 SB | 522 | 522 | 1,030 | 1 | 113 | 1 | 80 | 1 | 79 | 1 | 94 | 1,030 | 1 | 86 | 1 | 59 | 1 | 87 | 2 | 164 |
| MD 187 On-Ramp to I-495 Inner Loop GP | 304 | 304 | 1,000 | 0 | 0 | 0 | 0 | 28 | 392 | 0 | 27 | 1,000 | 0 | 0 | 0 | 0 | 46 | 441 | 0 | 0 |
| I-495 Outer Loop GP Off-Ramp to MD 187 | 523 | 523 | 1,015 | 32 | 273 | 26 | 245 | 36 | 334 | 15 | 174 | 1,015 | 22 | 253 | 16 | 175 | 22 | 243 | 19 | 196 |
| I-495 Outer Loop GP Off-Ramp to MD 187 NB | 524 | 524 | 1,250 | 38 | 373 | 35 | 321 | 32 | 334 | 2 | 131 | 1,250 | 3 | 105 | 5 | 119 | 5 | 151 | 1 | 111 |
| MD 187 On-Ramp to I-495 Outer Loop GP | 387 | 387 | 1,000 | 0 | 0 | 22 | 197 | 4 | 103 | 0 | 32 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at MD 190/Cabin John Parkway** | | | | | | | | | | | | | | | | | | | | |
| Cabin John Pkwy GP ramp to MD-190 | 512 | 1005 | 770 | 0 | 16 | 8 | 575 | 1 | 143 | 0 | 52 | 1,630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cabin John Pkwy On-Ramp to I-495 Inner Loop GP | 65 | 1008 | 1,230 | 2,261 | 2,517 | 2,177 | 2,516 | 2,423 | 2,518 | 2,429 | 2,519 | 1,000 | 0 | 0 | 102 | 1,220 | 386 | 1,926 | 413 | 1,802 |
| I-495 Outer Loop GP Off-Ramp to Cabin John Pkwy | 390 | 1002 | 1,140 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 850 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 190 EB On-Ramp to I-495 Outer Loop GP | 389 | 1003 | 1,180 | 0 | 51 | 0 | 23 | 0 | 0 | 0 | 0 | 2,450 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 190 WB On-Ramp to I-495 Outer Loop GP | 388 | 1000 | 990 | 59 | 457 | 55 | 314 | 63 | 460 | 34 | 212 | 2,450 | 30 | 123 | 29 | 125 | 31 | 131 | 23 | 108 |
| I-495 Inner Loop GP Off-Ramp to MD 190 | 513 | 1007 | 1,675 | 0 | 13 | 3 | 294 | 0 | 51 | 0 | 60 | 590 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD 190 EB On-Ramp to I-495 Inner Loop GP | 1009 | 1009 | 1,750 | 1,175 | 1,521 | 1,321 | 1,863 | 1,754 | 2,299 | 2,004 | 2,378 | 1,100 | 0 | 0 | 687 | 1,212 | 922 | 1,443 | 795 | 1,157 |
| MD-190 WB On-Ramp to I-495 Inner Loop GP | 1010 | 1010 | 2,100 | 2,611 | 2,987 | 2,755 | 2,984 | 2,890 | 2,988 | 2,887 | 2,988 | 1,480 | 0 | 0 | 1,422 | 2,140 | 2,031 | 2,140 | 1,933 | 2,140 |
| I-495 Inner Loop GP Off-Ramp to MD 190 | 1011 | 1011 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,320 | 25 | 138 | 28 | 152 | 26 | 145 | 22 | 122 |
| MD-190 On-Ramp to I-495 Outer Loop ML | 1004 | 1014 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,700 | 28 | 149 | 33 | 155 | 33 | 161 | 33 | 154 |
| MD-190 On-Ramp to I-495 Inner Loop ML | 1013 | 1013 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,130 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop ML Off-Ramp to Cabin John ML | 1012 | 1012 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cabin John Pkwy On-Ramp to I-495 Inner Loop ML | 1006 | 1006 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at Clara Barton Parkway** | | | | | | | | | | | | | | | | | | | | |
| I-495 Inner Loop GP Off-Ramp to Clara Barton Pkwy EB | 504 | 504 | 2,670 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,350 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop GP Off-Ramp to Clara Barton Pkwy WB | 506 | 506 | 1,750 | 0 | 0 | 0 | 6 | 2 | 66 | 3 | 76 | 2,870 | 0 | 0 | 4 | 153 | 59 | 367 | 117 | 593 |
| Clara Barton Pkwy EB On-Ramp to I-495 Inner Loop GP | 302 | 302 | 2,950 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop GP Off-Ramp to Clara Barton Pkwy WB | 508 | 508 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 1,600 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 15 |
| Clara Barton EB On-Ramp to I-495 Outer Loop GP | 510 | 510 | 1,550 | 62 | 586 | 695 | 2,103 | 1,087 | 1,964 | 123 | 1,056 | 2,110 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Clara Barton WB On-Ramp to I-495 Outer Loop GP | 511 | 511 | 2,160 | 798 | 2,449 | 3,862 | 4,495 | 4,444 | 4,495 | 4,408 | 4,494 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

JA1080

00001756

OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

## Table 6-23: PM Peak Period Ramp Queues – 2045 No Build and Preferred Alternative (Continued)

| Ramp Location | Available Storage (feet) | 2045 No-Build | | | | | | | | Available Storage (feet) | 2045 Preferred Alternative | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3-4 PM | | 4-5 PM | | 5-6 PM | | 6-7 PM | | | 3-4 PM | | 4-5 PM | | 5-6 PM | | 6-7 PM | |
| | | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) | Avg. (ft) | Max. (ft) |
| **I-495 at George Washington Parkway** | | | | | | | | | | | | | | | | | | |
| I-495 Inner Loop GP Off-Ramp to GWMP | 1,230 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,810 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Inner Loop GP | 2,200 | 1,377 | 4,545 | 2,682 | 4,551 | 3,906 | 4,556 | 4,376 | 4,556 | 2,000 | 0 | 0 | 147 | 2,451 | 4,066 | 4,339 | 3,878 | 4,339 |
| I-495 Outer Loop GP Off-Ramp to GWMP | 3,260 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop ML Off-Ramp to GWMP | 1,740 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,510 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Outer Loop ML | 2,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop ML Off-Ramp to GWMP | - | - | - | - | - | - | - | - | - | 750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Outer Loop C-D | - | - | - | - | - | - | - | - | - | 1,580 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Outer Loop ML ramp to I-495 Outer Loop C-D | - | - | - | - | - | - | - | - | - | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop ML Off-Ramp to GWMP | - | - | - | - | - | - | - | - | - | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-495 Inner Loop GP ramp to I-495 Inner Loop ML | - | - | - | - | - | - | - | - | - | 840 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GWMP WB On-Ramp to I-495 Inner Loop ML | - | - | - | - | - | - | - | - | - | 400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **I-495 at VA 193** | | | | | | | | | | | | | | | | | | |
| I-495 Inner Loop GP Off-Ramp to VA 193 | 1,130 | 9 | 100 | 12 | 94 | 7 | 92 | 7 | 127 | 1,130 | 10 | 90 | 11 | 93 | 12 | 108 | 9 | 142 |
| VA 193 NB On-Ramp to I-495 Inner Loop GP | 1,050 | 11 | 211 | 1,928 | 2,624 | 2,617 | 2,658 | 2,630 | 2,657 | 1,050 | 0 | 0 | 0 | 0 | 1,676 | 2,637 | 2,608 | 2,656 |
| I-495 Inner Loop GP slip ramp to VA 193 | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VA 193 On-Ramp to I-495 Outer Loop GP | 1,170 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,170 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VA 193 On-Ramp to I-495 Outer Loop GP | 900 | 26 | 203 | 33 | 263 | 44 | 312 | 29 | 270 | 900 | 38 | 277 | 36 | 267 | 44 | 283 | 40 | 300 |

Highlighted cells indicate locations where average or maximum queue lengths exceed available storage

00001757

JA1081



I-495 & I-270 Managed Lanes Study — Draft Application for Interstate Access Point Approval



**Figure 6-56: 2045 AM No Build vs Preferred Alternative Ramp Queue Spillback**



**Figure 6-57: 2045 PM No Build vs Preferred Alternative Ramp Queue Spillback**

00001758

 **OP·LANES**™  I-495 & I-270 Managed Lanes Study
MARYLAND                               Draft Application for Interstate Access Point Approval

**Summary of 2045 Operational Analysis Results**

As shown, with the Preferred Alternative, speeds, densities, and LOS are improved throughout the network. The Preferred Alternative also serves more vehicles in the study area during the entire AM and PM peak periods, except for the 6-7 AM hour. However, the Preferred Alternative serves significantly more vehicles while experiencing congestion due to external constraints (i.e., bottlenecks outside of the study area that impact operations within the study area), which may result in operational repercussions at vulnerable areas within the study area.

During the AM peak period, the most significant LOS improvements include: the I-495 Outer Loop lane-miles of LOS 'F' reduction from 44% (approximately 89,000 lane-miles) under No Build conditions to 2% (approximately 5,000 lane-miles) with the Preferred Alternative; and the I-270 Southbound lane-miles with LOS 'D' or better increasing from 70% (approximately 280,000 lane-miles) to 87% (approximately 428,000 lane-miles) while reducing those of LOS 'F' from 16% (approximately 65,000 lane-miles) to 6% (approximately 29,000 lane-miles) between No Build General Purpose/Local lanes and Preferred Alternative General Purpose/HOT lanes, respectively.

During the PM peak period, most significant LOS improvements include: the I-495 Outer Loop lane-miles of LOS 'F' reduction from 45% (approximately 91,000 lane-miles) under No Build conditions to 6% (approximately 13,000 lane-miles) with the Preferred Alternative; and the I-270 Northbound lane-miles with LOS 'D' or better increasing from 34% (approximately 153,000 lane-miles) to 55% (approximately 285,000 lane-miles) while reducing those of LOS 'F' from 57% (approximately 254,000 lane-miles) to 40% (approximately 206,000 lane-miles) between No Build General Purpose/Local lanes and Preferred Alternative General Purpose/HOT lanes, respectively. Under both No Build and Preferred Alternative PM peak period conditions, existing bottlenecks at locations outside of the study area become exacerbated, such as along I-270 Northbound from I-370 to MD 124; from MD 109 to MD 121; I-495 Inner Loop from MD 185 to MD 97; and from I-95 to MD 201. The northern section of I-270 from I-370 to I-70 is part of a separate, independent planning study under the I-495 and I-270 P3 Program. Improvements are needed in the northern section of I-270 with or without the improvements being considered under the Study. For the interim, signal timing improvements and an active warning system with messaging signs may be put in place to alert motorists at the onset of congestion in both the General Purpose and HOT lanes. Potential mitigation considerations are listed in **Chapter 8** to address both operational and safety concerns.

Overall travel times improve in the General Purpose Lanes under the Preferred Alternative conditions, with greater reductions in travel times along the HOT lanes. During both the AM and PM peak periods, the most significant travel time savings occur along the I-495 Outer Loop, particularly in the 8-10 AM and 5-7 PM peak hours for both the General Purpose and HOT lanes, respectively.

00001759



I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

The AM and PM Preferred Alternative increases throughputs throughout the project limits when compared to the 2045 No Build conditions, with the highest increases along I-495 Inner Loop and I-270 Northbound between the I-270 West Spur and the MD 187 interchange as well as between the I-270 split and the Montrose Road interchange, respectively. When compared to 2017 Existing conditions, the 2045 Preferred Alternative has increased throughput at all key locations during the AM peak period. Like the AM, all four I-495 Outer Loop and I-270 Southbound key locations have increased throughput during the PM peak period. Two of the four I-495 Inner Loop and I-270 Northbound key locations have decreased throughput during the second or third hour within the PM peak period, which include: I-495 Inner Loop between the I-270 West Spur and MD 187 as well as I-270 Northbound between the Shady Grove Road and I-370 interchanges. This degradation is caused by increased throughput more quickly reaching the existing bottleneck north of I-370 (outside the study area) in the first two hours of the PM peak period.

The Preferred Alternative improves queue spillback compared to No Build conditions at ramps throughout the study area, improving queue lengths at over 45 locations during the AM/PM peak periods, eliminating almost all ramp spillback during the AM peak period, and removing 8 ramp spillback locations that occur under 2027 PM No Build conditions. The remaining spillback locations that occur under PM conditions are due to existing bottlenecks along I-270 Northbound and I-495 Inner Loop that occur outside the study area and become exacerbated under future conditions.

00001760

JA1084

 **OP·LANES**
M A R Y L A N D   I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

## 6.5    SYNCHRO RESULTS

Synchro analysis was used to analyze the crossroads along the network. The results of the Synchro analysis are included in **Appendix I** and are summarized on the following pages.

Measures of effectiveness (MOEs) from the Synchro outputs were used to document operations at the signalized and unsignalized ramp junction intersections. Average control delay by movement, average control delay by approach, and overall intersection control delay (seconds/vehicle) was reported for each intersection. 50th and 95th percentile queue lengths by movement in feet were also reported. Overall average control delay values reflect various congestion levels based on delay thresholds established in the *Highway Capacity Manual 6th Edition* as shown in **Table 6-2 and Table 6-3. Appendix H** also contains a summary of travel speeds and density by link for the crossroads throughout the study area.

### 6.5.1    Existing Conditions

**Figure 6-58** summarizes the number of intersections operating at LOS 'A' through 'F' with 2017 existing conditions. **Table 6-24** summarizes 2017 existing delay and LOS at study intersections, based on Synchro. As shown, 1 intersection operates at LOS 'F' during the AM peak hour and 4 intersections operate at LOS 'F' during the PM peak hour. Additionally, 6 intersections operate at LOS 'E' during the AM peak hour and 3 intersections operate at LOS 'E' during the PM peak hour.

**Figure 6-58: 2017 Existing Synchro Number of Intersections by LOS**



00001761

JA1085



I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

## Table 6-24: 2017 Existing Synchro Intersection Delay and LOS Results

| Intersection | 2017 Existing | |
|---|---|---|
| | AM Delay (LOS) | PM Delay (LOS) |
| **I-270 at I-370 (Sam Eig Hwy)** | | |
| Sam Eig Hwy at Fields Rd | 24.6 (C) | 30.2 (C) |
| Washingtonian Blvd at I-370 WB Ramps | 17.9 (B) | 19.1 (B) |
| Washingtonian Blvd at I-370 EB Ramps | 12.3 (B) | 21.7 (C) |
| Sam Eig Hwy SBR at MD 119 (Great Seneca Hwy) | 3.1 (A) | 21.1 (C) |
| Sam Eig Hwy at MD 119 (Great Seneca Hwy) | 28.6 (C) | 38.7 (D) |
| Sam Eig Hwy at Diamondback Dr | 31.3 (C) | 36.6 (D) |
| **I-270 at Shady Grove Rd** | | |
| Omega Dr at MD 28 (Key West Ave) | 33.6 (C) | 36.4 (D) |
| Omega Dr at I-270 SB Off-Ramp (Unsignalized)* | 21.7 (C) | 37.1 (E) |
| Omega Dr/Fields Rd at Washingtonian Blvd | 7.5 (A) | 11.7 (B) |
| Shady Grove Rd at Corporate Blvd | 31.2 (C) | 39.2 (D) |
| Shady Grove Rd at I-270 SB Off-Ramp | 20.4 (C) | 16.8 (B) |
| Shady Grove Rd at I-270 NB Off-Ramp | 28.5 (C) | 13.0 (B) |
| Shady Grove Rd at Choke Cherry Rd | 21.1 (C) | 31.0 (C) |
| Redland Blvd at Piccard Dr | 12.4 (B) | 14.7 (B) |
| **I-270 at Gude Dr** | | |
| Gude Dr at Research Blvd | 61.1 (E) | 93.0 (F) |
| Gude Dr at Piccard Dr | 8.9 (A) | 18.3 (B) |
| **I-270 at MD 28 (Montgomery Ave)** | | |
| MD 28 at Hurley Ave | 42.3 (D) | 135.0 (F) |
| MD 28 at I-270 SB Ramps | 12.4 (B) | 14.0 (B) |
| MD 28 at I-270 NB Off-Ramp/Nelson St | 24.4 (C) | 31.9 (C) |
| MD 28 at Laird St/Bullard Cir | 14.5 (B) | 16.6 (B) |
| **I-270 at MD 189 (Falls Rd)** | | |
| MD 189 at Wootton Pkwy | 59.6 (E) | 47.1 (D) |
| MD 189 at I-270 Ramps (SPUI) | 64.9 (E) | 63.8 (E) |
| MD 189 at Great Falls Rd/Potomac Valley Rd | 24.7 (C) | 14.7 (B) |
| **I-270 at Wootton Pkwy** | | |
| Wootton Pkwy at Seven Locks Rd | 49.6 (D) | 31.3 (C) |
| Wootton Pkwy at Tower Oaks Rd | 21.3 (C) | 15.2 (B) |
| **I-270 at Montrose Rd** | | |
| Montrose Rd at Seven Locks Rd | 32.7 (C) | 38.0 (D) |
| Montrose Rd at Potomac Ave (Unsignalized)* | 37.7 (E) | 77.7 (F) |
| Montrose Rd at Tower Oaks Blvd | 42.0 (D) | 12.4 (B) |
| Montrose Rd at Farm Ln | 1.6 (A) | 3.5 (A) |
| Montrose Rd at Hitching Post Ln/Farm Haven Dr | 8.2 (A) | 9.1 (A) |
| Tower Oaks Blvd at I-270 NB Ramps/GEICO Entrance | 19.8 (B) | 17.7 (B) |
| Tower Oaks Blvd at Commercial Dr | 3.4 (A) | 4.9 (A) |
| **I-270 West Spur at Westlake Terrace** | | |
| Westlake Terrace at Westfield Montgomery Mall/Motor City Dr | 13.5 (B) | 21.5 (C) |
| Westlake Terrace at I-270 West Spur Ramps | 8.8 (A) | 12.6 (B) |
| Westlake Terrace at Rockledge Dr | 25.2 (C) | 42.2 (D) |

00001762

**OP·LANES** MARYLAND  I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

Table 6-24: 2017 Existing Synchro Intersection Delay and LOS Results (Continued)

| I-270 West Spur at Democracy Blvd | | |
|---|---|---|
| Democracy Blvd at Taveshire Way | 10.3 (B) | 12.1 (B) |
| Democracy Blvd at I-270 SB On-Ramp/I-270 SB Off-Ramp | 28.6 (C) | 105.5 (F) |
| Democracy Blvd at I-270 SB On-Ramp | 9.0 (A) | 9.3 (A) |
| Democracy Blvd at I-270 NB Ramps | 10.6 (B) | 9.9 (A) |
| Democracy Blvd at I-270 NB Off-Ramp | 33.1 (C) | 10.2 (B) |
| Democracy Blvd at Fernwood Rd | 63.1 (E) | 30.9 (C) |
| I-270 East Spur at Rockledge Dr/MD 187 (Old Georgetown Rd) | | |
| Rockledge Dr at Rock Forest Dr | 23.1 (C) | 33.8 (C) |
| Rockledge Dr at I-270 SB Ramps | 24.8 (C) | 40.4 (D) |
| Rockledge Dr at I-270 NB Ramps | 25.9 (C) | 18.5 (B) |
| MD 187 at Rock Spring Dr | 64.2 (E) | 50.8 (D) |
| MD 187 at I-270 SB Ramps | 41.7 (D) | 46.2 (D) |
| MD 187 at I-270 NB Ramps | 11.9 (B) | 14.5 (B) |
| MD 187 at Tuckerman Ln | 133.8 (F) | 70.4 (E) |
| I-495 at MD 190 (River Rd) | | |
| MD 190 at Seven Locks Rd | 36.1 (D) | 39.1 (D) |
| MD 190 at I-495 Outer Loop Off-Ramp | 11.5 (B) | 12.0 (B) |
| MD 190 at I-495 Inner Loop On-Ramp | 1.9 (A) | 7.8 (A) |
| MD 190 at Burdette Rd | 16.9 (B) | 31.7 (C) |
| I-495 at MD 187 (Old Georgetown Rd) | | |
| MD 187 at Lone Oak Dr/Manor Oak Way | 14.6 (B) | 12.5 (B) |
| MD 187 at I-495 Outer Loop Off-Ramp | 29.1 (C) | 32.8 (C) |
| MD 187 at I-495 Inner Loop Off-Ramp | 6.9 (A) | 30.0 (C) |
| MD 187 at Ryland Dr/Church Driveway | 16.2 (B) | 12.0 (B) |
| I-495 at MD 355 (Rockville Pk)/I-270 East Spur | | |
| MD 355 at Grosvenor Ln | 44.6 (D) | 36.0 (C) |
| MD 355 at I-495 Inner Loop Off-Ramp | 25.2 (C) | 17.6 (B) |
| MD 355 at Pooks Hill Rd | 31.2 (C) | 18.3 (B) |
| MD 355 at Alta Vista Rd/Bellevue Dr | 13.6 (B) | 23.9 (C) |

*Unsignalized (stop-controlled) intersection; delay and LOS for worst approach shown

### 6.5.2    Proposed Improvements

Based on the Synchro analysis of 2045 Preferred Alternative volumes, two improvements were identified at crossroad intersections within the study area. There are ongoing discussions with the City of Rockville and other stakeholders regarding these improvements. As such, these improvements are subject to change, pending those discussions with stakeholders.

- Wootton Parkway at Seven Locks Road
  - At this intersection, 565 westbound left-turning vehicles are projected during the AM peak hour with No Build conditions. With completion of the Preferred Alternative, this volume is projected to increase by 12% to 635 vehicles. During the PM peak hour, this volume is projected to be much lower with both No Build and Build conditions.
  - This intersection currently consists of a single westbound left-turn lane with exclusive/permissive phasing separated from the through lanes by a 10-foot wide

00001763



I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

    hatched area. To accommodate this increase in volume during the AM peak hour, the roadway will be restriped within the existing pavement to provide a second westbound left-turn lane along Wootton Parkway.

- o  To accommodate the double left-turn movement, this left-turn movement will be converted from exclusive/permissive left-turn phasing to exclusive left-turn phasing. Additionally, the opposing eastbound left-turn movement will be converted from permissive left-turn phasing to exclusive left-turning phasing to prevent sight distance issues between these vehicles and opposing through vehicles. This improvement has the potential for providing a safety benefit by eliminating left-turn crashes associated with permissive left-turning movements.
- o  This improvement is projected to reduce westbound left-turn delay from 122 seconds to 45 seconds and reduce the 95th percentile queue length from approximately 700 feet to approximately 400 feet. Delay for the eastbound through movement is projected to decrease from 36 seconds to 32 seconds, improving this movement's level of service (LOS) from LOS 'D' to LOS 'C', with no change in the 95th percentile queue length. The overall intersection delay is projected to decrease from 44 seconds to 26 seconds, improving intersection LOS from LOS 'D' to LOS 'C'.

- Gude Drive at Research Boulevard
  - o  At this intersection, with No Build conditions, 460 westbound left-turning vehicles are projected during the AM peak hour. With completion of the Preferred Alternative, this volume is projected to increase slightly to 485 vehicles, while the opposing eastbound through volume is projected to increase by 12% from 790 vehicles to 885 vehicles. During the PM peak hour, the westbound left-turn movement is projected to decrease from 435 vehicles to 355 vehicles, while the opposing eastbound through volume is projected to increase by 22% from 710 vehicles to 865 vehicles
  - o  This intersection currently consists of a single westbound left-turn lane with exclusive/permissive phasing. Along the eastbound approach, there are two dedicated through lanes. Widening to include a third eastbound through lane is not geometrically feasible due to right-of-way and environmental impacts both east and west of the intersection. Therefore, the Preferred Alternative will include widening to install a second westbound left-turn lane along Gude Drive, which would have fewer impacts.
  - o  To accommodate the double left-turn movement, this left-turn movement will be converted from exclusive/permissive left-turn phasing to exclusive left-turn phasing. Additionally, the opposing eastbound left-turn movement will be converted from permissive left-turn phasing to exclusive left-turning phasing to prevent sight distance issues between these vehicles and opposing through vehicles. This improvement has the potential for providing a safety benefit by eliminating left-turn crashes associated with permissive left-turning movements.
  - o  During the AM peak hour, this improvement is projected to decrease the westbound left-turn delay from 59 seconds to 23 seconds, improving from LOS 'E' to LOS 'C', and reduce its 95th percentile queue length from approximately 450 feet to approximately 200 feet. Eastbound through delay is projected to decrease from 72 seconds to 57 seconds with a small decrease in its 95th percentile queue length. Overall intersection delay is projected

00001764

JA1088

 I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

to decrease from 38 seconds to 29 seconds, improving intersection LOS from LOS 'D' to LOS 'C'.

o During the PM peak hour, this improvement is projected to decrease the westbound left-turn delay from 33 seconds to 28 seconds and reduce its 95th percentile queue length from approximately 250 feet to approximately 125 feet. Eastbound through delay and the 95th percentile queue length are projected to decrease slightly. Overall intersection delay is projected to remain approximately the same.

### 6.5.3    2027 Conditions

**Figure 6-59** summarizes the number of intersections operating at LOS 'A' through 'F' with No Build conditions and the Preferred Alternative. **Table 6-25** summarizes 2027 delay and LOS at study intersections, based on Synchro under No Build conditions and the Preferred Alternative. As shown, 1 intersection is projected to operate at LOS 'F' during the AM peak hour and 2 intersections are projected to operate at LOS 'F' during the PM peak hour with No Build conditions. Additionally, 2 intersections are projected to operate at LOS 'E' during the AM peak hour and 3 intersections are projected to operate at LOS 'E' during the PM peak hour with No Build conditions. With the Preferred Alternative, 1 intersection is projected to operate at LOS 'F' during each peak hour. Additionally, 1 intersection is projected to operate at LOS 'E' during the AM peak hour and 3 intersections are projected to operate at LOS 'E' during the PM peak hour with the Preferred Alternative. While there are more intersections with the Preferred Alternative (67 intersections) than with No Build conditions (60 intersections), fewer intersections operate at LOS 'E'/'F' with the Preferred Alternative.

**Table 6-26** summarizes queuing at ramp junction intersections. As shown, no queues spill back onto the freeways.

00001765



I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval



**Figure 6-59: 2027 No Build vs Preferred Alternative Synchro Number of Intersections by LOS**

00001766

JA1090


I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

#### Table 6-25: 2027 No Build and Preferred Alternative Synchro Intersection Delay and LOS Results

| Intersection | No Build | | Preferred Alternative | |
|---|---|---|---|---|
| | AM Delay (LOS) | PM Delay (LOS) | AM Delay (LOS) | PM Delay (LOS) |
| **I-270 at I-370 (Sam Eig Hwy)** | | | | |
| Sam Eig Hwy at Fields Rd | 22.2 (C) | 28.4 (C) | 22.2 (C) | 28.2 (C) |
| Washingtonian Blvd at I-370 WB Ramps | 20.5 (C) | 20.4 (C) | 20.0 (C) | 22.9 (C) |
| Washingtonian Blvd at I-370 EB Ramps | 10.7 (B) | 21.7 (C) | 14.3 (B) | 26.4 (C) |
| Sam Eig Hwy SBR at MD 119 (Great Seneca Hwy) | 4.7 (A) | 10.9 (B) | 5.4 (A) | 10.6 (B) |
| Sam Eig Hwy at MD 119 (Great Seneca Hwy) | 33.5 (C) | 44.9 (D) | 33.8 (C) | 44.6 (D) |
| Sam Eig Hwy at Diamondback Dr | 29.4 (C) | 38.5 (D) | 29.3 (C) | 38.7 (D) |
| **I-270 at Shady Grove Rd** | | | | |
| Omega Dr at MD 28 (Key West Ave) | 35.2 (D) | 37.8 (D) | 35.2 (D) | 37.8 (D) |
| Omega Dr at I-270 SB Off-Ramp (Unsignalized)* | 24.9 (C) | 46.8 (E) | 24.2 (C) | 46.8 (E) |
| Omega Dr/Fields Rd at Washingtonian Blvd | 7.6 (A) | 12.7 (B) | 7.6 (A) | 12.7 (B) |
| Shady Grove Rd at Corporate Blvd | 22.0 (C) | 32.3 (C) | 20.1 (C) | 31.0 (C) |
| Shady Grove Rd at I-270 SB Off-Ramp | 25.3 (C) | 17.7 (B) | 24.8 (C) | 17.0 (B) |
| Shady Grove Rd at I-270 NB Off-Ramp | 24.4 (C) | 12.7 (B) | 24.2 (C) | 9.9 (A) |
| Shady Grove Rd at Choke Cherry Rd | 19.8 (B) | 38.7 (D) | 19.3 (B) | 37.0 (D) |
| Redland Blvd at Piccard Dr | 10.7 (B) | 13.1 (B) | 12.5 (B) | 13.5 (B) |
| **I-270 at Gude Dr** | | | | |
| Gude Dr at Research Blvd | 62.2 (E) | 104.2 (F) | 27.2 (C) | 22.9 (C) |
| Gude Dr at I-270 HOT Lanes Access | N/A | N/A | 29.5 (C) | 27.4 (C) |
| Gude Dr at Piccard Dr | 9.5 (A) | 18.4 (B) | 8.2 (A) | 18.7 (B) |
| **I-270 at MD 28 (Montgomery Ave)** | | | | |
| MD 28 at Hurley Ave | 16.5 (B) | 22.5 (C) | 16.4 (B) | 22.2 (C) |
| MD 28 at I-270 SB Ramps | 14.9 (B) | 17.3 (B) | 14.1 (B) | 19.3 (B) |
| MD 28 at I-270 NB Off-Ramp/Nelson St | 21.9 (C) | 25.1 (C) | 21.7 (C) | 24.8 (C) |
| MD 28 at Laird St/Bullard Cir | 13.7 (B) | 13.7 (B) | 12.7 (B) | 13.9 (B) |
| **I-270 at MD 189 (Falls Rd)** | | | | |
| MD 189 at Wootton Pkwy | 53.1 (D) | 44.2 (D) | 49.4 (D) | 43.7 (D) |
| MD 189 at I-270 Ramps (SPUI) | 37.8 (D) | 54.4 (D) | N/A | N/A |
| MD 189 Crossover at I-270 SB Ramps | | | 16.4 (B) | 21.2 (C) |
| MD 189 EB at I-270 SB Off-Ramp | | | 5.5 (A) | 7.3 (A) |
| MD 189 WB at I-270 NB Off-Ramp | N/A | N/A | 2.0 (A) | 5.5 (A) |
| MD 189 Crossover at I-270 NB Ramps | | | 21.7 (C) | 24.3 (C) |
| MD 189 EB at I-270 NB Ramps | | | 8.7 (A) | 8.4 (A) |
| MD 189 at Great Falls Rd/Potomac Valley Rd | 16.8 (B) | 15.0 (B) | 18.1 (B) | 16.8 (B) |
| **I-270 at Wootton Pkwy** | | | | |
| Wootton Pkwy at Seven Locks Rd | 33.2 (C) | 30.0 (C) | 22.8 (C) | 32.6 (C) |
| Wootton Pkwy at Tower Oaks Rd | 25.5 (C) | 24.3 (C) | 26.0 (C) | 27.4 (C) |
| Wootton Pkwy at I-270 HOT Lanes Access | N/A | N/A | 24.7 (C) | 23.2 (C) |

*Unsignalized (stop-controlled) intersection; delay and LOS for worst approach shown

00001767


**OP·LANES**
MARYLAND   I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

**Table 6-25: 2027 No Build and Preferred Alternative Synchro Intersection Delay and LOS Results (Continued)**

| Intersection | No Build AM Delay (LOS) | No Build PM Delay (LOS) | Preferred Alternative AM Delay (LOS) | Preferred Alternative PM Delay (LOS) |
|---|---|---|---|---|
| **I-270 at Montrose Rd** | | | | |
| Montrose Rd at Seven Locks Rd | 29.7 (C) | 35.3 (D) | 29.9 (C) | 34.4 (C) |
| Montrose Rd at Potomac Ave (Unsignalized)* | 42.5 (E) | 104.9 (F) | 37.7 (E) | 104.9 (F) |
| Montrose Rd at Tower Oaks Blvd | 19.2 (B) | 10.5 (B) | 17.5 (B) | 12.7 (B) |
| Montrose Rd at Farm Ln | 1.9 (A) | 4.4 (A) | 1.9 (A) | 4.0 (A) |
| Montrose Rd at Hitching Post Ln/Farm Haven Dr | 12.9 (B) | 10.8 (B) | 12.9 (B) | 10.4 (B) |
| Tower Oaks Blvd at I-270 NB Ramps/GEICO Entrance | 18.7 (B) | 17.6 (B) | 18.2 (B) | 17.5 (B) |
| Tower Oaks Blvd at Commercial Dr | 3.6 (A) | 5.0 (A) | 3.4 (A) | 4.8 (A) |
| **I-270 West Spur at Westlake Terrace** | | | | |
| Westlake Terrace at Westfield Montgomery Mall/Motor City Dr | 12.6 (B) | 23.7 (C) | 9.6 (A) | 18.9 (B) |
| Westlake Terrace at I-270 West Spur Ramps | 12.0 (B) | 8.8 (A) | 33.3 (C) | 31.9 (C) |
| Westlake Terrace at Rockledge Dr | 29.4 (C) | 46.9 (D) | 30.8 (C) | 46.9 (D) |
| **I-270 West Spur at Democracy Blvd** | | | | |
| Democracy Blvd at Taveshire Way | 10.5 (B) | 12.1 (B) | 10.4 (B) | 12.0 (B) |
| Democracy Blvd at I-270 SB On-Ramp/I-270 SB Off-Ramp | 32.0 (C) | 46.7 (D) | 27.8 (C) | 47.0 (D) |
| Democracy Blvd at I-270 SB On-Ramp | 5.5 (A) | 17.8 (B) | | |
| Democracy Blvd at I-270 NB Ramps | 7.3 (A) | 7.2 (A) | 10.7 (B) | 8.5 (A) |
| Democracy Blvd at I-270 NB Off-Ramp | 18.8 (B) | 8.6 (A) | 16.8 (B) | 7.8 (A) |
| Democracy Blvd at Fernwood Rd | 41.1 (D) | 31.3 (C) | 36.6 (D) | 30.6 (C) |
| **I-270 East Spur at Rockledge Dr/MD 187 (Old Georgetown Rd)** | | | | |
| Rockledge Dr at Rock Forest Dr | 24.3 (C) | 34.8 (C) | 24.7 (C) | 34.5 (C) |
| Rockledge Dr at I-270 SB Ramps | 19.0 (B) | 34.0 (C) | 19.2 (B) | 32.1 (C) |
| Rockledge Dr at I-270 NB Ramps | 39.0 (D) | 25.0 (C) | 39.6 (D) | 28.5 (C) |
| MD 187 at Rock Spring Dr | 40.5 (D) | 61.5 (E) | 39.3 (D) | 58.4 (E) |
| MD 187 at I-270 SB Ramps | 23.4 (C) | 22.2 (C) | 22.8 (C) | 24.5 (C) |
| MD 187 at I-270 NB Ramps | 9.6 (A) | 14.6 (B) | 9.6 (A) | 15.8 (B) |
| MD 187 at Tuckerman Ln | 139.6 (F) | 76.7 (E) | 148.8 (F) | 73.6 (E) |
| **I-495 at MD 190 (River Rd)** | | | | |
| MD 190 at Seven Locks Rd | 37.4 (D) | 45.0 (D) | 34.4 (C) | 51.9 (D) |
| MD 190 at I-495 Outer Loop Off-Ramp | 12.1 (B) | 9.4 (A) | 20.8 (C) | 17.6 (B) |
| MD 190 at I-495 Inner Loop On-Ramp | 0.7 (A) | 7.0 (A) | 18.3 (B) | 19.8 (B) |
| MD 190 at Burdette Rd | 18.1 (B) | 40.9 (D) | 20.7 (C) | 44.7 (D) |
| MD 190 at I-495 Managed Lanes Access | N/A | N/A | 13.8 (B) | 22.0 (C) |
| **I-495 at MD 187 (Old Georgetown Rd)** | | | | |
| MD 187 at Lone Oak Dr/Manor Oak Way | 15.9 (B) | 17.4 (B) | 15.5 (B) | 17.7 (B) |
| MD 187 at I-495 Outer Loop Off-Ramp | 37.3 (D) | 14.9 (B) | 37.3 (D) | 17.9 (B) |
| MD 187 at I-495 Inner Loop Off-Ramp | 8.9 (A) | 21.5 (C) | 10.6 (B) | 22.5 (C) |
| MD 187 at Ryland Dr/Church Driveway | 15.8 (B) | 7.9 (A) | 14.5 (B) | 7.7 (A) |
| **I-495 at MD 355 (Rockville Pk)/I-270 East Spur** | | | | |
| MD 355 at Grosvenor Ln | 32.6 (C) | 31.5 (C) | 32.7 (C) | 32.3 (C) |
| MD 355 at I-495 Inner Loop Off-Ramp | 24.8 (C) | 17.1 (B) | 25.1 (C) | 18.3 (B) |
| MD 355 at Pooks Hill Rd | 31.3 (C) | 15.8 (B) | 32.8 (C) | 15.4 (B) |
| MD 355 at Alta Vista Rd/Bellevue Dr | 15.2 (B) | 27.1 (C) | 16.3 (B) | 23.5 (C) |

*Unsignalized (stop-controlled) intersection; delay and LOS for worst approach shown

00001768

JA1092



OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

## Table 6-26: 2027 Preferred Alternative Synchro Ramp Queuing Summary

| Ramp | AM 95th %ile Queue (ft) | PM 95th %ile Queue (ft) | Issue? |
|---|---|---|---|
| **I-270 at Shady Grove Rd** | | | |
| I-270 SB Off-Ramp to Omega Dr | 87 | 100 | No |
| I-270 SB Off-Ramp to Shady Grove Rd | 492 | 235 | No |
| I-270 NB Off-Ramp to Shady Grove Rd | 449 | 192 | No |
| I-270 NB Off-Ramp to Piccard Dr/Redland Blvd | 48 | 65 | No |
| **I-270 at Gude Dr** | | | |
| I-270 ML SB Off-Ramp to Gude Dr | 189 | 217 | No |
| I-270 ML NB Off-Ramp to Gude Dr | 407 | 330 | No |
| **I-270 at MD 28 (Montgomery Ave)** | | | |
| I-270 SB Off-Ramp to MD 28 | 206 | 244 | No |
| I-270 NB Off-Loop to WB MD 28 | N/A* | N/A* | N/A* |
| I-270 NB Off-Ramp to EB MD 28 or Nelson St | 164 | 296 | No |
| **I-270 at MD 189 (Falls Rd)** | | | |
| I-270 SB Off-Ramp to WB MD 189 | N/A* | N/A* | N/A* |
| I-270 SB Off-Ramp to EB MD 189 | 11 | 64 | No |
| I-270 NB Off-Ramp to WB MD 189 | 0 | 56 | No |
| I-270 NB Off-Ramp to EB MD 189 | 163 | 144 | No |
| **I-270 at Wootton Pkwy** | | | |
| I-270 ML SB Off-Ramp to Wootton Pkwy | 139 | 184 | No |
| I-270 ML NB Off-Ramp to Wootton Pkwy | 198 | 196 | No |
| **I-270 at Montrose Rd** | | | |
| I-270 SB Off-Ramp to WB Montrose Rd | N/A* | N/A* | N/A* |
| I-270 SB Off-Loop to EB Montrose Rd | N/A* | N/A* | N/A* |
| I-270 NB Off-Loop to WB Montrose Rd | N/A* | N/A* | N/A* |
| I-270 NB Off-Ramp to EB Montrose Rd | 0 | 0 | No |
| **I-270 West Spur at Westlake Terrace** | | | |
| I-270 Spur ML SB Off-Ramp to Westlake Terrace | 437 | 283 | No |
| I-270 Spur ML NB Off-Ramp to Westlake Terrace | 111 | 70 | No |
| **I-270 West Spur at Democracy Blvd** | | | |
| I-270 Spur SB Off-Ramp to Democracy Blvd | 250 | 818 | No |
| I-270 NB Off-Ramp to WB Democracy Blvd | 172 | 165 | No |
| I-270 NB Off-Ramp to EB Democracy Blvd | 477 | 211 | No |
| **I-270 East Spur at Rockledge Dr/MD 187 (Old Georgetown Rd)** | | | |
| I-270 SB/EB Off-Ramp to Rockledge Blvd | 441 | 351 | No |
| I-270 NB/WB Off-Ramp to Rockledge Blvd | N/A* | N/A* | N/A* |
| I-270 NB/WB Off-Ramp to MD 187 | 125 | 106 | No |
| **I-495 at MD 190 (River Rd)** | | | |
| I-495 OL Off-Ramp to MD 190 | 156 | 140 | No |
| I-495 OL ML Off-Ramp to MD 190 | 72 | 122 | No |
| I-495 IL ML Off-Ramp to MD 190 | 17 | 160 | No |
| I-495 IL Off-Ramp to MD 190 | 252 | 189 | No |
| **I-495 at MD 187 (Old Georgetown Rd)** | | | |
| I-495 OL Off-Ramp to MD 187 | 431 | 459 | No |
| I-495 IL Off-Ramp to MD 187 | 166 | 357 | No |
| **I-495 at MD 355 (Rockville Pk)/I-270 East Spur** | | | |
| I-495 OL Off-Ramp to NB MD 355 | N/A* | N/A* | N/A* |
| I-495 IL Off-Ramp to SB MD 355 | 400 | 288 | No |

*Uncontrolled movement; no queue reported in Synchro

00001769

JA1093



I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

### 6.5.4    2045 Conditions

**Figure 6-60** summarizes the number of intersections operating at LOS 'A' through 'F' with No Build conditions and the Preferred Alternative.

**Table 6-27** summarizes 2045 delay and LOS at study intersections, based on Synchro under No Build conditions and the Preferred Alternative. As shown, 2 intersections are projected to operate at LOS 'F' during the AM peak hour and 5 intersections are projected to operate at LOS 'F' during the PM peak hour with No Build conditions. Additionally, 4 intersections are projected to operate at LOS 'E' during the AM peak hour and 1 intersection is projected to operate at LOS 'E' during the PM peak hour with No Build conditions. With the Preferred Alternative, 1 intersection is projected to operate at LOS 'F' during the AM peak hour and 4 intersections are projected to operate at LOS 'F' during the PM peak hour. Additionally, 1 intersection is projected to operate at LOS 'E' during the AM peak hour and 2 intersections are projected to operate at LOS 'E' during the PM peak hour with the Preferred Alternative, including one intersection that operates at LOS 'F' with No Build conditions. While there are more intersections with the Preferred Alternative (67 intersections) than with No Build conditions (60 intersections), fewer intersections operate at LOS 'E'/'F' with the Preferred Alternative.

**Table 6-28** summarizes queuing at ramp junction intersections. As shown, no queues spill back onto the freeways.

00001770

JA1094

 I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval



**Figure 6-60: 2045 No Build vs Preferred Alternative Synchro Number of Intersections by LOS**

00001771

JA1095

 I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

### Table 6-27: 2045 No Build and Preferred Alternative Synchro Intersection Delay and LOS Results

| Intersection | No Build | | Preferred Alternative | |
|---|---|---|---|---|
| | AM Delay (LOS) | PM Delay (LOS) | AM Delay (LOS) | PM Delay (LOS) |
| **I-270 at I-370 (Sam Eig Hwy)** | | | | |
| Sam Eig Hwy at Fields Rd | 23.4 (C) | 29.6 (C) | 23.5 (C) | 29.1 (C) |
| Washingtonian Blvd at I-370 WB Ramps | 22.1 (C) | 20.7 (C) | 22.2 (C) | 23.3 (C) |
| Washingtonian Blvd at I-370 EB Ramps | 11.5 (B) | 21.7 (C) | 14.0 (B) | 26.9 (C) |
| Sam Eig Hwy SBR at MD 119 (Great Seneca Hwy) | 5.0 (A) | 12.4 (B) | 4.8 (A) | 12.2 (B) |
| Sam Eig Hwy at MD 119 (Great Seneca Hwy) | 34.7 (C) | 46.4 (D) | 34.1 (C) | 46.4 (D) |
| Sam Eig Hwy at Diamondback Dr | 30.6 (C) | 40.0 (D) | 30.7 (C) | 40.1 (D) |
| **I-270 at Shady Grove Rd** | | | | |
| Omega Dr at MD 28 (Key West Ave) | 38.8 (D) | 41.2 (D) | 38.2 (D) | 41.2 (D) |
| Omega Dr at I-270 SB Off-Ramp (Unsignalized)* | 36.1 (E) | 98.8 (F) | 32.2 (D) | 98.0 (F) |
| Omega Dr/Fields Rd at Washingtonian Blvd | 7.8 (A) | 15.6 (B) | 7.8 (A) | 15.6 (B) |
| Shady Grove Rd at Corporate Blvd | 23.1 (C) | 33.8 (C) | 20.6 (C) | 31.8 (C) |
| Shady Grove Rd at I-270 SB Off-Ramp | 26.5 (C) | 18.6 (B) | 21.1 (C) | 18.4 (B) |
| Shady Grove Rd at I-270 NB Off-Ramp | 21.8 (C) | 12.5 (B) | 19.5 (B) | 8.6 (A) |
| Shady Grove Rd at Choke Cherry Rd | 25.0 (C) | 45.8 (D) | 24.4 (C) | 44.5 (D) |
| Redland Blvd at Piccard Dr | 10.9 (B) | 13.8 (B) | 13.0 (B) | 15.1 (B) |
| **I-270 at Gude Dr** | | | | |
| Gude Dr at Research Blvd | 68.7 (E) | 121.4 (F) | 29.2 (C) | 28.4 (C) |
| Gude Dr at I-270 HOT Lanes Access | N/A | N/A | 37.0 (D) | 32.4 (C) |
| Gude Dr at Piccard Dr | 11.5 (B) | 20.0 (B) | 14.8 (B) | 32.3 (C) |
| **I-270 at MD 28 (Montgomery Ave)** | | | | |
| MD 28 at Hurley Ave | 16.9 (B) | 24.2 (C) | 17.4 (B) | 24.4 (C) |
| MD 28 at I-270 SB Ramps | 13.0 (B) | 17.9 (B) | 7.7 (A) | 19.7 (B) |
| MD 28 at I-270 NB Off-Ramp/Nelson St | 23.3 (C) | 26.6 (C) | 21.1 (C) | 24.2 (C) |
| MD 28 at Laird St/Bullard Cir | 15.9 (B) | 16.1 (B) | 14.0 (B) | 15.5 (B) |
| **I-270 at MD 189 (Falls Rd)** | | | | |
| MD 189 at Wootton Pkwy | 57.9 (E) | 44.3 (D) | 48.8 (D) | 44.5 (D) |
| MD 189 at I-270 Ramps (SPUI) | 38.5 (D) | 55.1 (E) | N/A | N/A |
| MD 189 Crossover at I-270 SB Ramps | N/A | N/A | 17.3 (B) | 25.0 (C) |
| MD 189 EB at I-270 SB Off-Ramp | | | 5.1 (A) | 6.8 (A) |
| MD 189 WB at I-270 NB Off-Ramp | | | 2.9 (A) | 6.7 (A) |
| MD 189 Crossover at I-270 NB Ramps | | | 24.2 (C) | 25.0 (B) |
| MD 189 EB at I-270 NB Ramp | | | 7.9 (A) | 8.1 (A) |
| MD 189 at Great Falls Rd/Potomac Valley Rd | 18.0 (B) | 15.3 (B) | 18.8 (B) | 19.5 (B) |
| **I-270 at Wootton Pkwy** | | | | |
| Wootton Pkwy at Seven Locks Rd | 36.2 (D) | 27.7 (C) | 25.8 (C) | 31.9 (C) |
| Wootton Pkwy at Tower Oaks Rd | 25.3 (C) | 24.0 (C) | 26.2 (C) | 36.0 (D) |
| Wootton Pkwy at I-270 HOT Lanes Access | N/A | N/A | 26.1 (C) | 23.9 (C) |

*Unsignalized (stop-controlled) intersection; delay and LOS for worst approach shown

00001772

JA1096

 **OP·LANES** MARYLAND   I-495 & I-270 Managed Lanes Study
Draft Application for Interstate Access Point Approval

**Table 6-27: 2045 No Build and Preferred Alternative Synchro Intersection Delay and LOS Results (Continued)**

| Intersection | No Build | | Preferred Alternative | |
|---|---|---|---|---|
| | AM Delay (LOS) | PM Delay (LOS) | AM Delay (LOS) | PM Delay (LOS) |
| **I-270 at Montrose Rd** | | | | |
| Montrose Rd at Seven Locks Rd | 30.0 (C) | 37.6 (D) | 29.9 (C) | 36.7 (D) |
| Montrose Rd at Potomac Ave (Unsignalized)* | 47.3 (E) | 143.3 (F) | 35.9 (E) | 162.9 (F) |
| Montrose Rd at Tower Oaks Blvd | 20.4 (C) | 12.0 (B) | 17.6 (B) | 15.1 (B) |
| Montrose Rd at Farm Ln | 2.0 (A) | 4.8 (A) | 2.0 (A) | 4.3 (A) |
| Montrose Rd at Hitching Post Ln/Farm Haven Dr | 14.3 (B) | 11.7 (B) | 14.2 (B) | 11.4 (B) |
| Tower Oaks Blvd at I-270 NB Ramps/GEICO Entrance | 19.1 (B) | 18.5 (B) | 17.9 (B) | 19.0 (B) |
| Tower Oaks Blvd at Commercial Dr | 4.0 (A) | 5.8 (A) | 3.6 (A) | 5.1 (A) |
| **I-270 West Spur at Westlake Terrace** | | | | |
| Westlake Terrace at Westfield Montgomery Mall/Motor City Dr | 13.5 (B) | 24.1 (C) | 9.8 (A) | 20.7 (C) |
| Westlake Terrace at I-270 West Spur Ramps | 14.1 (B) | 10.1 (B) | 37.5 (D) | 32.2 (C) |
| Westlake Terrace at Rockledge Dr | 34.9 (C) | 54.3 (D) | 34.8 (C) | 53.0 (D) |
| **I-270 West Spur at Democracy Blvd** | | | | |
| Democracy Blvd at Taveshire Way | 10.8 (B) | 11.7 (B) | 10.8 (B) | 11.3 (B) |
| Democracy Blvd at I-270 SB On-Ramp/I-270 SB Off-Ramp | 33.0 (C) | 50.9 (D) | 28.2 (C) | 39.5 (D) |
| Democracy Blvd at I-270 SB On-Ramp | 5.5 (A) | 18.6 (B) | | |
| Democracy Blvd at I-270 NB Ramps | 6.8 (A) | 7.5 (A) | 12.4 (B) | 12.3 (B) |
| Democracy Blvd at I-270 NB Off-Ramp | 20.0 (B) | 9.7 (A) | 16.3 (B) | 8.3 (A) |
| Democracy Blvd at Fernwood Rd | 47.3 (D) | 38.0 (D) | 41.5 (D) | 47.1 (D) |
| **I-270 East Spur at Rockledge Dr/MD 187 (Old Georgetown Rd)** | | | | |
| Rockledge Dr at Rock Forest Dr | 26.8 (C) | 40.6 (D) | 27.0 (C) | 41.1 (D) |
| Rockledge Dr at I-270 SB Ramps | 20.1 (C) | 40.6 (D) | 22.0 (C) | 34.8 (C) |
| Rockledge Dr at I-270 NB Ramps | 43.4 (D) | 32.9 (C) | 39.2 (D) | 33.4 (C) |
| MD 187 at Rock Spring Dr | 46.6 (D) | 98.7 (F) | 48.7 (D) | 96.8 (F) |
| MD 187 at I-270 SB Ramps | 25.8 (C) | 31.7 (C) | 25.9 (C) | 27.2 (C) |
| MD 187 at I-270 NB Ramps | 11.1 (B) | 15.6 (B) | 12.7 (B) | 14.8 (B) |
| MD 187 at Tuckerman Ln | 156.7 (F) | 92.3 (F) | 157.7 (F) | 94.2 (F) |
| **I-495 at MD 190 (River Rd)** | | | | |
| MD 190 at Seven Locks Rd | 41.6 (D) | 49.3 (D) | 38.0 (D) | 58.3 (E) |
| MD 190 at I-495 Outer Loop Off-Ramp | 13.5 (B) | 10.7 (B) | 21.6 (C) | 17.9 (B) |
| MD 190 at I-495 Inner Loop On-Ramp | 0.5 (A) | 3.7 (A) | 19.1 (B) | 21.6 (C) |
| MD 190 at Burdette Rd | 21.5 (C) | 49.9 (D) | 24.8 (C) | 79.9 (E) |
| MD 190 at I-495 Managed Lanes Access | N/A | N/A | 13.6 (B) | 23.0 (C) |
| **I-495 at MD 187 (Old Georgetown Rd)** | | | | |
| MD 187 at Lone Oak Dr/Manor Oak Way | 25.1 (C) | 20.7 (C) | 23.3 (C) | 21.0 (C) |
| MD 187 at I-495 Outer Loop Off-Ramp | 96.0 (F) | 11.6 (B) | 88.4 (F) | 12.9 (B) |
| MD 187 at I-495 Inner Loop On-Ramp | 9.4 (A) | 17.2 (B) | 8.6 (A) | 24.6 (C) |
| MD 187 at Ryland Dr/Church Driveway | 16.5 (B) | 10.4 (B) | 17.7 (B) | 11.3 (B) |
| **I-495 at MD 355 (Rockville Pk)/I-270 East Spur** | | | | |
| MD 355 at Grosvenor Ln | 33.4 (C) | 36.5 (D) | 33.8 (C) | 35.3 (D) |
| MD 355 at I-495 Inner Loop Ramp | 25.4 (C) | 16.5 (B) | 24.0 (C) | 20.8 (B) |
| MD 355 at Pooks Hill Rd | 35.7 (D) | 16.6 (B) | 36.6 (D) | 17.0 (B) |
| MD 355 at Alta Vista Rd/Bellevue Dr | 17.5 (B) | 29.3 (C) | 19.1 (B) | 28.4 (C) |

*Unsignalized (stop-controlled) intersection; delay and LOS for worst approach shown

00001773

 **OP·LANES** MARYLAND — I-495 & I-270 Managed Lanes Study

Draft Application for Interstate Access Point Approval

## Table 6-28: 2045 Preferred Alternative Synchro Ramp Queuing Summary

| Ramp | AM 95th %ile Queue (ft) | PM 95th %ile Queue (ft) | Issue? |
|---|---|---|---|
| **I-270 at Shady Grove Rd** | | | |
| I-270 SB Off-Ramp to Omega Dr | 100 | 171 | No |
| I-270 SB Off-Ramp to Shady Grove Rd | 513 | 232 | No |
| I-270 NB Off-Ramp to Shady Grove Rd | 423 | 175 | No |
| I-270 NB Off-Ramp to Piccard Dr/Redland Blvd | 41 | 51 | No |
| **I-270 at Gude Dr** | | | |
| I-270 ML SB Off-Ramp to Gude Dr | 205 | 281 | No |
| I-270 ML NB Off-Ramp to Gude Dr | 507 | 408 | No |
| **I-270 at MD 28 (Montgomery Ave)** | | | |
| I-270 SB Off-Ramp to MD 28 | 200 | 248 | No |
| I-270 NB Off-Loop to WB MD 28 | N/A* | N/A* | N/A* |
| I-270 NB Off-Ramp to EB MD 28 or Nelson St | 159 | 314 | No |
| **I-270 at MD 189 (Falls Rd)** | | | |
| I-270 SB Off-Ramp to WB MD 189 | N/A* | N/A* | N/A* |
| I-270 SB Off-Ramp to EB MD 189 | 34 | 48 | No |
| I-270 NB Off-Ramp to WB MD 189 | 9 | 65 | No |
| I-270 NB Off-Ramp to EB MD 189 | 152 | 101 | No |
| **I-270 at Wootton Pkwy** | | | |
| I-270 ML SB Off-Ramp to Wootton Pkwy | 156 | 203 | No |
| I-270 ML NB Off-Ramp to Wootton Pkwy | 254 | 248 | No |
| **I-270 at Montrose Rd** | | | |
| I-270 SB Off-Ramp to WB Montrose Rd | N/A* | N/A* | N/A* |
| I-270 SB Off-Loop to EB Montrose Rd | N/A* | N/A* | N/A* |
| I-270 NB Off-Loop to WB Montrose Rd | N/A* | N/A* | N/A* |
| I-270 NB Off-Ramp to EB Montrose Rd | 0 | 0 | No |
| **I-270 West Spur at Westlake Terrace** | | | |
| I-270 Spur ML SB Off-Ramp to Westlake Terrace | 497 | 327 | No |
| I-270 Spur ML NB Off-Ramp to Westlake Terrace | 115 | 90 | No |
| **I-270 West Spur at Democracy Blvd** | | | |
| I-270 Spur SB Off-Ramp to Democracy Blvd | 286 | 716 | No |
| I-270 NB Off-Ramp to WB Democracy Blvd | 201 | 251 | No |
| I-270 NB Off-Ramp to EB Democracy Blvd | 522 | 253 | No |
| **I-270 East Spur at Rockledge Dr/MD 187 (Old Georgetown Rd)** | | | |
| I-270 SB/EB Off-Ramp to Rockledge Blvd | 523 | 421 | No |
| I-270 NB/WB Off-Ramp to Rockledge Blvd | N/A* | N/A* | N/A* |
| I-270 NB/WB Off-Ramp to MD 187 | 223 | 141 | No |
| **I-495 at MD 190 (River Rd)** | | | |
| I-495 OL Off-Ramp to MD 190 | 163 | 145 | No |
| I-495 OL ML Off-Ramp to MD 190 | 78 | 132 | No |
| I-495 IL ML Off-Ramp to MD 190 | 17 | 194 | No |
| I-495 IL Off-Ramp to MD 190 | 268 | 194 | No |
| **I-495 at MD 187 (Old Georgetown Rd)** | | | |
| I-495 OL Off-Ramp to MD 187 | 434 | 285 | No |
| I-495 IL Off-Ramp to NB MD 187 | 107 | 425 | No |
| **I-495 at MD 355 (Rockville Pk)/I-270 East Spur** | | | |
| I-495 OL Off-Ramp to NB MD 355 | N/A* | N/A* | N/A* |
| I-495 IL Off-Ramp to SB MD 355 | 362 | 332 | No |

*Uncontrolled movement; no queue reported in Synchro

00001774

JA1098



I-495 & I-270 Managed Lanes Study

# APPENDIX F
# FINAL COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS TECHNICAL REPORT
## June 2022



U.S. Department of Transportation
**Federal Highway Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00005136



I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

## TABLE OF CONTENTS

1    **INTRODUCTION** ............................................................................................................... 1

   1.1    Overview ................................................................................................................... 1

   1.2    Study Corridors and the Preferred Alternative .................................................... 1

   1.3    Description of the Preferred Alternative ............................................................... 2

2    **METHODOLOGY** ................................................................................................................ 4

   2.1    CEA Analysis Area .................................................................................................... 4

   2.2    Data Collection ......................................................................................................... 5

   2.3    Analysis of Environmental Consequences and Mitigation ................................... 8

3    **EXISTING CONDITIONS AND ENVIRONMENTAL CONSEQUENCES** ................................. 1

   3.1    Land Use and Zoning, Planning, and Development ............................................... 1

      3.1.1    Existing Conditions ......................................................................................... 1

      3.1.2    Environmental Consequences ...................................................................... 10

   3.2    Population and Demographics .............................................................................. 13

      3.2.1    Existing Conditions ....................................................................................... 13

      3.2.2    Environmental Consequences ...................................................................... 18

      3.2.3    Mitigation ...................................................................................................... 19

   3.3    Economic, Employment, and Commuting Characteristics ................................. 19

      3.3.1    Existing Conditions ....................................................................................... 19

      3.3.2    Environmental Consequences ...................................................................... 27

      3.3.3    Mitigation ...................................................................................................... 28

   3.4    Housing ................................................................................................................... 29

      3.4.1    Existing Conditions ....................................................................................... 29

      3.4.2    Environmental Consequences ...................................................................... 31

      3.4.3    Mitigation ...................................................................................................... 31

   3.5    Community Facilities ............................................................................................. 31

      3.5.1    Existing Conditions ....................................................................................... 31

      3.5.2    Environmental Consequences ...................................................................... 36

      3.5.3    Mitigation ...................................................................................................... 37

   3.6    Property Acquisitions ............................................................................................ 38

      3.6.1    Existing Conditions ....................................................................................... 38

00005137

JA1100



I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

|  |  |  |
|---|---|---|
| 3.6.2 | Environmental Consequences | 38 |
| 3.6.3 | Mitigation | 41 |
| **4** | **COMMUNITY PROFILES AND CONSEQUENCES** | **42** |
| 4.1 | CEA Analysis Area Communities | 42 |
| 4.2 | What are the Community Profiles? | 42 |
| 4.3 | Summary of Environmental Consequences to Communities | 42 |
| **5** | **ENVIRONMENTAL JUSTICE ANALYSIS** | **45** |
| 5.1 | Environmental Justice Analysis Regulatory Context | 45 |
| 5.2 | Environmental Justice Analysis Methodology | 46 |
| 5.2.1 | Environmental Justice Analysis Area | 47 |
| 5.2.2 | Identification of Minority Race and Ethnicity Populations | 48 |
| 5.2.3 | Identification of Low-Income Populations | 48 |
| 5.3 | Historical Context | 50 |
| 5.4 | Existing Conditions of Environmental Justice Populations | 51 |
| 5.4.1 | Existing Minority Race and Ethnicity Populations | 51 |
| 5.4.2 | Existing Low-Income Populations | 55 |
| 5.4.3 | Summary: Total Environmental Justice Populations | 57 |
| 5.4.4 | Supplemental Community Data | 59 |
| 5.4.5 | Summary of the Existing Conditions of Environmental Justice Populations | 69 |
| 5.5 | Public Outreach with Environmental Justice Populations | 71 |
| 5.5.1 | Publication of DEIS, Public Hearings, and Associated Comment Period | 71 |
| 5.5.2 | Publication of SDEIS, Public Hearing, and Associated Comment Period | 72 |
| 5.5.3 | Environmental Justice Working Group and Environmental Justice Engagement Initiatives | 76 |
| 5.6 | Identification of Beneficial and/or Adverse Impacts to Environmental Justice Populations & Consideration of Mitigation or Community Enhancement Measures | 79 |
| 5.6.1 | No Build Alternative | 79 |
| 5.6.2 | Preferred Alternative | 80 |
| 5.7 | Comparison of Adverse Impacts to Environmental Justice Populations versus Non-Environmental Justice Populations | 101 |
| 5.8 | Determination of whether Disproportionately High and Adverse Impacts would Occur to Environmental Justice Populations under the Preferred Alternative | 108 |
| **6** | **REFERENCES** | **113** |

00005138



I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

## LIST OF TABLES

Table 2-1: CEA Analysis Area Communities and Included Census Block Groups ........................................... 7
Table 3-1: Comprehensive, Master, and Sector Plans .................................................................................. 5
Table 3-2: Land Use Permanently Converted to Transportation Right-of-Way for the Preferred Alternative ........................................................................................................................................................... 11
Table 3-3: Historic and Projected Population in Fairfax County, Montgomery County, and Maryland ..... 14
Table 3-4: Major Montgomery County Employers in CEA Analysis Area.................................................... 20
Table 3-5: Means of Transportation to Work .............................................................................................. 22
Table 3-6: Top 30 Employment Destinations for Workers Who Live in the CEA Analysis Area.................. 24
Table 3-7: Top 30 Home Destinations for Workers Employed in the CEA Analysis Area ........................... 26
Table 3-8: Local Property Tax Rates and Revenue ...................................................................................... 27
Table 3-9: Impacts to Community Facility Properties from the Preferred Alternative .............................. 36
Table 3-10: Summary of Right-of-Way Acquisitions and Impacts from the Preferred Alternative ........... 39
Table 3-11: Property Impacts by Geographic Area ...................................................................................... 40
Table 4-1: Property Impacts in Analysis Area Communities ....................................................................... 43
Table 5-1: HUD 2019 Low-Income Limit for the Washington-Arlington-Alexandria, ................................ 49
Table 5-2: Race and Ethnicity Characteristics of Block Groups within the EJ Analysis Area...................... 52
Table 5-3: EJ Analysis Area Household Income Characteristics ................................................................... 55
Table 5-4: Total Environmental Justice Populations ................................................................................... 57
Table 5-5: Block Groups within the EJ Analysis Area with Above-Average LEP Households ...................... 63
Table 5-6: EJ Analysis Area Schools with Above-Average Free and Reduced Lunch Program Participation ........................................................................................................................................................... 64
Table 5-7: Affordable Housing Complexes in the EJ Analysis Area ............................................................. 66
Table 5-8: EJ Analysis Area Populations with Above-Average Households Utilizing Food Stamps/SNAP .. 66
Table 5-9: Block Groups within EJ Analysis Area that Overlap with Equity Emphasis Areas ...................... 67
Table 5-10: Non-EJ Populations Identified for Additional EJ Engagement via Supplemental Data ............ 69
Table 5-11: Environmental Justice Working Group Meetings and Coordination ........................................ 76
Table 5-12: Property Impacts in Environmental Justice Populations .......................................................... 80
Table 5-13: Impacts to Public Parks, Public Parks with Historic Properties, and Historic Sites* (Section 4(f) Properties) in Environmental Justice Populations ...................................................................................... 81
Table 5-14: HOT Lanes Direct Access Locations in EJ Populations.............................................................. 83
Table 5-15: Impacted NSAs and Corresponding Noise Barrier Systems in EJ Populations ......................... 88
Table 5-16: Natural Resource Impacts in EJ Populations ............................................................................ 90
Table 5-17: Hazardous Materials Sites of Concern in EJ Populations ......................................................... 92
Table 5-18: HOT Lanes Access Construction Locations in EJ Populations .................................................. 97
Table 5-19: Comparison of Effects to EJ Populations versus Non-EJ Populations .................................... 101

## LIST OF FIGURES

Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative..................................... 2
Figure 1-2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow) ........................ 3
Figure 2-1: CEA Analysis Area Communities ................................................................................................. 6

00005139


I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

Figure 3-1: CEA Analysis Area Land Use Distribution ............................................................................. 2
Figure 3-2: Land Use within the CEA Analysis Area ............................................................................... 3
Figure 3-3: Smart Growth Priority Funding Areas ................................................................................. 9
Figure 3-4: Population Distribution Among CEA Analysis Area Communities ..................................... 14
Figure 3-5: Population Density within the CEA Analysis Area .............................................................. 15
Figure 3-6: Age Distribution by Sex ..................................................................................................... 16
Figure 3-7: Household Income .............................................................................................................. 17
Figure 3-8: Race and Ethnicity Characteristics of the CEA Analysis Area ........................................... 18
Figure 3-9: Occupations of Employed CEA Analysis Area Residents .................................................... 20
Figure 3-10: CEA Analysis Area Residents' Top 100 Employment Destinations .................................. 23
Figure 3-11: CEA Analysis Area Workers' Top 100 Home Destinations ............................................... 25
Figure 3-12: CEA Analysis Area Housing Unit Build Year ..................................................................... 29
Figure 3-13: CEA Analysis Area Housing Type by Tenure .................................................................... 30
Figure 3-14: MARC and Metrorail Transit within the CEA Analysis Area ............................................. 35
Figure 5-1: Environmental Justice Populations .................................................................................... 58
Figure 5-2: Maryland EJSCREEN EJscore for Census Tracts in the Analysis Area ................................ 62
Figure 5-3: Equity Emphasis Areas and Environmental Justice Populations ....................................... 68

## LIST OF APPENDICES

**Appendix A**  CEA Analysis Area Environmental Mapping
**Appendix B**  Zoning and Land Use Classification Table
**Appendix C**  Smart Growth Consistency Coordination Checklists
**Appendix D**  Community Profiles
**Appendix E**  Uniform Relocation Assistance Act
**Appendix F**  EJScreen Data and Mapping
**Appendix G**  EJ-Related Public Involvement Materials
**Appendix H**  EJ Engagement Initiatives Summary Report

00005140

JA1103

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

# 1 INTRODUCTION

## 1.1 Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing a Final Environmental Impact Statement (FEIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study). The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

This Final Community Effects Assessment and Environmental Justice Analysis Technical Report has been prepared to support the FEIS and focuses on the analysis of the Preferred Alternative. The Preferred Alternative, also referred to as Alternative 9 – Phase 1 South, includes building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. Refer to **Figure 1-1**. This Preferred Alternative was identified after extensive coordination with agencies, the public and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach.

The purpose of the Final Community Effects Assessment and Environmental Justice Analysis Technical Report is to present the existing conditions, an assessment of potential direct impacts of the Preferred Alternative to socioeconomic resources and final mitigation and community enhancements, if applicable. This Final Community Effects Assessment and Environmental Justice Analysis Technical Report builds upon the analysis in the Draft Community Effects Assessment and Environmental Justice Analysis Technical Report, DEIS and Supplemental DEIS (SDEIS), and has been prepared to support and inform the FEIS.

## 1.2 Study Corridors and the Preferred Alternative

In the SDEIS, published on October 1, 2021, FHWA and MDOT SHA identified the Preferred Alternative: Alternative 9 – Phase 1 South to be consistent with the previously determined phased delivery and permitting approach, which focuses on Phase 1 South. As a result, Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 in the DEIS but focuses the build improvements within the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway to west of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in dark blue in **Figure 1-1**. The improvements include two new HOT managed lanes in each direction along I-495 and I-270 within the Phase 1 South limits. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1-1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

00005141

**OP·LANES**
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

The 48-mile corridor Study limits remain unchanged: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland (shown in both dark and light blue in **Figure 1-1**).

**Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.3    Description of the Preferred Alternative

The Preferred Alternative includes a two-lane HOT managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure 1-2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to west of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

00005142

**OP·LANES**
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### Figure 1-2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow)



I-495 from the George Washington Memorial Parkway to west of MD 187

Approx. 194' - 198'

I-495: American Legion Bridge (Looking north towards Maryland)

Exit and entrance lanes provide access to the High-Occupancy Toll Lanes from the George Washington Memorial Parkway

Location for shared-use path on ALB

I-495 west of MD 187 to west of MD 5 - NO ACTION AT THIS TIME

Approx. 138' - 146'

I-270 from I-495 to I-370

Approx. 218' - 222'

00005143



## 2    METHODOLOGY

### 2.1    CEA Analysis Area

This Community Effects Assessment and Environmental Justice Analysis Technical Report defines and describes various existing community and socioeconomic conditions within the **CEA Analysis Area** surrounding the Preferred Alternative, Alternative 9 - Phase 1 South limits (**Figure 2-1**). The CEA Analysis Area was delineated to include all 2010 Census block groups[1] that are located within 0.25-mile to either side of the Phase 1 South limits in portions of Fairfax County, Virginia and Montgomery County, Maryland.[2] These Census block groups were then matched with the municipality or Census Designated Place (CDP) in which they were primarily located to define individual CEA Analysis Area Communities. As identified in **Table 2-1**, the CEA Analysis Area is composed of 66 block groups sorted into seven CEA Analysis Area Communities. **Figure 2-1** highlights each of the seven CEA Analysis Area Communities and **Appendix A** depicts the CEA Analysis Area across multiple figures to show the location of each block group.[3] (Note that CEA Analysis Area Community boundaries do not specifically follow municipality or CDP boundaries because the CEA Analysis Area Community boundaries are drawn along block group boundaries.)

Within this *Community Effects Assessment and Environmental Justice Analysis Technical Report*, **Chapter 3** details existing conditions by resource for the entire CEA Analysis Area. The description of each resource's existing conditions is followed immediately by the presentation of environmental consequences of the Preferred Alternative, Alternative 9 - Phase 1 South to these resources within the context of the entire CEA Analysis Area.

To enhance public understanding of impacts and accessibility to this Technical Report's data, a community profile for each of the seven CEA Analysis Area Communities is provided in **Chapter 4** and **Appendix D**. Each profile includes an overview of:

- The community location;
- Planning and development;
- Community facilities; and
- Minority race/ethnicity populations and low-income populations, if present.

The profiles also include community-specific mapping and figures presenting the population's distribution of racial and ethnicity characteristics, zoning and land use, and housing characteristics. The profile for

---

[1] Block groups are statistical divisions of Census Tracts and are generally defined to contain between 600 and 3,000 people. A block group usually covers a contiguous area. Each Census Tract contains at least one block group, and block groups are uniquely numbered within the Census Tract. Block groups never cross state, county, or Census Tract boundaries but may cross the boundaries of any other geographic entity (e.g. municipality, or Census-Designated Place). (https://www.census.gov/geo/reference/gtc/gtc_bg.html). Note that 2020 Census block group boundaries were not yet available to the public at the time of this study's publication.

[2] Based on preliminary evaluation, 0.25-mile to either side of the study corridors was established as a resource inventory boundary that would reasonably include areas that would potentially be subject to direct impacts from Alternative 9 - Phase 1 South. Expanding the CEA Analysis Area to include all Census block groups intersecting the 0.25-mile delineation provides a conservative spatial approximation of the neighborhoods surrounding the study corridors; additionally, necessary data is available at the Census block group-level.

[3] Note that the term "EJ Analysis Area" is used instead of "CEA Analysis Area" in the Environmental Justice Analysis in **Chapter 5**. The EJ Analysis Area is identical to the CEA Analysis Area defined here.

00005144

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

each CEA Analysis Area Community is immediately followed by a description of the long-term impacts of the Preferred Alternative to resources within each community. Impacts, including changes to land use and development, right-of-way acquisitions and potential relocations of businesses and residences, and impacted community facility properties and services are quantified for each of the CEA Analysis Area Communities. Qualitative impacts, including potential changes to community aesthetics and character, as well as development patterns, are also described for each CEA Analysis Area Community. Presenting impacts in this manner will help community members better understand how the alternatives may impact and benefit specific communities.

## 2.2    Data Collection

Preparation of this Community Effects Assessment and Environmental Justice Analysis Technical Report includes a review of resource data for the CEA Analysis Area. Resources reviewed included:

- Land use and zoning, planning, and development;
- Population and demographic characteristics;
- Economic, employment, and commuting characteristics;
- Housing stock, age, and tenure;
- Community facilities and services; and
- Environmental Justice (EJ) populations.

This information is sourced from the following:

- Geographic Information Systems (GIS) data from Fairfax and Montgomery Counties;
- Comprehensive, master, sector, transportation and related planning publications, as well as zoning ordinances for Fairfax and Montgomery Counties;
- Pipeline of Approved Development Projects from Montgomery County;
- Maryland Department of Labor;
- US Census 2010 and 2015-2019 American Community Survey (ACS) Five-Year Estimates;
- US Census Longitudinal Employer-Household Dynamics data (2018);
- Google Earth and Google Maps- Street View; and
- Field reconnaissance where data gaps are identified.

00005145

JA1108

**Figure 2-1: CEA Analysis Area Communities**



00005146

JA1109

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 2-1: CEA Analysis Area Communities and Included Census Block Groups

| CEA Analysis Area Community[4] | CEA Analysis Area Census Block Groups[5] | | |
|---|---|---|---|
| **Fairfax County, Virginia** | | | |
| McLean | • 4701.00 – 1 | • 4701.00 – 2 | • 4801.00 – 4 |
| **Montgomery County, Maryland** | | | |
| Potomac | • 7012.06 – 1<br>• 7012.06 – 2<br>• 7060.08 – 1<br>• 7060.08 – 2 | • 7060.09 – 2<br>• 7060.09 – 3<br>• 7060.12 – 1<br>• 7060.12 – 2 | • 7060.12 – 3<br>• 7060.13 – 1<br>• 7060.13 – 2 |
| Cabin John | • 7058.00 – 2 | • 7058.00 – 3 | |
| Bethesda | • 7044.03 – 1<br>• 7044.04 – 4<br>• 7045.02 – 1 | • 7045.02 – 2<br>• 7045.03 – 1 | • 7059.01 – 3<br>• 7059.02 – 3 |
| North Bethesda | • 7012.05 – 1<br>• 7012.05 – 2<br>• 7012.05 – 3<br>• 7012.05 – 4<br>• 7012.13 – 1<br>• 7012.13 – 2 | • 7012.13 – 3<br>• 7012.15 – 1<br>• 7012.15 – 2<br>• 7012.15 – 3<br>• 7012.15 – 4<br>• 7044.01 – 1 | • 7044.01 – 2<br>• 7045.01 – 1<br>• 7045.01 – 2<br>• 7045.01 – 3<br>• 7045.01 – 4 |
| Gaithersburg | • 7007.17 – 1<br>• 7007.17 – 3<br>• 7007.17 – 4<br>• 7008.16 – 1 | • 7008.16 – 2<br>• 7008.17 – 1<br>• 7008.17 – 2<br>• 7008.17 – 3 | • 7008.29 – 1 |
| Rockville | • 7007.18 – 1<br>• 7007.18 – 2<br>• 7010.01 – 2<br>• 7010.01 – 3<br>• 7010.02 – 1<br>• 7010.02 – 2 | • 7010.02 – 3<br>• 7010.04 – 2<br>• 7010.04 – 4<br>• 7010.05 – 1<br>• 7010.05 – 2<br>• 7010.06 – 1 | • 7010.06 – 2<br>• 7010.07 – 1<br>• 7010.07 – 2<br>• 7012.10 – 1<br>• 7012.11 – 3 |

---

[4] As used here, community refers to either a municipality or a Census-Designated Place (CDP), as delineated by the State of Maryland and the US Census Bureau, respectively. Many CEA Analysis Area block groups intersect and/or overlap with more than one community. For the purposes of this Technical Report, each of the CEA Analysis Area block groups has been assigned to the respective community in which most of their land area is located.

[5] Refer to **Appendix A** for the location of these block groups in relation to the corridors.

00005147

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## 2.3    Analysis of Environmental Consequences and Mitigation

23 USC 109(h) requires that US DOT "assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following:

- Air, noise, and water pollution;
- Destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;
- Adverse employment effects, and tax and property value losses;
- Injurious displacement of people, businesses and farms; and
- Disruption of desirable community and regional growth."

In **Section 3**, the environmental consequences of the Preferred Alternative, which is described in **Section 1,** are presented immediately following the description of the existing conditions for each of the resource types. Mitigation or community enhancement measures, if required, are also included for each impacted resource type.

00005148

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

# 3    EXISTING CONDITIONS AND ENVIRONMENTAL CONSEQUENCES

## 3.1    Land Use and Zoning, Planning, and Development

### 3.1.1    Existing Conditions

#### A.    Land Use and Zoning

Land use patterns and development goals are identified in long-term comprehensive plans that are implemented through zoning codes and maps adopted by local governments. Zoning codes regulate the type and density of development within delineated land areas to ensure compliance with the long-term comprehensive plans' land use and development goals. The CEA Analysis Area encompasses 27,006 acres of land; 3,337 acres of which are located just south of the American Legion Memorial Bridge in Fairfax County, Virginia and the remaining 23,628 acres are in Montgomery County (including the City of Gaithersburg and the City of Rockville), Maryland.

Land use conditions within the CEA Analysis Area were identified through the review of zoning designations. Zoning designations were used primarily because this data is consistently updated by municipalities, while the land use data provided by the Maryland Department of Planning dates from 2010. Fairfax County maintains current land use data (Fairfax, 2021). For the purposes of this Technical Report, existing conditions are generally referred to by their "land use." The land use types, described below, were summarized based on the primary land uses allowed under the counties' zoning codes. Some overlap in allowed land uses may occur. The distribution of each land use within the CEA Analysis Area is quantified in **Figure 3-1** and supporting mapping depicting land use within the CEA Analysis Area is provided as **Figure 3-2**. The table in **Appendix B** presents how local zoning/land use codes were categorized into high-level zoning/land use categories within the CEA Analysis Area.

- **Commercial/Employment:** includes, but is not limited to: retail, service, convenience, and lodging establishments; professional and medical offices; civic, cultural, and institutional establishments; public and private education and childcare facilities; public uses; places of worship; indoor entertainment.
- **Industrial:** includes but is not limited to: office and research parks; employment uses requiring larger tracts of land; production, manufacturing, assembly, and processing establishments; hospitals; retail and wholesale; automobile services; laundry services, warehouse, storage, and distribution.
- **Mixed-Use:** includes a mix of commercial/employment and residential uses.
- **Park/Open Space:** includes local, state, regional, and federal parks and recreational areas, including, but not limited to: stream valley parks, railroad trails, community centers, parkways, and National Historic Parks; smaller tracts of public and private undeveloped open space interspersed among developed areas; and agricultural lands.
- **Planned Unit/Planned Community:** includes land reserved for future development, primarily for residential communities.
- **Residential:** includes detached single-family dwelling units and duplex dwelling units, attached single-family row housing; garden apartments; high-rise apartments/condominiums; mobile homes; and trailer parks; plus, yards and associated areas.

00005149

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- **Transportation:** includes right-of-way reserved for road, rail, bicycle, pedestrian, and transit facilities, as well as supporting transportation infrastructure, such as park-and-ride facilities, maintenance areas, distribution warehouses, and open/forested areas adjacent to roadways.

Existing data reflect a highly-developed system of land use in the CEA Analysis Area. Most of the study area has been planned and built out based in large part on the presence of the existing I-495 and I-270 corridors. Sixty-nine percent of the CEA Analysis Area has been built out for either residential, industrial, mixed, commercial/employment, or planned community uses. Much of the area reflects dense land use patterns with little potential for additional development based on the lack of available space or on existing land use restrictions. As a whole, only 18 percent of the land in Montgomery County remains available for development as undeveloped land (Montgomery Planning, 2021). The relative composition of land use in the CEA Analysis Area is shown in **Figure 3-1**.

At 15,355 acres, residential zones account for 57 percent of the CEA Analysis Area. The second-most common land use is park/open space, which accounts for 4,697 acres, or 17 percent of the CEA Analysis Area. This is followed by transportation, which accounts for 3,686 acres, or 14 percent of the CEA Analysis Area. Mixed-use (1,518 acres), planned unit/planned community (1,114 acres), industrial (330 acres), and commercial/employment (306 acres) zones account for the remaining 12 percent of CEA Analysis Area land. Additional detail on land use for individual CEA Analysis Area Communities is provided in **Section 4** and **Appendix D**.

**Figure 3-1: CEA Analysis Area Land Use Distribution**



*Source: City of Gaithersburg GIS web map (https://maps.gaithersburgmd.gov/gallery/); City of Rockville GIS Open Data (http://data-rockvillemd.opendata.arcgis.com/); Montgomery County/MNCPPC MCATLAS (http://www.mcatlas.org/viewer/); Fairfax County Open Geospatial Data (https://www.fairfaxcounty.gov/maps/open-geospatial-data).*

00005150

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study — Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-2: Land Use within the CEA Analysis Area**



00005151

JA1114

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## B.    Farmland and Protected Lands

The *Farmland Protection Policy Act of 1981* (FPPA) strives to minimize the extent to which Federal programs contribute to the conversion of important farmlands to non-agricultural uses; lessen the adverse effects of federal actions on farmland; and assure that federal programs are operated in a manner that, to the extent practicable, will be compatible with state, local government, and private programs that protect farmland. According to federal regulations implementing the FPPA, *farmland* does not include land already in or committed to urban development, including lands identified as urbanized area on the 2010 Census urban area-based reference map[6].

The CEA Analysis Area is almost entirely within a Census urban area, except west of I-495 along the Potomac River in the Potomac and McLean CEA Analysis Area Communities, where the Chesapeake and Ohio Canal National Park and Clara Barton Parkway are located.

The CEA Analysis Area was reviewed for lands not covered by the FPPA, but protected under:

- Virginia state preservation programs;
- the Maryland Agricultural Land Preservation Foundation (MALPF);
- the Maryland Agricultural Easement Program;
- the Maryland Environmental Trust; and
- the Maryland Rural Legacy Program, including county Rural Legacy Programs (MCATLAS, 2018 and Montgomery County Rustic Roads Advisory Committee, 2015).

Per the Virginia Department of Conservation and Recreation's online Conservation Lands Database, there are a total of nine conservation easements spread throughout the McLean CEA Analysis Area Community. These easements are almost entirely privately owned, aside from one owned by the National Park Service, and are managed by a variety of entities including the Northern Virginia Conservation Trust, the Potomac Conservancy, and the Virginia Outdoors Foundation. The easements range from approximately one acre to approximately 63 acres (Virginia Department of Conservation and Recreation, 2021).

The McLean CEA Analysis Area Community also contains one non-profit fee simple holding owned by the Northern Virginia Conservation Trust that is approximately five acres. Additionally, Scott's Run Nature Preserve, owned by the Fairfax County Park Authority, is located on the banks of the Potomac River directly west of I-495 and is accessible from Georgetown Pike. Scott's Run encompasses approximately 384 acres (Virginia Department of Conservation and Recreation, 2021).

The CEA Analysis Area overlaps with a small portion of the Maryland Department of Natural Resources (DNR) designated Piney Branch Special Protection Area (SPA) in the Gaithersburg CEA Analysis Area

---

[6] *The Farmland Protection Policy Act* (7 CFR 658.2) states, "Farmland means prime or unique farmlands as defined in section 1540(c)(1) of the Act or farmland that is determined by the appropriate state or unit of local government agency or agencies with concurrence of the Secretary to be farmland of statewide or local importance.  "Farmland" does not include land already in or committed to urban development or water storage, Farmland "already in" urban development or water storage includes all such land with a density of 30 structures per 40-acre area. Farmland already in urban development also includes lands identified as "urbanized area" (UA) on the 2010 Census urban area-based reference map (https://www.census.gov/geographies/reference-maps/2010/geo/2010-census-urban-areas.html), or as urban area with a "tint overprint" on the USGS topographical maps, or as "urban-built-up" on the USDA Important Farmlands Maps."

00005152

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Community, north of Darnestown Road and south of Medical Center Way. Existing land uses at this location include roadways and adjacent strips of undeveloped land as well as development complexes and parking facilities associated with Shady Grove Adventist Hospital.

## C. Review of Approved Comprehensive, Master, and Sector Plans

The *Maryland Economic Growth, Resource Protection and Planning Act* (1992), as amended, articulates the State's growth policy through visions centered on concentrating development in suitable areas, protecting sensitive areas, and establishing funding mechanisms to achieve the visions. The Act also requires local jurisdictions to address these same visions in their comprehensive plans. Under the Act, local governments are required to review, and if necessary, update their plans once every six years.

Maryland's *Smart and Sustainable Growth Act of 2009* clarifies the link between local comprehensive plans and local land use ordinances. The bill defines the current requirement of "consistency". Actions that are "consistent with" or have "consistency with" a comprehensive plan are actions that further, and are not contrary to, the following items in the plan: policies; timing of implementation of the plan; timing of development; timing of rezoning; development patterns; land uses; and densities or intensities.

Planning and development goals within CEA Analysis Area Communities are guided by a variety of comprehensive, master, and sector plans. Relevant plans that overlap portions of the CEA Analysis Area are listed in **Table 3-1.** These plans generally set goals that include enhancing transportation efficiency by promoting the use of major highways and arterials networks to limit traffic impacts on local and neighborhood streets. Roadway-related recommendations referencing the study corridors have been italicized.

**Table 3-1: Comprehensive, Master, and Sector Plans**

| Planning Document | Roadway-Related Recommendations Referencing the Study Corridors |
|---|---|
| **Fairfax County, Virginia** | |
| Fairfax County Comprehensive Plan, 2017 Edition (Area II McLean Planning District (Amended February 20, 2018) | • *Identifies I-495 as a proposed high-occupancy toll lane facility from Old Dominion Drive north to Maryland* <br> • *I-495 south of Old Dominion Drive is an existing high-occupancy toll lane facility* |
| **Montgomery County, Maryland** | |
| Comprehensive Amendment to the Bethesda/Chevy Chase MP (1990) | • *Maximum six to eight-lane divided roadway system for I-495, from the Potomac River to Rock Creek Park* <br> • *Variable minimum right-of-way width for I-495* |
| North Bethesda Garrett Park MP (1992) | • *Maximum six-lane divided roadway for I-495* <br> • *Minimum 300-foot right-of-way width* |
| Gaithersburg Vicinity MP (1996) | • No recommendations specific to the study corridors |
| Potomac Subregion MP (2002) | • *Maximum eight-lane divided roadway system for I-495, 12-lane divided roadway for I-270 from the Rockville City line to the I-270 Spur, and six-lane divided highway for the I-270 spur from I-270 to I-495* <br> • *Minimum 300-foot right-of-way width for I-495 and I-270* |

00005153

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Planning Document | Roadway-Related Recommendations Referencing the Study Corridors |
|---|---|
| Capital Beltway HOV Lane Project and Interchange at the Intersection of Randolph Road and Veirs Mill Road (Amendment to the MP of Highways within Montgomery County) (2004) | • *Revised the Potomac Subregion Master Plan (2002) recommending:*<br>  ○ *Maximum eight-lane, plus two-High-Occupancy Vehicle (HOV) lanes, divided roadway system for I-495 from the American Legion Bridge to I-270 West Spur*<br>  ○ *Minimum 300-foot right-of-way width for I-495*<br>• *Revised the Bethesda-Chevy Chase MP (1990) to recommend HOV lanes*<br>• *HOV, or High-Occupancy Toll (HOT), lanes on I-495 between the American Legion Bridge and the I-270 West Spur*<br>• *Managed lanes that do not give preference to high-occupancy vehicles were not considered* |
| Guiding the Future of the MD 355/I–270 Corridor (2008) | • *Use value pricing for express lanes on I-270, the Inter-County Connector, and I-495 to enhance mobility and improve access.* |
| City of Gaithersburg MP (2009) (currently being updated) | • *Express Toll Lane (ETL) direct access ramps for I-270 at the Metropolitan Grove Road extended site* |
| Gaithersburg West MP Transportation Appendix (Draft March 2009) | • No recommendations specific to the study corridors |
| Great Seneca Science Corridor MP (2010) | • *Maximum 12-lane divided roadway system for I-270 between Great Seneca Creek (proximal to Game Preserve Road) and Shady Grove Road*<br>• *Minimum 300-foot right-of-way width for I-270*<br>• *Provide off-ramp right-of-way for the proposed new interchange at I-270 and Watkins Mill Road and grade-separated interchanges at I-270 at Watkins Mill Road extended and I-270 at Gude Drive*<br>• *Construction of improvements at the Watkins Mill interchange by MDOT SHA are underway. Completion is expected Summer 2020.*<br>• *There are no current MDOT SHA plans to add an interchange at Gude Drive* |
| Countywide Transit Corridors Functional MP (2013) | • *Transportation System Management (TSM) improvements are in place to provide a more efficient use of ROW along HOV lanes on I-270*<br>• *At the Fernwood Road bridge, high-occupancy-vehicle (HOV) ramps connecting with the HOV lanes on the I-270 West Spur, both to and from the north and south.* |
| Rockville 2040 Comprehensive MP Transportation Report (2016) | • No recommendations specific to the study corridors |
| Bethesda Downtown Sector Plan (2017) | • No recommendations specific to the study corridors |
| Grosvenor-Strathmore Minor Area MP (2017) | • No recommendations specific to the study corridors |

00005154

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Planning Document | Roadway-Related Recommendations Referencing the Study Corridors |
|---|---|
| Rock Spring MP (2017) | • No recommendations specific to the study corridors |
| Technical Update to the MP of Highways and Transitways (2018) | • *Minimum 300-foot right-of-way width for I-270 except between West Gude Drive and the I-270 Spur*<br>• *Designates I-270 between I-495 and I-370 as a "Freeway with Existing HOV Lanes"*<br>• *Designates I-495 between the I-270 West Spur and the Maryland--Virginia line as a "Freeway with Planned HOV Lanes."* |
| Rockville 2040: Comprehensive Plan Update (2021)[1] | • *"Protect and enhance Rockville's property, neighborhoods, and environment while supporting solutions to regional traffic congestion on I-270 and I-495"*<br>• *"Monitor and coordinate with Maryland Department of Transportation State Highway Administration (MDOT SHA) regarding any projects to alter I-270 through Rockville. The City strongly supports mass transit, transportation demand management (TDM), and other alternative solutions to traffic congestion on I-270 as opposed to widening or the creation of toll lanes on I-270 as a remedy."* |
| Regional | |
| National Capital Region Transportation Planning Board FY 2019-2024 Transportation Improvement Program (2018) | • *Major Highway Projects within the study corridors include:*<br>  ○ *I-495 and I-270 Traffic Relief Plan – TIP ID 6432, Total $7.6 Billion, FY 2019-2024 Program $129 Million, Complete 2025* |
| National Capital Region Transportation Planning Board Visualize2045 Long-Range Plan (2022 Update) | • *I-95/I-495 component of Traffic Relief Plan in Montgomery and Prince George's Counties to include two managed lanes in each direction, between Baltimore Washington Parkway and Virginia Stateline/Potomac River (Woodrow Wilson Bridge) (CLRP 1182)*<br>• *I-270 component of Traffic Relief Plan in Montgomery County to include two managed lanes in each direction, between I-495 and I-70/US 40 (CLRP 1186)* |

Source: Montgomery County Planning Department, Master Plan List, https://montgomeryplanning.org/planning/master-plan-list/ , accessed June 2021; Fairfax County Planning Division, Comprehensive Plan Documents, https://www.fairfaxcounty.gov/planning-development/fairfax-county-comprehensive-plan, accessed June 2021.

Note: [1] The Rockville 2040 Comprehensive Plan Update also states, "A return to pre-pandemic traffic volumes on I-270 will continue to impact Rockville's local roads and the City supports actions and investments that reduce of mitigate impacts from I-270 that do not result in additional lanes, toll roads, or right-of-way expansion by the State."

Various residential, mixed-use, commercial, and retail development projects are proposed within the Montgomery County portion of the CEA Analysis Area. Development projects that have been approved by their respective County Planning Board but not yet constructed are considered "in the Pipeline" and are summarized below.

The most readily available GIS data from Montgomery County indicates that, as of October 2021, 53 Pipeline development projects are located in the Montgomery County portion of the CEA Analysis Area

00005155



(M-NCPPC, 2019). The projects include 11 mixed-use developments, 29 residential developments, and 13 office and retail developments. Combined, these Pipeline development projects would result in 6,535 new[7] residential units and 19,543 office, retail, and industrial jobs. Development projects in Montgomery County and elsewhere along the study corridor would further increase travel demand by the planning horizon year of 2040.

Maryland's *Smart Growth Priority Funding Areas Act of 1997* (Smart Growth Act) directs Maryland state infrastructure funds to areas within or connecting with county-designated and state-certified Priority Funding Areas (PFAs). Growth-related projects include most State programs that encourage growth and development such as highways, sewer and water construction, economic development assistance, and State leases or construction of new office facilities. The Smart Growth Act legislatively designated certain areas as PFAs and established criteria for locally designated PFAs. Through Smart Growth, Maryland is committed to limiting sprawl development by directing funds where they can help to revitalize older neighborhoods, and redirect growth to already developed areas, saving the state's farmland, open spaces, and natural resources. Smart growth makes efficient use of land, water, and air; creates a sense of community and place; expands transportation, employment, and housing choices; distributes the costs and benefits of development in an equitable manner; and promotes the public health (MD Department of Planning). To evaluate the Study's growth implications, consistency with the MD Department of Planning's Planning Policy, and compliance with the Priority Funding Area Law, Smart Growth Coordination Checklists were completed by MDOT SHA and are included with related correspondence in **Appendix C** of this technical report. In an email dated January 12, 2022, MDP concurred with Planning Act Consistency and PFA Law compliance determinations for the Study. It was determined that the Preferred Alternative is located entirely within PFAs.

As shown in **Figure 3-3**, the vast majority of the CEA Analysis Area is within a Maryland Department of Planning-designated PFA (a small portion of the CEA Analysis Area in Potomac falls outside of a PFA). As the I-495 and I-270 Managed Lanes Study proposed improvements would expand existing major regional corridors around which PFAs are designated, improvements within the CEA Analysis Area would be consistent with the Smart Growth Act.

---

[7] New residential units are the sum of approved, unbuilt residential units for each project.

00005156

**OP·LANES** MARYLAND   I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### Figure 3-3: Smart Growth Priority Funding Areas



*Source: Maryland Department of Planning, http://mdpgis.mdp.state.md.us/pfa/*

00005157

JA1120

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

### 3.1.2    Environmental Consequences

Potential long-term impacts from the Preferred Alternative are described, herein, along with a description of the Preferred Alternative's consistency with Community Master Plans and other documents that guide land use, zoning, and development within the CEA Analysis Area. Any impacts to pending or approved developments are also identified.

Descriptions of existing land use conversion to transportation right-of-way refers to physical changes in land use and should not be interpreted as a change in the official Zoning Code designation, which is subject to county and municipal regulations and not an element of the I-495 & I-270 Managed Lanes Study. For indirect and cumulative impacts from the Preferred Alternative on land use and development in the region, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

### A.    The No Build Alternative

The No Build Alternative requires no right-of-way acquisition or conversion of land to transportation use.

Because the No Build Alternative would not provide HOV or toll facilities on I-495 or I-270, it would not be consistent with the following Comprehensive, Master or Sector Plans that call for HOV or toll facilities on I-495 or I-270:

- Fairfax County Comprehensive Plan, 2017 Edition;
- Capital Beltway HOV Lane Project and Interchange at the Intersection of Randolph Road and Veirs Mill Road (Amendment to the MP of Highways in Montgomery County) (2004);
- Guiding the Future of the MD 355/I-270 Corridor (2008); and
- National Capital Region Transportation Planning Board FY 2019-2024 Transportation Program (2018); and
- National Capital Region Transportation Planning Board Vision 2045 (2022 Update).

### B.    Preferred Alternative

The Preferred Alternative would result in the permanent conversion of 78.2 acres of existing land uses to right-of-way for the new HOT lanes under the Preferred Alternative. This conversion includes the alteration of existing transportation land use for non-highway facilities (e.g. railway, county right-of-way, vegetated buffer zones etc.) outside of the existing I-495 and I-270 highway footprint, to right-of-way for the new HOT lanes (**Table 3-2**). The conversion of land from its present use would be the result of expanding the existing transportation right-of-way to adjacent properties and accommodating stormwater management facilities or drainage improvements, new or reconstructed noise barriers, and utility relocation that cannot be accommodated within existing highway right-of-way.

The Preferred Alternative would also use 14.7 acres of existing land uses for temporary use during construction.

00005158

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

Table 3-2: Land Use Permanently Converted to Transportation Right-of-Way for the Preferred Alternative

| Land Use | Total Existing Land Use in the CEA Analysis Area (acres) | Temporary Land Use Impacts During Construction of the Preferred Alternative (acres) | Land Use Permanently Converted to Transportation ROW under the Preferred Alternative (acres) |
|---|---|---|---|
| **Transportation[1]** | 3,686 | <0.1 | <0.1 |
| *(% of land use type permanently impacted)* | -- | -- | *<0.1%* |
| **Residential** | 15,335 | 2.6 | 35.3 |
| *(% of land use type permanently impacted)* | -- | -- | *0.2%* |
| **Planned Unit/ Planned Community** | 1,114 | 0.2 | 8.2 |
| *(% of land use type permanently impacted)* | -- | -- | *0.7%* |
| **Park/Open Space** | 4,697 | 9.3 | 12.8 |
| *(% of land use type permanently impacted)* | -- | -- | *0.3%* |
| **Mixed-Use** | 1,518 | 2.6 | 16.3 |
| *(% of land use type permanently impacted)* | -- | -- | *1.1%* |
| **Industrial** | 330 | -- | 2.8 |
| *(% of land use type permanently impacted)* | -- | -- | *0.8%* |
| **Commercial/ Employment** | 306 | -- | 2.7 |
| *(% of land use type permanently impacted)* | -- | -- | *0.9%* |
| **Total Permanent Change in Land Use[2]** | **27,006** | **14.7** | **78.2** |
| *(% of land use type permanently impacted)* | -- | -- | *0.3%* |

[1]*Transportation Land Use is the land considered transportation use—such as railway facilities, county right-of-way, and vegetated buffer zones— by the owner jurisdictions that is located outside of the I-495 & I-270 highway footprint.*

Under the Preferred Alternative, conversion to transportation right-of-way would most commonly occur to residential land uses (35.3 acres), followed by mixed-use land uses (16.3 acres). Conversion of residential land use within the LOD accounts for 0.2 percent of residential land use in the CEA Analysis Area; conversion of mixed-use land uses within the LOD accounts for 1.1 percent of mixed-use land uses in the CEA Analysis Area. Conversion of park/open space land uses within the LOD accounts for 0.3 percent of the park/open space land uses in the CEA Analysis Area. Overall, 78.2 acres of land use, or 0.3 percent of the CEA Analysis Area, along the Phase 1 South limits would be permanently converted to transportation right-of-way.

The land use conversions under the Preferred Alternative would primarily consist of acquiring strips of land, or strip takes, from undeveloped areas or areas of trees and landscaping in yards that back to I-495 or I-270. The Preferred Alternative would not substantially affect the overall land use within the CEA

00005159

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Analysis Area. As shown in **Table 3-2**, 1.1 percent or less of each land use type would be impacted by the Preferred Alternative. The extent, pace, and location of development within the CEA Analysis Area would be influenced and controlled by the respective county land development policies and plans. Outside of PFAs, large lot development, or areas where sprawl is likely to occur, would be limited to low development capacity in the CEA Analysis Area. The Preferred Alternative would support opportunities for redevelopment and infill, with growth in the study area being directed to existing communities and along transportation corridors. Future planned growth is not impeded by the proposed improvements under the Preferred Alternative and is not dependent on the proposed improvements.

The vast majority of the Preferred Alternative LOD is located within the Washington DC-MD-VA Census Urbanized Area. The land use conversion would impact a small portion of undeveloped riparian buffer located immediately outside of the Census Urbanized Area where the Preferred Alternative is located in McLean, Virginia. This riparian buffer for the Potomac River is not active farm area, nor does it provide farm-oriented services. As with other areas along the LOD, impacts to this portion of McLean would be limited acquisitions of right-of-way along the existing I-495 roadway. Consultation with the US Department of Agricultural Natural Resource Conservation Service (NRCS) is required for FPPA review if a project has the potential to convert prime, statewide, unique, or locally important farmland to non-farm use. If required, NRCS review determines if a Farmland Conversion Impact Rating for Corridor Type Projects is obligatory for a project. However, the LOD outside of the Census urban area is excluded from FPPA regulation because the LOD will not impact Prime Farmland Soils, as the soils are located on parkland within the Potomac River. For additional discussion on farmland soils, refer to the *Final Natural Resources Technical Report* **(FEIS, Appendix M)**. Other than parkland discussed in the *Final Section 4(f) Evaluation* **(FEIS, Appendix G)** and historic properties discussed in the *Final Cultural Resources Technical Report* **(FEIS, Appendix I)**, areas subject to conservation or protection under state and local land use and zoning designations would not be impacted by the Preferred Alternative.

The Preferred Alternative would be compatible with planned and approved future development in Montgomery and Fairfax Counties, including those identified in **Section 3.1.1C**, by providing additional roadway capacity to accommodate existing traffic and long-term traffic growth as well as travel choices for enhanced trip reliability and the improved movement of goods and services, consistent with the Study's Purpose and Need. Improvements would continue to make the area desirable for business and residential development.

Further, the Preferred Alternative is generally consistent with Comprehensive, Master or Sector Plans that call for HOV or toll facilities on I-495, referenced in **Table 3-1.** The assumed right-of-way for the Preferred Alternative would be adjacent to the existing I-495 and I-270 alignments and within the 300-foot right-of-way of I-495 and I-270 as recommended in multiple planning documents referenced in **Table 3-1.** The Preferred Alternative is located entirely within PFAs and is consistent with the Smart Growth Act. The Preferred Alternative would not substantially affect the overall land use within the CEA Analysis Area as only 1.1 percent or less of each land use type would be impacted by the Preferred Alternative. Within the Phase 1 South limits, much of the land use has already been developed and there is a paucity of unoccupied land available for new development. Much of the unoccupied land is also designated by planning documents for preservation, further reinforcing the small likelihood of development pressure as a result of new or additional access to I4-95 and I-270 from the managed lanes.

00005160

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### C.    Mitigation or Community Enhancement Measures

All property owners affected by partial acquisition and its associated land use conversion to transportation right-of-way would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative.

During final design, the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The goal will be to design highway elements, including retaining walls, noise barriers, and other visual barriers, to be sensitive to the context of the surrounding land use.  Further, mitigation for resource impacts would be developed in accordance with jurisdictional agency requirements.

## 3.2    Population and Demographics

### 3.2.1    Existing Conditions

The CEA Analysis Area population presented is based on data from the US Census, ACS Five-Year Estimates, 2015-2019. At the time this technical report was written, the 2015-2019 ACS 5-Year Estimates were the most recently available data. Population data is presented per CEA Analysis Area block group within their representative community for comparison alongside state and county data. The CEA Analysis Area population is further described by demographic data to include: age, sex, households with disabilities, race, ethnicity, national origin, and household income distribution using data from the US Census, ACS Five-Year Estimates, 2015-2019. Like the population overview, demographic data is presented for comparison with state and county existing conditions. Where appropriate, maps are provided that illustrate relevant patterns and/or concentrations of demographic characteristics within the CEA Analysis Area. The text discussion references relevant patterns and/or concentrations by community, noting specific block groups with outlier data where appropriate. Demographic data is also presented for individual CEA Analysis Area Communities in **Section 4** and **Appendix D**.

00005161

JA1124

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## A.    Population

**Table 3-3** shows historic trends and projections for the population of Fairfax and Montgomery Counties and the State of Maryland. Over the twenty-year period between 1990 and 2010, Fairfax County saw the greatest increase in population growth, with its population increasing by 32 percent. During the same period, Montgomery County's population grew by 28 percent and Maryland's population grew by 21 percent. Through 2040 population growth in Fairfax County is projected to grow by 22 percent compared to projected growth in Montgomery County at 23 percent and Maryland at 17 percent.

**Table 3-3: Historic and Projected Population in Fairfax County, Montgomery County, and Maryland**

| Geography | 1990 | 2000 | 2010 | 2040 | Percent Change 1990–2010 | Percent Change 2010–2040 |
|---|---|---|---|---|---|---|
| Fairfax County | 818,600 | 969,700 | 1,081,700 | 1,317,300 | +32% | +22% |
| Montgomery County | 757,027 | 873,341 | 971,777 | 1,197,150 | +28% | +23% |
| Maryland | 4,780,753 | 5,296,486 | 5,773,552 | 6,739,410 | +21% | +17% |

*Source: Maryland Department of Planning, "Historical and Projected Total Population for Maryland's Jurisdictions," December 2020 and County of Fairfax, Virginia, "Demographic Reports 2020."*

Additionally, according to MWCOG Round 9.1a Cooperative Forecasting, between 2015 and 2045, the population of Montgomery County is expected to grow by 20.5 percent, while the population of Fairfax County is expected to grow by 25.9 percent.

The CEA Analysis Area is in the Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area. The total population of the CEA Analysis Area is 103,614 people. Of this total, approximately 97 percent reside in Montgomery County and three percent in Fairfax County. Population distribution throughout the CEA Analysis Area Communities is shown in **Figure 3-4** and **Figure 3-5**. Population density within the CEA Analysis Area (**Figure 3-5**) mirrors the density of residential development.

**Figure 3-4: Population Distribution Among CEA Analysis Area Communities**

00005162

JA1125

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-5: Population Density within the CEA Analysis Area**



00005163

JA1126

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## B.    Age and Sex Characteristics

Section 162 (a) of the *Federal-Aid Highway Act of 1973* (23 USC 324) provides protection against gender-based discrimination while *The Age Discrimination Act of 1975* prohibits discrimination on the basis of age. The distribution of male and female individuals across age cohorts for the CEA Analysis Area is shown in **Figure 3-6**. The distribution of male and female[8] individuals is similar across all ages. At 15 percent of the population, the 50 to 59 cohort is the largest age group in the CEA Analysis Area, followed by the 40 to 49 cohort, which comprises 14 percent of the CEA Analysis Area population. Individuals aged 80 and over make up five percent, or the smallest portion of the CEA Analysis Area.

**Figure 3-6: Age Distribution by Sex**



*Note: Age distribution is shown as a percentage.*
*Source: 2015–2019 American Community Survey 5–Year Estimates*

## C.    Disability Characteristics

Section 504 of the Rehabilitation Act of 1973/Americans with Disabilities Act of 1990 provides disabled individuals equal opportunities to participate in and have access to federal programs, benefits and services. Five (5.2) percent of the 60,402 households in the CEA Analysis Area include one or more persons with a disability. This proportion is equal to that of Fairfax County (5.2 percent); it is slightly less than that of Maryland (8.9 percent) and Montgomery County (5.7 percent).

---

[8] "Male" and "Female" are the only response options available in the 2015–2019 American Community Survey 5–Year Estimates.

00005164

JA1127

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## D. Household Income

The ACS Five-Year Estimates calculated the number of households in a geography that fall within an annual income range. **Figure 3-7** shows the number of households within the annual income range for the CEA Analysis Area, Montgomery County, and Fairfax County. Note that the income ranges provided by the ACS were not evenly divided for each range.

**Figure 3-7: Household Income**



*Source: 2015–2019 American Community Survey Five-Year Estimates*

Household income distribution in **Figure 3-7** indicates a generally affluent population within the CEA Analysis Area as a whole. Thirty-two percent of CEA Analysis Area households—the majority—earned $200,000 or more in annual income, followed by 13 percent of households earning $150,000 to $199,999 in annual income. The smallest proportion of the CEA Analysis Area households, five percent, earned $19,999 or less in annual income. In comparison, the State of Maryland had a lower percentage of households who earned an annual income of $200,000 or more, at 13 percent, and a lower percentage of households who earned an annual income of $150,000 to $199,999, at 11 percent. A higher percentage of households in Maryland, ten percent, earned an annual income of $19,999 or less. Additional information on low-income households as they relate to the identification of potential Environmental Justice populations is provided in **Section 5.2.3**.

## E. Race and Ethnicity

The breakdown of race and ethnicity characteristics for the CEA Analysis Area population are shown in **Figure 3-8**. The detailed race and ethnicity characteristics for Fairfax and Montgomery Counties, as well as each block group within the CEA Analysis Area are provided in **Table 5-2** in **Section 5.4.1**. Montgomery

00005165

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

County, with a total minority race and ethnicity population[9] of 56 percent represents a more diverse population compared to Maryland, which has a minority race and ethnicity population of 49 percent. The CEA Analysis Area, where 42 percent of the population identifies as a minority race or ethnicity, is less diverse than both the county and the state.

**Figure 3-8: Race and Ethnicity Characteristics of the CEA Analysis Area**



*Source: 2015–2019 American Community Survey Five-Year Estimates*

Over half (58 percent) of the CEA Analysis Area identifies as White alone, followed by those who identify as Asian alone (17 percent), those who identify as Hispanic or Latino of any race (11 percent), and those who identify as Black or African American alone (10 percent). Those who identify as some other race alone plus two or more races, Native Hawaiian and other Pacific Islander alone, or American Indian and Alaska Native alone comprise less than 10 percent each of the CEA Analysis Area population.

Additional detail on race and ethnicity characteristics as they relate to the identification of potential Environmental Justice populations is found in **Section 5.2.2**.

### 3.2.2    Environmental Consequences

Impacts to the CEA Analysis Area population and demographics were assessed in terms of potential impact to the overall composition of these resources throughout the CEA Analysis Area. Potential impacts include increased or decreased development within the CEA Analysis Area that may result in change to population or demographic characteristics. The potential for impacts to population and demographics within specific communities are presented for the No Build and the Preferred Alternative by CEA Analysis Area

---

[9] Total Minority Race and/or Ethnicity Population is the sum of persons self-identifying as Black or African American Alone, Hispanic or Latino (regardless of race), Asian American Alone, American Indian and Alaskan Native Alone, Native Hawaiian or other Pacific Islander Alone, Some Other Race Alone, and two or more races.

00005166

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

Community provided in **Section 4** and **Appendix D**. For indirect and cumulative impacts from the Preferred Alternative on the regional population, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

### A.    The No Build Alternative

The No Build Alternative would have no impact on population or demographic characteristics, including age and sex, disability, household income, and race and ethnicity characteristics, within the CEA Analysis Area. However, regardless of improvements within the study corridors the regional population is projected to experience significant growth over the 30-year period between 2010 and 2040. The total population of Fairfax County is expected to increase by 22 percent; as shown in **Table 3-3**, the total population of Montgomery County is expected to increase by 23 percent. Additionally, according to MWCOG Round 9.1a Cooperative Forecasting, between 2015 and 2045, the population of Montgomery County is expected to grow by 20.5 percent, while the population of Fairfax County is expected to grow by 25.9 percent. The increase in population and lack of improvements to I-495 and I-270 under the No Build Alternative resulting in increased congestion may limit planned growth for the CEA Analysis Area.

### B.    The Preferred Alternative

The Preferred Alternative does not result in any full acquisitions or residential or business displacements. By providing additional roadway capacity through HOT managed lanes, the Preferred Alternative would accommodate increased traffic and congestion attributed to the projected regional population growth between 2010 and 2045. The increased capacity on I-495 and I-270, access to travel choices, and enhanced trip reliability would maintain the area's desirability for future economic activity. The Preferred Alternative would have minimal impact on the overall population of the CEA Analysis Area; no impacts would occur to demographic characteristics, including age and sex, disability, household income, and race and ethnicity characteristics, within the CEA Analysis Area. The minimal demographic changes would be consistent with approved master plans and population growth projections associated with those plans.

### 3.2.3    Mitigation

Because minimal impacts on the overall population of the CEA Analysis Area and no impacts on demographic characteristics, including age and sex, disability, household income, and race and ethnicity characteristics, would occur within the CEA Analysis Area, no mitigation is required.

## 3.3    Economic, Employment, and Commuting Characteristics

### 3.3.1    Existing Conditions

### A.    Employment and Economic Characteristics

The CEA Analysis Area is home to 57,022 persons over 16 years of age who are employed in the civilian sector, plus 453 persons employed in the Armed Forces. In the CEA Analysis Area, 96 percent of the labor force is employed. In comparison, Fairfax and Montgomery Counties have the same percent of the labor force employed, while Maryland has a slightly lower percentage at 95 percent. Consistent with US Census data, *workers,* as presented here, refers to the CEA Analysis Area population employed in the civilian sector only, unless otherwise specified.  Workers can be characterized by *occupation*, which refers to "the kind of work a person does to earn a living" (US Census Bureau, 2018). **Figure 3-9** reveals that 28 percent of CEA Analysis Area residents are employed in management, business and financial occupations. Sales and office occupations, as well as administrative support occupations, employ 14 percent of CEA Analysis

00005167

Area residents. The remaining occupations each employ less than 11 percent of CEA Analysis Area residents.

**Figure 3-9: Occupations of Employed CEA Analysis Area Residents**



*Source: American Community Survey Five-Year Estimates (2015-2019)*

In addition to employment characteristics of CEA Analysis Area residents, the CEA Analysis Area can be described by its contributions to the regional economy. The Maryland Department of Labor identifies "major" employers to be businesses or institutions with 100 or more employees. Employers in Montgomery County with more than 750 employees (excluding state and local governments and post offices) are listed in **Table 3-4**. No Fairfax County major employers were identified within the Fairfax County portion of the CEA Analysis Area.

**Table 3-4: Major Montgomery County Employers in CEA Analysis Area**

| Company | Number of Location(s) in CEA Analysis Area Communities | Total Number Employed at Company throughout Montgomery County |
|---|---|---|
| AstraZeneca (formerly MedImmune) | 1 location in Gaithersburg | 750 - 999 |
| BAE Systems | 1 location in Rockville | 750 - 999 |
| Bio Reliance Corp. | 1 location in Gaithersburg | 750 - 999 |
| CVS Pharmacy | 1 location in Potomac<br>1 location in North Bethesda<br>1 location in Rockville | 750 - 999 |
| Giant Food | 2 locations in Potomac | 1,000+ |
| Home Depot | 1 location in Potomac | 750 - 999 |

00005168

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Company | Number of Location(s) in CEA Analysis Area Communities | Total Number Employed at Company throughout Montgomery County |
|---|---|---|
| | 1 location in Rockville | |
| Lockheed Martin Corp. | 2 locations in North Bethesda<br>2 locations in Rockville<br>1 location in Gaithersburg | 1,000+ |
| Macy's | 1 location in Potomac | 1,000+ |
| Marriott International, Inc. | 1 location in North Bethesda<br>2 locations in Gaithersburg<br>1 location in Rockville | 1,000+ |
| McDonald's | 2 locations in Potomac | 1,000+ |
| Montgomery College | 1 location in Gaithersburg | 750 - 999 |
| OpenText | 1 location in Gaithersburg | 750 - 999 |
| Safeway | 2 locations in Rockville | 1,000+ |
| Shady Grove Adventist Hospital | 1 location in Gaithersburg | 1,000+ |
| Silver Diner | 1 location in Gaithersburg | 1,000+ |
| Target | 1 location in Gaithersburg | 750 - 999 |
| USSI, Inc. | 1 location in Rockville | 1,000+ |

*Note: Excludes federal, state, and local governments.*

*Sources: Maryland Department of Labor, https://www.dllr.state.md.us/lmi/emplists/montgomery.shtml, accessed June 2021*

*Guiding the Future of the MD 355/I–270 Corridor* (2008), describes the I-270 corridor in Montgomery County as an internationally recognized biotechnology industry cluster. This industry cluster has key institutions in the CEA Analysis Area, including several major employers listed in **Table 3-4**. Per the Maryland Department of Commerce *Maryland BioHealth Directory*, at least 64 other biotechnology companies are located in the CEA Analysis Area.

The federal government industry cluster is also represented in the CEA Analysis Area by the following key institutions: National Institute of Standards and Technology (NIST); National Institutes of Health (NIH); Naval Surface Warfare Center; and the US Internal Revenue Service (IRS).

### B.    Commuting Characteristics[10]

American Community Survey (ACS) Five-Year Estimates (2015–2019) were reviewed to obtain information on the means of transportation to work. This data for the CEA Analysis Area is summarized in **Table 3-5**. Of the geographies displayed in **Table 3-5**, Maryland represents the largest proportion of commuters who drive alone (74 percent) to and from work, while the CEA Analysis Area and Montgomery County represent the smallest proportions of commuters who drive alone to and from work (66 and 65 percent, respectively).

---

[10] *Data collection for the American Community Survey Five-Year Estimates (2015-2019) precedes and therefore does not account for the effects of the COVID-19 global pandemic, including the increase in employees working from home. For MDOT SHA's statement on the COVID-19 global pandemic and the I-495 and I-270 Managed Lanes Study, see **FEIS, Chapter 4**.*

00005169



I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

Table 3-5: Means of Transportation to Work

| Geographic Unit | Car, Truck, Van, or Motorcycle: Drove Alone | Car, Truck, Van: Carpooled | Public Transportation* | Bicycle, Walked, or Other Means | Worked at Home |
|---|---|---|---|---|---|
| Fairfax County, Virginia | 71% | 10% | 10% | 3% | 7% |
| Montgomery County, Maryland | 65% | 10% | 15% | 4% | 6% |
| Maryland | 74% | 9% | 9% | 3% | 5% |
| **CEA Analysis Area** | **66%** | **8%** | **14%** | **4%** | **9%** |

*Includes bus, trolley bus, streetcar, trolley car, subway, railroad, ferryboat, and taxicab.
Source: American Community Survey Five-Year Estimates (2015-2019)

Longitudinal Employer-Household Dynamics (LEHD) data from the US Census Bureau was collected to describe where CEA Analysis Area commuters traveled to and from for work. LEHD data is used to characterize workforce dynamics for specific geographic locations. One of these data products, LEHD Origin-Destination Employment Statistics (LODES), provides details on home and employment destinations for residents and workers at the block group-level (US Census Bureau Center for Economic Studies, 2018). LODES data from 2018, the most recent year available, was used to identify the home and employment destinations to which residents and workers in the CEA Analysis Area commute. The top 100 employment destinations for workers living in the CEA Analysis Area is shown in **Figure 3-10** and the associated top 30 employment destinations for workers living in the CEA Analysis Area are listed in **Table 3-6**. The top 100 home destinations for workers employed in the CEA Analysis Area is shown **Figure 3-11** and the associated top 30 home destinations for workers employed in the CEA Analysis Area are listed in **Table 3-7**.

JA1133

00005170

OP·LANES™ MARYLAND   I-495 & I-270 Managed Lanes Study      Final Community Effects Assessment & EJ Analysis Technical Report

## Figure 3-10: CEA Analysis Area Residents' Top 100 Employment Destinations



**Residents' Employment Commute Destination**
Number of Jobs
- 3097 - 8303
- 1146 - 3096
- 578 - 1145
- 211 - 577
- 38 - 210

**Legend**
- Limit of Disturbance
- State Boundary
- County Boundary
- Waterbodies

**Employment Commute Destinations**

0  2  4    8 Miles

OP·LANES™ MARYLAND
Options & Opportunities for All

*Source: US Census Bureau, Center for Economic Studies, OnTheMap (https://onthemap.ces.census.gov)*

00005171

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 3-6: Top 30 Employment Destinations for Workers Who Live in the CEA Analysis Area

| Employment Destination | Number of Worker-Jobs | Share | Employment Destination | Number of Worker-Jobs | Share |
|---|---|---|---|---|---|
| Washington, DC | 8,250 | 17.9% | Wheaton CDP, MD | 289 | 0.6% |
| Rockville, MD | 4,638 | 10.1% | North Potomac CDP, MD | 282 | 0.6% |
| Bethesda CDP, MD | 4,399 | 9.5% | Beltsville CDP, MD | 258 | 0.6% |
| North Bethesda CDP, MD | 3,162 | 6.9% | Frederick, MD | 250 | 0.5% |
| Gaithersburg city, MD | 2,329 | 5.1% | Chantilly CDP, VA | 196 | 0.4% |
| Potomac CDP, MD | 2,172 | 4.7% | Aspen Hill CDP, MD | 184 | 0.4% |
| Tysons CDP, VA | 1,113 | 2.4% | Olney CDP, MD | 172 | 0.4% |
| Arlington CDP, VA | 1,058 | 2.3% | Greenbelt , MD | 168 | 0.4% |
| Germantown CDP, MD | 799 | 1.7% | McLean CDP, VA | 168 | 0.4% |
| Silver Spring CDP, MD | 790 | 1.7% | Montgomery Village CDP, MD | 163 | 0.4% |
| Baltimore , MD | 787 | 1.7% | Calverton CDP, MD | 161 | 0.3% |
| Columbia CDP, MD | 537 | 1.2% | Chillum CDP, MD | 161 | 0.3% |
| College Park, MD | 524 | 1.1% | Takoma Park, MD | 158 | 0.3% |
| Alexandria, VA | 463 | 1.0% | Towson CDP, MD | 156 | 0.3% |
| Reston CDP, VA | 462 | 1.0% | Friendship Heights Village CDP, MD | 155 | 0.3% |

Source: US Census Bureau, Center for Economic Studies, OnTheMap (https://onthemap.ces.census.gov)
Note: CDP stands for Census-Designated Place

As shown in **Figure 3-10** and summarized in **Table 3-6**, the primary employment destinations for workers living in the CEA Analysis Area are densely clustered around I-495 and I-270.  Of the 46,114 employed residents living in the CEA Analysis Area[11], the largest share (18 percent) commute to work in Washington, DC. CDPs and municipalities within the CEA Analysis Area account for the next-largest shares of employment destinations after Washington, DC: approximately 37 percent of the employed residents commute to CDPs and municipalities within the CEA Analysis Area. The size of the shares associated with the employment destinations indicate that the dense urban core of Washington, DC and the communities outside of DC and along I-270 are the central location of employment opportunities for those living in the CEA Analysis Area and the Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area.

[11] The number of employed residents in the CEA Analysis Area based on LEHD Origin-Destination Employment Statistics (LODES) data is different from the number of persons over 16 years-of-age who are employed in the civilian sector based on American Community Survey Five-Year Estimates (2015-2019) data.  Numbers from both ACS and LODES are derived from separate US Census Bureau programs and are valid in the various contexts of this Technical Report.

00005172

OP•LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

Figure 3-11: CEA Analysis Area Workers' Top 100 Home Destinations



Source: US Census Bureau, Center for Economic Studies, OnTheMap (https://onthemap.ces.census.gov)

00005173

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 3-7: Top 30 Home Destinations for Workers Employed in the CEA Analysis Area

| Home Destination | Number of Worker-Jobs | Share | Home Destination | Number of Worker-Jobs | Share |
|---|---|---|---|---|---|
| Germantown CDP, MD | 6,932 | 6.0% | Columbia CDP, MD | 1,781 | 1.5% |
| Gaithersburg city, MD | 5,074 | 4.4% | Clarksburg CDP, MD | 1,455 | 1.3% |
| Washington city, DC | 4,997 | 4.3% | Arlington CDP, VA | 1,426 | 1.2% |
| Rockville city, MD | 4,532 | 3.9% | Redland CDP, MD | 1,268 | 1.1% |
| North Bethesda CDP, MD | 3,146 | 2.7% | Damascus CDP, MD | 1,099 | 0.9% |
| Potomac CDP, MD | 2,774 | 2.4% | Ellicott City CDP, MD | 1,085 | 0.9% |
| Bethesda CDP, MD | 2,623 | 2.3% | Fairland CDP, MD | 904 | 0.8% |
| Aspen Hill CDP, MD | 2,443 | 2.1% | Travilah CDP, MD | 856 | 0.7% |
| Silver Spring CDP, MD | 2,308 | 2.0% | Ballenger Creek CDP, MD | 805 | 0.7% |
| Montgomery Village CDP, MD | 2,165 | 1.9% | Urbana CDP, MD | 730 | 0.6% |
| Olney CDP, MD | 2,140 | 1.8% | Bowie city, MD | 705 | 0.6% |
| North Potomac CDP, MD | 2,073 | 1.8% | Glenmont CDP, MD | 615 | 0.5% |
| Wheaton CDP, MD | 1,902 | 1.6% | Cloverly CDP, MD | 599 | 0.5% |
| Frederick city, MD | 1,901 | 1.6% | Laurel city, MD | 590 | 0.5% |
| Baltimore city, MD | 1,879 | 1.6% | South Laurel CDP, MD | 582 | 0.5% |

*Source: US Census Bureau, Center for Economic Studies, OnTheMap (onthemap.ces.census.gov)*
*Note: CDP stands for* Census-Designated Place

As shown in **Figure 3-11** and summarized in **Table 3-7**, the primary home destinations for workers employed in the CEA Analysis Area are also clustered around I-495 and I-270, although less densely than the employment destinations. Each of these top destinations is located within or adjacent to the study corridors and are likely accessed using I-495 and I-270. Of the 115,841 workers employed in the CEA Analysis Area,[12] the largest share (six percent) commute home to Germantown. CDPs and municipalities within the CEA Analysis Area account for the next-largest shares of home destinations after Germantown: approximately 16 percent of the workers commute home to CDPs and municipalities within the CEA Analysis Area. The smaller shares associated with each home destination indicate that, in general, workers live in more decentralized locations throughout the Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area.

## C.    Tax Base

Real and Personal Property Tax is the largest single source of revenue for county governments within the CEA Analysis Area. The tax rates for Fairfax and Montgomery Counties are summarized below in **Table 3-8**. Fairfax County acquires 79.2 percent of its revenue through real estate and personal property tax and Montgomery County acquires 46.3 percent of its revenue through property tax.

---

[12] See footnote #10.

00005174

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

#### Table 3-8: Local Property Tax Rates and Revenue

| CEA Analysis Area Locality | FY 2020 Real Property Tax Rates (per $100 assessed value) | FY 2020 County Property (Real and Personal) Tax Revenues ($ Million) |
|---|---|---|
| Fairfax County | $1.1500 | $3,531 |
| Montgomery County | $0.9786 | $1,836.8 |

*Source: Fairfax County, VA FY 2020 Fairfax County Adopted Budget Plan (Overview) and Maryland Association of Counties, FY 2020 Report of County Budgets, Tax Rates & Selected Statistics.*

### 3.3.2    Environmental Consequences

Potential economic, employment, and commuting characteristic impacts from the No Build and Preferred Alternative would include impacts to the local and regional economy and tax revenue impacts. Potential impacts from the No Build and Preferred Alternative to the CEA Analysis Area are described quantitatively and qualitatively. For indirect and cumulative impacts from the Preferred Alternative on employment and other socioeconomic resources, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

### A.    The No Build Alternative

Routine roadway maintenance activities related to the No Build Alternative would not directly result in right-of-way acquisitions or relocations to businesses or employment centers or access to area businesses or employment.

However, the No Build Alternative would not address existing or future congestion issues. Future traffic projections identify increased congestion within the CEA Analysis Area. Increased traffic congestion would lead to longer commuting times for individuals who use the I-495 and I-270 corridors, as documented in the *Final Traffic Technical Report* **(FEIS, Appendix A)**. Travel demand will continue to increase, exceeding the current capacity of the roadways. This would result in longer peak travel periods and/or additional volume on nearby roads as drivers attempt to avoid congestion. Increased traffic congestion may also result in a slight increase in the number of people who choose alternative means to commute to work other than driving alone.

The ability to move freight, services and commuting employees through the study corridors will increasingly depend on the performance of the existing travel lanes on I-495 and I-270. According to MDOT SHA estimates, the total congestion cost to users in the National Capital Region has exceeded all other regions in the state of Maryland. The No Build Alternative would have a negative effect on the regional economy. Increased traffic congestion would inhibit inter-community travel, including access to local businesses. It could also delay the delivery of goods to and from these businesses. Decreased mobility within the regional network would not support the planned economic growth in the region; as a result, a decrease in the rate of new business development would be expected. This would also affect existing businesses, as increased traffic and congestion would inconvenience potential customers, limiting the geographic base of individual businesses. Congestion expected under the No Build Alternative would also make product and supply delivery less predictable. While the No Build Alternative would have no direct effect on the existing tax base over the short-term because there would be no right-of-way

00005175

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

acquisitions or relocations, the negative effect on commuting and the regional economy could result in a diminished tax base if such businesses relocated to areas outside of the CEA Analysis Area.

### B.    Preferred Alternative

The Preferred Alternative does not result in any full acquisitions or residential or business displacements. There would be no impact to the distribution of worker occupation, or major employers within the CEA Analysis Area as a result of the Preferred Alternative.

The improvements proposed under the Preferred Alternative would help address increasing congestion, thereby maintaining mobility throughout the region.  By providing additional roadway capacity through managed lanes, I-495 and I-270 would accommodate increases in traffic that are expected to occur in the region. This added capacity would mitigate longer peak travel periods that would be expected under the No Build Alternative.  The added mobility would help support economic growth by maintaining the ability for residents and through travelers to access and patronize local businesses.  The maintained function of I-495 and I-270, option of travel choice, and enhanced trip reliability would support the planned economic growth in the region.  Managed lanes would maintain congestion-free conditions, thereby increasing one- or two-lane traffic flow predictability.  Reliable travel times create advantages for all users, including long-range fleets and commercial "just in time" freight delivery services.

The Preferred Alternative would not remove or relocate of any access points to I-495 or I-270; therefore, commercial trip patterns would likely not be affected.  However, by maintaining regional mobility, the Preferred Alternative would support planned residential, commercial, and industrial development in the CEA Analysis Area.

The drivers that use I-495 and I-270 within the Phase 1 South limits are important to the tax base for the CEA Analysis Area.  Revenue is generated through sales and use tax, commercial property tax, and income tax on residents. There are areas available for development and redevelopment throughout the CEA Analysis Area. It is anticipated that increased capacity, enhanced trip reliability, additional roadway choices, and the improved movement of goods and services would foster infill development in designated growth areas, consistent with the master plans of the affected communities.

It is expected that future tax revenue generated from the projected development and redevelopment growth in the CEA Analysis Area would outweigh the minimal reduction in tax base by the assumed project-related relocations.

### 3.3.3    Mitigation

Because benefits to the economy, employment, regional commutes, and tax base would occur under the Preferred Alternative, no mitigation is required. Ongoing coordination with area businesses during construction would occur to prevent or minimize both short- and long-term disruptions.

A separate initiative under MDOT's I-495 & I-270 Public-Private Partnership (P3) Program, Opportunity MDOT[13] has developed a strategy for workforce development to ensure that P3 Program strengthens economic development and opportunities for small businesses and individuals.

---

[13]  See https://oplanesmd.com/opportunity-mdot/.

00005176

  I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### 3.4    Housing

#### 3.4.1    Existing Conditions

The CEA Analysis Area contains 40,953 occupied housing units, plus an additional 1,791 unoccupied housing units (US Census, ACS Five-Year Estimates, 2015-2019). As shown in **Figure 3-12**, most of the housing stock in the CEA Analysis Area was between three to seven decades old. Of the total 42,744 housing units, 27 percent were built from 1950 to 1969, and 34 percent were built from 1970 to 1989. Thirty-five percent of the housing units were built after 1990, and four percent of the housing units were built in 1949 or earlier. The proliferation of housing in the CEA Analysis Area built between 1950 and 1989 reflects the suburbanization of metropolitan areas that was occurring throughout the United States during this time.

**Figure 3-12: CEA Analysis Area Housing Unit Build Year**



*Source: 2015–2019 American Community Survey 5–Year Estimates*

The CEA Analysis Area contains various types of housing structures, the composition and tenure of which is shown in **Figure 3-13**. Occupied housing units in the CEA Analysis Area were 69 percent owner-occupied and 31 percent renter-occupied.

00005177

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-13: CEA Analysis Area Housing Type by Tenure**



*Source: 2015–2019 American Community Survey 5–Year Estimates*

Detached single-family houses make up 44 percent, the largest portion, of the housing structure types in the CEA Analysis Area. Small and medium-sized apartment and condominium complexes with between five and 19 housing units collectively make up 12 percent of the CEA Analysis Area housing structure types. Single-family attached housing structures, such as rowhouses or townhouses make up 19 percent, and large apartment and condominium complexes, with 20 to more than 50 individual housing units comprise 24 percent. Houses subdivided into two, three, and four individual housing units make up one percent of the CEA Analysis Area housing structure types. While not shown in **Figure 3-13**, there are also 28 owned and 17 rented mobile home, boat, RV, or van housing units in the CEA Analysis Area; these comprise less than one percent of the housing structures.

The HUD Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, and Fairfax County Redevelopment and Housing Authority were consulted to locate housing complexes with subsidized units generally referred to as *low-income subsidized housing* within the CEA Analysis Area. With funding from federal, state, and local resources, 21 housing complexes in the CEA Analysis Area rent units at below-market rates for qualifying households. Low-income subsidized housing complexes primarily include multifamily apartment complexes. Additionally, Fairfax and Montgomery Counties administer rental housing vouchers for low-income households through various federal, state, and local affordable housing subsidy programs, including the federal Housing Choice Voucher (HCV) Program. Low-income households with housing vouchers live in market-rate and below-market-rate housing units throughout the CEA Analysis Area. Low-income subsidized housing complexes identified with the CEA Analysis Area are listed in **Section 5.4.4E**.

00005178

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### 3.4.2    Environmental Consequences

Impacts to housing were assessed in terms of effects the quantity, age, type, or tenure of CEA Analysis Area housing stock. The potential for impacts to housing to affect accessibility, community character, sense of place, cohesion, and isolation on the seven CEA Analysis Area Communities are evaluated **Chapter 4** and **Appendix D**. For indirect and cumulative impacts from the Preferred Alternative on housing patterns, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

### A.    The No Build Alternative

The No Build Alternative would not require residential relocations or right-of-way acquisition and would not affect the quantity, age, type, or tenure of CEA Analysis Area housing stock.

### B.    Preferred Alternative

Because the Preferred Alternative would not require residential relocations, no impacts to the quantity, age, type, or tenure of CEA Analysis Area housing stock would occur under the Preferred Alternative.

### 3.4.3    Mitigation

Because no impacts would occur to housing in the CEA Analysis Area, no mitigation is required.

## 3.5    Community Facilities[14]

### 3.5.1    Existing Conditions

Public and private community facilities within the CEA Analysis Area provide services to residents and businesses in the surrounding communities. Community facilities documented here fall into eight categories[15]:

- Educational Facilities
- Places of Worship
- Cemeteries[16]
- Health Care Facilities
- Public Parks and Parks with Historic Properties (Section 4(f) Properties)
- Recreation Centers

- Emergency Services, Law Enforcement, and Correctional Facilities
- Transportation
- Public Utilities
- Other, including libraries and post offices

---

[14] Impacts to CEA Analysis Area Communities are described in **Section 4** and **Appendix D**.

[15] Public parks and public parks with historic properties referenced in this assessment of community facilities are impacted in the Preferred Alternative and are being evaluated in accordance with Section 4(f) of the US Department of Transportation Act of 1966. Details on Section 4(f) impacts can be found in **FEIS, Chapter 5.4** and **FEIS, Chapter 6**.
[16] Cemeteries referenced in this assessment of community facilities are considered historic properties impacted by the Preferred Alternative and are being evaluated in compliance with Section 106 of the National Historic Preservation Act of 1966 (NHPA). Details on historic cemeteries are found in **FEIS, Chapter 5.7**.

00005179



I-495 & I-270 Managed Lanes Study          Final Community Effects Assessment & EJ Analysis Technical Report

Community facilities within the CEA Analysis Area are briefly described below.  The names and locations of community facilities are shown on mapping for each CEA Analysis Area Community, included in **Section 4** and **Appendix D**.

### A.    Educational Facilities

Within the CEA Analysis Area, 59 pre-kindergarten, primary and secondary schools, and childcare facilities were identified.  Educational facilities are distributed across the CEA Analysis Area counties, with two schools in Fairfax County and 57 schools in Montgomery County.  Educational facilities included four alternative and special education schools, 36 private/parochial schools, 16 public elementary and middle schools, and three public high schools.

One higher education facility is located within the CEA Analysis Area: the Johns Hopkins University, Montgomery County Campus in the Gaithersburg CEA Analysis Area Community.

### B.    Places of Worship

Within the CEA Analysis Area, 43 places of worship were identified, including three places of worship within Fairfax County and 40 in Montgomery County. Gibson Grove A.M.E Zion Church is significant for its association with the African American settlement of Gibson Grove that was founded in the 1880s by formerly enslaved people; the only remaining building associated with the community of Gibson Grove is the existing original church building. Details on this historic property are found in **FEIS, Chapter 5.7**.

### C.    Cemeteries

Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the site of a late nineteenth-century African American benevolent society, is located within the Cabin John CEA Analysis Area Community and is being evaluated under Section 106 of the National Historic Preservation Act of 1966 (NHPA). The cemetery was closely associated with the Gibson Grove A.M.E. Zion Church. The Montgomery County Poor Farm Cemetery, which was associated with the Montgomery County Almshouse, is located within the Rockville CEA Analysis Area and is also being evaluated under Section 106 of the NHPA. Details on these historic cemeteries are found in **FEIS, Chapter 5.7**.

### D.    Health Care

Six healthcare facilities were identified within the CEA Analysis Area: Adventist Healthcare Shady Grove Medical Center, Adventist Behavioral Health and Wellness, Adventist Rehabilitation Hospital of Maryland, Shady Grove Medical Center- Kaiser Permanente, Family Medicine Shady Grove, and Sterling Care Rockville Nursing.

### E.    Emergency Services, Law Enforcement, and Correctional Facilities

Within the CEA Analysis Area three fire stations and one police station were identified: Bethesda Fire Department Station 26, Cabin John Park Volunteer Fire Department Stations 10 and 30, Maryland State Police Barrack N- Rockville. These facilities serve the respective municipalities in which they're located. Additionally, the Montgomery County Detention Center is located within the CEA Analysis Area. All fire and police stations within Fairfax County are located outside of the CEA Analysis Area.

00005180

 **OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### F.    Public Parks and Public Parks with Historic Properties (Section 4(f) Properties)

Public parks and public parks with historic properties within the LOD of the Preferred Alternative were reviewed in support of the FEIS and the Section 4(f) Evaluation in **FEIS, Chapter 6**. Detailed information regarding public parks and public parks with historic properties and potential impacts are addressed in the *Final Section 4(f) Evaluation* (**FEIS, Appendix G**). Refer to the Community Profiles in **Appendix D** for a list of 25 Section 4(f) parks and parks with historic properties within each CEA Analysis Area Community.

### G.    Recreation Centers

Existing recreation centers within the CEA Analysis Area include the following: Activity Center at Bohrer Park, Casey Community Center, Clara Barton Recreation Center, Gaithersburg Miniature Golf Course, Gaithersburg Skate Park, North Bethesda Community Center (Planned), Our Lady of Bethesda Retreat Center, Rockville Senior Center, and Thomas Farm Community Center.

### H.    Transportation Facilities

The CEA Analysis Area is served regionally by a network of freeways and major highways, primarily under the jurisdiction of MDOT SHA and VDOT. A network of arterial and residential routes accommodates the movement of residents, goods, and services. Most of these routes are under the jurisdiction of Fairfax County Department of Transportation (DOT) and Montgomery County DOT. Additionally, some of the incorporated areas have jurisdiction over municipal routes within the CEA Analysis Area.

Regional and local public transportation and transit services, including railways and buses serve the CEA Analysis Area. Regional transit service is provided by the Maryland Area Regional Commuter (MARC) and the Washington Metropolitan Area Transit Authority (WMATA) as shown in **Figure 3-14**. MARC train service is an integral component of Maryland's transportation system, with nearly 190 miles of rail across three lines: Penn, Camden, and Brunswick. None of these lines intersect the CEA Analysis Area. WMATA operates rapid transit Metrorail service in DC, northern Virginia, and Montgomery and Prince George's Counties in Maryland. The CEA Analysis Area is intersected by the Red line, which is one of six total Metrorail lines. There are no MARC and Metrorail Stations within the CEA Analysis Area. No Park & Ride facilities were identified within the CEA Analysis Area.

Local transportation is also provided by way of a network of interconnected bike lanes, paved and natural surface trails, sharrows[17], and on-road routes. Local bus service within the CEA Analysis Area is provided by WMATA fixed-route bus service (Metrobus) and paratransit service (MetroAccess), as well as Montgomery County's Ride On service. Currently no local bus service is provided within the Fairfax County portion of the CEA Analysis Area. While many of these services have routes that cross either I-495 or I-270, only Ride On routes use either of these corridors. Ride On route 70 uses I-270 between I-370 and I-495 (at the I-270 eastern leg). The Maryland Transit Administration (MTA) operates four Commuter Bus Lines within the CEA Analysis Area.

---

[17] Shared roadways are open to both bicycle and vehicular travel, but do not contain assigned space for each, such as a dedicated bike lane. Sharrows, or shared lane markings, are used to provide guidance for bicyclists and drivers, allowing them to share the same lane. Source: MDOT, "What is a Bikeway," https://www.mdot.maryland.gov/tso/pages/Index.aspx?PageId=89.

00005181



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

One heliport at Adventist Healthcare Shady Grove Medical Center (Rockville, MD) was identified in the CEA Analysis Area.

### I.    Public Utilities

Public water and sewer services in the Virginia portion of the CEA Analysis Area are supplied by the Fairfax County Water Authority. The Occoquan Reservoir and the Potomac River are the two major sources for all water processed by the Fairfax County Water Authority for the Virginia portion of the CEA Analysis Area, which is in the Blue Plains Treatment Area.

Within the Maryland portion of the CEA Analysis Area public water and sewer services are supplied by the Washington Suburban Sanitary Commission (WSSC). The Patuxent River and the Potomac River are the sources for all processed water supplied by the WSSC to Montgomery County. Water from the Patuxent River is held in two reservoirs, Tridelphia and Rocky Gorge, and is pumped to the Patuxent Water Filtration Plant (WFP) located in Laurel where it is treated. The Potomac WFP is in Potomac and extracts water from the Potomac River. No filtration plants are located within the CEA Analysis Area.

Two wastewater treatment plants serve the CEA Analysis Area. The Piscataway Plant, located in Accokeek, Maryland is operated by the WSSC. The Blue Plains Plant located in southwest DC is managed by the DC Water and Sewer Authority. Neither plant is located within the CEA Analysis Area.

Electricity service and natural gas services in the Virginia portion of the CEA Analysis Area are provided primarily by Dominion Virginia Power and Washington Gas, respectively. Phone and cable services are provided primarily by Comcast, Cox of Northern Virginia, and Verizon. In the Maryland portion of the CEA Analysis Area, electricity and natural gas services are provided primarily by Baltimore Gas & Electric (BGE), Potomac Electric Power Company (PEPCO), Washington Gas, and FirstEnergy/Potomac Edison. Phone and cable services are provided primarily by Comcast, Verizon, and RCN.

### J.    Public Libraries and Post Offices

Fairfax and Montgomery Counties operate separate public library systems with individual branch locations providing service and accessibility to communities throughout the CEA Analysis Area. Within the CEA Analysis Area there is one branch of the Montgomery County public library system, the Davis branch. No branch locations for the Fairfax County Public Library system were identified within the CEA Analysis Area.

The US Postal Service operates four post office locations within the Maryland portion of the CEA Analysis Area. No post offices were identified within the Fairfax County portion of the CEA Analysis Area.

00005182

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-14: MARC and Metrorail Transit within the CEA Analysis Area**



00005183

JA1146

  I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

### 3.5.2    Environmental Consequences

Impacts to community facilities and services were assessed in terms of potential impact to the properties of individual facilities throughout the CEA Analysis Area. Potential impacts include partial property acquisitions for right-of-way, changes in access to the facilities, changes to viewsheds and visual impacts, and increased noise.  Potential impacts also include changes in traffic volumes and patterns that could affect ease of access, the service provided by the facility, or response times.

### A.    The No Build Alternative

The No Build Alternative would not result in any study-related construction and would therefore not directly impact community facilities within the CEA Analysis Area. However, under the No Build condition traffic congestion is anticipated to increase within the CEA Analysis Area, which would result in increased travel times along the study corridors. The No Build Alternative would result in increased response times for emergency services and travel times to other community facilities, especially during peak travel periods. Additionally, the No Build Alternative would not draw traffic off the local network and would not result in reduced delay on the surrounding local roadways.

### B.    Preferred Alternative

The Preferred Alternative is projected to reduce traffic on local roads by three and a half percent. This could result in improved response times for emergency services and travel times to other community facilities, especially during peak travel periods.

The Preferred Alternative would require partial acquisitions from the properties of one correctional facility, two healthcare facilities, four places of worship, one recreation center, two schools, and one historic cemetery identified in **Table 3-9**. These partial acquisitions will not affect access; will not impact buildings, amenities, or facilities on the properties; and will not cause any permanent or temporary closures of the community facilities. The Preferred Alternative would also impact 20 Section 4(f) resources, including 13 public parks and public parks with historic properties on a permanent and temporary basis. No permanent impacts to access, recreational amenities, or facilities will occur. Impacts to Section 4(f) properties are detailed in **FEIS, Chapter 6** and **FEIS, Appendix G**. Because the boundaries of the Montgomery County Poor Farm Cemetery are poorly understood and no marked graves remain, quantifiable impacts were not calculated at this time. The existing building of Gibson Grove A.M.E. Zion Church will not be impacted, but the property would be adversely affected by the construction of the Preferred Alternative. Details on historic cemeteries and historic properties are found in **FEIS, Chapter 5.7**.

**Table 3-9: Impacts to Community Facility Properties from the Preferred Alternative**

| CEA Analysis Area Community | CEA Analysis Area Block Group | Community Facilities | Property Acquisition (acres) | | |
|---|---|---|---|---|---|
| | | | Total | Perm. | Temp. |
| Rockville | 7007.18 - 2 | Shady Grove Medical Center, Kaiser Permanente | 0.5 | 0.5 | — |
| | 7010.01 - 2 | Montgomery County Poor Farm Cemetery | Unknown | | |
| | 7010.02 - 1 | Montgomery County Detention Center | 3.7 | 3.7 | 0.1 |

00005184

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

|  | 7010.04 - 2 | Rockville Senior Center | 1.1 | 1.0 | 0.1 |
|  |  | First Baptist Church* | 0.4 | 0.4 | — |
|  |  | First Christ Church of Scientist | <0.1 | <0.1 | <0.1 |
|  | 7010.05 - 1 | Rockville Christian Church* | 0.5 | 0.5 | — |
|  |  | Sterling Care Rockville Nursing | 0.9 | 0.9 | — |
|  |  | Julius West Middle School* | 0.6 | 0.6 | — |
| **Potomac** | 7060.09 - 3 | Carderock Springs Elementary School | 0.2 | 0.2 | 0.1 |
|  |  | Gibson Grove A.M.E. Zion Church | 0.1 | 0.1 | — |

*Note: "—" indicates zero property impacts. All community facility property impacts are partial acquisitions. No property displacements would occur under the Preferred Alternative. The total acreage may not equal the sum of the permanent and temporary impacts due to rounding.*

*\* Community facility property impact extends into block group 7010.06 – 2, also in the Rockville CEA Analysis Area Community.*

The Preferred Alternative would not eliminate existing access or provide new access to impacted community facility properties, as none of these properties are currently accessed directly from I-495 or I-270.[18] No permanent impacts to the operation of community facilities would occur. Changes to viewsheds from and noise levels at community facility properties would occur due to the construction and operation of the Preferred Alternative.

Impacts to services that support the communities within the study area, including transit and utilities, will continue to be coordinated in final design. Impacts to these services are anticipated to be minor to negligible. Existing bus transit services that utilize I-495 and I-270 would be permitted to use managed lanes implemented under the Preferred Alternative; as a result of this use, transit services would benefit from reduced travel times and enhanced reliability.

Minor utility relocations will occur and would be coordinated with the appropriate service providers during construction to ensure there is minimal disruption to utility customers.

### 3.5.3    Mitigation

Mitigation measures to lessen the visual impact of the improvements have been considered as appropriate. The design of all highway elements would follow aesthetic and landscaping guidelines and would be visually consistent with the existing highway setting. The aesthetic and landscaping guidelines would be developed by the Developer in consultation with local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and federal agencies.

Full property acquisitions have been avoided and other property impacts minimized through a series of engineering and design refinement approaches. As design of the LOD progressed, property impacts have been minimized where feasible. All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative.

---

[18] This discussion of impacts to community facilities excludes detailed impacts to public parks and public parks with historic properties, which are described in **FEIS, Chapter 5.4.3**.

00005185

 I-495 & I-270 Managed Lanes Study        Final Community Effects Assessment & EJ Analysis Technical Report

Mitigation for impacts to Section 4(f) properties, including public parks and public parks with historic properties, has been coordinated extensively with the Officials with Jurisdiction (OWJ) over the impacted park properties. The final mitigation commitments have been developed to include all possible planning to minimize harm. Refer to **FEIS, Chapter 6** and **FEIS, Appendix G** for additional details.

Noise abatement would be provided in all Noise Sensitive Areas where abatement has been found to be reasonable and feasible. Detail on noise impacts and abatement is provided in **FEIS, Chapter 5.9** and **FEIS, Appendix L**.

## 3.6    Property Acquisitions

Property acquisitions within the Preferred Alternative LOD for conversion to transportation right-of-way include only partial acquisitions with no full acquisitions. A partial acquisition is considered one that does not cause a business or residential relocation and has been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative LOD. A full property acquisition resulting in a relocation would be assumed where a principle building is located within 20 feet of the LOD. This methodology to determine where a full property acquisition would be required was developed in coordination with the MDOT SHA Office of Real Estate based on similar project experience and engineering judgment.

The Preferred Alternative LOD was determined from the proposed roadway typical section, interchange configuration, and roadside design elements. The proposed roadway typical section, roadside design features, and topography and terrain were used to determine the cut and fill lines required to construct the Preferred Alternative. Generally, the cut and fill lines were offset by an additional ten feet to create the LOD. For further details on the establishment of the LOD refer to the **FEIS, Chapter 3.1.2**. For details on the applicable federal and state regulations and methodology related to property acquisition, refer to the **FEIS, Chapter 5.5**.

### 3.6.1    Existing Conditions

Within the highly developed CEA Analysis Area well-established communities, parklands and open space, commercial, and industrial areas are traversed by state and local transportation rights-of-way. The existing I-495 right-of-way within the study corridor ranges in width between 150 and 300 feet, to accommodate a six- to eight-lane freeway (three to four lanes in each direction) plus auxiliary lanes in some locations. The I-495 median width varies from closed to approximately 36 feet wide with shoulders up to 12 feet in width along most of the roadway. The existing I-270 right-of-way from the I-495 split, north to I-370 varies between 250 and 300 feet. Where the I-270 east and west spurs intersect with I-495, I-270 carries a total of six lanes with the left lane of both directions used as a HOV lane during peak periods. North of the spurs, I-270 is a twelve-lane freeway with one high-occupancy vehicle (HOV) lane and five general purpose (GP) lanes in each direction. The median of I-270 is barrier-separated with full-width shoulders. Existing conditions are depicted as the No Build Alternative in **Figure 1-2**.

### 3.6.2    Environmental Consequences

#### A.    The No Build Alternative

The No Build Alternative would not result in impacts to properties.

00005186

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## B.    Preferred Alternative

The Preferred Alternative does not result in any full acquisitions or residential or business displacements.

The Preferred Alternative would impact 92.8 acres of right-of-way that is outside of the existing highway right-of-way (78.2 acres for permanent use and 14.7 acres for temporary use) primarily from properties adjacent to the existing I-495 and I-270 roadway alignments. This includes 30.2 acres of permanent and temporary impact to the 13 public parks and public parks with historic sites identified in **FEIS, Chapter 5, Table 5-5**. The number and types of properties impacted by the Preferred Alternative are shown in **Table 3-10**. The proposed right-of-way impacts would not eliminate existing access or provide new access to impacted properties, as none of these properties are currently accessed directly from I-495 or I-270.

**Table 3-10: Summary of Right-of-Way Acquisitions and Impacts from the Preferred Alternative**

| Property Types | Number of Properties[1] |
|---|---|
| Residential Relocations | 0 |
| Residential Properties Impacted | 255 |
| Business Relocations | 0 |
| Business/Other Properties Impacted[2,3] | 106 |
| Total Number of Properties Impacted | 361 |

[1] *The number of properties relocated or impacted is not broken out by permanent and temporary to avoid double-counting a property that is impacted for both permanent and temporary use. Only the total count is provided.*

[2] *Business/Other Properties Impacted is equal to the sum of impacted properties with non-residential zoning designations, including Commercial/Employment, Industrial, Mixed-use, Park/Open Space, Planned Unit/Planned Community, and Transportation.*

[3] *Includes the 13 impacted public parks and public parks with historic sites identified in FEIS Chapter 5, Table 5-5.*

The Preferred Alternative results in property impacts due to roadway widening to construct additional travel lanes, reconfiguration of interchange ramps, reconstruction of significant bridges and other structures, augmentation and extension of culverts, replacement or extension of existing noise barriers, construction of new noise barriers, and utility relocation that cannot be accommodated within existing highway right-of-way. Generally, the proposed property acquisition for right-of-way would include acquiring strips of land, or strip takes, from undeveloped areas or areas of trees and landscaping in yards that back to I-495 or I-270. Acquisition of larger areas would be needed for the accommodation of stormwater management (SWM) facilities or drainage improvements. The proposed SWM facilities are shown on the *Environmental Resource Mapping* **(FEIS, Appendix E)**.

A breakdown of partial property impacts along the study corridor is presented by areas between existing interchanges in **Table 3-11**. To provide localized context, property impacts are presented for 16 areas between existing interchanges; page references to the *Environmental Resource Mapping* **(FEIS, Appendix E)** are provided for each area. Each individual property acquisition identified will be evaluated further during final design.

00005187

JA1150

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

### Table 3-11: Property Impacts by Geographic Area

| Geographic Area | Permanent | Temporary | Total[1,2] |
|---|---|---|---|
| **Area 1: I-495 west side, south of George Washington Parkway (FEIS Appendix E, Map 1-2)** | | | |
| Number of Existing Properties Impacted | — | — | 11 |
| Total Acreage of Partial Property Acquisitions | 0.7 | 0.1 | 0.8 |
| **Area 2: I-495 west side, between George Washington Parkway and Clara Barton Parkway (FEIS Appendix E, Maps 2-5)** | | | |
| Number of Existing Properties Impacted | — | — | 8 |
| Total Acreage of Partial Property Acquisitions | 0.9 | 8.3 | 9.3 |
| **Area 3: I-495 west side, between Clara Barton Parkway and MD 190 (River Road) (FEIS Appendix E, Maps 5-10)** | | | |
| Number of Existing Properties Impacted | — | — | 55 |
| Total Acreage of Partial Property Acquisitions | 6.4 | 0.7 | 7.1 |
| **Area 4: I-495 west side, between MD 190 (River Road) and I-270 west spur (FEIS Appendix E, Maps 10-12)** | | | |
| Number of Existing Properties Impacted | — | — | 68 |
| Total Acreage of Partial Property Acquisitions | 8.7 | 0.5 | 9.2 |
| **Area 5: I-495 top side, between I-270 west spur and MD 187 (Old Georgetown Road) (FEIS Appendix E, Maps 12-14)** | | | |
| Number of Existing Properties Impacted | — | — | 7 |
| Total Acreage of Partial Property Acquisitions | 0.2 | 0 | 0.2 |
| **Area 6: I-495 top side, between MD 187 (Old Georgetown Road) and I-270 east spur – OUTSIDE LIMITS OF PREFERRED ALTERNATIVE – NO IMPACTS** | | | |
| Number of Existing Properties Impacted | — | — | 0 |
| Total Acreage of Partial Property Acquisitions | 0 | 0 | 0 |
| **Area 7: I-270 west spur, between I-495 and Democracy Boulevard (FEIS Appendix E, Maps 7,9)** | | | |
| Number of Existing Properties Impacted | — | — | 4 |
| Total Acreage of Partial Property Acquisitions | 1.5 | 0.7 | 2.1 |
| **Area 8: I-270 west spur, between Democracy Boulevard and Westlake Terrace (FEIS Appendix E, Maps 17-18)** | | | |
| Number of Existing Properties Impacted | — | — | 3 |
| Total Acreage of Partial Property Acquisitions | 1.3 | <0.1 | 1.3 |
| **Area 9: I-270 east spur, between I-495 and MD 187 (Old Georgetown Road) (FEIS Appendix E, Maps 19-20)** | | | |
| Number of Existing Properties Impacted | — | — | 4 |
| Total Acreage of Partial Property Acquisitions | 1.2 | 0 | 1.2 |
| **Area 10: I-270 west and east spurs, between Y-split and Westlake Terrace and MD 187 (FEIS Appendix E, Maps 18, 20-22)** | | | |
| Number of Existing Properties Impacted | — | — | 14 |
| Total Acreage of Partial Property Acquisitions | 6.8 | 0.1 | 6.9 |
| **Area 11: I-270 mainline, between Y-split and Montrose Road (FEIS Appendix E, Maps 22-26)** | | | |
| Number of Existing Properties Impacted | — | — | 63 |
| Total Acreage of Partial Property Acquisitions | 15.7 | 1.2 | 16.8 |
| **Area 12: I-270 mainline, between Montrose Road and MD 189 (Falls Road) (FEIS Appendix E, Maps 25-29)** | | | |
| Number of Existing Properties Impacted | — | — | 23 |
| Total Acreage of Partial Property Acquisitions | 12.8 | 0.3 | 13.2 |
| **Area 13: I-270 mainline, between MD 189 (Falls Road) and MD 28 (W. Montgomery Ave.) (FEIS Appendix E, Maps 29-31)** | | | |
| Number of Existing Properties Impacted | — | — | 45 |
| Total Acreage of Partial Property Acquisitions | 7.8 | 0.3 | 8.1 |
| **Area 14: I-270 mainline, between MD 28 (W. Montgomery Ave.) and Shady Grove Road (FEIS Appendix E, Maps 31-34)** | | | |
| Number of Existing Properties Impacted | — | — | 40 |

00005188

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Geographic Area | Permanent | Temporary | Total[1,2] |
|---|---|---|---|
| Total Acreage of Partial Property Acquisitions | 8.8 | 2.4 | 11.2 |
| Area 15: I-270 mainline, between Shady Grove Road and I-370 (FEIS Appendix E, Maps 34-38) | | | |
| Number of Existing Properties Impacted | — | — | 13 |
| Total Acreage of Partial Property Acquisitions | 4.8 | <0.1 | 4.8 |
| Area 16: I-270 mainline, north of I-370 (FEIS Appendix E, Maps 36, 39) | | | |
| Number of Existing Properties Impacted | — | — | 3 |
| Total Acreage of Partial Property Acquisitions | 0.6 | <0.1 | 0.6 |
| Phase 1 South - Total | | | |
| Number of Existing Properties Impacted | — | — | 361 |
| Total Right-of-way[3] (acres) | 78.2 | 14.6 | 92.8 |

Note: [1] The number of properties impacted is not broken out by permanent and temporary to avoid double-counting a property that is impacted for both permanent and temporary use. Only the total count is provided.

[2] The total acreage may not equal the sum of the permanent and temporary impacts due to rounding.

The properties that would be impacted by the Preferred Alternative are dispersed throughout the seven CEA Analysis Area Communities along the study corridors within the CEA Analysis Area. The impacts of the partial property acquisitions on individual communities are evaluated in **Section 4** and **Appendix D**.

### 3.6.3    Mitigation

All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions.

Property acquisition activities will be performed in accordance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act), as amended and all applicable Maryland State laws that establish the process through which MDOT SHA may acquire real property through a negotiated purchase or through condemnation. The *Uniform Relocation Assistance and Real Property Acquisition Policies Act* is included in **Appendix E**.

Note that it is the policy of MDOT SHA to ensure compliance with the provisions of *Title VI of the Civil Rights Act of 1964*, and related civil rights laws and regulations which prohibit discrimination on the grounds of race, color, sex, national origin, age, religion, or physical or mental handicap in all MDOT SHA projects funded in whole or in part of FHWA. MDOT SHA will not discriminate in highway planning, highway design, highway construction, right-of-way acquisitions, or provision of relocation advisory assistance. This policy has been incorporated into all levels of the highway planning process to ensure that proper consideration may be given to the social, economic, and environmental effects of all highway projects.

00005189

 I-495 & I-270 Managed Lanes Study      Final Community Effects Assessment & EJ Analysis Technical Report

# 4    COMMUNITY PROFILES AND CONSEQUENCES

## 4.1    CEA Analysis Area Communities

**Section 3** of this technical report presents impacts to environmental resources for the entire CEA Analysis Area, which includes all 66 Census block groups within 0.25-mile of the LOD. To better localize the impacts, the 66 block groups were matched with the municipality or Census Designated Place (CDP) in which they were primarily located to define the individual CEA Analysis Area Communities. The Gaithersburg, Rockville, North Bethesda, Bethesda, Cabin John, Potomac, and McLean CEA Analysis Area Communities are shown in **Figure 2-1**. Detail on the delineation is also provided in **Section 2.1**.

## 4.2    What are the Community Profiles?

To enhance public understanding of impacts and accessibility to the data presented in **Sections 3 and 5**, a profile for each of the seven CEA Analysis Area Communities was prepared (**Appendix D**). The profiles feature an overview of the community location; planning and development; community facilities; socioeconomic characteristics,[19] including minority/race populations and low-income populations, if present; and resource impacts, including impacted community facilities and services. Impacts are presented in this manner to communicate how the Preferred Alternative may impact specific communities.

Each community profile includes **Map 1**, which depicts the community, as defined for this technical report; the limits of the CEA Analysis Area; any overlaying city, town, municipal or Census Designated Place (CDP) boundaries; and the CEA Analysis Area block groups within the subject community. **Map 2** identifies and maps community facilities within the CEA Analysis Area Community.

Potential impacts from the Preferred Alternative to each CEA Analysis Area Community[20] are also described, including the number of impacted properties, the number and type of community facilities impacted, changes to land use, and potential noise abatement. Qualitative impacts, including potential changes to viewsheds, and a community's sense of place, cohesion, and isolation, are also highlighted for each CEA Analysis Area Community.

## 4.3    Summary of Environmental Consequences to Communities

Under the Preferred Alternative, properties that would be impacted by the improvements are dispersed throughout the seven CEA Analysis Area Communities. Right-of-way acquisitions under the Preferred Alternative would generally occur to properties adjacent to the existing I-495 and I-270 roadway alignments, acquiring strips of land from undeveloped areas or areas of trees and landscaping directly adjacent to I-495 or I-270. As described in **Section 3.6.1**, a partial acquisition would be needed when the

---

[19] Note that no persons identifying as American Indian and Alaska Native alone are estimated to live within the Cabin John, McLean, and Potomac CEA Analysis Area Communities. Additionally, no persons identifying as Native Hawaiian or Other Pacific Islander alone are estimated to live within the Bethesda, Gaithersburg, McLean, North Bethesda, and Rockville CEA Analysis Area Communities. These populations are not included in the corresponding bar charts in these profiles.

[20] As described previously, the terms "CEA Analysis Area Community" and "EJ Analysis Area Community" are interchangeable. For instance, the Gaithersburg EJ Analysis Area Community has the same block groups and boundaries as the Gaithersburg CEA Analysis Area Community. As such, the profile for the Gaithersburg CEA Analysis Area Community serves as the profile for the Gaithersburg EJ Analysis Area Community. See **Chapter 2.1** for delineation detail.

00005190

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

limits of disturbance[21] encroach onto a portion of the property but is more than 20 feet from a principal building.

The construction of the Preferred Alternative would include the following Study elements: managed lanes, shoulders, traffic barrier, direct access at-grade auxiliary lanes or ramps, reconstructed bridges, cut and fill slopes, SWM facilities, retaining walls, and noise walls along the existing highway corridors. Construction of the Preferred Alternative would also require relocation of signage, guardrails, communications towers, and light poles due to the widening of the roadway. Similarly, where noise barriers already exist, they would be replaced; additional noise barriers may be constructed as detailed in **FEIS, Chapter 5.9** and in the *Final Noise Technical Report* **(FEIS, Appendix L)**.

There are no residential or business relocations or displacements with the Preferred Alternative. As shown in **Table 4-1**, partial property impacts under the Preferred Alternative are dispersed throughout the seven Analysis Area Communities within the LOD.

Table 4-1: Property Impacts in Analysis Area Communities

| CEA Analysis Area Community | Number of Impacted Properties[1] | Property Acquisition (acres) | | |
|---|---|---|---|---|
| | | Perm. | Temp. | Total |
| Gaithersburg | 10 | 2.7 | <0.1 | 2.7 |
| Rockville | 114 | 32.2 | 3.0 | 35.2 |
| North Bethesda | 75 | 13.6 | 1.0 | 14.7 |
| Bethesda | 44 | 4.4 | 0.5 | 4.9 |
| Cabin John | 22 | 4.3 | 1.4 | 5.7 |
| Potomac | 81 | 19.7 | 4.9 | 24.6 |
| McLean[2] | 16 | 1.2 | 3.8 | 5.0 |
| Total | 361 | 78.2 | 14.7 | 92.8 |

Notes: [1] One impacted parcel falls in both the Cabin John and Potomac Analysis Area Communities and is counted twice for the purpose of this table; it is only counted once in the calculation of the total number of impacted parcels, which is equal to 361.

[2] Three of the parcels in the McLean Analysis Area Community are categorized as park/open space and are part of the George Washington Memorial Parkway.

Of the total 92.8 acres of property required under the Preferred Alternative, the Rockville Analysis Area Community would experience the greatest number and largest proportion (38 percent), by acreage, of the total property impacts, and the Potomac Analysis Area Community would experience the second greatest number and second greatest proportion (27 percent), by acreage, of the property impacts. At 10 properties and three percent of the total acreage of property impacts, the Gaithersburg Analysis Area Community would experience the smallest proportion of property impacts as it is located near the northern terminus of the Phase 1 South limits.

Property acquisitions under the Preferred Alternative would occur to properties adjacent to the existing I-495 and I-270 roadway alignments, acquiring strips of land from undeveloped areas or areas of trees and landscaping directly adjacent to I-495 or I-270. In addition, approximately 1.1 acres of right-of-way would be required for the compensatory or offsite stormwater management. (Offsite stormwater management

---

[21] Generally defined as the proposed boundary within which all construction, materials storage, grading, landscaping and related activities would occur.

00005191

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

locations are preliminary at this point in the Study and will be identified by the Developer in coordination with property owners during final design; refer to **FEIS, Chapter 3.1.6.E** for additional details on the compensatory stormwater management and potential impacts.)

Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the LOD along I-495 and I-270 and the fact that no properties would be displaced. As such, the existing sense of community cohesion of communities along the study corridors would not be impacted. The Preferred Alternative also would not eliminate access or provide new access to properties, nor would it impede access between residences, community facilities, and businesses as no properties are accessed directly from I-495 or I-270. MDOT SHA has committed to constructing a new sidewalk along the west side of Seven Locks Road under I-495, which would reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery in the historically African American community of Gibson Grove.

00005192

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## 5    ENVIRONMENTAL JUSTICE ANALYSIS

### 5.1    Environmental Justice Analysis Regulatory Context

All federal agencies must comply with Title VI of the 1964 Civil Rights Act and Executive Order (EO) 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations. Under Title VI and related statutes, each federal agency is required to ensure that no person is excluded from participation in, denied the benefit of, or subjected to discrimination under any program or activity receiving federal financial assistance on the basis of race, color, national origin,[22] age, sex, disability, or religion. EO 12898 states that "...each Federal agency shall make achieving Environmental Justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

EO 12898 directs federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law. A disproportionately high and adverse effect on minority and low-income populations is defined by the FHWA Order 6640.23A: *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2012), as an impact that:

- Would be predominately borne by a minority and/or low-income population, or
- Will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

The EO is intended to promote nondiscrimination in federal programs that affect human health and the environment, as well as provide minority and low-income communities access to public information and public participation.

The strategies developed under EO 12898 and subsequent Environmental Justice (EJ) FHWA guidance set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on the health or environment of minority and low-income populations to the greatest extent practicable and permitted by law. The guidance also addresses an important aspect of EJ: providing meaningful opportunities for public involvement by members of minority populations and low-income populations during the planning and development of programs, policies, and activities (including the identification of potential effects, alternatives, and mitigation measures, if required). The following policies and guidance documents provide assistance for addressing minority and low-income communities:

- US Department of Transportation (USDOT) Order 5610.2(c) *Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2021 revision);

---

[22] Including individuals with Limited English Proficiency.

00005193

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- FHWA Order 6640.23A, *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2012); and

- FHWA memorandum *Guidance on Environmental Justice and NEPA* (2011).

EO 12898 does not define the terms *minority* or *low-income*, but the terms have been defined in the USDOT and FHWA Orders on EJ. FHWA Order 6640.23A provides the following definitions, which have been used in this analysis:

- *Minority Individual* – A person who identifies as:

    1) Black: a person having origins in any of the black racial groups of Africa;

    2) Hispanic or Latino: a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race;

    3) Asian American: a person having origins in any of the original peoples of the Far East, Southeast Asia or the Indian subcontinent;

    4) American Indian and Alaskan Native: a person having origins in any of the original people of North America, South America (including Central America), and who maintains cultural identification through tribal affiliation or community recognition; or

    5) Native Hawaiian and Other Pacific Islander: a person having origins in any of the original peoples of Hawaii, Guam, Samoa or other Pacific Islands.

- *Low-Income Individual* – A person whose household income is at or below the US Department of Health and Human Services (HHS) poverty guidelines.

## 5.2    Environmental Justice Analysis Methodology

As stated in **Section 5.1**, the strategies developed under EO 12898, USDOT Order 5610.2(c), FHWA Order 6640.23A, and FHWA memorandum Guidance on Environmental Justice and NEPA (2011) set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on minority and low-income populations. Based on these strategies, the first four steps, below, were documented and updated in the DEIS and SDEIS EJ Analyses and have been updated and enhanced where necessary for this FEIS EJ Analysis:

1. The identification of minority race and ethnicity populations and low-income populations (EJ populations) along the 48-mile study corridor for the **DEIS (DEIS, Chapter 4.21.2A** and **4.21.2B** and **DEIS, Appendix E, Chapter 4.2.1 and 4.2.2)** and then an update on the identification of EJ populations for the Preferred Alternative, Alternative 9 - Phase 1 South limits in the **SDEIS (SDEIS, Chapter 4.21.2)**;

2. The review of demographic data to determine the existing environmental and community conditions of the EJ populations, documented in the **DEIS (DEIS, Chapter 4.21.3** and **DEIS, Appendix E, Chapter 4.3)** and enhanced in the **SDEIS (SDEIS, Chapter 4.21.2)**;

00005194

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

3. The documentation of public outreach as planned, conducted and refined throughout the study in consideration of the demographic and community data to ensure meaningful involvement in EJ populations, documented in the **DEIS (DEIS, Chapter 4.21.4** and **DEIS, Appendix E, Chapter 4.4)** and updated in the **SDEIS (SDEIS, Chapter 4.21.2)** and **FEIS (FEIS, Chapter 5.21.4)**; and

4. The identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Screened Alternatives in the **DEIS (DEIS, Chapter 4.21.5** and **DEIS, Appendix E, Chapter 4.5)**, and the identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Preferred Alternative, Alternative 9 - Phase 1 South updated in the **SDEIS (SDEIS, Chapter 4.21.3)** and **FEIS (FEIS, Chapter 5.21.6)**.

Steps #2, 3, and 4 are updated and Steps #5 through #8, below, are documented in this FEIS EJ Analysis in consideration of the Preferred Alternative, Alternative 9 - Phase 1 South:

5. The consideration of mitigation or community enhancement measures if unavoidable adverse effects are expected to occur under the Preferred Alternative (**Section 5.6**);[23]

6. A comparison of adverse effects to all EJ populations under the Preferred Alternative versus adverse effects to a non-EJ population reference community (**Section 5.7**);

7. A determination of whether disproportionately high and adverse impacts would occur to EJ populations under the Preferred Alternative (**Section 5.8**); and

8. A final conclusion of whether disproportionately high and adverse effects would occur to EJ populations, based on unmitigated adverse effects and whether public feedback has been addressed (**Section 5.8**).

### 5.2.1    Environmental Justice Analysis Area

This EJ Analysis describes the existing conditions of and potential impacts to minority race and ethnicity populations and low-income populations who live within the "EJ Analysis Area." The EJ Analysis Area is the same geographic analysis area used for the Community Effects Assessment (CEA) in **Section 3**. The EJ Analysis Area is composed of the same basic population units—Census block groups—as the CEA Analysis Area. Like the CEA Analysis Area, the EJ Analysis Area includes all 66 Census block groups that are located within 0.25-mile to either side of the Phase 1 South limits.[24] The 66 block groups can also be sorted into the same community designations as the CEA Analysis Area Communities that are defined in **Section 2.1**. Like the CEA Analysis Area, the EJ Analysis Area is located almost entirely within Montgomery County, Maryland, and partially within Fairfax County, Virginia.

For the purposes of this EJ Analysis, a block group within the EJ Analysis Area that meets the minority race and ethnicity population and/or low-income population criteria defined in **Sections 5.2.2** and **5.2.3** below is referred to as an "EJ population." (While it is understood that a population of minority race and ethnicity

---

[23] Steps #4 and 5 plus Steps #7 and 8 are combined in this FEIS EJ Analysis.

[24] The 0.25-mile buffer on either side of the study corridors was established as a resource inventory boundary that would reasonably include areas that would potentially be subject to direct impacts from the Preferred Alternative. Expanding the CEA Analysis Area/EJ Analysis Area to include all Census block groups intersecting the 0.25-mile delineation provides a conservative spatial approximation of the neighborhoods surrounding the study corridors.

00005195

 **OP·LANES**™ MARYLAND   I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

persons or a population of low-income persons does not necessarily live within delineated geographies along the study corridor, this EJ Analysis must rely on a basic unit of population to collect and analyze data— in this case, the block group.)

### 5.2.2    Identification of Minority Race and Ethnicity Populations

MDOT SHA, in coordination with FHWA, identified the methodology for the Environmental Justice Analysis for the Study. Using the methodology, the following definition applies to this Study:

- *Minority Populations* - Any readily identifiable groups of minority persons who live in geographic proximity, and if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed USDOT program, policy or activity. See USDOT Order 5610.2C and FHWA Order 6640.23A.

Per the Council on Environmental Quality (CEQ) Environmental Guidance Under NEPA (1997), a minority population is present when: (A) the minority race and ethnicity population of the affected area exceeds 50 percent or (B) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.

For the purposes of this EJ Analysis, the Census block group is used as the basic unit of population because it represents a "readily identifiable group of minority persons who live in geographic proximity" (FHWA Order 6640.23A). Additionally, this EJ Analysis uses a methodological approach based on Environmental Guidance Under NEPA (CEQ, 1997) approach (B), as approach (B) is slightly more conservative than approach (A). A block group within the EJ Analysis Area was considered an EJ population if its minority race and ethnicity population is equal to or exceeds 49 percent, which is the percent population of minority race and ethnicity individuals in Maryland. Maryland was chosen instead of Montgomery County as the appropriate unit of geographic analysis to compare the block groups within the EJ Analysis Area against because Maryland has a more conservative threshold for comparison, while Montgomery County has a relatively high level of multiracial diversity. If the block groups were compared to the County, fewer of the block groups would have a "meaningfully greater" percent population of minority race and ethnicity individuals, resulting in fewer block groups given elevated EJ consideration. As such, the percent population of minority race and ethnicity individuals of each block group was compared to that of Maryland.

### 5.2.3    Identification of Low-Income Populations

As stated previously, MDOT SHA, in coordination with FHWA, identified the methodology for the EJ Analysis for the Study. Using the methodology, the following definition applies to this Study:

- *Low-Income Population* – Any readily identifiable group of low-income persons who live in geographic proximity, and, if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed USDOT program, policy, or activity. See USDOT Order 5610.2C and FHWA Order 6640.23A.

For the purposes of this FEIS EJ Analysis, the Census block group is used as the basic unit of population because it represents a "readily identifiable group of low-income persons who live in geographic proximity" (FHWA Order 6640.23A). The ACS Five-Year Estimates (2015-2019) were also used to collect

00005196

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

the median household income and average household size data for each of the 66 block groups within the EJ Analysis Area. The average household size within the block groups was three persons. The HHS Poverty Guidelines provide a threshold median income for low-income designation by size of household. Using the HHS 2019 Poverty Guidelines income threshold for a three-person household, an EJ Analysis Area block group would have a median income of $21,330 or less to be considered a low-income population. However, no block groups within the EJ Analysis Area had a median household income at or below $21,330. Under the HHS 2019 Poverty Guidelines, no low-income populations would be in the EJ Analysis Area.

Additional guidance provided in the EJ Federal Interagency Working Group (IWG) report, *Promising Practices for EJ Methodologies in NEPA Reviews* (2016) was used to evaluate low-income populations for the EJ Analysis Area. Guidelines for identifying low-income populations explain that it may be appropriate for agencies to select a threshold for identifying low-income populations that exceed the poverty level as defined by the HHS Poverty Guidelines (IWG EJ 2016). While HHS Poverty Guidelines are calculated based on a national average, the EJ Analysis Area is in a high-income area compared to the rest of the 48 contiguous states. Because the cost of living in the EJ Analysis Area was determined to be greater than the national average and comparison with the HHS 2019 Poverty Guidelines did not yield any low-income populations, a more conservative methodology for determining low-income populations was adopted using the Department of Housing and Urban Development (HUD) 2019 Income Limits Survey. The HUD Income Limits Survey calculates the threshold for a low-income family/household designation at the Metropolitan Fair Market Rent (FMR)/Income Limits Area-level. The calculations are based on the number of persons in a family.

The HUD 2019 FMR/Income Limits, shown in **Table 5-1** provided a more appropriate comparison for determining low-income populations in the EJ Analysis Area. HUD defines low-income as a family earning 80 percent or less of an area's median family income. The EJ Analysis Area is in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area. As previously stated, the average household size within the EJ Analysis Area was three persons. Therefore, for this EJ Analysis, a block group was considered an EJ population if its median household income was at or below $69,850, the HUD 2019 Low-Income Limit for a family of three in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area.

**Table 5-1: HUD 2019 Low-Income Limit for the Washington-Arlington-Alexandria, DC-VA-MD FMR Area**

| Persons in Family/Household | Guideline |
|---|---|
| 1 | $ 54,350 |
| 2 | $ 62,100 |
| 3 | $ 69,850 |
| 4 | $ 77,600 |
| 5 | $ 83,850 |
| 6 | $ 90,050 |
| 7 | $ 96,250 |
| 8 | $ 102,450 |

*Source: Department of Housing and Urban Development, FY 2019 Income Limits Survey (https://www.huduser.gov/portal/datasets/il/il2019/2019summary.odn).*

00005197

 **OP·LANES**™  MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### 5.3    Historical Context

Current disparate economic and environmental health conditions of racially segregated communities can be traced largely to policy (or the lack thereof) enacted by federal, state, and local governments during the United States' period of suburbanization from 1940 to 1980. Suburbanization was made possible in part by construction of America's interstate highway systems that allowed families with automobiles, to live, work, and travel more conveniently and more extensively. However, the benefits and adverse impacts from construction and operation of these interstate highway systems, plus other regional and local highway networks, were not distributed equitably. Instead, the benefits and adverse impacts were purposefully concentrated among different racial populations, with majority-minority race and ethnicity communities—primarily black and African American communities— experiencing the most adverse impacts and the fewest benefits. Predominately white communities were typically intentionally avoided during highway design and construction yet experienced the most benefits from highway implementation.

Today's racially and economically segregated conditions in urban and metropolitan areas can be traced directly to decades of neighborhood destruction and residential displacements caused by highway projects plus housing policy and other racially marginalizing actions undertaken by local, state, and the federal government throughout the 20th century. Prior to passage of the National Environmental Policy Act (NEPA) in 1969, there were no regulatory requirements for a government agency to seek input from affected communities during the highway development process. Highways, such as the Southeast-Southwest Freeway (I-695) in DC and I-495 through the former Gibson Grove community in Cabin John,[25] were frequently routed through low-income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity. As shown in **Appendix F** and described in **Section 5.4.4A**, EJ mapping data provided by EPA and University of Maryland indicates that the concentration of communities with the greatest levels of EJ concern are located along the study corridor. Today's concentration of communities with the greatest level of EJ concern along the highway is directly related to the history of highway construction before national environmental policy.

Other environmental, public health, and socioeconomic conditions of the EJ Analysis Area are described in **Section 5.4**.

Grassroots organization and protest against these marginalizing practices led eventually to the adoption of civil rights and environmental legislation, including NEPA in 1969. NEPA requires consideration of a range of alternatives to a proposed action and opportunities for public engagement, including with EJ populations (defined in this regulatory context as minority race and ethnicity populations and low-income populations). The NEPA process works as intended through continual refinement of design based on public and agency input to avoid, minimize, and mitigate impacts to resources, including impacts that are disproportionately high and adverse to EJ populations.

---

[25] The historic Gibson Grove AME Zion Church was physically split from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery by construction of I-495 in Cabin John in the 1960s. Gibson Grove was a settlement founded and developed by formerly enslaved families, and the Church, Hall, and Cemetery are important features of this historic settlement. (See https://www.friendsofmoseshall.org/history.) Additional detail on the history and design avoidance of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is provided in **FEIS, Chapter 5.7**.

00005198



## 5.4    Existing Conditions of Environmental Justice Populations

The existing conditions of minority race and ethnicity populations and low-income populations are identified for each block group in the EJ Analysis Area. Per the methodology set forth in **Section 5.2**, of a total 66 block groups within the EJ Analysis Area along the study corridors within the Phase 1 South limits, 16 are considered EJ populationsEJ populations on the basis of minority race and ethnicity and/or low-income populations. The EJ populations and the Analysis Area Communities in which they are located are shown on **Figure 5-1**.

### 5.4.1    Existing Minority Race and Ethnicity Populations

Race and ethnicity data for the block groups within the EJ Analysis Area is displayed in **Table 5-2**.  As described in **Section 5.2**, a block group was identified as an EJ population if 49 percent or more of the block group population identified as a minority race and ethnicity. Of the 66 block groups within the EJ Analysis Area, 15 had minority race and ethnicity populations equal to or above 49 percent. In **Table 5-2** these block groups are highlighted in blue and identified as "yes" in the right-most column.

The EJ Analysis Area, where 42 percent of the population identifies as a minority race or ethnicity, is less diverse than both Montgomery County and the state, whose minority race or ethnicity populations are 56 percent and 49 percent, respectively. Minority race and ethnicity populations considered EJ populations were present to varying degrees in the Gaithersburg, North Bethesda, Potomac, and Rockville EJ Analysis Area Communities.

00005199

OP LANES™ MARYLAND — I-495 & I-270 Montgomery Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

Table 5-2: Race and Ethnicity Characteristics of Block Groups within the EJ Analysis Area

| EJ Analysis Area Community | Geographic Area/ Block Group | Total Population | American Indian and Alaska Native Alone | | Asian Alone | | Black or African American Alone | | Native Hawaiian and Other Pacific Islander Alone | | White Alone | | Some Other Race Alone and Two or More Races | | Hispanic or Latino, Regardless of Race | | Total Minority Population[1] | | Considered EJ Block Group Based on Minority Race and Ethnicity Population?[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | |
| | Fairfax County | 1,145,862 | 1,487 | <1% | 218,484 | 19% | 108,685 | 9% | 684 | <1% | 581,418 | 51% | 47,944 | 4% | 187,160 | 16% | 564,444 | 49% | n/a |
| | Montgomery County | 1,043,530 | 1,505 | <1% | 153,306 | 15% | 186,964 | 18% | 438 | <1% | 457,265 | 44% | 40,298 | 4% | 203,754 | 20% | 586,265 | 56% | n/a |
| | Prince George's County | 908,670 | 2,116 | <1% | 37,170 | 4% | 560,785 | 62% | 404 | <1% | 115,436 | 13% | 25,261 | 3% | 167,498 | 18% | 793,234 | 87% | n/a |
| | Maryland | 6,018,848 | 12,002 | <1% | 375,951 | 6% | 1,768,596 | 29% | 2,294 | <1% | 3,062,363 | 51% | 191,160 | 3% | 606,482 | 10% | 2,956,485 | 49% | n/a |
| | Total Block Groups within the EJ Analysis Area | 103,614 | 149 | <1% | 17,643 | 17% | 10,055 | 10% | 19 | <1% | 59,730 | 58% | 4,555 | 4% | 11,463 | 11% | 43,884 | 42% | n/a |
| **Fairfax County** | | | | | | | | | | | | | | | | | | |
| McLean | 4701.00 - 1 | 664 | 0 | <1% | 119 | 18% | 0 | <1% | 0 | <1% | 510 | 77% | 31 | 5% | 4 | 1% | 154 | 23% | no |
| | 4701.00 - 4 | 1,896 | 0 | <1% | 433 | 23% | 23 | 1% | 0 | <1% | 1,312 | 69% | 31 | 2% | 97 | 5% | 584 | 31% | no |
| | 4801.00 - 4 | 464 | 0 | <1% | 155 | 33% | 0 | <1% | 0 | <1% | 298 | 64% | 0 | <1% | 11 | 2% | 166 | 36% | no |
| **Montgomery County** | | | | | | | | | | | | | | | | | | |
| | 7012.06 - 1 | 1,481 | 0 | <1% | 254 | 17% | 12 | 1% | 0 | <1% | 1,074 | 73% | 59 | 4% | 82 | 6% | 407 | 27% | no |
| | 7012.06 - 2 | 1,920 | 0 | <1% | 218 | 11% | 0 | <1% | 0 | <1% | 1,374 | 72% | 0 | <1% | 328 | 17% | 546 | 28% | no |
| | 7060.08 - 1 | 1,849 | 0 | <1% | 393 | 21% | 27 | 1% | 0 | <1% | 1,336 | 72% | 85 | 5% | 8 | <1% | 513 | 28% | no |
| | 7060.08 - 2 | 862 | 0 | <1% | 176 | 20% | 41 | 5% | 8 | 1% | 569 | 66% | 38 | 4% | 30 | 3% | 293 | 34% | no |
| | 7060.09 - 2 | 1,725 | 0 | <1% | 267 | 15% | 45 | 3% | 0 | <1% | 1,235 | 72% | 9 | 1% | 169 | 10% | 490 | 28% | no |
| Potomac | 7060.09 - 3 | 1,456 | 0 | <1% | 125 | 9% | 20 | 1% | 0 | <1% | 1,075 | 74% | 19 | 1% | 217 | 15% | 381 | 26% | no |
| | 7060.12 - 1 | 892 | 0 | <1% | 144 | 16% | 121 | 14% | 0 | <1% | 465 | 52% | 48 | 5% | 114 | 13% | 427 | 48% | no |
| | 7060.12 - 3 | 1,335 | 0 | <1% | 292 | 22% | 235 | 18% | 0 | <1% | 424 | 32% | 68 | 5% | 316 | 24% | 911 | 68% | yes |
| | 7060.12 - 4 | 1,032 | 0 | <1% | 174 | 17% | 200 | 19% | 0 | <1% | 519 | 50% | 51 | 5% | 88 | 9% | 513 | 50% | yes |
| | 7061.13 - 1 | 1,411 | 0 | <1% | 156 | 11% | 12 | 1% | 0 | <1% | 1,024 | 73% | 37 | 3% | 182 | 13% | 387 | 27% | no |
| | 7061.13 - 2 | 1,478 | 0 | <1% | 340 | 23% | 0 | <1% | 0 | <1% | 912 | 62% | 118 | 8% | 108 | 7% | 566 | 38% | no |
| Cabin John | 7058.00 - 2 | 2,121 | 0 | <1% | 280 | 13% | 92 | 4% | 11 | 1% | 1,501 | 71% | 45 | 2% | 192 | 9% | 620 | 29% | no |
| | 7058 .00 - 3 | 1,141 | 0 | <1% | 1 | <1% | 16 | 1% | 0 | <1% | 987 | 87% | 14 | 1% | 123 | 11% | 154 | 13% | no |
| | 7012.05 - 1 | 2,425 | 0 | <1% | 52 | 2% | 189 | 8% | 0 | <1% | 1,736 | 72% | 233 | 10% | 215 | 9% | 689 | 28% | no |
| North Bethesda | 7012.05 - 2 | 3,100 | 0 | <1% | 412 | 13% | 188 | 6% | 0 | <1% | 2,166 | 70% | 235 | 8% | 99 | 3% | 934 | 30% | no |
| | 7012.05 - 3 | 762 | 0 | <1% | 143 | 19% | 33 | 4% | 0 | <1% | 455 | 60% | 0 | <1% | 131 | 17% | 307 | 40% | no |
| | 7012.05 - 4 | 815 | 0 | <1% | 41 | 5% | 144 | 18% | 0 | <1% | 547 | 67% | 35 | 4% | 48 | 6% | 268 | 33% | no |

00005200

JA1163

OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

| | Block | Total | | | | | | | | | | | | | | | | | EJ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bethesda** | 7012.13-1 | 1,239 | 0 | <1% | 194 | 16% | 329 | 27% | 0 | <1% | 689 | 56% | 0 | <1% | 27 | 2% | 550 | 44% | no |
| | 7012.13-2 | 998 | 0 | <1% | 117 | 12% | 9 | 1% | 0 | <1% | 576 | 58% | 73 | 7% | 223 | 22% | 422 | 42% | no |
| | 7012.13-3 | 2,251 | 0 | <1% | 480 | 21% | 237 | 11% | 0 | <1% | 1,249 | 55% | 86 | 4% | 199 | 9% | 1,002 | 45% | no |
| | 7012.15-1 | 961 | 0 | <1% | 44 | 5% | 89 | 9% | 0 | <1% | 716 | 75% | 24 | 2% | 88 | 9% | 245 | 25% | no |
| | 7012.15-2 | 964 | 25 | 3% | 107 | 11% | 16 | 2% | 0 | <1% | 697 | 72% | 21 | 2% | 98 | 10% | 267 | 28% | no |
| | 7012.15-3 | 2,678 | 0 | <1% | 543 | 20% | 215 | 8% | 0 | <1% | 1,217 | 45% | 233 | 9% | 470 | 18% | 1,461 | 55% | yes |
| | 7012.15-4 | 1,100 | 20 | 2% | 128 | 12% | 148 | 13% | 0 | <1% | 564 | 51% | 53 | 5% | 187 | 17% | 536 | 49% | yes |
| | 7044.01-1 | 1,821 | 0 | <1% | 160 | 9% | 81 | 4% | 0 | <1% | 1,300 | 71% | 109 | 6% | 171 | 9% | 521 | 29% | no |
| | 7044.01-2 | 1,468 | 5 | <1% | 211 | 14% | 63 | 4% | 0 | <1% | 1,004 | 68% | 47 | 3% | 138 | 9% | 464 | 32% | no |
| | 7045.01-1 | 546 | 0 | <1% | 44 | 8% | 29 | 5% | 0 | <1% | 442 | 81% | 8 | 1% | 23 | 4% | 104 | 19% | no |
| | 7045.01-2 | 982 | 0 | <1% | 165 | 17% | 82 | 8% | 0 | <1% | 500 | 51% | 118 | 12% | 117 | 12% | 482 | 49% | yes |
| | 7045.01-3 | 929 | 0 | <1% | 186 | 20% | 39 | 4% | 0 | <1% | 498 | 54% | 57 | 6% | 149 | 16% | 431 | 46% | no |
| | 7045.01-4 | 1,018 | 0 | <1% | 206 | 20% | 223 | 22% | 0 | <1% | 409 | 40% | 34 | 3% | 146 | 14% | 609 | 60% | yes |
| | 7044.03-1 | 1,559 | 0 | <1% | 175 | 11% | 24 | 2% | 0 | <1% | 1,139 | 73% | 55 | 4% | 166 | 11% | 420 | 27% | no |
| | 7044.04-4 | 1,433 | 0 | <1% | 136 | 9% | 165 | 12% | 0 | <1% | 1,006 | 70% | 15 | 1% | 111 | 8% | 427 | 30% | no |
| | 7045.02-1 | 746 | 0 | <1% | 52 | 7% | 10 | 1% | 0 | <1% | 659 | 88% | 11 | 1% | 24 | 3% | 87 | 12% | no |
| | 7045.02-2 | 1,800 | 0 | <1% | 242 | 13% | 45 | 3% | 0 | <1% | 1,331 | 74% | 66 | 4% | 151 | 8% | 469 | 26% | no |
| | 7045.03-1 | 1,572 | 0 | <1% | 154 | 10% | 42 | 3% | 0 | <1% | 1,250 | 80% | 15 | 1% | 143 | 10% | 322 | 20% | no |
| | 7059.01-3 | 1,461 | 0 | <1% | 159 | 11% | 45 | 3% | 0 | <1% | 1,104 | 76% | 10 | 1% | 143 | 10% | 357 | 24% | no |
| | 7059.02-3 | 1,277 | 3 | <1% | 237 | 19% | 42 | 3% | 0 | <1% | 885 | 69% | 34 | 3% | 76 | 6% | 392 | 31% | no |
| **Gaithersburg** | 7007.17-1 | 2,419 | 0 | <1% | 218 | 9% | 1,084 | 45% | 0 | <1% | 350 | 14% | 149 | 6% | 618 | 26% | 2,069 | 86% | yes |
| | 7007.17-3 | 2,585 | 0 | <1% | 171 | 6% | 788 | 30% | 0 | <1% | 310 | 12% | 70 | 3% | 1,252 | 48% | 2,275 | 88% | yes |
| | 7007.17-4 | 869 | 0 | <1% | 171 | 20% | 132 | 15% | 0 | <1% | 252 | 29% | 32 | 4% | 282 | 32% | 617 | 71% | yes |
| | 7008.16-2 | 2,246 | 49 | 2% | 1,263 | 56% | 817 | 33% | 0 | <1% | 192 | 9% | 43 | 2% | 459 | 20% | 2,054 | 91% | yes |
| | 7008.17-1 | 2,440 | 0 | <1% | 300 | 12% | 249 | 16% | 0 | <1% | 815 | 33% | 126 | 5% | 416 | 17% | 1,625 | 67% | yes |
| | 7008.17-2 | 1,521 | 0 | <1% | 367 | 24% | 198 | 11% | 0 | <1% | 551 | 36% | 266 | 8% | 228 | 15% | 970 | 64% | yes |
| | 7008.17-3 | 1,854 | 0 | <1% | 216 | 12% | 198 | 11% | 0 | <1% | 977 | 53% | 192 | 14% | 197 | 11% | 877 | 47% | no |
| | 7008.18-1 | 4,433 | 0 | <1% | 686 | 17% | 1,145 | 26% | 0 | <1% | 2,049 | 46% | 99 | 4% | 275 | 6% | 2,384 | 54% | yes |
| | 7008.29-1 | 1,500 | 0 | <1% | 686 | 46% | 58 | 4% | 0 | <1% | 576 | 38% | 225 | 7% | 81 | 5% | 924 | 62% | yes |
| **Rockville** | 7007.18-1 | 4,606 | 32 | 1% | 935 | 20% | 656 | 14% | 0 | <1% | 2,460 | 53% | 29 | 5% | 298 | 6% | 2,146 | 47% | no |
| | 7007.18-2 | 1,564 | 0 | <1% | 278 | 18% | 395 | 25% | 0 | <1% | 845 | 54% | 29 | 2% | 17 | 1% | 719 | 46% | no |
| | 7010.01-2 | 2,416 | 0 | <1% | 362 | 15% | 118 | 5% | 0 | <1% | 1,546 | 64% | 87 | 4% | 303 | 13% | 870 | 36% | no |
| | 7010.01-3 | 569 | 0 | <1% | 58 | 10% | 22 | 4% | 0 | <1% | 489 | 86% | 0 | <1% | 0 | <1% | 80 | 14% | no |
| | 7010.02-1 | 986 | 0 | <1% | 174 | 18% | 32 | 3% | 0 | <1% | 699 | 71% | 29 | <1% | 81 | 8% | 287 | 29% | no |
| | 7010.02-2 | 1,941 | 0 | <1% | 326 | 17% | 0 | <1% | 0 | <1% | 1,384 | 71% | 19 | 1% | 202 | 10% | 557 | 29% | no |
| | 7010.02-3 | 1,018 | 0 | <1% | 174 | 17% | 54 | 5% | 0 | <1% | 728 | 72% | 77 | 2% | 43 | 4% | 290 | 28% | no |
| | 7010.04-2 | 1,622 | 0 | <1% | 109 | 7% | 79 | 5% | 0 | <1% | 1,206 | 74% | 19 | 1% | 151 | 9% | 416 | 26% | no |
| | 7010.04-4 | 1,086 | 0 | <1% | 148 | 14% | 32 | 3% | 0 | <1% | 582 | 54% | 206 | 19% | 118 | 11% | 504 | 46% | no |
| | 7010.05-1 | 2,507 | 0 | <1% | 635 | 25% | 191 | 8% | 0 | <1% | 1,404 | 56% | 30 | 1% | 247 | 10% | 1,103 | 44% | no |

00005201

JA1164

00005202

**OP LANES MARYLAND** | I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7010.05 - 2 | 832 | 0 | <1% | 115 | 14% | 43 | 5% | 0 | <1% | 471 | 57% | 129 | 16% | 74 | 9% | 361 | 43% | no |
| 7010.06 - 1 | 1,626 | 0 | <1% | 604 | 37% | 71 | 4% | 0 | <1% | 868 | 53% | 16 | 1% | 67 | 4% | 758 | 47% | no |
| 7010.06 - 2 | 2,266 | 0 | <1% | 482 | 21% | 13 | 1% | 0 | <1% | 1,438 | 63% | 79 | 3% | 254 | 11% | 828 | 37% | no |
| 7010.07 - 1 | 2,564 | 0 | <1% | 842 | 33% | 256 | 10% | 0 | <1% | 1,179 | 46% | 40 | 2% | 247 | 10% | 1,385 | 54% | yes |
| 7010.07 - 2 | 763 | 15 | 2% | 125 | 16% | 113 | 15% | 0 | <1% | 447 | 59% | 46 | 6% | 17 | 2% | 316 | 41% | no |
| 7012.10 - 1 | 986 | 0 | <1% | 127 | 13% | 52 | 5% | 0 | <1% | 681 | 69% | 43 | 4% | 83 | 8% | 305 | 31% | no |
| 7012.11 - 3 | 763 | 0 | <1% | 76 | 10% | 0 | <1% | 0 | <1% | 477 | 63% | 179 | 23% | 31 | 4% | 286 | 37% | no |

*Note: Rows highlighted in blue and featuring a "yes" in the right-most column indicate that the block group is considered an Environmental Justice population.*

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

### 5.4.2    Existing Low-Income Populations

Median household income data for the EJ Analysis Area is provided in **Table 5-3**.  As described in **Section 5.2.3,** above, a block group was identified as low-income population if its median household income was at or below $69,850. Block groups within the EJ Analysis Area that qualified as low-income populations are highlighted in green and noted with a "yes" in the right-most column of the table.

**Table 5-3: EJ Analysis Area Household Income Characteristics**

| EJ Analysis Area Community | Geography/ Block Group | Median Household Income | Considered EJ Block Group Based on Low-Income Population? |
|---|---|---|---|
| | Maryland | $84,805 | n/a |
| | Virginia | $74,222 | n/a |
| | Montgomery County | $108,820 | n/a |
| | Prince George's County | $84,920 | n/a |
| | Fairfax County | $124,831 | n/a |
| McLean | 4701.00 - 1 | $228,594 | no |
| | 4701.00 - 2 | $250,000+ | no |
| | 4801.00 - 4 | $250,000+ | no |
| Potomac | 7012.06 - 1 | $133,750 | no |
| | 7012.06 - 2 | $208,155 | no |
| | 7060.08 - 1 | $250,000+ | no |
| | 7060.08 - 2 | $250,000+ | no |
| | 7060.09 - 2 | $250,000+ | no |
| | 7060.09 - 3 | $196,250 | no |
| | 7060.12 - 1 | $73,295 | no |
| | 7060.12 - 2 | $74,286 | no |
| | 7060.12 - 3 | $51,641 | yes |
| | 7060.13 - 1 | $206,250 | no |
| | 7060.13 - 2 | $212,557 | no |
| Cabin John | 7058.00 - 2 | $182,279 | no |
| | 7058.00 - 3 | $231,250 | no |
| North Bethesda | 7012.05 - 1 | $218,438 | no |
| | 7012.05 - 2 | $232,371 | no |
| | 7012.05 - 3 | $113,750 | no |
| | 7012.05 - 4 | $250,000+ | no |
| | 7012.13 - 1 | $223,125 | no |
| | 7012.13 - 2 | $113,398 | no |
| | 7012.13 - 3 | $102,738 | no |
| | 7012.15 - 1 | $85,144 | no |
| | 7012.15 - 2 | $59,111 | yes |
| | 7012.15 - 3 | $122,763 | no |
| | 7012.15 - 4 | $75,781 | no |
| | 7044.01 - 1 | $180,556 | no |

00005203

JA1166

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| EJ Analysis Area Community | Geography/ Block Group | Median Household Income | Considered EJ Block Group Based on Low-Income Population? |
|---|---|---|---|
| | 7044.01 - 2 | $215,192 | no |
| | 7045.01 - 1 | $121,731 | no |
| | 7045.01 - 2 | $200,625 | no |
| | 7045.01 - 3 | $152,228 | no |
| | 7045.01 - 4 | $219,545 | no |
| Bethesda | 7044.03 - 1 | $85,994 | no |
| | 7044.04 - 4 | $141,250 | no |
| | 7045.02 - 1 | $250,000+ | no |
| | 7045.02 - 2 | $198,250 | no |
| | 7045.03 - 1 | $200,428 | no |
| | 7059.01 - 3 | $240,313 | no |
| | 7059.02 - 3 | $250,000+ | no |
| Gaithersburg | 7007.17 - 1 | $64,596 | yes |
| | 7007.17 - 3 | $73,920 | no |
| | 7007.17 - 4 | $64,635 | yes |
| | 7008.16 - 1 | $93,721 | no |
| | 7008.16 - 2 | $87,043 | no |
| | 7008.17 - 1 | $81,328 | no |
| | 7008.17 - 3 | $90,889 | no |
| | 7008.17 - 2 | $103,531 | no |
| | 7008.29 - 1 | $180,104 | no |
| Rockville | 7007.18 - 1 | $107,196 | no |
| | 7007.18 - 2 | $82,083 | no |
| | 7010.01 - 2 | $107,759 | no |
| | 7010.01 - 3 | $246,750 | no |
| | 7010.02 - 1 | $156,111 | no |
| | 7010.02 - 2 | $208,295 | no |
| | 7010.02 - 3 | $161,250 | no |
| | 7010.04 - 2 | $147,434 | no |
| | 7010.04 - 4 | $119,750 | no |
| | 7010.05 - 1 | $121,625 | no |
| | 7010.05 - 2 | $161,563 | no |
| | 7010.06 - 1 | $178,438 | no |
| | 7010.06 - 2 | $177,917 | no |
| | 7010.07 - 1 | $122,443 | no |
| | 7010.07 - 2 | $84,917 | no |
| | 7012.10 - 1 | $217,625 | no |
| | 7012.11 - 3 | $182,778 | no |

*Note: Rows highlighted in green and featuring a "yes" in the right-most column indicate that the block group is considered an Environmental Justice population.*

00005204

JA1167



Of the 66 block groups within the EJ Analysis Area, four had a median household income below $69,850. Low-income populations considered EJ populations were present to varying degrees in the Potomac, North Bethesda, and Gaithersburg EJ Analysis Area Communities.

### 5.4.3    Summary: Total Environmental Justice Populations

In summary, 16 (or 24 percent) of the 66 block groups within the EJ Analysis Area  meet the minority race and ethnicity population and/or low-income household population criteria to be considered EJ populations. The 16 EJ populations are shown in **Table 5-4**.

**Table 5-4: Total Environmental Justice Populations**

| EJ Analysis Area Community | EJ Population | Meets EJ Population Criteria: | |
|---|---|---|---|
| | | Minority Race/Ethnicity | Low-Income |
| Gaithersburg | 7007.17 - 1 | ✓ | ✓ |
| | 7007.17 - 3 | ✓ | |
| | 7007.17 - 4 | ✓ | ✓ |
| | 7008.16 - 1 | ✓ | |
| | 7008.16 - 2 | ✓ | |
| | 7008.17 - 1 | ✓ | |
| | 7008.17 - 3 | ✓ | |
| | 7008.29 - 1 | ✓ | |
| Rockville | 7010.07 - 1 | ✓ | |
| North Bethesda | 7012.15 - 2 | | ✓ |
| | 7012.15 - 3 | ✓ | |
| | 7012.15 - 4 | ✓ | |
| | 7045.01 - 2 | ✓ | |
| | 7045.01 - 4 | ✓ | |
| Potomac | 7060.12 - 2 | ✓ | |
| | 7060.12 - 3 | ✓ | ✓ |

Of the 16 block groups identified as EJ populations approximate to the Preferred Alternative, 12 met the criteria[26] based on only minority race and ethnicity population criteria. These 12 block groups were located in the Gaithersburg, Rockville, Potomac, and North Bethesda EJ Analysis Area Communities displayed in **Figure 5-1**. Of the 16 block groups identified as EJ populations, one block group, in the North Bethesda EJ Analysis Area Community, met the criteria based on only low-income population criteria.[27]

Three of the 16 block groups identified as EJ populations met the criteria based on both minority race and ethnicity population criteria as well as low-income population criteria. These three block groups were identified in the Gaithersburg and Potomac EJ Analysis Area Communities.

---

[26] A block group was identified as an EJ population based on minority race and ethnicity population criteria if the block group's percent of minority race and ethnicity persons was equal to or exceeded that of Maryland's state-wide percent (49 percent).

[27] A block group was identified as an EJ population based on low-income population criteria if its median household income was at or below $69,850, the HUD 2019 Low-Income Limit for a family of three in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area.

00005205

**Figure 5-1: Environmental Justice Populations**



00005206

JA1169

 **OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

#### 5.4.4 Supplemental Community Data

Additional data reviewed to supplement the formal identification of EJ populations via the EJ Analysis methodology is summarized below, including: online EJ mapping tools, households' English-speaking status, the locations of low-income subsidized housing, the distribution of Food Stamps/Supplemental Nutrition Assistance Program (SNAP) benefits, the proportion of students receiving free and reduced-price lunch programs, and Equity Emphasis Areas.[28]

#### A. Online Environmental Justice Mapping Tools

##### a. EPA EJSCREEN (2.0)

The EPA hosts an online EJ screening and mapping tool[29] that combines environmental and demographic data for various geographies and presents them in maps and reports. The EPA uses publicly-available data and combines environmental and demographic characteristics (indicators) to produce an EJ Index for a specific geography. To remain consistent with the data collection used in this EJ Analysis, the EPA EJSCREEN geography used here is the Census block group.

For a selected block group, an EJSCREEN Demographic Index[30] is formulaically applied to an Environmental Indicator. The resulting score is the EJ Index[31] for the selected block group for the corresponding Environmental Indicator. An EJ Index is a percentile comparing the environmental and demographic characteristics of a selected block group[32] to those of all block groups within the State of Maryland. For instance, if a block group has an EJ Index score of 86 for the Hazardous Waste Proximity Indicator, it means that 14 percent of block groups in Maryland have higher values. The higher the EJ Index, the greater the potential for EJ concern.

EPA EJSCREEN generates EJ Indexes for the 12 Environmental Indicators listed below. Definitions of the EPA EJSCREEN Demographic Indexes and Environmental Indicators can be found in **Appendix F**.

- Particulate Matter $_{2.5}$
- Ozone
- Diesel Particulate Matter
- Air Toxics Cancer Risk

---

28 The National Capital Region Transportation Planning Board (TPB) Methodology for Equity Emphasis Areas references tract-level Census data to identify communities that have significant concentrations of low-income and/ or minority populations. Data from the American Community Survey for each of the following four population groups is used: Low-Income, African American, Asian, and Hispanic or Latino.

29 See https://www.epa.gov/ejscreen.

30 The demographic index is the combined average of percent minority race/ethnicity and percent low-income households.

31 Per EPA, an EJ Index ultimately measures disparity. Within EPA EJSCREEN, disparity is the difference between the Environmental Indicator's average value among minority race and ethnicity persons and low-income households in the block group versus the average values in the state. A higher EJ Index identifies a block group as contributing more toward the state's disparity in the respective Environmental Indicator category.

32 EJ Analysis Area block groups are all block groups that are located within one-quarter mile to either side of the Preferred Alternative LOD. There are a total of 66 EJ Analysis Area block groups. Additionally, EJ Analysis Area block groups are also grouped into EJ Analysis Area Communities for ease of reader understanding: the block groups are matched with the municipality or Census-Designated Place in which they are primarily located to form the EJ Analysis Area Community. Overall, the 66 EJ Analysis Area block groups can be sorted into seven EJ Analysis Area Communities. Refer to **Section 5.2.1** for additional detail and for how the EJ Analysis Area relates to the CEA Analysis Area.

00005207

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

- Air Toxics Respiratory Hazard Index
- Traffic Proximity
- Lead Paint
- Superfund Proximity
- Risk Management Plan Facility Proximity
- Hazardous Waste Proximity
- Underground Storage Tanks and Leaking Underground Storage Tanks
- Wastewater Discharge

EPA EJSCREEN EJ Indexes were generated per Environmental Indicator for each of the 66 block groups within the EJ Analysis Area and are listed in **Appendix F**. The EJ Indexes for each of the 66 block groups are also presented via a heat map for each Environmental Indicator in **Appendix F**. Additionally, a comparison and summary of EPA EJSCREEN EJ Indexes for the 16 block groups specifically identified as EJ populations EJ populationsper the Study methodology described in **Section 5.2** is provided in **Appendix F**.

Results from the review of EPA EJSCREEN data show that the EJ Indexes for seven of the Study's 16 EJ populations—all located in the Gaithersburg EJ Analysis Area Community— are at or above the 50th percentile in the state for all 12 Environmental Indicators. Another two of the Study's 16 EJ populations— both located in the Potomac EJ Analysis Area Community— are at or above the 50th percentile in the state for 11 of the 12 Environmental Indicators. For all of the EPA EJ Indexes except the Wastewater Discharge and Hazardous Materials Proximity Indicators, there are at least one non-EJ population that falls at or above the 50th percentile.

### b.  Maryland EJSCREEN

Influenced by the EPA EJSCREEN mapping tool, Maryland EJSCREEN, developed by the Community Engagement, Environmental Justice, and Health (CEEJH) Laboratory at the University of Maryland (UMD) School of Public Health, also assesses and maps EJ risks for Census tracts in Maryland.[33] Maryland EJSCREEN data is only available at the Census tract geographical level. As such, data was collected for the Census tracts in which the EJ populations are located. Note that a tract encompasses a larger population than a block group, which is the basic EJ population unit for the purposes of this Study.

For a selected tract, a value representing its Population Characteristics (which is based on an average value of the tract's sensitive populations and socioeconomic factors) is formulaically applied to a Pollution Burden Indicator (which is based on an average value of the tract's exposures and environmental effects). The resulting values for each Pollution Burden Indicator are combined into a single overall MD EJSCREEN EJ Score[34] for the selected tract. The EJ Score is a percentile of a selected tract to that of all tracts within the State of Maryland. For instance, a tract with an EJ Score of 90 is in the 90th percentile, meaning that only 10 percent of tracts in Maryland have higher EJ Scores. The higher the EJ Score, the greater the potential for EJ concern.

---

33 See https://p1.cgis.umd.edu/ejscreen/.
34 See https://p1.cgis.umd.edu/mdejscreen/help.html for definition details and explanations of methodology.

00005208

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Definitions of the MD EJSCREEN Population Characteristics and Pollution Burden Indicators can be found in **Appendix F**.

MD EJSCREEN Scores were generated for each of the 32 tracts are listed in **Appendix F**. The EJ Score for each of the tracts is also presented via a heat map in **Figure 5-2**. Additionally, a comparison and summary of MD EJSCREEN EJ Scores for the eight tracts containing the block groups specifically identified as EJ populations EJ populations per the Study's methodology described in **Section 5.2** is provided in **Appendix F**.

Results from the review of MD EJSCREEN data show that all eight of the Study's tracts containing EJ populations fall at or above the 50th percentile in the state for Exposure. The overall EJ Scores for five of the Study's eight tracts containing EJ populations fall at or above the 50th percentile in the state, while four tracts containing EJ populations fall at or above the 50th percentile for Sensitive Populations. Lastly, three of the Study's eight tracts containing EJ populations fall at or above the 50th percentile for both the Environmental Effects and Socioeconomic Factors. When looking at all 32 of the Analysis Area tracts, Gaithersburg, Rockville, North Bethesda, Bethesda, and Potomac all have some of the highest scores for various indicators. All of the indicators, except for Socioeconomic Factors, have tracts without EJ populations that fall at or above the 50th percentile.

### c. Summary of EJSCREEN Mapping Tools

The review of the EPA EJSCREEN and MD EJSCREEN data and mapping tools confirm that the methodology and identification of EJ populations completed to date for the Study is largely in line with similar assessments completed by outside expert institutions. The EJSCREEN tools also provide an additional layer of nuance by selecting specific, measurable, and common issues faced by EJ populations along the study corridors. Mapping is an easily digestible visual of where Analysis Area block groups and communities with higher concentrations of EJ populations are located.

The results of this review, in combination with the Study's formal EJ Analysis, will help inform and guide MDOT SHA and the Developer where EJ initiatives and outreach should be focused both prior to issuance of the ROD and implemented during final design and construction. Information on engagement outreach, and community enhancements to EJ populations is provided in **Section 5.5**.

00005209

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report



Figure 5-2: Maryland EJSCREEN EJScore for Census Tracts in the Analysis Area

00005210

JA1173

## B. Limited English-Speaking Households

Executive Order 13166 *Improving Access to Services for Persons with Limited English Proficiency* (2000) requires Federal agencies to examine the services they provide, identify any need for services to those with limited English proficiency (LEP), and develop and implement a system to provide those services so LEP persons can have meaningful access to them. A person who does not speak English as their primary language and who has a limited ability to read, speak, write or understand English may be LEP. In accordance with MDOT SHA's *Title VI Program Implementation Plan* (2015), "MDOT SHA will provide translation services to individuals that have limited ability to read, write, speak or understand English. SHA will seek to communicate with LEP populations and provide LEP individuals meaningful access to SHA programs and activities."[35] Interpretation services, particularly Spanish and American Sign Language (ASL), have been available both proactively and by request at each Public Workshop, Public Hearing, and applicable outreach event held for the study.

ACS Five-Year Estimates (2015-2019) data on limited English-Speaking households was evaluated to identify potential LEP populations within the EJ Analysis Area where specific LEP supporting outreach could be targeted. The ACS allows respondents to identify one's household as English-speaking only, Spanish-speaking, other Indo-European language-speaking, Asian and Pacific Island language-speaking, or other language-speaking. Respondents who identify as part of a non- English-speaking only household further classify as either a "limited English-speaking household" or, "not a limited English-speaking household."

The average proportion of LEP households within EJ Analysis Area was 5.5 percent. In comparison, the proportion of LEP households was lower in Montgomery and Fairfax Counties at 4.4 percent, and in Maryland at 1.8 percent. Of the 66 block groups within the EJ Analysis Area, 26 had an above-average percent of LEP households. Ten of the above-average block groups are block groups already identified as EJ populations; the remaining 16 above-average block groups are not considered EJ populations. The block groups in **Table 5-5** have an above-average (5.5 percent and above) percent of LEP households.

**Table 5-5: Block Groups within the EJ Analysis Area with Above-Average LEP Households**

| EJ Analysis Area Community | Block Group | Percent LEP Households (Above-Average) | EJ Population? |
|---|---|---|---|
| Gaithersburg | 7007.17 - 1 | 9.4% | yes |
| | 7007.17 - 3 | 24.0% | yes |
| | 7007.17 - 4 | 12.4% | yes |
| | 7008.16 - 1 | 7.0% | yes |
| | 7008.16 - 2 | 9.6% | yes |
| | 7008.17 - 2 | 12.8% | no |
| | 7008.17 - 3 | 7.1% | yes |
| Rockville | 7007.18 - 1 | 6.1% | no |
| | 7007.18 - 2 | 6.1% | no |
| | 7010.01 - 3 | 12.8% | no |
| | 7010.02 - 3 | 5.5% | no |

---

[35] MDOT SHA Title VI Program Implementation Plan accessed at https://www.roads.maryland.gov/OEO/TitleVI-Program-Implementation-Plan.pdf.

00005211

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

|  | 7010.04 - 2 | 7.5% | no |
|---|---|---|---|
|  | 7010.06 - 1 | 17.8% | no |
|  | 7010.06 - 2 | 7.2% | no |
|  | 7010.07 - 1 | 7.4% | yes |
|  | 7012.11 - 3 | 33.3% | no |
| North Bethesda | 7012.15 - 3 | 6.3% | yes |
|  | 7045.01 - 1 | 15.2% | no |
|  | 7045.01 - 3 | 15.2% | no |
| Bethesda | 7044.03 - 1 | 5.8% | no |
|  | 7044.04 - 4 | 6.0% | no |
| Potomac | 7012.06 - 2 | 7.2% | no |
|  | 7060.08 - 2 | 5.5% | no |
|  | 7060.12 - 1 | 12.1% | no |
|  | 7060.12 - 2 | 10.6% | yes |
|  | 7060.12 - 3 | 32.4% | yes |

## C.    Free and Reduced-Price Lunch Programs

The Virginia Department of Education (VDOE 2019-2020) and Maryland State Department of Education (MSDE 2019-2020) provide annual data on public school student enrollment in the free and reduced-price lunch program. Overall, 33.7 (33.7) percent of students enrolled in Montgomery County Public Schools receive Free and Reduced-Price (F&R) program benefits. Within the EJ Analysis Area, an average of 20.4 percent of students receive F&R program benefits. The six schools in **Table 5-6** have an above-average population of students who receive F&R program benefits.

**Table 5-6: EJ Analysis Area Schools with Above-Average Free and Reduced Lunch Program Participation**

| EJ Analysis Area Community | School | Percent F&R Program Participation (Above-Average) | Block Group | EJ Population? |
|---|---|---|---|---|
| Gaithersburg | Summit Hall Elementary School | 79.6% | 7007.17 - 3 | yes |
|  | Rosemont Elementary School | 57.4% | 7007.17 - 4 | yes |
|  | Gaithersburg High School | 42.1% | 7007.17 - 1 | yes |
|  | Fields Road Elementary School | 37.5% | 7008.16 - 2 | yes |
| Rockville | Beall Elementary School | 29.9% | 7010.05 - 1 | no |
|  | Julius West Middle School | 27.8% | 7010.05 – 1 | no |

*Source: Maryland State Department of Education (2019-2020); Virginia Department of Education (2019-2020)*

Four of the six of the schools with an above-average percentage of F&R program participation are in block groups already identified as EJ populations, with the exception of Beall Elementary School (located in block group 7010.05 - 1) and Julius West Middle School (located in block group 7010.05 – 1). No Fairfax County public schools in the EJ Analysis Area have above-average percentage of F&R program participation.

00005212



## D.    Places of Worship

Additionally, to support and facilitate outreach efforts, places of worship located within EJ Analysis Area Communities that contain minority or low-income populations were identified.  These include:

- Beth Sholom Congregation and Talmud Torah Synagogue
- Bethesda United Church of Christ
- Cabin John United Methodist Church
- Centro Cristiano Peniel
- Chinese Bible Church of Maryland
- Church of the Ascension
- Clinton AME Zion Church
- Concord Church
- Congressional Heights Baptist Church
- Cross Community
- Emmanuel Lutheran Church
- Epworth United Methodist Church
- Ezra Israel Congregation
- First Assembly of God Church
- First Baptist Church
- First Baptist Church of Rockville
- First Christ Church of Scientist
- Friends Meeting Church
- Gaithersburg Presbyterian Church
- Geneva United Presbyterian Church
- Good Shepherd Lutheran Church
- Greek Orthodox Church of Saint George
- Hermon Church
- Iglesia de Dios
- Iglesia Hispana Centro Cristiano de Rockville
- Immanuel Presbyterian Church
- Interfaith Works Community Ministry of Montgomery County
- Islamic Center of Maryland

- Islamic Community Center of Potomac
- Islamic Education Center
- Jerusalem - Mount Pleasant United Methodist Church
- Kingdom Hall of Jehovah's Witnesses
- Korean Presbyterian Church of Rockville
- Latvian Lutheran Church
- Living Faith Lutheran Church
- Magen David Sephardic Congregational Synagogue
- McLean Bible Church
- Mount Calvary Baptist Church
- Mount Zion Church (historical)
- National Korean United Methodist Church
- North Bethesda United Methodist Church
- Our Lady of China Pastoral Center
- Rockville Christian Church
- Rockville Church of Christ
- Rockville Church of God
- Rockville Presbyterian Church
- Rockville Seventh Day Adventist Church
- Saint Bartholemew Church
- Saint George Coptic Orthodox Church
- Saint James Episcopal Church
- Saint Jane DeChantel Church
- Saint Mark Orthodox Church
- Saint Mark United Presbyterian Church
- Saint Raphael Catholic Church
- Trinity Lutheran Church
- Ursuline Academy Convent
- Wildwood Baptist Church

## E.    Affordable Housing Complexes

The HUD Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, and Fairfax County Redevelopment and Housing Authority were consulted to locate affordable housing complexes with subsidized units within the EJ Analysis Area.  Affordable housing complexes are identified in their respective Community Profile in **Section 4** and **Appendix D** and in **Table 5-7**.  In the EJ Analysis Area, a total of 21 housing complexes rent units at affordable, below-market rates for qualifying households. Twelve of the 21 affordable housing complexes are located in EJ populations.

00005213

**OP·LANES**™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 5-7: Affordable Housing Complexes in the EJ Analysis Area

| EJ Analysis Area Community | Affordable Housing Complex | Block Group | Located in EJ Population? |
|---|---|---|---|
| Gaithersburg | 17 Barkley Apartments | 7007.17 - 1 | yes |
| | Amber Commons Apartments | 7007.17 - 1 | yes |
| | Montgomery Club VI | 7007.17 - 3 | yes |
| | Rosedale Apartments | 7007.17 - 4 | yes |
| | Montgomery Housing Inc | 7008.16 - 1 | yes |
| | Brighton Village Apartments | 7008.16 - 1 | yes |
| | Camden Washingtonian | 7008.16 - 2 | yes |
| | The Villages of Gaithersburg | 7008.16 - 2 | yes |
| | The Crossing at Washingtonian Center | 7008.17 - 2 | no |
| | Cadence at Crown | 7008.17 - 3 | yes |
| | The Flats at Shady Grove | 7012.11 - 3 | no |
| Rockville | Huntington at King Farm | 7007.18 - 1 | no |
| | Gables Upper Rock | 7007.18 - 2 | no |
| | Thomas Street Housing | 7010.05 - 1 | no |
| | Post at Falls Grove | 7010.07 - 1 | yes |
| | Camden at Falls Grove | 7010.07 - 2 | no |
| North Bethesda | Timberlawn Crescent | 7012.15 - 3 | yes |
| | St. Luke's Homes, Inc. | 7044.01 - 1 | no |
| Potomac | Chelsea Towers | 7060.12 - 1 | no |
| | Magruder's Discovery | 7060.12 - 1 | no |
| | Lakeview House Apartments | 7060.12 - 3 | yes |

## F.    Food Stamps/SNAP Benefits

American Community Survey Five-Year Estimates (2015-2019) were used to collect data on households utilizing Food Stamps/SNAP benefits. Thirty-one of the 66 block groups within the EJ Analysis Area contain households receiving Food Stamps/SNAP benefits; the remaining 35 block groups do not contain populations receiving Food Stamps/SNAP benefits. The average percent of households receiving Food Stamps/SNAP benefits for the 31 block groups is 4.8 percent. Of these 31 block groups, 11 have a proportion of households that receive Food Stamps/SNAP benefits at or above the five percent EJ Analysis Area average; these block groups are shown in **Table 5-8**.

Table 5-8: EJ Analysis Area Populations with Above-Average Households Utilizing Food Stamps/SNAP

| EJ Analysis Area Community | Block Group | Percent Households Utilizing Food Stamps/SNAP (Above-Average) | EJ Population? |
|---|---|---|---|
| Potomac | 7060.12 - 1 | 12.9% | no |
| | 7060.12 - 3 | 19.4% | yes |
| North Bethesda | 7045.01 - 4 | 5.7% | yes |
| Bethesda | 7044.04 - 4 | 7.7% | no |
| Gaithersburg | 7007.17 - 1 | 7.6% | yes |
| | 7007.17 - 3 | 5.9% | yes |

00005214

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

|  | 7007.17 - 4 | 11.0% | yes |
|---|---|---|---|
| **Rockville** | 7010.01 - 2 | 5.7% | no |
|  | 7010.01 - 3 | 5.3% | no |
|  | 7010.02 - 3 | 10.2% | no |
| **McLean** | 4801.00 - 4 | 6.5% | no |

### G.    Equity Emphasis Areas

The National Capital Region Transportation Planning Board (TPB) has designated Census tracts with higher-than-average concentrations of minority, low-income populations, or both, as Equity Emphasis Areas (EEA). EEAs are used in regional transportation planning to identify areas to target transportation improvements.

The EEA were reviewed to determine any overlap with block groups identified in this Study methodology as EJ populations.[36] Of 66 total block groups within the EJ Analysis Area, 15 overlap with Equity Emphasis Areas, as shown in **Table 5-9** and **Figure 5-3**.

Table 5-9: Block Groups within EJ Analysis Area that Overlap with Equity Emphasis Areas

| EJ Analysis Area Community | Block Group | EJ Population? |
|---|---|---|
| **Gaithersburg** | 7007.17 - 1 | yes |
|  | 7007.17 - 3 | yes |
|  | 7007.17 - 4 | yes |
|  | 7008.16 - 1 | yes |
|  | 7008.16 - 2 | yes |
|  | 7008.17 - 1 | yes |
|  | 7008.17 - 2 | no |
|  | 7008.17 - 3 | yes |
|  | 7008.29 - 1 | yes |
| **Rockville** | 7007.18 - 1 | yes |
|  | 7010.01 - 2 | no |
|  | 7010.01 - 3 | no |
|  | 7010.04 - 4 | no |
|  | 7010.05 - 1 | no |
|  | 7010.05 - 2 | no |

---

36 Note that the TPB methodology uses Census tracts, which encompass a larger geographic area than the Census block groups used in this EJ Analysis. As such, the comparison of EEAs and EJ populations is not a one-to-one geographic comparison.

00005215

**OP·LANES** MARYLAND  I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 5-3: Equity Emphasis Areas and Environmental Justice Populations**



00005216

JA1179

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## H.    MDOT SHA Voluntary Demographic Survey

It is MDOT SHA policy to offer a demographic survey to voluntarily complete for attendees of MDOT SHA public meetings. Ten attendees of the November 1, 2021 Virtual Public Hearing completed the survey. Eight survey respondents identified as White, one respondent identified as Asian, and one respondent identified as "other" race; one respondent was in the 18 to 40 age bracket, four were in the 40 to 65 age bracket, and five were in the 65 and over age bracket. Additionally, no survey respondents identified as having a disability to be accommodated at the Virtual Hearing, and no survey respondents identified any other language than English spoken at home. Note that, due to the voluntary nature of the survey and the small sample size, the results of the survey may not accurately represent the demographics of all the Virtual Public Hearing attendees.

### 5.4.5    Summary of the Existing Conditions of Environmental Justice Populations

EJ populations are highlighted and identified with "yes" in the Minority Population column of **Table 5-2** and "yes" in the Low-Income Population column of **Table 5-3**, as well as depicted in **Figure 5-1**. In total, 16 block groups within the EJ Analysis Area were identified as EJ populations.  Block groups identified as EJ populations that have a minority population exceeding 49 percent of the total block group population are highlighted in blue, those with a median income less than $69,850 are highlighted in yellow, and those that were identified as both minority and low-income populations are highlighted in green in **Figure 5-1**; the identification methodology for EJ populations is described in **Section 5.2**. The 16 EJ populations are located in the Analysis Area Communities of Gaithersburg, Rockville, Potomac, and North Bethesda.

As detailed in **Section 5.4.4** above, supplemental community data was reviewed to understand if there were any block groups or Analysis Area Communities not identified through this Study's EJ Analysis methodology that could benefit from the additional engagement given the formally identified EJ populations. Synthesizing the EJ Index scores above the 50th percentile from the EPA and MD EJSCREEN mapping tools,[37] plus the data on above-average limited English-Speaking households, low-income subsidized housing, households receiving Food Stamps/SNAP benefits, student participation in free and reduced-price lunch programs, and Equity Emphasis Areas, the non-EJ populations identified in **Table 5-10** may benefit from the additional EJ engagement.

**Table 5-10: Non-EJ Populations Identified for Additional EJ Engagement via Supplemental Data**

| EJ Analysis Area Community | Non-EJ Block Group within the EJ Analysis Area | Supplemental Data Results |
|---|---|---|
| Gaithersburg | 7008.17 - 2 | • Above-Average Percent LEP Households<br>• One Affordable Housing Complex<br>• Overlap with Equity Emphasis Area<br>• Tract Above 50th percentile- MD EJSCREEN Index Score |
| Rockville | 7007.18 - 1 | • Above-Average Percent LEP Households<br>• Above 50th percentile- EPAEJSCREEN indicator: Lead Paint |

[37] Excludes EPA EJSCREEN EJ index score for Wastewater Discharge Indicator due to incomplete dataset.

00005217

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | | |
|---|---|---|
| | | • One Affordable Housing Complex |
| | 7007.18 - 2 | • Above-Average Percent LEP Households<br>• Above 50th percentile- EPAEJSCREEN- Lead Paint<br>• One Affordable Housing Complex |
| | 7010.01 - 3 | • Above-Average Percent:<br>  ○ LEP Households<br>  ○ Food Stamps/SNAP<br>• Above 50th percentile- EPAEJSCREEN- Lead Paint<br>• Overlap with Equity Emphasis Area |
| | 7010.02 - 3 | • Above-Average Percent<br>  ○ Food Stamps/SNAP<br>  ○ LEP Households<br>• Above 50th percentile- EPAEJSCREEN- Underground Storage Tanks |
| | 7010.05 - 1 | • One Affordable Housing Complex<br>• Overlap with Equity Emphasis Area<br>• Tract Above 50th percentile- MD EJSCREEN Index Score<br>• Two Schools with Above-Average Percent F&R Program Participation |
| North Bethesda | 7012.05 - 3 | • Above 50th percentile- EPAEJSCREEN indicators:<br>  ○ Lead Paint<br>  ○ RMP Proximity<br>  ○ Superfund Proximity |
| Bethesda | 7044.04 - 4 | • Above-Average Percent:<br>  ○ Food Stamps/SNAP<br>  ○ LEP Households<br>• Above 50th percentile- MD EJSCREEN EJ Score TRACT |
| Potomac | 7060.12 - 1 | • Above-Average Percent<br>  ○ Food Stamps/SNAP<br>  ○ LEP Households<br>• Above 50th percentile- EPAEJSCREEN indicators:<br>  ○ Air Toxics Cancer Risk<br>  ○ Diesel PM<br>  ○ Respiratory Hazard<br>  ○ Ozone<br>  ○ PM2.5<br>  ○ RMP Proximity<br>  ○ Superfund Proximity<br>  ○ Traffic Proximity/Volume<br>• Tract Above 50th percentile- MD EJSCREEN Index Score<br>• Two Affordable Housing Complexes |
| McLean | 4801.00 - 4 | • Above-Average Percent Food Stamps/SNAP<br>• Above 50th percentile- EPAEJSCREEN indicators:<br>  ○ Air Toxics Cancer Risk<br>  ○ Respiratory Hazard<br>  ○ Ozone<br>  ○ PM2.5 |

00005218

JA1181


I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | | o RMP Proximity |
| | | o Superfund Proximity |
| | | o Underground Storage Tanks |

## 5.5    Public Outreach with Environmental Justice Populations

In addition to standard public notifications of the availability of the DEIS and announcement of the Public Hearings and associated comment period (as documented in **FEIS, Chapter 8**), MDOT SHA implemented additional notification methods to encourage meaningful involvement by low-income and minority race/ethnicity populations, as well as other traditionally marginalized populations in review of the DEIS and SDEIS and participation in the Public Hearings and comment periods.

### 5.5.1    Publication of DEIS, Public Hearings, and Associated Comment Period

Environmental Justice outreach efforts for publication of the DEIS and notification of the Public Hearings comment period and comment period include the following:

- Mailed and/or emailed flyers in English, Spanish, Amharic, and French[38] flyers to approximately 200 affordable housing complexes, schools, and places of worship[39] along the study corridors. Emailed PDFs of these flyers to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution.
- Uploaded to the project website the DEIS Executive Summary translated into Spanish, Amharic, and French.
- Provided hard copies of the translated DEIS Executive Summary at the DEIS viewing locations.
- Spanish language advertisements in *El Tiempo Latino*, *Washington Hispanic*, and on *eltiempo.com*.
- Additional County outreach:
  - o Montgomery County News press release;
  - o Inclusion in Montgomery County Executive's weekly newsletter;
  - o Inclusion in Montgomery County Department of Transportation bi-weekly newsletter and social media posts;
  - o Distribution of flyer via M-NCPPC Prince George's County Planning email databases:
    - Planning Department listserv with approximately 19,200 email addresses
    - Community Association listserv with approximately 700 email addresses
  - o Inclusion in Prince George's County social media posts; and
  - o Coordination with Prince George's County Faith-Based Advisory Board to distribute information to their ministry listserv with approximately 70 email addresses.

---

[38] Spanish, French, and Amharic are the top primary languages of English for Speakers of Other Languages (ESOL) learners in both counties.

[39] Includes Environmental Justice (EJ)- area schools with above-average participation in the Free and Reduced-price Meals Program; places of worship in EJ areas; and all affordable-housing complexes within CEA Analysis Area, plus Prince George's County along the study corridors.

00005219

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- Additional translation of flyer to Simplified Chinese, Korean, Malayalam, Punjabi, Tagalog, and Yoruba, uploaded to the project website, and distribution of hard copies to groceries largely serving immigrant communities:
  - ALDI (Beltsville, Lanham);
  - Anarkali Bazar (Greenbelt);
  - Giant Food (Greenbelt, Largo, Marlow Heights);
  - Global International Grocery (Silver Spring);
  - Great Wall Supermarket (Rockville);
  - Jumbo Food International Supermarket (Temple Hills);
  - La Colonia International Supermarket (Camp Springs);
  - Las Americas Market (Rockville);
  - Latino Market Grocery (Gaithersburg);
  - Lidl (District Heights);
  - Periyar Asian Grocery (Landover Hills);
  - Safeway (Greenbelt);
  - Save A Lot (Forestville); and
  - Shoppers (College Park, Forestville, Largo, New Carrollton).

Refer to **Appendix G** for EJ outreach materials used for the notification and public comment period associated with the DEIS.

### 5.5.2    Publication of SDEIS, Public Hearing, and Associated Comment Period

Environmental Justice outreach efforts for publication of the SDEIS and notification of the Public Hearing and comment period were similar to the DEIS outreach efforts and included the following:

- Newspaper print advertisements in *El Tiempo Latino*, *Washington Hispanic* and digital advertisements on *Afro.com*, and *Eltiempo.com,* and *Fairfaxtimes.com.*
- Ran additional online digital advertisements three weeks prior to the virtual public hearing, including digital advertisements targeted black and African American and Hispanic adults likely to own a home and commute over 20 miles daily using I-270 or I-495 via geofencing.[40]
- Ran Spanish-language radio advertisements two weeks prior to the virtual public hearing on WLZL-FM, a Spanish-language station that broadcasts to the Washington-Baltimore metropolitan area. The radio spot emphasized the virtual public hearing and project website.
- Developed a flyer to outreach to EJ populations that featured an emphasis on SDEIS availability, ways to comment, and the announcement of Virtual Public Hearing; the flyer included a QR code

---

[40] Online digital advertisements were run through the Exchange Display Network, which specializes in digital buys with geographic and demographic programmatic targeting. Digital advertisements targeted African Americans or Hispanic adults using geofencing and behavioral data. The target area was in zip codes which index the highest to target a specified audience segment; and behavioral data indicating the likelihood for that adult to own a home and commute over 20 miles daily using I-270 or I-495. Of the total 5 million-plus potential impressions, 20 percent, or 1.2 million impressions, targeted this demographic.

00005220

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

to link to SDEIS availability on the project website. The flyer was translated into in Spanish, Amharic, French, Chinese, and Korean based on the top languages spoken by LEP populations in Montgomery County as identified in the 2020 Montgomery County Department of Transportation *Language Assistance Plan*.

- Mailed flyer to approximately 200 affordable housing complexes, schools, and places of worship along the study corridors. PDFs of these flyers were emailed to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution.

- Mailed flyers to county advisory boards and community groups who serve minority race and ethnicity and other traditionally marginalized populations. PDFs of these flyers were emailed to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution. Advisory boards and community groups include, but are not limited to, the following:

  - Montgomery County
    - Faith Community Advisory Council
    - Gilchrest Immigrant Resource Center
    - Department of Housing and Community Affairs
    - Community Reach, Commission on People with Disabilities
    - Health and Human Services Latino Health Initiative
    - Literacy Council
    - DOT Division of Transit Services
    - Health and Human Services Office of Community Affairs
    - Office of Community Partnerships
    - Sidney Kramer Upcountry Regional Services Center
    - Health and Human Services Asian American Health Initiative
    - Office of Community Relations
    - Department of Social Services Internal and External Affairs

- Prince George's County:
  - Housing Authority
  - Community Outreach Promoting Empowerment Section (COPE)
  - Literacy Council
  - Aging and Disabilities Services Division

- Distributed hard copies of the translated flyer to grocery stores largely serving immigrant communities and libraries in Montgomery, Prince George's, and Frederick Counties. [41]

  - Admas International Market (Hyattsville)

---

[41] Attempts to drop off flyers were made at the listed specialty markets and grocery stores. Note that several locations were either closed or did not accept the flyers for posting or distribution.

00005221

JA1184

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

- o   ALDI (Beltsville and Lanham)
- o   Anarkali Bazar (Greenbelt)
- o   Asian Super Market (Frederick)
- o   Brunswick Branch Library (Brunswick)
- o   C. Burr Artz Public Library (Frederick)
- o   Chevy Chase Library (Chevy Chase)
- o   Davis (North Bethesda) Library (Bethesda)
- o   Ebenezer International Market (Frederick)
- o   Edward Fry Memorial Library at Point of Rocks
- o   El Eden International Market 2 (Frederick)
- o   Favor International Food (Silver Spring)
- o   Frederick Bazaar-Indian-Pak Grocery Store (Frederick)
- o   Giant Food (Greenbelt, Lanham, Upper Marlboro, and Marlow Heights)
- o   Glenarden Branch Library, PGCMLS (Glendarden)
- o   Global International Grocery (Silver Spring)
- o   Great Wall Supermarket (Rockville)
- o   Halal Market (Frederick)
- o   Hampton Park Post Office (Capitol Heights)
- o   Jumbo Food International Supermarket (Temple Hills)
- o   Kenilworth Post Office (Riverdale Park)
- o   Kensington Park Branch(Kensington)
- o   La Chiquita Grocery (Frederick)
- o   La Colonia International Supermarket (Camp Springs)
- o   Lagos Market International (Forestville/District Heights)
- o   Largo Post Office (Upper Marlboro)
- o   Largo-Kettering Branch Library, PGCMLS (Largo/Upper Marlboro)

00005222

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- o Las Americas Market  (Rockville)
- o Latino Market Grocery Inc (Gaithersburg)
- o Lidl (District Heights)
- o Megamart Gaithersburg (Gaithersburg)
- o Mercado Latino (Beltsville)
- o Mi Pueblo International Market (Frederick)
- o Middletown Public Town (Middletown)
- o Myersville Community Library (Myersville)
- o New Carrollton Branch Library, PGCMLS (New Carrollton/Hyattsville)
- o Orange Latin Market, Colombian & South American products (Gaithersburg)
- o Periyar Asian Grocery (Landover Hills)
- o Potomac Branch (Potomac)
- o Rockville Post Office (Rockville)
- o Safeway (Greenbelt)
- o Savanna International Market Inc (Gaithersburg)
- o Save A Lot (Forestville)
- o Shoppers (Bowie, College Park, New Carrolton, Forestville, Largo/Upper Marlboro)
- o Spauldings Branch Library (District Heights)
- o Temple Hills Post Office (Temple Hills)
- o Urbana Regional Library (Frederick/Urbana)
- o Walkersville Public Library (Walkersville)
- o Wegmans (Lanham)
- o West Lake Post Office (Bethesda)
- ▪ Contact was made to distribute flyers via Maryland-National Capital Park and Planning Commission (M-NCPPC) Prince George's County Planning email databases.

Additionally, translated versions of the SDEIS Executive Summary were posted to the project website, and all SDEIS documents were made Section 508-compliant on the project website. An online presentation

00005223

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

was setup on the project website where users could view the informational display boards in a web-based format that could be translated into multiple languages using Google Translate.

Refer to **Appendix G** for EJ outreach materials used for the notification and public comment period associated with the SDEIS.

### 5.5.3    Environmental Justice Working Group and Environmental Justice Engagement Initiatives

#### A.    Environmental Justice Working Group

In response to comments from the US EPA on the DEIS, a Working Group was established in Spring 2021 to support the Environmental Justice analysis and outreach efforts to be conducted for the Study moving forward. Agency members include FHWA, US EPA, MDOT SHA, Maryland Department of Planning (MDP), Montgomery County Department of Transportation (MCDOT), Maryland-National Capital Park and Planning Commission (M-NCPPC), and Prince George's County Department of Public Works and Transportation (DPW&T). The goals of the EJ Working Group are to:

- Develop potential mitigation measures should high and adverse disproportionate impacts occur and identify additional outreach opportunities using federal, state, and local experience;
- Identify potential commitments to EJ/public health community enhancement measures related to social/health vulnerability indicators; and
- Identify recommendations for additional engagement opportunities including FEIS notifications and post-NEPA outreach to communities.

EJ Working Group meetings have occurred on the dates listed in **Table 5-11.**

**Table 5-11: Environmental Justice Working Group Meetings and Coordination**

| DATE | AGENDA ITEMS |
|---|---|
| March 2, 2021 | Kick-off Meeting; Agency member introductions and discussion of goals |
| April 7, 2021 | Data collection to support existing conditions discussion in EJ Analysis; Discussion on EJ Public Outreach Plan and future opportunities; community enhancement considerations |
| September 15, 2021 | Review of draft EJ Public Outreach Plan: SDEIS/FEIS/ROD and future opportunities in consideration of the Preferred Alternative; community enhancement considerations |
| November 9, 2021 | Final EJ Outreach and Engagement Plan |

Based on ideas provided by MDOT SHA in the draft EJ Public Outreach Plan: SDEIS/FEIS/ROD and agreed upon by the EJWG, MDOT SHA initiated contact with Montgomery County, local advisory group leads, the City of Rockville, the City of Gaithersburg, and regional organizations to leverage their local knowledge and experience with community engagement and to seek recommendations on potential community enhancements. Contact was made with the University of Maryland, Center for Community Engagement, Environmental Justice, and Health (CEEJH) Laboratory, as well as the following Montgomery County Advisory Groups:

00005224


I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- African Affairs Advisory Group
- Asian Pacific Advisory Group
- Caribbean American Advisory Group
- Faith Community Advisory Council
- Latin American Advisory Group
- LGBTQ Advisory Group
- Middle Eastern American Advisory Group
- Senior Community

A meeting with MDOT SHA and the CEEJH Laboratory Director and faculty was held on October 20, 2021 to share EJ Analysis methodology and the targeted EJ outreach conducted to date, as well as seek additional suggestions for outreach and potential community enhancement efforts. Regarding the EJ Analysis methodology, general feedback received from the CEEJH suggested that data on environmental conditions should be used to supplement demographic data in the identification of populations of EJ concern, as living with overburdened environmental stressors is a key feature of EJ populations. Additionally, given the roadway-focused nature of the project, MDOT SHA was encouraged to focus on public health impacts from air quality impacts due to traffic proximity, as poor air quality contributes directly to many health concerns.

The discussion with CEEJH Laboratory underscored the importance of incorporating EPA and MD EJSCREEN data in the EJ Analysis (see Section 59), which provides data on existing environmental conditions along the study corridors. Additional organizations were also added to ongoing EJ outreach efforts.

MDOT SHA initiated communication with Montgomery County Advisory Groups and planners from the City of Rockville and City of Gaithersburg in Fall 2021, also to share targeted EJ outreach conducted to date and seek additional suggestions for outreach and potential community enhancement efforts. MDOT SHA requested the advisory groups to response to questions regarding the location of EJ populations, methods of communication, commonly spoken non-English languages, community enhancement priorities, and survey distribution options. The City of Rockville provided detailed information in response to the request including suggested methods for communication, languages and enhancement priorities within the City.

## B.    Environmental Justice Engagement Initiatives

Based on the results of the local, state and regional coordination conducted as part of the EJWG's EJ Public Outreach Plan, MDOT SHA implemented additional public-facing EJ outreach efforts to engage meaningfully and directly with underserved communities and identify strategies to minimize impacts and to identify community enhancements that could potentially be incorporated into the project.

00005225

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

In consideration of the pandemic and due to the large study area, MDOT SHA developed an online survey to seek feedback from EJ and other underserved populations on existing community concerns and strategies that could be implemented to address those concerns. The survey was distributed in a variety of ways including through multiple community "pop up" events hosted by MDOT SHA at local specialty markets in areas noted as having high percentages of low-income and/or minority populations. These community events allowed for meaningful, direct face-to-face engagement. Community members were able to complete the survey on iPads and ask questions of the staff. Multi-lingual staff were present at each pop-up event.  Pop-up events were held at the following locations in November 2021:

- Great Wall Supermarket (Pop-up Event with informational booth)

- Lotte Plaza Market (Pop-up Event with informational booth)

- Megamart (Pop-up Event with informational booth)

- H Mart (Pop-up Event with informational booth)

- Adarash Market (Pop-up Event with informational booth)

- Lotte Plaza Market (Pop-up Event with informational booth)

- Patel Brothers Farms Market (Pop-up Event with informational booth)

The survey was open for approximately six weeks, allowing respondents to complete the questions at their own pace. In addition to English, the survey was provided in Spanish, French, Amharic, Chinese, and Korean— the same top five non-English spoken languages that DEIS and SDEIS materials were translated into based on Montgomery County's Department of Transportation 2020 *Language Assistance Plan*. The survey and results are provided in the *Environmental Justice Outreach and Engagement Initiative for the Preferred Alternative* in **Appendix H**.

In addition to the direct face-to-face engagement, postcards, flyers, yard signs, targeted social media, local agency and community organization coordination were used to promote the survey.  Promotional materials included a QR code with a direct link to the survey online; the flyer also included the survey questions themselves. All materials were translated into the top five non-English languages identified above. Postcards and flyers were placed at local health clinics, specialty markets, grocery stores and places of worship. Yard signs with the QR code were placed at affordable housing complexes and near bus transit stations. In addition, an email with the survey was sent to 230 community email addresses informing people about the survey, inviting them to participate, and encouraging them to share the information with their community. Lastly, approximately 49 places of worship were contacted and, where allowed postcards and yard signs with the QR code were distributed.

The survey included three multiple choice questions about potential community betterment and needs, and one open-ended question asking what other improvements are needed in the respondent's community. Sixty-one people completed the survey.  The following are the most common responses to the multiple-choice questions in the survey.

Question #1: Transportation improvements needed:

00005226

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

1. Better lighting on streets and sidewalks (21%)
2. More or improved sidewalks (17%)
3. Traffic calming to make streets safer (15%)

Question #2: Neighborhood needs:

1. Recreation centers parks, and playgrounds (30%)
2. Sidewalks, trails, and bike lanes (26%)

Question #3: Environmental problems in your community:

1. Water quality (24%)
2. Noise (20%)
3. Safe and healthy housing (20%)

The most common responses to the open-ended question on community improvements needed were:

- Lighting
- Community services
- Safety
- Road (more or better)

For additional detail, refer to the *Environmental Justice Outreach and Engagement Initiative* for the Preferred Alternative in **Appendix H**.

## 5.6 Identification of Beneficial and/or Adverse Impacts to Environmental Justice Populations & Consideration of Mitigation or Community Enhancement Measures

Both beneficial and/or adverse effects to the existing conditions of EJ populations are considered in this EJ Analysis. Effects described in this section include physical impacts to existing private property, including community facility property, as well as physical impacts to transportation right-of-way. Per FHWA EJ Order 6640.23A, consideration is also given to effects on the following environmental characteristics: demographics, traffic, human health and safety; air quality; noise/vibration; water quality; hazardous materials; natural resources; visual landscape and aesthetic values; economy and employment; access and mobility; community cohesion/isolation and quality of life; and tolling considerations. Also considered in this section are mitigation and community enhancement measures for each resource, as applicable.

### 5.6.1 No Build Alternative

The No Build Alternative would not result in any Study-related construction and therefore no land use conversions or property acquisitions are required; no direct impacts would occur in EJ populations. Increased traffic congestion under the No Build Alternative would contribute to increased overflow congestion on the local road network. As a result, the No Build Alternative could result in increased response times for emergency services and increased travel times to community facilities, especially during peak travel periods.

Existing congestion on I-495 and I-270 occur for periods of ten to seven hours per day, respectively. Re-occurring congestion results in vehicles idling for extended periods which can increase emissions and impact air quality. The No Build Alternative would not address the existing congestion experienced along the study corridors.

00005227

 **OP·LANES**  MARYLAND   I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

### 5.6.2    Preferred Alternative

The Preferred Alternative would address existing and long-term traffic growth, including improvement to the local roadway network, increased trip reliability, enhanced multimodal connectivity and mobility, and additional travel options as described in **FEIS, Chapter 3** and as detailed in the traffic analysis in **FEIS, Chapter 4 and FEIS, Appendix A**. The impacts of the Preferred Alternative on various characteristics of EJ populations are presented in this section. Where quantifiable, the impacts are provided in a table for all EJ populations so the reader can better understand the distribution of impacts. A comparison of the impacts within EJ populations to the impacts within non-EJ populations is provided in **Section 5.7**.

Note that the nature of some of the following characteristics (aside from property) makes it difficult to precisely quantify effects at the block group-level. Therefore, the effects on these characteristics within EJ populations are described in a primarily qualitative manner.

### A.    Property

#### a.    Beneficial and/or Adverse Impacts

As shown in **Table 5-12**, partial property impacts would occur in six of the 16 EJ populations. Total partial property acquisition in EJ populations is 14.3 acres (12.3 acres permanently acquired and 2.0 acres temporarily acquired) from 31 property parcels. These permanent acquisitions are primarily strips of land, or strip takes, from undeveloped areas or areas of trees and landscaping in yards that back to I-495 or I-270 along the Phase 1 South limits. Note that permanent acquisitions may also occur to properties further away from I-495 or I-270 to accommodate offsite stormwater management facilities. (Offsite stormwater management locations are preliminary at this point in the Study and are being developed as part of the *Compensatory Plan* in **FEIS, Appendix D**.) No property displacements would occur under the Preferred Alternative.

All property impacts are included in the LOD and the calculations presented in **Table 5-12**. Impacted properties under the Preferred Alternative are shown on the Environmental Resource Mapping in **FEIS, Appendix E**.

**Table 5-12: Property Impacts in Environmental Justice Populations**

| EJ Analysis Area Community | EJ Population | Number of Impacted Properties* | Property Acquisition (acres) | | |
|---|---|---|---|---|---|
| | | | **Total** | **Perm.** | **Temp.** |
| Gaithersburg | 7007.17 - 1 | | — | | |
| | 7007.17 - 3 | | — | | |
| | 7007.17 - 4 | 1 | **0.2** | *0.2* | — |
| | 7008.16 - 1 | | — | | |
| | 7008.16 - 2 | 2 | **0.4** | *0.4* | *<0.1* |
| | 7008.17 - 1 | 7 | **2.0** | *2.0* | *<0.1* |
| | 7008.17 - 3 | | — | | |
| | 7008.29 - 1 | | — | | |
| Rockville | 7010.07 - 1 | 8 | **1.9** | *0.9* | *1.1* |
| North Bethesda | 7012.15 - 2 | | — | | |
| | 7012.15 - 3 | | — | | |
| | 7012.15 - 4 | | — | | |

00005228

JA1191

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | 7045.01 - 2 | 7 | **2.2** | *1.5* | *0.7* |
|---|---|---|---|---|---|
| **Potomac** | 7045.01 - 4 | | — | | |
| | 7060.12 - 2 | | — | | |
| | 7060.12 - 3 | 6 | **7.5** | *7.2* | *0.3* |

Note: "—" indicates zero property impacts.

### b. Mitigation

All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. *Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* information is provided in **Appendix E**.

## B. Community Facilities and Services and Section 4(f) Properties

### a. Beneficial and/or Adverse Impacts

No impacts would occur to community facility properties and services in EJ populations.

The Preferred Alternative would impact two Section 4(f) properties in EJ populations in the Gaithersburg and North Bethesda EJ Analysis Area Communities. The impacted public park and public park with historic properties (Section 4(f) properties) are shown in **Table 5-13**.

**Table 5-13: Impacts to Public Parks, Public Parks with Historic Properties, and Historic Sites\* (Section 4(f) Properties) in Environmental Justice Populations**

| EJ Analysis Area Community | EJ Population | Section 4(f) Property | Property Acquisition (acres) | | |
|---|---|---|---|---|---|
| | | | **Total** | **Perm.** | **Temp.** |
| **Gaithersburg** | 7007.17 - 1 | | — | | |
| | 7007.17 - 3 | | — | | |
| | 7007.17 - 4 | | — | | |
| | 7008.16 - 1 | | — | | |
| | 7008.16 - 2 | Malcolm King Park | **0.5** | *0.4* | *<0.1* |
| | 7008.17 - 1 | | — | | |
| | 7008.17 - 3 | | — | | |
| | 7008.29 - 1 | | — | | |
| **Rockville** | 7010.07 - 1 | | — | | |
| **North Bethesda** | 7012.15 - 2 | | — | | |
| | 7012.15 - 3 | | — | | |
| | 7012.15 - 4 | | — | | |
| | 7045.01 - 2 | Academy Woods | **0.2** | *0.2* | — |
| | 7045.01 - 4 | | — | | |
| **Potomac** | 7060.12 - 2 | | — | | |
| | 7060.12 - 3 | | — | | |

Note(s): "—" indicates zero property impacts. Since the SDEIS, Morris Park in block group 7007.17 – 4 is now avoided by the Preferred Alternative LOD.

\*Historic sites analyzed as part of the Section 4(f) Evaluation.

00005229

 **OP·LANES**™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

#### b. Mitigation

Because no community facility properties and services within EJ populations are impacted, no mitigation is required.[42]

Mitigation for impacts to Section 4(f) properties has been coordinated extensively with the Officials with Jurisdiction (OWJ) over the impacted park properties. The final mitigation commitments have been developed to include all possible planning to minimize harm. These measures include, but are not limited to, the following: landscaping, replacement land, visual and noise barriers, ecological and stream restoration, and funding of park related buildings and amenities. Refer to **FEIS, Chapters 6 and 7** and **FEIS, Appendix G** for additional details.

### C. Demographics

#### a. Beneficial and/or Adverse Impacts

Implementation of the Preferred Alternative would not result in changes to the existing population size or demographic characteristics (age and sex, disability, household income, race and ethnicity, Limited English Proficiency, Free and Reduced Lunch program of Food Stamps/SNAP program participation) of the EJ Analysis Area, including the existing population size or demographic characteristics of EJ populations. No property relocations would occur under the Preferred Alternative.

#### b. Mitigation

Because the existing population size or demographic characteristics of EJ populations would not be impacted, no mitigation is required.

### D. Traffic

#### a. Beneficial and/or Adverse Impacts

Traffic projections were typically measured in segments along the study corridors. As shown in **Figure 5-1**, the 16 EJ populations are located primarily along the I-270 Y-Split and I-270 in the Potomac, North Bethesda, Gaithersburg, and Rockville EJ Analysis Area Communities.

To determine traffic impacts proximal to the EJ populations, this EJ Analysis considers travel time and speed data[43] for the HOT and general purpose (GP) lanes along the following segments:

- I-270 Northbound from I-495 to I-370

---

[42] Note that the Gibson Grove A.M.E. Zion Church community in the EJ population 7060.09 – 3 in the Potomac EJ Analysis Area Community is closely associated with Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the site of a late nineteenth-century African American benevolent society building and cemetery and Section 106 property. Project activities at Morningstar Tabernacle No. 88 Moses Hall and Cemetery include the construction of noise barrier within the LOD. No permanent or temporary impacts or ground disturbance within the cemetery boundary would occur. Existing conditions and effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery are being evaluated through the Section 106 process, which is documented in **FEIS Chapter 5, Section 5.7** and **FEIS Appendix I; FEIS Chapter 6** and **FEIS Appendix G**.

[43] Impacts to local roadway networks were modeled in terms of vehicle hours of delay at the county-level and are not broken down by corridor segments. Arterial roadways in Montgomery County, used by drivers from both EJ populations and non-EJ populations, are projected to experience an approximately five percent reduction in delay under the Preferred Alternative. Also note that vehicle delay and roadway Levels of Service (LOS) were measured for the length of the study corridors and are also not broken down by corridor segments. As such, no delay or LOS data is available for corridor segments proximal to EJ populations.

00005230

**OP·LANES**
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- I-270 Southbound from I-370 to I-495

Under the Preferred Alternative in 2045, the average travel times for drivers in the HOT lanes on I-270 northbound between I-495 to I-370 is projected to be eight minutes with an average speed of 63 mph in the AM peak hours and 12 minutes with an average speed of 45 mph in the PM peak hours. In the reverse, southbound direction, the average travel times for drivers in the HOT lanes on this segment would be eight minutes with an average speed of 62 mph in the AM peak hours and eight minutes with an average speed of 63 mph in the PM peak hours. Travel time indexes (TTI)[44] projected for both northbound and southbound I-270 HOT lanes between I-495 and I-370 indicate that drivers would experience uncongested conditions in the AM and PM peak hours along all of I-495 and I-270 in the study corridors.

Should use of the HOT lanes not be a feasible economic choice for drivers from EJ populations, all existing GP lanes would remain free and would also experience traffic improvements under the Preferred Alternative in 2045 along the corridor segments adjacent to EJ populations identified above. The average travel times for drivers in the GP lanes on I-270 northbound between I-495 to I-370 is projected to be nine minutes with an average speed of 61 mph in the AM peak hours and 20 minutes with an average speed of 27 mph in the PM peak hours. In the reverse, southbound direction, the average travel times for drivers in the GP lanes on this segment would be 12 minutes with an average speed of 45 mph in the AM peak hours and 10 minutes with an average speed of 58 mph in the PM peak hours. Travel time indexes (TTI) projected for both northbound and southbound I-270 GP lanes between I-495 and I-370 indicate that drivers would experience uncongested conditions in the AM and PM peak hours, with the exception of drivers on the northbound I-270 during the PM peak, who may experience heavy congestion.

Drivers from EJ populations may benefit from direct access to HOT lanes and/or direct access for transit vehicles to transit stations, particularly at locations proximal to EJ populations. However, implementation of HOT lanes direct access ramps would include the effects of construction experienced by those who live and commute near the construction sites, including EJ populations. See **Section N** for a discussion of construction impacts on EJ populations.

The direct access locations shown in **Table 5-14** are proposed within or adjacent to EJ populations.

**Table 5-14: HOT Lanes Direct Access Locations in EJ Populations**

| EJ Analysis Area Community | EJ Population | Location/Description |
|---|---|---|
| Gaithersburg | 7007.17 – 1 | — |
| | 7007.17 – 3 | — |
| | 7007.17 – 4 | — |
| | 7008.16 – 1 | — |
| | 7008.16 – 2 | **I-270 at I-370**: a new interchange would be constructed for HOT lanes direct access to and from the south; the existing interchange ramps would be adjusted to accommodate widening of the mainline; direct access to Shady Grove Metro Station would also be provided |

---

[44] TTI quantifies the average travel time and congestion levels during the peak periods and is defined as the ratio of the average (50th percentile) travel time during a particular hour to the travel time during free-flow or uncongested conditions.

00005231

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | 7008.17 - 1 | — |
|---|---|---|
| | 7008.17 - 3 | — |
| | 7008.29 - 1 | — |
| **Rockville** | 7010.07 - 1 | **I-270 at Gude Drive**: a new interchange would be constructed for HOT lanes direct access |
| | 7012.15 - 2 | — |
| | 7012.15 - 3 | — |
| | 7012.15 - 4 | — |
| **North Bethesda** | 7045.01 - 2 | **I-495 at I-270 west spur**: a new interchange would be constructed for HOT lanes direct access;  the existing interchange would be reconstructed to accommodate HOT lanes |
| | 7045.01 - 4 | — |
| **Potomac** | 7060.12 - 2 | **I-270 west spur at Westlake Terrace**: existing HOV only ramps to and from the north would be repurposed to HOT lanes direct access ramps; new ramps would be constructed for HOT lanes direct access to and from the south; direct access to Montgomery Mall Transit Center would also be provided |
| | 7060.12 - 3 | |

*Note: "—" indicates no new direct access would be added in or adjacent to the corresponding EJ population.*

#### b.    Mitigation

Mitigation would not be required for traffic effects on EJ populations, because, at a minimum, all existing general purpose lanes would remain free and would experience a decrease in congestion conditions under the Preferred Alternative.

The Interstate Access Point Approval (IAPA) will evaluate potential ways to mitigate increases in traffic volumes to ensure safe and efficient operations at the project termini and at all interchanges within the Preferred Alternative. Potential mitigation strategies include signal timing adjustments, adding or extending turn lanes, changing lane assignments, pedestrian and bicycle improvements, modification to intersections such as new traffic signals, and TDM strategies such as dynamic signage.

See **Section O** for tolling considerations and EJ populations.

### E.    Air Quality

#### a.    Beneficial and/or Adverse Impacts

Currently, Montgomery County, Maryland and Fairfax County, Virginia are in attainment for all National Ambient Air Quality Standards (NAAQS) for airborne pollutants that have adverse impacts on human health and the environment (referred to as "criteria pollutants") with the exception of the 2015 8-hour ozone standard,[45] for which the counties are nonattainment.  Because the Managed Lanes Study is located in an Environmental Protection Agency (EPA) attainment area for Carbon Monoxide (CO) and fine particulate matter ($PM_{2.5}$), no analysis of these pollutants was required; however, a CO analysis of emissions from affected intersections and interchanges was conducted for the DEIS for transparency and

---

[45] These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

00005232



informational purposes since CO is a proxy for transportation emissions. The results of that analysis demonstrate that the worst-case interchanges and intersections for each Build and the No Build Alternative, using very conservative assumptions, would not cause or contribute to a violation of the CO NAAQS within the study corridor. See **FEIS, Chapter 5.8** and **FEIS, Appendix K** for additional details.

Ozone emissions are addressed in the regional air quality conformity analysis and there is no requirement to complete a project level analysis of ozone. The I-495 and I270 Managed Lanes Study is included in the federally mandated Air Quality Conformity Analysis that accompanies the National Capital Region Transportation Planning Board (TPB) *Visualize 2045* long-range plan. The *Visualize 2045* Air Quality Conformity Analysis is based upon the most current planning assumptions available for the Washington region, as well as the latest emissions factor model specified by EPA for use in these types of conformity assessments. As part of the air quality conformity determination, consultation with affected agencies such as the EPA, FHWA, FTA, and the Metropolitan Washington Air Quality Committee (MWAQC), plus the public, was completed.

The EPA has identified nine compounds with significant contributions from mobile sources that are among the national and regional-scale cancer drivers from their 1999 National Air Toxics Assessment. The nine compounds identified were acetaldehyde; acrolein; benzene; 1, 3-butadiene; diesel particulate matter (PM) plus diesel exhaust organic gases; ethylbenzene; formaldehyde; naphthalene; and polycyclic organic matter (POM). While FHWA considers these the priority MSATs, the list is subject to change and may be adjusted in consideration of future EPA rules. A quantitative assessment of MSAT emissions projections was conducted for the affected network for the Preferred Alternative. In general, all of the MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045, opening and design years, respectively. All MSAT pollutant emissions are expected to significantly decline in the opening and design years when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios.

Because the Study is in attainment for criteria pollutants' NAAQS,[46] transportation conformity requirements do not apply for this Study, meaning no further project-level air quality analysis was required. For this reason, air quality modeling at a localized level—the level at which EJ Analyses are otherwise conducted— is not available. Furthermore, due to industry-wide limitations in tools/techniques for measuring project-specific health outcomes,[47] detailed air quality effects on public health cannot be projected for any specific location along the Phase 1 South limits.

---

[46]These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

[47] While much work has been done to assess the overall public health risk from traffic proximity and MSATs exposure, it is a continuing area of research and the tools and techniques for assessing project-specific health outcomes as a result of lifetime MSAT exposure remain limited. These limitations impede the ability to evaluate how potential public health risks posed by MSAT exposure should be factored into project-level decision-making within the context of a NEPA Study such as the MLS. The FHWA, Environmental Protection Agency (EPA), the Health Effects Institute, and others have funded and conducted research studies to more clearly define potential risks from MSAT emissions associated with highway projects. An overview of FHWA-sponsored MSAT research efforts is provided in *FHWA Guidance Appendix D- FHWA Sponsored Mobile Source Air Toxics Research Efforts* (Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents). Please see FHWA Guidance Appendix D,

00005233

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Generally speaking, however, it is understood that "[a]ir toxics emissions from mobile sources have the potential to impact human health" (FHWA, 2018). The Health Effects Institute (HEI), which has conducted several FHWA-funded studies as documented in *FHWA Guidance Appendix D- FHWA Sponsored Mobile Source Air Toxics Research Efforts* (see **FEIS, Appendix K**), published a literature review of 700 studies examining the public health effects of traffic-related air pollution. The HEI literature review concludes that

> "[m]any aspects of the epidemiologic and toxicologic evidence relating adverse human health effects to exposure to primary traffic-generated air pollution remain incomplete. However, the Panel concluded that the evidence is sufficient to support a causal relationship between exposure to traffic-related air pollution and exacerbation of asthma. It also found suggestive evidence of a causal relationship with onset of childhood asthma, non-asthma respiratory symptoms, impaired lung function, total and cardiovascular mortality, and cardiovascular morbidity, although the data are not sufficient to fully support causality. For a number of other health outcomes, there was limited evidence of associations, but the data were either inadequate or insufficient to draw firmer conclusions. The Panel's conclusions have to be considered in the context of the progress made to reduce emissions from motor vehicles." (HEI, 2010)

Exposure to traffic-related air pollution would result from short-term construction activities (approximately four to five years) and long-term highway operations. EJ populations who live in areas with high EPA and MD EJSCREEN EJ Index scores (see **Section 5.4.4A** and **Appendix F**) may experience air quality impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores.

**b.    Mitigation or Community Enhancement Measures**

Construction-related air quality impacts of the project would be limited to short-term increased fugitive dust and mobile-source emissions, including carbon monoxide, during construction, which is expected to last four to five years. All required construction-related permits would be obtained from Maryland Department of the Environment (MDE) prior to construction. During construction the contractor may use the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance;

- Minimize traffic disruption to the extent possible, especially during peak travel hours;

- Cover trucks when hauling soil, stone, and debris (MDE Law);

- Use water trucks to minimize dust;

- Use dust suppressants if environmentally acceptable;

- Stabilize or cover stockpiles;

---

provided in **FEIS, Appendix K** for summaries of these studies and links to download the studies themselves. FHWA will continue to monitor the developing research in this field.

00005234

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- Construct stabilized construction entrances per construction standard specifications;

- Regularly sweep all paved areas including public roads;

- Stabilize onsite haul roads using stone; and

- Temporarily stabilize disturbed areas per MDE erosion and sediment standards.

Additionally, depending on the meteorological conditions, research has shown that noise barriers may deflect emissions and/or increase dispersion of emissions.

All state and local regulations regarding dust control and other air quality emission reduction controls would be followed. See **FEIS, Chapter 5.8** for additional detail.

Further, "active transportation" modes such as walking and bicycling have been shown to reduce human health risks and improve overall wellbeing.[48] Opportunities for active transportation will be provided under the Preferred Alternative via new and enhanced pedestrian and bicycle connections. Refer to **Section 5.8**, below, and **FEIS, Chapter 7** for detail on pedestrian and bicycle community enhancements.

### F.    Safety
#### a.    Beneficial and/or Adverse Impacts

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulation. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in-kind, at a minimum, and would be coordinated with the counties and local jurisdictions. Additional capacity on I-495 and I-270 would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. Further, by providing additional travel options, the Preferred Alternative is expected to reduce congestion on the mainline and local roadway networks, allowing for more reliable travel times for all users, including emergency responders. Refer to **FEIS, Appendix A**, *Final Traffic Analysis Report*.

#### b.    Mitigation

Safety mitigation considerations are described above.

### G.    Noise
#### a.    Beneficial and/or Adverse Impacts

The Noise Technical Report (**FEIS, Appendix L**) found that the Preferred Alternative would increase traffic noise in communities adjacent to the proposed limits of disturbance along the Phase 1 South limits. Noise

---

[48] Raynault, Eloisa and Ed Christopher. "How Does Transportation Affect Public Health?" *Public Roads Magazine*, Vol. 76 No. 6. Federal Highway Administration. Accessed at https://highways.dot.gov/public-roads/mayjune-2013/how-does-transportation-affect-public-health.

00005235

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

sensitive areas (NSAs) are composed of areas that have different land use activity categories, with varying levels of noise sensitivity, which have been combined into a single NSA. There are 60 NSAs adjacent to the Preferred Alternative LOD.

As shown in **Table 5-15**, 11 of the 60 NSAs are located in EJ populations. Of the 11 NSAs in EJ populations, nine would experience noise impacts[49] under the Preferred Alternative.

### b. Mitigation

Federal regulation (23 CFR 772) and the MDOT SHA Highway Noise Policy require that noise abatement be investigated at all NSAs where the Build condition traffic noise levels approach or exceed the FHWA Noise Abatement Criteria (NAC) for the defined land use category. Where noise abatement was warranted for consideration, it was examined to determine if the abatement is feasible and reasonable.[50]

**Table 5-15** identifies the NSAs and their corresponding noise barrier systems within EJ populations.

**Table 5-15: Impacted NSAs and Corresponding Noise Barrier Systems in EJ Populations**

| EJ Analysis Area Community | EJ Population | NSAs and Noise Barrier System Scenario |
|---|---|---|
| Gaithersburg | 7007.17 - 1 | — |
| | 7007.17 - 3 | NSA 5-01 would experience a noise impact and the existing noise barrier system would remain in place |
| | 7007.17 - 4 | — |
| | 7008.16 - 1 | NSA 5-02 would experience a noise impact and the existing noise barrier system would remain in place |
| | 7008.16 - 2 | NSA 5-04 would not experience a noise impact |
| | 7008.17 - 1 | NSA 5-06 and NSA 5-07 would experience noise impacts, but the associated noise barrier system is considered not feasible/reasonable; NSA 5-05: N/A* |
| | 7008.17 - 3 | — |
| | 7008.29 - 1 | — |
| Rockville | 7010.07 - 1 | NSA 5-14 would experience a noise impact, but the associated noise barrier system is considered not feasible/reasonable |
| North Bethesda | 7012.15 - 2 | — |
| | 7012.15 - 3 | NSA 5-33A would experience a noise impact and a new noise barrier system is recommended for construction |
| | 7012.15 - 4 | — |
| | 7045.01 - 2 | NSA 5-36 would experience a noise impact and the existing noise barrier system is recommended to be extended; |

---

[49] According to MDOT SHA and Virginia Department of Transportation (VDOT) guidance, an impact is identified when design year noise levels are predicted to equal or exceed the appropriate MDOT SHA or VDOT criteria for each NSA land use, or when predicted noise levels are anticipated to increase over existing year noise. Additional detail is located in **FEIS, Chapter 5.9**.

[50] Note that, in several areas, NSAs are grouped together with a single barrier system; if one of the NSAs is protected by an existing barrier system, it is assumed that all NSAs in that group are protected by the existing barrier system. Additional detail is provided in **FEIS, Table 5-20** in the noise impact analysis.

00005236

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | | NSA 2-03 would experience a noise impact and the existing noise barrier system would be replaced with a reconstructed system |
|---|---|---|
| | 7045.01 - 4 | — |
| Potomac | 7060.12 - 2 | — |
| | 7060.12 - 3 | NSA 5-32C: would experience a noise impact and a new noise barrier system recommended for construction |

Note: "—" indicates no NSA is located within the EJ population.
*Considered "no noise impact" for the purposes of this technical report.

For additional detail on noise impacts and abatement, see **FEIS, Chapter 5.9** and the *Noise Technical Report* **(FEIS, Appendix L)**.

## H.    Natural Resources

### a.    Beneficial and/or Adverse Impacts

As documented in the *Final Natural Resources Technical Report* in **FEIS, Appendix M**, the Preferred Alternative would impact various existing natural resources. Quantifiable impacts to wetlands, wetland buffers, waterways, floodplains, and tree canopy in EJ populations are provided in **Table 5-16**. Natural resource impacts would occur in ten EJ populations.

00005237

OP-LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical I

00005238

**Table 5-16: Natural Resource Impacts in EJ Populations**

| EJ Analysis Area Community | EJ Population | Wetlands (acres) | Wetland Buffers (acres) | Waters (linear feet) | Waters (square feet) | Tree Canopy Impacted (acres) | Floodplains (acres) |
|---|---|---|---|---|---|---|---|
| | 7007.17 - 1 | — | — | — | — | — | — |
| | 7007.17 - 3 | — | — | 98.7 | 1,638.3 | 0.8 | 0.2 |
| | 7007.17 - 4 | — | — | 247.2 | 2,258.4 | 7.6 | 0.3 |
| Gaithersburg | 7008.16 - 1 | — | — | 266.3 | 5,064.5 | 1.0 | 0.7 |
| | 7008.16 - 2 | — | — | 519.8 | 11,394.5 | 3.9*** | 0.4 |
| | 7008.17 - 1 | — | — | 1,041.6 | 15,119.0 | 25.4** | — |
| | 7008.17 - 3 | — | — | — | — | — | — |
| | 7008.29 - 1 | — | — | — | — | — | — |
| Rockville | 7010.07 - 1 | <0.1 | 0.1 | 1,008.8 | 25,328.7 | 11.4** | 1.9 |
| | 7012.15 - 2 | — | — | — | — | — | — |
| | 7012.15 - 3 | — | — | 142.3 | 1,196.4 | — | — |
| North Bethesda | 7012.15 - 4 | — | — | — | — | — | — |
| | 7045.01 - 2 | <0.1 | 0.3 | 1,498.6 | 11,290.7 | 24.6** | — |
| | 7045.01 - 4 | — | — | — | — | — | — |
| Potomac | 7060.12 - 2 | — | — | — | — | <0.1 | — |
| | 7060.12 - 3 | 0.1 | 0.7 | 1,807.7* | 10,221.9*** | 19.6*** | — |

Note: "—" indicates no impacts.

* Includes 27.0 linear feet of temporary waterline impacts.

** Includes <1.0 acre of temporary impact.

*** Includes 171.6 square feet of temporary impacts.

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### b.  Mitigation

Efforts to avoid and minimize impacts to natural resources have been developed throughout the Study. Efforts to mitigate these natural resource impacts along the Phase 1 South limits, including in EJ populations, are summarized as follows.

Based on the Preferred Alternative direct and indirect impacts, the current mitigation requirement estimate in Maryland includes 4.38 acres of wetland mitigation credits and 7,511 functional feet of stream credits that are detailed in **FEIS, Chapter 5.14.4**. No mitigation bank credits within an appropriate service area, or in-lieu fee programs were identified in Maryland when MDOT SHA initiated the project in 2018, and therefore MDOT SHA decided to pursue permittee-responsible mitigation for the requirements. The current proposed permittee-responsible, off-site mitigation in Maryland consists of two mitigation sites, including a total of 4.38 acres of potential wetland mitigation credits and 7,511 functional feet of potential stream mitigation credits. The remaining required stream mitigation credits will be provided by purchasing credits from a mitigation bank that will have an initial credit release in the fall of 2022.

The Study requires a Clean Water Act (CWA) Section 401 water quality certification from MDE and VDEQ indicating that anticipated discharges from the Study will comply with federally-mandated water quality standards. The submission of the request for water quality certification is anticipated in early 2022. Post-construction stormwater management and compliance with Total Maximum Daily Loads (TMDLs) requirements will be accounted for in the stormwater design and water quality monitoring to comply with required permits.

Erosion and sediment control, as well as stormwater management (SWM) techniques, are the most important minimization efforts in relation to water quality.  Impacts to water quality would be minimized through strict adherence to erosion and sediment control procedures and MDE storm water management regulations.  SWM would be developed in compliance with all applicable MDE regulations and guidance and designed in accordance with MDE's 2000 Maryland Stormwater Design Manual (MDE, 2009) and MDE's SWM Act of 2007.

Water quantity treatment would be met onsite or through waiver requests in specific areas. The project would attempt to meet water quality treatment requirements onsite, where practicable. Where this is not practicable, water quality requirements would be met offsite in accordance with MDE regulations. Other measures may also be considered in particularly sensitive watersheds after further coordination with resource agencies, such as redundant erosion and sediment control measures in especially sensitive watersheds and/or providing on-site environmental monitors during construction to provide extra assurance that erosion and sediment control measures are fully implemented and functioning as designed. These measures will also minimize potential impacts of contaminants on downstream drinking water supplies. Refer to **FEIS, Chapter 3.1.6** for details on the conceptual SWM analysis for the Preferred Alternative. Additionally, contaminants entering the Washington Aqueduct are also treated by the Dalecarlia and McMillan treatment plants, which must meet EPA's drinking water standards prescribed in the Aqueduct's National Pollution Discharge Elimination System (NPDES) Permit.

Unavoidable impacts to the tree canopy will be regulated by Maryland Department of Natural Resources (MDNR) under the Maryland Reforestation Law. Forest impacts must be replaced on an acre-for-acre or one-to-one basis on public lands. MDOT SHA would first be required to find available public land to be

00005239

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

reforested within the affected county and/or watershed. If this is not possible, MDOT SHA could purchase credits in a forest mitigation bank or pay into the MDNR Reforestation Fund that is used by MDNR to plant replacement trees. The site search results include 68 recommended off-site mitigation sites that could provide 39.96 acres of reforestation planting on public lands within the affected county and watershed of the Preferred Alternative. An additional 268.48 acres of potential reforestation could potentially be planted outside of the affected county and watershed but would require a variance from MDNR. In addition, forest impacts may be mitigated by purchasing credits from approved forest mitigation banks in the affected county and/or watershed. Any remaining mitigation required may be fulfilled through payment into the Reforestation Fund, as approved by MDNR.

All construction occurring within the FEMA designated floodplains must comply with Federal Emergency Management Agency (FEMA)-approved local floodplain construction requirements. Stormwater management would be provided, and all hydraulic structures would be designed to accommodate flood volumes without causing substantial impact. Culverts and bridges would be designed to limit the increase of the regulatory flood elevation to protect structures from flooding risks, and the use of standard hydraulic design techniques to maintain current flow and limit adjacent flood risk for all waterway openings would be applied where feasible. The use of state-of-the-art erosion and sediment control techniques and stormwater management controls would also minimize the risks or impacts to floodplains due to encroachments. MDOT SHA will submit project plans to MDE for approval of mitigation techniques in compliance with FEMA requirements, US Department of Transportation (USDOT) Order 5650.2, *Floodplain Management and Protection*, and Executive Order 11988, *Floodplain Management*.

Refer to **FEIS, Chapter 7** and the *Final Natural Resources Technical Report* **(FEIS, Appendix M)** for details on natural resource impacts and mitigation.

## I.    Hazardous Materials
### a.    Beneficial and/or Adverse Impacts

Construction of the Preferred Alternative would require disturbance of existing soil conditions, including identified hazardous materials sites of concern as documented in the *Hazardous Materials Technical Report* (**SDEIS, Appendix I**) and **FEIS, Chapter 5.10**. Within or adjacent to the Preferred Alternative limits of disturbance there are a total of 135 sites of concern assigned either a low, moderate, or high risk classification. EJ populations contain the 27 low risk, four moderate risk, and two high risk sites of concern identified in **Table 5-17**.

**Table 5-17: Hazardous Materials Sites of Concern in EJ Populations**

| EJ Analysis Area Community | EJ Population | Sites of Concern |
|---|---|---|
| Gaithersburg | 7007.17 - 1 | — |
| | 7007.17 - 3 | 1 low-risk |
| | 7007.17 - 4 | 1 low-risk |
| | 7008.16 - 1 | — |
| | 7008.16 - 2 | — |
| | 7008.17 - 1 | 6 low-risk, 1 moderate-risk |
| | 7008.17 - 3 | — |

00005240

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

|  | 7008.29 - 1 | — |
|---|---|---|
| **Rockville** | 7010.07 - 1 | 9 low-risk |
| **North Bethesda** | 7012.15 - 2 | — |
|  | 7012.15 - 3 | 2 low-risk |
|  | 7012.15 - 4 | 1 low-risk |
|  | 7045.01 - 2 | 5 low-risk |
|  | 7045.01 - 4 | — |
| **Potomac** | 7060.12 - 2 | — |
|  | 7060.12 - 3 | 2 low-risk, 3 moderate-risk, 2 high-risk |

Note: "—" indicates no low, moderate, or high sites of concern.

### b. Mitigation

Hazardous material mitigation would be conducted as necessary in accordance with federal, state, and local regulations. Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSIs) would be conducted to further investigate properties within the final LOD and vicinity that have a high potential for mobilization of hazardous materials as a result of construction activities. The Developer would be required to use best management practices to minimize the release of any hazardous materials during construction.

See **FEIS, Chapter 5.10** for detail on hazardous materials impact mitigation measures.

## J. Visual and Aesthetic Resources

### a. Beneficial and/or Adverse Impacts

The construction of the Preferred Alternative would include managed lanes, shoulders, traffic barriers, cut and fill slopes, stormwater management (SWM) facilities, retaining walls, and noise barriers along the existing highway corridor. Additionally, the Preferred Alternative would require modifications at existing interchanges to accommodate the mainline widening and direct access at-grade auxiliary lanes or ramps. Locations of interchange modifications, including where HOT lanes direct access would be constructed, in EJ populations is provided in **Table 5-14** in **Section N**. This may require the reconstruction of structures spanning the study corridors to lengthen or raise the elevation of these structures.

Construction of the Preferred Alternative would also require relocation of signage, guardrails, communications towers, and light poles due to the widening of the roadway. These ancillary features may be positioned closer to the adjacent land uses, including residential areas, commercial enterprises, and community facilities in EJ populations.

Construction would require the removal of vegetation to varying degrees throughout the study corridors. As a result of the vegetation removal, the wider interstates, added ramps, retaining walls, and noise barriers would become more visible and prominent. The views from adjacent properties, including residential properties, commercial enterprises, parkland/ open space properties in EJ populations would experience an impact.

However, impacts would generally be consistent with existing views along the majority of the Phase 1 South limits because of the dominant presence of the existing interstate facilities, including ancillary features, and the surrounding area's urbanized nature.

00005241

 **OP·LANES**™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Additional detail on impacts to visual and aesthetic resources is provided in the *Visual Impact Assessment* in **FEIS, Appendix H.**

#### b.    Mitigation

Mitigation measures to lessen the visual impact of the improvements in EJ populations would be considered as appropriate. Vegetation removal would be minimized, and additional landscaping may be incorporated in other areas as well. Mitigation for tree removal will be done in accordance with the Maryland Reforestation Law and National Park Service (NPS) and Maryland-National Capital Park and Planning Commission (M-NCPPC) agency requirements, such as on-site planting, when feasible. Details on tree removal mitigation is provided in **Section H.b.**

During final design, the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The goal will be to design highway elements, including retaining walls, noise barriers, and other visual barriers, to be sensitive to the context of the surrounding land use.  Further, mitigation for resource impacts would be developed in accordance with jurisdictional agency requirements.

### K.    Economy and Employment

#### a.    Beneficial and/or Adverse Impacts

No business displacements would occur under the Preferred Alternative.  There would be no overall impact to the distribution of worker occupation or major employers within EJ populations.

Proposed improvements would help address increasing congestion, thereby maintaining mobility throughout the region. Additionally, construction and expansion of transportation facilities has facilitated economic growth by providing access to employment and community facilities and allowing for more efficient movement of goods and services. These benefits would be inclusive of EJ populations.

Additionally, through Opportunity MDOT Program the agency will provide resources for job seekers as well as small, minority-, women- and veteran-owned businesses and disadvantaged businesses to access training, advisory services and advanced industry resources to prepare for potential opportunities to work with MDOT and the I-495 & I-270 P3 Program.

#### b.    Mitigation

MDOT SHA coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions during construction. No other mitigation would be required for economy and employment characteristics within EJ populations.

### L.    Access and Mobility

#### a.    Beneficial and/or Adverse Impacts

Due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270, the existing access between residences and community facilities and business, including those in EJ populations, would not be impacted. An increase in access may occur as a result of new and/or improved bicycle and pedestrian connections, as well as new direct connections between HOT lanes and major transit locations.

00005242

 **OP·LANES**  MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

An enhancement to mobility may occur due to reduced congestion on local routes, free bus transit usage of HOT lanes, and toll-free use of HOT lanes for eligible High Occupancy Vehicles with three or more passengers.

The same number of general purpose lanes will remain along with the addition of the four HOT lanes. The general purpose lanes will also be rehabilitated and resurfaced, and all bridges, including the American Legion Bridge, will be reconstructed. These improvements would benefit all drivers of the study corridors.

### b. Mitigation or Community Enhancements

The project elements and potential community enhancement measures referenced above would further enhance access and mobility in the EJ Analysis Area. Specifically, MDOT SHA has committed to the following enhancements:

- Direct and indirect access to existing and proposed transit stations, including Shady Grove, Twinbrook, and Medical Center Metro stations and Montgomery Mall Transit centers, and transit-oriented development areas within the EJ Analysis Area;
- Construction of new bus bays at WMATA Shady Grove Metrorail Station and increased parking at the Westfield Montgomery Mall Park and Ride:
- Constructing a new pedestrian/bicycle shared use path across the ALB to connect facilities in Maryland and Virginia;
- Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane;
- Constructing new sidepaths across MD 190 over I-495;
- Widening the existing variable-width sidepath along Seven Locks Road under I-495 (Cabin John Trail);
- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery in the historically African American community of Gibson Grove.

Impacts to access and mobility during construction would be minimized in compliance with MDOT SHA Work Zone Safety and Mobility requirements along the Phase 1 South limits and would include maintenance of the same number of existing lanes. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in-kind, at a minimum, and would be coordinated with the counties and local jurisdictions.

## M.   Community Cohesion and Quality of Life

### a. Beneficial and/or Adverse Impacts

Under the Preferred Alternative, partial property acquisition for right-of-way would occur throughout the Phase 1 South limits, including in EJ populations as identified in **Table 5-12** in **Section A**. The partial acquisitions are primarily strips of land, or strip takes, from undeveloped areas or areas of trees and

00005243

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

landscaping in yards that back to I-495 or I-270, resulting in a reduction of the overall property size. Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270 and the fact that no properties would be displaced. As such, the existing sense of community cohesion of EJ populations along the Phase 1 South would not be impacted. The Preferred Alternative also would not eliminate access or provide new access to properties, nor would it impede access between residences, community facilities, and businesses as no properties are accessed directly from I-495 or I-270.

Residents and employees, including those in EJ populations, who live, work, and utilize services immediately adjacent to the study corridors may experience changes in current quality of life due to property acquisition and temporarily during construction activities. However, residents and employees could experience a benefit to quality of life due to reduced congestion in general purpose lanes and HOT lanes along the Phase 1 South limits, plus enhanced trip reliability and travel choices to destination points within the region.

### b. Mitigation

To further enhance community cohesion and quality of life in the EJ Analysis Area, MDOT SHA has committed to the community enhancements identified above in **Section 5.6.2L.b**.

## N. Construction

### a. Beneficial and/or Adverse Impacts

Construction of the Preferred Alternative includes the following: mainline widening, addition of new direct access and reconstruction of existing interchanges, reconstruction of mainline bridges and overpasses, relocation of utilities, and construction/reconstruction of stormwater management, retaining walls, and noise barriers. Construction of these elements would occur along the Phase 1 South limits, including in EJ populations. Additionally, impacts from construction to visual and aesthetic resources, hazardous material sites of concern, air quality, and noise would occur throughout the limits, including within EJ populations. Details related to when construction related activities will occur will be determined in final design. It is anticipated that construction will last approximately five years.

A total of 2.0 acres in EJ populations would be required temporarily for construction access, staging, and materials storage.[51] Mainline widening would occur throughout the Phase 1 South limits. Construction for new direct access and for modifications to existing interchanges to accommodate highway widening would occur at 10 locations along the nine EJ populations identified in **Table 5-18**.

---

[51] The limits of disturbance of the Preferred Alternative accounts for areas needed for construction.

00005244

JA1207

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 5-18: HOT Lanes Access Construction Locations in EJ Populations

| EJ Analysis Area Community | Total EJ Analysis Area Block Groups | HOT Lanes Access Construction Required |
|---|---|---|
| Gaithersburg | 7007.17 - 1 | — |
| | 7007.17 - 3 | — |
| | 7007.17 - 4 | New Direct Access (I-270 at I-370 and Shady Grove Metro Station) |
| | 7008.16 - 1 | — |
| | 7008.16 - 2 | New Direct Access (I-270 at I-370 and Shady Grove Metro Station) |
| | 7008.17 - 1 | Adjusted Interchange Ramps (I-270 at Shady Grove Rd. Interchange) New Direct Access (I-270 at I-370 and Shady Grove Metro Station) |
| | 7008.17 - 3 | — |
| | 7008.29 - 1 | — |
| Rockville | 7010.07 - 1 | Adjusted Interchange Ramps (I-270 at MD 28 Interchange) New Direct Access (I-270 at Gude Drive) |
| North Bethesda | 7012.15 - 2 | — |
| | 7012.15 - 3 | Adjusted Interchange Ramps (I-270 East Spur at MD 187/Rockledge Dr.) |
| | 7012.15 - 4 | — |
| | 7045.01 - 2 | Adjusted Interchange Ramps (I-270 West Spur at Democracy Blvd.) New Direct Access (I-495 at I-270 West Spur) |
| | 7045.01 - 4 | Adjusted Interchange Ramps (I-495 at MD 187) |
| Potomac | 7060.12 - 2 | Adjusted Interchange Ramps (I-270 West Spur at Democracy Blvd.) |
| | 7060.12 - 3 | Adjusted Interchange Ramps (I-270 West Spur at Democracy Blvd.) Reconstructed Interchange Ramps (I-270 Y-Split Interchange) New Direct Access (I-495 at I-270 West Spur) |

Note: "—" indicates no direct access construction would occur.

Construction would require the removal of vegetation to varying degrees throughout the study corridors. As a result of the vegetation removal, the wider interstates, added ramps, retaining walls, and noise barriers would become more visible and prominent to adjacent properties. Additional detail on visual and aesthetic impacts is provided in **FEIS Chapter 5.6** and **FEIS, Appendix H**.

Most emissions associated with construction are considered short-term or temporary in nature. The primary air quality concerns during construction would be a potential short-term localized increase in the concentration of fugitive dust, as well as mobile source pollutant emissions. In general, all of the mobile source air toxics (MSAT) pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045, opening and design years, respectively. All MSAT pollutant emissions are expected to significantly decline in the opening and design years when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios. Additional detail on air quality impacts is provided in **FEIS, Chapter 5.8** and **FEIS, Appendix K**.

00005245

 **OP·LANES**™ MARYLAND  I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Areas around construction sites are likely to experience varied periods and degrees of noise impact. The extent and severity of these impacts depend on the phase of construction and the noise characteristics of construction equipment being used. Despite highway construction being a short-term phenomenon, significant noise impacts can occur. Additional detail on noise impacts is provided in **FEIS, Chapter 5.9** and **FEIS, Appendix L.**

### a. Mitigation

Impacts associated with construction will be further evaluated for the Preferred Alternative in final design including, traffic congestion associated with construction maintenance of traffic, impacts to business and residential access, utility disruptions, vibrations, sediment erosion and stormwater management, and construction related noise.

All construction impacts would be mitigated in accordance with federal, state, and local regulations. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. MDOT SHA and the P3 Developer will continue to coordinate with the neighboring communities through design and construction. Construction will require maintenance of traffic throughout the duration of work to minimize the disruption to highway users.

Visual and aesthetic impacts would generally be consistent with existing views of the study corridors as the surrounding area is adjacent to the existing interstate facilities and the surrounding area is urban and suburban in nature. MDOT SHA has coordinated with NPS and M-NCPPC on visual impacts and mitigation at their park properties.  During final design, MDOT SHA and the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies.

Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSIs) would be conducted to further investigate properties within and in the vicinity of the Preferred Alternative LOD that have a high potential for hazardous materials exposed during construction activities and require mitigation.

All required construction-related permits would be obtained from Maryland Department of the Environment (MDE) prior to construction. During construction the contractor may use the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance;
- Cover trucks when hauling soil, stone, and debris (MDE Law);
- Use water trucks to minimize dust;
- Use dust suppressants if environmentally acceptable;
- Stabilize or cover stockpiles;
- Construct stabilized construction entrances per construction standard specifications;
- Regularly sweep all paved areas including public roads;
- Stabilize onsite haul roads using stone; and

00005246

 - Temporarily stabilize disturbed areas per MDE erosion and sediment standards.

## O. Tolling Considerations

### a. Beneficial and/or Adverse Impacts

The FHWA's *Impacts of Congestion Pricing on Low-Income Populations* (FHWA 2017), explains that the impacts of congestion pricing on low-income populations vary widely by context and type of project (i.e., full facility tolling or partial facility tolling). In the tolled managed-lanes scenario, new travel choice becomes available for all users and additional network capacity is provided. According to FHWA, well planned congestion pricing schemes:

- "Increase transportation options for all commuters, including low-income commuters, to achieve relatively congestion-free travel on specific occasions.
- Demonstrate wide acceptance and usage of priced-managed facilities by low-income commuters.
- Demonstrate that low-income commuters, many of whom are transit riders, particularly benefit from reduced congestion and transit investments made from pricing revenues (FHWA 2017)"

Consistent with FHWA guidance, while the travel speed and trip reliability benefits offered by the tolled lanes under the Preferred Alternative could be a less feasible choice for EJ populations due to cost burden, all existing general purpose (GP) lanes would remain toll-free and would undergo some travel time improvements. Also, under the Preferred Alternative, the general purpose lanes will be rehabilitated including resurfacing, and all bridges including the ALB will be reconstructed. These improvements will benefit all drivers of the study corridors. Traffic analysis conducted in support of the Preferred Alternative indicates that travel times would improve and congestion would decrease along GP lanes. Similarly, because High Occupancy Vehicles (HOVs) with three or more passengers will also travel toll-free on the new managed lanes, the use and availability of car and vanpools should be enhanced. Proposed bicycle and pedestrian improvements also provide for enhanced connectivity and mobility to area transit. These affordable transportation options can particularly benefit potential users who may not have reasonable access to personal vehicles.

All electronic tolling (AET) methods would be enlisted to collect tolls for the managed lanes under the Preferred Alternative. Tolls would be set using dynamic pricing based on a tolling algorithm that would correlate the traffic volumes and demands with the toll rate. The advantage of using dynamic pricing is that it enables the HOT lanes to maintain a 45 miles per hour speed at all times and would reduce congestion in the GP lanes, which results in benefits for all users of the roadway facilities.

Toll rates were set through a public process by the Maryland Transportation Authority (MDTA) in accordance with COMAR 11.07.05. The MDTA toll rate proposal includes minimum toll and maximum toll rate ranges, soft rate caps, a process for annual toll escalation, and toll discounts for certain types of vehicles. The minimum and maximum toll rates are the lowest and highest toll rate per mile that would be charged for two-axle passenger vehicles in any tolling segment. The soft rate cap is the toll rate per mile that can only be exceeded when certain thresholds are met. The final toll rate range will be the recommended action for the MDTA Board and is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting.

I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

The toll rate range proposal will be limited to only Phase 1 South. Any action to set, revise and fix tolls outside of Phase 1 South limits would require a separate toll setting process in accordance with State law. For additional detail on tolling, see **FEIS, Chapter 3.1.9**.

### b.    Mitigation or Community Enhancement Measures

MDOT currently provides the following in managed lanes throughout the state:

- Free transponders for all customers;
- Prepaid cash/check payment options at MDTA walk-in centers, including four MVA's and six MDTA facilities;
- Allowing multiple payment methods, including credit card, cash, check or money order;
- Funding alternative modes of transportation through commuter programs such as Commuter Choice Maryland, Guaranteed Ride Home, and Maryland Rideshare;
- Providing more than 100 park-n-ride locations throughout the state; and
- Minimum prepaid balances sized to reduce the chance of users violating account minimums.

00005248

JA1211

 **OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## 5.7 Comparison of Adverse Impacts to Environmental Justice Populations versus Non-Environmental Justice Populations

**Table 5-19: Comparison of Effects to EJ Populations versus Non-EJ Populations**

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| Property | Property acquisition in EJ populations would total 14.3 acres from 31 properties, compared to property acquisition in non-EJ populations, which would total 78.6 acres from 330 properties.<br><br>Impacted properties in EJ populations account for 9% of the total impacted properties and 15% of the total impacted acreage along the entire Phase 1 South limits.<br><br>Impacted properties in non-EJ populations account for 91% of the total impacted properties and 85% of the total impacted acreage along the entire Phase 1 South limits.<br><br>All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. *The Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* information is provided in **Appendix E**.<br><br>Given the proportion of impacts and compensation requirements described above, the frequency and type of property impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Community Facilities, incl. Section 4(f) Properties (Public Parks and Public Parks with Historic Properties) | No residential or business property relocations would occur under the Preferred Alternative. No permanent or temporary impacts to community facility properties would occur in EJ populations. Impacts to 11 community facility properties, totaling 8.0 acres of impacts, would occur in non-EJ populations. Impacts to two Section 4(f) properties (public parks, public parks with historic properties, and historic sites) — Malcolm King Park and Academy Woods— totaling 0.6 acres of impact, would occur in EJ populations.* Impacts to 18 Section 4(f) properties**, totaling 32.6 acres of impact, would occur in non-EJ populations.***<br><br>Impacted community facility properties in non-EJ populations account for 100% of community facility property impacts. Impacted Section 4(f) properties in EJ populations account for 10% of the total impacted Section 4(f) properties and 2% of the impacted Section 4(f) property acreage.<br><br>All affected community facility property owners would be compensated for the fair market value of the acquired portion of land and any structures acquired for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. The |

00005249

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | *Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* is provided in **Appendix E**. |
| | Mitigation for impacts to Section 4(f) properties has been coordinated extensively with the Officials with Jurisdiction (OWJ) over the impacted park properties. Refer to **FEIS, Chapter 5.4** and **FEIS, Chapter 6**, and **FEIS, Appendix G** for detail on Section 4(f) properties. Refer to Chapter 7 for detail on mitigation related to impacted Section 4(f) properties. |
| | Given the proportion of impacts and mitigation described above, the frequency and type of community facility and Section 4(f) property impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| | *\*Since the SDEIS, Morris Park in block group 7007.17 – 4 is now avoided by the Preferred Alternative LOD.* |
| | *\*\*Includes the Washington Biologists' Field Club on Plummers Island, identified as a Section 4(f) property after the SDEIS. The impacts are not double counted for this property, as it is entirely within the Chesapeake and Ohio Canal National Historical Park.* |
| | *\*\*\*Minor differences in Section 4(f) impact calculations between the EJ Analysis and the Section 4(f) Evaluation are due to rounding.* |
| **Demographics** | No property relocations would occur under the Preferred Alternative. Implementation of the Preferred Alternative would not result in changes to the existing population size or demographic characteristics (age and sex, disability, household income, race and ethnicity, Limited English Proficiency, Free and Reduced Lunch program participation) of the EJ Analysis Area, including both EJ and non-EJ populations. |
| | Because the existing population size or demographic characteristics of the EJ Analysis Area would not be impacted, no mitigation is required. |
| | As such, the frequency and type of impacts to demographics would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Traffic** | The addition of direct access would occur at 4 locations in EJ populations and 5 locations in non-EJ populations. |
| | The Preferred Alternative is projected to provide operational benefits to the proposed managed lanes as well as general purpose lanes on the I-495 and I-270 interstate system, plus operational benefits to the surrounding local arterial network. The Preferred Alternative would significantly increase vehicle throughput across the American Legion Bridge and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network |

00005250


I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | compared to the No Build Alternative. Populations in both EJ populations and non-EJ populations would have the opportunity to experience these operational benefits. Refer to **FEIS, Chapter 7** for detail on mitigation related to traffic.<br><br>As such, the frequency and type of traffic impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Air Quality** | Because the Study is in attainment for criteria pollutants' NAAQS,[52] transportation conformity requirements do not apply for this Study, meaning no project-level air quality analysis was required. For this reason, air quality modeling at a localized level—the level at which this EJ Analyses are otherwise conducted— is not available.<br><br>Exposure to traffic-related air pollution under the Preferred Alternative would result from short-term construction activities (approximately five years) and long-term highway operations. The exposure would be distributed along the Phase 1 South limits, regardless of EJ status.<br><br>In general, all of the MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045, opening and design years, respectively. All MSAT pollutant emissions are expected to significantly decline in the opening and design years when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios. However, EJ populations who live in areas with high EPA and MD EJSCREEN EJ Index scores **(Appendix F)** may experience air quality and/or public health impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores.<br><br>Construction-related air quality impacts of the project would be limited to short-term increased fugitive dust and mobile-source emissions, including carbon monoxide, during construction. Construction related air quality mitigation measures would be applied to minimize air quality and public health impacts to all populations along the Phase 1 South limits, particularly to EJ populations. Refer to **FEIS, Chapter 5.8.4** for additional details. All required construction-related permits would be obtained from Maryland Department of the Environment (MDE) prior to construction. Dust control measures to minimize and mitigate impacts to air quality would be used to the greatest extent practicable. To minimize the amount of emissions generated during construction, efforts would be made to limit traffic disruptions, especially during peak travel hours. Further, depending on the meteorological conditions, research has shown that noise barriers may deflect emissions and/or increase dispersion of emissions. Refer to FEIS, Chapter 7 for detail on mitigation related to air quality. |

---

[52]These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

00005251

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | Further, "active transportation" modes such as walking and bicycling have been shown to reduce human health risks and improve overall wellbeing.[1] Opportunities for active transportation will be provided under the Preferred Alternative via new and enhanced pedestrian and bicycle connections. Refer to **Section 5.8** below, and **FEIS, Chapter 7** for detail on pedestrian and bicycle community enhancements. As such, air quality impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Safety** | No impacts would occur to safety along the Phase 1 South limits, including both EJ populations and non-EJ populations. |
| | The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with federal and state regulation. During construction, safety maintenance measures to protect drivers, bicyclists, and pedestrians would also be implemented in accordance with federal, state, and local regulations. |
| | Further, additional capacity on the Phase 1 South limits would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur; this benefit would occur for both EJ populations and non-EJ populations. Refer to **FEIS, Chapter 7** for detail on mitigation related to safety. |
| | As such, impacts to safety would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Noise** | Of a total of 60 NSAs, 11 are located in EJ populations and 49 are located in non-EJ populations. Two of the 11 NSAs in EJ populations would not experience a noise impact; Another 3 NSAs in EJ populations, while experiencing a noise impact, would not be protected by noise barrier systems as the systems are considered not reasonable and/or feasible. Ten of the 49 NSAs in non-EJ populations would not experience a noise impact. Another 7 NSAs in non-EJ populations, while experiencing a noise impact, would not be protected by noise barrier systems as the systems are considered not reasonable and/or feasible. |
| | Overall, a greater percentage of the total NSAs are located in non-EJ populations (82%) than in EJ populations (18%). A slightly lower percentage of NSAs in EJ populations would not experience a noise impact (18%) as compared to the NSAs in non-EJ populations that would not experience a noise impact (20%). Between EJ populations and non-EJ populations, the percentage of NSAs experiencing an impact but whose noise barrier systems would be considered not feasible and/or reasonable, is smaller in non-EJ populations (18%), as compared to the same type of NSAs in EJ populations (33%). |
| | Noise barrier feasibility and reasonableness criteria are based on federal regulation (23 CFR 772), the MDOT SHA *Highway Noise Abatement Planning and Engineering* |

00005252

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
|  | *Guidelines*, and *VDOT Highway Traffic Noise Impact Analysis Guidance Manual.* In general, noise abatement feasibility criteria focus on whether it is physically possible to build a noise barrier that achieves a minimally acceptable level of noise reduction, taking into consideration acoustics, safety, and access. Noise barrier reasonableness criteria focus on viewpoints, noise reduction design goal, and cost effectiveness. These criteria are applied equally wherever noise abatement was considered, regardless of NSA location. (Refer to **FEIS, Chapter 5.9** for detail on noise abatement.) |
|  | While the percentage of NSAs who experience noise impacts and whose barrier systems are considered not feasible and/or reasonable is greater in EJ populations versus non-EJ populations, overall, a substantially greater percentage of NSAs are located in non-EJ populations rather than EJ populations. The feasible and/or reasonable criteria is based on federal and state regulations and are applied equally wherever noise abatement is considered. As such, noise impacts would not be considered higher or more adverse to EJ populations under the Preferred Alternative. |
| **Hazardous Materials** | EJ populations contain 27 low, 4 moderate, and 2 high risk sites of hazardous materials sites of concern, while non-EJ populations contain 37 low, 56 moderate, and 9 high risk sites of hazardous materials sites of concern. |
|  | EJ populations account for 42% of the low, 7% of the moderate, and 18% of the high risk sites of hazardous materials sites of concern. Hazardous material mitigation would be conducted as necessary in accordance with federal, state, and local regulations. |
|  | As such, hazardous materials concerns would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Natural Resources** | Impacts would occur to natural resources in both EJ populations and non-EJ populations. Natural resource impacts would occur in 10 EJ populations and 32 non-EJ populations. |
|  | In comparison to non-EJ populations, EJ populations account for 5% of total impacts to wetlands, 17% of total impacts to wetland buffers, 16% of total impacts to waters (linear feet), 9% of total impacts to waters (square feet), 23% of total impacts to tree canopy, and 11% of total impacts to floodplains. |
|  | Impacts to natural resources will be mitigated in accordance with all applicable federal, state, and local regulations. Refer to **FEIS, Chapter 7** for detail on mitigation related to natural resources. |
|  | As such, impacts to natural resources would not be higher or more adverse to EJ populations under the Preferred Alternative. |

00005253

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| Visual Landscape and Aesthetic Values | The Preferred Alternative would result in changes to viewsheds or visual impacts in both EJ populations and non-EJ populations. New highway lanes would be added to the existing I-495 or I-270 corridor regardless of adjacency to an EJ population. The addition of project elements associated with the highway widening would not introduce new elements incompatible with the existing visual character or qualities, again regardless of adjacency to an EJ population.

During final design, MDOT SHA and the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The goal will be to design highway elements to be sensitive to the context of the surrounding land use, including historic and park resources. Refer to **FEIS**, **Chapter 7** for detail on mitigation related to the visual landscape and aesthetic values.

As such, impacts to the visual landscape and aesthetic values would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Economy and Employment | The Preferred Alternative would not result in business relocations and would not impact access to area businesses or employers. There would be no overall impact to the distribution of worker occupation, or major employers within EJ or non-EJ populations within the Analysis Area. Proposed improvements would help address increasing congestion, thereby maintaining mobility throughout the region, including areas with EJ populations.

Through the Opportunity MDOT Program, the agency will provide resources for job seekers and small, minority-, women-, and veteran-owned businesses and disadvantaged businesses to prepare for potential opportunities to work with MDOT and the I-495 & I-270 P3 Program.

As such, impacts economy and employment would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Access and Mobility | The Preferred Alternative would not permanently eliminate or impede access between residences and community facilities and businesses, including both those in EJ populations and non-EJ populations. An incremental enhancement to access may occur for both EJ populations and non-EJ populations due to reduced congestion on local routes.

Impacts to access and mobility during construction would be minimized in compliance with MDOT SHA Work Zone Safety and Mobility requirements along the Phase 1 South limits and would include maintenance of the same number of existing lanes. Under the Preferred Alternative, the same number of general purpose lanes will remain, along with the addition of the four HOT lanes. The general purpose lanes will also be rehabilitated and resurfaced, and all bridges, including the American Legion |

00005254

 I-495 & I-270 Managed Lanes Study　　Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | Bridge, will be reconstructed.  These improvements would benefit all drivers of the study corridors.<br><br>The Preferred Alternative includes toll-free travel for bus transit and High Occupancy Vehicles with three or more passengers (HOV3+), new, direct access to transit centers, and new and enhanced bicycle/pedestrian connections. Refer to **FEIS**, **Chapter 7** for detail on community enhancements related to access and mobility.<br><br>As such, impacts to access and mobility would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Community Cohesion and Quality of Life** | No changes would occur to the existing sense of community cohesion in EJ populations or non-EJ populations. Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270 and the fact that no properties would be displaced. Property- and construction- related changes to a local resident's or employee's existing quality of life would be experienced by both EJ populations and non-EJ populations. At the same time, local residents and employees, regardless of EJ status, could experience a benefit to quality of life due to reduced congestion in general purpose lanes and HOT lanes<br><br>To further enhance community cohesion and quality of life in the EJ Analysis Area, MDOT SHA has committed to new and enhanced bicycle/pedestrian connections to support additional affordable travel options. Specifically, MDOT SHA has committed to constructing a new sidewalk along the west side of Seven Lock Road under I-495 to *reestablish the historic connection* between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall Cemetery, in the historically African American community of Gibson Grove. Refer to **FEIS**, **Chapter 3.1.5** for additional bicycle and pedestrian improvements.<br><br>As such, impacts to community cohesion and quality of life would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Construction** | Construction of project elements would occur along the Phase 1 South limits, including in EJ populations. Impacts from construction to visual and aesthetic resources, hazardous material sites of concern, air quality, and noise would also occur throughout the Preferred Alternative limits, including within EJ populations.  It is anticipated that construction will last approximately five years. Mainline widening would occur throughout the Phase 1 South limits.<br><br>Two (2.0) acres in EJ populations and 12.6 acres in non-EJ populations would be required temporarily for construction access, staging, and materials storage; EJ populations contain 16% percent of total temporary property acquisition for construction.  Construction for new direct access and for modifications to existing |

00005255

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | interchanges to accommodate highway widening would occur at 10 locations in EJ populations and 8 locations in non-EJ populations. |
| | All construction impacts would be mitigated in accordance with federal, state, and local regulations. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. MDOT SHA and the Developer will continue to coordinate with the neighboring communities through design and construction. Refer to **FEIS, Chapter 7** for detail on mitigation related to construction. |
| | As such, impacts from construction would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Tolling Considerations** | Consistent with FHWA guidance, while the travel speed and trip reliability benefits offered by the tolled lanes under the Preferred Alternative could be a less feasible choice for EJ populations due to cost burden, all existing general purpose (GP) lanes would remain toll-free and would undergo some travel time improvements. Also, under the Preferred Alternative, the general purpose lanes will be rehabilitated including resurfacing, and all bridges including the ALB will be reconstructed. These improvements will benefit all drivers of the study corridors. Traffic analysis conducted in support of the Preferred Alternative indicates that travel times would improve and congestion would decrease along GP lanes. Similarly, because High Occupancy Vehicles (HOVs) with three or more passengers will also travel toll-free on the new managed lanes, the use and availability of car and vanpools should be enhanced. Proposed bicycle and pedestrian improvements also provide for enhanced connectivity and mobility to area transit. These affordable transportation options can particularly benefit potential users who may not have reasonable access to personal vehicles. |
| | As such, impacts from tolling would not be higher or more adverse to EJ populations under the Preferred Alternative. |

*Includes permanent and temporary impacts.*

[1] Raynault, Eloisa and Ed Christopher. "How Does Transportation Affect Public Health?" *Public Roads Magazine*, Vol. 76 No. 6. Federal Highway Administration. Accessed at https://highways.dot.gov/public-roads/mayjune-2013/how-does-transportation-affect-public-health.

## 5.8    Determination of whether Disproportionately High and Adverse Impacts would Occur to Environmental Justice Populations under the Preferred Alternative

Per FHWA Order 6640.23A, a *Disproportionately High and Adverse Effect on Minority and Low-Income Populations* is an adverse impact that:

(1) is predominately borne by a minority population and/or a low-income population; or

00005256

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

(2) will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

In determining whether a particular program, policy, or activity would have disproportionately high and adverse impacts on minority and low-income populations, Order 6640.23A states that FHWA (and MDOT SHA) should take into account "mitigation and enhancement measures and potential offsetting benefits to the affected minority and/or low-income populations" as well as "design, comparative impacts, and the relevant number of similar existing system elements in nonminority and non-low-income areas" (FHWA 2012).

Due to the parallel nature of the Preferred Alternative limits of disturbance to I-495 and I-270, plus the infrequent distribution of EJ and non-EJ populations along the Phase 1 South limits, impacts would occur consistently throughout the limits. Non-EJ populations would bear the majority of quantifiable impacts for various resources, including the following:

- 91 percent of impacted properties and 85 percent of impacted property acreage;
- 100 percent of impacted community facility properties and acreage;
- 90 percent of impacted Section 4(f) properties and 98 percent of impacted Section 4(f) property acreage;
- 58 percent of the low-risk, 93 percent of the moderate-risk, and 82 percent of the high-risk sites of hazardous materials concern; and
- 95 percent of impacts to wetlands, 83 percent of impacts to wetland buffers, 84 to 91 percent of impacts to waters (linear feet and square feet, respectively), 77 percent of impacts to the tree canopy, and 89 percent of impacts to floodplains.

Impacts to demographics, traffic, air quality and its effect on public health, safety, visual and aesthetic resources, economy and employment, access and mobility, community cohesion/isolation and quality of life, and impacts resulting from construction would occur consistently along the Phase 1 South limits and more frequently in non-EJ populations.

The types of impacts caused by the Preferred Alternative would not differ between EJ populations and non-EJ populations. The Preferred Alternative includes construction of the following project elements that are distributed throughout the Phase 1 South limits: mainline widening, addition of new direct access and reconstruction of existing interchanges, reconstruction of mainline bridges and overpasses, relocation of utilities, and construction/reconstruction of stormwater management, retaining walls, and noise barriers. Operation of the Preferred Alternative would also be consistent along the Phase 1 South limits. As such, the types of impacts caused by the Preferred Alternative would not be greater in magnitude in EJ populations versus non-EJ populations.

In response to public and agency input and concern about property impacts under the Build Alternatives analyzed in the DEIS, including considerable impacts to EJ populations, MDOT SHA selected the Preferred Alternative for Phase 1 South, which avoided all residential and business displacements and substantially reduced the number and location of potentially impacted EJ populations.

Given the reasoning documented in this EJ Analysis and summarized above and in accordance with EO 12898, USDOT Order 5610.2C, FHWA Order 6640.23A, and an FHWA Guidance on Environmental Justice

00005257

(EJ) and NEPA (2011), FHWA and MDOT SHA have determined that a disproportionately high and adverse impact would not occur to the EJ Analysis Area population under the I-495 and I-270 Managed Lanes Study Preferred Alternative.

However, to be responsive to community concerns raised during the outreach and engagement efforts, which identified priorities for improved sidewalks and bicycle facilities, better lighting, and traffic calming measures, MDOT SHA commits to working with the City of Rockville, the City of Gaithersburg, and Montgomery County to:

- Identify locations where safer pedestrian crossings on major state roadways are needed.
- Identify locations where additional pedestrian improvements including adding or upgrading sidewalk, restriping for bicycle lanes, adding or upgrading ADA ramps are needed.
- Identify locations along state roads with existing pedestrian facilities where more or better lighting is needed.

MDOT SHA has incorporated elements into the Preferred Alternative or has committed to additional improvements or the Developer has committed to certain enhancements as part of the P3 Agreement that support fair, accessible, and affordable transportation options for all users of the Study roadways, including traditionally underserved communities, including the following:[53]

- Supporting additional affordable, multimodal travel options including:
  - Toll-free travel for new bus transit on managed lanes for a faster, more reliable trip.
  - Toll-free travel for carpools/vanpools with three or more (3+) occupants.
  - Working with the local communities to expand transit fare subsidies for eligible low-income riders.

- Improving accessibility to work, school, and other modes of transportation via pedestrian and bicycle improvements:
  - Upgrading existing pedestrian and bicycle facilities impacted by the Preferred Alternative by replacing in-kind or upgrading to meet the master plan recommended facilities.
  - Where I-495 and I-270 or associated ramps cross over a roadway and the bridge would be replaced, the mainline and ramp bridges will be lengthened to accommodate the footprint of the master plan facility under the structure.
  - New pedestrian and bicycle facilities including a shared use path on the American Legion Bridge.
  - New sidepaths across MD 190 over I-495.
  - New sidewalk along Seven Locks Road to re-establish the historic connection in the historically African American community of Gibson Grove.
  - Providing safer pedestrian and bicycle improvements and connecting with planned City of Rockville improvements at the MD 189 and I-270 interchange.

[53] The elements listed that are not part of the base design of the Preferred Alternative will be documented in the Record of Decision or, if Developer lead, documented in the P3 Agreement and/or Memoranda of Understanding to ensure they are carried through project development.

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- Enhancing transit connectivity and mobility by:
    - o Direct and indirect access ramps from the managed lanes to existing transit stations including Shady Grove, Twinbrook, Rockville Metro Stations and Westfield Montgomery Mall Transit Center.
    - o Increasing the number of bus bays at WMATA Shady Grove Metrorail Station.
    - o Increasing parking capacity at the Westfield Montgomery Mall Transit Center.

- Upgrading existing transportation facilities throughout Phase 1 South for all users of the Study roadways by:
    - o Replacing or rehabilitating all existing bridges on or over I-495 and I-270 within the Phase 1 South corridor.
    - o Rehabilitating and repaving the existing general purpose lanes for smoother and safer travel for all users.

MDOT SHA has also committed to certain improvements within the historically African American community of Gibson Grove either as mitigation for direct impacts or as commitments for further enhancement. MDOT SHA will construct or fund a new parking lot for the Gibson Grove Church, provide stormwater improvements to the property, and provide a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between Gibson Grove Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Refer to **FEIS**, **Chapter 5.7** and **FEIS**, **Appendix J** for details.

Additionally, the Developer is committed to the following as part of the P3 Agreement:

- Working with Montgomery, Frederick and Prince George's Counties to expand transit fare subsidies for eligible low-income riders.

- The Developer will facilitate the development of a facility improvement program for the installation or replacement of sidewalks, crossings, or signal modifications and formalizing trail development that has pedestrian demand, then rank projects according to safety significance, readiness, and landowner consensus, as part of its commitment to support Montgomery County's Vision Zero Action Plan, which identifies strategies to eliminate serious and fatal collisions on County roads for vehicle occupants, pedestrians, and bicyclists by the end of 2030.[54]

- In support of community, environmental, and sustainability goals, the Developer is requiring the development of a Sustainability Plan for the project to achieve, at minimum, a Gold Award rating as recognized by the EnvisionTM Sustainable Infrastructure Rating System of the Institute for Sustainable Infrastructure ("ISI") and target a Platinum Award in collaboration with the Section Developer. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset, stakeholder and community engagement, natural resource management, ecosystems and biodiversity health, climate resilience and carbon emissions.

---

[54] See https://www.montgomerycountymd.gov/visionzero/.

00005259

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Refer to **Chapter 3, Sections 3.1.4** and **3.2** for detail on transit-related elements of the Preferred Alternative as well as transportation commitments. Refer to **Chapter 7, Section 7.2** for detail on all commitments.

MDOT SHA and the Developer will continue coordination with local and regional advisory groups to determine additional methods for engaging with underserved communities. This will be an ongoing effort that continues post-NEPA, through final design and construction.

00005260

JA1223



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

# 6    REFERENCES

**Fairfax County**

2020. *Demographic Reports*. Accessed at: fairfaxcounty.gov/demographics/sites/demographics/files/assets/demographicreports/fullrpt.pdf

2021. *Agricultural & Forestal Map*. Accessed at: fairfaxcountygis.maps.arcgis.com/apps/webappviewer/index.html?id=8703c68608b64c2890ddfed032f20d25.

2019. *Fairfax County Land Use Data: Existing Land use- Generalized*. Accessed at: https://www.fairfaxcounty.gov/maps/open-geospatial-data.

2021. Fairfax County Zoning Administration Division. *The Fairfax County Zoning Ordinance*. Accessed at: https://www.fairfaxcounty.gov/planning-development/zoning-ordinance.

2021. Fairfax County Department of Housing and Community Development. *Affordable Dwelling Unit Rental Program*. Accessed at: https://www.fairfaxcounty.gov/housing/rentalhousing.

**Federal Highway Administration (FHWA)**

2013. Raynault, Eloisa and Ed Christopher. "How Does Transportation Affect Public Health?" Public Roads Magazine, Vol. 76 No. 6. Accessed at https://highways.dot.gov/public-roads/mayjune-2013/how-does-transportation-affect-public-health.

2017. *Impacts of Congestion Pricing on Low-Income Populations: Efforts to Measure and Response to Income-Equity Concerns*. Accessed at: ops.fhwa.dot.gov/publications/fhwahop17019/index.htm.

2018. *Air Quality: Transportation & Toxic Air Pollutants—Research & Analysis*. Accessed at https://www.fhwa.dot.gov/environment/air_quality/air_toxics/research_and_analysis/.

**City of Gaithersburg**

2021. *City of Gaithersburg GIS web map – Zoning*. Accessed at: https://maps.gaithersburgmd.gov/gallery/.

**City of Rockville**

2021. *City of Rockville GIS Open Data – Zoning Districts*. Accessed at: https://data-rockvillemd.opendata.arcgis.com/datasets/rockville-zoning-districts/explore?location=39.086800%2C-77.154050%2C13.88.

**Health Effects Institute (HEI)**

2010. *Traffic-Related  Air Pollution: A Critical   Review of the Literature on   Emissions,  Exposure,  and Health Effects*. HEI Special Report 17. Accessed at: https://www.healtheffects.org/system/files/SR17TrafficReview_Exec_Summary.pdf.

00005261

JA1224



I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment and EJ Analysis Technical Report

# APPENDIX A:
## CEA Analysis Area Environmental Mapping

June 2022

00005262



JA1226

00005263

 I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment and EJ Analysis Technical Report

# APPENDIX F:
# EJScreen Data and Mapping

June 2022

## Purpose of Appendix F

Data and maps included in this appendix, which are referenced in the text of **FEIS, Chapter 5** and **FEIS, Appendix F**, provide information on existing environmental conditions and were reviewed as additional resources to assist with the identification and consideration of EJ populations within the EJ Analysis Area.

The following is included in **Appendix F**:

- Definitions for the EPA EJSCREEN Environmental Indicators and Demographic Indexes, and the MD EJSCREEN Pollution Burden Indicators and Population Characteristics (**Pages 2-4**)

- Data tables showing EPA EJSCREEN EJ Indexes  and MD EJSCREEN EJ Scores for each block group within the EJ Analysis Area (or tract, for MD EJSCREEN). Note that the values are the percentiles in which each block group or tract falls (as compared to the State of Maryland) for each Environmental Indicator or Pollution Burden Indicator. (**Pages 5-8**)

- Summary tables with results from the review of EPA EJSCREEN and MD EJSCREEN data (**Pages 9-14**)

- Heat maps showing EPA EJSCREEN EJ Indexes for all 12 Environmental Indicators (**Pages 15-26**).

1

00005351

## EPA EJSCREEN Definitions

The following definitions, accessed from https://www.epa.gov/ejscreen/overview-environmental-indicators-ejscreen and https://www.epa.gov/ejscreen/overview-demographic-indicators-ejscreen, describe the Environmental Indicators and Demographic Indicators that are used by the EPA to calculate EJ Indexes at the block group level. Also included is a definition of the Demographic Index, which is used along with the Environmental Indicators to generate EJ Indexes.

| | | |
|---|---|---|
| **Environmental Indicator** | **Hazardous Waste Proximity Index** | Count of hazardous waste facilities (Treatment, Storage, and Disposal Facility and Large Quantity Generators) within 5 km (or nearest beyond 5 km), each divided by distance in kilometers |
| | **Lead Paint Indicator** | Percent of housing units built pre-1960, as indicator of potential lead paint exposure |
| | **Air Toxics Cancer Risk** | Lifetime cancer risk from inhalation of air toxics |
| | **Diesel Particulate Matter** | Diesel particulate matter level in air, $\mu g/m^3$ |
| | **Air Toxics Assessment Respiratory Hazard Index** | Ratio of exposure concentration to health-based reference concentration |
| | **Ozone** | Ozone summer seasonal avg. of daily maximum 8-hour concentration in air in parts per billion |
| | **Particulate Matter (PM 2.5)** | $PM_{2.5}$ levels in air, $\mu g/m^3$ annual avg. |
| | **Proximity to Risk Management Plan (RMP) Sites** | Count of RMP (potential chemical accident management plan) facilities within 5 km (or nearest one beyond 5 km), each divided by distance in kilometers |
| | **Superfund Proximity** | Count of proposed or listed NPL – also known as superfund – sites within 5 km (or nearest one beyond 5 km), each divided by distance in kilometers |
| | **Traffic Proximity and Volume** | Count of vehicles (AADT, avg. annual daily traffic) at major roads within 500 meters, divided by distance in meters (not kilometers) |
| | **Underground Storage Tanks (UST) and Leaking UST (LUST)** | Count of LUSTs (multiplied by a factor of 7.7) and the number of USTs within a 1,500-foot buffered block group |
| | **Wastewater Discharge Indicator** | Risk-Screening Environmental Indicators (RSEI) modeled toxic concentrations at stream segments within 500 meters, divided by distance in kilometers (km) |
| **Demographic Indicator** | **Demographic Index** | Based on the average of two demographic indicators: percent low-income and percent people of color |
| | **Low-Income** | The percent of a block group's population in households where the household income is less than or equal to twice the federal "poverty level" |
| | **People of Color** | The percent of individuals in a block group who list their racial status as a race other than white alone and/or list their ethnicity as Hispanic or Latino. That is, all people other than non-Hispanic white-alone individuals. The word "alone" in this case indicates that the person is of a single race, not multiracial |
| | **Less than High School Education** | Percent of people age 25 or older in a block group whose education is short of a high school diploma |
| | **Linguistic Isolation** | Percent of people in a block group living in linguistically isolated households. A household which all members age 14 years and over speak a non-English language and also speak English less than "very well" (have difficulty with English) is linguistically isolated |
| | **Individuals Under Age 5** | Percent of people in a block group under the age of 5 |
| | **Individuals Over Age 64** | Percent of people in a block group over the age of 64 |

2

00005352

| | | |
|---|---|---|
| | **Unemployment Rate** | The percent of a block group's population that did not have a job at all during the reporting period, made at least one specific active effort to find a job during the prior 4 weeks, and were available for work (unless temporarily ill) |

## MD EJSCREEN Definitions

The following definitions, accessed from https://p1.cgis.umd.edu/mdejscreen/help.html, describe the breakdown of Pollution Burden Indicators (Exposure Indicators, Environmental Effects Indicators) and Population Characteristics (Sensitive Populations, Socioeconomic Factors) that are used to calculate the MD EJSCREEN Overall EJScore for tracts.

| | | |
|---|---|---|
| | **Exposure Indicator** | |
| | **National-Scale Air Toxics Assessment (NATA) Cancer Risks** | Lifetime risk of developing cancer from inhalation of toxins. Reported as risk per lifetime per million people |
| | **National-Scale Air Toxics Assessment (NATA) Respiratory Hazard Index** | Air toxics respiratory hazard index. This is the sum of hazard indices for those air toxics with reference concentrations based on respiratory endpoints, where each hazard index is the ratio of exposure concentration in the air to the health-based reference |
| | **National-Scale Air Toxics Assessment (NATA) Diesel Particulate Matter** | Levels of diesel particulate matter in the air. Reported as micrograms per cubic meter ($\mu g/m^3$) |
| | **Particulate Matter 2.5 (PM2.5)** | Levels of particulate matter with a diameter of 2.5 micrometers or smaller in air. Reported as micrograms per cubic meter ($\mu g/m^3$) |
| **Pollution Burden Indicator** | **Ozone** | Summer seasonal average of the maximum daily 8-hour concentration of ozone in air in parts per billion |
| | **Traffic Proximity and Volume** | Count of vehicles (average annual daily traffic) at major roads within 500 meters or close to 500 meters, divided by distance in meters |
| | **Environmental Effects Indicator** | |
| | **Lead Paint Indicator** | Percent of houses built before 1960, which likely contain lead paint |
| | **Proximity to Risk Management Plan Sites** | Count of RMP (potential chemical accident management plan) facilities within 5 kilometers or close to 5 kilometers, divided by distance in kilometers |
| | **Proximity to Treatment and Disposal Facilities** | Count of TSDF (hazardous waste management facilities) within 5 kilometers or closest to 5 kilometers, divided by distance in kilometers |
| | **Proximity to National Proximity List Sites** | Count of NPL/Superfund sites (polluted sites that pose a risk to human health and/or the environment) within 5 kilometers or close to 5 kilometers, divided by distance in kilometers |
| | **Proximity to Major Direct Water Discharges** | Toxic concentrations in stream segments within 500 meters, divided by distance in kilometers. Standards modeled after Risk-Screening Environmental Indicators (RSEI) |
| | **Watershed Failure** | Percent of each census tract's watershed that exceeds levels of phosphorus and/or Nitrogen |

3

00005353

| Population Characteristics | | |
|---|---|---|
| | **Sensitive Populations** | |
| | **Asthma Emergency Room Discharges** | Count of patients released from the hospital after being admitted for asthma or asthma-related distress |
| | **Myocardial Infraction Discharges** | Patients released from the hospital after being admitted for a heart attack or heart attack symptoms |
| | **Low Birth Weight Infants** | Babies born weighing less than 5.5 pounds |
| | **Socioeconomic Factors** | |
| | **Percent Low Income** | Percentage of individuals whose household income in the past 12 months is less than two times below the federal poverty level |
| | **Percent Non-White** | Percentage of individuals who define themselves as any race/ethnicity besides non-Hispanic white |
| | **Less Than High School Education** | Percentage of individuals 25 and older who lack a high school diploma |
| | **Linguistic Isolation** | Percentage of households in which no one 14 years old and older speaks English "very well," or households which speak only English |
| | **Individuals Under 5 Years Old** | Percentage of people under the age of 5 |
| | **Individuals Over 64 Years Old** | Percentage of people over the age of 64 |
| | **Unemployment** | Percentage of the population over the age of 16 that is unemployed and eligible for the labor force. Excludes retirees, students, homemakers, institutionalized persons except prisoners, those not looking for work, and military personnel on active duty |

4

00005354

## EPA EJSCREEN Raw Data*

| Block Group within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJ Index for Particulate Matter 2.5 (%ile in State) | EJ Index for Ozone (%ile in State) | EJ Index for 2017 Diesel Particulate Matter (%ile in State) | EJ Index for 2017 Air Toxics Cancer Risk (%ile in State) | EJ Index for 2017 Air Toxics Respiratory Hazard Index (%ile in State) | EJ Index for Traffic Proximity (%ile in State) | EJ Index for Lead Paint (%ile in State) | EJ Index for Superfund Proximity (%ile in State) | EJ Index for RMP Facility Proximity (%ile in State) | EJ Index for Hazardous Waste Proximity (%ile in State) | EJ Index for Underground Storage Tanks (%ile in State) | EJ Index for Wastewater Discharge (%ile in State) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4701.00 - 1 | Mclean | no | 42 | 44 | 24 | 44 | 43 | 3 | 44 | 42 | 42 | 10 | 70 | 12 |
| 4701.00 - 2 | Mclean | no | 16 | 18 | 3 | 20 | 16 | 9 | 21 | 22 | 22 | 3 | 25 | 5 |
| 4801.00 - 4 | Mclean | no | 53 | 54 | 49 | 54 | 53 | 19 | 37 | 52 | 54 | 24 | 70 | 12 |
| 7007.17 - 1 | Gaithersburg | yes | 92 | 91 | 94 | 90 | 91 | 79 | 57 | 74 | 74 | 96 | 83 | 73 |
| 7007.17 - 3 | Gaithersburg | yes | 92 | 92 | 95 | 91 | 92 | 99 | 73 | 75 | 75 | 96 | 63 | 67 |
| 7007.17 - 4 | Gaithersburg | yes | 66 | 66 | 71 | 65 | 67 | 93 | 76 | 61 | 59 | 81 | 81 | 58 |
| 7007.18 - 1 | Rockville | no | 21 | 23 | 4 | 22 | 17 | 5 | 57 | 33 | 35 | 2 | 0 | 41 |
| 7007.18 - 2 | Rockville | no | 42 | 43 | 29 | 42 | 41 | 27 | 57 | 46 | 47 | 7 | 6 | 43 |
| 7008.16 - 1 | Gaithersburg | yes | 91 | 90 | 94 | 89 | 91 | 99 | 65 | 74 | 74 | 96 | 63 | 62 |
| 7008.16 - 2 | Gaithersburg | yes | 63 | 62 | 66 | 62 | 62 | 70 | 65 | 59 | 58 | 79 | 70 | 59 |
| 7008.17 - 1 | Gaithersburg | yes | 54 | 54 | 55 | 54 | 54 | 68 | 57 | 54 | 53 | 59 | 67 | 51 |
| 7008.17 - 2 | Gaithersburg | no | 47 | 48 | 41 | 48 | 47 | 21 | 46 | 49 | 49 | 14 | 18 | 41 |
| 7008.17 - 3 | Gaithersburg | yes | 55 | 54 | 55 | 54 | 55 | 59 | 57 | 54 | 54 | 62 | 67 | 54 |
| 7008.29 - 1 | Gaithersburg | yes | 50 | 50 | 48 | 50 | 50 | 24 | 48 | 51 | 50 | 24 | 24 | 39 |
| 7010.01 - 2 | Rockville | no | 33 | 35 | 17 | 33 | 31 | 4 | 40 | 41 | 41 | 8 | 14 | 39 |
| 7010.01 - 3 | Rockville | no | 38 | 39 | 23 | 38 | 37 | 10 | 57 | 44 | 45 | 12 | 16 | 45 |
| 7010.02 - 1 | Rockville | no | 36 | 38 | 23 | 37 | 35 | 0 | 46 | 43 | 42 | 14 | 20 | 40 |
| 7010.02 - 2 | Rockville | no | 16 | 19 | 3 | 17 | 13 | 3 | 41 | 30 | 28 | 6 | 6 | 37 |
| 7010.02 - 3 | Rockville | no | 33 | 34 | 18 | 33 | 30 | 20 | 28 | 40 | 37 | 15 | 63 | 38 |
| 7010.04 - 4 | Rockville | no | 24 | 24 | 8 | 23 | 18 | 0 | 32 | 33 | 35 | 2 | 14 | 27 |
| 7010.04 - 4 | Rockville | no | 43 | 44 | 36 | 44 | 43 | 11 | 36 | 47 | 47 | 15 | 63 | 33 |
| 7010.05 - 1 | Rockville | no | 25 | 27 | 9 | 26 | 22 | 0 | 13 | 36 | 36 | 5 | 18 | 30 |
| 7010.05 - 2 | Rockville | no | 45 | 46 | 38 | 45 | 44 | 16 | 28 | 48 | 48 | 16 | 14 | 36 |
| 7010.06 - 1 | Rockville | no | 37 | 38 | 30 | 38 | 36 | 10 | 37 | 42 | 42 | 8 | 21 | 23 |
| 7010.06 - 2 | Rockville | no | 14 | 17 | 6 | 16 | 11 | 0 | 57 | 28 | 28 | 4 | 16 | 25 |
| 7010.07 - 1 | Rockville | yes | 47 | 47 | 40 | 47 | 46 | 23 | 57 | 48 | 49 | 13 | 29 | 27 |
| 7010.07 - 2 | Rockville | no | 48 | 48 | 42 | 48 | 47 | 12 | 47 | 49 | 50 | 15 | 23 | 30 |
| 7012.05 - 1 | North Bethesda | no | 9 | 4 | 1 | 10 | 7 | 0 | 17 | 24 | 28 | 2 | 22 | 44 |
| 7012.05 - 2 | North Bethesda | no | 3 | 4 | 0 | 3 | 2 | 0 | 18 | 17 | 23 | 0 | 9 | 42 |
| 7012.05 - 3 | North Bethesda | no | 46 | 49 | 46 | 49 | 49 | 7 | 57 | 50 | 51 | 32 | 70 | N/A |
| 7012.05 - 4 | North Bethesda | no | 39 | 40 | 27 | 39 | 38 | 1 | 42 | 44 | 45 | 15 | 21 | 45 |
| 7012.06 - 1 | Potomac | no | 22 | 24 | 10 | 23 | 18 | 4 | 57 | 34 | 32 | 6 | 13 | 44 |
| 7012.06 - 2 | Potomac | no | 14 | 17 | 5 | 16 | 11 | 12 | 28 | 28 | 26 | 10 | 63 | 38 |
| 7012.10 - 1 | Rockville | no | 34 | 36 | 28 | 34 | 32 | 26 | 57 | 41 | 38 | 14 | 63 | 34 |
| 7012.11 - 3 | Rockville | no | 42 | 43 | 36 | 42 | 41 | 40 | 42 | 46 | 47 | 7 | 21 | 33 |
| 7012.13 - 1 | North Bethesda | no | 40 | 41 | 28 | 40 | 39 | 13 | 57 | 44 | 47 | 11 | 25 | 43 |
| 7012.13 - 2 | North Bethesda | no | 46 | 46 | 38 | 46 | 45 | 14 | 57 | 48 | 49 | 19 | 63 | 43 |

00005355

5

| Block Group within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJ Index for Particulate Matter 2.5 (%ile in State) | EJ Index for Ozone (%ile in State) | EJ Index for 2017 Diesel Particulate Matter (%ile in State) | EJ Index for 2017 Air Toxics Cancer Risk (%ile in State) | EJ Index for 2017 Air Toxics Respiratory Hazard Index (%ile in State) | EJ Index for Traffic Proximity (%ile in State) | EJ Index for Lead Paint (%ile in State) | EJ Index for Superfund Proximity (%ile in State) | EJ Index for RMP Facility Proximity (%ile in State) | EJ Index for Hazardous Waste Proximity (%ile in State) | EJ Index for Underground Storage Tanks (%ile in State) | EJ Index for Wastewater Discharge (%ile in State) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7012.13 - 3 | North Bethesda | no | 35 | 36 | 20 | 35 | 33 | 6 | 46 | 40 | 44 | 8 | 20 | 40 |
| 7012.15 - 1 | North Bethesda | no | 42 | 43 | 31 | 39 | 41 | 4 | 40 | 45 | 47 | 15 | 26 | 39 |
| 7012.15 - 2 | North Bethesda | yes | 49 | 49 | 45 | 47 | 48 | 6 | 45 | 50 | 51 | 26 | 30 | 38 |
| 7012.15 - 3 | North Bethesda | yes | 46 | 46 | 38 | 43 | 45 | 5 | 57 | 48 | 49 | 20 | 34 | 43 |
| 7012.15 - 4 | North Bethesda | yes | 48 | 48 | 42 | 46 | 47 | 8 | 42 | 49 | 50 | 24 | 29 | 42 |
| 7044.01 - 1 | North Bethesda | no | 25 | 27 | 7 | 17 | 22 | 1 | 6 | 33 | 36 | 7 | 18 | 36 |
| 7044.01 - 2 | North Bethesda | no | 33 | 34 | 16 | 26 | 31 | 3 | 15 | 39 | 42 | 10 | 13 | 41 |
| 7044.03 - 1 | Bethesda | no | 26 | 28 | 8 | 18 | 23 | 0 | 32 | 33 | 36 | 7 | 20 | 37 |
| 7044.04 - 4 | Bethesda | no | 24 | 27 | 7 | 17 | 15 | 1 | 16 | 32 | 35 | 7 | 23 | 39 |
| 7045.01 - 1 | North Bethesda | no | 42 | 43 | 33 | 39 | 42 | 12 | 15 | 46 | 47 | 20 | 12 | 43 |
| 7045.01 - 2 | North Bethesda | yes | 44 | 44 | 35 | 40 | 43 | 4 | 41 | 47 | 47 | 27 | 26 | 46 |
| 7045.01 - 3 | North Bethesda | no | 43 | 44 | 34 | 40 | 42 | 7 | 15 | 46 | 47 | 23 | 27 | 43 |
| 7045.01 - 4 | North Bethesda | yes | 48 | 49 | 44 | 47 | 48 | 11 | 26 | 49 | 50 | 31 | 63 | 45 |
| 7045.02 - 1 | Bethesda | no | 33 | 34 | 19 | 26 | 30 | 1 | 18 | 39 | 40 | 18 | 63 | 43 |
| 7045.02 - 2 | Bethesda | no | 17 | 20 | 4 | 9 | 14 | 3 | 4 | 27 | 29 | 8 | 63 | 36 |
| 7045.03 - 1 | Bethesda | no | 15 | 18 | 3 | 8 | 12 | 1 | 1 | 25 | 29 | 6 | 63 | 39 |
| 7058.00 - 2 | Cabin John | no | 13 | 16 | 3 | 14 | 10 | 1 | 8 | 24 | 22 | 4 | 63 | 11 |
| 7058.00 - 3 | Cabin John | no | 23 | 26 | 9 | 24 | 20 | 6 | 4 | 25 | 6 | 9 | 16 | 7 |
| 7059.01 - 3 | Bethesda | no | 21 | 23 | 10 | 22 | 17 | 8 | 19 | 30 | 29 | 14 | 63 | 36 |
| 7059.02 - 3 | Bethesda | no | 33 | 35 | 22 | 33 | 31 | 1 | 33 | 38 | 34 | 19 | 63 | 34 |
| 7060.08 - 1 | Potomac | no | 28 | 30 | 26 | 29 | 25 | 40 | 27 | 33 | 20 | 45 | 29 | 10 |
| 7060.08 - 2 | Potomac | no | 38 | 39 | 37 | 38 | 36 | 27 | 36 | 43 | 42 | 26 | 32 | 24 |
| 7060.09 - 2 | Potomac | no | 21 | 24 | 12 | 22 | 18 | 9 | 41 | 32 | 31 | 20 | 28 | 23 |
| 7060.09 - 3 | Potomac | no | 25 | 28 | 16 | 26 | 23 | 2 | 37 | 34 | 33 | 17 | 63 | 30 |
| 7060.12 - 1 | Potomac | no | 52 | 52 | 51 | 52 | 52 | 50 | 47 | 52 | 52 | 44 | 29 | N/A |
| 7060.12 - 2 | Potomac | yes | 57 | 57 | 58 | 57 | 57 | 68 | 59 | 55 | 55 | 57 | 71 | N/A |
| 7060.12 - 3 | Potomac | yes | 57 | 57 | 58 | 57 | 57 | 58 | 58 | 55 | 55 | 58 | 74 | N/A |
| 7060.13 - 1 | Potomac | no | 24 | 27 | 12 | 25 | 21 | 9 | 30 | 34 | 34 | 20 | 63 | 38 |
| 7060.13 - 2 | Potomac | no | 35 | 36 | 25 | 36 | 33 | 1 | 27 | 41 | 42 | 24 | 17 | 41 |

*EPA EJSCREEN indexes are reported in percentiles, comparing the indicators in the Analysis Area block groups to those of all block groups within the State of Maryland. For example, if a block group has an EJ Index score of 85 for the hazardous waste proximity indicator, it means that only 14 percent of block groups in Maryland have higher EJ Index values. The higher the EJ Index, the greater the potential for EJ concern. See https://www.epa.gov/ejscreen/overview-environmental-indicators-ejscreen for definitions and detailed information about the program methodology.

00005356

6

## Raw MD EJSCREEN Data*

| Tract within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJScore (%ile in State) | Exposure (%ile in State) | Environmental Effect (%ile in State) | Sensitive Populations (%ile in State) | Socioeconomic Factors (%ile in State) |
|---|---|---|---|---|---|---|---|
| 4701.00 | McLean | no | n/a | n/a | n/a | n/a | n/a |
| 4801.00 | McLean | no | n/a | n/a | n/a | n/a | n/a |
| 7007.17 | Gaithersburg | yes | 0.72 | 0.96 | 0.52 | 0.60 | 0.78 |
| 7007.18 | Rockville | no | 0.45 | 0.89 | 0.09 | 0.47 | 0.35 |
| 7008.16 | Gaithersburg | yes | 0.52 | 0.84 | 0.33 | 0.18 | 0.72 |
| 7008.17 | Gaithersburg | yes | 0.58 | 0.92 | 0.36 | 0.54 | 0.49 |
| 7008.29 | Gaithersburg | yes | 0.46 | 0.56 | 0.19 | 0.64 | 0.45 |
| 7010.01 | Rockville | no | 0.37 | 0.86 | 0.40 | 0.05 | 0.17 |
| 7010.02 | Rockville | no | 0.35 | 0.88 | 0.37 | 0.09 | 0.06 |
| 7010.04 | Rockville | no | 0.36 | 0.72 | 0.33 | 0.10 | 0.29 |
| 7010.05 | Rockville | no | 0.53 | 0.95 | 0.60 | 0.29 | 0.28 |
| 7010.06 | Rockville | no | 0.39 | 0.88 | 0.34 | 0.11 | 0.23 |
| 7010.07 | Rockville | yes | 0.45 | 0.92 | 0.18 | 0.52 | 0.19 |
| 7012.05 | North Bethesda | no | 0.42 | 0.98 | 0.59 | 0.02 | 0.08 |
| 7012.06 | Potomac | no | 0.25 | 0.68 | 0.14 | 0.06 | 0.12 |
| 7012.10 | Rockville | no | 0.33 | 0.48 | 0.03 | 0.73 | 0.06 |
| 7012.11 | Rockville | no | 0.33 | 0.57 | 0.06 | 0.33 | 0.37 |
| 7012.13 | North Bethesda | no | 0.40 | 0.85 | 0.43 | 0.17 | 0.14 |
| 7012.15 | North Bethesda | yes | 0.48 | 0.99 | 0.70 | 0.06 | 0.17 |
| 7044.01 | North Bethesda | no | 0.52 | 0.99 | 0.81 | 0.08 | 0.20 |
| 7044.03 | Bethesda | no | 0.72 | 1.00 | 0.90 | 0.79 | 0.21 |
| 7044.04 | Bethesda | no | 0.57 | 0.98 | 0.95 | 0.28 | 0.09 |
| 7045.01 | North Bethesda | yes | 0.58 | 0.96 | 0.80 | 0.38 | 0.16 |
| 7045.02 | Bethesda | no | 0.41 | 0.93 | 0.71 | 0.00 | 0.01 |
| 7045.03 | Bethesda | no | 0.59 | 0.84 | 0.87 | 0.62 | 0.02 |
| 7058.00 | Cabin John | no | 0.45 | 0.62 | 0.63 | 0.55 | 0.00 |

00005357

I-495 and I-270 Managed Lanes Study
Final Community Effects Assessment and EJ Analysis Technical Report
Appendix F

| Tract within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJScore (%ile in State) | Exposure (%ile in State) | Environmental Effect (%ile in State) | Sensitive Populations (%ile in State) | Socioeconomic Factors (%ile in State) |
|---|---|---|---|---|---|---|---|
| 7059.01 | Bethesda | no | 0.49 | 0.65 | 0.62 | 0.67 | 0.02 |
| 7059.02 | Bethesda | no | 0.42 | 0.79 | 0.67 | 0.16 | 0.05 |
| 7060.08 | Potomac | no | 0.12 | 0.31 | 0.13 | 0.01 | 0.02 |
| 7060.09 | Potomac | no | 0.26 | 0.51 | 0.30 | 0.23 | 0.01 |
| 7060.12 | Potomac | yes | 0.50 | 0.67 | 0.17 | 0.46 | 0.71 |
| 7060.13 | Potomac | no | 0.40 | 0.79 | 0.58 | 0.11 | 0.13 |

*MD EJSCREEN data is reported in percentiles as a decimal from 0-1, comparing the indicators in each Analysis Area tract to those of all tracts within the State of Maryland. For example, a tract with a score of 0.9 is in the 90th percentile, meaning only 10 percent of tracts in Maryland have higher values. The higher the value, the greater the potential for EJ concern. See https://p1.cgis.umd.edu/mdejscreen/help.html for definitions and detailed information about the program methodology.

8

00005358

# EPA EJSCREEN Results*

| Summary | Percentile Range for the Study's EJ Populations | Study's Non-EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| **Hazardous Waste Proximity** | | |
| Nine of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Hazardous Waste Proximity.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Hazardous Waste Proximity in the EJ Analysis Area. | 13th – 96th | none |
| **Lead Paint** | | |
| Eleven of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Lead Paint.<br><br>The Gaithersburg and Potomac Analysis Area Communities contain the populations with the top 5 EJ Index percentiles for Lead Paint in the EJ Analysis Area. | 26th – 76th | Rockville<br>• 7007.18 – 1<br>• 7007.18 – 2<br>• 7010.01 – 3<br>• 7010.06 – 2<br>• 7012.10 – 1<br>North Bethesda<br>• 7012.05 – 3<br>• 7012.13 – 1<br>• 7012.13 – 2<br>Potomac<br>• 7012.06 – 1 |
| **Air Toxics Cancer Risk** | | |
| Ten of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Air Toxics Cancer Risk.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Air Toxics Cancer Risk in the EJ Analysis Area. | 47th – 65th | McLean<br>• 4801.00 - 4<br>Potomac<br>• 7060.12 - 1 |

| Summary | Percentile Range for the Study's EJ Populations | Study's Non-EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| **Diesel Particulate Matter** | | |
| Nine of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Diesel Particulate Matter. | 35th to 95th | McLean • 4801.00 - 4 Potomac • 7060.12 - 1 |
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Diesel Particulate Matter in the EJ Analysis Area. | | |
| **Air Toxics Respiratory Hazard Index** | | |
| Ten of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for the Air Toxics Respiratory Hazard Index. | 43rd to 92nd | McLean • 4801.00 - 4 Potomac • 7060.12 - 1 |
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Air Toxics Respiratory Hazard Index in the EJ Analysis Area. | | |
| **Ozone** | | |
| Ten of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Ozone. | 44th to 92nd | McLean • 4801.00 - 4 Potomac • 7060.12 - 1 |
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Ozone in the EJ Analysis Area. | | |
| **Particulate Matter (PM 2.5)** | | |
| Ten of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Particulate Matter. | 44th to 92nd | McLean • 4801.00 - 4 Potomac • 7060.12 - 1 |
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Particulate Matter in the EJ Analysis Area. | | |
| **Proximity to Risk Management Plan (RMP) Sites** | | |
| Thirteen of the Study's EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Proximity to Risk Management Sites. | 47th to 75th | McLean • 4801.00 - 4 |

0000536O

USCA4 Appeal: 24-1447    Doc: 30-4    Filed: 09/30/2024    Pg: 173 of 511

| Summary | Percentile Range for the Study's EJ Populations | Study's Non-EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Proximity to RMP Sites in the EJ Analysis Area. | | Potomac<br>• 7060.12 – 1<br>North Bethesda<br>• 7012.05 – 3<br>Rockville<br>• 7010.07 – 2 |
| **Superfund Proximity** | | |
| Eleven of the Study's EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Superfund Proximity. | 47th to 75th | McLean<br>• 4801.00 – 4<br>Potomac<br>• 7060.12 – 1<br>North Bethesda<br>• 7012.05 – 3 |
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Superfund Proximity in the EJ Analysis Area. | | |
| **Traffic Proximity** | | |
| Nine of the Study's EJ populations have EJ Indexes that are at or above 50th percentile in the state for Traffic Proximity. | 4th to 99th | Potomac<br>• 7060.12 – 1 |
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Traffic Proximity in the EJ Analysis Area. | | |
| **Wastewater Discharge** | | |
| Seven of the Study's EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Wastewater Discharge. | 27th to 73rd | none |
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Wastewater Discharge in the EJ Analysis Area. | | |

\* See https://www.epa.gov/EJSCREEN/overview-environmental-indicators-EJSCREEN for definitions and detailed information about the program methodology.
Note: *PM* is particulate matter.

## MD EJ SCREEN Results*

| Summary | Percentile Range for the Tracts Containing EJ Populations | Study's Tracts without EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| **Overall EJScore** | | |
| Five of the Study's 8 EJ tracts are at or above the 50th percentile in the state for overall EJ Scores.<br><br>The Gaithersburg, North Bethesda, and Bethesda Analysis Area Communities contain the tracts with the top 5 Overall EJScore percentiles in the EJ Analysis Area. | 58th to 72nd | Rockville<br>   • 7010.05<br>North Bethesda<br>   • 7044.01<br>Bethesda<br>   • 7044.03<br>   • 7045.03<br>   • 7044.04 |
| **Exposure** | | |
| All 8 of the Study's EJ tracts are at or above the 50th percentile in the state for Exposure.<br><br>The North Bethesda and Bethesda Analysis Area Communities contain the tracts with the top 5 Exposure percentiles in the EJ Analysis Area. | 56th – 99th | Rockville<br>   • 7007.18<br>   • 7010.01<br>   • 7010.02<br>   • 7010.04<br>   • 7010.05<br>   • 7010.06<br>   • 7012.11<br>North Bethesda<br>   • 7012.05<br>   • 7012.13<br>   • 7044.01<br>Bethesda<br>   • 7044.03<br>   • 7044.04 |

00005362

I-495 and I-270 Managed Lanes Study
Final Community Effects Assessment and EJ Analysis Technical Report
Appendix F

| Summary | Percentile Range for the Tracts Containing EJ Populations | Study's Tracts without EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| | | 7045.02 |
| | | 7045.03 |
| | | 7059.01 |
| | | 7059.02 |
| | | Cabin John |
| | | 7058.00 |
| | | Potomac |
| | | 7012.06 |
| | | 7060.09 |
| | | 7060.13 |
| **Environmental Effects** | | |
| Three of the Study's 8 EJ tracts are at or above the 50th percentile in the state for Environmental Effects.<br><br>The North Bethesda and Bethesda Analysis Area Communities contain the tracts with the top 5 Environmental Effects percentiles in the EJ Analysis Area. | $17^{th} - 80^{th}$ | Rockville<br>7010.05<br>North Bethesda<br>7044.01<br>7012.05<br>Bethesda<br>7044.04<br>7044.03<br>7045.03<br>7045.02<br>7059.02<br>7059.01<br>Cabin John<br>7058.00 |
| **Sensitive Populations** | | |

13

00005363

JA1240

*I-495 and I-270 Managed Lanes Study*
*Final Community Effects Assessment and EJ Analysis Technical Report*
*Appendix F*

| Summary | Percentile Range for the Tracts Containing EJ Populations | Study's Tracts without EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| Four of the Study's 8 EJ tracts are at or above the 50th percentile in the state for Sensitive Populations.<br><br>The Gaithersburg, Rockville, and Bethesda Analysis Area Communities contain the tracts with the top 5 Sensitive Populations percentiles in the EJ Analysis Area. | 6th – 64th | Rockville<br>• 7012.10<br>Bethesda<br>• 7044.03<br>• 7059.01<br>• 7045.03<br>Cabin John<br>• 7058.00 |
| **Socioeconomic Factors** | | |
| Three of the Study's 8 EJ tracts are at or above the 50th percentile in the state for Socioeconomic Factors.<br><br>The Gaithersburg and Potomac Analysis Area Communities contain the tracts with the top 5 Socioeconomic Factors percentiles in the EJ Analysis Area. | 16th – 78th | none |

\* See https://p1.cgis.umd.edu/mdejscreen/help.html for definitions and detailed information about the program methodology.

14

00005364





EPA EJ SCREEN:
Lead Paint Indicator Index

00005366

JA1243





EPA EJ SCREEN:
NATA Diesel Particulate
Matter Index

JA1245

00005368









Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

**Risk Management Plan Facilities Proximity Index (Percentile as compared to State)**

0 - 24th
25th - 49th
50th - 74th
75th - 100th

**EPA EJ SCREEN:**
**Risk Management Plan Facilities Proximity Index**

0   0.5   1   2 Miles

OP LANES
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

00005372



00005373



JA1251



| | | |
|---|---|---|
| **EPA EJ SCREEN:** | | |
| **Underground Storage** | | |
| **Tank Indicator Index** | | |

Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

Underground Storage Tanks
Indicator Index (Percentile as
compared to State)
0 - 18
19 - 34
35 - 83

0   0.5   1   2 Miles

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

00005375

JA1252





I-495 & I-270 Managed Lanes Study

# APPENDIX G
# FINAL SECTION 4(F) EVALUATION
## June 2022



U.S. Department
of Transportation

**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00005618



I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

## TABLE OF CONTENTS

**1    INTRODUCTION** ................................................................................................................**1**

1.1    Overview ....................................................................................................................... 1

1.2    Study Corridors and the Preferred Alternative........................................................... 1

1.3    Description of the Preferred Alternative ..................................................................... 2

1.4    Changes since the Draft Section 4(f) Evaluation, DEIS and SDEIS............................... 3

1.5    Summary of Section 4(f) Conclusions ......................................................................... 8

1.6    Regulatory Context ...................................................................................................... 9

1.6.1    Section 4(f) of the US Department of Transportation Act of 1966....................... 9

1.6.2    Other Relevant Authority..................................................................................... 10

**2    INVENTORY AND USE OF SECTION 4(F) PROPERTY** .................................................**13**

2.1    Overview ..................................................................................................................... 13

2.2    Section 4(f) Properties Avoided ................................................................................. 15

2.3    George Washington Memorial Parkway ..................................................................... 17

2.4    Chesapeake and Ohio Canal National Historical Park................................................ 21

2.5    Clara Barton Parkway.................................................................................................. 24

2.6    Washington Biologists' Field Club on Plummers Island ............................................. 26

2.7    Carderock Springs Historic District............................................................................. 27

2.8    Gibson Grove AME Zion Church.................................................................................. 29

2.9    Cabin John Stream Valley Park Unit 2 ........................................................................ 31

2.10    Burning Tree Club....................................................................................................... 34

2.11    Academy Woods ......................................................................................................... 34

2.12    Cabin John Regional Park............................................................................................ 37

2.13    Tilden Woods Stream Valley Park............................................................................... 39

2.14    Old Farm Neighborhood Conservation Area.............................................................. 41

2.15    Cabin John Stream Valley Park Unit 6 ........................................................................ 42

2.16    Bullards Park and Rose Hill Stream Valley Park ......................................................... 44

2.17    Rockmead Park ........................................................................................................... 46

2.18    Woottons Mill Park ..................................................................................................... 49

2.19    Woodley Gardens ....................................................................................................... 51

2.20    Rockville Senior Center and Park ............................................................................... 51

00005619


2.21   Ward Building........................................................................................................... 55

2.22   Malcolm King Park ................................................................................................. 55

**3     AVOIDANCE ALTERNATIVES AND ANALYSIS .............................................................58**

**4     ALL POSSIBLE PLANNING ......................................................................................63**

4.1   Summary of All Possible Planning Presented in DEIS and SDEIS ............................... 63

4.2   Preferred Alternative ............................................................................................ 64

4.3   American Legion Bridge (ALB) ................................................................................ 64

4.4   Morningstar Tabernacle No. 88 Moses Hall and Cemetery ........................................ 64

4.5   Mitigation............................................................................................................ 66

    4.5.1    National Park Service ...................................................................................... 66

    4.5.2    M-NCPPC .................................................................................................... 69

    4.5.3    City of Gaithersburg ...................................................................................... 72

    4.5.4    City of Rockville ............................................................................................ 72

    4.5.5    Maryland Historical Trust............................................................................... 72

**5     LEAST OVERALL HARM ..........................................................................................74**

5.1   Draft Section 4(f) Least Overall Harm Evaluation .................................................... 74

5.2   Final Least Overall Harm Analysis .......................................................................... 75

**6     COORDINATION.....................................................................................................80**

**7     CONCLUSION........................................................................................................81**

## LIST OF TABLES

Table 1: Comparison of Total Section 4(f) Impacts for Study Milestones ................................... 4

Table 2: Comparison of DEIS, SDEIS and Final Section 4(f) Evaluation Impacts ........................... 6

Table 3: Use of Section 4(f) Property.................................................................................... 14

Table 4: Avoided Section 4(f) Use by the Preferred Alternative............................................... 16

Table 5: Avoidance Alternatives ......................................................................................... 59

Table 6: Least Overall Harm Analysis .................................................................................. 77

## LIST OF FIGURES

Figure 1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative ......................... 2

Figure 2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow) ............ 3

Figure 3: George Washington Memorial Parkway .................................................................. 18

Figure 4: Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway and the Washington Biologists' Field Club .................................................................................................... 23

Figure 5: Carderock Springs Historic District......................................................................... 28

00005620



I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

Figure 6: Gibson Grove AME Zion Church .................................................................. 30
Figure 7: Cabin John SVP Unit 2 ................................................................................ 32
Figure 8: Burning Tree Club ....................................................................................... 35
Figure 9: Academy Woods .......................................................................................... 36
Figure 10: Cabin John Regional Park ......................................................................... 38
Figure 11: Tilden Woods SVP and Old Farm NCA ...................................................... 40
Figure 12: Cabin John Stream Valley Park, Unit 6 ..................................................... 43
Figure 13: Bullards Park and Rose Hill Stream Valley Park ....................................... 45
Figure 14: Rockmead Park .......................................................................................... 48
Figure 15: Woottons Mill Park .................................................................................... 50
Figure 16: Woodley Gardens ...................................................................................... 52
Figure 17: Rockville Senior Center and Park and Ward Building ............................... 54
Figure 18: Malcolm King Park .................................................................................... 56

00005621

JA1257



# 1   INTRODUCTION

## 1.1   Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing a Final Environmental Impact Statement (FEIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study). The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

This Final Section 4(f) Evaluation focuses on analysis of the Preferred Alternative. The Preferred Alternative, also referred to as Alternative 9 – Phase 1 South, includes building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from west of MD 187 to I-270. Refer to **Figure 1**. This Preferred Alternative was identified after extensive coordination with agencies, the public and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach.

The Final Section 4(f) Evaluation presents the existing conditions, an assessment of potential direct impacts of the Preferred Alternative to parks, recreation areas, and historic sites subject to Section 4(f) protection and final mitigation, if applicable, for unavoidable impacts. This Final Section 4(f) Evaluation builds upon the analysis in the Draft Section 4(f) Evaluation, DEIS and Supplemental DEIS (SDEIS), and has been prepared to support and inform the FEIS.

## 1.2   Study Corridors and the Preferred Alternative

In the SDEIS, published on October 1, 2021, FHWA and MDOT SHA identified the Preferred Alternative: Alternative: Alternative 9 – Phase 1 South to be consistent with the previously determined phased delivery and permitting approach, which focuses on Phase 1 South. As a result, Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 in the DEIS, but focuses the build improvements within the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway to west of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in **dark blue** in **Figure 1**. The improvements include two new HOT managed lanes in each direction along I-495 and I-270 within the Phase 1 South limits. There is no action, or no improvements, included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

The 48-mile corridor Study limits remain unchanged: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-

00005622

**OP·LANES**
MARYLAND
I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland (shown in both dark and light blue in **Figure 1**).

**Figure 1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.3    Description of the Preferred Alternative

The Preferred Alternative includes a two-lane HOT managed lanes network on I-495 and I-270 within the limits of Phase 1 South only. On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to west of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Typical sections depicting the proposed lane configurations along I-495 and I-270 are shown in **Figure 2** below.  Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

00005623

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

**Figure 2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow)**

I-495 from the George Washington Memorial Parkway to west of MD 187



I-495: American Legion Bridge (Looking north towards Maryland)



I-495 west of MD 187 to west of MD 5 - NO ACTION AT THIS TIME



I-270 from I-495 to I-370



## 1.4    Changes since the Draft Section 4(f) Evaluation, DEIS and SDEIS

**Table 1** provides a comparison of the total Section 4(f) impacts identified through the three major milestones of the study (DEIS, SDEIS and FEIS). These totals reflect the continued efforts of MDOT SHA to avoid and minimize impacts to Section 4(f) properties. The initial total of approximately 146.8 acres of Section 4(f) property impact (including permanent and temporary impacts) reported in the DEIS and Draft Section 4(f) Evaluation has been reduced to a total of approximately 33.2 acres for this Final Section 4(f) Evaluation and the corresponding FEIS. Of this impact, approximately 14.7 acres would be temporary [1], and approximately 18.5 acres would be permanent.

---

[1]  Temporarily impacted property would not be permanently acquired by MDOT SHA as part of this project.

00005624



The total number of Section 4(f) properties impacted was reduced by 38 properties based on the revised limits of the Preferred Alternative and other minimization measures after the DEIS. This left 21 properties with Section 4(f) use reported in the SDEIS. Since the SDEIS, two additional parks were avoided based on further design refinements – Cabin John Stream Valley Park (Rockville) and Morris Park. One additional Section 4(f) property was identified (the Washington Biologists' Field Club) bringing the final total to 20 properties. The highest impact to any single Section 4(f) property is now 10.1 acres to the Chesapeake and Ohio Canal National Historical Park (9.1 acres of which would be temporary). The largest permanent impact to any single Park is 5.7 acres of impact to Cabin John Regional Park.

**Table 1: Comparison of Total Section 4(f) Impacts for Study Milestones**

| Study Milestone | Total Section 4(f) Impacts (Acres) | Number of Section 4(f) Properties Impacted |
|---|---|---|
| DEIS and Draft Section 4(f) Evaluation (Alternative 9) | 146.8 | 59 |
| SDEIS (Preferred Alternative) | 39.1 | 21 |
| **FEIS and Final Section 4(f) Evaluation (Preferred Alternative)\*** | **33.2** | **20** |

Note: Impacts rounded to the closest 0.1 acres.

\* Includes the Washington Biologists' Field Club, which is contained entirely within the Chesapeake and Ohio Canal National Historical Park and was not identified as a Section 4(f) property until after the SDEIS due to recent identification of the property's NRHP eligibility.

The Preferred Alternative has resulted in a net reduction of approximately 113.6 acres of Section 4(f) properties, including both parks and historic resources, compared to the DEIS Alternative 9. (See **Section 2.1** for more detailed information). Impacts were avoided by limiting the Build Alternative to within the Phase 1 South limits, and by minimizing impacts to several parks and historic resources following consideration of public and agency comments received during the DEIS and SDEIS public comment periods.  MDOT SHA and FHWA coordinated closely with the Official with Jurisdiction (OWJs) in a series of office and field meetings to identify opportunities to further avoid and minimize impacts to historic resources and park land including contributing features within parks such as forested areas, wetlands and waterways within the Preferred Alternative limits of disturbance (LOD).

Since the DEIS and Draft Section 4(f) Evaluation, substantial efforts to avoid and minimize impacts to park and historic resources around the American Legion Bridge (ALB) have occurred. MDOT SHA and FHWA met with the National Park Service (NPS) on December 8, 2020 to discuss the limit of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design and construction, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historical Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of the approaches could further reduce the LOD. The Strike Team conducted detailed investigation of a top-down segmental

00005625



construction approach; a top-down cable stayed design approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the existing bridge could be consolidated to the northwest quadrant along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road with entrance from Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath. Refer to **SDEIS Section 4.4.3 and FEIS, Section 5.4.3** for additional details on the ALB Strike Team's efforts.

Another focus area for avoidance and minimization was at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery) located adjacent to I-495 inner loop just south of Cabin John Parkway. In response to comments received on the DEIS and Draft Section 4(f) Evaluation, impacts to the Morningstar Cemetery boundary were reduced from 0.3 acres (13,068 square feet) reported in the DEIS for Alternative 9 to complete avoidance as described in the SDEIS. Following consulting party input, additional research, and extensive minimization and avoidance efforts documented in the SDEIS, MDOT SHA and FHWA determined that the project would not adversely affect the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and MDOT SHA updated the effect in December 2021. The boundary of the historic property was also updated in December 2021 to include the area of potential burial features identified by the May 2021 ground penetrating radar survey within state-owned right-of-way. In its February 4, 2022, response, Maryland Historical Trust (MHT) did not concur with MDOT SHA and FHWA's specific no adverse effect finding for the Morningstar Tabernacle No. 88 Moses Hall and Cemetery based on the potential for additional burial features. As the project is governed by a programmatic agreement, which includes a treatment plan specifying the methods, limits, and consultation procedures for further investigation of areas with the potential for burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is made at this time. An effect determination will be made following completion of the additional investigations specified in the programmatic agreement and treatment plan. On May 2, 2022, MHT agreed with MDOT SHA's request to defer determination of effects to Morningstar Tabernacle No. 88 Moses Hall and Cemetery following completion of the additional investigations as specified in the Programmatic Agreement.

Two properties identified in the Draft Section 4(f) Evaluation are no longer evaluated in this Final Section 4(f) Evaluation due to ownership and avoidance. Millennium Garden Park in the City of Rockville was initially identified as a Section 4(f) property in the Draft Section 4(f) Evaluation, but based on further research, it was determined to be owned by MDOT SHA. Due to design refinements, the property is also avoided by the Preferred Alternative LOD. The second property, Cabin John Stream Valley Park in the City of Rockville, has also been avoided. This is due to further refinements of the stormwater management concept for the Preferred Alternative.

Design refinements have reduced impacts to two City of Gaithersburg parks including Morris Park and Malcolm King Park. Impacts to Morris Park in Gaithersburg have been eliminated completely, and permanent impacts to Malcolm King Park have been reduced by 0.8 acres compared to the SDEIS.

One newly identified Section 4(f) property, the Washington Biologists' Field Club, is included in this Final Section 4(f) Evaluation. The property was surveyed for eligibility on the NRHP and determined eligible by

00005626



OP·LANES™ MARYLAND      I-495 & I-270 Managed Lanes Study                Final Section 4(f) Evaluation

MHT after the SDEIS was published. The property would incur an estimated 0.28 acres of impacts, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. This impact was reduced from the previous impact of 1.9 acres under DEIS Alternative 9. A minimal amount of permanent impact to the WBFC would occur due to drill shafts for the new ALB in the amount of 217.8 square feet. The property is located entirely within another Section 4(f) property, the Chesapeake and Ohio Canal National Historical Park. More information is included in **Section 2.6**.

For the properties where a Section 4(f) use would occur under the Preferred Alternative, **Table 2** below provides a comparison of the impacts in the DEIS, the SDEIS, and this final Section 4(f) Evaluation. Note that the DEIS included only a total impact calculation and did not distinguish between permanent and temporary impacts as in the SDEIS and Final Section 4(f) Evaluation. The last column in **Table 2** summarizes, at a high-level, changes to impacts from the SDEIS related to design refinements of the Preferred Alternative LOD at each property. Additional details on changes to each property since the SDEIS are provided in **Sections 2.2 through 2.22**.

### Table 2: Comparison of DEIS, SDEIS and Final Section 4(f) Evaluation Impacts

| Section 4(f) Property | DEIS (Alt 9) Impact (acres) | SDEIS (Pref Alt) Impact (acres) | Final Section 4(f) Impacts (acres) | Change from SDEIS Impacts |
|---|---|---|---|---|
| George Washington Memorial Parkway | Total: 12.2 | Permanent: 0.7 Temporary: 3.7 Total: 4.4 | Permanent: 0.6 Temporary: 3.8 Total: 4.4 | Shift of 0.1 acres from permanent impact to temporary |
| Chesapeake and Ohio Canal National Historical Park | Total: 15.4 | Permanent: 1.0 Temporary: 9.1 Total: 10.1 | Permanent: 1.0 Temporary: 9.1 Total: 10.1 | No change |
| Clara Barton Parkway | Total: 1.8 | Permanent: 1.6 Temporary: 0.9 Total: 2.5 | Permanent: 1.1 Temporary: 0.6 Total: 1.7 | Impacts decreased by 0.8 acres, including a reduction of 0.5 acres of permanent and 0.3 acres of temporary impact. |
| Washington Biologists' Field Club | N/A | N/A | Permanent: <0.1 Temporary: 0.27 Total: 0.28 | Property was not identified as NRHP-eligible in the DEIS or SDEIS. However, impacts were reduced from 1.9 acres of permanent impact to 0.2 acres from the DEIS. |
| Carderock Springs Historic District | No Impact | Permanent: < 0.1 Temporary: < 0.1 Total: < 0.1 | Permanent: < 0.1 Temporary: < 0.1 Total: < 0.1 | No change |
| Gibson Grove AME Church | No Impact | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | Permanent: 0.6 Temporary: 0.0 Total: 0.6 | Permanent impacts increased by 0.5 acres |

00005627


I-495 & I-270 Managed Lanes Study     Final Section 4(f) Evaluation

| Section 4(f) Property | DEIS (Alt 9) Impact (acres) | SDEIS (Pref Alt) Impact (acres) | Final Section 4(f) Impacts (acres) | Change from SDEIS Impacts |
|---|---|---|---|---|
| Cabin John Stream Valley Park Unit 2 | Total: 1.1 | Permanent: 0.8 Temporary: 0.6 Total: 1.4 | Permanent: 0.6 Temporary: < 0.1 Total: 0.6 | Impacts decreased by 0.8 acres, including a reduction of 0.2 acres of permanent and 0.5 acres of temporary impact |
| Burning Tree Club | Total: 0.8 | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | No change |
| Academy Woods | Total: 0.2 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | No change |
| Cabin John Regional Park | Total: 5.7 | Permanent: 5.7 Temporary: 0.6 Total: 6.3 | Permanent: 5.7 Temporary: 0.6 Total: 6.3 | No change |
| Tilden Woods Stream Valley Park | Total: 0.2 | Permanent: 0.6 Temporary: 0.1 Total: 0.7 | Permanent: 0.3 Temporary: 0.1 Total: 0.4 | Permanent impacts reduced by 0.3 acres |
| Old Farm Neighborhood Conservation Area | Total: 0.1 | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | No change |
| Cabin John Stream Valley Park Unit 6 | Total: 0.4 | Permanent: 0.8 Temporary: 0.0 Total: 0.8 | Permanent: 0.8 Temporary: < 0.1 Total: 0.8 | Temporary impacts increased 0.02 |
| Cabin John Stream Valley Park (Rockville) | Total: 2.1 | Permanent: 2.1 Temporary: 0.0 Total: 2.1 | No impact | Impacts eliminated |
| Bullards Park and Rose Hill Stream Valley Park | Total: 0.3 | Permanent: 3.3 Temporary: 0.0 Total: 3.3 | Permanent: 3.3 Temporary: 0.0 Total: 3.3 | No change |
| Rockmead Park | Total: 0.2 | Permanent: 0.2 Temporary: 0.1 Total: 0.3 | Permanent: 0.2 Temporary: 0.1 Total: 0.3 | No change |
| Woottons Mill Park | Total: 0.2 | Permanent: 0.7 Temporary: 0.0 Total: 0.7 | Permanent: 0.7 Temporary: 0.0 Total: 0.7 | No change |
| Woodley Gardens | Total: 0.7 | Permanent: 1.2 Temporary: 0.1 Total: 1.3 | Permanent: 1.2 Temporary: 0.1 Total: 1.3 | No change |
| Rockville Senior Center and Park | Total: 0.7 | Permanent: 1.0 Temporary: 0.0 Total: 1.0 | Permanent: 1.0 Temporary: 0.0 Total: 1.1 | Temporary impact has increased by 0.1 acres |
| Ward Building | Total: 0.1 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | No change |

00005628

 I-495 & I-270 Managed Lanes Study      Final Section 4(f) Evaluation

| Section 4(f) Property | DEIS (Alt 9) Impact (acres) | SDEIS (Pref Alt) Impact (acres) | Final Section 4(f) Impacts (acres) | Change from SDEIS Impacts |
|---|---|---|---|---|
| Malcolm King Park | Total: 0.1 | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | Permanent: 0.4 Temporary: <0.1 Total: 0.5 | Permanent impacts decreased by 0.8 acres |
| Morris Park | Total: 0.1 | Permanent: 1.1 Temporary: 0.0 Total: 1.1 | No impact | Impacts eliminated |

Note: all impacts rounded to the closest 0.1 acres.

## 1.5 Summary of Section 4(f) Conclusions

This Final Section 4(f) Evaluation provides final conclusions regarding the use of Section 4(f) property, avoidance alternatives, all possible planning to minimize harm, and least overall harm as required by Section 4(f) and its implementing regulations at 23 CFR 774. This section provides a brief summary of the Section 4(f) conclusions, which are detailed in **Section 2** through **Section 5**.

As noted above, the Preferred Alternative would require total impacts to Section 4(f) properties of approximately 33.2 acres, including approximately 18.5 acres of permanent impact and 14.7 acres of temporary impact. A total of 20 Section 4(f) properties would require Section 4(f) use by the Preferred Alternative, of which 13 would be *de minimis* impacts. See **Section 2** for more detail.

The analysis of avoidance alternatives (**Section 3**) shows that there are no feasible and prudent alternatives to avoid the use of Section 4(f) property. The Preferred Alternative would not avoid the use of all Section 4(f) properties. It would, however, avoid approximately 110 acres of impact to 40 properties fully avoided by the Preferred Alternative.

**Section 4** details the efforts conducted by MDOT SHA to incorporate all possible planning to minimize harm to Section 4(f) properties into the Preferred Alternative. New measures intended to address all possible planning to minimize harm to Section 4(f) properties were documented in the SDEIS and this Final Section 4(f) Evaluation and are included in the Preferred Alternative's avoidance of 40 Section 4(f) properties as compared to the DEIS Alternative 9. Additional avoidance and minimization measures at Section 4(f) properties presented in the SDEIS and FEIS included extensive design refinements in the conceptual stormwater management and in the vicinity of the ALB and at Morningstar Cemetery, and new mitigation measures developed in coordination with the OWJs for each Section 4(f) property impacted. **Section 4.5** provides details on the comprehensive packages of mitigation developed in coordination with the OWJs for Section 4(f) impacts.

Based on the information presented in the Draft Section 4(f) Evaluation, the Updated Draft Section 4(f) Evaluation, and this Final Section 4(f) Evaluation, FHWA and MDOT SHA have reached a conclusion that the Preferred Alternative is the alternative with least overall harm as detailed in **Section 5**. The Preferred Alternative meets the Purpose and Need for the study and impacts far fewer Section 4(f) properties and total acreage relative to the other Build Alternatives that would meet the Purpose and Need.

00005629



I-495 & I-270 Managed Lanes Study                Final Section 4(f) Evaluation

## 1.6    Regulatory Context

### 1.6.1    Section 4(f) of the US Department of Transportation Act of 1966

Section 4(f) of the US Department of Transportation Act of 1966 as amended (49 U.S.C. 303(c) and 23 U.S.C. 138) is a Federal Law that protects properties defined in 23 CFR 774.17 as "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance, or land of an historic site of national, state, or local significance." Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT. As a USDOT agency, FHWA must comply with Section 4(f) and its implementing regulations at 23 CFR 774.

Regulations at 23 CFR 774.11(c) state Section 4(f) applies to a park, recreation area, or wildlife and waterfowl refuge determined to be significant. For properties where no determination exists, "the Section 4(f) property will be presumed to be significant." 23 CFR 774.17 further defines "Historic site" to include any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places (NRHP). The criteria for defining a site as eligible for inclusion in the National Register is further detailed in **Section 1.4.8.C**.

FHWA cannot approve a transportation project that uses any Section 4(f) property, unless:

- FHWA determines that there is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 774.3(a)); or
- FHWA determines that the use of Section 4(f) property, including any measures to minimize harm (such as avoidance, minimization, mitigation, or enhancements measures) committed to by the applicant, will have a de minimis impact on the property (23 CFR 774.3(b)).

An impact to a significant public park, recreation area, or wildlife and waterfowl refuge may be determined to be *de minimis* if the transportation use of the Section 4(f) property, including incorporation of any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures), does not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) (23 CFR 774.17). For historic sites, a *de minimis* impact means that FHWA has determined (in accordance with 36 CFR 800) that either no historic property is affected by the project or that the project will have "no adverse effect" on the historic property. A *de minimis* impact determination does not require analysis to determine if avoidance alternatives are feasible and prudent, but consideration of avoidance, minimization, mitigation or enhancement measures should occur.

Following 23 CFR 774.5(b), the public should be afforded an opportunity to review and comment on the effects of the Proposed Action on the protected activities, features, or attributes of the Section 4(f) parks, recreation areas or wildlife and waterfowl refuges. Opportunity for public review applies to historic sites as well. This is accomplished during the Section 106 process. Documentation of consulting party involvement is required (23 CFR 774.5(b) and 774.7(b)). Moreover, the official(s) with jurisdiction over the property, after being informed of the public comments and FHWA's intent to make the *de minimis* impact finding, must concur in writing that the project will not adversely affect the activities, features, or attributes that qualify the property for protection under Section 4(f).

00005630

 I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

### 1.6.2    Other Relevant Authority

#### A.    Capper-Cramton Act of 1930

The Capper-Cramton Act of May 29, 1930 (46 Stat. § 482), as amended, is a federal statute enacted for the acquisition, establishment, and development of the George Washington Memorial Parkway and for the acquisition of lands in the District of Columbia, Maryland and Virginia for a comprehensive park, parkway, and playground system in and around the National Capital Region. The Capper-Cramton Act empowered the National Capital Planning Commission (NCPC) to acquire lands in Maryland and Virginia for the George Washington Memorial Parkway, owned by the federal government and operated by NPS. Property records provided by NPS indicate portions of George Washington Memorial Parkway/Clara Barton Parkway known as Tracts 114-006, 114-009, 119-034, 119-040, 119-043, 119-044, 120-001, 120-003, 120-008 were acquired by funds from the Capper-Cramton Act. All impacts to Clara Barton Parkway are within the above referenced tracts.

The Capper-Cramton Act is discussed in this Section 4(f) Evaluation because impacts to some park properties under the jurisdiction of NPS and M-NCPPC may require additional coordination and approval under the Capper-Cramton Act. The M-NCPPC administers more than 2,200 acres of Maryland Stream Valley Parks in Montgomery and Prince George's Counties. Many of these lands were purchased with funds from the Capper-Cramton Act. There are no implementing regulations or mitigation requirements associated with the Capper-Cramton Act.

The Capper-Cramton Act (CCA) of 1930 (46 Stat. 482), as amended, states that lands purchased with funds appropriated under the CCA for the park, parkway, and playground system in Maryland shall be developed and administered by Maryland-National Capital Park and Planning Commission (M-NCPPC) in accordance with plans approved by the National Capital Park and Planning Commission (predecessor of NCPC). Changes to parks noted as having been purchased under CCA and, therefore, NCPC authority over CCA impacted parkland have occurred since the DEIS and SDEIS. Based on further research and coordination with NCPC and M-NCPPC, Cabin John Stream Valley Park, Unit 2 and Cabin John Regional Park were not acquired with Capper-Cramton funds and, therefore, NCPC does not have any Capper-Cramton jurisdiction over potentially impacted land in these two M-NCPPC owned and managed parks. Moreover, since the land is already owned by the State of Maryland and the Study is a State-sponsored project, NCPC does not have jurisdiction over Cabin John Stream Valley Park Unit 2 or Cabin John Regional Park under the Planning Act either. (Refer to NCPC's SDEIS Comment, dated November 19, 2021, **FEIS, Appendix T**.)

The Preferred Alternative will have impacts to George Washington Memorial Parkway, Clara Barton Parkway, and Chesapeake and Ohio National Historical Park. However, NPS has advised NCPC of its intent to "transfer," via the Highway Deed Easement Process, project-related land within the boundary of the George Washington Memorial Parkway to the State of Virginia and project-related land within the boundary of the Clara Barton Parkway and Chesapeake and Ohio National Historical Park to the State of Maryland should a build alternative be selected and a Record of Decision issued. These resulting changes would negate NCPC's Capper-Cramton jurisdiction over Clara Barton Parkway land and its Planning Act jurisdiction over George Washington Memorial Parkway and Chesapeake and Ohio Canal National Historical Park lands.

00005631



**OP·LANES**  M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

### B.    Section 6(f) of the Land and Water Conservation Fund Act

Section 6(f) of the Land and Water Conservation Fund Act of 1965 (LWCF) comprised a federal program of assistance to federal, state, and local governments for the acquisition of land and water for the benefit of all Americans. The LWCF is administered by the Department of Interior's NPS, which retains oversight of development projects that would cause impacts to or permanent conversion of recreational property acquired with LWCF monies. The implementing regulations at 36 CFR 59 apply solely to the "Program of Assistance to States." Section 36 CFR 59.1 discusses the post-completion responsibilities that "apply to each area of a facility for which LWCF assistance is obtained, regardless of the extent of participation of the program in the assisted area or facility and consistent with the contractual agreement between NPS and the State. Responsibility for compliance and enforcement of these provisions rests with the State for both State and locally sponsored projects."

Section 6(f) is discussed concurrently with Section 4(f) because recreational properties could have been acquired or improved with funds from the LWCF. While mitigation opportunities are more flexible under Section 4(f) and may or may not include replacement land, Section 6(f) directs NPS to assure replacement lands are of equal value, location and usefulness (NPS, 2019). Therefore, Section 6(f) requirements may influence the Section 4(f) mitigation for this project. In Maryland, the Director of Land Acquisition and Planning of the Maryland Department of Natural Resources (MDNR) administers the program. In Virginia, the Director of the Department of Conservation and Recreation administers the program.

MDOT SHA has not identified any State or locally sponsored projects which received LWCF assistance from the "Program of Assistance to States" that would experience an impact from the Managed Lanes Study. NPS has informed MDOT SHA that the Chesapeake and Ohio Canal National Historical Park received LWCF assistance from the federal side of the program. The property is not subject to the specific requirements set forth in Section 6(f) and its implementing regulations at 36 CFR 59.

### C.    Section 106 of the National Historic Preservation Act

Section 106 of the NHPA as amended and its implementing regulations at 36 CFR 800 are intended to preserve historical and archaeological sites in the United States. Regulations require that each federal agency take into account the effects of their undertakings on historic properties and to provide the Advisory Council on Historic Preservation (ACHP) with a reasonable opportunity to comment. Section 106 requires that federal agencies consult with the SHPO, Tribal Historic Preservation Officer (THPO), and Native Hawaiian Organizations, among other parties. The regulations at 36 CFR 800 define an undertaking, and specify how to identify historic properties, assess potential effects on historic properties, and resolve adverse effects. An historic property is any historic district, site, building, structure or object that is listed in or determined eligible for inclusion in the NRHP. Under Section 106, each federal agency must consider public views and concerns about historic preservation issues when making final project decisions. Refer to **FEIS, Appendix I** for the Cultural Resources Technical Report which includes details on how the Study is complying with Section 106 regulations.

00005632



I-495 & I-270 Managed Lanes Study                                Final Section 4(f) Evaluation

Section 4(f) stipulates that for a historic site to be granted protection, it must be considered significant (i.e., eligible for or listed in the NRHP).[2] Archaeological sites only qualify for Section 4(f) protection if they are significant *and* warrant preservation in place. No impacted archaeological sites that warrant preservation in place have been identified for the Preferred Alternative at this time. Judgments about a site's importance and preservation value are made by the FHWA after consultation with the SHPO and/or THPO, Federally recognized Indian Tribe as appropriate, and the ACHP if participating in the project.

In the event an archaeological site which warrants preservation in place is discovered during construction, the Section 4(f) process may be expedited, and any required evaluation of feasible and prudent avoidance alternatives will consider the level of investment already made. The review process, including the consultation with other agencies, will be shortened as appropriate.

### D.    Section 110 of the National Historic Preservation Act

Section 110 of the NHPA as amended establishes the broad preservation responsibilities of Federal agencies to ensure that historic preservation is fully integrated into the ongoing programs of all Federal agencies. Section 110(f) of the NHPA and its implementing regulations at 36 CFR 800.10 require that Federal agencies exercise a higher standard of care when considering undertakings that may directly and adversely affect National Historic Landmarks (NHLs). Prior to the approval of any Federal undertaking that may directly or adversely affect any NHL, the head of the agency shall undertake such planning and actions as may be necessary to minimize harm to such landmark, and to provide the ACHP with a reasonable opportunity to comment. No NHLs would be impacted by the Preferred Alternative.

The regulations at 36 CFR 800 also specify the participation of the ACHP in the resolution of adverse effects on NHLs, the invitation of the Secretary to participate in the consultation where there may be an adverse effect, and the ACHP's reporting of the outcome.

### E.    Maryland Program Open Space

Program Open Space (POS) was established under MDNR in 1969. The POS is split into a statewide program that purchases fee simple land for establishing state parks, forest, and wildlife and fisheries management areas and a local program that provides financial and technical assistance to subdivisions for the planning, acquisition, and/or development of recreation land and open space areas. Potential impacts to land or easements purchased with POS funds requires coordination with MDNR. No park properties subject to Maryland's Program Open Space would be impacted by the Preferred Alternative. Refer to **Section 2.1.3** for more information.

---

[2] *National Register Criteria for Evaluation:* The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and:

    A.   That are associated with events that have made a significant contribution to the broad patterns of our history; or

    B.   That are associated with the lives of persons significant in our past; or

    C.   That embody the distinctive characteristics of type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

    D.   That have yielded or may be likely to yield, information important in prehistory or history.

00005633



## 2    INVENTORY AND USE OF SECTION 4(F) PROPERTY

Pursuant to 23 CFR 774.17, a "use" of Section 4(f) property occurs:

- When land is **permanently incorporated** into a transportation facility;
- When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as defined in 23 CFR 774.13(d). A temporary occupancy of land does *not* constitute a "use" within the meaning of Section 4(f) if the following conditions are satisfied:
  - The duration of the occupancy must be less than the time needed for the construction of the project, and no change of ownership occurs;
  - Both the nature and magnitude of the changes to the Section 4(f) land are minimal;
  - No permanent adverse physical changes, nor interference with activities or purposes of the resources on a temporary or permanent basis, are anticipated;
  - The land must be returned to a condition that is at least as good as existed prior to the project; and
  - There is documented agreement with the appropriate Federal, State, or local officials having jurisdiction over the land that the above conditions have been met.
- When there is a **constructive use** of a Section 4(f) property. As defined in 23 CFR 774.15, a constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. The degree of impact and impairment must be determined in consultation with the OWJ in accordance with 23 CFR 774.15(d)(3).

### 2.1    Overview

The Draft Section 4(f) Evaluation included descriptions of all Section 4(f) properties identified within the corridor study boundary, the use of Section 4(f) properties for all previously evaluated alternatives, and discussion of minimization measures for each property. The SDEIS updated this information based on the Preferred Alternative (Alternative 9 – Phase 1 South) which avoids the use of Section 4(f) properties within the study limits outside of Phase 1 South where no improvements are proposed, resulting in lower overall impacts to Section 4(f) properties. Since the SDEIS, the design has advanced on the Preferred Alternative, and in coordination with the P3 Phase Developer, minor modifications to the Preferred Alternative have occurred.  These modifications included roadway design adjustments based on traffic operations, a new trail connection option from the American Legion Bridge (ALB) to the Chesapeake and Ohio Canal towpath, revisions to noise barrier locations based on further analysis, revisions to stormwater management and culvert augmentation sites, and continued application of avoidance and minimization efforts at sensitive resources.

**Table 3** presents the Section 4(f) properties impacted by the Preferred Alternative. Each property with a potential Section 4(f) use is then described in **Sections 2.2 through 2.22**. **Table 3** notes the Official with Jurisdiction (OWJ) for each Section 4(f) property; the OWJ is designated in the Section 4(f) regulations and are for the purposes of Section 4(f) only.

00005634

JA1270

 I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

## Table 3: Use of Section 4(f) Property

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Section 4(f) Approval | Final Section 4(f) Impacts[2] |
|---|---|---|---|---|
| George Washington Memorial Parkway | Advisory Council on Historic Preservation (ACHP), NPS, Virginia Department of Historic Resources (VDHR) | Public Park and Historic Property | Individual Evaluation | Permanent: 0.6 Temporary: 3.8 Total: 4.4 |
| Chesapeake and Ohio Canal National Historical Park[3] | ACHP, Maryland Historical Trust (MHT), NPS | Public Park and Historic Property | Individual Evaluation | Permanent: 1.0 Temporary: 9.1 Total: 10.1 |
| Clara Barton Parkway[3] | ACHP, MHT, NPS | Public Park and Historic Property | Individual Evaluation | Permanent: 1.1 Temporary: 0.6 Total: 1.7 |
| Washington Biologists' Field Club on Plummers Island | MHT, NPS | Historic Property | Individual Evaluation | Permanent: <0.1 Temporary: 0.27 Total: 0.28 |
| Carderock Springs Historic District | MHT | Historic Property | De minimis | Permanent: < 0.1 Temporary: < 0.1 Total: < 0.1 |
| Gibson Grove AME Church | MHT | Historic Property | Individual Evaluation | Permanent: 0.6 Temporary: 0.0 Total: 0.6 |
| Cabin John Stream Valley Park Unit 2 | Maryland-National Capital Park and Planning Commission (M-NCPPC) Montgomery County | Public Park | De minimis | Permanent: 0.6 Temporary: < 0.1 Total: 0.6 |
| Burning Tree Club | MHT | Historic Property | De minimis | Permanent: 1.3 Temporary: 0.0 Total: 1.3 |
| Academy Woods | MHT | Historic Property | De minimis | Permanent: 0.2 Temporary: 0.0 Total: 0.2 |
| Cabin John Regional Park | M-NCPPC Montgomery County | Public Park | Individual Evaluation | Permanent: 5.7 Temporary: 0.6 Total: 6.3 |
| Tilden Woods Stream Valley Park | M-NCPPC Montgomery County | Public Park | De minimis | Permanent: 0.3 Temporary: 0.1 Total: 0.4 |
| Old Farm Neighborhood Conservation Area | M-NCPPC Montgomery County | Public Park | De minimis | Permanent: 0.1 Temporary: 0.0 Total: 0.1 |
| Cabin John Stream Valley Park Unit 6 | M-NCPPC Montgomery County | Public Park | De minimis | Permanent: 0.8 Temporary: <0.1 Total: 0.8 |
| Bullards Park and Rose Hill Stream Valley Park | City of Rockville Department of Recreation and Parks | Public Park | Individual Evaluation | Permanent: 3.3 Temporary: 0.0 Total: 3.3 |
| Rockmead Park | City of Rockville Department of Recreation and Parks | Public Park | De minimis | Permanent: 0.2 Temporary: 0.1 Total: 0.3 |

00005635

JA1271

 I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Section 4(f) Approval | Final Section 4(f) Impacts[2] |
|---|---|---|---|---|
| Woottons Mill Park | City of Rockville Department of Recreation and Parks | Public Park | De minimis | Permanent: 0.7 Temporary: 0.0 Total: 0.7 |
| Woodley Gardens | MHT | Historic Property | De minimis | Permanent: 1.2 Temporary: 0.1 Total: 1.3 |
| Rockville Senior Center and Park | City of Rockville Department of Recreation and Parks, MHT | Public Park and Historic Property | De minimis | Permanent: 1.0 Temporary: 0.1 Total: 1.1 |
| Ward Building | MHT | Historic Property | De minimis | Permanent: 0.2 Temporary: 0.0 Total: 0.2 |
| Malcolm King Park | City of Gaithersburg Department of Parks, Recreation and Culture | Public Park | De minimis | Permanent: 0.4 Temporary: <0.1 Total: 0.5 |

Note: 1. Virginia Department of Historic Resources (VDHR) serves as the Virginia State Historic Preservation Office; Maryland Historical Trust (MHT) serves as the Maryland State Historic Preservation Office.

2. All impacts quantities rounded to the tenths of an acre. For purposes of determining Section 4(f) use, temporary impacts are considered short-term, construction related activities that do not require permanent incorporation of a Section 4(f) resource into a transportation facility. Short-term, construction related work includes but is not limited to construction staging, material and equipment storage, construction access easements, and other areas needed to support the construction, but not part of the long-term improvement.

3. Section 4(f) impacts to Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway as currently noted in Chapter 5 exclude the area that currently has an existing transportation use. The area within NPS property designated as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the Chesapeake and Ohio Canal and eastbound Clara Barton Parkway, and existing pier locations for the American Legion Bridge.

As described in Section 1.2.2.A of the Draft Section 4(f) Evaluation, a constructive use analysis was conducted to evaluate whether the proposed action, if not directly incorporating land from a Section 4(f) property, could have proximity impacts that would substantially impair the use or value of the resource. These analyses evaluated how the Preferred Alternative would affect neighboring or nearby Section 4(f) properties and determined if impacts from the proposal would result in substantial impairment of the activities, features or attributes that qualify the resource for protection under Section 4(f). The constructive use analysis determined that no constructive uses would occur from noise, visual intrusions, restrictions of access or vibrations.

## 2.2    Section 4(f) Properties Avoided

While the study limits remain the same as noted in the DEIS, the limits of build improvements under the Preferred Alternative are limited to Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Additionally, two park properties within the Phase 1 South area, Morris Park and Cabin John Stream Valley Park in Rockville, have been avoided based on design refinements since the SDEIS. As a result of these refinements, the Preferred Alternative would avoid the use of 40 Section 4(f) properties that were previously reported as Section 4(f) uses in the DEIS and Draft Section 4(f) Evaluation, totaling approximately 108.8 acres. This avoidance comprises the vast majority of the net reduction in impacts to Section 4(f) properties of 113.6 acres compared to DEIS

00005636

 I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

Alternative 9. The properties avoided and acreage of Section 4(f) use previously included in the DEIS and SDEIS are included in **Table 4**.

**Table 4: Avoided Section 4(f) Use by the Preferred Alternative**

| Section 4(f) Properties No Longer Impacted by the Preferred Alternative | Acres of Avoided Section 4(f) Use |
|---|---|
| Andrews Manor Park | 2.6 |
| Baltimore Washington Parkway | 69.3 |
| Beckett Field | 0.2 |
| Beltsville Agricultural Research Center (BARC) | 0.5 |
| Blair Local Park | 0.4 |
| Buddy Attick Lake Park | 0.1 |
| Cabin John Stream Valley Park (Rockville) | 2.1 |
| Calvary Evangelical Lutheran Church | <0.1 |
| Carsondale | 0.1 |
| Cherry Hill Road Park | 1.8 |
| Douglas E. Patterson Park | 0.7 |
| Fleming Local Park | 0.1 |
| Forest Glen Historic District | 0.2 |
| Forest Glen Neighborhood Park | 0.3 |
| Glenarden Historic District | 0.8 |
| Greenbelt Historic District | 0.3 |
| Greenbelt Park | 0.6 |
| Grosvenor Estate (Wild Acres) | 0.1 |
| Henry P. Johnson Park | <0.1 |
| Henson Creek Stream Valley Park | 0.1 |
| Heritage Glen Park | 0.5 |
| Hollywood Park | <0.1 |
| Indian Spring Club Estates and Indian Spring Country Club | 1.2 |
| Indian Springs Park (City of Greenbelt) | 0.1 |
| Indian Springs Terrace Local Park | 1.4 |
| Locust Hill Neighborhood Park | 0.3 |
| Manchester Estates Park | 0.5 |
| McDonald Field | <0.1 |
| Metropolitan Branch, Baltimore & Ohio Railroad | 8.8 |
| Montgomery Blair High School Athletic Fields | 1.4 |
| Morningstar Tabernacle No. 88 Moses Hall and Cemetery | 0.3 |
| Morris Park | 1.1 |
| National Park Seminary Historic District / Forest Glen | 1.2 |
| Northwest Branch Stream Valley Park, Unit 3 | 3.2 |
| Rock Creek Stream Valley Park, Unit 2 | 0.4 |
| Rock Creek Stream Valley Park, Unit 3 | 3.3 |

00005637

JA1273



**OP·LANES**
MARYLAND
I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

| Section 4(f) Properties No Longer Impacted by the Preferred Alternative | Acres of Avoided Section 4(f) Use |
|---|---|
| Sligo Creek Parkway | 4.1 |
| South Four Corners Neighborhood Park | 0.1 |
| Southwest Branch Stream Valley Park | 0.3 |
| Suitland Parkway | 0.3 |
| **TOTAL ACRES AVOIDED** | **108.8** |

Note: all avoided impacts presented are relative to DEIS Alternative 9.

Properties that would experience a Section 4(f) use from the Preferred Alternative are detailed in **Sections 2.3** through **2.21** below. Within the Preferred Alternative LOD, there is one property subject to the Capper-Cramton Act, Clara Barton Parkway, and one property, the Chesapeake and Ohio Canal National Historic Park, subject to Section 6(f). **Section 1.4.8** includes additional information on other relevant authority including Capper-Cramton Act of 1930 and Section 6(f) of the Land and Water Conservation Act.

## 2.3    George Washington Memorial Parkway

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** NPS, VDHR

**Type of Section 4(f) Approval:** Individual Evaluation

George Washington Memorial Parkway is a publicly-owned park and NRHP-listed historic district that extends along the Potomac River from I-495 to Mount Vernon in Virginia. The George Washington Memorial Parkway is administered by the NPS. The George Washington Memorial Parkway is a scenic roadway honoring the nation's first president that protects and preserves cultural and natural resources along the Potomac River below Great Falls to Mount Vernon. It is also a historic district listed in the NRHP for its association with twentieth-century parkway design, engineering, landscape architecture, park planning and conservation, commemoration, and its association with George Washington. Features within George Washington Memorial Parkway include the Potomac Heritage National Scenic Trail and Turkey Run Park conservation area. The park boundary of George Washington Memorial Parkway extends 38.3 miles and comprises approximately 7,300 acres, including all administrative units and features. Clara Barton Parkway (**Section 2.5**) is part of the larger George Washington Memorial Parkway Historic District with a separate historic boundary in Maryland.

George Washington Memorial Parkway is also a historic district that was listed in the NRHP on June 2, 1995. It is historically significant under Criterion B for its association with the life of George Washington and Criterion C for its embodiment of the distinctive characteristics of a parkway.

The Preferred Alternative would result in a Section 4(f) use of 4.4 acres of George Washington Memorial Parkway (**Figure 3**), including 0.6 acres of permanent impact and 3.8 acres of temporary impact.

The impacts to George Washington Memorial Parkway would be required to accommodate the construction, operation, and future maintenance of new direct access ramps to the managed lanes on I-495; the installation, operation, and future maintenance of electrical conduit and permanent signage to inform the traveling public of toll rates and operation of the facility, resurfacing of George Washington

00005638

JA1274

OP·LANES MARYLAND | I-495 & I-270 Managed Lanes Study | Final Section 4(f) Evaluation

**Figure 3: George Washington Memorial Parkway**



00005639

JA1275



**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

Memorial Parkway for maintenance of traffic during construction, construction of a shared use path along the I-495 inner loop and retaining wall. Detailed mapping of the Preferred Alternative design at George Washington Memorial Parkway can be found in **FEIS, Appendix E – Maps 2-4**. The Preferred Alternative would result in temporary closure of the Potomac Heritage National Scenic Trail within the LOD during construction. A detour route, if determined to be necessary, would be developed by MDOT SHA and the Developer in coordination with NPS, Fairfax County, and VDOT. The segment of the trail within the LOD would be restored on a new alignment after construction is completed. No other recreational facilities within George Washington Memorial Parkway would be impacted by the Preferred Alternative.

Since the SDEIS, the proposed impacts to George Washington Memorial Parkway under the Preferred Alternative have been modified to shift 0.1 acres from permanent impact to temporary. The proposed I-495 inner loop and shared use path along the east side of I-495 adjacent to George Washington Memorial Parkway was slightly realigned due to modifications of the design at the George Washington Memorial Parkway interchange. The permanent and temporary LOD is offset behind the proposed retaining wall along the shared use path and due to the realignment, the permanent needs decreased in discrete locations and the temporary needs increased in discrete locations.

MDOT SHA conducted extensive minimization efforts to reduce impacts in the vicinity of the ALB, including impacts to George Washington Memorial Parkway, by evaluating alternative bridge designs and construction staging methods and coordinating with NPS as described in **Section 1.5 and SDEIS Chapter 4, Section 4.4.3**. Minimization efforts resulted in the elimination of a construction access area within George Washington Memorial Parkway that was previously to be used for the location of a construction crane. A new interchange configuration pulled roadwork off the George Washington Memorial Parkway mainline within the park boundary, and a refined signing layout was developed limiting ground disturbance to only those areas where signs will be removed or placed and where electrical conduit must be placed. Through coordination with NPS, a retaining wall was included in the design adjacent to the proposed shared use path that runs parallel to I-495 to further reduce impacts.

MDOT SHA has coordinated with NPS to identify a comprehensive package of parkland mitigation commitments for impacts to George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historic Park, and Clara Barton Parkway. Parkland mitigation measures are summarized in the list below, with more details included in **Section 4.5.1**.

- Develop and implement a comprehensive ecological restoration plan and cost estimate for restoring limits of disturbance to preexisting conditions for the impacted area.
- Create/restore 1.53 acres of wetland northwest of American Legion Bridge (Site ID CHOH-13) per the Wetland Statement of Findings.
- Install new white legend and border on brown background guide signs along I-495 for the George Washington Memorial Parkway exit.
- Shift bridge piers north of Lock 13 to the maximum extent possible while maintaining adequate vertical clearance of 12 feet, 6 inches between towpath and bottom of bridge steel to accommodate NPS equipment. Design new ALB to capture all drainage outfall using downspouts. The downspouts will be located so the water does not drop onto areas with frequent pedestrian use.

00005640



- Complete a condition assessment of locks, masonry walls, towpath, and canal prism throughout entire LOD and coordinate with NPS to develop and implement a plan for repairs identified during condition assessment.

- Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (GWMP) and develop associated public interpretation materials (in Virginia).

- Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio Canal) and develop associated public interpretation materials (In Maryland).

- Prepare National Register Nomination for Dead Run Ridges Archaeological District.

- Develop Interpretive product on archeological sites; Create web-based Story Map, waysides, and/or brochures.

- Provide monetary compensation for a Cultural Landscape Report for Clara Barton Parkway (historical narrative; updated existing conditions and analysis and evaluation; and treatment guidelines for management of character defining features).

- Complete a condition assessment of Potomac Heritage Trail within the LOD and coordinate with NPS to develop and implement a plan to improve the trail within the LOD.

- Prepare Visitor and Ecological Impact Study.

- Acquire James Audia property (2 parcels totaling 1.4 acres) as replacement parkland for impacts to George Washington Memorial Parkway.

- Convey a portion of the MDOT SHA owned former Ridenour property (38.7 acres) as replacement parkland for impacts to the Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway.

- Provide monetary compensation up to $60,000 to update and refine the George Washington Memorial Parkway Climate Action Plan.

- The Preferred Alternative will result in temporary closure of the Potomac Heritage National Scenic Trail within the LOD during construction. A detour route, if determined to be necessary, will continue to be developed by MDOT SHA and the Developer in coordination with NPS, Fairfax County, and VDOT. The segment of the trail within the LOD would be restored on a new alignment after construction is completed.

- Evaluate drainage and sight distance considerations at the intersection of the shared use path and Chesapeake and Ohio Canal towpath during final design in coordination with NPS, within the LOD.

- Design and construct, in coordination with NPS and the Washington Biologists' Field Club, slope armoring along the upstream side of Plummers Island to mitigate for future slope erosion as a result of tree clearing with the LOD. The slope armoring could include, but is not limited to, a rip-rap slope, live staking, and brush layering or any combination of armoring that will provide a blended natural aesthetic with the topography and historic nature of the island.

Mitigation for the use of George Washington Memorial Parkway is consistent with stipulations identified in the Section 106 Programmatic Agreement and has been coordinated with the MHT and Section 106 consulting parties (**FEIS, Appendix J**).

00005641



## 2.4    Chesapeake and Ohio Canal National Historical Park

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

The Chesapeake and Ohio Canal National Historical Park is an NRHP-listed historic district and publicly-owned park and recreation area encompassing 19,575 acres. The Chesapeake and Ohio Canal National Historical Park stretches along the Potomac River from Rock Creek at Georgetown in Washington, DC, to Cumberland, Maryland, for 184.5 miles. Construction on the Chesapeake and Ohio Canal began in 1828 and concluded in 1850. The Chesapeake and Ohio Canal became a unit of the NPS as a national monument in 1961 and then established as a national historical park in 1971.

The Chesapeake and Ohio Canal National Historical Park was designated to preserve and interpret the 19th century transportation canal and its associated scenic, natural, and cultural resources; and to provide opportunities for education and appropriate outdoor recreation. The Chesapeake and Ohio Canal National Historical Park is listed on the NRHP and contains more than 1,300 historic structures, including one of the largest collections of 19th century canal features and buildings in the national park system.

The Chesapeake and Ohio Canal National Historical Park was listed in the NRHP on October 15, 1966, prior to becoming a national historical park. A supplementary listing under the name "Chesapeake and Ohio Canal National Historical Park" was added to the NRHP on February 3, 2015. The Chesapeake and Ohio Canal National Historical Park is listed in the NRHP under Criteria A, C, and D. In addition to 455 contributing resources previously listed in the NRHP, the supplemental listing added 796 contributing resources comprising 106 buildings, 175 sites, 483 structures, and 32 objects.

Based on property information provided by NPS, MDOT SHA has now evaluated impacts to the Chesapeake and Ohio Canal National Historical Park using a single boundary applicable to both the historic property and public park, rather than two separate boundaries as reported in the DEIS. This change to use a single boundary was made at the request of NPS. Impacts to the Chesapeake and Ohio Canal National Historical Park in the DEIS and Draft Section 4(f) Evaluation were based on readily available property information which included permits for operation and maintenance of the existing highway, including an area surrounding the highway, bridges, and ramps. While the intent to formally transfer property (via the Highway Deed Easement Process) from NPS to MDOT SHA was noted in historical documents, neither NPS nor MDOT SHA recovered official documentation formalizing the transfer. Therefore, the SDEIS and FEIS have provided an altered area delineated as within transportation use. MDOT SHA, FHWA, and NPS have agreed that the requirements of Section 4(f) do not apply to the area of the Chesapeake and Ohio Canal National Historical Park that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the Chesapeake and Ohio Canal and eastbound Clara Barton Parkway, and existing pier locations for the ALB.

00005642



The Preferred Alternative would result in a Section 4(f) use of 10.1 acres of the Chesapeake and Ohio Canal National Historical Park (**Figure 4**), including 1.0 acres of permanent impact and 9.1 acres of temporary impact.

The impacts to Chesapeake and Ohio Canal National Historical Park would be required to accommodate a temporary access road for construction vehicles and materials to build the new ALB and remove the existing structure, the construction and maintenance of the realigned ramp from I-495 northbound to Clara Barton Parkway, a temporary bridge crossing of the C&O Canal and towpath, and the construction of a shared-use path on the east side of the new ALB. Detailed mapping of the Preferred Alternative design at the Chesapeake and Ohio Canal National Historical Park can be found in **FEIS, Appendix E** – **Map 4**.

The Chesapeake and Ohio Canal towpath, which functions as a recreational facility, would be temporarily impacted due to the movement of construction vehicles across the towpath on the ALB access road and during construction of the new I-495 northbound and southbound bridges over the towpath, Canal, and eastbound Clara Barton Parkway and removal of the existing structures. Access to the Chesapeake and Ohio Canal towpath would be maintained for pedestrian and bike traffic during construction and would be returned to its original condition upon completion of construction. The proposed construction access road would be horizontally offset from the C&O Canal Towpath. Note that pedestrian traffic on the Chesapeake and Ohio Canal towpath would be maintained across the proposed construction access road at all times and the towpath would remain open. Flaggers would be located at the C&O Canal towpath to ensure safe passage of towpath users during construction.

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal Towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period.  To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the C&O Canal towpath and the MacArthur Boulevard sidepath outside of the study area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in **FEIS Appendix E**. No other recreational facilities within the Chesapeake and Ohio Canal National Historical Park would be impacted by the Preferred Alternative.

Impacts to the Chesapeake and Ohio Canal National Historical Park under the Preferred Alternative have not changed since the SDEIS.

00005643

 **OP·LANES** MARYLAND   I-495 & I-270 Managed Lanes Study                Final Section 4(f) Evaluation

**Figure 4: Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway and the Washington Biologists' Field Club**



00005644



MDOT SHA conducted extensive minimization efforts to reduce impacts in the vicinity of the ALB, including impacts to Chesapeake and Ohio Canal National Historical Park, by evaluating alternative bridge designs, construction access paths, and construction staging methods in coordination with NPS as described in **Section 1.4**. Minimization measures include the elimination of one proposed access road east of I-495. An overall reduction in the LOD was achieved due to the ALB Strike Team analysis, resulting in a proposed construction method requiring less work area within Chesapeake and Ohio Canal relative to the DEIS.

On March 12, 2020, MHT concurred that the Study would have an adverse effect on Chesapeake and Ohio Canal National Historical Park.

MDOT SHA has coordinated with NPS to identify a comprehensive package of parkland mitigation commitments for impacts to George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, and Clara Barton Parkway. These parkland mitigation measures are summarized in **Section 2.3** above, with more details included in **Section 4.5.1**. Mitigation for the use of Chesapeake and Ohio Canal National Historical Park is consistent with stipulations included a Section 106 Programmatic Agreement coordinated with MHT and the Section 106 consulting parties (**FEIS, Appendix J**)

## 2.5    Clara Barton Parkway

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

The Clara Barton Parkway is an administrative unit of George Washington Memorial Parkway within Maryland. Clara Barton Parkway extends 6.6 miles along the northern shore of the Potomac River between the Naval Surface Warfare Center at Carderock and the Washington, DC border with Maryland. The historic boundary in Maryland comprises 96.2 acres. Though Clara Barton Parkway has a separate historic boundary in Maryland, it is part of the larger George Washington Memorial Parkway Historic District.

Clara Barton Parkway is under the jurisdiction of NPS and was designed for recreational driving, to link sites that commemorate important episodes in American history, and to preserve habitat for local wildlife. The Clara Barton Parkway is also a historic property and was listed in the NRHP on June 2, 1995. It is historically significant under Criterion B for its association with the life of George Washington and Clara Barton, persons significant in our past, and Criterion C for its embodiment of the distinctive characteristics of a parkway.

The Preferred Alternative would result in a Section 4(f) use of 1.7 acres of the Clara Barton Parkway (**Figure 4**), of which 1.1 acres are permanent and 0.6 acres are temporary impacts.

The impacts to Clara Barton Parkway would be required to accommodate a temporary access road for construction vehicles and materials to build the new American Legion Bridge (ALB) and remove the existing structure for reconstruction and maintenance of I-495 northbound ramp to Clara Barton Parkway and the eastbound Clara Barton Parkway ramp to northbound I-495; and for construction of a trail connection between a shared-use path on the east side of the new ALB and the Chesapeake and Ohio

00005645



Canal towpath. Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. Detailed mapping of the Preferred Alternative design at Clara Barton Parkway can be found in **FEIS, Appendix E – Maps 4-5**.

Impacts to Clara Barton Parkway in the DEIS and Draft Section 4(f) Evaluation were based on readily available property information which included permits for operation and maintenance of the existing highway, including an area surrounding the highway, bridges, and ramps. While the intent to formally transfer property, via the Highway Easement Deed Process, from NPS to MDOT SHA was noted in historical documents, neither NPS nor MDOT SHA recovered official documentation formalizing the transfer. MDOT SHA, FHWA, and NPS have agreed that the requirements of Section 4(f) do not apply to the area of Clara Barton Parkway that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the Chesapeake and Ohio Canal and eastbound Clara Barton Parkway, and existing pier locations for the ALB.

Since the SDEIS, the proposed temporary impact to Clara Barton Parkway under the Preferred Alternative has decreased by 0.8 acres. The reduced impact area is due to the updated shared use path alignment as described above. The FEIS design concept also includes an alignment for the off-ramp from the I-495 inner loop to eastbound Clara Barton Parkway that is slightly offset from the previous design concept and is further outside of the existing transportation use area.

MDOT SHA conducted extensive efforts to reduce impacts in the vicinity of the ALB, including impacts to Clara Barton Parkway, by evaluating alternative bridge designs and construction staging methods and coordinating these efforts with NPS. Detailed construction evaluation resulted in the elimination of one proposed access road in the southwest quadrant of the bridge and Potomac River, just south of the Clara Barton Parkway.

MDOT SHA has coordinated with NPS to identify a comprehensive package of parkland mitigation commitments for impacts to George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, and Clara Barton Parkway. These parkland mitigation measures are summarized in **Section 2.3** above, with more details included in **Section 4.5.1**. Mitigation for the use of Clara Barton Parkway is consistent with stipulations included a Section 106 Programmatic Agreement coordinated with MHT and the Section 106 consulting parties (refer to **FEIS, Appendix J**).

00005646



## 2.6    Washington Biologists' Field Club on Plummers Island

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

The Washington Biologists' Field Club is a naturalist club composed of a cabin, recreational elements, and landscape features situated on a 12.2-acre island known as Plummers Island in the Potomac River. The island is situated on the northern side of the river, south of the Clara Barton Parkway and Locks 11 and 12 of the Chesapeake and Ohio Canal, and east of I-495 and the American Legion Memorial Bridge in Montgomery County, Maryland. According to Washington Biologist's Field Club records, the cabin building was constructed in 1901 by the club and is still utilized to this day by club members and the public. The island is accessed by crossing Rock Run Culvert from an unpaved trail that extends south from the Chesapeake and Ohio Canal Towpath near Lock 10. The island, currently owned by the NPS, is located within the NRHP boundaries of the Chesapeake and Ohio Canal National Historical Park (M: 12-46). The Washington Biologists' Field Club on Plummers Island is eligible for inclusion in the NRHP under Criterion A. The Washington Biologists' Field Club is a twentieth-century naturalist's club set on an island in the Potomac River. For over a century, Plummers Island has been used by scientists for short- and long-term biological research studies as well as natural history and geological studies.

The Washington Biologists' Field Club on Plummers Island was not known to be eligible for the NRHP when the DEIS and SDEIS were published. MDOT SHA conducted an evaluation of the property in coordination with MHT based on input from the public and Section 106 Consulting Parties received on the DEIS and SDEIS.

The Preferred Alternative would result in a Section 4(f) use of 0.28 acres of the Washington Biologists' Field Club on Plummers Island (**Figure 4**); less than 0.1 acres of that use would be permanent impact and 0.27 acres would be temporary impact.

Use of land within the boundary of the Washington Biologists' Field Club on Plummers Island would be required for the new ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers adjacent to the island, and slope protection. Access to the existing and proposed piers is required for these activities. The widened ALB would also result in new shaded area over Plummers Island potentially affecting vegetation.

In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Impacts were minimized by strategically locating the piers, specifically the new piers in close proximity to the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures.

Subsequent to publishing of the SDEIS, on October 8, 2021, MHT concurred with MDOT SHA's eligibility determination and finding of adverse effect for the Washington Biologists' Field Club on Plummers Island (see **FEIS, Appendix I**).

00005647



Mitigation for the use of the Washington Biologists' Field Club on Plummers Island is consistent with stipulations included a Section 106 Programmatic Agreement coordinated with MHT and the Section 106 consulting parties (see **FEIS, Appendix J**) and **Section 4.5**.

## 2.7   Carderock Springs Historic District

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

Carderock Springs is a planned residential development of 275 modernist houses located northwest of Bethesda in Montgomery County, Maryland. The Carderock Springs Historic District is significant under Criterion A as an example of a type of residential development which resulted from the collaborative efforts of builder Edmund J. Bennett and architects Keyes, Lethbridge, and Condon (KLC) in the suburbs of Washington, DC. The Carderock Springs Historic District is also significant under Criterion C for its distinctive examples of modernist houses in a carefully planned and landscaped development designed to have a "natural" appearance by retaining most of the original vegetation and topography.

The Preferred Alternative would result in a Section 4(f) use of less than 0.1 acres of the Carderock Springs Historic District (**Figure 5**), including less than 0.1 acres of permanent impact and less than 0.1 acres of temporary impact.

Impact to the Carderock Springs Historic District is due shifting of the mainline of I-495, constructing retaining and noise walls along the outer loop, and clearing vegetation and erosion and sediment control measures behind the proposed noise wall.  Detailed mapping of the Preferred Alternative design at the Carderock Springs Historic District can be found in **FEIS, Appendix D – Map 7**.

Impacts to the Carderock Springs Historic District under the Preferred Alternative have not changed since the SDEIS.

The Preferred Alternative would impact portions of two contributing properties in the Carderock Springs Historic District. No contributing structures would be impacted within the district.

In a letter dated October 8, 2021, MHT concurred with the finding of no adverse effect and *de minimis* determination for Carderock Springs Historic District (see **FEIS, Appendix I**). Therefore, FHWA has made a final *de minimis* impact determination for the Carderock Springs Historic District.

00005648

JA1284

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

**Figure 5: Carderock Springs Historic District**

00005649

JA1285


I-495 & I-270 Managed Lanes Study                          Final Section 4(f) Evaluation

## 2.8    Gibson Grove AME Zion Church

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** Individual Evaluation

Gibson Grove AME Zion Church is a small, wood-frame structure set on a hill overlooking Seven Locks Road, immediately north of I-495. Gibson Grove AME Zion Church is eligible for the NRHP under Criterion A. The church derives its significance from its association with the African American settlement of Gibson Grove that was founded in the 1880s by former slaves. The original church was a log structure that was replaced with the current edifice in 1923. It is the only remaining building associated with the African American Gibson Grove community.

The Preferred Alternative would result in a Section 4(f) use of 0.6 acres of the Gibson Grove AME Zion Church property (**Figure 6**), all of which would be permanent impact. The Gibson Grove Church building would not be directly impacted by the Preferred Alternative.

The impact is required to accommodate outfall stabilization, culvert augmentation, bridge reconstruction, and construction access. A shift of the roadway centerline towards the Gibson Grove AME Zion Church was included in the Preferred Alternative to avoid impacts to Morningstar Cemetery, located on the opposite side of I-495 from the Gibson Grove Church. Detailed mapping of the Preferred Alternative design at Gibson Grove AME Zion Church can be found in **FEIS, Appendix E – Map 8**.

MDOT SHA and FHWA made an adverse effect determination pursuant to Section 106 for Gibson Grove AME Zion Church; MHT concurred with this determination in a letter dated October 8, 2021 (see **FEIS, Appendix I**).

MDOT SHA has coordinated with MHT to identify mitigation commitments for impacts to Gibson Grove AME Zion Church. The mitigation identified includes construction or funding of a new parking lot for Gibson Grove Church, including an underground culvert as part of the stormwater management design. Mitigation for the use of Gibson Grove AME Zion Church is consistent with stipulations included a Section 106 Programmatic Agreement coordinated with MHT and the Section 106 consulting parties (see **FEIS, Appendix J**).

00005650

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study       Final Section 4(f) Evaluation

**Figure 6: Gibson Grove AME Zion Church**



00005651

JA1287

 OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

## 2.9    Cabin John Stream Valley Park Unit 2

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Cabin John Stream Valley Park Unit 2 is one of six units that comprise M-NCPPC Montgomery County's Cabin John Stream Valley Park, a publicly-owned park and recreation area. Cabin John Stream Valley Park Unit 2 extends north-south across I-495 from south of River Road to along Cabin John Parkway, where it abuts Unit 1 of the park. The entirety of Cabin John Stream Valley Park encompasses 520 acres across six units; of which Unit 2 comprises approximately 105 acres.

Cabin John Stream Valley Park features portions of the natural-surface Cabin John Trail that runs north-south and connects the stream valley park's Potomac Area to Cabin John Parkway. The park also features undeveloped wooded area that provides a protective buffer along Cabin John Creek. A portion of Cabin John Stream Valley Park, Unit 2 located south of I-495 and west of Cabin John Parkway is also designated by M-NCPPC as a Best Natural Area.  Best Natural Area are defined by M-NCPPC as areas of parkland containing one or more of the following:

- Large areas of contiguous, high-quality forest, marsh or swamp that show little evidence of past land-use disturbance
- Rare, threatened, endangered, or watch-list species
- The best examples of unique plant communities found in Montgomery County in the ten Major Terrestrial Natural Communities
- High quality wetlands, including those of Special State Concern as noted in COMAR Title 26
- Aquatic communities rated as good or excellent in the Countywide Stream Protection Strategy
- Special Trout Management Areas as noted in COMAR Title 08
- Areas of exceptional scenic beauty

The Preferred Alternative would result in a Section 4(f) use of 0.6 acres of permanent impacts and less than 0.1 acres of temporary impacts to Cabin John Stream Valley Park, Unit 2 (**Figure 7**).  The majority of these impacts would occur south of I-495 and west of Cabin John Parkway within the M-NCPPC-designated Best Natural Area and would involve clearing of vegetation.  The remainder of the impact would occur north of I-495 along the ramp from eastbound River Road to southbound Cabin John Parkway.

00005652

**OP·LANES** MARYLAND   I-495 & I-270 Managed Lanes Study          Final Section 4(f) Evaluation

**Figure 7: Cabin John SVP Unit 2**



JA1289

00005653



The impacts to Cabin John Stream Valley Park, Unit 2 would be required to accommodate widening of I-495, replacement of the bridges across Seven Locks Road and Cabin John Parkway and associated construction access, realigning the interchange with Cabin John Parkway, a proposed retaining wall and noise barrier along the inner loop of I-495, and providing northbound managed lane and general purpose lane access to River Road (**Figure 7**). The proposed noise barrier along the inner loop would be mounted on top of the retaining wall for much of its length adjacent to Cabin John Stream Valley Park Unit 2. Along southbound Cabin John Parkway, there would be impacts due to culvert augmentation and construction of a retaining wall along the Parkway and resurfacing of Cabin John Parkway for maintenance of traffic. Additionally, two culverts would be augmented in the southwest quadrant of the I-495 and River Road interchange. Detailed mapping of the Preferred Alternative design at Cabin John Stream Valley Park Unit 2 can be found in **FEIS, Appendix E – Maps 8 - 10**.

No recreational facilities within Cabin John Stream Valley Park Unit 2 would be impacted by the Preferred Alternative.

Since the SDEIS, the proposed impacts to Cabin John Stream Valley Park Unit 2 under the Preferred Alternative have decreased by 0.8 acres total, including a reduction of 0.2 acres of permanent impact and 0.6 acres of temporary impact. The FEIS design concept includes a different ramp configuration at the Cabin John Parkway/MD 190 interchange than what was proposed in the SDEIS design concept, which resulted in a narrower proposed pavement footprint along the I-495 inner loop at Cabin John Stream Valley Park Unit 2. The LOD was reset and reduced based on an offset from the proposed retaining wall and noise barrier along the inner loop and temporary construction needs.

M-NCPPC provided written agreement that the proposed impacts to Cabin John Stream Valley Park Unit 2 would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on April 5, 2022. On April 6, 2022, FHWA provided concurrence that the Section 4(f) use of Cabin John Stream Valley Park Unit 2 would be de minimis (see **FEIS Appendix S**).

MDOT SHA has coordinated with M-NCPPC to identify a comprehensive package of parkland mitigation commitments for impacts to Cabin John Stream Valley Park Unit 2. These parkland mitigation measures are summarized in the list below, with more details included in **Section 4.5.2**.

- Plan, design and construct improvements to formalize the Cabin John Trail trailhead parking area along Seven Locks Road.
- Stream stabilization along Cabin John Creek.
- Plan, design and implement forest and terrestrial vegetation mitigation.
- Plan, design, and construct wildlife passage areas under I-495 overpass of Cabin John Creek and Cabin John Parkway by lengthening new bridge structures. This will allow wildlife passage on the west side bank of Cabin John Creek while minimizing wildlife-vehicular conflicts along Cabin John Parkway by constructing wildlife exclusion fencing along the east side of the creek next to the Parkway, in coordination with M-NCPPC.

00005654



## 2.10   Burning Tree Club

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction**: MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

Burning Tree Club is a privately-owned, historic golf course in the northeast quadrant of the interchange of I-495 and River Road. The 221-acre club includes a Tudor Revival clubhouse and 18-hole golf course built in 1922 and 1923. Burning Tree Club is eligible for the NRHP under Criteria A and C. Burning Tree Club is significant under Criterion A as an exclusive, male-only social institution devoted to the pastime of golf, and an example of the type of recreational organization that flourished during the 1920s.

The Preferred Alternative would result in a Section 4(f) use of 1.3 acres of Burning Tree Club (**Figure 8**), all of which would be permanent impact.

The impacts to Burning Tree Club would be required to accommodate widening I-495, the augmentation of an existing culvert carrying Thomas Branch beneath I-495, construction of a retaining wall, and the realignment of Thomas Branch along the east side of I-495. Detailed mapping of the Preferred Alternative design at the Burning Tree Club can be found in **FEIS, Appendix E – Maps 10 and 11**.

Impacts to the Burning Tree Club under the Preferred Alternative have not changed since the SDEIS.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have no adverse effect on Burning Tree Club and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding based on the impacts presented in the DEIS. This initial MHT review was conducted prior to recent design changes and avoidance and minimization efforts. MDOT SHA anticipates that there would still be no adverse effect to the Burning Tree Club and submitted documentation for concurrence to MHT on September 8, 2021. In a letter dated October 8, 2021, MHT concurred with the finding of no adverse effect and *de minimis* determination for Burning Tree Club (**FEIS, Appendix I**). Therefore, FHWA has made a final *de minimis* impact determination for the Burning Tree Club.

## 2.11   Academy Woods

**Type of Section 4(f) Property: Historic Property**

**Official with Jurisdiction: MHT**

**Type of Section 4(f) Approval:** *De Minimis* Impact

Academy Woods is a Section 4(f) historic property comprised of a small neighborhood on 6.5 acres northeast of the western I-495 and I-270 spur interchange in Bethesda. The historic district is eligible for the NRHP under Criterion C as representative of a type, period, and method of construction.

The Preferred Alternative would result in a Section 4(f) use of 0.2 acres of Academy Woods (**Figure 9**), all of which would be permanent impact.

00005655

OP·LANES™
MARYLAND · I-495 & I-270 Managed Lanes Study · Final Section 4(f) Evaluation

**Figure 8: Burning Tree Club**



00005656

JA1292

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

**Figure 9: Academy Woods**



00005657

JA1293



The impacts to Academy Woods would be required to accommodate the construction, operation and future maintenance of a stormwater management facility, and construction of a noise barrier. Detailed mapping of the Preferred Alternative design at Academy Woods can be found in **FEIS, Appendix E – Map 13**.

The impacts to Academy Woods have not changed from those reported for Alternative 9 in the DEIS.

On March 12, 2020, MHT concurred that the Study would have no adverse effect on Academy Woods and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding (**FEIS, Appendix I**). As such, the impact to Academy Woods Historic District under the Preferred Alternative would constitute a minor use. Therefore, FHWA has made a final *de minimis* determination for Academy Woods.

## 2.12   Cabin John Regional Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

Cabin John Regional Park is a publicly-owned park and recreation area situated between Democracy Boulevard and southbound I-270. The 513.8-acre park contains a playground, dog park, picnic shelters, a miniature train, grills, horseshoe pits, and restrooms. The park has more than four miles of natural surface trails and two miles of hard surface trails. Athletic facilities include an indoor ice rink, baseball field, five softball fields, a volleyball court, and indoor tennis center. The Locust Grove Nature Center and Robert C. McDonnell Campground are also within the park.

A portion of Cabin John Regional Park is also designated by M-NCPPC as a Biodiversity Area.  Biodiversity Area are defined as areas of parkland containing one or more of the following:

- Large areas of contiguous, high-quality forest, marsh or swamp that are generally more than 100 acres and show little evidence of past land-use disturbance
- Rare, threatened, endangered, or watch-list species
- The best examples of unique plant communities found in Montgomery County
- Areas of exceptional scenic beauty

The Preferred Alternative would result in a Section 4(f) use of 6.3 acres of Cabin John Regional Park (**Figure 10**), including 5.7 acres of permanent impact and 0.6 acres of temporary impact. The impacted areas are located on the eastern edge of the park along southbound I-270 and are within the M-NCPPC-designated Biodiversity Area.

00005658

 **OP·LANES** MARYLAND   I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

### Figure 10: Cabin John Regional Park



00005659

JA1295



The impacts to Cabin John Regional Park would be required due to widening of southbound I-270 and construction of a retaining wall along the outside shoulder, utility relocations, a SWM facility, augmentation of two storm drains and one culvert, and outfall stabilization. Removal of vegetation within the impacted area would be necessary. Impacts would also occur to the connecting trail between the Highway Loop Trail and Kidney Bean Loop Trail. A portion of the connecting trail between the Highway Loop Trail and Kidney Bean Loop Trail would need to be realigned in coordination with M-NCPPC. Access to the trail would be maintained throughout construction. No other recreational facilities would be impacted by the Preferred Alternative. Detailed mapping of the Preferred Alternative design at Cabin John Regional Park can be found in **FEIS, Appendix E – Maps 22 - 25**.

Impacts to Cabin John Regional Park under the Preferred Alternative have not changed since the SDEIS.

MDOT SHA has coordinated with M-NCPPC to identify a comprehensive package of parkland mitigation commitments for impacts to Cabin John Regional Park. These parkland mitigation measures are summarized in the list below, with more details included in **Section 4.5.2**.

- Plan, design, and construct a fiberglass pedestrian bridge over the outfall/tributary to Cabin John Creek at STA 3640+00 for the natural surface connector trail.
- Plan, design, and construct improvements for pedestrian and cycling access to the Robert C. McDonnell campground access road.
- Plan, design, and construct improvements to the existing parking area on Tuckerman Lane near the Robert C. McDonnell Campground access road.
- Plan, design, and construct a fiberglass pedestrian bridge over Cabin John Creek to connect the Cabin John Trail to the Kidney Bean Loop Trail, in the vicinity of Goya Drive.
- Plan, design, and construct improvements for the stabilization of the Gainsborough Road stormwater outfall to Cabin John Creek with environmentally sensitive channel techniques.
- Plan, design and implement forest and terrestrial vegetation mitigation.

### 2.13 Tilden Woods Stream Valley Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Tilden Woods Stream Valley Park is a publicly-owned park, and recreation area, accessed via Sulky Lane in Bethesda. Tilden Woods Stream Valley Park extends along the banks of Old Farm Creek from Montrose Road to I-270. This 67.4-acre park consists of an undeveloped wooded area that provides a protective buffer along Old Farm Creek.

The Preferred Alternative would result in a Section 4(f) use of 0.4 acres of Tilden Woods Stream Valley Park (**Figure 11**), including 0.3 acres of permanent impact and 0.1 acres of temporary impact.

00005660

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study        Final Section 4(f) Evaluation

**Figure 11: Tilden Woods SVP and Old Farm NCA**



00005661

JA1297



The impacts to Tilden Woods Stream Valley Park would be required to accommodate an area for construction to widen I-270, replacing the bridge that carries I-270 over Tuckerman Lane, augmenting the existing culvert conveying Old Farm Creek beneath I-270, providing access for construction vehicles and materials, and utility relocation. Detailed mapping of the Preferred Alternative design at Tilden Woods Stream Valley Park can be found in **FEIS, Appendix E – Maps 21 and 22**.

No recreational facilities would be impacted by the Preferred Alternative at Tilden Woods Stream Valley Park.

The permanent impacts to Tilden Woods Stream Valley Park under the Preferred Alternative were reduced from 0.6 to 0.3 acres since the SDEIS.

M-NCPPC provided written agreement that the proposed impacts to Tilden Woods Stream Valley Park would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on April 5, 2022. On April 6, 2022, FHWA provided concurrence that the Section 4(f) use of Tilden Woods Stream Valley Park would be *de minimis* (see **FEIS Appendix S**).

MDOT SHA has coordinated with M-NCPPC to identify a comprehensive package of parkland mitigation commitments for impacts to Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6. These parkland mitigation measures are summarized in the list below, with more details included in **Section 4.5.2**.

- Plan, design, and construct improvements for the stabilization of the Greentree Road stormwater outfall from the pipe to a natural surface trail just south of Cabin John Creek with environmentally sensitive channel techniques, include a planting plan to compensate for forest impacts related to this work.
- Plan, design, and implement forest and terrestrial vegetation mitigation.
- Plan, design, and construct a single bridge structure with a clear span of Tuckerman Lane (including the associated pedestrian and bicycle facilities) and a clear span over Old Farm Creek.

## 2.14   Old Farm Neighborhood Conservation Area

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Old Farm Neighborhood Conservation Area is a publicly-owned park and recreation area at 7030 Tilden Lane in Rockville. The park is bounded to the west by I-270. The 0.8-acre park is composed of an undeveloped wooded area.

The Preferred Alternative would result in a Section 4(f) use of 0.1 acres of Old Farm Neighborhood Conservation Area (**Figure 11**), all of which would be permanent impact.

The impacts to Old Farm Neighborhood Conservation Area would be required to construct, operate, and maintain a stormwater management facility on land adjacent to the park. Detailed mapping of the

00005662



OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

Preferred Alternative design at Old Farm Neighborhood Conservation Area can be found in **FEIS, Appendix E – Map 22**.

No recreational facilities would be impacted by the Preferred Alternative at Old Farm Neighborhood Conservation Area.

Impacts to Old Farm Neighborhood Conservation Area under the Preferred Alternative have not changed since the SDEIS.

M-NCPPC provided written agreement that the proposed impacts to Old Farm Neighborhood Conservation Area would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on April 5, 2022. On April 6, 2022, FHWA provided concurrence that the Section 4(f) use of Old Farm Neighborhood Conservation Area would be *de minimis* (see **FEIS Appendix S**).

MDOT SHA has coordinated with M-NCPPC to identify a comprehensive package of parkland mitigation commitments for impacts to Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6. These parkland mitigation measures are summarized in the list in **Section 2.12** above, with more details included in **Section 4.5.2**.

## 2.15    Cabin John Stream Valley Park Unit 6

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Cabin John Stream Valley Park Unit 6 is one of six units that comprise M-NCPPC Montgomery County's Cabin John Stream Valley Park, a publicly-owned park and recreation area. Cabin John Stream Valley Park Unit 6 is the northernmost portion of the stream valley park and is situated east of I-270 bounded by Old Stage Road to the south and the I-270 offramp to Montrose Road to the north. The entirety of Cabin John Stream Valley Park encompasses 520 acres; of which Unit 6 comprises 19.8 acres. Cabin John Stream Valley Park features portions of the natural surface Cabin John Trail that runs north-south and connects the stream valley park's Potomac area to Cabin John Parkway as well as an undeveloped wooded area that provides a protective buffer along Cabin John Creek.

The Preferred Alternative would result in a Section 4(f) use of 0.8 acres of permanent impact and less than 0.1 acres of temporary impacts Cabin John Stream Valley Park Unit 6 (**Figure 12**).

00005663

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

**Figure 12: Cabin John Stream Valley Park, Unit 6**



00005664

JA1300



The impacts to Cabin John Stream Valley Park Unit 6 would be required to accommodate: tree removal, grading, improvements to the existing culvert, access for construction vehicles and materials, construction of a retaining wall along the realigned ramp from northbound I-270 to eastbound Montrose Road, and construction of a SWM facility. Detailed mapping of the Preferred Alternative design at Cabin John Stream Valley Park Unit 6 can be found in **FEIS, Appendix E – Maps 23 and 25**.

The Preferred Alternative would not impact any recreational facilities in Cabin John Stream Valley Park Unit 6.

The temporary impacts to Cabin John Stream Valley Park Unit 6 under the Preferred Alternative slightly increased to 0.02 acres.

M-NCPPC provided written agreement that the proposed impacts to Cabin John Stream Valley Park Unit 6 would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on April 5, 2022. On April 6, 2022, FHWA provided concurrence that the Section 4(f) use of Cabin John Stream Valley Park Unit 6 would be *de minimis* (see **FEIS Appendix S**).

MDOT SHA has coordinated with M-NCPPC to identify a comprehensive package of parkland mitigation commitments for impacts to Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6. These parkland mitigation measures are summarized in the list in **Section 2.12** above, with more details included in **Section 4.5.2**.

## 2.16    Bullards Park and Rose Hill Stream Valley Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** Individual Evaluation

Bullards Park and Rose Hill Stream Valley Park is a publicly-owned park and recreation area abutting the northbound lanes of I-270 in Rockville. The 4.7-acre park is divided into two sections. The stream valley park comprises the central and southern portions of the park while the northern portion, Bullards Park, contains basketball courts, hard and natural surface trails, a playground, and picnic area. The Preferred Alternative would result in a Section 4(f) use of 3.3 acres of Bullards Park and Rose Hill Stream Valley Park (**Figure 13**), all of which would be permanent impact.

The impacts to Bullards Park and Rose Hill Stream Valley Park would be required for grading or modification of existing stormwater management (SWM) facilities, including an existing joint-use SWM facility near the Julius West Middle School pond, and the modification of an existing SWM facility at the north end of the park property. Detailed mapping of the Preferred Alternative design at Bullards Park and Rose Hill Stream Valley Park can be found in **SDEIS, FEIS, Appendix E – Map 29**.

Impacts to Bullards Park and Rose Hill Stream Valley Park under the Preferred Alternative have not changed since the SDEIS.

00005665

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

**Figure 13: Bullards Park and Rose Hill Stream Valley Park**



00005666

JA1302



MDOT SHA and FHWA previously anticipated that the Section 4(f) use of Bullards Park and Rose Hill Stream Valley Park would be *de minimis* based on the impacts presented in the DEIS. However, based on changes to the impacts to Bullards Park and Rose Hill Stream Valley Park described in the SDEIS, the impacts are now anticipated to be greater than *de minimis,* and thus requiring an Individual Section 4(f) Evaluation. The increase in impact from the DEIS to the SDEIS was due to adjustment and evaluation of the LOD to account for culvert augmentation in the vicinity of the park.

No recreational facilities would be impacted by the Preferred Alternative in Bullards Park and Rose Hill Stream Valley Park.

MDOT SHA has coordinated with the City of Rockville to identify a comprehensive package of parkland mitigation commitments for impacts to Bullards Park and Rose Hill Stream Valley Park, Rockmead Park, Woottons Mill Park, and the Rockville Senior Center and Park. The the proposed mitigation for impacts to City of Rockville parks would include:

- Convey the 1.25-acre MDOT SHA-owned Millennium Garden Park (former Vernie Smith properties (Acct. nos. 16-0400205281 and 16-0400205270)) to City of Rockville.

- Acquire the 1.32-acre Betty B. Casey Property (on Fleet Street) (Acct. no 160400144125) and convey to the City of Rockville

- Acquire the 0.42-acre Lodging Partners LLC Property (41 Maryland Avenue) (Acct. no. 160403198603) and convey to the City of Rockville

- Acquire the 4.23-acre Cynthia Robertson Property (Potomac Woods) (Acct. no. 160401523951) and convey to the City of Rockville

- Continue to consult on context sensitive solutions, during the design phase, to the four existing parks (Bullards Park and Rose Hill Stream valley Park, Rockmead, Woottons Mill, and Rockville Senior Center). The consultation will be constrained to context sensitive solutions that are both compensatory to the impacts to Section 4(f) resources and a justifiable expenditure of public funds. For example, plantings and context sensitive stormwater management facility design.

Additional details are included in **Section 4.5.4**.

## 2.17   Rockmead Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

Rockmead Park is a publicly-owned park and recreational facility at 1800 Greenplace Terrace in Rockville. This 25.3-acre park abuts the southbound lanes of I-270. Park amenities include open space, benches, natural and hard surface paths, and playground equipment.

00005667



OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

The Preferred Alternative would result in a use of 0.3 acres of Rockmead Park (**Figure 14**), including 0.2 acres of permanent impact and 0.1 acres of temporary impact.

The impacts to Rockmead Park would be required to accommodate improvements to two existing culverts that convey waterways beneath I-270 and providing access for construction vehicles and materials, construction of a retaining wall and a noise barrier. Detailed mapping of the Preferred Alternative design at Rockmead Park can be found in **FEIS, Appendix E – Map 29**.

No recreational facilities would be impacted by the Preferred Alternative at Rockmead Park.

Impacts to Rockmead Park under the Preferred Alternative have not changed since the SDEIS.

The City of Rockville provided written agreement that the proposed impacts to Rockmead Park would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on April 26, 2022. On April 26, 2022, FHWA provided concurrence that the Section 4(f) use of Rockmead Park would be *de minimis* (see **FEIS Appendix S**).

MDOT SHA has coordinated with the City of Rockville to identify a comprehensive package of parkland mitigation commitments for impacts to Bullards Park and Rose Hill Stream Valley Park, Rockmead Park, Woottons Mill Park, and the Rockville Senior Center and Park. These parkland mitigation measures are summarized in the in **Section 2.16** above, with more details included in **Section 4.5.4**.

00005668

 I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

**Figure 14: Rockmead Park**



00005669

JA1305



OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

## 2.18    Woottons Mill Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

Woottons Mill Park is a publicly-owned park and recreation area on Hurley Road in Rockville. Woottons Mill Park extends along a portion of Watts Branch from the southwest quadrant of the I-270 and MD 28 interchange to the intersection of Scott Drive and Wootton Parkway.

Amenities within this 106.5-acre park include basketball and tennis courts, benches and picnic tables, natural surface and hard surface paths, playground equipment, and garden plots.

The Preferred Alternative would result in a Section 4(f) use of 0.7 acres of Woottons Mill Park (**Figure 15**), all of which would be permanent impact.

The impacts to Woottons Mill Park would be required to improve a storm drain outfall and augmentation of one culvert with potential stream restoration improvements. Detailed mapping of the Preferred Alternative design at Woottons Mill Park can be found in **FEIS, Appendix E – Map 30**.

No recreational facilities would be impacted by the Preferred Alternative in Woottons Mill Park.

Impacts to Woottons Mill Park under the Preferred Alternative have not changed since the SDEIS.

The City of Rockville provided written agreement that the proposed impacts to Woottons Mill Park would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on April 26, 2022. On April 26, 2022, FHWA provided concurrence that the Section 4(f) use of Woottons Mill Park would be *de minimis* (see **FEIS Appendix S**).

MDOT SHA has coordinated with the City of Rockville to identify a comprehensive package of parkland mitigation commitments for impacts to Bullards Park and Rose Hill Stream Valley Park, Rockmead Park, Woottons Mill Park, and the Rockville Senior Center and Park. These parkland mitigation measures are summarized in the in **Section 2.16** above, with more details included in **Section 4.5.4**.

00005670

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study       Final Section 4(f) Evaluation

**Figure 15: Woottons Mill Park**



JA1307

00005671



OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

## 2.19  Woodley Gardens

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

Woodley Gardens is a planned residential development containing Colonial Revival-style, single- and multi-family dwellings constructed between 1960 and 1970 in Rockville, Maryland. The approximately 200-acre development is east of I-270 and south of the Gude Drive overpass. Woodley Gardens is an important, early example of mixed housing types in a planned residential development and is, therefore, eligible for the NRHP under Criterion A as a historic district. Woodley Gardens is also significant as a historic district under Criterion C as an excellent, intact example of a planned residential development with a period of significance ranging from 1960 to 1970.

The Preferred Alternative would result in a Section 4(f) use of 1.3 acres of Woodley Gardens (**Figure 16**), including 1.2 acres of permanent impact and 0.1 acres of temporary impact.

The impacts to Woodley Gardens would be required to accommodate the construction, operation, and future maintenance of a stormwater management facility, construction of a retaining wall and noise barrier, utility relocations, and storm drain impacts. Detailed mapping of the Preferred Alternative design at Woodley Gardens can be found in **FEIS, Appendix E – Maps 30 and 31**.

Impacts to Woodley Gardens under the Preferred Alternative have not changed since the SDEIS.

In a letter dated October 8, 2021, MHT concurred with the finding of no adverse effect and *de minimis* determination for Woodley Gardens (**FEIS, Appendix I**). Therefore, FHWA has made a final *de minimis* impact determination for the Woodley Gardens.

## 2.20  Rockville Senior Center and Park

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** MHT, City of Rockville

**Type of Section 4(f) Approval:** *De Minimis* Impact

Rockville Senior Center and Park is a publicly-owned park and recreational facility at 1150 Carnation Drive in Rockville. This 12.1-acre park is immediately south of West Gude Drive and abuts the northbound lanes of I-270. Park amenities consist of benches, picnic tables, walking paths, a nature trail, community garden, outdoor fitness equipment, art, bocce ball court, and playground equipment. The senior center building features additional recreational facilities including fitness rooms, a woodworking studio and meeting space.

00005672

JA1308

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

**Figure 16: Woodley Gardens**



00005673

JA1309



The senior center building of the Rockville Senior Center and Park is the former Woodley Gardens Elementary School and contributes to the significance of Woodley Gardens, eligible for the NRHP under Criteria A and C as an early example of a developed residential-focused, mixed use community in Rockville. The landscaping and park elements of the senior center were added after 1982, outside the Woodley Gardens period of significance (1960-1970). Significant elements of Woodley Gardens include the dwellings, shopping center, swim club, Woodley Gardens Park, and the Rockville Senior Center building.

The Preferred Alternative would result in a use of 1.1 acres of Rockville Senior Center and Park (**Figure 17**) including 1.0 acres of permanent impact and 0.1 acres of temporary impact.

The impacts to Rockville Senior Center and Park would be required to accommodate the construction, operation, and future maintenance of a stormwater management facility, construction of a retaining wall and noise barrier, and widening of Gude Drive. Detailed mapping of the Preferred Alternative design at Rockville Senior Center and Park can be found in **FEIS, Appendix E – Map 32**.

Since the SDEIS, the proposed temporary impact to the Rockville Senior Center and Park under the Preferred Alternative has increased by 0.1 acres. The SDEIS design concept included a shift of the roadway centerline along I-270 that is not included in the FEIS concept. The proposed retaining wall along NB I-270 has moved closer to the Rockville Senior Center, resulting in an increase in temporary impacts.

No recreational facilities would be impacted by the Preferred Alternative at Rockville Senior Center and Park.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have no adverse effect on Woodley Gardens, including Rockville Senior Center; and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding based on the DEIS impacts. This initial MHT review was conducted prior to recent design changes and avoidance and minimization efforts. MDOT In a letter dated October 8, 2021, MHT concurred with the finding of no adverse effect and *de minimis* determination for Rockville Senior Center and Park (**FEIS, Appendix I**) based on the revised impacts described in this Final Section 4(f) Evaluation.

The City of Rockville provided written agreement that the proposed impacts to Rockville Senior Center and Park would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on April 26, 2022. On April 26, 2022, FHWA provided concurrence that the Section 4(f) use of Rockville Senior Center and Park would be *de minimis* (see **FEIS Appendix S**).

MDOT SHA has coordinated with the City of Rockville to identify a comprehensive package of parkland mitigation commitments for impacts to Cabin John Stream Valley Park (Rockville), Bullard Park and rose Hill Stream Valley Park, Rockmead Park, Woottons Mill Park, and the Rockville Senior Center and Park. These parkland mitigation measures are summarized in the in **Section 2.15** above, with more details included in **Section 4.5.4**.

00005674

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

Figure 17: Rockville Senior Center and Park and Ward Building

JA1311

00005675



## 2.21    Ward Building

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

The Ward Building is a Brutalist-style suburban corporate office constructed in 1978 at 1300 Piccard Drive, Rockville, Maryland. The property is 4.76 acres laying just east of I-270 and north of the Gude Drive overpass. The Ward Building is eligible under Criterion C for its high artistic value as an example of Brutalist-style architecture.

The Preferred Alternative would result in a use of 0.2 acres of the Ward Building (**Figure 17**), all of which would be permanent impact.

The impacts to the Ward Building would be required to accommodate widening of I-270, widening of Gude Drive, and construction area for a retaining wall. Detailed mapping of the Preferred Alternative design at the Ward Building can be found in **FEIS, Appendix E – Map 33**.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have no adverse effect on the Ward Building and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding based on the impacts described in the DEIS. This initial MHT review was conducted prior to recent design changes and avoidance and minimization efforts. In a letter dated October 8, 2021, MHT concurred with the finding of no adverse effect and *de minimis* determination for the Ward Building (see **FEIS, Appendix I**) based on the updated impacts included in this Section 4(f) Evaluation. Therefore, FHWA has made a final *de minimis* impact determination for the Ward Building.

## 2.22    Malcolm King Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Gaithersburg Department of Parks, Recreation and Culture

**Type of Section 4(f) Approval:** *De Minimis* Impact

Malcolm King Park is a publicly-owned park and recreation area at 1200 West Side Drive in Gaithersburg. The 72.9-acre park abuts the interchange of southbound I-270 and westbound I-370. Park amenities include a basketball court, picnic area, playground, tot lot, two miles of hiking trails, and two tennis courts. The majority of the park's acreage is wooded and serves as an environmental buffer for Muddy Branch.

The Preferred Alternative would result in a Section 4(f) use of 0.5 acres of Malcolm King Park (**Figure 18**) and less than 0.1 acres of temporary impact.

The impacts to Malcolm King Park would be required to accommodate a constructability area related to widening I-270; augmenting the existing culvert conveying Muddy Branch beneath I-270, stabilizing the Muddy Branch outfall, and improvements to the existing outfall for a culvert that passes under I-370. Detailed mapping of the Preferred Alternative design at Malcolm King Park can be found in **FEIS, Appendix E – Map 35**.

00005676

OP•LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

### Figure 18: Malcolm King Park



00005677

JA1313



OP·LANES™  I-495 & I-270 Managed Lanes Study     Final Section 4(f) Evaluation
MARYLAND

No recreational facilities would be impacted by the Preferred Alternative at Malcolm King Park.

Since the SDEIS, the proposed permanent impacts to Malcolm King Park under the Preferred Alternative have decreased by 0.8 acres. The SDEIS design concept included modifications to an existing culvert that crosses under I-270 north of I-370, including installation of an auxiliary culvert next to the existing. The culvert augmentation and improvements upstream and downstream of the culvert resulted in limits of disturbance and impacts to Morris Park and Malcolm King Park. Since the SDEIS, the design concept and improvement limits have been refined and the existing culvert no longer needs to be augmented.

MDOT SHA and FHWA previously anticipated that the Section 4(f) use of Malcolm King Park would be *de minimis* based on the impacts presented in the DEIS. The SDEIS recommended that the impacts would no longer be *de minimis* based on an increase in acreage presented in that document. However, the impacts presented in this Final Section 4(f) Evaluation have been further reduced and impacts to the property are now anticipated to be *de minimis*. The City of Gaithersburg provided written agreement that the proposed impacts to Malcolm King Park would not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) on March 23, 2022. On March 28, 2022, FHWA provided concurrence that the Section 4(f) use of Malcolm King Park would be *de minimis* (see **FEIS Appendix S).**

MDOT SHA has coordinated with the City of Gaithersburg to identify a comprehensive package of parkland mitigation commitments for impacts to Malcolm King Park. The parkland mitigation includes conveyance of a 4.03-acre property owned by MDOT SHA to the City of Gaithersburg as replacement parkland.

00005678



OP•LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

# 3    AVOIDANCE ALTERNATIVES AND ANALYSIS

A *feasible and prudent avoidance alternative* is one that avoids using any Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) property (23 CFR 774.17). In assessing the importance of protecting Section 4(f) properties, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute. The preservation purpose of Section 4(f) is described in 49 U.S.C. § 303(a), which states: "It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

An alternative is not *feasible* if it cannot be built as a matter of sound engineering judgement.

An alternative is not *prudent* if:

- It compromises the project to a degree that is unreasonable to proceed with the project in light of its stated Purpose and Need;
- It results in unacceptable safety or operational problems;
- It causes severe social, economic, or environmental impacts even after reasonable mitigation; severe disruption to established communities; severe disproportionate impacts to minority or low income populations; or severe impacts to environmental resources protected under other Federal statutes;
- It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
- It causes other unique problems or unusual factors; or
- It involves multiple factors above that while individually minor, cumulatively cause unique problems; or impacts of extraordinary magnitude.

The presence of linear, mostly north-south oriented, Section 4(f) properties such as Cabin John Stream Valley Park, George Washington Memorial Parkway, and Clara Barton Parkway, in contrast to the largely east-west oriented interstate corridors, limits the potential for feasible and prudent avoidance alternatives to exist in this corridor, which makes avoidance of all Section 4(f) properties difficult. Each of these park properties extends perpendicular to the alignment of I-495 or I-270. Additionally, the corridor study boundary is characterized as a densely populated, urban area with large residential communities, business complexes, large governmental institutions, numerous community facilities, and hundreds of sensitive cultural and natural resources. Since I-495 and I-270 are existing interstate systems that serve local and regional traffic and connect to major arterials in each county, addressing the need on a system level is critical to achieving the overall purpose of the Study.

Six alternatives that would completely avoid the use of Section 4(f) properties have been developed and were discussed in detail in **Section 3** of the **Draft Section 4(f) Evaluation (DEIS, Appendix F)**. They are evaluated in accordance with the definition of a *feasible* and *prudent* avoidance alternative found in 23 CFR 774.17 and are summarized briefly in **Table 5** below.

00005679

 I-495 & I-270 Managed Lanes Study                                         Final Section 4(f) Evaluation

The alternatives previously included in the DEIS least overall harm analysis are carried forward here, as they are still applicable to the current evaluation of least overall harm in this FEIS with revised project limits. The Preferred Alternative, a minimization alternative, is also included for evaluation in the revised discussion of least overall harm.

Table 5: Avoidance Alternatives

| Avoidance Alternative | Description | Avoidance Analysis Findings[3] |
|---|---|---|
| **Alternative 1: No Build Alternative** | Alternative 1 would avoid all Section 4(f) property impacts. Under this alternative routine maintenance and safety improvements would occur but there would be no changes to the existing lane configuration on I-495 and I-270. There would be no operational improvements or increased capacity along I-495 and I-270. | Alternative 1 would avoid impacts to Section 4(f) properties but would be unreasonable to proceed with in light of the Study's stated Purpose and Need. Alternative 1 causes other severe problems of a magnitude that substantially outweigh the importance of protecting Section 4(f) properties.<br><br>Prudence factor failed per 23 CFR 774.17:<br>• (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need |
| **Increased Bus Transit** | This alternative would include expansion of existing bus transit services within the limits of the Study on both I-270 and I-495 and the additional surrounding roadway network. This could be in the form of an increase in bus service on existing I-495 and I-270 within the limits of the Study, or consideration of dedicated facilities such as bus rapid transit systems on existing infrastructure. | An extensive regionwide network of dedicated BRT facilities along I-495 and I-270 would not achieve the Study's Purpose and Need. It would be unreasonable to proceed with the Bus Transit Alternative in light of the stated Purpose and Need. This avoidance alternative causes other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) properties.<br><br>Prudence factor failed per 23 CFR 774.17:<br>• (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need |
| **Transportation System Management/ Transportation Demand Management (TSM/TDM)** | Transportation System Management (TSM)/Transportation Demand Management (TDM) strategies are improvements to existing facilities that improve the operation and coordination of transportation services and facilities. | A TSM/TDM Alternative would not accommodate existing and future long-term traffic, nor would these measures enhance trip reliability. In addition, the TSM/TDM Alternative would not directly provide an additional travel choice, accommodate Homeland Security, improve the movement of goods and services, nor enhance multimodal connectivity; and it would not provide a revenue source. Based on these |

[3] Refer to the definition of *feasible and prudent avoidance alternative* in 23 CFR § 774.17.

00005680

 I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

| Avoidance Alternative | Description | Avoidance Analysis Findings[3] |
|---|---|---|
| | | factors, the TSM/TDM Alternative is not a feasible and prudent alternative. This avoidance alternative causes other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) properties.<br><br>Prudence factors failed per 23 CFR 774.17:<br>• (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need<br>• (ii) It results in unacceptable safety or operational problems |
| Section 4(f) Avoidance Alternative 1 | Section 4(f) Avoidance Alternative 1 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4, outside of I-495. To avoid the use of any Section 4(f) property on I-270, four managed lanes would be constructed off alignment to the west of existing I-270. The alignment of Section 4(f) Avoidance Alternative 1 would rejoin existing I-270 at the MD 200 interchange, the limit of the Study. | Section 4(f) Avoidance Alternative 1 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 1 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties.<br><br>Prudence factors failed per 23 CFR 774.17:<br>• (iii) After reasonable mitigation, it still causes:<br>  • (A) Severe social, economic, or environmental impacts;<br>  • (B) Severe disruption to established communities;<br>  • (D) Severe impacts to environmental resources protected under other Federal statutes;<br>• (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude |
| Section 4(f) Avoidance Alternative 2 | Section 4(f) Avoidance Alternative 2 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4. The managed lanes would be constructed inside the alignment of existing I-495 through nearly | Avoidance Alternative 2 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe |

00005681

JA1317

 I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

| Avoidance Alternative | Description | Avoidance Analysis Findings[3] |
|---|---|---|
| | full the limits of the Study. To avoid the use of any Section 4(f) property on I-270, four managed lanes would also be constructed off alignment to the east of existing I-270. | disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 2 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties.<br><br>Prudence factors failed per 23 CFR 774.17:<br>• (iii) After reasonable mitigation, it still causes:<br>  • (A) Severe social, economic, or environmental impacts;<br>  • (B) Severe disruption to established communities;<br>  • (D) Severe impacts to environmental resources protected under other Federal statutes;<br>• (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude |
| **Section 4(f) Avoidance Alternative 3** | Section 4(f) Avoidance Alternative 3 would construct four managed lanes as proposed in the Preferred Alternative. However, where impacts to Section 4(f) properties would occur, the location specific options would be incorporated into the alignment of Section 4(f) Avoidance Alternative 3. | Although Section 4(f) Avoidance Alternative 3 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 3 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties.<br><br>Prudence factors failed per 23 CFR 774.17:<br>• (iii) After reasonable mitigation, it still causes:<br>  • (A) Severe social, economic, or environmental impacts;<br>  • (B) Severe disruption to established communities;<br>  • (D) Severe impacts to environmental resources protected under other Federal statutes; |

00005682

JA1318

 I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

| Avoidance Alternative | Description | Avoidance Analysis Findings [3] |
|---|---|---|
| | | • (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude |

The Preferred Alternative would not avoid the use of all Section 4(f) properties. It would, however, avoid the use of 40 Section 4(f) properties, thus reducing the overall acreage of Section 4(f) use by roughly 108.8 acres compared to DEIS Build Alternative 9 (**Table 4**). Those 108.8 acres of impact to 40 properties would be fully avoided by the Preferred Alternative. This avoidance comprises the vast majority of the net reduction in impacts to Section 4(f) properties of 113.6 acres compared to DEIS Alternative 9.

00005683

JA1319



I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

## 4    ALL POSSIBLE PLANNING

Section 4(f) states FHWA may not approve the use of Section 4(f) property unless there is no feasible and prudent avoidance alternative, and the action includes all possible planning to minimize harm to the property resulting from such use. "All possible planning," as defined in 23 CFR 774.17, includes all reasonable measures to minimize harm or mitigate for adverse impacts and effects. The cost of mitigation should be a reasonable public expenditure in light of the severity of the impact on Section 4(f) property, in accordance with 23 CFR 771.105(e).

The DEIS and SDEIS presented measures that had been identified to ensure all possible planning to minimize harm and mitigate for adverse impacts and effects. These measures are summarized here and detailed in **Section 4 of the Draft Section 4(f) Evaluation (DEIS, Appendix F)** and **Chapter 5 of the SDEIS**. Additional minimization and mitigation efforts have been implemented in conjunction with the Preferred Alternative presented in this Final Section 4(f) Evaluation.

Since the publication of the SDEIS, MDOT SHA has coordinated with the OWJs for impacted Section 4(f) properties to identify specific mitigation commitments.

### 4.1    Summary of All Possible Planning Presented in DEIS and SDEIS

Pursuant to Section 106, MDOT SHA is in the process of drafting a Programmatic Agreement to resolve adverse effects to historic properties. In general, mitigation measures agreed upon as part of the Section 106 process satisfy the requirement to include all possible planning to minimize harm for historic properties under Section 4(f).

With regard to public parks, all possible planning will involve the minimization activities described herein as well as mitigation coordinated with the OWJs over public parks and recreation areas. All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project.

Mitigation measures involving the public parks and recreation areas may involve replacement of land and/or facilities of comparable value and function, or monetary compensation to enhance the remaining land.

**Section 4 of the Draft Section 4(f) Evaluation (DEIS, Appendix F)** includes detailed discussion of the methodology and assumptions for establishing LODs (**DEIS, Appendix F, Section 4.1**), the considerations for adjacent land use and minimization of the LOD (**DEIS, Appendix F, Section 4.2**) and a summary of potential mitigation measures (**DEIS, Appendix F, Section 4.3**).

New measures intended to address all possible planning to minimize harm to Section 4(f) properties were documented in the SDEIS and included in the Preferred Alternative's avoidance of 40 Section 4(f) properties as compared to the DEIS Alternative 9. Additional avoidance and minimization measures at Section 4(f) properties presented in the SDEIS and FEIS included extensive design refinements in the conceptual stormwater management and in the vicinity of the ALB and at Morningstar Cemetery, and new mitigation measures developed in coordination with the OWJs for each Section 4(f) property impacted.

00005684

JA1320



## 4.2    Preferred Alternative

The Preferred Alternative presented in this Final Section 4(f) Evaluation was developed as a Section 4(f) minimization alternative based in part on extensive coordination with and input from agencies and stakeholders, including the OWJs for Section 4(f) properties. Comments received on the DEIS and Draft Section 4(f) Evaluation from agencies and stakeholders specifically requested avoidance of significant parkland and historic resources within the study area. The Preferred Alternative is responsive to comments received and aligns the Study to be consistent with the previously determined phased delivery and permitting approach by limiting the build improvements to the area of Phase 1 South only while avoiding improvements on I-495 east of the I-270 East Spur. The result is complete avoidance of significant Section 4(f) properties within the study limits, *which remain the same as the DEIS*, on I-495 east of the I-270 east spur to MD 5 in Prince George's County. These include complete avoidance of significant stream valley parks including: Rock Creek, Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley Parks, as well as historic parks of national significance including the Baltimore-Washington Parkway, Greenbelt Park and Suitland Parkway.

## 4.3    American Legion Bridge (ALB)

MDOT SHA conducted an extensive engineering evaluation at the ALB to identify strategies for minimizing impacts at NPS owned Section 4(f) properties adjacent to the bridge including the Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, and George Washington Memorial Parkway. MDOT SHA convened a multidisciplinary team of experts referred to as the 'ALB Strike Team' to develop and evaluate alternatives for the replacement of the ALB that avoid impacts, to the greatest extent practicable, or reduce overall acreage impacts to the three NPS properties in the vicinity of the ALB.

The ALB Strike Team explored strategies for reducing the LOD including top-down construction, alternate construction phasing, alternate bridge types, and construction access requirements. Bridge type options were evaluated including conventional structures, cable stayed, and cast-in-place segmental bridges. Alternate construction phases such as Accelerated Bridge Construction techniques were also evaluated to investigate options to reduce the construction duration. Options for the ultimate roadway and bridge alignment as well as construction access and phasing to reduce impacts to Plummers Island were also considered.

The ALB Strike Team evaluation determined that one construction access road located in the northwest quadrant of the ALB and Potomac River would be sufficient to provide construction access for removal of the existing bridge and construction of a new bridge thus eliminating the need for construction access in the three other quadrants.

Overall, MDOT SHA's efforts to minimize impacts to NPS properties in the vicinity of the ALB has led to reductions of 5.3 acres at the Chesapeake and Ohio Canal National Historical Park and 7.8 acres at the George Washington Memorial Parkway relative to the DEIS impacts. Refer to **Section 1.5** for additional details.

## 4.4    Morningstar Tabernacle No. 88 Moses Hall and Cemetery

MDOT SHA has coordinated directly with the Friends of Moses Hall and other consulting parties since early 2020 on avoidance and minimization efforts at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery). In January 2021, MDOT SHA implemented bamboo removal within the

00005685



Morningstar Cemetery to continue documentation of the cemetery features and boundaries. Through design efforts that led to refinements of the LOD, MDOT SHA developed design options that would avoid impacts to the Section 4(f) property from 0.3 acres reported in the DEIS.

Further research and archaeological survey efforts have revealed new information about the property, including the discovery of possible burials indicated by ground-penetrating radar that may extend into existing MDOT SHA right-of-way. As a result of these investigations, MDOT SHA developed and presented in the SDEIS an alternative that eliminates all project impacts within the property boundary and avoids associated potential burial features within MDOT SHA right-of-way adjacent to the modern cemetery boundary. No property is needed from the cemetery for either temporary construction or permanent acquisition. The area of possible burial features within MDOT SHA right-of-way has now been included within the National Register eligible boundary of the property via an update in 2021. Because MDOT SHA right-of-way adjoining the cemetery where possible burials are indicated is no longer affected or needed for transportation use, MDOT SHA is pursuing transferring ownership of this portion of right-of-way to the cemetery trustees.

For the Preferred Alternative design, as presented in the SDEIS and FEIS, the typical section has been modified to include a narrow right shoulder along the reconstructed I-495 inner loop general purpose lanes adjacent to the cemetery property. The width of the right shoulder is reduced from 12 feet to 6 feet wide (measured between the edge of travel lane and face of concrete barrier) for a total length of approximately 400 feet including tapers. The total length of the narrow right shoulder excluding the tapers is approximately 235 feet. The proposed noise barrier along the right shoulder and the cemetery is located two feet behind the concrete traffic barrier. The LOD is offset behind the centerline of the noise barrier by 5.3 to 13.3 feet. This design avoids any right-of-way impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery historic property and provides a buffer to avoid performing earthwork at the nearest known GPR-indicated feature that may be a grave.

The proposed 24-foot-high noise barrier is provided to mitigate for noise and will have the additional benefit of screening the highway from view; 24 feet is an anticipated maximum height and may be somewhat reduced in final design to within the 16 to 24-foot height range. This segment of I-495 was completed in 1962, and the current view of the highway from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is not a historically significant or character-defining feature of the historic property. The existing noise level at the cemetery is 70 dBA, and MDOT SHA's noise analysis projects noise levels from the proposed highway to also be 70 dBA in 2045. Consistent with other historic properties adjoining I-495 and I-270, the placement of noise barrier is not considered a visual adverse effect because the view is not historically significant; the noise barrier provides benefit to the setting of the property by reducing highway noise from current conditions.

Following consulting party input, additional research, and extensive minimization and avoidance efforts documented in the SDEIS, MDOT SHA and FHWA determined that the project would not adversely affect the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and MDOT SHA updated the effect in December 2021. The boundary of the historic property was also updated in December 2021 to include the area of possible burial features identified by the May 2021 ground penetrating radar survey within state-owned right-of-way. In its February 4, 2022 response, MHT did not concur with MDOT SHA and FHWA's specific no adverse effect finding for the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. On

00005686



May 2, 2022, MHT agreed with MDOT SHA's request to defer of resolution of effects to Morningstar Cemetery to the PA.

Based on the current historic boundary, the Preferred Alternative would avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual, effects to the property have been identified from the Preferred Alternative. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas. The project will be governed by a PA, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the PA and treatment plan (Refer to **FEIS, Appendix J**).

## 4.5    Mitigation

MDOT SHA has coordinated extensively with the OWJs on Section 4(f) properties impacted by the Preferred Alternative to identify a comprehensive package of mitigation measures. Final mitigation commitments have been developed to include all possible planning to minimize harm in coordination with the OWJs. Mitigation measures in this section are organized by OWJ.

### 4.5.1    National Park Service

MDOT SHA has coordinated with NPS to identify a comprehensive package of mitigation and commitment measures to account for impacts to George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historic Park, and Clara Barton Parkway. The measures identified are listed below.

- Develop and implement a Comprehensive Ecological Restoration Plan and Cost Estimate for Restoring Limits of Disturbance to Preexisting Conditions for the impacted area. The plan shall include the following components:
    - Forest and terrestrial vegetation restoration including:
        - Avoiding and minimizing impacts to trees within and surrounding the LOD through a robust tree protection plan
        - Survey impacted vegetation community prior to construction to determine existing community composition and develop replanting plan based on survey results.
        - Replanting forest (including shrub and herbaceous layers) inch-for-inch within LOD in temporary impact areas and providing non-native invasive (NNI) species control and maintenance for 5 years within reforestation area.
        - Softening edge effects associated with disturbance by treating and removing non-native invasive species within a 50-foot buffer of the LOD and replanting native trees and shrubs in any gaps resulting from the removal of mature trees or non-native invasive species. In coordination with NPS during design, sensitive areas, such as areas of known archeological resources, within the 50-foot buffer will be excluded if ground disturbance is required.

00005687



- Providing monetary compensation for remaining tree impacts, based on inch for inch replacement of DBH impacted.

o Rare, Threatened and Endangered plant species restoration including:

- Conducting a final pre-construction RTE plant inspection.
- Collecting seeds and/or individual RTE plant species from impact area prior to construction.
- Cultivating plants and storing seeds/propagating plants from seed in an off-site nursery.
- Reestablishing RTE species from stored seed, and cultivated and propagated plants following construction and topsoil restoration.

o Topsoil salvage and restoration including:

- Salvaging topsoil from impact area and storing in nearest possible stockpile location.
- Restoring subsoils and reducing compaction via ripping, discing, plowing or double-digging following construction.
- Placing salvaged topsoil in impact area following construction.

o Herpetofauna translocation including:

- Conducting Herpetofauna relocation effort immediately prior to construction activities.
- Conducting a sweep through a portion of the impact area with approximately 10 biologists searching for and capturing reptiles and amphibians, and logging all captures.
- Relocating captured individuals safely away from the impact area.
- Conducting a second sweep through the same portion of impact area, logging all captures and relocating captured individuals.
- Conducting a third sweep and relocate effort, if the number of captured individuals is not dramatically reduced, and continue sweeping the portion of the work area until the number of captured individuals is minimal.
- Continuing the multiple sweep process until the entire work area is cleared

o Downed woody debris salvage and restoration including:

- Moving all downed woody debris from the impact area to the edge of the impact area just outside of the E&S measures as part of the clearing operation.
- Restoring downed woody debris to the impact area following construction and topsoil restoration.

- Create/restore 1.53 acres of wetland northwest of American Legion Bridge (Site ID CHOH-13) per the Wetland Statement of Findings
- Install new white legend and border on brown background guide signs along I-495 for the George Washington Memorial Parkway exit.



- Shift bridge piers north of Lock 13 to the maximum extent possible while maintaining adequate vertical clearance of 12 feet, 6 inches between towpath and bottom of bridge steel to accommodate NPS equipment. Design new ALB to capture all drainage outfall using downspouts. The downspouts will be located so the water does not drop onto areas with frequent pedestrian use.

- Complete a condition assessment of locks, masonry walls, towpath, and canal prism throughout entire LOD and develop and implement a plan for repairs identified during condition assessment.

- Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (GWMP) and develop associated public interpretation materials (in Virginia).

- Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio) and develop associated public interpretation materials (In Maryland).

- Prepare National Register Nomination for Dead Run Ridges Archaeological District.

- Develop Interpretive product on archeological sites; Create web-based Story Map, waysides, and/or brochures.

- Provide monetary compensation for a Cultural Landscape Report for Clara Barton Parkway (historical narrative; updated existing conditions and analysis and evaluation; and treatment guidelines for management of character defining features).

- Complete a condition assessment of Potomac Heritage Trail within the LOD and develop and implement a plan to improve the trail within the LOD.

- Prepare Visitor and Ecological Impact Study.

- Provide replacement parkland for permanent impacts to George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway.

- Provide monetary compensation up to $60,000 to update and refine the George Washington Memorial Parkway Climate Action Plan.

- A detour route for the Potomac Heritage National Scenic Trail within the LOD, if determined to be necessary, will continue to be developed by MDOT SHA and the Developer in coordination with NPS, Fairfax County, and VDOT. The segment of the trail within the LOD would be restored on a new alignment after construction is completed.

- MDOT SHA and the Developer will evaluate drainage and sight distance considerations at the intersection of the shared use path and Chesapeake and Ohio Canal towpath during final design in coordination with NPS.

- Design and construct, in coordination with NPS and the Washington Biologists' Field Club, slope armoring along the upstream side of Plummers Island to mitigate for future slope erosions as a result of tree clearing with the LOD. The slope armoring could include, but is not limited to, a rip-rap slope, live staking, and brush layering or any combination of armoring that will provide a blended natural aesthetic with the topography and historic nature of the island.

- MDOT SHA and the Developer will evaluate additional options for the American Legion Bridge during final design that would further minimize or avoid physical impact to Plummers Island.

00005689

JA1325

 I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

### 4.5.2    M-NCPPC

MDOT SHA has coordinated with M-NCPPC to identify a comprehensive package of mitigation measures to account for impacts to M-NCPPC park properties, including all possible planning to minimize harm to the Section 4(f) resources. Mitigation measures are grouped below based on general mitigation applicable to all park impacts, and mitigation measures specific to one or more M-NCPPC properties.

### A.    General Mitigation

General measures applicable to all M-NCPPC park impacts include:

- Acquire the 24.14-acre Bardon, Inc. property (Acct. no. 00402385) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC.
- Acquire the 0.57-acre Bardon, Inc. property (Acct. no. 02620882) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC.
- Evaluate the ability to re-convey unused property previously owned by M-NCPPC back to that agency post construction.
- Convey the MDOT SHA owned 3.15-acre right-of-way located at MD 97 and 16th Street.
- Convey two MDOT SHA owned 15.35-acre parcels located between Northwood High School and Northwest Stream Valley Park.

### B.    Cabin John Stream Valley Park Unit 2

Mitigation measures specific to Cabin John Stream Valley Park Unit 2 include:

- Plan, design and construct improvements to  formalize the parking area along Seven Locks Road including:
  - Reconstructing the existing driveway per MD Standard No. 630.02 or applicable County standard.
  - Pave the existing gravel lot with full depth asphalt. Paved area measures approximately 60' x 100'. Assume open section lot.
  - Optimizing parking lot design to provide maximum number of spaces, including ADA spaces (with signage) per the ADA Guidelines. Stripe new parking spaces.
  - Providing drainage and stormwater management facilities as required to treat new impervious area per County requirements.
  - Install signage prohibiting littering/dumping, replace existing trash can, and remove existing illicitly dumped material.
  - Relocate existing sign kiosk.
  - Construct bicycle repair stand, with tools and pump at Cabin John trailhead.
- Stream stabilization (~1,000 l.f.) along Cabin John Creek including:
  - Remove all concrete structures within stream both along existing banks and failed pieces in the stream.

00005690


I-495 & I-270 Managed Lanes Study                    Final Section 4(f) Evaluation

- o Rebuild banks with rock and vegetative stabilization techniques that promote environmental functions.
- o Replant riparian buffer with native seed, herbaceous plugs, and native shrubs and trees.
- o Install instream grade control structures (such as rock sill, crossvane, riffles, etc.) to transition stream into, through, and out of the underpass area in a stable and ecologically sound way.
- o Protect sewer manhole and restore I-495 on-ramp outfall to Cabin John Creek with environmentally sensitive channel techniques.
- Plan, design and implement forest and terrestrial vegetation mitigation including:
  - o NNI control for 7 years within 50' buffer of LOD.
  - o Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50 ft buffer from LOD).
  - o Plan, design, and construct wildlife passage areas area under I-495 overpass of Cabin John Creek and Cabin John Parkway by lengthening new bridge structures. This will allow wildlife passage on the west side bank of Cabin John Creek while minimizing wildlife-vehicular conflicts along Cabin John Parkway by constructing wildlife exclusion fencing along the east side of the creek next to the Parkway, in coordination with M-NCPPC.

## C.    Cabin John Regional Park

Mitigation measures specific to Cabin John Regional Park include:

- Plan, design and construct a fiberglass pedestrian bridge over the outfall/tributary to Cabin John Creek at STA 3640+00 for the natural surface connector trail including:
  - o Performing hydraulic study and determining feasibility of new crossing
  - o Constructing fiberglass bridge per M-NCPPC-provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC.
- Plan, design and construct improvements for pedestrian and cycling access to the Robert C. McDonell campground access road by:
  - o Reconstruction of existing bridge over Old Farm Creek in same location per M-NCPPC-provided specifications for Prefabricated Steel Truss Bridge (Section 401) and Helical Piles (Section 403) (hydraulically in-kind replacement).
  - o Provide temporary crossing for pedestrians and cyclists during bridge reconstruction.
  - o Provide stream stabilization work immediately upstream, underneath, and immediately downstream of the bridge.
  - o Limit time of year of bridge reconstruction to window when campground access is closed.
  - o Bridge design shall provide for ADA compliance, pedestrian access, and passage of cyclists without dismounting while incorporating a gate to prevent unauthorized access by vehicles.
- Plan, design and construct improvements to the existing parking area on Tuckerman Lane near the Robert C. McDonnell Campground access road including:

00005691



OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study                Final Section 4(f) Evaluation

- o Resurfacing the existing paved lot. (Paved area measures approximately 2500 SF. (75' x 100').
- o Optimize parking lot design to provide maximum number of spaces. Stripe new parking spaces. Incorporating ADA parking, as applicable.
- o Provide additional landscaping in vicinity of lot.
- Plan, design and construct a fiberglass pedestrian bridge over Cabin John Creek to connect the Cabin John Trail to the Kidney Bean Loop Trail, in the vicinity of Goya Drive including:
  - o Constructing fiberglass bridge per provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC.
  - o Design and construct in-stream grade control and bank protection structures to stabilize stream in the vicinity of the new bridge.
- Plan, design and construct improvements for the stabilization of the Gainsborough Road stormwater outfall to Cabin John Creek (approximately 255 linear feet) with environmentally sensitive channel techniques.
  - o Include a planting plan to compensate for forest impacts related to this work.
  - o Provide treatment of invasive bamboo surrounding the channel.
  - o Construct pedestrian trail bridge replacement over Gainsborough outfall channel
- Plan, design and implement forest and terrestrial vegetation mitigation including:
  - o Conducting forest stand delineation (FSD) within 100 ft buffer of LOD and develop a 7-year non-native invasive control management plan.
  - o Implementing a 7-year non-native invasive control management plan within 100 feet of the LOD in the biodiversity area. Specific target areas and species to be determined by M-NCPPC Montgomery Parks.
  - o Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (100 ft buffer from LOD).

### D. Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6

Mitigation measures specific to Tilden Woods Stream Valley park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6 include:

- Plan, design and construct improvements for the stabilization of the Greentree Road stormwater outfall from the pipe to a natural surface trail just south of Cabin John Creek (approximately 310 linear feet) with environmentally sensitive channel techniques. Include a planting plan to compensate for forest impacts related to this work.
- Plan, design and implement forest and terrestrial vegetation mitigation including:
  - o NNI control for 7 years within 50' buffer of LOD.
  - o Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50 ft buffer from LOD) on park property.

00005692

JA1328



- Plan, design, and construct a single bridge structure with a clear span of Tuckerman Lane (including the associated pedestrian and bicycle facilities) and a clear span over Old Farm Creek (including the restored floodplain and a wildlife passage):
  - o Provide wildlife passage area on northern bank per M-NCPPC specifications
  - o Provide fish passage under Old Farm Creek overpass by restoring the stream to a natural channel and tie into the existing stream restoration immediately upstream
  - o Stream span must maximize floodplain cross-sectional area

### 4.5.3   City of Gaithersburg

Mitigation specific to the impacts to Malcolm King Park include the conveyance of a 4.03-acre MDOT SHA-owned property (Acct. no. 09-02213932) to City of Gaithersburg.

### 4.5.4   City of Rockville

Mitigation measures for impacts to Bullard Park and Rose Hill Stream Valley Park, Rockmead Park, Woottons Mill Park, and the Rockville Senior Center and Park include:

- Convey the 1.25-acre MDOT SHA-owned Millennium Garden Park (former Vernie Smith properties (Acct. nos. 16-0400205281 and 16-0400205270)) to City of Rockville.
- Acquire the 1.32-acre Betty B. Casey Property (on Fleet Street) (Acct. no 160400144125) and convey to the City of Rockville
- Acquire the 0.42-acre Lodging Partners LLC Property (41 Maryland Avenue) (Acct. no. 160403198603) and convey to the City of Rockville
- Acquire the 4.23-acre Cynthia Robertson Property (Potomac Woods) (Acct. no. 160401523951) and convey to the City of Rockville
- Continue to consult on context sensitive solutions, during the design phase, to the four existing parks (Bullards Park and Rose Hill Stream valley Park, Rockmead, Woottons Mill, and Rockville Senior Center). The consultation will be constrained to context sensitive solutions that are both compensatory to the impacts to Section 4(f) resources and a justifiable expenditure of public funds. For example, plantings and context sensitive stormwater management facility design.

### 4.5.5   Maryland Historical Trust

Mitigation for Section 4(f) impacts to historic properties were coordinated with MHT. Mitigation measures are listed below. Because some of the historic properties are also park properties, some mitigation measures are duplicated from the lists above under park OWJs.

- Prepare a Cultural Landscape Report for Clara Barton Parkway.
- Prepare National Register Nomination for Dead Run Ridges Archaeological District.
- Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (GWMP) and develop associated public interpretation materials.

00005693



I-495 & I-270 Managed Lanes Study                                    Final Section 4(f) Evaluation

- Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio) and develop associated public interpretation materials.
- Complete National Register Nomination for Washington Biologists' Field Club on Plummers Island.
- Place temporary fencing along the LOD within Plummers Island to delimit construction activities.
- Fund or implement a photographic survey documenting conditions before, during and post-construction on Plummers Island within the APE boundary, and provide the results to the Washington Biologists' Field Club and NPS.
- Fund or develop GIS maps to document known current and historical study locations and key natural resource features within the APE on Plummers Island to assist in documenting change over time, and provide these files to Washington Biologists' Field Club and NPS
- Procure a sub-meter accurate GPS unit for Washington Biologists' Field Club to use in long-term monitoring of plant locations, collection sites, and other historical research features on Plummers Island.
- Provide for digitization and cataloging of historical records, subject to any availability or rights restrictions, related to Plummers Island and the WBFC that are housed at the Smithsonian Institution that are not currently available in electronic format, and provide the files to WBFC and NPS.
- Provide Washington Biologists' Field Club historical content related to Plummers Island as part of the above digitization effort to incorporate into their website
- Complete additional archaeological investigations of LOD surrounding Morningstar Tabernacle No. 88 Moses Hall and Cemetery and monitor for potential archaeological findings during construction.
- Design context-sensitive treatment of noise barrier facing the Morningstar Tabernacle No. 88 Moses Hall and Cemetery which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage. MDOT SHA will provide consulting parties and MD SHPO comment opportunity for project elements, specifically noise barrier, within the APE adjacent to the cemetery at a draft level of design and a second opportunity prior to finalization of design; for each review there will be a minimum 30-day review period.
- Complete additional archaeological investigations of the LOD in the general vicinity of the Montgomery County Poor Farm adjacent to I-270 near Wooten Parkway.
- Improve the stormwater drainage on the First Agape AME Zion Church (Gibson Grove Church) by routing drainage into a new underground culvert to be installed as part of the project. MDOT SHA will ensure a parking lot identified as part of the church's restoration plan, is constructed on church property following installation of the culvert drainage design. MDOT SHA will work with the church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the maximum extent practicable.

00005694

JA1330



## 5    LEAST OVERALL HARM

Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then only the alternative that causes the least overall harm may be approved. Because no feasible and prudent avoidance alternative has been identified, all remaining alternatives are evaluated to determine which would cause the least overall harm.

23 CFR 774.3(c)(1) identifies seven factors for identifying the alternative with the least overall harm.

- Factor 1: The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
- Factor 2: The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;
- Factor 3: The relative significance of each Section 4(f) property;
- Factor 4: The views of the OWJs over each Section 4(f) property;
- Factor 5: The degree to which each alternative meets the Purpose and Need for the project;
- Factor 6: After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and
- Factor 7: Substantial differences in costs among the alternatives.

### 5.1    Draft Section 4(f) Least Overall Harm Evaluation

The Draft Section 4(f) Evaluation included a preliminary assessment of least overall harm which compared location-specific avoidance options, other minimization alternatives, and Alternatives Retained for Detailed Study (ARDS) based on the least overall harm criteria. (Refer to **DEIS, Appendix F, Section 5**.)

The DEIS included discussion of 18 location-specific alternatives identified to avoid the use of individual Section 4(f) properties, developed to be incorporated into the DEIS Build Alternatives. Each alternative was evaluated using the seven factors of least overall harm. The alternatives consisted of alignment shifts, tunnels, or bridges that were developed to avoid specific Section 4(f) properties for which the impacts were not anticipated to be *de minimis*.

In general, the evaluation determined that these location specific options would result in additional use of other Section 4(f) properties, adverse impacts of a severe magnitude to resources not subject to Section 4(f) protection, or a substantial increase in cost. Because the location-specific options modify relatively short portions of the end-to-end Build Alternatives, each would meet the Purpose and Need of the Study to some degree. However, the analysis determined that the location specific options that more substantially deviate from the existing alignments of I-495 and I-270 and result in a lengthier travel routes would be less effective in addressing the project needs.

The DEIS considered other minimization alternatives including Alternative 5: 1-Lane High-Occupancy Toll Managed Lane Network and the MD 200 Diversion Alternative. These were evaluated along with the six Build Alternatives that were retained for detailed study in the DEIS. These alternatives included managed lanes that differ in the manner in which the proposed travel lanes would be designated and configured.

00005695

 I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

The six ARDS included Alternatives 8, 9, 9M, 10, 13B, and 13C. These are described in detail in the **DEIS, Chapter 2, Section 2.6**.

## 5.2    Final Least Overall Harm Analysis

The preliminary results of the Least Overall Harm Analysis were presented in the **DEIS, Appendix F, Section 5.4**, and are summarized below for each of the alternatives (**Table 6**). The table has been updated to include the Preferred Alternative and finalize the least overall harm analysis.

Based on the analysis detailed in Table below, MDOT SHA has identified the Preferred Alternative (Alternative 9 – Phase 1 South) as the alternative with least overall harm. The Preferred Alternative would have substantially equal ability to mitigate adverse impacts to each Section 4(f) property relative to the DEIS Build Alternatives (Alternatives 8, 9, 9 Modified, 10, 13B and 13C). However, due to the shorter limits and substantial number of properties avoided, the Preferred Alternative would have fewer property impacts to mitigate compared to the DEIS Build Alternatives. The Preferred Alternative would have substantially lower overall harm to Section 4(f) properties due to the shorter project limits and fewer Section 4(f) properties impacted. The lower overall harm applies in consideration of both the acreage and number of properties impacted relative to the DEIS Build Alternatives, as well as the relative significance of each Section 4(f) property.

MDOT SHA has provided multiple opportunities for the OWJ to provide their views on the least overall harm analysis, including the comment periods for the DEIS, Draft Section 4(f) Evaluation and SDEIS. Extensive coordination with the OWJs has been conducted to identify a comprehensive strategy of avoidance, minimization, and mitigation for unavoidable Section 4(f) impacts. Input from the OWJs has focused largely on avoidance, minimization and mitigation measures. No OWJs have objected to the identification of the Preferred Alternative as the alternative with least overall harm in accordance with the regulations at 23 CFR 774.

The Preferred Alternative satisfies the Purpose and Need for the Project, though to a somewhat lesser extent than the DEIS Build Alternatives as noted in **Table 6**. The Preferred Alternative would also require substantially lower magnitude of overall impacts to properties not protected by Section 4(f) due to the shorter project limits. The estimated cost of the Preferred Alternative ($3.0 to $3.5 billion) would be lower than other Build Alternatives.

While some of the other alternatives and location specific options would reduce harm to one or more Section 4(f) properties, each of these alternatives would have problems related to cost and/or the ability to meet Purpose and Need. The MD 200 Diversion Alternative and Alternative 5 would each fail to meet the Purpose and Need. Each of the Location Specific Options (LS-1 through LS-11) would meet the Purpose and Need, but would have substantially greater cost compared to the Preferred Alternative. Furthermore, many of the Location Specific Options would create additional impacts to other Section 4(f) properties as noted in **Table 6**.

Based on the information presented in the Draft Section 4(f) Evaluation, the Updated Draft Section 4(f) Evaluation, and this Final Section 4(f) Evaluation, FHWA and MDOT SHA have reached a conclusion that the Preferred Alternative is the alternative with least overall harm. The Preferred Alternative meets the Purpose and Need for the study and impacts far fewer Section 4(f) properties and total acreage relative

00005696


to the other Build Alternatives that would meet the Purpose and Need. The Preferred Alternative would avoid the use of 40 Section 4(f) properties totaling approximately 108.8 acres relative to the DEIS Build Alternatives. The Preferred Alternative would require use a total of 33.2 acres of Section 4(f) property (including temporary and permanent), compared to 146.8 acres for the DEIS Build Alternative 9. Coordination with the OWJs has continued since the DEIS and documented in the FEIS.

00005697

JA1333

OP LANES MARYLAND    I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

00005698

**Table 6: Least Overall Harm Analysis**

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Summary |
|---|---|---|---|---|---|---|---|---|
| **DES Build Alternatives** | | | | | | | | |
| Alternative 8 | Substantially equal ability to mitigate Section 4(f) property | Substantially equal relative harm given the physical footprint among the Build Alternatives. Harm would occur to properties as described in Section 2 | All DES build alternatives would impact the same number of Section 4(f) properties | OWJs provided views during the review period of the DES. Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion | Would meet the Purpose and Need to a lesser degree than other DES Build Alternatives. Would create traffic problems that would reduce trip reliability in the managed lanes. |
| Alternative 9 | | | | | Meets Purpose and Need to Greater Degree | | Total Cost of Alternative would be between $8.7 and $9.6 Billion | Would meet the Purpose and Need; impacts to properties protected by Section 4(f) are minimized; appropriate mitigation measures for use of Section 4(f) property to minimize harm. |
| Alternative 9 Modified | | | | | Meets Purpose and Need to a Lesser Degree | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $8.5 and $9.3 Billion. Not financially viable owing to lower revenue. | Would meet the Purpose and Need to a lesser degree than other DES Build Alternatives because it does not successfully address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| Alternative 10 | | | | | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than other Build Alternatives | Total Cost of Alternative would be between $9.0 and $9.9 Billion | Would have greater impacts to Section 4(f) Properties, natural resources, and property relocations as well as greater cost, but would provide no additional benefit in meeting Purpose and Need |
| Alternative 13B | | | | | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree than the other DES Build Alternatives. Would only accommodate traffic growth in the peak direction during the peak period. Would not be financially self-sufficient. |
| Alternative 13C | | | | | Meets Purpose and Need to a Lesser Degree | | Total Cost of Alternative would be between $8.8 and $9.7 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree than the other DES Build Alternatives. Would have negative impacts to travel along I-495 during the AM peak period as reversible lanes can only be operated in one direction at a time. Would not be financially self-sufficient. |
| **Preferred Alternative** | | | | | | | | |
| **Preferred Alternative Alternative 9 – Phase 1 South** | Substantially equal ability to mitigate adverse impacts to each Section 4(f) property relative to the DES Build Alternatives, with fewer property impacts to mitigate. | Substantially lower overall harm due to shorter project limits and fewer Section 4(f) properties impacted. | Less than DES Build Alternatives | Modified project limits to avoid Section 4(f) properties, in response to feedback from OWJ. OWJs provided views during the review period of the SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm. | Meets Purpose and Need to a Lesser Degree | Substantially lower magnitude of overall impacts to properties not protected by Section 4(f) due to shorter project limits | Cost of Alternative would be between $3.75 and $4.25 Billion. | Would meet the Purpose and Need. Would have substantially lower impacts to Section 4(f) properties and resources not protected by Section 4(f) due to shorter project limits. |

JA1334



OP LANES MARYLAND — I-495 & I-270 Managed Lanes Study

Final Section 4(f) Evaluation

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **Other Alternatives Considered** | | | | | | | | |
| MD 200 Diversion Alternative | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | OWJs provided views during the review period of the DES, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than DES Build Alternatives | Cost of Alternative would be between $7.0 and $8.1 Billion. Not financially viable owing to lower revenue. | The MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. Would not be financially self-sufficient. |
| Alternative 5 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | OWJs provided views during the review period of the DES, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than DES Build Alternatives | Cost of Alternative would be between $7.8 and $8.5 Billion. Not financially viable owing to lower revenue. | Alternative 5 does not meet the Study's Purpose and Need because it does not address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| **Location Specific Options** | | | | | | | | |
| L5-1 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative | Option L5-1 would meet the Purpose and Need of the project. It would cost $500 million more to construct than the DES Build Alternatives along this portion of the project. |
| L5-2 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | OWJs provided views during the review period of the DES, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | | Lesser Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative Not financially viable owing to lower revenue | Option L5-2 would adequately meet the Purpose and Need of the project. It would cost in excess of $1 billion more than the DES Build Alternatives along this portion of the project. |
| L5-3 | Less Ability to Mitigate than DES Build Alternatives | Greater Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative | Option L5-3 would result in 10.4 acres of additional impacts to Section 4(f) properties, which would create additional mitigation along this portion of the project when compared to the DES Build Alternatives. Would cost in excess of $1.7 billion more than the DES Build Alternatives along this portion of the project. |
| L5-4 | Less Ability to Mitigate than DES Build Alternatives | Greater Harm than DES Build Alternatives | Greater Harm than DES Build Alternatives | | | Greater Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives | When compared to the DES Build Alternatives, Option L5-4 would result in 11 acres of additional impacts to Section 4(f) properties and cost nearly $700 million more. |

00005699

JA1335



OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that qualify each Section 4(f) property for protection to benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| L5-5 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option L5-5 would result in 3.8 acres of additional impacts to Section 4(f) properties and cost $27 million more than the DEIS Build Alternatives along this portion of the Study. |
| L5-6 | Great Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option L5-6 would cost $25 million more than the DEIS Build Alternatives along this portion of the Study. |
| L5-7 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option L5-7 would result in an increase of 12 acres of impact to Section 4(f) properties, result in 547 additional relocations, and cost approximately $1.2 billion more than the DEIS Build Alternatives along this portion of the Study. |
| L5-8 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | OWJs provided views during the review period of the DEIS, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm. | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option L5-8 would result in 0.9 acres of additional impacts to Section 4(f) properties and cost $250 million more than the DEIS Build Alternatives along this portion of the Study. |
| L5-9 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternative | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option L5-9 would cost approximately $200 million more than the DEIS Build Alternatives along this portion of the Study. |
| L5-10 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | When compared to the DEIS Build Alternatives, Option L5-10 would result in 6.1 acres of additional impacts to one Section 4(f) property: BARC. Option L5-10 would cost approximately $88 million more than the DEIS Build Alternatives along this portion of the project. |
| L5-11 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option L5-11 would cost approximately $500 million more than the DEIS Build Alternatives along this portion of the project. |

USCA4 Appeal: 24-1447    Doc: 30-4    Filed: 09/30/2024    Pg: 271 of 511

00005700

JA1336


I-495 & I-270 Managed Lanes Study                              Final Section 4(f) Evaluation

## 6    COORDINATION

Section 4(f) regulations require the Draft Section 4(f) Evaluation be made available for coordination and comment to OWJs over the Section 4(f) resource (23 CFR §774.5). Since the publication of the DEIS in July 2020, MDOT SHA has conducted conference calls, meetings, and field reviews with, or sent letters to the following agencies with jurisdiction over parkland along the Phase 1 South limits: NPS, M-NCPPC Montgomery County, National Capital Planning Commission (NCPC), City of Rockville, and the City of Gaithersburg. FHWA and MDOT SHA have also held meetings and coordinated with the agencies with jurisdiction over historic sites, including NPS, ACHP, NCPC, MHT, and the VDHR. MDOT SHA has worked closely with the OWJs over all Section 4(f) properties to identify minimization and mitigation measures necessary for Section 4(f) approval. **FEIS, Section 8.3.2.C** details the meetings held and topics covered.

In addition to OWJs, the Section 4(f) Evaluation must be made available to the US Department of the Interior (USDOI) and as needed, to the US Department of Agriculture (USDA) and the Department of Housing and Urban Development (HUD) (23 CFR §774.5). In accordance with 23 CFR §774.5, USDOI has been provided an opportunity to review and comment on the Draft Section 4(f) Evaluation concurrent with the DEIS and the Updated Draft Section 4(f) Evaluation concurrent with the SDEIS. The latter included a preliminary conclusion on the avoidance and least overall harm analysis. USDOI consultation will continue with review of the Final Section 4(f) Evaluation in coordination with the FEIS which will enable USDOI to provide comments on FHWA's conclusions regarding the existence of feasible and prudent avoidance alternatives, the inclusion of all possible planning to minimize harm to Section 4(f) properties (including mitigation), and the least overall harm alternative. The Preferred Alternative would not affect resources requiring coordination with USDA and HUD and, therefore, consultation with these agencies is not necessary.

The public was afforded notice and opportunity for comment on the Draft Section 4(f) Evaluation and Updated Draft Section 4(f) Evaluation per 23 CFR 774(b)(2). This public involvement has been conducted in conjunction with the overall NEPA document public involvement process, as outlined in **FEIS, Chapter 8, Section 8.2**.

Prior to making a Section 4(f) *de minimis* impact determination, public notice and opportunity for public review is required. For historic resources, MDOT SHA has notified MHT and consulting parties of the intent to make a *de minimis* impact determination via letters as part of the Section 106 process. For park resources, the opportunity for public notice and review occurred as part of the public review of the DEIS and SDEIS as the intent to make a *de minimis* impact determination has been documented in the Draft Section 4(f) Evaluation and the Updated Section 4(f) Evaluation. A supplemental opportunity for public review was also provided for one park property that was not identified as a potential *de minimis* impact in the Draft Section 4(f) Evaluation or the Updated Draft Section 4(f) Evaluation, but due to additional impact minimization, was identified as a *de minimis* impact in the Final Section 4(f) Evaluation. All public comments on the DEIS, SDEIS, and subsequent opportunity for public review related to the intent to make *de minimis* impact determinations were provided to the OWJs. In addition, the MDOT SHA sent a request for written agreement from each OWJ that the impacts will not adversely affect the features, attributes, or activities qualifying the property for protection under Section 4(f).  The OWJs have concurred with multiple 4(f) de minimis applications, as required by regulation. This concurrence does not mean the OWJ supports the Preferred Alternative as defined in the FEIS. Section 4(f) compliance and a *de minimis* impact

00005701



I-495 & I-270 Managed Lanes Study    Final Section 4(f) Evaluation

determination is separate and distinct from other federal requirements and should not be construed as the OWJ supporting the Preferred Alternative. Refer to **FEIS**, **Appendices I and S** for copies of this correspondence.

# 7    CONCLUSION

Based on the information presented in the Draft Section 4(f) Evaluation, Updated Draft Section 4(f) Evaluation, and this Final Section 4(f) Evaluation, FHWA and MDOT SHA have concluded that there is no feasible and prudent alternative to the use of the Section 4(f) properties identified in **Table 3**, and the proposed action includes all possible planning to minimize harm, and the Preferred Alternative is the alternative with the least overall harm.

00005702

JA1338



I-495 & I-270 Managed Lanes Study

# CULTURAL RESOURCES TECHNICAL REPORT
## Volume 1:
## Overview and Effects Assessment
### June 2022



U.S. Department of Transportation
**Federal Highway Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00005777



I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

## TABLE OF CONTENTS

1    INTRODUCTION ............................................................................................................. 1

   1.1    Overview ......................................................................................................... 1

   1.2    Study Corridors and the Preferred Alternative ............................................... 1

   1.3    Description of the Preferred Alternative ......................................................... 2

   1.4    Summary of Cultural Resources Technical Report, Volumes 1 through 9 ......... 4

2    SECTION 106 PROCESS .................................................................................................. 7

   2.1    Section 106 Requirements and Procedures ..................................................... 7

   2.2    Consultation Initiation .................................................................................... 7

   2.3    Identification Efforts ...................................................................................... 8

      2.3.1    Area of Potential Effects ...................................................................... 8

      2.3.2    Identification of Historic Properties within the APE ........................... 10

      2.3.3    Architectural Resources Evaluations ................................................. 11

      2.3.4    Archaeological Resources Evaluations ............................................... 12

   2.4    Effects Assessment ....................................................................................... 12

      2.4.1    Properties Experiencing Adverse Effect ............................................. 13

      2.4.2    Historic Properties Experiencing No Adverse Effect ........................... 17

      2.4.3    National Historic Landmarks in the APE ............................................. 21

      2.4.4    Indirect and Cumulative Effects ........................................................ 21

   2.5    Resolution of Effects .................................................................................... 21

      2.5.1    Section 106 Programmatic Agreement ............................................... 21

## LIST OF TABLES

Table 1: Comparison of APE, CSB, LOD terms ............................................................. 10

Table 2: Historic Properties with Adverse Effect ........................................................ 14

Table 3: Category 1: Properties with Minor Elements within LOD ............................... 18

Table 4: Category 2: Adjacent to LOD, but no audible, atmospheric, or visual impacts to contributing features ...................................................................................................................... 19

Table 5: Category 3: Substantially removed from LOD, No noticeable effects anticipated ...................... 20

## LIST OF FIGURES

Figure 1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative ......................................... 2

Figure 2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow) ........................... 3

00005778

 I-495 & I-270 Managed Lanes Study

Cultural Resources Technical Report

## LIST OF APPENDICES

Appendix A    ACHP and Consulting Parties Correspondence
Appendix B    Consulting Parties List
Appendix C    Map of Historic Properties within Area of Potential Effects and Archaeological Sites and Survey Areas Proposed for Treatment

00005779

JA1341



OP·LANES™   I-495 & I-270 Managed Lanes Study      Cultural Resources Technical Report

# 1    INTRODUCTION

## 1.1   Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing a Final Environmental Impact Statement (FEIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study). The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

This Final Cultural Resources Technical Report has been prepared to support the FEIS and focuses on the analysis of the Preferred Alternative. The Preferred Alternative, also referred to as Alternative 9 – Phase 1 South, includes building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. Refer to **Figure 1**. This Preferred Alternative was identified after extensive coordination with agencies, the public and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach.

The purpose of the Final Cultural Resources Technical Report is to present the existing conditions, an assessment of potential direct impacts of the Preferred Alternative to cultural resources and final mitigation, if applicable, for unavoidable impacts. This Final Cultural Resources Technical Report builds upon the analysis in the Draft Cultural Resources Technical Report, DEIS and Supplemental DEIS (SDEIS), and has been prepared to support and inform the FEIS.

## 1.2   Study Corridors and the Preferred Alternative

In the SDEIS, published on October 1, 2021, FHWA and MDOT SHA identified the Preferred Alternative: Alternative 9 – Phase 1 South to be consistent with the previously determined phased delivery and permitting approach, which focuses on Phase 1 South. As a result, Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 in the DEIS but focuses the build improvements within the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway to east of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in dark blue in **Figure 1**. The improvements include two new HOT managed lanes in each direction along I-495 and I-270 within the Phase 1 South limits. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders, and agencies.

The 48-mile corridor Study limits remain unchanged: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland (shown in both dark and light blue in **Figure 1**).

00005780

**OP·LANES** MARYLAND   I-495 & I-270 Managed Lanes Study                Cultural Resources Technical Report

**Figure 1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.3   Description of the Preferred Alternative

The Preferred Alternative includes a two-lane HOT managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure 2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general-purpose lanes using pylons placed within a four-foot-wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

00005781


OP·LANES MARYLAND | I-495 & I-270 Managed Lanes Study    Cultural Resources Technical Report

**Figure 2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow)**

I-495 from the George Washington Memorial Parkway to east of MD 187

495

Approx. 194' - 198'

I-495: American Legion Bridge (Looking north towards Maryland)

495

Exit and entrance lanes provide access to the High-Occupancy Toll Lanes from the George Washington Memorial Parkway

High-Occupancy Toll Lanes with free transit and carpools of three or more

Possible location for shared-use path on ALB

I-495 east of MD 187 to west of MD 5 - NO ACTION AT THIS TIME

495

Approx. 138' - 146'

I-270 from I-495 to I-370

270

Approx. 218' - 222'

JA1344

00005782


I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

## 1.4    Summary of Cultural Resources Technical Report, Volumes 1 through 9

The following nine-volume cultural resources technical report was prepared in compliance with Section 106 of the National Historic Preservation Act (NHPA) of 1966, as amended, and its implementing regulations at 36 CFR Part 800. Section 106 requires federal agencies such as FHWA, to consider effects on historic properties of projects they carry out, approve, or fund. Therefore, MDOT SHA and FHWA identified historic properties within the undertaking's area of potential effects (APE); assessed effects to those properties; and consulted with the Maryland Historical Trust (MHT), representing Maryland's State Historic Preservation Officer (SHPO), the Virginia Department of Historic Resources (VDHR), representing Virginia's SHPO, and additional consulting parties throughout the Section 106 process. In addition, the report has been prepared to support and inform the Environmental Impact Statement (EIS).

Section 106 of the NHPA is a procedural requirement consisting of several steps for federal agencies to consider effects to historic properties resulting from undertakings. MDOT SHA, through delegated authority, assists in performing several of the steps on behalf of the FHWA. The process is initiated by determining the undertaking and identifying appropriate consulting parties. An APE is established in consultation with the SHPO(s), wherein historic properties, should they exist, may be affected by the proposed undertaking. MDOT SHA and FHWA then identify historic properties within the APE, and, if not previously evaluated, determine their eligibility for the National Register of Historic Places (NRHP), in consultation with consulting parties. Historic properties are districts, sites, buildings, structures, or objects listed in or eligible for inclusion in the register. Effects to such properties resulting from the proposed undertaking are then assessed. Adverse effects occur where there is an expected diminishment of those qualities that qualify a property for the NRHP. If adverse effects are anticipated, resolution of effects can occur through a binding agreement document that stipulates measures to avoid, minimize, and/or mitigate adverse effects to historic properties. Where undertakings are unusually complex, and/or effects cannot be fully determined, a programmatic agreement (PA) may be used to fulfill Section 106. Because of the Study's geographic scope, complexity, and limited design information, MDOT SHA and FHWA informed consulting parties of the intention to complete Section 106 via a PA resolving known adverse effects and stipulating ongoing consultation requirements as design advances. Accordingly, this report documents the identification and evaluation efforts to date, but additional efforts and consultation will occur under the PA.

This report, entitled *Cultural Resources Technical Report*, is Volume 1 and consists of an overview of the status of Section 106 review for the project and an assessment of effects to historic properties. Chapter 1 includes a description of the Preferred Alternative. Chapter 2 presents a review of the consultation undertaken as part of the Section 106 process. Chapter 3 is a summary of the effects assessment on historic properties within the APE. Chapter 4 presents the results of the Phase I archaeological identification survey and concludes with next steps for the Section 106 process consisting of additional archaeological investigations and the implementation of the Section 106 PA.

Volume 2 consists of the *Archaeological and Historic Architectural Gap Analysis and Assessment* (Hutchins-Keim et al. 2018) (Gap Analysis), a review of existing cultural resources information and studies of the APE, including a methodology for additional identification and evaluation of historic properties. At the time of the Gap Analysis development, cultural resources affected by the study in the Commonwealth of Virginia were assumed to be addressed separately by the Virginia Department of Transportation (VDOT) for their

00005783

 I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

ongoing project to extend the American Legion Memorial Bridge High Occupancy Toll (HOT) Lanes to the George Washington Parkway, called the 495 Express Lanes Northern Extension (NEXT) Project. Since the completion of the Gap Analysis, MDOT SHA has adopted an APE in Virginia based on VDOT's NEXT Project as of May 2019 and has incorporated the results of VDOT's cultural resources survey.

Volume 3, the *Architectural Resources Evaluation Technical Report*, documents architectural resources identification efforts. This study includes all architectural resources constructed in or before 1978, including a wide variety of resource types such dwellings, neighborhoods, commercial and industrial buildings, institutional buildings, and parks and parkways. A total of 353 resources were identified throughout the course of the Study. Of these, 352 were divided into multiple batches to facilitate review by MHT and additional consulting parties. The National Park Service (NPS) made a preliminary determination that Greenbelt Park (PG:67-69) was eligible for the purposes of Section 106 during a separate consultation process between the NPS and MHT. A total of 29 architectural historic properties (NRHP- eligible or listed resources) are within the APE.

Volume 4 consists of the *Phase I Archaeological Investigation for the I-495 & I-270 Managed Lanes Study, Montgomery and Prince George's County, Maryland and Fairfax County, Virginia*. Archaeological field evaluation was completed for of 39 of the 54 areas identified in the Gap Analysis, along with three proposed stormwater management features. Of these, seven survey areas were found to contain a total of 12 archaeological sites, and three newly identified archaeological sites were recommended for further study. The results of the Phase I archaeological survey, as well as recommendations for additional Phase I and Phase II studies, are presented in Volume 4.

Volume 5 is the *Phase II Archaeological Evaluation at Sites 18PR750, 18MO749, and 18MO751 for the I-495 & I-270 Managed Lanes Study Project, Prince George's and Montgomery Counties, Maryland*, which presents the NRHP evaluation results for two sites identified by the Study and a third, previously identified archaeological site. Site 18PR750 was identified by a prior study of the I-495 corridor, and sites 18MO749 and 18MO751, located within lands administered by NPS, were identified by the Phase I investigation included as Volume 4. The investigation recommended that site 18PR750 is not eligible for listing in the NRHP, and that sites 18MO749 and 18MO751 are eligible for listing in the NRHP.

Volume 6 is entitled *Phase I Archaeological Survey, Intensive Phase I Archaeological Survey of 44FX0373, and Phase II Archaeological Evaluation at Sites 44FX0374, 44FX0379, 44FX0381, 44FX0389, 44FX3160, and 44FX3900 Within the George Washington Memorial Parkway for I-495/I-270 Managed Lanes Study, Fairfax County, Virginia*. This volume presents the results of archaeological survey and evaluation of various sites that may be impacted by the Study in Virginia. The investigation concluded that significant archaeological resources are present, including a proposed NRHP-eligible archaeological district (Dead Run Ridges Archaeological District, 44FX3922).

Volume 7 is entitled *Phase I Archaeological Survey for I-495/I-270 Managed Lanes Study Stream Mitigation Sites at RFP3 Tuscarora Creek and PA-1 Back Branch in Prince George's and Frederick Counties, Maryland*. This volume presents the results of archaeological survey at stream and wetland mitigations sites. The investigation concluded that no intact archaeological resources are present and no further archaeology was recommended.

00005784

 I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

Volume 8 is entitled *Phase I Archaeological Survey for Proposed Stream Mitigation Sites for I-495/I-270 Managed Lanes Study, Anne Arundel, Charles, and Prince George's Counties, Maryland.* This volume presents the results of archaeological survey at additional stream and wetland mitigation sites. The investigation identified two archaeological sites at the Beltsville Agricultural Research Center in Montgomery County, which warrant Phase II evaluation, should the project potentially impact them.

Volume 9 is entitled *Documentation of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M: 35-212) for the I-495 & I-270 Managed Lanes Study and Remote Sensing of the Morningstar Cemetery and the Gibson Grove A.M.E. Zion Church (M: 29-39), Montgomery County, Maryland.* This volume presents the results of The Morningstar Cemetery documentation and remote sensing survey. The documentation consisted of historic and archival research, recordation of cemetery features, and mapping, together with archaeological monitoring of invasive bamboo removal. The remote sensing survey identified 378 probable and possible features that may be burials including some that extended into the MDOT SHA ROW north of the cemetery. The investigation recommended that project design be modified to avoid impacts to the Morningstar parcel and portions of the MDOT SHA ROW with the possibility of containing burials.

Volumes 1 through 6 were submitted to MHT, VDHR, and additional consulting parties for review and comment on January 10, 2020. Comments were received from VDHR on February 14, 2020, and from MHT on March 12, 2020; additional consulting parties completed their review on March 16, 2020. Comments on Volumes 1 through 6 were incorporated into this final Cultural Resources Technical Report. Volumes 7 through 9 were submitted to MHT, VDHR, and additional consulting parties in separate submissions for review and comment on February 11, 2021 (Volumes 7 and 8) and May 27 and September 8, 2021 (Volume 9).

00005785

JA1347



## 2    SECTION 106 PROCESS

### 2.1    Section 106 Requirements and Procedures

The implementing regulations for Section 106, codified at 36 CFR Parts 800.3 through 800.7 identify four broad steps for Section 106 review, with numerous requirements at each step: Initiating the Process, Identification of Historic Properties, Assessment of Effects, and Resolution of Effects. The following discussion of consultation summarizes the Study's compliance with Section 106 requirements.

### 2.2    Consultation Initiation

The Study, as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency" and requiring multiple Federal "permits, license or approvals" is an undertaking as defined at 36 CFR Part 800.16(y). Because this undertaking may affect historic properties, it is subject to further review under Section 106.

FHWA notified the Advisory Council on Historic Preservation (ACHP) on March 26, 2018, of the Study. ACHP chose to participate in consultation in a letter dated May 22, 2018 (see **Appendix A** for consultation correspondence).

MDOT SHA, on behalf of and in coordination with FHWA, initiated the Section 106 process and presented the Study by letter to MHT, VDHR and other consulting parties on April 12, 2018.

In 2018, MDOT SHA and FHWA continued invitation of additional parties to participate in the Section 106 compliance process for this undertaking, in accordance with 36 CFR Part 800.2[c][5] and 800.3[f], including tribal, federal, state, and local governments, many of whom were included in the initial consultation letter. FHWA consulted with federally recognized tribes; this included sending letters on June 17, 2019, to Virginia tribes requesting their interests in both the States of Maryland and Virginia. MDOT SHA has an established notification procedure, coordinated with FHWA, for federally recognized tribes who have already expressed an interest in Maryland. MDOT SHA identified and invited additional parties in 2019. Four additional consulting parties were identified and invited in 2020 following the publication of the DEIS. And MDOT SHA and FHWA invited one additional party since the publication of the SDEIS. **Appendix B** lists all invited consulting parties who have either affirmatively responded, or who continue to be provided information as having clear property or jurisdictional relationship to the Study regardless of participation.

The Study involves multiple federal agencies, each of whom may have certain approval, permitting, or other actions subject to Section 106. 36 CFR Part 800.2(a)(2) allows that "some or all the agencies may designate a lead Federal agency" [to] "act on their behalf, fulfilling their collective responsibilities under section 106". FHWA requested confirmation from the NPS, U.S. Army Corps of Engineers, U.S. Department of Agriculture, the U.S. Postal Service (USPS), the Federal Railroad Administration, the National Capital Planning Commission, the U.S. Coast Guard, and the Department of Defense that FHWA could serve as the lead federal agency for the Study. Each agency contacted confirmed that FHWA would serve as lead federal agency. Ultimately, the contacted agencies may or may not have a defined Section 106 undertaking that affects historic properties, due to evolving property and permitting needs, design advancement, or NRHP eligibility determinations of involved properties (i.e., if an involved agency's required action would not affect historic properties, or the property under their jurisdiction affected by

00005786


I-495 & I-270 Managed Lanes Study

Cultural Resources Technical Report

the study is not NRHP eligible, such agencies would not have an undertaking with potential to affect historic properties).

Section 106 public involvement requirements (36 CFR Part 800.2[d][3]) were fulfilled through the same processes used for general project outreach and NEPA compliance. Public outreach at Montgomery and Prince George's County locations provided Study and alternatives development information, including cultural resources information. The public also had opportunities to engage with the Study team and to submit comments on the Study. Interested individuals, organizations, and public agencies provided input on the scope of the EIS during April 2018 open houses. Public workshops in July 2018 gathered comments and information to help inform the alternatives development process. Public workshops in April and May 2019 presented information about the seven Study Screened Alternatives, including the relationship of the study boundaries to previously identified historic properties. This information, along with an ArcGIS-based interactive map with historic property locations, is available to the public online on the project website (https://495-270-p3.com).

The DEIS was published on July 10, 2020, and the DEIS comment period was 120 days, from July 10 to November 9, 2020. The public had various opportunities to comment: oral testimony at public hearings, written comments at public hearings, online comment forms, email, and written letters. Four virtual or online hearings were held in August and September 2020 and two in-person hearings were held in September 2020.

The SDEIS, reflecting the selection of the Preferred Alternative, was published on October 1, 2021, and the SDEIS comment period was 60 days, from October 1 to November 20, 2021. The public had various opportunities to comment: oral testimony at public hearings, online comment forms, email, and written letters. Two virtual or online hearings were held in November 2021.

Four consulting parties meetings have taken place, on May 3 and November 13, 2018, June 17, 2019, and March 10, 2021, all attended by FHWA. The first meeting provided overviews of the Study and the Section 106 process for this undertaking. A draft schedule of activities was also presented. The second meeting provided general Study updates, an update on Section 106 efforts, and outlined the development of the proposed PA. The third meeting included general Study updates, historic properties status updates, a preliminary list of adversely affected properties, and the PA development outline. The fourth meeting presented Study updates, ongoing avoidance and minimization efforts, and the first draft of the PA.

## 2.3    Identification Efforts

### 2.3.1    Area of Potential Effects

MDOT SHA, on behalf of and in coordination with FHWA, established the initial version of the Study's APE by letter to MHT and other parties on April 12, 2018 (36 CFR Part 800.4[a][1]). MDOT SHA and consultant RK&K, LLP additionally met with MHT on April 18, 2018, to discuss the project, APE, and proposed Section 106 consultation process. The APE is the geographic area within which an undertaking may directly or indirectly cause alteration in the character or use of historic properties (36 CFR Part 800.16[d]). Because the precise LOD was unknown at that time, FHWA and MDOT SHA developed a corridor study boundary (CSB), the envelope within which physical effects to historic properties were assumed to be possible. The CSB was defined as a line extending 300 feet from the centerline on either side of I-495 and I-270 within the study limits, expanding farther at certain interchanges. Within the CSB, FHWA and MDOT SHA

00005787

   I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

conducted archaeological survey to identify archaeological resources possibly subject to impact by the Study.

To capture anticipated visual, atmospheric, or audible effects, the APE generally encompassed an additional 250 feet on either side of the CSB. MHT accepted this APE without additional comments on May 17, 2018. VDHR indicated on April 17, 2018, their participation as a consulting party.

The APE has been modified since its original development. On May 14, 2019, the APE in Maryland was updated in the vicinity of the American Legion Bridge and the Chesapeake and Ohio (C&O) Canal National Historical Park as a result of additional constructability analysis for the American Legion Bridge replacement. In Virginia, including within the George Washington Memorial Parkway, the APE was updated to conform in part to the APE established by VDOT's NEXT project, which was more precisely defined and accounted for noise barriers and other factors shielding adjacent properties from indirect effects. MHT agreed with the APE update on June 13, 2019. VDHR requested MDOT SHA respond to the concerns of its office and NPS GWMP that an expanded APE may be necessary to account for visual effects due to tree removal on June 10, 2019.

The APE in Maryland was subsequently updated in November 2019 to ensure consistency of a 250-foot buffer of consideration on either side of the widest proposed alternative's LOD (Alternative 10), to account for those areas where design advancement of the engineered LOD required this expansion of the APE. The APE remained unchanged in Virginia, although MDOT SHA clarified that it would consider visual effects on the George Washington Memorial Parkway and C&O Canal National Historical Park in their entirety. MHT agreed with the APE updated on December 30, 2019. And with that clarification, on December 23, 2019, VDHR expressed its confidence in the APE as presented in May 2019.

MDOT SHA submitted an update to the APE in Maryland to include the LODs for stream and wetland mitigation sites on July 23, 2020. MHT agreed with the APE update on September 4, 2020. The APE remained unchanged in Virginia.

The APE was updated again in September 2021 to accommodate the Preferred Alternative. On September 8, 2021, MDOT SHA provided an update to the APE in Maryland and Virginia to reflect a 250-foot buffer around the LOD for the Preferred Alternative, additional avoidance and minimization measures, and proposed off-site compensatory stormwater mitigation locations (**Appendix C**). MHT and VDHR agreed with the APE update on October 8, 2021. MDOT SHA, in consultation with MHT, made additional, minor updates to the APE in Maryland for the Preferred Alternative on January 4, 2022 to reflect 19 additional off-site compensatory stormwater management and wetland mitigation sites and several small expansions to the LOD. MDOT SHA, in consultation with MHT, made a limited update to the LOD and APE in Maryland on March 31, 2022.

MDOT SHA includes a process for APE updates in the project PA, as design advances under the concessionaire. **Table 1** summarizes the distinctions among "APE", "CSB", and "LOD" as used in this technical report.

00005788

Table 1: Comparison of APE, CSB, LOD terms

| Term | Definition | Explanation |
|------|-----------|-------------|
| APE | Area of Potential Effects | The geographic boundaries where all effects to historic properties may occur, including visual, atmospheric, or audible effects. This may include effects to setting, feeling or viewshed that are not specific physical property impacts. This is the widest/most comprehensive boundary for evaluation of historic properties for the Study. The APE has been updated since initiation of the study. The APE now consists of a 250-foot buffer around the LOD for the Preferred Alternative: Alternative 9 – Phase 1 South, design avoidance and minimization efforts, and the LODs for stream and wetland and compensatory stormwater management mitigation sites. |
| CSB | Corridor Study Boundary | Upon initiation of the Study, the CSB was used as an initial survey boundary in the absence of engineered alternatives. The CSB consists of a line extending 300 feet outside the centerline of I-495 and I-270 within the study limits. Prior to design advancement establishing an LOD (see below), it was assumed physical impacts may occur within the CSB. The CSB was generally used for the boundaries of archaeological study (Volume 4), with the exception of the American Legion Bridge and Virginia portions of the APE, where design development permitted greater accuracy. |
| LOD | Limits of Disturbance | Following engineering design advancement, MDOT SHA developed "limits of disturbance" for where physical construction impacts are likely to occur as a result of the alternatives under consideration. In general, the LOD are narrower than the CSB and APE. As of September 8, 2021, the Preferred Alternative: Alternative 9 – Phase 1 South LOD now define limits where physical impacts are likely. |

### 2.3.2   Identification of Historic Properties within the APE

36 CFR Part 800.4 (a) and (b) requires consultation with the SHPO(s) regarding the scope of identification efforts for historic properties. To accommodate the large study area and number of properties requiring evaluation, including many post–World War II properties expected to reach the 50 years of age consideration threshold during the course of the anticipated project, MDOT SHA developed Volume 2 of this report, the Gap Analysis (Hutchins-Keim et al. 2018) and submitted it to MHT for review and comment on August 8, 2018. The Gap Analysis presents a detailed examination of the potential for Maryland archaeological and architectural historic properties that may be affected by the Study. The Gap Analysis was additionally shared with other consulting parties. The Gap Analysis includes an overview of previous surveys and recorded cultural resources within the APE; it evaluates the potential for encountering archaeological resources, provides for archaeological survey methodology, and includes recommendations for NRHP evaluations of historic architectural resources.

00005789

 I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

MHT responded with minor comments and agreed with the general approaches in the Gap Analysis on November 27, 2018 (**Appendix A of Volume 1**).

MDOT SHA, in consultation with MHT, committed to identify previously recorded and newly identified resources constructed in or before 1978, to account for properties that may reach 50 years in age prior to the anticipated end of construction. Properties younger than 50 years in age are generally not considered for inclusion in the NRHP except in cases of exceptional significance.

Over the course of the Study, MDOT SHA identified a total of 353 resources that required additional documentation or evaluation for the NRHP.

### 2.3.3    Architectural Resources Evaluations

Because the APE identified a large number of post–World War II developments and property types associated with suburban development of the Washington, D.C. area, the Gap Analysis identified a need for additional historic context to consistently evaluate these resources. A draft *Suburbanization Historic Context Addendum (1961–1980), Montgomery and Prince George's Counties, Maryland* (Suburbanization Context Addendum) was prepared and shared with consulting parties on October 19, 2018. The Suburbanization Context Addendum expands upon the coverage of suburbanization included in the *Suburbanization Historic Context and Survey Methodology: I-495/I-95 Capital Beltway Corridor Transportation Study, Montgomery and Prince George's Counties, Maryland* (Volumes I and II) (November 1999, revised May 2000). The Suburbanization Context Addendum expands the time period covered by the original study, which ends in 1960. It includes historical trends, development patterns, suburban development systems, property types, and significance assessment considerations for suburban resources in Maryland, particularly in Montgomery and Prince George's Counties. When relevant, the Study's NRHP evaluations relied on these two contexts. MHT responded with minor comments on the Suburbanization Context Addendum and agreed with the general approach in their acceptance of the Gap Analysis on November 27, 2018. MHT and additional consulting party comments were addressed in a final Suburbanization Context Addendum in May 2019.

Of 353 resources identified over the course of the Study, MDOT SHA submitted 352 architectural resource survey or evaluation forms to MHT for review and comment in 14 rolling batch submissions—the first was dated December 21, 2018, and the last was dated January 4, 2022. The NPS made its own preliminary eligibility determination for Greenbelt Park during the study efforts, and MDOT SHA deferred to the NPS evaluation. Printed copies of each form and archival discs with supporting files were provided to MHT via rolling batch submittals, at which time the additional consulting parties received the forms for review and comment via links to an ArcGIS Online web map maintained by MDOT SHA, where full evaluation forms were available for download (http://bit.ly/495-270-DOE). Comments were received from MHT and additional consulting parties and addressed as appropriate.

MDOT SHA has completed eligibility evaluations of architectural resources in the APE per the methodology described in the Gap Analysis; there are no eligibility findings where SHPO concurrence has not been obtained. MDOT SHA's survey and evaluation effort identified a total of 29 previously surveyed and newly identified architectural historic properties (NRHP-eligible or listed resources) within the Preferred Alternative APE. Volume 3 of this report, *Architectural Historic Properties Identification*, includes the results of the eligibility evaluations.

00005790

 I-495 & I-270 Managed Lanes Study          Cultural Resources Technical Report

### 2.3.4   Archaeological Resources Evaluations

The Gap Analysis outlined an archaeological testing approach to those portions of the CSB where direct physical impacts (specifically ground disturbance) were expected, at that time, to occur. The corridor was divided into numerous survey areas, each with an assessment of archaeological potential and an associated methodology for investigations to identify archaeological historic properties, and to evaluate significance of known archaeological properties. Volume 4 of this report, the *Phase I Archaeological Investigation for the I-495 & I-270 Managed Lanes Study, Montgomery and Prince George's County, Maryland and Fairfax County, Virginia* includes the results of these evaluations. Upon update of the APE in May 2019 to include work in Virginia, MDOT SHA proposed additional archaeological methodologies for the Virginia portion of the APE to VDHR. Archaeological evaluation in Virginia was not originally anticipated at the time the Gap Analysis was written. VDHR responded on June 28, 2019, indicating no additional comments at that time on the scope as proposed by MDOT SHA. The work was additionally coordinated with NPS as part of an Archaeological Resources Protection Act (ARPA) permit for work within the George Washington Memorial Parkway property. While the majority of areas in Maryland identified for archaeological evaluation were surveyed in preparation of this technical report, a number of areas were not accessible, or require additional evaluation to determine the presence of NHRP-eligible sites (see Section 2.5.1 of this volume and Volume 4). Such areas are identified for phased identification as part of the PA as part of an archaeological treatment plan. The PA includes archaeological evaluation requirements in response to design development and associated project activities (e.g. stormwater facilities, stream and wetland mitigation sites, etc.).

Sixty-seven archaeological resources are present within the CSB: 57 of the resources were identified prior to the Study, and 10 newly identified sites were documented as a result of the Phase I archaeological investigation (see **Volume 4**). Eight additional sites were newly identified by the Phase I archaeological investigations for the stream and wetland mitigation sites (**Volumes 7 and 8**). An intensive Phase I archaeological investigation and Phase II evaluations were conducted at seven resources in Virginia (**Volume 6**). In addition, Phase II evaluation studies were completed on one previously identified site (18PR750) and two newly identified sites (18MO749 and 18MO751) in Maryland (**Volume 5**). As a result of these investigations, seven archaeological resources were recommended eligible for listing in the NRHP. Twenty-eight of the 75 archaeological resources identified over the course of the Study are within the APE for the Preferred Alternative. Seven newly determined eligible archaeological historic properties were identified within the APE. There are no eligibility findings where SHPO concurrence has not been obtained.

### 2.4   Effects Assessment

MDOT SHA made an assessment of the effects of the undertaking on historic properties within the APE by applying the criteria of adverse effect in accordance with 36 CFR Part 800.5. An effect may occur when there is an alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the NRHP (36 CFR Part 800.16[I]). To be eligible for listing on the NRHP, historic properties (districts, sites, buildings, structures, and objects) must possess integrity of location, design, setting, materials, workmanship, feeling and association and meet at least one of the below four criteria:

- Criterion A – that are associated with events that have made a significant contribution to the broad patterns of our history; or
- Criterion B – that are associated with the lives of persons significant in our past; or

00005791



- Criterion C – that embody distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

- Criterion D – that have yielded, or may be likely to yield, information important in prehistory or history.

An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify it for inclusion in the NRHP in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association (36 CFR Part 800.5[a][1]).

Examples of adverse effects (36 CFR Part 800.5[a][2]) include:

- (i) Physical destruction of or damage to all or part of the property;

- (ii) Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation and provision of handicapped access, that is not consistent with the Secretary of the Interior's *Standards for the Treatment of Historic Properties* (36 CFR Part 68) and applicable guidelines;

- (iii) Removal of the property from its historic location;

- (iv) Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

- (v) Introduction of visual, atmospheric, or audible elements that diminish the integrity of the property's significant historic features;

- (vi) Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian tribe or Native Hawaiian organization; and

- (vii) Transfer, lease, or sale of property out of federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance.

A total of 29 known and newly determined-eligible architectural historic properties and seven newly determined eligible archaeological historic properties were identified within the Preferred Alternative APE (**Appendix C; Volume 3; Volumes 5 and 6**). The LOD were used to assess potential physical effects, and potential visual, atmospheric, or audible effects were considered within the entire APE. MDOT SHA has determined, on behalf of FHWA, that the Preferred Alternative will have an adverse effect on historic properties. See below for a discussion of these findings for individual historic properties. The effect assessments found an adverse effect on four architectural historic properties and six archaeological historic properties and the remainder of the historic properties in the APE are not adversely affected.

### 2.4.1    Properties Experiencing Adverse Effect

Four architectural historic properties (including parks and parkways) within the APE will be adversely affected by the Preferred Alternative (**Table 2**). No properties are proposed for complete demolition or destruction, but adversely affected properties will generally have contributing features of the property

00005792

 **OP·LANES**  MARYLAND    I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

experiencing physical impacts of varying degrees. In addition, six archaeological historic properties will be adversely affected within the LOD of the Preferred Alternative. Two of the sites will be partially or completely destroyed or significantly diminished in all aspects of integrity and four of the sites would have limited portions destroyed diminishing some aspects of integrity. Adversely affected properties are discussed individually below.

**Table 2: Historic Properties with Adverse Effect**

| State | MIHP#/ VDHR# | Jurisdiction | Name | Period of Significance | NRHP Criteria | Nature of Adverse Effect |
|---|---|---|---|---|---|---|
| MD | M: 12-46 | NPS/ C&O Canal NHP | Chesapeake and Ohio Canal National Historical Park | 1828-1924 | A, C, D | LOD Impacts to contributing features; diminishment of setting |
| MD and VA | M: 35-61 and 029-0228 (Virginia)* | NPS/ George Washington Memorial Parkway | George Washington Memorial Parkway/Clara Barton Parkway | 1930-1966 | B, C | LOD Impacts to contributing features; diminishment of setting (Virginia); temporary diminishment of setting (Maryland) |
| MD | M: 29-39 | Private | Gibson Grove A.M.E. Zion Church | 1923 | A | LOD Impacts; a temporary but long-term diminishment of the property's setting and feeling due to construction impacts |
| MD | M: 12-46-2 | NPS/ C&O Canal NHP | Washington Biologists' Field Club on Plummers Island | 1901-1971 | A | LOD impacts; diminishment of setting |
| MD | 18MO749 | NPS/ C&O Canal NHP | C&O Canal Site 1 | Early Woodland | D | The site will be partially or completely destroyed or significantly diminished in all aspects of integrity |
| MD | 18MO751 | NPS/ C&O Canal NHP | C&O Canal Site 3 | 1828-1924 | D | The site will be partially or completely destroyed or significantly diminished in all aspects of integrity |
| VA | 44FX3922 | NPS/ George Washington Memorial Parkway | Dead Run Ridges Archaeological District | Late Archaic-Woodland | D | Limited portions of individual sites within the district would likely be destroyed, and the district would likely be diminished in some aspects of integrity |
| VA | 44FX0374** | NPS/ GWMP | N/A | Late Archaic-Late Woodland | D | Limited portions of the margin of this site within the district would likely be destroyed |
| VA | 44FX0379** | NPS/ GWMP | N/A | Late Archaic-Early Woodland | D | Limited portions of the margin of this site within the district would likely be destroyed |
| VA | 44FX0389** | NPS/ GWMP | N/A | Late Archaic-Late Woodland | D | Limited portions of the margin of this site within the district would likely be destroyed |

Notes: * National Park Service-National Capital Parks-East
**Archaeological sites 44FX0374, 44FX0379, and 44FX0389 are each individually NRHP-eligible and contributing to the NRHP-eligible Dead Run Ridges Archaeological District (44FX3922).

00005793

 I-495 & I-270 Managed Lanes Study      Cultural Resources Technical Report

### A.  Chesapeake and Ohio Canal National Historical Park

Built between 1828 and 1850, the Chesapeake and Ohio (C&O) Canal operated until 1924, extending 184.5 miles from Georgetown, DC, to Cumberland, Maryland. It represents one of the most intact and impressive survivals of the American canal-building era. The C&O Canal National Historical Park, eligible under criteria A, C, and D, would be adversely affected.

Project activities at this location include accommodation of a temporary access road for construction vehicles and materials to build the new American Legion Bridge (ALB) and remove the existing structure, reconstruction and maintenance of the I-495 northbound ramp to Clara Barton Parkway and the eastbound Clara Barton Parkway ramp to northbound I-495, construction of a trail connection between a multi-use path on the east side of the new ALB and the C&O Canal towpath.

The Preferred Alternative includes the expansion of the ALB within the park boundaries, increasing visual and physical intrusion into the setting of the park, resulting in diminishment of setting. The minimization of the LOD at the ALB was documented in the SDEIS. Long-term construction access and staging is also required at the park, which will cause additional temporary diminishment of setting, feeling, and association for the duration of construction.

The park contains two archaeological historic properties that would also be adversely affected (18MO749 and 18MO751). Those sites are discussed separately in this section under "Archaeological Sites" (2.4.1.E).

### B.  George Washington Memorial Parkway/Clara Barton Memorial Parkway

As one of the nation's premier parkways, the circa-1930 George Washington Memorial Parkway/Clara Barton Parkway comprises 7,146 acres and extends 38.3 miles along the Potomac River. The northern section of the parkway runs on opposite sides of the Potomac River from Arlington Memorial Bridge to the Capital Beltway/I-495, a distance of 9.7 miles in Virginia, and includes the 6.6-mile Clara Barton Parkway in Maryland. The George Washington Memorial Parkway/Clara Barton Parkway, eligible under criteria B and C, would be adversely affected.

Project activities in the boundary of the George Washington Memorial Parkway in Virginia are confined to a small strip of land north of the westbound lanes of George Washington Memorial Parkway for resurfacing and the installation, static signing. In addition, LOD is needed along I-495 between the inner loop and George Washington Memorial Parkway accommodate a retaining wall and shared-use path. There is a small area in the southeast quadrant for the ALB pier and superstructure construction activities.

Project activities within the boundary of the Clara Barton Parkway in Maryland include construction of a temporary access road for construction vehicles and materials to build the new ALB and remove the existing structure, reconstruction and maintenance of I-495 northbound ramp to Clara Barton Parkway and the eastbound Clara Barton Parkway ramp to northbound I-495, and construction of a trail connection between a multi-use path on the east side of the new ALB and the C&O Canal towpath.

In both Maryland and Virginia, the George Washington Memorial Parkway/Clara Barton Parkway would experience temporary diminishment of setting and feeling for the duration of construction. Long-term construction access and staging is also required at the Clara Barton Parkway in Maryland, which will cause additional temporary diminishment of setting and feeling for the duration of construction.

00005794



The park, in Virginia, contains archaeological historic properties, the proposed Dead Run Ridges archaeological district, and its contributing sites, that would also be adversely affected, and those are discussed separately below in Section 2.4.1.E.

### C.    **Gibson Grove A.M.E. Zion Church**

Gibson Grove A.M.E. Zion Church is a small, wood-frame building set on a hill overlooking Seven Locks Road, immediately north of I-495. Gibson Grove A.M.E. Zion Church is significant for its association with the African American settlement of Gibson Grove that was founded in the 1880s by formerly enslaved people. The original church building was a log structure that was replaced with the current edifice in 1923. It is the only remaining building associated with the African American Gibson Grove community. The Gibson Grove A.M.E. Zion Church property, eligible under criterion A, would be adversely affected.

Proposed improvements at this location include outfall stabilization, culvert augmentation (including improvements to drainage on church property), bridge erection, and construction access. Physical impacts to the church property are limited to 0.1 acres along the north side of I-495, at a steep hillside adjoining the church. The new bridge over Seven Locks Road will result in temporary impacts to the church property during construction. In consideration of the small size of the church parcel, and the extent of construction activities on the property, there would be a temporary, but long term, diminishment of the property's integrity of setting and feeling due to construction impacts on the property.

### D.    **Washington Biologists' Field Club on Plummers Island**

The Washington Biologists' Field Club is a twentieth-century naturalist club on Plummers Island in the Potomac River. The Washington Biologists' Field Club is significant for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists. The Washington Biologists' Field Club on Plummers Island, eligible under criterion A, would be adversely affected.

The LOD on Plummers Island along the ALB will impact approximately 0.2 acres of the Washington Biologists' Field Club. This area is required for the bridge substructure, including permanent pier placement and construction activities. Construction activities within the LOD at the Washington Biologists' Field Club may include excavation; demolition of the existing bridge foundation and piers; installation of proposed foundations, piers, or abutments; and slope protection. Access to the existing and proposed piers is required for these activities. Impacts were minimized by strategically locating the new piers near the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations.

Although the majority of the historic features of the Washington Biologists' Field Club are outside the LOD, the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, a character-defining feature of the Washington Biologists' Field Club, resulting in diminishment of the property's integrity of setting.

00005795

JA1357

 I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

### E.  Archaeological Sites

#### a.  18MO749

Site 18MO749 is an Early Woodland archaeological site eligible under Criterion D. Because the site is within the LOD, the site would likely be partially or completely destroyed or significantly diminished in all aspects of integrity by construction of the project.

#### b.  18MO751

Site 18MO751 is a historic period (circa 1828-1924) archaeological site eligible under Criterion D. Because the site is within the LOD, the site would likely be partially or completely destroyed or significantly diminished in all aspects of integrity by construction of the project.

#### c.  Dead Run Ridges Archaeological District (44FX3922)

MDOT SHA evaluated a number of recorded precontact archaeological sites within the George Washington Memorial Parkway property in Virginia. MDOT SHA has determined that several of the investigated sites, together with previously recorded sites that were not investigated as part of the study, constitute a NRHP-eligible archaeological district of related resources (44FX3922); the district was determined eligible by the Keeper of the Register when VDHR did not concur with MDOT SHA's initial finding that the district was eligible. Contributing sites within the proposed district boundary and inside the Preferred Alternative LOD include 44FX0374, 44FX0379, and 44FX0389; these sites are also individually eligible for the NRHP. Sites 44FX3160 and 44FX3900 were investigated and found neither individually eligible nor, in the case of 44FX3160, contributing to the district (44FX3900 is not part of the defined District). Because the district is partially within the Preferred Alternative LOD, portions of individual sites within the district would likely be destroyed, and the district and sites 44FX0374, 44FX0379, and 44FX0389 would likely be diminished in some aspects of integrity by construction of the project, although impacts have been reduced from the DEIS.

As described in Volume 4, several areas within the LOD require additional investigation to evaluate the presence of archaeological sites and/or NRHP eligibility of sites. The PA identifies a process to minimize and/or mitigate adverse effects for eligible sites identified through these efforts if adverse effects cannot be avoided.

### 2.4.2   Historic Properties Experiencing No Adverse Effect

### A.   Architectural Historic Properties

Of the remaining 25 eligible or listed architectural historic properties within the Preferred Alternative APE, 24 would not be adversely affected by the project. These properties would either experience slight alteration of the characteristics that qualify them for inclusion in the NRHP, but there would be no diminishment of these characteristics, or there would be no appreciable alteration of the properties at all.

As context, the study corridor already includes substantial and congested highway facilities within the viewshed and audible setting of most properties. As such, increasing capacity and flow of the existing Beltway *in and of itself* would not generally result in substantive new audible, visual, or other adverse effects to the setting, feeling and association of these properties, because the existing setting already includes the I-495 and I-270 facilities. While the setting would be somewhat altered by the addition of new lanes, these are not newly introduced visual, atmospheric, or audible elements that would diminish

00005796

the integrity of significant historic features of nearby properties. Adverse effects are generally found, as above, when there are specific contributing features of historic properties either within or in close proximity to the project LOD that would be physically impacted in a manner beyond the general increase in capacity of the highway facilities.

The properties experiencing no adverse effect fall into three general groupings.

1. Properties where there is a minor portion of the historic property boundary within the LOD, but there are generally no contributing elements of the property within the LOD. No diminishment of location, design, materials, association, and workmanship would occur, and setting and feeling would be consistent with the existing highway facility.

2. Properties with no portion of the historic property boundary within the LOD but are adjacent to the LOD. No physical impacts would occur, and although some change may be perceptible, no visual, atmospheric, or audible elements that are substantially different from those that already exist, would be introduced. These properties are, or would be, screened by noise barriers and/or trees and vegetation.

3. Properties further removed from the LOD, that would experience no notable changes resulting from the proposed improvements.

Because individual discussion of these properties would be largely redundant, they are grouped in **Table 3**, **Table 4**, and **Table 5** with any relevant property-specific information informing the effect determination captured as a note in the appropriate column.

**Table 3: Category 1: Properties with Minor Elements within LOD**

| MIHP# | Name | Period of Significance | NRHP Criteria | Notes |
|---|---|---|---|---|
| M: 30-38 | Academy Woods | 1967-1974 | C | The LOD include minor portions of rear yards at 7221, 7224, and 7225 Grubby Thicket Way. Rear yards are adjacent to the existing highway, and the greatest area of impact, at 7224 Grubby Thicket Way, occurs at a wooded corner of the parcel, far removed from the house. |
| M: 17-01 | Beallsville Historic District | 1873-1945 | A, C | The LOD are within the yard of 19725 Darnestown Road, which does not contribute to the district. |
| M:37-16 | B&O Railroad, Metropolitan Branch | 1873-1945 | A, C | The LOD crosses beneath the railroad overpass, but no changes will occur to the railroad itself. |
| PG:62-14 | Beltsville Agricultural Research Center (BARC) | Unspecified | A, C | The LOD include small, wooded areas along the highway designated for tree removal, grading, and construction access; no contributing agricultural fields, buildings, or structures are within the LOD. |
| M: 18-8-1 | Boyds-White Grounds Historic District | 1870-1930 | A | The LOD include a fence at 15215 Barnesville Road and culvert wall near 15140 Barnesville Road that post-date the period of significance. The LOD also include portions of an empty lot on north side of Barnesville Road and a wooded lot at the southwest corner of Barnesville Road and |

00005797

 I-495 & I-270 Managed Lanes Study                Cultural Resources Technical Report

| MIHP# | Name | Period of Significance | NRHP Criteria | Notes |
|---|---|---|---|---|
| | | | | Clarksburg Road. The LOD will avoid contributing resources. |
| M: 35-121 | Burning Tree Club | 1922-1923 | A, C | The LOD include a portion of wooded areas along the highway near the contributing golf course, but no impacts to the course itself. |
| M: 29-59 | Carderock Springs Historic District | 1962-1967 | A, C | The LOD will impact approximately 3.2 square feet of the rear yard at 7610 Hamilton Springs Road, adjacent to the existing highway, and will not diminish the original topography and natural vegetation characteristic of the larger district. |
| M: 14-27 | Cedar Grove Historic District | Unspecified | A, C | The LOD just enter the southern boundary of the historic district, on the south side of Davis Mill Road, where no contributing resources are present. |
| M: 18-15 | Friends Advice | c. 1806-1951 | A, B, Criteria Consideration G | The LOD include parts of a wood fence and trees along road, which do not contribute to the property. |
| M: 12-44 | Sugarloaf Mountain Historic District | Mid-18th century-1939 | A, B, C, D | The LOD affect a post-1989 fence adjoining an agricultural field along Beallsville Road. Elsewhere, the LOD affects grassy areas along the roadside or adjoins modern buildings, including the mid-20th-century houses at 20400 Mouth of Monocacy Road and 22400 Dickerson Road and a 2003 house at 22318 Nicholson Farm Road. |
| M: 26-72-1 | Ward Building | 1978 | C | The LOD include a grass berm and areas of the parking lot, which do not contribute to the significance of the property. |
| M: 20-21 | Ward House | 1891-1969 | A, C | The LOD affects a noncontributing fence. |
| M: 26-71 | Woodley Gardens | 1960-1970 | A, C | The LOD at the northwest corner of the property include a noncontributing trail and grassy area, and minor portions of the rear yards at 8 – 13 Hawthorne Court, adjacent to the existing highway. At the Woodley Gardens Shopping Center, LOD impacts will be limited to the edge of the parking lot adjoining the existing highway. |

**Table 4: Category 2: Adjacent to LOD, but no audible, atmospheric, or visual impacts to contributing features**

| MIHP# | Name | Period of Significance | NRHP Criteria | Notes |
|---|---|---|---|---|
| M: 35-194 | Carderock Springs South | 1966-1971 | C | The historic property boundary is adjacent to the LOD at Persimmon Tree Road, but the houses, designed landscapes, and entrance sign are outside the LOD. |
| M: 29-79 | Congressional Country Club | 1924-1978 | A, C | The contributing 1978 golf course is across Eggert Drive from the LOD, but the buildings are substantially removed from the LOD |
| M: 17-63 | Seneca Historic District | Late 17th-early 20th centuries | A | The LOD adjoins the non-contributing Bretton Woods Golf Course (1968) |

00005798

JA1360

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Cultural Resources Technical Report

**Table 5: Category 3: Substantially removed from LOD, No noticeable effects anticipated**

| MIHP# | Name | Period of Significance | NRHP Criteria |
|---|---|---|---|
| F-1-134 | Carrollton Manor Rural Historic District (including the Hebb-Kline Farmstead, F-1-202) | 1855-1940 | A, C |
| M: 29-47 | David W. Taylor Model Basin | 1938-1970 | A, C |
| M: 30-39 | Grosvenor Park | 1963-1966 | A, C |
| M: 26-89 | Latvian Evangelical Lutheran Church of Washington, DC | 1975-1979 | A |
| M: 29-40 | Magruder Blacksmith Shop | c. 1750-1850 | C |
| M: 20-47 | National Institute of Standards and Technology (NIST) Headquarters | 1963-1969 | A, C |
| M: 29-52 | Naval Surface Warfare Center Carderock Division (NSWCCD) Historic District | 1938-1958 | A, C |
| M:24-49 | Washington Aqueduct | 1853-1939 | A, C |

B.   **Archaeological Historic Properties**

Out of the seven known NRHP-eligible seven archaeological historic properties within the LOD for the Preferred Alternative, six archaeological properties are adversely affected. One eligible archaeological site, 44FX0381, is outside of the LOD and will experience no adverse effect. However, as discussed more thoroughly in Chapter 4, several sites require additional evaluation, and further archaeological work is recommended at these locations to define site boundaries and determine potential impacts. These additional investigations are commitments documented in the PA. The PA also includes provisions for further evaluation, determining eligibility and effects findings in the event of changes to the LOD in response to design advancement or an inadvertent archaeological discovery during construction.

### 2.4.3   Deferred Effects Determination

MDOT SHA and FHWA requested and received concurrence from MHT to defer of resolution of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery to the PA. Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, visual, or cumulative adverse effects to the property have been identified from the Preferred Alternative. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas. The project will be governed by a PA, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current

00005799

 I-495 & I-270 Managed Lanes Study    Cultural Resources Technical Report

historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the PA and treatment plan (Refer to **FEIS, Appendix J**).

### 2.4.4    National Historic Landmarks in the APE

There is one National Historic Landmark (NHL) in the APE. The Washington Aqueduct was designated an NHL in 1973 and was determined eligible for the NRHP under Criteria A and C. The LOD at this location represent above-grade impacts, and no physical impacts to the historic property are anticipated. The project will cross an underground segment of the aqueduct at MacArthur Boulevard. The vertical aspect of the APE and LOD remains at the surface and ground disturbance at this location will be prohibited. Current project engineering is not expected to alter the character of the property; therefore, the project will not adversely affect the Washington Aqueduct.

### 2.4.5    Indirect and Cumulative Effects

36 CFR 800.5(1) notes that adverse effects "may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." The build alternatives, responding to an identified need for additional capacity, may be one factor in increased demand for residential or commercial development due to improved travel access along the study corridors – particularly in areas with undeveloped land such as northern Montgomery County and in the Frederick vicinity. Potential indirect effects could occur to historic properties resulting from increased population growth and development in the APE. However, these areas are subject to many greater economic and demographic pressures producing increased population and development that are not caused by the Study.

Past actions that have impacted historic properties include the numerous infrastructure and land development activities that have occurred in the APE. The APE has experienced substantial growth of population, housing, and employment since the mid-twentieth century. This has resulted in destruction or degradation of historic properties, including demolition for new construction and/or changes in land use. Present and future actions, including transportation projects and land development activity, would likely continue to impact cultural resources in similar ways. For transportation projects, however, existing protective regulations and consultation requirements associated with Section 106 and Section 4(f) resources would minimize and mitigate for such effects, reducing the overall net effect to historic properties. Potential future impacts to cultural resources from non-transportation projects would also be subject to applicable federal, state, and local planning ordinances that protect many of these resources.

There are no planned developments within the APE that are dependent on completion of the Preferred Alternative. The Study is responding to other large-scale pressures resulting in increased population and development that result in depleted capacity and congestion on I-495 and I-270; it is not the cause of generalized degradation of historic properties in the APE due to development. As a result, there are no indirect or cumulative adverse effects to historic properties specifically caused by the undertaking.

## 2.5    Resolution of Effects

### 2.5.1    Section 106 Programmatic Agreement

Due to the complexity and wide scope of the Study, the Section 106 process has concluded through the execution of a PA, as described at 36 CFR Part 800.14[b] (Refer to **FEIS, Appendix J**). FHWA notified the

00005800

 I-495 & I-270 Managed Lanes Study — Cultural Resources Technical Report

ACHP of this anticipated PA in March 2018, and the ACHP notified MDOT SHA and FHWA in May 2018 of their participation in consultation for this undertaking (36 CFR Part 800.6[a][1][iii]). The PA provides protocols for additional consultation, historic properties identification, effects assessment, and adverse effects resolution as design advances. MDOT SHA will oversee implementation of the PA as the project continues following the anticipated Record of Decision (ROD).

A.  **Architectural Resources**

MDOT SHA conducted consultation to identify mitigation to include in the PA for historic properties that would experience an adverse effect under the Preferred Alternative, and where design could be adjusted to avoid adverse effects. Mitigation is reasonable, feasible, and commensurate with the impact to the resources. Specific mitigation efforts for affected historic properties—Chesapeake and Ohio Canal National Historical Park, George Washington Memorial Parkway/Clara Barton Parkway, Gibson Grove A.M.E. Zion Church, and Washington Biologists' Field Club—are delineated in the PA and include elements such as: context-sensitive design, creation of interpretive materials, historic property documentation, and other property-specific initiatives.

B.  **Archaeological Resources**

For the known NRHP-eligible archaeological historic properties located within the LOD of the Preferred Alternative, the Section 106 consultation process assessed anticipated effects and efforts to avoid, minimize, or mitigate such effects. MDOT SHA recorded the agreed-upon terms and conditions in the PA to resolve adverse effects to the following affected archaeological historic properties: 18MO749, 18MO751, and Dead Run Ridges Archaeological District, 44FX3922 (which includes individually eligible and contributing sites 44FX0374, 44FX0379, and 44FX0389). These commitments include a flexible treatment plan to be incorporated by reference into the PA. Section 106 mitigation for unavoidable adverse effects to archaeological historic properties will include: recovery of archaeological data through excavation, reporting, and public interpretation of archaeological results.

Four previously identified archaeological sites within the LOD of the Preferred Alternative require additional evaluation to determine eligibility for the NRHP: 18MO190, 18MO191, 18MO457, and 18MO752. MDOT SHA recorded commitments in the PA and a treatment plan for phased evaluation of these sites.

MDOT SHA also recorded commitments in the PA for additional evaluation of areas inaccessible in the initial Phase I survey, or where additional investigations have been recommended. MDOT SHA recorded commitments for additional archaeological investigations at the fourteen survey areas that are within the boundary of the LOD for the Preferred Alternative: RS-1, RS-2, S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6, S-27, SWM S-27, S-28, S-8, S-10, and S-53, and CHOH-13.

The PA also includes provisions for avoidance, minimization, or mitigation of adverse effects to these resources or any newly identified resources, should they be determined NRHP-eligible.

C.  **Historic Cemeteries**

The two cemeteries within or near the LOD for the Preferred Alternative—the Montgomery County Poor Farm Cemetery and the Morningstar Tabernacle No. 88 Moses Hall and Cemetery—are subject to delineation, evaluation, and treatment or further investigation under the PA, as determined through

00005801

 I-495 & I-270 Managed Lanes Study                    Cultural Resources Technical Report

consultation. No known interments are affected by the Preferred Alternative, however, MDOT SHA will continue to define further investigation measures and work to avoid or minimize impacts and coordinate with affected communities on the treatment of human remains, should they be encountered. MDOT SHA has coordinated extensively with interested stakeholders to identify appropriate investigation measures or other context-sensitive commitments. The PA documents how, in the event of impacts to a NRHP-eligible cemetery, adverse effects will be addressed, and procedures for late discovery of human remains in compliance with state and federal regulations; this commitment also includes a treatment plan incorporated by reference into the PA.

00005802



**MARYLAND DEPARTMENT
OF TRANSPORTATION**

**STATE HIGHWAY
ADMINISTRATION**

Larry Hogan
Governor

Boyd K. Rutherford
Lt. Governor

Gregory Slater
Secretary

Tim Smith, P.E.
Administrator

September 8, 2021

Ms. Elizabeth Hughes
State Historic Preservation Officer
Maryland Historical Trust
100 Community Place
Crownsville, MD 21032-2023

Ms. Julie Langan
State Historic Preservation Officer
Department of Historic Resources
2801 Kensington Avenue
Richmond, VA 23221

Dear Ms. Hughes and Ms. Langan:

This letter serves to continue consultation under Section 106 of the National Historic
Preservation Act with the Maryland Historical Trust (MHT) and the Virginia Department of
Historic Resources (DHR) for Project No. AW073D12, I-495 & I-270 Managed Lanes Study
(MLS). The MLS is the first element of a broader I-495 & I-270 Public-Private Partnership (P3)
Program which considers improvements along the entire length of I-495 (Capital Beltway) in
Maryland, connecting into Virginia's portion of I-495, as well as the entire length of I-270
(Dwight D. Eisenhower Memorial Highway) up to I-70 in Frederick County, Maryland.

MDOT SHA's letter dated March 10, 2021 transmitted the first draft of the MLS Programmatic
Agreement, which identifies mitigation measures and commits to consultation procedures as the
project moves forward. Additionally, MDOT SHA's email of May 13, 2021, identified a new
Preferred Alternative – Alternative 9: Phase 1 South. The Preferred Alternative further aligns the
MLS with the phased delivery approach by providing two high-occupancy toll (HOT) managed
lanes in each direction on I-495 from the George Washington Memorial Parkway (GWMP) in
Virginia to east of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270
eastern spur from east of MD 187 to I-270. There is no action, and no improvements, included at
this time on I-495 east of the I-270 east spur to MD 5. The Preferred Alternative will be the focus
of a Supplemental Draft Environmental Impact Statement (SDEIS) anticipated to be published
October 1, 2021.

This letter transmits the revised Area of Potential Effects (APE) based on the new Preferred
Alternative, including an updated Limits of Disturbance (LOD). The APE also incorporates
potential compensatory stormwater management (SWM) sites that may be selected for the MLS.
These sites are being incorporated into a Compensatory Stormwater Management Plan for the P3

00005959

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Two

program and submitted as part of a Joint Permit Application to the United States Army Corps of Engineers and the Maryland Department of the Environment. All identified compensatory SWM locations are in Maryland. Additionally, this letter includes the results of MDOT SHA's archaeological and architectural investigations within the revised APE, together with updated National Register of Historic Places (NRHP) eligibility and effect findings, and revised effect determinations for Gibson Grove A.M.E. Zion Church, the Carderock Springs Historic District, and site 44FX0381 in Virginia, as well as revised effect findings for historic properties that are now outside the APE based on the new Preferred Alternative.

This update includes:

- A revision of the Area of Potential Effects (APE) to reflect the new Preferred Alternative and encompass compensatory stormwater management (SWM) along with previously coordinated stream and wetland mitigation sites in Maryland;
- Associated reductions in the LOD at Morningstar Tabernacle No. 88 Moses Hall and Cemetery, C&O Canal National Historical Park, and the George Washington Memorial Parkway, as part of ongoing minimization efforts;
- The results of ground-penetrating radar survey at Morningstar Tabernacle No. 88 Moses Hall and Cemetery, expected to be incorporated as an addendum to the archaeological report on the property provided May 27, 2021.
- New eligibility determinations for 14 architectural resources in Maryland;
- New, updated, or revised effect determinations for 15 architectural historic properties in Maryland (including 8 properties eliminated from the APE) and archaeological site 44FX0381 in Virginia.

**Revised Area of Potential Effects**

The APE for this project was previously defined as a 250-foot buffer of consideration on either side of the widest proposed build alternative's LOD (Alternative 10) and included additional buffer areas at the American Legion Bridge and elsewhere to capture setting, feeling, and viewshed effects. In addition, the APE included potential environmental mitigation sites where stream and wetland mitigation is proposed. The APE at these environmental mitigation locations was confined to the LOD.

With the identification of the new Preferred Alternative, Alternative 9: Phase 1 South, the APE has been revised accordingly. The APE has been reduced to align with the revised project limits along I-495 and I-270. Until now, the Alternative 10 LOD has been used to determine effects to historic properties. The new Preferred Alternative uses the Alternative 9 LOD and reflects changes in the LOD to minimize effects to historic properties. Within the revised corridor, the APE has shifted or expanded to accommodate the new Preferred Alternative, and portions of the APE where improvements are no longer proposed, generally the east side of the former study limits, have been removed. Discontiguous portions of the APE added in July 2020 to account for

00005960

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Three

stream mitigation sites remain unchanged, however only three of the sites are expected to move forward as part of Phase 1: CA-5, CA-2/3 and RFP-2.

Due to the large amount of impervious area requiring treatment for the Preferred Alternative and existing site constraints, all the required SWM could not be met onsite for the Preferred Alternative. Consequently, compensatory, or offsite, SWM opportunities were investigated to ensure the SWM water quality requirements of the Preferred Alternative could be met. The APE is confined to the LOD for each compensatory SWM site, as no substantive visual elements are proposed that would be new or inconsistent with the existing character of these locations. The LOD of these sites have been added to the revised APE (**Attachment 1**).

In Virginia, the revised APE generally follows the APE for the VDOT NEXT Project that was previously coordinated with VDHR, with some exceptions. The flyover ramps carrying managed lanes between the Capital Beltway and the George Washington Memorial Parkway have been eliminated. The revised APE includes a shared use path along the east side of I-495 in Virginia, across the American Legion Bridge to MacArthur Boulevard in Maryland.

The reduction in the project limits resulting from the new Preferred Alternative has eliminated 33 architectural historic properties from the APE, including eight properties that were previously identified as experiencing an adverse effect (presented in the table below) and one for which effects could not be fully determined (Polychrome Historic District, M: 32-5).

**Adverse Effect Properties Eliminated from the Revised APE for Alternative 9, Phase 1 South**

| MIHP# | Name | Type | Previous Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| PG:69-26 | Baltimore-Washington Parkway | Structure | Adverse | 3/2020 | 1942-1954 | A, C | Listed |
| PG:73-36 | Carsondale | District | Adverse | 9/2020 | 1955-1962 | A | Eligible |
| PG:72-26 and PG:73-26 | Glenarden Historic District | District | Adverse | 3/2020 | 1939-1977 | A | Eligible |
| PG:67-69 | Greenbelt Park | District | Adverse | 3/2020 | 1945-1972 (for Mission 66 era) | A, C, D | Eligible (for the purposes of Section 106) |
| M: 32-34 | Indian Spring Club Estates and Indian Spring Country Club | District | Adverse | 3/2020 | 1939-1957 | A, B, C | Eligible |
| M: 36-1 | National Park Seminary Historic District/Forest Glen/ Walter Reed A.M.C. Annex | District | Adverse | 3/2020 | 1894-ca. 1930 | Unspecified | Listed (MHT Easement) |
| M: 36-87 | Rock Creek Stream Valley Park, Units 2 and 3 | District | Adverse | 3/2020 | 1931-1970 | A | Eligible |
| M: 32-15 | Sligo Creek Parkway | District | Adverse | 3/2020 | Unspecified | A, C | Eligible |

00005961

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Four

**Minimization Efforts**
MDOT SHA has been engaged in ongoing design minimization efforts along the project corridor to reduce impacts to historic properties.

*Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M: 35-212)*

Archaeological mapping provided in May 2021 and Ground Penetrating Radar (GPR) (**Attachment 5**) surveys at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery), indicated features that may represent potential graves within the MDOT SHA Right-of-Way. In response, MDOT SHA has evaluated an alternative to avoid the Morningstar Cemetery and these associated potential graves.

The proposed typical section of the SDEIS layout along the northbound I-495 Inner Loop managed lane ramp in the vicinity of the cemetery consists of the following:
- 12-foot left shoulder (adjacent to concrete traffic barrier)
- 15-foot travel lane
- 4-foot right shoulder (adjacent to concrete traffic barrier)
- Noise barrier located five feet from the centerline of concrete traffic barrier

The proposed modification reduces the SDEIS northbound I-495 Inner Loop managed lane ramp left shoulder width to 6 feet (from 12 feet). The ramp's right shoulder remains 4 feet in width; however, the noise barrier would be relocated to the back of the concrete traffic barrier. The LOD would be established 5 feet from the centerline of the noise barrier for approximately 300 feet along the frontage of the Morningstar Cemetery property. An area similarly reducing impacts to existing right-of-way extends approximately 65 feet west of the identified potential graves to provide a buffer margin.

This alternative minimizes the overall width of the section avoiding earthwork (cuts or fills) at the nearest GPR-indicated feature that may be a grave.

Although this minimization effort has eliminated all project impacts within the property and avoids associated potentially indicated burial features within right-of-way adjacent to the cemetery, MDOT SHA continues to find that the property will be adversely affected pending further consultation regarding options for future investigations and other issues raised regarding indirect and cumulative effects.

*C&O Canal National Historical Park (M: 12-46) & George Washington Memorial Parkway/Clara Barton Parkway (M: 35-61 & 029-0228)*

MDOT SHA conducted extensive design minimization efforts to avoid or reduce impacts to the National Park Service administered C&O Canal National Historic Park and George Washington Memorial Parkway (GWMP) in the vicinity of the American Legion Bridge, including the

00005962

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Five

convening of an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources.

Several bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummers Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land. These minimization efforts have reduced impacts to the C&O Canal National Historical Park to 10.1 acres, a reduction of 5.3 acres compared to the DEIS Alternative 9.

Additional minimization efforts at the GWMP include a new interchange configuration that pulls roadwork off the GWMP mainline within the park boundary, and a refined signing layout that limits ground disturbance to only those areas where signs will be removed or placed and where electrical conduit must be placed. The minimization efforts have succeeded in reducing impacts to the GWMP to 4.4 acres, a reduction of 7.8 acres compared to the DEIS Alternative 9.

**Architecture**

*New Eligibility Determinations*

In the revised APE for the Preferred Alternative, including the portions added to encompass proposed SWM locations (Attachment 1B), MDOT SHA identified an additional 37 previously recorded Maryland Inventory of Historic Properties (MIHP) resources and 13 unrecorded resources. Two more resources potentially affected by SWM mitigation sites were identified and included as part of prior MLS project submittals.

Eight of the existing MIHP resources identified within the revised APE have previously been determined eligible for or are listed in the NRHP. Of the unevaluated resources (including both MIHP and unrecorded resources), MDOT SHA completed Determination of Eligibility (DOE) forms for 14 resources (**Attachment 2**) and has determined that three are eligible for listing in the NRHP. The Washington Biologists' Field Club on Plummers Island (WBFC) (M: 12-46-2) is significant under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists; the Magruder Blacksmith Shop (M: 29-40) is significant under Criterion C as a rare example of an 18th-century colonial-era commercial building in Montgomery County; and the Latvian Evangelical Lutheran

00005963

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Six

Church of Washington, DC, (M: 26-89) is significant under Criterion A for its association with the efforts of the church organization to preserve and promote Latvian culture and for its role as a cultural center for Latvian immigrants to the DC metropolitan area. The church has a period of significance of 1975-1979, and the property will become eligible for the NRHP upon reaching 50 years of age, assuming it maintains integrity.

MDOT SHA has determined a fourth resource, the Kelley House (M: 26-88) is not eligible for the NRHP. Research conducted did not identify events or persons of local, state or national significance, and the Kelley House is not significant under Criteria A or B. As a common example of the wing-and-gable form, and because of alterations to the house and its surroundings, the Kelley House is not significant under Criterion C.

The remaining 10 resources were documented using MHT's Short Form for Ineligible Historic Properties. These resources are not associated with historic events (Criterion A) or significant persons (Criterion B), and they are not significant for their design or construction (Criterion C). The resources do not have historical or architectural significance and not eligible for the NRHP.

The new eligibility determinations are summarized in **Attachment 3, Table 1**.

MDOT SHA did not evaluate 19 MIHP resources within the LOD for offsite SWM mitigation. Although the LOD fell within the MIHP boundaries of these resources or within the associated parcel(s), impacts to specific historical features were avoided. Three of the unevaluated resources were found to be no longer extant. For the remainder, the proposed SWM locations are along roadsides and at existing SWM facilities, and MDOT SHA has determined that the work proposed has no potential to affect historic properties. These 19 MIHP resources are included in **Attachment 3, Table 5**, and marked as "No Determination."

*New and Updated Effect Assessments*

Both physical effects as well as potential visual, atmospheric, or audible effects were considered within the entire APE. Since the effect assessment coordinated in the February 11, 2021, letter, MDOT SHA has identified 10 additional architectural historic properties in the APE. Seven of these historic properties are impacted by offsite SWM mitigation and three are part of the APE for the Alternative 9 Phase 1 South corridor.

MDOT SHA has determined that the seven properties within the LOD for offsite SWM mitigation will not be adversely affected by the project. Because effects to historic properties related to SWM activities are generally similar and limited in how they affect architectural or archaeological properties, these are summarized and presented along with other properties experiencing no adverse effect in **Attachment 3, Table 3**. The table also includes one additional historic property that was previously identified in earlier iterations of the APE: the B&O Railroad, Metropolitan Branch (M: 37-16). The previous no adverse effect determination for this property remains unchanged.

00005964

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Seven

Three historic properties are part of the APE for the Alternative 9 Phase I South corridor and are described in more detail below: the Magruder Blacksmith Shop, the Latvian Evangelical Lutheran Church of Washington, DC, and the Washington Biologists' Field Club. In addition, ongoing project development has resulted in sufficient information to determine effects for the Carderock Springs Historic District and Gibson Grove A.M.E Zion Church. Previously, effects to these two properties could not be fully determined. With this submittal, there are no remaining historic properties in the APE where MDOT SHA has not made an effect determination. Finally, the revised LOD has resulted in increased impacts but no change to the previous determination of no adverse effect for three historic properties: Burning Tree Club, the Ward Building, and Woodley Gardens. Architectural historic properties with new or updated effect determinations are described below.

- ***Magruder Blacksmith Shop (M: 29-40)*** and the ***Latvian Lutheran Church of Washington, DC (M: 26-89)***: Pending MHT concurrence that these resources are NRHP-eligible, MDOT SHA has determined that the project will not adversely affect the Magruder Blacksmith Shop or the Latvian Evangelical Lutheran Church of Washington, DC. Both properties are substantially removed from the LOD, and the study corridor already includes substantial and congested highway facilities within the viewshed and audible setting of these properties. While the setting would be somewhat altered by the addition of new lanes or other project elements, these are not newly introduced visual, atmospheric, or audible elements that would diminish the integrity of significant historic features of these properties. The LOD east of Magruder Blacksmith Shop is located along MD 190, in the median and on the opposite (south) side of the highway. At the Latvian Evangelical Lutheran Church of Washington, DC, the LOD is located to the east along Watts Branch, screened from the church by trees in Wootton's Mill Park. No noticeable effects resulting from the proposed improvements are anticipated at either historic property.

- ***Washington Biologists' Field Club on Plummers Island (M: 12-46-2)***: The WBFC is a twentieth-century naturalist club on Plummers Island in the Potomac River. The WBFC is eligible for the NRHP under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists. The LOD adjoining Plummers Island along the American Legion Bridge will impact approximately 0.2 acre of the WBFC. This area is required for the bridge substructure, including permanent pier placement and construction activities. Construction activities within the LOD at the WBFC may include excavation; demolition of the existing bridge foundation and piers; installation of proposed foundations, piers, or abutments; and slope protection. Access to the existing and proposed piers is required for these activities. Impacts were minimized by strategically locating the new piers near the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations. Although the majority of the

00005965

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Eight

historic features of the WBFC are outside the LOD, the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, a character-defining feature of the WBFC, resulting in diminishment of the property's integrity of setting. MDOT SHA has determined the project will adversely affect the WBFC.

- ***Carderock Springs Historic District (M: 29-59)***: Carderock Springs is a planned residential development of 275 modernist houses located northwest of Bethesda in Montgomery County, Maryland. The Carderock Springs Historic District is significant under Criterion A as an example of a type of residential development which resulted from the collaborative efforts of builder Edmund J. Bennett and architects Keyes, Lethbridge, and Condon (KLC) in the suburbs of Washington, DC. The Carderock Springs Historic District is also significant under Criterion C for its distinctive examples of modernist houses in a carefully planned and landscaped development designed to have a "natural" appearance by retaining most of the original vegetation and topography. Activities at this location are unchanged, but design advancement and further analysis of the LOD have resulted in a finding of no adverse effect for the property. The Preferred Alternative would result in impacts of less than 0.1 acre of the Carderock Springs Historic District, including permanent and temporary impacts. This impact has increased from the no impact reported in the DEIS. The LOD adjoining Carderock Springs Historic District is almost entirely within MDOT SHA right-of-way but will impact approximately 3.2 square feet of the rear yard at 7610 Hamilton Springs Road, a contributing resource within the district.  The increase in impact from the DEIS is due to design refinement, including advanced design at Cabin John Parkway Interchange to minimize impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery, as well as exchange ramps, construction of retaining and noise walls along the outer loop, and clearing and erosion and sediment control measures. The LOD includes a ten-foot offset behind the proposed noise wall. The proposed centerline of I-495 is shifted north compared to existing conditions through this section to minimize impacts to Morningstar Cemetery. These actions will not disturb the original topography and natural vegetation within Carderock Springs itself, and the proposed noise wall will further screen the district from visual and audible effects already present along I-495. No diminishment of location, design, materials, association, and workmanship will occur, and setting and feeling will remain consistent with the existing highway facility. MDOT SHA has determined the project will not adversely affect the Carderock Springs Historic District.

- ***Gibson Grove A.M.E. Zion Church (M: 29-39):*** Gibson Grove A.M.E. Zion Church is a small, wood-frame structure set on a hill overlooking Seven Locks Road, immediately north of I-495. Gibson Grove A.M.E. Zion Church is eligible for the NRHP under Criterion A. The church derives its significance from its association with the African American settlement of Gibson Grove that was founded in the 1880s by former enslaved people. The original church was a log structure that was replaced with the current edifice in 1923. It is the only remaining building associated with the African American Gibson Grove community. Design advancement activities at this location include outfall stabilization, culvert augmentation, bridge erection, and construction access. Some of these activities are included to improve the

00005966

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Nine

condition of the highway drainage on the property, as has been requested by the current church leaders. Physical impacts to the church property are limited to 0.1 acres along the north side of I-495, at a steep hillside adjoining the church. This slight increase in impacts is the result of advanced design at the Cabin John Parkway interchange for exchange ramps and to minimize impacts to Morningstar Tabernacle No. 88, Moses Hall and Cemetery. These design changes have caused a shift in the highway alignment to the north, resulting in increased impacts to Gibson Grove A.M.E. Zion Church from construction of a new bridge over Seven Locks Road. The new bridge will be widened to the north along Seven Locks Road, resulting in increased temporary impacts to the church property during construction. In consideration of the small size of the church parcel, and the extent of construction activities on the property, there would be a temporary, but long term, diminishment of the property's integrity of setting and feeling. MDOT SHA has determined the project will adversely affect the Gibson Grove A.M.E. Zion Church.

Activities at the following locations are unchanged, but the LOD has expanded:

- **Burning Tree Club (M: 35-121)**: Burning Tree Club is a privately-owned 221-acre golf club with a Tudor Revival clubhouse and 18-hole golf course built 1922-1923. Burning Tree Club is eligible for the NRHP under Criteria A and C. Burning Tree Club is significant under Criterion A as an example of the type of male-only, golf-oriented recreational organization that flourished during the 1920s and under Criterion C as a good example of a 1920s private golf club and course. Impacts to the Burning Tree Club have increased from 0.8 acre to 1.3 acres as a result of design refinements to accommodate widening I-495, the augmentation of an existing culvert carrying Thomas Branch beneath I-495, construction of a retaining wall, and the realignment of Thomas Branch along the east side of I-495. The revised LOD will not impact the golf course itself or its associated paths and will not alter the characteristics that qualify the property for the NRHP. MDOT SHA has determined that the project continues to have no adverse effect on the Burning Tree Club.

- **Ward Building (M: 26-72-1)**: The Ward Building is a Brutalist-style suburban corporate office constructed in 1978 at 1300 Piccard Drive, Rockville, Maryland. The property is 4.76 acres just east of I-270 and north of the Gude Drive overpass. The Ward Building is eligible under Criterion C for its high artistic value as an example of Brutalist-style architecture. Impacts to the Ward Building have increased from 0.1 acre to 0.2 acre as a result of design refinements, including an updated roadway configuration, grading and side slope construction associated with widening Gude Drive, and retaining wall construction. The LOD expansion encompasses areas along the parking lot surrounding the Ward Building and does not affect the characteristics that qualify the building for the NRHP. MDOT SHA has determined that the project continues to have no adverse effect on the Ward Building.

- **Woodley Gardens (M: 26-71)**: Woodley Gardens is a planned residential development containing Colonial Revival-style, single- and multi-family dwellings constructed between 1960 and 1970 in Rockville, Maryland. The approximately 200-acre development is east of I-

00005967

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Ten

270 and south of the Gude Drive overpass. Woodley Gardens is an important, early example of mixed housing types in a planned residential development and is, therefore, eligible for the NRHP under Criterion A as a historic district. Woodley Gardens is also significant as a historic district under Criterion C as an excellent, intact example of a planned residential development with a period of significance ranging from 1960 to 1970. Impacts to Woodley Gardens have increased from 0.7 to 1.3 acres due to design refinements including an updated roadway configuration resulting in changes to the location of the noise barrier and retaining wall, utility relocations, and storm drain impacts. The LOD expansion encompasses a portion of the parking lot adjoining the Woodley Gardens Shopping Center. The parking lot is a character-defining feature of the contributing shopping center, but impacts will be limited to several spaces along the edge of the lot and will not alter the characteristics that qualify the district for the NRHP. MDOT SHA has determined that the project continues to have no adverse effect on Woodley Gardens.

The revised LOD has not changed MDOT SHA's intent to request that FHWA make a *de minimis* impact finding for the minor Section 4(f) use of the three above properties, previously documented in a letter dated January 10, 2020. In addition, MDOT SHA will request that FHWA make a *de minimis* impact finding for the Carderock Springs Historic District. These new and updated *de minimis* properties are listed in in **Attachment 3, Table 4** of this letter.

The revised APE based on the Preferred Alternative (Alternative 9, Phase 1 South) has resulted in the elimination of 33 architectural historic properties from the APE (**Attachment 3, Table 9**). Eight of these historic properties were previously identified as experiencing an adverse effect. Assuming the Preferred Alternative is selected, the project will no longer adversely affect these properties. MDOT SHA has revised the effect assessment for these eight properties to No Adverse, and they are included in **Attachment 3, Table 3**. The Polychrome Historic District, for which effects were previously undetermined, is also among the 33 properties that are no longer affected by the project.

MDOT SHA's updated effect assessments for the project are summarized in **Attachment 3, Tables 6 - 8**. The revised effect assessments include overall findings of no adverse effect to 24 architectural historic properties and an adverse effect to 5 architectural historic properties. MDOT SHA has determined the project continues to have an adverse effect on architectural historic properties.

**Archaeology**

*Virginia*

The Alternative 9 Phase I South LOD in Virginia has been substantially reduced to largely follow the limits of disturbance of the VDOT NEXT project, as shown in **Attachment 1**. Under the Preferred Alternative, impacts to George Washington Memorial Parkway would be required to accommodate access for construction vehicles and materials to build the new American

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Eleven

Legion Bridge and remove the existing structure; construction, operation, and future maintenance of new direct access ramps to the managed lanes on I-495; the installation, operation, and future maintenance of electrical conduit and permanent signage to inform the traveling public of toll rates and operation of the facility; resurfacing of George Washington Memorial Parkway for maintenance of traffic during construction, and construction of a shared use path and retaining wall along the I-495 inner loop.

The MLS Alternative 9 Phase I South LOD would impact the Dead Run Ridges Archaeological District (44FX3922), which was determined eligible for the NRHP by the Keeper of the National Register on September 10, 2020. As indicated in our August 12, 2020 letter to the Keeper and our September 24, 2020 letter to DHR, MDOT SHA has determined, with DHR concurrence, that four sites which contribute to the District's eligibility are also individually eligible for the NRHP under Criterion D:  44FX0374, 44FX0379, 44FX0381, and 44FX0389.  The impacts of Alternative 9: Phase I South represent a substantial reduction of the LOD within the GWMP, and now amount to minor impacts along the margins of archaeological sites 44FX0374, 44FX0379, and 44FX0389 within 44FX3922.  Site 44FX0381 is no longer impacted by the revised LOD, and MDOT SHA, on behalf of FHWA, finds that site 44FX0381 is no longer adversely affected.  However, the remaining NRHP-eligible sites 44FX074, 44FX0379 and 44FX0389, and the Dead Run Ridges District (44FX3922) remain adversely affected, although the limits of disturbance have been minimized, and largely impact the margins of the affected sites.  MDOT SHA will continue to develop treatment approaches to mitigate for the adverse effect as part of the MLS PA and associated treatment plans, which will be finalized in consultation with the National Park Service, DHR and other relevant consulting parties including Tribal Nations.

*Maryland*

MDOT SHA submitted the report of archaeological mapping and recordation at the Morningstar Cemetery on May 27, 2021.  Since that time MDOT SHA has completed a high-resolution ground-penetrating radar (GPR) survey (**Attachment 5**) including portions of MDOT SHA right-of-way adjacent to the Cemetery.  MDOT SHA intends to incorporate this report into the final Morningstar Cemetery archaeological report provided in draft form in May 2021.  Because the results of the GPR survey augment the results of the mapping study and indicate the likelihood of additional burials outside the current private property boundary, MDOT SHA has been able to further minimize the LOD to avoid this area of state right-of-way and provide an additional buffer area avoiding ground disturbance in undisturbed areas near the cemetery.

The Alternative 9 Phase I South study area includes locations of potential water quality stream sites (including stream restoration and mitigation, wetland creation, and fish passage improvements); additionally, potential SWM pond locations have been identified as indicated in **Attachment 4**.  Recommended cultural resources investigations are also indicated in the attachment, and will be included in the archaeology treatment plan that is being developed as part of the PA.

00005969

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Twelve

As part of the MLS PA under development, MDOT SHA proposes archaeological investigations at the following locations: (1) fourteen survey areas to which access was denied and that are located within the boundary of the Alternative 9 Phase I South LOD, as described in Arnold et al. 2019; (2) the Montgomery County Poor Farm Cemetery (18NO266) in Rockville; (3) MDOT SHA will continue to consult with relevant parties on any additional archaeological investigations that may be appropriate at the Morningstar Cemetery, in light of the design avoidance and minimization efforts, and (4) Several archaeological sites would be impacted by the MLS project Preferred Alternative LOD, and require further investigation (18MO190, 18MO457, 18MO752, and 18MO191). The reduction in the project limits resulting from the new Preferred Alternative would require Phase I investigations at the following archaeology survey areas, along with Phase I or II investigations at the archaeological resources presented in the table below.

**Archaeological Investigations Required for the Revised APE**

| MIHP#/DHR# | Name | Type | Recommendations | Remarks |
|---|---|---|---|---|
| 18MO190 | Kavanagh XI | Archaeology | Phase I/II | |
| 18MO191 | Kavanagh XII | Archaeology | Phase II | May represent Ball Farmstead |
| 18MO457 | Booze Creek | Archaeology | Phase I/II | |
| 18MO752 | | Archaeology | Phase II | MNCPPC land |
| 18MO266 | Poor Farm Cemetery | Cemetery | PA | Create treatment plan tailored to the resource as part of the PA |
| N/A | Morningstar Cemetery | Cemetery | PA | Create treatment plan tailored to the resource as part of the PA |
| RS-1; RS-2; S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6; S-27; SWM S-27, S-28 S-8; S-10; S-53 | | Survey Areas | Complete Phase I investigations | |

**Prior Recommended Investigations - areas that are now outside APE and no longer required**

| MIHP#/DHR# | Name | Type | Recommendations | Remarks |
|---|---|---|---|---|
| 18MO514 | National Park Seminary archaeological site | Archaeology | | 18MO514 is no longer within the revised LOD |
| S-11; S-16a,c; S-17; S-30; S-33; S-29; S-37, S-44, S-54 | | Survey Areas | | No longer within the revised LOD |

MDOT SHA continues to find an adverse effect to two sites within the C&O Canal National Historic Park (18MO749 and 18MO751), and the Dead Run Ridges Archaeological District (44FX3922) and several constituent sites (44FX0374, 44FX0379, and 44FX0389) within the GWMP in Virginia, although some impacts have been reduced (as described above and enumerated in the table below). MDOT SHA will continue to consult regarding mitigation including data recovery approaches as part of the PA development.

00005970

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Thirteen

**Adversely Affected Archaeological Sites in the Revised APE**

| MIHP#/DHR# | Name | Type | Recommendation | Remarks |
|---|---|---|---|---|
| 44FX3922 | Dead Run Ridges Archaeological District | Archaeological District | Phase III | Mitigation Required (GWMP) |
| 44FX0374 | | Archaeology | Phase III | Mitigation Required (GWMP) |
| 44FX0379 | | Archaeology | Phase III | Mitigation Required (GWMP) |
| 44FX0389 | | Archaeology | Phase III | Mitigation Required (GWMP) |
| 18MO749 | Canal Site 1 | Archaeology | Phase III | Mitigation Required (C&O Canal) |
| 18MO751 | Canal Site 3 | Archaeology | Phase III | Mitigation Required (C&O Canal) |

**No Longer Within LOD and No Adverse Effect**

| MIHP#/DHR# | Name | Type | Recommendation | Remarks |
|---|---|---|---|---|
| 44FX0381 | | Archaeology | | 44FX0381 is no longer adversely affected (outside LOD) |

The Preferred Alternative entails no other impacts to archaeological resources not identified in previous correspondence.

*Revised Cultural Resource Totals*
The reduced project limits have resulted in the removal of one archaeological site and ten archaeology survey areas that required further investigation, as shown in the table above, and 8 architectural historic properties from the APE, as shown in the table on Page 3 and in Table 9. Assuming the Preferred Alternative is selected, the undertaking will no longer adversely affect these properties. Attached are summaries of the historic properties remaining in the APE (Attachment 3, Tables 2 and 3).

*Responses Requested – Maryland:*

MDOT SHA respectfully requests from MHT any comments on the revised APE, review of the enclosed information supporting the analysis, comments on the proposed cultural resources investigations, and your comments/concurrence on the following determinations in Maryland:

- The revised APE including Compensatory SWM mitigation sites
- That either no further work is required or Phase I Archaeology would be required (to be specified in the PA under development) as noted for potential SWM and water quality mitigation sites, as specified in **Attachment 4**
- Any comments on **Attachment 5**, Ground Penetrating Radar report
- The Washington Biologists' Field Club on Plummers Island is eligible for the NRHP and will be adversely affected
- The Magruder Blacksmith Shop is eligible for the NRHP but will not experience an adverse effect
- The Latvian Evangelical Lutheran Church of Washington, DC, is eligible for the NRHP but will not experience an adverse effect

00005971

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Fourteen

- The Kelley House is **not** eligible for the NRHP
- The 10 architectural resources documented on Short Forms are not eligible for the NRHP (**Attachment 3, Table 1**)
- Properties in **Attachment 3, Table 2 will** experience an adverse effect
- There will be no adverse effect to the NRHP-eligible properties in **Attachment 3, Table 3**, should the Preferred Alternative be selected
- Acknowledgement of FHWA's intent to make a *de minimis* determination for the purposes of 4(f) for properties listed in **Attachment 3, Table 4**
- No historic properties will be affected within the revised APE at those locations specified in **Attachment 3, Table 5**

*Responses Requested – Virginia*:

MDOT SHA respectfully requests from DHR any comments on the revised APE, review of the enclosed information supporting the analysis, comments on the proposed cultural resources investigations, and DHR concurrence that 44FX0381 is no longer adversely affected as an individual historic property.

We request the above responses from MHT and DHR by **October 8, 2021**. We look forward to working with the respective State Historic Preservation Offices and additional consulting parties on continued development of the proposed Programmatic Agreement for the MLS undertaking. Please feel free to contact Steve Archer, MDOT SHA Cultural Resources Team Leader at 410-545-8508 or sarcher@mdot.maryland.gov with any questions or information needs on this project.

Sincerely,

Digitally signed by
Steve Archer
Adobe Acrobat
version:
2021.005.20060

*for* Julie M. Schablitsky
Chief Archaeologist/Assistant Division Chief
Environmental Planning Division

00005972

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Fifteen

Attachments:

*Attachment 1(a) – APE (Corridor)*
*Attachment 1(b) – APE (Stormwater Management)*
*Attachment 1(c) – APE (Stream and Wetland – Unchanged from July 2020)*
*Attachment 2 – Determinations of Eligibility*
*Attachment 3 – Eligibility/Effects Table*
*Attachment 4 – Stormwater Management Sites Evaluation*
*Attachment 5 – Ground Penetrating Radar Report – Morningstar Cemetery*

cc:
      Mr. David Clarke, FHWA
      Mr. Marc Holma, Virginia DHR
      Ms. Jeanette Mar, Environmental Manager, FHWA Maryland Division
      Mr. Tony Opperman, VDOT
      Ms. Mandy Ranslow, ACHP
      Mr. John Simkins, FHWA Virginia Division
      Mr. Steve Archer, MDOT SHA-EPLD
      Mr. Richard Ervin, MDOT SHA-EPLD
      Mr. Jeffrey Folden, P.E., DBIA, Deputy Director, I-495 & I-270 P3 Office, MDOT SHA
      Mr. Matt Manning, MDOT SHA-EPLD
      Dr. Julie Schablitsky, MDOT SHA-EPLD
      I-495 & I-270 MLS Section 106 Consulting Parties

00005973



**Sierra Club Maryland Chapter**
P.O. Box 278
Riverdale, MD 20738
**(301) 277-7111**

April 12, 2021

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

Jeanette Mar
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore MD 21201

### RE: SECTION 106 COMMENTS FOR THE I-495 & I-270 MANAGED LANES STUDY

Dear Mr. Archer and Ms. Mar,

We appreciate the opportunity to participate in the I-495/I-270 Managed Lanes Study (MLS) Section 106 process as a consulting party. Founded in 1892, the Sierra Club is America's oldest and largest grassroots environmental organization, and nationwide it has approximately 800,000 members. The Maryland Chapter has over 70,000 members and supporters, a large number of whom reside in communities in Prince George's and Montgomery Counties that would be impacted, injured, and aggrieved by the planned I-495 & I-270 Managed Lanes Study project area, and who would be adversely affected. Many historic areas and sites of importance to these members and the counties at large are in the path of the project and will experience adverse effects that are not identified, assessed or resolved by the draft Programmatic Agreement circulated for public comment.

Our partners and the 50 groups that have signed on to our I-495 & I-270 MLS Draft Environmental Impact Assessment (DEIS) comments[1] have already expressed major concerns about the way the State of Maryland has conducted its environmental review and analysis of foreseeable adverse impacts on historic sites in the DEIS. Even in Phase 1A South of the project, there are at least four historic sites that have not been identified or accorded adequate assessment of adverse effects and avoidance, minimization, and mitigation measures. These include

---

[1] Sierra Club Maryland Chapter and Rock Creek Conservancy Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA), November 9, 2020. https://jillgrantlaw.com/wp-content/uploads/2020/11/2020-11-06-Comments-on-DEIS-4f-and-JPA.pdf

1

00006258

Plummers Island, Morningstar Tabernacle No. 88 Cemetery and Hall, Gibson Grove A.M.E. Zion Church, and Cedar Lane Unitarian Universalist Church.

Our comments are structured to address concerns with the programmatic agreement approach, the reasoning behind those concerns, site-specific comments for sites impacted by Phase IA South, and omitted or excluded alternatives whose lack of consideration limits opportunities for avoidance of impacts on historic sites. Lastly, we provide recommendations on the project's overall Section 106 approach.

We will not address historic sites in other potential phases of the project here but those sites' concerns need to be addressed fully as part of the Section 106 process, unless the I-495 & I-270 MLS is reduced to cover only Phase IA South while the remainder of the project is officially designated "no build."

**1. ISSUES WITH THE PROGRAMMATIC AGREEMENT APPROACH**

**The purely Programmatic Agreement approach for this project is inappropriate and inadequate as it impermissibly forecloses large measures to avoid impacts to historic properties (such as project scope, number of new lanes, and road alignment).**

**The Programmatic Agreement approach to the I-495 & I-270 MLS Section 106 process is not adequate to meet the requirements of federal law.** The Section 106 regulations provide that a Programmatic Agreement approach is appropriate in certain limited situations, including "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. §800.14(b)(1)(iii). Here, however, there is no reason to defer all identification of historic properties within the area of potential effects or the assessment of adverse effects and any measures to avoid and mitigate until later. While there may be alignment refinements that will occur during the design-build process, there are no other circumstances to warrant a departure from the normal section 106 process.

To the contrary, deferral of the Section 106 process until after major decisions are made about alternatives during the NEPA process will foreclose many reasonable, feasible, and prudent measures for avoiding, minimizing, or mitigating adverse effects to historic properties. It is immediately apparent, for example, that the historic Plummers Island, which will be impacted by the widening of the American Legion Bridge, will experience major adverse impacts from the alternatives currently being considered during the NEPA process. Upstream bridge alternative won't be available to avoid major impacts to Plummers Island if Section 106 analysis is deferred until after the alignment is already selected. Impacts to Plummers Island and numerous other historic properties discussed in more detail below that will clearly be affected by the proposed project must be considered now before the Record of Decision (ROD) is approved.

This is particularly critical, as the assessment of adverse effects is directly relevant to determinations of whether the project will use Section 4(f)-protected historic properties. The Federal Highway Administration's (FHWA's) determinations under Section 4(f) must be made in the ROD, and cannot lawfully be deferred. 23 C.F.R. § 774.7(e)(3) The assessment of NHRP eligibility, identification of foreseeable impacts, and measures to avoid adverse effects can be determined with information currently available. This is important reason to do identification of

2

00006259

historic property, determination of impacts and possible avoidance and minimization/mitigation measures upfront or else such measures may be foreclosed later by subsequent project decision making.

## 2. MORE DETAILED PROGRAMMATIC AGREEMENT APPROACH COMMENTS

The approach to Section 106 taken here impermissibly defers full consideration of historic properties listed in or eligible for listing in the National Register of Historic Places by relying on a boilerplate Programmatic Agreement that the Agencies will not execute until after selecting a Preferred Alternative. Among other things, delaying full assessment of historic properties until a Programmatic Agreement is executed ignores the Agencies' present duty to comply with NEPA, which requires a "hard look" at all of the environmental consequences that will flow from the Project if the Agencies grant the permits needed for the Project to proceed. Selection of an Alternative in the ROD, including impacts on historic properties. For these reasons, relying on an unexecuted Programmatic Agreement to carry out the Section 106 review process precludes, rather than assists, the Agencies and the public from understanding how these effects might harm historic and cultural resources as required by NEPA.

Without a complete understanding of the Project's full range of environmental effects, including harm to historic properties, there is no way that the Agencies can reasonably select a preferred alternative as required by NEPA or identify an alternative that avoids use of historic properties, parks, and recreation areas unless no other feasible and prudent alternative is available as required by Section 4(f).

Deferring the full identification of historic properties may be acceptable where the nature and scope of the resources would allow them to be easily avoided, as in the case of archaeological sites that are significant under National Register Criterion D. However, resources such as historic properties require an entirely different approach, because preservation in-place is the preferred treatment, and options to avoid harm to these resources may be foreclosed once an alternative is selected. The identification of those historic properties and the Project's potential effects on them must be completed at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after alternatives have been foreclosed.

For the reasons discussed above, it is impossible to comment meaningfully on the Agencies' plans concerning historic and cultural resources because important baseline questions have not been decided. Outstanding issues that need to be resolved include the complete identification of historic properties affected and how the Project will affect them

Moreover, the Agencies' Draft Section 4(f) Evaluation is likewise insufficient because it does not have full information needed to understand the complete range of adverse effects of the Project and therefore cannot know how the Project will use historic properties. For these reasons, among others, the Agencies should undertake a thorough identification of historic properties and assessment of adverse effects immediately, so that any findings can be incorporated into the Final EIS. As Sierra Club noted in its comments on the DEIS, the assessment of impacts on cultural and historic sites was grossly inadequate and incomplete.

3

00006260

### 3. SITE-SPECIFC COMMENTS

**Plummers Island:** One of the first sites at risk from Phase 1 of the I-495/I-270 Managed Lanes Project (MLP) is Plummers Island, an NPS historic site of ongoing long-term research. Plummers Island has historic status as part of the Chesapeake and Ohio (C&O) Canal National Historical Park. In addition to being part of C&O Canal NHP, Plummers Island also has historic significance distinct from the C&O Canal NHP designation. Yet Plummers Island is not even mentioned in the March 10, 2021 draft of the Section 106 Programmatic Agreement. The importance of Plummers Island has not yet been adequately recognized in the NEPA DEIS and Section 106 process. See Washington Biologist Field Club Section 106 letter to Steve Archer dated April 9, 2021.

**There is a need to build in more specific avoidance, minimization, and mitigation measures for Plummers Island.** Context sensitive design option for Plummers Island need to be pursed for an area of unique concern that will experience serious adverse effects. The WBFC has proposed specific mitigation measures that should be considered in the Section 106 process. Avoidance measures should be identified now and not deferred to the design review consultations during the design-build process. Delaying identification of the location and boundaries of this site until after implementation of a Programmatic Agreement prevents consideration of the impacts to the site during alternative selection under NEPA and undermines discussion of potential mitigation measures for any adverse effects under Section 106.

**Morningstar Tabernacle No. 88 Moses Hall and Cemetery:** Leaving boundary delineation and NRHP evaluation investigations at the Moses Hall Site and Cemetery to a later date prevents potential impacts to this site from being considered during current project design and NEPA consultations. It also does not allow for discussion of potential scope of mitigation efforts under Section 106.

**In the draft Section 106 Programmatic Agreement no specific consideration appears to be given to protecting the Morningstar Tabernacle No. 88 Moses Hall foundation. The hall foundation needs to be evaluated as a contributing resource to the overall site.** This ruins is historically significant, and is a significant contributory element to Moses Hall. The destruction of the foundation of Moses Hall, the site of an important 19th century African American benevolent society is not a small thing, and any significant adverse effect to it could also be seen as an environmental justice impact.

**Gibson Grove A.M.E. Zion Church:** In DEIS Appendix F, page 26, Gibson Grove A.M.E. Zion Church is listed as one of the "Section 4(f) Properties where there is no Use or Impact." on the 0.4 acre site. Similarly, the most recent draft Programmatic Agreement states:

> "MDOT SHA and FHWA have not identified an adverse effect to Gibson Grove A.M.E. church currently, …MDOT SHA and FHWA have not identified an adverse effect to Gibson Grove A.M.E. church currently; however, based on design refinements to avoid and minimize effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the church may be subject to additional temporary construction related impacts causing an adverse effect to the property. In this event, MDOT SHA and Gibson Grove A.M.E. church will continue to explore preservation enhancements to the property suggested by

4

Church leadership to be specified in subsequent drafts of this agreement." (I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement, March 10, 2021)

**This is incorrect. The NRHP eligible Gibson Grove A.M.E. Zion Church will unquestionably be adversely impacted by the project.** The highway is next to the church as it is, and the Beltway runoff is likely why the church was damaged by treefall in the first place. Any parking, staging or construction on the church side of the road will adversely impact the church property. It will require infilling and have visual impacts detracting for the character and viewshed of the little white church on the hill. That no measures are being taken now to avoid, minimize, and mitigate adverse impacts to the church is a major omission, as the likely adverse impacts to the site are significant.

**Cedar Lane Unitarian Universalist Church**: Cedar Lane Unitarian Universalist Church, which predates the Beltway, has a unique architectural design meant to blend with the environment. Designed by renowned architect Pietro Belluschi who designed the Julliard School building, Cedar Lane Unitarian Universalist Church should be considered for potential NRHP eligibility. This church is listed in the same table as the Gibson Grove A.M.E. Church, the table entitled: "Section 4(f) Properties where there is no Use or Impact". This church will be impacted. As was pointed out in DEIS testimony:

> "Cedar Lane Unitarian Universalist Church would be greatly impacted by this project, although the DEIS chart lists it as "no impact". The natural habitats and walking trails of Rock Creek Park are part of Cedar Lane's appreciation of spirituality in nature. The creek, the estuaries and wildlife adjoining Beach Drive and our church grounds are a community gathering place. The noise level is already extremely high and would be higher with this project." (DEIS testimony of Montgomery County Faith Alliance for Climate Solutions, October 27, 2020)

**There are undoubtedly many other sites deserving of historic status and protections, including in Environmental Justice communities in Prince George's County who have not been invited to be a part of the Section 106 process. The I-270 expansion will disturb burial sites in the Poor Farm Cemetery in Rockville, and the descendants of those buried there and other concerned stakeholders also should have a voice in the Section 106 process.**

**Although not impacted by the first phase of the project, Sligo Creek Parkway and Indian Springs community (beyond the YMCA properties) in Silver Spring should be promptly screened for National Register of Historic Places eligibility, with special attention to their Native American history in addition to their more recent history connected to the early days of settlement in the area (the Blair family, etc.) and the 20th Century.**

**4. BRIDGE ALTERNATIVES NOT CONSIDERED**

**A one-lane addition per side alternative was not fully considered for the American Legion Bridge and should have been.** Over a decade of study by MDOT, VDOT, and FHWA conclude that: "

5

00006262

"Along the Capital Beltway, there were two proposed typical sections for the long-term alternatives: a one-lane and a two-lane managed system. However, the physical footprint for all of the alternatives was the same and it included widening for two lanes per direction in Virginia and widening for one lane per direction on the American Legion Bridge and in Maryland. The widening in Maryland was constrained by the right-of-way, proximity to sensitive environmental features, and proximity to adjacent residences" (West Side Mobility Study, 2009, p. 21).

**A one-lane addition per side, rather than two, would significantly reduce risks and adverse impacts to historical sites, among others.** Previous studies only considered it possible to widen the Capital Beltway by one lane per direction on the American Legion Bridge and in Maryland. Yet a one-lane addition per side alternative (Alternative 5) for the American Legion Bridge and most of the Maryland Beltway was rejected by MDOT and FHWA as "not a reasonable alternative" (DEIS Appendix D, p. 1) and excluded from the Joint Permit Application alternatives.). It is worth asking again in this context why a one-lane addition per direction alternative was not considered more fully, an alternative which would entail less harm to Plummers Island and would preserve the integrity and reduce the closure time of the C&O Canal NHP towpath. A one additional lane per side alternative would also be much less disruptive for the adjacent impacted historical sites all along the entire MD Beltway, including the two Gibson Grove historical sites.

**The DEIS failed to include any upstream alternative (adding new lanes and bike/pedestrian path only to the upstream side of the American Legion Bridge), so no one was able to comment on it. It should have been included and would significantly reduce harm to Plummers Island and the C&O Canal NHP.** In 2021, an MDOT "strike team" noted the possibility of an upstream bridge alternative in which new lanes would all be added to the upstream side of the American Legion Bridge. Yet, this option was not presented in the DEIS for public comment, which is a major omission. If more people had known about it through the DEIS process, they would have had a chance to comment. Bridge options deserve discussion and analysis. The same error should not be made as a part of the Section 106 process.

**The addition of lanes only to the upstream side of the bridge would better protect Plummers Island from the worst adverse impacts of bridge construction.**

**Bridge construction alternatives were not considered by Virginia in their I-495 Express Lanes Northern Extension (495 NEXT) Environmental Assessment (EA). Bridge construction alternatives could have avoided and minimized impacts to some historic properties.** Virginia owns 21% of the American Legion Bridge, while Maryland owns 79% of it and the Potomac River. Virginia's EA for the bridge analyzed only Build or No Build alternatives, assuming continuation of Virginia's pattern of adding two new toll lanes, which does not consider what might be in the best interests of Maryland. This means that Virginia did not pose any bridge alternatives and by doing so may have foreclosed options for other alternatives. It is unclear to what extent the Capital Beltway Accord (an "agreement on principles" announced November 12, 2020 by VA Governor Ralph Northam and MD Governor Larry Hogan) may have biased the process and foreclosed opportunities for other alternatives, including in the design and reconstruction of the bridge. The misalignment of the processes with an EA in Virginia and EIS in Maryland also raises questions about the appropriateness and

6

00006263

adequacy of the analysis of alternatives for the bridge. This inattention to bridge alternatives in a NEPA process contrasts starkly with the thorough process of review, analysis, and vetting that occurred for the Woodrow Wilson Bridge, which was ultimately built to accommodate heavy rail to support multimodal connectivity. It also begs the question why the Virginia side of the Beltway expansion project was not subjected to an equivalent level of review as the Maryland side if they are supposed to be coordinating the projects.

**The MDOT Recommended Preferred Alternative, announced on January 27, 2021, which includes four new tolled lanes on the American Legion Bridge, further seems to have foreclosed alternatives from consideration that could have been explored during the NEPA process and been informed by the Section 106 process. The MDOT Recommended Preferred Alternative is also premature given the inadequacy of the analysis presented in the DEIS and the early stage of the Section 106 process.**

**A serious study of bridge alternatives and bridge construction impacts has not been undertaken. Instead, the DEIS merely notes that "Other minimizations options were also considered and discussed with NPS such as a double deck bridge, top-down construction and reduced typical sections and pier locations (Appendix F, Section 2.1.2.C)." Given the scenic value of the river and the sensitivity of the historic sites and ecological significance of the sites under the American Legion Bridge, this is not acceptable. Further, the project will have adverse effects on the George Washington Memorial Parkway and the Clara Barton Parkway as a result of the American Legion Bridge and 495 Next project in Virginia.**

**5. RECOMMENDATIONS ON THE OVERALL SECTION 106 APPROACH**

**While it may be appropriate to provide a process for continuing to consider ways to reduce impacts on historic properties throughout the design-build process, wholesale deferral of the Section 106 process is not appropriate.** Other projects have instead used a hybrid approach, such as that used by the U.S. Coast Guard for a bridge project in Bismarck, ND, in which only some reviews were deferred to allow design flexibility.

**We recommend that the PA's dispute resolution mechanism include the two State Historic Preservation Offices (MD SHPO and VA SHPO) and also give both SHPOs an opportunity to comment.**

**The project's predevelopment contract documents should be immediately scrutinized for language that could be harmful to historic sites, and any such wording discovered should be flagged by those involved in the Section 106 process to MDOT to have it amended or removed.** The heavy involvement of the profit-driven private developer in the remainder of the NEPA process is concerning in its own right. The predevelopment contract expected to be signed within a month directs the developer team to: "eliminate the potential for Unknown Archaeological Remains and Unknown Endangered Species"[2] "Eliminate" is a very odd use of language to use when considering what that could mean in our historical areas and sites of

---

[2] Phase P3 Agreement RFP, Exhibit 6 Predevelopment Work Requirements, December 18, 2020, p. 15. https://495-270-p3.com/wp-content/uploads/2020/12/Phase-P3-Agreement-Exhibit-6-RFP-December-18-2020.pdf

7

00006264

concern, including Morningstar Tabernacle No. 88 Cemetery and Plummers Island. Contract language like that does not impart confidence about what future contracts may look like. Less extreme language such as "re-assess" and "document any" seems more appropriate.

**More information should be disclosed about the construction contractor to the project team and the Section 106 consulting parties.** It is concerning that developer team did not put forth a construction contractor as the bid process required. Omitting the name of a construction contractor from the bid upon contract submission introduces a further uncertainty for the public and Section 106 consulting parties as nothing is known about the construction contractor or its reputation and track record of handling adjacent or impacted cultural and historic properties.

**Although the DEIS mentioned a U.S. Coast Guard (USCG) letter stating that a bridge permit for the American Legion Bridge would not be required,[3] a bridge permit should be required.** The bridge permit process is a standard requirement that should be followed, and can further build awareness of and protection for sensitive historic and ecological sites that fall in the vicinity of the American Legion Bridge, including Plummers Island and the C&O Canal NHP.

**Dust minimization and specifically OSHA crystalline silica construction dust standards must be upheld and the users and visitors of historic parkland and sites adjacent to the widening must be protected.** Requirements for this should be included in the Programmatic Agreement. The roads and bridges deconstruction processes required for the Project will create massive amounts of toxic crystalline silica construction dust. This will occur on the American Legion Bridge and the toxic dust will drift downriver and impact Plummers Island and the C&O Canal National Historic Park (the eighth most visited national park during 2020), including its popular towpath. Plummers Island animal and plant life and the biologists studying it would be at risk from this dust. Visitors to the C&O Canal NHP and its towpath will be as well. Such toxic air pollution causes respiratory diseases including asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer. This is an urgent public health issue. It is not addressed in the DEIS[4] nor in the Programmatic Agreement to date and it needs to be.

**CONCLUDING REMARKS**

**In conclusion, deferral of federally required assessment of impacts impermissibly forecloses opportunities to avoid, minimize, and mitigate impacts to historic properties.** The purely Programmatic Agreement approach to Section 106 is inadequate to meet federal regulations, given the incomplete identification of historic properties and assessment of impacts to them in the I-495 & I-270 MLS DEIS.

---

[3] Sierra Club Maryland Chapter and Rock Creek Conservancy Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA), November 9, 2020, p. 64. https://jillgrantlaw.com/wp-content/uploads/2020/11/2020-11-06-Comments-on-DEIS-4f-and-JPA.pdf

[4] For further information, see Sierra Club Maryland Chapter and Rock Creek Conservancy Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA), November 9, 2020, pp. 108-109. https://jillgrantlaw.com/wp-content/uploads/2020/11/2020-11-06-Comments-on-DEIS-4f-and-JPA.pdf

8

00006265

**The project's planned deferral of assessment of impacts offers inadequate protection for historical and cultural sites, many of which are known now to face significant adverse effects.** Deferral of identification and assessment of impacts forecloses to these historical sites the opportunity of benefiting from important avoidance, minimization, and mitigation measures.

**A hybrid approach to the Section 106 process** which involves Programmatic Agreement for some sites and Memoranda of Agreement for sites that will experience known adverse impacts is appropriate for a project of this nature, magnitude, and complexity.

**With reference to historic properties, there remain issues with the lack of appropriate alternatives analysis for the American Legion Bridge.**

**Several specific sites impacted by Phase 1A South of the project deserve significantly greater attention and assessment of impacts**, including in some cases screening for a determination of National Register of Historic Places eligibility. This includes Plummers Island and the Cedar Lane Unitarian Universalist Church in Bethesda.

**Sligo Creek Parkway and Indian Springs community** in Silver Spring should be screened for National Register of Historic Places eligibility, with special attention to their Native American history in addition to their more recent history connected to the early days of settlement the area (the Blair family, etc.) and the 20th Century.

We look forward to your prompt attention to the issues raised in our comments.

Thank you.


Josh Tulkin, State Director
Sierra Club Maryland Chapter

9

00006266

# Washington Biologists' Field Club

April 9, 2021

Dear Mr. Archer,

We write you on behalf of the Washington Biologists' Field Club (WBFC), which is a nonprofit organization charged by the National Park Service with the care and maintenance of Plummers Island. Plummers Island is part of the Chesapeake and Ohio (C&O) Canal National Historic Park, and is an historic site of unique and ongoing scientific research value. WBFC owned the land from 1908 to 1959, when it deeded Plummers Island to the United States Government while preserving the right to maintain the island as a natural wild area and use it for scientific research, as set forth in the attached Agreement (Appendix A).

We are concerned about the proposed I-495/I-270 and American Legion Bridge toll lane widening project and the significant, probable threats from bridge construction, operation, and maintenance to Plummers Island and its historic character, including its biota, and the century of intensive research activities that have taken place on the island. In order to ensure that project's impacts on Plummers Island receive adequate consideration, we request that you (1) designate WBFC as a consulting party to the National Historic Preservation Act Section 106 process immediately, (2) assess adverse effects from and consider alternatives to the project that will not impact Plummers Island, (3) consider Plummers Island for individual eligibility for the National Register of Historic Places, and (4) commit to undertaking the mitigation measures listed in this letter to minimize harm to Plummers Island resulting from the Maryland Department of Transportation's (MDOT's) current preferred alternative.

**1) We request WBFC be added as a consulting party to Section 106 immediately due to our special relationship to Plummers Island.**

We appreciate that an MDOT "strike team" came to learn more about Plummers Island on March 1, 2021. However, this was the first time anyone on this project communicated with us, and we continue to have major concerns with the proposed plan and the failure to acknowledge or assess its impacts on Plummers Island.

It came to our attention, not through the project team, that we were not invited to participate in the I-495/I-270 Managed Lanes Project Section 106 process, despite our unique relationship to Plummers Island. We learned just two weeks before the deadline that comments on the draft Section 106 Programmatic Agreement would be due on April 12, 2021.

This is an unfortunate oversight. WBFC has been responsible for the day-to-day maintenance of the island for almost 120 years, and is the entity most knowledgeable about the island, its historical status, and the long-term scientific studies ongoing on the island. Plummers Island is uniquely significant, independent of the historic

1

00006290

characteristics of the C&O Canal National Historical Park as a whole. Our organization, with its long relationship to the site, is uniquely suited to provide information that is directly relevant to the Section 106 process.

Any mitigation measures for the C&O Canal National Historical Park as a whole would not be sufficient to protect Plummers Island. The WBFC, as a discrete entity that has engaged in biological research on the Island since 1901, is best able to determine which impacts would or could result from American Legion Bridge construction and operation activities and which measures are needed to avoid, minimize, and mitigate these impacts.

Accordingly, WBFC should immediately be afforded consulting party status, and should be included in all communications in connection with the Section 106 process.

**2) We are dismayed that the cultural resource evaluations circulated as part of the DEIS fail to specifically identify or discuss the historic significance of Plummers Island.** The Section 106 identification process should include an evaluation of the significance of Plummers Island as an individually significant historic site independent of the C&O Canal National Historical Park, or at minimum, should include additional descriptions of its contributing significance to that site. The cultural resource evaluations undertaken to date have largely ignored Plummers Island and its unique historic characteristics.

**3) We are troubled by the approach taken by the draft Section 106 Programmatic Agreement, which does not contemplate identifying the adverse impacts on Plummers Island or looking at ways to resolve those impacts until after key decisions about the project are made and mitigation measures foreclosed.** It is not appropriate to defer the assessment of these impacts or any analysis of measures to mitigate adverse effects until after key decisions have been made about alternatives and the preferred alignment for the project, as avoiding or minimizing impacts to Plummers Island will require selecting appropriate bridge alignment and construction alternatives. There is sufficient information available now to undertake these evaluations, and this should be done now, before the widest range of options for mitigating and minimizing adverse effects to Plummers Island have been foreclosed.

The measures to protect the island and its biota (the subject of long-term ongoing research) need to be considered now and in detail. A memorandum of agreement, which would be executed before the Record of Decision, is a more appropriate vehicle for resolving adverse effects on Plummers Island than a programmatic agreement.

Due to the extraordinary sensitivity of the resources and the research that will be impacted by the Project, it is imperative that measures to avoid, reduce, and minimize impacts to Plummers Island be considered now, not deferred until after key project decisions have been made. We therefore request those protections be evaluated as part of the Section 106 process now, and specific commitments to resolve adverse effects be included in a memorandum of agreement and ultimately, in the Record of Decision for the project.

2

00006291

**4) The unique history and significance of Plummers Island must be assessed independently of its status as part of the Chesapeake & Ohio Canal National Historical Park.** A December 11, 2020 *Washington Post* article states: "Caryn Brookman, who oversees Maryland's environmental analysis of the highway expansion plan, said Plummers Island is protected as part of the 184-mile Chesapeake & Ohio Canal National Historical Park." However, the significance of Plummers Island goes beyond that. The significance of the island as a long-term research site should give it protection as a wildlife management area, and it is also a unique and significant historical site in its own right. The island's unique historic attributes include its value and history as an important research site (historic attributes are further reviewed in Appendix B).

The Federal Government acknowledged the importance of Plummers Island as a unique and special place in a unique management agreement with WBFC executed when Plummers Island was added to the C&O Canal National Historical Park in 1959 (see Appendix A). This agreement with the U.S. Government spared Plummers Island from destruction in the 1960 building of the American Legion Bridge, and the 1990s infilling of lanes in the middle of the bridge.

This 1959 agreement names some of the very unique and exceptional features of the island to the United States and to the world (full text below):

- The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and
- The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and
- The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and
- The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

The current plan to build on the island or use it as a construction platform is in violation of the 1959 agreement. Any construction or other activity on the island scarring the landscape destroys the natural biota and opens up the island's habitats to invasive species. Any such activity would violate the vitality, integrity and continuity of the ecosystem WBFC is warded to conserve, protect, study and report on.

It is now 2021 and WBFC has invested in 120 years of research, producing over 400 scientific papers on the flora and fauna of Plummers Island, documenting over 4,000 species there. The integrity of the island's ecosystem is crucial to our long-term research, of following trends over many years. This is a unique biological reserve and resource. Plummers Island is a special place within the Mather Gorge of the Potomac River, one of the most biotically diverse areas in the United States given its small geographical area. There are many endangered, threatened, and rare species on Plummers Island, many known only from the gorge or the island.

3

Among the 19,000+ pages of the DEIS, the only mention of Plummers Island is buried in the DEIS technical reports. It is in the 18th Appendix of Appendix L (i.e. sub-Appendix R of Appendix L) that Plummers Island is mentioned. The entirety of the comments about Plummers Island in DEIS or appendices are: "The study area includes a portion of Plummers Island south of the American Legion Bridge and a small stream known as Rock Run Culvert. Exposed bedrock occurs on Plummers Island." (DEIS, Appendix R of Appendix L, p. 1) In this Appendix, RTE (Rare Threatened and Endangered) survey maps are shown as occurring on and around the Maryland side of the American Legion Bridge, including parts of Plummers Island. Yet, the DEIS erroneously states: "None of the targeted RTE plant species were found during the surveys" (Full DEIS, p. 4-115).

**5) There are significant, irreversible adverse effects that would accrue to Plummers Island and WBFC research projects under the MDOT American Legion Bridge expansion plan.** The ongoing and active research spaces on this island are contributing historic features of the island, in addition to the architectural resources (the cabin built in 1901). There are distinct adverse effects that impact a property of such high research value, these include destruction of areas of the island, noise pollutants that impair the quality of studies, and many more things listed below and described in greater detail in Appendix C.

In the *Washington Post* article on Plummers Island, it is said the bridge would nearly double in size due to the new lanes, shoulders, and bike path. This would increase the runoff from the road, most of which is currently piped off the bridge low-point, and drained into a gully feeding into the bend of the channel adjacent to Plummers Island. In the draft Programmatic Agreement (Appendix H on an unnumbered page, PDF page 7) in the project DEIS, it states:

> **Duration:** Because of the anticipated duration of this project, and that there may be additional elements that continue, a 15-year duration may be appropriate, or until all terms of the agreement are fulfilled or the project becomes inactive; can include provisions for extension of the agreement.

This is a very substantial amount of time to be impacted by construction. For a small federally protected island immediately downriver of the American Legion Bridge with unique biological, historical, and research value, the magnitude of these threats is extraordinary.

The adverse effects to the island's historic features and significance as a research site posed by the I-495/I-270 project are extensive and further detailed in Appendix C of this letter. They include:
1. Damage to waterways
2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction
3. Destruction of WBFC research plots
4. Destruction of past collection sites
5. Habitat destruction and disturbance lead to more invasive organisms

4

6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out
7. Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge
8. Impacts on biota from salt and oil runoff from the bridge
9. Violation of long-term continuity of 120 years of research.

**6) Below are the minimum avoidance measures, design considerations, and mitigations to avoid or reduce impacts that should be made to avoid, minimize, and mitigate adverse effects to Plummers Island and the ongoing research there. These provisions should have been considered from the beginning of the MDOT-SHA project development and in the DEIS.**

As noted above, on March 1, 2021, an MDOT strike team for the project came to the island and spoke with the Washington Biologists' Field Club for the first time. It appeared the strike team had no idea of the significance of the island, and the information shared took them by surprise. Also, for the first time, we learned of the possibility of an upriver bridge alternative for addition of lanes only to the upriver side of the American Legion Bridge. No bridge alternatives were discussed in the Draft Environmental Impact Statement (DEIS), which is a major omission, and should have been presented there so that the public could have the same information to comment on. We would have certainly made DEIS comments on the bridge alternatives if any relevant information on bridge alternatives had been discussed in the DEIS. That information was lacking and clearly should have been included in the DEIS.

Clearly there needs to be a specific focus on design changes that will reduce and avoid impacts to Plummers Island. The first obvious choice for reducing and avoiding impacts is the "no build" option. Second is the upriver bridge alternative, which should have been evaluated in the DEIS and certainly must be now before the project is advanced.

Although WBFC is opposed to the American Legion Bridge expansion, particularly with toll lanes and lack of mass transit in the design (vans and buses from a few points are not an acceptable replacement for dedicated mass transit), the following types of mitigations are necessary and non-negotiable.

To protect Plummers Island, the minimum mitigations follow:

- Plan for major (not minor) flooding during the construction period.
- Avoid obstructing natural water flow into the Plummers Island channel.
- Build all the new lanes on the upriver side of the bridge.
- Build the access to and the construction platforms themselves only on the upriver side of the bridge and under the bridge.
- In any case, add sound barriers to the downstream side of the bridge.
- Use lane surfacing that is as quiet as possible.
- Place the outflow from bridge scuppers somewhere the runoff will not enter into Plummers Island waters.

5

00006294

- Avoid fugitive dust blowing onto the island by use of dust minimization measures including spraying.
- A waste and hazardous material disposal plan must ensure off-site disposal so as not to flow to or near Plummers Island.
- Provide prior notification informing WBFC of work schedules so notice can be given to researchers.
- Piping of road runoff (that contains oil and salt) is a major issue; currently the main scupper drainage flows into the channel separating the island from the mainland; future drainage should avoid the wetlands including the channel.
- For the duration of construction, any construction infrastructure should be designed to withstand major floods (over 14 feet) not minor (10-12 feet) floods; there have been 3 moderate (12-14 feet) and 2 major floods (17-19 feet) in the past 25 years. However, even minor floods recorded at Little Falls produce major flooding in the Plummers Island channel adjacent to the bridge (see Appendix D, point 6).
- Monitor during construction to ensure that construction work is not impacting the island and no construction workers or project personnel visit the island unless oriented and approved by the Washington Biologists' Field Club. These requirements should be included in bidding document and contractor's work plan as part of the environmental specifications that will be followed.
- Chance find or inadvertent discovery procedures should be followed and incorporated into bidding documents and contracts. Please provide a copy for our review to ensure they meet the requirements for protection of Plummers Island.

**7) To conclude, WBFC has had and continues to have a significant and primary responsibility to maintain this island as a long-term research site high in biodiversity with minimal disturbance. It must be protected.** We fund research studies each year. The island was already historically significant 60 years ago when the American Legion Bridge was built. It is only more significant and rarer today. It is nationally and globally significant, it is historically significant, and it is highly significant for ongoing research purposes. The research on the island is a historic feature.

We are not comfortable with the open-ended, non-committal attempts to reassure us that the strike team made. Under the Section 106 process, requests can be made for mitigations. There is a direct use of the island for purposes of Section 4(f) and a significant adverse effect under Section 106. Avoidance and mitigation measures cannot be deferred until later, after the Final Environmental Impact Statement, after the Record of Decision, or after predevelopment. That is already too late. We require assurances at an administrative level at all costs that the upriver bridge alternative (with all lanes added to the upriver side of the bridge) will be pursued and mitigation measures put in place to protect Plummers Island. Plummers Island is federally protected under legal agreements with the National Park Service and should become additionally protected with a determination of individual National Register of Historic Places eligibility or, at a minimum, assessment of contributing significance to the C&O Canal National Historic Park as soon as possible, with the biodiversity, engendered species, and research value of the island specifically identified as historical features of contributing importance.

6

00006295

**8) We reiterate our concerns with the nature of this process that does not allow the public to have adequate, timely information to advocate for their interests. We also reiterate that we support the no-build option.** Any proposals for redecking and rebuilding/refurbishment of the American Legion Bridge should fully assess potential alternatives and allow for public comment. Such proposals should also require, at a minimum, early focused attention on the high priority to avoid impacts on Plummers Island and to minimize and mitigate any potential adverse impacts to Plummers Island that may remain.

Respectfully,

Ralph Eckerlin, President

Robert Soreng, Vice President

Lowell Adams, Secretary

On behalf of the 85 members of the Washington Biologists' Field Club

7

00006296

**APPENDIX A: Full Text of Agreement with National Park Service**

AGREEMENT WITH NATIONAL PARK SERVICE

AGREEMENT AND STIPULATIONS BETWEEN THE WASHINGTON BIOLOGISTS'
FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA

This agreement made this 5th day of March, 1959, by and between the Washington
Biologists' Field Club, Inc. and the United States of America.

WITNESSETH:

WHEREAS, The United States Government has by condemnation proceedings, in the
United States District Court for the District of Maryland in Civil No. 10676 and by
order of Court made the 24th day of June, taken possession of the defendant's
Washington Biologists' Field Club, property designated in said proceedings as
parcels "A" and "B" in tract no. 7, and

WHEREAS, This property was acquired by the Washington Biologists' Field Club, Inc.
and has been used by the said Club as a natural wild area for scientific research for
over 50 years and a great many scientific papers have been written in reference to
biological and natural history discoveries made on said land and, more particularly,
on that part of said land known as parcel "B" and more familiarly known as
Plummers Island containing some 12.238 acres more or less, and

WHEREAS, The said Plummers Island has become among systematic biologists one of
the world's most famous collecting spots and type localities, and

WHEREAS, The discoveries have indicated the probability of new knowledge in the field
of biology and natural history, and

WHEREAS, The fame of this island is world-wide and many scientific organizations are
interested in its preservation as a source of discovery, and

WHEREAS, The Washington Biologists' Field Club, Inc. and the United States
Government desire to preserve this natural wild area as a sanctuary and scientific
research preserve.

Therefore, The United States Government's petitioner in the United States District Court
for the District of Maryland in Civil No. 10676 and the Washington Biologists'
Field Club, Inc., defendant, and the owner of said parcel of land known as parcel "B"
containing some 12.238 acres more or less which said land is an island in the
Potomac River and is more familiarly known as Plummers Island, do hereby
stipulate and agree that the said parcel "B" be withdrawn from these proceedings
and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed
the said island to the United States Government without monetary consideration
reserving in said deed to the Washington Biologists' Field Club, Inc., the right to

8

00006297

continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research and so long as the further provisions and stipulations contained herein are complied with which are as follows:

1. The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.

2. The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and will include the names and addresses of the officers, list of the members, and a summarization of the scientific investigations carried on.

3. The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or damage or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.

4. The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.

5. No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.

6. It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on 1 August 1958,

Honorary Members:

Bartsch, Paul
Mann, William M.
Ricker, P. L.

Active Members:

Aldrich, John W.
Appel, William D.
Benedict, J. E.
Blake, S. F.
Brown, Edgar
Clarke, J. F. G.

Compton, Lawrence V.
Davis, Malcolm
Duvall, Allen J.
Erickson, Ray C.
Erlanson, C. O.
Fredine, C. Gordon
Fuller, Henry S
Gabrielson, Ira N.
Gardner, Marshall C.
Graham, Edward H.
Griffith, Richard E.
Handley, C. O., Jr.
Hotchkiss, Neil
Jackson, Hartley H. T.

Krombein, Karl V.
Leonard, Emery C.
Lincoln, Frederick C.
Linduska, Joseph P.
Meehean, O. Lloyd
Morrison, J. P. E.
Nelson, A. L.
Oehser, Paul H.
Parker, Kenneth W.
Presnall, Clifford C.
Reed, Theodore H.
Russell, Paul G.
Setzer, Henry W.
Smith, Albert C.

9

00006298

| | | |
|---|---|---|
| Smith, Lyman B. | **Nonresident Members:** | Eklund, Carl R. |
| Sohns, Ernest R. | | Fowler, James A. |
| Stevenson, James O. | Allan, Philip F. | Hamlet, John |
| Stewart, Robert E. | Allen, Durward L. | Holt, Ernest O. |
| Stickel, William H | Archino, Samuel | McAtee, W. L. |
| Swift, Ernest F. | Bartlett, H. H. | Myers, G. S. |
| Uhler, F. M. | Bryant, Harold C. | Peterson, Roger T. |
| Vogt, George B. | Cahalane, Victor H. | Wallis, William W. |
| Walker, Ernest P. | Cottam, Clarence | Wherry, Edgar T. |
| Wetmore, Alexander | Couch, Leo K. | |
| Zahniser, Howard | Dargan, Lucas M. | |

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

7. It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.

8. The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island.

9. The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock or the National Park Service may provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc., and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10. It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists to the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or by a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11. It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc, or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice

10

00006299

that the provisions of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years then this stipulation and any like provisions of the deed to be executed conveying the property to the United States shall terminate.

12. It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13. It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein.


The United States of America

By: WILLIAM E. FINLEY

Director of the National Capital Planning Commission


Condemning Authority

The Washington Biologists' Field Club, Inc.

By: LLOYD W. SWIFT

President


I, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that Lloyd W. Swift, who signed this contract on behalf of the party, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

ALBERT C. SMITH, *Secretary*

11

00006300

**APPENDIX B: Historical Importance of Plummers Island, Maryland (Feb 2021)**

**Background:**
The Washington Biologists' Field Club (WBFC) was established in 1901 by a group of prominent biologists for the purpose of acquiring a parcel of land and carrying out intensive studies of all groups of plants and animals living in the same area. For this purpose, WBFC bought Plummers Island and adjacent land on the Maryland shore of the Potomac (leased in 1901 and purchased 1908), and WBFC biologists and their colleagues have been carrying out intensive research into the biology of the area for the past 120 years. The island became part of C&O Canal National Historic Park in 1961, but WBFC has retained stewardship of Plummers Island and continues to manage it as a research area.

Under the stewardship of WBFC, Plummers Island and adjacent land on the Maryland shore of the Potomac have been the subject of continuous long-term ecological research stretching over more than a century, providing an unequalled depth for study of long-term ecological change. Almost 400 scientific publications have documented many aspects of the island's biology, and current scientific studies are extending a foundation that has been almost 120 years in the making. We live in a time of extreme environmental change, and research on long-term changes in populations of organisms is of vital importance for understanding how to manage human activities in our changing world. The century-long record of studies on Plummers Island makes it a unique and extremely valuable resource for such studies, and it is sometimes called "the most thoroughly studied island in North America."

WBFC has also served to promote communication and collaboration among biologists working on all groups of organisms, partly through meetings and joint projects on Plummers Island. WBFC membership has included many scientists with international reputations, who have carried out research whose importance extends far beyond their own specialties. In particular, WBFC membership has included several of the major figures in the twentieth-century environmental movement (see especially Bailey, Peterson, Pinchot, Swift, and Zahniser, below). Much information about WBFC and Plummers Island, including documentation for much of this information, is in its website (https://wbfc.science) and a published history:

Perry, M. C. 2007. The Washington Biologists' Field Club: Its Members and Its History. Washington DC.

Extensive records for WBFC are archived at the National Museum of Natural History.

**There are four categories that confer significance for the National Register of Historic Places.**

Plummers Island has important associations under three of them:

12

00006301

## 1. Is the property associated with events, activities, or developments that were important in the past?

Long-term studies of factors influencing lichen growth and mortality on Plummers Island allowed Mason Hale and Jim Lawrey to provide compelling evidence that lichen decline following the opening of the new American Legion Bridge was due to uptake of pollutants from automobile exhaust. This evidence that was important in driving antipollution legislation in the second half of the twentieth century, and especially in convincing Congress to ban the use of tetraethyl lead in gasoline (see Hale, below).

## 2. With the lives of people who were important in the past?

Many members were well known in their fields and made important scientific contributions. Members that are remembered outside the immediate biological community for their contributions include:

**Vernon Bailey** - Chief Field Naturalist for the Biological Survey (Dept. of Agriculture). He played a leading role in documenting the diversity of wildlife in the U. S., and he developed no harm live traps and catch-and-release sampling methods to replace the wasteful sampling with lethal traps that had long been the norm for studying populations of small animals.

**Frederick Vernon Coville** - a Dept. of Agriculture scientist, his research allowed blueberries and cranberries to be cultivated commercially; before this work, they could not be grown and could only be collected from wild shrubs. Coville was also important in developing conservation policy for arid lands, and served as the first Director of the U. S. National Arboretum. He was a life trustee of the National Geographic Society and longtime chair of its Committee on Research, and a longtime advisor to the Carnegie Institution of Washington.

**Mason Ellsworth Hale Jr.** - an expert on lichens at the Smithsonian Institution; his work on factors influencing lichen growth and mortality allowed him to provide detailed evidence of lichen decline caused by uptake of pollutants from auto exhaust following the opening of the American Legion Bridge, evidence that was important in convincing Congress to ban the use of tetraethyl lead in gasoline (see above).

**Henry Weatherbee Henshaw** - a zoologist and ethnologist with the Bureau of Ethnology, later the Biological Survey (Dept. of Agriculture), he did important work on native North American languages, and produced the first serious study classifying languages for the continent as a whole.

**Frederick Gustav Meyer** - a Dept. of Agriculture scientist, he was the first to make scientific observations and collections of wild Arabica coffee in its native range in southwestern Ethiopia; led a UN-FAO expedition to collect genetically diverse coffee in Ethiopia and establish international germplasm repositories for coffee, resulting in development of high-quality disease-resistant arabica coffee; also much work on ornamental and medicinal plants.

**Roger Tory Peterson** - credited as the inventor of the modern field guide, and a major figure in the twentieth-century environmental movement; his field guides have been used by many millions of people.

13

00006302

**Gifford Pinchot** - first Chief of the US Forest Service and founder of the Society of American Foresters, considered the "father" of modern forestry; his decisions on management of multiuse lands set the agenda for American conservation; later a 2-term governor of Pennsylvania.

**Charles Vancouver Piper** - a Dept. of Agriculture scientist, he played the central role in bringing the soybean to American agriculture (now our second most important crop, worth $40 billion/year), and he was the first to apply modern plant breeding techniques to grasses for golf course greens.

**Lloyd W. Swift** - Director, Division of Wildlife Management, U. S. Forest Service, where he was responsible for coordinating management of game, fish, non-game, and endangered species within multiple-use management programs on the 200-million acres of National Forest lands; after retiring, he served as Secretary and board member of the World Wildlife Fund.

**Alexander Wetmore** - an internationally known ornithologist, served for seven years as Secretary of the Smithsonian Institution and a longtime trustee of the National Geographic Society.

**Howard Clinton Zahniser** - Director of the Wilderness Society, he played a major role in formulating the 1964 Wilderness Act.

### 3. With significant architectural history, landscape history, or engineering achievements?

**Architectural history** - The WBFC cabin on Plummers Island was built in 1901. We have very good documentation of its construction, and it has been well maintained, substantially in its original condition.

**Landscape history** - We have 120 years' data documenting the history of the return of natural vegetation to a heavily disturbed site (logged and farmed), and of factors influencing the spread of invasive species. This historical data has been essential to important accomplishments of scientists on Plummers Island. For instance, detailed documentation of lichen decline following the opening of I-495, crucial in convincing Congress to ban lead in gasoline (see above), would not have been possible without long-term historical data and collections that allowed them to document the abundance, health, and lead content of lichens on Plummers Island before and after the freeway construction. Long-term monitoring of the plants on Plummers Island has also been crucial for documenting when various invasive species first appeared, and what environmental factors may have led to their introduction and establishment.

**Engineering achievements** - None.

### 4. Does it have the potential to yield information through archeological investigation about our past?

No archaeological work has been done on Plummers Island. There are remnants of old rock walls, and possible hides for guards (Civil War era?) facing the Potomac River. Several past members have done important linguistic and ethnological work on North American cultures (especially Henshaw, above).

14

00006303

**Appendix C: Endangered, Threatened, and Rare Species on Plummers Island**

The species on Plummers Island, including endangered, threatened, and rare species, have been studied since 1901. They are part of the island's historic and ongoing research value. Current awareness of and attention to their protection in the state's DEIS process has been inadequate.

Plummers Island has numerous state endangered, threatened, and rare species. Plummers Island has three extant endangered plants that have been considered endangered in Maryland for many years and were mentioned as endangered in the I-495/I-270 Managed Lanes DEIS, Appendix R of Appendix L, page 1. These state endangered plants are:

1. Coville's Phacelia *(Phacelia covellei)*
2. Horse-tail Paspalum *(Paspalum fluitans)*
3. Pale Dock *(Rumex altissimus)*

Curiously in March 2021, Maryland DNR downgraded two of those species (Coville's Phacelia and Horse-tail Paspalum) from endangered to threatened although their status, if anything, is more imperiled by the planned widening of the American Legion Bridge. On what basis could these species have been downgraded? The WBFC cannot agree with this change without compelling evidence.

The above list of three state RTE plant species is not complete or exhaustive (see Simmons et al. 2020); there are additional Maryland RTE plants on the island, such as Smooth Rose Mallow *(Hibiscus laevis)* which is a rare plant of concern; Pink Valerian *(Valeriana pauciflora)* which is endangered; Leatherwood *(Dirca palustris)* which is threatened; and Sticky Goldenrod *(Solidago racemosa)* which is threatened and part of a rare natural community. There are also several grass and sedge species including Flat-spiked Sedge (*Carex planispicata*) and Open-flower Panic Grass (*Dichanthelium laxiflorum*). Other rare species include Ostrich Fern *(Matteuccia struthiopteris)* and Smooth Wild-petunia *(Ruellia strepens)*.

RTE animals that live on or utilize the island include Eastern Small-footed Myotis (state endangered) and Northern Long Eared Bat (state threatened/US threatened). We can provide recent inventories of species on Plummers Island upon request.

The Endangered Species Act protects both federally listed endangered species and those species deemed endangered, threatened, or in need of conservation within the state, based on habitat and conservation factors. At the state level, threatened and endangered species are regulated under the Maryland Non-game and Endangered Species Act (Annotated Code of Maryland 10-2A-01).

Excerpts from a December 2020 *Washington Post* article by Katherine Shaver tell more of the story:

15

00006304

*Tucked below the American Legion Bridge on the Maryland side of the Potomac River … Plummers Island, … "the most thoroughly studied island in North America."*

*For nearly 120 years, the 12-acre patch of rock and woods has been home to the Washington Biologists' Field Club. Its 85 botanists, entomologists, ornithologists and other scientists have spent decades scrutinizing the island's thousands of species of plants, insects and wildlife.*

*Robert Soreng, the club's vice president and a botanist at the Smithsonian National Museum of Natural History, said Plummers Island provides a critical research site because of its remarkable biodiversity and protected status under the National Park Service. Studying the same wilderness since 1901, he said, has revealed how nature responds to human development, climate change, invasive species and other changes.*

*"This is incredibly valuable for studying long-term trends," Soreng said. "We know more about what's there than in any other place."*

*But Soreng and other scientists say the island's research value is in danger of being lost to a new, wider American Legion Bridge. Under a plan by Maryland Gov. Larry Hogan (R) to relieve traffic congestion on the Capital Beltway, an expanded bridge between Virginia and Maryland could require piers on the island's western edge. Trees would also have to be cut in that area to build a road for construction vehicles to access the bridge site over four to five years.*

***Plummers Island is in the Potomac Gorge, between Great Falls and Georgetown. The gorge is home to hundreds of rare species, including the highest concentration of rare plants in Maryland, according to the National Park Service.***

*Moreover, the biologists say, its protection from development has provided a rare chance to do fieldwork nine miles from downtown Washington.*

*"When you think about the Washington area, there aren't many places that haven't been disturbed by humans," said Matthew Perry, a club member and emeritus scientist with the Patuxent Wildlife Research Center in Laurel.*

*Soreng said more than 400 scientific papers have emerged from Plummers Island research. The most well-known study showed that many of the island's lichen species had died off and others had soaked up significantly more lead after the bridge was built, because of emissions from leaded gasoline used at the time.*

*… Club members have included legendary ornithologist Roger Tory Peterson; Gifford Pinchot, the first chief of the U.S. Forest Service; and Frederick Coville, who helped establish the National Arboretum.*

*"There's an extraordinary concentration of world-class biologists," said Bruce Stein, a club member and chief scientist for the National Wildlife Federation.*

*"Everything that's in there," Soreng said, "someone is recording."*

*Ralph Eckerlin, the club's president and a Northern Virginia Community College biology professor, said he worries about the birds, crickets, katydids and other species that rely on calling out to one another.*

*Pamela Goddard, a Mid-Atlantic specialist for the National Parks Conservation Association, said Plummers Island must be spared as precious urban green space.*

*"The promise for national parks is that they'll be protected," Goddard said. "They're not here as land to be developed for a highway."*

16

00006305

**APPENDIX D: WBFC Comments on American Legion Bridge Construction and Expansion Impacts to Plummers Island**

**Threats to Plummers Island from American Legion Bridge Construction and Expansion** (Submitted to the MDOT-SHA Strike Team, February 28, 2021 for the March 1 joint meeting with WBFC)

1. **Damage to waterways:**
    a. Potomac River shore: mud flats and sandbars are wetland features in the MDOT recalibrated (post the DEIS comments) Zone of Destruction.
    b. We don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and Rock of Gibraltar (at the upper tip of the island) are destroyed or significantly altered. Sand bars and mud flat habitats could be substantially reduced for plants and animals that depend on these.
    c. The Island Channel (AKA "Rock Run Culvert"). The head of the channel down to the dog leg would not see daylight for years of construction. After which this part of the channel would be overshadowed by the 2 added lanes on the island side of the bridge. What are the consequences to waterways there and downstream?
    d. With the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the island flood plain, potentially adversely affecting much of that flood plain.
    e. If sub-point d happens, all research plots in the flood plain could be substantially altered, (including vegetation plots 1, 3, 9, 10, 11, 12, and habitats for plants and animals)
    f. The "frog water" pools at the head of the island noted in the DEIS and circumscribed in subsequent documents are highly vulnerable to disturbance (vegetation plot 3 is in this zone).
    g. Zone of potential effects/disturbance uncertain, but estimated by DEIS to be 2/5 of the island. What is the MDOT plan for protecting this zone?
    h. Amphibians are in global and local decline due to pollution, diseases, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island (Manville 1968 and https://collections.nmnh.si.edu/search/herps/): *Acris crepitans*, northern cricket frog; *Hyla versicolor*, eastern gray treefrog; *Lithobates clamitans*, green tree frog; *Lithobates palustris*, pickerel frog; *Lithobates sylvaticus*, wood frog; *Pseudacris crucifer*, spring peeper; *Pseudacris feriarum*, upland chorus frog; *Ambystoma maculatum*, spotted salamander; *Eurycea longicauda longicauda*, long-tailed salamander; *Hemidactylium scutatum*, four-toed salamander; *Notophthalmus viridescens viridescens*, eastern newt; *Pseudotriton ruber*, northern red salamander.

2. **Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of Plummers Island within the Zone of Destruction:**

17

00006306

a. *Hibiscus laevis* (mud flats just below and above point of rocks)
b. *Solidago racemosa* (point of rocks, below Rock of Gibraltar)
c. *Hypericum prolificum* (point of rocks, below Rock of Gibraltar)
d. *Paspalum fluitans* (mud flats just below and above point of rocks)
e. other native plants rare on the island occurring only on west end in Zone of Destruction: e.g., *Sedum ternatum*. (on Rock of Gibraltar)
f. Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR (Simmons et al. 2016)
g. Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

**3. Destruction of WBFC research plots:**
a. Vegetation research plots from 1997 and 2013-2015 will be destroyed (plots 4, 5, on the sandbar at the head of the island will be totally destroyed [see also sub-point 1e]), A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed.

**4. Destruction of past collection sites:**
a. many plants and animals were vouchered or recorded from the west end of the island, some are only known on the island from there.

**5. Habitat destruction and disturbance lead to more invasive organisms:**
a. the west end of the island is covered in a tangle of oriental bittersweet (first recorded from the island in 1982), and shrubs of amur honeysuckle (first recorded from the island in 1997), among many other invasive plants recorded there. Invasive species establishment and expansion will be sorely exacerbated by disturbance involved the construction process.

**6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out. Construction timbers potentially could rip out acres of trees and other vegetation in the island flood plain. Note 1**: 51 out of the 100 recorded historic Potomac River floods (over 9.4 ft at Little Falls Gauge, NOAA data) were recorded since the first bridge was built in 1962, 33 since the midsection of the bridge was filled in 1992, 1996 included 2 of the top 7 floods, and 2018 included 4 historic floods. In 2019 the island flood plain was inundated on and off for much of winter and spring. **Note 2**: Mather Gorge (Cohn 2004) is much narrower at the American Legion Bridge and Plummers Island than at Little Falls Gauge, so the high-water marks listed below substantially underestimate the peak flows at the

18

00006307

bridge and head of Island by as much as 7 ft (verified at the bridge side of the channel bend, March 25, 2021).

| rank | height | ft | date | | rank | height | ft | date |
|------|--------|----|------|---|------|--------|----|------|
| 5 | 19.29 | ft | 1/21/1996 | | 47 | 11.68 | ft | 4/18/2011 |
| 7 | 17.84 | ft | 9/8/1996 | | 50 | 11.56 | ft | 12/17/2018 |
| 31 | 12.82 | ft | 3/15/2010 | | 54 | 11.44 | ft | 9/21/2003 |
| 36 | 12.38 | ft | 6/5/2018 | | 58 | 11.3 | ft | 5/20/2011 |
| 37 | 12.35 | ft | 3/6/1993 | | 61 | 11.17 | ft | 1/27/2010 |
| 46 | 11.7 | ft | 5/18/2014 | | 65 | 11.01 | ft | 9/29/2018 |
| 67 | 10.87 | ft | 12/12/2003 | | 66 | 10.88 | ft | 3/12/2011 |
| 68 | 10.85 | ft | 9/11/2018 | | 90 | 10.16 | ft | 3/25/1993 |
| 70 | 10.79 | ft | 3/22/1998 | | 92 | 10.13 | ft | 1/29/1993 |
| 77 | 10.55 | ft | 4/18/1993 | | 95 | 10.09 | ft | 11/29/1993 |
| 81 | 10.43 | ft | 1/10/1998 | | 96 | 10.04 | ft | 5/13/2008 |
| 82 | 10.37 | ft | 3/30/1994 | | 97 | 9.97 | ft | 9/23/2003 |
| 86 | 10.33 | ft | 10/31/2012 | | 98 | 9.78 | ft | 9/9/2011 |
| 87 | 10.28 | ft | 3/30/2005 | | 99 | 9.67 | ft | 5/6/2009 |
| | | | | | 100 | 9.43 | ft | 4/17/2007 |

7. **Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge:**
   a. The noise factor cannot be ignored by humans or wildlife. Already the sound of traffic is disturbing to human conversation at our meeting place the WBFC Cabin grounds.

8. **Salt and oil runoff impacts on biota from the bridge:**
   a. This depends on where the outflow is drained from the bridge drainage scuppers (particularly at the bridge's low-point)
   b. The unintended consequences of that volume of road salts on freshwater ecosystems can be severe. A colleague is working on this very subject on area highways, and the impacts he found were surprisingly devastating. One of the worst impacts was mobilizing (and making bioavailable) toxic metals in waterways.

9. **Violation of long-term continuity of 120 years of research (Perry 2007; Shetler et al. 2006):**
   a. Lichen study on Plummers Island validated essentiality of long-term research contributing to national and global removal of Lead from gasoline: A drop from 70 species to 20 species due to sensitivity to Lead pollution on the island (Lawrey & Hale 1979).
   b. The decline of forest breeding birds on Plummers Island is related to the American Legion Bridge (Johnston & Winings 1987).

19

00006308

c. Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, *Compsilura concinna*, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island (**more than 3000** species documented there; Brown & Bahr 2008a,b), the island is a key place to further document this aspect of "insect apocalypse" (Jarvis 2018) assuming the island remains intact. Erwin (1981) and Brown (2001) have documented long-term trends in beetles and moths, respectively, with shifts in species composition related mainly to vegetation succession. The AL Bridge project puts WBFC Plummers Island research on trends in biodiversity in jeopardy.

d. Bellwether issues of plagues, invasions and expansion of exotic species are expected to be exacerbated due to disturbance from construction – some examples of timing of introductions spread, and manifestations of infestations of plants animals, and diseases from around the region are recorded from Plummers Island (plant records from Shetler et al. 2006, WBFC Invasive Biota Committee reports 2015-2020), and https://collections.nmnh.si.edu/search/botany/)

    i. arrival and expansion of garlic mustard (1915), now rampant

    ii. arrival and expansion of tree of heaven (or hell) (1933), now 50+ trees

    iii. arrival and expansion of Japanese honeysuckle (1949), now dominant

    iv. arrival and expansion of Japanese stilt grass (1979), now locally dominant

    v. arrival and expansion of oriental bittersweet (1982), now all over and covering trees

    vi. arrival and expansion of amur honeysuckle (1997), now dominant on west end

    vii. arrival and expansion of winter creeper (1997), now patchily established but potentially widespread.

    viii. arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread

    ix. Emerald Ash Borer (EAB) arrival and expansion in 2015 and death of ash trees (2016), mass die off of ash trees, a major shift in forest climax community (Simmons et al. 2016)

    x. fig buttercup arrival and expansion and expansion (3 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially

20

00006309

xi.   arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species, https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_America

xii.   arrival and expansion of Asian clams (*Corbicula fluminea*), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959, established in the Potomac River by 1982)

xiii.   Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years.

xiv.   Beech blight is coming. Popkin (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for the blight here, unless the forest is cut down for the bridge construction.

e.   Research following climate change impacts to the ecosystems and organisms on Plummers Island will be conflated with issues involved with disturbance from bridge construction and emplacements.

### References

Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. *The Washington Post -HEALTH & SCIENCE* (2018-09-25).

Brown, J. W. 2001. Species turnover in the Leafrollers (Lepidoptera: Tortricicae) of Plummers Island, Maryland: Assessing a century of inventory data. *Proceedings of the Entomological Society of Washington* 103(3): 673-685. https://www.biodiversitylibrary.org/bibliography/2510

Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. *Bulletin of the Biological Society of Washington* 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2

Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 192-226 http://dx.doi.org/10.2988/0097- 0298(2008)15[192:ALOTIO]2.0.CO;2

Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 65–74.

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. *BioScience*, Volume 54(1): 8–14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

21

00006310

Erwin, T. L. 1981. Natural History of Plummers Island, Maryland. XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. *Bulletin of the Biological Society of Washington* 5: 105-224.

Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal.pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? *The New York Times Magazine*, 27 November 2018, pp. 41–48.

Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. *Proceedings of the Biological Society of Washington* 100:762- 768. (December 31, 1987).

Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. *Science* Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS HISTORY  (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York  Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. *Science* Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. *Bulletin of the Biological Society of Washington*, 14(1): 1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science

Vogel, G. 2017. Where have all the insects gone! *Science* 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

00006311

## Washington Biologists' Field Club

October 8, 2021

Dear Mr. Archer,

We are writing you on behalf of the Washington Biologists' Field Club with regard to Plummers Island[1] and its associated channel and wetlands in response to the MDOT-SHA Section 106 letter of September 8, 2021 and including the email message from Mr. Archer entitled "1-495 and I-270 MLS Section 106 Materials, Comments Requested by October 8" and associated linked documents and attachments.

We frame our comments within the historical context of impacts to the long-term value of scientific research on Plummers Island and the biodiversity we have discovered there, and the quality of experience of the island, which are implicitly protected by recommendations for historical preservation of the place for future generations.

We remain highly concerned about the proposed I-495/I-270 and American Legion Bridge toll lane widening project and the significant, probable threats from bridge construction, operation, and maintenance to Plummers Island and its historic character, including its biota, and the century of intensive research activities that have taken place on the island. Since last writing and in line with our requests from April 2021, the Washington Biologists' Field Club (WBFC) has been added as a Section 106 consulting party, been recognized as a site of historic significance with National Register of Historic Places (NRHP) eligibility independent of the C & O Canal National Historical Park. Some of the project's adverse effects on the WBFC have also been recognized. These steps are important but do not go nearly far enough to protect Plummers Island, which the Federal Government agreed in 1959 to protect in perpetuity as a site for long-term scientific research so long as the WBFC still exists as an incorporated entity. In order to ensure that the proposed project's impacts on Plummers Island receive adequate attention and consideration, we have several concerns and requests which will be detailed in the remainder of this comment letter.

**As a reminder, Plummers Island is a small federally-owned island immediately downriver of the American Legion Bridge with unique historical, biological, and research value.** Plummers Island is NRHP eligible "under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists." The long-term, ongoing research value of Plummers Island is part of its NRHP eligibility. The I-495/I-270 project, which aims to nearly double the size of the American Legion Bridge, would have many adverse effects to the island's historic features and significance as a research site including:

---

[1] Montgomery County, Maryland, Potomac River, adjacent to the American Legion Bridge

1

00006346

1. Damage to waterways
2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction
3. Destruction of WBFC research plots
4. Destruction of past collection sites
5. Habitat destruction and disturbance lead to more invasive organisms
6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out
7. Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge
8. Impacts on biota from salt, oil and other toxic runoff from the new bridge
9. Violation of long-term continuity of 120 years of research.

**Plummers Island must be fully protected from the MDOT plan to expand the American Legion Bridge.** The taking of Plummers Island lands by this project as well as the destructive proximity impacts are a violation of the agreement with the Federal Government signed in 1959 to protect the Island in perpetuity so long as the WBFC still existed as an incorporated entity. The damage proposed for the Island violates the very principal upon which the Federal Government signed the agreement with WBFC, that the value of the property was the historic nature of the long-term research on the biodiversity of the Island, which at that time exceeded 58 years with long-term goals. Now that research has extended to 120 years.

**Yet, it appears that the most damaging project alternative has been selected and the necessary mitigations we discussed earlier in the year were ignored.**[2] Plummers Island, far from being protected, will have most of the new bridge overhang, casting its rare, endangered, and threatened biota in shadow and increasing impacts of noise, runoff, and more. There is clearly a disconnect that the very process affirming that major historical and scientific research significance of the island. The plan seems to ignore the results of its own process, and the revised plan egregiously violates the historic and research integrity of the very property it is responsible for protecting.

**1) Regarding the NRHP eligibility, we have the following requests:**

- **The NRHP determination narrative should better contextualize Plummers Island in its unique location as highlighted below.** Plummers Island is located within the Potomac Gorge, which itself has unique and important features. This publication offers a suitable kind of description: "The 9,700-acre (3925.5 ha) Potomac Gorge project area (see map on inside front cover) is the 15-mile (21.4 km) river corridor from Great Falls to the Key Bridge, including parts of Maryland, Virginia, and the District of Columbia. It is in the midst of a major metropolitan region inhabited by over 4.5 million people (see Cohen, 2005). The Potomac Gorge is widely recognized as one of the most biologically rich areas in the eastern United States, with more than 400 known occurrences of 200 state or globally rare plant

---

[2] See Appendix B for more on our interactions with the MDOT Strike Team. (M: 12-46-2):

2

00006347

and animal species, and ten globally rare plant communities. The Gorge's unusual concentration of species diversity and rarity is the direct result of its unique hydrology, geology, and geomorphology. This wild and free-flowing section of the Potomac River is one of the most intact eastern Fall Zone river systems with an abundance of parkland not subject to the environmental pressures of residential or commercial development."

- **The NRHP determination narrative should recognize that the research sites within the WBFC are important contributing features.** Specifically, Plummers Island has had national and international significance and species not only rare but new to science continue to be found and studied there, as recently as 2014 (Szlávecz et al, 2014). It is worth recalling that the 1959 agreement between WBFC and the Federal Government states:
  - The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and
  - The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and
  - The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and
  - The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

- **Correct inaccurate and misleading use of language related to Rock Run.** The Dovetail CRG report on the Maryland Historical Trust Determination of Eligibility Form continues the unprofessional practice of calling the channel separating Plummers Island from the mainland "Rock Run Culvert" (p. 1). This is an inaccurate and misleading name, mentioned in the DEIS, as the channel is neither a culvert nor is it any part of Rock Run (a nearby drainage with an outlet into the Potomac River about 1,000 ft. downstream from Plummers Island, and with its own real culvert passing under the C&O towpath just below Lock 11). The channel is a historical natural side stream of the Potomac River that prehistorically was more of a major river channel. When WBFC members reported this inaccurate name to the USGS and Board of Geographical Names, they fully agreed, and the name was removed from their listings (on or before 23 April 2021).The channel head has been displaced downstream about 40 feet (Soreng's estimate from a detailed 1950s topographical survey map and other observations), by ALB pier emplacements of 1960 and early 1990s, but the rest of the channel remains in its historical position from about 15 to 30 feet below the current channel head.

2) **We request that the understanding of the historic boundaries of Plummers Island be updated in all documentation pertaining to the project in light of the NRHP eligibility designation.** It is incorrect to say, "the majority of the historic features of the WBFC are outside the LOD." The entire island is NRHP eligible. Impacts to the

3

Western part of the island would be highly significant. The entire island is being used for research. Its associated channel and wetlands are, too. Encroaching on and over the island and placing piers on it is a direct adverse impact to one of the WBFC's most important and salient historic features: the long-term and ongoing use of the Island for research on the biodiversity of the Island.

3) **We request that those involved with this project make greater efforts to understand and recognize the scale and irreversibility of the adverse impacts the proposed plan would have and prioritize avoidance and mitigation of impacts.** Appendix C contains some examples of impacts to promote better understanding. Additional impact concerns are detailed in Appendices D and E. It is WBFC's view that Plummers Island was not part (or sufficiently part of) of the American Legion Bridge alignment decision making, and WBFC was not weighted properly in making this decision. At that time, no one was even talking about Plummers Island as it had barely been mentioned in the DEIS and had not been recognized as a significant historic site at that time. Avoiding Plummers Island is possible, it has just not been prioritized in MDOT's process. See SDEIS, at pp. 4-14- and 4-15. **The adverse impacts to Plummers Island affect the research value of the island. That is to say, the adverse impacts impact the qualities and attributes of the site that make it historically significant.** By destroying the value of the island for research of rare plant, insect, and other life forms, the project would be destroying decades of research. A complete and accurate identification of the project's effects on these sites and attributes is needed.

4) **More must be done to mitigate impacts. Moving the piers is not adequate mitigation.** Documentation sent as part of the Section 106 process on September 8, 2021 shows some of the adverse impacts to Plummers Island and yet they are still underestimated. **Moving the piers, as proposed by MDOT (below) is not sufficient mitigation to address the full spectrum of mitigation.** Additional minimum mitigations measures that are needed are listed in Appendix F, including shifting the ALB's 4 new lanes to the upstream side, rather than dividing those between the up and downstream sides.

"The LOD adjoining Plummers Island along the American Legion Bridge will impact approximately 0.2 acre of the WBFC. This area is required for the bridge substructure, including permanent pier placement and construction activities. **Construction activities within the LOD at the WBFC may include excavation; demolition of the existing bridge foundation and piers; installation of proposed foundations, piers, or abutments; and slope protection.** Access to the existing and proposed piers is required for these activities. Impacts were minimized by strategically locating the new piers near the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations.

4

Although the majority of the historic features of the WBFC are outside the LOD, the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, a character-defining feature of the WBFC, resulting in diminishment of the property's integrity of setting. MDOT State Highway Administration has determined the project will adversely affect the WBFC." (Sept 8, 2021 letter to Elizabeth Hughes and Julie Langan from Steve Archer for Julie M. Schablitsky, pages 7-8)

5) **We have major concerns about damage from construction to the channel that separates Plummers Island from the mainland. More information needs to be provided to us about impacts to the channel as soon as possible. Some of the measures discussed for this sensitive area would exacerbate adverse effects.** We noted that on maps the LOD is marked on the land of the Island, while the channel itself is not identified as part of the WBFC are even with the area of potential effects. This channel is integral to the sustainability of the adjoining Plummers Island wetlands and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WBFC - and the National Park Service - consider the Island's emergent wetland perimeter to be part of the biodiverse whole, and since 1901 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline.

The MDOT Strike team indicated the original DEIS plan to fill in the "culvert" (channel) with spall for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. This will have a serious adverse effect on the channel. With all the planned land-clearing and earth moving, and burning for construction ramps and the building of two new lanes on the downstream side of the ALB, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurances on this front that adequate precautions will be taken to avoid damage in this time period. Catastrophic flooding could destroy much of the long-term, ongoing research value of Plummers Island, a part of the Island's NRHP eligibility. Further explanation of these concerns can be found in Appendix C.

6) **WBFC has had and continues to have a significant and primary responsibility to maintain this island as a long-term research site high in biodiversity with minimal disturbance. It must be protected.** Under the Section 106 process, requests can be

5

made for mitigation measures. There is a direct use of the island for purposes of Section 4(f) and a significant adverse effect under Section 106. Avoidance and mitigation measures cannot be deferred until later, after the Final Environmental Impact Statement, after the Record of Decision, or after predevelopment. That is already too late. We require assurances at an administrative level that Plummers Island will be avoided and that the needed mitigation measures will be put in place after all avoidance options are exhausted.

Our mission is to protect the biodiversity of Plummers Island including its perimeter wetlands, our long-term research efforts, and the quality of the place as a whole for future generations. We need your attention, your understanding of the Island's value and sensitive ecology, and your support in this effort.

Respectfully,

Robert Soreng, President

Carla Dove, Vice President

Lowell Adams, Secretary

On behalf of the 88 members of the Washington Biologists' Field Club

6

00006351

**Appendix A: Documentation of Experience with Strike Team**

Two of the staff that have communicated with us have been professional and communicative with WBFC and led us to believe they have our best interests at heart. A MDOT-Strike Team asked WBFC to join them in a virtual video discussion in January of 2021. That hour long discussion considered our concerns documented by us as "Threats to Plummers Island" (see https://wbfc.science/plummers-island-threatened/) and discussed alternatives to the DEIS plans that might mitigate some damage to Plummers Island. The initial minutes of that meeting produced by the Strike Team provided a cursory account that basically said the meeting had taken place. We protested those minutes, and a fuller account was submitted by the Strike Team, but to our knowledge our further suggestions for modifications to the minutes were not added.

In the following week after the MDOT Strike Team meeting of January of 2021, WBFC was invited to join the Section 106 process as a consulting party. We did not recognize that invite until March of that year because the initial offer made by MDOT was sent through a clogged email box of a secondary contact rather than through the WBFC leader of the discussions, and once unearthed was then misunderstood. While we were heartened to be acknowledged as a consulting party, this delay caused us serious consternation that could have been avoided. However, most of the deliberations and communications of the section 106 process have been in meetings between Agencies that we were not privy to attend or review.

At our request, the Section 106 process has led to Plummers Island being recommended as a special historical place within the C & O Canal National Historical Park. We appreciate that MDOT hired a competent research company to study WBFC on Plummers Island and to file the Maryland Historical Trust Determination of Eligibility Form (DOE). That Form and report were submitted to MDOT in June of 2021, and the Section 106 supervisory team accepted that company's report (whether modified or not we do not know). The final report was sent to WBFC on 8 September 2021 and to the Maryland Historical Trust State Historic Trust Officer. The MDOT-SHA, Cultural Resources Team Leader, Mr. Archer, has answered multiple of our email questions in a prompt, professional and friendly manner, clarifying various aspects of the process and results. We believe that report represents a fair and unbiased, but brief, assessment of the history of the WBFC and some its most prominent members.

The report notes that WBFC contributions to science are many and details a few, but does not go into depth. To investigate the deeper impacts of the WBFC, its membership on society, and its science on biodiversity of the Potomac Gorge, on local and national scales DoveTail would have to access the full WBFC archives, and do further research stemming from those files. The DoveTail report notes WBFC archives were accessed in June of 2021. While it is true that most scientific publications and many photographs have been digitized, and many are available on-line, we note that the actual archives are stored in the Department of Botany, at the Smithsonian Institution, and could not have been accessed at that time due to Covid-19, nor could they have been accessed without knowledge or permission of the WBFC Archivist. Our Archivist has indicated that there are many more documents and photographs in the Archives that have not been digitized.

7

00006352

MDOT "Strike Team" representatives misled us in the meeting of January 2021, when they said they could potentially limit construction access under the ALB to from the upstream side (west side). This is confusing as on p. 5 paragraph 2 (MLS_106_Sept_8_Letter_sig) they write that that construction access will only be from the west side, while the map of 1 September and other communications suggest that the access will be from the "north side," which is both upstream and downstream through National Park land (i.e., nothing changed there). All this is disingenuous as in the building of the two east side lanes under Alternative 9, there is no way for them to not work on the east side of the bridge. The proposed solution of building the extra lanes only on the upstream side and other options presented to avoid damage to Plummers Island were rejected by the "stakeholders."

We request the evidence that these options were seriously considered and the full accounting of the reasons for their rejection. The public, their representatives, consulting parties, agencies, and contractors are all stakeholders. And all stakeholders are equal but some stakeholders are more equal than others, it appears. The Supplemental Draft Environmental Impact Statement (pp. 4-14 and 4-15) gives the description of the decision-making about the bridge construction, but it still doesn't explain how and to what extent Plummers Island was actually considered as a unique NRHP-eligible historical and important scientific research site within a national historical park.

In fact, WBFC was the prior owner of the NPS land on the downstream side of the ALB, now MDOT plans to turn that into a huge ramp to build the downstream lanes, if not to access the underside of the bridge and then to build it up and pave it over for new lanes.

MDOT, in the same January meeting, also said they could cantilever the bridge piers such that no piers would need to be placed on the island. That is not evident in the current MDOT plan. Moreover, they still plan to place a pier on the island.

The DEIS LOD on Plummers Island was crudely drawn, just a line across the head of the Island, with an additional 250-foot APE, extending to about 2/5ths of the Island. MDOT-SHA had Plummers Island LOD and APE zones surveyed in detail in the spring and summer of 2020 without consulting WBFC. Moreover, the survey team callously hacked down seven of the old age fringe trees on the island. The DEIS did not mention WBFC or consider the worth of 120 years of accounting and long-term research on the biota of Plummers Island by WBFC. Post the DEIS publication and comments period which ended in November of 2020, MDOT representatives keep saying in public comments, documents, and email messages to WBFC, that they had reduced the LOD on the Island significantly. Yet all they seem to have done in the current document (MLS_106_Sept_8_Att_1A_APE_Corridor_R, map 3) is draw a more precise but still-ragged LOD line of delineation. Map 3 also fails to capture lands in the NW corner of Plummers Island in Eligible / Listed, or Eligible – Pending SHPO Concurrence), and also fails in the same way to include the river front of Carderock section of the C & O National Historical Park upstream from the ALB. At one point this summer MDOT even publicized a map with no LOD line on the Island. We do not have faith that the LOD as currently mapped is more than a hollow public relations scheme to ward off complaints, or that it will even be adhered to if construction proceeds.

00006353

**Appendix B: Views on the Project**

From our (WBFC's) perspective, MDOT's selection of Alternative 9: Phase I South is the among the worst of the DEIS alternatives for it ignores and exacerbates climate change, puts the future of transit in the region in the reigns of a foreign conglomerate with a vested interest in opposing mass-transit options. Recent findings, detailed in *WTOP*, the *Washington Post*, and other media outlets, confirm what critics have been saying: that the whole freeway system is so backed up that adding capacity to a segment of I-495 is unlikely to result in long-term improvement to traffic flow. This undesirable alternative also has the most damaging impact on the Plummers Island scientific and historical site of the DEIS alternatives proposed.

From our perspective, the whole project was predicated on a need to rebuild the bridge in 10-15 years, when in fact the bridge is structurally sound and only requires redecking in 10 to 15 years.

From our perspective, reversing climate change requires doing things differently to reduce $CO_2$ output from personal vehicles, by adding mass transit alternatives and increasing people's reliance on telework, not to expand the current commuting status quo indefinitely.

From our perspective, adding 4 toll lanes to the ALB, is adding Luxury Lanes to keep those with deep pockets moving faster, while everyone else sits in congestion. And, as noted above, current studies using MWCOG traffic models confirm what critics have been saying: that the whole freeway system is so backed up that adding capacity to a segment of I-495 is unlikely to result in long-term improvement to traffic flow.

From our perspective, none of this achieves the goals of traffic improvement in the long-run. Recently published future congestion predictions tell us that within a decade after the project is completed (and noting there would be 10 years of miserable traffic during the construction project), in many places along the route and in the evening rush congestion would be no better that it is today. So, you get a 10-year window of viability of the project to reduce traffic … and lots of damage to historical properties and more $CO_2$. There absolutely needs to be smarter thinking of how people and goods are moved.

The project has been falsely pushed as something that must be urgently approved and driven by a private company as part of a public-private partnership, because it is too costly to be done using state funds. Therefore, it is argued, it must be designed to be extensive enough to be lucrative for the private sector. Yet, this very day, Maryland is sitting on a $5 billion dollar surplus of funds that could be used for transportation system improvements. *The Daily Record* reports on this in these articles: Maryland's flush finances have some officials pushing for more borrowing (Oct 4, 2021) and Hogan takes combative stance over use of state's revenue windfall (Oct 7, 2021).

9

00006354

## Appendix C: Impact Concerns

On project maps, the limits of disturbance (LOD) is marked on the land of the Island, while the channel itself is not considered as integral to the sustainability of the adjoining Plummers Island wetlands and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WBFC - and the National Park Service - consider the Island's emergent wetland perimeter to be part of the biodiverse whole, and since 1901 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline. The MDOT Strike team indicated the original DEIS plan to fill in the "culvert" (channel) with spall for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. Where is NEPA in this?

With all the planned land-clearing and earth moving, and burming for construction ramps and the building of two new lanes on the downstream side of the ALB, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurances on this front that adequate precautions will be taken to avoid damage in this time period. Due to Climate Change, the NOAA Atlas 14 used in preparation of the DEIS, is well out-of-date for frequency and intensity of massive floods. So-called hundred-year floods in Atlas 14 Volume 2, Revision 3 (2006) are now 5-10-year events, and two such events occurred in the last 12 years.

Moreover, the DEIS planned their construction activities around flood levels recorded at Little Falls Gauging station 3 miles downstream from the ALB and in a wide section of the Potomac River. The flood levels at the ALB, situated in the narrows of Mather Gorge, are 7 feet higher than posted at Little Falls (Soreng observation, January 2021, photo documented). From our perspective what they need to do in in the construction period, is build a flood protection wall on upstream side of the ALB that will withstand extreme floods. If this is not done all the heavy timber planking used to cover the channel for a construction platform could blow out in a high flood, and then wash across the Island along with other construction mud and debris, with catastrophic consequences.

Additionally, the LOD boundaries exclude the rocks at the head of the island situated in the Potomac River, which are connected to the Island except in flood stages and which harbor the highly rare Natural Community: Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosus*) / *Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491).

10

00006355

Global/State Ranks: G2/S1. (Simmons et al., 2016, 2020). These rocks bear the only significant and sustainable population of this community on Plummers Island.

These rocks also protect and produce the rare Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR. These communities occur downstream along the perimeter of Plummers Island and along the channel, and again are of small actual area on the Island such that any loss is a big loss to Plummers Island biodiversity.

MDOT representatives indicated that they considered our suggestion that the addition of 4 new lanes to the ALB could be made to the upstream side, rather than dividing those between the up and downstream sides. However, nothing changed their Alternative 9: Phase 1 South plan for two toll lanes on each side (in fact the bridge will have three lane widths added per direction!). These three additional lane widths on the downstream side would overshadow the Island by at least 20 ft. On top of this, MDOT's engineers ungraciously amended the Alternative 9 plans by placing a bike and foot traffic lane (requested by various consulting parties and DEIS comments) to the downstream side to further overshadow the Island.

Much of what we have discussed above relates to construction effects. However, there are myriad negative future effects to be concerned about.

Several rare plant species exist on the head of the Island adjacent to emergent perimeter wetlands. Their habitats will be utterly destroyed by the extended ALB lane overhang and emplacement of a pier on the Island. **This unnecessary "taking" of public lands and rare species cannot be mitigated with surveys, plant rescues/relocations, or other such measures. It will simply be forever lost. Moreover, there is no comparable occurrence of these rare species and habitats on the northwest side of the ALB.**

The noise in Plummers Island from the ALB, already injurious and distracting, will be exacerbated by the displacement of heavy vehicle traffic to the outermost lanes overhanging the Island, causing persistent and significant injury to the communications of native animals, human communications, and seriously impacting the quality of experience of the natural wild lands. We have discussed sound barriers and decking surfacing to reduce noise with MDOT representatives. However, we see nothing in the current document to address this.

WBFC has not found any MDOT plans to alter drainage to the channel or Plummers Island from the ALB in stormwater management (SWM) plans (Attachment 4 MLS Compensatory Stormwater Management Sites, September 2021). The low point on the ALB is just above the dogleg in the channel, and bridge scuppers drain the toxic runoff from there into the channel, further impacting and endangering the biota of the emergent wetlands and aquatic species. WBFC noted this problem in our DEIS comments and our Threats to Plummers Island document sent to MDOT and other organizations and agencies in early 2021.

11

00006356

**Appendix D: Endangered, Threatened, and Rare Species on Plummers Island**

The species on Plummers Island, including endangered, threatened, and rare species, have been studied since 1901. They are part of the island's historic and ongoing research value. Current awareness of and attention to their protection in the state's DEIS process has been inadequate.

Plummers Island has numerous state endangered, threatened, and rare species. Plummers Island has three extant endangered plants that have been considered endangered in Maryland for many years and were mentioned as endangered in the I-495/I-270 Managed Lanes DEIS, Appendix R of Appendix L, page 1. These state endangered plants are:

1. Coville's Phacelia *(Phacelia covellei)*
2. Horse-tail Paspalum *(Paspalum fluitans)*
3. Pale Dock *(Rumex altissimus)*

Curiously in March 2021, Maryland DNR downgraded two of those species (Coville's Phacelia and Horse-tail Paspalum) from endangered to threatened although their status, if anything, is more imperiled by the planned widening of the ALB. On what basis could these species have been downgraded? The WBFC cannot agree with this change without compelling evidence.

The above list of three state RTE plant species is not complete or exhaustive (see Simmons et al. 2020); there are additional Maryland RTE plants on the island, such as Smooth Rose Mallow *(Hibiscus laevis)* which is a rare plant of concern; Pink Valerian *(Valeriana pauciflora)* which is endangered; Leatherwood *(Dirca palustris)* which is threatened; and Sticky Goldenrod *(Solidago racemosa)* which is threatened and part of a rare natural community. There are also several grass and sedge species including Flat-spiked Sedge (*Carex planispicata*) and Open-flower Panic Grass (*Dichanthelium laxiflorum*). Other rare species include Ostrich Fern *(Matteuccia struthiopteris)* and Smooth Wild-petunia *(Ruellia strepens).*

RTE animals that live on or utilize the island include Eastern Small-footed Myotis (state endangered) and Northern Long Eared Bat (state threatened/US threatened). We can provide recent inventories of species on Plummers Island upon request.

The Endangered Species Act protects both federally listed endangered species and those species deemed endangered, threatened, or in need of conservation within the state, based on habitat and conservation factors. At the state level, threatened and endangered species are regulated under the Maryland Non-game and Endangered Species Act (Annotated Code of Maryland 10-2A-01).

Excerpts from a December 2020 *Washington Post* article by Katherine Shaver tell more of the story:

12

00006357

*Tucked below the American Legion Bridge on the Maryland side of the Potomac River … Plummers Island, … "the most thoroughly studied island in North America."*

*For nearly 120 years, the 12-acre patch of rock and woods has been home to the Washington Biologists' Field Club. Its 85 botanists, entomologists, ornithologists and other scientists have spent decades scrutinizing the island's thousands of species of plants, insects and wildlife.*

*Robert Soreng, the club's vice president and a botanist at the Smithsonian National Museum of Natural History, said Plummers Island provides a critical research site because of its remarkable biodiversity and protected status under the National Park Service. Studying the same wilderness since 1901, he said, has revealed how nature responds to human development, climate change, invasive species and other changes.*

*"This is incredibly valuable for studying long-term trends," Soreng said. "We know more about what's there than in any other place."*

*But Soreng and other scientists say the island's research value is in danger of being lost to a new, wider American Legion Bridge. Under a plan by Maryland Gov. Larry Hogan (R) to relieve traffic congestion on the Capital Beltway, an expanded bridge between Virginia and Maryland could require piers on the island's western edge. Trees would also have to be cut in that area to build a road for construction vehicles to access the bridge site over four to five years.*

***Plummers Island is in the Potomac Gorge, between Great Falls and Georgetown. The gorge is home to hundreds of rare species, including the highest concentration of rare plants in Maryland, according to the National Park Service.***

*Moreover, the biologists say, its protection from development has provided a rare chance to do fieldwork nine miles from downtown Washington.*

*"When you think about the Washington area, there aren't many places that haven't been disturbed by humans," said Matthew Perry, a club member and emeritus scientist with the Patuxent Wildlife Research Center in Laurel.*

*Soreng said more than 400 scientific papers have emerged from Plummers Island research. The most well-known study showed that many of the island's lichen species had died off and others had soaked up significantly more lead after the bridge was built, because of emissions from leaded gasoline used at the time.*

*… Club members have included legendary ornithologist Roger Tory Peterson; Gifford Pinchot, the first chief of the U.S. Forest Service; and Frederick Coville, who helped establish the National Arboretum.*

*"There's an extraordinary concentration of world-class biologists," said Bruce Stein, a club member and chief scientist for the National Wildlife Federation.*

*"Everything that's in there," Soreng said, "someone is recording."*

*Ralph Eckerlin, the club's president and a Northern Virginia Community College biology professor, said he worries about the birds, crickets, katydids and other species that rely on calling out to one another.*

*Pamela Goddard, a Mid-Atlantic specialist for the National Parks Conservation Association, said Plummers Island must be spared as precious urban green space.*

*"The promise for national parks is that they'll be protected," Goddard said. "They're not here as land to be developed for a highway."*

13

00006358

**APPENDIX E: April 2021 WBFC Comments on American Legion Bridge Construction and Expansion Impacts to Plummers Island**

**Threats to Plummers Island from American Legion Bridge Construction and Expansion** (Submitted to the MDOT-SHA Strike Team, February 28, 2021 for the March 1 joint meeting with WBFC)

1. **Damage to waterways:**
   a. Potomac River shore: mud flats and sandbars are wetland features in the MDOT recalibrated (post the DEIS comments) Zone of Destruction.
   b. We don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and Rock of Gibraltar (at the upper tip of the island) are destroyed or significantly altered. Sand bars and mud flat habitats could be substantially reduced for plants and animals that depend on these.
   c. The Island Channel (AKA "Rock Run Culvert"). The head of the channel down to the dog leg would not see daylight for years of construction. After which this part of the channel would be overshadowed by the 2 added lanes on the island side of the bridge. What are the consequences to waterways there and downstream?
   d. With the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the island flood plain, potentially adversely affecting much of that flood plain.
   e. If sub-point d happens, all research plots in the flood plain could be substantially altered, (including vegetation plots 1, 3, 9, 10, 11, 12, and habitats for plants and animals)
   f. The "frog water" pools at the head of the island noted in the DEIS and circumscribed in subsequent documents are highly vulnerable to disturbance (vegetation plot 3 is in this zone).
   g. Zone of potential effects/disturbance uncertain, but estimated by DEIS to be 2/5 of the island. What is the MDOT plan for protecting this zone?
   h. Amphibians are in global and local decline due to pollution, diseases, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island (Manville 1968 and https://collections.nmnh.si.edu/search/herps/): *Acris crepitans*, northern cricket frog; *Hyla versicolor*, eastern gray treefrog; *Lithobates clamitans*, green tree frog; *Lithobates palustris*, pickerel frog; *Lithobates sylvaticus*, wood frog; *Pseudacris crucifer*, spring peeper; *Pseudacris feriarum*, upland chorus frog; *Ambystoma maculatum*, spotted salamander; *Eurycea longicauda longicauda*, long-tailed salamander; *Hemidactylium scutatum*, four-toed salamander; *Notophthalmus viridescens viridescens*, eastern newt; *Pseudotriton ruber*, northern red salamander.

2. **Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of Plummers Island within the Zone of Destruction:**

14

00006359

    a. *Hibiscus laevis* (mud flats just below and above point of rocks)
    b. *Solidago racemosa* (point of rocks, below Rock of Gibraltar)
    c. *Hypericum prolificum* (point of rocks, below Rock of Gibraltar)
    d. *Paspalum fluitans* (mud flats just below and above point of rocks)
    e. other native plants rare on the island occurring only on west end in Zone of Destruction: e.g., *Sedum ternatum*. (on Rock of Gibraltar)
    f. Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR (Simmons et al. 2016)
    g. Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

**3. Destruction of WBFC research plots:**
    a. Vegetation research plots from 1997 and 2013-2015 will be destroyed (plots 4, 5, on the sandbar at the head of the island will be totally destroyed [see also sub-point 1e]), A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed.

**4. Destruction of past collection sites:**
    a. many plants and animals were vouchered or recorded from the west end of the island, some are only known on the island from there.

**5. Habitat destruction and disturbance lead to more invasive organisms:**
    a. the west end of the island is covered in a tangle of oriental bittersweet (first recorded from the island in 1982), and shrubs of amur honeysuckle (first recorded from the island in 1997), among many other invasive plants recorded there. Invasive species establishment and expansion will be sorely exacerbated by disturbance involved the construction process.

**6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out. Construction timbers potentially could rip out acres of trees and other vegetation in the island flood plain. Note 1**: 51 out of the 100 recorded historic Potomac River floods (over 9.4 ft at Little Falls Gauge, NOAA data) were recorded since the first bridge was built in 1962, 33 since the midsection of the bridge was filled in 1992, 1996 included 2 of the top 7 floods, and 2018 included 4 historic floods. In 2019 the island flood plain was inundated on and off for much of winter and spring. **Note 2**: Mather Gorge (Cohn 2004) is much narrower at the American Legion Bridge and Plummers Island than at Little Falls Gauge, so the high-water marks listed below substantially underestimate the peak flows at the

15

00006360

bridge and head of Island by as much as 7 ft (verified at the bridge side of the channel bend, March 25, 2021).

| rank | height | ft | date | | | | |
|------|--------|-----|------------|-----|--------|-----|------------|
| 5 | 19.29 | ft | 1/21/1996 | 47 | 11.68 | ft | 4/18/2011 |
| 7 | 17.84 | ft | 9/8/1996 | 50 | 11.56 | ft | 12/17/2018 |
| 31 | 12.82 | ft | 3/15/2010 | 54 | 11.44 | ft | 9/21/2003 |
| 36 | 12.38 | ft | 6/5/2018 | 58 | 11.3 | ft | 5/20/2011 |
| 37 | 12.35 | ft | 3/6/1993 | 61 | 11.17 | ft | 1/27/2010 |
| 46 | 11.7 | ft | 5/18/2014 | 65 | 11.01 | ft | 9/29/2018 |
| 67 | 10.87 | ft | 12/12/2003 | 66 | 10.88 | ft | 3/12/2011 |
| 68 | 10.85 | ft | 9/11/2018 | 90 | 10.16 | ft | 3/25/1993 |
| 70 | 10.79 | ft | 3/22/1998 | 92 | 10.13 | ft | 1/29/1993 |
| 77 | 10.55 | ft | 4/18/1993 | 95 | 10.09 | ft | 11/29/1993 |
| 81 | 10.43 | ft | 1/10/1998 | 96 | 10.04 | ft | 5/13/2008 |
| 82 | 10.37 | ft | 3/30/1994 | 97 | 9.97 | ft | 9/23/2003 |
| 86 | 10.33 | ft | 10/31/2012 | 98 | 9.78 | ft | 9/9/2011 |
| 87 | 10.28 | ft | 3/30/2005 | 99 | 9.67 | ft | 5/6/2009 |
| | | | | 100 | 9.43 | ft | 4/17/2007 |

7. **Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge:**
   a. The noise factor cannot be ignored by humans or wildlife. Already the sound of traffic is disturbing to human conversation at our meeting place the WBFC Cabin grounds.

8. **Salt and oil runoff impacts on biota from the bridge:**
   a. This depends on where the outflow is drained from the bridge drainage scuppers (particularly at the bridge's low-point)
   b. The unintended consequences of that volume of road salts on freshwater ecosystems can be severe. A colleague is working on this very subject on area highways, and the impacts he found were surprisingly devastating. One of the worst impacts was mobilizing (and making bioavailable) toxic metals in waterways.

9. **Violation of long-term continuity of 120 years of research (Perry 2007; Shetler et al. 2006):**
   a. Lichen study on Plummers Island validated essentiality of long-term research contributing to national and global removal of Lead from gasoline: A drop from 70 species to 20 species due to sensitivity to Lead pollution on the island (Lawrey & Hale 1979).
   b. The decline of forest breeding birds on Plummers Island is related to the American Legion Bridge (Johnston & Winings 1987).

16

00006361

c. Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, *Compsilura concinna*, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island (***more than 3000*** species documented there; Brown & Bahr 2008a,b), the island is a key place to further document this aspect of "insect apocalypse" (Jarvis 2018) assuming the island remains intact. Erwin (1981) and Brown (2001) have documented long-term trends in beetles and moths, respectively, with shifts in species composition related mainly to vegetation succession. The AL Bridge project puts WBFC Plummers Island research on trends in biodiversity in jeopardy.

d. Bellwether issues of plagues, invasions and expansion of exotic species are expected to be exacerbated due to disturbance from construction – some examples of timing of introductions spread, and manifestations of infestations of plants animals, and diseases from around the region are recorded from Plummers Island (plant records from Shetler et al. 2006, WBFC Invasive Biota Committee reports 2015-2020), and https://collections.nmnh.si.edu/search/botany/)

   i. arrival and expansion of garlic mustard (1915), now rampant
   ii. arrival and expansion of tree of heaven (or hell) (1933), now 50+ trees
   iii. arrival and expansion of Japanese honeysuckle (1949), now dominant
   iv. arrival and expansion of Japanese stilt grass (1979), now locally dominant
   v. arrival and expansion of oriental bittersweet (1982), now all over and covering trees
   vi. arrival and expansion of amur honeysuckle (1997), now dominant on west end
   vii. arrival and expansion of winter creeper (1997), now patchily established but potentially widespread.
   viii. arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread
   ix. Emerald Ash Borer (EAB) arrival and expansion in 2015 and death of ash trees (2016), mass die off of ash trees, a major shift in forest climax community (Simmons et al. 2016)
   x. fig buttercup arrival and expansion and expansion (3 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially

17

00006362

xi.   arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species, https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_America

xii.   arrival and expansion of Asian clams (*Corbicula fluminea*), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959, established in the Potomac River by 1982)

xiii.   Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years.

xiv.   Beech blight is coming. Popkin (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for the blight here, unless the forest is cut down for the bridge construction.

e.  Research following climate change impacts to the ecosystems and organisms on Plummers Island will be conflated with issues involved with disturbance from bridge construction and emplacements.

## References

Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. *The Washington Post -HEALTH & SCIENCE* (2018-09-25).

Brown, J. W. 2001. Species turnover in the Leafrollers (Lepidoptera: Tortricicae) of Plummers Island, Maryland: Assessing a century of inventory data. *Proceedings of the Entomological Society of Washington* 103(3): 673-685. https://www.biodiversitylibrary.org/bibliography/2510

Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. *Bulletin of the Biological Society of Washington* 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2

Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 192-226 http://dx.doi.org/10.2988/0097- 0298(2008)15[192:ALOTIO]2.0.CO;2

Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 65–74.

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. *BioScience*, Volume 54(1): 8–14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

00006363

Erwin, T. L. 1981. Natural History of Plummers Island, Maryland. XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. *Bulletin of the Biological Society of Washington* 5: 105-224.

Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal.pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? *The New York Times Magazine*, 27 November 2018, pp. 41–48.

Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. *Proceedings of the Biological Society of Washington* 100:762- 768. (December 31, 1987).

Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. *Science* Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS HISTORY (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. *Science* Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. *Bulletin of the Biological Society of Washington*, 14(1): 1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science

Vogel, G. 2017. Where have all the insects gone! *Science* 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

19

00006364

**Appendix F: Minimum Avoidance and Mitigation Measures Needed**

Below are the minimum avoidance measures, design considerations, and mitigations to avoid or reduce impacts that should be made to avoid, minimize, and mitigate adverse effects to Plummers Island and the ongoing research there. These provisions should have been considered from the beginning of the MDOT-SHA project development and in the DEIS. This content comes from WBFC's April 9, 2021 Section 106 comments.

No bridge alternatives were discussed in the Draft Environmental Impact Statement (DEIS), which is a major omission, and should have been presented there so that the public could have the same information to comment on. We would have certainly made DEIS comments on the bridge alternatives if any relevant information on bridge alternatives had been discussed in the DEIS. That information was lacking and clearly should have been included in the DEIS. A Supplemental DEIS has now been issued (October 1, 2021), and still no bridge alternatives are clearly delineated.

Clearly there needs to be a specific focus on design changes that will reduce and avoid impacts to Plummers Island. The first obvious choice for reducing and avoiding impacts is the "no build" option. Second is the upriver bridge alternative, which should have been evaluated in the DEIS and certainly must be now before the project is advanced.

Although WBFC is opposed to the American Legion Bridge (ALB) expansion, particularly with toll lanes and lack of mass transit in the design (vans and buses from a few points are not an acceptable replacement for dedicated mass transit), the following types of mitigations are necessary and non-negotiable.

To protect Plummers Island and its significant historic features and attributes, the minimum mitigations follow:

- Plan for major (not minor) flooding during the construction period.
- Avoid obstructing natural water flow into the Plummers Island channel.
- Build all the new lanes for the ALB on the upriver side of the bridge.
- Build the access to and the construction platforms themselves only on the upriver side of the bridge and under the bridge.
- In any case, add sound barriers to the downstream side of the bridge.
- Use lane surfacing that is as quiet as possible.
- Place the outflow from bridge scuppers somewhere the runoff will not enter into Plummers Island waters.
- Avoid fugitive dust blowing onto the island by use of dust minimization measures including spraying.
- A waste and hazardous material disposal plan must ensure off-site disposal so as not to flow to or near Plummers Island.
- Provide prior notification informing WBFC of work schedules so notice can be given to researchers.
- Piping of road runoff (that contains oil and salt) is a major issue; currently the main scupper drainage flows into the channel separating the island from the mainland; future drainage should avoid the wetlands including the channel.

20

00006365

- For the duration of construction, any construction infrastructure should be designed to withstand major floods (over 14 feet) not minor (10-12 feet) floods; there have been 3 moderate (12-14 feet) and 2 major floods (17-19 feet) in the past 25 years. However, even minor floods recorded at Little Falls produce major flooding in the Plummers Island channel adjacent to the bridge (see Appendix D, point 6).
- Monitor during construction to ensure that construction work is not impacting the island and no construction workers or project personnel visit the island unless oriented and approved by the Washington Biologists' Field Club. These requirements should be included in bidding document and contractor's work plan as part of the environmental specifications that will be followed.
- Chance find or inadvertent discovery procedures should be followed and incorporated into bidding documents and contracts. Please provide a copy for our review to ensure they meet the requirements for protection of Plummers Island.

21

00006366

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

**Date: 3 February 2022.**

Mr. Steven Archer

MDOT-SHA Cultural Resources Team Leader

Dear Mt. Archer,

Please see consider the included Washington Biologists' Field Club (WBFC) comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2. And include this report in the Administrative Record.

**Table of contents**

**General WBFC comments on the importance of Plummers Island and the PA letter and Draft Agreement**

**APPENDIX A: Agreement with National Park Service, 1959**

**APPENDIX B: Avoidance, Minimization and Partial Mitigations**

**APPENDIX C: Maps of Plummers Island and Alternative 9 ALB emplacement**

**APPENDIX D: Administrative Record letter sent to US Army Corps of Engineers**

**APPENDIX E: WBFC replies to MLS-106 Comments Table 1 Responses**

**APPENDIX F: Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland**

00006411

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

## General WBFC comments on PA letter and Draft Agreement.

**The Washington Biologists' Field Club (WBFC)** *declines to concur with this Programmatic Agreement*.\*
(\*with the one exception of the nomination of WBFC on Plummers Island to the National Register of Historic Places).

*The Washington Biologists' Field Club (WBFC) guiding mission is the study of long-term trends in biodiversity and community ecology on Plummers Island.*  We began this research in 1901 and continue it to this day.  MDOT's plan for expanding the American Legion Bridge onto Plummers Island and channel waters **seriously compromises our research goals of studying the Island as a whole system**.

Long-term studies such as those of WBFC are very important in this era of rapid change in climate, introduction of increasing numbers of invasive species and diseases, etc.  We can only conserve our natural resources if we understand "normal" ecosystem responses, and these require long-term monitoring of target sites.  The scientific community has responded to this need by creating new sites for long-term research, but it takes decades to build up a record long enough to understand many of the processes, and there are few sites that have been established long enough to give meaningful information.  Plummer's Island is one such site, and its preservation deserves high priority.

It must be emphasized that environmental damage cannot be "fixed" by any form of mitigation.  Plummer's Island is a research site conducting a multigenerational study of long-term ecological processes.  Destruction of the habitat, or serious damage to it, stops the ecological processes whose progress WBFC has been studying for over a century, and ends the long-term study.  Replanting will not continue these processes, it just makes a new beginning, returning the Island to where the WBFC study began in 1901.

Plummers Island is unjustly being treated as a sacrifice area.  The biodiversity on the Island is richly documented by 120 years of inventory by WBFC research.  This is a unique natural research area within close proximity to a heavily populated urban area. There are many rare species known here, including plants from within the LOD (**Appendix F**; Smithsonian National Museum of Natural History collections; and T & E survey done for NPS in 2020) (See also WBFC's DEIS, SDEIS and Section 106 comments of 2021 -- available at https://WBFC.science). Plants can't move out of the way, and natural habitat is being lost throughout the region. The rocky headland of the Island preserves a bit of the Potomac Gorge Riverside Outcrop Barren plant community (globally and state rare: G2, S1) -- possibly the eastern most extent of this vegetation unit in the Gorge (USNVC: CEGL006491) (Appendix C, map B). Not only is this area partly under the expanded ALB, *but the extended shadow will shade it out*.  This spit of land should be included as part of the Island, but Section 106 has incorrectly ruled it out of the historic property.  Ruling this piece of land out allows MDOT to say they are taking less of the Island than they actually are (see WBFC's virtual and written SDEIS comments, 2021). Additional rare communities within the APE and bordering on the LOD include; the Potomac River Bedrock Terrace Hardpan Forest (GEGL006209; G1G2/S1); Floodplain Terrace Forest (with wetland bedrock pools; and the Central Appalachian / Piedmont Basic Mesic Forest (USNVC: CEGL0084; G4G5/S4) with many sensitive species that are restricted to this habitat on the Island, several that are rare there.

Page **2** of **42**

00006412

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

The extent of the shadow cast by the nearly 100-yard-wide ALB will further shade out rare and sensitive plant and animal species and starve out native vegetation for some uncertain distance beyond the ALB but within the APE (this area is still unquantified by MDOT and its consultants - testament to the shoddy work and treatment given the Island by proponents of the project). Documenting the impacts of this shadow within the APE on plants and animals needs to be done for future transportation projects, but also for understanding perturbations to the long-term trends that are WBFC's guiding mission to document on the Island. WBFC calls for funding and conducting this research in Appendix B as partial mitigation for Alternative 9 (**Appendix B**).

The enlarged canopy of the nearly 100-yard-wide Alternative 9 ALB will predictably attract more homeless people.  The proximity of a homeless encampment presents significant additional problems for protecting Plummers Island and its historic cabin from vandalism.  There is abundant evidence of camping under the current ALB; leveled spots, campfire remains, trash, tree-cutting, and graffiti. Since the ALB was first constructed, the cabin, which up to then was in original condition, has deteriorated substantially due to vandalism, and sometimes has squatters living in it for months. Cutting down of trees for firewood has further disturbed the cabin grounds.  Section 106 documentation has utterly failed to take all of this into consideration.

Importantly, taking any part of Plummers Island violates the formal legally binding 1959 Agreement between WBFC and the National Park Service (**Appendix A**). Under this agreement WBFC gave the Island to the Federal Government in exchange for our continued maintenance and research of the Island as a wild natural area, so long as WBFC existed and complied with certain obligations.  WBFC has honored its part of the agreement for the ensuing 72 years.  WBFC has studied the Island for 121 years, making it a rare and precious part of the cultural and scientific natural heritage of the National Park system. The Section 106 process determined the *WBFC and Plummers Island* to be eligible for the Maryland Historical Trust and National Register of Historical Places, and this requires protecting the entire Island as a whole property.

With these points in mind, WBFC does not accept the MDOT's Alternative 9 plan. We consider it contrary to the above agreement, and the intent of NHPA laws protecting eligible Historical properties as whole units. We support the No Build Option (as stated in our DEIS, SDEIS, and Section 106 comments).  WBFC has fought to protect Plummers Island before, and here we are again. In addition to 7 years of legal battles to settle the patent dispute and purchase the Island in 1908, Club members held a 6-year vigil up to 1959 over the condemnation of the Island for the GW Parkway (resulting in the Appendix A agreement), and then spent 6 months more of wrangling in 1960 before the construction contract was let.  (see Washington Star articles in **Appendix A**)

Moreover, MDOT has failed to adequately and objectively justify the Least Environmentally Damaging Practicable Alternative (LEDPA) in the selection of Alternative 9.

WBFC commented on the DEIS, and was recognized as a consulting party in early 2021. The SDEIS is unacceptable, full of problems, and must be rewritten (WBFC separate, and co-signed Sierra Club comments submitted November 30, 2021). WBFC Section 106 comments were submitted in October 2021, and again with SDEIS comments.  Comments on the final Section 106 programmatic agreement are here by submitted by February 3, 2022.

Page **3** of **42**

00006413

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

One avoidance or minimization would be to redeck the ALB and not expand it. Alternative 5, adding only two lanes to the ALB, would be much less damaging to Plummers Island and adjacent waterways. Double decker or suspension bridges could significantly reduce damages to Plummers Island and adjacent waterways. However, the highway expansion plans do nothing to reduce the CO2 emissions driving global Climate Change.   As MDOT Secretary Greg Slater stated in 2021, the ALB is structurally sound and only needed redecking within 10-20 years. WBFC supports this No Build Option.

If Alternative 9 goes forward as MDOT & P3 companies propose, WBFC proposes the following avoidance, minimization and *partial mitigations* be adopted and coordinated through NPS, in consultation with WBFC in-so-far as they affect Plummers Island and its waterways:

With these points in mind, WBFC attaches **Appendix B: Avoidance, Minimization and Partial Mitigations under Sections 106, NHPA, NEPA, and 4(f), 10, and 404:**  There we outline specific avoidances, minimizations, and partial-mitigations in a framework of proposed research to evaluate the impacts of the ALB expansion on the biota of Plummers Island.  (see also https://wbfc.science/plummers-island-threatened/)

**Appendix C** includes maps of Plummers Island: Map A shows the ALB footprint and position of the LOD as best as can be determined from the MDOT images, in which the LOD is positioned on images that obscure the boundaries and features of Plummers Island (pink lines outline current ALB features, blue lines are Alternative 9 ALB outlines). Map B shows the LOD cutting through four vegetation zones, two research plots, and the rock buttresses along the channel, and the original head of the channel. Map B shows the positions of long-term vegetation plots. Map C is an image from MD iMAP, a Lidar map of ground level prominences, including the rock buttresses along the channel, and the current head of the channel. Map D is from a 1950s topographic survey with 1.5 ft contours, showing the rock buttresses, and the original head of the channel. Image E gives the source of Map D.

**Appendix D.** U.S. Army Corps of Engineers, Baltimore District MDOT's proposed Alternative 9 - Phase 1 South (Administrative Record letter sent January 19, 2022).  This letter requests careful attention to potential threats to Plummers Island, its channel and riparian wetlands, from hydrological impacts of the ALB Alternative 9 footprint and construction activities.  Changes to the flooding regime affect the land and thus affect the historical biological research and cultural aspects of the terrestrial property addressed in Section 106.

**Appendix E**. WBFC replies to responses on Comments on MLS 106 PA Comments Table 1 (MLS-106_Att-8_Jan-2022_PA_Draft_1_Comment Table.pdf). These are presented in table form with WBFC replies following each MLS-106 response.

**Appendix F**. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland, documents rare plants and plant communities on the Island.

**Some WBFC specific comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2.\***

*\*For more specific comments on the MLS Comments Table, see **Appendix E**.*

Page **4** of **42**

00006414

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

"WHEREAS, the U.S. Department of Transportation, Federal Highway Administration (FHWA) plans to approve the I-495 and I-270 Managed Lanes Study (MLS), a proposed Public-Private Partnership (P3) administered by the Maryland Department of Transportation State Highway Administration (MDOT SHA); and"

**WBFC comment 1:** *This assumes FHWA will approve the MLS. We don't think they should.*

"WHEREAS, the MLS Preferred Alternative, "Alternative 9 Phase I South" (Project) consists of construction of Priced Managed Lanes along Interstates 495 and 270, beginning in Fairfax County, Virginia, and extending north to approximately Interstate 370, and east along the separated portions of I-495 ("spurs") to approximately Maryland Route 187, as described in detail via documentation linked in Attachment 4; and"

**WBFC comment 2:** *The P3 toll lane revenue objectives are the driving force in selection of Alternative 9. There is reasonable expectation that a simple tolling for all vehicles crossing the bridge would generate revenues to the States and pay for the project directly with State and Federal funds. This would avoid P3 partners controlling (to maximize profits) the beltway by blocking mass-transportation incorporation into the beltway. Projections of future traffic were made without consideration of shifts to telecommuting, and potential reductions in traffic from adding effective mass-transit options. Moreover, the beltway expansion comes at the expense of accepting increased $CO_2$ emissions into the future faced by climate change driven by $CO_2$ emissions. The LEDPA for Alternative 9 is not justifiable nor even objectively evaluated for the alternatives proposed in the DEIS. As for WBFC on Plummers Island, the PA simply accepts the damages to the Island, and states that damages are minimized. WBFC believes that Plummers Island is being treated as a sacrifice area. This PA draft goes documents at great lengths avoiding and minimizing impacts to cemeteries and the ACHP site, but mentions Plummers Island only 4 times (briefly) in the cover document. By placement of most of the ALB expansion over Plummers Island, rather than on the upstream side of the bridge, the Section 106 PA shows a callous disregard for the historical nature of our 120 years of scientific studies, and the impacts to the continuity of the long-term research. Significantly, the PA does not address the Legal Agreement between the NPS and WBFC set forth in 1959, which protects the Island as a Natural Wild Area (**Appendix A**).*

"WHEREAS, the MDOT SHA, with the approval of FHWA, intends to deliver the Project as a P3 using the services of a private sector developer or multiple developers who will advance the Project and be responsible for design, construction, operation and maintenance, subject to approvals by MDOT SHA and/or FHWA; and"

"WHEREAS, FHWA has determined that the Project will have an adverse effect on National Register of Historic Places (NRHP)-listed or eligible properties ("historic properties") including the George Washington Memorial Parkway (Clara Barton Parkway), the Chesapeake and Ohio Canal National Historical Park, the Washington Biologists' Field Club on Plummers Island, Gibson Grove African Methodist Episcopal Zion Church, archaeological sites 44FX3922 (Dead Run Ridges Archaeological District), 44FX0374, 44FX0379, 44FX0389, 18MO749 and 18MO751; *that additional effects may not be completely known*; and that FHWA intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14 and to govern the implementation of the Project and the resolution of adverse effects; and"

Page **5** of **42**

00006415

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

"V. . Property-Specific Commitments
F. Washington Biologists' Field Club on Plummers Island
1. MDOT SHA will prepare a NRHP Nomination for the Washington
Biologists' Field Club on Plummers Island. MDOT SHA will provide a copy of
the nomination to NPS staff for review prior to submittal and address any
comments prior to formal submission of the nomination. Should the nomination
be unsuccessful, MDOT SHA will not be required to resubmit the nomination or
otherwise complete additional studies or research after addressing comments by
NPS staff."

**WBFC comment 3:** *We agree that WBFC on Plummers Island should be included in NRHP, and that*
*Plummers Island should be protected as a whole. MDOT is requested to fully fund and fulfill the*
*nomination process for NPS. **NPS and WBFC should be involved and consulted in the preparation of the***
***nomination of Plummers Island.***

Again, The Washington Biologists' Field Club (WBFC) **declines to concur with this Programmatic**
**Agreement**.*

(*with the one exception of the nomination of WBFC on Plummers Island to the NRHP).

Respectfully submitted, 3 February 2022,

Robert J. Soreng PhD., WBFC President

Carla Dove PhD, WBFC Vice President

Lowell W. Adams, WBFC Secretary

cc: Matt Manning (Consultant) <MManning.consultant@mdot.maryland.gov>, Alan T Whittemore
<atwhittemore@gmail.com>, Lowell Adams <lwadams4@gmail.com>, Carla <DOVEC@si.edu>,
Landsman, Andrew P <Andrew_Landsman@nps.gov>, Pamela Goddard <pgoddard@npca.org>, Kyle
Hart <khart@npca.org>, Stidham, Tammy <Tammy_Stidham@nps.gov>; Elizabeth Hughes, Maryland
Historical Trust <elizabeth.hughes@maryland.gov>.

Supporting information about WBFC
https://wbfc.science/
https://wbfc.science/about/
https://wbfc.science/plummers-island-threatened/
https://wbfc.science/research/

**Appendices A through F follow**.

Page **6** of **42**

00006416

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

## APPENDIX A:  Agreement with National Park Service, 1959

1) AGREEMENT WITH NATIONAL PARK SERVICE

AGREEMENT AND STIPULATIONS BETWEEN THE WASHINGTON BIOLOGISTS' FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA

This agreement made this 5th day of March, 1959, by and between the Washington Biologists' Field Club, Inc. and the United States of America.

WITNESSETH:

WHEREAS, The United States Government has by condemnation proceedings, in the United States District Court for the District of Maryland in Civil No. 10676 and by order of Court made the 24th day of June, taken possession of the defendant's Washington Biologists' Field Club, property designated in said proceedings as parcels "A" and "B" in tract no. 7, and

WHEREAS, This property was acquired by the Washington Biologists' Field Club, Inc. and has been used by the said Club as a natural wild area for scientific research for over 50 years and a great many scientific papers have been written in reference to biological and natural history discoveries made on said land and, more particularly, on that part of said land known as parcel "B" and more familiarly known as Plummers Island containing some 12.238 acres more or less, and

WHEREAS, The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and

WHEREAS, The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and

WHEREAS, The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and

WHEREAS, The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

Therefore, The United States Government's petitioner in the United States District Court for the District of Maryland in Civil No. 10676 and the Washington Biologists' Field Club, Inc., defendant, and the owner of said parcel of land known as parcel "B" containing some 12.238 acres more or less which said land is an island in the Potomac River and is more familiarly known as Plummers Island, do hereby stipulate and agree that the said parcel "B" be withdrawn from these proceedings and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed the said island to the United States Government without monetary consideration reserving in said deed to the Washington Biologists' Field Club, Inc., the right to continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research and so long as the further provisions and stipulations contained herein are complied with which are as follows:

Page **7** of **42**

00006417

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

1.      The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.

2.      The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and will include the names and addresses of the officers, list of the members, and a summarization of the scientific investigations carried on.

3.      The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or damage or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.

4.      The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.

5.      No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.

6.      It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on I August 1958,

Honorary Members:

| | | |
|---|---|---|
| Bartsch, Paul | Fuller, Henry S | Morrison, J. P. E. |
| Mann, William M. | Gabrielson, Ira N. | Nelson, A. L. |
| Ricker, P. L. | Gardner, Marshall C. | Oehser, Paul H. |
| Active Members: | Graham, Edward H. | Parker, Kenneth W. |
| Aldrich, John W. | Griffith, Richard E. | Presnall, Clifford C. |
| Appel, William D. | Handley, C. 0., Jr. | Reed, Theodore H. |
| Benedict, J. E. | Hotchkiss, Neil | Russell, Paul G. |
| Blake, S. F. | Jackson, Hartley H. T. | Setzer, Henry W. |
| Brown, Edgar | Johnson , David H. | Smith, Albert C. |
| Clarke, J. F. G. | Kelson, Keith R. | Smith, Lyman B. |
| Compton, Lawrence V. | Killip. E. P. | Sohns, Ernest R. |
| Davis, Malcolm | Krombein, Karl V. | Stevenson, James 0. |
| Duvall, Allen J. | Leonard, Emery C. | Stewart, Robert E. |
| Erickson, Ray C. | Lincoln, Frederick C. | Stickel, William H |
| Erlanson, C. 0. | Linduska, Joseph P. | Swift, Ernest F. |
| Fredine, C. Gordon | Meehean, 0. Lloyd | |

00006418

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| | | | |
|---|---|---|---|
| Uhler, F. M. | Vogt, George B. | Archino, Samuel | Fowler, James A. |
| | | Bartlett, H. H. | Hamlet, John |
| Walker, Ernest P. | | Bryant, Harold C. | Holt, Ernest O. |
| Wetmore, Alexander | | Cahalane, Victor H. | McAtee, W. L. |
| Zahniser, HowardNonresident Members: | | Cottam, Clarence | Myers, G. S. |
| | | Couch, Leo K. | Peterson, Roger T. |
| Allan, Philip F. | | Dargan, Lucas M. | Wallis, William W. |
| Allen, Durward L. | | Eklund, Carl R. | Wherry, Edgar T. |

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

7.      It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.

8.      The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island.

9.      The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock or the National Park Service may provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc., and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10.      It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists to the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or by a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11.      It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc, or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice that the provisions of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years then this

00006419

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

stipulation and any like provisions of the deed to be executed conveying the property to the United States shall terminate.

12.      It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13.      It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein.

The United States of America

By: WILLIAM E. FINLEY

Director of the National

Capital Planning Commission

Condemning Authority

The    Washington Biologists' Field Club, Inc.

By: LLOYD W. SWIFT

President

1, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that Lloyd W. Swift, who signed this contract on behalf of the party, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

ALBERT C. SMITH, Secretary

**Two Washington Star articles from 1960 follow:**

Page **10** of **42**

00006420

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

# Beltway Span Contract Let

## Work Starts Soon At Cabin John

The Maryland State Roads Commission has formally awarded a $2.8 million contract for construction of the long-awaited Cabin John Bridge, which will carry the Capitol beltway across the Potomac River.

Work on the bridge will get under way soon, according to John B. Funk, director-chairman of the State commission. The total cost of the bridge is estimated at nearly $5 million.

The contract was awarded to two Indiana contractors who submitted a joint bid. The firms are Ruckman and Hansen, Inc., of Fort Wayne, and Roy Ryan Sons Co., Inc., of Evansville.

The bridge, to cross the river near Glen Echo in Montgomery County, will connect the Maryland stretch of the Washington circumferential freeway with the Virginia counterpart. Maryland has agreed to pay 79 per cent of the cost and Virginia 21 per cent, using Federal interstate and matching State funds.

The bridge, of steel construction, is expected to be completed by the fall of 1962. It will actually be two spans, each carrying traffic in one direction.

Last October an agreement was reached between the Maryland Roads Commission and the National Park Service that broke a six-month stalemate over design of the span. Maryland agreed to move its approach roads to the bridge 100 feet upstream to avoid encroachment of a bird sanctuary at Plummer's Island.

The new bridge was given high priority because of the need to service the new Central Intelligence Agency headquarters at Langley, Va., now under construction. As a link in the circumferential highway it will help in siphoning traffic off congested arterial roads.

2) Washington Star 23 July 1960

00006421

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

*7-5-60 STAR*

# New Span to Unmask Island Jungle

**By ANNE H. CHRISTMAS**
Star Staff Writer

Fifty scientists are managing to hold on to an island sanctuary in the Potomac River despite encroachment on all sides.

The scientists have kept a six-year vigil to guard the privacy and natural beauty of the retreat.

The wooded isle is a 12-acre plot not far from the Maryland shore of Montgomery County, only nine miles from the White House. It has been known to generations of biologists as Plummers Island.

The scientific paradise—soon to be flanked by impressive highways—has been operated since 1901 by the Washington Biologists Field Club. Although the land was given to the Federal Government several years ago and is under the direction of the Interior Department, one of the terms of its transfer was that its use should be limited to club members and their guests.

**Trespassers Warned**

Today the membership is "unhappy but resigned" over the imminent construction of the Cabin John Bridge, which will cross but not touch one of the tips of Plummers Island. The scientists were so dedicated to the cause of maintaining their bailiwick in its primitive state, for further biological studies, that they were able to convince

the Maryland State Roads Commission to move the site for the bridge upstream 200 yards.

Few outsiders know how to arrive at the sanctuary from the main road and this is precisely what the scientists had in mind when they built there long ago. The pathway is unmarked and Park police are quick to warn away trespassers. Even the small rowboat that ferries passengers to the island is tightly locked and only a few keys exist outside the club membership.

If he is made of stern stuff, the invited guest can hike across club-owned woodland on the mainland, then take the pulley-operated boat across a short stretch of the river to the island itself. The approaches to the boat landing are ankle deep in mud even in dry weather.

Once landed on the island, the visitor instantly is impressed with its untouched quality.

"The club intends that nature shall take her course unmolested," the by-laws declare firmly.

**Jungle to Penetrate**

And unmolested it grows—a small jungle of undergrowth, a thick forest, great rocks and only a few narrow paths. The only building is a 56-year-old cabin built by the club members on a rocky crest about 60 feet above the water.

With typical restraint, an early history says, "It will not be necessary to describe in detail the erection of the cabin, the difficulties experienced in conveying the material to the bank of the river, and the seemingly interminable labor of transporting it from there by wire trolley to the building site—it was completed November 28, 1901."

The club at that time was leasing Plummers for $30 a year and eager to buy the land, but its title was cloudy because ownership never had been established since the original grant of territory adjacent to the island was made in 1684. Seven years of legal battles finally resulted in issuance of a patent on the island by the Maryland State Land Commissioner to the club.

**One Large Room**

The club house itself is virtually unchanged from its appearance when the house-warming was held in 1901. It is covered on the outside with

unpainted shingles laid upon solid lumber sheathing and lined with heavy building paper. It has only one large room, 14 by 28 feet, with a small kitchen in a lean-to at the rear, a broad porch facing the Virginia side, and a tremendous fireplace built to accommodate 4-foot logs.

In subsequent years the club bought 38 acres on the mainland, to insure its privacy and protect the right of way. It still is owned by the club.

One of the scientific objectives has been a thorough biological survey of the island. Members have logged in these species — 26 mammals, 186 birds, 22 reptiles, 20 amphibiana, 55 fishes, 776 flowering plants, 70 mosses, 80 lichens and 118 fungi.

Today the quiet of Plummers Island is disturbed only by the distant roar of bulldozers on the Virginia shore where the George Washington parkway is being built.

3) Washington Star July 5, 1960

00006422

JA1443

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

## APPENDIX B.  Avoidance, Minimization and Partial Mitigations

*For the Administrative Record*

Washington Biologists' Field Club's MDOT Avoidance, Minimization and Partial Mitigations Proposal

Date: February 3, 2022

Mr. Jeff Folden, I-495 & I-270
P3 Program Deputy Director I-495 & I-270 P3 Office
707 North Calvert Street,
Mail Stop P-60 Baltimore, Maryland, 21202
 MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza,
Suite 1520 Baltimore, Maryland 21201
jitesh.parikh@dot.gov

Elizabeth Hughes
Director/State Historic Preservation Officer
Maryland Historical Trust
100 Community Place, 3rd Floor
Crownsville, MD 21032-2023

*The Washington Biologists' Field Club (WBFC) guiding mission is the study of long-term trends in biodiversity and community ecology on Plummers Island.*  We began this research in 1901 and continue it to this day.  MDOT's plan for expanding the American Legion Bridge onto Plummers Island and channel waters **seriously compromises our research goals of studying the Island as a whole system**.

Long-term studies such as those of WBFC are very important in this era of rapid change in climate, introduction of increasing numbers of invasive species and diseases, etc.  We can only conserve our natural resources if we understand "normal" ecosystem responses, and these require long-term monitoring of target sites.  The scientific community has responded to this need by creating new sites for long-term research, but it takes decades to build up a record long enough to understand many of the processes, and there are few sites that have been established long enough to give meaningful information.  Plummer's Island is one such site, and its preservation deserves high priority.

It must be emphasized that environmental damage cannot be "fixed" by any form of mitigation.  Plummer's Island is a research site conducting a multigenerational study of long-term ecological processes.  Destruction of the habitat, or serious damage to it, stops the ecological processes whose progress WBFC has been studying for over a century, and ends the long-term study.  Replanting will not

Page **13** of **42**

00006423

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

continue these processes, it just makes a new beginning, returning the Island to where the WBFC study began in 1901.

Importantly, taking any part of Plummers Island violates the formal legally binding 1959 Agreement between WBFC and the National Park Service. Under this agreement WBFC gave the Island to the Federal Government in exchange for our continued maintenance and research of the Island as a wild natural area, so long as WBFC existed and complied with certain obligations.  WBFC has honored its part of the agreement for the ensuing 72 years.  WBFC has studied the Island for 121 years, making it a rare and precious part of the cultural and scientific natural heritage of the National Park system. The Section 106 process determined the *WBFC and Plummers Island* to be eligible for the Maryland Historical Trust and National Register of Historical Places, and this requires protecting the entire Island as a whole property.

With these points in mind, WBFC does not accept the MDOT's Alternative 9 plan. We consider it contrary to the above agreement, and the intent of NHPA laws protecting eligible Historical properties as whole units. We support the No Build Option (as stated in our DEIS, SDEIS, and Section 106 comments).

Moreover, MDOT has failed to adequately and objectively justify the Least Environmentally Damaging Practicable Alternative (LEDPA) in the selection of Alternative 9.

WBFC commented on the DEIS, and was recognized as a consulting party in early 2021. The SDEIS is unacceptable, full of problems, and must be rewritten (WBFC separate, and co-signed Sierra Club comments submitted November 30, 2021). WBFC Section 106 comments were submitted in October 2021, and again with SDEIS comments.  Comments on the final Section 106 programmatic agreement will be or will have been submitted by February 3, 2022.

**One avoidance** or minimization would be to redeck the ALB and not expand it. Alternative 5, adding only two lanes to the ALB, would be much less damaging to Plummers Island and adjacent waterways. Double decker or suspension bridges could significantly reduce damages to Plummers Island and adjacent waterways. However, the highway expansion plans do nothing to reduce the $CO_2$ emissions driving global Climate Change.   As MDOT Secretary Greg Slater stated in 2021, the ALB is structurally sound and only needed redecking within 10-20 years. We support this No Build Option.

If Alternative 9 goes forward as MDOT & P3 companies propose, WBFC proposes the following avoidance, minimization and *partial mitigations* be adopted and coordinated through NPS, in consultation with WBFC in-so-far as they affect Plummers Island and its waterways:

**Avoidance, Minimization and Partial Mitigations under Sections 106, NHPA, NEPA, and 4(f), 10, and 404 etc.:**

**01 -- Nomination of WBFC on Plummers Island to the National Register of Historical Places**:  **A)** MDOT fully funds and fulfills the nomination process for NPS. WBFC and NPS should be involved and consulted in the preparation of the nomination of Plummers Island.

**02 -- Bike & Pedestrian lane emplacement:**  This lane could be placed under the bridge or on the upstream side (avoidance and minimization), rather on the Island side of the bridge (as currently proposed in the SDEIS and Section 106 documents). **A)** Please revise the MDOT plan accordingly. This

Page **14** of **42**

00006424

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

minimization would reduce shading of the Island, and possibly the need for caissons on the Island, and potentially reduce the LOD. **B)** Furthermore, we note that archaeological sites are not particularly endangered by shadows or cave effects, and the archaeological site on the west side of the ALB may even be further protected by ALB overhanging lanes.  We see no justification or advantage to placing overhanging lanes over the long-term ecological study site of Plummers Island rather than overhanging the already buried archaeological site.

**03 -- Flooding potential:** Flood frequency has now increased enough that 500-year events are now 100-year events, and former 100-year floods are now 10 to 20-year events.  Moreover, flood stages are 7 ft higher at the head of Plummers Island than at NOAA's Little Falls Gauging Station 3 miles downstream in a wide section of the Potomac River. MDOT's planned destruction of the top of the rock ridge at the head of the island lining the west end of the channel, within the LOD, will further increase flooding impacts to the Island. **A)** We request that MDOT and US-ACE take extreme precautions in evaluation and preparation for potential 500-year flooding events occurring within the construction and immediately following periods.  **B)** Protect the rock ridge from any damage. **C)** If there is flooding damage to the Island resulting from MDOT's project we expect major financial penalty to MDOT as compensation to WBFC for damages to the Island and its and waters, and full cleanup efforts from MDOT.

**04 -- Pier and Caisson emplacements:** Where are the engineers planning to put the east bound ALB lane Piers?  It was suggested by MDOT in meeting with WBFC in early 2021, that they could avoid placing piers on the Island. However, the SDEIS indicated support structures will be on the Island and in the channel. Newer MDOT plans (diagram shown to WBFC, November 29, 2021, in a joint MDOT Section 106 meeting), show three caissons on the island, and three more opposite those in and on the west side of the channel, this set of caissons placed about 75 ft north from the head of the channel.  (In the same meeting WBFC was told that these would be reduced to two caissons on either side of the channel.) These caissons will trap logs and jam up the waters within the channel causing flood waters to cross the low gap between the rock ridge along the west end of the channel and headwall of the Island. Furthermore, MDOT's diagram shows an elongated pier would be placed under the bridge at the dogleg in the channel where it bends eastward. The diagram shows that pier to be footed in the channel, a placement that will deflect flood waters onto the island. **A)** MDOT needs a new plan to avoid increased flooding of the Island. We reject the whole idea of placing ALB supports on the Island and its channel.

**05 -- ALB construction platforms:** Trestles are proposed for construction platforms covering the western portion of channel separating Plummers Island from the mainland and bridge foundation, and presumably the west end of the Island up to the LOD.  What is the plan for installing those trestles? And how will the trestles be decked (timbers?). What is to prevent those timbers and trestles from blowing out in a massive flood? **A)** Ensure that platform decking is secure in the events of minor or major flooding. **B)** keep them off the Island.

**06 -- Channel impacts from construction and vegetation removal:** Embankments within the LOD on both sides of Plummers Island's channel are expected to collapse after the soil is disturbed by construction activities, and vegetation is removed and the remaining vegetation is shaded out. The destabilized embankment soil will naturally be deposited further downstream in the channel. **A)** We expect MDOT to make every effort to avoid and minimize embankment collapse and further sedimentation of the channel.

Page **15** of **42**

00006425

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

**07 -- Historical Hydrology**:  The channel head has shifted downstream and lost flow due to past ALB pier emplacements, and also caused avulsion of the head of the Island. The loss of land and adverse hydrological effects are sections 4(f), 10, 404, NEPA, and NHPA, issues to address.  **A)** MDOT is requested to restore the channel to original position and flow, pre-ALB, or at least improve the channel to flow regularly even at low waters at their expense.

**08 -- Channel impacts in the event of restoration of channel flow:** WBFC members and other researchers need routine access to the Island. We send out a member each week with duty to check the cabin and surrounds for damage and debris from public visitors.  Researchers need access to their study sites on the island.  **A)** In the event that channel flow is increased such as limits our access, we request some enhanced access, which could be a locked bridge or caged boat dock (as permitted under the 1959 WBFC agreement with the National Park Service).  **B)** We request that MDOT fund the access construction that best suits WBFC needs and NPS guidelines. (Estimated cost to MDOT for NPS design and installation: $200,000).

**09 -- Researching disturbance:  A)** We request MDOT funding of a "record in time" photographic survey before, during and after ALB construction, along with long-term follow-up, up to the APE boundary. **B)** MDOT Funding for development of ArcGIS maps to catalogue current and historical study locations and key resources to visualized changes over time. **C)** MDOT funds are requested to purchase for WBFC a highly accurate GPS unit for recording plot points, plant locations (including mapping of tree species), and collection sites. (Estimated cost to MDOT for WBFC equipment purchases: $20,000). **D)** MDOT funding and coordination with NPS and WBFC of research on the effects of the expanded ALB shadow on vegetation, arthropods, and amphibians. Baseline vegetation plots are to be established before construction, followed by resampling at 5-year intervals for 20 years, using NPS circular plots from the LOD out to the APE.  This will also serve to track invasive species spread. NPS, in coordination with WBFC, will analyze the data and publish this research using MDOT funding. (Estimated cost to MDOT for Research, see Item 17).

**10 -- Invasive species:**  WBFC has been studying invasive species with our vegetation plots and 120 years of collection records. The most invasive are: Amur-honeysuckle, Japanese-honeysuckle, oriental-bittersweet, tree-of-heaven, gill-over-the-ground, Japanese-stiltgrass, garlic-mustard, and various knotweeds.  In 2017 WBFC asked Invasive Plant Control (IPC) Inc. for a bid to remove the invasive trees and shrubs.  Their bid was $75,000 (unaffordable to us).   Now fig-buttercup has come onto the island (3 plants first noted in 2017 at the head of the Island) and is expanding exponentially (250 plants seen in the spring of 2021, all across the Island): This weed is projected to extensively cover the lower flood plains of the Island in the near future.  Japanese-stiltgrass is expanding exponentially also.  The spread of these invasive species will be exacerbated by clearing of vegetation and soil disturbance associated with the ALB construction.  Cost is a major impediment to control. C&O Canal NHPS has minimal funds for invasive plant control, and their efforts were curtailed by the Park's Head Ranger in about 2016. This is a long-term problem and requires long-term mitigation and research on effectiveness of methods of control. **A)** MDOT funding to NPS for invasive plant control and research is requested for the long term. (Estimated cost to MDOT for NPS expenses $5 million for invasive species control. For the Research budget see Item 17).

**11 – Abatement of Toxic Runoff**: The lowest point on the ALB drains through scuppers and culverts onto NPS land, cutting an erosional gully and then draining into our channel. The high point (75 m elevation)

00006426

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

along Maryland's I-495, ca. 1 mile NE from the ALB, drains down to the ALB the low point (36 m), just opposite the NW corner of Plummers Island. Road salts, antifreeze, and oils release toxic metals into the soil and water. Any accidental spill on the bridge or highway draining to the bridge currently dumps on to NPS land and then into our channel. **A)** MDOT must send this runoff elsewhere for treatment. **B)** MDOT Funding is requested for long-term research on toxic runoff from the ALB. **C)** Dust and debris from demolition and construction must be minimized to the maximal practicable extent. **D)** Effects of dust and sedimentation on the Island and in the channel must be studied as a long-term research project. (Estimated cost to MDOT for Research, see Item 17).

**12 – Abatement of Noise Pollution**: ALB traffic noise on the island disrupts animal communications and affects the quality of experience of the island for visitors. Having more lanes and traffic closer will amply the noise. Cutting of trees will also increase penetration of sound onto the island. **A)** Sound barriers, and special sound deadening tarmac surfacing must be added to MDOT plans for the ALB to minimize this impact. **B)** MDOT funding is requested for researching impacts of noise from the ALB and study of impacts on animal communications. **C)** Outdoor camera and microphone and monitoring equipment are requested for WBFC future research. (Estimated cost to MDOT for WBFC equipment purchases: $20,000). (Estimated cost to MDOT for Research, see Item 17).

**13 -- Vistas:** Clearing trees on the island and mainland adjacent to the Island adjacent to and under the newly expanded ALB will impact the quality of experience of the Island, and impact the remaining vegetation under the removed tree canopy and into the adjacent forest. The bridge itself will overhang the island up to the LOD, creating a cave, and an extended shadow that will limit afternoon sunlight to vegetation further inland. **A)** MDOT must limit tree cutting as much as possible. **B)** MDOT funding is requested to replant and reseed disturbed off-Island areas with hardy local strains of native trees, shrubs and herbaceous species as soon as possible, health of these plantings to be monitored by NPS.

**14 -- Expanded Online content**: **A)** MDOT Funding is requested for further digitization and cataloging of Smithsonian collections within the C&O NHP and Plummers Island. This would include funding for contractors and IT support. **B)** MDOT Funding is requested for digitization of WBFC archives of letters, photos and other documents at the Smithsonian. This would include contractors and IT support. NPS is also interested in this archive of materials for their historical records involving the 120-year old WBFC cabin. **C)** MDOT Funding for WBFC website development to further share our mission and knowledge. This would include hiring of a professional website developer for WBFC. **D)** MDOT Funding is requested for diversity and inclusion of underrepresented peoples in our outreach and education initiatives. (Estimated cost to MDOT for the above items: $200,000).

**15 – Financial support for inventories of understudied groups on the island:** WBFC maintains documented inventories of organisms on the Island, but not able to ensure that inventories for all groups of organisms are up to date at any one time; provide funding to hire experts to update and document inventories for groups that need it.

**16 -- Access During Construction:** We also request that access to Plummers Island not be curtailed during construction. If the Clara Barton parkway is closed during construction of the ALB and ramps, we request a temporary parkway crossing from the westbound lane to Lock 10 parking on the eastbound lane be established. Researchers will need access to research plots up to the LOD.

00006427

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

**17 --Long-term research:** Including items listed above, long-term research on the impact of bridge expansion on Plummers Island is needed. This will inform future construction projects by expanding our knowledge base of the impacts on biodiversity and community ecology. This will also assist WBFC in understanding perturbations to long-term trends of the Island's ecosystem caused by the MDOT project. Neither WBFC nor NPS have the funds or staff to carry out the required new research projects. Baseline plot data gathering must be completed prior to beginning ALB construction. We request external contracting and funding by MDOT-SHA for research, to be conducted by consulting companies, research universities and institutions, in coordination with WBFC and NPS. (Estimated cost to MDOT over a 20-year time period is $20 million.)

Respectfully,

Robert Soreng PhD, WBFC President

Carla Dove PhD, WBFC Vice President

Lowell Adams PhD, WBFC Secretary

Warren Wagner PhD, WBFC Treasurer

On behalf of the hundreds of past and present WBFC members.

Cc:

Page **18** of **42**

00006428

USCA4 Appeal: 24-1447    Doc: 30-4    Filed: 09/30/2024    Pg: 385 of 511

**APPENDIX C: Maps of Plummers Island and Alternative 9 ALB emplacement**



00006429

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2



00006430

JA1451

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2



00006431

JA1452

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2



Page **22** of **42**

00006432

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2



00006433

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

\* For map images cited in **APPENDIX D**, see **APPENDIX C.**, maps A (ALB Alternative 9 with ALB),

## APPENDIX D: Administrative Record letter sent to U.S. Army Corps of Engineers

NAB-Regulatory@usace.army.mil                                     January 19, 2022
U.S. Army Corps of Engineers, Baltimore District
Regulatory Branch (CENAB-OPR)
2 Hopkins Plaza
Baltimore, MD 21201

[Re: The protection of Waters of the U.S., C&O Canal National Historical Park, and Plummers Island from adverse impacts of MDOT's proposed Alternative 9 - Phase 1 South]

Dear USACE Baltimore District Regulatory Branch,

We have serious concerns regarding the adverse impacts to Waters of the U.S., C&O Canal National Historical Park, and Plummers Island if MDOT's proposed Alternative 9 - Phase 1 South for widening the American Legion Bridge is constructed as planned.  We are also very much concerned that environmental impacts are not adequately addressed in the DEIS/SEIS, that viable, less destructive alternatives were not properly analyzed and considered, and that Alternative 9 - Phase 1 South is not the Least Environmentally Damaging Practicable Alternative (LEDPA).  In fact, it is perhaps the most environmentally destructive of alternatives to federally owned lands and waterways east of the bridge.



Fig. 1. Globally rare Potomac River Bedrock Terrace Hardpan Forest (CEGL006209) at Plummers Island, C&O Canal National Historical Park, Montgomery County, Maryland.  The American Legion Bridge looms in the background at the head of the island.  Photo by R.H. Simmons.

00006434

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

Plummers Island is a unique 12.2-acre natural area within the Potomac River Gorge, C&O Canal National Historical Park, Montgomery County, Maryland. It is widely known as "The Most Thoroughly Studied Island in North America" (NPS sign on Plummers Island). Its natural history has been a subject of more than 400 scientific papers. More than 4,000 species have been documented there, by over 40,000 collections housed in the National Museum of Natural History, Smithsonian Institution. Numerous rare plant and animal species, and four globally rare plant communities are documented there. Alluvial habitats with overland, non-tidal flooding regimes and diverse, specialized vegetation comprise much of the island (Figs. 2 and 3).



Fig. 2. Rock ridge straight across the channel from the shadow of the American Legion Bridge at the 9 ft. flood stage (NOAA Little Falls Gauging Station). Photo by R.J. Soreng, March 2, 2021.

In the DEIS and SEIS, alternatives were mainly considered for which best suited the transportation goals of the project, with required analyses of environmental impacts not presented or poorly discussed. (https://oplanesmd.com/wp-content/uploads/2021/11/I495I270MLS_SDEISUpdatedSection4f.pdf). For example, Alternative 9 as the presumed LEDPA is not justified and the number and type of environmental impacts are not discussed. In fact, no specific discussion of the LEDPA relative to any of the alternatives could be found in the document.

Alternative 9 - Phase 1 South is preferred by MDOT as purportedly the most cost effective of alternatives, but it is the most destructive to Plummers Island and adjacent lands and waterways - largely owing to the physical expansion of the bridge eastward onto the island and the construction of enormous caissons and footers in the existing channel that follows the interior edge of island.

00006435

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

**Significant adverse impacts to Plummers Island and adjacent lands and waterways resulting from Alternative 9 include** (but are not limited to):

- The taking of several acres of the head of the island (western and northwestern end) by the installation of enormous concrete footers and caissons, resulting in a permanent loss of land, wildlife habitat, wetlands, and functional floodplain.
- The destruction of the north-south section of the bedrock channel (WOTUS) adjacent to the bridge through the installation of enormous concrete footers and caissons directly in the channel, as well as the total and permanent eclipse of sunlight resulting from the bridge deck extending entirely across the channel.
- Adverse impacts to aquatic wildlife as a result of permanent alterations to the channel.
- The destruction of an imprecisely quantified area (by MDOT) of bedrock vernal wetlands (WOTUS) under the proposed new deck and caissons of the bridge.
- The destruction of a high-quality, low forested ridge of bedrock outcrops and rare flora, such as one of two extant stations on the island for the state-rare Leatherwood (*Dirca palustris*); G4/S2 T. (Simmons et al. 2020)
- The installation of caissons and footers in the channel and on the island will intensify the strength of flood flows eastward, resulting in accelerated stream bank and floodplain erosion on the southwest part of the island, as well as the destruction of several natural communities and habitats in this area. Sediment loads from this disturbance will also impact the channel and island.
- Caissons in the channel will trap logs and other debris, resulting in semi-permanent log jams in the channel and a seriously degraded waterway.
- Placing such an embankment or structure across an active floodplain and channel will effectively interrupt flood flows and force more water to the east against the cut bank, hastening the undermining of the floodplain and forested slope there.
- An embankment in the form of caissons at this location will likely also create an eddy during high water that intensifies erosion upstream of the bridge.
- Sedimentation is a vital part of the energy cycle in these ecologically important riparian areas. Caissons or other continuous impediments constructed across this section of the floodplain and channel will disrupt this process, likely causing: 1) the structures to be regularly inundated by alluvium during even minor floods; 2) frequent flood risk to upland areas of the island owing to the removal of the rock ridge that currently protects such areas; and 3) the riparian areas downstream to be robbed of their natural sediment supply, which adversely disrupts the nutrient/energy cycle of these areas and eventually cause deflation of the riparian landscape.
- Six flood-dependent natural communities, some globally rare, will be negatively impacted, including Piedmont / Central Appalachian Sand Bar / River Shore (Tall Herbs Type): (USNVC: CEGL006481); global and state rare Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (USNVC: CEGL006491.); Piedmont / Central Appalachian Sycamore - River Birch Scour Woodland: (USNVC: CEGL003896); Floodplain Terrace Forest: (USNVC: CEGL002014); Piedmont / Central Appalachian Silver Maple Forest: (USNVC: CEGL006217); and globally rare Mid-Atlantic High Terrace Hardwood Floodplain Forest: (USNVC: CEGL006459). (Simmons et al. 2016)

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

- Three upland natural communities near the channel will also be adversely impacted, including the permanent deflection of solar exposure to light-demanding flora and habitats, because of hardscape encroachment across the channel onto the island: Coastal Plain / Outer Piedmont Basic Mesic Forest: (USNVC: CEGL006055); Central Appalachian Rich Red Oak - Sugar Maple Forest: (USNVC: CEGL008517); and the globally rare Potomac River Bedrock Terrace Hardpan Forest: (USNVC: CEGL006209).  (Simmons et al. 2016)
- The physical extent of the bridge decking will overtop the head of Plummers Island by 100 ft. or more, robbing vegetation and wildlife under the bridge of sunlight.
- Because of the proposed placement of the caissons in the channel and island, resulting in severely restricting water flow into the channel, the extensive, flood-dependent, state-rare Piedmont / Central Appalachian Rich Floodplain Forest: (USNVC: CEGL004073) along the channel on the mainland and island will be starved of their natural sediment supply, disrupting the nutrient/energy cycle and causing deflation of the riparian landscape.
- Bridge footings and caissons will likely create a pressure shadow in their lee that accelerate the deposition of sediment on the point bar and floodplain immediately downstream or change the form or composition.  In this case, highly detrimental deposition and flood scouring is expected, especially in the form of smothering logs and debris deposits overtop vegetation, wildlife, and habitats on the island.



Fig. 3. Old-age Piedmont / Central Appalachian Silver Maple Forest: (USNVC: CEGL006217) along the rocky bedrock channel at Plummers Island, Montgomery County, Maryland.  Photo by R.H. Simmons.

Under CWA Section 404(b)(1) Guidelines Alternatives Requirements, a permit cannot be issued in circumstances where a less environmentally damaging practicable alternative for the project exists.  The

00006437

environmental impacts that would result from Alternative 9 - Phase 1 South are significant, not minor. The project will severely impact national parklands, wetlands, and waterways.

WBFC (as a Consulting Party) formally submitted comments on the DEIS, SDEIS, and Section 106 on November 30, 2021, when comments on the SEIS were due. We also met with MDOT on several occasions to discuss our many issues, including those specifically involving hydrology and flooding.

*Until recently, engineering designs were not well enough along for anyone to comment on, specifically to evaluate effects of the bridge caissons and pier emplacements, including the reduction of the channel and leveling of the rock ridge at the head of the island.* The bridge design plan and placements were only made apparent in screen shares at the November 29, 2021, MDOT meeting. We did include some comments to that effect, but we needed more than 1 day to adequately evaluate the consequences.

We respectfully request that USACE not grant any permits for the Preferred Alternative, Alternative 9 - Phase 1 South, thereby requiring the Applicant to redesign its plans and submit a pre-construction request that provides a proper analyses and rationale of the LEDPA and alternatives, a thorough assessment of the myriad of irreplaceable natural resources affected by the proposed alternative, and required protections for all of the WOTUS currently threatened by the project. The NEPA evaluation needs to be thorough and uncompromising in protecting this special place.

We also request that the above information be placed in the administrative record, courtesy copied to the Project Manager who received the PJD, and furthermore to request that the 15-day resource agency review be re-coordinated to include this new information.

Thank you for your consideration of this important matter.

Sincerely,

Robert J. Soreng, President, Washington Biologists' Field Club (WBFC) and Smithsonian Institution scientist
https://wbfc.science/
Roderick H. Simmons, environmental scientist, WBFC

CC:

National Park Service, C&O Canal National Historical Park
Environmental Protection Agency
U.S. Fish and Wildlife Service
Federal Highway Administration
Maryland Dept. of the Environment
Maryland Dept. of Natural Resources
National Parks Conservation Association

00006438

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

# APPENDIX E: WBFC replies to MLS-106 Table 1 Responses

**Page 23 of 57 Programmatic Agreement Draft #1 Comment Table**

| Comment Control | Author | Section | Whereas Topic Sig/Priority | Comment | Response |
|---|---|---|---|---|---|
| 146 | WBFC | General | Plummers Island and C&O Canal | We request WBFC be added as a consulting party to Section 106 terms/debate due to our special relationship with Plummers Island. [refer our WBFC comment for full discussion of WBFC's relationship to Plummers Island]. Any mitigation measures for the C&O Canal National Historical Park as a whole would not be sufficient to protect Plummers Island. The WBFC is a discrete entity that has engaged in biological research on the Island since 1901, is best able to determine which impacts would or could result from American Legion Bridge construction and operation activities and which measures are needed to avoid, minimize, and mitigate these impacts. | WBFC has been added as a consulting party. |

**Response:** NPS has not commented on PA for MLS-106. WBFC was added as a consulting party. WBFC has been in joint meetings with MLS-106 crew on 3/4 4/26/2009, and had several email correspondences with Mr. Archer and company. The PA does not further document mitigations. WBFC lodged a partial mitigations letter with NPS Nov. 26 2021 [voted verbally by WBFC in the MLS-106 meeting Nov. 29]. An expanded order of partial mitigations is included here in a separate document.

WBFC Reply 3 Feb 2022

**Page 24 of 57 Programmatic Agreement Draft #1 Comment Table**

| Comment Control | Author | Section | Whereas Topic Sig/Priority | Comment | Response |
|---|---|---|---|---|---|
| 147 | WBFC | General | Plummers Island and C&O Canal | We are dismayed that the cultural resource evaluations circulated as part of the DEIS fail to specifically identify or discuss the historic significance of Plummers Island. The Section 106 identification process should include an evaluation of the significance of Plummers Island as an individually significant historic site independent of the C&O Canal National Historical Park, or at minimum, should include additional descriptions of its contributing significance to that site. The cultural resource evaluations undertaken to date have largely ignored Plummers Island and its unique historic characteristics. | DOE is complete, property is eligible, and effect is adverse with SHPO concurrence October 2021. |

**Response:** NPS has not commented on PA for MLS-106. Plummers Island must be protected as a whole under the eligibility criterion.

WBFC Reply 3 Feb 2022

**Page 25 of 57 Programmatic Agreement Draft #1 Comment Table**

| Comment Control | Author | Section | Whereas Topic Sig/Priority Comment | Response |
|---|---|---|---|---|

JA1460

00006439

USCA4 Appeal: 24-1447      Doc: 30-4      Filed: 09/30/2024      Pg: 396 of 511

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| Page 26 of 57 Programmatic Agreement Draft #1 Comment Table | | | | |
|---|---|---|---|---|
| Comment | Commenting Author | Section | Topic | Significant Comment | Response | WBFC Reply 3 Feb 2022 |
| 148 | WBFC | General | Plummers Island and C&O Canal | Why are troubled by the approach taken in the draft Section 106 Programmatic Agreement, which does not contemplate identifying the effects on Plummers Island or looking at ways to resolve those impacts until after key decisions about the project are made and mitigation measures foreclosed. It is not appropriate to defer the assessment of these impacts or any analysis of measures to mitigate adverse effects until after key decisions have been made and alternatives and the preferred alignment for the project, as avoiding or minimizing impacts to Plummers Island will require electing appropriate bridge alignment and construction alternatives. There is sufficient information available now to undertake these evaluations, and this should be done now, before the widest range of options for mitigating and minimizing adverse effects to Plummers Island have been foreclosed. This measures to protect the Island and its biota (the subject of long-term ongoing research) need to be considered now and in detail. A memorandum of agreement, which would be executed before the Record of Decision, is a more appropriate vehicle for resolving adverse effects on Plummers Island than is a programmatic agreement. Due to the extraordinary sensitivity of the resources and the research that will be impacted by the Project, it is imperative that measures to avoid, reduce, and minimize impacts to Plummers Island be considered now, and deferred until after any project decisions have been made. We therefore request those protections be evaluated as part of the Section 106 process now, and specific commitments to resolve adverse effects be included in a memorandum of agreement and, ultimately, in the Record of Decision for the project. | Property is eligible and effect is adverse with SHPO concurrence October 2021. SHPO concurrence on mitigation for the historic property, which will be documented in the Programmatic Agreement, not a separate Memorandum of Agreement. | NPS has not commented on Pli for MLS-106. WBFC text 2 here times in 2021. No memorandum of agreement has been proposed. The TAs does not convey document with NPS Nov. 29 2021 (details verbally by WBFC to the MLS-506 meeting Nov. 29). An expanded letter of gender mitigations is included here in a separate document. |
| 149 | WBFC | General | Plummers Island and C&O Canal | The unique history and significance of Plummers Island must be assessed independently of its status as part of the Chesapeake & Ohio Canal National Historical Park. [For full description of unique history see WBFC comment document] However, the significance of Plummers Island goes beyond that. The significance of this Island as a long-term research site should give it protection as a wildlife management area, and it is also a unique and significant historical site in its own right. The Island's unique historic attributes include its value and history as an important research site [Project attributes are further reviewed in Appendix B]. | DOE complete property eligible with SHPO concurrence October 2021. | NPS has not commented on Pli for MLS-106. Sierra Club comment 149 is on target. WBFC wholly agrees. |

JA1461

00006440

| 15/WBFC | General and C&D Canal | Phearreers Island | 1. There are significant, irreversible adverse effects that would accrue to Pheamrers Island and WBFC research projects under the MDOT American-cuplos bridge expansion plan. The ongoing and active research capacities on this Island are coordinated and are historic features of this Island, in addition to the architectural resources that are built in 1901). There are distinct adverse effects that impact a property of such high research value. These adverse effects impact areas of this island, most of which impair the quality of studies, and many more things listed below and described in greater detail in Appendix C. The adverse effects to this Island's historic features and significance as a research site posed by the I-495/I-270 project are overlooked and further detailed in Appendix C of this letter. They include: 1. Damage to wetlands and 2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction 3. Destruction of WBFC research plots 4. Destruction of part collection state 5. Habitat destruction and disturbance lead to more invasive organisms 6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction below out 7. Sound from bridge construction and closer proximity of traffic as 2 new bridge lanes after they open on the bridge impacts on biota from salt and soil runoff from the bridge 8. Violation of long-term continuity of 120 years of research. | Adverse effect: DOE complete. However, most concerns here are not related. | NPS has not commented on Pt per MLS-106. The PA has not determined land and property issues related to MLS-106 4. Destruction of rare plants and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction 5-6 Destruction of WBFC research plots & destruction of part collection state Habitat destruction and disturbance lead to more invasive organisms 8. Violation of long-term continuity of 120 years of research. |
| | | | | Response | WBFC Reply 3 Feb 2022 |

00006441

JA1462

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| Other commenting agencies/comments from Comment Table 1 | | | | | |
|---|---|---|---|---|---|
| Comm# | Comm. Author | Section | Mineral Topic | Project Comment | Response | WBFC Reply 3 Feb 2022 |
| | | | Plummers Island and C&O Canal through | | | |
| 151 | WBFC | General and C&O Canal | | 1. To protect Plummers Island, the minimum mitigations below: 1.Plan for major (root mass?) flooding during the construction period. 2. Avoid obstructing natural water flow into the Plummers Island channel... (largely illegible construction-related mitigation text describing bridge access, construction platforms, outflow from bridge scuppers, debris, flood risk, C&O Canal National Historic Park, Section 106 consultation, etc.) | SHA done, property eligible | NPS has not commented on Pr B for MLS-106. WBFC has had 2 additional meetings with MLS-106 leaders and staff of SHA runoff, or toxic public away from the site. MDOT has not provided WBFC with any work plans or assurances of monitoring the site is not damaged. Over 3.1 mile streets in Maryland... (largely illegible) Plummers Island. This is where much of the runoff drains out into the channel. This is a totally unacceptable and must be corrected with any new construction. |
| 152 | WBFC | General and C&O Canal | | (illegible additional project comment text regarding Plummers Island being federally protected legal agreements with the National Park Service, National Register of Historic Places, Section 106, biodiversity, research value...) | SHA done, property eligible | NPS has not commented on Pr B for MLS-106. Plummers Island must be protected as a whole under the new cultural resources effects are assessed at proposed information sites, not interpreting as a mitigation for adverse effects to historic properties. |
| 42 | NPS | ILT C | Projectwide Mitigation and Commitments | These are not historic preservation mitigations thus they don't belong in this Section 106. agreement document. Reformulation could be considered a mitigation for changes to historically formed areas, but that needs to be itemized. Federal's Section 106 consultation happening on the proposed locations of these mitigations? | Some of these best management practices will be captured in NEPA/permit conditions but may not be appropriate for 106 PA. MDOT SHA will continue to consult with the appropriate regulatory agencies as appropriate on historic mitigation. | NPS has not commented on Pr B for MLS-106. WBFC has had 2 additional meetings with MLS-106 leaders... research value. Once this site is disturbed the continuity of the long-term research is broken. |

00006442

JA1463

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| | | | | | Comment | Comment noted | WBFC response |
|---|---|---|---|---|---|---|---|
| SC NPS | | | | | | | |
| SC NPS | Kenneth A. Young (witness) | | General | 1 | It seems like there should be a broader mandate in this PA for ongoing consultations. Based on how little design has happened for the pre-draft 1 phases, the consulting parties haven't had the chance to see any detail and therefore can't fully input on adverse effects and possible design minimizations. | This is a general statement and seems only limited design plans. Thus, finalizing the PA is premature. | WBFC fully agrees with WPS comment. We still have seen only limited design plans for the ALB. |
| 522 Sierra Club (44) | General | PA Process | | 2 | "WHEREAS, FHWA will ensure additional identification, evaluation, assessment, is completed in a timely manner prior to construction, to allow practical opportunities to avoid, minimize, or mitigate for any potential adverse effects to historic properties, as stipulated under this PA;" Please clarify what constitutes a timely manner and what opportunities signatories will have for review. | The implementing regulations at 36 CFR 800.4(b)(1) for Section 106 of the National Historic Preservation Act (NHPA) requires a reasonable and good faith identification effort for historic properties. 36 CFR 800.4(b)(2) also permits a phased identification and evaluation, including "when effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. 800.5.14(b)(1)(iii). Here, however, there is no reason to defer an identification of historic properties within the area of potential effects of the assessment of adverse effects and any measures to avoid and mitigate until later. While there may be a alignment refinements that occur during the design-build process, there are no other circumstances to warrant a departure from the normal Section 106 process. [letter] (continued in 103) | WBFC agrees with the EC comment. |
| | | | | 3 | The purely Programmatic Agreement approach for this project is inappropriate and inadequate as it impermissibly forecloses large measures to avoid impacts to historic properties (such as project scope, number of new lanes, and road alignment). The Programmatic Agreement approach to the I-495 & I-270 MLS Section 106 process is not adequate to meet the requirements of federal law. The Section 106 regulations provide that a Programmatic Agreement is appropriate in certain limited situations, including "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. 800.14.(b)(1)(iii). Such reliance on a Programmatic Agreement is an inappropriate way to address historic properties and alternatives under consideration corridors of corridors, large and small, or where access to properties is restricted. Survey and National Register of Historic Places evaluation of hundreds of properties and archaeological survey areas was completed prior to the EIS. Very little survey work remains and generally only in areas where property access has been denied. The Programmatic Agreement currently under development, which will be signed and executed prior to the Record of Decision, will provide a framework for ongoing identification, evaluation, minimization, and mitigation of historic properties. | | |

00006443

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| 328/SC | General | JPA Process | | See reply under 322 | See WBFC comment under 322 |
|---|---|---|---|---|---|
| | | | The approach in Section 328 states here impermissibly defers full consideration of historic properties listed in or eligible for listing in the National Register of Historic Places by relying on a boilerplate Programmatic Agreement that the Agencies will not execute until after selecting a Preferred Alternative. Among other things, delaying full assessment of historic properties until a Programmatic Agreement is executed ignores the Agencies' present duty to comply with NEPA, which requires a "hard look" at all of the environmental consequences that will flow from the Project if the Agencies grant the permits needed for the Project to proceed. Selection of an Alternative in this ROD, including impacts on historic properties. For these reasons, relying on an unexecuted Programmatic Agreement to carry out the Section 106 review process precludes rather than assists, the Agencies and the public from understanding how these effects might harm historic and cultural resources as required by NEPA. Without a complete understanding of the Project's full range of environmental effects, including harms to historic properties, there is no way that the Agencies can reasonably select a preferred alternative as required by NEPA or identify an alternative that avoids use of historic properties, parks, and recreation areas unless no other feasible and prudent alternative is available as required by Section 4(f). Deferring the full identification of historic properties may be acceptable when the nature and scope of the resources would allow them to be easily avoided, as in the case of archaeological sites that are significant under National Register Criterion D. However, resources such as historic properties require an entirely different approach, because preservation in place is the preferred treatment, and seldom to avoid harm to these resources may be feasible ... issue an alternative is selected. The identification of these historic properties and the Project's potential effects on them must be completed at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after alternatives have been foreclosed. For this reason, we cannot conclude it is responsible to comment meaningfully on the Agencies' plans concerning historic and cultural resources because important baseline questions have not been decided. Outstanding issues that need to be resolved include the complete identification of | | |

Page **34** of **42**

00006444

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| | | | | |
|---|---|---|---|---|
| 33.PE SC | 34 E | C&C Comp / Plummers Island | | |
| | | | | |
| 33.PE SC | N/A | Pre-development Contract document review | | |
| | | Bridge Permit | | |

1) Plummers Island. One of the sites at risk from Phase 2 of the I-495/270 Managed Lanes Project (MLP) is Plummers Island, part of the Chesapeake and Ohio (C&O) Canal National Historical Park. In addition to being part of C&O Canal NHP, Plummers Island also has historic significance distinct from the C&O Canal NHP designation. Yet Plummers Island is not even mentioned in the March 10, 2021 draft of the Section 106 Programmatic Agreement. The importance of Plummers Island has not yet been adequately recognized in the NEPA, DEIS, and Section 106 process. See Washington Biologist Field Club Section 106 letter to Steve Archer dated April 9, 2021.

4) The project's predevelopment contract documents should be immediately scrutinized for language that could be harmful to historic sites, and any such wording discovered should be flagged by those involved in the Section 106 process so MDOT to have it protected or removed. The heavy involvement of the profit-driven private developer in the execution of the Section 106 process is concerning in its own right. The predevelopment contract expected to be signed within a month directs the developer team to: "Eliminate the potential for Unknown Archaeological Remains and Unknown Endangered Species". "Eliminate" is a very odd use of language to use when considering what that could mean to our historical area and titles of concern, including Morningstar Tabernacle No. 88 Cemetery and Plummers Island. Contract language like that does not impart confidence about what future contracts may look like. Less extreme language such as "Presence" and "document any" seems more appropriate.

1) Although the DEIS mentioned a US Coast Guard (USCG) letter stating that a bridge permit for the American Legion Bridge would not be required, a bridge permit should be required. The bridge permit process is a standard requirement that should be followed, and can further build awareness of and protection for sensitive historic and ecological sites that Sail in the vicinity of the American Legion bridge, including Plummers Island and the C&O Canal NHP.

Permitting question not applicable to WBFC. WBFC agrees with Section 106.

Permitting question not applicable to WBFC. WBFC agrees with SC Comment.

00006445

JA1466

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| 333 SC | N/A | Dead and Crystalline Silica | 2 Dust minimization and specifically OSHA restrictive silica construction dust standards must be upheld and the public and visitors of historic parkland and sites adjacent to the widening must be protected. Requirements for this should be included in the Programmatic Agreement. The roads and bridges (construction silica construction dust for the Project will create significant amounts of toxic crystalline silica construction dust. This will occur on The American Legion Bridge and the C&O Canal National Historic Park (the eighth most visited national park during 2020), including its popular towpath. Planners based animal and plant life and its biologics studying it would be at risk from this dust. Visitors to the C&O Canal NHP and its towpath will be as well. Such toxic air pollution causes respiratory diseases including asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer. This is an urgent public health issue. It is not addressed in the DEIS 4 nor in the Programmatic Agreement to date and it needs to be. | Not applicable to Section 106 | WBFC fully agrees with SC comment. Sending toxic dust over a historic parkland is not relevant to Section 106. |
| 333 SC | N/A | ALB Alternatives | 2 With reference to historic properties, there remain issues with the lack of appropriate alternatives analysis for the American Legion Bridge. | Current LOD reflects minimization efforts at ALB | WBFC fully agrees with SC comment. The LEDPA has not been adequately or objectively justified in the selection of Alternative 9. Alternative 9 is clearly the most destructive to Plummers Island of all the Alternatives presented. |
| 333 SC | N/A | PA Process | 2 A hybrid approach to the Section 106 process which involves Programmatic Agreement for some sites and Memoranda of Agreement for sites that will experience known adverse impacts is appropriate for a project of this nature, magnitude, and complexity. | Decline. The PA will govern construction and production of all adverse effects. | WBFC has asked for minimization and avoidance in Section 106 meetings. MDOT leaders suggested some, and then mitigated on them. WBFC has no assurances that MDOT will stay within the LOD, or maximally avoid damage to Plummers Island. Moreover, WBFC was provided no model showing the extent of overhang of PI until Nov 29, 2021. WBFC requested lanes be placed on the opposite side of the ALB, and were told this would be considered by MDOT. MDOT's newest model instead added more lanes to the PI side of the bridge along with pedestrian-bike lane, the landscape view of that model was not made clear before Section 106 comments were due in October 2021. It was only on 23 Nov 2021 WBFC was shown a draft model with the ALB extending to the LOD, the day before S2035 comments were due. On January 4, 2021, WBFC requested a detailed map of the LOD on a detailed contour map of PI. On January 18, MDOT said SHA had a detailed topographic survey of Plummers Island done in 2006, and a year and a half later, well into the process of a EIS, MDOT still says it can't provide a detailed map with the LOD on it? |

00006446

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

**APPENDIX F: Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland**



Rare Flora and Natural Communities
of Plummers Island,
Montgomery County, Maryland

July 2020

00006447

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

## Introduction

Plummers Island - an ancient "knickpoint" or rocky falls in the Potomac River Gorge east of Great Falls - is a forested, 12-acre island about nine miles upriver from Washington, D.C. in Montgomery County, Maryland. It holds the distinction of being "the most thoroughly studied island in North America." Plummers Island has been the home of the Washington Biologists' Field Club (WBFC) since 1901, shortly after botanist Charles Louis Pollard formed the club and began the search for a field station near Washington, D.C.

In 1959, the club gave the island to the United States (U.S. National Park Service) and has since continued a program of scientific research. For further information on WBFC's research activities and scientific publications, see https://WBFC.science.

A total of 4 globally rare natural communities, two of which are state rare; 21 state-rare extant flora, including one globally rare extant species; and 36 state-rare historic flora, including 4 globally rare historic taxa are known from the island.

### Rare Flora and Natural Communities

**Rare Natural Communities** (in order of lowest to highest in elevation)

Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR.

Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

Mid-Atlantic High Terrace Hardwood Floodplain Forest: *Acer saccharum - Fraxinus americana / Carpinus caroliniana / Podophyllum peltatum* Forest (USNVC: CEGL006459). Global/State Ranks: G3?/SNR.

Potomac River Bedrock Terrace Hardpan Forest: *Carya glabra - Quercus (rubra, montana) - Fraxinus americana / Viburnum rafinesqueanum/ Piptochaetium avenaceum* Forest (USNVC: CEGL006209). Global/State Ranks: G1G2/S1.

**Rare Flora**

*Extant Flora*

White Bear Sedge (*Carex albursina*) G5/S3 (last vouchered in 2004; observed by Soreng in 2020)
Pubescent Sedge (*Carex hirtifolia*) G5/S3 (last vouchered in 1934)
Flat-spiked Sedge (*Carex planispicata*) G4Q/S1S2 (*R.H. Simmons 3325*, 4 May 2013)

1

Page **38** of **42**

00006448

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

Northern Leatherflower (*Clematis viorna*) G5/S3 (last vouchered in 1982)
Needle-leaf Panic Grass (*Dichanthelium aciculare*) G5/S2? (*R.J. Soreng, 8289a*, 25 May 2013)
Open-flower Panic Grass (*Dichanthelium laxiflorum*) G5/S1? (last vouchered in 1960; photographed by Simmons in 2015)
Leatherwood (*Dirca palustris*) G4/S2 T (*R.H. Simmons 4067*, 6 Nov 2015)
Harbinger of Spring (*Erigenia bulbosa*) G5/S3 (last vouchered in 1983; observed by Soreng in 2020)
Halberd-leaf Rose-mallow (*Hibiscus laevis*) G5/S3 (last vouchered in 1982; photographed by Soreng in 2020)
Green Violet (*Hybanthus concolor*) G5/S3 (last vouchered in 1960)
Ostrich Fern (*Matteuccia struthiopteris*) G5/S2S3 (One of the largest known stands in the state. *R.H. Simmons 3532*, 5 May 2013)
Two-flower Melic (*Melica mutica*) G5/S3 (last vouchered in 2015, *R.J. Soreng 8340*)
Horse-tail Paspalum (*Paspalum fluitans*) G5/S2 E (*E.F. Wells 4507*, 20 Sep 1997)
Coville's Phacelia (*Phacelia covillei*) G3/S2 E (*R.H. Simmons 3920*, 14 May 2015)
Miami-mist (*Phacelia purshii*) G5/S3 (last vouchered in 1983; observed by Soreng on mossy rocks by plot 21 between 2013 and 2015)
Hairy Hop-tree (*Ptelea trifoliata* var. *mollis*) G5/S3 (*R.H. Simmons 3585*, 2 Jun 2013)
Smooth Wild-petunia (*Ruellia strepens*) G4GS/S2S3 (*R.H. Simmons 4221*, 9 Oct 2016)
Pale Dock (*Rumex altissimus*) G5/S1 E (last vouchered in 1997)
Sticky Goldenrod (*Solidago racemosa*) G5T3?/S1 T (photographed by Soreng in 2020)
Pink Valerian (*Valeriana pauciflora*) G4/S1 E (last vouchered in 1982)
Golden-alexanders (*Zizia aurea*) G5/S3 (*R.J. Soreng 9336*, 29 Apr 2017)

*Historic Flora*

Earleaf False Foxglove (*Agalinis auriculata*) G3/S1 E (last vouchered in 1936)
Canada Milkvetch (*Astragalus canadensis* var. *canadesis*) G5/S1 E (last vouchered in 1940)
Blue Wild Indigo (*Baptisia australis* var. *australis*) G5/S2 T (last seen in 1935 by Killip & Blake)
Short's Rock Cress (*Boechera dentata*) G5/S3 (last vouchered in 1916)
Nottoway Valley Brome Grass (*Bromus nottowayanus*) G3G5/S3S4 (last vouchered in 1947)
Hitchcock's Sedge (*Carex hitchcockiana*) G5/S1 E (last vouchered in 1933)
Short's Sedge (*Carex shortiana*) G5/S3S4 E (last vouchered in 1928)
Bur-reed Sedge (*Carex sparganioides*) G5/S3 (last vouchered in 1933)
Slender Dayflower (*Commelina erecta*) G5/S3 (last vouchered in 1960)
Spring Coralroot (*Corallorhiza wisteriana*) G5/S1 E (last vouchered in 1915)
Smartweed Dodder (*Cuscuta polygonorum*) G5/S1 E (last vouchered in 1961)
Many-flowered Flatsedge (*Cyperus lancastriensis*) G5/S2S3 (last vouchered in 1997)
Reflexed Flatsedge (*Cyperus refractus*) G5/S2? (last vouchered in 1960)
Dwarf Larkspur (*Delphinium tricorne*) G5/S3 (last seen in 1935 by Killip & Blake)
Toothed Tick-trefoil (*Desmodium cuspidatum*) G5/S1 (last vouchered in 1960)
White Trout Lily (*Erythronium albidum*) G5/S2 T (last vouchered in 1983)
Downy Milkpea (*Galactia volubilis*) G5/S3 (last vouchered in 1961)
Striped Gentian (*Gentiana villosa*) G4/S1 E (last vouchered in 1903)
Western Sunflower (*Helianthus occidentalis*) G5/S1 T (last vouchered in 1940)

2

00006449

JA1470

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

Eastern Bloodleaf (*Iresine rhizomatosa*) G5/S1 E (last vouchered in 1915)
[1]Violet Bush-clover (*Lespedeza frutescens*) G5/S3 (last vouchered in 1960)
Bog Twayblade (*Liparis loeselii*) G5/S1S2 (last vouchered in 1917)
Climbing Milkvine (*Matelea obliqua*) G4?/S1S2 E (last vouchered in 1937)
Purple Mecardonia (*Mecardonia acuminata* var. *acuminata*) G5/S2 E (last vouchered in 1939)
Basal Beebalm (*Monarda clinopodia*) G5/S3S4 (last vouchered in 1982)
Early Forget-me-not (*Myosotis verna*) G5/S3 (last vouchered in 1962)
Racemed Milkwort (*Polygala polygama*) G5/S1 T (last vouchered in 1950)
Small Pondweed (*Potamogeton pusillus* ssp. *pusillus*) G5/S2S4 (last vouchered in 1930)
Whorled Mountain-mint (*Pycnanthemum verticillatum*) G5/S1 E (last vouchered in 1951)
Virginia Sida (*Ripariosida hermaphrodita*) G3/S1 E (last vouchered in 1938)
Brown-eyed Susan (*Rudbeckia triloba*) G5/S3 (last vouchered in 1940)
Sessile-fruited Arrowhead (*Sagittaria rigida*) G5/S1 E (last vouchered in 1930)
Carolina Willow (*Salix caroliniana*) G5/S3 (last vouchered in 1982)
Snowy Campion (*Silene nivea*) G4?/S1 E (last vouchered in 1917)
Riverbank Goldenrod (*Solidago rupestris*) G4?/S1 X (last vouchered in 1903)
Sand Grape (*Vitis rupestris*) G3/S1 (last vouchered in 1906)

[1][= *Lespedeza violacea* (L.) Pers. (misapplied); "Due to a problem with the type specimen of *Lespedeza intermedia*, the name *Lespedeza violacea*, by which this species has long been known, applies to *L. intermedia*, and the name *L. frutescens* now applies to [*Lespedeza violacea*]" (VBA 2020)]

**Key to Global Rank**

G1: At very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
G2: At high risk of extinction due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors.
G3: At moderate risk of extinction due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
G4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
G5: Common, widespread, and abundant.
GH: Known only from historical occurrences but still some hope of rediscovery.
GNR: Not ranked.
GX: Not located despite intensive searches and virtually no likelihood of rediscovery.

**Key to State Rank**

S1: At very high risk of extirpation from the state due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
S2: At high risk of extirpation from the state due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors.
S3: At moderate risk of extirpation from the state due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.

3

Page **40** of **42**

00006450

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

S4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
S5: Common, widespread, and abundant.
SH: Known only from historical occurrences but still some hope of rediscovery.
SNR: Not ranked.
SX: Not located despite intensive searches and virtually no likelihood of rediscovery.

**Federal and State Status**

Legal status denotes a simple hierarchy of endangerment in three categories: Endangered (E), Threatened (T), and Endangered Extirpated (X). Federal Status is determined by the U.S. Fish and Wildlife Service.

*Federal Status*

LE = Listed Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
LT = Listed Threatened - A taxon is likely to become endangered in the foreseeable future.

*State Status*

E = Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
T = Threatened - A taxon is likely to become endangered in the foreseeable future.

## References

Fleming, A.H. 2015. Geologic-Geomorphic Map of Plummers Island. Unpublished report.
Harrison, J.W. 2016. The Natural Communities of Maryland: 2016 Natural Community Classification Framework. Maryland Department of Natural Resources, Wildlife and Heritage Service, Natural Heritage Program, Annapolis, Maryland. Unpublished report. 35 pages.
Maryland Natural Heritage Program. 2019. List of Rare, Threatened, and Endangered Plants of Maryland. Maryland Department of Natural Resources, 580 Taylor Avenue, Annapolis, MD 21401. DNR 03-031319-135
Shetler, S.G., S.S. Orli, E.F. Wells, and M. Beyersdorfer. 2006. Checklist of the Vascular Plants of Plummers Island, Montgomery County, Maryland. Bulletin of the Biological Society of Washington 14:1-57.
Simmons, R.H. 2015. Native Vascular Flora of the City of Alexandria, Virginia. City of Alexandria Department Recreation, Parks, and Cultural Activities, Alexandria, Virginia.
Simmons, R.H., A.H. Fleming, and R.J. Soreng. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished report.
Virginia Botanical Associates. 2020. Digital Atlas of the Virginia Flora (http://www.vaplantatlas.org, 23 July 2020). Virginia Botanical Associates, Blacksburg, Virginia.

4

00006451

JA1472

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

Prepared by:

Roderick H. Simmons, Robert J. Soreng, Edward M. Barrows, and Louise H. Emmons for the National Parks Conservation Association, July 2020.

Citation:

Simmons, R.H., R.J. Soreng, E.M. Barrows, and L.H. Emmons. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished technical report.

Cover photo:

A female Silver-spotted Skipper (*Epargyreus clarus*) possibly obtaining nectar from a Northern Leatherflower (*Clematis viorna*). Photo by Meghan T. First.

00006452

JA1473



I-495 & I-270 Managed Lanes Study

# FINAL AIR QUALITY TECHNICAL REPORT
## June 2022



U.S. Department
of Transportation

**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00014323



I-495 & I-270 Managed Lanes Study

Final Air Quality Techncial Report

## TABLE OF CONTENTS

1    INTRODUCTION .................................................................................................................. 1

1.1    Overview ................................................................................................................... 1

1.2    Study Corridors and the Preferred Alternative ........................................................ 1

1.3    Description of the Preferred Alternative ................................................................... 2

2    EXISTING CONDITIONS ........................................................................................................ 4

2.1    Background ................................................................................................................ 4

2.1.1    Attainment Status ......................................................................................... 4

3    ENVIRONMENTAL CONSEQUENCES .................................................................................... 5

3.1    Regional Conformity ................................................................................................. 5

3.2    Carbon Monoxide Analysis ....................................................................................... 5

3.3    MSAT Analysis ........................................................................................................... 6

3.3.1    MSAT Modeling Methodology ...................................................................... 6

3.3.2    Affected Network .......................................................................................... 7

3.3.3    MSAT Results ............................................................................................... 13

3.3.4    Incomplete or Unavailable Information for Project Specific MSAT Health Impacts Analysis ......... 20

3.3.5    MSAT Conclusions ....................................................................................... 22

3.4    Greenhouse Gas Analysis ........................................................................................ 22

3.4.1    Updated Affected Network for Greenhouse Gas Analysis .......................... 22

3.4.2    GHG Construction Emissions ....................................................................... 29

3.4.3    GHG Summary ............................................................................................. 31

4    MITIGATION ...................................................................................................................... 32

## LIST OF TABLES

Table 3-1: Projected Annual MSAT Emissions (Tons Per Year) on Affected Network ................................. 14

Table 3-2: Projected Annual MSAT Change in Emissions on Affected Network ........................................... 14

Table 3-3: Projected Annual MSAT Percent Change in Emissions on Affected Network ............................ 15

Table 3-4: Projected Annual CO2 Equivalent Emissions in Tons Per Year (TPY) on Affected Network ...... 25

Table 3-5: Projected Annual CO2 Equivalent Emissions (Tons Per Year) on Affected Network ................. 25

Table 3-6:  Annualized and Total ICE Greenhouse Gas Emissions (Metric Tons Carbon Dioxide Equivalents [MT CO2e] and Tons CO2e) ............................................................................................. 31

00014324

JA1475

 I-495 & I-270 Managed Lanes Study

Final Air Quality Techncial Report

## LIST OF FIGURES

Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative....................................2
Figure 1-2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow).......................3
Figure 3-1: MSAT Affected Network Used in DEIS (2040 Design Year)........................................................8
Figure 3-2: MSAT Affected Network Used in FEIS (2016 Year)................................................................10
Figure 3-3: MSAT Affected Network Used in FEIS (2025 Opening Year) ...................................................11
Figure 3-4: MSAT Affected Network Used in FEIS (2045 Design Year) .....................................................12
Figure 3-5: Acrolein MSAT Annual Emissions for Base, Opening, and Design Year Conditions.................16
Figure 3-6: Benzene MSAT Annual Emissions for Base, Opening, and Design Year Conditions.................16
Figure 3-7: 1,3 Butadiene MSAT Annual Emissions for Base, Opening, and Design Year Conditions .......17
Figure 3-8: Diesel MSAT Annual Emissions for Base, Opening, and Design Year Conditions ....................17
Figure 3-9: Formaldehyde MSAT Annual Emissions for Base, Opening, and Design Year Conditions........18
Figure 3-10: Naphthalene MSAT Annual Emissions for Base, Opening, and Design Year Conditions........18
Figure 3-11: Polycyclic Organic Matter MSAT Annual Emissions for Base, Opening, and Design Year Conditions.................................................................................................................................................19
Figure 3-12: Acetaldehyde MSAT Annual Emissions for Base, Opening, and Design Year Conditions.......19
Figure 3-13: Ethylbenzene MSAT Annual Emissions for Base, Opening, and Design Year Conditions.......20
Figure 3-14: Total Energy Consumption for Base, Opening, and Design Year Conditions..........................26
Figure 3-15: Total Gaseous Hydrocarbon GHG Annual Emissions for Base, Opening, and Design Year Conditions.................................................................................................................................................26
Figure 3-16: Total Methane GHG Annual Emissions for Base, Opening, and Design Year Conditions.......27
Figure 3-17: Total Nitrous Oxide GHG Annual Emissions for Base, Opening, and Design Year Conditions 27
Figure 3-18: Total Atmospheric CO2 GHG Annual Emissions for Base, Opening, and Design Year Conditions .................................................................................................................................................28
Figure 3-19: Total CO2 Equivalent GHG Annual Emissions for Base, Opening, and Design Year Conditions .................................................................................................................................................28

## LIST OF APPENDICES

Appendix A    CO Traffic Analysis Data
Appendix B    ICE Input Files
Appendix C    MOVES RunSpecs MSATs

00014325

JA1476



# 1    INTRODUCTION

## 1.1    Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing a Final Environmental Impact Statement (FEIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study).  The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

This Final Air Quality Technical Report has been prepared to support the FEIS and focuses on the analysis of the Preferred Alternative. The Preferred Alternative, also referred to as Alternative 9 – Phase 1 South, includes building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. Refer to **Figure 1-1**. This Preferred Alternative was identified after extensive coordination with agencies, the public and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach.

The purpose of the Final Air Quality Technical Report is to present the existing conditions, an assessment of potential direct impacts of the Preferred Alternative to air quality and final mitigation, if applicable, for unavoidable impacts.  This Final Air Quality Technical Report builds upon the analysis in the Draft Air Quality Technical Report, DEIS and Supplemental DEIS (SDEIS), and has been prepared to support and inform the FEIS.

## 1.2    Study Corridors and the Preferred Alternative

In the SDEIS, published on October 1, 2021, FHWA and MDOT SHA identified the Preferred Alternative: Alternative 9 – Phase 1 South to be consistent with the previously determined phased delivery and permitting approach, which focuses on Phase 1 South. As a result, Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 in the DEIS but focuses the build improvements within the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway to west of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in **Figure 1-1**. The improvements include two new HOT managed lanes in each direction along I-495 and I-270 within the Phase 1 South limits.  There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1-1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

The 48-mile corridor Study limits remain unchanged: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-

00014326

**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Air Quality Technical Report

370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland (shown in both dark and light blue in **Figure 1-1**).

**Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.3    Description of the Preferred Alternative

The Preferred Alternative includes a two-lane HOT managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure 1-2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

00014327

JA1478

 **OP·LANES** MARYLAND | I-495 & I-270 Managed Lanes Study | **Final Air Quality Technical Report**

### Figure 1-2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow)

**I-495 from the George Washington Memorial Parkway to east of MD 187**



Approx. 194' - 198'

**I-495: American Legion Bridge (Looking north towards Maryland)**



Exit and entrance lanes provide access to the High-Occupancy Toll Lanes from the George Washington Memorial Parkway

High-Occupancy Toll Lanes with free transit and carpools of three or more

Possible location for shared-use path on ALB

**I-495 east of MD 187 to west of MD 5 - NO ACTION AT THIS TIME**



Approx. 138' - 146'

**I-270 from I-495 to I-370**



Approx. 218' - 222'

00014328

JA1479



**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Air Quality Technical Report

## 2    EXISTING CONDITIONS

### 2.1    Background

As required by the Clean Air Act and Amendments (CAA), the EPA sets the National Ambient Air Quality Standards (NAAQS) for airborne pollutants that have adverse impacts on human health and the environment, referred to as criteria pollutants. The criteria pollutants are carbon monoxide (CO), sulfur dioxide ($SO_2$), ozone ($O_3$), particulate matter ($PM_{2.5}$ and $PM_{10}$), nitrogen dioxide ($NO_2$), and lead (Pb). In addition to the criteria pollutants for which there are NAAQS, EPA also regulates Mobile Source Air Toxics (MSATs). The nine priority MSATs are: benzene, 1,3-butadiene, formaldehyde, acrolein, acetaldehyde, diesel particulate matter, ethylbenzene, naphthalene, and polycyclic organic matter. Greenhouse gases (GHGs) are another pollutant monitored by EPA. The primary GHGs in the Earth's atmosphere are Carbon Dioxide ($CO_2$), Methane ($CH_4$), Nitrous Oxide ($N_2O$), and Fluorinated Gases. The methodologies for assessing the pollutants are summarized in the **DEIS, Chapter 4, Section 4.8** and within the *Air Quality Technical Report* (**DEIS, Appendix I**).

### 2.1.1    Attainment Status

The Study is located in Montgomery County, Maryland and Fairfax County, Virginia. The EPA Green Book[1] lists these counties as attainment for all NAAQS with the exception of the 2015 8-hour ozone standard, for which the counties are nonattainment. Since the area is designated attainment for fine particulate matter ($PM_{2.5}$), transportation conformity requirements pertaining to $PM_{2.5}$ do not apply for this project[2] and no further analysis of $PM_{2.5}$ emissions were evaluated per FHWA guidance.[3]

Since the Study is located in a region where the maintenance period for CO has expired, the CO NAAQS and EPA project-level ("hot-spot") transportation conformity requirements do not apply (**DEIS, Section 4.8.2**). However, CO is highlighted in the FHWA 1987 guidance as a transportation pollutant to be summarized in an EIS. Therefore, the DEIS presented the results of the potential impacts for CO at worst-case intersections throughout the study corridors. The methodologies and assumptions applied for the analysis are consistent with FHWA[4] and EPA guidance.[5,6] An updated traffic analysis on the Preferred Alternative was performed to determine the worst-case intersections and interchanges throughout the corridor.  A discussion of the results of that analysis is presented in **Section 3.2**.

---

[1] https://www.epa.gov/green-book

[2] For background, the EPA issued a final rule (81 FR 58010), effective October 24, 2016, on "Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements" that stated, in part: "Additionally, in this document the EPA is revoking the 1997 primary annual standard for areas designated as attainment for that standard because the EPA revised the primary annual standard in 2012." (See: https://www.gpo.gov/fdsys/pkg/FR-2016-08-24/pdf/2016-18768.pdf). Accordingly, Fairfax County is no longer designated as maintenance for $PM_{2.5}$, and the associated USEPA regulatory requirements for conformity for $PM_{2.5}$ are eliminated for northern Virginia

[3] Guidance for Preparing and Processing Environmental and Section 4(f) Documents October 30, 1987. https://www.environment.fhwa.dot.gov/projdev/impTA6640.asp

[4] https://www.environment.fhwa.dot.gov/projdev/impTA6640.asp

[5] https://www3.epa.gov/scram001/guidance/guide/coguide.pdf

[6] https://nepis.epa.gov/Exe/ZyPdf.cgi?Dockey=P100M2FB.pdf

00014329



# 3    ENVIRONMENTAL CONSEQUENCES

## 3.1    Regional Conformity

Since the study area is designated as non-attainment for the 2015 ozone standard, there must be a currently conforming transportation plan and program at the time of project approval, and the project must come from a conforming plan and program (or otherwise meet criteria specified in 40 CR 93.109(b)).

The Study is currently included in the NCRTPB Fiscal Year (FY) 2019 – 2024 TIP [TIP ID 6432 and Agency ID AW0731 (planning activities)][7] and the NCRTPB Visualize 2045 Long Range Plan (CEID 1182, CEID 3281, and Appendix B page 56)[8]. This Study is included in the Air Quality Conformity Determination[9] that accompanies the Visualize 2045 Plan. The Visualize 2045 Air Quality Analysis is based upon the latest planning assumptions available for the Washington region. The analysis used MOVES2014a, the latest emission factor model specified by EPA for use in preparation of state implementation plans and conformity assessments at the time of analysis.

As part of the conformity requirements, consultation with affected agencies such as the EPA, FHWA, FTA, and the Metropolitan Washington Air Quality Committee (MWAQC), as well as with the public was completed.  23 CFR 450.324(c) requires that The Metropolitan Planning Organization review and update the transportation plan at least every 4 years in air quality nonattainment and maintenance areas to confirm the transportation plan's validity and consistency with current and forecasted transportation and land use conditions and trends and to extend the forecast period to at least a 20-year planning horizon[10]. The National Capital Region Transportation Planning Board (TPB) is currently updating the Visualize 2045 plan, to be completed in 2022. The design concept and scope for the Preferred Alternative, which is not significantly different than that included in the current version of Visualize 2045, will be included in the Air Quality Conformity analysis accompanying the update to Visualize 2045 which will be approved in 2022.

## 3.2    Carbon Monoxide Analysis

Since the Study is located in a region that is attainment of the NAAQS for CO, only NEPA applies; EPA project level ("hot-spot") transportation conformity requirements do not apply. The Maryland counties were redesignated from a nonattainment area to attainment and entered a 20-year maintenance period for CO in March 1996. The area was considered a maintenance area for the 20 years following until March 2016 when the counties completed the maintenance period. Since the Maryland counties have completed the maintenance period, transportation conformity no longer applies for CO. Similarly, Fairfax County is designated attainment for CO. In addition, as discussed in **Section 2.1.1**, CO is highlighted in the FHWA 1987 guidance as a transportation pollutant to be summarized in an EIS. A CO analysis is not required for conformity since the study area is designated as maintenance for CO, however, since CO is a proxy for transportation emissions, potential impacts for CO were still analyzed for transparency under NEPA for

---

[7] 19 FY 2019 – 2024 Transportation Improvement Program for the National Capital Region. October 17, 2018. https://www.mwcog.org/visualize2045/document-library/

[8] 20 Visualize 2045: A Long-Range Transportation Plan for the National Capital Region. October 17, 2018. https://www.mwcog.org/visualize2045/document-library/

[9] 21 Air Quality Conformity Analysis of Visualize 2045 and the FY 2019 – 2024 Transportation Improvement Program. October 17, 2018. https://www.mwcog.org/visualize2045/document-library/

[10] https://ecfr.federalregister.gov/current/title-23/chapter-I/subchapter-E/part-450#p-450.324(c)

00014330



I-495 & I-270 Managed Lanes Study                                    Final Air Quality Technical Report

affected intersections and interchanges impacted by the Study. See DEIS Air Quality Technical Report **Section 3.2** for methodology.

An updated traffic analysis to determine the worst-case intersections and interchanges (using maximum peak hour volume and maximum peak hour delay) associated with the Preferred Alternative throughout the corridors was performed. The detailed results of that analysis are included in **Appendix A.** The results of the traffic study showed that, although some interchanges and intersections that were identified as being worst case in the updated analysis differed from the analysis included in the DEIS, overall, the maximum peak hour volumes and maximum peak hour delays were less than those for the top three intersections and interchanges used in the DEIS analysis. For this reason, the DEIS analysis can still be assumed to have projected worst-case emissions and that the project would not cause or contribute to a violation of the CO NAAQS.

## 3.3   MSAT Analysis

Because the Preferred Alternative includes no action for the majority of the study area, the affected network was updated to focus on just those segments near the project area using the FHWA suggested methodology for determining segments with meaningful changes resulting from the proposed improvements.  Based on the traffic analysis associated with the Preferred Alternative, fewer links met the affected network criteria compared to the Alternatives analyzed in the DEIS, which reduced the footprint of the affected area.  The updated affected network was developed using the updated Regional Travel Demand Forecast Metropolitan Washington Council of Governments (MWCOG) Regional Travel Demand Model for the Preferred Alternative in 2025 and 2045 analysis years. The results of an updated MSAT analysis using traffic data derived from this affected network are presented below.

### 3.3.1    MSAT Modeling Methodology

The methodology for the updated MSAT analysis is consistent with the MSAT modeling methodology described in the DEIS with the following exceptions:

- The latest version of the EPA MOVES model (MOVES3.0.1) was used which includes updated onroad exhaust emission rates, including HD GHG Phase 2 and Safer Affordable Fuel Efficiency (SAFE) rules, updated onroad activity, vehicle populations and fuels, added gliders and off-network idle, and revised inputs for hotelling and starts.

- Revised Affected Network for the Existing, Interim and Design Year Build and No Build conditions to reflect a smaller project area compared to the previous Affected Network in the DEIS along with a revised Design Year of 2045 (compared to 2040 in the DEIS); and

- Revised MOVES data manager files from MWCOG for the Affected Network.

In accordance with the latest MSAT guidance, the Study is still best characterized as one with "higher potential MSAT effects" since the projected Design Year traffic is still expected to reach the 140,000 to 150,000 AADT criteria.

00014331

 I-495 & I-270 Managed Lanes Study     Final Air Quality Technical Report

### 3.3.2   Affected Network

The MSAT analysis reflects the updated affected network from the DEIS for the Preferred Alternative to focus on just those segments within and near the project area using the traffic for the Preferred Build Alternative and the FHWA suggested methodology for determining segments with meaningful changes.

### A.   Previously Developed Affected Network

The affected network in the DEIS and Air Quality Technical Report (AQTR) was developed using procedures identified in the FHWA guidance and the Frequently Asked Questions (FAQ) Conducting Quantitative MSAT Analysis for FHWA NEPA Documents[11] for identifying segments within the traffic study area where meaningful changes were expected.  One of more of the following criterion was used to develop the Affected Network for the FEIS:

- Changes of ± 5% or more in AADT on congested highway links of LOS D or worse
- Changes of ± 10% or more in AADT on uncongested highway links of LOS C or better
- Changes of ± 10% or more in travel time
- Changes of ± 10% or more in intersection delay

For background, the criteria listed above were applied to the Metropolitan Washington Council of Governments (MWCOG) regional forecasting model for the 2040 design year, which was the latest model year available at the time the DEIS was initiated.  This same model was used as the basis for all traffic forecasting and operational analysis in the DEIS.  For the original network, all the criteria were applied, and no modeling artifacts were eliminated from the selected network.  The resulting network that was included in the AQTR and the DEIS is shown below in **Figure 3-1**.  Additional detail on the MWCOG model is described in the DEIS.

---

[11] Federal Highway Administration. *Frequently Asked Questions Conducting Quantitative MSAT Analysis for FHWA NEPA Documents.* November 7, 2017.

00014332

OP·LANES™
MARYLAND   I-495 & I-270 Managed Lanes Study          Final Air Quality Technical Report



**Figure 3-1: MSAT Affected Network Used in DEIS (2040 Design Year)**

00014333

JA1484



## B.    Updated Affected Network

For the FEIS, an updated version of the MWCOG model with projections out an additional five years to the year 2045 was used to develop the affected network. This updated MWCOG model is the basis for all traffic forecasting and operational analysis in the FEIS for the Preferred Alternative. Similar to the DEIS, the MWCOG model initially resulted in a relatively large affected network area. In consultation with FHWA, additional steps were taken to reduce the footprint of the affected network area to make it more consistent with the Preferred Alternative study area. These included eliminating the travel time criterion and removing modeling artifacts.

### Eliminate Travel Time Criterion

The project team determined that the application of the travel time criterion was introducing many additional links to the study area that were far removed from the actual geometric changes proposed under the project. Eliminating the travel time criterion from the analysis significantly reduced the footprint of the affected network area.

### Remove Artifacts

A final step was taken to refine the revised affected network further by removing modeling artifacts which were defined as non-contiguous flagged links which were not considered meaningful from the Preferred Alternative study area.

**Figure 3-2** thru **Figure 3-4** show the resultant affected network that was used in the MSAT modeling analysis for the FEIS for the 2016, 2025, and 2045 conditions, respectively. This reflects a more focused corridor-based study area consistent with the NEPA study area (rather than a regional study area) compared to the DEIS. The affected network better represents the actual impacts of the proposed improvements.

00014334

OP·LANES™
MARYLAND　　I-495 & I-270 Managed Lanes Study　　　　　　**Final Air Quality Technical Report**



**Figure 3-2: FEIS MSAT Affected Network (2016)**

00014335

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    **Final Air Quality Technical Report**



**Figure 3-3: FEIS MSAT Affected Network (2025)**

00014336

JA1487



**Figure 3-4: FEIS MSAT Affected Network (2045)**

00014337



I-495 & I-270 Managed Lanes Study                 Final Air Quality Technical Report

The latest version of the EPA MOVES model (MOVES3 Version 3.0.1) was run for each Affected Network using project specific traffic data developed for the Preferred Alternative consistent with the overall project traffic analysis as noted above. MOVES3 is an update to the previous version MOVES2014b which was used in the DEIS and includes many updates to exhaust emission rates to better estimate the real-world emissions of new vehicle technologies. "Compared to the previous MOVES2014 modeling tool, MOVES3 allows users to model the benefits from new regulations promulgated since MOVES2014 was released, incorporates the latest emissions data, and has improved functionality". Some of the major updates include new regulations such as:

- Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2; and
- Safer Affordable Fuel Efficient (SAFE) Vehicles Rule.

The MOVES RunSpec Inputs and County Data Manager are essentially unchanged from the DEIS, except that the Design Year of 2045 was run and updated MWCOG MOVES files were used for the County Data Manger database along with revised traffic project data for the Preferred Alternative. The MSAT regional emission trends (**DEIS, Appendix I, Section 3.4.2**) and MSAT health impact analysis (**DEIS, Appendix I, Section 3.4.4**) also remain unchanged from the DEIS.

### 3.3.3    MSAT Results

The results of the quantitative MSAT analysis for the Preferred Alternative Existing, Build and No Build conditions are presented in **Table 3-1**. Projected change in emissions for the Preferred Alternative compared to the 2025 and 2045 No Build conditions are provided in **Table 3-2** and **Table 3-3,** respectively. A graphical representation of the projected annual MSAT emissions for the base year and 2025 and 2045 No Build and Preferred Alternative by pollutant are presented in **Figure 3-5** through **Figure 3-13**. These tables and figures show that in general, all MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045. All MSAT pollutant emissions are expected to significantly decline in the Opening (average 72.9% decrease) and Design (average 89.29% decrease) years when compared to Existing conditions. These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios.

00014338



I-495 & I-270 Managed Lanes Study          Final Air Quality Technical Report

### Table 3-1: Projected Annual MSAT Emissions (Tons Per Year) on Affected Network

| Projected Annual MSAT Emissions in Tons Per Year (TPY) on Affected Network | | Annual Vehicle Miles Traveled (Million AVMT) | Acrolein (TPY) | Benzene (TPY) | 1,3 Butadiene (TPY) | Diesel PM (TPY) | Formaldehyde (TPY) | Naphthalene (TPY) | Polycyclic Organic Matter (TPY) | Acetaldehyde (TPY) | Ethylbenzene (TPY) | Total TPY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 Base Year | Preferred Alternative | 1,359.5 | 0.42 | 3.87 | 0.43 | 35.9 | 5.9 | 0.67 | 0.31 | 3.11 | 2.28 | 52.89 |
| 2025 Opening Year | Preferred Alternative | 1,444.4 | 0.10 | 1.35 | 0.08 | 7.83 | 1.51 | 0.15 | 0.06 | 0.96 | 1.01 | 13.05 |
| | No Build | 1,364.6 | 0.09 | 1.30 | 0.08 | 7.45 | 1.46 | 0.14 | 0.06 | 0.92 | 0.98 | 12.48 |
| 2045 Design Year | Preferred Alternative | 1,801.5 | 0.04 | 0.66 | 0.05 | 2.56 | 0.49 | 0.03 | 0.01 | 0.46 | 0.68 | 4.98 |
| | No Build | 1,674.4 | 0.03 | 0.62 | 0.05 | 2.4 | 0.46 | 0.03 | 0.01 | 0.43 | 0.64 | 4.67 |

### Table 3-2: Projected Annual MSAT Change in Emissions on Affected Network

| Projected Annual MSAT Change in Emissions on Affected Network | | Annual Vehicle Miles Traveled (Million AVMT) | Acrolein (TPY) | Benzene (TPY) | 1,3 Butadiene (TPY) | Diesel PM (TPY) | Formaldehyde (TPY) | Naphthalene (TPY) | Polycyclic Organic Matter (TPY) | Acetaldehyde (TPY) | Ethylbenzene (TPY) | Total TPY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 Opening Year | Difference (Preferred Alternative - Base) | 84.9 | -0.32 | -2.53 | -0.35 | -28.1 | -4.46 | -0.52 | -0.24 | -2.16 | -1.27 | -39.95 |
| | Difference (Preferred Alternative - No Build) | 79.8 | 0.003 | 0.05 | 0.003 | 0.38 | 0.048 | 0.005 | 0.002 | 0.03 | 0.03 | 0.551 |
| 2045 Design Year | Difference (Preferred Alternative - Base) | 442 | -0.38 | -3.21 | -0.43 | -33.4 | -5.48 | -0.64 | -0.29 | -2.66 | -1.61 | -48.1 |
| | Difference (Preferred Alternative - No Build) | 127.1 | 0.002 | 0.038 | 0.001 | 0.157 | 0.03 | 0.002 | 0.001 | 0.02 | 0.03 | 0.281 |

00014339

JA1490

 I-495 & I-270 Managed Lanes Study　　　Final Air Quality Technical Report

**Table 3-3: Projected Annual MSAT Percent Change in Emissions on Affected Network**

| Projected Annual MSAT Percent Change in Emissions on Affected Network | | Annual Vehicle Miles Traveled (Million AVMT) | Acrolein | Benzene | 1,3 Butadiene | Diesel PM | Formaldehyde | Naphthalene | Polycyclic Organic Matter | Acetaldehyde | Ethylbenzene |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 Opening Year | Percent Difference (Preferred Alternative - Base) | 6.24% | -75.7% | -65.2% | -80.8% | -78.2% | -74.7% | -77.9% | -78.6% | -69.3% | -55.7% |
| | Percent Difference (Preferred Alternative - No Build) | 5.85% | 3.3% | 3.77% | 3.54% | 5.08% | 3.29% | 3.35% | 3.69% | 3.46% | 3.15% |
| 2045 Design Year | Percent Difference (Preferred Alternative - Base) | 32.5% | -91.49% | -82.9% | -98.8% | -92.9% | -91.8% | -94.9% | -95.1% | -85.3% | -70.4% |
| | Percent Difference (Preferred Alternative - No Build) | 7.6% | 5.4% | 6.0% | 4.7% | 6.5% | 5.7% | 6.0% | 6.1% | 5.4% | 5.13% |

In general:

- For each MSAT, the long-term trend in emissions is downward. The downward trend in emissions is a result of technological improvements (i.e., more stringent vehicle emission and fuel quality standards coupled with ongoing fleet turnover) and is achieved despite increased VMT in this period.

- For each MSAT, the differences in forecast emissions for Build and No Build are relatively small, especially compared to the long-term downward trend in emissions for each MSAT.

- The Preferred Alternative conditions are expected to result in significant reductions in all MSATs compared to the Base Year in both the Opening and Design years as shown in **Table 3-1** through **Table 3-3**.

00014340

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study      Final Air Quality Technical Report



**Figure 3-5: Acrolein MSAT Annual Emissions for Base, Opening, and Design Year Conditions**



**Figure 3-6: Benzene MSAT Annual Emissions for Base, Opening, and Design Year Conditions**

00014341

JA1492



I-495 & I-270 Managed Lanes Study                    Final Air Quality Technical Report



**Figure 3-7: 1,3 Butadiene MSAT Annual Emissions for Base, Opening, and Design Year Conditions**



**Figure 3-8: Diesel MSAT Annual Emissions for Base, Opening, and Design Year Conditions**

00014342

OP•LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study          Final Air Quality Technical Report



**Figure 3-9: Formaldehyde MSAT Annual Emissions for Base, Opening, and Design Year Conditions**



**Figure 3-10: Naphthalene MSAT Annual Emissions for Base, Opening, and Design Year Conditions**

00014343



I-495 & I-270 Managed Lanes Study                    Final Air Quality Technical Report



**Figure 3-11: Polycyclic Organic Matter MSAT Annual Emissions for Base, Opening, and Design Year Conditions**



**Figure 3-12: Acetaldehyde MSAT Annual Emissions for Base, Opening, and Design Year Conditions**

00014344

**OP·LANES**
MARYLAND     I-495 & I-270 Managed Lanes Study          Final Air Quality Technical Report



**Figure 3-13: Ethylbenzene MSAT Annual Emissions for Base, Opening, and Design Year Conditions**

### 3.3.4    Incomplete or Unavailable Information for Project Specific MSAT Health Impacts Analysis

Information is incomplete or unavailable to credibly predict the project-specific health impacts due to changes in MSAT emissions associated with a proposed set of highway alternatives.[12] The outcome of such an assessment, adverse or not, would be influenced more by the uncertainty introduced into the process through assumption and speculation rather than any genuine insight into the actual health impacts directly attributable to MSAT exposure associated with a proposed action.

The EPA is responsible for protecting the public health and welfare from any known or anticipated effect of an air pollutant. They are the lead authority for administering the CAA and its amendments and have specific statutory obligations with respect to hazardous air pollutants and MSAT. The EPA is in the continual process of assessing human health effects, exposures, and risks posed by air pollutants. They maintain the IRIS, which is "a compilation of electronic reports on specific substances found in the environment and their potential to cause human health effects" (EPA, https://www.epa.gov/iris/). Each report contains assessments of non-cancerous and cancerous effects for individual compounds and quantitative estimates of risk levels from lifetime oral and inhalation exposures with uncertainty spanning perhaps an order of magnitude.

---

[12] Appendix C, Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents. October 18, 2016. https://www.fhwa.dot.gov/environMent/air_quality/air_toxics/policy_and_guidance/msat/page03.cfm

00014345



Other organizations are also active in the research and analyses of the human health effects of MSAT, including the Health Effects Institute (HEI). A number of HEI studies are summarized in Appendix D of FHWA's Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents. Among the adverse health effects linked to MSAT compounds at high exposures are: cancer in humans in occupational settings; cancer in animals; and irritation to the respiratory tract, including the exacerbation of asthma. Less obvious is the adverse human health effects of MSAT compounds at current environmental concentrations (HEI Special Report 16, https://www.healtheffects.org/publication/mobile-source-air-toxics-critical-review-literature-exposure-and-health-effects) or in the future as vehicle emissions substantially decrease.

The methodologies for forecasting health impacts include emissions modeling; dispersion modeling; exposure modeling; and then final determination of health impacts – each step in the process building on the model predictions obtained in the previous step. All are encumbered by technical shortcomings or uncertain science that prevents a more complete differentiation of the MSAT health impacts among a set of project alternatives. These difficulties are magnified for lifetime (i.e., 70 year) assessments, particularly because unsupportable assumptions would have to be made regarding changes in travel patterns and vehicle technology (which affects emissions rates) over that time frame, since such information is unavailable.

It is particularly difficult to reliably forecast 70-year lifetime MSAT concentrations and exposure near roadways; to determine the portion of time that people are actually exposed at a specific location; and to establish the extent attributable to a proposed action, especially given that some of the information needed is unavailable.

There are considerable uncertainties associated with the existing estimates of toxicity of the various MSAT, because of factors such as low-dose extrapolation and translation of occupational exposure data to the general population, a concern expressed by HEI (Special Report 16, https://www.healtheffects.org/publication/mobile-source-air-toxics-critical-review-literature-exposure-and-health-effects). As a result, there is no national consensus on air dose-response values assumed to protect the public health and welfare for MSAT compounds, and in particular for diesel PM. The EPA states that with respect to diesel engine exhaust, "[t]he absence of adequate data to develop a sufficiently confident dose-response relationship from the epidemiologic studies has prevented the estimation of inhalation carcinogenic risk (https://www.epa.gov/iris)."

There is also the lack of a national consensus on an acceptable level of risk. The current context is the process used by the EPA as provided by the CAA to determine whether more stringent controls are required in order to provide an ample margin of safety to protect public health or to prevent an adverse environmental effect for industrial sources subject to the maximum achievable control technology standards, such as benzene emissions from refineries. The decision framework is a two-step process. The first step requires EPA to determine an "acceptable" level of risk due to emissions from a source, which is generally no greater than approximately 100 in a million. Additional factors are considered in the second step, the goal of which is to maximize the number of people with risks less than 1 in a million due to emissions from a source. The results of this statutory two-step process do not guarantee that cancer risks from exposure to air toxics are less than 1 in a million; in some cases, the residual risk determination could result in maximum individual cancer risks that are as high as approximately 100 in a million. In a June 2008

00014346



decision, the US Court of Appeals for the District of Columbia Circuit upheld EPA's approach to addressing risk in its two-step decision framework. Information is incomplete or unavailable to establish that even the largest of highway projects would result in levels of risk greater than deemed acceptable.[13]

Because of the limitations in the methodologies for forecasting health impacts described, any predicted difference in health impacts between alternatives is likely to be much smaller than the uncertainties associated with predicting the impacts. Consequently, the results of such assessments would not be useful to decision makers, who would need to weigh this information against project benefits, such as reducing traffic congestion, accident rates, and fatalities plus improved access for emergency response, that are better suited for quantitative analysis.

### 3.3.5    MSAT Conclusions

What is known about mobile source air toxics is still evolving. Information is currently incomplete or unavailable to credibly predict the study-specific health impacts due to changes in MSAT emissions associated with each of the study Alternatives. Under the Preferred Alternative, there may be slightly higher MSAT emissions in the design year relative to the No Build Alternative due to increased VMT. However, lower MSAT levels are expected in the future compared to existing conditions due to cleaner engine standards coupled with fleet turnover. The magnitude of the EPA-projected reductions is so great that, even after accounting for VMT growth, MSAT emissions in the study area would be significantly lower in the future than they are today.

## 3.4    Greenhouse Gas Analysis

GHG emissions are different from criteria air pollutants since their effects are in the global atmosphere rather than localized. Greenhouse gas emissions from vehicles using roadways are a function of distance traveled (expressed as vehicle miles traveled (VMT)), vehicle speed, and road grade.

To date, no GHG emissions NAAQS have been established by the EPA and there is no approved regulatory requirement that has been established to analyze these emissions at a project level for transportation projects.    However, based on the President's recent Executive Order[14], the project's impacts on greenhouse gas (GHG) emissions and climate change should be documented in the Environmental Assessment (EA) consistent with the 2016 Council of Environmental Quality (CEQ) Final GHG NEPA guidance[15]. In order to meet the 2016 CEQ guidance, a quantitative GHG assessment was conducted consistent with the 2016 final CEQ guidance[16] and covers GHG emissions.

### 3.4.1    Updated Affected Network for Greenhouse Gas Analysis

---

[13] https://www.cadc.uscourts.gov/internet/opinions.nsf/284E23FFE079CD59852578000050C9DA/$file/07-1053-1120274.pdf)

[14] Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis". January 20, 2021.

[15] Memorandum for Heads of Federal Departments and Agencies from Christina Goldfuss, Council on Environmental Quality.  "Final guidance for Federal Departments and Agencies on Greenhouse Gas Emissions and the Effect of Climate Change in the National Environmental and Policy Act Reviews".  August 1, 2016

[16]   https://www.federalregister.gov/documents/2016/08/05/2016-18620/final-guidance-for-federal-departments-and-agencies-on-consideration-of-greenhouse-gas-emissions-and

00014347



For the FEIS, an updated version of the MWCOG model with projections out an additional five years to the year 2045 was used to develop the affected network for the MSAT analysis. This updated MWCOG model is the basis for all traffic forecasting and operational analysis in the FEIS for the Preferred Alternative. The affected network for purposes of the MSAT review was constrained to only the interstate system and immediate roadway links related to the reduced limits of the build improvements under the Preferred Alternative. The reduced affected network for the MSAT analysis was developed in consultation with FHWA to make it more consistent with the Preferred Alternative study area and in recognition that for the purpose of an MSAT analysis, those pollutants are measured at a project level.

Due to the global atmospheric impacts of GHG and the lack of an approved method for evaluating GHG at the project level, the Project has analyzed GHG within MSAT affected network as well as a broader more appropriate level for GHG. The traffic analysis finalized for the Preferred Alternative shows a less than 1% increase in VMT for the project overall. The affected network for purposes of analyzing MSATs for the Preferred Alternative is only a subset of the larger regional transportation network. Specifically, this analysis focused on the areas likely to experience meaningful changes in traffic as a result of the proposed improvements. The reduced affected network assumed for the MSAT review shows an increase in VMT as traffic is pulled from the local roadway network onto the interstate system due to the additional capacity. It does not account for the reduction in VMT from that local roadway network. Refer to **Section 3.3.2** for the details on development of the reduced affected network.

**Figure 3-2** thru **Figure 3-4** show the resultant affected network that was used in the MSAT modeling analysis for the FEIS for the 2016, 2025, and 2045 conditions, respectively. This reflects a more focused corridor-based study area consistent with the NEPA study area (rather than a regional study area) compared to the DEIS. Since there is no approved methodology for conducting a project-level quantitative Greenhouse Gas emissions analysis, there are numerous parameters that could be applied to conduct this review. Consistent with guidance on developing an affected network to analyze project-related pollutants, such as MSATs, MDOT SHA analyzed GHG emissions using the same affected network as the MSAT analysis. This definition of the affected network, however, is likely extremely conservative, as GHG emissions are most commonly considered on a regional or even broader level.

GHG emissions for the Existing, Opening and Design year Preferred Build and No Build Alternative were estimated consistent with the MSAT methodology discussed in Section 3.3.1, and include carbon dioxide equivalent (CO2e) and its constituent pollutants as included in the latest MOVES version 3.0.1. As discussed above, the latest version of MOVES specific to GHG includes regulatory updates:

- Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2; and
- Safer Affordable Fuel Efficient (SAFE) Vehicles Rule

To evaluate VMT for the Preferred Alternative, the VMT derived from the MSAT Affected Network for (refer to **Section 3.3.2**) was used to characterize the VMT changes for the GHG discussion. As noted above, this MSAT methodology is a very conservative approach for estimating GHG emissions given that they are considered a regional, even global pollutant. MSATs are considered more localized pollutants and the guidance for developing the affected network is specific to MSATs. The links identified in the Affected Network in **Section 3.3.2** include only roadway links that could significantly impact the study area. The

00014348



results of the quantitative GHG analysis are presented in **Table 3-4** while the change in emissions in tons per year (TPY) are presented in **Table 3-5** for the 2025 and 2045 Preferred Alternative and No Build conditions. A graphical representation of the projected annual GHG related emissions for the Base year, 2025 and 2045 No Build and Preferred Alternative by pollutant are presented in **Figure 3-14** through **Figure 3-19**. The analysis shows GHG emissions are expected to decline in the Opening and Design years for all GHG pollutants when compared to existing conditions. Specifically, for $CO_2e$, there is projected to be a 94,664 TPY decrease (13% reduction) in the Opening year and a 67,272 TPY decrease (9% reduction) in the Design year. These reductions occur despite projected increase in VMT on the affected network between the 2016 and 2025 and 2045 Build scenarios.

Under the No Build condition, VMT on the affected network would gradually increase for the years between 2016 and 2045 as employment and population in the area increases. Under the Preferred Alternative, VMT would experience an increase due to the factors affecting the No Build condition but would also increase because the additional capacity on I-495 and I-270 from the Preferred Alternative would pull traffic off of local roadways and onto the interstates. Since the affected network is comprised primarily of the interstates and small sections of adjoining roadways, the VMT under the Preferred Alternative experiences a larger increase on the affected network than on the regional model used for the overall project because while the increase in VMT on the interstates is accounted for, the model does not account for the decrease in VMT on local roadways (**Table 3-4**). Therefore, the approach to analyze GHG emissions applying the substantially more narrow affected network used for the MSAT analysis may not accurately reflect regional GHG emissions resulting from the Preferred Alternative.

00014349

 I-495 & I-270 Managed Lanes Study                Final Air Quality Technical Report

**Table 3-4: Projected Annual CO2 Equivalent Emissions in Tons Per Year (TPY) on Affected Network**

| Projected Annual GHG Emissions in Tons Per Year (TPY) on Affected Network | | Annual Vehicle Miles Traveled (Million AVMT) | Total Energy Consumption (MMBtu) | Total Gaseous Hydrocarbons (TPY) | Methane (TPY) | Nitrous Oxide (TPY) | Atmospheric CO2 (TPY) | CO2 Equivalent (TPY) |
|---|---|---|---|---|---|---|---|---|
| 2016 Base Year | Existing | 1,359.5 | 8,650,256 | 195 | 32.2 | 4.25 | 782,250 | 730,307 |
| 2025 Opening Year | Preferred Alternative | 1,444.4 | 7,530,968 | 86 | 20.8 | 2.76 | 634,308 | 635,643 |
| | No Build | 1,364.6 | 7,231,029 | 84 | 20.2 | 2.71 | 609,004 | 610,308 |
| 2045 Design Year | Preferred Alternative | 1,801.5 | 7,853,325 | 60 | 17.9 | 3.1 | 661,662 | 663,035 |
| | No Build | 1,674.4 | 7,381,940 | 57 | 16.9 | 2.9 | 621,933 | 623,243 |

**Table 3-5: Projected Annual CO2 Equivalent Emissions (Tons Per Year) on Affected Network**

| Projected Annual GHG Change in Emissions on Affected Network | | Annual Vehicle Miles Traveled (Million AVMT) | Total Energy Consumption (MMBtu) | Total Gaseous Hydrocarbons (TPY) | Methane (TPY) | Nitrous Oxide (TPY) | Atmospheric CO2 (TPY) | CO2 Equivalent (TPY) |
|---|---|---|---|---|---|---|---|---|
| 2025 Opening Year | Difference (Preferred Alternative - Base) | 84.9 | -1,119,288 | -108.3 | -11.4 | -1.5 | -93,943 | -94,664 |
| | Difference (Preferred Alternative - No Build) | 79.8 | 299,939 | 2.7 | 0.65 | 0.05 | 25,304 | 25,336 |
| 2045 Design Year | Difference (Preferred Alternative - Base) | 442 | -796,930 | -135.0 | -14.3 | -1.12 | -66,589 | -67,272 |
| | Difference (Preferred Alternative - No Build) | 127.1 | 471,385 | 3.0 | 0.97 | 0.13 | 39,728 | 39,792 |

00014350

JA1501

**OP·LANES** MARYLAND  |  I-495 & I-270 Managed Lanes Study          Final Air Quality Technical Report



**Figure 3-14: Total Energy Consumption for Base, Opening, and Design Year Conditions**



**Figure 3-15: Total Gaseous Hydrocarbon GHG Annual Emissions for Base, Opening, and Design Year Conditions**

00014351

JA1502



I-495 & I-270 Managed Lanes Study                    Final Air Quality Technical Report



**Figure 3-16: Total Methane GHG Annual Emissions for Base, Opening, and Design Year Conditions**



**Figure 3-17: Total Nitrous Oxide GHG Annual Emissions for Base, Opening, and Design Year Conditions**

00014352

JA1503

OP·LANES™
MARYLAND     I-495 & I-270 Managed Lanes Study          Final Air Quality Technical Report



**Figure 3-18: Total Atmospheric CO2 GHG Annual Emissions for Base, Opening, and Design Year Conditions**



**Figure 3-19: Total CO2 Equivalent GHG Annual Emissions for Base, Opening, and Design Year Conditions**

00014353

JA1504



**OP·LANES**
MARYLAND    I-495 & I-270 Managed Lanes Study                Final Air Quality Technical Report

### 3.4.2    GHG Construction Emissions

GHG emissions from the study will be generated from construction, from vehicles using roadways, and during operations and maintenance activities of the roadways. Construction emissions were discussed in **Section 3.6** of the DEIS and have been updated in the FEIS to include a quantitative analysis of the construction related GHG emissions of the Preferred Alternative using the FHWA's Infrastructure Carbon Estimator Tool (ICE) (Version 2.1.3)[17].

Per the ICE v2.1 User Guide, ICE is designed for a pre-engineering analysis of the energy and GHG emissions impacts of constructing and maintaining transportation infrastructure. A planning-level analysis is appropriate to produce "ballpark" estimates of the construction and maintenance impacts of long-range transportation decisions. It should be thought of as a sketch-planning analysis, rather than a detailed analysis of infrastructure design and construction parameters. A planning level analysis uses high-level estimates of construction activity in terms of lane miles or track miles before refined estimates are available. It is appropriate to analyze decisions that are made in the long-range planning or project development processes, before details about specific facility dimensions, materials, and construction practices are known. ICE does not analyze any tradeoffs between pavement types (e.g., asphalt vs. concrete), roadway designs (e.g., specific alignments and associated grading or structural differences), or bridge designs (e.g., steel vs. concrete structure). Rather it supports broad decision-making, such as the decision to build or not build a certain type of infrastructure, such as a freeway, bike path, or subway station, and alternatives analysis.[18]

ICE was run to calculate greenhouse gas (GHG) emissions from construction and maintenance activities over the lifecycle of the Preferred Build Alternative.  Activities covered by the tool are broken into the following categories:

1. Materials – This category includes upstream energy and emissions associated with project materials, particularly from four categories:
   a. Energy and fuel used in raw material extraction
   b. Energy and fuel used in material production
   c. Chemical reactions in material production, such as CO2 emitted from calcination of limestone.
   d. Energy and fuel used in raw material transportation

2. Transportation – This category includes upstream energy and emissions associated with fuel used to transport materials to site.

3. Construction – Energy and fuel used in construction equipment

4. Operations and Maintenance (O&M) – This category includes routine maintenance of infrastructure features, including:
   a. Fuel used in snow removal equipment
   b. Fuel used in vegetation management equipment

---

[17] https://www.fhwa.dot.gov/environment/sustainability/energy/tools/carbon_estimator/index.cfm
[18] http://www.dot.state.mn.us/sustainability/ghg-analysis.html

00014354



     c. Fuel used in other routine maintenance, such as sweeping, stripping, bridge deck repair, litter pickup, and maintenance of appurtenances activities

     d. Energy and emissions from roadway repair and rehabilitation

     e. Net energy and emissions from pavement preservation activities (optional)

5. Usage – This category is for energy and emissions associated with vehicle operations on roadways. It includes both vehicle use on the infrastructure and additional emissions due to traffic delay from construction.

Default settings in ICE were used for materials, construction equipment and fuel. Maintenance schedules would vary somewhat, and specifics are unknown at this time, therefore default values were used where specific values were not known.

## A. ICE Inputs

The Project's design engineers provided various inputs required to run ICE for the Preferred Alternative. A default lifecycle analysis of 30 years was chosen. Data requirements for running ICE included:

- Bridges and Overpasses
- Culverts
- Bike and Pedestrian Activities
- Roadway System and Roadway Projects
- Crossroads Existing and Proposed
- Lighting and Signage
- Vehicle Operation

Site specific values were input as provided, where site specific factors were not known default values were assumed. Specific input and assumptions used for the ICE model are included in **Appendix B.**

## B. ICE Results

The summary of the annualized ICE results from the model output for each activity in metric tons per CO2 equivalent (MTCO2e) and tons CO2e (TCO2e) are shown in **Table 3-6**. The results include GHG emissions related to materials, transportation, construction, operations and maintenance, and vehicle operations. The table includes annualized emissions and total emissions over the 30-year lifespan for MTCO2e and TCO2e. The results show that a majority of the ICE GHG emissions are expected to be associated with vehicle operations which include vehicles using the roadways including delay due to construction, followed by materials, O&M, construction and transportation.

00014355



I-495 & I-270 Managed Lanes Study                    Final Air Quality Technical Report

**Table 3-6:  Annualized and Total ICE Greenhouse Gas Emissions (Metric Tons Carbon Dioxide Equivalents [MT CO2e] and Tons CO2e)**

| Activity | Annualized Greenhouse Gas Emissions (MTCO2e) | Annualized Greenhouse Gas Emissions (TCO2e) | Total Greenhouse Gas Emissions (MTCO2e) | Total Greenhouse Gas Emissions (TCO2e) |
|---|---|---|---|---|
| Materials | 5,581 | 6,151 | 167,440 | 184,571 |
| Transportation | 318 | 350 | 9,546 | 10,523 |
| Construction | 2,312 | 2,548 | 69,371 | 76,468 |
| Operations and Maintenance | 4,195 | 4,624 | 133,264 | 146,898 |
| Usage (Vehicle Operations)* | 1,191,563 | 1,313,473 | 35,746,884 | 39,404,194 |
| **Total** | **1,203,969** | **1,327,146** | **36,126,505** | **41,026,623** |

Source: FHWA ICE model Output

\* Usage emissions are based on national defaults and are of total usage/vehicle operation emissions rather than as compared to the no-build alternative.

### 3.4.3    GHG Summary

Maryland is committed to reducing GHG and to preparing our State for the impacts of climate change. The Maryland Commission on Climate Change (MCCC) and its Mitigation Working Group (MWG) have demonstrated that commitment by working collaboratively with experts and stakeholders across State and local agencies, environmental, non-profit and academic institutions. The resulting body of work quantifies baseline GHG emissions by sector to understand the impacts that specific plans, policies, and programs will have on future emissions economy-wide. Statewide analyses do not indicate that the HOT lanes will impede Maryland's ability to meet our GHG emission reduction goals. In fact, the Greenhouse Gas Reduction Act (GGRA) Plan documents Maryland's existing and future emissions reductions under several scenarios, all of which include this project.  The document illustrates that Maryland will not only meet the 40% by 2030 goal, but that we are dedicated to working together to exceed that goal and to strive for a 50% reduction by 2030.

MDOT continues to be an active partner in the MCCC and Maryland's GHG reduction efforts.  We are leading the way on transportation sector scenario and emissions analyses. We have worked with stakeholders, communities, and our partners on the MWG to better understand the impacts of the changes within the transportation sector, ranging from technology improvements, such as the deployment of automated, connected, and electric vehicles to the importance of improving mobility and expanding telework

The proposed action is relatively minor in scope compared to the larger set of highway VMT and onroad mobile source GHG emissions that were assessed in a 2020 statewide (GHG) analysis[19]. Highway capacity expansion projects can reduce emissions by reducing congestion but may also lead to increased VMT

---

[19] https://mdot.maryland.gov/OPCP/2020-MCCC_Act_MDOT_Report_12-30-2020.pdf

00014356



**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Air Quality Technical Report

which can increase emissions and can also create additional emissions related to construction and maintenance. However, the emissions for this individual project would be expected to be much less than the collective total of all planned statewide projects and existing on road GHG emissions.

# 4    MITIGATION

While no mitigation measures are required since the Preferred Alternative does not cause or contribute to a violation of the NAAQS, additional measures have been considered and committed to by MDOT SHA to further reduce impacts to air quality. Measures that will be implemented during construction to help minimize emissions include the following:

- Implementing a *Diesel Emissions Reduction Program* that exceeds pertinent Federal and state regulations to minimize air pollution including MSAT emissions during construction consisting of initiatives such as:
  - o Ensuring diesel powered construction equipment to meet minimum emissions reduction requirements by engine manufacturer, or by being properly retrofitted with emissions control devices, or that clean fuels be used if necessary to meet the emissions reduction requirements.
  - o Retrofitting equipment that is used to be on the EPA Verified Retrofit Technology List.
  - o Requiring the use of ultra-low sulfur diesel fuel in construction equipment.
  - o Implementing a *Driver Training program* to provide incremental savings by more efficiently operating mobile and stationary machinery;
  - o Implementing a Truck Staging Area Plan for all construction vehicles waiting to load or unload material where emissions will have the least impact on sensitive areas and the public. These include but not limited to hospitals, schools, residences, motels, hotels, daycare facilities, elderly housing and convalescent facilities. All sources of emissions shall be located as far away as possible from fresh air intakes, air conditioners and windows.
- Implementing a *Greenhouse Gas Reduction Program* to reduce emissions during construction including initiatives such as:
  - o Use of alternative fuels and vehicle hybridization of construction vehicles, to the maximum extent practicable
  - o Maintaining existing vegetation, where possible
  - o Use of recycled and reclaimed materials, including use of recycled asphalt, use of industrial byproducts as cement substitutes, and recycled concrete, to the maximum extent practicable.
- Implementing an **Anti-Idling Policy** to avoid unnecessary idling of construction equipment in order to reduce engine emissions and to provide air quality benefits to those who live and work in or adjacent to the construction sites. The plan may include, but is not limited to:
  - o Idling of all mobile construction equipment, including delivery trucks, shall be limited to three minutes, except under certain conditions.

Long Term operations strategies that will be implemented as part of the MLS and can have an emissions benefit include:

00014357



- Incentivizing non-SOV travel options through new, extended or upgraded bicycle and pedestrian improvements, toll-free travel for High Occupancy Vehicles with three or more users (HOV 3+), carpool/vanpool and bus transit.
- Adding new direct access from the managed lanes to transit centers, enhancing multimodal mobility and connectivity.
- Expanding Park and Ride capacity at the Westfield Montgomery Mall Metro Station.
- Adding new bus bays at the Shady Grove Metro Station.
- Implementing a robust public relations campaign to promote HOV travel pre and post construction.

00014358



I-495 & I-270 Managed Lanes Study

# APPENDIX M

# FINAL NATURAL RESOURCES TECHNICAL REPORT

# June 2022



U.S. Department of Transportation

**Federal Highway Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00014914



i-495 & i-270 Managed Lanes Study    Final Natural Resources Technical Report

## TABLE OF CONTENTS

1   INTRODUCTION ...................................................................................................1

1.1   Overview ................................................................................................... 1

1.2   Study Corridors and the Preferred Alternative............................................ 1

1.3   Description of the Preferred Alternative .................................................... 2

2   EXISTING CONDITIONS AND ENVIRONMENTAL EFFECTS..........................................4

2.1   Topography, Geology, and Soils................................................................. 4

2.1.1   Regulatory Context and Methods.................................................... 4

2.1.2   Existing Conditions ........................................................................ 5

2.1.3   Environmental Effects..................................................................... 7

2.1.4   Avoidance, Minimization, and Mitigation........................................ 9

2.2   Air Quality ............................................................................................. 10

2.2.1   Regulatory Context and Methods.................................................. 10

2.2.2   Existing Conditions ...................................................................... 10

2.2.3   Environmental Effects................................................................... 11

2.2.4   Avoidance, Minimization, and Mitigation...................................... 12

2.3   Waters of the US and Waters of the State, Including Wetlands................... 12

2.3.1   Regulatory Context and Methods.................................................. 12

2.3.2   Existing Conditions ...................................................................... 23

2.3.3   Environmental Effects................................................................... 25

2.3.4   Avoidance, Minimization, and Mitigation...................................... 32

2.4   Watersheds and Surface Water Quality .................................................... 36

2.4.1   Regulatory Context and Methods.................................................. 36

2.4.2   Existing Conditions ...................................................................... 42

2.4.3   Environmental Effects................................................................... 55

2.4.4   Avoidance, Minimization and Mitigation....................................... 58

2.5   Groundwater and Hydrology ................................................................... 60

2.5.1   Regulatory Context and Methods.................................................. 60

2.5.2   Existing Conditions ...................................................................... 61

2.5.3   Environmental Effects................................................................... 66

2.5.4   Avoidance, Minimization and Mitigation....................................... 66

2.6   Floodplains............................................................................................ 66

00014915

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

| | | |
|---|---|---|
| 2.6.1 | Regulatory Context and Methods | 67 |
| 2.6.2 | Existing Conditions | 68 |
| 2.6.3 | Environmental Effects | 69 |
| 2.6.4 | Avoidance, Minimization, and Mitigation | 69 |
| 2.7 | Vegetation and Terrestrial Habitat | 70 |
| 2.7.1 | Regulatory Context and Methods | 70 |
| 2.7.2 | Existing Conditions | 72 |
| 2.7.3 | Environmental Effects | 81 |
| 2.7.4 | Avoidance, Minimization, and Mitigation | 83 |
| 2.8 | Terrestrial Wildlife | 85 |
| 2.8.1 | Regulatory Context and Methods | 85 |
| 2.8.2 | Existing Conditions | 87 |
| 2.8.3 | Environmental Effects | 89 |
| 2.8.4 | Avoidance, Minimization, and Mitigation | 90 |
| 2.9 | Aquatic Biota | 91 |
| 2.9.1 | Regulatory Context and Methods | 91 |
| 2.9.2 | Existing Conditions | 96 |
| 2.9.3 | Environmental Effects | 109 |
| 2.9.4 | Avoidance, Minimization, and Mitigation | 111 |
| 2.10 | Rare, Threatened, and Endangered Species | 113 |
| 2.10.1 | Regulatory Context and Methods | 113 |
| 2.10.2 | Existing Conditions | 115 |
| 2.10.3 | Environmental Effects | 134 |
| 2.10.4 | Avoidance, Minimization, and Mitigation | 136 |
| 2.11 | Unique and Sensitive Areas | 137 |
| 2.11.1 | Regulatory Context and Methods | 137 |
| 2.11.2 | Existing Conditions | 139 |
| 2.11.3 | Environmental Effects | 139 |
| 2.11.4 | Avoidance, Minimization, and Mitigation | 140 |
| **REFERENCES** | | **141** |
| **LIST OF ACRONYMS** | | **159** |
| **GLOSSARY** | | **165** |

00014916

JA1512


I-495 & I-270 Managed Lanes Study            Final Natural Resources Technical Report

## LIST OF TABLES

Table 2-1. Soils Hydrologic Group Descriptions ................................................................. 6
Table 2-2. Impact to Soils by Type in Acres ...................................................................... 8
Table 2-3. Impacts to Steep Slopes and Highly Erodible Soils in Acres ............................ 8
Table 2-4. Agency Coordination Meetings Since the Publication of the DEIS ................. 17
Table 2-5. Total Delineated Features within the Phase 1 South Portion of the Corridor Study Boundary 24
Table 2-6. Wetland Function & Value Impact Summary ................................................... 25
Table 2-7. Summary of Impacts to Wetlands and Waterways by Classification ............... 27
Table 2-8. Summary of Impacts to Wetland Buffers by Classification ............................. 27
Table 2-9. Summary of Impacts to Wetlands and Waterways by Classification within Virginia and Maryland Counties ........................................................................................ 28
Table 2-10. Summary of Impacts to Waterways by Classification within USGS HUC8 Watersheds ........... 28
Table 2-11. Summary of Impacts to Wetlands and Waterways by Classification within MD 8-Digit Watersheds ................................................................................................ 29
Table 2-12. Summary of Impacts to Wetland Buffers by Classification within MD 8-Digit Watersheds .... 30
Table 2-13. Summary of Impacts to Wetlands and Waters by Classification within MD 12-Digit Watersheds ................................................................................................................... 31
Table 2-14. Summary of Impacts to Wetland Buffers by Classification within MD 12-Digit Watersheds 32
Table 2-15. Maryland COMAR Stream Designated Use Classifications ............................ 39
Table 2-16. Maryland COMAR Stream Use Water Quality Criteria .................................. 40
Table 2-17. Maryland Criteria and Federal Water Quality Recommendations .................. 41
Table 2-18. Virginia Stream Class Water Quality Criteria ............................................... 42
Table 2-19. Virginia Criteria and Federal Water Quality Recommendations .................... 42
Table 2-20. Virginia Watershed Characteristics Summary .............................................. 43
Table 2-21. Watershed Characteristics Summary ........................................................... 44
Table 2-22. Summary of Chemical Grab Sample Water Quality Data for the Fairfax County Middle Potomac Watersheds ..................................................................................... 51
Table 2-23. Summary of In-situ Water Quality Data for the Fairfax County Middle Potomac Watersheds ................................................................................................................... 51
Table 2-24. Summary of In-situ Water Quality Data for the Rock Run Watershed .......... 52
Table 2-25. Summary of Chemical Grab Sample Water Quality Data for the Cabin John Creek Watershed ................................................................................................................... 53
Table 2-26. Summary of In-situ Water Quality Data for the Cabin John Creek Watershed ...................... 54
Table 2-27. Summary of In-situ Water Quality Data for the Rock Creek Watershed ........ 54
Table 2-28. Summary of In-situ Water Quality Data for the Watts Branch Watershed ..... 55
Table 2-29. Summary of In-situ Water Quality Data for the Muddy Branch Watershed .... 55
Table 2-30. Additional Impervious Surfaces by Watershed ............................................. 58
Table 2-31. Common Highway Runoff Contaminants ...................................................... 63
Table 2-32. USGS Groundwater Wells Representing Aquifers that Underlie the Phase 1 South Portion of the Corridor Study Boundary ..................................................................... 64
Table 2-33. Groundwater Quality Data for Selected Pollutants ...................................... 65
Table 2-34. Waterways and Associated Floodplains within the Phase 1 South portion of the Corridor Study Boundary ................................................................................................ 68
Table 2-35. Impacts to FEMA 100-Year Floodplain in Acres .......................................... 69

00014917

JA1513


Table 2-36. NPS Property Tree Survey Results .................................................................................. 73
Table 2-37. M-NCPPC Property Tree Survey Results ........................................................................ 73
Table 2-38. Common Invasive Species within the Phase 1 South Portion of the Corridor Study Boundary .................................................................................................................................................. 77
Table 2-39. Forest Conservation Easements Within the Phase 1 South Portion of the Corridor Study Boundary .......................................................................................................................................... 79
Table 2-40. Impacts to Forests in Acres .......................................................................................... 81
Table 2-41. Impacts to Surveyed Trees on NPS Properties............................................................. 82
Table 2-42. Impacts to Surveyed Trees on M-NCPPC Properties.................................................... 82
Table 2-43. Impacts to TMDL and ICC Reforestation Sites in Acres............................................... 83
Table 2-44. Impacts to Potential FIDS Habitat within the Preferred Alternative LOD in Acres ................ 90
Table 2-45. EPA Rapid Bioassessment Protocol Aquatic Habitat Ranking Criteria ........................ 92
Table 2-46. MBSS Aquatic Habitat Ranking Criteria....................................................................... 92
Table 2-47. VDEQ VSCI Scores and Rankings .................................................................................. 93
Table 2-48. FCDPWES Benthic IBI Scores and Rankings.................................................................. 93
Table 2-49. MBSS Benthic IBI Scores and Rankings ....................................................................... 94
Table 2-50. MCDEP BIBI Scores and Rankings................................................................................. 94
Table 2-51. FCDPWES Fish IBI Scores and Rankings........................................................................ 94
Table 2-52. MBSS Fish IBI Scores and Rankings.............................................................................. 95
Table 2-53. MCDEP Fish IBI Scores and Rankings........................................................................... 95
Table 2-54. Range of Aquatic Habitat Scores for the Fairfax County Middle Potomac Watersheds........... 97
Table 2-55. Range of Benthic IBI and VSCI Scores for the Fairfax County Middle Potomac Watersheds .. 98
Table 2-56. Range of Fish IBI Scores for the Fairfax County Middle Potomac Watersheds ...................... 99
Table 2-57. Range of Aquatic Habitat Scores for the Potomac River/Rock Run Watershed .................... 99
Table 2-58. Range of Benthic IBI Scores for the Potomac River/Rock Run Watershed............................ 99
Table 2-59. Range of Fish IBI Scores for the Potomac River/Rock Run Watershed................................ 100
Table 2-60. Additional Fish Species Likely to Occur within the Potomac River and Chesapeake and Ohio Canal ............................................................................................................................................. 101
Table 2-61. Range of Aquatic Habitat Scores for the Cabin John Creek Watershed ............................... 102
Table 2-62. Range of Benthic IBI Scores for the Cabin John Creek Watershed ...................................... 102
Table 2-63. Range of Fish IBI Scores for the Cabin John Creek Watershed............................................ 103
Table 2-64. Range of Aquatic Habitat Scores for the Rock Creek Watershed ........................................ 104
Table 2-65. Range of Benthic IBI Scores for the Rock Creek Watershed................................................ 105
Table 2-66. Range of Fish IBI Scores for the Rock Creek Watershed..................................................... 106
Table 2-67. Range of Aquatic Habitat Scores for the Watts Branch Watershed .................................... 106
Table 2-68. Range of Benthic IBI Scores for the Watts Branch Watershed............................................ 106
Table 2-69. Range of Fish IBI Scores for the Watts Branch Watershed................................................. 107
Table 2-70. Range of Aquatic Habitat Scores for the Muddy Branch Watershed .................................. 107
Table 2-71. Range of Benthic IBI Scores for the Muddy Branch Watershed .......................................... 108
Table 2-72. Range of Fish IBI Scores for the Muddy Branch Watershed................................................ 109
Table 2-73. Additional Impervious Surfaces by Watershed.................................................................. 111
Table 2-74. SSPRA Acreage within the  Phase 1 South Portion of the Corridor Study Boundary............. 119
Table 2-75. RTE Plant Species in Riparian Areas of the Potomac River Within the Phase 1 South Portion of the Corridor Study Boundary, as Indicated by MDNR .............................................................. 120

00014918

JA1514

 I-495 & I-270 Managed Lanes Study          Final Natural Resources Technical Report

Table 2-76. RTE Targeted Plant Species Survey within the Potomac River Gorge Portion of the Preferred Alternative .................................................................................................................................... 123

Table 2-77. First state records and rare invertebrates documented within the Potomac River Gorge of Maryland and Virginia.................................................................................................................................... 130

Table 2-78. Impacts to Unique and Sensitive Areas in Acres................................................................... 139

## LIST OF FIGURES

Figure 1. I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative ........................................ 2

Figure 2. Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow) ........................... 3

## LIST OF APPENDICES

Appendix A    Impact Tables
Appendix B    Natural Resources Inventory Maps
Appendix C    Soils Table
Appendix D    Overview and Key Maps
Appendix E    Delineated Features Table
Appendix F    Delineated Features Maps
Appendix G    Field Datasheets
Appendix H    Photo Documentation
Appendix I    NPS Property Additional Information
Appendix J    Wetland Functions and Values Table
Appendix K    Aquatic Biota and Water Quality Monitoring Stations Map
Appendix L    Observed Wildlife Table
Appendix M    Aquatic Biota Monitoring Table
Appendix N    Agency Correspondence
Appendix O    Sampled Fish Species Table
Appendix P    RTE Bat Bridge and Acoustic Surveys and Wood Turtle Survey
Appendix Q    Unique and Sensitive Areas Maps
Appendix R    RTE Plant Species Surveys
Appendix S    M-NCPPC Tree Inventory Report
Appendix T    Maryland Reforestation Law Mitigation Site Search Report

00014919

**OP•LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Table 2-14. Summary of Impacts to Wetland Buffers by Classification within MD 12-Digit Watersheds

| MDNR Watershed Number and Classification | AC | SF | AC | SF | AC | SF |
|---|---|---|---|---|---|---|
| | Permanent | | Temporary | | Total | |
| **Potomac River/Rock Run (021402020845)** | **1.03** | **44,998** | **0.22** | **9,306** | **1.25** | **54,304** |
| PEM | 0.43 | 18,858 | 0.14 | 5,851 | 0.57 | 24,709 |
| PFO | 0.60 | 26,140 | 0.08 | 3,455 | 0.68 | 29,595 |
| **Watts Branch (021402020846)** | **1.67** | **72,524** | **0.02** | **959** | **1.69** | **73,483** |
| PEM | 0.69 | 29,741 | 0.02 | 959 | 0.71 | 30,700 |
| PFO | 0.87 | 37,942 | 0.00 | 0 | 0.87 | 37,942 |
| PSS | 0.11 | 4,841 | 0.00 | 0 | 0.11 | 4,841 |
| **Cabin John Creek (021402070841)** | **3.56** | **155,037** | **0.00** | **98** | **3.56** | **155,135** |
| PEM | 2.24 | 97,584 | 0.00 | 98 | 2.24 | 97,682 |
| PFO | 1.32 | 57,453 | 0.00 | 0 | 1.32 | 57,453 |
| **Grand Total** | **6.26** | **272,559** | **0.24** | **10,363** | **6.50** | **282,922** |

### 2.3.4    Avoidance, Minimization, and Mitigation

#### A.    Avoidance and Minimization

Wetland and stream impacts from the Preferred Alternative LOD are unavoidable. The area within the Preferred Alternative LOD is characterized by an extensive network of streams and wetlands that are located adjacent to and flow beneath the existing roadway, resulting in unavoidable impacts to these resources with roadway modification and/or widening. However, efforts to avoid and minimize impacts have occurred throughout the planning process and would continue during more detailed phases of project design.

Avoidance and minimization efforts to reduce impacts to Waters of the US, including wetlands, involve a two-tiered approach. The first tier occurred during the planning stage of the study, where every reasonable effort was made to avoid wetlands and waterways to the maximum extent practicable. Agency recommendations for avoidance and minimization were evaluated and implemented wherever practicable. Permit conditions requiring avoidance of features would be included in the Nontidal Wetlands and Waterways Permit issued by MDE, and Department of the Army authorization issued by USACE under Section 404. Efforts to avoid and minimize direct impacts to stream channels and wetlands to date have included alignment shifts, alteration of SWM swales, addition of retaining walls, and revision of preliminary SWM and sound wall locations to avoid streams and wetlands. The Avoidance, Minimization, and Impacts Report (AMR) discusses avoidance and minimization efforts during the NEPA process in detail, including targeted avoidance and minimization areas. The AMR is a supporting document of the JPA and an appendix to the MLS FEIS. MDOT SHA is committed to continuing efforts to maximize avoidance and minimization where practicable.

The second tier of avoidance and minimization occurred at the public-private partnership (P3) design stage, with advancement of the design and further refinements to the limits of disturbance (LOD). The P3 Developer reduced impacts to wetlands and streams wherever practicable and their design was incorporated into the

00014951

JA1516



FEIS LOD. Impacts to wetlands and waterways will continue to be reduced wherever practicable as design is refined and finalized. The Developer will continue to look for opportunities to avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable. Monetary incentives have been added to the Section Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands and waterways.

Impacts to several waterways, wetlands and wetland buffers were reduced following public and agency comments received during the DEIS public comment period. All sound wall locations were reviewed and revised, as needed, to avoid impacts to wetlands and waterways. MDOT SHA and FHWA coordinated closely with M-NCPPC in a series of office and field meetings to avoid and minimize impacts to wetlands and waterways within all M-NCPPC parks located within the Preferred Alternative LOD. The most significant avoidance and minimization focus area since the DEIS is the area surrounding the American Legion Bridge.

### American Legion Bridge Strike Team Avoidance and Minimization

MDOT SHA and Federal Highway Administration met with the NPS on December 8, 2020, to discuss the LOD in the vicinity of the American Legion Bridge that was presented in the MLS DEIS. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park (CHOH) and GWMP units of the NPS.*

The ALB Strike Team conducted an intensive investigation in January 2021 to explore alternative design solutions, project phasing solutions, site access solutions, and the potential use of specialty construction techniques to limit the LOD. The ALB Strike Team presented its results to the NPS on February 8, 2021.

MDOT SHA established the Base LOD as the "Base Option," which includes a conventionally constructed bridge structure built in two phases on the existing bridge centerline with the assumption of temporary construction access over the Potomac River via trestles and causeways. This Base Option included minor LOD reductions from the DEIS LOD to minimize impacts to Plummers Island. The Base Option also started with construction access in all four quadrants and was minimized to remove the construction access in the southwest, southeast, and northeast quadrants, which significantly reduced impacts to NPS property.

The ALB Strike Team first reviewed the avoidance and minimization options developed by MDOT SHA to date, and agreed that these options were not practicable, except perhaps the top-down construction option, which they investigated in further detail. The Strike Team then reviewed the viability of the Base Option and confirmed that this on-center alignment with a conventional construction approach was a viable option. The ALB Strike Team also considered a "west shift" of the LOD to entirely avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option.

The ALB Strike Team then considered other bridge construction approaches to determine if any of them could limit the LOD further than the Base Option could. The Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach.

00014952



After field analysis and known information review, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along CBP, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath.

MDOT SHA determined the LOD options for the ALB based on the results of the ALB Strike Team investigations. The bridge construction types with the smallest LOD footprint were the Base Option and the Cast-In-Place Segmental Option, both with a similar LOD requirement. Both construction types could be built with an on-center alignment or a west-shift alignment. MDOT SHA compared the NPS land impacts and those of the natural and cultural resources surrounding the ALB and determined that the on-center alignment would impact the least amount of total NPS Land; would not require re-configuration of the CBP interchange; and would not require residential displacement, as the west shift alignment would. For these reasons, the on-center alignment with the reduced LOD required by the Base Option or Cast-In-Place Segmental bridge types was incorporated into the Preferred Alternative LOD.

Avoidance and minimization was coordinated closely with the NPS in the vicinity of the ALB. The NPS requires that a wetland and floodplain SOF be prepared in accordance with the Procedural Manual #77-1: Wetland Protection (NPS, 2016) during the NEPA process, documenting compliance with Director's Orders #77-1 and #77-2 for proposed actions that would result in adverse impacts to wetlands and floodplains. The NPS SOF characterizes the wetland and floodplain resources that may be adversely impacted within NPS managed lands as a result of implementing the Preferred Alternative LOD, describes adverse impacts that the project would likely have on these resources, and documents the steps that have been taken to avoid, minimize, and offset these impacts.

## B.    Screened Alternatives and Avoidance and Minimization Steps

A LOD was established for each Screened Alternative. Refer to the DEIS, Appendix L, Section 2.3.4.B for details regarding the Screened Alternatives LOD determination process and general avoidance and minimization protocols of natural resource features.

## C.    Mitigation

As part of the permitting process, a detailed Final Compensatory Wetlands and Waterways Mitigation Plan (CMP), including final nontidal wetlands and waterways mitigation design, has been developed and will require approval by the USACE and MDE prior to permit issuance. All nontidal wetlands and waterways mitigation measures employed to compensate for unavoidable project impacts to Waters of the US or Waters of the State would follow the federal Compensatory Mitigation Rule (33 CFR Parts 325 and 40 CFR Part 230), and other state nontidal wetlands and waterways compensatory mitigation guidelines, as well as other recommendations from federal and state resource agencies. When practicable measures have been taken to avoid and minimize impacts to aquatic resources, mitigation may be required in the form of establishment/creation, enhancement, or preservation to replace the loss of wetland, stream, and/or other aquatic resource functions.  Nontidal wetlands and waterways mitigation options under both the federal Compensatory Mitigation Rule and state mitigation guidelines would follow a watershed approach.

00014953



For further information regarding the nontidal wetlands and waterways compensatory mitigation process, refer to the DEIS, Appendix L, Section 2.3.4.C.

In Maryland, nontidal wetland mitigation requirements were developed based on MDE's *Maryland Nontidal Wetland Mitigation Guidance, Second Edition January 2011*. The MDE guidelines include standard replacement ratios based on the wetland type (e.g., emergent, forested, etc.) being impacted. Waterway (stream) mitigation requirements in Maryland were determined based on the USACE's *Maryland Stream Mitigation Framework Calculator Beta Version May 11, 2020* (MSMF). The MSMF is a new method that was developed primarily as a tool for the USACE in Maryland to promote minimization and avoidance of impacts to streams and provide an accounting tool when unavoidable impacts occur and must be mitigated, with the goal of achieving "no net loss." The new method provides a consistent and transparent process for stream impacts and mitigation quantification based on resource type, reach length, stream quality, drainage area, site sensitivity, and several other input values, resulting in a stream mitigation requirement that is recorded in functional feet. While all streams within the permanent LOD are considered impacted, they are not all filled or placed in culverts. Some streams will be relocated or altered as part of the Preferred Alternative. A conservative assessment of the final condition of each stream considered permanently impacted was used to determine the stream quality after construction in the MSMF.

Based on the Preferred Alternative impacts, the current mitigation requirement estimate in Maryland includes 4.38 acres of wetland mitigation credits and 7,511 functional feet of stream credits. No mitigation bank credits, or in-lieu fee programs were identified in Maryland when MDOT SHA initiated the project in 2018, and therefore MDOT SHA decided to pursue permittee-responsible nontidal wetlands and waterways mitigation for the requirements. For further details on the permittee-responsible nontidal wetlands and waterways mitigation site selection process refers to the Final Compensatory Wetlands and Waterways Mitigation Plan (CMP) (FEIS, Appendix O).

Off-site nontidal wetland and waterway compensatory mitigation in Maryland consists of two permittee-provided mitigation sites including a total of 4.61 acres of potential wetland mitigation credits and 6,304 functional feet of potential stream mitigation credits. The remaining required stream mitigation credits will be provided by purchasing credits from a mitigation bank that will have an initial credit release in the fall of 2022. Details on the Preferred Alternative impacts, nontidal wetland and waterway mitigation requirements, proposed mitigation sites, and Phase II mitigation plans will be included in the Final CMP.

Based on the Preferred Alternative impacts, in Virginia, wetland mitigation requirements were determined based on replacement ratios in the Virginia Administrative Code (9VAC25-680-70), and stream mitigation requirements were developed based on the USACE's *Unified Stream Methodology for use in Virginia, January 2007*. Privately-owned mitigation banks will be used to fulfill the current mitigation requirement estimate of 472 riverine mitigation credits in the Fairfax County Middle Potomac-Catoctin watershed. There are no permanent wetland impacts requiring mitigation in Virginia. MDOT SHA has identified specific mitigation bankers and confirmed credit availability in the Final CMP.

There will be temporary and some permanent wetlands and waterways impacts associated with the Section 404 nontidal wetland and waterway compensatory mitigation sites. However, these impacts will be compensated for onsite, since the mitigation site will result in overall function and value uplift.

00014954

 I-495 & I-270 Managed Lanes Study                    Final Natural Resources Technical Report

NPS requires avoidance, minimization, and compensation for unavoidable adverse impacts to NPS wetlands via restoration of degraded wetlands on NPS property at a minimum of a 1:1 restoration/replacement ratio that can be adjusted upward to ensure functional replacement. NPS requires that a wetland SOF be prepared in accordance with the Procedural Manual #77-1: Wetland Protection (NPS, 2016) during NEPA documenting compliance with D.O. #77-1 for proposed actions that would result in adverse impacts to wetlands. A Draft SOF was included in the SDEIS, Appendix G, and a final signed SOF will be attached to the ROD as a separate document.

The current NPS wetland mitigation requirement estimate includes a total of 0.90 acres of NPS wetland mitigation based on the functional impact replacement ratios that are described in the Final SOF. MDOT SHA worked with NPS to identify one mitigation site (CHOH-13) that includes approximately 1.49 acres of potential wetland mitigation. The site was identified in the NPS *Environmental Assessment (EA) for the Wetland Restoration Action Plan (WRAP) for Catoctin Mountain Park, Chesapeake & Ohio Canal National Historical Park, Harpers Ferry National Historical Park, Monocacy National Battlefield, April 2017* and is considered a high priority site due to its location within one of the NPS wetlands being impacted by the project. The CHOH-13 mitigation site is not included in the proposed MDE and USACE mitigation credit totals and has been identified for the sole purpose of fulfilling the NPS mitigation requirement. A concept design of the proposed mitigation site is included in the draft SOF (SDEIS, Appendix G) and will also be included in the Final SOF.

## 2.4    Watersheds and Surface Water Quality

### 2.4.1    Regulatory Context and Methods

#### A.    Surface Waters and Watershed Characteristics

Surface waters include rivers, streams, and open water features such as ponds and lakes. Streams are generally defined as water flowing in a channel with defined bed and bank and an ordinary high water mark. Section 401 and Section 402 of the Federal CWA (33 U.S.C. 1341 and 1342) regulate water quality and the introduction of contaminants to waterbodies. Section 401 of the CWA prohibits any applicant for a federal permit or license "to conduct any activity that may result in any discharge into waters of the United States, unless the State or authorized Tribe where the discharge would originate either issues a Section 401 water quality certification finding compliance with applicable water quality requirements or certification is waived" (40 CFR Part 121). The I-495 & I-270 Managed Lanes Study requires a Section 401 water quality certification from MDE and VDEQ indicating that anticipated discharges from the I-495 & I-270 Managed Lanes Study will comply with state water quality standards. MDE and VDEQ are the regulatory agencies responsible for ensuring adherence to water quality standards in Maryland and Virginia, respectively. In general, the National Pollutant Discharge Elimination System (NPDES) stormwater program requires permits for discharge from construction activities that disturb one or more acres, and discharges from smaller sites that are part of a larger common plan of development. Individual permits for erosion and sediment control approval will be submitted and approved as contract packages are developed.

Under the COMAR: Title 26 Department of the Environment, Subtitle 08 Water Pollution, Chapter 02 Water Quality (26.08.02), the State of Maryland has adopted water quality standards to enhance and protect water resources and serve the purposes of the Federal CWA. Similarly, all of Virginia's surface waters are classified by VDEQ according to designated uses promulgated in Virginia's water quality standards (9VAC 25-260). The water quality standards serve this purpose by designating uses to the waters of the state and setting criteria

00014955



I-495 & I-270 Managed Lanes Study

# FINAL AVOIDANCE, MINIMIZATION, AND IMPACTS REPORT

## June 2022



U.S. Department
of Transportation

**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00017681

00017682

 i-495 & i-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

**TABLE OF CONTENTS**

1   INTRODUCTION .................................................................................................................................1

2   AVOIDANCE & MINIMIZATION APPROACH.................................................................................3

    2.1   Corridor-Wide Avoidance and Minimization Applied to all Build Alternatives....................3

    2.2   Targeted Areas of Avoidance and Minimization ...................................................................4

        2.2.1   Potomac River, Plummers Island, and the American Legion Bridge ........................5

        2.2.2   Thomas Branch ........................................................................................................17

        2.2.3   Other Major Stream Crossings ................................................................................18

    2.3   Individual Resource Avoidance and Minimization ..............................................................20

        2.3.1   Noise Wall Barriers...................................................................................................20

        2.3.2   Vernal Pools .............................................................................................................20

        2.3.3   Northern Long-Eared Bat ........................................................................................20

        2.3.4   Other Avoidance and Minimization.........................................................................21

        2.3.5   Required Future Avoidance and Minimization.........................................................22

    2.4   Avoidance and Minimization Summary ..............................................................................23

3   UNAVOIDABLE IMPACTS .............................................................................................................24

    3.1   Impact Types .......................................................................................................................24

        3.1.1   Roadway ...................................................................................................................24

        3.1.2   Existing Culvert ........................................................................................................25

        3.1.3   Existing Bridge .........................................................................................................25

        3.1.4   New/Expanded Bridge..............................................................................................25

        3.1.5   Culvert Extension.....................................................................................................26

        3.1.6   New/Augmented Culvert .........................................................................................26

        3.1.7   Relocated Channel....................................................................................................27

        3.1.8   Stormwater Outfalls.................................................................................................27

        3.1.9   Construction Access.................................................................................................27

        3.1.10  Hydrology Loss.........................................................................................................28

        3.1.11  Shading.....................................................................................................................28

        3.1.12  Temporary Impacts ..................................................................................................28

    3.2   Impacts Related to Stormwater Management ....................................................................29

        3.2.1   Features Fully Impacted by the Roadway or Experiencing Hydrology Loss and Replaced with SWM Facilities 29

        3.2.2   Features Coordinated with the Regulatory Agencies that Could Be Impacted by SWM Facilities with Sufficient Justification ....................................................................................................30

        3.2.3   Features that Shall Not Be Impacted by SWM Facilities ..................................................30

00017683


3.3    Impacts Related to Augmented/Auxiliary Culverts ...................................................... 31

   3.3.1    Structure Modification/Replacement Methodology ............................................ 33

3.4    Aquatic Life Passage ............................................................................................ 33

3.5    Impact Narrative .................................................................................................. 34

   3.5.1    Mainline Impact Plate 1 ..................................................................................... 34

   3.5.2    Mainline Impact Plate 2 ..................................................................................... 34

   3.5.3    Mainline Impact Plate 3 ..................................................................................... 35

   3.5.4    Mainline Impact Plate 4 ..................................................................................... 36

   3.5.5    Mainline Impact Plate 5 ..................................................................................... 36

   3.5.6    Mainline Impact Plate 6 ..................................................................................... 37

   3.5.7    Mainline Impact Plate 7 ..................................................................................... 38

   3.5.8    Mainline Impact Plate 8 ..................................................................................... 39

   3.5.9    Mainline Impact Plate 9 ..................................................................................... 40

   3.5.10    Mainline Impact Plate 10 ................................................................................... 41

   3.5.11    Mainline Impact Plate 11 ................................................................................... 41

   3.5.12    Mainline Impact Plate 12 ................................................................................... 42

   3.5.13    Mainline Impact Plate 13 ................................................................................... 42

   3.5.14    Mainline Impact Plate 14 ................................................................................... 43

   3.5.15    Mainline Impact Plate 15 ................................................................................... 43

   3.5.16    Mainline Impact Plate 16 ................................................................................... 43

   3.5.17    Mainline Impact Plate 17 ................................................................................... 44

   3.5.18    Mainline Impact Plate 18 ................................................................................... 44

   3.5.19    Mainline Impact Plate 19 ................................................................................... 45

   3.5.20    Mainline Impact Plate 20 ................................................................................... 45

   3.5.21    Mainline Impact Plate 21 ................................................................................... 46

   3.5.22    Mainline Impact Plate 22 ................................................................................... 46

   3.5.23    Mainline Impact Plate 23 ................................................................................... 46

   3.5.24    Mainline Impact Plate 24 ................................................................................... 47

   3.5.25    Mainline Impact Plate 25 ................................................................................... 47

**4    CONCLUSION** ................................................................................................................ **48**

**REFERENCES** ........................................................................................................................ **49**

**ACRONYMS** ......................................................................................................................... **50**

00017684


I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

## LIST OF TABLES

Table 1. Comparison of Impacts for ALB Alignment Options .......................................................... 7
Table 2. Individual Features Avoided or Minimized ................................................................. 21
Table 3. Permanently Impacted Features Proposed for Replacement with SWM Facilities ...................... 30

## LIST OF FIGURES

Figure 1. I-495 & I-270 MLS Study Corridors – Preferred Alternative .......................................................... 2
Figure 2. Roadway Comparison Base and West Shift Options ..................................................................... 7
Figure 3. LOD Comparison Base and West Shift Options ..................................................................... 9
Figure 4. Impact Comparison Base and West Shift Option ..................................................................... 10
Figure 5. Proposed Construction Access for American Legion Bridge ..................................................................... 16

## LIST OF APPENDICES

Appendix A    Roadside LOD Modification Steps
Appendix B    Augmented Culvert Assessments
Appendix C    Existing and Proposed Culverts Greater than 150 Feet

00017685



I-495 & I-270 Managed Lanes Study          Final Avoidance, Minimization, and Impacts Report

# 1    INTRODUCTION

The I-495 & I-270 Managed Lanes Study (MLS) Avoidance, Minimization, and Impacts Report (AMR) describes the process of avoiding and minimizing impacts to wetlands, their buffers, waterways, and floodplains to the greatest extent practicable and presents justifications for impacts that were unavoidable. A multi-disciplinary team, hereafter referred to as the MLS Team, including roadway engineers, stormwater engineers, structural engineers, construction engineers, environmental planners, and environmental scientists, reviewed the entire corridor over a four-year period to identify avoidance and minimization opportunities and coordinate reduction of the Limits of Disturbance (LODs) with the regulatory and resource agencies.

The Federal Highway Administration (FHWA), as the lead Federal agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the project sponsor, have prepared an Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA) for the MLS. The purpose of the MLS is to develop a travel demand management solution(s) that addresses traffic congestion and improves trip reliability on I-495 and I-270 within the MLS study limits and to enhance existing and planned multimodal mobility and connectivity. The MLS study limits (**Figure 1**) include a 48-mile long and approximately 600-foot-wide roadway corridor, or corridor study boundary, spanning two states, three counties, and 15 Maryland 12-digit watersheds.

The 48-mile Study limits remain unchanged for the Preferred Alternative: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland.  The Preferred Alternative, Alternative 9 - Phase 1 South (shown in **dark blue** in **Figure 1**), includes build improvements within the limits of Phase 1 South only totaling approximately 15 miles of proposed improvements. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in **light blue** in **Figure 1**). The Preferred Alternative also includes 67 offsite compensatory stormwater quality treatment LODs necessary to achieve the project's stormwater quality treatment requirements, as included in the Compensatory Stormwater Mitigation Plan (FEIS, Appendix D).

00017686

**Figure 1. I-495 & I-270 MLS Study Corridors – Preferred Alternative**



Efforts have been made throughout the preliminary design process during the MLS planning stage to avoid and minimize impacts to wetlands, their buffers, waterways, and the Federal Emergency Management Agency (FEMA) 100-year floodplain to the greatest extent practicable while maintaining a corridor wide enough to support a constructible project. Avoidance and minimization of impacts to these resources is an integral part of the permitting process and is required by state and federal regulations. The AMR is submitted with the MLS Joint Permit Application (JPA) in accordance with the NEPA of 1969, Executive Order 11990, May 24, 1977 (42 FR 26961), which states that each agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds: (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use.

The AMR explains how the Build Alternative LODs were established based on a corridor-wide stepwise process of avoidance and minimization of impacts and describes the targeted avoidance and minimization of impacts to resources in the Preferred Alternative. The AMR then describes specific areas where additional agency coordination will be required prior to clearing or impact and provides an impact narrative, which includes the justification for unavoidable impacts, some of which may not be immediately apparent from a review of the JPA Impact Plates, such as the construction access areas. The JPA Impact Plates and Tables present all unavoidable impacts to wetland, wetland buffer, waterway, and floodplain features. Impacts were avoided and minimized to the greatest extent practicable at a planning level design for all Draft EIS (DEIS) Build Alternatives and a concept level design for the Preferred Alternative through collaboration between the MLS Team and regulatory and resource agencies.

00017687

 I-495 & I-270 Managed Lanes Study     Final Avoidance, Minimization, and Impacts Report

## 2    AVOIDANCE & MINIMIZATION APPROACH

The MLS Team worked closely with regulatory and resource agencies to limit impact to wetlands, wetland buffers, waterways, and floodplains to the greatest extent practicable during preliminary design, while assuring there was enough room for construction of the roadway and the required ancillary roadway systems, such as drainage culverts. The MLS team worked with regulatory and resource agencies for over 4 years to review potentially impacted natural resources and explore avoidance and minimization possibilities.

Avoidance and minimization was conducted corridor-wide using a five-stage standardized process to avoid and minimize impacts to all wetlands and waterways throughout the corridor by adding retaining walls, where necessary, to limit roadway impacts and by altering the preliminary stormwater management (SWM) design. This five-step process established the SDEIS LOD and set the design limits for the FEIS and developer. The preliminary design for the Preferred Alternative is within these design limits. Targeted avoidance and minimization of the Potomac River and Plummers Island, Thomas Branch, and other major stream crossings within Phase I South was closely investigated and the LOD and preliminary design were refined to avoid impacts to these resources to the greatest extent practicable during this stage of design. Individual resource avoidance and minimization was conducted throughout the preliminary design stage, taking into consideration resource agency requests for specific avoidance and minimization; adjusting new sound wall locations to limit impact to resources; and limiting the LOD only to those areas required for roadway expansion and constructability.

The MLS Team made a concerted effort to avoid and minimize impacts throughout the planning process and the Public Private Partnership authorized by the Maryland Board of Public Works for the MLS will continue to implement avoidance and minimization during the design-build stage of the project as the design advances and the LOD is refined.  Following the Record of Decision (ROD), the developer will be required to continue avoidance and minimization throughout final design and construction and document that the final design has fewer impacts to the Preferred Alternative or submit a permit modification.

### 2.1    Corridor-Wide Avoidance and Minimization Applied to all Build Alternatives

A LOD was established for each DEIS Build Alternative by implementing the following general design assumptions:

- the LOD was established 10 feet beyond the standard roadway typical section cut or fill limits;
- 10 or 14 feet beyond the exterior face of retaining walls; or
- at the existing state or county right-of-way (ROW) line when the aforementioned dimensions fell within these existing ROW lines.

A typical roadway section includes the added travel lanes, full-width median and outside shoulder, 8-foot flat bottom SWM bioswales or drainage channels, and slope grading to meet existing grade. The LOD at intersections and interchanges was set at the existing ROW except where the improvements outside of ROW or additional construction access was needed. The methods used to incorporate design features are detailed in the *Alternatives Technical Report* (DEIS Appendix B, Section 5).

00017688

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

A step-wise process was applied corridor-wide to avoid or limit impacts to natural resource features, which included the application of five progressively narrower roadside typical sections from widest to narrowest until impacts were avoided or Step 5 was reached.

The five roadside typical sections include:

- Step 1 - an open section with a full-width (8-foot) bioswale for SWM;
- Step 2 - an open section with a reduced-width (2-4-foot) bioswale for SWM;
- Step 3 - an open section with no surface SWM (drainage ditch only);
- Step 4 - a closed section with concrete barrier; and
- Step 5 - a closed section with retaining wall.

The five roadside typical sections are described further in the *Alternatives Technical Report* (DEIS Appendix B, Section 5.2.3) and displayed in **Appendix A** of this report. Avoidance and minimization steps were applied in interchanges where possible. Natural resources were avoided and minimized along the outer edge of interchanges using the same 5-step process as along the roadway. Additionally, the roadway team refined design and eliminated portions of the LOD within interchanges when feasible to limit impacts to natural resources. This five-step process established the SDEIS LOD and set the design limits for the FEIS and developer.

When the MLS Team reviewed the corridor for avoidance and minimization opportunities, they recognized the need for a balance between avoidance and minimization of impacts and providing adequate space to construct roadway improvements. The LOD was expanded in areas where construction activities would likely require additional space, such as around augmented culverts, and was reduced in areas adjacent to wetlands and waterways where practicable. Construction elements other than roadway widening that were considered in determining the extent of the LODs included: culvert or drainage outfalls, culvert augmentation, SWM, bridge construction/widenings, staging, stockpiling, access, outfall stabilization, noise walls, retaining walls, and construction equipment areas.

Corridor-wide design revisions to avoid and minimize direct impacts to natural resources to date include the following:

- Elimination of the collector-distributor system on I-270;
- Preliminary alignment shift designs;
- Alterations to preliminary roadside ditch and grading designs;
- Additions to preliminary retaining wall designs to minimize the roadway footprint;
- Revisions to preliminary ramp designs, construction access areas, and preliminary SWM facility locations;
- Relocations of preliminary managed lane access locations; and
- Revisions of proposed SWM facility locations.

## 2.2    Targeted Areas of Avoidance and Minimization

U.S. Army Corps of Engineers (USACE), Maryland Department of the Environment (MDE), U.S. Fish and Wildlife Service (USFWS), Environmental Protection Agency (EPA), Maryland Department of Natural Resources (MDNR), Maryland National Capital Park and Planning Commission (M-NCPPC), and National Park Service (NPS) requested a series of avoidance and minimization coordination meetings to focus on

00017689

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

areas of particular concern within the corridor study boundary to ensure that avoidance and minimization measures were applied to the maximum extent practicable while still meeting the MLS purpose and need. Avoidance and minimization of the following resources is discussed in detail due to their close proximity to the roadway and the more specific reasons listed below:

- The Potomac River crossing, including Plummers Island – Need to replace and widen the American Legion Bridge (ALB) over the river and tie-in to existing roadways on either side, and

- Thomas Branch – Potential need to culvert portions of the stream.

### 2.2.1    Potomac River, Plummers Island, and the American Legion Bridge

The existing ALB structures, linking the Virginia and Maryland portions of I-495 over the Potomac River, were constructed in the early 1960s and must be replaced by 2030 due to age and condition. Replacing these bridge structures as part of the MLS would eliminate the need for a follow-up bridge replacement project for which the state does not have funding allocated. MDOT SHA carefully considered various potential roadway alignments as well as various types of potential bridge structures to inform the LOD in this area to accommodate roadway widening and bridge replacement across the Potomac River while limiting impact to NPS property and resources.

The Preferred Alternative includes numerous LOD modifications since the DEIS, one of the most significant of which is in the vicinity of the ALB to address comments and concerns received from the NPS regarding impacts to NPS lands and resources.

Multiple alignments were considered when determining the LOD for the replacement of the ALB. Off-alignment bridge options were considered but were not retained for further study in the DEIS, since they were not practicable. Tunnel and full-span suspension on-alignment alternatives were also considered but were not retained for further study in the DEIS, because they would not allow for connection with the Clara Barton Parkway or George Washington Memorial Parkway and would be cost prohibitive. Alignment options that were investigated further include: an entirely offset alignment to either the east or west; a minimally offset alignment to either the east or west; and widening the structure on the existing alignment.

The ALB alignment determination required assessing impacts to wetlands, streams, forests, rare plant species, cultural resources, and adjacent properties such as the Naval Surface Warfare Center at Carderock in Maryland and a residential community along the Virginia shoreline of the Potomac River. Other factors considered when evaluating the proposed alignments included maintenance of traffic, constructability, construction access, and roadway engineering issues such as re-aligning the interchanges that lead to the ALB.

Building the replacement ALB on an entirely offset alignment to the east of the existing structure while traffic remains in its current configuration would result in unacceptable impacts to Plummers Island, an important biological and cultural resource within the Chesapeake and Ohio National Historical Park, and impacts the two other NPS parks in the vicinity of the ALB. This approach would not be feasible on the west side of the existing ALB either, due to unacceptable impacts to the Naval Surface Warfare Center Carderock Division property located on the north side of the Potomac River, to a residential community

00017690

JA1530

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

on the south side of the Potomac River and to two NPS parks (Clara Barton Parkway and Chesapeake and Ohio Canal National Historical Park).

A less impactful approach would be to construct a new structure on a minimally offset alignment, while placing traffic partly on the existing structure and partly on a new structure during construction. The minimally offset alignment to the east would still impact Plummers Island and NPS property more than would be acceptable and this alignment is not feasible. The minimally offset alignment to the west would avoid impacts to Plummers Island but would impact more NPS property and would require displacement of a residential property on the Virginia shoreline of the Potomac River. This "west shift" alignment was considered post-DEIS and is discussed further in **Section 2.2.1.A**.

Widening on the existing alignment would impact Plummers Island to some extent but would avoid impacts to the residential property on the Virginia side of the ALB and would impact less NPS property than the "west shift" alignment option. This "on-center" widening alignment, or base option, was considered post-DEIS and is discussed further in **Section 2.2.1.A**.

See **Figure 2** through **Figure 4** for a visualization of the base option and the west shift. A comparison of impacts for the base option, west shift, and on-center widening included in the Preferred Alternative LOD are displayed in **Table 2-1** below.

00017691

 OP·LANES™ MARYLAND

I-495 & I-270 Managed Lanes Study

Final Avoidance, Minimization, and Impacts Report

00017692

## Table 1. Comparison of Impacts for ALB Alignment Options

| Resource (unit) | DEIS LOD Conventional Construction (June 2020) | | | Centerline ALB Alignment (Base Option) March 4, 2021 | | | West Shift ALB Alignment March 4, 2021 | | | FEIS MDOT SHA RPA[3] March 21st, 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Perm | Temp | Total | Perm | Temp | Total | Perm | Temp | Total | Perm | Temp | Total |
| **NPS Park Properties[1]** | | | | | | | | | | | | |
| **Total NPS Properties Around ALB[2] (acres)** | **4.88** | **11.30** | **16.18** | **5.26** | **4.51** | **9.77** | **5.88** | **5.23** | **11.11** | **0.90** | **8.76** | **9.66** |
| Chesapeake and Ohio Canal National Historical Park (acres) | 4.88 | 7.69 | 12.57 | 5.09 | 4.25 | 9.34 | 5.88 | 4.93 | 10.81 | 0.87 | 8.46 | 9.33 |
| Clara Barton Parkway (acres) | 0 | 0.19 | 0.19 | 0 | 0.19 | 0.19 | 0 | 0.19 | 0.19 | 0.00 | 0.19 | 0.19 |
| George Washington Memorial Parkway (acres) | 0 | 3.42 | 3.42 | 0.17 | 0.07 | 0.24 | 0 | 0.11 | 0.11 | 0.03 | 0.11 | 0.14 |
| **Individual Trees within Park Boundaries** | | | | | | | | | | | | |
| Live Tree Impacts (#/DBH) | 1,108 / 14,033 | N/A | 1,108 / 14,033 | 805 / 10,032 | N/A | 806 / 10,032 | 878 / 11,136 | N/A | 878 / 11,136 | 803 / 9,994 | N/A | 803 / 9,994 |
| Standing Dead Tree Impacts (#/DBH) | 190 / 2,202 | N/A | 190 / 2,202 | 116 / 1,335 | N/A | 116 / 1,335 | 129 / 1,608 | N/A | 129 / 1,608 | 118 / 1,363 | N/A | 118 / 1,363 |
| **Natural Resources within the Potomac River Gorge** | | | | | | | | | | | | |
| NR Waters (acres) | 8.81 | N/A | 8.81 | 4.56 | 3.68 | 8.24 | 4.46 | 3.66 | 8.12 | 0.92 | 7.33 | 8.25 |
| NR Waters (linear feet) | 3,830 | N/A | 3,830 | 1,985 | 1,110 | 3,095 | 2,142 | 821 | 2,963 | 1,075 | 2,188 | 3,263 |
| NR Wetlands (acres) | 0.78 | N/A | 0.78 | 0.36 | 0.33 | 0.69 | 0.73 | 0.49 | 1.22 | 0.16 | 0.40 | 0.56 |
| Plummers Island Area (acres) | 0.28 | 1.69 | 1.97 | 0.28 | 0 | 0.28 | 0.00 | 0.04 | 0.04 | 0.004 | 0.26 | 0.26 |
| Forest Canopy (acres) | 17.74 | N/A | 17.74 | 6.72 | 4.56 | 11.28 | 6.56 | 6.06 | 12.62 | 4.85 | 6.93 | 11.78 |
| FEMA 100 Year Flood (acres) | 22.22 | N/A | 22.22 | 11.31 | 7.52 | 18.83 | 11.11 | 8.64 | 19.75 | 3.64 | 7.25 | 10.89 |
| FIDS (ac) | 7.01 | N/A | 7.01 | 3.29 | 1.01 | 4.30 | 1.27 | 2.71 | 3.98 | 1.70 | 2.46 | 4.16 |
| FIDS - DNR (ac) | 8.79 | N/A | 8.79 | 1.75 | 3.94 | 5.69 | 2.21 | 5.21 | 7.42 | 0.94 | 4.77 | 5.71 |
| RTEs (# species impacted) | 7 (4 poly / 3 point) | | | 6 (4 poly / 2 point) | | | 5 (4 poly / 1 point) | | | 6 (4 poly / 2 point) | | |

Notes:
1. These impact calculations are based on the NPS GIS Park Boundaries received via email from NPS personnel on 4/29/2021 (Tammy Stidham).
2. Impacts to properties excludes the areas within existing transportation easements; portions removed in GIS using spatial overlay before the impacts were calculated.
3. MDOT SHA RPA includes the Centerline ALB Alignment from March 4, 2021 with additional refinements to the design and constructability assumptions.

USCA4 Appeal: 24-1447    Doc: 30-4    Filed: 09/30/2024    Pg: 468 of 511

Figure 2. Roadway Comparison Base and West Shift Options



00017693

JA1533

**Figure 3. LOD Comparison Base and West Shift Options**



LOD Comparison
Base & West Shift Option

00017694

OP LANES™
M A R Y L A N D

**Figure 4. Impact Comparison Base and West Shift Option**



Impact Comparison
Base & West Shift Option

USCA4 Appeal: 24-1447    Doc: 30-4    Filed: 09/30/2024    Pg: 470 of 511

00017695



#### 2.2.1.A.  Alternative Bridge Design Options

Alternative bridge design options were considered to inform the LOD in the vicinity of the ALB, to determine the extent to which the LOD could be minimized to limit impacts to NPS land and natural and cultural resources, while still providing enough space to accommodate bridge construction and maintenance.

##### a.  Avoidance

Long-span Bridge:

The only avoidance option identified was replacement of the ALB with a long-span bridge. In order to avoid natural resources at the bridge location, permanent piers would need to be constructed completely beyond the limits of the resources. This would require a pier north of the Washington Aqueduct on the Maryland side and at, or south, of the existing south abutment in Virginia. The resulting clear span is at least 3,250 feet. A suspension bridge is the only feasible bridge type to span this distance and a bridge this long would be the 35th longest suspension bridge in the world, or the 5th longest in the U.S. Additional back-span dimensions for anchorage would be at least another 800-feet on each end for a total bridge length between cable anchorages of 4,850 feet. This length does not include a likely need for approach spans on either end to transition from the highway on grade to the suspended roadway. The total bridge length needed would make the interchanges at Clara Barton Parkway and George Washington Memorial Parkway inaccessible. Replacing the ALB with a suspension bridge would not be practicable, since it would eliminate the interchanges with the parkways in Maryland and Virginia; would be cost-prohibitive; and would drastically alter the viewshed of the surrounding natural area.

##### b.  Minimization

###### i.  DEIS Minimization Options

Reconstruct Bridge without Widening:

One minimization option identified was reconstructing the ALB without widening. The existing bridge out-to-out width is approximately 138-feet and carries five lanes of traffic in each direction. To maintain 10 lanes of traffic during construction with minimal offsets to temporary barriers requires 119-feet of bridge width. Therefore, a maximum of 19-feet of the existing bridge is available for demolition and reconstruction in the first phase. This means that only one lane at a time could be reconstructed and shifted onto the new bridge. A minimum of nine phases of traffic control would be required to fully replace the bridge. This assumes that all the deck joints between phases are structurally feasible; the existing piers are stable in a partially loaded and/or demolished condition; and the new superstructure configuration could be made compatible with the temporary lane placement. The resulting superstructure would be inefficient, because uniform girder spacing would not be feasible while accommodating the required construction phasing. In addition, in the middle three phases of demolition and construction, work would have to occur between active lanes of traffic. In the same phases, traffic in the same direction would be divided with a construction zone in between the travel lanes. No work zone for construction vehicles and equipment would be available on the bridge, because all bridge deck that is in place, either existing or proposed, would be required to carry traffic. This approach to construction is very unsafe for motorists and construction staff. There would be no emergency pull off lanes for five lanes of traffic in each direction. Construction work would occur between and over open lanes of traffic. The duration of construction, number of traffic shifts, and inefficient structure configuration would result in a highly

00017696



undesirable and expensive approach to construction. This option is not practicable due to extreme safety issues, construction inefficiencies and challenges, and prohibitive cost and duration.

Double-Deck Existing Bridge:

A double-deck bridge was considered in hopes of reducing the extent of the construction footprint and minimizing impacts to NPS property and natural resources. The out-to-out superstructure width of one direction of travel in the proposed condition would be approximately 124-feet. Since this is less than existing superstructure width, constructing a second deck over the existing bridge superstructure would provide sufficient width for the proposed lane configuration. Previous analysis of the existing substructure units indicate that the piers are currently loaded to the point that there is no additional capacity. The additional dead load from the second deck and the live load from the vehicles could not be accommodated by the existing substructure. In order to support the second deck, new substructure units independent from the existing, would need to be constructed. These would consist of new pier caps spanning across the entire width of the existing bridge to newly constructed column elements supported on large, deep foundations located outside the existing bridge. To minimize the impact of the foundation elements, they would likely consist of large diameter drilled shafts. The associated pier cap would span a minimum of 155-feet, resulting in a significant concrete beam that would greatly increase the vertical profile of the top deck in order to provide sufficient vehicular under clearance to the lower deck. The approach roadway modifications necessary to transition from side-by-side to stacked roadways would extend well beyond the interchanges on each end of the bridge.

Proposed Double-Deck Bridge:

Building on the discussion above, it is clear that the out-to-out superstructure width of a completely new double-deck bridge would be 124-feet. To support both decks, the substructure would need to be wider than the superstructure. Again, assuming large, drilled shaft foundations and columns, the out-to-out of the entire bridge would be approximately 144-feet, which is wider than the existing bridge. Some minor additional impacts to the resources would be likely. To build an entirely new bridge, the construction phasing would ideally require the new bridge to be built off of the existing bridge alignment. This would allow conventional maintenance of traffic on the existing bridge while the new double-deck structure is completed. The approach roadway modifications required for the option to double-deck the existing bridge remain with this option. Construction of either double-deck bridge option is not practicable, since it would require a new substructure so far beyond the width of the existing structure that it would not reduce the construction footprint or minimize impacts to natural resources from a conventional construction method but would be far more expensive than a conventionally constructed bridge.

Top-Down Construction:

Utilizing top-down construction techniques for the proposed bridge structure means that all construction equipment and access would be provided from the completed bridge deck. The contractor would begin construction at an abutment and the first pier working from the approach roadway behind the abutment. Next the superstructure would be constructed on the first span. All construction operations would then move onto the completed first span in order to construct the next pier and next span of superstructure. Construction would proceed in this manner along the entire length of the bridge until the full structure is complete. Two separate crews working from opposite ends of the bridge could each begin at opposite abutments and meet in the middle of the bridge. This technique would result in relatively short spans between pier locations due to limited equipment reach and capacity. The total footprint of pier elements

00017697



would be much larger than the footprint of a bridge with conventional span lengths. In addition, utilizing top-down construction does not address any of the issues with traffic phasing and work zones discussed in previous options.  While this type of construction would still require a construction access road to remove materials and would be relatively more expensive to construct than the conventional method, it was determined to be a viable option.

### ii. Strike Team Minimization Options

MDOT SHA and Federal Highway Administration met with the NPS to discuss the LOD presented in the MLS DEIS on December 8, 2020. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historical Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team conducted its intensive investigation in January 2021 to explore alternative design solutions, project phasing solutions, site access solutions, and the potential use of specialty construction techniques to limit the LOD. The ALB Strike Team presented its results to the NPS on February 8, 2021.

MDOT SHA established the Base LOD as the "Base Option," which includes a conventionally constructed bridge structure built in two phases on the existing bridge centerline with the assumption of temporary construction access over the Potomac River via trestles and causeways. This Base Option included minor LOD reductions from the DEIS LOD to minimize impacts to Plummers Island. The Base Option also started with construction access in all four quadrants and was minimized to remove the construction access in the southwest, southeast, and northeast quadrants, which significantly reduced impacts to NPS property.

The ALB Strike Team first reviewed the avoidance and minimization options developed by MDOT SHA to date, as described above, and the Strike Team agreed that these options were not practicable, except perhaps the top-down construction option, which they investigated in further detail. The Strike Team then reviewed the viability of the Base Option and confirmed that this on-center alignment with a conventional construction approach was a viable option. The ALB Strike Team also considered a "west shift" of the LOD to entirely avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option.

The ALB Strike Team then considered other bridge construction approaches to determine if any of them could limit the LOD further than the Base Option could. The Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach.

#### Top-Down Construction

The first type of construction method assessed by the Strike Team was the top-down approach. The Strike Team investigated whether the existing bridge could be used as a work platform as part of the top-down construction method, but determined it could not, since the northbound and southbound lanes are at very different elevations, making it impossible to shift traffic across the bridge during construction. This

00017698



also means that the existing bridge cannot be used for construction and material deliveries, except during light traffic periods that would allow a lane closure. Top-down construction approaches investigated included: gantry, pre-cast segmental, cast-in-place segmental, and cable stayed. The Strike Team determined that the gantry method was not viable, because the ALB would require either spread footing foundations on rock or drilled piers, both of which would require ground access to the foundation locations for construction. Pre-cast segmental construction would also not be viable, because segments for the ALB would be too large and heavy to transport to the site.

Cast-In-Place Segmental
A cast-in-place segmental construction method was determined to be viable. A cast-in-place segmental bridge option would fit within the Base LOD, with impacts similar to the Base Option. The cost of this option is likely competitive with the Base Option and would likely be faster to construct.

Cable Stayed
The next top-down option reviewed by the Strike Team was the Cable Stayed Option, which would use a top-down cantilever method of construction. The primary advantage of this method is that it requires the fewest number of foundations of all options considered, minimizing the permanent ground displacement area. This option would also reduce the shade and shadow areas under the bridge, which is known to affect anadromous fish species. The cable stayed option would require a 200-foot tower and cables and would have a significant effect on the overall viewshed. This is the most expensive construction method considered.

Slide-In Place
A third type of bridge construction considered by the Strike Team for the ALB is the Slide-In Place Option. This option would construct the entire new superstructure on falsework situated west of the existing bridge and then slide it in place over a weekend. This option was found to be the most impactful strike team option and therefore not viable.

The Strike Team also reviewed constructability and construction access options and those are summarized in **Section 2.2.1.B** below.

### 2.2.1.B.    Constructability Considerations

Construction equipment and personnel must be able to work below the bridge structures at river level to construct proposed piers and demolish the existing structure. Given the steep slopes on both shorelines of the Potomac River, limited access opportunities, and characteristics of the Potomac River channel, a site access plan is needed that requires additional LOD beyond the limits of the existing and proposed structures.

After field analysis and known information review, MDOT SHA and the ALB Strike Team determined that access to the site at river level can be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the towpath. Construction traffic could then turn south parallel to the existing structure and follow existing right-of-

00017699



**OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

way to the area below the existing/proposed bridge. It is important to note that pedestrian traffic on the Chesapeake and Ohio Canal towpath must be maintained throughout construction. A barrier between the haul road and the towpath would need to be constructed to ensure public safety. The site access plan on the north side of the ALB would require an approximate travel way width of 40 feet beyond the extent of the proposed bridge to supply enough area for crane booms, pump trucks, man lifts, and other equipment needed to reach the proposed bridge deck from river level.

Access to the site at river level from the south side is more difficult. The existing residential neighborhood in the bridge's southwest quadrant constricts this area for site access. It is proposed that access to the south side of the river be via means of a temporary river causeway and temporary bridge, such as floating bridges and barges. River flooding would also need to be considered in the design of this temporary structure, which would require a contingency plan should water levels rise and would require the temporary structures and barges be built to withstand the 100-year flood or be removable prior to flood events.

The proposed construction access is shown in **Figure 5**. Storage of construction equipment, vehicles, and materials could be accommodated within the temporary LOD indicated in the Final EIS (FEIS).

00017700

Figure 5. Proposed Construction Access for American Legion Bridge



American Legion Bridge
Northwest Construction
Access

Legend:
- ROW Limit of Disturbance
- Temporary Construction Access Path
- Delineated Stream
- Delineated Wetland
- Stream Impact
- Culvert Impact
- Wetland Impact

Potomac River

Clara Barton Pkwy.

C & O Canal Towpath

C & O Canal Lock 14

Culvert Outlet

American Legion Bridge

I-495

June 2022

16

OP LANES MARYLAND

I-495 & I-270 Managed Lanes Study



### 2.2.1.C.  Avoided and Minimized LOD in the Vicinity of the American Legion Bridge

MDOT SHA determined the LOD options for the ALB based on the results of the ALB Strike Team investigations. The bridge construction types with the smallest LOD footprint were the Base Option and the Cast-In-Place Segmental Option, both with a similar LOD requirement. Both construction types could be built with an on-center alignment or a west-shift alignment. MDOT SHA compared the NPS land impacts and those of the natural and cultural resources surrounding the ALB and determined that the on-center alignment would impact the least amount of total NPS Land; would not require re-configuration of the Clara Barton Parkway interchange; and would not require residential displacement, as the west shift alignment would. For these reasons, the on-center alignment with the reduced LOD required by the Base Option or Cast-In-Place Segmental bridge types was incorporated into the Preferred Alternative LOD.

### 2.2.2  Thomas Branch

The Thomas Branch mainstem, features 21C and 23A, is located in the Cabin John Creek MD 12-digit watershed (021402070841), which runs parallel to the corridor study boundary, with its headwaters beginning just south of MD 28 and continuing until it joins the Potomac River at the intersection of Cabin John Parkway and Clara Barton Parkway. The Thomas Branch mainstem was assessed and delineated from River Road (MD 190) to just North of Democracy Boulevard (**JPA Impact Plates 6 through 10**). Thomas Branch is a highly-restricted stream system confined by concrete trapezoidal channels; bedrock; sheet pile noise walls; high, steep valley walls; and residential development. I-495 was constructed in the center of the narrow, steep-sided Thomas Branch stream valley and a large portion of the stream was relocated to build the current alignment of I-495.

A preliminary geomorphic analysis was performed by MDOT SHA in July 2018, and the analysis concluded that the reach is highly constrained and restricted, and where not restricted, bank erosion and woody debris are moderately present. The results of this analysis and other field observations from the delineation and stream assessment were presented in an avoidance and minimization meeting with MDOT SHA, USACE, and MDE on May 13, 2019. Thomas Branch historically flowed down the center of the stream valley, but was relocated to either side of I-495 when the roadway was constructed in the 1960s. The majority of Thomas Branch is characterized by a high level of bank erosion where the banks are not armored; a shallow, wide channel incised in some areas with sheer 15-foot banks; bedrock blockages to fish passage; little instream habitat; low head dams; concrete trapezoidal channels, integrated concrete weirs, and riprap; and sheet pile walls abutting the stream or at the top of its banks. Thomas Branch is highly-degraded and has a limited functional value due to prior impacts, previous realignment, stream blockages, and a constrained channel environment. Although no recent fish data were available for Thomas Branch, Montgomery County Department of Environmental Protection (MCDEP) conducted fish sampling in 1996 and 2003. They documented blacknose dace, common carp, creek chub, and goldfish in 1996 and blacknose dace and creek chub in 2003.

Thomas Branch flows south from Democracy Boulevard, along the west side of the I-270 west spur and then along I-495 to River Road where it enters Cabin John Creek. Due to its proximity to the existing roadway and the surrounding steeply sloped topography, significant impacts to Thomas Branch could not be avoided or minimized, as relocation is not an option. Each impacted section of Thomas Branch is discussed as it flows south through the project area within the Impact Narrative, Section 3.3, of this report.

00017702

 I-495 & I-270 Managed Lanes Study     Final Avoidance, Minimization, and Impacts Report

Generally, Thomas Branch will be culverted for most of its length within the corridor study boundary due to its proximity to the roadway but will be maintained as an open channel wherever practicable.

### 2.2.3     Other Major Stream Crossings

Major stream crossings were examined to determine the potential for impact reduction. Stream crossings within the Preferred Alternative LOD that were shown as blue line streams on the USGS National Hydrography Dataset (NHD) layer and had a drainage area greater than 1.5 square miles were included in this report as "major stream crossings." The mainstem of Thomas Branch and the Potomac River required extensive investigation and are documented in the previous sections, while the remaining major stream crossings are discussed in this section. Proposed construction activities and impacts at these stream crossings vary widely, ranging from existing culverts that do not require modification to full bridge replacements. Likewise, the opportunity for impact reduction varies significantly by crossing.

#### 2.2.3.A.   Rock Run

Rock Run, feature 22M, flows south under the Clara Barton Parkway, Chesapeake and Ohio Canal, and the Chesapeake and Ohio Canal Towpath west of I-495. Rock Run flows through a two-cell 10-foot-by-10-foot Reinforced Concrete (RC) box culvert located at Station 114+00 Left (LT) (**JPA Impact Plate 3**). This structure is not proposed for replacement as part of the MLS and would not need to be extended to accommodate roadway widening. Preliminary hydrology and hydraulic estimates indicate that capacity augmentation would not be required. Since the Rock Run culvert is not proposed for extension or replacement, no targeted avoidance or minimization is possible at this feature location. The Preferred Alternative LOD near Rock Run includes areas necessary to allow access to construct the ALB over the Potomac River.

#### 2.2.3.B.   Booze Creek

Booze Creek, feature 22Z, flows south under Cabin John Parkway south of the I-495 and Cabin John Parkway interchange. The existing structure over Booze Creek flows through a three-cell 14-foot-by-9-foot RC box culvert located at Station 196+00 to 201+00 Right (RT) (**JPA Impact Plate 5**). This structure is not proposed for replacement as part of the MLS and would not need to be extended to accommodate roadway widening. Preliminary hydrology and hydraulic estimates indicate that capacity augmentation would not be required in this location. Since the Booze Creek culvert is not proposed for replacement or extension, no targeted avoidance or minimization is possible in this location. The Preferred Alternative LOD near Booze Creek includes construction access areas.

#### 2.2.3.C.   Cabin John Creek – River Road

Cabin John Creek – River Road, feature 22AA, flows south under the ramp from Cabin John Parkway to southbound I-495, and under I-495, between Seven Locks Road and Cabin John Parkway. The existing ramp structure is a four-span steel beam bridge, and the structure carrying I-495 is a five-span steel beam bridge, both located near Station 198+00 RT and LT (**JPA Impact Plate 5 & 6**). Reconfiguration of the I-495 and Cabin John Parkway interchange would require removal of these existing structures. Reconfigured I-495 and ramp crossings of Cabin John Creek would be on new bridge structures. Bridge design specifics, including under-clearance to the waterway, pier location, and span distance over the waterway would be determined during final design. Since bridge design details are unknown, additional avoidance and minimization other than what has been included in the preliminary design is not possible in this location at this time. The Preferred Alternative LOD near Cabin John Creek includes area to remove

00017703



existing structures and construct the new bridges. MDOT SHA commits to maintaining or improving aquatic life passage in Cabin John within the project limits.

### 2.2.3.D.    Cabin John Creek – Montrose Road

Cabin John Creek – Montrose Road, feature 24F, flows south under Montrose Road just east of the I-270 and Montrose Road interchange through a single cell 16-foot by 8-foot box culvert from Station 3615+00 to 3617+50 LT, and then flows west under I-270 through a single cell 16-foot by 8-foot box culvert at Station 3627+00 (**JPA Impact Plate 13 & 14**).  The Montrose Road structure is not proposed for replacement as part of the MLS and would not require extension to accommodate roadway widening. Preliminary hydrology and hydraulic estimates indicate that capacity augmentation would not be required at the Montrose Road structure. The I-270 structure is not proposed for replacement as part of the MLS and would not need to be extended to accommodate roadway widening. Preliminary hydrology and hydraulic estimates indicate that capacity augmentation may be required to maintain headwater depths. Since the Cabin John Creek culverts are not proposed for extension or replacement, no targeted avoidance or minimization is possible in this location. The Preferred Alternative LOD includes areas near Cabin John Creek at Montrose Road for maintenance of traffic and at I-270 for culvert augmentation.

### 2.2.3.E.    Muddy Branch

Muddy Branch, feature 29B, flows west under I-270 just north of the I-370 interchange. The existing Muddy Branch structure is a 120-inch corrugated metal pipe culvert located at Station 3328+00 RT and LT (**JPA Impact Plate 21**). This structure is not proposed for replacement as part of the MLS and would not need to be extended to accommodate roadway widening. Preliminary hydrology and hydraulic estimates indicate that capacity augmentation will not be required to maintain headwater depths. Since the Muddy Branch culvert is not proposed for extension or replacement, no targeted avoidance or minimization is possible in this location. The Preferred Alternative LOD near Muddy Branch includes area necessary to allow for roadway resurfacing.

### 2.2.3.F.    Watts Branch

Watts Branch, feature 27A, flows southwest under I-270 and under West Montgomery Avenue (MD 28) on the north side of the I-270 and West Montgomery Avenue interchange. Watts Branch flows through a 25-foot-by-8-foot RC box culvert under I-270 at Station 3479+00 RT and LT (**JPA Impact Plate 18**). Watts Branch then flows through a 25-foot-by-8-foot RC box culvert under West Montgomery Avenue at Station 3484 LT. These structures are not proposed for replacement as part of the MLS and would not need to be extended to accommodate roadway widening. Preliminary hydrology and hydraulic estimates indicate that capacity augmentation, or overflow pipes, will likely be required to be installed to maintain headwater depths. Since the culverted portions of the waterway (27A_C and 27A_C1) are proposed for augmentation, the areas downstream of the culverts have been designated as Limits of Restoration and Limits of Stabilization areas, which will require USACE and MDE review and approval of final stabilization/restoration design prior to any clearing or construction.

### 2.2.3.G.    Old Farm Creek

Old Farm Creek, feature 24A, flows west under I-270 on the north side of I-270 over Tuckerman Lane. Old Farm Creek flows through a 20-foot-by-10-foot RC box culvert under I-270 at Station 3683+00 (**JPA Impact Plate 11**).  This culvert would not need to be extended to accommodate roadway widening. Preliminary hydrology and hydraulic estimates indicate that capacity augmentation may be required to maintain

00017704

 I-495 & I-270 Managed Lanes Study     Final Avoidance, Minimization, and Impacts Report

headwater depths. Since the Old Farm Creek culvert is not proposed for extension or replacement, no targeted avoidance or minimization is possible in this location. The Preferred Alternative LOD near Old Farm Creek includes areas necessary to allow for culvert augmentation. MDOT SHA commits to maintaining or improving aquatic life passage in Old Farm Creek within the project limits.

## 2.3     Individual Resource Avoidance and Minimization

The MLS Team evaluated agency recommendations for avoidance and minimization and implemented them wherever practicable during preliminary stages of design. Resource impacts associated with proposed noise walls were evaluated to determine if they could be limited by altering the placement of the structures. Proposed noise wall locations were refined to limit impacts to wetlands and waterways as much as possible and the results of this process are included in **Section 2.3.1**. Vernal pool wetlands provide important habitat for various species of wildlife, including amphibians and invertebrates and are a protection priority for MDE. The MLS Team identified vernal pools within the Preferred Alternative in coordination with MDE and worked to eliminate these areas from the LOD, as detailed in **Section 2.3.2**. All natural resource impacts were scrutinized within the Preferred Alternative LOD to ensure that there was significant justification for including them either for roadway expansion, constructability, drainage, or culvert augmentation. **Section 2.3.3** details the individual wetland, wetland buffer, and waterway impacts that were avoided and minimized during this process.

### 2.3.1     Noise Wall Barriers

Noise wall barriers are necessary for the abatement of traffic noise impact to noise-sensitive areas, as discussed in **Section 5.9 of the FEIS.** Several existing noise walls will be impacted, and new noise barriers are proposed within the Preferred Alternative LOD.

Two specific noise wall configurations were revised to minimize the impact to waterway features. At Station 312+00 RT and Station 342+00 RT, the noise wall barriers were brought in closer to the roadway so that the barriers could cross waterway features 21B and 20B, respectively, at a location that would already be impacted by roadway widening instead of further downstream.

### 2.3.2     Vernal Pools

Potential vernal pools were identified during field delineation of wetlands and verified during agency field reviews with the regulatory agencies. Two vernal pools were identified within the Phase I South portion of the Preferred Alternative: 22L_VP and 22LL_VP. Both vernal pool wetlands are located in close proximity to the ALB, and the LOD was revised to avoid impact to these wetlands.

### 2.3.3     Northern Long-Eared Bat

The northern long-eared bat (NLEB) is a federally threatened species in Maryland and Virginia that requires Endangered Species Act Section 7 consultation with USFWS if tree clearing for transportation projects would be greater than 15 acres, as is the case for the MLS. MDOT SHA coordinated with USFWS during the development of the LOD to exclude forested areas greater than 300 feet from the existing roadway to protect potential NLEB habitat. A total of 11 discreet areas were excluded from the LOD including areas within NPS land near the ALB and M-NCPPC land near Cabin John Creek.

00017705

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### 2.3.4    Other Avoidance and Minimization

Based on agency comments, field reviews, and careful review of impacts and their justifications as the design progressed, the MLS Team requested revisions to the LOD to reduce or avoid impacts to specific features. **Table 2-2** includes a list of wetland, wetland buffer, and waterway feature impacts that were avoided or minimized throughout preliminary design.

Table 2. Individual Features Avoided or Minimized

| Feature ID | Classification and Type | Avoided or Minimized | Agency Requested |
|---|---|---|---|
| 19J_2 | Perennial Waterway | Avoided | No |
| 20F_C | Perennial Waterway | Avoided | No |
| 21B | Perennial Waterway | Minimized | No |
| 21Q | Palustrine Forested (PFO) Wetland | Minimized | Yes |
| 22JJ | PFO Wetland | Avoided | Yes |
| 22L, 22L_VP | Palustrine Emergent (PEM) Wetland (Vernal Pool) | Avoided | Yes |
| 22LL_VP | PEM Wetland (Vernal Pool) | Avoided | Yes |
| 22K | PEM Wetland | Minimized | Yes |
| 22I | PFO Wetland | Avoided | Yes |
| 22O | PFO Wetland | Minimized | Yes |
| 23E | Intermittent Waterway | Avoided | No |
| 23EE | PFO Wetland | Avoided | Yes |
| 23F | PEM Wetland | Minimized | Yes |
| 23H | Ephemeral Waterway | Avoided | No |
| 23HH | PFO Wetland | Avoided | Yes |
| 23G, 23G_1, 23G_C | Perennial Waterways | Avoided | No |
| 23GG | PFO Wetland | Minimized | Yes |
| 23K_1 | Perennial Waterway | Minimized | No |
| 23R, 23R_1, 23R_2 | Intermittent Waterways | Avoided | No |
| 23PP | Intermittent Waterway | Avoided | No |
| 23Q, 23Q_2 | Perennial Waterways | Avoided | No |
| 23NN | Perennial Waterway | Avoided | No |
| 23QQ | Ephemeral Waterway | Avoided | No |
| 23RR | Intermittent Waterway | Avoided | No |
| 23S | Intermittent Waterway | Avoided | No |
| 23SS | Ephemeral Waterway | Avoided | No |
| 23T | Ephemeral Waterway | Avoided | No |
| 23UU | Intermittent Waterway | Avoided | No |
| 23WW | PFO Wetland | Avoided | No |
| 24M | PEM Wetland | Avoided | No |
| 24N | PFO Wetland | Minimized | No |
| 25A_1 | Perennial Waterway | Avoided | Yes |
| 26G | Ephemeral Waterway | Avoided | No |
| 26G_1 | Intermittent Waterway | Avoided | Yes |
| 26H | PEM Wetland | Minimized | Yes |

00017706

 **OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study     Final Avoidance, Minimization, and Impacts Report

| Feature ID | Classification and Type | Avoided or Minimized | Agency Requested |
|---|---|---|---|
| 27F | PFO Wetland | Minimized | Yes |
| 29B, 29B_1 | Perennial Waterway | Avoided | No |
| 29C | Intermittent Waterway | Avoided | Yes |
| 29E, 29E_1 | Perennial Waterways | Avoided | Yes |
| 29F | Perennial Waterway | Avoided | No |
| 29G | PEM Wetland | Avoided | Yes |
| 29H | Intermittent Waterway | Avoided | Yes |
| 29J | PEM Wetland | Avoided | Yes |
| 29L | PFO Wetland | Avoided | No |
| 29M | PFO Wetland | Avoided | No |
| 29N | PFO Wetland | Avoided | No |
| 29P | Intermittent Waterway | Avoided | No |

### 2.3.5    Required Future Avoidance and Minimization

Areas of stream restoration, stream stabilization, and improvements to SWM facilities require some impact to natural resource features. However, the MLS Team determined that these impacts should be differentiated from the LOD to ensure that impacts to natural resources are avoided and minimized to the maximum extent practicable by requiring additional design detail prior to clearing or resource impact for construction in these limits. These Limits of Restoration (LOR), Limits of Stabilization (LOS), and Limits of Improvement to Stormwater Capacity (LOI) areas require special consideration of impacts and require further coordination with agencies before any construction activity including clearing can take place.

#### 2.3.5.A.    Limits of Restoration (LOR)

On-site stream restoration activities will impact some streams and the wetlands adjacent to those streams. Impacts to these environmentally sensitive areas are often associated with culvert augmentation. These impacts typically result from excavation and/or fill associated with stream restoration treatments that may include, but are not limited to: rock toe protection, log vanes, cross vanes, and boulder step pools. At this preliminary stage of design, the details of the restoration have not been completed and the estimated limits are conservative. To ensure environmentally sensitive design and to prevent unnecessary tree clearing or impacts, these stream restoration areas have been excluded from the LOD and included in LOR linework on the JPA impact plates. In LOR areas, USACE and MDE approval of final restoration design



is required prior to conducting any clearing or construction and will be focused on achieving ecological uplift with channel restoration.

00017707

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### 2.3.5.B.    Limits of Stabilization (LOS)

On-site stream stabilization activities will impact some short segments of stream and wetlands adjacent to these streams. Impacts to these environmentally sensitive areas are often associated with culvert augmentation. These impacts typically result from excavation and/or fill associated with stream stabilization treatments that may include, but are not limited to, scour pools and bank armoring. At this preliminary stage of design, the details of the stabilization have not been completed and the estimated limits are conservative. To ensure environmentally sensitive design and to prevent unnecessary clearing or impacts, these stream stabilization areas have been excluded from the LOD and included in the LOS linework on the JPA impact plates. In LOS areas, USACE and MDE approval of final stabilization



design is required prior to conducting any clearing or construction. Work in these areas may include stabilizing a bank or repairing a small erosion area, but not full pattern and profile type restoration.

### 2.3.5.C.    Limits of Improvements to Stormwater Capacity (LOI)

In some locations, streams and wetlands will be impacted by modifications to stormwater treatment facilities. In some cases, these modifications are necessary to increase storage capacity upstream of culverts and in other cases, modification may be needed to increase on-site stormwater quality or quantity treatment. Final stormwater design and culvert analysis cannot be completed at this stage of design and the estimated limits are conservative. To prevent unnecessary clearing and impacts, these improved stormwater and storage areas have been excluded from the LOD and included in LOI linework on the JPA impact plates. In LOI areas, USACE and MDE approval of stormwater treatment modifications is required prior to conducting any clearing or construction.



## 2.4    Avoidance and Minimization Summary

As evidenced in the above sections, all wetlands, their buffers, waterways, and floodplains were avoided and minimized to the maximum extent practicable **at this stage of the project**.

00017708

 **OP·LANES**™  MARYLAND | I-495 & I-270 Managed Lanes Study | Final Avoidance, Minimization, and Impacts Report

## 3　UNAVOIDABLE IMPACTS

Despite the avoidance and minimization measures discussed previously, many impacts to wetlands, their buffers, waterways, and floodplains were unavoidable. Unavoidable impacts result primarily from fill and structures used to support the widened roadway; new interchanges; direct access ramps; and construction access areas needed to complete construction. Channel relocation, SWM outfalls, and wetland hydrology loss also cause unavoidable impacts. **Section 3.1** discusses these distinct sources of impact. **Section 3.2** discusses how SWM relates to and, in some cases, causes impact. One unique unavoidable impact type results from the need to augment culverts and increase culvert capacity to prevent flood risk and these impacts are discussed in **Section 3.3.** The LOD has been set to accommodate improvements related to aquatic life passage, which is discussed in **Section 3.4**. Finally, the rationale for each type of unavoidable impact was evaluated and is detailed for each impacted feature in the Impact Narrative, included in **Section 3.5**.

### 3.1　Impact Types

A total of 15 distinct impact categories have been identified to help describe the most common design elements that would affect natural resources. The name of each impact category was selected to represent the main cause of impacts in the category; however, some ancillary elements may be included in these categories. The general description of each category is presented below. Specific feature impacts are included by station and resource following the general impact category descriptions in the Impact Narrative, **Section 3.5**.

#### 3.1.1　Roadway

Roadway impacts include any impact resulting directly from the roadway widening such as grading, cut/fill, and standard offsets (i.e. 10-foot offset from the limit of cut/fill and 10- to 14-foot offset from the back of retaining walls to allow for access and erosion and sediment control measures). Roadway impacts were determined by design elements such as additional travel lanes, new direct access interchanges, and modified interchanges.

00017709



I-495 & I-270 Managed Lanes Study　　Final Avoidance, Minimization, and Impacts Report



### 3.1.2　Existing Culvert

Channels classified as flowing within existing culverts or pipes inside the Preferred Alternative LOD are considered impacted. Existing culverts are located beneath roadways, so this impact type is considered a subset of roadway impacts. All existing culverts are assumed to be replaced in-kind or to remain in place unless augmentation of the culvert is apparent.

Since existing culverts are assumed to remain in place, it is also assumed that these segments of channels will maintain their existing function.

### 3.1.3　Existing Bridge

Jurisdictional features beneath existing bridges inside the Preferred Alternative LOD are considered impacted. Existing bridges are within the existing roadway footprint, so this impact type is considered a subset of roadway impacts. Existing bridges are assumed to remain in place unless the expansion or replacement of a bridge is apparent. It is assumed that features flowing beneath bridges will maintain their existing function.





### 3.1.4　New/Expanded Bridge

Jurisdictional features or portions of features that would be located under proposed new or expanded bridges are considered impacted. These impacts occur most commonly in direct access interchange and ramp additions. Since features below new or expanded bridges are within the proposed road edge, new or expanded bridge impacts are considered a subset of roadway impacts.

00017710

JA1550

 **OP·LANES** MARYLAND   I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### 3.1.5 Culvert Extension

Some existing culverts would need to be extended according to the preliminary design and any access to wetlands or waters due to these extensions is considered a culvert extension impact. Some impacts may be the result of tying the culvert flow back into the waterway.

If a feature is located behind or next to the headwall of a culvert extension, then the feature is considered impacted by roadway. If a feature is only located directly in front of the culvert extension, then the feature is considered impacted only by the culvert extension.



### 3.1.6 New/Augmented Culvert

New and augmented culvert impacts include any impact resulting directly from the construction of new culverts or new culverts installed alongside an existing culvert (augmented). These impacts do not include culvert extensions or existing culverts. New headwalls associated with new or augmented culverts are considered part of the construction of a new or augmented culvert, not a culvert extension. For more information regarding augmented/auxiliary culverts, please see **Section 2.2.3 Other Major Stream Crossings**.

If a feature is located behind or next to the headwall of a new/augmented culvert, then the feature is considered impacted by roadway. If the feature is only located directly in front of the new/augmented culvert, then the feature is considered impacted only by the new/augmented culvert.

00017711

JA1551



I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### 3.1.7    Relocated Channel

Relocated channel impacts are impacts to other wetland or waterway features resulting from the relocation of a channel.



### 3.1.8    Stormwater Outfalls

Some proposed SWM pond facility outfall locations are proposed along the edge of natural resource features. A feature was considered impacted by a proposed SWM facility outfall if the LOD or impact area was only increased for the SWM facility. If a feature did not appear to have a proposed SWM facility outfalling to it, but the LOD or impact area around the feature appeared to be increased specifically for the SWM facility, the feature was considered impacted by "construction access," discussed below.



### 3.1.9    Construction Access

Construction access impacts include any unavoidable impact outside of the standard offset areas resulting from access needed for outfall stabilization, fly-over ramp construction, bridge construction, and general constructability areas.



00017712

JA1552

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report



### 3.1.10  Hydrology Loss

Wetlands that were located partially within or near the temporary or permanent LODs were evaluated for their likelihood of being totally impacted by a loss of hydrology source(s) on a case-by-case basis. Wetlands were considered totally impacted if hydrology loss would occur to such an extent that the USACE definition of wetland hydrology would likely not exist after construction. To determine whether wetlands were impacted by hydrology loss, roadway drainage and SWM changes influencing the wetland were considered in conjunction with contour lines and the approximate drainage area contributing to the wetland. If it was estimated that over half of the hydrology to the wetland is proposed to be removed by MLS drainage and SWM alterations, then the wetland was considered fully impacted. For example, if the drainage area was relatively localized, fill is proposed to most of the wetland, and the open section roadway drainage providing most of the hydrology to the wetland would be captured, treated in SWM vault, and discharged directly into a stream channel, the wetland would be considered fully impacted.

Many wetlands completely encompassed by the LODs will experience hydrology losses; however, since wetlands entirely within the LODs are assumed to be fully impacted, it was not necessary to determine whether they would incur a hydrology loss.

### 3.1.11  Shading

The ALB will be replaced and widened and the bridge over Clara Barton Parkway will also be widened. Portions of wetland and waterway features adjacent to the existing bridges that had not been previously shaded will be shaded by the new bridge structures. Shading will likely affect the extent and type of vegetative cover as well as the temperature of these resources, which would change their habitat quality. MDE will consider the newly shaded portions of features as impacted with mitigation required, while USACE will not consider newly shaded features as impacted.



### 3.1.12  Temporary Impacts

Temporary and permanent LODs have been defined for the Preferred Alternative. Temporary disturbance areas are those areas that are short-term and related to the construction of the Preferred Alternative that will not require MDOT SHA to purchase land for long-term maintenance. Short-term, construction related work includes construction staging, material and equipment storage, construction easements, and other areas needed to support the construction, but not part of the long-term improvements. However, some impacts to wetlands and waterways within the temporary LOD may be considered permanent.

00017713


I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

Temporary impacts to wetlands and waterways are those that can be restored to pre-existing conditions (i.e. no major loss of vegetation and no loss of function and value). If construction would result in a change of classification or a loss of function, then the impact to the wetland or waterway would be considered permanent.

## 3.2    Impacts Related to Stormwater Management

Impacts to natural resources features resulting from SWM facility placement were avoided and minimized to the maximum extent practicable while still meeting SWM requirements. Some unavoidable impacts are associated with SWM pond facility outfalls to natural resource features and expansion of existing SWM facilities. Office and field coordination meetings were held with USACE, MDE, MDNR, and USFWS to appropriately balance the need for stormwater treatment and impacts to natural resources. This section presents the wetlands and waterways features that would be fully impacted by the roadway and replaced with SWM features; features that would experience hydrology loss from the roadway construction and be replaced with SWM facilities; features coordinated with the regulatory agencies that could be impacted by SWM facilities if sufficient justification were provided; and a list of remaining wetlands and waterways within the Preferred Alternative LOD that shall not be impacted by SWM facilities, as determined through extensive coordination with MDE and USACE.

### 3.2.1    Features Fully Impacted by the Roadway or Experiencing Hydrology Loss and Replaced with SWM Facilities

If natural resource features would be fully impacted by the proposed roadway footprint, then the regulatory agencies agreed that SWM facilities could be proposed in those locations. Features were considered fully impacted by the roadway design if the widening and roadside elements overlapped the features to such an extent that the feature would experience a total loss of function as a result of the impact.

The following wetlands will experience hydrology loss due to roadway construction, therefore SWM facilities are proposed on or near them. PEM wetland 22E (**JPA Impact Plate 4**) receives most of its hydrology from roadway drainage and will experience hydrology loss because of roadway widening, therefore a stormwater pond and stormwater swale are proposed adjacent to the proposed road edge. PFO wetland 23CC (**JPA Impact Plate 10**) receives most of its hydrology from untreated open section roadway drainage and will experience hydrology loss because new closed section drainage and SWM vaults will treat SWM and discharge directly to 23V_C, therefore a stormwater pond and a stormwater vault are proposed directly adjacent to the existing wetland's location.

The features that will be fully impacted by the proposed roadway footprint or would lose all hydrology and are proposed to be replaced with SWM facilities are presented in **Table 3-1**.

00017714

JA1554

 **OP·LANES**™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

**Table 3. Permanently Impacted Features Proposed for Replacement with SWM Facilities**

| Feature ID | Impact Plate | Classification | Impact | Replacement SWM Facility |
|---|---|---|---|---|
| 21D_1 | 6 | Intermittent | Roadway widening | Pond |
| 22A | 6 | Intermittent | Roadway widening | Pond |
| 22E | 4 | PEM | Hydrology loss | Swale, Pond |
| 22F, 22G, 22H | 5 | PEM, PFO, Intermittent | Roadway ramp construction and culvert replacement | Pond |
| 23CC | 10 | PFO | Hydrology loss | Adjacent swale |

### 3.2.2    Features Coordinated with the Regulatory Agencies that Could Be Impacted by SWM Facilities with Sufficient Justification

In certain locations, the regulatory agencies determined that SWM facilities may impact natural resource features if sufficient justification was provided for the impact. The following justifications for impacting the features were determined through several office and field meetings to consider the feature's current functions.

**Waterway 22H_1 and Wetlands 22F & 22G – Station 198+50 RT (JPA Impact Plate 5)**

Waterway 22H_1 is an intermittent ditch that drains PEM wetland 22F and PFO wetland 22G. These features will be impacted by ramp construction and the replacement of a culvert (currently waterway 22H_C) to span the proposed ramps. A stormwater pond is proposed north of wetland 22G to capture runoff that is currently captured by these features. Waterway 22H_1 and wetlands 22F and 22G are degraded in function, therefore the construction of a functioning SWM pond would benefit the overall water quality of the area.

**Waterway 22FF – Station 177+00 RT (JPA Impact Plate 4)**

Waterway 22FF is an ephemeral erosional feature that drains uplands and does not link to other features within the corridor study boundary. It originates on the roadside, receives sheet flow from a culvert under the roadway, and drains into a residential development outside of the study area. The feature has a degraded function and exhibits moderate erosion. Waterway 22FF would provide more benefit to the surrounding landscape if converted to a SWM facility, which would be capable of slowing down and improving the water quality of the sheet flow intercepted from the nearby culvert.

**Wetland 23GG – Station 3685+00 RT (Impact Plate 11)**

Wetland 23GG will be partially impacted by the replacement of an impacted existing SWM facility. The existing stormwater facility treats the adjacent Montgomery County school bus facility and roadway widening and associated drainage improvements will partially impact the facility, thus the facility will require improvements as part of this project.

### 3.2.3    Features that Shall Not Be Impacted by SWM Facilities

The wetland and waterway features listed below shall not be impacted by SWM facilities. These features are fully or partially within the Preferred Alternative LOD but not fully impacted by roadway elements to

00017715

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

the point of elimination; not impacted by hydrology loss to the point of being a full take; and were not previously coordinated with the regulatory agencies for SWM impact. In most cases, these features are within the Preferred Alternative LOD because of necessary nearby modifications to existing structures such as culverts, bridges, or outfalls. Features within the LOR, LOS, or LOI should also be considered as part of this list if not specifically included below.

**Wetlands**

- 21P PFO
- 21T PFO
- 22OO PFO
- 22R PFO
- 22TT PFO

- 22U PFO
- 22W PEM
- 22X PFO
- 22Y PEM
- 23W PEM

- 26E PEM
- 27G PSS
- 27F PFO

**Waterways**

- 22SS Perennial
- 22ZZ Perennial
- 22UU Intermittent
- 22HH_2 Intermittent
- 22Q_1 Perennial

- 23A_1 Perennial
- 23DD Intermittent
- 23K Perennial
- 23C Intermittent
- 25H Perennial

- 29K Intermittent
- 29D_D Intermittent
- 29A_2 Perennial

### 3.3    Impacts Related to Augmented/Auxiliary Culverts

One element that contributes to the LOD required for many streams is the potential need for capacity augmentation/auxiliary culverts to accommodate potential increases in surface water elevation and reduce flood risk. Culverts were evaluated throughout the study corridor to determine flood risk potential and auxiliary culverts, additional culvert pipes running alongside the existing culverts, are proposed in those areas where flood risk potential was identified.

MDE regulates surface water elevation increases for construction projects that would result in increased risk of flooding to adjacent properties, prohibiting such changes unless the areas at risk of flooding are purchased, placed in designated flood easement, or addressed by other means acceptable to MDE (COMAR 26.17.04.11 B(6)). A preliminary analysis was conducted within the MLS corridor of all hydraulic structures and culverts with a diameter greater than three feet or those less than three feet that appeared as if they may create hydraulic trespass on properties not owned by MDOT SHA. Augmentation to provide additional hydraulic capacity at these crossings is necessary to: 1) avoid potential highway overtopping during the 100-year return interval flood, and thus to meet MDOT SHA's design criteria, 2) mitigate for increases in 100-year water surface elevations that result from culvert extension required for roadway widening, or 3) eliminate a culvert from classification as a dam per MDE policy Memo No. 2 criteria. Culvert classification as a dam should ideally be avoided as it would require that additional work be performed at the upstream and downstream ends of the culvert to comply with MDE Dam Safety regulations (e.g. slip line the pipe or add filter diaphragm).

Each culvert was evaluated using HY-8 software to determine the capacity at the existing crossing and the likelihood of overtopping the roadway in the 100-year proposed conditions storm. Culverts were also analyzed for potential headwater increases above the 0.1-foot maximum allowable increase from existing

00017716

 **OP·LANES**™  MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

to proposed conditions that result in hydraulic trespass to properties that MDOT SHA does not own. Where either of these two potential risks were present, estimated overtopping in the 100-year proposed condition or potential headwater increases above the 0.1-foot maximum allowable increase, an auxiliary culvert was added to the proposed design.

Based on the initial planning level analysis and review, culvert augmentation was proposed at 39 culvert sites across Phase I South. Further desktop and field investigations were completed on behalf of MDOT SHA, as described below, and the proposed culvert augmentation and/or replacement locations were revised to 33 sites.

Investigations, including some site visits and initial hydrologic and hydraulic computations, were conducted to set the LOD at each augmentation site. The LOD was expanded in these areas to accommodate this work including any erosion and sediment control, maintenance of streamflow, and channel stabilization downstream of the augmentation. The process developed to set the LOD attempts to balance the planning level nature of this project and the limited data availability with the need to provide a conservative yet realistically sufficient LOD limit.

Site visits were conducted on behalf of MDOT SHA at all proposed culvert augmentation sites in Phase I South to assess existing site conditions and potential LOD requirements related to existing conditions and proposed crossing modification. A desktop review of each location was conducted to prepare for each site visit. An assessment form, included for reference in **Appendix B**, was developed to use in this study. Data obtained in the desktop review, such as details of the existing and proposed culvert geometry, drainage area parameters, and estimate of the potential capacity increase via augmentation, were compiled in the assessment form. Additional site-specific information, such as upstream and downstream channel conditions including any bank erosion, channel head cutting, or other instability; notation of any unusual site circumstances including any potentially impacted built infrastructure; and a photo documentation log, were added to the assessment form during the field investigations. Based on the field findings, the investigation team recommended LOD requirements for each augmentation site. A summary document for each culvert augmentation site provides information about the location and the basis of the LOD recommendations. These individual site summaries are presented in **Appendix B**.

Results of MDOT SHA's preliminary analysis were used to set the LOD around the auxiliary culverts and results were shared with the Phase Developer. The Phase Developer then conducted a preliminary hydrologic analysis for all 104 culvert locations within Phase 1 South and identified 38 locations where culvert augmentation, extension, modification, or replacement is expected. The Phase Developer reviewed the LOD and requested LOD expansions in any areas that required additional area for construction. The culvert augmentation locations determined by the Phase Developer and the resulting LOD is reflected in the JPA Impact Plates and the FEIS.

The Phase Developer will conduct detailed hydrologic and hydraulic analysis as part of the final design to determine where augmentation or modification is required at each of the 104 culvert locations. The detailed study will utilize additional data, including roadway and stream topographic survey, to thoroughly analyze each culvert crossing location. The detailed study will also assess the hydraulic impacts associated with augmentation to confirm that the proposed design meets all regulatory requirements. Based on the results of the detailed hydrologic and hydraulic analysis, culvert modification locations may change in the final design.

00017717



### 3.3.1    Structure Modification/Replacement Methodology

MDOT reviewed structure inspection reports and noted condition for all structures within the Preferred Alternative LOD, including bridges, ramps, box culverts, noise walls, and drainage structures. MDOT SHA will require the Phase Developer to replace or rehabilitate all existing structures for the Phase I South portion of mainline I-495 & I-270 and associated ramps, except for existing culverts and noise walls demonstrated to be in a state of good repair or where replacement of specific bridges has been deferred to later in the anticipated 50-year term of the P3 agreement as agreed to by MDOT SHA. If replacement is deferred, replacement requirements and permitting will be deferred until such time as the replacement is undertaken. If not deferred, structures must be replaced or rehabilitated within the initial design and construction term, which is anticipated to be approximately 5 years. Existing culverts and noise walls within the mainline and all existing structures outside of the mainline, but within the Preferred Alternative LOD, must meet the residual life requirements as outlined in the Technical Requirements and a minimum 25-year residual life at hand back requirement at the conclusion of the P3 term. Some structures outside of the mainline and associated ramps were determined not to need replacement based on existing inspection records. It is incumbent upon the Phase Developer to do the necessary inspections and evaluations to determine the ability to incorporate existing structures that are not required to be replaced into the ultimate project. If the Phase Developer determines that an existing structure cannot meet these requirements, that structure must be rehabilitated or replaced as part of the project.

## 3.4    Aquatic Life Passage

Another element influencing the LOD at major stream crossings is the need to promote aquatic life passage. Code of Maryland Regulations (COMAR) states that "the length of culverts shall be limited to a maximum of 150 feet unless it can be demonstrated through an environmental study that any adverse impacts will be adequately mitigated (COMAR 26.17.04.06 (B(3)))."

All proposed culverts that will be greater than 150 feet in length are included in **Appendix C**. Only two existing culverts that are currently less than 150 feet in length, waterways 22C_C and 22H_C, are proposed for replacement with culverts that will increase their length beyond 150-feet. Waterway 22C_C (unnamed tributary to Cabin John Creek) is proposed for replacement to accommodate ramp reconfiguration. The proposed culvert system will be over 150 feet long when combined into a single culvert along with nearby features 22A_C, 22B, 22C, and 22D. This intermittent channel and culvert system originates as highway drainage and the proposed culvert does not connect to any upstream habitat. Because this system does not connect to upstream habitat, aquatic passage is not likely to be adversely affected. Waterway 22H_C (unnamed tributary to Cabin John Creek) is proposed for replacement to accommodate roadway reconfiguration along Cabin John Parkway. The culvert is currently less than 150-feet long and will be over 200 feet long after its replacement. The source of water flowing into waterway 22H_C is a pipe draining runoff from a residential neighborhood, therefore there is no upstream aquatic habitat.

Most of the culverts within the project area are longer than 300-feet in their existing condition and have limited potential for aquatic life passage. MDOT SHA coordinated with USFWS, MDNR, and NMFS to determine a list of priority crossings within the project area for aquatic life passage. The agencies provided feedback based on the USFWS Nature's Network Imperiled Species Habitat Layer, MDNR's Bionet, and streams within the project area that provide anadromous fish habitat. The resulting list of streams within the project area that have been identified as aquatic life passage and anadromous fish habitat priorities

00017718

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

includes: the Potomac River, Cabin John Creek, Old Farm Creek, and Watts Branch. MDOT SHA coordinated with the resource agencies to include many commitments related to aquatic life passage in the FEIS. One of these is that MDOT SHA commits to maintaining or improving aquatic life passage in Cabin John Creek, Watts Branch, and Old Farm Creek within the Preferred Alternative LOD and will consider the recommendations outlined in the *Recommendations for Aquatic Organism Passage at Maryland Road-Stream Crossings* for new and replacement culverts. Please see FEIS Chapter 7 for a full list of commitments.

### 3.5    Impact Narrative

Wetland, wetland buffer, waterway, and floodplain impacts are unavoidable for the Preferred Alternative. The reason and rationale for each impact is described below by location and resource to add clarity to the impact plates. The descriptions include both temporary and permanent impacts. The impacted systems are described according to order of appearance on the Impact Plates and by station along the Phase I South portion of the corridor study boundary and impacts are generally discussed from upstream to downstream within impacted systems.

#### 3.5.1    Mainline Impact Plate 1

Project NEXT, a separate project from the I-495 and I-270 MLS, will impact the resources shown within the LOD on Impact Plate 1 before the MLS begins construction.

#### 3.5.2    Mainline Impact Plate 2

##### 3.5.2.A.    Station 95+50 to 97+50 LT & RT; Waterways 22WW, 22WW_C

Intermittent waterway 22WW_C is an existing culvert that requires replacement and headwall modification at the inlet end for a proposed new shared use path and retaining wall. Waterway 22WW_C will require outfall extension and modification to accommodate the widened roadway and associated retaining wall and noise wall. Intermittent waterways 22WW and 22UU will be permanently impacted by the 22WW_C culvert replacement and extension. A portion of the impact to waterway 22WW will be temporary in order to tie in the replaced inlet to 22WW_C.

##### 3.5.2.B.    Station 97+50 to 114+00 LT & RT

###### a.    Waterways 22UU, 22VV; Wetland 22TT

Intermittent waterway 22UU will be permanently impacted by roadway widening, access for ALB pier construction, the extension of 22WW_C, and accommodation of the Potomac Heritage trail. PFO wetland 22TT and part of ephemeral waterway 22VV will be temporarily impacted by construction access necessary to construct the ALB. Waterway 22VV will also be permanently impacted by roadway widening, structure modification, and the proposed shared use path.

###### b.    Waterways 22MM and 22MM_B

Perennial waterways 22MM and 22MM_B are the Potomac River, also a Traditionally Navigable Waterway. Waterways 22MM and 22MM_B will be permanently impacted by the construction of bridge piers supporting the ALB and will be temporarily impacted by access necessary to construct the ALB. Permanent impacts to the Potomac River were calculated based on the square foot (SF) increase in pier

00017719

 **OP·LANES** MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

footprint. The existing ALB piers total 945 SF and the proposed bridge piers total 2,214 SF resulting in an net permanent impact of 1,296 SF. All other impacts to the Potomac River are temporary for construction access. One of the existing in-water piers of the ALB will be eliminated and the proposed piers near Plummers Island will be drilled shaft piers, which will minimize impact to Plummers Island. Construction access impacts include temporary trestle and causeway construction, as well as potential barge operation in the mainstem of the Potomac River, and temporary bridging of the oxbow channel around Plummers Island, also 22MM, on the east side of the ALB.

### c.    Waterways 22NN, 22NN_B; Wetland 22OO

Intermittent waterways 22NN, 22NN_B, and part of PFO wetland 22OO and its buffer will be temporarily impacted by construction access necessary for the replacement of the ALB. Part of PFO wetland 22OO and its buffer and part of 22NN_B will also be permanently impacted by a bridge pier supporting the ALB, abutment fill, and shading from the widened ALB.

### d.    Waterways 22QQ, 22MM

Perennial waterway 22QQ and a portion of 22MM, the oxbow channel of the Potomac River around Plummers Island, will be temporarily impacted by outfall stabilization to repair erosion in 22QQ. 22MM, the oxbow channel of the Potomac River around Plummers Island, will also be temporarily impacted for construction of the widened ALB, and no bridge piers or hardened structures will be placed within the oxbow.

## 3.5.3    Mainline Impact Plate 3

### 3.5.3.A.    Station 114+50 to 116+00 LT; Waterway 22M_C; Wetlands 22W, 22PP

Part of PEM wetland 22W, its buffer, and perennial waterway 22M_C will be temporarily impacted by the ALB construction access road, which permits direct access to northbound and southbound I-495 for incoming and outgoing vehicles with minimal travel on the Clara Barton Parkway. PFO wetland 22PP and its buffer will be permanently impacted by grading associated with the widened roadway, retaining wall construction, and bridge abutment.

### 3.5.3.B.    Station 116+50 to 119+50 LT & RT; Waterways 22V, 22V_B, 22V_B1, 22V_1, 22V_2; Wetlands 22W and 22K

Intermittent waterways 22V_B1 and 22V_1will be permanently impacted by bridge piers for I-495 over Clara Barton Parkway and the Chesapeake and Ohio Canal. These features and 22V, 22V_2, and 22V_B will be temporally impacted by access to construct this bridge. Part of PEM wetland 22W and its buffer will be permanently impacted by shading from the widened bridge carrying I-495 over Clara Barton Parkway and the Chesapeake and Ohio Canal and temporarily impacted by access to construct this bridge. PEM wetland buffer 22K will also be temporarily impacted by impacted by construction access for this bridge.

### 3.5.3.C.    Station 123+50 to 126+50 RT; Waterways 22Q, 22Q_C; Wetlands 22X and 22Y

Perennial waterways 22Q and 22Q_C; PFO wetland 22X and its buffer; and PEM wetland 22Y and its buffer will be permanently impacted by the eastbound Clara Barton to northbound I-495 roadway ramp widening, retaining wall construction, and the construction of a nearby SWM pond and its outfall.

00017720

 **OP·LANES**™ MARYLAND   I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

#### 3.5.3.D.   Station 124+50 to 125+50 LT; Waterway 22P and Wetland Buffer 22O

Portions of intermittent waterway 22P and PFO wetland buffer 22O will be permanently impacted by construction access necessary for roadway widening.

#### 3.5.3.E.   Station 127+25 to 133+50 RT & LT

##### a.   Waterways 22HH, 22HH_C, 22HH_1

Intermittent waterway 22HH will be permanently impacted by construction access to build a noise wall and proposed retaining wall to support roadway widening. A portion of 22HH will be relocated to realign the channel outside of the retaining wall. Intermittent waterway 22HH_C, an existing culvert, will be permanently and temporarily impacted by roadway widening and construction of the I-495 Bridge over MacArthur Boulevard and Clara Barton Parkway. Intermittent waterway 22HH_1 will be permanently impacted by roadway widening and bridge construction.

##### b.   Waterways 22T, 22T_B, 22T_1, 22T_B1, 22T_2, 22HH_2; Wetland 22U

PFO wetland 22U and its buffer and intermittent waterways 22T, 22T_B, 22T_1, 22T_B1, and 22T_2 will be permanently impacted by roadway, ramp, and structure widening over Clara Barton Parkway and MacArthur Blvd. Intermittent waterway 22HH_2 will be permanently impacted by roadway and structure widening, proposed retaining wall construction, and the stabilization of tie-ins to 22HH_1 and 22T_2.

### 3.5.4   Mainline Impact Plate 4

#### 3.5.4.A.   Station 151+00 LT; Wetland 22E

PEM wetland 22E and its buffer will be permanently impacted by fill necessary to support the widened roadway. Since the wetland and buffer will be eliminated by roadway fill, a proposed SWM swale has been proposed in the new roadway fill.

#### 3.5.4.B.   Station 176+00 to 177+00 RT; Waterway 22FF

Ephemeral waterway 22FF will be permanently impacted by grading associated with the construction of a SWM facility. Since the waterway is currently functioning as a SWM pathway and does not connect to other jurisdictional features, the feature will be modified to function as a proper SWM pond with a functioning channel.

### 3.5.5   Mainline Impact Plate 5

#### 3.5.5.A.   Station 191+00 to 206+00 LT; Waterways 22AA_1, 22AA_2, 22AA_3, 22AA_B, 22AA_B1, 22BB, 22CC, 22CC_C, 22CC_1, 22DD, 22EE

Ephemeral waterways 22BB, 22CC, 22EE, 22CC_C, 22CC_1 and intermittent waterways 22DD_C and 22DD comprise a drainage network draining I-495 and an adjacent neighborhood. This drainage network is characterized by eroded channels, undersized culverts, and undermined concrete channel. Roadway widening and drainage/stormwater improvements will result in permanent impacts to these features. The hydrology forming portions of 22CC and 22EE will be captured in a SWM facility, while 22BB will be relocated to accommodate the new SWM facility and carry stormwater from the new facility to a new longer culvert replacing 22CC_C. A portion of the impact to 22CC will be temporary due to construction

00017721

JA1561

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

access. The longer culvert will help alleviate drainage concerns of the Gibson Grove AME Zion Church. A restored channel will carry flow from this culvert, accounting for the permanent impacts to 22CC_1 and 22DD, by replacing the undermined and eroding concrete lined channel with a stable armored channel. Cabin John Creek (features 22AA_1, 22AA_2, 22AA_3, 22AA_B, 22AA_B1) will be permanently impacted by roadway and ramp bridge replacements and necessary streambank stabilization and scour protection measures. A portion of water 22AA_1 will be temporarily impacted by construction access to remove a ramp bridge over Cabin John Creek.

### 3.5.5.B.  Station 197+00 to 200+00 RT

#### a.  Waterways 22H, 22H_1, 22H_C, 22KK; Wetlands 22F and 22G

Intermittent waterways 22H, 22H_1, and 22H_C will be replaced with a new 48-inch culvert to accommodate Cabin John Parkway ramp reconfiguration. PEM wetland 22F and its buffer, and PFO wetland 22G and its buffer will be permanently impacted by fill from the ramp reconfiguration. Perennial channel 22KK will be permanently impacted as it is relocated to accept flow from the new 48-inch culvert.

#### b.  Wetland 22GG

PEM wetland 22GG and its buffer will be permanently impacted by roadway fill and construction access for the reconfigured Cabin John Parkway Ramps and will lose hydrology due to these impacts. Since wetland 22GG and its buffer will be eliminated by construction impacts, a SWM vault and a SWM swale are proposed in this location.

#### c.  Waterways 22Z, 22Z_C, 22Z_1

Perennial waterways 22Z, 22Z_C, and 22Z_1, Booze Creek, will be permanently impacted by the reconfiguration of the Cabin John Parkway Ramps.

### 3.5.6   Mainline Impact Plate 6

#### 3.5.6.A.  Station 218+50 to 233+00 LT; Waterways 22A, 22A_C, 22B, 22C, 22C_C, 22D, 22AA

Intermittent waterways 22A, 22B, 22C and intermittent culverts 22A_C and 22C_C will be permanently impacted by roadway widening and ramp reconfiguration. All of these features will be removed and replaced with a new culvert system. A stormwater pond will be constructed at the beginning of this system to treat roadway runoff. Intermittent waterway 22D will be permanently impacted by construction access and outfall stabilization associated with the new roadway drainage and SWM. Perennial waterway 22AA (Cabin John Creek) will be permanently impacted by the stabilization of the tie-in to waterway 22D

#### 3.5.6.B.  Station 224+50 RT to 245+50 RT and 223+00 to 247+00 LT

#### a.  Waterways 21D, 21D_C, 21D_1, 21D_C1

Intermittent waterway 21D will be permanently impacted by roadway ramp construction and a SWM pond will be constructed upstream of its previous location. Intermittent waterways 21D_C and 21D_1 will be permanently impacted by roadway widening fill and SWM pond construction. Intermittent culvert 21D_C1 will be permanently impacted by roadway ramp shifts, and SWM swale construction. The existing intermittent channel complex, consisting of culverts and drainage ditches in this interchange, will be replaced with a stormwater treatment complex consisting of two treatment ponds connected by culverts directly to the Thomas Branch Culvert.

00017722

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### b. Waterways 21F, 21F_C

Intermittent culvert 21F_C, an existing 30-inch reinforced concrete pipe (RCP), will be replaced and extended to accommodate roadway widening. Intermittent waterway 21F will be permanently impacted by roadway widening fill, noise wall construction, retaining wall construction, and upstream stabilization for the augmentation of 21F_C that is included in a LOR.

### c. Waterways 21C_1, 21C_C1, 21G

Perennial waterway 21C_1 (Thomas Branch) will be permanently impacted by roadway widening fill, retaining wall construction and stream stabilization associated with the downstream culvert augmentation. Waterway 21C_1 will be relocated in an open channel adjacent to the retaining wall. Perennial culvert 21C_C1, an existing 12-foot-by-9-foot reinforced concrete box culvert (RCB) carrying Thomas Branch under I-495, will be extended to accommodate roadway widening and augmented with three 12-foot by 10-foot RCBs. Intermittent waterway 21G will be permanently impacted by the upstream headwall structure for the augmented 21C_C1 culvert.

### d. Waterways 21C_2, 21C_C2, 22AA

Perennial waterway 21C_2 (Thomas Branch) will be replaced with a pair of 16-foot-by-12-foot RCBs, permanently impacting its entire length depicted on this plate to accommodate roadway widening and a ramp to River Road. Perennial waterway 21C_C2, an existing 12-foot-by-9-foot RCB, will be augmented with three new 108-inch RCPs on the west side of the existing RCB. The existing culvert will be shortened to permit the construction of a plunge pool between the end of the culverts at Cabin John Creek (22AA). Perennial waterway 22AA (Cabin John Creek) will be permanently impacted by the downstream outfall and stabilization for augmented culvert 21C_C2 and temporarily impacted by construction access.

## 3.5.7    Mainline Impact Plate 7

### 3.5.7.A.    Station 249+50 to 261+00 RT and 261+00 to 279+00 LT

#### a. Waterways 21L_D, 21L_C, 21L_D1

To accommodate roadway widening, perennial waterway 21L_C, an existing 78-inch structural plate pipe (SPP) culvert, will be extended and augmented with an additional 60-inch RCP and will outfall into Thomas Branch in a plunge pool at the downstream end of a pair of box culverts. Perennial waterway 21L_D, a ditch, will be permanently impacted by roadway widening and relocated to flow into the extended 21L_C culvert. Perennial waterway 21L_D1, a ditch, will be permanently impacted and replaced by the extended 21L_C culvert.

#### b. Waterways, 21C, 21M

Perennial waterway 21C (Thomas Branch) will be permanently impacted by roadway widening. 21C will be placed into a pair 14.5-foot-by-11.5-foot RCBs near Station 278+00, will be relocated adjacent to the widened roadway retaining wall from Station 278+00 downstream to Station 266+00, and placed into a pair of 12-foot-by-10-foot RCBs from Station 266+00 to the junction with feature 21C_C. Intermittent waterway 21M, a ditch between a neighborhood drainage pipe and Thomas Branch, will be eliminated and the neighborhood drainage will be piped directly into culverted Thomas Branch at the upstream end of 21C_C.

00017723

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

#### c.  Waterways 21C_C, 21C_1

Perennial waterway 21C_C, an existing 12-foot-by-9-foot RCB, will be extended to accommodate roadway widening and augmented with a pair of flanking 12-foot-by-10-foot RCBs. This structure will convey Thomas Branch flow under I-495, and then turn to convey flow to the south, parallel to the I-495 inner loop and permanently impacting a portion of perennial waterway 21C_1. The remainder of 21C_1 will be permanently impacted downstream by roadway widening, retaining wall construction, and noise wall construction, and will be relocated adjacent to the roadway retaining wall.

#### d.  Waterway 21H; Wetlands 21P, 21T, 21Q

PFO wetland 21P and its buffer, part of PFO wetland 21T and its buffer, part of PFO wetland buffer 21Q, and ephemeral waterway 21H will be permanently impacted by relocation of Thomas Branch necessary to accommodate the widened roadway.

### 3.5.8  Mainline Impact Plate 8

#### 3.5.8.A.  Station 297+50 to 309+50 RT; Waterways 21B, 21U, 21B_C, 21J

Perennial waterway 21B will be permanently impacted by roadway widening fill, ramp construction, and noise wall construction. At the upstream end of 21B on this plate, the waterway within the LOD will be restored prior to flowing into a culvert. From Station 312+00 to Station 303+00 the waterway will be placed in a pair of 10-foot-by-4-foot RCBs under the roadway. 21B will be relocated and partially confined between two retaining walls from the end of the RCBs to Station 298+50 where it enters three 11-foot-by-5-foot RCBs crossing under I-495, which will replace 21B_C. These three RCBs will enter directly into culverted Thomas Branch at a junction box eliminating 21J, which connects flow from 21B_C to Thomas Branch in its existing condition. Perennial waterway 21U will be permanently impacted by the widened roadway, the relocated 21B, and noise wall construction. 21U will be piped under the proposed noise wall at the upstream end of a retaining wall and will flow into relocated 21B.

#### 3.5.8.B.  Station 279+50 to 297+00 LT; Waterway 21C, 21K, 21V

Perennial waterway 21C, Thomas Branch, will be permanently impacted by roadway widening and will be placed in a culvert running under the roadway for its entire length depicted on this plate. Thomas Branch could not be relocated as an open channel in this section because of the proximity of adjacent properties and the local topography. Upstream of the tie-in with 21B_C, Thomas Branch will flow in a pair of 16-foot-by-7-foot RCBs. Downstream of the tie-in with 21B_C, the stream will flow in a pair of 16-foot-by-10-foot RCBs. Intermittent waterway 21V will be permanently impacted by roadway widening and most of the channel will be replaced with a pipe flowing into Thomas Branch. Part of waterway 21V will remain open outside of the LOD, and 21V will be temporarily impacted by the tie-in to the open channel portion. A retaining wall is located is this section to reduce impact to properties and to 21V. Intermittent waterway 21K, a short channel carrying flow from a culvert under I-495 to Thomas Branch, will be eliminated and replaced by the proposed Thomas Branch culvert.

00017724

JA1564

 I-495 & I-270 Managed Lanes Study          Final Avoidance, Minimization, and Impacts Report

### 3.5.9    Mainline Impact Plate 9

#### 3.5.9.A.    Station 3747+00 to 3760+50 LT & RT

##### a.    Waterways 23A_C1, 23A_2, 23A_C2, 23A_3

Perennial waterways 23A_C1, 23A_2, 23A_C2 and 23A_3 carry Thomas Branch from the east side of the west I-270 spur to the west side of the spur diagonally through the Democracy Boulevard interchange. Roadway widening and resultant interchange improvements will permanently impact these features and force the abandonment of the original channel alignment. In the proposed condition, Thomas Branch will flow along the east side of the west I-270 spur through the interchange and will cross the spur near Station 3759+00. This new alignment results in shorter culverted sections of Thomas Branch. On this plate, Thomas Branch will flow in a relocated channel inside the Democracy Boulevard to northbound I-270 ramp and then under this ramp through three 84-inch RCPs. The stream will then flow through a short relocated channel and under the northbound I-270 to Democracy Boulevard ramp in three 84-inch RCPs, where it joins with the flow from 23D. The combined flow is described in **Section c** below.

##### b.    Waterways 23AA, 23AA_C, 23AA_1, 23AA_C1; Wetlands 23L, 23BB

The perennial channel and PEM wetland system consisting of perennial culverts 23AA_C and 23AA_C1; perennial waterway 23AA and 23AA_1; and PEM wetlands 23L and 23BB and their buffers will be permanently impacted by roadway widening and Democracy Boulevard interchange reconfiguration. The stream system will be combined with relocated Thomas Branch and will follow the flow path described in **Section a** above. The PEM wetland systems and their buffers will be filled to accommodate the widened roadway and relocated Thomas Branch.

##### c.    Waterways 23D, 23D_C

Intermittent waterway 23D will be permanently impacted and merged with relocated Thomas Branch at the end of the proposed Thomas Branch culvert under the northbound I-270 to Democracy Boulevard ramp. The merged streams will flow south in a relocated channel along the northbound I-270 to Democracy Boulevard ramp; through a pair of 12-foot-by-8-foot RCBs; then through a another relocated channel; and finally into three 11-foot-by-7-foot RCBs the cross perpendicularly under the west I-270 spur, permanently impacting and replacing 23D_C.

#### 3.5.9.B.    Station 3760+50 to 3779+00 RT

##### a.    Waterway 23A_3 and Wetland 23MM

Perennial waterway 23A_3 (Thomas Branch) will flow in a relocated channel south along the west side of the west I-270 spur until the channel naturally flows away from the edge of the west I-270 spur. As 23A_3 flows away from the spur, the channel will be permanently impacted by stream stabilization within the Limits of Stabilization shown on the plate. Part of PFO wetland 23MM and its buffer will be permanently impacted by stream stabilization within the limits of stabilization shown on the plate. Waterway 23A_3 flows outside of the LOD between Station 3766+00 and 3775+00 RT.

##### b.    Waterways 21C and 21I

Perennial waterway 21C (Thomas Branch) is a continuation of 23A_3 where it reenters the LOD at Station 3775+00 RT. Waterway 21C will be permanently impacted by roadway widening and will flow in a relocated channel along the west edge of the west I-270 spur adjacent to a retaining wall until it enters a proposed pair of 16-foot-by-7-foot RCBs and continues onto Plate 8. Perennial waterway 21I, a short

00017725

 OP•LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

stream segment flowing from a pipe under the west I-270 spur into Thomas Branch, will be eliminated by roadway widening, and the pipe will discharge directly into relocated Thomas Branch.

### 3.5.10  Mainline Impact Plate 10

#### 3.5.10.A. Station 3714+00 to 3722+50 LT & RT; Waterways 23V, 23V_C; Wetland 23CC

Intermittent waterway 23V and 23V_C will be permanently impacted by roadway widening, and part of 23V will be placed into a pipe. PFO wetland 23CC developed at the downstream end of culvert 23V_C and will be permanently impacted by roadway fill within the LOD and will lose its remaining hydrology due to roadway drainage. Wetland 23CC and its buffer are considered a total take, therefore SWM features are proposed in place of the wetland.

#### 3.5.10.B. Station 3741+00 to 3748+00 LT & RT

##### a.  Waterways 23A, 23A_C, 23A_1, 23A_C1; Wetland 23W

Perennial waterways 23A, 23A_1, and culverts 23A_C and 23A_C1 comprise the headwaters of Thomas Branch within the LOD. 23A and 23A_C will be permanently impacted by construction access and tie-in to the downstream stream restoration during construction. Feature 23A_1 will be permanently impacted by stream restoration within the limits of restoration shown on the plate and will also be partially filled due to roadway widening.  As described in **Section 3.6.9.A**, Thomas Branch is relocated to the east side of the west I-270 spur and 23A_1 flows into a pair of 8-foot-by-8-foot RCBs under Democracy Boulevard, which replace the function of permanently impacted culvert 23A_C1. Part of PEM wetland 23W and its buffer will be will permanently and temporarily impacted by roadway widening fill and stream restoration. A retaining wall will be installed adjacent to wetland 23W to minimize the fill impacts to the wetland and the wetland buffer.

### 3.5.11  Mainline Impact Plate 11

#### 3.5.11.A. Station 3683+00 LT & RT; Waterways 24A, 24A_C, 24A_1; Wetland 24W, 24X

Perennial waterway 24A, 24A_1, and culvert 24A_C (Old Farm Creek), flows as open channel and through an existing 20-foot-by-10-foot box culvert under I-270. These features are proposed for stream stabilization within the limits shown on the plate and will be permanently impacted by construction access and scour protection on either side of I-270. Impacts to Old Farm Creek may be required to ensure fish passage remains the same or is improved in this location. Portions of PEM wetland buffer 24W and PEM wetland 24X and its buffer will be permanently impacted by stream stabilization.

#### 3.5.11.B. Station 3683+00 to 3702+50 RT

##### a.  Waterways 23DD, 23K, 23K_1, 23K_C1, 23K_D, 23K_C; Wetlands 23F, 23X

All features along the west side of I-270 in this area will be permanently impacted by fill or drainage outfall improvements associated with the roadway widening of I-270. Intermittent waterway feature 23DD and perennial waterway 23K will be permanently impacted by fill despite the inclusion of a retaining wall adjacent to the SWM pond. Part of PEM wetland buffer 23F near Station 3679+00 will be permanently impacted by the construction of SWM features at the end of roadway drainage pipes. Portions of PEM wetland 23F, its buffer, and perennial channel 23K_1 will be permanently impacted by roadway drainage outfall improvements near Station 3695+00 and by channel relocation necessary to accommodate

00017726

 **OP·LANES**™
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

roadway widening and retaining wall construction near Station 3692+50. Culvert 23K_C1 will be permanently and temporarily impacted by construction access and maintenance of stream flow. Perennial ditch 23K_D will be permanently impacted by roadway widening. This ditch will be relocated for a short distance near Station 3691+50 and then placed in a 6-foot-by-12-foot RCB that will carry flow along I-270, under Tuckerman Lane and will discharge into Old Farm Creek. A portion pf 23K_D will be temporarily impacted by construction access necessary for the culvert construction and channel relocation. Culvert 23K_C will be permanently impacted, removed, and replaced with a 6-foot-by-12-foot RCB. PEM wetland 23X and its buffer will be eliminated by roadway widening.

### b. Wetland 23GG

The eastern portion of PFO wetland 23GG and its buffer will be permanently impacted by the restoration of a county-owned SWM pond located at the northeast corner of the bus depot, which is being impacted by roadway widening. The buffer of feature 23GG will be permanently impacted for proposed maintenance of traffic control purposes along Tuckerman Lane. Design options for proposed fill impacts to a portion of 23GG by the stormwater facility were discussed with MDE and USACE in the field and, of the options discussed, the selected option was deemed reasonable by both agencies, since the existing wetland is currently acting as a stormwater facility.

### 3.5.11.C. Station 4711 +00 LT; Waterway 23M

Ephemeral channel 23M will be permanently impacted by maintenance of traffic and construction access.

## 3.5.12    Mainline Impact Plate 12

### 3.5.12.A. Station 3661+60 R; Waterway 24C

Intermittent waterway 24C flows southwest from a non-jurisdictional drainage pipe under I-270 and will be permanently impacted by roadway widening, retaining wall construction, and SWM outfall stabilization.

## 3.5.13    Mainline Impact Plate 13

### 3.5.13.A. Station 3625+50 to 3627+50 LT & RT; Waterways 24K, 24F_2, 24F_C2, 24F_3

Perennial culvert 24F_C2, an existing 16-foot-by-8-foot concrete box culvert, will be augmented with an additional parallel 48-inch RCP and extended. Intermittent channel 24K and perennial channel 24F_2 will be permanently impacted by stream stabilization associated with the culvert 24F_C2 augmentation within the limits shown on the plate. Perennial waterway 24F_3 will be permanently impacted by the extension of the existing box culvert, the culvert 24F_C2 augmentation, and the stream stabilization associated with culvert augmentation within the limits shown on the plate.

### 3.5.13.B.  Station 3638+75 RT; Wetland 24N

A stormwater pond is proposed on the southbound side of I-270. Part of PFO wetland 24N and its buffer will be permanently impacted by the outfall from this new facility. The buffer of wetland 24N will be permanently impacted by stormwater pond construction and construction access for retaining wall and roadway widening.

00017727

JA1567

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### 3.5.13.C. Station 3639+25 to 3646+00 LT & RT; Waterways 24V, 24V_C, 24D; Wetlands 24N, 24Q

Intermittent culvert 24V_C, an existing 60-inch RCP, will be augmented with an additional 60-inch RCP to accommodate flow and extension to accommodate proposed noise and retaining walls on the east side of I-270 adjacent to the widened roadway. Intermittent waterway 24V will be permanently impacted by the culvert extension and augmentation for 24V_C. Perennial waterway 24D will be permanently impacted by repairing the existing failing outfall from 24V_C, construction of a pedestrian bridge to ensure safe trail connection across waterway 24D, and for stream restoration associated with culvert augmentation within the limits shown on the plate. PFO wetland 24Q has formed where non-jurisdictional drainage flowing north along I-270 encounters a surface trail and enters 24D. This wetland and its buffer will be permanently impacted by the 24D outfall repair, pedestrian bridge construction, and by grading of a stable non-jurisdictional swale to convey flow into 24D. Wetland 24Q and its buffer will lose hydrology due to the drainage improvements and this wetland and its buffer are considered a total take. Part of PFO wetland 24N and its buffer will be permanently impacted by the outfall repair, pedestrian bridge construction, and stream restoration. The trail and crossing are shown in FEIS Appendix E, Environmental Resource Mapping, Map 23.

### 3.5.14   Mainline Impact Plate 14

#### 3.5.14.A. Station 3614+00 to 3617+00 LT; Waterways 24F_C1, 24S; Wetland 24R

Perennial culvert 24F_C1, ephemeral waterway 24S, and part of PFO wetland buffer 24R will be permanently impacted by roadway widening and construction access.

### 3.5.15   Mainline Impact Plate 15

#### 3.5.15.A. Station 3581+00 to 3582+50 LT; Waterway 25F

Ephemeral waterway 25F will be permanently impacted by construction staging, storage, and access.

#### 3.5.15.B. Station 3571+50 RT

Part of PEM wetland buffer 25M will be permanently and temporarily impacted by roadway re-configuration on Wootton Parkway.

### 3.5.16   Mainline Impact Plate 16

#### 3.5.16.A. Station 3537+50 LT; Wetland 26H

Part of PEM wetland 26H and its buffer will be permanently impacted by roadway widening fill.

#### 3.5.16.B. Station 3559+75 to 3567+75 RT; Waterways 25E, 25H_1, 25H_C; Wetland 25K

Perennial waterway 25H_C, an existing 60-inch RCP that flows under I-270, requires augmentation with an additional 48-inch RCP and extension. Control structure modifications are required for the flow from perennial waterways 25E and 25H_1 and the surrounding PEM wetland 25K and its buffer into culvert 25H_C. All of these features will also be permanently impacted by widening of I-270, and these features will be potentially permanently impacted by stormwater improvements within the limits shown on the

00017728

 **OP·LANES**™
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

plate. These features are shown as permanent impacts for this JPA, but these areas will require additional design detail and avoidance and minimization effort prior to any disturbance.

### 3.5.16.C. Station 3561+25 to 3564+00 LT; Waterways 25H, 25H_C, 25N; Wetland 25D, 25P

Perennial waterway 25H and part of PFO wetland 25D and its buffer will be permanently impacted by the extension and augmentation of the existing culvert 25H_C and by stream restoration within the limits shown on the plate. Intermittent waterway 25N and part of PFO wetland 25P and its buffer will be permanently impacted by the stream restoration of 25H within the limits shown on the plate.

## 3.5.17   Mainline Impact Plate 17

### 3.5.17.A. Station 3507+00 to 3510+50 LT & RT; Waterways 26B, 26B_C, 26B_1, 26B_C1; Wetland 26A

Intermittent culvert 26B_C, an existing 48-inch RCP, will be augmented with a 72-inch RCP. Intermittent waterway 26B and PEM wetland 26A and its buffer will be permanently impacted by access for noise wall construction and maintenance of stream flow to permit augmentation of 26B_C. Waterway 26B and wetland 26A and its buffer will also be permanently impacted by grading for a headwater pool within the limits of improvement shown on the plate. Intermittent waterway 26B_1 will be permanently impacted by outfall stabilization from augmented culvert 26B_C. Intermittent culvert 26B_C1 will be permanently impacted by the 26B_C outfall stabilization and maintenance of stream flow.

### 3.5.17.B. Station 3521+50 to 3534+00 LT & RT; Waterways 26L, 26J, 26K, 26C, 26C_C, 26C_1, 26C_C1; Wetlands 26F, 26D, 26E

Intermittent waterways 26L, 26C, 26J, 26K, and most of PEM wetland 26F and its buffer are included in a "limits of improved SWM" area and shown as permanently impacted within the limits shown on the plate to allow for increased upstream storage to avoid culvert augmentation in this area. Closer to I-270, waterway 26C and wetland 26F and its buffer will be permanently impacted by control structure modification and roadway widening fill. Intermittent culvert 26C_C will be permanently impacted by roadway widening, proposed noise wall construction, proposed swale construction, and outfall stabilization. Intermittent waterways 26C_1 and 26C_C1 and PEM wetland 26D and its buffer will be permanently impacted by outfall stabilization downstream of culvert 26C_C. Part of wetland 26E and its buffer will be permanently impacted by outfall stabilization downstream of culvert 26C_C, and by roadway widening fill. A portion of 26E and its buffer will be temporarily impacted by access to construct the widened roadway and noise wall.

## 3.5.18   Mainline Impact Plate 18

### 3.5.18.A. Station 3475+50 to 3480+00 LT; Waterways 27A, 27B, 27C, 27D, 27A_C; Wetlands 27E and 27F

Perennial waterway 27A and 27A_C, Watts Branch, flows under I-270 in a 25-foot-by-8-foot RCB. This RCB will be augmented with a 96-inch RCP. Upstream stabilization and modified headwall construction associated with this augmentation will result in permanent impacts to perennial waterway 27A; intermittent waterways 27B and 27D; ephemeral channel 27C; part of PFO wetland 27F and its buffer; and

00017729

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

part of PFO wetland buffer 27E. Perennial culvert 27A_C will be permanently impacted by construction access and maintenance of stream flow.

### 3.5.18.B.  Station 3480+00 to 3486+50 RT; Waterways 27A_1, 27N, 27H, 27A_C1, 27A_2, 27K, 27A_C2, 27A_3, 27P; Wetlands 27G,27Q, and 27S

Perennial waterway 27A_1 will be permanently impacted by outfall stabilization immediately downstream of augmented culvert 27A_C. Further downstream, 27A_1; intermittent waterways 27N and 27H; and PSS wetland 27G and its buffer will be permanently impacted by stream restoration within the limits shown on the plate. 27A_1 flows into 27A_C1, a 25-foot-by-8-foot RCB, which will be augmented with a 96-inch RCP. 27A_C1 will be permanently impacted by construction access and maintenance of stream flow associated with this augmentation. Perennial waterway 27A_2 and ephemeral waterway 27K will be permanently impacted by outfall stabilization downstream of augmented culvert 27A_C1. Perennial culvert 27A_C2; perennial waterways 27A_3 and 27P; and PEM wetland 27Q and its buffer will be permanently impacted by construction access, maintenance of stream flow and outfall stabilization within the limits of stabilization shown on the plate. A portion of PEM wetland buffer 27S will be permanently impacted by outfall stabilization.

### 3.5.19    Mainline Impact Plate 19

#### 3.5.19.A.  Station 3399+50 to 3401+00 LT; Wetland 27M

PFO wetland 27M and its buffer will be permanently impacted by roadway fill, construction access, and staging and stockpiling.

#### 3.5.19.B.  Station 3404+00 to 3407+00 LT & RT; Waterways 27L and 27L_C

Intermittent storm drain 27L_C will be partially replaced at its inlet, and partially replaced and extended at its outlet.  Intermittent waterway 27L will be permanently impacted by the culvert modification of 27L_C and roadway widening.

### 3.5.20    Mainline Impact Plate 20

#### 3.5.20.A.  Station 3336+00 to 3343+00 RT; Waterways 29A_C, 29A, 29A_C1, 29A_1, 28B, 29A_C2

Perennial culvert 29A_C will be permanently impacted by construction access and maintenance of stream flow. Perennial waterway 29A will be permanently impacted by excavation of a headwater pool to store storm flows and avoid augmentation of downstream culverts. Perennial culvert 29A_C1 will be permanently impacted by construction access and maintenance of stream flow. Perennial waterway 29A_1 will be permanently impacted by outfall stabilization between culverts 29A_C1 and 29A_C2. Intermittent waterway 28B, which carries roadway drainage into 29A_1, will be permanently impacted by the construction of a SWM pond, which will treat roadway stormwater and provide increased water quality to Muddy Branch. Perennial culvert 29A_C2 will be permanently impacted by construction access and maintenance of streamflow.

00017730



I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### 3.5.20.B. Station 3339+50 to 3346+00 LT; Waterway 29K

Intermittent waterway 29K, a short channel between two pipes, will be permanently impacted by stabilization of the channel between the pipes.

## 3.5.21   Mainline Impact Plate 21

### 3.5.21.A. Station 3328+00 to 3330+50 LT & RT; Waterways 29B_C

Perennial waterway 29B_C will be permanently impacted by construction access for roadway construction.

### 3.5.21.B. Station 3332+75 to 3336+00 RT; Waterway 29A_2

Perennial waterway 29A_2 will be permanently impacted by outfall stabilization and by stream stabilization within the limits shown on the plate.

### 3.5.21.C. Station 3335+25 to 3337+00 LT; Waterway 29D_D

Intermittent waterway 29D_D will be permanently impacted by drainage outfall stabilization.

## 3.5.22   Mainline Impact Plate 22

### 3.5.22.A. Station 4717+00 to 4730+00 LT & RT

#### a.   Waterways 23U_1, 23U_C, 23U

Perennial waterway 23U_C, an existing 60-inch SPP culvert, is proposed for augmentation with a 42-inch RCP and extension. Perennial waterway 23U_1 will be permanently impacted by the extension of 23U_C to accommodate roadway widening and construction of a SWM pond. Perennial waterway 23U will be permanently impacted by the extension of 23U_C to accommodate roadway widening and by outfall stabilization at the downstream end of the augmented culvert within the limits of stabilization shown on the plate.

#### b.   Waterways 23N_D, 23N_C, 23N, 23N_1; Wetland 23LL

Perennial waterway 23N_C, an existing 60-inch RCP culvert, will be augmented with a 24-inch RCP. Intermittent waterways 23N_D and 23N will be permanently impacted by drainage stabilization and inlet/outfall modification upstream and downstream of culvert 23N_C. 23N, perennial waterway 23N_1, and part of PEM wetland 23LL and its buffer will be permanently impacted by outfall stabilization for the augmentation 23U_C within the limits of stabilization shown on the plate.

## 3.5.23   Mainline Impact Plate 23

### 3.5.23.A. Station 4768+50 to 4770+00 LT & RT; Waterways 23R_C

Waterway 23R_C will be permanently impacted by construction access for roadway widening.

00017731

JA1571

 **OP·LANES** MARYLAND | I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

### 3.5.24    Mainline Impact Plate 24

#### 3.5.24.A. Station 4782+00 to 4783+25 LT & RT; Waterways 23Q_C

Perennial waterway 23Q_C, an existing culvert, will be permanently impacted by construction access for roadway widening, retaining wall construction, and noise wall construction.

### 3.5.25    Mainline Impact Plate 25

#### 3.5.25.A. Station 316+00 to 327+50; Waterways 20D, 20C, 20C_C, 20D_C, 21B

Greentree Road and its related structure over I-495 will be modified. Perennial waterways 20D and 20C will be permanently impacted by construction access to facilitate Greentree Road modifications. Perennial culvert 20C_C will be permanently impacted by construction access for roadway widening, and perennial culvert 20D_C will be permanently impacted by construction access for Greentree Road modifications. Perennial waterway 21B will be permanently impacted by outfall stabilization at the downstream end of culvert 20D_C and by channel relocation necessary to accommodate roadway widening within the limits of restoration shown on the plate.

#### 3.5.25.B. Station 333+25 RT

Intermittent waterway 20E will be permanently impacted by proposed SWM swale construction and proposed noise wall construction.

#### 3.5.25.C. Station 343+00 RT

Intermittent waterway 20B will be permanently impacted by proposed SWM swale and vault construction and proposed noise wall construction.

00017732

JA1572

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

## 4    CONCLUSION

The avoidance and minimization process for the MLS began with an analysis of the roadway alignment, which determined that overall shifts of the roadway would not result in fewer impacts and would not be practicable. The roadway design, therefore, remained on the existing alignment overall with local shifts proposed to avoid impacting particularly sensitive or recreationally valuable areas. A five-step process for avoiding and minimizing wetlands and waterways was developed and applied corridor-wide, then avoidance and minimization was refined in targeted areas of particular concern. For over 4 years, a multidisciplinary team of roadway, structural, and stormwater engineers, construction specialists, environmental planners, and environmental scientists collaborated with regulatory and resource agencies to avoid and minimize impacts to wetlands, their buffers, waterways, and floodplains while maintaining adequate construction area for the proposed MLS.

Despite the concerted effort to avoid and minimize impacts to these natural resources to the greatest extent practicable at this stage of design, the MLS would still result in unavoidable impacts, given the extremely confined roadway corridor that would be affected. Nontidal wetlands and waterway mitigation for these impacts is discussed in the *Final Compensatory Wetlands and Waterways Mitigation Plan*, which is included in the JPA package. Further avoidance and minimization in coordination with agencies and landowners will continue in later stages of design.

00017733

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

## REFERENCES

Bates, K. K., B. Barnard, B. Heiner, P. Klavas, and P. D. Powers. 2003. *Design of Road Culverts for Fish Passage*. Washington Department of Fish and Wildlife.

FHWA, 2019. https://www.environment.fhwa.dot.gov/nepa/oneFederal_decision.aspx [Accessed 17 November 2019].

Galli J., P. Trieu, A. Maynard, K. Choi. 2010. *Anacostia Watershed Environmental Baseline Conditions and Restoration Report*. Metropolitan Washington Council of Governments (MWCOG). Washington, D.C. October 31, 2008. Final Draft dated January 8, 2010. Available at: http://www.anacostia.net/plan.html [Accessed 6 August 2018].

Maryland Department of the Environment (MDE). 2006. *Total Maximum Daily Loads of Fecal Bacteria for the Anacostia River Basin in Montgomery and Prince George's Counties, Maryland*.

MDE. 2012. *Watershed Report for Biological Impairment of the Cabin John Creek Basin in Montgomery County, Maryland: Biological Stressor Identification Analysis Results and Interpretation*.

MDE. 2018. TMDL Maps. Available at: https://mde.maryland.gov/programs/Water/TMDL/DataCenter/Pages/TMDLMaps.aspx. [Accessed November 2019].

Robison, E.G., A. Mirati, and M. Allen. 1999. *Oregon Road/Stream Crossing Restoration Guide: Spring 1999*.

United States Army Corps of Engineers (USACE). 1999. *The Highway Methodology Workbook Supplement – Wetland Functions and Values; A Descriptive Approach*. Available at: https://www.nae.usace.army.mil/Portals/74/docs/regulatory/Forms/HighwaySupplement6Apr2015.pdf [Accessed December 2019].

Weaver, C. R., Thompson, C. S., and Slatick, E. 1976. *Fish Passage Research at the Fisheries-Engineering Research Laboratory May 1965 to September 1970*. Rep. No. 32, North Pacific Division, U.S. Army Corps of Engineers.

00017734

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

## ACRONYMS

**ALB** – American Legion Bridge

**AMR** – Avoidance, Minimization, and Impacts Report

**COMAR** – Code of Maryland Regulations

**EIS** – Environmental Impact Statement; DEIS = Draft EIS; FEIS = Final EIS

**EPA** – Environmental Protection Agency

**FEMA** – Federal Emergency Management Agency

**FHWA** – Federal Highway Administration

**JPA** – Joint Permit Application

**LOD** – Limits of Disturbance

**LOI** – Limits of Improvement to Stormwater Capacity

**LOR** – Limits of Restoration

**LOS** – Limits of Stabilization

**LT** – left

**MCDEP** – Montgomery County Department of Environmental Protection

**MDE** – Maryland Department of the Environment

**MDOT SHA** – Maryland Department of Transportation State Highway Administration

**MDNR** – Maryland Department of Natural Resources

**MLS** – I-495 & I-270 Managed Lanes Study

**M-NCPPC** – Maryland National Capitol Park and Planning Commission

**NEPA** – National Environmental Policy Act

**NHD** – National Hydrography Dataset

**NLEB** – Northern Long-Eared Bat

**NPS** – National Park Service

**PEM** – palustrine emergent

**PFO** – palustrine forested

**RC** – reinforced concrete

**RCB** – reinforced concrete box culvert

00017735

JA1575

 I-495 & I-270 Managed Lanes Study    Final Avoidance, Minimization, and Impacts Report

**RCP** – reinforced concrete pipe

**ROD** – Record of Decision

**ROW** – right-of-way

**RT** – right

**SPP** – structural plate pipe

**SWM** – stormwater management

**USACE** – United States Army Corps of Engineers

**USFWS** – United States Fish and Wildlife Service

00017736

JA1576