No. 24-1447

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

**JOINT APPENDIX VOLUME 5 OF 9**

Jared E. Knicley
Nanding Chen
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org
nchen@nrdc.org

*Counsel for Appellants*

Andrew M. Bernie
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

*Counsel for Federal Appellees*

Fred R. Wagner
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
frwagner@venable.com

*Counsel for State Appellees*

September 30, 2024

# TABLE OF CONTENTS

## Volume 1

| Document | Page No. |
|---|---|

District Court Docket Report as of September 24, 2024 ...................... JA0001

Complaint, October 11, 2022................................................................ JA0014

Federal Defs.' Summ. J. Reply, October 4, 2023 (excerpt).................... JA0060

Memorandum Opinion, March 20, 2024.............................................. JA0062

Order on Summary Judgment, March 20, 2024 ................................... JA0130

Notice of Appeal, May 14, 2024 ......................................................... JA0132

Record of Decision (ROD), August 25, 2022...................................... JA0134

## Volume 2

| Document | Page No. |
|---|---|

Final Environmental Impact Statement (FEIS), June 2022.................. JA0354

## Volume 3

| Document | Page No. |
|---|---|

Final Environmental Impact Statement (FEIS),
　June 2022 (continued) .................................................................... JA0699

FEIS Appendix A - Final Traffic Analysis Technical
　Report, June 2022 (excerpt) ........................................................... JA0835

VISSIM Calibration Memo (Appendix D to Final
　Traffic Analysis Technical Report), June 2022 ...................................JA0850

FEIS Appendix B – Draft Application for Interstate Access
　Point Approval, June 2022 (excerpts) ............................................. JA0857

i

**Volume 4**

| Document | Page No. |
|---|---|

FEIS Appendix B – Draft Application for Interstate Access Point Approval, June 2022 (excerpts) (continued) ........................... JA1072

FEIS Appendix F - Final Community Effects Assessment and EJ Analysis Technical Report, June 2022 (excerpts)........................ JA1099

FEIS Appendix G - Final Section 4(f) Evaluation, June 2022 .............. JA1254

Cultural Resources Technical Report, vol. 1, June 2022 ...................... JA1339

Consultation letter with Maryland Historical Trust and Virginia Department of Historic Resources, September 8, 2021 ..................... JA1365

Maryland Sierra Club Section 106 Comments, April 12, 2021 .............. JA1380

Washington Biologists' Field Club (WBFC) Comments, April 9, 2021 .................................................................................... JA1389

WBFC Letter, October 8, 2021 .......................................................... JA1411

WBFC Comments on Programmatic Agreement, February 3, 2022 ............................................................................. JA1432

FEIS Appendix K - Final Air Quality Technical Report, June 2022.................................................................................... JA1474

FEIS Appendix M - Final Natural Resources Technical Report, June 2022 (excerpts) .......................................................... JA1510

FEIS Appendix N - Final Avoidance, Minimization, and Impacts Report, June 2022 ........................................................... JA1521

## Volume 5

| Document | Page No. |
|---|---|

FEIS Appendix Q - Final Indirect and Cumulative Effects
Technical Report, June 2022 (excerpts) ......................................... JA1577

FEIS Appendix T – MDOT Response to WBFC DEIS Comments
and Testimony (Robert Soreng), June 2022 .................................... JA1581

FEIS Appendix T - MDOT Response to Maryland Sierra Club
DEIS Comments, June 2022 .......................................................... JA1628

FEIS Appendix T – MDOT Response to WBFC SDEIS Comments,
June 2022 ..................................................................................... JA1743

Supplemental Draft Environmental Impact Statement (SDEIS),
October 2021 (excerpts) ................................................................ JA1767

Draft Environmental Impact Statement (DEIS),
June 2020 (excerpt) ...................................................................... JA1868

DEIS Appendix A - Purpose and Need Technical Report,
November 2018 (excerpt) .............................................................. JA1909

## Volume 6

| Document | Page No. |
|---|---|

DEIS Appendix F - Draft Section 4(f) Evaluation,
May 2020 (excerpts) ...................................................................... JA1911

DEIS Appendix I - Air Quality Technical Report,
May 2020 (excerpt) ....................................................................... JA2046

**Volume 7**

| Document | Page No. |
|---|---|

DEIS Appendix I - Air Quality Technical Report,
May 2020 (excerpt) (continued)....................................................... JA2131

Agency Coordination Plan, May 2018 ................................................ JA2163

EPA Technical Support Document for Ozone Conformity,
May 5, 2020 ................................................................................... JA2176

Maryland Sierra Club DEIS comments, November 6, 2020 .....................JA2186

Internal FHWA email re: AQ conformity, May 17, 2021 ..................... JA2399

Internal FHWA email re: AQ conformity, May 19, 2021 ....................... JA2402

Lichen Growth Responses to Stress Induced by Automobile
Exhaust Pollution, April 27, 1979 .................................................. JA2404

SDEIS Comment Review Meeting re: Traffic Analysis,
September 1, 2021 ......................................................................... JA2408

**Volume 8**

| Document | Page No. |
|---|---|

Maryland Sierra Club SDEIS Comments, November 30, 2021 ............. JA2415

State Treasurer Review of P3, July 9, 2021 ......................................... JA2598

Maryland National Capital Park and Planning Commission
Comments re Planned Alternative, November 30, 2021 ......................JA2610

Managed Lanes Study IAPA Comments (IAPA Technical
Report Errata Sheet), February 4, 2022 .................................................JA2628

**Volume 9**

**Document**                                                          Page No.

Maryland Historical Trust Determination of Eligibility
  Form for Plummers Island, August 20, 2021 (excerpt).................... JA2635

Roselie Ann Bright Comments on FEIS, July 14, 2022 ...........................JA2647

Zamurs and Associates Comments on FEIS, June 2022..........................JA2657

Maryland Sierra Club FEIS Comments, July 18, 2022 ...........................JA2668

CEEJH Lab Meeting Summary, October 20, 2021...................................JA2738

American Legion Bridge Strike Team Power Point,
  February 2, 2021 .............................................................. JA2740

Administrative Draft SDEIS Comment Errata Sheet,
  July 14, 2021 ....................................................................JA2748

Internal FHWA email re: Update on air quality modeling,
  July 7, 2021 .................................................................... JA2750

Influence of Roadway Emissions on $PM_{2.5}$, July 20, 2020 .......................JA2751

The New England Journal of Medicine, "The Need for a Tighter
  Particulate-Matter Air-Quality Standard," August 13, 2020 ...............JA2767

Monitoring Study of Near-Road $PM_{2.5}$ Concentrations in
  Maryland, August 14, 2015..................................................JA2771

EPA, Integrated Science Assessment for Particulate Matter,
  December 2019 (excerpt) ................................................... JA2782

American Legion Bridge Strike Team Report, November 2021 ...............JA2988



OP•LANES™
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

# APPENDIX Q
# FINAL INDIRECT AND CUMULATIVE EFFECTS
# TECHNICAL REPORT
## June 2022



U.S. Department
of Transportation
**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00021108

 I-495 & I-270 Managed Lanes Study

Final Indirect and Cumulative Effects Technical Report

## TABLE OF CONTENTS

1 INTRODUCTION ................................................................................................................................1
  1.1 Overview .......................................................................................................................................... 1
  1.2 Study Corridors and the Preferred Alternative................................................................................ 1
  1.3 Description of the Preferred Alternative .......................................................................................... 2
2 SCOPING AND METHODOLOGY ........................................................................................................4
  2.1 Legislation and Regulatory Guidance.............................................................................................. 4
  2.2 ICE Analysis Scope and Methodology .............................................................................................. 4
    2.2.1 Resource Identification and Data Collection ........................................................................ 4
    2.2.2 ICE Analysis Area Boundary ................................................................................................. 5
    2.2.3 ICE Time Frame .................................................................................................................. 15
    2.2.4 ICE Analysis Approach and Methodology ........................................................................... 16
3 INDIRECT AND CUMULATIVE EFFECTS ANALYSIS ...........................................................................19
  3.1 Background Information ................................................................................................................. 19
    3.1.1 Land Use............................................................................................................................. 19
    3.1.2 Population, Housing and Employment ................................................................................ 35
    3.1.3 Future Development in the ICE Analysis Area ...................................................................... 39
  3.2 ICE Analysis Results ....................................................................................................................... 43
    3.2.1 Socioeconomic Resources.................................................................................................. 44
    3.2.2 Cultural Resources ............................................................................................................. 49
    3.2.3 Natural Resources.............................................................................................................. 51
    3.2.4 Air Quality ......................................................................................................................... 63
  3.3 Summary and Conclusions ............................................................................................................. 64
4 REFERENCES ...................................................................................................................................67

## LIST OF TABLES

Table 2-1: Representative Sub-Boundaries for Environmental Resources................................................. 5
Table 2-2: Planning Area Boundaries........................................................................................................ 6
Table 2-3: Census Designated Places...................................................................................................... 10
Table 2-4: Data Sources and Methodology............................................................................................. 16
Table 3-1: Montgomery County Master Plans Within the ICE Analysis Area ........................................... 20
Table 3-2: Fairfax County Comprehensive Plan ...................................................................................... 24

00021109

 **OP·LANES**™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Indirect and Cumulative Effects Technical Report

RTE species habitat, is substantial. Habitat for RTE species has likely declined substantially as the ICE Analysis Area has become increasingly urbanized and developed, and the Preferred Alternative would require major incremental impact to RTE species habitat. Avoidance, minimization, and mitigation in consultation with agencies with jurisdiction would help to minimize the incremental effect of the Preferred Alternative on RTE species. More information on direct impacts to RTE species habitat and potential avoidance and mitigation measures is included in the *Final Natural Resources Technical Report* (**FEIS, Appendix M**).

### 3.2.4    Air Quality

Federal requirements for air quality analyses for transportation projects derive from NEPA and, where applicable, the federal transportation conformity rule (40 CFR Parts 51 and 93). NEPA guidance for air quality analyses for transportation projects may be found on or via the FHWA website for planning and the environment.

As required by the Clean Air Act, USEPA sets the National Ambient Air Quality Standards (NAAQS) for airborne pollutants that have adverse impacts on human health and the environment. The NAAQS are a set of baseline standards over which state governments can choose to impose stricter standards.

The project is currently included in the NCRTPB FY 2019 – 2024 Transportation Improvement Program (TIP) [TIP ID 6432 and Agency ID AW0731 (planning activities)] and the NCRTPB *Visualize 2045 Long-Range Plan* (CEID 1182, CEID 3281, and Appendix B page 56). This project is included in the Air Quality Conformity Analysis that accompanies the *Visualize 2045* Plan. The NCRTPB is currently updating the *Visualize 2045* plan, to be completed in 2022. The design concept and scope for the Preferred Alternative, which is not significantly different than that included in the current version of *Visualize 2045*, will be included in the Air Quality Conformity Determination accompanying the update to *Visualize 2045* which will be approved in 2022.

Montgomery County and Fairfax County were previously designated as maintenance areas for the Particulate Matter $(PM)_{2.5}$ 1997 primary annual standard, but the USEPA has revoked that NAAQS. Therefore, transportation conformity requirements no longer apply for the fine particulate matter $(PM_{2.5})$ standard and no analysis is necessary. Additionally, the Study is located in a region where the maintenance period for CO has expired and transportation conformity no longer applies. However, CO is highlighted in the FHWA 1987 guidance as a transportation pollutant to be summarized in an EIS, therefore, an updated traffic analysis to determine the worst-case intersections and interchanges for the Preferred Alternative was performed. For additional details, refer to the *Final Air Quality Technical Report* (**FEIS, Appendix K**)

### A.    Indirect Impacts

The quantitative assessment conducted for project-specific carbon monoxide (CO), quantitative analysis for mobile source air toxics (MSAT) impacts, and the regional conformity analysis conducted for ozone (NCRTPB) can be considered indirect effects analyses because they look at air quality impacts attributable to the project that occur in the future. These analyses demonstrate that, in the future 1) air quality impacts from CO will not cause or contribute to violations of the CO NAAQS, 2) MSAT emissions will be significantly lower than they are today when compared to the No Build condition for 2025 and 2045, and 3) the mobile source emissions budgets established for the region for purposes of meeting the ozone NAAQS will not be exceeded. Therefore, the indirect effects of the project are not expected to be significant.

00021175

 OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Indirect and Cumulative Effects Technical Report

## B.    Cumulative Impacts

The annual conformity analysis conducted by the NCRTPB represents a cumulative impact assessment for purposes of regional air quality because it assesses the incremental effect of the project in light of reasonably foreseeable future projects and effects of past and present projects. Federal conformity requirements, including specifically 40 CFR 93.114 and 40 CFR 93.115, apply as the area in which the project is located is designated as nonattainment for ozone. Accordingly, there must be a currently conforming transportation plan and program at the time of project approval, and the project must come from a conforming plan and program (or otherwise meet criteria specified in 40 CR 93.109(b)).

- The existing air quality designations for the region are based, in part, on the accumulated mobile source emissions from past and present actions, and these pollutants serve as a baseline for the current conformity analysis.

- The conformity analysis quantifies the amount of mobile source emissions for which the area is designated nonattainment/maintenance that will result from the implementation of all reasonably foreseeable regionally significant transportation projects in the region (i.e., those proposed for construction funding over the life of the region's transportation plan).

- The most recent conformity analysis was completed in October 2018, with FHWA and Federal Transit Administration issuing a conformity finding on October 17, 2018 for the TIP and CLRP covered by that analysis. This analysis demonstrates that the incremental impact of the proposed project on mobile source emissions, when added to the emissions from other past, present, and reasonably foreseeable future actions, as reflected in the transportation plan and TIP conformity determinations, will not cause or contribute to a new violation, increase the frequency or severity of any violation, or delay timely attainment of the NAAQS established by USEPA.

Regarding greenhouse gas (GHG) emissions, statewide analyses indicate that the HOT lanes will not impede Maryland's ability to meet its GHG emission reduction goals. According to the Greenhouse Gas Reduction Act Plan, including this project, Maryland is expected to exceed its 40% reduction by 2030 goal and strive for a 50% reduction by 2030.

Therefore, the cumulative impacts of the study are expected to be minimal.

## 3.3    Summary and Conclusions

The Preferred Alternative would have direct impacts to socioeconomic, cultural, and natural resources. These would include direct impacts to communities, parks, historic resources, wetlands and waterways, floodplains, and forested land.

Existing land use in the ICE Analysis Area includes a mix of developed residential, commercial, and institutional land uses, along with open spaces, forested areas, and relatively small areas of farmland. County and local master plans focus on protecting existing open space and residential communities by directing future development to designated areas. There are no planned developments in the ICE Analysis Area that are dependent upon the completion of the Preferred Alternative.

Potential for indirect effects from the Preferred Alternative would be primarily related to a potential increase in demand for land use development resulting from improved access along the I-270 and I-495 corridors. More rural, less developed portions of the ICE Analysis Area such as northern Montgomery

00021176



**OP LANES™**
MARYLAND

**WASHINGTON BIOLOGISTS' FIELD CLUB – ROBERT SORENG (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Robert Soreng

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Morning

**Transcription:**

My name is Robert Soreng, R-O-B-E-R-T S-O-R-E-N-G. My address is 5506, Uppingham Street, Chevy Chase, Maryland, 20815.

Can you hear me?

#1 ⟶ I am opposed to the highway expansion project. I support the No Build option. None of the presented DEIS alternatives are acceptable. I am a professional botanist and field biologist with a Bachelors, Masters and Ph.D in Science. I'm also a member of the Washington Biologists' Field Club, WBFC-Science. I'm also testifying on behalf of the Washington Biologist Field Club, WBFC purchased the property known as Plummers Island and the adjacent mainland up to the C&O Canal Towpath in 1901 for a meeting place and research station. The Club has been meeting on Plummers Island continuously for nearly 120 years. The Club gave the property to the National Park Service on July 24, 1959, with a written understanding that the Club retained the right to maintain the island as a natural wild area for its use, for scientific research, for meetings of the Club and to purchase, pursue the studies in field biology and natural history. The American Legion Bridge was constructed immediately to the west of the island starting in 1962. That construction led to many invasive plants infesting the island and disturbing the water flow to its flanking wetlands. Plummers Island is known as the most thoroughly studied island in North America and perhaps the world. Since 1901, nearly 400 scientific publications have focused on the island's biota. Birds, fish, mammals, reptiles, amphibians, plants, insects and others who'd been visited that the Potomac Gorge is a gem among our national parks. And I would say Plumbers Island is a crown jewel in that. The plant and animal diversity are tremendous, with many rare species and long-term ongoing research projects. I and many other biologists have walked and observed every nook and cranny of this topologically diverse island with its rocky hills and cliffs, including the globally and state rare Potomac River bedrock terrace [INAUDIBLE] forest and sensitive wetland bottoms. We love this place. Rebuilding and expanding the American Legion Bridge on the island would destroy much of it. I and all other WBFC members beg you to preserve this national treasure. Please visit our website WBFC-science. We will present more detail on our

#2 ⟶ written testimony. Thank you.

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
As described in Chapter 2 of the Supplemental DEIS, the Preferred Alternative includes the full replacement of the American Legion Bridge (ALB) on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of the coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the Chesapeake and Ohio Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints. A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land.

JA1581

I-495 & I-270 Managed Lanes Study

**Washington Biologists' Field Club**

For full comments on the DEIS Please see the attached pdf WBFC written Testimony. This Authorized I-495 and I-270 P3 Program DEIS Testimony is submitted on behalf of The Washington Biologists' Field Club (WBFC), November 2020.

The Site is https://WBFC.science

Dear MDOT Officials,

Thank you for the opportunity to comment on this important issue.

The WBFC is OPPOSED to the highway expansion project including the American Legion Bridge (ALB) expansion part.

WBFC supports the NO BUILD OPTION.

None of the other presented DEIS alternatives are acceptable.

WBFC considers the DEIS legally faulty and incomplete for several reasons, including:

- Destruction and disturbance of State of Maryland and National parklands with wetlands, including but not limited to several miles of Rock Creek Regional Park (including moving substantial stretches of Rock Creek), and ca. 80 acres of the Chesapeake & Ohio National Historical Park (C/O NHP), including ca. 5 acres of the 12 acre Plummers Island and moving "Rock Dan".
- The destruction of "Rock Run Culvert" in building the American Legion Bridge violates the integrity of Plummers Island (C/O NHP, Montgomery Co., Maryland).
- Lack of understanding or recognition of the value of the extensive historical and ongoing biological research on Plummers Island and the WBFC's 120 years of contributions and commitments to that. Records of many rare plants, animals and habitats from the Island were not considered.
- Lack of Due Diligence by study of impacts on Plummers Island's wetlands and rare plant communities, and rare plant and animal species (the evaluation of the organisms on the Island was apparently based on one summer visit to the head of the Island in 2019). DEIS APPENDIX L (Natural Resources Technical Report) inadequate. Appendices A-R cover Natural Resources considered along the route. As is documented below, APPENDIX L is woefully incomplete as concerns Plummers Island. Plummers Island is in the large Potomac River / Rock Run (PR/RR) Natural Resources unit, but the DEIS surveys for this large area of the Island was cursory, brief, and at the wrong season (the year to identify many of the organisms of concern.
- Lack of alternatives to condemning part of Plummers Island for the ALB proposed project.
- Lack of forward thinking on future transportation loads and patterns (many folks are teleworking and attending virtual meetings). With peak traffic flows down due to changed behavior patterns resulting from Covid-19, (toll lanes will be unlikely to provide revenue streams of sufficient reward to P3 contractors, likely leaving taxpayers on the hook for billions of dollars.
- Lack of forward thinking on Climate Change (only more cars powered by petrol).
- Lack of accepted Build options with mass transportation options (trains, light rail, monorail, etc.)
- Massive costs, with near certain cost overruns passed on to taxpayers. Regarding Washington Suburban Sanitary Commission (WSSC) expenditures, estimated to be $2 billion, it remains unclear if expectors would be responsible for this cost.
- Toll lanes that could cost as much as $50 in peak traffic hours, which would provide little benefit to the average commuter.
- Massive traffic congestion and delays during the construction period lasting 5-10 years, after which the traffic flow will be just as congested as it was prior to the construction due to the

---

Since the DEIS and Draft Section 4(f) Evaluation, substantial efforts to avoid and minimize impacts to park and historic resources around the American Legion Bridge (ALB) has occurred. MDOT SHA and FHWA met with the National Park Service (NPS) on December 8, 2020 to discuss the limit of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. The ALB Strike Team considered bridge construction approaches to determine if any of the approaches could further reduce the LOD. The Strike Team conducted detailed investigation of a top-down segmental construction approach; a top-down cable stayed design approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the existing bridge could be consolidated to the northwest quadrant along Clara Barton Parkway, eliminating the construction access from the other three quadrants of and significantly reducing impacts to NPS land.

MDOT SHA has minimized impacts to the Chesapeake & Ohio National Historical Park and would impact 0.28 acres of Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts would not relocate Rock Run or destroy the Rock Run Culvert. MDOT SHA assembled a team of bridge specialists from around the country to consider all alternatives for replacement of the American Legion Bridge. The Preferred Alternative represents the least impactful alternative to NPS land and resources. MDOT SHA understands the value of the extensive historical and ongoing biological research on Plummers Island and has considered the rare plants, animals, and habitats on Plummers Island within the Chesapeake and Ohio Canal National Historical Park in general. MDOT SHA is working closely with NPS to devise an ecological restoration plan to mitigate for project impacts in this area. A four season survey of RTE plant species on NPS lands within the project LOD was conducted in 2020 and will inform the ecological restoration in this area. MDOT SHA conducted a thorough analysis of potential COVID-19 impacts on traffic and determined that there would be a short-term reduction in traffic load, however it would soon return to pre-COVID 19 levels.

As described in Chapter 2 of the Supplemental DEIS, the Preferred Alternative includes the full replacement of the ALB on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of the coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the Chesapeake and Ohio Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints. A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the Island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land.

**#1**

**#2**

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.8 for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**

OP**LANES**™
MARYLAND

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

| | Comments addressed above. |
|---|---|

**#2 Cont**

encouragement of more cars to be on the road, also known as induced demand.
- Because the DEIS analysis is incomplete, it is impossible for the concerned Agencies to assess, and the public to comment on, the proposed project's impacts. The Agencies cannot wait until a final EIS is complete to analyze the project's full impacts, as it will then be too late for the public to meaningfully comment on them and for the Agencies to consider the public's comments and choose the alternative that best alleviates the impacts based on this information. We respectfully request that the Agencies conduct a supplemental EIS to provide the public the ability to meaningfully review and comment on the impacts before a final EIS is produced.

Alternative placement of the Bridge not considered in the DEIS
- MDOT should consider building and placing construction platforms only upstream from the current bridge to reduce impacts to the Chesapeake and Ohio Canal NHP and Plummers Island.
- MDOT should consider construction of other crossings to alleviate traffic over the ALB instead of bridge enlargement.
- We respectfully ask that agencies consider these options to the ALB portion of this project to reduce and minimize impacts to Plummers Island and the surrounding area.

WBHC Background. The WBHC (the Club) was founded in 1990 by professional field biologists living and working in the Washington, DC vicinity (Perry 2007). Perry (2007) provides a detailed history of the Club, the Island, and brief biographies of the hundreds of past and present members up to that time. The members are all professional biologists. Plummers Island, Chesapeake & Ohio Canal National Historical Park, Montgomery County, Maryland, has been the WBHC research station and meeting place since 1901 (Appendix 1). Plummers Island is located immediately downstream from the ALB. The Island covers 12.2 acres of land, the widest part of which is on the ALB end. The proposed expansion of the ALB, as part of the I-495 expansion, threatens the existence, and violates the integrity, of the Island as a designated natural wild area (Appendix 2). "Rock Run Culvert" as identified in the DEIS is actually a natural Potomac River channel that has divided the Island from the mainland since time immemorial (Perry 2007). There is a small true concrete and pipe culvert running under the ALB which drains into the river channel where the channel bends eastward (water apparently rarely flows from this ALB culvert).

The current ALB proposal would not just across the Island, move or destroy the true channel "Culvert" that separates the Island from the mainland, clear the trees and level a substantial part of the Island, clear the significant healthy native beach tree forest on the mainland side (Popkin 2019), a deadly beech disease is spreading in the NE USA, destroy the wetlands associated with the island and mainland, and result in major relocations of invasive plants. If implemented this DEIS project would jeopardize future research on trends in biodiversity on the Island. Noise pollution from expanding the ALB onto the Island would make WBHC meetings on the Island nearly impossible.

Old map (above) showing the real Rock Run and Plummers Island (copied from Perry 2007). Map of Plummers Island Pre-ALB (below.) Calling the Potomac River channel "Rock Run Culvert" allows it to be "excluded" from consideration as a protected wetland in the DEIS Natural Resources APPENDIX L. It is not a Culvert! And "Rock Run" has been misapplied to it.

Head of Plummers Island adjacent to ALB separated by "Rock Run" channel or "Culvert" from the mainland, showing Potomac Gorge Riverside Outcrop Barrens, wetland mud flats (inundated here) and sandbars.

The Draft EIS is seriously flawed in many ways. The most pertinent to the WBHC is the failure to

JA1583

OP-LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    FINAL ENVIRONMENTAL IMPACT STATEMENT

| | Comments addressed above. |
|---|---|

**#2 Cont**

discuss and evaluate the impact of the destruction of part of Plummers Island, a historical and biological treasure within the Chesapeake and Ohio Canal National Historical Park. There is not even a footnote about the incalculable value of the long-term research on the biology of this Island, and nothing about WBFC's place in it.

The WBFC leased Plummers Island in June 8, 1901, for a meeting place and research station, and built the cabin that year. The WBFC finally settled the legal purchase the property known as Plummers Island (Appendix 1), and most of the adjacent mainland up to the C&O Canal Tow Path, in 1908 (Ferry 2007).

The Club has been meeting on Plummers Island (continuously for nearly 120 years, and conducting research there on a wide range of subjects. The Club gave the property to the National Park Service on July 24, 1959, with the written understanding (Appendix 2) that the Club retained the right to maintain the island as a natural wild area, use it for scientific research, for meetings of the Club, and to pursue its studies in the field of biology and natural history.

Plummers Island is known as "the most thoroughly studied Island in North America", and perhaps in the world.

The Club holds events each year on the Island where members gather with guests. We maintain the historic Club cabin, "Wineramna Lodge," built in 1901. The name Wineramna was the name originally given to the cabin (Lodge) in 1906 and is translated from a Native American language meaning "beautiful island". The epithet wineramna has been given to many Latin names for various insects and mammals described from Plummers Island collections.

Wineramna Lodge built in 1901. The Cabin is still standing and well maintained by WBFC. There are always research projects ongoing on the Island, conducted both by members and by grantees funded by our Endowment Research funds. Many of these projects run for years, and are follow-ups to pre-ALB censuses, showing impacts of pollution, and changes in fauna and flora. WBFC reviews dozens of research grant proposals each year and annually funds 5 to 10 of them each year, with first priority given to studies on the Island, second priority to the Potomac Gorge, eventually allowing studies in the Mid-Atlantic region. Voucher specimens for plants and animals collected for the scientific studies on the Island are housed and catalogued in the National Museum of Natural History, Smithsonian Institution. These specimens and observations from catch and release and other sightings are reported in hundreds of published scientific papers.

The ALB was constructed immediately to the west (up river) of the Island starting in 1962. The placement of the original bridge was intentionally positioned to protect the Island (Appendix 2 & 3) to ensure the continuation of WBFC's valuable long-term biological research program. When the ALB was expanded in the early 1990s, the expansion was done by filling in the gap between the north and south-bound lanes, again avoiding direct damage to the Island. Despite the best efforts of engineers and construction implementation to avoid impacting the Island, the original ALB construction and 1992 expansion led to many invasive plants infesting the Island, and disturbing the water flow to its flanking wetlands. The worst of the invasive plant infestations are on the head of the Island adjacent to the ALB. Negative impacts of local environmental pollution on lichens and insects have been documented on the Island. Traffic on the ALB also led to Lead pollution from vehicle exhaust and declines in lichen species, which are particularly sensitive, from 70 to 20 (Lawrey & Hale 1979). This illustrates the importance of long-term scientific research on the Island, which influenced legislation to reduce lead in gasoline, and eventual reduction in lead contamination locally and world-wide.

Excerpt of Washington Post article 19 May 1994 by D'Vera Cohn about lichens and Pollution.

CO-349

00022559

JA1584

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 15 of 340

Since 1901, over 400 scientific publications have focused on the Island's biota: birds, fish, mammals, reptiles and amphibians, plants, insects, nemerteans, nematodes, and other groups (Many published titles in the Proceedings of the Biological Society of Washington, available at https://WBRC science-biological-studies) (see Appendix 7 for titles in this series)

An article in the Potomac Basin Reporter (1973) (Appendix 4) cited "1,226 species of plants and 4,299 species of animals on the Island..." including "1500 species of beetles" and "900 to 400 species of bees". The Island's hyper-biodiversity: for at least 175 species..."No less than 18 genera and three families of plants and animals have been described on the basis of specimens collected on the Island." Some of these numbers were overestimates made before computer databases were compiled. Insect inventories are still substantially incomplete (see Brown & Bahr 2008). The number of vascular plants recorded on the Island, stands around 900 (Shetler et al. 2006, including newer records).

Many thousands of plants and animals have been documented from Plummers Island over 120 years of WBRC research.

Invertebrates on the Island

The Brown & Bahr (2008b) appendix lists all invertebrate taxa known from the Island, including Insecta (Taxa are taxonomic groups of any rank, such as a species, genus, family, order, or class).

Class Insecta diversity on the Island

Brown & Bahr (2008a & b) documented the known insect species records for the Island. "Based on an examination of the insect collection of the National Museum of Natural History and a review of relevant literature, we document 3012 insect species in 253 families, encompassing 18 insect orders: Collembola, Odonata, Dermaptera, Blattodea, Phasmatodea, Orthoptera, Psocoptera, Thysanoptera, Hemiptera, Neuroptera, Megaloptera, Coleoptera (beetles), Mecoptera, Trichoptera, Lepidoptera, Diptera, Siphonaptera, and Hymenoptera." The authors acknowledge that 161 families of the 600 beetle species have been recorded for the Island, yet they conclude that probably includes only a quarter of the families likely present. Among insects recorded from Plummers Island are 856 species of butterflies and moths (Lepidoptera), with 27 different species of moths described from specimens collected on the Island (Brown et al. 2008). Many of these species were described from collectors made on the Island. No site in North America has been surveyed as intensively, yet much of the insect fauna remains to be studied, with hundreds of additional species likely to be documented.

Many of these Insect orders depend on wetland habitats for all or much of their life-cycles. Seven types of wetlands are characterized on the Island (Simmons et al. 2016, units 1-5).

Insects (Insecta are an taxonomic a globally and rare click beetles on the Island Steiner (2008) inventoried 128 species of Tenebrionidae beetles from Maryland, most of which occur on Plummers Island.

A few of the many Tenebrionidae from Plummers Island and nearby . (Steiner 2008 fig. 1-16)
In 2015 Steiner collected the first Emerald Ash Borer (E. Alb) on the Island. Within the following two years nearly all the mature American and Green Ash trees on the Island were dead or dying. These trees were major components of vegetation types 5 to 11 (see Plummers Island Plant Communities section, below), and they have been decimated over much of Eastern North America.

Imperial moth caterpillar (Eacles imperialis) at food Plummers Island, Oct. 2013 (Sorseng photo).
These moths are rarely seen any more in the area.
Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cecropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state

#3

### Response to DEIS Comment #3

MDOT SHA has worked with NPS to identify minimization measures at the American Legion Bridge location to reduce impacts to Plummers Island to the maximum extent practicable. The Preferred Alternative impacts approximately 0.28 acres of Plummers Island along its western edge, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. The majority of the island will not be impacted by the project and biodiversity research will be able to continue.

MDOT SHA has coordinated closely with USFWS regarding the Peregrine Falcon nest box on the American Legion Bridge. The nest box will be removed from the bridge prior to construction and replaced post-construction. Removal of the nest box is necessary, since the entire bridge will be replaced. Nesting at this location will be interrupted for the duration of construction. Since Plummers Island is located near suburban communities and is in close proximity to several existing roadways, it is likely its bird communities are currently and will continue to be affected by vehicular traffic and other nearby human activities.

MDOT SHA conducted a bat bridge survey at the American Legion Bridge as well as an acoustic survey throughout the corridor study boundary in coordination with the US Fish and Wildlife Service and Maryland Department of Natural Resources. The Northern Long-Eared bat and the Eastern Small-footed Myotis were not detected around the American Legion Bridge during this study. MDOT SHA is aware that several bat species and various other mammalian species occur in the vicinity of Plummers Island.

MDOT SHA is aware of the various plant communities and vegetation zones on Plummers Island. MDOT SHA conducted a four-season rare plant survey on NPS lands within the project LOD in 2020 and the small portion of Plummers Island that is within the LOD was included in this survey.

00022560

JA1585

00022561

CO-351

OP LANES™ MARYLAND
I-495 & I-270 Managed Lanes Study

## #3 Cont

endangered species because they have been hammered by an introduced biocontrol agent — a nonnative tachinid fly, *Compsilura concinnata*, which was introduced to try and control gypsy moths in Massachusetts. That fly has wrecked havoc on New England fauna in general and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John LiJ pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island, the Island would be a key place to further document this "insect apocalypse," assuming the Island remains intact. The DEIS' LLD project puts WDFC Plummers Island research on trophic in biodiversity in jeopardy.

**Birds on the Island and American Legion Bridge**

An established Peregrine Falcon nest is located on the American Legion Bridge and two adults and at least one chick was observed this past June (Putnam 2020). The nest box was put there by MD State Highway Association (SHD) working with US Fish & Wildlife Service (USFWS) in 2007, and peregrines have been nesting there for 12 years. In the DEIS document, "they propose moving the nest box to another location just before nesting season when the bridge construction begins, but as an established nest this accommodation may not be successful" (Carla Dove, WDFC member, Smithsonian Ornithologist, pers. comm.). A Mississippi Kite was also observed this year. Wetmore & Manville (in Manville 1963) account for birds known from the Island to that time. Johnston & Winings (1987) attribute the decline of forest breeding birds on the Island and vicinity to vehicular traffic.

**Mammals on the Island**

Five bat species are documented by Smithsonian collections from the Island. Among these are the Endangered northern long-eared bat, *Myotis septentrionalis*, and the eastern small-footed Myotis, *Myotis leibii*. The latter was separately described as *Myotis virsennana*. Other mammals collected include shrews, moles, mice, voles, eastern cottontail, eastern gray squirrel, Georgian bat, large brown bat, red bat, evening bat, whitetail deer, eastern skunk, mink, eastern long-tailed weasel, fox squirrel, eastern flying squirrel, eastern otter, chipmunk, eastern red fox, Virginia muskrat, and woodchucks have also been recorded (Manville 1968). Mammologists these days often monitor by catch and release and other methods, rather than preparing museum specimens from animals on the Island. For example, the last regional report of DNA was not recorded in recent years on Plummers Island. Also, DNA from bones, feathers, fur, or feces can now be used to precisely identify species.

**Plummers Island Plant Communities**

The National Park Service prepared a map of the vegetation zones in the region with a coarse map for Plummers Island. The plant communities were compared in finer detail in 2016 (Simmons et al. 2016). (Appendix 6, also available at WDFC.science.) This map included 12 communities, 8 within wetlands, and one upland type that is unique to the Potomac Gorge. These plant communities are proxies for where other organisms also live or might be found.

**Plummers Island wetlands (units 1 to 7)**

The Island's wetland habitats were mapped by Simmons et al. (2016). These were divided into 5 major communities, and 3 subdivisions within those. These include sandbars and mud flats (units 1 & 2), rocky narrows (Units O's & B), to regularly flooded bottom land forests (4-6). These areas flood frequently (Community 7 to higher and infrequently flooded. Community 8, ) Plummers Basic Mesic Forest, includes a rich herb layer that is rare in the Potomac Gorge and is rarely flooded. The sandbars, mud flats, and rock barrens occur on the Potomac River side. Mud flats also occur along the usually sluggish "Rock Bar" channel. The flooded bottom beach lands (units 5, 6 & 7)

## #4

Comment #3 addressed above

**Response to DEIS Comment #4**

The small portion of Plummers Island that is within the project LOD was delineated for wetlands and waterways based on Section 404 methods, as regulated by the US Army Corps of Engineers, and using NPS wetland delineation methodology as required in DO #77-1. The regulated wetlands within the LOD are depicted and reported in the DEIS and FEIS. This area was also included in the 4-season rare plant survey conducted in 2020 for the project. All rare plants targeted by the survey were reported in the survey report, including *Hibiscus laevis* and *Paspalum fluitans*. If these species were not reported in a particular location, then they were not observed within the survey area on the days in which the surveys were conducted.

Construction plans for the I-495 & I-270 Managed Lanes Study will seek to avoid changes in flow to the oxbow channel around Plummers Island and the Potomac River mainstem.

MDOT SHA is aware that Plummers Island supports a broad variety of plant species, some of which are rare and only found within the Potomac Gorge. MDOT SHA is coordinating closely with NPS to minimize impacts to the flora and fauna of Plummers Island and other NPS lands to the maximum extent practicable and to develop an ecosystem restoration plan to limit impacts and restore communities that are affected.

JA1586

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 17 of 340

**Comments addressed above.**

cover much of the area adjacent to "Rock Run" channel and the toe of the Island. There are some rock-bottomed swales in the interior the Island (unit 5A). The low benches are mostly flooded only when high waters reach above the 9 ft mark at Little Falls Gauging Station (3 miles downstream) (https://water.weather.gov/ahps2/hydrograph.php?gage=bdan2&wfo=lwx). This level is reached or exceeded often in winter and spring, but frequency and duration vary greatly from year to year. There are rare plants and animals in these zones. Many species records for the Island come only from these zones, and many of these species are reliant on these different wetland habitats for some or all of their life-cycles. Flooding above the 4.5 ft mark, basically makes the Island inaccessible even by wading, and covers all the sand and mud flats up to the breaks to the bench lands. See Brown & Dale (2009) for faunal inhabitants of the riparian zones.

Populations of two rare plants of concern were observed within the zone of disturbance in the riverside mud flat (Simmons et al. 2016, unit 1) on 31 October 2020 Hibiscus laevis and Paspalum fluitans. Neither of these were reported by the survey crew contracted for the DEIS. Any DEIS related construction plans should seek to avoid changes to water flowing to Plummers Island wetlands including "Rock Run" channel.

Hibiscus laevis in mud flats between Potomac Gorge Riverside Outcrop Barrens (by DEIS SHH102 survey stake, Sorong photo 2020). This species also occurs at the closer head of the Island

Potomac Gorge Riverside Outcrop Barrens
The rocky Potomac Gorge headlands on Plummers Island harbor the rare Solidago racemosa, and Hypericum prolificum. These barrens are routinely scoured by high floods, but these plants hang on!

Solidago racemosa, Potomac Gorge Riverside Outcrop Barrens at the head of the Island (Sorong photo 2020).

Potomac Gorge Riverside Outcrop Barrens near the head of the Island Hibiscus laevis in foreground. A118 in background (Simmons photo 2020).

Piedmont Basic Mesic Forest (unit 8).
This vegetation zone (floods rarely, being more than 15 ft above the low flow. This area is rich in herbaceous plant species known only here on the Island. And it is gorgeous to see in the spring. It includes the largest population of Jeffersonia diphylla (Twinleaf) that we know of in the Potomac Gorge. The rare Phacelia covillei thrives here, as does the rare Erigenia bulbosa and Valeriana pauciflora, and the featherwood shrub, Dirca palustris.

Piedmont Basic Mesic Forest includes a large stand of Jeffersonia diphylla (Sorong photo).

Potomac River Bedrock Terrace Hardpan Forest (unit 12)
This Globally and State rare plant community is endemic to the Potomac River Gorge. On the Island it covers the east and west knolls which rarely ever flood, being as much as 60 ft above the riparian zone. The vegetation is markedly different from the other zones as soils are thin over bedrock, and the trees and shrubs are stunted and slow growing. Various sedges and grass species (e.g. including Melica mutica, Dichanthelium aciculare, Piptochaetium avenaceum), and trees and shrubs, are only known from this zone on the Island.

Potomac River Bedrock Terrace Hardpan Forest (unit 12) ◆ Piptochaetium avenaceum / blackseed needle grass glade on A118 survey line. The bridge is visible in the background (Simmons photo 2020).
The Potomac Gorge is a gem among our National Parks

#4
Cont

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

(https://academic.oup.com/bioscience/article/54/1/8/234660).

Plummers Island is a special part of the middle section of the Potomac Gorge. The plant and animal diversity on remarkable with many rare species and long-term ongoing research projects. State and Globally rare plants and Natural Vegetation Communities are documented in Simmons et al. 2016 & 2000 (Appendix 5 & 6). These reports were based on over 120 years of collecting plants and making herbarium vouchers (detailed in Shetler et al. 2006); species surveys for a DNA barcoding project led by J. W. Kress (Gratham, 2009), and vegetation plot established from 1998 to 2000 by E. Fortson-Wells to document invasive plants in the flood plains of the island, followed up by a three year survey of invasive plants and vegetation between 2012 and 2015, conducted by the WBFC Invasive Biota Committee. Voucher specimens, housed at the United States National Herbarium, Department of Botany, National Museum of Natural History, Smithsonian Institution, are recorded and mostly imaged (records available online at https://collections.smith.edu/search/botany.) Many plants and animals occur in the Potomac Gorge at the northern extensions of their geographic ranges.

Many biologists have walked and observed every nook and cranny of this topographically diverse island with its rocky hills and cliffs, including the globally and state rare Potomac River Bedrock Terrace Hardpan Forest, and sensitive wetland bottoms of "Rock Run" Channel and sand lenses and mud flats on the Potomac River side of the Island. We love this place and its historical, current, and hopefully future biological relevance. Rebuilding and expanding any part of the American Legion Bridge or access to that on the Island would destroy or seriously damage much of it and violate the integrity of the Island.

The noise pollution and visual impact of the current ALH are annoying at best to our meetings on the Island. Expanding the ABL onto the Island will make conversation at meetings at the Cabin on the Island nearly impossible. The noise and air pollution with be much worse during the construction phase. The noise impact on birds may be more extreme (Johnston & Winings 1987). Rare plants and animals and their habitat will be lost. It will no longer be "Winnemana", a beautiful island.

If you argue otherwise, we are lost as a Nation. The efforts of science are meaningless. Losing even a piece of this Island is to lose the heart and soul of what our conservation ethic means.

We believe Plummers Island is as important as any of the national museums in Washington, DC, and WBFC members implore MDOT to preserve intact this Historical and Biological National Treasure.

Please visit our web site ◆ https://WBFC.science

Thank you,

WBFC President, Vice President, and members

Literature Cited

Boremien, S. 2018. 'Windshield test' highlights big drop in flying bugs. The Washington Post -HEALTH & SCIENCE (2018-09-25).

Brown, J. W. & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland. Brief Collecting History and Status of the Inventory. Bulletin of the Biological Society of Washington 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54-TIIFOPJ2A.CO.2

Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 192-226. http://dx.doi.org/10.2988/0097-0298(2008)15[192-ALOTIOJ2A.CO.2

Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 55-74.

OP LANES™ MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. BioScience, Volume 54(1):8-14. https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

Fleming, G. 2006. VEGETATION ECOLOGY of the POTOMAC GORGE, pdf. Virginia Department of Conservation and Recreation, Division of Natural Heritage, powerpoint document. https://www.dcr.virginia.gov/natural-heritage/document/pogovgeco03.pdf

Gambino, M. 2009 Leaking the DNA Code. Smithsonian Magazine August 2009. https://www.smithsonianmag.com/science-nature/cracking-the-dna-code-33970231/

Halfmann, C.A, Sorg, M, Jongejans, E, Siegel, H, Hofland, N, Schwan, H, et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https:doi.org/10.1371/journal.pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? The New York Times Magazine, 27 November 2018, pp. 41-49-48.

Johnston, W.H. & D.L. Wittings. 1997. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Wittings. Proceedings of the Biological Society of Washington 100:762-768. (December 31, 1987).

Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. Science. Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologist Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS FIELD CLUB: ITS MEMBERS AND ITS HISTORY (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC-science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. Science Nov 14 2019 https://dx.doi.org/10.1126/science.abz201

Putnam, J. 2020. eBird Checklist: https://ebird.org/ebird/view/checklist/S70920306 – eBird: An online database of bird distribution and abundance [web application]. eBird, Ithaca, New York. Available: http://www.ebird.org (Accessed: Date [month, day]).

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. Bulletin of the Biological Society of Washington 15(1): 1-57. https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H, Fleming, A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf available at https://WBFC.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Report prepared for the Maryland Conservation Association, July 2020. Appendix 5, pdf available at https://WBFC.science

Steiner, W. E. Jr. 2000. Records and habitat of the "rare click beetle," Cerophytum pulsator (Haldeman) in Virginia and Maryland (Coleoptera: Cerophytidae). Banisteria 15:43-45.

Steiner, W. E. Jr. 2008. A Checklist of the Darkling Beetles (Insecta: Coleoptera: Tenebrionidae) of Maryland, with Notes on the Species Recorded from Plummers Island Through the 20th Century. Bulletin of the Biological Society of Washington 17: 233-340.

Vogel, G. 2017. Where have all the insects gone? Science 2 May 2017, Vol. 356, Issue 6338, pp.

576-579 https://science.sciencemag.org/content/356/6338/576/full

Appendices:
1. WBFC Deed to Plummers Island (1908).
2. Transfer of the WBFC property to United States Government (1959).
3. Washington Post article, 1959
4. Potomac Basin Reporter, 1973 [Plummer Island Beetles & Bees and Type locality]
5. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland
6. Natural Communities of Plummers Island, Montgomery County, Maryland (Vegetation plots are numbered. Plot 4 was lost due to the ALB abutments reflecting the flow of Rock Run Channel / "Culvert" between 2000 and 2013. Plots not mapped, nor are two newer plots and older NPS plots).
7. Titles to the Bulletin of the Biological Society of Washington series "Natural History of Plummers Island, Maryland," and other key publications.

Appendix 1. Title to Plummers Island and adjacent mainland

Appendix 1. cont.

Appendix 1. cont.

Appendix 2. AGREEMENT WITH NATIONAL PARK SERVICE, 1959
AGREEMENT WITH NATIONAL PARK SERVICE
AGREEMENT AND DEPUTATIONS BETWEEN THE WASHINGTON BIOLOGISTS FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA
This agreement made this 5th day of March, 1959, by and between the Washington Biological Field Club, Inc. and the National Park Service.

WITNESSETH:
WHEREAS, The United States Government has by condemnation proceedings, in the United States District Court for the District of Maryland at Civil No. 10676 and by order of Court made the 24th day of June, acquired possession of the defendant's Washington Biologist Field Club, property designated on a deed proceedings as parcels "A" and "B" in tract no. 7, and

WHEREAS, This property was acquired by the Washington Biologist Field Club, Inc. and has been used by the said Club as a natural wild area for scientific research for over 50 years and a great many scientific papers have been written in reference to biological and natural history discoveries made on said land and, more particularly, on that part of said land known as parcel "B" and more familiarly known as Plummers Island containing some 12.238 acres more or less, and

WHEREAS, The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and

WHEREAS, The discoveries have indicated the probability of new knowledge in the field of biology, and

WHEREAS, The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and

WHEREAS, Maryland (Roadside Biologist Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research reserve.

Therefore, The United States Government's petitioner in the United States District Court for the District of Maryland at Civil No. 10676 and the Washington Biologist Field Club, Inc. defendant, and the owner of said parcel of land known as parcel "B" containing some 12.238 acres more or

00022564

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 20 of 340

00022565

less which said land is in an island in the Potomac River and is more familiarly known as Plummers Island, do hereby stipulate and agree that the said parcel "B" be withdrawn from these proceedings and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed the said island to the United States Government without monetary consideration reserving in said deed to the Washington Biologists' Field Club, Inc., the right to continue to maintain the island as a natural wild area and use it for scientific research and for the meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research and so long as the further provisions and stipulations contained herein are complied with which are as follows:

1. The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.

2. The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and will include the names and addresses of the officers, list of the members, and a summarization of the scientific investigations carried on.

3. The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.

4. The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.

5. No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.

6. It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on 1 August 1958,

Honorary Members:
Bartsch, Paul
Mann, William M.
Ricker, P. L.

Active Members:
Aldrich, John W.
Appel, William D.
Benedict, J. E.
Blake, S. F.
Brown, Edgar
Clarke, J. F. G.
Compton, Lawrence V.
Davis, Malcolm
Duvall, Allen J.
Erickson, Ray C.
Erlanson, C. O.
Fosdine, C. Gordon
Fuller, Henry S.
Gabrielson, Ira N.
Gardner, Marshall C.
Graham, Edward H.
Griffith, Richard E.
Handley, C. O., Jr.
Hotchkiss, Neil

Jackson, Hartley H. T.; Johnson, David H.
Kelson, Keith R.
Killip, E. P.
Kretzmann, Karl Y.
Leonard, Emery C.
Lincoln, Frederick C.
Linduska, Joseph P.
Meehean, O. Lloyd
Morrison, J. P. E.
Nelson, A. L.
Oehser, Paul H.
Parker, Kenneth W.
Presnall, Clifford C.
Reed, Theodore H.
Russell, Paul G.
Setzer, Henry W.
Smith, Albert C.
Smith, Lyman B.
Sohns, Ernest R.
Stevenson, James O.
Stewart, Robert E.
Stickel, William H.
Swift, Ernest F.
Uhler, F. M. Vogt, George B.
Walter, Ernest P.
Wetmore, Alexander
Zahnier, Howard Nonresident Members:
Allan, Philip F.
Allen, Durward L.
Archbus, Samuel
Bartlett, H. H.
Bryant, Harold C.
Cahalane, Victor H.
Cottam, Clarence
Cooper, Lee S.
Dorgan, Lucas M.
Eklund, Carl R.
Foster, James A.
Hamlet, John
Holt, Ernest O.
McAtee, W. L.
Myers, George S.
Peterson, Roger T.
Wolfe, William W.
Walker, Edgar F.

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 21 of 340


7. It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.

8. The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island

9. The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock of the National Park Service, nor provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc. and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10. It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists on the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or by a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11. It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc. or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice that the provision of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years that this stipulation and any like provision of the deed to be executed conveying the property to the United States shall terminate.

12. It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13. It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein.

The Washington Biologists' Field Club, Inc.
By: LLOYD W. SWIFT
President

I, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that I have full authority to execute this contract on behalf of the party; was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.
ALBERT C. SMITH, Secretary

---

Appendix 3. Washington Post Article, 1959.

Appendix 4. Potomac Bison Reporter – 1973 Beetles and Bees & Type locality

Appendix 5. Rare Plants of Plummers Island (Excerpt).
A total of 4 globally rare natural communities, two of which are state/rare extant flora, including one globally rare extant species, and 36 state-rare historic flora, including 4 globally rare historic taxa are known from the island.

Rare Flora and Natural Communities
Rare Natural Communities (in order of lowest to highest in elevation)

Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation (USNVC: CEGL006483). Non-Gobal mudflats. Global/State Ranks: G3/S3/SNR

Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type) (Hypericum prolificum, Juniperus virginiana) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

Mid-Atlantic High Terrace Hardwood Floodplain Forest : Acer saccharum - Fraxinus americana / Carpinus caroliniana / Podophyllum peltatum Forest (USNVC: CEGL006459). Global/State Ranks: G3?/SNR.

Potomac River Bedrock Terrace Hardpan Forest: Carya glabra - Quercus (rubra, montana) - Fraxinus americana / Viburnum rafinesquianum/ Piptochaetium avenaceum Forest (USNVC: CEGL006209). Global/State Ranks: G1/G2/S1.

Rare Flora

Extant Flora
White River Sedge (Carex albursina) G5/S3 (last vouchered in 2004, observed by Soreng in 2020)
Pubescent Sedge (Carex hirtifolia) G5/S3 (last vouchered in 1934)
Flat-spiked Sedge (Carex planispicata) G4Q/S3S2 (R.H. Simmons 3525, 4 May 2013)
Northern Leatherflower (Clematis viorna) G5/S3 (last vouchered in 1982)
Needle-leaf Panic-Grass (Dichanthelium aciculare) G5/S2? (R.J. Soreng, 4280a, 25 May 2013)
Open-flower Panic Grass (Dichanthelium laxiflorum) G5/S1? (last vouchered in 1960; photographed by Simmons in 2015)
Leatherwood (Dirca palustris) G4/S2 T (R.H. Simmons 4067, 6 Nov 2015)
Harbinger of Spring (Erigenia bulbosa) G5/S3 (last vouchered in 1983; observed by Soreng in 2020)
Halberd-leaf Rose-mallow (Hibiscus laevis) G5/S3 (last vouchered in 1982; photographed by Soreng in 2020)
Green Violet (Hybanthus concolor) G5/S3 (last vouchered in 1960)
Ostrich Fern (Matteuccia struthiopteris) G5/S3S3 (One of the largest known stands in the state: R.H. Simmons 3532, 5 May 2013)
Two-flower Melic (Melica mutica) G5/S3 (last vouchered in 2015; R.J. Soreng 8340)
Horse-tail Paspalum (Paspalum fluitans) G5/S2 E (E.F. Wells 4507, 20 Sep 1997)

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 22 of 340

I-495 & I-270 Managed Lanes Study

◆ = Lespedeza violacea (L.) Pers. (misapplied); "Due to a problem with the type specimen of Lespedeza intermedia, the name Lespedeza violacea, by which this species has long been known, applies to L. intermedia, and the name L. frutescens now applies to [Lespedeza violacea]" (VBA 2020)]

**Key to Global Rank:**
G1: At very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
G2: At high risk of extinction due to very restricted range; very few populations (often 20 or fewer), steep declines, or other factors.
G3: At moderate risk of extinction due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
G4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
G5: Common, widespread, and abundant.
GH: Known only from historical occurrences but still some hope of rediscovery.
GNE: Not ranked
GNR: Not located despite intensive searches and virtually no likelihood of rediscovery.

**Key to State Rank:**
S1: At very high risk of extirpation from the state due to extreme rarity (often 5 or fewer populations),
very steep declines, or other factors.
S2: At high risk of extirpation from the state due to very restricted range; very few populations (often 20 or fewer), steep declines, or other factors.
S3: At moderate risk of extirpation from the state due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
S4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
S5: Common, widespread, and abundant.
SH: Known only from historical occurrences and still some hope of rediscovery.
SNR: Not ranked.
SU: Currently unrankable due to lack of information or due to substantially conflicting information.
SX: Known only from historical occurrences and virtually no likelihood of rediscovery.

**Federal and State Status**
Legal status denotes a simple hierarchy of endangerment in three categories: Endangered (E), Threatened (T), and Endangered Extirpated (X). Federal Status is determined by the U.S. Fish and Wildlife Service.

**Federal Status**
LE = Listed Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
LT = Listed Threatened - A taxon is likely to become endangered in the foreseeable future.

**State Status**
E = Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
T = T

---

**Historic Flora**

Coville's Phacelia (Phacelia covillei) G3/S2 E (R.H. Simmons 3920, 14 May 2015)
Miami-mist (Phacelia purshii) G5/S3 (last vouched in 1983; observed by Soreng on mossy rocks by plot 21 between 2013 and 2015)
Hairy Hop-tree (Ptelea trifoliata var. mollis) G5/S3 (R.H. Simmons 3585, 2 Jun 2013)
Smooth Wild-petunia (Ruellia strepens) G4/G5/S2/S3 (R.H. Simmons 4221, 9 Oct 2016)
False Dock (Rumex altissimus) G5/S1 E (last vouchered in 1909)
Sticky Goldenrod (Solidago racemosa) G5T3?/S1 T (photographed by Soreng in 2020)
Pink Valerian (Valeriana pauciflora) G4/S1 E (last vouchered in 1982)
Golden-alexanders (Zizia aurea) G5/S3 (R.J. Sereng 3926, 29 Apr 2017)

Eared False Foxglove (Agalinis auriculata) G3/S1 E (last vouchered in 1936)
Canada Milkvetch (Astragalus canadensis var. canadensis) G5/S1 E (last vouchered in 1940)
Blue Wild Indigo (Baptisia australis var. australis) G5/S2 T (last seen in 1935 by Killip & Blake)
Short's Rock Cress (Boechera dentata) G5/S3 (last vouchered in 1916)
Northern Valley Brome Grass (Bromus nottowayanus) G4/G5/S3 (last vouchered in 1960)
Hitchcock's Sedge (Carex hitchcockiana) G5/S1 E (last vouchered in 1933)
Short's Sedge (Carex shortiana) G5/S3/S4 E (last vouchered in 1928
Bur-reed Sedge (Carex sparganioides) G5/S3 (last vouchered in 1933)
Slender Dayflower (Commelina erecta) G5/S3 (last vouchered in 1960)
Spring Coralroot (Corallorhiza wisteriana) G5/S1 T (last vouchered in 1915)
Smartweed Dodder (Cuscuta polygonorum) G5/S1 E (last vouchered in 1961)
Many-flowered Flatsedge (Cyperus lancastriensis) G5/S2/S3 (last vouchered in 1997)
Redhead Flatsedge (Cyperus refractus) G5/S2? (last vouchered in 1960)
Dwarf Larkspur (Delphinium tricorne) G5/S3 (last seen in 1935 by Killip & Blake)
Toothed Tick-trefoil (Desmodium cuspidatum) G5/S3 (last vouchered in 1960)
White Trout Lily (Erythronium albidum) G5/S2 T (last vouchered in 1983)
Downy Milkpea (Galactia volubilis) G5/S3 (last vouchered in 1961)
Striped Gentian (Gentiana villosa) G4/S1 E (last vouchered in 1903)
Woodland Sunflower (Helianthus occidentalis) G5/S1 T (last vouchered in 1940)
Eastern Bloodleaf (Iresine rhizomatosa) G5/S1 E (last vouchered in 1915)
◆ Violet Bush-clover (Lespedeza frutescens) G5/S3 (last vouchered in 1960)
Bog Twayblade (Liparis loeselii) G5/S3/S2 (last vouchered in 1917)
Climbing Milkvine (Matelea obliqua) G4?/S1/S2 E (last vouchered in 1937)
Purple Macombnia (Macombnia scarminia var. scarminia) G5/S2 E (last vouchered in 1939)
Leaf Bachelor (Monarda clinopodia) G5/S3/S4 (last vouchered in 1982)
Early Forget-me-not (Myosotis verna) G5/S3 (last vouchered in 1962)
Racemed Milkwort (Polygala polygama) G5/S3 T (last vouchered in 1950)
Small Pondweed (Potamogeton pusillus ssp. pusillus) G5/S2/S4 (last vouchered in 1936)
Mountain-mint (Pycnanthemum verticillatum) G5/S1 (last vouchered in 1951)
Virginia Sida (Ripariosida hermaphrodita) G3/S1 E (last vouchered in 1938)
Brown-eyed Susan (Rudbeckia triloba) G5/S3 (last vouchered in 1940)
Stiffe-leaved Arrowhead (Sagittaria rigida) G5/S1 E (last vouchered in 1930)
Carolina Willow (Salix caroliniana) G5/S3 (last vouchered in 1982)
Snowy Campion (Silene nivea) G4?/S1 E (last vouchered in 1917)
Riverbank Goldenrod (Solidago rupestris) G4?/S1 X (last vouchered in 1903)
Sand Grape (Vitis rupestris) G3/S1 (last vouchered in 1906)

---

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 23 of 340

WBFC Comments and Testimony, November 2020

My name is Ralph Eckerlin, WBFC President
My address is 4955 Roslyn Road, Annandale, VA 22003
I am a Research Biologist, B.A, M.S., Ph.D. (1974) in Zoology.
I am a Research Associate with the Smithsonian Institution, National Museum of Natural History.

My name is Robert Soreng, WBFC Vice-president
My address is 5506 Uppingham St. Chevy Chase, MD 20815
I am a Research Biologist, B.S., M.S., Ph.D. (1986) in Plant Sciences.
I am a Research Associate with the Smithsonian Institution, National Museum of Natural History

**This Authorized I-495 and I-270 P3 Program DEIS Testimony is submitted on behalf of The Washington Biologists' Field Club (WBFC)**, November 2020.

Our website is https://WBFC.science

Dear MDOT Officials:

Thank you for the opportunity to comment on this important issue.

The WBFC is OPPOSED to the highway expansion project including the American Bridge Legion (ALB) expansion part.

WBFC supports the **NO BUILD OPTION**

None of the other presented DEIS alternatives are acceptable.

**WBFC considers the DEIS legally faulty and incomplete for many reasons, including:**

- Destruction and disturbance of State of Maryland and National parklands with wetlands, including but not limited to several miles of Rock Creek Regional Park (including moving substantial stretches of Rock Creek), and ca. 80 acres of the Chesapeake & Ohio National Historical Park (CONHP), including ca. 5 acres of the 12 acre Plummers Island and moving "Rock Run".

- The destruction of "Rock Run Culvert" in building the American Legion Bridge violates the integrity of Plummers Island (CONHP, Montgomery Co., Maryland).

- Lack of understanding or recognition of the value of the extensive historical and ongoing biological research on Plummers Island and the WBFC's 120 years of contributions and commitments to that. Records of many rare plants, animals and habitats from the island were not considered.

1 | P a g e

**#1**

## Response to DEIS Comment #1

Refer to Chapter 9, Section 3.3.8 for a response to Analysis of Alternatives Retained for Detailed Study.

Since the DEIS and Draft Section 4(f) Evaluation, substantial efforts to avoid and minimize impacts to park and historic resources around the American Legion Bridge (ALB) has occurred. MDOT SHA and FHWA met with the National Park Service (NPS) on December 8, 2020 to discuss the limit of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. The ALB Strike Team considered bridge construction approaches to determine if any of the approaches could further reduce the LOD. The Strike Team conducted detailed investigation of a top-down segmental construction approach; a top-down cable stayed design approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the existing bridge could be consolidated to the northwest quadrant along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land.

The Preferred Alternative does not impact Rock Creek Regional Park or Rock Creek. MDOT SHA has minimized impacts to the Chesapeake & Ohio National Historical Park and would impact 0.28 acres of Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts would not relocate Rock Run or destroy the Rock Run Culvert. MDOT SHA assembled a team of bridge specialists from around the country to consider all alternatives for replacement of the American Legion Bridge. The Preferred Alternative represents the least impactful alternative to NPS land and resources. MDOT SHA understands the value of the extensive historical and ongoing biological research on Plummers Island and has considered the rare plants, animals, and habitats on Plummers Island and within the Chesapeake and Ohio Canal National Historical Park in general. MDOT SHA is working closely with NPS to devise an ecological restoration plan to mitigate for project impacts in this area. A four season survey of RTE plant species in this area was completed. The LOD was conducted in 2020 and will inform the ecological restoration in this area. MDOT SHA conducted a thorough analysis of potential COVID-19 impacts on traffic and determined that there would be a short-term reduction in traffic load, however it would soon return to pre-COVID-19 levels.

As described in Chapter 2 of the Supplemental DEIS, the Preferred Alternative includes the full replacement of the ALB on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of the coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the Chesapeake and Ohio Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints. A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land.

Refer to Chapter 9, Section 3.2.8 for a response to Alternatives Not Retained for Detailed Study.

MDOT SHA did consider records of many rare plants, animal, and habitats within the Potomac Gorge. Information related specifically to Plummers Island was added to the SDEIS and FEIS.

00022968

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 24 of 340


WBFC DEIS Comments and Testimony, November 2020

- Lack of Due Diligence on study of impacts on Plummers Island's wetlands and rare and plant communities, and rare plant and animal species (the evaluation of the organisms on the Island was apparently based on one summertime visit to the head of the Island in 2019). DEIS APPENDIX L (Natural Resources Technical Report) subordinate Appendices A-R cover Natural Resources considered along the route. As is documented below, APPENDIX L is woefully incomplete as concerns Plummers Island. Plummers Island is in the large Potomac River / Rock Run (PR/RR) Natural Resources unit. The DEIS surveys for rare plants and animals on the Island was cursory, brief, and at the wrong season of the year to identify many of the organisms of concern.

- Lack of alternatives to condemning part of Plummers Island for the ALB proposed project.

- Lack of consideration of the impact of the Covid-19 epidemic on present and future transportation loads and patterns (many folks are teleworking and attending virtual meetings). With peak traffic flows down due to changed behavior patterns resulting from Covid-19, toll lanes will be unlikely to provide revenue streams of sufficient reward to P3 contractors, likely leaving taxpayers on the hook for billions of dollars.

- Lack of forward thinking on Climate Change (only more cars are powered by petrol).

- Lack of accepted Build options with mass transportation options (trains, light rail, monorail, etc.)

- Massive costs, with near certain cost overruns passed on to taxpayers. Regarding Washington Suburban Sanitary Commission (WSSC) expenditures, estimated to be $2 billion, it remains unclear if ratepayers would be responsible for this cost.

- Toll lanes that could cost as much as $50 in peak traffic hours, which would provide little benefit to the average commuter.

- Massive traffic congestion and delays during the construction period lasting 5-10 years, after which the traffic flow will be just as congested as it was prior to the construction due to the encouragement of more cars to be on the road, also known as induced demand.

- Because the DEIS's analysis is incomplete, it is impossible for the concerned Agencies to assess, and the public to comment on, the proposed project's impacts. The Agencies cannot wait until a final EIS is complete to analyze the project's full impacts, as it will then be too late for the public to meaningfully comment on them and for the Agencies to consider the public's comments and choose the alternative that best alleviates the impacts based on this information. We respectfully request that the Agencies conduct a supplemental EIS to provide

MDOT SHA conducted a detailed, four-season rare plant survey on National Park Service lands within the project LOD, including the 0.28-acre portion of Plummers Island that is within the project LOD and would be affected. The survey targeted 41 rare plant species and methodology and results are included in the *Rare, Threatened, and Endangered Plant Survey Report* (November 2020).

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

#1 Cont

CO-359

00022599

WBFC DEIS Comments and Testimony, November 2020

the public the ability to meaningfully review and comment on the impacts before a final EIS is produced.

**Alternative placement of the Bridge not considered in the DEIS**

- MDOT should consider building and placing construction platforms only upstream from the current bridge to reduce impacts to the Chesapeake and Ohio Canal NHP and Plummers Island.

- MDOT should consider construction of other crossings to alleviate traffic over the ALB instead of bridge enlargement.

- We respectfully ask that agencies consider these options to the ALB portion of this project to reduce and minimize impacts to Plummers Island and the surrounding area.

**WBFC Background.** The WBFC (the Club) was founded in 1900 by professional field biologists living and working in the Washington, DC vicinity (Perry 2007). Perry (2007) provides a detailed history of the Club, the Island, and brief biographies of the hundreds of past and present members up to that time. The members are all professional biologists. Plummers Island, Chesapeake & Ohio Canal National Historical Park, Montgomery County, Maryland, has been the WBFC research station and meeting place since 1901 (Appendix 1). Plummers Island is located immediately downstream from the ALB. The Island covers 12.2 acres of land, the widest part of which is on the ALB end. The proposed expansion of the ALB, as part of the I-495 expansion, threatens the existence, and violates the integrity, of the Island as a designated **natural wild area** (Appendix 2). "Rock Run Culvert" as identified in the DEIS is actually a natural Potomac River channel that has divided the Island from the mainland since time immemorial (Perry 2007). There is a small true concrete and pipe culvert running under the ALB which drains into the river channel where the channel bends eastward (water apparently rarely flows from this ALB culvert).

The current ALB proposal would cut across the Island, move or destroy the true channel "Culvert" that separates the Island from the mainland, clear the trees and level a substantial part of the Island, **clear the significant healthy native beech tree forest on the mainland side** (Popkin 2019, a deadly beech disease is spreading in the NE US), destroy the wetlands associated with the Island and mainland, and result in major infestations of invasive plants. **If implemented this DEIS project would jeopardize future research on trends in biodiversity on the Island.** Noise pollution from expanding the ALB onto the Island would make WBFC meetings meetings on the Island nearly impossible.

3 | P a g e

Comments addressed above.

#1
Cont

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 26 of 340

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020





Old map (above) showing the real Rock Run and Plummers Island and Plummers Island (copied from Perry 2007). Map of Plummers Island Pre-AIB (below). Calling the Potomac River channel "Rock Run Culvert" allows it to be "excluded" from consideration as a protected wetland in the DEIS Natural Resources APPENDIX L. It is not a culvert! And "Rock Run" has been misapplied to it.



4 | P a g e

WBFC DEIS Comments and Testimony, November 2020



Head of Plummers Island adjacent to A18 separated by "Rock Run" channel or "Culvert" from the mainland, showing Potomac Gorge Riverside Outcrop Barrens, wetland mud flats (inundated here) and sandbars.

The Draft EIS is seriously flawed in many ways. The most pertinent to the WBFC is the failure to discuss and evaluate the impact of the destruction of part of Plummers Island, a historical and biological treasure within the Chesapeake and Ohio Canal National Historical Park. There is not even a footnote about the incalculable value of the long-term research on the biology of this island, and nothing about WBFC's place in it.

The WBFC leased Plummers Island in June 8, 1901, for a meeting place and research station, and built the cabin that year. The WBFC finally settled the legal purchase the property known as Plummers Island (Appendix 1), and most of the adjacent mainland up to the C&O Canal Tow Path, in **1908** (Perry 2007).

The Club has been meeting on Plummers Island continuously for nearly 120 years, and conducting research there on a wide range of subjects. The Club gave the property to the National Park Service on July 24, 1959, with the written understanding (Appendix 2) that the Club retained the right to maintain the island as **a natural wild area**, use it for scientific

5 | P a g e

Comments addressed above.

#1
Cont

**#1 Cont**

*WBFC DEIS Comments and Testimony, November 2020*

research, for meetings of the Club, and to pursue its studies in the field of biology and natural history.

Plummers Island is known as "**The most thoroughly studied island in North America**", and perhaps in the world.



### Plummers Island

**"THE MOST THOROUGHLY STUDIED ISLAND IN NORTH AMERICA"**

Plummers Island has been the home of the Washington Biologists' Field Club since 1901. Its 1959 the club gave the island to the United States, and has since continued a program of scientific research. The island and its rocks, plants, animals and the cabin are protected by federal law.

Washington Biologists' Field Club

National Park Service
U.S. Department of the Interior

The Club holds events each year on the island where members gather with guests. We maintain the historic Club cabin, "Winnemana Lodge," built in 1901. The name Winnemana was the name originally given to the cabin (Lodge) in 1906 and is translated from a Native American language meaning "beautiful island." The epithet *winnemana* has been given to Latin names for various insects and mammals described from Plummers Island collections.

6 | P a g e

Comments addressed above.

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

WBFC DEIS Comments and Testimony, November 2020



**Winnemana Lodge** built in 1901. The Cabin is still standing and well maintained by WBFC.

There are always research projects ongoing on the Island, conducted both by members and by grantees funded by our Endowment Research funds. Many of these projects run for years, and are follow-ups to pre-ALB censuses, showing impacts of pollution, and changes in fauna and flora. WBFC reviews dozens of research grant proposals each year and usually funds 5 to 10 of them each year, with first priority given to studies on the Island, second priority to the Potomac Gorge, eventually allowing studies in the Mid-Atlantic region. Voucher specimens for plants and animals collected for the scientific studies on the Island are housed and catalogued in the National Museum of Natural History, Smithsonian Institution. These specimens and observations from catch and release and other sightings are reported in hundreds of published scientific papers.

The ALB was constructed immediately to the west (up river) of the Island starting in 1962. The placement of the original bridge was intentionally positioned to protect the Island (Appendix 2 & 3) to ensure the continuation of WBFC's valuable long-term biological research program.

7 | P a g e

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

When the ALB was expanded in the early 1990s, the expansion was done by filling in the gap between the north and south-bound lanes, again avoiding direct damage to the Island. Despite the best efforts of engineers and construction implementation to avoid impacting the Island, the original ALB construction and 1992 expansion led to many invasive plants infesting the Island, and disturbing the water flow to its flanking wetlands. The worst of the invasive plant infestations are on the head of the Island adjacent to the ALB. Negative impacts of local environmental pollution on lichens and insects have been documented on the Island. Traffic on the ALB also led to lead pollution from vehicle exhaust and declines in lichen species, which are particularly sensitive, from 70 to 20 (Lawrey & Hale 1979). This illustrates the importance of long-term scientific research on the Island, which influenced legislation to reduce lead in gasoline, and eventual reduction in lead contamination locally and world-wide.

**Excerpt of Washington Post article 19 May 1994 by D'Vera Cohn about lichens and Pollution.**

Lichen research also shows that the bridge has become a dominant factor in shaping the Island's ecology.

Lichens, which are crusty combinations of algae and fungus, are superb barometers of pollution. They soak up nutrition from the air, along with any toxins hanging about. There were 70-species of lichen on Plummers Island at the turn of the century; now there are 20.

Their decline began after the bridge was built. When Lawrey and his late colleague and mentor, Mason Hale, scraped lichen samples off rocks and boiled them analyzed, they found their lead content had more than tripled from 1958 to 1970. Their joint article on their findings, blaming car exhaust for the pollution, was published in the journal Science in 1978.

Recent lichen research is more encouraging. Lead concentrations have been dropping, in tandem with the phasing out of leaded gasoline. Eventually, Lawrey hopes, the number of lichen species will rise, as has happened in other locales.

"We'll have to just wait and see," he said. "Fortunately, the club will be here forever, and some club member—if it is not me—will find out the answer."

*This page is intentionally left blank.*

00022575

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 31 of 340

OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

WBFC DEIS Comments and Testimony, November 2020

Since 1901, over 400 scientific publications have focused on the island's biota: birds, fish, mammals, reptiles and amphibians, plants, insects, arachnids, nematodes, and other groups (Many published titles in the Proceedings of the Biological Society of Washington, available at https://WBFC-science/biological-studies/) (see Appendix 7 for titles in this series)

An article in the Potomac Basin Reporter (1973) (Appendix 4) cited "1,226 species of plants and 4,293 species of animals on the island…." Including "1500 species of beetles" and "300 to 400 species of bees". The island "is 'type-locality' for at least 175 species, …" "No less than 16 genera and three families of plants and animals have been described on the basis of specimens collected on the island." Some of these numbers were overestimates made before computer databases were compiled. Insect inventories are still substantially incomplete (see Brown & Bahr 2008). The number of vascular plants recorded on the island, stands around 900 (Shetler et al, 2006; including newer records).

Many thousands of plants and animals have been documented from Plummers Island over 120 years of WBFC research.

**Invertebrates on the island**

The Brown & Bahr (2008b) appendix lists all invertebrate taxa known from the island, including insects. (Taxa are taxonomic groups of any rank, such as a species, genus, family, order, or class).

**Class Insecta diversity on the island**

Brown & Bahr (2008a & b) documented the known insect species records for the island. "Based on an examination of the insect collection of the National Museum of Natural History and a review of relevant literature, we document 3012 insect species in 253 families, encompassing 18 insect orders: Collembola, Odonata, Dermaptera, Blattodea, Phasmatodea, Orthoptera, Psocoptera, Thysanoptera, Hemiptera, Neuroptera, Megaloptera, Coleoptera (beetles), Mecoptera, Trichoptera, Lepidoptera, Diptera, Siphonaptera, and Hymenoptera." The authors acknowledge that 16 families of the 600 beetle species have been recorded for the island, yet they conclude this probably includes only a quarter of the families likely present. Among insects recorded from Plummers Island are 836 species of butterflies and moths (Lepidoptera), with 27 different species of moths described from specimens collected on the island (Brown et al. 2008). Many of these species were described from collections made on the island. *No site in North America has been surveyed as intensively, yet much of the insect fauna remains to be studied, with hundreds of additional species likely to be documented.*

9 | Page

*This page is intentionally left blank.*

00022676

**OP•LANES™**
MARYLAND

WBFC DEIS Comments and Testimony, November 2020

Many of these insect orders depend on wetland habitats for all or much of their life-cycles. Seven types of wetlands are characterized on the Island (Simmons et al. 2016, units 1-5).

Steiner (2000) documented a globally and state-rare click beetle on the Island. Steiner (2008) inventoried 128 species of Tenebrionidae beetles from Maryland, most of which occur on Plummers Island.



A few of the many Tenebrionidae from Plummers Island and nearby. (Steiner 2008 fig. 1-16)

10 | P a g e

*This page is intentionally left blank.*

JA1602

WBFC DEIS Comments and Testimony, November 2020

In 2015 Steiner collected the first Emerald Ash Borer (EAB) on the island. Within the following two years nearly all the mature American and Green Ash trees on the island were dead or dying. These trees were major components of vegetation types 5 to 11 (see Plummers Island Plant Communities section, below), and they have been decimated over much of Eastern North America.



Imperial moth caterpillar (*Eacles imperialis*) at head Plummers Island, Oct. 2013 (Soreng photo). These moths are rarely seen any more in the area.

Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, *Compsilura concinna*, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long

11 | Page

00022578

---

*This page is intentionally left blank.*

**OP·LANES™**
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

WBFC DEIS Comments and Testimony, November 2020

history of research on insects of Plummers Island, the island would be a key place to further document this "insect apocalypse," assuming the island remains intact. _The DEIS ALB project puts WBFC Plummers Island research on trends in biodiversity in jeopardy._

**Birds on the Island and American Legion Bridge**

An established Peregrine Falcon nest is located on the American Legion Bridge and two adults and at least one chick was observed this past June (Putnam 2020). The nest box was put there by MD State Highway Association (SHD) working with US Fish & Wildlife Service (USFWS) in 2007, and peregrines have been nesting there for 12 years. In the DEIS document, "they propose moving the nest box to another location just before nesting season when the bridge constructions begins, but as an established nest this recommendation may not be successful" (Carla Dove, WBFC member, Smithsonian Ornithologist, pers. comm.). A Mississippi Kite was also observed this year. Wetmore & Manville (in Manville 1968) account for birds known from the island to that time. Johnston & Winings (1987) attribute the decline of forest breeding birds on the island and vicinity to vehicular traffic.

**Mammals on the Island**

Five bat species are documented by Smithsonian collections from the island. Among these are the Endangered northern long-eared bat, Myotis septentrionalis, and the eastern small-footed Myotis, Myotis leibii. The latter was separately described as Myotis winnemana. Other mammals collected include shrews, moles, voles, eastern cottontail, eastern gray squirrel, Georgian bat, large brown bat, red bat, evening bat, whitetail deer, eastern skunk, mink, eastern long-tailed weasel, fox squirrel, eastern flying squirrel, eastern otter, chipmunk, eastern red fox, Virginia muskrat, and woodchucks have also been recorded (Manville 1968). Mammologists these days often monitor by catch and release and other methods, rather than preparing museum specimens from animals on the island. For example, the last regional report of an eastern wood rat was reported on Plummers Island. Also, DNA from bones, feathers, fur, or feces can now be used to precisely identify species.

**Plummers Island Plant Communities**

The National Park Service prepared a map of the vegetation zones in the region with a coarse map for Plummers Island. The plant communities were remapped in finer detail in 2016

12 | Page

This page is intentionally left blank.

JA1604

**OP‹LANES™** MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

WBFC DEIS Comments and Testimony, November 2020

(Simmons et al., 2016). (Appendix 6, also available at WBFC.science). This map included 12 communities, 8 within wetlands, and one upland type that is unique to the Potomac Gorge. These plant communities are proxies for where other organisms also live or might be found.

**Plummers Island wetlands (units 1 to 7).**

The Island's wetland habitats were mapped by Simmons et al. (2016). These were divided into 5 major communities, and 3 subdivisions within those. These include sandbars and mud flats (units 1 & 2), rocky outcrop barrens (3A & B), to regularly flooded bottom land forests (4-6). These areas flood frequently. Community 7 is higher and infrequently flooded. Community 8, I Piedmont Basic Mesic Forest, includes a rich herb layer that is rare in the Potomac Gorge and is rarely flooded.

The sandbars, mud flats, and rock barrens occur on the Potomac River side. Mud flats also occur along the usually sluggish "Rock Run" channel. The flooded bottom bench lands (units 5, 6 & 7) cover much of the area adjacent to "Rock Run" channel and the toe of the Island. There are some rock-bottomed swales in the interior the Island (unit 5A). The low benches are mostly flooded only when high waters reach above the 9 ft mark at Little Falls Gauging Station (3 miles downstream) (https://water.weather.gov/ahps2/hydrograph.php?gage=brkm2&wfo=lwx). This level is reached or exceeded often in winter and spring, but frequency and duration vary greatly from year to year. There are rare plants and animals in these zones. Many species records for the Island come only from these zones, and many of these species are reliant on these different wetland habitats for some or all of their life-cycles. Flooding above the 4.5 ft mark, basically makes the Island inaccessible even by wading, and covers all the sand and mud flats up to the breaks to the bench lands. See Brown & Bahr (2008) for Insect inhabitants of the riparian zones.

Populations of two rare plants of concern were observed within the zone of disturbance in the riverside mud flats (Simmons et al. 2016, unit 1) on 31 October 2020 *Hibiscus laevis* and *Paspalum fluitans*. Neither of these were reported by the survey crew contracted for the DEIS. Any DEIS related construction plans should seek to avoid changes to water flowing to Plummers Island wetlands including "Rock Run" channel.

**Response to DEIS Comment #1**

It appears from Simmons et al., 2016 that Unit 1 is outside of the Study Preferred Alternative Limits of Disturbance. Our plant survey did document populations of *Hibiscus laevis* and *Paspalum fluitans* within the Study Preferred Alternative Limits of Disturbance. The project has agreed to conducting additional rare plant surveys during the flowering season of each of the rare plant species documented in the 2020 rare plant survey prior to construction.


#1

JA1605

OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

WBFC DEIS Comments and Testimony, November 2020



*Hibiscus laevis* in mud flats between Potomac Gorge Riverside Outcrop Barrens (by DEIS SHH102 survey stake, Someng photo 2020). This species also occurs at the closer head of the island

**Potomac Gorge Riverside Outcrop Barrens**

The rocky Potomac Gorge headlands on Plummers Island harbor the rare *Solidago racemosa*, and *Hypericum prolificum*. These barrens are routinely scoured by high floods, but these plants hang on!

14 | Page

*This page is intentionally left blank.*



WBFC DEIS Comments and Testimony, November 2020

*Solidago racemosa,* Potomac Gorge Riverside Outcrop Barrens at the head of the Island (Sorensg photo 2020).

Potomac Gorge Riverside Outcrop Barrens near the head of the Island *Hibiscus laevis* in foreground. AL8 in background (Simmons photo 2020).

15 | Page

*This page is intentionally left blank.*

00022582

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

**Piedmont Basic Mesic Forest (unit 8).**

This vegetation zone floods rarely, being more than 15 ft above the low flow. This area is rich in herbaceous plant species known only here on the island. And it is gorgeous to see in the spring. It includes the largest population of *Jeffersonia diphylla* (Twinleaf) that we know of in the Potomac Gorge. The rare *Phacelia covillei* thrives here, as does the rare *Erigenia bulbosa* and *Valeriana pauciflora*, and the leatherwood shrub, *Dirca palustris*.



Piedmont Basic Mesic Forest includes a large stand of *Jeffersonia diphylla* (Soreng photo).

**Potomac River Bedrock Terrace Hardpan Forest (unit 12)**

This Globally and State rare plant community is endemic to the Potomac River Gorge. On the island it covers the east and west knolls which rarely ever flood, being as much as 60 ft above

16 | P a g e

I-495 & I-270 Managed Lanes Study

WBFC DEIS Comments and Testimony, November 2020

the riparian zone. The vegetation is markedly different from the other zones as soils are thin over bedrock, and the trees and shrubs are stunted and slow growing. Various sedges and grass species (e.g. including *Melica mutica, Dichanthelium aciculare, Piptochaetium avenaceum*), and trees and shrubs, are only known from this zone on the Island.



Potomac River Bedrock Terrace Hardpan Forest (unit 12) – *Piptochaetium avenaceum* / blackseed needle grass glade on ALB survey line. The bridge is visible in the background (Simmons photo 2020).

**The Potomac Gorge is a gem among our National Parks**
([https://academic.oup.com/bioscience/article/54/1/8/234660](https://academic.oup.com/bioscience/article/54/1/8/234660)).

Plummers Island is a special part of the middle section of the Potomac Gorge. The plant and animal diversity are tremendous with many rare species and long-term ongoing research projects. State and Globally rare plants and Natural Vegetation Communities are documented in Simmons et al. 2016 & 2000 (Appendix 5 & 6). These reports were based on over 120 years

17 | P a g e

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

of collecting plants and making herbarium vouchers (detailed in Shetler et al. 2006), species surveys for a DNA barcoding project led by J. W. Kress (Gambino, 2009), and vegetation plots established from 1998 to 2000 by E. Fortson-Wells to document invasive plants in the flood plains of the island, followed up by a three year survey of invasive plants and vegetation between 2012 and 2015, conducted by the WBFC Invasive Biota Committee. Voucher specimens, housed at the United States National Herbarium, Department of Botany, National Museum of Natural History, Smithsonian Institution, are recorded and mostly imaged (records available online at https://collections.nmnh.si.edu/search/botany/ ). Many plants and animals occur in the Potomac Gorge at the northern extensions of their geographic ranges.

Many biologists have walked and observed every nook and cranny of this topographically diverse island with its rocky hills and cliffs, including the globally and state rare **Potomac River Bedrock Terrace Hardpan Forest**, and sensitive **wetland bottoms** of "Rock Run" Channel and sand terrace and mud flats on the Potomac River side of the island. We love this place and its historical, current, and hopefully future biological relevance. **Rebuilding and expanding any part of the American Legion Bridge or access to that on the island would destroy or seriously damage much of it and violate the integrity of the island.**

The noise pollution and visual impact of the current ALB are annoying at best to our meetings on the island. Expanding the ALB onto the island will make conversation at meetings at the Cabin on the island nearly impossible. The noise and air pollution will be much worse during the construction phase. The noise impact on birds may be more extreme (Johnston & Winings 1987). Rare plants and animals and habitat will be lost. It will no longer be "Winnemanna", a beautiful island.

If you argue otherwise, we are lost as a Nation. The efforts of science are meaningless. Losing even a piece of this island is to lose the heart and soul of what our conservation ethic means.

We believe Plummers Island is as important as any of the national museums in Washington, DC, and WBFC members *implore MDOT to preserve intact this* **Historical and Biological National Treasure.**

**Please visit our web site – https://WBFC.science**

Thank you

WBFC President, Vice President, and members

*[signatures]*

18 | Page

---

Comments addressed above

**Response to DEIS Comment #2**

In earlier coordination, NPS requested that no noise barriers be constructed within NPS-managed land due to Section 4(f) concerns.

#2



FINAL ENVIRONMENTAL IMPACT STATEMENT

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

**Literature Cited**

Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. *The Washington Post - HEALTH & SCIENCE* (2018-09-25).

Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. *Bulletin of the Biological Society of Washington* 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2

Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 192-226 http://dx.doi.org/10.2988/0097-0298(2008)15[192:ALOTI]2.0.CO;2

Brown, J. W., Epstein, M., Varrs, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 65–74.

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. *BioScience*, Volume 54(1): 8–14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

Fleming, G. 2006. VEGETATION ECOLOGY OF THE POTOMAC GORGE. pdf. Virginia Department of Conservation and Recreation, Division of Natural Heritage. powerpoint document. https://www.dcr.virginia.gov/natural-heritage/document/pgorgeeco3.pdf

Gambino, M. 2009 Craking the DNA Code. *Smithsonian Magazine* August 2009. https://www.smithsonianmag.com/science-nature/cracking-the-dna-code-33970231/

Hallmann, CA, Sorg, M, Jongejans, E, Siepel, H, Hofland, N, Schwan, H, et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal. pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? *The New York Times Magazine*, 27 November 2018, pp. 41–48.

Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. *Proceedings of the Biological Society of Washington* 100:762- 768. (December 31, 1987).

19 | Page

JA1611

WBFC DEIS Comments and Testimony, November 2020

Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. *Science* Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB, ITS MEMBERS AND ITS HISTORY (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown at WBFC Book at https://WBFC-science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. *Science* Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201

Putnam, J. 2020. eBird Checklist: https://ebird.org/ebird/view/checklist/S70502036 – eBird: An online database of bird distribution and abundance (web application). *eBird*, Ithaca, New York. Available: http://www.ebird.org (Accessed: 2 November 2020).

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. *Bulletin of the Biological Society of Washington*, 14(1): 1-57 https://wbfc-science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H., Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://WBFC-science/wp-content/uploads/2019/09/columna_island_nc_map_v3.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 6, pdf. available at https://WBFC-science

Steiner, W. E. Jr. 2000. Records and habitat of the "rare click beetle," *Ceroplytum pulsator* (Haldeman), in Virginia and Maryland (Coleoptera: Cerophylidae). *Banisteria* 15:43-45.

Steiner, W. E., Jr. 2008. A Checklist of the Darkling Beetles (Insecta: Coleoptera: Tenebrionidae) of Maryland, with Notes on the Species Recorded from Plummers Island Through the 20th Century. *Bulletin of the Biological Society of Washington* 15: 233-140.

201 | Page

This page is intentionally left blank.

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

WBFC DEIS Comments and Testimony, November 2020

Vogel, G. 2017. Where have all the insects gone! *Science* 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

**Appendices:**

1. WBFC Deed to Plummers Island (1908).

2. Transfer of the WBFC property to United States Government (1959).

3. Washington Post article, 1959

4. Potomac Basin Reporter, 1973 [Plummer Island Beetles & Bees and Type locality]

5. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland.

6. Natural Communities of Plummers Island, Montgomery County, Maryland.

(Vegetation plots are numbered. Plot 4 was lost due to the ALB abutments redirecting the flow of Rock Run Channel / "Culvert" between 2000 and 2013. Plots not mapped, nor are two newer plots and older NPS plots)

7. Titles in the Bulletin of the Biological Society of Washington series "Natural History of Plummers Island, Maryland," and other key publications.

21 | P a g e

JA1613

WBFC DES Comments and Testimony, November 2020

**Appendix 1. Title to Plummers Island and adjacent mainland**



22 | Page

WBFC DES Comments and Testimony, November 2020

**Appendix 1. cont.**

23 | Page

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 45 of 340

**OP LANES**
MARYLAND

I-495 & I-270 Managed Lanes Study

WBFC DEIS Comments and Testimony, November 2020

**Appendix 1. cont.**





WBFC DEIS Comments and Testimony, November 2020

**Appendix 2 AGREEMENT WITH NATIONAL PARK SERVICE, 1959**

### AGREEMENT AND STIPULATIONS BETWEEN THE WASHINGTON BIOLOGISTS' FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA

This agreement made this 5th day of March, 1959, by and between the Washington Biologists' Field Club, Inc. and the United States of America.

WITNESSETH:

WHEREAS, The United States Government has by condemnation proceedings, in the United States District Court for the District of Maryland in Civil No. 10676 and by order of Court made the 24th day of June, taken possession of the defendant's Washington Biologists' Field Club, property designated in said proceedings as parcels "A" and "B" in tract no. 7, and

WHEREAS, This property was acquired by the Washington Biologists' Field Club, Inc. and has been used by the said Club as a natural wild area for scientific research for over 50 years and a great many scientific papers have been written in reference to biological and natural history discoveries made on said land and, more particularly, on that part of said land known as parcel "B" and more familiarly known as Plummers Island containing some 12.238 acres more or less, and

WHEREAS, The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and

WHEREAS, The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and

WHEREAS, The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and

WHEREAS, The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

24 | Page

CO-380

00022590

JA1615

OP‑LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    FINAL ENVIRONMENTAL IMPACT STATEMENT

## WBFC DEIS Comments and Testimony, November 2020

Therefore, The United States Government is petitioner in the United States District Court for the District of Maryland in Civil No. 10676 and the Washington Biologists' Field Club, Inc., defendant, and the owner of said parcel of land known as parcel "B" containing some 12.238 acres more or less which said land is an island in the Potomac River and is more familiarly known as Plummers Island, do hereby stipulate and agree that the said parcel "B" be withdrawn from these proceedings and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed the said island to the United States Government without monetary consideration reserving in said deed to the Washington Biologists' Field Club, Inc. the right to to continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific purposes and so long as the further provisions and stipulations contained herein are complied with which are as follows:

1. The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.
2. The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and a summarization of the scientific investigations carried on.
3. The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or damage or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.
4. The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.
5. No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.
6. It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on 1 August 1958.

Honorary Members: Johnson, David H.; Kelson, Keith R.; Killip, E. P.
Vogt, George B.; Walker, Ernest P.; Wetmore, Alexander

26 | Page

## WBFC DEIS Comments and Testimony, November 2020

Bartsch, Paul
Mann, William M.
Ricker, P. L.

Active Members:
Aldrich, John W.
Appel, William D.
Benedict, J. E.
Blake, S. F.
Brown, Edgar
Clarke, J. F. G.
Compton, Lawrence V.
Davis, Malcolm
Duvall, Allen J.
Erickson, Ray C.
Erlanson, C. O.
Froelse, C. Gordon
Fuller, Henry S
Gabrielson, Ira N.
Gardner, Marshall C.
Graham, Edward H.
Griffith, Richard E.
Handley, C. O., Jr.
Hotchkiss, Neil
Jackson, Hartley H. T.

Kromhem, Karl V.
Leonard, Emery C.
Lincoln, Frederick C.
Lindska, Joseph P.
Meehean, O. Lloyd
Morrison, J. P. E.
Nelson, A. L.
Oxhser, Paul H.
Parker, Kenneth W.
Presnall, Clifford C.
Reed, Theodore H.
Russell, Paul G.
Setzer, Henry W.
Smith, Albert C.
Smith, Lyman B.
Sohn, Ernest R.
Stevenson, James O.
Stewart, Robert E.
Stickel, William H
Swift, Ernest F.
Uhler, F. M.

Zabeiser, Howard/Nonresident
Members:
Allan, Philip F.
Allen, Durward L.
Arcinno, Samuel
Bartlet, H. H.
Bryant, Harold C.
Cahalane, Victor H.
Cottam, Clarence
Coach, Leo K.
Dargan, Lucas M.
Eklund, Carl R.
Fowler, James A.
Hamlet, John
Holt, Ernest O.
McAtee, W. L.
Myers, G. S.
Peterson, Roger T.
Wallis, William W.
Wherry, Edgar T.

27 | Page

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

7. It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.
8. The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island.
9. The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock or the National Park

JA1616

00022591



WBFC DEIS Comments and Testimony, November 2020

Service may provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc. and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10. It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists to the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or to a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11. It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc. or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice that the provisions of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years then this stipulation and any like provisions of the deed to be executed conveying the property to the United States shall terminate.

12. It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13. It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein

The United States of America
By: WILLIAM E. FINLEY          *Director of the National*
*Capital Planning Commission*          *Condemning Authority*

28 | Page

WBFC DEIS Comments and Testimony, November 2020

The   Washington Biologists' Field Club, Inc.

By: LLOYD W. SWIFT

President

I, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that Lloyd W. Swift, who signed this contract on behalf of the party, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body; and is within the scope of its corporate powers.

ALBERT C. SMITH, *Secretary*

29 | Page

00022592

WBFC DEIS Comments and Testimony, November 2020

Appendix 3. Washington Post Article, 1959.

## —It's for the Birds

**Plummers Island is for the birds, and it's going to stay that way.**

The National Capital Planning Commission voted yesterday to accept an offer by the Washington Biologists Field Club, Inc., to donate the Potomac Island near Cabin John as part of the George Washington Memorial Parkway.

The deed will stipulate that the nature group can continue to use the island for its bird studies. The Commission will drop a condemnation suit to acquire the island, but still plans to push another suit involving Club-owned land on the Maryland shore.

WBFC DEIS Comments and Testimony, November 2020

Appendix 4. Potomac Basin Reporter - 1973 Beetles and Bees & Type locality

## Plummers Island: Unknown, But Famous in Its Way

Plummers Island, a tiny, rocky 12 acres jutting out of the Potomac River above Washington, D.C., is unknown to the general public. Among biologists, however, this spot downstream from Cabin John is one of the world's most famous spots for studying plants and animals. On any given day, a scientist probably could discover a new insect species on the island.

Discovering new species or a preponderance of old ones has been the particular concern of members of the Washington Field Biologists Club, a professional organization of limited membership, since the turn of the Century. The Club acquired the Island in 1901 and later gave it to the National Park Service with the stipulation that members could continue research on flora and fauna. Inaccessibility and a heavy insect population at certain times of the year have made the Island undesirable to visitors — and thus preserved it, somewhat.

Members of the Club have listed more than 1,226 species of plants and 4,293 species of animals on the Island (everything from a dog to a jumping mouse or a rare bird; 1500 species of beetles alone live on Plummers, along with 300 to 400 species of bees). It is the "type-locality" for at least 175 species, meaning it is associated with the discovery of new species. No less than 16 genera and three families of plants and animals have been described on the basis of specimens collected on the Island.

Because these scientists have had unique access to specimens collected over three-quarters of a century, many comparative studies were possible. One recent study of lichens suggests that metropolitan Washington air pollution is weakening the relative immunity of certain kinds of lichen to insects, causing them to disappear.

Important news about measuring environmental changes from these and other biological indicators will be forthcoming from the Biologists Club.

JA1618

## WBFC DES Comments and Testimony, November 2020

### Appendix 5. Rare Plants of Plummers Island (Excerpt).

A total of 4 globally rare natural communities, two of which are state rare; 24 state-rare extant flora, including one globally rare extant species; and 36 state-rare historic flora, including 4 globally rare historic taxa are known from the island.

#### Rare Flora and Natural Communities

Rare Natural Communities (in order of lowest to highest in elevation)

Piedmont / Central Appalachian Sand Bar / River Shore (Low Herb Type): *Eragrostis hypnoides – Lindernia dubia – Leersia oryzoides – Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global State Rank: G3/S3R.

Piedmont / Acidic Outcrop Barren (Potomac Gorge Type): *(Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium – Solidago racemosa – Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL004491). Global State Rank: G2/S1.

Mid-Atlantic High Terrace Hardwood Floodplain Forest: *Acer saccharum – Fraxinus americana / Carpinus caroliniana / Podophyllum peltatum* Forest (USNVC: CEGL004699). Global State Rank: G3?/S3?R.

Potomac River Bedrock Terrace Hardpan Forest: *Carya glabra – Quercus (rubra, montana) – Fraxinus americana / Viburnum prunifolium / Piptochaetium avenaceum* Forest (USNVC: CEGL006209). Global State Rank: G1/G2/S1.

#### Rare Flora

Extant Flora

White Bear Sedge (*Carex albursina*) (S3/S3) (last observed in 2004; observed by Steury in 2020)
Paleocarse Sedge (*Carex festucacea*) (S3/S3) (last observed in 1934)
Flat-edged Sedge (*Carex planispicata*) (G4Q/S3S2) (*H.H. Simmons* 3325, 4 May 2013)
Northern Leatherflower (*Clematis viorna*) (S3/S3) (last observed in 1982)
Needle-leaf Panic Grass (*Dichanthelium aciculare*) (S3/S3S2) (*B.L. Steury* 3296b, 25 May 2013)
Open-flower Panic Grass (*Dichanthelium lanuflorum*) (S3/S3) (last observed in 1960; photographed by Simmons in 2015)
Leatherwood (*Dirca palustris*) (S4/S3) (*B.L. Simmons* 4937, 6 Nov 2015)
Harbinger of Spring (*Erigenia bulbosa*) (S3/S3) (last observed in 1983; observed by Steury in 2020)
Halberd-leaf Rose-mallow (*Hibiscus laevis*) (S3/S3) (last observed in 1982; photographed by Steury in 2020)

Green Violet (*Hybanthus concolor*) (S3/S3) (last observed in 1960)
Ostrich Fern (*Matteuccia struthiopteris*) (G5/S2S3) (One of the largest known stands in the state: *H.H. Simmons* 3332, 5 May 2013)
Two-flower Melic (*Melica mutica*) (S3/S3) (last observed in 2015; *B.L. Steury* 8340)
Hoary-leaf Poppplum (*Phacelia covillei*) (G3/S2) (*H.H. Simmons* 3920, 14 May 2013)
Coville's Phacelia (*Phacelia covillei*) (G3/S2) (*E.H. Simmons* 3970, 14 May 2013)
Mistletoe (*Phoradendron leucarpum*) (S3/S3) (last observed in 1983; observed by Steury on mossy rocks by plot 21 between 2013 and 2015)
Hairy Hop-tree (*Ptelea trifoliata* var. *mollis*) (S3/S3) (*E.H. Simmons* 3385, 2 Jun 2013)
Smooth Wild-petunia (*Ruellia strepens*) (G4/S3S2S) (*B.L. Steury* 4221, 9 Oct 2016)
Pale Dock (*Rumex altissimus*) (S3/S1E) (last observed in 1997)
Sticky Goldenseal (*Solidago racemosa*) (G5T3/S3T) (photographed by Steury in 2020)
Pale St. Johns-wort (*Triadenum virginicum*) (last observed in 1982)
Golden-chinwheat (*Zizia aurea*) (S3/S3) (*B.L. Steury* 5836, 29 Apr 2017)

## WBFC DES Comments and Testimony, November 2020

Historic Flora

Ear-leaf False Foxglove (*Agalinis auriculata*) (G3/S1E) (last observed in 1936)
Canada Milkvetch (*Astragalus canadensis* var. *canadensis*) (G5/S1E) (last observed in 1940)
Blue Wild Indigo (*Baptisia australis* var. *australis*) (G3/S3S2T) (last seen in 1935 by Killip & Blake)
Short's Rock Cress (*Boechera dentata*) (S3/S3) (last observed in 1916)
Nodding Wild Onion, Bronze Grass (*Bromus nottowayanus*) (G4G5/S3S3) (last observed in 1947)
Hitchcock's Sedge (*Carex hitchcockiana*) (G5/S1E) (last observed in 1933)
Short's Sedge (*Carex shortiana*) (G5/S3S4 E) (last observed in 1920)
Bur-reed Sedge (*Carex sparganioides*) (G5/S3) (last observed in 1933)
Slender Dayflower (*Commelina erecta*) (G5/S3) (last observed in 1960)
Spring Coralroot (*Corallorhiza wisteriana*) (G5/S1 E) (last observed in 1915)
Smartweed Dodder (*Cuscuta polygonorum*) (G5/S1 E) (last observed in 1961)
Many-flowered Flatsedge (*Cyperus lancastriensis*) (G5/S2S3) (last observed in 1997)
Redroot Flatsedge (*Cyperus erythrorhizos*) (G5/S2T) (last observed in 1960)
Dwarf Larkspur (*Delphinium tricorne*) (G5/S3) (last seen in 1935 by Killip & Blake)
Toothed Tick-trefoil (*Desmodium cuspidatum*) (G5/S3) (last observed in 1960)
White-tinted Lily (*Erythronium albidum*) (G5/S2 T) (last observed in 1983)
Downy Milkpea (*Galactia volubilis*) (G5/S3) (last observed in 1961)
Striped Gentian (*Gentiana villosa*) (G4/S1 E) (last observed in 1903)
Western Sunflower (*Helianthus occidentalis*) (G5/S3 T) (last observed in 1940)
Eastern Bluetlad (*Iresine rhizomatous*) (G5/S1 E) (last observed in 1915)
Violet Bush-clover (*Lespedeza frutescens*) (G5/S3) (last observed in 1960)
Bog Twayblade (*Liparis loeselii*) (G5/S1S2) (last observed in 1917)
Climbing Milkvine (*Matelea obliqua*) (G4T3/S3S2 E) (last observed in 1915)
Purple Meadowrue (*Thalictrum dasycarpum* var. *dasycarpum*) (G5/S3S2 E) (last observed in 1939)
Basal Beebalm (*Monarda clinopodia*) (G5/S3S4) (last observed in 1982)
Early Pennywort (*Obolaria virginica*) (G5/S3) (last observed in 1962)
Racemed Milkwort (*Polygala polygama*) (G5/S1 T) (last observed in 1950)
Small Pondweed (*Potamogeton pusillus* ssp. *pusillus*) (G5/S2S4) (last observed in 1930)
Whorled Mountain-mint (*Pycnanthemum verticillatum*) (G5/S1 E) (last observed in 1951)
Virginia Snail (*Sisyrinchium mucronatum*) (G5/S1 E) (last observed in 1950)
Brown-eyed Susan (*Rudbeckia triloba*) (G5/S3) (last observed in 1940)
Canada Burnet (*Sanguisorba canadensis*) (G5/S1S2 E) (last observed in 1930)
Carolina Willow (*Salix caroliniana*) (G5/S3) (last observed in 1982)
Snowy Campion (*Silene nivea*) (G4T4/S1 E) (last observed in 1917)
River-bank Wild Rye (*Elymus riparius*) (G4?/S3) (last observed in 1903)
Sand Grape (*Vitis rupestris*) (G3/S3) (last observed in 1906)

†[*= *Lespedeza violacea* (L.) Pers. (misapplied); "Due to a problem with the type specimen of *Lespedeza intermedia*, the name *Lespedeza violacea*, by which this species has long been known, applies to *L. intermedia*, and the name *L. frutescens* now applies to [*Lespedeza violacea*]" (VBA 2020)]

Key to Global Rank
G1: Very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
G2: At high risk of extinction due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors.
G3: At moderate risk of extinction due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
G4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
G5: Common, widespread, and abundant.



00022594

JA1619

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 50 of 340

OP◆LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

00022595

CO-385



35 | Page

## WBFC DES Comments and Testimony, November 2020

GH: Known only from historical occurrences but still some hope of rediscovery.
GNR: Not ranked.
GX: Not located despite intensive searches and virtually no likelihood of rediscovery.

**Key to State Rank**
S1: A very high risk of extirpation from the state due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
S2: At high risk of extirpation from the state due to very restricted range, few populations (often 20 or fewer), steep declines, or other factors.
S3: At moderate risk of extirpation from the state due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
S4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
S5: Common, widespread, and abundant.
SH: Known only from historical occurrences but still some hope of rediscovery.
SNR: Not ranked.
SX: Not located despite intensive searches and virtually no likelihood of rediscovery.

**Federal and State Status**
Legal status denotes a simple hierarchy of endangerment in these categories: Endangered (E), Threatened (T), and Endangered Extirpated (X). Federal Status is determined by the U.S. Fish and Wildlife Service.

*Federal Status*
LE = Listed Endangered – A taxon is threatened with extinction throughout all or a significant portion of its range.
LT = Listed Threatened – A taxon is likely to become endangered in the foreseeable future.
*State Status*
E = Endangered – A taxon is threatened with extinction throughout all or a significant portion of its range.
T = Threatened – A taxon is likely to become endangered in the foreseeable future.

### References

Fleming, A.H. 2015. Geologic-Geomorphic Map of Plummers Island. Unpublished report. (https://wbfc.science/wp-content/uploads/2019/09/geologic_map_plummers_island.pdf)

Harrison, J.W. 2016. The Natural Communities of Maryland: 2016 Natural Community Classification Framework. Maryland Department of Natural Resources, Wildlife and Heritage Service, Natural Heritage Program, Annapolis, Maryland. Unpublished report. 35 pages.

Maryland Natural Heritage Program. 2019. List of Rare, Threatened, and Endangered Plants of Maryland. Maryland Department of Natural Resources. 580 Taylor Avenue, Annapolis, MD 21401. DNR 03-033319-135

Shetler, S.G., S.S. Orli, E.F. Wells, and M. Beyersdorfer. 2006. Checklist of the Vascular Plants of Plummers Island, Montgomery County, Maryland. Bulletin of the Biological Society of Washington 14:1-57. https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H. 2015. Native Vascular Flora of the City of Alexandria, Virginia. City of Alexandria Department Recreation, Parks, and Cultural Activities. Alexandria, Virginia.

Simmons, R.H., A.H. Fleming, and R.J. Soreng. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished report. https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v12.pdf

Virginia Botanical Associates. 2020. Digital Atlas of the Virginia Flora (http://www.vaplantatlas.org, 23 July 2020). Virginia Botanical Associates, Blacksburg, Virginia.

34 | Page

JA1620



WBFC DEIS Comments and Testimony, November 2020

XII. A biological note on Trypoxylon richardsi Sandhouse, by Karl V. Krombein. Vol. 72, pp. 101-102. July 24, 1959.

XIII. Descriptions of new wasps from Plummers Island, Maryland (Hymenoptera: Aculeata), by Karl V. Krombein. Vol. 78, pp. 1-17. March 30, 1962.

XIV. Biological notes and description of the larva and pupa of Cephenus glyphicus (Say) (Coleoptera: Dytiscidae), by Paul J. Spangler. Vol. 75, pp. 19-23. March 30, 1962.

XV. Descriptions of the stages of Chaetodactylus krombeini, new species, a mite associated with the bee, Osmia lignaria Say (Acarina: Chaetodactylidae), by Edward W. Baker. Vol. 75, pp. 227-236. August 28, 1962.

XVI. Biological notes on Chaetodactylus krombeini Baker, a parasitic mite of the megachild bee, Osmia (Osmia) lignaria Say (Acarina: Chaetodactylidae), by Karl V. Krombein. Vol. 75, pp. 237-249. August 28, 1962.

XVII. Annotated list of the wasps, by Karl V. Krombein. Vol. 76, pp. 255-280. December 31, 1963.

XVIII. The hibiscus wasp, an abundant rarity, and its associates (Hymenoptera: Sphecidae), by Karl V. Krombein. Vol. 77, pp. 73-112. June 26, 1964.

XIX. Annotated list of the aphids (Homoptera: Aphididae), by Mortimer D. Leonard. Vol. 79, pp. 117-126. May 23, 1966.

XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. January 1968.

XXI. Infestation of the lichen Parmelia baltimorensis Gyel. & For. by Hypogastrura packardi Folsom (Collembola), by Mason E. Hale, Jr. Vol. 85, pp. 287-296. August 30, 1972.

XXII. Biting midges (Diptera: Ceratopogonidae). 1: Introduction and key to genera, by Willis W. Wirth, Nipham C. Ratanaworabhan, and Donald H. Messersmith. Vol. 90, pp. 615-647. October 17, 1977.

---

WBFC DEIS Comments and Testimony, November 2020

Appendix 7. Titles in the Proceedings of the Biological Society of Washington series Natural History of Plummers Island, Maryland, and other key publications.

The series "Natural History of Plummers Island, Maryland" was published in the Proceedings of the Biological Society of Washington as listed below, except for XX, XXV, and XXVI, which were published elsewhere:

I. Introduction, by William R. Maxon. Vol. 48, p. 115-117. August 22, 1935.

II. Flowering plants and ferns, by Ellsworth P. Killip and Sidney F. Blake. Vol. 48, pp. 118-134. August 22, 1935.

III. Mosses, by Emery C. Leonard. Vol. 48, pp. 135-137. August 22, 1935.

IV. Birds, by Albert K. Fisher, Vol. 48, pp. 159-167, November 15, 1935.

V. Fungi, by John A. Stevenson and Edna M. Ermold. Vol. 49, pp. 123-131. August 22, 1936.

VI. Reptiles and amphibians, by Maurice K. Brady. Vol. 50, pp. 137-139. September 10, 1937.

VII. Hepaticae, by Emery C. Leonard and M. E. Pierce. Vol. 52, pp. 21-22. March 11, 1939.

VIII. Lichens, by Emery C. Leonard and Ellsworth P. Killip. Vol. 52, pp. 23-26. March 11, 1939.

IX. Mammals, by Edward A. Goldman and Hartley H. T. Jackson. Vol. 52, pp. 131-134. October 11, 1939.

X. Flowering plants and ferns–Supplement 1, by Ellsworth P. Killip and Sidney F. Blake. Vol. 66, pp. 31-38. March 30, 1953.

XI. Blue-green algae (Myxophyceae), by Francis Drouet. Vol. 67, pp. 239-241. November 15, 1954.



WBFC DES Comments and Testimony, November 2020

XXIII. Studies on lichen growth rate at Plummers Island, Maryland, by James D. Lawrey and Mason E. Hale, Jr. Vol. 90, pp. 698-725. October 17, 1977.

XXIV. Biting midges (Diptera: Ceratopogonidae) 2: the species of the tribes Heteromyiini and Sphaeromiini, by Willis W. Wirth and William L. Grogan, Jr. Vol. 91, pp. 847-903. February 23, 1979.

XXV. Biting midges (Diptera: Ceratopogonidae), 3: the species of the tribe Stilobezziini, by Willis W. Wirth and William L. Grogan, Jr. *Bulletin of the Biological Society of Washington* No. 5, pp. 1-102. December 9, 1981.

XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): An analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction, by Terry L. Erwin. *Bulletin of the Biological Society of Washington* No. 5, pp. 104-224. December 9, 1981.

XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. *Proceedings of the Biological Society of Washington* 100:762-768. December 31, 1987.

XXVIII. [XXVIII]. Current diversity, historical analysis, and biotic integrity of fishes in the lower Potomac basin in the vicinity of Plummers Island, Maryland, by Wayne C. Starnes. *Proceedings of the Biological Society of Washington* 115(2):273-320, 2002.

XXIX. Checklist of the vascular plants of Plummers Island, Maryland, by Stanwyn G. Shetler, Sylvia S. Orli, Elizabeth F. Wells, and Marcie Beyersdorfer. *Bulletin of the Biological Society of Washington* 14: 1-58. Jan 2006).

SELECTED OTHER PUBLICATIONS COVERING PLUMMERS ISLAND

Among other publications dealing at least in part with Plummers Island or the Washington Biologists' Field Club are the following:

Adamski, D. and Ronald W. Hodges. 1996. An annotated list of North American Blastobasinae (Lepidoptera: Gelechioidea: Coleophoridae), *Proceedings of the Entomological Society of Washington* 98: 708-740.

WBFC DES Comments and Testimony, November 2020

Allan, Philip. 1952. Croupedacusta sowerbii in Maryland. *Proceedings Biological Society of Washington* 65:109110.

Bailey, Vernon. 1923. Mammals of the District of Columbia. *Proceedings Biological Society of Washington* 36:103-138.

Baker, Edward, W. 1964. Villa coeremani, a new species of Saprogilyphidae from a crabronine wasp (Acarina). *Entomology News* 75:43-46.

Banks, N., C. T. Greene, Waldo L. McAtee and Raymond C. Shannon. 1916. District of Columbia Diptera: Syrphidae. *Proceedings of the Biological Society of Washington* 29: 173-294.

Barber, Herbert S. 1951. North American fireflies of the genus Photuris. *Smithsonian Miscellaneous Collections* 117(1). vi + 58 pp.

Barrows, Edward M., Aaron F Howard, Brent W. Steury. 2012. Fruit Production and Phenology of Phocelis cevilli (S. Watson (Hyrophyll aceeae) in the Potomac Gorge Area of Maryland and Virginia. *Marilandica* Spring: 1-16.

Barrows, Edward M. 2013. Habitat abundances of a cricket-parasitizing wasp Rhopalosoma nearcticum (Hymenoptera Rhopalosomatidae) in a United States mid-Atlantic park. *Open Journal of Animal Sciences.* 3(4): 311-315.

Brown, John W. 2001. Species turnover in the leafrollers (Lepidoptera: Tortricidae) of Plummers Island, Maryland: Assessing a century of inventory data. *Proceedings of the Entomological Society of Washington* 103: 673-685.

Brown, John W. 2005. Long-term data show declines in insect composition on Plummers Island, Chesapeake and Ohio Canal National Historic Park. *Natural Resource Year In Review-2004:* 69.

Brown, K. M., G. A. Baltazar, B. N. Weinstein, and M. B. Hamilton. 2003. Isolation and characterization of nuclear microsatellite loci in the anadromous marine fish Morone saxatilis (striped bass). *Molecular Ecology Notes* 3: 414-416.

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 53 of 340

WBFC DEIS Comments and Testimony, November 2020

Brown, K. M., G.A. Baltazar, M. B. Hamilton. 2005. Reconciling nuclear microsatellite and mitochondrial marker estimates of population structure: breeding population structure of Chesapeake Bay striped bass (*Morone saxatilis*). *Heredity* 94:606-615.

Busck, August 1906. Notes on some tortricid genera with descriptions of new American species. *Proceedings of the Biological Society of Washington* 19: 173–182.

Busck, August 1906. New American Tineina. *Canadian Entomologist* 38: 121–125.

Busck, August 1907. A review of the tortricid subfamily Phaloniinae with descriptions of new American species. *Journal of the New York Entomological Society* 15: 19–36.

Busck, August 1907. New genera and species of American Microlepidoptera. *Journal of the New York Entomological Society* 15: 134–140.

Busck, August 1908. A generic revision of American moths of the family Oecophoridae with descriptions of new species. *Proceedings of the United States National Museum* 35 (1644): 187– 207.

Busck, August 1909. Notes on Microlepidoptera, with descriptions of new North American species. *Proceedings of the Entomological Society of Washington* 11: 87–103.

Busck, August and C. Heinrich. 1922. Life history of Ethmia macelhosiella Busck. *Proceedings of the Entomological Society of Washington* 24: 1–9.

Butte, Jamarthun G. 1968. Revision of the tribe Chalepini of Mexico north of Mexico (Coleoptera: Chrysomelidae). I. Genus Xenochalepus Weise. *Coleopterist Bulletin* 22(2): 45-62.

Butte, Jamarthun G. 1968. II. Genus Chalepus Thunberg. *Journal New York Entomology Society* 76: 117- 133.

Butte, Jamarthun G. 1968. III. Genus Odontota Chevrolat. *Coleopterist Bulletin* 22(4):101-124.

Christmas, June II. 1960. New span to unmask island jungle. *Washington evening Star*, p. B-3. (July 5).

40 | P a g e


WBFC DEIS Comments and Testimony, November 2020

Clarke, John F. G. 1941. Revision of the North American moths of the family Oecophoridae, with descriptions of new genera and species. *Proceedings of the United States National Museum* 90: 33– 286.

Cole, F. R., A. E. Malloch and Waldo L. McAtee. 1924. District of Columbia Diptera: Trunoptera (Cyrtidae, Bombyliidae, Theretidae, Stenopidae). *Proceedings of the Entomological Society of Washington* 26: 181–195.

Cooke, May T. 1929. Birds of the Washington, D.C. region. *Proceedings of the Biological Society of Washington* 42:1-80.

Crawford, James C. 1909. A new family of parasitic Hymenoptera. *Proceedings of the Entomological Society of Washington* 11:63-64.

Davis, Donald R. 1990. Superfamily Tineiodea, pp. 50–55. In: Miller, Scott E. and Ronald W. Hodges (eds.), Primary types of microlepidoptera in the Museum of Comparative Zoology (with a discussion on V. T. Chambers' work). *Bulletin of the Museum of Comparative Zoology* 152.

Donnelly, Thomas W. 1961. The Odonata of Washington, D.C., and vicinity. *Proceedings of the Entomological Society of Washington* 63:1-13.

Eldridge, Mark, Jr. 1951. Biologists devote half century to lab on Potomac island. *Washington Post*, p. A- 1. (August 20).

Fischer, Max. 1967. Die neurfischen Arten der Gattung Synaldis (Hymenoptera, Braconidae). *Polskie Pismo Entomologiczne* 37:464-467.

Fisher, James. 1955. Excerpt from "City in the Woods" [account of 1953 shad bake], pp. 51-52 in Wild America: the record of a 30,000 mile journey around the continent by a distinguished naturalist and his British colleague by Roger Tory Peterson and James Fisher. Boston: Houghton Mifflin. 434 pp.

Fleming, Peggy, and Barbee Kunal. 1992. Newly documented species of vascular plants in the District of Columbia. *Castanea* 57:132-146.

41 | P a g e

00022598

WBFC DES Comments and Testimony, November 2020

Frye, C. T., and C. Lea. Atlas and Annotated List of Caves (Cyperaceae) of Maryland and the District of Columbia. *Maryland Naturalist* 44(2):41-108.

Gardner, Marshal C. 1950. A list of Maryland mammals: Part I, marsupials and insectivores: Part II, bats. *Proceedings of the Biological Society of Washington* 63:65-68, 111-114.

Gardner, Marshall C 1950. A list of Maryland mammals. Part II, bats. *Proceedings of the Biological Society of Washington* 63: 111-114.

Hale, Mason E., Jr. 1970. Single-lobe growth patterns in the lichen Parmelia cuperata. *Bryologia* 73: 72-81.

Hale, Mason E., Jr. and James D. Lawrey. 1985. Annual rate of lead accumulation in the lichen Pseudoparmelia baltimorensis. *Bryologia* 88:5-7.

Hart, C. W., Jr. 1964. Two new entocytherid ostracods from the vicinity of Washington, D.C. *Proceedings of the Biological Society of Washington* 77:243-246.

Heinrich, C. 1923. Revision of the North American moths of the subfamily Eucosminae of the family Olethreutidae. *United States National Museum Bulletin* 123, 298 pp.

Heinrich, C. 1926. Revision of the North American moths of the subfamilies Laspeyresiinae and Olethreutinae. *United States National Museum Bulletin* 132, 216 pp.

Hodges, Ronald W. 1962a. The genus Periaudee Chambers in North America. *Proceedings of the Entomological Society of Washington* 64: 145-154.

Hodges, Ronald W. 1962b. A review of the genus Periploca with descriptions of nine new species. *Pan-Pacific Entomologist* 38: 83-97.

Hodges, Ronald W. 1964. A review of the North American moths of the family Walshiidae. *Proceedings of the United States National Museum* 115: 289-330.

WBFC DES Comments and Testimony, November 2020

Hodges, Ronald W. 1969. Nearctic Walshiidae-notes and new taxa (Lepidoptera: Gelechioidea). *Smithsonian Contributions to Zoology* 98:1-30.

Hoffman, R. L., S. M. Roble and W. E. Steiner, Jr. 2002. Thirteen additions to the known beetle fauna of Virginia (Coleoptera: Scirtidae, Bothrideridae, Cleridae, Tenebrionidae, Melyridae, Callirhipidae, Cerambycidae, Chrysomelidae). *Banisteria* 20: 53-61.

Hood, J. Douglas. 1917. An annotated list of the Thysanoptera of Plummer's Island, Maryland. *Insector Inscitiae Menstruus* 5:53-65.

Jeannel, R. 1963. Supplément a la monographie des Anillini: sur quelques especes nouvelles de l'Amerique du Nord. *Revue Francaise d'Entomologie* 30:145-152.

Kalmbach, E. R. 1968. An ornithological treasure awaits resurrection. *Auk* 85:703-706. [McAtee MS on bird names.]

Karren, Jay. 1966. A revision of the genus Exema of America north of Mexico (Chrysomelidae, Coleoptera). *University of Kansas Science Bulletin* 46: 647-695.

Killip, Ellsworth P. 1931. Plants recently discovered on Plummers Island as a result of low-water conditions. *Proceedings of the Biological Society of Washington* 44:111-115.

Knab, F., and Raymond C. Shannon. 1916. Taxypedidae in the United States. *Insector Inscitiae Menstruus* 4:33-36.

Krombein, Karl V. 1963. Notes on the Entomognathus of eastern United States. *Proceedings of the Biological Society of Washington* 76:247-254.

Krombein, Karl V. 1963. A new Chrysura from Plummers Island, Maryland. *Entomology News* 74:149-152.

Krombein, Karl V. 1963. The first parasite relationship of Xylocola virginiana Rohwer and Omalus intermedius (Aaron). *Proceedings of the Entomological Society of Washington* 65: 264.

WBFC DEIS Comments and Testimony, November 2020

Kremblin, Karl V. 1964. Miscellaneous prey records of solitary wasps. V. (Hymenoptera: Aculeata). *Bulletin of the Brooklyn Entomological Society* 58:118-120.

Kremblin, Karl V. 1967. *Trap-nesting wasps and bees: life histories, nests, and associates.* Smithsonian Publication 4676, Smithsonian Press, Washington, D.C. vi+570 pp.

Lawrey, James D., and Mason E. Hale, Jr. 1981. Retrospective study of lichen lead accumulation in the northeastern United States. *Bryologist* 84:449-456.

Lawrey, James D., and Mason E. Hale, Jr. 1991. The species-area curve as an index of disturbance in saxicolous lichen communities. *Bryologist* 94:377382.

Lawrey, James D. 1992. Natural and randomly assembled lichen communities compared using the species area curve. *Bryologist* 95(2):137-141.

Lawrey, James D., and Mason E. Hale, Jr. 1979. Lichen growth responses to stress induced by automobile exhaust pollution. *Science* 204:423-424.

Leo, C., and C. T. Frye. 2002. Carex (Cyperaceae) in the Potomac River Gorge of Maryland, Virginia, and the District of Columbia. *Bartonia* No. 61: 93-116.

Leonard, Mortimer D. 1968. Further records of aphids from Plummers Island, Md. (Homoptera: Aphididae). *Proceedings of the Entomological Society of Washington* 70: 84.

Long, E. John. 1957. A haven for the biologist is Plummers Island. *Nature Magazine* 50: 465-468.

Long, E. John. 1966. The Island. *American Forests* 72: 22-24, 59-61.

Malloch, J. R., and Waldo L. McAtee. 1924. Flies of the family Drosophilidae of the District of Columbia region. *Proceedings of the Biological Society of Washington* 37: 25-42.

Malloch, J. R., C. T. Greene, and Waldo L. McAtee. 1931. District of Columbia Diptera: Rhagionidae. *Proceedings of the Entomological Society of Washington* 33: 213-220.

WBFC DEIS Comments and Testimony, November 2020

Manville, Richard H. 1972. A "sister" organization. *Cosmos Club Bulletin* 25(5):7-10.

Margolis, B. E., M. S. Castro, and R. L. Raesly. 2001. The impact of beaver impoundments on the water chemistry of two Appalachian streams. *Canadian Journal of Fisheries and Aquatic Sciences* 58: 2271-2283.

Margolis, B. E., R. L. Raesly, and D. L. Shumway. 2001. The effects of beaver-created wetlands on the benthic macroinvertebrate assemblages of two Appalachian streams. *Wetlands* 21(4):554-563.

McAtee, Waldo L. 1908. Notes on an orthopterous leaf roller. *Entomological News* 19:488-491.

McAtee, Waldo L. 1918. A sketch of the natural history of the District of Columbia. *Bulletin of the Biological Society of Washington* 1:1-142.

McAtee, Waldo L., and Alfred C. Weed. 1915. First list of the fishes of the vicinity of Plummers Island, Maryland. *Proceedings of the Biological Society of Washington* 28:1-14.

McAtee, Waldo L. 1920. Cercopidae of the vicinity of Washington, D.C., with the description of new varieties of Clastoptera (Homoptera). *Proceedings of the Biological Society of Washington* 33: 171-176.

McAtee, Waldo L. 1921. Membracidae of the vicinity of Washington, D.C. *Proceedings of the Biological Society of Washington* 34: 123-134.

McAtee, Waldo L. 1927. Cicadidae of the vicinity of Washington, D.C. *Proceedings of the Entomological Society of Washington* 29: 70-72.

McAtee, Waldo L. and N. Banks. 1920. District of Columbia Diptera: Asilidae. *Proceedings of the Entomological Society of Washington* 22: 13-33.

McAtee, Waldo L. and A. N. Caudell. 1917. First list of the Dermaptera and Orthoptera of Plummer's Island, Maryland, and vicinity. *Proceedings of the Entomological Society of Washington* 19: 100-122.

I-495 & I-270 Managed Lanes Study

WBFC DES Comments and Testimony, November 2020

McAtee, Waldo L. and W. R. Walton.1918. District of Columbia Diptera: Tabanidae. *Proceedings of the Entomological Society of Washington* 20: 188–206.

McComb, Charles W. 1963. A checklist and host index of the Diaspididae of Maryland and the District of Columbia. *University of Maryland Entomology Leaflet* 50. 38 pp., mimeo.

McComb, Charles W. 1967. A revision of the Cholomus subgenus Microcholomus in North America north of Mexico (Hymenoptera: Braconidae). *University of Maryland, Agricultural Experiment Station Bulletin* A-149. 148 pp.

McComb, Charles W. and R. A. Brum. 1963. A checklist and host index of the tetranychoid mites of Maryland and nearby areas. *University of Maryland Entomology Leaflet* 49. 20 pp., mimeo.

Miller, D. C. 1974. Revision of the New World Chaetarthria (Coleoptera: Hydrophilidae). *Entomologica Americana* 49:1-123.

Miller, S. E. and Ronald W. Hodges. 1990. Primary types of microlepidoptera in the Museum of Comparative Zoology (with a discussion on V. T. Chambers' work). *Bulletin of the Museum of Comparative Zoology* 152: 45-87.

Muesebeck, Carl F. W. 1963. A platygasterid parasite of certain wasp larvae. *Beitrage zur Entomologie* 13: 391-394.

Orr, R. L. 1994. Baseline survey of Odonata (dragonflies and damselflies) of the C&O Canal National Historical Park (Potomac River Corridor). Unpublished report to C&O National Historical Park. 16 October 1994.

Orr, R. L. 1995. Odonata of Plummers Island. *Argia* 7: 6-8.

Paradiso, John L. 1969. Mammals of Maryland. *North American Fauna* 66. iv + 193 pp.

Peck, S. B. 1982. A review of the ectoparasitic beetles of North America (Coleoptera: Leptinidae). *Canadian Journal of Zoology* 60: 1517-1527.

46 | Page

WBFC DES Comments and Testimony, November 2020

Perkins, P. D. 1981 (1980). Aquatic beetles of the family Hydraenidae in the Western Hemisphere: Classification, biogeography and inferred phylogeny (Insecta: Coleoptera). *Quaestiones Entomologicae* 16(1/2): 15-54.

Ribble, D. W. 1968. Revision of two subgenera of Andrena: Micrandrena Ashmead and Derandrena, new subgenus (Hymenoptera: Apoidea). *Bulletin of the Nebraska State Museum* 8: 237–394.

Robbins, C. A., and Sidney F. Blake. 1931. Cladonia in the District of Columbia and vicinity. *Rhodora* 33: 145-159.

Robinson, Harold. 1967. New species of Dolichopodidae from the United States and Mexico (Diptera). *Proceedings of the Entomological Society of Washington* 69: 114-127.

Sherwood, John. 1977. The curious world called Winnemana. *Washington Star* (May 8).

Smetana, A. 1974. Revision of the genus Cymbiodyta Bed. (Coleoptera: Hydrophilidae). *Memoir of the Entomological Society of Canada* 93. iv + 113 pp.

Smetana, A. 1978. Revision of the subfamily Sphaeridiinae of America north of Mexico (Coleoptera: Hydrophilidae). *Memoirs of the Entomological Society of Canada* 105. 292 pp.

Smetana, A. 1980. Revision of the genus Hydrochara Berth. (Coleoptera: Hydrophilidae). *Memoirs of the Entomological Society of Canada* 111. 100 pp.

Smetana, A. 1985. Revision of the Subfamily Helophorinae of the Nearctic Region (Coleoptera: Hydrophilidae). *Memoirs of the Entomological Society of Canada* 131. 154 pp.

Smith, D. R. 1969. Nearctic sawflies I. Blennocampinae: Adults and larvae (Hymenoptera: Tenthredinidae). *United States Department of Agriculture Technical Bulletin* No. 1397. 179 pp. + 19 pls.

Solis, M. A. 2008. Pyraloidea and their known hosts (Lepidoptera: Insecta) from Plummers Island. *Bulletin of the Biological Society of Washington* 15(1): 88-106.

47 | Page

WBFC DEIS Comments and Testimony, November 2020

Sommer, Stefan Andreas 1986. The pollination ecology and breeding system of Hamamelis virginiana L. (Hamamelidaceae). M.S. Thesis, University of Maryland, College Park, MD. 48, 83 leaves.

Staines, C. L. 2004. Changes in the chrysomelid (Coleoptera) community over a 95-year period on a Maryland river island (USA), pp. 413–422. In Jolivet, P., J. A. Santiago-Blay & M. Schmitt (eds.), New developments in the biology of Chrysomelidae. Academic Publishing, The Hague.

Staines, C.L. and S. L. Staines. 1999. Observations on Euphoria inda (L.) (Insecta: Coleoptera: Scarabaeidae). The Maryland Naturalist 43: 31–33.

Staines, C. L., and S. L. Staines. 1998. The leaf beetles (Insecta: Coleoptera: Chrysomelidae): potential indicator species assemblages for natural area monitoring, pp. 233–244. In: Therres, G. D. (ed.), Conservation of biological diversity: A key to the restoration of the Chesapeake Bay Ecosystem and beyond. Maryland Department of Natural Resources, Annapolis, Maryland.

Steiner, W. E., Jr. 2000. Records and habitat of the "rare-click beetle," Cerophytum pulsator (Haldeman), in Virginia and Maryland (Coleoptera: Ceryphytidae). Banisteria 15: 43–45.

Steiner, W. E., Jr. 2008. A Checklist of the Darkling Beetles (Insecta: Coleoptera: Tenebrionidae) of Maryland, with Notes on the Species Recorded from Plummers Island Through the 20th Century. Bulletin of the Biological Society of Washington 15: 233–140.

Stewart, Robert E., and Chandler S. Robbins. 1958. Birds of Maryland and the District of Columbia. United States Department of Interior, North American Fauna 62. 401 pp.

Steyskal, G. C. 1963. A second North American species of Traglops Coquillett. Proceedings of the Entomological Society of Washington 65: 51–54.

Stork, N. E. 1984. Additions to the list of Carabidae (Coleoptera) in the fauna of Plummers Island, Maryland. Coleopterists' Bulletin 28: 137–141.

Tauber, C. A. 1969. Taxonomy and biology of the lacewing genus Meleoma. University of California Publications in Entomology 58. 94 pp.

WBFC DEIS Comments and Testimony, November 2020

Viereck, Henry L. 1912. Descriptions of one new family, eight new genera, and thirty-three new species of ichneumon-flies. Proceedings of the U.S. National Museum 43: 575–593.

Zimmerman, J. 1970. A taxonomic revision of the aquatic beetle genus Laccophilus (Dytiscidae) of North America. Memoirs of the American Entomological Society 26. 275 pp.

OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

SIERRA CLUB MARYLAND CHAPTER (FULL SUBMITTAL)

Sierra Club Maryland Chapter

Please find the attached comments on the I-495 and I-270 Managed Lanes Study: Draft
Environmental Impact Statement Draft Section 4(f) Evaluation and Joint Federal/State Application
(JPA) for your review and consideration (US ACE Application Number (NAB-2018-0152) and the
MDE Tracking Numbers 20-NT-0114 / 202060649). Also attached is a list of attachments to the
comments (the actual files will be sent separately) for your review and consideration. Please
confirm receipt. The comments are submitted on behalf of the following Organizations:

Sierra Club Maryland Chapter
350 Montgomery County, MD
Audubon Naturalist Society
Baltimore 350
Baltimore Transit Equity Coalition
Bikemore
Breathe Free Montgomery
Cedar Lane Unitarian Universalist Church Environmental Justice Ministry
Central Maryland Transportation Alliance
Chesapeake Bay Foundation
Citizens Against Beltway Expansion
Coalition for Smarter Growth
DontWiden270.org
DoTheMostGood Montgomery County
Forest Estates Civic Association
Forest Glen Citizens Association
Friends of Moses Hall Consulting Party (Cabin John, MD)
Friends of Quincy Watershed
Friends of Sligo Creek
Greenbelt Climate Action Network
HoCo Climate Action (Howard County)
Indian Spring Residents Opposed to Beltway Widening Group (ISROBWG)
Indivisible Howard County
Interfaith Power & Light (DC-MD-NoVA)
League of Women Voters of Maryland
Long Branch Civic Association
Maryland Conservation Council
Maryland Legislative Coalition
Maryland PIRG
College Park Mayor Patrick Wojahn
Montgomery County Faith Alliance for Climate Solutions
NAACP Maryland State Conference
National Parks Conservation Association
Neighbors of the Northwest Branch
North Hills of Sligo Creek Civic Association
Our Revolution Maryland
Nova Citizens Association

Rock Creek Conservancy (the Conservancy is a signatory for the JPA comments (Section II.C.5
and II.C.6) only)
Rock Creek Hills Citizens' Association
Save Our Seminary at Forest Glen Inc.
Sierra Club
Takoma Park Mobilization
The Climate Mobilization Montgomery County chapter
The Ocean Foundation
U.S. Public Interest Research Group (U.S. PIRG)
Union of Concerned Scientists
Unitarian Universalist Legislative Ministry of Maryland
Virginia Parks Matter
Washington Area Bicyclist Association
West Montgomery County Citizens Association

Thank you,

JA1628



OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

November 6, 2020

*Submitted via email to: MLS-NEPA-P3@mdot.maryland.gov, LChaplin@mdot.maryland.gov, Jeanette.klair@dot.gov, john.j.dinne@usace.army.mil, MDE-MLSprojects@maryland.gov*

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Jeanette Mar
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore MD 21201

Jack Dinne
USACE Baltimore District
2 Hopkins Plaza
Baltimore, MD 21201-2930

Steve Hurt
MDE Wetlands and Waterways Program
1800 Washington Blvd., Suite 4300
Baltimore, MD 21230-1708

**Re: Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) (USACE Application Number (NAB-2018-02152) and the MDE Tracking Numbers 20-NT-0114 / 202060649)**

On behalf of the undersigned Organizations and their members and supporters, we submit the following comments in response to Notice of Availability of the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation. 85 Fed. Reg. 41,583.

We oppose the addition of managed lanes to expand I-495 & I-270. The expansion would harm human health and the environment, destroy homes and parkland, and reduce property values. The expansion would also cost billions of dollars, likely to be borne by Maryland citizens, and provide benefits to a small minority of drivers who are wealthy enough to afford the high tolls or fortunate enough to have their toll payments reimbursed. The DEIS and Draft Section 4(f) Evaluation are woefully insufficient and do not provide the public or the deciding agencies with the opportunity to meaningfully review and consider the impacts of the proposed

expansion. Additionally, the joint Clean Water Act § 404 permit application for the expansion should be denied because it fails to meet Clean Water Act requirements and is not in the public interest.

In light of such a basis (or lack thereof), no build alternative can be selected. The DEIS and procurement process should be stopped until an unbiased purpose and need statement has been articulated and received concurrence from cooperating agencies; a wider set of reasonable alternatives have been added and retained for detailed study; and a DEIS is prepared that appropriately presents the impacts of the proposed project and alternatives on the public and the environment.

Sincerely,

Sierra Club Maryland Chapter[1]

350 Montgomery County, MD

Audubon Naturalist Society

Baltimore 350

Baltimore Transit Equity Coalition

Bikemore

Breathe Free Montgomery

Cedar Lane Unitarian Universalist Church Environmental Justice Ministry

Central Maryland Transportation Alliance

Chesapeake Bay Foundation

[1] The Organizations would like to acknowledge Jill Grant & Associates, LLC; Norm Marshall (Smart Mobility Inc.); Will Cook (Cultural Heritage Partners, PLLC); John Zamurs (Zamurs and Associates, LLC); and Mark Stout (Mark L. Stout Consulting) for assisting the groups in drafting these comments. We would also like to thank the many volunteers who dedicated their time and expertise to these comments: Aileen Craig, The Nature Conservancy; Robin Clark Eilenberg, Maryland Staff Attorney, Chesapeake Bay Foundation; Lee Epstein, Director of Lands Program and Special Counsel, Chesapeake Bay Foundation; Janet Gallant, DontWiden270.org; Danielle Goddard and Kyle Hart, National Parks Conservation Association; Denisse Guitarra and Eliza Cava, Audubon Naturalist Society; Amanda Hungerford, Arthur Katz; Sarah Lesher; Rodolfo E. Pérez, P.E., Consulting Engineer; Klaus Philipsen, FAIA, President ArchPlan Inc.; Stewart Schwartz, Executive Director, Coalition for Smarter Growth; Ok Varner, Sr., Tellow, The Ocean Foundation; B. Peter Yarrington, Freshwater Ecologist/Fisheries Biologist.

JA1629

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 60 of 340



November 6, 2020
Page iii

Citizens Against Beltway Expansion

Coalition for Smarter Growth

DontWiden270.org

DoTheRightGood Montgomery County

Forest Estates Civic Association

Forest Glen Citizens Association

Friends of Moses Hall Consulting Party (Cabin John, MD)

Friends of Quincy Watershed

Friends of Sligo Creek

Greenbelt Climate Action Network

HoCo Climate Action (Howard County)

Indian Spring Residents Opposed to Beltway Widening Group (ISROBWG)

Indivisible Howard County

Interfaith Power & Light (DC.MD.NoVA)

League of Women Voters of Maryland

Long Branch Civic Association

Maryland Conservation Council

Maryland Legislative Coalition

Maryland PIRG

College Park Mayor Patrick Wojahn

Montgomery County Faith Alliance for Climate Solutions

NAACP Maryland State Conference

National Parks Conservation Association

Neighbors of the Northwest Branch

November 6, 2020
Page iv

North Hills of Sligo Creek Civic Association

Our Revolution Maryland

Nova Citizens Association

Rock Creek Hills Citizens' Association

Rock Creek Conservancy (the Conservancy is a signatory for the JPA comments (Section II.C.5 and II.C.6) only)

Save Our Seminary at Forest Glen Inc.

Sierra Club

Takoma Park Mobilization

The Climate Mobilization Montgomery County chapter

The Ocean Foundation

U.S. Public Interest Research Group (U.S. PIRG)

Union of Concerned Scientists

Unitarian Universalist Legislative Ministry of Maryland

Virginia Parks Matter

Washington Area Bicyclist Association

West Montgomery County Citizens Association

Woodside Forest Civic Association

JA1630

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 61 of 340

OP●LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

November 6, 2020
Page v

## COMMENTS ON THE BELTWAY EXPANSION PROJECT DEIS AND JPA

### Table of Contents

I.  The DEIS Does Not Sufficiently Analyze or Present the Costs of the Project or Its Impacts on Public and Private Property. ........................................................... 3

II. Problems with the NEPA Analysis. ........................................................... 12

A. Segmentation Problems. ........................................................... 13

    1. The DEIS Unlawfully Considers the Impacts from Only a Segment of the Broader P3 Program to Add Managed Lanes to I-495 & I-270. ........................................................... 13

    2. The Agencies Should Have Performed a Programmatic EIS to Consider the Impacts of the Project within the Context of the P3 Program or the Greater Regional Plan. ........................................................... 15

B. Problems with the Purpose and Need Statement and the Alternatives Considered in the DEIS ........................................................... 16

    1. The Purpose and Need Statement is Unreasonably Narrow and Unlawfully Constrains the Range of Considered Alternatives. ........................................................... 16

    2. The Project Purpose and Need Is Based on Inaccurate Traffic and Financial Assumptions. ........................................................... 19

    3. The Agencies Failed to Consider All Reasonable Alternatives, Making the Alternatives Analysis Inadequate. ........................................................... 22

C. The DEIS Does Not Adequately Address the Water Quality Impacts from the Project. ........................................................... 42

    1. The DEIS Fails to Examine How Increased Stormwater Will Affect Receiving Waterways. ........................................................... 42

    2. The Analysis of Stormwater Management Needs is Incomplete and Lacks Supporting Data. ........................................................... 47

    3. The DEIS Fails to Account for MS4 Permitting Requirements. ........................................................... 50

    4. The DEIS Fails to Consider Viable Stormwater Avoidance and Mitigation Options. ........................................................... 50

    5. The Corps Should Deny the Joint Permit Application for a Clean Water Act § 404 Permit Because It Fails to Meet Clean Water Act Requirements and Is Not in the Public Interest. ........................................................... 52

November 6, 2020
Page vi

    6. The Draft Compensatory Mitigation Plan is Incomplete, and the Final Plan Should be Made Available to the Public Prior to Issuing any Permit. ........................................................... 56

    7. The DEIS Fails to Consider Alternatives That Would Avoid or Minimize Adverse Impacts to Waterways, Wetlands, Floodplains, and Other Natural Resources. ........................................................... 60

D. The DEIS Lacks Information Supporting the Decision Not to Require a Permit for Construction at the American Legion Bridge. ........................................................... 64

E. The DEIS Fails to Adequately Identify and Analyze Impacts on Aquatic Species, Aquatic Habitat, and Fisheries. ........................................................... 64

F. The DEIS Fails to Adequately Identify and Analyze Impacts on Federal and State Rare, Threatened, or Endangered Species and Habitats ........................................................... 66

    1. The DEIS Fails to Adequately Identify Impacts on the Northern Long-Eared Bat and Indiana Bat. ........................................................... 66

    2. The DEIS Fails to Adequately Identify Maryland Aquatic Species and Fails to Account for Impacts to Maryland and Virginia Species ........................................................... 67

G. The DEIS Does Not Sufficiently Evaluate Hazardous Materials. ........................................................... 67

H. The DEIS Does Not Adequately Analyze Air Emissions. ........................................................... 72

    1. The DEIS Does Not Perform Sufficient Emissions and Health Analyses for Particulate Matter (PM₁₀ and PM₂.₅) or Nitrogen Dioxide (NO₂). ........................................................... 73

    2. The DEIS's Air Quality Analysis Missed Parking Lots. ........................................................... 82

    3. The DEIS Fails to Properly Address Ozone and its Precursors. ........................................................... 83

    4. The DEIS Fails to Sufficiently Address Mobile Source Air Toxics. ........................................................... 86

    5. The DEIS Does Not Properly Perform the Necessary Carbon Monoxide Hot-Spot Analysis. ........................................................... 90

    6. Climate Change and Greenhouse Gas Emissions. ........................................................... 91

    7. The DEIS Fails to Consider the Relationship Between Air Quality and Covid-19, the Agencies Must Release a Supplemental EIS That Does So. ........................................................... 99

    8. The DEIS and Its References to Visualize 2045 Lack Clarity in Data Sets and Prevent Meaningful Public Review. ........................................................... 101

JA1631

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 62 of 340

OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

00022638

CO-428

November 6, 2020
Page vii

9.   The DEIS's (Insufficient) GHG and Other Emissions Analyses are Based on Data that Were Already Outdated When the DEIS was Published .......... 102

10.  The DEIS's Air Quality Environmental Justice Discussion is Insufficient .......... 104

11.  The DEIS's Analysis of Construction Impacts is Insufficient .......... 106

12.  The DEIS Ignores the Impacts of Construction-Generated Silica Dust, Which is a Public Health Hazard .......... 108

13.  Technical Errors and Omissions .......... 109

I.   The DEIS Fails to Adequately Identify and Analyze Impacts to Forests .......... 111

J.   The DEIS Does Not Sufficiently Consider Noise .......... 112

K.   The DEIS Relies on Flawed Traffic Modeling .......... 113

1.   Flaws in the MWCOG Model Used in the I-495 and I-270 DEIS .......... 115

2.   Foreseeable Impacts of Building I-495 and I-270 Managed Lanes .......... 133

3.   Appendix A: Traffic Forecasts .......... 144

4.   Appendix B: DEIS Wrongly Claims that Over-Capacity Assignments Indicate Latent Demand .......... 146

5.   Appendix C: The Virginia Express Lanes Caused the Worst Bottleneck on I-495 .......... 150

L.   Other Traffic Problems in the DEIS .......... 155

1.   Increase in "Heavy Truck versus Car" Crashes and Fatalities .......... 155

2.   Bottlenecks: Traffic Will Stall and Pollute as it Funnels Down .......... 156

M.   The Agencies Failed to Take the Required "Hard Look" At Environmental Justice Issues .......... 156

1.   The Agencies' Methodology for Identifying Environmental Justice Populations is Fundamentally Flawed .......... 157

2.   The Agencies' Discussion of Environmental Justice Lacks Any Meaningful Analysis of Impacts to Environmental Justice Populations .......... 158

3.   The Agencies Failed to Consider Whether the Project Will Disproportionately Affect Environmental Justice Populations .......... 159

November 6, 2020
Page viii

4.   The Agencies' Failure to Take a "Hard Look" at Environmental Justice Impacts Precluded Meaningful Participation by Environmental Justice Populations .......... 160

N.   The DEIS Does Not Address Induced Demand .......... 161

O.   The DEIS Does Not Adequately Examine The American Legion Bridge Contiguous .......... 165

P.   NEPA Procedural Problems .......... 167

1.   The Agencies Violated NEPA by Initially Providing the Public with an Incomplete DEIS and then Adding Appendices Without Notifying the Public .......... 167

2.   The Agencies Systematically Downplayed and Misconstrued Public Comments Opposing the Project .......... 170

3.   The Agencies' Decision to Hold Public Hearings During a Time that Guaranteed Lower Public Participation .......... 175

4.   The Agencies' Refusal to Provide Underlying Environmental Data, Files and Referenced Documents in the DEIS Hinders Meaningful Public Review and Violates NEPA .......... 176

III. Problems with the Section 4(f) and National Historic Preservation Act Analyses .......... 195

A.   The DEIS and Section 4(f) Analysis Fail to Adequately Address the Project's Effects on Historic and Cultural Resources .......... 195

1.   The Agencies Failed to Take a "Hard Look" at the Project's Effects on Historic and Cultural Resources Because Information Related to These Resources is Not Complete .......... 196

2.   The Agencies Have Failed to Comply With Section 110(f) of the National Historic Preservation Act .......... 198

B.   The Agencies' Section 4(f) Analysis Fails to Comply With the Letter and Intent of the Department of Transportation Act Because it Does Not Consider the Full Range of Ways That the Project Will Use – Directly, Indirectly, and Constructively – Historic Sites of Local, State, or National Significance, and Parks .......... 200

C.   The Agencies Cannot Reasonably Rely on a Non-Executed Programmatic Agreement to Satisfy NEPA, Section 110(f), or Section 4(f) .......... 203

IV.  Conclusion .......... 204

JA1632

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 63 of 340

**OP·LANES™ MARYLAND**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 1

The draft environmental impact statement (DEIS) for the proposed I-495 and I-270 expansion (Project) violates the National Environmental Policy Act (NEPA) and is a disservice to the public because it presents incomplete and inadequate analyses.[2] Moreover, even the inadequate information presented in the DEIS shows that the Project will harm Maryland citizens and their environment and cannot be justified. **The Organization oppose the build alternatives retained for detailed study in the DEIS (all for tolled highway expansion) and support the no build alternative.** The U.S. Department of Transportation (DOT) Federal Highway Administration (FHWA) and the Maryland Department of Transportation (MDOT) State Highway Administration (SHA) (together, Agencies) must not go forward with this flawed DEIS.

These comments identify the Organizations' key concerns regarding the DEIS, including but not limited to the following:

- The DEIS fails to adequately present the true costs of the Project. The DEIS presents an incomplete and vague estimate of capital costs and revenues and ignores significant financial costs that the Project would impose on the state and its citizens, including a direct subsidy to a private developer, costs of relocation of utilities, decreases in property values, and financial risks associated with the Public Private Partnership (P3) Program.

- The DEIS improperly considers only one segment of the proposed I-495 and I-270 managed lane expansion P3 expansion Project, preventing meaningful evaluation of other viable, less costly, and less harmful alternatives to roadway expansion that would actually relieve congestion.

- The DEIS's purpose and need statement is unreasonably narrow and unlawfully restricts the range of alternatives considered to various permutations of managed lane highway expansions, all of which have nearly identical environmental impacts. As a result, the DEIS fails to consider other reasonable types of alternatives, such as multimodal alternatives.

- The DEIS fails to analyze the Project's water quality impacts, including how increased stormwater generated by the Project will affect receiving waterways. The DEIS fails to consider viable stormwater avoidance and mitigation options that would avoid or minimize adverse impacts on waterways, wetlands, floodplains, and other natural resources.

- The Joint Federal/State Application for a Clean Water Act (CWA) § 404 permit fails to meet CWA requirements and is not in the public interest.

[2] The Project consists of the segment covering 48 miles from I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including improvements to the American Legion Bridge over the Potomac River, to west of MD 5, and along I-270 from I-495 to north of I-370.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 2

- The DEIS does not adequately analyze impacts on aquatic species, aquatic habitat, fisheries, state and federal rare, threatened, or endangered species, or forests.

- The DEIS does not sufficiently analyze how hazardous materials located along the highway corridors may be disturbed by the Project.

- The DEIS does not adequately analyze air emissions, including the increase the Project will cause in harmful particulate matter and greenhouse gas emissions. The limited and cross-filled air quality analysis presented in the DEIS does not support the general statements in that document downplaying air quality impacts, and in fact shows the Project will impair the health of communities around the Project, including environmental justice communities.

- The DEIS's traffic modeling, which is central to the DEIS, is flawed and fails to acknowledge or address foreseeable impacts from the Project such as induced demand and greater congestion and backups on arterial roads connecting to the managed lanes. Few will benefit from the managed lanes but the majority will subsidize them.

- The DEIS fails to take the required hard look at environmental justice issues. It uses a flawed methodology and fails to perform any meaningful analysis of impacts, let alone disproportionate impacts, thereby precluding meaningful participation by environmental justice communities.

- The DEIS fails to adequately address the Project's effects on historic and cultural resources.

- The DEIS process itself was flawed. DEIS appendices were added after the DEIS was released, without notice to the public. The DEIS also relies on documents and data that the Agencies have unlawfully withheld from the public.

The DEIS appears designed to reach a pre-determined result—expand I-495 and I-270 with managed lanes—without meaningfully considering the Project's impacts or considering viable alternatives. The Agencies' consistent failure, in every section of the DEIS, to take the required hard look at the Project's impacts and their failure to provide the public with documents and data underlying the DEIS's conclusion prevent meaningful public comment and render the process unlawful.

The Agencies must use all available information to analyze less costly multimodal options to relieve congestion in the region, ones that do not cause such significant harm to human health and the environment, and they must provide the public with a true opportunity to review and comment on these options. At a minimum, the Agencies must not move forward with any of the fundamentally flawed build alternatives without a new purpose and need statement, additional new alternatives, and a new DEIS that addresses the failures identified in these comments. The new DEIS must align with the actual planning of the Project and provide the public an opportunity to review and comment on the impacts that the Agencies glossed over, pushed off to later, inappropriately minimized, or altogether failed to evaluate.

OP LANES™ MARYLAND · I-495 & I-270 Managed Lanes Study

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 3

**I.    The DEIS Plan Not Sufficiently Analyze or Present the Costs of the Project or its Impacts on Public and Private Property**

MDOT SHA and Governor Hogan have repeatedly promised that the P3 Program, adding toll lanes to 70 miles of I-495 and I-270, will not tax Maryland taxpayer dollars or require the destruction and relocation of any homes.[1] The website for the Project says:

The overall P3 Program will be delivered at no net cost to the State, with no public Transportation Trust Fund contribution and with all debt to-be-recourse to the State, MDOT will ensure each P3 Agreement is implemented to meet this commitment.[2]

Further, the DEIS itself states:

The State of Maryland does not have the funds to construct improvements of this magnitude with an estimated cost of approximately $8 to 10 Billion. Additionally, even with the tolls to pay back loans, the State does not have enough bonding capacity to take out these loans to pay for the improvements.[3]

DEIS, at ES-12; *see also id.* at ES-20, 1-14; 2-42; *id.*, App. P, at 7, 81, 160, 244 ("New bridges and smoother pavement will be provided for all users at no cost to the Transportation Trust Fund").

---

[1] *See, e.g.*, Dominque Maria Bonessi, *Here's Everything You Need To Know About The Capital Beltway Expansion*, WAMU88.5 (May 29, 2019), https://wamu.org/story/19/05/29/heres-everything-you-need-to-know-about-the-capital-beltway-expansion/; Mitti Hicks, *MDOT Officials on Widening I-270: 'We're Not Going to Take Your Home,'* Montgomery Community Media (Oct 14, 2018), https://www.mymcmedia.org/mdot-officials-on-widening-i-270-were-not-going-to-take-your-home/; Kate Ryan, *Despite Skepticism, Hogan Says No Homes Will be Razed for I-270 Widening*, WTOPnews (Sept. 4, 2018) https://wtop.com/maryland/2018/09/despite-skepticism-hogan-says-no-homes-will-be-razed-for-i-270-widening/; Katherine Shaver, *Report: Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead*, Frederick News-Post (Oct. 22, 2017), https://www.fredericknewspost.com/news/politics_and_government/transportation/hogan-s-plan-to-add-additional-toll-lanes-faces-a-long-tough-road-ahead/article_... ("the state's only expense. Rahn said, would come in hiring "the very best" lawyers and financial consultants to oversee its interests in what are typically highly complex deals. He said the private companies would be on the hook for paying off the construction debt, regardless of how much toll revenue materialized."); Robert McCartney, et al., *Maryland Gov. Larry Hogan Proposes Widening the Beltway and I-270 to Include 4 Toll Lanes*, Washington Post (Sept. 21, 2017), https://www.washingtonpost.com/local/trafficandcommuting/maryland-gov-larry-hogan-proposes-to-widen-the-beltway-and-i-270-to-include-4-toll-lanes/2017/09/21/13c15414-9e56-11e7-9083-fbfddf6804a2_story.html?noredirect=on&utm_term=.fe547abe6d14

[2] Updates, FAQs, https://495-270.p3.com/updates/faqs (visited Oct. 8, 2020)

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 4

Based on the premise of no taxpayer funding, together with claims that the state does not have the funds to pay for improvements, the Agencies eliminated alternatives that would have required public subsidy to deliver. *E.g.*, DEIS, at ES-9; *id.*, App. B, at 29-30.

However, the DEIS shows that each of the retained build alternatives would require the government to relocate 25-34 homes, DEIS, at ES-17. These build alternatives would also destroy hundreds of acres of parkland and historic properties, and would directly affect, even if not condemn, nearly 1,500 additional private properties entering their property value. *Id.* It appears MDOT and state taxpayers will be responsible for the full costs of those takings and other damages.

Based on its likely inaccurate cost estimates, the DEIS also estimates that the build alternatives might require a state subsidy to be paid to the developer ranging from $482 million to more than $1 billion depending on the construction price and interest rate. DEIS, at 2-48 to 2-50. This range is an underestimate of the true extent of the subsidy; in particular, it does not include an estimated $1 to $2 billion needed to fund the required relocation of water and sewer infrastructure[4] and other kinds of utility relocation (electricity, gas, internet and cable television),[5] compensation to unsuccessful bidders,[6] or the $325 million already spent or

---

[3] Letter from Montgomery County Council to Gregory Slater (May 14, 2020), https://static1.squarespace.com/static/5b72e6db02c64b2ff2b8cbc3/t/5ccf10b03c6f451074c0b182/915f8b48277828/WSSC-MDOT-Letter.pdf; Memorandum to Prince George's County Council and Montgomery County Council re Agenda Item #1 Briefing: Possible Impacts of the I-270 and I-495 Road Widening P3 Project on WSSC WATER Infrastructure (March 12, 2020), https://www.montgomerycountymd.gov/council/Resources/Files/agenda/cm/2020/20200312/20200312-2.pdf; *Triple Under Beltway And I-270 Expansion Plan*, WAMU (March 16, 2020), https://wamu.org/story/20/03/16/water-bills-to-maryland-could-nearly-triple-under-beltway-and-i-270-expansion-plan/; Bruce DePuyt, *Express Toll Lanes Could Force Water Bills in Montgomery and Prince George's*, Maryland Matters (March 13, 2020), https://www.marylandmatters.org/2020/03/13/express-toll-lanes-could-force-water-bills-in-montgomery-and-prince-georges/

[4] Bruce DePuyt, *Expressways, Cables Could Face Major Disruption by Plan to Widen Beltway and I-270*, WTOPnews (Oct. 28, 2020), https://wtop.com/dc-transit/2020/10/express-cables-could-face-major-disruption-by-plan-to-widen-beltway-and-i-270/; Bruce DePuyt, *Labyrinth of Pipelines and Cables Could Face Major Disruption by Highway Plan — And Who Would Foot the Bill?*, Maryland Matters (Oct. 28, 2020), https://www.marylandmatters.org/2020/10/28/labyrinth-of-pipes-and-cables-could-face-major-disruption-by-highway-plan-and-who-would-foot-the-bill/

[5] Board of Public Works Transcript, at 32 (June 5, 2019), https://bpw.maryland.gov/MeetingDocs/2019-Jun-5-Transcript.pdf

---

CO-430

00022640

CO-431

00022641

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 5

budgeted," nor does it account for the cost of adequate environmental mitigation, promised transit, or long-lasting pandemic supply chain issues (which will likely increase costs). For example, it is estimated that the average customer would pay an extra $2,250 per household over the next 20 years for the water and sewer relocations required by the Project, yet this is not disclosed or analyzed in the DEIS.[8]

Moreover, although it is not clear what risks MDOT, the State of Maryland, and Maryland taxpayers will be liable for, it is likely these could be significant. For example, one of the private entities that is on MDOT's shortlist for the P3 contract recommended, based on recent projects they participated in, that risks of encountering unknown pre-existing historical, environmental, or hazardous conditions, settlement geotechnical and soil conditions, the need for right of way acquisition, interface with utility owners, and many other risks be allocated to MDOT.[9] Transurban, another bidder, recently has been involved in a dispute in a P3 project in Australia that is likely to result in taxpayers being on the hook for an additional $570 million due to a reinterpretation of the shadow toll.[10] MDOT has created or intends to create a term sheet outlining risk allocations for the P3 Program and has not publicly released that document.[11] MDOT's supplement to the Presolicitation Report for the P3 Program clearly provides for the state to pay for some risks, including some governmental approvals, certain unspecified events, some

[8] $99 million plus $35 million. Michael Laris, *Rejected Maryland Toll-Road Contract Goes to Different Bidder*, Washington Post (Dec. 19, 2018), https://www.washingtonpost.com/local/trafficandcommuting/rejected-maryland-toll-road-contract-goes-to-different-bidder/2018/12/19/be216b5e-039d-11e9-b5df-5d3874f1ac36_story.html; Danielle E. Gaines, *Reaction to Governor's Budget Proposal: Upbeat So Far*, Maryland Matters (Jan. 15, 2020), https://www.marylandmatters.org/2020/01/15/reaction-to-governors-budget-proposal-upbeat-so-far/.

[9] Bruce DePuH, *Pipes, Cables Could Pose Major Disruption by Plan to Widen Beltway and I-270*, WTOP News (Jan. 28, 2020), https://wtop.com/dc-transit/2020/01/pipes-cables-could-face-major-disruption-by-plan-to-widen-beltway-and-i-270/.

[10] ACS Infrastructure Development, Response to Request for Information, at 4-6 https://www.roads.maryland.gov/OC/ACS_Infrastructure_Development.pdf

[11] Kyana Rooney and Matt Johnston, *West Gate Tunnel's Toxic Soil Removal on Cost Victorian Taxpayers up to $750m*, Herald Sun (Sept. 22, 2020), https://www.heraldsun.com.au/news/west-gate-tunnels-toxic-soil-removal-to-cost-victorian-taxpayers-up-to-750m/news-story/99b28a3fa1be06df4fce52f626b65457

[12] Maryland Transportation Authority and Maryland Department of Transportation, Request for Qualifications, § 3.4 (June 7, 2020) https://www.oplanesmd.com/wp-content/uploads/2020/06/OPL1-293_3.2.2J_P3_Phase_1_RFQ-1.pdf

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 6

financial risks from interest rate assumptions, toll collection, enforcement, and leakage risk, as well as risks of termination or developer default.[13]

Because the allocation of risk can completely change the financial viability of the Project (particularly from MDOT's and the State of Maryland's point of view), and financial viability was used to screen alternatives and is a key part of the consideration of the alternatives in the DEIS, MDOT must publicly release its allocation of risk outline and utilize all available financial information in selecting and analyzing alternatives and their financial viability. These risks underscore the need for a new and complete evaluation of the Project's environmental impacts and the harms that would occur should the Agencies move forward with the current insufficient analysis. Who is going to bear these costs? Why are these costs not considered in the financial viability analysis? The Agencies must not move forward without providing an accurate analysis of the Project's financial viability that does not ignore significant expenses.

The DEIS also does not explain assumptions made regarding the cost of construction, which impacts the Project's financial viability and the public subsidy the state would pay the private company.

First, no itemized budget has ever been shared with the public, precluding meaningful review and comment. The DEIS does not disclose assumptions in the cost estimate. For example, the traffic analysis in the DEIS assumes fewer exits from the toll lanes than are now expected; does the cost estimate include the costs of the extra exit ramps that were added later in the process? What assumptions does the cost estimate make about exit and entrance ramp configurations where there will be separate ramps for general purpose lanes and the toll lanes? Does the cost estimate take into account the need to have spatial separation to avoid traffic conflicts such as backups from one ramp that block the other ramp?[14]

Additionally, the DEIS states that the Agencies screened alternatives based on calculated construction costs using the MDOT State Highway Administration's (MDOT SHA's) 2017 Highway Construction Cost Estimating Manual as well as unit costs from the March 2018 and July 2019 Common Guides. DEIS, at 2-6; DEIS, App. B, at 188. However, the Agencies have not provided public access to these documents, despite the requirement in NEPA that they be publicly available. 40 C.F.R. § 1502.21 (2019); id. § 1501.12 (2020).[15] This lack of transparency precludes meaningful public comment.

[13] Supplement to the Presolicitation Report for the I-495 and I-270 P3 Program, at 2, 4-6 (Apr. 12, 2019), https://495-270-p3.com/wp-content/uploads/2019/04/PSR-Supplement.pdf

[14] Since the DEIS was published, revised Council on Environmental Quality (CEQ) regulations implementing NEPA went into effect. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). These regulations are likely unlawful and already subject to four lawsuits. *See* Compl. for Declaratory and Injunctive Relief, California v. Council on Env't Quality, No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020); Compl., Env't Inst. Health All. v. Council on Env't Quality, No 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); Compl., Wild Va. v. Council on Env't Quality, No. 3:20-cv-





I-495 & I-270 Managed Lanes Study

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 2

Second, it appears that the capital cost estimate was calculated based on lane miles to be repaired[17] without considering the unique costs of this Project, including 1) expanding the highway, 2) building entrances and exits, 3) dealing with elevated lanes, 4) 170 bridges that would need to be rebuilt, and 5) any other specific infrastructure or mitigation costs necessary when adding two separated managed lanes in both directions.[16] It appears that the capital cost estimate assumes 25% roadway rebuilding without explanation, but this assumption is not supported and makes no sense given Maryland Secretary of Transportation Pete Rahn's statement that "it needs to be reconstructed because we have roadbed underneath it and the system frankly has got to be taken down to the dirt and brought back up."[17]

Third, the DEIS estimates capital costs for the build alternatives ranging from $8.7 billion to $10 billion. DEIS, at ES-17. However, these cost estimates, which were used to analyze financial viability for this Project—the 48-mile segment that the DEIS purports to address—are similar to those presented for the P3 Program, which includes two additional segments perpetually explained from the DEIS. See Supplemental PNR Report (stating that estimates indicate that the P3 Program, which covers more than 70 miles of highway, will require more

00045-SKLM (W.D. Va. July 29, 2020); Compl. for Declaratory and Injunctive Relief, Alaska Cmty. Action on Toxics v. Council on Env't Quality, No. 3:20-cv-05159 (N.D. Cal. July 29, 2020)). If the Agencies move forward with the NEPA process, they should comply with the old regulations, as well as DOT regulations, rather than applying new regulations retroactively. Acting based on regulations that are both unlawful in themselves and unlawfully applied would render the Agencies' actions also unlawful. Nonetheless, under either of CEQ's regulations, the DEIS is insufficient and unlawful. This letter cites to both regulations throughout these comments, using the year to differentiate between 2019 vs. 2020.

[15] Sean Emerson, *Hogan's Proposed Beltway Widening Project Could Require Taxpayer Funding and Exorbitant Tolls*, Greater Greater Washington (Dec. 1, 2017), https://ggwash.org/view/65741/hogans-proposed-beltway-widening-project-could-require-taxpayer-funding-and-exorbitant-tolls ("Plans said the 80-lane-mile estimate for this corridors was generated based on the approximate cost per lane mile of repairing parts of area Interstates ($100 million per lane mile), multiplied by the number of lane miles in the concept.").

[16] Maryland's Secretary of Transportation Pete Rahn previously explained that "the Washington Beltway that can no longer be expanded and it needs to be reconstructed because we have roadbed underneath it and the system frankly has got to be taken right down to the dirt and brought back up." Sean Slone, *Transportation Policy Academy 2015 – DC – Maryland Secretary of Transportation Pete Rahn*, The Council of State Governments (May 10, 2015), https://web.archive.org/web/20201106213120/https://knowledgecenter.csg.org/kc/content/transportation-policy-academy-2015-%E2%80%93-dc-%E2%80%93-maryland-secretary-transportation-pete-rahn.

[17] *Id.*

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 3

than $9 billion - $11 billion in investment).[18] The Agencies must clarify the basis for their cost estimates and which segments of I-495 and I-270 they cover.

The costs presented in the DEIS are only for this 48-mile segment, but MDOT has been misleading the public about the total 70-mile P3 Program's cost, which would be significantly higher than promised. *See* Larry Hogan, Office of the Governor, Press Release (Sept. 21, 2017), https://www.roads.maryland.gov/OC/Traffic-Relief-Plan-Press-Release.pdf (Governor Hogan Announces Widening of I-270, Capital Beltway (I-495), and Baltimore-Washington Parkway (MD 295) $9 Billion Traffic Relief Plan, Largest Highway P3 in North America RFI Released Today" ("With the total project estimated value at $9 billion"). What will be the total cost of the entire 70-mile P3 Program?

Fourth, the DEIS states that the recommended range of contingency factors for capital cost estimates in the planning/concept development phase, which is the current phase of the Project, is 25 to 40%. DEIS, App. D, at 148. The DEIS states that the preliminary capital cost estimates include a 25% contingency. *Id.* However, the DEIS does not: 1) explain the source of this recommended range, nor 2) explain why the Agencies picked the low end of this range. It does not appear there is any justification for the decision. Adding to the confusion, the DEIS Appendix B says a more detailed assessment of financial viability, which was completed in November 2019 and updated in January 2020, used a 10% range between the high and low capital costs. DEIS, App. B, at 194. The DEIS does not explain why this range was used either. Such a low range is not justified until a project is near the final design phase, which the Project certainly has not reached. In fact, the DEIS tries to excuse much of its cursory environmental analysis by asserting the Project is only in an early planning stage. Therefore, it appears likely that the subsidy, described in the DEIS on 2-48 through 2-50 in the high capital cost scenario will be significantly higher than the $500 million to $1 billion presented.

Fifth, hidden in Appendix B, the DEIS states that in the preliminary capital cost estimates, "construction costs were adjusted to reflect assumed efficiencies in costs for major items such as asphalt pavement and structural materials." DEIS, App. B, at 148. The DEIS does not, however, explain what adjustments were made or the amount of the adjustments. Without this information, the public cannot meaningfully review and comment on the validity of these adjustments.

Sixth, despite multiple drastic changes in the project scope, the estimated capital cost of around $9 billion dollars has remained surprisingly constant. Since it was first announced, the P3 Program has been separated into phases, expanded to include an agreement to rebuild and widen the American Legion Bridge, and amended to require billions in water pipe infrastructure

[18] *See also* Sean Emerson, *Hogan's Proposed Beltway Widening Project Could Require Taxpayer Funding and Exorbitant Tolls*, Greater Greater Washington (Dec. 1, 2017), https://ggwash.org/view/65741/hogans-proposed-beltway-widening-project-could-require-taxpayer-funding-and-exorbitant-tolls (stating $9 billion cost estimate was for the three corridors).

---

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 67 of 340

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 9

relocation. [37] The estimated capital cost, on the other hand, has not been adjusted to reflect these significant cost revisions.

Last, MDOT has unduly asserted as a reason for eliminating other alternatives that the state does not have the ability to finance any type of congestion relief. However, the ability to finance a congestion relief alternative depends on the cost of that alternative, which MDOT has not revealed. Moreover, after the breakdown in negotiations regarding the Purple Line P3, with the private party seeking to terminate the P3 agreement, MDOT's chief financial officer conceded that the state could issue new bonds and seek a low-interest federal loan to cover the over $1 billion of project costs remaining. [38] A similar approach appears to have been rejected out of hand for the current Project, without explanation by MDOT.

How can the Agencies eliminate alternatives and analyze the retained alternatives for financial viability without having an accurate picture of the finances of the Project (the 48-mile segment at issue)? How can the public meaningfully comment on the Agencies' conclusions without an accurate picture of the Project's finances? The fact is that neither party can do so, meaning that the Agencies should not move forward with the Project without supplementing the DEIS and providing the public an opportunity to review and comment on the Project's financial viability. While MDOT-SHA wants the Project to proceed as a pre-development public-private-partnership, it must first disclose and analyze the Project's true monetary and environmental costs and allow the public to meaningfully review and comment on these costs before a final EIS is released. The Agencies certainly should not release a Record of Decision selecting a preferred alternative without understanding and analyzing these costs.

Relatedly, the DEIS cover page states that it was submitted not only by DOT FHWA but also by MDOT SHA, and page ES-2 states that both FHWA, as the Federal Agency, and MDOT SHA, as the Local Project Sponsor, have prepared the DEIS. MDOT SHA has stated that that there is no federal funding for the Project and that they have spent significant funds on planning for the Project, which they expect to proceed through the P3 Program (if it goes forward). [39] If different options is chosen, including an alternative or alternatives involving transportation demand management and public transit (which should have been analyzed), MDOT SHA might not be repaid their planning funds. MDOT SHA also has agreed to pay millions of dollars in application costs to the private bidders for the P3 if they are not

[37] Bruce DuPont, *Is Hogan's Highway-Widening Plan Corporate, $9 Billion Prize Dog Dies Not, Maryland Matters* (Sept. 1, 2020), https://www.marylandmatters.org/2020/09/01/as-hogans-widening-plan-changes-9-billion-prize-has-dog-died/.

[38] Bruce DuPont, *Purple Line Will be Delayed as MDOT Seeks Management Solution, WTOPnews* (Sept. 20, 2020), https://www.wtop.com/dc-transit-line/2020/09/purple-line-will-be-delayed-as-mdot-seeks-management-solution/; Katherine Shaver, *Maryland Would Have to Divert Money from Other Projects if Purple Line Builders Quit, State Transit Chief Tells Court*, Washington Post (Sept. 8, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-would-have-to-divert-money-from-other-projects-if-purple-line-builders-quit-state-transit-chief-tells-court/2020/09/08/18538e29_anex.html

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 10

chosen or the Project does not go forward. [39] MDOT therefore has violated NEPA's requirement that Agencies cannot commit resources prejudicing selection of alternatives before making a final decision. 40 C.F.R. §§ 1502.2(f); 1506.1 (2019). MDOT SHA has not disclosed how much it has already spent on the planning for the P3 Program nor how much it intends to spend going forward, but those amounts appear to be significant. [40] Moreover, MDOT SHA has not disclosed the financial interests of contractors that have assisted with the NEPA and P3 process, even though their participation likely creates a conflict of interest. MDOT must disclose its own financial interests and conflict regarding the DEIS as well as those of the contractors, especially because they may have influenced the selection of alternatives. *See, e.g.*, 40 C.F.R. § 1506.5(c) (2019).

Additionally, if an appropriation will be required due to the likelihood of a substantial public subsidy, as discussed above, then the DEIS should have discussed the applicability of the Maryland Environmental Policy Act (MEPA), which requires certain state agencies to prepare an "environmental effects report" on "each proposed State action significantly affecting the quality of the environment." Md. Code Ann., Nat. Res. § 1-304(a). MEPA defines "proposed state action" to include "requests for legislative appropriations and other legislative actions." *Id.* § 1-301(d). Maryland's Guidelines for implementation of the Maryland Environmental Policy Act, which are applicable to all state agencies, define "other legislative actions" as "requests by the unit of the Department [or other State agency] for proposed legislative acts and/or a change in existing acts or agency authority." Guidelines, IV.A.1 (June 29, 1974). Because MDOT has not been transparent about the finances of this Project, it is not clear if the Project will require a

[39] *See* MDOT and MDTA, Request for Qualifications, Phase 1 of the I-495 & I-270 P3 Program, at 27-28 (Feb. 7, 2020), ("MDOT intends to provide each Shortlisted Proposer who delivers a compliant Proposal and is not selected as the Selected Proposer with a reimbursement payment"); ACS Infrastructure Development, Response to Request for Information, at 12-13 https://www.iandjr.maryland.gov/OPL-ACS_Infrastructure_Development.pdf (one of the entities on the P3 shortlist responding to MDOT's question of how much the stipend for reimbursement should be as $1,500,000 - $2,000,000 after issuance of the final RFP and $2,000,000 - $5,000,000 after submission of proposals).

[40] MDOT-SHA has hired Ernst & Young LLP as a Financial Transaction and Market Advisor, CDM Smith as Traffic Revenue Consultant, as well as Arland and Venable as outside legal counsel, but has not disclosed the amounts of taxpayer dollars it has spent on these consultants now how they will be paid. MDOT-SHA, I-495 & I-270 P3 Program Industry Forum, at 27, https://495-270.p3.com/wp-content/uploads/2018/12/Industry-Forum-PPP_2018-12-10_WEB.PDF-1-1.pdf; Katherine Shaver, *Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead*, Frederick News-Post (Oct. 22, 2017), https://www.fredericknewspost.com/news/politics_and_government/transportation/hogan-s-plan-to-add-additional-toll-lanes-faces-a-article_596e27ad-8b97-5f2d-b73f-f2e84f7bed37.html ("The state's only expense, Rahn said, would come in hiring "the very best" lawyers and financial consultants to oversee its interests in what are typically highly complex deals."). The DEIS's also lists sixty-six individuals representing seventeen private entities as preparers. DEIS, at 8-3.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 68 of 340

OP-LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 11

request for appropriations such that an environmental effects report must be prepared. However, it does appeal that MDOT has already spent a significant amount of taxpayer funds on the Project, intends to spend significant additional taxpayer funds through a subsidy, and intends to transfer additional liability onto taxpayers for water, sewer, and other environmental impacts. Therefore, it appears likely that the Project will require legislative appropriations, other legislative actions, or both and so is subject to the MEPA's requirements.

Given the high costs likely to be borne by the State of Maryland and its citizens, contrary to the DEIS's stated purpose and need, the Project will strain Maryland's ability to pay for critical infrastructure needs. The American Society of Civil Engineers' (ASCE) Report Card for Maryland's infrastructure gave the state an overall C grade because its infrastructure is in "mediocre condition requiring attention."[19] The ASCE identified the following as among the state's most critical infrastructure challenges:

- **Drinking Water:** C. Aging drinking water infrastructure negatively affects the reliability of the water system. To safeguard reliable supply of potable water more funding is needed to pay $9.3 billion in drinking water infrastructure over the next 20 years.

- **Wastewater:** C. Maryland continues to face significant wastewater challenges including reducing the sanitary sewer overflows, leakage from urban areas that have aging pipes, and quantity of inadequate or failing septic systems. From rehabilitation of aging collection systems to completion of treatment works, the projected wastewater infrastructure capital costs for the next 20 years will be on the order of $10 billion.

- **Stormwater:** C. The Chesapeake Bay water quality has steadily declined over the last decades. In 2010, new limits on the pollutants that can enter the bay were set, but stormwater infrastructure costs to comply with these regulations are projected to be more than $3 billion and will tax the already limited resources of local municipalities and the state.

- **Transit:** D. Maryland's transit system includes buses, MARC, Baltimore light rail and the share of the Metro subway. The system faces a $2 billion budget shortfall to achieve both a state of good repair and on-time service performance across all its modes.

- **Hazardous Dams:** C. Dams are an essential part of Maryland's infrastructure to provide flood control, drinking water supply, agriculture irrigation, hydropower

[19] ASCE 2020 Report Card for Maryland's Infrastructure covers twelve categories: aviation, bridges, dams, drinking water, energy, ports, rail, roads, solid waste, stormwater, transit, and wastewater. ASCE graded the roads network C based on traffic congestion but, since approximately 80% of the roads network is in fair to very good condition, ASCE did not specify a funding gap to repair those conditions.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 12

and recreation. There are currently 539 dams in Maryland of which approximately 45% are high hazard and significant hazard dams that require repairs at a cost of $218 million.

- **Schools and Deficient Bridge Needs.** The ASCE also estimates a $615 million funding gap in school capital expenditures and $623 million are necessary to replace the structural deficient bridges in the state's inventory.

The total funding gap the ASCE reports for the previous listing of infrastructure priorities is $25.76 billion. Launching a P3 venture to build the Project poses credible risks that a failed P3 might put the Project's financial burden back on the state and thereby divert a significant portion of funds that otherwise could be used to close the $25.76 billion infrastructure funding gap. The Project will also push billions of its own costs onto the providers of this infrastructure. These concerns are compounded by the COVID-19 pandemic's substantial impact on travel, which has reduced gas tax revenue and imperiled billions of dollars necessary to maintain Maryland's infrastructure in a state of good repair.

## II.    Problems with the NEPA Analysis

The DEIS fails to take the required hard look at the human health and environmental impacts of the Project. From the outset, MDOT had already determined that "a system of priced managed lanes . . . is the only means to provide congestion relief in the near term for the region."[20] To facilitate this pre-ordained conclusion, the Agencies repeatedly provide excuses in the DEIS for their cursory review by positing that many Project details remain unknown. The analysis presented in the DEIS therefore is lacking and is contrary to the purpose of NEPA. By failing to adequately study the available information, the DEIS prevents the public from understanding and commenting on the consequences of the Project. The DEIS also prevents the Agencies from reaching a decision on the Project that is based on a complete consideration of environmental impacts and that utilizes all practicable measures to avoid harms.

As explained throughout these comments, the Agencies should not move forward with a build alternative in the NEPA process but should work to identify a solution that will provide true congestion relief. Should the Agencies nevertheless decide to move forward with the Project, the agencies must start over and prepare a new DEIS that addresses the insufficient analyses of financial and environmental impacts discussed in these comments and provides the public with a meaningful opportunity to comment on these impacts. At a minimum, the Agencies must provide a supplemental EIS.

[20] Letter from Pete K. Rahn to Comptroller Peter Franchot, et al., at 2 (Dec. 13, 2018), https://495-270-p3.com/wp-content/uploads/2018/12/PSR_Final_the-Correct-Letter-1.pdf



I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

00022645

CO-435

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 13

preferred alternative. DOT Guidance on the Use of Combined Final Environmental Impact Statements/Records of Decision and Errata Sheets in National Environmental Policy Act Reviews, at 3. Both those factors are present here. Therefore, if FHWA eventually publishes a FEIS, it should issue the FEIS separately from and in advance of issuing a ROD in order to afford the public an opportunity to comment. Also the FEIS and ROD should not be combined because, regardless of what happens next, the public will need an opportunity to comment on the FEIS before the ROD is adopted.

### A. Segmentation Problems

**1. The DEIS Unlawfully Considers the Impacts from Only a Segment of the Broader P3 Program to Add Managed Lanes to I-495 & I-270**

Agencies are required to consider connected actions in the same. 40 C.F.R. § 1508.25(a)(1) (2019). This requirement prevents agencies from engaging in segmentation, that is, circumventing NEPA by not studying the cumulative impacts of a single project. "This rule against segmentation was developed to prevent the piecemeal environmental analysis of interrelated projects, which could give an inaccurate impression of overall environmental effects." *N.C. All. for Transp. Reform v. DOT*, 151 F. Supp. 2d 661, 680 (M.D.N.C. 2001).

Under Council of Environmental Quality (CEQ) regulations, "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts . . . should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2) (2019). Courts consider three factors to determine if separate project segments are in fact cumulative actions that, based on the CEQ regulations, should be discussed in the same impact statement: (1) whether they are part of a single project; (2) whether they were announced simultaneously; and (3) whether construction of both (or in the case of the Project all three) portions was reasonably foreseeable. *N.C. All. for Transp. Reform*, 151 F. Supp. 2d 661, 684-85 (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214-15 (9th Cir. 1998)).

In addition, under DOT regulations, three criteria must be met by any transportation action reviewed under an individual EIS. First, the action being reviewed must "[c]onnect logical termini and be of sufficient length to address environmental matters on a broad scope." 23 C.F.R. § 771.111(f)(1). Second, the action is required to "[h]ave independent utility or independent significance, *i.e.*, be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made." *Id.* § 771.111(f)(2). Lastly, the action must not "restrict consideration of alternatives for other reasonably foreseeable transportation improvements." *Id.* § 771.111(f)(3).

The DEIS unlawfully segments the P3 Program, which proposes to add managed lanes throughout I-495 and I-270 and analyzes only the 48-mile segment covered by the Project, violating both CEQ and FHWA regulations. The DEIS violates the CEQ regulations because the Project segment it addresses is part of a larger single project to expand I-495 and I-270; the three segments of the single project were announced simultaneously; and construction of all three segments is reasonably foreseeable, especially since MDOT-SHA is moving forward with contracting and construction planning on all three.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 14

The DEIS violates the FHWA regulations because the segment it addresses does not connect logical termini. For example, it would create bottlenecks and worsen traffic at its endpoints if it were the only segment constructed. The DEIS also fails to provide the public with documents the Agencies relied on to decide on the segment's termini, precluding meaningful review, in violation of NEPA. *See infra* Section 2.F.4. The DEIS also violates the independent utility requirement because none of the three segments would "have taken place in the other's absence." *Defs. of Wildlife v. N.C. Dept. of Transp.*, 762 F.3d 374, 395 (4th Cir. 2014) (quoting *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012)). In fact, because the Project segment does not match up with any of the phases in the P3 program, this segment cannot be funded without the other segments. Finally, by limiting the scope of the DEIS to a segment that is only part of the overall P3 Program, the DEIS restricts consideration of partial or full public transportation options (such as expanding the Maryland Area Regional Commuter lines) that would be viable if evaluated based on the entire P3 Program. Going forward with this segmentation will also prevent similar public transit options from being considered when the other two segments go through the NEPA process.

Further, the analysis of widening Upper I-270 are purposely being ignored until a later date, while trying to get the first part of the larger project NEPA-approved and underway. Not addressing Upper I-270 issues in this DEIS precludes an adequate evaluation of Project's direct impacts, indirect impacts, and cumulative effects and foreseeable project risks such as the profitable private developer not being willing to complete Upper I-270 with the political risks; Section 4(f) risks; and the fact that that portion would not meet the narrow purpose and need or be profitable without state subsidy.[24] former Transportation Secretary Pete Rahn disclosed during an October 2019 interview that I-270 was divided into two phases because of issues with the Monocacy Battlefield:

> the Governor's direction was that I-270 be our first phase. And he didn't say 370 to the Beltway. He said 270. So we now have Phase 1A and 1B — 1B being north of 370. And what we're having to deal with there is a uniqueness to I-270, particularly impacted by the Monocacy battlefield. That's why 270 has been separated into two. We currently have [taken] the initial scope of the NEPA [National Environmental Policy Act] process for that section north. So we're not ignoring it.[25]

Monocacy National Battlefield, which directly touches the current Upper I-270, is on the National Register of Historic Places. Any attempts at expanding that highway would create significant environmental and Section 4(f) impacts. Attempting in order to avoid analysis of a

---

[24] "From the very beginning, our statement of goal has been not zero cost to the state. The word 'net' is important here, because we know there are areas like 270 north that will have a cost that is going to exceed our projections for revenue generated by that section. That by itself would equal a subsidy or gap funding." *T4 Transportation (J&L Rahn Table I-270 Partnerships, Growth and Cents*, Bethesda Magazine (Oct. 24, 2019), https://bethesdamagazine.com/bethesda-beat/traffic-transportation/q-a-with-j-l-s-270-contractors/three-growth-and-cents/.

[25] *Id.* (alterations in original)

00022646

CO-436

**OP·LANES** MARYLAND

I-495 & I-270 Managed Lanes Study

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 15

unique segment, with a historic National Battlefield, is not a valid reason to segment a proposal's NEPA review. End points may not be created simply to avoid proper analysis of cumulative impacts.

No action on Lower I-270 should proceed without completing a NEPA-compliant evaluation of impacts arising from widening Upper I-270 and studying the cumulative impacts of this single project.

2.    **The Agencies Should Have Performed a Programmatic EIS to Consider the Impacts of the Project within the Context of the P3 Program or the Greater Regional Plan**

In addition to the prohibition in NEPA against segmentation, NEPA requires that, if a "systematic program is likely to generate disparate yet related impacts," the Agencies must at least consider whether a Programmatic EIS (PEIS) is required and must articulate "a rational connection between the facts and the choice made." *Found. on Econ. Trends v. Heckler,* 756 F.2d 143, 160 (D.C. Cir. 1985) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)). Whether a PEIS is required is not "(a) Could the [PEIS] be sufficiently forward looking to contribute to the [agency's] basic planning of the overall program" and, (b) I-how the [agency] purport to segment the overall program, thereby unreasonably constricting the scope of ... environmental evaluation?" *Piedmont Envtl. Council v. F.E.R.C.,* 558 F.3d 304, 316 (4th Cir. 2009) (quoting *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n,* 677 F.2d 883, 888-89 (D.C. Cir. 1981)) (alterations in original). A PEIS should be prepared when federal actions are connected or cumulative, 40 C.F.R. § 1508.25(a)(1)-(2) (2019), or when actions are similar, and a single statement is the best vehicle for assessing environmental effects, id. § 1508.25(a)(3) (2019). For actions that are a series of interrelated proposals, courts look to whether cumulative systemic effects from different projects could be meaningfully evaluated together. The crucial issue is whether the multiple actions have a combined effect that could be overlooked if examined separately.

The Agencies' failure to perform a PEIS first for the region's Traffic Relief Plan and then for the P3 Program violates NEPA. The DEIS is limited in scope to a mere 48-mile segment of the P3 Program, which addresses I-495 and I-270 as well as the region's overall Traffic Relief Plan for improving congestion throughout projects around the Washington, DC/Baltimore region, even though the DEIS recognizes the need for enhanced connectivity to other forms of transportation in the region and for improvement of a "major regional transportation network[] that supports the movement of passenger and freight travel within the National Capital Region." *See* ADOT?; "Purpose and Need." https://495-270-p3.com/environmental/purpose-and-need . Furthermore, the Notice of Intent to prepare this Project's EIS notes that "Express Toll Lanes on I-495 and I-270, as well as other corridors in the Baltimore Washington Region, [are] part of the 'Constrained Long-Range Plan'" to "ease the impact of congestion." 83 Fed. Reg. 11,812, 11,813 (March 16, 2018) (emphasis added). Given the Notice of Intent's recognition of a regional-wide plan to ease traffic congestion and the subsequently planned improvements, through this Project, to lower I-495 and the portion of I-270 from I-370 to I-70, the Project must be seen as one of several 'related enterprises associated within a single program and planned together,' and therefore requires a PEIS. *Nat'l Wildlife Fed'n,* 677 F.2d at 887-88.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 16

The current DEIS segment is part of a "systematic program likely to generate disparate yet related impacts." Maryland's Traffic Relief Plan as well as the P3 Program are single programs comprised of multiple associated enterprises planned together with a singular purpose: relieving traffic congestion in the region surrounding Washington, DC. Subsequent traffic relief projects are already planned and may result in a need for further congestion-relief actions in the future. These subsequent actions would also require EISs and are an "interdependent part of a larger action" that share "mutual dependence with other actions requiring an EIS." *Taxpayers Envtl. Council,* 558 F.3d at 317. Therefore, a PEIS is required.

The DEIS also improperly segments the currently studied Project in a way that unreasonably constricts the scope of environmental evaluation. Given the subsequent actions to be undertaken that are directly tied to the P3 Program and the Traffic Relief Plan, the limited scope of the DEIS prevents a complete environmental evaluation from taking place. The segmentation does not allow the evaluation of the larger P3 Program or the Traffic Relief Plan for the region, yet, the approval of this first segment will commit the Agencies to particular choices with regard to the subsequent segments. On the other hand, the cumulative effects of the entire Traffic Relief Plan, or at the very least of the P3 Program, have a combined effect that could and should be evaluated together.

Considering the regional scope of the Project, within the broader P3 Program and Traffic Relief Plan, at a minimum the Agencies were obligated to consider the need for a PEIS and explain why a PEIS was not performed. By not doing so, the Agencies have prevented the public from meaningful input into this decision.

**II.    Problems with the Purpose and Need Statement and the Alternatives Considered in the DEIS**

1.    **The Purpose and Need Statement is Unreasonably Narrow and Unlawfully Constrains the Range of Considered Alternatives**

Section 102 of NEPA requires a federal agency to include a detailed statement on the environmental impacts of the proposed action, any adverse environment effects which cannot be avoided should the action be implemented, and alternatives to it. 42 U.S.C. § 4332(C). In order to comply with Section 102, an EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives." 40 C.F.R. § 1502.13 (2019). The Purpose and Need Statement sets the parameters for the range of alternatives that the agency will consider in the EIS. *See Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195-96 (D.C. Cir. 1991). Agencies may not define a project's "objectives in unreasonably narrow terms." *City of Carmel-by-The-Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir. 1997). Further, a Purpose and Need Statement premised on false or inaccurate information fails to provide a basis for "informed evaluation or a reasoned decision," and therefore does not satisfy NEPA's requirements. *Sierra Club v. U.S. Army Corps of Eng'rs,* 701 F.2d 1011, 1030 (2d Cir. 1983).

A Purpose and Need Statement must allow an EIS to be more than a "foreordained formality." *Citizens Against Burlington,* 938 F.2d at 196. Though an agency must take an

OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 17

applicant's objectives into account when developing the purpose and need statement, it is the agency's duty to "[d]efine the objectives of its action." *Colo. Envt'l Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999). An agency "may not circumvent the requirement" against defining its objectives in unreasonably narrow terms "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives." *Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

The DEIS states that its purpose is to "develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within [Project] limits and enhances existing and planned multimodal mobility and connectivity." DEIS, at 1-4. The DEIS states that the needs being addressed are to: "Accommodate Existing Traffic and Long-Term Traffic Growth; Enhance Trip Reliability; Provide Additional Roadway Travel Choices; Improve Movement of Goods and Services; and Accommodate Homeland Security." *Id.* In addition, the DEIS includes two goals: the use of alternative funding approaches for financial viability, and environmental responsibility. *Id.* at ES-6, 1-14.

This narrow purpose statement limits the possible alternatives to traffic management strategies and so eliminates any alternative that does not involve managed lanes and cannot attract highway toll concessionaires. *See* DEIS, Apn. B, at 94. Specifically, the DEIS states that traffic management strategies represent only "*one* option in the transportation 'tool-kit' that [has] been identified to address the growing congestion." DEIS, at 1-7 (emphasis added). Further, the DEIS notes that "[m]anaged lanes are an option to provide users with a more reliable travel time for their trip" and "are an option to provide drivers with a choice to pay for a less congested trip." *Id.* at 1-9 (emphasis added).

As a result, the Agencies, guided by the narrow Purpose and Need Statement, gave detailed consideration to only the alternatives that included some form of traffic management. DEIS, at 2-24. The Notice of Intent to prepare the EIS states that "[m]anaged lanes are needed," and "[a]dditional roadway management options are needed."[37] Rather than being evaluated as an option among competing alternatives, the Project's Federal Register notice says a P3 will be "pursued."[38] This clearly indicates that the NEPA process was skewed toward the privately operated toll roads from the beginning: non-managed lane alternatives put forward in the DEIS were mere 'window dressing.' Prior to reviewing alternatives or selecting a preferred alternative, the Agencies had already concluded that "MDOT's traditional funding sources would be unable to effectively finance, construct, operate, and maintain highway systems of this magnitude."[39] By including 'additional roadway travel choices' in the Purpose and Need Statement, DEIS, at 1-4, and restricting consideration to a limited category of alternatives, the Agencies foreclosed the

[37] Notice of Intent to Prepare Environmental Impact Statement, I-495 & I-270 Managed Lanes Study, 83 Fed. Reg. 11,812, 11,812 (March 16, 2018).

[38] *Id.*

[39] *Id.*

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 18

possibility of meeting the broader project goals by other reasonable means, such as TSM/TDM, mass transit, or multimodal strategies. The Maryland-National Capital Parks and Planning Commission (M-NCPPC) and National Capital Planning Commission (NCPC), both Cooperating Agencies, have raised these issues with the Agencies throughout the NEPA process.[40] M-NCPPC's non-concurrence on the Purpose and Need Statement and the ARDS, and NCPC's abstention from concurring on the ARDS are noted in the DEIS, at 1-1, 2-2.[41] Montgomery County has also repeatedly raised the issue of the insufficiency of the purpose and need and limited alternatives.[42]

The non-concurrence of the Purpose and Need Statement can be traced to the nature of the Project. The DEIS "is the first element of the broader I-495 & I-270 Public-Private Partnership (P3) Program." DEIS, at 1-1. The P3 Program, in turn, is itself the largest component of MDOT SHA's broad Traffic Relief Plan.[43] Under the P3 Program, MDOT SHA is "seeking input from the private sector to design, build, finance, operate, and maintain improvements on both I-495 and I-270."[44] Under the P3 model a private company would build and manage the proposed Project in exchange for receiving the revenue from the managed lane tolls for a certain period of time. Because private investors rely on high profit margins to recoup their investments and make

[40] The One Federal Decision policy states that the FHWA, "should obtain a written concurrence from all cooperating agencies whose authorization is required for the project at three key milestones: 1) Purpose and Need, 2) Alternatives To Be Carried Forward for Evaluation, and 3) the Preferred Alternative." Memorandum of Understanding Implementing One Federal Decision under Executive Order 13807 (April 9, 2018), https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-signed-4-9-18-w-Sig.pdf.

[41] M-NCPPC non-concurrences are explained in more detail in the following documents: Planning Department letter to MDOT SHA, P3 Authority that being evaluated at an early stage before Purpose and Need Statement M-NCCCP Comments (Oct. 18, 2018), https://montgomeryplanningboard.org/wp-content/uploads/2018/10/I-495-and-I-270-Managed-Lanes-Study.pdf; M-NCPPC Comments, https://montgomeryplanning.org/wp-content/; M-NCPPC Non-Concurrence Vote on the Revised Alternatives for the Interstate 495 and 270 Managed Lanes Study on November 20 (Nov 20, 2020), https://montgomeryplanning.org/wp-content/uploads/2020/11/495-and-270-managed-lanes-study-alternatives-for-the-interstate-495-and-270-managed-lanes-study-non-concurrence-vote.pdf.

[43] I-495 & I-270 Managed Lanes Study Purpose Briefing (Sept 11, 2018), at 60, 66, 80, 90, https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2018/18091112018025113.pdf.

[44] *Id.*

OP·LANES™ MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 19

a profit, traffic management strategies like managed toll lanes are common in P3 projects.[35] The DEIS claims that the state lacks the funding resources to "effectively finance, construct, operate, and maintain highway improvements of the magnitude that are needed to address roadway congestion and enhance trip reliability in these study corridors," and therefore any such options considered in the study must use "a P3 in order to design, build, finance, operate, and maintain the proposed infrastructure improvements." DEIS, at 1-14. By limiting the Purpose and Need Statement to travel demand management solutions that are financially profitable to a private sector investor the Agencies unlawfully adopted the private interests of potential P3 investors and excluded alternatives that did not meet their specific private objectives. The purpose and need must be rewritten to allow for a legitimate search for solutions to congestion in the Maryland side of the Greater Washington Region. The Agencies should then consider a diverse range of alternatives, as discussed in more detail in Section II.E.3.

2. The Project Purpose and Need Is Based on Inaccurate Traffic and Financial Assumptions

NEPA requires that an EIS contain high-quality information and accurate analysis. See 40 C.F.R § 1500.1(b) (2019). If an agency relies on incomplete data, or if data relevant to the proposed project is unavailable, the EIS must disclose this shortcoming. See Lands Council v. Powell, 395 F.3d 1019, 1032 (9th Cir. 2005) (Forest Service violated NEPA by relying on data that it knew had shortcomings but did not disclose those shortcomings until its decision was challenged). Further, the use of inaccurate data to support the need for a proposed project is a violation of NEPA, See N.C. All. for Transp. Reform v. DOT, 151 F. Supp. 2d 661, 688 (M.D.N.C. 2001) (DOT violated NEPA by permitting the need for a transportation project on overstated traffic projection estimates).

The Agencies state that one need for the Project is to "Accommodate Existing Traffic and Long-Term Traffic Growth." DEIS, at 1-4. The DEIS bases this need on the existing traffic and growth projection data found in the 2018 Maryland State Highway Mobility Report, Id. at 1-6. However, this data relies on development of the impact of COVID-19 on existing and future traffic patterns. Since March of 2020, traffic patterns have changed significantly in response to COVID-19; schools and businesses across America have closed and travel patterns have been upended. Due to the closures, many Americans who are working are doing so remotely from home, and there are predictions of large exoduses from urban centers that could change city populations for years to come.[36] In addition, because of long-term school closures and a lack of childcare resources, many employees of businesses that have reopened their offices are likely to continue

[35] See Public Private Partnership Concessions for Highway Projects: A Primer, at 13 (2010), https://www.fhwa.dot.gov/ipd/pdfs/p3/p3_concession_primer.pdf ("Even the private perspective, large projects provide sufficient profit potential to merit the substantial investment required to participate in a procurement process.")

[36] Pete Bigelow, Transportation's Moving Target: Waves of Relocations Prompted by COVID-19, Automotive News (October 6, 2020), https://www.autonews.com/mobility-report-newsletter/transportations-moving-target-waves-relocations-prompted-covid-19.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 20

working remotely for the foreseeable future. The country is also facing record unemployment rates, which may be forcing many to stay home or travel less.[37] As a result, the nation's roadways – including I-495 and I-270 – are less-traveled.

The Agencies already have data on how COVID-19 has affected traffic patterns in the region, and can look at recent data from Virginia managed lanes to see how COVID-19 has changed their travel patterns and managed lane use. The Agencies must go back and reevaluate the Purpose and Need Statement (as well as the DEIS analyses) based on this data.

Even if a COVID-19 vaccine is available in the coming months, many businesses have made decisions to continue having employees work remotely or provide more flexibility to work from home part-time or on occasion. In the event that a vaccine is not quickly available and more businesses decide to have some employees return to offices, safety and health concerns are predicted to relegate the vast majority of the commuters to their own vehicles, putting a stop to carpooling that reduced rush hour traffic in the past.

Overall, the impact of COVID-19 on traffic patterns is unclear. As some projections suggest, COVID-19 may result in lasting reductions in rush hour traffic, especially for non-freight travel.[38] However, health precautions may result in more cars being on the road. In either event, the Agencies must consider the possible eventualities and their implications for the Project. If this long-term impact is less traffic, there may be no need for the Project and going forward with a P3 for managed lanes would amount to a financial boondoggle. If, on the other hand, there is substantially more traffic than projected in the 2018 Maryland State Highway Mobility Report, the Project may be insufficient and a wasted investment in permanent infrastructure. The Agencies must consider both possibilities, analyze the ways in which COVID-19 may impact future traffic patterns, and evaluate whether the stated need for the Project is still appropriate.

Additionally, the stated need does not take into account changes in traffic from the construction or stopping of construction of the Purple Line and the Innovative Congestion Management Project along the I-270 corridor. The Purple Line has not been completed and that project is in fact in difficulty, as discussed in more detail in Section I, but the DEIS relies on its

[37] Carmen Reinicke, Fewer Than Half of Working Americans Will Have a Paycheck in May as Devastating Coronavirus Layoffs Persist, Economist Says, Business Insider (April 24, 2020), https://www.businessinsider.com/layoffs-coronavirus-less-than-half-americans-workers-paycheck-wage-may-2020-4.

[38] Itzh Palma, Traffic Speeds Continue Falling Across the Country, But Still Up vs Pre-COVID, INRIX (Aug. 4, 2020), https://inrix.com/blog/2020/08/us-speeds/ ("Despite the growth in the AM commute in most cities, however, traffic congestion has yet to return in a significant way in the morning; Seattle, Boston and Washington DC, for example, show no change in [increased] travel speeds from a month ago")

00022648
CO-438

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 73 of 340

00022649

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 21

completion in order to eliminate other transit options. This reliance is misplaced and should not be factored into the need for this Project.

The financial assumptions that underlie the Project's purpose and need are also inaccurate. The DEIS bases the financial viability requirement on the assumption that Maryland cannot fund large-scale infrastructure projects without utilizing a P3 model and that the Project will cost taxpayers no money if delivered through such a model. As is discussed in more detail in Section I of this document, the DEIS makes unsupported claims that managed toll lanes provided through a P3 private concessionaire "provide[s] needed large-scale improvements decades earlier than would otherwise be realized using traditional funding." DEIS, at 1-14. The ability for a P3 to deliver this type of project earlier or for less cost to the state flies in the face of Maryland's recent experience with the Purple Line and other states' P3 experiences. MDOT SHA repeatedly made similar claims when defending its decision to deliver the Purple Line through a P3, which it claimed could achieve "up to 20 percent in cost savings for the project over its life and allow MTA to deliver the project without adding significant organizational and internal cost responsibilities to the agency."[99] However, these claims have proven unfounded as the P3 concessionaire that was contracted to deliver the Purple Line has walked away from the project after more than three years of project delays[100] and "nearly $800 million in cost overruns."[101]

The DEIS also claims that "the State's traditional funding sources, including the Maryland Transportation Trust Fund, are unable to effectively finance, construct, operate, and maintain highway improvements of the magnitude that are needed to address roadway congestion and enhance trip reliability in these study corridors, due to the fiscal constraints of the program and the state-wide transportation needs." DEIS, at 1-14. However, as discussed in more detail in Section I, these claims are not supported by the information in the DEIS and are counter to statements made by MDOT-SHA indicating that the state can indeed issue new bonds backed by toll revenue streams, like tolls or transit fares, and can seek low-interest federal loans similar to those which concessionaires have access to. Supra note 20.

The financial assumptions underlying this study are flawed and the need statement are also faulty because they rely on toll lane revenue projections that do not take into account the impact of COVID-19. The financial viability of toll lanes looks even more uncertain now that toll revenues have plummeted throughout the country, spurring the toll road association to ask Congress for a

---

99 Purple Line FEIS, Record of Decision, Att. C at 136, https://www.purplelinemd.com/component/jdownloads/send/28-record-of-decision/81-attachments-c-fois-comment-and-responses.
100 Briana Adhikusuma, State Figuring Out Who Will Take Over Purple Line Project, Bethesda Magazine (Sept. 15, 2020), https://bethesdamagazine.com/bethesda-beat/transportation/state-figuring-out-who-will-take-over-purple-line-project/.
101 Bruce DePuyt, Purple Line Will be Delayed as MDOT Seeks Management Solution, WTOP (Sept. 23, 2020), https://wtop.com/maryland/2020/09/purple-line-will-be-delayed-as-mdot-seeks-management-solution/.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 22

$9.2 billion COVID-19 relief package to assist the toll industry with staying afloat.[42] Additionally, in April, 2020 the I-495 Express Lanes, a managed-lane project, saw its credit rating "downgraded due to its high vulnerability to congestion levels."[43] In sum, the financial assumptions underlying the financial viability criteria for the Project come nowhere near being the high-quality information or support for the accurate analysis required by NEPA, and instead are fatally flawed. See 40 C.F.R. § 1501.1(b) (2019).

**3.    The Agencies Failed to Consider All Reasonable Alternatives, Making the Alternatives Analysis Inadequate**

The alternatives analysis is the "heart" of an EIS. 40 C.F.R. § 1502.14 (2019). NEPA requires that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a) (2019) (emphasis added). An agency must consider a range of alternatives "sufficient to permit a reasoned choice among the options." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1243 (10th Cir. 2011) (quoting *Ass'ns in Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998)); *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991) (oppose is required to "consider a range of alternatives that covers the full spectrum of possibilities.") The DEIS, however, fails to consider many reasonable alternatives to the Project, examples of which are discussed below, and is therefore inadequate. *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) ("[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate.").

**a.    The Agencies Did Not Consider Multimodal Alternatives in the Alternatives Analysis**

With the input of state, federal, and local regulatory agencies, the Agencies identified a preliminary range of alternatives based on previous transportation studies in the region and proposed engineering improvements. DEIS, at 2-7. In addition to the no build alternative, alternatives included adding general purpose lanes, High-Occupancy (HOV) lanes, priced managed lanes, transportation systems/demand management, contraflow lanes, and reversible lanes. DEIS, at 2-8. In all, FHWA's preliminary range included 20 alternatives and variations, the vast majority of which involved adding lanes:

---

42 Ed Hazzina, *Toll Road Association: Federal Money is Route to Recovery*, Pittsburgh Post-Gazette (May 25, 2020), https://www.post-gazette.com/news/transportation/2020/05/25/Toll-road-association-Federal-money-route-will-help-it-heal-of-recovery-affirm-tomorrow-stories/202005250105.
43 Trevor d'Olier-Lees and Dhruul Shah, *North America's P3 Toll Roads to Avoid Permanent Traffic Reduction, After lockdowns Led to Financial Duress, S&P Global Ratings' See an Uncertain Road to Recovery*, Infrastructure Investor (July 6, 2020), https://www.infrastructureinvestor.com/north-americas-p3-toll-roads-to-avoid-permanent-traffic-reduction/.



OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 23

- Alternative 1: No Build
- Alternative 2: Transportation Systems Management/Transportation Demand Management (TSM/TDM)
- Alternative 3: Add one GP Lane in each direction on I-495 and I-270
- Alternative 4: Add one HOV lane in each direction on I-495 and retain existing HOV lane in each direction on I-270
- Alternative 5: Add one managed lane in each direction on I-495 and convert one existing HOV lane in each direction to a priced managed lane on I-270
- Alternative 6: Add two GP lanes in each direction on I-495 and I-270
- Alternative 7: Add two HOV lanes in each direction on I-495 and retain one existing HOV lane and add one HOV lane in each direction on I-270
- Alternative 8: Add two priced managed lanes in each direction on I-495 and add one priced managed lane in each direction and retain one existing HOV lane in each direction on I-270
- Alternative 9: Add two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270
- Alternative 10: Add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only
- Alternative 11: Physically separate traffic using C-D lanes, adding two GP lanes in each direction on I-495
- Alternative 12A: Convert existing GP lane on I-495 to contraflow lane during peak periods
- Alternative 12B: Convert existing HOV lane on I-270 to contraflow lane during peak periods
- Alternative 13A: Add two priced managed reversible lanes on I-495
- Alternative 13B: Convert existing HOV lanes to two priced managed reversible lanes on I-270
- Alternative 13C: Add two priced managed reversible lanes and retain one existing HOV lane on each direction on I-270
- Alternative 14A: Heavy Rail transit
- Alternative 14B: Light Rail transit
- Alternative 14C: Fixed guideway Bus Rapid Transit (BRT)10 off alignment of existing roadway
- Alternative 15: Add one dedicated bus lane on I-495 and I-270

DEIS, at 2-8 to 2-9.

These preliminary alternatives were assessed using six criteria related to the Purpose and Need Statement: Engineering Considerations, Homeland Security, Movement of Goods and Services, Multimodal Connectivity, Financial Viability, and Environmental. DEIS, at 2-3 to 2-7. Based on these factors, Alternatives 1, 5, 8, 9, 10, 13B, and 13C—all involving priced managed lanes (other than the no build alternative)—were given further consideration. DEIS, at 2-10.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 24

Each of the 20 preliminary alternatives was dedicated to a single project with one mode of transportation, that is, either fully transit or fully highway. However, as the Agencies admitted in the DEIS, the I-495 and I-270 congestion problem is "so great that no single highway or transit improvement will provide significant relief to the long-term demand." DEIS, at 2-13. In order to consider the "full spectrum of possibilities" required by NEPA, therefore, the Agencies must consider multimodal alternatives that combine both transit and highway improvements. And there are reasonable alternatives for managing congestion that consist of mixed transit and highway actions that went ignored.

To sidestep the obvious availability of multimodal alternatives, FHWA reiterated MDOT's claim that the proposed Purple Line light rail project is the "transit" portion of the proposed project. See generally DEIS, at 2-14, 2-15. However, simply referencing the Purple Line does not satisfy NEPA requirements as it does not analyze the option and it ignores the myriad other transit options that alone or in conjunction with a highway action could relieve traffic congestion. Additionally, as of the date of these comments, the Purple Line remains tied up in disputes. Further, eliminating transit and other non-highway expansion alternatives early in the NEPA analysis prevents the Agencies from choosing a mixture of different alternatives in the record of decision. At a minimum the Agencies should consider alternatives that include TSM/TDM, mass transit options, multimodal options, and the MD 200 Diversion alternative as put forward by county leaders (not the version reviewed by the Agency). Mobility plans should also tie in holistically to land use and economic development planning, which the Project does not do. Additionally, FHWA must consider combinations of alternatives, such as the SMART alternative developed below, see infra Section II.B.3.g.

b.    None of the Alternatives Retained for Detailed Study Incorporated Transit Crossing Woodrow Wilson Bridge or the American Legion Bridge

The stated goal of a project "necessarily dictates the range of 'reasonable alternatives'" considered in the EIS. Westlands Water Dist. v. U.S. Dept. of Interior, 376 F.3d 853, 865 (9th Cir. 2004) (quoting City of Carmel-By-The-Sea, 123 F.3d at 1155). FHWA included "multimodal connectivity" as a need of the DEIS. DEIS, at 2-5. Woodrow Wilson Bridge is vital to that multimodal connectivity. As significant cost to the State of Maryland, the bridge was designed and built to accommodate rail traffic. However, the DEIS does not analyze, or even discuss, how any of the alternatives will ensure that rail traffic will cross the Woodrow Wilson Bridge.

It is essential that the new American Legion Bridge accommodate rail traffic, as was done for the Woodrow Wilson Bridge. That none of the build alternatives accommodate rail, and therefore the Project fails to meet the stated purpose of enhancing existing and planned multimodal mobility and connectivity.

The Capital Beltway/Purple Line Study of 2002 developed six rail alternatives, including two alternatives across the Potomac River. The alternatives analysis for the DEIS should have evaluated all six of these alternatives, identified those to be carried forward as alternatives retained for detailed study, and explained why each alternative not carried forward was not

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 75 of 340

00022651


OP•LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 36

selected.[44] Within the DEIS also the Purple Line as a transit alternative in the I-495 corridor, in fact, only 39% of the Purple Line as recommended in the 2002 report is under construction. The DEIS provides an evaluation of completing the other 62% of the Purple Line and no explanation for why this alternative was not evaluated. MDOT should have considered this developed rail alternative and explained specifically why each was dropped from further study in similar detail to the 17 rejected alignment modifications discussed on pages 1-11 to 1-17 in the Purple Line DEIS Definition of Alternatives Technical Report.[45]

    c.    **The Agencies Improperly Eliminated Alternatives that Could Meet Some Purposes of the Project**

NEPA does not mandate that an EIS consider any specific project alternatives. At the same time, however, it does not allow an agency to eliminate alternatives "merely because they do not offer a complete solution" to the purpose and need of the proposed project. *Nat. Res. Def. Council v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

The Agencies eliminated non-managed lane alternatives because those alternatives did not meet one or two specific aspects of the purpose and need of the Project, even though the Agencies admitted that those alternatives met other aspects (and even though the alternatives selected also did not meet all aspects). In particular, the Agencies eliminated alternatives because they were not based on the type of PPP program that MDOT SHA wanted and would not bring in revenue, and therefore the Agencies found they were not financially viable. For example, the Agencies found that alternative 2, the TSM/TDM alternative, "would improve the operations of the existing transportation system." DEIS, at 2-11. This finding is consistent with a recent study by the National Capital Region Transportation Planning Board that found transportation demand management offered the most traffic reductions.[46] But at least in part due to considering this alternative only as a stand-alone option, the Agencies dropped it from further consideration.

[44] SHA, MTA, Rummel, Klepper & Kahl, and Parsons Brinckerhoff, Capital Beltway/Purple Line Study Initial Findings & Recommendations Draft, 2002, at S-12, Figure S-8. https://495-270gp3.com/site-content/uploads/MDOT-Capital_Beltway_Purple_Line_Study_2002.pdf. This report is cited on page 3 of Appendix A of the DEIS.

[45] Purple Line Alternatives Analysis/Draft Environmental Impact Statement, 2008. See the Definition of Alternatives Technical Report at https://purplelinemd.com/index.php/12-about-purplelinemd/8-about-facts-technical-reports

[46] National Capital Region Transportation Planning Board, *An Assessment of Regional Initiatives for the National Capital Region, Technical Report on Phase II of the TPB Long-Range Plan Task Force*, at xi, 64 (Dec. 2017), https://www.mwcog.org/file.aspx?&A=7Z+8+6H8RXGUxNsM69OZ6cSbNIJLnthtmSEUcp2FUMPyazZCs3dib+Xj5vIUN3bWmQWWvI9uf5GpJ48X0m6rpF9ss19HDC9c 8Qf4bAkQ. David Alpert, *The Best Way to Improve Transportation is for Congestion ... *, Greater Greater Washington (Nov. 16, 2017), https://ggwash.org/view/65596/ths-best-way-improve-transportation-is-congestion-pricing-study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 36

citing its failure to address long-term traffic growth and the fact that it would not provide a revenue source.[3]

Additionally, the Agencies dropped alternatives 3 and 6 (adding one or two general-purpose lanes) because they would not provide a revenue source and there would be no ability to manage long-term demand and ensure that the highways (with one or two additional general lanes) would not exceed their projected capacity. *Id.* at 2-11 to 2-12. But this determination means that under the retained managed lane build alternatives, there would also be no ability to manage long-term demand and ensure the general-purpose lanes would not exceed capacity. In fact, with one or two fewer general-purpose lanes, capacity would be exceeded sooner. In the managed lane build alternatives, those who cannot afford the tolls, or freight traffic which generally will not pay the tolls, will be left in badly or even worse off than they would be under alternatives 3 and 5. Yet, the Agencies did not include any discussion of this concern in the DEIS.

The Agencies also eliminated transit-only alternatives. Those include heavy rail, light rail, bus rapid transit, and dedicated bus-only managed lanes. The Agencies claimed that these alternatives would not address existing and long-term traffic growth in the study corridors or improve trip reliability. DEIS, at 2-13 to 2-17. But their statement is unexplained and unsupported; it done correctly, including by combining those with highway options as discussed in subsection (a) above, transit options could significantly reduce traffic in the region and improve trip reliability, even more so than managed lanes. The Agencies also dropped those alternatives from consideration because they would improve no additional roadway travel choice. *Id.* However, transit alternatives do provide additional roadway travel choices, and further, to the extent the Agencies are in effect requiring an alternative to include new car-driving choices, such a requirement would be unreasonably narrow.

It appears that the main reason for eliminating the transit-only alternatives was concern about their financial viability, particularly the lack of a revenue stream that would enable a P3 to construct the alternative at no cost to the state. This reasoning is faulty. Public transit options do provide a revenue stream. Public transit options can be implemented using a P3 (see the Purple Line project). MDOT has recently conceded that it could finance a significant public transit project. *See supra* note 20).

[3] Maryland Transportation Authority, which runs the state's eight toll facilities, announced a gloomy financial forecast through 2026, citing a $422 million reduction in toll revenue. Luz Lazo, *People are Driving Less and Slipping the Toll Roads, Leaving Less Money for Local Projects*, Washington Post (July 4, 2020).

CO-441

JA1645

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 76 of 340

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 27

development and the DEIS makes it impossible for either the Agencies or the public to understand or meaningfully consider the extent to which the managed lane build alternatives may not be financially viable. Additionally, the DEIS shows that the managed lane build alternatives cannot be completed while meeting the goal of environmental responsibility, yet the Agencies did not examine this in any detail to remove the alternatives that failed to meet this goal, as discussed more fully in Section II.D.3.d.

**d.    The Agencies Did Not Use Environmental Impact as a Differentiator Between Preliminary Alternatives**

The DEIS acknowledges that the preliminary range of alternatives "could have a varying degree of potential environmental impacts" but states that the Agencies screened out all options that did not meet "the transportation purpose and need," and so "the consideration of the potential for varying degrees of environmental impacts was not a differentiator in whether the alternative should be retained or dismissed." DEIS, App. II, at 94. The objective of NEPA is to rigorously explore all reasonable alternatives in light of their environmental impacts. By not considering and comparing the environmental impacts of the preliminary range of alternatives, the Agencies failed to identify whether any of those preliminary alternatives may have had less environmental impact than the screened alternatives. This is particularly problematic because, as the DEIS acknowledges, "The overall difference in environmental impacts between the Screened Alternatives was not significant." DEIS, App. II, at 95. The Agencies improperly screened out any alternatives that may have had less impact and improperly narrowed the alternatives to be studied in detail in the DEIS to those which have almost identical environmental impacts. This approach directly conflicts with the objectives of NEPA and is a fundamental flaw in the DEIS.

https://www.washingtonpost.com/local/traffic/commuting-people-are-driving-less-and-shopping-more-and-that-could-mean-worse-traffic-ahead/2020/07/15/e7762d5d-beaf-11ea-bda0-bc3c8b9c-b89/d8c0f7fbe6-story.html?itid=sn_local_commuting_6; see also https://www.virginiadot.org/Coronavirus_Pandemic/ (showing 64% decrease from May 2019 when the tolls yielded $238,000 in toll revenue in May, down 90 percent from May 2019 when the tolls generated $2.5 million" and the Dulles Toll Road had a year-to-date revenue drop of 33 percent, at $28.4 million. Id.; see also Jack Moore, DC-Area Toll Revenue Plunges 90% amid Coronavirus Pandemic, WTOPnews (Aug. 12, 2020), https://wtop.com/dc-transit/2020/08/dc-area-toll-revenue-plunges-90-amid-coronavirus-pandemic/ (toll revenue generated by the 495 Express Lanes in Virginia fell to just $3 million in April, May and June, down by 68% compared to the same time period last year); Editorial, Commuting Habits Have Changed During COVID-19. What's the Future?, Richmond Times-Dispatch (Oct. 12, 2020), https://richmond.com/opinion/editorial/commuting-habits-have-changed-during-covid-19-whats-the-future/article_c334f4b7-2ae2-546e-8f8e-1b66a64a5c84.html

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 28

**e.    The DEIS Failed to Analyze a True Intercounty Connector (Maryland MD 200 Diversion Alternative) to the Use Side of the Beltway That Would Avoid Expansion in Sensitive Areas and Property Relocations**

The DEIS presents an MD Diversion Alternative Analysis but it improperly adds managed lanes to I-95 to the model, which reduces that alternative's environmental and traffic benefits. The addition of these managed lanes is not necessary to evaluate the MD 200 Diversion Alternative and the Agencies must analyze the Diversion without this addition. The MD 200 Diversion Alternative should be studied in more detail with various modeling assumptions, including analyses with and without the I-95 segment.

Furthermore, the Agencies failed to consider a variety of assumptions that would incentivize the MD 200/I-270 route over traveling on I-495/I-95, for example, the use of operational changes such as restructuring the tolling systems and speed limits currently in place and adding more dynamic signage. Without the I-95 managed lane segment there is a reduction in environmental impact, which results in a greater benefit coming from the MD 200 Alternative. The analysis provided by MDOT SHA fails to demonstrate that the MD 200 Diversion is not a reasonable alternative technique under NEPA or a reasonable avoidance technique under Section 4(f).

**f.    The DEIS Failed to Consider Rail Transportation as a Reasonable Alternative to Additional Highway Lanes.**

The DEIS fails to consider rail transportation, and specifically the Maryland Area Regional Commuter (MARC) Brunswick Line, as a reasonable alternative to further highway expansion. Instead, the DEIS states that the MARC Brunswick Line would not improve trip reliability along I-495 or the I-270 corridor based solely on citations from the 2007 MARC Growth Plan, which extends until 2035, rather than considering the 2018 MARC Cornerstone Plan for 2045 that better fits the 2040 planning horizon of the DEIS.[48] The MARC Cornerstone Plan outlines $3.34 billion in capital investments for the Brunswick Line (more than twice the investments in the 2007 plan), including over $700 million for additional mainline track segments designated as critical path items because these are essential to realize the line's full potential to support the I-270 corridor.[49] The Cornerstone Plan notes that a major impediment to improve passenger service and reach the Brunswick Line's ridership targets is that CSX, not MARC, owns the right of way and the priority for CSX is moving freight, not passengers.[50]

---
[48] Maryland Department of Transportation Maryland Transit Administration, MARC Cornerstone Plan, https://s3.amazonaws.com/mta-website-images/mta-website/staging/files/Transit%20Projects/Cornerstone/MCP_MARC.pdf

[49] Id. at 59.

[50] Id. at 12.

JA1646

00022652

CO-442

OP LANES™ MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 29

This impediment has notoriously plagued the line during peak travel hours, restrained the daily number of operable trains and schedules, and underscores the urgency for the additional mainline tracks to enable MARC to operate more fluidly. CSX will allow MARC to increase the number and frequency of trains only when the MDOT implements the installation of additional tracks. Unfortunately, the ball has been in MDOT's court for over a decade.

The DEIS says nothing about the ridership gains to be realized by 2035 with additional tracks for the Brunswick Line. For example, if the planned segments had been added by 2020, the line would have a daily seating capacity of 19,400 passengers. Instead, the line's daily ridership has remained flat, hovering just above 7,000 passengers because MDOT has not delivered those critical path items.

The DEIS is supposed to examine ways to improve trip reliability along I-270 and address actual traffic growth[50] of 36,400 non-truck vehicles by 2040. However, the DEIS says nothing about how many of those vehicle drivers could turn into MARC passengers if the critical Brunswick Line improvements were implemented over the 23 years it takes to reach that traffic estimate. The DEIS therefore does not provide taxpayers with a transparent examination of the obstacles and untapped potential for a rail line that carries 95% of commuting trips, offers 70% of its passengers easy driving access to stations, and has over 1.3 million jobs located within a 30-minute walk or transit trip to the stations.

If the last segment of additional mainline track is installed by 2040, the Brunswick Line daily seating capacity would be 26,460 passengers, which in 19,603 more than the daily passengers recorded in 2017. This growth in passenger capacity is equivalent to over half the traffic growth forecast for I-270 and provides ample margin to accommodate the share of future drivers who could gravitate towards more convenient rail service if MDOT funds and implements the line improvements.

The DEIS estimates that the toll lanes alternatives that the DEIS promotes, when compared to the no-build alternative, will only save up to 4 minutes in peak travel time (25% trip reduction) and only in the I-270 Southbound direction; none of the toll lanes alternatives saves time when traveling in the I-270 Northbound direction.[51] These meager toll lane results, when compared to the potential of the Brunswick Line if properly funded, make the Agencies' refusal to study new-highway alternatives fatally flawed.

To provide all taxpayers with a comprehensive transportation network that truly supports mobility and enhances equal opportunity for economic prosperity, the Agencies must rigorously

---

[50] The DEIS Traffic Analysis Technical Report, Figure 3-1, Annual Average Daily Traffic (AADT) along Study Roadways, projects a traffic growth for I-270 of 40,000 vehicles from 2017 to 2040. The DEIS divides this growth by 9% of this traffic are trucks which leaves 36,400 non-truck vehicles as the potential market for alternative travel modes.

[51] DEIS, Traffic Analysis Technical Report, Tables 5-5 and 5-6 (Corridor Travel Time Summary (minutes) AM and PM Peak Periods).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 30

and transparently examine all alternatives leveraging the knowledge gained from the work by the Transportation Planning Board and Montgomery County planners.

ii.    The Agencies Must Consider a System Management Accessibility Based Transit (SMART) Alternative

### Deficiency of the Alternatives Analysis

i    The Alternatives Analysis

The Alternatives Analysis proceeds from a badly flawed Purpose and Need Statement, which appears to be "preordered" to favor a toll-enhanced highway widening scheme. The Purpose element states as follows:

The Purpose of the Study is to develop a travel demand solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the study limits and enhances existing and planned multimodal mobility and connectivity.[52]

The flaws in this statement include the use of the word "congestion" instead of "mobility" or "accessibility" (which we will return to later), the focus on two facilities rather than two corridors, and the absence of broader concerns, such as climate change and social and economic equity. The Needs element adds to the trouble.

The Purpose and Need Statement identifies "Accommodate Existing Traffic and Long-Term Traffic Growth" as a primary need.[53] This discussion muddles the concept of congestion (delay) with increased traffic (vehicle miles traveled, or VMT). However, as we demonstrate, these are different phenomena.[54] The proposed roadway widening (the build alternatives) will accommodate more automobile traffic (more VMT) but will not (after a few years) reduce delay. Increasing VMT is an accelerant to climate change (greenhouse gas emissions) and is harmful to broad social and environmental goals, including equitable access to housing and jobs. Increased VMT should be considered a negative outcome, not a need.

The Purpose and Need Statement lists the statement "Incorporate Alternative Funding Sources to Achieve Financial Viability" under "Other Goals and Objectives," but it is in fact a

---

[52] DEIS, 1-4.

[53] DEIS, 1-4.

[54] M-NCPPC has made similar observations: "The Purpose and Need does not clearly articulate the problem, as congestion is merely a symptom. Specifically, we are looking for analysis of the regional travel patterns that contribute to the congestion now experienced on I-495 and I-270, what type of congestion is occurring and whether it is link or merge and weaving capacity, where is the congestion occurring, and how frequently it occurs." M-NCPPC, Briefing and Discussion for I-495 & I-270 Managed Lanes Study (Oct. 11, 2018), https://montgomeryplanningboard.org/wp-content/uploads/2018/10/Briefing_and_discussion_for_October_Full_Commission_Meeting.pdf

00022653

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 78 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 31

main driver of the DEIS.[56] Alternative funding is not a transportation need; it is an implementation strategy. And in this case, the failure of the People I Line P3 scheme casts a long shadow on the "financial viability" of this implementation strategy.

These two elements of the Purpose and Need Statement—traffic growth and tolling—are then used as the main criteria for vetting the alternatives. If an alternative does not widen the highway and does not include toll revenue, it fails the Purpose and Need.[57]

The Alternatives Analysis dismisses all alternatives to a managed lane expansion rather summarily. The DEIS starts with 20 alternatives, including the required "no build" option (which in practice it is never selected), one TSM/TDM option, five very sketchily described transit options, and 14 highway options.[58]

The TSM/TDM option is dismissed because it would not prevent congestion from returning to current levels by 2040 (even though the preferred option would not prevent that either).[59] However, the 2004/2005 Capital Beltway Study, cited in the DEIS as a framework study for the Project, states that MDOT SHA believed the TSM/TDM alternative should be "carried forward and incorporated into all build alternates."[60] The elements of the TSM/TDM alternative will be discussed at greater length under the Transportation Systems Management and Operation (TSMO) section of our proposed Robust Alternative below.

The five transit options are also quickly dismissed. "Transit alone would not meet this Study's Purpose and Need to address the existing and long-term traffic growth in the study corridors."[61] Interestingly, the writers of the DEIS support this conclusion with a quotation from a 2002 MDOT study: "Congestion on the Beltway itself as well as demand on the other transportation facilities is so great that no single highway or transit improvement will provide significant relief for the long-term demand."[62]

---

[56] DEIS, 1-14.

[57] DEIS, 2-8 - 2-9.

[58] DEIS, 2-11.

[59] MDOT SHA, Capital Beltway Study, Public Display Boards (May 6, 2004), https://webarchive.org/web/20170202113503/http://apps.roads.maryland.gov/WebProjectLifeCycle/AW318_11JHDOCS/Documents/International_Public_Workshop_IW318%20Display%20Boards_FINAL_5-6-04.pdf

[60] DEIS, 2-13.

[61] DEIS, 2-13.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 32

For the present purpose it is not necessary to review all the highway alternatives. It is enough to say that the whole exercise leads inexorably to a toll-financed highway widening as the preferred alternative.

**ii   A Robust Alternative**

Since the alternatives to a toll-financed highway widening were poorly drawn and cavalierly dismissed in the DEIS Alternatives Analysis, what would a genuine alternative look like?

First, a reworked Purpose statement should be advanced:

The Purpose of the Study is to develop infrastructure and policy solutions that will improve accessibility and mobility in the Northwest and Beltway corridors while reducing vehicle miles traveled, supporting sustainable land use and economic development, and promoting social, environmental, and economic equity.[62]

The Robust Alternative presented below attempts to address this restated Purpose, and includes a set of infrastructure and policy initiatives that, working together, should advance this goal more efficiently than the toll-financed highway widening scheme and without its huge negative environmental impacts.

For discussion purposes, these comments call this alternative the SMART Alternative, an acronym for System Management/Accessibility/Rapid Transit, the three elements of the program.

**Transit**

We address the transit element of the SMART alternative first. Residents of the Northwest (I-270) corridor – and to a lesser extent the Beltway corridor – already have access to a better transit system than most suburban Americans. The next challenge is to develop the existing system, along with some new elements, to form a network of transit options that will enable those residents to use transit to move about their towns and their region for their daily needs.

The Rapid Transit element of the SMART Alternative is a set of transit improvements that will provide the high capacity, high frequency, high quality element of the transit network. These include, for the Northwest corridor, the Metro Red Line, the Brunswick MARC Line, and the Montgomery County Bus Rapid Transit (BRT) lines.

---

[62] This broader Purpose and Need reflects the broader objectives used in some past Maryland studies. For example, the 2004/2005 Capital Beltway Study purpose and need included objectives like: improve regional mobility; provide enhanced safety; maximize travel operational efficiencies; provide cost-effective transportation infrastructure; and support the area's economic growth and the environment. Capital Beltway Study Public Display Boards, see supra, note 59.

00022654

JA1648



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 33

## Brunswick MARC Line

The most underutilized public transportation asset in the Northwest corridor is the MARC Brunswick commuter rail line. The Brunswick Line runs roughly parallel to I-270 and the Red Line through Montgomery County and has the potential – with appropriate infrastructure improvements and institutional realignment – to become a high-capacity, high-quality regional rail line.

The Brunswick Line runs for a total of 88 route miles[63], extending from Union Station in Washington DC to Brunswick MD, with some trains going on to Martinsburg WV and some going on a branch line to Frederick MD. It runs adjacent to the Metro Red Line in central Montgomery County between the White Flint Metro station and the northwestern terminus of the Red Line at Shady Grove, with an interchange station at Rockville. South of White Flint, the Brunswick Line tracks run east to Union Station through Silver Spring, while the Red Line follows a more westerly alignment through Bethesda.

The Brunswick Line is currently (pre-pandemic) runs 7 morning peak-hour trains eastbound toward Union Station and 9 evening peak-hour trains westbound, with one midday westbound train and no trains on weekends. This limited service generates only some 6,000 or so daily riders.[64]

The service and capacity on the Brunswick Line can be dramatically expanded. The Maryland Transit Administration (MTA) developed a plan for upgrading all three MARC lines in its 2007 MARC Growth and Investment Plan. That plan called for increasing seating capacity on the line from 7,000 to 26,000,[65] with frequent peak-hour service, and increasing off-peak and weekend service. The plans sketched out a set of incremental capital improvements needed to make this growth possible, centered on adding a third track through much of Montgomery County, but also including new rail cars and improved station facilities.[66] The total capital cost of these upgrades was estimated at $531 million with an additional $18 million in annual operation and maintenance costs.[67]

The Growth and Investment Plan schedule for the Brunswick Line improvements would have extended to 2035, but even that distant date has been removed from MTA documents.

[63] Maryland Statewide Rail Plan, April 2015, 4-27.

[64] Maryland Statewide Rail Plan, April 2015, 4-27.

[65] MARC Growth and Investment Plan, 2007, 29.

[66] MARC GIP, 23-26.

[67] MARC GIP, 30-31.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 34

which currently show no commitment to those improvements.[68] In fact, these improvements – and more – can and should be made much more quickly. A planning document by the advocacy group Action Committee for Transit provides a more richly detailed "feasibility study" than MTA's outline.[69]

What kind of difference can a high-quality, high-capacity regional rail line provide? For reference, the Caltrain commuter rail line south of San Francisco, already a major carrier of passengers, is planning to upgrade from typical commuter service to frequent all-day service. Their business plan projects that ridership will increase from 65,000 per day to 180,000 per day, which is equivalent, according to their press office, to adding 5 ½ lanes to the adjacent freeway.[70]

The Growth and Investment Plan identifies one key impediment to improving the Brunswick Line that must be addressed: the line is owned and operated by the freight railroad CSX. As the plan notes, MARC must "negotiate" time-slots with CSX.[71] Although adding a third track on the mainline (and a second track in Frederick) should provide ample capacity for both passenger and freight rail operations, there is no guarantee that that will happen. Experience in other rail corridors suggests that where a freight railroad owns and operates track (including dispatching trains in real time), passenger traffic always has a lower priority than freight. It is unrealistic to shut down freight traffic on the Brunswick Line (mainly known as the Metropolitan Subdivision in CSX parlance). CSX identifies this line as an element of its "National Gateway" system, which includes improving rail routes to permit "double-stacking" of containers moving mainly Chinese manufactured goods from the Port of Baltimore to Midwest destinations. Although a more westerly route (the old B&O Mainline) travels a shorter distance to the port, that route is constrained by tunnels and is limited to a single track for double-stack trains. Therefore, freight must be part of the equation on the Brunswick Line.

To resolve this problem, we strongly recommend that the Brunswick Line be taken into public ownership. This would probably require an act of Congress, as CSX would be expected to aggressively resist this change. Ownership and operation of the line should pass to Maryland

[68] Also Holt, (A MARC's Normal Plan to Improve Service a Step Backwards?) Greater Greater Washington (Dec. 3, 2019), https://ggwash.org/view/74948/is-marcs-train-ride-news-convenient-plan-goes-backwards.

[69] Action Committee for Transit, MARC Brunswick/Frederick Line Improvement Proposal, (Nov. 2016), http://actfortransit.org/archives/reports_and_other/MARCBrunswickImprovementProposal.pdf.

[70] Erin Baldassari, Caltrain has an Ambitious Plan to Run BART-Like Service. Here's What it Will Mean for Bay Area Traffic, The Mercury News (July 22, 2019), https://www.mercurynews.com/2019/07/22/caltrain-has-an-ambitious-plan-to-run-bart-like-service-heres-what-it-will-mean-for-bay-area-traffic.

[71] MARC GIP, 10.

00022655


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 35

DOT—or Amtrak—which would guarantee that passenger traffic has priority while preserving freight movements.

## Metro Red Line

The Red Line is the core transit spine of the Northwest Corridor, running from Union Station in Washington to Shady Grove, with eight stations along the corridor in Montgomery County (and another branch via Silver Spring to Glenmont). WMATA, the transit agency, has recently expanded capacity on the outer portion of the line by eliminating the "Grosvenor turnaround."[72] Planning should be undertaken for a possible Red Line extension to Germantown, as proposed by transit advocates,[73] and more Transit Oriented Development opportunities.

## Bus Rapid Transit

A planned network of Bus Rapid Transit (BRT) routes in Montgomery County will provide another layer of high-quality public transportation in the Northwest Corridor.

As defined by the Federal Transit Administration:

Bus Rapid Transit (BRT) is a high-quality bus-based transit system that delivers fast and efficient service that may include dedicated lanes, busways, traffic signal priority, off-board fare collection, elevated platforms and enhanced stations. Because BRT contains features similar to a light rail or subway system, it is often considered more reliable, convenient and faster than regular bus services.[74]

Montgomery County has adopted a transit plan outlining 10 county BRT lines plus one MDOT line, the Corridor Cities Transitway, although that line was defunded last year.[75] The first county line, the US 29 "Flash" between Silver Spring Transit Center and Burtonsville, began operations

---

[72] Stephen Repetski, *Metro Version: More Trains Bring More Riders to the Red Line*, Greater Greater Washington (July 25, 2019), https://ggwash.org/view/73123/metro-restores-more-trains-bringing-more-riders-to-the-red-line.

[73] Montgomery County Advocates for Better Transportation, *A Transit Vision for the I-270 Corridor*, http://mcfortransit.org/I-270_corridor.html.

[74] Federal Transit Administration, *Bus Rapid Transit*, (Dec. 9, 2015), https://www.transit.dot.gov/research-innovation/bus-rapid-transit.

[75] Montgomery County Planning Department, *Countywide Transit Corridors Functional Master Plan*, (Dec. 2013), http://www.montgomeryplanning.org/transportation/highways/documents/countywide_transit_corridors_plan_2013-12.pdf

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 36

on October 14, 2020.[76] Although this line is not likely to have an effect on either the Northwest or Beltway corridors, it will provide operating experience and travel data that will inform future projects.

These projects would directly benefit mobility in the Northwest corridor: MD 355, the Corridor Cities Transitway, and Veirs Mill Road.

The MD 355 Flash BRT[77] is one of the first BRT route to be implemented by the county. It would traverse MD 355 from the Bethesda Metro to Clarksburg, partially on separate lanes and partially in mixed traffic (with the exact alignment to be determined). The southern half of the line would run parallel to the Metro Red Line, with a likely interchange at the Rockville Metro with the Red Line and MARC and presumably at other Metro stations as well. The entire route north of the Beltway would parallel I-270 and would provide an alternative travel option for people to gain access both to activity centers along MD 355 and to higher speed transit (MARC and Red Line) without using a car. The line will provide service to existing[78] and planned developments along the corridor.[79]

The Corridor Cities Transitway,[80] if it is re-funded, would also improve mobility in the Northwest corridor, tying together a number of residential and employment centers in 16 stations on a somewhat circuitous 15-mile route between Shady Grove Metro and the COMSAT site near Clarksburg; although not suited for long-distance travel, the alignment would provide relief for I-270 through its direct access to these centers. Initially planned as a light rail route, then reconfigured for IRT, the project was defunded by MDOT in 2019 as part of a general retreat from transit. The project should be revisited as part of the overall BRT plan.

---

[76] Press Release, *Montgomery County's Department of Transportation Launches 'Flash,' Maryland's First Bus Service of Its Kind, in Ceremonial Led by County Executive Elrich and Council President Katz*, Montgomery County Government (Oct. 14, 2020), https://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail.aspx?Item_ID=29054.

[77] See Montgomery County Department of Transportation, *MD355 Bus Rapid Transit*, https://www.montgomerycountymd.gov/dot-dte/projects/MD355BRT/ and, Montgomery County Department of Transportation, *MD 355 BRT Corridor Planning Study Phase 2 Draft)*, (June 2019), https://montgomeryplanningboard.org/wp-content/uploads/2019/06/Attachment-A-DRAFT-MD-355-BRT-Corridor-Summary-Report.pdf.

[78] https://www.rockvillemd.gov/DocumentCenter/View/21729/Rockville-2040-Open-House-Poster—Transportation?bidId=

[79] MD 355 BRT Corridor Planning Study, 78.

[80] See Montgomery Planning, *Corridor Cities Transitway*, https://montgomeryplanning.org/planning/transportation/transit-planning/corridor-cities-transitway/.

00022656

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 81 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 37

The third BRT route providing support for the Northwest corridor will traverse Veirs Mill Road for seven miles between Rockville and Wheaton Metro stations.[51]

### Beltway corridor

The Capital Beltway (I-495), which was designed for interstate highway connectivity, has few transit alternatives. The most important one is the Purple Line, which if it is completed will connect several radial Metro lines and important activity centers (Bethesda, Silver Spring, College Park, etc.).[52]

### Transportation Systems Management and Operations (TSMO)

The second element of our proposed SMART alternative is System Management. This is a broad term for a set of strategies that highway agencies use to improve the operation and reliability of a roadway without adding additional through-traffic lanes. Examples include "smart" (computerized) traffic signals, variable message signs, and online and telephone traveler information. The DEIS discusses — but then dismisses — this idea under Alternative 2: TSM/TDM (transportation system management/transportation demand management). The DEIS states that "these types of solutions optimize the existing system" but rejects them because they "do not support long-term traffic growth." It notes that some TSM/TDM are already being implemented on I-270 under the Innovative Congestion Management project, but states that although there are near-term benefits, modeling predicts that traffic will "return to existing levels of congestion by 2040." (As discussed elsewhere, congestion should be expected to return to current levels by then even with a major capacity increase.) The DEIS does state that some elements of the TSM/TDM alternative will be kept in the Project. DEIS, at 2-11.

Although we have used the labels "system management" and "TSM/TDM" for this category of transportation strategies, the current technical term is Transportation Systems Management and Operations (TSMO), defined in federal law as an integrated set of "strategies to optimize the performance of existing infrastructure through the implementation of multimodal and intermodal, cross-jurisdictional systems, services, and projects designed to preserve capacity and improve security, safety, and reliability of the transportation system."[53]

MDOT is no stranger to TSMO techniques. The DEIS, as noted above, references TSMO strategies already implemented on I-270, with more to come. In fact, MDOT is one of the national leaders in this field. Its recently adopted a TSMO strategic plan that chronicles its

---

[51] Montgomery County Department of Transportation, Veirs Mill Road Bus Rapid Transit, https://www.montgomerycountymd.gov/dot-dte/projects/VeirsMillBRT.

[52] Coalition for Smarter Growth, Purple Line, https://www.smartergrowth.net/maps/land/purple-line/

[53] MAP-21, Pub. L. 112-141, 126 Stat. 405, 422, § 1103(a)(30)(A).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 38

experience and sets out a full set of goals, objectives, and strategies for expanding and implementing TSMO activities in the state.[54]

Interestingly, the TSMO Strategic Plan takes a decidedly more positive view than the DEIS does of TSMO as an alternative to capacity increases:

When comparing TSMO improvements to capacity improvements, the return on investment and benefit cost analysis usually justifies the operational improvement. This is particularly evident when mitigating the travel time reliability on severely congested roadways. Monitoring the improvements by selecting indicators such as value of time, value of travel time reliability, and fuel costs allows for direct comparisons. MDOT SHA monitors some of these costs through their annual mobility reporting process. The net cost and time savings outcomes favor TSMO from a traveler's perspective. Additionally, projects adding capacity often have huge environmental impacts, which delay project development as well as construction.[55]

Or, in summary form:

Compared to capacity expansion, TSMO strategies:

• Address all sources of congestion, recurring and non-recurring.
• Are inexpensive and cost-effective.
• Take little or no extra right-of-way.
• Can be deployed in months rather than years.[56]

MDOT has recently adopted an implementation plan for the next generation of TSMO projects." The Northwest corridor is included in "System 12" in the plan. System 12 includes the TSMO work currently being implemented on I-270 and references the proposed widening

---

[54] MDOT SHA, TSMO: Maryland Transportation Systems Management & Operations: Strategic Plan, (Oct 2018), https://www.roads.maryland.gov/OPPEN/2018_MDOT_TSMO_Strategic_Plan.pdf

[55] TSMO Strategic Plan, 12.

[56] TSMO Strategic Plan, 27.

[57] MDOT SHA, TSMO Master Plan, (July 2020), https://roads.maryland.gov/OPPEN/TSMO_Master_Plan.pdf

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 82 of 340



OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 39

project. Also included is a major installation of TSMO elements on MD 355, including should circuit "PV, "smart" traffic signals, and fiber optic links.[89]

The Beltway corridor is not included in the TSMO master plan, and this is a corridor where TSMO planning and implementation should have the highest priority.

Accessibility

The third leg of the SMART alternative is Accessibility; this is the transportation and land use piece of the puzzle. Transportation planners have long realized that building pieces of infrastructure without linking that work to land use planning can cause more problems than it solves. Fortunately, today both transportation planners and land use planners are generally well aware of the need to work together. One sign of their awareness is the choice often made today to focus on improving "accessibility"—the ability of people to easily gain access to desired destinations—rather than "mobility"—the business of moving vehicles through space.

Land use patterns have a major impact on travel behavior. A 2017 report prepared by the Washington, DC-area Metropolitan Planning Organization composed 10 transportation infrastructure and policy initiatives, ranging from a Regional Express Travel Network to Transit Rail Extensions to Optimize Regional Land Use Balance, on a variety of measurements.[90] The Transit Rail Extensions to Optimize Regional Land Use balance (which included East-West population shifts as well as densification) scored second in Reduction of Daily Vehicle Hours of Delay and for first in both Reduction of Vehicle Miles Travelled and Average Fleet Travel Times to Intercity Hubs (major airports and train stations).[91]

A new report from the Brookings Institution explores this topic in depth, especially focusing on the importance of proximity to key services.[92] The key takeaways:

- People travel over 7 miles on average for every trip they take, but these distance vary widely across different metro areas and neighborhoods;

[89] TSMO Master Plan, 56-58.

[90] National Capital Region Transportation Planning Board, An Assessment of Regional Initiatives for the National Capital Region, (Dec. 2017), https://www.mwcog.org/file.aspx?D=lsJR0DCoD%5BBO0CSReNbNJfLpbvtoSEVcgs%2FUMb7zd%2Fs3dhL%2NYvfTYwWwroQEWv1mU6gZZ6XMf0mRbWWkAB%2iO9G%2Fs34.

[91] Id. at 26; Transportation Planning Board, "Long-Range Plan Task Force: Draft Analysis Results, 15 November 2017.

[92] Adie Tomer, Joseph Kane, and Jennifer S. Vey, Connecting People and Places: Exploring New Measures of Travel Behavior, Brookings Institution (Oct. 2020), https://www.brookings.edu/wp-content/uploads/2020/10/Corridors-of-Demand.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 40

- Human-scale neighborhood designs lead to shorter distance trips;

- People traveling in automobile-oriented neighborhoods face longer trips overall, regardless of the trip's purpose;

- Trip distances vary by income and race, reflecting patterns of racial and economic segregation;

- Transportation policy should use pricing and performance measurement to more actively support human-scaled neighborhoods;

- Land use policies should promote growth in neighborhoods that support proximity and spatial equity; and

- America must electrify its vehicle fleet in order to mitigate climate change while new policies and practices are being developed.[93]

Of particular importance for our purposes is the adoption by state and local agencies of integrated land use and transportation plans and policies that will maximize the benefit and utility of transportation investments. Sadly, the State of Maryland has in recent years retreated from its earlier role as a national leader in Smart Growth planning, but other jurisdictions have continued to do valuable transportation and land use planning.

Montgomery County, known as a pioneer in good regional planning, has published a new draft master plan, Thrive Montgomery 2050, which aggressively addresses the challenges of our times and lays out a set of principles that are congruent with the SMART alternative.[94] The "Trends and Challenges" section includes several pertinent points, including:

- We are not producing enough housing in accessible locations to meet our needs;

- We need to stop planning for cars and emphasize transit, walking and biking;

- Declining trends in public health and well-being indicate a growing need for a healthier more active lifestyle; and

- Climate change threatens all aspects of life.[94]

[92] Tomer, 4-5.

[93] Thrive Montgomery 2050, Public Hearing Draft Plan, Montgomery Planning (Oct. 2020), https://montgomeryplanning.org/wp-content/uploads/2020/10/Public-Hearing-Draft-Plan-Thrive-Montgomery-2050-final-10-5.pdf

[94] Thrive Montgomery, 19-24.

00022658

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 83 of 340

00022659

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 41

The "major themes" of the plan are:

• Complete Communities through compact form of development and urbanism;

• Corridors are the place for new growth;

• Start planning for people instead of planning for cars;

• Eradicate greenhouse gas emissions;

• Evolution of single-family neighborhoods near transit;

• Racial justice and equity;

• Great design and the importance of place; and

• Regional solutions and strategies.[95]

*Thrive Montgomery* goes on to catalog a comprehensive list of goals, policies, and actions that will advance these themes.[96] They plan is a solid foundation for the SMART alternative in Montgomery County and runs completely counter to the direction taken by the Project.

More localized planning efforts also support the SMART alternative. For example, Montgomery County has adopted a neighborhood plan for the Veirs Mill corridor, a largely single-family home area with a planned Bus Rapid Transit line referred to earlier in these comments. The plan "seeks to improve connectivity between transit and community uses and facilities, enhance safety for all users of Veirs Mill Road, support the existing residential scale and character, and introduce limited redevelopment opportunities to strengthen the existing neighborhood centers and identity."[97] This is a good example of how linking transportation and land use planning can improve mobility, accessibility, and quality of life for residents in a variety of settings.

Much further out on the Northwest corridor, Frederick County is developing a plan for a sprawling, auto-oriented zone south of the city of Frederick. The plan includes moving toward mixed-use development, interconnectivity of roads and streets, form-based codes, and transit-oriented development at the Monocacy MARC station.[98]

[95] *Thrive Montgomery*, 37-45.

[96] *Thrive Montgomery*, 54-56.

[97] Veirs Mill Corridor Master Plan, at 2 (April 2019), https://montgomeryplanning.org/wp-content/uploads/2020/01/Veirs-Mill-Corridor-Master-Plan-Approved-and-Adopted-WEB.pdf.

[98] The South Frederick Corridors Plan: Briefing Book, September 2020, 59-63.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 42

The Beltway corridor is so far-ranging that land use policies must be adopted at a local scale to have a beneficial effect. We also must recognize that the pandemic has led to a significant increase in working from home, some portion of which may be long-lasting,[99] supporting what some have called the "good localization."[100]

**C. The DEIS Does Not Adequately Address the Water Quality Impacts from the Project**

**1. The DEIS Fails to Examine How Increased Stormwater Will Affect Receiving Waterways**

Under NEPA the Agencies must "carefully consider[] detailed information concerning significant environmental impacts" and make the public aware of these environmental effects before a proposed action is chosen. *Robertson v. Methow Valley Citizens' Council*, 490 U.S. 332, 349 (1989); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010). Among other things, the Agencies must provide detailed information on how polluted stormwater from the Project will affect receiving waterways.

The Clean Water Act (CWA) prohibits discharges of pollutants to waters of the United States without a permit. 33 U.S.C. §§ 1311, 1342. The Agencies state that they will meet all required permitting for stormwater runoff but fail to address how increased stormwater runoff and the associated increase in pollutant loads to receiving waterways will meet established effluent limitations. *See id.* § 1362(11) (defining an effluent limitation as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance"). The type, quantity, and contents of the discharge determine the limitations the permit must impose on the discharger and should be carefully considered in the DEIS.

Stormwater collects pollutants on its way to stormwater management facilities and eventually into municipal separate storm sewer systems and receiving waterways. These discharges can negatively impact the chemical, physical, and biological conditions of waterways. It is well-recognized that stormwater can degrade water quality, particularly in urban settings, yet the DEIS fails to take a hard look at how the large increases in stormwater from the build

[99] Jonathan Captiol, *D.C. Area Employers are Open to the Idea of More Permanent Teleworking; That Could Help Traffic*, Washington Business Journal (Sept. 16, 2020), https://www.bizjournals.com/washington/news/2020/09/16/teleworking-survey-census.html.

[100] Mitch Shaw, *Transportation Officials Anticipating "Great Localization" After COVID-19*, Standard-Examiner (Sept. 16, 2020), https://www.standard.net/news/transportation/transportation-officials-anticipating-great-localization-after-covid-19/article_e650b801-543e-50f7-8895-8e58fec86b7b.html.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 43

alternatives will impact water quality.[10] The Maryland Department of the Environment has itself stated that "[i]t becomes fairly easy for all organizations, individuals, and government agencies to agree that urban stormwater is a problem that must be addressed." MDE, Response to Formal Comments for Montgomery County NPDES Permit (2009).

Fifteen Maryland watersheds (MDNR 12-digit) and two Virginia watersheds will be affected by the build alternatives. See DEIS, App. I, pp. 45, 47 (Table 2-4-7). [Maryland watersheds: Potomac River – Lower Northwest Branch, Upper Rock Creek, Northwest Branch, Paint Branch, Little Paint Branch, Bald Hill Branch, Upper Beaverdam Creek, Patuxent River Western Branch – Upper Southwest Branch, Upper Southwest Branch, Patuxent River Western Branch – Lower Southwest Branch, Upper Beaverdam Creek, Watts Branch, and Muddy Branch; Virginia: Scotts Run, Dead Run]. All impacted Maryland and Virginia watersheds except Scotts Run are already impaired by one or more pollutant for one or more designated use, meaning that the waterways in these watersheds currently do not meet water quality standards. DEIS, App. I, at 47, 48; see 33 U.S.C. § 1313. DEIS, App. I, at 55. The build alternatives would increase impervious surface areas and the numbers of vehicles traveling the Beltway and I-270, thereby increasing stormwater runoff and pollutant loads. The build alternatives would add between 49.4 and 108.4 acres of impervious surface in the Cabin John Creek, Northwest Branch, and Upper Beaverdam watersheds, and between 0-13.9 acres in Northwest Branch, Little Paint Branch, Muddy Branch, Watts Branch, and Bald Hill Branch watersheds. DEIS, at 4-91. The DEIS lists assessments of these watersheds' water quality in Table 4-28 (Summary of Watershed Quality Index, Narrative Score Results) and the majority are classified as poor or very poor in Indices of Biological Integrity (IBI) scores. DEIS, at 4-106. For example, the Upper Beaverdam is classified as "Very Poor-Fair" in benthic invertebrate IBI scores and "Very Poor-Fair" in fish IBI scores. DEIS, App. I, at 55. In impervious surface area and very low IBI score, each of these build alternatives will further degrade stream conditions. Stormwater impacts will be one of the largest environmental impacts of this Project and yet the DEIS fails to specify how new stormwater loads will impact the water quality of receiving waterways.

    a.    The DEIS Fails to Identify Stormwater Volume and Pollutant Loads

DEIS Section 2.7 provides an overview of applicable federal, state, and local stormwater and water quality requirements that the selected alternative will need to meet under the Clean Water Act, Maryland Stormwater Management Act, and Montgomery County and Prince George's County stormwater management requirements. It identifies how much impervious surface would be added by the build alternatives (Table 2-5) and how many major culvert crossings may be built. DEIS, at 2-37 to 2-39, but doesn't discuss Fairfax County

[10] See, e.g., National Academies of Science, Committee on Reducing Stormwater Discharge Contribution to Water Pollution, Urban Stormwater Management in the United States (2009), https://www.nap.edu/read/12465/chapter/1; see also Hallie Miller, Report Faults Maryland for Failings in Chesapeake Bay Pollution, Washington Post (Aug. 18, 2020), https://www.washingtonpost.com/local/md-politics/maryland-failing-in-chesapeake-bay-pollution-20200818-36836-54525f-a193-11ea-bc96-6df35e6472ed_story.html.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 44

stormwater management (SWM) requirements. Importantly, the DEIS fails to provide an estimate of stormwater volumes or pollutant loads by alternative. DEIS, at 2-39. Instead, the Agencies punt this analysis until after the NEPA process is concluded. DEIS, at 2-39 ("A detailed SWM analysis will be performed for the Selected Alternative during final design to determine required and provided stormwater management volumes."). It appears the Agencies may have already conducted some volume calculations given that this information is needed to estimate the location and type of stormwater facilities needed along the proposed new highway lanes. DEIS, at 2-37 to 2-38, but this information is not included in the DEIS.

    b.    The DEIS Fails to Take a "Hard Look" at How Increased Stormwater Will Affect Receiving Waterways

The impacts of stormwater on receiving waterways is discussed only superficially in the DEIS. The DEIS mentions that "[t]he evaluation of potential water quality loss and major culvert crossings was also conducted" and that "SWM water quality requirements and treatment . . . will improve current conditions." DEIS, at 2-37. It is hard to imagine, however, how increased stormwater will improve current conditions. Even if it were to do so, there are no data presented regarding water quality loss or improvement, only tables and estimates of the amount of impervious surface to be added and conclusory statements indicating that stormwater will negatively impact receiving waterways.

The DEIS also fails to model how anticipated increases of stormwater volumes will impact water chemistry. For example, DEIS § 4.13.3 states:

All Build Alternatives would affect surface waters, surface water quality, and watershed characteristics in the corridor study boundary due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels and increases in impervious surface in their watersheds. The impacts to jurisdictional surface waters by classification are summarized in Table 4-20 of this chapter. The impacts to jurisdictional surface waters are provided in the Natural Resources Technical Report (Appendix I, Section 2.3).

DEIS, at 4-89; see also id. at 4-90 to 4-91. However, these references do not discuss the likely impacts to water quality in any detail. Table 4-20 provides information on the total square footage and acres of wetlands and waterways that would be disturbed by each alternative, but provides no information on impact to water chemistry. The flaws in Appendix I, which also is referenced, are discussed further below.

Similarly, DEIS § 4.13.3 states:

In addition to tree removal, stormwater discharges also have the potential to increase surface water temperatures in nearby waterways. The effect of the temperature change depends on stream size, existing temperature regime, the volume and temperature of stream baseflow, and the degree of shading. Thermal effects from decreased shading and stormwater discharge are of particular concern

CO-450

00022660

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 85 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 45

For Tier III and IV stream networks, such as Point Branch and Northwest Branch, as they support aquatic biota less tolerant of stormwater conditions.

DEIS, at 4-90. Yet the DEIS fails to quantify the likely temperature changes or to discuss their likely impacts on the affected waterways. *See also* discussion at DEIS, at 4-90 to 4-91 (providing general descriptions of the effects of chlorides, organic pollutants, and sediments on water quality, but neglecting to specify or otherwise analyze their effects in the context of the Project, except to say that they "increase in impervious areas").

The DEIS identifies where the most and least impervious areas would be added, but still does not analyze the impacts and refers to the same flawed Appendix L that is discussed below:

All Build Alternatives would add the most impervious surface to the Cabin John Creek, Northwest Branch, and Upper Beaverdam MD 12-digit watersheds, with between 49.4 and 108.4 acres added. The least additional impervious surface would be added to Northwest Branch, Little Paint Branch, Muddy Branch, Watts Branch, and Bald Hill Branch watersheds, with between 0 and 13.9 acres added. The only Tier II watershed that would experience an increase in impervious surface is the Beaverdam Creek – Northeast Branch watershed, with an increase of less than 0.1 acres. Refer to the *Natural Resources Technical Report* (Appendix L, Section 2.3) for a discussion of jurisdictional surface water impacts and Table 4-29 for additional impervious surface by Build Alternative.

*Id.* at 4-91; Table 4-29 simply provides the amount of impervious surface to be added to each of the seventeen impacted watersheds.

The DEIS also fails to provide any details on the mitigation measures that would be required, other than to say:

Water quality would be protected by implementing strict erosion and sediment control plans with BMPs (best management practices) appropriate to protect water quality during construction activities. Post-construction stormwater management and compliance with total maximum daily loads (TMDLs) will be accounted for in the stormwater design and water quality monitoring to comply with required permits.

*Id.*

Appendix L, Section 2.3, identifies existing water quality conditions for the watersheds and the most common contaminants found to highway stormwater before making the following conclusory statement:

There would be no effect on surface waters and watershed characteristics from the No Build Alternative. However, all No-action Alternatives would affect surface waters and watershed characteristics in the corridor study boundary due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 46

Impacts to jurisdictional surface waters are discussed in Section 2.3.3 and the impacts to jurisdictional surface waters by MDNR 12-digit watershed are included in Table 2.3-8. Watersheds would also be impacted by increasing impervious surface area. SWM controls will be included in the final design to reduce velocity of runoff flow and negative impact to water quality. Section 2.4.5.C includes more information regarding environmental effects to water quality. Additional information regarding SWM assumptions are discussed in Section 2.7.3 of the DEIS. Note that although the corridor study boundary intersects the Piscataway Creek Tier II watershed, no features were identified and therefore no impacts would occur within this watershed.

DEIS, App. L, at 78.

Appendix L, Section 2.3.3 makes no reference to stormwater impacts. Table 2.3-8 merely provides the total area of wetlands and waterways that will be disturbed. Appendix L, Section 2.4.3 simply references information provided in Section 4.13.3 of the main DEIS document.

In Appendix L, Section 2.3, the Agencies provide thirty-three pages of data and discussion showing the existing chemical and physical conditions of each impacted watershed, DEIS, App. L, at 45-78, but fail to provide any analysis of the effect that the most common contaminants found in highway stormwater runoff would have on water quality in these watersheds. *Id.* at 78; § 2.4.3(A), (C). In fact, the only time the effects of stormwater are ever mentioned in the summary of watershed existing conditions is in a small section discussing Sligo Creek that states, "direct effects of runoff would likely affect water quality." DEIS, App. L, at 66. There is no information cited to support how the Agencies arrived at this conclusion or to what extent Sligo Creek would be impacted. There is no discussion of stormwater in the existing conditions sections for the other sixteen watersheds.

The Agencies must identify how building new highway lanes and reconnecting existing lanes, which are the only build alternatives being considered, will increase stormwater flow and pollutant loads. DOT should model the anticipated stormwater runoff to identify and characterize the quantity and quality of runoff, including identifying estimated total volumes, peak discharge, and velocity. This discussion should include an itemized calculation of stormwater from each drainage area for each proposed alternative and models showing how this stormwater would impact the ability of the receiving waterway to meet existing effluent limitations. The analysis should also consider how the lack of proposed onsite treatment and the water quality trading credits relied upon by the Agencies to meet stormwater permitting requirements will impact local waterways.

More comments on the proposed use of water quality trading are provided in Section II.C.4 of this document. There are models readily available to the Agencies that would allow them to provide meaningful information about the risk of adverse effects of runoff on receiving waterways, which could then be used to inform a determination of the degree and nature of the impact, the need for mitigation measures, and the potential effectiveness of such management measures for reducing these risks. *See for example*, Storm Water Management Model (SWMM), EPA, https://www.epa.gov/water-research/storm-water-management-model-swmm. The DEIS

JA1655

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 47

must contain a stormwater impact analysis and provide the public with an opportunity to comment on these Project impacts.

2. **The Analysis of Stormwater Management Needs is Incomplete and Lacks Supporting Data**

The Agencies must evaluate all relevant data and "articulate a satisfactory explanation" for the conclusions reached in the EIS. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Agencies fail to explain and provide sufficient data in the DEIS to support the stormwater management needs identified in the DEIS. The Agencies must provide an explanation for the findings in Table 2-5 as to the number of lanes that will need to be reconstructed. Additionally, the DEIS fails to consider impacts to smaller culverts.

a. **The DEIS Provides Insufficient Data to Support its Impervious Surface Area Calculations and the Selection of Stormwater Management Facilities That is Proposed**

Section 2.7.2 identifies the types of stormwater management to be used to manage the large quantities of stormwater that will be produced by all build alternatives. DEIS at 2-57 to 2-59. The DEIS identifies the type of stormwater facilities (quantity ponds, Environmental Site Design (ESD) ponds, swales, quantity vaults, and water quality vaults) and water culverts to be used and their proposed locations based on the amount of impervious surface area calculated for each build alternative. DEIS at 2-58, Table 2-5. However, no photos, maps, or data are provided to support the calculated impervious areas presented in Table 2-5. *Id.*[a] A footnote to Table 2-5 states that "Offsite requirements are based on the engineering design as of January 2020." This design should have been included in the DEIS, but it was not.

The DEIS proposes new stormwater facilities to be built along the study corridor to accommodate stormwater runoff but fails to consider impacts to existing stormwater management facilities. DEIS at 2-58; *see* DEIS, App. D, EnvMapping, web_part1 to EnvMapping, web_part9. The DEIS does not provide information on existing stormwater management facilities. Due to this lack of information it is unclear how the construction of new facilities will impact existing facilities proposed at the same site. It appears that some newly proposed facilities would be built on top of or overlapping existing stormwater management facilities. For example, Map 59 in Appendix D, Environmental Mapping, proposes these facilities within the traffic loops where I-270 meets Democracy Boulevard. There are already seven existing facilities located at the same location as the proposed facilities (numbers 150657 through 150660). *See* MDOT SHA NPDES SWM FAC mapping tool, available at

---

[a] Table 2-5 provides the acres of impervious area for each build alternative broken down by: Required Quantity surface area (acres); Provided Quantity surface area (acres); Required ESD surface area (acres); Provided ESD surface area (acres); Required ESD surface area (acres); and Impervious Area Requiring Offsite Treatment (acres).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 48

https://www.arcgis.com/home/webmap/viewer.html?useExisting=1&layers=d589b42c24f4c49823546296a327b...

The DEIS also fails to describe or account for how existing stormwater runoff will be managed if and when existing facilities are removed or replaced for new facilities in situations where new facilities replace old facilities, the DEIS should explain how they will be built with sufficient capacity to address all existing and new stormwater runoff. There are several publicly available resources the Agencies can use to identify existing facilities along the study corridor.[b] The Agencies established the limits of disturbance (LOD) by estimating the areas around the build alternatives that will be impacted by "construction, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities." DEIS, at 2-40. The LOD for each build alternative should be cross-referenced with the appropriate local map and line of treatment and storage should be accounted for in the planning and design of stormwater management facilities. Proposed stormwater management facilities are shown on the DEIS Environmental Resource Maps, but the maps fail to show the drainage areas to the facilities. *See* DEIS, App. D, EnvMapping, web_part1. This means that these maps also fail to show where facilities will connect into existing drainage networks. All drainage areas and areas used to connect facilities to existing drainage networks need to be included within the LOD. It is unclear whether the LOD currently includes these areas given that they are not included on any of the DEIS maps. Without maps showing the drainage areas and any other data used to calculate the impervious surface areas provided in Table 2-5 and identify connection points to existing drainage infrastructure, the public is foreclosed from reviewing and commenting on the sufficiency of the proposed stormwater management facilities.

---

[b] MDOT SHA NPDES SWMFAC:
https://www.arcgis.com/home/webmap/viewer.html?useExisting=1&layers=d589b42c24f4c49823546296a327b...

Prince George's County Clean Water Map:
https://www.arcgis.com/apps/webappviewer/index.html?id=4169a343555903b3e4d6e6279902SE

Montgomery County (map at bottom of page):
https://www.montgomerycountymd.gov/water/stormwater/maintenance.html

Fairfax County:
https://www.fairfaxcounty.gov/fsev/apps/Jade/Index.html?configFlase=https://www.fairfaxcounty.gov/fsev/apps/Ancestry/Essentials/DLIST/sites/Jade/virtualfiles/env/Resources/ConfigOutfall...

CO-452

00022662

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 87 of 340

I-495 & I-270 Managed Lanes Study

CO-453

00022663

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 89

### b. No Information is Provided to Support the Percentage of Existing Lanes to be Recommended

The amount and type of stormwater management required under the Maryland Stormwater Management Act of 2007 is dictated in part by the amount of impervious surface area created and reconstructed. Md. Code. Ann., Env't §§ 4-201.1, 4-203 (2014). Specifically, if the percentage of lanes that need to be reconstructed exceeds 40%, "all existing impervious areas located within a project's LOD are required for management." Maryland Stormwater Design Manual, Chapter 5, p. 5-117. To calculate the amount of new and reconstructed impervious surface, the Agencies "assum[ed] all shoulders and 25 percent of the existing lanes would need to be reconstructed." DEIS, at 2-57. The Agencies calculated this percentage by conducting a "field investigation[] to determine existing conditions," id. However, no information is provided to support the conclusion that only 25% of existing impervious surface will be reconstructed, leaving the public unable to review and comment on this finding. In fact, there appears to be little basis for arriving at the 25% figure, particularly in light of a statement by former Maryland Secretary of Transportation Pete Rahn that "the Washington Beltway [] can no longer be expanded and it needs to be reconstructed because we have ninth underneath it and the system finally has got to be taken right down to the dirt and brought back up."[108] The Agencies must provide sufficient information to support their conclusion, including field logs, maps, photos, or other information needed to calculate this important number.

Regardless of the percentage of reconstructed impervious surface,[109] the Organizations encourage the Agencies to account for and provide for treatment of all stormwater from existing lanes given that much of this polluted water is currently untreated.[110] Additionally, the DEIS assumes that culverts that need to be replaced to accommodate increased stormwater volumes will be installed using trenchless construction techniques that will not disturb the existing road. Although this would be an ideal outcome, there is no information provided in the DEIS to suggest all culverts can be replaced using trenchless technology and the Organizations urge the Agencies to consider that at least some percentage of replaced culverts may require road reconstruction.

[108] Sean Slone, Transportation Policy Academy 2015 – DC – Maryland Secretary of Transportation Pete Rahn, The Council of State Governments (May 19, 2015), https://web.archive.org/web/20200901121216/https://knowledgecenter.csg.org/kc/content/transportation-policy-academy-2015-%E2%80%93-dc-%E2%80%93-maryland-secretary-transportation-pete-rahn.

[109] The MDOT SHA NPDES SWMF AC shows that much of the existing highway does not have stormwater management facilities. MDOT SHA NPDES SWM FAC mapping tool, available at https://www.arcgis.com/home/webmap/viewer.html?useExisting=1&layers=4f588f3a2f4f4f48235d6829a0d32fb.

### c. Impacts to Culverts Smaller Than 36 Inches Must be Considered

DEIS Section 2.7.2.c examines how major culverts, defined as culverts 36 inches in diameter or greater, will be impacted by the increase of stormwater flow and proposes that some culverts will need to be replaced by larger culverts. DEIS, at 2-58. However, no consideration is given to smaller culverts. Adding impervious surface area will have more significant detrimental impact on smaller channels with smaller drainage areas given that the percentage of impervious surface area added will be higher for these channels. As in the case for the issues discussed above, the DEIS fails to identify exactly which culverts would need to be replaced with larger ones and where these culverts are located. A list of the culverts to be replaced should be provided along with the data used to identify these culverts. The proposed new culverts should be included on the Environmental Resource Maps, DEIS, App. D, EnvMapping_web_part4.

### 3. The DEIS Fails to Account for MS4 Permitting Requirements

The DEIS does not discuss how the stormwater management proposed for Scotts Run and Dead Run will comply with the Virginia Stormwater Management Act and the Fairfax County stormwater management ordinance. These laws control the Virginia Stormwater Management Program and Municipal Separate Storm Sewer System (MS4) permitting requirements. Va. Code Ann. § 62.1-44.15:24, et seq.; 9 Va. Admin. Code §§ 25-870 et seq.; Code of the County of Fairfax, Virginia § 124-1-1 et. seq. The DEIS is also silent on how the build alternatives may impact MDOT SHA's ability to meet existing National Pollutant Discharge Elimination System (NPDES) MS4 permit requirements, including MDOT SHA's obligation to reduce 20% of impervious highway surfaces that have no other treatment in order to reduce stormwater runoff. National Pollutant Discharge Elimination System, Municipal Separate Stormwater Sewer System Discharge Permit for Maryland State Highway Administration (SHA), No. 11-DP-3313 (MD0068276) (Oct. 9, 2015) (requiring restoration of 20% of MDOT SHA's impervious area (i.e., the ISR requirement)," as well as the development of "restoration plans to address stormwater WLAs to address Chesapeake Bay and local water quality impacts.").

### 4. The DEIS Fails to Consider Viable Stormwater Avoidance and Mitigation Options

The DEIS fails to sufficiently consider stormwater avoidance and mitigation options that would avoid or minimize stormwater impacts. Instead, the Agencies claim that impacts to waterways will be sufficiently addressed through the permitting process that will not occur after the NEPA process is complete. The permitting process will not, however, fulfill the Agencies' obligations under NEPA to fully evaluate alternatives; the Agencies must consider viable stormwater avoidance and mitigation options to allow for the proper consideration of the build options and other available alternative that would have less impact.

The DEIS fails to consider areas immediately surrounding the build alternatives, but outside the LOD, for possible stormwater management. The DEIS explains that "[t]he design for offsite SWM, including ponds and large facilities along the roadside and within interchanges, was developed to a concept level of detail and was included within the LOD." DEIS, App. I, at

JA1657

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 88 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 52



Figure 2-6: Alternative 9 Typical Sections

SWM Swale    UGS

The Agencies propose using a project-specific Water Quality Bank that will utilize water quality trading credits to meet the requirement to make up for the lack of onsite treatment for any build alternative selected. The DEIS states that this bank will be "developed through a variety of means including but not limited to the transfer of excess water quality credits from other MDOT programs (e.g. the TMDL program)." DEIS, at 2-38. The DEIS fails to provide information regarding where these offsite treatment credits would come from or whether there are sufficient credits available within the local watershed. Furthermore, it is unclear how many credits will be coming from the MDOT SHA banking program or if MDOT SHA currently has sufficient credits available within its program to meet the credit needs of this proposed project. MDOT SHA already struggles to meet its requirements under its NPDES MS4 permit and it is unclear how the Agency intends to obtain sufficient credits to meet the proposed project stormwater permitting requirements. Will credits be obtained from within the local 8-digit watershed? Will the credits come from an MDOT SHA or private stream restoration project or some other credit source? Where would the credits come from if MDOT SHA's NPDES MS4 permit is not reissued? Without knowing where the credits will come from it is impossible for the Agencies to determine whether the proposed build alternatives will cause violations of the Clean Water Act, 33 U.S.C. §§ 1311, 1342. The Agencies must provide this information during the NEPA process and the public should be afforded the opportunity to comment on this new information.

**5.    The Corps Should Deny the Joint Permit Application for a Clean Water Act § 404 Permit Because It Fails to Meet Clean Water Act Requirements and Is Not in the Public Interest**

The Agencies have submitted a Joint Federal/State Application (JPA) for alterations to waterways and wetlands, including for discharges of dredged and fill material into waters of the

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 51

32. This statement effectively means that any amount of stormwater that cannot be managed and treated by a stormwater management facility within the LOD will not be addressed onsite.

Furthermore, the impacted waterways already classified as less than high quality are impaired primarily because of degradation caused by lack of stormwater management and environmental treatment from existing runoff from I-495, as well as inadequate and inconsistent maintenance of the current outfalls.[169] MDOT SHA is responsible for the existing degradation, and should not be allowed to use the degradation it caused to suggest that less mitigation is needed. These impacted waterways should be treated in the same way as the high-quality resources are treated. The highly urbanized nature of the Rock Creek area must be accounted for and the extremely high value ecosystem functions of these resources must be appropriately mitigated.

The Agencies propose to address a large amount of stormwater from the Project through the use of compensatory stormwater management, i.e., treating stormwater in another area instead of treating the stormwater created by the Project (also known as water quality trading). The Agencies base this proposal on a finding that there is not enough land available along the study corridor to hold and treat all stormwater projected by the selected alternatives. DEIS, at 2-37. The DEIS explains the need for offsite treatment as follows: "[d]ue to the large amount of impervious area requiring treatment for each build alternative and existing site constraints, ESD could not be met for the build alternatives within the study area." DEIS, at 2-38. For example, alternative 10 (odd two-priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only) would require 434 acres of offsite treatment i.e., treating more than the stormwater from 434 acres of impervious surface (a volume that is not disclosed in the DEIS, as discussed above) will go untreated if alternative 10 is selected. The Agencies do not indicate how they plan to meet Fairfax County's requirement that water quantity requirements be met on-site. Also, Fairfax County only allows for water quality treatment to be implemented both on-site and off-site as a last resort, i.e., up to 25% of water quality pollutant reductions. Code of the County of Fairfax, Virginia § 124-4-4 to 124-4-5.

The DEIS fails to analyze whether underground storage or stormwater swales could be used to manage stormwater. For example, the build alternatives could utilize more space within the right-of-way between elevated pavement, and proposed drainage ditches could be designed as stormwater management swales. Underground storage could also be built into the shoulders/medians where there is less regular traffic. See the revised alternative image below for an example.

---
[169] Carol S. Rubin, Memo to M-NCPPC, Comments to DEIS and Joint Permit Application, at 5 (Oct. 19, 2020) https://www.mncppc.org/DocumentCenter/View/15230/I0212DA-Commission-Meeting-Staff-Report-2020-and-JPA-comments-A8059MR

OP LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

00022864

JA1658

00022665

**OP LANES™ MARYLAND** — I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 53

United States, DEIS, JPA, Part 1. CWA § 404 permits are required for such discharges. 33 U.S.C. § 323.3, and the U.S. Army Corps of Engineers (Corps) and MDE must conduct their review of § 404 permit applications in accordance with EPA's § 404(b)(1) Guidelines, 40 C.F.R. Part 230; the Corps' implementing regulations, 33 C.F.R. Part 325, Appendix B; and the Maryland Department of the Environment's wetland regulations, Md. Code Regs. §§ 26.23.01.01 et. seq. Maryland alone has its own mitigation ratios that must be used depending on the type of wetland impacted and the type of mitigation approved. Md. Code Regs. §§ 26.23.04.03, 26.24.05.01.

a.  The JPA Fails to Meet CWA § 404(b)(1) Requirements

The Corps should deny the JPA for a Section 404 permit because the permit application fails to meet CWA § 404(b)(1) requirements. First, the JPA must be denied because there is "a practicable alternative to the proposed discharge which would have less adverse impact to the aquatic ecosystem." 40 C.F.R. § 230.10(a). The DEIS fails to consider the alternatives in sufficient detail to satisfy this requirement. Furthermore, CWA § 404(b)(1) creates a presumption that a practicable alternative to the failure to discharge is available because the proposed build alternatives would negatively impact wetlands, which are considered a "special aquatic site." 40 C.F.R. § 230.10(d); Id. § 230.41. It appears that the alternatives analysis in the DEIS is being used to support the JPA application, however, the Corps is required to conduct their own independent analysis of alternatives, which should include any alternatives not examined in the DEIS which might have fewer adverse impacts. Any additional alternatives considered by the Corps must be included in the DEIS because the CWA § 404 permit process is running concurrently with the NEPA process. In any event, the Organizations suggest that the Corps consider the alternatives discussed in Section II.B.3 of this document to determine if these alternatives would have fewer adverse impacts on the aquatic ecosystem. These practicable alternatives were not considered in the DEIS and "could be reasonably obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity" but not cause as much harm to wetlands and waterways. 40 C.F.R. § 230.10(a)(2). Second, pursuant to 40 C.F.R. § 230.10(b), the Corps must deny the permit unless it finds that the proposed discharges "will not cause or contribute to violations of any applicable State water quality standards and CWA § 307, 33 U.S.C. § 1317(a)(1), or jeopardize the existence of endangered or threatened species, including all species listed in the DEIS Natural Resources Technical Report, Appendix N, Agency Correspondence. Potential violations of water quality standards are discussed in more detail in Section II.C.1 and Section II.C.2. of this document.

The Corps must adhere to the Endangered Species Act (ESA) requirements discussed in Section II.F of this comment document and must deny the CWA § 404 permit requested for the Project if the proposed discharges will jeopardize the existence of any endangered or threatened species or if it could result in the likelihood of the destruction or adverse modification of formally designated critical habitat. 40 C.F.R. § 230.10(b). The DEIS fails entirely to identify how the Project or the proposed compensatory mitigation plan will impact endangered species or habitat (aquatic and otherwise.) The DEIS fails to even specify which species reside in the various waterways and other areas that may be affected by the Project. Despite the lack of detail in the JPA, a careful review of the JPA application, read together with the relevant DEIS documents,

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 54

suggests sensitive species could be affected by the Project and the proposed compensatory mitigation plans, but the application fails to take these impacts into consideration.

The draft compensatory mitigation plan, DEIS, JPA, Part 13, at 32, states that a preliminary review of the U.S. Fish & Wildlife Service (FWS) online database to identify potential rare, threatened, or endangered species on record for mitigation sites was conducted, but no consultation with FWS or NYFW was conducted. The Agencies must consult with FWS and National Marine Fisheries Service (NMFS) to determine what species may be present at the mitigation sites and determine if a biological opinion is needed. See also DEIS, JPA, Part 18, at 38 ("DNR [Maryland Department of Natural Resources] noted that fish passage will be a concern and should be considered . . . [Greened] noted that the proposed restoration approach would consider fish passage"); DEIS, JPA, Part 18, at 69 ("it was noted that the site is within a Sensitive Species Project Review Area"). The failure to examine what species are on proposed mitigation sites, or how their habitat might be disrupted, is particularly concerning given that Maryland DNR previously stated that "[s]everal [wetland sites] are deemed "not acceptable" by Maryland [and] if they have been "identified as important habitat for rare, threatened and endangered plants or wildlife.'"[108] The JPA should be rejected given its failure to specify, for each mitigation site, which species are present, and how the Project may affect those species and their habitat.

Third, pursuant to 40 C.F.R. § 230.10(c), the Corps should deny the JPA because the discharges are likely to contribute to significant degradation of water quality. The additional discharges proposed under the JPA will contribute cumulatively to significant degradation of wetlands, life stages of aquatic life and other water-dependent wildlife, aquatic ecosystem diversity, and aesthetic value of the impacted wetlands and waterways.

Fourth, pursuant to 40 C.F.R. § 230.10(d), the JPA must be denied because the Agencies have failed to take sufficient steps to minimize harm to protected waters, which include wetlands that serve as habitat to plants and animals. 40 C.F.R. § 230.3. Adverse impacts may be minimized by the selection of the discharge location, treating or limiting the material to be discharged, controlling the material after it has been discharged and the method of dispersion, utilizing technology to reduce impacts, and avoiding interference with animals and their habitat. See 40 C.F.R. Subpart H.

b.  Issuing a CWA § 404 Permit Would Not be in the Public Interest

Even if the JPA for a Section 404 permit meets EPA's Section 404(b)(1) guidelines, the Corps should deny the permit because the proposed build alternatives are not in the public interest. The Corps must conduct a public interest review to evaluate "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a). During this review the Corps must give equal weight to all comments from local municipalities, in addition to those from state and federal agencies and any

[108] Maryland Nontidal Wetland Mitigation Guidance, Second Edition, at 74 (2011). https://mde.maryland.gov/programs/Water/WetlandsandWaterways/AboutWetlands/Documents/www.mde.state.md.us/assets/document/wetlandswaterways/MDTGUIDE082011.pdf

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 90 of 340



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 55

expert analyses provided. 33 C.F.R. § 320.4(a)(3). This review should reflect that "wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b).

Furthermore, because the Project is at least partially funded by federal and state agencies, the Corps "shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use." Exec. Order No. 11,990, 42 Fed. Reg. 26,961 (May 24, 1977). The Corps' regulations at 33 C.F.R. § 320.4(b)(3) also require the Corps to consider Maryland's wetland protection laws, including the state's goal to achieve "no net overall loss in nontidal wetland acreage and function, and to strive for a net resource gain in nontidal wetlands." Md. Code Regs. 26.23.04.03. The public interest review must also consider information provided through the consultation process required with the FWS, NMFS, and DNR. Additionally, the Corps is required to avoid authorizing floodplain development whenever practicable alternatives exist outside the floodplain because they "possess significant natural values and carry out numerous functions important to the public interest." 33 C.F.R. § 320.4(l).

The JPA and DEIS fail to provide information on the status of the public interest analysis. However, given that the Corps has included a Draft Compensatory Mitigation Plan and that plan "presents the approach to compensatory mitigation for the unavoidable impacts from the Build Alternatives and includes Phase I Mitigation Design Plans for permittee-responsible mitigation," it can be assumed that the Corps has made some determination regarding whether the Project would be in the public interest. The Organizations request the Corps to provide the public with its public interest determination and any information not already included in the DEIS that it relied upon to support its determination. Without this information, and the additional information requested throughout this comment document, the Organizations and the public are unable to fully assess and comment on the Corps' public interest determination. The information that has been provided in the DEIS and JPA fails to show that the relative extent of the public and private need for the Project will outweigh the Project's negative impact on air and water quality, wetlands, floodplains, historic properties, fish and wildlife, the floodplain, scenic values, recreation, and private property.

Should the Corps decide to approve the permit, it must include special conditions that (a) "identify the party responsible for providing the compensatory mitigation;" (b) "incorporate, by reference, the final mitigation plan approved by the district engineer;" (c) "state the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and (d) "describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan." 33 C.F.R. § 332.3(k). Additionally, the Organizations request that the permit require monitoring for a period sufficient to ensure that the affected streams and ecosystems return to a self-reliable state and the mitigation is meeting all performance standards, and also request that the Corps not waive any monitoring. 33 C.F.R. § 332.6 ("The mitigation plan must provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period must be required for aquatic resources with slow

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 56

development rates (e.g., forested wetlands, bogs).") The DEIS states that, following construction, the public mitigation sites will be placed in MDOT SHA's monitoring program and will be monitored separately by the private remediation site providers for up to ten years. DEIS, App. N, at 30-31. However, stream and wetland ecosystems, once disturbed, including by restoration, may take up to 20 years to return to a self-reliable state.

    iii.   The DEIS Fails to Provide Information Regarding the Status of the CWA § 401 Certification Process

The DEIS also fails to indicate the status of the state water quality certification that are required before any CWA § 404 permit is authorized, unless the certification is waived. 33 U.S.C. § 1341(a)(1); 40 C.F.R. Part 121. The DEIS simply indicates that a Section 401 Water Quality Certificate is required from both Maryland and Virginia. DEIS, at 4-78. The Organizations are not aware of the status of the certification process.

**6.   The Draft Compensatory Mitigation Plan is Incomplete, and the Final Plan Should be Made Available to the Public Prior to Issuing any Permit**

Pursuant to the Corps' regulations, a comprehensive compensatory mitigation plan must include the following information: clear objectives, a description of legal arrangements and instruments to be used to ensure long-term protection of the mitigation sites, baseline information, identification of credits, mitigation work plan, maintenance plan, detailed performance standards, monitoring requirements, long-term management plan, an adaptive management plan, and financial assurance. 33 C.F.R. § 332.4. The Organizations request the final compensatory mitigation plan be made available to the public prior to issuing any permit and that the public be afforded the opportunity to comment on the final plan.

The JPA contains proposed impact plans, tables, footplan delineation information, and a partial draft compensatory mitigation plan (including Phase I Design Plans). DEIS, JPA, Part 1 – Part 21. However, the draft compensatory mitigation plan does not provide detailed information on the proposed maintenance plan, performance standards, mitigation work plan, monitoring requirements, long-term management plan, or adaptive management plan, or financial assurances that states that these issues will be addressed during the development of the Phase II Mitigation Design Plans. DEIS, JPA, Part 13, at 29-31. Additionally, the DEIS does not appear to take existing watershed planning into account, although the document refers to county master plans to justify the need for expanded highways. The Organizations urge the Corps to take a watershed approach to compensatory mitigation, as recommended by the relevant guidance.[100]

[100] The 2000 in-lieu fee guidance embraces the watershed approach for in-lieu fee mechanisms, stating, "[l]ocal watershed planning efforts, as a general matter, identify wetland and other aquatic resources that have been degraded and have established a prioritization list of

00022666   CO-456

OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 57

Although the JPA provides a brief summary of Project objectives it fails to provide sufficient details as to how lost wetland and stream functionality will be replaced by the proposed compensatory mitigation. *See* DEIS, JPA, Part 13, at 30. This omission is of particular concern given that most of the Phase I proposed sites are far away from the proposed build alternatives and will not abate localized wetland and stream functionality degradation. *See* DEIS, JPA, Part 18, Figure 3-1, at 69. Furthermore, the objectives fail to provide concrete information as to what success will look like at the proposed sites because there are no performance standards provided. *See* DEIS, JPA, Part 13, at 30. The JPA simply states, "[p]erformance standards for all of the wetland mitigation sites will be in accordance with the Performance Standards and Monitoring Protocol for Permittee-Responsible Nontidal Wetland Mitigation Sites in Maryland, April 20, 2018." *Id.* The Organizations urge the Agencies to use mitigation banks rather than permittee-responsible mitigation or in-lieu fee programs. Although the stated goal for the mitigation package is "to improve upon the ecological functions in these watersheds with a focus on the impaired conditions and needs," and the mitigation sites are to be selected in part on their "potential for watershed improvements," proximity to the impaired areas, and "replacement of lost functions and values," DEIS, App. N, at 6, 9, 20, in practice more weight appears to have been given to construction feasibility and mitigation credits tied to theoretical functional uplift. Ultimately, the sites selected were those evaluated with the simplest index: acreage, for wetland credit, and in analog, linear feet for streams. These measurements do not allow for a true assessment of the value of the exchange of the wetland or stream lost to highway construction for one or another alternative proposed mitigation site, unlike a function-based system.

In addition to the traditional search for mitigation sites on public lands, "MDOT SHA issued a Request for Proposals (RFP) for full-delivery services to provide permittee-responsible stream and wetland mitigation credits on private lands," DEIS, App. N, at 23. Likely because of the limited methods used for selecting potential mitigation sites, no attempt was made to find mitigation sites that would capture "the impact of each subwatershed. The RFP and any attempt to assess the overall impact on ecosystem function of each subwatershed, beyond a catalog of the additional impervious surface by watershed of each build alternative, nor is there a description to any of the proposed mitigation sites of how they will contribute to the 8-digit watersheds the smaller and more localized watersheds in which they are connected. A few of the proposed sites are paired, usually a stream with adjacent wetland. The DEIS occasionally focuses on

restoration needs. In-lieu fee mitigation projects should be planned and developed to address the specific resource needs of a particular watershed." 65 Fed. Reg. 66,914-17 (Nov. 7, 2000).

The 1995 mitigation banking guidance encourages a watershed-based approach as the overall goal of a mitigation bank: "The overall goal of a mitigation bank is to provide economically efficient and flexible mitigation opportunities, while fully compensating for wetland and other aquatic resource losses in a manner that contributes to the long-term ecological functioning of the watershed within which the bank is to be located. The goal will include the need to replace essential aquatic functions that are anticipated to be lost through authorized activities within the bank's service area. In some cases, banks may also be used to address other resource objectives that have been identified in a watershed management plan or other resource assessment." 60 Fed. Reg. 58,605-14 (Nov. 28, 1995).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 58

discusses how the function of a proposed mitigation site might be improved upon by being connected with individual watercourse reaches above or below the site, but more often than not it appears that most sites will not be connected to individual watercourse reaches. But there seems to be no effort to analyze the contribution of mitigation at the specified site to improved function of the whole watershed, nor an explanation of how function lost in the Project will be compensated by these mitigations. Instead, in a series of tables analyzing each of the 40-odd sites examined as possible mitigation sites, the criteria seem to be focused on the potential for uplift (functional and ecological) of that site taken as a stand-along unit, and consequently the credit that might accrue after proposed mitigation measures are applied to transform the site. Instead of this approach, the Organizations recommend the Corps take a function-based approach when assessing impacts and mitigation credits.[109]

Another issue of concern is the selection of private sites from the responses to the RFP. The largest of such sites is the Konterra mitigation project, which proposes over 27,000 linear feet of stream and 30 acres of wetland mitigation. This site is described as containing "former sand/gravel borrow pits, which later served as a depository for washings from excavated materials. The cells are comprised of poor quality, monotypic wetlands." DEIS, App. N, Agency Meeting Minutes. It is unclear whether a wetland can even be engineered from the shale clay at this site. Instead of this site, the Organizations support the proposed site in Rock Creek (MPA00002),[110] particularly as it is in the watershed where the Rock Creek Conservancy recently did a conservation landscaping project. Rock Creek Conservancy also supports

[109] A number of function-based frameworks have been proposed and are available for use. The Wetland Evaluation Technique (WET) (Adamus, 1987) cited in Richard Reppert, Wetlands Mitigation Banking Demonstration Study July 1992 US Army Corps of Engineers, IWR Report 92-WMB-1;

Maryland Department of the Environment, *Performance Standards and Monitoring Protocol For Permittee-Responsible Nontidal Wetland Mitigation Sites,* (April 20, 2018);Richard Starr, Will Harman and Sandra Davis, *Final Draft Function-Based Stream Assessment Methodology,* Habitat Restoration Division Chesapeake Bay Field Office U.S. Fish and Wildlife Service CAFE - §15 - 06 (May 2015);

EPA Office of Wetlands, Oceans, and Watersheds, *A Function-Based Framework for Stream Assessment and Restoration Projects, US Environmental Protection Agency,* EPA 843-K-12-006 (May 2012);

Margaret A. Palmer, Kelly L. Hondula, and Benjamin J. Koch, *Ecological Restoration of Streams and Rivers: Shifting Strategies and Shifting Goals,* Annu. Rev. Ecol. Evol. Syst., 45:247-69 (2014).

[110] Although many of Rock Creek's tributaries and the main stem are in poor to fair condition. This should not exclude them from consideration; expectations should just be managed accordingly.

00022667

OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

CO-488

00022668

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 60

Mitigation Design Plans, mitigation work plan, performance standards, monitoring requirements, long-term management and adaptive management plans, and financial assurances documents, rather than just summaries of these documents.

**7.    The DEIS Fails to Consider Alternatives That Would Avoid or Minimize Adverse Impacts to Waterways, Wetlands, Floodplains, and Other Natural Resources**

**ii.    All Build Alternatives Have Similar Impacts**

The impacts to wetlands and waterways summarized in Table 4-20 indicate that all of the build alternatives that were considered have similar, if not identical, impacts.

Table 4-20: Summary of Impacts to USACE/MDE Wetlands and Waterways Corridor-wide

DEIS, at 4-81.

This conclusion is confirmed in the JPA.

In Maryland, DEIS Build Alternative impacts range from **16.08 to 16.52 acres of wetlands, and 151,880 to 153,635 linear feet of streams. Each alternative would permanently impact 1-48 acres of Palustrine Open Waters (POWs).** These impacts occur in the following three federal HUC-8 watersheds. Middle Potomac-Anacostia Occoquan, Middle Potomac-Catoctin, and Patuxent. **In Virginia, each DEIS Build Alternative would impact a total of 0.95 acres of wetland and 3,349 linear feet of streams in the Middle Potomac-Catoctin watershed.**

DEIS, JPA, Part 13, at 4 (emphasis added).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 59

restoration sites. MO 0002 [112] MO D001A [113] and WSSI 501 59 [114] The Conservancy generally recommends coupling stream restoration projects with upland stormwater management, because if there is not a reduction in stormwater flows to restored streams they are vulnerable to degradation in the future.

The Organizations also support the restoration of the mainstem of Portal Branch, particularly if paired with green streets installations within the watershed (as most of its impairment is due to stormwater that flows from nearby outfalls). Most of the watershed that feeds (and damages) Portal Branch is in Montgomery County. Deerpoint Run, a small stream off Dansil Road near Beach Drive, is inundated with sediment and is a good candidate for restoration given that the removal of sediment and the addition of regenerative stormwater conveyance would allow for the reestablishment of amphibian habitat in what is an existing wetland. Finally, the Organizations encourage the Agencies to review the Potomac River Tunnel project currently under development by DC Water under the C&O Canal and parts of Rock Creek Park, as this project offers a model for adding stormwater storage relatively unobtrusively and without significant disruption aboveground.

Although the DEIS discusses potential remedial sites, there does not appear to be any examination of records that would indicate whether hazardous waste may be located at or near the proposed mitigation sites. [115] There is only the most tangential reference to the indirect impact of the expanded highways on the proposed mitigation sites and the rest of the ecosystem, namely that there will be an increase in impervious surface. The Agencies should examine whether the proposed remedial sites have hazardous substances in soil or groundwater that would require additional expenditures to remediate. This issue is of particular concern at sites within or near industrial areas.

The JPA does not include sufficient information to determine the soundness of the proposed mitigation plan. This information must be completed by the Corps, 33 C.F.R. § 332.4(c), and should be provided to the public given the large amount of wetlands and streams that will be lost and/or with the proposed build alternatives, the amount of controversy surrounding the overall Project, and Maryland's goal of "no net overall loss in nontidal wetland acreage and function, and to strive for a net resource gain in nontidal wetlands." Md. Code Regs. 26.23.04.03. Furthermore, this information will improve the chances that the proposed mitigation projects, to be conducted on both private and public lands, will actually meet the mitigation objectives. The Organizations request that the Corps provide actual copies of the Phase II

---

[112] This site was eliminated because of a culvert in need of repair. The culvert should be included in the project. While potential for the ecological uplift may be somewhat limited, removal of current and reduction of sediments would be a benefit from a stormwater perspective.

[113] Access constraints should be further explored before eliminating.

[114] Being high in the landscape should not be an immediate disqualifier, it may simply call for different techniques.

[115] See discussion of further issues related to hazardous substances in Section II.G.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 93 of 340

00022969

CO-459

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 41

Table 5-12 provides a list of direct impacts to surface waters, wetlands, and 100-year floodplain, by acreage.

**Table 5-12 Natural Resources Direct Impacts**

| Alternative | 8 | 9 | 10 | 13B | 13C |
|---|---|---|---|---|---|
| Surface Waters (linear feet) | 149,000 | 151,000 | 152,000 | 152,000 | 152,000 |
| Wetlands (acres) | 25 | 26 | 26 | 26 | 26 |
| 100-Year Floodplain (acres) | 114 | 120 | 120 | 120 | 120 |
| Unique and Sensitive Areas (acres) | 395 | 406 | 408 | 411 | 407 |
| Targeted Ecological Areas | 75 | 77 | 77 | 77 | 77 |
| Green Infrastructure Corridors | 279 | 286 | 286 | 286 | 287 |
| Rare, Threatened and Endangered Species Habitat (acres) | 177 | 183 | 183 | 183 | 183 |
| FIDS (acre) | 25 | 28 | 28 | 28 | 28 |
| Forest Canopy (acres) | 1,434 | 1,497 | 1,497 | 1,525 | 1,505 |

DEIS, App. O, at 56. Other than alternative 5, which the Agencies excluded from further consideration, all the alternatives have almost identical impacts on all of the natural resources listed.

There is virtually no difference in impacts on Maryland wetlands and streams regardless of which alternative is selected, and no difference at all in impacts to Palustrine Open Waters and Virginia wetlands and streams. The DEIS fails to consider any alternatives, other than the no build alternative, that might have lower adverse environmental impacts. The NEPA process is intended to provide "a full and fair discussion of [the project's] significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. None of the alternatives considered would avoid or minimize adverse impacts. Furthermore, the DEIS fails to demonstrate that there is no practicable alternative with less extensive impacts to wetlands and waterways than the proposed highway expansion alternatives.

b.    The DEIS Fails to Study or Mitigate Indirect Impacts

The DEIS does not contain any examination of indirect impacts from the build alternatives, let alone consider ways to mitigate those impacts. First, the agencies' analysis of downstream impacts from stormwater is conclusory and incomplete. The only information provided on this issue is a conclusion that some indirect downstream impacts will occur, but they would be:

minimized through the development and application of approved erosion and sediment control plans and stormwater-related best management practices (BMPs). In addition, coordination with state and local agencies overseeing water resources in the ICE Analysis Area will continue throughout the study to determine appropriate mitigation for impacts.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 42

DEIS, at 4-154, 4-156 (Table 4-41).

Second, the DEIS is silent on the impact that climate change and the associated increase of heavy rain events will have on future volumes of stormwater. It is well-accepted that climate change can significantly increase stormwater. EPA has said that "climate changes, such as the amount, timing, and intensity of rain events, in combination with land development, can significantly affect the amount of stormwater runoff that needs to be managed."[116] MDE has stated that:

More intense rainfall resulting from the combined effects of global climate change and localized factors, for example, the influence of the urban canopy on rainfall, is likely to increase peak flooding in urban environments. Continued increase in impervious surface attendant with development would exacerbate this problem. Aquatic ecosystems will likely be degraded by more flashy runoff and increased temperatures. Intensified rainfall events and warmer surfaces (roads, roofs, etc.) would result in rapid increases in stream temperatures, limiting habitat suitability for native fishes and other organisms. Higher peak flows and degraded streams would also transmit more nutrients and sediments to the Chesapeake Bay and its tidal tributaries, contributing to water quality impairment in the estuaries.[117]

The DEIS must consider how anticipated increases of stormwater will impact receiving waterways, and must incorporate this information into the stormwater volume and impact modeling conducted by the Agencies to determine the impact of the build alternatives on receiving waterways. Areas of the Beltway already flood during heavy rain,[118] making it paramount that the analysis conducted for any added lanes should incorporate anticipated increases of stormwater in the cumulative impacts analysis.

ii.    The Limit of Disturbance Delineation is Inaccurate

The DEIS incorrectly defines the area that will be disturbed by the proposed expansion by too narrowly delineating the LOD and fails to account for all impacts to streams and

---

[116] EPA, Stormwater Management In Response To Climate Change: Lessons From The Chesapeake Bay and Great Lakes Regions (Final Report), EPA/600/R-15/087F (Mar. 2016), at 1, https://cfpub.epa.gov/si/si_public_file_download.cfm?p_download_id=530268&Lab=NCEA.

[117] MDE, University of Maryland, Maryland Department of Natural Resources, Comprehensive Assessment of Climate Change Impacts in Maryland, Chapter 7 (rev July 2018), at 2, https://mde.state.md.us/programs/Air/ClimateChange/Documents/FINAL-Chapt%202C%20impacts_web.pdf.

[118] Jason Samenow and David Streit, Torrential Rain Triggers Widespread Flooding in D.C. Area, Inundating Roads, Stranding Motorists, Up to 6 Inches of Rain Fell, Washington Post (Sept. 10, 2020), https://www.washingtonpost.com/weather/2020/09/10/dc-area-forecast-tropical-downpours-today-could-produce-area-flooding/.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 64

wetlands. The current LOD is based on standard roadway sections and modeling and fails to include all actual impacts. This approach minimizes the appearance of impacts and artificially limits the scope of impacts analyzed. The LOD does not adequately address likely environmental impacts to natural resources, including impacts to receiving waterways, as some of these impacts occur outside the artificially narrowed LOD.

Detailed field review demonstrates that the current LOD does not comprehensively reflect expectations of environmental impact and what would be needed to restore and mitigate after the Project. The LOD needs adjustments in many locations, often to allow for stable outfall transitions, stormwater management, or rehabilitation of impacted assets. Both the locations and the choice between direct access ramps or slip lanes appear to be based entirely on geographic impact without consideration of the relationship to existing and future origin-destination patterns, planned land use, economic development considerations including major facility planning, social equity, and efficient access to transit facilities, or effect on local traffic patterns.

As indicated earlier, the private concessionaire, not the state, will be responsible for the design and engineering of the highway improvements. Therefore, the access decisions presented within the LOD are based on the Agencies' preliminary planning and design without adequate consideration of local planning and needs, and with minimal, if any, engineering and commerciability analyses. Moreover, the Agencies have created the LOD without the detailed analysis that the private concessionaire will apply during the design phase, particularly based on the economics of the project.

An example is provided by the LOD adjustments that were made to Rock Creek SVU2. The road edge along Rock Creek near Cedar Drive has been designed with a retaining wall in an attempt to avoid impacting Rock Creek. See DEIS, APP. D, Env't&mposing, web part2, Map 67. The LOD does not account for impacts to Rock Creek that would likely occur in-stream because the LOD stops at the bank. Installation of the retaining wall proposed for this location would impact the stream, including increasing instability to the streambank and the stream bed. Moreover, for the stream to have long term stability along the existing wall (and not undermine the wall), in-stream stabilization measures will be necessary, which are not accounted for in the DEIS because the stream is not included within the LOD. The LOD needs to include all impacted areas and should also include potentially impacted areas given that the LOD may need to be revised once design details are available, which will occur after the completion of the NEPA process.

    d.    **The DEIS Fails to Sufficiently Analyze the Impact to Floodplains and Increase in Flood Risks**

The DEIS states that, "[t]he full [indirect and cumulative effects] Analysis Area contains approximately… 6,700 acres of FEMA's 100-year floodplains." DEIS, at 148. Yet, despite this enormous impact to floodplains, the Agencies have decided, "[f]loodplain analysis will be conducted at a later stage of design." DEIS, at 495. The DEIS fails to analyze how the build alternatives would increase flood risks by changing the hydraulic function and elevation of floodplains. There is consensus that impervious surface increases flooding and models exist that would allow the Agencies to estimate the causal effects of impervious surface on flood

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 65

magnitude.[119] The Agencies must conduct a floodplain impact analysis that looks at direct and cumulative effects in the DEIS and the public must be afforded the opportunity to comment on the Agencies' findings.

    D.    **The DEIS Lacks Information Supporting the Decision Not to Require a Permit for Construction at the American Legion Bridge**

The DEIS states that the U.S. Coast Guard (USCG) will not be requiring a bridge permit for the proposed construction at the American Legion Bridge, despite the fact that construction would usually require a permit under 33 C.F.R. § 115.01. The Agencies do not explain, but simply state that "the USCG stated that a bridge permit would not be required under Section 10 [of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403)] for the American Legion Bridge" and cite to Appendix N of the Natural Resource Technical Report (Appendix L). DEIS, at 4-79. We were unable to locate this letter in the appendix. If this letter is included somewhere else within the DEIS documents, please indicate where it is located. If it is not included in the DEIS, the Organizations request that the Agencies make this letter and any other information supporting the bridge permit determination available to the public and provide the public with an opportunity to comment on this information.

    E.    **The DEIS Fails to Adequately Identify and Analyze Impacts on Aquatic Species, Aquatic Habitat, and Fisheries**

The Project would impact approximately 152,000 linear feet of waterways, and yet the DEIS fails to provide a detailed description and analysis of the impacts of the Project on aquatic biotic resources. Instead the DEIS provides only a "watershed quality index" that includes a brief narrative description ("good," "poor," "very poor") of existing aquatic conditions for habitat, benthic invertebrates, and fish but provides no analysis of direct or indirect effects on aquatic biotic resources. See DEIS, at 4-106. The DEIS Natural Resources Technical Report (NRTR), see DEIS, App. L, is referenced several times as containing further information regarding impacts to aquatic resources, but the appendix also fails to indicate how aquatic habitat, benthic invertebrates, or fish will be impacted by the build alternatives. Appendix L simply provides additional information on the current conditions of aquatic habitat, fish populations, and benthic macroinvertebrates, DEIS, App. L, at 113 to 146. The analysis of impacts in the NRTR is limited to one conclusory statement:

[119] Erica Gies, *Expanding Paved Areas Has an Outsize Effect on Urban Flooding*, Scientific American (May 15, 2020) ("[E]very time a city expands roads, sidewalks or parking lots by one percentage point, the annual flood magnitude in nearby waterways increases by 3.3 percent."), https://www.scientificamerican.com/article/expanding-paved-areas-has-an-outsize-effect-on-urban-flooding/; Annalise G. Blum, Paul J. Ferraro, Stacey A. Archfield, Karen R. Ryberg, *Causal Effect of Impervious Cover on Annual Flood Magnitude for the United States*, Geophysical Research Letters, Vol. 47, Issue 5, e2019GL086480 (Feb. 13, 2020), https://doi.org/10.1029/2019GL086480.



00022670

JA1664

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 95 of 340


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 65

all Screened Alternatives have the potential to affect aquatic biota in the corridor study boundary due to direct and indirect impacts to perennial and intermittent stream channels. Stream channel impacts associated with the Screened Alternatives range from 153,702 to 156,084 LF and wetland impacts range from 15.4 to 16.5 acres. Impacts are provided in more detail in Table 2.3-3 and in Table 2.9-58 and Table 2.9-59 below."

DEIS, App. L, at 146.

The citations referenced in the above excerpt from the DEIS provide no further analysis, but rather present summaries of the amount of impervious surface, the feet and acres, that would be added under the build alternatives. The linear feet and acres of impervious surface to be added by the build alternatives tells the Agencies and the public nothing about how the build alternatives would impact aquatic biota.

Given the complete lack of information on impacts, it is no surprise that the DEIS also fails to provide any information on how the Agencies plan to mitigate potential impacts to aquatic biota. Section 4.8.4 of the DEIS states that MDOT SHA will continue to coordinate with regulatory agencies and resource managers to identify sensitive aquatic resources and determine potential avoidance and minimization as Project designs are refined. DEIS, at 4-109, but these issues are not first addressed in the DEIS in order for the environmental impacts of the Project to be considered. There is general information on aquatic resources and mitigation in several DEIS appendices, but none of this information provides any analysis of impacts to the existing aquatic biota. See DEIS, NRTR, App. K, Aquatic Resources Technical Report; DEIS, App. M, AMR; DEIS, NRTR, App. M; DEIS, App. X, Compensatory Mitigation Plan, App. A - M. The DEIS must be supplemented with sufficient data to analyze direct and indirect effects on biotic aquatic resources and provide a detailed description of proposed mitigation of those impacts.

The delineated parameters of the Corridor Study Boundary define the area to which data on existing environmental conditions were gathered: 300 feet on either side of the centerline of I-495 and I-270. DEIS, at 4-2. This area is too limited to fully evaluate the direct effects of the Project on aquatic biota in streams and wetlands and is certainly too restricted to evaluate indirect downstream effects. For direct effects, the study boundary needs to be expanded to include all waterways and wetlands that will receive stormwater from or otherwise be impacted by the Project. For indirect effects, the analysis should consider all cumulative and secondary effects on aquatic ecosystems, including those downstream from the waters that are directly impacted.

Separately, the Organizations request that the Agencies reference in the body of the DEIS the aquatic biota maps that currently are buried in appendices. See, e.g., DEIS, NRTR, App. B, Natural Resources Inventory Mapbook, Part 1 to Part 6. See also, NRTR, App. K, Aquatic Biota and Surface Water Sampling Monitoring Map. Although this information does not help the public determine the potential impacts of the Project on aquatic biotic resources, it at least provides information on the location of these resources.

**F.    The DEIS Fails to Adequately Identify and Analyze Impacts on Federal and State-listed Rare, Threatened, or Endangered Species and Habitats**

The Endangered Species Act establishes a process for identifying and protecting plant and animal species that are "threatened" or "endangered." 16 U.S.C. §§ 1531-1544. Section 7 of the ESA requires federal agencies to consult with the FWS and National Marine Fisheries Service to make sure that any proposed federal agency action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the species'] critical habitat . . . ." 16 U.S.C. § 1536(a)(2). If FWS or NMFS advises the agency that the proposed action area includes neither a listed species nor its critical habitat, then there is no need for further consultation. 50 C.F.R. § 402.12(d)(1). However, if the agency determines that the action is likely to adversely affect a listed species or its critical habitat, then the agency must engage in formal consultation, which requires the agency to prepare a "biological assessment" of the action and require FWS or NMFS to issue a "biological opinion" as to whether the action is likely to "jeopardize the continued existence of any listed species or destroy or adversely modify" critical habitat. 50 C.F.R. § 402.14(b).

In addition, the agencies must act to reopen the consultation process when "new information reveals effects of the action that may affect listed species or critical habitat." 50 C.F.R. § 402.16(b). If the biological opinion finds jeopardy of species or destruction or adverse modification of critical habitat, the FWS or NMFS must suggest "reasonable and prudent alternatives" to the proposed activity that would not violate the ESA. 16 U.S.C. § 1536(b)(4). The agency cannot take the proposed action until it receives the biological opinion or the incidental take statement, can provide a reasonable and prudent alternative approved by FWS or NMFS and receive an incidental take statement from FWS or NMFS before the proposed action can move forward. *Id.*

The Maryland Nongame Endangered Species Conservation Act regulates activities in a similar fashion but applies to impacts on plants and wildlife, including their habitats, listed on the Maryland Threatened and Endangered Species list. Md. Code Ann., Nat. Res. § 10-2A-01 to 10-2A-09. The Maryland Threatened and Endangered Species list is more expansive than the federal list. Two federally listed species, the Northern Long-Eared Bat and the "Need of Conservation" In Virginia, federally listed threatened and endangered wildlife species are protected under the Virginia Endangered Species Act of 1972, Va. Code Ann. § 29.1-563 to 29.1-570, and Virginia's listed threatened and insect species are protected under the Endangered Plant and Insect Species Act of 1979, Va. Code Ann. § 3.2-1000 to 3.2-1011. The Virginia Threatened and Endangered Species list is also more expansive than the federal list.

**1.    The DEIS Fails to Adequately Identify Impacts on the Northern Long-Eared Bat and Indiana Bat**

Two federally listed bat species, the Northern Long-Eared Bat and Indiana Bat, have been identified by FWS as potentially being impacted by the build alternatives. DEIS, at 4-111. Therefore, a formal ESA § 7 consultation must take place, requiring FWS to perform biological assessments and FWS to issue biological opinions pursuant to 50 C.F.R. § 402.14(b). The DEIS states that field studies will be conducted to identify whether the bats are using habitat that may be impacted by the build alternatives. DEIS, at 4-111. It appears that no biological

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 65

reprinted has been issued yet, given that none is referenced in the DEIS. Moreover, the field studies FWS directed FHWA to conduct have not yet been performed. DEIS, at 4-111. The biological assessments along with the FWS determinations as to whether the build alternatives will cause "jeopardy or adverse modification" must be completed prior to the conclusion of the NEPA process. Furthermore, if FWS determines that the species may be jeopardized, destroyed or adversely modified, then the Project must incorporate the alternative actions suggested by FWS.

**2.    The DEIS Fails to Adequately Identify Maryland Aquatic Species and Fails to Account for Impacts to Maryland and Virginia Species**

The DEIS does not identify Maryland special-status aquatic species that may be present in waterways within the corridor study boundary area or areas that may be affected downstream. Some fish species and aquatic invertebrate species possibly occurring in the project area are identified in Appendix N of DEIS Appendix L (NRTR: Agency Correspondence); however, it is unclear whether this appendix provides the complete list of Maryland aquatic rare, threatened, or endangered species. Importantly, there are a number of state rare, threatened or endangered species identified in the close proximity to the Project, including freshwater mussels, several host meadow plants and a rare crayfish. Several of the State-listed species are sensitive to changes in hydrology, sedimentation, and temperature. The wetlands review that the Agencies conducted relied solely on the National Wetlands Inventory, not real-time ground-truthing data. An extensive on-the-ground wetland survey should be conducted along the Project route with specific attention to wetlands that could, if disturbed, result in changes to hydrology, temperature or sedimentation. This information should be provided in the main DEIS document.

The DEIS fails to provide any information on how the Agencies plan to avoid, and if necessary, mitigate any harm to Maryland or Virginia rare, threatened, or endangered species. See DEIS, at 4-109 to 4-112. All proposed mitigation measures should be included in NEPA documents to provide the public with information regarding how the Agencies plan to avoid illegal takings of those species during any proposed construction and operation of the build alternatives.

**G.    The DEIS Does Not Sufficiently Evaluate Hazardous Materials**

The DEIS does not adequately assess hazardous materials along the highway corridors. It identifies hazardous waste sites but does not consider the specific hazardous substances that may be present nor their site distribution. At a minimum, water and soil sampling for hazardous substances of concern should be conducted at the 65 High Priority sites identified in the DEIS. A discovery of additional hazardous materials after the DEIS is completed may cause expensive delays in the Project, with any required cleanup likely to be paid for with taxpayer funds rather than by the private sector. But the DEIS nevertheless postpones investigation of this issue until after a decision on the alternatives is made.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 66

The DEIS states:

At the time of this assessment, the anticipated depths of subsurface disturbance for areas with known or potential hazardous waste or contaminants is uncertain and additional design modifications may avoid many, if not all, of the identified sites of concern and PFCs [Potential Environmental Concerns]. If, following the selection of a preferred alternative, proposed construction could impact an identified or potentially hazardous waste or contaminated site, the Final EIS would address and resolve issues associated with the site(s), identified by the Study Team, raised by the public and responsible government agencies.

DEIS, App. K, at 13. First, it is unclear what the Agencies propose to do once a preferred alternative is selected. Would the selection change if it would impact contaminated sites? This question argues for performing a more thorough investigation of hazardous materials in the first place and presenting the information in the DEIS which also would allow the public to review and comment on the issue.

According to the DEIS, the hazardous materials investigation was based on a one-quarter mile buffer from the limits of disturbance. DEIS, at 4-2, 4-72. The DEIS also explains that the build alternatives would result in similar limits of disturbance. Id. at 4-23. Therefore, as explained in the DEIS, the number of sites of concern for hazardous materials is the same for all the build alternatives. Id. at 4-73. Whether proposed construction could impact a potentially hazardous waste or contaminated site should have been evaluated before releasing the DEIS, the Agencies must not move forward with this Project before performing and releasing this evaluation.

It appears that there has been no soil or groundwater sampling or reporting of hazardous substances and that there will not be any until construction starts. Nor does there appear to be any system proposed to monitor for hazardous substance during construction, after soil disturbance occurs due to the construction or severe weather events.

Appendix K states that the Agencies evaluated potential sites of concern within a one-quarter mile buffer of each of the screened alternatives using a methodology comparable to the 2005 Initial Site Assessment for the Capital Beltway Study (MDOT SHA, 2005). DEIS, App. K, at 10, Appendix K. The DEIS further states that "Seven criteria were used to rank the sites of concern based on the general ranking methodology used in the Draft December 2005 Initial Site Assessment Capital Beltway Study." Id. at 11. However, the Agencies have failed to provide the referenced Capital Beltway Study, precluding meaningful review of this methodology. See infra Section II.F.4.a. The Agencies must not move forward with the NEPA process until this information is made publicly available.

The Sites of Concern Priority Maps included in Appendix K show 22 very large pink areas, within and spreading out from the Limit of Disturbance, representing Listed Sites Unknown, that is, very large areas where the presence or absence of hazardous waste is unknown. There does not seem to be any plan for investigating potential hazards in these areas before construction begins.



USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 96 of 340

00022672

JA1666

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 97 of 340

Appendix Q of the DEIS (Conceptual Mitigation Report) says that hazardous waste sites identified as High Priority in that appendix, mapped in bright red, with "the potential for contaminant mobilization within or adjacent to the LODs of the Build Alternatives," and which include "gasoline stations, businesses operating at former gasoline stations, auto repair facilities, dry-cleaning facilities, former dry cleaning facilities, government facilities, landfills, and the Joint Base Andrews Air Force Base National Priorities List site . . . may require additional investigation to determine the extent and location of existing contaminants and whether or not those contaminants would impact construction activities. These properties have a high potential for contaminant mobilization." DEIS, App Q, at 37. Appendix Q also confirms that, for the 22 sites in pink on the Sites of Concern Priority Maps, a "review of detailed site documentation for properties within and in vicinity of the final LODs would occur in future design phases of the Study, when property access is obtained to characterize contaminant distributions, and/or their potential for mobilization during construction activities." Id. In other words, the DEIS postpones this analysis, as noted above, leaving taxpayers to bear the liability for risks from unknown hazardous materials. See supra Section I.

The 38 sites identified in Appendix Q as Moderate High Priority and the 34 sites identified as Moderate Priority "would include underground storage tanks containing materials other than gasoline, jet fuel, kerosene fuel, waste oil or solvents, surface stains, suspected drums, unidentifiable mounds [sic] aboveground storage tanks with surface stains, suspected Polychlorinated Biphenyl (containing transformers, stressed vegetation, and hazardous materials storage sites. These sites may or may not require additional evaluation and characterization based on the needs of the final design and construction in the area." DEIS, App. Q, at 37. Again, the DEIS postpones this analysis and allows for future surprises.

Appendix Q states:

Because the study corridors have been used for vehicular traffic since (the Beltway's and I-270's) construction in the 1950s, it is reasonable to assume that the highway) has been the source of several oil/petroleum, break-downs, and other automotive issues – due to both its daily use and the required maintenance activities. These would have resulted in numerous releases of fuel and other petroleum oils— including leaded gasoline before its gradual phase-out in the late 1970s. Since the inception of these releases and their subsequent subsurface transport are poorly documented, this hazardous material concern would need to be considered a non-point source pollution concern affecting the entire corridor. Pollutants of concern would be diesel-range and gasoline-range petroleum products, and hazardous metals. This concern would be most pronounced within the urbanized areas and other sections of high vehicle use along the corridor. Since this contaminant risk cannot be quantified or used in addressing areas of greater or lesser priority, this concern was not evaluated as part of this assessment. However, it is recommended that this non-point source pollution concern should be addressed in any PSI [Preliminary Site Investigation] conducted within the investigation area, **with the possibility that contingency plans for contaminated soils would need to be initiated**

DEIS, App. Q, at 38 (emphasis added). In other words, this whole corridor is likely contaminated from vehicle accidents, including major fluid spills, such as the tank truck that flipped on the Maryland side of the American Legion Bridge on March 28, 2019, releasing a substantial quantity of fuel.[19] But the Agencies do not evaluate this contamination at all in the DEIS, despite their obligation under NEPA to take a hard look at all the environmental impacts in the DEIS.

Appendix Q further states:

**Following the evaluation of additional information, subsurface sampling would be conducted for those properties needing additional soil and/or groundwater analysis beyond the information documented in detailed regulatory records.** The PSIs would implement a tiered approach to any additional investigation based on the risk of contaminant mobilization, distance from the alignment, and likelihood of impact due to environmental factors such as depth to groundwater and construction requirements (refer to DEIS Chapter 4, Section 4.21.3 and *Hazardous Materials Technical Report* (DEIS, App. K) for additional details)

DEIS, App. Q, at 38 (emphasis added). Similarly, Appendix X recommends that Preliminary Site Investigations (PSIs) be conducted prior to construction by MDOT SHA. DEIS, App. X, at 26. The DEIS explains that after conducting PSIs, the "developer would be required to use best management practices to minimize the release of any hazardous materials during construction." DEIS, at 4-158. Again, these are issues that should be investigated and addressed now, rather than after decisions are made. Because the build alternatives have the same LODs and the hazardous materials investigation was based on a one-quarter mile buffer from the LODs, there does not appear to be any difference between the build alternatives that would justify waiting for this selection.

Relatedly, the DEIS explains:

Site owners of many of the identified properties may have undertaken additional site characterization studies and/or remediation pursuant to various state and federal regulatory programs, including UST, RCRA, CERCLA, and VCP requirements. Prior to designing the PSI, coordination should be made with MDE, VDEQ and USEPA to obtain additional information on the identified properties in order to further characterize subsurface conditions anticipated during project construction and develop the scope for additional investigation.

DEIS, App. X, at 26. This statement suggests that information may already exist characterizing and addressing some of the hazardous materials issues likely to arise from the build alternatives.

[19] Jennifer Ortiz and Reem Nadeem, *Traffic Terrors: After 15-Hour Shutdown, Lanes Reopen on Lower Loop at American Legion Bridge*, WUSA9.com (Mar. 29, 2019), https://wtop.com/local/2019/03/traffic-reopen-on-lower-loop-after-legion-bridge/

00022673

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 98 of 340

OP LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 72

It appears, however, that the Agencies did not attempt to obtain it, or even find out which of the identified properties have undertaken additional site characterization or remediation. The DEIS should not ignore this important data.

The DEIS also seems to rely on an assumption that only point sources of hazardous wastes within a quarter mile of the LOD need be considered. This is a faulty assumption for two reasons. First, the LOD is inaccurately reported and far too small for the actual proposed build alternatives. See supra Section II.C.1. Second, no reason is provided for the quarter mile cut off. There is virtually no attention paid (there are a few exceptions) to potential plumes of hazardous waste extending beyond the LOD, either as they exist now or as they might be disturbed by construction (highway or otherwise) or by the torrential rain events the region is experiencing more and more often with climate change; for example, there was a 6" plus rain event on Sept. 10, 2020, centered on Hyattsville but also reaching close to the existing Beltway near New Hampshire Ave.[131] Even pollutants not particularly soluble in water can migrate through soils during such events. The decision to only analyze within a quarter mile of the LOD is without justification.

Furthermore, there does not seem to be any analysis of hazardous wastes in areas proposed for mitigating wetland and waterhead loss, nor any proposal to proactively analyze these areas for such wastes. While many of these proposed sites are in rural or relatively undeveloped areas, agricultural practices in the past included the use of long-lasting toxic chemicals such as arsenic. If these sites are disturbed by land-moving equipment in the process of (re)constructing stream channels and wetlands, toxic chemicals can be mobilized and moved into ground and surface water.

The DEIS also improperly ignores PFAS contamination. Andrews Naval Air Force Base on I-495 is on the National Priorities List and is known to have contaminated soil, sediment, surface water and groundwater with petroleum and hazardous chemicals, including PFAS. DEIS, App. E to App. K, at PDF pg. 28-29.[132] The DEIS makes no further mention of PFAS contamination at Andrews Air Force Base or other rates. On February 14, 2019, EPA published

[131] Jason Samenow and David Streit, *Torrential Rains Triggers Widespread Flooding in D.C. Area, Inundating Roads, Stranding Motorists; Up to 6 Inches of Rain Fall*, Washington Post (Sept. 10, 2020), https://www.washingtonpost.com/weather/2020/09/10/dc-area-forecast-torrential-downpours-today-could-produce-areas-flooding/.

[132] *See also* Letter from Lee Currey to Community Water Systems, et al., PFAS (Dec. 18, 2019), https://mde.maryland.gov/programs/Water/water_supply/Documents/PFAS_MDE_memo_to_CommunityAndPCNT_PWS(2019-12-13)_final.pdf; Pat Elder, *Report Shows 15 Military Bases in Maryland Contaminated With PFAS*, Civilian Exposure, https://www.civilianexposure.org/report-shows-15-military-bases-in-maryland-contaminated-with-pfas/.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 73

the PFAS Action Plan.[133] On February 20, 2020, the EPA issued preliminary determinations to regulate PFOA and PFAS in drinking water and also issued a supplemental proposal regulating new uses of PFAS as requiring review under TSCA.[134] Currently, there are multiple legislative proposals in Congress to address the challenges associated with PFAS. There is no justification for ignoring this problem in the DEIS. Any site with PFAS should be identified and mitigation proposed for work in that area. PFAS discovered after the EIS process is completed are likely to cause delays and to be mitigated with taxpayer funds rather than being paid by or negotiated with the private sector. This concern is borne out by a P3 project in Australia (the West Gate Tunnel), involving one of the P3 bidders here, Transurban, which was recently delayed, with the builders trying to walk away, based on $1 billion cost overruns and claims that the extent of PFAS contamination discovered during construction was an unforeseeable force majeure event, despite warnings of the contamination early on.[135] The omission from the DEIS of any analysis of PFAS contamination appears to invite the exact same problems of substantial delay and cost overruns.

## II. The DEIS Does Not Adequately Analyze Air Emissions

The Federal Highway Administration has a webpage devoted to transportation and public health (https://www.fhwa.dot.gov/planning/health_in_transportation/). It premises that "USDOT is committed to promoting better consideration of health outcomes in transportation." Among other objectives, the webpage indicates that the Agency is focused on improving air quality. In conjunction with the Centers for Disease Control, it developed a Transportation Health Tool (https://www.transportation.gov/mission/health/transportation-health-tool-background).

[133] U.S. Envtl. Prot. Agency, *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, EPA 823R18004 (Feb. 2019), https://www.epa.gov/sites/production/files/2019-02/documents/pfas_action_plan_021319_508compliant_1.pdf.

[134] Press Release, U.S. Envtl. Prot. Agency, *EPA Announces Proposal Decision to Regulate PFOA and PFOS in Drinking Water* (Feb. 20, 2020), https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

[135] Timna Jacks and Clay Lucas, *Transurban Linked to Rip Up West Gate Tunnel Contract, Court Documents Allege*, The Age (June 9, 2020), https://www.theage.com.au/national/victoria/transurban-launches-legal-action-against-west-gate-tunnel-s-builders-20200609-p550os.html; Timna Jacks, *Transurban Warned on PFAS Before West Gate Tunnel Contracts Signed*, The Age (Jan. 31, 2020), https://www.theage.com.au/national/victoria/transurban-warned-on-pfas-before-west-gate-tunnel-contracts-signed-20200131-p53vna.html; Richard Willingham, *West Gate Tunnel Builders Seek to Terminate Contract Over Contaminated Soil, Transurban Talks ABC*, ABC News (Jan. 29, 2020), https://www.abc.net.au/news/2020-01-29/west-gate-tunnel-builders-seek-to-terminate-contract-over-cbg-11909402; Richard Willingham, *West Gate Tunnel Workers Laid Off After Delays Caused by PFAS Contamination*, ABC News (Jan. 22, 2020), https://www.abc.net.au/news/2020-01-22/west-gate-tunnel-workers-laid-off-contamination/11891456.

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 99 of 340

00022675

CO-465

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and FPA
November 6, 2020
Page 73

The Agency fails to meet this commitment in its considerations of potential air quality impacts from this extensive Project. To better address the air quality and related public health impacts, the air quality analysis must correct errors, add analysis and assessment of the additional items (as indicated) and perform a complete re-analysis of the Project to more accurately and completely assess and describe to the public and decisionmakers the potential negative air quality impacts of the Project.

### 1. The DEIS Does Not Perform Sufficient Emissions and Health Analyses for Particulate Matter (PM₁₀ and PM₂.₅) or Nitrogen Dioxide (NO₂)

The DEIS only contains a microscale (or hot spot) analysis for carbon monoxide (CO). Based on scale and scope, this Project should have a hotspot analysis performed for both species of particulate matter (PM₁₀ and PM₂.₅) and for nitrogen dioxide (NO₂). These three pollutants are transportation-related pollutants for which there are short-term National Ambient Air Quality Standards (NAAQS) for these pollutants indicates that ambient concentrations can fluctuate significantly in the short term and that even short-term exposures can have negative health effects.

In establishing the NAAQS for the particulate matter species, USEPA reviewed health studies and found that particulate pollution exposure can lead to many problems, including:

- premature death in people with heart or lung disease

- nonfatal heart attacks

- irregular heartbeat

- aggravated asthma

- decreased lung function

- increased respiratory symptoms, such as irritation of the airways, coughing or difficulty breathing.

Similarly for NO₂, USEPA found that breathing air with a high concentration of NO₂ can irritate airways in the human respiratory system which can aggravate respiratory diseases, particularly asthma, evidenced by respiratory symptoms (such as coughing, wheezing or difficulty breathing) and leading to hospital admissions and visits to emergency rooms.

Although these pollutants all have serious negative health impacts, some are more dangerous to the public than others. McCubbin and Delucchi examined the health effects (morbidity, hospitalizations, and mortality) of various pollutants.[126] They found that CO, the

[126] D. R. McCubbin and M. A. Delucchi, *The Health Costs of Motor Vehicle Related Air Pollution*, Journal of Transport Economics and Policy 33, 253-286 (Sept. 1999).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and FPA
November 6, 2020
Page 74

pollutant analyzed in the DEIS, has the fewest impact of the three on public health (although it is still of importance). They found that NO₂ has about 1.3 times more negative effects on public health than CO. Of most concern was particulate matter, where they found: "The most striking results are the large damages caused by ambient particulate matter (PM), and the large contribution of motor vehicles to ambient particulate levels." The authors calculated that PM exposure is about 50 times more damaging to public health than CO.

Appendix I of the DEIS states that the Project area is in attainment of the NAAQS for these three pollutants (NO₂, PM₁₀ and PM₂.₅) and therefore a consideration of these pollutants is not necessary to meet the requirements of the transportation conformity regulations (40 C.F.R. Parts 51 and 93).Even if that is correct, there is nothing preventing the Project sponsors from considering these pollutants for the purpose of NEPA, to completely and thoroughly assess the impacts of the Project, and to fully inform the affected residents of, and visitors to, the area. In particular, NEPA requires the analysis of all environmental impacts, direct, indirect, and cumulative, the DEIS should take a hard look at the air impacts of the Project, including impacts that are caused by future segments of the P3 Program and associated land use changes.

Importantly, the attainment status of the overall area for PM₂.₅, PM₁₀ and NO₂ is not representative of the air quality and the potential health outcomes in the more immediate area surrounding the Project. The pollutants at issue are microscale pollutants, meaning that their concentration can change greatly over short distances, as shown in the figure below.



A. Stability Category

From: "Predictions and analysis of near-road concentrations using a reduced-form emissions/dispersion model", Batterman, Zhang, and Kononowech, Environmental Health, June 2010



USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 100 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and EPA
November 6, 2020
Page 75

The concentration of these pollutants can vary substantially at only a few meters' distance. As a result, people in the houses, buildings, playgrounds, and on the sidewalks nearest the Project roadways will experience the greatest health impacts. The emission loading from additional vehicles traveling on the roadways due to this Project would serve to exacerbate existing pollutant concentrations. Despite the area's attainment status for some criteria pollutants, the actual concentrations of these microscale pollutants in the Project area and along its roadways are not known.

The attainment or non-attainment status of an area is determined by monitoring of ambient air quality at various locations that meet siting and equipment criteria promulgated by USEPA. None of these monitoring sites are in the Project area or even close to the Project area. Figures 2-1 through 2-5 of Appendix I show the locations of the nearest monitors for some of these pollutants. These monitors are located at substantial distances from the Project area and therefore do not represent air quality in the Project area or at individual intersections or analysis sites in the Project area. The above figure shows how the concentration of an air pollutant, and thus its health impact, can taper off within less than 100 meters, yet the nearest ambient monitor for PM₂.₅ and PM₁₀ is approximately 3.1 miles (almost 5,000 meters) from the Project area (Monitor 240330030 in Maryland) and the nearest monitor for NO₂ is approximately 2.1 miles (over 3,000 meters) from the Project area (Monitor 110010050 in the District of Columbia).

In addition, the Project area's attainment status for PM₂.₅ is tenuous. Table 2-4 of Appendix I indicates that Monitor 110010053, located in the District of Columbia, has measured a weighted arithmetic mean concentration of PM₂.₅ of 10.2 $\mu$g/m³. This is very close to the NAAQS annual standard of PM₂.₅ of 12 $\mu$g/m³. Thus, even a small incremental contribution from this project could cause air quality in the Project area to exceed the health-based NAAQS for PM₂.₅.

### ii.    Fine Particulate Matter Conformity

The air quality analysis for this Project must include a localized, hot-spot analysis for PM₂.₅, PM₁₀ and NO₂, not just for CO. This localized analysis is necessary to inform the public, and in particular residents and visitors to the area, of the potential negative health impacts associated with the Project which, as discussed above, may move from PM and NO₂ than from CO. The current PM and NO₂ air quality monitoring sites do not provide useful information, for the reasons explained above. Also, the near violation of the PM₂.₅ NAAQS strongly suggests that the incremental addition of PM₂.₅ pollution due to the Project could cause the entire region to be declared unhealthful for PM₂.₅.

Clean Air Act (CAA) Section 176(c), 42 U.S.C. § 7506(c), requires that federally approved highway and transit activities be consistent with ("conform to") the purpose of the State Implementation Plan (SIP). "Conformity to the purpose of the SIP" means that transportation activities will not cause or contribute to new air quality violations, worsen existing violations, or delay timely attainment of the relevant NAAQS or any interim milestones. Id.

The DEIS states that "The Air Quality Analysis Study Area (i.e., Montgomery County, Prince George's County, and Fairfax County) is an attainment area for the particulate matter

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and EPA
November 6, 2020
Page 76

(PM₂.₅), and therefore transportation conformity requirements pertaining to PM₂.₅ do not apply for this Project and no further analysis of PM₂.₅ emissions were evaluated per FHWA guidance." DEIS at 4-59 (footnotes omitted). The DEIS also states:

For background, the EPA issued a final rule (81 FR 58010), effective October 24, 2016, on "Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements" that stated, in part: "Additionally, in this document the EPA is revoking the 1997 primary annual standard for areas designated as attainment for that standard because the EPA revised the primary annual standard in 2012." (See: https://www.gpo.gov/fdsys/pkg/FR-2016-08/06/pdf/2016-15768.pdf). Accordingly, Fairfax County is no longer designated as maintenance for PM₂.₅, and the associated USEPA regulatory requirements for conformity for PM₂.₅ are eliminated for northern Virginia.

MDOT is correct in its plain reading that the Final Rule implementing the 2012 PM₂.₅ NAAQS revoked the 1997 primary annual standard for areas designated attainment for that standard like the Washington, DC-MD-VA area. The area had been re-designated as maintenance for the 1997 PM₂.₅ NAAQS. [126] But as the Washington, DC-MD-VA area is in attainment of the 2012 PM₂.₅ NAAQS. However, EPA cannot revoke conformity requirements for so-called "orphan areas," or areas that were designated nonattainment or maintenance for the now-revoked NAAQS. Thus, this Project will need to demonstrate conformity against the PM₂.₅ maintenance plan, including with the PM₂.₅ transportation conformity budgets, for the Washington, DC-MD-VA area, and the Agencies must analyze PM₂.₅ emissions.

The 2016 Rule explained that areas that have been redesignated to attainment for the 1997 NAAQS "will be required to implement their approved maintenance plan for the 1997 primary annual PM₂.₅ NAAQS and their PSD program. The approved maintenance plan can only be revised if the revision meets the requirements of CAA section 110(l) and, if applicable, CAA section 193." 81 Fed. Reg. at 58,142.

CAA § 193 prohibits modification of a control requirement in effect or required to be adopted as of November 15, 1990 (the date of enactment of the 1990 CAA Amendments), unless such a modification would insure equivalent or greater emissions reductions. CAA § 172(e), which addresses relaxation of the NAAQS, requires protections for areas that have not attained the NAAQS prior to a relaxation by requiring controls that are at least as stringent as the controls applicable in nonattainment areas prior to any such relaxation.

When revoking the 1997 NAAQS, EPA explained that "Continued attainment of the 1997 primary annual PM₂.₅ NAAQS in areas that have been redesignated to attainment for the 1997 primary annual PM₂.₅ NAAQS will be ensured through the ongoing implementation of the approved maintenance plan

[127] Approval and Promulgation of Air Quality Implementation Plans; District of Columbia, Maryland, and Virginia; Approval of the Redesignation Requests and Maintenance Plan of the Washington, DC-MD-VA Nonattainment Area for the 1997 Annual Fine Particulate Matter Standard, 79 Fed. Reg. 60,081 (Oct. 6, 2014).

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 101 of 340



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 77

that applies in these areas. These areas are required to implement their approved CAA section 175A maintenance plan for the 1997 primary annual PM2.5 NAAQS. *Id.* Ced. Reg. at 58,143.

The United States Court of Appeals for the District of Columbia Circuit issued a decision in *South Coast Air Quality Management District v. EPA*, 882 F.3d 1138 (D.C. Cir. 2018), making this obligation clear. This case involved a challenge to EPA's final rule for implementing the 2008 Ozone NAAQS, the 2008 Ozone NAAQS Implementation Rule. The court vacated portions of EPA's 2008 Ozone NAAQS SIP Requirements Rule, in particular those providing that EPA could revoke conformity requirements for areas that were attaining the 2008 Ozone NAAQS but were in maintenance (or nonattainment) for the revoked 1997 Ozone NAAQS. The court explained that conformity requirements are "controls" subject to the CAA's anti-backsliding provisions. *Id.* at 1149. The court further explained that CAA's anti-backsliding requirements apply to both maintenance and nonattainment orphan areas: "Even after revocation of the 1997 NAAQS, an orphan maintenance area is `an area that was designated as a nonattainment area at the time [it was] redesignated . . . to an attainment area.'" *Id.* at 1155. The court concluded that "the revocation of the 1997 NAAQS does not waive the unambiguous mandate that conformity requirements apply to orphan maintenance areas." *Id.* This is true regardless of whether the more recent NAAQS are more stringent.

Requirements for conformity do not differ from pollutant, but instead are all governed under CAA § 176(c), 42 U.S.C. § 7506(c). The situation of the Washington, DC-MD-VA being our "orphan maintenance area" is therefore covered by *South Coast II* and conformity must be completed for this Project with regards to PM2.5 under the 1997 NAAQS.

**b.    The DEIS Must Include a PM2.5 Hot-Spot Analysis and an Analysis of PM2.5 Health Impacts**

In addition to the required conformity determination, the Organizations request that the Agencies perform a PM2.5 modeling analysis to analyze the impact of emissions from this Project both on NAAQS compliance and on the public health.

First, the Agencies must perform a PM2.5 hot-spot analysis based on the project being constructed in an attainment area (in addition to the reasons discussed in Section II.H.1. as explained directly above), the area is still subject to controls due to CAA's anti-backsliding provisions. Moreover, the DEIS ignores other times a hot-spot analysis is required, for example, "new highway projects that have a significant number of diesel vehicles, and expanded highway projects that have a significant increase in the number of diesel vehicles," and "Projects affecting intersections that are at Level-of-Service D, E, or F with a significant number of diesel vehicles, or those that will change to Level-of-Service D, E, or F because of increased traffic volumes from a significant number of diesel vehicles related to the project." 40 C.F.R. § 93.123(b)(1)(i), (ii). The DEIS states that the Project will accommodate increased movement of freight trucks. *See, e.g.,* DEIS, at 4-61. The Organizations therefore believe the proposed Project requires a hot-spot analysis. Or, regardless of CAA requirements, such an analysis should be done to truly take a hard look at the Project's environmental and human health impacts.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 78

Second, the EIS requirement serves two important functions: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The EIS is one of NEPA's action-forcing procedures to ensure that agencies take a hard look at the environmental consequence of proposed actions. *Id.* at 350.

It is scientifically established that increased PM2.5 concentrations at levels below the current primary annual NAAQS (12 µg/m³) cause human health harms (such as respiratory, cardiovascular, nervous system, cancer, and mortality). The DEIS must not ignore these health impacts based on claims of purported conformity.

EPA itself has recognized this link:

• Evidence continues to support a linear, no-threshold concentration—response relationship, but with less certainty in the shape of this curve at lower concentrations (i.e., below about 8 µg/m³). Integrated Science Assessment for Particulate Matter (ISA), EPA/600/R-19/188, at ES-23 (Dec. 2019).

• Recent studies that focus on the shape of the C-R (concentration-response) curve provide new insight into the health effects evaluated in previous reviews and continue to provide evidence of a linear, no-threshold relationship between both short- and long-term PM2.5 exposure and several respiratory and cardiovascular effects, and mortality. *Id.* at 1-48.

• For long-term PM2.5 exposure, most of the evidence on the shape of the C-R curve comes from studies of mortality with some initial recent evidence from studies of respiratory and cardiovascular effects, as well as lung cancer mortality and incidence. Epidemiologic studies of long-term PM2.5 exposure and mortality used a variety of statistical approaches and outpoint analyses, which support a linear, no-threshold relationship for total (nonaccidental) mortality, especially at lower ambient PM2.5 concentrations, with confidence in some studies in the range of 5–8µg/m³. Additionally, there is initial evidence indicating that the slope of the C-R curve may be steeper (marginally) at lower concentrations for cardiovascular mortality. Evaluation of the C-R relationship is more limited for respiratory and cardiovascular effects, but overall studies support a linear relationship, specifically at long-term PM2.5 concentrations ranging from 10–12 and 5–10µg/m³, respectively. *Id.* at ES-19.

*See also* ISA at ES-9 to ES-17. The Independent Particulate Matter Review Panel, made up of former members of the EPA Clean Air Scientific Advisory Committee Particulate Matter Review Panel, recently explained:

FINAL ENVIRONMENTAL IMPACT STATEMENT

00022677

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and EPA
November 6, 2020
Page 79

We concluded that the current $PM_{2.5}$ standards are insufficient to protect public health, on the basis of a review of the scientific evidence from epidemiologic studies, toxicologic studies in animals, and controlled human exposure studies; this evidence is consistent within each discipline and coherent among the multiple disciplines in supporting a causal, biologically plausible relationship between ambient concentrations well below the current $PM_{2.5}$ standards and adverse health effects, including premature death.[128]

It is also scientifically certain that short-term exposure to $PM_{2.5}$ concentrations causes human health harms. EPA explains, "A large body of scientific evidence spanning many decades clearly demonstrates there are health effects attributed to both short-and long-term PM exposure, with the strongest evidence for a relationship between some health effects and short-term $PM_{2.5}$ exposure." [ PM_{2.5} at 35-22. EPA further explains that short-term exposure to $PM_{2.5}$ causes cardiovascular effects and mortality and is likely to cause respiratory effects. *Id.* at I-20. A recent comprehensive study examining over 43 years of hospital admissions records for Medicare beneficiaries found:

For the newly studied diseases, each 1 µg/m³ increase in short term $PM_{2.5}$ was associated with an annual increase of 2050 hospital admissions (95% confidence interval 1914 to 2187 admissions), 12 216 days in hospital (11358 to 13 075), US$31m (£24m, €28m; $25m to $36m) in inpatient and post-acute care costs, and $2.5bn ($2.0bn to $2.9bn) in value of statistical life. For diseases with a previously known association, each 1 µg/m³ increase in short-term exposure to $PM_{2.5}$ was associated with an annual increase of 3642 hospital admissions (3434 to 3851), 20 098 days in hospital (18950 to 21247), $69m ($65m to $73m) in inpatient and post-acute care costs, and $4.1bn ($3.5bn to $4.7bn) in value of statistical life.[129]

The Organizations ask: Do the Agencies believe that there are no human health harms from $PM_{2.5}$ below the current primary annual NAAQS of 12 µg/m³? If so, what is the basis for this belief? If not, why are the Agencies performing no analysis of the human health impacts from $PM_{2.5}$ emissions caused by the proposed alternatives? There is no valid justification for not considering and analyzing these well-documented impacts.

[128] Independent Particulate Matter Review Panel, *The Need for a Tighter Particulate-Matter Air-Quality Standard*, N. Engl. J. Med. 383;7 (Aug. 13, 2020); *see also* Advice from the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft - September 2019), Docket ID No. EPA-HQ-OAR-2015-5072 (Oct. 22, 2019).

[129] Yanguang Wei, et al., *Short Term Exposure to Fine Particulate Mother and Hospital Admission Risks and Costs in the Medicare Population: Time Stratified, Case Crossover Study*, BMJ, 2019; 367:16258 (Nov. 27, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6889251/.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and EPA
November 6, 2020
Page 80

Moreover, the DEIS fails to consider $PM_{2.5}$ concentrations at monitors close to the Beltway, I-270, or other nearby highways. A 2015 study using $PM_{2.5}$ monitoring at 159 meters (approximately 509 feet) from the Beltway in Largo, Maryland found that roadway traffic contributes 12 to 17% of the total $PM_{2.5}$ concentration.[130] The near road monitor consistently showed higher concentrations than Maryland's other, non-near-road monitors. Sadly, the estimated annual $PM_{2.5}$ concentration for the full years of the study was 13.0 µg/m³, which is above the current standard of 12 µg/m³. Further concerning, the data showed fifteen days during the monitoring period when the concentration exceeded 35 µg/m³ with the highest 24-hour concentrations each year between 30.9 and 41.4 µg/m³ and an hour when the concentration rose as high as 255 µg/m³. These concentrations are at levels scientifically accepted to cause adverse health effects, including premature death. And that is without the additional construction and cars that the Project would create.

For whatever reason, MDOT did not continue monitoring near the Beltway and the DEIS does not even mention this study. But the study shows that were the Agencies to measure concentrations near the Beltway today, the concentrations would likely exceed or be close to exceeding the NAAQS. And the added $PM_{2.5}$ emissions from the Project, due to construction and increased vehicle miles traveled (which were not analyzed in the DEIS), would likely cause a near road monitor to exceed the NAAQS while also certainly causing negative health outcomes.

Unfortunately, Maryland does not currently operate any near road $PM_{2.5}$ monitors in the Washington, DC-MD-VA area, despite that area having over 2.5 million people. *See* 40 C.F.R. § 58.10(a)(8)(i), Appendix D § 4.7.1(b)(2) (requiring operational near-road $PM_{2.5}$ monitors in areas having over 2.5 million people by January 1, 2015). Washington, DC has one, along the Anacostia Freeway, which has different attributes from the Beltway and I-270, and the monitor has only one year of valid measurements (2019). That monitor and other non-near-road monitors also show elevated annual $PM_{2.5}$ concentrations,[131] which even if they do not violate the NAAQS are well above levels that are known to cause harm. At those levels, small increases are proven to cause additional harms, yet the DEIS does not even consider these harms. The Agencies must analyze the impacts the Project, and its $PM_{2.5}$ emissions, will have on the public.

A study based on a road-widening project in London capable of proving that there is clear evidence that new or expanded roads rapidly fill with either displaced or induced traffic, offsetting any short-term gains in eased traffic flows. More importantly, that study found:

$PM_{10}$ increased during the construction period up to 15µgm³ during working hours compared to concentrations before the road works. . . . After the completion of the road works

[130] Helen Ginsberg, et al., *Monitoring Study of the Near-Road $PM_{2.5}$ Concentrations in Maryland*, Journal of the Air & Waste Management Association Volume 65, 2015 - Issue 9 (Aug. 14, 2015), https://www.tandfonline.com/doi/full/10.1080/10962247.2015.1056887.

[131] *See* Design Values 2019, Table AQS $PM_{2.5}$ (NAAQS Standard), https://epa.maps.arcgis.com/apps/MapSeries/index.html?appid=bc6f7e061a14014b2e606be450 b5b.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 102 of 340

00022678

CO-468

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 103 of 340

00022679



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 81

widening there was an increase in all pollutants from the road during each hour 2-4µg m⁻³ for PM2.5, 1 µg m⁻³ for PM2.5, 40 and 8 µg m⁻³ for NOx and NO2, respectively.[132]

Another study found that "Annual average incremental PM2.5 from major roadways ranged from 0.1 to 2.0 µg m⁻³."[133]

A recent report found that highway vehicles are responsible for up to 0.55 µg m⁻³ of ambient PM2.5 in Virginia, with some of those emissions coming from bordering states such as Maryland.[134] The report summarized the measurable transportation-attributable health burden in Virginia, including a mean estimate of 199 premature deaths and $1.6 billion in social welfare costs. Moreover, this burden was found to disproportionately impact socially vulnerable communities.

Converting the pollutant increases from the proposed added lanes into harms using a concentration response curve shows the Project will harm the public, increase hospitalizations and cause premature deaths. A 2018 meta-analysis found "a 1µg m⁻³ increase in PM2.5 was associated with a 1.29% increase in all-cause mortality (95% CI [confidence interval] 1.09-1.50) at a mean exposure of 10 ug/m³, which decreased to 1.03% (95% CI 0.97-1.11) at a mean exposure of 15.7 µg/m³ (for mean level across all tracks), and to 0.82% (95% CI 0.52-1.12) at 30 µg/m³."[135] The study found the "increase was largest for cardiovascular, cardiovascular and elderly mortality with 1.92% (95% CI 1.59-2.25), 1.46% (95% CI 1.25-1.67) and 1.61% (95% CI 1.35-1.85), respectively at a mean exposure of 10 µg/m³," but smaller for

[132] Janet Font, et al., *Degradation in Urban Air Quality From Construction Activity and Increased Traffic Arising From a Road Widening Scheme*, Science of the Total Environment 497-498, at 123-132 (Aug. 14, 2014), https://reader.elsevier.com/reader/sd/pii/S0048969714010969?token=A5B9500110982401L1326a19bb2842fc324331556C0962745a1d185221f1829C9C7494A1A83626D1D28 DCBF2A1

[133] Amudo Mukherjee, et al., *Influence of Roadway Emissions on Near-Road PM2.5 Monitoring Data Analysis and Implications*, Transportation Research Part D: Transport and Environment Volume 86, 102442 (July 2, 2020), https://www.sciencedirect.com/science/article/pii/S1361920920305295

[134] *An Assessment of the Health Burden of Ambient PM2.5 Concentrations in Virginia*, Industrial Economics, and Virginia Clinicians for Climate Action, at 8-10 (Oct. 28, 2020), https://cee82d6b-79a4-447f-9567-a8a3838b6b93.filesusr.com/ugd/bvb313_164fd61c65a6844378db4239ad7f617.pdf

[135] Alina Vodonos, Yara Abu Awad, and Joel Schwartz, *The Concentration Response Between Long-Term PM2.5 Exposure and Mortality: A Meta-Regression Approach*, Environmental Research 166, 677-689, at 679 (Aug. 1, 2018), http://www.scientificintegrityinstitute.org/FRNAPM25280918.pdf

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 82

respiratory and lung cancer deaths with 1.17% (95% CI 0.85-1.41) and 1.22% (95% CI 0.87-1.30), respectively.[136] Moreover, geographical locations with higher percent of PM2.5 sourced from traffic was significantly associated with higher estimates with a 2.05% increase in mortality rate (95% CI 1.89-2.81) per µg/m³."[137] The study concluded:

Assuming that the space time models have higher effect estimates because of smaller exposure error, the best estimated all-cause mortality effects size at 10 µg/m³ would be 1.63% (95% CI 1.18-2.04). In addition, our meta-regression restricted to studies with mean concentrations below 10 µg/m³ was significant with a 2.4% increase per 1 µg/m³, (95% CI 0.8-4.0).[138]

The Agencies could use well-supported concentration-response curves such as this to estimate the mortality impacts of increased PM2.5 emissions from the build alternatives. With millions of people living in Montgomery and Prince George's County, even a 1 µg/m³ increase in PM2.5 concentrations caused by the build alternatives compared to the no build alternative would lead to thousands of premature deaths, thousands more hospitalizations, and billions in lost social welfare costs. Real lives will be harmed by even small increases in PM2.5 concentrations. To comply with NEPA and make a decision on the project with an understanding of its impacts, the Organizations request that the Agencies conduct PM2.5 monitoring near the Beltway and I-270, analyze the current concentrations and increases that would be caused by the build alternatives, and study the health impacts of the build alternatives. NEPA requires that FHWA consider reasonable alternatives that will reduce emissions and pollutant exposury; it is not reasonable or legally permissible under NEPA for the Agencies not to use the best science available to estimate the impact of the build alternatives' emissions on concentrations of PM2.5 and the corresponding health impacts that would result.

2. The DHS's Air Quality Analysis Missed Parking Lots

The air quality analysis that is reported in Appendix F also ignored a source of emissions which should be included in the air quality studies. The TCO analysis and the required analysis for PM10, PM2.5 and NOx (as described above) must include emissions from the operation of vehicles in nearby major parking lots (greater than 100 spaces).

The importance of parking lots as a source of indirect motor vehicle pollution has been well known for many years and has been the subject of regulation and permitting across the nation. See, e.g., Oregon Department of Environmental Air Quality, Rule 340-254-6060; North Carolina Department of Environment and Natural Resources, Guidelines for Evaluating the Air Quality Impacts of Transportation Facilities, https://www.bacombecounty.org/comment/WecAir/forms/F-guide.pdf. Devoted

[136] *Id.* at 684.

[137] *Id.*

[138] *Id.*


OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and EPA
November 6, 2020
Page 81

County, Florida, Broward County Parking Facility License.
https://library.municode.com/fl/broward_county/codes/code_of_ordinances. Studies have found that levels of air pollution are higher (more unhealthful) in the vicinity of parking lots. Dalterman, Kazukokumehar, and Kovannikon discovered that nitrogen oxide (including $NO_2$) levels were up to 1.9 times greater than accepted levels and CO levels also exceeded acceptable levels.[139] They did not look at $PM_{10}$ and $PM_{2.5}$.) Similarly, Steinbergn and Kkperis found elevated levels of CO (up to 35% higher), nitrogen oxides (including $NO_2$) and volatile organic compounds (including benzene) near parking facilities.[140]

These findings are not surprising since vehicles operate differently in parking lots than they do on roadways or Interstates. In parking lots, vehicles cruise around looking for a parking spot at slow speeds, which elevates emissions. They also idle for extended periods, which elevates emissions. In parking lots vehicle engines are started after being turned off for a period of time, which also elevates emissions. Many vehicles undergoing these "cold-starts," "slow speeds and idling generate these higher emissions in and near parking lots. Analytic techniques for including emissions from parking lots are well known. In formulating its Motor Vehicle Emission Simulator (MOVES), its current emissions model, EPA recognized the different operating characteristics of vehicles in and around parking lots and derived an "off-network" mode for the model, designed specifically to analyze and calculate the emissions associated with parking lot conditions. Information and guidance on how to use MOVES for parking lots is available. See Chapter 4 of input Guidelines for Motor Vehicle Emissions Simulator Model, Volume 2: Practitioners' Handbook; Project Level Inputs, NCHRP 25-38. EPA's approved dispersion model, AERMOD, could than be used to calculate concentrations of those pollutants to generate more accurate estimates of air pollution associated with this Project.

The Project sponsor should examine the land uses within 1000 meters of the analysis sites to determine if there are any major parking lots located nearby. Sites with nearby parking lots must be re-analyzed to include parking lot emissions of CO, $PM_{10}$, $PM_{2.5}$ and $NO_2$.

### 3.   The DEIS Fails to Properly Address Ozone and Its Precursors

There is a large body of peer-reviewed and accepted research, built over the past 40 years, that connecting both regional and local air pollutants to adverse public health outcomes such as pulmonary disease, cardiovascular disease, neurological effects, and even cancer.[141] Ground-level ozone is particularly harmful for the most vulnerable members of society.

[139] Penas Dalterman, Dasgoole Kaziuikmemar, & Mirdarapu Kysanankas, *Air Pollution at Parking Lot of Vilnius*, Journal of Engineering and Landscape Management, 12:1, 38-43 (2004). https://www.tandfonline.com/doi/pdf/10.1080/16486897.2004.9636633.

[140] J. Steinberge & J. Kkperis, *Urban Air Pollution: Input from Car Parking Zones*, 73 Urban Transport V. 851, (2004). https://www.witpress.com/Secure/elibrary/papers/UT04/UT04803P1.pdf.

[141] *See, e.g.*, 83 Fed. Reg. 42,986, 43,337 (Aug. 24, 2018).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and EPA
November 6, 2020
Page 82

including those with pre-existing health conditions, the elderly, and children.[142] Low-income families and communities of color are disproportionately exposed to elevated levels of ozone pollution and other factors that exacerbate the risks of exposure, such as inadequate access to health care and proximity to sources of harmful pollution, including heavy traffic.[143] In its 2013 Integrated Science Assessment, EPA found that "most studies of individuals have reported that individuals with low SES (socioeconomic status) and those living in neighborhoods with low SES (socioeconomic status) are more at risk for $O_3$ [ozone]-related health effects, resulting in increased risk of respiratory hospital admissions and ED [emergency department] visits."[144] Yet the DEIS performs no health analysis beyond referencing a NAAQS conformity modeling performed two years prior.

Based on the scale and scope of this Project, the air quality analysis should include a regional emissions analysis (or mesoscale analysis) of ozone precursors (volatile organic compounds (VOCs) and nitrogen oxides ($NO_x$)). The Project area is in a moderate ozone non-attainment area. If the Project is completed, it will result in a massive increase in VMT of about one thousand million annual VMT, based on traffic projections for the build alternatives.

[142] See EPA, Integrated Science Assessment for Ozone and Related Photochemical Oxidants, Sections 8.3.1.1, 8.3.1.2, 8.2.2, 8.2.3, EPA-600/R-10/076F (2013).

[143] See D. Schraufnagel, et al., *Air Pollution and Noncommunicable Diseases: A Review by the Forum of International Respiratory Societies' Environmental Committee, Part 1: The Damaging Effect of Air Pollution*, Chest, 155(2), 469-416 (Nov. 9, 2018), https://doi.org/10.1016/j.chest.2018.10.042 ("Susceptibility is partly under genetic and epigenetic regulation. Although air pollution affects people of all regions, ages, and social groups, it is likely to cause greater illness in those with heavy exposure and greater susceptibility. Persons are more vulnerable to air pollution if they have other illnesses or less social support."); JK Grynim, and GD Thurston, *The Burden of Air Pollution: Impacts on Racial Minorities*, Envtl. Health Perspectives, 109(4): 501-6 (Aug. 2001) (identifying socioeconomic status and access to healthcare as key factors influencing risk of negative health effects from exposure to ozone and other air pollutants); M.L. Bell, F. Dominici, *Effect Modification by Community Characteristics on the Short-Term Effects of Ozone Exposure and Mortality in 98 US Communities*, 167 Am. J. Epidemiology 986 (Apr. 15, 2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2430754 (finding that "some populations (i.e., Black/African American and the unemployed) may bear a higher health burden from ozone and that a higher prevalence of control air conditioning may modify ozone exposure, thereby lessening its health impacts."); R. Onus et al., *Air Pollution and Exacerbation of Asthma in African-American Children in Los Angeles*, Epidemiology, Vol. 12 (2) 200-8 (Mar. 2001); see also, J.T. Lee et al., *Effect of Air Pollution on Asthma-Related Hospital Admissions for Children by Socioeconomic Status Associated with Area of Residence*, 61 Archives Envtl. Occupational Health 123 (2006); S. Cakmak et al., *The Risk of Dying on Days of Higher Air Pollution Among the Socially Disadvantaged Elderly*, 111 Envtl. Res. 388 (2011).

[144] EPA, Integrated Science Assessment for Ozone and Related Photochemical Oxidants, EPA-600/R-10/076F, at 8-28 (2013).

00022680

FINAL ENVIRONMENTAL IMPACT STATEMENT

CO-470

APPENDIX I – DEIS COMMENTS – COMMUNITY ORGANIZATIONS

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 85

Although the area's latest transportation conformity determination indicates that, with the completion of this Project,[*] the area will meet the required emissions tests for VOCs and NOx, the Project will still generate large amounts of these ozone precursors. These amounts should be reported so that the public and decisionmakers are aware of the Project's impact on emissions of these pollutants.

In addition, since the formation of ozone occurs miles downwind and hours after the release of ozone precursors, the regional emissions of ozone precursors should be reported and assessed for their potential impact on downwind areas that also do not meet the ozone NAAQS. These areas may include the Baltimore area, the Philadelphia area, the Seaford City area in Delaware, and Kent and Queen Anne's Counties in Maryland, among others. The Project sponsor should consult with officials in the affected nonattainment areas to determine if these areas will be able to complete successful future transportation conformity determinations and meet their air quality attainment goals despite the transport of ozone and ozone precursors into these areas as a result of the Project.

FHWA's Technical Advisory T 6640.8A (Oct. 30, 1987, Guidance for Preparing and Processing Environmental and Section 4(f) Documents, states that a DEIS should, when addressing air quality concerns that occur on the macroscale, present information on ozone and related pollutants:

Ozone (O3), Hydrocarbons (HC), and Nitrogen Oxide (NOx) air quality concerns are regional in nature and as such meaningful evaluation on a project-by-project basis is not possible. Where these pollutants are an issue, the air quality emissions inventories in the State Implementation Plan (SIP) should be referenced and briefly summarized in the draft EIS. Further, the relationship of the project to the SIP should be described in the draft EIS. . . .

Ozone pollution is a significant issue in the geographic area in which the Project is proposed. The Washington, DC-MD-VA nonattainment area is in maintenance status for the 2008 ozone NAAQS and must address conformity levels in its maintenance plan. The region is also currently in non-attainment for the 2015 ozone NAAQS and a monitor located several miles upwind of this project has a current design value that is 2 ppb above the health-based standard. The correct thing to do in the statement of public health and welfare would be to evaluate whether the Project will allow the Washington, DC area to achieve all health-based federal ozone standards. The bare minimum would be for the DEIS to at least include summary information, as recommended by FHWA guidance, on ozone precursor levels related to the conformity levels, but the DEIS failed to do so.

The lack of ozone precursor information in the DEIS is particularly troubling since the evidence from *Visualize 2045* shows that for both VOCs (Exhibit 17) and NOx emissions during

[165] Air Quality Conformity Analysis of Visualize 2045 and the FY 2019 – 2024 Transportation Improvement Program, October 17, 2018, https://www.mwcog.org/visualize2045/documents/library.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 86

ozone season (Exhibit 18), the maintenance plan for the area at issue is above the agreed-to Tier 1 budgets for both 2025 and 2030.

4. **The DEIS Fails to Sufficiently Address Mobile Source Air Toxics**

FHWA's guidance requires that a project of this size be evaluated with regards to Mobile Source Air Toxics (MSATs). While the DEIS provides information about how the levels of various MSATs will change because of a build alternative, the Agencies just insert template EIS language that has been used by Departments of Transportation (DoTs) around the country for years to avoid evaluating the health impacts of MSATs. This omission is not acceptable.

Motor vehicles are a primary source of benzene emissions (second only to smoking).[166] EPA last updated the Integrated Risk Assessment (IRA) for Benzene in 2003 and it was determined to be a human carcinogen, the highest level of certainty of adverse health impacts available. EPA, through the Integrated Risk Information System (IRIS), provides both a Reference Dose (RfD) and Reference Concentration (RfC) for Benzene.[167] These data can easily be used in conjunction with modeled emissions from EPA's MOVES and information about the populations that live, go to school, work, and otherwise inhabit the area near I-495 and I-270 to determine the impact that the change in Benzene levels would have on public health, and thereby to determine if the increased risk is acceptable.

Benzene is not the only air toxic associated with motor vehicles. EPA also provides the same degree of information for numerous other air toxics such as:

• Diesel PM – Likely to be a human carcinogen (Evaluated 2003)[168]

• Formaldehyde – Probable human carcinogen (Evaluated 1990)[169]

• 1,3-butadiene – Carcinogenic to humans by inhalation (Evaluated 2002)[170]

• Acetaldehyde – Probable human carcinogen (Evaluated 2002)[171]

[166] Wallace L., *A Major Sources of Benzene Exposure*, Environmental Health Perspectives, 82, 165–169 (1989), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1568165

[167] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=276

[168] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=642

[169] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=419

[170] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=139

[171] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=290

00022681



OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 87

- Naphthalene – Impacts nervous and respiratory function (Evaluated 1998)[152]
- Toluene – Impacts kidney function (Evaluated 2005)[153]
- Xylene – Impacts nervous function (Evaluated 2003)[154]

Even though this information has been available for nearly 20 years, due to amendments to the Clean Air Act put in place 30 years ago, MDOT states:

In particular, the tools and techniques for assessing project-specific health outcomes as a result of lifetime MSAT exposure remain limited. These limitations impede the ability to evaluate how potential public health risks posed by MSAT exposure should be factored into project-level decision-making within the context of NEPA.

DEIS, Apt. I, at 77. It is ahead that in the past 30 years MDOT has not developed an approach to evaluate MSATs. This language comes from a template utilized by DoTs around the country that claim we can never know if people exposed to these will get cancer. The DEIS uses this language despite the fact that FHWA in the mid-2000's developed a protocol that can be the basis of system to evaluate MSATs.[155] It is hard to understand how 15 years later, the DEIS would still be claiming that tools and techniques do not exist to evaluate MSATs for a highway project.

Additionally, the DEIS also could have utilized systems developed by other agencies to conduct an evaluation of the health impacts from MSATs.

- Minnesota Department of Transportation – Air toxics template dated 2007[156]

[152] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=436;
[153] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=118.
[154] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=270.
[155] Michael Claggett and Terry L. Miller, *Recent Enhancements of Mobile Source Air Toxics: A Methodology for Evaluating Mobile Source Air Toxic Emissions Among Transportation Project Alternatives*, U.S. Dept. of Transportation, Federal Highway Administration, https://www.fhwa.dot.gov/ENVIROnment/air_quality/air_toxics/research_and_analysis/mobile_source_air_toxics/msatemissions.cfm
[156] http://www.dot.state.mn.us/stateaid/projectdelivery/environmental/guidance/air-toxics-category-2-sample-webtoxic-two-nitrochange-crew-connector-roadway.doc

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 88

- South Coast Air Quality Management District – *Health Risk Assessment Guidance for Analyzing Cancer Risk from Mobile Source Diesel Idling Emissions for CEQA Air Quality Analyses (August 2003)*[157]
- Sacramento Metropolitan Air Quality Management District – Mobile Source Air Toxics Protocol (2019)[158]

Given that there are eleven public schools (five in Montgomery County and six in Prince George's County) that are within 500 meters of I-495 and I-270 within the scope of the Project, such as Montgomery Blair High School that directly abuts the Project area, at a minimum the impacts of increased air toxics being breathed day in and day out by young Marylanders must be evaluated. We know young people will be in these facilities nearly half of the year, for years on end, breathing these toxics. MDOT can develop approximations for exposure that these vulnerable populations are likely to experience, and it has an obligation to do so.

For MDOT to have failed to come up with a solution to evaluate MSATs, despite the decades it had available, the numerous data points provided by EPA and other researchers, and the examples provided by other jurisdictions, and instead for MDOT to cut and paste form language into the DEIS to avoid analyzing the risk of getting cancer or experiencing other negative health effects from MSATs, is completely unacceptable.

Additionally, the MSAT analysis presented in Appendix I downplays the significance of the findings regarding this important set of air pollutants. The discussion in the Appendix emphasizes a reduction in MSAT emissions over time and minimizes the large increase in MSAT emissions and, therefore, exposure, associated with the Project (the build versus no-build comparisons). Figures 3-41 to 3-49 show substantial decreases in MSAT emissions over time, but these emission declines have nothing to do with completion of this Project. These declines are the result of improvements in vehicle and fuel technology mandated by the federal government and have no relation to the Project or the selection of any of its alternatives. Instead, the DEIS should focus on the substantial increase in MSAT emissions of 13.3% (see Table 3-36 of Appendix I), directly attributable to the Project. Five of the six analyzed alternatives show these increases, with the range depending on the alternative and the specific pollutant considered.

Although there are no NAAQS established for these pollutants, the Maryland Department of Environmental Quality (MDEQ) has established "screening levels" for a myriad of hazardous air pollutants. (https://mde.maryland.gov/programs/Permits/AirManagementPermits/Documents/2012-Revised-

[157] https://www.aqmd.gov/docs/default-source/ceqa/handbook/mobile-source-toxics-analysis.doc?sfvrsn=2
[158] http://www.airquality.org/Residents/CEQA-Land-Use-Planning/Mobile-Source-Air-Toxics-Protocol

00022682

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 90

EPA Speciate (cvedb.com/search-all) with various compound forms of the pollutants listed by MDEQ. This list includes the MSATs analyzed for the Project. For example:

| MSAT | 1-hour screening level (ng/m3) | 8-hour screening level (ng/m3) |
| --- | --- | --- |
| acrolein | | 2.29 |
| benzene | 28.0 | 82.0 |
| 1,3 butadiene | | 29.11 |
| formaldehyde | | 6.3 |
| naphthalene | | 36.49 |
| acetaldehyde | | 5.46 |
| ethylbenzene | | 5400.0 |

These chemical compounds are associated with elevated cancer risks and other major health concerns. The MSAT analysis for the Project should assess whether the increased exposures of these pollutants due to the construction and operation of the Project, or any increased exposure, are acceptable, rather than using uncertainties in the science and analyzed techniques as justification to sidestep the issue, as is done in the MSAT discussion in Appendix I. A health risk assessment should be performed to more completely assess the potential air quality and health impacts of the Project and to evaluate the need for mitigation measures to reduce the risk of exposing residents and the general public to these dangerous chemicals.

The screening levels shown above and on the MDEQ hazardous air pollutant list are geared toward worker exposures and protections. However, they offer a starting point for analysis. Historically, screening levels or other standards to protect the health of the general population are more stringent than guidelines for worker protection. Nevertheless, the DEIS should use these values to analyze the Project's potential MSAT health impacts. Specifically, it should:

• determine the appropriate screening level from several related MSAT compounds pollutants on the MDEQ list to compare to the MSAT compounds emission rates determined by MOVES run and analyzed for the DEIS

• re-run MOVES as necessary (see comment regarding speeds, Section II.II.I.13)

• Determine appropriate concentration levels for each MSAT for each appropriate time scale (1-hour, 8-hour, daily, annual, etc.)

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 80

• compare against appropriate screening level

• perform a health risk assessment to indicate increased cancer and other disease risks

• determine if this is acceptable to build this project.

The analytical approach described above and the preparation of a health risk assessment to assess health impacts of MSATs from transportation projects is not new. The California Department of Transportation has performed health risk assessments for its projects (e.g., Schrefer Hain Bridge Replacement and Truck Expressway), using guidance provided by the California Air Resources Board (http://www.arb.ca.gov/toxics/(DOTs)-LandUse-Planning/Mobile-Sources-Air-Toxics-Protocol). It is not clear why the residents in and around the Project area are being accorded less protection than the residents of California.

Finally, the MSAT discussion in Section 3.4 of Appendix I is unclear. The opening discussion suggests that only the portion of the Project area that exceeds FHWA's threshold for a quantitative MSAT analysis was considered in the study. Yet much of the discussion later in the section focuses on the "affected network." This inconsistency should be clarified and an MSAT analysis should be done for the entire affected network, not just those segments that meet FHWA's thresholds.

5.    The DEIS Does Not Properly Perform the Necessary Carbon Monoxide Hot-Spot Analysis

The carbon monoxide (CO) hot-spot analysis presented in the DEIS incorrectly applies EPA's CO Hot-Spot modeling guidance, Guideline for Modeling Carbon Monoxide from Roadway Intersections, (USEPA-454-R-92-005, Office of Air Quality Planning and Standards, November 1992, in two important respects. Correct application of the Guidance would likely result in higher predicted CO concentrations resulting from the Project, and, potentially, reveal a greater air quality impact from the Project.

The misapplications relate to the temperature and stability class used in the analysis.

Temperature – Table 3-25 indicates that the emission factors were derived for the average temperature for January. However, EPA's Hot Spot Guidance states that the temperature used in a hot-spot analysis should correspond to the average of the five highest non-overlapping 8-hour CO readings from an appropriately sited CO monitor (page 4-7 of the Guidance). The Project sponsors should calculate the correct temperature to be used, based on the Guidance; re-run the MOVES model to generate correct emission factors; and re-run the CALMQRC dispersion model to obtain the correct predicted CO concentrations.

Stability class – Page 4-8 of EPA's Hot-Spot Guidance identifies two stability classes that may be used in a CO analysis: stability class D and stability class E. Stability class D applies to urban areas and stability class E applies to rural areas. The Guidance offers advice if an analysis area has a mixture of land uses (i.e., see class D if more than half the area is urban). The air quality analysis for this Project assumed a stability class D (urban) for every analysis site

00022683

OP LANES MARYLAND
I-495 & I-270 Managed Lanes Study

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 108 of 340

OP·LANES™ MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 91

within the Project corridor. The Project corridor is 48 miles long. While some of the analysis sites are likely urban in character, and the approximately modeled as stability class D, other sites are likely more suburban or rural in character. If the area of these sites is less than half urban in character, they should be modeled with stability class E. Rather than making a blanket assumption that stability class D applies throughout the Project corridor, the Project sponsors should review each analysis site to determine its urban/suburban/rural character and model each site with the appropriate stability class.

It should not be overlooked that the Project will increase CO concentrations at every site that was analyzed, in many cases nearly doubling the expected concentrations under a build scenario compared to the no-build case (see Table 3-29). The build concentrations, while still below the 1-hour and 8-hour CO NAAQS, represent a substantial negative impact on air quality. CO is a poison to the human body, and any increase represents an unneeded exposure to this poison for nearby residents and visitors to the Project area. The build alternatives increase VMT and congestion, reduce vehicle efficiency, and cause much higher concentrations of carbon monoxide at the sites analyzed.

Two other issues should be considered as well with regard to the CO analysis for the Project.

1) The CO analysis in Table 3-29 only looked at intersections and interchanges in the immediate Project corridor. However, the greenhouse gas and MSAT analyses uncovered a much wider "affected network" with many more intersections negatively affected by the Project. CO hot spot analyses were not done at any of these locations. Performing analyses at these locations will almost certainly uncover similar findings, i.e., a substantial increase in CO concentrations. Thus, it appears that the entire region will experience a substantial increase in CO levels as a result of this Project.

2) As pointed out below, there are several other technical errors and omissions in the air quality analysis. When those errors and omissions are corrected and the air quality analysis is redone, it is expected to reveal much higher CO emissions and CO concentrations at the analyzed locations and at locations yet to be analyzed on the "affected network." Some of those re-calculated CO concentrations may approach or exceed the 8-hour CO NAAQS. If that is the case, then this Project will be the reason for new or exacerbated violations of an air quality standard. This result would be highly significant, impacting public health for years to come, and should not be allowed unless sufficient mitigation measures can be found and implemented to reduce these concentrations to safe levels.

## 6. Climate Change and Greenhouse Gas Emissions

Construction and operation of this Project will violate the spirit, if not the letter, of the Maryland Greenhouse Gas Reduction Act of 2009 and the Greenhouse Gas Emissions Reduction Act – Reauthorization (GGRA of 2016), which requires a 40% reduction in greenhouse gas emissions (GHGs) by 2030 from 2006 levels. While this target applies across all sectors of the Maryland economy, the transportation sector is required to help achieve this target. Construction

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 92

and completion of this Project will seriously stymie and delay, if not prevent, achievement of this target, placing a greater burden on other sectors of the Maryland economy to reach the target.

The Air Quality Appendix of the DEIS (Appendix I) acknowledges that the transportation sector accounts for 28% of Maryland's greenhouse gas emissions. (Examination of the Greenhouse Gas Emissions Reduction Act 2019 Draft Plan shows that Maryland's transportation sector's share will rise to 40% of economy-wide GHGs as other sectors of the economy get cleaner. See The Greenhouse Gas Emissions Reduction Act 2019 GGRA Draft Plan, Appendix C, Figure ES-1, transportation on-road plan transportation non-road. **Yet these figures do not even include the excess GHGs that will be generated by the construction and operation of this Project!**

Appendix I also shows that of the six alternatives analyzed and compared to the no-build alternative, five would increase GHGs substantially. (As noted above, the DEIS indicates that Alternative 5, the one screened alternative that reduces GHGs, has been dropped from further consideration.) The increases range from over 300 thousand tons per year of $CO_2e$ to nearly 500 thousand tons per year of $CO_2e$ in the opening year of 2025. This magnitude of GHG increases will occur just within the Project area. Appendix I of the Greenhouse Gas Emissions Reduction Act: 2019 GGRA Draft Plan identifies a number of transportation strategies that the Plan indicates are necessary to even approach the GHG reduction target for the transportation sector. Many of these strategies are challenging to implement from an administrative, financial, logistical and policy perspective. It is unfortunate that the difficult work undertaken to implement these strategies will be undermined, to a large degree, by the construction and operation of this Project.

For example, alternative 8 for this Project shows a 499 thousand ton increase in GHGs compared to the no-build alternative in 2025 (Table 3-56 of Appendix I). To use the units of Appendix I of the 2019 GGRA Draft Plan, this translates to 0.0096 million metric tons of $CO_2e$. Table 6.1 of Appendix I identifies a number of strategies and their potential greenhouse gas emission reductions. For example:

- Intermodal Freight Centers Access Improvement     0.017 mmt $CO_2e$

- Load by example – Alternative Fuel Usage in State Fleet     0.094 mmt $CO_2e$

- Truck Stop Electrification     0.007 mmt $CO_2e$

It is unfortunate that the GHG increase from this Project are will substantially reduce the effectiveness of the above-cited and many other strategies.

The DEIS misleadingly states:

By reducing congestion and increasing speeds, vehicle travel duration and the associated amount of fuel combustion and associated emissions will decrease, minimizing the impacts of GHGs. Thus, the study area would see a net reduction

00022684

JA1678

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 109 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 93

in GHG emissions under any of the Build Alternatives, even though VMT increases relative to the No Build Alternative and 2015 levels.

DEIS at 4-62. The DEIS claims, but fails to quantify, supposed reductions in GHGs that the build alternatives will bring based on reduced congestion and increased speeds. The Organization have repeatedly asked the Agencies for the basis of this claim but it has not been provided. Again, what is the basis for this claim in the DEIS? How much will reduced congestion and increasing speeds reduce GHGs in the build alternatives? What levels of reduced congestion are the Agencies relying on, and how does that congestion compare to the level the Agencies rely on elsewhere in the DEIS to make the managed lanes financially viable? To what extent, and how, does this claim account for reduced demand or land use changes? The Agencies presumably have performed this calculation in their analysis, so it should be easy to present. Why are the Agencies hiding this impact, and presenting the public with only the final result of changes in GHGs (one which incorporates other factors such as fuel efficiency increases)?

There also is an inconsistency between the DEIS and the 2019 FFRA Draft Plan with respect to GHGs, resulting in incorrect information for Maryland's climate change planning efforts. The DEIS for this project shows a substantial increase in GHGs associated with this Project, as presented in Appendix I. On the other hand, in Appendix J of the 2019 GGRA Draft Plan, MDOT identifies "Managed Lanes (I-270/I-495 Traffic Relief Plan Implementation)" as an "Emerging Policy Scenario" with a 0.051 mmtCO₂e emission reduction (Table 6.1 of Appendix J, Appendix II of Appendix J does not provide any significant information on how these emission reductions were derived. What assumption was MDOT relying on in the GGRA Draft Plan to reach this conclusion? Clearly there is a discrepancy in the climate change planning scenario, with the newer calculations in the Project demonstrating that the optimistic assumption and outcomes for the previous, older Managed Lanes (I-270/I-495 Traffic Relief Plan Implementation) strategy are not correct. When will MDOT update the GGRA Plan to fix this faulty assumption and incorrect GHG impact? How can MDOT rely on the previous, inaccurate reduction analysis when saying in another arena that the Project will increase GHGs?

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 94



**Figure 6.1 Policy Scenario 1 Emissions Outcomes**

The attached Figure from Appendix J of the Draft Plan shows how tenuous the achievement of the "40 by 30" target is in the transportation sector, relying on "Emerging" and "Innovative" strategies to achieve the target. Construction and completion of this Project may prevent the emission reduction target from being achieved and so undermine Maryland's GHG policy.

Further, Maryland's 2019 GGRA Draft Plan of 2019 assumes deployment of 600,000 electric vehicles in Maryland by 2030.[159] This assumption forms the bulk of the projected emissions reductions necessary to achieve the "40 by 30" target. Yet, in its 2019 Annual Report,[160] the Maryland Electric Vehicle Infrastructure Council reports that only approximately 23,000 plug-in electric vehicles had been registered in Maryland by the end of 2019. This statistic makes the likelihood of reaching the electric vehicle deployment goal and, therefore, the "40 by 30" target highly unlikely, even without the Project, which will add large amounts of unaccounted-for GHGs into the atmosphere and will essentially make Maryland's climate action targets impossible to attain.

159

https://mde.maryland.gov/programs/Air/ClimateChange/Documents/2019GGRAPlus/Appendices%20J%20-%20MDOT%20GGRA%20Draft%20Plan.pdf

[160] http://www.mdot.maryland.gov/newMDOT/Planning/Electric_Vehicle/Documents/2019-ZEVIC_Annual_Report_Final.pdf



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 95

    Appendix I of the DEIS does not provide information on the GHGs associated with construction of the Project, postponing disclosure of that impact to the Final EIS. This omission violates the requirements of NEPA because it keeps important information from the public and decisionmakers – information needed to evaluate the potential environmental impacts of the Project – and thereby favors selection of one of the build alternatives. The construction of new highway lanes is an intense activity using many types of equipment. The operation of this equipment will generate large amounts of GHGs. For the 4&-mile segment of the Project, the construction will be long-lasting and involve many different pieces of equipment. This activity will use fuel for power and will produce emissions that include greenhouse gasses. It is expected that the greenhouse gas emission tonnage will be large and will, in addition to the increase in GHGs from vehicle operation on the expanded highways, offset much of the progress that Maryland is trying to accomplish in attaining its GHG reduction targets.

    The following list contains off-road equipment commonly used in highway construction, with the most common engine and fuel type and the emissions (kg) of $CO_2$ per 100 hours of operation.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 96

Aerial Lifts  Diesel  739

Air Compressors  Gas 4-Stroke  777

Bore/Drill Rigs  Gas 4-Stroke  326

Cement and Mortar Mixers  Gas 4-Stroke  521

Concrete/Industrial Saws  Gas 2-Stroke  255

Cranes  Diesel  4,600

Crawler Tractors Diesel 27,030

Crushing/Proc. Equipment  Gas 4-Stroke  935

Dumpers/Tenders  Gas 4-Stroke  467

Excavators  Diesel  5,774

Forklifts  LPG  1,353

Generator Sets  Gas 4-Stroke  830

Graders  Diesel  6,585

Off-Highway Tractors Diesel 27,030

Off-Highway Trucks Diesel 27,078

Other Construction Equipment Diesel 10,190

Other General Industrial Equipment  Gas 4-Stroke  474

Other Material Handling Equipment  Diesel  1,673

Pavers  Diesel  3,810

Paving Equipment  Gas 4-Stroke  655

Plate Compactors  Gas 4-Stroke  367

Pressure Washers  Gas 4-Stroke  750

Pumps  Gas 4-Stroke  621

Rollers  Diesel  3,070

USCA4 Appeal: 24-1447      Doc: 30-5      Filed: 09/30/2024      Pg: 110 of 340

JA1680



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 97

case for this Project) generates 24.1 lbs of greenhouse gas emissions per square yard. Using this emission factor and assuming 12-foot-wide lanes, 4-foot-wide shoulders on each side of the roadway, and new roadways in each direction for the Project yields construction greenhouse gas estimates of:

| One lane, each direction | 8, 143 tons greenhouse gasses |
|---|---|
| Two lanes each direction | 12, 216 tons greenhouse gasses |

While these are very large tonnages, they are still conservative figures. They do not include several important additional considerations that would lead to higher greenhouse gas emissions:

- Bridge construction. The estimates do not include additional emissions due to bridge construction, including the American Legion Bridge. FHWA estimates that bridge construction could increase construction emissions by 30% (Infrastructure Carbon Estimator Final Report and User's Guide).

- Routine Maintenance. Typically, roadways require repaving after 15 years of use and reconstruction after 30 years of use. They also require snow removal and vegetation management. This could lead to another 120 gallons of diesel fuel consumed for each lane mile of the Project. These impacts have also not been added to the above estimates.

- Operational impacts on the existing facility. During construction, there will likely be impacts on the existing roadway. These include lane closures, lane narrowing, and detours. These impacts will affect traffic speeds, causing traffic to move at a slower speed and concomitantly increasing greenhouse gas emissions. The actual increase in emissions will depend on the length and duration of the actual lane closures and detours.

In reality, therefore, the actual greenhouse gas emissions due to the construction of the Project will likely be much higher than the conservative tonnage estimates calculated above.

The Sierra Club Maryland Chapter expressed these concerns in the comments to the Board of Public Works on the I-495 and I-270 P3 Program on June 4, 2019 ("Climate Change Impacts of Proposed Expansion of I-270 and I-495" Author: David Smedick, Policy Director, Maryland Sierra Club), but they still were not addressed in the DEIS.

Thus, GHGs from construction, in combination with the increase in GHGs from the operation of the expanded highway (up to 699 thousand tons per year of CO₂) plus the conservative estimate of 12 thousand tons of CO2 emissions associated with the construction of the project's roadway) yield a massive increase in GHGs associated with this Project and puts Maryland's greenhouse gas emissions reduction targets seriously in jeopardy.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 96

| | |
|---|---|
| Rough Terrain Forklifts | Diesel | 3,200 |
| Rubber Tired Dozers | Diesel | 7,815 |
| Rubber Tired Loaders | Diesel | 7,815 |
| Scrapers | Diesel | 12,412 |
| Signal Boards | Diesel | 513 |
| Skid Steer Loaders | Diesel | 724 |
| Surfacing Equipment | Gas 4-Stroke | 543 |
| Sweeper/Scrubbers | Diesel | 2,220 |
| Tractors/Loaders/Backhoes | Diesel | 1,342 |

Source: National Cooperative Highway Research Program, Greenhouse Gas Mitigation Measures for Transportation Construction, Maintenance, and Operations Activities, Program 25-25, Task 58.

The actual equipment used for construction of the Project will depend on the items and specifications for the Project. There are tools available to calculate the emissions associated with the construction of a roadway project. Section 3.6 of Appendix I of the DEIS identifies one tool available to calculate greenhouse gas emissions from construction of the project: Infrastructure Carbon Estimator (ICE).

https://www.fhwa.dot.gov/environment/sustainability/energy/tools/carbon_estimator/ However, to apply this tool requires specific details about the project and its construction methods which are not generally available to the public reviewers of a DEIS.

Examination of the literature, however, shows a number of studies that have examined GHGs from construction of roadways and that can be used to provide generalized estimates of greenhouse gas emissions from the construction of this Project. These include Chidiроtu and Galbohos, *Energy Usage and Greenhouse Gas Emissions of Pavement Processes* [144] *for Asphalt Concrete Pavements* (July 2010) [144]; Williams-Derry, *Increases in Greenhouse Gas Emissions From Highway-Widening Projects*, (Oct. 2007) [145]; Ega's *Greenhouse Gas Emissions Mitigation in Road Construction and Rehabilitation A Toolkit for Developing Countries* [146], etc. Chidirotu and Galbohos calculated that construction of a new roadway (which would be the

[144] https://www.pavementpreservation.org/icpp/paper/paper65_2010.pdf

[145] http://www.fe.sdu.edu.za/reports/ambiolu-the-roads.pdf

[146] https://www.esmap.org/sites/default/files/esmap-files/Road_Emission_Optimization_User_Manual%5B1%5D.pdf

CO-477

00022687

JA1681

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 111 of 340

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 112 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 99

**7. The DEIS Fails to Consider the Relationship Between Air Quality and Covid-19: the Agencies Must Release a Supplemental EIS That Does So**

Especially given the current environment, it is not acceptable for the DEIS to not include an analysis of air quality impacts on public health. As of writing these comments, the two counties that this project runs through have the highest levels of COVID-19 infections and deaths in Maryland (32,880 infections and 835 deaths in Prince George's County, 25,692 infections and 832 deaths in Montgomery County).[164] Many of those deaths are in communities that are near I-495 and I-270.

Since COVID-19 began devastating communities in Maryland and throughout the nation, researchers have been hard at work understanding the illness. One thing has become clear: higher levels of air pollution are correlated with higher incidence and mortality from COVID-19. Some of the studies that have related negative health outcomes from COVID-19 and automobile-related air pollution have found:

- "Chronic [$NO_2$] exposure is an important contributor to the high COVID-19 fatality rates observed."[165]
- "Statistically significant, positive associations between long-term exposure to $NO_2$ and COVID-19 case-fatality rate and mortality rate, independent of $PM_{2.5}$ and ozone."[166]
- "We found that an increase of 1 µg/m3 in the long-term average $PM_{2.5}$ is associated with a statistically significant 11% (95% CI, 6 to 17%) increase in the county's COVID-19 mortality rate."[167]

[164] https://coronavirus.maryland.gov/. Accessed October 20, 2020.

[165] Ogen, Y., *Assessing Nitrogen Dioxide (NO2) Levels as a Contributing Factor to Coronavirus (COVID-19) Fatality*, The Science of the Total Environment, 726, 138605 (Apr. 11, 2020), https://doi.org/10.1016/j.scitotenv.2020.138605.

[166] Liang, D., Shi, L., Zhao, J., Liu, P., Schwartz, J., Gao, S., Sarnat, J., Liu, Y., Ebelt, S., Scovronick, N., & Chang, H. H., *Urban Air Pollution May Enhance COVID-19 Case-Fatality and Mortality Rates in the United States*, The Innovation (Oct. 8, 2020), https://doi.org/10.1016/j.xinn.2020.100047.

[167] Wu, et al., *Air Pollution and COVID-19 Mortality in the United States: Strengths and Limitations of an Ecological Regression Analysis*, Science Advances 2020, 6: eabd4049 (Nov. 4, 2020), https://advances.sciencemag.org/content/advances/6/45/eabd4049.full.pdf

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 100

- "Short-term exposure to higher concentrations of $PM_{2.5}$, $PM_{10}$, $CO$, $NO_2$ and ozone is associated with an increased risk of COVID-19 infection."[168]
- "[Re-]enforcing pollutant release limits is indeed related to health betterment in society's cumulative exposure to HAPs at levels below reference concentration (RfC), an estimate of daily inhalation exposure likely to be without an appreciable risk of deleterious effects during a lifetime (EPA 2020d), may heighten population vulnerability to COVID-19 mortality," and "signals of cumulative exposure [to air toxics] impacting COVID-19 mortality."[169]
- $PM_{2.5}$ contributed ~15% to COVID-19 mortality worldwide, 27% in East Asia, 19% in Europe, and 17% in North America.[170]
- According to our results, a one µg/m3 increase in $PM_{2.5}$ (about 18% of the average concentration of $PM_{2.5}$) increases the number of severe cases by roughly 2% and same-day deaths by 3% from the mean case rate in a county.[171]

Based on these studies, additional analysis is needed in the DEIS to demonstrate how this Project will or will not adversely impact communities experiencing higher levels of mortality and other negative health impacts from COVID-19.

[168] Zhu, Y., Xie, J., Huang, F., & Cao, L., *Association Between Short-Term Exposure to Air Pollution and COVID-19 Infection: Evidence from China*, Science of the Total Environment, 727, 138704 (July 20, 2020), https://doi.org/10.1016/j.scitotenv.2020.138704.

[169] Petroni, Michael, Dustin Hill, Lydia Younes, Liesl Barkman, Sarah Howard, I Brielle Howell, Jaime Miravalle and Mary H Collins, *Hazardous Air Pollutants, Composite Toxic Releases and Socioeconomic Factors, and COVID-19 Mortality in the United States*, Environmental Research Letters, Volume 15, Number 9 (Sept. 11, 2020), https://iopscience.iop.org/article/10.1088/1748-9326/aba512/meta#erlaba512s2...

[170] Andrea Pozzer et al., *Regional and Global Contributions of Air Pollution to Risk of Death from COVID-19*, Cardiovascular Research (Oct. 26, 2020), https://academic.oup.com/cardiovascres/advance-article-doi/10.1093/cvr/cvaa288/5940460

[171] Wu, Austin, et al., *COVID-19 Mortality and Contemporaneous Air Pollution*, International Center for Public Policy, Working Paper 20-16 (Oct. 2020), https://icepp.gsu.edu/files/2020/10/paper2016.pdf



00022688

JA1682

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 113 of 340

## 8. The DEIS and Its Reference to Visualize 2045 Lack Clarity in Data Sets and Prevent Meaningful Public Review

A build alternative from this Project cannot be approved unless it is included in a regional emissions analysis and "the project's design concept and scope have not changed significantly from those that were included in the regional emissions analysis. . ." 40 C.F.R. § 93.121 (a).

Appendix I states that the managed lanes for I-270 and I-495 are included in the NCRTPB Fiscal Year (FY) 2019 – 2024 TIP (Visualize 2045).[172] DEIS, App. I, at 23. Appendix B of Visualize 2045 mention managed lanes for I-270 and I-495 as stated, but that is where the clarity ends. There are four discrepancies that need to be resolved.

First, Visualize 2045 relies on a base case of 2019 for its projections. Yet all of the analysis presented in Appendix I is based on 2016. The previously approved Constrained Long Range Plan (CLRP) was 2016-based, but Appendix B of the 2016 CLRP does not include the managed lane project. It is unclear whether the data being shown in the DEIS corresponds to Visualize 2045 and its base case of 2019 and if so how that is being presented in a 2016 base case, or if outdated modeling is being used. All work should only rely on data used in Visualize 2045 and the assessment should be redone to reflect that data.

Secondly, only one option is presented for managed lanes on I-270 and I-495 in Visualize 2045 in terms of modeling assumptions. Yet five alternatives are proposed in the DEIS that include High Occupancy Toll (HOT) lanes and Express Toll Lanes (ETL). Since no ozone precursor information is presented, nor is it made clear which alternative was considered in Visualize 2045, it is not possible to evaluate if some, if not most, of the alternatives increase emissions beyond the approved CLRP or even beyond conformity budgets. It appears that Visualize 2045's conformity analysis assumes mostly ETL lanes and some High Occupancy Vehicle (HOV) lanes, but no HOT lanes.[173] It also appears Visualize 2045's analysis is based on the entire 70 miles of the P3 Program with a completion year of 2025 but that appears extremely unlikely and this DEIS is only for a segment of the Program. Table 5-39 of Appendix I shows that $CO_2$ emissions from Alternatives 8, 9, 10 13B, and 13C range from an increase in $CO_2$ emissions by 7.3% to 12.4% in the 2025 opening year. Depending on which alternative was included in the baseline assumptions in Visualize 2045, it is quite possible that these alternatives will lead to future emissions that do not conform with the CLRP, but this analysis does not provide any clarity as to whether they would and so should be redone.

Thirdly, there is no evaluation of 2030 or another year between 2025 and 2040. Conformity evaluations require no more than 10 years between conformity evaluations. 2030 was the year chosen in Visualize 2045, and therefore will be assumed to be the most logical year to

[172] FY 2019 – 2024 Transportation Improvement Program for the National Capital Region (Oct. 17, 2018), https://www.mwcog.org/visualize2045/documents/library/.

[173] Air Quality Conformity Analysis: Visualize 2045, A Long-Range Transportation Plan for the National Capital Region, at B-43 to B-45 (Oct. 17, 2018).

choose. It is particularly troubling that 2030 was not included in the DEIS because that year appears to have the greatest potential to lead to conformity problems given that the modeled emissions for both VOC (Exhibit 17) and NOx (Exhibit 18) are the closest to violating the Tier 2 budgets (they both also violate the Tier 1 budgets already). In both cases the projected ozone season day emissions are within 5 tons per day of the Tier 2 budget. As a result, evaluation of 2030 is necessary for an acceptable analysis.

Finally, these discrepancies could have been resolved had model inputs for MOVES been provided. In Appendix D of the Air Quality Technical Report, RunSpecs for MOVES were provided. While these would be necessary to conduct a thorough review of the inputs used in the modeling as well as the outputs that were created by MOVES, they do not provide the truly necessary data, namely the MySQL input and output databases from the MOVES runs. Without this information, it is impossible to determine if MDOT is relying on valid assumptions for vehicle speeds, VMT growth, the split between diesel and gasoline vehicles, etc. This also makes it impossible to compare the alternatives to what is modeled in Visualize 2045. Finally, it makes it impossible to evaluate whether the alternatives that were not the basis for Visualize 2045 would indeed allow this project to remain under conformity budgets. Without this information the air quality assessment cannot be considered a truly open public process and therefore it should be revised and a new public comment period provided to allow for evaluation of this additional data and revised analysis.

## 9. The DEIS's (Insufficient) GHG and Other Emissions Analyses are Based on Data that Were Already Outdated When the DEIS was Published

The DEIS ignores EPA's and National Highway Traffic Safety Administration's revocation of California fuel efficiency standards and their weakening of national fuel efficiency standards.[174]

The DEIS states:

It should be noted the Safer Affordable Fuel Efficient (SAFE) Vehicles Rule, finalized in September 2020, only affects the estimates. EPA (Energy Administration) estimates. This new rule would require less stringent CAFE and $CO_2$ emissions standards through 2026 compared to the standards implemented in 2012 which it replaces. . . . A major factor in mitigating the GHG emissions associated with this increase in VMT is more stringent fuel economy standards. EIA projects that vehicle energy efficiency, thus GHG emissions, on a permile basis, will improve by 28 percent between 2012 and 2040.

[174] The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks, 85 Fed. Reg. 24,174 (April 30, 2020); The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310 (Sept. 27, 2019).

00022689

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 114 of 340

00022690

CO-480



JA1684

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 104

DEIS, at 4-62, *id.*, App. I, at 118-19. The Agencies appear to: 1) recognize the significance of fuel efficiency standards, and 2) recognize the significant roll back of those standards. Nevertheless, the emissions analyses in the DEIS rely on fuel efficiency gains from now-revoked standards. The two that rule mentioned above, revoking California's waiver (whose emission standards Maryland also had adopted) and the SAFE Vehicle Rule, contain detailed analyses of their impacts on fuel efficiency. The remaining dockets also contain detailed analyses depicting the roll back "analyses, the Agencies believe the roll back" analyses are scientifically sound? Why does the DEIS fail to address the impact of the two rules? What would the GHG emission from the build alternatives be under the currently effective legal landscape?

Whatever the Agencies' reasoning for ignoring these issues in the DEIS, they must supplement the DEIS to analyze GHG and other air emissions using modeling based on currently effective fuel efficiency standards. The Agencies certainly should not reach a decision based only on what the air emissions from the various alternatives would have been under now-revoked standards.

Not only does the 2020 SAFE Vehicles Rule impact the emission estimates the DEIS presents that relied on Energy Information Administration (EIA) data, the SAFE Vehicles Rule also impacts the entirety of the MOVES model that was used throughout the DEIS and Visualize 2045, including for determining vehicle types. The MOVES model is based on the earlier fuel efficiency standards, so the Agencies are relying on a now outdated model. The SAFE Vehicles Rule changes fleet size, fleet age distribution, fleet mix of vehicle types, VMT by vehicle type, and VMT growth rates.[178] Any planning done with an outdated MOVES model lacks a basis in reality and is unlawful. As explained in comments on the SAFE Rule: "The SAFE Vehicles Rule, by changing the fundamental assumptions of vehicle fuel-efficiency, would invalidate California's air quality emissions model (known as EMFAC) which is used by the State to meet the Federal Clean Air Act requirements... the DEIS does not address how the Agencies have adjusted the model (if appears they have not).[179]

Moreover, the increased emissions of all air pollutants from this California waiver revocation and the weakened SAFE Vehicles Rule impact the ability to meet the Ozone and other NAAQS. The Metropolitan Washington Council of Governments and National Capital Region Transportation Planning Board commented that they "are concerned that any reduction of the 2024 Greenhouse Gas and CAFE Final Rule will make it increasingly difficult for the region to realize the reductions in NOx emissions needed to comply with the 2015 Ozone

[177] *See* North Carolina Department of Environmental Quality, *Comments on Proposed Rulemaking and Draft Environmental Impact Statement for "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks"*, Docket ID Nos. NHTSA-2018-0067 EPA-HQ-OAR-2018-0283 (Oct. 26, 2018), https://www.regulations.gov/document?D=EPA-HQ-OAR-2018-0283-4100.

[179] Letters from Industry Coalition to Diane Feinstein and California Congressional Delegation, (September 10, 2019 and June 12, 2019).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 105

NAAQS."[177] The DEIS does not explain if or how the now standards were taken into account in determining the project's synthetic sufficiency (if appears they were not). Have the Agencies evaluated whether the build alternatives would cause or contribute to a NAAQS violation under the current legal landscape, with the SAFE Rule and waiver revocation, as well as all of the current Administration's withholding of regulations that provided for decreased emissions of ozone, $PM_{2.5}$ and other criteria pollutant? The Agencies must do so before moving forward and present the results for public comment.

Further, the GHG emissions estimates do not appear to consider the effects of induced demand or land use changes after the highways are expanded.

The Agencies must start over and properly analyze the proposed alternatives' impacts on air emissions, including GHGs, based on accurate and current laws, data, and models.

**10.    The DEIS's Air Quality Environmental Justice Discussion is Insufficient**

Appendix E and Section 21 of Chapter 4 of the DEIS purport to address environmental justice concerns. These sections of the DEIS are completely inadequate to address the air quality concerns of environmental justice communities negatively impacted by this Project. They are inadequate in two significant respects:

1)    These sections misrepresent the discussion and findings from the air quality studies carried out for the Project and documented in Appendix I. They minimize the outcome of the air quality studies by focusing on their least negative aspects. For example, Chapter 4 Section 21.5.B states "... the Build Alternatives are not predicted to increase emission burdens compared to the No Build Alternative in 2040, aside from a slight increase in ghg emissions; nor cause or contribute to a violation of the NAAQS, no long-term or regional air quality impacts are anticipated, and no mitigation measures are warranted." (Page 4-136). Yet Appendix I tells a different story. Tables 3-34 through 3-36 show increases in MSATs in 2025 for all Build Alternatives and continue to show increases in 2040 for some MSATs for some alternatives. Similarly, Tables 3-37 through 3-39 show increases in greenhouse gas emissions for all likely build alternatives with continuing increases in greenhouse gas emissions for all likely build alternatives in 2040. Thus, the Project corridor and the environmental justice communities will be subject to increased MSAT and greenhouse gas emissions starting in 2025 and continuing every year through at least 2040! The above quote also downplays the near doubling of projected CO concentrations due to this Project at analyzed locations and likely elsewhere in the Project area (the affected network), as well.

[177] MWCOG Comment on the Proposed SAFE Vehicle Rule for CAFE and Tailpipe Carbon Dioxide Emissions Standards for Vehicle Year 2021-2026 Light-Duty Vehicles, Docket ID No. EPA-HQ-OAR-2018-0283 (Oct. 17, 2018), https://www.regulations.gov/document?D=EPA-HQ-OAR-2018-0283-3326.



OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 105

2) These sections are incomplete because it does not identify additional air quality sources and stressors for the environmental justice communities. Industrial and commercial emissions sources such as power plants, freight yards, rail yards, truck terminals, bus terminals, ports, depots, etc. have historically been sited in environmental justice communities and disproportionately affect these communities. The increased emissions from the Project would impose an additional emissions burden on these communities. The Environmental Justice Chapter and Appendix must address this aspect of the Project. The Project sponsors must structure the Project corridor and the affected network to identify these types of industrial and commercial emissions sources and assess the impact of the Project's new and additional emissions, and downgradient air quality, on those communities already suffering from excess air pollution from other sources.

3) We also agree with the deficiencies identified by Ron Blalck and Eyal Li in their testimony presented during the Project public hearings.

Ron Blalck, Public Health Foundation CEO, stated in his September 3, 2020 testimony:

One of the most grievous examples of how human health was not adequately considered is found in Chapter one on Appendix 8 [sic], both addressing environmental justice and the impact on minority communities. The study notes that there are 199 black groups within the Environmental Justice Analysis area and 107 have minority populations equal to or greater than 50 percent. Unfortunately, the health impacts of minority communities have been excluded from the document. Chapter four in Appendix 8 states that excess emissions may be reduced. Even in the unlikely event this is true, those emissions will be closer where people live and play with many fewer trees to filter the pollutants. And what about emissions increases on the roads to and from the Beltway to 270? In Chapter four, there are 61. The following statement is made. Information is currently incomplete or unavailable to reliably predict the study's specific health impacts. This is an inaccurate statement. Valid and reliable data exist and science exists to model and predict health impacts. Unfortunately, none of these are addressed in the study. And looking at the study team of over 70 individuals, I was unable to find a single individual with an MPH degree in epidemiology, with expertise to analyze the data and human health impacts. The absence of facts, data and data sources about the impacts on human health and no evidence sound public health science has been used in developing the DEIS is unacceptable and is an embarrassment to the state and to the citizens. In the event that any of the global roads continue to be considered, this DEIS must not redone. That is a legal requirement.[78]

[78] I-495 and I-270 Managed Lanes Study Joint Public Hearing, at 11-12 (Sept. 3, 2020), https://495-270-p3.com/wp-content/uploads/2020/10/ALB_JPH_September_3_Combined.pdf

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 106

Eyal Li, an environmental engineer at the Union of Concerned Scientists, stated:

On behalf of our 24,000 supporters in Maryland and our network of more than 26,000 scientists, engineers and public health professionals nationwide, you see we strongly oppose the proposed addition of lanes to I-495 and I-270 and supports a No Build option. We urge the MDOT SHA to evaluate additional alternatives for detailed study that provide equitable and sustainable mobility options for Maryland residents, including public transit, transportation, demand management on existing roadways, and transit-oriented land use that weren't considered in-depth in the DEIS.

UCS is particularly concerned about the project's disproportionate health impacts on marginalized communities near the highways. The race and ethnicity characteristics of the analysis area reveal that Latino, Asian Americans, and African-Americans are overrepresented by 50, 49, and 9 percent, respectively, while white residents are underrepresented by 37 percent compared to their population statewide. In 2010, UCS released a study showing African-American and Latino Marylanders are exposed to levels of traffic-related air pollution that are 12 and 11 percent higher than the average white. White Maryland residents. Chronic exposure to particular matter pollution from vehicles causes increased death rates attributed to cardiovascular disease and respiratory ailments, including COVID-19, among other conditions. Given the systematic oppression of marginalized groups throughout history, we call on the Maryland DOT to shoulder a greater burden of proof than its actions are not harmful to the health and well-being of minority populations, low-income populations and/or indigenous peoples.[79]

## 11.    The DEIS's Analysis of Construction Impacts is Insufficient

The DEIS fails to analyze harmful air emissions from construction activities, including increased particulate matter, silica dust particles, $CO_2$ and greenhouse gas emissions. The Agencies attempt to justify this failure by claiming construction will be segmented and each construction segment will take less than five years. DEIS at 4-158.

This justification does not meet the Agencies' obligations under NEPA or the CAA. First, it is unlawful to segment a project in order to avoid analyzing the impacts from construction. Second, construction, even within the currently studied segment of the plan, will certainly take more than five years. Even ignoring the 32 additional miles of proposed construction that will be needed for the overall P3 Program, this study is proposing to construct managed lanes on 48 miles and re-construct the American Legion Bridge. By contrast, the $2 billion Virginia I-495

[79] I-495 and I-270 Managed Lanes Study, Joint Public Hearing, at 5-6 (Aug. 18, 2020), https://495-270-p3.com/wp-content/uploads/2020/10/MLS_PH_August_18_Combined.pdf

CO-481

00022691

JA1685

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 107

Capital Beltway High-Occupancy Toll Lanes project that added four new managed lanes to 14 miles of the Beltway contracted for five years of construction and took 4.5 years to construct.[160] The DEIS states that "it is anticipated that construction of any phases will last approximately four to five years." DEIS, at 4-157. However, the DEIS does not explain the basis for this expectation. The Agencies have not specified how long they intend the construction to be under contract, but it certainly will be longer than 5 years even for phases, let alone for the entire P3 program. The Agencies must analyze the air emissions and other impacts construction will have on the environment and human health and provide that analysis to the public in a supplemental EIS.

The DEIS states that "A quantitative analysis of the construction related GHG emissions for the Preferred Alternative will be conducted using FHWA's Infrastructure Carbon Estimator tool. The results of that analysis will be included in the FEIS." DEIS, at 4-158; see also DEIS, App L, at 119. Delaying an analysis until after the public comment period on the DEIS has closed prevents meaningful public comment and violates NEPA. Why are the Agencies waiting until an FEIS (which they plan to release at the same time as the ROD) to consider and provide the public with such important information about the Project's impacts? There is no justification for withholding this information or excluding the Project through without considering it. The Agencies must provide that information to the public in the air quality analysis before proceeding with the NEPA's process.

Further, the assertion in the DEIS that detours need not be considered in an air quality analysis of a transportation project is misleading. The stated reference only applies to the maximum allowable duration of a detour before it must be included in the modeling analysis for a project-level "hot-spot" conformity determination in a CO, PM10 or PM2.5 nonattainment or maintenance area. There is no prohibition against considering the air quality impacts of detours and traffic diversions in an air quality analysis conducted under NEPA.

The EIS for this Project should assess and report the potential air quality impacts of detours and diversions that are in place or at last one year. For those locations where traffic detours and diversions result in air quality impacts, appropriate mitigation measures must be identified. Detours and diversions have the effect of adding traffic to existing roadways, and/or narrowing roadways and causing lane closures, thereby reducing those roadways' capacity. This leads to higher traffic volumes, lower speeds and greater congestion, resulting in greater emissions and higher pollutant concentrations, which negatively affect drivers, as well as the health concerns of residents and visitors to the Project area during construction, a thorough, detailed, project-wide consideration of detours and diversions should be included in the air quality analysis for this Project.

[160] U.S. Dept. of Transp. Federal Highway Admin, Public-Private Partnership (P3) Procurement: A Guide for Public Owners (March 2019), https://www.fhwa.dot.gov/ipd/pdfs/p3/p3_procurement_guide_0319_appb.aspx

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 108

Also, the DEIS discusses air quality mitigation measures in generic terms. More information must also be presented on mitigation measures to protect and limit exposure to harmful pollutants for construction workers.

It is important to raise and discuss worker safety and health issues in the DEIS, rather than leaving it as an item in the Project's final construction details and specification, where this issue is often addressed. Typically, a state DOT may insert a simple catch-all that imposes all responsibility on the contractor, requiring the contractor to observe and follow all laws, rules, and regulations.

Working on transportation facilities can be hazardous for the contractor's employees. Studies have shown that exposure to harmful levels of pollutants are frequently encountered. For example, a recent report indicated that "Airborne levels of crystalline silica associated with 7 major road repair tasks ... indicated a significant risk of overexposure to crystalline silica for workers who performed the 5 highway repair tasks involving concrete.[161] This type of information should be made available to the public and decision makers so that projected costs can be more fully assessed and risks to worker health can be weighed with other risks and benefits of the Project.

12.    The DEIS Ignores the Impacts of Construction-Generated Silica Dust, Which Is a Public Health Hazard

The roads and bridges deconstruction processes required for the Project will create massive amounts of toxic crystalline silica construction dust. Such toxic air pollution will cause respiratory diseases in children, grandchildren, and the entire public, especially for those closer to I-495 and I-270.[162] These illnesses include asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer.[163] This is an urgent public health issue. And it is not addressed in the DEIS.

[161] David J. Valiante, et al., Highway Repair: A New Silicosis Threat, American Journal of Public Health Research and Practice, Vol 94, No. 5, 876 (May 2004). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448252.pdf/0448670.pdf

[162] Id. at 876-80; Examples of Silica Dust-Producing Tasks, Highway/Road Construction and Repair, New Jersey Occupational Health Surveillance Program Silicosis Surveillance & Intervention Project. https://www.nj.gov/health/workplacehealthandsafety/documents/silicosis/highwayjobs.pdf; Silicosis: There is No Cure But it Can be Prevented!, New York State Department of Health (June 2017), https://www.health.ny.gov/environmental/workplace/hnn_disease_registry/docs/silicosis1_med.pdf

[163] Danger in the Air: Health Concerns for Silica in Outdoor Air, Environmental Working Group (Sept. 25, 2014), https://www.ewg.org/research/unknown-health-concerns-silica-outdoor-air

00022692

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 117 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 109

According to the National Cancer Institute and OSHA, and various other U.S. and British sources, workers in such environments must wear respiratory protection masks and take various other precautions. As the I-495 and I-270 road and bridge construction occurs, with the continuous generation of harmful silica dust, without significant mitigation measures being taken, it will become necessary for schools to prohibit outdoor recess, sports events, and all outdoor activities (no walking, no bicycling). Some schools may have to shut down, such as Julius West Middle School, Farmland Elementary, Carderock Elementary, and Walter Johnson High, and what about precautions for others, of whatever age, should they also stay indoors and then need to wear respiratory facemasks when they go outside?

The massive and continuous generation of toxic silica dust will require major mitigation measures, such as vacuum systems and watering by tanker trucks, which are only marginally effective.[18] There is also the issue of disposal of this toxic material and the environmental impact. Moreover, these necessary precautions will require more equipment and workers and will generate more traffic and pollution (and costs) during the deconstruction phase. Yet, none of this is covered in the DEIS.

### 13. Technical Errors and Omissions

Review of the air quality analysis for the Project revealed several technical errors and omissions, all of which, individually and in combination, lead to underestimate vehicular emissions and air pollutant concentrations and, therefore, underestimate potential impacts to overall air quality and public health. Specifically:

- Page 42 of Appendix I indicates that period speeds were used to generate emission factors for the dispersion analysis and Page 96 indicates average speeds were used for the greenhouse gas and MSAT analyses. These data are not appropriate for use in the air quality analysis at issue here. Peak hour speeds, rather than period speeds and average speeds, should be used. Peak hour speeds are slower than period and average speeds, thereby producing higher emissions and higher concentrations of pollutants. This makes the analysis more conservative and more reflective of periods associated with higher levels of air pollution. Peak hour speeds are typically used on project-level air quality analysis for transportation projects. The Traffic Technical Analysis Report (Appendix C) indicates that peak hour speeds are available. Consequently, all the air quality analyses must be redone with peak hour speeds. This affects the hot-spot analysis and the regional or mesoscale analyses (the MSAT and greenhouse gas analyses).

[18] This reference concerns air quality criteria and mitigation measures for silica dust for above ground construction works in a project. InteraTunnel Environmental Management Framework, Melbourne MetroRail Authority, at 32-35 (Dec. 2019), https://metrotunnel.vic.gov.au/_data/assets/pdf_file/0006/96135/Environment-Management-Framework-updated-December-2019.pdf. This Project should also have these kind of mitigation measures, particularly when road, soundwall, and bridge demolition will occur near "sensitive receptors," including schools.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 110

- The state-of-the-art practice for the air quality analysis for a transportation project is to examine three years for analysis. Typically, the opening year is analyzed, an intermediate year (such as 10 years after opening) and an outer year (such as 20 years after opening). This is done to capture the year with highest emissions, combining two different competing effects. Due to improvement in vehicle technology and cleaner fuels, emissions are expected to decrease into the future. On the other hand, increasing VMT with time leads to higher emissions. By analyzing appropriately separated years, the year with the highest emissions, and potentially the greatest air quality, and public health impact, is captured. The analysis for this project did look at the opening year but instead chose to analyze a year 15 years after opening. By doing so, the analysis may have missed the year with the highest emissions and therefore have understated the potential emissions and air pollutant concentrations.

- Examination of the Traffic Technical Analysis Report discloses that an indication of the effects of induced demand were accounted for in the future traffic estimates. Induced demand is a well-known phenomenon that results in additional travel when highways are expanded, or capacity is increased. This means that for the air quality analysis, the traffic volume used are underestimated and speeds are overestimated, leading to lower emission estimates than would actually occur. Techniques are available to account for induced demand, such as Susan Handy and Marlon Boarnet, *Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use and Greenhouse Gas Emissions: Policy Brief*, California Environmental Protection Agency Air Resources Board (Sep. 30, 2014), https://ww2.arb.ca.gov/sites/default/files/2020-06/Impact_of_Highway_Capacity_and_Induced_Travel_on_Passenger_Vehicle_Use_and_Greenhouse_Gas_Emissions_Policy_Brief.pdf. and Volker et al., *Induced Vehicle Travel in the Environmental Review Process*, Transportation Research Record (June 15, 2020).

- There is a discrepancy in what is defined as the project area for the hot-spot analysis and for the MSAT and greenhouse gas analyses. There should only be one project area for this Project. The hot-spot analysis considered intersections and interchanges in the immediate Project corridor, while the other two analyses looked at the "affected network" as determined from changed conditions on various roadways based on runs of the National Capital Region Transportation Planning Board transportation demand model. The project-level analysis should examine the intersections in the affected network as determined by the Project. This affected network now becomes the project area for air quality analysis purposes. The hot-spot analysis should examine the intersections in the affected network to determine if any meet the criteria for a hot-spot analysis. If they do, then they must undergo an analysis. This will provide a more complete picture of potential air quality impacts of the Project.

- Appendix I mentions the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule, finalized on March 30, 2020. This new rule requires less stringent emission standards through 2026 compared to the standards which they replace. Since these standards have gone through the review and public processes and have been finalized, they should be

CO-483

00022693

JA1687

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 111

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 112

part of the air quality analysis for this Project. Emission rates for the hot-spot analysis and the NEPA and greenhouse gas analyses should be recalculated and the appropriate comparisons for each analysis re-examined. In general, this new rule is expected to show higher emission rates and greater levels of air pollutants.

The fact that every error and omission results in an underreporting of emissions and air quality effects is troubling. The outcome is a minimization and an undervaluation of the impacts this Project would have on air quality and public health throughout the entire region.

### I. The DEIS Fails to Adequately Identify and Analyze Impacts to Forests

Tree canopy provides extraordinary ecological value for habitat, water processing and cleansing, and mitigating climate change by sequestering carbon and providing cooling shade. Forested lands are increasingly scarce in the impacted counties, whose streams are already under assault. Approximately 1,500 acres of "tree canopy "/forest loss is anticipated for each build alternative. DEIS, at 4-160. Of that amount, about 19 acres are county and state Forest Conservation Act (FCA) areas with easements, 61 acres are TMDL-required reforestation sites, and almost five acres are tree replacement mitigation sites created to mitigate impacts from the construction of the Intercounty Connector. *Id.*, Table 4-25. These re- or afforested areas are often found in highway cloverleafs. 76 acres of forest loss would occur on National Park land. *Id.*, Table 4-26. It is telling that both FCA- and ICC-required forest mitigation sites, even if protected by easements, may so readily be lost due to the construction of yet more highway. Indeed, it should be made especially difficult to take such areas for any purposes, let alone the construction of additional highway lane-miles.

While both forest mitigation processes and costs have for paying fees-in-lieu into a Maryland Department of Natural Resources (MDNR) mitigation fund are mentioned in the DEIS, DEIS, at 4-101, no detail is provided. For example, there is no discussion of where tree mitigation will occur, whether it will occur near where trees are destroyed, or whether sufficient forest mitigation funds are available for these two counties and in the impacted sub-watersheds. In addition, Maryland FCA mitigation requirements are relatively weak in terms of their replacement ratios, currently allowing thousands of acres of forested land to be lost to development and not replaced each year, neither Montgomery nor Prince George's County has enacted and implemented such rules, as Anne Arundel, Howard, and Frederick Counties have recently done. The DEIS must provide more detailed information on how the loss of tree canopy in the impacted watershed will be avoided and mitigated.

Instead, the public is asked to take on faith that the already inadequate mitigation promised in the DEIS will be accomplished, and that the newly planted trees or forest will, in fact, remain intact – but apparently, only until the next new highway, highway alteration, or highway expansion. This is neither the way that that forestland should be located in general, nor the way that state-mandated forest mitigation laws envision deforestation.

### J. The DEIS Does Not Sufficiently Consider Noise

The noise analysis contains rather neutral and therefore misleading conclusions with respect to the amount, duration, and effect of construction noise, as it shows that in some cases at least, with respect to continuous traffic noise, the Project would negatively impact quality of life for those living, working, or attending school nearby. DEIS, at 4-67, Table 4-15. Examples of the latter include several instances of parkland (one with a public golf course that has significant amount of citizen usage, Sligo Creek Park), single family residences near schools, playing fields and churches, all of which are proximate to where I-95 meets I-495; an apartment complex along I-270; and single family residences in the Adelphi area. The DEIS ignores or glosses over the additional homes and properties impacted by noise from the build alternatives, which can be seen on maps, but are not quantified because the DEIS only describes impacts to overall areas. The public should know whether their property would be subject to loud noise because of the Project.

Regular, heavy construction noise that exceeds 70-75 dBA – sometimes substantially, since dBA is on a logarithmic scale – and which drones on full-blast for 6 or 8 hours/day over a period of months and years, has adverse health consequences, and these will be experienced by many if not most of the 36 environmental justice communities impacted by this Project. These health consequences include sleep deprivation, hearing loss, increased heart rate, construction of the blood vessels and elevated blood pressure, as well as increased risk of Alzheimer's disease and other forms of dementia.[103] High volume traffic noise resulting from the newly configured highway can also be incessant and health-damaging. Where high volume traffic noise is adequately mitigated by noise barriers, those noise volumes can be reduced, but if effective barriers are deemed too costly the impacts on nearby populations and homes can be severe. It is not clear in the DEIS that mitigation will be forthcoming in those instances, and once again, environmental justice communities will suffer disproportionately. The DEIS even states that noise barrier systems will not be installed in nine areas with environmental justice communities. DEIS, at 4-139. Instead of merely assuming or recommending noise barriers, the Agencies must commit to noise walls along all stretches of the Project that impact communities, schools, parkland, and places of worship. Given that the LODs for all the built alternatives are virtually identical, there is no justification for delaying this decision. This should not be left to the whim of a private developer to decide based on what is most profitable for them if it is allowed to build the Project. If it suffers, the communities will suffer. Moreover, the DEIS must fully consider and analyze the health impacts from the increased and expanded noise of the Project with and without any barriers that are not committed to be built.

---

[103] Jennifer Weuve, et al., *Long-Term Community Noise Exposure in Relation to Dementia, Cognition, and Cognitive Decline in Older Adults*, Alzheimer's & Dementia (Oct. 20, 2020) https://alz.journals.onlinelibrary.wiley.com/doi/10.1002/alz.12191; Nicholas Bakalir, *Living in Noisy Neighborhoods May Raise Your Dementia Risk*, New York Times (Oct. 28, 2020), https://www.nytimes.com/2020/10/28/well/mind/living-in-noisy-neighborhoods-may-raise-your-dementia-risk.html



OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

00022694

JA1688

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 119 of 340



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 113

### K.    The DEIS Relies on Flawed Traffic Modeling[185]

The Maryland I-495 & I-270 Managed Lanes Project Draft Environmental Impact Statement and Draft Section 4(f) Evaluation (DEIS) tells a simplistic traffic story. It claims that if the Project is not constructed, corridor traffic volumes will grow significantly and delays will grow exponentially. It claims that the Project will reduce congestion in the general-purpose lanes relative to traffic conditions today. It claims that the Project will alleviate congestion on other roads.[186]

This simple story is wrong. The same premises were made in the Virginia I-495 Express Lanes Final Environmental Impact Statement (FEIS), and the results were completely different. During the peak traffic periods, the Express Toll lanes created what is the worst bottleneck on I-495 today—at the northern terminus of the lanes. The FEIS either did not disclose this impact or it was not anticipated. As a result, the Virginia Department of Transportation (VDOT) had to quickly open a shoulder lane to partially mitigate this bottleneck.

(Pre-Covid) travel times in the Virginia I-495 general-purpose lanes are higher today than they were before the Express Lanes opened and much higher than forecast in the FEIS. The FEIS got this wrong. Otherwise in the peak periods, the effects of the Express Lanes are complex, causing both increases in traffic on some roads and decreases on others. The FEIS wrongly claimed that the project would only benefit other roads.

---

[185] This Traffic Modeling Section was prepared by Norman Marshall, President, Smart Mobility, Inc. Mr. Marshall received a B.S. in Mathematics from Worcester Polytechnic Institute (1977) and an M.S. in Engineering Sciences from Dartmouth College (1982). Mr. Marshall's studies at Dartmouth College included graduate courses in transportation modeling. Mr. Marshall has 33 years of professional experience in transportation modeling and transportation planning including 14 years at RSG Inc. (1987-2001) and 19 years at Smart Mobility Inc. (2001-now). Mr. Marshall's primary professional focus is regional travel demand modeling and related transportation planning. Mr. Marshall is a nationally known expert in this field and has completed projects in over 30 states including work for the U.S. government, state Departments of Transportation, Metropolitan Planning Organizations, cities and non-profit organizations. One of Mr. Marshall's particularly notable projects is a $250,000 project with the California Air Resources Board where he led a team including the University of California in reviewing the state's regional travel demand models. Mr. Marshall has many peer-reviewed publications and conference presentations, including presentations at national Transportation Research Board conferences in 2017, 2018 and 2019. Mr. Marshall is an Associate Member of the Transportation Research Board. Mr. Marshall's resume is attached to these comments.

[186] Current Transportation Secretary Greg Slater committed in January 2020 about this Project: "And what we're showing is a 35 percent reduction in delay on 495 and 270, as well as a seven percent reduction in delay on the surrounding arterial roads." Board of Public Works Meeting, at 24 (Jan. 8, 2020), https://bpw.maryland.gov/MeetingDocs/2020-Jan-8-Transcript.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 114

Part of the reason things in Virginia did not turn out as anticipated is due to reliance on flawed modeling. Flaws in the Metropolitan Washington Council of Governments (MWCOG) model include that it: (1) does not constrain traffic flow to capacity; (2) does not properly feed congested travel times back to non-work trip destinations; (3) assumes no increased traffic from road expansion; (4) fails to accurately forecast bottlenecks; (5) cannot calculate net congestion tradeoffs; and (6) cannot accurately model peak period conditions.

The claims made in the Maryland DEIS are the same as those made in the Virginia FEIS. The underlying modeling approach is the same.

Based on empirical data from Virginia and Maryland, understanding of model flaws, and data analysis, the reasonably foreseeable impacts of constructing managed lanes on I-495 and I-270 follow.

1) Expanding I-495 and I-270 will shift traffic from the shoulder hours into the peak hours and create and/or exacerbate bottlenecks. The flawed models employed in the DEIS analyses are incapable of forecasting this type of problem. As bottlenecks are most likely at the terminus of the managed lanes, project planning is critically important as well as the final extent of the project.

2) An improvement in general-purpose lane speed is unlikely because constructing the managed lanes will shift traffic from the shoulder hours into the peak hours, and the general-purpose lanes will be just as congested during the peak hours as they would have been otherwise. The foundational premise of this Project is that extreme congestion in the general-purpose lanes is needed to justify the high tolls that will be required to fund the project.

3) Constructing the I-495 and I-270 managed lanes is likely to make arterial congestion worse. No trip begins or ends on a limited access highway, and traffic does not magically switch between limited access highways and arterials as is presented in the DEIS. Any shifts between these roadways slows increases traffic on some arterials and decreases traffic on others. As managed lanes concentrate traffic in peak hours, arterial roads at I-495 and I-270 interchanges will be severely impacted, and these impacts are likely to outweigh the congestion benefits of traffic diversion from other arterials. The DEIS models are incapable of calculating these tradeoffs.

4) If the managed lanes are constructed, it is likely that there will be significant traffic growth (induced travel) and induced land impacts.

5) Managed lane proponents stress "choice." In fact, the choice is between two bad options: extreme congestion vs. extremely high tolls. Only about 1/6 of the daily traffic is carried by the Virginia I-495 Express Lanes despite the Express Lanes having 1/3 of the roadway capacity. This is an inefficient use of infrastructure. The other 5/6 of traffic is carried by the general-purpose lanes. The estimates in the DEIS are consistent with this pattern. The toll lanes are "chosen" primarily by high-income travelers and/or transit riders who are having the tolls reimbursed. This elite group will remain small because most economic increases in

CO-485

00022895

JA1689

**OP‑LANES™ MARYLAND** — I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 115

demand by other users will prompt the tolls to increase further, becoming even less affordable.

6) The managed lanes would benefit only the few who are able to unfold the majority of travelers. There would be no benefits for non-users of the toll lanes, that is, most travelers. Non-users of the toll lanes would face continued high congestion in the general-purpose lanes and increased congestion on arterial roadways accessing I-495 and I-270 interchanges. Nevertheless, a portion of their taxes likely would go toward subsidizing the private toll lanes as has occurred in Virginia

The flawed traffic models used in the DEIS overestimate future congestion to justify the project. The DEIS fails to acknowledge that the project depends on peak period general purpose lane congestion while also causing additional connecting arterial congestion and large bottlenecks where the toll lanes end. The proposed managed lanes in Maryland would make congestion worse for the majority of peak period drivers and push drivers to choose between extreme congestion and extremely high tolls to make the lanes profitable. The promised benefits for non-users of the toll lanes will not materialize, and taxpayers will likely have to subsidize the project.

**1.    Flaws in the MWCOG Model Used in the I-495 and I-270 DEIS**

Traffic growth forecasts in the Maryland I-495 & I-270 Managed Lanes Project Draft Environmental Impact Statement (DEIS) are unrealistically high. The projected forecasts are based on the Metropolitan Washington Council of Governments (MWCOG) regional travel demand model, which has two fatal flaws that exaggerate traffic growth in congested conditions:

1) The MWCOG model does not constrain traffic flow to capacity; and
2) The MWCOG model does not properly feed congested travel lanes back to non-work trips.

**i.    MWCOG Model Does Not Constrain Traffic Flow to Capacity**

The MWCOG model includes an hourly capacity value for each roadway segment. Modelers best practice is to use "ultimate capacity," i.e. the maximum volume that should be assigned to a link by the forecasting model.[186] The MWCOG model sets freeway capacity at 2,000 vehicles per lane per hour in lower-density areas and 1,900 per-lane per hour in higher-density areas. As shown in Figure 1 reproduced from the DEIS, the maximum traffic volumes mostly max out around 8000 for the four-lane sections (not including segments with more lanes including the American Legion Bridge, the split south of the I-95 spur, the I-95 interchange area, and the approach to the Woodrow Wilson Bridge).

[186] Cambridge Systematics, Vanasse Hangen Brustlin, Gallop, Bhat, C.R., Shapiro Transportation Consulting, and Martin Alexiou Bryson, Travel Demand Forecasting: Parameters and Techniques, National Cooperative Highway Research Program Report 716, 2012.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 116

At the modeling reference states, the MWCOG's model capacity is the "maximum volume that should be assigned to a link by the forecasting model." Assigned volumes that exceed capacity are errors, and assigned volumes that greatly exceed capacity are serious model errors. Alan Horowitz, one of the most respected experts in travel demand modeling wrote:

*I am quite familiar with alternatives that assign traffic well beyond a volume-to-capacity ratio (v/c) of 1, and I cannot fathom why anybody would take any of this seriously, either as a realistic representation of the future or as a strawman case study.*

*... do not publish any alternative scenarios with facilities loaded beyond a v/c ratio of 1.1.[187] [Horowitz, 2015]*

In the DEIS, many segments of I-495, I-270 and other roads are loaded with v/c greater than 1.1 (Figure 2). Horowitz admonishes that the DEIS modeling should not be published with v/c > 1.1. Therefore, these model results should not be used for planning purposes. However, not only does the DEIS publish these modeling results and use them for planning, but it even goes so far as to represent these over-capacity assignments as a performance measure. This claim is false and is rebutted in the Appendix 13 of this section.

The MWCOG model relies on 40-year-old Static Assignment Algorithm (STA) that was adopted when computers were less powerful than today's smart phones. STA treats every road segment as independent of other road segments. In peak periods, traffic on I-495 and I-270 is characterized by queues behind bottlenecks. In STA, there are no queues behind bottlenecks, and the MWCOG models cannot capture backups at the merges on I-270/I-495 or accurately model conditions during the peak of rush hour traffic

A peer-reviewed journal article authored by Norm Marshall: *Forecasting the Impossible: The Status Quo of Estimating Traffic Flows With Static Traffic Assignment and the Future of Dynamic Traffic Assignment*[188] documents that STA always produces impossibly high freeway traffic volumes in congested networks and cannot be relied on for planning. The only solution is to replace STA with a more modern Dynamic Traffic Assignment (DTA) algorithm. MWCOG has a long-term plan to replace STA with DTA. Alan Horowitz also wrote: "Choose DTA over STA whenever possible."[189]

[187] Horowitz, Alan. Posting on the Travel Model Improvement Program (TMIP) listserv, March 2019
[188] Marshall, Norman. Forecasting the impossible: The status quo of estimating traffic flows with static traffic assignment and the future of dynamic traffic assignment, Research in Transportation Business & Management, Volume 29, 2018, 85-92. https://www.sciencedirect.com/science/article/pii/S2210539517002322?via%3Dihub
[189] Horowitz, Alan. Posting on the Travel Model Improvement Program (TMIP) listserv, March 2019.

00022696

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 121 of 340



i-495 & i-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 118

*Figure 2: Impossible Traffic Forecasts in MWCOG 2040 No Build Afternoon Peak Period
(Segments with Volume/Capacity Greater than 1.1 Shown in Red)*

Shady Grove Rd — RT 28 — I-270 — Montrose Rd — I-270 — I-495 — MD 190 — Clara Barton Pkwy — American Legion Br — VA 193

Source: Mapped from MWCOG model link in DEIS.

[19] Loaded network file downloaded from
ftp://ftpexova.dmv@ftp.mwcog.org/MD_SHA_TRP_Study_2040_AM_Model_Files.zip
referenced in DEIS, App. C, at 841.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 117

*Figure 1: 2017 I-495 Inner and Outer Loop Peak Period Hourly Volumes*

Figure 2-12: I-495 Existing (2017) Inner Loop Peak Period Hourly Volumes

Figure 2-13: I-495 Existing (2017) Outer Loop Peak Period Hourly Volumes

Source: DEIS, 2020.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 122 of 340

OP▲LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 119

All the model traffic forecasts for roadway segments shown in red have volume-to-capacity ratios greater than 1.1. As it now advises, these results should neither be published nor used in planning. The AM peak period map is similar.

b. MWCOG Model Does Not Properly Feed Congested Travel Times Back to Non-Work Trip Destinations

All good travel demand models employ a feedback process so that the destinations chosen are sensitive to congested travel time. The MWCOG model feeds back congested travel time from the morning peak period, but only for work trips. The destination choices for the other trip types are based on off-peak travel times. This is inadequate. As Norm Marshall commented about the MWCOG model in 2002:

The TPB DCV2 model does include distribution feedback. However, the feedback mechanism is only applied to home-based work trips. Specifically, AM congested times are used to distribute HBW trips while off-peak uncongested times are used to distribute HBS, HBO, and NHB trips.[19] The underlying assumption by TPB staff is that congestion does not influence non-work trip making...

In a publication by the Travel Model Improvement Program (TMIP) - a program sponsored by the EPA and U.S. DOT - entitled *Incorporating Feedback in Travel Forecasting: Methods, Pitfalls, and Common Concerns* dated March 1996, the authors provide technical guidance on incorporating feedback in the traditional four-step model. Some of the findings published in the report ... [include] ... Feedback should be implemented for the work-related trips at a minimum, and the other purposes should be examined for their percentage of peak travel.[20]

In the 2002 review, in the forecast year, modeled congestion on the Potomac River crossings was severe. The MWCOG model assumed that non-work travelers, including those making shopping trips, would cross the river regardless of congestion, because peak period congestion did not affect their destination choices in the model. Perversely, these non-work travelers crowded out work trips from the Potomac River bridges in the model during peak times. It appears that these problems remain in the MWCOG model today and are especially relevant to modeling the American Legion Bridge. The MWCOG model over-assigns non-work trips to all the bridges during peak periods because the model is not representing travel times for these trips properly.

In the DEIS 2040 no build model, MWCOG morning and afternoon peak period traffic volumes for all Potomac River bridge crossings are ridiculously high (Figure 3). All greatly

[19] HBS = Home-based Shop; HBO = Home-based Other; NHB = Non Home-Based
[20] Letter Concerning "Effects of Proposed Potomac River Crossings on Land Use and Traffic and Identification of Serious Deficiencies in TPB Version 2 Transportation Model," Dow 4, 2002, http://www1.mwcog.org/uploads/committee-documents/pF5vX0%20a07%63%20Lf.pdf

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 120

exceed the 1.1 volume-to-capacity ratio threshold, and range as high as 2.75, i.e., the bridge traffic volume is 275% of the highest possible volume.

Figure 2: Wildly Impossible Potomac Bridge Traffic Forecasts in MWCOG 2040 No Build Morning and Afternoon Peak Periods



| | Point of Rocks | American Legion | Chain | Francis Scott Key | Theodore Roosevelt | Arlington Memorial | I-395 | Woodrow Wilson |
|---|---|---|---|---|---|---|---|---|
| AM | 2.75 | 1.36 | 2.48 | 1.63 | 1.43 | 1.67 | 1.44 | 1.37 |
| PM | 2.50 | 1.27 | 2.33 | 1.67 | 1.40 | 1.59 | 1.30 | 1.29 |

Source: I extracted data from MWCOG model link in DEIS.

a. MWCOG Model Assumes No Increased Traffic from Road Expansion

In general, freeway expansion causes induced travel. A review of the induced travel research by Handy and Boarnet (2014) concluded that induced travel is real, and that the magnitude is strong enough to prevent capacity expansion from reducing congestion:

*Thus, the best estimate for the long-run effect of highway capacity on VMT [vehicle miles traveled] is an elasticity close to 1.0, implying that in congested metropolitan areas, adding new capacity to the existing system of limited-access highways is*

00022698

JA1692

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 121

The DEIS rejected Alternative 6 adding only general-purpose lanes because of the induced travel impacts:

*The results of the Alternative 6 modeling indicated that latent demand, meaning trips from other routes, times and modes, would be expected to fill the GP lanes by 2040, resulting in worse traffic operations than all of the Screened Alternatives in several instances, including network-wide delay and average travel time.* (DEIS, at 2-12)[96]

Induced travel represents the difference between Build Vehicle Miles Traveled (VMT) and no build VMT. The DEIS models cannot accurately account for induced travel because the MWCOG model overestimates traffic growth in the no build alternative.

In the long-term, induced land use is an important cause of induced travel. Widening I-270 in the late 1980s is a classic case study.

*In the five years before construction began, officials endorsed 1,745 new homes in the area stretching from Rockville to Clarksburg. During the next five years, 13,642 was approved.[97]*

By 1997, I-270 was routinely overrunning its designed capacity, and peak-hour traffic volumes on some segments had surpassed levels forecasted for 2010.

A primary cause of the inaccurate traffic forecasts was inaccurate land use forecasts which were assumed to be the same for both no build and build analyses. The total number of households forecast for the Washington region for the year 2000 was only off by 2 percent. However, the forecasts were completely wrong about the distribution of the households.[98]

---

[95] Susan Handy and Marlon G. Boarnet, *Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use and Greenhouse Gas Emissions: Policy Brief*, prepared for California Air Resources Board (Sept. 30, 2014).

[96] See Appendix B of this report for a discussion of latent demand, induced travel and generated traffic.

[97] Alan Sipress, *Md.'s Lesson: Widen the Roads, Drivers Will Come*, Washington Post (Jan. 4, 1999), https://www.washingtonpost.com/wp-srv/digest/traffic4.htm.

[98] Data from National Capital Region Transportation Planning Board, Metropolitan Washington Council of Governments, "Comparison of 1994 Study Forecasts with Most Recent Data: I-270 Corridor, June 18, 2001.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 122

Growth was much lower in the region's core than forecast, and much higher in western suburban areas, especially in the I-270 corridor.

Figure 4 compares the 2000 forecast made before the I-270 widening with actual 2000 numbers. The largest forecasting error was for Montgomery County in the I-270 corridor, where the actual number of households in 2000 exceeded the forecast by 27 percent. Widening I-270 was a primary cause.

Figure 4: Washington DC Region: Suburban Freeway Projects Shifted Households to Suburbs from Core.[99]



2000 households compared to pre I-270 widening forecasts for 2000

Montgomery in I-270 corridor
Prince William/Cities
Loudon
Fairfax/Cities
Montgomery outside corridor
Alexandria
Prince George/Cities
Arlington
District of Columbia

-20%   -10%   0%   10%   20%

Source: Data from National Capital Region Transportation Planning Board and MWCOG.

The total number of regional households in 2000 was 2 percent less than forecast prior to the I-270 widening project. When the I-270 widening project was planned, forecast housing and employment growth in the corridor was moderate, and growth in the region's core was expected to be much stronger.[99] The forecasts were completely wrong about the distribution of the households. Growth was much lower in the region's core than forecast, and much higher in western suburban areas, especially in the I-270 corridor.

---

[99] National Capital Region Transportation Planning Board and Metropolitan Washington Council of Governments: Induced Travel: Definition, Forecasting Process, and a Case Study in the Metropolitan Washington Region, September 19, 2001.

[100] Data from National Capital Region Transportation Planning Board, Metropolitan Washington Council of Governments, "Comparison of 1994 Study Forecasts with Most Recent Data: I-270 Corridor, June 18, 2001.

00022699

USCA4 Appeal: 24-1447      Doc: 30-5      Filed: 09/30/2024      Pg: 124 of 340

Comments of the Maryland Sierra Club et al. on the Belway Expansion Project DEIS and JPA
November 6, 2020
Page 123

The other areas where growth exceeded the forecast are suburban Virginia areas where freeway capacity also was expanded. Projects in these areas include construction of the Dulles Greenway, the Route 234 Bypass, and widening I-66.

The suburban increases were balanced by declines and slower growth in the core of the region, including D.C., Arlington, Prince George's County, and Alexandria.

The I-495 and I-270 DEIS states on page 144, "As the land use assumptions do not vary between Alternative 1/No-Build and the Build Screened Alternatives, all the trip generation are equal among scenarios; there will not be new housing developments or new places of employment." Such assumptions are clearly debatable. Widening I-270 and I-495 will likely induce land use and travel. Induced travel causes increased energy use and air pollution, including greenhouse gas emissions.

The DEIS also asserts: "Induced demand represents new trips. While the project may generate some new trips, MWCOG modeling shows that the amount of induced demand caused directly by the project would be less than 1% of the total VMT in the region."[20] Despite this assertion, due to its deficiencies, the MWCOG model cannot accurately account for reduced travel. (See Appendix II.)

**d. MWCOG Model Fails to Accurately Forecast Bottlenecks**

Figures 5 and 6 show the traffic increases in peak hour traffic on Virginia I-495 following the opening of the Express Lanes (EL) and General-Purpose Lanes (GPL). The increases are calculated as the average of post-construction 2013-2019 to pre-construction 2005-2007. Appendix C provides details of how these numbers were estimated.

---

[20] DEIS, App. C, Traffic Analysis Technical Report, May 2020, at 144.

---

Comments of the Maryland Sierra Club et al. on the Belway Expansion Project DEIS and JPA
November 6, 2020
Page 124



*Figure 5: Changes in Outer Loop GPL Peak Hour Traffic in Virginia (After Express Lanes Opening (change per segment comparing 2013-2019 to 2005-2007 traffic volumes)*

*Figure 6: Changes in Inner Loop GPL Peak Hour Traffic in Virginia (After Express Lanes Opening (change per segment comparing 2013-2019 to 2005-2007 traffic volumes)*

Source: Virginia Department of Transportation traffic count reports.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 125

In general, the before and after decreases in peak hour GPL volumes are small, on the order of 200-300 per hour, or less than 5% of the total GPL peak hour traffic volume. The one outlier shown in Figure 5 for the Outer Loop southbound between SR 193 to the Dulles Toll Road is not an exception but is just a quirk in the data. The Express Lanes begin in this section, and the VDOT traffic count is after the split. If the count were upstream of the split, no such large reduction would be shown.

What is most striking in the data is that the higher peak hour volumes carried in 4 lanes (4 GPL + 2 EL) also extend into the 4-lane GPL sections north and south of the endpoints of the Express Lanes. There is little, if any, congestion relief where the Express Lanes are parallel to the general-purpose lanes, but much worse congestion upstream and downstream. This large increase in peak hour traffic was caused by the opening of the Express Lanes and has resulted in the worst bottleneck on I-495 in the afternoon on the Inner Loop where the Express Lanes must merge back into the general-purpose lanes. (See Appendix C for more details.)

The Express Lanes opened in November 2012. This bottleneck problem was not anticipated or disclosed in the planning process. Only a few months later in June 2013, VDOT announced a plan to partially address these problems by opening a shoulder lane on the left side of the Inner Beltway to increase the effective width to five general-purpose lanes at the merge.

Expanding I-495 and I-270 in Maryland likely will result in similar unintended negative congestion impacts, creating and/or exacerbating bottlenecks. The Virginia modeling was not up to the task of forecasting these types of problems and the DEIS modeling is not either.

e.    MWCOG Model Cannot Calculate Net Congestion Tradeoffs

The MWCOG model treats daily traffic as a composite of four time periods[206] including a 3-hour morning peak period (6-9 a.m.) and a 4-hour afternoon peak period (3-7 p.m.). The time shifts that resulted from the opening of the Express Lanes in Virginia is mostly within these peak periods, i.e., it shifts traffic from what planners call the "shoulder" hours into the peak hour. The MWCOG model does not have any way of considering time shifts within the peak periods and therefore cannot calculate the congestion changes related to such shifts.

Instead, the MWCOG model calculates vehicle hours of delay (VHD) as if traffic volumes are constant throughout the 3-hour morning peak period and 4-hour afternoon peak period. The calculated VHD grows exponentially as a function of the volume-to-capacity ratio (V/C) – especially when modeled V/C exceeds 1.0. As discussed above, V/C greater than 1.0 is impossible and represents model errors. Figure 7 shows MWCOG model arterial delay in minutes per mile as a function of V/C.

---

[206] Four time periods: morning peak, midday, afternoon peak, and overnight.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 126

Figure 7: MWCOG Model Vehicle Minutes of Delay Per Mile for 40 mph Arterial[208]

Source: MWCOG model documentation.

In the figure, a road segment with calculated V/C = 1.0 has 1.5 minutes of delay per mile, and modeled delay grows exponentially with an impossible V/C = 3.0. V/C in the MWCOG model is not capped at 1.2, and there are higher V/C road segments in the model, including the value of 2.75 for the Point of Rocks Bridge shown in Figure 3. Beyond the V/C point shown in the Figure 7, MWCOG model VHD continues to increase exponentially – 6.6 minutes per mile at V/C = 1.3, 8.6 minutes per mile at V/C = 1.6, and so forth with MWCOG model table values as high as V/C = 3.0.

As shown in Figure 8, 81% of regional afternoon peak period VHD in the 2040 no build modeling is from impossible assignments with volume-to-capacity ratio exceeding 1.0. The exponential increases in modeled delay as a function of V/C makes MWCOG model VHD more of a metric of model errors than a metric of real-world performance.

---

[208] Calculated from MWCOG Calibration Report for the TPB Travel Forecasting Model, Version 2.3, on the 3,722-Zone, Area System: Final Report, January 20, 2012.

00022701

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 126 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 127

The DEIS modeling proposes that congestion is going to get much worse in the future, but that I-495/I-270 managed lanes will make it somewhat less bad. In fact, however, the real story the told by the VHD outputs is that the MWCOG model overestimates future traffic volumes and translates relatively small increases in VMT into large increases in VHD. For example, for an arterial roadway in the model where the volume has reached capacity in the peak period, a 1% increase in traffic volume in the MWCOG model translates into a 10% increase in VHD per vehicle. This amplification of small VMT changes into large VHD numbers is just a way of making impacts look larger.

**L.    DEIS Models Cannot Accurately Model Peak Period Conditions**

As documented above, the peak period traffic volume outputs from the MWCOG model are not capacity constrained. The model forecasts impossibly high volumes for many roadway segments including segments of I-495 and I-270 that are the focus of the DEIS.

The DEIS analysis takes these over-capacity assignments and uses them as inputs to a VISSIM microsimulation model that is capacity constrained. This is a useless exercise because the VISSIM model can only report that the inputs are impossible. The DEIS tries to represent what are essentially VISSIM error messages as measure of latent demand. This claim is false and is rebutted in the Appendix II of this report.

This is an example of an old computer adage—"garbage in—garbage out." The two-model process is analogous to money laundering. Bad forecasts from the MWCOG model are filtered through the VISSIM model and come out as very detailed process-looking numbers. However, the underlying MWCOG model forecasts are invalid, and the VISSIM outputs also are invalid.

Figure 10 shows afternoon peak period "demand" (vehicles per hour) on the American Legion Bridge Inner Loop from the MWCOG model. Figure 11 shows afternoon peak period "throughput" (vehicles per hour) on the American Legion Inner Loop from the VISSIM model.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 128

*Figure 9: 2040 No Build Regional Afternoon Peak Period VHD – Road Segments with Possible w/c ≤ 1.0 vs. Impossible w/c > 1.0*



Source: Data extracted from MWCOG model link in DEIS.

The DEIS VHD calculations are invalid. However, even if they were valid, they do not provide a compelling case for the proposed managed lanes project. Figure 9 takes the DEIS VHD numbers for a combination of Montgomery and Prince George's Counties and divides by current and 2040 population so the alternatives can be compared on a per-capita basis.

*Figure 9: DEIS Vehicle Minutes of Delay Per Capita for Montgomery and Prince George's Counties[204]*



Source: DEIS, 2020.

---

[204] Numbers from DEIS Table I-1, p. I-5 and DEIS, App. C, Table 5-23, at 149.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 127 of 340

Comments of the Maryland Sierra Club et al, on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 130

can never get so bad that it will reduce traffic volumes by 50% on a road that is already very congested.

The DEIS framing of "demand" vs. "throughput" is fundamentally wrong. Demand is not a point; demand is a curve with more demand when the price is lower and less demand when the price is higher. For un-tolled roads, this "price" is primarily based on the value of travel time. The generalized price for toll roads includes both cost and time. As shown in this illustration from the Federal Highway Administration, there is a market equilibrium balance between demand and price/supply (Figure 12).

*Figure 12: Market Equilibrium User Costs and Traffic Volumes (EHWA)[20]*



**Exhibit 4. Equilibrium user costs and traffic volumes.**

P = price, V = volume.

Source: Federal Highway Administration, 2017.

The narrative accompanying the figure reproduced above states:

When supply and demand are in balance, a market is said to be in *equilibrium*. This is often represented as the intersection of a supply curve and a demand curve, which determines the market-clearing price and quantity (see Exhibit 4). At this point, everyone who purchases the good is willing to (collectively) buy that amount at that price, and producers are willing to supply that quantity at that price. If either the supply or demand curves shift, the market price and quantity will also change.

For highway travel, demand is determined as described above. The "supply" curve, however, is essentially represented by the generalized cost curve. The intersection of these two curves determines how high traffic volumes will be and what the

[20] Federal Highway Administration, Economics: Pricing, Demand, and Economic Efficiency – A Primer, 2017. https://tps.fhwa.dot.gov/publications/fhwahop08041/cp_primt_03.htm

CO-493

00022703

---

Comments of the Maryland Sierra Club et al, on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 129

*Figure 10: DEIS "Demand" for American Legion Bridge Inner Loop in the Afternoon Peak Period*



Source: Graphed numbers from DEIS Appendix C.

*Figure 11: DEIS "Throughput" for American Legion Bridge Inner Loop in the Afternoon Peak Period*



Source: Graphed numbers from DEIS Appendix C.

Neither of the graphics represents reality. As discussed above, the 2040 no build alternative afternoon period volumes cannot increase significantly from existing volumes due to capacity constraints; therefore, the DEIS "demand" volumes are impossible. The graphic showing future no build throughput being much less than throughput today is implausible and the large dip in throughput in ridiculous. It would never happen and is just an artifact of VISSIM model limitations. The impossible over-capacity input cause VISSIM model errors. Congestion

JA1697





Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 131

associated average highway-user costs will be at that volume level. When the level of demand is low relative to the capacity of the road, it will be uncongested, and prices will be relatively constant even as volumes increase (the "flat" part of the user cost curve in Exhibit 4). However, when demand levels are high and the road is congested, both user costs and traffic volumes will be higher, potentially rising sharply as demand continues to increase.

The dichotomy put forward in the DEIS of "demand" vs. "throughput" does not exist. There are only traffic volumes at the equilibrium point. The volume $V_e$ represents the point on the demand curve where the cost equals $P_e$. The "throughput" should equal this equilibrium traffic volume.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 132

Figure 13 shows a more realistic estimate of forecast traffic based on the experience of the Virginia Express Lanes. The 2040 no build traffic volumes would be very similar to existing traffic volumes because of capacity constraints. The 2040 build volumes (represented here as Alternative 9)[20] would be significantly higher – and particularly higher during the mid-point of the afternoon peak period in the 4-5 and 5-6 hours. This shift happened following the opening of the Virginia Express Lanes.

*Figure 13: Realistic American Legion Bridge Inner Loop in the Afternoon Peak Period Traffic Volumes*

Source: Created this graphic based on Virginia Express Lanes data.

[20] Alternative 9, according to the DEIS, is two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 133

## 2. Foreseeable Impacts of Building I-495 and I-270 Managed Lanes

### a. Managed Lanes Are Unlikely to Reduce Congestion on the General-Purpose Lanes

The small reductions in general-purpose lane volumes shown in Figures 5 and 6 have not improved general-purpose lane travel times. As shown in Figure 14, the Express Lane operator, Transurban, reports reliably fast travel times in the southbound Express Lanes and large average time savings compared to the general-purpose lanes.

*Figure 14: Transurban Travel Time Data[287]*

Full length cash trout 495 southbound Express and regular lanes

Source: Transurban, 2019.

Figure 14 shows average general-purpose lane travel times of about 60 minutes. Assuming that this is for the entire 14-mile length, this represents a speed of about 15 mph. However, Figure 13 could represent a shorter distance because the average time shown for the Express Lanes of about 10 minutes is impossible for the entire 14-mile length (because it would require an average speed of 94 mph). If the segment underlying the data is shorter than the full 14 miles, the actual general-purpose lane speeds may have been even lower than 15 mph.

[287] Jaff, Elisa. Transurban. 495 and 95 Express Lanes: Customer choice regional benefit. Presented as part of the Transportation Research Board's Webinar on Ensuring Equity with Priced Managed Lanes in April 2019. http://onlinepubs.trb.org/onlinepubs/webinars/190420.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 134

Researchers at the University of Virginia found that in March 2018, average morning and peak hour travel times in the general-purpose lanes were typically 28-30 mph.[288] March 2018 was one of the better months in the Transurban data. However, the discrepancy between the two sets of data is unexplained. An estimate of 20 mph is used in the figure below.

[288] Jablecious, Simona and Donna Chen. Empirical Evidence for Estimating the Value of Travel Time on Express Lanes: Northern Virginia Regional Case Study, 2018.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 129 of 340

00022705

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 135

The Virginia I-495 Express Lanes FEIS reported pre-construction "violating" speeds for the Outer Loop of 46 mph in the AM peak hour and 39 mph in the PM peak hour, i.e., twice the speeds reported for today by Transurban. This suggests that peak hour general-purpose lane speeds have declined significantly since opening the Express Lanes. As shown in Figure 15, current general-purpose lane speeds are generally much lower than was forecast in the FEIS.

*Figure 15: I-495 General-Purpose Speed – Historical, FEIS Forecast, and Estimated Actual[306]*



Source: Virginia Express Lanes 2006 FEIS Forecast and current data.

The DEIS general-purpose lane travel time forecasts are invalid because (as discussed above):

- The models overestimate no-build traffic volumes; and
- The models fail to account for the shift to the peak hours that would follow managed lanes construction.

These two factors cause the models to overestimate general-purpose lane congestion in the no build alternative and underestimate general-purpose lane congestion in the build alternative.

[306] Virginia Department of Transportation (VDOT), Capital Beltway Study: Final Environmental Impact Statement and Section 4(f) Evaluation, Table 2-9, at 45, April 2006, http://www.virginiadot.org/VDOT/Projects/Northern_Virginia/asset_upload_file72_72985.pdf

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 136

The Virginia experience suggests that constructing similar managed lanes in Maryland would do little or nothing to reduce congestion on the general-purpose lanes. In fact, as discussed in a subsequent section of this report, the entire premise of this project is that extreme congestion is needed to justify the extremely high tolls required to pay for the project.

**b. Managed Lanes Are Likely to Make Arterial Congestion Worse**

The DEIS puts forward a simplistic and incorrect framing of diversion from arterial roadways to I-495/I-270. It pretends that traffic is magically subtracted from one class of roadway and added to the other. In fact, no trip begins and ends on a limited access roadway and a traffic shift from arterials to I-495/I-270 necessarily adds traffic to some arterials as it reduces traffic on others. Figure 16 shows a typical example from Google Maps comparing routes between Bethesda and Silver Spring.

*Figure 16: Google Maps Recommended Route from Bethesda to Silver Spring*



Source: Google Maps, 2020.

Google Maps recommends a route using I-495 over an arterial route even through the I-495 route is more than 50% longer in miles (8.2 miles vs. 5.4 miles) because it is 2 minutes faster (16 minutes vs. 18 minutes). The I-495 route reduces the traffic volume on Jones Bridge Road and East-West Highway, but it adds traffic to MD 355 and US 29. Whether this represents a net congestion benefit depends on the congestion levels on all these roads.

The DEIS assumes trips like this should be on I-495 and that the non-freeway route represents undesirable diversion. However, circuitous routing that adds vehicle miles traveled (VMT) and air pollution including greenhouse gas emissions is undesirable. Adding express toll lanes also is likely to make arterial congestion worse because it concentrates peak spreading and will increase peak hour arterial traffic in the areas around I-495 and I-270 interchanges. The increased peak hour traffic congestion in these areas is likely to outweigh the congestion benefits on other roads.

Here is real world example. As discussed above, the opening of the Express Lanes in Virginia in November 2012 caused the worst I-495 bottleneck. Several months later in June

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 130 of 340

00022706

OP LANES MARYLAND | I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 137

2018 VDOT announced a plan to partially address these problems by opening a shoulder lane on the left side of the Inner Beltway to increase the effective width to five general-purpose lanes at the merge. The public relations handout developed at this time stated that there would be "no impact to nearby bridges and neighborhoods.[260]

This change was implemented in 2015. Residents of McLean have complained that this seemingly minor change had a large impact on their community as it shifts the bottleneck further north and adds significant congestion to Georgetown Pike and other intersecting local streets.[261] Figure 17 shows traffic congestion at one of the key intersections where McLean residents are concerned about I-495 congestion spreading to I-495.

*Figure 17: Georgetown Pike Westbound at I-495*



Source: Google Maps, 2020.

As a response to these complaints, in 2018 VDOT analyzed returning to the original configuration. It found that such a return would improve operations at the SR 193 intersection [contradicting their 2013 public relations handout]: "as a result of the merge area for the Express Lanes moving back to the Old Dominion Drive area, which meters the traffic and provides a more consistent flow to the mainline near Route 193."[262] However, it also found that the closure of the shoulder lane would increase delay on the I-495 Express Lanes. The change was not made

[260] *VDOT 495 North Traffic Congestion to Get Better With New VDOT Shoulder-Use Lane Project*, Express Lanes (June 28, 2013), https://www.expresslanes.com/uploads/f090582-Shoulder_Use_Lane_Project_121013.pdf.

[261] Brian Trompeter, *Residents Fume Over I-495 Shoulder Lane in McLean*, InsideNova (Jan. 16, 2018), https://www.insidenova.com/news/arlington/residents-fume-over-i-495-shoulder-lane-in-mclean-article-4bd28742-f871-11e2-8a7ba-f903a288cea.html.

[262] VDOT, *I-495 Auxiliary Lane Study*, May 9, 2018.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 138

because Express Lanes traffic was prioritized over MacLean traffic. Nevertheless, even with the use of the shoulder lane, this merge area remains the worst bottleneck on I-495.

The VDOT quote uses the word "meters." Traffic metering is an underappreciated congestion control measure. Peak period traffic bottlenecks are inevitable but can be used as a management tool by choosing the bottleneck locations, metering traffic there, and providing peak period protection to other roadways. Constructing managing lanes focuses more traffic in the peak hours and undermines peak spreading and traffic metering.

    i.   Managed Lanes Would Benefit Only the Few Able to Pay Tolls

The Virginia I-495 Express toll lanes only carry about 1/6 of the daily traffic volume on the sections with Express Lanes despite being 1/3 of roadway capacity (Figures 18 and 19). The other 5/6 of traffic is carried in the general-purpose lanes. This is an inefficient use of infrastructure.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 139

Figure 18: 2019 Daily Virginia Outer Loop Average Daily Traffic Volumes[20]



Source: Virginia Department of Transportation traffic count data, 2019.

[20] Commonwealth of Virginia Department of Transportation Average Daily Traffic Volumes with Vehicle Classification Data on Interstate, Arterial and Primary Route 2019. https://www.virginiadot.org/info/resources/Traffic_2019/AADT_PrimaryInterstate_2019.pdf

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 140

Figure 19: 2019 Daily Virginia Inner Loop Average Daily Traffic Volumes



Source: Virginia Department of Transportation traffic count data, 2019.

The DEIS forecasts managed lane usage for Alternative 9 ranging from 10% to 31% during the 7-8 a.m. peak hour and from 12% to 35% during the 4-5 p.m. peak hour (DEIS, Appendix C, Figures 5-19 − 5-22, p. 99-100). These numbers are consistent with the estimate of 1/6 of daily traffic for Virginia because the managed lanes will attract a larger share of traffic during the peak hour. Only about 1/6 of the Maryland I-495 and I-270 traffic will be carried by the managed lanes despite being 1/3 of roadway capacity.

One of the "big ideas" from the 2018 Capital Region Transportation Forum was that "There's a market for $40 toll lanes." As reported in an article on the event, Nicholas Donohue from the Virginia Department of Transportation explained that "paying a $40 toll won't be an everyday choice for most people."[21]

The DEIS stresses "choice" — but who are these 1/6 that can afford to choose the Express Lanes? Researchers at the University of Virginia studied Virginia Express Lanes tolls and time savings. They found:

[21] LongenStke, Lindsey. Five Big Ideas from the Capital Region Transportation Forum, Greater Washington Board of Trade December 13, 2018 https://www.bot.org/five-big-ideas-from-the-capital-region-transportation-forum/



USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 133 of 340

00022709

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 141

The I-495 Express Lanes appear to provide the most time savings around 8:45 a.m. Mondays, when the toll also rises to around $1.75 per mile, and Wednesday evenings around 5:30 p.m. when tolls rise to a similar level.[215]

Whether paying $1.75 per mile is worth it depends on both how much time is saved and an individual's "value of time" expressed in $/hour. Figure 20 shows how high a value of time is needed to justify using the Express Lanes vs. the speed on the general-purpose lanes.

*Figure 20: Value of Time Needed to Justify Paying $1.75 Per Mile Toll (Toll Lanes at 60 mph)*



Source: I created this figure using basic math.

The U.S. General Accountability Office recommends using half the median wage for a typical value of time. The median wage in Maryland is $23.10 per hour.[216] This corresponds to a value of time of $11.05 per hour which would not justify a $1.75 per mile toll until general-purpose speeds decline to 5 mph. Wages in the study area are higher than the Maryland average, so it is possible that the median income worker might be willing to pay up to the $21 per hour at a general-purpose lane speed of 10 mph. However, such a worker would not be able to buy in at this price, because with then much congestion, higher-income travelers would outbid them and the dynamic price would rise above $1.75. In fact, the DEIS shows a preliminary toll estimate as high as $2.36 per mile for I-270.[217]

215 Mass Smith, *For Tolls Worth it on Virginia's HOT Lanes?*, WTOPnews (July 24, 2018), https://wtop.com/dc-transit/2018/07/are-tolls-worth-it-on-virginias-hot-lanes/.
216 Occupational Employment Statistics, May 2019 State Occupational Employment and Wage Estimates Maryland, Bureau of Labor Statistics, https://www.bls.gov/oes/current/oes_md.htm#00-0000.
217 DEIS, App. C, at 888.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 142

d.   Taxpayers May Not Be Off the Hook for Managed Lane Costs

This choice between extreme congestion and extremely high tolls is fundamental to making the managed lanes attractive to private operators. They need high peak hour tolls to pay off bonds. They need extreme congestion to justify high tolls. Most toll roads including the Virginia I-495 Express Lanes lose money in the early years and count on increasing congestion in the future to allow them to raise tolls to the point that the investment finally pays off. Figure 21 shows Transurban's I-495 losses by year since the project was opened.

*Figure 21: Transurban's I-495 Express Lanes Losses[218]*



Source: Created graph using information from Transurban financial reports.

The Virginia I-495 Express Lanes have never been profitable, and cumulative losses now exceed $400 million. The 2020 fiscal year ending June 30th includes Covid-19 impacts, but it doesn't appear the road was on its way to profitability even before this. If the Virginia I-495 Express Lanes are ever to break even, the worst toll rates are yet to come.

The I-95 Express Lanes (also managed by Transurban) were profitable pre-Covid-19, but were not in FY 2020. It appears that a radial commuting route like I-95 is a better market than a circumferential highway like I-495. It is likely that the private operators are hoping to duplicate the I-95 success by extending the I-495 Express Lanes into Maryland in order to emphasize a radial north-south I-270/I-495 commuter route Maryland into Virginia.

The DEIS promises a free lunch where the entire project is paid for by private funding. As shown in Figure 22, this is not what happened in Virginia. The Virginia I-495 Express Lanes were constructed at a cost of over $2 billion with private equity and private bonds providing less than half the total. The larger share (over $5 billion) came from a government Transportation Infrastructure Finance and Innovation (TIFIA loan) and $495 million from the Virginia Department of Transportation.

The VDOT $495 million contribution was, pre-Covid, supporting just 46,000 transactions per day for the VA I-495 Express Lanes.

Virginia did not plan to contribute to the Express Lanes but was pushed into it in order to make a deal that was acceptable to the private entities. Maryland likely will be in an even weaker

218 Reporting Suite, Transurban, https://www.transurban.com/investor-centre/reporting-suite.

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 134 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 143

bargaining position. This project will look riskier post-Covid, because it is not certain that prior travel patterns ever will return completely. The poor I-495 Express Lanes financial performance will cast doubt on the financial viability of the east-west I-495 sections in Maryland.

Figure 22: Virginia I-495 Express Lanes Construction Cost[229]



Legend: VDOT, Government/TIFIA loan, Private bonds, Private equity

Source: Federal Highway Administration project profile.

When asked about the potential for high tolls, Terry Owens, a state spokesman for the project, said,

> ...the group's assertion that motorists "will" pay the amounts projected by COG is "inaccurate, misleading and suggests a lack of understanding" of the federal environmental review process. The final toll rate will be set by the Maryland Transportation Authority's board after public hearings.[230]

This contention that the private operators will assume all the risk for construction but allow a public board to hold down toll rates is frankly implausible. If Maryland goes ahead with this project, it can be expected that negotiations with private operators on a binding long-term contract will include discussions of.

[229] Federal Highway Administration, Project Profile: Capital Beltway High Occupancy/Toll (HOT) Lanes (I-495), https://www.fhwa.dot.gov/ipd/project_profiles/va_capital_beltway.aspx

[230] Katherine Shaver, Beltway, I-270 Toll Lanes Could Cost More Than $1.50 and $2 Per Mile, Study Says, Washington Post (Oct. 16, 2020), https://www.washingtonpost.com/local/trafficandcommuting/beltway-i-270-toll-lanes-could-cost-more-than-2-per-mile-study-says/2020/10/15/a3c76ef2-0f2f-11eb-8a35-237ef1eb2ef7_story.html

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 144

- Maryland making financial contributions (in addition to the many millions already being spent on studies and that will be spent on a bidding process),
- Maryland committing to a minimum rate of return and/or specified high toll rates,
- Maryland assuming risk, and/or
- the private operators agreeing only to build a small section of the entire project which they see as most profitable, creating the type of bottleneck problem that has occurred in Virginia at the end of the managed lanes.

### 3. Appendix A: Traffic Forecasts

Figure A1 shows DEIS daily traffic data and forecasts for I-495 and I-270. The DEIS forecasts significant traffic growth in the 2040 no-build alternative, particularly in the north-south direction, and considerably higher growth in the build alternatives (Alternative 9, which appears to be preferred by MDOT).[31]

Figure A1: Maryland DEIS Daily Traffic Data and Forecasts (Table 3-1 and 3-2)



Legend: 2017, 2040 No Build, 2040 Build

I-495 south to north     I-495/I-270 south to east

Source: DEIS, 2020.

[31] Alternative 9, according to the DEIS, is two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270.

00022710

JA1704



USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 135 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project FEIS and JPA
November 6, 2020
Page 146

### 4.   Appendix B: DEIS Wrongly Claims that Over-Capacity Assignments Indicate Latent Demand

Generated traffic is a critical concept that is explained by Litman in Box B1.

*Box B1. Excerpt from Generated Traffic and Induced Travel: Implications for Transport Planning*

> Todd Litman, Victoria Transport Policy Institute, July 1, 2020 https://www.vtpi.org/gentraf.pdf
>
> Traffic engineers often compare traffic to a fluid, assuming that a certain volume must flow through the road system, but it is more appropriate to compare urban traffic to a gas that expands to fill available space (Jacobsen 1997). Traffic congestion tends to maintain equilibrium: traffic volumes increase to the point that congestion delays discourage additional peak-period vehicle trips. Expanding congested roads attracts latent demand, trips from other routes, times and modes, and encourage longer and more frequent travel. This is called generated traffic, referring to additional peak-period vehicle traffic on a particular road. This consists in part of induced travel, which refers to absolute increases in vehicle miles travel (VMT) compared with what would otherwise occur (Hills 1996; Schrieder 2018).
>
> This is not to suggest that increasing road capacity provides no benefits, but generated traffic affects the nature of these benefits. It means that road capacity expansion benefits consist more of increased peak-period mobility and less of reduced traffic congestion. Accurate transport planning and project appraisal must consider these three impacts:
>
> 1. Generated traffic reduces the predicted congestion reduction benefits of road capacity expansion (a type of rebound effect).
> 2. Induced travel imposes costs, including downstream congestion, accidents, parking costs, pollution, and other environmental impacts.
> 3. The additional travel that is generated provides relatively modest user benefits, since it consists of marginal value trips travel that consumers are most willing to forego.
>
> Ignoring these factors distorts planning decisions...

Litman makes an important distinction between latent demand and induced travel, with generated traffic encompassing both.

- *Latent demand: Additional trips that would be made if travel conditions improved (less congested, higher design speeds, lower vehicle costs or tolls)*
- *Induced travel: An increase in total vehicle mileage due to roadway improvements that increase vehicle trip frequency and distance, but exclude travel shifted from other times and routes*

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project FEIS and JPA
November 6, 2020
Page 145

Officials offered a similar forecast of significant growth in the 1998 FEIS for the Virginia Express Lanes (Figure A2), but total daily I-495 traffic has changed little in 21 years and is much lower today than what was forecast in the FEIS no-build scenario. Presumably, the 1998 FEIS modeling forecast even higher traffic volume for the build alternative but those numbers are not reported in the FEIS and therefore are not shown in Figure A2.

*Figure A2: Virginia FEIS Daily Traffic Data and Forecasts (from FEIS Tables 3-1 and 3-2)*

Source: Virginia Express Lanes FEIS, 2006.

OP LANES MARYLAND

I-495 & I-270 Managed Lanes Study

00022711

JA1705

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 147

> *Generated traffic: Additional peak-period vehicle trips on a particular roadway that occur when capacity is increased. This may consist of shifts in travel time, route, mode, destination and frequency.*[222]

**The MWCOG Model Assignments Are Not Intended to Include Any Latent Travel**

The DEIS uses the phrase latent demand in the same way Litman does: "… latent demand refers to people who want to use I-495 or I-270 during the peak hours, but do not because of the congestion." (DEIS, Appendix C, p. 70). The DEIS then mistakenly assumes that over-capacity MWCOG model forecasts can be used to quantify latent travel demand. This assumption is not supported by MWCOG model documentation or by the professional travel demand modeling literature in general.

The DEIS used MWCOG Version 2.3.71. The MWCOG website includes travel demand model documentation on the versions 2.3.70, 2.3.75 and 2.3.78, including:

- The TPB Version 2.3 Travel Model, Build 70, also known as the Version 2.3.70 Travel Mode becomes the adopted travel model on October 18, 2017
  - User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.70 (Volume 1)
  - Highway and Transit Networks from the VDOT and MDOT Off-Cycle Amendment to the 2016 CLRP (TPB Version 2.3.70 Travel Model)

- The TPB Version 2.3 Travel Model, Build 75, also known as the Version 2.3.75 Travel Mode becomes the adopted travel model on October 17, 2018
  - User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.75, Volume 1 of 2: Main Report and Appendix A (Flowcharts)
  - User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.75, Volume 2 of 2: Appendices B (Batch Files), C (Cube TP/input Scripts), and D (AEMS Fortran Control Files)
  - Highway and Transit Networks for the TPB Ver. 2.3.75 Travel Model and Air Quality Conformity Analysis of Visualize 2045 and the FY 2019-2024 TIP

- The user's guide and the highway and transit networks documentation for the current model, Ver 2.3.78, were released April 14, 2020.

---

[222] Litman, 2020, at 3.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 148

  - User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.78, Metropolitan Washington Council of Governments, National Capital Region Transportation Planning Board, April 14, 2020.
  - Highway and Transit Networks used in the Air Quality Conformity Analysis of the 2020 Amendment to Visualize 2045 and the FY 2021-2024 TIP (Ver. 2.3.78 Travel Model), Metropolitan Washington Council of Governments, National Capital Region Transportation Planning Board, April 14, 2020

- Validation reports:
  - Calibration Report for the TPB Travel Demand Forecasting Model, Version 2.3, on the 8,722-Zone Area System, Final Report, Washington, D.C.: National Capital Region Transportation Planning Board, January 20, 2012.

  - In 2013, the Version 2.3 Travel Model was validated to year-2010 conditions. Updates to the model resulting from this validation work were part of Ver 2.3.52. The model validation effort was documented in the following memo: Milone, Ronald. Memorandum to Files, "2010 Validation of the Version 2.3 Travel Demand Model," Memorandum, June 30, 2013.

  - In 2019, TPB staff conducted a re-validation of Version 2.3.75 to year-2014 conditions. This work was documented in the following memo: Feng Xie to Dusan Vuksan and Mark Moran, "Late-2014 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, March 12, 2019.

It appears that the version 2.3.75 documentation and validation report are generally consistent with the version used in the DEIS (2.3.71).

None of the ten model documents on the MWCOG website make any reference to "latent", "induced" or "generated" demand. The MWCOG model's traffic volume outputs are intended to represent actual traffic volumes - either for the base year or for a forecast year. This is apparent in the latest validation report (2019). It compares traffic volumes assigned by the model to traffic counts - both for an entire day (Figure 81) and for each of the four model time periods (Figure 26). In each case, the target is an exact match.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 136 of 340

JA1706



I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 149

Figure A3: MWCOG Model Daily Traffic Volumes vs. Counts[23]

Table A3-1. Estimated and Observed 2014 Daily VMT by Facility Type*

| Facility Type | Links w/ Counts | Observed ("O") | Estimated ("E") | Ratio (E/O) | Standard 1 Acceptable | Preferable |
|---|---|---|---|---|---|---|
| Freeway | 537 | 29,430,832 | 31,618,131 | 1.07 | ±7% | ±6% |
| Major Arterial | 1,867 | 14,796,395 | 15,865,341 | 1.07 | ±15% | ±10% |
| Minor Arterial | 2,939 | 10,897,071 | 12,343,027 | 1.13 | ±35% | ±20% |
| Collector | 1,144 | 2,311,056 | 1,718,205 | 0.74 | ±25% | ±20% |
| Expressway | 224 | 5,063,294 | 4,826,840 | 0.95 | ±15% | ±10% |
| Ramp | 2 | 30,176 | 26,161 | 0.87 | N/A | N/A |
| **Total** | **6,693** | **62,517,224** | **66,377,704** | **1.06** | **18%** | **12%** |

Source: MWCOG, 2019.

Figure 26: MWTOG Model Daily Traffic Volumes vs. Counts[24]

Table A4. 2014 VMT Estimated to Observed Ratio (E/O) by Time Period and Facility Type*

| | Links w/ Counts | AM Peak | Mid-day | PM Peak | Night | Daily |
|---|---|---|---|---|---|---|
| Freeway | 125 | 1.12 | 1.40 | 0.93 | 1.12 | 1.13 |
| Major Arterial | 543 | 1.05 | 1.08 | 0.87 | 1.15 | 1.02 |
| Minor Arterial | 596 | 1.33 | 1.12 | 1.17 | 1.37 | 1.22 |
| Collector | 319 | 0.81 | 0.68 | 0.71 | 0.72 | 0.72 |
| Expressway | 93 | 0.91 | 1.07 | 0.82 | 0.98 | 0.94 |
| **Total** | **1,676** | **1.09** | **1.20** | **0.92** | **1.12** | **1.07** |

Source: MWCOG, 2019.

Note: * Based on 1,676 directional data with hourly traffic counts ( total of them are ramps)

The model outputs summarized in the tables above include both overestimated and underestimated traffic volumes relative to counts. Some of the overestimated volumes are impossibly high because they exceed roadway capacity, but these errors are not an estimate of latent demand—they are just errors.

[23] Sha, Feng, "Case 2013 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, (March 12, 2019).

[24] Sha, Feng, "Case 2013 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, (March 12, 2019).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 150

## 5.    Appendix C: The Virginia Express Lanes Caused the Worst Bottleneck on I-495

Peak hour traffic volumes increased sharply after the Express Lanes opened. Peak hour traffic numbers were extracted from VDOT traffic reports by multiplying Annual Average Daily Traffic (AADT) by the estimate of the portion traveling during the peak hour or design hour (K Factor).

The VDOT reports do not include AADT for the Express Lanes except for a 2019 value of 13,000 at the southern exit. This 13,000 per direction number is used as an estimate. The VDOT traffic reports include K factors for the Express Lanes at the southern end in both directions. In 2019, these K factors were 0.1756 for the Outer Loop and 0.2053 for the Inner Loop. As shown in Figure C1, these are over two times the average K factors for parallel general-purpose lane (GP) segment. This is logical because there is much less incentive to use the Express Lanes during off-peak periods, even given lower toll rates.

Figure C1: I-495 K Factors Showing Concentration of Express Lanes Traffic in Peak Hour[25]



Source: Virginia Department of Transportation traffic count reports, 2019.

The K-factors in Figure C1 show that traffic on the general-purpose lanes is spread widely across the day. This is an efficient use of the roadway capacity. "Peak spreading" is an underappreciated congestion management strategy. In sharp contrast, a large proportion of traffic parallel to Express Lanes.

[25] From VDOT traffic data report. General-purpose-lanes K Factor is average of segments parallel to Express Lanes.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 138 of 340

OP LANES™
MARYLAND

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 151

on the Express Lanes is during the peak hours. This undermines the congestion relief that otherwise would result from peak spreading and causes unintended negative consequences.

Figures 7 and 8 earlier in this report (reworked[20] for convenience as Figures C2 and C3 above the estimated change in peak hour traffic volume[20] for the Outer and Inner Loop GPL before and after construction. The "Before" numbers are averages from 2005-2007. The "After" numbers are averages from 2013-2019. The period 2008-2012 is omitted due to the extended construction period.

C2: Change in Outer Loop GPL Peak Hour Traffic in Virginia (After Express Lanes Opening)



Source: Virginia Department of Transportation traffic count reports.

[20] Calculated as AADT x K Factor.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 152

C3: Change in Inner Loop GPL Peak Hour Traffic in Virginia (After Express Lanes Opening)

Source: Virginia Department of Transportation traffic count reports.

The I-495 Inner Loop often is severely congested for several miles both north and south of the Potomac River in the afternoon. Therefore, the American Legion Bridge is often considered a primary bottleneck in the system. However, a close examination of speed data above that the worst bottleneck is the first mile north of the end of the Express Lanes north of the Dulles Toll Road. This case is presented fully in Appendix A of this report.

Figure C4 shows Inner Loop speeds for 15-minute intervals from 7 a.m. to 10 a.m. Speeds for 11 Inner Loop segments are shown – from the Route 123 interchange at the bottom south to the Glebe John Parkway interchange at the top north. The gray dashed line above the GW Parkway interchange line represents the state line. The northbound speeds at the Georgetown Pike interchange (just north of the Express Lane merge are 20 mph or less for a 2-hour period, but the speeds at the American Legion Bridge (above the gray dashed line) never fall below 35 mph. The bridge is not the primary bottleneck in the morning peak period.

CO-504

00022714

JA1708

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 139 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and FEA
November 6, 2020
Page 153

Figure C4: Inner Loop Morning Peak-Period Speed Data (DREQ)[27]

Source: Virginia Department of Transportation, 2018.

Legend: Purple box: peak hour for core study area, white box: longer study period.

[27] Extracted from VDOT, I-495 Express Lanes Northern Extension Environmental Assessment Scoping Framework Document (November 15, 2018), Figure 7, p. 22. The purple box highlights the peak hour and the white box is for the peak period.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and FEA
November 6, 2020
Page 154

The afternoon picture is similar because queues behind bottlenecks spill back into upstream bottlenecks. Nevertheless, Figure C5 shows that the worst afternoon bottleneck in the system is also north of the Express Lanes merge. Compared to the American Legion Bridge, the Express Lanes merge area:

- becomes severely congested (red) about an hour earlier,
- is severely congested for about two hours longer, and
- has lower maximum speeds (8 mph vs 15 mph).

Figure C5: Inner Loop Afternoon Peak-Period Speed Data (DREQ)[28]

Source: Virginia Department of Transportation, 2018.

Legend: Purple box: peak hour for core study area, white box: longer study period.

[28] Extracted from VDOT, I-495 Express Lanes Northern Extension Environmental Assessment Scoping Framework Document (November 15, 2018), Figure 7, p. 22. The purple box highlights the peak hour and the white box is for the peak period.

00022715

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 155



Figure C6: I-495 Inner Loop from SR 192 to George Washington Parkway/ Peak Hour Traffic Volume (Vehicles) by Year[259]

Source: Virginia Department of Transportation traffic count reports.
Note: 2008-2012 omitted because of construction during this period.

Figure C6 shows that there was adequate capacity for the pre-Express Lanes traffic volume on four general purpose lanes (less than 8000 vehicles per hour) but not enough for the post-Express Lanes traffic volume. After the Express Lanes opened, the peak hour volume immediately shot up to about 9200 vehicles per hour and has stayed constant at that level from 2013 through 2019. This constant value indicates that this is the maximum capacity for this roadway segment – even with the use of the shoulder lane. The extreme delay results from the queue that spills back behind this bottleneck – a bottleneck that was caused by the Express Lanes project and the worst bottleneck on I-495 in Virginia.

**I.    Other Traffic Problems in the DEIS**

**1.    Increase in "Heavy Truck versus Car" Crashes and Fatalities**

Well over 95% of severe to fatal traffic injuries occur to the occupants of passenger cars, vans, and SUVs, as compared to trucks. With the road widening and toll lanes added to the I-270 and the I-495 Beltway, there will be a great increase in such truck-versus-car collisions.

[259] Estimated from VDOT annual Daily Traffic Volume Estimate reports.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 156

Finally, Figure C6 shows Inner Loop peak hour traffic for the segment from Georgetown Pike (SR 193) to the George Washington Parkway (the first segment with VDOT data after the Express Lanes merge).

These horrific crashes will occur when cars and trucks need to shift from on ro to off lanes to get to exits, and also because heavy trucks and tractor trailers need much greater stopping distances than do cars. If the cars ahead need to suddenly slow or stop, the trucks following in their wakes may be unable to avoid the crash.

The DEIS includes Appendix C – Traffic Analysis Technical Report, which is merely a statistical review of historic crash data along I-270 and I-495 to help identify potential safety impacts[?] of the Managed Lanes Study. The analysis is sorely lacking in any inputs or insights about how to mitigate or prevent such crashes. In the five-year review period of 2012-2016 there were a total of 2,938 crashes along I-270. There was no breakdown of the types of injuries, nor their severity. Nor was there information about the mismatch of large trucks and tractor-trailers interacting with passenger vehicles (cars, minivans, SUVs).

Look at the multiple lane designs for two of the proposals for I-270. Design 9 has 7 lanes in each direction, and design 10 has 8 lanes in each direction. Imagine you're going about 60 mph and you're on a northbound toll lane, and suddenly realize you need to exit. But all the adjacent lanes are jammed with vehicles all moving between 45 and 60 mph. How confident are you in being able to make six lane changes through traffic to your right in a rainstorm on a dark night?

The DEIS also lacks a sufficient safety analysis and does not consider how potentially increased speeds in managed lanes will reduce safety, causing crash injuries to be more severe and even fatal at higher speeds. The rise in traffic fatalities during the COVID-19 epidemic demonstrates this phenomenon.

**2.    Bottleneck: Traffic Will Stall and Pollute as it Funnels Down**

The proposed build-out of I-270 will expand the road in each direction from the present four lanes to seven or eight lanes, which must then funnel down to four lanes in Gaithersburg, and then to two lanes north of Germantown to northbound I-270. Those bottlenecks will cause immense backups on I-270 south of Germantown.

During the 5 years (or more) of the construction phase for the Project, the local traffic will have to be re-routed throughout the surrounding local streets. There will be construction barriers preventing local travel in certain areas, thus forcing circuitous re-routing that will greatly increase the time and distances for travel. Imagine trying to get from the northbound on I-270 to your home in Frederick when major portions of I-270 are missing or restricted to one or two lanes. Living in Montgomery County will be a traffic nightmare.

**M.    The Agencies Failed to Take the Required "Hard Look" At Environmental Justice Issues**

Executive Order 12,898 directs each federal agency to "make achieving environmental justice part of its mission." Executive Order 12,898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 8,113 (Feb. 16, 1994) [hereinafter EO 12,898], § 1-101. Moreover, agencies are required to include an

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 141 of 340

**OP LANES™ MARYLAND**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 157

environmental justice analyses in their NEPA review. *See Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017). The purpose of this environmental justice analysis is to determine whether the proposed federal action will have a "disproportionately adverse effect on minority and low-income populations." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003).

As with all NEPA requirements, agencies must "take a 'hard look' at environmental justice issues." *Sierra Club*, 867 F.3d at 1368, and their analysis is measured against the "arbitrary and capricious" standard. *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (arbitrary and capricious standard applies to every section of an EIS). Thus, an agency's environmental justice analysis must be both thorough and "reasonable and adequately explained." *Id.*

The Agencies failed to discharge this duty. First, the DEIS uses a fundamentally flawed methodology to identify environmental justice populations. Second, far from investigating the Project's environmental impacts on environmental justice populations, the Agencies relied on conclusory statements and alleged regulatory compliance to evade any meaningful analysis. Third, the DEIS does not compare environmental justice impacts to impacts on the general population, a necessary step to identify any "disproportionately adverse effect on minority and low-income populations." *Mid States Coal. for Progress*, 345 F.3d at 541 (emphasis added). Finally, by failing to adequately consider the impacts of the project on environmental justice populations, FHWA prevented those populations from effectively participating in the NEPA process. *See* 40 C.F.R. § 1500.1(b) (2019).

**1. The Agencies' Methodology for Identifying Environmental Justice Populations Is Fundamentally Flawed**

NEPA requires that an EIS contain high-quality information and accurate analysis. *See* 40 C.F.R. § 1500.1(b) (2019). If the agency relied on an incomplete model or the relevant data is unavailable, the EIS must disclose this shortcoming. *See Lands Council v. Powell*, 395 F.3d 1019, 1031-32 (9th Cir. 2005) (citing 40 C.F.R. § 1502.22 (2005)) (Forest Service violated NEPA by relying on data that it knew had shortcomings but did not disclose those shortcomings until its decision was challenged).

Here, the Agencies relied on census block group data for its environmental justice analysis. *See* DEIS, App. E, at 70. As a threshold matter, census block data is deficient because it excludes "pockets of minority or low-income communities, including those that may be experiencing disproportionately high and adverse effects." EPA, *Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses*, 2.1.1 (1998). Further, as FHWA itself has found, census data fails to reveal the intricate communal networks that could exacerbate negative impacts on environmental justice populations. *See* FHWA, U.S. DOT, *Environmental Justice Reference Guide* 15 (2015) (FHWA Guidance). FHWA did not disclose these shortcomings in the DEIS.

To remedy these limitations, the Agencies' environmental justice analysis must incorporate supplemental demographic data. For instance, the environmental justice analysis

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 158

should include data from a full range of state and local health, environmental, and economic agencies. *See* CEQ, Exec. Office of the President, *Environmental Justice Guidance Under the National Environmental Policy Act* 14 (1997) (CEQ Guidance). Additionally, FHWA should conduct a door-to-door household survey of the study corridor to identify cultural practices and patterns of living that are relevant to the environmental justice analysis.[20]

**2. The Agencies' Discussion of Environmental Justice Lacks Any Meaningful Analysis of Impacts to Environmental Justice Populations**

The Agencies failed to adequately analyze and explain the impacts of its proposed actions on environmental justice populations. At a minimum, the analysis must be sufficient to demonstrate that the Agencies have "adequately considered and disclosed the environmental impact of its action and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983).

Proper analysis is especially important in the environmental justice context. Over the past 40 years, research has connected localized air pollutants to adverse health outcomes including pulmonary and cardiovascular disease, neurological effects, and cancer. 83 Fed. Reg. 42,986 (Aug. 24, 2018). These effects are compounded in environmental justice populations due to their proximity to major interstates and highway systems. *Id.* Though the DEIS admits there are at least 111 environmental justice populations within the study area, DEIS, App. E, at 72, it fails to adequately identify or evaluate the adverse environmental effects on any of these communities, and is therefore arbitrary and capricious.

    **a. The Agencies Improperly Relied on Conclusory Statements to Sidestep Their Duty to Take a Hard Look at Environmental Justice Populations**

The DEIS makes several conclusory statements regarding potential environmental impacts, but these prove insufficient to discharge the Agencies' duty to take a hard look at environmental justice issues. *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (alteration in original) (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985)) ("[s]imple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA").

In discussion of air quality impacts, the DEIS simply states that "construction-related effects of the project would be limited." DEIS, App. E, at 105. However, the analysis does not consider, or even list, the harmful effects of construction-related fugitive dust.[21] Similarly, the DEIS asserts that "impacts by relocation or partial property acquisition would be limited to the individuals immediately affected by the property acquisition." DEIS, App. E, at 107. The DEIS

[20] *Cf. Friends of Buckingham v. State Air Pollution Control Bd.*, No. 19-1152, (4th Cir. Jan. 7, 2020).

[21] *See supra* Section II.H.1, 10, 11, & 12.

00022717

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 160

cites no data—neither quantitative nor qualitative—to support this conclusion. This is especially concerning, as the environmental justice context, where "the intricate relationships that exist between community members or institutions" could exacerbate negative impacts that would be benign in other communities. FHWA Guidance at 15.

FHWA's conclusory statements regarding environmental justice impacts in the DEIS are plainly insufficient under NEPA. Instead, the agency must evaluate all relevant data and "articulate a satisfactory explanation" for the conclusions reached in the EIS. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**b.    The Agencies Cannot Rely on Regulatory Compliance to Obviate NEPA's Requirement to Consider Impacts on Environmental Justice Populations**

Even if the Agencies intend to follow all relevant regulations to construct the Project, regulatory compliance does not obviate the need to conduct a proper environmental justice analysis. Indeed, a compliant project may still result in "significant environmental damage." *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971). Consequently, whether a project will violate a regulation is a distinctly different inquiry from whether the project will have "disproportionately high and adverse" impacts on environmental justice populations.

In its short discussion on air quality impacts, the DEIS states that the project will follow "[s]tate and local regulations regarding dust control and other air quality emission reduction controls." DEIS, App. E, at 105, but provides no analysis of the actual impact of the dust or emissions. Similarly, instead of discussing the potential impacts that congestion pricing would have on environmental justice communities, the DEIS simply notes that toll prices would be set "in accordance with [Maryland law]," which requires public notice. DEIS, App. E, at 108. Compliance with regulations or established processes is also relied upon to excuse the superficial discussion of impacts to water quality, visual aesthetics, mobility, and the local economy. *See* DEIS, App. E, at 105-07.

"Meeting a regulatory standard cannot replace the "reasonably thorough discussion of the significant aspects of the probable environmental consequences" as required by NEPA. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992). Otherwise, the consideration of environmental justice issues would be limited to projects that cannot lawfully obtain permits in the first place. This stance is illogical and at odds with principles of environmental justice codified in EO 12,898.

**3.    The Agencies Failed to Consider Whether the Project Will Disproportionately Affect Environmental Justice Populations**

NEPA requires an agency to consider whether a proposed project's impacts on environmental justice populations will be "*disproportionately* high and adverse." EO 12,898, § 1-101 (emphasis added). To that end, an environmental justice analysis must "compare the

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 161

demographics of an affected population with demographics of a more general character." *Mid States' Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003).

Here, the Agencies did not compare the impacts on any of the 111 identified environmental justice populations to a more general affected population. In fact, the only comparison in the environmental justice analysis is a small table comparing the project alternatives to one another. *See* DEIS, App. E, at 109, Table 4-7. The table simply lists seven alternatives and whether each alternative has the potential to adversely affect 13 environmental resources that may be present in environmental justice populations, without even stating what those effects might be, let alone comparing them to effects on the general population. *Id.*

An EIS must *compare* impacts on populations to determine whether the environmental justice impacts "appreciably exceed" impacts to the general population. CEQ Guidance at 26-27. Not only should the comparison be quantitative, but the distinct culture and structure of environmental justice communities means the comparison should include qualitative analysis as well. *See id.* at 14. Even with the limited and insufficient data provided at the census block level, disproportionality of impact would be expected for some of the "informal public populations living within the impacted counties.

**4.    The Agencies' Failure to Take a "Hard Look" at Environmental Justice Impacts Precluded Meaningful Participation by Environmental Justice Populations**

The NEPA process relies on public scrutiny. *See* 40 C.F.R. § 1500.1(b) (2019). Further, environmental justice principles prohibit agencies from excluding low-income and minority populations from participating in the NEPA process. EO 12,898, § 2-2. However, without taking a hard look at environmental justice impacts, a DEIS cannot foster the "informed public participation" that is central to NEPA. *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

An informed evaluation of the project's impacts on environmental justice populations, which was lacking here, is critical to "effective community participation." CEQ Guidance at 4. The Agencies' failure to adequately disclose the impacts of its action "preclude[d] meaningful evaluation of the effectiveness of the agency's proposed action." *"Found. for Animals v. Norton*, 281 F. Supp. 2d 209, 227 (D.D.C. 2003).

Additionally, the Agencies did not conduct sufficient outreach to communities of color. During the scoping and commenting periods, outreach and informational materials, like interpretation messages, were largely made available in English only, and the multilingual factsheets that were provided are hard to find on the Project website. Communities of color should be afforded equal access to and participation in every level of decisions making on projects that will impact their communities, but this has not occurred with the Project. For example, the percentage of people who answered the public opinion survey conducted during the scoping period shows 18% fewer respondents came from Prince George's County (which is majority African-American and Latino) than Montgomery County. DEIS, App. P, at 18 (Table 2-6) (showing 39% of respondents were from the project area from the I-495/I-95 Interchange to the I-495/US 50 Interchange and only 21% of communities were from the I-495/US 50

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 143 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 161

Interchange to the Woodrow Wilson Bridge). The lack of outreach to these communities of color flies in the face of the Principles of Environmental Justice.[35]

Had the Agencies taken a legally sufficient hard look at the project's environmental justice impacts and conducted more outreach to these communities, low-income and minority populations would be better informed of the Beltway expansion's environmental effects on their communities and, consequently, would be able to offer meaningful comment. *See Center for Biological Diversity v. Gould*, 150 F. Supp. 3d 1170, 1182 (E.D. Cal. 2015) (agency's failure to include environmental information that it relied upon in its decision precluded plaintiffs from submitting more complete comments and thus violated NEPA). Instead, the DEIS gives environmental justice populations scant basis to "understand and consider meaningfully the factors involved." *Concerned Citizens on I-190 v. Sec'y of Transp.*, 641 F.2d 1, 5 (1st Cir. 1981). Accordingly, the Agencies must supplement the DEIS with a thorough discussion of environmental impacts that meets NEPA's requirements, complete with information that would allow environmental justice populations to meaningfully participate in the NEPA process.

N.    The DEIS Does Not Address Induced Demand

Building this hugely expensive highway capacity increase project will not solve the congestion problem but will cause long-term growth in automobile traffic and greenhouse gas emissions. Current research confirms that building new highway capacity does not, in the long run, reduce highway congestion.[36] Rather, it stimulates an increase in Vehicle Miles Traveled to soak up the new capacity, resulting in new congestion, more VMT, and more greenhouse gas emissions.

---

[35] *See* People of Color Environmental Leadership Summit, *17 Principles of Environmental Justice*, https://www.ejnet.org/ej/principles.pdf.

[36] Ronald T. Milam et al., *Closing the Induced Vehicle Travel Gap Between Research and Practice*, Transportation Research Record: Journal of the Transportation Research Board, No. 2653, at 10-16 (2017); Handy, Susan and Marlon G. Boarnet, *Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use and Greenhouse Gas Emissions: Policy Brief*, California Air Resources Board, (2014), https://ww2.arb.ca.gov/sites/default/files/2020-03/Impact_of_Highway_Capacity_and_Induced_Travel_on_Passenger_Vehicle_Use_and_Greenhouse_Gas_Emissions_Policy_Brief.pdf; *Increasing Highway Capacity Unlikely to Relieve Traffic Congestion*, Policy Brief, National Center for Sustainable Transportation, University of California, Davis, (Oct 2015). https://ww2.arb.ca.gov/sites/default/files/2020-03/Increasing_Highway_Capacity_Unlikely_to_Relieve_Traffic_Congestion_Policy_Brief.pdf

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 162

Researchers have concluded that "[i]ncreased roadway capacity induces additional VMT in the short-run, and a roughly equivalent VMT in the long-run."[34] Further, "increases in GHG emissions attributable to capacity expansion are substantial"[35] and the increase in VMT "offsets any reductions in GHG emissions that would result from improved traffic flow."[36]

A timely new paper by three experts in the field titled "Induced Vehicle Travel in the Environmental Review Process" confirms and elaborates on these findings and suggests how they should be applied in the environmental review process.[37]

The pertinent findings of this new study are summarized below:

1. "Roadway capacity expansion is frequently proposed as a solution to traffic congestion" due to "flawed logic…The logic is flawed because it does not account for the induced vehicle travel effect. Constructing new highway lanes generally increases the average speed of highway traffic and thereby reduces the effective cost of driving on the highway. That, in turn, reduces more vehicle travel on the highway—more vehicle miles traveled."[38]

2. Induced travel is often not fully accounted for in the planning and environmental review process. "As a result, agencies often overestimate the traffic congestion-reducing benefits of capacity expansion projects and underestimate the project's environmental impacts, resulting in a potential overallocation of public money on road construction."[39] [emphasis in original]

3. The authors detail the process of induced travel (a term they believe more accurately describes the phenomenon than "induced demand"):

The reduction in the time cost of vehicle travel induces driving by inducing shifts in travel behavior that increase VMT on the road network and can ultimately return congestion to pre-expansion levels. These behavioral responses can include shifts from non-auto travel modes to driving, shifts in destinations, and shifts in driving routes, as well as entirely new trips. These responses can cause increases

---

[34] Handy, 2015, 1.

[35] Handy, 2015, 1.

[36] Handy, 2014, 7.

[37] Volker, Jamey M. B., Amy E. Lee, and Susan Handy, *Induced Vehicle Travel in the Environmental Review Process*, Transportation Research Record: Journal of the Transportation Research Board, No. 2674, at 468-479 (June 15, 2020).

[38] Volker, 468.

[39] Volker, 468.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 144 of 340


OP LANES™ MARYLAND

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 163

in both personal and commercial driving. In the longer term, adding capacity to highways or other major roadways can lead to changes in residential and employment location decisions that increase travel distances and may eventually spur commercial or residential growth in the region. The latter effect, an increase in population and jobs, represents a shift in the demand curve, increasing VMT even further, and is sometimes referred to as "induced demand." Instead of the intended effect of steady-state VMT and congestion relief, the initially reduced congestion and resulting decrease in time cost of driving induces yet more driving. The increasing VMT then worsens congestion and can start the whole process over again in a vicious cycle.[249]

4. A range of studies suggests that VMT grows to consume new highway capacity in 5 to 10 years.[250]

5. Studies identify four broad components of induced VMT growth: (1) increased household VMT, (2) increased commercial truck VMT, (3) diversion of traffic from other routes, and (4) migration (population increase). The share of each of these will vary from situation to situation. All but (3) diversion, represent new VMT.[251]

6. "Current travel demand models do not fully account for induced travel." The models "have do an adequate job of accounting for changes in route and shifts in mode, but they underestimate increases in VMT attributable to increases in trip frequencies and lengths that capacity expansion will induce."[252]

7. The authors have created an "Induced Travel Calculator" instrument, which, however, has not yet been calibrated for cases outside California.[253]

8. The authors examined five highway expansion projects in California. They found that the environmental documents for these projects "differ widely in their discussion, analysis, and reporting of induced travel. The documents range from not mentioning induced travel by name nor by concept, to addressing induced travel in response to public comments, to citing the induced travel report and explaining why it does not apply to this project."[254]

[249] Volker, 469.

[250] Volker, 469-470.

[251] Volker, 470.

[252] Volker, 470.

[253] Volker, 471.

[254] Volker, 473.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 164

9. One of the case studies presented by the authors is the addition of 10.2 lane miles to I-405 in Los Angeles. The purpose of the project, according to the EIS, was to "reduce existing and forecast traffic congestion." The subject of induced traffic was not raised in the DEIS, but was addressed in response to public comments. The response minimized the concern, stating that the widening served "latent demand" per "new demand." The authors conclude: "The discussion does not acknowledge that providing new capacity to serve this latent demand could generate additional vehicle travel, that is, induced VMT." The Induced Travel Calculator estimates that the I-405 project will produce an additional 87.8 million VMT per year.[256]

10. The authors present three main conclusions to their review of case studies: First, the environmental documents "did not address induced travel in much detail except in response to comments." Second, responses to public comments on the subject "were inconsistent both within and across the documents, and they were inconsistent with the induced travel literature." Third, where estimates of induced travel were included in the environmental documents, they were much lower than the predictions of the Induced Travel Calculator, in some cases by orders of magnitude.[257]

11. The authors, not surprisingly, recommend further research in this area, "particularly given the confluence of the vast sums of funding that continue to flow toward roadway expansion projects and the urgency of reducing VMT as a way to combat climate change and alleviate many other environmental, economic, and social impacts of driving and highway infrastructure."[258]

The I-495/I-270 DEIS does have a discussion of induced travel ("latent and induced demand"), contained in the traffic technical report.[259] To classify this DEIS alongside the Volker et al. case studies, the DEIS contains some discussion of induced travel, but neither references the current literature on the subject, nor recognizes it as a significant factor.

Of the four factors contributing to induced travel cited by Volker et al. (item 5 above), the only one discussed in detail is diversion from other (in this case, arterial) routes. Mirroring the I-495 EIS, this is labeled "induced demand": "Latent demand represents diverted trips. The project will improve the system by serving more latent demand on the freeways instead of on arterials."[260]

[255] Volker, 474.

[256] Volker, 477.

[257] Volker, 478.

[258] DEIS, App. C, Traffic Analysis Technical Report.

[259] DEIS, App. C, at 144.



USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 145 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 166

this would be released during the RFP phase. Can MDOT and MDTA provide further visibility on timing and key terms of this agreement?

Will Shortlisted Proposers have an opportunity to comment on the agreement before it is executed?

Please also confirm that this agreement is only intended to cover the Section Work that will be delivered in Virginia.

What are the risks related to the Capital Beltway Accord anticipated by MDOT to be covered by the JPA agreement as mentioned in section 5.2 of the RFQ?[255]

The response from MDOT in this March 23, 2020 document was initially "PENDING" but was later changed to:

More information regarding the Capital Beltway Accord, the scope of the Section Work, and the form of the Section P3 Agreement, which will identify risk allocations for the Section Developer, will be provided as part of the draft RFP documents to the Shortlisted Proposers.[256]

This important information does not appear to have been included in the DEIS. Given the importance of the American Legion Bridge, its potential to connect the two states by rail in addition to highway, and the fact that rail is not currently being considered, it is inappropriate to minimize the actual number of alternatives and importance of fully informed decision making in relation to the American Legion Bridge. The nature and impact of the Bi-state Accord and how it will constrain state decision-making should have been evaluated in the DEIS to give the public an opportunity to comment. Reserving space for rail on the American Legion Bridge should have been considered in the DEIS. At a minimum, all information that has been provided to shortlisted proposers should also have been included in the DEIS.

The DEIS also should include consideration of and reference to the proposed 495 Next project on the Virginia side of the American Legion Bridge as well as the Bi-state Capital Beltway Accord. Specifically, information and documents from both the VA 495 Next project and consultations between Maryland and Virginia regarding the Bi-state Capital Beltway Accord should be considered in the DEIS. The DEIS should describe whether the cumulative impact of the 495 Next traffic data has been incorporated into the traffic analysis as well as whether cumulative impacts to neighborhoods and the environment have been considered. The DEIS does not examine those issues, although these questions and concerns have been raised with MDOT and VDOT, and it remains unclear to what extent these issues have been considered by the

[255] Addendum No. 2 and 3, Phase 1 of the I-495 & I-270 Public-Private Partnership (P3) Program Request for Qualifications (RFQ), MDOT SHA, at 2, 1 (Mar 23, 2020), https://bgbid.bidtbmyt.org/accc44w55562d0d09e788&sver=15snbver=2311.

[256] Id.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 165

The document does recognize other induced travel ("induced demand") as a factor, but concludes that it will have only a minor impact: "Induced demand represents new trips. While the project may generate some new trips, MWCOG modeling shows that the amount of induced demand caused directly by the project would be less than 1% of the total VMT in the region."[251]

Land use changes that could be a result of highway widening are explicitly *not* considered in the DEIS: "There is little room for increased land use along I-270 and I-495 in the areas (sic) already built out, and the model already accounts for changes in land use in areas further from these facilities."[252]

It seems likely that this DEIS is a case of traffic modeling (here by the MWCOG traffic model) underestimating VMT differential between the build cases and the no-build cases (see Volker item 6 above).

We recommend that DEIS be tasked with using the Volker et al. Induced Travel Calculator to provide a more accurate picture of the reduced travel that would be generated by the highway widening.

O. **The DEIS Does Not Adequately Examine The American Legion Bridge Conferences**

The DEIS fails to take a hard look at the environmental impacts of continuing the American Legion Bridge. The impacts from the Bridge reconstruction and widening go well beyond a traditional highway expansion.[253] The Bridge's reconstruction will significantly impact the traffic costs and benefits of the Project, including potential bottlenecks, as well as air emission and hotspots.

The station, plans, and risks relating to the Bridge reconstruction remain unknown to the public. The "Bi-state Capital Beltway Accord" announced on November 12, 2019 by Governors Hogan and Northam merely represents an "agreement on principals," not a written agreement.[254] Shortlisted proposers were perplexed about the Capital Beltway Accord; MDOT and VDOT asked:

The RFQ mentions that MDOT and VDOT intend to enter into a bi-state, bipartisan accord regarding the coordination of the Project within Virginia. MDOT indicated

[251] Id.

[252] Id.

[253] See, e.g., the extensive considerations and mitigations undertaken for the Woodrow Wilson Bridge: Woodrow Wilson Bridge Improvement Study Supplemental Draft Environmental Impact Statement I-95/I-495 Dedication, FHWA and Virginia Department of Transportation (June 1996), https://babel.hathitrust.org/cgi/pt?id=uiug.30112055020296788&view=1up&seq=1 (see chapter-1).

[254] I-495 & I-270 P3 Program Phase 1 Transaction Summary, at 6.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 146 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 167

Agencies. (f, et al.[257] The Project's cumulative impacts should include the Potomac Heritage Trail, (George Washington Parkway), and any other federal, state or local parklands and natural resources relating to the American Legion Bridge and 495 Next project in Virginia.

**V.    NEPA Procedural Problems**

1.    **The Agencies Violated NEPA by Initially Providing the Public with an Incomplete DEIS and then Adding Appendices Without Notifying the Public**

NEPA requires that FHWA "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures[,]" "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected[,]" and "[i]n all cases … mail notice to those who have requested it on an individual action." 40 C.F.R. § 1506.6 (2019). NEPA also required the Agencies to circulate the appendices together with the DEIS or make them readily available upon request. 40 C.F.R. § 1502.18 (2019); 40 C.F.R. § 1502.19 (2020). Specifically, the Agencies:

must circulate the draft EIS for comment. The draft EIS must be made available to the public and transmitted to agencies for comment no later than the time the document is filed with the Environmental Protection Agency in accordance with 40 CFR 1506.9. The draft EIS must be transmitted to:

(1) Public officials, interest groups, and members of the public known to have an interest in the proposed action or the draft EIS.

23 C.F.R. § 771.123(i).

The Agencies instructed the interested public to sign up for email updates about the DEIS. On Friday, July 10, the Agencies announced on the Project's website and emailed those who signed up for notifications that the DEIS, including supporting traffic, environmental, engineering and financial analysis, was available online at 495-270-P3.com DEIS.

As noted, a number of people went to that website and downloaded the DEIS's PDF files to start their review, including reviewers within and members of the Organizations.[258] The public had every right to expect that the files on the website the Agencies directed them to contained the draft EIS.

[257] See Letter from VDOT and MDOT to Sierra Club re 495 Next, (Nov. 2, 2020); Letter from Sierra Club to VDOT and MDOT re 495 Next, (Sept. 30, 2020).

[258] The Organizations do not know how many people downloaded the wrong files on July 10 and 11, but the Agencies certainly do. The Organizations request that the Agencies disclose that number.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 168

DEIS and supporting information. The public had every right to start using their limited time to review and comment on the files on the website.

However, seven weeks later, on August 18, 2020, it was reported in the media that the files available on 495-270-P3.com DEIS on July 10 and July 11 were incomplete and that at some point on July 11, MDOT SHA added a new appendix and modified another appendix, adding about 1,700 new pages.[259] The Agencies claimed that the new information was added on Saturday, July 11.[259] Disturbingly, despite having the ability to notify the public about the added files through emails, publication in the Federal Register, or other means, the Agencies kept this change secret. As a result, the Agencies left many people reviewing and working on comments based on the incomplete DEIS for over a month.

If that were not bad enough, the Agencies still did not inform the public of the new files even after some local reports indicated their existence, with the result that many people continue to review the incorrect DEIS on 495.com DEIS downloaded from the posted DEIS after July 10. After discovering the unannounced and unexplained DEIS changes, on August 22, 2020, the Organizations wrote to the Agencies requesting that the Agencies:

1.    Announce to the public that the DEIS downloaded from the 495-270-P3.com DEIS website on July 10 was incomplete;

2.    Provide an itemized list of changes made to the posted DEIS after July 10, and when these changes were made; and

3.    Extend the comment period to 90 days from the day of that announcement.

The Organizations explained that by law, the public is entitled to review the complete DEIS and the Agencies are required to circulate appendices or make them readily available upon request. The Organizations further explained that everyone who downloaded the files was unknowingly reviewing incomplete information. The Organizations also requested a count of how many people downloaded the incomplete documents on July 10. The Organizations explained that the 90 day comment period should not begin until the Agencies informed the public that they were reviewing incomplete information; otherwise, the comment period would be arbitrarily shortened

[259] Louis Peck, *UPDATED: State's I-495/I-270 Study Expanded Without Proper Notice, Regional Agency Complains*, Bethesda Magazine (Aug. 18, 2020), https://bethesdamagazine.com/bethesda-beat/transportation/states-i-495-i-270-study-expanded-without-proper-notice-regional-agency-complains/; Bruce DePuyt, *Local Planners Fume Over Unreported Additions to Highway Document*, Maryland Matters (Aug. 18, 2020), https://www.marylandmatters.org/2020/08/18/local-planners-fume-over-unreported-additions-to-highway-document/.

[260] A "Wayback Machine" website captured from the morning of Saturday, July 11 shows the website still containing the incorrect DEIS. http://web.archive.org/web/20200711094558/https://495-270-p3.com/DEIS/.

00022722

CO-512

JA1716





Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 169

for these people or, even worse, leaves some of the public commenting on incomplete information. Last, the Organizations requested that the Agencies add public hearings at least 15 days after providing notice to the public that the posted DEIS was incomplete.

On September 8, 2020, MDOT SHA responded by confirming that the DEIS and supporting appendices on the website were incomplete as of July 10 and that two new appendices were uploaded sometime on July 11 after the initial release. The response ignored the bulk of the Organizations' requests, but said

Considering the clarification of the facts regarding publication and availability of the DEIS and Technical Reports on July 10, we will not provide for further extending the comment period on the grounds that the DEIS was not complete.

This response is insufficient and the Agencies' actions with respect to their error render the process unlawful. As explained in the Organizations' letter, an untold number of people were reviewing an incomplete DEIS from July 10 until August 18. An untold number of people still are reviewing an incomplete DEIS and will be submitting comments based on the incomplete DEIS. The Organizations have attempted to inform their reviewers and members of this problem and make sure they submit comments based on the complete DEIS. However, the Organizations cannot reach everyone, and it is not in any event their obligation to inform the public. There is no justifiable reason why on July 11, August 18, or even September 8, the Agencies did not send out a simple notification to the public explaining the error and informing them that they could download the corrected DEIS files. Until the Agencies do so, and provide additional time to comment, they cannot legally proceed with the NEPA process.

Moreover, sometime after August 26, a month and a half after releasing the DEIS, the Agencies changed the title of one of the appendices: "Appendix A & B: MD 200 Diversion Alternative Analysis Results Paper" was changed to "Appendix A & B: MD 200 Diversion Alternatives Analysis Results Paper and Alternative 9 Modified Preliminary Evaluation."[50] The Agencies again made this change without informing the public. The Organizations and the public have to ensure they are reviewing the right ones, because the Agencies keep changing what is posted as the DEIS without providing notice to the public. The Organizations and the public still cannot be confident they are reviewing the correct version of the DEIS.

The Organizations therefore request that the Agencies:

1. Announce to the public that the DEIS downloaded from the 495-270-P3.com/DEIS website on July 10 was incomplete;

2. Provide an itemized list of changes made to the posted DEIS after July 10, and state when these changes were made;

[50] See https://web.archive.org/web/20200826182138/https:/495-270-p3.com/deis/#DEIS

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 170

3. Extend the comment period to 90 days from the date of that announcement; and

4. Add public hearings at least 15 days after providing notice to the public that the posted DEIS was incomplete.

2. **The Agencies Systematically Downplayed and Miscounted Public Comments Opposing the Project**

According to the DEIS, MDOT SHA received over 2,900 public comment submissions over the Project's three public comment periods. DEIS, at 5-2. Under the NEPA process, MDOT SHA was required to collect, report on, and respond to public comments. Instead of transparently documenting the number of comments that were opposed to part or all of the Project, MDOT SHA employed policies and practices that kept opposition comments from being accurately labeled and fully counted in reported data. The information presented below shows how MDOT SHA's downplayed opposition comments.

i. MDOT SHA's Undercounted Opposition Comments

MDOT SHA quantified and reported on the content of public comments by tabulating the theme labels it assigns to each comment. MDOT SHA established a policy to label a comment as being in opposition to the Project only if the submitter used exactly the right words. No comparable stipulation was made for pro-Project comments. MDOT SHA's stated that:

"Opposition to I-495 & I-270 Managed Lanes Study" was typically only selected [as a theme label] when a submitter stated it directly. Otherwise, opposition or critical sentiments toward the Study proposed improvements may be interpreted through [such themes as] "Support for Alternative Transportation Improvements," "Effectiveness of Proposed Alternatives at Addressing Traffic," "Support for Transit," or "Support for Alternative 1-No-Build"

A clear example of how this played out is the unequal treatment of an opposition letter signed by multiple grassroots groups and a pro-Project letter signed by multiple business groups.[51]

1. The opposition letter spoke of the "egregious failure" of Project alternatives. MDOT SHA's gave the letter the following three theme labels, none of which indicate opposition of any kind:

[51] See The first letter is from the Maryland Transit Opportunities Coalition (MTOC), *Summary of Public and Stakeholder Engagement for the Recommended ARDS*, at PDF page 419. The second letter is from regional businesses, id., at PDF page 446. MDOT SHA's assigned labels for the MTOC letter can be seen on page 292 and for the business groups' letter on page 294 of the referenced document.

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 148 of 340



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 171

- "I-495 & I-270 Managed Lanes Study Process/NEPA"
- "Public-Private Partnership Program"
- "Support for Transit"

2. In contrast, the business groups' pro-Project letter – nearly identical in length to the opposition letter – received seven theme labels, five of which call out support, even though the letter writers used the word "support" only once:

  - "Public-Private Partnership Program"
  - "Regional Economy"
  - "Support for General Price-Managed Toll Lanes"
  - "Support for High-Occupancy Vehicle Lanes"
  - "Support for I-495 & I-270 Managed Lane Study"
  - "Support for Specific ARDS Build Alternative"
  - "Support for Transit"

3. MDOT SHA interpreted multiple instances of support in the pro-Project letter.

4. But MDOT SHA failed to interpret any opposition in the letter that speaks of the Project's "egregious failures."

5. This disparity is significant because this process leads to inaccurate representation of comments that do not support the Project or P3 Program. In the case of these two letters, the theme label count is 0 instances of opposition and 5 instances of support.

The following is a representative example of the significant number of individual submissions assigned theme labels that nullified the writers' opposition to the Project:

6. "Terrible idea! You're going to adversely impact quality of life and potentially adversely impact property values for an entire community with no likely long-term benefit to the traffic conditions in Montgomery County. This looks like a fast-moving train by financially interested parties, with no concern for affected Montgomery homeowners. The Governor should care about these voters' concerns and rights! Over the long haul, this will reduce the excellence of one of our school systems in the country because of impact on community." *MDOT Summary*, App. C. at 10.

7. MDOT SHA did not label this submission as opposing anything. The comment's three assigned theme labels effectively hide the writer's voice and intent:

  - "Property/Community Impacts"

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 172

- "Effectiveness of Proposed Alts. in Addressing Traffic"
- "I-495 & I-270 Managed Lanes Study Process/NEPA"

  b. MDOT SHA Says Opposition Must Be "Interpreted" from the Theme Labels, but MDOT Makes That Impossible

MDOT SHA chose overly broad and opaque theme labels that did not effectively convey the points found in opposition submissions. MDOT SHA's themes worked to confuse, neutralize, and hide the content of public opposition comments. MDOT SHA even acknowledged this subterfuge, stating: "[c]omments under neutral themes (i.e., comment themes without 'support' or 'opposition') are not necessarily neutral in tone." *Summary of Public and Stakeholder Engagement for the Recommended PDEIS* at 21. In the DEIS process for a P3 Program as large, costly, long, consequential, and controversial as this one, there is no excuse for not having a menu of theme labels that reflect the Project and capture and convey the public's reaction to it. Anything less, including what we see here, violates the intent of the NEPA public comment process.

Additionally, the numbers, names, and definitions of MDOT SHA's theme labels varied significantly across the three comment periods, making it impossible to compare theme totals, or to "interpret" what the public said about the project in the aggregate.

- The first public comment period had 17 themes; the second comment period had 7; the third comment period had 58. *DEIS*, App. P, at 17, 32-33, 52-56.

- The names and definitions of the themes changed between comment periods:
  ○ The theme "Environmental" in the first comment period is defined as "Mentioned environmental aspects, such as wildlife and natural resources." *Id.*, at 16.
  ○ The theme "Environmental Considerations" in the second period covered natural resources and wildlife habitat, traffic noise levels, vehicle emissions, air quality, residential property, and overall quality of life. (*Stormwater, Public Workshop Summary*, at 16-17 (Jan. 2019)). Including opposition comments about "residential property" and "overall quality of life" under Environmental Considerations in this context is the same as burying those comments.
  ○ The theme "General Environmental Impacts" in the third period meant general pollution and potential physical impacts to the environment. *DEIS*, App. P, at 53.

- The definitions of themes became increasingly opaque from one comment period to the next. In the first period, at least some of definitions included the word "concerns" indicating, for instance, that a comment labeled "Noise" was about "Specific noise concern." *DEIS*, App. P, at 17. By the second and third periods, the word "concerns" disappeared, and all theme labels just indicated that the commenter made a statement,

00022724

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 149 of 340

OP·LANES™ MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 173

question, or suggestion about the theme. Most theme labels gave no indication of the writer's opinion or point of view.

For the second comment period, MDOT SHA did not provide a matrix showing each individual comment matched to its theme labels. We know the matching was done because there are cumulative totals in the summary table in the Alternative Public Workshops Summary, Appendix C, at PDF page 55. We also know because MDOT SHA speaks in vague terms about it: "A number of comment submissions stated preference for HOV lanes, opposition to HOV lanes or suggestion on how to most effectively implement HOV lanes in the Study, and questions about tolling." DEIS, App. P, at 32.

But for the second comment period, we cannot see individual comments matched to their MDOT SHA comment labels. This disadvantages opposition comments:

- ○ The second comment period had the largest number of submissions: 2,282.
- ○ The majority of comments were from Rockville and Silver Spring, DEIS, App. P, at 32, where levels of opposition to the Project were – and remain – high.
- ○ That means we would expect that many of the comments submissions during this comment period would have been in opposition to the Project.
- ○ Without the ability to see comments matched with their theme labels, the public cannot verify the accuracy of MDOT SHA's labeling and characterizations and no way to hold MDOT SHA responsible for mislabeling and miscounting.
- ○ The voices of opposition comment submitters are lost.

**i.    MDOT SHA's Decisions Regarding Which Comment Submissions to Include in Its Totals Led to Undercounting of Opposition Comments**

The following examples show how MDOT SHA's "gatekeeper" decisions disfavored opposition submissions. MDOT SHA counted two opposition petitions, with a total of 1,950 signatures, as only two comments in the official tally:

8. In MDOT SHA's own words: "Petitions were received from Growing [East County (with 1,323 signatures) and Sierra Club Maryland Chapter (with 627 signatures). Each petition was counted as one comment submission." *Alternative Public Workshops Summary* at 14.

9. MDOT SHA did this, even though the submitter of the Growing East County petition wrote: "Attached are signatures and comments . . . in opposition to the proposed Beltway widening. Contact information for each of this petition signers can be provided if necessary for the public record." *Id.* at 97 (emphasis added).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 174

In contrast, MDOT SHA appeared to count supportive submissions with identical content as discrete submissions. In MDOT SHA's own words: "Submissions with almost identical content in support of the Study accounted for 141 submissions containing the 'Support for I-495 & I-270 Managed Lanes Study' comment theme" *Summary of Public and Stakeholder Engagement For the Environmental Impact EIS*, at 21. Of the 157 comments listed in the ARDS (final summary table, *id.* at 21-22, as being in support of the Managed Lanes Study, 141 seem to be, by MDOT's submission, cut-and-pastes of identical text. Contrast that with 1,950 opposition petition signers being counted as only two.

Comments received by telephone during the second comment period, as recorded in the *Alternative Public Workshops Summary* table (PDF page 55), show 115 calls received: 12 of the callers were counted as not supporting the Managed Lanes Study. However, one of the 115 lines detailing those calls says, "8/8/2018: 26 calls captured – Opposed to project – destroy homes, community – Rockville" (PDF page 57). Those 26 opposition calls were counted as only one call.

**ii.    MDOT SHA's Treatment of Opposition Comments Makes Its Final Accounting Not Credible**

Given MDOT SHA's treatment of opposition comments, it should come as no surprise that the final comment period's Summary of Comments by Theme table, in quantifying the 1,873 comments found in 1,035 submissions, identified only 335 comments, or less than 10%, as opposing anything at all. *Summary of Public and Stakeholder Engagement for the Recommended SEIS*, at 21-22. Even with the addition of the 81 comments labeled "Support for Alternative 1-No Build," the total shown as opposing the project is under 11%. As the information presented here indicates, significant opposition to the Project is hidden. *Id.* This accounting is not credible and not acceptable.

MDOT SHA was required to fully and accurately report on public comments as part of the NEPA process. The evidence of biased policies, processes, and practices, and the resulting minimizing of public opposition to the Project shows MDOT SHA has not complied with this requirement. MDOT SHA must correct the record of all three public comment periods. We urge MDOT SHA to:

1. create new menus of themes that enable the truthful and accurate capture of opposition comments;
2. relabel all comment submissions using the new menus of themes; and
3. compile individual comment theme-label matrices and summary tables for all three comment periods and make them easily accessible by the public.

For the current DEIS public comment period, MDOT SHA must ensure that all opposition comments are fully, accurately, and publicly labeled and reported on.

JA1719

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 150 of 340

00022726

---



I-495 & I-270 Managed Lanes Study

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 175

**3.  The Agencies' Decision to Hold Public Hearings During a Time that Guaranteed Lower Public Participation**

The inopportune timing of this Project's public hearings did not escape attention. That timing, combined with other actions taken by MDOT, bolsters the appearance of a desire to suppress public engagement and participation to mask the heavy opposition to the Project. Several op-eds raised concerns with the timing of the public hearings. Two examples are provided below.

This one was published before the hearings:[263]

Gov. Larry Hogan's proposed I-495/I-270 project will influence transportation and economic development in the Washington region for the next 50 years. Given the potential consequences of this project, it is inexplicable why the Maryland Department of Transportation is holding the bulk of its public hearing in August.

If you have any familiarity with politics, you know that August is the Valley of Death for public participation – a time to sneak through the unwanted and unacceptable. While the August hearings will be online, the reality is that even more than ever they are totally inappropriate.

Many citizens are desperately focused on their jobs, worried about food and even being evicted. School and children are an existential preoccupation. Does school open? Are my kids safe? What do I do for child care if they are at home? These are just some of the concerns.

With an increasing COVID-19 infection rate in Maryland it is hardly the time that the public will be thinking about something that is not an immediate crisis.

This one was published after the hearings:[264]

If the goal was to maximize public participation, the timing of this hearings couldn't have been worse, in the middle of a pandemic, an economic crisis, massive unemployment, a superheated presidential campaign, and unprecedented weather events. During the second and final in-person hearing on Sept. 10 in Rockville, the day I testified, the area was paralyzed by a torrential rainstorm and flash flooding.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 176

**4.  The Agencies' Refusal to Provide Underlying Environmental Data, Files and Referenced Documents in the DEIS Hinders Meaningful Public Review and Violates NEPA**

The CEQ regulations implementing NEPA require that the Agencies:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

∙ ∙ ∙

(d) Solicit appropriate information from the public:

∙ ∙ ∙

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

40 C.F.R. § 1506.6 (2019); *id.* § 1506.6 (2020). Moreover, NEPA requires that Agencies "insure the professional integrity, including scientific integrity, of the discussions and analysis in environmental impact statements [and] shall identify any methodologies used." *Id.* § 1502.24 (2019); *cf.* § 1502.23 (2020). "NEPA's procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (2019).

The CEQ regulations explain that:

Agencies shall incorporate material into an environmental statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited (the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

---

263 Arthur Katz, *Opinion: What's the Hurry on Governor's I-495, I-270 Project?* Maryland Matters (Aug. 1, 2020), https://www.marylandmatters.org/2020/08/01/opinion-whats-the-hurry-on-governors-i495-i270-project/.

264 Gary Hodge, *The Fatally Flawed Scheme to Outsource Md.'s Highways to Toll-Road Profiteers,* Maryland Matters (Sept. 21, 2020), https://www.marylandmatters.org/2020/09/21/gary-hodge-the-fatally-flawed-scheme-to-outsource-md-s-highways-to-toll-road-profiteers/.

---

CO-516

JA1720

OP LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 136

*Id.* § 1502.21 (2019) (emphasis added); *id.* § 1501.12 (2020). The public's review and comment is important and the Agencies' decision-making must be informed by it. *Id.* §§ 1501.8(b), 1503.4(a), 1505.2(b) (2020).

"To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions." *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015); *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir. 2008) (NEPA requires agencies "to take a 'hard look' at how the choices before them affect the environment, and then to place their data and conclusions before the public"). NEPA's EIS requirement "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). It would be arbitrary and capricious to take action without data needed to carefully consider whether a project would have a significant environmental impact and without providing data to the public during the NEPA process to allow the opportunity to participate in the decisionmaking process. *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2012).

Ultimately, FHWA, as the lead Agency, is responsible for the accuracy, scope, and content of environmental documents prepared by the Agency, MDOT SHA, or a contractor, and must independently evaluate the information. 40 C.F.R. § 1506.5 (2019); 23 C.F.R. § 771.09(c).

The DEIS references materials such as MDOT SHA's 2004/2005 Capital Beltway Study, MDOT SHA's 2017 Highway Construction Cost Estimating Manual, and tool costs from the March 2018 and July 2019 Common Item Guides, discussed in Section A above, but the Agencies did not make these documents reasonably available for public review within the time allowed for comment. Further, the DEIS reaches conclusions based on traffic modeling and data files that have not been made available for public review. The Organizations have tried to work with the Agencies to obtain the data underlying the DEIS process. And FHWA cannot abdicate its responsibility for the NEPA process by claiming it does not have data that underlie the DEIS's conclusions. FHWA must independently verify these conclusions, which it cannot do without reviewing the underlying data. Moreover, FHWA is independently responsible for compliance with NEPA, and must obtain and publicly provide data underlying the DEIS's conclusions. The Agencies must make available to the public the materials referenced in the DEIS and the data the Agencies need to reach their conclusions, and provide the public with additional time to review and comment on the DEIS with the benefit of this material.

    ii.    **The Agencies Refused to Provide Copies of the MDOT SHA's 2004/2005 Capital Beltway Study Despite Their Reliance on it in the DEIS and the Organizations' Specific Request for it**

The MDOT SHA's 2004/2005 Capital Beltway Study is referenced in the DEIS in the following places:

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 137

Management strategies were evaluated in several prior studies for these corridors: Capital Beltway Study, I-270 Multi-modal Corridor Study, and the West Side Mobility Study. The management strategies previously evaluated in these prior studies include HOV, High-occupancy toll (HOT), or express toll lanes (ETLs).

DEIS, at 1-7.

Data from the 2006 MDOT SHA Draft Capital Beltway Study, Natural Environmental Technical Report (NETR) and the 2017 MDOT SHA I-270 ICM Project provide vegetation cover type information that remains applicable within the Maryland portions of the corridor study boundary.

DEIS, at 4-98.

In 2003, the transit and highway portions of the Capital Beltway/Purple Line Study were separated into two independent studies, the Purple Line Project and the Capital Beltway Study (MDOT SHA et al., 2013), with the justification that both projects were needed to meet the demands of the corridor. . . .

The 2004 Capital Beltway Study focused on roadway improvements that would address congestion of the Beltway. MDOT SHA carried three alternatives forward into the Alternatives Retained for Detailed Study (ARDS): 1) No-build; 2) Build Alternative 2 – six general-purpose and four ETLs, and 3) Build Alternative 3 – eight general-purpose and two ETLs. In 2004, environmental technical reports were completed analyzing the potential impacts to these three alternatives, in anticipation of completing the NEPA process. However, due to changes in transportation priorities, the NEPA process of the Capital Beltway Study was not completed and a Draft Environmental Impact Statement was not published.

DEIS, at 4-6.

Alternatives development and evaluation for the I-495 & I-270 Managed Lanes Study was informed by . . . the Capital Beltway/Purple Line Study . . . the 2004 Capital Beltway Study . . . Each of these studies included, in part, proposed transportation solutions reflecting some of the operational and/or engineering alternatives that were considered in development of the Preliminary Range of Alternatives. In particular, the studies evaluated the implementation of managed lanes including ETLs, HOV lanes, HOT lanes and parallel transit facilities on I-495, I-270, and I-95. These studies considered the potential to provide additional capacity along I-495 and I-270 that would connect with other regional transportation facilities. The solutions retained in these studies are listed in the respective sections below.

DEIS, App. B, at 9.

CO-517

00022727

JA1721

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 179

The 2004 Capital Beltway Study focused on roadway improvements that would address congestion on the Beltway from the American Legion Bridge to the Woodrow Wilson Bridge. MDOT SHA carried three alternatives forward into the Alternatives Retained for Detailed Study (ARDS): 1) No Build; 2) Build Alternative 2 – six GP lanes and four ETLs; and 3) Build Alternative 3 – eight GP lanes and two ETLs. In 2005, preliminary environmental technical reports were prepared analyzing the potential impacts to these three alternatives, in anticipation of completing the NEPA process. However, due to changes in transportation priorities, the NEPA process for the Capital Beltway Study was not completed and a DEIS was not published. A brief description of the ARDS, excluding the No Build, is provided below.

3.4.1 Alternative 2 – 6&4 Build Alternative (6 General Purpose & 4 Express Toll Lanes include TSM Transportation Demand Management (TDM) Strategies)

This alternative would have provided one additional lane per direction that would have been tolled and would have converted one existing GP lane per direction to be tolled. Both lanes would have been concurrent flow and marked using pavement striping (no barrier separation from the GP lanes). The proposed typical section would have included six GP lanes and four ETLs (Figure 3-1).

TSM/TDM included measures to optimize the existing transportation system (TSM) and measures to affect the demand on the existing system (TDM). The strategies were improvements that would have increased safety and enhanced operation without any increase to lane capacity. The TDM strategies focused on system demand and techniques to change drivers' behavior. Typical solutions would have included modest interchange improvements, employer participating flexible work hour or telecommuting programs, and parking restrictions/fees.

3.4.2 Alternative 3 – 8&2 Build Alternative (8 General Purpose & 2 Express Toll Lanes includes TSM/TDM Strategies)

This alternative would have provided one additional concurrent flow (no barrier separation) lane per direction that would have been tolled. The typical section would have included eight GP lanes and two ETLs (Figure 3-2). A modified version of Alternative 3 has been included in this study as Alternative 5. More detail on Alternative 5 is provided in Section 4.2.

*Id. at 10-12 (footnotes omitted).*

MDOT SHA, MDOT MTA, and VDOT have performed numerous studies to evaluate a myriad of transportation solutions on I-495 and I-270. Options from the previous studies and planning documents were incorporated into the list of Preliminary Range of Alternatives for this Study. In particular, MDOT SHA reviewed alternatives that had been assessed to some level of detail from the following studies: the 1998 Capital Beltway HOV Feasibility Study, 2002 Capital

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 180

Beltway/Purple Line Study, 2002 I-270/US 15 Multi-Modal Corridor Study, 2004 Capital Beltway Study, and the 2009 West Side Mobility Study.

*Id.* at 19.

Existing forest canopy conditions within the Maryland portion of the corridor study boundary were identified based on field investigations from MDOT SHA's 2006 Capital Beltway Study and 2017 I-270 ICM Program and GIS desktop review of Chesapeake Conservancy Conservation Innovation Center High Resolution Data of forest canopy.

*Id.* at 116.

The possibility and uncertainty of airborne or subsurface contaminant migration from an off-site location was assessed by evaluating potential sites of concern within a one-quarter mile buffer of each of the screened alternative LODs (the hazardous materials investigation area, see corridor overview map in Appendix D). For continuity and comparison with previous NEPA investigation along the I-495 corridor, the assessment of sites of concern uses a methodology comparable with the 2005 Initial Site Assessment for the Capital Beltway Study (MDOT SHA, 2005).

DEIS, App. K, at 10.

Each site of concern within the hazardous materials investigation area was evaluated and given a ranking based on a combination of the data review, site reconnaissance findings and distance from the LOD for each Alternative. Because Alternatives 8 and 9 have the same LOD, these Alternatives were evaluated as a single Alternative. Seven criteria were used to rank the sites of concern based on the general ranking methodology used in the Draft, December 2005 Initial Site Assessment Capital Beltway Study to allow for consistency and comparison between the investigations.

*Id.* at 11.

Data from the 2006 MDOT SHA, Draft Capital Beltway Study, Natural Environmental Technical Report (NETR) and the 2017 MDOT SHA, I-270 ICM Project provide vegetation cover type information that remains applicable within the Maryland portions of the corridor study boundary.

Descriptions of land cover included below were adapted from the Draft Capital Beltway Study NETR (MDOT SHA, 2006) and the I-270 ICM Program field investigation. Although the Draft Capital Beltway Study NETR information was collected in 2006, the land cover are all provided by the same based on windshield survey and aerial review; therefore, the data collected for this purpose remains valid.



USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 152 of 340

00022728

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 153 of 340



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 181

DEIS, App. L, at 96.

Moreover, the DEIS lists the 2004/2005 Capital Beltway Study as a reference in Appendix K and Appendix L (without a link to or description of where to find the study). The Agencies clearly referenced, considered, and relied on this study to make decisions regarding the current DEIS, its scope, and its methodology.

The Organizations searched for this study in order to meaningfully review and provide comment on the DEIS, but they could not find it. Accordingly, on July 21, 2020, the Organizations sent the following email to the Agencies:

In our review of the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement, we noticed that the DEIS references and relies on data from an MDOT SHA Capital Beltway Study, but we could not find that study on the 495-270-p3.com website or linked in the references sections. *See* Draft Environmental Impact Statement, at 1-7, 4-98; Appendix L, at 96; *see also* Letter from Pete K. Rahn, MDOT Secretary, to Montgomery County Council Members, at 7 https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2018/180911/20180911_3.pdf ("The framework for the plan was developed based on previous studies including the Capital Beltway Planning Study.... These previous studies contains valuable technical information and will provide insight as MDOT delivers transformative, innovative solutions.").

We request that you provide that study and its accompanying data on 495-270-p3.com or by email. If it is already available online, please direct us to that location.

The Agencies' response did not comply with NEPA. First, on August 3, 2020, MDOT responded by treating the Organizations' email as a Maryland Public Information Act Request. MDOT stated that it was providing an incomplete preliminary draft copy of the Capital Beltway Study's Natural Environmental Technical Report, with redactions based on the deliberative process privilege and intra-agency memoranda privilege. MDOT stated that the document requested is a rough draft that was never finalized and that redacted sections of the National Environmental Technical Report contain "very preliminary interpretive analysis of yet defined alternatives for that project." MDOT now considers this request closed." MDOT provided 8 PDFs from the Study's Natural Environmental Technical Report: 1) unredacted cover pages, 2) an unredacted table of contents, 3) an unredacted introduction chapter, 4) an unredacted chapter describing the affected environment, 5) a completely redacted chapter that analyzed the environmental consequences, 6) an unredacted reference list, 7) an appendix of wetland descriptions, and 8) another appendix of wetland descriptions.

The letter ignored the Organizations' request for the Capital Beltway Study itself, including the study's nine other technical reports,[20] rather than only the Natural Environmental

[20] The Capital Beltway Study also includes: Socioeconomic and Land Use Technical Report, Secondary and Cumulative Effects Analysis Technical Memorandum, Section 4 Evaluation, Air Quality Technical Report, Noise and Vibration Technical Report, Traffic Analysis Technical

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 182

Technical Report. That would be like providing Appendix L to the DEIS in response to a request for the DEIS. It also was misleading in that MDOT's response could be taken to mean that the one report/appendix was the entirety of the study. Moreover, the Environmental Consequences chapter of the Natural Environmental Technical Report that was provided was entirely redacted, making review impossible.

On August 27, 2020, Heath Parikh, from FHWA, followed up on MDOT's response by email stating:

The purpose of the reference to the Capital Beltway Study was to indicate that traffic management solutions have been the subject of several previous studies, i.e. the Capital Beltway Study, I-270 Multi-modal Corridor Study, and the West Side Mobility Study (DEIS pg. 1-7) and to draw upon previous data collection efforts related to vegetation cover type information in the study area (DEIS pg. 4-98 and DEIS Appendix L pg. 96). Though the report was never finalized in its entirety, the information the DEIS referred to was accurate for the purpose it was referenced.

We understand that MDOT SHA has provided you a redacted copy of the draft report containing information referenced in the DEIS. To reduce confusion over the purpose of this reference and to clarify conclusions were not being drawn from a draft report, the Final Environmental Impact Statement (FEIS) will remove references to the Draft Capital Beltway Report. All comments will be reviewed and considered in the FEIS.

This response is nonsense. First, the Capital Beltway Study is clearly referenced and relied upon for additional reasons beyond merely indicating it was previously studied. *See, e.g.*, DEIS, App. B, at 11 (explaining that a modified version of a Capital Beltway Study alternative was included in this study); DEIS, App. K, at 10, 11 (claiming to use the same or a comparable methodology for hazardous materials assessment to that in the Capital Beltway Study, but not providing the Capital Beltway Study for review). Moreover, MDOT has officially stated that the framework for this plan was developed based on the Capital Beltway Planning Study.[28]

Report, Assessment of Effects to Archaeological and Historical Properties, Phase I Archaeological Identification Survey for the I-495 Capital Beltway Mainline Project and Storm Water Management Ponds, and Preliminary Survey Assessment of Transportation Corridor Alignments (I/A/2M/A/T).

[28] Letter from Pete K. Rahn, Maryland Department of Transportation to Roger Berliner, Nancy Floreen, and Tom Hucker, Montgomery County Council, at 2 (Oct. 23, 2017), available as PDF page 7 of 2018-09-07-Managed Lanes Study Briefing with Letters Attached. https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2018/180911/20180911_3.pdf

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 154 of 340

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 183

Second, regardless of the Agencies' stated purpose for referencing the study in the DEIS, the Agencies must by law provide the public the opportunity to review the referenced study and comment on how it is used in the DEIS, as explained above.

Third, removing any reference in the final EIS to a document that was relied upon in the DEIS does not remove the Agencies' legal obligation to make the referenced document publicly available. Instead FHWA's action seems to be an attempt to conceal the Agencies' failure to comply with the law.

The Organizations tried again to obtain copies of the referenced materials, and sent the following email on September 8, 2020, to MDOT SHA and FHWA:

Thank you for your response. To clarify, did MDOT SHA or FHWA consider any information from the full Capital Beltway Study in developing the DEIS beyond the unreduced information provided by MDOT SHA on August 3? That includes information considered in the references noted below and anywhere else in the DEIS (potential other places such as Appendix B, Appendix E, Appendix K.) If so, we request those documents, unreduced, as soon as possible, in order to meaningfully analyze and comment on the DEIS.

On September 22, 2020, MDOT responded:

The MDOT SHA did not consider any additional information beyond the records previously provided to you on August 3, 2020. Therefore, the MDOT SHA has no additional records responsive to your request and now considers this request closed.

This response beggars belief and is contradicted by former MDOT SHA Secretary of Transportation Pete Rahn's 2017 letter to Montgomery County Council Transportation, Infrastructure, Energy & Environment Committee, which stated, "[t]he framework for the plan was developed based on previous studies including the Capital Beltway Planning Study, West Side Mobility Study, I-270 Multi-Modal Corridor Study."[367] The Agencies clearly relied on information in the Capital Beltway Study that make decisions impacting the DEIS, which will also impact a final EIS, or they would not have referenced it in all the instances noted above. Yet the Agencies refuse to provide the Capital Beltway Study to the public.

The information discussed and described in the DEIS from the Capital Beltway Study is not found in the unreduced parts of the provided Capital Beltway Study Natural Environmental Technical Report. The public therefore has no way to review, evaluate, or comment on those statements. To the extent MDOT SHA (or FHWA) truly did not consider any additional information beyond the unreduced sections of the Natural Environmental Technical Report, that omission would be arbitrary and capricious; there is no justification for the failure to ignore the majority of a study that examined the exact same issues—whether and how to expand the Beltway—as the current DEIS is looking at.

367 Id.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 184

Moreover, the Agencies' statement in the DEIS that "the NEPA process of the Capital Beltway Study was not completed and a Draft Environmental Purpose Statement was not published," "due to changes in transportation priorities," is disingenuous. See DEIS, App. B, at 10. First, the Organizations request that the Agencies explain what this statement is based on and what the changes in transportation priorities were. If the only thing that was examined in the Capital Beltway Study was the limited unreduced portion of the Natural Environmental Technical Report, how would the Agencies know why the Capital Beltway Study's NEPA process was not completed? The Organizations further request all information the Agencies possess regarding the reasons that NEPA process was discontinued. The Agencies' refusal to provide the study and its supporting information prevents the public from meaningfully evaluating the Agencies' claim.

The NEPA process for the Capital Beltway Study apparently showed that widening the Beltway by two lanes per side was not feasible[368], and that determination may have been a reason why the NEPA process was not completed. The "analysis found that four additional lanes could fit on Maryland's portion of the Beltway if they were double-decked 80 feet in the air —

368 Other MDOT SHA studies come to the same conclusion, finding that only one lane per side should be considered. The I-270 Multimodal Study of 2004 states: "Only one additional lane is being considered on I-270 between MD 121 and I-70 and this additional lane will be evaluated as an HOV lane in Alternative 3A/B." The West Side Mobility Study of 2009 says:

However, the physical footprint for all of the alternatives was the same and it included widening for two lanes per direction in Virginia and widening for one lane per direction on the American Legion Bridge and in Maryland. The widening in Maryland was constrained by the right-of-way, proximity to sensitive environmental features, and proximity to adjacent residences.

MDOT SHA, West Side Mobility Study, at 21 (Nov. 2009), https://web.archive.org/web/20131102090913/http://sationalbeltway.mdstatesafe.com/pdfs/Final_Westside_Mobility_Study_Report.pdf. As recently as 2015, former MDOT SHA Secretary Pete Rahn said:

How do we address I-270, which is the most congested corridor in the state? How do you address an interstate that there is no room to expand? How do you deal with the Washington Beltway that can no longer be expanded and it needs to be reconstructed because we have much underneath it and the system frankly has got to be taken right down to the dirt and brought back up?

Sean Slone, Transportation Policy Academy 2015 – DC – Maryland Secretary of Transportation Pete Rahn, The Council of State Governments (May 19, 2015), https://web.archive.org/web/20200906121216/https://knowledgecenter.csg.org/kc/content/transportation-policy-academy-2015-%E2%80%93-dc-%E2%80%93-maryland-%E2%80%93-transportation-pete-rahn.

CO-520

00022730

JA1724

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 185

an idea rejected as prohibitively expensive and impractical."[208] If that finding, even if preliminary, played any role in the NEPA process being stopped, the Agencies should and claim in this DEIS that the process was stopped for other reasons.

Removing references to the study, while consistent with MDOT SHA's lack of transparency throughout this process, only serves to hide the Agencies' rationale and preclude meaningful public review and comment. The Agencies must provide the entire Capital Beltway Study to the public and re-open public comment on the DEIS. Hearing on response to this DEIS with the same underlying information the Agencies' utilized.

    b.    **The Agencies Have Not Publicly Provided the Traffic Model or Spreadsheets Containing Traffic and Speed Data that the Agencies Relied on to Reach Their Conclusions**

The DEIS relies on traffic and speed data and modeling as a backbone to conclusions throughout the document.[209] Unfortunately, the DEIS provides an incomplete accounting of this data and modeling, mostly presenting some of the modeling results and data in table or figure form in the DEIS and appendices PDFs. It is common for agencies, including FHWA, to publicly release the underlying data and modeling files either with the DEIS or, at a minimum, upon request. But the Agencies refused to do either here, instead delaying and withholding the data and modeling files, preventing the public from meaningfully reviewing the DEIS's traffic-based conclusions.

On October 1, 2020, the Sierra Club Maryland Chapter sent a request to the Agencies for the following basic information:

1) A WOOO model traffic assignment output files for each of the 4 modeled periods (AM peak, midday, PM Peak, and night) for the:

    * base year, and
    * future year for all the alternatives shown in DEIS Table 2-3 (1, 5, 8, 9, 9M, 10, 13B and 13C)

2) The spreadsheets containing the traffic data in DEIS Appendix C Traffic Analysis Technical Report Figures 2-10, 2-11, 2-12, 2-13, 2-14 and 2-15.

[208] Katherine Shaver, *Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead*, Frederick News-Post (Oct. 22, 2017), https://www.fredericknewspost.com/news/politics_and_government/transportation/hogan-s-plan-to-add-additional-toll-lanes-faces-a...506d7a6-8b27-5124-b751-d7a4ffba137.html

[209] *See, e.g.*, DEIS, at ES-13 to ES-14, 1-1 to 1-14, 2-3 to 2-31, 2-41 to 2-44, 2-48 to 2-50; Chapter 3, 4-58 to 4-63, 4-137 to 4-138.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 186

3) The spreadsheets containing the speed data in DEIS Appendix C Traffic Analysis Technical Report Figures 2-20, 2-21, 2-22, 2-23, 2-24 and 2-25.

These are simply files that the Organizations' traffic consultant has received from departments of transportation numerous times in the past regarding proposed highway projects. The request simply requires copying and pasting computer folders to a cloud-based folder and emailing the link. The Agencies or their consultants should have these files organized and easy to provide, based on their use to form the basis for conclusions in the DEIS. Hearing on response to this request, the Sierra Club Maryland Chapter followed up on October 9, 2020, requesting the information by October 13, in order to meet the upcoming comment deadline.

Despite the request for the underlying data and files not being a Maryland Public Information Act (PIA) request, but rather a request for files required to be publicly disclosed under NEPA, on October 13, MDOT responded that the request was forwarded to the MDOT PIA Manager. Then, on October 14, MDOT's PIA Manager sent a letter stating the traffic data spreadsheet for Figures 2-12 through 2-15 are available in the DEIS appendix PDF. For the rest of the request, MDOT's PIA Manager wrote it could not reveal or provide any underlying data and information until the Sierra Club Maryland Chapter paid $6,294.51. The PIA Manager said this is MDOT's estimated cost to prepare, search, and review the documents, without further explanation. Also on October 14, FHWA responded, but merely said MDOT SHA would respond to the inquiry.

On October 15, 2020, the Sierra Club Maryland Chapter reiterated the request for the files and explained that the Agencies' response was unlawfully withholding underlying environmental data in violation of NEPA.

First, the underlying data requested is required to be disclosed publicly with the DEIS. 40 C.F.R. § 1500.1(b) (2019) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency's comments, and public scrutiny are essential to implementing NEPA"); *id.* § 1502.21 (2019) (underlying data may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment"); *cf. Ecology Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015) ("To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinion and arrives at its decisions."). MDOT and FHWA's failure to provide this data violates NEPA.

The Sierra Club Maryland Chapter explained that the request was not one under Maryland's PIA but a request for files required to be disclosed under NEPA. The Sierra Club Maryland Chapter further explained that the requested data and files was not publicly available in Appendix C of the DEIS. Figures and tables presented in the DEIS appendix to support the Agencies' conclusions that were created from data files and models do not provide 1) the complete data

OP⟨LANES⟩™ MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 187

used to create those figures and tables or 2) the underlying formula and calculations that went into those figures and tables.

The Sierra Club Maryland Chapter further explained that providing these files should not take more than two hours, let alone cost $6,294.51, and pointed out three instances where this data had been provided previously to their consultant without charge:

1. Florida Department of Transportation District 1 – Collier County MPO RTP Update;

2. Colorado Department of Transportation – I-70 East EIS;

3. Berkeley Charleston Dorchester Council of Governments (South Carolina) - RTP Update and I-526 Extension;

4. New York Department of Transportation – Hunts Point Interstate Access Improvement Project DEIS;

5. Southern California Association of Governments – High Desert Corridor DEIR;

6. Arkansas Department of Transportation – I-30 Planning and Linkages Study;

7. Utah Department of Transportation– West Davis Corridor DEIS;

8. Texas Department of Transportation – RTP Update and South Mopac modeling;

9. Charlottesville/Albemarle Metropolitan Planning Organization (Virginia) – Charlottesville Bypass.

It is unclear why the Agencies think this project is so different than all of those such that it warrants withholding the data files. The Sierra Club Maryland Chapter requested that the files be provided by October 19, 2020 and further requested an extension of the comment period to allow a reasonable opportunity to review and comment on the traffic analysis and its conclusions. The Sierra Club Maryland Chapter also followed up to FHWA explaining that, as the lead Agency, FHWA is responsible for compliance with NEPA and requested the files from FHWA.

Hearing no response, the Sierra Club Maryland Chapter followed up on October 20 with both Agencies.

Later that day, FHWA stated: "We do not have the data files that you are requesting in FHWA's record for the I-495 & I-270 Managed Lane Study. Our subject matter experts reviewed the traffic analysis and information included in the DEIS and appendices, and FHWA agreed with the analysis as presented."

This response is insufficient. First, FHWA is responsible for complying with NEPA's requirements, including publicly providing underlying environmental data that formed the DEIS's conclusions to enable meaningful public review. If FHWA truly does not have this data,

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 188

it has the responsibility to obtain it, which it easily could, and provide it. Second, FHWA is responsible for the accuracy, scope, and content of environmental documents prepared by the Agency, MDOT SHA, or a contractor, and must independently evaluate the information. This includes evaluating the data files that form the basis of conclusions made in the DEIS. Has FHWA truly not reviewed the underlying traffic data and modeling that underlie the DEIS? How can FHWA agree with the analysis without reviewing its underlying data and modeling?

The Sierra Club Maryland Chapter also followed up with MDOT on October 27, after hearing no response from that Agency. Finally, on November 2, a week before the comment deadline, MDOT responded claiming first that the State of Maryland simply disagrees that NEPA requires the production of these files and data, and that documents responsive to the request can be found in the DEIS's Appendix F. (Note that the requestor has looked and have not found the Microsoft Excel or modeling files requested in the appendix.) MDOT stated that "some of the records you seek include data contained in the work papers of outside MDOT consultants and/or the work product of outside entities." MDOT related that it has revised its estimate such that the Sierra Club Maryland chapter must pay $6,082.60 before the Agency will begin working on the request. It is not clear why this amount is different than MDOT's earlier estimate.

The Organizations request that the Agencies make the data used to support the traffic conclusions in the DEIS be made publicly available. Contrary to MDOT's claim, this is required by NEPA. Merely presenting the end result of some of that data as figures and tables is not sufficient the public cannot meaningfully review the conclusions. MDOT's changing claims that providing this data would cost over $6,000 are not credible and run contrary to every other department of transportation providing the data promptly free of charge. What is different about this DEIS than others that prevents the transparent production of underlying traffic data? Finally, FHWA remains responsible for complying with NEPA and cannot skirt its responsibilities by claiming it does not have the files.

00022733



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 189

**i.** **The Format and Structure of the DEIS Hides Impact Information from Affected People and the Public**

There are many examples of how the DEIS is structured to hide impacts on community assets, but here is just one of the most egregious. The Organizations scoured the DEIS and its appendices and sub-appendices (some appendices over 1500 pages, plus 25 more appendices in the JPA, Appendix E) to identify properties that would be impacted by the Project. In Table 3-10 below, more than 75 community properties and places will be impacted by the Project. In Appendix E, Table 5-10 to allow the project to be built, but their names are not listed. This includes five schools and 14 places of worship.

**Table 3.10 Summary of Impacted Community Facility Properties Within the CEA Analysis Area**

| Type of Community Facility Property | Alternative 8 and 9 | Alternatives 10 | Alternative 13B | Alternative 13C |
|---|---|---|---|---|
| Schools (#) | 5 | 5 | 5 | 5 |
| Higher Education (#) | 1 | 1 | 1 | 1 |
| Places of Worship (#) | 12 | 14 | 14 | 14 |
| Hospitals (#) | 3 | 3 | 3 | 3 |
| Recreation Centers (#) | 4 | 4 | 4 | 4 |
| Publicly-Owned Parks (#) | 44 | 45 | 45 | 45 |
| Police Stations and Correctional Facilities (#) | 1 | 2 | 2 | 1 |
| Public Libraries, Post Offices, etc. (#) | 2 | 2 | 2 | 1 |
| **Total Community Facility Properties Impacted (#)** | **72** | **75** | **76** | **75** |

*We were unable to identify these properties specifically. We currently assume; there would be an additional mitigation-only licensed Alternative.*

DEIS, App. E, CEA EJ Tech Report, at 53.

It is impossible to identify the names of these properties or other identifying information from the DEIS documents. When asked for the list of names of places corresponding to this Table, MDOT FHWA responded:

Please note that information presented in Tables 3-10 of Appendix E, page 53 (item 2 of your email) is depicted in Appendix E, Chapter 5 & Appendix C (CEA Analysis Area Community Profiles and Effects) and, as the information presented in Table 3-11, Appendix E, page 66 (item 3 of your email) is depicted in Environmental Resource Mapping (DEIS Appendix D).[29]

When the lead agency project managers should be going into the communities and finding out firsthand to help them understand impacts and locate their mitigation requests, yet, many of these communities are unaware their community areas are in harm's way from this

[29] October 30, 2020 Email responses from FHWA to Maryland Sierra Club regarding "Request for I-495/I-270 DEIS underlying data" sent on October 23, 2020.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 190

Project and that they are legally entitled to voice their concerns and defend their need for mitigation measures. And when groups want to help their community members understand what is happening and how their lives could be impacted, they have often been shut out with comments like this. This shows MDOT SHA's disregard for transparency and accountability. Everyone has a right to know what those significantly impacted places are, to know if their children attend those schools or their families use those community facilities. When a document is over 19,500 pages, it would show good faith to provide, when asked, this requested information in a clear and accessible way.

So to identify more information regarding the properties listed in Tables 3-10 and 3-11 of Appendix E, the Agencies (the MDOT project manager was asked and copied on FHWA's response and made no further reply) asked the reader and our Organizations to hopscotch between Appendix C, D, and E, and Chapter 5 (a combined 2,029 pages). However, even after doing this full review of these appendices, we were unable to identify this information. The complete information needed is not in those chapters, despite their assertions otherwise. Only bits and pieces are extractable from those chapters, but the complete information is simply not there.

In the same email request, the following documents were requested:

1) The underlying data and complete itemized budget that went into Table 8-1 (Appendix B, page 148), including the assumed "efficiencies" coefficient and detailed explanation of any and all assumptions used to lower the estimates.

4) The DEIS provided estimated opening year (2025) average weekday toll rates per mile, varying from $0.68 per mile to $0.77 per mile. In order to calculate an average, the data necessarily contains maximum and minimum tolls. Please provide the underlying data for 13 time periods and underlying data for the average tolls given on DEIS page 2-43, including the maximum and minimum tolls.

5) The AM peak per mile rates were given on page 883 of Appendix C. Please provide the equivalent table for the PM peak.

6) Any cost-benefit or value-for-money analyses done for this project to establish the cost-savings of using the public-private partnership financing method in place of increasing bonding capacity and using a more traditional design-build approach.

FHWA's response stated, "[w]e do not have the data files or analyses requested in your email for items 1, 4, 5 and 6 in FHWA's record for the I-495 & I-270 Managed Lanes Study." It is concerning that the agency does not have and has not bothered to obtain this underlying data.

**d.** **The Agencies Should Provide All Documents That Formed the Basis of the DEIS and Re-Open the Comment Period**

In addition to refusing to make referenced documents available, the Agencies have failed to provide requested documents that the Agencies considered and relied on in the DEIS and that they are required to provide pursuant to NEPA, the Freedom of Information Act (FOIA), and the

CO-523



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 191

Maryland Public Information Act (PIA). On February 18, 2020, the Sierra Club Maryland Chapter and Rock Creek Conservancy requested records used in the DEIS as well as in the earlier steps of retaining and eliminating alternatives from detailed study:

1. Terminus Concerns/Logical Termini records, including communications with the U.S. Department of Transportation and the Virginia Department of Transportation, regarding the logical terminus of the I-495 & I-270 Managed Lanes Study concerning connecting I-495 managed lanes to the Woodrow Wilson Bridge.

2. Records of the Stormwater Management Report for the project, including existing and proposed stormwater management impacts to state and national park property from the project.

3. Records of the project's impacts to state and national parkland.

4. Records (including traffic, financial, avoidance, minimization, and other environmental analyses) related to the decision to select the project's Alternatives Retained for Detailed Study and to eliminate Alternative 3 and MD-200 diversion from further review. See Alternatives Retained for Detailed Study, https://495-270-p3.com/environmental/alternatives/alternatives-retained-for-detailed-study/.

5. Records of the project's impacts on greenhouse gas emissions, including but not limited to, reports and analyses performed to provide the project's estimated greenhouse gas emissions impact in Maryland's 2019 Greenhouse Gas Reduction Act Draft Plan and all records supporting and relating to the following tweet:

https://twitter.com/MDOTNews/status/1322405556599337669.

NEPA requires that the Agencies:

Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to the made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

40 C.F.R. § 1506.6(f) (2019).

The Sierra Club Maryland Chapter and Rock Creek Conservancy have made clear repeatedly that their requests seek information that underlie the DEIS, not draft versions of the DEIS. However, over the course of five months, the Agencies refused to turn over these records, in violation of their NEPA, FOIA, and PIA obligations, and hindering meaningful comment as a result. See 5 U.S.C. § 552(a)(3), (a)(4)(B), (b), & (e) (providing the public a right to obtain

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and IPA
November 6, 2020
Page 192

access to federal agency records, except to the extent such records are protected from disclosure); Md. Code Ann., GP § 4-103 (providing public a right to access records that are in possession of state and local government agencies). FHWA is required to determine whether to comply with the request within 20 business days, which may be extended 10 business days in unusual circumstances, and upon determination, must make records promptly available. 5 U.S.C. § 552(a)(6)(A), (B)(i), (C)(i); 49 C.F.R. § 7.31(a)(2). MDOT is required to promptly grant or deny a request, not more than 30 days after receipt. Md. Code Ann., GP § 4-203(a). If MDOT denies inspection of a responsive record, it must provide "a brief description of the undisclosed record that will enable the applicant to assess the applicability of the legal authority for the denial." Id. § 4-203(c)(1)(O)(3) requires "a brief description of the undisclosed record and non-exempt material, MDOT must permit inspection of the non-exempt portion of a record, typically by redacting the exempt material. See id. § 4-203(e)(1)(ii). And if inspection is denied as not in the public interest under § 4-343, MDOT must provide "an explanation of why reducing information would not address the reasons for the denial." Id. § 4-203(c)(1)(O)(2)(B).

Four months after the February 18 request, and after repeated follow-up, on June 24 (by letter dated June 17), FHWA: 1) produced three unredacted documents, 2) produced 71 redacted documents, and 3) claimed that an additional 253 unspecified responsive records were withheld in full pursuant to FOIA exemptions 4, 5, and 6. The only unredacted documents produced were two letters sent by Sierra Club Maryland Chapter and Rock Creek Conservancy themselves to FHWA, and a Stream Channel Assessment prepared by Maryland National Capital Parks and Planning Commission. Almost all documents with redactions were emails with only the sender, receiver, and subject left unredacted. FHWA's actions violate 40 C.F.R. § 1506.6(f) (2019); 5 U.S.C. § 552(a)(6)(A), (B)(i), (b)(5); 49 C.F.R. § 7.31(a)(2), and prevent Sierra Club Maryland Chapter and Rock Creek Conservancy, and the public, from meaningfully commenting on the DEIS.

MDOT-SHA's response to Sierra Club Maryland Chapter and Rock Creek Conservancy's request shows an even more flagrant violation of their NEPA and PIA obligations, and a general lack of transparency regarding the Project. At each point, the Sierra Club Maryland Chapter and Rock Creek Conservancy emphasized their willingness to work with MDOT to efficiently obtain the needed information, only to be met with changing reasoning, lies, and untruthful paths. The Agencies should not get anywhere with the NEPA process until MDOT-SHA publicly releases the documents that were sought, which formed the basis for decisions in the DEIS.

Initially, MDOT falsely denied having records responsive to two of the requests (communications between MDOT, the U.S. Department of Transportation, and the Virginia Department of Transportation with regard to the Project's logical termini and the requested Stormwater Management Report for the Project). The Agency also denied other requests broadly, without specification, claiming that the documents being sought were preliminary, pre-decisional, deliberative, and subject to a non-disclosure agreement with FHWA, and that the documents' release was not in the public interest. With respect to one request about the Project's estimated greenhouse gas emissions, the Agency

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 159 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 193

eventually agreed to produce responsive documents by April 30, 2020 at no charge, based on a narrowed scope of search.

The Agency's broad exemption claims are improper, particularly for information underlying decisions that already had been made. While pre-decisional deliberative materials may be protected, "[o]nce an agency's decision has been made, the records embodying the decision or policy, and all subsequent explanations and rationales, are available for public inspection." Maryland Public Information Act Manual, 3-30 (14th ed. October 2015). Moreover, "[t]he exception [for pre-decisional deliverable materials] is also meant to cover only the deliberative parts of agency memoranda or letters. Generally, it does not apply to records that are purely objective or factual or to scientific data." Id. Sierra Club Maryland Chapter and Rock Creek Conservancy explained that they were "seeking records that formed the basis of this already made decision. If MDOT-SHA is asserting that these decisions were made based on incomplete and benefited records, please tell us so." Letter from Sierra Club Maryland Chapter and Rock Creek Conservancy to MDOT, at 2 (March 16, 2020).

MDOT first responses to Sierra Club Maryland Chapter and Rock Creek Conservancy that it would not abide by its agreement to respond to one of the requests by April 30, 2020 because of the COVID-19 state of emergency) declared on March 5, 2020 and the stay at home order released on March 31, 2020. MDOT-SHA requested the Sierra Club Maryland Chapter and Rock Creek Conservancy's "agreement to extend the 30-day period for providing a time and cost estimate, as well as the 30-day period for responding to your request, until 10 days after the date that the state of emergency is lifted." Letter from MDOT to Sierra Club Maryland Chapter and Rock Creek Conservancy, at 4 (Apr. 14, 2020). MDOT estimated that the response would involve potentially 150 emails and their attachments, which, according to the Agency, was overwhelming under remote working conditions. Sierra Club Maryland Chapter and Rock Creek Conservancy did not agree to this indefinite extension request, but the Agency nevertheless has not released any documents responsive to the request. The state of emergency was recently resolved and it is still ongoing.[27] If MDOT cannot produce responsive documents regarding the Project and the DEIS because of the state of emergency, or review the 150 emails and their attachments, MDOT also should delay the DEIS process until the state of emergency is over.

With respect to the other requests for records underlying the DEIS, MDOT stated generally that all records are exempt as pre-decisional and deliberative, based on its claim that "Draft documents are not automatically denied. Each is considered on a case-by-case basis." Letter from MDOT to Sierra Club Maryland Chapter and Rock Creek Conservancy, at 4 (Apr. 14, 2020). MDOT further stated "In reference to the Logical Terminal paper, this paper falls

[27] Larry Hogan, Renewal of Declaration of State of Emergency and Existence of Catastrophic Health Emergency — COVID-19 (Oct. 6, 2020), https://governor.maryland.gov/wp-content/uploads/2020/10/Renewal-of-State-of-Emergency-10.06.20.pdf. October 30, 2020 marked the 10th time Hogan renewed this declaration of emergency, which was first made on March 5, 2020. (Abigail Constantino, *Maryland Once Again Renews State of Emergency During Pandemic*, WTOPnews (Oct. 30, 2020), https://wtop.com/coronavirus/2020/10/maryland-coronavirus-update-oct-30/).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 194

under the jurisdiction of the FHWA, and they have reiterated that it is a confidential report and is not disclosable under FOIA or PIA." Id.

Sierra Club Maryland Chapter and Rock Creek Conservancy responded and explained that MDOT's response:

again fails to satisfy MDOT-SHA's obligations under Maryland GP § 4-203(c)(1), which requires "a brief description of the undisclosed records that will enable the applicant to assess the applicability of the legal authority for the denial," and for details pursuant to Maryland GP § 4-343, "an explanation of why redacting information would not address the reasons for the denial."

Letter from Sierra Club Maryland Chapter and Rock Creek Conservancy to MDOT, at 2 (Apr. 23, 2020).

Sierra Club Maryland Chapter and Rock Creek Conservancy repeatedly followed up with MDOT on their requests and were ignored. Finally, on June 23, 2020, MDOT responded, but instead of withholding documents based on the previously claimed exemptions or a finding that they did not possess responsive documents, MDOT refused to review and provide documents for three of the requests, including the one MDOT had previously agreed to produce by April 30 at no charge, until the Sierra Club Maryland Chapter and Rock Creek Conservancy paid **$302,853.12**. It appears, but is not clear, that MDOT withdrew its previously claimed exemptions. Sierra Club Maryland Chapter and Rock Creek Conservancy had requested a fee waiver because the information was in the public interest, but the letter ignored that request.

On July 7, 2020, Sierra Club Maryland Chapter and Rock Creek Conservancy requested that MDOT respond to their unaddressed requests regarding stormwater and parkland impacts and respond to the fee waiver request, which detailed how their requests were in the public interest and explained how such a waiver was justified. After getting no response, Sierra Club Maryland Chapter and Rock Creek Conservancy followed up on July 22, 2020.

On July 24, 2020, MDOT responded by pointing Sierra Club Maryland Chapter and Rock Creek Conservancy to the Project's website and saying: "Given the number of documents publicly and readily available at this time, we recommend that you review those records and file a new request for any additional records you may be seeking" and that "MDOT considers this request closed." Letter from MDOT to Sierra Club Maryland Chapter and Rock Creek Conservancy, at 2 (July 24, 2020). MDOT did not address the fee waiver request or other requests.

Because the response did not answer the Sierra Club Maryland Chapter and Rock Creek Conservancy's question, on July 27, 2020, they followed up with the below email:

Based on your July 24 letter and previous letters, we understand MDOT SHA has:

1) Denied the organizations' request for a fee waiver with respect to the requests numbered 1, 4, and 5 in the February 18 PIA request; and

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 156

In addition to numerous historic resources, should the Proposal move forward, the National Parks Conservation Association estimates that seven National Parks including Greenbelt Park, Chesapeake & Ohio Canal National Historical Park, Clara Barton Parkway, George Washington Memorial Parkway, Baltimore-Washington Parkway, Suitland Parkway, and Rock Creek Park would be harmed – amounting to approximately eighty-six acres of National Park land – along with dozens of local and regional parks amounting to approximately 725 acres.[273] The Agencies should note that Greenbelt Park, C & O Canal National Historical Park, George Washington Memorial Parkway, Clara Barton Memorial Parkway, Baltimore-Washington Parkway, Suitland Parkway, and Rock Creek Park are each listed or eligible for listing in the National Register of Historic Places. However, the Agencies have concluded that adverse effects cannot be fully determined.[274]

Nevertheless, as these comments have already made clear, a federal agency may not proceed with a proposed action until it performs an environmental review that includes meaningful consideration of alternatives to the proposed action that would avoid, have or have a less harmful impact. In addition to the other environmental considerations already discussed, environmental review must include meaningful consideration of impacts to historic and cultural resources, too. An accurate DEIS is important because the Project is expected to adversely affect these properties and sites, along with other environmental impacts that these comments have discussed.

Notwithstanding the importance of these resources to the American public, the DEIS fails to adequately consider the Project's effects on historic and cultural resources for three reasons. First, the DEIS relies admittedly on incomplete information. Second, the DEIS fails to consider the effect of Section 110(f) of the National Historic Preservation Act and the heightened scrutiny it requires federal Agencies to apply to resolve adverse effects on National Historic Landmarks, such as the Greenbelt Historic District and Washington Aqueduct. Third, in preparing the Section 4(f) analysis, the Agencies failed to consider alternatives that would have emerged (if they had used all possible planning to avoid use of historic properties and parks, among other resources, by exploring feasible and prudent alternatives. For the reasons discussed below, the DEIS violates the letter and intent of federal historic preservation laws that the Agencies are required by Congress to follow. The Agencies must prepare a Supplemental EIS to correct these defects.

**i. The Agencies Failed to Take a "Hard Look" at the Project's Effects on Historic and Cultural Resources Because Information Related to These Resources is Not Complete**

The DEIS is fundamentally flawed because it has failed to give adequate consideration not only to all historic and cultural resources that would be adversely affected, but also to Project alternatives that would avoid harm to those resources or have a less harmful impact, which

---

[273] National Parks Conservation Association, "Highway Expansions Threaten Our Parks,"
https://www.npca.org/advocacy/95-don-t-pave-our-wildlands-parks.

[274] DEIS, App. G, Cultural Resources Technical Report 3.1.2, at 26-28.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 155

2) Concluded that all records in MDOT SHA's possession that are responsive to requests numbered 2 and 3, and that are not already publicly available, are exempt from disclosure under Maryland GP §§ 4-343 or 4-344.

If any part of this is incorrect, please let us know by Monday, August 3.

As of November 6, 2020, Sierra Club Maryland Chapter and Rock Creek Conservancy have not received a response.

Throughout the process, MDOT has misrepresented, obfuscated, and violated its obligations under the PIA and NEPA. MDOT's actions to hide documents relevant to the DEIS demonstrate a lack of transparency and intent to preclude meaningful public review on the Project. MDOT has admitted that it performs an environmental review that includes responsive documents based on a claim that it has already provided some, or even many, related documents online. Nor can other Agency withhold a document that it relied on to decide the terminus of the Project by claiming that the document is proprietary, confidential, or subject to a non-disclosure agreement, once the Agencies use the document in the DEIS process, they must make it publicly available under both NEPA and the PIA.

MDOT based decisions made prior to and within the DEIS on documents that it still will not dutifully disclose. It is shocking that MDOT would demand that two nonprofit organizations pay the Agency over $800,000 just for the Agency to evaluate releasing documents that underlie a project as significant as this one, particularly when the Agencies should have made these documents publicly available from the start. And it is shocking that MDOT would deny the request for a fee waiver without explanation. Provision of these documents, and compliance with NEPA, particularly with such a significant project, is certainly in the public interest.

This letter requests that the Agencies put a halt to the NEPA process until they provide the public with access to all relevant documents that underlie decisions made in the DEIS. Once that occurs, the Agencies must provide a new comment period. As it stands, by refusing to provide such documents, the DEIS only provides a selective presentation, and does not allow the public to meaningfully review or comment on the DEIS and its alternatives.

**III.   Problems with the Section 4(f) and National Historic Preservation Act Analyses**

**A.   The DEIS and Section 4(f) Analysis Fail to Adequately Address the Project's Effects on Historic and Cultural Resources**

The Project has the potential to cause irreparable damage to historic and cultural resources in the pathway of the proposed interstate expansion plans. In addition to National Historic Landmarks, such as the Greenbelt Historic District and Washington Aqueduct, the continued integrity of numerous other historic and cultural resources, including parks, are threatened, too.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 160 of 340

00022736

CO-526

JA1730

USCA4 Appeal: 24-1447     Doc: 30-5     Filed: 09/30/2024     Pg: 161 of 340



00022737

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 197

include the parks and parkways owned by the National Park Service. As with other effects on the human environment, NEPA requires that the Agencies take a "hard look" at the effects of the Project on historic and cultural resources should the Project receive all necessary approvals.²⁷³

Here, however, the Agencies have not gone far enough to evaluate the effects of the Project on those resources. No "hard look" has occurred as required by law because the NEPA analysis has too many unanswered questions about how historic and cultural resources will be affected.²⁷⁴ Specific examples of ways the DEIS is deficient include, but are not limited to, the following:

- The Maryland Historical Trust, Maryland's State Historic Preservation Office or SHPO has stated that additional archaeological investigations are warranted.
- The DEIS's reliance on a smaller "Limits of Disturbance" radius, instead of a broader Area of Potential Effect that would consider all potential direct, indirect, and cumulative effects, impermissibly restricts consideration of the Project's true effects on historic and cultural resources and incorrectly limits effects considered to physical impacts only, even though adverse visual, audible, and atmospheric effects are also expected.
- The DEIS admits that its analysis is not only incomplete, but that it cannot assess all effects on historic and cultural resources because the Agencies do not know what they are.
- The DEIS admits that 320 resources within the Area of Potential Effect require additional documentation or evaluation for purposes of determining listing or eligibility for listing in the National Register of Historic Places.
- The DEIS fails to consider effects on cultural resources, such as Indian Spring, that are tied to American Indian tribes.
- The boundaries of the Montgomery County Poor Farm Cemetery and the Moses Hall Cemetery have not been delineated and the potential for an unknown number of grave sites being disturbed is acknowledged.²⁷⁵

---

²⁷³ *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970) (courts must examine the methodology and substance of agency decisions to ensure that they have adequate factual support).

²⁷⁴ The "hard look" doctrine could never be satisfied where information needed to analyze environmental effects is not complete. *See id.*

²⁷⁵ DEIS, Ch. 4 Env'tl Commentaries C Historic Cemeteries, at 4-55; *see also* Katherine Shaver, *Maryland Beltway Expansion Might Require Moving Part of Historic African American Cemetery*, Washington Post (Oct. 17, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-beltway-expansion-might-require-moving-part-of-historic-african-american-cemetery/2020/10/17/ae4690ca-0de5-11eb-8a35-237ef1eb2ef7_story.html. The potential impacts to these sites are not sufficiently evaluated, nor is there discussion of how impacts may be avoided.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 198

- The DEIS fails to consider all direct, indirect, and cumulative effects of how the removal of trees near the Project's proximity will affect the integrity of Greenbelt Historic District, a National Historic Landmark.
- The DEIS fails to make clear the extent to which the Project might harm the Washington Aqueduct, a National Historic Landmark.
- By limiting its scope to physical harm only, the DEIS fails to consider all direct, indirect, and cumulative impacts on historic and cultural resources.

Taken together, these shortcomings demonstrate a fundamental failure of the DEIS, which was likely masked due to efforts to comply with the "One Federal Decision" rule: it is not complete, and therefore prevents the Agencies from taking a hard look at the Project's impacts.

In addition to these overall deficiencies, the DEIS impermissibly defers full consideration of historic properties listed in or eligible for listing in the National Register of Historic Places by relying on a boilerplate Programmatic Agreement that the Agencies will not execute until after selecting a Preferred Alternative. Although a Programmatic Agreement may be sufficient for compliance with Section 106 of the National Historic Preservation Act, delaying full assessment of historic properties until a Programmatic Agreement is executed ignores the Agencies' present duty to comply with NEPA, which requires a "hard look" at all of the environmental consequences that will flow from the Project if the Agencies grant the permits needed for the Project to proceed. It is also impossible to understand how the Agencies could ever select a Preferred Alternative for the Final EIS without having fully considered this information. For these reasons, relying on an unexecuted Programmatic Agreement as part of the Section 106 review process mandated by the National Historic Preservation Act precludes, rather than assists, the Agencies and the public from understanding how these effects might harm historic and cultural resources as required by NEPA.

2. **The Agencies Have Failed to Comply With Section 110(f) of the National Historic Preservation Act**

Section 110(f) of the National Historic Preservation Act mandates that federal agencies have affirmative, substantive responsibilities to protect National Historic Landmarks to the "maximum extent possible."²⁷⁶ Section 110(f) provides:

Prior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency *shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to such landmark*. The head of the Federal Agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.²⁷⁷

---

²⁷⁶ 54 U.S.C. § 306107. (emphasis added).

²⁷⁷ *Id.* (emphasis added).

JA1731



OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 199

Section 110(f) imposes a stringent substantive standard for any project that will adversely affect a National Historic Landmark. Congress authorized the National Historic Landmark program to recognize "properties of exceptional value to the nation as a whole rather than to a particular State or locality."[286] In contrast to properties listed in the National Register of Historic Places, which are nominated by state historic preservation officers and federal agencies,[287] the Secretary of the Interior designates National Historic Landmarks based on the Department's own research. Each property considered for National Historic Landmark designation must be approved and recommended by the National Park System Advisory Board.[288]

Section 110(f) was enacted in 1980 as part of a comprehensive set of amendments to the NHPA,[289] the amendments significantly expanded the statutory responsibilities of federal agencies to preserve and protect historic properties. The legislative history of Section 110(f) states explicitly that it "establishes a higher standard of care to be exercised by federal agencies" with respect to National Historic Landmarks, as compared to the standard imposed by Section 106 of the NHPA, which applies to all sites listed in, or eligible for, the National Register of Historic Places.[290] Section 106, part of the original 1966 NHPA, requires only that federal agencies "take into account" the effect of their undertakings on historic properties, and afford the Advisory Council on Historic Preservation an opportunity to comment in advance on any such proposed undertaking.[291] Section 110(f) requires more than that. "[Section 110(f)] does not supersede Section 106, but complements it by setting a higher standard for agency planning in relationship to [National Historic] landmarks before the agency brings the matter to the [Advisory] Council."[292]

The higher standard was described by the National Park Service (NPS) in The Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to Section 110 of the National Historic Preservation Act of 1966, ("Section 110 Guidelines"), which state that "Section 110(f) of the NHPA requires that Federal agencies exercise a higher standard of care when considering undertakings that may directly and adversely affect NHLs [National Historic Landmarks]."[293] The Section 110 Guidelines further direct

---

[286] 36 C.F.R. § 65.2(a).

[287] Id. §§ 60.5-60.9.

[288] Id. § 65.5(d)-(e).

[289] See Pub. L. No. 96-515, 94 Stat. 2957, 2981 (1980).

[290] H.R. Rep. No. 96-1457, at 38 (1980), reprinted in 1980 U.S.C.C.A.N. 6378, 6401.

[291] 54 U.S.C. § 306108.

[292] H. Rep. No. 96-1457, at 38, reprinted in 1980 U.S.C.C.A.N. at 6401.

[293] 63 Fed. Reg. 20,495, 20,503 (Apr. 24, 1998).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 200

agencies to "consider all prudent and feasible alternatives to avoid an effect on the NHL."[294] This language mirrors that of Section 4(f) of the Department of Transportation Act.[295] The explicit terms of the statutory language of Section 110(f), as well as its legislative history, provide clear guidance as to the statute's strict mandate—to set the strongest and highest standard possible for protection of the nation's historic landmarks.

Here, the Agencies did not comply with Section 110(f) of the NHPA. In a letter dated March 16, 2020, HWI's notified the Department of the Interior that two National Historic Landmarks—Greenbelt Historic District and the Washington Aqueduct—are within the Project's Area of Potential Effects. However, the latter inaccurately minimized the expected effects that the Project will have on the historic resources and, as such, is insufficient. The DEIS contains no further evidence of compliance with Section 110(f)'s substantive requirements. Therefore, the DEIS is deficient as a matter of law because the Agencies have not undertaken "all possible planning" to minimize harm to National Historic Landmarks.

A Supplemental EIS is needed because the DEIS fails to consider alternatives that have been developed using all possible planning to minimize harm as Section 110(f) requires. Therefore, the Agencies should not select a Preferred Alternative or issue the Final EIS until they have complied with their Section 110(f) responsibilities and the Secretary of the Interior is satisfied that the Project will either avoid harming National Historic Landmarks or that all possible planning has been undertaken to minimize harm. In addition, the Agencies have a duty to inform the public of race alternatives that this information is disclosed not only so that the public will understand effects on National Historic Landmarks, but also so that Agencies can make an informed decision about the least harmful alternative.

**B.    The Agencies' Section 4(f) Analysis Fails to Comply With the Letter and Intent of the Department of Transportation Act Because it Does Not Consider the Full Range of Ways That the Project Will Use—Directly, Indirectly, and Constructively—Historic Sites of Local, State, or National Significance, and Parks**

Section 4(f) of the Department of Transportation Act of 1966 is the most stringent federal historic preservation law ever enacted. Congress passed it to protect public parks, recreation areas, wildlife and waterfowl refuges, and any significant public or private historic sites.[296] Section 4(f) applies to all transportation projects that require funding or approval by the U.S. Department of Transportation. Although minor changes to Section 4(f) have occurred since it

---

[294] Id.

[295] 49 U.S.C. § 303.

[296] 49 U.S.C. § 303(c).

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 163 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 201

was established, federal courts have repeatedly validated the importance of this policy goal and need for compliance with Section 4(f)'s mandate.[289]

Section 4(f)'s mandate is substantive rather than procedural in nature. Protected sites cannot be "used" in transportation projects unless there is no feasible and prudent avoidance alternative and "all possible planning" is incorporated to minimize harm resulting from the use.[290] When deciding whether a protected site will be "used," courts construe the term broadly.[291]

Moreover, the Federal Highway Administration (FHWA) and Federal Transit Administration have adopted regulations to define "use" of Section 4(f)-protected sites. Under these regulations, a "use" of protected property occurs where: (1) land from a 4(f) property is permanently incorporated into a transportation project; or (2) there is a temporary occupancy of a 4(f) site that causes adverse impacts that are contrary to the statute's preservation purposes; or (3) when constructive use of the site occurs.[292]

Here, the Agencies have not complied with either the letter or spirit of Section 4(f). So far, the Agencies have identified a total of 113 Section 4(f) properties within the corridor study boundary including historic sites, parks, and recreation areas.

Of the 113 Section 4(f) properties, the Draft Evaluation notes that 68 would have a Section 4(f) use and 43 would be avoided. Of the 68 Section 4(f) properties that have a use, 36 would result in minor Section 4(f) use; 22 require an evaluation of avoidance alternatives and analysis of least overall harm; and four properties meet the exception criteria. Not all of these conclusions, however, are accurate.

First, as part Section 4(f) review, and for the same reasons the Agencies have failed to take a hard look at historic and cultural resources, the Agencies have improperly deferred the full identification of historic resources and the full extent of their "use." As a result, the Draft Section 4(f) Evaluation is not complete. Second, the Agencies have ignored indirect and cumulative effects on historic resources, even though they would amount to a "constructive use."

[289] See id. at 404-05; Eastern Franklin Riverfront Trackway & Bridge Comm. v. Lewis, 701 F.2d 784, 787-88 (9th Cir. 1983); Stop H-3 Ass'n v. Dole, 740 F.2d 1442, 1447 (9th Cir. 1984).

[290] 49 U.S.C. § 303(c); 23 C.F.R. § 774.3.

[291] Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982) ("Even off-site activities are governed by § 4(f) if they could create sufficiently serious impacts that would substantially impair the value of the site in terms of its significance and enjoyment."); Stop H-3 Ass'n v. Coleman, 533 F.2d 434, 445, 452-53 (9th Cir. 1976) (4-lane highway passing within 100-200 feet of a historic petroglyph rock would result in "constructive use").

[292] See 23 C.F.R. § 774.17.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 202

If this Project is approved. Therefore, the Agencies have failed to recognize or satisfy the stringent mandate of Section 4(f) to avoid and minimize harm.

For example, the Section 4(f) Evaluation does not make clear how the Agencies intend to address impacts on a historic African American cemetery, also raising environmental justice implications.[295] Other historic properties identified by the Maryland Historical Trust within the administrative record are incorporated herein by reference, as well as sites that require additional study for eligibility determinations.

In addition, the National Parks Conservation estimates that seven National Parks including Greenbelt, the Chesapeake & Ohio Canal, Clara Barton Parkway, George Washington Memorial Parkway, Baltimore-Washington Parkway, Suitland Parkway, and Rock Creek Park[296] would be harmed – amounting to approximately eighty-six acres of National Park land – along with dozens of local and regional parks amounting to approximately 725 acres.[297] However, the Section 4(f) Evaluation fails to address the full extent of the Project's use of these resources. Consequently, the Agency could not possibly consider all feasible and prudent alternatives that would avoid this harm.

The Agencies' decision to defer full consideration of historic properties and affected park acreage, along with the full extent of their use or constructive use, renders the Project legally vulnerable under Section 4(f) of the Department of Transportation Act.[298] For this reason, the Agencies should prepare a revised Section 4(f) Evaluation to address this deficiency.

[295] See Katherine Shaver, *Maryland Beltway Expansion Might Require Moving Part of Historic African American Cemetery*, Washington Post (Oct. 17, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-beltway-expansion-might-require-moving-part-of-historic-african-american-cemetery/2020/10/17/ac46f6cc-0da5-11eb-8a35-237ef1eb2cf7_story.html.

[296] In addition, it is anticipated that Rock Creek Stream Valley Park Units 2 and 3, which are managed by Maryland-National Capital Parks and Planning Commission, will also experience adverse effects or "use." However, the Section 4(f) analysis does not appear to adequately consider these effects or alternatives to avoiding them.

[297] National Parks Conservation Association, *Highway Expansways Threatens Our Parks*, https://www.npca.org/advocacy/95-dont-pave-over-our-parks-and-communities. It is also expected that the following estimates are the minimum estimate of acreage that will likely be used by the Project: George Washington Memorial Parkway (12.2 acres); C & O Canal (15.4 acres); Clara Barton Parkway (1.8 acres); Baltimore-Washington Parkway (69.3 acres); and Greenbelt Park (0.6 acres). The Agencies have refused to estimate the amount of acreage affected by Suitland Parkway, another flaw in the Section 4(f) Evaluation.

[298] See *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368 (D.C. Cir. 1999).

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 164 of 340

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 265

**C.    The Agencies Cannot Reasonably Rely on a Non-Executed Programmatic Agreement to Satisfy NEPA, Section 110(f), or Section 4(f)**

Relying on an unexecuted Programmatic Agreement for NEPA, Section 110(f), and Section 4(f) purposes is fundamentally flawed. Programmatic Agreements are a common legal tool used in the separate Section 106 process under the National Historic Preservation Act that are used to spell out the terms of formal, legally binding agreement between federal agencies and other parties.[299]

Programmatic Agreements are used when the effects of an undertaking are not fully known, as is the case in implementing approaches that do not follow the normal Section 106 process, usually in the name of streamlining project approval. Here, however, the Agencies cannot reasonably rely on a Programmatic Agreement that is not yet fully drafted or executed to satisfy their Section 110(f), NEPA, or Section 4(f) responsibilities.

By contrast, full information is needed now to comply with these individual mandates that do not depend on the outcome of a Section 106 Programmatic Agreement. Without a complete understanding of the Project's full range of environmental effects, including harm to historic properties and parks, there is no way that the Agencies can reasonably select a preferred alternative as required by NEPA, see all possible planning to minimize harm to National Historic Landmarks as required by Section 110(f), or identify an alternative that avoids uses of historic properties, parks, and recreation areas unless no other feasible and prudent alternative is available as required by Section 4(f).

The *Corridor H* case, like this one, involved a long, linear transportation project that was the subject of a Programmatic Agreement under Section 106 of the National Historic Preservation Act. The Programmatic Agreement there deferred the identification of historic properties to the future. Although a Programmatic Agreement may be adequate for purposes of compliance with Section 106, the court found it was not adequate to comply with Section 4(f). In *Corridor H*, the historic resources at stake were large rural historic landscapes and battlefields, which could not be avoided without going outside the alignment that had been studied for the project. As a result, the agency could not document that it had made a meaningful evaluation of whether the project would require the "use" of historic properties under Section 4(f) unless and until it had sufficient information on whether historic properties existed within the corridor.[300] Here, the Agencies cannot make a reasonable evaluation, either. Thus, the DEIS and Draft Section 4(f) Evaluation are insufficient.

---
[299] 36 C.F.R. § 800.14(b).

[300] In fact, a large rural historic district was later determined eligible for the National Register, which required a major reroute of the proposed highway. Likewise, in this case, it makes no sense for the Agencies to forge ahead based on incomplete information that could later require the Project's rerouting.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 266

Deferring the full identification of historic properties may be acceptable where the nature and scope of the resources would allow them to be easily avoided, as in the case of archaeological sites that are only significant under National Register Criterion D. However, resources such as historic properties and parks require an entirely different approach, because they have in-place significance, and the project may not be able to avoid harm to those resources without selecting a different alternative. If a determination of National Register eligibility would influence the agency's selection of alternatives under Section 4(f) (and Section 106 and NEPA as well), then the identification of those historic properties, and the Project's potential effects on them, must be evaluated at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after alternatives have been foreclosed.

Therefore, we request that Agencies develop a mitigation measure that is not currently offered, but that will provide a timely way for indirect and cumulative effects to be monitored and meaningful consequences if the effect turn out to be significant.

For the reasons discussed above, it is impossible to comment meaningfully on the Agencies' plans concerning historic and cultural resources because important baseline questions have not been decided. Outstanding issues that need to be resolved include the complete identification of historic properties affected and how the Project will affect them. In addition, it is impossible to determine how the Project will affect two National Historic Landmarks, especially when the Agencies have failed to consider anything other than physical impacts or comply with the heightened review mandates required by Section 110(f) of the NEPA.

Moreover, the Agencies' Draft Section 4(f) Evaluation is likewise insufficient because it does not have full information needed to understand the complete range of direct, indirect, and cumulative effects of the Project and therefore cannot know how the Project will use historic properties and parks. For these reasons, among others, the Agencies should issue a Supplemental DEIS, as well as a revised Section 4(f) Evaluation, addressing these issues fully. A Supplemental DEIS is especially appropriate where, as here, the DEIS acknowledges that damage to cultural resources may be irreversible and irretrievable.[301] If the Agencies refuse to issue a Supplemental DEIS, their analysis in the DEIS will be wide open to legal challenge as arbitrary, capricious, and contrary to law.[302]

**IV.    Conclusion**

The Project will harm the environment and human health and the Agencies should not move forward with the flawed and inadequate DEIS. We urge the Agencies to restart the NEPA process after reformulating the Purpose and Need Statement to appropriately identify a solution that will equitably increase mobility and connectivity and reduce congestion. Any proposed solution should utilize the best available science and data and incorporate meaningful feedback

---
[301] DEIS, Ch. 4 Environmental Consequences, at 4-159.

[302] 5 U.S.C. § 706 (an executive agency's decision amounts to an abuse of discretion if arbitrary, capricious, or contrary to law).

JA1734

00022740

OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 205

from the public and lessons learned from failed highway expansions and P3 projects in the past. We also urge the Agencies to consider alternatives that utilize transportation demand management and multimodal alternatives. The new NEPA process should be characterized by transparency and community outreach conducted in good faith to ensure that the public in general, and environmental justice communities specifically, are provided the information needed to fully vet the alternatives considered by the Agency. The new NEPA process must now predetermine the outcome prior to its beginning, as the current process has done. If the Agencies nevertheless decide to move forward with the predetermined Project, the Agencies must fix the fundamental flaws identified throughout this document and provide a Supplemental EIS with revised analyses and an opportunity to review and comment on the impacts the Agencies failed to evaluate in this DEIS. If the Agencies decide to move forward without providing the required Supplemental EIS, the Agencies should scrutinize the PRES and ROD in order to provide the public an opportunity to comment on the new information likely to be provided in any FEIS, including the selection of the preferred alternative.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

**Comment Attachments**

| Date | Title |
|---|---|
| 1989 | Major Sources of Benzene Exposure |
| 1995-01-04 | Md's Lesson Widen the Roads, Drivers Will Come |
| 1999-09 | The Health Costs of Motor Vehicle Related Air Pollution |
| 2001-03 | Air Pollution and Exacerbation of Asthma in African American Children in Los Angeles |
| 2001-08 | The Burden of the Air Pollution Impacts among Racial Minorities |
| 2002-11-04 | Letter Concerning Effects of Proposed Potomac River Crossings |
| 2002 | Capital Beltway Purple Line Study Initial Findings & Recommendations Draft |
|  | South Coast Air Quality Management District Health Risk Assessment Guidance |
| 2003-08 | Capital Beltway Study Public Display Boards |
| 2004-05-06 | Highway Repair A New Silicosis Threat |
| 2004-05 | Air Pollution at Parking Lots of Vilnius |
| 2004 | Urban Air Pollution Input from Car Parking Places |
| 2006-01 | Capital Beltway Study-NETR Appendix B 3-3-05 |
| 2006-01 | Capital Beltway Study NETR Chapter 2_Redacted |
| 2006-01 | Capital Beltway Study NETR Chapter 3_Redacted |
| 2006-01 | Capital Beltway Study NETR Cover and Dividers |
| 2006-01 | Capital Beltway Study-NETR-Appendix A References |
| 2006-01 | Capital Beltway Study-NETR-Appendix C Wetland and Waterways Chart |
| 2006-01 | Capital Beltway Study-NETR-Ch1 121593 |
| 2006-01 | Capital Beltway Study-NETR-TOC 11306 |
| 2007-08 | Minnesota Department of Transportation - Air toxics template |
| 2007-10 | Increases in Greenhouse-Gas Emissions From Highway Widening Projects |
| 2008-04-15 | Effect Modification by Community Characteristics on the Short term Effects of Ozone Exposure and Mortality in 98 US Communities |
| 2009-03-12 | Near Road Air Quality Monitoring Factors Affecting Network Design and Interpretation of Data |
| 2009-11 | West Side Mobility Study |
| 2010-06-25 | Prediction and Analysis of Near Road Concentrations |

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA November 6, 2020

| | |
|---|---|
| 2016-07 | Energy Usage and Greenhouse Gas Emissions of Pavement Preservation Processes for Asphalt Concrete Pavements |
| 2011-01 | Maryland Nontidal Wetland Mitigation Guidance 2nd Ed. |
| 2012 | Travel Demand Forecasting Parameters and Techniques |
| 2013-02 | Integrated Science Assessment for Ozone and Related Photochemical Oxidants |
| 2013-12 | Countywide Transit Corridors Functional Master Plan |
| 2014-08-14 | Degradation in Urban Air Quality From Construction Activity and Increased Traffic |
| 2014-09-15 | Danger in the Air Health Concerns for Silica in Outdoor Air |
| 2014-09-30 | Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use |
| 2014-11 | Ecological Restoration of Streams and Rivers Shifting Strategies and Shifting Goals |
| 2015-05-19 | Transportation Policy Academy 2015 – DC Maryland Secretary of Transportation Pete Rahn |
| 2015-05 | Final Draft Function Based Stream Assessment Methodology |
| 2015-08-14 | Monitoring Study of the Near Road PM2.5 Concentrations in Maryland |
| 2016-03 | Stormwater Management In Response To Climate Change Impacts |
| 2016-11 | MARC Brunswick Frederick Line Improvement Proposal |
| 2017-06 | Silicosis There Is No Cure But it Can be Prevented? |
| 2017-09-21 | Maryland Gov. Larry Hogan Proposes Widening the Beltway and I-270 to Include 4 Toll Lanes |
| 2017-10-22 | Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead |
| 2017-11-16 | The Best Way to Improve Transportation in Our Region is |
| 2017-12-01 | Hogan's Proposed Beltway Widening Project Could Require Taxpayer Funding and Exorbitant Tolls |
| 2017-12 | An Assessment of Regional Initiatives for the National Capital Region, Technical Report |
| 2017 | Closing the Induced Vehicle Travel Gap Between Research and Practice |
| 2017 | Economics Pricing, Demand, and Economic Efficiency – A Primer |
| 2018-01-16 | Residents Fume Over I-495 Shoulder Lane in McLean |
| 2018-04-20 | MDE Performance Standards and Monitoring Protocol For Permittee |
| 2018-07 | Comprehensive Assessment of Climate Change Impacts in Maryland |
| 2018-07 | Sacramento Metropolitan Air Quality Management District Board-Adopted Methodology |

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA November 6, 2020

| | |
|---|---|
| 2018-08-01 | The Concentration-Response Between Long-Term PM2.5 Exposure and Mortality |
| 2018-09-04 | Despite Skepticism, Hogan Says No Homes Will Be Razed for I-270 Widening |
| 2018-09-07 | Managed Lanes Study Briefing with Letter Attached |
| 2018-10-11 | MDOT Officials on Widening I-270 'We're Not Going to Take Your Home' |
| 2018-10-17 | MWCOG Comments on SAFE Vehicles Rule |
| 2018-10-26 | North Carolina Environmental Quality Comment on SAFE Vehicles Rule |
| 2018-12-19 | Rejected Maryland Toll-Road Contract Goes to Different Bidder |
| 2018-12 | Forecasting the Impossible The Status Quo of Estimating Traffic Flows |
| 2019-03-29 | Traffic Terrors After 13-Hour Shutdown, Lanes Reopen on Inner Loop at American Legion Bridge |
| 2019-04 | MDOT GGRA Draft Plan Appendix J |
| 2019-05-19 | Conditions Leading to Elevated PM2.5 at Near-Road Monitoring Sites |
| 2019-05-29 | Here's Everything You Need To Know About The Capital Beltway Expansion |
| 2019-07-22 | Caltrain has an Ambitious Plan to Run BART-Like Service |
| 2019-07-25 | Metro Reasons More Trains Being More Riders to the Red Line |
| 2019-09-10 | Letter from Industry Coalition re SAFE Vehicles Rule Impact on Transportation Projects |
| 2019-10-22 | Advice from the Independent Particulate Matter Review Panel |
| 2019-10-24 | A Transportation Q&A, Balm Talks I-270, Partnerships, Growth and More |
| 2019-11-09 | Air Pollution and Noncommunicable Diseases |
| 2019-11-27 | Short Term Exposure to Fine Particulate Matter and Hospital Admission Risks and Costs |
| 2019-12-03 | Is MARC's Newest Plan to Improve Service a Step Backwards |
| 2019-12-18 | Letter from Lee Currey to Community Water Systems |
| 2019-12 | Integrated Science Assessment for Particulate Matter |
| 2019-12 | Metro/Tunnel Environmental Management Framework |
| 2019 | Air Pollution and Noncommunicable Diseases |
| 2020-01-08 | Board of Public Works Meeting |
| 2020-01-15 | Reaction to Governor's Budget Proposal Upbeat So Far |
| 2020-01-22 | West Gate, Tunnel Workers Laid Off After Delays Caused by PFAS Contamination |



OP LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| Date | Description |
|---|---|
| 2020-01-29 | West Gate Tunnel Builders Seek to Terminate Contract Over Contaminated Soil |
| 2020-01-31 | Transurban Warned on PFAS Before West Gate Tunnel Contracts Signed |
| 2020-02-07 | Request for Qualifications |
| 2020-02-13 | Causal Effect of Impervious Cover on Annual Flood Magnitude |
| 2020-02-18 | MDOT JPA Request |
| 2020-02-18 | USDOT+FHWA FOIA Request |
| 2020-03-03 | MDOT JPA request response |
| 2020-03-12 | Memorandum to Prince George's County Council and Montgomery County Council |
| 2020-03-13 | Express Toll Lanes Could Raise Water Bills in Montgomery and Prince George's |
| 2020-03-16 | MDOT JPA Request Response Letter |
| 2020-03-16 | Water Bills In Maryland Could Nearly Triple Under Beltway And I-270 Expansion Plan |
| 2020-03-18 | FHWA letter re extension of time |
| 2020-03-25 | Addendum No. 2 and 3, Phase 1 of the I-495 & I-270 Public-Private Partnership |
| 2020-03-30 | Emails with MDOT re JPA request |
| 2020-04-10 | Long-Term Community Noise Exposure in Relation to Dementia |
| 2020-04-11 | Assessing Nitrogen Dioxide (NO2) Levels as a Contributing Factor to Coronavirus (COVID-19) Fatality |
| 2020-04-14 | Email with MDOT re JPA request |
| 2020-04-14 | MDOT Follow Up Response to JPA Request |
| 2020-04-15 | Association Between Short-Term Exposure to Air Pollution and COVID-19 Infection: Evidence from China |
| 2020-04-23 | MDOT JPA Request Response Letter |
| 2020-04-24 | Fewer Than Half of Working Americans Will Have a Paycheck in May |
| 2020-05-06 | Email with MDOT re JPA request |
| 2020-05-14 | Letter from Montgomery County Council to Gregory Slater |
| 2020-05-15 | Expanding Paved Areas Has an Outsize Effect on Urban Flooding |
| 2020-05-19 | Emails with MDOT re JPA request |
| 2020-05-25 | Toll Road Association Federal Money is Route to Recovery |
| 2020-05-28 | Email with MDOT re JPA request |

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| Date | Description |
|---|---|
| 2020-06-01 | Emails with FHWA re FOIA request |
| 2020-06-09 | Transurban Asked to Rip Up West Gate Tunnel Contract, Court Documents Allege |
| 2020-06-15 | Emails with MDOT re JPA request |
| 2020-06-15 | Induced Vehicle Travel in the Environmental Review Process |
| 2020-06-23 | Emails with MDOT re JPA request |
| 2020-06-23 | MDOT SHA Response to JPA Request |
| 2020-06-24 | FHWA FOIA Response |
| 2020-07-01 | Generated Traffic and Induced Travel Implications for Transport Planning |
| 2020-07-02 | Influence of Roadway Emissions on Near-Road PM2.5 |
| 2020-07-04 | People Are Driving Less and Skipping the Toll Roads, Leaving Less Money for Local Projects |
| 2020-07-07 | MDOT-SHA JPA Request Response Letter |
| 2020-07-10 | FHWA and MDOT email re Release of DEIS |
| 2020-07-21 | Email to MDOT and FHWA re Missing Reference Capital Beltway Study |
| 2020-07-22 | Email with MDOT re JPA request |
| 2020-07-24 | MDOT SHA JPA Response |
| 2020-07-27 | Email with MDOT re JPA request |
| 2020-08-01 | Opinion What's the Hurry on Governor's I-495, I-270 Project |
| 2020-08-03 | MDOT SHA Response to Request for Missing References |
| 2020-08-04 | Traffic Speeds Continue Falling Across the Country, But Still Up vs Pre-COVID |
| 2020-08-12 | DC-Area Toll Revenue Plunges 90% Amid Coronavirus Pandemic |
| 2020-08-13 | The Need for a Tighter Particulate-Matter Air-Quality Standard |
| 2020-08-18 | Local Planners Fume Over Unexpected Additions to Highway Document |
| 2020-08-18 | Report faults Maryland for failings in Bay pollution |
| 2020-08-18 | 270 Study Expanded Without Proper Notice, Regional Agency Complains |
| 2020-08-25 | State's I-495 I-Email re Request for Extension Missing Appendices |
| 2020-08-25 | MDOT Response to Requests re Changing Appendices |
| 2020-08-27 | Jacob Parikh Email re Missing References |
| 2020-08-28 | State Adds 30 days to Comment Period for I-495 I-270 Environmental Impact Study |
| 2020-08 | Urgent Concern on Toxic Silica Dust as Public Health Hazard |

OP LANES MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| 2020-09-01 | As Isgan's Highway-Widening Plan Changes, $9 Billion Price Tag Does Not |
| 2020-09-08 | Email re Follow Up to MDOT and FHWA re Missing References |
| 2020-09-08 | Maryland Would Have to Divert Money from Other Projects if Purple Line Builders Quit |
| 2020-09-08 | Terrential Rain Triggers Widespread Flooding in D.C. Area, Inundating Roads, Stranding Motorists |
| 2020-09-30 | Hazardous Air Pollutant Exposure as a Contributing Factor to COVID-19 Mortality in the United States |
| 2020-09-11 | State Figuring Out Who Will Take Over Purple Line Project |
| 2020-09-16 | D.C.-Area Employees are Open to the Idea of More Permanent Teleworking |
| 2020-09-16 | Transportation Officials Anticipating 'Great Localization' After COVID-19 |
| 2020-09-21 | The Fatally Flawed Scheme to Outsource Md.'s Highways to Toll-Road Profiteers |
| 2020-09-22 | MDOT Letter re Missing Reference |
| 2020-09-23 | Purple Line Will be Delayed as MDOT Seeks Management Solution |
| 2020-09-24 | Project Website with Email Sign Up Notice 2 |
| 2020-09-24 | Project Website with Email Sign Up Notice |
| 2020-09-30 | Letter from Sierra Club to VDOT and MDOT re 495 NEXT |
| 2020-09 | Sacramento Metropolitan Air Quality Management District Mobile Sources Air Toxics Protocol |
| 2020-10-01 | Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-06 | Hogan Extends State of Emergency |
| 2020-10-08 | Transportation's Moving Target Wave of Relocations Prompted by COVID-19 |
| 2020-10-08 | Urban Air Pollution May Enhance COVID-19 Case-Fatality and Mortality Rates in the United States |
| 2020-10-09 | Email re Follow up Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-01 | MDOT Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-11 | National Association of Clean Air Agencies Comments on SAFE Vehicles Rule |
| 2020-10-12 | Editorial Commuting Habits Have Changed During COVID-19 |
| 2020-10-14 | FHWA Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-14 | Report Shows 15 Military Bases in Maryland Contaminated With PFAS |
| 2020-10-15 | Email re Follow Up to FHWA Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-16 | Beltway, I-270 Toll Lanes Could Cost More Than $1.50 and $2 Per Mile |

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| 2020-10-17 | Maryland Beltway Expansion Might Require Moving Part of Historic African American Cemetery |
| 2020-10-19 | Carol S. Rubin Memo to 3C-NCPPC Comments to DEIS and JPA |
| 2020-10-20 | Email re Follow Up to FHWA Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-20 | Email re Follow Up to MDOT Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-20 | FHWA Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-20 | Long-Term Community Noise Exposure in Relation to Dementia, Cognition, and Cognitive Decline |
| 2020-10-26 | Regional and Global Contributions of Air Pollution to Risk of Death from COVID-19 |
| 2020-10-27 | Email re Follow Up to MDOT Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-28 | An Assessment of the Health Burden of Ambient PM2.5 Concentrations in Virginia |
| 2020-10-28 | Labyrinth of Pipelines and Cables Could Face Major Disruption by Highway Plan |
| 2020-10-28 | Living in Noisy Neighborhoods May Raise Your Dementia Risk |
| 2020-10-28 | Pipes, Cables Could Face Major Disruption by Plan to Widen Beltway and I-270 |
| 2020-10-30 | FHWA Email re Request for Underlying Data |
| 2020-10 | Connecting People and Places Exploring New Measures of Travel Behavior |
| 2020-10 | COVID-19 Mortality and Contemporaneous Air Pollution |
| 2020-10 | Norm Marshall Resume |
| 2020-10 | Thrive Montgomery 2050, Public Hearing Draft Plan |
| 2020-11-02 | Letter from VDOT and MDOT to Sierra Club re 495 NEXT |
| 2020-11-02 | MDOT Letter Response re Underlying Traffic Data |
| 2020-11-04 | Air Pollution and COVID-19 Mortality in the United States |
| 2020-11-04 | A Transit Vision for the I-270 Corridor |
| | ACS Infrastructure Development, Response to Request for Information |
| | Corridor Cities Transitway |
| | Examples of Silica Dust-Producing Tasks, Highway Road Construction and Repair |
| | Greenhouse Gas Emissions Mitigation in Road Construction and Rehabilitation |
| | Highway Expansions Threaten Our Parks |
| | The Principles of Environmental Justice |

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 169 of 340

**MDOT SHA Response to the Sierra Club:**

**Introduction**

The introductory portion of the comment letter summarizes specific comments offered the in rest of the document and restates the organizations' opposition to the proposed action. Because all topics summarized in the introductory pages are covered separately below, as well as in responses to common themes raised by numerous other parties, this portion of the comment letter does not require a specific response.

**Comments on Cost of Project and Impacts on Public and Private Property**

The comments concerning estimated projects costs and potential impacts have been substantially updated as reflected in the Supplemental Draft Environmental Impact Statement (SDEIS). In particular, the estimated range of costs for the Preferred Alternative is between $3 and $3.5 billion, which is substantially smaller than the build alternatives outlined in the DEIS. Similarly, the range of project impacts has been reduced substantially, and no property relocations would be required. Comments concerning outdated cost estimates have been superseded by approval of the Board of Public Works with Accelerate Maryland Partners, Inc. for Phase I South, including payments to cover upfront predevelopment costs. The comments state incorrectly that the project costs will require diversion of funds from other state infrastructure priorities. For more detail and responses to comments concerning the current financial structure of the Public-Private Partnership (P3) program, refer to FEIS Chapter 9, Section 9.3.5. For a response to comments about the most current summary of impacts to property and community facilities, refer to FEIS Chapter 5, Sections 5.3, 5.4 and 5.5 Chapter 9, Section 9.3.4.K.

**Comments on NEPA Analysis**

*Segmentation*

The introductory paragraphs of this comment cite to or summarize case law and portions of the Council on Environmental Quality (CEQ) regulations and require no specific response. The remainder of the comments address a proposed action on I-270 North of the I-370 interchange. A pre-NEPA Study for potential improvements on I-270 North is being conducted independent from the MLS for that action. FHWA has carefully considered the proposed action's operational independence, the hallmark for determining whether there is an inappropriate segmentation. As outlined in the DEIS, I-370 (just north) was chosen as the northern terminus to allow the I-270 northbound mainline improvements that are carried to I-370 to be merged and transitioned into the existing general purpose lanes and HOV lanes safely, minimizing congestion due to lane drops and merges. Additionally, I-370 links MD200 with I-270 and is a major traffic generator that carries over 100,000 vehicles per day under existing conditions (2016). The average annual daily traffic volume on I-270 north of I-370 and MD 117 is approximately 10 percent less than the volume south of I-370 in existing conditions, indicating that a significant portion of traffic on I-270 comes from and goes to I-370. Refer to DEIS, Chapter 1, Section 1.1.

The decision concerning the scope of analysis to be conducted under NEPA lies within the discretion of the lead agencies. Depending on the factual circumstances, a programmatic or a project-specific analysis could be conducted to fulfill NEPA's procedural requirements. In this case, proceeding with a project-level review for the MLS was entirely appropriate. The geographic scope of the MLS, while large, is distinctly defined. It includes 37 miles of I-495 and 11 miles of I-270. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), the lead agencies have identified the MLS as an independent action that may proceed regardless of whether other actions of the Op-Lanes Maryland Program are implemented. Furthermore, the identified scope of the MLS has been sufficiently defined to be advanced with a project-level NEPA document. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70, have been determined to possess independent utility from the MLS and thus will require separate project-level NEPA documents.

---

The introductory paragraph of this comment cites to or summarizes case law and portions of the CEQ regulations and require no specific response. The remainder of the comment states incorrectly that MDOT SHA must prepare a programmatic EIS for the P3 Program. The Governor's articulation of a broad plan to address congestion and mobility across the state does not mandate preparation of a programmatic NEPA document. The lead agencies properly exercised its discretion in this case to advance a specific project in the order it believes best serves the public and to prepare an appropriate NEPA analysis for that project. Any future proposal for improvements to the remaining parts of I-495 within the study limits outside of Phase I South would advance separately and would be subject to appropriate additional environmental studies, analysis and collaboration with the public, stakeholders, and agencies.

*Purpose and Need and Alternatives Considered*

The introductory paragraphs of this comment cite to or summarize case law and portions of the CEQ regulations and require no specific response. The remainder of the comment is largely addressed in the following common responses provided in the FEIS along with the internal citations to other NEPA documents: for a response to comments on the agency's formulation of the Purpose and Need, refer to DEIS and SDEIS Chapter 1, DEIS Appendix A, FEIS Chapter 9, Section 9.3.1; for a response to comments about the consideration of alternatives, including the specific alternatives mentioned in the comments, refer to DEIS Chapters 2 and 3, DEIS Appendix B, FEIS Chapter 9, Sections 9.3.2 and 9.3.3.

The comments also refer to the pandemic's impact on travel patterns and whether the impacts of COVID-19 diminish the need for the proposed action. For an analysis of current travel trends and the potential impacts of the pandemic on study area congestion, refer to FEIS Chapter 4, Section 4.2.2 and 4.5, FEIS Appendix C and FEIS Chapter 9, Section 9.3.1.

The comments also refer to the potential for a replacement of the American Legion Bridge (ALB) to accommodate rail traffic. The SDEIS accurately states that design options for the ALB will be completed so as not to preclude a future transit line across the bridge. Refer to FEIS Chapter 9, Section 9.3.3.D.

The comments also claim that the lead agencies should have used environmental impacts as a differentiator between preliminary alternatives. The NEPA record demonstrates that environmental impacts were considered as an initial screening criterion as presented to agencies and the public. Analysis of environmental resources considered as part of the alternatives screening process can be found at DEIS Chapter 2, Section 2.2, DEIS Appendix B. The majority of Preliminary Alternatives were located along the existing I-495 and I-270 corridors, and while operationally different, have similar physical footprints. The exception were two rail transit alternatives as they would be on separate alignments adjacent to the existing interstates and, thus, would have a larger physical footprint.

Finally, the comment suggests a completely different alternative. MDOT SHA and FHWA have discretion to establish a project Need, asks that the agencies consider a different alternative. MDOT SHA and FHWA have discretion to establish a project Purpose and Need and in this case the Purpose and Need was vetted and approved through an inter-agency process. Refer to comment response, above. An agency is required to analyze a reasonable range of alternative that meet the stated Purpose and Need, and not alternatives that would satisfy some other project Purpose and Need preferred by the other parties.

*Water Quality Impacts*

For a response to comments about impacts to water resources, refer to FEIS Chapter 9, Section 9.3.4.E.

For additional information about impacts to water resources, refer to FEIS, Chapter 5 and Appendix M.

For additional information about stormwater management, refer to DEIS Chapter 2, Section 2.2.7, SDEIS Chapter 2, Section 2.3.2 and FEIS Chapter 3, Section 3.1.6.

For additional information about the Compensatory SWM Mitigation Plan, refer to FEIS Appendix D.

00022745

OP·LANES™ MARYLAND　　I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Stormwater Management requirements in Virginia will be met by the SWM facilities provided in the FEIS and as required per the applicable laws and regulations of Virginia and under the requirements set forth by VDOT and VDOT's MS4 permit. This project will not adversely impact MDOT SHA's MS4 permitting requirements. The MDOT SHA National Pollutant Discharge Elimination System (NPDES) database tracks all existing best management practices (BMP) and any impacts to existing BMPs from this project will be tabulated as a water quality (WQ) loss, which will be replaced by SWM facilities within the project area or within the compensatory SWM locations. Therefore, the existing level of treatment will remain unchanged. As Maryland requires 50% treatment of the reconstructed untreated impervious area, this project will result in additional water quality for existing untreated impervious area, adding to the MDOT SHA overall MS4 treatment provided.

*Decision Not to Require Permit for American Legion Bridge Construction*

A September 23, 2019, letter from the U.S. Coast Guard confirms that no bridge permit under Coast Guard Authorization Act of 1982 will be required. This letter has been included in the Final Natural Resources Technical Report, FEIS Appendix M, sub-appendix N. However, impacts due to pier and abutment placement within the Potomac River for the replacement bridge are included in the Joint Federal/State Application for the Alteration of Any Floodplain, Waterway, Tidal or Non-Tidal Wetland in Maryland to comply with Section 404 and 401 of the Clean Water Act. Refer to FEIS Appendix P.

*Impacts to Aquatic Species, Aquatic Habitat and Fisheries*

This portion of the comment letter refers to quantities of potential impacts to waterways from the DEIS and supporting documents that are no longer applicable. As documented in the SDEIS, waterway impacts have been substantially reduced, as are potential effects on aquatic resources. The comment states incorrectly that the analysis of aquatic impacts is reflected in one based on a DEIS Appendix but ignores the comprehensive analysis of aquatic resources reflected in the remainder of the technical report. For additional information about impacts to aquatic species, refer to SDEIS Chapter 4, Sections 4.12 and 4.18, and FEIS Chapter 5, Section 5.18. Also refer to responses to Sierra Club SDEIS letter.

*Impacts to Rare, Threatened and Endangered Species and Habitat*

The introductory paragraphs to this portion of the letter cite its statutory and regulatory provisions concerning the analysis of a project potential impacts on rare, threatened, or endangered species and require no specific response. For additional information about impacts to wildlife, including bat species, refer to DEIS and SDEIS Chapter 4, Sections 4.17 and 4.19, SDEIS Appendix H, and FEIS Chapter 5, Section 5.19. For a response to comments about impacts to wildlife and wildlife habitat, refer to FEIS Chapter 9, Section 9.3.4.I. Also refer to responses to Sierra Club SDEIS letter.

*Hazardous Materials*

The NEPA analysis of potential impacts from hazardous materials was prepared in accordance with FHWA Technical Advisory T6640.8A, "Guidance for Preparing and Processing Environmental and Section 4(f) Documents." This guidance requires, in part, that an agency identify the location of known or potential waste sites and the relationship to alternatives under consideration. If a known or potential site could be impacted by an alternative, the agency should provide information about the site, potential impacts and public health concerns, and potential measures to eliminate or mitigate those impacts. The Final EIS should address issues raised by the public and agencies. For the MLS, the DEIS summarizes all the issues and information. Refer to DEIS Chapter 4, Section 4.10 and Appendix K. The SDEIS provided additional information, as well as the potential for hazardous materials concerns during construction of the Preferred Alternative. Refer to SDEIS Chapter 4, Section 4.10. SDEIS Appendix I. The SDEIS properly summarizes the investigations and recommended site investigations and protocols that will be conducted prior to acquisition of right-of-way and prior to construction. These processes are designed

to characterize surficial and subsurface soils and groundwater at site where it is anticipated to be encountered. Investigations will consider locations of previous releases of materials, if any, former/current/abandoned storage tanks, and inferred groundwater flow. Procedures to address testing and handling of any sites with hazardous waste or other contaminants are also described. Also refer to FEIS, Chapter 5, Section 5.10.

*Air Emissions*

The comment letter expresses concerns with the scope and content of the DEIS analysis of project air quality impacts, and summarizes studies related to certain constituent pollutants. The comments admit that the agency is not required to perform hot spot analyses for PM 10, PM 2.5 and NO2 but requests that additional air quality analyses are included in the NEPA process. While the lead agencies acknowledge the information presented in the comments, as described in detail in the EIS documents and supporting technical appendices, the agency appropriately followed relevant FHWA guidance concerning the assessment of criteria pollutants applicable to the study area based on Federal Clean Air Act rules, and therefore fulfills NEPA obligations to analyze potential impacts of the range of reasonable build alternatives and no-build alternative. For additional information about air quality impacts, see DEIS Chapter 4, Section 4.8 and Appendix I and FEIS Chapter 5, Section 5.8 and Appendix K. For a response to comments about impacts to air quality, refer to FEIS Chapter 9, Section 9.3.4.F. Also refer to responses to Sierra Club SDEIS response letter.

The comments request additional air quality analysis be performed for all parking lots greater than 100 spaces adjacent to the proposed highway improvements. The lead agencies are not required to analyze air quality from existing facilities that are outside of scope of the study, outside of the study limits and not impacted by the proposed improvements or part of the proposed action. The lead agencies properly considered air quality impacts in the analysis of indirect and cumulative effects and concluded that, based on the regional air quality conformity analysis, the incremental impact of the proposed project on mobile source emissions, when added to past, present and reasonably foreseeable future actions, will not cause or contribute to a new violation, increase in the frequency or severity of any violation, or delay timely attainment of the National Ambient Air Quality Standards established by the Environmental Protection Agency. Refer to FEIS Chapter 5, Section 5.22.

While acknowledging that there is no requirement to do so, the comments request additional air quality analysis be performed for ground-level ozone and its precursor. The scope of the air quality analysis is appropriate because ozone emissions are addressed in the regional air quality conformity analysis which is described in the DEIS and SDEIS. As the data is included in the currently conforming long range plan, Visualize 2045, the proposed action is demonstrated to not cause an exceedance of the NAAQS including ozone.

For a response to the air quality analysis including Mobile Source Air Toxics, refer to FEIS, Chapter 9, Section 9.3.4(F). Also refer to DEIS, Chapter 4, Section 4.8.1, DEIS Appendix I, and SDEIS, Chapter 4, Section 4.8.1.

For a response to CO Hot Spot analysis, refer to FEIS, Chapter 9, Section 9.3.4.F. Also refer to DEIS, Chapter 4, Section 4.8.1 DEIS Appendix I and SDEIS, Chapter 4.8.1.

The comments question the scope and content of the analysis of potential project Greenhouse Gas (GHG) emissions and those related to project construction. For additional information about climate change and greenhouse gases, refer to FEIS Chapter 5, Sections 5.8 and 5.23 and FEIS Appendix K. For a response about climate change and greenhouse gases, refer to FEIS Chapter 9, Section 9.3.4.G. For additional information about construction impacts to air quality, refer to FEIS Chapter 5, Sections 5.8 and 5.23 and FEIS Appendix K. For a response to comments about construction impacts, refer to FEIS Chapter 9, Section 9.3.4.I.

The comments request additional air quality analysis related to the COVID-19 pandemic and cite to articles speculating about the potential nexus between air pollution and COVID-19 health impacts. Because of the uncertainty regarding the

**OP·LANES™** MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

00022747

future course of the pandemic, the lack of substantial information and absence of approved regulations, guidance and methodology for such an analysis, the lead agencies are not required to conduct this additional analysis.

As accurately noted in DEIS Appendix K, the project is included in the approved 2018 constrained long-range plan, Visualize 2045, and the corresponding air quality conformity analysis. Page 39 of the Visualize 2045 Plan describes the Traffic Relief Plan as constructing four managed lanes on I-495/I-95 and I-270 for their entire length. As properly noted in DEIS Appendix J, prior to the Record of Decision being signed, the selected alternative will be included in the TIP and Long Range Plan, and the accompanying Transportation Conformity Determination. The traffic forecast for the draft air quality analysis in the DEIS appropriately used 2016 as the base year, the anticipated opening year of 2025 and design year based on a 20-year planning horizon as 2040. The final air quality analysis updated the traffic forecast to use the design year of 2045. Refer to FEIS, Chapter 9, Section 9.3.4.F and FEIS Appendix K.

The draft air quality analysis completed for the DEIS alternatives used the US EPA approved model, MOVES2014 which did not include the updated fuel efficiency standards. While not mandatory, the lead agencies used the updated model, MOVES3 (3.0.1), as approved by EPA for the final air quality analysis in the FEIS. MOVES3 includes many updates to exhaust emission rates to better estimate the real-world emissions of new vehicle technologies. Compared to the previous MOVES2014 modeling tool, MOVES3 allows users to model the benefits from new regulations promulgated since MOVES2014 was released, incorporates the latest emissions data, and has improved functionality. Some of the major updates include new regulations such as the Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2 and the Safer Affordable Fuel Efficient (SAFE) Vehicles Rule. Refer to FEIS Chapter 5, Section 5.8 and FEIS Appendix K.

For information concerning the detailed summary of air potential EJ impacts, refer to DEIS and SDEIS Chapter 4, Section 4.21, DEIS Appendix K, FEIS Chapter 5, Sections 5.8 and 5.21, and FEIS Appendix F. For a response to comments about environmental justice and equity, refer to FEIS Chapter 9, Section 9.3.4.D.

The comments repeat concerns with the types of potential air impacts associated with project construction. For additional information about construction impacts to air quality, refer to FEIS Chapter 5, Sections 5.8 and 5.23 and FEIS Appendix K. For a response to comments about construction impacts, refer to FEIS Chapter 9, Section 9.3.4.I.

Regarding avoiding and mitigating fugitive dust during construction, the FEIS outlines measures that will be implemented during construction to help minimize construction related dust and emissions include the following:

- Implementing a **Diesel Emissions Reduction Program** that exceeds pertinent Federal and state regulations to minimize air pollution including MSAT emissions during construction
- Implementing a **Truck Staging Area Plan** for all construction vehicles waiting to load or unload material where emissions will have the least impact on sensitive areas and the public. These include but not limited to hospitals, schools, residences, motels, hotels, daycare facilities, elderly housing and convalescent facilities. All sources of emissions will be located as far away as possible from fresh air intakes, air conditioners and windows.
- Implementing a **Greenhouse Gas Reduction Program** to reduce emissions during construction
- Implementing an **Anti-Idling Policy** to avoid unnecessary idling of construction equipment in order to reduce engine emissions and to provide air quality benefits to those who live and work in or adjacent to the construction sites.
- Implementing **dust control** mitigation measures during construction to limit the production of dust, when practicable

Refer to FEIS, Chapter 9, Section 9.3.4.F., FEIS Chapter 5, Section 5.8 and FEIS Appendix K.

For responses to comments on technical omissions in the air quality analysis, see below:

Accepted practice for selecting analysis years for an MSAT analysis is to estimate emissions for a base year, the expected first year of operation, and the project design year. In the DEIS MSAT and GHG analyses, emissions were estimated for 2016, 2025, and 2040. The quantitative MSAT and GHG analyses were updated for the preferred alternative and an updated design year of 2045 was used in those analyses.

For a response to induced demand in the traffic analysis, refer to FEIS Chapter 9, Section 9.3.4.B.

Per FHWA MSAT guidance, MDOT SHA developed an affected network to be used in the quantitative MSAT analysis for the project. This MSAT affected network was also used for the quantitative GHG analysis. The need for a project level "hot spot" conformity analysis is determined by the attainment status of the county the project is located in. A CO hot spot analysis was not required for this project as Montgomery, Prince Georges, and Fairfax counties are not in non attainment for the CO National Ambient Air Quality Standards (NAAQS). However, CO is highlighted in the FHWA 1987 guidance as a transportation pollutant to be summarized in an EIS. Therefore, the DEIS presented the results of the potential impacts for CO at worst-case intersections throughout the study corridors. The methodologies and assumptions applied for the CO analysis are consistent with FHWA and EPA guidance. The quantitative MSAT and GHG analyses were updated for the Preferred Alternative using the latest version of the EPA MOVES model (MOVES3 Version 3.0.1). This version of MOVES includes new regulations such as the Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2 and the Safer Affordable Fuel Efficient (SAFE) Vehicles Rule.

*Impacts to Forests*

The lead agencies appropriately evaluated potential impacts to forest resources, including forest canopy and vegetated habitat. The Preferred Alternative has dramatically reduced the quantity of potential tree (or forest) canopy loss compared to the data referenced in the comment. For a summary of terrestrial and forest impacts, refer to SDEIS, Chapter 4, Section 4.16, DEIS Chapter 5, Section 5.16 and FEIS Appendix M and N. Maryland Reforestation Law requires state-funded highway project applicants that impact one acre or more of forest to provide one-to-one mitigation according to a preference for on-site planting within the project corridor. Beyond on-site mitigation, the applicant may accomplish off-site planting on public lands within the affected county or watershed, purchase credits from approved forest mitigation banks within the affected county or watersheds and payment into the Maryland Reforestation Fund. The mitigation plan for forest impacts has been developed in close coordination with appropriate local, state, or federal agencies. Refer to FEIS M. For responses to comments about forest (tree) canopy impacts, refer to FEIS Chapter 9, Section 9.3.4.J.

*Noise*

The lead agencies have conducted and documented a comprehensive assessment of potential project noise impacts and the evaluation of proposed noise mitigation. For additional information about noise impacts, refer to DEIS and SDEIS Chapter 4, Section 4.9, DEIS Appendix J, SDEIS Appendix J, and FEIS Chapter 5, Section 5.9 and Appendix I. For a response to comments about noise impacts, refer to FEIS Chapter 9, Section 9.3.4.H.

*Alleged Flaws in Traffic Modeling*

For a response to comments about traffic modeling and analysis, refer to FEIS Chapter 9, Section 9.3.4.B. Also refer to responses to Sierra Club SDEIS letter.

*Other Traffic Comments*

For additional information about traffic modeling and analysis, refer to DEIS Chapter 3 and Appendix C and FEIS Chapter 4 and Appendix A.

For a response to comments about vehicle safety, refer to FEIS Chapter 9, Section 9.3.4.O.

For additional information about vehicle safety, including congestion-related crashes, refer to FEIS Appendix A.

JA1741



00022748

*Environmental Justice Issues*

This portion of the letter cites to summarizes case law and portions of the CEQ regulations in several sections and requires no specific response. The remainder of the comments concern the scope and methodology used to analyze environmental justice (EJ) impacts generally, including reference to portions of the study area in Prince George's County that will no longer be impacted by the Preferred Alternative. For information concerning the detailed summary of all potential EJ impacts, including the agency's comprehensive program to encourage public participation of all identified minority and/or low-income communities in the study area, refer to DEIS and SDEIS Chapter 4, Section 4.21, DEIS Appendix E, FEIS Chapter 5, Sections 5.8 and 5.21, and FEIS Appendix F. For a response to comments about environmental justice and equity, refer to FEIS Chapter 9, Section 9.3.4.D. Also refer to responses to Sierra Clubs SDEIS letter.

*Induced Demand*

The comment letter summarizes a 2020 Transportation Research Record article concerning considerations of induced demand in environmental reviews, including a proposed "calculator" that has not been calibrated for use outside of California. The lead agencies acknowledge the reference. The record contains a comprehensive assessment of the potential induced demand related to the proposed action. Refer to DEIS Appendix E. For a response to comments about induced demand, refer to FEIS Chapter 9, Section 9.3.4.B.

*American Legion Bridge Contingencies*

The NEPA record reflects an extensive effort to consider impacts related to the replacement of the American Legion Bridge (ALB). Substantial interagency coordination was conducted to consider and then incorporate avoidance and minimization efforts related to bridge design in order to address all resources, including Section 106 and Section 4(f) properties, around the replacement bridge. Refer to SDEIS, Chapter 2, Section 2.3.4.C and FEIS Chapter 9, Section 9.3.4.C.

The lead agencies invited VDOT to be a cooperating agency in development of the EIS in consideration of the southern terminus that extends over the ALB into the Commonwealth of Virginia and ties into Virginia Department of Transportation (VDOT) facilities. Extensive coordination with VDOT has occurred and, while the MLS is independent of the 495 NEXT project, close coordination regarding completing, traffic and environmental analyses has occurred over the last four years. Impacts to Virginia resources were considered in the scope of the Study and were included in the EIS documents. The 495 NEXT project was included in the MLS design year models for both No Build and Build Alternatives. MDOT SHA coordinated with VDOT regarding traffic analyses throughout the Study, including regular meetings and sharing of information related to traffic counts, forecasts, and simulation models used on our respective studies to ensure that the data was compatible. Close coordination with VDOT occurred during development of the Preferred Alternative to ensure compatibility with the 495 NEXT project.

*Alleged Procedural Problems*

The introductory paragraph of this comment cites to or summarizes case law and portions of the CEQ regulations and require no specific response. The comments note a minor error in uploading DEIS appendices to the project website which was brought to the lead agencies attention and rectified in one day. All DEIS material was available to the public for the full duration of the comment period and beyond, with the lead agencies instituting extraordinary measures during the pandemic to ensure maximum public participation and doing so in a manner that was protective of public health. For additional information about public involvement throughout the NEPA process, refer to DEIS and SDEIS Chapter 7, DEIS Appendix P, FEIS Chapter 8 and Appendix R. For a response to comments about public involvement during the NEPA process, refer to FEIS Chapter 9, Section 9.3.7. The lead agencies conducted a comprehensive scoping process, including making preliminary NEPA documents, such as the summary of Alternatives Retained for Detailed Study, available for public review and informal comment. The letter states incorrectly that the lead agencies improperly summarized or "miscounted" the public input on the preliminary NEPA documents. The lead agencies reviewed all comments received and properly summarized the content of those comments during the preliminary scoping stages of the NEPA review in order to inform production of the DEIS. The lead agencies were aware of and considered all such comments, in opposition

to or in support of the project, and properly noted the submission of petitions and other mailings or communications. Once the EIS documents were made available for formal comment periods, MDOT SHA reprinted and made available all comments on the DEIS and SDEIS and responded to all substantive comments in the FEIS. Support for or opposition to the project and/or the Preferred Alternative as stated in all public comments is accurately reflected in the NEPA record and available for review. MDOT SHA received and responded to each request for records in compliance with the Maryland Public Information Act (MPIA) as did FHWA in compliance with the Freedom of Information Act (FOIA); commenter has not filed any appeal under either MPIA or FOIA to the said responses.

**Section 4(f) and NHPA Analysis**

*Effects on Historic and Cultural Resources*

The Preferred Alternative eliminated the majority of resources referenced in this comment. Remaining impacts have been minimized to the extent practicable at this stage of design and reasonable mitigation to address the adverse effect has been developed in consultation with interested parties. The remainder of the comments summarize general concerns with the analysis of potential project impacts on parkland, historical and cultural resources. For a response to concerns over the Section 106 process, refer to DEIS and SDEIS Appendix D, FEIS Chapter 9, Section 9.3.4.C, FEIS Appendices E and J. For additional information about historic architectural and archaeological resources, refer to SDEIS Chapter 2, Section 2.3, FEIS Chapter 5, Section 5.7, and FEIS Appendices E, I and J. For additional information about the Section 4(f) evaluation, refer to DEIS and SDEIS Chapter 5, DEIS Appendix F, FEIS Chapters 5, 6, and 7, and FEIS Appendix G.

*Agency Did Not Follow Intent of DOT*

The Study includes a comprehensive analysis of all potential Section 4(f) resources, including the potential for constructive uses of those resources. The quantity of potential Section 4(f) impacts noted in these comments was reduced substantially as a result of identification of the Preferred Alternative, based in part on extensive coordination with and input from agencies, stakeholders, including Officials with Jurisdiction (OWJ) for Section 4(f) properties. The Final Section 4(f) Evaluation reflects consideration of all potential uses of parkland or historical resources and a comprehensive package of mitigation measures, including improvements to park facilities and amenities, tree planting and invasive species control, water quality improvements, ecological restoration, among others. The record of coordination with OWJs and stakeholders is reflected in DEIS Chapter 5, SDEIS Chapter 5 and FEIS Chapter 6. Refer to the Final Section 4(f) Evaluation in FEIS Chapter 6 and FEIS Chapter 9, Section 9.3.4.C.

*Cannot Rely on Non-Executed Programmatic Agreement*

The comment incorrectly states that the lead agencies relied solely on the anticipated execution of a Programmatic Agreement to fulfill obligations to analyze project impacts on cultural and historic resources. The lead agencies conducted a comprehensive analysis of cultural and historic properties in coordination with the State Historic Preservation Officers, the Maryland Historical Trust, the Virginia Department of Historic Resources and other agency and community consulting parties. For a summary of the complete analysis of impacts to historical architectural, historic cemeteries, archaeological, and other historical resources, refer to FEIS, Chapter 5, Section 5.7, Chapter 9, Section 9.3.4.C. The executed Programmatic Agreement, which reflects all agreed to mitigation measures as a result of the Section 106 consultation process appears at FEIS, Appendix J.

**Conclusion**

This portion of the letter summarizes all previous comments and does not require a separate response.

JA1742

WASHINGTON BIOLOGISTS' FIELD CLUB – ROBERT SORENG

**From:** Robert Soreng <soreng@gmail.com>
**Sent:** Tuesday, November 30, 2021 8:41 PM
**To:** SHA OPLANESMLS
**Subject:** SDEIS Comments from WBFC
**Attachments:** WBFC-SDEIS comments 30 Nov 2021 1.5.pdf

Please accept the attached SDEIS comments from WBFC

Respectfully,
Rob Soreng

--
WBFC President

https://wbfc.science/

*This page is intentionally left blank.*

00022921

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 174 of 340



WBFC SDEIS Comments 30 November 2021

WBFC SDEIS Comments 30 November 2021

Mr. Jeff Folden, I-495 & I-270
P3 Program Deputy Director I-495 & I-270 P3 Office
707 North Calvert Street,
Mail Stop P-601 Baltimore, Maryland, 21202
MLS NEPA P3@mdot.maryland.gov

Ms. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza,
Suite 1520 Baltimore, Maryland 21201
jitesh.parikh@dot.gov

**This Authorized Testimony on the I-495 and I-270 P3 Program SDEIS is submitted on behalf of the hundreds of past and present members of the Washington Biologists' Field Club (WBFC).** November 30 2021.

Our website is https://WBFC.science

Dear MDOT Officials:

Thank you for the opportunity to comment on this important issue. WBFC is a Section 106 Consulting Party, and "WBFC on Plummers Island" was determined by MDOT's Section 106, Cultural Resources Team analyses to be eligible for nomination to the National Register of Historical Places. The main contributing features for eligibility were the history of the WBFC and historic research record of 120 years of documenting the ecosystems and biodiversity of Plummers Island. Plummers Island is widely known as "**The most thoroughly studied island in North America.**" We have identified the following flaws in the SDEIS as relates to Plummers Island:

#1    - Plummers Island needs to be considered as a whole including its riparian wetlands. Any affects on the island wetlands and waterways needs to be considered as 4(f) issues in the NEPA process. The SDEIS does not adequately address this, and the Section 106 process considered only the dryland property.

#2    - Destruction and disturbance of Chesapeake & Ohio National Historical Park (CONHP) lands and riparian and pond wetlands, including "ca. 0.2" acres (SDEIS calculation) of the 12.2 acre Plummers Island, Montgomery Co., Maryland, is underestimated in the SDEIS and unacceptable. Moreover, we don't believe construction impacts can or will be contained within the SDEIS Limits of Disturbance (LOD) (see map, Appendix 8). The positioning of the

1

**Response to SDEIS Comment #1**

The historic property boundary for the Washington Biologists' Field Club was established using the tax parcel boundary, as is standard for MDOT SHA Section 106 survey efforts. In preparing the National Register of Historic Places determination of eligibility documentation, MDOT SHA did not find character-defining features of the historic property that justified a different boundary.

**Response to SDEIS Comment #2**

Despite the extensive avoidance and minimization efforts to NPS properties around the ALB including Plummers Island, impacts to Plummers Island could not be avoided completely, but impacts have been reduced by approximately 1.6 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, the impacts have been reduced to approximately 0.28 acres of impact at Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

No wetlands, as delineated per Section 404 or the National Park Service, will be impacted on Plummers Island by the Preferred Alternative. The impact to the island was determined based on the Ordinary High Water (OHW) Mark. Area within the OHW mark is considered waterway by the US Army Corps of Engineers and permitted as such. Area landward of the OHW mark is considered part of the island. All construction impacts would be contained within the Limits of Disturbance included in the Final Environmental Impact Statement.

We appreciate the ecological importance of Plummers Island and the greater Potomac Gorge, which include rare habitats and rare, threatened, and endangered (RTE) organisms. We recognize the long-term biological studies conducted on and around the island have contributed to the understanding of these important habitats and the wildlife they support and that impacts would not only affect these diverse habitats and wildlife, but would also affect a place that is important to many people for recreation. MDOT SHA has limited impact to Plummers Island and the Potomac Gorge to the greatest extent practicable, while maintaining constructability of the project. MDOT SHA conducted a four-season RTE plant survey in 2020 to identify the RTE plant species located within the project area. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided and will continue to coordinate with the Washington Biologists Field Club to ensure your concerns are heard and responded to.

JA1744

00022922

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

00022923

CO-713

**WBFC SDEIS Comments 30 November 2021**

**#2Cont**

LOD on Plummers Island is obscured on the SDEIS maps relative to the rocky ridge line protecting the Island from flooding. We can't identify exactly where the critical LOD line runs. Compare maps in Appendices 6, 7 and 8.

- Lack of understanding the impacts of the proposed construction to the value of the extensive of contributions and commitments by WBFC to a 120 year long-term record of historical and ongoing biological research on ecosystems and biodiversity of Plummers Island is evident. Impacts to the many rare plants, animals, habitats, and long-term research plots on the Island have not been adequately considered. This severely impairs the integrity of Plummers Island and our long-term research.

**#3**

- The destruction of the upper end of the misnamed "Rock Run Culvert" (proposed new name Plummers Channel), placement of caissons on the Island, and reshaping of the rocky outcrops flanking the channel on the west end of the Island, for expanding the American Legion Bridge under Alternative 9, seriously affects the Island.

**#4**

- The SDEIS lacks full consideration of flooding impacts of pier, caisson, and trestle emplacements, particularly those that will inevitably result from frequent logjams in the channel.

**#5**

- The SDEIS lacks plans for diverting and treating ALB runoff including road salts, oil, antifreeze, and further toxic by-products from these, or from spills resulting from accidents. (Currently these drain onto NPS land and into the Channel from the lowest point on the ALB.) The SDEIS lacks plans for mud, dust, and debris resulting from construction and demolition of the current ALB, which will fill the channel and drift and fall over and impact the land environment of Plummers Island.

**#6**

- The SDEIS lacks plans for noise reduction from the expanded bridge overhanging Plummers Island and to expanded traffic. The noise is a serious threat to animal communications.

**#7**

- The SDEIS lacks alternatives to placing the proposed bike and pedestrian lane to overhang Plummers Island.

**#8**

- The SDEIS lacks consideration of the impact of the Covid-19 epidemic on present and future transportation loads and patterns (many folks are teleworking, attending virtual meetings and appointments, and shopping online). With peak traffic flows down due to changed behavior patterns resulting from Covid-19, toll lanes will be unlikely to provide revenue streams of sufficient reward to P3 contractors, likely leaving taxpayers on the hook for billions of dollars.

**#9**

- The SDEIS lacks smart-growth forward-thinking on Climate Change (only more cars, more low occupancy vehicle traffic) remains a problem in the SDEIS. MDOT has declined to study.

---

**Response to SDEIS Comment #3**

The oxbow of the Potomac River around Plummers Island would not be impacted by the Preferred Alternative. Bridge piers will not be placed in the oxbow and the bridge will span the oxbow to limit disruption to the waterway. The rocky outcrops flanking the channel will not be significantly reshaped, however bridge pier supports will need to be located on the rocky outcrop. The bridge pier support is anticipated to be a drilled shaft, which would limit the impact to the existing land form.

**Response to SDEIS Comment #4**

Full hydrologic and hydraulic analysis will be completed in final design to ensure that the implications of bridge construction on potential flooding are fully considered for both the oxbow of the Potomac River around Plummers Island and the Potomac River itself.

**Response to SDEIS Comment #5**

Water quality treatment for the ALB is not feasible since NPS has indicated that they will not accept any SWM on their land and all the land surrounding the ALB is owned by NPS. Some alternative practices exist that may be feasible to provide some level of pretreatment of the bridge or approaches that may be incorporated into the drainage design. These practices are not approved to provide water quality credit in Maryland and may prove to be infeasible given the various site constraints during final design. However, MDOT SHA will consider use of these alternative practices on or around the ALB area within MDOT SHA ROW.

**Response to SDEIS Comment #6**

While there have been many published studies discussing the effect of noise on wildlife, there is not an approved methodology for defining noise impacts to wildlife and evaluating the effectiveness of abatement. The analysis of noise impacts and abatement for this project was completed in compliance with FHWA regulations (23 CFR 772), which are written to protect the human environment. Humans as a species are perceptible to a specific range of sound frequencies; the noise levels used in our analysis are weighted to reflect this.

**Response to SDEIS Comment #7**

The shared use path is part of the new ALB. The shared use path is supported by both state Governor's and has a large amount of support from the public.

**Response to SDEIS Comment #8**

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to SDEIS Comment #9**

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

---

2

JA1745

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#9 Cont**

delayed, or hidden from state official's requests, recalculations of projected traffic reductions due to Covid-19 impacts on commuters and P3 revenues.

See response to Comment #9 above.

**#10**

- The SDEIS lacks consideration Build options with well-connected mass transportation options (trains, light rail, monorail, etc.), including on the American Legion Bridge. The P3 selected Alternative 9 is the worst option in this regard.

**Response to SDEIS Comment #10**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to SDEIS Comment #11**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated cost of repairs.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

**#11**

- Massive construction costs, with near certain cost overruns will be passed on to taxpayers. Regarding Washington Suburban Sanitary Commission (WSSC) expenditures, estimated to be $2 billion, it is obvious ratepayers and taxpayers will be responsible for this cost.

**Response to SDEIS Comment #12**
Refer to Chapter 9, Section 3.6.A for a response on opposition to managed lanes or tolling public roads.

Refer to Chapter 9, Section 3.6.B for a response to toll rate ranges and toll rate setting process.

**#12**

- Toll lanes within Maryland could cost as much as $50 in peak traffic hours, *just to get to or return from Virginia toll lanes*, on I-495-270, which would provide little if any benefit to the average local commuter. These rates are expected to go up yearly with inflation, and compensation to the P3s as they deem it needed.

**Response to SDEIS Comment #13**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

**#13**

- P3 revenues will most mostly go to overseas and out-of-state conglomerates, with limited contributions to needed infrastructure returned to Maryland (if MD gets anything). With the new 2021 Federal Infrastructure bill signed into law, the alternative of paying for the project without using P3 partners should be fully considered. P3 control of the project represents unacceptable legal power in corporate hands to curtail future mass-transit developments on the beltway and connecting highways.

**Response to SDEIS Comment #14**
Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

**Response to SDEIS Comment #15**
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis and impacts.

**#14**

- Massive traffic congestion and delays are inevitable during the construction period lasting 5-10 years, after which the traffic flow is projected to be just as congested 10 years later-on due to the encouragement of more cars to be on the road, also known as induced demand.

**#15**

- Because the SDEIS's engineering analyses for Alternative 9 are still incomplete, it is impossible for the concerned Agencies, Consulting Parties, and the public to fully comment on, the full scope of the proposed project's impacts at this time. We respectfully request that MDOT prepare a revised SDEIS to provide all of the ability to meaningfully review and comment on the impacts before a final EIS is produced.

**Response to SDEIS Comment #16**
Based on our biennial bridge inspection findings and experience on similar heavily-traveled steel superstructure bridges, MDOT SHA estimates that the current lifespan of the superstructure and substructure of the existing ALB are 10-15 years before they would deteriorate to poor condition needing replacement.

This assumes that additional repairs and preservation activities are not undertaken during that time. Even with repairs and preservation activities, such as a deck replacement, cleaning, painting, and steel repairs to the superstructure, and concrete repairs to the substructure units, this 59-year-old bridge would require considerable capital investment to maintain it in a state of good repair. In determining the need to replace a structure, we consider the cost to maintain and rehabilitate all three elements (deck, superstructure and substructure), the functional needs of the bridge, and the disruption to traffic during construction.

**Alternative placements and designs of the American Legion Bridge (ALB) were summarily rejected by MDOT and P3 stakeholders in favor of Alternative 9.**

**#16**

- By MDOT's own analysis (stated as recently as this year by Secretary Slater) the ALB is structurally sound and only required redecking in 10 to 20 years.

- According to the unredacted copy of the MDOT 2005 plan for expanding I-495, only one extra lane in either direction was needed to relieve traffic congestion. And even that plan was

WSBC SDEIS Comments 30 November 2021

1

USCA4 Appeal: 24-1447   Doc: 30-5   Filed: 09/30/2024   Pg: 176 of 340

JA1746

00022924

**OP LANES**
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

---

WBFC SDEIS Comments 30 November 2021

dropped due to concerns over environmental damage and proximity to parks, neighborhoods, cemeteries, and facilities.

- The full accounting for reasoning for acceptance of Alternative 9 has not been presented to the public. It is evident that P3 stakeholders and Governor Hogan decided on this outcome before the DEIS was published in 2020, for their own convenience, revenue stream desires, lowest construction costs, and political posturing, thus, overruling all environmental concerns, destruction of properties, actual transportation needs (then projected, or subsequently needing adjustment for Covid-19 impacts), and any of the dozen other alternatives proposed in the DEIS.

- Much more information has come to MDOT on the impacts to Plummers Island since that backroom decision for Alternative 9 was made and the DEIS was published. WBFC presented formal public written and virtual comments to MDOT on the DEIS (Appendix 9) and Section 106 documents (Appendices 2 to 7), documenting the Club's long history and extensive research on Plummers Island ecosystems and biodiversity, and threats to the Island. WBFC has held three meetings with MDOT-SHA in the winter and fall of 2021 to voice our concerns about impacts to Plummers Island ecosystems, biological diversity, and our long-term research program. Although some modifications resulted, WBFC still has major concerns (Appendices 1 to 8).

- To avoid, minimize or reduce impacts to the Chesapeake and Ohio Canal National Historical Park and Plummers Island MDOT could have chosen to only redeck the ALB, or to build a narrow double decker bridge or a suspension bridge instead of expanding the current bridge over Plummers Island on the east side and a newly discovered archaeological site on the west side.

- We respectfully ask that agencies consider other options to the ALB portion of this project to avoid impacts to Plummers Island and the surrounding National Historical Park area.

WBFC continues to support the NO Build Option.

Robert Soreng, WBFC President

Carla?

Lowell?

**Appendices**

---

**Response to SDEIS Comment #17**

Refer to Chapter 3 and Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to SDEIS Comment #18**

MDOT SHA acknowledges receipt of the WBFC DEIS Comment Letter dated November 6, 2020 that was appended to this SDEIS Comment Letter. Refer to Appendix T for a response to this DEIS Comment Letter.

**Response to SDEIS Comment #19**

During the NEPA Study, options for rehabilitating or replacing the ALB were considered including double decking the existing bridge or constructing a new double decker bridge.

Construction of a second deck over the existing structure is infeasible. The existing bridge piers cannot accommodate the load from a second deck. A new second deck structure would have to include structure elements that would completely span across the existing bridge width and new large piers and foundations that would support the new structure. These new piers would include substantial impact in the Potomac River and both shorelines, including on Plummer's Island, outside of the existing bridge footprint. MDOT must maintain traffic on the existing American Legion Bridge, and this would not be possible if a new deck were to be constructed over the existing bridge.

A new double-deck bridge replacing the existing bridge would have to be built off alignment since the structural design for such a bridge would have to be constructed completely separate from any demolition of the existing bridge. Either an upstream or downstream alignment would have considerable impacts along the Potomac River, both shorelines to accommodate the new alignment, and impacts to the George Washington Memorial Parkway and Clara Barton Parkway interchanges. In addition, a double-deck bridge would require substantial area on each shoreline to accommodate bifurcating the two directions of I-495 and ramping one direction to be above the other. Similar impacts and challenges would be associated with other major bridge designs, such as a suspension or cable-stayed bridge.

As noted in the FEIS, Section 4.4 and in the FEIS, Section 5.4, the ALB Strike Team considered a "west shift" of the LOD to entirely avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option. However, MDOT SHA compared the NPS land impacts and those of the natural and cultural resources surrounding the ALB and determined that the on-center alignment would impact the least amount of total NPS land; would not require re-configuration of the Clara Barton Parkway interchanges; and would not require residential displacement, as the west shift alignment would. For these reasons, the on-center alignment with the reduced LOD required by the Base Option or Cast-In-Place Segmental bridge types was incorporated into the Preferred Alternative LOD.

---

#17

#18

#19

2

00022925

JA1747

00022926

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

**Response to SDEIS Comment #20**

While there will be shading to the head of the oxbow of the Potomac River around Plummers Island from construction, trestles will be constructed over the channel so that the flow will not be affected. The trestles will be constructed so as not to increase flood flow onto the Potomac River floodplain. However, this floodplain functions to dissipate floodwaters from this large river on a regular basis, and alteration of the floodplain is part of the river's flood cycle. Detailed hydrology and hydraulics analysis will be completed for this oxbow channel and for the Potomac River prior to construction to ensure that the pier design does not negatively impact flow. MDOT SHA has limited impact to Plummers Island to the greatest extent practicable. The vernal pool, "frog water," on Plummers Island has been avoided and will not be affected by the Preferred Alternative. Protective silt fencing would be placed prior to construction to ensure that impacts do not extend beyond the LOD.

**Response to SDEIS Comment #21**

MDOT SHA conducted a four-season RTE plant survey in 2020 to identify the RTE plant species located within the LOD. MDOT SHA is coordinating closely with WFS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided. One component of the ecosystem restoration plan includes collection of seeds from seed-dispersed rare plant species prior to construction and propagation in a plant nursery followed by replanting post-construction. Similarly, threatened individual plant species that cannot be propagated by seed will be collected, propagated, and replanted.

**Response to SDEIS Comment #22**

MDOT SHA has limited impact to Plummers Island to the greatest extent practicable to limit impacts to the important long-term research plots located there. Unfortunately, there are a couple of research plots that would be affected by construction and shading of the replacement bridge and could not be avoided. MDOT SHA would like to work with WBFC to ensure that the disturbance results in the least impact to long-term studies.

**Response to SDEIS Comment #23**

MDOT SHA has limited impact to Plummers Island to the greatest extent practicable to limit impacts to past research plots and collection sites. There is no alternative to replacing the American Legion Bridge and unfortunately it passes through an important ecological area.

**Response to SDEIS Comment #24**

Invasive species do often establish in disturbed areas. The ecosystem restoration plan developed to mitigate for impacts will include a plan to control invasive species and will replant disturbed areas with native plant species to limit the opportunity for non-native colonization.

---

WBFC SDEIS Comments 30 November 2021

Appendix 1. Threats to Plummers Island, March 2021. https://whfc.science/wp-content/uploads/2021/02/Threats-to-Plummers-Island-4.6.pdf

WBFC comments on ALB construction and expansion impacts to Plummers Island Threats to Plummers Island from American Legion Bridge construction and expansion 1) Damage to waterways: a) Potomac River shore: mud flats and sandbars are wetland features in the MDOT reinforced (post the DEIS comments) Zone of Destruction. b) we don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and flock of Gibraltar at the upper up of the island) are destroyed or significantly altered. Sand bars and mud flats below could be substantially reduced by plants and animals that depend on these. c) the Island Channel (AKA "Rock Run Culvert"). The head of the channel down to the dog leg would not we daylight for years of construction. After which this part of the Channel would be overshadowed by the 2 added lanes on the Island side of the Bridge. What are the consequences to waterways there and downstream? d) with the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the Island flood plain, potentially adversely affecting much of that flood plain. e) if sub-point d happens, all research plots in the flood plain could be substantially altered, (including vegetation plots 1, 3, 10, 11,12, and habitats for the "frog water" pools at the head of the Island within in the DEIS and circumscribed in subsequent documents are highly vulnerable to disturbance (vegetation plot 3 is in this zone). g) Zone of potential effects/disturbance even, but estimated by DEIS to be 2/5 of the Island. What is the MDOT plan for protecting this zone? h) Amphibians are in global and local decline due to pollution, disease, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island (Maevalle 1998 and http://collections.nmnh.si.edu/search/herps/). Acris crepitans, northern cricket frog; Hyla versicolor, eastern gray treefrog; Lithobates clamitans, green frog; Lithobates palustris, pickerel frog; Lithobates sylvaticus, wood frog; Pseudacris crucifer, spring peeper; Pseudacris feriarum, upland chorus frog; Ambystoma maculatum, spotted salamander; Carassius longicauda, long-tailed salamander; Hemidactylium scutatum, four-toed salamander; Plethodon cinereus, eastern red-backed salamander; Plethodon glutinosus, northern slimy salamander; Notophthalmus viridescens viridescens, eastern newt; Pseudotriton ruber, northern red salamander. 2) Destruction of rare plants (Simeons et al. 2020) and rare plant communities (Simeons et al. 2016) from the far west end of the Island within the Zone of Destruction: a) Hibiscus laevis (mud flats just below and above point of rocks) b) Solidago racemosa (point of rocks, below flock of Gibraltar) c) Hypericum prolificum (point of rocks, below flock of Gibraltar) d) Paspalum fluitans (mud flats just below and above point of rocks) WBFC comments on ALB construction and expansion impacts to Plummers Island and other native plants rare on the Island occurring only on west end in Zone of Destruction: e.g., Sedum ternatum, (on flock of Gibraltar) f) Piedmont / Central Appalachian Seepage Wetland plant community: Eragrostis hypnoides - Ludwigia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation (USNVC: CEG006983). Non-tidal mudflats, Global/State Ranks: G3/SNR (Simeons et al. 2016) g) Potomac Gorge Riverside Outcrop Barrens (Potomac Gorge Type) (Hypericum prolificum, Eubotrys racemosa / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia Herbaceous Vegetation (USNVC: CEG010691), Global/State Ranks: G1/S3. 3) Destruction of WBFC research plots from 1997 and 2013-2015 will be destroyed (plots 4, 5, on the sandbar at the head of the Island will be totally destroyed [see also 1) e)], A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed. 4) Destruction of past collection sites: a) many plants and animals were vouchered or recorded from the west end of the Island, 50me are only known on the Island from there. 5) Habitat destruction and disturbance lead to more invasive organisms: a) the west end of the Island is covered in a tangle of Oriental bittersweet (first vouchered in 1932), and kinds of other honeysuckle (first vouchered in 1917), among many other invasive plants recorded there. Invasive species establishment and expansion will be surely exacerbated by disturbance involved the

5

#20

#21

#22

#23

#24

JA1748

OP LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**Response to SDEIS Comment #25**

MDOT SHA recognizes the dynamic flood regime of the Potomac River and understands the concerns associated with large storms during construction. To minimize this risk, trestles and temporary construction platforms will be built to withstand the 100-year storm to ensure that construction materials do not blow out during storm events. Full hydrologic and hydraulic analysis will be completed in the final design to ensure that the implications of bridge construction on potential flooding are fully considered for both the oxbow of the Potomac River around Plummers Island and the Potomac River itself.

**Response to SDEIS Comment #26**

In earlier coordination, NPS requested that no noise barriers be constructed within NPS-managed land due to Section 4(f) concerns.

**Response to SDEIS Comment #27**

Water quality treatment for the ALB is not feasible since NPS has indicated that they will not accept any SWM on their land and all the land surrounding the ALB is owned by NPS. Some alternative practices exist that may be feasible to provide some level of pretreatment of the bridge or approaches that may be incorporated into the drainage design. These practices are not approved to provide water quality credit in Maryland and may prove to be infeasible given the various site constraints during final design. However, MDOT SHA will consider use of these alternative practices on or around the ALB area within MDOT SHA ROW.

**Response to SDEIS Comment #28**

We understand that the long-term biological studies conducted on and around Plummers Island have contributed and continue to contribute to the understanding of a myriad of plant and animal species, trends in biodiversity, and effects of climate change, as well as many other important research contributions. MDOT SHA has limited impact to Plummers Island and the Potomac Gorge to the greatest extent practicable, while maintaining constructability of the project. The American Legion Bridge requires replacement, and it is unfortunate that it crosses important ecological areas that support long-term research. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided.

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 180 of 340

OP·LANES™ MARYLAND
I-495 & I-270 Managed Lanes Study

*This page is intentionally left blank.*

#28
Cont

WBEC SDEIS Comments 30 November 2021

of amur honeysuckle (1997), now dominant on west end; viii) arrival and expansion of winter creeper (1997), now patchily established but potentially widespread vii) arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread ix) Emerald Ash Borer (EAB) arrival and expansion in 2015 and death of ash trees (2016), mass die-off of ash trees, a major shift in forest climax community (Stemonn et al. 2016) x) fig buttercup arrival and expansion (5 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially xi) arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species. https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_America xii) arrival and expansion of Asian clams (Corbicula fluminea), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959, established in the Potomac River by 1982) xiii) Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years. xiv) Beech blight is coming; Poplin (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for this blight here, unless the forest is cut down for the Bridge construction. WBEC comments on ALB construction and expansion impacts to Plummers Island c) Following climate change impacts to the ecosystems on Plummers Island will be conflated with issues involved with disturbance from bridge construction and emplacements. References Bonnstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. The Washington Post HEALTH & SCIENCE (2018-09-25). Brown, J. W. 2001. Species turnover in the leaf rollers (Lepidoptera: Tortricidae) of Plummers Island, Maryland: Assessing a century of inventory data. Proceedings of the Entomological Society of Washington 103(3): 673-685. https://www.biodiversitylibrary.org/bibliography/7550 Brown, J. W., & S. M. Bahr III. 2008a. The insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. Bulletin of the Biological Society of Washington 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2 Brown, J. W., & S. M. Bahr III. 2008b. Appendix (List of the Invertebrates of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 192-226 http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2 An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 65-74. Cohn, J.P. 2006. The Wildest Urban River: Potomac River Gorge. BioScience, Volume 54(1): 8-14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2 Irwin, T. L. 1981. Natural History of Plummers Island, Maryland. XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. Bulletin of the Biological Society of Washington 5: 105-224. Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal.pone.0185809 Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? The New York Times Magazine, 27 November 2018, pp. 41-48. Johnston, W. H. & D. L. Wiings. 1997. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Wiings. Proceedings of the Biological Society of Washington 100:762-768. (December 31, 1987). Lavery, J. O., M. E. Hale Jr 1979. Lichen Growth Responses to stress Induced by Automobile Exhaust Pollution. Science Vol. 204, Issue 4391, pp. 423-424 https://doi.org/10.1126/science.204.4391.423 Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Vietmeire and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.) WBEC comments on ALB construction and expansion impacts to Plummers Island Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS FIELD CLUB: ITS MEMBERS AND ITS HISTORY (1900-2006). The

JA1750



USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 181 of 340

WBEC SDEIS Comments 30 November 2021

Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown on WBFC Book at https://WBFCscience/wp-content/uploads/2019/09/wbfc_booklet.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. Science Nov 14 2019 https://dx.doi.org/10.1126/science.aba2001 Stotler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. Bulletin of the Biological Society of Washington, 14(1):1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf Simmons, R.H, Fleming A.H., Sorreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6. pdf available at https://WBFC.science/wp/content/uploads/2019/09/plummer_island_nc_map_v3.3.pdf Simmons R.H., Sorreng R.J., Berman E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf available at https://WBFC.science Vogel, G. 2017. Where have all the insects gone? Science 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

Appendix 2. Section 106 comments, 8 October 2021.

1 Washington Biologists' Field Club October 8, 2021 Dear Mr. Archer, We are writing you on behalf of the Washington Biologists' Field Club with regard to Plummers Island 1 and its associated channel and wetlands in response to the MDOT-SHA Section 106 letter of September 8, 2021 and including the email message from Mr. Archer entitled "I-495 and I-270 MLS Section 106 Materials, Comments Requested by October 8" and associated linked documents and attachments. We frame our comments within the historical context of impacts to the long-term value of scientific research on Plummers Island and the biodiversity we have discovered there, and the quality of experience of the island, which are implicitly protected by recommendations for historical preservation of the place for future generations. We remain highly concerned about the proposed I-495/I-270 and American Legion Bridge toll lane widening project and the significant, probable threats from bridge construction, operation, and maintenance to Plummers Island and its historic character, including its biota, and the century of intensive research activities that have taken place on the island. Since last writing and in line with our requests from April 2021, the Washington Biologists' Field Club (WBFC) has been added as a Section 106 consulting party, been recognized as a site of historic significance with National Register of Historic Places (NRHP) eligibility, independent of the C & O Canal National Historical Park. Some of the project's adverse effects on the WBFC have also been recognized. These steps are important but do not go nearly far enough to protect Plummers Island, which the Federal Government agreed in 1959 to protect in perpetuity as a site for long-term scientific research so long as the WBFC still exists as an incorporated entity. In order to ensure that the proposed project's impacts on Plummers Island receive adequate attention and consideration, we have several concerns and requests which will be detailed in the remainder of this comment letter. As a reminder, Plummers Island is a small federally-owned island immediately downriver of the American Legion Bridge with unique historical, biological, and research value. Plummers Island is NRHP-eligible "under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists." The long-term, ongoing research value of Plummers Island is part of its NRHP eligibility. The I-495/I-270 project, which aims to nearly double the size of the American Legion Bridge, would have numerous adverse effects to the island's historic features and significance as a research site including: 1 Montgomery County, Maryland. Potomac River, adjacent to the American Legion Bridge 2.1. Damage to waterways 2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction 3. Destruction of WBFC research plots 4. Destruction of past collection sites 5. Habitat destruction

---

**Response to SDEIS Comment #29**

MDOT SHA has been consulting with the Washington Biologists Field Club and Maryland Historical Trust through the Section 106 process. MDOT SHA found the WBFC on Plummers Island to be eligible for the National Register of Historic Places, has found an adverse effect to the property, and is identifying mitigation through the Programmatic Agreement.

MSOT SHA responded to your Section 106 comments through the Section 106 process and development of the draft Programmatic Agreement which was shared with representatives of the WBFC on January 4th as a consulting party.

See previous pages for responses to other comments outside the Section 106 process that were raised.

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

WBIC SDEIS Comments 30 November 2021

and disturbance lead to more invasive organisms 6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out 7. Sound from bridge construction and closer proximity of traffic, in 2 new bridge lanes after they open on the bridge 8. Impacts on biota from salt, oil and other toxic runoff from the new bridge 9. Violation of long-term continuity of 120 years of research. Plummers Island must be fully protected from the new MDOT plan to expand the American Legion Bridge. The taking of Plummers Island lands by this project as well as the obstructive proximity impacts are a violation of the agreement with the Federal Government signed in 1959 to protect the Island in perpetuity so long as the WBFC still existed as an incorporated entity. The damage proposed for the Island violates the very principal upon which the Federal Government signed the agreement with WBFC; that the value of the property was the historic nature of the long-term research on the biodiversity of the Island, which at that time exceeded 58 years with long-term goals. Now that research has extended to 120 years. Yet, it appears that the most damaging project alternative has been selected and the necessary mitigations we discussed earlier in this year were ignored 3. Plummers Island, far from being protected, will have most of the new bridge overhang, casting its rare, endangered, and threatened biota in shadow and increasing impacts of noise, runoff, and more. There is clearly a disconnect that the very process affirming that major historical and scientific research significance of the Island. The plan seems to ignore the results of its own process, and the revised plan egregiously violates the historic and research integrity of the very property it is responsible for protecting. 1) Regarding the NRHP eligibility, we have the following requests: • The NRHP determination narrative should better contextualize Plummers Island in the unique location as highlighted below. Plummers Island is located within the Potomac Gorge, which itself has unique and important features. This publication offers a suitable kind of description: "The 9,700-acre (3935.5 ha) Potomac Gorge project area (see map on inside front cover) is the 15-mile (21.4 km) river corridor from Great Falls to the Key Bridge, including parts of Maryland, Virginia, and the District of Columbia. It is in the midst of a major metropolitan region inhabited by over 4.5 million people (on Cohen, 2006). The Potomac Gorge is widely recognized as one of the most biologically rich areas in the eastern United States, with more than 400 known occurrences of 200 state or globally rare plant 2 See Appendix B for more on our interactions with the MDOT Strike Team. (M:12-46; 2): 3 and animal species, and ten globally rare plant communities. The Gorge's unusual concentration of species diversity and rarity is the direct result of its unique hydrology, geology, and geomorphology.) This wild and free-flowing section of the Potomac River is one of the most intact eastern Fall Zone river systems with an abundance of parkland not subject to the environmental pressures of residential or commercial development." • The NRHP determination narrative should recognize that the research sites within the WBFC are important contributing features. Specifically, Plummers Island has had national and international significance and species not only rare but new to science continue to be found and studied there, as recently as 2014 (Sikovicz et al. 2014). It is worth recalling that the 1959 agreement between WBFC and the Federal Government states: • The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and • The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and • The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and • The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research province. • Correct inaccurate and misleading use of language related to Rock Run. The Dovetail CRG report on the Maryland Historical Trust Determination of Eligibility Form continues the unprofessional practice of calling the channel separating Plummers Island from the mainland "Rock Run Culvert" (p. 1). This is an inaccurate and misleading name, mentioned in the DEIS, as the channel is neither a culvert nor is it any part of Rock Run (a nearby drainage with an outlet into the Potomac River about 1,000 ft. downstream from Plummers Island, and with its own real culvert passing under the C&O towpath just below Lock 11). The channel is a historical natural side stream of the Potomac River that prehistorically was more of a major river channel. When WBFC members reported this inaccurate name to the

See response above for SDEIS Comment #29.

#29
Cont

OP LANES™ MARYLAND
I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**WBEC SDEIS Comments 30 November 2021**

USGS and Board of Geographical Names, they fully agreed, and the name was removed from their listings (on or before 23 April 2021). The channel head has been displaced downstream about 40 feet (Corengi's estimate from a detailed 1950s topographical survey map and other observations), by MLB per emplacements of 1960 and early 1990s, but the rest of the channel remains in its historical position from about 15 to 30 feet below the current channel head. 2) We request that the understanding of the historic boundaries of Plummers Island be updated in all documentation pertaining to the project in light of the NRHP eligibility designation. It is incorrect to say, "the majority of the historic features of the WBEC are outside the LOD." The entire island is NRHP eligible. Impacts to the 4 Western part of the island would be highly significant. The entire island is being used for research. Its associated channel and wetlands. Its floscwalking on and over the island and planting plans on it is a direct adverse impact to one of the WBEC's most important and salient historic features: the long-term and ongoing use of the island for research on the biodiversity of the island. 3) We request that those involved with this project make greater efforts to understand and recognize the scale and irreversibility of the adverse impacts the proposed plan would have and prioritize avoidance and mitigation of impacts. Appendix C contains some examples of impacts to promote better understanding. Additional impact concerns are detailed in Appendices D and E. It is WBEC's view that Plummers Island was not part (or sufficiently part of the American Legion Bridge alignment decision making, and WBEC was not weighed properly in making this decision. At that time, no one was even talking about Plummers Island as it had barely been mentioned in the DEIS and had not been recognized as a significant historic site at that time. Avoiding Plummers Island is possible, it has just not been prioritized in MDOT's process. See SDEIS, at pp. 4-14- and 4-15. The adverse impacts to Plummers Island affect the research value of the island. That is to say, the adverse impacts impact the qualities and attributes of the site that make it historically significant. By destroying the value of the island for research of rare plant, insect, and other life forms, the project would be destroying decades of research. A complete and accurate identification of the project's effects on these sites and attributes is needed. 4) More must be done to mitigate impacts. Moving the piers is not adequate mitigation. Documentation units as part of the Section 106 process on September 8, 2021 shows some of the adverse impacts to Plummers Island and yet they are still underestimated. Moving the piers, as proposed by MDOT (below) is not sufficient mitigation to address the full spectrum of mitigation. Additional minimum mitigation measures that are needed are listed in Appendix E, including shifting the ALB 4 new lanes to the upstream side, rather than dividing those between the up and downstream sides. "The LOD adjoining Plummers Island along the American Legion Bridge will impact approximately 0.2 acre of the WBEC. This area is required for the bridge substructure, including permanent pier placement and construction activities. Construction activities within the LOD at the WBEC may include excavation, demolition of the existing bridge foundation and piers, installation of proposed foundations, piers, or abutments, and slope protection. Access to the existing and proposed piers is required for these activities, with access minimized by strategically locating the new piers near the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations. 5 Although the majority of the historic features of the WBEC are outside the LOD, the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, a character-defining feature of the WBEC, resulting in diminishment of the property's integrity of setting. MDOT State Highway Administration has determined the project will adversely affect the WBEC." (Sept 8, 2021 letter to Elizabeth Hughes and Jake Langan from Steve Archer for Julie M. Schablitsky, pages 7-8) 5) We have major concerns about damage from construction to the channel that separates Plummers Island from the mainland. More information needs to be provided to us about impacts to the channel as soon as possible. Some of the measures discussed for this sensitive area would exacerbate adverse effects. We noted that on maps the LOD is marked on the land of the island, while the channel itself is not identified as part of the WBEC are even with the area of potential effects. This channel is integral to the sustainability of the adjoining Plummers Island wetlands

18

See response above for SDEIS Comment #29.

**#29 Cont**

00022931

JA1753

I-495 & I-270 Managed Lanes Study



00022932

WSFC SDEIS Comments 30 November 2021

...and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WRBC – and the National Park Service – consider the Island's emergent wetland perimeter to be part of the biodiverse whole, and since 2001 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline. The MDOT Strike Team indicated the original DEIS plan to fill in the "culvert" (channel) with spall for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. This will have a serious adverse effect on the channel. With all the planned land-clearing and earth-moving, and barring for construction camps and the building of two new lanes on the downstream side of the ALB, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurances on this front that adequate precautions will be taken to avoid damage in this time period. Catastrophic flooding could destroy much of the long-term, ongoing research value of Plummers Island, a part of the Island's MBIP eligibility. Further explanation of these concerns can be found in Appendix C. 6) WRBC has had and continues to have a significant and primary responsibility to maintain this Island as a long-term research site high in biodiversity with minimal disturbance. It must be protected. Under the Section 106 process, requests can be 6 made for mitigation measures. There is a direct use of the Island for purposes of Section II(f) and a significant adverse effect under Section 106. Avoidance and mitigation measures cannot be deferred until later, after the Final Environmental Impact Statement, after the Record of Decision, or after predevelopment. That is already too late. We require assurances at an administrative level that Plummers Island will be avoided and that the needed mitigation measures will be put in place after all avoidance options are exhausted. Our mission is to protect the biodiversity of Plummers Island including its perimeter wetlands, our long-term research efforts, and the quality of the place as a whole for future generations. We need your attention, your understanding of the Island's value and sensitive ecology, and your support in this effort. Respectfully, Robert Soreng, President Carla Dove, Vice President Lowell Adams, Secretary On behalf of the 88 members of the Washington Biologists' Field Club 7 Appendix A: Documentation of Experience with Strike Team Two of the staff that have communicated with us have been professional and communicative with WRBC and led us to believe they have our best interests at heart. A MDOT Strike Team asked WRBC to join them in a virtual video discussion in January of 2021. That hour long discussion considered our concerns documented by us as "Threats to Plummers Island" (see https://wbfc.science/plummers-island-threatened/) and discussed alternatives to the DEIS plans that might mitigate some damage to Plummers Island. The initial minutes of that meeting produced by the Strike Team provided a cursory account that basically said the meeting had taken place. We protested those minutes, and a fuller account was submitted by the Strike Team, but to our knowledge our further suggestions for modifications to the minutes were not added. In the following week after the MDOT Strike Team meeting of January of 2021, WRBC was invited to join the Section 106 process as a consulting party. We did not recognize that invite until March of that year because the initial offer made by MDOT was sent through a clogged email box of a secondary contact rather than through the WBFC leader of the discussions, and once unearthed was then misunderstood. While we were heartened to be acknowledged as a consulting party, this delay caused us serious consternation that could have been avoided. However, most of the deliberations and communications of the Section 106 process have been in meetings between Agencies that we were not privy to attend or review. At our request, the Section 106 process has led to Plummers Island being recommended as a special historical place within the C & O Canal National Historical Park. We appreciate that MDOT hired a competent research company to study WRBC on Plummers Island and to file the Maryland

See response above for SDEIS Comment #29.

#29 Cont

CO-722

11

JA1754

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 185 of 340

**WBEC SDEIS Comments 30 November 2021**

Historical Trust Determination of Eligibility form (DOE). That form and report were submitted to MDOT in June of 2021, and the Section 106 supervisory team accepted that company's report (whether modified or not we do not know). The final report was sent to WBEC on 9 September 2021 and to the Maryland Historical Trust State Historic Trust Officer. The MDOT-SHA, Cultural Resources Team Leader, Mr. Archer, has answered multiple of our email questions in a prompt, professional and friendly manner, clarifying various aspects of the process and results. We believe that report represents a fair and unbiased, but brief, assessment of the history of the WBEC and some of its most prominent members. The report notes that WBEC contributions to science are many and details a few, but does not go into depth. To investigate the deeper impacts of the WBEC, its membership on society, and its science on biodiversity of the Potomac Gorge, on local and national scales DoeFull would have to access the full WBEC archives, and do further research stemming from those files. The DoeFull report notes WBEC archives were accessed in June of 2021. While it is true that most scientific publications and many photographs have been digitized, and many are available on-line, we note that the actual archives are stored in the Department of Botany, at the Smithsonian Institution, and could not have been accessed at that time due to Covid-19, nor could they have been accessed without knowledge or permission of the WBEC Archivist. Our Archivist has indicated that there are many more documents and photographs in the Archives that have not been digitized. A MDOT "Strike Team" representatives visited us in the meeting of January 2021, when they said they could potentially limit construction access under the ALB to from the upstream side (west side). This is confusing as on p. 5 paragraph 2 (MIS_106_Sept_8_Letter_sig) they write that that construction access will only be from the west side, while the map of 1 September and other communications suggest that the access will be from the "north side," which is both upstream and downstream through National Park land (i.e., nothing changed there). All this is disingenuous as in the building of the two east side lanes under Alternative 9, there is no way for them to not work on the east side of the bridge. The proposed solution of building the extra lanes only on the upstream side and other options presented to avoid damage to Plummers Island were rejected by the "stakeholders." We request the evidence that these options were seriously considered and the full accounting of the reasons for their rejection. The public, their representatives, consulting parties, agencies, and contractors are all stakeholders. And all stakeholders are equal but some stakeholders are more equal than others, it appears. The Supplemental Draft Environmental Impact Statement (pp. 4-18. and 4-19) gives the description of the decision-making about the bridge construction, but it still doesn't explain how and to what extent Plummers Island was actually considered as a unique NRHP-eligible historical and important scientific research site within a national historical park. In fact, WBEC was the prior owner of the NPS land on the downstream side of the ALB, now MDOT plans to turn that into a huge ramp to build the downstream lanes, if not to access the underside of the bridge and then to build it up and pave it over for new lanes. MDOT, in the same January meeting, also said they could cantilever the bridge piers such that no piers would need to be placed on the island. That is not evident in the current MDOT plan. Moreover, they still plan to place a pier on the island. The 3DIS LOD on Plummers Island was crudely drawn, just a line across the head of the island, with an additional 250-foot APE, extending to about 2/5ths of the island. MDOT-SHA had Plummers Island LOD and APE zones surveyed in detail in the spring and summer of 2020 without consulting WBEC. Moreover, the survey team culturally backed down seven of the old age fringe trees on the island. The DEIS did not mention WBEC or consider the worth of 170 years of accounting and long-term research on the biota of Plummers Island by WBEC. Post the DEIS publication and comments period which ended in November of 2020, MDOT representatives keep saying in public comments, documents, and email messages to WBEC, that they had reduced the LOD on the island significantly. Yet all they seem to have done in the current document (MIS_106_Sept_8_Att_13_APE_Corridor_8_map 3) is draw a more precise but still ragged LOD line of delineation. Map 3 also fails to capture lands in the NW corner of Plummers Island in Eligible / Listed, or Eligible – Pending SHPO Concurrence), and also fails in the same way to include the river front of Carderock section of the C & O National Historical Park upstream from the ALB. At one point this summer MDOT even published a

11

**#29 Cont**

See response above for SDEIS Comment #29.

**#29 Cont**

WBEC SDEIS Comments 30 November 2021

map with no I-270 lane on the Island. We do not have faith that the LOD as currently mapped is more than a hollow public relations scheme to ward off complaints, or that it will even be adhered to once construction proceeds. 9 Appendix B: Views on the Project From our (WBEC's) perspective, MDOT's selection of Alternative 9: Phase I South is the among the worst of the SDEIS alternatives for it ignores and exacerbates climate change, puts the future of transit in the region in the grips of a foreign conglomerate with a vested interest in opposing mass-transit options. Recent findings, detailed in WTOP, the Washington Post, and other media outlets, confirm what critics have been saying: that the whole freeway system is to backed up that adding capacity to a segment of I-495 is unlikely to result in long-term improvement to traffic flow. This undeniable alternative also has the most damaging impact on the Plummers Island scientific and historical site of the SDEIS alternatives proposed. From our perspective, the whole project was predicated on a need to rebuild the bridge in 10-15 years, when in fact the bridge is structurally sound and only requires redecking in 10 to 15 years. From our perspective, reversing climate change requires doing things differently to reduce CO2 output from personal vehicles, by adding mass transit alternatives and increasing people's reliance on network, not to expand the current commuting status quo indefinitely. From our perspective, adding 4 toll lanes to the A,B, is adding Luxury Lanes to keep those with deep pockets moving faster, while everyone else sits in congestion. And, as noted above, current studies using MWCOG traffic models confirm what critics have been saying: that the whole freeway system is so backed up that adding capacity to a segment of I-495 is unlikely to result in long term improvement to traffic flow. From our perspective, none of this achieves the goals of traffic improvement in the longrun. Recently published future congestion predictions tell us that within a decade after the project is completed (and noting there would be 10 years of miserable traffic during the construction project), in many places along the route and in the evening rush congestion would be no better that it is today. So, you get a 10 year window of viability of the project to reduce traffic... and lots of damage to historical properties and more CO2. There absolutely needs to be another thinking of how people and goods are moved. The project has been falsely posited as something that must be urgently approved and driven by a private company as part of a public-private partnership, because it is too costly to be done using state funds. Therefore, it is argued, it must be designed to be extensive enough to be lucrative for the private sector. Yet, this very day, Maryland is sitting on a $5 billion dollar surplus of funds that could be used for transportation system improvements. The Daily Record reports on this in these articles: Maryland's Rush finances have some officials pushing for more borrowing (Oct 4, 2021) and Hogan takes combative stance over use of state's revenue windfall (Oct 7, 2021). 10 Appendix C: Impact Concerns On project maps, the limits of disturbance (LOD) is marked on the land of the Island, while the channel itself is not considered as integral to the sustainability of the A,B, wetlands and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WBEC - and the National Park Service - consider the Island's emergent wetland perimeter to be part of the biodiverse whole, and since 1901 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline. The MDOT Strike team indicated the original ISIS plan to fill in the "culvert" (channel) with spoil for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. Where is ISEPA in this? With all the planned land-clearing and earth moving, and burning for construction ramps and the building of two new lanes on the downstream side of the A,B, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurance on this front that adequate precautions will be taken to avoid damage in this time period. Due to

11

See response above for SDEIS Comment #29.

#29

WSRC SDEIS Comments 30 November 2021

Climate Change: the NOAA Atlas 14 used in preparation of the DEIS, is well out-of-date for frequency and intensity of massive floods. So-called hundred-year floods in Atlas 14 Volume 2, Revision 3 (2006) are now 5-10-year events, and two such events occurred in the last 12 years. Moreover, the DEIS planned their construction activities around flood levels recorded at Little Falls Gauging station 3 miles downstream from the ALB and in a wide section of the Potomac River. The flood levels at the ALB, situated in the narrows of Mather Gorge, are 7 feet higher than that posted at Little Falls (Sorreg observation, January 2021, photo documented). From our perspective what they need to do in in the construction period, is build a flood protection wall on upstream side of the ALB that will withstand extreme floods. If this is not done all the heavy timber planking used to cover the channel for a construction platform could blow out in a high flood, and then wash across the Island along with other construction mud and debris, with catastrophic consequences. Additionally, the LOD boundaries exclude the rocks at the head of the Island situated in the Potomac River, which are connected to the Island except in flood stages and which harbor the highly rare Natural Community Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type); (Hypericum prolificum, (Labiatya racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia Herbaceous Vegetation (USWVC CEGL006491); 11 Global/State Ranks: G1/S1L (Simmons et al., 2016, 2020). These rocks bear the only significant and sustainable population of this community on Plummers Island. These rocks also protect and produce the rare Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation (USWVC CEGL004683). Non-tidal mudflats. Global/State Ranks: G3/SNR. These communities occur downstream along the perimeter of Plummers Island and along the channel, and again are of small actual area on the Island such that any loss is a big loss to Plummers Island biodiversity. MDOT representatives indicated that they considered our suggestion that the addition of 4 new lanes to the ALB could be made to the upstream side, rather than dividing those between the up and downstream sides. However, nothing changed their Alternative 9 Phase 1 South plan for two toll lanes on each side (in fact the bridge will have three lane widths added per direction!). These three additional lane widths on the downstream side would overshadow the Island by at least 20 ft. On top of this, MDOT's engineers ungraciously amended the Alternative 9 plans by placing a bike and foot traffic lane (requested by various consulting parties and DEIS comments) to the downstream side to make it overshadow the Island. Much of what we had discussed above relates to construction effects. However, there are myriad negative future effects to be concerned about. Several rare plant species exist on the head of the Island adjacent to emergent perimeter wetlands. Their habitats will be utterly destroyed by the extended ALB lane overhang and emplacement of a pier on the Island. This unnecessary "baking" of public lands and rare species cannot be mitigated with surveys, plant rescues/relocations, or other such measures. It will simply be forever lost. Moreover, there is no comparable occurrence of these rare species and habitats on the northwest side of the ALB. The noise in Plummers Island from the ALB is already injurious and distracting, will be exacerbated by the displacement of heavy vehicle traffic to the outermost lanes overhanging the Island, causing persistent and significant injury to the communications of native animals, human communications, and seriously impacting the quality of experience of the natural wild lands. We have discussed sound barriers and decking surfacing to reduce noise with MDOT representatives. However, we see nothing in the current document to address this. WSRC has not found any MDOT plans to alter drainage to the channel or Plummers Island from the ALB in stormwater management (SWM) plans (Attachment 4 MLS Compensatory Stormwater Management Sites, September 2021). The low point on the ALB is just above the dogleg in the channel, and bridge scuppers drain the toxic runoff from there into the channel, further impacting and endangering the biota of the emergent wetlands and aquatic species. WSRC notes this problem in our DEIS comments and our Threats to Plummers Island document sent to MDOT and other organizations and agencies in early 2021. 12 Appendix D: Endangered, Threatened, and Rare Species on Plummers Island. The species on Plummers Island, including endangered, threatened, and rare species, have been studied since 1901. They are part of the Island's historic and ongoing research value. Current awareness of and attention to their protection

14

See response above for SDEIS Comment #29.

00022935

JA1757

**WBC SDEIS Comments 30 November 2021**

In the state's DEIS process has been inadequate. Plummers Island has numerous state endangered, threatened, and rare species. Plummers Island has three extant endangered plants that have been considered endangered in Maryland for many years and were mentioned as endangered in the MFS/I-270 Managed Lanes DEIS, Appendix K of Appendix I, page 1. These state endangered plants are: 1. Coville's Phacelia (*Phacelia covellei*) 2. Norse-tail Paspalum (*Paspalum fluitans*) 3. Pale Dock (*Rumex altissimus*) Curiously, in March 2021, Maryland DNR downgraded two of those species (Coville's Phacelia and Horse-tail Paspalum) from endangered to threatened although their status, if anything, is more imperiled by the planned widening of the ALB. On what basis could these species have been downgraded? The WBC cannot agree with this change without compelling evidence. The above list of three state RTE plant species is not complete or exhaustive (see Simmons et al. 2020); there are additional Maryland RTE plants on the island, such as Smooth Rose Mallow (*Hibiscus laevis*) which is a rare plant of concern, Pink Valerian (*Valeriana pauciflora*) which is endangered; Leatherwood (*Dirca palustris*) which is threatened; and Sticky Goldenrod (*Solidago racemosa*) which is rare. There are also several grass and sedge species including Flat-spiked Sedge (*Carex planispicata*) and Open-flower Panic Grass (*Dichanthelium laxiflorum*). Other rare species include: Ostrich Fern (*Matteuccia struthiopteris*) and Smooth Wild-petunia (*Ruellia strepens*). RTE animals that live on or utilize the island include: Eastern Small-footed Myotis (state endangered) and Northern long Eared Bat (state threatened/US threatened). We can provide recent inventories of species on Plummers Island upon request. The Endangered Species Act protects both federally listed endangered species and those species deemed endangered, threatened, or in need of conservation within the state, based on habitat and conservation factors. At the state level, threatened and endangered species are regulated under the Maryland Non-game and Endangered Species Act (Annotated Code of Maryland 10-2A-01). Excerpts from a December 2020 Washington Post article by Katherine Shaver tell more of the story: 13 Tucked below the American Legion Bridge on the Maryland side of the Potomac River ... Plummers Island, ... "the most thoroughly studied island in North America." For nearly 120 years, the 12-acre patch of rock and woods has been home to the Washington Biologists' Field Club. Its 65 botanists, entomologists, ornithologists and other scientists have spent decades scrutinizing the island's thousands of species of plants, insects and wildlife. Robert Soreng, the club's vice president and a botanist at the Smithsonian National Museum of Natural History, said Plummers Island provides a critical research site because of its remarkable biodiversity and protected status under the National Park Service. Studying the same wilderness since 1901, he said, has revealed how nature responds to human development, climate change, invasive species and other changes. "This is incredibly valuable for studying long-term trends," Soreng said. "We know more about what's there than in any other place." But Soreng and other scientists say the island's research value is in danger of being lost to a new, wider American Legion Bridge. Under a plan by Maryland Gov. Larry Hogan (R) to relieve traffic congestion on the Capital Beltway, an expanded bridge between Virginia and Maryland could require piers on the island's western edge. Trees would also have to be cut so that area to build a road for construction vehicles to access the bridge site over four to five years. Plummers Island is in the Potomac Gorge, between Great Falls and Georgetown. The gorge is home to hundreds of rare species, including the highest concentration of rare plants in Maryland, according to the National Park Service. Moreover, the biologists say, its protection from development has provided a rare chance to do field work near miles from downtown Washington. "Where you think about the Washington area, there aren't many places that haven't been disturbed by humans," said Matthew Perry, a club member and emeritus scientist with the Patuxent Wildlife Research Center in Laurel. Soreng said more than 400 scientific papers have emerged from Plummers Island research. The most well-known study showed that many of the island's lichen species had died off and others had soaked up significantly more lead after the bridge was built, because of emissions from leaded gasoline used at the time. ... Club members have included legendary ornithologist Roger Tory Peterson; Gifford Pinchot, the first chief of the U.S. Forest Service; and Frederick Coville, who helped establish the National Arboretum. "There's an extraordinary concentration of world-class biologists," said Bruce Stein, a club member and chief scientist for

13

See response above for SDEIS Comment #29.

**#29 Cont**

OP LANES™ MARYLAND

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#29 Cont**

WBRC SDEIS Comments 30 November 2021

The National Wildlife Federation. "Everything that's in there," Sereny said, "someone is recording." Ralph Eckerlin, the club's president and a Northern Virginia Community College biology professor, said he worries about the birds, crickets, katydids and other species that rely on calling out to one another. Pamela Goddard, a Mid-Atlantic specialist for the National Parks Conservation Association, said Plummers Island must be spared as precious urban green space. "The premise for national parks is that they'll be protected," Goddard said. "They're not here as land to be developed for a highway." 14 APPENDIX E: April 2021 WBRC Comments on American Legion Bridge Construction and Expansion Impacts to Plummers Island from American Legion Bridge Construction and Expansion [submitted to the MDOT SHA Strike Team, February 29, 2021 for the March 1 joint meeting with WBRC). 1. Damage to waterways a. Potomac River shore (mud flats and sandbars are wetland features in the MDOT reallocated [post the DEIS comments] Zone of Destruction. b. We don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and Rock of Gibraltar (at the upper lip of the island) are destroyed or significantly altered. Sand bars and mud flat habitats could be substantially reduced for plants and animals that depend on these. c. The Island Channel [AKA "Rock Run Culvert"]. The head of the channel down to the dog leg would not see daylight for years of construction. After which this part of the channel would be overshadowed by the 2 added lanes on the island side of the bridge. What are the consequences to waterways there and downstream? d. With the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the island flood plain, potentially adversely affecting much of that flood plain. e. If sub-point d happens, all research plots in the flood plain could be substantially altered. (Including vegetation plots 1, 3, 9, 10, 11, 12, and habitats for plants and animals) f. The "frog water" pools at the head of the island noted in the DEIS and circumscribed in subsequent documents with 2 major vulnerable to disturbance [vegetation plot 3 is in this zone]. g. Zone of potential effects/disturbance uncertain, but estimated by DEIS to be 2/5 of the island. What is the MDOT plan for protecting this zone? f. Amphibians are in global and local decline due to pollution, disease, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island [Marsville 1968 and https://collections.nmnh.si.edu/search/herps/): Acris crepitans, northern cricket frog; Hyla versicolor, eastern gray treefrog; Lithobates clamitans, green tree frog; Lithobates palustris, pickerel frog; Lithobates sylvaticus, wood frog; Pseudacris crucifer, spring peeper; Pseudacris feriarum, upland chorus frog; Ambystoma maculatum, spotted salamander; Eurycea bislineata longicauda, long-tailed salamander; Hemidactylium scutatum, four-toed salamander; Notophthalmus viridescens viridescens, eastern newt; Pseudotriton ruber, northern red salamander. 2. Destruction of rare plants [Simmons et al. 2020] and rare plant communities [Simmons et al. 2016] from the far west end of Plummers Island within the Zone of Destruction. a. Hibiscus laevis [mud flats just below and above point of rocks] b. Solidago racemosa [point of rocks, below Rock of Gibraltar] c. Hypericum prolificum [point of rocks, below Rock of Gibraltar] d. Paspalum fluitans [mud flats just below and above point of rocks] e. other native plants rare on the island occurring only on west end in Zone of Destruction: e.g., Sedum ternatum, [on Rock of Gibraltar] f. Piedmont / Central Appalachian Sand Bar / River Shore [Low Herbs Type]: Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation [USNVC: CEG1004483]; Non-tidal mudflats. Global/State Ranks: G3/SNR [Simmons et al. 2016]. g. Potomac Gorge Riverside Outcrop Barren [Potomac Gorge Type]: [Hypericum prolificum, Eubotrys racemosa / Solidago/Hypericum racemosum prolificum - Solidago bicolor - tristis. Global/State Ranks: G2/S1.3. Destruction of WBRC research plots: a. Vegetation research plots from 1997 and 2013-2015 will be destroyed [plots 4, 5, on the sandbar at the head of the island will be totally destroyed (see slab point 1d)]. A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed. 4. Destruction of past collection sites. a. many plants and animals were vouchered or recorded from the west end of the island, some are only known on the island from there. 5. Habitat destruction and disturbance lead to more invasive organisms. a. the west end of the island is covered in a tangle of oriental bittersweet [first recorded from the island in 1982], and shrubs of anual honeysuckle [first recorded

---

See response above for SDEIS Comment #29.

JA1759

USCA4 Appeal: 24-1447     Doc: 30-5     Filed: 09/30/2024     Pg: 190 of 340

**WBFC SDEIS Comments 30 November 2021**

From the island in 1997), among many other invasive plants recorded there. Invasive species establishment and expansion will be sorely exacerbated by disturbance involved the construction process. 6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms employed for construction blow out. Construction timbers potentially could rip out acres of trees and other vegetation in the island flood-plain. Note 1-51 out of the 100 recorded historic Potomac River floods (over 54 ft at Little Falls Gauge, NOAA data) were recorded since the first bridge was built in 1962, 33 since the midsection of the bridge was filled in 1992, 1996 included 2 of the top 7 floods, and 2018 included 4 historic floods. In 2019 the island flood plain was inundated on and off for much of winter and spring. Note 2: Mather Gorge (Cohn-2004) is much narrower at the American region (bridge and Plummers Island than at Little Falls Gauge, so the high-water marks listed below substantially underestimate the peak flows at the 16 bridge and head of island by as much as 7 ft (verified at the bridge side of the channel bend, March 25, 2021): rank height ft date 47 11.68 ft 4/18/2011 5 10.39 ft 1/21/1996 50 11.56 ft 12/17/2018 7 13.84 ft 9/8/1996 54 11.44 ft 9/21/2003 11 13.82 ft 3/19/1936 58 11.3 ft 5/20/2011 16 12.38 ft 6/2/2018 61 11.17 ft 1/27/2000 37 12.35 ft 3/6/1993 65 11.01 ft 9/29/2018 46 11.7 ft 5/28/2014 66 10.88 ft 3/11/2011 67 10.87 ft 12/22/2003 90 10.16 ft 3/25/1993 68 10.85 ft 9/11/2018 92 10.13 ft 1/29/1993 70 10.79 ft 3/22/1998 95 10.09 ft 11/20/1993 77 10.55 ft 4/10/1993 96 10.04 ft 5/13/2008 81 10.41 ft 1/10/1988 97 9.97 ft 9/21/2003 82 10.17 ft 1/30/1994 98 9.78 ft 9/9/2011 86 10.31 ft 10/30/2012 99 9.67 ft 5/6/2009 87 10.28 ft 3/30/2005 100 9.43 ft 4/17/2007 7. Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge. a. The noise factor cannot be ignored by humans or wildlife. Already the sound of traffic is disturbing to human conversation at our meeting place the WBFC Cabin grounds. 8. Salt and oil runoff impacts on biota from the bridge a. This depends on where the outflow is drained from the bridge drainage scuppers (particularly at the bridge's low point) b. The unintended consequences of that volume of road salts on freshwater ecosystems can be severe. A colleague is working on this very subject on area highways, and the impacts he found were surprisingly devastating. One of the worst impacts was mobilizing (and making bioavailable) toxic metals in waterways. 9. Violation of long-term continuity of 120 years of research (Perry 2007; Shetler et al. 2006): a. Lichens study on Plummers Island validated essentially of long-term research contributing to national and global removal of soot from gasoline; A stop from 78 species to 20 species due to sensitivity to lead pollution on the island (Lawrey & Hale 1979). b. The decline of forest breeding birds on Plummers Island is related to the American region Bridge (Johnston & Winnings 1987). 17 c. Insects, like other organisms, are experiencing major declines globally (Borenstein 2028; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cecropsia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species, because they have been hammered by an introduced biocontrol agent – a non-native tachinid fly, Compsilura concinna, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity, but impacts here are not yet known (John Lill pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island (more than 3000 species documented there; Brown & Bahr 2009a,b), the island is a key place to further document this aspect of "insect apocalypse" (Jarvis 2018) assuming the island remains intact. Erwin (1981) and Brown (2001) have documented long-term trends in beetles and moths, respectively, with shifts in species composition related mainly to vegetation succession. The A1 bridge project puts WBFC Plummers Island research on trends in biodiversity in jeopardy. d. Bellwether issues of plagues, invasions and expansion of exotic species are expected to be exacerbated due to disturbance from construction – some examples of forcing of introductions spreads, and manifestations of infestations of plants, animals and diseases from around the region are recorded from Plummers Island (giant records from Shetler et al. 2006, WBFC Invasive Biota Committee reports 2015- 2020), and http://collections.nmnh.si.edu/search/botany/i. arrival and expansion of garlic mustard (1935), now rampant ii. arrival and expansion of tree of heaven (or hell) (1936), now 50+ trees iii. arrival and expansion of Japanese honeysuckle (1949), now dominant iv. arrival and

See response above for SDEIS Comment #29.

#29
Cont

00022938

JA1760

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 191 of 340

I-495 & I-270 Managed Lanes Study

#29

WBHC SDEIS Comments 30 November 2021

expansion of Japanese stilt grass (1979), now locally dominant v. arrival and expansion of oriental bittersweet (1982), now all over and covering trees vi. arrival and expansion of amur honeysuckle (1997), now dominant on west end vii. arrival and expansion of winter creeper (1997), now patchily established but potentially widespread viii. arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread ix. Emerald Ash borer (EAB) arrival and expansion in 2015 and death of ash trees (2016), mass die off of ash trees, a major shift in forest climax community (Simmons et al. 2016) x. fig buttercup arrival and expansion and expansion (3 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially 18 xi. arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species, https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_America xii. arrival and expansion of Asian clams (Corbicula fluminea), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959; established in the Potomac River by 1982) xiii. Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years. xiv. Beech blight is coming, Poplar (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for the blight here, unless the forest is cut down for the bridge construction. e. Research following climate change impacts to the ecosystems and organisms on Plummers Island will be confounded with issues involved with disturbance from bridge construction and emplacements. References Boersstein, S. 2018. "Windshield test" highlights big drop in flying bugs. The Washington Post. HEALTH & SCIENCE (2018-09-35). Brown, J. W. 2001. Species turnover in the LepiVolkes (Lepidoptera: Tortricidae) of Plummers Island, Maryland: Assessing a century of inventory data. Proceedings of the Entomological Society of Washington 103(3): 672-685. https://www.biodiversitylibrary.org/bibliography/2510 Brown, J. W., B. S. M. Bahr B. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. Bulletin of the Biological Society of Washington 15: 54-64. https://doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2 Brown, J. W., B. S. M. Bahr B. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 192-226 http://dx.doi.org/10.2988/0097-0298(2008)15[192:ALOTI]2.0.CO;2 Brown, J. W., Epstein, M., Vorns, K., Watkins, R., Bahr, S. M., Koleki, E. 2008. An overview of the Lepidoptera ( Insecta) of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 65-74. Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. BioScience, Volume 54(1): 8-14. https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2 19 Erwin, T. L. 1981. Natural History of Plummers Island, Maryland XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. Bulletin of the Biological Society of Washington 5: 105-224. Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal.pone.0185809 Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? The New York Times Magazine, 27 November 2018, pp. 41-48. Johnston, W. H. & D.L. Wiinings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. Proceedings of the Biological Society of Washington 100:762–768. (December 31, 1987) Laurens, J. D., M. E. Hahn & N. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. Science Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423 Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, Biologists' Field Club, pp. 1-44. (January 1968.) Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS

See response above for SDEIS Comment #29.

JA1761

**#29**

WBFC SDEIS Comments 30 November 2021

HISTORY (1900-2006), The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown on WBFC Book at https://WBFC.science/wpcontent/uploads/2019/09/wbfc_booklon.pdf Popkin, G. 2019. A mysterious disease is striking American beech trees. Science Nov 14 2019 https://dx.doi.org/10.1126/science.aba2203 Stetler, S. G., S. S. Orzi, E. I. Welk & M. Feyersdofer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. Bulletin of the Biological Society of Washington, 14(1): 1-57 https://wbfc.science/wpcontent/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf Simmons, R.H. Fleming, A.H., Sorieng, R.I. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf available at https://wbfc.science/wpcontent/uploads/2019/09/plummersl_island_nc_map_v1.1.pdf Simmons R.H., Sorieng R.I., Barrows E.M., Emmons L.H. 2009. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf available at https://WBFC.science Vogel, G. 2017. Where turn all the insects gone? Science 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full 20 Appendix F: Minimum Avoidance and Mitigation Measures Needed Below are the minimum avoidance measures, design considerations, and mitigations to avoid or reduce impacts that should be made to avoid, minimize, and mitigate adverse effects to Plummers Island and the mapping research there. These provisions should have been considered from the beginning of the MDOT-SHA project development and in the DEIS. This content comes from WBFC's April 9, 2021 Section 106 comments. No bridge alternatives were discussed in the Draft Environmental Impact Statement (DEIS), which is a major omission, and should have been presented there so that the public could have the same information to comment on. We would have certainly made DEIS comments on the bridge alternatives if any relevant information on bridge alternatives had been discussed in the DEIS. That information was lacking and clearly should have been included in the DEIS. A Supplemental DEIS has now been issued (October 1, 2021), and still no bridge alternatives are clearly delineated. Clearly there needs to be a specific focus on design changes that will reduce and avoid impacts to Plummers Island. The first obvious choice for reducing and avoiding impacts is the "no build" option. Second is the upriver bridge alternatives, which should have been evaluated in the DEIS and certainly must be now before the project is advanced. Although WBFC is opposed to the American Legion Bridge (ALB) expansion, particularly with toll lanes and lack of mass transit in the design (cars and buses from a few points are not an acceptable replacement for dedicated mass transit), the following types of mitigations are necessary and non-negotiable. To protect Plummers Island and its significant historic features and attributes, the minimum mitigations follow: • Plan for major (not minor) flooding during the construction period. • Avoid obstructing natural flow into the Plummers Island channel • Build all the new lanes for the ALB on the upriver side of the bridge. • Build the access to and the construction platforms themselves only on the upriver side of the bridge and under the bridge • In any case, add sound barriers to the downstream side of the bridge. • like lane surfacing that is as quiet as possible. • Pave the access roads over the island from the mainland; no future drainage should avoid the drainage flows onto the channel separating the island from the mainland. • Restore all the wetlands including the channel. 21 • For the duration of construction, any construction infrastructure should be designed to withstand major floods (over 14 feet) not minor (10-12 feet) floods; there have been 3 moderate (13-14 feet) and 2 major floods (17-18 feet) in the past 25 years. However, even minor floods recorded at Little Falls produce major flooding in the Plummers Island channel adjacent to the bridge (see Appendix D, point G). • Monitor during construction to ensure that construction work is not impacting the island and no construction

---

See response above for SDEIS Comment #29.


OP LANES™
MARYLAND

i-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**WBFC Comments 30 November 2021**

workers or project personnel visit the island unless oriented and approved by the Washington Biologists' Field Club. These requirements should be included in bidding document and contractor's work plan as part of the environmental specifications that will be followed. « Chance find or inadvertent discovery procedures should be followed and incorporated into bidding documents and contracts. Please provide a copy for our review to ensure they meet the requirements for protection of Plummers Island.

**Appendix 3. WBFC's concerns expressed to MDOT meeting and position on the ALB, 30 November 2021.**

Read, November 29 in our joint Teams meeting (flooding concerns added November 30 after review of MDOT maps in our Teams meeting), 2021

This is WBFC's position on I-495-295 American Legion Bridge expansion in regard to Plummers Island:

Avoidance of Plummers Island is essential. We discussed avoidances with MDOT strike team in early 2021. Some minimizations were made, however, Mitigation and Minimization are not solutions to our concerns.

MDOT needs another highway and American Legion Bridge plan. WBFC supports the No Build option. We urge NPS to support the No Build Option. This MDOT carry-on-as-usual plan, as well being a threat to our 120-year-long research project, does not account for climate change impacts or major changes in commuter patterns due to covid and teleworking. There are smarter ways to deal with traffic. This project is not supported by rigorous data and is wasteful, with minimal improvements in commuting time only after 5 to 10 year construction disruptions. And luxury-lane Tolling by the P3 is an insult to the local public, filling coffers overseas and with minimal funds funneling back to needed infrastructure at home. Expanding the American Legion Bridge laterally by 4 new lanes is the most environmentally damaging of MDOT's alternatives to Plummers Island.

#29 Cont

#30

See response above for SDEIS Comment #29.

**Response to SDEIS Comment #30**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. The No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need and for the Selection of the Preferred Alternative, please see related Common Theme Responses and the SDEIS and FEIS.

Transit alternatives were considered. Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.6.A for a response on opposition to managed lanes or tolling public roads.

Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to SDEIS Comment #31**

Despite the extensive avoidance and minimization efforts to NPS properties around the ALB including Plummers Island, impacts to Plummers Island could not be avoided completely, but impacts have been reduced by approximately 1.6 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, approximately 0.28 acres of impact at Plummers Island would be impacted, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

**Response to SDEIS Comment #32**

See response to Comment #4 above.

**Response to SDEIS Comment #33**

The historic property boundary for the Washington Biologists' Field Club was established using the tax parcel boundary, as is standard for MDOT SHA Section 106 survey efforts. In preparing the National Register of Historic Places determination of eligibility documentation, MDOT SHA did not find character-defining features of the historic property that justified a different boundary.

**Response to SDEIS Comment #34**

See response to Comment #22 above.

**Response to SDEIS Comment #35**

Water quality treatment for the ALB is not feasible since NPS has indicated that they will not accept any SWM on their land and all the land surrounding the ALB is owned by NPS. Some alternative practices exist that may be feasible to provide some level of pretreatment of the bridge or approaches that may be incorporated into the drainage design. These practices are not approved to provide water quality credit in Maryland and may prove to be infeasible given the various site constraints during final design. However, MDOT SHA will consider use of these alternative practices on or around the ALB area within MDOT SHA ROW.

00022942

---

WBFC SDEIS Comments 30 November 2021

These are our concerns.

Beyond Section 106 and NHPA this is a 4F issue for Plummers Island. Plummers Island needs to be protected as a whole, including its riparian and wetland margins.

The impacts that will result from current the MDOT SDEIS proposal will seriously affect all our ongoing long-term research. WBFC's core mission is treating the island as a site for long-term monitoring of the ecosystem and biodiversity changes. Disturbance resets our 120-year record back to zero by terminating the ecosystem processes. Tree cutting, stream and land habitat disturbance will also inevitably lead to further uncontrolled proliferation of invasive species.

**#31**

**#32**

Flooding. The proposed positioning of the caisson pilings in the channel is alarming. WBFC has noted three massive log jams in the last few years in the channel at the northwest dog-leg, and at the rock ledge crossing at the toe of the island. These jams dam the flow and back up flood waters flushing these over the low terraces of the island. The inevitable log jams forming at the caissons will predictably result in a massive river eddy that will swell above the there's tide and force a flow around the west end of the rock ridge at the west end of the island and through the ancient river side-channel directly behind the rock ridge. This flow will swash out plots 4 & 5, and 3 for sure, and possibly plot 1 (one recent flood season stripped the top soil from the island up to the 6ft contour, leaving only sandy bottom lands). Trees are falling at alarming rates along the Potomac Gorge bottomlands due to dead ash trees from emerald-ash-borer, oak die-off from fungus, hemlocks dying from woolly aigid infestations, and beech blight (heading this way from the northeast), stresses from higher temperatures and more frequent droughts, leading to more huge logs being ferried down-river by more frequent massive floods resulting from climate change. The placement of the caissons forms a perfect sieve for catching logs which are often over 30 ft long, but even shorter ones stick and pile up. What will happen with the trestles in addition to the caissons?

**#33**

In addition, we are still trying to get a clear understanding of the topographic position of the line of the LOD. The rocky ridge at the west end of the island (centered at the dent in the LOD line) is a distinctive island feature that seems to be within the LOD. Reduction/obstruction of that ridge will seriously impact future flooding of the island. This ridge keeps the channel from overflowing the island at most flood stages. Unfortunately, the MDOT maps occlude/obscure these topographic features.

**#34**

Rare, Threatened and Endangered Plants and Animals. There are rare plant and animal species, and rare plant communities documented on the island including its riparian margins, both within the LOD and APE. MDOT has seen WBFC and NPS reports of these. These should be fully protected.

**#35**

Toxic Runoff. The lowest point on the ALB and nearby I-495 lanes drains into our channel and the river. Toxic runoff from the bridge needs to be treated before dumping onto the land and then into the channel and Potomac River. Salts, oil, and antifreeze which release toxic metals can no longer be dumped into NPS land and our waters. If there is a major accidental spill on this ALB drainage that waste will end up directly in the channel and river.

23

JA1764

USCA4 Appeal: 24-1447    Doc: 30-5    Filed: 09/30/2024    Pg: 195 of 340

00022943

OP·LANES™
MARYLAND

WBHC SDEIS Comments 30 November 2021

Potomac River

*Gary Peterson, 2015*

7B. Explanation of Geological map of Plummers Island, 2015.

WBHC SDEIS Comments 30 November 2021

## GEOLOGIC-GEOMORPHIC MAP OF PLUMMERS ISLAND
*BY GARY PETERSON, 2015*

### GEOMORPHOLOGY OF PLUMMERS ISLAND

Appendix 8. SDEIS map of the Alternative 9 emplacement of the American Legion Bridge. Old bridge buttresses and piers and bridge - pink, new bridge buttresses, piers and caissons - blue, new lanes - orange, yellow line LOD.

24

25

CO-733

JA1765

OP•LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

WBFC SDEIS Comments 30 November 2021

Appendix 9. Link to WBFC DEIS comments, November 2020. https://wbfc-science/wp-content/uploads/2021/03/WBFC-written-Testimony-on-I-495-270-DEIS-Nov-6-2020.pdf

*This page is intentionally left blank.*

00022944





# I-495 & I-270 MANAGED LANES STUDY

## Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation

### October 2021







00027631

# I-495 & I-270 MANAGED LANES STUDY

**Montgomery and Prince George's Counties, Maryland & Fairfax County, Virginia**

## SUPPLEMENTAL DRAFT ENVIRONMENTAL IMPACT STATEMENT
and
## UPDATED DRAFT SECTION 4(f) EVALUATION

Submitted Pursuant to:
42 U.S.C. §4332(2)(C) and 49 U.S.C. §303

By:
U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
and
MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

In Cooperation with:
U.S. Army Corp of Engineers, National Park Service,
U.S. Environmental Protection Agency, National Capital Planning Commission,
Maryland Department of the Environment,
Virginia Department of Transportation, and Maryland-National Capital Park and Planning Commission

_9/23/2021_
Date of Approval

Tim Smith, P.E., Administrator
Maryland Department of Transportation
State Highway Administration

_9/23/2021_
Date of Approval

Gregory Murrill, Division Administrator
Federal Highway Administration

The following persons may be contacted for additional information concerning this document:

Mr. Jeffrey T. Folden, P.E., DBIA
Maryland Department of Transportation,
State Highway Administration, I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202
410-637-3320

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
410-962-4440

This Supplemental Draft Environmental Impact Statement (SDEIS) has been prepared, in accordance with 23 CFR 771.130, to consider new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South. Building off the analysis in the existing Draft Environmental Impact Statement (DEIS), the SDEIS is limited in scope to focus on new information available and analyses completed since the July 10, 2020 DEIS publication while referencing the DEIS for information that remains valid. The Preferred Alternative focuses on constructing two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the GWMP in Virginia to east of MD 187 on I-495, including the American Legion Bridge, and on I-270 from I-495 to north of I-370 and on the I-270 east spur from east of MD 187 to I-270. No action or no improvements are proposed east of the I-270 East Spur as part of the Preferred Alternative. This SDEIS presents a description of the Preferred Alternative, 2045 No Build and Preferred Alternative traffic analyses, the permanent and temporary impacts associated with the Preferred Alternative, including avoidance and minimization efforts as well as details related to the current efforts on conceptual mitigation for unavoidable impacts. Comments on the SDEIS are due 11:59 PM on November 15, 2021 and should be sent to Jeff Folden at the above address or submitted using the online comment form at oplanesmd.com/SDEIS. FHWA does not intend to issue a combined FEIS/ROD.

00027632



# Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation

## October  2021



U.S. Department
of Transportation

**Federal Highway Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00027633

Supplemental Draft Environmental Impact Statement



## TABLE OF CONTENTS

EXECUTIVE SUMMARY ....................................................................................................................... ES-1

**1    PURPOSE AND NEED** ..........................................................................................................1-1
1.1    Background and Context.....................................................................................................1-1
1.2    Study Purpose and Need.....................................................................................................1-2

**2    ALTERNATIVES** ...................................................................................................................2-1
2.1    Overview of Alternatives Development Process ................................................................2-1
2.2    Preferred Alternative .........................................................................................................2-4
2.3    Elements of the Preferred Alternative...............................................................................2-6
    2.3.1    Interchanges and HOT Managed Lanes Access......................................................2-6
    2.3.2    Stormwater Management Considerations .............................................................2-10
    2.3.3    Cross Culverts.......................................................................................................2-13
    2.3.4    Construction and Short-term Effects ....................................................................2-14
    2.3.5    Limit of Disturbance .............................................................................................2-17
    2.3.6    Tolling ...................................................................................................................2-18
    2.3.7    Transit-Related Elements......................................................................................2-21
    2.3.8    Pedestrian and Bicycle Facility Considerations...................................................2-23
2.4    Transportation Commitments and Enhancements.............................................................2-27
2.5    Phase 1 Solicitation Process and P3 Agreement..............................................................2-28
    2.5.1    Selection of the Phase Developer .........................................................................2-29
    2.5.2    NEPA and the Progressive P3 Work Together .....................................................2-29

**3    TRANSPORTATION AND TRAFFIC** .................................................................................3-1
3.1    Introduction ........................................................................................................................3-1
    3.1.1    Traffic Analysis Data Collection and Modeling Methodology...............................3-1
    3.1.2    Traffic Analysis Area..............................................................................................3-2
    3.1.3    Traffic Modeling Assumptions ...............................................................................3-2
    3.1.4    Impact of COVID-19 Pandemic on Traffic Demand and Forecasts ......................3-5
3.2    Existing Conditions.............................................................................................................3-7
3.3    Future Traffic Conditions and Alternatives Analysis ........................................................3-7
    3.3.1    Speed.......................................................................................................................3-8
    3.3.2    Delay .....................................................................................................................3-10
    3.3.3    Travel Time...........................................................................................................3-11

00027634

| | 3.3.4 | Level of Service | 3-12 |
| | 3.3.5 | Throughput | 3-13 |
| | 3.3.6 | Local Network | 3-14 |
| | 3.3.7 | Summary | 3-15 |
| 3.4 | | Next Steps | 3-16 |
| **4** | | **ENVIRONMENTAL RESOURCES, CONSEQUENCES & MITIGATION** | **4-1** |
| 4.1 | | Land Use and Zoning | 4-3 |
| | 4.1.1 | Introduction | 4-3 |
| | 4.1.2 | Affected Environment | 4-3 |
| | 4.1.3 | Environmental Consequences | 4-4 |
| 4.2 | | Demographics | 4-4 |
| | 4.2.1 | Introduction | 4-4 |
| | 4.2.2 | Affected Environment | 4-5 |
| | 4.2.3 | Environmental Consequences | 4-5 |
| 4.3 | | Communities & Community Facilities | 4-5 |
| | 4.3.1 | Introduction | 4-5 |
| | 4.3.2 | Affected Environment | 4-5 |
| | 4.3.3 | Environmental Consequences | 4-5 |
| | 4.3.4 | Mitigation | 4-9 |
| 4.4 | | Parks and Recreational Facilities | 4-9 |
| | 4.4.1 | Introduction | 4-9 |
| | 4.4.2 | Affected Environment | 4-10 |
| | 4.4.3 | Environmental Consequences | 4-10 |
| | 4.4.4 | Mitigation | 4-18 |
| 4.5 | | Property Acquisitions and Relocations | 4-18 |
| | 4.5.1 | Introduction | 4-18 |
| | 4.5.2 | Affected Environment | 4-18 |
| | 4.5.3 | Environmental Consequences | 4-22 |
| | 4.5.4 | Mitigation | 4-22 |
| 4.6 | | Visual and Aesthetic Resources | 4-24 |
| | 4.6.1 | Introduction | 4-24 |
| | 4.6.2 | Affected Environment | 4-25 |
| | 4.6.3 | Environmental Consequences | 4-27 |

00027635

JA1771



Supplemental Draft Environmental Impact Statement

| 4.6.4 | Mitigation | 4-27 |
| 4.7 | Historic Architectural and Archaeological Resources | 4-28 |
| 4.7.1 | Introduction | 4-28 |
| 4.7.2 | Affected Environment | 4-30 |
| 4.7.3 | Environmental Consequences | 4-33 |
| 4.7.4 | Mitigation | 4-40 |
| 4.8 | Air Quality | 4-41 |
| 4.8.1 | Introduction | 4-41 |
| 4.8.2 | Affected Environment | 4-42 |
| 4.8.3 | Environmental Consequences | 4-42 |
| 4.8.4 | Mitigation | 4-44 |
| 4.9 | Noise | 4-45 |
| 4.9.1 | Introduction | 4-45 |
| 4.9.2 | Affected Environment | 4-46 |
| 4.9.3 | Environmental Consequences | 4-46 |
| 4.9.4 | Mitigation | 4-47 |
| 4.9.5 | Statement of Likelihood | 4-48 |
| 4.10 | Hazardous Materials | 4-51 |
| 4.10.1 | Introduction | 4-51 |
| 4.10.2 | Affected Environment | 4-51 |
| 4.10.3 | Environmental Consequences | 4-51 |
| 4.10.4 | Mitigation | 4-53 |
| 4.11 | Topography, Geology, and Soils | 4-53 |
| 4.11.1 | Introduction | 4-53 |
| 4.11.2 | Affected Environment | 4-54 |
| 4.11.3 | Environmental Consequences | 4-54 |
| 4.11.4 | Mitigation | 4-55 |
| 4.12 | Waters of the US and Waters of the State, Including Wetlands | 4-55 |
| 4.12.1 | Introduction | 4-55 |
| 4.12.2 | Affected Environment | 4-57 |
| 4.12.3 | Environmental Consequences | 4-57 |
| 4.12.4 | Mitigation | 4-58 |
| 4.13 | Watersheds and Surface Water Quality | 4-63 |

00027636



| | | |
|---|---|---|
| 4.13.1 | Introduction | 4-63 |
| 4.13.2 | Affected Environment | 4-64 |
| 4.13.3 | Environmental Consequences | 4-65 |
| 4.13.4 | Mitigation | 4-71 |
| 4.14 | Groundwater Hydrology | 4-73 |
| 4.14.1 | Introduction | 4-73 |
| 4.14.2 | Affected Environment | 4-73 |
| 4.14.3 | Environmental Consequences | 4-73 |
| 4.14.4 | Mitigation | 4-73 |
| 4.15 | Floodplains | 4-74 |
| 4.15.1 | Introduction | 4-74 |
| 4.15.2 | Affected Environment | 4-74 |
| 4.15.3 | Environmental Consequences | 4-75 |
| 4.15.4 | Mitigation | 4-75 |
| 4.16 | Vegetation and Terrestrial Habitat | 4-76 |
| 4.16.1 | Introduction | 4-76 |
| 4.16.2 | Affected Environment | 4-76 |
| 4.16.3 | Environmental Consequences | 4-77 |
| 4.16.4 | Mitigation | 4-78 |
| 4.17 | Terrestrial Wildlife | 4-80 |
| 4.17.1 | Introduction | 4-80 |
| 4.17.2 | Affected Environment | 4-80 |
| 4.17.3 | Environmental Consequences | 4-80 |
| 4.17.4 | Mitigation | 4-81 |
| 4.18 | Aquatic Biota | 4-81 |
| 4.18.1 | Introduction | 4-81 |
| 4.18.2 | Affected Environment | 4-82 |
| 4.18.3 | Environmental Consequences | 4-83 |
| 4.18.4 | Mitigation | 4-84 |
| 4.19 | Rare, Threatened, and Endangered Species | 4-85 |
| 4.19.1 | Introduction | 4-85 |
| 4.19.2 | Affected Environment | 4-85 |
| 4.19.3 | Environmental Consequences | 4-89 |

00027637

JA1773



   4.19.4   Mitigation ................................................................................................4-92

  4.20   Unique and Sensitive Areas ..................................................................................4-92

    4.20.1   Introduction .............................................................................................4-92

    4.20.2   Affected Environment.............................................................................4-92

    4.20.3   Environmental Consequences................................................................4-93

    4.20.4   Mitigation ................................................................................................4-93

  4.21   Environmental Justice (EJ) and Title VI Compliance ............................................4-93

    4.21.1   Introduction .............................................................................................4-93

    4.21.2   Affected Environment.............................................................................4-94

    4.21.3   Environmental Consequences...............................................................4-102

    4.21.4   Mitigation ..............................................................................................4-105

  4.22   Indirect and Cumulative Effects ..........................................................................4-105

    4.22.1   Introduction ...........................................................................................4-105

    4.22.2   Affected Environment...........................................................................4-106

    4.22.3   Environmental Consequences...............................................................4-107

  4.23   Consequences of Construction ............................................................................4-109

    4.23.1   Visual and Aesthetic Resources ...........................................................4-109

    4.23.2   Hazardous Materials .............................................................................4-110

    4.23.3   Air Quality .............................................................................................4-110

    4.23.4   Noise .....................................................................................................4-111

  4.24   Commitment of Resources ..................................................................................4-111

    4.24.1   Irreversible and Irretrievable Commitment of Resources ....................4-111

    4.24.2   Short-Term Effects/Long-Term Effects ................................................4-112

**5**    **UPDATED DRAFT SECTION 4(F) EVALUATION** ........................................................**5-1**

  5.1   Introduction .........................................................................................................5-1

    5.1.1   Purpose and Background .........................................................................5-1

    5.1.2   Description of Preferred Alternative.........................................................5-2

    5.1.3   Changes Since the Draft Section 4(f) Evaluation and DEIS .................5-3

  5.2   Inventory and Use of Section 4(f) Properties.......................................................5-4

    5.2.1   Overview .................................................................................................5-5

    5.2.2   George Washington Memorial Parkway...............................................5-10

    5.2.3   Chesapeake and Ohio Canal National Historical Park.........................5-12

    5.2.4   Clara Barton Parkway...........................................................................5-15

00027638



Supplemental Draft Environmental Impact Statement

| 5.2.5 | Carderock Springs Historic District | 5-17 |
|---|---|---|
| 5.2.6 | Gibson Grove AME Zion Church | 5-19 |
| 5.2.7 | Cabin John Stream Valley Park Unit 2 | 5-19 |
| 5.2.8 | Burning Tree Club | 5-23 |
| 5.2.9 | Academy Woods | 5-25 |
| 5.2.10 | Cabin John Regional Park | 5-25 |
| 5.2.11 | Tilden Woods Stream Valley Park | 5-28 |
| 5.2.12 | Old Farm Neighborhood Conservation Area | 5-30 |
| 5.2.13 | Cabin John Stream Valley Park Unit 6 | 5-31 |
| 5.2.14 | Cabin John Stream Valley Park (Rockville) | 5-33 |
| 5.2.15 | Bullards Park and Rose Hill Stream Valley Park | 5-35 |
| 5.2.16 | Rockmead Park | 5-37 |
| 5.2.17 | Woottons Mill Park | 5-37 |
| 5.2.18 | Woodley Gardens | 5-39 |
| 5.2.19 | Rockville Senior Center and Park | 5-41 |
| 5.2.20 | Ward Building | 5-45 |
| 5.2.21 | Malcolm King Park | 5-45 |
| 5.2.22 | Morris Park | 5-46 |
| 5.3 | Avoidance Alternatives and Analysis | 5-48 |
| 5.4 | All Possible Planning | 5-51 |
| 5.4.1 | Summary of All Possible Planning Presented in DEIS | 5-51 |
| 5.4.2 | Preferred Alternative | 5-51 |
| 5.4.3 | American Legion Bridge (ALB) | 5-52 |
| 5.4.4 | Morningstar Tabernacle No. 88 Moses Hall and Cemetery | 5-52 |
| 5.4.5 | Mitigation | 5-53 |
| 5.5 | Least Overall Harm | 5-54 |
| 5.5.1 | Draft Section 4(f) Least Overall Harm Evaluation | 5-55 |
| 5.5.2 | Updated Least Overall Harm Analysis | 5-55 |
| 5.6 | Coordination | 5-60 |
| 5.7 | Conclusion | 5-61 |
| 6 | ONE FEDERAL DECISION | 6-1 |
| 7 | PUBLIC INVOLVEMENT AND AGENCY COORDINATION | 7-1 |
| 7.1 | Introduction | 7-1 |

00027639



Supplemental Draft Environmental Impact Statement

7.2 Public Involvement.................................................................................7-1

  7.2.1 DEIS Notice of Availability and Comment Period........................................7-1

  7.2.2 Public Outreach with Environmental Justice (EJ) Populations.......................7-4

  7.2.3 Other Community Meetings and Stakeholder Outreach Events ....................7-6

  7.2.4 SDEIS Comment Period and Public Hearing.............................................7-9

7.3 Agency and Stakeholder Coordination ..................................................7-9

  7.3.1 Natural Resource Agency Coordination.................................................7-14

  7.3.2 Section 106 Consultation...................................................................7-16

  7.3.3 Section 4(f) Agency Coordination........................................................7-18

7.4 Incorporation of Public and Agency Input into the Study.........................7-19

**8 LIST OF PREPARERS.............................................................................8-1**

**9 DISTRIBUTION LIST..............................................................................9-1**

9.1 Federal Agencies ...............................................................................9-1

9.2 Federally Recognized Tribes ................................................................9-1

9.3 State of Maryland Agencies .................................................................9-1

9.4 Commonwealth of Virginia Agencies .....................................................9-2

9.5 State Recognized and Other Tribal Groups.............................................9-2

9.6 County and Local Agencies .................................................................9-2

9.7 SDEIS Availability...............................................................................9-2

**10 REFERENCES ....................................................................................10-1**

## LIST OF TABLES

Table 2-1: Interchange Improvements and HOT Managed Lane Access Locations under the Preferred Alternative[1].................................................................................2-7

Table 2-2: Stormwater Management for the Preferred Alternative .......................................2-11

Table 2-3: Compensatory SWM Phase 1 South Potential...................................................2-13

Table 2-4: Compensatory SWM Potential Phase 1 South Environmental Impacts ..................2-13

Table 2-5: Summary and Comparison of Shared Use Path Options ......................................2-25

Table 3-1: Existing Average Daily Traffic (ADT)..............................................................3-7

Table 3-2: Existing and No Build Average Daily Traffic (ADT) ............................................3-7

Table 3-3: 2045 Average Daily Traffic (ADT) .................................................................3-8

Table 3-4: 2045 Average Speed ..................................................................................3-8

Table 3-5: 2045 Corridor Travel Speed (mph) Results from VISSIM Model............................3-9

Table 3-6: 2045 System-Wide Delay ...........................................................................3-10

Table 3-7: 2045 Travel Time Index (TTI).......................................................................3-11

Table 3-8: 2045 Travel Time Index (TTI) Results for General Purpose Lanes from VISSIM Model.........3-12

Table 3-9: 2045 Percent of Lane-Miles Operating at LOS F ...............................................3-12

00027640

Supplemental Draft Environmental Impact Statement

Table 3-10: 2045 Vehicle Throughput.................................................................................3-13
Table 3-11: 2045 Vehicle Throughput Results from VISSIM Model.......................................3-13
Table 3-12: 2045 Effect on the Local Network....................................................................3-14
Table 3-13: 2045 Local Network Results from MWCOG Model ............................................3-15
Table 4-1: Summary of Quantifiable Impacts for the Preferred Alternative ..........................4-3
Table 4-2: Conversion of Land Use Within the Preferred Alternative LOD (Acres) .................4-4
Table 4-3: Property Impacts in Analysis Area Communities...................................................4-6
Table 4-4: Property Impacts to Community Facilities from the Preferred Alternative ..............4-9
Table 4-5: Potential Public Park Impacts (Acres) ...............................................................4-10
Table 4-6: Summary of NPS Wetland and Floodplain Impacts on NPS Properties..................4-12
Table 4-7: NPS Historic Properties with Adverse Effect......................................................4-13
Table 4-8: RTE Plant Species Surveyed within the Potomac River Gorge Portion...................4-13
Table 4-9: Survey Trees on NPS Properties and Impacts from the Preferred Alternative.........4-15
Table 4-10: Summary of Impacts from the Preferred Alternative to Parks Acquired ..............4-17
Table 4-11: M-NCPPC Parkland and Resource Impacts (Acres) ............................................4-19
Table 4-12: City of Rockville Parkland and Resource Impacts (Acres)....................................4-20
Table 4-13: City of Gaithersburg Parkland and Resource Impacts (Acres) .............................4-21
Table 4-14: Summary of Right-of-Way Acquisitions and Impacts from the Preferred Alternative .........4-22
Table 4-15: Property Impacts by Geographic Area...............................................................4-23
Table 4-16: Historic Architectural Properties within the APE for the Preferred Alternative.................4-31
Table 4-17: Eligible Archaeological Resources within the APE of the Preferred Alternative ..................4-32
Table 4-18: Historic Architectural Properties with Known Adverse Effect.............................4-34
Table 4-19: Historic Properties with Revised Effect Determinations Subsequent to the DEIS...............4-36
Table 4-20: Archaeological Resources with a Known Adverse Effect......................................4-38
Table 4-21: Summary of Noise Sensitive Area (NSA) Impacts and .........................................4-48
Table 4-22: Sites of Potential Concern Summary ...............................................................4-52
Table 4-23: Impact to Soils by Type in Acres.....................................................................4-54
Table 4-24: Impacts to Steep Slopes and Highly Erodible Soils in Acres.................................4-55
Table 4-25: Summary of Impacts to USACE/MDE Wetlands and Waterways ..........................4-58
Table 4-26: Summary of Delineated NPS Wetland Features and Impacts on NPS Properties within the Preferred Alternative LOD ............................................................................................4-59
Table 4-27:  Maryland Wetland and Stream Mitigation Requirements ..................................4-61
Table 4-28: Proposed Mitigation Sites...............................................................................4-61
Table 4-29: Summary of Impacts to Waterways by Classification within USGS HUC8 Watersheds........4-65
Table 4-30: Summary of Impacts to Wetlands and Waterways by Classification within MD 8-Digit Watersheds ...............................................................................................................4-66
Table 4-31: Impacts to Wetland Buffers by Classification within MD 8-Digit Watersheds ......................4-66
Table 4-32: Summary of Impacts to Wetlands and Waterways by Classification ....................4-67
Table 4-33: Additional Impervious Surfaces by MDNR 12-Digit Watershed ...........................4-71
Table 4-34: Additional Impervious Surface by 8-Digit Watershed .........................................4-71
Table 4-35: Waterways and Associated Floodplains within the Preferred Alternative LOD ....................4-74
Table 4-36: Impacts to FEMA 100-Year Floodplain in Acres.................................................4-75
Table 4-37: Impacts to Forests in Acres.............................................................................4-77
Table 4-38: NPS Tree Survey Results and Impacts on NPS Properties....................................4-77

00027641



Supplemental Draft Environmental Impact Statement

Table 4-39: Impacts to Potential FIDS Habitat Within the Preferred Alternative in Acres.....................4-81
Table 4-40: Summary of Watershed Quality Index Narrative Score Results ...........................................4-83
Table 4-41: SSPRA Impact Acreage within the Preferred Alternative ....................................................4-86
Table 4-42: RTE Plant Species Surveyed within the Potomac River Gorge Portion................................4-87
Table 4-43: Impacts to Unique and Sensitive Areas (acres)...................................................................4-93
Table 4-44: Environmental Justice Working Group Meetings ...............................................................4-101
Table 4-45: Comparison of Effects to EJ Block Groups Compared to Non-EJ Block Groups.................4-102
Table 5-1: Summary of Section 4(f) Property Use .................................................................................5-6
Table 5-2: Avoided Section 4(f) Use by the Preferred Alternative .........................................................5-9
Table 5-3: Avoidance Alternatives ........................................................................................................5-49
Table 5-4: Least Overall Harm Analysis.................................................................................................5-56
Table 7-1: DEIS Viewing Locations ........................................................................................................7-2
Table 7-2: Environmental Justice Working Group Meetings ..................................................................7-6
Table 7-3: Stakeholder and Community Meetings .................................................................................7-7
Table 7-4: Agency & Stakeholder Coordination Meetings Post-DEIS Publication .................................7-10
Table 7-5: IAWG Meetings Post-DEIS Publication..................................................................................7-13
Table 7-6: City of Rockville and City of Gaithersburg Meetings Post-DEIS Publication .........................7-14
Table 7-7: Natural Resource Related Meetings .....................................................................................7-14
Table 7-8: Section 106 Consultation Meetings Post-DEIS Publication....................................................7-17

## LIST OF FIGURES

Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative.................................1-2
Figure 2-1: Alternatives Screening Process............................................................................................2-2
Figure 2-2: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative.................................2-4
Figure 2-3: Alternative 9 – Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow).......2-5
Figure 2-4: Proposed HOT Managed Lanes Access Locations..................................................................2-9
Figure 2-5: Shared Use Path Option 2 Alignment (Shown in White).......................................................2-26
Figure 2-6: Shared Use Path Option 3 Alignment (Shown in White).......................................................2-26
Figure 2-7: Shared Use Path Option 4 Alignment (Shown in White).......................................................2-27
Figure 3-1: Limits of VISSIM Model Network and Interchange Locations Included along I-495 and I-2703-3
Figure 3-2: Daily Traffic Volume Changes on I-495 and I-270 During COVID-19 Pandemic vs. 2019 .........3-6
Figure 4-1: Analysis Area Communities .................................................................................................4-7
Figure 4-2: Phase 1 South Wetland and Stream Mitigation Sites............................................................4-62
Figure 4-3: Environmental Justice Populations Adjacent to the Preferred Alternative LOD...................4-96
Figure 4-4: Maryland EJSCREEN EJScore for Census Tracts in the Analysis Area....................................4-99
Figure 5-1: I-495 & I-270 Managed Lanes Study Corridors –  Preferred Alternative.................................5-2
Figure 5-2: George Washington Memorial Parkway.................................................................................5-11
Figure 5-3: Chesapeake and Ohio C&O Canal NHP and Clara Barton Parkway .......................................5-14
Figure 5-4: Carderock Springs Historic District .....................................................................................5-18
Figure 5-5: Gibson Grove AME Zion Church ...........................................................................................5-20
Figure 5-6: Cabin John SVP Unit 2 .........................................................................................................5-22
Figure 5-7: Burning Tree Club ...............................................................................................................5-24
Figure 5-8: Academy Woods..................................................................................................................5-26

00027642



Supplemental Draft Environmental Impact Statement

Figure 5-9: Cabin John Regional Park...................................................................................................5-27
Figure 5-10: Tilden Woods SVP and Old Farm NCA ...........................................................................5-29
Figure 5-11: Cabin John Stream Valley Park, Unit 6...........................................................................5-32
Figure 5-12: Cabin John Stream Valley Park (Rockville)....................................................................5-34
Figure 5-13: Bullards Park and Rose Hill Stream Valley Park............................................................5-36
Figure 5-14: Rockmead Park ...............................................................................................................5-38
Figure 5-15: Woottons Mill Park .........................................................................................................5-40
Figure 5-16: Woodley Gardens ...........................................................................................................5-42
Figure 5-17: Rockville Senior Center and Park and Ward Building ...................................................5-44
Figure 5-18: Malcolm King Park and Morris Park ..............................................................................5-47

## LIST OF APPENDICES

| | |
|---|---|
| APPENDIX A | Traffic Evaluation Memorandum: Alternative 9 – Phase 1 South |
| APPENDIX B | COVID-19 Travel Analysis and Monitoring Plan |
| APPENDIX C | Compensatory Stormwater Mitigation Plan (July 12, 2021) |
| APPENDIX D | Environmental Resource Mapping |
| APPENDIX E | Noise Analysis Technical Report Addendum (July 2021) |
| APPENDIX F | Natural Resources Impact Tables: Alternative 9 – Phase 1 South |
| APPENDIX G | Wetland and Floodplain Statement of Findings July 2021 |
| APPENDIX H | Rare, Threatened and Endangered Species and Plant Survey Reports |
| APPENDIX I | Limited Phase 1 Environmental Site Assessment Phase 1 South |
| APPENDIX J | Visual Impact Assessment Questionnaire |
| APPENDIX K | EJSCREEN Data & Mapping Supporting the Environmental Justice Analysis |

## ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| 495 NEXT | Virginia Department of Transportation I-495 Express Lanes Northern Extension |
| AC | Acres |
| ACHP | Advisory Council on Historic Preservation |
| ADT | Annual Daily Traffic |
| ALB | American Legion Bridge |
| AMR | Avoidance, Minimization, and Impacts Report |
| APE | Area of Potential Effects |
| ARDS | Alternatives Retained for Detailed Study |
| AST | Aboveground Storage Tank |
| BMP | Best Management Practice |
| BRT | Bus Rapid Transit |
| C&O | Chesapeake and Ohio |
| CAVs | Connected and Automated Vehicles |
| CCA | Capper-Cramton Act |
| CEA | Community Effects Assessment |

00027643

JA1779



Supplemental Draft Environmental Impact Statement

| CFR | Code of Federal Regulations |
| $CH_4$ | Methane |
| CLRP | Constrained Long-Range Plan |
| CMP | Compensatory Mitigation Plan |
| CNE | Common Noise Environment |
| CO | Carbon Monoxide |
| $CO_2$ | Carbon Dioxide |
| COMAR | Code of Maryland Regulations |
| $C_{pv}$ | Channel Protection Volume |
| CWA | Clean Water Act |
| dB | Decibel |
| dBA | A-weighted Decibel |
| DBH | Diameter at Breast Height |
| DEIS | Draft Environmental Impact Statement |
| DHR | Department of Historical Resources |
| DOT | Department of Transportation |
| DPW&T | Department of Public Works & Transportation |
| E&S | Erosion and Sediment Control |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EJ | Environmental Justice |
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| ESA | Environmental Site Assessment |
| ESD | Environmental Site Design |
| ETC | Electronic Toll Collection |
| ETL | Express Toll Lane |
| FEIS | Final Environmental Impact Statement |
| FEMA | Federal Emergency Management Agency |
| FHWA | Federal Highway Administration |
| FIDS | Forest Interior Dwelling Bird Species |
| FTA | Federal Transit Administration |
| GHG | Greenhouse Gases |
| GI | Green Infrastructure |
| GIA | Green Infrastructure Assessment |
| GIS | Geographic Information System |
| GP | General Purpose |
| GWMP | George Washington Memorial Parkway |
| H&H | Hydrologic and Hydraulic |
| HB | House Bill |
| HOA | Homeowners' Association |

00027644

JA1780



| HOT | High-occupancy Toll |
| HOV | High-occupancy Vehicle |
| HUC | Hydrologic Unit Code |
| HUD | Housing and Urban Development |
| IAPA | Interstate Access Point Approval |
| IAT | Impervious Area Treatment |
| IAWG | Interagency Working Group |
| IB | Indiana Bat |
| IBI | Indices of Biological Integrity |
| ICC | Intercounty Connector |
| ICE | Indirect and Cumulative Effects |
| ICM | Innovative Congestion Management |
| JD | Jurisdictional Determination |
| JPA | Joint Permit Application |
| KLC | Keyes, Lethbridge, and Condon |
| LF | Linear Feet |
| LOD | Limits of Disturbance |
| LOS | Level of Service |
| LRP/VCP | Land Restoration Program/Voluntary Cleanup Program |
| LUST | Leaking Underground Storage Tank |
| MARC | Maryland Area Regional Commuter |
| MCCC | Maryland Commission on Climate Change |
| MCDOT | Montgomery County Department of Transportation |
| MDE | Maryland Department of the Environment |
| MDNR | Maryland Department of Natural Resources |
| MDOT SHA | Maryland Department of Transportation State Highway Administration |
| MDP | Maryland Department of Planning |
| MDTA | Maryland Transportation Authority |
| MERLIN | Maryland's Environmental Resources and Land Information Network |
| MHT | Maryland Historical Trust |
| MIHP | Maryland Inventory of Historic Properties |
| M-NCPPC | Maryland-National Capital Park and Planning Commission |
| MPO | Metropolitan Planning Organization |
| MPH | Miles per Hour |
| MSATs | Mobile Source Air Toxics |
| MSFCMA | Magnuson-Stevens Fishery Conservation and Management Act |
| MTA | Maryland Transit Administration |
| MWCOG | Metropolitan Washington Council of Governments |
| MWG | Mitigation Working Group |
| $N_2O$ | Nitrous Oxide |
| NAAQS | National Air Quality Standards |

00027645

JA1781



Supplemental Draft Environmental Impact Statement

| | |
|---|---|
| NAC | Noise Abatement Criteria |
| NB | Northbound |
| NCPC | National Capital Planning Commission |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NIST | National Institute of Standards and Technology |
| NLEB | Northern Long-eared Bat |
| NMFS | National Marine Fisheries Service |
| $NO_2$ | Nitrogen Dioxide |
| NOAA | National Oceanic and Atmospheric Administration |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NPDES | National Pollutant Discharge Elimination System |
| NSA | Noise-sensitive Area |
| $O_3$ | Ozone |
| OFD | One Federal Decision |
| OWJ | Officials with Jurisdiction |
| P3 | Public-Private Partnership |
| PA | Programmatic Agreement |
| Pb | Lead |
| PCB | Polychlorinated Biphenyl |
| PCT | Piscataway Conoy Tribe of Maryland |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PM | Particulate Matter |
| PPE | Personal Protective Equipment |
| PSI | Preliminary Site Investigations |
| PSS | Palustrine Scrub-shrub |
| PTI | Planning Time Index |
| $Q_\phi$ | Quantity Management |
| RBP | Rapid Bioassessment Protocol |
| RFP | Request for Proposals |
| ROD | Record of Decision |
| RTE | Rare, Threatened, and Endangered |
| SB | Southbound |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| SF | Square Feet |
| SFB | Small-footed Bat |
| SGCN | Species of Greatest Conservation Need |
| $SO_2$ | Sulfur Dioxide |

00027646

JA1782



Supplemental Draft Environmental Impact Statement

| | |
|---|---|
| SOF | Statement of Findings |
| SPA | Special Protection Area |
| SSPRA | Sensitive Species Project Review Areas |
| SVP | Stream Valley Park |
| SWAP | State Wildlife Action Plan |
| SWM | Stormwater Management |
| TDM | Transportation Demand Management |
| TEA | Targeted Ecological Area |
| TMDL | Total Maximum Daily Loads |
| TNM | Traffic Noise Model |
| TSM | Transportation System Management |
| TTI | Travel Time Index |
| USACE | United States Army Corps of Engineers |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USDOI | United States Department of the Interior |
| USDOT | United States Department of Transportation |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| USPS | United States Postal Service |
| UST | Underground Storage Tank |
| VAC | Virginia Administrative Code |
| VDCR | Virginia Department of Conservation and Recreation |
| VDEQ | Virginia Department of Environmental Quality |
| VDGIF | Virginia Department of Game and Inland Fisheries |
| VDHR | Virginia Department of Historic Resources |
| VDOT | Virginia Department of Transportation |
| VMT | Vehicle Miles Traveled |
| WBFC | Washington Biologists' Field Club |
| WHS | Wildlife and Heritage Service |
| WMATA | Washington Metropolitan Area Transit Authority |
| WQ$_v$ | Water Quality Volume |
| WQC | Water Quality Certification |
| WSSC | Washington Suburban Sanitary Commission |
| WUS | Waters of the United States |

00027647

JA1783



# EXECUTIVE SUMMARY

## Overview

### What is the Purpose of the Supplemental Draft Environmental Impact Statement?

An Environmental Impact Statement (EIS) may be supplemented at any time, in accordance with 23 CFR 771.130, when the Federal Highway Administration (FHWA) determines that changes to the proposed action or new information relevant to environmental concerns or impacts from the proposed action were not evaluated in the Draft EIS (DEIS). This Supplemental Draft Environmental Impact Statement (SDEIS) has been prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS discloses new information relevant to the Preferred Alternative focusing on new information while referencing the DEIS for information that remains valid. The SDEIS also describes the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS will be available for the public to review and comment on the Preferred Alternative during a 45-day comment period. Following the comment period of the SDEIS, FHWA and the Maryland Department of Transportation State Highway Administration (MDOT SHA) will consider comments received and will respond to substantive comments on the DEIS and SDEIS in the Final Environmental Impact Statement (FEIS).

### What is the Focus of the SDEIS?

The SDEIS focuses on new information related to the Preferred Alternative for the I-495 & I-270 Managed Lanes Study (Study). The Study is considering alternatives that address roadway congestion within the specific Study scope which remains unchanged from the DEIS: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including replacement of the American Legion Bridge over the Potomac River, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs, in Montgomery and Prince George's Counties, Maryland. The Preferred Alternative, Alternative 9 - Phase 1 South (shown in **dark blue** in **ES-Figure 1**), includes build improvements within the limits of Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **ES-Figure 1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of the Study, improvements on the remainder of the interstate system may still be needed in the future and would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies.

00027648



Supplemental Draft Environmental Impact Statement

### ES-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative



## What Is the Study's Purpose and Need?

The Purpose and Need Statement remains the same as presented in the **DEIS, Chapter 1** and in the full Purpose and Need Statement in **DEIS, Appendix A.** However, the purpose and needs are restated below for ease to the reader.

The Study's purpose is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

The needs for the Study are:

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices
- Accommodate Homeland Security
- Improve Movement of Goods and Services

Two goals for the Study were also identified in addition to the purpose and needs: (1) the use of alternative funding approaches for financial viability and (2) environmental responsibility. Refer to **Chapter 1** and **DEIS, Appendix A** for additional information on the Study's Purpose and Need.

## Does the Purpose and Need remain valid with the Preferred Alternative?

Identifying Alternative 9 - Phase 1 South as the Preferred Alternative does not alter the Study's Purpose and Need. The overall need for improvements in the study area remains valid, regardless of the build alternatives evaluated and any potential change to the limits of construction for a preferred alternative. The stated project needs, to accommodate existing and long-term traffic growth, to enhance trip reliability, and to provide additional roadway choices, are still necessary to address transportation

00027649



Supplemental Draft Environmental Impact Statement

challenges in the study area. In addition, MDOT SHA continues to consider potential changes in traffic and mobility trends as a result of the pandemic, as described in **Chapter 3** of this SDEIS, and will report on those findings in the FEIS.

## Will Comments on the DEIS be Addressed?

All substantive comments received on DEIS and SDEIS will be reviewed and responded to in the FEIS.

Over the last year, MDOT SHA and FHWA have considered the nearly 3,000 comments received on the DEIS and have worked with our partner agencies and stakeholders to address many of the common comments received through the following efforts:

- Aligning the Preferred Alternative and permitting process with the phased delivery approach focusing on addressing the severe congestion at the American Legion Bridge as priority.
- Avoiding and significantly reducing property, community, historic, natural resources and parkland impacts.
- Avoiding all residential and business displacements.
- Avoiding impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery.
- Identifying on-site and off-site stormwater management to meet regulatory requirements.
- Monitoring and analyzing traffic impacts associated with the COVID-19 Pandemic to understand any impacts to the Study.
- Committing to priority bicycle, pedestrian, and transit improvements to increase multi-modal options for travel within the study corridors.
- Including toll-free travel under the Preferred Alternative for High Occupancy Vehicles (HOV) with three (3) or more user, transit buses, carpool/vanpool and motorcyclists to reduce the reliance on single occupancy vehicles and provide equitable travel options.

This effort was possible through the extensive agency and stakeholder coordination that occurred since publication of the DEIS in July 2020 including:

- Establishing Economic, Transit and Environmental Justice Working Groups
- Holding over 60 individual stakeholder Meetings with municipalities, non-governmental organizations, elected officials and communities.
- Holding over 80 resource and regulatory agency meetings to discuss DEIS comments, avoidance, minimization, and mitigation opportunities; and
- Holding over 60 field and office meetings with regulatory agencies to discuss natural resource impacts, stormwater management, culvert augmentation and permitting.

Refer to SDEIS **Chapters 4** and **5** for more detail on avoidance, minimization and mitigation efforts and **SDEIS, Chapter 7** for more detail on public and agency coordination.

## How Has the COVID-19 Pandemic Impacted the Study?

The COVID-19 global pandemic had a profound impact on the daily routines of people across the world, affecting the way residents and commuters in the National Capital Region work, travel, and spend their free time. These changes have altered traffic demand, transit use, and traffic volumes on all roadways in

00027650



Supplemental Draft Environmental Impact Statement

Maryland, the District of Columbia, and Virginia, including I-495 and I-270. MDOT SHA has been closely monitoring the changes in traffic patterns throughout the pandemic. Refer to **SDEIS, Appendix B** for the COVID-19 Travel Analysis and Monitoring Plan. This plan includes a sensitivity analysis that will confirm the need for the project and verify that the Preferred Alternative would provide benefits if future demand is less than projected. Results will be included in the FEIS.

The traffic data shows a severe drop in traffic volumes in April 2020 after stay-at-home orders were issued across Maryland, with daily traffic volumes on I-270 and I-495 reducing by more than 50 percent compared to April 2019. With the rollout of vaccines in early 2021, the corresponding drop in COVID-19 cases, and the gradual reopening of schools and businesses, traffic volumes have continued to recover and are back to over 90 percent of normal as of August 2021. Transit use has been slower to recover, with usage of the Maryland Department of Transportation Maryland Transit Administration (MDOT MTA) services still down approximately 50 percent compared to pre-pandemic levels as of August 2021 per data presented on MDOT's coronavirus tracking website.

The COVID-19 Travel Analysis and Monitoring Plan will continue to evaluate transportation trends and confirm that the capacity improvements proposed under the Preferred Alternative would be needed and effective if future demand changes substantially from the pre-pandemic forecasts. MDOT SHA must ensure that transportation improvements are being developed to meet our State's needs not only for today, but for the next 25-plus years. Because long-term travel trends are far from settled and because the most recent data suggests traffic is rebounding close to pre-pandemic levels, the SDEIS forecasts continue to apply models that were developed and calibrated prior to 2020 for use in evaluating projected 2045 conditions in this document. However, MDOT SHA will continue to review new data as it becomes available. The sensitivity analysis evaluating several "what if" scenarios related to future traffic demand due to potential long-term changes to teleworking, e-commerce, and transit use as part of the *COVID-19 Travel Analysis and Monitoring Plan* (**SDEIS, Appendix B**) is ongoing.

Refer to **Chapter 3, Section 3.1.4 and SDEIS, Appendix B** for additional detail on the impact of the COVID-19 pandemic on the Study. Results will be presented in the FEIS.

## Supplemental Draft Environmental Impact Statement

### What is Included in the Supplemental Draft Environmental Impact Statement vs. the Final Environmental Impact Statement?

This SDEIS has been prepared to present new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South. FHWA and MDOT SHA have identified Alternative 9 Phase 1 South as the Preferred Alternative.

This SDEIS supplements the existing DEIS that was published on July 10, 2020. The SDEIS is limited to focus on new information while referencing the DEIS for information that remains valid. The detailed documentation of existing conditions, methodologies, assessments of effects of the DEIS Build Alternatives, and conceptual mitigation, when applicable, are included in the Study technical reports appended to the DEIS (**Appendices A through S**) and are available through the Program website (https://495-270-p3.com/deis/#DEIS).

The SDEIS presents a description of the Preferred Alternative, as well as the associated traffic analysis along with the permanent and temporary impacts associated with the Preferred Alternative. With the advancement of the Preferred Alternative, coordination with the resource agencies on avoidance, minimization, and conceptual mitigation has continued. The SDEIS describes the current efforts from the

00027651



Supplemental Draft Environmental Impact Statement

July 2020 DEIS publication through summer 2021 on the avoidance, minimization, and conceptual mitigation. Final mitigation and commitments will be included with the Record of Decision (ROD).

The SDEIS is available so that interested citizens, elected officials, government agencies, businesses, and other stakeholders can review and comment on the Preferred Alternative over a 45-day comment period and during a virtual public hearing on November 1, 2021 (refer to oplanesmd.com/SDEIS for the latest details on the virtual public hearing).

After circulation of the SDEIS and review and consideration of comments received, a FEIS will be developed. The FEIS will focus on any additional analysis and refinements of the data, as well as responding to substantive comments received on the DEIS and SDEIS. Additional analyses or final analyses that will be presented in the FEIS include:

- Final Visual Impacts Assessment for the Preferred Alternative, including renderings and final mitigation

- Final Air Quality Analysis for the Preferred Alternative including CO, MSATs, Greenhouse Gas Emissions and construction related air quality impacts.

- Final Section 4(f) Evaluation with the final Least Overall Harm Analysis.

- Final Environmental Justice Analysis including consideration of mitigation, comparison of adverse effects from the Preferred Alternative within EJ populations to adverse effects within a non EJ population reference community and final conclusion of whether disproportionately high and adverse effects would occur.

- Final Mitigation Package including all final measures to mitigate unavoidable impacts for all resources identified through coordination with jurisdictional agencies.

- Final Wetland and Floodplain Statement of Findings identifying final mitigation for impacts to wetlands and floodplain on National Park Service property.

- Final Application Joint Federal/State Application and supporting documentation for the Alteration of Any Floodplain, Waterway, Tidal or Nontidal Wetlands.

## What is the Format of the SDEIS?

The format of the SDEIS follows the same format as the July 10, 2020 DEIS and contains ten chapters.

- **Chapter 1** presents the Study's Purpose and Need, which is unchanged from the DEIS, but repeated for ease of the reader. This chapter is supported by the *Purpose and Need Statement* (**DEIS, Appendix A,** https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf).

- **Chapter 2** presents a description of the Preferred Alternative. It also describes other common elements of the Preferred Alternative such as, limits of disturbance (LOD),[1] managed lanes access, stormwater management, culverts, construction and short-term effects, transit elements, pedestrian and bicycle considerations, and tolling.

- **Chapter 3** presents results from the traffic operational analyses conducted for the 2045 No Build Alternative and Preferred Alternative. It also discusses how the effects of the pandemic are being

---

[1] The limits of disturbance are the proposed boundary within which all construction, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities would occur.

00027652



Supplemental Draft Environmental Impact Statement

considered in the traffic analysis, as well as the effects to local roadway networks. This chapter is supported by *Traffic Evaluation Memorandum – Alternative 9: Phase 1 South* in **SDEIS, Appendix A.**

- **Chapter 4** presents the permanent and temporary impacts associated with the Preferred Alternative. It also provides an update on the measures to avoid, minimize, and mitigate potential environmental effects, where applicable. Final mitigation will be included in the FEIS.

- **Chapter 5** presents the Updated Draft Section 4(f) Evaluation, which updates the potential Section 4(f) uses and mitigation associated with the Preferred Alternative to significant public parks, recreational areas, and historic properties in compliance with Section 4(f) of the US Department of Transportation (USDOT) Act of 1966. This chapter is a supplement to the *Draft Section 4(f) Evaluation* (**DEIS, Appendix F,** https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppF_Draft-Section-4f-Eval_web.pdf).

- **Chapter 6** acknowledges that on January 20, 2021, *Executive Order 13807: Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,* was revoked in the *Executive Order 13990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis.*

- **Chapter 7** presents a summary of the public outreach and agency coordination for the Study that has occurred, since publication of the DEIS in July 2020 through summer 2021.

- **Chapter 8** presents the List of Preparers of the SDEIS.

- **Chapter 9** presents the Distribution List of agencies, organizations, and persons to whom the SDEIS was made available for review and comment as well as information on public availability of the SDEIS.

- **Chapter 10** presents the references for the SDEIS.

The SDEIS focuses on new information related to the Preferred Alternative. The complete SDEIS and supporting appendices can be found on the Program website: oplanesmd.com/SDEIS. Existing information from the July 2020 DEIS that has not changed will not be repeated in the SDEIS, but the DEIS and supporting technical analyses are available for review and reference on the Program website: https://495-270-p3.com/deis/.

## What are the Ways to Comment on the SDEIS?

FHWA and MDOT SHA invite interested elected officials, state and local governments, other Federal agencies, Native American tribal governments, organizations, and members of the public to provide comments on the SDEIS. The SDEIS for the Study and technical reports can be viewed and downloaded from the project website at: oplanesmd.com/SDEIS.

The public comment period opens on October 1, 2021 and will continue until November 15, 2021. *Written and oral comments will be given equal consideration*. MDOT SHA and FHWA will review all comments, and consider and respond to all substantive comments received or postmarked by that date in the preparation of the FEIS. Comments received or postmarked after that date will be reviewed and considered to the extent practicable. A virtual public hearing will be held on November 1, 2021.  Refer to oplanesmd.com/SDEIS for the latest information on the public hearing details.

00027653



Supplemental Draft Environmental Impact Statement

Comments on the SDEIS may be made by:

- Oral testimony at the virtual Public Hearing, on November 1, 2021
- SDEIS comment form at oplanesmd.com/SDEIS
- Email to MLS-NEPA-P3@mdot.maryland.gov
- Letters to Jeff Folden, I-495 & I-270 P3 Program Deputy Director, I-495 & I-270 P3 Office, 707 North Calvert Street, Mail Stop P-601, Baltimore MD 21202
- Call-in a comment at 855-432-1483 and leave a voicemail that is limited to three minutes

## Alternatives

### What is the Preferred Alternative?

In January 2021, Alternative 9 was announced as the MDOT SHA Recommended Preferred Alternative based on results of traffic, engineering, financial, and environmental analyses, as well as public comment. After several months of further coordinating with and listening to agencies and stakeholders regarding Alternative 9 as the Recommended Preferred Alternative, MDOT SHA decided to align the Study to be consistent with the previously determined phased delivery and permitting approach which focused on Phase 1 South only. As a result, FHWA and MDOT SHA identified a new Recommended Preferred Alternative: Alternative 9 – Phase 1 South. Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 but limited to the Phase 1 South limits only (**Figure ES-1**). This Preferred Alternative was identified after coordination with resource agencies, the public and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program's planned project phased delivery and permitting approach. FHWA and Cooperating Agencies[2] concurred on Alternative 9 - Phase 1 South as the Preferred Alternative in June 2021.

The Preferred Alternative includes a two-lane, High Occupancy Toll (HOT) managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure ES-2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

---

[2] NCPC and M-NCPPC did not concur on the Preferred Alternative.

00027654



Supplemental Draft Environmental Impact Statement

**Figure ES-1: Alternative 9 – Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)**
I-495 from the George Washington Memorial Parkway to east of MD 187



I-495: American Legion Bridge (Looking north towards Maryland)



I-495 east of MD 187 to west of MD 5 - NO ACTION AT THIS TIME



I-270 from I-495 to I-370



## What Transit Components Are Included in the Preferred Alternative?

While standalone transit alternatives were found to not meet the Study's Purpose and Need, the Preferred Alternative includes transit elements consistent with the project purpose of enhancing existing and planned multimodal mobility and connectivity. (Refer to **Chapter 2, Section 2.3.7** for additional details on the transit-related elements of the Preferred Alternative.) In furtherance of this key consideration and to address public and agency comments received to-date, MDOT SHA has identified opportunities to enhance transit mobility and connectivity within the Preferred Alternative. These include the following elements:

- Allowing bus transit usage of the HOT managed lanes toll free to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to urban and suburban activity and economic centers.

- Accommodating direct and indirect connections from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro (I-370), Twinbrook Metro (Wootton Parkway), Montgomery Mall Transit Center (Westlake Terrace), and Medical Center Metro (MD 187).

- Regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service have been committed to as part of the Preferred Alternative and include:

00027655



Supplemental Draft Environmental Impact Statement

    o   Construction of new bus bays at WMATA Shady Grove Metrorail Station

    o   Increased parking capacity at the Westfield Montgomery Mall Park and Ride

Transit elements were also considered by the Transit Work Group and the joint I-495/American Legion Bridge Transit/Transportation Demand Management (TDM) study by the Virginia Department of Trail and Public Transit and the Maryland Department of Transportation Maryland Transit Administration. Both of these initiatives resulted in reports.

The *Transit Service Coordination Report* completed in coordination with the Transit Work Group was made available to the public in June 2020 on the P3 Program website (https://495-270-p3.com/transit-benefits/) and it is being used to inform affected counties and transit providers about the significant transit opportunities offered by managed lanes such as strategies to maximize the benefits of reliability and speed; provide a basis for the evaluation and prioritization of future capital and operating needs in the service area; and initiate discussions about ways to incorporate regional transit services into the P3 Program.

The *I-495/ALB Transit/TDM Final Report and Plan* was completed in March 2021 and was posted online. (http://www.drpt.virginia.gov/media/3375/i495_alb_transittdm_study_finalreport_030521_combined.pdf) It identified a series of potential investment packages to provide new mobility choices to service bi-state travel. Each package outlined a combination of transit service elements, technology enhancements, Commuter Assistance Programs, and parking needs. The investment packages offered options to move more people across the American Legion Bridge (ALB) in fewer vehicles.

## What Additional Transit Commitments Have Been Made through the P3 Agreement?

On August 11, 2021, in accordance with Maryland law, MDOT and MDTA presented to and received approval from the Board of Public Works to award the Phase 1 P3 Agreement to the Selected Proposer for the predevelopment work related to Phase 1 South of the P3 Program. As part of its proposal, the Phase Developer has committed to provide an estimated $300 million for transit services in Montgomery County over the operating term of Phase 1 South.

To further support transit services, MDOT has committed, upon financial close of the Section P3 Agreement for Phase 1 South, to fund not less than $60 million for design and permitting of high priority transit investments in Montgomery County, such as Phase I of the Corridor Cities Transitway, Bus Rapid Transit in the MD 355 Corridor, or other high priority projects and to construct and equip the Metropolitan Grove Bus Operations and Maintenance Facility.

## Is the Replacement of the American Legion Bridge Part of the Managed Lanes Study?

Yes, the Preferred Alternative includes the full replacement of the American Legion Bridge (ALB) with a new, wider bridge (not widening of the existing bridge) to accommodate the two HOT lanes in each direction. The existing bridge is nearly 60 years old and would need to be replaced sometime over the next decade regardless of this Study. The new bridge would be constructed in phases to maintain the same number of existing lanes at all times during construction. The new bridge will be replaced in the same existing location.

The reconstructed ALB will include a shared use path to provide bicycle and pedestrian connection between Virginia and Maryland. Refer to **SDEIS, Chapter 2, Section 2.3.8** for the shared use path options under consideration.

00027656



### Does the Preferred Alternative Address Stormwater Management?

Yes, a preliminary, conceptual level stormwater management (SWM) analysis was completed for the Preferred Alternative and used to assist with the determination of the LOD. (Refer to **Chapter 2, Section 2.3.2** of this document for additional details.) In accordance with the Maryland Stormwater Management Act of 2007, MDOT SHA will ensure SWM water quantity and quality requirements, and treatment will be provided and will improve current conditions, as required under the SWM Act.

For the Preferred Alternative, the water quantity management requirement will be met within each drainage segment, except one: the ALB drainage segment. Based on typical practice, a quantity waiver could be granted for the ALB due to the direct discharge to the Potomac River, a major waterway.

For water quality requirements, the Preferred Alternative will meet the environmental site design (ESD) requirements to the maximum extent practicable (MEP) on-site. However, due to the amount of impervious area requiring treatment and existing site constraints, the full amount of required water quality could not be provided in all drainage segments. For those drainage segments where water quality could not be met on-site, the deficit will be met using compensatory stormwater management within the same watershed as defined by the MDOT SHA *Sediment and Stormwater Guidelines and Procedures* (SSGP), Section 5.5. Based on the results of an off-site compensatory stormwater management analysis, numerous potential water quality sites were identified to meet and exceed the full impervious area treatment (IAT) required for the Preferred Alternative. (Refer to **Chapter 2, Section 2.3.2** and **SDEIS, Appendix C** for additional details on the compensatory stormwater management.)

### What Happens to the Improvements That Were Studied for I-495, East of the I-270 East Spur to MD 5?

While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately, and would be subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies.

## Tolling

### Why Do the New Lanes Need to Be Tolled and Why Does the State Need a Developer to Build Them?

The State of Maryland does not have the funds to construct improvements of this magnitude with an estimated cost of approximately $3 to $3.5 billion as the estimated cost of the Phase 1 South improvements. Additionally, even with the tolls to pay back loans, the State does not have enough bonding capacity to take out loans to pay for the improvements. Therefore, the State has selected a Phase Developer through a competitive process and has entered into a Phase P3 agreement whereby the Developer will design, build, finance, operate, and maintain the managed lanes for a period of time using the toll revenue. MDOT SHA would continue to own all of the lanes on I-495 and I-270 and ensure the highway meets their intended transportation function.

### How Will the Toll Rates Be Set?

The toll-rate range setting process is led by the MDTA. They are the only State entity with the authority to set, revise, and fix toll rates in accordance with Transportation Article §4-312 of the Annotated Code of Maryland and COMAR Title 11 Department of Transportation, Subtitle 07 MDTA, Chapter 05 Public Notice of Toll Schedule Revisions (11.07.05). The MDTA is responsible for setting the toll rate ranges and conducting toll collection operations for the Phase 1 South limits.

00027657



Supplemental Draft Environmental Impact Statement

The toll rate range setting process is centered around a proposal by the MDTA staff to establish minimum toll rates, maximum toll rates, soft rate caps within the minimum and maximum toll rate ranges, a process for annual toll escalation, and toll discounts for certain types of vehicles.

The process for conducting the public hearings and recording comments from the public is specified in Transportation Article, §4-312, Annotated Code of Maryland. The initial proposal was presented to the MDTA Board on May 20, 2021. Per the process, the Board voted to take the toll proposal to public hearings and a public comment period, thereby ensuring the public is engaged in the toll rate range setting process and complying with State law by providing opportunities for public review and comment.

Public hearings were held on July 12 and 14, 2021 and all public hearing materials, including information and studies used in the analysis to justify the toll rate range proposal, were posted on the MDTA's website and remain available for the public to view at https://mdta.maryland.gov/ALB270TollSetting. The comment period lasted from May 20 through August 12, 2021. At the August 26, 2021 MDTA Board Meeting, the MDTA staff presented a summary and analysis of any public comments received at the public hearings. In addition, they responded to questions from the Board members. A summary of the public comments received and the analysis of the comments is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting/PublicParticipation.

After consideration of the public comments, at the September 30, 2021, MDTA Board Meeting, the MDTA staff presented the final toll rate range proposal. This final toll rate range will be the recommended action for the Board and is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting.

## What Could the Toll Rates Be?

Rather than solely focusing on revenue, the Preferred Alternative will be designed to maintain speeds of 45 mph or greater in the HOT lanes. The goal of the HOT lanes is to maintain free-flowing traffic and to use pricing factors to influence traffic flow. As such, the toll rate range will be set to ensure the HOT lanes operate to established operational metrics, which applies the economic principles of supply and demand to influence the utilization of the HOT lanes. The Phase 1 Section Developer will be responsible for setting toll rates within the established toll rate ranges, if approved at the end of the toll rate range setting process.

The proposed toll rate ranges for Preferred Alternative - Phase 1 South limits are available on the MDTA website at http://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessandProposal. The toll rate ranges will consist of minimum toll rates, soft toll rate caps, and maximum toll rates for the HOT lanes. The rates will also include annual escalation factors to ensure the toll rate ranges are adequate to cover the full term of the P3 Program agreements (anticipated to be 50 years). Toll rates will be set dynamically, meaning they could change up to every five minutes based on traffic volumes or speed in the HOT lanes to provide customers who choose to use the HOT lanes and pay a toll, a faster and more reliable trip. The actual toll rates will change based on real-time traffic within each tolling segment.

## Transportation and Traffic
### What Traffic Analysis Was Updated for the SDEIS?
The traffic analysis was updated from a design year of 2040 to a design year of 2045 for the No Build and Preferred Alternatives using traffic volume projections from an updated version of the MWCOG regional forecasting model, Version 2.3.75. The DEIS used an earlier version of the MWCOG model, Version 2.3.71, which was the latest available model version when the Study was initiated and only projected traffic demand out to the year 2040.

00027658



Supplemental Draft Environmental Impact Statement

For future traffic conditions, the Preferred Alternative was evaluated and compared to the No Build condition using the updated 2045 forecasts for several key operational metrics, including: speed, delay, travel time, level of service, throughput, and the effect on the local network. These metrics are the same metrics used in the DEIS to evaluate and compare the alternatives. Refer to **Chapter 3** of this SDEIS and **SDEIS, Appendix A** for additional details.

**SDEIS, Chapter 3** also discusses how MDOT SHA is considering the effects of the COVID-19 pandemic on traffic demand and forecasts. Refer to **Chapter 3, Section 3.1.4** and **SDEIS, Appendix B** for additional details.

### What Are the Results of the Traffic Operational Analyses?

The design year 2045 traffic operational evaluation results for the No Build Alternative and the Preferred Alternative are summarized below and presented in **Chapter 3** of this SDEIS and **SDEIS, Appendix A**.

The **No Build Alternative** would not address any of the significant operational issues experienced under existing conditions. It would not be able to accommodate long-term traffic growth, resulting in slow travel speeds, significant delays, long travel times, and an unreliable network. Compared to the 2040 No Build results presented in the DEIS, the 2045 No Build results show higher delays and travel times on I-495 and I-270 due to additional projected traffic growth between 2040 and 2045. This traffic growth is anticipated despite additional transit projects included in the 2045 forecast that help to slightly reduce projected delays on the surrounding local roadway network.

The **Preferred Alternative** is projected to provide tangible operational benefits to the system even though it includes no action or no improvements for a large portion of the study area to avoid and minimize impacts. This alternative would significantly increase throughput across the American Legion Bridge and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. Although the Preferred Alternative provides less improvement to traffic operations when compared to the Build Alternatives, that included the full 48-mile study limits evaluated in the DEIS (such as Alternatives 9 and 10), it was chosen based in part on feedback from the public and stakeholders who indicated a strong preference for eliminating property and environmental impacts on the top and east side of I-495. Congestion would be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits.

The FEIS and Interstate Access Point Approval (IAPA), which is an FHWA approval to ensure safety, operations, and engineering acceptability on the interstate system, will include a more detailed assessment of the future mainline and localized operational impacts of the Preferred Alternative. Opportunities to further address safety and operations will be evaluated on the Selected Alternative after the conclusion of NEPA and during final design.

Overall, the Preferred Alternative provides tangible operational benefits that would be significantly better than the No Build.

## Environmental Resources, Consequences and Mitigation

### What Are the Effects of the Preferred Alternative on the Environmental Resources?

The environmental consequences presented in **Chapter 4** are described for the Preferred Alternative. Since the DEIS, design has advanced on the Preferred Alternative. The permanent or long-term and

00027659

Supplemental Draft Environmental Impact Statement



temporary or short-term, construction-related effects are quantified and presented in this SDEIS. The summary of environmental effects of the Preferred Alternative are presented in **Table ES-1.**

**Table ES-1: Summary of Quantifiable Impacts from the Preferred Alternative**

| Resource | Permanent[1] | Temporary[1] | Total[1] |
|---|---|---|---|
| Total Potential Impacts to park properties (acres) | 21.0 | 15.1 | 36.1 |
| Total Right-of-way Required[2] (acres) | 97.2 | 18.7 | 115.9 |
| Number of Properties Directly Affected (count) | - | - | 501 |
| Number of Residential Relocations (count) | - | - | 0 |
| Number of Business Relocations (count) | - | - | 0 |
| Number of Historic Properties with Adverse Effect[3] (count) | - | - | 11 |
| Noise Sensitive Areas Impacted (count) | - | - | 49 |
| Hazardous Materials Sites of Concern (count) | - | - | 255 |
| Wetlands of Special State Concern (acres) | 0 | 0 | 0 |
| Wetlands[4] (acres) | 3.7 | 0.6 | 4.3 |
| Wetland 25-foot buffer[4] (acres) | 6.5 | 0.6 | 7.1 |
| Waterways[4] (square feet) | 673,757 | 343,945 | 1,017,702 |
| Waterways[4] (linear feet) | 43,852 | 2,701 | 46,553 |
| Tier II Catchments (acres) | 0 | 0 | 0 |
| 100-Year Floodplain (acres) | 33.7 | 15.1 | 48.8 |
| Forest canopy (acres) | 479.6 | 20.3[5] | 500.1 |
| Rare, Threatened and Endangered Species Habitat (acres) | 33.4 | 23.0 | 56.4 |
| Sensitive Species Project Review Area (acres) | 24.5 | 20.0 | 44.5 |
| Unique and Sensitive Areas (acres) | 139.2 | 29.4 | 168.5 |

Notes: The impacts in this table are for the mainline improvements for the Preferred Alternative. Any impacts associated with the compensatory stormwater management are preliminary and discussed in SDEIS, Appendix C.

[1] All values are rounded to the tenths place

[2] The right-of-way is based on State records research and filled in with county right-of-way, as necessary.

[3] Refer to Chapter 4, Section 4.7 for additional details on the effects to historic properties.

[4] Refer to **Table 4-25, Section 4.12** for additional details on the impacts to wetlands and waterways.

[5] Temporary forest canopy impacts are cleared forest in areas that will not be permanently acquired or altered by roadway construction. Replanting will occur in these areas. Impacts will be avoided and minimized, and replanting will be maximized within the corridor as determined in final design.

*Blue Text = Adjusted to match Table 4-1, Page 4-3 (11/10/21)*

What Avoidance and Minimization Opportunities Have Been Considered for Effects to Environmental Resources?

Since the publication of the DEIS, avoidance and minimization opportunities to historic properties, parklands, wetlands, wetland buffers, waterways, forests, and the Federal Emergency Management Agency's 100-year floodplain have advanced through extensive coordination with the regulatory and resource agencies. The Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream features. The impacts associated with the Preferred Alternative were avoided and minimized to the greatest extent practicable in all areas at this preliminary stage of the Study, and avoidance and minimization techniques were specifically refined in some areas of sensitive or recreationally valuable resources, such as the NPS park properties around the American Legion Bridge. Refer to **Chapters 2, 4 and 5** of this document for additional details. The effort to avoid, minimize, and mitigate impacts will continue through ongoing and future coordination with the applicable regulatory and resource agencies.  The final avoidance, minimization and mitigation will be documented in the FEIS.

00027660



### What Minimization Efforts Have Been Incorporated into the Preferred Alternative LOD at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery Property?

In response to public, agency and stakeholder comments following the DEIS publication, MDOT SHA refined the LOD at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery property. In late winter 2021, impacts to Morningstar Cemetery were reduced from 0.3 acres (13,068 square feet) reported in the DEIS for Alternative 9 to approximately 14 square feet of temporary area needed for the construction of a noise barrier adjacent to the property. This effort also avoided all ground disturbance within the cemetery boundary. The reduction was in response to public and agency comments and resulted from design modifications, including changes to the Cabin John Parkway interchange ramp configuration, to minimize impacts to the cemetery property. In summer 2021, additional investigation was conducted to detect and map both potential marked and unmarked graves within and adjacent to the Morningstar Cemetery boundary. Further design refinements were made in response to the results of this investigation and complete avoidance of the Morningstar Cemetery property has now been achieved.

### What Minimization Efforts Have Been Incorporated into the Preferred Alternative LOD at the Park Properties and Associated Resources Around the American Legion Bridge?

The most significant avoidance and minimization efforts since the Draft Section 4(f) Evaluation and DEIS focused around the ALB. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the LOD in the vicinity of the ALB that was presented in the DEIS. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the C&O Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the C&O Canal and a temporary haul road paralleling the C&O Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park. Refer to **Chapter 4, Section 4.12.4** for additional details on the ALB Strike Team's efforts.

### What Mitigation Is Being Considered for Unavoidable Environmental Effects?

The advancement of conceptual mitigation for unavoidable effects to environmental resources from the Preferred Alternative has occurred since the DEIS. The proposed conceptual mitigation is discussed by applicable resource in **Chapter 4** and further detailed in the *Conceptual Mitigation Plan* (**DEIS, Appendix Q**) for the following resources: wetlands; forests; rare, threatened, and endangered species; parkland; cultural resources; noise; air; properties; hazardous materials; topography, geology, soils; groundwater; environmental justice; visual aesthetic; aquatic biota; and unique and sensitive areas. Further mitigation

00027661



Supplemental Draft Environmental Impact Statement

measures will be identified and refined as the Study progresses and in consideration of public, stakeholder, and agency comment on this SDEIS. The final mitigation will be documented in the FEIS.

## What Is the Updated Draft Section 4(f) Evaluation?

Section 4(f) of the USDOT Act of 1966, as amended (49 U.S.C. 303(c)) stipulates that the USDOT, including the FHWA, cannot approve the use of land from a publicly-owned park, recreation area, wildlife or waterfowl refuge, or public or private historic site unless the following conditions apply:

- FHWA determines that there is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR §774.3(a)(1) and (2)); or
- FHWA determines that the use of the Section 4(f) properties, including any measures to minimize harm committed to by the applicant, will have a *de minimis* impact on the property (23 CFR §774.3(b)).

Since the publication of the Draft Section 4(f) Evaluation and DEIS in July 2020, the Preferred Alternative has been identified as Alternative 9 – Phase 1 South, which includes the same build improvements proposed as part of Alternative 9 in the DEIS and Draft Section 4(f) Evaluation but limited to the Phase 1 South limits only. No action or no improvements would occur within the study limits outside of Phase 1 South. This decision on the Preferred Alternative considered further coordination with and listening to agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. The Preferred Alternative is responsive to comments received requesting avoidance of Section 4(f) resources and aligns the Study to be consistent with the previously determined phased delivery and permitting approach.

**Chapter 5** of this SDEIS includes the Updated Draft Section 4(f) Evaluation to provide information on the Preferred Alternative. The information included in this Updated Draft Section 4(f) Evaluation will inform FHWA's consideration of the use of Section 4(f) property by the Preferred Alternative. This chapter of the SDEIS provides updated, supplemental information for the Draft Section 4(f) Evaluation, which was included as **DEIS, Appendix F**. This supplemental information does not replace the Draft Section 4(f) Evaluation; it only provides additional analysis. The Section 4(f) Evaluation and this supplement follows established USDOT regulations at 23 CFR 774, FHWA's 2012 Section 4(f) Policy Paper, and 23 U.S.C. 138 and 39 U.S.C. 303.

## What Are the Section 4(f) Impacts?

A "use" of (or impact to) Section 4(f) property occurs:

(i) When land is **permanently incorporated** into a transportation facility;
(ii) When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in 23 CFR §774.13(d); or
(iii) When there is a **constructive use** of a Section 4(f) property as determined by the criteria in 23 CFR §774.15.

The Preferred Alternative would avoid the use of 38 Section 4(f) properties totaling approximately 105 acres relative to the DEIS Build Alternatives. The Preferred Alternative would require use a total of 39.1 acres of 21 Section 4(f) properties (including temporary and permanent), compared to a total of 146.8 acres for the DEIS Build Alternative 9.

00027662

Supplemental Draft Environmental Impact Statement 

Refer to **SDEIS, Chapter 5, Section 5.2** and **DEIS, Appendix F** for additional details. Conceptual mitigation for Section 4(f) impacts has been identified, but coordination with the OWJs for the Section 4(f) properties is still ongoing. The Final Section 4(f) Evaluation will reflect ongoing coordination with OWJs to coordinate impacts and mitigation, and *de minimis* coordination with the OWJs. The Final Section 4(f) Evaluation will also include finalization of the analysis to demonstrate all possible planning to minimize harm, and finalization of the Least Overall Harm Analysis, and final mitigation commitments.

## What Are the Next Steps for the Study?

This SDEIS has been approved by FHWA and MDOT SHA and distributed to Federal, state, and local agencies, as well as organizations and other interested parties and is available for public review. There will be a virtual public hearing held during a 45-day review period for the SDEIS; the comment deadline is November 15, 2021. During this 45-day review period, the SDEIS is available in public locations throughout the study corridors and on the Program website oplanesmd.com/SDEIS Comments on the SDEIS are considered equally regardless of whether received orally or in writing and may be made by:

- Oral testimony at the virtual public hearing on November 1, 2021
- SDEIS comment form at oplanesmd.com/SDEIS
- Email to MLS-NEPA-P3@mdot.maryland .gov
- Letters to Jeff Folden, I-495 & I-270 P3 Program Deputy Director, I-495 & I-270 P3 Office, 707 North Calvert Street, Mail Stop P-601, Baltimore MD 21202
- Call-in a comment at 855-432-1483 and leave a voicemail that is limited to three minutes

Following the 45-day review period, the MDOT SHA and FHWA will review all comments and respond to all substantive comments received or postmarked by the end of the comment period in the preparation of the FEIS. Comments received or postmarked after that date will be reviewed and considered to the extent practicable. In addition to the disposition of all substantive comments received on the DEIS and SDEIS, the FEIS will summarize additional and updated information not refined or quantified in the SDEIS, and mitigation measures. The ROD will document the commitments to be carried forth during final design and construction.

# Public-Private Partnership (P3) Program

## What Is a P3?

A Public-Private Partnership (P3) is an alternative model for delivery of a capital project. A P3 is a partnership between the public or governmental sector with private entities. The P3 seeks to harness private sector expertise, innovation, and funding in order to deliver public infrastructure for the benefit of the public owner and users of the infrastructure. P3s seek to successfully leverage the respective strengths of the public and private sectors to deliver large, complex infrastructure projects in a cost effective and timely fashion. Functions under a P3 agreement may include designing, building, financing, operating, and maintaining a transportation facility. The following definitions of limits are provided to assist in understanding the NEPA and Phase 1 Solicitation process.

- Phase 1: I-495 from south of the ALB to I-270 and I-270 from I-495 to I-70. These are also the limits of the Phase 1 P3 Agreement.
- Phase 1 South: I-495 from south of the ALB to I-270 and I-270 from I-495 to I-370. These are also the limits of the NEPA Preferred Alternative.
- Phase 1 North: I-270 from I-370 to I-70.

00027663

JA1799



Supplemental Draft Environmental Impact Statement

## What is the Status of the Phase 1 Solicitation Process and P3 Agreement?

The Maryland BPW originally approved the P3 designation for the P3 Program in June 2019 and provided a supplemental approval in January 2020. These approvals allowed MDOT SHA to use Progressive P3 process to design and construct Phase 1 of the P3 Program, by seeking a Phase Developer for Phase 1. This progressive approach allowed the solicitation process to proceed without final commitment during the NEPA process.

As part of the Progressive P3 solicitation, MDOT followed a Request for Proposal (RFP) process seeking interested phase developers in February 2020. MDOT and MDTA, with participation from local jurisdictions, developed a shortlist of four highly qualified Proposers in July 2020. Three of the four shortlisted firms submitted proposals to enter into the Phased P3 Agreement for Phase 1 to assist in the pre-development work, deliver Phase 1 including I-495 from the ALB to I-270, and along I-270 from I-495 to I-70. In February 2021, MDOT SHA identified the Selected Proposer that could best deliver the project in a manner most advantageous to the State.

On August 11, 2021, in accordance with Maryland law, MDOT and MDTA presented to and received approval from the Board of Public Works to award the Phase 1 P3 Agreement to the Selected Proposer, a jointly owned company created for the project, called Accelerate Maryland Partners, Inc. (AMP). They will be completing the predevelopment work related to Phase 1 of the P3 Program.

In accordance with the terms and conditions of the Phase 1 P3 Agreement, MDOT and AMP will further advance predevelopment work on the first section, which includes from the vicinity of the George Washington Memorial Parkway across the American Legion Bridge to I-270 and on I-270 up to I-370, ("Phase 1 South"). The Preferred Alternative in this SDEIS is aligned with the Phase 1 South limits, which is the first section planned for delivery under the Project. As part of its proposal, the Phase Developer has committed to provide an estimated $300 million for transit services in Montgomery County over the operating term of Phase 1 South. To further support transit services, MDOT has committed, upon financial close of the Section P3 Agreement for Phase 1 South, to fund no less than $60 million for design and permitting of high priority transit investments in Montgomery County, such as Phase I of the Corridor Cities Transitway, Bus Rapid Transit in the MD 355 Corridor, or other high priority projects and to construct and equip the Metropolitan Grove Bus Operations and Maintenance Facility.

AMP, as the Phase Developer, is working collaboratively with MDOT, MDTA, and the stakeholders on pre-development work including advancing the preliminary design and due-diligence activities to further minimize impacts. After completion of the predevelopment work with respect to Phase 1 South and, the FEIS, MDOT would seek final approval from the BPW to move forward with the Section P3 Agreement under which a subsidiary of the Phase Developer (called the "Section Developer") will be responsible for the final design, construction, financing, operations, and maintenance of a particular section for an estimated term of 50 years.

00027664

JA1800

Supplemental Draft Environmental Impact Statement



# 1   PURPOSE AND NEED

The Study Purpose and Need has not changed.  Refer to the Draft Environmental Impact Statement (DEIS), Chapter 1 and DEIS, Appendix A.  These materials can be viewed through the following links on the Program website:

DEIS, Chapter 1: https://495-270-p3.com/wp-content/uploads/2020/11/2020-06-02_DEIS_01_Purpose_and_Need.pdf

DEIS, Appendix A: https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf

This SDEIS Chapter includes the following updates:

- Identification of the Preferred Alternative, Alternative 9 – Phase 1 South, which is comprised of two, new high-occupancy toll (HOT) managed lanes in each direction on I-495 from George Washington Memorial Parkway (GWMP) to I-270 and then on I-270 from I-495 to I-370 as well as along I-495 and the I-270 east spur to MD 187. No action or improvements on I-495 from the I-270 east spur to west of MD 5.

## 1.1   Background and Context

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, have prepared a Supplemental Draft Environmental Impact Statement (SDEIS) under the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study).  The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

In January 2021, Alternative 9 was announced as the MDOT SHA's Recommended Preferred Alternative based on results of traffic, engineering, financial, and environmental analyses, as well as public comment. After several months of further coordinating with and listening to agencies and stakeholders regarding Alternative 9 as the Recommended Preferred Alternative, MDOT SHA decided to align the Study to be consistent with the previously determined phased delivery and permitting approach which focused on Phase 1 South only. As a result, FHWA and MDOT SHA identified a new Recommended Preferred Alternative: Alternative 9 – Phase 1 South. Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 but limited to the Phase 1 South limits only.

The Preferred Alternative focuses solely on building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. Refer to **Figure 1-1**. This Preferred Alternative was identified after coordination with resource agencies, the public and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program planned project phased delivery and permitting approach.

00027665

JA1801



Supplemental Draft Environmental Impact Statement

The 48-mile Study limits remain unchanged: I-495 from south of the GWMP in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland. The Preferred Alternative, Alternative 9 - Phase 1 South (shown in **dark blue** in **Figure 1-1**), includes build improvements within the limits of Phase 1 South only totaling approximately 15 miles of proposed improvements. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1-1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

**Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.2  Study Purpose and Need

The Purpose and Need Statement remains the same as presented in the **DEIS, Chapter 1** and in the full Purpose and Need Statement in **DEIS, Appendix A**. However, the purpose and needs are restated below for ease to the reader.

The purpose of the Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the study limits and enhances existing and planned multimodal mobility and connectivity.

The needs for the Study are:

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices

00027666



Supplemental Draft Environmental Impact Statement

- Improve Movement of Goods and Services
- Accommodate Homeland Security.

Two goals for the Study were identified in addition to the needs: (1) the use of alternative funding approaches for financial viability and (2) environmental responsibility.

00027667

JA1803



The proposed action, along with other future transportation projects would cause noise impacts, with potential cumulative effects on communities in the vicinity of improved and new roadways. Cumulative impacts to water quality could occur from stream loss and the incremental increase of impervious surfaces that may increase runoff from past, present, and future development projects. These would be minimized through the use of BMPs during construction and use of SWM facilities. The incremental effect would be minimized by the required permitting process, which would identify avoidance, minimization, and mitigation as needed to offset wetland losses.

## 4.23 Consequences of Construction

The LOD of the Preferred Alternative accounts for areas needed for construction. The assumed areas for construction access, staging and materials storage are identified on the *Environmental Resource Mapping* (**SDEIS, Appendix D**). Since the DEIS, design and LOD refinements have occurred. The long-term effects and short-term, construction-related effects of the Preferred Alternative have been quantified and documented in this SDEIS. Impacts associated with construction that will be further evaluated for the Preferred Alternative in final design including, traffic congestion associated with construction maintenance of traffic, impacts to business and residential access, utility disruptions, vibrations, sediment erosion and stormwater management, and construction related noise.

Due to the magnitude of the Study, MDOT SHA acknowledged in the DEIS the need to construct any Build Alternative in phases. Phase 1 South of the P3 Program, construction of the Preferred Alternative along I-495 from the vicinity of the George Washington Memorial Parkway in Virginia, across and including the ALB, to its interchange with I-270 at the West Spur, and I-270 from its interchange with I-495 to its interchange with I-370. A separate, independent NEPA study would include I-270 north of I-370 up to I-70.

It is anticipated that construction will last approximately four to five years. Details related to when construction related activities will occur will be determined in final design; however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. MDOT SHA will continue to coordinate with the neighboring communities through design and construction. Construction will require maintenance of traffic throughout the duration of work to minimize the disruption to highway users.

### 4.23.1 Visual and Aesthetic Resources

Construction would require the removal of vegetation to varying degrees throughout the study corridors. As a result of the vegetation removal, the wider interstates, added ramps, retaining walls, and noise barriers would become more visible and prominent from both the dynamic and static views. The static views from adjacent properties, including residential properties, commercial enterprises, parkland/ open space properties, and a number of community resources would experience an impact; however, impacts would generally be consistent with existing views of the study corridors as the surrounding area is adjacent to the existing interstate facilities and the surrounding area is urban in nature. Temporary visual impacts from both dynamic and static views will occur from the addition of construction equipment including cranes, heavy vehicles, trucks, borrow material and equipment stockpiling, safety signage, temporary barriers, etc. MDOT SHA has also been coordinating with NPS and M-NCPPC on visual impacts and mitigation at their park properties. Final mitigation as agreed upon with these agencies will be documented in the FEIS and ROD.

00027822



### 4.23.2 Hazardous Materials

Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSIs) would be conducted to further investigate properties within and in the vicinity of the Preferred Alternative LOD that have a high potential for mitigation contaminated materials exposed during construction activities (refer to **Section 4.10** for additional details). Proposed investigation for the high concern sites should adequately characterize surficial and subsurface soils, as well as groundwater, if anticipated to be encountered. Sample locations should take into account locations of previous releases, former/current/abandoned storage tanks, and inferred groundwater flow, as well as proposed soil/groundwater disturbance during construction. The Developer would be required to use best management practices to minimize the release of any hazardous materials during construction.

### 4.23.3 Air Quality

Most emissions associated with construction are considered short-term or temporary in nature. The primary air quality concerns during construction would be a potential short-term localized increase in the concentration of fugitive dust (including airborne $PM_{2.5}$ and $PM_{10}$), as well as mobile source emissions, including pollutants such as CO. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours. A quantitative analysis of the construction-related GHG emissions for the Preferred Alternative will be conducted using FHWA's Infrastructure Carbon Estimator tool. The results of that analysis will be included in the FEIS.

Mobile source emissions include pollutants such as CO. Since CO emissions from motor vehicles generally increase with decreasing vehicle speed, disruption of traffic during construction (such as temporary reduction of roadway capacity and increased queue lengths) could result in short-term elevated concentrations of CO. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours.

Construction and subsequent maintenance of the project would also generate GHG emissions. Preparation of the roadway corridor (e.g., earth-moving activities) involves a considerable amount of energy consumption and resulting GHG emissions; manufacture of the materials used in construction and fuel used by construction equipment also contribute to GHG emissions; and on-road vehicle delay during construction would also increase fuel use, resulting in GHG emissions. A quantitative analysis of the construction related GHG emissions for the Preferred Alternative will be conducted using FHWA's Infrastructure Carbon Estimator tool. The results of that analysis will be included in the FEIS.

During construction the contractor may use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance;
- Cover trucks when hauling soil, stone, and debris (MDE Law);
- Use water trucks to minimize dust;
- Use dust suppressants if environmentally acceptable;
- Stabilize or cover stockpiles;
- Construct stabilized construction entrances per construction standard specifications;
- Regularly sweep all paved areas including public roads;
- Stabilize onsite haul roads using stone; and
- Temporarily stabilize disturbed areas per MDE erosion and sediment standards.

00027823



Supplemental Draft Environmental Impact Statement

### 4.23.4 Noise

Noise would be generated from the construction of the highway improvements and the noise barriers. (Refer to **Section 4.9** for additional details). The Developer would be responsible for developing a construction work sequence that minimizes the duration of time without a noise barrier in place.

Land uses that are sensitive to vehicular noise are also sensitive to construction noise. Despite highway construction being a short-term phenomenon, significant noise impacts can occur. The extent and severity of these impacts depend on the phase of construction and the noise characteristics of construction equipment being used. As with any major construction project, areas around the construction site are likely to experience varied periods and degrees of noise impact. This type of project will likely employ the following equipment, which could be a source of construction noise: bulldozers and earthmovers; front-end loaders; dumps and other diesel trucks; and compressors. Generally, sensitive land uses near construction zones may experience noise levels between 78 dB(A) and 83 dB(A). Maintenance and adjustments to equipment, temporary noise barriers, construction of permanent noise barriers first where possible, variation of construction activity areas, public involvement, and financial incentives to contractors are all mitigation procedures that can decrease temporary noise impacts. During final design, these mitigation measures will be considered to minimize public exposure to short-term noise impacts. Wherever possible, the Developer will be required to construct any proposed noise barrier prior to demolishing the existing sound barrier. This would reduce noise and screen neighborhoods from construction activities. Where a proposed noise barrier cannot be constructed prior to demolishing an existing noise barrier, the Developer will be required to begin construction of the new noise barrier within 60 days of beginning the existing sound barrier demolition; the developer would also be required to continue construction operations of the proposed noise barrier until it is completed. Contract provisions will allow the P3 Developer to salvage and reuse certain sound barrier materials to minimize construction duration. These provisions were added to reduce construction impacts to surrounding properties.

## 4.24  Commitment of Resources

### 4.24.1  Irreversible and Irretrievable Commitment of Resources

The construction of the Preferred Alternative would result in the commitment of natural, physical, and financial resources that would be irreversible and irretrievable. The irreversible dedication of land to transportation use for the construction of the Preferred Alternative would render the land unusable for any other use. Approximately 115.9 acres of land converted to transportation use under the Preferred Alternative, 97.2 acres of permanent and 18.7 temporary impacts (refer to **Section 4.1.3, Table 4-2**). Land used in the construction and operation of the proposed facility (right-of-way) is considered an irreversible commitment during the time period that the land is used for a transportation facility.

As part of this permanent land alteration, approximately 500 acres of forest canopy (refer to **Section 4.16.3, Table 4-37**), 4.3 acres of wetlands, and 45,779.7 linear feet of streams (refer to **Section 4.12.3, Table 4-25**) have the potential to be affected by the Preferred Alternative. While forest, stream and wetland mitigation would account for some of these losses, these individual distinct ecosystems could be irreversibly impacted.

Significant amounts of fossil fuels, electricity, labor, and highway construction materials would be irretrievably expended for the construction of the Preferred Alternative. Anticipated construction materials would include aggregates, asphalt, cement, gravel, and sand. Concrete and steel would be

00027824

JA1806

Supplemental Draft Environmental Impact Statement 

# 5    UPDATED DRAFT SECTION 4(F) EVALUATION

This Updated Draft Section 4(f) Evaluation provides information focused on the Preferred Alternative being studied in the Supplemental Draft Environmental Impact Statement (SDEIS). This supplemental information does not replace the DEIS or Draft Section 4(f) Evaluation published in July 2020. The DEIS documents can be viewed through the following links on the Program website:

DEIS, Chapter 5: https://oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_05_Section_4f.pdf

DEIS, Appendix F: https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppF_Draft-Section-4f-Eval_web.pdf

This SDEIS Chapter includes the following updates:

- Identification of the Preferred Alternative, which is Alternative 9 – Phase 1 South
- Reduced list of Section 4(f) Properties based on the Preferred Alternative limits of disturbance
- Identification of temporary and permanent impacts to Section 4(f) properties
- Updates on all possible planning to avoid and minimize the use of Section 4(f) properties within the Preferred Alternatives limits
- Updated Least Overall Harm Analysis and Coordination

The Final Section 4(f) Evaluation, including final mitigation for unavoidable Section 4(f) uses, will be included with the Final Environmental Impact Statement (FEIS) along with the Least Overall Harm Analysis conclusion.

## 5.1   Introduction

Section 4(f) of the US Department of Transportation (USDOT) Act of 1966 as amended (49 USC. 303(c)) is a Federal law that protects significant publicly-owned parks, recreation areas, wildlife and/or waterfowl refuges, or any significant public or private historic sites. Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT.  As a USDOT agency, FHWA must comply with Section 4(f) and its implementing regulations at 23 CFR 774.

### 5.1.1   Purpose and Background

Since the publication of the Draft Section 4(f) Evaluation and DEIS in July 2020, the Preferred Alternative has been identified as Alternative 9 – Phase 1 South. Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 in the DEIS and Draft Section 4(f) Evaluation but limited to the Phase 1 South limits only (I-495 from the George Washington Memorial Parkway to east of MD 187 and I-270 from I-495 to I-370 and on the I-270 east spur to MD 187).  The Preferred Alternative is described in **Section 5.1.2** below. This decision to identify Alternative 9 – Phase 1 South as the Preferred Alternative was based in part on extensive coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties (See **DEIS Chapter 5, Section 5.4** for information on OWJ). Comments received on the DEIS and Draft Section 4(f) Evaluation from agencies and

JA1807

00027827

Supplemental Draft Environmental Impact Statement

stakeholders specifically requested avoidance of significant parkland and historic resources within the study corridors. The Preferred Alternative is responsive to comments received and aligns the Study to be consistent with the previously determined phased delivery and permitting approach by limiting the build improvements to Phase 1 South and avoiding improvements on I-495 east of the I-270 east spur. The result is complete avoidance of significant Section 4(f) properties within the Study limits, which remain the same as the DEIS, on I-495 east of the I-270 east spur to MD 5 in Prince George's County.

This Updated Draft Section 4(f) Evaluation provides information focused on the potential impacts to Section 4(f) properties as related to the Preferred Alternative being discussed in the SDEIS. The information included in this Updated Draft Section 4(f) Evaluation will inform FHWA's consideration of the use of Section 4(f) property by the Preferred Alternative. This chapter of the SDEIS provides updated, supplemental information for the Draft Section 4(f) Evaluation included in **DEIS, Appendix F**. This supplemental chapter does not replace the Draft Section 4(f) Evaluation; it only provides additional analysis. The Section 4(f) Evaluation and this supplement follow established US DOT regulations including 23 CFR 774, FHWA's *2012 Section 4(f) Policy Paper*, and 23 USC 138 and 39 USC 303.

### 5.1.2  Description of Preferred Alternative

Alternative 9 – Phase 1 South has been identified as the Preferred Alternative and includes two, new high-occupancy toll (HOT) managed lanes network on portions of I-495 and I-270 (shown in **dark blue** in **Figure 5-1**). On I-495, the Preferred Alternative consists of adding two, HOT managed lanes in each direction from the George Washington Memorial Parkway in Virginia to east of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one HOT managed lane in each direction from I-495 to I-370 and on the I-270 east spur to MD 187. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur (shown in **light blue** in **Figure 5-1**). Along I-270, the existing collector-distributor (C-D) lane designation from Montrose Road to I-370 would be removed as part of the proposed improvements.

**Figure 5-1: I-495 & I-270 Managed Lanes Study Corridors –  Preferred Alternative**



00027828

JA1808



Supplemental Draft Environmental Impact Statement

### 5.1.3  Changes Since the Draft Section 4(f) Evaluation and DEIS

The Preferred Alternative which includes build improvements only within the Phase 1 South limits avoids approximately 105 acres of Section 4(f) properties, including both parks and historic resources. In addition, impacts to several parks and historic resources were reduced following consideration of public and agency comments received during the DEIS public comment period.  MDOT SHA and FHWA coordinated closely with the OWJs in a series of office and field meetings to identify opportunities to further avoid and minimize impacts to historic resources and park land including contributing features within parks such as forested areas, wetlands and waterways within the Preferred Alternative limits of disturbance (LOD). (Refer to **SDEIS, Chapter 7**, for a summary of agency coordination.)

Since the DEIS and Draft Section 4(f) Evaluation, substantial efforts to avoid and minimize impacts to park and historic resources around the American Legion Bridge (ALB) has occurred. MDOT SHA and FHWA met with the National Park Service (NPS) on December 8, 2020 to discuss the limit of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design and construction, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historical Park (C&O Canal NHP) and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of the approaches could further reduce the LOD. The Strike Team conducted detailed investigation of a top-down segmental construction approach; a top-down cable stayed design approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the existing bridge could be consolidated to the northwest quadrant along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the C&O Canal and a temporary haul road paralleling the C&O Canal towpath. Refer to **Chapter 4, Section 4.4.3** for additional details on the ALB Strike Team's efforts.

Another focus area for avoidance and minimization was at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery) located adjacent to I-495 inner loop just south of Cabin John Parkway. In response to comments received on the DEIS and Draft Section 4(f) Evaluation, impacts to the Morningstar Cemetery boundary were reduced from 0.3 acres (13,068 square feet) reported in the DEIS for Alternative 9 to approximately 14 square feet of temporary area needed for construction access to build a noise barrier adjacent to the property. This design refinement also resulted in complete avoidance of ground disturbance within the cemetery boundary.  In July 2021, additional investigation was conducted to detect and map both potential marked and unmarked graves within and adjacent to the cemetery boundary. Complete avoidance of the Morningstar Cemetery property has been achieved based on further design refinements in response to the results of this investigation.

With identification of a Preferred Alternative, design refinements have progressed and quantified impacts have been further broken down into permanent or long-term effects and temporary or short-term

00027829

JA1809



construction-related effects. Additional opportunities to avoid, minimize, and mitigate effects will be considered and the commitments will be documented in the Final Section 4(f) Evaluation and the FEIS.

Since the DEIS, MDOT SHA has further evaluated the ownership of Millennium Garden Park, which was previously identified as a Section 4(f) property in the Draft Section 4(f) Evaluation. MDOT SHA has determined that, even though the property is maintained as a park by the City of Rockville, it is owned by MDOT SHA for transportation use. In accordance with 23 CFR 774.11(h), the Millennium Garden Park property is not subject to Section 4(f) as it is owned by MDOT SHA for transportation use and has not been included in this Updated Draft Section 4(f) Evaluation.

## 5.2   Inventory and Use of Section 4(f) Properties

Regulations at 23 CFR 774.17 define a Section 4(f) property as "publicly-owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance, or land of an historic site of national, state, or local significance." 23 CFR 774.17 further defines "Historic site" to include any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places (NRHP).

Pursuant to 23 CFR 774.17, a "use" of Section 4(f) property occurs:

(1) When land is **permanently incorporated** into a transportation facility;

(2) When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in 23 CFR 774.13(d); that is, when one or more of the following criteria for temporary occupancy are not met:

- The duration of the occupancy must be less than the time needed for the construction of the project, and no change of ownership occurs;
- Both the nature and magnitude of the changes to the Section 4(f) land are minimal;
- No permanent adverse physical changes, nor interference with activities or purposes of the resources on a temporary or permanent basis, are anticipated;
- The land must be returned to a condition that is at least as good as existed prior to the project; and
- There is documented agreement with the appropriate Federal, State, or local officials having jurisdiction over the land that the above conditions have been met.

(3) When there is a **constructive use** of a Section 4(f) property. As defined in 23 CFR 774.15, a constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. The degree of impact and impairment must be determined in consultation with the Officials with Jurisdiction in accordance with 23 CFR 774.15(d)(3). Refer to the Section 4(f) Evaluation, Section 1.2.2 A for a preliminary analysis of constructive use.

An impact to a significant public park, recreation area, or wildlife and waterfowl refuge may be determined to be *de minimis* if the transportation use of the Section 4(f) property, including incorporation of any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement

00027830

measures), does not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) (23 CFR 774.17). For historic sites, a *de minimis* impact means that FHWA has determined (in accordance with 36 CFR 800) that either no historic property is affected by the project or that the project will have "no adverse effect" on the historic property. A *de minimis* impact determination does not require analysis to determine if avoidance alternatives are feasible and prudent, but consideration of avoidance, minimization, mitigation or enhancement measures should occur.

### 5.2.1  Overview

The Draft Section 4(f) Evaluation included descriptions of all Section 4(f) properties identified within the corridor study boundary, the use of Section 4(f) properties for all previously evaluated alternatives, and discussion of minimization measures for each property. The Preferred Alternative included in this SDEIS (Alternative 9 – Phase 1 South) avoids the use of Section 4(f) properties within the Study limits outside of Phase 1 South where no improvements are proposed, resulting in lower overall impacts to Section 4(f) properties. **Table 5-1** presents the Section 4(f) properties impacted by the Preferred Alternative. Each property with a potential Section 4(f) use is then described in **Sections 5.2.2 through 5.2.23** of this chapter. **Table 5-1** notes the Official with Jurisdiction (OWJ) for each Section 4(f) property; the OWJ is designated in the Section 4(f) regulations and are for the purposes of Section 4(f) only.

The last column in **Table 5-1** summarizes, at a high-level, changes to impacts from the DEIS related to design refinements of the Preferred Alternative LOD at each property.  Additional details on changes to each property since the DEIS are provided in **Sections 5.2.2 through 5.2.23.**  Refinements to the LOD for the Preferred Alternative included the following elements:

- Profile adjustments and roadway shifts due to mainline widening
- Inclusion of pedestrian and bicycle facilities for roads that cross over I-495 and I-270
- Direct access ramps and exchange ramps for access to the HOT managed lanes
- Interchange ramp relocation, reconfiguration, and tie-ins due to mainline widening
- On-site drainage and stormwater management, including swales, ponds, and large facilities along the roadside and within interchanges
- Relocation of existing streams, where determined to be feasible
- Culvert extensions, auxiliary pipes, and outfall stabilization areas
- Noise barrier replacement/construction
- Reconstruction of I-495 and I-270 mainline and interchange ramp bridges over water and roadways
- Full replacement of the ALB
- Utility relocations
- Avoidance and impact minimization of adjacent land uses such as: streams, wetlands, historic properties, parks, and private properties
- Construction access, staging, materials storage, grading, clearing, and erosion and sediment control

00027831

JA1811

Supplemental Draft Environmental Impact Statement

## Table 5-1: Summary of Section 4(f) Property Use

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Anticipated Section 4(f) Approval | Impact[2] (acres) | Change from DEIS Alternative 9 |
|---|---|---|---|---|---|
| George Washington Memorial Parkway | Advisory Council on Historic Preservation (ACHP), NPS, Virginia Department of Historic Resources (VDHR) | Public Park and Historic Property | Individual Evaluation | Permanent: 0.7 Temporary: 3.7 Total: 4.4 | Total impact reduced by 7.8 acres from DEIS impact of 12.2 acres |
| Chesapeake & Ohio Canal National Historical Park[3] | ACHP, Maryland Historical Trust (MHT), NPS | Public Park and Historic Property | Individual Evaluation | Permanent: 1.0 Temporary: 9.1 Total: 10.1 | Total impact reduced by 5.3 acres from DEIS impact of 15.4 acres; altered areas within transportation use; revised property boundary to combine Public Park and Historic Property areas |
| Clara Barton Parkway[3] | ACHP, MHT, NPS | Public Park and Historic Property | Individual Evaluation | Permanent: 1.6 Temporary: 0.9 Total: 2.5 | Total impact increased by 0.7 acres from DEIS impact of 1.8 acres; altered areas within transportation use; revised property boundary to combine Public Park and Historic Property areas |
| Carderock Springs Historic District | MHT | Historic Property | De minimis | Permanent: < 0.1 Temporary: < 0.1 Total: < 0.1 | Total impact increased by less than 0.1 acres from no impact in DEIS |
| Gibson Grove AME Church | MHT | Historic Property | Individual Evaluation | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | Total impact increased by 0.1 acres from no impact in DEIS |

00027832

JA1812

Supplemental Draft Environmental Impact Statement

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Anticipated Section 4(f) Approval | Impact[2] (acres) | Change from DEIS Alternative 9 |
|---|---|---|---|---|---|
| Cabin John Stream Valley Park Unit 2 | Maryland-National Capital Park and Planning Commission (M-NCPPC) Montgomery County, NCPC | Public Park | *De minimis* | Permanent: 0.8 Temporary: 0.6 Total: 1.4 | Total impact increased by 0.3 acres from DEIS impact of 1.1 acres |
| Burning Tree Club | MHT | Historic Property | *De minimis* | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | Total impact increased by 0.5 acres from DEIS impact of 0.8 acres |
| Academy Woods | MHT | Historic Property | *De minimis* | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | No change |
| Cabin John Regional Park | M-NCPPC Montgomery County | Public Park | Individual Evaluation | Permanent: 5.7 Temporary: 0.6 Total: 6.3 | Total impact increased by 0.6 acres from DEIS impact of 5.7 acres |
| Tilden Woods Stream Valley Park | M-NCPPC Montgomery County | Public Park | *De minimis* | Permanent: 0.6 Temporary: 0.1 Total: 0.7 | Total impact increased by 0.5 acres from DEIS impact of 0.2 acres |
| Old Farm Neighborhood Conservation Area | M-NCPPC Montgomery County | Public Park | *De minimis* | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | No change |
| Cabin John Stream Valley Park Unit 6 | M-NCPPC Montgomery County | Public Park | *De minimis* | Permanent: 0.8 Temporary: 0.0 Total: 0.8 | Total impact increased by 0.4 acres from DEIS impact of 0.4 acres |
| Cabin John Stream Valley Park (Rockville) | City of Rockville Department of Recreation and Parks | Public Park | Individual Evaluation | Permanent: 2.1 Temporary: 0.0 Total: 2.1 | No change |
| Bullards Park and Rose Hill Stream Valley Park | City of Rockville Dept. of Recreation and Parks | Public Park | Individual Evaluation | Permanent: 3.3 Temporary: 0.0 Total: 3.3 | Total impact increased by 3.0 acres from DEIS impact of 0.3 acres, impact likely greater than *de minimis* |
| Rockmead Park | City of Rockville Department of Recreation and Parks | Public Park | *De minimis* | Permanent: 0.2 Temporary: 0.1 Total: 0.3 | Total impact increased by 0.1 acres from DEIS impact of 0.2 acres |

00027833

JA1813

Supplemental Draft Environmental Impact Statement

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Anticipated Section 4(f) Approval | Impact[2] (acres) | Change from DEIS Alternative 9 |
|---|---|---|---|---|---|
| Woottons Mill Park | City of Rockville Department of Recreation and Parks | Public Park | De minimis | Permanent: 0.7 Temporary: 0.0 Total: 0.7 | Total impact increased by 0.5 acres from DEIS impact of 0.2 acres |
| Woodley Gardens | MHT | Historic Property | De minimis | Permanent: 1.2 Temporary: 0.1 Total: 1.3 | Total impact increased by 0.6 acres from DEIS impact of 0.7 acres |
| Rockville Senior Center and Park | City of Rockville Department of Recreation and Parks, MHT | Public Park and Historic Property | De minimis | Permanent: 1.0 Temporary: 0.0 Total: 1.0 | Total impact increased by 0.3 acres from DEIS impact of 0.7 acres |
| Ward Building | MHT | Historic Property | De minimis | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | Total impact increased by 0.1 acres from DEIS impact of 0.1 acres |
| Malcolm King Park | City of Gaithersburg Department of Parks, Recreation and Culture | Public Park | Individual Evaluation | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | Total impact increased by 1.2 acres from DEIS impact of 0.1 acres, impact likely greater than de minimis |
| Morris Park | City of Gaithersburg Department of Parks, Recreation and Culture | Public Park | Individual Evaluation | Permanent: 1.1 Temporary: 0.0 Total: 1.1 | Total impact increased by 1.0 acres from DEIS impact of 0.1 acres, impact likely greater than de minimis |

Note: 1. Virginia Department of Historic Resources (VDHR) serves as the Virginia State Historic Preservation Office; Maryland Historical Trust (MHT) serves as the Maryland State Historic Preservation Office.

2. All impacts rounded to the tenths. The DEIS impacts reflect Build Alternative 9. For purposes of determining Section 4(f) use, temporary impacts are considered short-term, construction related activities that do not require permanent incorporation of a Section 4(f) resource into a transportation facility. Short-term, construction related work includes but is not limited to construction staging, material and equipment storage, construction access easements, and other areas needed to support the construction, but not part of the long-term improvement.

3. Section 4(f) impacts to C&O Canal NHP and Clara Barton Parkway as currently noted in Chapter 5 exclude the area that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the C&O Canal and eastbound Clara Barton Parkway, and existing pier locations for the American Legion Bridge.

While the Study limits remain the same as noted in the DEIS, the limits of build improvements under the Preferred Alternative are limited to Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Therefore, the Preferred Alternative would avoid the use of 38 Section 4(f) properties that were previously reported as Section 4(f) uses in the DEIS and

00027834

Supplemental Draft Environmental Impact Statement

Draft Section 4(f) Evaluation, totaling approximately 105 acres. The properties avoided and acreage of Section 4(f) use previously included in the DEIS are included in **Table 5-2**.

**Table 5-2: Avoided Section 4(f) Use by the Preferred Alternative**

| Section 4(f) Properties No Longer Impacted by the Preferred Alternative | Acres of Avoided Section 4(f) Use |
|---|---|
| Andrews Manor Park | 2.6 |
| Baltimore Washington Parkway | 69.3 |
| Beckett Field | 0.2 |
| Beltsville Agricultural Research Center (BARC) | 0.5 |
| Blair Local Park | 0.4 |
| Buddy Attick Lake Park | 0.1 |
| Calvary Evangelical Lutheran Church | <0.1 |
| Carsondale | 0.1 |
| Cherry Hill Road Park | 1.8 |
| Douglas E. Patterson Park | 0.7 |
| Fleming Local Park | 0.1 |
| Forest Glen Historic District | 0.2 |
| Forest Glen Neighborhood Park | 0.3 |
| Glenarden Historic District | 0.8 |
| Greenbelt Historic District | 0.3 |
| Greenbelt Park | 0.6 |
| Grosvenor Estate (Wild Acres) | 0.1 |
| Henry P. Johnson Park | <0.1 |
| Henson Creek Stream Valley Park | 0.1 |
| Heritage Glen Park | 0.5 |
| Hollywood Park | <0.1 |
| Indian Spring Club Estates and Indian Spring Country Club | 1.2 |
| Indian Springs Park (City of Greenbelt) | 0.1 |
| Indian Springs Terrace Local Park | 1.4 |
| Locust Hill Neighborhood Park | 0.3 |
| Manchester Estates Park | 0.5 |
| McDonald Field | <0.1 |
| Metropolitan Branch, Baltimore & Ohio Railroad | 8.8 |
| Montgomery Blair High School Athletic Fields | 1.4 |
| Morningstar Tabernacle No. 88 Moses Hall and Cemetery | 0.3 |
| National Park Seminary Historic District / Forest Glen | 1.2 |
| Northwest Branch Stream Valley Park, Unit 3 | 3.2 |
| Rock Creek Stream Valley Park, Unit 2 | 0.4 |
| Rock Creek Stream Valley Park, Unit 3 | 3.3 |
| Sligo Creek Parkway | 4.1 |
| South Four Corners Neighborhood Park | 0.1 |

October 2021

00027835



Supplemental Draft Environmental Impact Statement

| Section 4(f) Properties No Longer Impacted by the Preferred Alternative | Acres of Avoided Section 4(f) Use |
|---|---|
| Southwest Branch Stream Valley Park | 0.3 |
| Suitland Parkway | 0.3 |
| **TOTAL ACRES AVOIDED** | **105.6** |

Note: all avoided impacts presented are relative to DEIS Alternative 9.

Properties that would experience a Section 4(f) use from the Preferred Alternative are detailed in **Sections 5.2.2** through **5.2.23** below. Within the Preferred Alternative LOD, there are four properties subject to the Capper Cramton Act and one property, the C&O Canal NHP, subject to Section 6(f). Refer to **Chapter 4, Section 4.4** and **Table 4-9** for discussion of park properties subject to the Capper Cramton Act. **Section 1.2.8** in the Draft Section 4(f) Evaluation includes additional information on other relevant authority including Capper Cramton Act of 1930 and Section 6(f) of the Land and Water Conservation Act (**DEIS, Appendix F**).

### 5.2.2   George Washington Memorial Parkway

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** NPS, VDHR

**Type of Section 4(f) Approval:** Individual Evaluation

George Washington Memorial Parkway is a publicly-owned park and NRHP-listed historic district that extends along the Potomac River from I-495 to Mount Vernon in Virginia. The George Washington Memorial Parkway is administered by the NPS. The George Washington Memorial Parkway is a scenic roadway honoring the nation's first president that protects and preserves cultural and natural resources along the Potomac River below Great Falls to Mount Vernon. It is also a historic district listed in the NRHP for its association with twentieth-century parkway design, engineering, landscape architecture, park planning and conservation, commemoration, and its association with George Washington. Features within George Washington Memorial Parkway include the Potomac Heritage National Scenic Trail and Turkey Run Park conservation area. The park boundary of George Washington Memorial Parkway extends 38.3 miles and comprises approximately 7,300 acres, including all administrative units and features. Clara Barton Parkway (**Section 5.2.4**) is part of the larger George Washington Memorial Parkway Historic District with a separate historic boundary in Maryland.

George Washington Memorial Parkway is also a historic district that was listed in the NRHP on June 2, 1995. It is historically significant under Criterion B for its association with the life of George Washington and Criterion C for its embodiment of the distinctive characteristics of a parkway.

The Preferred Alternative would result in a Section 4(f) use of 4.4 acres of George Washington Memorial Parkway (**Figure 5-2**), including 0.7 acres of permanent impact and 3.7 acres of temporary impact. This impact has been reduced by 7.8 acres compared to the total impact of 12.2 acres reported in the DEIS for Alternative 9.

00027836

Supplemental Draft Environmental Impact Statement

**Figure 5-2: George Washington Memorial Parkway**

Legend
- Limits of Disturbance
- LOD Decrease from DEIS
- LOD Increase from DEIS
- Historic Property
- Park Property
- Trails
- Potential 4(f) Use
- Property Lines

Section 4(f)
Property

George Washington
Memorial Parkway

0    0.05    0.1
Miles

00027837

JA1817



The impacts to George Washington Memorial Parkway would be required to accommodate access for construction activities to build the new American Legion Bridge and remove the existing structure; the construction, operation, and future maintenance of new direct access ramps to the managed lanes on I-495; the installation, operation, and future maintenance of electrical conduit and permanent signage to inform the traveling public of toll rates and operation of the facility, resurfacing of George Washington Memorial Parkway for maintenance of traffic during construction, construction of a shared use path along the I-495 inner loop and retaining wall. Detailed mapping of the Preferred Alternative design at George Washington Memorial Parkway can be found in **SDEIS, Appendix D – Maps 2-4**.

The Preferred Alternative may result in temporary impacts to the Potomac Heritage National Scenic Trail during construction. A detour would be provided for users of the Potomac Heritage National Scenic Trail if impacted during construction of the Preferred Alternative. The trail would be restored after construction is completed. No other recreational facilities within George Washington Memorial Parkway would be impacted by the Preferred Alternative.

The decrease in impact from the DEIS is due to minimization measures applied at the ALB. MDOT SHA conducted extensive minimization efforts to reduce impacts in the vicinity of the ALB, including impacts to George Washington Memorial Parkway, by evaluating alternative bridge designs and construction staging methods and coordinating with NPS as described in **Section 5.1.3 and Chapter 4, Section 4.4.3**. Minimization efforts resulted in the elimination of a construction access area within George Washington Memorial Parkway that was previously to be used for the location of a construction crane. A new interchange configuration pulled roadwork off the George Washington Memorial Parkway mainline within the park boundary, and a refined signing layout was developed limiting ground disturbance to only those areas where signs will be removed or placed and where electrical conduit must be placed. Through coordination with NPS, a retaining wall was included in the design adjacent to the proposed shared use path that runs parallel to I-495 to further reduce impacts.

Coordination is ongoing with NPS to identify parkland mitigation opportunities. Potential mitigation measures under consideration include acquisition of replacement parkland; wetland restoration; reforestation; trail improvements; and species-specific mitigations for RTE plant species. Mitigation for the use of George Washington Memorial Parkway would also be consistent with stipulations identified in the Section 106 Programmatic Agreement and would be coordinated with the MHT and Section 106 consulting parties. Final mitigation commitments including all possible planning to minimize harm will be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.3   Chesapeake and Ohio Canal National Historical Park

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

The Chesapeake and Ohio Canal National Historical Park (C&O Canal NHP) is an NRHP-listed historic district and publicly-owned park and recreation area encompassing 19,575 acres. The C&O Canal NHP stretches along the Potomac River from Rock Creek at Georgetown in Washington, DC, to Cumberland, Maryland, for 184.5 miles. Construction on the C&O Canal began in 1828 and concluded in 1850. The C&O Canal

00027838

became a unit of the NPS as a national monument in 1961 and then established as a national historical park in 1971.

The C&O Canal NHP was designated to preserve and interpret the 19th century transportation canal and its associated scenic, natural, and cultural resources; and to provide opportunities for education and appropriate outdoor recreation. The C&O Canal NHP is listed on the NRHP and contains more than 1,300 historic structures, including one of the largest collections of 19th century canal features and buildings in the national park system.

The C&O Canal NHP was listed in the NRHP on October 15, 1966, prior to becoming a national historical park. A supplementary listing under the name "Chesapeake and Ohio Canal National Historical Park" was added to the NRHP on February 3, 2015. The C&O Canal NHP is listed in the NRHP under Criteria A, C, and D. In addition to 455 contributing resources previously listed in the NRHP, the supplemental listing added 796 contributing resources comprising 106 buildings, 175 sites, 483 structures, and 32 objects.

Based on property information provided by NPS, MDOT SHA has now evaluated impacts to the C&O Canal NHP using a single boundary applicable to both the historic property and public park, rather than two separate boundaries as reported in the DEIS. This change to use a single boundary was made at the request of NPS. Impacts to the C&O Canal in the DEIS and Draft Section 4(f) Evaluation were based on readily available property information which included permits for operation and maintenance of the existing highway, including an area surrounding the highway, bridges, and ramps. While the intent to formally transfer property from NPS to MDOT SHA was noted in historical documents, neither NPS nor MDOT SHA recovered official documentation formalizing the transfer. Therefore, this SDEIS has altered the area delineated as within transportation use. MDOT SHA, FHWA, and NPS have agreed that Section 4(f) impacts to C&O Canal could exclude the area that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the C&O Canal and eastbound Clara Barton Parkway, and existing pier locations for the ALB.

The Preferred Alternative would result in a Section 4(f) use of 10.1 acres of the C&O Canal NHP (**Figure 5-3**), including 1.0 acre of permanent impact and 9.1 acres of temporary impact. These impacts have decreased by 5.3 acres compared to the total impact of 15.4 acres reported in the DEIS for Alternative 9.

The impacts to C&O Canal NHP would be required to accommodate a temporary access road for construction vehicles and materials to build the new ALB and remove the existing structure, the construction and maintenance of the realigned ramp from I-495 northbound to Clara Barton Parkway, a temporary bridge crossing of the C&O Canal and towpath, and the construction of a shared-use path on the east side of the new ALB. Detailed mapping of the Preferred Alternative design at the C&O Canal NHP can be found in **SDEIS, Appendix D – Map 4**.

00027839



Supplemental Draft Environmental Impact Statement

**Figure 5-3: Chesapeake and Ohio C&O Canal NHP and Clara Barton Parkway**

00027840

JA1820

The C&O Canal towpath, which functions as a recreational facility, would be temporarily impacted during construction. The C&O Canal Towpath would be maintained for pedestrian and bike traffic during construction and would be returned to its original condition upon completion of construction. The proposed construction access road would be horizontally offset from the C&O Canal Towpath. Note that pedestrian traffic on the C&O Canal Towpath would be maintained across the proposed construction access road at all times and the towpath would remain open. Flaggers would be located at the C&O Canal towpath to ensure safe passage of towpath users during construction. Preliminary conceptual design for the proposed shared use path is still under review, and alternative configurations are being evaluated and coordinated with project stakeholders including NPS, Montgomery County Department of Transportation (MCDOT), and Maryland-National Capital Park and Planning Commission (M-NCPPC) (refer to **Section 2.3.8** for the shared-use path options under consideration). No other recreational facilities within the C&O Canal NHP would be impacted by the Preferred Alternative.

The decrease in impacts at the C&O Canal NHP resulted from minimization measures that have been applied around the ALB. MDOT SHA conducted extensive minimization efforts to reduce impacts in the vicinity of the ALB, including impacts to C&O Canal NHP, by evaluating alternative bridge designs, construction access paths, and construction staging methods in coordination with NPS as described in **Section 5.1.3**. Minimization measures include the elimination of one proposed access road east of I-495. An overall reduction in the LOD was achieved due to the ALB Strike Team analysis, resulting in a proposed construction method requiring less work area within C&O Canal relative to the DEIS.

On March 12, 2020, MHT concurred that the Study would have an adverse effect on C&O Canal NHP.

Coordination is ongoing with NPS to identify parkland mitigation opportunities. Potential mitigation measures under consideration include: acquisition of replacement parkland; wetland restoration; rehabilitation to canal, towpath, and masonry structures; reforestation; and species-specific mitigations for RTE plant species. Mitigation for the use of C&O Canal NHP would also be consistent with stipulations identified in the Section 106 Programmatic Agreement and would be coordinated with the MHT and Section 106 consulting parties. Final mitigation commitments including all possible planning to minimize harm will be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.4   Clara Barton Parkway

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

The Clara Barton Parkway is an administrative unit of George Washington Memorial Parkway within Maryland. Clara Barton Parkway extends 6.6 miles along the northern shore of the Potomac River between the Naval Surface Warfare Center at Carderock and the Washington, DC border with Maryland. The historic boundary in Maryland comprises 96.2 acres. Though Clara Barton Parkway has a separate historic boundary in Maryland, it is part of the larger George Washington Memorial Parkway Historic District.

Clara Barton Parkway is under the jurisdiction of NPS and was designed for recreational driving, to link sites that commemorate important episodes in American history, and to preserve habitat for local wildlife.



The Clara Barton Parkway is also a historic property and was listed in the NRHP on June 2, 1995. It is historically significant under Criterion B for its association with the life of George Washington and Clara Barton, persons significant in our past, and Criterion C for its embodiment of the distinctive characteristics of a parkway.

The Preferred Alternative would result in a Section 4(f) use of 2.5 acres of the Clara Barton Parkway (**Figure 5-3**), of which 1.6 acres are permanent and 0.9 acres are temporary impacts. This impact has increased by 0.7 acres from the total impact of 1.8 acres reported in the DEIS for Alternative 9.

The impacts to Clara Barton Parkway would be required to accommodate a temporary access road for construction vehicles and materials to build the new American Legion Bridge (ALB) and remove the existing structure for reconstruction and maintenance of I-495 northbound ramp to Clara Barton Parkway and the eastbound Clara Barton Parkway ramp to northbound I-495; and for construction of a trail connection between a shared-use path on the east side of the new ALB and the existing sidepath along MacArthur Boulevard. Detailed mapping of the Preferred Alternative design at Clara Barton Parkway can be found in **SDEIS, Appendix D – Maps 4-5**.

Impacts to Clara Barton Parkway in the DEIS and Draft Section 4(f) Evaluation were based on readily available property information which included permits for operation and maintenance of the existing highway, including an area surrounding the highway, bridges, and ramps. While the intent to formally transfer property from NPS to MDOT SHA was noted in historical documents, neither NPS nor MDOT SHA recovered official documentation formalizing the transfer. Therefore, this SDEIS has altered the area delineated as within transportation use. MDOT SHA, FHWA, and NPS have agreed that Section 4(f) impacts to C&O Canal NHP and Clara Barton Parkway could exclude the area that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the C&O Canal and eastbound Clara Barton Parkway, and existing pier locations for the ALB.

Despite the increase in impacts from the DEIS, MDOT SHA conducted extensive efforts to reduce impacts in the vicinity of the ALB, including impacts to Clara Barton Parkway, by evaluating alternative bridge designs and construction staging methods and coordinating these efforts with NPS. Detailed construction evaluation resulted in the elimination of one proposed access road in the southwest quadrant of the bridge and Potomac River, just south of the Clara Barton Parkway.

Coordination is ongoing with NPS to identify parkland mitigation opportunities. Potential mitigation measures under consideration include funds to support recommended safety improvements to Clara Barton Parkway. Mitigation for the use of Clara Barton Parkway would also be consistent with stipulations identified in the Section 106 Programmatic Agreement and would be coordinated with the MHT and Section 106 consulting parties. Final mitigation commitments including all possible planning to minimize harm will be included in the Final Section 4(f) Evaluation and FEIS.

00027842



Supplemental Draft Environmental Impact Statement

### 5.2.5   Carderock Springs Historic District

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

Carderock Springs is a planned residential development of 275 modernist houses located northwest of Bethesda in Montgomery County, Maryland. The Carderock Springs Historic District is significant under Criterion A as an example of a type of residential development which resulted from the collaborative efforts of builder Edmund J. Bennett and architects Keyes, Lethbridge, and Condon (KLC) in the suburbs of Washington, DC. The Carderock Springs Historic District is also significant under Criterion C for its distinctive examples of modernist houses in a carefully planned and landscaped development designed to have a "natural" appearance by retaining most of the original vegetation and topography.

The Preferred Alternative would result in a Section 4(f) use of less than 0.1 acres of the Carderock Springs Historic District (**Figure 5-4**), including less than 0.1 acres of permanent impact and less than 0.1 acres of temporary impact. This impact has increased from no impact reported in the DEIS.

The increase in impact from the DEIS is due to design refinements to avoid and minimize impacts to Morningstar Cemetery located on the opposite side of I-495 from the Carderock Springs Historic District. The proposed centerline of I-495 is shifted north compared to existing conditions through this section to avoid and minimize impacts to Morningstar Cemetery. Impact to the Carderock Springs Historic District is due shifting of the mainline, adding managed lanes exchange ramps, constructing retaining and noise walls along the outer loop, and clearing and erosion and sediment control measures. Detailed mapping of the Preferred Alternative design at the Carderock Springs Historic District can be found in **SDEIS, Appendix D – Map 7**.

The Preferred Alternative would impact portions of two contributing properties in the Carderock Springs historic district. No contributing structures would be impacted within the district.

MDOT SHA had included provisions for making an effect determination at a later time (upon design advancement) to Carderock Springs Historic District under an initial draft Section 106 Programmatic Agreement. However, based on refined design MDOT SHA anticipates that there would be no adverse effect, and will coordinate the finding with MHT for concurrence. If MHT concurs, FHWA would make a *de minimis* impact determination for the Carderock Springs Historic District. A final *de minimis* determination would be documented in the Final Section 4(f) Evaluation and FEIS.

00027843

JA1823



Supplemental Draft Environmental Impact Statement

## Figure 5-4: Carderock Springs Historic District

JA1824

00027844



Supplemental Draft Environmental Impact Statement

### 5.2.6   Gibson Grove AME Zion Church

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** Individual Evaluation

Gibson Grove AME Zion Church is a small, wood-frame structure set on a hill overlooking Seven Locks Road, immediately north of I-495. Gibson Grove AME Zion Church is eligible for the National Register of Historic Places under Criterion A. The church derives its significance from its association with the African American settlement of Gibson Grove that was founded in the 1880s by former slaves. The original church was a log structure that was replaced with the current edifice in 1923. It is the only remaining building associated with the African American Gibson Grove community.

The Preferred Alternative would result in a Section 4(f) use of 0.1 acres of the Gibson Grove AME Zion Church property (**Figure 5-5**), all of which would be permanent impact. This impact has increased by 0.1 acres compared to no impact reported in the DEIS for Alternative 9. The Gibson Grove Church building will not be directly impacted by the Preferred Alternative.

The increase in impact from the DEIS is due to design refinements including outfall stabilization, culvert augmentation, bridge reconstruction, and construction access. A shift of the roadway centerline towards the Gibson Grove AME Zion Church was included in the Preferred Alternative to avoid impacts to Morningstar Cemetery, located on the opposite side of I-495 from the Gibson Grove Church. Detailed mapping of the Preferred Alternative design at Gibson Grove AME Zion Church can be found in **SDEIS, Appendix D – Map 8**.

MDOT SHA and FHWA are currently assessing the potential for an adverse effect to Gibson Grove AME Zion Church and has requested concurrence from MHT on the determination pursuant to Section 106. Mitigation for the use of Gibson Grove AME Zion Church would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the MHT and Section 106 consulting parties. Final mitigation commitments including all possible planning to minimize harm will be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.7   Cabin John Stream Valley Park Unit 2

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Cabin John Stream Valley Park Unit 2 is one of six units that comprise M-NCPPC Montgomery County's Cabin John Stream Valley Park, a publicly-owned park and recreation area. Cabin John Stream Valley Park Unit 2 extends north-south across I-495 from south of River Road to along Cabin John Parkway, where it abuts Unit 1 of the park. The entirety of Cabin John Stream Valley Park encompasses 520 acres across six units; of which Unit 2 comprises approximately 105.0 acres.

00027845

JA1825



Supplemental Draft Environmental Impact Statement

**Figure 5-5: Gibson Grove AME Zion Church**

00027846

JA1826

Cabin John Stream Valley Park features portions of the natural-surface Cabin John Trail that runs north-south and connects the stream valley park's Potomac Area to Cabin John Parkway. The park also features undeveloped wooded area that provides a protective buffer along Cabin John Creek.

The Preferred Alternative would result in a Section 4(f) use of 1.4 acres of Cabin John Stream Valley Park, Unit 2 (**Figure 5-6**), including 0.8 acres of permanent impact and 0.6 acres of temporary impact. This impact has increased by 0.3 acres compared to the total impact of 1.1 acres reported in the DEIS for Alternative 9.

The impacts to Cabin John Stream Valley Park would be required to accommodate widening of I-495, replacement of the bridges across Seven Locks Road and Cabin John Parkway and associated construction access, realigning the interchange with Cabin John Parkway, a proposed noise barrier along the inner loop of I-495, and providing northbound managed lane access to River Road (**Figure 5-6**). Along southbound Cabin John Parkway, there would be impacts due to culvert augmentation and construction of a retaining wall along the Parkway and resurfacing of Cabin John Parkway for maintenance of traffic. Additionally, two culverts would be augmented in the southwest quadrant of the I-495 and River Road interchange. Detailed mapping of the Preferred Alternative design at Cabin John Stream Valley Park Unit 2 can be found in **Appendix D – Maps 8 - 10**.

The increase in impact from the DEIS is due to design refinements along I-495 for construction of bridges and new interchange modifications. The alignment shift of I-495 included to reduce impacts at Morningstar Cemetery also led to redesigned of the direct access ramp connection to the River Road interchange which resulted in an increase in LOD at Cabin John Stream Valley Park Unit 2.

No recreational facilities within Cabin John Stream Valley Park Unit 2 would be impacted by the Preferred Alternative.

FHWA intends to make a *de minimis* impact determination for Cabin John Stream Valley Park Unit 2 if M-NCPPC concurs that the Preferred Alternative, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection, and in consideration of public comments.

MDOT SHA would identify and pursue the acquisition of replacement parkland in coordination with M-NCPPC as potential mitigation for parkland impacts. Other mitigation measures under consideration include a visual barrier at the edge of the ramps along southbound I-495, stream bank and bed stabilization, and removal of a concrete lined channel along a tributary to Cabin John Creek. MDOT SHA is coordinating with M-NCPPC to develop final mitigation commitments at Cabin John Stream Valley Park Unit 2 including all possible planning to minimize harm to be included in the Final Section 4(f) Evaluation and FEIS.

00027847



**Figure 5-6: Cabin John SVP Unit 2**

JA1828

00027848

Supplemental Draft Environmental Impact Statement

### 5.2.8  Burning Tree Club

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

Burning Tree Club is a privately-owned, historic golf course in the northeast quadrant of the interchange of I-495 and River Road. The 221-acre club includes a Tudor Revival clubhouse and 18-hole golf course built in 1922 and 1923. Burning Tree Club is eligible for the NRHP under Criteria A and C. Burning Tree Club is significant under Criterion A as an exclusive, male-only social institution devoted to the pastime of golf, and an example of the type of recreational organization that flourished during the 1920s.

The Preferred Alternative would result in a Section 4(f) use of 1.3 acres of Burning Tree Club (**Figure 5-7**), all of which would be permanent impact. This impact has increased by 0.5 acres compared to the total impact of 0.8 acres reported in the DEIS for Alternative 9.

The impacts to Burning Tree Club would be required to accommodate widening I-495, the augmentation of an existing culvert carrying Thomas Branch beneath I-495, construction of a retaining wall, and the realignment of Thomas Branch along the east side of I-495. Detailed mapping of the Preferred Alternative design at the Burning Tree Club can be found in **SDEIS, Appendix D – Maps 10 and 11**.

The increase in impact from the DEIS is due to design refinements, including proposed relocation of Thomas Branch and utilities, and construction of a headwall structure.

The LOD expansion is located at the edge of the property, along the Capital Beltway. The revised LOD would not impact the golf course itself or its associated paths and would not alter the characteristics that qualify the property for the NRHP.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have no adverse effect on Burning Tree Club and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding based on the impacts presented in the DEIS.  This initial MHT review was conducted prior to recent design changes and avoidance and minimization efforts. MDOT SHA anticipates that there would still be no adverse effect to the Burning Tree Club and submitted documentation for concurrence to MHT on September 8, 2021. Therefore, FHWA still intends to make a *de minimis* impact determination for Burning Tree Club provided MHT concurs with the effect determination and acknowledges the intent to make the *de minimis* finding. A final *de minimis* determination would be documented in the Final Section 4(f) Evaluation and FEIS.

00027849

JA1829



Supplemental Draft Environmental Impact Statement

### Figure 5-7: Burning Tree Club



00027850



Supplemental Draft Environmental Impact Statement

### 5.2.9  Academy Woods

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

Academy Woods is a Section 4(f) historic property comprised of a small neighborhood on 6.5 acres northeast of the western I-495 and I-270 spur interchange in Bethesda. The historic district is eligible for the NRHP under Criterion C as representative of a type, period, and method of construction.

The Preferred Alternative would result in a Section 4(f) use of 0.2 acres of Academy Woods (**Figure 5-8**), all of which would be permanent impact. There has been no change compared to the impact reported in the DEIS for Alternative 9.

The impacts to Academy Woods would be required to accommodate the construction, operation and future maintenance of a stormwater management facility, and construction of a noise barrier. Detailed mapping of the Preferred Alternative design at Academy Woods can be found in **SDEIS, Appendix D – Map 13**.

The impacts to Academy Woods have not changed from those reported for Alternative 9 in the DEIS. Refer to the **DEIS Appendix F, Section 2.2.1** for more detail.

On March 12, 2020, MHT concurred that the Study would have no adverse effect on Academy Woods and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. As such, the impact to Academy Woods Historic District under the Preferred Alternative would constitute a minor use. FHWA intends to issue a finding of *de minimis* impact to Academy Woods. A final *de minimis* determination would be documented in the Final Section 4(f) Evaluation and FEIS.

### 5.2.10  Cabin John Regional Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

Cabin John Regional Park is a publicly-owned park and recreation area situated between Democracy Boulevard and southbound I-270. The 513.8-acre park contains a playground, dog park, picnic shelters, a miniature train, grills, horseshoe pits, and restrooms. The park has more than four miles of natural surface trails and two miles of hard surface trails. Athletic facilities include an indoor ice rink, baseball field, five softball fields, a volleyball court, and indoor tennis center. The Locust Grove Nature Center and Robert C. McDonnell Campground are also within the park.

The Preferred Alternative would result in a Section 4(f) use of 6.3 acres of Cabin John Regional Park (**Figure 5-9**), including 5.7 acres of permanent impact and 0.6 acres of temporary impact. This impact has increased by 0.6 acres compared to the total impact of 5.7 acres reported in the DEIS for Alternative 9.

00027851

JA1831



Supplemental Draft Environmental Impact Statement

**Figure 5-8: Academy Woods**



JA1832

00027852



Supplemental Draft Environmental Impact Statement

**Figure 5-9: Cabin John Regional Park**

00027853

JA1833



The impacts to Cabin John Regional Park would be required due to widening of southbound I-270 and construction of a retaining wall along the outside shoulder, utility relocations, a SWM facility, augmentation of two storm drains and one culvert, and outfall stabilization. Impacts would occur to the connecting trail between the Highway Loop Trail and Kidney Bean Loop Trail. Detailed mapping of the Preferred Alternative design at Cabin John Regional Park can be found in **SDEIS, Appendix D – Maps 23 - 25**.

A portion of the connecting trail between the Highway Loop Trail and Kidney Bean Loop Trail would need to be realigned in coordination with M-NCPPC. Access to the trail would be maintained throughout construction. No other recreational facilities would be impacted by the Preferred Alternative.

The increase in impact from the DEIS is due to expanded LOD needed to accommodate culvert augmentation, outfall stabilization, utility relocation, updated roadway configuration and retaining wall, and temporary drainage needs along the retaining wall. Expansion of the LOD in certain areas was in response to M-NCPPC's comments to ensure stable outfall channels.

MDOT SHA has identified potential mitigation opportunities for the site including tree planting and improvements to the connecting trail between the Highway Loop Trail and Kidney Bean Loop Trail. MDOT SHA would also identify and pursue the acquisition of replacement parkland in coordination with M-NCPPC as potential mitigation for parkland impacts. Also under consideration are a visual barrier along southbound I-270 and improvements to the Robert C. McDonnell Campground. MDOT SHA is coordinating with M-NCPPC to develop final mitigation commitments at Cabin John Regional Park including all possible planning to minimize harm to be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.11 Tilden Woods Stream Valley Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Tilden Woods Stream Valley Park is a publicly-owned park, and recreation area, accessed via Sulky Lane in Bethesda. Tilden Woods Stream Valley Park extends along the banks of Old Farm Creek from Montrose Road to I-270. This 67.4-acre park consists of an undeveloped wooded area that provides a protective buffer along Old Farm Creek. This park is under the jurisdiction of M-NCPPC and was acquired in pieces beginning in 1961 using Program Open Space funds.

The Preferred Alternative would result in a Section 4(f) use of 0.7 acres of Tilden Woods Stream Valley Park (**Figure 5-10**), including 0.6 acres of permanent impact and 0.1 acres of temporary impact. This impact has increased by 0.5 acres compared to the total impact of 0.2 acres reported in the DEIS for Alternative 9.

00027854



Supplemental Draft Environmental Impact Statement

Figure 5-10: Tilden Woods SVP and Old Farm NCA



00027855

JA1835



The impacts to Tilden Woods Stream Valley Park would be required to accommodate an area for construction to widen I-270, replacing the bridge that carries I-270 over Tuckerman Lane, augmenting the existing culvert conveying Old Farm Creek beneath I-270, providing access for construction vehicles and materials, and utility relocation. Detailed mapping of the Preferred Alternative design at Tilden Woods Stream Valley Park can be found in **SDEIS, Appendix D – Maps 22 and 23**.

No recreational facilities would be impacted by the Preferred Alternative at Tilden Woods Stream Valley Park.

The increase in impact from the DEIS is due to design refinements including culvert augmentation and utility relocation.

FHWA intends to make a *de minimis* impact determination for Tilden Woods Stream Valley Park if M-NCPPC Montgomery County concurs that the Preferred Alternative, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection and in consideration of public comments.

MDOT SHA would identify and pursue the acquisition of replacement parkland in coordination with the M-NCPPC as potential mitigation for impacts to parkland. Replacement parkland of equal or greater monetary and recreational value is required for Tilden Woods Stream Valley Park because the impacted park was acquired with Program Open Space Funds. MDOT SHA has also identified potential offsite tree planting mitigation opportunities. MDOT SHA is coordinating with M-NCPPC to develop mitigation commitments at Tilden Woods Stream Valley Park and final mitigation will be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.12 Old Farm Neighborhood Conservation Area

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Old Farm Neighborhood Conservation Area is a publicly-owned park and recreation area at 7030 Tilden Lane in Rockville. The park is bounded to the west by I-270. The 0.8-acre park is composed of an undeveloped wooded area.

The Preferred Alternative would result in a Section 4(f) use of 0.1 acres of Old Farm Neighborhood Conservation Area (**Figure 5-10**), all of which would be permanent impact. The impact has not changed compared to the total impact reported in the DEIS for Alternative 9.

The impacts to Old Farm Neighborhood Conservation Area would be required to construct, operate, and maintain a stormwater management facility on land adjacent to the park. Detailed mapping of the Preferred Alternative design at Old Farm Neighborhood Conservation Area can be found in **SDEIS, Appendix D – Map 23**.

No recreational facilities would be impacted by the Preferred Alternative at Old Farm Neighborhood Conservation Area.

00027856



Supplemental Draft Environmental Impact Statement

FHWA intends to make a *de minimis* impact determination for Old Farm Neighborhood Conservation Area if M-NCPPC, Montgomery County concurs that the Preferred Alternative, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection, and in consideration of public comments.

MDOT SHA would identify and pursue the acquisition of replacement parkland in coordination with M-NCPPC as potential mitigation for impacts to parkland. Potential tree planting mitigation is also under consideration. MDOT SHA is coordinating with M-NCPPC to develop mitigation commitments at the Old Farm Neighborhood Conservation Area and final mitigation will be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.13 Cabin John Stream Valley Park Unit 6

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

Cabin John Stream Valley Park Unit 6 is one of six units that comprise M-NCPPC Montgomery County's Cabin John Stream Valley Park, a publicly-owned park and recreation area. Cabin John Stream Valley Park Unit 6 is the northernmost portion of the stream valley park and is situated east of I-270 bounded by Old Stage Road to the south and the I-270 offramp to Montrose Road to the north. The entirety of Cabin John Stream Valley Park encompasses 520 acres; of which Unit 6 comprises 19.8 acres. Cabin John Stream Valley Park features portions of the natural surface Cabin John Trail that runs north-south and connects the stream valley park's Potomac area to Cabin John Parkway as well as an undeveloped wooded area that provides a protective buffer along Cabin John Creek.

The Preferred Alternative would result in a Section 4(f) use of 0.8 acres of Cabin John Stream Valley Park Unit 6 (**Figure 5-11**), all of which would be permanent impact. This impact has increased by 0.4 acres compared to the total impact of 0.4 acres reported in the DEIS for Alternative 9.

The impacts to Cabin John Stream Valley Park Unit 6 would be required to accommodate: tree removal, grading, improvements to the existing culvert, access for construction vehicles and materials, construction of a retaining wall along the realigned ramp from northbound I-270 to eastbound Montrose Road, and construction of a SWM facility. Detailed mapping of the Preferred Alternative design at Cabin John Stream Valley Park Unit 6 can be found in **SDEIS, Appendix D – Map 24**.

The Preferred Alternative would not impact any recreational facilities in Cabin John Stream Valley Park Unit 6.

The increase in impact from the DEIS is due to design refinements including culvert augmentation, stormwater pond location, and updated roadway configuration and retaining wall. Expansion of the LOD in certain areas was in response to M-NCPPC's comments to improve stormwater management and existing drainage issues.

00027857

Supplemental Draft Environmental Impact Statement 

## Figure 5-11: Cabin John Stream Valley Park, Unit 6

00027858

JA1838



Supplemental Draft Environmental Impact Statement

FHWA intends to make a *de minimis* impact determination for Cabin John Stream Valley Park Unit 6 if M-NCPPC concurs that the Preferred Alternative, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection, and in consideration of public comments.

MDOT SHA would identify and pursue the acquisition of replacement parkland in coordination with M-NCPPC as potential mitigation for parkland impacts MDOT SHA is coordinating with M-NCPPC to develop final mitigation commitments at Cabin John Stream Valley Park Unit 6 including all possible planning to minimize harm to be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.14 Cabin John Stream Valley Park (Rockville)

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** Individual Evaluation

Cabin John Stream Valley Park (Rockville) is a publicly-owned park and recreation area east of Tower Oaks Boulevard and south of Preserve Parkway in Rockville. The 4.5-acre park provides a wooded buffer along a portion of the environmentally sensitive Cabin John Creek.

The Preferred Alternative would result in a Section 4(f) use of 2.1 acres of Cabin John Stream Valley Park (Rockville) (**Figure 5-12**), all of which would be permanent impact. This impact has not changed compared to the total impact reported in the DEIS for Alternative 9.

The impacts to Cabin John Stream Valley Park (Rockville) would be required to construct, operate, and maintain a stormwater management facility. Detailed mapping of the Preferred Alternative design at Cabin John Stream Valley Park (Rockville) can be found in **SDEIS, Appendix D – Map 26**. Refer to the **DEIS Appendix F, Section 2.2.1** for more detail.

No recreational facilities in Cabin John Stream Valley Park (Rockville) would be impacted by the Preferred Alternative.

MDOT SHA would identify and pursue the acquisition of replacement parkland and/or other mitigation opportunities in coordination with the City of Rockville. Final mitigation commitments at Cabin John Stream Valley Park including all possible planning to minimize harm will be included in the Final Section 4(f) Evaluation and FEIS.

00027859



Supplemental Draft Environmental Impact Statement

**Figure 5-12: Cabin John Stream Valley Park (Rockville)**

JA1840

00027860



Supplemental Draft Environmental Impact Statement

### 5.2.15 Bullards Park and Rose Hill Stream Valley Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** Individual Evaluation

Bullards Park and Rose Hill Stream Valley Park is a publicly-owned park and recreation area abutting the northbound lanes of I-270 in Rockville. The 4.7-acre park is divided into two sections. The stream valley park comprises the central and southern portions of the park while the northern portion, Bullards Park, contains basketball courts, hard and natural surface trails, a playground, and picnic area. The Preferred Alternative would result in a Section 4(f) use of 3.3 acres of Bullards Park and Rose Hill Stream Valley Park (**Figure 5-13**), all of which would be permanent impact. This impact has increased by 3.0 acres compared to the total impact of 0.3 acres reported in the DEIS for Alternative 9.

The impacts to Bullards Park and Rose Hill Stream Valley Park would be required for grading or modification of existing stormwater management (SWM) facilities, including an existing joint-use SWM facility near the Julius West Middle School pond, and the modification of an existing SWM facility at the north end of the park property. Based on continued coordination with the City of Rockville, MDOT SHA, and FHWA, the assumption regarding the applicability of Section 4(f) to the existing joint-use SWM facility and potential impacts may be modified and updated in the Final Section 4(f) Evaluation. Detailed mapping of the Preferred Alternative design at Bullards Park and Rose Hill Stream Valley Park can be found in **SDEIS, Appendix D – Map 30**.

The increase in impact from the DEIS is due to further adjustment and evaluation of the LOD to account for culvert augmentation in the vicinity of this park.

No recreational facilities would be impacted by the Preferred Alternative in Bullards Park and Rose Hill Stream Valley Park.

MDOT SHA and FHWA previously anticipated that the Section 4(f) use of Bullards Park and Rose Hill Stream Valley Park would be *de minimis* based on the impacts presented in the DEIS. However, impacts to Bullards Park and Rose Hill Stream Valley Park are now anticipated to be greater than *de minimis,* and thus requiring an Individual Section 4(f) Evaluation.

MDOT SHA has identified potential park mitigation and enhancement opportunities for Bullards Park and Rose Hill Stream Valley Park, including trail and path improvements, addition of park amenities such as benches, and the addition of decorative landscaping. MDOT SHA would also identify and pursue the acquisition of replacement parkland in coordination with the City of Rockville as potential mitigation for parkland impacts. MDOT SHA will continue coordinating with the City of Rockville to identify final mitigation commitments including all possible planning to minimize harm for inclusion in the Final Section 4(f) Evaluation and FEIS.

00027861

JA1841



Supplemental Draft Environmental Impact Statement

### Figure 5-13: Bullards Park and Rose Hill Stream Valley Park

JA1842

00027862



Supplemental Draft Environmental Impact Statement

### 5.2.16 Rockmead Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

Rockmead Park is a publicly-owned park and recreational facility at 1800 Greenplace Terrace in Rockville. This 25.3-acre park abuts the southbound lanes of I-270. Park amenities include open space, benches, natural and hard surface paths, and playground equipment.

The Preferred Alternative would result in a use of 0.3 acres of Rockmead Park (**Figure 5-14**), including 0.2 acres of permanent impact and 0.1 acres of temporary impact. This impact has increased by 0.1 acres compared to the total impact of 0.2 acres reported in the DEIS for Alternative 9.

The impacts to Rockmead Park would be required to accommodate improvements to two existing culverts that convey waterways beneath I-270 and providing access for construction vehicles and materials, construction of a retaining wall and a noise barrier. Detailed mapping of the Preferred Alternative design at Rockmead Park can be found in **SDEIS, Appendix D – Map 30**.

No recreational facilities would be impacted by the Preferred Alternative at Rockmead Park.

FHWA intends to make a *de minimis* impact determination for Rockmead Park if the City of Rockville Department of Recreation and Parks concurs that the Preferred Alternative, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection, and in consideration of public comments.

MDOT SHA would identify and pursue the acquisition of replacement parkland in coordination with the City of Rockville as potential mitigation for impacts to parkland. MDOT SHA has identified additional potential mitigation opportunities including stream restoration, trail and path improvements, additional park amenities, improvements to playground equipment, and decorative landscaping. MDOT SHA is coordinating with the City of Rockville to develop mitigation commitments at Rockmead Park and final mitigation will be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.17 Woottons Mill Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

Woottons Mill Park is a publicly-owned park and recreation area on Hurley Road in Rockville. Woottons Mill Park extends along a portion of Watts Branch from the southwest quadrant of the I-270 and MD 28 interchange to the intersection of Scott Drive and Wootton Parkway.

00027863

JA1843

Supplemental Draft Environmental Impact Statement



**Figure 5-14: Rockmead Park**

JA1844

00027864



The increase in impact from the DEIS is due to design refinements requiring additional LOD for a noise wall, an updated roadway configuration and retaining wall, and further adjustment and evaluation of the LOD to account for culvert augmentation within the park.

Amenities within this 106.5-acre park include basketball and tennis courts, benches and picnic tables, natural surface and hard surface paths, playground equipment, and garden plots.

The Preferred Alternative would result in a Section 4(f) use of 0.7 acres of Woottons Mill Park (**Figure 5-15**), all of which would be permanent impact. The impact has increased by 0.5 acres compared to the total impact of 0.2 acres reported in the DEIS for Alternative 9.

The impacts to Woottons Mill Park would be required to improve a storm drain outfall, and augmentation of one culvert with potential stream restoration improvements. Detailed mapping of the Preferred Alternative design at Woottons Mill Park can be found in **SDEIS, Appendix D – Map 31**.

No recreational facilities would be impacted by the Preferred Alternative in Woottons Mill Park.

The increase in impact from the DEIS is due to design refinements for culvert augmentation.

FHWA intends to make a *de minimis* impact determination for Woottons Mill Park if the City of Rockville Department of Recreation and Parks concurs that the Preferred Alternative, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection, and in consideration of public comments.

MDOT SHA has also identified potential mitigation opportunities including trail and path improvements, improvements to basketball and/or tennis courts, improvement to the bridge over Watts Branch, improvements to the Veirs Drive parking area, and shade tree planting. MDOT SHA is coordinating with City of Rockville to develop mitigation commitments at Woottons Mill Park to be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.18 Woodley Gardens

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

Woodley Gardens is a planned residential development containing Colonial Revival-style, single- and multi-family dwellings constructed between 1960 and 1970 in Rockville, Maryland. The approximately 200-acre development is east of I-270 and south of the Gude Drive overpass. Woodley Gardens is an important, early example of mixed housing types in a planned residential development and is, therefore, eligible for the NRHP under Criterion A as a historic district. Woodley Gardens is also significant as a historic district under Criterion C as an excellent, intact example of a planned residential development with a period of significance ranging from 1960 to 1970.

00027865



Supplemental Draft Environmental Impact Statement

### Figure 5-15: Woottons Mill Park

00027866

JA1846



Supplemental Draft Environmental Impact Statement

The Preferred Alternative would result in a Section 4(f) use of 1.3 acres of Woodley Gardens (**Figure 5-16**), including 1.2 acres of permanent impact and 0.1 acres of temporary impact. This impact has increased by 0.6 acres compared to the total impact of 0.7 acres reported in the DEIS for Alternative 9.

The impacts to Woodley Gardens would be required to accommodate the construction, operation, and future maintenance of a stormwater management facility, construction of a retaining wall and noise barrier, utility relocations, and storm drain impacts. Detailed mapping of the Preferred Alternative design at Woodley Gardens can be found in **SDEIS, Appendix D – Maps 31 and 32**.

The increase in impact from the DEIS is due to design refinements including an updated roadway configuration resulting in changes to the location of the noise barrier and retaining wall, utility relocations, and storm drain impacts.

The LOD expansion encompasses a portion of the parking lot adjoining the Woodley Gardens Shopping Center. The parking lot is a character-defining feature of the contributing shopping center, but impacts will be limited to several spaces along the edge of the lot and will not alter the characteristics that qualify the district for the NRHP.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have no adverse effect on Woodley Gardens and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding based on the impacts identified in the DEIS. This initial MHT review was conducted prior to recent design changes and avoidance and minimization efforts.  MDOT SHA anticipates that there would still be no adverse effect to Woodley Gardens, and have submitted documentation for concurrence to MHT as of September 8, 2021. Therefore, FHWA intends to make a finding of *de minimis* impact to Woodley Gardens provided MHT concurs with the effect determination and acknowledges the intent to make the *de minimis* finding. A final de minimis determination would be documented in the Final Section 4(f) Evaluation and FEIS.

### 5.2.19 Rockville Senior Center and Park

**Type of Section 4(f) Property:** Historic Property and Public Park

**Officials with Jurisdiction:** MHT, City of Rockville

**Type of Section 4(f) Approval:** *De Minimis* Impact

Rockville Senior Center and Park is a publicly-owned park and recreational facility at 1150 Carnation Drive in Rockville. This 12.1-acre park is immediately south of West Gude Drive and abuts the northbound lanes of I-270. Park amenities consist of benches, picnic tables, walking paths, a nature trail, community garden, outdoor fitness equipment, art, bocce ball court, and playground equipment. The senior center building features additional recreational facilities including fitness rooms, a woodworking studio and meeting space.

00027867



Supplemental Draft Environmental Impact Statement

**Figure 5-16: Woodley Gardens**



00027868

JA1848

The senior center building of the Rockville Senior Center and Park is the former Woodley Gardens Elementary School and contributes to the significance of Woodley Gardens, eligible for the NRHP under Criteria A and C as an early example of a developed residential-focused, mixed use community in Rockville. The landscaping and park elements of the senior center were added after 1982, outside the Woodley Gardens period of significance (1960-1970). Significant elements of Woodley Gardens include the dwellings, shopping center, swim club, Woodley Gardens Park, and the Rockville Senior Center building.

The Preferred Alternative would result in a use of 1.0 acres of Rockville Senior Center and Park (**Figure 5-17**) all of which would be permanent impact. This impact has increased by 0.3 acres compared to the total impact of 0.7 acres reported in the DEIS for Alternative 9.

The impacts to Rockville Senior Center and Park would be required to accommodate the construction, operation, and future maintenance of a stormwater management facility, construction of a retaining wall and noise barrier, and widening of Gude Drive. Detailed mapping of the Preferred Alternative design at Rockville Senior Center and Park can be found in **SDEIS, Appendix D – Map 33**.

No recreational facilities would be impacted by the Preferred Alternative at Rockville Senior Center and Park.

The increase in impact from the DEIS is due to design refinements including an updated roadway configuration that resulted in changes to the location of the retaining wall and noise barrier, and grading and side slope construction associated with widening Gude Drive.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have no adverse effect on Woodley Gardens, including Rockville Senior Center; and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding based on the DEIS impacts. This initial MHT review was conducted prior to recent design changes and avoidance and minimization efforts. MDOT SHA anticipates that there would still be no adverse effect to the Rockville Senior Center and Park and submitted documentation for concurrence to MHT on September 8, 2021.  FHWA intends to make a finding of *de minimis* impact to Rockville Senior Center and Park if the City of Rockville Department of Recreation and Parks and MHT concur that the Preferred Alternative, after measures to mitigate and minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection, and in consideration of public comments. A final *de minimis* determination would be documented in the Final Section 4(f) Evaluation and FEIS.

Parkland mitigation measures will be identified in coordination with the City of Rockville. Potential mitigation measures include replacement parkland, trail/path improvements, addition of park amenities such as benches along or near the path, and addition of decorative landscaping along or near the path. Final mitigation commitments including all possible planning to minimize harm will be included in the Final Section 4(f) Evaluation and FEIS.

00027869

JA1849

Supplemental Draft Environmental Impact Statement

**Figure 5-17: Rockville Senior Center and Park and Ward Building**

00027870

JA1850



### 5.2.20 Ward Building

**Type of Section 4(f) Property:** Historic Property

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

The Ward Building is a Brutalist-style suburban corporate office constructed in 1978 at 1300 Piccard Drive, Rockville, Maryland. The property is 4.76 acres laying just east of I-270 and north of the Gude Drive overpass. The Ward Building is eligible under Criterion C for its high artistic value as an example of Brutalist-style architecture.

The Preferred Alternative would result in a use of 0.2 acres of the Ward Building (**Figure 5-17**), all of which would be permanent impact. This impact has increased by 0.1 acres compared to the total impact of 0.1 acres reported in the DEIS for Alternative 9.

The impacts to the Ward Building would be required to accommodate widening of I-270, widening of Gude Drive, and construction area for a retaining wall. Detailed mapping of the Preferred Alternative design at the Ward Building can be found in **Appendix D – Map 33**.

The increase in impact from the DEIS is due to updated roadway configuration, grading and side slope construction associated with widening Gude Drive, and retaining wall construction.

The LOD expansion encompasses areas along the parking lot surrounding the Ward Building and would not affect the characteristics that qualify the building for the NRHP.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have no adverse effect on the Ward Building and provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding based on the impacts described in the DEIS. This initial MHT review was conducted prior to recent design changes and avoidance and minimization efforts. MDOT SHA anticipates that there would still be no adverse effect to the Ward Building and submitted documentation for concurrence to MHT on September 8, 2021. Therefore, FHWA intends to make a finding of *de minimis* impact to the Ward Building provided MHT concurs with the effect determination and acknowledges the intent to make the *de minimis* finding. A final *de minimis* determination would be documented in the Final Section 4(f) Evaluation and FEIS.

### 5.2.21 Malcolm King Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Gaithersburg Department of Parks, Recreation and Culture

**Type of Section 4(f) Approval:** Individual Evaluation

Malcolm King Park is a publicly-owned park and recreation area at 1200 West Side Drive in Gaithersburg. The 72.9-acre park abuts the interchange of southbound I-270 and westbound I-370. Park amenities include a basketball court, picnic area, playground, tot lot, two miles of hiking trails, and two tennis courts. The majority of the park's acreage is wooded and serves as an environmental buffer for Muddy Branch.

00027871



The Preferred Alternative would result in a Section 4(f) use of 1.3 acres of Malcolm King Park (**Figure 5-18**), all of which would be permanent impact. This impact has increased by 1.2 acres compared to the total impact of 0.1 acres reported in the DEIS for Alternative 9.

The impacts to Malcolm King Park would be required to accommodate a constructability area related to widening I-270; augmenting the existing culvert conveying Muddy Branch beneath I-270, stabilizing the Muddy Branch outfall, and improvements to the existing outfall for a culvert that passes under I-370. Detailed mapping of the Preferred Alternative design at Malcolm King Park can be found in **SDEIS, Appendix D – Map 36**.

No recreational facilities would be impacted by the Preferred Alternative at Malcolm King Park.

The increase in impact from the DEIS is due to design refinements including additional LOD for culvert augmentation, outfall stabilization, and an updated roadway configuration.

MDOT SHA and FHWA previously anticipated that the Section 4(f) use of Malcolm King Park would be *de minimis* based on the impacts presented in the DEIS. However, based on the increased impacts identified in this SDEIS, impacts to Malcom King Park are now anticipated to be greater than *de minimis*, and thus requiring an individual Section 4(f) evaluation.

MDOT SHA would identify and pursue the acquisition of replacement parkland in coordination with the City of Gaithersburg as potential mitigation for impacts to parkland. Other potential mitigation opportunities include trail/path improvements and improvements to or addition of playground equipment. MDOT SHA is coordinating with the City of Gaithersburg to develop mitigation commitments at Malcolm King Park and final mitigation will be included in the Final Section 4(f) Evaluation and FEIS.

### 5.2.22 Morris Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Gaithersburg Department of Parks, Recreation and Culture

**Type of Section 4(f) Approval:** Individual Evaluation

Morris Park is a publicly-owned park and recreation area on Summit Hall Road in Gaithersburg. The 37.2-acre park abuts the interchange of northbound I-270 and westbound I-370. Park amenities include two baseball fields, three tennis courts, a basketball court, soccer field, picnic pavilion, picnic area with grill, playground, and tot lot. Wooded areas of the park provide an environmental buffer along Muddy Branch creek.

The Preferred Alternative would result in a Section 4(f) use of 1.1 acres of Morris Park (**Figure 5-18**), all of which would be permanent impact. The impact to Morris Park has increased by 1.0 acres compared to the total impact of 0.1 acres reported in the DEIS for Alternative 9.

The impacts to Morris Park would be required to accommodate an area for construction related to widening I-270, augmenting the existing culvert conveying Muddy Branch beneath I-270, stabilizing the Muddy Branch outfall, and storm drain improvements.

00027872

Supplemental Draft Environmental Impact Statement 

**Figure 5-18: Malcolm King Park and Morris Park**



00027873

JA1853

No recreational facilities would be impacted by the Preferred Alternative at Morris Park.

The increase in impact from the DEIS is due to design refinements requiring additional LOD for culvert augmentation and a storm drain improvements. Detailed mapping of the Preferred Alternative design at Morris Park can be found in **SDEIS, Appendix D – Map 36**.

MDOT SHA and FHWA previously anticipated that the Section 4(f) use of Malcolm King Park would be *de minimis* based on the impacts presented in the DEIS. However, based on the increased impacts identified in this SDEIS, impacts to Morris Park are now anticipated to be greater than *de minimis*, and thus requiring an individual Section 4(f) evaluation.

MDOT SHA would identify and pursue the acquisition of replacement parkland in coordination with the City of Gaithersburg as potential mitigation for impacts to parkland. Other potential mitigation opportunities include trail/path improvements, improvements to tennis courts, and improvements to or addition of playground equipment. MDOT SHA is coordinating with the City of Gaithersburg to develop mitigation commitments at Morris Park and final mitigation will be included in the Final Section 4(f) Evaluation and FEIS.

## 5.3  Avoidance Alternatives and Analysis

Section 4(f) stipulates that the USDOT, including the FHWA, cannot approve a transportation project that uses Section 4(f) property, unless FHWA determines that:

- There is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 774.3(a)(1) and (2)); or

- The use of the Section 4(f) properties, including any measures to minimize harm (such as avoidance, minimization, mitigation, or enhancements measures) committed to by the applicant, will have a *de minimis* impact on the property (23 CFR 774.3(b)).

**Section 3** of the **Draft Section 4(f) Evaluation (DEIS, Appendix F)** included discussion of six avoidance alternatives, summarized briefly in the following table. No feasible and prudent alternatives were identified that completely avoid the use of Section 4(f) property. **Table 5-3** summarizes the avoidance alternatives evaluated in the Draft Section 4(f) Evaluation.

The alternatives previously included in the DEIS least overall harm analysis are carried forward here, as they are still applicable to the current evaluation of least overall harm in this SDEIS with revised project limits. The Preferred Alternative, a minimization alternative, is also included for evaluation in the revised discussion of least overall harm.

00027874

JA1854

Supplemental Draft Environmental Impact Statement



## Table 5-3: Avoidance Alternatives

| Avoidance Alternative | Description | Avoidance Analysis Findings[1] |
|---|---|---|
| **Alternative 1: No Build Alternative** | Alternative 1 would avoid all Section 4(f) property impacts. Under this alternative routine maintenance and safety improvements would occur but there would be no changes to the existing lane configuration on I-495 and I-270. There would be no operational improvements or increased capacity along I-495 and I-270. | Alternative 1 would avoid impacts to Section 4(f) properties but would be unreasonable to proceed with in light of the Study's stated Purpose and Need. Alternative 1 causes other severe problems of a magnitude that substantially outweigh the importance of protecting Section 4(f) properties. |
| **Increased Bus Transit** | This alternative would include expansion of existing bus transit services within the limits of the Study on both I-270 and I-495 and the additional surrounding roadway network. This could be in the form of an increase in bus service on existing I-495 and I-270 within the limits of the Study, or consideration of dedicated facilities such as bus rapid transit systems on existing infrastructure. | An extensive regionwide network of dedicated BRT facilities along I-495 and I-270 would not achieve the Study's Purpose and Need. It would be unreasonable to proceed with the Bus Transit Alternative in light of the stated Purpose and Need. This avoidance alternative causes other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) properties. |
| **Transportation System Management/ Transportation Demand Management (TSM/TDM)** | Transportation System Management (TSM)/Transportation Demand Management (TDM) strategies are improvements to existing facilities that improve the operation and coordination of transportation services and facilities. | A TSM/TDM Alternative would not accommodate existing and future long-term traffic, nor would these measures enhance trip reliability. In addition, the TSM/TDM Alternative would not directly provide an additional travel choice, accommodate Homeland Security, improve the movement of goods and services, nor enhance multimodal connectivity; and it would not provide a revenue source. Based on these factors, the TSM/TDM Alternative is not a feasible and prudent alternative. This avoidance alternative causes other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) properties. |

---

[1] Refer to the definition of *feasible and prudent avoidance alternative* in 23 CFR § 774.17.

00027875

JA1855



Supplemental Draft Environmental Impact Statement

| Avoidance Alternative | Description | Avoidance Analysis Findings[1] |
|---|---|---|
| Section 4(f) Avoidance Alternative 1 | Section 4(f) Avoidance Alternative 1 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4, outside of I-495. To avoid the use of any Section 4(f) property on I-270, four managed lanes would be constructed off alignment to the west of existing I-270. The alignment of Section 4(f) Avoidance Alternative 1 would rejoin existing I-270 at the MD 200 interchange, the limit of the Study. | Section 4(f) Avoidance Alternative 1 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 1 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties. |
| Section 4(f) Avoidance Alternative 2 | Section 4(f) Avoidance Alternative 2 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4. The managed lanes would be constructed inside the alignment of existing I-495 through nearly full the limits of the Study. To avoid the use of any Section 4(f) property on I-270, four managed lanes would also be constructed off alignment to the east of existing I-270. | Avoidance Alternative 2 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 2 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties. |
| Section 4(f) Avoidance Alternative 3 | Section 4(f) Avoidance Alternative 3 would construct four managed lanes as proposed in the Preferred Alternative. However, where impacts to Section 4(f) properties would occur, the location specific options would be incorporated into the alignment of Section 4(f) Avoidance Alternative 3. | Although Section 4(f) Avoidance Alternative 3 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 3 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties. |

The Preferred Alternative presented in this SDEIS would not avoid the use of all Section 4(f) properties. It would, however, avoid the use of 38 Section 4(f) properties totaling roughly 105 acres compared to DEIS Build Alternative 9 (**Table 5-2**). Those 105 acres of impact to 38 properties would be fully avoided by the Preferred Alternative.

00027876

JA1856



Supplemental Draft Environmental Impact Statement

## 5.4  All Possible Planning

Section 4(f) states FHWA may not approve the use of Section 4(f) property unless there is no feasible and prudent avoidance alternative, and the action includes all possible planning to minimize harm to the property resulting from such use. "All possible planning," as defined in 23 CFR 774.17, includes all reasonable measures to minimize harm or mitigate for adverse impacts and effects. The cost of mitigation should be a reasonable public expenditure in light of the severity of the impact on Section 4(f) property, in accordance with 23 CFR 771.105(e).

The DEIS presented measures that had been identified to ensure all possible planning to minimize harm and mitigate for adverse impacts and effects. These measures are summarized here and detailed in **Section 4 of the Draft Section 4(f) Evaluation** (**DEIS, Appendix F**). Additional minimization and mitigation efforts have been implemented in conjunction with the Preferred Alternative presented in this SDEIS and Updated Draft Section 4(f) Evaluation.

### 5.4.1  Summary of All Possible Planning Presented in DEIS

Pursuant to Section 106, MDOT SHA is in the process of drafting a Programmatic Agreement to resolve adverse effects to historic properties. In general, mitigation measures agreed upon as part of the Section 106 process satisfy the requirement to include all possible planning to minimize harm for historic properties under Section 4(f).

With regard to public parks, all possible planning will involve the minimization activities described herein as well as mitigation coordinated with the OWJs over public parks and recreation areas. All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project.

Members of the public are also afforded an opportunity to provide comments. Mitigation measures involving the public parks and recreation areas may involve a replacement of land and/or facilities of comparable value and function, or monetary compensation to enhance the remaining land.

**Section 4 of the Draft Section 4(f) Evaluation** (**DEIS, Appendix F**) includes detailed discussion of the methodology and assumptions for establishing LODs (**DEIS, Appendix F, Section 4.1**), the considerations for adjacent land use and minimization of the LOD (**DEIS, Appendix F, Section 4.2**) and a summary of potential mitigation measures (**DEIS, Appendix F, Section 4.3**).

New measures intended to address all possible planning to minimize harm to Section 4(f) properties are documented in this SDEIS and included in the Preferred Alternative's avoidance of 38 Section 4(f) properties as compared to the DEIS Alternative 9. Additional avoidance and minimization measures at Section 4(f) properties include extensive design refinements in the vicinity of the ALB and at Morningstar Cemetery, and new conceptual mitigation measures developed in coordination with the OWJs for each Section 4(f) property impacted.

### 5.4.2  Preferred Alternative

The Preferred Alternative presented in this SDEIS was developed as a Section 4(f) minimization alternative based in part on extensive coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. Comments received on the DEIS and Draft Section 4(f) Evaluation from agencies and stakeholders specifically requested avoidance of significant

00027877

parkland and historic resources within the Study area. The Preferred Alternative is responsive to comments received and aligns the Study to be consistent with the previously determined phased delivery and permitting approach by limiting the build improvements to the area of Phase 1 South only while avoiding improvements on I-495 east of the I-270 East Spur. The result is complete avoidance of significant Section 4(f) properties within the Study limits, *which remain the same as the DEIS*, on I-495 east of the I-270 east spur to MD 5 in Prince George's County. These include complete avoidance of significant stream valley parks including: Rock Creek, Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley Parks, as well as historic parks of national significance including the Baltimore-Washington Parkway, Greenbelt Park and Suitland Parkway.

### 5.4.3    American Legion Bridge (ALB)

MDOT SHA conducted an extensive engineering evaluation at the ALB to identify strategies for minimizing impacts at NPS owned Section 4(f) properties adjacent to the bridge including the C&O Canal NHP, Clara Barton Parkway, and George Washington Memorial Parkway. MDOT SHA convened a multidisciplinary team of experts referred to as the 'ALB Strike Team' to develop and evaluate alternatives for the replacement of the ALB that avoid impacts, to the greatest extent practicable, or reduce overall acreage impacts to the three NPS properties in the vicinity of the ALB.

The ALB Strike Team explored strategies for reducing the LOD including top-down construction, alternate construction phasing, alternate bridge types, and construction access requirements. Bridge type options were evaluated including conventional structures, cable stayed, and cast-in-place segmental bridges. Alternate construction phases such as Accelerated Bridge Construction techniques were also evaluated to investigate options to reduce the construction duration. Options for the ultimate roadway and bridge alignment as well as construction access and phasing to reduce impacts to Plummer's Island were also considered.

The ALB Strike Team evaluation determined that one construction access road located in the northwest quadrant of the ALB and Potomac River would be sufficient to provide construction access for removal of the existing bridge and construction of a new bridge thus eliminating the need for construction access in the three other quadrants.

Overall, MDOT SHA's efforts to minimize impacts to NPS properties in the vicinity of the ALB has led to reductions of 5.3 acres at the C &O Canal NHP and 7.8 acres at the George Washington Memorial Parkway relative to the DEIS impacts. Refer to **Section 5.1.3** for additional details.

### 5.4.4    Morningstar Tabernacle No. 88 Moses Hall and Cemetery

MDOT SHA has coordinated directly with the Friends of Moses Hall and other consulting parties since early 2020 on avoidance and minimization efforts at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery). In January 2021, MDOT SHA implemented bamboo removal within the Morningstar Cemetery to continue documentation of the cemetery features and boundaries. Through design efforts that led to refinements of the LOD, MDOT SHA developed design options that would avoid all ground disturbance within the cemetery parcel and reduce impacts to the overall Section 4(f) property from 0.3 acre reported in the DEIS to the current estimated impact of less than 0.1 acre (approximately 14 square feet of temporary area) associated with the construction of a noise barrier adjacent to the property.

00027878



Supplemental Draft Environmental Impact Statement

In July 2021, MDOT SHA evaluated an alternative to avoid the Morningstar Cemetery and associated potential graves identified in an area of adjacent right-of-way through ground-penetrating radar (GPR) survey.

The proposed typical section of the SDEIS layout along the northbound I-495 inner loop managed lane ramp in the vicinity of the cemetery consists of the following:

- 12-foot left shoulder (adjacent to concrete traffic barrier)
- 15-foot travel lane
- 4-foot right shoulder (adjacent to concrete traffic barrier)
- Noise barrier located five feet from the centerline of concrete traffic barrier

The proposed modification reduces the northbound I-495 inner loop managed lane ramp left shoulder width to 6 feet (from 12 feet). The ramp's right shoulder remains four (4) feet in width; however, the noise barrier would be relocated to the back of the concrete traffic barrier. The LOD is established five feet from the centerline of the noise barrier for approximately 300 feet along the frontage of the Morningstar Cemetery property. An area similarly reducing impacts to existing right-of-way extends approximately 65 feet west of the identified potential graves to provide a buffer margin.

This alternative minimizes the overall width of the section avoiding earthwork (cuts or fills) at the nearest GPR-indicated feature that may be a grave.

Although this minimization effort has eliminated project impacts within the property and avoids associated potentially indicated burial features within right-of-way adjacent to the cemetery, MDOT SHA continues to find that the property will be adversely affected pending further consultation regarding options for future investigations and other issues raised regarding indirect and cumulative effects. Any potential proximity effects of the Preferred Alternative, such as visual changes, would not substantially impair the aesthetic features or attributes of Morningstar Cemetery that contribute to the value of the property. Nor would the Preferred Alternative restrict access to the property. The overall proximity impacts from the Preferred Alternative would not substantially impair the activities, features, or attributes that qualify Morningstar Cemetery for protection under Section 4(f); therefore no constructive use would occur per 23 CFR 774.15.

Additional information about investigation and mitigation activities at Morningstar Cemetery are detailed in **SDEIS, Chapter 4, Section 4.7.3.D** and **Section 4.7.4.D**.

### 5.4.5   Mitigation

MDOT SHA has coordinated extensively with the OWJs on Section 4(f) properties impacted by the Preferred Alternative to identify potential mitigation measures. Potential mitigation measures identified in this SDEIS are preliminary in nature, as this coordination is ongoing. Final mitigation commitments including all possible planning to minimize harm will be developed in more detail in coordination with the OWJs and included in the Final Section 4(f) Evaluation and FEIS.

Potential mitigation measures for parkland identified to date include:

- Identification and acquisition of replacement parkland;
- Trail and path improvements;

00027879



Supplemental Draft Environmental Impact Statement

- Addition of park amenities, recreational equipment and facilities;
- Landscaping, tree planting and reforestation;
- Visual and noise barriers;
- Wetland creation or restoration;
- Stream restoration;
- Species-specific mitigations for RTE species;
- Funds to support safety improvements; and,
- Parking, roadway and bridge improvements within park areas.

Potential mitigation measures for historic properties identified in the current draft PA include:

- Property-specific design-review consultation to ensure context-sensitive design for new facilities;
- Cultural Landscape documentation;
- Rehabilitation of historic structures and features;
- Data recovery, research and archaeological treatment plans;
- Cemeteries and human remains treatment plan;
- Preservation of vegetation and planting for vegetative screening;
- Development of historical interpretive materials, plaques and signage located for public accessibility; and,
- Completion of NRHP nominations.

## 5.5  Least Overall Harm

Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then only the alternative that causes the least overall harm may be approved. Because no feasible and prudent avoidance alternative has been identified, all remaining alternatives are evaluated to determine which would cause the least overall harm.

23 CFR 774.3(c)(1) identifies seven factors for identifying the alternative with the least overall harm.

- Factor 1: The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
- Factor 2: The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;
- Factor 3: The relative significance of each Section 4(f) property; and
- Factor 4: The views of the OWJs over each Section 4(f) property.
- Factor 5: The degree to which each alternative meets the Purpose and Need for the project;
- Factor 6: After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and
- Factor 7: Substantial differences in costs among the alternatives.

00027880



Supplemental Draft Environmental Impact Statement

### 5.5.1  Draft Section 4(f) Least Overall Harm Evaluation

The Draft Section 4(f) Evaluation included a preliminary assessment of least overall harm which compared location-specific avoidance options, other minimization alternatives, and Alternatives Retained for Detailed Study (ARDS) based on the least overall harm criteria. (Refer to **DEIS, Appendix F, Section 5**.)

The DEIS included discussion of 18 location-specific alternatives identified to avoid the use of individual Section 4(f) properties, developed to be incorporated into the DEIS Build Alternatives. Each alternative was evaluated using the seven factors of least overall harm. The alternatives consisted of alignment shifts, tunnels, or bridges that were developed to avoid specific Section 4(f) properties for which the impacts were not anticipated to be *de minimis*.

In general, the evaluation determined that these location specific options would result in additional use of other Section 4(f) properties, adverse impacts of a severe magnitude to resources not subject to Section 4(f) protection, or a substantial increase in cost. Because the location-specific options modify relatively short portions of the end-to-end Build Alternatives, each would meet the Purpose and Need of the Study to some degree. However, the analysis determined that the location specific options that more substantially deviate from the existing alignments of I-495 and I-270 and result in a lengthier travel routes would be less effective in addressing the project needs.

The DEIS considered other minimization alternatives including Alternative 5: 1-Lane High-Occupancy Toll Managed Lane Network and the MD 200 Diversion Alternative. These were evaluated along with the six Build Alternatives that were retained for detailed study in the DEIS. These alternatives included managed lanes that differ in the manner in which the proposed travel lanes would be designated and configured. The six ARDS included Alternatives 8, 9, 9M, 10, 13B, and 13C. These are described in detail in the **DEIS, Chapter 2, Section 2.6**.

### 5.5.2  Updated Least Overall Harm Analysis

The preliminary results of the Least Overall Harm Analysis were presented in the **DEIS, Appendix F, Section 5.4**, and are summarized below for each of the alternatives (**Table 5-4**). The table has been updated to include the Preferred Alternative included in this SDEIS.

00027881



**Table 5-4: Least Overall Harm Analysis**

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **DEIS Build Alternatives** | | | | | | | | |
| **Alternative 8** | Substantially equal ability to mitigate adverse impacts to each Section 4(f) property relative to the DEIS Build Alternatives | Substantially equal relative harm given the physical footprint among the Build Alternatives. Harm would occur to properties as described in Section 2 | All DEIS build alternatives would impact the same number of Section 4(f) properties | OWJs provided views during the review period of the DEIS and Draft Section 4(f) Evaluation; coordination ongoing until Final Section 4(f) | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion | Would meet the Purpose and Need to a lesser degree than other DEIS Build Alternatives. Would create traffic problems that would reduce trip reliability in the managed lanes. |
| **Alternative 9** | | | | | Meets Purpose and Need to Greater Degree | | Total Cost of Alternative would be between $8.7 and $9.6 Billion | Would meet the Purpose and Need; impacts to properties protected by Section 4(f) are minimized; appropriate mitigation measures for use of Section 4(f) property to minimize harm. |
| **Alternative 9 Modified** | | | | | Meets Purpose and Need to a Lesser Degree | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $8.5 and $9.3 Billion. Not financially viable owing to lower revenue. | Would meet the Purpose and Need to a lesser degree than other DEIS Build Alternatives because it does not successfully address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| **Alternative 10** | | | | | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than other Build Alternatives | Total Cost of Alternative would be between $9.0 and $9.9 Billion | Would have greater impacts to Section 4(f) Properties, natural resources, and property relocations as well as greater cost, but would provide no additional benefit in meeting Purpose and Need |
| **Alternative 13B** | | | | | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree than the other DEIS Build Alternatives. Would only accommodate traffic growth in the peak direction during peak period. Would not be financially self-sufficient. |
| **Alternative 13C** | | | | | Meets Purpose and Need to a Lesser Degree | | Total Cost of Alternative would be between $8.8 and $9.7 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree. Would have negative impacts to travel along I-495 during the AM peak period as reversible lanes can only be operated in one direction at a time. Would not be financially self-sufficient. |
| **SDEIS Preferred Alternative** | | | | | | | | |
| **Preferred Alternative Alternative 9 – Phase 1 South** | Substantially equal ability to mitigate adverse impacts to each Section 4(f) property relative to the DEIS Build Alternatives, with fewer property impacts to mitigate. | Substantially lower overall harm due to shorter project limits and fewer Section 4(f) properties impacted. | Less harm than DEIS Build Alternatives | Modified project limits to avoid Section 4(f) properties, in response to feedback from OWJ; coordination ongoing until Final Section 4(f) | Meets Purpose and Need to a Lesser Degree | Substantially lower magnitude of overall impacts to properties not protected by Section 4(f) due to shorter project limits | Cost of Alternative would be between $3.0 and $3.5 Billion. | Would meet the Purpose and Need. Would have substantially lower impacts to Section 4(f) properties and resources not protected by Section 4(f) due to shorter project limits. |

JA1862

Supplemental Draft Environmental Impact Statement



| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that qualify each Section 4(f) property to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **Other Alternatives Considered** | | | | | | | | |
| MD 200 Diversion Alternative | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation; coordination ongoing until Final Section 4(f) | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Cost of Alternative would be between $7.0 and $8.1 Billion. Not financially viable owing to lower revenue. | The MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. Would not be financially self-sufficient. |
| Alternative 5 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation; coordination ongoing until Final Section 4(f) | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Cost of Alternative would be between $7.8 and $8.5 Billion. Not financially viable owing to lower revenue. | Alternative 5 does not meet the Study's Purpose and Need because it does not address existing traffic and trip reliability growth or enhance trip reliability, and is not financially viable. |
| **Location Specific Options** | | | | | | | | |
| LS-1 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-1 would meet the Purpose and Need of the project, it would cost $600 million more to construct than the DEIS Build Alternatives along this portion of the project. |
| LS-2 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation; coordination ongoing until Final Section 4(f) | Meets Purpose and Need | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative Not financially viable owing to lower revenue | Option LS-2 would adequately meet the Purpose and Need of the project, it would cost in excess of $1 billion more than the DEIS Build Alternatives along this portion of the project. |
| LS-3 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-3 would result in 10.4 acres of additional impacts to Section 4(f) properties, which would create additional mitigation along this portion of the project when compared to the DEIS Build Alternatives. Would cost in excess of $1.7 billion more than the DEIS Build Alternatives along this portion of the project. |
| LS-4 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives | When compared to the DEIS Build Alternatives, Option LS-4 would result in 11 acres of additional impacts to Section 4(f) properties and cost nearly $700 million more. |

JA1863

00027883

Supplemental Draft Environmental Impact Statement



| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| LS-5 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-5 would result in 3.8 acres of additional impacts to Section 4(f) properties and cost $27 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-6 | Great Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-6 would cost $25 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-7 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-7 would result in an increase of 12 acres of impact to Section 4(f) properties, result in 547 additional relocations, and cost approximately $1.2 billion more than the DEIS Build Alternatives along this portion of the Study. |
| LS-8 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation, coordination ongoing until Final Section 4(f) | Meets Purpose and Need | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-8 would result in 0.9 acres of additional impacts to Section 4(f) properties and cost $250 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-9 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-9 would cost approximately $200 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-10 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | When compared to the DEIS Build Alternatives, Option LS-10 would result in 6.1 acres of additional impacts to one Section 4(f) property: BARC. Option LS-10 would cost approximately $88 million more than the DEIS Build Alternatives along this portion of the project. |
| LS-11 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-11 would cost approximately $500 million more than the DEIS Build Alternatives along this portion of the project. |

00027884

Supplemental Draft Environmental Impact Statement



| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that quality each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| LS-12 | Greater Ability to Mitigate than DES Build Alternatives | Substantially Equal | Less Harm than DES Build Alternatives | OWJs to provide views during the review period of the DES and Draft Section 4(f) Evaluation, coordination ongoing until Final Section 4(f) | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than DES Build Alternatives | Less than DES Build Alternatives; greater cost than the Preferred Alternative | Option LS-12 would cost approximately $1 million less than the DES Build Alternatives. However, Option LS-12 would result in two displacements versus none by the DES Build Alternatives or the Preferred Alternative. |
| LS-13 | Substantially Equal | Substantially Equal | Substantially Equal | | | Greater Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative | Option LS-13 would cause severe impacts to community resources, potentially resulting in the relocation of 166 properties and cost approximately $400 million more than the DES Build Alternatives. |
| LS-14 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative | Option LS-14 would cause additional impacts to wetlands and forest resources and cost approximately $125 million more than the DES Build Alternatives. |
| LS-15 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative | Option LS-15 would cost approximately $25 million more than the DES Build Alternatives along this portion of the Study. |
| LS-16 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | | | Greater Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative | Option LS-16 would cost approximately $1.6 billion more than the DES Build Alternatives along this portion of the project. |
| LS-17 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | | | Greater Magnitude of Adverse Impacts than DES Build Alternatives | Greater Cost than DES Build Alternatives or Preferred Alternative | Option LS-17 would cost approximately $270 million more than the DES Build Alternatives along this portion of the project. |
| LS-18 | Greater Ability to Mitigate than DES Build Alternatives | Less Harm than DES Build Alternatives | Less Harm than DES Build Alternatives | | | Greater Magnitude of Adverse Impacts than DES Build Alternatives | Less Cost than DES Build Alternatives or Preferred Alternative | Option LS-18 would be more difficult to permit than the DES Build Alternatives. |



00027885

JA1865

Based on the information presented in the Draft Section 4(f) Evaluation and this Updated Draft Section 4(f) Evaluation, FHWA and MDOT SHA have reached a preliminary conclusion that the Preferred Alternative is the alternative with least overall harm. The Preferred Alternative meets the Purpose and Need for the study and impacts far fewer Section 4(f) properties and total acreage relative to the other Build Alternatives that would meet the Purpose and Need. The Preferred Alternative would avoid the use of 38 Section 4(f) properties totaling approximately 105 acres relative to the DEIS Build Alternatives. The Preferred Alternative would require use a total of 39.1 acres of Section 4(f) property (including temporary and permanent), compared to 146.8 acres for the DEIS Build Alternative 9. Because the OWJs have not had a chance to review the updated information related to the Preferred Alternative, and mitigation is not yet finalized, this least overall harm conclusion is preliminary. Coordination with the OWJs has continued since the DEIS and will continue to the Final Section 4(f) Evaluation and the FEIS. The Final Section 4(f) Evaluation, FEIS, and Record of Decision (ROD) will include final mitigation commitments including all possible planning to minimize harm developed in coordination with the OWJs, final *de minimis* determinations with documented concurrence from the OWJs, and the final determination of the alternative with least overall harm.

## 5.6 Coordination

Section 4(f) of the US Department of Transportation Act of 1966 mandates that use of a publicly-owned park, recreation area, wildlife/waterfowl refuge, or historic site for a transportation project cannot be approved unless certain conditions are applied. Section 4(f) regulations require the Draft Section 4(f) Evaluation be made available for coordination and comment to OWJs over the Section 4(f) resource (23 CFR §774.5). Since the publication of the DEIS in July 2020, MDOT SHA has conducted conference calls, meetings, and field reviews with, or sent letters to the following agencies with jurisdiction over parkland along the Phase 1 South limits: NPS, M-NCPPC Montgomery County, National Capital Planning Commission (NCPC), City of Rockville, and the City of Gaithersburg. FHWA and MDOT SHA have also held meetings and coordinated with the agencies with jurisdiction over historic sites, including NPS, ACHP, NCPC, MHT, and the VDHR. MDOT SHA has worked closely with the OWJs over all Section 4(f) properties to identify minimization and mitigation measures necessary for Section 4(f) approval. **Tables 7-4, 7-5** and **7-6** in **Chapter 7** of this document in detail the meetings held and topics covered. Coordination with the OWJs will continue, as needed, through the development of the Final Section 4(f) Evaluation and will focus on efforts to further reduce impacts and harm to Section 4(f) properties and the development of appropriate Section 4(f) mitigation and enhancement opportunities. Prior to the Final Section 4(f) Evaluation, a draft of the Final Section 4(f) Evaluation will be provided for coordination and comment to the OWJs over their Section 4(f) resource, such as MHT for historic properties.

In addition to OWJs, the Section 4(f) Evaluation must be made available to the US Department of the Interior (USDOI) and as needed, to the US Department of Agriculture (USDA) and the Department of Housing and Urban Development (HUD) (23 CFR §774.5). The Draft Section 4(f) Evaluation was provided to USDOI for review in conjunction with the DEIS in July 2020. USDOI provided preliminary comments to MDOT SHA but those comments did not represent the formal consultation of FHWA with USDOI, as required under 23 CFR §774.5(a). USDOI will again be afforded the opportunity to review and provide comments on the Updated Draft Section 4(f) Evaluation in conjunction with this chapter. However, formal coordination with USDOI is not expected to occur until the Final Section 4(f) Evaluation as this will enable USDOI to provide comments on FHWA's conclusions regarding the existence of feasible and prudent

00027886

avoidance alternatives, the inclusion of all possible planning to minimize harm to Section 4(f) properties (including mitigation), and the least overall harm alternative. The Preferred Alternative would not affect resources requiring coordination with USDA and HUD and, therefore, consultation with these agencies is not necessary.

The public was afforded notice and opportunity for comment on the Draft Section 4(f) Evaluation per 23 CFR 774(b)(2). This public involvement has been conducted in conjunction with the overall NEPA document public involvement process, as outlined in **SDEIS, Chapter 7**. Additional public notice and opportunity for comment will be provided concurrent with the SDEIS.

Prior to making a Section 4(f) *de minimis* impact determination, public notice and opportunity for public review is required. For historic resources, MDOT SHA has notified MHT and consulting parties of the intent to make a *de minimis* impact determination via letters as part of the Section 106 process. For park resources, the opportunity for public notice and review is occurring as part of the public review of the DEIS and SDEIS as the intent to make a *de minimis* impact determination has been documented in the Draft Section 4(f) Evaluation and the Updated Section 4(f) Evaluation.  Prior to the Final Section 4(f) Evaluation, a draft of the Final Section 4(f) Evaluation will be provided to the OWJs over each Section 4(f) resource, such as MHT for historic properties, for review and comment.

### 5.7  Conclusion

Based on the information presented in the Draft Section 4(f) Evaluation and this Updated Draft Section 4(f) Evaluation, FHWA and MDOT SHA have reached a preliminary conclusion that the Preferred Alternative is the alternative with least overall harm.

The Final Section 4(f) Evaluation will reflect ongoing coordination with OWJs to coordinate impacts and mitigation, and *de minimis* coordination with the OWJs. The Final Section 4(f) Evaluation will also include finalization of the analysis to demonstrate all possible planning to minimize harm, and finalization of the Least Overall Harm Analysis, and final mitigation commitments.

00027887

JA1867

# I-495 & I-270 MANAGED LANES STUDY

**Montgomery and Prince George's Counties, Maryland & Fairfax County, Virginia**

### DRAFT ENVIRONMENTAL IMPACT STATEMENT
and
### DRAFT SECTION 4(f) EVALUATION

Submitted Pursuant to:
42 U.S.C. §4332(2)(C) and 49 U.S.C. §303

By:
U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
and
MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

In Cooperation with:
U.S. Army Corp of Engineers, National Park Service
U.S. Environmental Protection Agency, National Capital Planning Commission,
Maryland Department of Environment, Maryland Department of Natural Resources,
Virginia Department of Transportation, and Maryland National Capital Park and Planning Commission

06/22/2020
_____
Date of Approval

Tim Smith, P.E., Administrator
Maryland Department of Transportation
State Highway Administration

6/24/2020
_____
Date of Approval

Gregory Murrill, Division Administrator
Federal Highway Administration

The following persons may be contacted for additional information concerning this document:

| | |
|---|---|
| Lisa B. Choplin, DBIA | Mr. Jitesh Parikh |
| Maryland Department of Transportation | Federal Highway Administration |
| State Highway Administration | George H. Fallon Building |
| I-495 & I-270 P3 Office | 31 Hopkins Plaza, Suite 1520 |
| 707 North Calvert Street, Mail Stop P-601 | Baltimore, Maryland 21201 |
| Baltimore, MD 21202 | 410-962-4440 |
| 410- 637-3300 | |

The purpose of the I-495 & I-270 Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity. The specific Study scope includes: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including improvements to the American Legion Bridge over the Potomac River, to west of MD 5, and along I-270 from I-495 to north of I-370, including the East and West I-270 Spurs. This Draft Environmental Impact Statement (DEIS) presents the Study Purpose and Need, reasonable alternatives, the existing environmental conditions, and the analysis of the anticipated beneficial and adverse environmental effects of the alternatives. The DEIS provides a comparative analysis between the No Build Alternative and six Build Alternatives; the Preferred Alternative will be identified in the Final Environmental Impact Statement (FEIS). Comments on the DEIS are due by October 8, 2020 and should be sent to Lisa B. Choplin at the above address or submitted using the online comment form at 495-270-p3.com/DEIS. The Federal Highway Administration does not intend to issue a combined FEIS / Record of Decision.

00035712

00035713



# Draft Environmental Impact Statement and Draft Section 4(f) Evaluation

## June 2020



U.S. Department
of Transportation
**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00035714

00035715



Draft Environmental Impact Statement

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ................................................................................................**ES-1**
**1     PURPOSE AND NEED** ...............................................................................................**1-1**
  1.1    Overview of Study Corridors .....................................................................................1-1
  1.2    Study Purpose and Need.............................................................................................1-4
  1.3    Accommodate Existing Traffic and Long-Term Traffic Growth...................................1-4
    1.3.1    Population and Employment Growth .................................................................1-4
    1.3.2    Traffic Growth ...................................................................................................1-6
  1.4    Enhance Trip Reliability..............................................................................................1-7
  1.5    Provide Additional Roadway Travel Choices...............................................................1-9
  1.6    Accommodate Homeland Security ..............................................................................1-9
  1.7    Improve Movement of Goods and Services...............................................................1-10
    1.7.1    Movement of Freight Goods............................................................................1-10
    1.7.2    Movement of Commuting Employees ..............................................................1-11
  1.8    Other Goals and Objectives .....................................................................................1-14
    1.8.1    Incorporate Alternative Funding Sources to Achieve Financial Viability .........1-14
    1.8.2    Environmental Responsibility .........................................................................1-14
**2     ALTERNATIVES DEVELOPMENT**.............................................................................**2-1**
  2.1    Overview of Alternatives Development Process ..........................................................2-1
  2.2    Screening Criteria.......................................................................................................2-3
    2.2.1    Engineering Considerations ...............................................................................2-3
    2.2.2    Homeland Security.............................................................................................2-5
    2.2.3    Movement of Goods and Services ......................................................................2-5
    2.2.4    Multimodal Connectivity....................................................................................2-5
    2.2.5    Financial Viability ..............................................................................................2-6
    2.2.6    Environmental....................................................................................................2-6
  2.3    Regional Transportation Planning...............................................................................2-7
  2.4    Preliminary Range of Alternatives ..............................................................................2-7
  2.5    Screened Alternatives.................................................................................................2-9
    2.5.1    Alternatives Retained for Further Consideration .............................................2-10
    2.5.2    Alternatives Dropped from Further Consideration...........................................2-11
    2.5.3    Additional Alternatives Analysis ......................................................................2-17
  2.6    Alternatives Retained and Evaluated in this Document .............................................2-24

00035716

JA1872



Draft Environmental Impact Statement

| | 2.6.1 | Alternative 1 | 2-25 |
| | 2.6.2 | Alternative 8 | 2-25 |
| | 2.6.3 | Alternative 9 | 2-26 |
| | 2.6.4 | Alternative 9M | 2-26 |
| | 2.6.5 | Alternative 10 | 2-29 |
| | 2.6.6 | Alternative 13B | 2-29 |
| | 2.6.7 | Alternative 13C | 2-30 |
| 2.7 | | Common Elements Among the Build Alternatives | 2-32 |
| | 2.7.1 | Interchanges and Managed Lanes Access | 2-32 |
| | 2.7.2 | Stormwater Management Consideration | 2-37 |
| | 2.7.3 | Construction and Short-term Effects | 2-39 |
| | 2.7.4 | Limits of Disturbance | 2-40 |
| | 2.7.5 | Tolling | 2-41 |
| | 2.7.6 | Transit-Related Elements | 2-45 |
| | 2.7.7 | Pedestrian and Bicycle Considerations | 2-47 |
| | 2.7.8 | Construction Phasing | 2-47 |
| 2.8 | | Financial Viability | 2-48 |
| **3** | | **TRANSPORTATION AND TRAFFIC** | **3-1** |
| 3.1 | | Introduction | 3-1 |
| | 3.1.1 | Traffic Analysis Data Collection and Modeling Methodology | 3-1 |
| | 3.1.2 | Traffic Analysis Area | 3-2 |
| | 3.1.3 | Traffic Modeling Assumptions | 3-2 |
| 3.2 | | Existing Conditions | 3-5 |
| 3.3 | | Future Traffic Conditions and Alternatives Analysis | 3-7 |
| | 3.3.1 | Speed | 3-8 |
| | 3.3.2 | Delay | 3-9 |
| | 3.3.3 | Travel Time | 3-10 |
| | 3.3.4 | Level of Service | 3-12 |
| | 3.3.5 | Throughput | 3-12 |
| | 3.3.6 | Local Network | 3-13 |
| | 3.3.7 | Summary | 3-16 |
| 3.4 | | Next Steps | 3-16 |
| **4** | | **ENVIRONMENTAL RESOURCES, CONSEQUENCES & MITIGATION** | **4-1** |

00035717



Draft Environmental Impact Statement

4.1 Land Use and Zoning ........................................................................4-4

 4.1.1 Introduction and Methodology ........................................................4-4

 4.1.2 Affected Environment ........................................................4-4

 4.1.3 Environmental Consequences ........................................................4-7

4.2 Demographics ........................................................................4-8

 4.2.1 Introduction and Methodology ........................................................4-8

 4.2.2 Affected Environment ........................................................4-9

 4.2.3 Environmental Consequences ........................................................4-10

4.3 Communities & Community Facilities ........................................................4-11

 4.3.1 Introduction and Methodology ........................................................4-11

 4.3.2 Affected Environment ........................................................4-11

 4.3.3 Environmental Consequences ........................................................4-14

 4.3.4 Mitigation ........................................................4-18

4.4 Parks and Recreational Facilities ........................................................4-18

 4.4.1 Introduction and Methodology ........................................................4-18

 4.4.2 Affected Environment ........................................................4-18

 4.4.3 Environmental Consequences ........................................................4-19

 4.4.4 Mitigation ........................................................4-22

4.5 Property Acquisitions and Relocations ........................................................4-22

 4.5.1 Introduction and Methodology ........................................................4-22

 4.5.2 Affected Environment ........................................................4-22

 4.5.3 Environmental Consequences ........................................................4-23

 4.5.4 Mitigation ........................................................4-24

4.6 Visual and Aesthetic Resources ........................................................4-29

 4.6.1 Introduction and Methodology ........................................................4-29

 4.6.2 Affected Environment ........................................................4-29

 4.6.3 Environmental Consequences ........................................................4-33

 4.6.4 Mitigation ........................................................4-35

4.7 Historic Architectural and Archaeological Resources ........................................................4-35

 4.7.1 Introduction and Methodology ........................................................4-35

 4.7.2 Affected Environment ........................................................4-39

 4.7.3 Environmental Consequences ........................................................4-44

 4.7.4 Mitigation ........................................................4-55

00035718

4.8    Air Quality ........................................................................................................................... 4-58

4.8.1    Introduction and Methodology ........................................................................... 4-58

4.8.2    Affected Environment .......................................................................................... 4-60

4.8.3    Environmental Consequences ............................................................................. 4-61

4.8.4    Mitigation ............................................................................................................ 4-62

4.9    Noise ................................................................................................................................... 4-63

4.9.1    Introduction and Methodology ........................................................................... 4-63

4.9.2    Affected Environment .......................................................................................... 4-64

4.9.3    Environmental Consequences ............................................................................. 4-65

4.9.4    Mitigation ............................................................................................................ 4-66

4.9.5    Statement of Likelihood ...................................................................................... 4-66

4.10    Hazardous Materials ......................................................................................................... 4-72

4.10.1    Introduction and Methodology ........................................................................... 4-72

4.10.2    Affected Environment .......................................................................................... 4-72

4.10.3    Environmental Consequences ............................................................................. 4-73

4.10.4    Mitigation ............................................................................................................ 4-74

4.11    Topography, Geology, and Soils ....................................................................................... 4-75

4.11.1    Introduction and Methodology ........................................................................... 4-75

4.11.2    Affected Environment .......................................................................................... 4-75

4.11.3    Environmental Consequences ............................................................................. 4-76

4.11.4    Mitigation ............................................................................................................ 4-77

4.12    Waters of the US and Waters of the State, Including Wetlands ....................................... 4-77

4.12.1    Introduction and Methodology ........................................................................... 4-77

4.12.2    Affected Environment .......................................................................................... 4-79

4.12.3    Environmental Consequences ............................................................................. 4-80

4.12.4    Mitigation ............................................................................................................ 4-83

4.13    Watersheds and Surface Water Quality ........................................................................... 4-87

4.13.1    Introduction and Methodology ........................................................................... 4-87

4.13.2    Affected Environment .......................................................................................... 4-88

4.13.3    Environmental Consequences ............................................................................. 4-89

4.13.4    Mitigation ............................................................................................................ 4-92

4.14    Groundwater Hydrology ................................................................................................... 4-93

4.14.1    Introduction and Methodology ........................................................................... 4-93

00035719

JA1875



Draft Environmental Impact Statement 

4.14.2     Affected Environment.................................................................................4-93

4.14.3     Environmental Consequences....................................................................4-94

4.14.4     Mitigation...............................................................................................4-94

4.15     Floodplains .....................................................................................................4-95

4.15.1     Introduction and Methodology..................................................................4-95

4.15.2     Affected Environment.................................................................................4-95

4.15.3     Environmental Consequences....................................................................4-96

4.15.4     Mitigation...............................................................................................4-97

4.16     Vegetation and Terrestrial Habitat ..................................................................4-98

4.16.1     Introduction and Methodology..................................................................4-98

4.16.2     Affected Environment.................................................................................4-99

4.16.3     Environmental Consequences....................................................................4-99

4.16.4     Mitigation.............................................................................................4-101

4.17     Terrestrial Wildlife ........................................................................................4-101

4.17.1     Introduction and Methodology................................................................4-101

4.17.2     Affected Environment...............................................................................4-102

4.17.3     Environmental Consequences..................................................................4-104

4.17.4     Mitigation.............................................................................................4-105

4.18     Aquatic Biota.................................................................................................4-105

4.18.1     Introduction and Methodology................................................................4-105

4.18.2     Affected Environment...............................................................................4-105

4.18.3     Environmental Consequences..................................................................4-107

4.18.4     Mitigation.............................................................................................4-109

4.19     Rare, Threatened, and Endangered Species ...................................................4-109

4.19.1     Introduction and Methodology................................................................4-109

4.19.2     Affected Environment...............................................................................4-113

4.19.3     Environmental Consequences..................................................................4-117

4.19.4     Mitigation.............................................................................................4-118

4.20     Unique and Sensitive Areas ...........................................................................4-118

4.20.1     Introduction and Methodology................................................................4-118

4.20.2     Affected Environment...............................................................................4-119

4.20.3     Environmental Consequences..................................................................4-119

4.20.4     Mitigation.............................................................................................4-120

00035720

JA1876



4.21    Environmental Justice and Title VI Compliance ........................................................4-120

    4.21.1    Introduction and Regulatory Context ...............................................4-120

    4.21.2    Environmental Justice Analysis Methodology ...............................4-122

    4.21.3    Existing Conditions of Environmental Justice Populations ...........4-124

    4.21.4    Public Outreach with Environmental Justice Populations ............4-130

    4.21.5    Identification of Beneficial and Adverse Effects to Environmental Justice Populations ........
    ............................................................................................................4-136

4.22    Indirect and Cumulative Effects ..................................................................4-144

    4.22.1    Introduction and Methodology...........................................................4-144

    4.22.2    Affected Environment.............................................................................4-148

    4.22.3    Environmental Consequences...............................................................4-153

4.23    Consequences of Construction .....................................................................4-157

    4.23.1    Visual and Aesthetic Resources ...........................................................4-157

    4.23.2    Hazardous Materials ...............................................................................4-158

    4.23.3    Air Quality .................................................................................................4-158

    4.23.4    Noise ...........................................................................................................4-159

4.24    Commitment of Resources ...........................................................................4-159

    4.24.1    Irreversible and Irretrievable Commitment of Resources .............4-159

    4.24.2    Short-Term Effects/Long-Term Effects ...............................................4-160

5    DRAFT SECTION 4(F) EVALUATION .............................................................5-1

    5.1    Introduction ........................................................................................................5-1

    5.2    Use of Section 4(f) Properties .........................................................................5-1

        5.2.1    Exceptions to Section 4(f) Use ..............................................................5-2

        5.2.2    De Minimis Impact ...................................................................................5-2

    5.3    Proposed Action .................................................................................................5-3

    5.4    Officials with Jurisdiction ................................................................................5-3

    5.5    Section 4(f) Properties ......................................................................................5-3

    5.6    Avoidance Alternatives and Analysis ..........................................................5-12

    5.7    All Possible Planning to Minimize Harm .....................................................5-16

    5.8    Least Overall Harm .........................................................................................5-17

    5.9    Coordination .....................................................................................................5-18

    5.10    Mitigation...........................................................................................................5-20

6    ONE FEDERAL DECISION ..................................................................................6-1

00035721

JA1877



Draft Environmental Impact Statement

6.1    Background .................................................................................................................. 6-1

6.2    Agency Roles ............................................................................................................... 6-1

6.3    Concurrence Points ...................................................................................................... 6-2

6.4    Federal Cooperating Agencies Authorization .............................................................. 6-3

6.4.1    Ongoing Coordination with National Park Service (NPS) ........................................ 6-3

6.4.2    Ongoing Coordination with US Army Corps of Engineers (USACE) Regarding Avoidance and Minimization to Jurisdictional Features .......................................................................... 6-9

6.4.3    Ongoing Coordination with US Environmental Protection Agency (EPA) ................ 6-9

6.4.4    Ongoing Coordination with National Capital Planning Commission (NCPC) ............ 6-9

6.5    Permits, Approvals and Authorizations Required ....................................................... 6-11

7    PUBLIC INVOLVEMENT AND AGENCY COORDINATION ........................................... 7-1

7.1    Introduction ............................................................................................................... 7-1

7.2    Public Involvement ..................................................................................................... 7-1

7.2.1    Public Workshops and Comment Periods ............................................................. 7-1

7.2.2    Public Outreach with Environmental Justice Populations ..................................... 7-2

7.2.3    Small-Scale Meetings and Outreach Events .......................................................... 7-5

7.2.4    Public Hearings .................................................................................................... 7-5

7.3    Agency Coordination ................................................................................................... 7-6

7.3.1    Scoping Outreach ................................................................................................ 7-7

7.3.2    Interagency Working Group Meetings .................................................................. 7-7

7.3.3    Regulatory and Resource Agency Consultation ..................................................... 7-11

7.4    Incorporation of Public and Agency Input into the Study ............................................ 7-12

8    LIST OF PREPARERS .................................................................................................. 8-1

9    DISTRIBUTION LIST ................................................................................................... 9-1

9.1    Federal Agencies ........................................................................................................ 9-1

9.2    Federally Recognized Tribes ........................................................................................ 9-1

9.3    State of Maryland Agencies ......................................................................................... 9-1

9.4    Commonwealth of Virginia Agencies ........................................................................... 9-2

9.5    State Recognized and Other Tribal Groups ................................................................... 9-2

9.6    County and Local Agencies .......................................................................................... 9-2

9.7    DEIS Availability .......................................................................................................... 9-3

10    REFERENCES ............................................................................................................. 10-1

00035722

JA1878

Draft Environmental Impact Statement

## LIST OF TABLES

Table 1-1: Regional Population Growth.................................................................................1-5
Table 1-2: Regional Employment Growth.............................................................................1-6
Table 1-3: 2017 and Projected 2040 No Build TTI for Most Congested Segments in AM Peak..............1-8
Table 1-4: 2017 and Projected 2040 No Build TTI for Most Congested Segments in PM Peak..............1-8
Table 2-1: PRELIMINARY Effects Comparison of the Screened Alternatives (JUNE 2019 IMPACTS) and the MD 200 Diversion Alternative..............................................................................................2-23
Table 2-2: Alternatives Evaluated in the DEIS......................................................................2-24
Table 2-3: Summary of Effects Comparison of the Build Alternatives...................................2-31
Table 2-4: Proposed Interchange Modifications and Managed Lanes Access Locations.........2-33
Table 2-5: Stormwater Management per Build Alternative ..................................................2-38
Table 2-6: Estimated Cashflows for Build Alternatives........................................................2-50
Table 3-1: Existing Average Daily Traffic (ADT).....................................................................3-6
Table 3-2: 2040 No Build Average Daily Traffic (ADT) ...........................................................3-7
Table 3-3: 2040 Build Average Daily Traffic (ADT) ...............................................................3-8
Table 3-4: 2040 Average Speed ...........................................................................................3-8
Table 3-5: 2040 Corridor Travel Speed Results from VISSIM Model .......................................3-9
Table 3-6: 2040 System-Wide Delay...................................................................................3-10
Table 3-7: 2040 Travel Time Index (TTI)..............................................................................3-10
Table 3-8: 2040 Travel Time Index (TTI) Results for General Purpose Lanes from VISSIM Model..........3-11
Table 3-9: 2040 Percent of Lane-Miles Operating at LOS F .................................................3-12
Table 3-10: 2040 Vehicle Throughput.................................................................................3-13
Table 3-11: 2040 Vehicle Throughput Results from VISSIM Model.......................................3-14
Table 3-12: 2040 Effect on the Local Network.....................................................................3-15
Table 3-13: 2040 Local Network Results from MWCOG Model ............................................3-15
Table 4-1: Summary of Quantifiable Impacts by Alternative..................................................4-3
Table 4-2: Land Use Conversion of the Build Alternatives Within the CEA Analysis Area.........4-7
Table 4-3: Overview of Potential Impacts by CEA Analysis Area Community .........................4-14
Table 4-4: Property Relocations..........................................................................................4-16
Table 4-5: Potential Public Park Impact by Build Alternative (Acres)....................................4-20
Table 4-6: Relocation and Right-of-Way Requirements.......................................................4-23
Table 4-7: Full and Partial Property Acquisition by Corridor Area Between Existing Interchanges.........4-25
Table 4-8: Section 106 Consulting Parties List ...................................................................4-36
Table 4-9: Historic Properties within the APE......................................................................4-39
Table 4-10: Newly-Identified Eligible Archaeological Resources..........................................4-43
Table 4-11: Historic Architectural Properties with Known Adverse Effect.............................4-44
Table 4-12: Number of Historic Properties (Historic Architectural and Archaeological Resources).......4-45
Table 4-13: Historic Properties Where Effects Cannot Be Fully Determined .........................4-46
Table 4-14: Archaeological Resources with a Known Adverse Effect....................................4-54
Table 4-15: Summary of Noise Sensitive Area (NSA) Impacts and .......................................4-67
Table 4-16: Sites of Potential Concern Priority Summary.....................................................4-73
Table 4-17: Impact to Soils by Type in Acres ......................................................................4-76
Table 4-18: Impacts to Steep Slopes and Highly Erodible Soils in Acres...............................4-77

00035723



Table 4-19: Total Number of Delineated Features ................................................................................4-80
Table 4-20: Summary of Impacts to USACE/MDE Wetlands and Waterways Corridor-wide.................4-81
Table 4-21: Summary of Delineated NPS Wetland Features and Impacts on NPS Properties ...............4-82
Table 4-22: Comparison of a Two Managed Lane Alternative Pre-Avoidance and Minimization (A&M) ......
.............................................................................................................................................................4-86
Table 4-23: Waterways and Associated Floodplains within the Corridor Study Boundary ....................4-96
Table 4-24: Impacts to FEMA 100-Year Floodplain in Acres ...................................................................4-97
Table 4-25: Impacts to Forests in Acres ................................................................................................4-100
Table 4-26: Tree Canopy Cover Impacts on NPS Properties in Acres ...................................................4-100
Table 4-27: Impacts to Forest Interior Dwelling Species Habitat in Acres...........................................4-104
Table 4-28: Summary of Watershed Quality Index Narrative Score Results .........................................4-106
Table 4-29: Additional Impervious Surfaces by Watershed..................................................................4-108
Table 4-30: SSPRA Acreage Impacted by Build Alternative ..................................................................4-114
Table 4-31: RTE Plant Species in Riparian Areas of the Potomac River ...............................................4-114
Table 4-32: Virginia and Maryland State Listed Species From the Potomac Gorge Known or Potentially
Occurring (VDCR/NPS/MDNR) Within the Corridor Study Boundary ....................................................4-116
Table 4-33: Impacts to Unique and Sensitive Areas (acres)..................................................................4-120
Table 4-34: HUD 2016 Low-Income Limit for the Washington-Arlington-Alexandria, .........................4-124
Table 4-35: Voluntary Demographic Survey Results.............................................................................4-129
Table 4-36: Public Involvement Efforts in or near EJ Populations ........................................................4-131
Table 4-37: Right-of-Way Requirements in EJ Populations ..................................................................4-136
Table 4-38: Potential for Adverse Effects to Environmental Resources within EJ Populations.............4-142
Table 4-39: ICE Analysis Data Sources and Methodology.....................................................................4-147
Table 4-40: Indirect Effects in the ICE Analysis Area ...........................................................................4-153
Table 4-41: Cumulative Effects in the ICE Analysis Area.......................................................................4-156
Table 5-1: Inventory of Section 4(f) Properties that Would Not Experience a Use................................5-8
Table 5-2: Inventory of Section 4(f) Properties with Use .......................................................................5-9
Table 5-3: Inventory of Properties that Qualify as Section 4(f) Exemptions .........................................5-12
Table 5-4: Section 4(f) Officials with Jurisdiction Coordination Summary ...........................................5-19
Table 6-1: Potential Impacts to NPS Properties.....................................................................................6-4
Table 6-2: Summary of NPS Wetland Impacts on NPS Properties within the Corridor Study Boundary ..6-4
Table 6-3: NPS Historic Properties with Adverse Effect..........................................................................6-5
Table 6-4: Virginia and Maryland State Listed Species From the Potomac Gorge Known or Potentially
Occurring (VDCR/NPS/MDNR) Within the Corridor Study Boundary ......................................................6-6
Table 6-5: Tree Canopy Cover Impacts on NPS Properties in Acres .......................................................6-7
Table 6-6: Summary of Minimization of Impacts to Parks Acquired ....................................................6-11
Table 6-7: Likely Permits and Approvals..............................................................................................6-12
Table 7-1: Lead, Cooperating, Participating, and Notified Agencies for the Study ................................7-8
Table 7-2: Summary of Interagency Working Group (IAWG) Meetings ................................................7-10

00035724

JA1880



Draft Environmental Impact Statement

## LIST OF FIGURES

Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors .......................................................1-3
Figure 1-2: Average Annual Daily Truck Traffic ......................................................................1-12
Figure 1-3: Residents' Employment Commute Destinations in Montgomery and Prince George's Counties ..................................................................................................................................1-13
Figure 2-1: Alternatives Screening Process ..............................................................................2-1
Figure 2-2: MD 200 Diversion Alternative ..............................................................................2-20
Figure 2-3: Sample Travel Times on Dynamic Message Sign ..................................................2-21
Figure 2-4: Alternative 1 (No Build) Typical Sections .............................................................2-25
Figure 2-5: Alternative 8 Typical Sections ..............................................................................2-26
Figure 2-6: Alternative 9 Typical Sections ..............................................................................2-26
Figure 2-7: Alternative 9M Typical Sections ...........................................................................2-27
Figure 2-8: Alternative 9 Modified ..........................................................................................2-28
Figure 2-9: Alternative 10 Typical Sections ............................................................................2-29
Figure 2-10: Alternative 13B Typical Sections ........................................................................2-30
Figure 2-11: Alternative 13C Typical Sections ........................................................................2-30
Figure 2-12: Example Direct Access Interchange ....................................................................2-32
Figure 2-13: Example At-Grade Access Slip Ramp Configuration ...........................................2-33
Figure 2-14: Proposed Managed Lanes Access Locations .......................................................2-36
Figure 3-1: Limits of VISSIM Model Network and Interchange Locations Included along I-495 and I-270 ....
..................................................................................................................................................3-3
Figure 4-1: Land Use within the CEA Analysis Area .................................................................4-5
Figure 4-2: CEA Analysis Area Land Use Composition .............................................................4-6
Figure 4-3: CEA Analysis Area Communities ..........................................................................4-12
Figure 4-4: Trees Framing I-495, West Side View ..................................................................4-30
Figure 4-5: Overall View- North side Inner loop looking east at Route 29 Interchange .........4-30
Figure 4-6: Median Plantings Separate I-495 Inner and Outer Loops at I-95 Interchange Outer Loop looking West ..................................................................................................................................4-30
Figure 4-7: View Showing Adjacent Development and Vegetation on East side near Ritchie Marlboro Road intersection ..................................................................................................................................4-31
Figure 4-8: Concrete Deck Bridge with Green Paint Beam on East side at Ardwick Ardmore Road intersection ..................................................................................................................................4-31
Figure 4-9: View of Washington, DC Temple from I-495, Looking West ................................4-31
Figure 4-10: View of Bethesda Trolley Trail Crossing I-495, Looking East .............................4-32
Figure 4-11: I-270 Looking North at the MD 189 Interchange ...............................................4-33
Figure 4-12: I-270 Looking North at Gude Drive Bridge .........................................................4-33
Figure 4-13: I-270 Looking North at Wooton Parkway Bridge ...............................................4-33
Figure 4-14: Five-Step Avoidance and Minimization Process .................................................4-85
Figure 4-15: EJ Populations in the EJ Analysis Area .............................................................4-126
Figure 4-16: Overall ICE Analysis Area Boundary ................................................................4-146
Figure 4-17: Projected Population Growth 2015 – 2040 by TAZ ...........................................4-151
Figure 4-18: Projected Employment Growth 2015 -2040 by TAZ ..........................................4-152
Figure 5-1: Inventory of Section 4(f) Property in the Corridor Study Boundary (Map 1 of 3) .................5-5

00035725

JA1881



Draft Environmental Impact Statement

Figure 5-2: Inventory of Section 4(f) Property in the Corridor Study Boundary (Map 2 of 3)...................5-6
Figure 5-3: Inventory of Section 4(f) Property in the Corridor Study Boundary (Map 3 of 3)...................5-7
Figure 7-1: EJ Populations along the Study Corridors............................................................................7-3

## LIST OF APPENDICES

| | |
|---|---|
| APPENDIX A | Purpose and Need Statement |
| APPENDIX B | Alternatives Technical Report |
| APPENDIX C | Traffic Technical Report |
| APPENDIX D | Environmental Resource Mapping |
| APPENDIX E | Community Effects Assessment/ Environmental Justice Technical Report |
| APPENDIX F | Draft Section 4(f) Evaluation |
| APPENDIX G | Cultural Resources Technical Report |

|  |  |  |
|---|---|---|
| | Volume 1: | Overview and Effects Assessment |
| | Volume 2: | Archaeological and Historic Architectural Gap Analysis and Assessment |
| | Volume 3: | Architectural Resources Evaluation Technical Report |
| | Volume 4: | Phase I Archaeological Investigation |
| | Volume 5: | Phase II Archaeological Evaluation at Sites 18PR750, 18MO749, and 18MO751 for the I-495 & I-270 Managed Lanes |
| | Volume 6: | Phase I Archaeological Survey, Intensive Phase I Archaeological Survey of 44FX0373, and Phase II Archaeological Evaluation at Sites 44FX0374, 44FX0379, 44FX0381, 44FX0389, 44FX3160, and 44FX3900 Within the George Washington Memorial Parkway for the I-495 Northern Extension (NEXT) Project and the I-495/I-270 Managed Lanes Study, Fairfax County, Virginia |

| | |
|---|---|
| APPENDIX H | Draft Section 106 Programmatic Agreement |
| APPENDIX I | Air Quality Technical Report |
| APPENDIX J | Noise Analysis Technical Report |
| APPENDIX K | Hazardous Materials Technical Report |
| APPENDIX L | Natural Resources Technical Report |
| APPENDIX M | Avoidance, Minimization & Impacts Report (AMR) |
| APPENDIX N | Draft Compensatory Mitigation Plan |
| APPENDIX O | Indirect and Cumulative Effects Technical Report |
| APPENDIX P | Public Involvement & Agency Coordination Technical Report |
| APPENDIX Q | Conceptual Mitigation Plan |
| APPENDIX R | Joint Permit Application, including the following supporting documents: |

1. Application
2. Impact Plates
3. Impact Tables

| | |
|---|---|
| APPENDIX S | Environmental Assessment Form |

00035726

JA1882



Draft Environmental Impact Statement

## ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| AA | Alternatives Analysis |
| AASHTO | American Association of State Highway and Transportation Officials |
| AADT | Average Annual Daily Traffic |
| ACHP | Advisory Council on Historic Preservation |
| ADA | Americans with Disabilities Act |
| ADT | Annual Daily Traffic |
| APE | Area of Potential Effects |
| ARDS | Alternatives Retained for Detailed Study |
| AST | Aboveground Storage Tank |
| ATM | Active Traffic Management |
| BMP | Best Management Practice |
| BO | Biological Opinion |
| BRT | Bus Rapid Transit |
| CAA | Clean Air Act |
| CCT | Corridor Cities Transitway |
| C-D | Collector-Distributor |
| CCA | Capper-Cramton Act |
| CDP | Census Designated Place |
| CEA | Community Effects Assessment |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| $CH_4$ | Methane |
| CLRP | Constrained Long-Range Plan |
| CO | Carbon Monoxide |
| $CO_2$ | Carbon Dioxide |
| COMAR | Code of Maryland Regulations |
| $CP_v$ | Channel Protection Volume |
| CRZ | Critical Root Zone |
| CSXT | CSX Transportation |
| CTB | Consolidated Transportation Bonds |
| CWA | Clean Water Act |
| dB | Decibel |
| dBA | A-weighted Decibel |
| DEIS | Draft Environmental Impact Statement |
| DHR | Department of Historical Resources |
| DMS | Dynamic message signs |
| DSL | Dynamic speed limit |
| E&S | Erosion and Sediment Control |
| EA | Environmental Assessment |
| EDR | Environmental Data Resources, Inc. |

00035727

JA1883



Draft Environmental Impact Statement

| EFH | Essential Fish Habitat |
| EIA | Energy Information Administration |
| EJ | Environmental Justice |
| EO | Executive Order |
| ESD | Environmental Site Design |
| ETC | Electronic Toll Collection |
| ETL | Express Toll Lane |
| FAQs | Frequently Asked Questions |
| FAST | Fixing America's Surface Transportation Act |
| FCDPWES | Fairfax County Department of Public Works and Environmental Services |
| FEIS | Final Environmental Impact Statement |
| FEMA | Federal Emergency Management Agency |
| FFPA | Farmland Protection Policy Act |
| FHWA | Federal Highway Administration |
| FIDS | Forest Interior Dwelling Bird Species |
| FTA | Federal Transit Administration |
| FWCA | Fish and Wildlife Coordination Act |
| GDP | Gross Domestic Product |
| GHG | Greenhouse Gases |
| GI | Green Infrastructure |
| GIA | Green Infrastructure Assessment |
| GIS | Geographic Information System |
| GP | General Purpose |
| GWMP | George Washington Memorial Parkway |
| HCS | Highway Capacity Software |
| HFC | Hydrofluorocarbons |
| HOT | High-occupancy Toll |
| HOV | High-occupancy Vehicle |
| HUD | Housing and Urban Development |
| IAWG | Interagency Working Group |
| IBI | Indices of Biological Integrity |
| ICC | Intercounty Connector |
| ICE | Indirect and Cumulative Effects |
| ICM | Innovative Congestion Management |
| IPaC | Information Planning and Consultation |
| IRVM | Integrated Roadside Vegetation Management |
| JBA | Joint Base Andrews |
| LF | Linear Feet |
| LOD | Limits of Disturbance |
| LOS | Level of Service |
| LUST | Leaking Underground Storage Tank |

00035728

JA1884



Draft Environmental Impact Statement

| MARC | Maryland Area Regional Commuter |
|------|--------------------------------|
| MBSS | Maryland Biological Stream Survey |
| MCDEP | Montgomery County Department of Environmental Protection |
| MDE | Maryland Department of the Environment |
| MDL | Maryland Department of Labor |
| MDNR | Maryland Department of Natural Resources |
| MDOT SHA | Maryland Department of Transportation State Highway Administration |
| MDP | Maryland Department of Planning |
| MDTA | Maryland Transportation Authority |
| MGS | Maryland Geological Survey |
| MHT | Maryland Historical Trust |
| M-NCPPC | Maryland-National Capital Park and Planning Commission |
| MOU | Memorandum of Understanding |
| MP | Master Plan |
| MSATs | Mobile Source Air Toxics |
| MSFCMA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSTM | Maryland Statewide Transportation Model |
| MTA | Maryland Transit Administration |
| MWCOG | Metropolitan Washington Council of Governments |
| $N_2O$ | Nitrous Oxide |
| NAAQS | National Air Quality Standards |
| NAC | Noise Abatement Criteria |
| NB | Northbound |
| NCHRP | National Cooperative Highway Research Program |
| NCPC | National Capital Planning Commission |
| NCRTPB | National Capital Region Transportation Planning Board |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NLEB | Northern Long-eared Bat |
| NMFS | National Marine Fisheries Service |
| $NO_2$ | Nitrogen Dioxide |
| NOAA | National Oceanic and Atmospheric Administration |
| NOI | Notice of Intent |
| NPL | National Priorities List |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NSA | Noise-sensitive Area |
| NWI | National Wetlands Inventory |
| $O_3$ | Ozone |
| OFD | One Federal Decision |

00035729

JA1885



Draft Environmental Impact Statement

| OHW | Ordinary High Water |
| OMB | Office of Management and Budget |
| OWJ | Officials with Jurisdiction |
| P3 | Public-Private Partnership |
| PA | Programmatic Agreement |
| Pb | Lead |
| PCB | Polychlorinated Biphenyl |
| PECs | Potential Environmental Concerns |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PGDoE | Prince George's County Department of the Environment |
| PM | Particulate Matter |
| PSI | Preliminary Site Investigations |
| PSS | Palustrine Scrub-shrub |
| PTI | Planning Time Index |
| $Q_p$ | Quantity Management |
| QW | Queue Warning |
| RBP | Rapid Bioassessment Protocol |
| $Re_v$ | Recharge Volume |
| RFP | Request for Proposals |
| ROD | Record of Decision |
| ROW | Right-of-way |
| RTE | Rare, Threatened, and Endangered |
| SB | Southbound |
| SDWA | Safe Drinking Water Act |
| SF | Square Feet |
| SGCN | Species of Greatest Conservation Need |
| $SO_2$ | Sulfur Dioxide |
| SPA | Special Protection Area |
| SPUI | Single Point Urban Interchange |
| SSPRA | Sensitive Species Project Review Areas |
| SVP | Stream Valley Park |
| SWM | Stormwater Management |
| TAZ | Traffic Analysis Zone |
| TDM | Transportation Demand Management |
| TEA | Targeted Ecological Area |
| TFAD | Travel Forecasting and Analysis Division |
| TIP | Transportation Improvement Program |
| TMDL | Total Maximum Daily Loads |
| TNM | Traffic Noise Model |
| TPB | Transportation Planning Board |

00035730

JA1886

Draft Environmental Impact Statement



| | |
|---|---|
| TSM | Transportation System Management |
| TTI | Travel Time Index |
| USACE | United States Army Corps of Engineers |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USDA BARC | United States Department of Agriculture Beltsville Agricultural Research Center |
| USDOT | United States Department of Transportation |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| UST | Underground Storage Tank |
| VAC | Code of Virginia |
| VDACS | Virginia Department of Agriculture and Consumer Services |
| VDCR | Virginia Department of Conservation and Recreation |
| VDCR-DNH | Virginia Department of Conservation and Recreation- National Heritage |
| VDEQ | Virginia Department of Environmental Quality |
| VDGIF | Virginia Department of Game and Inland Fisheries |
| VDH | Virginia Department of Health |
| VDOF | Virginia Department of Forestry |
| VDOT | Virginia Department of Transportation |
| VMRC | Virginia Marine Resources Commission |
| VWPP | Virginia Water Protection Permit |
| VMT | Vehicle Miles Traveled |
| WHS | Wildlife and Heritage Service |
| WMATA | Washington Metropolitan Area Transit Authority |
| $WQ_v$ | Water Quality Volume |

00035731

JA1887

Draft Environmental Impact Statement 

# EXECUTIVE SUMMARY

## Study Overview

### What Is the I-495 & I-270 Managed Lanes Study?

The I-495 & I-270 Managed Lanes Study (Study) is the first element of the broader I-495 & I-270 Public-Private Partnership (P3) Program. This Study is considering alternatives that address roadway congestion within the specific Study scope of 48 miles from I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including improvements to the American Legion Bridge over the Potomac River, to west of MD 5, and along I-270 from I-495 to north of I-370, including the East and West I-270 Spurs. I-495 and I-270 in Maryland are the two most heavily traveled freeways in Maryland, each with an Average Annual Daily Traffic (AADT) volume up to 260,000 vehicles per day in 2018 (MDOT SHA, 2019) (refer to **Figure ES- 1**).

**Figure ES- 1: I-495 & I-270 Managed Lanes Study Corridors**



The Study evaluated rational end points, known as logical termini. The Study extends beyond the logical termini to include the area of influence for traffic and environmental analyses. There are three logical termini for the MLS as follows:

- **Western Terminus**: on I-495, 0.4 miles south of George Washington Memorial Parkway interchange; allows outer loop mainline improvements that are carried to the George Washington Memorial Parkway to be merged and transitioned into the existing mainline lanes without causing congestion due to lane drops and merges. The managed lanes would connect directly into the proposed extension of the Virginia Express Lanes.

- **Southern Terminus**: on I-495, 1.3 miles west of MD 5; allows inner loop mainline improvements that are carried to MD 5, a regional access controlled north-south highway, to be merged into the existing mainline lanes before the express-local system without causing congestion due to lane drops, weaving, and merging.

00035732



Draft Environmental Impact Statement

- **Northern Terminus**: on I-270, 0.6 miles north of I-370; allows northbound mainline improvements that are carried to I-370 to be merged and transitioned into the existing general purpose lanes and the high occupancy vehicle (HOV) lane safely, minimizing congestion due to lane drops and merges. I-370 links to MD 200, a major east-west tolled highway. The HOV lane from 0.6 miles north of I-370 will continue to its current terminus at MD 121 (Clarksburg Road), 8 miles north of I-370.

The traffic modeling and analysis has encompassed the next interchange beyond these three limits as the area of traffic influence. Furthermore, the logical termini for the area of environmental review and analysis area have been extended beyond these intersecting roadways to account for the necessary distance for the mainline improvements to tie into the existing roadway operations.

## Who Is Leading the Study?

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, have prepared a Draft Environmental Impact Statement (DEIS) under the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study.



## What Other Agencies Are Involved in the Study?

FHWA and MDOT SHA have conducted extensive outreach with Federal, state, regional, and local agencies, in addition to interested stakeholders and the general public, throughout the duration of the Study. At the initiation of the Study, an Agency Coordination Plan was developed. The purpose of the Plan was to establish the structure and timing for coordination with the involved agencies during the Study (refer to **Chapter 7** and **Appendix P** of the DEIS for additional details).

Agencies actively involved in the Study include Cooperating and Participating Agencies. Cooperating Agencies are Federal agencies other than a Lead Agency that have jurisdiction by law or special expertise with respect to any environmental resources potentially impacted[1]. Participating Agencies are any Federal, state, tribal, regional, and local agencies that may have an interest in the Study and the environmental review process[2]. At the initiation of the Study, agencies were invited to be Cooperating, Participating, and Notified Agencies[3]. There are eight Cooperating, 18 Participating, and seven Notified Agencies for the Study. Refer to **Chapter 7, Table 7-1** for a complete list of these agencies and their roles.

The Cooperating Agencies for the Study are:

- US Army Corps of Engineers (USACE) Baltimore District
- US Environmental Protection Agency (EPA)
- National Park Service (NPS)
- National Capital Planning Commission (NCPC)

- MD Department of Environment (MDE)
- Maryland Department of Natural Resources (MDNR)
- Virginia DOT (VDOT)
- Maryland-National Capital Park and Planning Commission (M-NCPPC)

---

[1] Cooperating Agency as defined in 40 CFR 1508.5. A State or local agency of similar qualifications or, when the effects are on lands of tribal interest, a Native American tribe may, by agreement with the lead agencies, also become a Cooperating Agency.
[2] Participating Agency as defined in 23 USC 139(d)
[3] Notified Agencies have been defined for this Study to include all other agencies who could have an interest in the Study, or that have a role that is yet to be determined. These agencies would be notified of Study milestones concurrently with the public and those milestone notification points are part of the public involvement plan.

00035733



Draft Environmental Impact Statement

FHWA and MDOT SHA have held Interagency Working Group Meetings, as well as resource specific meetings with the agencies, and will continue to hold meetings with the Cooperating, Participating and other interested agencies to keep them informed and engaged in the environmental review process.

## How Has the Public Been Engaged in the Study?

The public has been engaged at every step of the process, and are a key component of the NEPA process, including the review of this DEIS. To date, MDOT SHA has extensively engaged the public through the following ways, among others:

- Large Public Workshops
  - o Four (4) Scoping Public Workshops
  - o Four (4) Alternatives Public Workshops
  - o Eight (8) Alternatives Retained for Detailed Study Public Workshops
- Community Association Meetings (21)
- Stakeholder/Large Landowner Meetings (85)
- Presentations to regional, state and local elected officials
- Actively maintaining public and elected officials mailing lists
- Program and Study Newsletters (3)
- Public and Elected Official Email Blasts
- Targeted Outreach to Underserved Communities
- Social Media
- Radio
- Regional and local newspapers
- P3 Program webpage (495-270-p3.com/)

## How Has the Covid-19 Pandemic Impacted the Study?

MDOT SHA recognizes the substantial impact of the COVID-19 stay-at-home order on current transportation patterns throughout the region. We understand COVID-19 is impacting all Marylanders today – in how we work, in how we spend our free time, and in how we travel. While MDOT's number one priority is the health and safety of Marylanders, we are continuing with our efforts to ensure transportation improvements are being developed to meet our State's needs not only for today but for the next 20-plus years. We are aware of the reduced traffic on interstates such as I-495 and I-270 due to the COVID-19 stay-at-home order. MDOT SHA also acknowledges the uncertainty surrounding post-shutdown traffic levels and transit use. There is no definitive traffic model to predict how this unprecedented global pandemic will affect long-term future traffic projections and transit use. MDOT SHA is committed to tracking trends in travel behavior and monitoring traffic volumes over time as businesses and schools slowly begin to reopen. We will evaluate and consider all new information that becomes available to ensure the solutions will meet the needs of Marylanders now and in the future.

00035734

JA1890



Draft Environmental Impact Statement

# Draft Environmental Impact Statement

## What Is the Draft Environmental Impact Statement?

The Draft Environmental Impact Statement (DEIS) provides a detailed description of the Study Purpose and Need, reasonable alternatives, the existing environmental conditions, and the analysis of the anticipated beneficial and adverse environmental effects and consequences of the alternatives, and potential mitigation. The DEIS provides a comparative analysis between the No Build Alternative and the Build Alternatives so that interested citizens, elected officials, government agencies, businesses, and other stakeholders can assess the potential social, cultural, and natural environmental effects of the Study. The DEIS is supported by 19 technical reports, which are listed in the adjacent text box and appended to the document.

> **What are the Supporting Technical Reports to the DEIS?**
>
> A. Purpose and Need Statement
> B. Alternatives Technical Report
> C. Traffic Technical Report
> D. Environmental Resource Mapping
> E. Community Effects Assessment/ Environmental Justice Technical Report
> F. Draft Section 4(f) Evaluation
> G. Cultural Resources Technical Report
> H. Draft Section 106 Programmatic Agreement
> I. Air Quality Technical Report
> J. Noise Analysis Technical Report
> K. Hazardous Materials Technical Report
> L. Natural Resources Technical Report
> M. Avoidance, Minimization & Impacts Report (AMR)
> N. Draft Compensatory Mitigation Plan
> O. Indirect and Cumulative Effects Technical Report
> P. Public Involvement & Agency Coordination Technical Report
> Q. Conceptual Mitigation Plan
> R. Joint Permit Application
> S. Environmental Assessment Form

After circulation of the DEIS, a Final Environmental Impact Statement (FEIS) will be developed. The FEIS will identify the Preferred Alternative and focus on any additional analysis and refinements of the data, as well as responding to substantive comments received on the Draft EIS. Upon completion of the EIS process, the Federal Lead Agency issues a Record of Decision (ROD) which identifies the Selected Action as a result of the Study, after considering a reasonable range of alternatives and all practicable means to avoid, minimize, or mitigate environmental harm.

## What Is the Format of the DEIS?

The DEIS provides a summary of the 19 technical reports and contains ten chapters. Detailed documentation of existing conditions, methodologies, assessments of effects, and conceptual mitigation, when applicable, are included in the Study technical reports appended to this DEIS (**Appendices A through S**).

- **Chapter 1** presents the Study's Purpose and Need. This chapter is supported by the *Purpose and Need Statement* (**Appendix A**).

- **Chapter 2** presents the chronology of alternatives development and analysis for the Study. It includes a description of the alternatives considered and screening analysis, including the No Build Alternative. It also describes other common elements of the Build Alternatives such as, limits of disturbance (LOD),[4] managed lanes access, stormwater management, construction and short-term effects, transit

---

[4] The limits of disturbance are the proposed boundary within which all construction, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities would occur.

00035735



Draft Environmental Impact Statement

elements, pedestrian and bicycle considerations, tolling, financial viability, and the benefits of managed lanes. This chapter is supported by the *Alternatives Technical Report* (**Appendix B**).

- **Chapter 3** presents the existing and future traffic conditions and the results from the traffic operational analyses conducted for each of the Build Alternatives. This chapter is supported by the *Traffic Technical Report* (**Appendix C**).

- **Chapter 4** presents the existing environmental conditions (affected environment) identified along the study corridors, the anticipated effects to the resources (environmental consequences), and measures to avoid, minimize, and mitigate potential environmental effects, where applicable. This chapter is supported by **Appendices D through R**.

- **Chapter 5** presents a summary of the *Draft Section 4(f) Evaluation*, which discusses the potential effects to significant public parks, recreational areas, and historic properties in compliance with Section 4(f) of the US Department of Transportation (USDOT) Act of 1966. This chapter is supported by *Draft Section 4(f) Evaluation* (**Appendix F**).

- **Chapter 6** presents the Executive Order 13807: *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*[5] that requires Federal agencies to process environmental reviews and authorization decisions for major infrastructure projects as "One Federal Decision."

- **Chapter 7** presents a summary of the public outreach and agency coordination for the Study that has occurred, to date. This chapter is supported by the *Public Involvement and Agency Coordination Technical Report* (**Appendix P**) and other resource-specific appendices.

- **Chapters 8 and 9** present the List of Preparers of the DEIS and the Distribution List of agencies, organizations, and persons to whom the DEIS was made available for review and comment.

- **Chapter 10** presents the references for the DEIS.

## What Are Some Common Terms Used Throughout the DEIS?

- ***Study corridors***, as defined in the Study scope, includes I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including the American Legion Bridge crossing over the Potomac River, to west of MD 5 in Prince George's County, Maryland; and I-270 from I-495 to I-370 in Montgomery County, including the east and west I-270 spurs north of I-495. (Refer to **Chapter 1** for additional details.)

- ***Corridor study boundary*** was defined as 48 miles long and approximately 300 feet on either side of the centerline of I-495 and I-270. It was used to define the data collection area for gathering information on existing environmental conditions. The corridor study boundary was used in the environmental resource investigations for Natural Resources, summarized in **Sections 4.11 through 4.20 of Chapter 4**, and parks and Section 4(f) Resources summarized in **Section 4.4** and **Chapter 5**.

- ***Limits of Disturbance (LOD)*** were defined for each Build Alternative as the proposed boundary within which all construction, staging, materials storage, grading, clearing, erosion and sediment control,

---

[5] https://www.whitehouse.gov/presidential-actions/presidential-executive-order-establishing-discipline-accountability-environmental-review-permitting-process-infrastructure/

00035736



Draft Environmental Impact Statement

landscaping, drainage, stormwater management (SWM), noise barrier replacement/construction, and related construction activities would occur (refer to **Chapter 2, Section 2.7.4**).

## What Are The Ways to Comment on the DEIS and Draft Section 4(f) Document?

FHWA and MDOT SHA invite interested elected officials, state and local governments, other Federal agencies, Native American tribal governments, organizations, and members of the public to provide comments on the DEIS and Draft Section 4(f) Evaluation. The DEIS for the Study and technical reports can be viewed and downloaded from the project website at: https://495-270-p3.com/DEIS/

The public comment period opens on July 10, 2020 and will continue until October 8, 2020. _Written and oral comments will be given equal consideration_, and FHWA will review all comments, and consider and respond to all substantive comments received or postmarked by that date in the preparation of the FEIS. Comments received or postmarked after that date will be reviewed and considered to the extent practicable. A series of virtual and in-person public hearings will occur at least 30 days after the Notice of Availability.  Refer to https://495-270-p3.com/DEIS/  for the latest information on  the Public Hearings dates and locations.

Comments on the DEIS may be made by:

- Oral testimony at one of the Public Hearings in the main hearing room
- Oral testimony to a court reporter at a Public Hearing in private in a separate room
- DEIS comment form at https://495-270-p3.com/DEIS/
- Email to MLS-NEPA-P3@mdot.maryland.gov
- Written comments on a comment form at a Public Hearing
- Letters to Lisa B. Choplin, DBIA, I-495 & I-270 P3 Program Director,  I-495 & I-270 P3 Office, 707 North Calvert Street, Mail Stop P-601, Baltimore MD 21202

## What Is the Study's Purpose and Need?

The Study Purpose and Need was developed through a comprehensive process that included the examination of past studies, a review of existing regional plans, and an analysis of the environmental and socioeconomic conditions in the region. The full Purpose and Need Statement that was concurred upon by the Cooperating Agencies[6] in November 2018 is included in **Appendix A**.

The Study's purpose is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

The needs for the Study are:
- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices
- Accommodate Homeland Security
- Improve Movement of Goods and Services

---

[6] NCPC concurred on the Purpose and Need only; M-NCPPC did not concur on the Purpose and Need.

00035737



Draft Environmental Impact Statement

Two goals for the Study were identified in addition to the needs: (1) the use of alternative funding approaches for financial viability and (2) environmental responsibility. Refer to **Chapter 1** and **Appendix A** for additional information on the Study's Purpose and Need.

## Alternatives Considered

### What Is the Process to Screen the Alternatives Considered?

The alternatives development and screening can be described through a five-step process that narrows the Preliminary Range of Alternatives under consideration down to the Preferred Alternative (refer to **Figure ES- 2**). The first four steps are presented in this DEIS and the last step will be documented in the FEIS. This process was conducted in collaboration with agency partners and included public review. Through a series of analytical steps, as well as agency and public review, these Preliminary Alternatives were narrowed to the Screened Alternatives and then down to the Alternatives Retained for Detailed Study (ARDS) (refer to **Chapter 2**). Generally, in NEPA, the term ARDS refers to only those alternatives retained for detailed study; however, in this DEIS, additional alternatives were studied in detail and the substantial data analyzed is presented. Those alternatives which were studied in detail met the Purpose and Need and were determined to be reasonable are referred to as the Build Alternatives. As the level of design and analysis detail increased, the number of alternatives being considered decreased.

**Figure ES- 2: Alternatives Screening Process**

| Complete Initial Screening of Alternatives | Additional Alternatives Analysis Resulting from Public and Agency Input | Addition of Alternative 9 Modified | **WE ARE HERE** | |
|---|---|---|---|---|
| **Preliminary Range of Alternatives** | **Screened Alternatives** | **Alternatives Retained for Detailed Study (ARDS)** | **Build Alternatives Evaluated in the DEIS** | **Preferred Alternative Documented in the Final EIS (FEIS)** |
| | Additional Engineering, Environmental, Traffic, and Financial Analysis | | Concurrence on Preferred Alternative Following Evaluation of Public and Agency Comments | |

### What Was the Preliminary Range of Alternatives Considered?

A range of 15 Preliminary Alternatives was identified based on previous, relevant studies and planning documents, and input received during the NEPA scoping process from the public and from Federal, state, and local regulatory agencies. The Preliminary Range of Alternatives included:

- Alternative 1: No Build
- Alternative 2: Transportation Systems Management / Transportation Demand Management (TSM/TDM)
- Alternative 3: Add one General Purpose (GP) Lane
- Alternative 4: Add one HOV lane in each direction on I-495 and retain existing HOV lane in each direction on I-270

00035738



Draft Environmental Impact Statement

- Alternative 5: Add one priced[7] managed lane network in each direction on I-495 and convert one existing HOV lane in each direction to a priced managed lane on I-270
- Alternative 6: Add two GP lanes in each direction on I-495 and I-270
- Alternative 7: Add two HOV lanes in each direction on I-495 and retain one existing HOV lane and add one HOV lane in each direction on I-270
- Alternative 8: Add two priced managed lanes in each direction on I-495 and add one priced managed lane in each direction and retain one existing HOV lane in each direction on I-270
- Alternative 9: Add two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270
- Alternative 10: Add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only
- Alternative 11: Physically separate traffic using C-D lanes, adding two GP lanes in each direction on I-495
- Alternative 12A: Convert existing GP lane on I-495 to contraflow lane during peak periods
- Alternative 12B: Convert existing HOV lane on I-270 to contraflow lane during peak periods
- Alternative 13A: Add two priced managed reversible lanes on I-495
- Alternative 13B: Convert existing HOV lanes to two priced managed reversible lanes on I-270
- Alternative 13C: Add two priced managed reversible lanes and retain one existing HOV lane in each direction on I-270
- Alternative 14A: Heavy Rail[8] transit
- Alternative 14B: Light Rail[9] transit
- Alternative 14C: Fixed guideway Bus Rapid Transit (BRT)[10] off alignment of existing roadway
- Alternative 15: Add one dedicated bus lane on I-495 and I-270

The analysis of the Preliminary Range of Alternatives was completed by applying screening criteria to each alternative related to the Study's Purpose and Need, refer to **Chapter 2, Section 2.5**. A qualitative assessment of these criteria was made using readily available information (data available from existing sources). An alternative was dropped from further consideration at this stage in the process only if the available information demonstrated it clearly did not meet the Study's Purpose and Need. Screened Alternatives were identified as those that met the screening criteria or required additional analysis to determine their ability to meet the Purpose and Need. The initial screening of alternatives was documented in the *Alternatives Technical Report* (**Appendix B**). Refer to **Chapter 2, Section 2.4** for additional details on the Preliminary Alternatives.

## What Were the Screened Alternatives Considered?

The Screened Alternatives were presented to the public through the program website via written documentation and a video in February 2019 and included:

---

[7] Based on public and agency input, MDOT SHA defined priced managed lanes as High-Occupancy Toll (HOT) lanes or Express Toll Lanes (ETL) and the descriptions of the alternatives were modified accordingly.

[8] Heavy Rail is a mode of transit service (also called metro, subway, rapid transit, or rapid rail) operating on an electric railway with the capacity for a heavy volume of traffic. It is characterized by high speed and rapid acceleration passenger rail cars operating singly or in multi-car trains on fixed rails.

[9] Light Rail is a mode of transit service (also called streetcar, tramway, or trolley) operating passenger rail cars singly (or in short trains) on fixed rails. Light rail vehicles are typically driven electrically with power being drawn from an overhead electric line via a trolley or a pantograph and driven by an operator on board the vehicle.

[10] Bus Rapid Transit is a high-quality bus-based transit system that delivers fast and efficient service that may include dedicated lanes, busways, traffic signal priority, off-board fare collection, elevated platforms, and enhanced stations.

00035739



Draft Environmental Impact Statement

- Alternative 1: No Build – Though this alternative does not meet the Study's Purpose and Need, consistent with NEPA requirements, it was carried forward for further evaluation to serve as a base case for comparing the other alternatives
- Alternative 5: One HOT Managed Lane Network
- Alternative 8: Two ETL Managed Lanes Network on I-495 and one ETL and one HOV Lane Network on I-270
- Alternative 9: Two HOT Managed Lanes Network
- Alternative 10: Two ETL Managed Lanes Network on I-495 and I-270 and Retain one HOV Lane on I-270 only
- Alternative 13B: Two HOT Managed Lanes Network on I-495 and two Reversible HOT Managed Lanes Network on I-270
- Alternative 13C: Two ETL Managed Lanes Network on I-495 and two Reversible ETL Managed Lanes Network on I-270, and retain one HOV Lane on I-270 only

Additional engineering, traffic, financial, and environmental analyses were completed, and used to determine the reasonableness of the Screened Alternatives to be carried forward as the ARDS. The Recommended Alternatives Retained for Detailed Study (ARDS) included all of the Screened Alternatives and they were presented at the Spring 2019 Public Workshops. Following these workshops, the Recommended ARDS were further analyzed, and Alternative 5 was dropped from further consideration.

## Why Was Alternative 5 Dropped from Further Consideration?

Alternative 5 was identified as a Screened Alternative and considered adding one priced managed lane in each direction on I-495 and converting one existing HOV lane in each direction to a priced managed lane on I-270. In response to agency comments and public input, MDOT SHA and FHWA further assessed the detailed analysis of Alternative 5 and found it would perform the worst of the Screened Alternatives for most metrics used to evaluate existing traffic and long-term traffic growth and trip reliability and would perform the worst amongst the Screened Alternatives in system-wide delay, corridor travel time, density/level of service[11], and travel time (general purpose lanes). In addition, Alternative 5 failed to meet the goal of financial viability, as it would require a significant public subsidy to deliver. Based on the financial analysis results and the deficiencies in addressing the existing traffic and long-term traffic growth and trip reliability, FHWA and MDOT SHA determined that Alternative 5 was not a reasonable alternative as it did not meet the Study's Purpose and Need, and it was not carried forward as an ARDS for the Study. However, to facilitate Cooperating Agencies' decisions for their actions and to be transparent, Alternative 5 is included in the comparison of impacts in **Chapters 3** and **4** of this DEIS. The results of the screening of alternatives and the rationale for the identification of the ARDS are summarized in **Chapter 2, Sections 2.5** and **2.6** and documented in the *Alternatives Technical Report* (**Appendix B**).

## What Other Alternatives Have Been Considered?

### MD 200 Diversion Alternative

Following the Spring 2019 Public Workshops and agency meetings, several Cooperating and Participating Agencies requested that MDOT SHA evaluate an alternative (the MD 200 Diversion Alternative) that would provide an alternative route for travelers to use MD 200 (Intercounty Connector) instead of the top side of I-495 between I-270 and I-95 to avoid or reduce impacts to significant, regulated resources and residential relocations.

---

[11] Level of Service (LOS) is a letter grade assigned to a section of roadway that measures the quality of traffic flow, ranging from LOS A to LOS F.

00035740



Draft Environmental Impact Statement

In the near term, the premise of this alternative has merit due to the currently available capacity on MD 200, a Maryland Transportation Authority (MDTA) facility. As such, MDOT SHA is working with MDTA to encourage through traffic from points north on I-95 that is destined for the American Legion Bridge or beyond (and the reverse movement) to utilize MD 200 to take advantage of the near-term spare capacity and potentially provide some relief to the top side of I-495. In an attempt to divert some of this traffic, MDOT SHA has proposed to MDTA to provide travel times for I-495 and MD 200 through the use of the existing dynamic messaging signs. If the travel times show the trip is shorter on MD 200 and the toll is amenable to travelers, then they may choose to divert to MD 200.

However, in addressing the Study's Purpose and Need, the MD 200 Diversion Alternative must also accommodate *long-term* traffic growth, enhance trip reliability, and improve the movement of goods and services. In the design year of 2040, the traffic analysis results indicated that the MD 200 Diversion Alternative would perform worse than most of the Screened Alternatives in many metrics used to evaluate the reasonableness of the alternatives. The MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. A summary of the MD 200 Diversion Alternative analysis is included in **Chapter 2, Section 2.5.3.b** and documented in the *Alternatives Technical Report* (**Appendix B**).

### Alternative 9 Modified (9M)

MDOT SHA and FHWA evaluated an additional alternative after the ARDS were identified called Alternative 9 Modified (Alternative 9M) in response to public and agency comments on the ARDS. Alternative 9M would consist of a blend of Alternative 5 and Alternative 9 in an effort to avoid or reduce impacts to sensitive environmental resources and property relocations on the top side of I-495 (I-270 West Spur and I-95). The analysis was completed to determine if this alternative, which includes a reduction of lanes on the top side of I-495, would sufficiently meet the Study's Purpose and Need. Overall, Alternative 9M would be a blend of these two Screened Alternatives with the primary difference on the top side of I-495 between I-270 West Spur and I-95 being the addition of one HOT lane instead of two HOT lanes in each direction.

Alternative 9M was evaluated to the same level of detail as the Screened Alternatives and was found to meet the Study's Purpose and Need, and therefore is included as a reasonable alternative in this DEIS. A summary of the Alternative 9 Modified analysis is included in **Chapter 2, Section 2.6.4** and is documented in Appendix B of the *Alternatives Technical Report* (**Appendix B**).

## What Are the Alternatives Retained and Analyzed in the DEIS?

Preliminary engineering along with additional traffic, financial, and environmental analyses were considered to determine the reasonableness of the Screened Alternatives to be carried forward as the ARDS. This DEIS presents the additional analysis and comparison of impacts between the ARDS, hereinafter referred to as the **Build Alternatives**, and the No Build Alternative. The alternatives retained and analyzed in the DEIS are summarized in **Table ES- 1**. Refer to **Chapter 2** for additional discussion on the development of the alternatives for this Study.

00035741

JA1897



Draft Environmental Impact Statement

#### Table ES- 1: Alternatives Retained and Analyzed in the DEIS

| Alternative | Description |
|---|---|
| **Alternative 1** | No Build |
| **Alternative 8** | 2-Lane, ETL Managed Lanes Network on I-495 and 1-ETL and 1-Lane HOV Managed Lane on I-270 |
| **Alternative 9** | 2-Lane, HOT Managed Lanes Network on both I-495 & I-270 |
| **Alternative 9 Modified (9M)** | 2-Lane, HOT Managed Lanes Network on west and east side of I-495 and on I-270; 1-Lane HOT Managed Lane on top side of I-495 |
| **Alternative 10** | 2-Lane, ETL Managed Lanes Network on I-495 & I-270 plus 1-Lane HOV Managed Lane on I-270 only |
| **Alternative 13B** | 2-Lane, HOT Managed Lanes Network on I-495; HOT Managed, Reversible Lane Network on I-270 |
| **Alternative 13C** | 2-Lane, ETL Managed Lanes Network on I-495, ETL Managed, Reversible Lane Network and 1-Lane HOV Managed Lane on I-270 |

The No Build Alternative does not meet the Study's Purpose and Need but was retained for comparison with the other alternatives. The results of the screening of alternatives and the rationale for the identification of the alternatives retained and analyzed in the DEIS are summarized in **Chapter 2, Section 2.5** and documented in the *Alternatives Technical Report* (**Appendix B**).

### What Transit Components Are Included in the Build Alternatives?

While standalone transit alternatives were found to not meet the Study's Purpose and Need, each Build Alternative includes the following transit elements consistent with the project purpose of enhancing existing and planned multimodal mobility and connectivity:

- Allowing free bus usage in the managed lanes to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to activity and economic centers.

- Accommodating direct and indirect connections to existing transit stations and planned Transit-Oriented Development at the Silver Spring Metro/MARC (US 29), Shady Grove Metro (I-370), Twinbrook Metro (Wootton Parkway), Montgomery Mall Transit Center (Westlake Terrace), Medical Center Metro (MD 187 and MD 185), Kensington MARC (MD 185), Greenbelt Metro/MARC (Cherrywood Lane), New Carrollton Metro/MARC/Amtrak (US 50), Largo Town Center Metro (MD 202 and MD 214), and Branch Avenue Metro (MD 5).

These elements are also being considered by the *Transit Work Group*, which includes representatives from the transit and planning jurisdictions who were both directly and indirectly affected by the P3 Program, including Montgomery, Prince George's, Frederick, Howard, Anne Arundel and Charles counties, as well as MDOT MTA commuter bus, MARC and WMATA, MDOT Secretary's Office of Planning and Capital Programming, MDOT SHA, FHWA, Federal Transit Administration (FTA), and the MWCOG. Initiated in May 2019, the Transit Work Group met eight times to provide input on existing transit services and help identify feasible opportunities for transit to use the managed lanes (refer to **Chapter 2, Section 2.7.6**).

The *Transit Service Coordination Report* was made available to the public in June 2020 on the P3 Program website (https://495-270-p3.com/transit-benefits/) and it is being used to inform affected counties and transit providers about the significant transit opportunities offered by managed lanes such as strategies to maximize the benefits of reliability and speed; provide a basis for the evaluation and prioritization of

00035742



future capital and operating needs in the service area; and initiate discussions about ways to incorporate regional transit services into the P3 Program.

### Is the Replacement of the American Legion Bridge Part of the Managed Lanes Study?

Yes, all Build Alternatives include the full replacement of the American Legion Bridge with a new, wider bridge (not widening of the existing bridge). The existing bridge is nearly 60 years old and would need to be replaced sometime over the next few decades regardless of this Study. The new bridge would be constructed in phases to maintain the same number of existing lanes at all times, and therefore the new bridge will be replaced in the same existing location.

### How Have Public Comments on the Alternatives Been Considered?

To date, the public and stakeholders have been encouraged to provide comments on the scope of the Study, the Purpose and Need, range of alternatives, initial screening of alternatives, environmental and property avoidance and minimization measures, and potential mitigation measures. Through the public engagement process, MDOT SHA has taken a hard look at comments received and incorporated certain elements into the Study including, but not limited to: removing the existing Collector-Distributor lanes on I-270 to minimize right-of-way needs along I-270; committing to a pedestrian path along a new American Legion Bridge; eliminating or providing certain managed lanes direct access locations; avoiding relocation of the Rock Creek to significantly minimize impacts to this significant resource; committing to replacing all existing noise barriers; and incorporating certain transit elements while continuing to coordinate with local transit providers for additional opportunities to accommodate existing and planned multimodal connectivity and mobility. To address comments received from the public and agencies on the Recommended Alternatives Retained for Detailed Study (ARDS) and to avoid or minimize environmental and community impacts along the top side of I-495, MDOT SHA analyzed additional alternatives including MD 200 (ICC) Diversion Alternative and Alternative 9 Modified. The results of these analyses can be found in **Chapters 2, 3 and 4** as well as the *Draft Section 4(f) Evaluation* in **Appendix F**.

## Tolling

### Why Do the New Lanes Need to Be Tolled and Why Does the State Need a Developer to Build Them?

The State of Maryland does not have the funds to construct improvements of this magnitude with an estimated cost of approximately $8 to 10 Billion. Additionally, even with the tolls to pay back loans, the State does not have enough bonding capacity to take out loans to pay for the improvements. Therefore, the State will select a Developer through a competitive process and will enter into a P3 agreement whereby the Developer would design, build, finance, operate, and maintain the managed lanes for a period of time using the toll revenue. MDOT SHA would continue to own all of the lanes on I-495 and I-270 and ensure the highway meets their intended transportation function.

### How Will the Managed Toll Lanes Work?

All of the Build Alternatives would include dynamic tolling for the managed lanes (HOT or ETL) for the full length of the Study. The toll rates would be adjusted dynamically within the approved toll rate range and could change in response to real-time variations in traffic conditions every five to 15 minutes. The tolls would be collected electronically at highway speeds, with no toll plazas, no toll booths, and no cash payments. Through this approach, traffic flow would be managed, congestion would be reduced, and a minimum average operating speed of 45 mph would be maintained in the managed lanes.

00035743



Draft Environmental Impact Statement

### How Will the Toll Rates Be Set?

The toll rate ranges will be set following the process outlined in the Code of Maryland Regulations (COMAR) 11.07.05 – Public Notice of Toll Schedule Revisions, including public input. In general, a recommended range of toll rates will be developed to manage the traffic and ensure the facilities can meet the necessary traffic performance requirements. The toll rate range would include an upper limit on the toll rate per mile.  The recommended toll rate range will be presented to the MDTA Board Members for review. Public hearings and a minimum 60-day public comment period will be held so the public has the opportunity to provide comments on the toll rate range. The public comments will be summarized for the MDTA Board Members (including proposed revisions, if necessary) and the Board will vote on the toll rate range. Once the managed lanes are opened, the toll rates will be adjusted dynamically within the approved MDTA toll rate range to ensure the traffic and lane performance requirements are achieved.

### What Could the Toll Rates Be?

The planning study and the DEIS do not recommend the final proposed toll rate ranges for the managed lanes; however, potential toll rates were estimated to meet the goals of the Study (manage traffic demand and congestion on the I-270 and I-495, and ensure 45 mph in managed lanes), and to determine if the Build Alternatives would be financially viable. Therefore, for planning purposes only, the estimated opening year (2025) average weekday toll rates per mile (in 2020 $) for all time periods for passenger cars using an E-ZPass transponder were: $0.70/mile for Alternative 8; $0.69/mile for Alternative 9; $0.77 for Alternative 9M; $0.68/mile for Alternative 10; $0.73/mile for Alternative 13B; and $0.71/mile for Alternative 13C. Ultimately, the toll rate ranges will be set by the MDTA Board after public review and comment. It is not anticipated that the environmental and community impacts described in this DEIS would be substantially different once a final toll rate range is approved because the modeling process for estimating potential planning-level toll rates is similar to the modeling process to support analysis of toll rate ranges that will be presented to MDTA for consideration by the Board.

## Transportation and Traffic

### What Is a Managed Lane?

Highway facilities that use strategies, such as lane-use restrictions or congestion pricing, to optimize the number of vehicles that can travel the highway to maintain free-flowing speeds. Managed lanes are designed to operate at an acceptable level of service even when the adjacent general purpose lanes are congested. Because they are managed to control the number of vehicles using the lane to keep them flowing, managed lanes provide users with a more reliable option to reach their destination(s). Managed Lanes may include, but are not limited to: HOV lanes, HOT Lanes, ETLs, and bus-only lanes.

### What Traffic Analysis Was Performed for the Study?

Detailed traffic operational analyses were performed for each of the Build Alternatives to evaluate their ability to meet the Study's Purpose and Need in the design year of 2040. The evaluation methodology included a three-step process. First, a regional forecasting model was developed for each of the Build Alternatives using the Metropolitan Washington Council of Governments Travel Demand Model (Metropolitan Washington Council of Governments (MWCOG) model), which is the model typically used by MDOT SHA and other transportation agencies to evaluate projects in the Washington, DC Metropolitan Area. MWCOG model Version 2.3.71 was used, which was the latest model version available when the analysis was initiated. Next, the outputs from the MWCOG model were used to develop balanced traffic volume projections for the design year of 2040 for each roadway segment and ramp movement within the Study limits for each Build Alternative during the peak periods. Finally, traffic simulation models for

00035744



Draft Environmental Impact Statement

each of the Build Alternatives were developed using VISSIM software to determine the projected operational performance of several key metrics during the AM peak period (6:00 AM to 10:00 AM) and the PM peak period (3:00 PM to 7:00 PM).

## What Are the Results of the Traffic Operational Analyses?

The design year 2040 traffic operational evaluation for each Alternative are summarized below and presented in **Chapter 3** of this DEIS.

- **Alternative 1 (No Build)** would not address any of the operational issues experienced under existing conditions, and it would not be able to accommodate long-term traffic growth, resulting in slow travel speeds, delays, long travel times, and an unreliable network.

- **Alternative 5** was determined to not be a reasonable alternative, as it does not meet the Study's Purpose and Need due to deficiencies in addressing the existing traffic and long-term traffic growth and trip reliability. However, the results for Alternative 5 have been included in this DEIS for comparison purposes only. Refer to the *Alternatives Technical Report* (**Appendix B**) for more information.

- **Alternative 8**, **Alternative 13B**, and **Alternative 13C** would all outperform the No Build Alternative in every metric. However, these alternatives would not rank first in any of the operational metrics studied and would therefore only be expected to provide moderate benefits.

- **Alternative 9M** was not originally included as a Build Alternative, but it has been evaluated to the same level of detail. This alternative was studied as a blend of Alternative 5 and Alternative 9. Refer to **Chapter 2, Section 2.6.4** and the *Alternatives Technical Report* (**Appendix B**) for more information. Alternative 9M would outperform Alternative 1 in every metric, but it would not rank first in any of the operational metrics studied, similar to Alternative 8, Alternative 13B, and Alternative 13C.

- **Alternative 9** and **Alternative 10** would consistently perform well in all the operational metrics studied, and each alternative ranked first in three of the six key metrics. Alternative 9 would perform the best in terms of average speed, LOS, and effect on the local network. Alternative 10 would perform the best in terms of delay, travel time index, and throughput. These two alternatives would be expected to provide the best operational benefits to the I-495 and I-270 Managed Lanes Study area and the surrounding transportation network. Refer to **Chapter 3** and **Appendix C** for detailed information.

# Environmental Resources, Consequences and Mitigation

## What Environmental Resources Were Considered in the Analysis Documented in the DEIS and Supporting Technical Reports?

**Chapter 4** of the DEIS presents the existing environmental conditions (affected environment) identified along the study corridors, the anticipated effects to the resources (environmental consequences), and measures to avoid, minimize, and mitigate unavoidable effects to those resources. Additional opportunities to avoid and minimize effects will be considered and documented in the FEIS. The environmental resources and topics analyzed were:

00035745

JA1901



Draft Environmental Impact Statement

1. Land Use and Zoning
2. Demographics
3. Communities and Community Facilities
4. Parks and Recreational Facilities
5. Property Acquisitions and Relocations
6. Visual and Aesthetic Resources
7. Historic Architectural and Archeological Resources
8. Air Quality
9. Noise
10. Hazardous Materials
11. Topography, Geology and Soils
12. Waters of the US and Waters of the State, including Wetlands
13. Watersheds and Surface Water Quality
14. Groundwater Hydrology
15. Floodplains
16. Vegetation and Terrestrial Habitat
17. Terrestrial Wildlife
18. Aquatic Biota
19. Rare, Threatened and Endangered Species
20. Unique and Sensitive Areas
21. Environmental Justice and Title VI Compliance
22. Indirect and Cumulative Effects
23. Consequences of Construction
24. Commitment of Resources

## What Are the Effects of the Build Alternatives on the Environmental Resources?

The environmental consequences presented in **Chapter 4** are described for the No Build and Build Alternatives. Because the Build Alternatives would either expand and/or reconfigure existing highways, in a constrained built environment, and because the engineering requirements are similar between all Build Alternatives, the total scope of impacts is anticipated to be very similar. At this stage of design, quantified impacts presented are assumed to be permanent or long-term effects in the DEIS (refer to **Tables ES-2 and 4-1**). As design is advanced on a Preferred Alternative, the long-term effects will be refined, and the specific short-term, construction-related effects will be segregated and quantified and documented in the FEIS. The anticipated construction effects are discussed qualitatively throughout **Chapter 4** and in **Chapter 2, Section 2.7.3**. The summary of environmental effects comparison between the No Build and Build Alternatives is presented in **Table ES-2.**

## What Avoidance and Minimization Opportunities Have Been Considered for Effects to Environmental Resources?

At this stage in the NEPA Study, avoidance and minimization opportunities to parklands, wetlands, wetland buffers, waterways, forests, and the Federal Emergency Management Agency's 100-year floodplain have been identified and coordinated with the regulatory and resource agencies. Impacts were avoided and minimized to the greatest extent practicable in all areas at this preliminary stage of the Study, and avoidance and minimization techniques were specifically refined in some areas of sensitive or recreationally valuable resources. Refer to **Chapter 4,** *Draft Section 4(f) Evaluation* (**Appendix F**), and *Avoidance, Minimization & Impacts Report* (**Appendix M**) for additional details. The effort to avoid, minimize and mitigate unavoidable impacts will continue through ongoing and future coordination with the applicable regulatory and resource agencies.

## What Mitigation Is Being Considered for Unavoidable Environmental Effects?

Mitigation for unavoidable effects to environmental resources were considered based on the effects of the Build Alternatives. The proposed conceptual mitigation is discussed by applicable resource in **Chapter 4** and further detailed in the *Conceptual Mitigation Plan* (**Appendix Q**) for the following resources: wetlands; forests; rare, threatened, and endangered species; parkland; cultural resources; noise; air; properties; hazardous materials; topography, geology, soils; groundwater; environmental justice; visual

00035746

JA1902



Draft Environmental Impact Statement

aesthetic; aquatic biota; and unique and sensitive areas. Further mitigation measures will be identified and refined as the Study progresses and in consideration of public, stakeholder, and agency comment.

## What Is Section 4(f)?

Section 4(f) of the USDOT Act of 1966, as amended (49 U.S.C. 303(c)) stipulates that the USDOT, including the FHWA, cannot approve the use of land from a publicly-owned park, recreation area, wildlife or waterfowl refuge, or public or private historic site unless the following conditions apply:

- FHWA determines that there is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR §774.3(a)(1) and (2)); or
- FHWA determines that the use of the Section 4(f) properties, including any measures to minimize harm committed to by the applicant, will have a *de minimis* impact on the property (23 CFR §774.3(b)).

## What Are the Section 4(f) Impacts?

A "use" of (or impact to) Section 4(f) property occurs:

(i)    When land is **permanently incorporated** into a transportation facility;
(ii)   When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in 23 CFR §774.13(d); or
(iii)  When there is a **constructive use** of a Section 4(f) property as determined by the criteria in 23 CFR §774.15.

A total of 111 Section 4(f) properties were identified within the corridor study boundary including public parks and recreation areas and historic sites. Of the 111 Section 4(f) properties, 68 would have a Section 4(f) use (impact) and 43 would be avoided. Of the 68 Section 4(f) properties that have a use, 36 would result in minor Section 4(f) use, 22 require an evaluation of avoidance alternatives and analysis of least overall harm, and four properties meet the exception criteria. Refer to **Chapter 5, Section 5.5** and **Appendix F** for additional details on the *Draft Section 4(f) Evaluation*.

00035747

JA1903

Draft Environmental Impact Statement

00035748



## Table ES- 2: Summary of Effects Comparison of the Alternatives[1]

| | Resource | Alt 1 No Build | Alt 5[2] | Alt 8 | Alt 9 | Alt 9M | Alt 10 | Alt 13B | Alt 13C |
|---|---|---|---|---|---|---|---|---|---|
| Environmental | Total Potential Impacts to Section 4(f) Properties including park and historic properties (acres) | 0 | 141.7 | 146.8 | 146.8 | 144.7 | 149.0 | 145.5 | 146.7 |
| | Number of Historic Properties with Adverse Effect[3] [Adverse effect cannot be determined][4] | 0 | 13 [7] | 13[7] | 13[7] | 13[7] | 13[7] | 13[7] | 13[7] |
| | 100-Year Floodplain (acres) | 0 | 114.3 | 119.5 | 119.5 | 116.5 | 120.0 | 119.5 | 119.9 |
| | Unique and Sensitive Areas (acres) | 0 | 395.3 | 408.2 | 408.2 | 401.8 | 410.8 | 406.7 | 408.6 |
| | Sensitive Species Project Review Area (acres) | 0 | 151.7 | 155.0 | 155.0 | 153.7 | 155.0 | 155.0 | 155.0 |
| | Forest canopy (acres) | 0 | 1,434 | 1,497 | 1,497 | 1,477 | 1,515 | 1,489 | 1,503 |
| | Wetlands of Special State Concern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Wetlands, Field-Reviewed (acres) | 0 | 15.4 | 16.3 | 16.3 | 16.1 | 16.5 | 16.3 | 16.1 |
| | Wetlands 25-foot buffer (acres) | 0 | 51.2 | 53.1 | 53.1 | 52.7 | 53.6 | 53.1 | 53.5 |
| | Waters of the US (linear feet) | 0 | 153,702 | 155,922 | 155,922 | 155,229 | 156,948 | 155,822 | 156,632 |
| | Tier II Catchments (acres) | 0 | 55.2 | 55.3 | 55.3 | 55.3 | 55.3 | 55.3 | 55.3 |
| | Noise Receptors Impacted[5] | 0 | 3,661 | 4,470 | 4,470 | 4,249 | 4,581 | 4,411 | 4,461 |
| Traffic | System-wide Delay Savings vs. No Build (AM/PM)[6] | 0 | 20%/22% | 23%/33% | 34%/33% | 30%/30% | 35%/34% | 27%/22% | 26%/34% |
| Engineering | Total Right-of-way Required[7] (acres) | 0 | 284.9 | 323.5 | 323.5 | 313.4 | 337.3 | 318.9 | 329.3 |
| | Number of Properties Directly Affected | 0 | 1,240 | 1,475 | 1,475 | 1,392 | 1,518 | 1,447 | 1,479 |
| | Number of Residential Relocations | 0 | 25 | 34 | 34 | 25 | 34 | 34 | 34 |
| | Number of Business Relocations | 0 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | Width of Pavement on I-495 (feet) | 138–146 | 170–174 | 194–198 | 194–198 | 170–198 | 194–198 | 194–198 | 194–198 |
| | Width of Pavement on I-270 (feet) | 228–256 | 194–198 | 218–222 | 218–222 | 218–222 | 242–248 | 202–206 | 226–230 |
| | Capital Cost Range [Construction & ROW] (billions) | N/A | $7.8–$8.5 | $8.7 – $9.6 | $8.7 – $9.6 | $8.5–$9.4 | $9.0 – $10.0 | $8.7 – $9.6 | $8.8 - $9.7 |

Notes: [1] Preliminary impacts represented in this table assume total impacts; permanent and temporary impacts will be distinguished in the FEIS.

[2] MDOT SHA and FHWA determined Alternative 5 is not a reasonable alternative, but it is included in the DEIS for comparison purposes only.

[3] Refer to Chapter 4, Section 4.7 and Appendix G, Volume 1 for additional details on the effects to historic properties.

[4] Based on current design information, effects cannot be fully determined on the 7 historic properties. MDOT SHA will evaluate these properties further as design advances.

[5] Noise receptors are noise-sensitive land uses which include residences, schools, places of worship, and parks, among other uses. Note that these numbers include receptors that do not have an existing noise wall as well as receptors that have an existing noise wall which is expected to be replaced

[6] Previous versions of this table used a similar metric of Annual Average Hours of Savings per Commuter. System-Wide Delay Savings better reflects benefits to all road users.]

[7] The right-of-way is based on State records research and filled in with county right-of-way, as necessary. With the Section 4(f) properties, some boundaries vary based on the presence of easements and differences in the size and location of historic and park boundaries.

## What Permits, Approvals and Authorizations Will Likely Be Required?

In addition to NEPA compliance, many permits, approvals and authorizations are being coordinated concurrently with the NEPA process or would be obtained prior to construction of any improvements. **Table ES- 3** summarizes the Federal, state, and local permits, authorizations and approvals that will likely be required based on the current Study design assumptions and associated impacts. Refer to **Chapter 6, Section 6.5**.

### Table ES- 3: Likely Permits and Approvals

| | Permit/ Approval | Responsible/Permitting Agency |
|---|---|---|
| **Concurrent with NEPA or within 90 days from the Record of Decision** | National Environmental Policy Act (NEPA) Approval – Record of Decision[1] | Federal Highway Administration |
| | Section 4(f) Approval | Federal Highway Administration |
| | Endangered Species Act Consultation | US Fish and Wildlife Service / NOAA-NMFS |
| | Section 106 Programmatic Agreement | Federal Highway Administration |
| | Clean Water Act Section 404 and Section 10 | US Army Corps of Engineers |
| | Maryland/Virginia State Waters (Section 401) | US Army Corps of Engineers / Maryland Department of Environment / Virginia Department of Environmental Quality |
| | Maryland Nontidal Wetlands and Waterways Permit | Maryland Department of Environment |
| | Virginia Wetland Protection Permit | Virginia Department of Environmental Quality |
| **Prior to Construction** | Special Use Permit - Construction in VA and MD | National Park Service |
| | Capper-Cramton Park Permits | National Capital Planning Commission |
| | Park Construction Permit - M-NCPPC | Maryland National Capital Park and Planning Commission |
| | Maryland Reforestation Law Approval | Maryland Department of Natural Resources |
| | State and County Forest Conservation Easement Revision Approvals | Maryland Department of Natural Resources / Maryland National Capital Park and Planning Commission |
| | General Permit for Stormwater Associated with Construction Activity - MD | US Environmental Protection Agency / Maryland Department of the Environment |
| | General Permit for Stormwater Associated with Construction Activity - VA | US Environmental Protection Agency / Virginia Department of Environmental Quality |
| | Stormwater Management/Erosion and Sediment Control | Maryland Department of Transportation - State Highway Administration Plan Review Division / Maryland Department of the Environment |
| | Stormwater Management/Erosion and Sediment Control | US Environmental Protection Agency / Maryland Department of the Environment / Virginia Department of Environmental Quality |
| | Clean Water Act Section 402 (MS4) | Maryland Department of the Environment |
| | Water Appropriation and Use Permit | Maryland Department of the Environment |

Note: [1]The lead agency is responsible for preparing and publishing a single ROD for all Federal agencies with authorization responsibility for the project to support any necessary authorization decisions. The ROD will incorporate the decisions of each such agency, unless an exception to a single ROD is met as set forth in Section XIII or where Federal law provides for the lead agency to issue a combined FEIS/ROD. Memorandum of Understanding Implementing One Federal Decision Under Executive Order 13807, https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf

Draft Environmental Impact Statement

## What is the One Federal Decision Executive Order?

The I-495 & I-270 Managed Lanes Study is following the "One Federal Decision" *Executive Order 13807: Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects*[12] requires Federal agencies to process environmental reviews and authorization decisions for major infrastructure projects as "One Federal Decision (OFD)." The Executive Order 13807 (EO) sets a goal of reducing the average time to complete environmental reviews under the National Environmental Policy Act and authorization decisions for major infrastructure projects to two years from the publication of the Notice of Intent (NOI). The EO also directs that, except under certain circumstances,[13] the Federal lead agency and all Cooperating and Participating Agencies shall "record any individual agency decision in one Record of Decision (ROD)" and prepare a single Environmental Impact Statement (EIS). Provided the EIS includes adequate detail to inform the agency decisions, the EO requires obtaining permits and approvals within 90 days of the issuance of the ROD[14]. The EO also requires major infrastructure projects to be managed under a single permitting timetable covering environmental review and authorizations.

## What Are the Next Steps for the Study?

This DEIS has been signed by FHWA and MDOT SHA and distributed to Federal, state, and local agencies, as well as organizations and other interested parties and is available for public review. There will be Public Hearings held during a 90-day review period for the DEIS; the comment deadline is October 8, 2020. During this 90-day review period, the DEIS is available in public locations throughout the study corridors and on the project website https://495-270-p3.com/DEIS/. Comments on the DEIS are considered equally regardless of whether received orally or in writing and may be made by:

- Oral testimony at one of the public hearings in the main hearing room
- Oral testimony to a verbatim recorder at a public hearing in private in a separate room
- Written comments on a comment form at a public hearing
- Letters to Lisa B. Choplin, DBIA, I-495 & I-270 P3 Program Director, I-495 & I-270 P3 Office, 707 North Calvert Street, Mail Stop P-601, Baltimore MD 21202
- DEIS comment form at https://495-270-p3.com/DEIS/
- Email to MLS-NEPA-P3@mdot.maryland .gov

Following the 90-day review period, the MDOT SHA and FHWA will review all comments and respond to all substantive comments received or postmarked by the end of the comment period in the preparation of the FEIS. Comments received or postmarked after that date will be reviewed and considered to the extent practicable. In addition to the disposition of all substantive comments, the FEIS will summarize

---

[12] Exec. Order No. 13807, 82 Fed. Reg. 40463 (August 15, 2017), https://www.whitehouse.gov/presidential-actions/presidential-executive-order-establishing-discipline-accountability-environmental-review-permitting-process-infrastructure/

[13] The EO provides that a single ROD shall be issued, "unless the project sponsor requests that agencies issue separate NEPA documents, the NEPA obligations of a cooperating or participating agency have already been satisfied, or the lead Federal agency determines that a single ROD would not best promote completion of the project's environmental review and authorization process."

[14] The lead Federal Agency may extend the 90-day deadline if it determines Federal law prohibits the agency from issuing its approval within 90 days or an extension would better promote completion of the project's environmental review and authorization process or the project sponsors requests a different timeline. Exec. Order No. 13807, 82 Fed. Reg. 40463 (August 15, 2017). https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf

00035750

additional and updated information not refined or quantified in the DEIS, identification of the Preferred Alternative and factors that support the selection, and commitments and mitigation measures to be carried forth during final design and construction.

## Public-Private Partnership (P3) Program

### What Is a P3?

A Public-Private Partnership (P3) is an alternative model for delivery of a capital project. A P3 is a partnership between the public or governmental sector with private entities. The P3 seeks to harness private sector expertise, innovation and funding in order to deliver public infrastructure for the benefit of the public owner and users of the infrastructure. P3s seek to successfully leverage the respective strengths of the public and private sectors to deliver large, complex infrastructure projects in a cost effective and timely fashion. Functions under a P3 agreement may include designing, building, financing, operating, and maintaining a transportation facility.

### Why Is a P3 Being Considered for This Study?

There are several reasons for utilizing a P3:

- Private Financing Results in Faster Construction: P3 projects can move forward when the state does not have available funding because the private sector finances the improvements based on future funding or revenue. It would take more than 25 years to fund I-495 & I-270 P3 Program congestion relief improvements relying on state funds and would use all of MDOT's capital expansion budget for this one project.

- Transfer of Risks: The state and the private sector share the risks based on who can best manage each risk to provide the best value to the state.

- Operations and Maintenance: The state can benefit from having the private sector operate the highway and maintain it (for example, pavement repairs, grass mowing) at a more economical cost. Without the P3 Program, it is estimated that MDOT would need to invest $1.7 billion in bridge replacement/rehabilitation and pavement rehabilitation over the next decade simply to just maintain the existing roadways on I-495 and I-270 in Montgomery and Prince George's Counties in a state of good repair, with no congestion relief.

- Limited Government Funding: Projects that include a future revenue source may be constructed with limited or no governmental funding upfront. In fact, the I-495 & I-270 P3 Program has a goal to implement the Program at no net cost to the state.

### How Would the Project Be Constructed?

The focus of this DEIS is on addressing transportation needs within the 48-mile Study limits: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including improvements to the American Legion Bridge over the Potomac River, to west of MD 5, and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs.

Due to the magnitude of the Study, MDOT SHA would need to construct any Build Alternative in phases. Phase 1 of the P3 Program would include that portion of the MLS along I-495 from the vicinity of the George Washington Memorial Parkway in Virginia, across and including the ALB, to its interchange with I-270 at the West Spur, and I-270 from its interchange with I-495 to its interchange with I-370. A Phase 1

00035751

Draft Environmental Impact Statement

P3 Agreement would also include I-270 up to I-70 which would be advanced through a separate, independent NEPA study.

The Maryland Board of Public Works approved the competitive solicitation process for Phase 1 to move forward for the selection of a Phase Developer to assist MDOT SHA with preliminary development and design activities, in accordance with federal regulations. No commitment will be made by MDOT SHA as to any alternative that is being or may be evaluated through the NEPA process.

It is expected that Phase 1 would be developed and delivered by a Phase 1 Developer, under a Phase 1 P3 Agreement. The southern portion of Phase 1 from I-495 in the vicinity of the George Washington Memorial Parkway to I-270 and I-270 from I-495 to I-370 would be developed, constructed, and delivered first. Additionally, given the magnitude of the improvements, the Phase Developer would be expected to develop and deliver the southern portion of Phase 1 in two or more sections, to be agreed upon with MDOT.

00035752

JA1908

The image is at the top right corner showing the highway study logo.

**PURPOSE AND NEED**



# 3

## 3   STUDY PURPOSE AND NEED

The study purpose and need were developed through a comprehensive process that included the examination of past studies, a review of existing regional plans, and an analysis of the environmental and socioeconomic conditions of the region. The purpose of the I-495 & I-270 Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the study limits and enhances existing and planned multimodal mobility and connectivity. The study will address the following needs.

- **Accommodate Existing Traffic and Long-Term Traffic Growth**. High travel demand from commuter, business, and recreational trips results in severe congestion from 7 to 10 hours per day on the study corridors, which is expected to deteriorate further by the planning horizon year of 2040. Additional capacity is needed to address existing and future travel demand and allow travelers to use the facilities efficiently.

- **Enhance Trip Reliability**. Congestion on I-495 and I-270 results in unpredictable travel times. Travelers and freight commodities place a high value on reaching their destinations in a timely and safe manner, and in recent years, the study corridors have become so unreliable that uncertain travel times are experienced daily. More dependable travel times are needed to ensure trip reliability.

- **Provide Additional Roadway Travel Choices**. Travelers on I-495 and I-270 do not have enough options for efficient travel during extensive periods of congestion. Additional roadway management options are needed to improve travel choices, while retaining the general-purpose lanes.

- **Accommodate Homeland Security**. The National Capital Region is considered the main hub of government, military, and community installations related to homeland security. These agencies and installations rely on quick, unobstructed roadway access during a homeland security threat. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur.

00036084



- **Improve Movement of Goods and Services.** I-495 and I-270 are major regional transportation networks that support the movement of passenger and freight travel within the National Capital Region. Existing congestion along both corridors increases the cost of doing business due to longer travel times and unreliable trips. The effects of this congestion on the movement of goods and services is a detriment to the health of the local, regional, and national economy. Efficient and reliable highway movement is necessary to accommodate passenger and freight travel, moving goods and services through the region.

Additional capacity and improvements to enhance reliability must be financially viable. MDOT's traditional funding sources would be unable to effectively finance, construct, operate, and maintain improvements of this magnitude. Revenue sources that provide adequate funding, such as pricing options, are needed to achieve congestion relief and address existing high travel demand.

Given the highly constrained area surrounding the interstates, MDOT SHA recognizes the need to plan and design this project in an environmentally responsible manner. MDOT SHA will strive to avoid and minimize community, natural, cultural, and other environmental impacts, and mitigate for these unavoidable impacts at an equal or greater value. MDOT SHA will work with our federal, state, and local resource agency partners in a streamlined, collaborative, and cooperative way to meet all regulatory requirements to ensure the protection of significant environmental resources. Any build alternatives will adequately offset unavoidable impacts while prioritizing and coordinating comprehensive mitigation measures near the study area which are meaningful to the environment and the community.

The following sections describe existing conditions and transportation issues that shape the project needs.

## 3.1 Accommodate Existing Traffic and Long-Term Traffic Growth

The state of Maryland experiences the second longest commuting times in the nation, according to 2015 US Census American Community Survey data. The National Capital Region is the most congested region in the nation based on annual delay and congestion per auto commuter. Specifically, the I-270 and I-495 corridors are among the most congested corridors in Maryland. More than 240,000 vehicles travel on I-495 on a daily basis, and it is congested an average of 10 hours per day. Over 260,000 vehicles travel on I-270 on a daily basis, and it is congested seven hours per day on average. (MDOT SHA obtained the speed and travel time data from INRIX for the I-495 and I-270 corridors.)

The *2016 Maryland State Highway Mobility Report* (MODT SHA, 2016b)[5] documents substantial traffic growth in the National Capital Region as a result of increasing population and employment levels. This employment and population growth is occurring not only in Washington DC (DC), but also in the near and far suburbs of DC, creating demand for suburb-to-suburb travel in the region, as well as suburb to DC travel. Approximately 240,000 vehicles commute daily from Maryland into DC and an additional 120,000 vehicles commute to the suburbs of Montgomery and Prince George's Counties from out of state (MDOT SHA, 2016b). Both of these statistics show the large movement of people into and around the National Capital Region at peak periods and the movement of goods throughout the day; all of this movement focused around the major interstates.

---

[5] This Purpose and Need Statement was finalized in November 2018 and was based on the 2016 Mobility Report. The DEIS Purpose and Need Chapter 1 has been updated with the latest numbers from the 2018 Mobility Report.

00036085