No. 24-1447

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

**JOINT APPENDIX VOLUME 6 OF 9**

Jared E. Knicley
Nanding Chen
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org
nchen@nrdc.org

*Counsel for Appellants*

Andrew M. Bernie
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

*Counsel for Federal Appellees*

Fred R. Wagner
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
frwagner@venable.com

*Counsel for State Appellees*

September 30, 2024

## TABLE OF CONTENTS

### Volume 1

**Document**                                                      **Page No.**

District Court Docket Report as of September 24, 2024 ...................... JA0001

Complaint, October 11, 2022............................................................... JA0014

Federal Defs.' Summ. J. Reply, October 4, 2023 (excerpt)................... JA0060

Memorandum Opinion, March 20, 2024............................................. JA0062

Order on Summary Judgment, March 20, 2024 .................................. JA0130

Notice of Appeal, May 14, 2024 ........................................................ JA0132

Record of Decision (ROD), August 25, 2022...................................... JA0134

### Volume 2

**Document**                                                      **Page No.**

Final Environmental Impact Statement (FEIS), June 2022.................. JA0354

### Volume 3

**Document**                                                      **Page No.**

Final Environmental Impact Statement (FEIS),
    June 2022 (continued) ................................................................ JA0699

FEIS Appendix A - Final Traffic Analysis Technical
    Report, June 2022 (excerpt) ........................................................ JA0835

VISSIM Calibration Memo (Appendix D to Final
    Traffic Analysis Technical Report), June 2022 ...................................JA0850

FEIS Appendix B – Draft Application for Interstate Access
    Point Approval, June 2022 (excerpts) ............................................ JA0857

i

## Volume 4

| Document | Page No. |
|---|---|

FEIS Appendix B – Draft Application for Interstate Access Point Approval, June 2022 (excerpts) (continued) ........................... JA1072

FEIS Appendix F - Final Community Effects Assessment and EJ Analysis Technical Report, June 2022 (excerpts) ........................ JA1099

FEIS Appendix G - Final Section 4(f) Evaluation, June 2022 .............. JA1254

Cultural Resources Technical Report, vol. 1, June 2022 ....................... JA1339

Consultation letter with Maryland Historical Trust and Virginia Department of Historic Resources, September 8, 2021 ..................... JA1365

Maryland Sierra Club Section 106 Comments, April 12, 2021 .............. JA1380

Washington Biologists' Field Club (WBFC) Comments, April 9, 2021 ................................................................................... JA1389

WBFC Letter, October 8, 2021 ........................................................... JA1411

WBFC Comments on Programmatic Agreement, February 3, 2022 ............................................................................. JA1432

FEIS Appendix K - Final Air Quality Technical Report, June 2022 ................................................................................... JA1474

FEIS Appendix M - Final Natural Resources Technical Report, June 2022 (excerpts) ........................................................... JA1510

FEIS Appendix N - Final Avoidance, Minimization, and Impacts Report, June 2022 ........................................................... JA1521

## Volume 5

**Document**                                                      **Page No.**

FEIS Appendix Q - Final Indirect and Cumulative Effects
Technical Report, June 2022 (excerpts) ......................................... JA1577

FEIS Appendix T – MDOT Response to WBFC DEIS Comments
and Testimony (Robert Soreng), June 2022 .................................... JA1581

FEIS Appendix T - MDOT Response to Maryland Sierra Club
DEIS Comments, June 2022 .......................................................... JA1628

FEIS Appendix T – MDOT Response to WBFC SDEIS Comments,
June 2022 ...................................................................................... JA1743

Supplemental Draft Environmental Impact Statement (SDEIS),
October 2021 (excerpts) ................................................................ JA1767

Draft Environmental Impact Statement (DEIS),
June 2020 (excerpt) ...................................................................... JA1868

DEIS Appendix A - Purpose and Need Technical Report,
November 2018 (excerpt) .............................................................. JA1909

## Volume 6

**Document**                                                      **Page No.**

DEIS Appendix F - Draft Section 4(f) Evaluation,
May 2020 (excerpts) ...................................................................... JA1911

DEIS Appendix I - Air Quality Technical Report,
May 2020 (excerpt) ........................................................................ JA2046

## Volume 7

Document                                                                  Page No.

DEIS Appendix I - Air Quality Technical Report,
   May 2020 (excerpt) (continued)....................................................... JA2131

Agency Coordination Plan, May 2018 ................................................ JA2163

EPA Technical Support Document for Ozone Conformity,
   May 5, 2020 ................................................................................... JA2176

Maryland Sierra Club DEIS comments, November 6, 2020 .................... JA2186

Internal FHWA email re: AQ conformity, May 17, 2021 ..................... JA2399

Internal FHWA email re: AQ conformity, May 19, 2021 ...................... JA2402

Lichen Growth Responses to Stress Induced by Automobile
   Exhaust Pollution, April 27, 1979 .................................................. JA2404

SDEIS Comment Review Meeting re: Traffic Analysis,
   September 1, 2021 .......................................................................... JA2408

## Volume 8

Document                                                                  Page No.

Maryland Sierra Club SDEIS Comments, November 30, 2021 ............. JA2415

State Treasurer Review of P3, July 9, 2021 ......................................... JA2598

Maryland National Capital Park and Planning Commission
   Comments re Planned Alternative, November 30, 2021 ...................... JA2610

Managed Lanes Study IAPA Comments (IAPA Technical
   Report Errata Sheet), February 4, 2022 ................................................ JA2628

**Volume 9**

| Document | Page No. |
|---|---|

Maryland Historical Trust Determination of Eligibility
Form for Plummers Island, August 20, 2021 (excerpt)..................... JA2635

Roselie Ann Bright Comments on FEIS, July 14, 2022 ...........................JA2647

Zamurs and Associates Comments on FEIS, June 2022..........................JA2657

Maryland Sierra Club FEIS Comments, July 18, 2022 ...........................JA2668

CEEJH Lab Meeting Summary, October 20, 2021...................................JA2738

American Legion Bridge Strike Team Power Point,
February 2, 2021 ............................................................... JA2740

Administrative Draft SDEIS Comment Errata Sheet,
July 14, 2021 .....................................................................JA2748

Internal FHWA email re: Update on air quality modeling,
July 7, 2021.................................................................... JA2750

Influence of Roadway Emissions on PM$_{2.5}$, July 20, 2020 .......................JA2751

The New England Journal of Medicine, "The Need for a Tighter
Particulate-Matter Air-Quality Standard," August 13, 2020 ...............JA2767

Monitoring Study of Near-Road PM$_{2.5}$ Concentrations in
Maryland, August 14, 2015....................................................JA2771

EPA, Integrated Science Assessment for Particulate Matter,
December 2019 (excerpt) ............................................... JA2782

American Legion Bridge Strike Team Report, November 2021 ...............JA2988



# APPENDIX F
# DRAFT SECTION 4(f) EVALUATION

## May 2020







00038576

00038577

DRAFT SECTION 4(f) EVALUATION



## TABLE OF CONTENTS

1    INTRODUCTION ........................................................................................................................1

　1.1    Overview .................................................................................................................... 1

　1.2    Regulatory Context .................................................................................................... 3

　1.3    Study Purpose and Need............................................................................................ 14

　1.4    Proposed Action ........................................................................................................ 15

　1.5    Common Elements of the Build Alternatives............................................................ 17

2    INVENTORY AND USE OF SECTION 4(F) PROPERTY .....................................................18

　2.1    Section 4(f) Property along I-495 ............................................................................... 28

　2.2    Section 4(f) Property along I-270 ............................................................................... 118

　2.3    Impacted Properties that Qualify as Exceptions to Section 4(f) ............................... 143

　2.4    Summary of Section 4(f) Property with Potential *De Minimis* Impacts ................... 147

　2.5    Archaeological Properties.......................................................................................... 148

3    AVOIDANCE ANALYSIS ........................................................................................................149

　3.1    Avoidance Alternatives ............................................................................................. 149

　3.2    Avoidance Analysis Summary ................................................................................... 156

4    ALL POSSIBLE PLANNING....................................................................................................158

　4.1    Methodology and Assumptions for Establishing Limits of Disturbance .................. 159

　4.2    Considerations for Adjacent Land Use and Minimization of the LOD ...................... 159

　4.3    Mitigation.................................................................................................................. 162

5    LEAST OVERALL HARM .......................................................................................................165

　5.1    Location Specific Options.......................................................................................... 165

　5.2    Other Minimization Alternatives Considered .......................................................... 254

　5.3    Proposed Action ........................................................................................................ 259

　5.4    Results of Least Overall Harm Analysis .................................................................... 269

6    COORDINATION....................................................................................................................275

　6.1    Department of Interior ............................................................................................. 275

　6.2    Officials with Jurisdiction over Public Parks............................................................. 275

　6.3    Officials with Jurisdiction of Historic Sites .............................................................. 278

　6.4    Coordination with Other Agencies............................................................................ 279

　6.5    Public......................................................................................................................... 279

7    CONCLUSION ........................................................................................................................280

00038578

JA1913

**DRAFT SECTION 4(f) EVALUATION**



**APPENDIX A** ................................................................................................................................. **281**

**APPENDIX B** ................................................................................................................................. **294**

## LIST OF TABLES

Table 1-1: Section 4(f) Properties in the Corridor Study Boundary Acquired............................................ 12

Table 1-2: Parks in the Corridor Study Boundary Improved or Acquired with funds from LWCF ............. 12

Table 2-1: Inventory of Section 4(f) Properties with Use or *de minimis* impact........................................ 23

Table 2-2: Impacts to Properties that Qualify as Exceptions to Section 4(f) ............................................. 26

Table 2-3: Inventory of Section 4(f) Properties where there is no Use or Impact...................................... 26

Table 2-4: Section 4(f) Use of Contributing Properties in Carsondale....................................................... 97

Table 2-5: Section 4(f) Use of Contributing Properties in the Glenarden Historic District......................... 99

Table 2-6: Properties with Impacts Subject to an Exception to Section 4(f) ............................................ 143

Table 2-7: Summary of Section 4(f) Properties with Potential De *Minimis* Impact Finding .................... 147

Table 5-1: Section 4(f) Properties Avoided by Option LS-1...................................................................... 167

Table 5-2: Section 4(f) Properties Avoided by Option LS-2...................................................................... 173

Table 5-3: Section 4(f) Properties Avoided by Option LS-3...................................................................... 174

Table 5-4: Properties Experiencing an Increase in Section 4(f) Use by Option LS-3 ................................ 174

Table 5-5: Properties Avoided by Option LS-4 ........................................................................................ 183

Table 5-6: Properties Experiencing an Increase in Section 4(f) Use by Option LS-4................................. 184

Table 5-7: Properties Avoided by Option LS-5 ........................................................................................ 190

Table 5-8: Properties Experiencing an Increase in Section 4(f) Use by Option LS-5................................. 190

Table 5-9: Properties Avoided by Option LS-6 ........................................................................................ 194

Table 5-10: Properties Experiencing an Increase in Section 4(f) Use by Option LS-6............................... 195

Table 5-11: Section 4(f) Properties Avoided by LS-7................................................................................ 201

Table 5-12: Properties Experiencing an Increase in Section 4(f) Use by Option LS-7............................... 202

Table 5-13: Section 4(f) Properties Avoided by LS-10.............................................................................. 215

Table 5-14: Properties Experiencing an Increase in Section 4(f) Use by Option LS-10............................. 216

Table 5-15: Properties Avoided by Option LS-12..................................................................................... 226

Table 5-16: Properties Avoided by Option LS-15..................................................................................... 238

Table 5-17: Property Avoided by Option LS-16........................................................................................ 247

Table 5-18: Properties Experiencing an Increase in Section 4(f) Use by Option LS-16............................. 247

Table 5-19: Difference in Use of Section 4(f) Properties among the Proposed Action and Alternative 5 254

Table 5-20: Section 4(f) Properties Avoided by MD 200 Diversion Alternative........................................ 258

Table 5-21: Total Potential Impacts to Section 4(f) properties by Build Alternative................................. 259

Table 5-22: Summary of the Least Overall Harm Analysis of Alternatives .............................................. 271

Table A-1: Relevant Correspondence with Agencies and Officials with Jurisdiction over Section 4(f) Properties................................................................................................................................................ 282

## LIST OF FIGURES

Figure 1-1: Limits of Managed Lanes Study ................................................................................................. 2

Figure 2-1: Section 4(f) Property Overview (Map 1 of 3)............................................................................ 20

Figure 2-2: Section 4(f) Property Overview (Map 2 of 3)............................................................................ 21

00038579

JA1914



Figure 2-3: Section 4(f) Property Overview (Map 3 of 3) .............................................................................. 22
Figure 2-4: Section 4(f) Property (Map 1 of 35) ......................................................................................... 35
Figure 2-5: Section 4(f) Property (Map 2 of 35) ......................................................................................... 36
Figure 2-6: Section 4(f) Property (Map 3 of 35) ......................................................................................... 42
Figure 2-7: Section 4(f) Property (Map 4 of 35) ......................................................................................... 43
Figure 2-8: Section 4(f) Property (Map 5 of 35) ......................................................................................... 44
Figure 2-9: Section 4(f) Property (Map 6 of 35) ......................................................................................... 50
Figure 2-10: Section 4(f) Property (Map 7 of 35) ....................................................................................... 51
Figure 2-11: Section 4(f) Property (Map 8 of 35) ....................................................................................... 60
Figure 2-12: Section 4(f) Property (Map 9 of 35) ....................................................................................... 61
Figure 2-13: Section 4(f) Property (Map 10 of 35) ..................................................................................... 62
Figure 2-14: Section 4(f) Property (Map 11 of 35) ..................................................................................... 70
Figure 2-15: Section 4(f) Property (Map 12 of 35) ..................................................................................... 73
Figure 2-16: Section 4(f) Property (Map 13 of 35) ..................................................................................... 79
Figure 2-17: Section 4(f) Property (Map 14 of 35) ..................................................................................... 80
Figure 2-18: Section 4(f) Property (Map 15 of 35) ..................................................................................... 81
Figure 2-19: Section 4(f) Property (Map 16 of 35) ..................................................................................... 82
Figure 2-20: Section 4(f) Property (Map 17 of 35) ..................................................................................... 83
Figure 2-21: Section 4(f) Property (Map 18 of 35) ..................................................................................... 84
Figure 2-22: Section 4(f) Property (Map 19 of 35) ..................................................................................... 85
Figure 2-23: Section 4(f) Property (Map 20 of 35) ................................................................................... 102
Figure 2-24: Section 4(f) Property (Map 21 of 35) ................................................................................... 103
Figure 2-25: Section 4(f) Property (Map 22 of 35) ................................................................................... 104
Figure 2-26: Section 4(f) Property (Map 23 of 35) ................................................................................... 113
Figure 2-27: Section 4(f) Property (Map 24 of 35) ................................................................................... 114
Figure 2-28: Section 4(f) Property (Map 25 of 35) ................................................................................... 115
Figure 2-29: Section 4(f) Property (Map 26 of 35) ................................................................................... 116
Figure 2-30: Section 4(f) Property (Map 27 of 35) ................................................................................... 117
Figure 2-31: Section 4(f) Property (Map 28 of 35) ................................................................................... 119
Figure 2-32: Section 4(f) Property (Map 29 of 35) ................................................................................... 125
Figure 2-33: Section 4(f) Property (Map 30 of 35) ................................................................................... 126
Figure 2-34: Section 4(f) Property (Map 31 of 35) ................................................................................... 128
Figure 2-35 Section 4(f) Property (Map 32 of 35) .................................................................................... 132
Figure 2-36: Section 4(f) Property (Map 33 of 35) ................................................................................... 133
Figure 2-37: Section 4(f) Property (Map 34 of 35) ................................................................................... 141
Figure 2-38: Section 4(f) Property (Map 35 of 35) ................................................................................... 142
Figure 3-1: Alternative 1 Typical Sections ................................................................................................ 150
Figure 3-2: Alignment of Section 4(f) Avoidance Alternatives 1, 2, and 3 ............................................... 155
Figure 4-1: Open Section with Full Stormwater Management .................................................................. 160
Figure 4-2: Open Section with Reduced Stormwater Management ........................................................... 161
Figure 4-3: Closed Section with No Stormwater Management .................................................................. 161
Figure 4-4: Closed Section with Concrete Barrier ..................................................................................... 162
Figure 4-5: Closed Section with Retaining Wall ....................................................................................... 162
Figure 5-1: Overview Map of Location Specific Options LS-1 and LS-2 ..................................................... 168

00038580

JA1915



Figure 5-2: Detail of Location Specific Options LS-1 and LS-2 (Map 1 of 3)................................................ 169
Figure 5-3: Detail of Location Specific Options LS-1 and LS-2 (Map 2 of 3)................................................ 170
Figure 5-4: Detail of Location Specific Options LS-1 and LS-2 (Map 3 of 3)................................................ 171
Figure 5-5: Overview Map of Location Specific Option LS-3........................................................................ 176
Figure 5-6: Detail of Location Specific Option LS-3 (Map 1 of 6) ............................................................... 177
Figure 5-7: Detail of Location Specific Option LS-3 (Map 2 of 6) ............................................................... 178
Figure 5-8: Detail of Location Specific Option LS-3 (Map 3 of 6) ............................................................... 179
Figure 5-9: Detail of Location Specific Option LS-3 (Map 4 of 6) ............................................................... 180
Figure 5-10: Detail of Location Specific Option LS-3 (Map 5 of 6) ............................................................. 181
Figure 5-11: Detail of Location Specific Option LS-3 (Map 6 of 6) ............................................................. 182
Figure 5-12: Overview Map of Location Specific Option LS-4...................................................................... 185
Figure 5-13: Detail of Location Specific Option LS-4 (Map 1 of 4) ............................................................. 186
Figure 5-14: Detail of Location Specific Option LS-4 (Map 2 of 4) ............................................................. 187
Figure 5-15: Detail of Location Specific Option LS-4 (Map 3 of 4) ............................................................. 188
Figure 5-16: Detail of Location Specific Option LS-4 (Map 4 of 4) ............................................................. 189
Figure 5-17: Overview Map of Location Specific Option LS-5...................................................................... 192
Figure 5-18: Detail of Location Specific Option LS-5................................................................................... 193
Figure 5-19: Overview Map of Location Specific Option LS-6...................................................................... 196
Figure 5-20: Detail of Location Specific Option LS-6 (Map 1 of 4) ............................................................. 197
Figure 5-21: Detail of Location Specific Option LS-6 (Map 2 of 4) ............................................................. 198
Figure 5-22: Detail of Location Specific Option LS-6 (Map 3 of 4) ............................................................. 199
Figure 5-23: Detail of Location Specific Option LS-6 (Map 4 of 4) ............................................................. 200
Figure 5-24: Overview Map of Location Specific Option LS-7...................................................................... 203
Figure 5-25: Detail of Location Specific Option LS-7 (Map 1 of 2) ............................................................. 204
Figure 5-26: Detail of Location Specific Option LS-7 (Map 2 of 2) ............................................................. 205
Figure 5-27: Overview Map of Location Specific Option LS-8...................................................................... 208
Figure 5-28: Detail of Location Specific Option LS-8 (Map 1 of 2) ............................................................. 209
Figure 5-29: Detail of Location Specific Option LS-8 (Map 2 of 2) ............................................................. 210
Figure 5-30: Overview Map of Location Specific Option LS-9...................................................................... 212
Figure 5-31: Detail of Location Specific Option LS-9 (Map 1 of 2) ............................................................. 213
Figure 5-32: Detail of Location Specific Option LS-9 (Map 2 of 2) ............................................................. 214
Figure 5-33: Overview Map of Location Specific Option LS-10.................................................................... 217
Figure 5-34: Detail of Location Specific Option LS-10 (Map 1 of 4) ........................................................... 218
Figure 5-35: Detail of Location Specific Option LS-10 (Map 2 of 4) ........................................................... 219
Figure 5-36: Detail of Location Specific Option LS-10 (Map 3 of 4) ........................................................... 220
Figure 5-37: Detail of Location Specific Option LS-10 (Map 4 of 4) ........................................................... 221
Figure 5-38: Overview Map of Location Specific Option LS-11.................................................................... 223
Figure 5-39: Detail of Location Specific Option LS-11 (Map 1 of 2) ........................................................... 224
Figure 5-40: Detail of Location Specific Option LS-11 (Map 2 of 2) ........................................................... 225
Figure 5-41: Overview Map of Location Specific Option LS-12.................................................................... 227
Figure 5-42: Detail of Location Specific Option LS-12 (Map 1 of 3) ........................................................... 228
Figure 5-43: Detail of Location Specific Option LS-12 (Map 2 of 3) ........................................................... 229
Figure 5-44: Detail of Location Specific Option LS-12 (Map 3 of 3) ........................................................... 230
Figure 5-45: Overview Map of Location Specific Option LS-13.................................................................... 232

00038581



Figure 5-46: Detail of Location Specific Option LS-13 ................................................................ 233
Figure 5-47: Overview Map of Location Specific Option LS-14 .................................................... 235
Figure 5-48: Detail of Location Specific Option LS-14 (Map 1 of 2) ........................................... 236
Figure 5-49: Detail of Location Specific Option LS-14 (Map 2 of 2) ........................................... 237
Figure 5-50: Overview Map of Location Specific Option LS-15 .................................................... 240
Figure 5-51: Detail of Location Specific Option LS-15 (Map 1 of 6) ........................................... 241
Figure 5-52: Detail of Location Specific Option LS-15 (Map 2 of 6) ........................................... 242
Figure 5-53: Detail of Location Specific Option LS-15 (Map 3 of 6) ........................................... 243
Figure 5-54: Detail of Location Specific Option LS-15 (Map 4 of 6) ........................................... 244
Figure 5-55: Detail of Location Specific Option LS-15 (Map 5 of 6) ........................................... 245
Figure 5-56: Detail of Location Specific Option LS-15 (Map 6 of 6) ........................................... 246
Figure 5-57: Overview Map of Location Specific Options LS-16 and LS-17 ................................. 249
Figure 5-58: Detail of Location Specific Option LS-16 (Map 1 of 4) ........................................... 250
Figure 5-59: Detail of Location Specific Option LS-16 (Map 2 of 4) ........................................... 251
Figure 5-60: Detail of Location Specific Option LS-16 (Map 3 of 4) ........................................... 252
Figure 5-61: Detail of Location Specific Option LS-16 (Map 4 of 4) and Location Specific Option LS-17 . 253
Figure 5-62: Alternative 5 Typical Sections .............................................................................. 255
Figure 5-63: MD 200 Diversion Alternative .............................................................................. 257
Figure 5-64: Alternative 8 Typical Sections .............................................................................. 261
Figure 5-65: Alternative 9 Typical Sections .............................................................................. 262
Figure 5-66: Alternative 10 Typical Sections ............................................................................ 266
Figure 5-67: Alternative 13B Typical Sections .......................................................................... 267
Figure 5-68: Alternative 13C Typical Section ............................................................................ 269

## ABBREVIATIONS AND ACRONYMS

| ACHP | Advisory Council on Historic Preservation |
|------|-------------------------------------------|
| BRT | Bus Rapid Transit |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CLRP | Constrained Long-Range Plan |
| DEIS | Draft Environmental Impact Statement |
| DOI | Department of the Interior |
| EIS | Environmental Impact Statement |
| ESD | Environmental Site Design |
| ETL | Express Toll Lane |
| FAST | Fixing America's Surface Transportation Act |
| FHWA | Federal Highway Administration |
| GP | General Purpose |
| HOT | High-Occupancy Toll |

00038582

**DRAFT SECTION 4(f) EVALUATION**



| | |
|---|---|
| HOV | High-Occupancy Vehicle |
| HUD | Housing and Urban Development |
| ICC | Intercounty Connector |
| ICM | Innovative Congestion Management |
| LOD | Limits of Disturbance |
| LWCF | Land Water Conservation Fund |
| MDE | Maryland Department of the Environment |
| MDNR | Maryland Department of Natural Resources |
| MDOT SHA | Maryland Department of Transportation State Highway Administration |
| MDTA | Maryland Transportation Authority |
| MHT | Maryland Historical Trust |
| M-NCPPC | Maryland-National Capital Park and Planning Commission |
| NCA | Neighborhood Conservation Area |
| NCPC | National Capital Planning Commission |
| NEPA | National Environmental Policy Act |
| NHP | National Historic Preservation |
| NHPA | National Historic Preservation Act |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| OWJ | Official(s) with Jurisdiction |
| PA | Programmatic Agreement |
| POS | Program Open Space |
| SHPO | State Historic Preservation Office(r) |
| SVP | Stream Valley Park |
| THPO | Tribal Historic Preservation Office(r) |
| TPB | Transportation Planning Board |
| U.S.C. | United States Code |
| USDA | United States Department of Agriculture |
| USDOT | United States Department of Transportation |
| VDHR | Virginia Department of Historic Resources |
| VDOT | Virginia Department of Transportation |
| VMT | Vehicle Miles Traveled |

00038583



# 5

## 5    LEAST OVERALL HARM

Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then only the alternative that causes the least overall harm may be approved. Since the discussion in Section 3 demonstrates there is no feasible and prudent avoidance alternative, all remaining alternatives are evaluated to determine which would cause the least overall harm. Therefore, this section provides a review of the multiple remaining alternatives that use one or more Section 4(f) properties, including alternatives that would eliminate or reduce the use of individual Section 4(f) properties.

23 CFR 774.3(c)(1) identifies seven factors for identifying the alternative with the least overall harm.

- **Factor 1:** The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
- **Factor 2:** The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;
- **Factor 3:** The relative significance of each Section 4(f) property; and
- **Factor 4:** The views of the OWJ over each Section 4(f) property.
- **Factor 5:** The degree to which each alternative meets the Purpose and Need for the project;
- **Factor 6:** After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and
- **Factor 7:** Substantial differences in costs among the alternatives.

### 5.1    Location Specific Options

The following discussion describes location specific alternatives that would avoid the use of individual Section 4(f) properties and evaluates those alternatives using the seven factors of least overall harm. Each option would be integrated into the Proposed Action in a manner that would avoid the Section 4(f) property(ies) identified in the sections below. The options consist of alignment shifts, tunnels, or bridges that were developed to avoid those Section 4(f) properties for which the Section 4(f) use is not anticipated to be *de minimis*. In general, these location specific options would result in additional use of other Section 4(f) properties, adverse impacts of a severe magnitude to resources not subject to Section 4(f) protection, or a substantial increase in cost. Because the location specific options modify relatively short portions of

00038757



the end-to-end Proposed Action, each would meet the Purpose and Need of the Study to some degree. However, those location specific options that more substantially deviate from the existing alignments of I-495 and I-270 and result in a lengthier travel routes would be less effective in addressing the project needs.

### 5.1.1    Location Specific Option 1 (LS-1)

**Section 4(f) Properties Avoided: C&O Canal NHP and Clara Barton Parkway**

#### A.    Description

The Proposed Action would replace the existing American Legion Bridge on alignment. The newly constructed bridge would be wide enough to accommodate managed lanes and result in a Section 4(f) use of George Washington Memorial Parkway (**Section 2.1.1**), C&O Canal NHP (**Section 2.1.2**), and Clara Barton Parkway (**Section 2.1.3**). The conceptual design of the bridge that would be constructed as part of the Proposed Action would require the placement of piers within the boundary of George Washington Memorial Parkway in Virginia as well as the construction of temporary access roads within the boundaries of Clara Barton Parkway and C&O Canal NHP in Maryland and George Washington Memorial Parkway in Virginia.

Option LS-1 would construct a new suspension bridge east of the existing American Legion Bridge to avoid the Section 4(f) use of C&O Canal NHP and Clara Barton Parkway (**Figure 5-1** through **Figure 5-4**). The new bridge would carry both GP and managed lanes and feature a clear span of 3,250 feet, a length which could only be met by a suspension bridge. In order to anchor the towers and cables that support the design, the bridge span would extend 800 feet beyond the towers at either side of the crossing. The design of the suspension bridge would require placing the western tower within the Turkey Run area of George Washington Memorial Parkway and thus would not avoid a use of that Section 4(f) property. Option LS-1 would eliminate all interchanges between I-495 and George Washington Memorial Parkway and Clara Barton Parkway.

#### B.    Analysis

In consideration of Least Overall Harm Factor 5, applying Option LS-1 would compromise the ability of the Study to meet the Purpose and Need by adding significant risk to financial viability through removing direct access to the managed lanes at George Washington Memorial Parkway. Additionally, in consideration of Least Overall Harm Factor 7, Option LS-1 would cost approximately $900 million, or $600 million more than the Proposed Action along this portion of the project. Even though it avoids the Section 4(f) use of C&O Canal NHP and Clara Barton Parkway, owing to the substantial difference in cost and compromised ability to meet the Purpose and Need, Option LS-1 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of two NPS Section 4(f) properties and significantly reduces the use of George Washington Memorial Parkway (as listed in **Table 5-1**), there would be greater ability to mitigate adverse impacts caused by Option LS-1 when compared to the Proposed Action. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-1 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

00038758



**Table 5-1: Section 4(f) Properties Avoided by Option LS-1**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| George Washington Memorial Parkway[1] | 11.5 |
| C&O Canal NHP | 15.4 |
| Clara Barton Parkway | 1.8 |
| **Total Section 4(f) Property Avoided** | **28.7** |

*1. Option LS-1 would not totally avoid the use of George Washington Memorial Parkway*

The three Section 4(f) properties situated along the bridge option qualify for Section 4(f) protection as both public recreational facilities and historic sites. These properties are George Washington Memorial Parkway, Clara Barton Parkway, and Chesapeake and Ohio Canal NHP. In consideration of Least Overall Harm Factor 3, the properties are of substantially equal significance. While the Proposed Action would result in a Section 4(f) use of each of these properties, Option LS-1 would only result in the use of George Washington Memorial Parkway.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation.

Option LS-1 would span the Potomac River and result in fewer impacts to streams and wetlands. However because the proposed suspension bridge would be erected off alignment, Option LS-1 would result in greater impacts to forest resources in Maryland and Virginia. Under Option LS-1, removing the existing American Legion Bridge and portion of I-495 would provide opportunities to mitigate for impacts to trees. Neither the Proposed Action nor Option LS-1 would result in relocations. In consideration of Least Overall Harm Factor 6, Option LS-1 and the Proposed Action would result in substantially equal harm to resources not protected by Section 4(f).

00038759

DRAFT SECTION 4(f) EVALUATION





**Figure 5-1: Overview Map of Location Specific Options LS-1 and LS-2**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

### Location Specific Options Overview Map

Map 1.1.0

### Legend

**Location Specific Options**
- Option LS-1
- Option LS-2

- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property Permitted to MDOT-SHA
- Suspension Bridge
- Tunnel

0   750   1,500   Feet

May 2020

00038760

168



DRAFT SECTION 4(f) EVALUATION

**Figure 5-2: Detail of Location Specific Options LS-1 and LS-2 (Map 1 of 3)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 1.1.1

0  150  300 Feet

**Location Specific Options**
- Option LS-1
- Option LS-2

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Suspension Bridge
- Tunnel

GEORGE WASHINGTON MEMORIAL PKWY

CAPITAL BELTWAY

Scott's Run Nature Preserve

George Washington Memorial Parkway

May 2020

169
00038761

00038762

DRAFT SECTION 4(f) EVALUATION



Figure 5-3: Detail of Location Specific Options LS-1 and LS-2 (Map 2 of 3)

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 1.1.2

0   150   300   Feet

**Legend**

Location Specific Options
- Option LS-1
- Option LS-2

- Centerline of Proposed Action
- Historic Property
- Park Property

- Map Match Line
- Grade Separation
- Property Permitted to MDOT-SHA

- Suspension Bridge
- Tunnel

Clara Barton Parkway

Chesapeake and Ohio Canal National Historical Park

George Washington Memorial Parkway

GEORGE WASHINGTON MEMORIAL PKWY

Maryland (Montgomery County)
Virginia (Fairfax County)

CAPITAL BELTWAY

May 2020

170

JA1924

DRAFT SECTION 4(f) EVALUATION



**Figure 5-4: Detail of Location Specific Options LS-1 and LS-2 (Map 3 of 3)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**

- Option LS-1
- Option LS-2

**Legend**

- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property Permitted to MDOT-SHA
- Suspension Bridge
- Tunnel

**Location Specific Options Map**

Map 1.1.3

0  150  300 Feet

May 2020

JA1925

00038763

171



### 5.1.2  Location Specific Option 2 (LS-2)

**Section 4(f) Properties Avoided: George Washington Memorial Parkway, C&O Canal NHP, and Clara Barton Parkway**

#### A.  Description

The Proposed Action would replace the existing American Legion Bridge on alignment with widening and result in the Section 4(f) use of George Washington Memorial Parkway (**Section 2.1.1**), C&O Canal NHP (**Section 2.1.2**), and Clara Barton Parkway (**Section 2.1.3**). The conceptual design of the bridge that would be constructed as part of the Proposed Action would require the placement of piers within the boundary of George Washington Memorial Parkway in Virginia as well as the construction of temporary access roads within the boundaries of Clara Barton Parkway and C&O Canal NHP in Maryland and George Washington Memorial Parkway in Virginia.

Option LS-2 would construct a tunnel to carry both the GP lanes and managed lanes beneath the Potomac River close to the alignment of the existing American Legion Bridge (**Figure 5-1** through **Figure 5-4**). In order to reach the required depth of 80 to 120 feet to safely tunnel beneath the Potomac River and avoid the use of Section 4(f) property, the tunnel would need to be approximately 11,000 feet long. Tunnel portal locations would be approximately 2,000 feet south of the George Washington Memorial Parkway in Virginia, and 2,200 feet north of MacArthur Boulevard in Maryland. Direct access to the George Washington Parkway and Clara Barton Parkway from I-495 would be eliminated.

#### B.  Analysis

In consideration of Least Overall Harm Factor 5, implementing Option LS-2 would compromise the ability of the Study to meet the Purpose and Need by adding significant risk to financial viability through removing direct access, especially at George Washington Memorial Parkway. Additionally, in consideration of Least Overall Harm Factor 7, Option LS-2 would cost in approximately $1.3 billion or $1 billion more than the Proposed Action along this portion of the project. Even though it avoids impacts to C&O Canal NHP, Clara Barton Parkway, and George Washington Memorial Parkway, owing to the substantial difference in cost and compromised ability to meet the Purpose and Need, Option LS-2 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-2 would have a greater ability to mitigate for the use of Section 4(f) property owing to avoiding the use of the three NPS Section 4(f) properties listed in **Table 5-2**. In support of this assessment, Option LS-2 would create additional opportunities for mitigation through the removal of the existing I-495. Implementing Option LS-2 would have the beneficial effect of eliminating the visual and physical intrusion of the American Legion Bridge and I-495 on George Washington Memorial Parkway, C&O Canal NHP, and Clara Barton Parkway. In consideration of Least Overall Harm Factor 2, when compared to the Proposed Action Option LS-2 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection.

The three Section 4(f) properties along the tunnel option qualify for Section 4(f) protection as both public recreational facilities and historic sites. These properties are George Washington Memorial Parkway, C&O Canal NHP, and Clara Barton Parkway. In Consideration of Least Overall Harm Factor 3, the properties are

00038764



of substantially equal significance. The Proposed Action would result in significant impacts to each of these three Section 4(f) properties. Option LS-2 would not impact any of the three.

**Table 5-2: Section 4(f) Properties Avoided by Option LS-2**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| George Washington Memorial Parkway | 12.2 |
| C&O Canal NHP | 15.4 |
| Clara Barton Parkway | 1.8 |
| **Total Section 4(f) Property Avoided** | **29.4** |

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

Option LS-2 would construct a tunnel to convey both the managed lanes and GP lanes beneath the Potomac River near the alignment of the existing American Legion Bridge. When compared to the Proposed Action, Option LS-2 would result in fewer impacts to streams, wetlands, and forest resources. Option LS-2 would result in some impacts to forest resources at the locations of the tunnel portals. The full area of forest impacts would depend on the method of construction, but any impacts are expected to be less than the Proposed Action. Additionally, five residential relocations would be necessary at the location of the tunnel portal in Maryland, when compared to the Build Alternatives, which would require none at this location. In consideration of Least Overall Harm Factor 6, when compared to the Proposed Action Option LS-2 would result in less harm to Section 4(f) properties and resources not protected by Section 4(f).

### 5.1.3  Location Specific Option 3 (LS-3)

**Section 4(f) Properties Avoided: Unit 3 of Rock Creek Stream Valley Park, Bethesda Trolley Trail, and Locust Hill Neighborhood Park**

#### A.  Description

The Proposed Action would widen I-495 on alignment through Rock Creek Stream Valley Park, Unit 3, as described in **Section 2.1.9** and expand the highway beyond the existing MDOT SHA easement.

Option LS-3 would relocate the GP and managed lanes on I-495 approximately 0.5 mile to the south to avoid impacts to Unit 3 of Rock Creek Stream Valley Park (**Figure 5-5** through **Figure 5-11**). The drastic alignment shift to the south is needed to avoid impacts while maintaining the existing movements on I-495 at I-270, MD 187, MD 355, and MD 185, as well as accommodate proposed direct access to the managed lanes system. In designing the alignment shift option, additional consideration was given to avoiding significant elements of the Section 4(f) properties on the south side of I-495. To achieve avoidance of Unit 3 of Rock Creek Stream Valley Park while also minimizing to the extent possible impacts to other Section 4(f) properties, a shift of 0.5 mile is necessary.

00038765



### B.    Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-3 would result in 10.4 acres of additional impacts to Section 4(f) properties. Despite eliminating the use of the Section 4(f) properties listed in **Table 5-3**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-4** This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-3 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. Implementing Option LS-3 would result in demolishing the historic Grosvenor Estate and eliminating North Chevy Chase Local Park.

In consideration of Least Overall Harm Factor 6, Option LS-3 would cause severe impacts to community resources, potentially resulting in the relocation of 325 properties. Option LS-3 would also impact the roadway infrastructure of several existing communities, potentially cutting off access to these areas. In consideration of Least Overall Harm Factor 7, Option LS-3 would cost an estimated $2.8 billion or $1.7 billion more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-3 would result in more harm than the Proposed Action.

**Table 5-3: Section 4(f) Properties Avoided by Option LS-3**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 3 | 3.3 |
| Locust Hill Neighborhood Park | 0.3 |
| Bethesda Trolley Trail | 0.2 |
| **Total Section 4(f) Property Avoided** | **3.8** |

**Table 5-4: Properties Experiencing an Increase in Section 4(f) Use by Option LS-3**

| Section 4(f) Property | Increase in Impact (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 2 | 0.2 |
| North Chevy Chase Local Park | 5.8 |
| Fleming Local Park | 2.0 |
| Grosvenor Estate | 4.0 |
| Elmhirst Parkway Neighborhood Conservation Area | 2.0 |
| In the Woods | 0.2 |
| **Total Increase in Use of Section 4(f) Property** | **14.2** |

00038766



In consideration of Least Overall Harm Factor 3, Unit 3 of Rock Creek Stream Valley Park is a large, heavily used, multi-function, recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County where no comparable facilities exist. The park is also historically significant for its association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As historic sites of statewide significance and parts of a large park that offers diverse recreational opportunities to a regional population, Units 2 and 3 of Rock Creek Stream Valley Park are the most significant Section 4(f) property along this portion of the Study.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-3 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038767

DRAFT SECTION 4(f) EVALUATION



**Figure 5-5: Overview Map of Location Specific Option LS-3**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Overview Map**

Map 2.1.0

0   750   1,500
Feet

**Legend**

- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement

**Location Specific Options**

- Option LS-3
- Option LS-4
- Option LS-5



**Figure 5-6: Detail of Location Specific Option LS-3 (Map 1 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Legend**

Centerline of Proposed Action ▬ ▬ Map Match Line
▨ Historic Property
▨ Park Property

**Location Specific Options**
Option LS-3

**Location Specific Options Map**

0   150   300   Feet

Map 2.1.1

May 2020

177

00038769

DRAFT SECTION 4(f) EVALUATION



**Figure 5-7: Detail of Location Specific Option LS-3 (Map 2 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 2.1.2

0    150    300
Feet

**Legend**

━━ Centerline of Proposed Action
▨ Historic Property
▨ Park Property
╴╴╴ Map Match Line

**Location Specific Options**
▨ Option LS-3





**Figure 5-8: Detail of Location Specific Option LS-3 (Map 3 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 2.1.3

0   150   300   Feet

**Location Specific Options**
Option LS-3

**Legend**
Centerline of Proposed Action
Historic Property
Park Property
Map Match Line

00038771

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 30 of 226

**Figure 5-9: Detail of Location Specific Option LS-3 (Map 4 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 2.1.4

0  150  300 Feet

**Legend**

━━━ Centerline of Proposed Action

▨ Historic Property

▨ Park Property

⌐ ⌐ Map Match Line

**Location Specific Options**

▨ Option LS-3

DRAFT SECTION 4(f) EVALUATION



Figure 5-10: Detail of Location Specific Option LS-3 (Map 5 of 6)

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 2.1.5

0   150   300 Feet

**Legend**

Location Specific Options
- Option LS-3

Centerline of Proposed Action
Historic Property
Park Property
Map Match Line
Property in MDOT-SHA Easement

May 2020

181

00038773



**Figure 5-11: Detail of Location Specific Option LS-3 (Map 6 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Rock Creek SVP Unit 2

Rock Creek SVP Unit 3

CONNECTICUT AVE

Rock Creek SVP Unit 3

CAPITAL BELTWAY

North Chevy Chase Local Park

**Location Specific Options**
Option LS-3

**Legend**
— Centerline of Proposed Action
Historic Property
Park Property
▪ ▪ Map Match Line
Property in MDOT-SHA Easement

**Location Specific Options Map**

Map 2.1.6

0   150   300
Feet

00038774

00038775



### 5.1.4   Location Specific Option 4 (LS-4)

**Section 4(f) Properties Avoided: Unit 2 of Rock Creek Stream Valley Park, National Park Seminary Historic District/Forest Glen, and Metropolitan Branch, B&O Railroad**

A.   **Description**

The Proposed Action would widen I-495 on existing alignment through Unit 2 of Rock Creek Stream Valley Park, as described in **Section 2.1.11** and expand the highway beyond the existing MDOT SHA easement. Option LS-4 would relocate mainline I-495 approximately 0.5 miles to the north to avoid a Section 4(f) use of Rock Creek Stream Valley Park, Unit 2 (**Figure 5-12** through **Figure 5-16**). LS-4 would avoid the Section 4(f) use of Rock Creek Stream Valley Park, Unit 2; National Park Seminary Historic District/Forest Glen; and Metropolitan Branch, B&O Railroad. Option LS-4 would avoid a Section 4(f) use of Metropolitan Branch, B&O Railroad through a grade separation. However, the alignment of Option LS-4 would bisect Rock Creek Stream Valley Park, Unit 3, and result in the increased Section 4(f) of Forest Glen Historic District, Forest Glen Neighborhood Park, and the Washington DC Temple.

B.   **Analysis**

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-4 would result in 11 acres of additional impacts to Section 4(f) properties. Despite eliminating the use of the Section 4(f) properties listed in in **Table 5-5**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-6**. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-4 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 6, Option LS-4 would cause severe impacts to community resources, potentially resulting in the relocation of 257 properties. By comparison, the Proposed Action would not result in any relocations along this portion. In consideration of Least Overall Harm Factor 7, Option LS-4 would cost an estimated $1.4 billion or $700 million more than the Proposed Action on this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources and substantial difference in cost, Option LS-4 would result in more harm than the Proposed Action.

#### Table 5-5: Properties Avoided by Option LS-4

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 2 | 0.4 |
| National Park Seminary Historic District | 1.2 |
| Metropolitan Branch, B&O Railroad | 8.8 |
| **Total Section 4(f) Property Avoided** | **10.4** |

00038776



Table 5-6: Properties Experiencing an Increase in Section 4(f) Use by Option LS-4

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 3 | 14.3 |
| Forest Glen Historic District | 2.8 |
| Forest Glen Neighborhood Park | 1.2 |
| Washington, DC Temple | 3.0 |
| **Total Increase in Use of Section 4(f) Property** | **21.3** |

In consideration of Least Overall Harm Factor 3, Unit 2 of Rock Creek Stream Valley Park is a large, heavily used, multi-function recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County where no comparable facilities exist. The park is also historically significant for its association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As historic sites of statewide significance and parts of a large park that offers diverse recreational opportunities to a regional population, Units 2 and 3 of Rock Creek Stream Valley Park are the most significant Section 4(f) property along this portion of the Study.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-4 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038777

DRAFT SECTION 4(f) EVALUATION

**Figure 5-12: Overview Map of Location Specific Option LS-4**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Overview Map**

Map 2.2.0

0    750    1,500 Feet

**Location Specific Options**
- Option LS-3
- Option LS-4
- Option LS-5

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement

May 2020

DRAFT SECTION 4(f) EVALUATION



**Figure 5-13: Detail of Location Specific Option LS-4 (Map 1 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

0    150    300    Feet

Map 2.2.1

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Property in MDOT-SHA Easement

**Location Specific Options**
- Option LS-3
- Option LS-4

May 2020

186

00038779

DRAFT SECTION 4(f) EVALUATION





**Figure 5-14: Detail of Location Specific Option LS-4 (Map 2 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**

**Legend**

Centerline of Proposed Action

Historic Property

Park Property

Map Match Line

Option LS-4

**Location Specific Options Map**

Map 2.2.2

0    150    300 Feet

May 2020

DRAFT SECTION 4(f) EVALUATION



Figure 5-15: Detail of Location Specific Option LS-4 (Map 3 of 4)

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 2.2.3

**Legend**

— Centerline of Proposed Action
Historic Property
Park Property

- - Map Match Line
Grade Separation

**Location Specific Options**
Option LS-4
Option LS-5

0   150   300  Feet

DRAFT SECTION 4(f) EVALUATION



Figure 5-16: Detail of Location Specific Option LS-4 (Map 4 of 4)

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 2.2.4

0   150   300 Feet

**Legend**

Centerline of Proposed Action
Historic Property
Park Property
Map Match Line
Grade Separation

**Location Specific Options**
Option LS-4
Option LS-5

May 2020

189

00038782

USCA4 Appeal: 24-1447      Doc: 31-1      Filed: 09/30/2024      Pg: 41 of 226



### 5.1.5   Location Specific Option 5 (LS-5)

**Section 4(f) Property Avoided: National Park Seminary Historic District/Forest Glen**

#### A.   Description

The Proposed Action would widen I-495 on existing alignment at this location. The widening would require replacing the bridges carrying the historic Metropolitan Branch, B&O Railroad and Linden Lane across I-495. The replacement and relocation of these bridges would impact National Park Seminary Historic District/Forest Glen as described in **Section 2.1.12**. Option LS-5 would relocate the replacement bridge carrying Metropolitan Branch, B&O Railroad further to the east to avoid impacts to National Park Seminary Historic District/Forest Glen (**Figure 5-17** and **Figure 5-18**).

#### B.   Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-5 would result in 3.8 acres of additional impacts to Section 4(f) properties. Despite eliminating the Section 4(f) use of National Park Seminary Historic District/Forest Glen (**Table 5-7**), total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-8**. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-5 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 6, Option LS-5 would cause severe impacts to community resources, potentially resulting in the relocation of 16 properties, including the demolition of contributing properties within Capitol View Park Historic District. In consideration of Least Overall Harm Factor 7, Option LS-5 would cost approximately $182 million, which is $27 million more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-5 would result in more harm than the Proposed Action.

**Table 5-7: Properties Avoided by Option LS-5**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| National Park Seminary Historic District | 1.3 |
| **Total Section 4(f) Property Avoided** | **1.3** |

**Table 5-8: Properties Experiencing an Increase in Section 4(f) Use by Option LS-5**

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 2 | 0.1 |
| Capitol View Park Historic District | 5.0 |
| **Total Increase in Use of Section 4(f) Property** | **5.1** |

In consideration of Least Overall Harm Factor 3, Unit 2 of Rock Creek Stream Valley Park is a large, heavily used, multi-function, recreational facility that provides opportunities to a wide segment of densely

00038784



populated lower Montgomery County where no comparable facilities exist. The park is also historically significant for its association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As an historic site of statewide significance and part of a large park that offers diverse recreational opportunities to a regional population, Unit 2 of Rock Creek Stream Valley Park is the most significant Section 4(f) property along this portion of the Study. In consideration of relative significance, National Park Seminary Historic District is an historically significant architectural folly comprising a unique location, setting, feeling, and collection of architecture. While National Park Seminary is a unique and significant historic site, it does not provide the recreational opportunities of Rock Creek Park. Comparatively, a small impact to Rock Creek Park under Option LS-5 would not result in a Section 4(f) use of significant features or attributes that characterize the property as an historic site or would negatively affect the qualities of the park that qualify the property for Section 4(f) protection. Capital View Park Historic District is a pre-World War II residential subdivision. When compared to Rock Creek Park and National Park Seminary Historic District, pre-World War II subdivisions are a relatively well represented Section 4(f) property type. However, Option LS-5 would result in significant impacts to Capitol View Park Historic District and would result in the demolition of multiple residential dwellings that contribute to the significance of the district.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-5 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038785



DRAFT SECTION 4(f) EVALUATION

Figure 5-17: Overview Map of Location Specific Option LS-5

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-3
- Option LS-4
- Option LS-5

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement

**Location Specific Options Overview Map**

Map 2.3.0

0   750   1,500 Feet

May 2020

192

00038786

JA1948

DRAFT SECTION 4(f) EVALUATION



**Figure 5-18: Detail of Location Specific Option LS-5**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 2.3.1

0   150   300   Feet

**Location Specific Options**
- Option LS-4
- Option LS-5

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation

May 2020

193
00038787



### 5.1.6    Location Specific Option 6 (LS-6)

**Section 4(f) Properties Avoided: Sligo Creek Parkway, South Four Corners Neighborhood Park, Blair Local Park, Montgomery Blair High School Athletic Fields**

#### A.    Description

The Proposed Action would widen I-495 on existing alignment at this location. The widening would impact Sligo Creek Parkway, as described in **Section 2.1.17.** Option LS-6 would relocate I-495 approximately 0.7 miles to the south to avoid a Section 4(f) use of Sligo Creek Parkway (**Figure 5-19** through **Figure 5-23**). Avoidance would be achieved by bridging over the narrowest portion of Sligo Creek Parkway. Option LS-6 would maintain the same typical section as the Proposed Action while eliminating the Section 4(f) use of National Park Seminary Historic District/Forest Glen.

#### B.    Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-6 would result in 12 acres of additional impacts to Section 4(f) properties. Despite eliminating the use of the Section 4(f) properties listed in **Table 5-9**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-10**. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-6 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. While avoiding impacts to four Section 4(f) properties, the additional impacts to Indian Spring Club Estates and Indian Spring Country Club would be considerable and result in the demolition of dozens of contributing residential dwellings. By comparison, the impacts to Sligo Creek Stream Valley Park from the Proposed Action are to landscaping features that can be more readily mitigated.

In comparison to the Proposed Action and in consideration of Least Overall Harm factor 6, Option LS-6 would cause severe impacts to community resources, potentially resulting in the relocation of 547 properties. Implementing Option LS-6 would also impact the established land use patterns, and roadway infrastructure in multiple communities, potentially cutting off access to these areas. In consideration of Least Overall Harm factor 7, Option LS-6 would cost approximately $2 billion, which is $1.2 billion more than the Proposed Action along this portion of the project. In comparison to the Proposed Action, Option LS-6 would not be a reasonable public expenditure. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-6 would result in more harm than the Proposed Action.

#### Table 5-9: Properties Avoided by Option LS-6

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
| --- | --- |
| Sligo Creek Parkway | 4.1 |
| South Four Corners Park | 0.1 |
| Blair Local Park | 0.4 |
| Montgomery Blair Senior High School Athletic Fields | 1.4 |
| **Total Acreage of Section 4(f) Properties Avoided** | **6.0** |

00038788



Table 5-10: Properties Experiencing an Increase in Section 4(f) Use by Option LS-6

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Indian Spring Club Estates and Indian Spring Country Club | 18.0 |
| **Total Increase in Use of Section 4(f) Property** | **18.0** |

In consideration of Least Overall Harm Factor 3, Sligo Creek Stream Valley Park is a heavily used recreational facility in the lower portion of Montgomery County. It is also historically significant for its association with social history, recreation, transportation, and conservation during the first half of the twentieth century. Owing to its location, heavy use and historical significance, Sligo Creek Stream Valley Park is the most significant Section 4(f) property along this portion of the Study. Montgomery Blair High School Athletic Fields and Blair Local Park provide a diversity of recreational opportunities to the broader community and are also significant Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-6 would maintain the same typical section as the Proposed Action and although longer in distance, would meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038789

DRAFT SECTION 4(f) EVALUATION



**Figure 5-19: Overview Map of Location Specific Option LS-6**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.



**Location Specific Options Overview Map**

Map 3.1.0

Location Specific Options
- Option LS-6
- Option LS-7
- Option LS-8

Legend
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement
- Bridge

May 2020

00038790

JA1952

**Figure 5-20: Detail of Location Specific Option LS-6 (Map 1 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 3.1.1

0   150   300   Feet

Legend

Location Specific Options
- Option LS-6

Centerline of Proposed Action
Historic Property
Park Property
Map Match Line
Grade Separation
Property in MDOT-SHA Easement

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 50 of 226



**Figure 5-21: Detail of Location Specific Option LS-6 (Map 2 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Sligo Creek Parkway

**Location Specific Options**
- Option LS-6

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line

**Location Specific Options Map**

Map 3.1.2

0   150   300
Feet

198

00038792



**Figure 5-22: Detail of Location Specific Option LS-6 (Map 3 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 3.1.3

0  150  300 Feet

**Legend**

**Location Specific Options**
Option LS-6

Centerline of Proposed Action
Historic Property
Park Property
Map Match Line
Grade Separation

00038793

DRAFT SECTION 4(f) EVALUATION



**Figure 5-23: Detail of Location Specific Option LS-6 (Map 4 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-6
- Option LS-7
- Option LS-8

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Bridge

**Location Specific Options Map**

Map 3.1.4

0  150  300
Feet

May 2020

00038784

200

00038795



### 5.1.7  Location Specific Option 7 (LS-7)

**Section 4(f) Properties Avoided: Indian Spring Club Estates and Indian Spring Country Club and Indian Springs Terrace Local Park.**

#### A.  Description

The Proposed Action would widen I-495 on existing alignment at this location. The proposed improvements would result in impacts to Indian Spring Club Estates and Indian Spring Country Club (**Section 2.1.21**) and Indian Springs Terrace Local Park (**Section 2.1.22**). Option LS-7 would relocate I-495 approximately 65 feet to the north while maintaining the same typical section as the Proposed Action (**Figure 5-24** through **Figure 5-26**). Option LS-7 would eliminate impacts to two Section 4(f) properties: Indian Spring Club Estates and Indian Spring Country Club and Indian Springs Terrace Local Park.

#### B.  Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-7 would result in 0.9 acre of additional impacts to Section 4(f) properties. Despite eliminating the Section 4(f) use of the properties listed in **Table 5-11**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-12**. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-7 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 6, Option LS-7 would cause severe impacts to community resources, potentially eliminating the Montgomery Blair High School Athletic Fields and a significant portion of the recreational facilities in Blair Local Park. The impacts to these parks would require the complete and challenging redesign of the athletic fields in order to provide adequate playing fields to support sports for both the broader community and high school students. The large area of impact to these athletic fields under Option LS-7 would require reconfiguring the site plan to convert the existing parking lot into athletic fields and realigning the exit and entry to the school to construct a new parking garage. In consideration of Least Overall Harm Factor 7, Option LS-7 would cost approximately $410 million, which is $250 million more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-7 would result in more harm than the Proposed Action.

#### Table 5-11: Section 4(f) Properties Avoided by LS-7

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Indian Spring Club Estates and Indian Spring Country Club Historic District | 1.2 |
| Indian Spring Terrace Local Park | 1.4 |
| **Total Section 4(f) Property Avoided** | **2.6** |

00038796



Table 5-12: Properties Experiencing an Increase in Section 4(f) Use by Option LS-7

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Montgomery Blair High School Athletic Fields | 1.7 |
| Blair Local Park | 1.8 |
| **Total Increase in Use of Section 4(f) Property** | **3.5** |

In consideration of Least Overall Harm Factor 3, Montgomery Blair High School Athletic Fields and Blair Local Park provide a diversity of recreational opportunities in densely populated lower Montgomery County. For this reason, these parks are the most significant Section 4(f) properties along this portion of the project. Indian Spring Club Estates and Indian Spring Country Club is historically significant as an example of pre-World War II middle class residential architecture. Significant examples of this type of suburban residential historic districts from this time period and that retain integrity are rare. For this reason, the historic district is more significant as a Section 4(f) property than Indian Springs Terrace Local Park.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-7 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038797

DRAFT SECTION 4(f) EVALUATION



Figure 5-24: Overview Map of Location Specific Option LS-7

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

## Location Specific Options
- Option LS-6
- Option LS-7
- Option LS-8

## Legend
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement
- Bridge

**Location Specific Options Overview Map**

0   750   1,500 Feet

Map 3.2.0

203

00038798

May 2020

JA1960

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 57 of 226



**Figure 5-25: Detail of Location Specific Option LS-7 (Map 1 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Blair Local Park

Montgomery Blair High School Athletic Fields

Indian Springs Terrace Local Park

Indian Spring Club Estates and Indian Spring Country Club

Pooks Hill Historic District

Hastings NHA

**Location Specific Options Map**

Map 3.2.1

0  150  300  Feet

**Location Specific Options**
Option LS-6
Option LS-7

**Legend**
Centerline of Proposed Action
Historic Property
Park Property
Map Match Line

495 270 MANAGED LANES STUDY

204

00038799

May 2020

JA1961

DRAFT SECTION 4(f) EVALUATION



**Figure 5-26: Detail of Location Specific Option LS-7 (Map 2 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-6
- Option LS-7
- Option LS-8

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Bridge

Blair Local Park

Indian Spring Local Park

Indian Spring Club Rollingwood Spring Country Club

Montgomery Blair High School Athletic Fields

UNIVERSITY BLVD E

MARYLAND STATE HIGHWAY

495

CAPITAL BELTWAY

**Location Specific Options Map**

Map 3.2.2

0  150  300 Feet

JA1962

0038801



### 5.1.8   Location Specific Option 8 (LS-8)

**Section 4(f) Property Avoided: Unit 3 of Northwest Branch Stream Valley Park**

A.   **Description**

The Proposed Action would replace the bridge carrying I-495 across Unit 3 of Northwest Branch Stream Valley Park. The proposed improvements would result in impacts to the park, as described in **Section 2.1.23**. Option LS-8 would involve constructing a longer bridge across Northwest Branch Stream Valley Park in order to avoid impacts to the Section 4(f) property (**Figure 5-27** through **Figure 5-29**). The bridge would be constructed on the existing alignment. Staging and stockpiling would take place offsite, outside the park boundary.

The greatest challenge would be maintaining operation of the existing highway while building the bridge from the surface of the roadway in a manner that does not result in permanent impacts to Northwest Branch Stream Valley Park. This would be accomplished through a lengthy and complicated maintenance of traffic plan that would shift traffic on I-495 to one bridge while construction takes place on the newly proposed span. This would result in significant congestion over a lengthy period of time. Under Option LS-8, to avoid a Section 4(f) use of the park, the existing bridges would be stabilized and remain in place.

B.   **Analysis**

In consideration of Least Overall Harm Factor 7, implementing Option LS-8 would cost $270 million, which is $200 million more than the Proposed Action along this portion of the project. Stabilizing rather than removing the existing bridges would incur additional maintenance costs over time. Despite avoiding the Section 4(f) use of Northwest Branch Stream Valley Park, owing to the substantial difference in cost, Option LS-8 would result in greater harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, as it avoids the use of Northwest Branch Stream Valley Park when compared to the Proposed Action Option LS-8 would have greater ability to mitigate adverse impacts to Section 4(f) property. In consideration of Least Overall Harm Factor 2, Option LS-8 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Option LS-8 would avoid the use of Northwest Branch Stream Valley Park. There are no other Section 4(f) properties in the vicinity.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-8 would meet the Purpose and Need to a degree that is comparable to the Proposed Action.

In consideration of Least Overall Harm Factor 6, by constructing the replacement bridge from the surface of the highway, Option LS-8 would avoid impacts to Northwest Branch and the associated flood plain and wetland systems, forest resources, as well as the flora and fauna within Northwest Branch Stream Valley Park. Construction would also be staged offsite. Impacts to Northwest Branch Stream Valley Park from the Proposed Action are largely related to constructability – both building the new structure and removing the current bridges. By comparison, implementing Option LS-8 would largely avoid ecological impacts

00038802

**DRAFT SECTION 4(f) EVALUATION**



within Northwest Branch Stream Valley Park. Neither the Proposed Action nor Option LS-8 would result in any relocations along this portion of the project.

00038803

JA1965

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 62 of 226

**Figure 5-27: Overview Map of Location Specific Option LS-8**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Location Specific Options Overview Map

Map 3.3.0

0  750  1,500 Feet

**Location Specific Options**

Option LS-6
Option LS-7
Option LS-8

**Legend**

Centerline of Proposed Action
Historic Property
Park Property
Map Match Line
Grade Separation
Property in MDOT SHA Easement
Bridge

00038804

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 63 of 226



**Figure 5-28: Detail of Location Specific Option LS-8 (Map 1 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

CAPITAL BELTWAY

(Northwest)
Branch-NVP
Unit 5

MATCH LINE

**Map 3.3.1**

**Location Specific Options Map**

0   150   300   Feet

**Location Specific Options**
- Option LS-6
- Option LS-7
- Option LS-8

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement
- Bridge

00038806

DRAFT SECTION 4(f) EVALUATION



**Figure 5-29: Detail of Location Specific Option LS-8 (Map 2 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Brookview Local Park

CAPITAL BELTWAY

Randolph Rd

Northwest Branch SVP Unit 3

**Location Specific Options**

Option LS-8

**Legend**

- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement
- Bridge

**Location Specific Options Map**

Map 3.3.2

0   150   300   Feet

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 65 of 226

0038807



### 5.1.9  Location Specific Option 9 (LS-9)
**Section 4(f) Property Avoided: Cherry Hill Road Park**

#### A.  Description

The Proposed Action would widen I-495 on existing alignment at this location and result in a Section 4(f) use of 1.8 acres from Cherry Hill Park, as described in **Section 2.1.24**. Option LS-9 would avoid impacts to Cherry Hill Road Park by relocating I-495 approximately 85 feet to the north while maintaining the same typical section as the Proposed Action and eliminating stormwater management facilities on park property (**Figure 5-30** through **Figure 5-32**).

#### B.  Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-9 would result in 6.1 acres of additional impacts to BARC. The impacts to BARC would include an agricultural field that contributes to the historical significance of the Section 4(f) property. These impacts could be mitigated through documentation or reconfiguring the field, but historically significant activities would still be severely impacted. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-9 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. In consideration of Least Overall Harm factor 7, Option LS-9 would cost approximately $350 million or $88 million more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property and substantial difference in cost, Option LS-9 would result in more harm than the Proposed Action.

BARC is historically significant for its association with the history and development of agricultural research and the New Deal. It is also historically significant for being associated with the landscape architecture of A.D. Taylor. As a unique historic site and in consideration of Least Overall Harm Factor 3, it possesses greater significance as a Section 4(f) property than Cherry Hill Road Park.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-9 would maintain the same typical section as the Proposed Action and although longer in distance, would meet the Purpose and Need of the Study to a degree comparable to the Proposed Action. In consideration of Least Overall Harm Factor 6, impacts to resources not protected by Section 4(f) would be comparable to the Proposed Action.

00038808

00038809

DRAFT SECTION 4(f) EVALUATION



Figure 5-30: Overview Map of Location Specific Option LS-9

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.



**Location Specific Options Overview Map**

Map 4.1.0

0    750    1,500    Feet

**Location Specific Options**
- Option LS-9

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property in MDOT-SHA Easement

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 69 of 226

**Figure 5-31: Detail of Location Specific Option LS-9 (Map 1 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Location Specific Options

Option LS-9

Legend

Centerline of Proposed Action

Historic Property

Park Property

Map Match Line

Property in MDOT-SHA Easement

Location Specific Options Map

Map 4.1.1

0  150  300 Feet

DRAFT SECTION 4(f) EVALUATION



**Figure 5-32: Detail of Location Specific Option LS-9 (Map 2 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
Option LS-9

**Legend**
Centerline of Proposed Action
Historic Property
Park Property
Map Match Line
Property in MDOT-SHA Easement

Map 4.1.2

**Location Specific Options Map**

0  150  300 Feet

May 2020

0038813



### 5.1.10 Location Specific Option 10 (LS-10)

**Section 4(f) Properties Avoided: Greenbelt Park, Baltimore Washington Parkway, and McDonald Field.**

A. **Description**

The Proposed Action would widen I-495 on alignment, replace the existing bridges over the Baltimore Washington Parkway and construct a new direct access interchange that would accommodate both the GP and managed lanes. These improvements would result in impacts to Greenbelt Park (**Section 2.1.30**) and Baltimore Washington Parkway (**Section 2.1.31**). Option LS-10 would retain the existing interchange configuration for the GP lanes. The managed lanes would be constructed on a new, parallel tunnel south of existing I-495 (**Figure 5-33** through **Figure 5-37**). Option LS-10 would eliminate direct access to Baltimore Washington Parkway from the managed lanes. The alignment of the managed lanes would diverge south from I-495 east of Kenilworth Avenue and continue southeast, tunneling underneath Greenbelt Park and Baltimore Washington Parkway. The second tunnel portal would be placed east of Greenbelt Park and intersect with mainline I-495 east of Good Luck Road.

B. **Analysis**

In consideration of Least Overall Harm Factor 7, Option LS-10 would cost $1.6 billion, which is approximately $500 million more than the Proposed Action along this portion of the project. . The method for constructing the tunnel (bore versus open trench) has not been determined as part of this analysis, and complex construction risks would be high, thus costs could be higher. In consideration of Least Overall Harm Factor 5, implementing Option LS-10 would compromise the ability of the Study to meet the Purpose and Need by adding significant risk to financial viability through removing direct access to the managed lanes at Baltimore Washington Parkway Even though it avoids the Section 4(f) use of the three Section 4(f) properties listed in **Table 5-13**, owing to the substantial difference in cost and compromised ability to meet the Purpose and Need, Option LS-10 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of three Section 4(f) properties – despite the increased use of the Section 4(f) properties listed in **Table 5-14** – when compared to the Proposed Action Option LS-10 would result in greater ability to mitigate adverse impacts to Section 4(f) property. In consideration of Least Overall Harm Factor 2, Option LS-10 would also result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

**Table 5-13: Section 4(f) Properties Avoided by LS-10**

| Section 4(f) Property | Avoidance of Section 4(f) Property (in Acres) |
|---|---|
| Greenbelt Park | 0.6 |
| Baltimore Washington Parkway | 69.3 |
| McDonald Field | < 0.1 |
| **Total Section 4(f) Property Avoided** | **69.9** |

00038814



Table 5-14: Properties Experiencing an Increase in Section 4(f) Use by Option LS-10

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Buddy Attick Lake Park (part of Greenbelt Historic District) | 0.3 |
| Indian Springs Park (part of Greenbelt Historic District) | 1.1 |
| Good Luck Estates Park | 4.2 |
| Youth Sports Memorial Park | < 0.1 |
| Robert Frost Park | 1.0 |
| **Total Increase in Use of Section 4(f) Property** | **6.7** |

In consideration of Least Overall Harm Factor 3, both Baltimore Washington Parkway and Greenbelt Park are NPS properties that qualify for Section 4(f) protection as public parks and historic sites. Baltimore Washington Parkway is a significant public parkway with gentle hills and modest vistas significant for its landscape architecture and design. Greenbelt Park features a campground, trails, and picnic areas. The park is historically significant for its association with the NPS Mission 66 program and providing recreational opportunities in suburban Washington, DC. These two properties are the most significant Section 4(f) properties along this portion of the project.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. In consideration of Least Overall Factor 6, impacts to resources not protected by Section 4(f) would be comparable to the Proposed Action.

00038815

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 74 of 226



**Figure 5-33: Overview Map of Location Specific Option LS-10**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

## Location Specific Options
- Option LS-10

## Legend
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Property Permitted to MDOT-SHA
- Tunnel

**Location Specific Options Overview Map**

Map 5.1.0

0    750    1,500    Feet

217

0003816

DRAFT SECTION 4(f) EVALUATION

Figure 5-34: Detail of Location Specific Option LS-10 (Map 1 of 4)

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

Location Specific Options Map

Map 5.1.1

0    150    300
Feet

**Legend**

Centerline of Proposed Action
Historic Property
Park Property
Map Match Line
Property Permitted to MDOT-SHA
Tunnel

**Location Specific Options**

Option LS-10

May 2020

JA1979

218

00038817

DRAFT SECTION 4(f) EVALUATION

**Figure 5-35: Detail of Location Specific Option LS-10 (Map 2 of 4)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**

**Legend**

Location Specific Options
- Option LS-10

- Centerline of Proposed Action
- Historic Property
- Park Property

- Map Match Line
- Property Permitted to MDOT-SHA
- Tunnel

**Location Specific Options Map**

Map 5.12

0  150  300  Feet

May 2020

219

00038818



**Figure 5-36: Detail of Location Specific Option LS-10 (Map 3 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Dresden Green Park

Robert Frost Park

CAPITAL BELTWAY

Good Luck Road

Youth Memorial Sports Park

Good Luck Estates Park

Greenbelt Park

WB BW PARKWAY

**Location Specific Options**

Option LS-10

**Legend**

— Centerline of Proposed Action
▨ Historic Property
▢ Park Property
▨ Map Match Line
▢ Tunnel

**Location Specific Options Map**

Map 5.1.3

0  150  300 Feet

MANAGED LANES STUDY
495 270



**Figure 5-37: Detail of Location Specific Option LS-10 (Map 4 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 5.1.4

0   150   300 Feet

**Location Specific Options**

■ Option LS-10

**Legend**

— Centerline of Proposed Action

⬚ Historic Property

▨ Park Property

- - - Map Match Line

⬚ Tunnel

Robert Frost Park

Dresden Green Park

USCA4 Appeal: 24-1447      Doc: 31-1      Filed: 09/30/2024      Pg: 79 of 226



### 5.1.11 Location Specific Option 11 (LS-11)

**Section 4(f) Property Avoided: Carsondale**

#### A. Description

The Proposed Action would widen I-495 on existing alignment at this location. The improvements would involve reconfiguring the interchange with US 50. In order to accommodate the new interchange, the Proposed Action would result in impacts of 0.1 acre to Carsondale, as described in **Section 2.1.34**. On March 12, 2020 MHT concurred that no effect determination could be made and additional consultation is required. Under 23 CFR 774.17, Section 4(f) requires a Section 106 finding of no adverse effect or no historic properties affected to apply a *de minimis* impact. This analysis assumes Carsondale would be adversely affected. Based on these assumptions, the evaluation of avoidance alternatives is required.

Option LS-11 would relocate US 50 approximately 18 feet to the north of its existing alignment east of the interchange with I-495 (**Figure 5-38** through **Figure 5-40**). Option LS-11 would hold the existing southern edge of pavement along US 50 eastbound, where the highway borders the northern boundary of Carsondale. Option LS-11 additionally requires realigning both the GP and managed lane ramps connecting I-495 and US 50.

#### B. Analysis

In consideration of Least Overall Harm Factor 6, Option LS-11 would result in two residential relocations in the middle of a subdivision, resulting in negative impacts to community cohesion. The Proposed Action would not require any relocations along this portion of the project. Owing to the impacts to community resources, Option LS-11 would result in more harm than the Proposed Action.

Under the Proposed Action, impacts to Carsondale would involve demolishing a detached garage and potentially filling-in a backyard pool from two contributing properties. Even with the adverse impacts to two contributing properties, the larger historic district would retain its historical significance. Option LS-11 would avoid the use of 0.1 acre of Carsondale. In consideration of Least Overall Harm Factor 1, Option LS-11 has a greater ability to mitigate for adverse impacts. However, because mitigation would significantly reduce the harm to Carsondale caused by the Proposed Action, in consideration of Least Overall Harm Factor 2, the Proposed Action and Option LS-11 would both result in minimal remaining harm.

In consideration of Least Overall Harm Factor 3, Option LS-11 would avoid the use of Carsondale and the use of additional Section 4(f) properties in the vicinity would not change. In consideration of Least Overall Harm Factor 4, OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-11 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action. In consideration of Least Overall Harm factor 7, Option LS-11 would cost approximately $216 million, which is $1 million less than the Proposed Action.

00038822

00038823

JA1985

DRAFT SECTION 4(f) EVALUATION

**Figure 5-38: Overview Map of Location Specific Option LS-11**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Overview Map**

Map 6.1.0

0   750   1,500 Feet

**Legend**

Centerline of Proposed Action
Grade Separation
Historic Property
Park Property
Map Match Line

**Location Specific Options**

Option LS-11
Option LS-12

00038824

223

JA1986



**Figure 5-39: Detail of Location Specific Option LS-11 (Map 1 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 6.1.1

0   150   300   Feet

**Legend**

— Centerline of Proposed Action
▨ Historic Property
▨ Park Property
⌐_¬ Map Match Line

**Location Specific Options**
Option LS-11
Option LS-12

May 2020

224

00038825

JA1987

DRAFT SECTION 4(f) EVALUATION

Figure 5-40: Detail of Location Specific Option LS-11 (Map 2 of 2)



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 6.1.2

0   150   300 Feet

**Location Specific Options**
- Option LS-11
- Option LS-12

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line

May 2020

225

00038826

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 85 of 226

0038827



### 5.1.12 Location Specific Option 12 (LS-12)

**Section 4(f) Properties Avoided: Glenarden Historic District and Henry P. Johnson Park**

#### A.   Description

The Proposed Action would widen I-495 on alignment in the vicinity of Glenarden Historic District and Henry P. Johnson Park resulting in the Section 4(f) use of both properties (**Sections 2.1.35** and **2.1.36**). Option LS-12 would relocate I-495 approximately a half mile to the east to avoid impacts to Section 4(f) properties (**Figure 5-41** through **Figure 5-44**). A shift this far from the existing alignment is due to the size of Glenarden Historic District, which is situated on either side of I-495. Option LS-12 would result in impacts to one Section 4(f) property outside the Corridor Study Boundary: Ardmore Neighborhood Park.

#### B.   Analysis

In consideration of Least Overall Harm Factor 6, Option LS-12 would cause severe impacts to community resources, potentially resulting in the relocation of 166 properties, including Ardmore Elementary School. By comparison, the Proposed Action may cause one residential displacement along this portion of the project. In consideration of Least Overall Harm factor 7, Option LS-12 would cost approximately $1 billion, which is $400 million more than the Proposed Action along this portion of the project.

Option LS-12 would eliminate the 0.8 acre use of the two Section 4(f) properties listed in **Table 5-15** and result in 0.8 acres of impact to Ardmore Neighborhood Park. Under the Proposed Action, impacts to Glenarden Historic District would consist of demolishing outbuildings and grading the landscaped areas. Option LS-12 would result in impacts to basketball courts, a playground, and access to Ardmore Neighborhood Park. In consideration of Least Overall Harm Factor 1, Option LS-12 has a greater ability to mitigate for adverse impacts. However, because mitigation would significantly reduce the harm to Glenarden Historic District caused by the Proposed Action and given the nature of the potential impacts to Ardmore Neighborhood Park by Option LS-12, in consideration of Least Overall Harm Factor 2, Option LS-12 would cause more severe remaining harm than the Proposed Action.

**Table 5-15: Properties Avoided by Option LS-12**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Glenarden Historic District | 0.8 |
| Henry P. Johnson Park | <0.1 |
| **Total Section 4(f) Properties Avoided** | **0.8** |

In consideration of Least Overall Harm Factor 3, Glenarden Historic District is significant as a middle-class African American community in the DC suburbs. This property type is underrepresented on the NRHP. For this reason, Glenarden Historic District is the most significant Section 4(f) property along this portion of the project.

In consideration of Least Overall Harm Factor 4, OWJ have not provided views regarding least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-12 would maintain the same typical section as the Proposed Action. However, owing to the length of the Option LS-12 and substantial difference in cost, it would meet the Purpose and Need of the Study to a slightly lesser degree than the Proposed Action.

00038828

00038829

DRAFT SECTION 4(f) EVALUATION



**Figure 5-41: Overview Map of Location Specific Option LS-12**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Overview Map**

Map 6.2.0

0   750   1,500
Feet

**Location Specific Options**
- Option LS-11
- Option LS-12

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation

May 2020

DRAFT SECTION 4(f) EVALUATION

Figure 5-42: Detail of Location Specific Option LS-12 (Map 1 of 3)



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
Option LS-11
Option LS-12

**Legend**
Centerline of Proposed Action
Historic Property
Park Property
Map Match Line

**Location Specific Options Map**

0   150   300 Feet

Map 6.2.1

May 2020

228

00038831

JA1993

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 90 of 226



**Figure 5-43: Detail of Location Specific Option LS-12 (Map 2 of 3)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

0   150   300 Feet

Map 6.2.2

**Legend**

— Centerline of Proposed Action
▨ Historic Property
▢ Park Property
▯ Map Match Line

**Location Specific Options**

▨ Option LS-12

May 2020

229

00038832

JA1994



**Figure 5-44: Detail of Location Specific Option LS-12 (Map 3 of 3)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 6.2.3

0  150  300
Feet

**Legend**

— Centerline of Proposed Action
⌐ ⌐ Map Match Line
▨ Historic Property
▢ Park Property

**Location Specific Options**

▨ Option LS-12

LANDOVER RD

Henry P.
Johnson
Park

Glenarden
Historic
District

00038833



### 5.1.13 Location Specific Option 13 (LS-13)

**Section 4(f) Property Avoided: Suitland Parkway**

#### A. Description

The Proposed Action would widen I-495 on existing alignment at this location. The improvements would involve replacing or widening the bridges that carry I-495 over Suitland Parkway and result in impacts of 0.3 acre to Suitland Parkway. This impact that may require transfer of lands out of federal ownership, as described in **Section 2.1.39**. Under 36 CFR 800.5(a)(2)(vii), the transfer of land out of federal ownership is identified as a Section 106 adverse effect. Not enough information is known about the design of the Proposed Action for MDOT SHA to determine a Section 106 effect finding for Suitland Parkway. On March 12, 2020 MHT concurred that no effect determination could be made and additional consultation is required. Under 23 CFR 774.17, Section 4(f) requires a Section 106 finding of no adverse effect or no historic properties affected to apply a *de minimis* impact. This analysis assumes Suitland Parkway would be adversely affected. Based on these assumptions, the evaluation of avoidance alternatives is required.

Option LS-13 would involve spanning Suitland Parkway to avoid a Section 4(f) use (**Figure 5-45** and **Figure** 5-46). Any structure that would span Suitland Parkway would need to be precast segmental or cast-in-place, post-tensioned and balanced cantilever. The main span of the structure would be approximately 575 feet in length over Suitland Parkway with 200-foot approach spans at either side for a total length of approximately 975 feet. The width of the structure would be approximately 100 feet with approximately 20-feet between the inner loop and outer loop structures.

#### B. Analysis

In consideration of Least Overall Harm factor 7, implementing Option LS-13 would cost approximately $244 million, which is $125 million more than the Proposed Action along this portion of the project. In consideration of Least Overall Harm Factor 6, when compared to the Proposed Action, Option LS-13 would result in additional impacts to 0.6 acre of additional forest resources and 0.1 acre of wetlands. Despite avoiding the Section 4(f) use of Suitland Parkway, owing to the substantial difference in cost and additional impacts to resources not protected by Section 4(f), Option LS-13 would result in greater harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of Suitland Parkway when compared to the Proposed Action Option LS-13 would have greater ability to mitigate adverse impacts to Section 4(f) property. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-13 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Option LS-13 would avoid the use of Suitland Parkway. There are no additional Section 4(f) properties in the vicinity.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-13 would meet the Purpose and Need to a degree that is comparable to the Proposed Action.

00038834

JA1996

00038835



DRAFT SECTION 4(f) EVALUATION

**Figure 5-45: Overview Map of Location Specific Option LS-13**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.



**Location Specific Options Overview Map**

Map 7.1.0

0    750    1,500    Feet

**Location Specific Options**
- Option LS-13
- Option LS-14

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property Permitted to MDOT-SHA
- Bridge

JA1998

232

00038836



DRAFT SECTION 4(f) EVALUATION

**Location Specific Options**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

Figure 5-46: Detail of Location Specific Option LS-13

**Location Specific Options**

- Option LS-13

**Legend**

- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property Permitted to MDOT-SHA
- Bridge

**Location Specific Options Map**

Map 7.1.1

0   150   300   Feet



### 5.1.14  Location Specific Option 14 (LS-14)

**Section 4(f) Property Avoided: Andrews Manor Park**

#### A.  Description

The Proposed Action would widen I-495 on existing alignment at this location. The improvements would result in impacts to Andrews Manor Park as described in **Section 2.1.41**. Option LS-14 would involve shifting the I-495 mainline approximately 85 feet north to avoid the Section 4(f) use of the park (**Figure 5-47** through **Figure 5-49**). The stormwater management facility would be relocated to the existing alignment of I-495 that would be vacated under the design of Option LS-14. No additional Section 4(f) property would experience a use from Option LS-14.

#### B.  Analysis

In consideration of Least Overall Harm Factor 6, Option LS-14 would cause severe impacts to community resources, potentially resulting in the relocation of 41 properties. The Proposed Action would not result in any relocations along this portion of the Study. In consideration of Least Overall Harm Factor 7, Option LS-14 would cost approximately $193 million or $25 million more than the Proposed Action along this portion of the project. Owing to the severe impacts to community resources and substantial difference in cost, Option LS-14 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of Andrews Manor Park when compared to the Proposed Action Option LS-14 would have greater ability to mitigate adverse impacts to Section 4(f) property. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-14 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Option LS-14 would avoid the use of Andrews Manor Park. There are no additional Section 4(f) properties in the vicinity.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-14 would meet the Purpose and Need to a degree that is comparable to the Proposed Action.

00038838

00038839

DRAFT SECTION 4(f) EVALUATION



Figure 5-47: Overview Map of Location Specific Option LS-14



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-13
- Option LS-14

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Grade Separation
- Property Permitted to MDOT-SHA
- Bridge

**Location Specific Options Overview Map**

Map 7.2.0

0   750   1,500   Feet

00038840

DRAFT SECTION 4(f) EVALUATION



**Figure 5-48: Detail of Location Specific Option LS-14 (Map 1 of 2)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 7.2.1

0    150    300 Feet

**Location Specific Options**
- Option LS-14

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line

May 2020

236

00038841

JA2003

DRAFT SECTION 4(f) EVALUATION

**Figure 5-49: Detail of Location Specific Option LS-14 (Map 2 of 2)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Manchester
Estates Park

Andrews
Manor Park

**Location Specific Options**

Option LS-14

**Legend**

Centerline of Proposed Action
Historic Property
Park Property

Map Match Line

**Location Specific
Options Map**

Map 7.2.2

0    150    300
Feet

JA2004

0038843



### 5.1.15 Location Specific Option 15 (LS-15)

**Section 4(f) Properties Avoided: Cabin John Regional Park, Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park, Unit 6.**

#### A. Description

The Proposed Action would widen I-270 on alignment at this location. The widening would result in impacts to Cabin John Regional Park as described in **Section 2.2.2**, Tilden Woods Stream Valley Park (**Section 2.2.3**), Old Farm Neighborhood Conservation Area (**Section 2.2.4**) and Unit 6 of Cabin John Stream Valley Park (**Section 2.2.5**).

Option LS-15 would relocate the west spur of I-270 up to 1.6 miles to the west, avoiding the four Section 4(f) properties (**Figure 5-50** through **Figure 5-56**). The wide westerly shift is necessary because Cabin John Regional Park is a contiguous resource that extends over a mile to the west of I-270. The arc of Option LS-15 was designed to avoid Section 4(f) property, minimize property relocations, and connect to I-495 near the existing interchange. Existing I-270 would be removed from service between the west spur interchange with I-495 and the Montrose Road interchange.

#### B. Analysis

In consideration of Least Overall Harm Factor 6, Option LS-15 would cause severe impacts to community resources, potentially resulting in the relocation of 700 properties. Option LS-15 would also impact the roadway infrastructure of several existing communities, potentially cutting off access to these areas. In consideration of Least Overall Harm Factor 7, Option LS-15 would cost an estimated $2.5 billion or $1.6 billion more than the Proposed Action along this portion of the project. Owing to the severe impacts to community resources and substantial difference in cost, Option LS-15 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the Section 4(f) use of the four properties listed in **Table 5-16**, when compared to the Proposed Action Option LS-15 would have greater ability to mitigate adverse impacts to Section 4(f) property. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-15 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Cabin John Regional Park is a large, heavily used, multi-function recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County in a location where no comparable facilities exist. It is the most significant Section 4(f) property along this portion of the Study.

**Table 5-16: Properties Avoided by Option LS-15**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Cabin John Regional Park | 5.7 |
| Tilden Woods Stream Valley Park | 0.2 |
| Old Farm Neighborhood Conservation Area | 0.1 |
| Cabin John Stream Valley Park, Unit 6 | 0.4 |
| **Total Section 4(f) Property Avoided** | **6.4** |

00038844

JA2006



In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-15 would maintain the same typical section as the Proposed Action, but owing to the length and significant disruption to established communities would meet the Purpose and Need of the Study to a lesser degree than the Proposed Action.

00038845

JA2007



**Figure 5-50: Overview Map of Location Specific Option LS-15**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.



**Location Specific Options**
- Option LS-15
- Option LS-16
- Option LS-17

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line

**Location Specific Options Overview Map**

Map 8.1.0

0   750   1,500 Feet

May 2020

240

00038846

JA2008

USCA4 Appeal: 24-1447   Doc: 31-1   Filed: 09/30/2024   Pg: 105 of 226

**Figure 5-51: Detail of Location Specific Option LS-15 (Map 1 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.



Map 8.1.1

**Location Specific Options Map**

0   150   300
Feet

**Legend**

— Centerline of Proposed Action
▨ Historic Property
▨ Park Property
▨ Map Match Line

**Location Specific Options**

Option LS-15



JA2009

DRAFT SECTION 4(f) EVALUATION



Figure 5-52: Detail of Location Specific Option LS-15 (Map 2 of 6)

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Map Rose Match Line

Cabin John Regional Park

Seven Locks Match Line

**Location Specific Options**
■ Option LS-15

**Legend**
■ Centerline of Proposed Action
▨ Historic Property
▢ Park Property
Ⅰ ─ Ⅰ Map Match Line

**Location Specific Options Map**

0   150   300 Feet

Map 8.1.2

May 2020

242

00038848

JA2010

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 107 of 226

**Figure 5-53: Detail of Location Specific Option LS-15 (Map 3 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 8.1.3

0    150    300 Feet

**Legend**

- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line

**Location Specific Options**

- Option LS-15

May 2020

JA2011

243

00038846

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 108 of 226

**Figure 5-54: Detail of Location Specific Option LS-15 (Map 4 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

Map 8.1.4

0   150   300 Feet

**Location Specific Options**

Option LS-15

**Legend**

Centerline of Proposed Action

Historic Property

Park Property

Map Match Line

JA2012

DRAFT SECTION 4(f) EVALUATION

**Figure 5-55: Detail of Location Specific Option LS-15 (Map 5 of 6)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options Map**

0   150   300   Feet

Map 8.1.5

**Legend**

— Centerline of Proposed Action    ⌐ ¬ Map Match Line
▨ Historic Property
▢ Park Property

**Location Specific Options**

▨ Option LS-15

May 2020

245

00038851

JA2013

DRAFT SECTION 4(f) EVALUATION



**Figure 5-56: Detail of Location Specific Option LS-15 (Map 6 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**

Option LS-15
Option LS-16
Option LS-17

**Legend**

Centerline of Proposed Action
Historic Property
Park Property
Map Match Line

**Location Specific Options Map**

Map 8.1.6

0  150  300 Feet

May 2020

246

JA2014

00038852

0038853



### 5.1.16 Location Specific Option 16 (LS-16)

**Section 4(f) Property Avoided: Cabin John Regional Park**

#### A.   Description

The Proposed Action would widen I-270 on existing alignment at this location. The widening would result in impacts to Cabin John Regional Park as described in **Section 2.2.2**. Option LS-16 would shift the I-270 mainline approximately 160 feet to the east while maintaining the same typical section as the Proposed Action (**Figure 5-57** through **Figure 5-61**). The design of Option LS-16 would realign the I-270 split into the east and west spurs.

#### B.   Analysis

In consideration of Least Overall Harm Factor 6, Option LS-16 would cause severe impacts to community resources, potentially resulting in the relocation of 60 properties. In consideration of Least Overall Harm Factor 7, Option LS-16 would cost an estimated $920 million or $270 million more than the Proposed Action along this portion of the project. Owing to the severe impacts to community resources and substantial difference in cost, Option LS-16 would result in more harm than the Proposed Action.

**Table 5-17: Property Avoided by Option LS-16**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Cabin John Regional Park | 5.7 |
| **Total Section 4(f) Property Avoided** | **5.7** |

**Table 5-18: Properties Experiencing an Increase in Section 4(f) Use by Option LS-16**

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Tilden Woods Stream Valley Park | 0.9 |
| Old Farm Neighborhood Conservation Area | 0.6 |
| Cabin John Stream Valley Park, Unit 6 | 2.4 |
| **Total Section 4(f) Property Avoided** | **3.9** |

In consideration of Least Overall Harm Factor 1, Option LS-16 would avoid the use of Cabin John Regional Park (**Table 5-17**) and increase the Section 4(f) use of the four properties listed in **Table 5-18**. The net result is when compared to the Proposed Action, Option LS-16 would reduce use of Section 4(f) properties by 1.8 acres. When compared to the Proposed Action Option LS-16 would have greater ability to mitigate adverse impacts to Section 4(f) property. However, the Proposed Action would primarily result in impacts to the edges and boundaries of the Section 4(f) properties where they meet the existing transportation facility. By comparison, Option LS-16 would result in significant impacts to the protected activities, attributes and features of the Section 4(f) properties listed in **Table 5-18**. Therefore, in consideration of Least Overall Harm Factor 2, Option LS-16 would result in greater harm to Section 4(f) properties than the Proposed Action.

00038854

JA2016



In consideration of Least Overall Harm Factor 3, Cabin John Regional Park is a large, heavily used, multi-function recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County in a location where no comparable facilities exist. It is the most significant Section 4(f) property along this portion of the Study. In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-16 would maintain the same typical section as the Proposed Action and would meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

### 5.1.17 Location Specific Option 17 (LS-17)

**Section 4(f) Property Avoided: Cabin John Stream Valley Park (Rockville)**

### A.    Description

The Proposed Action would widen I-270 on-alignment. The widening would result in impacts to Cabin John Stream Valley Park (Rockville) as a result of the construction of a stormwater management facility as described in **Section 2.2.6**. Option LS-17 would similarly widen I-270 on alignment, but would avoid the use of Cabin John Regional Park (Rockville) by eliminating the proposed stormwater management facility (**Figure 5-57** and **Figure 5-61**).

### B.    Analysis

In consideration of Least Overall Harm Factor 6, Option LS-17 would reduce impacts to forest resources by approximately 2 acres. However it would also eliminate a stormwater management facility and result in a quantity treatment deficit that would affect the ability of the project to secure a state permit. A stormwater management facility is required at this location to address a quantity treatment deficit along this portion of the project. Engineering studies determined no additional suitable locations for stormwater treatment are along this portion of the project. As a result, in consideration of Least Overall Harm Factor 5, Option LS-17 would meet the Purpose and Need to a lesser degree than the Proposed Action because MDOT SHA would not be able to deliver the project in an environmentally responsible manner. Owing the compromised ability to meet the Purpose and Need and adverse impacts to the treatment of stormwater runoff, Option LS-17 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the Section 4(f) use of Cabin John Stream Valley Park (Rockville), Option LS-17 would have greater ability than the Proposed Action to mitigate adverse impacts. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-17 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, Option LS-17 would avoid the use Cabin John Stream Valley Park (Rockville). The use of additional Section 4(f) properties in the vicinity would not change. In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 7, Option LS-17 would cost $35 million, approximately $3 million less than the Proposed Action.

00038855

USCA4 Appeal: 24-1447      Doc: 31-1      Filed: 09/30/2024      Pg: 114 of 226



**Figure 5-57: Overview Map of Location Specific Options LS-16 and LS-17**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts

**Location Specific Options Overview Map**

0    750    1,500    Feet

Map 8.2.0

**Location Specific Options**
- Option LS-15
- Option LS-16
- Option LS-17

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line

DRAFT SECTION 4(f) EVALUATION

**Figure 5-58: Detail of Location Specific Option LS-16 (Map 1 of 4)**

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.

I-270 SPUR

MD 187 / OLD GEORGETOWN RD

MANAGED LANES STUDY 495 270

Vidтом Methodist Church

**Location Specific Options Map**

Map 8.2.1

0   150   300 Feet

**Location Specific Options**

Option LS-16

**Legend**

Centerline of Proposed Action

Historic Property

Park Property

Map Match Line

May 2020

250

00038857

DRAFT SECTION 4(f) EVALUATION



Figure 5-59: Detail of Location Specific Option LS-16 (Map 2 of 4)

Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
Option LS-16

**Legend**
Centerline of Proposed Action
Historic Property
Park Property

Map Match Line

Map 8.22

**Location Specific Options Map**

0    150    300    Feet

JA2020

00038858

DRAFT SECTION 4(f) EVALUATION



**Figure 5-60: Detail of Location Specific Option LS-16 (Map 3 of 4)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
Option LS-15
Option LS-16

**Legend**
Centerline of Proposed Action
Historic Property
Park Property
Map Match Line

**Location Specific Options Map**

Map 8.2.3

0   150   300 Feet

00038859

DRAFT SECTION 4(f) EVALUATION

Figure 5-61: Detail of Location Specific Option LS-16 (Map 4 of 4) and Location Specific Option LS-17

Location Specific Options are not dies gned to the same level o f deail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes, a standard width of 200 feet was applied to allow estimation of environmental impacts.



**Legend**

— Centerline of Proposed Action ⌐_ ¬ Map Match Line

▨ Historic Property

▢ Park Property

**Location Specific Options**

■ Option LS-15
■ Option LS-16
■ Option LS-17

N

Map 8.2.4

**Location Specific Options Map**

0   150   300 Feet

MANAGED LANES STUDY 495 270

00038860

00038861



## 5.2    Other Minimization Alternatives Considered

### 5.2.1    Alternative 5: 1-Lane, High-Occupancy Toll Managed Lane Network

#### A.    Description

This alternative consists of adding one HOT managed lane in each direction on I-495. On I-270, Alternative 5 would convert the one existing HOV lane in each direction to an HOT managed lane (**Figure 5-62**). Buses would be permitted to use the managed lanes.

#### B.    Analysis

In consideration of Least Overall Harm Factor 5, Alternative 5 would not meet the Purpose and Need of the Study owing to deficiencies in addressing the existing traffic and long-term traffic growth and trip reliability. Detailed analysis, including a full comparison of impacts and financial information in relation to the other Proposed Action, is found in the **Chapter 2** of the DEIS and the *Alternatives Technical Report* attached as **Appendix B** of the DEIS. Alternative 5 would perform the worst for most metrics used to evaluate existing traffic and long-term traffic growth and trip reliability and would perform the worst amongst the Screened Alternatives in system-wide delay, corridor travel time, density/level of service and travel time (GP lanes). For this reason, Alternative 5 would result in more harm than the Proposed Action.

**Table 5-19: Difference in Use of Section 4(f) Properties among the Proposed Action and Alternative 5**

| Section 4(f) Property | Section 4(f) Use from Alt 5 (Acres) | Section 4(f) Use from Proposed Action (Acres) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Alt 8 | Alt 9 | Alt 9M | Alt 10 | Alt 13B | Alt 13C |
| BARC | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Montgomery Blair High School Athletic Fields | 1.1 | 1.4 | 1.4 | 1.1 | 1.4 | 1.4 | 1.4 |
| Blair Local Park | 0.3 | 0.4 | 0.4 | 0.3 | 0.4 | 0.4 | 0.4 |
| Burning Tree Club | 0.5 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Cabin John Regional Park | 4.4 | 5.7 | 5.7 | 5.7 | 7.2 | 4.5 | 5.2 |
| Forest Glen Historic District | 0.1 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 |
| Glenarden Historic District | 0.6 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Indian Spring Club Estates Historic District | 1.1 | 1.2 | 1.2 | 1.1 | 1.2 | 1.2 | 1.2 |
| C&O Canal NHP | 14.8 | 15.4 | 15.4 | 15.4 | 15.4 | 15.4 | 15.4 |
| George Washington Memorial Parkway | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 |
| Greenbelt Park | 0.3 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Henry P. Johnson Park | 0.0 (*Avoided*) | < 0.1 | < 0.1 | < 0.1 | < 0.1 | < 0.1 | < 0.1 |
| Locust Hill Neighborhood Park | 0.2 | 0.3 | 0.3 | 0.2 | 0.3 | 0.3 | 0.3 |
| Manchester Estates Park | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Rock Creek Stream Valley Park, Unit 2 | 0.2 | 0.4 | 0.4 | 0.2 | 0.4 | 0.4 | 0.4 |
| Rock Creek Stream Valley Park, Unit 3 | 2.5 | 3.3 | 3.3 | 2.5 | 3.3 | 3.3 | 3.3 |
| Sligo Creek Parkway | 3.3 | 4.1 | 4.1 | 3.3 | 4.1 | 4.1 | 4.1 |
| **Impacts to Section 4(f) Properties (Ac)** | **42.4** | **47.9** | **47.9** | **45.4** | **49.4** | **46.7** | **47.4** |

00038862

**DRAFT SECTION 4(f) EVALUATION**



When compared to the Proposed Action, Alternative 5 would result in less use to the 16 Section 4(f) properties listed in **Table 5-19**. Alternative 5 would also impact one fewer Section 4(f) property than the Proposed Action: Henry P. Johnson Park. For the remaining Section 4(f) properties that would experience a use, there is no difference in the area of impacts between the Proposed Action and Alternative 5. In consideration of Least Overall Harm Factor 1, because Alternative 5 would result in less use of Section 4(f) property through the length of the Study, there would be greater ability to mitigate adverse impacts when compared to the Proposed Action. Additionally in consideration of Least Overall Harm Factor 2, Option LS-1 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 5 would result in less Section 4(f) use of each of these properties, save Baltimore Washington Parkway.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 6, owing to a narrower typical section, when compared to Proposed Action, Alternative 5 would result in fewer impacts to wetlands, waterways, and forest resources. It would also result in fewer relocations. In consideration of Least Overall Harm Factor 7, Alternative 5 would cost between $ 7.7 billion and $8.6 billion, which compares to between $8.2 Billion and $9.9 Billion for the Proposed Action.

**Figure 5-62: Alternative 5 Typical Sections**



00038863



### 5.2.2   MD 200 Diversion Alternative

Through the agency coordination process supporting the development of the DEIS, a few cooperating and participating agencies requested that MDOT SHA evaluate an alternative that would provide an alternate route for travelers to use MD 200 (Intercounty Connector) instead of the top side of I-495 between I-270 and I-95. The alternative was born out of a desire of the agencies to avoid or reduce impacts to significant, regulated resources and residential displacements.

### A.   Description

From a traffic standpoint, the MD 200 Diversion Alternative would provide an alternative route by directing travelers to use MD 200 instead of the top side of I-495 between I-270 and I-95 (**Figure 5-63**). MD 200 Diversion Alternative would consist of the following elements:

- No widening or capacity improvements along I-495 between the I-270 West Spur and I-95.

- Consideration of TSM/TDM improvements along I-495 between the I-270 East Spur and I-95.

- Two managed lanes added in each direction on I-495 between the Study limits south of George Washington Parkway, at the Virginia Department of Transportation HOT lane extension south of the American Legion Bridge, and the I-270 West Spur.

- Two managed lanes added in each direction on I-495 between I-95 and the Study limits west of MD 5.

- Conversion of the one existing HOV lane in each direction to a HOT managed lane on I-270 and the addition of one HOT managed lane in each direction on I-270, resulting in a two-lane managed lanes network on I-270.

- Two managed lanes added in each direction of I-95 between the MD 200 and I-495.

In general, the MD 200 Diversion Alternative would result in fewer environmental impacts than the Proposed Action. This is the result of no widening or capacity improvements for approximately 10.5 miles along the top side of I-495. Under the MD 200 Diversion Alternative because there are no impacts along the top side of I-495, 13 Section 4(f) properties would be avoided with this alternative compared to the Proposed Action. Specifically, this alternative would avoid four Section 4(f) properties under the authority of the Capper-Cramton Act: Units 2 and 3 of Rock Creek Stream Valley Park, Sligo Creek Parkway, and Unit 3 of Northwest Branch Stream Valley Park. No new Section 4(f) properties along I-95 would be impacted by the MD 200 Alternative.

00038864

DRAFT SECTION 4(f) EVALUATION 



Figure 5-63: MD 200 Diversion Alternative

## B.     Analysis

In consideration of Least Overall Harm Factor 5, the MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. MD 200 will not have adequate capacity to accommodate the projected traffic by design year 2040 and the viable TSM/TDM solutions would not provide adequate congestion relief on I-495. The MD 200 Diversion Alternative Analysis Results Paper is included as an attachment to the *Alternatives Technical Report* enclosed as **Appendix B**. As the MD 200 Diversion Alternative would not meet the Purpose and Need of the Study, it would cause more harm than the Proposed Actions.

00038865



In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action, the MD 200 Diversion Alternative avoids the Section 4(f) use (between 14.9 and 17.9 acres) of the 15 properties listed in Table 5-19. Because of this avoidance, the MD 200 Diversion Alternative would have greater ability to mitigate adverse impacts than the Proposed Action. Additionally, in consideration of Least Overall Harm Factor 2, the MD 200 Diversion Alternative would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

**Table 5-20: Section 4(f) Properties Avoided by MD 200 Diversion Alternative**

| Section 4(f) Property | Avoided Potential Use under MD 200 Diversion Alternative from the Proposed Action |
|---|---|
| Fleming Local Park | 0.1 Acre |
| Grosvenor Estate | 0.1 Acre to 0.2 Acre (Alt 10) |
| Rock Creek Stream Valley Park, Unit 3 | 2.5 Acres (Alts 5 and 9M) to 3.3 Acres |
| Rock Creek Stream Valley Park, Unit 2 | 0.2 Acre (Alts 5 and 9M) to 0.4 Acre |
| Locust Hill Neighborhood Park | 0.2 Acre (Alts 5 and 9M) to 0.4 Acre |
| Metropolitan Branch, B&O Railroad | 8.8 Acres |
| National Park Seminary Historic District/ Forest Glen | 1.2 Acres |
| Forest Glen Historic District | 0.1 Acre (Alts 5 and 9M) to 0.2 Acre |
| Forest Glen Neighborhood Park | 0.2 Acre (Alts 5 and 9M) to 0.3 Acre |
| Sligo Creek Parkway | 3.3 Acres (Alts 5 and 9M) to 4.1 Acres |
| South Four Corners Neighborhood Park | < 0.1 Acre (Alts 5 and 9M) to 0.1 Acre |
| Indian Spring Club Estates | 1.1 Acres (Alts 5 and 9M) to 1.2 Acres |
| Indian Springs Terrace Local Park | 1.2 Acres (Alts 5 and 9M) to 1.4 Acres |
| Montgomery Blair High School Athletic Fields | 1.1 Acres (Alts 5 and 9M) to 1.4 Acres |
| Blair Local Park | 0.3 Acres (Alts 5 and 9M) to 0.4 Acres |
| Northwest Branch Stream Valley Park | 3.2 Acres |

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 0**). When compared to the Proposed Action, the MD 200 Diversion Alternative would result in less Section 4(f) use of Units 2 and 3 of Rock Creek Stream Valley Park and Sligo Creek Parkway.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 6, owing to a narrower typical section along I-495 between the I-270 east spur and the I-95 interchange, when compared to Proposed Action, the MD 200 Diversion Alternative would result in fewer impacts to wetlands, waterways, and forest resources. It would also

00038866



result in fewer relocations. In consideration of Least Overall Harm Factor 7, the MD 200 Diversion Alternative would cost between $6.7 billion and $8.1 billion, which compares to between $8.2 Billion and $9.9 Billion for the Proposed Action. However, the MD 200 Diversion Alternative would require a subsidy of public funding, which means that even with toll revenue, the State would have to pay approximately $310 million over the life of the project.

## 5.3   Proposed Action

There are six Build Alternatives that are being retained for detailed study in the DEIS. These alternatives include managed lanes that differ in the manner in which the proposed travel lanes would be designated and configured. The six Build Alternatives were summarized in **Section 1.4.3** of this document and are described in detail in the DEIS. The total impacts to Section 4(f) property are listed in **Table 5-21**. Because the No Build would not result in the use of any Section 4(f) property, it is evaluated as an avoidance alternative in **Section 3.1.1**.

**Table 5-21: Total Potential Impacts to Section 4(f) properties by Build Alternative**

| Alternative | Potential Impact in Acres to Section 4(f) Properties |
|---|---|
| 8 | 146.8 |
| 9 | 146.8 |
| 9M | 144.7 |
| 10 | 149.0 |
| 13B | 145.5 |
| 13C | 146.7 |

### 5.3.1   Alternative 8: Two-Lane, ETL Managed Lane Network on I-495 and One-Lane ETL and One-Lane HOV Managed Lane Network on I-270

A.   **Description**

This alternative consists of adding two ETL managed lanes in each direction on I-495, retaining one existing HOV lane in each direction on I-270, and adding one ETL managed lane in each direction on I-270 (**Figure 5-64**). Buses would be permitted to use the managed lanes.

B.   **Analysis**

In consideration of Least Overall Harm Factor 5, Alternative 8 would meet the Purpose and Need of the Study to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 8 provides the least benefit compared to the other Build Alternatives in several metrics used to evaluate each alternative's ability to accommodate existing and long-term traffic growth, including average speed in the GP lanes, overall network delay during the AM peak period, and average annual travel time savings per commuter. Additionally, because Alternative 8 only provides a single ETL along I-270, slow-moving vehicles can reduce trip reliability in the managed lanes under Alternative 8 compared to the other Build Alternatives, which all provide two-lane systems. Owing to the compromised ability to meet the Purpose and Need, Alternative 8 would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 8 would result in 146.8 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Alternative 9 would result in the same area of impact to Section 4(f) properties. Each of the Build

00038867

JA2029



Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 8 and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 8 would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 8 would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 8 would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost of Alternative 8 is approximately $8.7 Billion to $9.6 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 8 cashflow estimates indicate a more positive financial self-sufficient position (requiring no public subsidy) than several other Build Alternatives. Results for the baseline scenario indicated net payments to the state of approximately $833 million over the lifetime of the concessionaire's stake in the roadway. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,627 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the state may be required to provide a subsidy of approximately $584 million.

00038868

DRAFT SECTiON 4(f) EVALUATION



**Figure 5-64: Alternative 8 Typical Sections**



### 5.3.2   Alternative 9: Two Lane, High-Occupancy Toll Managed Lanes Network

#### A.   Description

Alternative 9 consists of adding two HOT managed lanes in each direction on I-495, converting the one existing HOV lane in each direction on I-270 to a HOT managed lane, and adding one HOT managed lane in each direction on I-270, resulting in a two-lane, managed lane network on both highways (**Figure 5-65**). Buses would be permitted to use the managed lanes.

#### B.   Analysis

In consideration of Least Overall Harm Factor 5, Alternative 9 would meet the Purpose and Need of the Study to a greater degree than the other Build Alternatives that comprise the Proposed Action. Alternative 9 performs consistently well when evaluating traffic metrics to accommodate existing and long-term traffic growth. It also performs the best among the Build Alternatives when evaluating average speed and corridor travel times on I-495 and I-270 within the limits of the Study. Alternative 9 would provide a reliable trip in the managed lanes and enhance reliability of the trip in the GP lanes.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost of Alternative 9 is approximately $8.7 Billion to $9.6 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 9 cashflow estimates indicate that it would be the most likely to be financially self-sufficient (requiring no public subsidy), representing a substantial difference in the cost among the alternatives. In the baseline scenario, positive excess cashflows would be approximately $960 million over the lifetime of the concessionaire's stake in the roadway. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,762 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the State may be required to provide a subsidy of approximately $482 million (lowest of the potential subsidies estimated from the financial analysis). Owing to meeting the Purpose and Need of the Study to a greater degree and for having the most financially self-sufficient outlook, Alternative 9 results in less harm than the other Build Alternatives in the Proposed Action.

00038869



In consideration of Least Overall Harm Factor 1, Alternative 9 would result in 146.8 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Alternative 8 would result in the same area of impact to Section 4(f) properties. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 9 and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 9 would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 9 would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 9 would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

**Figure 5-65: Alternative 9 Typical Sections**



00038870



### 5.3.3  Alternative 9 Modified

#### A.    Description

Overall, Alternative 9M would be a blend of Alternatives 5 and 9 with the primary difference on the top side of I-495 between I-270 and I-95 being the addition of one HOT lane instead of two HOT lanes in each direction:

- Two HOT managed lanes added in each direction on I-495 on the west side – between the Study limits south of the George Washington Memorial Parkway and the I-270 West Spur, including the American Legion Bridge.

- Conversion of the one existing HOV lane in each direction to a HOT managed lane on I-270 and the West Spur, and the addition of one HOT managed lane in each direction on I-270 and the West Spur, resulting in a two-lane managed lanes network. (Similar to Alternative 9, **Figure 5-65**).

- Conversion of the one existing HOV lane in each direction to a HOT managed lane on the I-270 East Spur. (Similar to Alternative 5, **Figure 5-62**.

- One HOT managed lane in each direction on I-495 between the I-270 West Spur and I-95. (Similar to Alternative 5).

- Two HOT managed lanes added in each direction on I-495 on the east side – between I-95 and the Study limits west of MD 5. (Similar to Alternative 9).

#### B.    Analysis

In consideration of Least Overall Harm Factor 5, Alternative 9M would meet the Purpose and Need of the Study to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 9M provides less benefit than all of the other Build Alternatives, save Alternative 8, owing to deficiencies in addressing the existing traffic and long-term traffic growth and trip reliability. Because Alternative 9M only provides a single HOT lane in each direction of I-495 between the I-270 west spur and I-95 interchange, slow-moving vehicles can reduce trip reliability in the managed lanes compared to the other Build Alternatives, which all provide two-lane systems.

In consideration of Least Overall Harm Factor 7, Alternative 9M would cost approximately $8.2 to $9.1 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 9M cashflow estimates indicate that it would may be financially self-sufficient. In the baseline scenario, positive excess cashflows would be approximately $459 over the lifetime of the concessionaire's stake in the roadway. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,190 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the State may be required to provide a subsidy of approximately $827 million. Owing to the compromised ability to meet Purpose and Need and a financial outlook that is less than Alternatives 9 and 10, Alternative 9M would result in greater harm than the other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 9M would result in 144.7 acres of impacts to Section 4(f) properties, the least among the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and

00038871



edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 9M and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 9M would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 9M would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 9M would result in less impact to Units 2 (0.2 acre less) and 3 (0.8 acre) of Rock Creek Stream Valley Park and Sligo Creek Parkway (0.8 acre) than the other Build Alternatives.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, owing to a narrower typical section no I-495 between the I-270 west spur and I-95, when compared to the Proposed Action, Alternative 9M would result in fewer impacts to wetlands, waterways, and forest resources. It would also result in fewer relocations. Detailed mapping of Alternative 9M can be found in **Appendix D** of the DEIS.

### 5.3.4   Alternative 10: Two ETL Managed Lanes Network on I-495

#### A.   Description

Alternative 10 consists of adding two ETL managed lanes in each direction on I-495, retaining one existing HOV lane per direction on I-270, and adding two ETL managed lanes in each direction on I-270 (**Figure 5-66**). Buses would be permitted to use the managed lanes.

#### B.   Analysis

In consideration of Least Overall Harm Factor 5, Alternative 10 would meet the Purpose and Need of the Study to a degree similar to Alternative 9, and greater than the other Build Alternatives that comprise the Proposed Action. Alternative 10 would perform well for metrics used to measure the criteria of existing traffic and long-term traffic growth, but not as strongly as Alternative 9. Owing to the compromised ability to meet the Purpose and Need, Alternative 8 would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 10 would result in 149.0 acres of impacts to Section 4(f) properties, the largest when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries

00038872



and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 10 and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 10 would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 10 would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 10 would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, while Alternative 10 has the widest typical section, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost to Build Alternative 10 is $9 Billion to $9.9 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 10 cashflow estimates indicate a more positive financial self-sufficient position (requiring no public subsidy) than Alternatives 8, 9M, 13B, and 13C. Results for the baseline scenario indicated positive excess cashflows of approximately $866 million. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,711 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the state may be required to provide a subsidy of approximately $604 million.

00038873



**Figure 5-66: Alternative 10 Typical Sections**





### 5.3.5   Alternative 13B: HOT Managed Reversible Lanes on I-495 and Two, Managed Lanes on I-270

#### A.   Description

This alternative consists of adding two HOT managed lanes in each direction on I-495 and converting the existing HOV lanes in both directions to two HOT managed, reversible lanes on I-270 (**Figure 5-67**). Buses would be permitted to use the managed lanes.

#### B.   Analysis

In consideration of Least Overall Harm Factor 5, Alternative 13B would meet the Purpose and Need of the Study to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 13B would better accommodate existing and long-term traffic growth on I-495. However, on I-270, Alternative 13B would only provide better trip reliability and accommodate existing and long-term traffic grown in the peak direction of travel during peak periods. While the reversible HOT lanes on I-270 could accommodate the peak traffic demand, it would have negative impacts to travel along I-495 during the AM peak period. During this time, no northbound HOT lanes would be available along I-270, which would preclude any travelers along I-495 from using the HOT lanes if they were also destined for travel along northbound I-270. This would reduce the potential demand for the HOT lanes along both directions of I-495 approaching I-270 and increase the demand for the already over-capacity adjacent GP lanes. Owing to the compromised ability to meet the Purpose and Need, Alternative 13B would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 13B would result in 145.5 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 13B and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 13B would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when

00038874



compared to the Build Alternatives that comprise the Proposed Action, Alternative 13B would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 13B would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost to build Alternative 13B is $8.7 Billion to $9.6 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 13B cashflow estimates indicate that it would be the least likely to be financially self-sufficient among the Build Alternatives. Results for the baseline scenario indicated positive excess cashflows of approximately $196 million. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $1,907 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the state may be required to provide a subsidy of approximately $1,088.

**Figure 5-67: Alternative 13B Typical Sections**



00038875

DRAFT SECTION 4(f) EVALUATION



### 5.3.6   Alternative 13C: ETL Managed Reversible Lanes and one HOV Managed Lane Network on I-270

A.   Description

This alternative consists of adding two ETL managed lanes in each direction on I-495 and retaining the existing HOV lanes in both directions and adding two ETL managed, reversible lanes on I-270 (**Figure 5-68**). Alternative 13C would maintain the existing roadway network on I-270 with HOV lanes to allow for free HOV travel while adding two managed, reversible lanes. Buses would be permitted to use the managed lanes.

B.   Analysis

In consideration of Least Overall Harm Factor 5, Alternative 13C meets the Purpose and Need to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 13C would slightly outperform Alternative 13B – while still falling shy of Alternatives 9 and 10 – for the network delay metric because one HOV lane would be maintained in the non-peak direction under this alternative. Under Alternative 13C reversible HOT lanes on I-270 could accommodate the peak traffic demand, but the alternative would have negative impacts to travel along I-495 during the AM peak period and reversible lanes can only be operated in one direction at a time. Owing to the compromised ability to meet the Purpose and Need, Alternative 13C would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 13C would result in 146.7 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 13C and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 13C would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 13C would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section In consideration of Least Overall Harm Factor 1, because it avoids the use of three Section 4(f) properties – despite the increased use of the Section 4(f) properties listed in **Table 5-14** – when compared to the Proposed Action Option LS-10 would result in greater ability to mitigate adverse impacts to Section 4(f) property. In consideration of Least Overall Harm Factor 2, Option LS-10 would also

00038876

JA2038



result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. When compared to the Proposed Action, Alternative 13C would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost to build Alternative 13C is $8.8 Billion to $9.7 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 13C cashflow estimates would be less likely to be financially self-sufficient than Alternatives 8, 9, and 10. In the base case scenario, positive excess cashflows would be approximately $328 million. Under a lower construction price and lower interest rate scenario, the positive excess cashflows would be estimated at $2,065 million, compared to the result for a higher construction price and higher interest rate scenario which indicate negative cashflows where the State may be required to provide a subsidy of approximately $998 million.

**Figure 5-68: Alternative 13C Typical Section**



## 5.4    Results of Least Overall Harm Analysis

The location specific options, other minimization alternatives, and the Build Alternatives set forth in the DEIS were each evaluated above in terms of the seven Least Overall Harm factors defined in 23 CFR 774.3(c)(1). The following preliminary analysis, as summarized in **Table 5-22**, considers how each alternative compare to the others based on the seven Least Overall Harm factors to ultimately identify the alternative that would result in the least overall harm.

The nature of the build alternatives being considered in this case, the proposed expansion of two major existing highway facilities, influences greatly how the Least Overall Harm factors are applied to the Section 4(f) analysis. Many of the resources described above have already been impacted by the development and subsequent expansions of I-495 and I-270. Other resources have been developed and/or managed in recognition of the presence of these crucial regional transportation facilities. Moreover, the constrained

00038877



built environmental surrounding I-495 and I-270 in light of the large amount of commercial and residential development in proximity to the limits of the Study means that there are only minimal differences between each alternative in the Section 4(f) properties impacted and harm resulting from the use of those properties.

Therefore, certain of the least overall harm factors are weighted more heavily in this draft analysis than others because the potential harm or benefit associated with some factors is greater than with others. For instance, the ability to mitigate adverse impacts (Factor 1) is weighted less heavily because it is anticipated that acceptable mitigation for all identified Section 4(f) uses will be similar for all Build Alternatives. Similarly, the relative severity of the remaining harm to Section 4(f) properties and the relative significance of Section 4(f) properties (Factors 2 and 3) are also weighted less heavily because there is little variation among the alternatives considered in this evaluation in terms of the remaining harm to Section 4(f) properties and the array of Section 4(f) properties impacted.

For this preliminary analysis, the views of the OWJ (Factor 4) are not yet considered because discussions with the OWJ are ongoing and will not be available until the Final Section 4(f) Evaluation. By contrast, the views of the OWJ will be weighted more heavily than Factors 1,2, and 3 as it is anticipated that their comments will provide beneficial diversity to the analysis of least overall harm.

By contrast, the magnitude of any adverse impacts to resources not protected by Section 4(f) (Factor 6) is relatively more important because many substantial non-Section 4(f) resources such as well-developed residential communities, streams, wetlands, and forests are commonly located adjacent to the existing highways and are highly valued in this project area. Substantial differences in costs among the alternatives (Factor 7) is also weighted more heavily than Factors 1, 2, and 3 because many of the differences in cost described above are extremely high. Beyond the numerical differences in basic construction, condemnation, and other costs, because this project will be delivered through a Public-Private Partnership, MDOT/SHA must also consider the long-term financial viability of each alternative. This factor is weighted more heavily in this analysis because differences in cost, especially for alternatives that are predicted to require state subsidies, could result in substantial harm to the financial viability of the P3 program for this project. Finally, the degree to which each alternative meets the Purpose and Need for the project (Factor 5) is weighted more heavily in this analysis because alternatives that hinder or prevent the project's ability to accommodate existing traffic and long-term traffic growth would likely result in economic, environmental and quality of life harm to Maryland and the entire Greater Washington region.

The preliminary Least Overall Harm analysis is presented in **Table 5-22** below. The final results will be presented in the Final Section 4(f) evaluation.

00038878

JA2040

00038879

DRAFT SECTION 4(f) EVALUATION



Table 5-22: Summary of the Least Overall Harm Analysis of Alternatives

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **Build Alternatives within the Proposed Action** | | | | | | | | |
| Alternative 8 | | | | | Meets Purpose and Need to a Lesser Degree. | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion. | Would meet the Purpose and Need to a lesser degree than other Build Alternatives. Would create traffic problems that would reduce trip reliability in the managed lanes. |
| Alternative 9 | | | | | Meets Purpose and Need to a Greater Degree | | Total Cost of Alternative would be between $8.7 and $9.6 Billion | Meets Purpose and Need. Impacts to properties protected by Section 4(f) are minimized; appropriate mitigation measures for use of Section 4(f) property to minimize harm. |
| Alternative 9 Modified | Substantially equal ability to mitigate adverse impacts to each Section 4(f) property | Substantially equal relative harm given the physical footprint among the Build Alternatives. Harm would occur to properties as described in Section 2 | All build alternatives would impact the same number of Section 4(f) properties | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation. Views of OWJs will be considered and | Meets Purpose and Need to a Lesser Degree | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $8.5 and $9.3 Billion. Not financially viable owing to lower revenue. | Would meet the Purpose and Need to a lesser degree than other Build Alternatives because it does not successfully address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| Alternative 10 | | | | | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than other Build Alternatives | Total Cost of Alternative would be between $9.0 and $9.9 Billion | Would have greater impacts to Section 4(f) Properties, natural resources, and property relocations as well as greater cost, but would provide no additional benefit in meeting Purpose and Need. |
| Alternative 13B | | | | | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree than the other Build Alternatives. Would only accommodate traffic growth in the peak direction during a peak period. Would not be financially self-sufficient. |
| Alternative 13C | | | | | Meets Purpose and Need to a Lesser Degree | protected by Section 4(f) | Total Cost of Alternative would be between $8.8 and $9.7 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree. Would have negative impacts to travel along I-495 during the AM peak period as reversible lanes can only be operated in one direction at a time. Would not be financially self-sufficient. |

271

JA2042

00038880



**DRAFT SECTION 4(f) EVALUATION**

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **Other Alternatives Considered** | | | | | | | | |
| MD 200 Diversion Alternative | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $7.0 and $11 Billion. Not financially viable owing to lower revenue. | The MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. Would not be financially self-sufficient. |
| Alternative 5 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $7.8 and $15.5 Billion. Not financially viable owing to lower revenue. | Alternative 5 does not meet the Study's Purpose and Need because it does not address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| **Location Specific Options** | | | | | | | | |
| LS-1 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-1 would meet the Purpose and Need of the project. It would cost $600 million more to construct than the Build Alternatives along this portion of the project. |
| LS-2 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Meets Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives. Not financially viable owing to lower revenue | Option LS-2 would adequately meet the Purpose and Need of the project; it would cost in excess of $1 billion more than the Build Alternatives along this portion of the project. |
| LS-3 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-3 would result in 10.4 acres of additional impacts to Section 4(f) properties, which would create additional mitigation along this portion of the project. when compared to the Build Alternatives. Would cost in excess of $1.7 billion more than the Build Alternatives along this portion of the project. |
| LS-4 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | When compared to the Build Alternatives, Option LS-4 would result in 11 acres of additional impacts to Section 4(f) properties and cost nearly $700 million more. |



**DRAFT SECTION 4(f) EVALUATION**

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| LS-5 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-5 would result in 3.8 acres of additional impacts to Section 4(f) properties and cost $27 million more than the Build Alternatives along this portion of the Study. |
| LS-6 | Great Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-6 would cost $25 million more than the Build Alternatives along this portion of the Study. |
| LS-7 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-7 would result in an increase of 12 acres of impact to Section 4(f) properties, result in 547 additional relocations, and cost approximately $1.2 billion more than the Build Alternatives along this portion of the Study. |
| LS-8 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Meets Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-8 would result in 0.9 acre of additional impacts to Section 4(f) properties and cost $250 million more than the Build Alternatives along this portion of the Study. |
| LS-9 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternative | Greater Cost than Build Alternatives | Option LS-9 would cost approximately $200 million more than the Build Alternatives along this portion of the Study. |
| LS-10 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | When compared to the Build Alternatives, Option LS-10 would result in 6.1 acres of additional impacts to one Section 4(f) property: BARC. Option LS-10 would cost approximately $88 million more than the Build Alternatives along this portion of the project. |
| LS-11 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-11 would cost approximately $500 million more than the Build Alternatives along this portion of the project. |

00038882

JA2044



**DRAFT SECTION 4(f) EVALUATION**

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| LS-12 | Greater Ability to Mitigate than Build Alternatives | Substantially Equal | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than Build Alternatives | Less cost than Build Alternatives | Option LS-12 would cost approximately $1 million less than the Build Alternatives. However, Option LS-12 would result in two displacements versus none by the Build Alternatives. |
| LS-13 | Substantially Equal | Substantially Equal | Substantially Equal | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-13 would lessen or were impacts to community resources, potentially resulting in the relocation of 166 properties and cost approximately $400 million more than the build alternatives. |
| LS-14 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-14 would cause additional impacts to wetlands and forest resources and cost approximately $125 million more than the Build Alternatives. |
| LS-15 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-15 would cost approximately $25 million more than the Build Alternatives along this portion of the Study. |
| LS-16 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-16 would cost approximately $1.6 billion more than the Build Alternatives along this portion of the project. |
| LS-17 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-17 would cost approximately $270 million more than the Build Alternatives along this portion of the project. |
| LS-18 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Less Cost than Build Alternatives | Option LS-18 would be more difficult to permit than the Build Alternatives. |

00038883

JA2045



# APPENDIX I
# AIR QUALITY TECHNICAL REPORT
## May 2020



U.S. Department
of Transportation
**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00044910

00044911

AIR QUALITY TECHNICAL REPORT



## TABLE OF CONTENTS

1    INTRODUCTION ..................................................................................... 1
    1.1    Overview ......................................................................................... 1
    1.2    Study Corridors ............................................................................... 1
    1.3    Study Purpose and Need ................................................................. 3
    1.4    Alternatives Evaluated ................................................................... 4
2    EXISTING CONDITIONS ........................................................................ 9
    2.1    Regulatory Framework ................................................................... 9
      2.1.1    National Environmental Policy Act of 1969 ............................. 9
      2.1.2    Clean Air Act ........................................................................ 10
      2.1.3    Greenhouse Gases and State of Maryland Policies ............... 14
    2.2    Monitored Ambient Air Quality ................................................... 16
    2.3    Climate and Meteorology ............................................................. 22
    2.4    Attainment Status ......................................................................... 22
3    ENVIRONMENTAL CONSEQUENCES .................................................... 23
    3.1    Regional Conformity ..................................................................... 23
    3.2    Carbon Monoxide Analysis ........................................................... 23
      3.2.1    Traffic Information ............................................................... 24
      3.2.2    Methodology ........................................................................ 24
      3.2.3    Dispersion Modeling Results ............................................... 74
    3.3    Particulate Matter ($PM_{2.5}$) ......................................................... 77
    3.4    Mobile Source Air Toxics Analysis ................................................ 77
      3.4.1    MSAT Research .................................................................... 77
      3.4.2    MSAT Modeling Methodology .............................................. 78
      3.4.3    MSAT Results ....................................................................... 96
      3.4.4    Incomplete or Unavailable Information for Project Specific MSAT Health Impacts Analysis 107
      3.4.5    MSAT Conclusions ............................................................. 108
    3.5    Greenhouse Gases and State of Maryland Policies ...................... 109
      3.5.1    Greenhouse Gas Emissions Analysis ................................... 110
      3.5.2    GHG Conclusions ............................................................... 119
    3.6    Construction Impacts ................................................................... 119
    3.7    Indirect Effects and Cumulative Impacts Assessment .................. 120

00044912

**AIR QUALITY TECHNICAL REPORT**



3.7.1    Indirect Effects ........................................................................................ 120

3.7.2    Cumulative Impacts .................................................................................. 121

4    **MITIGATION**........................................................................................**122**

5    **CONCLUSIONS**.....................................................................................**123**

6    **REFERENCES** ......................................................................................**126**

## LIST OF TABLES

Table 2-1: National Ambient Air Quality Standards........................................................ 10

Table 2-2: Criteria Pollutant Descriptions................................................................. 13

Table 2-3: Carbon Monoxide Monitoring Data (2016-2018) ................................................ 16

Table 2-4: PM2.5 Monitoring Data (2016-2018) ........................................................... 18

Table 2-5: Ozone Monitoring Data (2016-2018) ........................................................... 19

Table 3-1: Opening Year (2025) Alternative 5 Intersection Volume and Level of Service Ranking...........30

Table 3-2: Design Year (2040) Alternative 5 Intersection Volume and Level of Service Ranking..............30

Table 3-3: Opening Year (2025) Alternative 8 Intersection Volume and Level of Service Ranking...........30

Table 3-4: Design Year (2040) Alternative 8 Intersection Volume and Level of Service Ranking..............31

Table 3-5: Opening Year (2025) Alternative 9 Intersection Volume and Level of Service Ranking ...........31

Table 3-6: Design Year (2040) Alternative 9 Intersection Volume and Level of Service Ranking..............31

Table 3-7: Opening Year (2025) Alternative 10 Intersection Volume and Level of Service Ranking...........32

Table 3-8: Design Year (2040) Alternative 10 Intersection Volume and Level of Service Ranking............32

Table 3-9: Opening Year (2025) Alternative 13B Intersection Volume and Level of Service Ranking..........32

Table 3-10: Design Year (2040) Alternative 13B Intersection Volume and Level of Service Ranking.........33

Table 3-11: Opening Year (2025) Alternative 13C Intersection Volume and Ranking...............................33

Table 3-12: Design Year (2040) Alternative 13C Intersection Volume and Level of Service Ranking.........33

Table 3-13: Opening Year (2025) Alternative 5 Interchange Volume and Delay Ranking.........................35

Table 3-14: Design Year (2040) Alternative 5 Interchange Volume and Delay Ranking...........................35

Table 3-15: Opening Year (2025) Alternative 8 Interchange Volume and Delay Ranking.........................36

Table 3-16: Design Year (2040) Alternative 8 Interchange Volume and Delay Ranking...........................36

Table 3-17: Opening Year (2025) Alternative 9 Interchange Volume and Delay Ranking.........................37

Table 3-18: Design Year (2040) Alternative 9 Interchange Volume and Delay Ranking...........................37

Table 3-19: Opening Year (2025) Alternative 10 Interchange Volume and Delay Ranking .......................38

Table 3-20: Design Year (2040) Alternative 10 Interchange Volume and Delay Ranking.........................38

Table 3-21: Opening Year (2025) Alternative 13B Interchange Volume and Delay Ranking.......................39

Table 3-22: Design Year (2040) Alternative 13B Interchange Volume and Delay Ranking........................39

Table 3-23: Opening Year (2025) Alternative 13C Interchange Volume and Delay Ranking......................40

Table 3-24: Design Year (2040) Alternative 13C Interchange Volume and Delay Ranking........................40

Table 3-25: MOVES2014b Input Parameters ...........................................................42

Table 3-26: MOVES2014b Prince Georges County Emission Factor Results.................................43

Table 3-27: MOVES2014b Montgomery County Emission Factor Results.................................46

Table 3-28: Summary of CAL3QHC Input Parameters .................................................50

Table 3-29: CAL3QHC CO Modeling Results for Worst-Case Interchanges ...............................75

00044913



Table 3-30: CAL3QHC CO Modeling Results for Worst-Case Intersections ................................................ 76
Table 3-31: Average Daily Traffic Volumes ................................................................................................ 78
Table 3-32: Proposed MOVES RunSpec Inputs for MSAT Emissions Modeling ........................................ 95
Table 3-33: MOVES County Data Manager for MSAT Emissions Modeling ............................................... 95
Table 3-34: Projected Annual MSAT Emissions (Tons Per Year) on "Affected Network" ......................... 97
Table 3-35: Projected Annual MSAT Change in Emissions on "Affected Network" .................................. 98
Table 3-36: Projected Annual MSAT Percent Change in Emissions on "Affected Network" .................. 100
Table 3-37: Projected Annual CO2 Equivalent Emissions in Tons Per Year (TPY) on "Affected Network" 111
Table 3-38: Projected Annual CO2 Equivalent Emissions (Tons Per Year) on "Affected Network" .......... 112
Table 3-39: Projected Annual CO2 Equivalent Emissions (Percent Change) on "Affected Network" ...... 113

## LIST OF FIGURES

Figure 1-1: Study Area Corridors .............................................................................................................. 2
Figure 1-2: Typical Sections of Alternatives Considered ........................................................................... 7
Figure 2-1: Carbon Monoxide Monitoring Locations .............................................................................. 17
Figure 2-2: PM2.5 Monitoring Locations ................................................................................................... 20
Figure 2-3: Ozone Monitor Locations ...................................................................................................... 21
Figure 3-1: CO Study Area Intersection and Interchanges ...................................................................... 25
Figure 3-2: CO Study Area Intersection and Interchanges ...................................................................... 26
Figure 3-3: CO Study Area Intersection and Interchanges ...................................................................... 27
Figure 3-4: CO Intersection Screening Flowchart .................................................................................... 28
Figure 3-5: MD 5 and Authority Road Receptor Locations ..................................................................... 52
Figure 3-6: MD 97 and Inner Loop Ramp Receptor Locations ................................................................ 53
Figure 3-7: MD 187 and I-270 South Bound Ramp Receptor Locations .................................................. 54
Figure 3-8: US 29 and Direct Access Ramp 2 HOT Lanes Receptor Locations ........................................ 55
Figure 3-9: US 29 and Direct Access Ramp ALT 5 Receptor Locations .................................................... 56
Figure 3-10: US 29 and Inner Loop Ramp Receptor Locations ................................................................ 57
Figure 3-11: US 29 and Outer Loop Ramp Receptor Locations ............................................................... 58
Figure 3-12: I-270 and I-370 Receptor Locations .................................................................................... 59
Figure 3-13: I-270 and MD189 Receptor Locations ................................................................................. 60
Figure 3-14: I-495 and I-95 Receptor Locations ...................................................................................... 61
Figure 3-15: I-495 and I-270 and MD 355 Receptor Locations ............................................................... 62
Figure 3-16: I-495 and I-270 Spur Receptor Locations ............................................................................ 63
Figure 3-17: I-495 and MD 193 Receptor Locations ................................................................................ 64
Figure 3-18: I-495 and MD 650 Receptor Locations ................................................................................ 65
Figure 3-19: I-495 and MD 5 Receptor Locations .................................................................................... 66
Figure 3-20: I-495 and MD 97 Receptor Locations .................................................................................. 67
Figure 3-21: I-495 and MD 185 Receptor Locations ................................................................................ 68
Figure 3-22: I-495 and MD 190 Receptor Locations ................................................................................ 69
Figure 3-23: I-495 and US 50 Receptor Locations ................................................................................... 70
Figure 3-24: MD 97 and Outer Loop Ramp Receptor Locations .............................................................. 71
Figure 3-25: MD 187 and SPUR Receptor Locations ............................................................................... 72
Figure 3-26: MD 202 and Outer Loop Ramp Receptor Locations ............................................................ 73

00044914

JA2050



Figure 3-27: Average Daily Traffic Locations ............................................................................. 79
Figure 3-28: National MSAT Emission Trends 2010 – 2050 for Vehicles Operating on Roadways ............ 80
Figure 3-29: MSAT Affected Network 2025 Screened Alternative 5 ............................................... 83
Figure 3-30: MSAT Affected Network 2025 Screened Alternative 8 ............................................... 84
Figure 3-31: MSAT Affected Network 2025 Screened Alternative 9 ............................................... 85
Figure 3-32: MSAT Affected Network 2025 Screened Alternative 10 ............................................. 86
Figure 3-33: MSAT Affected Network 2025 Screened Alternative 13B ........................................... 87
Figure 3-34: MSAT Affected Network 2025 Screened Alternative 13C ........................................... 88
Figure 3-35: MSAT Affected Network 2040 Screened Alternative 5 ............................................... 89
Figure 3-36: MSAT Affected Network 2040 Screened Alternative 8 ............................................... 90
Figure 3-37: MSAT Affected Network 2040 Screened Alternative 9 ............................................... 91
Figure 3-38: MSAT Affected Network 2040 Screened Alternative 10 ............................................. 92
Figure 3-39: MSAT Affected Network 2040 Screened Alternative 13B ........................................... 93
Figure 3-40: MSAT Affected Network 2040 Screened Alternative 13C ........................................... 94
Figure 3-41: 1,3 Butadiene Results for Base, Opening, and Design Year Conditions ...................... 102
Figure 3-42: Acetaldehyde Results for Base, Opening, and Design Year Conditions ...................... 102
Figure 3-43: Acrolein Results for Base, Opening, and Design Year Conditions ............................. 103
Figure 3-44: Benzene Results for Base, Opening, and Design Year Conditions ............................. 103
Figure 3-45: Diesel PM Results for Base, Opening, and Design Year Conditions ........................... 104
Figure 3-46: Ethylbenzene Results for Base, Opening, and Design Year Conditions ..................... 104
Figure 3-47: Formaldehyde Results for Base, Opening, and Design Year Conditions .................... 105
Figure 3-48: Naphthalene Results for Base, Opening, and Design Year Conditions ...................... 105
Figure 3-49: POM Results for Base, Opening, and Design Year Conditions .................................. 106
Figure 3-50: Total Energy Consumption Results for Base, Opening, and Design Year Conditions ........... 115
Figure 3-51: Total Gases Hydrocarbons Results for Base, Opening, and Design Year Conditions ........... 115
Figure 3-52: Methane Results for Base, Opening, and Design Year Conditions ............................ 116
Figure 3-53: Nitrous Oxide Results for Base, Opening, and Design Year Conditions .................... 116
Figure 3-54: Atmospheric CO2 Results for Base, Opening, and Design Year Conditions ................ 117
Figure 3-55: CO2 Equivalent Results for Base, Opening, and Design Year Conditions .................. 118

## LIST OF APPENDICES

Appendix A    Raw Traffic Data
Appendix B    Alternative Concepts
Appendix C    Traffic Rankings
Appendix D    MOVES RunSpecs CO
Appendix E    CAL3QHC Input and Output
Appendix F    MOVES RunSpecs MSATs
Appendix G    FlowChart for Developing the Affected Network along with Timeline for Developing Traffic Data
Appendix H    Traffic Network Link Data by Alternative

00044915

JA2051

**AIR QUALITY TECHNICAL REPORT**



## ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| AADT | Average Annual Daily Traffic |
| ADT | Average Daily Traffic |
| AVMT | Annual Vehicle Miles Traveled |
| CAAA | Clean Air Act Amendments |
| CCA | Clean Air Act |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CH₄ | Methane |
| CLRP | Constrained Long-Range Plan |
| CO₂ | Carbon Dioxide |
| EIA | Energy Information Administration |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ETL | Express Toll Lanes |
| FAST | Fixing America's Surface Transportation Act |
| FAQ | Frequently Asked Questions |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| GGRA | Greenhouse Gas Reduction Act |
| GHGs | Greenhouse Gases |
| GP | General Purpose |
| HEI | Health Effects Institute |
| HOT | High-Occupancy Toll |
| HOV | High-Occupancy Vehicle |
| IRIS | Integrated Risk Information System |
| LOS | Level of Service |
| MDE | Maryland Department of The Environment |
| MDOT SHA | Maryland Department of Transportation State Highway Administration |
| MOVES | Motor Vehicle Emissions Simulator |
| MPO | Metropolitan Planning Organization |
| MSATs | Mobile Source Air Toxics |
| MWCOG | Metropolitan Washington Council of Governments |
| N₂O | Nitrous Oxide |
| NAAQS | National Ambient Air Quality Standards |
| NCRTPB | National Capital Region Transportation Planning Board |
| NEPA | National Environmental Policy Act |
| NOAA | National Oceanic and Atmospheric Administration |
| PM | Particulate Matter |
| POM | Polycyclic Organic Matter |
| SIP | State Implementation Plan |

00044916

**AIR QUALITY TECHNICAL REPORT**



| | |
|---|---|
| $SO_2$ | Sulfur Dioxide |
| TCI | Transportation and Climate Initiative |
| TIP | Transportation Improvement Program |
| TPB | Transportation Planning Board |
| TPY | Tons per Year |
| VMT | Vehicle Miles Traveled |
| VPD | Vehicles per Day |
| VPH | Vehicles per Hour |
| VPHPL | Vehicles per Hour per Lane |

00044917

JA2053

AIR QUALITY TECHNICAL REPORT



**1**

# 1    INTRODUCTION

## 1.1    Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing an Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study). The Study is evaluating potential transportation improvements to portions of the I-495 and I-270 corridors in Montgomery and Prince George's Counties, Maryland, and Fairfax County, Virginia.

This EIS is being prepared in accordance with FHWA and Council on Environmental Quality (CEQ) regulations for implementing NEPA and provisions of the Fixing America's Surface Transportation (FAST) Act. The content of the EIS also conforms to CEQ guidelines, which provide direction regarding implementation of the procedural provisions of NEPA, and the FHWA's Guidance for *Preparing and Processing Environmental and Section 4(f) Documents* (Technical Advisory T6640.8A, October 1987).

The purpose of the Air Quality Technical Report is to present the potential air quality impacts associated with the Study in compliance with NEPA and the Clean Air Act and Amendments (CAA), and has been prepared to support and inform the EIS. This report begins with a description of the study corridors, followed by a summary of the Purpose and Need, and a description of the alternatives evaluated.

## 1.2    Study Corridors

I-495 and I-270 in Maryland are the two most heavily traveled freeways in the National Capital Region, each with Average Annual Daily Traffic (AADT) volume up to 260,000 vehicles per day in 2018 (MDOT SHA, 2019). I-495 is the only circumferential route in the region that provides interregional connections to many radial routes in the region, such as I-270, US 29 (Colesville Road), I-95, the Baltimore-Washington Parkway, US 50 (John Hanson Highway), and MD 5 (Branch Avenue). I-270 is the only freeway link between I-495 and the fast-growing northwest suburbs in northern Montgomery County and the suburban areas in Frederick County. In addition to heavy commuter traffic demand, I-495 provides connectivity along the East Coast, as it merges with I-95 in Maryland for 25 miles around the east side of Washington, DC. **Figure 1-1** presents the study area corridors.

00044918

JA2054

**AIR QUALITY TECHNICAL REPORT**



## Figure 1-1: Study Area Corridors



00044919



## 1.3    Study Purpose and Need

The purpose of the Study is to develop a travel demand management solution(s) that addresses congestion and improves trip reliability on I-495 and I-270 within the study limits and enhances existing and planned multimodal mobility and connectivity. The study will address the following needs:

- **Accommodate Existing Traffic and Long-Term Traffic Growth** - High travel demand from commuter, business, and recreational trips results in severe congestion from seven to ten hours per day on the study corridors, which is expected to deteriorate further by the planning horizon year of 2040. Additional capacity is needed to address existing and future travel demand and congestion, reduce travel times, and allow travelers to use the facilities efficiently.

- **Enhance Trip Reliability -** Congestion on I-495 and I-270 results in unpredictable travel times. Travelers and freight commodities place a high value on reaching their destinations in a timely and safe manner, and in recent years, the study corridors have become so unreliable that uncertain travel times are experienced daily. More dependable travel times are needed to ensure trip reliability.

- **Provide Additional Roadway Travel Choices -** Travelers on I-495 and I-270 do not have enough options for efficient travel during extensive periods of congestion. Additional roadway management options are needed to improve travel choices, while retaining the general purpose (GP) lanes.

- **Accommodate Homeland Security** - The National Capital Region is considered the main hub of government, military, and community installations related to homeland security. These agencies and installations rely on quick, unobstructed roadway access during a homeland security threat. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur.

- **Improve Movement of Goods and Services** - I-495 and I-270 are major regional transportation networks that support the movement of passenger and freight travel within the National Capital Region. Existing congestion along both corridors increases the cost of doing business due to longer travel times and unreliable trips. The effects of this congestion on the movement of goods and services is a detriment to the health of the local, regional, and national economy. Efficient and reliable highway movement is necessary to accommodate passenger and freight travel, moving goods and services through the region.

Additional capacity and improvements to enhance reliability must be financially viable. MDOT's traditional funding sources would be unable to effectively finance, construct, operate, and maintain improvements of this magnitude. Revenue sources that provide adequate funding, such as pricing options, are needed to achieve congestion relief and address existing high travel demand.

Given the highly constrained area surrounding the interstates in the study corridors, MDOT SHA recognizes the need to plan and design this project in an environmentally responsible manner. MDOT SHA will strive to avoid and minimize community, natural, cultural, and other environmental impacts, and mitigate for any unavoidable impacts at an equal or greater value. MDOT SHA will work with our federal,

00044920

AIR QUALITY TECHNICAL REPORT



state, and local resource agency partners in a streamlined, collaborative, and cooperative way to meet all regulatory requirements to ensure the protection of environmental resources to the maximum extent practicable. Any screened alternatives will adequately offset unavoidable impacts while prioritizing and coordinating comprehensive mitigation measures near the study area which are meaningful to the environment and the community.

## 1.4    Alternatives Evaluated

Eight alternatives are being evaluated and compared in the technical reports supporting the EIS. These include Alternatives 1, 5, 8, 9, 9M, 10, 13B, and 13C and are illustrated in the typical sections shown in **Figure 1-2**.

The following terms are used in the description of the alternatives.

- **GP Lanes** are lanes on a freeway or expressway that are open to all motor vehicles.[1]

- **Managed Lanes** are highway facilities, or a set of lanes, where operational strategies are proactively implemented and managed in response to changing conditions.[2]

- **High-Occupancy Toll (HOT) Lanes** are High-Occupancy Vehicle (HOV) facilities that allow lower-occupancy vehicles, such as solo drivers, to use the facilities in return for toll payments, which could vary by time of day and level of congestion.[1]

- **Express Toll Lanes (ETL)** are dedicated managed lanes within highway rights-of-way that motorists may use by paying a variably priced toll.[3]

- **High-Occupancy Vehicle (HOV) Lanes** are any preferential lane designated for exclusive use by vehicles with two or more occupants for all or part of a day, including a designated lane on a freeway, other highway or a street, or independent roadway on a separate right-of-way.[4]

- **Reversible Lanes** are facilities in which the direction of traffic flow can be changed at different times of the day to match peak direction of travel, typically inbound in the morning and outbound in the afternoon.[1]

### A.    Alternative 1: No Build

The No Build Alternative, often called the base case, includes all projects in the Visualize2045 Plan, the latest Constrained Long-Range Plan (CLRP) which was approved by the National Capital Region Transportation Planning Board (NCRTPB) on October 17, 2018.[5] This includes other projects impacting the facilities that are subject to this Study. Specifically, the CLRP reflects the Purple Line which is currently under construction (Spring 2019), and the extension of the I-495 Express Lanes in Virginia from north of the Dulles Toll Road interchange to the American Legion Bridge (Virginia's 495 Express Lanes Northern Extension [NEXT] Project). Alternative 1 also includes the I-270 Innovative Congestion Management Contracts, which are providing a series of construction projects to improve mobility and safety at key

---

[1] National Cooperative Highway Research Program, Research Report 835, Guidelines for Implementing Managed Lanes. Transportation Research Board. 2016

[2] https://ops.fhwa.dot.gov/publications/managelanes_primer/index.htm

[3] https://www.fhwa.dot.gov/ipd/tolling_and_pricing/defined_demand_mgmt_tool.aspx

[4] https://ops.fhwa.dot.gov/freewaymgmt/hovguidance/glossary.htm

[5] https://www.mwcog.org/visualize2045/document-library/

00044921



points along I-270 targeted to reduce congestion at key bottlenecks along the corridor. All improvements are being implemented within the existing roadway right-of-way and are anticipated to be completed by in 2021. While these improvements will improve mobility and safety, they will not address the long-term roadway capacity needs for the I-270 corridor. Routine maintenance and safety improvements along I-495 and I-270 are included in the No Build Alternative, but it does not include new capacity improvements to I-495 and I-270. Consistent with NEPA requirements, Alternative 1 will be carried forward for further evaluation to serve as a base case for comparing the other alternatives.

### B.    Alternative 5: 1-Lane, High-Occupancy Toll Managed Lane Network

This alternative consists of adding one HOT managed lane in each direction on I-495 and converting the one existing HOV lane in each direction to a HOT managed lane on I-270. Buses would be permitted to use the managed lanes.

### C.    Alternative 8: 2-Lane, Express Toll Lane Managed Lanes Network on I-495 and 1-Lane Express Toll Lane and 1-Lane HOV Managed Lane Network on I-270

This alternative consists of adding two ETL managed lanes in each direction on I-495, retaining one existing HOV lane in each direction on I-270, and adding one ETL managed lane in each direction on I-270. Buses would be permitted to use the managed lanes.

### D.    Alternative 9: 2-Lane, High-Occupancy Toll Managed Lanes Network

This alternative consists of adding two HOT managed lanes in each direction on I-495, converting the one existing HOV lane in each direction on I-270 to a HOT managed lane, and adding one HOT managed lane in each direction on I-270, resulting in a two-lane, managed lane network on both highways. Buses would be permitted to use the managed lanes.

### E.    Alternative 10: 2-Lane, Express Toll Lane Managed Lanes Network and 1-Lane HOV Managed Lane Network on I-270 Only

This alternative consists of adding two ETL managed lanes in each direction on I-495, retaining one existing HOV lane per direction on I-270, and adding two ETL managed lanes in each direction on I-270. Buses would be permitted to use the managed lanes.

### F.    Alternative 13B: 2-Lane, High-Occupancy Toll Managed Lanes Network on I-495 and HOT Managed Reversible Lanes Network on I-270

This alternative consists of adding two HOT managed lanes in each direction on I-495 and converting the existing HOV lanes in both directions to two HOT managed, reversible lanes on I-270. Buses would be permitted to use the managed lanes.

### G.    Alternative 13C: 2-Lane, ETL Managed Lanes Network on I-495 and ETL Managed, Reversible Lanes Network and 1-Lane HOV Managed Lane Network on I-270

This alternative consists of adding two ETL managed lanes in each direction on I-495 and retaining the existing HOV lanes in both directions and adding two ETL managed, reversible lanes on I-270. Alternative 13C would maintain the existing roadway network on I-270 with HOV lanes to allow for HOV travel while adding two managed, reversible lanes. Buses would be permitted to use the managed lanes.

00044922

JA2058



### H.  Consideration of Alternative 9M

The analysis for the Screened Alternatives summarized above was completed in Spring of 2019 and reflects information available to MDOT SHA at that time. As the Study progressed through the NEPA process, the project team obtained comments as a result of cooperating agency coordination. As a result of this continued effort, MDOT SHA and FHWA have evaluated an additional alternative for the Study known as Alternative 9M. Alternative 9M is considered a blend of two Screened Alternatives, Alternative 5 (one-lane HOT) and Alternative 9 (two-lane HOT).

Alternative 9M has the same LOD as Alternative 9 along I-495 from south of the George Washington Memorial Parkway in Virginia to the I-270 West Spur and from the I-95 interchange to west of MD 5 as well as along I-270 from I-495 to I-370. Alternative 9M has the same LOD as Alternative 5 along I-495 from I-270 West Spur to the I-95 interchange. Alternative 9M includes the same build elements as the other Screened Alternatives including direct access locations and interchange improvements.

Because Alternative 9M is a blend of Alternatives 9 and 5, the environmental impacts associated with Alternative 9M are covered in this Technical Report. Specific impacts associated with Alternative 9M have been quantified and are shown in the DEIS for comparison with the other Screened Alternatives. Any differences in the quantity or intensity of impacts between Alternative 9M and other alternatives are noted either in tables or text in the DEIS.

00044923

AIR QUALITY TECHNICAL REPORT



## SCREENED ALTERNATIVES

Figure 1-2: Typical Sections of Alternatives Considered



**1** No Build (Existing):
All projects in Constrained Long Range Plan (CLRP) including UTP (Innovative Congestion Management (ICM) Improvements)

**5** 1-Lane, HOT Managed Lane Network:
Add one HOT managed lane in each direction on I-495 and convert one existing GP lane in each direction to a HOT managed lane on I-270

**8** 2-Lane, ETL Managed Lanes Network on I-495, 1-Lane ETL and 1-Lane HOV Managed Lane network on I-270 only
Add two ETL managed lanes in each direction on I-495 and add one ETL managed lane in each direction and one HOV managed lane in each direction on I-270

**9** 2-Lane, HOT Managed Lane Network:
Add two HOT managed lanes in each direction on I-495 and convert one existing GP lane in each direction and add one HOT managed lane in each direction on I-270

Legend

NOT TO SCALE

MDOT MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00044924

JA2060

AIR QUALITY TECHNICAL REPORT





00044925

MAY 2020



# 2

# 2 EXISTING CONDITIONS

## 2.1 Regulatory Framework

### 2.1.1 National Environmental Policy Act of 1969

Federal requirements for air quality analyses for transportation projects derive from NEPA and, where applicable, the federal transportation conformity rule (40 CFR Parts 51 and 93). NEPA guidance for air quality analyses for transportation projects may be found on or via the FHWA website for planning and the environment.[6]

For purposes of NEPA, general guidance for project-level air quality analyses is provided in the FHWA 1987 Technical Advisory 6640.8A, *Guidance for Preparing and Processing Environmental and Section 4(f) Documents*,[7] which focuses on carbon monoxide.

### A. Mobile Source Air Toxics

On October 18, 2016, FHWA issued updated interim guidance regarding Mobile Source Air Toxics (MSATs) in a NEPA analysis to include the US Environmental Protection Agency's (EPA) recent Motor Vehicle Emissions Simulator (MOVES), Version 2014a emission model along with updated research on air toxic emissions from mobile sources.

The EPA identified nine compounds with significant contributions from mobile sources that are among the national and regional-scale cancer drivers from their 1999 National Air Toxics Assessment. The nine compounds identified were: acetaldehyde; acrolein; benzene; 1, 3-butadiene; diesel particulate matter (PM) plus diesel exhaust organic gases; ethylbenzene; formaldehyde; naphthalene; and polycyclic organic matter (POM). While FHWA considers these the priority MSATs, the list is subject to change and may be adjusted in consideration of future EPA rules.

The October 2016 FHWA guidance presents a tiered approach for assessing MSATs in NEPA documents. The three levels are for projects with: (1) no meaningful MSAT effects; (2) low potential MSAT effects; and (3) high potential MSAT effects, respectively. The FHWA guidance defines the levels of analysis for each type of MSAT effect as:

---

[6] http://www.fhwa.dot.gov/environment/index.cfm

[7] https://www.environment.fhwa.dot.gov/projdev/impTA6640.asp

00044926

AIR QUALITY TECHNICAL REPORT



- No analysis for projects with no potential for meaningful MSAT effects;
- A qualitative analysis for projects with low potential MSAT effects; and
- A quantitative analysis for projects with high potential MSAT effects.

Each Screened Alternative was evaluated against each threshold criteria in order to determine the type of MSAT analysis required to satisfy NEPA. As demonstrated in Section 3.4, in accordance with the latest 2016 MSAT guidance, the project is best characterized as one with "higher potential MSAT effects" since the projected Design Year traffic is expected to reach the 140,000 to 150,000 AADT criteria. As a result, a quantitative assessment of MSAT emissions projections was conducted for the affected network for each Alternative.

### 2.1.2    Clean Air Act

The CAA is the overarching statute regulating air quality in the US. The CAA requires the EPA to set standards for air pollutants, approve state plans and enforce deadlines for reducing air pollution, among many other responsibilities. The CAA Amendments of 1990 direct EPA to implement environmental policies and regulations that ensure acceptable levels of air quality. EPA's transportation conformity rule (40 CFR part 93) provides the criteria and procedures for implementing the transportation conformity provisions of the CAA.

### A.    National Ambient Air Quality Standards

As required by the CAA, EPA sets the National Ambient Air Quality Standards (NAAQS) for airborne pollutants that have adverse impacts on human health and the environment. The NAAQS are a set of baseline standards over which state governments can choose to impose stricter standards.

Table 2-1 presents the NAAQS established by the EPA for criteria air pollutants, namely: carbon monoxide (CO), sulfur dioxide ($SO_2$), ozone ($O_3$), PM, nitrogen dioxide ($NO_2$), and lead (Pb). There are two types of NAAQS—primary and secondary: "Primary standards provide public health protection, including protecting the health of "sensitive" populations such as asthmatics, children, and the elderly. Secondary standards provide public welfare protection, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings."[8]

#### Table 2-1: National Ambient Air Quality Standards

| Pollutant | Primary/Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|
| Carbon Monoxide (CO) | primary | 8 hours | 9 ppm | Not to be exceeded more than once per year |
| | | 1 hour | 35 ppm | |
| Lead (Pb) | primary and secondary | Rolling 3-month average | 0.15 $\mu g/m^{3(1)}$ | Not to be exceeded |

---

[8] From the EPA preamble to the NAAQS table: https://www.epa.gov/criteria-air-pollutants/naaqs-table

00044927

**AIR QUALITY TECHNICAL REPORT**



| Pollutant | | Primary/Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| Nitrogen Dioxide (NO₂) | | primary | 1 hour | 100 ppb | 98th percentile of 1-hour daily maximum 8-hour concentrations, averaged over 3 years |
| | | primary and secondary | 1 year | 53 ppb [2] | Annual Mean |
| Ozone (O₃) | | primary and secondary | 8 hours | 0.070 ppm [3] | Annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years |
| Particle Pollution (PM) | PM₂.₅ | primary | 1 year | 12.0 µg/m³ | annual mean, averaged over 3 years |
| | | secondary | 1 year | 15.0 µg/m³ | annual mean, averaged over 3 years |
| | | primary and secondary | 24 hours | 35 µg/m³ | 98th percentile, averaged over 3 years |
| | PM₁₀ | primary and secondary | 24 hours | 150 µg/m³ | Not to be exceeded more than once per year on average over 3 years |
| Sulfur Dioxide (SO₂) | | primary | 1 hour | 75 ppb [4] | 98th percentile of 1-hour daily maximum 8-hour concentrations, averaged over 3 years |
| | | secondary | 3 hours | 0.5 ppm | Not to be exceeded more than once per year |

(1) In areas designated nonattainment for the Pb standards prior to promulgation of the current (2008) standards, and for which implementation plans to attain or maintain the current (2008) standards have not been submitted and approved, the previous standards (1.5 µg/m3 as a calendar quarter average) also remain in effect.

(2) The level of the annual NO2 standard is 0.053 ppm. It is shown here in terms of ppb for the purposes of clear comparison to the 1-hour standard level.

(3) Final rule signed October 1, 2015, and effective December 28, 2015. The previous (2008) O3 standards additionally remain in effect in some areas. Revocation of the previous (2008) O3 standards and transitioning to the current (2015) standards will be addressed in the implementation rule for the current standards.

(4) The previous SO2 standards (0.14 ppm 24-hour and 0.03 ppm annual) will additionally remain in effect in certain areas: (1) any area for which it is not yet 1 year since the effective date of designation under the current (2010) standards, and (2) any area for which an implementation plan providing for attainment of the current (2010) standard have not been submitted and approved and which is designated nonattainment under the previous SO2 standards or is not meeting the requirements of a SIP call under the previous SO2 standards (40 CFR 50.4(3)). A SIP call is an EPA action requiring a state to resubmit all or part of its State Implementation Plan to demonstrate attainment of the required NAAQS.

Source: https://www.epa.gov/criteria-air-pollutants/naaqs-table, accessed July 30, 2018.

00044928

JA2064



The EPA is required to publish a list of all geographic areas in and out of compliance with the NAAQS. Attainment status is determined on a pollutant by pollutant basis. Areas that routinely exceed a NAAQS for a particular pollutant are designated as "nonattainment areas". Areas which were designated "nonattainment" but have been redesignated to "attainment" are called "maintenance areas". The attainment classifications are described in the following bullets:

- <u>Attainment</u> – area has monitored air quality that meets the NAAQS.

- <u>Nonattainment</u> – area has monitored air quality that does not meet the NAAQS.

- <u>Maintenance</u> – Once a nonattainment area meets the standards and additional redesignation requirements in the CAA [Section 107(d)(3)(E)], EPA will designate the area as a "maintenance area.".

- <u>Unclassifiable and Unclassifiable/Attainment</u> – An area that cannot be designated based on available information as meeting or not meeting the NAAQS.

When a region is designated as a nonattainment area, it must develop a plan for meeting the appropriate standard. The plan is known as an attainment plan and must be submitted to the EPA for approval. After the area has met the standard, the state may request that the area be redesignated. As part of the request to redesignate the area, the region must develop a Maintenance State Implementation Plan (SIP) to demonstrate that it will continue to meet the criteria. Transportation plans, programs and projects in nonattainment and maintenance areas must be found to "conform" to the purpose of the SIP before the project can receive federal funds or approvals. A transportation improvement program (TIP) presents projects over the next several years and a long-range plan (LRP) covers a longer period of time. The metropolitan planning organization (MPO) is designated to develop the TIP and LRP for a region, and to document conformity with SIP provisions.

## B. Criteria Pollutants

As shown in **Table 2-1**, pollutants that have established NAAQS are referred to as criteria pollutants. The criteria pollutants are ozone, carbon monoxide, PM ($PM_{2.5}$ and $PM_{10}$), nitrogen dioxide, $SO_2$, and lead. Transportation conformity is required in areas designated nonattainment and maintenance by the EPA for the transportation-related criteria pollutants: ozone, PM, nitrogen dioxide, and carbon monoxide.[9] Effects on human health and the general environment, as well as how they disperse and are deposited in the atmosphere, vary from pollutant to pollutant. A description of each criteria pollutant is provided in **Table 2-2**.[10] While the Study Area is an EPA attainment area for CO and PM2.5, a CO analysis of emissions from affected intersections and interchanges was conducted for transparency and informational purposes since CO is a proxy for transportation emissions.

---

[9] https://www.fhwa.dot.gov/Environment/air_quality/conformity/policy_and_guidance/faqs/genfaqsmemo.cfm
[10] https://www.des.nh.gov/organization/commissioner/pip/factsheets/ard/documents/ard-41.pdf

00044929

**AIR QUALITY TECHNICAL REPORT**



Table 2-2: Criteria Pollutant Descriptions

| Pollutant | Sources | Health and Environmental Effects |
|---|---|---|
| **Ozone ($O_3$) Ground-level** - A colorless gas that forms as a result of chemical reactions between volatile organic compounds, nitrogen oxides, and oxygen in the presence of heat and sunlight. | Motor vehicles, electric utilities, factories, landfills, industrial solvents, and miscellaneous small sources such as gas stations, lawn equipment, etc. | Causes coughing, chest tightness, wheezing and can inflame and damage lung tissue. Aggravates asthma and can even be a cause of asthma. Irritates the respiratory system, reduces lung function and makes it more difficult to breathe. Aggravates chronic lung diseases and may cause permanent lung damage. May reduce yield of agricultural crops and damages forests and other vegetation. |
| **Carbon Monoxide (CO)** - An odorless, colorless gas resulting from incomplete fossil fuel combustion. | Motor vehicles (the majority of CO in NH), small engines, some industrial processes, boilers and incinerators. High concentrations can be found in confined spaces like parking garages, poorly ventilated tunnels, or traffic intersections especially during peak hours. | Impairs the ability of blood to deliver oxygen to vital tissues affecting the cardiovascular, pulmonary, and nervous systems. Symptoms include dizziness, headaches, nausea, fatigue, memory and visual impairment, and decreased muscular control. |
| **Nitrogen Dioxide ($NO_2$)** - A brownish gas that forms quickly when fuel is burned at high temperatures. Contributes to the formation of ground-level ozone and fine particle pollution. | Motor vehicles, electric utilities, industrial boilers, and off-road equipment. | Irritates the lungs, may cause lung damage and lower resistance to respiratory infections such as influenza. May adversely affect terrestrial and aquatic ecosystems through regional transport and deposition. |
| **Particulate Matter (PM)** - Mixture of solid particles and liquid droplets in the air; particles may be visible or microscopic. | Formed directly from windblown dust, crushing and grinding operations, unpaved roads and construction, fuel combustion (from motor vehicles, power plants, industrial facilities), wood stoves, and agriculture (plowing, burning off fields). May also be formed in the atmosphere from gases such as $SO_2$ and $NO_x$. | Causes eye, nose and throat irritation, decreased lung function, aggravated asthma, development of chronic bronchitis, irregular heartbeat, nonfatal heart attacks, and premature death in people with heart or lung disease. Serves as a carrier for toxic metals, damages human-made materials, and is a major cause of reduced visibility in many parts of the US. |
| **Sulfur Dioxide ($SO_2$)** A highly reactive colorless gas, odorless at low concentrations, but pungent at very high concentrations. | Formed when fuel containing sulfur (mainly oil and coal) is burned in industrial, institutional, utility, and residential furnaces and boilers. Other sources include petroleum refineries, smelters, paper mills, and chemical plants. | May cause breathing problems, respiratory illness, alterations in the lung's defenses, aggravation of existing cardiovascular disease, and permanent damage to lungs. Forms acid aerosols and sulfuric acid, which are associated with acidification of lakes and streams, accelerated corrosion of buildings and monuments, and reduced visibility. |
| **Lead** - A heavy metal found naturally in the environment and in manufactured products. | Soil, dust, paint, etc., transportation sources using lead in their fuels, coal combustion, smelters, car battery plants, and combustion of garbage containing lead products. | Elevated levels can cause brain and other nervous system damage and adversely affect kidney function, blood chemistry, and digestion if ingested or directly inhaled. Children are at special risk due to cumulative effects even at low doses. Lead can also harm wildlife through deposition onto leaves which are a food source for grazing animals. |

*Source: New Hampshire Department of Environmental Services, 2012*

00044930



## C.    Transportation Conformity

The CAA, Section 176(c) (42 USC 7506(c)), requires that highway projects receiving federal funding and approval "conform to" state air quality implementation plans. Pursuant to this statute, the EPA issued the federal transportation conformity rule (40 CFR Parts 51 and 93) pursuant to transportation conformity requirements in the CAA as amended. Copies of the EPA conformity regulation and associated guidance are available on the EPA website. In general, the rule requires conformity determinations for transportation plans, programs and projects in "nonattainment or maintenance areas for transportation-related criteria pollutants for which the area is designated nonattainment or has a maintenance plan" (40 CFR 93.102(b)). Federal conformity requirements, including specifically 40 CFR 93.114 and 40 CFR 93.115, apply as the area in which the project located is designated as nonattainment for ozone. The study area is in an attainment area for fine PM ($PM_{2.5}$), therefore, transportation conformity requirements pertaining to $PM_{2.5}$ do not apply for this Project[11] and no further analysis of $PM_{2.5}$ emissions were evaluated per FHWA guidance.[12]

## D.    Criteria and Procedures for Determining Conformity

The criteria and procedures for determining conformity of transportation plans, programs, and projects are provided in 40 CFR 93.109.

For projects in nonattainment or maintenance areas, the federal transportation conformity rule requires a currently conforming transportation plan and program at the time of project approval (40 CFR 93.114) and for the project to be from a conforming plan and program (40 CFR 93.115). If the project is of a type that is not required to be specifically identified in the plan, the project must be consistent with the policies and purpose of the transportation plan and not interfere with other projects specifically included in the transportation plan (40 CFR 93.115(b)).

Additionally, the design concept and scope of the project as specified in the program at the time of the regional conformity determination should be adequate to determine the project's contribution to regional emissions, and any mitigation measures associated with the project should have written commitments from the project sponsor and/or operator (40 CFR 93.115(c)).

In CO and PM nonattainment and maintenance areas, an analysis of localized emissions may be required for federally funded or approved projects. This analysis is called a "hot-spot" analysis. The CO and PM hot spot test requirements are provided in 40 CFR 93.116.

### 2.1.3    Greenhouse Gases and State of Maryland Policies

Greenhouse gases (GHGs) are another pollutant monitored by EPA. GHGs trap heat from the sun in the atmosphere and warm the planet to acceptable temperatures to support liquid water and life. According

---

[11] For background, the EPA issued a final rule (81 FR 58010), effective October 24, 2016, on "Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements" that stated, in part: "Additionally, in this document the EPA is revoking the 1997 primary annual standard for areas designated as attainment for that standard because the EPA revised the primary annual standard in 2012." (See: https://www.gpo.gov/fdsys/pkg/FR-2016-08-24/pdf/2016-18768.pdf). Accordingly, Fairfax County is no longer designated as maintenance for PM2.5, and the associated USEPA regulatory requirements for conformity for PM2.5 are eliminated for northern Virginia

[12] Guidance for Preparing and Processing Environmental and Section 4(f) Documents October 30, 1987. https://www.environment.fhwa.dot.gov/projdev/impTA6640.asp

00044931



the National Oceanic and Atmospheric Administration (NOAA), without GHGs, the average temperature of the Earth would be around 0° F, instead of its present 57° F.

The combustion of coal, oil, and gas by humans has increased the amount of GHGs in the atmosphere, mostly in the form $CO_2$. According to the NOAA, pre-industrial levels of $CO_2$ in the atmosphere were approximately 280 parts per million by volume (ppmv). Current levels are over 380 ppmv and have been steadily increasing at a rate of 1.9 ppmv per year since the year 2000. This level exceeds the natural range of the past 650,000 years of 180 to 300 ppmv.

In 2009, the state of Maryland passed the Greenhouse Gas Reduction Act (GGRA). The GGRA, which led to the creation of Maryland's wide-ranging Greenhouse Gas Reduction Plan, directed the state to reduce GHG levels by 25 percent by 2020. In 2015, the MDE issued a report stating that Maryland was on track to the meet the 25 percent reduction goal by 2020. In 2016, the governor of Maryland reauthorized the GGRA and extended its GHG reduction goals to 40 percent by 2030. In late 2019, the MDE released and began taking stakeholder comments on the 2019 GGRA Draft Plan which outlines Maryland's strategies to achieve the goal of reducing emissions 40 percent by 2030. A description of the four primary GHGs in the Earth's atmosphere that are emitted by human-generated activities is provided below.

**Carbon Dioxide ($CO_2$).** Carbon dioxide is the most prevalent of the four human-generated GHGs. $CO_2$ is emitted primarily from the burning of fossil fuels (oil, natural gas, coal) by power plants and motor vehicles, the burning of solid waste, trees, and wood products, and as a result of chemical reactions such as the manufacture of cement. $CO_2$ is removed from the atmosphere (sequestered) when it is absorbed by plants as part of the biological carbon cycle.

**Methane ($CH_4$).** Methane is emitted during the production and transport of various energy sources, including coal, natural gas, and oil. $CH_4$ also comes from agricultural practices and from landfills as waste decays.

**Nitrous Oxide ($N_2O$).** Nitrous Oxide is emitted during various agricultural and manufacturing activities as well as during combustion of fossil fuels and solid waste.

**Fluorinated Gases.** Hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are synthetic gases that are emitted from a variety of industrial processes. Fluorinated gases may be used in place of ozone-depleting gases such as chlorofluorocarbons. While these gases may be emitted in smaller quantities than the others, they are very potent and have a High Global Warming Potential. For mobile source analyses based on fossil fuel consumption, $CO_2$ is the predominant GHG emitted; therefore, this analysis focuses on $CO_2$ to represent GHG emissions. Regulation of GHG emissions is a focal point of the Maryland Clean Car Program, which was introduced to reduce GHG emissions from vehicular sources and improve air quality in its densely populated counties. In 2007, Maryland became the 12th state to adopt the California Low Emission Vehicle Tier II (Cal LEV II) standards, a set of tailpipe emission standards more stringent than the federal Tier II standards at that time. In 2009, the federal government announced that the federal standards will be fully merged with the stricter California standards by Model Year 2016.

GHG emissions from transportation sources account for approximately 29 percent of the US total GHG making it the largest contributor of US GHG emissions. As such, for transparency purposes, MDOT prepared a summary of GHG emissions from the Proposed Alternatives.

00044932

AIR QUALITY TECHNICAL REPORT



## 2.2    Monitored Ambient Air Quality

MDE's Air and Radiation Management Administration is responsible for implementing and enforcing regulations to ensure that the air Maryland citizens breathe is clean and healthful. One of their functions is to operate a statewide network of air quality monitors that continuously measure air quality. This data is made available through the EPA's AirData website.[13] A review of data provided for the most recent three years (2016-2018) at the monitoring stations nearest the study area are used to describe the existing ambient air quality in the study area and are presented in **Table 2-3** through **Table 2-5** for CO, PM₂.₅, and ozone, respectively. The monitoring locations are also depicted in **Figure 2-1** through **Figure 2-3** for each pollutant. The measured ambient air concentrations closest to the study area were all well below the corresponding NAAQS, except for the exceedance of the 2015 8-hour ozone standard recorded at some of the monitor locations.

**Table 2-3: Carbon Monoxide Monitoring Data (2016-2018)**

| Site ID | Location | 2016 | | | | 2017 | | | | 2018 | | | | CO NAAQS | |
| | | 1-Hr Avg. (ppm) | | 8-Hr Avg. (ppm) | | 1-Hr Avg. (ppm) | | 8-Hr Avg. (ppm) | | 1-Hr Avg. (ppm) | | 8-Hr Avg. (ppm) | | | |
| | | 1st Max | 2nd Max | 1st Max | 2nd Max | 1st Max | 2nd Max | 1st Max | 2nd Max | 1st Max | 2nd Max | 1st Max | 2nd Max | 1-hr PPM | 8-hr PPM |
| 110010023 | District of Columbia | 2.2 | 2.1 | 2 | 1.8 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 35 | 9 |
| 110010041 | District of Columbia | 2.7 | 2.7 | 2.3 | 2.3 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 35 | 9 |
| 110010043 | District of Columbia | 1.6 | 1.6 | 1.3 | 1.3 | 1.8 | 1.8 | 1.4 | 1.3 | 2.1 | 1.6 | 1.3 | 1.1 | 35 | 9 |
| 110010051 | District of Columbia | 2.2 | 2 | 1.8 | 1.7 | 2.7 | 2.7 | 2.6 | 2.3 | 2.2 | 2.1 | 2.0 | 1.9 | 35 | 9 |
| 240330030 | Prince George's | 2 | 1.9 | 1.1 | 0.8 | 1 | 0.9 | 0.7 | 0.7 | 1.2 | 0.8 | 0.8 | 0.7 | 35 | 9 |
| 510130020 | Arlington | 3.7 | 3.7 | 1.8 | 1.6 | 2.1 | 2 | 1.6 | 1.2 | 1.6 | 1.6 | 1.2 | 1.2 | 35 | 9 |
| 515100021 | Alexandria City | 3.1 | 2.5 | 1.9 | 1.5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 35 | 9 |
| 510590031 | Fairfax | 1.9 | 1.1 | 1 | 1 | 1.5 | 1.5 | 1.1 | 1.1 | 1.3 | 1.2 | 1.0 | 0.9 | 35 | 9 |

*Source: https://www.epa.gov/outdoor-air-quality-data/monitor-values-report*

---

[13] https://www.epa.gov/outdoor-air-quality-data/monitor-values-report

00044933

**AIR QUALITY TECHNICAL REPORT**



### Figure 2-1: Carbon Monoxide Monitoring Locations

00044934

JA2070

AIR QUALITY TECHNICAL REPORT



## Table 2-4: PM₂.₅ Monitoring Data (2016-2018)

| Site ID | Monitor # | Location | 2016 | | 2017 | | 2018 | | PM₂.₅ NAAQS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 98th Percentile (ug/m³) | Weighted Arithmetic Mean (ug/m3) | 98th Percentile (ug/m³) | Weighted Arithmetic Mean (ug/m3) | 98th Percentile (ug/m³) | Weighted Arithmetic Mean (ug/m3) | 24-hour (ug/m3) | Annual (ug/m3) |
| 110010041 | 1 | District of Columbia | 16 | 7.9* | 18 | 8.9 | 21 | 8.8 | 35 | 12 |
| 110010042 | 1 | District of Columbia | 20 | 8.0* | 18 | 9.1* | N/A | N/A | 35 | 12 |
| 110010043 | 1 | District of Columbia | 17 | 7.9* | 15 | 7.5 | 19 | 8.7 | 35 | 12 |
| | 2 | District of Columbia | 21 | 8.2* | N/A | N/A | N/A | N/A | 35 | 12 |
| | 4 | District of Columbia | 20 | 9.6* | 22 | 9.7 | 23 | 7.6 | 35 | 12 |
| 110010051 | 1 | District of Columbia | 23 | 9.8* | 19 | 10.2 | 21 | 9.5 | 35 | 12 |
| | 2 | District of Columbia | N/A | N/A | N/A | N/A | N/A | N/A | 35 | 12 |
| 240313001 | 3 | Montgomery | 16 | 6.4 | 15 | 6.1 | 18 | 8.8* | 35 | 12 |
| 240330030 | 1 | Prince George's | 16 | 7 | 14 | 6.6 | 15 | 6.5 | 35 | 12 |
| | 2 | Prince George's | 21 | 6.9 | 14 | 6.5 | 14 | 6 | 35 | 12 |
| | 3 | Prince George's | 18 | 8.6 | 15 | 7.3 | 16 | 5.8 | 35 | 12 |
| 240338003 | 1 | Prince George's | 16 | 6.7 | N/A | N/A | N/A | N/A | 35 | 12 |
| | 2 | Prince George's | 25 | 8.3* | N/A | N/A | N/A | N/A | 35 | 12 |
| 510130020 | 1 | Arlington | 18 | 7.5 | 16 | 7.7 | 16 | 7.4 | 35 | 12 |
| | 2 | Arlington | 19 | 7.5 | 16 | 7.7 | 16 | 7.4 | 35 | 12 |
| 510590030 | 1 | Fairfax | 17 | 6.7 | 15 | 6.9 | 17 | 6.9 | 35 | 12 |
| 510590031 | 3 | Fairfax | 15 | 8.1* | 19 | 9.0* | 20 | 8.9 | 35 | 12 |

Source: https://www.epa.gov/outdoor-air-quality-data/monitor-valuesreport

Note: * indicates the mean does not satisfy minimum data requirements.

00044935

**AIR QUALITY TECHNICAL REPORT**



Table 2-5: Ozone Monitoring Data (2016-2018)

| Site ID | Location | 2016 4th Max 8-Hour (ppm) | 2017 4th Max 8-Hour (ppm) | 2018 4th Max 8-Hour (ppm) | 2015 Ozone NAAQS 8-hour PPM |
|---|---|---|---|---|---|
| 110010041 | District of Columbia | 0.065 | 0.056 | 0.050 | 0.070 |
| 110010043 | District of Columbia | 0.072 | 0.071 | 0.073 | 0.070 |
| 110010050 | District of Columbia | 0.071 | 0.067 | 0.073 | 0.070 |
| 240313001 | Montgomery | 0.065 | 0.065 | 0.069 | 0.070 |
| 240330030 | Prince George's | 0.069 | 0.069 | 0.070 | 0.070 |
| 240338003 | Prince George's | 0.073 | 0.072 | 0.070 | 0.070 |
| 240339991 | Prince George's | 0.07 | 0.07 | 0.073 | 0.070 |
| 510130020 | Arlington | 0.072 | 0.07 | 0.070 | 0.070 |
| 510590030 | Fairfax | 0.073 | 0.068 | 0.066 | 0.070 |

Source: https://www.epa.gov/outdoor-air-quality-data/monitor-values-report

00044936

**AIR QUALITY TECHNICAL REPORT** 



Figure 2-2: PM₂.₅ Monitoring Locations

00044937

JA2073

**AIR QUALITY TECHNICAL REPORT**



### Figure 2-3: Ozone Monitor Locations



00044938



## 2.3     Climate and Meteorology

The Washington, DC Metropolitan Area is located along the Potomac River between the Blue Ridge Mountains and Atlantic Ocean. As is typical with many mid-Atlantic cities along the coast, the DC area is known for its hot, humid summers, pleasant springs and falls, and mild winters. The combination of heat humidity in the summer brings frequent thunderstorms which can occasionally produce tornadoes. During the winter, nor'easters can affect the area producing the largest amounts of snowfall. The average annual precipitation is approximately 40 inches. The annual average temperature is 56° F with the lowest temperatures occurring in January and the highest in July.[14]

## 2.4     Attainment Status

The study corridor is within the EPA defined Washington DC-MD-VA area which includes portions of Montgomery County and Prince George's County, Maryland as well as a small area in Fairfax County, Virginia. The EPA Green Book[15] lists these counties as attainment for all NAAQS with the exception of the 2015 8-hour ozone standard,[16] for which the counties are nonattainment. The EPA recently redesignated the area to maintenance/attainment for the 2008 8-hour ozone standard.[17]

The Maryland counties were redesignated from a nonattainment area to attainment and entered a 20-year maintenance period for carbon monoxide (CO) in March 1996. The area was considered a maintenance area for the 20 years following until March 2016 when the counties completed the maintenance period. Since the Maryland counties have completed the maintenance period, transportation conformity no longer applies for CO. The study corridor is in an attainment area for fine PM ($PM_{2.5}$).[18] Similarly, Fairfax County is designated attainment for CO, and is also considered attainment for the 1997 fine PM per the EPA 2016 ruling.

---

[14] https://www.usclimatedata.com/climate/district-of-columbia/united-states/3178

[15] https://www.epa.gov/green-book

[16] https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

[17] https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation

[18] The USEPA issued a final rule (81 FR 58010), effective October 24, 2016, on "Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements" that stated, in part: "Additionally, in this document the EPA is revoking the 1997 primary annual standard for areas designated as attainment for that standard because the EPA revised the primary annual standard in 2012." (See: https://www.gpo.gov/fdsys/pkg/FR-2016-08-24/pdf/2016-18768.pdf). Accordingly, Washington, DC-MD-VA is no longer designated as maintenance for PM2.5, and the associated USEPA regulatory requirements for conformity for PM2.5 are eliminated for Washington (DC-MD-VA).

00044939

**AIR QUALITY TECHNICAL REPORT**



**3**

## 3    ENVIRONMENTAL CONSEQUENCES

### 3.1    Regional Conformity

The Study is currently included in the NCRTPB Fiscal Year (FY) 2019 – 2024 TIP (TIP ID 6432 and Agency ID AW0731 (planning activities)][19] and the NCRTPB Visualize 2045 Long Range Plan (CEID 1182, CEID 3281, and Appendix B page 56).[20] This Study is included in the Air Quality Conformity Analysis[21] that accompanies the Visualize 2045 Plan. As part of the conformity analysis, consultation with affected agencies such as the EPA, FHWA, FTA, and the Metropolitan Washington Air Quality Committee (MWAQC), as well as with the public was completed. Prior to the Record of Decision being signed, the selected alternative will be included in the TIP and Long Range Plan, along with a Transportation Conformity Determination.

### 3.2    Carbon Monoxide Analysis

As the Study is located in a region that is attainment of the NAAQS for CO, only NEPA applies; EPA project-level ("hot-spot") transportation conformity requirements do not apply. The Maryland counties were redesignated from a nonattainment area to attainment and entered a 20-year maintenance period for CO in March 1996. The area was considered a maintenance area for the 20 years following until March 2016 when the counties completed the maintenance period. Since the Maryland counties have completed the maintenance period, transportation conformity no longer applies for CO. Similarly, Fairfax County is designated attainment for CO. In addition, as discussed in **Section 2.1.1**, CO is highlighted in the FHWA 1987 guidance as a transportation pollutant to be summarized in an EIS. A CO analysis is not required for conformity since the study area is designated as maintenance for CO, however, since CO is a proxy for transportation emissions, potential impacts for CO were still analyzed for transparency under NEPA for affected intersections and interchanges impacted by the Study.

---

[19] FY 2019 – 2024 Transportation Improvement Program for the National Capital Region. October 17, 2018. https://www.mwcog.org/visualize2045/document-library/

[20] Visualize 2045: A Long-Range Transportation Plan for the National Capital Region. October 17, 2018. https://www.mwcog.org/visualize2045/document-library/

[21] Air Quality Conformity Analysis of Visualize 2045 and the FY 2019 – 2024 Transportation Improvement Program. October 17, 2018. https://www.mwcog.org/visualize2045/document-library/

00044940



The methodologies and assumptions applied for the analysis are consistent with FHWA[22] and EPA guidance.[23] Air quality modeling was performed using MOVES emission factors, VISSIM traffic data, and the CAL3QHC Version 2.0 dispersion model. CO concentrations were estimated for the No Build Alternative and the Screened Alternatives at worst-case intersections throughout the study area.

### 3.2.1 Traffic Information

Traffic forecasts were developed for the existing (2016), opening (2025) and design year (2040) conditions for each Screened Alternative and the No Build Alternative, including AM and PM peak hour Level of Service (LOS), volume and delay for intersections and interchanges in the Study area and consistent with the traffic analysis developed for the Study. Traffic data are included in **Appendix A** and were used for ranking and selecting the worst-case intersections and interchanges for comparison to the CO NAAQS.

### 3.2.2 Methodology

A detailed effort was undertaken as part of the traffic analysis to identify all signalized intersections and interchanges that were likely significantly impacted by the Study. These intersections and interchanges are shown in **Figure 3-1** through **Figure 3-3**. These selected intersections interchanges served as the starting point for selecting the top three worst-case intersections and interchanges for quantitative analysis (i.e., CO Hot-Spot modeling). The traffic analysis team completed an operations analysis of each intersection using traffic forecasts developed on an intersection-by-intersection basis and the Synchro simulation package. The delay, LOS and traffic volume for every intersection identified was completed, and the results placed in an Excel table in order to rank the intersections using the EPA's detailed guidance.[24] The flowchart in **Figure 3-4** is an excerpt from EPA's 1992 Guideline which presents the methodology for screening/ranking intersections for a quantitative analysis.

---

[22] Guidance for Preparing and Processing Environmental and Section 4(f) Documents. October 30, 1987. https://www.environment.fhwa.dot.gov/projdev/impTA6640.asp

[23] Guideline for Modeling Carbon Monoxide from Roadway Intersections. July 19, 1993. https://www3.epa.gov/scram001/guidance/guide/coguide.pdf; Using MOVES2014 in Project-Level Carbon Monoxide Analyses. March 2015. https://nepis.epa.gov/Exe/ZyPdf.cgi?Dockey=P100M2FB.pdf

[24] US part, Guideline for Modeling Carbon Monoxide from Roadway Intersections, USEPA-454/R-92-005, Office of Air Quality Planning and Standards, November 1992.

00044941

AIR QUALITY TECHNICAL REPORT

Figure 3-1: CO Study Area Intersection and Interchanges



Carbon Monoxide Screening
Intersections and Interchanges

Legend
— Project Corridor
□ State Boundary
□ County Boundary
● Worst-Case Intersections
● Other Intersections
■ Worst-Case Interchanges
■ Other Interchanges

MAY 2020

0064942

25

AIR QUALITY TECHNICAL REPORT

Figure 3-2: CO Study Area Intersection and Interchanges



Carbon Monoxide Screening
Intersections and Interchanges

Legend

— Project Corridor      ● Worst-Case Intersections      ■ Worst-Case Interchanges
□ State Boundary        ● Other Intersections           ■ Other Interchanges
□ County Boundary

MAY 2020

26

00044943

AIR QUALITY TECHNICAL REPORT



Figure 3-3: CO Study Area Intersection and Interchanges

**Carbon Monoxide Screening**
Intersections and Interchanges

Legend

— Project Corridor
☐ State Boundary
☐ County Boundary

● Worst-Case Intersections
● Other Intersections

■ Worst-Case Interchanges
■ Other Interchanges

MAY 2020

00044945

**AIR QUALITY TECHNICAL REPORT**



Figure 3-4: CO Intersection Screening Flowchart

It is assumed that if the selected worst-case intersections and interchanges evaluated in the quantitative analysis do not show an exceedance of the NAAQS, none of the ranked intersections or interchanges will. This assumes that these intersection/interchanges will have the highest CO impacts and those intersections/interchanges with lower traffic volumes and less congestion will have lower ambient air impacts. Thus, if no exceedances of the CO NAAQS occur for the opening and design years when the results of the modeling are added to monitored background levels at each of the worst-case intersections/interchanges evaluated, then it can reasonably be assumed that the alternatives would not cause or contribute to a violation of the CO NAAQS at any location throughout the study corridor.

00044946



## A.    Intersection Rankings

An analysis of the LOS and peak hourly volumes were evaluated for the Screened Alternatives to confirm the worst-case intersection locations for consideration for CO hot-spot modeling. The intersections were summarized by worst-case peak AM or PM volumes and LOS for all Screened Alternatives for opening and design year conditions. Traffic volumes used in the ranking of the signalized intersections are included in **Appendix A.** The signalized intersections were ranked by LOS and the higher of the AM or PM peak hourly-ranked volumes and were summarized for each of the Screened Alternatives. A summary of the ranked intersections including LOS, peak AM and PM hourly volumes and delay are included in **Appendix C** for each Alternative.

**Table 3-1** through **Table 3-12** show the top three worst-case intersections ranked by LOS and the higher of the peak AM or PM volumes for all Screened Alternatives for 2025 and 2040, respectively. The top three maximum peak hour volumes and maximum peak hour delays are highlighted in yellow in each table These worst-case intersections are also denoted as a yellow circle in **Figure 3-1** through **Figure 3-3** above. The traffic analysis, as summarized below, demonstrates that the top three intersections selected for evaluation in the CO hot-spot analysis have the highest traffic volumes and worst-case LOS (i.e., LOS A being the best and LOS F being the worst) for all Screened Alternatives. Therefore, they are representative of the locations where peak CO concentrations would be expected to occur throughout the corridor. It should be noted that the top three intersections may be common to alternatives, e.g., common intersections. As mentioned above, it is assumed that if these intersections show peak ground level CO concentrations below the CO NAAQS, then all other locations in the study area would also be below the CO NAAQS.

The top three ranked intersections for volume and LOS for each alternative were chosen for dispersion modeling consistent with the November 1992 EPA Guidance. For the highway intersections, a worst-case analysis approach was taken using MOVES2014b and CAL3QHC (invoked via the latest version of the FHWA CAL3i interface software) to develop conservative estimates for CO concentrations. This approach is designed to overestimate CO emissions of the Study and produce worst-case results from the air quality/dispersion modeling. CAL3i provides a user-friendly interface for the EPA CAL3QHC model that serves to facilitate and streamline the modeling process, particularly for worst-case analyses. Details on the assumptions used for the worst-case modeling analyses are provided later in this report.

00044947

AIR QUALITY TECHNICAL REPORT



**Table 3-1: Opening Year (2025) Alternative 5 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,170 | 6,375 | 7,170 | 92,150 | F | 101.5 | C | 34.3 |
| 2 | | 7.15 | MD 5 | Auth Road | 6,710 | 5,655 | 6,710 | 80,770 | A | 1.6 | A | 0.8 |
| 3 | New Intersections | 58.15 | US 29 | Direct Access Ramp | 6,240 | 5,870 | 6,240 | 78,770 | A | 7.8 | C | 22.6 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Single-Point Urban Interchange | 46.15 | MD 187 | I-270 SB Ramp | 2,820 | 4,485 | 4,485 | 54,410 | B | 15.6 | F | 125.8 |
| 2 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,170 | 6,375 | 7,170 | 92,150 | F | 101.5 | C | 34.3 |
| 3 | | 36.15 | MD 187 | Capital Beltway | 3,320 | 3,960 | 3,960 | 36,675 | E | 71.7 | B | 71.7 |

**Table 3-2: Design Year (2040) Alternative 5 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,625 | 6,780 | 7,625 | 98,000 | F | 113.1 | D | 46.3 |
| 2 | | 7.15 | MD 5 | Auth Road | 7,135 | 6,015 | 7,135 | 85,900 | C | 24.4 | A | 1.0 |
| 3 | New Intersections | 58.15 | US 29 | Direct Access Ramp | 6,645 | 6,250 | 6,645 | 83,875 | A | 6.1 | C | 28.0 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 46.15 | MD 187 | I-270 SB Ramp | 2,995 | 4,775 | 4,775 | 57,875 | B | 16.4 | F | 140.7 |
| 2 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,625 | 6,780 | 7,625 | 98,000 | F | 113.1 | D | 46.3 |
| 3 | New Intersections | 56.15 | US 29 | Inner Loop | 4,655 | 5,150 | 5,150 | 65,475 | B | 13.0 | D | 52.3 |

**Table 3-3: Opening Year (2025) Alternative 8 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,070 | 6,345 | 7,070 | 91,315 | F | 101.7 | D | 39.0 |
| 2 | | 58.15 | US 29 | Direct Access Ramp | 7,015 | 6,590 | 7,015 | 84,325 | A | 8.4 | C | 34.0 |
| 3 | New Intersections | 7.15 | MD 5 | Auth Road | 6,700 | 5,650 | 6,700 | 81,010 | A | 2.8 | A | 0.8 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 46.15 | MD 187 | I-270 SB Ramp | 2,870 | 4,505 | 4,505 | 54,335 | B | 15.8 | F | 103.3 |
| 2 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,070 | 6,345 | 7,070 | 91,315 | F | 101.7 | D | 39.0 |
| 3 | New Intersections | 57.15 | US 29 | Outer Loop | 6,015 | 6,140 | 6,140 | 74,835 | F | 82.3 | B | 19.1 |

JA2084

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 181 of 226

AIR QUALITY TECHNICAL REPORT



**Table 3-4: Design Year (2040) Alternative 8 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 28.IS | MD97 | Inner Loop Ramp | 7,570 | 6,735 | 7,570 | 97,375 | F | 112.7 | E | 61.4 |
| 2 | New Intersections | 58.IS | US 29 | Direct Access Ramp | 7,430 | 7,010 | 7,430 | 89,500 | B | 11.8 | D | 36.4 |
| 3 | | 7.IS | MD5 | Auth Road | 7,125 | 5,955 | 7,125 | 85,800 | A | 1.9 | A | 1.0 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | 46.IS | MD 187 | I-270 SB Ramp | 3,055 | 4,790 | 4,790 | 57,800 | B | 15.8 | F | 140.5 | 140.5 |
| 2 | Replaced by Diamond Intersection | 28.IS | MD97 | Inner Loop Ramp | 7,570 | 6,735 | 7,570 | 97,375 | F | 112.7 | E | 61.4 | 112.7 |
| 3 | New Intersections | 57.IS | US 29 | Outer Loop | 6,495 | 6,495 | 6,495 | 79,975 | F | 93.6 | D | 41.5 | 93.6 |

**Table 3-5: Opening Year (2025) Alternative 9 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | New Intersections | 58.IS | US 29 | Direct Access Ramp | 7,370 | 6,740 | 7,370 | 86,100 | B | 13.1 | C | 30.2 |
| 2 | Replaced by Diamond Intersection | 28.IS | MD97 | Inner Loop Ramp | 7,305 | 6,450 | 7,305 | 94,525 | F | 114.3 | D | 39.0 |
| 3 | | 7.IS | MD5 | Auth Road | 7,010 | 5,720 | 7,010 | 83,460 | A | 4.4 | A | 0.8 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 28.IS | MD97 | Inner Loop Ramp | 7,305 | 6,450 | 7,305 | 94,525 | F | 114.3 | D | 39.0 | 114.3 |
| 2 | | 46.IS | MD 187 | I-270 SB Ramp | 2,960 | 4,570 | 4,570 | 55,420 | B | 16.0 | E | 79.7 | 79.7 |
| 3 | New Intersections | 57.IS | US 29 | Outer Loop | 6,315 | 6,300 | 6,315 | 78,060 | E | 63.3 | B | 19.9 | 63.3 |

**Table 3-6: Design Year (2040) Alternative 9 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | New Intersections | 58.IS | US 29 | Direct Access Ramp | 7,520 | 7,020 | 7,520 | 88,725 | A | 9.3 | C | 34.6 |
| 2 | Replaced by Diamond Intersection | 28.IS | MD97 | Inner Loop Ramp | 7,455 | 6,715 | 7,455 | 97,375 | F | 112.4 | E | 55.1 |
| 3 | | 7.IS | MD5 | Auth Road | 7,150 | 5,960 | 7,150 | 85,950 | C | 20.1 | A | 0.9 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | 46.IS | MD 187 | I-270 SB Ramp | 3,015 | 4,760 | 4,760 | 57,225 | B | 15.6 | F | 138.2 | 138.2 |
| 2 | Replaced by Diamond Intersection | 28.IS | MD97 | Inner Loop Ramp | 7,455 | 6,715 | 7,455 | 97,375 | F | 112.4 | E | 55.1 | 112.4 |
| 3 | New Intersections | 57.IS | US 29 | Outer Loop | 6,440 | 6,565 | 6,565 | 80,475 | E | 74.1 | C | 28.2 | 74.1 |

JA2085

AIR QUALITY TECHNICAL REPORT



**Table 3-7: Opening Year (2025) Alternative 10 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | New Intersections | 58.15 | US 29 | Direct Access Ramp | 6,610 | 7,075 | 7,075 | 83,510 | B | 11.0 | C | 30.4 |
| 2 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 6,310 | 7,005 | 7,005 | 91,500 | F | 104.0 | D | 39.3 |
| 3 | | 7.15 | MD 5 | Auth Road | 5,605 | 6,725 | 6,725 | 80,835 | A | 1.7 | A | 0.8 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,005 | 6,310 | 7,005 | 91,500 | F | 104.0 | D | 39.3 | 104.0 |
| 2 | New Intersections | 57.15 | US 29 | Outer Loop | 6,055 | 6,180 | 6,180 | 75,710 | E | 60.4 | C | 22.7 | 60.4 |
| 3 | | 46.15 | MD 187 | I-270 SB Ramp | 2,640 | 4,370 | 4,370 | 53,000 | B | 16.0 | D | 50.5 | 50.5 |

**Table 3-8: Design Year (2040) Alternative 10 Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | New Intersections | 58.15 | US 29 | Direct Access Ramp | 7,000 | 7,520 | 7,520 | 88,725 | B | 12.2 | D | 36.8 |
| 2 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 6,715 | 7,455 | 7,455 | 97,375 | F | 112.9 | E | 59.4 |
| 3 | | 7.15 | MD 5 | Auth Road | 5,960 | 7,150 | 7,150 | 85,950 | B | 19.3 | A | 0.9 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 46.15 | MD 187 | I-270 SB Ramp | 2,805 | 4,655 | 4,655 | 56,400 | C | 30.6 | F | 125.0 | 125.0 |
| 2 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,455 | 6,715 | 7,455 | 97,375 | F | 112.9 | E | 59.4 | 112.9 |
| 3 | New Intersections | 57.15 | US 29 | Outer Loop | 6,440 | 6,565 | 6,565 | 80,475 | E | 70.2 | C | 28.3 | 70.2 |

**Table 3-9: Opening Year (2025) Alternative 13B Intersection Volume and Level of Service Ranking**

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | New Intersections | 58.15 | US 29 | Direct Access Ramp | 6,600 | 7,040 | 7,040 | 83,550 | B | 10.5 | B | 19.3 |
| 2 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 6,295 | 7,000 | 7,000 | 90,960 | F | 112.8 | D | 40.8 |
| 3 | | 7.15 | MD 5 | Auth Road | 5,605 | 6,715 | 6,715 | 81,395 | A | 2.6 | A | 0.8 |

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 28.15 | MD 97 | Inner Loop Ramp | 7,000 | 6,295 | 7,000 | 90,960 | F | 112.8 | D | 40.8 | 112.8 |
| 2 | | 46.15 | MD 187 | I-270 SB Ramp | 2,900 | 4,545 | 4,545 | 55,075 | B | 16.1 | F | 106.3 | 106.3 |
| 3 | | 16.15 | MD 202 | Outer Loop Ramp | 3,245 | 4,420 | 4,420 | 54,545 | C | 21.8 | D | 44.3 | 44.3 |

00044950

JA2086

AIR QUALITY TECHNICAL REPORT



**Table 3-10: Design Year (2040) Alternative 13B Intersection Volume and Level of Service Ranking**

Ranked by Volume

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max PM Peak Hour LOS | Max PM Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 281S | MD 97 | Inner Loop Ramp | 7,505 | 6,695 | 7,505 | 97,150 | F | 122.4 | E | 56.3 | F | 122.4 |
| 2 | New Intersections | 581S | US 29 | Direct Access Ramp | 7,480 | 7,025 | 7,480 | 88,850 | B | 11.3 | C | 28.6 | C | 28.6 |
| 3 | | 71S | MD 5 | Auth Road | 7,140 | 5,960 | 7,140 | 86,550 | B | 19.8 | A | 0.9 | B | 19.8 |

Ranked by LOS

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max PM Peak Hour LOS | Max PM Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | New Intersections | 561S | US 29 | Inner Loop | 4,695 | 5,080 | 5,080 | 63,775 | A | 9.5 | F | 152.8 | F | 152.8 |
| 2 | Replaced by Diamond Intersection | 281S | MD 97 | Inner Loop Ramp | 7,505 | 6,695 | 7,505 | 97,150 | F | 122.4 | E | 56.3 | F | 122.4 |
| 3 | Replaced by Diamond Intersection | 461S | MD 187 | I-270 SB Ramp | 3,085 | 4,840 | 4,840 | 58,625 | B | 16.1 | F | 120.7 | F | 120.7 |

**Table 3-11: Opening Year (2025) Alternative 13C Intersection Volume and Ranking**

Ranked by Volume

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max PM Peak Hour LOS | Max PM Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 281S | MD 97 | Inner Loop Ramp | 7,050 | 6,365 | 7,050 | 91,215 | F | 113.4 | D | 46.7 | F | 113.4 |
| 2 | New Intersections | 581S | US 29 | Direct Access Ramp | 6,985 | 6,520 | 6,985 | 83,375 | | | | | | 22.1 |
| 3 | New Intersections | 71S | MD 5 | Auth Road | 6,735 | 5,605 | 6,735 | 80,925 | | | | | | 0.8 |

Ranked by LOS

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max PM Peak Hour LOS | Max PM Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 281S | MD 97 | Inner Loop Ramp | 7,050 | 6,365 | 7,050 | 91,215 | F | 113.4 | D | 46.7 | F | 113.4 |
| 2 | New Intersections | 461S | US 29 | I-270 SB Ramp | 2,795 | 4,510 | 4,510 | 54,375 | B | 16.2 | F | 94.0 | F | 94.0 |
| 3 | New Intersections | 571S | US 29 | Outer Loop | 5,990 | 6,060 | 6,060 | 73,720 | E | 62.3 | B | 17.1 | E | 62.3 |

**Table 3-12: Design Year (2040) Alternative 13C Intersection Volume and Level of Service Ranking**

Ranked by Volume

| Volume Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max PM Peak Hour LOS | Max PM Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 281S | MD 97 | Inner Loop Ramp | 7,550 | 6,775 | 7,550 | 97,400 | F | 128.4 | B | 12.6 | F | 128.4 |
| 2 | New Intersections | 581S | US 29 | Direct Access Ramp | 7,435 | 6,945 | 7,435 | 88,775 | | | | | | 37.1 |
| 3 | New Intersections | 71S | MD 5 | Auth Road | 7,165 | 5,960 | 7,165 | 86,125 | | | | | | 0.8 |

Ranked by LOS

| LOS Rank | Build Condition Modification Notes | ID | Mainline | Cross Street | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Daily Volume | Peak AM Hour LOS | Peak AM Hour Delay (s) | Peak PM Hour LOS | Peak PM Hour Delay (s) | Max PM Peak Hour LOS | Max PM Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Replaced by Diamond Intersection | 461S | MD 187 | I-270 SB Ramp | 2,975 | 4,790 | 4,790 | 57,800 | B | 15.6 | F | 134.6 | F | 134.6 |
| 2 | New Intersections | 581S | MD 97 | Inner Loop Ramp | 7,550 | 6,775 | 7,550 | 97,400 | F | 128.4 | B | 12.6 | F | 128.4 |
| 3 | New Intersections | 291S | MD 97 | Outer Loop Ramp | 6,320 | 6,445 | 6,445 | 88,725 | E | 68.7 | A | 6.5 | E | 68.7 |

JA2087

00044951



## B.    Interchange Rankings

Interchanges were also ranked for each Screened Alternative by worst-case volumes for the mainline traveling through each interchange. Traffic volumes used in the ranking of the interchanges are included in **Appendix C**. The interchange locations studied for each Alternative are shown **Table 3-1** through **Table 3-11**. A summary of the ranked interchanges by volume and delay are included in **Appendix C** for each Alternative. The top three interchanges by volume and delay for each Screened Alternative were chosen for dispersion modeling. **Table 3-13** through **Table 3-24** presents the top three interchanges ranked by volume for each Alternative for the 2025 and 2040 condition, respectively. Similarly, the top three maximum peak hour volumes and maximum peak hour delays are highlighted in yellow in each table. These worst-case interchanges are also denoted as a red box in **Figure 3-1** through **Figure 3-3**, above. A review of the worst-case interchanges demonstrates the top three interchanges for each Alternative clearly have the highest traffic volumes and delays.

00044952

USCA4 Appeal: 24-1447    Doc: 31-1    Filed: 09/30/2024    Pg: 185 of 226

AIR QUALITY TECHNICAL REPORT



## Table 3-13: Opening Year (2025) Alternative 5 Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 34,330 | 39,024 | 39,024 | 6.6 | 2.0 | 6.6 |
| 2 | 11.IC | Capital Beltway | US 50 | 26,352 | 27,207 | 27,207 | 7.9 | 2.3 | 7.9 |
| 3 | 16.IC | Capital Beltway | I-95 | 23,057 | 25,471 | 25,471 | 2.8 | 3.6 | 3.6 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.IC | Capital Beltway | I-270 and MD 355 | 22,400 | 20,356 | 22,400 | 12.1 | 120.0 | 120.0 |
| 2 | 21.IC | Capital Beltway | MD 185 | 24,606 | 23,147 | 24,606 | 4.2 | 63.9 | 63.9 |
| 3 | 17.IC | Capital Beltway | MD 650 | 20,956 | 24,562 | 24,562 | 63.8 | 6.9 | 63.8 |

## Table 3-14: Design Year (2040) Alternative 5 Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 32,565 | 37,832 | 37,832 | 1.6 | 5.4 | 135.0 |
| 2 | 11.IC | Capital Beltway | US 50 | 26,679 | 28,656 | 28,656 | 13.5 | 2.5 | 134.9 |
| 3 | 16.IC | Capital Beltway | I-95 | 21,112 | 26,522 | 26,522 | 135.0 | 3.7 | 99.4 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.IC | Capital Beltway | I-95 | 21,112 | 26,522 | 26,522 | 135.0 | 3.7 | 135.0 |
| 2 | 22.IC | Capital Beltway | I-270 and MD 355 | 22,964 | 20,718 | 22,964 | 2.9 | 134.9 | 134.9 |
| 3 | 3.IC | Capital Beltway | MD 5 | 21,963 | 25,665 | 25,665 | 99.4 | 1.7 | 99.4 |

MAY 2020

00044953

JA2089

AIR QUALITY TECHNICAL REPORT



## Table 3-15: Opening Year (2025) Alternative 8 Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 38,280 | 42,856 | 42,856 | 1.6 | 1.9 | 1.9 |
| 2 | 25.IC | Capital Beltway | MD 190 | 29,333 | 25,806 | 29,333 | 5.2 | 2.6 | 5.2 |
| 3 | 11.IC | Capital Beltway | US 50 | 28,724 | 28,588 | 28,724 | 3.5 | 2.1 | 3.5 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.IC | Capital Beltway | I-270 and MD 355 | 25,458 | 25,499 | 25,499 | 4.4 | 65.9 | 65.9 |
| 2 | 21.IC | Capital Beltway | MD 185 | 27,138 | 27,682 | 27,682 | 3.4 | 39.8 | 39.8 |
| 3 | 18.IC | Capital Beltway | MD 193 | 22,628 | 26,313 | 26,313 | 6.9 | 33.1 | 33.1 |

## Table 3-16: Design Year (2040) Alternative 8 Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 40,246 | 43,137 | 43,137 | 14.3 | 3.1 |
| 2 | 11.IC | Capital Beltway | US 50 | 30,123 | 30,162 | 30,162 | 3.2 | 2.3 |
| 3 | 25.IC | Capital Beltway | MD 190 | 29,729 | 24,540 | 29,729 | 6.1 | 61.9 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay (s) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.IC | Capital Beltway | I-270 and MD 355 | 24,671 | 26,026 | 26,026 | 32.0 | 72.1 | 72.1 |
| 2 | 25.IC | Capital Beltway | MD 190 | 29,729 | 24,540 | 29,729 | 6.1 | 61.9 | 61.9 |
| 3 | 24.IC | Capital Beltway | I-270 Spur | 23,726 | 18,638 | 23,726 | 33.0 | 53.8 | 53.8 |

00044954

JA2090

AIR QUALITY TECHNICAL REPORT



**Table 3-17: Opening Year (2025) Alternative 9 Interchange Volume and Delay Ranking**

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 36,745 | 42,984 | 42,984 | 1.8 | 1.8 | 1.8 |
| 2 | 11.IC | Capital Beltway | US 50 | 29,443 | 29,258 | 29,443 | 3.8 | 2.3 | 3.8 |
| 3 | 25.IC | Capital Beltway | MD 190 | 28,749 | 27,025 | 28,749 | 29.4 | 3.0 | 29.4 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.IC | Capital Beltway | I-270 and MD 355 | 26,379 | 25,449 | 26,379 | 27.0 | 62.7 | 62.7 |
| 2 | 21.IC | Capital Beltway | MD 185 | 27,880 | 27,142 | 27,880 | 3.9 | 41.2 | 41.2 |
| 3 | 25.IC | Capital Beltway | MD 190 | 28,749 | 27,025 | 28,749 | 29.4 | 3.0 | 29.4 |

**Table 3-18: Design Year (2040) Alternative 9 Interchange Volume and Delay Ranking**

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 34,837 | 42,529 | 42,529 | 1.5 | 2.0 | |
| 2 | 11.IC | Capital Beltway | US 50 | 29,372 | 30,185 | 30,185 | 3.5 | 2.3 | |
| 3 | 20.IC | Capital Beltway | MD 97 | 28,909 | 29,034 | 29,034 | 24.8 | 25.7 | |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3.IC | Capital Beltway | MD 5 | 23,079 | 26,297 | 26,297 | 81.4 | 2.0 | 81.4 |
| 2 | 22.IC | Capital Beltway | I-270 and MD 355 | 27,304 | 26,135 | 27,304 | 3.1 | 71.6 | 71.6 |
| 3 | 24.IC | Capital Beltway | I-270 Spur | 22,922 | 20,480 | 22,922 | 12.0 | 47.3 | 47.3 |

00044955

JA2091

AIR QUALITY TECHNICAL REPORT



### Table 3-19: Opening Year (2025) Alternative 10 Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 39,264 | 46,360 | 46,360 | 3.6 | 2.3 | 3.6 |
| 2 | 25.IC | Capital Beltway | MD 190 | 28,729 | 27,624 | 28,729 | 27.5 | 2.9 | 27.5 |
| 3 | 11.IC | Capital Beltway | US 50 | 28,381 | 28,639 | 28,639 | 3.1 | 2.2 | 3.1 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 24.IC | Capital Beltway | I-270 Spur | 22,849 | 21,094 | 22,849 | 42.6 | 1.9 | 42.6 |
| 2 | 21.IC | Capital Beltway | MD 185 | 27,202 | 26,942 | 27,202 | 3.2 | 42.6 | 42.6 |
| 3 | 18.IC | Capital Beltway | MD 193 | 22,695 | 26,022 | 26,022 | 8.2 | 31.2 | 31.2 |

### Table 3-20: Design Year (2040) Alternative 10 Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 40,900 | 47,317 | 47,317 | 7.7 | 8.2 | 95.3 |
| 2 | 11.IC | Capital Beltway | US 50 | 29,435 | 30,253 | 30,253 | 3.5 | 2.3 | 85.5 |
| 3 | 25.IC | Capital Beltway | MD 190 | 29,365 | 28,789 | 29,365 | 28.2 | 6.0 | 72.4 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3.IC | Capital Beltway | MD 5 | 23,280 | 26,354 | 26,354 | 95.3 | 2.0 | 95.3 |
| 2 | 22.IC | Capital Beltway | I-270 and MD 355 | 26,259 | 25,889 | 26,259 | 10.5 | 85.5 | 85.5 |
| 3 | 21.IC | Capital Beltway | MD 185 | 27,780 | 27,863 | 27,863 | 16.0 | 72.4 | 72.4 |

MAY 2020

00044956

AIR QUALITY TECHNICAL REPORT



**Table 3-21: Opening Year (2025) Alternative 13B Interchange Volume and Delay Ranking**

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 35,561 | 41,028 | 41,028 | 2.0 | 2.0 | 2.0 |
| 2 | 11.IC | Capital Beltway | US 50 | 28,132 | 28,769 | 28,769 | 2.9 | 2.2 | 2.9 |
| 3 | 20.IC | Capital Beltway | MD 97 | 27,795 | 28,197 | 28,197 | 16.6 | 19.7 | 19.7 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 21.IC | Capital Beltway | MD 185 | 27,387 | 27,152 | 27,387 | 2.9 | 36.6 | 36.6 |
| 2 | 22.IC | Capital Beltway | I-270 and MD 355 | 26,335 | 25,382 | 26,335 | 3.0 | 32.7 | 32.7 |
| 3 | 25.IC | Capital Beltway | MD 190 | 27,918 | 26,555 | 27,918 | 28.5 | 2.7 | 28.5 |

**Table 3-22: Design Year (2040) Alternative 13B Interchange Volume and Delay Ranking**

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 36,952 | 38,924 | 38,924 | 2.7 | 9.8 | 83.2 |
| 2 | 11.IC | Capital Beltway | US 50 | 29,756 | 29,948 | 29,948 | 3.3 | 2.3 | 67.8 |
| 3 | 25.IC | Capital Beltway | MD 190 | 28,244 | 26,334 | 28,244 | 32.2 | 13.6 | 60.4 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.IC | Capital Beltway | I-270 and MD 355 | 25,780 | 24,652 | 25,780 | 58.2 | 83.2 | 83.2 |
| 2 | 3.IC | Capital Beltway | MD 5 | 23,906 | 26,226 | 26,226 | 67.8 | 1.9 | 67.8 |
| 3 | 36.IC | I-270 | I-370 | 21,212 | 22,327 | 22,327 | 15.6 | 60.4 | 60.4 |

00044957

JA2093

AIR QUALITY TECHNICAL REPORT



## Table 3-23: Opening Year (2025) Alternative 13C Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 38,060 | 43,777 | 43,777 | 2.2 | 2.4 | 2.4 |
| 2 | 25.IC | Capital Beltway | MD 190 | 29,012 | 26,886 | 29,012 | 26.7 | 2.6 | 26.7 |
| 3 | 11.IC | Capital Beltway | US 50 | 28,319 | 28,867 | 28,867 | 4.1 | 2.3 | 4.1 |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 24.IC | Capital Beltway | I-270 Spur | 23,429 | 21,104 | 23,429 | 54.4 | 3.0 | 54.4 |
| 2 | 36.IC | I-270 | I-370 | 20,893 | 25,389 | 25,389 | 4.9 | 49.3 | 49.3 |
| 3 | 21.IC | Capital Beltway | MD 185 | 27,175 | 27,229 | 27,229 | 3.0 | 37.2 | 37.2 |

## Table 3-24: Design Year (2040) Alternative 13C Interchange Volume and Delay Ranking

| Volume Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 33.IC | I-270 | MD 189 | 38,379 | 45,112 | 45,112 | 25.2 | 3.4 | |
| 2 | 11.IC | Capital Beltway | US 50 | 29,907 | 30,284 | 30,284 | 3.5 | 3.3 | |
| 3 | 25.IC | Capital Beltway | MD 190 | 29,576 | 27,524 | 29,576 | 27.2 | 34.1 | |

| Delay Rank | ID | Mainline | Cross Road | Peak AM Hour Volume | Peak PM Hour Volume | Max Peak Hour Volume | Peak AM Hour Delay (s) | Peak PM Hour Delay (s) | Max Peak Hour Delay |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.IC | Capital Beltway | I-270 and MD 355 | 25,379 | 25,107 | 25,379 | 40.3 | 74.5 | 74.5 |
| 2 | 21.IC | Capital Beltway | MD 185 | 26,443 | 27,369 | 27,369 | 28.7 | 64.6 | 64.6 |
| 3 | 24.IC | Capital Beltway | I-270 Spur | 23,931 | 21,232 | 23,931 | 54.3 | 5.4 | 54.3 |

00044958

JA2094



The traffic analysis, as summarized above, demonstrates that the top three interchanges for each Screened Alternative selected for evaluation in the CO hot-spot analysis have the highest traffic volumes and delays, and therefore are representative of the locations where peak CO concentrations would be expected to occur throughout the corridor. It should be noted that the top three interchanges may be common to Alternatives, e.g., common interchanges (i.e., worst-case intersections for one Alternative may be the same for other Alternatives). For example, I-270/MD 89 interchange is in the top three ranked interchanges for all Alternatives, therefore this interchange is common to all Alternatives.

As mentioned earlier, it is assumed that if these interchanges show peak ground level CO concentrations below the CO NAAQS, then all other locations in the study area would also be below the CO NAAQS. Similar to the intersections, for the highway interchanges, a worst-case analysis approach was taken using MOVES2014b and CAL3QHC (invoked via the latest version of the FHWA CAL3i interface software) to develop conservative estimates for CO concentrations. Details on the assumptions used for the worst-case modeling analyses are provided in the following sections.

## C.    MOVES Emission Rates

Vehicle emission rates for CO were estimated using the latest version of the EPA Motor Vehicle Emissions Simulator model (MOVES2014b). The methodologies and assumptions used for the MOVES modeling are consistent with FHWA and EPA guidance.[25],[26] Modeling was conducted for the opening and design years, 2025 and 2040 respectively, in addition to the existing year (2016) for both Build and No Build conditions, specifically:

- Vehicle and fuels data required for input into the MOVES model was provided by MDOT SHA, Metropolitan Washington Council of Governments (MWCOG), and EPA Defaults data for 2016, 2025 and 2040 conditions, consistent with the latest planning assumptions for the study corridor.

- Fuel data, vehicle population, and age distribution data were provided by MDOT SHA/MWCOG/EPA Defaults to populate the MOVES project data manager database for the areas where the worst-case interchanges and intersections are located (i.e., Montgomery County and Prince Georges County).

- MOVES link files were developed for each worst-case intersection/interchange studied for each analysis year. The link file includes road type, worst-case volumes, link lengths, roadway speed, and roadway grade.

- The roadway grades for the interchanges were derived from plans where available, or from profile data based on US Geological Survey elevation data from Geographic Information System files or Google Earth data.

- Mobile source emissions were calculated based on peak-period congested speeds at which vehicles travel through the interchange/intersection, and idle emissions were used to represent queuing vehicles.

- Worst-case meteorological data for the areas where the worst-case interchanges are located were also assumed in the project data manager database.

[25] Guidance for Preparing and Processing Environmental and Section 4(f) Documents. October 30, 1987. https://www.environment.fhwa.dot.gov/projdev/impTA6640.asp and
[26] Guideline for Modeling Carbon Monoxide from Roadway Intersections. July 19, 1993. https://www3.epa.gov/scram001/guidance/guide/coguide.pdf; Using MOVES2014 in Project-Level Carbon Monoxide Analyses. March 2015. https://nepis.epa.gov/Exe/ZyPdf.cgi?Dockey=P100M2FB.pdf

00044959

AIR QUALITY TECHNICAL REPORT



The geographic bounds of the CO analysis were determined based on the locations of affected intersections and interchanges. Since all the affected intersections and interchanges are located in Montgomery and Prince Georges counties in Maryland, the geographic area for the CO analysis was based on these counties. A summary of the MOVES inputs is presented in **Table 3-25**.

Table 3-25: MOVES2014b Input Parameters

| Parameter | Assumption |
|---|---|
| Scale Menu | Domain: Project<br>Calculation Type: Inventory |
| Evaluation Month | January |
| Time Span | Year = 2016, 2025, 2040<br>Hour = 7 AM to 8 AM<br>Days = Weekdays |
| Geographic Bounds | Montgomery County<br>Prince George's County |
| Vehicles Equipment | All vehicle types for diesel and gasoline and compressed natural gas transit buses only |
| Link Files | Roadway Specific |
| Roadway Grade and Link Speeds | Plans where available or Google Earth data and posted speed limits |
| Meteorology | Average Temp and Humidity in January 2016 |
| Fuel Inputs | Provided by MDOT SHA/MWCOG/EPA Defaults |
| Vehicle Population and Age Distribution | Provided by MDOT SHA/MWCOG/EPA Default |
| Pollutants and Process Panel | CO Running and CO Crankcase |
| Output Panel | Grams and Miles Selected as Units<br>Population and Distance Traveled |

The MOVES runs generated CO emission rates for input into the CAL3QHC dispersion.

## D.    Emission Factors

Mobile source emission factors are calculated based on posted speeds at which vehicles travel through the intersections/interchanges. The MOVES runs were used to generate CO emission rates for input into the CAL3QHC dispersion model for the existing (2016), opening (2025) and design year (2040) conditions.

As an example of the CO emission rates, **Table 3-26** and **Table 3-27** summarize the emission factors generated by MOVES for each year and vehicle speed for each of the interchanges and intersections modeled using MOVES2014b for Montgomery County and Prince Georges County, respectively. A sample MOVES input and output file is provided in **Appendix D**. A complete set of MOVES input/output files can be made available upon request.

00044960

JA2096

**AIR QUALITY TECHNICAL REPORT**



Table 3-26: MOVES2014b Prince Georges County Emission Factor Results

| Speed | Description | Roadway Grade | 2016 Emission Factor (g/mi) | 2016 Emission Factor (g/hr) | 2025 Emission Factor (g/mi) | 2025 Emission Factor (g/hr) | 2040 Emission Factor (g/mi) | 2040 Emission Factor (g/hr) |
|---|---|---|---|---|---|---|---|---|
| 65 | INTERSTATE_65MPH_00 | 0 | 3.02 | | 1.61 | | 0.70 | |
| 65 | INTERSTATE_65MPH_01 | 1 | 4.15 | | 2.31 | | 1.06 | |
| 65 | INTERSTATE_65MPH_02 | 2 | 5.42 | | 3.06 | | 1.44 | |
| 65 | INTERSTATE_65MPH_03 | 3 | 7.01 | | 3.94 | | 1.87 | |
| 65 | INTERSTATE_65MPH_04 | 4 | 8.89 | | 5.02 | | 2.40 | |
| 65 | INTERSTATE_65MPH_05 | 5 | 11.21 | | 6.37 | | 3.05 | |
| 65 | INTERSTATE_65MPH_06 | 6 | 13.32 | | 7.59 | | 3.63 | |
| 60 | INTERSTATE_60MPH_00 | 0 | 2.84 | | 1.49 | | 0.63 | |
| 60 | INTERSTATE_60MPH_01 | 1 | 3.76 | | 2.07 | | 0.92 | |
| 60 | INTERSTATE_60MPH_02 | 2 | 4.91 | | 2.75 | | 1.27 | |
| 60 | INTERSTATE_60MPH_03 | 3 | 6.41 | | 3.60 | | 1.69 | |
| 60 | INTERSTATE_60MPH_04 | 4 | 8.09 | | 4.55 | | 2.15 | |
| 60 | INTERSTATE_60MPH_05 | 5 | 10.06 | | 5.68 | | 2.70 | |
| 60 | INTERSTATE_60MPH_06 | 6 | 12.33 | | 7.01 | | 3.33 | |
| 55 | INTERSTATE_55MPH_00 | 0 | 2.89 | | 1.50 | | 0.61 | |
| 55 | INTERSTATE_55MPH_01 | 1 | 3.73 | | 2.02 | | 0.88 | |
| 55 | INTERSTATE_55MPH_02 | 2 | 4.80 | | 2.67 | | 1.21 | |
| 55 | INTERSTATE_55MPH_03 | 3 | 6.18 | | 3.47 | | 1.61 | |
| 55 | INTERSTATE_55MPH_04 | 4 | 7.79 | | 4.37 | | 2.05 | |
| 55 | INTERSTATE_55MPH_05 | 5 | 9.61 | | 5.40 | | 2.55 | |
| 55 | INTERSTATE_55MPH_06 | 6 | 11.76 | | 6.65 | | 3.15 | |
| 45 | INTERSTATE_RAMPS_45MPH_00 | 0 | 3.06 | | 1.55 | | 0.62 | |
| 45 | INTERSTATE_RAMPS_45MPH_01 | 1 | 3.85 | | 2.04 | | 0.86 | |
| 45 | INTERSTATE_RAMPS_45MPH_02 | 2 | 4.81 | | 2.61 | | 1.15 | |
| 45 | INTERSTATE_RAMPS_45MPH_03 | 3 | 5.90 | | 3.26 | | 1.48 | |
| 45 | INTERSTATE_RAMPS_45MPH_04 | 4 | 7.30 | | 4.07 | | 1.88 | |
| 45 | INTERSTATE_RAMPS_45MPH_05 | 5 | 9.01 | | 5.03 | | 2.35 | |
| 45 | INTERSTATE_RAMPS_45MPH_06 | 6 | 10.69 | | 5.99 | | 2.81 | |
| 35 | INTERSTATE_RAMPS_35MPH_00 | 0 | 3.34 | | 1.68 | | 0.64 | |
| 35 | INTERSTATE_RAMPS_35MPH_01 | 1 | 3.94 | | 2.03 | | 0.81 | |
| 35 | INTERSTATE_RAMPS_35MPH_02 | 2 | 4.69 | | 2.45 | | 1.01 | |
| 35 | INTERSTATE_RAMPS_35MPH_03 | 3 | 5.63 | | 3.01 | | 1.29 | |
| 35 | INTERSTATE_RAMPS_35MPH_04 | 4 | 6.73 | | 3.63 | | 1.59 | |
| 35 | INTERSTATE_RAMPS_35MPH_05 | 5 | 8.14 | | 4.43 | | 1.98 | |
| 35 | INTERSTATE_RAMPS_35MPH_06 | 6 | 9.54 | | 5.23 | | 2.36 | |
| 25 | INTERSTATE_RAMPS_25MPH_00 | 0 | 3.82 | | 1.89 | | 0.68 | |
| 25 | INTERSTATE_RAMPS_25MPH_01 | 1 | 4.34 | | 2.16 | | 0.80 | |
| 25 | INTERSTATE_RAMPS_25MPH_02 | 2 | 4.96 | | 2.48 | | 0.94 | |
| 25 | INTERSTATE_RAMPS_25MPH_03 | 3 | 5.76 | | 2.94 | | 1.15 | |
| 25 | INTERSTATE_RAMPS_25MPH_04 | 4 | 6.64 | | 3.43 | | 1.39 | |
| 25 | INTERSTATE_RAMPS_25MPH_05 | 5 | 7.70 | | 4.04 | | 1.68 | |
| 25 | INTERSTATE_RAMPS_25MPH_06 | 6 | 8.95 | | 4.77 | | 2.04 | |

00044961

JA2097

**AIR QUALITY TECHNICAL REPORT**



| Speed | Description | Roadway Grade | 2016 Emission Factor (g/mi) | 2016 Emission Factor (g/hr) | 2025 Emission Factor (g/mi) | 2025 Emission Factor (g/hr) | 2040 Emission Factor (g/mi) | 2040 Emission Factor (g/hr) |
|---|---|---|---|---|---|---|---|---|
| 0 | INTERSTATE_RAMPS_QUEUE | 0 | | 17.47 | | 4.01 | | 0.80 |
| 55 | OTHERFREEWAY_55MPH_00 | 0 | 2.89 | | 1.51 | | 0.62 | |
| 55 | OTHERFREEWAY_55MPH_01 | 1 | 3.74 | | 2.04 | | 0.89 | |
| 55 | OTHERFREEWAY_55MPH_02 | 2 | 4.80 | | 2.69 | | 1.23 | |
| 55 | OTHERFREEWAY_55MPH_03 | 3 | 6.19 | | 3.50 | | 1.63 | |
| 55 | OTHERFREEWAY_55MPH_04 | 4 | 7.81 | | 4.41 | | 2.08 | |
| 55 | OTHERFREEWAY_55MPH_05 | 5 | 9.65 | | 5.46 | | 2.58 | |
| 55 | OTHERFREEWAY_55MPH_06 | 6 | 11.82 | | 6.72 | | 3.19 | |
| 50 | OTHERFREEWAY_50MPH_00 | 0 | 2.97 | | 1.53 | | 0.62 | |
| 50 | OTHERFREEWAY_50MPH_01 | 1 | 3.79 | | 2.04 | | 0.88 | |
| 50 | OTHERFREEWAY_50MPH_02 | 2 | 4.81 | | 2.66 | | 1.20 | |
| 50 | OTHERFREEWAY_50MPH_03 | 3 | 6.04 | | 3.40 | | 1.57 | |
| 50 | OTHERFREEWAY_50MPH_04 | 4 | 7.56 | | 4.26 | | 2.00 | |
| 50 | OTHERFREEWAY_50MPH_05 | 5 | 9.35 | | 5.28 | | 2.49 | |
| 50 | OTHERFREEWAY_50MPH_06 | 6 | 11.29 | | 6.40 | | 3.03 | |
| 45 | OTHERFREEWAY_45MPH_00 | 0 | 3.06 | | 1.56 | | 0.62 | |
| 45 | OTHERFREEWAY_45MPH_01 | 1 | 3.85 | | 2.05 | | 0.87 | |
| 45 | OTHERFREEWAY_45MPH_02 | 2 | 4.80 | | 2.62 | | 1.16 | |
| 45 | OTHERFREEWAY_45MPH_03 | 3 | 5.89 | | 3.28 | | 1.49 | |
| 45 | OTHERFREEWAY_45MPH_04 | 4 | 7.29 | | 4.10 | | 1.90 | |
| 45 | OTHERFREEWAY_45MPH_05 | 5 | 9.01 | | 5.07 | | 2.37 | |
| 45 | OTHERFREEWAY_45MPH_06 | 6 | 10.71 | | 6.03 | | 2.84 | |
| 35 | OTHERFREEWAY_35MPH_00 | 0 | 3.33 | | 1.68 | | 0.64 | |
| 35 | OTHERFREEWAY_35MPH_01 | 1 | 3.93 | | 2.03 | | 0.81 | |
| 35 | OTHERFREEWAY_35MPH_02 | 2 | 4.66 | | 2.45 | | 1.01 | |
| 35 | OTHERFREEWAY_35MPH_03 | 3 | 5.60 | | 3.02 | | 1.30 | |
| 35 | OTHERFREEWAY_35MPH_04 | 4 | 6.70 | | 3.65 | | 1.60 | |
| 35 | OTHERFREEWAY_35MPH_05 | 5 | 8.11 | | 4.45 | | 1.99 | |
| 35 | OTHERFREEWAY_35MPH_06 | 6 | 9.52 | | 5.26 | | 2.38 | |
| 0 | OTHERFREEWAY_QUEUE | 0 | | 17.66 | | 4.06 | | 0.83 |
| 45 | MAJOR_ARTERIAL_45MPH_00 | 0 | 3.12 | | 1.61 | | 0.65 | |
| 45 | MAJOR_ARTERIAL_45MPH_01 | 1 | 3.91 | | 2.09 | | 0.88 | |
| 45 | MAJOR_ARTERIAL_45MPH_02 | 2 | 4.85 | | 2.64 | | 1.16 | |
| 45 | MAJOR_ARTERIAL_45MPH_03 | 3 | 6.01 | | 3.32 | | 1.49 | |
| 45 | MAJOR_ARTERIAL_45MPH_04 | 4 | 7.51 | | 4.19 | | 1.93 | |
| 45 | MAJOR_ARTERIAL_45MPH_05 | 5 | 9.16 | | 5.16 | | 2.40 | |
| 45 | MAJOR_ARTERIAL_45MPH_06 | 6 | 10.89 | | 6.18 | | 2.90 | |
| 40 | MAJOR_ARTERIAL_40MPH_00 | 0 | 3.31 | | 1.70 | | 0.67 | |
| 40 | MAJOR_ARTERIAL_40MPH_01 | 1 | 4.06 | | 2.15 | | 0.89 | |
| 40 | MAJOR_ARTERIAL_40MPH_02 | 2 | 4.95 | | 2.67 | | 1.14 | |
| 40 | MAJOR_ARTERIAL_40MPH_03 | 3 | 5.97 | | 3.26 | | 1.43 | |
| 40 | MAJOR_ARTERIAL_40MPH_04 | 4 | 7.35 | | 4.06 | | 1.82 | |
| 40 | MAJOR_ARTERIAL_40MPH_05 | 5 | 8.86 | | 4.96 | | 2.27 | |

00044962

**AIR QUALITY TECHNICAL REPORT**



| Speed | Description | Roadway Grade | 2016 | | 2025 | | 2040 | |
|---|---|---|---|---|---|---|---|---|
| | | | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) |
| 40 | MAJOR_ARTERIAL_40MPH_06 | ,6 | 10.49 | | 5.94 | | 2.75 | |
| 35 | MAJOR_ARTERIAL_35MPH_00 | 0 | 3.59 | | 1.86 | | 0.72 | |
| 35 | MAJOR_ARTERIAL_35MPH_01 | 1 | 4.24 | | 2.23 | | 0.90 | |
| 35 | MAJOR_ARTERIAL_35MPH_02 | 2 | 5.10 | | 2.72 | | 1.13 | |
| 35 | MAJOR_ARTERIAL_35MPH_03 | 3 | 5.97 | | 3.22 | | 1.37 | |
| 35 | MAJOR_ARTERIAL_35MPH_04 | 4 | 7.11 | | 3.88 | | 1.69 | |
| 35 | MAJOR_ARTERIAL_35MPH_05 | 5 | 8.46 | | 4.69 | | 2.09 | |
| 35 | MAJOR_ARTERIAL_35MPH_06 | 6 | 10.05 | | 5.67 | | 2.59 | |
| 0 | MAJOR_ARTERIAL_QUEUE | 0 | | 17.83 | | 4.17 | | 0.91 |
| 45 | MAJOR_COLLECTOR_45MPH_00 | 0 | 3.13 | | 1.62 | | 0.66 | |
| 45 | MAJOR_COLLECTOR_45MPH_01 | 1 | 3.92 | | 2.09 | | 0.89 | |
| 45 | MAJOR_COLLECTOR_45MPH_02 | 2 | 4.86 | | 2.65 | | 1.17 | |
| 45 | MAJOR_COLLECTOR_45MPH_03 | 3 | 6.02 | | 3.33 | | 1.50 | |
| 45 | MAJOR_COLLECTOR_45MPH_04 | 4 | 7.51 | | 4.20 | | 1.94 | |
| 45 | MAJOR_COLLECTOR_45MPH_05 | 5 | 9.16 | | 5.17 | | 2.41 | |
| 45 | MAJOR_COLLECTOR_45MPH_06 | 6 | 10.89 | | 6.18 | | 2.91 | |
| 35 | MAJOR_COLLECTOR_35MPH_00 | 0 | 3.60 | | 1.86 | | 0.73 | |
| 35 | MAJOR_COLLECTOR_35MPH_01 | 1 | 4.25 | | 2.24 | | 0.91 | |
| 35 | MAJOR_COLLECTOR_35MPH_02 | 2 | 5.10 | | 2.73 | | 1.14 | |
| 35 | MAJOR_COLLECTOR_35MPH_03 | 3 | 5.97 | | 3.23 | | 1.38 | |
| 35 | MAJOR_COLLECTOR_35MPH_04 | 4 | 7.11 | | 3.88 | | 1.69 | |
| 35 | MAJOR_COLLECTOR_35MPH_05 | 5 | 8.46 | | 4.69 | | 2.10 | |
| 35 | MAJOR_COLLECTOR_35MPH_06 | 6 | 10.04 | | 5.68 | | 2.60 | |
| 25 | MAJOR_COLLECTOR_25MPH_00 | 0 | 4.24 | | 2.14 | | 0.79 | |
| 25 | MAJOR_COLLECTOR_25MPH_01 | 1 | 4.88 | | 2.51 | | 0.97 | |
| 25 | MAJOR_COLLECTOR_25MPH_02 | 2 | 5.51 | | 2.88 | | 1.16 | |
| 25 | MAJOR_COLLECTOR_25MPH_03 | 3 | 6.16 | | 3.25 | | 1.33 | |
| 25 | MAJOR_COLLECTOR_25MPH_04 | 4 | 7.15 | | 3.85 | | 1.62 | |
| 25 | MAJOR_COLLECTOR_25MPH_05 | 5 | 8.81 | | 4.89 | | 2.14 | |
| 25 | MAJOR_COLLECTOR_25MPH_06 | 6 | 10.01 | | 5.63 | | 2.51 | |
| 0 | MAJOR_COLLECTOR_QUEUE | 0 | | 17.92 | | 4.27 | | 0.99 |
| 45 | MINOR_ARTERIAL_45MPH_00 | 0 | 3.04 | | 1.59 | | 0.64 | |
| 45 | MINOR_ARTERIAL_45MPH_01 | 1 | 3.83 | | 2.06 | | 0.88 | |
| 45 | MINOR_ARTERIAL_45MPH_02 | 2 | 4.75 | | 2.61 | | 1.15 | |
| 45 | MINOR_ARTERIAL_45MPH_03 | 3 | 5.89 | | 3.29 | | 1.49 | |
| 45 | MINOR_ARTERIAL_45MPH_04 | 4 | 7.37 | | 4.16 | | 1.92 | |
| 45 | MINOR_ARTERIAL_45MPH_05 | 5 | 9.01 | | 5.13 | | 2.40 | |
| 45 | MINOR_ARTERIAL_45MPH_06 | 6 | 10.72 | | 6.15 | | 2.90 | |
| 35 | MINOR_ARTERIAL_35MPH_00 | 0 | 3.51 | | 1.83 | | 0.72 | |
| 35 | MINOR_ARTERIAL_35MPH_01 | 1 | 4.15 | | 2.20 | | 0.89 | |
| 35 | MINOR_ARTERIAL_35MPH_02 | 2 | 4.98 | | 2.69 | | 1.12 | |
| 35 | MINOR_ARTERIAL_35MPH_03 | 3 | 5.83 | | 3.19 | | 1.36 | |
| 35 | MINOR_ARTERIAL_35MPH_04 | 4 | 6.95 | | 3.84 | | 1.68 | |

00044963

AIR QUALITY TECHNICAL REPORT



| Speed | Description | Roadway Grade | 2016 | | 2025 | | 2040 | |
|---|---|---|---|---|---|---|---|---|
| | | | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) |
| 35 | MINOR_ARTERIAL_35MPH_05 | 5 | 8.28 | | 4.65 | | 2.08 | |
| 35 | MINOR_ARTERIAL_35MPH_06 | 6 | 9.86 | | 5.63 | | 2.59 | |
| 25 | MINOR_ARTERIAL_25MPH_00 | 0 | 4.13 | | 2.10 | | 0.78 | |
| 25 | MINOR_ARTERIAL_25MPH_01 | 1 | 4.75 | | 2.47 | | 0.96 | |
| 25 | MINOR_ARTERIAL_25MPH_02 | 2 | 5.36 | | 2.83 | | 1.14 | |
| 25 | MINOR_ARTERIAL_25MPH_03 | 3 | 5.98 | | 3.20 | | 1.31 | |
| 25 | MINOR_ARTERIAL_25MPH_04 | 4 | 6.95 | | 3.79 | | 1.60 | |
| 25 | MINOR_ARTERIAL_25MPH_05 | 5 | 8.60 | | 4.83 | | 2.12 | |
| 25 | MINOR_ARTERIAL_25MPH_06 | 6 | 9.78 | | 5.56 | | 2.50 | |
| 0 | MINOR_ARTERIAL_QUEUE | 0 | | 17.56 | | 4.09 | | 0.88 |
| 25 | LOCAL_25MPH_00 | 0 | 4.31 | | 2.15 | | 0.80 | |
| 25 | LOCAL_25MPH_01 | 1 | 4.97 | | 2.54 | | 0.98 | |
| 25 | LOCAL_25MPH_02 | 2 | 5.63 | | 2.91 | | 1.17 | |
| 25 | LOCAL_25MPH_03 | 3 | 6.29 | | 3.28 | | 1.34 | |
| 25 | LOCAL_25MPH_04 | 4 | 7.30 | | 3.88 | | 1.63 | |
| 25 | LOCAL_25MPH_05 | 5 | 8.96 | | 4.91 | | 2.15 | |
| 25 | LOCAL_25MPH_06 | 6 | 10.17 | | 5.65 | | 2.51 | |
| 0 | LOCAL_QUEUE | 0 | | 18.02 | | 4.36 | | 1.03 |

Notes: Grams per mile is denoted as (g/mi), grams per hour denoted as (g/hr)

**Table 3-27: MOVES2014b Montgomery County Emission Factor Results**

| Speed | Description | Roadway Grade | 2016 | | 2025 | | 2040 | |
|---|---|---|---|---|---|---|---|---|
| | | | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) |
| 65 | INTERSTATE_65MPH_00 | 0 | 2.75 | | 1.61 | | 0.70 | |
| 65 | INTERSTATE_65MPH_01 | 1 | 3.80 | | 2.30 | | 1.05 | |
| 65 | INTERSTATE_65MPH_02 | 2 | 4.98 | | 3.06 | | 1.43 | |
| 65 | INTERSTATE_65MPH_03 | 3 | 6.40 | | 3.95 | | 1.86 | |
| 65 | INTERSTATE_65MPH_04 | 4 | 8.08 | | 5.03 | | 2.39 | |
| 65 | INTERSTATE_65MPH_05 | 5 | 10.17 | | 6.38 | | 3.04 | |
| 65 | INTERSTATE_65MPH_06 | 6 | 12.06 | | 7.60 | | 3.62 | |
| 60 | INTERSTATE_60MPH_00 | 0 | 2.58 | | 1.49 | | 0.62 | |
| 60 | INTERSTATE_60MPH_01 | 1 | 3.43 | | 2.06 | | 0.92 | |
| 60 | INTERSTATE_60MPH_02 | 2 | 4.51 | | 2.76 | | 1.26 | |
| 60 | INTERSTATE_60MPH_03 | 3 | 5.89 | | 3.61 | | 1.68 | |
| 60 | INTERSTATE_60MPH_04 | 4 | 7.38 | | 4.56 | | 2.14 | |
| 60 | INTERSTATE_60MPH_05 | 5 | 9.14 | | 5.69 | | 2.69 | |
| 60 | INTERSTATE_60MPH_06 | 6 | 11.18 | | 7.01 | | 3.32 | |
| 55 | INTERSTATE_55MPH_00 | 0 | 2.62 | | 1.49 | | 0.61 | |
| 55 | INTERSTATE_55MPH_01 | 1 | 3.41 | | 2.02 | | 0.88 | |
| 55 | INTERSTATE_55MPH_02 | 2 | 4.41 | | 2.67 | | 1.21 | |
| 55 | INTERSTATE_55MPH_03 | 3 | 5.68 | | 3.48 | | 1.61 | |
| 55 | INTERSTATE_55MPH_04 | 4 | 7.13 | | 4.38 | | 2.04 | |

00044964

JA2100

**AIR QUALITY TECHNICAL REPORT**



| Speed | Description | Roadway Grade | 2016 Emission Factor (g/mi) | 2016 Emission Factor (g/hr) | 2025 Emission Factor (g/mi) | 2025 Emission Factor (g/hr) | 2040 Emission Factor (g/mi) | 2040 Emission Factor (g/hr) |
|---|---|---|---|---|---|---|---|---|
| 55 | INTERSTATE_55MPH_05 | 5 | 8.76 | | 5.41 | | 2.54 | |
| 55 | INTERSTATE_55MPH_06 | 6 | 10.69 | | 6.66 | | 3.14 | |
| 45 | INTERSTATE_RAMPS_45MPH_00 | 0 | 2.77 | | 1.54 | | 0.62 | |
| 45 | INTERSTATE_RAMPS_45MPH_01 | 1 | 3.52 | | 2.03 | | 0.86 | |
| 45 | INTERSTATE_RAMPS_45MPH_02 | 2 | 4.42 | | 2.61 | | 1.14 | |
| 45 | INTERSTATE_RAMPS_45MPH_03 | 3 | 5.44 | | 3.27 | | 1.47 | |
| 45 | INTERSTATE_RAMPS_45MPH_04 | 4 | 6.73 | | 4.08 | | 1.88 | |
| 45 | INTERSTATE_RAMPS_45MPH_05 | 5 | 8.27 | | 5.05 | | 2.34 | |
| 45 | INTERSTATE_RAMPS_45MPH_06 | 6 | 9.78 | | 6.00 | | 2.80 | |
| 35 | INTERSTATE_RAMPS_35MPH_00 | 0 | 3.04 | | 1.67 | | 0.64 | |
| 35 | INTERSTATE_RAMPS_35MPH_01 | 1 | 3.61 | | 2.03 | | 0.80 | |
| 35 | INTERSTATE_RAMPS_35MPH_02 | 2 | 4.31 | | 2.45 | | 1.00 | |
| 35 | INTERSTATE_RAMPS_35MPH_03 | 3 | 5.20 | | 3.02 | | 1.28 | |
| 35 | INTERSTATE_RAMPS_35MPH_04 | 4 | 6.22 | | 3.65 | | 1.58 | |
| 35 | INTERSTATE_RAMPS_35MPH_05 | 5 | 7.51 | | 4.45 | | 1.97 | |
| 35 | INTERSTATE_RAMPS_35MPH_06 | 6 | 8.79 | | 5.25 | | 2.35 | |
| 25 | INTERSTATE_RAMPS_25MPH_00 | 0 | 3.48 | | 1.89 | | 0.68 | |
| 25 | INTERSTATE_RAMPS_25MPH_01 | 1 | 3.98 | | 2.16 | | 0.80 | |
| 25 | INTERSTATE_RAMPS_25MPH_02 | 2 | 4.57 | | 2.49 | | 0.94 | |
| 25 | INTERSTATE_RAMPS_25MPH_03 | 3 | 5.33 | | 2.95 | | 1.15 | |
| 25 | INTERSTATE_RAMPS_25MPH_04 | 4 | 6.16 | | 3.45 | | 1.39 | |
| 25 | INTERSTATE_RAMPS_25MPH_05 | 5 | 7.15 | | 4.06 | | 1.68 | |
| 25 | INTERSTATE_RAMPS_25MPH_06 | 6 | 8.31 | | 4.80 | | 2.04 | |
| 0 | INTERSTATE_RAMPS_QUEUE | 0 | | 13.64 | | 3.77 | | 0.80 |
| 55 | OTHERFREEWAY_55MPH_00 | 0 | 2.61 | | 1.50 | | 0.62 | |
| 55 | OTHERFREEWAY_55MPH_01 | 1 | 3.40 | | 2.03 | | 0.89 | |
| 55 | OTHERFREEWAY_55MPH_02 | 2 | 4.39 | | 2.69 | | 1.22 | |
| 55 | OTHERFREEWAY_55MPH_03 | 3 | 5.67 | | 3.50 | | 1.63 | |
| 55 | OTHERFREEWAY_55MPH_04 | 4 | 7.12 | | 4.41 | | 2.07 | |
| 55 | OTHERFREEWAY_55MPH_05 | 5 | 8.76 | | 5.46 | | 2.57 | |
| 55 | OTHERFREEWAY_55MPH_06 | 6 | 10.70 | | 6.72 | | 3.18 | |
| 50 | OTHERFREEWAY_50MPH_00 | 0 | 2.68 | | 1.52 | | 0.62 | |
| 50 | OTHERFREEWAY_50MPH_01 | 1 | 3.45 | | 2.04 | | 0.88 | |
| 50 | OTHERFREEWAY_50MPH_02 | 2 | 4.40 | | 2.66 | | 1.19 | |
| 50 | OTHERFREEWAY_50MPH_03 | 3 | 5.54 | | 3.40 | | 1.56 | |
| 50 | OTHERFREEWAY_50MPH_04 | 4 | 6.92 | | 4.27 | | 1.99 | |
| 50 | OTHERFREEWAY_50MPH_05 | 5 | 8.52 | | 5.29 | | 2.48 | |
| 50 | OTHERFREEWAY_50MPH_06 | 6 | 10.25 | | 6.40 | | 3.02 | |
| 45 | OTHERFREEWAY_45MPH_00 | 0 | 2.76 | | 1.55 | | 0.62 | |
| 45 | OTHERFREEWAY_45MPH_01 | 1 | 3.50 | | 2.04 | | 0.86 | |
| 45 | OTHERFREEWAY_45MPH_02 | 2 | 4.39 | | 2.62 | | 1.15 | |
| 45 | OTHERFREEWAY_45MPH_03 | 3 | 5.41 | | 3.28 | | 1.49 | |
| 45 | OTHERFREEWAY_45MPH_04 | 4 | 6.69 | | 4.10 | | 1.89 | |

00044965

**AIR QUALITY TECHNICAL REPORT**



| Speed | Description | Roadway Grade | 2016 Emission Factor (g/mi) | 2016 Emission Factor (g/hr) | 2025 Emission Factor (g/mi) | 2025 Emission Factor (g/hr) | 2040 Emission Factor (g/mi) | 2040 Emission Factor (g/hr) |
|---|---|---|---|---|---|---|---|---|
| 45 | OTHERFREEWAY_45MPH_05 | 5 | 8.23 | | 5.08 | | 2.37 | |
| 45 | OTHERFREEWAY_45MPH_06 | 6 | 9.75 | | 6.04 | | 2.83 | |
| 35 | OTHERFREEWAY_35MPH_00 | 0 | 3.02 | | 1.68 | | 0.64 | |
| 35 | OTHERFREEWAY_35MPH_01 | 1 | 3.58 | | 2.03 | | 0.81 | |
| 35 | OTHERFREEWAY_35MPH_02 | 2 | 4.27 | | 2.45 | | 1.01 | |
| 35 | OTHERFREEWAY_35MPH_03 | 3 | 5.15 | | 3.02 | | 1.29 | |
| 35 | OTHERFREEWAY_35MPH_04 | 4 | 6.16 | | 3.65 | | 1.60 | |
| 35 | OTHERFREEWAY_35MPH_05 | 5 | 7.45 | | 4.46 | | 1.99 | |
| 35 | OTHERFREEWAY_35MPH_06 | 6 | 8.73 | | 5.27 | | 2.37 | |
| 0 | OTHERFREEWAY_QUEUE | 0 | | 13.72 | | 3.80 | | 0.83 |
| 45 | MAJOR_ARTERIAL_45MPH_00 | 0 | 2.83 | | 1.60 | | 0.65 | |
| 45 | MAJOR_ARTERIAL_45MPH_01 | 1 | 3.56 | | 2.08 | | 0.88 | |
| 45 | MAJOR_ARTERIAL_45MPH_02 | 2 | 4.44 | | 2.64 | | 1.15 | |
| 45 | MAJOR_ARTERIAL_45MPH_03 | 3 | 5.52 | | 3.32 | | 1.49 | |
| 45 | MAJOR_ARTERIAL_45MPH_04 | 4 | 6.89 | | 4.20 | | 1.92 | |
| 45 | MAJOR_ARTERIAL_45MPH_05 | 5 | 8.39 | | 5.17 | | 2.39 | |
| 45 | MAJOR_ARTERIAL_45MPH_06 | 6 | 9.96 | | 6.19 | | 2.89 | |
| 40 | MAJOR_ARTERIAL_40MPH_00 | 0 | 3.00 | | 1.70 | | 0.67 | |
| 40 | MAJOR_ARTERIAL_40MPH_01 | 1 | 3.70 | | 2.15 | | 0.89 | |
| 40 | MAJOR_ARTERIAL_40MPH_02 | 2 | 4.54 | | 2.67 | | 1.14 | |
| 40 | MAJOR_ARTERIAL_40MPH_03 | 3 | 5.48 | | 3.26 | | 1.42 | |
| 40 | MAJOR_ARTERIAL_40MPH_04 | 4 | 6.75 | | 4.07 | | 1.82 | |
| 40 | MAJOR_ARTERIAL_40MPH_05 | 5 | 8.14 | | 4.97 | | 2.26 | |
| 40 | MAJOR_ARTERIAL_40MPH_06 | 6 | 9.62 | | 5.95 | | 2.74 | |
| 35 | MAJOR_ARTERIAL_35MPH_00 | 0 | 3.27 | | 1.85 | | 0.72 | |
| 35 | MAJOR_ARTERIAL_35MPH_01 | 1 | 3.87 | | 2.23 | | 0.90 | |
| 35 | MAJOR_ARTERIAL_35MPH_02 | 2 | 4.68 | | 2.73 | | 1.13 | |
| 35 | MAJOR_ARTERIAL_35MPH_03 | 3 | 5.49 | | 3.23 | | 1.36 | |
| 35 | MAJOR_ARTERIAL_35MPH_04 | 4 | 6.54 | | 3.89 | | 1.68 | |
| 35 | MAJOR_ARTERIAL_35MPH_05 | 5 | 7.79 | | 4.70 | | 2.08 | |
| 35 | MAJOR_ARTERIAL_35MPH_06 | 6 | 9.27 | | 5.69 | | 2.58 | |
| 0 | MAJOR_ARTERIAL_QUEUE | 0 | | 13.89 | | 3.92 | | 0.90 |
| 45 | MAJOR_COLLECTOR_45MPH_00 | 0 | 2.83 | | 1.61 | | 0.65 | |
| 45 | MAJOR_COLLECTOR_45MPH_01 | 1 | 3.57 | | 2.09 | | 0.89 | |
| 45 | MAJOR_COLLECTOR_45MPH_02 | 2 | 4.45 | | 2.65 | | 1.16 | |
| 45 | MAJOR_COLLECTOR_45MPH_03 | 3 | 5.52 | | 3.33 | | 1.50 | |
| 45 | MAJOR_COLLECTOR_45MPH_04 | 4 | 6.89 | | 4.21 | | 1.93 | |
| 45 | MAJOR_COLLECTOR_45MPH_05 | 5 | 8.39 | | 5.17 | | 2.40 | |
| 45 | MAJOR_COLLECTOR_45MPH_06 | 6 | 9.95 | | 6.19 | | 2.90 | |
| 35 | MAJOR_COLLECTOR_35MPH_00 | 0 | 3.27 | | 1.86 | | 0.73 | |
| 35 | MAJOR_COLLECTOR_35MPH_01 | 1 | 3.88 | | 2.24 | | 0.90 | |
| 35 | MAJOR_COLLECTOR_35MPH_02 | 2 | 4.68 | | 2.73 | | 1.14 | |
| 35 | MAJOR_COLLECTOR_35MPH_03 | 3 | 5.49 | | 3.23 | | 1.37 | |

00044966

**AIR QUALITY TECHNICAL REPORT**



| Speed | Description | Roadway Grade | 2016 | | 2025 | | 2040 | |
|---|---|---|---|---|---|---|---|---|
| | | | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) | Emission Factor (g/mi) | Emission Factor (g/hr) |
| 35 | MAJOR_COLLECTOR_35MPH_04 | 4 | 6.54 | | 3.89 | | 1.69 | |
| 35 | MAJOR_COLLECTOR_35MPH_05 | 5 | 7.79 | | 4.71 | | 2.09 | |
| 35 | MAJOR_COLLECTOR_35MPH_06 | 6 | 9.26 | | 5.69 | | 2.59 | |
| 25 | MAJOR_COLLECTOR_25MPH_00 | 0 | 3.84 | | 2.13 | | 0.79 | |
| 25 | MAJOR_COLLECTOR_25MPH_01 | 1 | 4.46 | | 2.51 | | 0.97 | |
| 25 | MAJOR_COLLECTOR_25MPH_02 | 2 | 5.07 | | 2.89 | | 1.15 | |
| 25 | MAJOR_COLLECTOR_25MPH_03 | 3 | 5.69 | | 3.26 | | 1.32 | |
| 25 | MAJOR_COLLECTOR_25MPH_04 | 4 | 6.62 | | 3.86 | | 1.61 | |
| 25 | MAJOR_COLLECTOR_25MPH_05 | 5 | 8.17 | | 4.91 | | 2.14 | |
| 25 | MAJOR_COLLECTOR_25MPH_06 | 6 | 9.30 | | 5.65 | | 2.51 | |
| 0 | MAJOR_COLLECTOR_QUEUE | 0 | | 13.99 | | 4.02 | | 0.99 |
| 45 | MINOR_ARTERIAL_45MPH_00 | 0 | 2.75 | | 1.58 | | 0.64 | |
| 45 | MINOR_ARTERIAL_45MPH_01 | 1 | 3.47 | | 2.05 | | 0.87 | |
| 45 | MINOR_ARTERIAL_45MPH_02 | 2 | 4.33 | | 2.61 | | 1.15 | |
| 45 | MINOR_ARTERIAL_45MPH_03 | 3 | 5.38 | | 3.28 | | 1.48 | |
| 45 | MINOR_ARTERIAL_45MPH_04 | 4 | 6.73 | | 4.16 | | 1.92 | |
| 45 | MINOR_ARTERIAL_45MPH_05 | 5 | 8.21 | | 5.13 | | 2.39 | |
| 45 | MINOR_ARTERIAL_45MPH_06 | 6 | 9.76 | | 6.15 | | 2.89 | |
| 35 | MINOR_ARTERIAL_35MPH_00 | 0 | 3.18 | | 1.82 | | 0.71 | |
| 35 | MINOR_ARTERIAL_35MPH_01 | 1 | 3.77 | | 2.19 | | 0.89 | |
| 35 | MINOR_ARTERIAL_35MPH_02 | 2 | 4.55 | | 2.68 | | 1.12 | |
| 35 | MINOR_ARTERIAL_35MPH_03 | 3 | 5.33 | | 3.18 | | 1.36 | |
| 35 | MINOR_ARTERIAL_3SMPH_04 | 4 | 6.36 | | 3.84 | | 1.67 | |
| 35 | MINOR_ARTERIAL_35MPH_05 | 5 | 7.59 | | 4.65 | | 2.07 | |
| 35 | MINOR_ARTERIAL_35MPH_06 | 6 | 9.05 | | 5.63 | | 2.58 | |
| 25 | MINOR_ARTERIAL_25MPH_00 | 0 | 3.73 | | 2.08 | | 0.77 | |
| 25 | MINOR_ARTERIAL_25MPH_01 | 1 | 4.32 | | 2.46 | | 0.95 | |
| 25 | MINOR_ARTERIAL_25MPH_02 | 2 | 4.90 | | 2.83 | | 1.13 | |
| 25 | MINOR_ARTERIAL_25MPH_03 | 3 | 5.49 | | 3.20 | | 1.30 | |
| 25 | MINOR_ARTERIAL_25MPH_04 | 4 | 6.40 | | 3.79 | | 1.59 | |
| 25 | MINOR_ARTERIAL_25MPH_05 | 5 | 7.94 | | 4.83 | | 2.12 | |
| 25 | MINOR_ARTERIAL_25MPH_06 | 6 | 9.04 | | 5.57 | | 2.49 | |
| 0 | MINOR_ARTERIAL_QUEUE | 0 | | 13.62 | | 3.82 | | 0.88 |
| 25 | LOCAL_25MPH_00 | 0 | 3.93 | | 2.15 | | 0.80 | |
| 25 | LOCAL_25MPH_01 | 1 | 4.57 | | 2.54 | | 0.98 | |
| 25 | LOCAL_25MPH_02 | 2 | 5.21 | | 2.93 | | 1.16 | |
| 25 | LOCAL_25MPH_03 | 3 | 5.85 | | 3.31 | | 1.33 | |
| 25 | LOCAL_25MPH_04 | 4 | 6.80 | | 3.90 | | 1.62 | |
| 25 | LOCAL_25MPH_05 | 5 | 8.36 | | 4.94 | | 2.14 | |
| 25 | LOCAL_25MPH_06 | 6 | 9.51 | | 5.68 | | 2.51 | |
| 0 | LOCAL_QUEUE | 0 | | 14.17 | | 4.12 | | 1.03 |

Notes: Grams per mile is denoted as (g/mi), grams per hour denoted as (g/hr)

00044967

JA2103



### E.    Dispersion Modeling Scenarios

Normally, the worst case ranked intersection and interchanges would be modeled individually for comparison to the NAAQS in order to evaluate CO impacts for each Alternative. As shown in Tables 3-26 and 3-27, CO emission factors are expected to decline over time due to improved fuel quality and continued fleet turnover to vehicles constructed to more stringent exhaust emission standards for CO. Therefore, future CO impacts from the Screened Alternatives are not expected to exceed the NAAQS and existing CO concentrations at worst case intersection and interchanges are expected to be higher than those for 2025 and 2040. Therefore, in an effort to streamline the CO analysis, a screening analysis was conducted using a worst-case modeling approach for interchanges and intersections in lieu of separate Alternative analysis. This worst-case screening approach has been used by other state Departments of Transportation for NEPA purposes and has been reviewed by FHWA. The worst-case assumptions serve to overestimate the project's CO emissions and concentrations. Worst-case traffic volumes (set at the theoretical per lane maximum 2,200 vehicles per hour per lane [vphpl])[27] were assumed for the CO analyses at the worst-case interchanges and intersections. This is a conservative assumption as the worst-case traffic volumes tend to be significantly higher than the forecast design and opening year modeled volumes. In addition, ramp lanes tend to accommodate fewer vehicles per hour, but this conservative approach assumes full utilization at a capacity of a mainline travel lane. The screening analysis was conducted for 2016, 2025 and 2040 Build and No Build scenarios for the worst-case intersections and interchanges. Since the intersections and interchanges are common to all alternatives, they would all be covered by the screening analysis. For the No Build analysis, forecasted No Build traffic volumes were used for each worst-case intersection and interchange.

### F.    Dispersion Modeling

The latest version of the CAL3QHC model (04244) was used to predict worst-case 1-hour CO concentrations from free-flow links using the latest version of the FHWA CAL3i. CAL3i is a software package that incorporates the EPA CAL3QHC dispersion model and various worst-case default parameters per EPA guidance. The peak 1-hour concentrations from CAL3QHC were scaled by a persistence factor of 0.70 (EPA default) to estimate 8-hour concentrations. A summary of inputs used in the CAL3Interface model are shown in **Table 3-28**.

#### Table 3-28: Summary of CAL3QHC Input Parameters

| CAL3QHC Parameters | Worst-Case Analysis Inputs |
|---|---|
| Surface Roughness Coefficient | 108 centimeters |
| Background CO Concentrations | 1-hour: 1.9 ppm<br>8-hour: 0.8 ppm |
| Wind Speed | 1.0 m/s |
| Stability Class | Urban D |
| Mixing Height | 1,000 meters |
| Wind Direction | 10-degree increments |
| Volumes (VPH) | Worst-Case or Project Specific |
| Saturation Flow Rates | 1,600 vphpl (CAL3QHC default)[1] |

[27] Highway Capacity Manual: A Guide for Multimodal Mobility Analysis, Version 6.0, Exhibit 12-4

00044968



| CAL3QHC Parameters | Worst-Case Analysis Inputs |
|---|---|
| Signal Type | 1=pretimed, clearance lost time=2 seconds |
| Arrival Rate | 3=average |
| Average Cycle Length | 120 seconds |
| Average Red Time | 62 seconds |

Notes: CAL3QHC saturation flow of 1,600 vphpl is for default for signalized intersections for each queue line.

Worst-case modeled concentrations from CAL3QHC were added to appropriate background CO concentrations in the affected intersection/interchange area of Montgomery and Prince Georges counties for comparison to the NAAQS. The 1-hour and 8-hour CO background concentrations were based on the most recent (2016) design values for Prince George's County[28]. Prince George's County was chosen as there is no data available for Montgomery County. Therefore, a 1-hour background concentration of 1.9 ppm and an 8-hour background concentration of 0.8 ppm were added to modeled results. CAL3QHC Input and Output files are contained in **Appendix E**.

### G.  Receptors

Receptor locations are placed in the vicinity of each interchange and intersection at worst-case locations such as sidewalks, property lines, and parking lots where the public generally has access. For worst-case analyses for freeways, receptors are placed 20 feet from the roadway edge; for arterial streets (including intersections), the receptors are placed 10 feet from the roadway edge (i.e., at the nearest possible location for the model, which assumes a 10-foot mixing zone next to the roadway).

Receptor locations for each worst-case interchange and intersection were generated in CAL3i consistent with EPA modeling guidelines which indicate the receptors must be located a minimum of 3 meters from the edge of the roadway and positioned at a height of 1.8 meters (5.9 feet) above the ground. **Figure 3-5** through **Figure 3-26** shows the receptor locations (in blue along with the roadway geometry in green) at the interchanges and intersections as displayed in the CAL3i interface. The modeled conditions are conservative as the theoretical worst-case traffic volumes along with other assumptions were applied which together would serve to overestimate impacts and yield conservative results. If the peak CO concentrations at the worst-case areas selected in the analysis are below the NAAQS for CO, it is assumed that all other locations in the corridor would also remain below the thresholds.

---

[28] USEPA Air Quality Design Values. https://www.epa.gov/air-trends/air-quality-design-values#report Last accessed on 4/30/2018.

00044969

**AIR QUALITY TECHNICAL REPORT**



### Figure 3-5: MD 5 and Authority Road Receptor Locations



00044970

**AIR QUALITY TECHNICAL REPORT**



Figure 3-6: MD 97 and Inner Loop Ramp Receptor Locations



00044971

JA2107

**AIR QUALITY TECHNICAL REPORT**



Figure 3-7: MD 187 and I-270 South Bound Ramp Receptor Locations



00044972

JA2108

**AIR QUALITY TECHNICAL REPORT**



## Figure 3-8: US 29 and Direct Access Ramp 2 HOT Lanes Receptor Locations





00044973

JA2109

**AIR QUALITY TECHNICAL REPORT**





### Figure 3-9: US 29 and Direct Access Ramp ALT 5 Receptor Locations



00044974

JA2110

**AIR QUALITY TECHNICAL REPORT**



### Figure 3-10: US 29 and Inner Loop Ramp Receptor Locations



Receptor / Highway Layout Map (feet)

00044975



## Figure 3-11: US 29 and Outer Loop Ramp Receptor Locations

Receptor / Highway Layout Map (feet)



00044976

**AIR QUALITY TECHNICAL REPORT**



**Figure 3-12: I-270 and I-370 Receptor Locations**



00044977

JA2113

**AIR QUALITY TECHNICAL REPORT**



**Figure 3-13: I-270 and MD189 Receptor Locations**



JA2114

00044978

**AIR QUALITY TECHNICAL REPORT**



### Figure 3-14: I-495 and I-95 Receptor Locations



00044979

JA2115

**AIR QUALITY TECHNICAL REPORT**



Figure 3-15: I-495 and I-270 and MD 355 Receptor Locations



00044980

**AIR QUALITY TECHNICAL REPORT**



### Figure 3-16: I-495 and I-270 Spur Receptor Locations



00044981

**AIR QUALITY TECHNICAL REPORT**



**Figure 3-17: I-495 and MD 193 Receptor Locations**



00044982

**AIR QUALITY TECHNICAL REPORT**





Figure 3-18: I-495 and MD 650 Receptor Locations



00044983

**AIR QUALITY TECHNICAL REPORT**



### Figure 3-19: I-495 and MD 5 Receptor Locations



00044984

**AIR QUALITY TECHNICAL REPORT**





Figure 3-20: I-495 and MD 97 Receptor Locations



00044985

**AIR QUALITY TECHNICAL REPORT**



**Figure 3-21: I-495 and MD 185 Receptor Locations**



00044986

JA2122

**AIR QUALITY TECHNICAL REPORT**



**Figure 3-22: I-495 and MD 190 Receptor Locations**



00044987

**AIR QUALITY TECHNICAL REPORT**





**Figure 3-23: I-495 and US 50 Receptor Locations**



00044988

**AIR QUALITY TECHNICAL REPORT**



### Figure 3-24: MD 97 and Outer Loop Ramp Receptor Locations

Receptor / Highway Layout Map (feet)



00044989

**AIR QUALITY TECHNICAL REPORT**



### Figure 3-25: MD 187 and SPUR Receptor Locations



00044990

JA2126

**AIR QUALITY TECHNICAL REPORT**





**Figure 3-26: MD 202 and Outer Loop Ramp Receptor Locations**



00044991



### 3.2.3    Dispersion Modeling Results

The results of the 1-hour and 8-hour CO hot-spot analysis for the worst-case interchange and intersection locations are presented in **Table 3-29** and **Table 3-30**, respectively for the opening and design year Build and No Build conditions. As documented in **Section 3.2**, this analysis conservatively assumed worst-case conditions, overestimating the emissions results for each alternative compared to forecast volumes. As such, there is no comparison between Alternatives as discussed above, however this screening analysis approach is designed to streamline the analysis and still demonstrate CO impacts are expected to be below the NAAQS for all Alternatives. The tables include the overall worst-case modeled concentrations for the AM and PM peak periods as well as the modeled receptor number. The concentrations in **Table 3-29** and **Table 3-30** also include the appropriate 1-hour and 8-hour background concentrations of 1.9 ppm and 0.8 ppm, respectively, for comparison to the CO NAAQS. The highest 1-hour predicted concentrations at the interchanges for the opening and design year Build conditions were 8.6 ppm and 4.9 ppm, respectively. The maximum 1-hour concentration for all future Build conditions was predicted to occur at the I-495 and I-270/MD 355 interchange. Similarly, the highest 1-hour predicted concentrations at the intersections for the opening and design year Build conditions were 7.3 ppm and 4.3 ppm, respectively. The maximum 1-hour concentrations for all Build conditions were predicted to occur at the US 29 and Direct Access Ramp intersection. *All predicted peak 1-hour CO concentrations are below the 1-hour CO NAAQS of 35 ppm.*

The peak 1-hour values generated by CAL3QHC were scaled by a persistence factor of 0.7 (EPA default) to generate peak 8-hour CO concentrations. These values were then added to the appropriate background concentration for comparison to the CO NAAQS. As the CAL3QHC model only predicts a 1-hour concentration, a persistence factor is used to estimate an 8-hour concentration from the 1-hour concentration. The highest 8-hour concentrations for the opening and design year Build conditions for the interchanges were 5.5 ppm and 2.9 ppm, respectively. Similar to the peak 1-hour concentrations, the maximum 8-hour CO concentration was also predicted to occur at the same interchange for the future Build and No Build conditions. Similarly, the highest 8-hour concentrations for the opening and design year Build conditions for intersections were 4.6 ppm and 2.5 ppm, respectively and are expected to occur at the same intersection as the maximum 1-hour concentrations. *All predicted peak 8-hour CO concentrations are below the 8-hour CO NAAQS of 9 ppm.*

These results demonstrate that the worst-case interchanges and intersections for each Screened and No Build alternative, using very conservative assumptions, would not cause or contribute to a violation of the CO NAAQS within the study corridor. Therefore, expected CO concentrations for all Alternatives assuming forecast traffic volumes are expected to be lower compared to the worst case and also below the CO NAAQS.

00044992



AIR QUALITY TECHNICAL REPORT

**Table 3-29: CAL3QHC CO Modeling Results for Worst-Case Interchanges**

| Interchange CO Modeling Results | (hour) | Existing 2016 Conc. (ppm) | Rec. (#) | 2025 Build Conc. (ppm) | Rec. (#) | No Build Conc. (ppm) | Rec. (#) | 2040 Build Conc. (ppm) | Rec. (#) | No Build Conc. (ppm) | Rec. (#) | NAAQS PPM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IC.3 I-495 & MD 5 | 1-Hr | 9.40 | 1 | 6.40 | 1 | 3.60 | 1 | 3.90 | 1 | 2.70 | 1 | 35 |
| | 8-Hr | 6.05 | | 3.95 | | 1.99 | | 2.20 | | 1.36 | | 9 |
| IC.11 I-495 & US 50 | 1-Hr | 9.50 | 13 | 7.10 | 13 | 4.00 | 9 | 4.30 | 13 | 3.00 | 13 | 35 |
| | 8-Hr | 6.12 | | 4.44 | | 2.27 | | 2.48 | | 1.57 | | 9 |
| IC.16 I-495 & I-95 | 1-Hr | 9.60 | 1 | 7.00 | 1 | 4.60 | 1 | 4.10 | 1 | 3.00 | 1 | 35 |
| | 8-Hr | 6.19 | | 4.37 | | 2.69 | | 2.34 | | 1.57 | | 9 |
| IC.17 I-495 & MD 650 | 1-Hr | 6.90 | 1 | 5.20 | 1 | 3.30 | | 3.30 | 1 | 2.60 | | 35 |
| | 8-Hr | 4.30 | | 3.11 | | 1.78 | | 1.78 | | 1.29 | | 9 |
| IC.18 I-495 & MD 193 | 1-Hr | 6.60 | 9 | 5.00 | 9 | 3.30 | | 3.20 | 9 | 2.70 | | 35 |
| | 8-Hr | 4.09 | | 2.97 | | 1.78 | | 1.71 | | 1.36 | | 9 |
| IC.20 I-495 & MD 97 | 1-Hr | 8.90 | 1 | 6.50 | 1 | 3.80 | 1 | 3.90 | 1 | 2.80 | 5 | 35 |
| | 8-Hr | 5.70 | | 4.02 | | 2.13 | | 2.20 | | 1.43 | | 9 |
| IC.21 I-495 & MD 185 | 1-Hr | 7.40 | 9 | 5.50 | 9 | 3.10 | 9 | 3.40 | 9 | 2.50 | 13 | 35 |
| | 8-Hr | 4.65 | | 3.32 | | 1.64 | | 1.85 | | 1.22 | | 9 |
| IC.22 I-495 & I-270/MD 355 | 1-Hr | 11.90 | 1 | 8.60 | 1 | 4.00 | 1 | 4.90 | 1 | 2.80 | 1 | 35 |
| | 8-Hr | 7.80 | | 5.49 | | 2.27 | | 2.90 | | 1.43 | | 9 |
| IC.33 I-270 & MD 189 | 1-Hr | 7.40 | 1 | 5.30 | 1 | 3.10 | 5 | 3.40 | 1 | 2.50 | 1 | 35 |
| | 8-Hr | 4.65 | | 3.18 | | 1.64 | | 1.85 | | 1.22 | | 9 |
| IC.36 I-270 & I-370 | 1-Hr | 8.10 | 5 | 6.10 | 1 | 3.80 | 1 | 3.80 | 1 | 2.80 | 1 | 35 |
| | 8-Hr | 5.14 | | 3.74 | | 2.13 | | 2.13 | | 1.43 | | 9 |
| IC.24 I-495 & I-270 Spur | 1-Hr | 8.00 | 9 | 6.40 | 9 | 4.40 | 9 | 4.00 | 9 | 3.10 | 9 | 35 |
| | 8-Hr | 5.07 | | 3.95 | | 2.55 | | 2.27 | | 1.64 | | 9 |
| IC.25 I-495 & MD 190 | 1-Hr | 7.90 | 13 | 6.20 | 13 | 3.60 | 9 | 3.80 | 9 | 2.70 | 13 | 35 |
| | 8-Hr | 5.00 | | 3.81 | | 1.99 | | 2.13 | | 1.36 | | 9 |

MAY 2020

00044993

USCA4 Appeal: 24-1447   Doc: 31-1       Filed: 09/30/2024   Pg: 226 of 226

AIR QUALITY TECHNICAL REPORT

Notes:
1. Receptor Number represents the modeled receptor number of maximum modeled concentration from CAL3QHC.
2. Modeled concentrations include 1-hour Background Value of 1.9 ppm and 8-hour background value of 0.8 ppm.
3. Bold numbers reflect overall maximum concentrations.

Table 3-30: CAL3QHC CO Modeling Results for Worst-Case Intersections

| Intersection CO Modeling Results | | 2016 | | 2025 Build | | 2025 No Build | | 2040 Build | | 2040 No Build | | NAAQS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Conc. (ppm) | Rec. (#) | Conc. (ppm) | Rec. (#) | Conc. (ppm) | Rec. (#) | Conc. (ppm) | Rec. (#) | Conc. (ppm) | Rec. (#) | PPM |
| IS.7 | MD 5 & Auth Road | 1-Hr | 6.10 | 1 | 4.10 | 1 | 2.50 | 1 | 2.90 | 1 | **2.30** | 13 | 35 |
| | | 8-Hr | 3.74 | | 2.34 | | 1.22 | | 1.50 | | **1.08** | | 9 |
| IS.16 | MD 202 & Outer Loop Ramp | 1-Hr | 4.60 | 9 | 3.20 | 2 | 2.50 | 4 | 2.40 | 2 | 2.20 | 1 | 35 |
| | | 8-Hr | 2.69 | | 1.71 | | 1.22 | | 1.15 | | 1.01 | | 9 |
| IS.28 | MD 97 & Inner Loop Ramp | 1-Hr | 5.10 | 5 | 4.30 | 5 | 2.50 | 5 | 2.90 | 5 | 2.10 | 1 | 35 |
| | | 8-Hr | 3.04 | | 2.48 | | 1.22 | | 1.50 | | 0.94 | | 9 |
| IS.29 | MD 97 & Outer Loop Ramp | 1-Hr | 5.20 | 8 | 4.20 | 1 | **2.80** | 4 | 2.90 | 9 | **2.30** | 4 | 35 |
| | | 8-Hr | 3.11 | | 2.41 | | **1.43** | | 1.50 | | **1.08** | | 9 |
| IS.46 | MD 187 & I-270 SB Ramp | 1-Hr | 5.50 | 13 | 3.90 | 5 | 2.30 | 1 | 2.80 | 5 | 2.00 | 1 | 35 |
| | | 8-Hr | 3.32 | | 2.20 | | 1.08 | | 1.43 | | 0.87 | | 9 |
| IS.58 | US 29 & Direct Access Ramp | 1-Hr | BUILD ONLY | X | **7.30** | 18 | BUILD ONLY | X | **4.30** | 27 | BUILD ONLY | X | 35 |
| | | 8-Hr | BUILD ONLY | | **4.58** | | BUILD ONLY | | **2.48** | | BUILD ONLY | | 9 |
| IS.56 | US 29 and Outer Loop | 1-Hr | BUILD ONLY | X | 4.00 | 5 | BUILD ONLY | X | 2.80 | 1 | BUILD ONLY | X | 35 |
| | | 8-Hr | BUILD ONLY | | 2.27 | | BUILD ONLY | | 1.43 | | BUILD ONLY | | 9 |
| IS.57 | US 29 and Inner Loop | 1-Hr | BUILD ONLY | X | 3.90 | 9 | BUILD ONLY | X | 2.80 | 1 | BUILD ONLY | X | 35 |
| | | 8-Hr | BUILD ONLY | | 2.20 | | BUILD ONLY | | 1.43 | | BUILD ONLY | | 9 |

Notes:
1. Receptor Number represents the modeled receptor number of maximum modeled concentration from CAL3QHC.
2. Modeled concentrations include 1-hour Background Value of 1.9 ppm and 8-hour background value of 0.8 ppm
3. Bold numbers reflect overall maximum concentrations.



00044994

JA2130