No. 24-1447

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

_____

## JOINT APPENDIX VOLUME 9 OF 9

_____

Jared E. Knicley
Nanding Chen
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org
nchen@nrdc.org


*Counsel for Appellants*

Andrew M. Bernie
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

*Counsel for Federal Appellees*

Fred R. Wagner
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
frwagner@venable.com

*Counsel for State Appellees*

September 30, 2024

## TABLE OF CONTENTS

### Volume 1

**Document**                                                                 **Page No.**

District Court Docket Report as of September 24, 2024 ....................... JA0001

Complaint, October 11, 2022................................................................. JA0014

Federal Defs.' Summ. J. Reply, October 4, 2023 (excerpt)................... JA0060

Memorandum Opinion, March 20, 2024.............................................. JA0062

Order on Summary Judgment, March 20, 2024 .................................. JA0130

Notice of Appeal, May 14, 2024 ......................................................... JA0132

Record of Decision (ROD), August 25, 2022...................................... JA0134

### Volume 2

**Document**                                                                 **Page No.**

Final Environmental Impact Statement (FEIS), June 2022................... JA0354

### Volume 3

**Document**                                                                 **Page No.**

Final Environmental Impact Statement (FEIS),
    June 2022 (continued) ................................................................... JA0699

FEIS Appendix A - Final Traffic Analysis Technical
    Report, June 2022 (excerpt) .......................................................... JA0835

VISSIM Calibration Memo (Appendix D to Final
    Traffic Analysis Technical Report), June 2022 ..................................JA0850

FEIS Appendix B – Draft Application for Interstate Access
    Point Approval, June 2022 (excerpts) ............................................ JA0857

**Volume 4**

| Document | Page No. |
|---|---|

FEIS Appendix B – Draft Application for Interstate Access Point Approval, June 2022 (excerpts) (continued) ........................... JA1072

FEIS Appendix F - Final Community Effects Assessment and EJ Analysis Technical Report, June 2022 (excerpts) ........................ JA1099

FEIS Appendix G - Final Section 4(f) Evaluation, June 2022 ............... JA1254

Cultural Resources Technical Report, vol. 1, June 2022 ....................... JA1339

Consultation letter with Maryland Historical Trust and Virginia Department of Historic Resources, September 8, 2021 ..................... JA1365

Maryland Sierra Club Section 106 Comments, April 12, 2021 ............. JA1380

Washington Biologists' Field Club (WBFC) Comments, April 9, 2021 .................................................................................. JA1389

WBFC Letter, October 8, 2021 .......................................................... JA1411

WBFC Comments on Programmatic Agreement, February 3, 2022 ............................................................................. JA1432

FEIS Appendix K - Final Air Quality Technical Report, June 2022 ..................................................................................... JA1474

FEIS Appendix M - Final Natural Resources Technical Report, June 2022 (excerpts) ........................................................ JA1510

FEIS Appendix N - Final Avoidance, Minimization, and Impacts Report, June 2022 ............................................................. JA1521

## Volume 5

**Document**                                                                    **Page No.**

FEIS Appendix Q - Final Indirect and Cumulative Effects
Technical Report, June 2022 (excerpts) ......................................... JA1577

FEIS Appendix T – MDOT Response to WBFC DEIS Comments
and Testimony (Robert Soreng), June 2022 .................................... JA1581

FEIS Appendix T - MDOT Response to Maryland Sierra Club
DEIS Comments, June 2022 ......................................................... JA1628

FEIS Appendix T – MDOT Response to WBFC SDEIS Comments,
June 2022 ................................................................................... JA1743

Supplemental Draft Environmental Impact Statement (SDEIS),
October 2021 (excerpts) ............................................................... JA1767

Draft Environmental Impact Statement (DEIS),
June 2020 (excerpt) ..................................................................... JA1868

DEIS Appendix A - Purpose and Need Technical Report,
November 2018 (excerpt) .............................................................. JA1909

## Volume 6

**Document**                                                                    **Page No.**

DEIS Appendix F - Draft Section 4(f) Evaluation,
May 2020 (excerpts) ..................................................................... JA1911

DEIS Appendix I - Air Quality Technical Report,
May 2020 (excerpt) ...................................................................... JA2046

## Volume 7

| Document | Page No. |
|---|---|

DEIS Appendix I - Air Quality Technical Report,
May 2020 (excerpt) (continued)...................................................... JA2131

Agency Coordination Plan, May 2018 ................................................ JA2163

EPA Technical Support Document for Ozone Conformity,
May 5, 2020 ................................................................................... JA2176

Maryland Sierra Club DEIS comments, November 6, 2020.....................JA2186

Internal FHWA email re: AQ conformity, May 17, 2021..................... JA2399

Internal FHWA email re: AQ conformity, May 19, 2021....................... JA2402

Lichen Growth Responses to Stress Induced by Automobile
Exhaust Pollution, April 27, 1979 .................................................. JA2404

SDEIS Comment Review Meeting re: Traffic Analysis,
September 1, 2021 ......................................................................... JA2408

## Volume 8

| Document | Page No. |
|---|---|

Maryland Sierra Club SDEIS Comments, November 30, 2021............. JA2415

State Treasurer Review of P3, July 9, 2021......................................... JA2598

Maryland National Capital Park and Planning Commission
Comments re Planned Alternative, November 30, 2021 ......................JA2610

Managed Lanes Study IAPA Comments (IAPA Technical
Report Errata Sheet), February 4, 2022 .................................................JA2628

**Volume 9**

| Document | Page No. |
|---|---|

Maryland Historical Trust Determination of Eligibility
Form for Plummers Island, August 20, 2021 (excerpt).................... JA2635

Roselie Ann Bright Comments on FEIS, July 14, 2022 ...........................JA2647

Zamurs and Associates Comments on FEIS, June 2022..........................JA2657

Maryland Sierra Club FEIS Comments, July 18, 2022 ...........................JA2668

CEEJH Lab Meeting Summary, October 20, 2021...................................JA2738

American Legion Bridge Strike Team Power Point,
February 2, 2021 .............................................................. JA2740

Administrative Draft SDEIS Comment Errata Sheet,
July 14, 2021 ....................................................................JA2748

Internal FHWA email re: Update on air quality modeling,
July 7, 2021.................................................................... JA2750

Influence of Roadway Emissions on PM$_{2.5}$, July 20, 2020 .......................JA2751

The New England Journal of Medicine, "The Need for a Tighter
Particulate-Matter Air-Quality Standard," August 13, 2020 ...............JA2767

Monitoring Study of Near-Road PM$_{2.5}$ Concentrations in
Maryland, August 14, 2015....................................................JA2771

EPA, Integrated Science Assessment for Particulate Matter,
December 2019 (excerpt) ............................................... JA2782

American Legion Bridge Strike Team Report, November 2021 ...............JA2988

# MARYLAND HISTORICAL TRUST
## DETERMINATION OF ELIGIBILITY FORM

NR Eligible: Yes ___

No ___

Property Name: **Washington Biologists' Field Club on Plummers Island**          Inventory Number: **M: 12-46-2**

Address: Plummers Island on the Potomac River          Historic District: No

City: Cabin John          Zip Code: 20818          County: Montgomery

USGS Quadrangle(s): Falls Church

Property Owner: United States of America          Tax Account ID: 07-00437236

Tax Map Parcel(s): P705          Tax Map: GN121

Project: I-495 & I-270 Managed Lanes Study          Agency: MDOT SHA

Agency Prepared By: Dovetail CRG

Preparer's Name: Mical Tawney Adriana T. Moss          Date Prepared: August 20, 2021

Documentation is presented in: Project review and compliance files

Preparer's Eligibility Recommendation: Recommended

Criteria: X A     B     C     D

Considerations: A     B     C     D     E     F     G

| | |
|---|---|
| *Complete if the property is a contributing or non-contributing resource to a NR district/property:* | |
| Name of the District/Property: C&O Canal National Historical Park | |
| Inventory Number: M: 12-46          Eligible:          Listed: Yes | |

Site visit by MHT Staff ___ yes     ___ no          Name:          Date:

Description of Property and Justification:

Setting

The Washington Biologists' Field Club on Plummers Island (WBFC) is a private research station composed of a cabin, recreational elements, and landscape features situated on a 12.23-acre island known as Plummers Island in the Potomac River (Eckerlin et al. 2021). The island is situated on the northern side of the river, south of the Clara Barton Parkway and Locks 11 and 12 of the Chesapeake and Ohio (C&O) Canal, and east of I-495 and the American Legion Memorial Bridge in Montgomery County, Maryland. According to WBFC records, the cabin building was constructed in 1901 by the club and is still used by club members and the public (Carla Dove, personal communication 2021; Perry 2007). The island is accessed by crossing Rock Run Culvert from an unpaved trail that extends south from the C&O Canal Towpath near Lock 10. The island, currently owned by the National Park Service (NPS), is located within the National Register of Historic Places (NRHP) boundaries of the C&O Canal National Historical Park (M: 12-46).

Description

| MARYLAND HISTORICAL TRUST REVIEW | |
|---|---|
| Eligibility recommended: | Eligibility not recommended: |
| Criteria: ___ A ___ B ___ C ___ D | Considerations: ___ A ___ B ___ C ___ D ___ E ___ F ___ G |
| MHT Comments: | |
| | |
| | |
| Reviewer, Office of Preservation Services: | Date: |
| | |
| Reviewer, National Register Program: | Date: |

*Special DOE form produced for the I-270 & I-495 Managed Lanes Study*

**Exhibit J**

00177560

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                 Washington Biologists' Field Club on Plummers Island

Page 2

The WBFC cabin and several associated recreational elements, situated atop the highest part of the island on the eastern of two naturally terraced rock formations, are surrounded by local native, introduced, and invasive flora, fauna, birds, and insects that the club members research (Washington Biologists' Field Club 2021a). The two rock formations (late Precambrian muscovite schist to the west and gneiss to the east), also called rock buttresses, feature many small to large rock outcrops of erosional remnants of former falls and gorge walls with sparse herbaceous vegetation (Fleming 2015; Simmons et al. 2016). Lower points of the island, between and surrounding the rock formations, are covered with plants and trees whereas the southern bank of the island, exposed to the Potomac River, features a sandy and muddy bank with boulder-like colluvium and rocky outcrops (Fleming 2015). The island is thickly covered by primarily mature deciduous trees including silver maple, red oak, birch, and other minor species such as sycamores. The island comprises 12 natural communities of which four are globally rare communities (two of which are also rare to the state). Twenty-one species within the communities are state-rare extant flora species (including one globally rare extant species) and 36 state-rare historic flora species (four of which are globally rare historic taxa) (Simmons et al. 2016, 2020). For over a century, the vegetation on the island has grown unplanned and organically, without intervention by the researchers. The scientists mark their research plots of study with pin flags or flagging tape, which can be found all over the island today. South and downslope from the cabin is Cactus Rock, a part of lichen studied throughout the mid-twentieth century and a traditional gathering spot for the club members due to its vistas of the Potomac River and associated wildlife (Perry 2007, 30, 34; Robert Soreng, personal communication 2021). The island is also open to the public who use it for fishing, hiking, or to observe wildlife (Carla Dove, personal communication 2021).

The one-story, three-bay cabin faces south and has a side-gabled roof. Constructed into a slope, the building sits on a stone and timber post foundation supporting a wood-frame structural system clad in cypress shingles. A one-story, three-bay full-width porch with wood decking spans the south elevation, and timber posts support the moderately pitched shed roof. The main entrance, centrally positioned beneath the porch, is filled with a single-leaf flush wood door, a replacement of the original. A secondary entrance in the north elevation has a similar door and mirrors the primary entrance on the opposite elevation. Window openings are unglazed, enclosed only by operable, wood, vertical board shutters. The low-pitched, side-gabled roof features replacement asphalt shingles. An exterior-end, broad, rubble stone chimney is centered on the west elevation; it was repaired with new mortar where necessary in the 1990s but entirely reconstructed in 2015 utilizing the stone of the original chimney (Perry 2007, 10; Steve Sheffield, personal communication 2021). A one-story, shed-roofed wing is appended to the east half of the north elevation. This wing, which appears original to the building according to historic images on file with the club, is clad with cypress shingles and features a metal stovepipe flue and an engaged, poured-concrete porch that covers a single-leaf, wood door on the wing's west elevation and the single-leaf door on the main block's north elevation (Perry 2007, 18).

The interior of the cabin has an open plan, and the structural system is left exposed. New wooden cross beams were installed in the 1990s; however, the floor, floor supports, and walls were only repaired as necessary (Perry 2007, 10). A loft area, where researchers formerly slept during periods of on-site study, is in the west half of the building above the fireplace (Carla Dove, personal communication 2021). The brick fireplace hearth and surround which formerly featured a wooden mantel supported by wood rounded posts, were completely reconstructed using brick for the surround and concrete block for the fire box in 2015 (Perry 2007, 10, 17; Steve Sheffield, personal communication 2021). Above the fireplace surround, the chimney is parged. The wing contains a kitchen, which has a stove, stainless-steel stovepipe, and cabinets.

In addition to the cabin, there are many man-made recreational and landscape elements on the island associated with the WBFC. Four circa-1990 wood picnic tables and benches are permanently installed to the north of the cabin atop the eastern rock formation, and just northwest of the tables is a circa-1904 stone fire pit (A) (associated letter throughout remainder of text correlates to the site plan submitted with this DOE) that is used for roasting oysters at annual gatherings (Perry 2007, 10, 18). Also near the cabin are a series of four steel posts stamped with "U.S.S.," standing for United States Steel, set in a rectangle shape just northwest of the cabin on the west side of the picnic site; they are the supports to set up a temporary latrine on event days (Robert Soreng, personal communication 2021). The original signage situated at the eastern end of the island upon entry was recently replaced with a metal sign on wood posts by the NPS; the original sign is currently kept inside the cabin. Bronze memorial plaques, dating between the 1940s and the early 2000s, have been fixed to the eastern stone formation marking the scattering of cremated remains of former club members, or other commemorative honors.

In the western section of the island is a fire pit (B) and the remains of a possible fire pit (C) created from stone found on the island. The fire pit (B) is located atop the highest point of the western rock formation while the remnants of a possible fire pit (C)

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                    Washington Biologists' Field Club on Plummers Island

Page 3

is situated just southeast of the western rock formation in a lower-lying area of the island. WBFC members do not know for whom or when these were constructed and if they are still in use (Robert Soreng, personal communication 2021).

Historic Context

The WBFC was founded in the early twentieth century by a group of like-minded scientists and researchers. The idea for a club came about after Charles L. Pollard (1872–1945) learned about a biology club in New Jersey. Pollard, a curator at the U.S. National Museum (the Smithsonian Institute) and editor of the Plant World magazine, was inspired to form a similar club for biologists in the Washington, D.C., area (The Manchester Journal 1945; Perry 2007, 2). In January 1900, Pollard and other scientists met for the first time in Pollard's home at 1854 Fifth Street in Washington, D.C.; it was here that the WBFC was born (Perry 2007, 2). In addition to Pollard, the other early members of the club included Adrian Pieters (botanist in charge of seed and plant introduction and distribution in the U.S. Department of Agriculture), William Palmer (a taxidermist and modeler at the Smithsonian), Orator Cook (curator at the National Herbarium and professor of botany at George Washington University), William Hay (head of biology at Washington High School and visiting professor at Howard University and Georgetown University), Guy Collins (Office of Botanical Investigations), William Maxon (chairman of botany at the U.S. National Museum/Smithsonian), Edward Morris (a biologist with Washington high schools), and William Pollock (U.S. National Herbarium) (Perry 2007, 2). These founding members were all scientists, botanists, curators, geneticists, zoologists, and biologists living in and around the Washington, D.C. area. Many taught at local schools, such as Georgetown or Howard University, or worked closely with the United States Department of Agriculture, the Smithsonian Institution, and other institutions (Perry 2007).

Soon after forming, the WBFC began looking for a more permanent location for their club to meet and conduct research. According to the early club members, it was necessary for the WBFC headquarters to be situated in an area with easy access to the natural environment in order to research and collect biological materials, the focus of their club's activities. Initially, the WBFC rented a cottage in Upper Marlboro, Maryland; however, the inconvenient distance of the cottage from Washington, D.C., made it difficult for members to make the trip, and the club began looking for another location (Perry 2007, 2). In 1901, the same year that the WBFC was formally incorporated "for the promotion of research of fauna and flora and the general advancement of biological science," the club relocated to Plummers Island, the present-day location of the club (The Evening Star 1901, 3; Perry 2007, 2). Plummers Island, an island situated in the Potomac River and located to the northwest of Washington, D.C., was an ideal location for the WBFC as it offered a natural setting where the club could conveniently conduct research and gather data. The island had been brought to the club members' attention by a fellow researcher who had collected biological specimens on the island before (Perry 2007, 2).

The WBFC originally rented the land on Plummers Island for $30 a year, but after several years of negotiation with the landowner, the club purchased the 12.23-acre island in 1908 (Washington Biologists' Field Club Archives n.d.; Washington Biologists' Field Club 2021a). In that same year, they purchased 25 acres of land on the mainland, just to the north of the island past the C&O Canal (Washington Biologists' Field Club 2021a). Since the island was undeveloped, the WBFC constructed a cabin to support their research mission and provide a place where club members could stay during trips to the island. Club members William Beattie and William Palmer drew the plans for the cabin, which was to be constructed on the highest point of the island, and obtained building materials for its construction (Perry 2007, 2; Washington Biologists' Field Club 2021a). Construction started in the spring of 1901 and the cabin was completed by November of that year, comprising a one-story one-room building with a rear kitchen wing (Perry 2007, 3). The total cost of the cabin came to $200, which is approximately $6,200 today (Perry 2007, 3).

As the WBFC continued to grow, so too did their land holdings in the area. Issues with individuals trespassing on their mainland property prompted the organization to purchase additional land in the 1920s, bringing their mainland holdings to 38.5 acres (The Washington Post 1927; Perry 2007, 6). Throughout the early- to mid-twentieth century, the club continued to maintain, visit, and research the island and the mainland property. However, in June 1958, the National Capital Planning Commission (NCPC) initiated condemnation proceedings against the WBFC's land holdings for the expansion of the George Washington Parkway under the Capper-Cramton Act. (Perry 2007, 7). It was also around this time that a site to the west of Plummers Island was selected for the construction of a bridge across the Potomac River that would connect with the planned Capital Beltway (I-495) (Perry 2007, 7). After an unsuccessful attempt to find a new location for their club, an agreement was reached with the NCPC in February 1959 that allowed the club to transfer the property to NPS but maintain use of the island (The Washington

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                 Washington Biologists' Field Club on Plummers Island

Page 4

---

Post 1959). In exchange, the WBFC received financial compensation only for its mainland holdings (Perry 2007, 7). In the agreement, the club was permitted to fence the island to keep the public out. Instead, the club has asked non-members to respect the island and the cabin, to not stay overnight, and to remove their trash (Robert Soreng, personal communication 2021). Today, the WBFC continues to operate under that agreement with NPS.

Since its inception, the WBFC has sought to conduct research and advance various biology-affiliated fields of study. Using Plummers Island as the base for most of the club's research, members have conducted a wide variety of studies, many of which have been long term, intending to provide a better understanding of the natural environment over time. Topics ranged from field- or species-specific research to research on the general natural history of the island and surrounding area. Studies from the 1900s, 1910s, and 1920s examined fish, insects, reptiles, birds, and mammals located on the island and in the surrounding D.C. area. (Washington Biologists' Field Club 2021b). The earliest study that explored the natural history of Washington, D.C., was conducted by Waldo McAtee in 1918, and future studies expanded upon his work (McAtee 1918; Perry 2007, 191–192).

Starting in the mid to late 1930s, club members began a series on the natural history of Plummers Island. The series, documenting the flora and fauna observed on the island to that time, included the contributions of multiple club members, including William Maxon, co-founding member; Albert Kenrick Fisher, surgeon and co-founder of the Branch of Economic Ornithology in the U.S. Department of Agriculture (USDA) and the Division of Economic Ornithology and Mammalogy; Sidney Blake, botanist and plant taxonomist; Ellsworth Killip, botanist and curator at the Smithsonian Institution; Emery Leonard, botanist; Edna M. Ermold, biologist with the USDA specializing in mycological collections; and Maurice Brady, research staffer for the Bureau of Biological Survey of the USDA (Washington Biologists' Field Club 2021b). By 1960, the WBFC had documented 26 mammals, 186 birds, 22 reptiles, 20 amphibians, 55 fishes, 776 flowering plants, 70 mosses, 80 lichens, and 118 fungi on the island (Christmas 1960). This ongoing series has continued into the 21st century.

The club's early studies have provided important baselines for identifying environmental changes on the island over time. Already by the 1930s, club members and other scientists recognized the value of continuous observation of the island to outside researchers. In his 1935 introduction to the "Natural History of Plummers Island," cofounding member William Maxon noted the alteration of habitat and resulting changes in species on the island over 35 years and how scientific observations throughout that period had given it an "almost unique place in current natural history studies" (Maxon 117). The club's long history of extensive research on the island, if not wide-ranging or individually groundbreaking, is rare in the field of biological studies, making the island a valuable point of comparison for future studies in the area or in similar environments (Cohn 1994).

In a notable study starting in the 1960s, Mason E. Hale, Jr., curator of lichens at the Smithsonian Institution, and James Lawrey, of George Mason University, examined the long-term growth rate of rock-inhabiting lichens on the island. To do so, Hale and Lawrey relied on data from specimens collected by WBFC members on Plummers Island since 1907, giving them access to over 60 years of detailed information (Lawrey 2011, 6). Lawrey and Hale found that lichen growth was slower on Plummers Island than other nearby areas. The study demonstrated that lichens located near roads and other heavily populated regions can accumulate lead and other metals (Lawrey and Hale Jr. 1979) and inferred through comparisons of past and present-day lichen species on the island that a less diverse community and fewer species existed on the island because of environmental stressors (Lawrey 2011, 7). This research added to the growing body of evidence demonstrating how elements of the natural environment can be negatively impacted by roadways and other forms of air pollution, supporting efforts in Congress and at the EPA in the 1970s to eventually eliminate the use of tetraethyl lead in gasoline as part of air quality and emissions standards (Eckerlin et al. 2021, 13; Environmental and Energy Study Institute 2016; U.S. Energy Information Administration 2020).

Throughout its history, the WBFC membership has included prominent scientists, researchers, and practitioners in diverse fields of biology. From 1901 to 1996, membership of the club was limited to 50 members, all of whom were male (Perry 2007, 8). It was not until 1995 that women were recruited to join the club; the organization's first female president was elected in 2005 (The Washington Post 2005). Because of the limited membership opportunities, club members have historically been leaders in their respective fields. Members have often held influential positions in Washington, D.C.-area educational institutions, government agencies, and non-profit organizations, directing research and policy at the national level. Since its inception, the WBFC has provided a forum for members with ties to the Smithsonian Institution, the USDA, the Department of the Interior, the National Institute of Standards and Technology, the University of Maryland, Georgetown University, George Washington University, the National Council for Science and the Environment, and many others. Their membership has included multiple directors of the National Museum of Natural History, the National Zoological Park, the Fish and Wildlife Service, and the

00177563

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2          Washington Biologists' Field Club on Plummers Island

Page 5

Patuxent Wildlife Refuge. These ties with various institutions have made the WBFC a uniquely influential avocational club.

Notable members with achievements outside the WBFC include Vernon Bailey, who developed live traps that would not harm small animals during study; Frederick Coville, whose research allowed for blueberries and cranberries to be grown commercially; Henry Henshaw, a zoologist and ethnologist who completed an extensive study on native North American languages; Charles Piper, who is credited with making the soybean one of America's top crops; and Roger Tory Peterson, who developed the first modern field guide with his "A Field Guide to the Birds" in 1934.

In the realm of national policy, influential members have included Gifford Pinchot, the first chief of the U.S. Forest Service and "father" of modern forestry; Howard Zahniser, who was critical to the creation of the 1964 Wilderness Act which made it possible to preserve and protect certain lands in the U.S. from development (Eckerlin et al. 2021, 13); Clarence Fredine, who as chief of the National Park Service's Division of International Affairs in 1964 organized and expanded student conservation programs and developed the service's policies for international activities; and John S. Gottschalk, who as director of the Bureau of Sport Fisheries and Wildlife (1964-70), initiated the first formal endangered species program, introduced innovative waterfowl management concepts, and brought about the ban on the use of DDT (Ravo 1999). Although these achievements were made outside the WBFC, the prestigious membership of the WBFC was particularly unique for a scientific club.

Today, the WBFC has about 65 active members. Research is still conducted on the island by members and outside researchers; the club offers research grants to those seeking financial assistance to complete a study (Washington Biologists' Field Club 2021c). Grants have helped fund studies on fish in the Potomac River, on breeding birds on the island, on plants specific to the area, and many other topics (Perry 2007, 11). The breadth of research completed on Plummers Island supports the claim that it is the most thoroughly studied island in North America (Ethridge 1951; Eckerlin et al. 2021, 12).

In addition to conducting research, members of the club have maintained the natural and man-made elements of the island. In the mid-1960s, repairs were made to the property, specifically the cabin, which had been frequently vandalized. Shutters were added to windows, sturdier doors were installed, the roof was replaced, and the kitchen was enlarged and given new windows. Maintenance repairs were made again the 1990s, including reconstruction of the original fireplace with brick and concrete block, replacing an original wood surround. Support beams were added to the cabin interior to reinforce the roof and provide additional storage. In 2015, the chimney was reconstructed using the original fieldstone. This regular upkeep of the cabin has allowed members to continue to utilize the space there while completing research (Perry 2007, 10). The WBFC still meets on the island to complete research, attend annual meetings -- which often coincide with an annual shad bake and oyster roast -- and to spend time in the natural environment they have preserved on the island for over 100 years.

Evaluation

The Washington Biologists' Field Club on Plummers Island is eligible for inclusion in the NRHP under Criterion A. The WBFC is a twentieth-century, private-club research station set on an island in the Potomac River. For over a century, Plummers Island has been used by scientists for short- and long-term biological research studies as well as natural history and geological studies. Nearly 400 published studies have established and expanded upon a continuous body of research encompassing 120 years of observation. These studies have provided a unique source of long-term historical data for comparative studies involving the effects of outside forces such as climate change, invasive species, and pollution. Few places in the world provide a similar breadth of historical data with a location so close to a national capital.

In part due to the WBFC's proximity to Washington, D.C., club members, consisting of some of the leading researchers in their respective fields, have contributed to, influenced, and continue to inform new knowledge and understanding of biology, natural resources, and agriculture (Perry 2007, iv). The WBFC has been a forum for major scientific figures in the twentieth-century environmental movement for over a century. This membership of influential policymakers is unique among twentieth-century naturalist clubs.

The WBFC is eligible for listing in the NRHP under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists.

00177564

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2        <u>Washington Biologists' Field Club on Plummers Island</u>

Page 6

The WBFC is not eligible under Criterion B. Although there have been several notable individual members of the club that have made lasting and significant contributions to their fields, these specific accomplishments were made outside of their association with the WBFC. Such individuals are more appropriately represented by other properties more directly associated with their productive lives. Their cumulative importance as part of a club of prominent scientific members is best expressed under Criterion A.

With respect to NRHP Criterion C, the built environment of the WBFC is not a unique resource. The island contains a natural landscape that has evolved over time with limited human intervention. The only building on the island, the 1901 cabin, is typical of vernacular buildings of the period and has been altered. Other structures or designed elements include the fire pits, memorial plaques, hiking trails, and signs. Neither the cabin nor these simple additions represent the work of a master or possess high artistic value. As a natural landscape, its significance is derived from an association with the research and studies conducted on it; therefore, the WBFC is not significant under Criterion C.

The resource was not evaluated under Criterion D.

Period of Significance

The WBFC derives its significance from its role as an important research site and for its unique membership including influential Washington, D.C.-area biologists. Its period of significance begins in 1901, when the club acquired the island, constructed the cabin, and began their work on the island, and continues to 1971, the current 50-year cut-off date as established by the NPS in National Register Bulletin 16A, regarding historic properties in which significant activities began within the period of significance and continue to have importance, but no more specific date can be identified to end the historic period (U.S. Department of the Interior National Park Service 1997, 42). The WBFC does not qualify as exceptionally important under Criteria Consideration G, but future investigations may determine that the period of significance extends beyond 1971.

Character-Defining Features

Cabin site: the cabin site includes the cabin, picnic area, and fire pit (A) atop the easternmost rock formation. The 1901 cabin and adjacent picnic site have been used since the club's founding as a gathering place for researchers during their studies and club events and continue to be used as such. The cabin has been altered with new materials as part of repairs over time, but its use and overall design remain intact. Likewise, although the picnic tables themselves are 1990s replacements, the picnic area has been in continuous use since the establishment of the club on Plummers Island in 1901.

Memorial plaques: these plaques on the western rock formation of the island commemorate past important members of the club and indicate the location of several members' cremated remains. The plaques demonstrate the important role the island has played in members' lives and are one of the club's few physical alterations to the island, reflecting the value of past contributions of the founders and other members to the club.

Walking trails: the trails were established by club members to access the cabin, picnic site, and study areas and have been an integral part of the landscape for over a century. Although walking trails may change over time, the presence of trails on the island (as opposed to specific alignments or locations) is an important aspect of the WBFC's character.

Cactus Rock: a local landmark used as a traditional gathering spot and Potomac River overlook; it has also played an important role in the study of lichens on the island.

The natural, unplanned character of the Plummers Island landscape: although specific plants, plant communities and geological features, other than those noted above, do not contribute to the historical significance of the WBFC, the overall character of the landscape, which has been allowed to evolve naturally and organically for over a century, is a character-defining feature of the property. The continual, undirected growth and evolution of the natural environment played a pivotal role in the club's contributions over the last century, as researchers studied changes to the flora and fauna of the island resulting from outside stimuli such as drought, invasive species, pollution, etc. that reflect similar changes occurring in the world at large.

Fire pit (B) and fire pit (C) do not contribute to the property's significance. These appear similar to fire pit (A) but are not in use

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                    Washington Biologists' Field Club on Plummers Island

Page 7

and are not documented in the club's history. The NPS sign near the entrance to the island is a later replacement and is also noncontributing.

Integrity

The WBFC and Plummers Island have undergone continuous change and evolution over time. As such, the integrity of the WBFC is not tied closely to design, materials, and workmanship, but more to the location, setting, feeling, and association.

The WBFC has integrity of location due to its continued presence on Plummers Island.

The WBFC retains integrity of design. The layout and appearance of the buildings and structures on the island retain the appearance of an early twentieth-century naturalist club.

Setting: The WBFC retains integrity of setting. The island's natural landscape has undergone continuous change, but specific flora and fauna are not critical to the club's significance. The natural setting on Plummers Island is intact.

The WBFC lacks integrity of materials and workmanship. Changes to the cabin and picnic area over time include the replacement of doors and the roof, the addition of ceiling support beams, the reconstruction of the fireplace, and the reconstruction of the chimney. However, these aspects of integrity are not critical to the WBFC's significance.

The WBFC retains integrity of feeling and association. The island location, natural landscape, and the presence of the cabin, picnic area, walking trails, and other features combine to convey the character of the WBFC from the early through the mid-twentieth century.

Boundary

The resource encompasses 12.23 acres and is confined to the current tax parcel which is found on Montgomery County Tax Map GN11, Parcel P705 (2021).


References:

Christmas, Anne H. 1960. "New Span to Unmask Island Jungle," Evening Star (Washington, D.C.), July 5, 1960. Accessed June 1, 2021. www.newsbank.com.

Cohn, D'Vera. 1994. "Island Under a Microscope: In Plummers, Scientists Have a Living Laboratory." The Washington Post. May 19, 1994, C1.

Eckerlin, Ralph, Robert Soreng, and Lowell Adams. 2021. Washington Biologists' Field Club Comments on Section 106 Process for Construction of I-495/I-270 Project. Letter on file at Washington Biologists' Field Club archives, Cabin John, Maryland.

Environmental and Energy Study Institute. 2016. Fact Sheet: A Brief History of Octane in Gasoline - From Lead to Ethanol. Accessed June 9, 2021. https://www.eesi.org/papers/view/fact-sheet-a-brief-history-of-octane.

Ethridge, Mark. 1951. "Biologists Devote Half Century to Lab on Potomac Island." The Washington Post. August 20, 1951, 1. Accessed April 22, 2021. www.newsbank.com.

The Evening Star. 1901. "Certificates of Incorporation." May 24, 1901, 3. Accessed May 24, 2021. www.newspapers.com.

Fleming, Tony. 2015. Geologic-Geomorphic Map of Plummers Island. Accessed June 9, 2021. https://wbfc.science/wp-content/uploads/2019/09/geologic_map_plummers_island.pdf.

Lawrey, J. D. 2011. A lichen biomonitoring program to protect resources in the National Capital

Region by detecting air quality effects. Natural Resource Technical Report NPS/NCRN/NRTR—2011/450. National Park Service, Fort Collins, Colorado. Accessed June 9, 2021. https://irma.nps.gov/DataStore/DownloadFile/428476.

Lawrey, James D., and Mason E. Hale, Jr. 1979. "Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution." Science 204, no. 4391:423–424. Accessed June 1, 2021. https://science.sciencemag.org/content/204/4391/423.

The Manchester Journal. 1945. "Arlington Librarian Dies Suddenly." August 23, 1945, 2. Accessed May 24, 2021. www.newspapers.com.

Maxon, William R. "Natural History of Plummers Island: I. Introduction." Proceedings of the Biological Society of Washington 48: 115-138. Accessed June 21, 2021. https://wbfc.science/wp-content/uploads/2020/07/1935_Maxon_NatHistPlummerIntro.pdf.

McAtee, W.L. 1918. "A Sketch of the Natural History of the District of Columbia." Bulletin of the Biological Society of Washington 1:1–150. Accessed June 1, 2021. https://wbfc.science/wp-content/uploads/2020/07/1918_McAtee_SketchNaturalHistory.pdf.

Perry, Matthew C. (editor). 2007. The Washington Biologists' Field Club: Its Members and Its History (1900–2006). The Maple Press Company, York, Pennsylvania. Accessed May 24, 2021. https://wbfc.science/wp-content/uploads/2019/09/wbfc_booksm.pdf.

Ravo, Nick. 1999. "John S. Gottschalk, 86, a Leader in Federal Efforts to Save Species." The New York Times. August 24, 1999. Section B, page 11. Accessed August 10, 2021. https://www.nytimes.com/1999/08/24/us/john-s-gottschalk-86-a-leader-in-federal-efforts-to-save-species.html.
Simmons, R.H., A.H. Fleming, and R.J. Soreng. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Accessed June 9, 2021. https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf.

Simmons, R.H., R.J. Soreng, E.M. Barrows, and L.H. Emmons. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished technical report. Report on file at the Washington Biologists' Field Club archives, Cabin John, Maryland.

U.S. Department of Interior, National Park Service. 1997. How to Complete the National Register Registration Form. National Register Bulletin 16A. Accessed June 22, 2021. https://nps.gov/subjects/nationalregister/upload/NRB16A-Complete.pdf.

U.S. Energy Information Administration. 2020. "Leaded gasoline was gradually taken off the U.S. market." Gasoline Explained. U.S. Energy Information Administration, Washington, D.C. Accessed June 9, 2021. https://www.eia.gov/energyexplained/gasoline/gasoline-and-the-environment-leaded-gasoline.php.

Washington Biologists' Field Club. 2021a. The History of the Washington Biologists' Field Club on Plummers Island. Accessed May 24, 2021. https://wbfc.science/the-history-of-the-washington-biologists-field-club-on-plummers-island/.

--- 2021b. Scientific Papers Associated with Plummers Island. Accessed June 1, 2021. https://wbfc.science/scientific-papers-associated-with-plummers-island/.

--- 2021c. Research. Accessed June 1, 2021. https://wbfc.science/research/.

Washington Biologists' Field Club Archives. n.d. Miscellaneous files on record. Accessed June 1, 2021.

The Washington Post. 1901. "District Biologists Incorporate." May 24, 1901, 12. Accessed April 22, 2021. www.newsbank.com.

--- 1927. "Suburban Rockville." June 28, 1927, 2. Accessed April 22, 2021. www.newsbank.com.

--- 1959. "Plummers Island – It's for the Birds." February 6, 1959, B1. Accessed April 22, 2021. www.newsbank.com.

00177567

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                    Washington Biologists' Field Club on Plummers Island

Page 9

--- 1990. "Mason E. Hale – Lichens Expert." April 27, 1990, C6. Accessed April 22, 2021. www.newsbank.com.

--- 2005. "Field Club's Gender Evolution." May 22, 2005, C02. Accessed June 1, 2021. www.newsbank.com.

00177568

M: 12-46-2          Washington Biologists' Field Club on Plummers Island
MAPS

**Washington Biologists' Field Club on Plummers Island**

Location: Plummers Island on the Potomac River
City: Cabin John                                      Montgomery County



USGS 7.5' Quadrangle - Falls Church

Scale: 1:24,000

00177569

M: 12-46-2          Washington Biologists' Field Club on Plummers Island
MAPS

**Washington Biologists' Field Club on Plummers Island**

Location: Plummers Island on the Potomac River
City: Cabin John                                    Montgomery County



Parcel Boundaries

Scale: 1:3,000

00177570



00177571

# ROSELIE ANN BRIGHT, SC.D., M.S.

July 14, 2022

**Re: Comments on FEIS's Lack of a Serious Analysis of Impacts to Public Health**

Dear Josh Tulkin and the Sierra Club Maryland Chapter:

I have reviewed the I-495 and I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS) Chapters 1–3, Chapter 5 sections 1–3, 5–11, and 21–23, Chapters 7–9, Appendix (App'x) F sections 1–5, App'x K sections 1–4, App'x L Executive Summary, App'x Q sections 1–3 and Appendix A, and App'x T.6 in order to assess whether the FEIS adequately evaluated the public health impacts of the proposed MLS, from my perspective as an epidemiologist since 1980 with experience that includes environmental epidemiology training, observational ("real world") epidemiology research and methods development, and federal review of medical epidemiology studies and other documents. See attached CV. In my professional opinion, the FEIS fails to adequately address and review the adverse health effects of the Preferred Alternative.

The Preferred Alternative, known as Phase 1 South, will increase traffic on the highways by creating induced demand. The FEIS states that transportation improvements will result in economic growth and population growth, which it acknowledges will increase traffic and demand for further transportation improvements. See FEIS § 9.3.4.N. Yet, the FEIS ignores the indirect and cumulative effects of the increased traffic and construction for the Preferred Alternative, including, importantly, by failing to discuss and quantify its health impacts. This failure violates NEPA's mandate to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings," 42 U.S.C. § 4331, and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." Id. § 4331. NEPA's mandate requires agencies to incorporate impacts on the human health into any comprehensive EIS. The Agencies fail to do so here.

Before discussing specific health impacts, it must be noted that the Agencies appear to be manipulating their traffic models to reduce the area with anticipated indirect and cumulative effects. While the area of traffic influence was initially modeled to include upper Montgomery and Frederick Counties, the Agencies reduced the modeled area of influence:

> [s]imilar to the DEIS, the MWCOG model initially resulted in a relatively large, affected network area. In consultation with FHWA, additional steps were taken to reduce the footprint of the affected network area to make it more consistent with the Preferred Alternative study area. These included eliminating the travel time criterion and removing modeling artifacts.

FEIS App'x K § 3.3.2.B. Thus, for all discussed impacts, the Agencies seem to have artificially constrained the model to avoid evaluating the full impacts of the Preferred Alternative, health-related or otherwise. For example, the FEIS largely ignores the network impacts of the Preferred Alternative by declining to address impacts to feeder roads, local and other smaller regional roads,

**Exhibit E**

00177621

and alternative routes affected by the Preferred Alternative.[1] Moreover, each health impact discussed below that the Agencies ignored is compounded by the Agencies' failure to consider the entire geographic area affected by the Preferred Alternative, including those smaller and regional roads.

First, the FEIS ignores the obvious increase in traffic-related injuries and death from the increase in vehicle miles traveled in private vehicles predicted under the Preferred Alternative. It also does not discuss the likely increase in road deaths from pedestrians and cyclists,[2] risks that are higher in the United States than in 28 other high-income countries.[3]

Second, the FEIS does not quantify impacts to health from mobile source air toxic (MSAT) emissions or other health impacts from traffic-caused air pollution. The FEIS says:

> Per FHWA's Updated Interim Guidance on MSAT Analysis in NEPA Documents (2018), information is incomplete or unavailable to credibly predict the project-specific health impacts due to changes in MSAT emissions associated with a proposed set of highway alternatives. The outcome of such an assessment, adverse or not, would be influenced more by the uncertainty introduced into the process through assumption and speculation rather than any genuine insight into the actual health impacts directly attributable to MSAT exposure associated with a proposed action.

> These limitations impede the ability to evaluate how potential public health risks posed by MSAT exposure should be factored into project-level decision-making within the context of a NEPA Study such as the Study. However, the Final Air Quality Technical Report for the FEIS includes a more detailed discussion of the uncertainties associated with predicting health impacts of project alternatives. Refer to FEIS, Appendix K. The FEIS summarizes that "[a]ir toxics emissions from mobile sources have the potential to impact human health" (FHWA, 2018).

FEIS at § 9.3.4.L (9-56). The Agencies decline to quantify MSAT impacts by relying on an FHWA-funded, 2010 Health Effects Institute literature review which concludes that there is a

---

[1] While the FEIS claims that vehicle miles traveled on local roads will decrease under the Preferred Alternative, FEIS § 5.8.3.B, this claim makes no sense because more vehicles on the highway will lead to more vehicle miles on local roads.

[2] Morency P, et al. Traveling by Bus Instead of Car on Urban Major Roads: Safety Benefits for Vehicle Occupants, Pedestrians, and Cyclists. J Urban Health. 2018 Apr; 95(2): 196–207. DOI: 10.1007/sl l524-017-0222-6; Beck LF, Dellinger AM, O'Neil ME. 2007. Motor Vehicle Crash Injury Rates by Mode of Travel, United States: Using Exposure-Based Methods to Quantify Differences. American Journal of Epidemiology 166(2): 212-218. doi: 10.1093/aje/kwm064; Savage I. Comparing the Fatality Risks in United States Transportation Across Modes and Over Time. Research in Transportation Economics. 2013; 43(1):9-22. DOI: 10.1016/j.retrec.2012.12.011. https://faculty.wcas.northwestern.edu/ipsavage/436.pdf.

[3] Yellman MA, Sauber-Schatz EK. Motor Vehicle Crash Deaths — United States and 28 Other High-Income Countries, 2015 and 2019. Morbidity and Mortality Weekly Report. July 1, 2022. 71(26):837-843. https://www.cdc.gov/mmwr/volumes/71/wr/mm7126a1.htm?s_cid=mm7126a1_w.

2

00177622

"causal relationship between exposure to traffic-related air pollution and exacerbation of asthma" and a suggestive causal relationship for other health impacts from air pollution, but ultimately concludes that for several health outcomes, the data were inadequate or insufficient to draw firmer conclusions. FEIS § 9.3.4.L. However, much more research has been done since 2010, and the FEIS should have considered and reviewed that literature. Recent research finds a causal relation between even low-levels of traffic-caused air pollution and ill health in children and adults, including lung problems (asthma, pneumonia), cardiovascular problems (myocardial infarction), poor pregnancy outcomes, poor physical growth, school absences, reduced cognitive abilities (autism, academic performance, dementia), and earlier mortality.[4]

---

[4] Ernani F. Choma, et al., Health Benefits of Decreases in On-Road Transportation Emissions in the United States from 2008 to 2017, PNAS 118(51) (Dec. 2021), *available at* doi: 10.1073/pnas.2107402118; Luo Z et al. Impacts of Vehicle Emission on Air Quality and Human Health in China, Science of the Total Environment, Vol. 813 (Mar. 20, 2022), *available at* https://doi.org/10.1016/j.scitotenv.2021.152655; WHO-Europe, Health Effects of Transport-Related Air Pollution, *available at* https://www.euro.who.int/__data/assets/pdf_file/0006/74715/E86650.pdf; Kheirbek I, et al., The Contribution of Motor Vehicle Emissions to Ambient Fine Particulate Matter Public Health Impacts in New York City: A Health Burden Assessment, Environmental Health (2016) 15:89, *available at* DOI 10.1186/s12940-016-0172-6; McCubbin DR, et al., The Health Costs of Motor-Vehicle-Related Air Pollution, Journal of Transport Economics and Policy, Vol. 33(3):253-86 (Sep. 1999), *available at* https://www.jstor.org/stable/20053815; Anderson, Michael L, As the Wind Blows: The Effects of Long-Term Exposure to Air Pollution, Journal of the European Economic Association 18(4): 1886-1927 (Aug. 2020), *available at* DOI: 10.1093/jeea/jvz051; Austin, Wes, et al., School Bus Emissions, Student Health and Academic Performance, Economics of Education Review (2019) *available at* https://www.nber.org/papers/w25641. DOI: 10.3386/w25641; Beatty, Timothy KM and Jay P Shimshack, School Buses, Diesel Emissions, and Respiratory Health, Journal of Health Economics, 30(5): 987–999 (2011), *available at* DOI: 10.1016/j.jhealeco.2011.05.017; Bell, Michelle L, et al., Ozone and Short-Term Mortality in 95 U.S. Urban Communities, 1987-2000, Journal of the American Medical Association, 292(19), 2372–2378 (2004), *available at* DOI: 10.1001/jama.292.19.2372; Bell, Michelle L. et al, Challenges and Recommendations for the Study of Socioeconomic Factors and Air Pollution Health Effects, Environmental Science and Policy 8 (5): 525–533 (2005), *available at* https://doi.org/10.1016/j.envsci.2005.06.003; Benmarhnia, Tarik, et al., Using Instrumental Variables Under Partial Observability of Endogenous Variables for Assessing Effects of Air Pollution on Health (2017), *available at* https://mauricio-romero.com/pdfs/papers/partialiv.pdf; Bishop, Kelly C., et al., Hazed and Confused: The Effect of Air Pollution on Dementia, Technical Report, NBER Working Paper No. 24970 (2018), *available at* https://www.nber.org/papers/w24970; Case, Anne, et al, The Lasting Impact of Childhood Health and Circumstance, Journal of Health Economics 24(2): 365–389 (2005), *available at* DOI: 10.1016/j.jhealeco.2004.09.008; Currie, Janet, et al., Air Pollution and Infant Health: What Can We Learn from California's Recent Experience?, The Quarterly Journal of Economics 120(3): 1003–1030 (2005), *available at* https://www.jstor.org/stable/25098761; Currie, Janet et al., Traffic Congestion and Infant Health: Evidence From E-ZPass, American Economic Journal: Applied Economics 3(1):65–90 (2011),

3

00177623

*available at* https://www.aeaweb.org/articles?id=10.1257/app.3.1.65; Currie, Janet et al, Does Pollution Increase School Absences?, Review of Economics and Statistics 91(4): 672–694 (2009); Currie, Janet et al, What Do We Know About Short-and Long-Term Effects of Early-Life Exposure To Pollution?, Annu. Rev. Resour. Econ. 6(1): 217–247 (, 2014), *available at* http://www.nber.org/papers/w19571.pdf; Currie, Janet et al., Air Pollution and Infant Health: Lessons From New Jersey, Journal of Health Economics, 28(3): 688–703 (2009), *available at* DOI: 10.1016/j.jhealeco.2009.02.001; Di, Qian, et al., Association of Short-Term Exposure to Air Pollution With Mortality in Older Adults, Journal of the American Medical Association, 318(24): 2446–2456 (2017); Dominici, Francesca, et al., Science and Regulation. Particulate Matter Matters, Science, 344(6181): 257–259 (2014), *available at* DOI: 10.1126/science.1247348; Gauderman, W. et al., Childhood Asthma and Exposure To Traffic and Nitrogen Dioxide, Epidemiology, 16(6): 737–743 (2005), *available at* DOI: 10.1097/01.ede.0000181308.51440.75; Gauderman WJ, et al. Effect of Exposure to Traffic on Lung Development From 10 to 18 Years of Age: A Cohort Study, Lancet 369(9561):571-7 (Feb. 17, 2007). *available at* DOI: 10.1016/S0140-6736(07)60037-3; Gent, Janneane F., et al., Association of Low-Level Ozone and Fine Particles with Respiratory Symptoms in Children with Asthma, Journal of the American Medical Association, 290(14): 1859–1867 (2003), *available at* DOI: 10.1001/jama.290.14.1859; Hoek, Gerard, et al., Long-Term Air Pollution Exposure and Cardio-Respiratory Mortality: A Review, Environmental Health, 12(43) (2013), *available at* DOI: 10.1186/1476-069X-12-43; Hyder, Ayaz, et al., PM2.5 Exposure and Birth Outcomes: Use of Satellite- and Monitor-Based Data, Epidemiology 25(1): 58 (2014), *available at* DOI: 10.1097/EDE.0000000000000027; Isen, Adam, et al., Every Breath You Take–Every Dollar You'll Make: The Long-Term Consequences of the Clean Air Act of 1970, Journal of Political Economy 125(3): 848–902 (2017), *available at* https://www.journals.uchicago.edu/doi/abs/10.1086/691465; Jerrett, Michael, et al., Long-Term Ozone Exposure and Mortality, New England Journal of Medicine 360(11): 1085–1095 (2009), *available at* DOI: 10.1056/NEJMoa0803894; Jerrett M, et al., Traffic-Related Air Pollution and Asthma Onset in Children: A Prospective Cohort Study With Individual Exposure Measurement, Environ Health Prospect 116(10):1433-8 (Oct. 2008), *available at* DOI: 10.1289/ehp.10968; Knittel, Christopher R, et al., Caution, Drivers! Children Present: Traffic, Pollution, and Infant Health, Review of Economics and Statistics 98(2): 350–366 2016. http://hdl.handle.net/1721.1/113913; Krewski D, et al., Extended Follow-up and Spatial Analysis of the American Cancer Society Study Linking Particulate Air Pollution and Mortality, Res Rep Health Eff Inst. (140): 5-114, 115-36 (May 2009); Lleras-Muney, Adriana, The Needs of the Army Using Compulsory Relocation in the Military to Estimate the Effect of Air Pollutants on Children's Health, Journal of Human Resources, 45(3): 549–590 (2010), *available at* https://www.jstor.org/stable/25703469; Mar, Therese F. and Jane Q. Koenig, Relationship Between Visits to Emergency Departments for Asthma and Ozone Exposure in Greater Seattle, Washington, Annals of Allergy, Asthma, and Immunology 103(6): 474–479 (2009), *available at* DOI: 10.1016/S1081-1206(10)60263-3; Marcus, Michelle, On the Road to Recovery: Gasoline Content Regulations and Child Health, Journal of Health Economics, 54: 98–123 (2017), *available at* DOI: 10.1016/j.jhealeco.2017.04.003; McConnell R, et al. Traffic, Susceptibility, and Childhood Asthma, Environ Health Prospect 114(5):766-72 (May 2006), *available at* DOI: 10.1289/ehp.8594; McConnell R, et al. Childhood Incident Asthma and Traffic-Related Air Pollution at Home and School, Environ. Health Perspect. 118(7): 1021-6 (July 2010), *available*

4

00177624

Third, the FEIS also understates the impacts of the Preferred Alternative on MSAT emissions. While the FEIS explains numerous times that, under the Preferred Alternative, MSAT emissions are expected to "significantly decline in the Opening (2025) and Design (2040) years when compared to base conditions (2016)," see, e.g., FEIS § 9.3.4.F, the FEIS tables showing the MSAT data reveal that projected MSATs are *lower* under the No Build alternative. FEIS App'x. K, Tbl. 3-1. The FEIS of course does not grapple with this discrepancy. Recent research has shown that some air quality monitoring is manipulated to undermeasure poor air quality.[5] It is possible

*at* DOI: 10.1289/ehp.0901232; Medina-Ramon, Mercedes, et al., The Effect of Ozone and PM10 on Hospital Admissions for Pneumonia and Chronic Obstructive Pulmonary Disease: A National Multicity Study, American Journal of Epidemiology, 163(6): 579–588 (2006); Neidell, Matthew J, Air Pollution, Health, and Socio-Economic Status: The Effect of Outdoor Air Quality on Childhood Asthma, Journal of Health Economics 23(6): 1209–1236 (2004), *available at* DOI: 10.1016/j.jhealteco.2004.05.002; Peters, Annette, et al., Exposure to Traffic and the Onset of Myocardial Infarction, New England Journal of Medicine, 351(17): 1721–1730 (2004), *available at* DOI: 10.1056/NEJMoa040203; Ponce, Ninez A, et al., Preterm Birth: The Interaction of Traffic-Related Air Pollution with Economic Hardship in Los Angeles Neighborhoods, American Journal of Epidemiology, 162(2): 140–148 (2005), *available at* DOI: 10.1093/aje/kwi173; Schwartz, Joel, Air Pollution and Daily Mortality: A Review and Meta Analysis, Environmental Research 64(1): 36–52 (1994), *available at* DOI: 10.1006/enrs.1994.1005; Simeonova, Emilia, et al., Congestion Pricing, Air Pollution and Children's Health, Technical Report, NBER Working Paper No. 24410 (2018); Stieb, David M, et al., Ambient Air Pollution, Birth Weight and Preterm Birth: A Systematic Review and Meta-Analysis, Environmental Research 117: 100–111 (2012), *available at* doi: 10.1016/j.envres.2012.05.007; Triche EW, et al., Low-Level Ozone Exposure and Respiratory Symptoms in Infants, Environ Health Prospect., 114(6):911-6 (June 2006), *available at* DOI: 10.1289/ehp.8559; Volk, Heather E, et all, Traffic-Related Air Pollution, Particulate Matter, and Autism, JAMA Psychiatry 70(1): 71–77 (2013), *available at* DOI: 10.1001/jamapsychiatry.2013.266; Vrijheid, Martine, et al., Environmental Pollutants and Child Health—A Review of Recent Concerns, International Journal of Hygiene and Environmental Health, 219(4-5): 331–342 (2016), *available at* DOI: 10.1016/j.ijheh.2016.05.001; Zawacki, Margaret, et al., Mobile source Contribution to Ambient Ozone and Particulate Matter in 2025, Atmospheric Environment 188:129–141 (2018); Alexander D, et al., The Impact of Car Pollution on Infant and Child Health: Evidence from Emissions Cheating. Federal Reserve Bank of Chicago WP 2019-04 (2019), *available at* https://doi.org/10.21033/wp-2019-04; Schwartz, J et al., Estimating Causal Effects of Local Air Pollution on Daily Deaths: Effect of Low Levels, Environ Health Prospect, 125(1): 23-29 (Jan. 2017), *available at* DOI: 10.1289/EHP232.
[5] Grainger, Corbett, et al., Do Regulators Strategically Avoid Pollution Hotspots When Siting Monitors? Evidence from Remote Sensing of Air Pollution, 2016; Grainger, Corbet, and Andrew Schreiber. Discrimination in Ambient Air Pollution Monitoring? AEA Papers and Proceedings. 109: 277-82 (May 2019), *available at* https://www.aeaweb.org/articles?id=10.1257/pandp.20191063; Mu Y, Rubin E, Zou E. What's Missing in Environmental (Self-)monitoring: Evidence from Strategic Shutdowns of Pollution Monitors. NBER Working Paper No. w28735. Last revised 15 May 2022, *available at* http://www.nber.org/papers/w28735; Zou, Eric. Unwatched Pollution: the Effect of Intermittent

00177625

that the data used in the FEIS monitors may not be accurate so that the baseline data used in the FEIS are also inaccurate.

Fourth, the FEIS fails to adequately discuss mobile source pollution from tire and brake wear.[6] As noted in a recent article:[7]

> Every time a car brakes, accelerates, or changes direction, the friction wears down the exterior of the tire, sending particles into the environment. Some remain suspended in the air, and others get swept into local waterways, where they can have devastating effects on plant and animal life. … The vulcanized rubber compound that makes up the outermost layer, the tread, often contains sulfur, zinc, carbon black, bisphenol A (BPA), and other chemicals. A lot of that gets swept off the roads by rain, along with motor oil, bits of pavement, and other litter.

When particulate matter ($PM_{2.5}$ and $PM_{10}$) air quality analyses are done, tire and brake wear are typically components of the analysis. Non-exhaust emissions—particles released into the air from brake wear, tire wear, road surface wear and resuspension of road dust during on-road vehicle usage—"are currently believed to constitute the majority of primary particulate matter from road transport, 60 percent of $PM_{2.5}$ and 73 percent of $PM_{10}$."[8]

Fifth, the FEIS fails to discuss the health hazards caused during the construction process because of increased silica dust in construction areas. The impacts of increased silica dust were described in comments submitted by Byron Bloch, an auto safety expert, SDEIS, App. T.6.B.2 at C-95-C-107, but the FEIS fails to respond adequately to these important comments.

Sixth, while the FEIS acknowledges the need for barriers to reduce noise impacts, the FEIS generally fails to acknowledge the long-term health impacts of noise "leakage" at the highway entrance or exits or on other roads affected by the Preferred Alternative. The health impacts of traffic noise, including heart disease, blood pressure, brain damage, and cancer, are well recognized.[9] The FEIS focuses only on the health impacts from noise during construction and does

---

Monitoring on Air Quality, American Economic Review. 111(7): 2101-26 (Oct. 2017), *available at* https://files.webservices.illinois.edu/7199/zoueric-jmp.pdf.

[6] Beate Baensch-Baltruschat, et al., Tyre and Road Wear Particles (TRWP) - A Review of Generation, Properties, Emissions, Human Health Risk, Ecotoxicity, and Fate in the Environment, Science of The Total Environment 733 (2020).

[7] Lindsey McGinnis, A pollution solution where the rubber meets the road, The Christian Science Monitor (Nov. 9, 2020), *available at*
https://www.csmonitor.com/Environment/2020/1109/A-pollution-solution-where-the-rubber-meets-the-road.

[8] Press Release: Pollution From Tyre Wear 1,000 Times Worse Than Exhaust Emissions, Emissions Analytics (Mar. 6, 2020), *available at*
https://www.emissionsanalytics.com/news/pollution-tyre-wear-worse-exhaust-emissions.

[9] Babisch W, et al., Blood Pressure of 8-14 year old Children in Relation to Traffic Noise at Home--Results of the German Environmental Survey for Children (GerES IV), Sci Total Environ. 407(22):5839-43 (Nov. 1, 2009), *available at* DOI: 10.1016/j.scitotenv.2009.08.016;

6

00177626

Babisch W, et al., Traffic Noise and Risk of Myocardial Infarction, Epidemiology 16(1):33-40 (Jan., 2005), *available at* DOI: 10.1097/01.ede.0000147104.84424.24; Babisch W, et al., Increased Catecholamine Levels in Urine in Subjects Exposed to Road Traffic Noise: The Role of Stress Hormones in Noise Research, Environ Int. 26(7-8):475-81 (Jun. 2001), *available at* DOI: 10.1016/s0160-4120(01)00030-7; Babisch W, Road Traffic Noise and Cardiovascular Risk, Noise and Health 10:27-33 (2008), *available at* DOI: 10.4103/1463-1741.39005; Babisch W, et al., Road Traffic Noise and Hypertension--Accounting for the Location of Rooms, Environ Res.133:380-7 (Aug., 2014), *available at* DOI: 10.1016/j.envres.2014.05.007; Babisch W, Updated Exposure-Response Relationship Between Road Traffic Noise and Coronary Heart Diseases: a Meta-Analysis, Noise Health 16(68):1-9 (Jan. – Feb., 2014), *available at* DOI: 10.4103/1463-1741.127847; Birk M, et al., Road Traffic Noise: Self-Reported Noise Annoyance Versus GIS Modelled Road Traffic Noise Exposure, J Environ Monit. 13(11):3237-45 (Nov. 2011), *available at* DOI: 10.1039/c1em10347d; Bodin T, Albin M, Ardö J, Stroh E, Ostergren PO, Björk J, Road Traffic Noise and Hypertension: Results from a Cross-Sectional Public Health Survey in Southern Sweden, Environmental Health 8: 38 (2009), *available at* DOI: 10.1186/1476-069X-8-38; Cai Y, et al., Long-Term Exposure to Traffic Noise and Mortality: A Systematic Review and Meta-Analysis of Epidemiological Evidence Between 2000 and 2020, Environ Pollut. 269:116222 (Jan. 15, 2021), *available at* DOI: 10.1016/j.envpol.2020.116222; Cantuaria ML, et al., Residential Exposure to Transportation Noise in Denmark and Incidence of dementia: National Cohort Study, BMJ 8;374:n1954 (Sept. 2021), *available at* DOI: 10.1136/bmj.n1954; Cole-Hunter T, et al, Long-Term Exposure to Road Traffic Noise and All-Cause and Cause-Specific Mortality: a Danish Nurse Cohort Study, Sci Total Environ. 10;820:153057 (May, 2022), *available at* DOI: 10.1016/j.scitotenv.2022.153057; de Bont J, et al., Urban Environment and Obesity and Weight-Related Behaviours in Primary School Children, Environ Int. 155:106700 (Oct. 2021), *available at* DOI: 10.1016/j.envint.2021.106700; de Kluizenaar Y, Janssen SA, van Lenthe FJ, Miedema HM, Mackenbach JP, Long-Term Road Traffic Noise Exposure is Associated with an Increase in Morning Tiredness, Acoustical Society of America 126: 626-633 (2009), *available at* DOI: 10.1121/1.3158834; Foraster M, et al., Exposure to Road Traffic Noise and Cognitive Development in Schoolchildren in Barcelona, Spain: A Population-Based Cohort Study, PLoS Med. 19(6):e1004001 (Jun. 2, 2022), *available at* DOI: 10.1371/journal.pmed.1004001; Fuks K, et al., Long-Term urban particulate Air Pollution, Traffic Noise, and Arterial Blood Pressure, Environ Health Perspect. 119(12):1706-11 (Dec. 2011), *available at* DOI: 10.1289/ehp.1103564; Gui S-Y, et al., Traffic Noise and Adiposity: A Systematic Review and Meta-Analysis of Epidemiological Studies, Environ Sci Pollut Res Int. (Mar. 23, 2022), *available at* DOI: 10.1007/s11356-022-19056-7; Hoffmann B, et al., Air Quality, Stroke, and Coronary Events: Results of the Heinz Nixdorf Recall Study from the Ruhr Region, Dtsch Arztebl Int. 112(12):195-201 (Mar. 20, 2015), *available at* DOI: 10.3238/arztebl.2015.0195; Kaelsch H, et al., Are Air Pollution and Traffic Noise Independently Associated with Atherosclerosis: the Heinz Nixdorf Recall Study, Eur Heart J. 35(13):853-60 (Apr. 2015), *available at* DOI: 10.1093/eurheartj/eht426; Lan Y, et al., Transportation Noise Exposure and Anxiety: A Systematic Review and Meta-Analysis, Environ Res. 191:110118 (Dec. 2020), *available at* DOI: 10.1016/j.envres.2020.110118; Li A, et al., Environmental Noise Exposure and Mental Health: Evidence From a Population-Based Longitudinal Study, Am J Prev Med. S0749-3797(22)00156-8 (Apr. 21, 2022), *available at* DOI: 10.1016/j.amepre.2022.02.020; Lim Y-H, et al., Long-Term Exposure to Air Pollution, Road

7

00177627

Traffic Noise, and Heart Failure Incidence: The Danish Nurse Cohort, J Am Heart Assoc. 10(20):e021436 (Oct. 19, 2021), *available at* DOI: 10.1161/JAHA.121.021436; Lim Y-H, et al., Long-Term Exposure to Road Traffic Noise and Incident Myocardial Infarction: A Danish Nurse Cohort Study, Environ Epidemiol 5(3):e148 (Apr. 22, 2021) *available at* DOI: 10.1097/EE9.0000000000000148; Liu C, et al., The Associations Between Traffic-Related Air Pollution and Noise With Blood Pressure in Children: Results from the GINIplus and LISAplus studies, Int J Hyg Environ Health 217(4-5):499-505 (Apr. – May 2014), *available at* DOI: 10.1016/j.ijheh.2013.09.008; Liu S, et al., Long-Term Air Pollution and Road Traffic Noise Exposure and COPD: the Danish Nurse Cohort, Eur Respir J. 58(6):2004594 (Dec. 2, 2021), *available at* DOI: 10.1183/13993003.04594-2020; Liu S, et al., Long-Term Exposure to Ambient Air Pollution and Road Traffic Noise and Asthma Incidence in Adults: The Danish Nurse Cohort, Environ Int. 152:106464 (Jul. 2021), *available at* DOI: 10.1016/j.envint.2021.106464; Mac Domhnaill CM, et al., Road Traffic Noise and Cognitive Function in Older Adults: A Cross-Sectional Investigation of The Irish Longitudinal Study on Ageing, BMC Public Health 21(1):1814 (Oct. 8, 2021), *available at* DOI: 10.1186/s12889-021-11853-y; Magnoni P, et al., Residential Exposure to Traffic-Borne Pollution as a Risk Factor for Acute Cardiocerebrovascular Events: A Population-Based Retrospective Cohort Study in a Highly Urbanized Area, Int J Epidemiol 50(4):1160-1171 (Aug. 30, 2021), *available at* DOI: 10.1093/ije/dyab068; Okazaki Y, et al., Characterizing Potential Risk Triggered by Road Traffic Noise in Comparison with Typical Air Pollutants $NO_2$ and $PM_{2.5}$, Environ Syst Decis. 41(1):147-162 (2021), *available at* DOI: 10.1007/s10669-021-09800-8; Pitchika A, et al., Long-Term Associations of Modeled and Self-Reported Measures of Exposure to Air Pollution and Noise at Residence on Prevalent Hypertension and Blood Pressure, Sci Total Environ. 593-594:337-346 (Sept. 1, 2017), *available at* DOI: 10.1016/j.scitotenv.2017.03.156; Sanok S, et al., Road Traffic Noise Impacts Sleep Continuity in Suburban Residents: Exposure-Response Quantification of Noise-Induced Awakenings from Vehicle Pass-Bys at Night, Sci Total Environ. 817:152594 (Apr. 15, 2022), *available at* DOI: 10.1016/j.scitotenv.2021.152594; Mette Sørensen, et al., Road and Railway Noise and Risk for Breast Cancer: A Nationwide Study Covering Denmark, Environ Res. 195:110739 (Apr., 2021), *available at* DOI: 10.1016/j.envres.2021.110739; Stansfeld SA, Noise Effects on Health in the Context of Air Pollution Exposure, Int J Environ Res Public Health 12(10):12735-60 (Oct. 14, 2015), *available at* DOI: 10.3390/ijerph121012735; Stansfeld S, Clark C, Health Effects of Noise Exposure in Children, Curr Environ Health Rep. 2(2):171-8 (Jun., 2015), *available at* DOI: 10.1007/s40572-015-0044-1; Stansfeld S, et al., Road Traffic Noise, Noise sensitivity, Noise Annoyance, Psychological and Physical Health and Mortality, Environ Health 20(1):32 (Mar. 25, 2021), *available at* DOI: 10.1186/s12940-021-00720-3; Tangermann L, et al., The Association of Road Traffic Noise with Problem Behaviour in Adolescents: A Cohort Study, Environ Res. 207:112645 (May 1, 2022), *available at* DOI: 10.1016/j.envres.2021.112645; Thacher JD, et al., Long-Term Exposure to Transportation Noise and Risk for Type 2 Diabetes in a Nationwide Cohort Study from Denmark, Environ Health Perspect 129(12):127003 (Dec., 2021), *available at* DOI: 10.1289/EHP9146; Tiesler CMT, et al., Exposure to Road Traffic Noise and Children's Behavioural Problems and Sleep Disturbance: Results from the GINIplus and LISAplus Studies, Environ Res. 123:1-8 (May, 2013), *available at* DOI: 10.1016/j.envres.2013.01.009; van Kempen E, et al., The Quantitative Relationship Between Road Traffic Noise and Hypertension: A Meta-Analysis, J Hypertens 30(6):1075-86 (Jun., 2012), *available at* DOI:

8

00177628

not fully address the health impacts from the anticipated long-term increases in noise under the Preferred Alternative or meaningfully consider the literature describing adverse health impacts from noise.

Seventh, the FEIS acknowledges that the Preferred Alternative will remove many acres of green space and trees along the route, see e.g., FEIS at 5-97, 5-107-5-108, 5-180, but fails to discuss the adverse impacts of a decrease in green space like health-related decreases in quality of life.[10]

Eighth, as discussed in Dr. Bialek's comments on the FEIS, the soil near the roadways contains lead deposited during the decades when motor vehicles used leaded gasoline. The DEIS explains that the companies implementing the Preferred Alternative must test the soil and mitigate lead hazards. See DEIS at R-30. However, the FEIS does not discuss any soil sampling or the extent of proposed testing and mitigation, how much that mitigation might cost, or how it will be performed, nor when or how the health impacts from activities disturbing lead-contaminated soil will be mitigated. There is no indication that that any final approval of the Preferred Alternative

---

10.1097/HJH.0b013e328352ac54; van Kempen EE, Kruize H, Boshuizen HC, Ameling CB, Staatsen BA, de Hollander AE, The Association Between Noise Exposure and Blood Pressure and Ischemic Heart Disease: A Meta-Analysis, Environmental Health Perspectives 110: 307-317 (2002), *available at* DOI: 10.1289/ehp.02110307; Voss S, et al., ENVINT-D-20-01309: Long-Term Exposure to Air Pollution, Road Traffic Noise, Residential Greenness, and Prevalent and Incident Metabolic Syndrome: Results from the Population-Based KORA F4/FF4 Cohort in Augsburg, Germany, Environ Int. 147:106364 (Feb., 2021), *available at* DOI: 10.1016/j.envint.2020.106364; Wang T-C, et al., Association Between Exposure to Road Traffic Noise and Hearing ImpAirment: A Case-Control Study, J Environ Health Sci Eng. 19(2):1483-1489 (Jul. 20, 2021), *available at* DOI: 10.1007/s40201-021-00704-y; Weyde KV, et al., A Longitudinal Study of Road Traffic Noise and Body Mass Index Trajectories from Birth to 8 Years, Epidemiology 29(5):729-738 (Sept. 2018), *available at* DOI: 10.1097/EDE.0000000000000868; WHO (World Health Organization), Guidelines for Community Noise (1999), *available at* www.who.int/docstore/peh/Noise/guidelines2.html; Yli-Tuomi T, et al., Exposure-Response Functions for the Effects of Traffic Noise on Self-Reported Annoyance and Sleep Disturbance in Finland: Effect of Exposure Estimation Method, Int J Environ Res Public Health 19(3):1314 (Jan. 25, 2022), *available at* DOI:10.3390/ijerph19031314.

[10] Alizadeh G, et al., Social, Economic, Technological, and Environmental Factors Affecting Cardiovascular Diseases: A Systematic Review and Thematic Analysis, Int J Prev Med. 13:78 (April 2022), *available at* https://www.ijpvmjournal.net/article.asp?issn=2008-7802;year=2022;volume=13;issue=1;spage=78;epage=78;aulast=Alizadeh;type=0; Moitra S, et al., Roles of the Physical Environment in Health-Related Quality of Life in Patients with Chronic Obstructive Pulmonary Disease, Environ Res. 203:111828 (Jan. 2022), *available at* DOI: 10.1016/j.envres.2021.111828; Bereziartua A, et al., Exposure to Surrounding Greenness and Natural-Cause and Cause-Specific Mortality in the ELAPSE Pooled Cohort, Environ Int. 11:166:107341 (June 2022), *available at* DOI: 10.1016/j.envint.2022.107341.

00177629

will be conditioned on a binding obligation on the part of the companies to mitigate this serious impact.

Ninth, the FEIS does not address impacts from platinum and other palladium group substances that are emitted by catalytic converters as air emissions and contaminate soil and water through air deposition. In fact, the FEIS does not even mention the health impacts from these toxic substances, even though recent studies have characterized these impacts.[11]

Thank you for allowing me to submit this letter as part of your Chapter's review of the FEIS document.

Sincerely,

*Roselie A Bright*

Roselie Ann Bright, Sc.D., M.S.

---

[11] Khaiwal Ravindra, et al., Platinum Group Elements in the Environment and Their Health Risk, Sci Total Environ 318(1-3):1-43 (Jan. 5, 2004), DOI: 10.1016/S0048-9697(03)00372-3; Wiseman, CLS et al., Platinum Group Element and Cerium Concentrations in Roadside Environments in Toronto, Canada, Chemosphere, 145:61-7 (Feb. 2016), DOI: 10.1016/j.chemosphere.2015.11.056; Savignan L, et al., Platinum Group Elements Contamination in Soils: Review of the Current State, Chemosphere 271:129517 (2021 May), DOI: 10.1016/j.chemosphere.2020.129517.

00177630

# ZAMURS AND ASSOCIATES, LLC

Transportation   Air Quality   Energy   Climate Change   Sustainability

**Review and Comment**

**I-495 and I-270 Managed Lanes Study**

**Final Environmental Impact Study**

**And**

**Final Section 4(f) Evaluation**

**Dated June 2022**

In its comments of November 6, 2020, and November 30, 2021, the Sierra Club Maryland Chapter offered highly technical, specific, and detailed comments concerning the failings of the air quality, greenhouse gas and environmental justice aspects of the DEIS and SDEIS. In reviewing the FEIS and its response to comments, it is highly disappointing to see that the comments have not been sufficiently or significantly addressed. In many cases, the comments have been simply ignored. In other cases, they have been lumped together with other comments to facilitate a very generalized and inadequate response. In addition to new information and comments presented below, all previous comments are to be considered as outstanding and are remanded for further consideration.

**Transportation Conformity**

Under the transportation conformity rule (40 CFR Parts 51 and 93), a regionally significant transportation project must be found to conform to the purpose of the State Implementation Plan before it can be approved and adopted. Paragraph 51.400(d) indicates that FHWA projects must be found to conform before they are adopted, accepted, approved, or funded by FHWA. Similarly, §51.450(b) and 93.129(b) forbid recipients of Federal transportation assistance (for this project that is Maryland Department of Transportation) to approve a regionally significant project unless it is included in a conforming long-range Plan and Transportation Improvement Program (TIP). For a project approval, it must have the same design scope and concept as the project included in the conforming Plan or TIP (§ 51.422 (b)(1) and (c)(1) and 93.115 (b)(1) and (c)(1)). Examination of the FEIS for the project, specifically Appendix K, the Final Technical Air Quality Report, and the conformity determination of the "Visualize 2045, a Long-Range Transportation Plan for the National Capital Region", adopted June 2022, identified

1

**Exhibit G**

00177664

a substantial difference in the design scope and concept of the project as included in the conformity determination and the project as described in the FEIS, that make approval of the FEIS and the project by FHWA and Maryland Department of Transportation untenable.

The Air Quality Appendix identifies the opening year for the project as 2025. However, the air quality conformity determination distinguishes several important design elements of the project to be completed in 2030. These elements include:

1. I-270 Northbound Toll Lanes, I-370 to Middlebrook Road;
2. I-270 Southbound Toll Lanes, Middlebrook Road to I-370;
3. I-270 Northbound Toll Lanes, Middlebrook Road to MD 121;
4. I-270 Southbound Toll Lanes, MD 121 to Middlebrook Road; and
5. I-270 Toll Lanes, MD 121 to I 70 / US 40.

These design elements may contribute significant emission additions to the regional emissions for ozone precursors in the conformity determination. By not including these design elements in the emissions analysis for the horizon year 2025, the regional emissions analysis may be severely underestimating ozone precursor emissions from the transportation system. It should be noted that the 2025 analysis year comes closest to the mobile source emissions budget, as shown in Figures 6 and 7 of the conformity determination, indicating a greater possibility of not meeting the appropriate emissions test. With the exclusion of these design elements from the 2025 horizon year emissions analysis, the design scope and concept of the project as described in the FEIS and as described in the most recent conformity determination are not consistent.

The opening year of 2025 in the FEIS and the opening year of 2025 of some design elements as shown on the conformity determination seems highly unlikely. Since the conformity determination horizon year of 2025 analyzed for ozone precursors, the design elements as modeled in the determination would have to be open by the summer of 2025 (since ozone is a summertime pollutant) to properly account for the emissions from those design elements. It is highly unlikely that this estimated $3.75 – 4.25-billion-dollar project will be able to be completed in three years from now. In fact, the FEIS recognizes that construction is expected to last five years (Page 96, Appendix F – Final Community Affects Assessment and Environmental Justice Analysis Technical Report) and Appendix B of Appendix K, which considers construction greenhouse gas emissions and indicates the project will not be open in 2027. Thus, an opening year for the project of 2025 is not feasible and, therefore, the project FEIS and the conformity determination do not have the same design scope and concept. A more reasonable opening year should be determined, and both the air quality analysis and the conformity determination should be re-analyzed with a new opening year to determine the project's impact on air quality, both on a project level and on a regional basis.

As explained above, because the design scope and content of the project as described in the FEIS and as described in the National Capital Transportation Planning Board conformity determination is not consistent with one another, both FHWA and Maryland DOT cannot approve the FEIS. Under §51.406 and 93.307, this project must be treated as a project not from a conforming TIP and Plan. Accordingly, the National Capital Transportation Planning Board must re-evaluate conformity with the same opening year for all elements of the project, consistent with the FEIS. Upon completion, FHWA and Maryland DOT could approve the FEIS (assuming a successful comparison to the motor vehicle emissions budgets). Alternatively, FHWA/Maryland DOT must perform a regional ozone precursor emissions analysis to

2

00177665

document that the project, as completed, will not cause the motor vehicle emissions budgets to be exceeded.

## Air Quality/NEPA issues

For a project of this scale and cost, it is surprising and disappointing to read the numerous inconsistencies, inaccuracies, and misstatements between the DEIS and its air quality study and the FEIS and its air quality study.

The response to comments (MLS_FEIS_App%20T%20DEIS%20&%20SDEIS%20C&R_T.2.A_Volume%203_June%202022p.pdf) relies on the analyses for carbon monoxide and the conformity determination (cited above) as indicating that the project will not cause a new exceedance of a National Ambient Air Quality Standard (NAAQS) or exacerbate an existing violation. This is not correct.  The conformity determination only considered ozone precursors. It did not consider any other pollutants. The Air Quality studies (DEIS and FEIS) did examine carbon monoxide (although with many technical errors). However, the pollutants that cause the greater health impacts, $PM_{2.5}$, $PM_{10}$ and $NO_2$ remain unexamined and unconsidered, despite the legal obligation to assess these pollutants under NEPA.

The Response to Comments document (cited above) indicates the Sierra Club Maryland Chapter "requested" analyses for these pollutants. That is not correct. Under NEPA, project sponsors must take a "hard look" at the potential adverse impacts of the project and mitigate to the extent practicable. The analysis for these pollutants is part of that "hard look". In their comments on the DEIS (November 6, 2020) and on the SDEIS (November 30, 2021), the Sierra Club Maryland Chapter offered numerous studies that demonstrate the potential linkage of transportation projects to elevated emissions, elevated concentration levels and increased adverse health effects. To add to this evidence, two additional studies are brought forth for consideration as to the negative health effects of these pollutants.

The Supplement to the 2019 Integrated Science Assessment for Particulate Matter (EPA/600/R-22/028, May 2022) examined recent health studies related to exposure to ambient $PM_{2.5}$ levels. The study found elevated incidences of cardiovascular effects and mortality at a short-term ambient level of 7.1 ug/m$^3$ over a 24-hour period average and a long-term ambient level of 5.9 ug/m$^3$ on an annual average. This study also found enhanced susceptibility to PM related health effects in EJ communities. This EPA study will likely lead to a tightening of the NAAQS for $PM_{2.5}$.

A recent article in the Guardian (https://www.theguardian.com/environment/2022/jun/03/car-tyres-produce-more-particle-pollution-than-exhausts-tests-show, June 3, 2022) demonstrated that tire wear produced high levels of particulates, significantly greater than produced by exhaust emissions. The particulates produced a wide range of toxic compounds. While this study focused on ultrafine particulates, it nevertheless documents the linkage between transportation and health impacts. There are currently no ambient air quality standards for ultrafine particulates but there are standards for larger particulates ($PM_{2.5}$ and $PM_{10}$). The project sponsors should use $PM_{2.5}$ and $PM_{10}$ as proxies for particulates in general and address the health concerns associated with particulate emissions by performing the required analyses for $PM_{2.5}$ and $PM_{10}$.

3

00177666

These two additional studies plus all the previously cited studies indicate that recent evidence shows the health connection between transportation and transportation projects and increased risk of adverse health effects. Instead of addressing this issue in a technically sound manner, the project sponsors rely on outdated FHWA guidance as an excuse for not performing an analysis for these pollutants, The cited guidance, GUIDANCE FOR PREPARING AND PROCESSING ENVIRONMENTAL AND SECTION 4(F) DOCUMENTS (FHWA TECHNICAL ADVISORY, T 6640.8A, October 30, 1987) is over 30 years old and only addresses carbon monoxide and ozone precursors. It was developed prior to the promulgation of the NAAQS for $PM_{2.5}$ (1997), $PM_{10}$ (1987) and $NO_2$ (2010) and has not been updated to account for these pollutants.

USEPA also recognized the microscale aspect of these pollutants by establishing both a short-term NAAQS (1 hour or 24-hour average) and a long-term NAAQS (annual average). In its November 6, 2020, comments on the DEIS, the Sierra Club Maryland Chapter documented how concentrations of these pollutants can vary substantially over short distances. Reliance on regulatory fixed air quality monitors many miles away from the project area does not accurately depict actual concentrations and exposures that residents and visitors in the project area are subject to. Nevertheless, in its November 30, 2021, comments on the SDEIS, the Sierra Club Maryland Chapter documented that the nearest regulatory monitors exceed the concentration level of the NAAQS for $PM_{2.5}$, indicating that elevated levels likely exist in the project area, and it is critical to determine whether the project will exacerbate those elevated concentrations as well as how much the project will increase concentrations closer to the highway and what the health impacts associated with those increased concentrations will be.

The traffic analysis continues to show that traffic levels along the project exceed the 125,000 annual average daily traffic count and it continues to fail to document levels of diesel truck traffic. In designated $PM_{2.5}$ nonattainment and maintenance areas, that level of traffic (along with a needed diesel truck percentage) would be sufficient to trigger a micro-scale $PM_{2.5}$ analysis, according to USEPA guidance (PM Hot-spot Guidance Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas, EPA-420-B-21-037 October 2021). The attainment/nonattainment status of an area should not be the only determinant for this type of analysis. In order to provide public health protection to the residents and visitors in the area, the project sponsors must perform a $PM_{2.5}$ analysis to ascertain the potential air quality impacts of this major project, especially since it appears the project would otherwise meet the thresholds for an analysis in a nonattainment or maintenance area.

### Environmental Justice

Perhaps no section of the FEIS is as full of misleading and inaccurate statements as in Appendix F, Final Community Affects Assessment and Environmental Justice Analysis Technical Report, particularly with regard to air quality and the effects of the project on identified environmentally disadvantaged communities. Page 86 of Appendix F concedes that "(E)xposure to traffic-related air pollution would result from short-term construction activities (approximately four to five years) and long-term highway operations. EJ populations who live with high EPA and MD EJSCREEN EJ index scores … may experience air quality impacts from construction activities and highway operations more acutely than populations with lower EJ index scores." Yet, Appendix F inaccurately states on Page 85 "… air quality modeling at a localized level – the level at which this EJ analyses are otherwise conducted – is not available.

4

00177667

Furthermore, due to industry-wide limitations and tools/techniques for measuring project-specific health outcomes, detailed air quality effects on public health effects cannot be projected for any specific location along the Phase I South limits."

The statement on Page 85 is incorrect. The tools for doing these types of analyses are well known and available. For the criteria pollutants ($PM_{2.5}$, $PM_{10}$ and $NO_2$) emission and dispersion models are approved by USEPA for use in these types of analyses. Determination of health outcomes would be based on comparing the results from these models to the relevant peer-reviewed literature on concentration-response relationships for those pollutants. For mobile source air toxics, the November 6, 2020, comments by the Sierra Club Maryland Chapter documented examples of health risk assessment procedures for transportation projects around the country and application of a procedure to a specific transportation project. The November 6, 2020, comments also offered air quality guideline values that can be used to compare the outcome of an analysis to possible health outcomes. Although the uncertainties of health outcomes and impacts for mobile source air pollutants may be greater than those for criteria pollutants, nevertheless it is not appropriate for the project sponsors to rely on outdated and misleading guidance from FHWA to avoid informing the public of air quality and health impacts of the project. Table 3-3 of the Appendix K, Final Air Quality Technical Report, shows increases in emissions for all the mobile source air pollutants, ranging from 4.7% to as high as 6.5%. The project sponsors should not impose their judgement that the possible uncertainties in some aspects of a health risk assessment are too large and use that as an excuse not to disclose the impacts to the residents and visitors of the project area and to decision makers. Instead, the project sponsors must fully and openly assess the health impacts of the increases in mobile source emissions and let the public and decision makers decide whether those impacts are acceptable for this project to go forward. Only then would an analysis and a project EIS comply with the requirements of NEPA.

Table 5.4 of Appendix F identifies EJ communities in Gaithersburg, Rockville, North Bethesda, and Potomac. Appendix H of the Final Traffic Analysis Technical Report (Appendix A of the FEIS) identifies locations in the project area that will suffer from bottlenecks and general traffic congestion based on Level of Service (LOS) F. An LOS of F signifies severe congestion. Not surprisingly, many of these bottlenecks and congested stretches of the Preferred Alternative occur on EJ communities. According to Appendix H, some of these locations will experience the highest vehicle densities of the entire project area. Some examples of bottlenecks and severe congestion in EJ areas include:

- I-270 between Maryland 85 and Maryland 117
- I-270/Montrose Road interchange
- I-270 between Shady Grove Road and I-370
- I-270 W Spur interchange with I-495
- I-495 between Clara Barton Parkway and Maryland 201

In these already-overburdened communities, it is imperative that negative air quality impacts do not occur or are not exacerbated. Therefore, the project sponsors are obligated to examine potential concentrations of $PM_{2.5}$, $PM_{10}$ and $NO_2$ under NEPA and under the intent of the EJ regulations and guidance. This is especially important since, as is generally well understood and as Appendix H confirms, the longest stretches of congestion and most severe bottlenecks will be in the general-purpose lanes, compared to the HOT lanes. Numerous Figures in the FEIS and Appendices show that the general-purpose lanes will be on the outside of the roadway and closer to the communities impacted. The

5

November 6, 2020, comments by the Sierra Club Maryland Chapter showed how concentrations of air pollutants emitted by traffic increase exponentially with decreasing distance from the emission source. Thus, as the roadway is expanded, the more congested general-purpose lanes will be shifted closer to the community, increasing exponentially the likelihood of a significant negative air quality impact. The project sponsors must perform these analyses to determine whether this is the case and employ mitigation measures, if needed, to lessen the impact.

**Particulate Matter Considerations**

Regarding $PM_{2.5}$ emissions and concentrations, the Sierra Club Maryland Chapter explained in its November 6, 2020, comments pertaining to the DEIS, the applicability of transportation conformity requirements for the Washington D.C.-Maryland-Virginia area. As explained in those comments, this area should be considered as a $PM_{2.5}$ orphan maintenance area. The court case that established orphan nonattainment/maintenance areas (South Coast Air Quality Management District v EPA, DC Cir. 2018) and EPA's implementing guidance with respect to transportation conformity (Transportation Conformity Guidance for the South Coast II Court Decision, EPA-420-B-18-050 November 2018) are silent on the applicability of the decision to former $PM_{2.5}$ nonattainment areas. However, conformity requirements cannot differ from pollutant to pollutant but are all governed by the general requirements of the Clean Air Act Amendments of 1990. Since conformity requirements for ozone orphan areas are non-quantitative, this would likely be the case for $PM_{2.5}$ areas as well for regional emissions. However, it is expected that $PM_{2.5}$ hot-spot analysis requirements would apply to major projects (such as the I-270/I-495 Managed Lanes project) in these types of areas. The importance of doing $PM_{2.5}$ analyses for NEPA purposes are explained above and in the previous two sets of comments by the Sierra Club Maryland Chapter. The transportation conformity aspects only add additional urgency to performing these analyses.

**Climate change**

The Preferred alternative will increase greenhouse gas emissions by close to 40 thousand tons of CO2 equivalent (CO2eq) as shown in Table 3-5 of Appendix K, an unnecessary increase on these emissions that will have to be offset by other means.

In its November 30, 2021, comments, the Sierra Club Maryland Chapter indicated it was contrary to NEPA to submit a SDEIS for the preferred alternative without including an analysis of the greenhouse gas emissions associated with the construction and maintenance of the preferred alternative. The FEIS does have such an analysis. Unfortunately, it is presented in a manner that it is impossible to isolate the emissions associated with the construction and maintenance of the preferred alternative compared to the No-Build alternative.

The construction greenhouse gas emission analysis assumes construction starts in 2023 and presents results for a 30-year lifespan, or 2053. The assumed completed project operational greenhouse gas emissions analysis goes out to 2045 (Tables 3-4 and 3-5 of Appendix K), making a direct comparison difficult. Appendix K greenhouse gas emissions are presented in tons per year while conventional reporting of greenhouse gas emissions is presented in metric tons per year.

6

00177669

In order to be able to isolate the construction and maintenance effects of the project correctly, the analysis should have presented the No-Build operational emissions from the affected transportation network plus maintenance emissions due to maintaining the existing roadway in place compared to greenhouse gas emissions (including upstream materials emissions, transportation of materials to the site emissions and direct construction equipment emissions) from the construction of the project, emissions of maintaining the additional lanes, and effects of construction on the operation of the roadways (detours and delays from construction). It should be noted that the greenhouse gas construction emission analysis incorrectly assumed speeds on the facilities during construction would be unchanged from normal operating conditions because all traffic lanes would remain open (Table on Page 4 of Appendix B of Appendix K). It is well known that during construction, the capacity of the roadways will be reduced by drivers slowing their normal driving speeds due to construction activities in the median or on the shoulders and/or due to lane narrowing during construction. Thus, assuming normal operating speeds during construction severely underestimates usage greenhouse gas emissions and the greenhouse gas emissions analysis results in the FEIS may be significantly understated.

Nevertheless, using the information that is available in the FEIS and Appendix K, it is possible to get a rough estimate of the true impact of this project on climate change. Using the annualized construction greenhouse gas emissions column from Table 3-6 as the best available estimate of combined annual construction emissions and operating emissions and converting the value to million metric tons yields 1.2 mmt (million metric tons). Table 3-5 of Appendix K estimates an additional 39,792 tons of greenhouse gas emissions from the preferred alternative. Converting this value to million metric tons yields and additional 0.36 mmt. Combining these values, produces a best available estimate of 1.56 mmt of total greenhouse gas emissions associated with this project. This means that starting in 2023 as constructions is expected to begin, greenhouse gas emissions associated with the project will increase every year until the level of 1.56 mmt of greenhouse gas emissions is reached (on an annualized basis). Although it is not possible to distinguish the actual greenhouse gas emissions from the analysis in Appendix K, it is reasonable to extrapolate that this high level of greenhouse gas emissions will continue for many years as construction proceeds and the roadways remain open during construction.

Below are Tables 3.1 and 4.1 from Appendix J of the Maryland 2030 Greenhouse Gas Emissions Reduction Act (GGRA) Plan.[1] Appendix J is the Maryland DOT component of the Plan and documents what steps and strategies are necessary to achieve Maryland's climate goals. Table 3.1 shows emission benefits and the dollar costs of various funded strategies in place to reduce greenhouse gas emissions from the transportation sector in Maryland. Table 4.1 shows additional strategies that are unfunded. The cost-benefit of amounts of mmt reduction of these strategies contrast with the I-495/I-270 Managed Lanes Phase 1 South project that will emit 1.56 mmt every year.[2] Given the urgent need to reduce greenhouse gas emissions, drastic impacts of climate change (increased extreme temperatures, increased wildfires, increased droughts, increased extreme rainfall, etc.), and the requirements of Maryland's Climate Solutions Now Act (SB528) which sets a statewide GHG reduction goal of 60% by

---

[1] https://mde.maryland.gov/programs/Air/ClimateChange/Pages/Greenhouse-Gas-Emissions-Reduction-Act-(GGRA)-Plan.aspx

[2] For another reference point on greenhouse gas emissions, the average passenger vehicle emits about 404 grams of CO2 per mile, and a typical passenger vehicle emits about 4.6 metric tons of carbon dioxide per year. Source: EPA, Greenhouse Gas Emissions from a Typical Passenger Vehicle, last updated June 30, 2022, *available at* https://www.epa.gov/greenvehicles/greenhouse-gas-emissions-typical-passenger-vehicle.

7

00177670

2031 and net zero by 2045, it would seem that Maryland and FHWA could find a more beneficial project to improve quality of life and fight climate change. Montgomery County, where the project is located, has also adopted ambitious greenhouse gas reduction goals in its climate action plan, which aims to cut greenhouse gas emissions 80% in five years and to eliminate them by 2035.[3]

Table 3.1 Policy Scenario 1 Strategies Summary Table

| Strategies (Funded) | GHG Emission Reduction (mmt $CO_2e$) | Estimated Costs ($M) |
|---|---|---|
| 2018/2019 MPO Plans & Programs yield lower annual VMT growth (estimated at 0.6% per year growth) | 1.712 | $10,146.5 |
| On-Road Technology (CHART, Traveler Information) | 0.142 | $247.0 |
| Freight and Freight Rail Programs (National Gateway, Howard Street Tunnel, MTA rail projects) | 0.037 | $503.2 |
| Public Transportation (New rail or bus capacity or frequency, improved operations) | 0.011 | $2,009.8 |
| Public Transportation (50% EV transit bus fleet) | 0.074 | $625.1 |
| Intercity Transportation Initiatives (Amtrak NE Corridor, Intercity bus) | 0.006 | $0.0 |
| Transportation Demand Management | 0.146 | $63.9 |
| Pricing Initiatives (Electronic Tolling) | 0.022 | $188.5 |
| Bicycle and Pedestrian Strategies (current program continuation and expansion through 2030) | 0.024 | $263.8 |
| Port of Baltimore Drayage Track Replacements | 0.005 | $18.0 |
| BWI Airport parking shuttle bus replacements | <0.001 | $26.1 |
| MDOT Vehicle Fleet (Fleet Innovation Plan) | 0.006 | n/a |
| **Total Policy Scenario #1** | **2.19** | **$14,091.9** |

---

[3] Christine Zhu, Montgomery County Council votes to require climate impact assessment for proposed legislation, Bethesda Beat, July 12, 2022, available at https://bethesdamagazine.com/bethesda-beat/government/montgomery-county-council-votes-to-require-climate-impact-assessment-for-proposed-legislation/.

8

00177671

Table 4.1 Policy Scenario 2 Strategies Summary Table

| Strategies (Unfunded) | GHG Emission Reduction (mm $CO_2e$) | Estimated Costs ($M) |
|---|---|---|
| **Emerging Strategies** | | |
| TSMO/Integrated Corridor Management (Limited Access System) | 0.08 to 0.14 | $108 to $152 |
| TSMO/Integrated Corridor Management (Arterial System) | 0.10 to 0.18 | $453 to $680 |
| Variable Speeds/Speed Management | 0.01 to 0.02 | $108 to $152 |
| Intermodal Freight Centers Access Improvement | 0.02 | $2,240 to $3,136 |
| Commercial Vehicle Technologies (Idle Reduction, Low-Carbon Fleet, Dynamic Routing) | 0.03 to 0.05 | Uncertain § |
| Regional Clean Fuel Standard | 0.895 | $148 |
| Eco-Driving (informal implementation underway) | 0.042 | $3 to $5 |
| EV Market Share Ramp-up of an additional 255,000 vehicles | 0.88 | $140 |
| Extended CAFE Standards (Model Years 2026-2030) | 0.80 | $0 |
| Transit capacity/service expansion (fiscally unconstrained) | 0.019 to 0.039 | $2,307 to $2,659 |
| MARC Growth and Investment Plan / Cornerstone Plan | 0.038 to 0.064 | $1,078 |
| Transit-Oriented Development (TOD) Build-Out (20 zones) | 0.033 | $4 to $8 |
| 50% to 75% EV Transit Bus Fleet | 0.081 to 0.103 | $93 |
| Expanded TDM strategies (dynamic) | 0.274 to 0.972 | $15 to $30 |
| Expanded Telework | 0.300 to 0.793 | $100 to $200 |
| Expanded bike/pedestrian system development | 0.040 to 0.051 | $103 |
| **Innovative Strategies** | | |
| Autonomous/Connected Vehicle Technologies | 0.68 to 0.73 | $43 to $63 |
| Zero-Emission Truck Corridors | 0.03 to 0.06 | $34 to $128 |
| Freight Villages/Urban Freight Consolidation Centers | 0.03 to 0.04 | $4,705 to 6,893 |
| Speed Management on Freeways (increased enforcement) | 0.04 to 0.20 | $7 to $14 |
| High-Speed Rail/SCMAGLEV | 0.011 to 0.021 | $45,300 to $47,300 |
| Pay-As-You-Drive Insurance | 0.123 to 0.292 | n/a §§ |
| **Total Policy Scenario #2 "Emerging and Innovative"** | **4.539 to 6.417** | **$56,893 to $62,886** |

§ Policy change with potential incentive program. Uncertain costs.
§§ Policy action with supportive technology/programs offered by private sector.

**Unaddressed or Insufficiently Addressed Previous Comments**

The following comments from the Sierra Club Maryland Chapter were ignored or not sufficiently addressed and are cited again as a failing of the FEIS.

November 6, 2020

1) Comment II. 1 – The DEIS does not perform Sufficient Emissions and Health Analyses for Particulate Matter ($PM_{10}$ and $PM_{2.5}$) or Nitrogen Dioxide ($NO_2$).

   There is very little if any discussion related to $PM_{10}$ and $NO_2$ in the FEIS and the Response to comments

2) Comment II.1.a – Fine Particulate Matter Conformity
   There is very little if any discussion related to this in the FEIS and the Response to Comments. See above for additional comments.

3) Comment II.2 – The DEIS's Air Quality Analysis Missed Parking Lots
   There is very little, if any, discussion related to this in the FEIS and the Response to Comments. Parking lots are an important emission source and can have elevated levels of transportation-related pollutants associated them. These emissions sources are not included in background

9

00177672

concentrations and emissions must be included when analyzing pollutant hot-spot situations for a technically sound and complete analysis.

4) Comment II.4- The DEIS Fails to Sufficiently Address Mobile Source Air Toxics

Although a mobile source air toxics emissions analysis was performed, the comments on completing this analysis to make it a health risk assessment have not been addressed.

5) Comment II. 5 – The DEIS Does Not Properly Perform the Necessary Carbon Monoxide Hot-Spot Analysis

The comments on temperature and stability class have not been addressed.

November 30, 2021

1) Comment IV.B. 1 – Particulate Matter and Nitrogen Dioxide

There is very little if any discussion related to $PM_{10}$ and $NO_2$ in the FEIS and the Response to comments

2) Comment IV.B. 2 – Carbon Monoxide
The comments on source-receptor distance and persistence factor have not been addressed.

3) Comment IV. B. 3 – Mobile Source Air Toxics

See above comment regarding failure to perform a health risk assessment

4) Comment IV. B. 4 – Parking Lots

See comment above. There is very little, if any, discussion related to this in the FEIS and the Response to Comments.

5) Comment IV. C. – The SDEIS Fails to Address Air Quality Concerns in Environmental Justice Communities

The comments on adequacy of analysis sites and accounting for Environmental Indicators have not been addressed.

6) Comment IV. F.- Information in the SDEIS Reveals Numerous Additional Air Quality-Related Concerns that the SDEIS Fails to Analyze

There is very little, if any, discussion related to this in the FEIS and the Response to Comments.

There are also several air quality related inconsistencies within the FEIS and between the FEIS and the earlier DEIS and SDEIS. Namely:

—— The mobile source air toxics and greenhouse gas analyses used the current EPA-approved emissions model, MOVES 3.0.1. Yet the carbon monoxide analysis relies on the older version of the model, MOVES 2014b. A consistent air quality analysis should use the same emission model for all transportation-related air pollutants.

10

00177673

—— Different traffic networks were used in earlier analyses compared to the analyses in the FEIS. Page 9 of Appendix K, the Final Technical Air Quality Report, indicates two parameters were removed from the development of the traffic network, compared to the traffic network used in the earlier project documents. One parameter, the travel time criterion, likely materially affects the results of the air quality analysis. Travel time can be a surrogate for speed, delay, or congestion, all of which affect emissions and therefore, air quality levels. For a proper air quality analysis, all traffic roadways that are affected by the project, including those whose travel time is affected substantially should be included in the network. The second parameter, called "artifacts", are not sufficiently defined, or discussed. This could potentially lead to an underestimation of emissions, depending on the links (or other parameters) removed.

—— It is unclear from Appendix K whether the same roadway network was used to generate emissions for the mobile source air toxics and greenhouse gas emissions analyses. Page 23 of Appendix K states "… the Project has analyzed GHG within MSAT affected network as well as a broader more appropriate level for GHG". Later, on the same page, it is indicated that the same network was used for both pollutants. Whichever statement is actually correct, the same traffic network should be used for both pollutants.

—— As shown in the comments by Smart Mobility, Inc. on the traffic modelling performed for this study, the traffic volumes, speeds, and levels of congestion may not have been properly determined. If so, this would affect the air quality analyses that were done for the project. This could indicate that the No-Build emissions and CO concentrations (since CO was the only pollutant for which atmospheric concentrations were calculated) were overstated, leading to an incorrect impression regarding the emissions and CO concentrations of the Preferred Alternative and its supposed benefits. Given this observation, it is especially critical that the air quality studies be re-done with correct traffic inputs. This includes re-analysis for CO, greenhouse gasses, mobile source air toxics and inclusion of PM 2.5, PM 10 and NO 2 (for the reasons explained above and in earlier comments).

11

00177674

July 18, 2022

Ms. Jeanette Mar and Mr. Jitesh Parikh
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201
jitesh.parikh@dot.gov
jeanette.mar@dot.gov

Mr. Jeffrey Folden, P.E., DBIA
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Program Deputy Director
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202
MLS-NEPA-P3@mdot.maryland.gov
oplanesMLS@mdot.maryland.gov

**Re: Comments on I-495 & I-270 Managed Lane Study Final Environmental Impact Statement and Final Section 4(f) Evaluation**

      The National Environmental Policy Act ("NEPA") mandates environmental impact statements for projects of the type and scale of the I-495 & I-270 Managed Lanes Study ("Project"). In an environmental impact statement, NEPA requires that the relevant agencies disclose significant impacts and that the public have a meaningful opportunity to review and comment on those impacts before major decisions are made. On June 17, 2022, the Federal Highway Administration ("FHWA") and the Maryland Department of Transportation State Highway Administration (the "Agencies") issued a final environmental impact statement ("FEIS") for the Project and opened a 30-day review period for the FEIS.

      The FEIS describes the Agencies' preferred alternative and appears to formally conclude the NEPA and Transportation Act 4(f) portions of the Agencies' environmental review process. Despite its length, and despite two rounds of public comments identifying flaws in the prior drafts, the FEIS and its appendices present incomplete and inadequate analyses of environmental impacts and fail to achieve the fundamental objectives of NEPA. The undersigned Organizations oppose the preferred alternative put forth in the FEIS and support the no build alternative.

      We provide the comments below to address issues raised by the FEIS. Where new information has become available since the supplemental draft environmental impact statement ("SDEIS"), it has been included and discussed. The comments provided below refer specifically to the FEIS and supplement the comments on the draft environmental impact statement ("DEIS") and SDEIS that were provided to the Agencies on November 9, 2020, and November 30, 2021, respectively, by the Maryland Chapter of the Sierra Club and other organizations. Unfortunately, the FEIS largely disregards the technical and procedural issues raised in the previous comments. Collectively, our comments present failures of the Agencies' environmental review process that, if not addressed, constitute violations of NEPA and other governing statutes that will render any record of decision invalid.

      The comments identify the Organizations' key concerns regarding the FEIS, including the FEIS's failure to:

i

- Allow meaningful public comment throughout the NEPA review process, in part by failing to provide key documents and analyses that underpin the FEIS
- Address previous flaws and new, serious flaws in the traffic analysis
- Adequately assess impacts to public health from the construction and operation of the Project
- Adequately address significant adverse effects on sensitive historic and cultural resources
- Take the required hard look at environmental justice issues.

As we have consistently noted in our comments, the environmental review process for the Project seemed designed to reach a pre-determined result, namely, to expand I-495 and I-270 with toll lanes, without meaningfully involving the public, considering viable alternatives, or considering the preferred alternative's environmental impacts.

The Agencies must not move forward with the preferred alternative or any of the fundamentally flawed build alternatives without full and proper consideration of additional, less harmful and costly alternatives that address the real needs for transportation improvements in the region and providing the public with a new environmental review document that addresses the failures identified and accords the public a meaningful opportunity to review and comment.

Sincerely,

Sierra Club Maryland Chapter[1]

Aloha Enterprises, Inc.

ArchPlan Inc.

Audubon Naturalist Society

Bikemore

Carderock Springs Citizens Association

Central Maryland Transportation Alliance

Chesapeake Climate Action Network

Citizens Against Beltway Expansion

---

[1] The Organizations would like to acknowledge Jill Grant & Associates, LLC, Norm Marshall (Smart Mobility, Inc.), John Zamurs, PhD (ZAMURS AND ASSOCIATES, LLC), Ronald Bialek, MPP, Byron Bloch, Roselie Bright, Sc.D., Shannon Browne, PhD, Arthur Katz, and Dr. Benjamin Ross, for assisting the groups in drafting these comments. We would also like to thank the many organizations and volunteers who dedicated their time and expertise to these comments, including: David Cottingham; Barbara Coufal, Co-Chair, Citizens Against Beltway Expansion; Andrea Ferster; Andrew Gallant, Janet Gallant, Co-coordinator, DontWiden270.org; National Parks Conservation Association; Paula Posas; Robert Soreng, PhD, President of the Washington Biologists' Field Club; Sally Stolz, Co-coordinator, DontWiden270.org; Peter Yarrington, Audubon Naturalist Society Volunteer.

00177761

City of Rockville

Climate Reality Montgomery County

Coalition for Smarter Growth

Conservation Montgomery

DontWiden270.org

Downtown Residents Advocacy Network (Baltimore)

Elders Climate Action Maryland Chapter

Environmental Justice Ministry, Cedar Lane Unitarian Universalist Church

Friends of Sligo Creek

Howard County Climate Action

Indivisible Howard County Maryland

Job Opportunities Task Force

Maryland Conservation Council

Maryland League of Conservation Voters

Maryland Legislative Coalition

Maryland Nonprofits

MLC Climate Justice Wing

National Parks Conservation Association

Neighbors of the Northwest Branch

North Hills of Sligo Creek Civic Association

Northern Virginia Citizens Association

Our Revolution Maryland

Policy Foundation of Maryland

Rogue Tulips LLC

Strong Future MD

iii

Takoma Park Mobilization Environment Committee

The Climate Mobilization, Montgomery County Chapter

Transform Maryland Transportation Coalition

Transit Choices

Voices Maryland

Washington Area Bicyclist Association

Washington Biologists' Field Club

Waterkeepers Chesapeake

Woodside Forest Civic Association

iv

00177763

TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................................... 1

I.    The Agencies' Environmental Review Process Fails to Satisfy Public Participation
      Requirements. ................................................................................................................... 3

      A.    The 30-day Availability Period on the FEIS Is Insufficient and Must Be Extended. ......... 3

      B.    The Agencies Have Not Tabulated the Public Comments on the FEIS, Contrary to
            Their Prior Practice, Thereby Dismissing and Erasing the Public's Voice ....................... 6

II.   The Traffic Models Used in the FEIS Are Deeply Flawed. ........................................... 11

      A.    The Traffic Modeling in the FEIS Fails to Address Critical Errors Identified by
            Commenters and Introduces New Errors. ...................................................................... 11

      B.    The U.S. DOT Must Re-Examine the Traffic Modeling in the FEIS To Ensure Its
            Integrity and the Agencies Must Address Possible Inconsistencies Between the
            FEIS's Traffic Model and the Traffic Modelling Used to Support Revenue Models
            for the Project.............................................................................................................. 14

      C.    There Are Serious Problems with the Current FEIS that Indicate the Traffic Models
            and How They Are Applied Should Be Reviewed Independently Before Final
            Decisions Are Made...................................................................................................... 18

III.  The FEIS Fails To Address Impacts to Public Health. ................................................. 20

      A.    Respirable Crystalline Silica Construction Dust Remains a Major Unaddressed
            Public Health Hazard of this Project that the Agencies Are Ignoring. ........................... 22

      B.    The FEIS Fails To Address the Health Impacts of Traffic Safety Issues from the
            Preferred Alternative..................................................................................................... 23

IV.   The FEIS's Discussion and Evaluation of Plummers Island, Certain NPS Lands, the
      Potomac River, and Impacts to the Northern Lon-Eared Bats and Other Bats Is Incomplete
      and Contrary to Applicable Legal Requirements........................................................... 25

      A.    Throughout the Environmental Review Processes, the Agencies Have Failed to
            Consider the Full Scope of Impacts to Plummers Island. ............................................. 25

      B.    The FEIS Fails to Address Several Outstanding Issues Pertaining to National Park
            Service Land Around the American Legion Bridge, Including on Both the
            Maryland and Virginia Sides of the Potomac River. ..................................................... 33

      C.    The FEIS Does Not Adequately Identify and Analyze Impacts to the Potomac
            River.............................................................................................................................. 36

      D.    The FEIS's Analysis of Impacts to the Northern Long-Eared Bat and Other Bats Is
            Inadequate and Even More Outdated than Before, Given Recent Regulatory
            Developments and New Revelations About the Scope of Construction........................... 38

V.    The FEIS Fails to Meet the Agencies' Environmental Justice Obligations Despite
      Numerous Commenters' Efforts in Identifying Deficiencies in the Agencies' Analysis. ............ 41

      A.    Delaying the EJ Analysis Until the FEIS Precluded Meaningful Public Review
            Including, Most Importantly, Review and Comment by EJ Populations. ........................ 41

      B.    Cumulative Impacts to the African American Morningstar Moses Hall and
            Cemetery Site Have Been Disregarded and Dismissed by the Agencies, Unlawfully

v

Preventing an "Adverse Effects" Determination for a Nationally-Recognized 4(f) Protected Resource................................................................................................................................... 42

C.   In Violation of Title VI, the Agencies Failed to Provide Meaningful Opportunities for Review and Comment on Agency Plans by Non-English Speaking Populations by Directing Limited English Proficiency Commenters to an Inaccurate SDEIS Executive Summary........................................................................................................................... 52

D.   The Agencies' EJ Analysis Suffers from Serious Deficiencies by Failing to Analyze Cumulative Impacts to EJ Populations. ............................................................................ 53

E.   The FEIS Fails to Take a "Hard Look" at Air Quality Impacts to EJ Populations........... 55

F.   The FEIS Fails to Quantify Impacts to the Gaithersburg EJ Area.................................... 56

G.   The EJ Analysis Ignores Impacts to EJ Populations East of the I-270 Spur. ................... 56

H.   The FEIS Fails to Fully Assess Construction and Post-Construction Impacts to the Julius West Middle School and Other Sensitive Sites Next to the Highway..................... 57

I.   The FEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative................. 57

J.   The FEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes ............................................................................................................. 58

VI.   The FEIS Fails To Disclose the Socioeconomic and Societal Impacts of Private Concessionaire Contracts and Their Influence on Future Land Use Policies............................... 59

VII.   Conclusion .................................................................................................................................. 62

EXHIBIT LIST .................................................................................................................................. 64

vi

00177765

# EXECUTIVE SUMMARY

Despite its length, and despite two rounds of public comments identifying serious flaws in the prior drafts, the FEIS and its appendices present incomplete and inadequate analyses of environmental impacts and fail to achieve the fundamental objectives of NEPA. The signatory Organizations to this comment oppose the preferred alternative put forth in the FEIS and support the no build alternative.

Viewed through the lens of NEPA's twin goals—disclosure of significant impacts and public participation—the Project's environmental review process has been operationally and legally insufficient. The FHWA- and MDOT-approved NEPA-documents have failed in numerous required areas to disclose significant impacts. The NEPA process led by these two agencies failed to allow for meaningful public participation by assigning inadequate comment periods for voluminous documents and by failing to respond to comments provided by the public and elected officials until after the public comment process closed, precluding a productive back-and-forth discussion between the public, their elected officials, and the agencies.

These comments identify the Organizations' key concerns regarding the FEIS, including but not limited to the following:

- The FEIS process itself was flawed. Public comment periods were too short to allow meaningful comments on the voluminous documents and attachments that comprised the FEIS, SDEIS, and DEIS. The Agencies provided only an availability period rather than a public comment period on the FEIS and did not even provide an email address for submission of comments. The FEIS, like the DEIS and SDEIS, relies on documents and data that the Agencies have unlawfully withheld from the public. The FEIS also fails to meaningfully respond to public comments.

- There are serious flaws in the traffic analysis. Based on changes between the model outputs in the FEIS and SDEIS, it appears that manipulation of the models may have occurred. Like others, we call on the U.S. DOT to review the traffic model in the FEIS to ensure that the ROD is based on valid and credible traffic modeling. Moreover, the information presented in the FEIS shows that the preferred alternative will create new and larger traffic problems at key interchanges and merge areas by creating bottlenecks. The limited benefits of the toll lanes, available when most needed only to those who can afford them, cannot justify the magnitude of harm they will cause.

- The FEIS ignores the negative impacts of the preferred alternative on safety on the toll lanes, general purpose lanes, and arterial roads. These human health impacts must be evaluated and presented for public review and comment. The preferred alternative will increase vehicle miles traveled and those extra miles will lead to more (preventable) deaths on the highway. In addition, the air pollution and, specifically, the extra particulate matter pollution caused by those extra miles will cause innumerable health impacts to the people living along the highway.

1

00177766

- The FEIS still does not adequately analyze air emissions, including the increase the Project will cause in harmful particulate matter and greenhouse gas emissions. Like the air quality analyses presented in the DEIS and SDEIS, the limited and error-filled air quality analysis presented in the FEIS does not support the general statements in that document downplaying air quality impacts, and in fact shows the Project will impair the health of communities around the Project, including environmental justice communities. Shockingly, the FEIS fails to meaningfully acknowledge or propose to mitigate the harmful air quality impacts and other pollution caused by construction of the preferred alternative, including from silica dust, a carcinogenic air pollutant generated by highway construction.

- The FEIS fails to adequately acknowledge or address the Project's adverse effects on historic and cultural resources, including the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland, and Plummers Island, a globally unique biodiversity hotspot and site of over 120 years of long-term research in the D.C.-metro area. The Agencies have also failed to comply with their duties under the Section 4(f) of the Department of Transportation Act (Section 4(f)) with respect to these resources in numerous ways. Throughout the process, the Agencies rejected reasonable, prudent, and feasible alternatives that would minimize harm or avoid the use and destruction of significant features and attributes of these important historic resources and, ultimately, made arbitrary determinations about the adverse effects from the Project by failing to consider many important cumulative impacts from highway construction and operation. In the case of Morningstar Tabernacle No. 88 Hall and Cemetery, FHWA came to its conclusion of no adverse effects by wrongly ignoring the historic injustices caused by the highway construction in the 1960s.

- The FEIS fails to take the required hard look at environmental justice issues. The FEIS overlooks many of the harms that EJ communities will suffer during construction and operation of the preferred alternative, including localized air quality impacts from newly created bottlenecks and impacts from the loss of an otherwise free lane on I-270. In its belated analysis of adverse impacts to EJ communities, the Agencies use a flawed methodology and fail to grapple with historic inequities facing those communities from the initial construction of the highway system and the greater susceptibility of EJ populations to the impacts of environmental pollution.

- The FEIS does not adequately analyze impacts on federally threatened or endangered species and state rare, threatened, or endangered species.

As we have consistently noted in our comments, the environmental review process for the Project seemed designed to reach a pre-determined result, namely, to expand I-495 and I-270 with costly toll lanes, without meaningfully involving the public, considering viable alternatives, or

00177767

considering the full range of the preferred alternative's environmental impacts. The Agencies should have aimed to provide a model process here that not only met but exceeded the legal baseline for proper review in recognition that there is a wider scope of impacts—including societal impacts relating to loss of governmental control and accountability—that need to be discussed for projects proceeding under a public-private partnership. The I-495 & I-270 Managed Lanes Study project and future projects being attempted as public-private partnerships have different long-term impacts than projects using a conventional design-build procurement process, which has been the norm since the interstate system developed over a half century ago.

## I.  The Agencies' Environmental Review Process Fails to Satisfy Public Participation Requirements.

An EIS has "twin functions": preparation of the EIS is designed to require agencies to take a hard look at the consequences of their proposed actions, and distribution of the EIS is designed to provide important information about the proposed action to the public for notice and comment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 356 (1989). The NEPA process relies on public scrutiny. *See* 40 C.F.R. § 1500.1(b) (2019). Public scrutiny is meaningful only if the agencies involved provide the public with sufficient information and time to craft their comments.

Here the Agencies have instead thwarted public participation by limiting comment periods, declining to provide *any* public comment period on the FEIS, let alone one of sufficient length, and issuing their responses to comments in unwieldy PDFs that are hard to open and navigate and inaccessible to people with certain disabilities. For these reasons, as well as those detailed further below, the Agencies have failed to satisfy their public participation requirements.

### A.  The 30-day Availability Period on the FEIS Is Insufficient and Must Be Extended.

The 26,500-page FEIS includes new studies, a revised traffic model, and a new environmental justice analysis that the public has not had any opportunity to review. A 30-day availability period without even an email address listed for submitting comments[2] does not provide meaningful opportunity to review and comment on this FEIS. According to MDOT's own press release, the FEIS contains "modified analysis methodologies, conducted new analyses, studied new or modified existing alternatives, refined design ... , and identified ... mitigation ... [and] unavoidable impacts." We therefore reiterate our letter-request to Secretary Pete Buttigieg, of June 30, 2022, for a comment period of at least 60 days.[3]

---

[2] Op Lanes Maryland, Environmental I-495 & I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS), last accessed on July 9, 2022 at
https://web.archive.org/web/20220709150006/https:/oplanesmd.com/feis/.
[3] Letter from the Sierra Club Maryland Chapter, et al. to Secretary Buttigieg (June 30, 2022), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/62groups_495-270FEIS_letter_SecButtigieg_30Jun2022.pdf and attached as Exhibit A. We will be providing other materials referenced in these comments under separate cover.

3

00177768

Our request for an adequate comment period is not new. In the SDEIS, the Agencies announced that they would defer critical analyses until the FEIS. We reiterate our SDEIS comments that this delay of critical analyses contravenes the NEPA process. SDEIS Comments at iii, 2-3, 74, 98, 100-03, 110-12, 122-23, 128, 136-37, 151, 154, 171, 173.[4] Given this improper delay, since January 2022, we and others have explained to FHWA and MDOT the need for an extended comment period on the FEIS. We hereby incorporate by reference the letters from the Sierra Club Maryland Chapter,[5] the Mayor and Council of Rockville,[6] 82 legislators in the Maryland General Assembly,[7] ten Prince George's County mayors,[8] the Montgomery County Executive,[9] 31 civic and environmental groups, and multiple members of Congress.[10] As many Maryland legislators explained in their request, without providing a meaningful opportunity for public comment on the FEIS that includes the ability to comment on "critical analyses needed for the public and policymakers to provide input" the public is unable to "shape final decisions about the I-495/I-270 toll lanes," as required by law.

After the FEIS was released, letter-requests to FHWA for a 60-day review and comment period were made by 62 local and national groups, several Maryland jurisdiction representatives,[11]

[4] Sierra Club, et al., Comments on I-495 & I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation (Nov. 30, 2021) (hereinafter "SDEIS Comments"), *available at*,
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/2021-12-27%20-%20Sierra%20Club%20et%20al.%20SDEIS%20comments.pdf.
[5] Letter from Josh Tulkin to Jeanette Mar et al. (Jan. 4, 2022), attached as Exhibit A, *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/SC-Letter-495270MLS-SDEIS-FEISReviewPd-2022Jan4.pdf.
[6] Letter from Bridget Donnell Newton, Mayor, et al. to Jeanette Mar et al. (Jan. 26, 2022), attached as Exhibit A, *available at*
https://static1.squarespace.com/static/5b72c6a8da02bc640472bf8c/t/61fee871b03f6828336629d3/1644095602555/FHA+Letter+FINAL+012622%281%29.pdf.
[7] Letter from Senator Pamela Beidle et al. to Gregory Murrill, Div. Admin., FHWA, Maryland Division (Feb. 22, 2022), attached as Exhibit A, *available at*
https://mcusercontent.com/6cdc39da7c0238a0521e24885/files/932d6527-1fc6-5b38-81ac-cba0cf957ae1/FWHA_Letter.pdf.
[8] Letter from Mayor Sadara Barrow, et al,. to Gregory Murrill, et al. (Feb. 26, 2022), attached as Exhibit A, *available at* https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_feceda725e324136bb9f7cd6f54b9f33.pdf.
[9] Letter from Marc Elrich, Montgomery County Executive Gregory Murrill, et al. (Mar. 10, 2022), attached as Exhibit A, *available at* https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_5ea4194f64224e46b8a0a4706f543f59.pdf.
[10] Letter from Rep. Anthony Brown & Rep. Raskin to Secretary Buttigieg (June 13, 2022), attached as Exhibit A.
[11] Letter from 62 local and national civic and environmental groups and several Maryland jurisdiction representatives to Secretary Pete Buttigieg (June 30, 2022) attached as Exhibit A, *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/62groups_495-270FEIS_letter_SecButtigieg_30Jun2022.pdf

4

00177769

24 members of the Montgomery County Delegation of the Maryland General Assembly,[12] and, recently, from the Rockville City Council.[13]

The letter from the Maryland Delegates and Senators stated:

[T]he public, its representatives, and reviewing agencies can only now begin examining long-requested environmental justice and greenhouse gas emissions analyses, mitigation plans, the project's recently changed traffic model, and MDOT's responses to the 5,000 comments it received during the public comment periods for the Draft EIS and Supplemental Draft EIS. ... In a February 22, 2022, letter to the FHWA and MDOT, over 80 members of the Maryland General Assembly called for a redo of the project's Supplemental Draft EIS to include the key missing analyses.

In spite of that February 22, 2022, letter, the Agencies did not redo the SDEIS and instead proceeded to release the 26,500 page FEIS. The FEIS includes many new analyses, but the public was provided no formal public comment period to meaningfully review and address the flaws in these late-breaking analyses. Like those legislators, we call on you to open a formal public comment period of sufficient time to meet your statutory obligations under NEPA.

In addition, as noted above, the FEIS incorporates new traffic data and analysis, and these inputs were not released as part of the FEIS—contrary to NEPA's requirements that the underlying data requested must be disclosed publicly with the FEIS. 40 C.F.R. § 1500.1(b) (2019) ("NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA"); *id.* § 1502.21 (2019) (underlying data may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment"); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015) ("To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions."). The Agencies' failure to provide this data before *and after* releasing the FEIS violates NEPA.

On June 29, 2022, MD Sierra Club requested the underlying data for the revised traffic model.[14] Rather than comply with NEPA's mandates and release these traffic data and analyses, we had to request them from MDOT and, as of the submission of these comments, MDOT has not yet released them. MDOT stated that it is processing our request not under NEPA but, rather, as a Maryland Public Information Act request and could not commit to providing the data in time for us to analyze and address them in these comments. MDOT's information officer explained:

---

[12] Letter from 24 Delegates and Senators in the Montgomery County Delegation of the Maryland General Assembly to Gregory Murrill, et al. (July 8, 2022), attached as Exhibit A.

[13] Robert Dyer, Rockville Mayor & Council Ask for More Time To Study New I-495/I-270 Managed Lanes Material, Rockville Nights (July 12, 2022), *available at* http://www.rockvillenights.com/2022/07/rockville-mayor-council-ask-for-more.html?m=1.

[14] *See* Smart Mobility, Inc. Report, attached as Exhibit B, App'x A.

5

00177770

As this is a request for records, this falls under the Maryland Public Information Act (PIA) and is being handled accordingly. We are in the initial stages of this request and are preparing the legally required 10-day letter which is due July 14, 2022. We are advising you that we do not anticipate providing these records to you within the first 10 business days.[15]

As the attached statement by Norm Marshall, our traffic expert, makes clear, his ability to meaningfully comment on the traffic model is therefore limited because "I do not have access to this underlying data." Given these delays and for all the foregoing reasons, our request for a 60-day review period is not only reasonable, it is essential to carrying out NEPA's core purpose of providing a "springboard for public comment." *Robertson*, 490 U.S. at 351–352. The review period for other recent, large highway projects has been 60 or 75 days and the Maryland (and Virginia) public deserves a similar review period.[16] The FEIS, when added to the over 19,000-page draft EIS and over 8,000-page supplemental DEIS that it incorporates by reference, consists of 53,500 pages. Adequate formal public review periods are needed to ensure that the public has sufficient time for meaningful review of the Project's impacts. For these reasons and those expressed in our June 2022 letter and in letters from many others, the Agencies must provide a comment period of at least 60 days to comply with NEPA's public disclosure obligations.

### B. The Agencies Have Not Tabulated the Public Comments on the FEIS, Contrary to Their Prior Practice, Thereby Dismissing and Erasing the Public's Voice[17]

As part of the public comment process, NEPA requires agencies to respond to all substantive comments, including those with opposing viewpoints. *See* 40 C.F.R. § 1503.4 (the final EIS "shall consider substantive comments timely submitted during the public comment."); *id.* § 1502.9(c) ("At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."). This mandate requires agencies to disclose opposing viewpoints so that the agencies can "internalize opposing viewpoints into the final decisionmaking process." *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167–68 (9th Cir. 2003) ("The [Forest] Service's failure to disclose and analyze these opposing

---

[15] Email from MDOT to Jill Grant & Associates (July 1, 2022), attached as Exhibit B, App'x B.

[16] Sixty and 75-day FEIS review periods have been provided for other recent highway projects, such as the I-26 Connector in Asheville, N.C. and the I-45 in Houston, TX, respectively. *See* John Boyle, *I-26 Connector Environmental Impact Statement released, major hurdle for project passed*, Asheville Citizen Times (Feb. 5, 2020), *available at* https://www.citizen-times.com/story/news/local/2020/02/05/asheville-i-26-connector-environmental-impact-statement-released-nc-dot/4664937002/ (describing 60-day comment period); Texas DOT, Notice Final Environmental Impact Statement Available for Public Review - North Houston Highway Improvement Project, *available at* https://www.txdot.gov/inside-txdot/get-involved/about/hearings-meetings/houston/092520.html (explaining that the comment period on the FEIS was extended by 30 days, for a total of 75 days).

[17] This section incorporates by reference DEIS and SDEIS comments describing how the Agencies' systematically downplayed and miscounted public comments opposing the Project.

6

00177771

viewpoints violates NEPA and 40 C.F.R. § 1502.9(b) of the implementing regulations.")
(citing *Cal. v. Block,* 690 F.2d 753, 770–71 (9th Cir. 1982)) (stating that NEPA's requirement that
responsible opposing viewpoints are included in the final impact statement "reflects the paramount
Congressional desire to internalize opposing viewpoints into the decisionmaking process to ensure
that an agency is cognizant of all the environmental trade-offs that are implicit in a decision")).

Instead of following these legal requirements, the Agencies ignored opposing viewpoints;
declined to tally the number of comments opposing the Project in the FEIS, contrary to their prior
practice; responded to all public comments after the public could formally reply; and, in several
cases, responded to similar comments in an inconsistent manner.

> **1.** **The Agencies Have Failed To Provide Any Analysis or Tabulation of the Contents of the 5,000+ DEIS and SDEIS Comments, Hindering the Ability of Decisionmakers To Determine the Level and Nature of Public Opinion and Opposition to the Plan or To Take the Comments into Account.**

In the FEIS, the Agencies do more than downplay and miscount public comments opposing
the Project, as they did in the DEIS. In the FEIS, the Agencies fail to provide *any* analysis or
tabulation of the contents of the comments, making it virtually impossible, due to the sheer number
of comments, for decisionmakers to determine the level and nature of public opinion and
opposition to the Project.

The only way reviewing agencies, elected officials, decision-makers at all levels, and the
public can determine public sentiment as expressed in the comments is to read and tally the
contents of 5,000+ raw comments reprinted in the FEIS, Appendix T.

This is an impossibly burdensome task for reviewers and the public.

The Agencies make even limited comment review onerous in light of the laborious
processes the public must go through to access the comments and associated replies and references.
Among the barriers to accessing and reading the FEIS Appendix T's 13 files and 5,732 pages
containing the public comments: some of the text cannot be searched; the text cannot be copied
and pasted from the pdf files; printouts are difficult to read, even for those with unimpaired vision;
and three screens must be open at once in order to see an original comment, its associated response
page, and the referenced material.

The protected PDF format that does not allow for copying of text presents extreme
difficulties for the visually impaired and renders it virtually impossible to read the FEIS responses
to comments. The printouts are too small to read even assuming ready access to a printer. The
visually impaired need to copy the text and enlarge it to read it. The audio text reading function is
not possible or practical for many people who have visual impairments (much less who speak a
language other than English and need to have text copied to translate it) and is highly inefficient
for meaningful review.

A frustrated FEIS reviewer submitted this comment to the Hogan Administration: "I cannot
even copy/paste text from MLS FEIS PDF files. The MLS FEIS .pdf files are password protected.

00177772

I can't even copy text to paste into an email. What am I able to do? Nothing but look and don't touch? This is terrible customer service. <Survey Comments>." The July 13, 2022, reply on behalf of the Hogan Administration from Jeffrey T. Folden, Director of the I-495 & I-270 P3 Office included this sentence:

> Each document was released as a secured PDF to ensure the document would not be manipulated. The customer-friendly PDF format also offers graphic integrity and preserves intended content and layout regardless of the operating system, device, or software application it is viewed on. All content in the FEIS can be read, printed, referenced, and shared."

*See* Exhibit C. This response confirms that the document text is not copy-and-pasteable and that this limitation was intentional. The inability to copy text presents an enormous barrier to providing meaningful comments on the FEIS (as was the case for the DEIS and SDEIS), as well as excludes people with visual limitations from the opportunity for meaningful review in the short review periods afforded. The use of a protected PDF format with uncopiable text in NEPA documents should be seriously reexamined—and ideally discontinued—at the federal and state agency level as a barrier to meaningful public participation and as a discrimination issue for people with visual impairments.[18]

None of these burdens and barriers was necessary. MDOT created a DEIS/SDEIS comments database that MDOT could have used (or shared) for comment tabulation and analysis. "As comments were received, they were reviewed, considered, and uploaded to a database used as a repository for comments received" (FEIS Appendix T Introduction, p. 3). Of note, in all 26,500+ pages of the FEIS, this is the only mention of the comments database.

2.  **The Agencies' Extended Delay in Responding to 5,047 Comments and Providing a Response Outside of Any Formal Comment Opportunity Prevented the Public and Their Elected Officials from Having Meaningful Interaction with the Agencies During the Decisionmaking Process.**

According to the FEIS, MDOT SHA received 2,909 public comments by the DEIS deadline of November 9, 2020, and 2,138 public comments by the SDEIS deadline of November 30, 2021 (FEIS 9-2).

The public, including officials from 22 cooperating agencies and "other agencies," FEIS App'x T Introduction at 4, who submitted comments by the DEIS deadline, waited *1 year and 7 months, or 585 days,* to have access to the comments and receive some sort of response (in many cases, just a list of cross references) from the Agencies via the FEIS. Commenters to the SDEIS waited *6.5 months, or 199 days.*

---

[18] In the public hearings held in 2021, the hearing officer showed a slide entitled "Title VI of the Civil Rights Act of 1964" that states: "MDOT SHA prohibits discrimination on grounds of … disability." Source: I-495 & I-270 MLS Virtual Public Hearing, November 1, 2021 at minute 10:20, https://youtu.be/4g0L9qk-L60.

8

00177773

These massive delays even in responding to elected officials and the public prevented them from having needed information, meaningful constituent-elected interactions about issues, opportunities for advocacy, and input into the decisionmaking process.

###### 3.    In the FEIS, the Agencies Erase the Public Voice by Failing to Make Any Analysis of the 5,000+ Public Comments.

As noted above, nowhere in the FEIS documents covering 74 files and 26,500 pages is there an attempt at analysis, tabulation, or quantifying of the contents of the 5,000+ public comments.

The lack of tabulation and analysis is a marked change from the Agencies' treatment of public comments for the first three public comment periods[19] (see details of previous comment treatment, as described in our DEIS comments at 173-178[20] and DontWiden270.org's DEIS comments, FEIS App. T.2.A at 75-82).

The Agencies, for the Project's first three comment periods, differentiated between the number of discrete submissions and the number of separate points made within the submissions. The cumulative totals for the three periods: 3,937 individual submissions containing 16,129 points. The FEIS, in contrast, tallies only the number of submissions, with no numerical indication of the scope or complexity of their contents.

In the DEIS, the Agencies published a tally (albeit based on flawed label assignments and other biases) of the numbers of comments reflecting support or opposition to the Project during the previous comment periods. After observing the Agencies' biased processes for tallying comments, advocacy organizations developed a compensatory strategy. We suggested that commenters make their opposition clear by beginning each DEIS and SDEIS comment submission with a version of, "I oppose the toll lane plan and support the no-build option."

Given such clear, consistent messages, the Agencies could easily have published an FEIS tally of submissions expressing opposition. Instead, the Agencies got around our "fix" by tallying *none* of the opinions expressed in the submissions. This effectively removed public opinion from the FEIS except on a submission-by-submission basis, repeated 5,000+ times.

---

[19] The "first three comment periods" referenced and incorporated in MDOT's DEIS and SDEIS were originally detailed in MDOT's Scoping Report (June 2018); the Alternatives Public Workshops Summary (January 2019); and the Summary of Public and Stakeholder Engagement for the Recommended Alternatives Retained for Detailed Study (September 2019).

[20] Sierra Club, et al., Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) (Nov. 6, 2020) (hereinafter "DEIS comments"), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u18365/2020-11-09-Comments%20on%20DEIS%2C%204%28f%29%2C%20and%20JPA%20%281%29%20%281%29.pdf.

00177774

In reply to comments that started with, "I oppose the toll lane plan and support the no-build option," the Agencies ignored the opinion and "replied" with an unasked-for explanation of what the no-build option is. *See, e.g.*, FEIS App'x. T.2.A Vol. 1 at CO-76.

> **4.    The Agencies Give Nonsensical, False, and Inconsistent Responses to Nearly Identical Comments from the Sierra Club and DontWiden270.org Regarding the Agencies' Previous, Biased Treatment of Public Comments.**

The FEIS gives nonsensical, false, and inconsistent responses to nearly identical comments from the Sierra Club and DontWiden270.org regarding the Agencies' previous, biased treatment of public comments.[21]

From the Agencies' response to the Sierra Club:

> The letter states incorrectly that the lead agencies improperly summarized or 'miscounted' the public input on these preliminary NEPA documents. The lead agencies reviewed all comments received and properly summarized the content of those comments during the preliminary scoping stages of the NEPA review in order to inform production of the DEIS."

FEIS App'x T.2.A. Vol. 3 at CO-538. The Agencies provide no evidence or documentation to support their response.

In contrast, the Agencies' response to DontWiden270.org does *not* dispute or respond to evidence of MDOT's previous biased treatment of opposition comments, simply accepting, for instance, this documented example: MDOT established a policy to label a comment as being in opposition to the Project only if the submitter used exactly the right words. No comparable policy was established for pro-Project comments. *See* Sierra Club DEIS Comments at 166.

The Agencies' response to the Sierra Club, but not to DontWiden270.org, says, "Once the EIS documents were made available for formal comment periods, MDOT SHA reprinted and made available all comments on the DEIS and SDEIS and responded to all substantive comments in the FEIS." FEIS App'x T.2.A. Vol. 3 at CO-538.

If this were true, the publication of those DEIS and SDEIS comments would have happened *before* issuance of the FEIS, since the FEIS does not allow for a "formal comment period." Where, when, and to whom were those reprints made available?

---

[21] For references to the points in this section, see responses to Dontwiden270.org's DEIS submission, FEIS App'x. T.2.A Vol. 1 at CO-76-82, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf and the responses to Sierra Club's DEIS submission. FEIS App'x T.2.A Vol. 3 at C0-538, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-3_June-2022p.pdf.

10

00177775

The Agencies' response to the Sierra Club's comments says: "Support for or opposition to the project and/or the Preferred Alternative as stated in all public comment is accurately reflected in the NEPA record and available for review." *Id.*

Since the FEIS does not tabulate support or opposition, how and where are "support for or opposition to the project and/or the Preferred Alternative" accurately reflected in the NEPA record? Does the Agencies' reply assume the reviewing federal agencies are creating their own tabulations from the raw public comments?

The Agencies' response to DontWiden270.org's comment makes a different point about support and opposition: "…a comment stating support or opposition is not a yes/no vote for the project."[22]

Yet the Agencies' treatment of comments from the first three public comment periods indicates the opposite: the Agencies clearly tabulated support and opposition to the Project, albeit in a biased and misleading manner.

## II.    The Traffic Models Used in the FEIS Are Deeply Flawed.

### A.    The Traffic Modeling in the FEIS Fails to Address Critical Errors Identified by Commenters and Introduces New Errors.

In our comments on the SDEIS, we explained that the traffic modeling supporting the SDEIS had serious errors. The SDEIS's traffic model presents a simplistic traffic story that, if the preferred alternative is not constructed, corridor traffic volumes will grow significantly and delays will grow exponentially. Based on this model, the SDEIS claims that the preferred alternative will reduce congestion on the general-purpose lanes and alleviate congestion on other roads relative to traffic conditions today. But that simple story relied on flawed modeling. *See* SDEIS Comments at 18-38; *see generally id.* at 39-96.

As described more fully in the attached expert report by Norman Marshall, President of Smart Mobility, Inc., (July 2022) (hereinafter "Marshall Report"),[23] the revised traffic modeling used in the FEIS does not remedy the acknowledged errors with the previous traffic model used in the SDEIS. To the contrary, the new model results are, instead, rife with evidence that the Agencies "have failed to comply with their own Agency guidance concerning traffic modeling" such that "the output is seriously compromised as a result of these modeling errors." *See* Marshall Report at 2.

Mr. Marshall's ability to thoroughly critique the traffic model was hampered because MDOT has refused to release the underlying data and model files, in violation of NEPA's public disclosure requirements. *See* Marshall Report at 4-5; *id.* App'x A-B; *see also* Section I.A of these comments. Even so, Mr. Marshall and others identified serious deficiencies in the FEIS traffic models. The Marshall Report details several categories of errors, some of which persist from the

---

[22] FEIS App'x T.2.A Vol. I, p. CO-80, https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[23] The Smart Mobility, Inc., Report is attached as Exhibit B.

11

00177776

flawed modeling from the SDEIS and some of which are new. These errors undermine the simplistic story the Agencies continue to tell that the preferred alternative is necessary to address traffic congestion and reduce travel times. Instead, the models "appear to overstate travel time savings and inadequately capture congestion, gridlock conditions, and bottlenecks," Marshall Report at 23, based on the following errors:

- Given dramatic changes in predicted speed/travel time and vehicle throughput[24] between the SDEIS and FEIS, it appears that the modelers made parameter changes after they validated the traffic model, even though "it is only possible to have confidence in traffic microsimulation model outputs if the model is well calibrated to real-world base year data and [] these validated parameters are maintained in all alternatives analyses." As explained further in the Marshall Report, changing model parameters can have dramatic impacts on speed/travel time and throughput metrics. Marshall Report at 5-8.

- There are unexplained differences between the traffic "count" data in the FEIS and DEIS. The better model fit in the FEIS "appears to be achieved by changing the data rather than by changing the simulated volumes." But, changing the data inputs "at this point in the process after the calibration step [needs] to be disclosed and justified." That justification is not provided in the FEIS. It is possible that the FEIS modelers may be "fitting one model to another model rather than to actual data," which MDOT guidance strongly cautions against doing. *Id.* at 8-10.

- Even though input demand and the highway networks are described as "almost identical" in the SDEIS and FEIS, the FEIS shows much higher throughput under the 2045 no build alternative and also unexplained improvements in performance of the preferred alternative over the no build alternative. The only plausible explanations is that the model parameters have been changed since the model validation. If that is correct "the [p]referred alternative modeling is invalid." *Id.* at 10-15.

- To achieve reliable results from a traffic model, a modeler must reach convergence by running multiple simulations to receive comparable results. The FEIS states that only five simulations were run, the minimum required by MDOT. But, "[i]n heavily congested simulations, it generally is necessary to average more than 5 simulations. The report does not demonstrate that 5 simulations is sufficient for convergence." Again, without the underlying traffic files it is impossible to verify if the model was run enough times to achieve convergence. *Id.* at 15-16.

---

[24] Throughput is defined as "the number of vehicles that pass by a given point in the roadway network in a set amount of time." SDEIS at 3-13.

12

00177777

- As in the SDEIS, the FEIS traffic modeling invalidly shows future throughput to be much lower than existing throughput. This error was not addressed in the FEIS responses to comments. *Id.* at 17-18.

- As in the SDEIS, the FEIS continues to falsely insist that there is some increasing "demand" that exists independently from actual traffic volumes. Inputting unrealistic "demand" into the traffic model causes gridlock in the model and produces unrealistically low throughput. *Id.* at 18-20.

- Unlike the SDEIS, the FEIS adds a third model to its sequenced modeling approach, but this newly introduced model suffers from the same inherent problems as the other models. *Id.* at 20-22.

As we explained in our SDEIS comments, *see* SDEIS Comments at 19-20, rather than relying on flawed models, the Agencies should examine empirical data from Virginia and Maryland to understand the reasonably foreseeable impacts of constructing managed lanes on I-495 and I-270, which include the following:

1) Expanding I-495 and I-270 will shift traffic from the shoulder hours into the peak hours and create and/or exacerbate bottlenecks. As bottlenecks are most likely at the terminus of the managed lanes, phasing is critically important as well as the final extent of the Project.

2) An improvement in general-purpose lane speed is unlikely because constructing the managed lanes will shift traffic from the shoulder hours into the peak hours, and the general-purpose lanes will be just as congested during the peak hours as they would have been otherwise. The foundational premise of this Project is that extreme congestion in the general-purpose lanes is needed to justify the high tolls that will be required to fund the preferred alternative.

3) Constructing the I-495 and I-270 managed lanes is likely to make arterial congestion worse. No trip begins or ends on a limited access highway, and traffic does not magically switch between limited access highways and arterials despite what is presented in the SDEIS. Any shifts between these roadway classes causes traffic increases on some arterials and traffic decreases on others. As managed lanes concentrate traffic in the peak hour, arterial roads at I-495 and I-270 interchanges will be severely impacted, and these impacts are likely to outweigh the congestion benefits of traffic diversion from other arterials. The SDEIS models are incapable of calculating these tradeoffs.

4) If the managed lanes are constructed, it is likely that there will be significant traffic growth (induced travel) and induced land use impacts.

5) Managed lane proponents stress "choice." In fact, the choice is between two bad options: extreme congestion vs. extremely high tolls. Only about 1/6 of the daily traffic is carried by the Virginia I-495 Express Lanes despite the Express Lanes

13

having 1/3 of the roadway capacity. This is an inefficient use of infrastructure. The other 5/6 of traffic is carried by the general-purpose lanes. The toll lanes are "chosen" primarily by high-income travelers and/or travelers who are having the tolls reimbursed. This elite group will remain small because increases in demand by other users will prompt the tolls to increase further, becoming even less affordable.

6) The managed lanes will benefit only the few who are able to outbid the majority of travelers. There will be no benefits for non-users of the toll lanes. Non-users of the toll lanes (most travelers) will face continued high congestion in the general-purpose lanes and increased congestion on arterial roadways accessing I-495 and I-270 interchanges. Nevertheless, a portion of their taxes likely will go toward subsidizing the private toll lanes as has occurred in Virginia.

7) The MDTA toll-setting exercise was theater to mollify a skeptical public. The rates are set so high that the private operator will be able to maximize revenue through algorithms that cynically have been labeled "jam and harvest." These algorithms intentionally increase congestion in the general-purpose lanes prior to traffic peaking to justify charging higher tolls during the traffic peak. It's the public that gets "jammed" as their money gets "harvested."

The flawed traffic models used in the FEIS, like those in the SDEIS, continue to overestimate future congestion to justify the preferred alternative. The proposed managed lanes in Maryland will make congestion worse for most peak period drivers and push drivers to choose between extreme congestion and extremely high tolls that are set to make the lanes profitable.

As a result of these flawed models, the evaluation of numerous impacts that rely on traffic modeling, including air quality and environmental justice, is likewise flawed, and the consideration of reasonable, prudent, and feasible alternatives under NEPA and Section 4(f) is tainted. As one court observed, "In the area of the need for the subject [highway] segment, . . . predictions of traffic volumes in various target years of the several alternative transportation systems studied *are crucial*. Errors in traffic volume projections most likely would result in errors in conclusions based on traffic volume projections." *Movement Against Destruction v. Trainor*, 400 F. Supp. 533, 548 (D. Md. 1975) (emphasis added). *See also* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."). Accordingly, a new draft NEPA document must be issued based on a revised and corrected traffic model.

**B.      The U.S. DOT Must Re-Examine the Traffic Modeling in the FEIS To Ensure Its Integrity and the Agencies Must Address Possible Inconsistencies Between the FEIS's Traffic Model and the Traffic Modelling Used to Support Revenue Models for the Project.**

**1.      MTOC Has Identified Inconsistencies in the Traffic Model that Warrant an Investigation into the Integrity of the Model.**

After the FEIS was released, Dr. Benjamin Ross, President of Maryland Transit Opportunities Coalition ("MTOC"), asked U.S. DOT Deputy Secretary Polly Trottenberg

14

to examine evidence of possible scientific fraud in the FEIS traffic model. We incorporate by reference MTOC's letter to U.S. DOT[25] and additional information revealed in the subsequent articles.[26]

Dr. Ross found that "[t]he numbers [from the traffic model] simply do not look like what a computer model would produce."[27] Further, the FEIS modeling for the 2045 no build alternative appears inconsistent "with correction of errors in model inputs, coding, or numerical methods, but would be consistent with arbitrary adjustment of intermediate or final outputs."[28]

In MTOC's letter, Ross explains that the FEIS's traffic model predicted that certain evening rush-hour travel times for the 2045 no build alternative would be less than predicted by the SDEIS models, even though the traffic counts in many spots are the same in both models. For example:

> the predicted evening rush-hour travel time from Connecticut Avenue to I-95 on the Beltway Inner Loop is 15 minutes faster in the FEIS than in the SDEIS. The travel time from Rock Spring Park to I-95 is half an hour faster. Yet, in the two reports, the number of vehicles exiting the Inner Loop onto I-95 is exactly identical in each of the four pm peak hours, 3:00 to 4:00, 4:00 to 5:00, 5:00 to 6:00, and 6:00 to 7:00.[29]

Based on these predicted results, the FEIS model outputs do not appear to be consistent with traffic modeling principles that, as commuting times decrease on a particular route, vehicles will switch from other routes to save time:

---

[25] Letter from MTOC to Deputy Sec'y Polly Trottenberg, USDOT (July 11, 2022) (hereinafter "MTOC Letter"), *available at*
https://transitformaryland.org/sites/default/files/scientificintegrityletter.pdf, and attached as Exhibit D.

[26] Bruce DePuyt, Toll Lanes Critic Accuses MDOT of "Scientific Fraud" in Key Report, Maryland Matters (July 12, 2022), *available at*
https://www.marylandmatters.org/2022/07/12/toll-lanes-critic-accuses-mdot-of-scientific-fraud-in-key-report/; Katherine Shaver, Maryland Toll Lane Critics Cite 'Possible Scientific Fraud' in Traffic Study, Washington Post (July 12, 2022), *available at*
https://www.washingtonpost.com/transportation/2022/07/12/maryland-toll-lanes-traffic-study/; Andrew Gelman, Don't Go Back to Rockville: Possible Scientific Fraud in the Traffic Model for a Highway Project?, Statistical Modeling, Causal Inference, and Social Science Blog (July 12, 2022), *available at* https://statmodeling.stat.columbia.edu/2022/07/12/dont-go-back-to-rockville-possible-scientific-fraud-in-the-traffic-model-for-a-highway-project/; Alex Daugherty, Weekly Transportation post, Politico (July 12, 2022).

[27] Shaver, Maryland Toll Lane Critics Cite 'Possible Scientific Fraud' in Traffic Study, Washington Post.

[28] *See* MTOC Letter.

[29] Letter from MTOC to Deputy Sec'y Polly Trottenberg, at 2.

15

00177780

With such large differences between the two models in predicted travel time, the [model] algorithm must assign some trips that took other routes in the SDEIS model to the eastbound Beltway [] in the FEIS model… and it is next to impossible that the changes would exactly cancel out in each of the four hours [so that the traffic volumes between the FEIS and SEIS are exactly identical].[30]

In his letter, Dr. Ross identifies FEIS traffic model outputs that appear inconsistent with traffic model runs but "could … arise from ad hoc alteration of model outputs for the purposes of generating a desired conclusion."[31]

Based on these potential issues with the FEIS's traffic model, Dr. Ross asks U.S. DOT to complete an independent examination of the Record of Decision for the I-495/I-270 Managed Lane Study to ensure the veracity of the traffic modeling data or, at a minimum, conduct a peer review of the modeling report.

After the new traffic model was released as part of the FEIS, Maryland Sierra Club requested that MDOT provide the underlying data files associated with the traffic model. As explained in the comments of Norm Marshall, these underlying data files were necessary in order to fully assess the accuracy of this model. Not only did MDOT refuse to supply these underlying data files in response to Sierra Club's timely request, MDOT subsequently asserts that these files may be provided only upon payment of over $21,000, and may not be provided even then, thus ensuring that the accuracy of this traffic model will not be questioned. MDOT's refusal to disclose this underlying data, in clear violation of NEPA, strongly suggests that MDOT is trying to hide something and that Mr. Ross's concerns about fraud are well-founded. We join this request for U.S. DOT to conduct a thorough examination of the traffic model. Failure to do so violates NEPA, which requires that the conclusions reached in environmental documents be supported by accurate data. *See* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.").

2.     **The FEIS Traffic Model Appears to be Inconsistent with the Traffic Model Used To Predict Revenue.**

The FEIS used different traffic models to predict environmental impacts and to predict toll revenue. According to the FEIS, FEIS at 10-2, the environmental impact traffic model was done by RK&K. The March 12, 2021, Preliminary Toll Rate Due Diligence Report, submitted to the Maryland Transportation Authority ("MDTA") by CDM Smith, states on page 3 that the model used for traffic and revenue estimates "was originally based on the Metropolitan Washington Council of Governments (MWCOG) regional travel demand model but with updates and enhancements incorporated by CDM Smith." It also states on page 2 that "[t]he developer [MDOT's partner in the Public-Private Partnership] will perform their own T&R [Traffic and Revenue] studies to support project financing." Because the Project may be funded using

---

[30] *Id.* Ex. 1 at 2.

[31] *Id.* Ex. 1 at 3.

16

Transportation Infrastructure Finance and Innovation Act funding, this model, like the FEIS model, will be submitted to U.S. DOT.

The FEIS fails to acknowledge or discuss an apparent inconsistency between its traffic model and the traffic models used to predict revenue. Using one traffic model to predict environmental impacts and an inconsistent traffic model to predict revenue is unacceptable. It is as dishonest as keeping two sets of financial records and showing numbers to lenders that are inconsistent with the numbers shown to tax collectors. Both the environmental impact traffic model and MDTA's revenue traffic model were used to project 2045 traffic conditions for the preferred alternative. However, the Preliminary Toll Rate Due Diligence Report that was made public by MDTA includes only 2025 numbers, and only a very limited number of those. Thus, we are not able to directly compare results of the two models. No results whatsoever of the developer's traffic model have been publicly released, so the public is unable to comment on any possible inconsistencies between that model and the FEIS model.

Nonetheless, the very sparse information in the Preliminary Toll Rate Due Diligence Report suggests a possible inconsistency between its model and the FEIS model. Table 7 of the toll rate report predicts that in 2025, average traffic in the two-lane tollway reaches the soft cap threshold (variously given in MDOT documents as 3200 or 3300 cars per hour) only in one roadway segment: northbound immediately north of River Road (MD 190). That segment forks between I-270 and the Beltway; the threshold is exceeded on the I-270 fork from 4:00 to 7:00 pm and on the Beltway fork between 6:00 and 7:00 pm. In the northbound segment immediately south of Montrose Road, it predicts that the soft cap will be hit frequently despite falling short of it under average conditions.

The FEIS forecast for 2045, twenty years later, shows the toll lane traffic volume exceeding 3300 cars per hour only in the northbound segment between River Road and the I-270 fork, between 3:00 and 6:00 pm. It predicts toll lane traffic volumes between 3200 and 3300 cars per hour only in one other segment, the segment immediately south of Montrose Road.

The forecasts in the Preliminary Toll Rate Due Diligence Report assume a steadily increasing demand for automobile travel due to population and job growth, and a more rapidly growing demand for toll lane travel due to increasing income levels. The growth in travel demand should be reflected in rising traffic volumes and increasing toll rates. Thus, one would expect the report to predict tolls reaching the soft cap more frequently in 2045 than in 2025. However, the FEIS traffic model does not predict traffic volumes sufficient to activate the soft cap. The FEIS failed to grapple with this issue and explain or correct the inconsistencies between the two models.

The reliance on inaccurate data—even in the face of explicit warnings about its inaccuracies—tainted the required consideration of alternatives and therefore violates NEPA.

17

00177782

C.    **There Are Serious Problems with the Current FEIS that Indicate the Traffic Models and How They Are Applied Should Be Reviewed Independently Before Final Decisions Are Made.**

Table 1 shows a comparison of the SDEIS and FEIS PM trip travel times. The difference between the no build ("NB") and general purpose ("GP") travel times both increase and decrease, but all GP and NB travel times in the FEIS are reduced. GP lanes are the non-toll lane part of the toll road.

Table 1. Comparison of FEIS to SDEIS Numbers

| PM Trips | SDEIS | | | FEIS | | |
|---|---|---|---|---|---|---|
| | NB | GP | Difference | NB | GP | Difference |
| GW Parkway to I-370 | 42 | 52.1 | 10.1 | 27.9 | 36.8 | 8.9 |
| Clara Barton to I-370 | 37.3 | 48.6 | 11.3 | 25.1 | 35.8 | 10.7 |
| River Road to I-370 | 24.4 | 30.8 | 6.4 | 17 | 26.6 | 9.6 |

Table 2 shows the difference projected between the FEIS and the SDEIS projected travel times for identical GP trips. The trips are the PM trips from the George Washington (GW) Parkway, Clara Barton Parkway, and River Road to the end of the toll lanes on I-270 at I-370.

Table 2. Travel Time Different Between SDEIS and FEIS for GP Lanes - PM

| | SDEIS | FEIS | Difference | % Reduction |
|---|---|---|---|---|
| GW Parkway to I-370 | 52.1 | 36.8 | 15.3 | 30 |
| Clara Barton to I-370 | 48.6 | 35.8 | 12.8 | 26 |
| River Road to I-370 | 30.8 | 26.6 | 4.2 | 15 |

What Table 2 shows is that there is a substantial reduction of travel times for the FEIS compared to the SDEIS. We are talking about a 30 to 15% reduction from 15 to 4 minutes. The result of these changes is to provide MDOT with the ability to claim higher average speeds for the general purpose (GP) part of the toll lanes in the newest analysis, despite the fact that the MDOT's own analysis projects on average a 10-minute advantage (faster trips) from the GW, Clara Barton, and River Road PM trips to I-370 for the no build alternative.

In fact, when you examine the key trips from River Road along the Beltway to Old Georgetown Road exit or to the Democracy exit on the I-270 West Spur, the comparative slowdown between trips in the GP lanes vs. the No Build has grown enormously – 137% (Table 3) for the Beltway trip and 33% (Table 4) for the I-270 West Spur trip.

Table 3. Trip times from River Road to Old Georgetown Road – PM

| SDEIS | | FEIS | | % Difference |
|---|---|---|---|---|
| NB | GP | NB | GP | |

00177783

| | 37.3 | 41.9 | 18.3 | 29 | |
|---|---|---|---|---|---|
| Difference GP-NB | 4.6 | | | 10.9 | 137% |

Table 4. Trip times from River Road to Democracy - PM

| SDEIS | | FEIS | | % Difference |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 10.4 | 16.7 | 4.9 | 13.3 | |
| Difference GP-NB | 6.3 | | 8.4 | 33% |

While there a clear advantage for the no build in the PM trips, reducing the travel times of the GP portion of the toll road minimizes the devastating effects of the PM Beltway Chokepoint by giving the appearance that the speeds will be acceptable.

Figure 1. Map of project area with labeled interchanges and chokepoint



*Maryland Department of Transportation State Highway Administration I-495 & I-270 P3 Office map.*

Interchanges and chokepoint labeled by author.

Table 5 and 6 illustrate another inexplicable change between the SDEIS and FEIS. For trips from Connecticut Ave to the GW Parkway (Table 5) and Connecticut to River Road (Table 6) there is a 470% and 656% increase in the projected travel time advantage for the FEIS versus

00177784

the SDEIS for GP lanes over the no build lanes in the PM travel time. The Connecticut to GW Parkway and Connecticut to River Road No Build travel time changes between the SDEIS and the FEIS are 240% and 295%. It is puzzling that such a mismatch could occur and not explained.

Table 5. Trip from Connecticut to GWP - PM Minutes

| SDEIS | | FEIS | | Increase Time |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 16.4 | 10.1 | 39.4 | 9.8 | |
| Difference GP-NB | 6.3 | | 29.6 | 470% |

Table 5a. % Change Between SDEIS and FEIS for Connecticut to GWP - PM Minutes

| NB-SDEIS | NB -FEIS | | % Difference | |
|---|---|---|---|---|
| 16.4 | 39.3 | | 240% | |

Table 6. Trip from Connecticut to River Road - PM minutes

| SDEIS | | FEIS | | Increase Time |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 10.9 | 7 | 32.2 | 6.6 | |
| Difference GP-NB | 3.9 | | 25.6 | 656% |

6a. % Change Between SDEIS and FEIS from Connecticut to River Road - PM minutes

| NB-SDEIS | NB-FEIS | | % Difference | |
|---|---|---|---|---|
| 10.9 | 32.2 | | 295% | |

    As explained more fully in the attached report, taken together these types of changes that clearly favor the Agencies' desired outcome require detailed and independent analysis that cannot be produced in 30 days for 26,000 pages with limited resources of outside groups.[32] Changes of this magnitude should not happen after two rounds of analysis before the FEIS, and they certainly should not completely favor MDOT's desired outcome.

**III.    The FEIS Fails To Address Impacts to Public Health.**

    The FEIS fails to disclosure serious public health risks and impacts and suffers from deficiencies in its analysis of the public health impacts of the evaluated alternatives. Throughout the NEPA process for this Project, we have requested that the Agencies conduct a full analysis of

---

[32] *See* Katz Report, attached as Exhibit H.

20

00177785

public health impacts, including, for example, an analysis of localized air quality impacts or health impacts from traffic safety issues. The Agencies have declined to do so.

Based on their close review of the FEIS and its appendices, several health experts—including a public health expert, air quality expert, traffic safety and crash analysis expert, and an epidemiologist—have provided letters and reports explaining where the FEIS has failed to disclose or analyze serious public health impacts of the Project..

Roselie Bright, Sc.D., and Ronald Bialek, MPP, explain that the FEIS suffers from a deficient analysis of impacts including a failure to address traffic-related injuries and deaths from an increase in vehicle miles traveled, adverse health impacts and deaths from increased mobile source air toxics and other sources of air pollution, and adverse health impacts from construction- and traffic-related noise. As Bright notes, the FEIS fails to acknowledge or discuss the links between, for example, increased air pollution from traffic and high rates of asthma or heart disease.[33] As Bialek highlights, these health impacts are likely to be disproportionately higher in EJ populations, given historic inequities. [34]

The report by ZAMURS AND ASSOCIATES, LLC, explains that the FEIS's air quality discussion lacks a discussion of the preferred alternative's impacts on criteria pollutants and other pollutant emissions and also fails to address air quality concerns in environmental justice communities, despite previous comments identifying these missing analyses. [35] Further, the FEIS fails to fully evaluate the effects of bottlenecks that will be created under the preferred alternative and, importantly, the air quality impacts from the bottlenecks that may concentrate around the end points of the preferred alternative, in areas where EJ populations live. *See* ZAMURS AND ASSOCIATES Report at 5-6.

Further, as discussed below, Byron Bloch, a longtime expert in traffic safety, discusses failures to address the public health impacts of traffic safety issues from the preferred alternative and from respirable silica dust caused by highway construction.[36]

Impacts to public health are an important part of any "hard look" analysis required by NEPA. Many of the proposed actions under the preferred alternative will cause significant, adverse public health impacts, whether directly, indirectly, or cumulatively. For all the reasons explained in the experts' letters and reports as well as those explained in our prior comments, this FEIS fails to take that hard look. As a result, the preferred alternative is likely to cause significant, adverse health impacts, unexamined in the FEIS.

---

[33] *See* Letter of Roselie Bright to Sierra Club, attached as Exhibit E.

[34] *See* Letter from Ronald Bialek to Sierra Club, attached as Exhibit F.

[35] *See* ZAMURS AND ASSOCIATES, LLC Report, attached as Exhibit G.

[36] *See* Bloch Report, attached as Exhibit I.

21

00177786

A.    **Respirable Crystalline Silica Construction Dust Remains a Major Unaddressed Public Health Hazard of this Project that the Agencies Are Ignoring.**

MDOT and FHWA have failed to disclose or address critical health risks raised by safety experts regarding large volumes of toxic crystalline silica dust that will be released as the Project carries out demolitions of soundwalls, bridges, and highways to reconstruct and enlarge them for this Project. Their disregard and dismissal of this health risk flies in the face of recent, more stringent U.S. Occupational Safety and Health Administration ("OSHA") regulations for silica dust and known risks explored in articles with titles like, "Highway Repair: A New Silicosis Threat."[37]

OSHA explains that "[r]espirable crystalline silica . . . is created when cutting, sawing, grinding, drilling, and crushing stone, rock, concrete, brick, block, and mortar."

Research has shown silica dust to be a known carcinogen and one of the most harmful components of particulate matter, which is a mixture of small airborne particles of organic chemicals, metals, minerals and soil.

The Agencies do not address any of the construction-related risks of silica dust. The FEIS instead minimizes all construction-related air pollution: "Because the project's construction duration is not anticipated to exceed six years in any single location, most air emissions associated with construction are considered temporary in nature."[38]

That statement raises even more profound questions and concerns. Construction is not anticipated to exceed six years in any single location. Therefore, they consider it temporary. Six years in a single location is the entire elementary school education of a student at Carderock Springs Elementary School, which is already badly affected by its proximity to I-495. Six years is one less year than all of middle and high school, and surely will not provide comfort to the staff, students, and parents of students at Julius West Middle School, already adversely impacted by proximity to I-270. It is doubtful that another vulnerable population, the seniors at Rockville Senior Center, feel that six years is temporary.

The issue with air pollution from highway construction cannot be swept under the rug by a generic reference to "most emissions." A major issue facing all populations living, working, and going to school along the proposed construction route is the respirable crystalline silica dust. As one website correctly observes, "There are no regulations for bystanders or enforced protections for surrounding civilians. Unfortunately, the nature of respirable dust particles can put bystanders at risk of inhalation exposure far beyond the confines of the construction site."[39]

---

[37]  David J. Valiante, et al, Highway Repair: A New Silicosis Threat, Am. J. Public Health 94(5): 876-880 (May 2004), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448352/.
[38]  FEIS at 9-50.
[39]  How Far Can Respirable Dust Actually Travel? Sep 24, 2019, available at https://www.nosilicadust.com/how-far-can-respirable-dust-actually-travel/.

22

00177787

Toxic crystalline silica dust is a known carcinogen, it is very light and can drift hundreds of feet and even miles, and it causes multiple lung and breathing ailments and even death. Bryon Bloch, a longtime expert in traffic safety, states that the Project's FEIS is "evasive and fraught with omissions on such critical areas as: The generation of toxic silica construction dust that will assuredly cause asthma, silicosis, and lung cancer to many residents."[40]

He continues:

It is outrageous that this FEIS does NOT adequately address concerns for the toxic and carcinogenic crystalline silica construction dust that will be generated daily during at least the six years of road demolition and re- construction... including the multiple bridges and soundwalls. The FEIS ignores any concerns that thousands of our children through seniors will be sickened with asthma, silicosis, COPD, and lung cancer. In their response, MDOT simply refers to "fugitive dust" and then mentions that they "may" use some measures to minimize or mitigate.[41]

Contrast this evasive smoke-and-mirrors response with the evidence presented by the National Cancer Institute about silica construction dust being toxic and carcinogenic, and by the American Public Health Association about road re-construction projects causing silicosis. Yes, there are OSHA requirements to help protect the on-site workers from breathing respirable silica dust, but what about the nearby citizens and neighborhoods and schools? One of the MDOT measures is that they *"may use"* water trucks... but that means a fleet of daily tanker trucks and spraying huge amounts of water to hopefully capture enough of the silica dust, etc., and then how and where is it safely dispersed (without adversely affecting our public water supply ala Flint, Michigan)? Mitigation techniques are only mentioned in broad brush terms, and that they *"may"* be used... and that these measures are only partially effective at best.

For these reasons and those Mr. Bloch presents more fully in his report, the Agencies' failure to disclose and meaningfully grapple with the impacts of silica dust in their FEIS denies the public and decisionmakers the needed understanding of this Project's health impacts for populations living, working, and going to school near the highways.

**B.    The FEIS Fails To Address the Health Impacts of Traffic Safety Issues from the Preferred Alternative.**

The FEIS fails to address how the preferred alternative road design will lead to more vehicle crashes, including the lethal truck-vs.-car crashes. It also fails to address the safety impacts

---

[40] *See* Bloch Report, attached as Exhibit I.

[41] Full quote in FEIS at 5-181 "To manage fugitive dust emissions during construction, the contractor may use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:"

23

00177788

of the severe bottleneck the Project creates where seven lanes will funnel down to two north of Gaithersburg.

Traffic collisions on the widened highways are likely to increase under the preferred alternative. The FEIS does not, however, fully evaluate these impacts. As the FEIS explains, "safety was not one of the specific elements identified in the Study's Purpose and Need." FEIS at 60.

If the preferred alternative is built, there will be seven northbound and seven southbound lanes on I-270, with two central toll lanes. This proposed road design is likely to create multiple safety problem. Vehicles will be required to shift to and from the central toll lanes to the outer lanes to exit. According to Bryon Bloch, a longtime expert in traffic safety, this configuration "will lead to many severe collisions."[42]

Further, the road configuration proposed under the preferred alternative will cause more frequent truck versus car crashes. For example, the proposed design does not address the need for safety shoulder or break-down lanes. FHWA recommends at least 12-foot shoulders adjacent to the outer travel lanes on roads, like I-270, with heavy truck traffic. Instead, the road designs for the preferred alternative:

> look like an artist's concept, and [do] not include any technical details to describe such necessary features as entry and exit ramps, how the traffic will enter and exit the toll lanes, how the traffic on the central toll lanes will transition to the exits, and other details.[43]

Shoulders less than 12 feet adjacent to outer travel lanes carry safety risks. The FEIS talks about "typical sections" of highway but is not clear about where and how frequently a 12-foot shoulder for the general purpose lanes will be maintained. For example, it was disclosed in the final 4(f) evaluation that next to the Morningstar Moses Cemetery:

> The width of the right shoulder is reduced from 12 feet to 6 feet wide (measured between the edge of travel lane and face of concrete barrier) for a total length of approximately 400 feet including tapers. The total length of the narrow right shoulder excluding the tapers is approximately 235 feet.[44]

This FEIS does not disclose how the risk is managed between toll lanes and general purpose lanes and whether when the general purpose lane shoulder is less than 12 feet, the toll lane shoulder is also proportionally narrower or if the general purpose lanes bear the entirety of the safety risks associated with a narrower shoulder adjacent to the outer lane.

In addition, Mr. Bloch opines, the preferred alternative will exacerbate the traffic backup bottlenecks as the seven lanes heading north on I-270 will funnel to two lanes just north of

---

[42] *See* Report of Byron Bloch at 1, attached as Exhibit 1.

[43] *Id.* at 4.

[44] FEIS App'x G Final 4(f) Evaluation at 65, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/11_MLS_FEIS_AppG_Final-Section-4f-Evaluation_-June-2022p.pdf

00177789

Gaithersburg. There are already bottlenecks in the Gaithersburg area from a less severe funneling from five lanes to two. As addressed more fully elsewhere in this Section, bottlenecks cause localized air pollution. Gaithersburg hosts several EJ populations who should not be asked to bear this additional environmental burden.

Based on his review of the FEIS, Mr. Bloch concludes:

The FEIS fails to address how the Alternative 9 road design will lead to more vehicle crashes, including the lethal truck-vs.-car crashes (which I have analyzed for many years as a national auto safety expert analyzing many such actual collision accidents). The lane shifting and cross-overs to and from the toll lanes to entry and exit locations will exacerbate such collisions with severe to fatal consequences for the occupants of passenger vehicles.

The FEIS should have, but did not, thoroughly evaluate these safety issues and corresponding impacts to public health while analyzing the effects of the alternatives. Instead, it includes a proposed alternative that is likely to cause significant health impacts from unsafe road conditions.

IV.     **The FEIS's Discussion and Evaluation of Plummers Island, Certain NPS Lands, the Potomac River, and Impacts to the Northern Lon-Eared Bats and Other Bats Is Incomplete and Contrary to Applicable Legal Requirements.**

A.      **Throughout the Environmental Review Processes, the Agencies Have Failed to Consider the Full Scope of Impacts to Plummers Island.**

Plummers Island is a unique natural research area that hosts many rare plant species while at the same time being close to a heavily populated urban area. It is the site of important, long-term scientific studies conducted by the Washington Biologists' Field Club ("WBFC" or "Club"), a non-profit organization comprised of influential and accomplished scientists and charged by the National Park Service with the care and maintenance of the Island. The Island also serves as the meeting place for the Club's members. WBFC has documented the rich ecosystems and biodiversity on Plummers Island through over 120 years of research. Plummers Island is entitled to protection under Section 4(f), both as part of the C & O Canal Historical Park and as a significant historic resource that is individually eligible for listing in the National Register of Historic Places as the Washington Biologists' Field Club on Plummers Island.

In the preferred alternative, the Agencies plan to take part of Plummers Island, place piers for the highway on the Island, undertake construction of the Project from the Island, destroy important research plots of rare plant species and habitat, and overshadow the Island and its significant research areas by as much as 30 feet with noisy new bridge lanes. All of these impacts constitute a use of Plummers Island that must be evaluated under Section 4(f).

WBFC was a consulting party in the Agencies' Section 106 process, but in spite of WBFC's attempts to protect the Island through its consulting role, the Agencies have failed to do so. Nonetheless, the Agencies appropriately recognized the Island's historic significant and have

25

00177790

agreed to nominate Plummers Island to the National Register of Historic Places. Yet, the Agencies have failed to protect the whole of the property, including the riparian areas outside the ordinary high water mark, or evaluate feasible and prudent alternatives that would avoid or minimize harm to the protected features of Plummers Island.

Under the binding 1959 agreement between WBFC and the National Park Service,[45] the parties memorialized their intent to "preserve this natural wild area as a sanctuary and scientific research preserve," and WBFC gave the Island to the federal government, who agreed to ensure that any improvements on the island "shall not be inconsistent with the uses to which the island has been dedicated by the [WBFC]" in exchange for WBFC's continued maintenance and research on the Island as a wild natural area, so long as WBFC existed and complied with certain obligations. WBFC's extensive studies of the Island make it a rare and precious part of the cultural and scientific natural heritage of the National Park system.

As we now discuss, the failure to acknowledge the full scope of the impact of the Project on Plummers Island, including the long-term research and sensitive research sites that will be destroyed by the Project, and the failure to evaluate feasible and prudent alternatives that would avoid or minimize harm to the protected features of Plummers Island, violates Section 4(f).

### 1. The Agencies Violated Section 4(f) of the Transportation Act by Failing To Mitigate all Proposed Impacts to the Island.

The Agencies' failures to avoid or minimize impacts to Plummers Island violate Section 4(f) of the Department of Transportation Act. The Act bars the FHWA from approving any transportation project that "requires the use of . . . any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such . . . historic site resulting from such use." 23 U.S.C. § 138(a); 49 U.S.C. § 303(c). *See* SDEIS Comments at 136. FHWA determinations under Section 4(f) must be made in the ROD and cannot lawfully be deferred. 23 C.F.R. § 774.7(e)(3). *See generally* Sierra Club, Section 106 Comment Letter (Apr. 12, 2021).

The Agencies have now missed their opportunity to adopt an alternative to using Plummers Island as part of the Project or to adopt mitigation in compliance with Section 4(f). Understanding that the Agencies were unlikely to select an alternative that avoided the Island entirely, WBFC proposed mitigation efforts on many different topics in the Section 106 process. *See supra.* The Agencies rejected some of those proposals. They also failed to treat effects to wetlands and waterways as Section 4(f) issues. Now the FHWA has run out of time to formally agree to any meaningful mitigation to comply with its Section 4(f) responsibilities in the ROD because they deferred a final determination on Section 106 mitigation until the execution of the programmatic agreement after the NEPA process. The FEIS does not propose to include reasonable alternatives

---

[45] *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement, App'x A (Feb. 3, 2022) (attaching 1959 Agreement between WBFC and NPS).

00177791

that would avoid or mitigate harm to the Island in the preferred alternative, suggesting that it is very unlikely that the full mitigation required by Section 4(f) will be approved in the ROD.

The preferred alternative will cause irreparable harm to Plummers Island. Environmental damage to Plummers Island cannot be fixed by any form of post-hoc mitigation, as is apparently contemplated by the programmatic agreement. Plummers Island is a research site that hosts a multigenerational study of long-term ecological processes. Destruction of, or serious damage to, the habitat stops the ecological processes whose progress WBFC has been studying for over a century and ends the long-term study. The Agencies' proposed "comprehensive ecological restoration plan" on NPS land to address impacts from the preferred alternative, FEIS at 5-110, is not a solution.[46] Instead, it disrupts long-term research begun in 1901 and forces the WBFC to start a new study from scratch. The deferral of consideration of these long-term impacts violates Section 4(f). *See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 371 (D.C. Cir. 1999) (because the historic properties protected by Section 106 and Section 4(f) are similarly defined, "it follows that the [Federal Highway Administration] must complete its Section 106 determinations before it can comply with section 4(f)").

## 2. Areas Within the Riparian Zones of the Island Must be Considered When Evaluating Impacts to the Island.

In the FEIS and the Section 106 process, the Agencies improperly ignored impacts to Plummers Island beyond the Island's ordinary high water mark. For over 120 years, as part of its overall research, WBFC has studied the wider, riparian margins of Plummers Island. This ecosystem-wide approach to the Island is part of the legacy of WBFC on Plummers Island. However, MDOT continues to say the Island ends at the ordinary high water mark because it failed to recognize the character-defining features of the historic property that justify a different boundary. The Agencies also arbitrarily declined to treat Plummers Island as a separate historic site of national significance worthy of special protections within the larger Chesapeake & Ohio Canal National Historical Park, despite the clear determination of eligibility for the WBFC at Plummers Island made by the Maryland Historical Trust during the course of the Section 106 process.[47]

The FHWA's failure to recognize this use of WBFC at Plummer's Island for purposes of Section 4(f) is contrary to the historic record and inconsistent with the purpose of the proposed designation of Plummers Island on the National Register of Historic Places. Because of the legacy of the WBFC and its research, the federal government determined Plummers Island to be eligible for the Maryland Historical Trust and the National Register of Historical Places, and historic designation requires protecting the Island as a whole.

---

[46] At a minimum, however, as required by the Section 106 process, MDOT and NPS should consult with WBFC before and during any proceeding "restorations."

[47] *See* Maryland Historical Trust, Determination of Eligibility Form for Washington Biologists' Field Club on Plummers Island (Aug. 20, 2021), attached as Exhibit J.

27

### 3. WBFC Was not Properly Included in the Planning Process and the Agencies Improperly Rejected its Recommendations To Minimize Impacts to Plummers Island.

WBFC, despite its historic relationship with Plummers Island, was not originally included in the National Historic Preservation Act Section 106 process. Once WBFC was included as a consulting party to the Section 106 process, the Agencies met with WBFC and agreed to a five-year study of impacts from the Project with photographic documentation. Despite the fact that WBFC at Plummers Island will be used and its research sites will be irreparably damaged the by the Project, the Agencies have not agreed to WBFC's mitigation requests, including proposals for long-term monitoring of invasive species and the effects of the shadow from the bridge or WBFC's request for NPS funding for research using NPS standard plots emplaced and followed for 20 years to capture impacts more fully.[48] WBFC's suggestions were either ignored or dispensed with on engineering and cost grounds. For example, under the preferred alternative, the Agencies plan to build a shared use path on the bridge in a manner that would overhang Plummers Island, despite WBFC's objections and suggestions of where else to place it.

Moreover, WBFC was not given notice of MDOT's field visits to Plummers Island so that WBFC could oversee the work to avoid damage to certain plots and rare species. MDOT's contracted crews have already hacked down seven fringe trees (NPS was notified and fined the company, but that doesn't change the fact that the trees had already been cut down). MDOT has failed to respect WBFC's role on the Island throughout the planning process and provide appropriate advance notice for disturbances to Plummers Island.

WBFC should have been included in the Section 106 process from the beginning, and its reasonable mitigation requests should have been honored. Instead, the Agencies have pushed forward with a plan that will contravene WBFC's goals and permanently damage this important resource. More importantly, in doing so, the FHWA has violated its responsibilities under Section 4(f) to avoid or minimize harm to WBFC at Plummers Island as a stand-alone Section 4(f)-protected historic site.

### 4. Mitigation for Impacts to Plummers Island Should Have Been Evaluated in the NEPA Process from the Beginning Instead of Being Channeled into a Section 106 Process that Will Conclude after the Comment Period Is over and the ROD Is Signed.

The Agencies' failures to fully consider impacts to Plummers Island as part of the NEPA and Section 4(f) reviews is an artifact of their decision to address impacts to the Island in a Section

---

[48] Proposed mitigation included the following: Nomination of WBFC on Plummers Island to the National Register of Historical Places; bike & pedestrian lane emplacement; flooding potential; pier and caisson emplacements; ALB construction platforms; channel impacts from construction and vegetation removal; researching disturbance; invasive species; abatement of toxic runoff; abatement of noise pollution; vistas; expanded online content; financial support for inventories of understudied groups on the island; access during construction; and long-term research. *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement at 14-18 (Feb. 3, 2022).

28

106 programmatic agreement that will not be executed until after the NEPA and Section 4(f) processes have concluded. The decision to rely on a programmatic agreement for Plummers Island was in error. Section 106 regulations provide that a programmatic agreement is appropriate in certain limited situations, including "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. §800.14(b)(1)(iii). Here, however, there was no reason to defer all identification of historic properties within the area of potential effects or the assessment of adverse effects and any measures to avoid and mitigate. WFBC and other commenters provided fulsome comments about possible adverse effects to the Island and numerous suggestions for proposed mitigation.

Because of the decision to proceed with a programmatic agreement, the Agencies claimed that they could not fully consider impacts to Plummers Island in the NEPA and Section 4(f) processes and declined to consider reasonable alternatives to avoid impacts (such as project scope, number of new lanes, and road alignment). But delaying consideration of the impacts to the site during alternative selection under NEPA and Section 4(f) undermined discussion of potential mitigation measures for any adverse effects. *See* Sierra Club Section 106 Comments of October 8, 2021.[49]

For example, in the FEIS, the Agencies essentially state that disrupting the continuity of WBFC's research is unavoidable, by ignoring reasonable alternatives that avoid impacts to Plummers Island. The no build option was dismissed without sufficient consideration. In addition, the ALB Strike Team considered a construction approach with a "west shift" of the LOD to entirely avoid impacts to Plummers Island, FEIS at 5-28, and determined it a viable option. The FEIS does not sufficiently explain why this west shift was rejected, particularly because "[a]n additional goal of the ALB Strike Team was to develop and evaluate alternatives for the avoidance and minimization of [impacts to] Plummers Island as it is a recognized ecologically sensitive and an NRHP-eligible historic property in addition to being part of the larger Chesapeake and Ohio Canal National Historical Park." FEIS at 5-28.

Damage to the Island was not inevitable. Allowing construction of the Project to impact the Island demonstrates the Agencies' error in failing to explore reasonable, prudent, and feasible alternatives under NEPA and directly violates the FHWA's substantive obligations under Section 4(f)

## 5. The Agencies Violated NEPA by Failing To Fully Account for Toxic Runoff, Water Quality Impacts, and Other Likely Impacts to the Island.

Despite WBFC's and other comments explaining the likely impacts of the Project on Plummers Island, the FEIS does not provide NEPA's required "hard look" with respect to the Island.

---

[49] Sierra Club Maryland Chapter Section 106 Comments on the I-495 & I-270 MLS (Oct. 8, 2021), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u18365/MDSierraClub-Section106Comments-10-08-2021.pdf.

29

00177794

First, by limiting their consideration to areas landward of the ordinary high water mark on the Island, the Agencies claim that the preferred alternative will impact less of the Island than would have been indicated if those areas had been properly included.[50] The area that was considered is partly under the expanded ALB and the extended shadow will shade it out. Additional rare communities within the area of potential effects and bordering on the LOD include the Potomac River Bedrock Terrace Hardpan Forest; Floodplain Terrace Forest (with wetland bedrock pools); and the Central Appalachian / Piedmont Basic Mesic Forest with many sensitive species that are restricted to these habitats on the Island, including several that are rare. Plants cannot move out of the way and natural habitat is already being lost throughout the region. The rocky headland of the Island preserves a bit of the Potomac Gorge Riverside Outcrop Barren plant community (globally and state rare) and possibly the easternmost extent of this vegetation unit in the Gorge.[51]

Second, the FEIS includes incomplete maps of the Island, which adds to the Agencies' failure to consider the full extent of the impacts from the preferred alternative. In previous MDOT slides, the positions of piers from the post-construction ALB appears to be wider and overhang Plummers Island more than as illustrated in the FEIS. The Agencies have not explained this discrepancy between MDOT's slides and information in the FEIS. WBFC remains concerned that the FEIS understates anticipated impacts to Plummers Island. Further, the destruction and disturbance of Chesapeake & Ohio Canal National Historical Parklands and riparian and pond wetlands is not likely to be contained within the LOD. In addition, in the maps of Plummers Island, the FEIS fails to completely catalogue the Island's water resources. For example, the Agencies did not fully map the frog water pools in the area of potential effects. There is a pool northwest of the mapped pools not drawn on the map. And there is further pooling northeast of the mapped pools that should be mapped as wetlands. The Agencies cannot fully evaluate impacts to the Island if they cannot even accurately describe its current state.

Third, the FEIS fails to consider toxic runoff onto the Island or reasonable mitigation to address it. Most bridges studied for toxic runoff rise up from the surrounding lead-in roads (convex). The ALB is concave, draining as much as a half mile in either direction from Maryland and Virginia lead-in highways. The low point in the curve is between the bend in Plummers Channel and the adjacent mainland. Currently drainage runs onto the NPS mainland, the channel, and the land edge under the bridge on both sides. The expanded I-495 and ALB would substantially increase surface runoff from the ALB, including toxic pollutants onto NPS land and into Plummers Channel. In addition, the lowest point on the ALB drains through scuppers and culverts onto NPS land, cutting an erosional gully and then draining into Plummers channel. *See* WBFC Comments on Section 106 at 16.T (Feb. 3, 2022). The Potomac River water may show little increase in pollutants due to its disproportionately large volumes. In contrast, Plummers Channel does not flow much of the time, and runoff accumulates in the water there until the surface flow threshold

---

[50] WBFC emphasized this point in its virtual and written SDEIS comments in 2021. WBFC's prior comments on the Section 106 process and comments on the DEIS and SDEIS are available at https://wbfc.science/plummers-island-threatened/.

[51] *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement, App'x C map B (Feb. 3, 2022), attached as Exhibit M.

30

significantly breaches the channel head (level at or above 4.3 ft at Littlefalls Gauging Station). Between 3.4 and 4.2 ft Plummers Channel currently back fills from the bottom. Below 3.5 ft it is mostly stagnant.[52] Yet, the FEIS fails to discuss drainage directly onto Plummers Island or into Plummers Channel.[53] The Agencies plan to address ALB storm water management by relying on compensatory sites. FEIS at 3-20. Sierra Club criticized this approach in its SDEIS comments, *see* SDEIS Comments at 97-101, and continues to object to it. By relying on compensatory stormwater management, the FEIS seems to say that nothing can be done about contaminated runoff.[54] The Agencies also state that meeting stormwater quantity management goals on the shorelines adjacent to the ALB is infeasible. *See* FEIS at 3-18. The FEIS demonstrates that the Agencies are still planning an unlawful game of "wait-and-see" when it comes to how stormwater will affect this precious resource.

Fourth, the Agencies have failed to properly survey and analyze the occurrences of rare, threatened, and endangered species on Plummers Island and in the vicinity. As Dr. Browne explains more fully in her attached letter, the Agencies failed to properly survey for certain rare species on the Island and in the vicinity, including bats.[55] For example, they only performed bat surveys for two nights per site, even though bats frequently change roosts in the summer, so surveys should be performed for multiple nights to address presence or absence. Without mist netting and acoustic monitoring, more surveying is needed to determine the presence of threatened and endangered species on Plummers Island and in the vicinity of the American Legion Bridge on both sides of the Potomac River.

Fifth, the FEIS asserts that certain permanent impacts to Plummers Island will be temporary. The FEIS states that impacts to Plummers Island will be "permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities," affecting "approximately 0.28 acres of impacts to the island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact." FEIS at 5-29. The FEIS notes, "[t]emporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers adjacent to the island, and slope protection. Access to the existing and proposed piers is required for these activities." *Id*. These "temporary" construction activities have permanent effects. Armoring embankments, cutting down trees, destroying vegetation in the LOD, and creating a dead zone under the bridge and an extended shadow over the Island will irreparably damage the Island.

---

[52] The measures above are based on WBFC member Robert J. Soreng's estimates from having crossed to the Island many times. Dr. Soreng notes that even with the recent big rains the river level has been well below 4.3 ft.

[53] Plummers Channel is identified in the DEIS and SDEIS as "Rock Run Culvert," although it is neither Rock Run nor a culvert, and in the FEIS as a Potomac River "oxbow," although it is now officially named Plummers Channel by the USGS Board of Geographic Names.

[54] MDOT did not respond to comments about runoff from spills onto the Island from accidents. Several recent accidents have caused spills.

[55] *See* Letter from Shannon P. Brown, PhD to Sierra Club Maryland Chapter (July 18, 2022), attached as Exhibit K.

31

00177796

Even the FEIS recognizes that the "temporary" construction impacts may cause permanent damage to certain important plant species that are being studied on Plummers Island:[56]

> Some impacts to RTE [or rare, threatened, and endangered] plants will occur on Plummers Island, though most will occur in areas that will be temporarily disturbed during construction of the new ALB. RTE plants potentially affected within the areas of temporary disturbance on Plummers Island include thousands of horse-tail crown grass plants, about a dozen pale dock plants, 30-50 halberd-leaf rose-mallow plants, and 10-50 Rand's goldenrod plants. All of these plants occur either along the Plummers Island shoreline of the oxbow of the Potomac River or along the Plummers Island shoreline of the Potomac River. As noted above, because of the duration of construction of the new ALB and potential shading effects from the expanded ALB, the plant impacts are likely more permanent than temporary, even though they occur outside of the permanent footprint of the bridge. The RTE plant impacts resulting from the bridge pier footprint on Plummers Island would be to a few dozen horse-tail crown grass plants along the edge of the oxbow of the Potomac River.

FEIS at 5-127. The FEIS does not, however, acknowledge that many other "temporary" impacts are permanent disruptions to the integrity of the Island. Plummers Island is currently managed for scientific research to study long-term trends with no disturbance. The preferred alternative is antithetical to that purpose and the FEIS fails to acknowledge the full impacts to Plummers Island and to WBFC's mission. These acknowledged impacts also increase the severity of the use of Plummers Island under Section 4(f), and the FHWA's violation of its substantive obligation under Section 4(f) to consider prudent and feasible alternatives that would avoid or minimize harm to the important research sites that will be destroyed by the Project.

### 6. The Agencies also Do Not Address Concerns to Plummers Island from Flooding.

The FEIS fails to accurately describe the likely impacts of the preferred alternative due to the risks of catastrophic flooding to the Island. As noted above, the Agencies improperly limited consideration of impacts to Plummers Island to those that occur within the Island's ordinary high-water mark.

The FEIS's evaluation of construction and long-term impacts to the Island from flooding is also inadequate. In the FEIS, the Agencies state that hydrologic analysis will not be completed until final design, but without full hydrologic analysis the FEIS is incomplete. *See* FEIS 5-84 (explaining that a general assessment of hydrologic effects for the Project will be completed "once final limits of cut and fill are determined the final phase of engineering design"). Flow in the

---

[56] The FEIS explains "the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the Island, a character-defining feature of the WFBC, resulting in diminishment of property's integrity of setting." FEIS at 9-33. It does not, however, fully describe the impacts from the Project or attempt to avoid or fully mitigate them, as discussed *supra.*

32

channel will be affected simply by removing the old piers at the river's edge, let alone by flooding adding to this impact, but the FEIS does not address these impacts.

The flooding issues from planned caisson and pier emplacements (creating perfect conditions for logjams) and leveling or trimming the rock ridge that constrains the channel overflow from flooding the island are major and reasonably foreseeable adverse issues that require prompt attention and avoidance, minimization, or mitigation and were not fully addressed in the FEIS.

Similarly, the Agencies indicate that the construction process will be designed to address 100-year floods, but those floods now come more frequently than historic 100-year floods. The FEIS must acknowledge that the data it is using to evaluate construction impacts is outdated and understates the risks to the Island. Given the increasing frequency of more extreme rains, there is a potential for catastrophic flooding at the ALB in Mather Gorge narrows.

In sum, throughout this process, the Agencies have continued to undervalue both Plummers Island and WBFC's important role in protecting it. As a result, they have recommended an alternative that will, among other things, permanently impact RTE plants, destroy WBFC long-term research, denude, overshadow, and armor the upper end of the Island, and increase the risk that stormwater runoff or catastrophic flooding will cause large-scale damage to the Island. The Agencies still lack smart-growth-forward thinking to address climate change, and instead of coming up with smart-growth solutions they plan to permanently damage the irreplaceable natural resource that Plummers Island represents.

## B. The FEIS Fails to Address Several Outstanding Issues Pertaining to National Park Service Land Around the American Legion Bridge, Including on Both the Maryland and Virginia Sides of the Potomac River.

### 1. There Is No Stormwater Management Planned for the American Legion Bridge, Which May Run Afoul of Clean Water Act Requirements.

With no plan for stormwater treatment on the ALB, water will drain directly from the Bridge into the Potomac River. While original plans included stormwater management on National Park Service ("NPS") properties to address runoff from the Bridge, this control measure has been eliminated because, the Agencies claim, the NPS will not allow stormwater management facilities on their properties except in narrow circumstances not applicable here. *See* FEIS at 3-18.[57]

However, according to the FEIS at ES-10, Maryland Water Quality Standards, and likely Virginia Water Quality Standards as well, require onsite treatment of all new impervious areas and

---

[57] The Agencies must clearly explain why stormwater management to address Bridge runoff is not appropriate on Plummers Island because it is not clear that restriction applies given that Plummers Island is NPS-owned land.

33

00177798

for stormwater to leave a site in equal or better condition that it arrived. That requirement applies to most if not all of the ALB, yet nothing is being done to comply with it.

Observers of the Project involved in the Section 106 process have suggested that several of the scuppers on the American Legion Bridge will drain directly onto Plummers Island (National Park Service property), which would seem counter to the Agency's interpretation of NPS's policy regarding stormwater management on their property. This proposed stormwater drainage exacerbates the harm to this Section 4(f)-protected property discussed above.

Even beyond the legal requirements, it is highly concerning that no stormwater management is planned for an area that is concave and receives stormwater from large amounts of impervious surface in both Maryland and Virginia. Moreover, that stormwater flows directly into the Potomac River, a source of drinking water for 6 million people.

The Potomac River Keeper Network states:

The Potomac River provides clean, safe drinking water to almost 6 million people within the river basin. Close to 100 million gallons of water are taken from the river and transported to homes, schools, restaurants, hospitals, and dozens of other businesses and amenities daily. This water is used for drinking, cooking, cleaning, showering, and removing waste.[58]

According to the Potomac River Basin Drinking Water Source Protection Partnership,[59] pollution in the Potomac River from de-icing materials, hazardous spills, and stormwater are challenges to providing a reliable and safe supply of drinking water. Those challenges will significantly increase if the Agencies proceed with the preferred alternative of widen I-495 and the ALB by adding toll lanes without addressing increased stormwater runoff or spills into the Potomac. The FEIS should have addressed these stormwater issues given their extensive health and safety ramifications. No project should be cleared to move forward with such poor planning.

> **2.    Over 1,000 Trees Will Be Removed from National Park Service Land, Which Remains an Unacceptable Number from the Perspectives of the National Park Conservation Association, National Capital Planning Commission, and Most Likely the National Park Service As Well.**

According to the FEIS, in July 2021, the National Park Service objected to the removal of 858 trees on NPS property, including along the C&O Canal. FEIS App'x S at 14. Under the preferred alternative, 815 trees will be removed from the C&O Canal, 270 removed along the Clara

---

[58] Potomac River Keeper Network, https://www.potomacriverkeepernetwork.org/imagine-a-day-without-water-october-21st/#:~:text=The%20Potomac%20River%20provides%20clean,people%20within%20the%20river%20basin.

[59] Potomac River Basin Drinking Water Source Protection Partnership, *available at* https://www.potomacdwspp.org/about-us/.

00177799

Barton Parkway, and 76 from the George Washington Memorial Parkway, resulting in a total of 1,161 trees to be removed on NPS property. *Id.* at Tbl. 5-9. This is an unacceptable level of impact for which no apparent mitigation has been proposed. Given that these resources are protected under Section 4(f), the FHWA is obligated to consider whether there are prudent and feasible alternatives that would avoid or minimize the harm resulting from the destruction of so many trees.

### 3. Further Investigation Is Required into Whether it Is Legal Without Congress's Review and Approval to De-Federalize Capper Crampton Lands and Transfer Them to the States for Transportation Use.

A November 19, 2021, letter from the National Capital Planning Commission to MDOT SHA[60] stated:

> Regarding the two federal parkway lands, NPS has advised NCPC of its intent to "transfer" project-related George Washington Memorial Parkway land to the State of Virginia and project-related Clara Barton Parkway and Chesapeake & Ohio National Historic Park land to the State of Maryland. These resulting changes would negate NCPC's Capper-Crampton jurisdiction over Clara Barton Parkway land and our Planning Act jurisdiction over George Washington Memorial Parkway and C&O Canal National Historic Park lands. Given these facts, NCPC has no formal review authority over any aspect of the Alternative 9 - Phase I South Alternative; however, please note that NCPC would still be legally obligated to comply with the CCA requirements and 1941 and 1951 Agreements until such as time the land transfers are complete. This includes ensuring that M-NCPPC consents to the transfers and obtains compensation for its contribution to the land purchase.

Yet, two years earlier, there were concerns about the legality and optics of taking this course of action. Meeting notes obtained by FOIA state:

> There was a discussion on de-federalizing CC lands. NCPC was not sure if that is allowed but were concerned with optics and risks associated with it even if it [sic] allowed. NCPC talked about [sic] 1963 perpetual easement agreement between the State and M-NCPPC due to the widening and construction of the Capital Beltway."[61]

---

[60] November 19, 2021, Letter to MDOT SHA's Jeffrey T. Folden from Marcel Acosta, Executive Director of National Capital Planning Commission, Re: I-495/270 Managed Lanes Study Draft Supplemental Environmental Impact Statement Comments.

[61] Meeting notes from Federal Highway Administration (FHWA) and National Capital Planning Commission (NCPC) Meeting, Location: NCPC Headquarters, November 1, 2019, attached as Exhibit L.

00177800

In another bullet, the meeting notes stated: "NCPC informed FHWA that NPS reached out to them to let them know about the 1941 agreement on George Washington (GW) Parkway which stipulates NCPC's role."

The Agencies must justify these proposed land transfers, including identifying the "risks" noted by NCPC, explaining the decision-making process, and describing why the transfers are consistent with the applicable law, including all relevant agreements.

### C. The FEIS Does Not Adequately Identify and Analyze Impacts to the Potomac River.

#### 1. Information Is Lacking and Still Needed Regarding Recreational Use of the Potomac River During Construction.

The Potomac River flows under the American Legion Bridge (ALB), which will be replaced under the preferred alternative. Recreational users of the Potomac River are deeply concerned about the impact of construction of the new bridge on the River.

The Canoe Cruisers Association, one of these concerned groups, submitted comments on the EIS documents, FEIS App'x T.2.B. Vol. 1 at CO-566 – CO-569, and summarized their concerns in an opinion piece in Maryland's *Bay Journal*:

> It is anticipated that the construction of the [American Legion] bridge will take five years and double the size of the current one. This will inevitably harm natural and recreational experiences and the river itself. Increased noise, restriction of the channel with barges, riprap and heavy equipment are certainties, and intermittent closures of the river to recreational boating are very likely. . . . The Potomac River is nationally recognized as an important historic, scenic and recreational waterway . . . . Two of the 11 nationally designated scenic land and water trails in the U.S. run under the American Legion Bridge: The Park Service's Potomac Heritage National Scenic Trail [and the] Captain John Smith Chesapeake National Historic Trail. . . . MDOT's environmental documentation fails to even mention the impact of bridge construction on these monumental historic and recreational sites. . . . The department must describe how it can and will avoid adverse impacts. [62]

In their comments and article, the Canoe Cruisers Association raised concerns about boating access, safety, and environmental impacts to the Potomac River during construction of the new ALB. Unfortunately, the boating concerns raised by Canoe Cruisers Association have been generally dismissed.

---

[62] David Cottingham, Maryland Silent on Recreational Impacts of Potomac Bridge Project, Bay Journal (Apr. 13, 2022), *available at* https://www.bayjournal.com/opinion/forum/maryland-silent-on-recreational-impacts-of-potomac-bridge-project/article_40e00ae8-af71-11ec-9558-b354667002⬤6.html.

00177801

For example, the Maryland Historic Preservation Office concluded that the Potomac River under the ALB is not an historic resource covered by the National Historic Preservation Act. Even though the National Park Service has designated the Potomac beneath the ALB as part of the Potomac Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, NPS did not echo the Canoe Cruisers Association's concern about adverse impacts to those waterway trails in its comments during the EIS or historic preservation reviews.

In their response to comments on the FEIS, the Agencies stated that, during construction, no dikes or large stones will be placed in the Potomac except around the new piers supporting the ALB. Further, they expect to construct the new bridge using "trestles" for the heavy equipment:

> During construction, it is anticipated that causeways, trestles and barges will be utilized to access the ALB corridor for demolition and construction. It is not anticipated that rocks will be placed across the Potomac due to it's [sic] depth and that off the banks, the contractor will utilize steel trestles supported on temporary pilings that will be removed at the completion of construction as well as barges to obtain access. During the heavy construction operations, it is anticipated that *water users will have temporary disembarkment and rentry [sic] requirements to detour around the construction* (emphasis added). These are anticipated to be intermittent during construction. Permanent riprap for scour protection is anticipated to be placed around the pier footings but not across the entire channel between piers.

FEIS App'x T.2.B.Vol.1 at CO-567. Construction is expected to take up to 5 years and the proposed construction zone across the Potomac is about 600 feet long. The Agencies provide no information about where the "disembarkment and re-entry" points will be and no details on how frequently these "intermittent" disruptions will occur.

The Agencies further conclude that, "[w]hile the Potomac River has a recreational use, it is not a park as defined under Section 4(f) or the US Department of Transportation (USDOT) Act of 1996 as amended. Construction of the new ALB should *not prohibit the navigability* of the main channel of the Potomac River and construction will be limited to the shorelines." FEIS App'x T.2.A.Vol.1 at CO-568 (emphasis added).

Construction will certainly *interfere with or impede the navigability* of the Potomac for several years, even though it may not "prohibit" it, except intermittently.

More still needs to be disclosed to the recreational users of the Potomac and the public about how the Potomac will be impacted by the proposed demolition of the current American Legion Bridge and by its rebuilding and approximate doubling in size.

37

2.  **The Agencies Should Have Considered Whether the Potomac River Is a Section 4(f) Resource Due to its Inclusion Within the C & O Canal Historical Park.**

The Agencies should have considered whether the Potomac River is a Section 4(f) recreational resource due to its location within the C & O Canal National Historical Park, the fact that it is part of the Potomac Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, and possibly due to its designation as a state wild and scenic river.

FHWA's Section 4(f) policy paper states:

Those portions of publicly owned rivers, which are designated as recreational trails are subject to the requirements of Section 4(f). Of course, Section 4(f) would also apply to lakes and rivers, or portions thereof, which are contained within the boundaries of a park, recreation area, refuge, or historic site to which Section 4(f) otherwise applies. [63]

Based on these criteria, the Potomac River should qualify as a Section 4(f) recreational resource. The River passes through the 4(f)-protected C & O Canal National Historical Park, passes around the 4(f)-protected resource Plummers Island within the C & O National Historical Park, and is part of the Potomac River Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, both of which are recreational resources.

Additionally, the Potomac River is designated by the state of Maryland as a "scenic waterway" under the state Department of Natural Resources' Scenic and Wild Rivers System, which underscores its importance as a recreational resource within Maryland. Given this designation, the FHWA should have consulted the state's Wild Rivers Advisory Council as it weighed whether the state's management plan designates the river as a "significant park, recreation area, or wildlife and waterfowl refuge" and is therefore protected under Section 4(f).

D.  **The FEIS's Analysis of Impacts to the Northern Long-Eared Bat and Other Bats Is Inadequate and Even More Outdated than Before, Given Recent Regulatory Developments and New Revelations About the Scope of Construction.**

Throughout the NEPA process, we have emphasized that the Agencies' analysis of potential impacts to the Northern Long-Eared Bat relies on an outdated, 2016 Endangered Species Act ("ESA") Section 4(d) Rule, *see, e.g.*, SDEIS Comments at 118, and fails to sufficiently analyze the threat to bats, *see* DEIS comments at 74. We incorporate by reference the points we made in those comments in their entirety and note that the Agencies never responded to them in the FEIS.

The Agencies' assessment is now even more outdated in light of the U.S. Fish and Wildlife Service's proposed classification of the Northern Long-Eared Bat as endangered and the fact that, with construction extending into Virginia, even more bats, and potentially more bat species, will be impacted. These impacts were not properly evaluated by the Agencies' bat surveys.

---

[63] Section 4(f) Policy Paper, Question 21A, *available at*
https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx#addex21.

38

00177803

1.    **The FEIS Fails To Consider a Court Decision Invalidating the Fish and Wildlife Service's Listing for the Northern Long-Eared Bat as Threatened and the Agency's New Proposal To List it as Endangered.**

As we noted in our SDEIS comments, the U.S. District Court for the District of Columbia held that the designation of the Northern Long-Eared Bat as threatened, rather than endangered, was arbitrary and capricious. That opinion was issued before the DEIS was released for comment, *Center for Biological Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020), giving the Agencies ample time to consider and address its effects. The FEIS does not, however, even acknowledge this decision. Instead, like the SDEIS and DEIS, the FEIS states—without caveat—that the Project is "covered" by the Programmatic Biological Opinion on the 4(d) Rule for the bat. FEIS at 5-126; FEIS App'x M, Sub-App'x N at 176-77; see also FEIS at 9-53; FEIS App'x M at 134 (explaining that the ESA consultation process has been "completed"); see also FEIS App'x M, Sub-App'x N at 84-85.

Correspondence from the Fish and Wildlife Service indicates that the decision to rely on the 4(d) Rule was made in 2019, before the D.C. District Court determined that the reasoning for the threatened status was arbitrary and capricious. FEIS App'x M, Sub-App'x N at 37. This letter also indicates that, in 2019, the Fish and Wildlife Service understood that a change in the Northern Long-Eared Bat's status would limit the Project's flexibility and even indicated a willingness to consider exemptions from the ESA's prohibition on "taking" endangered species, including potentially "exempt[ing] taking associated with tree removal during the active season, but outside of the pup season, in known occupied habitat." FEIS App'x M, Sub-App'x N at 37. MDOT SHA and FHWA were also aware of the impacts of a change in the ESA listing status: in a letter to MDOT, the Fish and Wildlife Service wrote that, because the Indiana Bat, a species found near the corridor study boundary, was endangered, there was "not as much flexibility" as there was when constructing around the Northern Long-Eared Bat's habitat when that bat species was listed as only threatened. FEIS App'x M, Sub-App'x P at 35. Further, the Agencies knew early on that forest clearing "may affect" the Northern Long-Eared Bat. FEIS App'x M, Sub-App'x P at 33. Despite that knowledge, the Agencies have not changed or even discussed possible changes to the Project in response to the changing status of the Northern Long-Eared Bat.

Importantly, the FEIS does not consider the Fish and Wildlife Service's recent proposal to list the Northern Long-Eared Bat as an endangered species under the ESA which, if finalized, will nullify the 2016 4(d) Rule. U.S. Fish and Wildlife Service, Proposed Listing, 87 Fed. Reg. 16442 (Mar. 23, 2022). None of the Agencies' correspondence even acknowledges this proposal or its implications and the Agencies have failed to undertake any conferencing procedures to address how the Project will be modified if the bat is ultimately listed as endangered.[64]

---

[64] On July 5, a federal district court in California vacated several ESA rules issued in 2019, returning the ESA consultation process to the regulatory regime that governed before 2019. The Agencies should ensure that its consultation is consistent with that applicable law and acknowledge that any consultation conducted under the now-vacated rules is invalid.

39

00177804

The Agencies must conduct a proper ESA Section 7 consultation and NEPA process that addresses the Northern Long-Eared Bat's likely change in status.

>    **2.     Because of Newly Disclosed Construction in Virginia, There Are More Species that Will Be Affected and Impacts to These Species Should Have Been Assessed Throughout the Process, Rather than Included Only in the FEIS.**

Under the proposed alternative, construction will take place in Fairfax County, Virginia. Virginia constituents were not informed of this proposed construction until the FEIS was released in June 2022.[65] Among other things, in the FEIS, the public learned that the Virginia Department of Wildlife Resources specifically identified Virginia's state-endangered Little Brown Bat and state-endangered Tri-colored Bat as species that could be impacted. FEIS App'x M, Sub-App'x N at 131. The Agencies have determined that there are 14.4 acres of suitable bat habitat and 18.2 acres of somewhat suitable bat habitat, FEIS App'x M at 118, and that there is a "high likelihood" that construction will impact these species. FEIS at 5-126.  These impacts should have been discussed in the DEIS and SDEIS rather than sprung on Virginians in the FEIS, especially since Virginia's state government flagged these species as among those that could be impacted before the SDEIS was issued, FEIS App'x M, Sub-App'x N at 131, yet these additional species impacts were not discussed in the SDEIS, leaving the public without a sufficient opportunity to comment on them.

>    **3.     Surveys of Northern Long-Eared Bat Habitat Continue To Be Inadequate, and the FEIS Fails To Address this Inadequacy.**

To determine the impacts of the Project on the Northern Long-Eared Bat, the Agencies conducted surveys and sought to identify "known" maternity roost trees and hibernacula. These surveys were incomplete, however, for reasons outlined in our SDEIS comments, see SDEIS Comments at 118, meaning that the EIS process did not consider the full range of the bats' potential habitat.[66]

The Agencies have acknowledged possible impacts to Northern Long-Eared Bat and the potential of the preferred alternative to cause adverse impacts to bat habitat. SDEIS Comment at

---

[65] Bruce DePuyt, *MDOT's Plan to Build Toll Lanes in Fairfax is an Unwelcome Surprise to Some Virginians,* Maryland Matters (Jun. 16, 2022),
https://www.marylandmatters.org/2022/06/16/mdots-plan-to-build-toll-lanes-in-fairfax-is-an-unwelcome-surprise-to-some-virginians/.

[66] The Fish and Wildlife Service recently recognized that its determination of a species' habitat must not be artificially constrained. It therefore rescinded a 2020 regulatory definition of "habitat," in the definition of "critical habitat," as too restrictive because it did not include areas that "'currently or periodically' contain something deemed a necessary 'resource of condition'" or which could serve in that manner "after restoration activities or other changes occur." U.S. Fish & Wildlife Service, Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 87 Fed. Reg. 37757, 37758 (June 24, 2022).

00177805

118. For bridges in particular, the Agencies have now determined that the project area has several areas that "support or could support roosting bats," including the Northern Long-Eared Bat: the American Legion Bridge, Clara Barton Parkway Eastbound bridge (which was *not surveyed*), the McArthur Boulevard/Clara Barton Parkway Westbound bridge, and Seven Locks Road Bridge. FEIS App'x M at 117.

Yet, nowhere does the 26,500-page FEIS respond to our concerns with the incomplete bat surveys. FEIS App'x T at 826-31 (FEIS response to comments). Because the habitat surveys were inadequate, the FEIS's assertion that there are no Northern Long-Eared Bats within the LOD, FEIS App'x M at 118, is inadequate for the same reasons that assertion fell short in the SDEIS. *See* SDEIS Comments at 118-19.

The Agencies' failure to consider and address new information, in this case regarding the likely endangered status of the Northern Long-Eared Bat; failure to consider impacts to Virginia bats; and reliance on incomplete habitat studies all resulted in a deficient analysis, in violation of NEPA and the ESA. 40 C.F.R. §§ 1500.1(b); 1502.1. The FEIS also should have analyzed reasonably foreseeable future actions like the likely listing of the Northern Long-Eared Bat as endangered, but it did not, in violation of NEPA regulations. 40 C.F.R. §§ 1508.7, 1508.25.

## V.    The FEIS Fails to Meet the Agencies' Environmental Justice Obligations Despite Numerous Commenters' Efforts in Identifying Deficiencies in the Agencies' Analysis.

### A.    Delaying the EJ Analysis Until the FEIS Precluded Meaningful Public Review Including, Most Importantly, Review and Comment by EJ Populations.

As we explained in our previous comments, by delaying an analysis of EJ impacts until the FEIS, the Agencies prevented full and fair participation by all potentially affected communities. *See* SDEIS Comments at 122-23. These procedural missteps violate NEPA, Title VI, Executive Order 12,898, USDOT Order 5610.2(a), and FHWA Order 6640.23A, among others. USDOT Order 5610.2(a) in particular requires the Department of Transportation to "fully consider[] environmental justice principles throughout planning and decision-making processes." Waiting until the FEIS to disclose key analyses violates this order and fundamental environmental justice principles. As the Maryland-National Capital Park and Planning Commission wrote, waiting to analyze certain EJ issues in the FEIS:

> is far from a best practice since it obstructs public comment and community input. Waiting until after the selection of a preferred alternative to evaluate impacts to minority communities means that disproportionate impacts will not be considered in the formulation of the preferred alternative and thus do not receive the attention NEPA and Title VI of the Civil Rights Act of 1964 [] demand from the Lead Agencies.

M-NCPPC Comments on the SDEIS at 7 (Nov. 30, 2021). Similarly, by waiting until the FEIS to disclose these impacts and present the proposed mitigation for the preferred alternative, the Agencies impair the ability of the public—and EJ populations—to have meaningful input into ways to reduce impacts to EJ communities from the preferred alternative.

41

**B.    Cumulative Impacts to the African American Morningstar Moses Hall and Cemetery Site Have Been Disregarded and Dismissed by the Agencies, Unlawfully Preventing an "Adverse Effects" Determination for a Nationally-Recognized 4(f) Protected Resource.**

Friends of Moses Hall, the National Trust for Historic Preservation, Cabin John Citizens Association, Maryland-National Capital Park and Planning Commission, and Sierra Club Maryland Chapter have long raised the issue of cumulative effects and environmental injustice from the Project in relation to the cemetery and hall site of the Morningstar Tabernacle No. 88 of the Ancient United Order of Sons & Daughters, Brothers & Sisters of Moses in Cabin John, Maryland. These organizations, Section 106 consulting parties or signatories, have offered comments about Morningstar Moses Cemetery and Hall on the NEPA documents and in comment letters to MDOT SHA, FHWA, and other agencies as part of the Section 106 process. Their NEPA and Section 106 comments and all Section 106 agency communications are incorporated by reference in these comments.

The Morningstar Tabernacle No. 88 site abuts Interstate 495 in Cabin John, Maryland, because, as the FEIS recognizes:

> Highways, such as the Southeast-Southwest Freeway (I-695) in D.C. and I-495 through the former Gibson Grove community in Cabin John, were frequently routed through low- income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity.
> The historic Gibson Grove A.M.E. Zion Church was physically split from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery by construction of I-495 in Cabin John in the 1960s. Gibson Grove was a settlement founded and developed by formerly enslaved families, and the Church, Hall, and Cemetery are important features of this historic settlement. (See https://www.friendsofmoseshall.org/history.)

FEIS at 5-135-5-136. The Morningstar Tabernacle No. 88 is a National Register-eligible historic site located in what was a thriving African American community before it was split apart by the construction of the Beltway, which caused the decline of the community. Descendants of this once thriving community still live down the road and in the area. They, with community members and advocates, visit multiple times a year to provide upkeep for the cemetery site they regard as sacred and hallowed. Right next to this cemetery, I-495 was built in the 1960s, widened in the 1990s for increased traffic, and a subdivision was also built around the edges of the cemetery. Now the highway will be widened with four more lanes. Despite this, the Agencies maintain that cumulative impacts to the site do not have to be considered because the harms of the original highway construction occurred prior to the enactment of the National Environmental Policy Act (1970) and the National Historic Preservation Act (1966).

00177807

According to 32 C.F.R. § 651.16 (cumulative impacts), "(a) NEPA analyses must assess cumulative effects, which are the impact on the environment resulting from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."

All aspects of this definition apply to the Morningstar site. The past impacts are listed above, the current impact is four proposed new lanes of highway to be added right next to it, and the future impacts are the rest of this toll lane project, which will result in the highway becoming saturated with more and more car and tractor trailer traffic and resulting noise, dust, and air pollution with each new toll lane expansion in the overall plan. MDOT SHA's March 31, 2022, Section 106 letter explains the future impacts:

> The [I-495 & I-270 Managed Lanes Study] is the first element of the broader Op Lanes Maryland program which considers improvements along the entire length of I-495 (Capital Beltway) in Maryland, connecting into Virginia's portion of I-495, as well as the entire length of I-270 (Dwight D. Eisenhower Memorial Highway) up to I-70 in Frederick County, Maryland.[67]

The cumulative impacts to this site are clearly an adverse effect to Moses Hall that should have been acknowledged for this important Section 4(f)-protected historic resource. Morningstar Tabernacle No. 88 Moses Cemetery and Hall was named by the National Trust for Historic Preservation as one of America's "11 Most Endangered Historic Places" in 2021. Failure to acknowledge this adverse effect has deprived Moses Hall of the protections that it is entitled to under Section 4(f) that would have allowed it to have a say in determining the mitigation measures for the adverse, cumulative impacts still accumulating to it from this highway expansion and reasonably foreseeable future actions.

The cumulative impacts on Moses Hall from past actions are undeniable and have been fully acknowledged by the Agencies. In a *Washington Post* article entitled "Maryland will avoid Moses Morningstar Cemetery when widening Beltway," Julie Schablitsky, the Chief, Cultural Resources Section and Chief Archaeologist at MDOT, is quoted as follows:

> "We own the faults of the Maryland Roads Commission impacting this community 60 years ago," Schablitsky said during a recent visit to the cemetery. "It's our responsibility now to repair that damage and come in and do the right thing."[68]

---

[67] Section 106 Letter from Steve Archer to Elizabeth Hughes and Julie Langan, March 31, 2022 at 1. Notably, the FEIS itself never mentions this fact, that this is just one small part of a larger plan for putting toll lanes along the entire Beltway and beyond. Similarly, the FEIS does not consider cumulative impacts of the clearly reasonably foreseeable much larger overall toll lane expansion plan.

[68] Katherine Shaver, African American Gravesites Detected Near the Capital Beltway Will Be Spared in Road-Widening Plans, The Washington Post (Sept. 9, 2021). https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/.

00177808

MDOT's public position took a sharp turn on January 4, 2022, when the Agencies asserted, "[b]ecause the 1960s impacts [of the original Beltway construction) occurred prior to laws that required consideration of effects, . . . . there is not an adverse effect to the historic property based on 'cumulative' impacts."[69]

This conclusion is wrong as a matter of law. There is absolutely no support in the Section 106 regulations for this arbitrary cut-off date for consideration of cumulative impacts. On the contrary, they unconditionally state that: "[a]dverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5(a)(1). Nor is there any authority for this arbitrary cut-off date in the Council on Environmental Quality's cumulative impact regulations or in related regulatory guidance on cumulative impact analyses.

Furthermore, not only were those past cumulative impacts significant, they had a significant disproportionate impact on an environmental justice community and its most central community feature, the benevolent society hall and cemetery that bonded the community. As even the Agencies appear to acknowledge, a grave injustice was done when the Beltway was constructed. The imperative to consider past wrongs to environmental justice communities is confirmed by Executive Order 13990 (Jan. 20, 2021),[70] which applies to projects such as this one, that would utilize federal funding. The Executive Order cites the nation's commitment to "conserve our national treasures and monuments, places that secure our national memory. *Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice.*" (emphasis added). The Agencies' acknowledgement of this past wrong but refusal to consider these past impacts in the FEIS clearly violates NEPA and has the effect of depriving these historic resources of the protections to which they are entitled under Section 4(f). In other words, rather than remediate these past wrongs, the Agencies have doubled-down on them and compounded the harm.

While the FEIS acknowledges the past harm resulting from the Beltway's original construction, MDOT's January 4, 2022, letter asserted, without any substantiation, that no impacts to the cemetery occurred from the 1992 Beltway widening. That position is not credible. Basic math indicates that when a highway is widened, it increases throughput (which translates to more noise, dust, and pollution) and impervious surface, causing greater stormwater runoff, to which this site is particularly vulnerable by the state's own admission.

---

[69] MDOT SHA Section 106 letter from Julie M. Schablitsky to Elizabeth Hughes and Julie Langan dated Jan. 4, 2022 at 3.
[70] Exec. Order 13990, 86 C.F.R 7037 (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/

00177809

The response from consulting parties to the Agencies' flawed argument that they could apply a cutoff date to their analysis of cumulative effects was swift and scathing. The National Trust for Historic Preservation, Friends of Moses Hall, Sierra Club and other consulting parties raised legal objections to the Agencies' arbitrary and incorrect argument that no cumulative effects prior to 1966 and 1970 could be considered.

Still set on avoiding an adverse effects determination, the Agencies deflected and reframed the argument to focus on direct impacts to burials, claiming that an adverse effects determination depends on whether there are direct impacts to burials. And instead of taking a closer look to determine if there were grave shafts beyond the area surveyed, they asked for the determination of effect to be deferred until after the Project's Record of Decision.

The reframing went thus:

In [Maryland Historical Trust's ("MHT")] letter of February 4, 2022, the rationale for not concurring with the specific effect finding for Morningstar Cemetery was due to potential for additional burials outside the defined boundaries of the property that may exist or be impacted.

MDOT SHA and FHWA note that based on the specific issues raised by MHT, in the absence of other project changes not anticipated at this time, the potential for adverse effects is narrowly limited to the issue of the possibility of extant, unverified burials outside the defined boundary of the property that cannot be further avoided. FHWA finds that the issues related to atmospheric, audible, visual, and cumulative effects to the property, have been addressed. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas, and there has been no specific disagreement expressed by MHT on these assessments.[71]

In this statement, not only do they deny any adverse effects, they misrepresent the comment of MHT[72] to justify their commitment to a position of "no adverse effect."

Despite the Agencies firmly maintained commitment to that unsupported legal argument, the Agencies themselves provide information within the FEIS that undercuts the argument. MDOT acknowledges cumulative adverse effects to the property. Examples include (emphasis added):

---

[71] Section 106 Letter from Steve Archer to Elizabeth Hughes and Julie Langan, March 31, 2022.

[72] The MHT February 4, 2022 letter states regarding the Morningstar site that:

"Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property."

00177810

"*Understanding that the Beltway was constructed adjacent to these sensitive resources*, MDOT SHA has committed to construct the following pedestrian connections between the Gibson Grove A.M.E. Zion Church and the Morningtar[sic] Tabernalce[sic] No. 88 Moses Hall Cemetery to restore the historic connection along Sevel[sic] Locks Road: . . ."[73]

Commitment to "Constructing a new sidewalk along the west side of Seven Lock Road under I-495 to *reestablish the historic connection* between Gibson Grove Church and the Moses Hall Cemetery."[74]

Commitment to "*Gifting land owned by MDOT SHA with potential graves* back to Trustees of Moses Hall Cemetery."[75]

EJ mapping data provided by US EPA and University of Maryland (UMD) indicates that the concentration of communities with the greatest levels of EJ concern are *located along the study corridors*. Today's concentration of *communities with the greatest levels of EJ concern along the highway is directly related to the history of highway construction* before national environmental policy.

Today's *racially and economically segregated conditions* in urban and metropolitan areas can be *traced directly to decades of neighborhood destruction and residential displacements caused by highway projects plus housing policy and other racially marginalizing actions* undertaken by local, state, and the federal government *throughout the 20th century*.[76]

But then, remarkably, the FEIS fails to acknowledge that these impacts will be adverse. The FEIS sums up the Agencies' position:

Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the Preferred Alternative. No diminishment of location,

---

[73] FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[74] FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[75] This statement provides an acknowledgment of having taken cemetery land in 1962. That taking causes cumulative impacts to the community in the present day. FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[76] FEIS at 5-135.

46

00177811

design, setting, materials, workmanship, feeling or association has been found in these areas.[77]

Cumulative impacts from past Beltway construction are indisputably adverse; this site has been subject to longstanding, historic race-based discrimination in transportation planning in the state. The conclusion that there will be no use of Moses Hall for purposes of Section 4(f) is premature given that the serious legal issues regarding cumulative effects have been ignored.

The Agencies' wrongful dismissal and disregard of cumulative effects and other adverse effects to this site, as described above, is exacerbated by their deferral of the determination of impacts for the site through their decision to proceed with a Section 106 Programmatic Agreement.[78]

After walking back their initial determination of adverse effects and then making a contested determination of no adverse effect, the Agencies are postponing effects determination for the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland. This approach violates FHWA's obligations to avoid and minimize harm to these historic resources under Section 4(f). *See Corridor H Alternatives, Inc. v. Slater,* 166 F.3d 368, 371 (D.C. Cir. 1999) (Because the historic properties protected by Section 106 and Section 4(f) are similarly defined, "it follows that the [Federal Highway Administration] must complete its Section 106 determinations before it can comply with section 4(f)").

The contentious issue surrounding the adverse effect determination for Morningstar Tabernacle No. 88 site cannot be deferred. In a letter to Dr. Julie M. Schablitsky of MDOT, the MHT clearly stated on February 4, 2022, that: "it is our opinion that the finding of adverse effect remains valid for this historic property."

Sierra Club objects to MDOT's deferral of the adverse effect determination for several additional specific reasons:

1. MDOT's new proposed plan to defer a determination of adverse effect for Morningstar Tabernacle No. 88 site until after issuance of the Record of Decision will foreclose major options for alternatives and mitigation.

2. Adverse effects can be determined now since, *inter alia*, there are over two dozen probable or possible grave shafts in the right-of-way abutting the land where the highway will be widened and heavy construction equipment will be used. The probable and possible grave shafts conform to the same patterns observed in the rest of the cemetery.

---

[77] Appendix T.2.B. Vol. 2 at CO-831.

[78] See more detail on this in Sierra Club's April 14, 2022 Section 106 comment letter, available at: https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-Section106Comments-14April2022final.pdf.

00177812

3. These effects, when added to the noise, vibration, and other proximity impacts of the Project and the cumulative impacts from past Beltway construction, are indisputably adverse and will substantially interfere with the use and enjoyment of this site; hence, even assuming some degree of post-ROD mitigation, there is no basis for arguing that there will be no adverse cumulative effects to this important historical site, which has been subject to longstanding, historic race-based discrimination in transportation planning in this state.

4. The FHWA's obligations to avoid or minimize harm to this site under Section 4(f) is clear, and the FHWA's failure to recognize the full scope of the significant use and harm to the site violates Section 4(f).

In summary, while the full extent of the adverse effect can be addressed as part of the programmatic agreement, the adverse effect determination must be made now. The Agencies' failure to consider the cumulative impacts associated with discriminatory and destructive past actions perpetuates and exacerbates a gross injustice, and violates both NEPA and Section 4(f).

48

00177813

**2. Possible and Probable Burials in the State Right of Way Adjoining the Morningstar Cemetery and Hall Site Are at Risk from the Project and Have Not Been Sufficiently Investigated to Instill Confidence in the Cemetery Boundaries Determined by the Agencies.**

Next to what is known as the "current historic boundary" of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery are potential burials extending into the state highway right of way. No ground-penetrating radar was done around the currently known area of graves to determine how much further they extend. MDOT SHA and FHWA were unable to gain concurrence from Maryland Historical Trust for a "no adverse effects determination" in large part due to these potential graves, and thus the Agencies requested that the effects determination be deferred, depriving the Friends of Moses Hall and other descendants and supporters from a Section 4(f) adverse effects determination during the decision-making window that would have allowed the site to have further avoidance and mitigation measures.

MDOT SHA owns land from the original Beltway construction with potential graves. The graves in a parcel of MDOT right of way are not just potential but, based on ground-penetrating radar, are "possible" and "probable" and number several dozen. This indicates that the "current historic boundary" that MDOT SHA uses today is inaccurate and smaller than the true historic boundary of the cemetery.

The Agencies have claimed that there is no adverse effect to the Morningstar cemetery based on their "current historic boundary," even in the face of evidence that this boundary is likely not the site's accurate historic boundary. Of interest in this regard, a Maryland Public Information Act request for documents from the time of the original construction of the Beltway revealed a state payout to a McGuire Funeral Services, Inc. for a burial site located in the true historic boundary (but outside of MDOT's "current historic boundary").[79] *See* figure at right. The most likely reason for this payout was for reburials from the cemetery due to

**State Rds Comm vs. Andrew Mickens and Jones' heirs**



---

[79] See scan of original receipt in Report of Findings from Historical I-495 Right-of-Way Records Research prepared by Friends of Moses Hall, February 2022, at Attachment 1 *available at* https://static1.squarespace.com/static/600c2298f983552f0a55148b/t/61fe8ed7e0e2b44d94c5861c/1644072672567/FMH+-+ROW+RESEARCH+REPORT+-+FINAL.pdf.

49

00177814

Beltway construction.

Further reinforcing the issues with the boundary of the cemetery are the ground-penetrating radar data reported on by the Washington Post. Says the article: "The outer edges of the construction site will be about five feet from the closest area where radar found a possible burial, a project spokesman said. Previous plans had showed the Beltway expanding into the grassy area and about one-fifth of the 1.5-acre cemetery."[80]

In the same article, Illinois archaeologist Tim Horsley, who undertook the ground penetrating radar, expressed that "most of the anomalies appeared in adjacent rows. The total of 377 probable or possible burials in the cemetery is probably artificially low, he wrote, because his equipment couldn't reach the entire cemetery."[81]

Given this likely location of burials, a five-foot buffer from the edge of where graves were found in a ground-penetrating radar study that failed to reach the entire cemetery is insufficient to ensure that additional graves will not be disturbed.
The FEIS states:

- Through additional investigation and survey including ground penetrating radar (GPR), MDOT SHA identified potential unmarked graves within state-owned right-of-way adjacent to I-495.[82]

- MDOT SHA acknowledges there is some potential for human remains associated with historic properties to be present adjacent to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery . . . , which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments.[83]

Yet the Agencies still maintain:

1. Based on the current historic boundary, the preferred alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the preferred alternative. No diminishment of location,

---

[80] Katherine Shaver, African American Gravesites Detected Near the Capital Beltway Will Be Spared in Road-Widening Plans, The Washington Post (Sept. 9, 2021), *available at* https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/.
[81] *Id.*
[82] FEIS T.2.A. Vol. 2 -at CO-326.
[83] *Id.* at CO-244.

00177815

design, setting, materials, workmanship, feeling or association has been found in these areas.[84]

2.  The Project will be governed by a programmatic agreement, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the programmatic agreement and treatment plan.[85]

Given the implicit acknowledgement that subsequent studies under the programmatic agreement may reveal adverse effects on Moses Hall and Cemetery, the following conclusions in the FEIS are both unsubstantiated and premature:

"[T]here are no indirect or cumulative adverse effects to historic properties specifically caused by the undertaking."[86]

"The Preferred Alternative avoids ground disturbance of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery."[87]

"MDOT SHA has completed extensive . . . archaeological research that thoroughly documents the Morningstar Tabernacle No. 88 Moses Hall Cemetery and its significant features . . ."[88]

"[T]he lead agencies have far exceeded the obligation to consider and address potential project EJ concerns."[89]

For further information in support of these points, please see relevant additional information and arguments in Sierra Club Section 106 comments dated February 3, 2022, and

---

[84] Appendix T.2.B. Vol. 2 at CO-831, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/68_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.B_Volume-2_June-2022p.pdf

[85] *Id.*

[86] FEIS App'x I: CRTR Volume 1: Cultural Resources Tech Report at 2 I *available at* https://oplanesmd.com/wp-content/uploads/2022/06/13_MLS_FEIS_App-I_CR_Vol-1_Cover-Report_June-2022_REDACTED.pdf

[87] FEIS T.2.A.vol2 -at CO-244.

[88] FEIS T.2.A.vol2 -at CO-245.

[89] FEIS App'x T.2.B.Vol.2 at CO-829.

51

00177816

April 14, 2022.[90] We incorporate by reference the FEIS comment letter of Friends of Moses Hall dated July 15, 2022.[91]

> **C.    In Violation of Title VI, the Agencies Failed to Provide Meaningful Opportunities for Review and Comment on Agency Plans by Non-English Speaking Populations by Directing Limited English Proficiency Commenters to an Inaccurate SDEIS Executive Summary.**

As we explained in our comments on the SDEIS, for weeks, the executive summary of the SDEIS incorrectly downplayed some of the environmental impacts of the preferred alternative. *See* SDEIS Comments at 17-18. The Agencies belatedly corrected these errors in the English version on November 20, 2021, less than three weeks before comment deadline (although many commenters had downloaded the SDEIS already, had already completed their review, and even had already submitted their comments). But the Agencies did not change the SDEIS Executive Summaries in Amharic, Chinese, French, Korean, and Spanish, leaving non-English speakers with inaccurate environmental impacts to review and comment on until November 17, 2021, fewer than 13 days before the comment period closed, when they revised those summaries without public notice.[92] This omission violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Executive Order 13166, "Improving Access to Services with Persons with Limited English Proficiency," 65 Fed. Reg. 50,121 (Aug. 16, 2000), which require that project sponsors be certain that Limited English Proficiency populations have meaningful access to review and comment on agency plans.

In the FEIS, the Agencies summarized their outreach to communities with limited English proficiency and explained that "translated versions of the SDEIS Executive Summary were posted to the project website," SDEIS at 5-149, without noting the errors in that summary. In their response to comments in the FEIS, the Agencies downplay the SDEIS errors as "minor" and do not mention the delay in addressing errors in the non-English versions:

---

[90] Available at the following links respectively:

https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/MDSierraClub-Section106Comments-3Feb2022.pdf;

https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-Section106Comments-14April2022final.pdf.

[91] *See* FEIS comment letter of Friends of Moses Hall (July 15, 2022).

[92] Some time on or after November 17, 2021, fewer than 13 days from the public comment deadline, MDOT and/or FHWA silently posted new Amharic, Chinese, French, Korean, and Spanish Executive Summaries that corrected the inaccuracies. Members of the public who relied on those translated versions and somehow became aware of the corrections therefore had a very limited time in which to comment. *Compare* https://web.archive.org/web/20211117153534/https://oplanesmd.com/sdeis (capture of SDEIS website from 3:35 PM on November 17 with links to old and incorrect Executive Summaries), *with* https://oplanesmd.com/sdeis/ (current SDEIS website with links to new Executive Summaries that include "FINAL_UPDATED-11_16_2021" in file name titles).

52

00177817

MDOT SHA promptly corrected a minor error in the environmental impacts summary chart, Table ES-1 of the SDEIS, upon notification by the Sierra Club Maryland Chapter. The document was updated on the project website and a replacement chart was provided at all locations where the document was publicly accessible. … The minor error in the summary chart, Table ES-1 of the SDEIS does not require withdrawal and republication of the SDEIS.

Further, the Agencies undermined their own outreach efforts to populations with limited English proficiency populations because the flyers distributed at groceries and notices in newspapers targeting non-English populations, *see* FEIS at 5-147-5-149, unfortunately directed people to the online versions of the SDEIS at OpLanesMD.com/SDEIS, and the SDEIS had errors for most of the comment period. This failure to correct the website for weeks more for non-English speakers violates the Agencies' Title VI obligations.

### D. The Agencies' EJ Analysis Suffers from Serious Deficiencies by Failing to Analyze Cumulative Impacts to EJ Populations.

In the FEIS, the Agencies have finally produced a determination of whether the preferred alternative has disproportionately high and adverse effects to environmental justice populations. The conclusion that the preferred alternative will not have disproportionate adverse effects on EJ populations is wrong and the analysis suffers from serious deficiencies.

For example, the Agencies do not apply the appropriate definition of "adverse effects" as that term is used in the relevant USDOT EJ orders. "Adverse effects" is defined in USDOT Order 5610.2(a) as requiring a cumulative analysis of a list of possible effects on EJ populations:

> the totality of significant *individual or cumulative* human health or environmental effects, including interrelated social and economic effects, which may include, but are not limited to: bodily impairment, infirmity, illness or death; air, noise, and water pollution and soil contamination; destruction or disruption of man-made or natural resources; destruction or diminution of aesthetic values; destruction or disruption of community cohesion or a community's economic vitality; destruction or disruption of the availability of public and private facilities and services; vibration; adverse employment effects; displacement of persons, businesses, farms, or nonprofit organizations; increased traffic congestion, isolation, exclusion or separation of minority or low-income individuals within a given community or from the broader community; and the denial of, reduction in, or significant delay in the receipt of, benefits of DOT programs, policies, or activities.

USDOT Order 5610.2(a), App'x. A.

This Order requires the Agencies to analyze the "totality of individual or cumulative" effects. NEPA also requires a cumulative analysis of impacts to EJ populations. Rather than evaluating the effects cumulatively, however, in the FEIS, the Agencies evaluate each environmental stressor to EJ populations (i.e., noise, displacement, air quality, etc.) in isolation and conclude that, because the impacts from individual environmental stressors do not disproportionately impact EJ populations compared to non-EJ populations, there is no overall

53

00177818

JA2726

disproportionate impact. *See* FEIS at 5-155-5-160. For example, as to hazardous materials sites of concern, the FEIS tallies the number of affected communities with hazardous materials sites for EJ versus non-EJ populations:

> EJ populations contain 27 low, 4 moderate, and 2 high risk sites of hazardous materials sites of concern, while non-EJ populations contain 37 low, 56 moderate, and 9 high risk sites of hazardous materials sites of concern. … As such hazardous material concerns would not be higher or more adverse to EJ populations under the Preferred Alternative.

FEIS at 5-157. The analysis does not address cumulative adverse effects to EJ populations by *aggregating* all impacts to each EJ population, *i.e.*, it does not examine whether each EJ and non-EJ population is affected by additional noise, hazardous waste impacts, and water pollution from the preferred alternative. The Agencies thus failed to evaluate whether, once cumulative impacts are considered, EJ populations are disproportionately affected as compared to non-EJ populations.

As EPA stated in its comments on the DEIS, a proper EJ analysis requires looking at multiple impacts at the same time:

> In a preliminary review, the [EJSCREEN, EJ mapping-and-screening] tool demonstrates that the MLS alternative peripheries may now face various disproportionate environmental challenges in the context of EJ, including concerns with air toxics and hazardous waste (involving treatment storage disposal facilities and large quantity generators).

EPA, Technical Comments on I-495 & I-270 MLS, DEIS (Nov. 9, 2020), FEIS App'x T.1.A Vol 1 at AG-39.

In addition, the Agencies' analysis in the FEIS does not thoroughly evaluate the historical and existing environmental burdens borne by EJ populations together with the predicted impacts from the preferred alternative. EJ populations have already experienced high levels of air pollution as well as other harmful environmental stressors and a proper analysis must account for EJ populations' resulting increased susceptibility to environmental impacts. The EPA highlighted this point when reviewing the EJ analysis in the SDEIS:

> Table 4-45 indicates that block groups which the project characterizes as EJ and Non-EJ may face similar environmental consequences from certain hazards (e.g. air pollution). EPA notes that certain populations (e.g., low-income and/or people of color populations) may face elevated susceptibility of impacts that may affect other populations less severely. Thus the EPA encourages the project to address the potential for adverse impacts in areas of potential EJ concern even if less vulnerable areas may face similar conditions.

EPA, Technical Comments on I-495 & I-270 MLS, SDEIS (Nov. 30, 2021).

Most importantly, the FEIS completely ignores the egregious cumulative impacts resulting from past actions by MDOT, namely the original construction of the beltway in the 1960s that intentionally targeted and discriminated against EJ populations. *See* discussion above. As this

54

discussion points out, this arbitrary cut-off date for considering cumulative impacts of past action lacks any support in the law or agency guidance. *Id.* The Agencies' environmental justice analysis subverts the requirements of NEPA and USDOT Order 5610.2(a) which require a holistic analysis of cumulative impacts to populations. The Agencies' EJ analysis is therefore invalid and unlawful.

E.    **The FEIS Fails to Take a "Hard Look" at Air Quality Impacts to EJ Populations.**

In its brief discussion of environmental justice, the SDEIS made several conclusory statements regarding potential air quality impacts that were insufficient to discharge the Agencies' duty to take a hard look at environmental justice issues as required under NEPA. *See* SDEIS Comments at 123-24. The FEIS echoes conclusory statements from the SDEIS that "the Preferred Alternative is not predicted to increase emission burdens for Mobile Source Air Toxics." SDEIS at 4-102; *see* FEIS at 9-46 & 9-56 (explaining that, under the preferred alternative, MSAT emissions are expected to "significantly decline in the Opening (2025) and Design (2040) years when compared to base conditions (2016)"). The environmental review documents provide no explanation or support for these assertions, however, which are called into question by the fact that the DEIS showed substantial increases ranging from 4.1% to 13.3% in emissions of MSAT directly attributable to the build alternatives it evaluated. Likewise, the FEIS tables showing the MSAT data appear to show that projected MSATs are *lower* under the No Build alternative. FEIS App'x. K, Tbl. 3-1.

Throughout the comment process, we have asked for a local-level analysis of air emissions to determine the impacts of construction and operation of the preferred alternative on EJ populations, which are more susceptible to health impacts of air pollution. The FEIS still does not include a proper analysis of local-level air emissions. *See supra* Section III. As in the DEIS and SDEIS, the FEIS states that, because no conformity analysis was required, the Agencies have declined to study local-level air impacts. The full indirect and cumulative effects of the preferred alternative remain unknown without this analysis.

Furthermore, even though the Agencies could not support the following statement with data, the SDEIS stated:

> Air quality impacts associated with construction would not differ between EJ block groups and non-EJ block groups. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours.

SDEIS at 4-103.

In contrast, the FEIS states that EJ populations "[m]ay experience air quality and/or public health impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores." FEIS at 5-155. While we appreciate this revision, given that, like the SDEIS, the FEIS disclaims having performed any construction air quality assessment, *see* FEIS at 5-154, or a health assessment, the Agencies have not fulfilled their obligations to evaluate air quality impacts to EJ populations. As described in the attached comments of Roselie Bright, Sc.D. and Ronald Bialek, MPP, the FEIS suffers from a deficient analysis of impacts to public health

00177820

and has failed to address dozens of studies and journal articles finding causal links between, for example, increased air pollution from traffic and high rates of asthma or heart disease. As Bialek highlights, these health impacts are likely to be disproportionately higher in EJ populations, given historic inequities.

Likewise, the FEIS fails to fully evaluate the effects of bottlenecks that will be created under the preferred alternative and, importantly, the air quality impacts from the bottlenecks that may concentrate around the end points of the preferred alternative, in areas where EJ populations live. *See* ZAMURS AND ASSOCIATES Report at 5-6; *see also* SDEIS Comments at 124-25. As also noted in the attached report by Norm Marshall, the serious flaws in the traffic model affect the assessment of air qualify impacts in general, and therefore the evaluation of air quality impacts on EJ populations is also flawed. As discussed below, these air quality impacts result in significant public health impacts across the board that were also ignored in the FEIS, and these public health impacts will disproportionately affect EJ populations, particularly children.

In short, the Agencies have failed to appropriately describe and, as a consequence, mitigate the disproportionate air quality impacts on minority and low-income communities, despite their obligation to do so—and to make the information available to the public for review and comment—under NEPA, USDOT Order 5610.2(a), and USDOT order 6640.23A, before moving forward with the preferred alternative.

### F.    The FEIS Fails to Quantify Impacts to the Gaithersburg EJ Area.

In the FEIS, the Agencies finally recognize that several census blocks in the Gaithersburg area have EJ populations and impacts to those areas should be fully evaluated. However, even with the Agencies' new analysis, they have failed to acknowledge real air quality and other health impacts from the preferred alternative, impacts that will disproportionately affect EJ populations, including those in the Gaithersburg area.

In our comments on the SDEIS, we listed different health assessments and air quality and other environmental impact analyses that the Agencies should have performed to accurately and quantitatively describe the potential impacts of the Project on the environmental concerns most negatively affecting the Gaithersburg community, as shown by EPA's EJSCREEN tool. SDEIS Comments at 113-14. These analyses and health risk assessments were not performed. In their expert report, ZAMURS AND ASSOCIATES, LLC explain that the "the pollutants that cause the greater health impacts, $PM_{2.5}$, $PM_{10}$ and $NO_2$ remain unexamined and unconsidered, despite the legal obligation to assess these pollutants under NEPA." ZAMURS AND ASSOCIATES Report at 3. Thus, the true impacts to the EJ populations in the Gaithersburg community remain unquantified in the FEIS.

### G.    The EJ Analysis Ignores Impacts to EJ Populations East of the I-270 Spur.

In our SDEIS comments, we explained that the Agencies were improperly segmenting the Project by limiting their environmental review to exclude the significant environmental impacts anticipated from later phases of the Project to expand I-495 east of the I-270 spur and the northern portions of I-270. *See* SDEIS Comments at 12 (comparing proposed environmental impacts).

56

Based on public statements by Project proponents, the Agencies will ultimately seek approval for lane widening and toll lanes on I-495 from the American Legion Bridge to the Woodrow Wilson Bridge in Virginia and the northern portions of I-270, exactly as originally proposed. *See* SDEIS Comments at 8-17.

This improper segmentation of the Project also affects the Agencies' EJ analysis. The Agencies cannot avoid their obligations to evaluate impacts to EJ populations throughout the area, including in majority-minority Prince Georges County, that will be impacted by the later phases of the Project. A proper EJ analysis requires an evaluation from the American Legion Bridge to the Woodrow Wilson Bridge in Virginia—the scope of the Project initially proposed.

By deferring a full EJ analysis until after the first phase of the Project is approved, the Agencies are attempting to bias approval of the Project by making the highway expansion east of the I-270 spur seem inevitable and essentially "shoving under the rug" the likely significant impacts to EJ populations anticipated in later phases of the Project. We remain concerned that the Agencies will also attempt to streamline the environmental review process for that next phase by relying on the (inadequate) analyses performed for the first phase of the Project and even further curtailing the public comment process, thus reducing opportunities for the community to engage in review of the Project.

### H. The FEIS Fails to Fully Assess Construction and Post-Construction Impacts to the Julius West Middle School and Other Sensitive Sites Next to the Highway.

As described in Section IV of these comments and in the attached expert comment letter by Rosalie Bright, the generation of silica dust during road construction is a significant health hazard that the FEIS fails to adequately discuss. As the 1-270 and I-495 road and bridge construction takes place, there will be continuous generation of harmful silica dust, and precautions (i.e., staying indoors, keeping all windows closed, and wearing facemasks to go outside) may be needed to protect sensitive populations at schools (Julius West Middle School, Farmland Elementary, Carderock Springs Elementary, and Walter Johnson High) and other sites close to the highways.

In general, the FEIS fails to adequately identify, describe, and quantify the health impacts to these sensitive populations that will be impacted by silica dust under the preferred alternative.

### I. The FEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative

As explained in our previous comments, the SDEIS recognizes that the preferred alternative would create bottlenecks outside the preferred alternative limits, SDEIS at ES-12, 2-6, but the SDEIS does not accurately analyze these bottlenecks nor the arterial congestion that the preferred alternative would cause at the terminus of the managed lanes. These bottlenecks and additional congestion will create additional air quality impacts in the areas where they occur and cause travel delays for EJ populations living beyond the ends of Project development and, as noted

57

00177822

below, for EJ populations who must continue to use the general purpose lanes due to the unaffordability of tolls in the managed lanes.

Travel delays cause disproportionate impacts to EJ populations who face long commutes and inflexible work environments where late arrivals can mean dismissal. By failing to acknowledge these real impacts of bottlenecks, the FEIS fails to sufficiently evaluate impacts to EJ populations.

### J.     The FEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes

The SDEIS did not provide a full picture of the costs of toll lanes on EJ communities. As we noted in our SDEIS comments, an analysis of the dynamic toll pricing revealed that driving in toll lanes could cost up to $50 per passenger car in 2021 dollars, for certain routes. *See* SDEIS Comments at 86-87; 126-27. These high tolls are exclusive, inequitable, and discriminatory. Toll lanes will not be accessible to working families. Lower income environmental justice populations who cannot afford the toll lanes will disproportionately rely on the free general-purpose lanes. In addition, as discussed above, the Agencies' traffic models are still flawed and still fail to acknowledge the new and worsened bottlenecks around the end points of the toll lanes that will disproportionately harm EJ populations living beyond the limits of the proposed new toll lanes.

Yet, the FEIS retains misguided statements from the SDEIS that fail to address the regressive impacts of predicted high tolls and overstate the purported benefits of eliminating peak-commuting-time HOV lines in favor of HOV 3+ lanes. *See* SDEIS Comments at 126-128. The FEIS even echoes the claim from the SDEIS that "populations in both EJ block groups and non-EJ block groups would have the opportunity to experience the[] operational benefits," from the toll lanes and HOV3+ lanes in the preferred alternative. SDEIS at 4-102 & 4-104; *see, e.g.,* FEIS at 5-162 (describing the HOV 3+ lanes as part of "affordable multimodal travel options").

These statements mischaracterize the likely impacts of the preferred alternative on EJ populations. As we have explained, the predicted benefits of the preferred alternative in reducing traffic times overall are overstated. Further, the aforementioned "benefits" will not reach EJ populations, who will be will be priced out of the toll lanes and required to rely on limited general purpose travel lanes. As the M-NCPPC explained, "[t]o simply conclude that everyone is benefiting with travel time savings when the project design does not provide equitable access to the managed lanes creates another layer of inequity." M-NCPPC Briefing and Discussion for July 15, 2020, Full Commission Meeting I-495 & I-270 Managed Lanes Study – DEIS Comments at 8 (June 8, 2020).

Further, the general purpose lanes as configured after building toll lanes will become less safe relative to today due to: additional traffic and congestion; new and worsened bottlenecks with end merge-point congestion; loss of the inside shoulder lane; a higher concentration of 18-wheelers that are kept off the toll lanes by unaffordable tolls and whose numbers are increasing following the COVID-19 pandemic; removal of an existing non-tolled lane in each direction of I-270, squeezing more traffic into fewer general purpose lanes; inferior maintenance of the free lanes compared to the toll lanes and poorer safety during emergencies and slower access to emergency

58

00177823

response owing to space constraints and loss of the inside shoulder lane. *See* SDEIS Comments at 71-85; *see also supra* Section II.

Although the Agencies have now proposed mitigation related to the toll lanes, the mitigation is not focused on making toll lanes more affordable for low income and EJ populations or making the general-purpose lanes safer, but rather focused on transit fare subsidies and toll-free buses, FEIS at 5-163-164, actions that do not remove the inequity of the two-tier system that would be created by the toll lanes.

That the preferred alternative is inequitable is not surprising. Transurban is on record saying its goal in our region is to "maximize the tolls" and admitted that: "[a]n increase in the number or improvement in quality of alternative roads, public transportation or mass transit options, . . . and their relative convenience, affordability and efficiency, could reduce traffic volumes on our toll roads and therefore reduce our earnings."[93]

That the Agencies have failed to grapple with the inequities of the preferred alternative in their FEIS is, however, disappointing and, more importantly, violates NEPA and Title VI.

## VI.    The FEIS Fails To Disclose the Socioeconomic and Societal Impacts of Private Concessionaire Contracts and Their Influence on Future Land Use Policies.

Legal expert Ellen Dannin (2011) describes how infrastructure privatization of the type being proposed for the I-495 and I-270 project impacts socioeconomics and society,[94] even impacting future legislation and land use policies.

> Provisions commonly found in infrastructure privatization contracts make the public the guarantor of private contractors' expected revenues. Indeed, were it not for provisions that protect contractors from diminution of their expected returns, the contracts would be far shorter and much less complex. An effect of those contract provisions is to give private contractors a quasi-governmental status with power over new laws, judicial decisions, propositions voted on by the public, and other government actions that a contractor claims will affect toll roads and revenues. Giving private contractors such a role may well violate the non-delegation doctrine that bars private entities from exercising power that is inherently governmental.[95]

---

[93] Transurban Prospectus at 13 (Sept. 16, 2020),
https://links.sgx.com/FileOpen/Transurban%20Finance%20Company%20Pty%20Ltd_Secured%20Euro%20MTN%20Programme%20OC.ashx?App=Prospectus&FileID=46449.
[94] See more on societal impacts in "5 questions for Donald Cohen of In the Public Interest," The New Common Sense newsletter from the Hewlett Foundation's Economy and Society Initiative (April 7, 2022), *available* at https://hewlett.org/5-questions-for-donald-cohen-of-in-the-public-interest/.

[95] Dannin, 2011. Crumbling Infrastructure, Crumbling Democracy: Infrastructure Privatization Contracts and Their Effects on State and Local Governance

00177824

These impacts result from provisions commonly found in infrastructure contracts, including compensation events, noncompetition provisions, and the contractor's right to object to and receive compensation for legislative, administrative, and judicial decisions.

> "The operation of these provisions gives private contractors power over decisions that affect the public interest and are normally made by public officials and subject to oversight, disclosure, and accountability—none of which apply to private contractors."[96]

Such provisions are fundamental to the I-495 and I-270 project and written into the term sheet.[97] The project's 20 compensation events wherein the state monetarily compensates the developer include: "Discriminatory Change in Law," and "construction or expansion of a Competing Facility." These funds come from taxpayers. This has all been described in earlier comments.[98]

The P3 process ensures and protects that the developer's private interest in avoiding any competing facilities near its toll lanes, regardless of what would serve the public interest . As a September 2020 Transurban prospectus explains,

> An increase in the number or improvement in quality of alternative roads, public transportation or mass transit options, ... and their relative convenience, affordability and efficiency, could reduce traffic volumes on our toll roads and therefore reduce our earnings.[99]

Greater mobility and transportation options that are good for Marylanders and for addressing the climate crisis are not in the developer or their shareholder's interest.

Maryland taxpayer funds are even required to compensate the developer for "physical damage to the Work caused by other MDOT capital works projects [or VDOT capital works projects] in the immediate vicinity of the Section (excluding work undertaken by a Section Developer Related Entity)." So Maryland taxpayers pay the developer Transurban if VDOT capital works projects damage the toll lanes.

The term sheet clarifies in relation to compensation and relief events:

---

[96] Ellen Dannin, *Crumbling Infrastructure, Crumbling Democracy: Infrastructure Privatization Contracts and Their Effects on State and Local Governance*, 6 *Nw. J. L. & Soc. Pol'y* 47 (2011)., https://elibrary.law.psu.edu/fac_works/10/

[97] Term sheet. Compensation Events. Relief Events at 13-17. https://www.oplanesmd.com/wp-content/uploads/2021/06/Phase-1-P3-Agreement-Exhibit-8-%E2%80%93-Section-P3-Agreement-Term-Sheet.pdf

[98] See Sierra Club et al. SDEIS comments.

[99] Transurban Prospectus, September 16, 2020, page 13, publicly available on the website of the Singapore Stock Exchange.

00177825

To the extent a Compensation Event or a Relief Event directly causes an adverse cost or schedule impact on the Section Developer, the Section Developer may claim an extension to applicable deadlines for performance or relief from compliance with its obligations. Notice of such claim must be provided within 30 days after the date the Section Developer first became aware (or should reasonably have become aware) that the relevant Compensation Event or Relief Event had occurred.

If such adverse impact is caused by a Compensation Event, the Section Developer may also claim compensation which places the Section Developer in a "no better/no worse" position, as compared to immediately prior to the occurrence of the Compensation Event.

The developer is protected from risks, it is the state that is taking the risk from 30 compensation and relief events.

The Dannin article says that study of a proposed toll highway made clear that "the 'free' money comes at the very high cost of eliminated highway capacity, increased congestion and degradation of highway safety."

> [D]egraded roadway conditions and increased traffic congestion are] an essential part of the JPPHA's plan. Without these failing conditions, little traffic would be induced to use the expensive Jefferson Parkway. . . . By starving SH 93 and Arvada roadways of needed improvements, JPPHA would ensure congestion and push some traffic to its road. However, what is good for a road is not good for drivers. The goal of state highway access should be to promote mobility, not to impair mobility to promote the ability to toll a road. . . . . (Dannin, 2011)

In this case, degraded roadway conditions will occur from the majority of the heavy truck traffic concentrated in the general-purpose lanes degrading the infrastructure more quickly. Roadway conditions will also worsen due to removal of the left lane shoulder from the general-purpose lanes and likely more accidents. Increased congestion will occur during rush hour due to developer toll algorithms, because of new bottlenecks created at the ends of the toll lanes, and because of I-270 having two of its existing lanes converted to toll lanes (reducing publicly available road and squeezing more traffic into fewer general-purpose lanes).

To avoid being taken advantage of and protect the public interest in an infrastructure privatization deal, six principles[100] are recommended, none of which appear to have been prioritized for this project.

1. protecting the public welfare;
2. ensuring value for money;
3. taking all contingencies into account
4. establishing principles to justify the inclusion of each contract term;
5. demonstrating the superiority of privatization over public provision; and

---

[100] Dannin, 2011, p. 82.

61

00177826

6. establishing a process that ensures all relevant information is presented and properly evaluated.[101]

Egregiously, alternatives other than toll lanes were not seriously considered and no value for money analysis was done.

Negative financial and societal impacts have not been adequately reflected in discussions and debate for at least two reasons. First, the state treasurer was not able to have the necessary – support to review the Phase P3 agreement contract[102] to understand its costs and risks. Second, the far-reaching negative impacts are inconvenient and not a desired part of the state or developer's narrative that toll roads will happen "at no net cost"[103] to the taxpayer. Far from no-net-cost, the private toll roads will subordinate the interests of taxpayers and the public to the private toll operator's interest in maximizing toll revenue. By failing to disclose the foreseeable negative impacts of an intended largescale privatization of state infrastructure, the FEIS tainted the consideration of alternatives for not only this project but future projects.[104]

## VII. Conclusion

Despite a review process where thousands of public commenters, elected officials, and state and federal agencies have tried to steer the Agencies onto the path of equity, justice, climate resilience, and smart growth, the preferred alternative as proposed in the FEIS will have significant, irreversible negative impacts on Maryland, its air, water, land, climate, residents and communities, historic resources, ecosystems, flora, and fauna.

As in the SDEIS and DEIS, these impacts are either ignored or underestimated in the FEIS, contrary to the Agencies' legal requirements. The limited benefits of the preferred alternative, meanwhile, are routinely overstated in the FEIS, and in some cases, like the traffic models, appear to be the result of improper manipulation rather than data and science.

When considering the cost of widening the American Legion Bridge and both the Maryland and Virginia I-495 projects, there is virtually no benefit provided to the traveling public except for

---

[101] Dannin, 2011.

[102] John Tulkin and Klaus Philipsen, August 9, 2021, available at https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0810-hogan-toll-lanes-20210809-qtety5ezcncdrkt4ewaqpuaz4q-story.html

[103] Katherine Shaver, Washington Post, July 1 2022.

[104] More on these issues can be read here: "Meta-monopoly," MacroBusiness, June 9, 2022, *available at* https://web.archive.org/web/20220611204818/https://www.macrobusiness.com.au/2022/06/meta-monopoly-transurban-gouges-subsidies-from-taxpayers/; Gary Hodge, Opinion: Plans to Privatize Maryland's Highways with Toll Lanes are Not in the Public Interest - Maryland Matters, July 14, 2022, available at https://www.marylandmatters.org/2022/07/14/opinion-plans-to-privatize-marylands-highways-with-toll-lanes-are-not-in-the-public-interest/; Transurban, APA Group 'ripe for takeout' in shrinking public market

00177827

marginal benefits for toll payers that evaporate when they too will be faced with heavy traffic congestion at the termini of the toll lanes. Virginia's toll lanes, now constructed, demonstrate the likely impacts of the Project on traffic patterns and congestion. As we have noted throughout this process, the tradeoffs and harms to the environment, climate, taxpayers, Section 4(f)-protected properties, and communities at large far outweigh the Project's benefits.

This $3-to-$7 billion-dollar first phase of a Project that will not relieve congestion and will worsen bottlenecks does not fulfill its purpose and need. If the Project is to go forward, it should be rethought entirely, constructed as a public project with public money, and scaled to the needs and constraints of the affected region of Maryland. It must avoid impacts to irreplaceable resources like Plummers Island and Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland, rather than cut a path with rippling impacts that signals disrespect to the communities that cherish them.

The Agencies must pause this process by withdrawing the FEIS and analyzing less costly multimodal options to improve mobility in the region that do not cause such significant harm to human health and the environment. The Agencies must also provide the public with a meaningful opportunity to review and comment on these options prior to undertaking a new FEIS.

At a minimum, the Agencies must not move forward with the preferred alternative or any of the fundamentally flawed build alternatives without considering additional new alternatives, the many analyses that have been ignored or improperly deferred, and a new review process that addresses the failures identified in these comments and prior comments.

63

00177828

**EXHIBIT LIST**

Exhibit A     Compiled Letters Regarding Extension of Comment Period

Exhibit B     Smart Mobility, Inc., Review of Maryland I-495 & I-270 Managed Lanes Final Environmental Impact Statement and Final Section 4(f) Evaluation, July 2022

Exhibit C     Andrew Gallant Comment and Jeffrey T. Folden Response, July 2022

Exhibit D     Benjamin Ross, Maryland Transit Opportunities Coalition, July 11, 2022 Letter to Deputy Sec. Polly Trottenberg  Mentioned on pg. 12 of Master Copy

Exhibit E     Roselie Ann Bright, Comments on FEIS Regarding Lack of Analysis of Health Impacts, July 14, 2022

Exhibit F     Ron Bialek, Letter to MD Sierra Club Reviewing and Commenting on I-495 & I-270 MS FEIS, July 16, 2022

Exhibit G     ZAMURS AND ASSOCIATES, LLC, Review and Comment I-495 and I-270 Managed Lanes Study Final Environmental Impact Study and Final Section 4(f) Evaluation, June 2022

Exhibit H     Arthur Katz Comments on FEIS Traffic Concerns, July 2022

Exhibit I     Byron Bloch Comments on FEIS Safety Concerns, July 2022

Exhibit J     WBFC Determination of Eligibility, August 20, 2021

Exhibit K     Shannon Browne Letter to MD Sierra Club on FEIS, July 18, 2022

Exhibit L     Federal Highway Administration (FHWA) and National Capital Planning Commission (NCPC) Meeting Notes, November 1, 2019

Exhibit M     Washington Biologists' Field Club (WBFC) Comments on MLS-106, February 3, 2022

64

00177829

JA2737



**CEEJH Lab Meeting**
**October 20, 2021**

### I-495 & I-270 MLS EJ OUTREACH DISCUSSION WITH
### CENTER FOR COMMUNITY ENGAGEMENT, ENVIRONMENTAL JUSTICE, AND HEALTH (CEEJH) LAB
### MEETING SUMMARY

| | |
|---|---|
| Date / Time: | **10/20/2021** |
| Location: | **Conference call (C) / Microsoft Teams** |
| Meeting Purpose: | **Discussion of MLS, EJ-focused outreach and mitigation** |

| Name | Organization | Email |
|---|---|---|
| Dr. Sacoby Wilson | CEEJH Lab (UMD) | swilson2@umd.edu |
| Joe Galarraga | CEEJH Lab (UMD) | jrgal@terpmail.umd.edu |
| Stacy Talmadge | MDOT SHA (Blackwater) | stalmadge@mdot.state.md.us |
| Erron Ramsey | MDOT SHA (RK&K) | eramsey@rkk.com |
| Karen Kahl | MDOT SHA (RK&K) | kkahl@rkk.com |
| Brittany Rolf | MDOT SHA (RK&K) | brolf@rkk.com |

**Handouts:** Powerpoint shared on screen

**Outstanding Action Items or Deliverables:**

| Action Item or Deliverable | Responsible Party | Target Date |
|---|---|---|
| Provide MDOT contact information to Dr. Wilson for CEEJH Lab EJ Scorecard input | Erron/Caryn/Karen | 10/29/2021 |

**Notes:**

**Comments on EJ Analysis**

- Dr. Wilson acknowledged that under the previous alternatives there would have been a greater impact to EJ populations on the top and east side but because there is no action there are fewer EJ populations.

- He said it is important to identify Environmental Justice populations not only by demographic characteristics, but by existing overburdened conditions. He referenced Executive Order 14008 and the Justice 40 Initiative under development by the White House and agencies, which helps define "disadvantaged populations" and focuses on "securing Environmental Justice" and economic opportunities for disadvantaged populations.

- Air quality is a big concern in disadvantaged populations because it contributes directly to many health concerns, which can multiply into other overburdened conditions (i.e. healthcare access and costs, job flexibility, etc.). Air quality assessment should inform the baseline to use in an air quality monitoring network.

- He said the 49% comparison to the state may be too high for initially identifying EJ populations by minority race/ethnicity characteristics.



**CEEJH Lab Meeting**
**October 20, 2021**

**Health Impact Assessment**
- Stressed that a Health Impact Assessment (HIA) is the best way to address Environmental Justice in documentation. Noted that we've already done some of the work for the scoping process.
- An HIA would be key to identifying underlying issues related directly or indirectly to traffic proximity or other exposure and would help target mitigation/ improvements.
- Emphasized the importance of considering potential air quality and public health impacts from transportation projects at a hyperlocal level, as well as SWM and runoff considerations.
- Construction impacts should also be considered for shorter term air quality and runoff concerns.
- Hyperlocal/mobile air quality monitoring could track exposure risks from potential increase in combustible byproducts.
- Consider coordinating with the State Department of Health about climate change and health impacts. There is a new tool that Department of Health will be rolling out soon related to this.

**Engagement/Outreach Ideas**
- CASA de Maryland;
- Centro de Apollo Familiar;
- Local community and transit coalitions;
- Faith-based communities ;
- Barbershops and beauty salons (Health Advocates In-Reach and Research Campaign (HAIR) from Maryland Center for Health Equity at UMD; led by Dr. Stephen Thomas, [ HYPERLINK "mailto:sbt@umd.edu" ]);
- Ethnic food stores;
- Small healthcare clinics;
- NAACP, Montgomery County, MD branch ([ HYPERLINK "mailto:naacpmont7@aol.com" ]);
- Interfaith Power and Light (DC.MD.NoVA) – an environmental ministry group.

**Mitigation Ideas**
- Develop a Health Impact Assessment;
- Develop a Community Benefits Agreement;
- Diesel bus transition to electric/hybrid buses;
- Traffic calming, roundabouts and signage to control speeding and increase pedestrian safety in communities;
- Complete Streets;
- SWM, especially to address flooding;
- Beautification projects.

**EJ Score Card for State Agencies**
- This was an offer/ask of us to provide contact information. They are developing an EJ Score Card for each state agency using publically available information on agency websites and agency contacts. Treating MDOT as a whole not considering each modal agency.
- They have reached out to MDOT Communications and an email was received from Jeff Folden on 10/21. They are awaiting a response from MDOT before they publish the EJ Score Card for the 2019-2020 timeframe. (Not sure who should follow up- Heather Murphy, TSO?)

00186888



WELCOME

I-495 & I-270 Managed Lanes Study

American Legion Bridge Strike Team Briefing

February 2, 2021

Pre-decisional & Deliberative
00187734



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION



# AGENDA

- Introduction
- Strike Team Overview
- Review of NEPA DEIS options
- Review of Strike Team Bridge Alternatives
  - Base Case
  - Slide In Options (2)
  - Cable Stay Option
  - Segmental Option
- Access Study
- Environmental Impacts Summary
- Recap and Notable Take-aways
- Q & A

Pre-decisional & Deliberative

Pre-decisional & Deliberative

00187735

2

USCA4 Appeal: 24-1447    Doc: 31-4    Filed: 09/30/2024    Pg: 114 of 391

# AMERICAN LEGION BRIDGE STRIKE TEAM OVERVIEW



00187736



**MARYLAND DEPARTMENT OF TRANSPORTATION**
STATE HIGHWAY ADMINISTRATION

# ALB STRIKE TEAM OVERVIEW - MEMBERS

| Name | Organization | Role |
|------|--------------|------|
| Jim Ruddell | MDOT SHA | Bridge Construction / Team Lead |
| Phil Waldvogel | MDOT SHA | Bridge Design |
| Jamal Elkaissi | FHWA | Structures |
| Reggie Holt | FHWA | Structures |
| Siva Kesavan | MDOTSHA | Geotechnical |
| Mark Roberts | MDOT SHA | Roadway |
| | | |
| Steve Archer | MDOT SHA | Cultural Resources |
| Maddy Sigrist | MDOT SHA | Natural Resources |
| Justin Reel | MDOT SHA | Natural Resources |
| David Smith | MDOT SHA | Natural Resources |
| Daniel Salgado | FHWA | Water Resources |
| Jeanette Mar | FHWA | NEPA |

Pre-decisional & Deliberative
00187737

JA2743

4



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

# ALB STIKE TEAM OVERVIEW - GOALS

*"to develop and evaluate alternatives for the replacement of the American Legion Bridge (ALB) to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the C&O Canal National Historic Park and George Washington Memorial Parkway (GWMP) units of the National Park Service (NPS)."*



Pre-decisional & Deliberative

00187738

5

USCA4 Appeal: 24-1447    Doc: 31-4    Filed: 09/30/2024    Pg: 117 of 391



# ENVIRONMENTAL AND CULTURAL FEATURES



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

# ENVIRONMENTAL AND CULTURAL FEATURES

- Resources, Areas of Interest, Areas of Avoidance

- Site Challenges

- Other Considerations



00187740

7



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status. The proposed managed lane access points are based on preliminary traffic and revenue analyses and may change as more detailed analyses are completed.
MD
DC
VA
Current Map
George Washington Memorial Parkway/Clara Barton Memorial Parkway
Naval Surface Warfare Center Carderock Division (NSWCCD) Historic District
David W. Taylor Model Basin
Clara Barton Parkway
Chesapeake and Ohio Canal National Historical Park
Montgomery County, Maryland
Fairfax County, Virginia
Map 56 Match Line
Map 57 Match Line
Map 59 Match Line
CLARA BARTON PKWY
MACARTHUR BLVD
EGGERT DR
CAPRI PL
TAMMY CT
Congressional Country Club
CAPITAL BELTWAY
RIVERCREST DR
LIVE OAK DR
CARLYNN DR
CARLYNN CT
RIVER ROCK TERR
RIVER TRAIL CT
RIVER TRAIL LA
PERSIMMON TREE RD
PERSIMMON CT
CABIN OAK HILL RD
TOMLINSON AVE
BARKWATER CT
Carderock Springs South
Washington Aqueduct
At-grade access to/from managed lanes proposed north of Clara Barton Parkway interchange.
Limit of Disturbance accommodates construction and access needs for replacement of American Legion Memorial Bridge.
George Washington Memorial Parkway
George Washington Memorial Parkway/Clara Barton Memorial Parkway
Chesapeake and Ohio Canal National Historical Park
Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.
Legend
Alternative 8, 9, 10, 13B, & 13C LOD
Map Match Line
Right-of-Way
Parcel Boundaries
Roadway Baseline
Edge of Lane
Proposed New or Reconstructed Bridge
Proposed Stormwater Management Facility
General Purpose Lanes
Managed Lanes
Potential Noise Barrier Replacement or Construction (Approximate Location)
Trails
FEMA Floodplain 100 Year
Delineated Waterways (Feature ID, Refer to NRTR)
Delineated Wetlands (Feature ID, Refer to NRTR)
NWI Wetlands and Waterbodies
Forest Interior Dwelling Habitat
Forest Conservation Act Easements
Historic Properties
Park Property
1 in = 400 feet
0 100 200 400 Feet
Property and environmental needs are preliminary. As the study moves forward, further avoidance and minimization to reduce needs will be evaluated and prioritized, including incentivizing the private sector through innovation.
Environmental Resource Mapping
Alternatives 8, 9, 10, 13B, 13C
for I-495
Appendix D
Map58
495
270
MANAGED LANES STUDY

8

00187741

| Comment No. | Commenting Agency | Page and Section | Comment |
|---|---|---|---|
| 1 | FHWA | Page 1 Section 4 Environmental Resources | The SDEIS provides links to both the [ HYPERLINK "https://495-270-p3.com/wp-content/uploads/2020/11/2020-06-02_DEIS_04_Environmental.pdf" ] and the [ HYPERLINK "https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_Appl_Air-Quality_web.pdf" ] (page 77 - 108) appear to be the old analysis. It is not clear where the new MSAT information can be accessed. |
| 2 | FHWA | Page 4-35 Section 4.8.1 | Suggest deleting "per FHWA guidance" and the citation. Referencing the 1987 TA doesn't make sense since there weren't any PM2.5 NAAQS at that time. |
| 3 | FHWA | Page 4-34 Section 4.8.1 | Nothing in this section discusses ozone nonattainment and conformity. Please add language. It is unclear why certain NAAQS and AQ status (nonattainment/maintenance) are included in the introduction and others are discussed under the affected environment |
| 4 | FHWA | Page 4-34 Section 4.8.1, 4.8.3 | It is not possible to ascertain if the updated air quality analysis are going to be completed appropriately because they are not included in the SDEIS documentation. |
| 5 | FHWA | Page 4-37 Section 4.8.3 | Transportation conformity must undergo public review and comment. If the FEIS/ROD is not available for a review and comment opportunity than the SDEIS must include the determination of conformity. There should be language addressing how the project meets project-level conformity requirements. |
| 6 | | Page Section | |
| 7 | | Page Section | |
| 8 | | Page Section | |
| 9 | | Page Section | |
| 10 | | Page Section | |
| 11 | | Page Section | |
| 12 | | Page Section | |
| 13 | | Page Section | |
| 14 | | Page Section | |

MANAGED 495 270 LANES STUDY

Administrative Draft – Supplemental DEIS
Errata Sheet

| | | |
|---|---|---|
| 15 | Page | |
| | Section | |
| 16 | Page | |
| | Section | |
| 17 | Page | |
| | Section | |
| 18 | Page | |
| | Section | |
| 19 | Page | |
| | Section | |
| 20 | Page | |
| | Section | |
| 21 | Page | |
| | Section | |
| 22 | Page | |
| | Section | |
| 23 | Page | |
| | Section | |
| 24 | Page | |
| | Section | |
| 25 | Page | |
| | Section | |
| 26 | Page | |
| | Section | |
| 27 | Page | |
| | Section | |
| 28 | Page | |
| | Section | |
| 29 | Page | |
| | Section | |
| 30 | Page | |
| | Section | |

00189878

| | |
|---|---|
| **From:** | Perritt, Karen (FHWA) |
| **To:** | Jensen, Gary (FHWA) |
| **Subject:** | FW: Update on air quality modeling for I495/I270 MLS project |
| **Date:** | Wednesday, July 7, 2021 10:03:00 AM |

**From:** Perritt, Karen (FHWA)
**Sent:** Tuesday, July 6, 2021 3:19 PM
**To:** Hansen, Christopher (FHWA) <christopher.hansen@dot.gov>; Ho, Cecilia (FHWA) <Cecilia.Ho@dot.gov>
**Cc:** Gavin, James (FHWA) <james.gavin@dot.gov>; Cogburn, Megan (FHWA) <megan.cogburn@dot.gov>; Parikh, Jitesh (FHWA) <Jitesh.Parikh@dot.gov>; Mar, Jeanette (FHWA) <Jeanette.Mar@dot.gov>
**Subject:** RE: Update on air quality modeling for I495/I270 MLS project
Hi Chris,

Thank you for sharing this update. Much appreciated! I am assuming that during this process that the air quality modeling (and Plan/TIP) will reflect the project as described in the documentation to support the ROD (for the current 14-mile NEPA study). The important component isn't so much that the projects are delineated by line-item as it is that the modeling and planning documents reflect the project as described in the ROD.

Thanks,
Karen

**From:** Hansen, Christopher (FHWA) <christopher.hansen@dot.gov>
**Sent:** Tuesday, July 6, 2021 3:12 PM
**To:** Ho, Cecilia (FHWA) <Cecilia.Ho@dot.gov>; Perritt, Karen (FHWA) <Karen.Perritt@dot.gov>
**Cc:** Gavin, James (FHWA) <james.gavin@dot.gov>; Cogburn, Megan (FHWA) <megan.cogburn@dot.gov>; Parikh, Jitesh (FHWA) <Jitesh.Parikh@dot.gov>; Mar, Jeanette (FHWA) <Jeanette.Mar@dot.gov>
**Subject:** Update on air quality modeling for I495/I270 MLS project
Hi Cecilia and Karen,

I wanted to briefly update you on this project. Since the TPB removed the I495/I270 project from the air quality model inputs that will inform the future long-range plan for release next year, MDOT has been working with the TPB members to attempt to add the project back in at the meeting scheduled later this month. Jitesh, Jeanette, and I spoke with MDOT earlier today and asked that if the project is successfully added back in to the air quality modeling, to separate out the Phase 1 south project (that is, the current 14-mile NEPA study) from the north project (separate project still in pre-NEPA). By line-iteming the current I495/I270 project, this should hopefully make the project-level conformity determination a clean and straight-forward process once the new long-range plan is released and the ROD is ready for signature. MDOT indicated they will attempt to separate the two projects as just described.

If this email raises any questions or concerns, let me know and I can set up a meeting.

Jitesh or Jeanette, please provide any corrections to my above summary if needed.

Thanks,
Chris

00189890

Transportation Research Part D 86 (2020) 102442



Contents lists available at ScienceDirect

# Transportation Research Part D

journal homepage: www.elsevier.com/locate/trd





# Influence of roadway emissions on near-road PM$_{2.5}$: Monitoring data analysis and implications

Anondo Mukherjee[a], Michael C. McCarthy[a], Steven G. Brown[a,*], ShihMing Huang[a], Karin Landsberg[b], Douglas S. Eisinger[a]

[a] Sonoma Technology Inc., 1450 N. McDowell Blvd., Suite 200, Petaluma CA 94954, USA
[b] Washington State Department of Transportation (WSDOT), Environmental Services Office, 310 Maple Park Avenue SE, PO Box 47318, 360.705. 7491, Olympia, WA 98504 7318, USA

ARTICLE INFO

Keywords:
Near-road
PM$_{2.5}$
Air pollution
Roadway emissions

ABSTRACT

Transportation projects must undergo a transportation conformity hotspot analysis if they are designated as projects of local air quality concern (POAQC). We examined particulate matter 2.5 μm in aerodynamic diameter or smaller (PM$_{2.5}$) concentrations measured in 2017 from 48 near-road monitoring sites across the U.S. Annual average PM$_{2.5}$ increments, the difference between near-road and background PM$_{2.5}$, were between 0.1 ± 0.2 μg/m$^3$ and 2.0 ± 0.2 μg/m$^3$ for sites without noted confounding factor(s). The highest PM$_{2.5}$ increment from monitors 10 or more meters from the roadway was 1.4 ± 0.2 μg/m$^3$. Using modeled national average exhaust emissions, and associated near-road contribution to PM$_{2.5}$, the upper bound of 2.0 ± 0.2 μg/m$^3$ is projected to decrease 30% from 2017 to 2040, for the types of highways assessed here, assuming a roadway with 8% heavy-duty vehicles and constant traffic volumes. These results can help inform transportation conformity POAQC designations.

## 1. Introduction

Motor vehicle emissions contribute to particulate matter in the United States through the direct emission of particulate matter 2.5 μm in aerodynamic diameter or smaller (PM$_{2.5}$) and the emission of precursor gases that form PM$_{2.5}$ through gas-to-particle conversion (McCarthy et al., 2006; Abu-Allaban et al., 2007; Brown et al., 2012; Jimenez et al., 2009; May et al., 2014; Saha et al., 2018a; Stroud et al., 2014; Massoli et al., 2012; Kittelson et al., 2006). For roadways with significant traffic, a concern is the potential for elevated localized PM$_{2.5}$ levels, i.e., hot spots (Yanosky et al., 2018; U.S. Environmental Protection Agency, 2015a). A number of factors impact the traffic contribution to PM$_{2.5}$, including the traffic mix and volume, the age of vehicles, vehicle speed, meteorological conditions, local topography, and the built environment, including roadway geometry and the presence of barriers or sound walls (Zhu et al., 2002; Baldauf et al., 2008; 2016; Yanosky et al., 2018).

Diesel emissions from heavy-duty diesel vehicles (HDDVs) are an important component of total roadway PM$_{2.5}$ emissions (Gertler, 2005; California Air Resources Board, 2015). The vehicle fleet of the U.S. is dominated by gasoline conventional cars, light trucks, commercial trucks (including HDDVs), with a smaller fraction (~1.6%) of hybrid and electric vehicles that is forecast to increase in the coming decades (U.S. Energy Information Administration, 2020). In addition to exhaust emissions, traffic-related PM$_{2.5}$ emissions

* Corresponding author.
E-mail addresses: amukherjee@sonomatech.com (A. Mukherjee), mmccarthy@sonomatech.com (M.C. McCarthy), sbrown@sonomatech.com (S.G. Brown), shuang@sonomatech.com (S. Huang), landsbk@wsdot.wa.gov (K. Landsberg), doug@sonomatech.com (D.S. Eisinger).

https://doi.org/10.1016/j.trd.2020.102442

Available online 02 July 2020
1361-9209/ © 2020 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/BY-NC-ND/4.0/).

00193102

also include brake wear, tire wear, and resuspended road dust (Gerder et al., 2000; Clayton et al., 2003; Dabek-Zlororzynska et al., 2016). Beginning in 2014, the U.S. Environmental Protection Agency (EPA) mandated the deployment of air quality monitors alongside selected major roadways in the United States; these have been used to examine the impact of traffic-related pollution (Watkins, 2016; Seagram et al., 2019; DeWinter et al., 2018). Measurements at the near-road sites focus on $PM_{2.5}$, carbon monoxide (CO) and nitrogen dioxide ($NO_2$), and typically do not include $PM_{10}$ measurements.

Given that approximately 20% of the U.S. population lives near major roadways, studies have examined the associations between exposure to traffic-related pollutants (TRAPs) and health outcomes (Rowangould, 2013; Urman et al., 2014; Brandt et al., 2014; Starling et al., 2020; Hegseth et al., 2019). Studies have found negative health impacts, such as reduced lung function, low birth weights, and increased asthma and risk of heart failure, for individuals living within 300 m of major roadways (Ghosh et al., 2016; Urman et al., 2014; Brandt et al., 2014; Health Effects Institute, 2010). Even modest exposure to TRAPs can lead to respiratory symptoms (Hegseth et al., 2019).

Quantifying the contribution of major roadways to near-road $PM_{2.5}$ is an ongoing field of study. A study of three urban sites in Canada found that traffic-related emissions contributed between 15 and 35% of $PM_{2.5}$, primarily through exhaust emissions (diesel and gasoline), re-suspended road dust and break wear (Dabek-Zlotorzynska et al., 2019). Prior studies examined incremental $PM_{2.5}$ impacts from major roads, using U.S. near-road monitor data from 2015 and 2016 (Seagram et al., 2019; DeWinter et al., 2018; Brown et al., 2019; Rattigan et al., 2020). A study of two-year average incremental $PM_{2.5}$ from 2017 to 2018 found an average increment value of 0.5 $\mu g/m^3$ (0.17 – 0.84 $\mu g/m^3$, 95% confidence interval) based on 72 U.S. near-road monitors and nearby sites, with higher incremental impacts seen for rural sites (Lal et al., 2020). This corresponded to an average traffic contribution of 5% of total $PM_{2.5}$ at near road sites. The study herein provides novel results by examining the annual average $PM_{2.5}$ increments in 2017 while accounting for confounding factors, and by presenting increments calculated using two different methods.

Clean Air Act (CAA) section 176(c) (42 U.S.C. 7506(c)) mandates that transportation projects that are federally funded must not cause or worsen air quality violations or delay attainment of the National Ambient Air Quality Standards (NAAQS) and must conform to the purpose of the State Implementation Plan (SIP) for air quality (i.e., "transportation conformity"). CAA transportation conformity requirements are promulgated by the EPA to ensure that federally funded transportation projects do not impede the SIP. In 2006, EPA issued a final rule (40 CFR 93.123(b)(1)) entitled "$PM_{2.5}$ and $PM_{10}$ Hot-Spot Analysis in Project-Level Transportation Determinations for the New $PM_{2.5}$ and Existing $PM_{10}$ National Ambient Air Quality Standards" (PM hot-spot rule), and in 2015 EPA issued updated guidance for quantitative PM hot-spot analyses (U.S. Environmental Protection Agency, 2015a). Accordingly, transportation projects are required to undergo quantitative PM hot-spot analysis if they are identified, through interagency consultation among federal, state, and local air quality and transportation agencies, as a project of local air quality concern (POAQC).

The transportation conformity regulation (40 CFR 93.123(b)) defines conditions to determine whether a project is a POAQC; these conditions include significant levels of diesel vehicle traffic or identification in a PM SIP as a POAQC. The preamble to the 2006 final rule gives this example: "A project on a new highway or expressway… with annual average daily traffic (AADT) greater than 125,000 where 8% or more of such AADT is diesel truck traffic." In practice, the final decision of whether a project is a POAQC is discussed and decided through interagency consultation. If a project is determined to be POAQC, the subsequent $PM_{2.5}$ hot-spot analysis must follow a detailed procedure accounting for base-year and future-year traffic activity related to the proposed project, and modeling associated emissions and air quality. Contributions of $PM_{2.5}$ that are modeled to result from the project are summed with the estimated background concentration and compared to the NAAQS. Required transportation conformity analyses can vary depending on the area—for example, modeling road dust is not required for every analysis. Given the complexity of quantitative $PM_{2.5}$ hot-spot analyses, information that clarifies which projects are unlikely to be a POAQC is valuable. The work presented here improves understanding of incremental $PM_{2.5}$ impacts of major U.S. roadways and can directly inform POAQC determinations.

The objectives of this near-road particulate matter study were to: (1) assess the annual average increment of $PM_{2.5}$ representing the impact of roadway emissions on $PM_{2.5}$ at near-road monitoring sites in 2017, (2) quantify the relationship between the increments and site-specific factors such as traffic volumes and the monitor's distance to the roadway, (3) use modeled exhaust emissions to forecast changes in traffic-related $PM_{2.5}$ between 2017 and 2040, and (4) draw insights relevant to the conformity requirements for transportation project $PM_{2.5}$ hot-spot analysis, including implications for which transportation projects can be reasonably excluded from consideration as a POAQC. This study provides novel results including an examination of which near-road sites had high incremental $PM_{2.5}$, what factors are associated with high incremental $PM_{2.5}$, and how traffic-related $PM_{2.5}$ is forecast to change in the coming decades as the vehicle fleet changes and exhaust emissions decrease.

## 2. Methods

This study examined the contribution of roadway emissions to annual average $PM_{2.5}$ concentrations at U.S. near-road monitors in 2017. To complete $PM_{2.5}$ increment analyses, we refined the data to remove various confounding factors that might skew understanding of roadway impacts. First, we examined $PM_{2.5}$ measurements from 48 near-road sites that had at least one ambient site within 40 km where $PM_{2.5}$ measurements met EPA data completeness thresholds during 2017. Total near-road $PM_{2.5}$ concentrations from these sites were compared to the NAAQS to establish a national-scale understanding of near-road $PM_{2.5}$. Next, we narrowed our sample to 40 near-road sites where the near-road and the ambient site measured $PM_{2.5}$ using identical monitoring instruments, and we estimated $PM_{2.5}$ increments for those sites. Each of the 40 near-road sites was then evaluated for potential confounding factors, including characteristics of the near-road environment (such as site elevation or the presence of nearby barriers, commonality of land use between near-road and background monitors, and potential sea breeze effects) that could skew findings. Removing sites with a noted confounding factor resulted in a sample of 20 near-road monitoring sites. The locations of the near-road sites used at each stage

00193103

A. Mukherjee, et al.                                                                                                    Transportation Research Part D 86 (2020) 102442



Fig. 1. Locations of the 48 near-road PM$_{2.5}$ monitoring sites operating in 2017. Eight sites had no matching instrument at the near-road and nearby ambient sites, incremental PM$_{2.5}$ is calculated for the remaining 40 sites. Of those 40 sites, 20 sites had a noted confounding factor, the focused case is the remaining 20 sites.

of analysis are shown in Fig. 1. In summary, we narrowed our data sample to remove confounding factors and improve increment evaluation in the following progression:

1. 48 sites: all of the near-road sites with an ambient monitor available for background
2. 40 sites: near-road sites paired with ambient sites using identical monitoring instruments
3. 20 sites: our "focused case" sample after addressing confounding factors

The statistical relationships between the annual average PM$_{2.5}$ increment and traffic volumes, distance from roadway, and meteorological variables were assessed for the 20 site cases using pairwise correlation of determination (R$^2$), regression models, and a general additive model (GAM). Finally, we used the near-road increments calculated with 2017 data and emissions forecasts to estimate the traffic impact on PM$_{2.5}$ from 2018 to 2040. The forecast analysis employed estimates of the fraction of traffic-related PM$_{2.5}$ emissions originating from exhaust, as well as estimated changes in exhaust emissions, predicted by the EPA Motor Vehicle Emissions Simulator (MOVES) and the Emission FACtors (EMFAC) models. We then evaluated the implications of these results for the POAQC designation of proposed highway projects.

*2.1. Data sources*

This section details the sources of data used in this study, completeness thresholds, initial data processing steps, and methods used to calculate variables.

*2.1.1. Air quality data and near-road site characteristics*

A list of near-road monitoring sites and site information is available from the EPA at https://www3.epa.gov/ttnamti1/nearroad.html. Sites in this study are identified by their EPA Air Quality System (AQS) site ID codes. Some cities have multiple near-road sites (e.g., Denver-0027 and Denver-0028), and some sites have collocated measurements of PM$_{2.5}$, identified by their parameter occurrence code (POC) (e.g., Milwaukee-0056-1 and Milwaukee-0056-3). EPA also provides the geographic coordinates of the monitor and the distance of the near-road monitor from the road, defined as the distance to the edge of the roadway. EPA metadata include AADT and fleet-equivalent AADT (FE-AADT) information for the target road from the year of site installation. EPA developed the FE-AADT calculation to represent an emissions-weighted traffic volume, taking into account both AADT and fleet mix (U.S. Environmental Protection Agency, 2012). FE-AADT is calculated as:

$$(AADT - HD_c) + (HD_m \times HD_c)$$

where HD$_c$ is the volume of heavy-duty vehicles on the target roadway, and HD$_m$ is a scaling factor that represents the ratio of heavy-

3

00193104

**Table 1**
Near-road site characteristics and 2017 increments from IDW and nearest-monitor methods, for the focused case of 20 near-road sites where all sites with a noted confounding factor have been removed. The nonparametric Mann-Whitney U (MWU) test p-value shows whether the near-road and background $PM_{2.5}$ values are statistically different populations, p-values less than 0.01 indicate statistically different populations with 99% or greater confidence.

| Site Name | AQS ID | Annual Average $PM_{2.5}$(2017) | IDW $PM_{2.5}$ increment | IDW MWU p-value | Nearest Monitor $PM_{2.5}$ increment | Nearest Monitor MWU p-value | Average Wind Speed (m/s) | Percent Downwind | Percent Upwind | Percent Parallel | Distance to Road (meters) | FE-AADT | AADT | Number of Trucks | Method Type | Number of background stations (IDW) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Birmingham-2059 | 01-073-2059 | 10.33 | 0.5 ± 0.2 | $6.4 \times 10^{-06}$ | 0.3 ± 0.2 | 0.006 | 0.2 | 36 | 38 | 27 | 23 | 215,527 | 141,190 | 8,260 | FRM | 4 |
| Charlotte-0045 | 37-119-0045 | 8.65 | 0.5 ± 0.2 | $2.4 \times 10^{-08}$ | 0.4 ± 0.2 | $3.2 \times 10^{-05}$ | 1.0 | 13 | 41 | 45 | 30 | 260,830 | 153,000 | 11,981 | FRM | 2 |
| Cheektowaga-0023 | 36-029-0023 | 7.39 | 0.5 ± 0.1 | $1.9 \times 10^{-09}$ | 0.2 ± 0.2 | 0.0039 | 2.5 | 47 | 33 | 20 | 20 | 220,543 | 131,019 | 9,947 | FRM | 2 |
| Columbus-0038 | 39-049-0038 | 8.72 | 0.5 ± 0.2 | $4.2 \times 10^{-07}$ | 0.5 ± 0.2 | $9.8 \times 10^{-08}$ | 1.0 | 37 | 35 | 28 | 32 | 286,050 | 142,361 | 15,965 | FRM | 3 |
| Denver-0027 | 08-031-0027 | 7.93 | 1.7 ± 0.4 | $4.5 \times 10^{-11}$ | 1.8 ± 0.4 | $7.9 \times 10^{-11}$ | 1.0 | 24 | 25 | 52 | 9 | 263,118 | 249,000 | 1,569 | FEM | 6 |
| Denver-0028 | 08-031-0028 | 8.92 | 1.3 ± 0.2 | $3.4 \times 10^{-39}$ | 1.4 ± 0.2 | $4.3 \times 10^{-41}$ | 1.1 | 33 | 25 | 42 | 6 | 210,835 | 192,000 | 2,093 | FRM | 3 |
| Indianapolis-0087 | 18-097-0087 | 10.55 | 0.5 ± 0.2 | $1.8 \times 10^{-10}$ | 0.6 ± 0.2 | $2.2 \times 10^{-09}$ | 1.9 | 28 | 36 | 36 | 25 | 362,110 | 189,760 | 19,150 | FRM | 5 |
| Laurel-0006 | 24-027-0006 | 8.49 | 1.0 ± 0.2 | $3.9 \times 10^{-19}$ | 1.1 ± 0.2 | $8.2 \times 10^{-22}$ | 1.0 | 25 | 31 | 44 | 16 | 452,309 | 186,750 | 29,507 | FEM | 4 |
| Long Beach-4008 | 06-037-4008 | 14.9 | 2.0 ± 0.3 | $1.5 \times 10^{-48}$ | 2.0 ± 0.3 | $2.6 \times 10^{-49}$ | 1.1 | 52 | 23 | 25 | 9 | 619,008 | 192,000 | 47,445 | FRM | 2 |
| Louisville-0075 | 21-111-0075 | 8.86 | 0.8 ± 0.2 | $8.0 \times 10^{-16}$ | 0.9 ± 0.2 | $5.9 \times 10^{-15}$ | 1.9 | 30 | 32 | 38 | 32 | 247,600 | 163,000 | 9,400 | FRM | 2 |
| Memphis-0100 | 47-157-0100 | 8.14 | 0.3 ± 0.2 | $7.3 \times 10^{-05}$ | 0.3 ± 0.2 | $2.4 \times 10^{-05}$ | 2.1 | 23 | 44 | 33 | 24 | 292,968 | 140,850 | 16,902 | FRM | 2 |
| Milwaukee-0056 | 55-079-0056 | 7.52 | 0.3 ± 0.3 | $4.7 \times 10^{-06}$ | 0.4 ± 0.2 | $1.0 \times 10^{-05}$ | 2.3 | 47 | 18 | 35 | 14 | 133,000 | 133,000 | 0 | FRM | 3 |
| Minneapolis-0962 | 27-053-0962 | 7.72 | 0.1 ± 0.2 | 0.16 | 0.1 ± 0.2 | 0.18 | 1.7 | 30 | 34 | 36 | 33 | 387,250 | 277,000 | 12,550 | FEM | 6 |
| New Orleans-0021 | 22-071-0021 | 8.07 | 0.4 ± 0.2 | $6.6 \times 10^{-04}$ | 0.5 ± 0.2 | $5.1 \times 10^{-06}$ | 3.2 | 41 | 33 | 25 | 29 | 129,229 | 68,015 | 6,802 | FRM | 2 |
| Providence-0030 | 44-007-0030 | 8.31 | 2.0 ± 0.2 | $1.3 \times 10^{-63}$ | 2.0 ± 0.2 | $2.7 \times 10^{-52}$ | 2.2 | 44 | 17 | 39 | 5 | 416,790 | 186,300 | 25,610 | FEM | 5 |
| Rochester-0015 | 36-055-0015 | 6.69 | 0.5 ± 0.2 | 0.002 | 0.2 ± 0.2 | 0.002 | 3.5 | 40 | 19 | 41 | 20 | 144,717 | 110,990 | 3,747 | FRM | 1 |
| Sacramento-0015 | 06-067-0015 | 9.46 | 0.5 ± 0.2 | $1.7 \times 10^{-10}$ | 0.6 ± 0.2 | $7.7 \times 10^{-11}$ | 1.5 | 29 | 27 | 44 | 20 | 475,000 | 186,000 | 32,111 | FRM | 3 |
| San Jose-0006 | 06-085-0006 | 10.81 | 1.4 ± 0.2 | $6.9 \times 10^{-15}$ | 1.2 ± 0.2 | $1.1 \times 10^{-29}$ | 2.2 | 33 | 13 | 53 | 32 | 294,140 | 191,000 | 11,460 | FEM | 4 |
| Tempe-4019 | 04-013-4019 | 8.14 | 0.5 ± 0.1 | $6.9 \times 10^{-15}$ | 1.0 ± 0.1 | $4.6 \times 10^{-30}$ | 0.7 | 45 | 40 | 15 | 12 | 624,315 | 320,138 | 33,797 | FEM | 7 |
| Washington DC-0051 | 11-001-0051 | 10.23 | 0.7 ± 0.4 | 0.00017 | 0.2 ± 0.4 | 0.41 | 1.6 | 27 | 47 | 26 | 15 | 172,747 | 115,480 | 6,363 | FEM | 3 |

4

USCA4 Appeal: 24-1447    Doc: 31-4    Filed: 09/30/2024    Pg: 126 of 391

JA2754

00193105

duty to light-duty emissions of oxides of nitrogen ($NO_x$). The number of HDDVs was estimated from FE-AADT and AADT, using the EPA's recommended national default scaling value of $HD_m = 10$. Because the provided FE-AADT is based on $NO_x$ emissions, we use it as a proxy for HDDV scaled traffic, and also examine the relationship between number of HDDVs and incremental $PM_{2.5}$ directly.

Daily and hourly $PM_{2.5}$ measurements from all ambient monitors within 40 km of a near-road site were acquired from EPA's AQS. The network of ambient monitors was designed to monitor regional compliance with federal and state health standards, so ambient monitors are not typically sited in areas known to be near major emission sources. AQS measurements have been quality-controlled by the submitting agency. Data with specific qualifier flags to indicate quality assurance errors or exceptional events were excluded from this analysis. Only near-road and ambient measurement sets with over 75% completeness in at least 3 out of 4 quarters (Jan-Mar, Apr-Jun, Jul-Sep, Oct-Dec) were used in this study. Measurements from 48 near-road sites, and their nearby ambient monitors were used in the study.

Near-road sites with sufficient data completeness are presented in **Supplementary Table S1**, along with site characteristics. Land use indicators of population density, land surface imperviousness, and urban percentage show the near-road sites span a range of environments. Near-road monitors are stationed within 50 m of major roadways; the monitor's distance to road and the roadway's AADT and FE-AADT values are presented in Table 1 for the 20-site case.

### 2.1.2. Meteorological data

For all near-road sites, collocated measurements were used when they met the completeness threshold of 75%. If no collocated measurements were available, then the nearest meteorological site with complete data for the year was used. For 27 of the 48 near-road sites, collocated hourly meteorological measurements of wind speed and wind direction were available for over 75% of the year. For 14 of the 48 sites, hourly meteorological measurements of wind speed and wind direction, with over 75% completeness, were available from a nearby AQS monitor within 30 km. For the remaining seven sites, hourly wind speed and direction data from the MesoWest database (University of Utah, 2020) were used.

For the 48 sites, hourly wind direction data were used to characterize when the near-road monitor was upwind or downwind of the road, or when winds were parallel with the road. First, the angle from the near-road monitor to the center of the nearby road was deduced from the coordinates using the program ArcMap. Next, the wind direction was classified as upwind, downwind, or parallel, using 120-degree bins for each category. The percentage of time for each day in each wind category was calculated from hourly data. Daily average wind speed and direction were calculated by taking vector averages of the hourly wind speeds and using the resulting magnitude as daily average wind speed. Annual average values were calculated from these variables.

### 2.1.3. Land use

The following resources were used to examine land use characteristics of the domains around the near-road sites. NASA's Socioeconomic Data and Applications Center provides a data product, Gridded Population of the World (GPW) at spatial resolution of 30 arc seconds (approximately 1 km). Population Density version 4.10 for the year 2015 was used, assuming negligible changes between 2015 and 2017. The GPW record of numbers of persons per square kilometer represents residents and is consistent with national census records (Doxsey-Whitfield et al., 2015). The gridded data products of imperviousness and land cover were obtained from the National Land Cover Database (NLCD) 2011 at 30-meter resolution, developed by the USGS. Imperviousness is defined between 0 and 100%, with 100% representing impervious concrete, and 0% representing natural environments such as soil. The land use product contains 96 different categories. These categories were classified into three bins: urban, 50% urban, and non-urban.

Gridded land use datasets were then processed alongside spatial AQS metadata of site location using the ArcGIS program, ArcMap. Domains were created with a radius of 1, 5, and 10 km, centered around the near-road monitors and nearby ambient monitors. Average population density, imperviousness, and percentage of urban land use (derived from land cover) were calculated for these domains, with missing data (typically representing rivers or other natural features) classified as a value of zero for all three land use variables. We binned near-road and ambient sites into one of four land uses: rural, suburban, urban, or dense urban. If no ambient monitor in the same land use bin was within 20 km of the near-road site, we identified land use as a confounding factor. Based on these criteria, and on a visual examination identifying the densest urban regions, the commonality of land use between near-road and nearby ambient site was determined.

### 2.2. Increment calculation

For sites with hourly data, a daily average $PM_{2.5}$ was calculated, using a 75% completeness threshold for each day. Background $PM_{2.5}$ at near-road sites using ambient monitors within a 40 km radius was estimated in two ways: (1) using the nearest ambient monitor to represent background concentrations, and (2) using an inverse distance squared weighting (IDW) average of multiple monitors. For the IDW method, ambient sites are given a relative weighting factor that is proportional to the inverse length of the distance from the near-road monitor squared, so that sites closer to the near-road monitor play a stronger role in representing the background. This method follows EPA guidance (see section 8 in U.S EPA (2015a)) and is consistent with prior published near-road analyses (Seagram et al., 2019). Daily $PM_{2.5}$ increments representing the contribution from traffic were calculated as the difference between the near-road value and the background value for both the IDW and nearest-monitor methods. Daily $PM_{2.5}$ increments were then averaged to calculate the annual average $PM_{2.5}$ increment. The uncertainty for each annual average increment is calculated as the 95% confidence interval on the mean, defined as $1.96 \times$ standard deviation (increment)/(N-1)^0.5, where N represents the number of days of valid data. The non-parametric Mann-Whitney paired $U$ test was used to determine whether the daily average $PM_{2.5}$ values were statistically significantly higher at near-road sites than the background estimate.

5

00193106

*A. Mukherjee, et al.*                              *Transportation Research Part D 86 (2020) 102442*



Fig. 2. (a) daily average $PM_{2.5}$ distributions at Milwaukee-0056 and a nearby ambient monitoring site for FRM and BAM (FEM), and (b) four increment distributions derived from near-road and ambient measurements.

### 2.3. Data analysis methods: Confounding factors

We evaluated four confounding factors that could impact the calculated increment at each near-road site: (1) the commonality of instrument method at near-road and ambient sites, (2) characteristics of the near-road site environment, (3) commonality of land use between near-road and nearby ambient sites, and (4) the sea breeze effect.

Monitoring instruments that meet specific quality control and operational standards are designated by the EPA as Federal Reference or Equivalent Methods (FRM or FEM) (U.S. Environmental Protection Agency, 2016). While these instruments have met rigorous standards, there still remain differences in instrumental precision and performance, depending on the chemical composition of the PM sampled, the instrument method, and environmental conditions. A national 3-year assessment from 2014 to 2016 found that biases unique to each instrument were less than 10% for FRM instruments, and up to 22% for some FEM instruments (U.S. Environmental Protection Agency, 2015b).

A case study of the Milwaukee-0056 site was used to illustrate the impact of choosing differing or identical instrument methods at the near-road and ambient sites. Milwaukee-0056 and a nearby ambient site (55-0790058) are 282 m apart, meaning the background concentrations at the two sites were likely quite similar. Both sites had two sets of instrumentation available, the FRM gravimetric R & P Model 2025 and the FEM Met One BAM-1020. The distributions of the four sets of measurements and the four sets of resulting increments for 2017 are shown in Fig. 2. Only times when measurements from all four instruments were available were used for this case study. For the case of a near-road BAM and a nearby FRM, the resulting average increment was $-0.2\ \mu g/m^3$. For the case of a near-road FRM and a nearby BAM, the resulting average increment was $1.1\ \mu g/m^3$. There is lower uncertainty when identical instruments are used to calculate the increment than when mixed method comparisons are used. The resulting distributions when using FRMs at both sites (average increment of $0.4\ \mu g/m^3$) and using BAMs at both sites (average increment of $0.5\ \mu g/m^3$) are similar. Because EPA's assessments of instrument bias and the Milwaukee case study show that different instrument comparisons can be a confounding factor, increments were restricted to identical instrument comparisons, which results in a set of 40 near-road sites. The FRM identical instrument comparison was chosen for Milwaukee-0056 and other sites when possible, because FRM identical instrument comparisons result in the lowest uncertainty given the lower bias of FRM instruments.

Next, the immediate environment of the near-road sites was examined to see whether local topography or other environmental characteristics were a confounding factor in measuring near-road $PM_{2.5}$ for any sites. The immediate area of the near-road sites was examined using Google Earth and Google Maps Street View. Google Earth was used to quantify the elevation difference between the near-road monitor and the centroid of the target road. Street View was used to determine the presence or absence of any barriers such as sound walls, trees, or bushes near the monitor or between the monitor and the roadway. Many sites had complex local topography and/or a complex built environment, including nearby interchanges, depressed roadways, or nearby walls that could influence the $PM_{2.5}$ measurements. Four sites were identified as having near-road site environmental factors that could confound the resulting increments: Livonia-0095, Tacoma-0024, Nashville-0040, and Ontario-0027.

The availability of ambient monitors that can provide an accurate representation of the background $PM_{2.5}$ was examined using land use data. $PM_{2.5}$ can vary substantially within a metropolitan domain; for example, variations in annual average $PM_{2.5}$ of about 2.5-30% were observed in Jefferson County in the years 2000–2009 (Superczynski and Christopher, 2011). Jefferson County includes the Birmingham-2059 near-road site and is roughly equivalent to our 40 km radius zone. The study of Jefferson County found substantially higher $PM_{2.5}$ near the urban center of Birmingham, driven by emissions from manufacturing, industry, and power generation (Superczynski and Christopher, 2011). A case study of the Cleveland-0073 near-road site was used to illustrate how land

00193107

JA2756

A. Mukherjee, et al.

Transportation Research Part D 86 (2020) 102442



Fig. 3. Distribution of daily average $PM_{2.5}$ at 48 near-road monitoring sites in 2017, sorted by annual mean. The annual mean (orange circles) and 98th percentile of 24-hr $PM_{2.5}$ concentrations (blue squares) are shown. The orange dashed lined denotes the annual NAAQS threshold (12 $\mu g/m^3$), and the blue dashed line denotes the daily average NAAQS threshold (35 $\mu g/m^3$). (For interpretation of the references to colour in this figure legend, the reader is referred to the web version of this article.)

use differences can correlate with $PM_{2.5}$ gradients and confound the calculation of the increment (see Figure Supplementary figure 1).

Another confounding factor that could skew representation of background $PM_{2.5}$ is the "sea breeze effect." The sea breeze effect is the impact of meteorology on the environment of coastal domains and other areas near large bodies of water. Coastal communities often experience a diurnal pattern of winds flowing toward the land during the day and toward the ocean during the night, driven by the pressure gradient resulting from different rates of heating on land and on water. This diurnal wind circulation, and the absence of major emissions from the water, leads to lower air pollutant concentrations alongside coastal regions. The sea breeze effect can lead to a positive or negative bias in calculating the increment. A case study of the Berkeley-0013 near-road site was used to illustrate how the sea breeze effect can impact the increment (see Figure Supplementary figure 2). After considering all of these confounding factors, we developed a final set of 20 near-road sites for use in our analysis.

### 3. Results

#### 3.1. $PM_{2.5}$ NAAQS comparison for 48 near-road sites

The distributions of daily average near-road $PM_{2.5}$ from the 48 near-road sites in 2017 are presented in Fig. 3. The $PM_{2.5}$ NAAQS (annual and 98th percentile daily average) are also shown. Fig. 3 compares measured concentrations to the NAAQS for research purposes only; the analysis represents only one year of data and does not represent a calculation to determine attainment status. Sites with multiple instruments (POCs) are plotted separately; different distributions are due to the differences in instrument method and

7

00193108

A. Mukherjee, et al.

Transportation Research Part D 86 (2020) 102442



**Fig. 4.** Distributions of annual average $PM_{2.5}$ increments using identical instrument methods from 40 near-road sites, computed using inverse distance squared weighting (IDW) and the nearest-monitor method (Nearest). A focused case of 20 sites where all sites with a noted confounding factor have been removed is shown at the top. The 10 sites with a confounding factor and positive increments are shown at the middle, and the 10 sites with a confounding factor and negative increments are shown at the bottom. Sites are rank-ordered by IDW increment. FRM vs FEM represents instrument measurement type. The x-axis scale differs among the plots.

in the sampling intervals. Two sites, Long Beach-4008 (POC 1 and POC 3) and Ontario-0027, exceeded the annual average $PM_{2.5}$ NAAQS value of 12 µg/m³. Five sites exceeded the daily 98th percentile $PM_{2.5}$ value of 35 µg/m³: Long Beach-4008 (POC 1 and POC 3), Ontario-0027, Oakland-0012, San Jose-0006, and Seattle-0030.

8

00193109

### 3.2. PM$_{2.5}$ increments at Near-Road sites

The range of calculated annual average PM$_{2.5}$ increment values is shown in Fig. 4. Only the 40 sites with identical instrument comparisons are shown. Among all 40 sites, a negative increment was observed at 10 sites, increments from 0 µg/m$^3$ to 0.6 µg/m$^3$ at 15 sites, increments from 0.7 µg/m$^3$ to 1.5 µg/m$^3$ at 11 sites, and increments from 1.7 µg/m$^3$ to 2.1 µg/m$^3$ at four sites. When the PM$_{2.5}$ value from the background estimate is higher than the value from the near-road site, a negative increment results.

The distribution of IDW and nearest-monitor increments are very similar. Denver-0027, Long Beach-4008, Providence-0030, and Cincinnati-0048 are the four sites with the highest increments; their monitors were sited less than 10 m from their roadways (8.7, 9, 5 and 8 m, respectively). This is consistent with literature indicating a modest PM$_{2.5}$ concentration gradient from the roadway (Karner et al., 2010; Baldauf et al., 2008; Saha et al., 2018b). In contrast, the other 36 sites had a wide range of distance to road, with most monitors (with the exception of three sites) more than 10 m from the roadway. Thus, while not all sites in close proximity to the roadway had a high increment, all sites with increments greater than 1.4 ± 0.2 µg/m$^3$ were within 10 m of the road. In addition to distance from the road, other variables including traffic volume, fleet mix, and meteorology contributed to the variability of the increments seen in Fig. 4.

Thirty sites had a positive increment. The increment values at the 30 sites ranged from 0.1 µg/m$^3$ at Minneapolis-0962 to 2.1 µg/m$^3$ at Cincinnati-0048. The upper bound of increments from the IDW or the nearest-monitor method of estimating the background is identical. While some differences exist between the nearest-monitor and IDW methods of calculating the increment, they are less than 0.5 µg/m$^3$ for 87% of sites, and less than 0.2 µg/m$^3$ for 69% of sites. At three sites, the IDW and nearest-monitor derived increments are the same because only one monitor with an identical instrument method was available at those sites. The uncertainty on each annual average increment and the instrument method type, FEM or FRM, is shown in Fig. 4. Increments greater than 1.5 µg/m$^3$ were found from both FEM instrument sites (Cincinnati-0048 and Providence-0030) and FRM instrument sites (Long Beach-4008 and Denver-0027).

Rattigan et al. (2020) found annual near-road increments of 0.27 µg/m$^3$ and 0.92 µg/m$^3$ for the Rochester-0015 and Queens-0125 sites respectively, using the nearest site as urban background. We find a similar value of 0.2 µg/m$^3$ for Rochester-0015 and a smaller value of 0.4 µg/m$^3$ (nearest-monitor method) for the Queens-0125 site. Lal et al. (2020) examined two-year average incremental PM$_{2.5}$ from 2017 to 2018 and found that for 28 of 72 (~38%) near-road sites, the PM$_{2.5}$ values were lower at the near-road site than at the nearby background site. This is very similar to the results shown in Fig. 4, where for 10 out of 40 (25%) near-road sites, the PM$_{2.5}$ values were lower at the near-road site than the background estimate, leading to negative increments. Lal et al. (2020) found that these cases were due to cleaner vehicle fleets, formation of secondary PM from on-road emissions occurring downwind, the impact of other local sources at the non-road sites, and dispersion relating to the local meteorology environments. These factors explain the same result shown in Fig. 4, for the 10 out of 40 cases with a negative increment.

Next, we examined a focused case of increments from 20 near-road sites where sites with one or more of the previously discussed confounding factors have been removed. The procedure for removing sites with a confounding factor is detailed in Section 2.3, and examples are provided in Fig. 2 and the Supplementary Figures. Increments from these 20 sites are presented in the top panel of Fig. 4. The upper bound of PM$_{2.5}$ increments is 2.0 ± 0.2 µg/m$^3$ for this focused case. Only three sites have an increment greater than 1.5 µg/m$^3$, and all of these have monitors sited less than 10 m from the roadway. The average increments with 95% confidence intervals for these 20 sites are 0.8 ± 0.3 µg/m$^3$ for both the IDW and nearest-monitor methods. These values are comparable to the two-year 2017-2018 average increment value of 0.50 ± 0.33 µg/m$^3$ based on 72 sites found by Lal et al. (2020). Differences for any given near-road site increment are due to the unique methodology used to calculate the increment in this study.

Table 1 lists the 20 sites included in the focused case. Increments from the IDW and nearest-monitor methods are presented only where identical method comparisons were available. The meteorological parameters of average wind speed and upwind vs. down-wind conditions for the near-road sites are shown. The Mann–Whitney paired $U$ test shows that the near-road PM$_{2.5}$ values were statistically significantly higher than the background estimates at above 99% confidence (p-value less than 0.01) for all 20 sites except Minneapolis0962 (increment values of 0.1 µg/m$^3$ for both nearest monitor and IDW methods) and Washington DC-0051 (only for nearest monitor background increment 0.2 µg/m$^3$). This means that increments from the other 18 sites, and all increments higher than 0.2 µg/m$^3$ are statistically significant at above 99% confidence from the 20 site case. These two sites are retained in order to represent low increment cases, where as expected near-road and background populations may not have a statistically significant difference.

### 3.3. Comparison to Meteorology, Traffic, and site characteristic variables

The focused case of 20 increments was used to assess the relationship of near-road increments to variables representing meteorology, traffic, and site characteristics. The coefficient of determination ($R^2$ value) is presented for both the IDW and nearest-monitor calculations of the increment (Table 2). Increments were compared with annual average wind speed; percent of time the near-road site was downwind, parallel, or upwind of the adjacent roadway; distance to road; FE-AADT; AADT; and estimated number of HDDVs. A positive correlation with the increment was seen for FE-AADT, AADT, and the percent of time the near-road site was parallel or downwind of the road. A negative correlation was seen between the increment and percent of time upwind of the road, distance to road, and wind speed. For the IDW method, the largest correlation was for distance to road ($R^2 = 0.34$), followed by percent upwind ($R^2 = 0.25$) and FE-AADT ($R^2 = 0.12$). Weaker correlations were observed for the number of HDDVs, percent of time parallel to the road, AADT, and average wind speed. Almost no correlation was seen for percent of time downwind of the road. FE-AADT and number of HDDVs show a higher correlation to the increment than AADT, likely indicating the importance of HDDVs in

9

00193110

**Table 2**

Coefficient of Determination ($R^2$ value) for IDW and Nearest Monitor increments for the focused case of 20 sites. Variables are rank-ordered by IDW Method $R^2$ values.

| Variable | IDW Method | Nearest Monitor |
|---|---|---|
| Distance to Road | 0.34 | 0.87 |
| Percent Upwind | 0.25 | 0.28 |
| FE-AADT | 0.12 | 0.22 |
| Number of HDDVs | 0.10 | 0.16 |
| Percent Parallel | 0.09 | 0.08 |
| AADT | 0.07 | 0.17 |
| Average Wind Speed | 0.06 | 0.07 |
| Percent Downwind | 0.03 | 0.04 |

contributing to $PM_{2.5}$ emissions for these roadways. Increments calculated through the IDW method and the nearest-monitor method showed very similar statistical relationships to the meteorology and traffic variables.

Regressions for the IDW-calculated increment and three other variables, distance to road, percent of time the monitor was upwind, and FE-AADT are shown in Fig. 5. A linear regression ($y = a \cdot x + b$) was used for FE-AADT, and an inverse relationship ($y = a /x + b$) was used for distance to road and percent of time the monitor was upwind. The coefficients and p values of these regressions are shown in Table 3. The p values show that these modeled relationships are statistically significant for distance to road above 99% confidence. The modeled increment falls from approximately 2 $\mu g/m^3$ at 5 m from the roadway to approximately 0.5 $\mu g/m^3$ at 30 m from the roadway (99.9% confidence that the relationship exists). The increment falls from 1.5 $\mu g/m^3$ when the receptor is upwind of the road 15% of the time, to 0.75 $\mu g/m^3$ when the receptor is upwind of the road 30% of the time (97% confidence). The linear regression for FE-AADT predicts a relationship of 0.14 $\mu g/m^3$ higher $PM_{2.5}$ values for every increase of 100,000 in FE-AADT (87% confidence).

In order to represent multiple explanatory variables at once, a GAM was used to predict the near-road IDW increment using distance to road, percent of time a site was upwind, and FE-AADT (the top three factors from Table 2). The model was run to optimize the restricted maximum likelihood estimation (REML), and each of the three predictor variables was given three degrees of freedom. The p value, and relative variable importance of these three variables are presented in Table 4. The model had an overall adjusted $R^2$



Fig. 5. The relationship between the IDW $PM_{2.5}$ increment in comparison to FE-AADT (a), percent of time upwind (b), and distance to road (c). Regressions are shown in black, with the range of the standard error of the regression line shown in dark grey.

00193111

**Table 3**

The intercepts, slopes, p values, and $R^2$ values for the regressions presented for three cases in Fig. 5. For FE-AADT, a linear regression is used, of the form $y = a \cdot x + b$. For distance to road and percent upwind, an inverse relationship is used, of the form $y = a/x + b$.

| Regression Model | Distance to Road vs IDW Increment | Percent Upwind vs IDW Increment | FE-AADT vs IDW Increment |
|---|---|---|---|
| a | 9.15 | 19.93 | $1.40 \times 10^{-6}$ |
| b | 0.17 | 0.05 | 0.35 |
| p value | $0.000185^a$ | 0.034 | 0.127 |
| $R^2$ | 0.34 | 0.25 | 0.12 |

[a] Statistically significant relationship at 99% or higher confidence.

**Table 4**

The p value and relative variable importance of the three variables examined using a GAM model to predict the near-road IDW increment.

| Regression Model | Distance to Road | Percent Upwind | FE-AADT |
|---|---|---|---|
| p value | $000032^a$ | 0.15 | 0.22 |
| relative variable importance | 1 | 0.23 | 0.19 |

[a] Statistically significant relationship at 99% or higher confidence.

value of 0.63, predicting the majority of the variability in the IDW increment. Distance to road was the variable with the highest relative importance and had the lowest p value, whereas percent of time the monitor was upwind and FE-AADT had a similar relative variable importance, about 20% of the distance to road. Overall, the regression models shown in Fig. 5, the correlations shown in Table 3, and the GAM model show a statistically significant correlation between distance to road and the increment, and also show a modest correlation between FE-A ADT and percentage of time a site was upwind with the increment, which was statistically significant in the pairwise comparison case.

## 4. Implications for POAQC screening

Under transportation conformity, interagency consultation partners weigh proposed transportation projects on a case-by-case basis and assess whether a project is a POAQC requiring quantitative $PM_{2.5}$ hot-spot assessment. $PM_{2.5}$ conditions are dynamic in metropolitan areas—the vehicle fleet becomes cleaner each year as older, higher-polluting vehicles are replaced by vehicles meeting more stringent emissions standards, and regional air quality conditions generally improve over time. EPA, for example, documents a 41% decrease in $PM_{2.5}$ concentrations nationally from 2000 to 2017 (U.S. Environmental Protection Agency, 2020). Section 93.123(b)(1)(i) requires $PM_{2.5}$ hot-spot analyses to be completed for "New highway projects that have a significant number of diesel vehicles, and expanded projects that have a significant increase in the number of diesel vehicles." In the context of changing fleet emissions and regional air quality, interagency consultation partners must dynamically assess factors that lead to a POAQC determination, including the significance of diesel vehicle traffic under present and forecast scenarios. This discussion illustrates how quantitative data from this study can be used to inform POAQC determinations.

The upper bound of the 2017 $PM_{2.5}$ increment was $2.0 \pm 0.2 \ \mu g/m^3$ for the focused case of 20 near-road sites, where the sites with possible confounding factors have been removed. The upper bound of the increment for near-road sites with monitors sited 10 m or more from the roadway was $1.4 \pm 0.2 \ \mu g/m^3$. The implications for designating proposed roadway projects as POAQC are shown in Section 4.1, followed in Section 4.2 by the forecasts of the upper bound of traffic-related $PM_{2.5}$ for the coming decades using projected changes in emissions.

### 4.1. The current influence of traffic emissions on annual average $PM_{2.5}$

The near-road sites represent a wide range of highway environments, with substantial variability in traffic volume, fleet mix, meteorology, and other environmental conditions shown in Table 1. For the set of 20 near-road sites, the monitor distance to the road ranged from 5 to 33 m from the roadway. As shown in Table 1, average wind speed ranges from 0.24 m/s to 3.11 m/s, and the percent of hours upwind ranged from 13.5% to 46.5%. AADT ranged from ~68,000 to ~320,000; FE-AADT ranged from ~129,000 to ~ 624,000; and estimated number of HDDVs ranged from 0 to 47,445. Long Beach-4008, the site with the highest estimated number of HDDVs, had an increment of $2.0 \pm 0.3$, which is equivalent to the upper bound from Providence0030. About half of the sites (11 out of 20) had more than 10,000 HDDVs. The roadway geometry within 1 km of these sites showed wide variety, with numerous sites stationed at curved roadways and within 500 m of a major interchange. The immediate environment of the near-road sites was also diverse, including dividers, complex lane structures, and other structures of the built environment at many sites. Considering all of these factors, the increments represent traffic-related $PM_{2.5}$ over a wide range of highway project conditions. These findings provide the following insights, which can inform POAQC determinations. These insights are applicable to transportation project situations covered by the data set evaluated here (see Table 1).

• Proposed highway projects for sites where the current (i.e., 2017) ambient air quality (i.e., background concentration) has an

11

00193112

**Table 5**

Ratios of $PM_{2.5}$ traffic emissions by process from modeled studies of Providence-0030 and Indianapolis-0087, and a measurement campaign in Toronto.

| Process | Modeled $PM_{2.5}$ Emissions (%)Providence | Modeled $PM_{2.5}$ Emissions (%)Indianapolis | Measured $PM_{2.5}$ Emissions (%)Toronto |
|---|---|---|---|
| Running Exhaust | 49 | 40 | 65 |
| Re-suspended Road Dust | 44 | 53 | 13 |
| Brake and Tire Wear | 7 | 7 | 22 |
| Total | 100 | 100 | 100 |

annual average $PM_{2.5}$ level of at least 2.0 $\pm$ 0.2 $\mu g/m^3$ below the NAAQS value (currently set at 12 $\mu g/m^3$) should not expect to see air quality impacts that result in an average annual $PM_{2.5}$ concentration above the NAAQS.

• Proposed highway projects where the only receptors of concern are beyond 10 m of the roadway, and where the current annual average $PM_{2.5}$ level is at least 1.4 $\pm$ 0.2 $\mu g/m^3$ below the NAAQS value, should not expect to see air quality impacts that result in an average annual $PM_{2.5}$ above the NAAQS.

Given the statistical relationships demonstrated in Tables 2, 3, and 4 it is clear that distance to road, the percent of time the near-road site is upwind of the road, and FE-AADT are key factors influencing the increment. These relationships were shown in Fig. 5. The interagency consultation process can weigh how specific project conditions relate to the variables shown in Fig. 5 and can consider these relationships in the context of POAQC determination. For example, based on the 20 site case, the $PM_{2.5}$ increment is estimated to fall ~ 50% between 10 m and 30 m from the roadway (Fig. 5c).

### 4.2. Projecting the impact of emission changes over time

The results from the near-road monitoring sites, showing the range of traffic-related $PM_{2.5}$ impacts, can be synthesized with our understanding of the projected change of vehicle emissions in the coming decades. First, we examine the relative contribution of exhaust and nonexhaust emissions to traffic-related $PM_{2.5}$. Second, we forecast how the exhaust emissions of $PM_{2.5}$ will change over time with fleet turnover. Third, we use these findings to forecast how the increments identified in Section 3 will change in the coming decades.

### 4.2.1. The contribution of exhaust emissions to traffic-related $PM_{2.5}$

Traffic-related $PM_{2.5}$ emissions come from three sources: exhaust, re-suspended road dust, and brake and tire wear. Table 5 shows results from three analyses about the relative contributions of $PM_{2.5}$ emissions from these sources. The contribution from surface wear is incorporated into the re-suspended road dust category. Companion work by the study team used the MOVES and AERMOD models to estimate site-specific emissions for two cases Craig et al., 2020. For the case of Providence-0030, a target roadway with 186,300 AADT and 13.7% HDDV, the exhaust was found to contribute to 49% of traffic $PM_{2.5}$ emissions in 2015 and 2016. For the case of Indianapolis-0087, a target roadway with 189,760 AADT and 10.1% HDDV, the exhaust was found to contribute to 40% of traffic $PM_{2.5}$ emissions in 2016. A study by Jeong et al. (2019) examined the traffic emissions of a roadway in Toronto in 2016 with 400,000 AADT, using the chemical composition of $PM_{2.5}$ and source apportionment. They found that exhaust contributed to 65% of traffic-related $PM_{2.5}$ emissions, with a strong dependence on HDDV fraction (approximately 6–13% of the fleet mix). For comparison, a review article examining studies from roadways around the world found that exhaust emissions contributed to the majority of overall traffic $PM_{2.5}$ emissions in most of the published studies reviewed (Pant and Harrison, 2013).

**Table 6**

Projected exhaust-only $PM_{2.5}$ emissions of vehicles for the calendar years 2017-2040 for six cases. For the six columns to the left, emissions are shown in grams per mile per average vehicle, for HDDV, LDV, and a fleet mix with 8% HDDV and 92% LDV. Emissions are shown for a national average modeled using MOVES, and for San Francisco using EMFAC. For the six columns to the right, the same emissions are shown relative to the baseline year of 2017.

| Year | MOVES HDDV | MOVES LDV | MOVES HDDV 8% | EMFAC HDDV | EMFAC LDV | EMFAC HDDV 8% | MOVES HDDV Percent of 2017 | MOVES LDV Percent of 2017 | MOVES HDDV 8% Percent of 2017 | EMFAC HDDV Percent of 2017 | EMFAC LDV Percent of 2017 | EMFAC HDDV 8% Percent of 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2017 | 0.22042 | 0.00807 | 0.02506 | 0.12152 | 0.00216 | 0.01171 | 100 | 100 | 100 | 100 | 100 | 100 |
| 2018 | 0.19095 | 0.00749 | 0.02216 | 0.09684 | 0.00218 | 0.00976 | 87 | 93 | 88 | 80 | 101 | 83 |
| 2019 | 0.16631 | 0.00698 | 0.01973 | 0.07686 | 0.00220 | 0.00818 | 75 | 87 | 79 | 63 | 102 | 70 |
| 2020 | 0.14486 | 0.00656 | 0.01762 | 0.05888 | 0.00217 | 0.00670 | 66 | 81 | 70 | 48 | 100 | 57 |
| 2025 | 0.07571 | 0.00497 | 0.01063 | 0.00902 | 0.00172 | 0.00231 | 34 | 62 | 42 | 7 | 80 | 20 |
| 2030 | 0.04051 | 0.00397 | 0.00690 | 0.00857 | 0.00130 | 0.00188 | 18 | 49 | 28 | 7 | 60 | 16 |
| 2035 | 0.02778 | 0.00341 | 0.00536 | 0.00830 | 0.00100 | 0.00158 | 13 | 42 | 21 | 7 | 46 | 14 |
| 2040 | 0.02579 | 0.00315 | 0.00497 | 0.00814 | 0.00084 | 0.00143 | 12 | 39 | 20 | 7 | 39 | 12 |

00193113

#### 4.2.2. Projections of exhaust emissions from 2017 to 2040

The projected exhaust emissions for U.S. vehicle fleets for the calendar years 2017 to 2040 are shown in Table 6. Emissions in grams per mile per average vehicle are shown for HDDVs, light-duty vehicles (LDVs), and an average vehicle in a vehicle fleet composed of 8% HDDVs and 92% LDVs. The 8% HDDV case is a weighted average using 8% HDDV emission rate and 92% LDV emission rate. National average emission estimates are presented using the MOVES 2014 model developed by the EPA, and for San Francisco using the EMFAC2017 model, developed by the California Air Resources Board (CARB). The percent change of the emissions reductions relative to the year 2017 are shown in the last six columns of Table 6. A decrease of exhaust emissions is shown in all cases for both vehicle types, due to fleet turnover. For example, the exhaust emissions of a roadway with 8% HDDV in San Francisco are projected to decrease by 88% by 2040 using EMFAC, assuming constant AADT and a constant HDDV fraction of 8%. The specific change in exhaust emissions for a given roadway will depend on changes in the regional vehicle fleet and traffic activity over time.

#### 4.2.3. Projected traffic contribution to $PM_{2.5}$

The upper bound of traffic-related $PM_{2.5}$ represented by the increment for near-road sites in 2017 can be combined with the projected change in exhaust emissions (Table 6) and an assumed fraction of traffic-related $PM_{2.5}$ due to exhaust, to forecast the upper bound of traffic-related $PM_{2.5}$ in the coming decades. In 2017, the upper bound of the observed annual average $PM_{2.5}$ traffic impact was $2.0 \pm 0.2\ \mu g/m^3$, with an upper bound of $1.4 \pm 0.2\ \mu g/m^3$, for sites with monitors 10 m or more from the roadway. Using the example based on the modeled Indianapolis-0087 study, which is the most conservative assumption out of the three cases in Table 5, we can take the fraction of 40% to illustrate a lower end estimate of the contribution of exhaust emissions to total traffic-related emissions. The change in the $PM_{2.5}$ traffic impact for a given project can then be calculated using the equation:

$$PM_{2.5} increment\ (future\ year)\ \mu g/m^3 = 1.22 + 0.82 \cdot [Percent\ change\ from\ 2017\ to\ future\ year]$$

Where $1.22\ \mu g/m^3$ is the 60% of traffic-driven $PM_{2.5}$ that is attributed to non exhaust factors and $0.82\ \mu g/m^3$ is the 40% of traffic-driven $PM_{2.5}$ that is attributed to exhaust, which is forecast to decrease. Likewise, for distances 10 m or more from the roadway, we have the equation:

$$PM_{2.5} increment,\ 10\ meters\ or\ greater\ from\ roadway\ (future\ year)\ \mu g/m^3$$
$$= 0.86 + 0.58 \cdot [Percent\ change\ from\ 2017\ to\ future\ year]$$

The projected change of the $PM_{2.5}$ increment is illustrated in the following examples. These examples are based on the formulas above, use the MOVES national average emissions estimate, and assume a project with constant vehicle speeds and an HDDV fraction of 8% for all years. The exhaust emissions are projected to be 42% of 2017 emissions by 2025 and 20% of 2017 emissions by 2040 (see Table 6). Using the equations above, the $PM_{2.5}$ impact of a highway would fall from $2.0 \pm 0.2\ \mu g/m^3$ in 2017 to $1.6 \pm 0.2\ \mu g/m^3$ by 2025, and to $1.4 \pm 0.2\ \mu g/m^3$ by 2040, if AADT, fleet mix, and vehicle speeds remain constant. Following the same method, for the domain greater than or equal to 10 m from the roadway, the $PM_{2.5}$ impact of a highway would fall from $1.4 \pm 0.2\ \mu g/m^3$ in 2017 to $1.1 \pm 0.2\ \mu g/m^3$ by 2025 and $1.0 \pm 0.2\ \mu g/m^3$ by 2040. This procedure only accounts for changing exhaust emissions caused by fleet turnover, and does not account for the full range of factors in forecasting incremental $PM_{2.5}$ impacts that may be considered during interagency consultation. Other factors which may influence incremental $PM_{2.5}$ that are not evaluated in this study include the trend toward heavier vehicles, leading to greater nonexhaust traffic emissions, and the trend toward more hybrid and electric vehicles leading to lower traffic emissions (Timmers and Achten, 2016).

The near-road $PM_{2.5}$ increment will vary year by year for any given site, due to changes in traffic emissions, meteorology, and other site-specific factors such as local scale non-traffic emissions. Non-traffic emissions are a confounding factor on the true near-road increment. As shown in Section 4.2, national average exhaust emissions are forecast to decrease over 50% by 2025 (see case 3 in Table 6). Fig. 4 shows that only three out of 20 near-road sites in the focused case had $PM_{2.5}$ increments greater than $1.5\ \mu g/m^3$. Year-to-year meteorological variations will impact the absolute concentrations, but since regional-scale changes in factors such as precipitation and wind speed would be relatively consistent across an urban area, such conditions should similarly affect near-road and nearby monitoring sites. Thus, for transportation project situations covered by the data set evaluated here (see Table 1), the value of $2.0 \pm 0.2\ \mu g/m3$ is a reasonable representation of an upper bound roadway impact, particularly in light of expected emissions reductions due to fleet turnover in the coming decades.

As discussed earlier, POAQC determinations are considered during interagency consultation on a case by-case basis for proposed projects. Under the transportation conformity requirements, Section 93.123(b)(1)(i), consultation partners evaluate whether projects involve a significant number or increase in diesel vehicles. The analysis procedures presented here can dynamically link proposed projects to anticipated incremental air quality impacts over time, thus helping to define on a case-by-case basis whether projects involve significant changes in diesel vehicles and merit being identified as a POAQC. The assessment process can reflect site-specific characteristics such as projected changes of fleet-average exhaust emissions, HDDV fraction, AADT, the distance between the roadway edge and sensitive receptor locations, and the persistence of prevailing wind direction.

### 5. Conclusion

Measurements from 48 near-road highway monitoring sites across the U.S. were used to examine the annual average $PM_{2.5}$ impact of traffic in 2017. These sites have diverse meteorological, roadway, and traffic conditions. The impact of roadway emissions was

00193114

represented by the $PM_{2.5}$ increment, which is the difference between near-road and background estimates of $PM_{2.5}$. The background estimates were calculated using an IDW method and a nearest-monitor method. Based on published EPA findings of instrument performance, we investigated the influence of differences in instrument method on the increment calculation, using the Milwaukee-0056 near-road site as a case study. Consistent with EPA's findings, we found the potential for variation in outcomes across instrument methods. Because of this confounding factor, only identical instrument methods were used to calculate the increment. Three other confounding factors were assessed: characteristics of the near-road monitoring environment, the commonality of land use between the near-road site and the ambient site, and the sea breeze effect. These factors were assessed for the 48 sites on a case-by-case basis. This methodology can be used by future studies to examine incremental impacts of $PM_{2.5}$ and other traffic-related pollutants, in the U.S. and in other environments.

A focused set of 20 sites was chosen, where all sites with noted confounding factor(s) were removed; increment values for this set ranged from near zero to $2.0 \pm 0.2 \ \mu g/m^3$. The increments for sites located 10 m or more from the roadway were between zero and $1.4 \pm 0.2 \ \mu g/m^3$. Relationships between the increment and meteorological, traffic, and site variables were assessed. The three variables with the greatest explanatory power and highest pairwise correlations with the increment were distance to road, percent of time the monitor was upwind of the road, and PE-AADT. Increments calculated from the IDW method and the nearest-monitor method had an identical upper bound ($2.0 \pm 0.2 \ \mu g/m^3$) and similar correlations with meteorological, traffic and site variables. Regressions showed a statistically significant relationship between $PM_{2.5}$ and distance from the roadway, with $PM_{2.5}$ decreasing 50% between 10 and 30 m from the roadway. The data evaluated represent a diversity of environments and conditions, for roadways up to approximately 624,000 PE-AADT.

The increment results were combined with estimates of the exhaust fraction contribution to $PM_{2.5}$ and the projected change of exhaust emissions between 2017 and 2040. Holding traffic volume, travel speeds, and fleet mix constant, traffic-related $PM_{2.5}$ is projected to decrease in the coming decades because of reduced g/mi exhaust emissions from newer vehicles and fleet turnover. Using MOVES national average emissions, and a conservative assumption that only 40% of the 2017 increment was due to exhaust, the upper bound of traffic-related $PM_{2.5}$ is projected to fall from $2.0 \pm 0.2 \ \mu g/m^3$ in 2017 to $1.4 \pm 0.2 \ \mu g/m^3$ in 2040, assuming constant traffic conditions. The forecasting methodology can be used by project analysts seeking to understand the future-year $PM_{2.5}$ impact of a possible roadway project, using site-specific factors.

This work builds on and refines work presented previously. Previous studies estimated $PM_{2.5}$ increments greater than $2.0 \ \mu g/m^3$ at a few near-road monitors in both 2015 and 2016 (DeWinter et al., 2018; Seagram et al., 2019). At each site where increments were previously reported as being greater than $2.0 \ \mu g/m^3$, confounding factors were present that are now addressed in the work presented here. These confounding factors include, for example, different monitoring instruments at the background and near-road sites, and characteristics of the environment surrounding the near-road monitoring site. In addition, as shown in Fig. 5 of Seagram et al. (2019), there is emerging evidence that near-road $PM_{2.5}$ concentrations are generally trending downward, a finding consistent with expectations related to downward-trending fleet-averaged g/mi $PM_{2.5}$ exhaust emission rates. For these reasons, 2017 data are used here to identify $2.0 \pm 0.2 \ \mu g/m^3$ as the upper bound of traffic-related $PM_{2.5}$ increments, in comparison to findings from previous analyses and earlier calendar years.

A key factor for transportation conformity is to weigh whether background concentrations plus an expected project increment will be below the NAAQS. This study examined annual average comparisons of the $PM_{2.5}$ increment and traffic variables; our analysis presents the upper bound of traffic-related annual average near-road $PM_{2.5}$ increments, derived from 2017 concentration data and a diverse set of near-road sites. The results can inform interagency consultation regarding potential project impacts and help consultation participants determine whether a project meets the definition of a POAQC under the transportation conformity requirements. Future work is needed to assess the relative contribution of exhaust and non-exhaust $PM_{2.5}$ emissions, and to refine understanding of non-exhaust emission changes and changing travel activity over time.

## Acknowledgements

This work was funded as part of the Near-Road Air Quality Research Pooled Fund TPF5(284), under the U.S. Federal Highway Administration Transportation Pooled Fund Program, agreement number Y-11498. The lead agency for TPF5(284) is the Washington State Department of Transportation. Other participants that funded this work include FHWA and the Arizona, California, Colorado, Ohio, Texas, and Virginia Departments of Transportation. Results shown here reflect the views of the authors and do not necessarily represent the views of the TPF partner organizations. The authors would also like to acknowledge Nealson Watkins of the U.S. Environmental Protection Agency for providing metadata of near-road monitoring sites.

## Appendix A. Supplementary material

Supplementary data to this article can be found online at https://doi.org/10.1016/j.trd.2020.102442.

## References

Abu-Allaban M., Gillies J.A., Gerder A.W., Clayton R., and Proffitt D. (2007) Motor vehicle contributions to ambient PM10 and PM2.5 at selected urban areas in the USA. Environmental Monitoring and Assessment, 132(1), 155-163. doi: 10.1007/s10661-006-9511-3.

Baldauf R., Thoma E., Hays M., Shores R., Kinsey J.S., Gullet B., Kimbrough S., Isakov V., Long T., Snow R., Khlystov A., Weinstein J., Chen F.-L., Seila R., Olson D., Gilmour I., Cho S.-H., Watkins N., Rowley P., and Bang J. (2008) Traffic and meteorological impacts on near-road air quality: summary of methods and trends from

14

00193115

the Raleigh near-road study. J. Air Waste Manage. 58, 865-878, July.

Baldauf, R.W., Isakov, V., Deshmukh, P., Venkatram, A., Yang, B., Zhang, K.M., 2016. Influence of solid noise barriers on near-road and on-road air quality. Available at. Environ. Environ. 129, 265–276. https://doi.org/10.1016/j.atmosenv.2016.01.025.

Brandt, S., Perez, L., Künzli, N., Lurmann, F., Wilson, J., Pastor, M., McConnell, R., 2014. Cost of near-roadway and regional air pollut on-attributable childhood asthma in Los Angeles County. November Available at. J. Allergy Clinical Immunology 134 (5), 1028-1035. https://doi.org/10.1016/j.jaci.2014.09.029.

Brown, S.G., Lee, T., Norris, GA., Roberts, P.T., Collett Jr., J.L., Paatero, P., Worsnop, D.R., 2012. Receptor modeling of near-roadway aerosol mass spectrometer data in Las Vegas, Nevada, with EPA PMF. Available at. Atmos. Chem. Phys. 12, 309-325. https://doi.org/10.5194/acp12-309-2012 (ST-3873).

Brown S.G., Penfold B.M., Mukherjee A., Landsberg K., and Eisinger D. (2019) Conditions leading to elevated PM2.5 at near-road monitoring sites: case studies in Deaver and Indianapolis. International Journal of Environmental Research and Public Health, 16(9), 1634. doi: 10.3390/ijerph16091634 (ST17047), May 10.

Available at https://www.mdpi.com/1660-4601/16/9/1634.

California Air Resources Board (2015) DUPLICATE = = USE 16934 = = Sustainable freight: pathways to zero and near-zero emissions. Discussion document. April. Available at https://ww3.arb.ca.gov/gmp/sfti/sustainable-freight-pathways-to-zero-and-near-zero-emissions-discussion-document.pdf.

Clayron R., Gertler A.W., Proffitt D., Gillies J.A., and AbuAllaban M. (2003) Particulate matter (PM2.5 and PM10) apportionment for on-road mobile sources. Final report prepared for the National Cooperative Highway Research Program, Transportation Research Board, National Research Council. Washington, DC, Project HR-25-18, January.

Dabek-Zlotorzynska E., Celo V., Ding L., Herod D., Jeong C.-H., Evans G. and Hilker N. (2019) Characteristics and sources of PM2.5 and reactive gases near roadways in two metropolitan areas in Canada. Atmos. Environ, 218, doi: 10.1016/j.atmosenv.2019.116980, December 1.

Craig, Kan., Baringer., Lynn. Chang, Shih-Ying, McCarthy, Michael, Kai. Song, Ravi. Vikram, Eisinger., Douglas, Landsberg, Karin, 2020. Analysis of modeled near-road particulate matter concentrations in Indianapolis during 2016. Atmos. Environ Submitted for publication.

DeWinter, J.L., Brown, S.G., Seagram, A.F., Landsberg, K., Eisinger, D.S., 2018. A national-scale review of air pollutant concentrations measured at near-U.S. near-road monitoring network during 2014 and 2015. Atmos. Environ. 183, 94–105 10.1016/j.atmosenv.2018.04.003 (STI-6777).

Doxsey-Whitfield E., MacManus K., Adamo S.B., Pistolesi L., Squires J., Borkovska O., and Baptista S.R. (2015) Taking advantage of the improved availability of census data: a first look at the gridded population of the world, version 4. Papers in Applied Geography, 1(3), 226-234, July 3. Available at https://doi.org/10.1080/23754931.2015.1014272.

Gertler A.W., Gillies J.A., and Pierson W.R. (2000) An assessment of the mobile source contribution to PM10 and PM2.5 in the United States. Water Air and Soil Pollution, 123(1,4), 203-214, Oct.

Gertler, A.W., 2005. Diesel vs. gasoline emissions: does PM from diesel or gasoline vehicles dominate in the US? Atmos. Environ. 39 (13). 2349–2355. https://doi.org/10.1016/j.atmosenv.2004.05.065.

Ghosh, R., Lurmann, F., Perez, L., Penfold, B., Brandt, S., Wilson, J., Milet, M., Künzli, N., McConnell, R., 2016. Near-roadway air pollution and coronary heart disease: burden of disease and potential impact of greenhouse gas reduction strategy in southern California. February. Available at. Environ. Health. Persp. 124 (2), 193–200. https://doi.org/10.1289/ehp1408865.

Health Effects Institute (2010) Traffic-related air pollution: a critical review of the literature on emissions, exposure, and health effects. Report prepared by the Health Effects Institute, Boston, MA, Special Report 17, January. Available at https://www.healtheffects.org/publication/traffic-related-air-pollution-critical-review-literature-emissions-exposure-and-health.

Hegseth, M.N., Oftedal B.M., Höper, A.C., Aminoff, A.L., Thomassen, M.R., Svendsen, M.V., Fell, A.K.M., 2019. Self-reported traffic-related air pollution and respiratory symptoms among adults in areas with modest levels of traffic. PLoS ONE 14 (12). e0226221. https://doi.org/10.137 l/journal.pone.0226321.

Jeong, C.-H., Wang, J.M., Hilker, N., Debosz, J., Sofowote, U., Su, Y., Noble, M., Healy, R.M., Munoz, T., Dabek-Zlotorzynska, E., Celo, V., White, L., Audette, C., Herod, D., Evans, G.J., 2019. Temporal and spatial variability of traffic-related PM₂.₅ sources: comparison of exhaust and non-exhaust emissions. Available at. Atmos. Environ. 198, 55–69 https://doi.org/10.1016/j.atmosenv.2018.10.038.2019/02/01/.

Jimenez J.L., Canagaratna M.R., Donahue N.M., Prévôt A.S.H., Zhang Q., Kroll J.H., DeCarlo P.F., Allan J.D., Coe H., Ng N.L., Aiken A.C., Docherty K.S., Ulbrich I.M., Grieshop A.P., Robinson A.L., Duplissy J., Smith J.D., Wilson K.R., Lanz V.A., Hueglin C., Sun Y.L., Tian J., Laaksonen A., Raatikainen T., Rautiainen J., Vaattovaara P., Ehn M., Kulmala M., Tomlinson J.M., Collins D.R., Cubison M.J., Dunlea E.J., Huffman J.A., Onasch T.B., Alfarra M.R., Williams P.I., Bower K., Kondo Y., Schneider J., Drewnick F., Borrmann S., Weimer S., Demerjian K., Salcedo D., Cottrell L., Griffin R., Takami A., Miyoshi T., Hatakeyama S., Shimono A., Sun J.Y., Zhang Y.M., Dzepina K., Kimmel J.R., Sueper D., Jayne J.T., Herndon S.C., Trimborn A.M., Williams L.R., Wood E.C., Middlebrook A.M., Kolb C.E., Baltensperger U., and Worsnop D.R. (2009) Evolution of organic aerosols in the atmosphere. Science, 326. 1525-1529, doi: 10.1126/science.1180353, December 11.

Karner, A., Eisinger, D.S., Niemeier, D., 2010. Near-roadway air quality: synthesizing the findings from real-world data. Available at. Environ. Sci. Technol. 44, 5334-5344. https://doi.org/10.1021/es100008x (STI-3923).

Kittelson D.B., Watts W.F., and Johnson J.P. (2006) On-road and laboratory evaluation of combustion aerosols—part I: summary of diesel engine results. Journal of Aerosol Science, 37(8), 913-930, doi: 10.1016/j.jaerosci.2005.08.005, August.

Lal R.M. Aru R., and Armistead R. (2020) Assessment of the contribution of (monitoring) network including comparison with nearby monitors within U.S. cities. Environmental Research Letters (in press). doi: 10.1088/1748-9326/ab8156. Available at https://iopscience.ioporg/article/10.1088/1748-9326/ab8156.

Massoli, P., Forner, E.C., Canagaratna, M.R., Williams, L.R., Zhang, Q., Sun, Y., Schwab, J.J., Trimborn, A., Onasch, T.B., Demerjian, K.L., Kolb, C.E., Worsnop, D.R., Jayne, J.T., 2012. Pollution gradients and chemical characterization of particulate matter from vehicular traffic near major roadways: results from the 2009 Queens College Air Quality Study in NYC. Aerosol Sci. Technol. 46 (1 1), 1201–1218. https://doi.org/10.1080/02786826.2012.701784.

May, A.A., Nguyen, N.T., Presto, A.A., Gordon, T.D., Lipsky, E.M., Karve, M., Gutierrez, A., Robertson, W.H., Zhang, M., Brandow, C., Chang, O., Chen, S., Cicero-Fernandez, P., Dinkins L., Fuentes, M., Huang, S.-M., Ling, R., Long, J., Maddox, C., Massetti, J., McCauley, E., Miguel, A., Na, K., Ong, R., Pang, Y., Rieger, P., Sax, T., Truong, T., Vo, T., Chattopadhyay, S., Maldonado, H., Maricq, M.M., Robinson, A.L., 2014. Gas- and particle-phase primary emissions from in-use, on-road gasoline and diesel vehicles. Atmospheric Environment 88, 247-260. https://doi.org/10.1016/j.atmosenv.2014.01.046. January 28.

McCarthy, M.C., Eisinger, D.S., Hafner, H.R., Chinkin, L.R., Roberts, P.T., Black, K.N., Clark, N.N., McMurry, P.H., Winer, A.M., 2006. Particulate matter: a strategic vision for transportation-related research. September. Available at. Environ. Sci. Technol. 40 (18), 5593–5599. https://doi.org/10.1021/es062767r (STI-904750-2884).

Pant, P., Harrison, R.M., 2013. = = DUPLICATE = = USE 15907 Estimation of the contribution of road traffic emissions to particulate matter concentrations from field measurements: a review. Available at. Atmos. Environ. 77, 78-97. https://doi.org/10.1016/j.atmosenv.2013.04.028.

Rattigan O.V., Carpenter A.C., Civerolo K.L., and Felton H.D. (2020) Pollutant measurements at near road and urban background sites in New York. USA. Atmospheric Pollution Research. doi: 10.1016/j.apr.2020.01.014. Available at http://www.sciencedirect.com/science/article/pii/S1309104220300246.

Rowangould, G.M., 2013. A census of the US near-roadway population: public health and environmental justice considerations. Transportation Research Part D: Transport and Environment 25, 59–67.

Saha, P.K., Khlystov, A., Grieshop, A.P., 2018a. Downwind evolution of the volatility and mixing state of near-road aerosols near a US interstate highway. Available at. Atmos. Chem. Phys. 18 (3), 2139–2154. https://doi.org/10.5194/acp-18-2139-2018.

Saha, P.K., Khlystov, A., Snyder, M.G., Grieshop, A.P., 2018b. Characterization of air pollutant concentrations, fleet emission factors, and dispersion near a North Carolina interstate freeway across two seasons. Available at. Atmos. Environ. 177, 143–153. https://doi.org/10.1016/j.atmosenv.2018.01.019.

Seagram, A.F., Brown, S.G., Huang, S., Landsberg, K., Eisinger, D.S., 2019. National assessment of near-road air quality in 2016: multiyear pollutant trends and estimation of near-road PM₂.₅ increment. Transp. Res. Rec. https://doi.org/10.3.177/0361198119825535 (STI-6963).

Sterling, A.P., Moore, B.F., Thomas, D.S.K., Peel, J.L., Zhang, W., Adgate, J.L., Magzamen, S., Martenies, S.E., Alshouse, W.B., Dabelea, D., 2020. Prenatal exposure to traffic and ambient air pollution and infant weight and adiposity: the healthy start study. Available at. Environ. Res. 182. 109190. https://doi.org/10.1016/j.envres.2020.109130.

Stroud, C.A., Liggio, J., Zhang, J., Gordon, M., Staebler, R.M., Makar, P.A., Zhang, Q., Li, S.-M., Mihele, C., Lu, G., Wang, D.K., Wentzell, J., Brook, J.R., Evans, G.J., 2014. Rapid organic aerosol formation downwind of a highway: Measured and model results from the FEVER study. J. Geophys. Res: Atmospheres 1 I9 (3),

00193116

JA2765

1663–1679. https://doi.org/10.1002/2013jd020222.

Superczynski, S.D., Christopher, S.A., 2011. Exploring land use and land cover effects on air quality in central Alabama using GIS and remote sensing. Remote Sensing 3, 2552–2567. https://doi.org/10.3390/rs3122552.

Timmers, V.R.J.H., Achten, P.A.J., 2016. Non-exhaust PM emissions from electric vehicles. Available at: Atmos. Environ. 134, 10–17. https://doi.org/10.1016/j.atmosenv.2016.03.017.

U.S. Energy Information Administration (2020) Annual energy outlook 2020, Table 45: transportation fleet car and truck stock by type and technology, Reference case. Available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=55-AEO2020&region=0-0&cases=ref2020&start=2018&end=2050&f=A&linechart=&sourcekey=0MSC.

U.S. Environmental Protection Agency (2012) Near-road NO2 monitoring: technical assistance document. EPA-454/B-12-002. June. Available at http://www.epa.gov/ttn/amtic/nearroad.html.

U.S. Environmental Protection Agency (2015a) Transportation conformity guidance for quantitative hotspot analyses in PM2.5 and PM10 nonattainment and maintenance areas. Prepared by the EPA Office of Transportation and Air Quality, Transportation and Climate Division, Washington, DC, EPA-420-B-15-084, November. Available at http://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100NMXM.pdf, appendix available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100NN22.pdf.

U.S. Environmental Protection Agency (2015b) 3-year quality assurance report for calendar years 2011, 2012, and 2013: PM2.5 ambient air monitoring program. EPA-454/R-15-002. March. Available at https://www3.epa.gov/ttnamti1/files/ambient/pm25/qa/2013pm25qaReport.pdf.

U.S. Environmental Protection Agency (2016) List of designated reference and equivalent methods. June 17. Available at https://www3.epa.gov/ttn/amtic/criteria.html.

U.S. Environmental Protection Agency (2020) Particulate matter (PM2.5) trends. Available at https://www.epa.gov/air-trends/particulate-matter-pm25-trends.

University of Utah, Department of Atmospheric Sciences (2020) MesoWest. Available at https://mesowest.utah.edu/html/help/main_index.html.

Urman, R., McConnell, R., Islam, T.S., Avol, E.L., Lurmann, F.W., Vora, H., Lin, W.S., Rappaport, E.B., Gilliland, F.D., Gauderman, W.J., 2014. Associations of children's lung function with ambient air pollution: joint effects of regional and near-roadway pollutants. Thorax 69 (6), 540–547. https://doi.org/10.1136/thoraxjnl-2012-203159. June.

Watkins N. (2016) Near-road air quality monitoring network: status and data. Presentation given at the 2016 National Ambient Air Monitoring Conference, St. Louis, MO. August 11, by the U.S. Environmental Protection Agency, Office of Air and Radiation. Washington, DC. Available at https://www.epa.gov/sites/production/files/2016-09/documents/near-road_air_qualitymonitoring.pdf.

Yanosky, J.D., Fisher, J., Liao, D., Rim, D., Wal, R.V., Groves, W., Puett, R.C., 2018. Application and validation of a line-source dispersion model to estimate small scale traffic-related particulate matter concentrations across the conterminous US. Air Qual. Atmos. Health 11 (6), 741–754. https://doi.org/10.1007/s11869-018-0580-6.

Zhu, Y., Hinds, W.C., Kim, S., Shen, S., Sioutas, C., 2002. Study of ultrafine particles near a major highway with heavy-duty diesel traffic. Atmos. Environ. 36 (27), 4323–4335. https://doi.org/10.1016/s1352-2310(02)00354-0. September.

00193117

The NEW ENGLAND JOURNAL of MEDICINE

## SOUNDING BOARD

# The Need for a Tighter Particulate-Matter Air-Quality Standard

Independent Particulate Matter Review Panel

The Environmental Protection Agency (EPA) proposes to retain the current National Ambient Air Quality Standards (NAAQS) for fine particulate matter (particles with a diameter of ≤2.5 $\mu$m [$PM_{2.5}$]) — that is, levels not exceeding an annual average of 12 $\mu$g per cubic meter and a 24-hour average of 35 $\mu$g per cubic meter.[1] The current NAAQS were set in 2012 on the basis of a scientific review that was largely completed in 2010.[2] At that time, available epidemiologic evidence, supported by toxicologic evidence and a risk assessment conducted by EPA staff, indicated that annual exposure to $PM_{2.5}$ caused premature death at ambient concentrations as low as 11 $\mu$g per cubic meter. However, on the basis of more recent evidence, as described below, exposure to ambient $PM_{2.5}$ at the levels of the current standards is estimated by the EPA to be responsible for tens of thousands of premature deaths in the United States each year.[3]

The Clean Air Act requires air-quality standards that are "requisite to protect the public health" with an "adequate margin of safety." Such standards "shall accurately reflect the latest scientific knowledge" regarding "the kind and extent of all identifiable effects on public health." According to requirements of the Clean Air Act, the EPA administrator "shall appoint an independent scientific review committee," known as the Clean Air Scientific Advisory Committee, to periodically "review" the standards.

We were members of the EPA Clean Air Scientific Advisory Committee Particulate Matter (PM) Review Panel that was formed in 2015. By law, the Clean Air Scientific Advisory Committee, which we augmented, has seven members, including at least one physician. However, seven members are not enough to provide breadth, depth, and diversity of expertise, experience, and perspective in the multiple scientific disciplines necessary for these reviews. That is why, for four decades,

the Clean Air Scientific Advisory Committee has been augmented with panels of additional experts for the periodic review of each regulated air pollutant. It has been common to have multiple experts in epidemiology, toxicology, and controlled human exposure studies on these panels, as well as experts in the measurement and modeling of air pollution, exposure and risk assessment, uncertainty analysis, and other areas.

In 2016, we advised the EPA administrator about the Integrated Review Plan for subsequent science and policy assessments. Our PM Review Panel was dismissed by press release on October 10, 2018, just before the draft science assessment was released. Shortly thereafter, we formed the nongovernmental Independent Particulate Matter Review Panel. Our volunteer panel continued to review the science and develop advice for the EPA administrator and the public. We reconvened, with support from the Union of Concerned Scientists and former EPA staff. During a 2-day meeting of our nongovernmental panel, conducted under the ground rules for an official EPA federal advisory committee, we deliberated on the strengths and limitations of available scientific evidence.[4]

In the past two decades, over multiple review cycles, the EPA has used evidence- and risk-based approaches to assess the NAAQS. The evidence-based approach takes into account empirical research on the health hazard posed by an air pollutant, as well as the ambient concentrations at which adverse effects are observed, and is based on a thoughtful and comprehensive synthesis of epidemiologic studies, controlled human exposure studies, and toxicologic studies in animals.[3,4] The risk-based approach uses concentration–response relationships inferred from key epidemiologic studies to estimate the population risk under current and potential alternative standards. Given uncertainties, the risk-based ap-

The New England Journal of Medicine
Downloaded from nejm.org on October 9, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

00193221

SOUNDING BOARD

proach used by EPA staff provides useful qualitative insights regarding the magnitude of the risk and risk reduction. Our panel gave more weight to the evidence-based approach, with the risk-based approach providing supporting information.

We delivered our findings in a report submitted to the administrator and the EPA docket on October 22, 2019.[4] We concluded that the current PM$_{2.5}$ standards are insufficient to protect public health, on the basis of a review of the scientific evidence from epidemiologic studies, toxicologic studies in animals, and controlled human exposure studies; this evidence is consistent within each discipline and coherent among the multiple disciplines in supporting a causal, biologically plausible relationship between ambient concentrations well below the current PM$_{2.5}$ standards and adverse health effects, including premature death.[3] The epidemiologic evidence is consistent across studies with diverse designs, populations, pollutant mixtures, locations, and statistical approaches. For example, new epidemiologic studies consider large populations and report effects below the current annual standard, either by restricting the cohort analyzed to persons living in areas with lower levels of ambient exposure or because the average cohort exposures are well below the annual standard.[5,7] The populations in these studies are more than an order of magnitude larger than those in studies available for previous reviews, which has been made possible by scientific developments in quantification of spatial variability in ambient concentrations with the use of new modeling tools. We found no evidence for an ambient concentration threshold for health effects at the lowest observed levels, either for annual or for 24-hour exposure periods.

Populations with preexisting health conditions (e.g., cardiovascular disease, respiratory disease, diabetes, and obesity) or increased exposures (e.g., disadvantaged populations) represent a substantial portion of the U.S. population. These populations are at increased risk for harm from particulate air pollution, owing to their location near emission sources or to demographic or clinical characteristics (e.g., age or disease status) that increase their susceptibility.

The results of the evidence-based review clearly call into question the adequacy of the existing standards. Furthermore, the risk assessment conducted by the EPA shows that, in a sample of

people 30 years of age or older living in 47 urban study areas, a large number of premature deaths are attributable to PM$_{2.5}$ exposure under the current standard.[3] The estimated all-cause mortality from long-term exposure to PM$_{2.5}$, calculated on the basis of the 2015 air quality adjusted to just meet the existing standards, ranges from 13,500 to 52,100 deaths annually. The actual air quality in the selected study areas is typically somewhat above the current standards and is adjusted downward, with the use of air-quality models, to enable quantification of what the risk would be if the current standards were met. In addition, the estimated all-cause mortality from short-term exposure to PM$_{2.5}$ ranges from 1200 to 3870 deaths annually. For locations in which ambient PM$_{2.5}$ concentrations would meet the annual standard but not the daily standard, the EPA estimates relative risk reductions of 21 to 27% by changing the standard from 12 $\mu$g per cubic meter to 9 $\mu$g per cubic meter. Although there is uncertainty around the estimates, the risk assessment supports the conclusions based on the scientific evidence that at the levels of the current fine-particle standards, the risk of premature death is unacceptably high.

The EPA risk assessment focused on all-cause mortality, mortality due to ischemic heart disease, and mortality due to lung cancer. Exposure to current levels of PM$_{2.5}$ is also causally linked to numerous other adverse health outcomes, including long- and short-term cardiovascular events, respiratory illnesses, death from cancers other than lung cancer, and nervous system diseases (e.g., cognitive decrements and dementia). Additional health concerns, such as adverse pregnancy and birth outcomes, are associated with particulate air pollution, although the evidence of causality is weaker.

We unequivocally and unanimously concluded that the current PM$_{2.5}$ standards do not adequately protect public health. An annual standard between 10 $\mu$g per cubic meter and 8 $\mu$g per cubic meter would protect the general public and at-risk groups. However, even at the lower end of the range, risk is not reduced to zero. The margin of safety increases as the level of the standard is lowered within this range. The choice of standard within this range is a policy judgment reserved for the EPA administrator. In the interest of environmental justice, we advised the administrator that disparities in health risk borne

681

The New England Journal of Medicine
Downloaded from nejm.org on October 9, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

JA2768

00193222

by minority communities need to be taken into consideration in choosing a margin of safety.

In contrast to the recommendation of the EPA staff that the 24-hour $PM_{2.5}$ standard also be retained, the current 24-hour standard does not provide an adequate level of public health protection in locations for which the 24-hour standard, and not the annual standard, would be violated. On the basis of the scientific evidence, and with the acknowledgment that there is a continuum of adverse effects that decrease as the level of the standard decreases, the panel recommends that the 24-hour standard be set between 30 $\mu$g per cubic meter and 25 $\mu$g per cubic meter.

Between 2017 and 2018, all Clean Air Scientific Advisory Committee members were replaced. The seven-member committee newly appointed by the EPA largely reached a different conclusion than we did.[8] The lone physician–scientist on the committee found that the weight of evidence, including recent epidemiologic studies, reasonably calls into question the adequacy of the current long-term standard. However, the committee chair, an industry consultant, and some other members of the committee concluded that there is no evidence that calls into question the adequacy of the current standards. Nonetheless, the committee noted the "exceptional nature" of the current review, including the dismissal of our panel, the accelerated timeline, and the production of a policy assessment before the science assessment was completed. Although some committee members acknowledged our report, the Clean Air Scientific Advisory Committee largely disregarded the advice from our panel.

There is no doubt that on promulgating a final rule, the EPA will be sued. Federal courts have in the past given considerable deference to the Clean Air Scientific Advisory Committee regarding its scientific advice. Will the courts defer to a committee that has been arbitrarily and capriciously deprived of a particulate matter–specific expert panel? Or will the courts look elsewhere, such as to public comments from experts and input from the dismissed panel?

The dismissal of our review panel is just one of numerous recent ad hoc changes to scientific review of the NAAQS since 2017 that undermine the quality, credibility, and integrity of the review process and its outcome. Other changes include imposing nonscientific criteria for appointing the Clean Air Scientific Advisory Committee members related to geographic diversity and affiliation with governments, replacing the entire membership of the chartered committee over a period of 1 year, banning nongovernmental recipients of EPA scientific research grants from committee membership while allowing membership for persons affiliated with regulated industries, ignoring statutory requirements for the need for a thorough and accurate scientific review of the NAAQS in setting a review schedule, disregarding key elements of the committee-approved Integrated Review Plan, reducing the number of drafts of a document for committee review irrespective of whether substantial revision of scientific content is needed, commingling science and policy issues, and creating an ad hoc "pool" of consultants that fails to address the deficiencies caused by dismissing the Clean Air Scientific Advisory Committee PM Review Panel. The courts are already grappling with the ban on academic recipients of research grants.

Although our panel did not specifically assess other current EPA initiatives, there are at least two that are closely related to $PM_{2.5}$. One is the so-called Transparency in Regulatory Science proposed rule and supplement. This rule could exclude from regulatory consideration studies for which data are not publicly available, irrespective of their scientific rigor.[9] Such an exclusion could apply to studies based on data from human participants, including epidemiologic studies such as the seminal Harvard Six Cities and American Cancer Society studies, which were important in previous NAAQS reviews. The other initiative is a change to the EPA benefit–cost assessment to exclude "cobenefits." As an example, the Mercury and Air Toxics Standard for power plants reduces mercury emissions but has the cobenefit of also reducing $PM_{2.5}$ emissions.[10] For this and other rules, $PM_{2.5}$ cobenefits can be much larger than the direct benefits of reducing the pollutant specifically targeted by the rule. The multiple EPA initiatives aimed at undermining the appropriate role of scientific and economic assessment of adverse effects from $PM_{2.5}$ directly threaten health.

The 60-day public comment period for the proposed rule, which ends on June 29, 2020, is the last remaining opportunity for experts and stakeholders to provide input on a flawed rule-making that ignores science and that will lead to avoidable premature deaths.

The New England Journal of Medicine
Downloaded from nejm.org on October 9, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

SOUNDING BOARD

October 2019 meetings of the Independent Particulate Matter Review Panel were hosted by the Union of Concerned Scientists (UCS). Some panelists received travel reimbursement from UCS. Panelists did not accept honoraria or other compensation. This article reflects exclusively the deliberations of the panel.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

The members of the writing committee (H. Christopher Frey, Ph.D., Peter J. Adams, Ph.D., John L. Adgate, Ph.D., M.S.P.H., George A. Allen, B.S., John Balmes, M.D., Kevin Boyle, Ph.D., Judith C. Chow, Sc.D., Douglas W. Dockery, Sc.D., Henry D. Felton, M.S., Terry Gordon, Ph.D., Jack R. Harkema, D.V.M., Ph.D., Patrick Kinney, Sc.D., Michael T. Kleinman, Ph.D., Rob McConnell, M.D., Richard L. Poirot, B.A., Jeremy A. Sarnat, Sc.D., Lianne Sheppard, Ph.D., Barbara Turpin, Ph.D., and Ron Wyzga, Sc.D.) assume responsibility for the overall content and integrity of this article.

The affiliations of the members of the writing committee are as follows: North Carolina State University, Raleigh (H.C.F.), and the University of North Carolina Gillings School of Global Public Health, Chapel Hill (B.T.); Carnegie Mellon University, Pittsburgh (P.J.A.); Colorado School of Public Health, Aurora (J.L.A.); Northeast States for Coordinated Air Use Management (G.A.A.), Harvard University T.H. Chan School of Public Health (D.W.D.), and Boston University (P.K.) — all in Boston; Lung Biology Center, University of California, San Francisco, San Francisco (J.B.), University of California, Irvine, Irvine (M.T.K.), University of Southern California Keck School of Medicine, Los Angeles (R.M.), and retired, Palo Alto (R.W.) — all in California; Virginia Tech, Blacksburg (K.B.); Desert Research Institute, Reno, NV (J.C.C.); New York State Department of Environmental Conservation, Albany (H.D.F.), and New York University Langone Health, New York (T.G.); Michigan State University, East Lansing (J.R.H.); independent consultant, Burlington, VT (R.L.P.); Rollins School of Public Health, Atlanta (J.A.S.); and University of Washington, Seattle (L.S.).

This article was published on June 10, 2020, at NEJM.org.

1. Review of the National Ambient Air Quality Standards for particulate matter. Washington, DC: Environmental Protection Agency, April 30, 2020 (https://www.federalregister.gov/documents/2020/04/30/2020-08143/review-of-the-national-ambient-air-quality-standards-for-particulate-matter).
2. Samet JM, Clean Air Scientific Advisory Committee. Letter to Hon. Lisa P. Jackson, administrator, Environmental Protection Agency, re: CASAC review of Policy assessment for the review of the PM NAAQS — second external review draft (June 2010): EPA-CASAC-10-015. Washington, DC: September 10, 2010 (https://yosemite.epa.gov/sab/sabproduct.nsf/CCF9F4C0500C500F8525779D0073C593/$File/EPA-CASAC-10-015-unsigned.pdf).
3. Policy assessment for the review of the National Ambient Air Quality Standards for particulate matter: EPA-452/R-20-002. Research Triangle Park, NC: Environmental Protection Agency, January 2020.
4. Frey HC, Adams P, Adgate JL, et al. Advice from the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's policy assessment for the review of the National Ambient Air Quality Standards for particulate matter (external review draft — September 2019), submitted to Hon. Andrew Wheeler, Administrator, docket ID no. EPA-HQ-OAR-2015-0072, and Clean Air Scientific Advisory Committee, U.S. Environmental Protection Agency. Washington, DC: October 22, 2019 (https://ucs-documents.s3.amazonaws.com/science-and-democracy/IPMRP-FINAL-LETTER-ON-DRAFT-PA-191022.pdf).
5. Di Q, Wang Y, Zanobetti A, et al. Air pollution and mortality in the Medicare population. N Engl J Med 2017;376:2513-22.
6. Shi L, Zanobetti A, Kloog I, et al. Low-concentration $PM_{2.5}$ and mortality: estimating acute and chronic effects in a population-based study. Environ Health Perspect 2016;124:46-52.
7. Pinault L, Tjepkema M, Crouse DM, et al. Risk estimates of mortality attributed to low concentrations of ambient fine particulate matter in the Canadian Community Health Survey cohort. Environ Health 2016;15:18.
8. Cox LA CASAC review of EPA's policy assessment for the review of the National Ambient Air Quality Standards for particulate matter (external review draft — September 2019): EPA-CASAC-20-001. Washington, DC: Clean Air Scientific Advisory Committee, Environmental Protection Agency, December 16, 2019.
9. Thorp HH, Skipper M, Kiermer V, Berenbaum M, Sweet D, Horton R. Joint statement on EPA proposed rule and public availability of data (2019). Science 2019;366(6470):eaba3197.
10. Aldy J, Kotchen M, Evans M, Fowlie M, Levinson A, Palmer K. Report on the proposed changes to the federal mercury and air toxics standards: report of the External Environmental Economics Advisory Committee. December 2019 (https://scholar.harvard.edu/files/jaldy/files/e-eeac_report_december_2019.pdf).

DOI: 10.1056/NEJMsb2011009
Copyright © 2020 Massachusetts Medical Society.

683

The New England Journal of Medicine
Downloaded from nejm.org on October 9, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

00193224

JA2770





## Journal of the Air & Waste Management Association

ISSN: 1096-2247 (Print) 2162-2906 (Online) Journal homepage: https://www.tandfonline.com/loi/uawm20

# Monitoring study of the near-road PM$_{2.5}$ concentrations in Maryland

Helen Ginzburg, Xiaobo Liu, Michael Baker, Robert Shreeve, R.K.M. Jayanty, David Campbell & Barbara Zielinska

To cite this article: Helen Ginzburg, Xiaobo Liu, Michael Baker, Robert Shreeve, R.K.M. Jayanty, David Campbell & Barbara Zielinska (2015) Monitoring study of the near-road PM$_{2.5}$ concentrations in Maryland, Journal of the Air & Waste Management Association, 65:9, 1062-1071, DOI: 10.1080/10962247.2015.1056887

To link to this article: https://doi.org/10.1080/10962247.2015.1056887

📅 Published online: 14 Aug 2015.

📝 Submit your article to this journal ⟳

📊 Article views: 2401

🔍 View related articles ⟳

⬤ View Crossmark data ⟳

🔗 Citing articles: 14 View citing articles ⟳

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=uawm20

00193536

TECHNICAL PAPER

# Monitoring study of the near-road PM$_{2.5}$ concentrations in Maryland

Helen Ginzburg,[1,*] Xiaobo Liu,[1] Michael Baker,[2] Robert Shreeve,[3] R.K.M. Jayanty,[4] David Campbell,[5] and Barbara Zielinska[5]

[1]WSP-Parsons Brinckerhoff Inc., New York, NY, USA
[2]URS, ICC Construction, Beltsville, MD, USA
[3]Maryland State Highway Administration, Baltimore, MD, USA
[4]RTI International, Research Triangle Park, NC, USA
[5]Desert Research Institute, Reno, NV, USA

*Please address correspondence to: Helen Ginzburg, Parsons Brinckerhoff Inc., New York, NY, USA; e-mail: ginzburg@pbworld.com

The Maryland State Highway Administration (SHA) monitoring program monitored the impact of vehicular emissions on the concentrations of the fine particles smaller than 2.5 microns (PM2.5). PM2.5 concentrations were monitored in close proximity to a highway in order to determine whether traffic conditions on the roadway impact concentrations at this location. The monitoring program attempted to connect monitored concentrations with the roadway traffic exhaust or with the other sources of PM2.5. PM2.5 concentrations were collected near the Capital Beltway (I-495/I-95) in Largo, Maryland. The monitoring program was launched on May 13, 2009 and continued through the end of 2012. Two co-located monitors, one for continuous PM2.5 measurements and the other for speciation measurements, were used in this program. Meteorological and traffic information was also continuously collected at or near the monitoring site. Additionally, data from the two other monitoring locations, one at the Howard University-Beltsville, MD and one at McMillan Reservoir, DC, was used for comparison with the data collected at the SHA monitoring location. The samples collected by the speciation monitor were analyzed at the RTI and DRI Laboratories to determine the composition and the sources of the collected PM2.5 samples. Based on the apportionment analysis, the contribution of roadway sources is about 12 to 17 percent of PM2.5 at the near-road site.

Implications: PM$_{2.5}$ monitoring at 150 m (approximately 500 feet) from a major highway in Maryland near Washington, DC, demonstrated that roadway traffic contributes to the total PM$_{2.5}$ concentration near the roadway, but the contribution at such distance is small, in the order of 12–17% of the total.

## Introduction

Higher emissions from traffic cause higher public exposure to vehicle-related pollution. Emissions from motor vehicles and their impacts on the public exposed to them have been subject of research for several decades. However, as our knowledge of these emissions and their effects and controls accumulates and develops, different pollutants and different areas of concern come into focus. Several studies of near-road pollution were conducted in the recent years as the problem of adverse health effects of lengthy exposure to traffic emissions (especially from diesel-fueled vehicles) came into U.S. Environmental Protection Agency (EPA) and public attention. The strengthening of the U.S. air quality standards connected with traffic emissions (PM$_{2.5}$ [particulate matter with an aerodynamic diameter <2.5 μm] and NO$_2$ [nitrogen dioxide]) in the recent years is another indication of the heightened awareness of this pollution (EPA, 2012).

Almost one-third of the population in the United States either lives or spends significant portion of the day in the close vicinity of busy or congested roadways, one-fifth within

one-third of a mile, and 10% within 300 feet (Rowangould, 2013). Health Effects Institute (HEI) review of traffic-related air pollution (2010) presented a comprehensive review of vehicle emission studies and assessments of vehicular pollution health impacts (HEI Panel, 2010). This review focused on the monitoring and modeling studies of motor-vehicle emissions in the urban environment and in close proximity to busy roadways in the United States and worldwide and the health impact.

Several major roadside EPA and Federal Highway Administration (FHWA) studies were conducted to measure concentrations and estimate public exposure to the vehicular emissions: in Brooklyn, New York (2004), in Raleigh, North Carolina (2008), in Las Vegas, Nevada (2010), and in Detroit, Michigan (2011). Roadside emissions and exposure to them were studied in many other monitoring and wind-tunnel assessments (Yoon, 2003; Baldauf et al., 2009, 2012; Black et al., 2009; Kimbrough et al., 2011; Ginzburg et al., 2012; Schattanek et al., 2012). These studies tried to determine which pollutants are common and most prevalent, which produced the most damaging health impacts, what are the effects of traffic emissions at different distances from roadway (Baldauf et al.,

1062

Journal of the Air & Waste Management Association, 65(9):1062–1071, 2015. Copyright © 2015 A&WMA. ISSN: 1096-2247 print
DOI: 10.1080/10962247.2015.1056887    Submitted January 29, 2015; final version submitted April 17, 2015; accepted May 22, 2015.
Color versions of one or more of the figures in the article can be found online at www.tandfonline.com/uawm.

00193537

JA2772

*Ginzburg et al. / Journal of the Air & Waste Management Association 65 (2015) 1062–1071*    1063

2008) and answer many other related questions. Pollutants that were studied included carbon monoxide, mobile source air toxics, black carbon and particulate matter, nitrogen oxides, and secondary formations. A few studies looked at the concentrations at various distances from the edge of the roadway (1998 Netherlands monitoring, 2002 Los Angeles study, 2008 Raleigh study, and 2010 Nevada study), but most field observations were limited either in time and/or in scope (HEI Panel, 2010). Other research was aimed at connecting collected data with the vehicular exhaust emissions to attribute monitored concentrations to the supposed source.

In the study of ultrafine particles near the major truck route (I-710) in Los Angeles, monitored particulate concentrations dropped sharply with distance from the roadway (Zhu et al., 2002). At a distance little more than 100 m (300 feet) away from the roadway, monitored concentrations were close to background concentrations. The 2012 study near the same roadway also looked at pollutant gradients downwind of a freeway carrying a high volume of diesel traffic (Zhou and Levy, 2007). This recent study confirmed the results of the previous study. The results obtained from this monitoring study suggest that motor-vehicle emissions from the I-710 increase the atmospheric concentration of most combustion-related pollutants above background levels, especially within the first 80 m (262.5 feet) from the edge of the freeway. Roadside concentrations of nitrogen oxides ($NO_x$), carbon monoxide (CO), and volatile organic compounds (VOCs) may be a factor of 2–4 higher than the community average ambient concentrations (Fujita et al., 2011). Heavy-duty diesel vehicles can increase these ratios to as much as a factor of 10 for $NO_x$ and black carbon (Westerdahl, et al., 2005).

The Raleigh study monitored criteria pollutants including $PM_{2.5}$ and included black carbon among other pollutants (Baldauf et al., 2008). Among other results, this study demonstrated that peak-hour levels and daily concentration variation decreased with distance from the roadway. The monitoring project in Nevada studied mobile source air toxics (MSAT) criteria pollutants, including $PM_{2.5}$ and black carbon at 2.0–300 m (66–984 feet) from the roadway (Black, 2009). This study demonstrated that near-road concentration patterns are influenced by daytime turbulence. Similar results were obtained in the study of roadside concentrations of particulate matter in Chennai, India (Muruganandam and Nagendra, 2011). An analysis that processed data from 41 roadside monitoring studies from 1978 through 2008 normalized measured concentrations of several traffic-generated pollutants to either edge of the road concentration or the background (as reported in the studies) concentration (Karner et al., 2010). The decrease to background level was found from as close as 80–100 m (262.5–328 feet) to 160 m (525 feet). Another analysis of the data extracted from the published studies (Polidori and Fine, 2012) also found that road traffic emissions of particulate matter influence concentrations as far as 100–400 m (328–1312 feet) from the edge of the roadway (Zhou and Levy, 2007).

Current EPA research concentrates on examination of multipollutant environment and interference between different mobile source pollutants in the vicinity of busy roadways. The other area of current interest is pollution patterns in the complex terrain near roadways: near depressed roads, near obstacles, etc. The monitoring study presented in this study focused on one pollutant, $PM_{2.5}$, examined its impact at a single point location away from a high-volume interstate highway for a prolonged time period, and tried to apportion collected mass to the traffic emissions from this roadway.

Concentrations of particles smaller than 2.5 microns in diameter ($PM_{2.5}$) were collected at a monitoring site located in close proximity to a heavily traveled roadway for over 3½ yr to determine whether these concentrations can be correlated with local traffic and/or meteorological conditions. The Maryland State Highway Administration (SHA) monitoring program studied the impact of vehicular exhaust from highway traffic on the concentrations of the fine particulates to determine whether or not monitored concentrations came from roadway traffic or from the other sources of $PM_{2.5}$ such as residential or commercial heating and air conditioning, or other background sources. The monitoring program started on May 13, 2009, and continued for 3½ yr through the end of 2012, which allowed collection of sufficient number of valid measurements. The collected data were analyzed to determine whether and to what degree the $PM_{2.5}$ concentrations were affected by the traffic emissions.

## Monitoring Program Setup

$PM_{2.5}$ concentrations were collected at a location 149 m (489 feet) from the edge of the Capital Beltway (I-495/I-95) near the MD 214 interchange in Largo, Maryland. The monitoring site was selected near a major highway (I-95) with high average daily traffic (ADT) volumes. The selected site complies with the EPA neighborhood siting criteria (EPA, 1998) in terms of distances from vehicular roadways and nearby obstacles. The site was located east of the Beltway to take advantage of the prevailing westerly winds (Figure 1).

The monitoring study followed the recommended EPA procedures (EPA, 1999, 2006, 2011; Watson et al., 2011). Two monitors, one for continuous $PM_{2.5}$ measurements and the



**Figure 1.** Monitoring site location.

00193538

1064                    *Ginzburg et al. / Journal of the Air & Waste Management Association 65 (2015) 1062–1071*

other for speciation measurements, both manufactured by Met One Instruments Inc., were used in this study. The continuous monitor, Beta Attenuation Mass Monitor (E-BAM) (Met One Instruments, Inc., 2014a), collected hourly samples; the speciation monitor, Super SASS (Met One Instruments, Inc., 2014b), operated on a 1-in-6-day schedule, with the collected samples sent to the Research Triangle Park (RTI) International laboratory and the Desert Research Institute (DRI) for chemical speciation and semivolatile organic analysis. Using the speciation data, DRI performed receptor modeling to determine, based on chemical composition, whether sources of the collected particulate matter can be identified. The monitors were located within a 12-foot by 12-foot fenced area secured with a lock. Each monitor was mounted on a secure tripod. Hardwired AC (alternating current) electric power was provided.

The following additional data were collected for use in this study:

(1) Traffic volumes and speeds on the Capital Beltway were collected at approximately 0.50 km (0.31 mile) to the north of the monitoring site. The data collected at this location are representative of the traffic near the monitoring site because there are no exits to or from the Capital Beltway between the sensor location and the monitoring location.

(2) Meteorological data (wind data, ambient temperature, and relative humidity) were collected at the PM$_{2.5}$ monitoring location on a continuous basis.

(3) PM$_{2.5}$ concentrations were collected by the Maryland Department of the Environment (MDE) site at the Howard University (HU)-Beltsville monitor. This monitoring station is located approximately 3 km (1.6 miles) from I-95 (a major highway with an ADT count of 100,000 in 2008) and 500 m (0.3 mile) from US Route 1 (a local route that carries an ADT of 21,000). In addition, the HU-Beltsville monitor is separated from Route 1 by a forested area. There are two PM$_{2.5}$ monitors at this location: one for continuous PM$_{2.5}$ monitoring and one for speciation purposes.

(4) PM$_{2.5}$ concentrations were collected near the McMillan Reservoir as part of the District of Columbia Department of Environment (DDOE) monitoring program. This monitor, which is intended for measuring the effects of vehicular emissions, is located 10.8 km (6.7 miles) from I-95, less than 300 m (0.2 mile) from Rhode Island Avenue, and approximately 800 m (0.5 mile) from Georgia Avenue in Washington, DC. Continuous and speciation PM$_{2.5}$ monitoring is conducted at this location.

The relative locations of all three monitoring sites are presented on Figure 2. All three monitoring locations including the study location are at about the same elevation above the sea level, which is around 170 feet.

## Data Collected

The program collected 29,647 hr (1234 days) of continuous PM$_{2.5}$ concentrations and 204 daily samples of data for speciation analysis. The data recovery rate for the continuous



Figure 2. Monitoring site location relative to the comparison monitoring sites.

Table 1. Concentrations (μg/m³) by year

| Parameter | 2009* | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Maximum 24-hr concentration | 39.9 | 40.3 | 41.4 | 41.0 |
| 98% concentration | 27.9 | 36.6 | 33.0 | 31.7 |
| Number of days >35 μg/m³ | 2 | 7 | 4 | 2 |
| Number of daily observations | 229 | 337 | 364 | 304 |

*Notes.* *Monitoring program started on May 13, 2009.

monitoring was 93%. PM$_{2.5}$ hourly concentrations collected by the E-BAM monitor were processed to determine daily (24-hr) average concentrations. The highest hourly monitored concentration for the entire period was 255 μg/m³. Table 1 presents the highest collected daily concentrations and the number of concentrations exceeding 35 μg/m³ in each calendar year. On 15 days during the monitored period, the measured concentration exceeded the level of 35 μg/m³, the level of the 24-hr National Ambient Air Quality Standard (NAAQS) for PM$_{2.5}$. However, this standard is set in the statistical form with design value comparable to the 3-yr average of the 98th percentile of the yearly 24hr daily PM$_{2.5}$ concentrations. In the course of the monitoring program, the 98th percentile daily concentrations in each year except 2010 did not exceed 35 μg/m³. The 98th percentile average for the three calendar years in the monitoring period was 32.3 μg/m³, which is below the 24-hr NAAQS. The estimated annual PM$_{2.5}$ concentration for the three full years was 13.0 μg/m³, below the current PM$_{2.5}$ annual NAAQS of 15 μg/m³, but above the recently adapted stricter annual PM$_{2.5}$ standard of 12 μg/m³, which is planned to come in effect in 2015.

The tendency of the 24-hr total concentrations from the Super SASS monitor corresponded well with the tendency of the continuous monitoring concentrations collected with the E-BAM monitor, as illustrated on Figure 3 for the first quarter of 2012.

00193539

*Ginzburg et al. / Journal of the Air & Waste Management Association 65 (2015) 1062–1071*    1065



**Figure 3.** Daily PM$_{2.5}$ concentrations in the first quarter of 2012 (E-BAM and Super SASS at SHA site and continuous monitors at HU-Beltsville and McMillan sites).

The samples collected by Super SASS were sent to the RTI laboratory for chemical speciation and gravimetric analysis (Homolya and Rice, 1999). In addition, the quartz filter samples were combined by month, extracted, and analyzed for semivolatile organic compounds by the Organic Analysis Laboratory at the DRI. Using the resulting speciation data, the DRI performed source apportionment analyses using the Chemical Mass Balance (CMB-8) program to determine, based on chemical composition, whether sources of the collected particulate matter can be identified.

The speciation analyses for each month were summarized, and the summary for the period (Figure 4) indicated that the

major elements of the collected PM$_{2.5}$ material were organic carbon (36%), sulfates (23%), nitrates (9%), elemental carbon (8%), and ammonium (9%).

The meteorological parameters were observed on an hourly basis, including wind speed and direction, ambient temperature, and relative humidity. A total of 39,376 hr were observed from May 13, 2009, through December 31, 2012, for the ambient temperature and humidity. The wind observations counted 30,444 hr for the same period.

Wind speed and direction are presented on Figure 5. The strongest wind was 13.0 m/sec (29.1 miles per hour). One of reasons for the monitoring site selection was its location east of the Capital Beltway, downwind of the highway during prevailing westerly winds; however, since this region is in the path of low-pressure systems, wind directions change frequently. Prevailing winds from the southwest (that blow towards the monitoring site from I-95) were generally stronger than the winds in the direction away from the monitoring site (from east-northeast).

During the 29,647 monitoring hours, there were 1738 hr with precipitation. Half of the time the precipitation was not significant (with intensity lower than 0.04 inch per hour). No significant deterioration in the monitored PM$_{2.5}$ concentrations during the hours of precipitation was detected mostly because of low intensity of precipitation in bulk of the precipitation hours.

Volumes, speeds, and vehicle classification data were collected for the north- and southbound directions of the I-95 road section adjacent to the monitoring site. These traffic data are composed of information collected by NAVTEQ (Navigation Technology) traffic collection, (NAVTEQ, 2014) from May 13 through December 5, 2009, and by an ATR (Automatic Traffic Recorder; Maryland State Highway Administration, 2014) from December 6, 2009, through the end of the monitoring period. The NAVTEQ data contained only four vehicle classes



**Figure 4.** Speciation results—major monitored elements.



**Figure 5.** Speed and direction observed at the SHA monitoring site (2009–2012).

00193540

and from these classes, the 13 classes that the ATR collects were projected using the historic data at this location. A set of correction factors were developed to convert the four classes of NAVTEQ traffic volume data into 13 classes of loop detector traffic volume data for each vehicle class for each day of the week on an hour-by-hour basis. In the last 2 months of 2012, the sensors for axle-based classification failed and were not repaired due to impending road resurfacing. The speeds and volumes by three length-based classes as opposed to 13 FHWA classes were collected for November–December 2012. Classification data were restored based on the length-based classes and historic data collected during the program.

The relevant results of the traffic data collected on I-95 are as follows:

(1) Average annual daily traffic (AADT) volumes were approximately 205,291 vehicles.
(2) Average vehicular speeds were 59–63 mph.
(3) The maximum daily volume was 248,836 vehicles.
(4) The peak hourly traffic volume was 16,454 vehicles.
(5) Night traffic was lighter than the daytime traffic.
(6) Heavy-duty vehicles constituted up to 6% of the daily traffic.

The nighttime total volumes are lower, but the heavy-duty trucks (HDTs) volume and percentage of HDTs in the total traffic volume are higher. Heavy-duty vehicles constituted around 13% of the nighttime traffic, with a maximum of from 22% to 33%.

## Data Analysis

The collected data were analyzed to determine whether and to what degree the $PM_{2.5}$ concentrations were affected by the traffic emissions. The hourly data for the days exceeding 35 $\mu g/m^3$ was plotted (see Figures 6 and 7) against the hourly traffic (total volume and HDTs) to see if there is a connection. The peak hourly concentrations that brought the 24-hr average above the reference level do not correspond to high traffic (or HDT) volumes as shown at Figures 6 and 7. Wind directions during peak hours were away from the monitoring site, otherwise the monitors would have register higher concentration during these hours. However, as shown below, wind directions do not have a high correspondence with the monitored concentrations at the SHA site.



Figure 6. Hourly $PM_{2.5}$ concentrations and traffic volumes.



Figure 7. Hourly $PM_{2.5}$ concentrations and HDT traffic volumes.

## Comparison of monitored $PM_{2.5}$ concentrations with Maryland Department of the Environment and District of Columbia Department of Environment sites

Hourly $PM_{2.5}$ concentrations at MDE's Howard University–Beltsville and DDOE's McMillan Reservoir monitors measured concurrently with the monitoring period of this study were compared with the data collected at the SHA monitor. Average and maximum 24-hr $PM_{2.5}$ concentrations at each of these monitors are provided in Table 2. The average hourly and daily concentrations at the SHA site were higher than at either the Howard University–Beltsville or McMillan Reservoir monitors. The standard deviation of concentrations monitored at the SHA station was also greater than at the other two locations.

### $PM_{2.5}$ concentrations and meteorological data

The 2009–2012 monitoring period data were roughly divided into two seasons: summer (May–September) and winter (October–December). Average hourly concentrations were plotted against average hourly ambient temperatures for these two seasons (Figures 8 and 9).

As shown, there appears to be an inverse relationship between concentrations and temperatures. The monitored data show that $PM_{2.5}$ concentrations are lower during the daytime (i.e., when traffic volumes are higher) than during the nighttime

Table 2. 24-Hour $PM_{2.5}$ concentrations ($\mu g/m^3$) measured at continuous monitors.

| Parameter | SHA Monitor | Howard University–Beltsville | McMillan Reservoir |
|---|---|---|---|
| Average | 13.0 | 11.6 | 10.3 |
| Standard deviation | 7.5 | 5.5 | 5.9 |
| Maximum 24-hr concentration | 41.4 | 39.6 | 41.5 |
| Minimum 24-hr concentration | 0.0 | 0.7 | −0.3 |
| Number of hourly observations | 29,647 | 28,445 | 27,748 |

00193541

*Ginzburg et al. / Journal of the Air & Waste Management Association 65 (2015) 1062–1071*    1067



Figure 8. Diurnal variation of the ambient air temperature and monitored $PM_{2.5}$ concentrations during the summer season.



Figure 9. Diurnal variation of the ambient air temperature and monitored $PM_{2.5}$ concentrations during the winter season.

(when ambient air temperatures and traffic volumes are lower). Black carbon concentrations were also lower during the day in another study in Raleigh, North Carolina (Baldauf et al., 2008). Concentration variation is also greater in the summer season when temperature variations are also greater.

Atmospheric buoyancy could be a factor affecting pollutant concentrations during daytime and nighttime periods. Daytime turbulence increases mixing and dispersion and decreases $PM_{2.5}$ concentrations. In the nighttime, more stable atmospheric conditions diminish dispersion and cause higher $PM_{2.5}$ concentrations. Wind speeds associated with turbulence and atmospheric stability could be another factor associated with pollutant concentrations under daytime and nighttime periods.

No significant correlation of measured concentrations with wind direction was found, perhaps due to the distance from the roadway traffic to the monitor location. Correlation with wind speed from all directions was tested along with the correlation with only westerly winds (i.e., from the roadway to the monitor). Some correlation with the wind speed was found when only winds blowing directly from the roadway towards the monitor (i.e., 247.5°–292.5°) were considered. Concentrations were found to decrease with the increase in the wind speeds. This was a result of the increase in the atmospheric turbulence. Similar results were obtained in earlier studies.

### $PM_{2.5}$ concentrations and traffic data

Monitored $PM_{2.5}$ concentrations were compared with traffic volumes collected along a section of the Capital Beltway near



Figure 10. Average hourly traffic volumes and monitored $PM_{2.5}$ concentrations.

the monitoring site. The local roads around the site have very low AADT, which was not taken into account. Figures 10 and 11 present average hourly concentrations and average hourly traffic volumes. The traffic volumes presented are either total volumes (i.e., in both directions) or HDT volumes (in both directions).

Based on vehicle registration data (both national and for Prince George's County, Maryland), it was assumed that at least two-thirds of the HDT fleet on the Capital Beltway was dieselfueled, and that emissions from these vehicles would contribute to nearby $PM_{2.5}$ concentrations. However, the data show an inverse variation between HDT traffic volumes and $PM_{2.5}$ concentrations at the SHA monitor—lower concentrations were recorded during periods with higher total truck volumes. This could be the effect of the daytime turbulence: the high HDT volumes are higher during the daytime when turbulence is also high.

To determine if there is a correlation between local traffic-related emissions and $PM_{2.5}$ concentrations at the monitoring site, analyses were conducted using only hours, firstly, when the wind was blowing from the roadway towards the monitor and, secondly, when HDT percentage in the traffic mix was higher (at nighttime hours). Additionally, the analysis examined the sensitivity of the monitored concentrations to the travel speeds. The analyses were conducted separately for each season to explore the impact of the season variation.



Figure 11. Average hourly heavy-duty vehicle volumes and monitored $PM_{2.5}$ concentrations.

00193542

1068     *Ginzburg et al. / Journal of the Air & Waste Management Association 65 (2015) 1062–1071*

No significant correlation between the traffic-flow characteristics and monitored concentrations were found. An additional analysis of hourly concentrations for days with recorded $PM_{2.5}$ levels greater than the 35 $\mu g/m^3$ 24-hr NAAQS did not reveal any direct relationship between traffic volumes and monitored concentrations.

### Comparison of speciation results

Comparison of compounds in the collected $PM_{2.5}$ samples reveal that elemental carbon is higher at the SHA site than at the McMillan or HU-Beltsville sites (see Figure 12). Elemental (or black) and organic carbon are products of the incomplete combustion of fossil fuels or biofuels. According to the review of national inventories of elemental and organic carbon emissions, the prevalent source of black carbon is on-road diesel combustion (Chow et al., 2010). The gasoline-fueled engines exhaust elemental carbon (EC) primarily in cold temperatures before the engine has warmed up and generally in small amounts compared with diesel-fueled engines. As there are few (if any) cold engines traveling on the Capital Beltway near the SHA site, the higher levels of EC at the SHA site is therefore an indicator of higher impacts of emissions from diesel traffic, since this is the only continuous major source of EC in the vicinity of the monitor that operates on a continuous basis.

Organic carbon (OC) is generated from various types of combustion (residential heating, cooking, agricultural burning, forest fires, as well as on/off-road fuel combustion). It also results from photochemical reactions with the vehicle exhaust gases ($NO_x$ and VOCs) in the atmosphere and decomposition of biological material (e.g., plant detritus and food wastes). Since the OC levels are similar at the McMillan Reservoir and HU-Beltsville site, the OC concentrations measured at these sites are likely to be of regional origin—generated by traffic in the region, other regional sources, and/or by secondary formation in the atmosphere.

A crustal matter comparison also shows slightly higher levels at the SHA site, which may indicate the presence of a major roadway in the vicinity. Part of this crustal matter could be resuspended road dust.

Nitrate, sulfate, and ammonium are secondary aerosols produced by photochemical reaction of combustion products. The dominant source of ammonium sulfate in the United States is



**Figure 12.** Comparison of species distribution between SHA, McMillan, and HU-Beltsville sites.

sulfur dioxide ($SO_2$) from coal-fired power plants, whereas ammonium nitrate results from conversion of nitrogen oxides, which are produced by all combustion sources.

The "other" pollutants on Figure 12 are composed of the compounds that are not connected with nearby roadway traffic emissions.

### Apportionment of the $PM_{2.5}$ mass concentrations at the SHA site

To attribute the compounds found on the sampling filters to emission sources, the samples collected during the monitoring period were analyzed for gravimetric mass, OC and elemental carbon (EC), nitrate, sulfate, several cations such as ammonium, sodium, and potassium, and trace elements by X-ray fluorescence spectroscopy. Additionally, individual quartz filters collected in a month were combined and extracted with a solvent. The solvent extracts were analyzed for over 100 organic compounds, including polycyclic aromatic hydrocarbons, hopanes, steranes, and alkanes, using a gas chromatograph–mass spectrometer. Monthly average ambient concentrations of all analytes were calculated, and 45 of the most chemically stable and consistently detected analytes were selected for use in source apportionment.

Apportionments were estimated using version 8 of the Chemical Mass Balance (CMB-8) receptor model (Fujita et al., 2007, pp. 721–740; EPA, 2004). The CMB-8 program finds the linear sum of products of source profile abundances and source contributions that best match the observed chemical composition of samples collected at a receptor site. The results provide an estimate of the amount of each measured parameter in individual ambient samples that was contributed by each source type represented by a profile, along with calculated uncertainty for the estimates. Since CMB-8 quantifies contributions from chemically distinct source types, rather than emissions from individual sources, emissions with similar chemical composition cannot be distinguished from each other and chemical species that are created or transformed during transport may not be correctly apportioned.

Source profiles were selected to represent major on-road source types: light-duty gasoline powered vehicle exhaust, heavy-duty diesel vehicle exhaust, brake wear, and tire wear. The vehicle exhaust profiles were composites of multiple measurements of cooled and diluted vehicle exhaust collected during the National Renewable Energy Laboratory, Department of Energy (NREL/DOE) Gas/Diesel PM Split project in Riverside, California (Fujita et al., 2007). Several composite profiles were used for both the gasoline and diesel source categories, to represent different fleet mixes and driving patterns. These profiles do not represent current diesel vehicle emissions control technology, which began to be implemented in trucks manufactured after 2006. Although this may contribute some additional uncertainty to the apportionment of EC and nitrate, the EPA's MOVES2014 emission model estimates that in 2010 more than 80% of heavy-duty trucks were pre-2007 model year (EPA, 2014). The composite profiles for brake wear and tire wear were created at University of California Riverside's CE-CERT (College of Engineering

00193543

*Ginzburg et al. / Journal of the Air & Waste Management Association 65 (2015) 1062-1071*   1069

Table 3. Annual source apportionment of PM$_{2.5}$ mass concentrations

| Year | PM$_{2.5}$ Concentration ($\mu g/m^3$) | Gasoline Exhaust | Diesel Exhaust | Tire and Brake Wear | Ammonium Sulfate | Ammonium Nitrate | Crustal Matter (Unidentified) | Other Unidentified Source (Not Directly from Vehicles) | Total On-Road |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 10,619 | $0.6 \pm 1.3\%$ | $9.5 \pm 1.5\%$ | $2.4 \pm 0.1\%$ | $33.4 \pm 1.1\%$ | $7.9 \pm 0.2\%$ | 1.4% | 45% | 12.5% |
| 2010 | 10,613 | $1.3 \pm 1.6\%$ | $13.0 \pm 2.3\%$ | $2.2 \pm 0.1\%$ | $36.9 \pm 1.5\%$ | $20.1 \pm 0.8\%$ | 2% | 24% | 17% |
| 2011 | 9712 | $1.5 \pm 1.0\%$ | $9.0 \pm 4.4\%$ | $2.1 \pm 0.1\%$ | $31.4 \pm 2.3\%$ | $13.3 \pm 1.3\%$ | 1% | 41% | 13% |
| 2012 | 9936 | $0.9 \pm 0.6\%$ | $9.0 \pm 1.0\%$ | $2.2 \pm 0.1\%$ | $27.9 \pm 0.8\%$ | $14.4 \pm 0.4\%$ | 2% | 44% | 12% |

*Notes:* PM$_{2.5}$ source apportionment results for ICC site for 2009–2012 monitoring years are from DRI.

Center for Environmental Research & Technology) laboratory using specially designed simulators (Fitz et al., 2003). Source profiles for biogenic sources such as forest fires, residential wood burning, vegetative decay, and cooking were not included, since identification of these sources typically relies on polar organic species, which were not part of the ambient data set. Based on prior experience, it is not expected that biogenic sources would be substantial contributors to the average composition of roadside ambient aerosol at this site, which is near a major highway in an area cleared of vegetation and surrounded by residential and light industrial land use (see Figure 1).

The results of the apportionment indicated that, on an annual basis, approximately 12.5–17% of the sampled aerosol mass came from on-road sources (see Table 3 and Figures 13, 14, 15, and 16), which was a combination of gasoline and diesel exhausts and brake and tire wear. The crustal material percentage indicated in the table is based on the measured amounts of major soil elements (Al, Si, Fe, etc.) adjusted to their common oxide forms, since no local soil profile was available. The individual monthly total direct roadway contributions varied from 7% to 20% depending on the season—slightly lower in the summer (7–16%) because of larger contributions from organic aerosols. A portion of the ammonium



Figure 14. PM$_{2.5}$ apportionments at SHA site in 2010 by month.



Figure 15. PM$_{2.5}$ apportionments at SHA site in 2011 by month.

nitrate and ammonium sulfate compounds found in the sampled PM$_{2.5}$ matter could also be attributed to on-road sources, but are more likely to be of regional origin. These compounds are present in large proportions in the air over the Northeast United States, and since they are secondary aerosol components produced by atmospheric chemical reactions, it is impossible to separate regional impacts from that of local traffic impacts using the CMB receptor model.



Figure 13. PM$_{2.5}$ apportionments at SHA site in 2009 by month.

00193544



**Figure 16.** PM$_{2.5}$ apportionments at SHA site in 2012 by month.

In addition, an AERMOD modeling study was conducted to compare the modeled and monitored impacts of the roadway traffic emissions. The study utilized an average hourly traffic data collected at the SHA ATR station and the Baltimore-Washington International (BWI) Airport meteorological data. The results of the analysis indicated that the highest contribution of the road emissions at the monitoring site would constitute approximately 12% of the highest measured concentration at the site. This is in agreement with the apportionment results.

## Conclusion

The SHA monitoring program was set to research into the influence of the traffic emissions on the PM$_{2.5}$ concentrations close to the major roadways. The program utilized two PM$_{2.5}$ monitors, the E-BAM and the Super SASS, located about 150 m (500 feet) away from the Capital Beltway (I-95/I-495). The first unit was used for continuous monitoring and the second for speciation monitoring. Additional data collected included on-site meteorological observations, traffic information on Capital Beltway about 150 m away from the monitoring site, and continuous and speciation PM$_{2.5}$ data at the HU-Beltsville and McMillan Reservoir sites selected for comparison. A total of 29,647 hr (1234 days) of continuous PM$_{2.5}$ concentrations and 204 daily samples of speciation monitoring were collected during the 3½ yr of observations at the SHA monitoring site.

The analysis of continuous concentrations at the SHA site found no exceedances of the current 24-hr or then current annual PM$_{2.5}$ NAAQS. The 24-hr concentration comparable to the standard was 32.3 µg/m³ and the annual design concentration is 13.0 µg/m³.

Comparison with the PM$_{2.5}$ concentrations collected at HU-Beltsville and McMillan Reservoir sites showed that concentrations at the SHA site were consistently higher. The EC concentrations (a surrogate for diesel particulate matter) were also consistently higher at the SHA site. This difference would point to the singular major emission source near the SHA site —the Capital Beltway traffic. However, no direct correlation with traffic volumes (general or HDT) or speeds was found in

the collected data. This result could indicate that impacts of traffic emissions are not immediately noticeable at the distance of 150 m (500 feet) from the roadway. The apportionment analysis revealed that about 12.5–17% (the average of 14.2%) of particulate material collected at the site could be attributed to the roadway sources. This result is supported by the results of the AERMOD modeling conducted for the site.

## Acknowledgment

The program would not be possible without the vigilance and uninterrupted attention from our field engineers, Megan Berg and Nick Campanella from the URS construction services at the Intercounty Connector Project. The authors express their appreciation to Jeff Nichol, James O'Rourke, and other laboratory staff at RTI International for training and laboratory analyses.

## References

Baldauf, R., D. Heist, V. Isakov, S. Perry, G.S.W. Hagler, S. Kimbrough, R. Shores, K. Black, and L. Brixey. 2012. Air quality variability near a highway in a complex urban environment. *Atmos. Environ.* 64:169–178. doi:10.1016/j.atmosenv.2012.09.054.

Baldauf, R., E. Thoma, M. Hays, R. Shores, J. Kinsey, B. Gullett, S. Kimbrough, V. Isakov, T. Long, R. Snow, A. Khlystov, J. Weinstein, F.L. Chen, R. Seila, D. Olson, I. Gilmour, S.H. Cho, N. Watkins, P. Rowley, and J. Bang. 2008. Traffic and meteorological impacts on near-road air quality: Summary of methods and trends from the Raleigh near-road study. *J. Air Waste Manage. Assoc.* 58:865–878. doi:10.3155/1047-3289.58.7.865

Baldauf, R., N. Watkins, D. Heist, C. Bailey, P. Rowley, and R. Shores. 2009. Near-road air quality monitoring: Factors affecting network design and interpretation of data. *Air Qual. Atmos. Health* 2:1–9. doi:10.1007/s11869-009-0028-0

Black, K., V. Martinez, M. Gaber, R. Baldauf, E. Thoma, and D.L. Costa. 2009. Study design to evaluate mobile source emissions in the near-road environment. *EM* 2009(January):26–29.

Chow, J., J.G. Watson, D.H. Lowenthal, L.A. Chen, and N. Motallebi. 2010. Black and organic carbon emission inventories: Review and application to California. *J. Air Waste Manage. Assoc.* 60:497–507. doi:10.3155/1047-3289.60.4.497

Fitz, D.R., J.M. Chow, and B. Zielinska. 2003. Development of a Gas and Particulate Matter Organic Speciation Profile Data Base. Final report prepared for San Joaquin Valleywide Air Pollution Study Agency, Sacramento, CA: California Air Resources Board.

Fujita, E.M., D.E. Campbell, W.P. Arnott, J.C. Chow, and B. Zielinska. 2007. Evaluations of the chemical mass balance method for determining contributions of gasoline and diesel exhaust to ambient carbonaceous aerosols. *J. Air Waste Manage. Assoc.* 57:721–740. doi:10.3155/1047-3289.57.6.721

Fujita, E.M., D.E. Campbell, B. Zielinska, W.P. Arnott, and J.C. Chow. 2011. *Concentrations of Air Toxics in Motor Vehicle-Dominated Microenvironments.* Research Report 156. Boston, MA: Health Effects Institute.

Fujita, E.M., B. Zielinska, D.E. Campbell, W.P. Arnott, J. Sagebiel, L. Reinhart, J.C. Chow, N. P.A. Gabele, W. Crews, R. Snow, N. Clark, S. Wayne, and D.R. Lawson. 2007. Variations in speciated emissions from spark-ignition and compression ignition motor vehicles in the California's South Coast air basin. *J. Air Waste Manage. Assoc.* 57:705–720. doi:10.3155/1047-3289.57.6.705

Ginzburg, H., G. Schattanek, D. Lowes-Hobson, D. Gill, S. Tarantino, and A. Kasprak. 2012. Nitrogen oxides (NO$_x$) near road monitoring program as part of the operating certification renewal of the central artery/tunnel project in Boston, Massachusetts. Paper presented at the 105th Air and Waste

00193545

Management Association Annual Conference and Exhibition 2012. ACE. San Antonio, Texas. June 19–22, 2012.

Health Effects Institute Panel on the Health Effects of Traffic-Related Air Pollution. 2010. *Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects.* Special Report 17. Boston, MA: Health Effects Institute.

Homolya, J., and J. Rice. 1999. *Particulate Matter (PM2.5) Speciation Guidance; Final Draft, Edition 1.* Research Triangle Park, NC: U.S. Environmental Protection Agency.

Karner, A.A., D.S. Eisinger, and D.A. Niemeier. 2010. Near roadway air quality: Synthesizing the findings from real-world data. *Environ. Sci. Technol.* 44:5334–5344. doi:10.1021/es100008x

Kimbrough S., R.C. Shores, and D.A. Whitaker. 2011. U.S. Environmental Protection Agency/Federal Highway Administration near road collaboration project: National near-road MSAT study. Paper presented at the Transportation Planning, Land Use, and Air Quality Conference, Transportation Research Board, San Antonio, Texas, May 9–11, 2011.

Maryland State Highway Administration. 2014. Internet Traffic Monitoring System (I-TMS). http://shagbhisdadt.mdot.state.md.us/ITMS_Public/default.aspx (accessed 2009–2012).

Met One Instruments, Inc. 2014a. E-BAM, a portable real time beta gauge traceable to USEPA requirements for automated PM2.5 and PM10 measurement. http://www.metone.com/documents/E-BAM_Datasheet_Rev_Aug09.pdf (accessed November 2008).

Met One Instruments, Inc. 2014b. SASS/Super SASS speciation sampler to USEPA speciation requirements. http://www.metone.com/documents/SASS030Particulate.pdf (accessed November 2008).

Muruganandam, B.S., and S.M.S. Nagendra. 2011. Characterizing temporal variations of roadside PM10 and PM2.5 mass concentration. Paper presented at the Transportation Research Board's 2011 Transportation Planning, Land Use and Air Quality Conference, San Antonio, Texas, May 9–11, 2011.

NAVTEQ (Navigation Technology). 2014. Intelligent Transportation Infrastructure program. http://here.com/traffic (formerly www.Traffic.com) (accessed May–December 2009)

Polidori, A., and P.M. Fine. 2012. *Ambient Concentrations of Criteria and Air Toxic Pollutants in Close Proximity to a Freeway with Heavy-Duty Diesel Traffic.* California: South Coast Air Quality Management District.

Rowangould, G.M. 2013. A census of the US near-roadway population: Public health and environmental justice considerations. *Transport. Res. D Transport Environ.* 25:59–67. doi:10.1016/j.trd.2013.08.003

Schattanek, G., H. Ginzburg, and J. Faeth. 2012. Air monitoring study to evaluate pollution effects of subway construction in New York City. In *Proceedings of the 105th Air & Waste Management Association Annual Conference and Exhibition 2012, ACE, San Antonio, Texas, June 19–22, 2012.* San Antonio, TX: Air & Waste Management Association.

Thoma, E., R.C. Shores, V. Isakov, and R.W. Baldauf. 2008. Characterization of near-road pollutant gradients using path-integrated optical remote sensing. *J. Air Waste Manage. Assoc.* 58:879–890. doi:10.3155/1047-3289.58.7.879

U.S. Environmental Protection Agency. 1998. 40 CFR part 58, Appendix E—Probe and Monitoring Path Siting Criteria for Ambient Air Quality Monitoring. http://www.gpo.gov/fdsys/granule/CFR-1998-title40-vol5/CFR-1998-title40-vol5-appE/content-detail.html (accessed 2009).

U.S. Environmental Protection Agency. 1999. 40 CFR part 50, Revisions to Reference Methods for the Determination of Fine Particulate Matter as PM2.5 in the Atmosphere. http://www.epa.gov/ttnamti1/files/cfr/metl.pdf (accessed 2009)

U.S. Environmental Protection Agency. 2004. EPA-CMB8.2 Users Manual. EPA-452/R-04-011. http://www.epa.gov/scram001/models/receptor/EPA-CMB82Manual.pdf (accessed 2009).

U.S. Environmental Protection Agency. 2006. 40 CFR parts 53 and 58. Revised Requirements for Designation of Reference and Equivalent Methods for PM2.5 and Ambient Surveillance for Particulate Matter; Final Rule. http://www.gpo.gov/fdsys/pkg/FR-2006-10-17/pdf/06-8478.pdf (accessed 2009).

U.S. Environmental Protection Agency. 2011. 40 CFR part 50, Appendix L—Reference Method for the Determination of Fine Particulate Matter as PM2.5 in the Atmosphere. http://www.gpo.gov/fdsys/granule/CFR-2011-title40-vol2/CFR-2011-title40-vol2-part50-appL/content-detail.html (accessed 2009).

U.S. Environmental Protection Agency. 2011. 40 CFR part 50, Appendix N—Interpretation of the National Ambient Air Quality Standards for PM2.5. http://www.gpo.gov/fdsys/granule/CFR-2011-title40-vol2/CFR-2011-title40-vol2-part50-appN (accessed 2009).

U.S. Environmental Protection Agency. 2012. The National Ambient Air Quality Standards: Overview of the EPA's Revisions to the Air Quality Standards for Particulate Pollution (Particulate Matter). http://www.epa.gov/pm/2012/decisoverview.pdf (accessed December 2012).

U.S. Environmental Protection Agency. 2014. Tools for MOVES. http://www.epa.gov/otaq/models/moves/tools.htm#flee-2014 (accessed 2014).

Watson, J.G., J.C. Chow, L.W. Chen, D.H. Lowenthal, E.M. Fujita, H.D. Kuhns, D.A. Soderman, D.E. Campbell, H. Moosmuller, D. Zhu, and N. Motallebi. 2011. Particulate emission factors for mobile fossil fuel and biomass combustion sources. *Sci. Total Environ.* 409:2384–96. doi:10.1016/j.scitotenv.2011.02.041

Westerdahl, D., S. Fruin, T. Sax, P.M. Fine, and C. Sioutas. 2005. Mobile platform measurements of ultrafine particles and associated pollutant concentrations on freeways and residential streets in Los Angeles. *Atmos. Environ.* 39:3597–3610. doi:10.1016/j.atmosenv.2005.02.034

Yoon, S.J. 2003. Measuring vehicle volumes and monitoring and modeling of PM2.5 concentrations in a travel center associated with a major urban interstate and interchange. In *Proceedings of the Air & Waste Management Conference, San Diego, CA, June 22-26, 2003.* San Antonio, TX: Air & Waste Management Association.

Zhou, Y., and J.I. Levy. 2007. Factors influencing the spatial extent of mobile source air pollution impacts: A meta-analysis. *BMC Public Health.* 7:89. doi:10.1186/1471-2458-7-89

Zhu, Y., W.C. Hinds, S. Kim, S. Shen, and C. Sioutas. 2002. Study of ultrafine particles near a major highway with heavy-duty diesel traffic. *Atmos. Environ.* 36:4323–4335. doi:10.1016/S1352-2310(02)00354-0

## About the Authors

**Helen Ginzburg** is an air quality scientist and a principal professional associate and **Xiaobo Liu** is an environmental engineer at Parsons Brinckerhoff in New York.

**Michael Baker** is an environmental construction manager for URS Corporation on the Intercounty Connector Project in Maryland.

**Robert Shreeve** is a deputy director at the Office of Environmental Design and Office of the Intercounty Connector at Maryland State Highway Administration in Baltimore.

**R.K.M. Jayanty** is a distinguished fellow at RTI International, Research Triangle Park, North Carolina.

**David Campbell** is an associate research scientist in the Division of Atmospheric Sciences and **Barbara Zielinska** is a research professor at the Desert Research Institute in Reno, NV.

00193546



00196360



United States
Environmental Protection
Agency

EPA/600/R-19/188
December 2019
www.epa.gov/isa

# Integrated Science Assessment
# for
# Particulate Matter

December 2019

Center for Public Health and Environmental Assessment
Office of Research and Development
U.S. Environmental Protection Agency
Research Triangle Park, NC

00196361

# DISCLAIMER

This document has been reviewed in accordance with the U.S. Environmental Protection Agency policy and approved for publication. Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

00196362

# CONTENTS

**INTEGRATED SCIENCE ASSESSMENT TEAM FOR PARTICULATE MATTER** ___LXVI

**AUTHORS, CONTRIBUTORS, AND REVIEWERS** _____ **LXX**

**ACRONYMNS AND ABBREVIATIONS** _____ **LXXVII**

**PREFACE** _____ **P-1**

P.1. Legislative Requirements for the Review of the National Ambient Air Quality Standards _____ P-1
    P.1.1. Overview and History of the Reviews of the Primary and Secondary National Ambient
        Air Quality Standard for Particulate Matter_____ P-3
P.2. Purpose and Overview of the Integrated Science Assessment _____ P-9
P.3. Process for Developing Integrated Science Assessments _____ P-11
    P.3.1. Scope of the ISA _____ P-14
    P.3.2. Evaluation of the Evidence _____ P-17
        P.3.2.1. Biological Plausibility_____ P-17
        P.3.2.2. Comparing Epidemiologic Study Results _____ P-19
        P.3.2.3. Assessing Causality _____ P-20
P.4. References _____ P-21

**EXECUTIVE SUMMARY**_____ **ES-1**

Purpose and Scope of the Integrated Science Assessment _____ ES-1
Sources and Exposure to PM _____ ES-5
Dosimetry of Inhaled PM _____ ES-7
Health and Welfare Effects of PM Exposure _____ ES-8
Health Effects of PM$_{2.5}$ Exposure _____ ES-12
    Respiratory Effects_____ ES-12
    Cardiovascular Effects_____ ES-13
    Nervous System Effects_____ ES-15
    Cancer _____ ES-15
    Mortality _____ ES-16
Policy-Relevant Considerations for Health Effects Associated with Particulate Matter Exposure ___ ES-17
PM Exposure and Welfare Effects_____ ES-20
Scientific Considerations and Key Findings of the Health and Welfare Effects Evidence _____ ES-21
    Health Effects Evidence: Key Findings _____ ES-22
    Welfare Effects Evidence: Key Findings _____ ES-24
References _____ ES-25

**CHAPTER 1    INTEGRATED SYNTHESIS**_____ **1-1**

1.1 Introduction_____ 1-1
    1.1.1 Purpose _____ 1-1
    1.1.2 Organization of the ISA _____ 1-2
1.2 From Emissions Sources to Exposure to PM _____ 1-3
    1.2.1 Emission Sources and Distribution of Ambient Concentrations _____ 1-4
        1.2.1.1 Sources and Emissions of PM _____ 1-5
        1.2.1.2 Atmospheric Processes and PM Formation _____ 1-7
        1.2.1.3 Monitoring and Modeling of PM _____ 1-8
        1.2.1.4 National PM Concentrations _____ 1-9

00196363

1.2.1.5     Spatial and Temporal Variability in PM Concentrations _____ 1-10

1.2.1.6     Summary _____ 1-12

1.2.2     Assessment of Human Exposure _____ 1-13

1.3   Dosimetry of PM _____ 1-17

1.4   Evaluation of the Health Effects of PM _____ 1-19

1.4.1     Health Effects of $PM_{2.5}$ _____ 1-21

1.4.1.1     Respiratory Effects _____ 1-21

1.4.1.1.1     Respiratory Effects Associated with Short-Term $PM_{2.5}$ Exposure _____ 1-21

1.4.1.1.2     Respiratory Effects Associated with Long-Term $PM_{2.5}$ Exposure _____ 1-22

1.4.1.2     Cardiovascular Effects _____ 1-24

1.4.1.2.1     Cardiovascular Effects Associated with Short-Term $PM_{2.5}$ Exposure _____ 1-24

1.4.1.2.2     Cardiovascular Effects Associated with Long-Term $PM_{2.5}$ Exposure _____ 1-25

1.4.1.3     Nervous System Effects _____ 1-27

1.4.1.3.1     Nervous System Effects Associated with Long-Term $PM_{2.5}$ Exposure _____ 1-27

1.4.1.4     Cancer _____ 1-29

1.4.1.4.1     Cancer Associated with Long-Term $PM_{2.5}$ Exposure _____ 1-29

1.4.1.5     Mortality _____ 1-30

1.4.1.5.1     Mortality Associated with Short-Term $PM_{2.5}$ Exposure _____ 1-30

1.4.1.5.2     Mortality Associated with Long-Term $PM_{2.5}$ Exposure _____ 1-31

1.4.2     Health Effects of $PM_{10-2.5}$ _____ 1-41

1.4.3     Health Effects of UFPs _____ 1-41

1.5   Policy-Relevant Considerations _____ 1-42

1.5.1     Potential Copollutant Confounding _____ 1-43

1.5.1.1     Short-Term $PM_{2.5}$ Exposure _____ 1-43

1.5.1.2     Long-Term $PM_{2.5}$ Exposure _____ 1-45

1.5.2     Timing of Effects _____ 1-46

1.5.2.1     Averaging Time _____ 1-46

1.5.2.2     Lag Structure of Associations _____ 1-47

1.5.3     Concentration-Response Relationship _____ 1-48

1.5.3.1     Short-Term Exposure _____ 1-48

1.5.3.2     Long-Term Exposure _____ 1-49

1.5.4     PM Components and Sources _____ 1-50

1.5.4.1     Respiratory Effects _____ 1-51

1.5.4.2     Cardiovascular Effects _____ 1-51

1.5.4.3     Mortality _____ 1-52

1.5.5     Populations and Lifestages at Potentially Increased Risk of a PM-Related Health Effect _____ 1-53

1.6   Welfare Effects of PM _____ 1-56

1.6.1     Visibility Impairment _____ 1-56

1.6.2     Climate Effects _____ 1-57

1.6.3     Materials Effects _____ 1-57

1.7   Summary of Causality Determinations for Health and Welfare Effects _____ 1-59

1.7.1     Health Effects Evidence: Key Findings _____ 1-61

1.7.1.1     Causal and Likely to be Causal Relationship _____ 1-61

1.7.1.1.1     Epidemiologic Evidence _____ 1-61

1.7.1.1.2     Experimental Evidence _____ 1-62

1.7.1.1.3     Policy-Relevant Considerations _____ 1-62

1.7.1.2     Suggestive of, but not Sufficient to Infer, a Causal Relationship_____ 1-63

1.7.1.2.1     Epidemiologic Evidence _____ 1-63

iv

1.7.1.2.2      Experimental Evidence _____ 1-64
    1.7.1.3      Inadequate to Infer the Presence or Absence of a Causal Relationship _____ 1-64
        1.7.1.3.1      Epidemiologic Evidence _____ 1-64
        1.7.1.3.2      Experimental Evidence _____ 1-65
    1.7.2      Welfare Effects Evidence: Key Findings_____ 1-65
    1.7.3      Comparison of Causality Determinations from 2009 PM ISA and Current PM ISA _____ 1-66
1.8   References _____ 1-70

**CHAPTER 2      SOURCES, ATMOSPHERIC CHEMISTRY, AND AMBIENT CONCENTRATIONS _____ 2-1**

2.1   Summary Overview _____ 2-1
2.2   Atmospheric Size Distributions _____ 2-2
2.3   Primary Sources and Atmospheric Formation _____ 2-5
    2.3.1      Primary PM$_{2.5}$ Emissions _____ 2-7
        2.3.1.1      National-Scale Emissions _____ 2-7
        2.3.1.2      Urban-Scale Emissions_____ 2-9
    2.3.2      Secondary PM$_{2.5}$ Formation _____ 2-12
        2.3.2.1      Precursor Emissions _____ 2-13
        2.3.2.2      Secondary Inorganic Aerosols _____ 2-15
        2.3.2.3      Secondary Organic Aerosols _____ 2-17
    2.3.3      Primary PM$_{10-2.5}$ Emissions _____ 2-19
    2.3.4      Ultrafine Particles _____ 2-20
        2.3.4.1      Primary Sources _____ 2-24
        2.3.4.2      New Particle Formation_____ 2-25
2.4   Measurement, Monitoring, and Modeling _____ 2-26
    2.4.1      PM$_{2.5}$ and PM$_{10}$ _____ 2-26
    2.4.2      PM$_{10-2.5}$ _____ 2-27
    2.4.3      Ultrafine Particles: Number, Surface Area, Mass _____ 2-29
        2.4.3.1      Particle Number and Number Distribution_____ 2-29
        2.4.3.2      Surface Area_____ 2-32
        2.4.3.3      Mass _____ 2-33
    2.4.4      Chemical Components _____ 2-35
    2.4.5      Satellite Remote Sensing _____ 2-35
    2.4.6      Monitoring Networks _____ 2-38
    2.4.7      Chemical Transport Models _____ 2-41
2.5   Ambient Concentrations _____ 2-44
    2.5.1      Spatial Distribution _____ 2-44
        2.5.1.1      Variability Across the U.S. _____ 2-44
            2.5.1.1.1      PM$_{2.5}$ _____ 2-44
            2.5.1.1.2      PM$_{10}$_____ 2-48
            2.5.1.1.3      PM$_{10-2.5}$ _____ 2-51
            2.5.1.1.4      PM$_{2.5}$:PM$_{10}$ _____ 2-54
            2.5.1.1.5      Ultrafine Particles _____ 2-56
            2.5.1.1.6      PM$_{2.5}$ Components _____ 2-59
            2.5.1.1.7      PM$_{10-2.5}$ Components _____ 2-62
            2.5.1.1.8      Ultrafine Particle Components _____ 2-63
            2.5.1.1.9      Reactive Oxygen Species _____ 2-64
        2.5.1.2      Urban and Neighborhood-Scale Variability_____ 2-65
            2.5.1.2.1      PM$_{2.5}$ _____ 2-65

2.5.1.2.2    $PM_{10}$ _____ 2-66

2.5.1.2.3    $PM_{10-2.5}$ _____ 2-66

2.5.1.2.4    Ultrafine Particles _____ 2-67

2.5.1.2.5    Chemical Components _____ 2-68

2.5.2    Temporal Variability _____ 2-69

2.5.2.1    Regional Trends _____ 2-69

2.5.2.1.1    $PM_{2.5}$ _____ 2-69

2.5.2.1.2    $PM_{10}$ _____ 2-72

2.5.2.1.3    $PM_{10-2.5}$ _____ 2-74

2.5.2.1.4    Ultrafine Particles _____ 2-75

2.5.2.1.5    Chemical Components _____ 2-75

2.5.2.2    Seasonal Variations _____ 2-79

2.5.2.2.1    $PM_{2.5}$ _____ 2-79

2.5.2.2.2    $PM_{10-2.5}$ _____ 2-80

2.5.2.2.3    Ultrafine Particles _____ 2-83

2.5.2.2.4    Particulate Matter (PM) Components _____ 2-83

2.5.2.3    Hourly and Weekday-Weekend Variability _____ 2-85

2.5.3    Common Patterns of Particulate Matter Characteristics in the U.S. _____ 2-86

2.5.4    Background Particulate Matter _____ 2-90

2.5.4.1    Natural Background _____ 2-91

2.5.4.2    Intercontinental Transport _____ 2-92

2.6    Summary _____ 2-94

2.7    References _____ 2-97

CHAPTER 3    EXPOSURE TO AMBIENT PARTICULATE MATTER _____ 3-1

3.1    Introduction _____ 3-1

3.2    Conceptual Overview of Human Exposure _____ 3-2

3.2.1    Exposure Terminology _____ 3-2

3.2.2    Conceptual Model of Total Personal Exposure _____ 3-5

3.2.3    Exposure Considerations Specific to Particulate Matter _____ 3-7

3.3    Methodological Considerations for Use of Exposure Data and Models _____ 3-8

3.3.1    Surface Measurement _____ 3-10

3.3.1.1    Ambient Monitoring _____ 3-11

3.3.1.2    Personal Monitoring _____ 3-11

3.3.2    Modeling _____ 3-15

3.3.2.1    Data Averaging _____ 3-17

3.3.2.2    Spatial Interpolation Methods _____ 3-19

3.3.2.3    Land Use Regression and Spatiotemporal Modeling _____ 3-20

3.3.2.3.1    Land Use Regression _____ 3-21

3.3.2.3.2    Spatiotemporal Modeling _____ 3-24

3.3.2.4    Mechanistic Models _____ 3-25

3.3.2.4.1    Chemical Transport Model Applications for Exposure Estimation _____ 3-25

3.3.2.4.2    Dispersion Modeling Applications for Exposure Estimation _____ 3-28

3.3.2.4.3    Hybrid Approaches _____ 3-31

3.3.3    Satellite-Based Methods for Exposure Estimation _____ 3-35

3.3.4    Microenvironmental Exposure Modeling _____ 3-40

3.3.5    Exposure Assignment Methods in Epidemiologic Studies _____ 3-42

vi

00196366

3.4   Exposure Assessment and Interpretation of Epidemiologic Study Results _____ 3-53
    3.4.1   Relationships Influencing Exposure _____ 3-53
        3.4.1.1   Air Exchange Rate and Infiltration _____ 3-53
        3.4.1.2   Indoor-Outdoor Concentration Relationships _____ 3-57
        3.4.1.3   Personal-Ambient Concentration Relationships _____ 3-61
    3.4.2   Factors Contributing to Error in Estimating Exposure to Particulate Matter _____ 3-65
        3.4.2.1   Time-Activity Patterns _____ 3-66
        3.4.2.2   Spatial Variability in Concentrations _____ 3-71
        3.4.2.3   Instrument Accuracy and Precision _____ 3-74
        3.4.2.4   Model Accuracy and Precision _____ 3-75
    3.4.3   Costressor Relationships _____ 3-77
        3.4.3.1   Temporal Relationships among Ambient Particulate Matter and Copollutant
                  Exposures _____ 3-78
        3.4.3.2   Spatial Relationships among Ambient Particulate Matter and Copollutant
                  Exposures _____ 3-88
        3.4.3.3   Personal and Indoor Relationships between Particular Matter and Copollutant
                  Exposures _____ 3-88
        3.4.3.4   Traffic-Related Noise _____ 3-93
    3.4.4   Particulate Matter Composition and Exposure Assessment _____ 3-94
        3.4.4.1   Composition _____ 3-95
        3.4.4.2   Reactive Oxygen Species_____ 3-103
    3.4.5   Influence of Exposure Errors on Results from Epidemiologic Studies of Different
            Designs _____ 3-106
        3.4.5.1   Short-Term Exposure Studies_____ 3-107
            3.4.5.1.1   Time-Series Studies _____ 3-107
            3.4.5.1.2   Panel Studies _____ 3-111
        3.4.5.2   Long-Term Exposure Cohort Studies _____ 3-112
3.5   Summary _____ 3-118
3.6   References _____ 3-122

CHAPTER 4    DOSIMETRY OF PARTICULATE MATTER _____ 4-1

4.1   Introduction_____ 4-1
    4.1.1   Size Characterization of Inhaled Particles _____ 4-3
    4.1.2   Structure and Function of the Respiratory Tract_____ 4-4
        4.1.2.1   Anatomy _____ 4-4
        4.1.2.2   Breathing Rates _____ 4-6
        4.1.2.3   Epithelial Lining Fluid _____ 4-8
    4.1.3   Route of Breathing _____ 4-10
    4.1.4   Ventilation Distribution _____ 4-12
    4.1.5   Particle Inhalability _____ 4-13
    4.1.6   Thoracic and Respirable Particles _____ 4-14
    4.1.7   Dose and Dose Metrics _____ 4-19
4.2   Particle Deposition _____ 4-21
    4.2.1   Mechanisms of Deposition _____ 4-22
    4.2.2   Deposition Patterns _____ 4-24
        4.2.2.1   Total Respiratory Tract Deposition _____ 4-26
        4.2.2.2   Extrathoracic Region_____ 4-27
        4.2.2.3   Tracheobronchial and Alveolar Region _____ 4-33
        4.2.2.4   Sites of Localized Deposition _____ 4-33
    4.2.3   Interspecies Patterns of Deposition _____ 4-34
    4.2.4   Factors Modulating Deposition _____ 4-36
        4.2.4.1   Physical Activity _____ 4-36

vii

| | | | |
|---|---|---|---|
| 4.2.4.2 | Age | | 4-39 |
| 4.2.4.3 | Sex | | 4-41 |
| 4.2.4.4 | Body Mass Index | | 4-41 |
| 4.2.4.5 | Anatomical Variability | | 4-42 |
| 4.2.4.6 | Ventilation Distribution | | 4-43 |
| 4.2.4.7 | Respiratory Tract Disease | | 4-44 |
| 4.2.4.8 | Particle Hygroscopicity | | 4-46 |
| 4.2.5 | Summary | | 4-48 |
| 4.3 | Particle Clearance | | 4-49 |
| 4.3.1 | Clearance Mechanisms | | 4-50 |
| 4.3.1.1 | Extrathoracic Region | | 4-50 |
| 4.3.1.2 | Tracheobronchial Region | | 4-50 |
| 4.3.1.3 | Alveolar Region | | 4-52 |
| 4.3.2 | Interspecies Clearance and Retention | | 4-54 |
| 4.3.3 | Particle Translocation | | 4-55 |
| 4.3.3.1 | Olfactory Delivery | | 4-56 |
| 4.3.3.2 | Pulmonary Delivery | | 4-60 |
| 4.3.3.2.1 | Membrane Translocation | | 4-60 |
| 4.3.3.2.2 | Extrapulmonary Distribution | | 4-61 |
| 4.3.3.3 | Transplacental Barrier Transport | | 4-66 |
| 4.3.4 | Factors Modulating Particle Clearance | | 4-67 |
| 4.3.4.1 | Age | | 4-67 |
| 4.3.4.2 | Sex | | 4-68 |
| 4.3.4.3 | Respiratory Tract Disease | | 4-68 |
| 4.3.4.4 | Particle Overload | | 4-70 |
| 4.3.5 | Summary | | 4-70 |
| 4.4 | References | | 4-72 |

**CHAPTER 5    RESPIRATORY EFFECTS _____ 5-1**

| | | | |
|---|---|---|---|
| 5.1 | Short-Term PM$_{2.5}$ Exposure and Respiratory Effects | | 5-1 |
| 5.1.1 | Biological Plausibility | | 5-3 |
| 5.1.1.1 | Injury, Inflammation, and Oxidative Stress | | 5-4 |
| 5.1.1.2 | Activation of Sensory Nerves | | 5-6 |
| 5.1.1.3 | Summary | | 5-7 |
| 5.1.2 | Asthma Exacerbation | | 5-7 |
| 5.1.2.1 | Hospital Admissions and Emergency Department (ED) Visits | | 5-8 |
| 5.1.2.1.1 | Hospital Admissions | | 5-19 |
| 5.1.2.1.2 | Emergency Department (ED) Visits | | 5-20 |
| 5.1.2.1.3 | Summary of Asthma Hospital Admissions and Emergency Department (ED) Visits | | 5-21 |
| 5.1.2.2 | Respiratory Symptoms and Asthma Medication Use in Populations with Asthma | | 5-22 |
| 5.1.2.2.1 | Children | | 5-22 |
| 5.1.2.2.2 | Adults | | 5-27 |
| 5.1.2.3 | Lung Function Changes in Populations with Asthma | | 5-28 |
| 5.1.2.3.1 | Children | | 5-28 |
| 5.1.2.3.2 | Adults | | 5-33 |
| 5.1.2.3.3 | Controlled Human Exposure Studies | | 5-34 |
| 5.1.2.3.4 | Animal Toxicological Studies | | 5-35 |

viii

5.1.2.3.5    Summary of Lung Function in Populations with Asthma _____ 5-35
5.1.2.4    Subclinical Effects Underlying Asthma Exacerbation _____ 5-35
5.1.2.4.1    Children _____ 5-35
5.1.2.4.2    Adults _____ 5-42
5.1.2.4.3    Controlled Human Exposure Studies _____ 5-43
5.1.2.4.4    Animal Toxicological Studies _____ 5-43
5.1.2.4.5    Summary of Subclinical Effects Underlying Asthma Exacerbation _____ 5-46
5.1.2.5    Summary of Asthma Exacerbations _____ 5-46
5.1.3    Allergy Exacerbation _____ 5-47
5.1.4    Chronic Obstructive Pulmonary Disease (COPD) Exacerbation _____ 5-48
5.1.4.1    Hospital Admissions and Emergency Department (ED) Visits _____ 5-49
5.1.4.1.1    Hospital Admissions _____ 5-55
5.1.4.1.2    Emergency Department (ED) Visits _____ 5-56
5.1.4.1.3    Summary of Chronic Obstructive Pulmonary Disease (COPD) Hospital
Admissions and Emergency Department (ED) Visits _____ 5-56
5.1.4.2    Respiratory Symptoms and Medication Use _____ 5-57
5.1.4.3    Lung Function Changes in Adults with Chronic Obstructive Pulmonary
Disease (COPD) _____ 5-61
5.1.4.3.1    Epidemiologic Studies _____ 5-61
5.1.4.3.2    Controlled Human Exposure Studies _____ 5-61
5.1.4.4    Subclinical Effects Underlying Exacerbation of Chronic Obstructive Pulmonary
Disease (COPD) _____ 5-61
5.1.4.4.1    Epidemiologic Studies _____ 5-61
5.1.4.4.2    Controlled Human Exposure Studies _____ 5-62
5.1.4.4.3    Animal Toxicological Studies _____ 5-62
5.1.4.5    Summary of Exacerbation of Chronic Obstructive Pulmonary Disease (COPD)__ 5-63
5.1.5    Respiratory Infection _____ 5-63
5.1.5.1    Hospital Admissions and Emergency Department (ED) Visits _____ 5-64
5.1.5.1.1    Hospital Admissions _____ 5-71
5.1.5.1.2    Emergency Department (ED) Visits _____ 5-72
5.1.5.2    Outpatient and Physician Visit Studies _____ 5-73
5.1.5.3    Subclinical Effects Underlying Respiratory Infection _____ 5-73
5.1.5.4    Summary of Respiratory Infection _____ 5-73
5.1.6    Combinations of Respiratory-Related Hospital Admissions and Emergency
Department (ED) Visits _____ 5-74
5.1.6.1    Hospital Admissions _____ 5-83
5.1.6.2    Emergency Department (ED) Visits _____ 5-84
5.1.6.3    Summary of Respiratory-Related Hospital Admissions and Emergency
Department (ED) Visits _____ 5-85
5.1.7    Respiratory Effects in Healthy Populations _____ 5-86
5.1.7.1    Epidemiologic Studies _____ 5-86
5.1.7.1.1    Respiratory Symptoms _____ 5-87
5.1.7.1.2    Lung Function Changes _____ 5-87
5.1.7.1.3    Subclinical Effects _____ 5-88
5.1.7.2    Controlled Human Exposure Studies _____ 5-93
5.1.7.3    Animal Toxicological Studies _____ 5-94
5.1.7.3.1    Lung Function _____ 5-94
5.1.7.3.2    Respiratory Tract Injury _____ 5-99

00196369

| 5.1.7.3.3 | Respiratory Tract Oxidative Stress | 5-99 |
| 5.1.7.3.4 | Respiratory Tract Inflammation | 5-100 |
| 5.1.7.3.5 | Morphology | 5-102 |
| 5.1.7.3.6 | Allergic Sensitization | 5-102 |
| 5.1.7.3.7 | Pathways Related to Otitis Media | 5-103 |
| 5.1.7.4 | Summary of Respiratory Effects in Healthy Populations | 5-103 |
| 5.1.8 | Respiratory Effects in Populations with Cardiovascular Disease | 5-104 |
| 5.1.9 | Respiratory Mortality | 5-106 |
| 5.1.10 | Policy-Relevant Considerations | 5-107 |
| 5.1.10.1 | Examination of Potential Copollutant Confounding | 5-108 |
| 5.1.10.1.1 | $PM_{2.5}$ within the Multipollutant Mixture | 5-113 |
| 5.1.10.2 | Model Specification | 5-116 |
| 5.1.10.3 | Lag Structure | 5-118 |
| 5.1.10.4 | The Role of Season and Temperature on $PM_{2.5}$ Associations | 5-123 |
| 5.1.10.4.1 | Season | 5-123 |
| 5.1.10.4.2 | Temperature | 5-127 |
| 5.1.10.5 | Averaging Time of $PM_{2.5}$ Concentrations | 5-128 |
| 5.1.10.6 | Concentration-Response Relationship and Threshold Analyses | 5-130 |
| 5.1.11 | Short-term exposure to $PM_{2.5}$ Components and Sources and Respiratory Effects | 5-137 |
| 5.1.11.1 | Elemental and Black Carbon | 5-139 |
| 5.1.11.2 | Organic Carbon | 5-142 |
| 5.1.11.3 | Secondary $PM_{2.5}$—Sulfate, Nitrate, Ammonium | 5-143 |
| 5.1.11.4 | Metals | 5-144 |
| 5.1.11.5 | Other $PM_{2.5}$ components | 5-146 |
| 5.1.11.6 | Sources of $PM_{2.5}$ | 5-146 |
| 5.1.11.7 | Summary | 5-148 |
| 5.1.12 | Summary and Causality Determination | 5-148 |
| 5.2 | Long-Term $PM_{2.5}$ Exposure and Respiratory Effects | 5-155 |
| 5.2.1 | Biological Plausibility | 5-156 |
| 5.2.2 | Lung Function and Development | 5-159 |
| 5.2.2.1 | Lung Development | 5-160 |
| 5.2.2.1.1 | Epidemiologic Studies | 5-160 |
| 5.2.2.1.2 | Animal Toxicological Studies | 5-166 |
| 5.2.2.2 | Lung Function | 5-167 |
| 5.2.2.2.1 | Children | 5-167 |
| 5.2.2.2.2 | Adults | 5-174 |
| 5.2.2.3 | Summary of Lung Function and Development | 5-176 |
| 5.2.3 | Development of Asthma | 5-176 |
| 5.2.3.1 | Asthma in Children | 5-177 |
| 5.2.3.1.1 | Copollutant Confounding | 5-182 |
| 5.2.3.1.2 | Concentration-Response Relationship | 5-183 |
| 5.2.3.2 | Asthma in Adults | 5-184 |
| 5.2.3.3 | Subclinical Effects Underlying Development of Asthma | 5-188 |
| 5.2.3.3.1 | Epidemiologic Studies | 5-188 |
| 5.2.3.3.2 | Animal Toxicological Study | 5-188 |
| 5.2.4 | Development of Allergic Disease | 5-189 |
| 5.2.5 | Development of Chronic Obstructive Pulmonary Disease (COPD) | 5-191 |
| 5.2.6 | Respiratory Infection | 5-193 |

00196370

5.2.7    Severity of Respiratory Disease _____ 5-195
  5.2.7.1    Epidemiologic Studies_____ 5-196
  5.2.7.2    Animal Toxicological Study _____ 5-196
5.2.8    Subclinical Effects in Healthy Populations _____ 5-197
  5.2.8.1    Respiratory Tract Oxidative Stress _____ 5-199
  5.2.8.2    Respiratory Tract Inflammation _____ 5-200
  5.2.8.3    Morphological Effects _____ 5-201
  5.2.8.4    Summary of Subclinical Effects in Healthy Populations _____ 5-201
5.2.9    Subclinical Effects in Populations with Cardiovascular Disease_____ 5-202
5.2.10   Respiratory Mortality _____ 5-204
  5.2.10.1   Potential Copollutant Confounding of the PM$_{2.5}$-Mortality Relationship_____ 5-206
5.2.11   Respiratory Effects and Declining PM$_{2.5}$ Concentrations _____ 5-208
  5.2.11.1   Bronchitis _____ 5-208
  5.2.11.2   Pulmonary Function _____ 5-209
  5.2.11.3   Summary _____ 5-210
5.2.12   Associations between Long-Term Exposure to PM$_{2.5}$ Components and Sources and
         Respiratory Effects _____ 5-211
  5.2.12.1   Elemental Carbon, Black Carbon, and Organic Carbon _____ 5-213
  5.2.12.2   Metals _____ 5-214
  5.2.12.3   Oxidative Potential _____ 5-214
  5.2.12.4   Summary _____ 5-215
5.2.13   Summary and Causality Determination _____ 5-215
5.3  Short-Term PM$_{10-2.5}$ Exposure and Respiratory Effects _____ 5-220
5.3.1    Biological Plausibility _____ 5-221
  5.3.1.1    Injury, Inflammation, and Oxidative Stress _____ 5-222
  5.3.1.2    Activation of Sensory Nerves _____ 5-223
  5.3.1.3    Summary _____ 5-224
5.3.2    Asthma Exacerbation _____ 5-224
  5.3.2.1    Hospital Admissions and Emergency Department (ED) Visits _____ 5-225
    5.3.2.1.1    Concentration-Response Relationship_____ 5-231
  5.3.2.2    Respiratory Symptoms and Medication Use _____ 5-232
  5.3.2.3    Lung Function _____ 5-233
  5.3.2.4    Subclinical Effects Underlying Asthma Exacerbation _____ 5-234
    5.3.2.4.1    Epidemiologic Studies _____ 5-234
    5.3.2.4.2    Controlled Human Exposure Studies _____ 5-235
    5.3.2.4.3    Animal Toxicological Studies _____ 5-236
  5.3.2.5    Summary of Asthma Exacerbation _____ 5-236
5.3.3    Chronic Obstructive Pulmonary Disease (COPD) Exacerbation _____ 5-237
  5.3.3.1    Hospital Admissions and Emergency Department (ED) Visits _____ 5-242
    5.3.3.1.1    Hospital Admissions_____ 5-242
    5.3.3.1.2    Emergency Department (ED) Visits _____ 5-242
  5.3.3.2    Other Epidemiologic Studies_____ 5-243
  5.3.3.3    Summary of Exacerbation of Chronic Obstructive Pulmonary Disease (COPD)_ 5-243
5.3.4    Respiratory Infection _____ 5-243
  5.3.4.1    Hospital Admissions and Emergency Department (ED) Visits _____ 5-244
  5.3.4.2    Outpatient and Physician Visit Studies _____ 5-248
  5.3.4.3    Summary of Respiratory Infection_____ 5-248
5.3.5    Combinations of Respiratory-Related Hospital Admissions and Emergency
         Department (ED) Visits _____ 5-249
5.3.6    Respiratory Effects in Healthy Populations _____ 5-257
  5.3.6.1    Epidemiologic Studies_____ 5-258

00196371

5.3.6.2    Controlled Human Exposure _____ 5-259

5.3.6.3    Animal Toxicological Studies _____ 5-259

5.3.6.4    Summary of Respiratory Effects in Healthy Populations _____ 5-260

5.3.7    Respiratory Mortality _____ 5-261

5.3.7.1    Characterizing the $PM_{10-2.5}$-Respiratory Mortality Relationship _____ 5-261

5.3.7.1.1    Copollutant Confounding _____ 5-262

5.3.7.1.2    Lag Structure of Associations_____ 5-264

5.3.7.1.3    Effect Modification _____ 5-265

5.3.8    Summary and Causality Determination _____ 5-266

5.4    Long-Term $PM_{10-2.5}$ Exposure and Respiratory Effects _____ 5-270

5.4.1    Biological Plausibility _____ 5-270

5.4.2    Lung Function and Development _____ 5-272

5.4.3    Development of Asthma _____ 5-273

5.4.4    Development of Allergic Disease _____ 5-274

5.4.5    Respiratory Infection _____ 5-274

5.4.6    Severity of Asthma _____ 5-275

5.4.7    Subclinical Effects in Healthy Populations _____ 5-275

5.4.8    Respiratory Mortality _____ 5-276

5.4.9    Summary and Causality Determination _____ 5-276

5.5    Short-Term UFP Exposure and Respiratory Effects_____ 5-279

5.5.1    Biological Plausibility _____ 5-279

5.5.1.1    Injury, Inflammation, and Oxidative Stress _____ 5-281

5.5.1.2    Activation of Sensory Nerves _____ 5-282

5.5.1.3    Summary _____ 5-282

5.5.2    Asthma Exacerbation _____ 5-283

5.5.2.1    Epidemiologic Studies_____ 5-283

5.5.2.2    Controlled Human Exposure _____ 5-287

5.5.2.3    Animal Toxicological Studies _____ 5-287

5.5.3    Chronic Obstructive Pulmonary Disease (COPD) Exacerbation _____ 5-288

5.5.4    Respiratory Infection _____ 5-291

5.5.5    Combinations of Respiratory-Related Hospital Admissions and Emergency
        Department (ED) Visits _____ 5-294

5.5.6    Respiratory Effects in Healthy Populations _____ 5-297

5.5.6.1    Lung Function _____ 5-297

5.5.6.1.1    Epidemiologic Studies _____ 5-297

5.5.6.1.2    Controlled Human Exposure Studies _____ 5-299

5.5.6.1.3    Animal Toxicological Studies _____ 5-299

5.5.6.2    Summary of Respiratory Effects in Healthy Populations _____ 5-301

5.5.7    Respiratory Effects in Populations with Cardiovascular Disease _____ 5-301

5.5.8    Respiratory Mortality _____ 5-302

5.5.9    Summary and Causality Determination _____ 5-302

5.6    Long-Term UFP Exposure and Respiratory Effects _____ 5-305

5.6.1    Biological Plausibility _____ 5-305

5.6.2    Development of Asthma _____ 5-308

5.6.3    Subclinical Effects in Healthy Populations and Populations with Cardiovascular
        Disease _____ 5-309

5.6.4    Respiratory Mortality _____ 5-311

5.6.5    Summary and Causality Determination _____ 5-311

5.7    References _____ 5-313

xii

00196372

**CHAPTER 6    CARDIOVASCULAR EFFECTS** _____ **6-1**

6.1   Short-Term PM$_{2.5}$ Exposure and Cardiovascular Effects _____ 6-1
  6.1.1   Biological Plausibility _____ 6-3
  6.1.2   Ischemic Heart Disease and Myocardial Infarction _____ 6-7
    6.1.2.1   Emergency Department (ED) Visits and Hospital Admissions _____ 6-7
      6.1.2.1.1   Acute Myocardial Infarction (MI) and Angina Pectoris _____ 6-12
    6.1.2.2   Epidemiologic Studies of ST Segment Depression_____ 6-14
  6.1.3   Heart Failure and Impaired Heart Function _____ 6-16
    6.1.3.1   Emergency Department (ED) Visits and Hospital Admissions _____ 6-16
    6.1.3.2   Controlled Human Exposure Studies of Impaired Heart Function_____ 6-21
    6.1.3.3   Toxicological Studies of Impaired Heart Function _____ 6-21
  6.1.4   Ventricular Depolarization, Repolarization, and Arrhythmia _____ 6-22
    6.1.4.1   Emergency Department (ED) Visits and Hospital Admissions for Arrhythmia
              and Out-of-Hospital Cardiac Arrest_____ 6-23
      6.1.4.1.1   Arrhythmias _____ 6-23
      6.1.4.1.2   Out-of-Hospital Cardiac Arrest _____ 6-27
    6.1.4.2   Epidemiologic Studies of Arrhythmia and Conduction Abnormalities _____ 6-30
      6.1.4.2.1   Conduction Abnormalities _____ 6-36
    6.1.4.3   Controlled Human Exposure Studies for Arrhythmia and Conduction
              Abnormalities _____ 6-38
    6.1.4.4   Toxicological Studies for Arrhythmia and Conduction Abnormalities _____ 6-40
  6.1.5   Cerebrovascular Disease and Stroke_____ 6-41
    6.1.5.1   Emergency Department (ED) Visits and Hospital Admissions _____ 6-42
      6.1.5.1.1   Emergency Department (ED) Visits and Hospital Admissions Visits for Stroke
                Subtypes _____ 6-46
  6.1.6   Blood Pressure and Hypertension _____ 6-47
    6.1.6.1   Emergency Department (ED) Visits and Hospital Admissions _____ 6-48
    6.1.6.2   Epidemiologic Studies of Changes in Blood Pressure (BP) _____ 6-51
    6.1.6.3   Controlled Human Exposure Studies of Changes in Blood Pressure (BP) _____ 6-57
    6.1.6.4   Toxicological Studies of Changes in Blood Pressure (BP) _____ 6-59
      6.1.6.4.1   Renin-Angiotensin System _____ 6-60
  6.1.7   Venous Thromboembolism Disease and Pulmonary Embolism _____ 6-61
    6.1.7.1   Emergency Department (ED) Visits and Hospital Admissions _____ 6-62
  6.1.8   Combinations of Cardiovascular-Related Emergency Department (ED) Visits and
          Hospital Admissions_____ 6-66
  6.1.9   Cardiovascular Mortality_____ 6-72
  6.1.10  Heart Rate (HR) and Heart Rate Variability (HRV)_____ 6-73
    6.1.10.1   Epidemiologic Studies of Heart Rate (HR) and Heart Rate Variability (HRV) ____ 6-74
    6.1.10.2   Controlled Human Exposure Studies of Heart Rate (HR) and Heart Rate
               Variability (HRV) _____ 6-80
    6.1.10.3   Toxicological Studies of Heart Rate (HR) and Heart Rate Variability (HRV)_____ 6-83
      6.1.10.3.1   Heart Rate Variability (HRV) _____ 6-83
  6.1.11  Systemic Inflammation, Oxidative Stress, and Blood Lipids _____ 6-85
    6.1.11.1   Epidemiologic Studies of Systemic Inflammation and Oxidative Stress _____ 6-85
    6.1.11.2   Controlled Human Exposure Studies of Short-Term PM$_{2.5}$ Exposure and
               Systemic Inflammation, Oxidative Stress, and Blood Lipids _____ 6-89
      6.1.11.2.1   Systemic Inflammation _____ 6-89
      6.1.11.2.2   Oxidative Stress _____ 6-90
      6.1.11.2.3   Blood Lipids _____ 6-90

00196373

6.1.11.3    Toxicological Studies of Systemic Inflammation, Oxidative Stress, and Blood Lipids _____ 6-92

     6.1.11.3.1    Systemic Inflammation _____ 6-92

     6.1.11.3.1    Oxidative Stress _____ 6-94

     6.1.11.3.2    Blood Lipids _____ 6-94

6.1.12   Coagulation _____ 6-94

   6.1.12.1    Epidemiologic Studies of Coagulation _____ 6-95

   6.1.12.2    Controlled Human Exposure Studies of Coagulation _____ 6-97

   6.1.12.3    Toxicological Studies of Coagulation and Thrombosis _____ 6-99

6.1.13   Endothelial Dysfunction and Arterial Stiffness _____ 6-100

   6.1.13.1    Epidemiologic Studies of Impaired Vascular Function _____ 6-101

     6.1.13.1.1    Digital Vascular Function _____ 6-101

     6.1.13.1.2    Arterial Stiffness _____ 6-102

     6.1.13.1.3    Biomarkers of Endothelial Injury_____ 6-102

   6.1.13.2    Controlled Human Exposure Studies of Short-Term $PM_{2.5}$ Exposure and Impaired Vascular Function _____ 6-106

     6.1.13.2.1    Arterial Stiffness _____ 6-108

   6.1.13.3    Toxicological Studies of Impaired Vascular Function _____ 6-110

6.1.14   Policy-Relevant Considerations _____ 6-111

   6.1.14.1    Examination of Potential Copollutant Confounding _____ 6-111

     6.1.14.1.1    $PM_{2.5}$ within the Multipollutant Mixture _____ 6-117

   6.1.14.2    The Role of Season and Temperature on $PM_{2.5}$ Associations _____ 6-117

   6.1.14.3    Lag Structure _____ 6-119

6.1.15   Associations between $PM_{2.5}$ Components and Sources and Cardiovascular Effects ___ 6-122

   6.1.15.1    Elemental and Black Carbon _____ 6-124

   6.1.15.2    Organic Carbon _____ 6-126

   6.1.15.3    Secondary $PM_{2.5}$—Sulfate, Nitrate, Ammonium _____ 6-127

   6.1.15.4    Metals _____ 6-127

   6.1.15.5    Other $PM_{2.5}$ components_____ 6-128

   6.1.15.6    Sources of $PM_{2.5}$_____ 6-128

   6.1.15.7    Associations between $PM_{2.5}$ Components and Sources and Effects in People with Diabetes _____ 6-130

   6.1.15.8    Toxicological Studies of Individual Components and Sources as Part of the Particulate Matter (PM) Mixture _____ 6-131

6.1.16   Summary and Causality Determination _____ 6-136

6.2   Long-Term $PM_{2.5}$ Exposure and Cardiovascular Effects _____ 6-140

   6.2.1    Biological Plausibility _____ 6-142

   6.2.2    Ischemic Heart Disease and Myocardial Infarction _____ 6-145

     6.2.2.1    Epidemiologic Studies_____ 6-146

   6.2.3    Cerebrovascular Disease and Stroke_____ 6-152

     6.2.3.1    Epidemiologic Studies_____ 6-152

       6.2.3.1.1    Subclinical Cerebrovascular Disease_____ 6-158

   6.2.4    Atherosclerosis_____ 6-159

     6.2.4.1    Epidemiologic Studies_____ 6-160

     6.2.4.2    Toxicological Studies of Atherosclerosis_____ 6-164

   6.2.5    Heart Failure and Impaired Heart Function _____ 6-166

     6.2.5.1    Epidemiologic Studies_____ 6-166

     6.2.5.2    Toxicological Studies of Impaired Heart Function _____ 6-170

   6.2.6    Ventricular Depolarization, Repolarization, and Arrhythmia _____ 6-172

     6.2.6.1    Epidemiologic Studies_____ 6-172

   6.2.7    Blood Pressure and Hypertension _____ 6-174

00196374

6.2.7.1    Epidemiologic Studies _____ 6-174
    6.2.7.1.1    Blood Pressure _____ 6-174
    6.2.7.1.2    Hypertension _____ 6-180
    6.2.7.1.3    Gestational Hypertension and Pre-eclampsia _____ 6-182
    6.2.7.1.4    Renal Function _____ 6-182
6.2.7.2    Toxicological Studies of Changes in Blood Pressure (BP) _____ 6-182
    6.2.7.2.1    Renin-Angiotensin System _____ 6-183
6.2.8    Venous Thromboembolism Disease and Pulmonary Embolism _____ 6-184
    6.2.8.1    Epidemiologic Studies _____ 6-185
6.2.9    Combinations of Cardiovascular-Related Outcomes _____ 6-187
6.2.10    Long-Term PM$_{2.5}$ Exposure and Cardiovascular Mortality _____ 6-189
6.2.11    Heart Rate (HR) and Heart Rate Variability (HRV) _____ 6-192
    6.2.11.1    Epidemiologic Studies of Heart Rate Variability (HRV) _____ 6-192
    6.2.11.2    Toxicological Studies of Heart Rate (HR) and Heart Rate Variability (HRV) ____ 6-193
6.2.12    Systemic Inflammation, Oxidative Stress, and Blood Lipids _____ 6-194
    6.2.12.1    Epidemiologic Studies _____ 6-194
        6.2.12.1.1    Systemic Inflammation _____ 6-194
        6.2.12.1.2    Blood Lipids _____ 6-195
    6.2.12.2    Toxicological Studies _____ 6-195
        6.2.12.2.1    Systemic Inflammation _____ 6-196
        6.2.12.2.2    Oxidative Stress _____ 6-196
        6.2.12.2.3    Blood Lipids _____ 6-197
6.2.13    Coagulation _____ 6-198
    6.2.13.1    Epidemiologic Studies _____ 6-198
6.2.14    Impaired Vascular Function and Arterial Stiffness _____ 6-199
    6.2.14.1    Epidemiologic Studies _____ 6-199
    6.2.14.2    Toxicological Studies _____ 6-200
6.2.15    Copollutant Confounding _____ 6-201
6.2.16    Concentration-Response Relationship _____ 6-206
6.2.17    Associations between PM$_{2.5}$ Components and Sources and Cardiovascular Effects ____ 6-214
    6.2.17.1    Toxicological Studies of Individual Components and Sources as Part of a Particulate Matter Mixture _____ 6-217
6.2.18    Summary and Causality Determination _____ 6-219
6.3    Short-Term PM$_{10-2.5}$ Exposure and Cardiovascular Effects _____ 6-224
6.3.1    Biological Plausibility _____ 6-225
6.3.2    Ischemic Heart Disease and Myocardial Infarction _____ 6-227
    6.3.2.1    Emergency Department (ED) Visits and Hospital Admissions _____ 6-228
6.3.3    Heart Failure and Impaired Heart Function _____ 6-229
    6.3.3.1    Emergency Department (ED) Visits and Hospital Admissions _____ 6-229
    6.3.3.2    Toxicological Studies of Impaired Heart Function _____ 6-230
6.3.4    Ventricular Depolarization, Repolarization, and Arrhythmia _____ 6-230
    6.3.4.1    Emergency Department (ED) Visits and Hospital Admissions for Arrhythmia and Out-of-Hospital Cardiac Arrest _____ 6-231
        6.3.4.1.1    Out-of-Hospital Cardiac Arrest _____ 6-231
    6.3.4.2    Epidemiologic Studies for Arrhythmia and Conduction Abnormalities _____ 6-232
6.3.5    Cerebrovascular Disease and Stroke _____ 6-232
    6.3.5.1    Emergency Department (ED) Visits and Hospital Admissions _____ 6-232
6.3.6    Blood Pressure and Hypertension _____ 6-233
    6.3.6.1    Epidemiologic Studies of Changes in Blood Pressure (BP) _____ 6-234
    6.3.6.2    Controlled Human Exposure Studies of Changes in Blood Pressure (BP) _____ 6-234

00196375

6.3.6.3     Toxicological Studies of Changes in Blood Pressure (BP) _____ 6-235
6.3.7     Combinations of Cardiovascular-Related Emergency Department (ED) Visits and
          Hospital Admissions_____ 6-236
6.3.8     Cardiovascular Mortality_____ 6-239
  6.3.8.1     Characterizing the $PM_{10-2.5}$ Cardiovascular Mortality Relationship _____ 6-240
  6.3.8.2     Copollutant Confounding _____ 6-240
  6.3.8.3     Lag Structure of Associations _____ 6-243
  6.3.8.4     Effect Modification _____ 6-244
    6.3.8.4.1     Season _____ 6-244
    6.3.8.4.2     Temperature_____ 6-245
6.3.9     Heart Rate (HR) and Heart Rate Variability (HRV)_____ 6-245
  6.3.9.1     Epidemiologic Studies of Heart Rate (HR) and Heart Rate Variability (HRV) ___ 6-245
  6.3.9.2     Controlled Human Exposure Studies of Heart Rate (HR) and Heart Rate
              Variability (HRV) _____ 6-245
6.3.10    Systemic Inflammation and Oxidative Stress _____ 6-246
  6.3.10.1    Epidemiologic Studies of Systemic Inflammation and Oxidative Stress _____ 6-247
  6.3.10.2    Controlled Human Exposure Studies of Systemic Inflammation and Oxidative
              Stress _____ 6-247
6.3.11    Coagulation _____ 6-249
  6.3.11.1    Epidemiologic Studies of Coagulation _____ 6-250
  6.3.11.2    Controlled Human Exposure Studies of Coagulation and Thrombosis _____ 6-250
6.3.12    Endothelial Dysfunction and Arterial Stiffness _____ 6-250
  6.3.12.1    Controlled Human Exposure Studies of Impaired Vascular Function _____ 6-251
6.3.13    Summary and Causality Determination _____ 6-252
6.4   Long-Term $PM_{10-2.5}$ Exposure and Cardiovascular Effects _____ 6-256
  6.4.1     Biological Plausibility _____ 6-256
  6.4.2     Ischemic Heart Disease and Myocardial Infarction _____ 6-258
  6.4.3     Heart Failure and Impaired Heart Function _____ 6-262
    6.4.3.1     Epidemiologic Studies_____ 6-263
    6.4.3.2     Toxicological Studies of Impaired Heart Function _____ 6-264
  6.4.4     Cerebrovascular Disease and Stroke_____ 6-265
  6.4.5     Atherosclerosis_____ 6-269
  6.4.6     Blood Pressure and Hypertension _____ 6-271
    6.4.6.1     Epidemiologic Studies_____ 6-271
    6.4.6.2     Toxicological Studies of Changes in Blood Pressure (BP) _____ 6-271
  6.4.7     Peripheral Vascular Disease (PVD), Venous Thromboembolism, Pulmonary
            Embolism _____ 6-272
  6.4.8     Cardiovascular Mortality_____ 6-273
  6.4.9     Systemic Inflammation and Oxidative Stress _____ 6-275
    6.4.9.1     Epidemiologic Studies_____ 6-275
    6.4.9.2     Toxicological Studies _____ 6-275
  6.4.10    Summary and Causality Determination _____ 6-276
6.5   Short-Term UFP Exposure and Cardiovascular Effects _____ 6-278
  6.5.1     Biological Plausibility _____ 6-279
  6.5.2     Ischemic Heart Disease and Myocardial infarction_____ 6-282
    6.5.2.1     Emergency Department (ED) Visits and Hospital Admissions _____ 6-282
    6.5.2.2     Epidemiologic Studies of ST Segment Depression_____ 6-283
  6.5.3     Heart Failure and Impaired Heart Function _____ 6-283
    6.5.3.1     Emergency Department (ED) Visits and Hospital Admissions _____ 6-283
    6.5.3.2     Toxicological Studies of Impaired Heart Function _____ 6-283
  6.5.4     Ventricular Depolarization, Repolarization, and Arrhythmia _____ 6-284

xvi

00196376

6.5.4.1     Emergency Department (ED) Visits and Hospital Admissions for Arrhythmia and Out-of-Hospital Cardiac Arrest _____ 6-284
6.5.4.2     Epidemiologic Studies for Arrhythmia and Conduction Abnormalities _____ 6-285
6.5.4.3     Controlled Human Exposure Studies for Arrhythmia and Conduction Abnormalities _____ 6-286
6.5.4.4     Toxicological Studies for Arrhythmia and Conduction Abnormalities _____ 6-286
6.5.5     Cerebrovascular Disease and Stroke _____ 6-287
6.5.5.1     Emergency Department (ED) Visits and Hospital Admissions _____ 6-287
6.5.6     Blood Pressure and Hypertension _____ 6-288
6.5.6.1     Emergency Department (ED) Visits and Hospital Admissions _____ 6-288
6.5.6.2     Epidemiologic Studies of Changes in Blood Pressure (BP) _____ 6-288
6.5.6.3     Controlled Human Exposure Toxicology Studies of Changes in Blood Pressure (BP) _____ 6-289
6.5.6.4     Toxicological Studies of Changes in Blood Pressure (BP) _____ 6-290
6.5.7     Combinations of Cardiovascular-Related Emergency Department (ED) Visits and Hospital Admissions _____ 6-291
6.5.8     Cardiovascular Mortality _____ 6-292
6.5.9     Heart Rate (HR) and Heart Rate Variability (HRV) _____ 6-293
6.5.9.1     Epidemiologic Studies of Heart Rate (HR) and Heart Rate Variability (HRV) ___ 6-293
6.5.9.2     Controlled Human Exposure Studies of Heart Rate (HR) and Heart Rate Variability (HRV) _____ 6-294
6.5.9.3     Toxicological Studies of Heart Rate (HR) and Heart Rate Variability (HRV) ____ 6-295
6.5.10     Systemic Inflammation and Oxidative Stress _____ 6-296
6.5.10.1     Epidemiologic Studies of Systemic Inflammation and Oxidative Stress _____ 6-296
6.5.10.2     Controlled Human Exposure Studies Examining Short-Term UFP Exposure and Systemic Inflammation and Oxidative Stress _____ 6-297
6.5.10.3     Toxicological Studies of Short-Term Ultrafine Particle (UFP) Exposure and Systemic Inflammation and Oxidative Stress _____ 6-298
6.5.11     Coagulation _____ 6-299
6.5.11.1     Epidemiologic Studies _____ 6-299
6.5.11.2     Controlled Human Exposure Studies _____ 6-300
6.5.12     Endothelial Dysfunction and Arterial Stiffness _____ 6-301
6.5.12.1     Epidemiologic Studies _____ 6-301
6.5.12.2     Controlled Human Exposure Studies _____ 6-302
6.5.13     Summary and Causality Determination _____ 6-303
6.6     Long-Term UFP Exposure and Cardiovascular Effects _____ 6-306
6.6.1     Biological Plausibility _____ 6-306
6.6.2     Atherosclerosis _____ 6-306
6.6.3     Heart Failure and Impaired Heart Function _____ 6-307
6.6.4     Blood Pressure and Hypertension _____ 6-308
6.6.5     Systemic Inflammation and Oxidative Stress _____ 6-308
6.6.5.1     Epidemiologic Studies _____ 6-308
6.6.5.2     Toxicological Studies _____ 6-309
6.6.6     Summary and Causality Determination _____ 6-309
6.7     References _____ 6-311

CHAPTER 7     METABOLIC EFFECTS _____ 7-1

7.1     Short-Term PM$_{2.5}$ Exposure and Metabolic Effects _____ 7-1
7.1.1     Biological Plausibility _____ 7-2
7.1.2     Glucose and Insulin Homeostasis _____ 7-4
7.1.2.1     Epidemiologic Studies_____ 7-5
7.1.2.2     Toxicological Studies _____ 7-7
7.1.2.3     Summary _____ 7-9

00196377

| | | |
|---|---|---|
| 7.1.3 | Other Indicators of Metabolic Function | 7-9 |
| 7.1.3.1 | Inflammation | 7-9 |
| 7.1.3.2 | Liver Function | 7-10 |
| 7.1.4 | Summary and Causality Determination | 7-11 |
| 7.2 | Long-Term $PM_{2.5}$ Exposure and Metabolic Effects | 7-12 |
| 7.2.1 | Biological Plausibility | 7-13 |
| 7.2.2 | Metabolic Syndrome | 7-16 |
| 7.2.3 | Glucose and Insulin Homeostasis | 7-18 |
| 7.2.3.1 | Epidemiologic Studies | 7-18 |
| 7.2.3.2 | Toxicological Studies | 7-24 |
| 7.2.3.3 | Summary | 7-27 |
| 7.2.4 | Type 2 Diabetes Mellitus | 7-28 |
| 7.2.4.1 | Epidemiologic Studies of Type 2 Diabetes Mellitus | 7-28 |
| 7.2.4.2 | Summary | 7-33 |
| 7.2.5 | Other Indicators of Metabolic Function | 7-34 |
| 7.2.5.1 | Inflammation | 7-34 |
| 7.2.5.2 | Liver Function | 7-39 |
| 7.2.5.2.1 | Epidemiologic Studies | 7-39 |
| 7.2.5.2.2 | Toxicological Studies | 7-40 |
| 7.2.5.3 | Endocrine Hormones | 7-41 |
| 7.2.5.4 | Adiposity and Weight Gain | 7-41 |
| 7.2.5.4.1 | Epidemiologic Studies | 7-41 |
| 7.2.5.4.2 | Toxicological Studies | 7-42 |
| 7.2.5.5 | Gestational Diabetes | 7-43 |
| 7.2.6 | Age of Onset of Type 1 Diabetes | 7-43 |
| 7.2.6.1 | Epidemiologic Studies | 7-43 |
| 7.2.6.2 | Toxicological Studies | 7-44 |
| 7.2.6.3 | Summary | 7-44 |
| 7.2.7 | Associations between $PM_{2.5}$ Components and Sources and Metabolic Effects | 7-44 |
| 7.2.8 | Copollutant Confounding | 7-45 |
| 7.2.9 | Metabolic Disease Mortality | 7-46 |
| 7.2.10 | Summary and Causality Determination | 7-48 |
| 7.3 | Short-Term $PM_{10-2.5}$ Exposure and Metabolic Effects | 7-52 |
| 7.4 | Long-Term $PM_{10-2.5}$ Exposure and Metabolic Effects | 7-53 |
| 7.4.1 | Biological Plausibility | 7-53 |
| 7.4.2 | Type 2 Diabetes Mellitus | 7-54 |
| 7.4.3 | Summary and Causal Determination | 7-56 |
| 7.5 | Short-Term UFP Exposure and Metabolic Effects | 7-58 |
| 7.6 | Long-Term UFP Exposure and Metabolic Effects | 7-58 |
| 7.7 | References | 7-60 |

| | | |
|---|---|---|
| **CHAPTER 8** | **NERVOUS SYSTEM EFFECTS** | **8-1** |
| 8.1 | Short-Term $PM_{2.5}$ Exposure and Nervous System Effects | 8-1 |
| 8.1.1 | Biological Plausibility | 8-2 |
| 8.1.1.1 | Activation of Sensory Nerves and Modulation of the Autonomic Nervous System (ANS) | 8-4 |
| 8.1.1.2 | Inflammation | 8-5 |
| 8.1.1.3 | Summary of Biological Plausibility | 8-6 |
| 8.1.2 | Activation of the Sympathetic Nervous System and the Hypothalamic-Pituitary-Adrenal (HPA) Stress Axis | 8-6 |
| 8.1.2.1 | Controlled Human Exposure Study | 8-6 |

00196378

8.1.2.2    Animal Toxicological Studies _____ 8-7
8.1.3    Brain Inflammation and Oxidative Stress _____ 8-9
8.1.3.1    Controlled Human Exposure Study_____ 8-9
8.1.3.2    Animal Toxicological Studies _____ 8-10
8.1.4    Diseases of the Nervous System and Depression _____ 8-12
8.1.5    Components and Sources of $PM_{2.5}$ _____ 8-14
8.1.6    Summary and Causality Determination _____ 8-15
8.2    Long-Term $PM_{2.5}$ Exposure and Nervous System Effects _____ 8-17
8.2.1    Biological Plausibility _____ 8-18
8.2.1.1    Upregulation of the Renin-Angiotensin (RAS) and Activation of the
Sympathetic Nervous System (SNS) _____ 8-20
8.2.1.2    Inflammation _____ 8-20
8.2.1.3    Summary of Biological Plausibility _____ 8-21
8.2.2    Activation of the Sympathetic Nervous System and the
Hypothalamic-Pituitary-Adrenal (HPA) Stress Axis _____ 8-22
8.2.3    Brain Inflammation and Oxidative Stress _____ 8-23
8.2.4    Morphologic Changes in the Brain _____ 8-27
8.2.4.1    Epidemiologic Studies_____ 8-28
8.2.4.2    Animal Toxicological Studies _____ 8-29
8.2.5    Cognitive and Behavioral Effects _____ 8-30
8.2.5.1    Animal Toxicological Studies _____ 8-31
8.2.5.2    Epidemiologic Studies_____ 8-32
8.2.5.2.1    Anxiety and Depression _____ 8-39
8.2.6    Neurodegenerative Diseases _____ 8-41
8.2.7    Neurodevelopmental Effects _____ 8-45
8.2.7.1    Cognitive and Behavioral Effects _____ 8-49
8.2.7.2    Autism_____ 8-49
8.2.7.2.1    Epidemiologic Studies _____ 8-49
8.2.7.2.2    Animal Toxicological Studies _____ 8-53
8.2.8    Components and Sources of $PM_{2.5}$ _____ 8-54
8.2.9    Summary and Causality Determination _____ 8-57
8.3    Short-Term $PM_{10-2.5}$ Exposure and Nervous System Effects _____ 8-61
8.3.1    Biological Plausibility _____ 8-62
8.3.1.1    Summary of Biological Plausibility _____ 8-64
8.3.2    Activation of the Sympathetic Nervous System and the
Hypothalamic-Pituitary-Adrenal (HPA) Stress Axis _____ 8-64
8.3.3    Brain Inflammation and Oxidative Stress _____ 8-65
8.3.4    Summary and Causality Determination _____ 8-66
8.4    Long-Term $PM_{10-2.5}$ Exposure and Nervous System Effects _____ 8-67
8.4.1    Biological Plausibility _____ 8-68
8.4.2    Brain Inflammation and Oxidative Stress _____ 8-69
8.4.3    Cognitive and Behavioral Effects in Adults_____ 8-70
8.4.4    Neurodevelopmental Effects _____ 8-73
8.4.5    Summary and Causality Determination _____ 8-73
8.5    Short-Term UFP Exposure and Nervous System Effects _____ 8-75
8.5.1    Biological Plausibility _____ 8-75
8.5.1.1    Activation of Sensory Nerves and Modulation of the Autonomic Nervous
System (ANS)_____ 8-77
8.5.1.2    Inflammation _____ 8-78
8.5.1.3    Summary of Biological Plausibility _____ 8-78
8.5.2    Activation of the Sympathetic Nervous System and the
Hypothalamic-Pituitary-Adrenal (HPA) Stress Axis _____ 8-79

00196379

| | | | |
|---|---|---|---|
| 8.5.2.1 | Controlled Human Exposure Study | | 8-79 |
| 8.5.2.2 | Animal Toxicological Study | | 8-80 |
| 8.5.3 | Brain Inflammation and Oxidative Stress | | 8-80 |
| 8.5.4 | Cognitive and Behavioral Effects | | 8-83 |
| 8.5.4.1 | Epidemiologic Studies | | 8-83 |
| 8.5.4.2 | Animal Toxicological Studies | | 8-83 |
| 8.5.5 | Summary and Causality Determination | | 8-84 |
| 8.6 | Long-Term UFP Exposure and Nervous System Effects | | 8-86 |
| 8.6.1 | Biological Plausibility | | 8-86 |
| 8.6.1.1 | Inflammation | | 8-88 |
| 8.6.1.2 | Summary of Biological Plausibility | | 8-89 |
| 8.6.2 | Activation of the Sympathetic Nervous System and the Hypothalamic-Pituitary-Adrenal (HPA) Stress Axis | | 8-89 |
| 8.6.3 | Brain Inflammation and Oxidative Stress | | 8-90 |
| 8.6.4 | Morphologic Changes | | 8-93 |
| 8.6.5 | Cognitive and Behavioral Effects | | 8-94 |
| 8.6.6 | Neurodevelopmental Effects | | 8-95 |
| 8.6.6.1 | Epidemiologic Studies | | 8-95 |
| 8.6.6.2 | Animal Toxicological Studies | | 8-96 |
| 8.6.7 | Summary and Causality Determination | | 8-100 |
| 8.7 | References | | 8-103 |

**CHAPTER 9      REPRODUCTIVE AND DEVELOPMENTAL EFFECTS _____ 9-1**

| | | | |
|---|---|---|---|
| 9.1 | PM$_{2.5}$ Exposure and Reproductive and Developmental Effects | | 9-2 |
| 9.1.1 | Male and Female Reproduction and Fertility | | 9-3 |
| 9.1.1.1 | Biological Plausibility | | 9-3 |
| 9.1.1.2 | Male Reproduction | | 9-6 |
| 9.1.1.2.1 | Epidemiologic Studies | | 9-6 |
| 9.1.1.2.2 | Animal Toxicological Studies | | 9-6 |
| 9.1.1.3 | Female Reproduction | | 9-8 |
| 9.1.1.3.1 | Epidemiologic Studies | | 9-8 |
| 9.1.1.3.2 | Animal Toxicological Studies | | 9-9 |
| 9.1.2 | Pregnancy and Birth Outcomes | | 9-10 |
| 9.1.2.1 | Biological Plausibility | | 9-10 |
| 9.1.2.2 | Maternal Health during Pregnancy | | 9-13 |
| 9.1.2.2.1 | Epidemiologic Studies | | 9-13 |
| 9.1.2.2.2 | Animal Toxicological Studies | | 9-14 |
| 9.1.2.3 | Fetal Growth, Birth Weight, and Body Length at Birth | | 9-16 |
| 9.1.2.3.1 | Epidemiologic Studies | | 9-18 |
| 9.1.2.3.2 | Animal Toxicological Studies | | 9-22 |
| 9.1.2.3.3 | Animal Toxicological Studies for Changes in Anogenital Distance | | 9-24 |
| 9.1.2.3.4 | Animal Toxicological Studies for Altered Sex Ratio in Litters at Birth | | 9-24 |
| 9.1.2.4 | Preterm Birth | | 9-24 |
| 9.1.2.4.1 | Epidemiologic Studies | | 9-25 |
| 9.1.2.4.2 | Animal Toxicological Studies | | 9-32 |
| 9.1.2.5 | Birth Defects | | 9-32 |
| 9.1.2.5.1 | Epidemiologic Studies | | 9-33 |
| 9.1.2.5.2 | Animal Toxicological Studies | | 9-33 |
| 9.1.2.6 | Fetal and Infant Mortality | | 9-34 |

00196380

9.1.3    Developmental Effects _____ 9-35
9.1.3.1        Respiratory Developmental Effects_____ 9-36
9.1.3.1.1        Epidemiologic Studies _____ 9-36
9.1.3.1.2        Animal Toxicological Studies _____ 9-37
9.1.3.2        Neurodevelopmental Effects _____ 9-37
9.1.3.2.1        Epidemiologic Studies _____ 9-37
9.1.3.2.2        Animal Toxicological Studies _____ 9-38
9.1.3.3        Cardiovascular Developmental Effects _____ 9-38
9.1.3.3.1        Animal Toxicological Studies _____ 9-38
9.1.3.4        Postnatal Growth and Development _____ 9-39
9.1.4    Associations between $PM_{2.5}$ Components and Sources and Reproductive and
        Developmental Effects _____ 9-39
9.1.5    Summary and Causality Determination _____ 9-41
9.1.5.1        Male and Female Fertility and Reproduction _____ 9-41
9.1.5.2        Pregnancy and Birth Outcomes _____ 9-43
9.1.5.3        Developmental Outcomes_____ 9-46
9.2  $PM_{10-2.5}$ Exposure and Reproductive and Developmental Effects _____ 9-46
9.2.1    Male and Female Reproduction and Fertility _____ 9-46
9.2.1.1        Biological Plausibility_____ 9-46
9.2.1.2        Male and Female Reproduction and Fertility _____ 9-47
9.2.2    Pregnancy and Birth Outcomes _____ 9-47
9.2.2.1        Biological Plausibility_____ 9-47
9.2.2.2        Pregnancy and Birth Outcomes _____ 9-47
9.2.3    Developmental Effects _____ 9-51
9.2.4    Summary and Causality Determination _____ 9-51
9.2.4.1        Male and Female Fertility and Reproduction _____ 9-51
9.2.4.2        Pregnancy and Birth Outcomes _____ 9-54
9.3  UFP Exposure and Reproductive and Developmental Effects _____ 9-56
9.3.1    Male and Female Reproduction and Fertility _____ 9-56
9.3.1.1        Biological Plausibility_____ 9-56
9.3.1.2        Male Reproductive Function _____ 9-58
9.3.1.3        Female Reproduction and Fertility _____ 9-59
9.3.2    Pregnancy and Birth Outcomes _____ 9-60
9.3.2.1        Biological Plausibility_____ 9-60
9.3.2.2        Pregnancy and Birth Outcomes _____ 9-60
9.3.3    Developmental Effects _____ 9-61
9.3.3.1        Neurodevelopmental Effects _____ 9-62
9.3.3.1.1        Neurobehavioral Effects_____ 9-62
9.3.3.1.2        Changes in Brain Structure _____ 9-62
9.3.4    Summary and Causality Determination _____ 9-63
9.3.4.1        Male and Female Fertility and Reproduction _____ 9-63
9.3.4.2        Pregnancy and Birth Outcomes _____ 9-65
9.4  References _____ 9-67

CHAPTER 10    CANCER _____ 10-1

10.1  Introduction_____ 10-1
10.1.1    Evaluation of the Relationship between Long-Term PM Exposure and Cancer _____ 10-1
10.1.2    Carcinogens and the Development of Cancer _____ 10-2
10.2  $PM_{2.5}$ Exposure and Cancer _____ 10-3
10.2.1    Biological Plausibility _____ 10-4

xxi

10.2.1.1    Genotoxicity _____ 10-6
10.2.1.2    Epigenetic Effects _____ 10-8
10.2.1.3    Carcinogenic Potential _____ 10-8
10.2.1.4    Characteristics of Carcinogens and Hallmarks of Cancer _____ 10-9
10.2.1.5    Summary of Biological Plausibility _____ 10-9
10.2.2  Genotoxicity _____ 10-9
10.2.2.1    Mutagenicity _____ 10-10
10.2.2.2    DNA Damage _____ 10-14
  10.2.2.2.1    Toxicological Studies _____ 10-14
  10.2.2.2.2    Controlled Human Exposure Studies _____ 10-18
  10.2.2.2.3    Epidemiologic Studies _____ 10-19
  10.2.2.2.4    Summary _____ 10-21
10.2.2.3    Cytogenetic Endpoints _____ 10-21
  10.2.2.3.1    Toxicological Studies _____ 10-21
  10.2.2.3.2    Epidemiologic Studies _____ 10-21
  10.2.2.3.3    Summary _____ 10-24
10.2.2.4    Other Markers _____ 10-24
  10.2.2.4.1    Toxicological Studies _____ 10-24
  10.2.2.4.2    Controlled Human Exposure Studies _____ 10-25
  10.2.2.4.3    Epidemiologic Studies _____ 10-26
  10.2.2.4.4    Summary _____ 10-26
10.2.2.5    Summary of Genotoxicity _____ 10-26
10.2.3  Epigenetic Effects_____ 10-27
10.2.3.1    Methylation of Promoters of Tumor Suppressor Genes _____ 10-28
10.2.3.2    Methylation of Repetitive Line Elements _____ 10-29
  10.2.3.2.1    Toxicological Studies _____ 10-29
  10.2.3.2.2    Epidemiologic Studies _____ 10-31
10.2.3.3    Noncoding Microribonucleic Acids (miRNAs) _____ 10-33
10.2.3.4    Summary of Epigenetic Effects_____ 10-34
10.2.4  Carcinogenic Potential _____ 10-34
10.2.5  Cancer Incidence, Mortality, and Survival _____ 10-36
10.2.5.1    Lung Cancer _____ 10-36
  10.2.5.1.1    Lung Cancer Mortality _____ 10-45
  10.2.5.1.2    Lung Cancer Incidence _____ 10-50
  10.2.5.1.3    Copollutant Models _____ 10-54
  10.2.5.1.4    Concentration-Response Relationship_____ 10-55
  10.2.5.1.5    Summary _____ 10-60
10.2.5.2    Other Cancers _____ 10-61
  10.2.5.2.1    Breast Cancer _____ 10-64
  10.2.5.2.2    Brain Cancer _____ 10-65
  10.2.5.2.3    Liver Cancer_____ 10-65
  10.2.5.2.4    Leukemia _____ 10-66
  10.2.5.2.5    Multiple Cancers _____ 10-66
  10.2.5.2.6    Summary _____ 10-67
10.2.5.3    Cancer Survival _____ 10-67
10.2.6  Associations between $PM_{2.5}$ Sources and Components and Cancer _____ 10-72

xxii

JA2804

00196382

10.2.7   Summary and Causality Determination _____ 10-73
10.3 PM$_{10-2.5}$ Exposure and Cancer _____ 10-77
   10.3.1   Biological Plausibility _____ 10-78
      10.3.1.1      Genotoxicity _____ 10-79
      10.3.1.2      Summary of Biological Plausibility _____ 10-80
   10.3.2   Genotoxicity _____ 10-81
      10.3.2.1      Toxicological Studies _____ 10-81
      10.3.2.2      Controlled Human Exposure Studies _____ 10-83
      10.3.2.3      Epidemiologic Studies _____ 10-83
      10.3.2.4      Summary of Genotoxicity _____ 10-84
   10.3.3   Cancer Incidence and Mortality _____ 10-84
      10.3.3.1      Lung Cancer _____ 10-84
      10.3.3.2      Other Cancers _____ 10-86
      10.3.3.3      Summary _____ 10-86
   10.3.4   Summary and Causality Determination _____ 10-86
10.4 UFP Exposure and Cancer_____ 10-88
   10.4.1   Biological Plausibility _____ 10-89
      10.4.1.1      Genotoxicity _____ 10-90
      10.4.1.2      Summary of Biological Plausibility _____ 10-91
   10.4.2   Genotoxicity _____ 10-92
      10.4.2.1      Toxicological Studies _____ 10-92
      10.4.2.2      Controlled Human Exposure Studies _____ 10-93
      10.4.2.3      Summary of Genotoxicity _____ 10-94
   10.4.3   Cancer Incidence and Mortality _____ 10-94
   10.4.4   Summary and Causality Determination _____ 10-94
10.5 References _____ 10-96

CHAPTER 11    MORTALITY_____ 11-1

11.1 Short-Term PM$_{2.5}$ Exposure and Total Mortality _____ 11-1
   11.1.1   Biological Plausibility for Short-Term PM$_{2.5}$ Exposure and Total (Nonaccidental)
            Mortality _____ 11-8
   11.1.2   Associations between Short-Term PM$_{2.5}$ Exposure and Total (Nonaccidental)
            Mortality in All-Year Analyses _____ 11-9
      11.1.2.1      Examination of PM$_{2.5}$-Mortality Relationship through Causal Modeling Methods  11-10
   11.1.3   Associations between Short-Term PM$_{2.5}$ and Cause-Specific Mortality in All-Year
            Analyses _____ 11-13
   11.1.4   Potential Copollutant Confounding of the PM$_{2.5}$-Mortality Relationship _____ 11-14
   11.1.5   Other Potential Confounders of the PM$_{2.5}$-Mortality Relationship _____ 11-16
      11.1.5.1      Long-Term Temporal Trends and Weather_____ 11-16
      11.1.5.2      Influence of Long-Term PM$_{2.5}$ Concentrations on Short-Term PM$_{2.5}$
                    Associations _____ 11-19
   11.1.6   Effect Modification of the PM$_{2.5}$-Mortality Relationship _____ 11-19
      11.1.6.1      Season _____ 11-20
      11.1.6.2      Temperature _____ 11-21
      11.1.6.3      City and Regional Characteristics _____ 11-24
         11.1.6.3.1      Composition/Mixtures_____ 11-24
         11.1.6.3.2      Exposure Factors _____ 11-28
   11.1.7   Evaluation of Exposure Assessment Techniques _____ 11-31
      11.1.7.1      Monitor Representativeness _____ 11-31
      11.1.7.2      Urban versus Rural Locations_____ 11-33
   11.1.8   Timing of Effects and Exposure Metrics _____ 11-34
      11.1.8.1      Lag Structure of Associations _____ 11-34

00196383

11.1.8.2      24-Hour Average versus Subdaily (Peak) Exposures _____ 11-36
11.1.9   Alternative PM Size Fractions and Exposure Metrics_____ 11-37
11.1.10  Concentration-Response Relationship and Threshold Analyses _____ 11-37
11.1.11  Associations between PM$_{2.5}$ Sources and Components and Mortality _____ 11-41
    11.1.11.1    PM$_{2.5}$ Components _____ 11-42
        11.1.11.1.1     Single Component Models _____ 11-46
        11.1.11.1.2     Additional PM$_{2.5}$ Component Analyses_____ 11-50
        11.1.11.1.3     Summary _____ 11-51
    11.1.11.2    Sources_____ 11-51
11.1.12  Summary and Causality Determination _____ 11-53
11.2 Long-Term PM$_{2.5}$ Exposure and Total Mortality _____ 11-58
    11.2.1   Biological Plausibility for Long-Term PM$_{2.5}$ Exposure and Total Mortality _____ 11-66
    11.2.2   Associations between Long-Term PM$_{2.5}$ Exposure and Mortality _____ 11-66
        11.2.2.1     Results of American Cancer Society and Harvard Six Cities Cohort Studies ___ 11-66
        11.2.2.1     Results of Other North American Cohort Studies _____ 11-69
        11.2.2.2     Cardiovascular Mortality _____ 11-77
        11.2.2.3     Respiratory Mortality_____ 11-78
        11.2.2.4     Studies with Analyses that Inform Causal Inference _____ 11-78
        11.2.2.5     Studies of Temporal Trends and Life Expectancy _____ 11-80
    11.2.3   Potential Copollutant Confounding of the PM$_{2.5}$-Mortality Relationship _____ 11-81
    11.2.4   Concentration-Response Relationship _____ 11-84
    11.2.5   Evaluation of Factors That May Influence PM$_{2.5}$ Associations _____ 11-90
        11.2.5.1     Comparison of Exposure Assessment Techniques _____ 11-90
        11.2.5.2     Comparison of Statistical Techniques_____ 11-91
        11.2.5.3     Effects of Different Long-Term Exposure Windows _____ 11-92
    11.2.6   Associations between PM$_{2.5}$ Sources and Components and Mortality _____ 11-93
    11.2.7   Summary and Causality Determination _____ 11-96
11.3 Short-Term PM$_{10-2.5}$ Exposure and Total Mortality _____ 11-102
    11.3.1   Biological Plausibility for Short-Term PM$_{10-2.5}$ Exposure and Total Mortality _____ 11-105
    11.3.2   Associations between Short-Term PM$_{10-2.5}$ Exposure and Total (Nonaccidental)
             Mortality in All-Year Analyses _____ 11-106
    11.3.3   Associations between Short-Term PM$_{10-2.5}$ Exposure and Cause-Specific Mortality in
             All-Year Analyses _____ 11-107
    11.3.4   Potential Confounding of the PM$_{10-2.5}$-Mortality Relationship _____ 11-109
        11.3.4.1     Copollutants _____ 11-109
        11.3.4.2     Long-Term Temporal Trends and Weather_____ 11-111
    11.3.5   Effect Modification of the PM$_{10-2.5}$-Mortality Relationship _____ 11-112
        11.3.5.1     Season and Temperature _____ 11-113
        11.3.5.2     Role of Exposure Assignment and Exposure Misclassification_____ 11-113
    11.3.6   Concentration-Response Relationship and Related Issues _____ 11-114
        11.3.6.1     Lag Structure of Associations _____ 11-114
        11.3.6.2     Concentration-Response Relationship and Threshold Analyses _____ 11-115
        11.3.6.2.1     Summary _____ 11-115
    11.3.7   Summary and Causality Determination _____ 11-116
11.4 Long-Term PM$_{10-2.5}$ Exposure and Total Mortality _____ 11-120
    11.4.1   Biological Plausibility for Long-Term PM$_{10-2.5}$ Exposure and Total Mortality _____ 11-120
    11.4.2   Associations between Long-Term PM$_{10-2.5}$ Exposure and Mortality _____ 11-121
    11.4.3   Summary and Causality Determination _____ 11-124
11.5 Short-Term UFP Exposure and Total Mortality _____ 11-127
    11.5.1   Biological Plausibility for Short-Term UFP Exposure and Total Mortality _____ 11-133
    11.5.2   Associations between Short-Term UFP Exposure and Total Mortality in Multicity
             Studies_____ 11-133

xxiv

00196384

11.5.3   Associations between Short-Term UFP Exposure and Total Mortality in Single-City Studies _____ 11-135
11.5.4   Summary and Causality Determination _____ 11-138
11.6 Long-Term UFP Exposure and Total Mortality _____ 11-141
11.6.1   Biological Plausibility for Long-Term UFP Exposure and Total Mortality _____ 11-141
11.6.2   Associations between Long-Term UFP Exposure and Total Mortality _____ 11-142
11.6.3   Summary and Causality Determination _____ 11-142
11.7 References _____ 11-144

**CHAPTER 12   POPULATIONS AND LIFESTAGES POTENTIALLY AT INCREASED RISK OF A PARTICULATE MATTER-RELATED HEALTH EFFECT 12-1**

12.1 Introduction _____ 12-1
12.2 Approach to Evaluating and Characterizing the Evidence for Populations or Lifestages Potentially at Increased Risk _____ 12-2
12.3 Pre-existing Diseases/Conditions _____ 12-5
12.3.1   Cardiovascular Disease _____ 12-7
12.3.2   Pre-existing Diabetes and Metabolic Syndrome _____ 12-10
12.3.3   Obesity _____ 12-13
12.3.4   Elevated Cholesterol _____ 12-16
12.3.5   Pre-existing Respiratory Disease _____ 12-18
12.3.5.1     Asthma _____ 12-18
12.3.5.2     Chronic Obstructive Pulmonary Disease (COPD)_____ 12-19
12.4 Genetic Factors _____ 12-20
12.5 Sociodemographic Factors _____ 12-22
12.5.1   Lifestage_____ 12-22
12.5.1.1     Children _____ 12-23
12.5.1.2     Older Adults _____ 12-25
12.5.2   Sex _____ 12-29
12.5.3   Socioeconomic Status _____ 12-31
12.5.4   Race _____ 12-34
12.5.5   Residential Location _____ 12-39
12.5.5.1     Urban/Rural Residential Locations _____ 12-39
12.5.5.2     Residential Proximity to Traffic _____ 12-41
12.6 Behavioral and Other Factors_____ 12-43
12.6.1   Smoking _____ 12-43
12.6.2   Diet_____ 12-44
12.7 Conclusions _____ 12-47
12.8 References _____ 12-52

**CHAPTER 13   WELFARE EFFECTS_____ 13-1**

13.1 Introduction_____ 13-1
13.2 Effects on Visibility _____ 13-2
13.2.1   Introduction _____ 13-2
13.2.2   Visibility Impairment _____ 13-4
13.2.2.1     Visibility Metrics _____ 13-4
13.2.2.2     Monitoring of Visibility Impairment _____ 13-6
13.2.3   Relationship between Particulate Matter and Visibility Impairment _____ 13-10
13.2.3.1     Estimated Mass Extinction _____ 13-12
13.2.3.2     Hygroscopic Growth _____ 13-15
13.2.3.3     Reconstructing $b_{ext}$ from Particulate Matter Speciation Data _____ 13-16
13.2.4   Seasonal and Spatial Patterns of Visibility Impairment _____ 13-17
13.2.4.1     Seasonal and Spatial Light Extinction $PM_{2.5}$ Species Contributions _____ 13-20

00196385

| | | |
|---|---|---|
| 13.2.4.2 | Long-Term Trends | 13-37 |
| 13.2.4.3 | Characteristic Fine Particulate Mass Light Scattering Efficiencies | 13-41 |
| 13.2.5 | Human Perception of Haze and Landscape Features | 13-42 |
| 13.2.6 | Summary and Causality Determination | 13-44 |
| 13.3 Effects on Climate | | 13-45 |
| 13.3.1 | Introduction | 13-45 |
| 13.3.2 | Overview of the Physics of Climate Change and Radiative Forcing | 13-46 |
| 13.3.2.1 | Observed Recent Climate Change: Detection and Attribution | 13-47 |
| 13.3.2.2 | Metrics of Climate Change, Including Radiative Forcing | 13-48 |
| 13.3.3 | Effects of Particulate Matter on Radiative Forcing: Mechanisms | 13-52 |
| 13.3.3.1 | Interactions of Particulate Matter with Radiation | 13-52 |
| 13.3.3.2 | Interactions of Particulate Matter with Clouds | 13-53 |
| 13.3.3.3 | Effects of Absorbing Particulate Matter on Snow and Ice Albedo | 13-54 |
| 13.3.3.4 | Effect of Particle Size on the Interactions of Particulate Matter with Climate | 13-54 |
| 13.3.4 | Estimates of Radiative Forcing from Total Particulate Matter | 13-55 |
| 13.3.4.1 | Forcing Due to Interactions of Particulate Matter with Radiation | 13-57 |
| 13.3.4.2 | Forcing Due to Interactions of Particulate Matter with Clouds | 13-60 |
| 13.3.4.3 | Total Radiative Forcing Due to Interactions of Particulate Matter with Clouds and Radiation | 13-60 |
| 13.3.4.4 | Forcing Due to the Effects of Absorbing Particulate Matter on Albedo | 13-60 |
| 13.3.4.5 | Recent Trends in Particulate Matter Forcing | 13-61 |
| 13.3.5 | Effects of Particulate Matter on Climate by Species | 13-64 |
| 13.3.5.1 | Sulfate | 13-65 |
| 13.3.5.2 | Nitrate | 13-66 |
| 13.3.5.3 | Organic Carbon, Including Brown Carbon | 13-66 |
| 13.3.5.4 | Black Carbon | 13-67 |
| 13.3.5.5 | Dust | 13-68 |
| 13.3.6 | Climate Response to Changing Particulate Matter, Including Feedbacks | 13-68 |
| 13.3.7 | Effect of Particulate Matter on U.S. Regional Climate | 13-70 |
| 13.3.8 | Uncertainties in Estimates of Particulate Matter Effects on Radiative Forcing and Climate: Summary | 13-74 |
| 13.3.9 | Summary and Causality Determination | 13-76 |
| 13.4 Effects on Materials | | 13-77 |
| 13.4.1 | Introduction | 13-77 |
| 13.4.2 | Soiling and Corrosion | 13-78 |
| 13.4.3 | Dose-Response Relationships | 13-81 |
| 13.4.4 | Damage Functions | 13-85 |
| 13.4.5 | Summary and Causality Determination | 13-87 |
| 13.5 References | | 13-88 |

| | | |
|---|---|---|
| **APPENDIX** | **DEVELOPMENT OF THE INTEGRATED SCIENCE ASSESSMENT** | **A-1** |
| A.1 | Introduction | A-1 |
| A.2 | Literature Search and Initial Screen | A-3 |
| A.2.1 | Literature Search Techniques | A-3 |
| A.2.2 | Initial Screening of Studies from Literature Search | A-4 |
| A.2.3 | Documentation | A-5 |
| A.3 | Full Evaluation of Studies | A-6 |
| A.3.1 | Scope | A-6 |
| A.3.2 | Individual Study Quality | A-9 |
| A.3.2.1 | Health Approach | A-9 |
| A.3.2.2 | Nonecological Welfare Effects Approach | A-17 |
| A.3.2.3 | Other Approaches | A-17 |

00196386

A.4   Peer Review and Public Participation _____ A-18

    A.4.1   Call for Information _____ A-18

    A.4.2   Integrated Review Plan _____ A-19

    A.4.3   Peer Input _____ A-19

    A.4.4   Internal Technical Review _____ A-20

    A.4.5   Clean Air Scientific Advisory Committee (CASAC) Peer Review _____ A-20

A.5   Quality Assurance _____ A-22

A.6   Conclusion _____ A-23

A.7   References _____ A-24

xxvii

00196387

# LIST OF TABLES

| | | |
|---|---|---|
| Table P-1 | History of the National Ambient Air Quality Standards (NAAQS) for particulate matter, 1971−2012. | P-4 |
| Table P-2 | Weight-of-evidence for causality determinations. | P-12 |
| Table ES-1 | Summary of causality determinations for PM exposure and health effects from the 2009 and current Integrated Science Assessment for Particulate Matter. | ES-9 |
| Table ES-2 | Summary of causality determinations for relationships between PM exposure and welfare effects from the 2009 and current Integrated Science Assessment for Particulate Matter. | ES-21 |
| Table 1-1 | *Causal* and *likely to be causal* causality determinations for short- and long-term $PM_{2.5}$ exposure. | 1-20 |
| Table 1-2 | Key evidence contributing to *causal* and *likely to be causal* causality determinations for $PM_{2.5}$ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter. | 1-33 |
| Table 1-3 | Key evidence contributing to *causal* causality determinations for PM exposure and welfare effects evaluated in the Integrated Science Assessment for Particulate Matter. | 1-58 |
| Table 1-4 | Health and welfare effects causality determinations from the 2009 and current Integrated Science Assessment for Particulate Matter. | 1-66 |
| Table 2-1 | Particle transport and removal by size. | 2-5 |
| Table 2-2 | Particle formation, composition, and sources. | 2-6 |
| Table 2-3 | Modes of atmospheric particle populations. | 2-21 |
| Table 2-4 | Summary statistics for $PM_{2.5}$ 2013−2015 (concentrations in $\mu g/m^3$). | 2-47 |
| Table 2-5 | Summary statistics for $PM_{10}$ 2013−2015 (concentrations in $\mu g/m^3$). | 2-50 |
| Table 2-6 | Summary statistics for $PM_{10-2.5}$ 2013−2015 (concentrations in $\mu g/m^3$). | 2-53 |
| Table 2-7 | $PM_{2.5}$:$PM_{10}$ ratios from National Core network. | 2-54 |
| Table 2-8 | Comparison between two urban-scale studies of UFP seasonal and spatial variability. | 2-68 |

00196388

Table 3-1    New or innovative methods for personal sampling of PM exposures published since the 2009 PM ISA.    3-12

Table 3-2    Comparison of models used for estimating concentration or exposure.    3-16

Table 3-3    Statistical measures used for air quality model performance evaluation.    3-17

Table 3-4    Comparison of dispersion models with data from a tracer study in Idaho Falls, ID and a near-road study in Sacramento, CA and an UFP study in Somerville, MA and Chinatown in Boston, MA.    3-30

Table 3-5    Summary of exposure estimation methods, their typical use in PM epidemiologic studies, and related errors and uncertainties.    3-45

Table 3-6    Total and age-stratified time-activity data from the Consolidated Human Activity Database.    3-67

Table 3-7    Total and race/ethnicity-stratified time-activity data from the Consolidated Human Activity Database.    3-67

Table 3-8    Total and sex-stratified time-activity data from the Consolidated Human Activity Database.    3-68

Table 3-9    Total and education-stratified time-activity data from the Consolidated Human Activity Database, among adults 20−64 years.    3-68

Table 3-10    The influence of exposure metrics on error in health effect estimates.    3-109

Table 4-1    Typical respiratory parameters and body weights among animals and humans.    4-7

Table 4-2    Breathing patterns with activity level in adult human male.    4-37

Table 5-1    Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions, emergency department visits, physician visits for asthma.    5-12

Table 5-2    Epidemiologic studies of short-term exposure to $PM_{2.5}$ and respiratory symptoms and medication use in children with asthma.    5-25

Table 5-3    Epidemiologic studies of short-term exposure to $PM_{2.5}$ and lung function in populations with asthma.    5-30

Table 5-4    Study-specific details from a controlled human exposure study of short-term $PM_{2.5}$ exposure and lung function in individuals with asthma.    5-34

Table 5-5    Epidemiologic studies of short-term exposure to $PM_{2.5}$ and subclinical effects underlying asthma exacerbation.    5-38

xxix

00196389

Table 5-6     Study-specific details from a controlled human exposure study of short-term $PM_{2.5}$ exposure and subclinical effects underlying asthma exacerbation. _____ 5-43

Table 5-7     Study-specific details from animal toxicological studies of short-term $PM_{2.5}$ exposure and subclinical effects underlying asthma exacerbation. _____ 5-45

Table 5-8     Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for chronic obstructive pulmonary disease. _____ 5-51

Table 5-9     Epidemiologic studies of short-term $PM_{2.5}$ exposure and respiratory symptoms, lung function, and pulmonary inflammation in adults with chronic obstructive pulmonary disease. _____ 5-58

Table 5-10    Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for respiratory infection. _____ 5-66

Table 5-11    Epidemiologic studies of short-term $PM_{2.5}$ exposure and respiratory-related hospital admissions and emergency department visits. ____ 5-77

Table 5-12    Epidemiologic studies of short-term $PM_{2.5}$ exposure and respiratory effects in healthy populations. _____ 5-89

Table 5-13    Study-specific details from controlled human exposure studies of short-term $PM_{2.5}$ exposure and respiratory effects in healthy populations. ____ 5-94

Table 5-14    Study-specific details from animal toxicological studies of short-term $PM_{2.5}$ exposure and respiratory effects in healthy animals. _____ 5-96

Table 5-15    Study-specific details from animal toxicological studies of short-term $PM_{2.5}$ exposure and respiratory effects in models of cardiovascular disease. _____ 5-106

Table 5-16    Combined influence of short-term $PM_{2.5}$ exposure and copollutants on emergency department visits for asthma. _____ 5-115

Table 5-17    Odds ratios for quintile analyses in Gleason et al. (2014) from single-pollutant $PM_{2.5}$ analyses and analyses examining effect modification by high weed pollen days. _____ 5-127

Table 5-18    Summary of evidence for a *likely to be causal relationship* between short-term $PM_{2.5}$ exposure and respiratory effects. _____ 5-150

Table 5-19    Associations of long-term $PM_{2.5}$ exposure with lung development in children from longitudinal studies with repeated measures. _____ 5-163

xxx

00196390

Table 5-20    Associations of long-term $PM_{2.5}$ exposure with lung function in children and adults. _____ 5-168

Table 5-21    Longitudinal studies of long-term $PM_{2.5}$ exposure and asthma incidence in children. _____ 5-178

Table 5-22    Long-term $PM_{2.5}$ exposure and asthma and wheeze incidence and prevalence in adults. _____ 5-185

Table 5-23    Study-specific details from an animal toxicological study of long-term $PM_{2.5}$ exposure and subclinical effects underlying development of asthma. _ 5-189

Table 5-24    Study-specific details from an animal toxicological study of long-term $PM_{2.5}$ exposure and severity of an asthma-like phenotype. _____ 5-197

Table 5-25    Study-specific details from animal toxicological studies of long-term $PM_{2.5}$ exposure and subclinical effects. _____ 5-198

Table 5-26    Study-specific details from animal toxicological studies of long-term $PM_{2.5}$ exposure and subclinical effects in populations with cardiovascular disease. _____ 5-203

Table 5-27    Summary of evidence for a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and respiratory effects. _____ 5-216

Table 5-28    Epidemiologic studies of short-term $PM_{10-2.5}$ exposure and hospital admissions, emergency department visits, and physician visits for asthma. _ 5-227

Table 5-29    Study-specific details from a controlled human exposure study of short-term $PM_{10-2.5}$ exposure and lung function in populations with asthma. _____ 5-234

Table 5-30    Study-specific details from a controlled human exposure study of short-term $PM_{10-2.5}$ exposure and subclinical effects underlying asthma. ___ 5-236

Table 5-31    Epidemiologic studies of short-term $PM_{10-2.5}$ exposure and exacerbation of chronic obstructive pulmonary disease. _____ 5-239

Table 5-32    Epidemiologic studies of short-term $PM_{10-2.5}$ exposure and respiratory infections. _____ 5-246

Table 5-33    Epidemiologic studies of short-term $PM_{10-2.5}$ exposure and respiratory-related hospital admissions and emergency department visits. __ 5-251

Table 5-34    Study-specific details from a controlled human exposure study of short-term $PM_{10-2.5}$ exposure and respiratory effects in a healthy population. _____ 5-259

xxxi

00196391

Table 5-35    Study-specific details from animal toxicological studies of short-term $PM_{10-2.5}$ exposure and respiratory effects in healthy animals. _____ 5-260

Table 5-36    Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between short-term $PM_{10-2.5}$ exposure and respiratory effects. _____ 5-267

Table 5-37    Study-specific details from an animal toxicological study of long-term exposure to $PM_{10-2.5}$ and respiratory effects in healthy animals. _____ 5-276

Table 5-38    Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between long-term $PM_{10-2.5}$ exposure and respiratory effects._____ 5-278

Table 5-39    Epidemiologic studies of short-term UFP exposure and asthma hospital admissions, emergency department visits, and physician visits. _____ 5-285

Table 5-40    Study-specific details from an animal toxicological study of short-term UFP exposure and subclinical effects underlying asthma exacerbation in a model of allergic airway disease. _____ 5-288

Table 5-41    Epidemiologic studies of short-term UFP exposure and exacerbation of chronic obstructive pulmonary disease. _____ 5-290

Table 5-42    Epidemiologic studies of short-term UFP exposure and respiratory infection. _____ 5-292

Table 5-43    Epidemiologic studies of short-term UFP exposure and respiratory-related hospital admissions and emergency department visits. _____ 5-295

Table 5-44    Study-specific details from animal toxicological studies of short-term UFP exposure and respiratory effects in healthy animals. _____ 5-300

Table 5-45    Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between short-term UFP exposure and respiratory effects._____ 5-303

Table 5-46    Study-specific details from animal toxicological studies of long-term UFP exposure and allergic responses._____ 5-308

Table 5-47    Study-specific details from animal toxicological studies of long-term UFP exposure and respiratory effects in healthy animals. _____ 5-310

Table 5-48    Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between long-term UFP exposure and respiratory effects._____ 5-312

xxxii

00196392

Table 6-1    Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for ischemic heart disease and myocardial infarction. _____ 6-9

Table 6-2    Details from epidemiologic studies of ST segment depression. _____ 6-15

Table 6-3    Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for congestive heart failure. ___ 6-17

Table 6-4    Study-specific details from a controlled human exposure study of short-term $PM_{2.5}$ exposure and impaired heart function. _____ 6-21

Table 6-5    Study-specific details from toxicological studies of short-term $PM_{2.5}$ exposure and impaired heart function. _____ 6-22

Table 6-6    Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for cardiac arrhythmia. _____ 6-24

Table 6-7    Epidemiologic studies of short-term $PM_{2.5}$ exposure and out-of-hospital cardiac arrest. _____ 6-27

Table 6-8    Epidemiologic studies of short-term $PM_{2.5}$ exposure and arrhythmia. _____ 6-32

Table 6-9    Epidemiologic studies of short-term $PM_{2.5}$ exposure and conduction abnormalities. _____ 6-37

Table 6-10    Study-specific details from controlled human exposure studies of short-term $PM_{2.5}$ exposure and arrhythmia and conduction abnormalities. ___ 6-39

Table 6-11    Study-specific details from toxicological studies of short-term $PM_{2.5}$ exposure and arrhythmia and conduction abnormalities. _____ 6-41

Table 6-12    Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for cerebrovascular disease and stroke. _____ 6-42

Table 6-13    Epidemiologic studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for hypertension. _____ 6-48

Table 6-14    Epidemiologic studies of short-term $PM_{2.5}$ exposure and blood pressure. ____ 6-53

Table 6-15    Study-specific details from controlled human exposure studies of short-term $PM_{2.5}$ exposure and blood pressure. _____ 6-58

Table 6-16    Study-specific details from toxicological studies of short-term $PM_{2.5}$ exposure and blood pressure. _____ 6-60

Table 6-17    Study-specific details from animal toxicological studies of the renin-angiotensin system. _____ 6-61

xxxiii

00196393

Table 6-18    Epidemiologic studies of short-term $PM_{2.5}$ concentrations and hospital admission and emergency department visits for peripheral vascular disease. ........................................................................ 6-62

Table 6-19    Epidemiologic studies of short-term $PM_{2.5}$ concentrations and combinations of cardiovascular-related hospital admissions and emergency department visits. ........................................................ 6-67

Table 6-20    Epidemiologic studies of short-term $PM_{2.5}$ exposure and heart rate variability. ........................................................................... 6-77

Table 6-21    Study-specific details from controlled human exposure studies of short-term $PM_{2.5}$ exposure and heart rate and heart rate variability. ......... 6-82

Table 6-22    Study-specific details from toxicological studies of short-term $PM_{2.5}$ exposure and heart rate and heart rate variability. ........................... 6-84

Table 6-23    Epidemiologic studies of short-term $PM_{2.5}$ exposure and systemic inflammation and oxidative stress. ............................................... 6-87

Table 6-24    Study-specific details from controlled human exposure studies of short-term $PM_{2.5}$ exposure and inflammation, oxidative stress, and blood lipids. .................................................................................... 6-90

Table 6-25    Study-specific details from toxicological studies of short-term $PM_{2.5}$ exposure and systemic inflammation, oxidative stress, and blood lipids. ....... 6-93

Table 6-26    Epidemiologic studies of short-term $PM_{2.5}$ exposure and coagulation. ......... 6-96

Table 6-27    Study-specific details from controlled human exposure studies of short-term $PM_{2.5}$ exposure and coagulation. ............................... 6-99

Table 6-28    Study-specific details from toxicological studies of short-term $PM_{2.5}$ exposure and coagulation. ..................................................... 6-100

Table 6-29    Epidemiologic studies of short-term $PM_{2.5}$ exposure and endothelial dysfunction. ........................................................................... 6-103

Table 6-30    Study-specific details from controlled human exposure studies of short-term $PM_{2.5}$ exposure and impaired vascular function. ................ 6-108

Table 6-31    Study-specific details from toxicological studies of short-term $PM_{2.5}$ exposure and impaired vascular function. ................................... 6-110

Table 6-32    Summary of studies evaluating short-term exposure to $PM_{2.5}$ components and sources in people with diabetes. ........................................... 6-130

xxxiv

00196394

Table 6-33   NPACT study results for identified source categories and occurrence of heart rate and heart rate variability changes. _____ 6-135

Table 6-34   Summary of evidence for a *causal relationship* between short-term $PM_{2.5}$ exposure and cardiovascular effects. _____ 6-139

Table 6-35   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and ischemic heart disease._____ 6-146

Table 6-36   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and cerebrovascular disease._____ 6-153

Table 6-37   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and atherosclerosis._____ 6-161

Table 6-38   Study-specific details from toxicological studies of long-term $PM_{2.5}$ exposure and atherosclerosis. _____ 6-165

Table 6-39   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and heart failure. _____ 6-168

Table 6-40   Study-specific details from toxicological studies of long-term $PM_{2.5}$ exposure and impaired heart function. _____ 6-171

Table 6-41   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and arrhythmia and ventricular conduction. _____ 6-173

Table 6-42   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and blood pressure in adults. _____ 6-176

Table 6-43   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and blood pressure in children. _____ 6-178

Table 6-44   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and hypertension. _____ 6-181

Table 6-45   Study-specific details from toxicological studies of long-term $PM_{2.5}$ exposure and blood pressure. _____ 6-184

Table 6-46   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and thromboembolism. _____ 6-186

Table 6-47   Characteristics of epidemiologic studies examining the association between long-term $PM_{2.5}$ exposures and cardiovascular diseases. _____ 6-188

Table 6-48   Study-specific details from toxicological studies of long-term $PM_{2.5}$ exposure and heart rate and heart rate variability. _____ 6-194

00196395

Table 6-49   Study-specific details from toxicological studies of long-term $PM_{2.5}$ exposure and inflammation, oxidative stress, and blood lipids. ............ 6-197

Table 6-50   Study-specific details from toxicological studies of long-term $PM_{2.5}$ exposure and impaired vascular function. ............................................. 6-201

Table 6-51   Summary of epidemiologic studies examining the concentration-response relationship or conducting threshold analyses for long-term exposure to $PM_{2.5}$ and cardiovascular morbidity. ...................................................... 6-207

Table 6-52   Summary of epidemiologic studies examining the concentration-response relationship or conducting threshold analyses for long-term exposure to $PM_{2.5}$ and cardiovascular mortality. ........................................................ 6-211

Table 6-53   Study results for identified source categories and occurrence of heart rate and heart rate variability changes (Chen et al., 2010). ......................... 6-219

Table 6-54   Summary of evidence for a *causal relationship* between long-term $PM_{2.5}$ exposure and cardiovascular effects. ......................................................... 6-222

Table 6-55   Study-specific details from toxicological studies of short-term $PM_{10-2.5}$ exposure and impaired heart function. ............................................... 6-230

Table 6-56   Study-specific details from controlled human exposure studies of short-term $PM_{10-2.5}$ exposure and blood pressure. ............................. 6-235

Table 6-57   Study-specific details from toxicological studies of short-term $PM_{10-2.5}$ exposure and blood pressure. ................................................... 6-236

Table 6-58   Epidemiologic studies of short-term $PM_{10-2.5}$ exposure and hospital admissions and emergency department visits for cardiovascular disease. ___ 6-237

Table 6-59   Study-specific details from controlled human exposure studies of short-term $PM_{10-2.5}$ exposure and heart rate and heart rate variability. _____ 6-246

Table 6-60   Study-specific details from controlled human exposure studies of short-term $PM_{10-2.5}$ exposure and inflammation and oxidative stress. _____ 6-249

Table 6-61   Study-specific details from controlled human exposure studies of short-term $PM_{10-2.5}$ exposure and impaired vascular function. _____ 6-252

Table 6-62   Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between short-term $PM_{10-2.5}$ exposure and cardiovascular effects. ........................................................................ 6-254

Table 6-63   Characteristics of epidemiologic studies examining the association between long-term $PM_{10-2.5}$ exposures and ischemic heart disease. _____ 6-259

xxxvi

00196396

Table 6-64   Characteristics of epidemiologic studies examining the association between long-term $PM_{10-2.5}$ exposures and heart failure. ..................... 6-264

Table 6-65   Study-specific details from a toxicological study of long-term $PM_{10-2.5}$ exposure and impaired heart function impaired heart function. ............... 6-265

Table 6-66   Characteristics of epidemiologic studies examining the association between long-term $PM_{10-2.5}$ exposures and stroke. ......................... 6-266

Table 6-67   Characteristics of an epidemiologic study examining the association between long-term $PM_{10-2.5}$ exposures and atherosclerosis. ................ 6-270

Table 6-68   Study-specific details from a toxicological study of long-term $PM_{10-2.5}$ exposure and blood pressure. ................................... 6-272

Table 6-69   Characteristics of an epidemiologic study examining the association between long-term $PM_{10-2.5}$ exposures and other cardiovascular outcomes. .. 6-272

Table 6-70   Epidemiologic studies of long-term exposure to $PM_{10-2.5}$ and cardiovascular mortality. ............................................. 6-274

Table 6-71   Study-specific details from a toxicological study examining long-term $PM_{10-2.5}$ exposure and of systemic inflammation. ..................... 6-276

Table 6-72   Summary of evidence indicating that the evidence is *suggestive of, but not sufficient to infer, a causal relationship* between long-term $PM_{10-2.5}$ exposure and cardiovascular effects. .................................. 6-277

Table 6-73   Study-specific details from toxicological studies of short-term UFP exposure and impaired heart function. ............................ 6-284

Table 6-74   Study-specific details from controlled human exposure studies of short-term UFP exposure and conduction abnormalities. ................ 6-286

Table 6-75   Study-specific details from toxicological studies of short-term UFP exposure and conduction abnormalities. ......................... 6-287

Table 6-76   Study-specific details from controlled human exposure studies of short-term UFP exposure and blood pressure. ....................... 6-290

Table 6-77   Study-specific details from toxicological studies of short-term UFP exposure and blood pressure. .................................. 6-291

Table 6-78   Study-specific details from controlled human exposure studies of short-term UFP exposure and changes in heart rate and heart rate variability. ................................................. 6-295

xxxvii

00196397

Table 6-79    Study-specific details from a toxicological study examining short-term UFP exposure and heart rate and heart rate variability. _____ 6-295

Table 6-80    Study-specific details from controlled human exposure studies of short-term UFP exposure and systemic inflammation. _____ 6-298

Table 6-81    Study-specific details from a controlled human exposure study of short-term UFP exposure and systemic inflammation. _____ 6-299

Table 6-82    Study-specific details from controlled human exposure studies of short-term UFP exposure and coagulation and thrombosis. _____ 6-301

Table 6-83    Study-specific details from controlled human exposure studies of short-term UFP exposure and impaired vascular function. _____ 6-303

Table 6-84    Summary indicating that evidence is *suggestive of, but not sufficient to infer, a causal relationship* between short-term UFP exposure and cardiovascular effects. _____ 6-304

Table 6-85    Characteristics of an epidemiologic study examining the association of UFP with circulating markers of inflammation and coagulation. _____ 6-307

Table 6-86    Study-specific details from a toxicological study of long-term UFP exposure and impaired heart function. _____ 6-307

Table 6-87    Study-specific details from a toxicological study of long-term UFP exposure and blood pressure. _____ 6-308

Table 6-88    Study-specific details from a toxicological study of long-term UFP exposure and systemic inflammation and oxidative stress. _____ 6-309

Table 6-89    Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between long-term UFP exposure and cardiovascular effects. _____ 6-310

Table 7-1    Criteria for clinical diagnosis of metabolic syndrome. _____ 7-3

Table 7-2    Criteria for clinical diagnosis of diabetes. _____ 7-3

Table 7-3    Epidemiologic studies of short-term $PM_{2.5}$ exposure and effects on glucose and insulin homeostasis. _____ 7-6

Table 7-4    Study-specific details from animal toxicological studies of short-term $PM_{2.5}$ exposure and metabolic homeostasis. _____ 7-7

Table 7-5    Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between short-term $PM_{2.5}$ exposure and metabolic effects. _____ 7-12

xxxviii

00196398

Table 7-6     Epidemiologic studies of long-term $PM_{2.5}$ exposure and glucose and insulin homeostasis. _____ 7-19

Table 7-7     Study-specific details from animal toxicological studies of long-term $PM_{2.5}$ exposure and glucose and insulin homeostasis. _____ 7-26

Table 7-8     Epidemiologic studies of long-term $PM_{2.5}$ exposure and diabetes._____ 7-29

Table 7-9     Study-specific details from animal toxicological studies of long-term $PM_{2.5}$ exposure and inflammation and other indicators of metabolic function. _____ 7-35

Table 7-10    Epidemiologic studies of long-term $PM_{2.5}$ exposure and indicators of liver function. _____ 7-40

Table 7-11    Epidemiologic studies of long-term $PM_{2.5}$ exposure and overweight or obesity. _____ 7-42

Table 7-12    Epidemiologic studies of long-term $PM_{2.5}$ exposure and age of onset for type 1 diabetes. _____ 7-44

Table 7-13    Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between long-term $PM_{2.5}$ exposure and metabolic effects._____ 7-49

Table 7-14    Summary of studies examining the relationships for long-term $PM_{10-2.5}$ exposure and diabetes. _____ 7-55

Table 7-15    Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between long-term $PM_{10-2.5}$ exposure and metabolic effects._____ 7-57

Table 7-16    Study-specific details from a animal toxicological study of long-term UFP exposure and metabolic homeostasis. _____ 7-59

Table 8-1     Study-specific details from a controlled human exposure study of short-term $PM_{2.5}$ exposure and activation of the sympathetic nervous system and hypothalamic-pituitary-adrenal stress axis. _____ 8-7

Table 8-2     Study-specific details from animal toxicological studies of short-term $PM_{2.5}$ exposure and activation of the sympathetic nervous system and hypothalamic-pituitary-adrenal stress axis. _____ 8-8

Table 8-3     Study-specific details from a controlled human exposure study of short-term $PM_{2.5}$ exposure and brain inflammation and oxidative stress. ____ 8-10

Table 8-4     Study-specific details from animal toxicological studies of short-term $PM_{2.5}$ exposure and brain inflammation and oxidative stress. _____ 8-11

xxxix

00196399

Table 8-5    Epidemiologic studies examining the association between short-term
PM$_{2.5}$ exposures and nervous system effects. _____ 8-13

Table 8-6    Studies of the association between short-term exposure to PM$_{2.5}$
components and nervous system effects. _____ 8-14

Table 8-7    Summary of evidence that is *suggestive of, but not sufficient to infer, a
causal relationship* between short-term PM$_{2.5}$ exposure and nervous
system effects. _____ 8-16

Table 8-8    Study-specific details from animal toxicological studies of long-term
PM$_{2.5}$ exposure and activation of the sympathetic nervous system and
hypothalamic-pituitary-adrenal stress axis. _____ 8-23

Table 8-9    Study-specific details from animal toxicological studies of long-term
PM$_{2.5}$ exposure and brain inflammation and oxidative stress. _____ 8-24

Table 8-10    Epidemiologic studies examining the association between long-term PM$_{2.5}$
exposure and brain morphology using magnetic resonance imaging. _____ 8-29

Table 8-11    Study-specific details from animal toxicological studies of long-term
PM$_{2.5}$ exposure and morphologic effects. _____ 8-30

Table 8-12    Study-specific details from animal toxicological studies of long-term
PM$_{2.5}$ exposure and cognitive and behavioral effects. _____ 8-31

Table 8-13    Characteristics of epidemiologic studies examining the association
between long-term PM$_{2.5}$ exposures and cognitive function. _____ 8-36

Table 8-14    Characteristics of epidemiologic studies examining the association
between long-term PM$_{2.5}$ exposures and indicators of depression or
anxiety. _____ 8-40

Table 8-15    Characteristics of epidemiologic studies examining the association
between long-term PM$_{2.5}$ exposures and neurodegenerative diseases. _____ 8-43

Table 8-16    Characteristics of epidemiologic studies examining the association
between short-term PM$_{2.5}$ exposure and cognitive effects in children. _____ 8-47

Table 8-17    Characteristics of epidemiologic studies examining the association of
long-term PM$_{2.5}$ exposure and autism spectrum disorders. _____ 8-51

Table 8-18    Study-specific details from an animal toxicological study of long-term
PM$_{2.5}$ exposure and neurodevelopmental effects. _____ 8-53

Table 8-19    Characteristics of epidemiologic studies examining the association
between long-term exposure to PM$_{2.5}$ sources and components and
cognitive function. _____ 8-55

xl

00196400

Table 8-20    Summary of evidence for a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and nervous system effects. _____ 8-57

Table 8-21    Study-specific details from a controlled human exposure study of short-term $PM_{10-2.5}$ exposure and activation of the sympathetic nervous system/hypothalamic-pituitary-adrenal stress axis. _____ 8-65

Table 8-22    Study-specific details from an animal toxicological study of short-term $PM_{10-2.5}$ exposure and brain inflammation and oxidative stress. _____ 8-66

Table 8-23    Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between short-term $PM_{10-2.5}$ exposure and nervous system effects. _____ 8-67

Table 8-24    Study-specific details from an animal toxicological study of long-term $PM_{10-2.5}$ exposure and brain inflammation and oxidative stress. _____ 8-70

Table 8-25    Characteristics of epidemiologic studies examining the association of long-term $PM_{10-2.5}$ exposures with cognitive function and behavioral and neurodevelopmental effects. _____ 8-71

Table 8-26    Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between long-term $PM_{10-2.5}$ exposure and nervous system effects. _____ 8-74

Table 8-27    Study-specific details from a controlled human exposure study of short-term UFP exposure and activation of the sympathetic nervous system and hypothalamic-pituitary-adrenal stress axis. _____ 8-79

Table 8-28    Study-specific details from an animal toxicological study of short-term UFP exposure and activation of the sympathetic nervous system and hypothalamic-pituitary-adrenal stress axis. _____ 8-80

Table 8-29    Study-specific details from animal toxicological studies of short-term UFP exposure and brain inflammation and oxidative stress. _____ 8-82

Table 8-30    Study-specific details from animal toxicological studies of short-term UFP exposure and cognitive and behavioral effects. _____ 8-83

Table 8-31    Summary of evidence for a *suggestive of, but not sufficient to infer, a causal relationship* between short-term UFP exposure and nervous system effects. _____ 8-85

Table 8-32    Study-specific details from an animal toxicological study of long-term UFP exposure and activation of the sympathetic nervous system and hypothalamic-pituitary-adrenal stress axis. _____ 8-90

00196401

Table 8-33   Study-specific details from animal toxicological studies of long-term UFP exposure and brain inflammation and oxidative stress. 8-91

Table 8-34   Study-specific details from animal toxicological studies of long-term UFP exposure and morphologic changes. 8-94

Table 8-35   Study-specific details from an animal toxicological study of long-term UFP exposure and cognitive and behavioral effects. 8-95

Table 8-36   Characteristics of the epidemiologic study examining the association between long-term UFP exposure and neurodevelopmental effects. 8-96

Table 8-37   Study-specific details from animal toxicological studies of long-term UFP exposure and neurodevelopmental effects. 8-97

Table 8-38   Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between long-term UFP exposure and nervous system effects. 8-101

Table 9-1   Recent animal toxicological study of male reproduction. 9-7

Table 9-2   Recent animal toxicological study of female reproductive function. 9-10

Table 9-3   Key toxicological studies of $PM_{2.5}$ exposure and pregnancy and birth outcomes. 9-16

Table 9-4   Epidemiologic studies of $PM_{2.5}$ exposure and effects on fetal growth and birth weight.[a] 9-19

Table 9-5   Recent animal toxicological studies of $PM_{2.5}$ exposure and effects on fetal growth and birth weight. 9-23

Table 9-6   Epidemiologic studies of $PM_{2.5}$ exposure and preterm birth.[a] 9-27

Table 9-7   Summary of developmental effects. 9-36

Table 9-8   Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between $PM_{2.5}$ exposure and male and female reproduction and fertility. 9-42

Table 9-9   Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between $PM_{2.5}$ exposure and pregnancy and birth outcomes. 9-44

Table 9-10   Epidemiologic studies of exposure to $PM_{10-2.5}$ and reproductive effects. 9-48

Table 9-11   Summary of evidence that it is *inadequate to infer the presence or absence of a causal relationship* between $PM_{10-2.5}$ exposure and male and female reproduction and fertility. 9-53

xlii

00196402

Table 9-12    Summary of evidence that it is *inadequate to infer the presence or absence of a causal relationship* between $PM_{10-2.5}$ exposure and pregnancy and birth outcomes. _____ 9-55

Table 9-13    Recent animal toxicological studies of UFP exposure and male and female reproduction. _____ 9-59

Table 9-14    Recent animal toxicological study of pregnancy and birth outcomes. _____ 9-61

Table 9-15    Summary of UFP Exposure and Developmental Outcomes. _____ 9-63

Table 9-16    Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between UFP exposure and male and female reproduction and fertility. _____ 9-64

Table 9-17    Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between UFP exposure and pregnancy and birth outcomes. _____ 9-66

Table 10-1    Study-specific details and $PM_{2.5}$ concentrations from recent epidemiologic studies that examined DNA damage. _____ 10-20

Table 10-2    Study-specific details and $PM_{2.5}$ concentrations from recent epidemiologic studies that examined cytogenetic endpoints. _____ 10-22

Table 10-3    Study-specific details and $PM_{2.5}$ concentrations from recent epidemiologic studies that examined DNA methylation. _____ 10-31

Table 10-4    Study-specific details and $PM_{2.5}$ concentrations from recent epidemiologic studies that examined lung cancer mortality and incidence and those evaluated in the 2009 PM ISA. _____ 10-37

Table 10-5    Summary of results from studies that examined long-term $PM_{2.5}$ exposure and mortality in the American Cancer Society—Cancer Prevention Study II (ACS-CPS II). _____ 10-46

Table 10-6    Study-specific details and $PM_{2.5}$ concentrations from recent epidemiologic studies that examined long-term $PM_{2.5}$ exposure and cancer in other organs or systems. _____ 10-61

Table 10-7    Study-specific details and $PM_{2.5}$ concentrations from recent epidemiologic studies that examined cancer survival. _____ 10-68

Table 10-8    Summary of evidence for a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and cancer. _____ 10-74

Table 10-9    Study-specific details and $PM_{10-2.5}$ concentrations from recent epidemiologic studies that examined lung cancer incidence. _____ 10-85

00196403

Table 10-10   Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between long-term $PM_{10-2.5}$ exposure and cancer. _____ 10-88

Table 10-11   Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between long-term UFP exposure and cancer. _____ 10-95

Table 11-1   Study-specific details and $PM_{2.5}$ concentrations from multicity studies in the 2004 PM AQCD, the 2009 PM ISA, and recent multicity studies. _____ 11-3

Table 11-2   Methods and results from epidemiologic studies that applied causal modeling methods. _____ 11-12

Table 11-3   Study-specific details of multicity and U.S.-based single-city studies that examine the relationship between short-term exposure to $PM_{2.5}$ components and mortality. _____ 11-43

Table 11-4   Summary of evidence for a *causal relationship* between short-term $PM_{2.5}$ exposure and total mortality. _____ 11-54

Table 11-5   North American epidemiologic studies of long-term $PM_{2.5}$ exposure and mortality. _____ 11-59

Table 11-6   European epidemiologic studies of long-term $PM_{2.5}$ exposure and mortality. _____ 11-75

Table 11-7   Summary of epidemiologic studies examining the concentration-response relationship or conducting threshold analyses for long-term $PM_{2.5}$ exposure and total (nonaccidental) mortality. _____ 11-85

Table 11-8   Summary of evidence for a *causal relationship* between long-term $PM_{2.5}$ exposure and total mortality. _____ 11-98

Table 11-9   Study-specific details and $PM_{10-2.5}$ concentrations from multicity studies in the 2004 PM AQCD, 2009 PM ISA, and recent multicity studies and meta-analyses. _____ 11-103

Table 11-10   Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between short-term $PM_{10-2.5}$ exposure and total mortality. _____ 11-117

Table 11-11   Epidemiologic studies of long-term $PM_{10-2.5}$ exposure and mortality. _____ 11-122

Table 11-12   Summary of evidence that is *suggestive of, but not sufficient to infer, a causal relationship* between long-term $PM_{10-2.5}$ exposure and total mortality. _____ 11-126

Table 11-13   Study-specific details and UFP concentrations from epidemiologic studies in the 2009 PM ISA and recent studies. _____ 11-128

00196404

Table 11-14   Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between short-term UFP exposure and total mortality. ........................................................................ 11-140

Table 11-15   Summary of evidence that is *inadequate to infer the presence or absence of a causal relationship* between long-term UFP exposure and total mortality. ........................................................................ 11-143

Table 12-1   Characterization of evidence for factors potentially increasing the risk for particulate matter-related health effects. ........................................... 12-4

Table 12-2   Prevalence of cardiovascular diseases, diabetes, obesity, and respiratory diseases among adults by age and region in the U.S. in 2016. ............... 12-6

Table 12-3   Summary of evidence for populations potentially at increased risk of $PM_{2.5}$-related health effects. .......................................................... 12-48

Table 13-1   Outline of the types of instruments used to measure scene/landscape characteristics, atmospheric scattering, absorption, and extinction. .......... 13-7

Table 13-2   Mass scattering efficiencies for urban, remote, and ocean regions. .......... 13-13

Table 13-3   Mass scattering efficiency recommendations. ........................................ 13-14

Table 13-4   Composite PM components. .......................................................... 13-19

Table 13-5   Estimates of global mean radiative forcings due to anthropogenic PM. ...... 13-55

Table A-1   Scientific considerations for evaluating the strength of inference from studies on the health effects of particulate matter. ............................. A-10

00196405

# LIST OF FIGURES

| | | |
|---|---|---|
| Figure P-1 | Illustrative figure for potential biological pathways for health effects following PM exposure. | P-19 |
| Figure ES-1 | Comparison of PM size fractions. | ES-2 |
| Figure ES-2 | Long-term trend in national monthly average $PM_{2.5}$ concentrations ($\mu g/m^3$) from 2000−2015. | ES-6 |
| Figure 1-1 | Summary of causality determinations for health effect categories for the PM ISA. | 1-60 |
| Figure 1-2 | Summary of causality determinations for nonecological welfare effects for the PM ISA. | 1-65 |
| Figure 2-1 | Comparison of particle size distribution by particle number, surface area, and mass. | 2-3 |
| Figure 2-2 | Primary $PM_{2.5}$ emissions at the U.S. national scale. (A) $PM_{2.5}$ emissions from the 2002 U.S. EPA National Emissions Inventory versus the 2014 U.S. EPA National Emissions Inventory. (B) Largest, national-scale sources of $PM_{2.5}$. "Other" includes all remaining source sectors, all of which emit 2% or less of the national $PM_{2.5}$ emissions total. | 2-8 |
| Figure 2-3 | Primary $PM_{2.5}$ emissions for (A) Queens County, NY; (B) Philadelphia County, PA; (C) Los Angeles County, CA; (D) Sacramento County, CA; (E) Maricopa County, AZ (Phoenix). | 2-11 |
| Figure 2-4 | Relative $PM_{2.5}$ precursor emissions by U.S. sector: (A) sulfur dioxide, (B) nitrogen oxide, (C) ammonia, (D) volatile organic compounds. | 2-14 |
| Figure 2-5 | Difference in select $PM_{2.5}$ precursor emissions from the 2002 and 2014 National Emission Inventories. | 2-15 |
| Figure 2-6 | National emissions of $PM_{10}$. | 2-20 |
| Figure 2-7 | Examples of the particle number distribution (top) and surface-area distribution (bottom) during clean (blue) and polluted (red) conditions in Nanjing, China, during winter.[a] | 2-22 |
| Figure 2-8 | Examples of the particle number distribution (top) and surface-area distribution (bottom) during clean (blue) and polluted (red) conditions in Helsinki, Finland, during spring.[a,b] | 2-23 |
| Figure 2-9 | Size ranges collected by various UFP sampling procedures. | 2-31 |

xlvi

00196406

Figure 2-10    $PM_{2.5}$ network including near-road monitors. _____ 2-39

Figure 2-11    National Core Multipollutant Monitoring Network. _____ 2-41

Figure 2-12    Seasonal average $PM_{2.5}$ mean bias ($\mu g/m^3$) in Community Multiscale Air
Quality simulations for 2011 at Interagency Monitoring of Protected
Visual Environments (circles), Chemical Speciation Network (triangles),
Air Quality System hourly (squares), and Air Quality System daily
(diamonds) sites for (a) winter, (b) spring, (c) summer, and (d) fall.[a] _____ 2-43

Figure 2-13    Three-year avg $PM_{2.5}$ concentrations 2013−2015. _____ 2-45

Figure 2-14    98th percentile 24-hour $PM_{2.5}$ concentrations 2013−2015. _____ 2-46

Figure 2-15    98th percentile $PM_{10}$ concentrations (2013−2015). _____ 2-49

Figure 2-16    98th percentile concentrations for $PM_{10-2.5}$ between 2013−2015. _____ 2-51

Figure 2-17    Sites in New York state which reported particle number counts to Air
Quality System. _____ 2-58

Figure 2-18    Average hourly particle number concentrations from three locations in
New York state for 2014−2015.[a] _____ 2-58

Figure 2-19    Contributions of sulfate, nitrate, organic carbon, elemental carbon, crustal
material, and sea salt to $PM_{2.5}$. _____ 2-60

Figure 2-20    Increase or decrease in 3-year annual avg $PM_{2.5}$ concentrations between
2003−2005 and 2013−2015. _____ 2-70

Figure 2-21    Average $PM_{2.5}$ concentration trends 2005−2014. _____ 2-71

Figure 2-22    Long-term trend in national monthly and annual average $PM_{2.5}$
concentrations ($\mu g/m^3$) from 2000−2015. _____ 2-72

Figure 2-23    Increase or decrease in 98th percentile 24-hour $PM_{10}$ concentrations
between 2003−2005 and 2013−2015. _____ 2-73

Figure 2-24    $PM_{10}$ second highest concentration trends from 2005−2014. _____ 2-74

Figure 2-25    Contributions of sulfate, nitrate, organic carbon, elemental carbon, crustal
material, and sea salt to $PM_{2.5}$ at selected sites 2003−2005. _____ 2-76

Figure 2-26    Contributions of sulfate, nitrate, organic carbon, elemental carbon, crustal
material, and sea salt to $PM_{2.5}$ at selected sites 2013−2015. _____ 2-77

Figure 2-27    National monthly concentrations ($\mu g/m^3$) of (a) sulfate, (b) nitrate, and
(c) organic carbon from 2000−2015. _____ 2-78

xlvii

00196407

| Figure 2-28 | National average $PM_{2.5}$ concentration by month 2000−2015. | 2-80 |
| Figure 2-29 | Regions used for coarse PM comparison. | 2-81 |
| Figure 2-30 | Average daily $PM_{10-2.5}$ concentrations over the 4-year period 2011−2014 collected by the Interagency Monitoring of Protected Visual Environments network. | 2-82 |
| Figure 2-31 | Ambient $PM_{2.5}$ seasonal composition 2013−2015. | 2-84 |
| Figure 2-32 | Diurnal variation of $PM_{2.5}$ concentrations in urban areas. | 2-86 |
| Figure 2-33 | Sulfate as percentage of $PM_{2.5}$ in eastern urban areas 2003−2005 and 2013−2015. | 2-88 |
| Figure 3-1 | Tiers of exposure models relevant to epidemiology studies and input data types for each exposure model tier. | 3-10 |
| Figure 3-2 | Indoor-outdoor ratios for UFP, $PM_{2.5}$, and black carbon measured at 90 residences. | 3-59 |
| Figure 3-3 | Indoor-outdoor ratios for UFP size obtained in a test house on the National Institute for Standards and Technology facility for open and closed window conditions. | 3-61 |
| Figure 3-4 | Correlations between personal exposure and ambient PM concentration in Baltimore, MD. | 3-63 |
| Figure 3-5 | Slopes of the relationship between personal exposure and ambient PM concentration in four U.S. cities. | 3-65 |
| Figure 3-6 | Spatial correlation of $PM_{2.5}$ components for monitor pairs described in the review study. | 3-73 |
| Figure 3-7 | Correlations between $PM_{2.5}$ and copollutants for all data combined (top left), timescales within 1 hour (top right), short-term timescales within 2 weeks (bottom left), and long-term timescales greater than 2 weeks (bottom right). | 3-81 |
| Figure 3-8 | Distribution of Pearson correlation coefficients for annual 24-hour avg concentration of $PM_{2.5}$ with collocated copollutants from the Air Quality System during 2013−2015. | 3-82 |
| Figure 3-9 | Distribution of Pearson correlation coefficients for comparison of seasonal 24-hour avg concentration $PM_{2.5}$ with collocated copollutants from the Air Quality System during 2013−2015. | 3-83 |

00196408

Figure 3-10    Pearson correlations between $PM_{10-2.5}$ and copollutants for short-term exposures. _____ 3-84

Figure 3-11    Distribution of Pearson correlation coefficients for annual 24-hour avg concentration of $PM_{10-2.5}$ with collocated copollutants from the Air Quality System during 2013−2015. _____ 3-85

Figure 3-12    Distribution of Pearson correlation coefficients for comparison of seasonal 24-hour avg concentration of $PM_{10-2.5}$ with collocated copollutants from the Air Quality System during 2013−2015. _____ 3-86

Figure 3-13    Correlations between UFP and copollutants for short-term exposures. _____ 3-87

Figure 3-14    Correlations between personal exposure to $PM_{2.5}$ mass and personal exposure to gases. _____ 3-90

Figure 3-15    Slopes for personal-ambient relationships. Top: Personal exposure to gaseous copollutants related to ambient exposure of $PM_{2.5}$ mass or elemental carbon or sulfate components. _____ 3-91

Figure 3-16    Slopes for personal-personal relationships between $PM_{2.5}$ mass or sulfate component and gaseous copollutants. _____ 3-92

Figure 3-17    Distribution of Pearson correlation coefficients for annual 24-hour avg $PM_{2.5}$ mass concentration with mass concentration of $PM_{2.5}$ components from the Air Quality System during 2013−2015. _____ 3-96

Figure 3-18    Distribution of Pearson correlation coefficients for comparison of seasonal 24-hour avg total $PM_{2.5}$ mass with mass concentration of $PM_{2.5}$ components from the Air Quality System during 2013−2015. _____ 3-96

Figure 3-19    Distribution of Pearson correlation coefficients for annual 24-hour avg total $PM_{2.5}$ mass concentration with mass concentration of $PM_{2.5}$ components from the peer-reviewed literature during 2013−2015. _____ 3-97

Figure 3-20    Maps illustrating national-scale variability of Pearson correlation coefficients for comparison of seasonal 24-hour avg total $PM_{2.5}$ mass concentration with mass concentration of $PM_{2.5}$ components from the Air Quality System during 2013−2015. _____ 3-98

Figure 3-21    Distribution of Pearson correlation coefficients for annual 24-hour avg total mass concentration of $PM_{10-2.5}$ with mass concentration of $PM_{10-2.5}$ components from the Air Quality System during 2013−2015. _____ 3-99

Figure 3-22    Distribution of Pearson correlation coefficients for comparison of seasonal 24-hour avg total $PM_{10-2.5}$ mass concentration with mass concentration of $PM_{10-2.5}$ components from the Air Quality System during 2013−2015. _____ 3-100

00196409

Figure 3-23    Distribution of Pearson correlation coefficients for annual 24-hour avg total $PM_{10-2.5}$ mass concentration with mass concentration of $PM_{10-2.5}$ components from the peer-reviewed literature. _____ 3-101

Figure 3-24    Map illustrating national-scale variability of Pearson correlation coefficients for comparison of seasonal 24-hour avg total $PM_{10-2.5}$ mass concentration with mass concentration of the Si component of $PM_{10-2.5}$ from the Air Quality System during 2013−2015. _____ 3-102

Figure 3-25    Distribution of Pearson correlation coefficients for annual 24-hour avg total $PM_{0.25}$ mass concentration with mass concentration of $PM_{0.25}$ components from the peer-reviewed literature. _____ 3-103

Figure 3-26    Pearson correlations of ambient air measures of oxidative potential with $PM_{2.5}$ mass and $PM_{2.5}$ components. _____ 3-105

Figure 4-1    Diagrammatic representation of human respiratory tract regions. _____ 4-5

Figure 4-2    Sampling conventions for U.S. EPA's $PM_{2.5}$ and $PM_{10}$ and occupational criteria for thoracic and respirable fractions. _____ 4-16

Figure 4-3    Thoracic fraction (i.e., particle penetration through the extrathoracic region) as a function of breathing route in adult male during light exercise ($V_T = 1,250$ mL; $f = 20$ min$^{-1}$). _____ 4-17

Figure 4-4    Multispecies comparison of the thoracic fraction for nasal breathing with consideration for inhalability (i.e., particle penetration through the extrathoracic region). _____ 4-19

Figure 4-5    Predicted total and regional particle deposition adjusted for particle inhalability in select mammalian species. (A) Total deposition, (B) extrathoracic deposition, (C) tracheobronchial deposition, (D) pulmonary deposition. _____ 4-25

Figure 4-6    Experimental and predicted (Multi-Path Particle Dosimetry model) total lung deposition for controlled tidal breathing on a mouthpiece. _____ 4-27

Figure 4-7    Predicted nanoparticle olfactory dose rate (particles/hour) for resting ventilation (human, 7.5 L/min; rat, 0.288 L/min) and a concentration of one particle/cm$^3$ at any given particle size. _____ 4-29

Figure 4-8    Comparison of group mean human nasal deposition data with nasal cast deposition data. _____ 4-31

Figure 4-9    Comparison of individual level data for 2-μm inspiratory nasal deposition efficiency in during light exercise in adults and children with nasal cast model efficiency. _____ 4-32

1

00196410

Figure 4-10    Experimental regional particle deposition (normalized to total deposition) in select mammalian species. (A) extrathoracic deposition (nasal breathing); (B) tracheobronchial deposition; and (C) pulmonary deposition. _____ 4-35

Figure 4-11    Effect of increasing minute ventilation on total and regional deposition. ____ 4-38

Figure 4-12    Total deposition fraction of hygroscopic sodium chloride and hydrophobic diethylhexyl sebacate oil aerosols in adults during oral breathing at rest as a function of dry particle diameter. _____ 4-48

Figure 5-1    Potential biological pathways for respiratory effects following short-term $PM_{2.5}$ exposure. _____ 5-4

Figure 5-2    Summary of associations between short-term $PM_{2.5}$ exposures and asthma hospital admissions for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-10

Figure 5-3    Summary of associations from studies of short-term $PM_{2.5}$ exposures and asthma emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-11

Figure 5-4    Summary of associations between short-term $PM_{2.5}$ exposures and respiratory symptoms and medication use in populations with asthma._____ 5-24

Figure 5-5    Summary of associations between short-term $PM_{2.5}$ exposures and exhaled nitric oxide in populations with asthma. _____ 5-37

Figure 5-6    Summary of associations between short-term $PM_{2.5}$ exposures and chronic obstructive pulmonary disease hospital admissions and emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-50

Figure 5-7    Summary of associations between short-term $PM_{2.5}$ exposures and respiratory infection hospital admissions and emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-65

Figure 5-8    Summary of associations from studies of short-term $PM_{2.5}$ exposure and respiratory-related hospital admission and emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations._____ 5-75

Figure 5-9    Summary of associations for short-term $PM_{2.5}$ exposure and respiratory-related outcomes from copollutant models with ozone for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-109

Figure 5-10    Summary of associations for short-term $PM_{2.5}$ exposure and respiratory-related outcomes from copollutant models with nitrogen dioxide for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-110

00196411

JA2833

Figure 5-11   Summary of associations for short-term $PM_{2.5}$ exposure and respiratory-related outcomes from copollutant models with sulfur dioxide for a 10-$\mu$g/m$^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-111

Figure 5-12   Summary of associations for short-term $PM_{2.5}$ exposure and respiratory-related outcomes from copollutant models with carbon monoxide for a 10-$\mu$g/m$^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. ___ 5-112

Figure 5-13   Summary of associations for short-term $PM_{2.5}$ exposure and respiratory-related outcomes from copollutant models with $PM_{10-2.5}$ for a 10-$\mu$g/m$^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____ 5-113

Figure 5-14   Rate ratio and 95% confidence intervals for individual lag days from a constrained cubic polynomial distributed lag model examining associations between short-term $PM_{2.5}$ exposure and pediatric asthma emergency department visits in Atlanta, GA. _____ 5-119

Figure 5-15   Relative risk and 95% confidence intervals for individual lag days from a constrained distributed lag model examining associations between short-term $PM_{2.5}$ exposure and asthma hospital admissions in Denver, CO. _ 5-120

Figure 5-16   Percent increase in respiratory-related hospital admissions for a distributed lag model up to 0−7 days for a 10-$\mu$g/m$^3$ increase in 24-hour avg $PM_{2.5}$ concentrations across 708 U.S. counties. _____ 5-121

Figure 5-17   Pooled relative risks across 10 Canadian cities by synoptic weather category. _____ 5-126

Figure 5-18   Association between short-term $PM_{2.5}$ exposure and respiratory-related emergency department visits in Atlanta, GA at lag 1 for 24-hour avg and subdaily exposure metrics. _____ 5-129

Figure 5-19   Concentration-response for associations between 3-day avg (lag 0−2) $PM_{2.5}$ concentrations and emergency department visits for pediatric asthma at the 5th to 95th percentile of $PM_{2.5}$ concentrations in the Atlanta, GA area during the warm season. _____ 5-131

Figure 5-20   Concentration-response curve for lag 0−2-day $PM_{2.5}$ concentrations and asthma emergency department visits for children (<9 years old; Panel A) and all ages (Panel B). _____ 5-133

Figure 5-21   Estimated relative risks for short-term $PM_{2.5}$ exposure and asthma hospital admissions at lag 0−1 adjusted for ozone at lag 0−1 allowing for a possible nonlinear relationship in New York, NY. _____ 5-134

Figure 5-22   Concentration-response relationship between 0−2 day mean $PM_{2.5}$ concentrations and chronic obstructive pulmonary disease emergency department visits in Ontario, Canada. _____ 5-135

00196412

Figure 5-23    Cutpoint analysis examining the association between short-term $PM_{2.5}$ exposure and respiratory-related hospital admissions, lag 0−5, relative to 5 μg/m$^3$. .................................................................................................. 5-137

Figure 5-24    Associations for short-term exposure to $PM_{2.5}$ total mass and elemental or black carbon with respiratory effects by outcome group. ...................... 5-140

Figure 5-25    Distribution of associations for all respiratory effects and short-term $PM_{2.5}$ mass and $PM_{2.5}$ components exposure. ................................................... 5-145

Figure 5-26    Associations for asthma exacerbations with short-term exposure to $PM_{2.5}$ mass and components. ........................................................................ 5-147

Figure 5-27    Potential biological pathways for respiratory effects following long-term $PM_{2.5}$ exposure. .................................................................................... 5-157

Figure 5-28    Longitudinal repeated measure studies of long-term $PM_{2.5}$ exposure and lung development. .................................................................................. 5-162

Figure 5-29    Long-term exposure to $PM_{2.5}$ and lung function in children. ..................... 5-173

Figure 5-30    Long-term exposure to $PM_{2.5}$ and asthma incidence in children. ............... 5-181

Figure 5-31    Concentration-response relationship of prenatal $PM_{2.5}$ with children's repeated wheeze. .................................................................................. 5-184

Figure 5-32    Asthma and wheeze incidence and prevalence in adults in relation to long-term $PM_{2.5}$ exposure. ...................................................................... 5-187

Figure 5-33    Exposure measurements from South Coast Air Basin (Karr et al., 2007), Puget Sound Region, WA (Karr et al., 2007), and Georgia Air Basin, British Columbia (Karr et al., 2009b). ...................................................... 5-194

Figure 5-34    Associations between long-term exposure to $PM_{2.5}$ and respiratory mortality in recent North American cohorts. .............................................. 5-205

Figure 5-35    Long-term exposure to $PM_{2.5}$ and mortality in single pollutant models and models adjusted for ozone or nitrogen dioxide. ....................................... 5-207

Figure 5-36    Estimated bronchitic symptom prevalence at age 10 years versus long-term change in mean $PM_{2.5}$ concentrations among Children's Health Study (CHS) participants by asthma status. .................................................... 5-209

Figure 5-37    Mean 4-year lung-function growth versus the mean levels of $PM_{2.5}$. ......... 5-210

Figure 5-38    Heat map of associations observed between long-term exposure $PM_{2.5}$ and $PM_{2.5}$ components and respiratory health. .............................................. 5-212

00196413

Figure 5-39    Distribution of associations for $PM_{2.5}$ and $PM_{2.5}$ components examined in studies detailed in Figure 5-38._____5-213

Figure 5-40    Potential biological pathways for respiratory effects following short-term $PM_{10-2.5}$ exposure._____5-222

Figure 5-41    Summary of associations from studies of short-term $PM_{10-2.5}$ exposures and asthma hospital admissions and emergency department (ED) visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{10-2.5}$ concentrations. _____5-226

Figure 5-42    Concentration-response relationship between short-term $PM_{10-2.5}$ exposure and asthma emergency department visits at lag 2 for a natural spline model with three degrees of freedom (df) for Dongguan, China. _____5-232

Figure 5-43    Summary of associations between short-term $PM_{10-2.5}$ exposures and chronic obstructive pulmonary disease hospital admissions and emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{10-2.5}$ concentrations. _____5-238

Figure 5-44    Summary of associations between short-term $PM_{10-2.5}$ exposures and respiratory infection hospital admissions and emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{10-2.5}$ concentrations._____5-244

Figure 5-45    Summary of associations from studies of short-term $PM_{10-2.5}$ exposures and respiratory-related hospital admissions and emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. _____5-250

Figure 5-46    Concentration-response relationship between short-term $PM_{10-2.5}$ exposure and respiratory-related hospital admissions, lag 0−5, relative to 5 $\mu g/m^3$.____5-257

Figure 5-47    Percent increase in respiratory mortality for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{10-2.5}$ concentrations in single- and copollutant models.____5-262

Figure 5-48    Associations between short-term $PM_{10-2.5}$ exposure and respiratory mortality as a function of the correlation between $PM_{10-2.5}$ and $PM_{2.5}$ stratified by strength of the association with $PM_{2.5}$. _____5-263

Figure 5-49    Potential biological pathways for respiratory effects following long-term $PM_{10-2.5}$ exposure._____5-271

Figure 5-50    Potential biological pathways for respiratory effects following short-term UFP exposure._____5-280

Figure 5-51    Potential biological pathways for respiratory effects following long-term UFP exposure._____5-307

Figure 6-1    Potential biological pathways for cardiovascular effects following short-term exposure to $PM_{2.5}$._____6-4

liv

JA2836

00196414

Figure 6-2    Results of studies of short-term ambient $PM_{2.5}$ exposure and hospital admissions and emergency department visits for ischemic heart disease and myocardial infarction. ........................................................................... 6-13

Figure 6-3    Results of studies of short-term ambient $PM_{2.5}$ concentrations and hospital admissions and emergency department visits for heart failure. .................. 6-20

Figure 6-4    Results of studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for arrhythmia. ........................................ 6-26

Figure 6-5    Results of studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for cerebrovascular disease. ................... 6-46

Figure 6-6    Results of studies of short-term $PM_{2.5}$ exposure and combinations of cardiovascular-related hospital admissions and emergency department visits for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. ......... 6-71

Figure 6-7    Percent increase in cause-specific cardiovascular mortality outcomes for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations observed in multicity studies and meta-analyses. ................................................................. 6-73

Figure 6-8    Associations between short-term exposure to $PM_{2.5}$ and cardiovascular effects in single pollutant models and models adjusted for ozone for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. ........................ 6-112

Figure 6-9    Associations between short-term exposure to $PM_{2.5}$ and cardiovascular effects in single pollutant models and models adjusted for nitrogen dioxide for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. .............. 6-113

Figure 6-10   Associations between short-term exposure to $PM_{2.5}$ and cardiovascular effects in single pollutant models and models adjusted for sulfur dioxide for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. .............. 6-114

Figure 6-11   Associations between short-term exposure to $PM_{2.5}$ and cardiovascular effects in single pollutant models and models adjusted for carbon monoxide for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. ..... 6-115

Figure 6-12   Associations between short-term exposure to $PM_{2.5}$ and cardiovascular effects in single pollutant models and models adjusted for $PM_{10-2.5}$ for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations. ........................ 6-116

Figure 6-13   Pattern of relative risks for single day lags 0−14 for aggregate cardiovascular disease hospitalizations (left) and ischemic heart disease hospitalizations (right) reported by Kim et al. (2012). ................................ 6-120

Figure 6-14   Heat map of associations observed between short-term $PM_{2.5}$ and $PM_{2.5}$ component exposure and combinations of cardiovascular-related hospital admissions and emergency department visits. ........................................... 6-123

00196415

Figure 6-15    Distribution of associations for combinations of cardiovascular-related hospital admissions and emergency department visits and short-term $PM_{2.5}$ and $PM_{2.5}$ components exposure in studies detailed in Figure 6-14. _____ 6-124

Figure 6-16    Potential biological pathways for cardiovascular effects following long-term exposure to $PM_{2.5}$. _____ 6-143

Figure 6-17    Associations between long-term exposure to $PM_{2.5}$ and ischemic heart disease or myocardial infarction. Associations are presented per $5\text{-}\mu g/m^3$ increase in pollutant concentration. _____ 6-150

Figure 6-18    Associations between long-term exposure to $PM_{2.5}$ and the incidence of stroke for a $5\text{-}\mu g/m^3$ increase in $PM_{2.5}$ concentrations. _____ 6-157

Figure 6-19    Associations between long-term exposure to $PM_{2.5}$ and cardiovascular mortality in recent North American cohorts. _____ 6-191

Figure 6-20    Associations between long-term exposure to $PM_{2.5}$ and cardiovascular morbidity in single-pollutant models and models adjusted for copollutants. _ 6-202

Figure 6-21    Associations between long-term exposure to $PM_{2.5}$ and cardiovascular mortality in single-pollutant models and models adjusted for ozone. _____ 6-204

Figure 6-22    Long-term exposure to $PM_{2.5}$ and cardiovascular mortality in single-pollutant models and models adjusted for other pollutants. _____ 6-205

Figure 6-23    The linear longitudinal association of long-term average $PM_{2.5}$ concentrations with coronary artery calcification progression (Agatston units per year) across the range of concentrations. _____ 6-208

Figure 6-24    Nonlinear association of annual average $PM_{2.5}$ concentration (2003) and natural log-transformed coronary artery calcification. _____ 6-209

Figure 6-25    Concentration-response relationship between long-term $PM_{2.5}$ exposure and incident hypertension. _____ 6-210

Figure 6-26    Concentration-response relationship between long-term $PM_{2.5}$ exposure and cardiovascular mortality in the Harvard Six Cities study using penalized splines (1974−2009). _____ 6-213

Figure 6-27    Concentration-response curve for ischemic heart disease mortality in the CanCHEC study. _____ 6-214

Figure 6-28    Distribution of associations of long-term exposure to $PM_{2.5}$ and $PM_{2.5}$ component concentrations with cardiovascular outcomes. _____ 6-215

Figure 6-29    Results of studies of long-term exposure to $PM_{2.5}$ and $PM_{2.5}$ component concentrations and cardiovascular outcomes. _____ 6-216

00196416

Figure 6-30    Potential biological pathways for cardiovascular effects following short-term exposure to $PM_{10-2.5}$. _____ 6-226

Figure 6-31    Percent increase in cardiovascular mortality for a 10-µg/m$^3$ increase in 24-hour avg $PM_{10-2.5}$ concentrations in single- and copollutant models. ___ 6-241

Figure 6-32    Associations between short-term $PM_{10-2.5}$ exposure and cardiovascular mortality as a function of the correlation between $PM_{10-2.5}$ and $PM_{2.5}$ stratified by strength of the association with $PM_{2.5}$. _____ 6-242

Figure 6-33    Potential biological pathways for cardiovascular effects following long-term exposure to $PM_{10-2.5}$. _____ 6-257

Figure 6-34    Associations between long-term exposure to $PM_{10-2.5}$ and ischemic heart disease. _____ 6-262

Figure 6-35    Associations between long-term exposure to $PM_{10-2.5}$ and stroke._____ 6-268

Figure 6-36    Potential biological pathways for cardiovascular effects following short-term exposure to UFP. _____ 6-280

Figure 7-1    Disorders of glycemia: etiologic types and stages. _____ 7-2

Figure 7-2    Potential biological pathways for metabolic effects following short-term $PM_{2.5}$ exposure._____ 7-3

Figure 7-3    Potential biological pathways for metabolic effects following long-term $PM_{2.5}$ exposure. _____ 7-14

Figure 7-4    Locally weighted scatterplot smoothing regression of hazard ratios on $PM_{2.5}$ concentration for composite diagnosis of metabolic syndrome and each individual component according to the level of exposure among older adult males in the Normative Aging Study (NAS). _____ 7-17

Figure 7-5    Concentration-response relationship for $PM_{2.5}$ using restricted cubic spline with three degrees of freedom (adjusted for age, sex, body mass index, waist-hip ratio, smoking status, and month of blood draw)._____ 7-22

Figure 7-6    Smoothed associations between insulin resistance and long-term $PM_{2.5}$ exposure assessed using generalized additive models adjusted for sex, age, and body mass index. _____ 7-23

Figure 7-7    $PM_{2.5}$ effects on insulin resistance and glucose tolerance in mice exposed to 19.6−139 µg/m$^3$ $PM_{2.5}$ for 30 days to 17 weeks. _____ 7-24

Figure 7-8    Concentration-response relationship between the concentration of $PM_{2.5}$ and incident diabetes among the cohort, depicted using a natural cubic spline function with two degrees of freedom._____ 7-32

00196417

Figure 7-9    Association (log relative hazard) between 5-year running average level at residence and incident diabetes in the Danish Nurses Study. _____ 7-33

Figure 7-10   Associations between long-term $PM_{2.5}$ exposure and incident diabetes in longitudinal epidemiologic studies. _____ 7-34

Figure 7-11   Copollutant model results for studies of long-term exposure to $PM_{2.5}$ and incident diabetes. _____ 7-46

Figure 7-12   Relative risk of diabetes-related mortality in relation to long-term $PM_{2.5}$ exposure. _____ 7-48

Figure 7-13   Potential biological pathways for metabolic effects following long-term $PM_{10-2.5}$ exposure. _____ 7-54

Figure 8-1    Potential biological pathways for nervous system effects following short-term $PM_{2.5}$ exposure. _____ 8-3

Figure 8-2    Potential biological pathways for nervous system effects following long-term $PM_{2.5}$ exposure. _____ 8-19

Figure 8-3    Associations between long-term $PM_{2.5}$ exposure and cognitive effects. _____ 8-33

Figure 8-4    Associations between long-term $PM_{2.5}$ exposur and cognitive effects. _____ 8-35

Figure 8-5    Associations between long-term $PM_{2.5}$ exposure and indicators of depression or anxiety. _____ 8-39

Figure 8-6    Associations between long-term $PM_{2.5}$ exposure and neurodegenerative diseases. _____ 8-42

Figure 8-7    Associations between long-term $PM_{2.5}$ exposure and cognitive effects. _____ 8-46

Figure 8-8    Potential biological pathways for nervous system effects following short-term $PM_{10-2.5}$ exposure. _____ 8-63

Figure 8-9    Potential biological pathways for nervous system effects following long-term $PM_{10-2.5}$ exposure. _____ 8-68

Figure 8-10   Potential biological pathways for nervous system effects following short-term UFP exposure. _____ 8-77

Figure 8-11   Potential biological pathways for nervous system effects following long-term UFP exposure. _____ 8-88

Figure 9-1    Potential biological pathways for male and female reproduction and fertility effects following $PM_{2.5}$ exposure. _____ 9-4

00196418

Figure 9-2     Potential biological pathways for pregnancy and birth outcomes following PM$_{2.5}$ exposure. ........................................................................... 9-11

Figure 9-3     Heat map of associations observed between PM$_{2.5}$ and PM$_{2.5}$ components and birth outcomes and effects on pregnancy. ................................. 9-40

Figure 9-4     Potential biological pathways for male and female reproduction and fertility effects following UFP exposure. ........................................... 9-57

Figure 10-1    Key steps in the development of cancer. ........................................... 10-2

Figure 10-2    Potential biological pathways for the development of cancer following exposure to PM$_{2.5}$. ........................................................................... 10-5

Figure 10-3    Summary of associations reported in previous and recent cohort studies that examined long-term PM$_{2.5}$ exposure and lung cancer mortality and incidence. ........................................................................................ 10-44

Figure 10-4    PM$_{2.5}$—lung cancer incidence odds ratios for a 10 μg/m$^3$ increase in PM$_{2.5}$ concentrations from sensitivity analyses using different exposure assignment approaches in the Canadian National Enhanced Cancer Surveillance System (NECSS) study. ................................................. 10-52

Figure 10-5    Adjusted relative risk for lung cancer mortality plotted over estimated daily dose of PM$_{2.5}$ (milligrams) and increments of cigarette smoking (cigarettes per day) compared with never smokers. ............................ 10-57

Figure 10-6    Concentration-response relationship between long-term PM$_{2.5}$ exposure and lung cancer incidence using a natural cubic spline and 3 degrees of freedom in the Canadian National Breast Cancer Screening Survey (CNBCSS) cohort. ............................................................................. 10-58

Figure 10-7    Fully adjusted hazard ratios (95% confidence intervals) for lung cancer mortality in categorical analyses of mean PM$_{2.5}$ (1999−2000) concentrations in never smokers in the American Cancer Society—Cancer Prevention Study II (ACS-CPS II) cohort. ........................................... 10-59

Figure 10-8    Potential biological pathways for the development of cancer following exposure to PM$_{10-2.5}$. ..................................................................... 10-79

Figure 10-9    Potential biological pathways for the development of cancer following exposure to UFP. ............................................................................ 10-90

Figure 11-1    Summary of associations between short-term PM$_{2.5}$ exposure and total (nonaccidental) mortality in multicity studies for a 10 μg/m$^3$ increase in 24-hour avg concentrations. ........................................................... 11-11

00196419

Figure 11-2    Summary of associations between short-term $PM_{2.5}$ exposure and cardiovascular and respiratory mortality in multicity studies for a 10 $\mu g/m^3$ increase in 24-hour avg concentrations. _____ 11-14

Figure 11-3    Summary of association between short-term $PM_{2.5}$ exposure and total (nonaccidental) mortality for a 10 $\mu g/m^3$ increase in 24-hour avg concentrations in single- and copollutant models from previous and recent multicity studies. _____ 11-16

Figure 11-4    Percent increase in cardiovascular mortality for a 10 $\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations at lag 0−1 in Philadelphia, PA (May 1992−September 1995) across statistical models used in multicity studies. _____ 11-18

Figure 11-5    Relationship between estimated $PM_{2.5}$-mortality association and temperature in 75 U.S. cities. _____ 11-22

Figure 11-6    Bivariate $PM_{2.5}$-temperature response surfaces for total (nonaccidental) mortality using same-day 24-hour mean temperature and lag 0 and lag 1 $PM_{2.5}$ concentrations. _____ 11-23

Figure 11-7    Percent increase in mortality for a 10 $\mu g/m^3$ increase in $PM_{2.5}$ concentrations at lag 0 and lag 0−1 in single-pollutant models and models containing indicator variables representative of days with specific pollution profiles. _____ 11-26

Figure 11-8    Dendrogram showing relationships among the 17 largest and 5 midsize National Morbidity, Mortality, and Air Pollution Study (NMMAPS) cities using $PM_{2.5}$ composition data from Chemical Speciation Network (CSN) for 2005−2007. _____ 11-27

Figure 11-9    Maps of Core-Based Statistical Areas (CBSAs) by cluster based on (A) residential infiltration factors and (B) residential infiltration and commuting factors. _____ 11-30

Figure 11-10   Percent increase in mortality at lag 0−1 for a 10 $\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ concentrations based on location of residence using modeled and monitored $PM_{2.5}$ concentrations. _____ 11-34

Figure 11-11   Concentration-response relationship between short-term $PM_{2.5}$ concentrations and mortality (lag 0−1) in an analysis restricted to person-time with daily $PM_{2.5}$ concentrations <30 $\mu g/m^3$. _____ 11-39

Figure 11-12   Two-pollutant analysis of the $PM_{2.5}$ concentration-response curve with penalized splines for both $PM_{2.5}$ and ozone to examine the percent increase in daily mortality at lag 0−1 days. _____ 11-40

00196420

Figure 11-13   Heat map of associations observed between short-term $PM_{2.5}$ and $PM_{2.5}$ components exposure and mortality in multi- and single-city studies. _____ 11-45

Figure 11-14   Distribution of total (nonaccidental) mortality associations for $PM_{2.5}$ and $PM_{2.5}$ components examined in studies detailed in Figure 11-13. _____ 11-46

Figure 11-15   Percent increase in mortality for $PM_{2.5}$ and $PM_{2.5}$ components for an interquartile range (IQR) increase in concentrations at lag 1 across 72 U.S. cities. _____ 11-48

Figure 11-16   Percent increase in total (nonaccidental) mortality for individual cities within the 64 U.S. cities examined in the National Particle Component Toxicity (NPACT) study for a median interquartile range (IQR) increase in factor scores for the cities combined. _____ 11-53

Figure 11-17   Associations between long-term $PM_{2.5}$ exposure and total (nonaccidental) mortality in the American Cancer Society cohort. _____ 11-68

Figure 11-18   Associations between long-term $PM_{2.5}$ exposure and total (nonaccidental) mortality in recent North American cohorts. _____ 11-70

Figure 11-19   Associations between long-term $PM_{2.5}$ exposure and all cardiovascular disease and all respiratory mortality in recent North American cohorts. _____ 11-71

Figure 11-20   Associations between long-term $PM_{2.5}$ exposure and mortality in single pollutant models and models adjusted for ozone. _____ 11-82

Figure 11-21   Long-term $PM_{2.5}$ exposure and mortality in single pollutant models and models adjusted for other pollutants. _____ 11-83

Figure 11-22   Examples of concentration-response relationships between long-term $PM_{2.5}$ exposure and total (nonaccidental) or all-cause mortality in (A) the Harvard Six Cities study using penalized splines (1974−2009); (B) long-term time-series study; (C) the Medicare cohort using thin-plate spines. _____ 11-88

Figure 11-23   Examples of concentration-response relationships between long-term $PM_{2.5}$ exposure and total (nonaccidental) mortality in (A) the CCHS; (B) the CanCHEC; (C) the CNBSS. _____ 11-89

Figure 11-24   Heat map of associations observed between $PM_{2.5}$ and $PM_{2.5}$ components and mortality. _____ 11-95

Figure 11-25   Distribution of mortality associations for $PM_{2.5}$ and $PM_{2.5}$ components examined in studies detailed in Figure 11-24. _____ 11-96

00196421

Figure 11-26  Summary of associations between short-term $PM_{10-2.5}$ exposure and total (nonaccidental) mortality in multicity studies for a 10 $\mu g/m^3$ increase in 24-hour avg concentrations. _____ 11-107

Figure 11-27  Summary of associations between short-term $PM_{10-2.5}$ exposure and cardiovascular and respiratory mortality in multicity studies for a 10 $\mu g/m^3$ increase in 24-hour avg concentrations. _____ 11-108

Figure 11-28  Summary of associations between short-term $PM_{10-2.5}$ exposure and total (nonaccidental) mortality for a 10 $\mu g/m^3$ increase in 24-hour avg concentrations in single and copollutant models from multicity studies. ___ 11-110

Figure 11-29  Incidence rate ratios as a function of the correlation between short-term $PM_{10-2.5}$ and $PM_{2.5}$ concentrations stratified by $PM_{2.5}$ associations. _____ 11-111

Figure 11-30  Percent increase in total (nonaccidental), cardiovascular, and respiratory mortality across eight European cities for a 10,000 number/$cm^3$ increase in 24-hour avg number concentration (NC) across lags 0 to 10 days. _____ 11-135

Figure 11-31  Association between short-term number concentration for particles 300−1,000 nm ($NC_{300-1,000}$) and total number concentration ($NC_{total}$) exposure in single and copollutant models and respiratory mortality in Beijing, China. _____ 11-138

Figure 12-1  Differences in $PM_{2.5}$ exposure by socioeconomic status. _____ 12-32

Figure 12-2  Differences in $PM_{2.5}$ exposure by race. _____ 12-36

Figure 13-1  IMPROVE 2011−2014 regional monthly mean $PM_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the eastern U.S. _____ 13-22

Figure 13-2  IMPROVE 2005−2008 regional monthly mean $PM_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the eastern U.S. _____ 13-23

Figure 13-3  IMPROVE 2011−2014 regional monthly mean $PM_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the northwestern U.S. _____ 13-24

Figure 13-4  IMPROVE 2005−2008 regional monthly mean $PM_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the northwestern U.S. _____ 13-25

Figure 13-5  IMPROVE 2011−2014 regional monthly mean $PM_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the northwestern U.S. _____ 13-26

Figure 13-6  IMPROVE 2005−2008 regional monthly mean $PM_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the southwestern U.S. _____ 13-27

JA2844

00196422

Figure 13-7    Chemical Speciation Network 2011−2014 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the eastern U.S. _____ 13-28

Figure 13-8    Chemical Speciation Network 2005−2008 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the eastern U.S. _____ 13-29

Figure 13-9    Chemical Speciation Network 2011−2014 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the northwestern U.S. _____ 13-30

Figure 13-10   Chemical Speciation Network 2005−2008 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the northwestern U.S. _____ 13-31

Figure 13-11   Chemical Speciation Network 2011−2014 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the southwestern U.S. _____ 13-32

Figure 13-12   Chemical Speciation Network 2005−2008 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for the southwestern U.S. _____ 13-33

Figure 13-13   IMPROVE 2005−2008 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for Hawaii, Alaska, and the Virgin Islands. _____ 13-34

Figure 13-14   Chemical Speciation Network 2005−2008 regional monthly mean PM$_{2.5}$ reconstructed light extinction coefficients ($b_{ext}$, per Mm) for Alaska and Hawaii. _____ 13-35

Figure 13-15   IMPROVE 2000−2011 trends (%/yr) in the reconstructed mean 20% haziest (top) and clearest (bottom) ambient light extinction coefficient ($b_{ext}$ at 550 nm). _____ 13-39

Figure 13-16   Simulations of the view at Great Smoky Mountains National Park, TN (top), and Washington, DC (bottom), corresponding to the mean 20% haziest $b_{ext}$ in 1990 (left side of image) and 2012 (right side of image). ____ 13-40

Figure 13-17   The effective PM$_{2.5}$ light extinction efficiency calculated as the ratio of the annual average reconstructed PM$_{2.5}$ $b_{ext}$ and PM$_{2.5}$ concentrations. _____ 13-42

Figure 13-18   Mean deciview values of 50% acceptability in five visibility preference studies (Colorado, Arizona, British Columbia, District of Columbia 2001, District of Columbia 2009). _____ 13-43

00196423

Figure 13-19   Global mean radiative forcing from anthropogenic activities from 1750 to 2011. _____ 13-50

Figure 13-20   Schematic illustrating the effects of PM on climate. _____ 13-51

Figure 13-21   Schematic of mechanisms by which PM affects climate and the terminology used in the Intergovernmental Panel on Climate Change Fifth Assessment Report to categorize PM radiative forcings. _____ 13-53

Figure 13-22   Radiative forcing from PM interactions with radiation from six PM components in the AeroCom ensemble of models, overlain with total radiative forcing from PM interactions with radiation for each model (yellow). _____ 13-58

Figure 13-23   Spatial distributions of radiative forcing due to changing PM from 1850 to 2000 in the Atmospheric Chemistry and Climate Model Intercomparison Project model ensemble. _____ 13-59

Figure 13-24   Time evolution of radiative forcing due to interactions of particulate matter with radiation and the effects of black carbon on snow and ice albedo. _____ 13-62

Figure 13-25   Mean radiative forcings due to interactions of PM with radiation from a subset of the Atmospheric Chemistry and Climate Model Intercomparison Project models for the 1980 to 2000 time period. _____ 13-63

Figure 13-26   Estimated annual mean top-of-the-atmosphere radiative forcings due to interactions of PM with radiation for the 1750−2010 period. _____ 13-64

Figure 13-27   Mean radiative forcings (left columns) and their standard deviations (right columns) from the Atmospheric Chemistry and Climate Model Intercomparison Project ensemble for the 1850−2000 time period. _____ 13-65

Figure 13-28   Top: Observed change in surface air temperatures between 1930 and 1990. Bottom: Effect of U.S. anthropogenic PM sources on surface air temperatures for the 1970−1990 period when U.S. particulate loading was at its peak. _____ 13-72

Figure 13-29   Trends in aerosol optical depth measured by the Multiangle Imaging Spectro Radiometer satellite instrument over the 2001−2013 time period. __ 13-73

Figure 13-30   Increase of haze (H in %) with mass of deposit (M in $\mu g/cm^2$) on glass under (a) sheltered conditions and (b) conditions where glass panes were exposed directly to the weather. _____ 13-80

Figure 13-31   Example of a dose-response curve for effects on materials, showing change in reflectance versus square root of dose for acrylic emulsion house paint. _____ 13-83

00196424

Figure 13-32    Temporal trend in haze values of glass at different locations. _____ 13-84

Figure 13-33    Predictions of materials damage to various materials based on damage
                functions._____ 13-86

Figure A-1      Overview of the process for development of Integrated Science
                Assessments. _____ A-2

lxv

00196425

# INTEGRATED SCIENCE ASSESSMENT TEAM FOR PARTICULATE MATTER

**Executive Direction**

Dr. John Vandenberg (Director)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Steven J. Dutton (Deputy Director)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Reeder Sams II (Deputy Director—Acting)—Center for Computational Toxicology and Exposure, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Debra Walsh (Deputy Director—Retired)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jane Ellen Simmons (Branch Chief)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Christopher Weaver (Branch Chief)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Tara Greaver (Branch Chief—Acting)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Andrew Hotchkiss (Branch Chief—Acting)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jennifer Nichols (Branch Chief—Acting)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jennifer Richmond-Bryant (Branch Chief—Acting)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Alan Vette (Branch Chief—Acting)—Center for Environmental Measurement and Modeling, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

**Scientific Staff**

Mr. Jason Sacks (Assessment Lead, Integrated Science Assessment for Particulate Matter)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

lxvi

00196426

Dr. Barbara Buckley (Deputy Assessment Lead, Integrated Science Assessment for Particulate Matter)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Michelle Angrish—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Renee Beardslee (Separated)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. James Brown—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Evan Coffman—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Allen Davis—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Stephanie Deflorio-Barker—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Brooke L. Hemming—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Erin Hines—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Ellen Kirrane—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Dennis Kotchmar (Retired)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Meredith Lassiter—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Thomas Long—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Thomas Luben—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

lxvii

Dr. Stephen McDow—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jennifer Nichols—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Molini M. Patel (Separated)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Joseph P. Pinto (Retired)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jennifer Richmond-Bryant (Separated)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Michael Stewart—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Christopher Weaver—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

## Technical Support Staff

Ms. Marieka Boyd—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Kenneth J. Breito (Separated)—Senior Environmental Employment Program, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Annamarie Cory—Oak Ridge Associated Universities, Inc., Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Charlene Finley (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Beth Gatling (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. William Griffin (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Hillary Hollinger—Oak Ridge Associated Universities, Inc., Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

lxviii

00196428

JA2850

Mr. Saturo Ito (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Ryan Jones—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Lukas Kerr—Oak Ridge Associated Universities, Inc., Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Emily Lau (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Mckayla Lein—Oak Ridge Associated Universities, Inc., Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Connie Meacham (Retired)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Danielle Moore—Senior Environmental Employment Program, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Francis Polakiewicz—Oak Ridge Associated Universities, Inc., Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. R. Byron Rice—Oak Ridge Associated Universities, Inc., Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Samuel Thacker—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Erin Vining—Oak Ridge Associated Universities, Inc., Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Richard N. Wilson—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

00196429

# AUTHORS, CONTRIBUTORS, AND REVIEWERS

## Authors

Mr. Jason Sacks (Assessment Lead, Integrated Science Assessment for Particulate Matter)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Barbara Buckley (Deputy Assessment Lead, Integrated Science Assessment for Particulate Matter)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Neil Alexis†—Center for Environmental Medicine, Asthma and Lung Biology, UNC School of Medicine, University of North Carolina, Chapel Hill, NC

Dr. Michelle Angrish—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Renee Beardslee (Separated)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Adam Benson (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. James Brown—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Barbara Buckley—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Matt Campen†—Health Sciences: Clinical & Translational Science Center, University of New Mexico, Albuquerque, NM

Dr. Elizabeth Chan*—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Evan Coffman—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Allen Davis—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Steven J. Dutton—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Sorina Eftim†—ICF International, Fairfax, VA

00196430

Dr. Jay Gandy†—Fay W. Boozman College of Public Health, University of Arkansas, Little Rock, AR

Dr. Brooke L. Hemming—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Erin Hines—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Katelyn Holliday†—Postdoctoral Fellow in Epidemiology, University of North Carolina, Chapel Hill, NC

Dr. Veli-Matti Kerminen†—Institute for Atmospheric and Earth System Research, University of Helsinki, Finland

Dr. Marianthi-Anna Kioumourtzoglou†—Mailman School of Public Health, Columbia University, New York, NY

Dr. Ellen Kirrane—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Dennis Kotchmar (Retired)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Igor Koturbash†—Fay W. Boozman College of Public Health, University of Arkansas, Little Rock, AR

Dr. Markku Kulmala†—Institute for Atmospheric and Earth System Research, University of Helsinki, Finland

Dr. Meredith Lassiter—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Vijay Limaye (Separated)—Region 5, U.S. Environmental Protection Agency, Chicago, IL

Dr. Petter Ljungman†—Institute of Environmental Medicine, Karolinska Institute, Solna, Sweden

Dr. Thomas Long—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Thomas Luben—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. William Malm†—Cooperative Institute for Research in the Atmosphere, Colorado State University, Fort Collins, CO

Mr. Joseph F. McDonald—Center for Environmental Measurement and Modeling, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

00196431

Dr. Stephen McDow—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Loretta Mickley†—John A. Paulson School of Engineering and Applied Sciences, Harvard University, Cambridge, MA

Mr. Ihab Mikati (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. James Mulholland†—School of Civil and Environmental Engineering, College of Engineering, Georgia Tech University, Atlanta, GA

Dr. Jennifer Nichols—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Molini M. Patel (Separated)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Robert Pinder—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Joseph P. Pinto (Retired)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Kristen Rappazzo—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jennifer Richmond-Bryant (Separated)—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Maria Rosa†—Postdoctoral Fellow, Environmental Medicine and Public Health, Mount Sinai School of Medicine, New York, NY

Dr. Armistead Russell†—School of Civil and Environmental Engineering, College of Engineering, Georgia Tech University, Atlanta, GA

Dr. Brett Schichtel†—Cooperative Institute for Research in the Atmosphere, Colorado State University, Fort Collins, CO

Dr. Michael Stewart—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Lindsay Wichers Stanek—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Michelle Turner†—Barcelona Institute for Global Health, Barcelona, Spain

Dr. Laura Van Winkle†—Center for Health and the Environment, University of California, Davis, CA

lxxii

00196432

Dr. James Wagner†—Institute for Integrative Toxicology, Michigan State University, East Lansing, MI

Dr. Christopher Weaver—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Greg Wellenius†—Institute at Brown for Environment & Society, Brown University, Providence, RI

Dr. Eric Whitsel†—Gillings School of Global Public Health, University of North Carolina, Chapel Hill, NC

Dr. Catherine Yeckel†—Yale School of Public Health, Yale University, New Haven, CT

Dr. Antonella Zanobetti†—Harvard T.H. Chan School of Public Health, Harvard University, Cambridge, MA

Dr. Max Zhang†—Sibley School of Mechanical and Aerospace Engineering, Cornell University, Ithaca, NY

†Under subcontract through ICF International
*Current affiliation is Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

## Contributors

Dr. Stephanie Deflorio-Barker—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Allison Elder†—University of Rochester Medical Center, University of Rochester, Rochester, NY

Dr. Brett Gantt—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Tim Hanley—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. James T. Kelly—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Ms. Rachel Long—University of North Carolina at Chapel Hill, Chapel Hill, NC

Ms. April Maxwell (Separated)—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jeanette Reyes*—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

†Under subcontract through ICF International
*Current affiliation is Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

lxxiii

## Reviewers

Dr. Sara Adar—School of Public Health, University of Michigan, Ann Arbor, MI

Dr. Ryan Allen—Faculty of Health Sciences. Simon Fraser University, Burnaby, BC, Canada

Ms. Breanna Alman (Separated)—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Chad Bailey—Office of Transportation and Air Quality, Office of Air and Radiation, U.S. Environmental Protection Agency, Ann Arbor, MI

Dr. Lisa Baxter—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Timothy C. Benner—Office of Science Advisor, Policy, and Engagement, U.S. Environmental Protection Agency, Washington, DC

Dr. Janet Burke—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Wayne Cascio—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Elizabeth Chan—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jana Compton—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Corvallis, OR

Mr. Leland Deck—Office of Air Policy and Program Support, Office of Air and Radiation, U.S. Environmental Protection Agency, Washington, DC

Dr. David M. DeMarini—Center for Computational Toxicology and Exposure, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Neal Fann—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Aimen K. Farraj—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Arlene Fiore—Department of Earth and Environmental Sciences, Columbia University, Palisades, NY

Dr. Kristen M. Foley—Center for Environmental Measurement and Modeling, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. M. Ian Gilmour—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

00196434

Dr. David Grantz—Department of Botany & Plant Sciences, University of California, Davis, CA

Dr. Nicole Hagan—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Gayle Hagler—Center for Environmental Measurement and Modeling, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Jaime Hart—Harvard T.H. Chan School of Public Health, Harvard University, Cambridge, MA

Dr. Michael Hays—Center for Environmental Measurement and Modeling, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Mehdi Hazari—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Marion Hoyer—Office of Transportation and Air Quality, Office of Air and Radiation, U.S. Environmental Protection Agency, Ann Arbor, MI

Ms. Sheila Igoe—Office of General Counsel, U.S. Environmental Protection Agency, Washington, DC

Dr. Kazuhiko Ito—New York City Department of Health and Mental Hygiene, New York, NY

Dr. Annie Jarabek—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Ilona Jaspers—Gillings School of Global Public Health, University of North Carolina, Chapel Hill, NC

Dr. Scott Jenkins—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Thomas Kirchstetter—Civil and Environmental Engineering, University of California, Berkley, CA

Dr. Mike Kleeman—Department of Civil and Environmental Engineering, University of California, Davis, CA

Dr. Urmila P. Kodavanti—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Morton Lippman—Department of Environmental Medicine, New York University, Tuxedo, NY

Dr. Danelle T. Lobdell—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Daniel Malashock**—Office of Children's Health Protection, Office of the Administrator, U.S. Environmental Protection Agency, Washington, DC

lxxv

00196435

Dr. Rohit Mathur—Center for Environmental Measurement and Modeling, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Colette Miller—Oak Ridge Institute for Science and Education, Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Fred Miller—Frederick J. Miller & Associates, Raleigh-Durham, NC

Dr. Lucas Neas—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Zach Pekar—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Kent Pinkerton—College of Biological Sciences, University of California, Davis, CA

Dr. Sanjay Rajagopalan—Department of Medicine, Case Western Reserve University, Cleveland, OH

Dr. Allen Robinson—Engineering and Public Policy, College of Engineering, Carnegie Mellon University, Pittsburgh, PA

Dr. Ivan Rusyn—Veterinary Medicine & Biomedical Sciences, Texas A&M University, College Station, TX

Dr. Stefanie Sarnat—Rollins School of Public Health, Emory University, Atlanta, GA

Ms. Erika Sasser—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Dina Schreinemachers—Center for Public Health and Environmental Assessment, Office of Research and Development, U.S. Environmental Protection Agency, Research Triangle Park, NC

Mr. Matt Small—Region 9, U.S. Environmental Protection Agency, San Francisco, CA

Ms. Susan Stone—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Adam Szpiro—Department of Biostatistics, University of Washington, Seattle, WA

Dr. Karen Wesson—Office of Air Quality Planning and Standards, Office of Air and Radiation, U.S. Environmental Protection Agency, Research Triangle Park, NC

Dr. Yifang Zhu—Jonathan and Karin Fielding School of Public Health, University of California, Los Angeles, CA

**Current affiliation is Office of Radiation and Indoor Air, Office of Air and Radiation, U.S. Environmental Protection Agency, Washington, DC

# ACRONYMNS AND ABBREVIATIONS

| Acronym/Abbreviation | Meaning |
|---|---|
| 3B-HSD | 3-beta-hydroxysteroid dehydrogenase |
| 5hmC | 5-hydroxymethylcytosine |
| 5mC | 5-methylcytosine |
| 5mdC | 5-methyl-2'-deoxycytidine |
| 8-OHdG | 8-hydroxy-2'-deoxyguanosine |
| 99mTc | technicium-99m |
| AARP | American Association of Retired Persons |
| ABI | ankle-brachial index |
| AC | air conditioning |
| ACCMIP | Atmospheric Chemistry and Climate Model Intercomparison Project |
| ACE | angiotensin-converting enzyme |
| ACGIH | American Conference of Governmental Industrial Hygienists |
| aci | aerosol cloud interactions |
| ACL | Americans Changing Lives |
| ACS | American Cancer Society |
| Acta1 | alpha skeletal actin |
| ADHD | attention deficit, hyperreactive disorder |
| ADI | Autism Diagnostic Interview |
| ADMS | Atmospheric Dispersion Modelling System |
| ADOS | Autism Diagnostic Observation Schedule |
| Adrb2 | adrenergic beta 2 |
| AER | air exchange rate |
| AERMOD | American Meteorological Society/U.S. EPA Regulatory Model |
| AeroCom | Aerosol Comparisons between Observations and Models |
| AERONET | Aerosol Robotic Network |
| AF | atrial fibrillation |
| AGD | anogenital distance |
| AhR | aryl hydrocarbon receptor |

| Acronym/Abbreviation | Meaning |
|---|---|
| AHR | airway hyperresponsiveness |
| AHS | Agricultural Health Study |
| AHSMOG | Adventist Health and Smog |
| AI | augmentation index |
| AIC | Akaike's information criterion |
| ALT | alanine transaminase |
| Ang | angiotensin |
| ANS | autonomic nervous system |
| AOD | aerosol optical depth |
| APC | antigen presenting cell(s) |
| APEX | Air Pollutants Exposure model |
| ApoE | apolipoprotein E |
| AQCD | Air Quality Criteria Document |
| AQHI | Air Quality Health Index |
| AQI | Air Quality Index |
| AQS | Air Quality System |
| AR4 | Fourth Assessment Report from the IPCC |
| AR5 | Fifth Assessment Report from the IPCC |
| ari/ARI | aerosol radiation interactions; acute respiratory infection |
| ARIES | Aerosol Research and Inhalation Epidemiology Study |
| ASD | autism spectrum disorder |
| AST | aspartate aminotransferase |
| At1r | angiotensin 1 receptor |
| ATPase | adenosine triphosphatase |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| avg | average |
| B1r | bradykinin type 1 receptor |
| BACE | beta-site APP-cleaving enzyme |
| BAD | bronchial artery diameter |
| BAL | bronchoalveolar lavage |
| BALB | albino inbred mouse strain |
| BALF | bronchoalveolar lavage fluid |

00196437

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| BAMSE | Children, Allergy, Milieu, Stockholm, Epidemiological Survey | CAD | coronary artery disease |
| | | CALINE | California LINE (source dispersion model) |
| bap | absorption by particles coefficient | CALINE4 | California Line Source Dispersion Model 4 |
| BC | black carbon | | |
| bext | light extinction coefficient | CALIPSO | Cloud Aerosol Lidar and Infrared Pathfinder Satellite Observation |
| BG | background | | |
| bhp | brake horsepower | CalNex | California Nexus Study |
| BIC | Bayesian information criterion | CAMx | Comprehensive Air Quality Model with Extensions |
| BMC | Boston Medical Center | CanCHEC | Canadian Census Health and Environment Cohort |
| BME | Bayesian maximum entropy | | |
| BMI | body mass index | CAPES | China Air Pollution and Health Effects Study |
| BNP | B-type natriuretic peptide | | |
| BP | blood pressure | CAPPS | Canadian Asthma Primary Preventions Study |
| BPDE | benzo[a]pyrene 7,8-diol-9,10-epoxide | CAPs | concentrated ambient particles |
| BrC | brown carbon | CASAC | Clean Air Scientific Advisory Committee |
| bsg | scattering by gases coefficient | CBSA | core-based statistical area |
| BSID | Bayley Scale of Infant Development | CBVD | cerebrovascular disease |
| | | CC | corpus callosum |
| bsp | sum of light scattering by (aerosol) particles coefficient | CC16 | club cell secretory protein |
| | | CCHS | Canadian Community Health Survey |
| BTEX | benzene, toluene, ethylbenzene, xylene | CCR | California Cancer Registry |
| BVAIT | B-Vitamin Atherosclerosis Intervention Trial | CDC | Centers for Disease Control and Prevention |
| BW | bronchial wash | CEN | European Committee for Standardization |
| BWGA | birth weight for gestational age | | |
| BWHS | Black Women's Health Study | CERAD | Consortium to Establish a Registry for Alzheimer's Disease |
| C57BL | wild type c57 black mouse | | |
| $C_6H_6$ | benzene | CESD | Center for Epidemiological Studies Depression Scale |
| CA | California | | |
| CA SEER | California Surveillance Epidemiology and End Results cancer registry | CESD-R | Center for Epidemiological Studies Depression Scale Revised |
| $Ca^{2+}$ | calcium | CF | cystic fibrosis |
| CAA | Clean Air Act | CFD | computational fluid dynamics |
| CAAA | 1977 Clean Air Act Amendments | CFR | Code of Federal Regulations |
| CAC | coronary artery calcification | CHAD | Consolidated Human Activity Database |
| $CaCO_3$ | calcium carbonate | | |

lxxviii

00196438

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| CHARGE | Childhood Autism Risks from Genetics and the Environment | CSN | Chemical Speciation Network |
| CHD | coronary heart disease | CTM | chemical transport model |
| CHE | controlled human exposure | CTS | California Teachers Study |
| CHF | congestive heart failure | CuZn | copper zinc |
| CHIMERE | multiscale chemical transport model for atmospheric composition analysis and forecast | CV | coefficient of variation; cardiovascular |
| | | C-V | cross-validation |
| CHS | Children's Health Study | CVD | cardiovascular disease(s) |
| CI | confidence interval | CXCR3 | chemokine receptor 3 |
| cIMT | carotid intimal-medial thickness | DA | diacetate |
| | | $d_{ae}$ | aerodynamic diameter of a particle |
| cm | centimeter(s) | DASH | Denver Aerosol Sources and Health |
| $cm^2$ | square centimeters | | |
| $cm^3$ | cubic centimeter(s) | DBA | dibenz[a,h]anthracene |
| CMAQ | Community Multiscale Air Quality (model) | DBP | diastolic blood pressure |
| | | DCFH | 2′,7′-dicholorfluorescein |
| CNBSS | Canadian National Breast Screening Study | DCH | Diet, Cancer, and Health Study |
| CNS | central nervous system | DDST | Denver Developmental Screening Test |
| CO | carbon monoxide | DE | diesel exhaust |
| $CO^2$ | carbon dioxide | DEARS | Detroit Exposure and Aerosol Research Study |
| COD | coefficient of divergence | | |
| COGNAC | Cognition and Air Pollution in Children | Dec | December |
| | | DEE | diesel engine exhaust |
| Col3a1 | collagen type 3 alpha | DEP | diesel exhaust particle |
| COM | combustion | df | degrees of freedom |
| COPD | chronic obstructive pulmonary disease | DF | deposition fraction |
| | | dg | decigram(s) |
| COX | cyclooxygenase | DG | dentate gyrus |
| COX-1 | cyclooxygenase-1 | dL | deciliter(s) |
| COX-2 | cyclooxygenase-2 | DL | distributed lag |
| CPC | condensation particle counter | DLCO | diffusing capacity of the lung for carbon monoxide |
| CPS | Cancer Prevention Study | | |
| Cr | Koschmieder relationship | DM | diabetes mellitus |
| C-R | concentration-response (relationship) | DMSO | dimethylsulfoxide |
| | | DNA | deoxyribonucleic acid |
| CRH | corticotropin-releasing hormone | DNC | Danish Nurse Cohort |
| | | Dp | physical diameter of a particle |
| CRP | C-reactive protein | DTPA | diethylenetriaminepentaacetate |
| CSF | cerebrospinal fluid | | |

lxxix

00196439

| Acronym/Abbreviation | Meaning |
|---|---|
| DTT | dithiothreitol |
| dv | deciview(s) |
| DVT | deep vein thromboses |
| EC | elemental carbon |
| ECG | electrocardiogram |
| ECRHS | European Community Respiratory Health Survey |
| ED | emergency department |
| EF | ejection fraction |
| EFAD | early onset familial Alzheimer disease |
| EFFECT | Enhanced Feedback for Effective Cardiac Treatment |
| EGU | electricity-generating unit |
| ELF | epithelial lining fluid |
| ELITE | Early Versus Late Intervention Trial with Estradiol |
| eNO | exhaled nitric oxide |
| ENVIRONAGE | ENVIRonmental influence ON early AGEing |
| EOM | extracted organic material |
| EP | entire pregnancy |
| EPCs | endothelial progenitor cells |
| ER | endoplasmic reticulum |
| ERF | effective radiative forcing |
| ERFaci | effective radiative forcing due to aerosol-cloud interactions |
| ERFari | effective radiative forcing due to aerosol-radiation interactions |
| ERK | extracellular signal-regulated kinase |
| ESCAPE | European Study of Cohorts for Air Pollution Effects |
| ET | extrathoracic |
| ET-1 | endothelin-1 |
| ETA | endothelin A |
| EU | European Union |
| EURAD | European Air Pollution Dispersion |
| $f$ | breathing frequency |
| F344 | Fischer 344 rat strain |
| FA | filtered air; fatty acid |

| Acronym/Abbreviation | Meaning |
|---|---|
| FBG | fasting blood glucose |
| $Fe_2O_3$ | iron (III) oxide |
| $FEF_{25-75}$ | forced expiratory flow between 25 and 75% of forced vital capacity |
| FEM | Federal Equivalent Method |
| FeNO | fractional exhaled nitric oxide |
| FeO | iron (II) oxide |
| $FEV_1$ | forced expiratory volume in 1 second |
| $F_{inf}$ | infiltration factors |
| FINRISK | Finland Risk |
| FMD | flow-mediated dilation |
| fmsYFP | yellow fluorescent protein |
| FO | fish oil |
| FOXp3 | forkhead box P3 |
| FPG | formamidopyrimidine DNA glycosylase |
| FR | Federal Register |
| FRC | functional residual capacity |
| FRM | Federal Reference Method |
| FSH | follicle stimulating hormone |
| FSIGT | frequently sampled intravenous glucose tolerance (test) |
| FSIQ | Full Scale Intelligence Quotient |
| FVB | Friend leukemia virus B |
| FVC | forced vital capacity |
| FXII | coagulation factor XII |
| g | gram(s) |
| GABA | gamma-aminobutryic acid |
| GALA | Genes-Environments and Admixture in Latino Americans |
| GAM | generalized additive model |
| GASP | Genetics and Environment: Prospective Study on Infancy in Italy |
| GC | gas chromatograph |
| GCLC | glutamate cysteine ligase catalytic subunit |
| GCLM | glutamate cysteine ligase modifier subunit |

lxxx

00196440

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
| --- | --- | --- | --- |
| GD | gestation day | $H_2O_2$ | hydrogen peroxide |
| GDI | gasoline direct injection | $H_2SO_4$ | sulfuric acid |
| GDM | gestational diabetes mellitus | HA | hospital admission |
| GE | gasoline exhaust | HAED | hospital admission or emergency department |
| GEE | gasoline engine exhaust | | |
| GEM | gaseous elemental mercury | HAPEM | Hazardous Air Pollutant Exposure Model |
| GEOS | Goddard Earth Observing System | HbA1c | glycated hemoglobin |
| GEOS-Chem | Goddard Earth Observing System with global chemical transport model | HBM | Hierarchical Bayesian Model |
| | | HD-DE | high-dose diesel exhaust |
| | | HDL | high-density lipoprotein |
| GFAP | glial fibrillary acidic protein | HEI | Health Effects Institute |
| GGT | gamma glutamyltransferase | HEPA | high-efficiency particulate air (filter) |
| GI | gastrointestinal | | |
| GINI | German Infant Nutrition Intervention | HERO | Health and Environmental Research Online database |
| GINIplus | German Infant Nutrition Intervention plus environmental and genetic influences | HF | heart failure; high frequency domain of HRV |
| | | HFD | high fat diet |
| GIS | geographic information system | HNE | hydroxynonenal |
| GISS | Goddard Institute for Space Studies | $HNO_3$ | nitric acid |
| | | HNR | Heinz Nixdorf Recall (study) |
| GLM | generalize linear model | HO-1 | heme oxidase 1 |
| GLuA1 | glutamatergic receptor protein subunit A1 | HOMA | Homeostatic Model Assessment |
| GLuA2 | glutamatergic receptor protein subunit A2 | HOMA-IR | Homeostatic Model Assessment of Insulin Resistance |
| GPS | global positioning system | | |
| GSD | geometric standard deviation | HPA | hypothalamic-pituitary-adrenal |
| GSHPx | glutathione peroxidase | HPFU | Health Professionals Follow-Up |
| GSS | glutathione synthetase gene | | |
| GST | glutathione S-transferase | HPLC | high-performance liquid chromatography |
| GSTM1 | glutathione S-transferase mu 1 | HPMEC | human pulmonary microvasculature endothelial |
| GSTP1 | glutathion S-transferase pi 1 | | |
| GTP | global temperature potential | HR | heart rate; hazard ratio |
| GTT | glucose tolerance test | HRS | Health and Retirement Survey |
| GWP | global warming potential | HRV | heart rate variability |
| GWR | geographically weighted regression | HS | hemorrhagic stroke |
| | | HSC | Harvard Six Cities (study) |
| h | hour(s) | hs-CRP | high sensitivity C-reactive protein |
| $H^+$ | hydrogen ion | | |

lxxxi

00196441

| Acronym/Abbreviation | Meaning |
|---|---|
| IARC | International Agency for Research on Cancer |
| IBA-1 | ionized calcium binding adaptor molecule |
| IBG | impaired blood glucose |
| ICAM-1 | intercellular adhesion molecule 1 |
| ICD | International Classification of Disease |
| ICD10 | International Classification of Disease version 10 |
| ICD9 | International Classification of Disease version 9 |
| ICR | Institute of Cancer Research |
| ICRP | International Commission on Radiological Protection |
| ICS | inhaled corticosteroid |
| ICU | intensive care unit |
| IDW | inverse-distance weighting |
| IFN | interferon |
| IgE | immunoglobulin E |
| IgG1 | immunoglobulin G1 |
| IGM | impaired glucose metabolism |
| IGT | impaired glucose tolerance |
| IHD | ischemic heart disease |
| IKK | inhibitor of nuclear factor-$\kappa$B kinase |
| IL | interleukin |
| IL1$\beta$ | interleukin-1 beta |
| IL-4 | interleukin-4 |
| IL-6 | interleukin-6 |
| IMPROVE | Interagency Monitoring of Protected Visual Environments |
| INMA | *INfancia y Medio Ambiente*—(Environment and Childhood) |
| iNOS | inducible nitric oxide synthase |
| IO | iodine monoxide |
| IOM | institutes of medicine |
| IPCC | Intergovernmental Panel on Climate Change |
| IQ | intelligence quotient |
| IQR | interquartile range |

| Acronym/Abbreviation | Meaning |
|---|---|
| IR | insulin resistance |
| IRP | Integrated Review Plan |
| ISA | Integrated Science Assessment |
| ISO | International Organization for Standardization |
| ITT | insulin tolerance test |
| IUGR | Intra-uterine growth restriction |
| IVF | in vitro fertilization |
| K | potassium |
| KC | keratinocyte-derived chemokine |
| kg | kilogram(s) |
| km | kilometer(s) |
| km$^2$ | square kilometer(s) |
| KORA | *Kooperative Gesundheitsforschung in der Region Augsburg* (Cooperative Health Research in the Region of Augsburg) |
| LAC | light-absorbing carbon |
| LAVI | left atrial volume index |
| LBL | Lawrence Berkeley Laboratory |
| LBW | low birth weight |
| LDH | lactate dehydrogenase |
| LDL | low-density lipoprotein |
| Ldlr$^{-/-}$ | low-density lipoprotein receptor null |
| LDSA | lung deposited surface area |
| LF | low frequency |
| LH | luteinizing hormone |
| LHID2000 | Longitudinal Health Insurance Database for 2000 |
| LINE-1 | long interspersed nucleotide element-1 |
| LISA | Lifestyle Factors on the Development of the Immune System and Asthma |
| LISAplus | Lifestyle Factors on the Development of the Immune System and Asthma plus Air Pollution and Genetics on Allergy Development |

00196442

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| lnSDNN | natural log of the standard deviation of all normal-to-normal intervals | MI | myocardial infarction |
| | | MIDI | Minnesota Infant Development Inventory |
| LOOCV | leave-one-out cross validation | min | minute(s) |
| LOX | lysyl oxidase | MINAP | Myocardial Ischaemia National Audit Project |
| LPR | liver-to-phantom ratio | | |
| LRI | lower respiratory infection | MIP | macrophage inflammatory protein |
| LRTI | lower respiratory tract infection | | |
| LTE4 | leukotriene E4 | MISR | Multiangle Imaging Spectroradiometer |
| LUR | land use regression | | |
| LUR-BME | land use regression—Bayesian maximum entropy | mL | milliliter(s) |
| | | MMAD | mass median aerodynamic diameter |
| LV | left ventricular | | |
| LVDP | left ventricular developed pressure | MMD | mass median diameter |
| | | MMEF | maximum midexpiratory flow |
| LVMI | left ventricular mass index | mm Hg | millimeters of mercury |
| m | meter(s) | MMP | mitochondria membrane potential |
| $m^2$ | square meters | | |
| $m^3$ | cubic meters | MMP-9 | matrix metallopeptidase 9 |
| MAAS | Manchester Asthma and Allergy Study | MMT | million metric tons |
| | | MnSOD | manganese superoxide dismutase |
| MAP | mean arterial pressure | | |
| max | maximum | mo | month(s) |
| MC | mass concentration | Mo | molybdenum |
| MCAPS | Medicare Air Pollution Study | MOBILIZE | Maintenance of Balance, Independent Living, Intellect, and Zest in the Elderly |
| MCDI | McArthur Communicative Development Inventory | | |
| | | MODIS | MODerate Resolution Imaging Spectroradiometer |
| MCI | mild cognitive impairment | | |
| MCP | monocyte chemoattractant protein | MOUDI | micro-orifice uniform deposit impactor |
| MCP-1 | monocyte chemoattractant protein-1 | MPPD | Multi-Path Particle Dosimetry (model) |
| MCT | mucoid connective tissue | MRI | magnetic resonance imaging |
| MDA | malondialdehyde | mRNA | messenger ribonucleic acid |
| MDL | method detection limit | MSA | metropolitan statistical area |
| MED-PARTICLES | particles size and composition in Mediterranean countries: geographical variability and short-term health effects | MSE | mean-squared error |
| | | Muc5AC | mucin 5AC, oligomeric mucus/gel-forming |
| MEF | midexpiratory flow | MV | minute volume |
| MESA | Multi-Ethnic Study of Atherosclerosis | MVE | motor vehicle exhaust |
| | | $Na^+$ | sodium ion |
| mg | milligram(s) | $Na_2O$ | sodium oxide |

lxxxiii

00196443

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| NAAQS | National Ambient Air Quality Standards | NIST | National Institute of Standards and Technology |
| NADPH | nicotinamide adenine dinucleotide phosphate hydrogen | NLCS | Netherlands Cohort Study on Diet and Cancer |
| | | nm | nanometer(s) |
| NAEPP | National Asthma Education and Prevention Program | NMBF | normalized mean bias factor |
| NAFLD | nonalcoholic fatty liver disease | NME | normalized mean error |
| NALF | nasal airway lavage fluid | NMMAPS | National Morbidity, Mortality, and Air Pollution Study |
| NAPCA | National Air Pollution Control Administration | NMSE | normalized mean squared error |
| NAS | Normative Aging Study | NO | nitric oxide |
| NASA | National Aeronautics and Space Administration | $NO_2$ | nitrogen dioxide |
| | | $NO_3^-$ | nitrate |
| NC | number concentration | $NO_X$ | oxides of nitrogen ($NO + NO_2$) |
| NCLS-Air | Netherlands Cohort Study on Diet and Cancer | $NOX2^{-/-}$ | NADPH oxidase 2 null |
| NCore | National Core (multipollutant monitoring network) | NPACT | National Particle Component Toxicity Initiative |
| $NC_{total}$ | total number concentration | NPF | new particle formation |
| ND | not detected | NQO1 | NADPH-quinone oxidoreductase 1 |
| NECSS | National Enhanced Cancer Surveillance System | NR | not reported |
| NEI | National Emissions Inventory | NR-DE | nanoparticle rich diesel exhaust |
| NFkB | nuclear factor kappa B | Nrf2 | nuclear factor erythroid 2-related factor |
| ng | nanogram(s) | NRPB | National Radiological Protection Board |
| $NH_3$ | ammonia | | |
| $NH_4$ | ammonium | NTP | nitroprusside |
| $NH_4^+$ | ammonium ion | $O_2$ | oxygen gas |
| $NH_4NO_3$ | ammonium nitrate | $O_3$ | ozone |
| NHANES | National Health and Nutrition Examination Survey | OAQPS | Office of Air Quality Planning and Standards |
| NHID | National Health Insurance Database | OC | organic carbon |
| | | OCM | organic carbon matter |
| NHIS | National Health Interview Survey | oGTT | oral glucose tolerance test |
| | | OH | hydroxide |
| NHLBI | National Heart, Lung, and Blood Institute | OHCA | out-of-hospital cardiac arrest |
| NHS | Nurses' Health Study | OM | organic matter |
| NIH | National Institutes of Health | OO | olive oil |
| NIH-AARP | National Institutes of Health—American Association of Retired Persons (diet and health cohort) | OP | oxidative potential |
| | | OR | odds ratio |
| | | OTH | other primary sources |

00196444

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| OVA | ovalbumin | PIAMA | Prevention and Incidence of Asthma and Mite Allergy |
| oxoG | oxoguanine | PM | particulate matter |
| $p$ | probability value | $PM_{10}$ | particulate matter with a nominal mean aerodynamic diameter less than or equal to 10 μm.[1] |
| PACF | partial autocorrelation function | | |
| PAGE | Parkinson's Genes and Environment (study) | | |
| PAH | polycyclic aromatic hydrocarbon(s) | $PM_{10-2.5}$ | particulate matter with a nominal mean aerodynamic diameter greater than 2.5 μm and less than or equal to 10 μm.[2] |
| PAI-1 | plasminogen activator inhibitor 1 | | |
| PAPC | 1-palmitoyl-2-arachidonoyl-sn-phosphatidylcholine | $PM_{2.5}$ | particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 μm.[3] |
| PARP1 | poly (ADP-ribose) polymerase-1 | | |
| Pb | lead | PM25abs | $PM_{2.5}$ light absorption coefficient |
| PBAP | primary biological aerosol particle | PMF | positive matrix factorization |
| PBR | peripheral-type benzodiazepine receptor | PMN | polymorphonuclear leukocyte |
| | | PN | particle number |
| PD | Parkinson's disease | PNC | particle number count |
| PE | phenylephrine; postexposure; pulmonary embolism | PND | postnatal day |
| | | pNN50 | mean number of times per hour in which change in consecutive normal sinus (NN) intervals exceeds 50 milliseconds |
| PEF | peak expiratory flow | | |
| PEFR | peak expiratory flow rate | | |
| Penh | enhanced pause | POA | primary organic aerosol (PM from fossil fuel and biofuel) |
| PFI | port fuel injection | | |
| PI | posterior interval | POC | primary organic carbon |
| PI3K | phosphoinositide 3-kinases | POM | particulate organic matter |
| | | PP | pulse pressure |

---

[1] A measurement of thoracic particles (i.e., that subset of inhalable particles thought small enough to penetrate beyond the larynx into the thoracic region of the respiratory tract). In regulatory terms, particles with an upper 50% cut-point of $10 \pm 0.5$ μm aerodynamic diameter (the 50% cut point diameter is the diameter at which the sampler collects 50% of the particles and rejects 50% of the particles) and a penetration curve as measured by a reference method based on Appendix J of 40 CFR Part 50 and designated in accordance with 40 CFR Part 53 or by an equivalent method designated in accordance with 40 CFR Part 53.

[2] A measurement of thoracic coarse particulate matter or the coarse fraction of $PM_{10}$. In regulatory terms, particles with an upper 50% cut-point of 10 μm aerodynamic diameter and a lower 50% cut-point of 2.5 μm aerodynamic diameter (the 50% cut point diameter is the diameter at which the sampler collects 50% of the particles and rejects 50% of the particles) as measured by a reference method based on Appendix O of 40 CFR Part 50 and designated in accordance with 40 CFR Part 53 or by an equivalent method designated in accordance with 40 CFR Part 53.

[3] A measurement of fine particles. In regulatory terms, particles with an upper 50% cut-point of 2.5 μm aerodynamic diameter (the 50% cut point diameter is the diameter at which the sampler collects 50% of the particles and rejects 50% of the particles) and a penetration curve as measured by a reference method based on Appendix L of 40 CFR Part 50 and designated in accordance with 40 CFR Part 53, by an equivalent method designated in accordance with 40 CFR Part 53, or by an approved regional method designated in accordance with Appendix C of 40 CFR Part 58.

00196445

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| ppb | parts per billion | RH | relative humidity |
| ppm | parts per million | RHI | Reactive Hyperemia Index |
| PR | time interval between the beginning of the P wave to the peak of the R wave | RIOPA | Relationship among Indoor, Outdoor, and Personal Air |
| | | RMSE | root-mean-squared error |
| PROM | premature rupture of membranes | RNA | ribonucleic acid |
| | | RoLS | Rome Longitudinal Study |
| PSD | postsynaptic density protein | ROS | reactive oxygen species |
| PSD-95 | postsynaptic density protein 95 | RR | relative risk; rate ratio; risk ratio |
| PTB | preterm birth | | |
| PU | pulmonary | RS | remote sensing |
| PVD | peripheral vascular disease | RSV | respiratory syncytial virus |
| PWV | pulse wave velocity | RTp | time interval between the beginning of R wave and peak of the T wave |
| Q | flow | | |
| QRS | time interval between the beginning of the Q wave and the peak of the S wave | RTP | Research Triangle Park |
| | | RVM | Right Ventricular Mass |
| QT | time interval between from beginning of the Q wave to end of the T wave | s | second(s) |
| | | SAGE | Study of Asthma, Genes, and the Environment |
| QTc | corrected QT interval | SALIA | Study on the influence of Air pollution on Lung function, Inflammation, and Aging; Study on the Influence of Air Pollution on the Lung |
| r | correlation coefficient | | |
| R² | coefficient of determination | | |
| RAS | renin-angiotensin system | | |
| RCT | randomized control trial | SAPALDIA | Swiss study on Air Pollution and Lung Diseases in Adults |
| redox | reduction-oxidation | | |
| REGARDS | REasons for Geographic and Racial Differences in Stroke | SBP | systolic blood pressure |
| | | SC | surface area concentration |
| REGICOR | *Registre Gironi del Cor* (Girona Heart Registry) | SCQ | social communication questionnaire |
| REM-Calgrid | Regional Eulerian Model—California Grid Model | SD | standard deviation |
| | | S-D | Sprague-Dawley |
| RESPIRA | Italian acronym for *Rischio ESPosizione Inquinamento aRia Atmosferica* study | SDNN | standard deviation of normal-to-normal intervals |
| | | SE | standard error |
| REVEAL-HBV | Risk Evaluation of Viral Load Elevation and Associated Liver Disease/Cancer-Hepatitis B Virus | SEARCH | Southeastern Aerosol Research and Characterization |
| | | SEM | standard error of the mean |
| RF | radiative forcing | SES | socioecononomic status; sample equilibration system |
| RFaci | radiative forcing due to aerosol-cloud interactions | SETIL | population-based CC study of childhood cancer in Italy |
| RFari | radiative forcing due to aerosol-radiation interactions | | |
| | | SGA | small for gestational age |

00196446

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| SH | spontaneously hypertensive | TAG | Traffic, Asthma, and Genetics (study) |
| SHEDS | Stochastic Human Exposure and Dose Simulation (model) | TAPES | Taipei Air Pollution Exposure System for Health Effects |
| SHR | spontaneously hypertensive rats | TB | tracheobronchial |
| SHS | second-hand smoke | TBARS | thiobarbituric acid reactive substances |
| sICAM | soluble intercellular adhesion molecule 1 | TC | total carbon |
| SIDS | sudden infant death syndrome | TCHS | Taiwan Children's Health Study |
| $SiO_2$ | silica | TEOM | tapered element oscillating microbalance |
| SIS | six item screener | | |
| SLAMS | State and Local Air Monitoring Stations | TF | tissue factor |
| SMPS | scanning mobility particle sizer | Tg | teragram(s) |
| SNP | sodium nitroprusside | TG | triglyceride |
| SNPs | single nucleotide polymorphisms | TGF | transforming growth factor |
| | | Th1 | T helper type 1 |
| SNS | sympathetic nervous system | Th17 | T helper type 17 |
| $SO_2$ | sulfur dioxide | Th2 | T helper type 2 |
| $SO_4$ | sulfate | Ti | titanium |
| $SO_4^{2-}$ | sulfate | TIA | transient ischemic attack |
| SOA | secondary organic aerosol | TICS | Telephone Interview of Cognitive Status |
| SOC | secondary organic carbon | | |
| SOD | superoxide dismutase | $TiO_2$ | titanium dioxide |
| SOPHIA | Study of Particles and Health in Atlanta | TLR | toll-like receptor |
| | | TLR4 | toll-like receptor 4 |
| $SO_x$ | sulfur oxides | TNF | tumor necrosis factor |
| SPMSQ | Short Portable Mental Status Questionnaire | TOA | top of the atmosphere |
| | | tPA | tissue plasminogen activator |
| SR-B1 | scavenger receptor-B1 | TRANSPHORM | European Study of Transport-Related Air Pollution and Health Impacts-Integrated Methodologies for Assessing Particulate Matter |
| SRM | standard reference material | | |
| SRS | Social Responsiveness Scale | | |
| StAR | steroidogenic acute regulatory | | |
| STEMI | ST segment elevation myocardial infarction | TRAP | traffic-related ambient particles |
| sTNF | soluble tumor necrosis factor | TrIPS | Trucking Industry Particle Study |
| sVCAM-1 | soluble vascular cell adhesion molecule-1 | | |
| | | TROY | Testing Responses on Youth |
| SVE | supraventricular ectopy | TRP | transient receptor potential |
| T1D | type 1 diabetes | TSP | total suspended particulates |
| T2D | type 2 diabetes | U.K. | United Kingdom |
| | | U.S. | United States of America |

lxxxvii

00196447

| Acronym/Abbreviation | Meaning | Acronym/Abbreviation | Meaning |
|---|---|---|---|
| U.S.C. | U.S. Code | WT | wild type |
| U.S. EPA | U.S. Environmental Protection Agency | wt | weight |
| UF | ultrafine | yr | year(s) |
| UFIREG | Ultrafine Particles—An Evidence-Based Contribution to the Development of Regional and European Environmental and Health Policy | | |
| UFP | ultrafine particle | | |
| URI | upper respiratory infection | | |
| V | vanadium | | |
| VACES | Versatile Aerosol Concentration Enrichment System | | |
| VCAM-1 | vascular cell adhesion molecule-1 | | |
| $V_d$ | deposition velocity | | |
| VEGF | vascular endothelial growth factor | | |
| VHM and PP | Vorarlberg Health Monitoring and Promotion Program | | |
| VOC | volatile organic compound | | |
| VPTB | very preterm birth | | |
| $V_T$ | tidal volume | | |
| VTE | venous thromboembolism | | |
| vWF | Von Willebrand factor | | |
| W | west | | |
| WBC | white blood cell | | |
| WCC | white cell count | | |
| WHI | Women's Health Initiative | | |
| WHIMS | Women's Health Initiative Memory Study | | |
| WISC | Wechsler Intelligence Scale for Children | | |
| WISH | Women's Isoflavone Soy Health | | |
| WKY | Wistar Kyoto | | |
| WM | white matter | | |
| $Wm^{-2}$ | watts per square meter | | |
| $w/m^2$ | watts per square meter | | |
| WRF | Weather Research and Forecasting (model) | | |

00196448

# PREFACE

The Preface to the Integrated Science Assessment for Particulate Matter (PM ISA) outlines the legislative requirements of a National Ambient Air Quality Standard (NAAQS) review and the history of the PM NAAQS. This information provides an understanding of the function of the ISA, and in terms of providing a starting point for this PM ISA, presents the basis for the decisions that supported the previous PM NAAQS review. In addition, the Preface details the purpose of the ISA as well as specific issues pertinent to evaluating the scientific evidence within this ISA, including the scope of the ISA and discipline-specific decisions that governed parts of the review.

## P.1.   Legislative Requirements for the Review of the National Ambient Air Quality Standards

Two sections of the Clean Air Act (CAA) govern the establishment, review, and revision of the National Ambient Air Quality Standards (NAAQS). Section 108 [42 U.S. Code (U.S.C.) 7408] directs the Administrator to identify and list certain air pollutants and then to issue air quality criteria for those pollutants. The Administrator is to list those air pollutants that in their "judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare," "the presence of which in the ambient air results from numerous or diverse mobile or stationary sources," and "for which …[the Administrator] plans to issue air quality criteria…" [42 U.S.C. 7408(a)(1) (CAA, 1990a)]. Air quality criteria are intended to "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare, which may be expected from the presence of [a] pollutant in the ambient air…" [42 U.S.C. 7408(b)]. Section 109 [42 U.S.C. 7409 (CAA, 1990b)] directs the Administrator to propose and promulgate "primary" and "secondary" NAAQS for pollutants for which air quality criteria are issued. Section 109(b)(1) defines a primary standard as one "the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health."[4] A secondary standard, as defined in Section 109(b)(2), must "specify a level of air quality the attainment and maintenance of which, in the judgment of the Administrator, based on such criteria, is requisite to protect

---

[4] The legislative history of Section 109 indicates that a primary standard is to be set at "…the maximum permissible ambient air level…which will protect the health of any [sensitive] group of the population," and that for this purpose "reference should be made to a representative sample of persons comprising the sensitive group rather than to a single person in such a group" S. Rep. No. 91:1196, 91st Cong., 2d Sess. 10 (1970).

00196449

the public welfare from any known or anticipated adverse effects associated with the presence of [the] air pollutant in the ambient air."[5]

The requirement that primary standards provide an adequate margin of safety was intended to address uncertainties associated with inconclusive scientific and technical information available at the time of standard setting. It was also intended to provide a reasonable degree of protection against hazards that research has not yet identified.[6] Both kinds of uncertainty are components of the risk associated with pollution at levels below those at which human health effects can be said to occur with reasonable scientific certainty. Thus, in selecting primary standards that provide an adequate margin of safety, the Administrator is seeking not only to prevent pollution levels that have been demonstrated to be harmful but also to prevent lower pollutant levels that may pose an unacceptable risk of harm, even if the risk is not precisely identified as to nature or degree. The CAA does not require the Administrator to establish a primary NAAQS at a zero-risk level or at background concentration levels, but rather at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety.[7] In so doing, protection is provided for both the population as a whole and those groups and lifestages potentially at increased risk for health effects from exposure to the air pollutant for which each NAAQS is set.

In addressing the requirement for an adequate margin of safety, the U.S. Environmental Protection Agency (U.S. EPA) considers such factors as the nature and severity of the health effects involved, the size of the sensitive group(s), and the kind and degree of the uncertainties. The selection of any particular approach to providing an adequate margin of safety is a policy choice left specifically to the Administrator's judgment.[8]

In setting standards that are "requisite" to protect public health and welfare as provided in Section 109(b), the U.S. EPA's task is to establish standards that are neither more nor less stringent than necessary for these purposes. In so doing, the U.S. EPA may not consider the costs of implementing the standards.[9] Likewise, "[a]ttainability and technological feasibility are not relevant considerations in the promulgation of national ambient air quality standards."[10]

Section 109(d)(1) requires that "not later than December 31, 1980, and at 5-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under Section 108

---

[5] Section 302(h) of the Act [42 U.S.C. 7602(h)] provides that all language referring to effects on welfare includes, but is not limited to, "effects on soils, water, crops, vegetation, man-made materials, animals, wildlife, weather, visibility and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being…" (CAA, 2005).

[6] See *Lead Industries Association v. EPA*, 647 F.2d 1130, 1154 [District of Columbia Circuit (D.C. Cir.) 1980]; *American Petroleum Institute v. Costle*, 665 F.2d 1176, 1186 (D.C. Cir. 1981); *American Farm Bureau Federation v. EPA*, 559 F. 3d 512, 533 (D.C. Cir. 2009); *Association of Battery Recyclers v. EPA*, 604 F. 3d 613, 617–18 (D.C. Cir. 2010).

[7] See *Lead Industries v. EPA*, 647 F.2d at 1156 n.51; *Mississippi v. EPA*, 744 F. 3d 1334, 1339, 1351, 1353 (D.C. Cir. 2013).

[8] See *Lead Industries Association v. EPA,* 647 F.2d at 1161–62; *Mississippi v. EPA,* 744 F. 3d at 1353.

[9] See generally, *Whitman v. American Trucking Associations,* 531 U.S. 457, 465–472, 475–476 (2001).

[10] See *American Petroleum Institute v. Costle,* 665 F. 2d at 1185.

SECTION P.1: Legislative Requirements for the Review of the National Ambient Air Quality Standards

P-2

00196450

and the national ambient air quality standards…and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate…." Section 109(d)(2) requires that an independent scientific review committee "shall complete a review of the criteria…and the national primary and secondary ambient air quality standards…and shall recommend to the Administrator any new…standards and revisions of existing criteria and standards as may be appropriate…." Since the early 1980s, this independent review function has been performed by the Clean Air Scientific Advisory Committee (CASAC).[11]

### P.1.1. Overview and History of the Reviews of the Primary and Secondary National Ambient Air Quality Standard for Particulate Matter

NAAQS are defined by four basic elements: indicator, averaging time, level, and form. The indicator defines the pollutant to be measured in the ambient air for the purpose of determining compliance with the standard. The averaging time defines the time period over which air quality measurements are to be obtained and averaged or cumulated, considering evidence of effects associated with various time periods of exposure. The level of a standard defines the air quality concentration used (i.e., an ambient concentration of the indicator pollutant) in determining whether the standard is achieved. The form of the standard defines the air quality statistic that is compared with the level of the standard in determining whether an area attains the standard. For example, the form of the current primary annual fine particulate matter ($PM_{2.5}$) standard is the annual mean averaged over 3 years. The Administrator considers these four elements collectively in evaluating the protection to public health provided by the primary NAAQS.

Particulate matter (PM) is the generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes. Particles originate from a variety of anthropogenic stationary and mobile sources, as well as from natural sources. Particles may be emitted directly or formed in the atmosphere by transformations of gaseous emissions such as sulfur oxides ($SO_X$), oxides of nitrogen ($NO_X$), ammonia ($NH_3$) and volatile organic compounds (VOCs). Examples of secondary particle formation include: (1) the conversion of $SO_2$ to sulfuric acid ($H_2SO_4$) vapor that nucleates new particles or condenses on existing particles and further reacts with $NH_3$ to form various inorganic salts (e.g., ammonium sulfate, $[NH_4]_2SO_4$, or ammonium bisulfate, $NH_4HSO_4$); (2) the conversion of nitrogen dioxide ($NO_2$) to nitric acid ($HNO_3$) vapor that condenses onto existing particles and reacts further with ammonia to form ammonium nitrate ($NH_4NO_3$); and (3) reactions involving gaseous VOCs yielding organic compounds with low vapor pressures that nucleate or condense on existing particles to form secondary organic particulate matter [SOPM; U.S. EPA (2004)]. The chemical and physical properties of PM vary greatly with time, region, meteorology, and source category,

---

[11] Additional information on CASAC is available at:
https://yosemite.epa.gov/sab/sabpeople.nsf/WebCommittees/CASAC.

SECTION P.1: Legislative Requirements for the Review of the National Ambient Air Quality Standards

00196451

thus complicating the assessment of health and welfare effects. These reviews are briefly described below, and further details are provided in the Integrated Review Plan (U.S. EPA, 2016).

The U.S. EPA first established NAAQS for PM in 1971 (36 FR 8186, April 30, 1971), based on the original criteria document (NAPCA, 1969).[12] The Federal Reference Method (FRM) specified for determining attainment of the original standards was the high-volume sampler, which collects PM up to a nominal size of 25 to 45 micrometers (μm; referred to as total suspended particulates or TSP). The primary standards were at 260 μg/m[3], 24-hour avg, not to be exceeded more than once per year, and 75 μg/m[3], annual geometric mean. The secondary standards were 150 μg/m[3], 24-hour avg, not to be exceeded more than once per year, and 60 μg/m[3], annual geometric mean. Since then, the Agency has completed multiple reviews of the air quality criteria and standards, as summarized in Table P-1.

**Table P-1     History of the National Ambient Air Quality Standards (NAAQS) for particulate matter, 1971–2012.**

| Final Rule/Decision | Indicator | Averaging Time | Level (μg/m³) | Form |
|---|---|---|---|---|
| 1971 36 FR 8186 April 30, 1971 | TSP | 24 h | 260 (primary) 150 (secondary) | Not to be exceeded more than once per year |
| | | Annual | 75 (primary) 60 (secondary) | Annual geometric mean |
| 1987 52 FR 24634 July 1, 1987 | PM10 | 24 h | 150 | Not to be exceeded more than once per year on average over a 3-yr period |
| | | Annual | 50 | Annual arithmetic mean, averaged over 3 yr |
| 1997 62 FR 38652 July 18, 1997 | PM2.5 | 24 h | 65 | 98th percentile, averaged over 3 yr |
| | | Annual | 15 | Annual arithmetic mean, averaged over 3 yr[a] |
| | PM10 | 24 h | 150 | Initially promulgated 99th percentile, averaged over 3 yr; when 1997 standards were vacated in 1999, the form of 1987 standards remained in place (not to be exceeded more than once per yr on average over a 3-yr period) |
| | | Annual | 50 | Annual arithmetic mean, averaged over 3 yr |

---

[12] Prior to the review initiated in 2007 (see below), the AQCD provided the scientific basis for the NAAQS.

SECTION P.1: Legislative Requirements for the Review of the National Ambient Air Quality Standards
P-4

00196452

### Table P-1 (Continued): History of the National Ambient Air Quality Standards (NAAQS) for particulate matter, 1971–2012.

| Final Rule/Decision | Indicator | Averaging Time | Level (µg/m³) | Form |
|---|---|---|---|---|
| 2006 71 FR 61144 October 17, 2006 | PM$_{2.5}$ | 24 h | 35 | 98th percentile, averaged over 3 yr |
| | | Annual | 15 | Annual arithmetic mean, averaged over 3 yr[a] |
| | PM$_{10}$ | 24 h | 150 | Not to be exceeded more than once per year on average over a 3-yr period |
| 2012 78 FR 3085 January 15, 2013 | PM$_{2.5}$ | 24 h | 35 | 98th percentile, averaged over 3-yr[b] |
| | | Annual | 12 (primary) 15 (secondary) | Annual arithmetic mean, averaged over 3-yr[c] |
| | PM$_{10}$[d] | 24 h | 150 | Not to be exceeded more than once per year on average over 3-yr |

FR = *Federal Register*; h = hour; µg/m³ = micrograms per cubic meter; PM = particulate matter; PM$_{2.5}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 µm; PM$_{10}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 10 µm; TSP = total suspended particles; yr = year.

Note: When not specified, primary and secondary standards are identical.

[a]The level of the 1997 annual PM$_{2.5}$ standard was to be compared with measurements made at the community-oriented monitoring site recording the highest level, or, if specific constraints were met, measurements from multiple community-oriented monitoring sites could be averaged ("spatial averaging"). This approach was judged to be consistent with the short-term exposure epidemiologic studies on which the annual PM$_{2.5}$ standard was primarily based, in which air quality data were generally averaged across multiple monitors in an area or were taken from a single monitor that was selected to represent community-wide exposures, not localized "hot spots" (62 FR 38672). These criteria and constraints were intended to ensure that spatial averaging would not result in inequities in the level of protection afforded by the PM$_{2.5}$ standards. Community-oriented monitoring sites were specified to be consistent with the intent that a spatially averaged annual standard provide protection for persons living in smaller communities, as well as those in larger population centers.

[b]The level of the 24-h standard is defined as an integer (zero decimal places) as determined by rounding. For example, a 3-yr avg 98th percentile concentration of 35.49 µg/m³ would round to 35 µg/m³ and thus meet the 24-h standard and a 3-yr avg of 35.50 µg/m³ would round to 36 and, hence, violate the 24-h standard (40 Code of Federal Regulations Part 50 Appendix N).

[c]In the revisions to the PM NAAQS finalized in 2006, U.S. EPA tightened the constraints on the spatial averaging criteria by further limiting the conditions under which some areas may average measurements from multiple community-oriented monitors to determine compliance (71 FR 61165-61167, October 17, 2006).

[d]The U.S. EPA revoked the annual PM$_{10}$ NAAQS in 2006.

In October 1979 (44 FR 56730, October 2, 1979), the U.S. EPA announced the first periodic review of the air quality criteria and NAAQS for PM. Revised primary and secondary standards were promulgated in 1987 (52 FR 24634, July 1, 1987). In the 1987 decision, the U.S. EPA changed the indicator for particles from TSP to PM$_{10}$, in order to focus on the subset of inhalable particles small enough to penetrate to the thoracic region of the respiratory tract (including the tracheobronchial and alveolar regions), referred to as thoracic particles.[13] The level of the 24-hour standards (primary and secondary) was set at 150 µg/m³, and the form was one expected exceedance per year, on average over

---

[13] PM$_{10}$ refers to particles with a nominal mean aerodynamic diameter less than or equal to 10 µm. More specifically, 10 µm is the aerodynamic diameter for which the efficiency of particle collection is 50%. Larger particles are not excluded altogether but are collected with substantially decreasing efficiency while smaller particles are collected with increasing efficiency.

SECTION P.1: Legislative Requirements for the Review of the National Ambient Air Quality Standards

00196453

3 years. The level of the annual standards (primary and secondary) was set at 50 $\mu g/m^3$, and the form was annual arithmetic mean, averaged over 3 years.

In April 1994, the U.S. EPA announced its plans for the second periodic review of the air quality criteria and NAAQS for PM, and in 1997 the U.S. EPA promulgated revisions to the NAAQS (62 FR 38652, July 18, 1997). In the 1997 decision, the U.S. EPA determined that the fine and coarse fractions of $PM_{10}$ should be considered separately. This determination was based on evidence that serious health effects were associated with short- and long-term exposures to fine particles in areas that met the existing $PM_{10}$ standards. The U.S. EPA added new standards, using $PM_{2.5}$ as the indicator for fine particles (with $PM_{2.5}$ referring to particles with a nominal mean aerodynamic diameter less than or equal to 2.5 μm). These new standards were as follows: (1) an annual standard with a level of 15.0 $\mu g/m^3$, based on the 3-year avg of annual arithmetic mean $PM_{2.5}$ concentrations from single or multiple community-oriented monitors[14] and (2) a 24-hour standard with a level of 65 $\mu g/m^3$, based on the 3-year avg of the 98th percentile of 24-hour $PM_{2.5}$ concentrations at each monitor within an area. Also, the U.S. EPA established a new reference method for measuring $PM_{2.5}$ in the ambient air and adopted rules for determining attainment of the new standards. To continue to address the coarse fraction of $PM_{10}$ (referred to as thoracic coarse particles or $PM_{10-2.5}$; generally including particles with a nominal mean aerodynamic diameter greater than 2.5 μm and less than or equal to 10 μm), the U.S. EPA retained the annual $PM_{10}$ standard and revised the form of the 24-hour $PM_{10}$ standard to be based on the 99th percentile of 24-hour $PM_{10}$ concentrations at each monitor in an area. The U.S. EPA revised the secondary standards by setting them equal in all respects to the primary standards.

Following promulgation of the 1997 PM NAAQS, petitions for review were filed by a large number of parties, addressing a broad range of issues. In May 1999, the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) upheld the U.S. EPA's decision to establish fine particle standards, holding that "the growing empirical evidence demonstrating a relationship between fine particle pollution and adverse health effects amply justifies establishment of new fine particle standards.[15]" The D.C. Circuit also found "ample support" for the U.S. EPA's decision to regulate coarse particle pollution, but vacated the 1997 $PM_{10}$ standards, concluding that the U.S. EPA had not provided a reasonable explanation justifying use of $PM_{10}$ as an indicator for coarse particles. Pursuant to the D.C. Circuit's decision, the U.S. EPA removed the vacated 1997 $PM_{10}$ standards, and the pre-existing 1987 $PM_{10}$ standards remained in place (65 FR 80776, December 22, 2000). The D.C. Circuit also upheld the

---

[14] The level of the 1997 annual $PM_{2.5}$ standard was to be compared with measurements made at the community-oriented monitoring site recording the highest concentration or, if specific constraints were met, measurements from multiple community-oriented monitoring sites could be averaged (i.e., "spatial averaging"). In the last review (completed in 2012) the U.S. EPA replaced the term "community-oriented" monitor with the term "area-wide" monitor. Area-wide monitors are those sited at the neighborhood scale or larger, as well as those monitors sited at micro- or middle scales that are representative of many such locations in the same CBSA (78 FR 3236, January 15, 2013).

[15] *American Trucking Associations v. U.S. EPA*, 175 F. 3d 1027, 1055−56 (D.C. Cir. 1999).

SECTION P.1: Legislative Requirements for the Review of the National Ambient Air Quality Standards

U.S. EPA's determination not to establish more stringent secondary standards for fine particles to address effects on visibility.

The D.C. Circuit also addressed more general issues related to the NAAQS, including issues related to the consideration of costs in setting NAAQS and the U.S. EPA's approach to establishing the levels of NAAQS. Regarding the cost issue, the court reaffirmed prior rulings holding that in setting NAAQS the U.S. EPA is "not permitted to consider the cost of implementing those standards." Regarding the levels of NAAQS, the court held that the U.S. EPA's approach to establishing the level of the standards in 1997 (i.e., both for PM and for the ozone NAAQS promulgated on the same day) effected "an unconstitutional delegation of legislative authority." Although the court stated that "the factors U.S. EPA uses in determining the degree of public health concern associated with different levels of ozone and PM are reasonable," it remanded the rule to the U.S. EPA, stating that when the U.S. EPA considers these factors for potential non-threshold pollutants "what U.S. EPA lacks is any determinate criterion for drawing lines" to determine where the standards should be set.

The D.C. Circuit's holding on the cost and constitutional issues were appealed to the U.S. Supreme Court. In February 2001, the Supreme Court issued a unanimous decision upholding the U.S. EPA's position on both the cost and constitutional issues.[16] On the constitutional issue, the Court held that the statutory requirement that NAAQS be "requisite" to protect public health with an adequate margin of safety sufficiently guided the U.S. EPA's discretion, affirming the U.S. EPA's approach of setting standards that are neither more nor less stringent than necessary.[17]

In October 1997, the U.S. EPA published its plans for the third periodic review of the air quality criteria and NAAQS for PM (62 FR 55201, October 23, 1997). After the CASAC and public review of several drafts, the U.S. EPA's NCEA finalized the Air Quality Criteria Document (AQCD) in October 2004 (U.S. EPA, 2004). The U.S. EPA's OAQPS finalized a Risk Assessment and Staff Paper in December of 2005 (Abt, 2005; U.S. EPA, 2005).[18] On December 20, 2005, the U.S. EPA announced its proposed decision to revise the NAAQS for PM, and solicited comment on a broad range of options (71 FR 2620, January 17, 2006). On September 21, 2006, the U.S. EPA announced its final decisions to revise the primary and secondary NAAQS for PM to provide increased protection of public health and welfare, respectively (71 FR 61144, October 17, 2006). With regard to the primary and secondary standards for fine particles, the U.S. EPA revised the level of the 24-hour $PM_{2.5}$ standards to 35 $\mu g/m^3$, retained the level of the annual $PM_{2.5}$ standards at 15.0 $\mu g/m^3$, and revised the form of the annual $PM_{2.5}$

---

[16] *Whitman v. American Trucking Associations*, 531 U.S. 457, 464, 475–76.

[17] The Supreme Court remanded the case to the Court of Appeals for resolution of any remaining issues that had not been addressed in that court's earlier rulings. Id. at 475–76. In a March 2002 decision, the Court of Appeals rejected all remaining challenges to the standards, holding that the U.S. EPA's $PM_{2.5}$ standards were reasonably supported by the administrative record and were not "arbitrary and capricious" *American Trucking Associations v. EPA*, 283 F. 3d 355, 369-72 (D.C. Cir. 2002).

[18] Prior to the review initiated in 2007, the Staff Paper, rather than the PA, presented the U.S. EPA staff's considerations and conclusions regarding the adequacy of existing NAAQS and, when appropriate, the potential alternative standards that could be supported by the evidence and information.

SECTION P.1: Legislative Requirements for the Review of the National Ambient Air Quality Standards

00196455

standards by narrowing the constraints on the optional use of spatial averaging. For the primary and secondary standards for $PM_{10}$, the U.S. EPA retained the 24-hour standards, with levels at 150 μg/m³, and revoked the annual standards.[19] The Administrator judged that the available evidence generally did not suggest a link between long-term exposure to existing ambient levels of coarse particles and health or welfare effects. In addition, a new reference method was added for measuring $PM_{10-2.5}$ in the ambient air to provide a basis for approving Federal Equivalent Methods (FEMs) and to promote the gathering of scientific data to support future reviews of the PM NAAQS.

Several parties filed petitions for review following promulgation of the revised PM NAAQS in 2006. These petitions addressed the following issues: (1) selecting the level of the primary annual $PM_{2.5}$ standard; (2) retaining $PM_{10}$ as the indicator of a standard for thoracic coarse particles, retaining the level and form of the 24-hour $PM_{10}$ standard, and revoking the $PM_{10}$ annual standard; and (3) setting the secondary $PM_{2.5}$ standards identical to the primary standards. On February 24, 2009, the U.S. Court of Appeals for the District of Columbia Circuit issued its opinion in the case American Farm Bureau Federation v. U.S. EPA. The court remanded the primary annual $PM_{2.5}$ NAAQS to U.S. EPA because U.S. EPA failed to adequately explain why the standards provided the requisite protection from both short- and long-term exposures to fine particles, including protection for at-risk populations.[20] Regarding the standards for $PM_{10}$, the court upheld U.S. EPA's decisions to retain the 24-hour $PM_{10}$ standard to provide protection from thoracic coarse particle exposures and to revoke the annual $PM_{10}$ standard. For the secondary $PM_{2.5}$ standards, the court remanded the standards to U.S. EPA because the Agency failed to adequately explain why setting the secondary PM standards identical to the primary standards provided the required protection for public welfare, including protection from visibility impairment. The U.S. EPA responded to the court's remands as part of the next review of the PM NAAQS, which was initiated in 2007 (discussed below).

In June 2007, the U.S. EPA initiated the fourth periodic review of the air quality criteria and the PM NAAQS by issuing a call for information in the *Federal Register* (72 FR 35462, June 28, 2007). Based on the NAAQS review process, as revised in 2008 and again in 2009,[21] the U.S. EPA held science/policy issue workshops on the primary and secondary PM NAAQS (72 FR 34003, June 20, 2007; 72 FR 34005, June 20, 2007), and prepared and released the planning and assessment documents that comprise the review process [i.e., IRP (U.S. EPA, 2008), ISA (U.S. EPA, 2009a)], REA planning

---

[19] In the 2006 proposal, the U.S. EPA proposed to revise the 24-hour $PM_{10}$ standard in part by establishing a new $PM_{10-2.5}$ indicator for thoracic coarse particles (i.e., particles generally between 2.5 and 10 μm in diameter). The U.S. EPA proposed to include any ambient mix of $PM_{10-2.5}$ that was dominated by resuspended dust from high-density traffic on paved roads and by PM from industrial sources and construction sources. The U.S. EPA proposed to exclude any ambient mix of $PM_{10-2.5}$ that was dominated by rural windblown dust and soils and by PM generated from agricultural and mining sources. In the final decision, the existing $PM_{10}$ standard was retained, in part due to an "inability…to effectively and precisely identify which ambient mixes are included in the [$PM_{10-2.5}$] indicator and which are not" (71 FR 61197, October 17, 2006).

[20] *American Farm Bureau Federation v. U.S. EPA*, 559 F. 3d 512, 520−27 (D.C. Cir. 2009).
[21] The history of the NAAQS review process, including revisions to the process, is discussed at https://www.epa.gov/naaqs.

SECTION P.1: Legislative Requirements for the Review of the National Ambient Air Quality Standards
P-8

00196456

documents for health and welfare (Office of Air and Radiation, 2009; U.S. EPA, 2009b), a quantitative health risk assessment (U.S. EPA, 2010b)[22] and an urban-focused visibility assessment (U.S. EPA, 2010a),[23] and PA (U.S. EPA, 2011)]. In June 2012, the U.S. EPA announced its proposed decision to revise the NAAQS for PM (77 FR 38890, June 29, 2012).

In December 2012, the U.S. EPA announced its final decisions to revise the primary NAAQS for PM to provide increased protection of public health (78 FR 3086, January 15, 2013). Regarding primary standards for $PM_{2.5}$, the U.S. EPA revised the level of the annual $PM_{2.5}$ standard[24] to 12.0 $\mu g/m^3$ and retained the 24-hour $PM_{2.5}$ standard, with its level of 35 $\mu g/m^3$. For the primary $PM_{10}$ standard, the U.S. EPA retained the 24-hour standard, with its level of 150 $\mu g/m^3$, to continue to provide protection against effects associated with short-term exposure to thoracic coarse particles (i.e., $PM_{10-2.5}$). Regarding the secondary PM standards, the U.S. EPA generally retained the 24-hour and annual $PM_{2.5}$ standards[25] and the 24-hour $PM_{10}$ standard to address visibility and nonvisibility welfare effects. On judicial review, the revised standards were upheld in all respects.[26]

## P.2.   Purpose and Overview of the Integrated Science Assessment

The Integrated Science Assessment (ISA) is a comprehensive evaluation and synthesis of the policy-relevant science "useful in indicating the kind and extent of identifiable effects on public health or welfare which may be expected from the presence of [a] pollutant in ambient air," as described in Section 108 of the Clean Air Act (CAA, 1990a). This ISA communicates critical science judgments of the health and welfare criteria for particulate matter (PM), and serves as the scientific foundation for the review of the current primary (health-based) and secondary (welfare-based) National Ambient Air Quality Standards (NAAQS) for PM. For evaluating the welfare-based evidence, the PM ISA focuses specifically on the nonecological effects of PM (i.e., visibility, materials effects, and climate) because the ecological effects are assessed in the ISA for Oxides of Nitrogen, Oxides of Sulfur, and Particulate Matter—Ecological Criteria as a result of these criteria pollutants being interrelated through complex

---

[22] The quantitative assessment of health risks conducted in the last review was presented in the Quantitative Health Risk Assessment for Particulate Matter (U.S. EPA, 2010b). In the current review, quantitative assessments for health-related exposures and risks, if warranted, would be presented in the Health Risk and Exposure Assessment (HREA). For consistency with the documents developed under the current NAAQS process, the Quantitative Health Risk Assessment for Particulate Matter (U.S. EPA, 2010b) from the last review will be referenced in this document as the 2010 HREA.

[23] The quantitative assessment of welfare effects conducted in the last review was presented, in part, in the Urban-Focused Visibility Assessment (U.S. EPA, 2010a). In the current review, quantitative assessments for welfare effects, if warranted, would be presented in the Welfare Risk and Exposure Assessment (WREA). The Urban-Focused Visibility Assessment (U.S. EPA, 2010a) from the last review will be referenced in this document as the 2010 UFVA.

[24] The U.S. EPA also eliminated the option for spatial averaging.

[25] Consistent with the primary standard, the U.S. EPA eliminated the option for spatial averaging with the annual standard.

[26] *NAM v U.S. EPA*, 750 F.3d 921 (D.C. Cir. 2014).

SECTION P.2: Purpose and Overview of the Integrated Science Assessment

00196457

chemical and physical atmospheric processes and all contributing to nitrogen (N) and sulfur (S) deposition (U.S. EPA, 2016). While the focus of the evaluation of the visibility and climate evidence is on PM, for materials effects, as detailed in the Integrated Review Plan (IRP), the PM ISA summarizes soiling and deterioration of materials attributable to PM and related N and S components because of the difficulty associated with isolating the effects of gaseous and particulate N and S dry and wet deposition and because the ISA for Oxides of Nitrogen, Oxides of Sulfur, and Particulate Matter—Ecological Criteria focuses only on ecological effects (U.S. EPA, 2016).

This ISA evaluates relevant scientific literature published since the 2009 PM ISA (U.S. EPA, 2009a), integrating key information and judgments contained in the 2009 PM ISA and previous assessments of PM, i.e., 2004 AQCD for PM (U.S. EPA, 2004), 1996 AQCD for PM (U.S. EPA, 1996), 1982 AQCD for PM and Sulfur Oxides (U.S. EPA, 1982) and its Addendum (U.S. EPA, 1986). and the 1969 AQCD for PM (NAPCA, 1969). Thus, this ISA updates the state of the science that was available for the 2009 PM ISA, which informed decisions on the primary and secondary PM NAAQS in the review completed in 2012. In 2012, the U.S. EPA lowered the annual $PM_{2.5}$ standard to a mean of 12 $\mu g/m^3$, which is based on the annual mean averaged over 3 years, while retaining the 24-hour $PM_{2.5}$ standard of 35 $\mu g/m^3$, which is based on the 98th percentile averaged over 3 years (78 FR 3086). As part of the primary annual $PM_{2.5}$ standard, the U.S. EPA eliminated the spatial averaging provision to avoid disproportionate impacts on susceptible populations (i.e., populations potentially at increased risk of a PM-related health effect). The $PM_{2.5}$ standards are meant to provide increased protection for children, older adults, and people with pre-existing heart and lung disease as well as other potentially susceptible populations against an array of $PM_{2.5}$-related health effects, including premature mortality, increased hospital admissions and emergency department (ED) visits, and the development of chronic respiratory disease. Additionally, the U.S. EPA retained the current primary 24-hour $PM_{10}$ standard at a level of 150 $\mu g/m^3$, which is not to be exceeded more than once per year over 3 years, to protect against health effects due to short-term exposure to thoracic coarse particles ($PM_{10-2.5}$) including premature mortality and increased hospital admissions and ED visits (78 FR 3086).

For the secondary PM standards, the U.S. EPA retained the annual $PM_{2.5}$ standard at 15 $\mu g/m^3$ as well as the 24-hour $PM_{2.5}$ standard of 35 $\mu g/m^3$ and the 24-hour $PM_{10}$ standard of 150 $\mu g/m^3$ (78 FR 3086). However, the form of the annual secondary $PM_{2.5}$ standard was changed to remove the option of spatial averaging. These secondary standards protect against nonvisibility welfare effects including ecological effects, effects on materials, and climate effects. To protect against PM-related visibility impairment, the U.S. EPA identified a target degree of protection defined as a $PM_{2.5}$ visibility index of 30 deciviews (dv), which is based on the 90th percentile of 24-hour avg $PM_{2.5}$ concentrations over 3 years (78 FR 3086). However, a U.S. EPA analysis determined that the current secondary 24-hour $PM_{2.5}$ standard would provide sufficient protection, and in some cases greater protection, therefore a distinct secondary standard was not needed to provide requisite protection for both visibility and nonvisibility related welfare effects.

SECTION P.2: Purpose and Overview of the Integrated Science Assessment

00196458

This new review of the primary and secondary PM NAAQS is guided by several policy-relevant questions that are identified in The Integrated Review Plan for the National Ambient Air Quality Standards for Particulate Matter (U.S. EPA, 2016). To address these questions and update the scientific judgments in the 2009 PM ISA (U.S. EPA, 2009a), this ISA aims to:

- Assess whether new information (since the last PM NAAQS review) further informs the relationship between exposure to PM and specific health and nonecological welfare effects.
- Inform whether the current indicators (i.e., $PM_{2.5}$ for fine particles and $PM_{10}$ for thoracic coarse particles), averaging times (e.g., 24-hour avg, annual average), and levels of the PM NAAQS are appropriate.

In addressing policy-relevant questions, this ISA aims to characterize the independent health and welfare effects of PM, specifically $PM_{2.5}$ (fine PM; particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 μm) and $PM_{10-2.5}$ (thoracic coarse or coarse PM; particulate matter with a nominal mean aerodynamic diameter greater than 2.5 μm and less than or equal to 10 μm) and whether there is evidence of an independent health effect for other size fractions [e.g., ultrafine particles (UFP), generally considered as particulates with a diameter less than or equal to 0.1 μm (typically based on physical size, thermal diffusivity or electrical mobility); U.S. EPA (2009a)] or specific PM components (e.g., metals). In characterizing whether there is evidence of an independent health and welfare effect due to PM, the ISA considers possible influences of other atmospheric pollutants, including both gaseous (i.e., $O_3$, $NO_2$, $SO_2$, and CO) and other PM size fractions. The information summarized in this ISA will serve as the scientific foundation for reviewing the current primary and secondary PM NAAQS.

## P.3.   Process for Developing Integrated Science Assessments

The U.S. EPA uses a structured and transparent process for evaluating scientific information and determining the causal nature of relationships between air pollution exposures and health effects [details provided in the Preamble to the Integrated Science Assessments (U.S. EPA, 2015)] and the Appendix. The ISA development process describes approaches for literature searches, criteria for selecting and evaluating relevant studies, and a framework for evaluating the weight of evidence and forming causality determinations. Table P-2 provides a description of each of the five causality determinations and the types of scientific evidence that is considered for each category for both health and welfare effects.

00196459

## Table P-2    Weight-of-evidence for causality determinations.

| | Health Effects | Ecological and Other Welfare Effects |
|---|---|---|
| Causal relationship | Evidence is sufficient to conclude that there is a causal relationship with relevant pollutant exposures (e.g., doses or exposures generally within one to two orders of magnitude of recent concentrations). That is, the pollutant has been shown to result in health effects in studies in which chance, confounding, and other biases could be ruled out with reasonable confidence. For example: (1) controlled human exposure studies that demonstrate consistent effects, or (2) observational studies that cannot be explained by plausible alternatives or that are supported by other lines of evidence (e.g., animal studies or mode-of-action information). Generally, the determination is based on multiple high-quality studies conducted by multiple research groups. | Evidence is sufficient to conclude that there is a causal relationship with relevant pollutant exposures. That is, the pollutant has been shown to result in effects in studies in which chance, confounding, and other biases could be ruled out with reasonable confidence. Controlled exposure studies (laboratory or small- to medium-scale field studies) provide the strongest evidence for causality, but the scope of inference may be limited. Generally, the determination is based on multiple studies conducted by multiple research groups, and evidence that is considered sufficient to infer a causal relationship is usually obtained from the joint consideration of many lines of evidence that reinforce each other. |
| Likely to be causal relationship | Evidence is sufficient to conclude that a causal relationship is likely to exist with relevant pollutant exposures. That is, the pollutant has been shown to result in health effects in studies where results are not explained by chance, confounding, and other biases, but uncertainties remain in the evidence overall. For example: (1) observational studies show an association, but copollutant exposures are difficult to address and/or other lines of evidence (controlled human exposure, animal, or mode of action information) are limited or inconsistent or (2) animal toxicological evidence from multiple studies from different laboratories demonstrate effects but limited or no human data are available. Generally, the determination is based on multiple high-quality studies. | Evidence is sufficient to conclude that there is a likely causal association with relevant pollutant exposures. That is, an association has been observed between the pollutant and the outcome in studies in which chance, confounding, and other biases are minimized but uncertainties remain. For example, field studies show a relationship, but suspected interacting factors cannot be controlled, and other lines of evidence are limited or inconsistent. Generally, the determination is based on multiple studies by multiple research groups. |
| Suggestive of, but not sufficient to infer, a causal relationship | Evidence is suggestive of a causal relationship with relevant pollutant exposures but is limited, and chance, confounding, and other biases cannot be ruled out. For example: (1) when the body of evidence is relatively small, at least one high-quality epidemiologic study shows an association with a given health outcome and/or at least one high-quality toxicological study shows effects relevant to humans in animal species or (2) when the body of evidence is relatively large, evidence from studies of varying quality is generally supportive but not entirely consistent, and there may be coherence across lines of evidence (e.g., animal studies or mode of action information) to support the determination. | Evidence is suggestive of a causal relationship with relevant pollutant exposures, but chance, confounding, and other biases cannot be ruled out. For example, at least one high-quality study shows an effect, but the results of other studies are inconsistent. |

SECTION P.3: Process for Developing Integrated Science Assessments
P-12

00196460

**Table P-2 (Continued): Weight of evidence for causality determinations.**

| | Health Effects | Ecological and Other Welfare Effects |
|---|---|---|
| Inadequate to infer the presence or absence of a causal relationship | Evidence is inadequate to determine that a causal relationship exists with relevant pollutant exposures. The available studies are of insufficient quantity, quality, consistency, or statistical power to permit a conclusion regarding the presence or absence of an effect. | Evidence is inadequate to determine that a causal relationship exists with relevant pollutant exposures. The available studies are of insufficient quality, consistency, or statistical power to permit a conclusion regarding the presence or absence of an effect. |
| Not likely to be a causal relationship | Evidence indicates there is no causal relationship with relevant pollutant exposures. Several adequate studies, covering the full range of levels of exposure that human beings are known to encounter and considering at-risk populations and lifestages, are mutually consistent in not showing an effect at any level of exposure. | Evidence indicates there is no causal relationship with relevant pollutant exposures. Several adequate studies examining relationships with relevant exposures are consistent in failing to show an effect at any level of exposure. |

Source: U.S. EPA (2015).

As part of this process, a draft of the ISA is reviewed by the Clean Air Scientific Advisory Committee (CASAC), which is a formal independent panel of scientific experts, and by the public. As this ISA informs the review of the primary and secondary PM NAAQS, it integrates and synthesizes information characterizing exposure to PM and potential relationships with health and welfare effects. Relevant studies include those examining atmospheric chemistry, spatial and temporal trends, and exposure assessment, as well as U.S. EPA analyses of air quality and emissions data. Relevant health research includes epidemiologic, controlled human exposure, and toxicological studies on health effects, as well as studies on dosimetry and biological plausibility. Additionally, relevant welfare research includes studies examining visibility impairment, effects on materials, and climate impacts.

The U.S. EPA initiated the current review of the primary and secondary PM NAAQS in December 2014 with a call for information from the public (U.S. EPA, 2014). Subject-area experts and the public were also able to recommend studies and reports to consider for the ISA during a science/policy issue "kick-off" workshop held at the U.S. EPA in February 2015. Thereafter, the U.S. EPA routinely conducted literature searches to identify relevant peer-reviewed studies published since the previous ISA (i.e., since May 2009). Multiple search methods were used [Preamble to the ISAs (U.S. EPA, 2015), and further detailed in the Appendix], including searches in the PubMed and Web of Science databases. These searches were meant to broadly capture all potentially relevant PM literature. To ensure the most policy-relevant evaluation of the current state of the science, the scope of this PM ISA reflects not only the evolving PM literature base but also the ability of the studies evaluated to directly inform the policy-relevant questions that form the basis of this review. Using both the scope of this ISA, detailed below, as well as the policy-relevant questions outlined in the PM IRP, studies that were uninformative based on title screening were excluded. Studies that were judged to be potentially relevant based on review of the abstract or full text and "considered" for inclusion in the ISA are documented in the Health and Environmental Research Online (HERO) website. The HERO project page for this ISA

SECTION P.3: Process for Developing Integrated Science Assessments

P-13

00196461

(https://hero.epa.gov/hero/particulate-matter) contains the references that are cited in the ISA, the references that were considered for inclusion but not cited, and electronic links to bibliographic information and abstracts.

### P.3.1. Scope of the ISA

As initially detailed in the PM IRP (U.S. EPA, 2016) and further expanded upon here, when evaluating the broad body of literature across scientific disciplines, the U.S. EPA considers whether the studies fall within the scope of the PM ISA (i.e., provide information which can address key policy-relevant questions). Thus, the focus of the PM ISA with respect to the health effects evidence is on studies of short-term (i.e., hours up to 1 month) and long-term (i.e., 1 month to years) exposures conducted at concentrations of PM that are relevant to the range of human exposures across ambient microenvironments (up to 2 mg/m$^3$, which is one to two orders of magnitude above ambient concentrations), and (1) include a composite measure of PM[27] or (2) characterize PM and apply some approach to assess the direct effect of PM when the exposure of interest is a source-based mixture (e.g., diesel exhaust, gasoline exhaust, wood smoke). For epidemiologic studies, the scope is further refined when evaluating the evidence for those health outcomes that the 2009 PM ISA concluded a *causal relationship* (i.e., short- and long-term PM$_{2.5}$ exposure and mortality and cardiovascular effects) to ensure the evaluation of the evidence focuses on the studies that are the most policy-relevant. Therefore, the focus is on those studies conducted in areas where mean PM$_{2.5}$ concentrations are <20 μg/m$^3$ or, in the case of a multicity study, where more than half of the cities have concentrations <20 μg/m$^3$. However, studies with mean PM$_{2.5}$ concentrations exceeding 20 μg/m$^3$ are included if they address specific areas of uncertainty or where limitations remain in the evidence base, as identified in the 2009 PM ISA, such as copollutant confounding. The scope is broader for experimental studies when examining biological plausibility for PM health effects, and in some cases, includes in vitro studies, studies that use intratracheal (IT) installation, studies examining relative toxicity, and studies conducted at concentrations >2 mg/m$^3$.

In the first case, studies that focus on a single component, group of components, or source, must also examine a composite measure of PM (e.g., mass of PM$_{2.5}$ and/or PM$_{10-2.5}$, or in the case of ultrafine particles [UFP] mass, particle number, etc.). This requirement helps in comparing effects or associations observed for individual components or alternative metrics to the current mass-based PM indicators. To assess the relationship between PM$_{2.5}$ components and specific health effects in experimental studies, this ISA relies on the approach initially outlined in the 2009 PM ISA and further refined in Stanek et al. (2011). This approach is consistent with the Health Effects Institute (HEI) review panel of the National Particle Component Toxicity (NPACT) initiative that states both source categories and component concentrations should be used directly in the health analyses with a focus on examining consistencies and

---

[27] Composite measures of PM may include mass, volume, surface area, or number concentration.

SECTION P.3: Process for Developing Integrated Science Assessments
P-14

00196462

differences between the two approaches (Lippmann et al., 2013). Thus, experimental studies included within this ISA fulfill the following four criteria: (1) the studies examined exposures consisting of $PM_{2.5}$ from U.S. airsheds or those representative of the U.S. (e.g., Europe, Canada); (2) the studies examined at least five PM components; (3) the studies grouped PM components using statistical methods, for which the groups were not predefined based on common physical or chemical properties (e.g., water soluble vs. nonsoluble); and (4) the studies applied a formal statistical analysis to investigate the relationship between groups of PM components or PM sources and health effects. The criteria applied to both experimental and epidemiologic studies in evaluating PM components ensures that a systematic approach is used in both identifying and evaluating those studies that examine PM components.

The second case primarily applies to experimental studies that attempt to disentangle the effect of PM on health from a complex air pollution mixture of particles, gases, and components distributed between the gas and particle phases. Studies that assess the PM effect from a source-based mixture (e.g., wood smoke, diesel exhaust, gasoline exhaust, etc.) are only included if they use filtration (e.g., a particle trap) or another approach to differentiate between effects due to the mixture and effects due to the particles alone.

Whereas the preceding paragraphs focused broadly on the scope of the entire PM ISA, there are additional nuances that further frame the scope of the ISA, specifically with respect to UFPs. UFPs have often been defined as particles <0.1 μm (U.S. EPA, 2009a), but depending on the scientific discipline, the methods used and the particle sizes examined to assess the UFP-health effects relationship varies. UFP exposures in animal toxicological and controlled human exposure studies typically use a particle concentrator, which can result in exposures to particles <0.30 μm (Section 2.4.3.1). Whereas toxicological studies typically rely on examining UFP mass, epidemiologic studies examine multiple UFP metrics, including particle number concentration (NC), mass concentration (MC), and surface area concentration (SC). However, depending on the monitor used and the metric, the UFP size distribution included within each of these ranges can vary. Some studies that examine NC use no additional size classification and instead measure NC over the entire size range of the particle counter. If the entire size range is measured, limited available measurement data in the U.S. and Europe indicates that approximately 67 to 90% of NC consists of particles <0.1 μm (Section 2.4.3.1). Studies that examine MC or SC often include a range of particle sizes up to 0.3 μm. Currently, there is no consensus within the scientific community on the metric that best represents exposure to UFPs (Baldauf et al., 2016). Consequently, this ISA focuses on evaluating the UFP-health effects relationship of particles <0.3 μm for MC and SC metrics included in experimental studies, and any size range that includes particles <0.1 μm for NC. Focusing on these criteria will provide the most comprehensive assessment of UFPs and ensure that the metric examined represents primarily the UFP size range.

Across disciplines, studies defined as examining UFPs, but focusing on the sources, transport, and fate of fibers and unique nano-objects (namely, dots, hollow spheres, plates, rods, fibers, tubes) are not reviewed because substantial exposures to fibers and unique nano-objects generally occur in the

SECTION P.3: Process for Developing Integrated Science Assessments
P-15

00196463

occupational settings rather than the ambient environment. Furthermore, the in vivo disposition of unique nano-objects is not likely relevant to the behavior of ultrafine (UF) aerosols found in ambient air, which are created by combustion sources and photochemical formation of secondary organic aerosols. However, some studies focusing on engineered nano- or ultrafine particles (e.g., carbon black, titanium dioxide) are included if they contribute to an understanding of the dosimetry or biological plausibility of PM.

In addition to the specific parameters that broadly form the overall scope of the review of PM and health effects, additional criteria were applied in evaluating the evidence for cancer. As detailed in the PM IRP, the PM ISA focuses on whether PM can directly cause cancer through only inhalation exposures at ambient and near-ambient concentrations (i.e., up to 2 mg/m$^3$). When evaluating the epidemiologic evidence for cancer, consistent with the overall scope of the ISA, the focus is on those studies with composite measures of PM. Whereas the ISA tends not to focus on the health effects evidence from in vitro studies, such studies are discussed regarding the mutagenicity of PM because they provide information on the biological pathways underlying cancer. While some components of PM are known carcinogens (e.g., hexavalent chromium), the focus of this ISA is on composite measures of PM (e.g., $PM_{2.5}$). When applicable, comparisons are made with the effects or associations observed for individual PM components to help inform the adequacy of current mass-based PM indicators. As such, the relationship between PM exposure and cancer is evaluated similarly to that of other health effects, resulting in the exclusion of studies that examine individual PM components without a composite PM measure. The evaluation of cancer includes studies that use PM filter extracts with the understanding that bioavailability of PM components in vivo is a complex issue not easily mimicked by extraction of PM collected on filters. Overall, the evaluation of cancer in the ISA will primarily focus on studies of inhaled PM because these studies are more relevant to ambient exposure conditions, with the recognition of the extensive historical evaluations on the mutagenicity, genotoxicity, and carcinogenicity of whole PM exposures (i.e., not defined by size fraction).

For nonecological welfare effects (i.e., visibility, climate, and materials effects), this ISA will build on information from the last review by discussing PM's role in impairing visibility, in radiative forcing, which can cause global and regional climate change, and in damaging and soiling materials. For visibility effects, studies are included that advance our understanding of visual impairment of airborne PM, such as studies of atmospheric chemistry, visibility preference, or other measures of adversity to public welfare, in urban and rural settings. This ISA focuses on climate as the welfare effect as listed in the Clean Air Act Amendments of 1970 with a focus on radiative forcing, surface meteorological trends, and climate feedbacks, and not on downstream ecosystem effects, human health effects, or future air quality projections resulting from changes in climate (CAA, 1970). The primary literature base for the evaluation of the effects of airborne and deposited PM on climate comes from recent national and international climate assessments such as the National Climate Assessment (Melillo et al., 2014) and the Intergovernmental Panel on Climate Change (IPCC, 2014), as well as other recent and more focused reports relevant to PM climate forcing [e.g., U.S. EPA (2012)]. The focus is on studies that inform the independent role of PM in climate forcing as well as effects on U.S. national and regional climate. For

SECTION P.3: Process for Developing Integrated Science Assessments
P-16

00196464

effects on materials, studies included in the PM ISA examine the role of PM and relevant precursor gases on materials damage and soiling. Specifically, studies that examine both particulate and gaseous contributions from oxides of nitrogen and oxides of sulfur along with other PM components are included here due to the difficulty associated with isolating the effects of gaseous and particulate N and S wet deposition.

### P.3.2.  Evaluation of the Evidence

The Preamble to the ISAs (U.S. EPA, 2015) describes the general framework for evaluating scientific information, including criteria for assessing study quality and developing scientific conclusions. Aspects specific to evaluating studies of PM are described in the Appendix, which were applied to studies that fit the overall scope of the PM ISA. Categories of health and welfare effects were considered for evaluation in this ISA if they were examined in previous U.S. EPA assessments for PM or in multiple recent studies. Therefore, in this ISA, the broad health effects categories evaluated include those considered in the 2009 PM ISA (i.e., respiratory effects, cardiovascular effects, central nervous system effects, cancer, and mortality) along with the addition of metabolic effects. New research indicates it is more appropriate to further refine the category of reproductive and developmental effects to instead focus overall conclusions specifically on fertility and pregnancy effects, and birth outcomes separately. The welfare effects categories evaluated include visibility impairment, effects on materials, and climate.

#### P.3.2.1.    Biological Plausibility

In forming the key science judgments for each of the health effects categories evaluated, the PM ISA draws conclusions about relationships between PM exposure and health effects by integrating information across scientific disciplines and related health outcomes and synthesizing evidence from previous and recent studies. A new advancement in this ISA is the inclusion of biological plausibility sections that are specific for each PM size fraction, exposure duration, and broad health outcome category for which causality determinations are formed within each of the health effects chapters (Chapter 5, Chapter 6, Chapter 7, Chapter 8, Chapter 9, Chapter 10, and Chapter 11). These sections outline potential pathways along the exposure to outcome continuum and provide plausible links between inhalation of PM (i.e., $PM_{2.5}$, $PM_{10-2.5}$, or UFPs) and health outcomes at the population level. Biological plausibility can strengthen the basis for causal inference (U.S. EPA, 2015). In this ISA, biological plausibility is part of the weight-of-evidence analysis that considers the totality of the health effects evidence, including consistency and coherence of effects described in experimental and observational studies. Although there is some overlap in the potential pathways between the health effects chapters, each biological plausibility section is tailored to the specific broad health outcome category, PM size fraction, and exposure duration being evaluated within the respective section of each health effects chapter.

SECTION P.3: Process for Developing Integrated Science Assessments
P-17

00196465

Each of the biological plausibility sections includes a figure depicting potential biological pathways that is accompanied by text. The figures illustrate possible pathways related to PM exposure that are based upon evidence evaluated in previous assessments, both AQCDs and ISAs, as well as evidence from more recent studies. The text characterizes the evidence upon which the figures are based, including results of studies demonstrating specific effects related to PM exposure and considerations of physiology and pathophysiology. Together, the figure and text portray the available evidence that supports the biological plausibility of PM exposures leading to specific health outcomes. Gaps and limitations in the evidence base correspond to gaps in the figure and accompanying text. In addition to portraying the plausible pathways leading to health outcomes, these figures provide insights on future research that may address knowledge gaps.

A model figure is presented below to illustrate its features (Figure P-1). Each box represents evidence that has been demonstrated in a study or group of studies for a particular effect related to exposure to a specific size fraction of PM. While most of the studies used to develop the figures are experimental studies (i.e., animal toxicological and controlled human exposure studies), some observational epidemiologic studies also contribute to the pathways. These epidemiologic studies are generally: (1) panel studies that measure the same or similar effects as the experimental studies (and thus provide supportive evidence) or (2) emergency department and hospital admission studies or studies of mortality, which are effects observed at the population level. The boxes are arranged horizontally, with boxes on the left side representing initial effects that reflect early biological responses and boxes to the right representing intermediate (i.e., subclinical or clinical) effects and effects at the population level. The boxes are color coded according to their position in the exposure to outcome continuum.

The arrows that connect the boxes indicate a progression of effects resulting from PM exposure. In most cases, arrows are dotted (Arrow 1), denoting a possible relationship between the effects. While most arrows point from left to right, some arrows point from right to left, reflecting progression of effects in the opposite direction or a feedback loop (Arrow 2). In a few cases, the arrows are solid (Arrow 2), indicating that progression from the upstream to downstream effect occurs as a direct result of PM exposure. This relationship between the boxes, where the upstream effect is necessary for progression to the downstream effect, is termed "essentiality" (OECD, 2016). Evidence supporting essentiality is generally provided by experimental studies using pharmacologic agents (i.e., inhibitors) or animal models that are genetic knockouts. The use of solid lines, as opposed to dotted lines, reflects the availability of specific experimental evidence that PM exposure results in an upstream effect which is necessary for progression to a downstream effect.

In the figures, upstream effects are sometimes linked to multiple downstream effects. To illustrate this proposed relationship using a minimum number of arrows, downstream boxes are grouped together within a larger shaded box and a single arrow (Arrow 3) connects the upstream single box to the outside of the downstream shaded box containing the multiple boxes. Multiple upstream effects may similarly be linked to a single downstream effect using an arrow (Arrow 4) that connects the outside of a shaded box,

SECTION P.3: Process for Developing Integrated Science Assessments
P-18

00196466

which contains multiple boxes, to an individual box. In addition, arrows sometimes connect one individual box to another individual box that is contained within a larger shaded box (Arrow 2) or two individual boxes both contained within larger shaded boxes (Arrow 5). Thus, arrows may connect individual boxes, groupings of boxes, and individual boxes within groupings of boxes depending on the proposed relationships between effects represented by the boxes.



PM = particulate matter.

Note: The boxes above represent the effects for which there is experimental or epidemiologic evidence related to PM exposure, and the arrows indicate a proposed relationship between those effects. Solid arrows denote evidence of essentiality as provided, for example, by an inhibitor of the pathway or a genetic knockout model used in an experimental study involving PM exposure. Shading around multiple boxes is used to denote a grouping of these effects. Arrows may connect individual boxes, groupings of boxes, and individual boxes within groupings of boxes. Progression of effects is generally depicted from left to right and color coded (gray = exposure; green = initial effect; blue = intermediate effect; orange = effect at the population level or a key clinical effect). Here, population-level effects generally reflect results of epidemiologic studies. When there are gaps or limitations in the evidence, there are complementary gaps in the figure and the accompanying text below.

**Figure P-1    Illustrative figure for potential biological pathways for health effects following PM exposure.**

### P.3.2.2.    Comparing Epidemiologic Study Results

For consistency in evaluating health effects evidence for epidemiologic studies, additional parameters to those outlined in the scope (Section P.3.1) were developed. To help compare results across epidemiologic studies, risk estimates were standardized to a defined increment for both short- and long-term exposure to $PM_{2.5}$ and $PM_{10-2.5}$, unless otherwise noted in the text. To determine the appropriate increment, the distribution of $PM_{2.5}$ and $PM_{10-2.5}$ concentrations were examined across the three most recent years of air quality data (2012−2014) within the U.S. For both $PM_{2.5}$ and $PM_{10-2.5}$, an increment of

SECTION P.3: Process for Developing Integrated Science Assessments

00196467

10 $\mu g/m^3$ was defined for short-term exposure studies; this value approximates the 50th–95th percentile of concentrations and accounts for the variability observed in daily $PM_{2.5}$ concentrations. An increment of 5 $\mu g/m^3$ was defined for long-term exposure studies; this value approximates the 25th–75th percentile of concentrations and represents the variation observed in long-term mean concentrations. Because there is no extensive monitoring network for UFPs within the U.S., results from UFP studies are not standardized and reflect the increment of exposure defined in each study evaluated. Additionally, in assessing correlations, either with other copollutants or variables, in epidemiologic studies high, moderate, or low correlations are explicitly defined as: low correlation, $r < 0.40$; moderate correlation, $r \geq 0.40$ and $r < 0.70$; and high correlation, $r \geq 0.70$. Consistency interpreting the epidemiologic evidence through approaches such as the standardization of risk estimates and the evaluation of correlations, in combination with the integration of evidence across scientific disciplines, supports a thorough evaluation of the current state of the science for PM.

### P.3.2.3.   Assessing Causality

In the evaluation of the evidence, determinations are made about causation, not just association, and are based on judgments about the consistency of evidence within a discipline, the coherence of effects across disciplines, and the biological plausibility of observed effects, as well as related uncertainties. The ISA uses a formal causal framework [Table II of the Preamble to the ISAs (U.S. EPA, 2015)] to classify the weight of evidence for both health and welfare effects according to the five-level hierarchy summarized below.

- *Causal relationship*: the pollutant has been shown to result in health or welfare effects at relevant exposures based on studies encompassing multiple lines of evidence and chance, confounding, and other biases can be ruled out with reasonable confidence.

- *Likely to be causal relationship*: there are studies in which results are not explained by chance, confounding, or other biases, but uncertainties remain in the health or welfare effects evidence overall. For example, the influence of co-occurring pollutants is difficult to address, or evidence across scientific disciplines may be limited or inconsistent.

- *Suggestive of, but not sufficient to infer, a causal relationship*: health or welfare effects evidence is generally supportive but not entirely consistent or is limited overall. Chance, confounding, and other biases cannot be ruled out.

- *Inadequate to infer the presence or absence of a causal relationship*: there is insufficient quantity, quality, consistency, or statistical power of results from studies of health or welfare effects.

- *Not likely to be a causal relationship*: several adequate health or welfare effects studies, examining the full range of anticipated exposure concentrations and for health effects, potential at-risk populations, and lifestages, consistently show no effect.

SECTION P.3: Process for Developing Integrated Science Assessments
P-20

00196468

## P.4. References

Abt (Abt Associates Inc). (2005). Particulate matter health risk assessment for selected urban areas: Draft report (pp. 164). (EPA Contract No. 68-D-03-002). Research Triangle Park, NC: U.S. Environmental Protection Agency.

Baldauf, RW; Devlin, RB; Gehr, P; Giannelli, R; Hassett-Sipple, B; Jung, H; Martini, G; McDonald, J; Sacks, JD; Walker, K. (2016). Ultrafine particle metrics and research considerations: Review of the 2015 UFP Workshop. Int J Environ Res Public Health 13. http://dx.doi.org/10.3390/ijerph13111054.

CAA (Clean Air Act). (1970). Clean Air Act Amendments of 1970, Pub. L. No. 91-604 (pp. 1676-1713).

CAA (Clean Air Act). (1990a). Clean Air Act, as amended by Pub. L. No. 101-549, section 108: Air quality criteria and control techniques, 42 USC 7408. http://www.law.cornell.edu/uscode/text/42/7408.

CAA (Clean Air Act). (1990b). Clean Air Act, as amended by Pub. L. No. 101-549, section 109: National primary and secondary ambient air quality standards, 42 USC 7409. https://www.law.cornell.edu/uscode/text/42/7409.

CAA (Clean Air Act). (2005). Clean Air Act, section 302: Definitions, 42 USC 7602. http://www.gpo.gov/fdsys/pkg/USCODE-2005-title42/pdf/USCODE-2005-title42-chap85-subchapIII-sec7602.pdf.

IPCC (Intergovernmental Panel on Climate Change). (2014). Climate change 2014: Synthesis report. In RK Pachauri; L Meyer (Eds.), Climate change 2014: Synthesis report Contribution of working groups I, II and III to the fifth assessment report of the Intergovernmental Panel on Climate Change. Geneva, Switzerland.

Lippmann, M; Chen, LC; Gordon, T; Ito, K; Thurston, GD. (2013). National Particle Component Toxicity (NPACT) Initiative: Integrated epidemiologic and toxicologic studies of the health effects of particulate matter components: Investigators' Report [HEI] (pp. 5-13). (177). Boston, MA: Health Effects Institute.

Melillo, JM; Richmond, T; Yohe, GW. (2014). Climate change impacts in the United States: The third National Climate Assessment. In JM Melillo; T Richmond; GW Yohe (Eds.), Climate change impacts in the United States: The third National Climate Assessment. Washington, D.C.: U.S. Government Printing Office. http://nca2014.globalchange.gov/report.

NAPCA (National Air Pollution Control Administration). (1969). Air quality criteria for particulate matter. Washington, DC.

OECD (Organisation for Economic Co-operation and Development). (2016). Users handbook supplement to the guidance document for developing and assessing AOPs. (ENV/JM/MONO(2016)12). http://dx.doi.org/10.1787/5jlvl m9dl g32-en.

Office of Air and Radiation (EPA Office of Air and Radiation). (2009). Particulate matter national ambient air quality standards: Scope and methods plan for urban visibility impact assessment. (EPA-452/P-09-001). Research Triangle Park, NC: U.S. Environmental Protection Agency.

Stanek, LW; Sacks, JD; Dutton, SJ; Dubois, JJB. (2011). Attributing health effects to apportioned components and sources of particulate matter: An evaluation of collective results [Review]. Atmos Environ 45: 5655-5663. http://dx.doi.org/10.1016/j.atmosenv.2011.07.023.

U.S. EPA (U.S. Environmental Protection Agency). (1982). Air quality criteria for particulate matter and sulfur oxides (final, 1982) [EPA Report]. (EPA 600/8-82/029a). Washington, DC: Environmental Criteria and Assessment Office. http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=46205.

U.S. EPA (U.S. Environmental Protection Agency). (1986). Second addendum to air quality criteria for particulate matter and sulfur oxides (1982): Assessment of newly available health effects information [EPA Report]. (EPA/600/8-86/020F). Research Triangle Park, NC: Environmental Criteria and Assessment Office.

U.S. EPA (U.S. Environmental Protection Agency). (1996). Air quality criteria for particulate matter [EPA Report]. (EPA/600/P-95/001aF-cF. 3v). Research Triangle Park, National Center for Environmental Assessment-RTP Office NC.

SECTION P.4: References

00196469

U.S. EPA (U.S. Environmental Protection Agency). (2004). Air quality criteria for particulate matter [EPA Report]. (EPA/600/P-99/002aF-bF). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment- RTP Office. http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=87903.

U.S. EPA (U.S. Environmental Protection Agency). (2005). Review of the national ambient air quality standards for particulate matter: policy assessment of scientific and technical information. oaqps staff paper [EPA Report]. (EPA/452/R-05/005). Research Triangle Park, NC.

U.S. EPA (U.S. Environmental Protection Agency). (2008). Integrated review plan for the national ambient air quality standards for particulate matter [EPA Report]. Research Triangle Park, NC.

U.S. EPA (U.S. Environmental Protection Agency). (2009a). Integrated science assessment for particulate matter [EPA Report]. (EPA/600/R-08/139F). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment- RTP Division. http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=216546.

U.S. EPA (U.S. Environmental Protection Agency). (2009b). Particulate matter national ambient air quality standards: Scope and methods plan for health risk and exposure assessment. (EPA-452/P-09-002). Research Triangle Park, NC: Office of Air Quality Planning and Standards.

U.S. EPA (U.S. Environmental Protection Agency). (2010a). Particulate matter urban-focused visibility assessment. Final document. (EPA-452/R-10-004). Research Triangle Park, NC: Office of Air and Radiation.

U.S. EPA (U.S. Environmental Protection Agency). (2010b). Quantitative Health Risk Assessment for Particulate Matter. Research Triangle Park, NC: US Environmental Protection Agency.

U.S. EPA (U.S. Environmental Protection Agency). (2011). Policy assessment for the review of the particulate matter national ambient air quality standards [EPA Report]. (EPA 452/R-11-003). Research Triangle Park, NC.

U.S. EPA (U.S. Environmental Protection Agency). (2012). Report to Congress on black carbon [EPA Report]. (EPA-450/R-12-001). http://www.epa.gov/blackcarbon/2012report/fullreport.pdf.

U.S. EPA (U.S. Environmental Protection Agency). (2014). Notice of workshop and call for information on integrated science assessment for particulate matter. Fed Reg 79: 71764-71766.

U.S. EPA (U.S. Environmental Protection Agency). (2015). Preamble to the integrated science assessments [EPA Report]. (EPA/600/R-15/067). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, RTP Division. https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=310244.

U.S. EPA (U.S. Environmental Protection Agency). (2016). Integrated review plan for the national ambient air quality standards for particulate matter [EPA Report]. (EPA-452/R-16-005). Research Triangle Park, NC. https://yosemite.epa.gov/sab/sabproduct.nsf/0/eb862b233tbd0cde85257dda004fcb8c!OpenDocument&TableRow=2.0.

SECTION P.4: References

00196470

# EXECUTIVE SUMMARY

## Purpose and Scope of the Integrated Science Assessment

This Integrated Science Assessment (ISA) is a comprehensive evaluation and synthesis of policy-relevant science aimed at characterizing exposures to ambient particulate matter (PM), and health and welfare effects associated with these exposures.[28] PM is a mixture of solid particles and liquid droplets found in the ambient air,[29] which encompasses multiple size fractions (e.g., fine PM [$PM_{2.5}$, particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 μm]; thoracic coarse or coarse PM [$PM_{10-2.5}$, particulate matter with a nominal mean aerodynamic diameter greater than 2.5 μm and less than or equal to 10 μm]; and ultrafine particles [UFPs, generally considered as particulates with a diameter less than or equal to 0.1 μm, typically based on physical size, thermal diffusivity, or electrical mobility]) and is comprised of various components (e.g., metals, black carbon, etc.; Figure ES-1). The evaluation of the science and the overarching conclusions of the ISA serves as the scientific foundation for the review of the primary (health-based) and secondary (welfare-based) National Ambient Air Quality Standard (NAAQS) for PM. This ISA focuses on nonecological welfare effects[30] because ecological effects resulting from deposition of PM and PM components are being considered in a separate assessment as part of the review of the secondary (welfare-based) NAAQS for oxides of nitrogen and sulfur, and PM (U.S. EPA, 2018).

---

[28] The general process for developing an ISA, including the framework for evaluating weight of evidence and drawing scientific conclusions and causal judgments, is described in a companion document, *Preamble to the Integrated Science Assessments* (U.S. EPA, 2015), https://www.epa.gov/isa.

[29] As defined by U.S. EPA. https://www.epa.gov/pm-pollution/particulate-matter-pm-basics.

[30] From this point forward referred to as welfare effects.

SECTION: Purpose and Scope of the Integrated Science Assessment
ES-1

00196471



μm = micrometer; PM = particulate matter; PM$_{2.5}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 μm; PM$_{10}$ = particulate matter with a nominal aerodynamic diameter less than or equal to 10 μm.
Source: U.S. EPA (https://www.epa.gov/pm-pollution/particulate-matter-pm-basics).

**Figure ES-1    Comparison of PM size fractions.**

In 2012, the U.S. Environmental Protection Agency (U.S. EPA) established a new annual PM$_{2.5}$ primary standard of 12 μg/m$^3$ (the annual mean averaged over 3 years) and retained the 24-hour PM$_{2.5}$ standard of 35 μg/m$^3$ (the 98th percentile averaged over 3 years; 75 FR 3086).[31] For the primary PM$_{10}$ standard, the U.S. EPA retained the 24-hour standard of 150 μg/m$^3$ (not to be exceeded more than once per year on average over 3 years) to continue to provide protection against effects associated with short-term exposure to thoracic coarse particles (i.e., PM$_{10-2.5}$). Regarding the secondary PM standards, the U.S. EPA retained the 24-hour (i.e., 35 μg/m$^3$) and annual (i.e., 15 μg/m$^3$) PM$_{2.5}$ standards[32] and the 24-hour PM$_{10}$ standard (i.e., 150 μg/m$^3$) to address visibility and nonvisibility welfare effects. On judicial review, the revised and retained standards were upheld in all respects. NAM v EPA, 750 F.3d 921 (D.C. Cir. 2014).

This ISA updates the 2009 ISA for Particulate Matter [U.S. EPA (2009); hereafter referred to as the 2009 PM ISA] with studies and reports published from January 2009 through approximately January 2018. The U.S. EPA conducted in-depth literature searches using well-defined methods to identify peer-reviewed studies on relevant topics such as health and welfare effects, atmospheric chemistry, ambient concentrations, and exposure. In addition, input on recent studies that the U.S. EPA should

---

[31] The legislative requirements and history of the PM NAAQS are described in detail in the Preface to this ISA.
[32] Consistent with the primary standard, the U.S. EPA eliminated the option for spatial averaging with the annual standard.

SECTION: Purpose and Scope of the Integrated Science Assessment
ES-2

00196472

consider in the process of developing the ISA was also solicited from subject-matter experts and the public during a kick-off workshop held at the U.S. EPA in February 2015 (U.S. EPA, 2014). After the broad literature search was conducted and additional studies were identified during the kick-off workshop, the U.S. EPA used various systematic review techniques to identify the most policy-relevant studies and evaluate overall study quality (see the Appendix). To fully describe the state of available science, the U.S. EPA also included in this ISA the most relevant studies from previous assessments.

Section 109(d)(2) of the Clean Air Act, describes the appointment of an independent scientific review committee and their role in reviewing the documents developed by U.S. EPA that provide the air quality criteria defined in Section 108(a)(2), herein the draft PM ISA. This independent review function has been performed by the Clean Air Scientific Advisory Committee (CASAC) of the U.S. EPA's Science Advisory Board. The U.S. EPA released the External Review Draft of the PM ISA on October 23, 2018 (83 FR 53471), which was reviewed in a public meeting of the CASAC to discuss the ISA and provide an independent scientific peer review of the document (83 FR 55529). The CASAC review of the External Review Draft of the PM ISA resulted in a final letter to the Administrator detailing their review, which was released on April 11, 2019.[33]

The Administrator responded to the CASAC's letter on the External Review Draft of the PM ISA on July 25, 2019,[34] and indicated the Agency will "incorporate the CASAC's comments and recommendations, to the extent possible, and create a final PM ISA so that it may be available to inform a proposed decision on any necessary revisions of the NAAQS in early 2020." The U.S. EPA focused on addressing comments presented in the main body of the CASAC letter (i.e., the cover letter and consensus responses to charge questions), and to the extent possible, addressed individual CASAC member comments as well as public comments on the draft PM ISA. The consensus CASAC comments on the draft PM Policy Assessment (December 16, 2019) stated "…the Draft PM ISA, does not provide a … comprehensive, systematic review of relevant scientific literature; inadequate evidence and rationale for altered causal determinations; and a need for clearer discussion of causality and causal biological mechanisms and pathways." To address these comments in the Final PM ISA, the EPA: (1) added text to the Preface and developed a new Appendix to more clearly articulate the process of ISA development; (2) revised the causality determination for long-term UFP exposure and nervous system effects to *suggestive of, but not sufficient to infer, a causal relationship*; and (3) added additional text to the Preface (Section P.3.2.1) as well as text in the health effects chapters to clarify the discussion of biological plausibility and its role in forming causality determinations. Additionally, the U.S. EPA focused on addressing those comments that contributed to improving clarity, could be addressed in the near-term, and identified errors in the draft PM ISA. Lastly, Administrator Wheeler noted, "for those comments and

---

[33] Available at:
https://yosemite.epa.gov/sab/sabproduct.nsf/264cb1227d55e02c85257402007446a4/6CBCBBC3025E13B4852583D90047B352/$File/EPA-CASAC-19-002+.pdf.
[34] Available at:
https://yosemite.epa.gov/sab/sabproduct.nsf/264cb1227d55e02c85257402007446a4/6CBCBBC3025E13B4852583D90047B352/$File/EPA-CASAC-19-002_Response.pdf.

SECTION: Purpose and Scope of the Integrated Science Assessment

ES-3

00196473

recommendations that are more significant or cross-cutting and which were not fully addressed, the Agency will develop a plan to incorporate these changes into future PM ISAs as well as ISAs for other criteria pollutant reviews."

As in the 2009 PM ISA, this ISA determines the causal nature of relationships between health effects and exposure to $PM_{2.5}$, $PM_{10-2.5}$, and UFPs (Chapter 5, Chapter 6, Chapter 7, Chapter 8, Chapter 9, Chapter 10, and Chapter 11). To accomplish this task, a defined scope was developed to narrow the focus to studies that address the question of whether PM exposure directly causes health effects (see Preface). Health effects are considered in relation to exposures at concentrations of PM that are relevant to the range of human exposures across ambient microenvironments, generally within one to two orders of magnitude of current conditions (i.e., up to 2 mg/m$^3$; Preface, Section P.3.1). The ISA also evaluates: the relationship between PM components and sources to assess whether there is evidence that a component, group of components, or source is more closely related to health effects than PM mass (see Preface); whether specific populations or lifestages are at increased risk of PM-related health effects; and the causal nature of relationships between PM and welfare effects. In the evaluation of the welfare-based evidence (Chapter 13), the PM ISA focuses specifically on the nonecological welfare effects of PM (i.e., visibility, materials effects, and climate). The ecological effects of PM are assessed in the ISA for Oxides of Nitrogen, Oxides of Sulfur, and Particulate Matter—Ecological Criteria because these criteria pollutants are interrelated through complex chemical and physical atmospheric processes and all contribute to nitrogen (N) and sulfur (S) deposition (U.S. EPA, 2018). However, in its assessment of effects on materials, the PM ISA summarizes soiling and deterioration of materials attributable to PM and related N and S components because of the difficulty associated with isolating the effects of gaseous and particulate N and S dry and wet deposition, and because the ISA for Oxides of Nitrogen, Oxides of Sulfur, and Particulate Matter—Ecological Criteria focuses only on ecological effects (U.S. EPA, 2018).

Key to interpreting the health and welfare effects evidence is understanding the sources, chemistry, and distribution of PM in the ambient air (Chapter 2). It is these atmospheric relationships and processes that influence human exposure (Chapter 3) and the uptake of inhaled PM in the respiratory tract (Chapter 4). The uptake of PM and its deposition in the body directly influences the biological mechanisms by which PM could result in a health effect (Chapter 5, Chapter 6, Chapter 7, Chapter 8, Chapter 9, Chapter 10, and Chapter 11). Further, the ISA aims to characterize the effect of PM (i.e., $PM_{2.5}$, $PM_{10-2.5}$, and UFP) on health by evaluating whether there is evidence of an independent effect in epidemiologic studies, often assessed through copollutant models, or a direct effect (i.e., exposure to only PM elicits a health effect) in experimental studies. The ISA also informs policy-relevant issues (Section 1.5), such as (1) potential copollutant confounding (Section 1.5.1); (2) timing of effects (i.e., averaging time of exposure metric and lag at which associations are observed in epidemiologic studies; Section 1.5.2); (3) PM concentration-response relationship(s), and evaluation of potential thresholds below which effects do not occur (Section 1.5.3); (4) PM components and sources and relationships with health effects (Section 1.5.4); and (5) populations or lifestages at increased risk for health effects related to PM exposure (Section 1.5.5 and Chapter 12).

SECTION: Purpose and Scope of the Integrated Science Assessment
ES-4

00196474

## Sources and Exposure to PM

The main objective of the ISA is to characterize health and welfare effects related to ambient PM exposure. This requires understanding PM sources, atmospheric formation, measurement methods, and concentrations. Additionally, characterizing the health effects of PM requires an understanding of the factors that affect both exposure to ambient PM and the uncertainty in estimating exposure. These factors include unmeasured variability in $PM_{2.5}$, $PM_{10-2.5}$, and UFP concentrations and size distributions, exposure to copollutants, and uncharacterized PM composition.

Particulate matter is comprised of components that are directly emitted (primary PM) as well as formed through atmospheric chemical reactions involving gaseous precursors (secondary PM; Section 2.3). Both primary and secondary PM contribute substantially to overall PM mass in ambient air. Within an urban environment, most primary $PM_{2.5}$ emissions are from anthropogenic sources and include some combination of industrial activities, motor vehicles, cooking, and fuel combustion, including biomass burning. However, in many locations, secondary PM formed from the precursors sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_X$), ammonia ($NH_3$), and volatile organic compounds (VOCs), accounts for the majority of $PM_{2.5}$ mass. Direct emissions of primary $PM_{2.5}$ have decreased slightly (~9% since 2002), along with a substantial decrease in emissions since 2006 of the major $PM_{2.5}$ precursors $SO_2$ and $NO_X$, 65 and 30%, respectively. $PM_{10-2.5}$ is almost entirely primary in origin, composed largely of crustal material, sea salt, and biological material. Ambient UFPs originate from two distinct processes, primary particles directly emitted from specific sources like motor vehicles and new particle formation by photochemical processes under favorable atmospheric conditions.

There are well-established Federal Reference Methods (FRM) and national monitoring networks for $PM_{2.5}$, $PM_{10}$, and $PM_{10-2.5}$, but not for UFPs (Section 2.4). Recent monitoring initiatives include the implementation of the National Core multipollutant monitoring network, which includes measurements of $PM_{2.5}$ and $PM_{10-2.5}$, along with a suite of other pollutants, a new near-road monitoring network that includes $PM_{2.5}$ monitors at 36 sites, and the first routine monitoring of UFPs by measuring particle number count (NC) at 24 sites. Satellite-based measurements in conjunction with chemical transport models have also become increasingly used for estimating $PM_{2.5}$ concentrations. In general, the fraction of $PM_{10}$ accounted for by $PM_{2.5}$ is higher in the eastern U.S. than in the western U.S. $PM_{10-2.5}$ concentrations are more spatially variable than $PM_{2.5}$ concentrations. The limited amount of available UFP measurements data indicates that the highest UFP concentrations occur in the winter and near roads with heavy traffic, often over short time periods. Overall, UFP concentrations are more spatially variable than $PM_{2.5}$. As Figure ES-2 shows, the long-term trend in monthly average $PM_{2.5}$ concentrations decreased by about 5 μg/m³ from 2000 to 2015. Much of this decrease can be attributed to a corresponding decrease in sulfate concentrations, especially in the eastern U.S., attributed to reduced $SO_2$ emissions. Sulfate concentrations are mainly associated with $PM_{2.5}$ and have historically been highest in summer. The reduction in $PM_{2.5}$ and sulfate concentrations has coincided with a shift in the season with the highest national average concentration, from summer to a more even distribution of $PM_{2.5}$

SECTION: Sources and Exposure to PM

00196475

concentrations between summer and winter. Additionally, the reduction in PM$_{2.5}$ concentrations has resulted in an increase in the contribution of PM$_{10-2.5}$ to PM$_{10}$ concentrations.



µg/m³ = micrograms per cubic meter; PM$_{2.5}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 µm.
Note: Black = mean, gray = 90th percentile.
Source: Chan et al. (2018).

**Figure ES-2     Long-term trend in national monthly average PM$_{2.5}$ concentrations (µg/m³) from 2000−2015.**

Fixed-site monitoring is frequently used for obtaining PM$_{2.5}$ exposure surrogates in epidemiologic studies of both short-term and long-term exposure (Section 3.3), given that spatial variability in PM$_{2.5}$ concentrations tends to be lower than that observed for other size fractions. Fixed-site monitoring for PM$_{10-2.5}$ has been performed using several different methods. Thus, because PM$_{10-2.5}$ is typically more spatially variable than PM$_{2.5}$ it is important to consider the method used to measure PM$_{10-2.5}$ to characterize errors and uncertainties in the data that are related both to the monitoring method and the proximity of the individual receptor to the monitor. UFPs also tend to be more spatially variable than PM$_{2.5}$, contributing to uncertainties in exposure assignments. The condensation particle counter (CPC) is most commonly used to measure UFPs. However, some portion of the UFP size distribution may be omitted using CPC because these counters do not typically measure particles smaller than 10 nm.

Modeling approaches, such as spatial interpolation methods, land use regression, dispersion models, and chemical transport models (CTMs), have for years provided estimates of exposure where no measurements are available. More recently, hybrid models have become available that draw on input from CTMs, satellite observations of aerosol optical density, surface measurements of PM concentration, and land use variables. Most studies using hybrid methods are applied to model PM$_{2.5}$ and have out-of-sample

SECTION: Sources and Exposure to PM

00196476

cross-validations with $R^2 > 0.8$. Models are employed less frequently to estimate $PM_{10-2.5}$ and UFP exposures, despite $PM_{10-2.5}$ and UFP typically being more spatially variable than $PM_{2.5}$. This is related in part to less availability of input data.

When particles enter a building envelope, they may be lost during the process of infiltration indoors, producing an infiltration factor ($F_{inf}$) < 1 (Section 3.4). $F_{inf}$ varies with season, window opening, building age, wind speed, and particle size distribution (with $F_{inf}$ lower for $PM_{10-2.5}$ and UFP compared with $PM_{2.5}$). When examining the influence of estimated exposures on health effect estimates in a time-series study of short-term $PM_{2.5}$ exposure, use of a fixed-site monitor in lieu of a microenvironmental model that accounted for infiltration produced considerably attenuated health effect estimates, which resulted in an underestimation of the health effect association. Infiltration of $PM_{2.5}$ through a building envelope may change the temporal variability of the indoor $PM_{2.5}$ concentration time series, resulting in reduced correlation between the health effect of interest and the estimated exposure. In an epidemiologic study of long-term $PM_{2.5}$ exposure, simulating indoor concentrations produced unbiased health effect estimates.

In summary, exposure error tends to underestimate health effects associations in epidemiologic studies of PM exposure, although bias in either direction can occur. Recent improvements in estimating spatial resolution of the $PM_{2.5}$ concentration surface have reduced bias and uncertainty in health effect estimates. $PM_{10-2.5}$ and UFP concentrations tend to be more spatially variable than $PM_{2.5}$ concentrations, but data are either unavailable or less often available to fit or validate hybrid models for those size fractions. Consequently, there is typically less uncertainty in health effect estimates derived from both monitored and modeled exposure estimates for $PM_{2.5}$ compared with either $PM_{10-2.5}$ or UFP.

## Dosimetry of Inhaled PM

Particle dosimetry characterizes the intake, deposition, and retention of PM in the respiratory tract (Chapter 4). The basic understanding of particle dosimetry has not changed since the last review. Quantification of the fraction of inhaled particles reaching the lung and the small fraction of deposited particles that enter the blood, distribute around the body, and accumulate in organs and tissues has improved. Understanding the dosimetry of particles is crucial to providing evidence for biologically plausible pathways that support the link between PM exposure and a range of health effects spanning multiple organ systems.

A variety of factors influence the amount of inhaled particles deposited and retained in the respiratory tract. These factors include exposure concentration and duration, activity level, and breathing conditions (e.g., nasal vs. oronasal route and minute ventilation), and particle properties (e.g., particle size, hygroscopicity, and solubility in airway fluids and cellular components). The inhalability of a particle is particularly important when extrapolating between species because it decreases more rapidly as particle size increases in rodents (commonly used in laboratory studies) than in humans. In people, the fraction of oral versus nasal breathing is influenced by age, activity level, sex, disease status

SECTION: Dosimetry of Inhaled PM

ES-7

00196477

(e.g., allergies, upper respiratory infections), and perhaps body mass index, which ultimately contributes to the fraction of particles inhaled and reaching the lower respiratory tract.

Recent evidence demonstrates the translocation of poorly soluble particles (generally less than 200 nm) from the respiratory tract into circulation with transport to other organs. For example, in both humans and rodents, a small fraction of gold nanoparticles depositing in the peripheral lung may move into circulation. The fraction of deposited particles that move into circulation is dependent on particle size and is in the range of 0.2% or less for particles between 5 and 200 nm but may reach a few percent for smaller particles. The translocated particles are distributed around the body and may be retained in other organs or eliminated via urine. Some more limited data show that particles may also reach the fetus in a size-dependent manner. Although translocation in humans has only been demonstrated for gold nanoparticles and, to some degree, for titanium dioxide, the translocation of several types of nanoparticles has been demonstrated in rodents. The importance of elemental composition on particle translocation has not yet been ascertained. These studies suggest that, following deposition in the lung, a small fraction of ambient particles under 200 nm may translocate into circulation.

## Health and Welfare Effects of PM Exposure

This ISA integrates information on PM exposure and health effects from epidemiologic, controlled human exposure, and toxicological studies to determine the causal nature of relationships between exposure to PM of various size fractions (i.e., $PM_{2.5}$, $PM_{10-2.5}$, and UFPs) and broad health effect categories. For most health effect categories, effects are evaluated separately for short-term exposures (i.e., hours up to approximately 1 month) and long-term exposures (i.e., 1 month to years), except for reproductive and developmental effects where exposures are considered to be long term. For welfare effects, the ISA evaluates evidence as it pertains to visibility impairment, climate effects, and effects on materials. A consistent and transparent framework [Preamble to the ISA (U.S. EPA, 2015), Table II] is applied to classify the health and welfare effects evidence according to a five-level hierarchy:

1. *Causal relationship*
2. *Likely to be causal relationship*
3. *Suggestive of, but not sufficient to infer, a causal relationship*
4. *Inadequate to infer the presence or absence of a causal relationship*
5. *Not likely to be a causal relationship*

The causality determinations presented in Table ES-1, reflect the PM size fraction, exposure duration, and health effect category combinations evaluated in this ISA. The conclusions presented are informed by recent findings in combination with the evidence detailed in the 2009 PM ISA. Important considerations include: (1) determining whether laboratory studies of humans and animals, in combination with epidemiologic studies, inform the biological mechanisms by which PM can impart health effects and provide evidence demonstrating that PM exposure can independently cause a health effect; (2) determining whether there is consistency in epidemiologic evidence across various geographic

SECTION: Health and Welfare Effects of PM Exposure
ES-8

00196478

locations, populations, and methods used to estimate PM exposure; (3) evaluating epidemiologic studies that examine the potential influence of factors (i.e., confounders) that could bias associations observed with PM exposure; (4) determining the coherence of findings integrated across controlled human exposure, epidemiologic, and toxicological studies; and (5) making judgments regarding the influence of error and uncertainty on the relationship between PM exposure and health effects in the collective body of available studies. Table ES-2 details the causality determinations for the welfare effects.

**Table ES-1    Summary of causality determinations for PM exposure and health effects from the 2009 and current Integrated Science Assessment for Particulate Matter.**

| Summary of Causality Determinations | | |
|---|---|---|
| **Size Fraction** | **2009 PM ISA** | **Current PM ISA** |
| *Chapter 5. Respiratory Effects* | | |
| **Short-Term Exposure** | | |
| $PM_{2.5}$ | Likely to be causal | Likely to be causal |
| $PM_{10-2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| UFP | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| **Long-Term Exposure** | | |
| $PM_{2.5}$ | Likely to be causal | Likely to be causal |
| $PM_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Inadequate |
| *Chapter 6. Cardiovascular Effects* | | |
| **Short-Term Exposure** | | |
| $PM_{2.5}$ | Causal | Causal |
| $PM_{10-2.5}$ | Suggestive of, but sufficient to infer | Suggestive of, but not sufficient to infer |
| UFP | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| **Long-Term Exposure** | | |
| $PM_{2.5}$ | Causal | Causal |
| $PM_{10-2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |

SECTION: Health and Welfare Effects of PM Exposure
ES-9

00196479

**Table ES-1 (Continued): Summary of causality determinations for PM exposure and health effects from the 2009 and current Integrated Science Assessment for Particulate Matter.**

| Summary of Causality Determinations | | |
|---|---|---|
| Size Fraction | 2009 PM ISA | Current PM ISA |
| UFP | Inadequate | Inadequate |
| *Chapter 7. Metabolic Effects* | | |
| **Short-Term Exposure** | | |
| PM$_{2.5}$ | --- | Suggestive of, but not sufficient to infer |
| PM$_{10-2.5}$ | --- | Inadequate |
| UFP | --- | Inadequate |
| **Long-Term Exposure** | | |
| PM$_{2.5}$ | --- | Suggestive of, but not sufficient to infer |
| PM$_{10-2.5}$ | --- | Suggestive of, but not sufficient to infer |
| UFP | --- | Inadequate |
| *Chapter 8. Nervous System Effects* | | |
| **Short-Term Exposure** | | |
| PM$_{2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |
| PM$_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Suggestive of, but not sufficient to infer |
| **Long-Term Exposure** | | |
| PM$_{2.5}$ | --- | Likely to be causal |
| PM$_{10-2.5}$ | --- | Suggestive of, but not sufficient to infer |
| UFP | --- | Suggestive of, but not sufficient to infer |
| *Chapter 9. Reproductive and Developmental Effects* | | |
| **Male and Female Reproduction and Fertility** | | |
| PM$_{2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| PM$_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Inadequate |

00196480

**Table ES-1 (Continued): Summary of causality determinations for PM exposure and health effects from the 2009 and current Integrated Science Assessment for Particulate Matter.**

| Summary of Causality Determinations | | |
|---|---|---|
| Size Fraction | 2009 PM ISA | Current PM ISA |
| **Pregnancy and Birth Outcomes** | | |
| PM$_{2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| PM$_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Inadequate |
| _Chapter 10._ Cancer | | |
| PM$_{2.5}$ | Suggestive of, but not sufficient to infer | Likely to be causal |
| PM$_{10-2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |
| UFP | Inadequate | Inadequate |
| _Chapter 11._ Mortality | | |
| **Short-Term Exposure** | | |
| PM$_{2.5}$ | Causal | Causal |
| PM$_{10-2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| UFP | Inadequate | Inadequate |
| **Long-Term Exposure** | | |
| PM$_{2.5}$ | Causal | Causal |
| PM$_{10-2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |
| UFP | Inadequate | Inadequate |

PM$_{2.5}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 μm; PM$_{10-2.5}$ = particulate matter with a nominal mean aerodynamic diameter greater than 2.5 μm and less than or equal to 10 μm; UFP = ultrafine particles.

[a]An array of outcomes are evaluated as part of a broad health effect category: physiological measures (e.g., airway responsiveness), clinical outcomes (e.g., hospital admissions), and cause-specific mortality. Total mortality includes all nonaccidental causes of mortality and is informed by findings for the spectrum of morbidity effects (e.g., respiratory, cardiovascular) that can lead to mortality.

Note: The 2009 PM ISA made causality determinations for the broad category of "Reproductive and Developmental Effects." Causality determinations for 2009 represent this broad category and not specifically for "Male and Female Reproduction and Fertility" and "Pregnancy and Birth Outcomes." Table P-2 provides a description of each of the five causality determinations and the types of scientific evidence that is considered for each category. Previous causality determinations taken from the 2009 PM ISA (U.S. EPA, 2009).

SECTION: Health and Welfare Effects of PM Exposure
ES-11

00196481

## Health Effects of PM$_{2.5}$ Exposure

Across the PM size fractions evaluated within this ISA, the most substantial scientific evidence supporting relationships between short- and long-term PM exposure is for PM$_{2.5}$. The causality determinations for PM$_{2.5}$ reflect the total body of scientific evidence, building on the conclusions presented in the 2009 PM ISA. The following sections detail those exposure duration and broad health effect categories for which this ISA concluded a *causal* or *likely to be causal* determination, reflecting the highest degree to which the evidence reduces chance, confounding, and other biases in the exposure–health effect relationship. The causality determinations for health effect categories for which there is a larger degree of uncertainty or limited examination of the relationship between PM$_{2.5}$ exposure and health effects are *suggestive of, but not sufficient to infer, a causal relationship* and *inadequate to determine the presence or absence of a causal relationship*. These causality determinations are summarized in Table ES-1.

### Respiratory Effects

As in the 2009 PM ISA, the current ISA concludes there is a *likely to be causal relationship* between short-term PM$_{2.5}$ exposure and respiratory effects (Section 5.1). Recent epidemiologic studies continue to provide strong evidence for a relationship between short-term PM$_{2.5}$ exposure and several respiratory-related endpoints, including asthma exacerbation, chronic obstructive pulmonary disease (COPD) exacerbation, and combined respiratory-related diseases, particularly from studies examining emergency department (ED) visits and hospital admissions. The consistent, positive associations observed for asthma and COPD ED visits and hospital admissions across studies that used different approaches to control for the potential confounding effects of weather (e.g., temperature) are further supported by evidence of increased symptoms and medication use in response to short-term PM$_{2.5}$ exposure, which are indicative of asthma and COPD exacerbations. Animal toxicological studies of short-term PM$_{2.5}$ exposure provide coherence and biological plausibility for asthma and COPD exacerbations by demonstrating asthma-related responses in an animal model of allergic airways disease and enhanced lung injury and inflammation in an animal model of COPD. Animal toxicological evidence in healthy animals demonstrates altered host defense, greater susceptibility to bacterial infection, airway irritant effects, as well as other effects. While there is animal toxicological evidence supporting asthma and COPD exacerbations, the broader body of experimental studies conducted in healthy animals generally provides biological plausibility for respiratory effects in association with short-term PM$_{2.5}$ exposure, not specifically for asthma or COPD exacerbation. Controlled human exposure studies provide minimal evidence of effects due to short-term PM$_{2.5}$ exposure, such as decrements in lung function and pulmonary inflammation, though these studies are limited in terms of endpoints evaluated and the size and health status of study subjects. Recent epidemiologic studies build upon the limited number of studies that previously examined potential copollutant confounding and indicate that PM$_{2.5}$ associations with asthma

SECTION: Health Effects of PM2.5 Exposure

00196482

exacerbation, combined respiratory-related diseases, and respiratory mortality remain relatively unchanged in copollutant models with gaseous pollutants (i.e., $O_3$, $NO_2$, $SO_2$, with more limited evidence for CO) and other particle sizes (i.e., $PM_{10-2.5}$). The copollutant results in combination with animal toxicological evidence further support an independent effect of $PM_{2.5}$ on respiratory health. Evidence of consistent, positive associations between $PM_{2.5}$ and respiratory mortality supports a continuum of respiratory-related effects.

Both the 2009 PM ISA, and the current ISA concluded there is a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and respiratory effects (Section 5.2). There is strong evidence from multiple cohorts that varied in study location, exposure assessment methods, and time periods examined that reported an association between long-term $PM_{2.5}$ exposure and lung development (i.e., lung function growth). Additional, although more limited, evidence from epidemiologic studies indicates associations between long-term $PM_{2.5}$ exposure and asthma development in children, asthma prevalence in children, childhood wheeze, and pulmonary inflammation. Animal toxicological studies demonstrating impaired lung development resulting from pre- and postnatal $PM_{2.5}$ exposure and the development of an allergic phenotype along with an increase in airway responsiveness following long-term $PM_{2.5}$ exposure provide biological plausibility for these findings. There is limited assessment of potential copollutant confounding of respiratory morbidity outcomes, but recent animal toxicological studies partially address the independence of $PM_{2.5}$ effects by demonstrating $PM_{2.5}$-induced oxidative stress, inflammation, and morphological changes in both upper and lower airways. This broad body of experimental evidence indicating $PM_{2.5}$-related respiratory effects in healthy populations generally provides biological plausibility for respiratory effects in association with long-term $PM_{2.5}$ exposure. Additional epidemiologic evidence indicates an acceleration of lung function decline in adults, as well as consistent evidence for respiratory mortality and cause-specific respiratory mortality, thereby providing evidence of a continuum of effects in response to long-term $PM_{2.5}$ exposure. The relationship between long-term $PM_{2.5}$ exposure and respiratory effects is further supported by epidemiologic studies demonstrating improvements in lung function growth and bronchitic symptoms in children and improvement in lung function in adults in association with declining $PM_{2.5}$ concentrations.

### Cardiovascular Effects

Consistent with the 2009 PM ISA, this ISA concludes there is a *causal relationship* between short-term $PM_{2.5}$ exposure and cardiovascular effects (Section 6.1). The strongest evidence comes from epidemiologic studies that reported consistent, positive associations between short-term $PM_{2.5}$ exposure and cardiovascular-related ED visits and hospital admissions across studies that used different approaches to control for the potential confounding effects of weather (e.g., temperature), particularly for ischemic heart disease (IHD) and heart failure (HF), as well as cardiovascular-related mortality. Recent examinations of potential copollutant confounding generally indicate that the associations observed between $PM_{2.5}$ exposure and cardiovascular effects in single-pollutant models remain relatively

SECTION: Health Effects of PM2.5 Exposure

ES-13

00196483

unchanged in copollutant models, providing evidence that the observed associations with $PM_{2.5}$ are not artifacts due to confounding by another air pollutant. The independence of a $PM_{2.5}$ cardiovascular effect is further supported by recent experimental studies. Controlled human exposure studies expand upon previous findings and demonstrate $PM_{2.5}$-induced changes in endothelial function, which is coherent with animal toxicological studies demonstrating the same effect. Moreover, experimental evidence demonstrating decreased cardiac contractility and altered left ventricular pressure is coherent with epidemiologic studies observing positive associations between ambient $PM_{2.5}$ and ED visits and hospital admissions for HF. Thus, the collective body of experimental evidence supports and provides biological plausibility for epidemiologic studies reporting associations, particularly between short-term $PM_{2.5}$ exposure and IHD and HF outcomes, as well as a range of other cardiovascular-related effects (e.g., arrhythmia, thrombosis) that can result in more severe outcomes, possibly including death.

The 2009 PM ISA, as well as the current PM ISA, concluded there is a *causal relationship* between long-term $PM_{2.5}$ exposure and cardiovascular effects (Section 6.2). Epidemiologic studies of multiple recent U.S.-based cohorts along with reanalyses of these cohorts provide strong evidence of consistent, positive associations between long-term $PM_{2.5}$ exposure and cardiovascular mortality. These studies used a variety of exposure assessment and statistical techniques and examined various spatial domains (e.g., $1 \times 1$-km grid cells, census tract, etc.) in many locations where mean annual average $PM_{2.5}$ concentrations are ≤12 µg/m$^3$. Recent epidemiologic studies of cardiovascular morbidity have greatly expanded upon the body of evidence available at the completion of the 2009 PM ISA by focusing on populations with distinct demographic characteristics (e.g., postmenopausal woman, male doctors, etc.) and extensively considering potential confounders (e.g., socioeconomic status [SES]). Although an extended analysis of the Women's Health Initiative (WHI) cohort strengthened the initial observation of a relationship between long-term $PM_{2.5}$ exposure and coronary events among postmenopausal women, additional cohorts of women similar to the WHI cohort did not report consistent, positive associations with coronary heart disease (CHD), myocardial infarction, or stroke. Longitudinal studies examining the progression of atherosclerosis in relation to long-term exposure to $PM_{2.5}$ reported inconsistent results that were dependent upon the vascular bed examined, but there was evidence of $PM_{2.5}$-associated coronary artery calcification, a strong predictor of CHD, within a study focusing on the progression of atherosclerosis in a healthy population (i.e., Multi-Ethnic Study of Atherosclerosis and Air Pollution [MESA–Air]). A limited number of epidemiologic studies examining other cardiovascular effects provide some evidence of associations with HF, blood pressure, and hypertension, as well as subclinical cardiovascular biomarkers. Recent studies also reduce the uncertainty associated with potential copollutant confounding by reporting that associations between long-term $PM_{2.5}$ exposure and cardiovascular mortality remained relatively unchanged or increased in copollutant models adjusted for $O_2$, $NO_2$, $SO_2$, and $PM_{10–2.5}$. Evidence from animal toxicological studies further supports a direct $PM_{2.5}$ effect on the cardiovascular system and provides coherence with effects observed in epidemiologic studies. For example, animal toxicological studies demonstrating atherosclerotic plaque progression in mice is coherent with epidemiologic studies of atherosclerosis, and animal toxicological studies reporting increased coronary artery wall thickness, decreased cardiac contractility and output, and changes in blood

SECTION: Health Effects of PM2.5 Exposure

00196484

pressure are coherent with epidemiologic studies of HF. Furthermore, when considering the collective body of evidence, there are biologically plausible pathways by which long-term exposure to $PM_{2.5}$ could lead to a continuum of effects potentially resulting in death.

### Nervous System Effects

The 2009 PM ISA did not make a causality determination for long-term $PM_{2.5}$ exposure and nervous system effects because of the paucity of available data. Since the 2009 PM ISA, the literature base has greatly expanded, and the combination of animal toxicological and epidemiologic evidence supports a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and nervous system effects (Section 8.2). Animal toxicological studies provide evidence for a range of nervous system effects including neuroinflammation and oxidative stress, neurodegeneration, cognitive effects, and effects on neurodevelopment. Epidemiologic studies, although fewer in number, generally support associations between long-term $PM_{2.5}$ exposure and changes in brain morphology, cognitive decrements, and dementia. Both experimental and epidemiologic evidence are well substantiated and coherent, supporting a pathway involving neuroinflammation in specific regions of the brain (i.e., the hippocampus, cerebral cortex and hypothalamus) and morphologic changes in the brain indicative of neurodegeneration. Overall, the limited assessment of copollutant confounding introduces some uncertainty in interpreting the epidemiologic studies, but this uncertainty is addressed, in part, by the direct evidence of effects provided by experimental animal studies. In addition to the nervous system effects primarily observed in adults, there is preliminary but limited epidemiologic evidence of neurodevelopmental effects, specifically autism spectrum disorder (ASD). Evidence for this outcome is supported by an animal toxicological study demonstrating $PM_{2.5}$-induced inflammatory and morphologic changes in regions of the brain consistent with ASD.

### Cancer

The 2009 PM ISA concluded that evidence was *suggestive of a causal relationship*[35] between long-term $PM_{2.5}$ exposure and cancer (Section 10.2). Building upon the decades of research on whole PM exposures and evidence presented in the 2009 PM ISA, recent experimental and epidemiologic evidence indicating genotoxicity, epigenetic effects (i.e., hypo- and hypermethylation of DNA), and carcinogenic potential due to $PM_{2.5}$ exposure, along with strong epidemiologic evidence for increases in the risk of lung cancer incidence and mortality, supports a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and cancer. $PM_{2.5}$ exhibits various characteristics of carcinogens, as shown in studies demonstrating genotoxic effects (e.g., DNA damage), epigenetic alterations, oxidative stress, and

---

[35] Since the 2009 PM ISA, the causality determination language has been updated and this category is now stated as *suggestive of, but not sufficient to infer, a causal relationship*.

SECTION: Health Effects of PM2.5 Exposure

ES-15

00196485

electrophilicity. Studies of cancer development have often focused on whole PM exposures,[36] not individual PM size fractions, or individual components often found to comprise $PM_{2.5}$ (e.g., hexavalent chromium, arsenic). Ames *Salmonella*/mammalian-microsome mutagenicity assays of $PM_{2.5}$ and $PM_{2.5}$ extracts demonstrate that PM contains mutagenic agents. In vitro and in vivo toxicological studies demonstrate the potential for $PM_{2.5}$ exposure to result in DNA damage, which is supported by limited human evidence. Cytogenic effects (e.g., chromosomal aberrations), and differential expression of genes potentially relevant to genotoxicity or cancer pathogenesis have also been demonstrated. There is also limited evidence for cellular and molecular changes that could lead to genomic instability as well as for the carcinogenic potential of $PM_{2.5}$, which is demonstrated by enhanced tumor formation in animals treated with urethane. The experimental and epidemiologic evidence of genotoxicity, epigenetic effects, and carcinogenic potential provides biological plausibility for the results from multiple epidemiologic studies conducted in diverse cohorts in terms of geographic coverage and population demographics reporting primarily consistent, positive associations between long-term $PM_{2.5}$ exposure and lung cancer incidence and mortality, particularly in never smokers. In the limited assessment of potential copollutant confounding, $PM_{2.5}$-lung cancer incidence and mortality associations were found to be relatively unchanged in models with $O_3$.

### Mortality

As in the 2009 PM ISA, the current ISA concludes there is a *causal relationship* between short-term $PM_{2.5}$ exposure and total (nonaccidental) mortality (Section 11.1). Recent multicity studies conducted in the U.S., Canada, Europe, and Asia in combination with the single- and multicity studies evaluated in the 2009 PM ISA continue to provide evidence of consistent, positive associations between short-term $PM_{2.5}$ exposure and total mortality. The positive associations reported across studies reflect both traditional analyses using ambient monitors as well as analyses conducted in both urban and rural locations that use new exposure assignment techniques and rely on multiple sources of $PM_{2.5}$ data (e.g., ambient monitors, statistical models, and satellite images). Recent studies also expand upon the assessment of potential confounding by copollutants as well as other factors (e.g., temporal trends, weather, long-term PM concentrations). These analyses indicate that $PM_{2.5}$-mortality associations are relatively unchanged in copollutant models with gaseous pollutants and $PM_{10-2.5}$, and when instituting different approaches to control for other confounders, both in terms of covariates included in statistical models and degrees of freedom employed. The positive associations reported for total mortality are supported by positive associations for cause-specific mortality (i.e., cardiovascular- and respiratory-related mortality). The consistent and coherent evidence across scientific disciplines for cardiovascular morbidity, particularly ischemic events and HF (Chapter 6), and to a lesser degree for respiratory morbidity, with the strongest evidence for exacerbations of COPD and asthma (Chapter 5), provide biological plausibility for cause-specific mortality and ultimately total mortality. Recent studies

---

[36] Whole PM exposures represent exposures that contain both PM and gaseous pollutants.

SECTION: Health Effects of PM2.5 Exposure

00196486

also further reduce chance, confounding, and other biases in the relationship between short-term $PM_{2.5}$ exposure and total mortality.

Both the 2009 PM ISA and the current ISA concludes there is a *causal relationship* between long-term $PM_{2.5}$ exposure and total (nonaccidental) mortality (Section 11.2). Additional reanalyses and extensions of the American Cancer Society and Harvard Six Cities cohorts, as well as new cohorts consisting of Medicare participants, people that live in Canada, or people employed in a specific job (e.g., teacher, nurse, etc.) further support a positive association between long-term $PM_{2.5}$ exposure and total mortality, particularly in areas with annual mean concentrations <20 μg/m³, and in some cases below 12 μg/m³. Positive associations persist regardless of the exposure assignment approach used (i.e., ambient monitors or the combination of monitoring, modeling, and satellite data); in copollutant models, particularly with $O_3$ and more limited evidence for $NO_2$ and $PM_{10-2.5}$; and across studies that control for a range of individual- and ecological covariates, such as smoking status and SES. The evidence for total mortality is supported by positive associations for cause-specific mortality, including cardiovascular, respiratory, and lung cancer mortality. The coherence of effects across scientific disciplines for cardiovascular morbidity, particularly for CHD, stroke and atherosclerosis, and respiratory morbidity for the development of COPD, contribute to the biological plausibility for mortality due to long-term $PM_{2.5}$ exposure. Additionally, recent studies demonstrating increases in life expectancy due to decreases in long-term $PM_{2.5}$ concentrations further support a relationship between long-term $PM_{2.5}$ exposure and total mortality.

## Policy-Relevant Considerations for Health Effects Associated with Particulate Matter Exposure

This section describes issues relevant for considering the potential significance of impacts of ambient PM, particularly $PM_{2.5}$, exposure on public health (Section 1.5),[37] including potential copollutant confounding of $PM_{2.5}$-health effects associations, the relationship between $PM_{2.5}$ exposure and the timing of health effects, the shape of the concentration-response (C-R) relationship, whether $PM_{2.5}$ components and sources are more closely associated with health effects than $PM_{2.5}$ mass, and the identification of populations and lifestages potentially at increased risk of a $PM_{2.5}$-related health effect.

Recent epidemiologic studies greatly expand upon the evidence informing whether associations observed between short- and long-term $PM_{2.5}$ exposure and health are confounded by other pollutants observed in the air pollution mixture. The examination of potential copollutant confounding in studies of respiratory and cardiovascular effects are primarily limited to studies of ED visits and hospital admissions. Across studies of short-term $PM_{2.5}$ exposure and respiratory and cardiovascular effects and mortality, correlations between $PM_{2.5}$ and gaseous (i.e., $SO_2$, $NO_2$, CO, and $O_3$) and particulate pollutants (i.e., $PM_{10-2.5}$) varied across studies, with low to moderate correlations (i.e., <0.7). Collectively, studies of

---

[37] Section 1.5 in Chapter 1 integrates the evidence across all health chapters, but each health chapter has individual discussions on the topics discussed within this section.
SECTION: Policy-Relevant Considerations for Health Effects Associated with Particulate Matter Exposure

00196487

short-term $PM_{2.5}$ exposure that examined potential copollutant confounding indicated that associations remained relatively unchanged in copollutant models, and in instances where associations were attenuated, they remained positive. Far fewer studies examined potential copollutant confounding and long-term $PM_{2.5}$ exposure, but there has been an expansion of studies focusing on mortality. Studies focusing on respiratory (i.e., lung function and asthma development) and cardiovascular effects (i.e., cardiovascular mortality), along with lung cancer incidence and mortality, provide initial evidence that associations with $PM_{2.5}$ are relatively unchanged in copollutant models with primarily traffic-related pollutants (i.e., $NO_2$, $NO_X$, and CO) and $O_3$. For mortality, the most extensive analyses were conducted for $O_3$, with more limited assessments of other pollutants, but overall associations remained unchanged in copollutant models for total (nonaccidental) mortality and cardiovascular and respiratory mortality.

An important question that informs different aspects of the PM NAAQS is the timing of observed effects due to short-term $PM_{2.5}$ exposure, specifically the averaging time of the exposure metric in epidemiologic studies and the lag days over which health effects are observed. Some recent epidemiologic studies focusing on respiratory- and cardiovascular-related ED visits and hospital admissions, cardiovascular effects (e.g., ST elevation, myocardial infarction, and out-of-hospital cardiac arrest), and mortality examined associations between subdaily exposure metrics and the widely used 24-hour avg exposure metric. Across the studies evaluated, the available evidence does not indicate that subdaily averaging periods for $PM_{2.5}$ are more closely associated with health effects than the 24-hour avg exposure metric. In addition to examining potential differences in associations by averaging time of the exposure metric, recent epidemiologic studies evaluated the timing of effects by systematically examining whether there is evidence of an immediate (e.g., lag 0−1 days), delayed (e.g., lag 2−5 days), or prolonged (e.g., lag 0−5 days) effect of PM on health. Epidemiologic studies examining potential differences in associations in relation to short-term $PM_{2.5}$ exposure focused on respiratory- and cardiovascular-related ED visits and hospital admissions as well as mortality. While recent studies provided evidence of associations in the range of 0−5 days for respiratory effects, there was evidence of an immediate effect for cardiovascular effects and mortality (i.e., 0−1 days) with some initial evidence of associations occurring over longer exposure durations (e.g., 0−4 days).

An examination of the C-R relationship between $PM_{2.5}$ exposure and health effects can help determine both the shape of the C-R curve and address the question of whether a threshold exists (i.e., concentration) below which there is no evidence of an effect of $PM_{2.5}$ on health. Studies of short-term $PM_{2.5}$ exposure and health are limited to studies of respiratory-related ED visits, hospital admissions, and mortality. Epidemiologic studies of respiratory disease and asthma ED visits and hospital admissions focusing on the shape of the C-R curve provide initial evidence of a linear relationship with less certainty at concentrations below 10 $\mu g/m^3$. However, studies focusing on whether the $PM_{2.5}$ association changes at different concentration ranges (i.e., cutpoint analyses) provide some evidence of potential nonlinearities in the C-R relationship. Epidemiologic studies of mortality greatly expand upon the evidence evaluated in the 2009 PM ISA where C-R analyses were limited to studies of $PM_{10}$. Evidence from U.S. studies examining short-term $PM_{2.5}$ exposure and mortality indicate a linear

SECTION: Policy-Relevant Considerations for Health Effects Associated with Particulate Matter Exposure

00196488

relationship at concentrations as low as 5 µg/m³ with cutpoint analyses providing no evidence of a threshold.

For long-term $PM_{2.5}$ exposure, most of the evidence on the shape of the C-R curve comes from studies of mortality with some initial recent evidence from studies of respiratory and cardiovascular effects, as well as lung cancer mortality and incidence. Epidemiologic studies of long-term $PM_{2.5}$ exposure and mortality used a variety of statistical approaches and cutpoint analyses, which support a linear, no-threshold relationship for total (nonaccidental) mortality, especially at lower ambient $PM_{2.5}$ concentrations, with confidence in some studies in the range of 5–8 µg/m³. Additionally, there is initial evidence indicating that the slope of the C-R curve may be steeper (supralinear) at lower concentrations for cardiovascular mortality. Evaluation of the C-R relationship is more limited for respiratory and cardiovascular effects, but overall initial assessments support a linear relationship, specifically at long-term $PM_{2.5}$ concentrations ranging from 10–12 and 5–10 µg/m³, respectively.

Recent epidemiologic and experimental studies extensively build on those studies evaluated in the 2009 PM ISA that examined relationships between exposure to $PM_{2.5}$ components and sources and health effects. As detailed in the Preface, this ISA focuses on specific study criteria to thoroughly evaluate whether there is evidence that an individual component(s) and/or source(s) is more closely related to health effects than PM mass. Across the health effects categories evaluated in this ISA, most studies that examine PM sources and components focused on $PM_{2.5}$. In studies examining both short- and long-term exposure, a variety of health effects were examined ranging from subclinical (e.g., changes in lung function, respiratory symptoms) to more overt (e.g., ED visits, hospital admissions, and mortality). Across exposure durations and health effects categories, it was concluded that many $PM_{2.5}$ components and sources are associated with many health effects, and the evidence does not indicate that any one source or component is consistently more strongly related to health effects than $PM_{2.5}$ mass.

Lastly, an important consideration in evaluating whether the NAAQS provides public health protection is assessing whether there are specific populations or lifestages at increased risk of a PM-related health effect. Whereas the ISA provides substantial evidence of health effects due to short- and long-term exposure to $PM_{2.5}$ across populations with diverse characteristics (e.g., children, older adults, people with pre-existing cardiovascular diseases, etc.), an evaluation of whether any of these populations are at increased risk of a PM-related health effect relies on evidence from specific types of studies that can directly inform this question as detailed in Section 1.5.5 and Chapter 12. Based on the framework for characterizing the evidence for populations potentially at increased risk of an air pollutant-related health effect detailed in the 2013 $O_3$ ISA (U.S. EPA, 2013), this ISA concludes there is adequate evidence that children are at increased risk of a $PM_{2.5}$-related health effect based on strong evidence of impaired lung function growth and additional evidence of decrements in lung function and asthma development. Additionally, there is adequate evidence that nonwhite people are at increased risk of $PM_{2.5}$-related health effects based on studies of long-term $PM_{2.5}$ exposure and mortality and studies demonstrating differential exposure by race. There was also suggestive evidence that populations with

SECTION: Policy-Relevant Considerations for Health Effects Associated with Particulate Matter Exposure

00196489

pre-existing cardiovascular and respiratory disease, that are overweight or obese, with genetic variants in genes in the glutathione transferase pathway and genes related to oxidant metabolism, that are of low SES, or are current or former smokers are at increased risk for $PM_{2.5}$-related health effects. Inadequate evidence exists to determine whether having diabetes, being in an older lifestage (i.e., older adults), residential location (including proximity to source and urban residence), sex, or diet increase the risk of $PM_{2.5}$-related health effects.

## PM Exposure and Welfare Effects

Compared with the evaluation of the health effects evidence, the evaluation of the welfare effects evidence focuses broadly on PM and not individual size fractions or exposure durations. Additionally, the evaluation, as noted previously, focuses on the welfare effects of visibility impairment, climate effects, and effects on materials due to the ecological effects of PM being evaluated in the ISA for Oxides of Nitrogen, Oxides of Sulfur and Particulate Matter—Ecological Criteria (U.S. EPA, 2018).

As noted in Table ES-2, this ISA concludes a *causal relationship* between PM visibility impairment, climate effects, and effects on materials which is consistent with the 2009 PM ISA. For visibility impairment (Section 13.2), the relationship between PM and light extinction has been well characterized. The rapid decline in $PM_{2.5}$ sulfate that has occurred from 2002−2012 (i.e., −4.6% per year in rural areas and −6.2% per year in urban areas) has contributed to improvements in visibility in many areas. However, an increasing amount of light extinction is now due to nitrate and organic matter. There have been no recent visibility preference studies; however, a recent meta-analysis demonstrates that scene-dependent haze metrics better account for preference than does using the deciview scale as a metric. For climate (Section 13.3), there is substantial evidence indicating that PM affects the radiative forcing of the climate system, both through direct scattering and absorption of radiation, and indirectly, by altering cloud properties. However, there are still substantial uncertainties with respect to key processes linking PM and climate, particularly those involving aerosol-cloud interactions, because of the scale difference between PM-relevant cloud processes and the resolution of state-of-the-art models, and the indirect impacts and feedbacks in the climate system resulting from an initial radiative perturbation due to PM. Lastly, for effects on materials (Section 13.4), most of the evidence has focused on examining PM effects on stone used for historic monuments and buildings. Recent evidence further expands the understanding of soiling and corrosion process for glass and metals and demonstrates that atmospheric soiling can affect energy efficiency of photovoltaic systems and of some buildings.

00196490

**Table ES-2   Summary of causality determinations for relationships between PM exposure and welfare effects from the 2009 and current Integrated Science Assessment for Particulate Matter.**

| | Causality Determination | |
| --- | --- | --- |
| **Welfare Effect Category** | **2009 PM ISA** | **Current PM ISA** |
| Visibility impairment Section 13.2.6 | Causal relationship | Causal relationship |
| Climate effects Section 13.3.9 | Causal relationship | Causal relationship |
| Effects on materials Section 13.4.5 | Causal relationship | Causal relationship |

PM = particulate matter.
Previous causality determinations taken from the 2009 PM ISA (U.S. EPA, 2009). Table P-2 provides a description of each of the five causality determinations and the types of scientific evidence that is considered for each category.

## Scientific Considerations and Key Findings of the Health and Welfare Effects Evidence

As summarized in the Preface (Section P.3), the Preamble to the ISAs (U.S. EPA, 2015) describes the process by which the U.S. EPA evaluates the strengths and limitations in the scientific evidence using a weight-of-evidence framework to form causality determinations within the ISAs. There are five different causality determinations, which may be used to characterize evidence with each determination delineated by the degree to which chance, confounding, and other biases affect interpretation of the scientific evidence (Table P-2). As documented by the extensive evaluation of evidence throughout the subsequent chapters of this ISA, the U.S. EPA carefully considers uncertainties in the evidence, and the extent to which recent studies have addressed or reduced uncertainties from previous assessments, as well as the strengths of the evidence. Uncertainties considered in the epidemiologic evidence, for example, include the potential for confounding by copollutants or covarying factors (e.g., temporal trends and weather in short-term exposure studies, and individual-level and ecological factors in long-term exposure studies) and exposure error. The U.S. EPA evaluates many other important considerations (not uncertainties) such as coherence of evidence from animal and human studies, evaluation of different PM components, heterogeneity of risk estimates, and the shape of concentration-response relationships. All aspects are evaluated in drawing scientific conclusions and making causality determinations. Where there is clear evidence linking PM to effects and minimal remaining uncertainties, the U.S. EPA concludes a *causal* or *likely to be causal* relationship.

Key findings of the health effects evidence spanning each of the PM size fractions and welfare effects evaluated in this ISA are summarized below and in Chapter 1 (Section 1.6). These highlights

SECTION: Scientific Considerations and Key Findings of the Health and Welfare Effects Evidence
ES-21

00196491

encapsulate the strengths and limitations in the evidence base that ultimately lead to the formation of causality determinations. For the health (i.e., respiratory and cardiovascular effects, and mortality due to short- and long-term $PM_{2.5}$ exposure) or welfare effects categories for which *causal* or *likely to be causal* determinations were made, recent findings were found to reduce or fully address previous uncertainties in the evidence and increase the strength of U.S. EPA's scientific conclusions. For other PM-effect relationships, the key findings highlighted below indicate where there is strength in the evidence, but uncertainties remain, resulting in causality determinations of *suggestive of, but not sufficient to infer, a causal relationship* or in some cases *inadequate to infer the presence or absence of a causal relationship*, both of which reflect that there is limited evidence to evaluate both strengths and weaknesses.

## Health Effects Evidence: Key Findings

A large body of scientific evidence spanning many decades clearly demonstrates there are health effects attributed to both short- and long-term PM exposure, with the strongest evidence for a relationship between some health effects and $PM_{2.5}$. Generally, for most health effects and exposures to $PM_{10-2.5}$ and UFPs, there are more limitations and uncertainties across scientific disciplines (i.e., atmospheric chemistry, exposure science, and both epidemiology and experimental sciences), complicating the interpretation of the evidence. The collective body of evidence for each of the PM size fraction, exposure, and health effect category combinations evaluated in this ISA was carefully considered and assessed, including the inherent strengths, limitations, and uncertainties in the overall body of evidence such as the available methods, models and data used within and across studies. This full assessment of the current state of the science for $PM_{2.5}$, $PM_{10-2.5}$, and UFPs resulted in the causality determinations detailed in Table 1-4. Through identification of the strengths and limitations in the evidence, this ISA may help in prioritizing research efforts to support future PM NAAQS reviews. Examples of the key findings in the health effects evidence considered in this PM ISA include:

### $PM_{2.5}$

- There are many recent epidemiologic studies conducted in diverse geographic locations, that include different population demographics, use a variety of exposure assignment techniques, and include different approaches and covariates to control for potential confounders that continue to report consistent positive associations between short- and long-term $PM_{2.5}$ exposure and respiratory and cardiovascular effects and mortality. This evidence is consistent with the large body of previously published epidemiologic studies reporting positive associations between $PM_{2.5}$ exposure and respiratory and cardiovascular effects and mortality and in some cases strengthens and extends the evidence base for other health effects.

- New $PM_{2.5}$ exposure assignment methods that use several sources of available data (i.e., satellite observations, model predictions, and ambient monitors) in epidemiologic studies better allow for the inclusion of less urban areas. These methods are well validated by $PM_{2.5}$ monitors in areas with moderate-to-high population density. Although fewer monitors are available for model validation in sparsely populated rural areas compared with urban areas, $PM_{2.5}$ concentrations are

SECTION: Scientific Considerations and Key Findings of the Health and Welfare Effects Evidence
ES-22

00196492

typically lower and more spatially homogeneous in rural areas, resulting in the need for fewer validation sites.

- The large number of animal toxicological and controlled human exposure studies provide coherence and biological plausibility for effects observed in epidemiologic studies of short- and long-term $PM_{2.5}$ exposure, particularly respiratory and cardiovascular effects, and mortality.

- Both animal toxicological and controlled human exposure studies, using concentrated ambient particle (CAP) exposures, provide evidence of a direct effect of PM exposure on various health effects.

- Epidemiologic studies that conducted copollutant analyses show that associations remain relatively unchanged when adjusting for gaseous pollutants and other particle size fractions (e.g., $PM_{10-2.5}$), addressing a key uncertainty identified in the 2009 PM ISA.

- Recent epidemiologic studies indicate that the observed heterogeneity in risk estimates is not attributed solely to differences in the composition of $PM_{2.5}$, but also reflects city-specific exposure conditions (e.g., housing and commuting characteristics).

- Evidence continues to support a linear, no-threshold concentration—response relationship, but with less certainty in the shape of the curve at lower concentrations (i.e., below about 8 $\mu g/m^3$).

- For health effects where it was concluded that the evidence is *suggestive of, but not sufficient to infer, a causal relationship* (i.e., short- and long-term $PM_{2.5}$ exposure and metabolic effects, male and female reproduction and fertility, pregnancy and birth outcomes, and short-term exposures and nervous system effects), epidemiologic and experimental studies report inconsistent evidence of an association/effect or there are relatively few studies focusing on the health effect of interest.

### $PM_{10-2.5}$

- Routine national monitoring of $PM_{10-2.5}$ was initiated in 2011. $PM_{10-2.5}$ concentrations are more spatially variable than $PM_{2.5}$. Although some $PM_{10-2.5}$ data are available across the nation, micro- to neighborhood-scale data are not widely available, adding uncertainty to the interpretation of results from epidemiologic studies, especially for long-term exposure studies that rely on spatial contrasts to examine associations with health effects.

- Epidemiologic studies that examined associations between short- and long-term $PM_{10-2.5}$ exposure and various health effects use multiple methods to estimate concentrations, complicating the comparison of results across studies.

- For some health effects, few or no experimental studies examined the relationship with short- and long-term exposure to $PM_{10-2.5}$. The few studies conducted provide inconsistent evidence of effects due to $PM_{10-2.5}$ exposures contributing to limited coherence and biological plausibility.

- The causality determinations for all health outcome categories for short- and long-term $PM_{10-2.5}$ exposure was concluded as either *suggestive of, but not sufficient to infer, a causal relationship* or *inadequate to infer the presence or absence of a causal relationship*, indicating limitations and uncertainties in the evidence base.

### UFPs

- There is no national ambient monitoring network in place to measure UFP concentrations; thus, there is limited information on UFP exposures within the U.S.

SECTION: Scientific Considerations and Key Findings of the Health and Welfare Effects Evidence
ES-23

- There are a limited number of epidemiologic studies that examined short- or long-term UFP exposure and various health effects.

- It is difficult to assess the results across epidemiologic studies because of the different size ranges of UFPs examined, the exposure metrics used, and spatial and temporal variability of UFP concentrations.

- While there is strong and consistent animal toxicological evidence linking long-term UFP exposure to nervous system effects, there is limited human data, represented by a single epidemiologic study, to support these effects.

- For all other health effect categories, animal toxicological studies and controlled human exposure studies provide limited, and in some instances inconsistent, evidence of effects due to short- or long-term UFP exposure contributing to limited coherence and biological plausibility.

- There is evidence of translocation of UFPs outside of the respiratory tract to the circulation and to the brain via the olfactory nerve. With respect to the brain, it is unclear whether this translocation occurs in humans as well as in animals. There is also uncertainty surrounding the mechanisms and degree to which particles translocate from the respiratory tract to the brain; however, translocation of particles to the brain may not be required for UFP-related nervous system effects.

- For health effects where it was concluded that the evidence is *suggestive of, but not sufficient to infer, a causal relationship* limitations and uncertainties in the evidence base remain, while for health effects where it was concluded *inadequate to infer the presence or absence of a causal relationship*, few or no epidemiologic and experimental studies examined the relationship between short- or long-term UFP exposures.

## Welfare Effects Evidence: Key Findings

A large body of scientific evidence spanning many decades also demonstrates there are welfare effects attributed to PM. This collective body of evidence contributed to the causality determinations detailed in Chapter 13 of this ISA for each of the nonecological welfare effects evaluated (see Table 1-4). Examples of the key findings in the welfare effects evidence considered in this PM ISA include:

- Recent studies further confirm evidence from previous assessments supporting the strong relationship between PM and the nonecological welfare effects of visibility impairment, effects on climate, and materials damage.

- For visibility impairment and materials damage there is extensive evidence demonstrating the relationship between PM and light extinction and PM effects on stone, respectively.

- While there is substantial evidence indicating that PM affects the climate system, specifically through radiative forcing, there are still substantial uncertainties in key processes, such as interactions between clouds and aerosols and the indirect impacts and feedbacks in the climate system due to the radiative effect of PM.

00196494

## References

Chan, EAW; Gantt, B; McDow, S. (2018). The reduction of summer sulfate and switch from summertime to wintertime PM2.5 concentration maxima in the United States. Atmos Environ 175: 25-32. http://dx.doi.org/10.1016/j.atmosenv.2017.11.055.

U.S. EPA (U.S. Environmental Protection Agency). (2009). Integrated science assessment for particulate matter [EPA Report]. (EPA/600/R-08/139F). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment- RTP Division. http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=216546.

U.S. EPA (U.S. Environmental Protection Agency). (2013). Integrated science assessment for ozone and related photochemical oxidants [EPA Report]. (EPA/600/R-10/076F). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment-RTP Division. http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=247492.

U.S. EPA (U.S. Environmental Protection Agency). (2014). Notice of workshop and call for information on integrated science assessment for particulate matter. Fed Reg 79: 71764-71766.

U.S. EPA (U.S. Environmental Protection Agency). (2015). Preamble to the integrated science assessments [EPA Report]. (EPA/600/R-15/067). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, RTP Division. https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=310244.

U.S. EPA (U.S. Environmental Protection Agency). (2018). Integrated science assessment for oxides of nitrogen, oxides of sulfur and particulate matter ecological criteria (2nd external review draft). (EPA/600/R-18/097). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment. http://cfint.rtpnc.epa.gov/ncea/prod/recordisplay.cfm?deid=340671.

SECTION: References

00196495

# CHAPTER 1    INTEGRATED SYNTHESIS

---

### *Overall Conclusions of the Particulate Matter (PM) Integrated Science Assessment (ISA)*

- Recent evidence spanning scientific disciplines (i.e., atmospheric chemistry, exposure science, dosimetry, epidemiology, controlled human exposure, and animal toxicology) builds upon evidence detailed in the 2009 PM ISA and reaffirms a *causal relationship* between short- and long-term $PM_{2.5}$ exposure and cardiovascular effects and total (nonaccidental) mortality, and a *likely to be causal relationship* for respiratory effects.
- Recent experimental and epidemiologic evidence supports a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and nervous system effects.
- Recent evidence, primarily from studies of lung cancer incidence and mortality, in combination with the decades of research on the mutagenicity and carcinogenicity of PM supports a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and cancer.
- Remaining uncertainties and limitations in the scientific evidence contribute to a *suggestive of, but not sufficient to infer, a causal relationship* and *inadequate to infer the presence or absence of a causal relationship* for all other exposure, size fraction, and health effects category combinations.
- Recent evidence builds upon and reaffirms that there is a *causal relationship* between PM and the nonecological welfare effects: visibility impairment, climate effects, and materials effects.
- The assessment of PM sources and components confirms and continues to support the conclusion from the 2009 PM ISA: *Many $PM_{2.5}$ components and sources are associated with many health effects, and the evidence does not indicate that any one source or component is more strongly related with health effects than $PM_{2.5}$ mass.*
- Many populations (e.g., healthy, diseased, etc.) and lifestages (e.g., children, older adults, etc.) have been shown to be at risk of a health effect in response to short- or long-term PM exposure, particularly $PM_{2.5}$. However, of the populations and lifestages examined, current scientific evidence indicates that only some populations may be at <u>*disproportionately increased risk*</u> of a $PM_{2.5}$-related health effect, including nonwhite populations, children, people with specific genetic variants in genes in the glutathione transferase pathway, people who are overweight or obese, people with pre-existing cardiovascular and respiratory diseases, people of low socioeconomic status (SES), and people who smoke or were former smokers. Inadequate evidence exists to determine whether having diabetes, being in an older lifestage (i.e., older adults), residential location (including proximity to source and urban residence), sex, or diet increase the risk of $PM_{2.5}$-related health effects.

---

## 1.1    Introduction

### 1.1.1    Purpose

The subsequent chapters of this ISA evaluate and characterize in detail the current state of the science with respect to the health and nonecological welfare effects[38] from exposure to particulate matter (PM). The overall scope of the ISA, which governs the types of studies considered in evaluating the scientific evidence, is detailed in the Preface. Aspects specific to identifying, through literature searches,

---

[38] Hereafter welfare effects refers to nonecological welfare effects, unless otherwise noted. The ecological effects resulting from the deposition of PM and PM components are being considered in a separate assessment as part of the review of the secondary (welfare-based) NAAQS for oxides of nitrogen, oxides of sulfur, and PM (U.S. EPA, 2018).

SECTION 1.1: Introduction

00196496

and systematically evaluating studies of PM that form the basis of the causality determinations detailed within this ISA are described in the Appendix. The main chapters of the ISA provide both the scientific basis for causality determinations[39] and policy-relevant scientific information that supports the review of the National Ambient Air Quality Standards (NAAQS) for PM. The purpose of this chapter is not to summarize each of the chapters, but to synthesize the key findings on each topic considered in characterizing PM exposure and relationships with respect to health and welfare effects. This ISA builds on and integrates evidence evaluated in prior assessments including the 2009 PM ISA (U.S. EPA, 2009) and earlier assessments, e.g., 2004 PM Air Quality Criteria Document [AQCD; U.S. EPA (2004)] and 1996 PM AQCD (U.S. EPA, 1996).

### 1.1.2    Organization of the ISA

The ISA consists of the Preface (legislative requirements and history of the primary and secondary PM NAAQS; and purpose and overview of the ISA along with the overall scope, the assessment of biological plausibility, and the process for evaluating evidence), Executive Summary, and 13 chapters. Chapter 1 synthesizes the scientific evidence that best informs the policy-relevant questions detailed within the *Integrated Review Plan for the Primary National Ambient Air Quality Standards for Particulate Matter* [PM IRP; U.S. EPA (2016)] that frame this review of the primary (health-based) and secondary (welfare-based) PM NAAQS. Chapter 2 characterizes the sources of PM, atmospheric processes related to PM formation, and trends in ambient PM concentrations, for specifically $PM_{2.5}$ (fine PM; PM with a nominal mean aerodynamic diameter less than or equal to 2.5 µm), $PM_{10-2.5}$ (thoracic coarse or coarse PM; PM with a nominal mean aerodynamic diameter greater than 2.5 µm and less than or equal to 10 µm), and ultrafine particles [UFPs, generally considered as particulates with a diameter less than or equal to 0.1 µm (typically based on physical size, thermal diffusivity, or electrical mobility)]. Chapter 3 describes methods to estimate human exposure to PM and the effect of exposure measurement error on associations with health effects. Chapter 4 describes the dosimetry of the various size fractions of PM. Chapter 5, Chapter 6, Chapter 7, Chapter 8, Chapter 9, Chapter 10, and Chapter 11 evaluate and integrate epidemiologic, controlled human exposure, and animal toxicological evidence and characterize the biological pathways that potentially underlie the development of health effects resulting from short-term and long-term exposure to $PM_{2.5}$, $PM_{10-2.5}$, and UFPs for respiratory effects, cardiovascular effects, metabolic effects, nervous system effects, reproductive and developmental effects, cancer, and mortality, respectively. Chapter 12 evaluates the scientific evidence on populations and lifestages potentially at increased risk of a PM-related health effect. Lastly, Chapter 13 evaluates the scientific evidence for welfare effects, focusing specifically on the nonecological welfare effects of visibility impairment, climate effects, and effects on materials. The Appendix outlines the various steps taken

---

[39] The general process for developing an ISA, including the framework for evaluating weight-of-evidence and drawing scientific conclusions and causal judgments, is described in a companion document, Preamble to the Integrated Science Assessments (U.S. EPA, 2015), and also detailed within the Appendix.

00196497

during the entirety of the development of the ISA, including literature searches, systematic evaluations of study quality, the peer-review process, and the process of quality assurance.

A key consideration in the health effects assessment is the extent to which evidence indicates that $PM_{2.5}$, $PM_{10-2.5}$, and UFPs exposures independently cause health effects. To that end, Chapter 1 draws upon information about the sources, atmospheric chemistry, and distribution of ambient PM, as well as background sources of ambient PM (Section 1.2.1). Additionally, it characterizes exposures to ambient PM of different size fractions and identifies pollutants and other factors related to the distribution of or exposure to ambient PM that can potentially influence epidemiologic associations observed between health effects and $PM_{2.5}$, $PM_{10-2.5}$, and UFP exposures (Section 1.2.2). The chapter also summarizes information on the dosimetry of inhaled PM of different size fractions (Section 1.3). The discussions of the health effects evidence and causality determinations (Section 1.4) details the extent to which there is biological plausibility for the various PM exposure duration-health effects relationships evaluated, and provides an integrated summary of the epidemiologic and experimental (i.e., animal toxicological and controlled human exposure) evidence and whether it collectively supports independent relationships between exposure to $PM_{2.5}$, $PM_{10-2.5}$, or UFPs and health effects.[40] This chapter also integrates evidence across the ISA for specific policy-relevant issues that are informative in the PM NAAQS review (Section 1.5), specifically: potential copollutant confounding (Section 1.5.1); the timing of effects, which includes the lag structure of associations and averaging time for exposure metrics (Section 1.5.2); the shape of the concentration-response relationship and whether a threshold exits (Section 1.5.3); and whether individual PM components or exposure metrics representative of PM sources are a better indicator for the PM-health effects relationship than PM mass (Section 1.5.4). Additionally, as part of the discussion of policy-relevant considerations, this chapter summarizes the evidence as to whether specific populations or lifestages are at increased risk of a PM-related health effect, which is an important consideration in evaluating whether the NAAQS provides public health protection (Section 1.5.5). This chapter also characterizes the welfare effects evidence and the role of PM, specifically on the nonecological effects of visibility, climate, and materials (Section 1.6). Lastly, Section 1.7, summarizes the causality determinations for all PM size fraction, exposure duration, and health and welfare effects combinations evaluated within this ISA.

## 1.2     From Emissions Sources to Exposure to PM

The characterization of human exposure is key to understanding the relationships between ambient PM (i.e., $PM_{2.5}$, $PM_{10-2.5}$, and UFP) and health effects. Exposure to PM is influenced by a variety of factors including, but not limited to, time-activity patterns, building characteristics, and amount of PM in the ambient air. The latter is influenced by sources and atmospheric processes contributing to ambient

---

[40] When discussing epidemiologic evidence, as detailed in the Preface, risk estimates are for a 10-$\mu g/m^3$ increase in 24-hour avg $PM_{2.5}$ and $PM_{10-2.5}$ concentrations and a 5-$\mu g/m^3$ increase in annual $PM_{2.5}$ and $PM_{10-2.5}$ concentrations.

SECTION 1.2: From Emissions Sources to Exposure to PM

00196498

PM concentrations that together can influence the spatial and temporal patterns of PM. The spatial and temporal variation in PM exposure in the population and the adequacy of methods used to estimate exposure, inform the strength of inferences that can be drawn about the health and welfare effects related to PM exposure.

### 1.2.1    Emission Sources and Distribution of Ambient Concentrations

PM is a complex mixture of solid and liquid droplets that is often characterized by distinct size fractions (i.e., $PM_{2.5}$, $PM_{10-2.5}$, and UFPs). The characteristics of each PM size fraction can vary in terms of: sources and emissions, atmospheric processes that result in PM formation, variability in concentrations over time and space, and monitoring.

Observations and new developments in characterizing ambient PM build on the conclusions reported in the 2009 PM ISA, as summarized in Chapter 2. In the 2009 PM ISA, decreasing trends were reported through 2007 with monitoring data beginning in 1999 for $PM_{2.5}$ and 1988 for $PM_{10}$. In addition, for the years 2005−2007, there was considerable variability in daily average concentrations of $PM_{2.5}$. PM size was also observed to vary with location, with a generally larger fraction of $PM_{10}$ mass accounted for by $PM_{10-2.5}$ size in western cities (e.g., Phoenix, AZ and Denver, CO) and by $PM_{2.5}$ mass in eastern U.S. cities (e.g., Pittsburgh and Philadelphia, PA). Compared to the larger PM size fractions, there was more limited information on the regional and temporal variability of UFPs. The composition of $PM_{2.5}$ nationally was also observed to vary, with higher sulfate concentrations in the summer and in the eastern U.S., and higher particulate organic carbon (OC) concentrations in the western and southeastern U.S. Little information was available on $PM_{10-2.5}$ or UFP composition. In urban areas, $PM_{2.5}$, $PM_{10}$, and UFPs were all observed to peak during morning rush hour and exhibited an evening rush hour peak that was broader than the morning peak and which extended into the overnight period, reflecting the collapse of the mixing layer after sundown. In terms of measuring PM, notable advances have taken place in real-time PM mass measurement methods, single particle aerosol mass spectrometry methods, organic speciation methods, and dichotomous samplers for distinguishing $PM_{2.5}$ and $PM_{10-2.5}$. Major PM sources identified included combustion of fossil fuel, either by stationary sources or by transportation for primary PM, and formation of sulfates from $SO_2$ emitted mainly by electric power generating units (EGUs). Progress was also noted in understanding the chemistry of new particle formation and the formation of secondary organic aerosol (SOA). Background PM typically accounts for a small fraction of urban $PM_{2.5}$ or $PM_{10}$, but high PM concentrations can occur during episodic events like wildfires or dust storms.

Changes in ambient PM characteristics, as well as new research developments, have occurred since the 2009 PM ISA. Ambient annual average $PM_{2.5}$ concentrations in the U.S. have continued to decline and on average were 3.4 $\mu g/m^3$ lower in the period from 2013−2015 than in the period from 2005−2007: decreasing from a 3-year avg of 12 $\mu g/m^3$ for 2005−2007 to 8.6 $\mu g/m^3$ for 2013−2015 . However, while $PM_{2.5}$ concentrations were observed to decline in both time periods, the national average

00196499

$PM_{10-2.5}$ concentrations have stayed about the same. Monthly national average $PM_{2.5}$ concentrations were higher in summer than in winter from 2002−2008, but this pattern reversed during the period of 2012−2015, when monthly average $PM_{2.5}$ concentrations became higher in winter than in summer. A greater reduction in sulfate concentrations than other component concentrations resulted in smaller sulfate contributions to $PM_{2.5}$ mass in 2013−2015 compared to 2005−2007, especially in the eastern U.S. At many locations sulfate has been replaced by organic material as the greatest contributor to $PM_{2.5}$ mass. Much of the organic material is SOA, and there has been continued progress in understanding SOA precursors, formation processes, and components. The declines in $PM_{2.5}$ and sulfate concentrations are consistent with a large reduction in $SO_2$ emissions, mainly from decreased EGU coal combustion. Monitoring network changes have provided a more extensive set of observations for understanding the contributions of $PM_{2.5}$ and $PM_{10-2.5}$ to $PM_{10}$. The decrease in $PM_{2.5}$ concentrations has resulted in smaller $PM_{2.5}:PM_{10}$ ratios in many locations. $PM_{10}$ in the East and Northwest is in the range of 50−60% $PM_{2.5}$, while $PM_{10}$ in the western U.S. is generally less than 50% $PM_{2.5}$. Routine measurement of UFPs is in its beginning stages, with only a few locations starting to report monitoring data to U.S. EPA's Air Quality System (AQS).

### 1.2.1.1    Sources and Emissions of PM

PM is comprised of components that are directly emitted (primary particles) as well as formed through atmospheric chemical reactions involving gaseous precursors (secondary particles). The sources of PM vary with PM size fraction.

$PM_{2.5}$ can be generated from both natural and anthropogenic sources. The greatest contributors to primary $PM_{2.5}$ at the national level are agricultural dust, dust resuspended through on-road activities, and fires (i.e., wildfires, prescribed fires, and agricultural fires; see Section 2.3.1.1 and Figure 2-2). On a national scale, anthropogenic emissions have been estimated to account for 40% of total primary $PM_{2.5}$ emissions and 16% of total $PM_{10}$ emissions (U.S. EPA, 2017). However, this does not account for secondary PM, much of which is derived at least in part from anthropogenic precursors. On an urban scale, sources that emit $PM_{2.5}$ vary from city to city. Generally, anthropogenic sources account for nearly all urban primary $PM_{2.5}$ emissions and include some combination of industrial activities, motor vehicles, cooking, and fuel combustion, and often wood smoke, as well as construction and road dust. (Section 2.3.1.2). Both urban anthropogenic primary sources and more regional secondary generation contribute substantially to $PM_{2.5}$ mass in urban locations.

Source contributions to primary $PM_{2.5}$ emissions have changed over time. For example, changes in both gasoline and diesel emissions controls have led to reductions in primary $PM_{2.5}$ emitted from newer vehicles, and primary emissions from stationary fuel combustion, industrial activities, and nonroad vehicles have also decreased (Section 2.3.1.2). Natural and international sources are generally minor contributors to $PM_{2.5}$ in urban areas. In many locations secondary PM accounts for the majority of $PM_{2.5}$

SECTION 1.2: From Emissions Sources to Exposure to PM

00196500

mass. The major PM precursors that can ultimately contribute to $PM_{2.5}$ mass include sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_X$), ammonia ($NH_3$), and volatile organic compounds (VOCs; Section 2.3.2.1). $SO_2$ emissions are mainly from EGUs (67%) while $NO_X$ is emitted by several combustion sources, including on-road vehicles (34%), off-road vehicles (21%), and EGUs (13%). $NH_3$ emissions are dominated by livestock waste (55%) and fertilizer application (26%), and VOCs, on a national scale, are mainly biogenic in origin (70%; Section 2.3.2.1). Emissions of some $PM_{2.5}$ precursors, and subsequently their overall contribution to $PM_{2.5}$ mass, have changed over time (Section 2.3.2.1). Since the 2009 PM ISA, $SO_2$ emissions have been reduced from 13.9 million metric tons (MMT) in 2006 to 4.8 MMT in 2014, representing a 65% reduction and the greatest reduction among all precursor emissions (Section 2.3.2.1). $NO_X$ emissions were also substantially reduced during the same time, decreasing from 19.4 MMT in 2006 to 13.5 MMT in 2014, representing an overall reduction of 30%. $NH_3$ emissions, however, have remained relatively constant over time, with estimates of 3.8 MMT in 2006 and 3.9 MMT in 2014 (Section 2.3.2.1).

$PM_{2.5}$ consists of both primary PM, generated mostly from combustion-related activities and secondary PM from atmospheric chemical reactions of precursor emissions. $PM_{10-2.5}$, however, is almost entirely primary in origin, produced by surface abrasion or by suspension of sea spray or biological material (e.g., microorganisms, pollen, plant and insect debris; Section 2.3.3). Major sources on a national scale are unpaved road dust and agricultural dust—and specifically in urban areas—paved road dust and construction dust. Dust events can also result from international transport, and some of the dust particles in these events fall into the $PM_{10-2.5}$ size range. Primary biological aerosol particles can also be an important contributor to $PM_{10-2.5}$, including fungal spores, bacteria, viruses, and plant debris.

Ambient UFPs originate from two distinct processes: primary particles directly emitted from specific sources and new particle formation (NPF), which occurs because of particular atmospheric conditions that allow for particle nucleation (Section 2.3.4). UFP and $PM_{2.5}$ primary sources are largely indistinguishable because UFP is usually emitted by the same sources as $PM_{2.5}$ and grows out of the ultrafine size range through coagulation or gas-to-particle condensation over a short duration to form particles within the $PM_{2.5}$ size range. (Section 2.3.4.1). However, differences in the location of UFP sources can subsequently lead to differences in the spatial distribution and population exposure to both UFPs and $PM_{2.5}$. For example, freshly emitted motor vehicle exhaust often occurs on busy urban streets in residential neighborhoods, while emissions from electric power generation occur further away from human activity, and more particles are likely to grow larger than the UFP size range before reaching populated areas. It typically takes between about half a day and 3 days before newly formed particles grow larger than 100 nm in diameter. As a result, although UFP size increases from 10 to 25 nm within 100 m of a source, vehicle-related PM components are still mainly in the UFP size range as far as 1 km from a major highway.

Although relatively limited information is available on a source-by-source basis to capture changes in UFP emissions over time, analyses of individual sources where new source requirements have been instituted allow for an assessment of source contributions to UFP emissions. Most new research on

SECTION 1.2: From Emissions Sources to Exposure to PM

00196501

UFP emissions has focused on automobile exhaust, in part because some of the highest observed UFP concentrations have been observed in near-road environments. For example, new requirements on heavy-duty diesel highway engines that were phased in from 2007−2010 and focused on reducing PM and $NO_X$ emissions have led to reductions in UFP number concentration (NC) of more than 90% compared with earlier diesel engine models (Section 2.3.4.1). Although these newer diesel highway engines generate, on average, a smaller amount of UFP emissions than earlier models, there can still be discrete periods of extremely high UFP formation. This is because thermal desorption of adsorbed sulfates can build up within the exhaust catalyst system and then be released in a single burst (Section 2.3.4.1). Motor vehicles are a leading source of UFP emissions, especially near roadways, and there are recent reports of high UFP concentrations also occurring downwind of airports. However, stationary point sources are also important, particularly at further distances from roadways. Gasoline and diesel-powered highway vehicles, nonroad diesel engines, and industrial sources are likely the largest sources of UFPs in populated areas, where relative contributions of mobile and stationary sources of UFPs are likely to vary considerably depending on location, season, and time of day.

### 1.2.1.2   Atmospheric Processes and PM Formation

The atmospheric processes that result in PM formation, specifically oxidation reactions to form sulfates and nitrates, have been well characterized in previous assessments [U.S. EPA (2009); (U.S. EPA, 2004); Section 2.3.2.2]. As a result, recent research has focused primarily on the formation of SOA, showing it to be a sizeable contributor to $PM_{2.5}$ mass under a variety of atmospheric conditions (Section 2.3.2.3). New research has increased our understanding of how a substantial amount of SOA is produced by several important processes, including reactions of the biogenic VOC isoprene, cloud processing, and further oxidation of gas-phase products formed from atmospheric VOC oxidation. Additionally, PM formation from biogenic VOC reactions has been reported to be enhanced by anthropogenic influences, including $NO_x$ and $SO_2$ precursor emissions. (Section 2.3.2.3). Compositional analyses have shown that organosulfates and organonitrates often account for a large fraction of SOA, up to 5−10% for organosulfates and up to 10−20% for organic nitrates (Section 2.3.2.3). Examination of atmospheric processes that lead to SOA formation has led to observations that atmospheric aging (oxidation) of organic aerosols increases reactive oxygen species activity of ambient PM (Section 2.5.1.1.7). This is an important finding because reactive oxygen species (ROS) have been shown to contribute to cellular oxidative stress in respiratory tract cells (Section 5.1.1).

In addition to exploring SOA formation, recent studies have further examined particle nucleation. New instrumentation has made it possible to measure atmospheric molecular clusters and to directly observe the process of particle nucleation (Section 2.3.4). This research has also focused on identifying the chemical species important in the particle nucleation process. Previous research had focused mainly on the role of sulfate and water, with increasing evidence that organic species were also involved. More

SECTION 1.2: From Emissions Sources to Exposure to PM
1-7

00196502

recent research has identified the importance of additional species, including ammonia and amines, as well as extremely low volatility organic compounds in particle nucleation. (Section 2.3.4.2).

### 1.2.1.3    Monitoring and Modeling of PM

Broadly, PM is measured through: (1) well-established, long-term national monitoring networks based on well-established monitoring methods; (2) individual monitors established for a specific period to characterize air quality or conduct an epidemiologic study using a variety of established or experimental methods; and (3) satellite measurements. Depending on the PM size fraction, the extent to which information is available on ambient concentrations will vary by the monitoring capabilities currently available.

For $PM_{2.5}$ and $PM_{10}$, extensive national air monitoring networks have been established based on Federal Reference Methods (FRMs) for supporting air quality analyses in monitoring for compliance with the PM NAAQS, for measuring the spatial and temporal trends of air pollutants, and to support research to assess exposure and health risks from PM exposures (Section 2.4.6). Because PM itself is a complex mixture, additional monitoring networks have been established to capture information on $PM_{2.5}$ components. Specifically, the Chemical Speciation Network (CSN), and the Interagency Monitoring of Protected Visual Environments (IMPROVE) network, which was established for the specific purpose of understanding the relationship between PM composition and atmospheric visibility impairment, were both established to monitor $PM_{2.5}$ components (Section 2.4.6).

Two new national monitoring networks provide additional monitoring of $PM_{2.5}$ and/or $PM_{10-2.5}$ (Section 2.4.6). The first national monitoring network was established as a result of the 2010 $NO_2$ NAAQS. It instituted near-road monitors that were placed within 50 m of heavily trafficked roads in urban areas, and many of these near-road monitoring sites also conducted routine monitoring of $PM_{2.5}$. The NCore monitoring network was deployed starting in January 2011 and included measurements for $PM_{2.5}$ and $PM_{10-2.5}$. The $PM_{10-2.5}$ measurements were based on a new FRM and were compared with previously used methods that relied on taking the difference between $PM_{10}$ and $PM_{2.5}$ FRM measurements (Section 2.4.6). The new $PM_{10-2.5}$ monitoring requirements are met by using identical instrumentation for both $PM_{2.5}$ and $PM_{10}$ except for the sampler cutpoint (i.e., using the same sampler design, filter type, and filter face velocity for both $PM_{2.5}$ and $PM_{10}$ in the same sampler).

To date, most monitoring efforts with respect to PM have focused on mass-based measurements of $PM_{2.5}$, $PM_{10}$, and $PM_{10-2.5}$. Recently, some monitors have been deployed to measure UFP concentrations. Routine network particle number concentration (NC) measurements were initiated at 24 sites, made possible by the recent development of water-based condensation particle counters (CPCs; Section 2.4.6). In other research, new CPCs have been developed, which are capable of measuring NC of particles with aerodynamic diameter 0.001 μm and larger, and these are especially useful for investigating the atmospheric nucleation of particles. (Section 2.4.3.1). Analysis of particle number count data from

SECTION 1.2: From Emissions Sources to Exposure to PM

00196503

field studies shows that UFPs are likely to vary considerably among widely used methods, reflecting differences in the size ranges measured. Although size ranges of ambient UFP measurements can vary depending on the monitor used, it is important to note that the ambient UFP size range varies from that used in experimental (i.e., animal toxicological and controlled human exposure) studies that rely on concentrated ambient particle (CAP) UFP exposures. Specifically, UFP CAPs result in particle size ranges up to 0.18–0.3 μm, which is larger than the nominal UFP size limit of less than 0.1 μm, which has previously been defined as the upper size cut as detailed in the 2009 PM ISA. Because the contribution to mass from particles less than 0.1 μm is relatively small, much of the mass may be associated with particles greater than 0.1 μm. However, as described in Section 2.4.3.1, the difference in NC between UFP CAPs and ambient UFPs is likely to be much less than the difference in mass (Section 2.4.3.3).

Some of the biggest developments since the 2009 PM ISA include the use of satellite-based measurements to estimate $PM_{2.5}$ concentrations and the continued evolution of chemical transport models (CTMs). Satellite-based measurements have become widely used and are now combined with modeled data and ground level measurements to extend spatial coverage and improve spatial resolution of $PM_{2.5}$ estimates (Section 2.4.5). Although satellite-based $PM_{2.5}$ measurements allow for an expansion of the spatial coverage of epidemiologic studies, they are subject to measurement errors not encountered with FRM or other ground-based measurements; they are particularly limited by data availability because they cannot provide measurements during days with cloud or snow cover. This is because $PM_{2.5}$ is not directly measured and its estimation is based on computational algorithms involving a range of assumptions, such as vertical distribution and particle composition (Section 2.4.5). With respect to CTMs, advances have included the addition of biogenic VOC chemistry, organic aerosol aging, cloud chemistry, dry deposition, meteorological processes, wind-blown dust, and ammonia emissions. Collectively, these additions have resulted in demonstrable improvements in predicting seasonal variation and long-term changes in $PM_{2.5}$ concentrations (Section 2.4.7).

### 1.2.1.4    National PM Concentrations

Recent assessments of ambient PM concentrations have shown a general decline over time. $PM_{2.5}$ concentrations are generally lower than those reported in the 2009 PM ISA, decreasing from a national 3-year avg of 12 μg/m³ for 2005–2007 to 8.6 μg/m³ for 2013–2015 (Section 2.5.1.1.1 and Section 2.5.2.1.1). Similar to the trend in $PM_{2.5}$ concentrations, national 3-year avg $PM_{10}$ concentrations have declined by 15% compared with those reported for 2005–2007 and are estimated at 21.1 μg/m³ for 2013–2015, reflecting decreases in $PM_{2.5}$ concentrations. As detailed in Section 1.2.1.3, limited data are available from national monitors for $PM_{10-2.5}$ and UFP. As a result, it is difficult to assess trends in $PM_{10-2.5}$ and UFP concentrations over time ($PM_{10-2.5}$: Section 2.5.1.1.3, and Section 2.5.2.1.3; UFP: Section 2.5.1.1.5, and Section 2.5.2.1.4).

00196504

An examination of $PM_{2.5}$ composition trends provides further information about the overall reductions in $PM_{2.5}$ concentrations that have occurred over time. The biggest change in $PM_{2.5}$ composition since the 2009 PM ISA is the reduction in sulfate concentrations. Between 2000 and 2015, nationwide annual average sulfate concentration decreased by 17% at urban sites and 20% at rural sites. This change is most evident in the eastern U.S. and has resulted in organic matter or nitrate now being the greatest contributor to $PM_{2.5}$ mass in most locations (Section 2.5.1.1.6). The observed decline in $PM_{2.5}$ sulfate concentrations can be attributed to a similar decline in $SO_2$ emissions as noted in Section 1.2.1.1. The overall reduction in sulfate concentrations likely contributed substantially to the decrease in national average $PM_{2.5}$ concentrations, as well as the decline in the fraction of $PM_{10}$ accounted for by $PM_{2.5}$, when compared with the years 2005−2007 (Section 2.5.1.1.6).

### 1.2.1.5    Spatial and Temporal Variability in PM Concentrations

Although there has been an overall reduction in national PM concentrations over time, there are distinct spatial and temporal patterns in PM concentrations. At a macro scale, $PM_{2.5}$ concentrations are generally higher and more spatially uniform in the eastern U.S. than in the western U.S. (Section 2.5.1.1.1). While $PM_{2.5}$ concentrations are generally higher in the eastern U.S., the highest reported concentrations are an exception to this trend, occurring in California. Especially high $PM_{2.5}$ concentrations are observed in the San Joaquin Valley, where multiple monitors recorded 3-year avg concentrations greater than 14 $\mu g/m^3$, and in the Los Angeles, CA basin, where 3-year avg concentrations exceeded 12 $\mu g/m^3$ at several monitors. In the eastern U.S., the highest $PM_{2.5}$ concentrations are in or near the Ohio Valley, extending eastward into Pennsylvania, where 3-year avg concentrations for numerous monitors exceeded 10 $\mu g/m^3$. On a national scale there are distinct east and west patterns in long-term average $PM_{2.5}$ concentrations, but on an urban scale there is no clear pattern of $PM_{2.5}$ spatial variability, with some observations indicating relatively uniform concentrations and others depicting a high degree of variability (Section 2.5.1.2.1).

Seasonal analyses have shown a change in the season with the highest $PM_{2.5}$ concentrations. Compared with the 2009 PM ISA, where seasonal $PM_{2.5}$ concentrations were highest in the summer, recent data indicate higher average $PM_{2.5}$ concentrations in the winter, which reflect lower $SO_2$ emissions and consequent lower summertime sulfate concentrations (Section 2.5.1.1.1 and Section 2.5.2.2.1) Within most urban areas, $PM_{2.5}$ exhibits peaks in the morning and evening rush hours (Section 2.5.2.3).

In general, the fraction of $PM_{10}$ accounted for by $PM_{2.5}$ is higher in the eastern U.S. than in the western U.S. (Section 2.5.1.1.4). Compared with $PM_{2.5}$, $PM_{10-2.5}$ concentrations are more spatially variable (Section 2.5.1.2.3). Ninety-eighth percentile $PM_{10-2.5}$ concentrations greater than 40 $\mu g/m^3$ were observed in multiple locations in California, as well as in the southwestern states of Nevada, Arizona, New Mexico, Texas, and the central plains states of Oklahoma, Missouri, and Iowa, and around urban areas of St. Louis, MO, Cleveland, OH, and southern Florida. While not directly comparable to $PM_{10-2.5}$,

SECTION 1.2: From Emissions Sources to Exposure to PM

1-10

00196505

monitoring data for $PM_{10}$ concentrations, which are available for many more years, can inform and are often consistent with the observed spatial and temporal pattern of $PM_{10-2.5}$ concentrations. Compared with the 2004 AQCD (U.S. EPA, 2004), $PM_{10-2.5}$ has now been shown to account for more $PM_{10}$ in the eastern U.S. upon examining the fraction of $PM_{2.5}$ that comprises $PM_{10}$. The $PM_{2.5}$ fraction of $PM_{10}$ appears to have decreased from 60−70%, as detailed in the 2004 PM AQCD, to approximately 50−60% in 2013−2015, although the data varied between the assessments with the 2013−2015 observations based on national network data and the 2004 data based on a limited number of field study samples (Section 2.5.1.1.4). All U.S. regions display clear seasonal variations in $PM_{10-2.5}$ concentrations, with the lowest concentrations occurring around January and the highest occurring in the summer months (Section 2.5.2.2.2). Most $PM_{10-2.5}$ measurements are based on 24-hour monitoring; however, considerably higher $PM_{10-2.5}$ concentrations have been observed using monitors capable of recording higher time resolution measurements, potentially indicating a tendency for intense $PM_{10-2.5}$ short-term episodes not captured by 24-hour monitoring (Section 2.5.1.1.3).

Data on the spatial and temporal variability in UFP concentrations is rather limited, particularly in the U.S. However, a single U.S. study that measured a full year of urban, size-resolved, particle number count measurements indicated about 90% of particles were smaller than 0.1 μm. (Section 2.5.1.1.5). The limited amount of available UFP measurements data indicates that the highest UFP concentrations occur in the winter and near roads with heavy traffic, often over short time periods (Section 2.5.1.2.4 and Section 2.5.2.2.3). Overall, UFP concentrations are more spatially variable than $PM_{2.5}$ (Section 2.5.1.2.4). Examinations of temporal variability show that UFP concentrations typically rise substantially in the morning and remain high into the evening hours when they reach their maximum, with distinct rush hour and early afternoon peaks. Additionally, there is evidence of seasonal impacts on the temporal variability of UFP concentrations, with high afternoon concentrations during warmer months possibly due to photochemical formation, and lower concentrations through the night (Section 2.5.1.1.5 and Section 2.5.2.2.3).

A detailed evaluation of the composition of $PM_{2.5}$, $PM_{10-2.5}$, and UFPs finds that each size fraction is dominated by several components. The composition of $PM_{2.5}$ has clear geographic differences. In the eastern U.S., sulfate and organic matter are the highest contributors to total mass, whereas in the western U.S., organic matter is most often the highest contributor, although sulfate, nitrate, and crustal material (e.g., soil dust) can also be abundant (Section 2.5.1.1.6). When examining the absolute concentrations of specific components, the highest nitrate concentrations are observed in the western U.S., particularly in California, but with some elevated concentrations in the upper Midwest. Seasonally, nitrate concentrations are much higher in the winter than summer in all locations (Section 2.5.1.1.6). Organic and elemental carbon concentrations are both more uniformly distributed in the eastern U.S., but more variable among western U.S. locations. The highest urban concentrations in the western U.S. occur during fall and winter (Section 2.5.1.1.6). Crustal material is a substantial contributor to $PM_{2.5}$ mass in dry areas of the western U.S., such as in Phoenix, AZ and Denver, CO (Section 2.5.1.1.6). As noted previously, $PM_{10-2.5}$ concentrations are highest in the southwestern U.S. and are observed to be largely

SECTION 1.2: From Emissions Sources to Exposure to PM
1-11

00196506

dominated by crustal material, but organic material can also represent a substantial contribution to mass, as well as biological material like bacteria, viruses, fungal spores, pollen, and plant debris (Section 2.5.1.1.6). For UFPs, there is still relatively limited information on its composition, but initial data indicate that urban UFPs are rich in organic and elemental carbon, while sulfate and ammonium are likely to be substantial contributors to UFPs in some areas where new particle formation occurs (Section 2.5.1.1.6).

Background PM generally refers to PM that is formed by sources or processes that cannot be influenced by actions to control PM concentrations. Various background definitions have been used for NAAQS reviews. U.S. background concentration of a pollutant is the concentration resulting from natural primary and precursor sources everywhere in the world plus anthropogenic sources outside of the U.S. Similarly, North American background concentration is the concentration resulting from natural primary and precursor sources everywhere in the world plus anthropogenic sources outside of the U.S., Canada, and Mexico. U.S. background sources of PM include wind erosion of natural surfaces, volcanic production, wildfires, sea salt, biological material like pollen and spores, SOA produced by oxidation of biogenic hydrocarbons, and particles transported from overseas. Background PM can be episodic, as is the case for volcanic eruptions, forest fires, and dust storms. Or it can be more consistent, as is the case for relatively constant, low level contributions from natural and intercontinental sources outside of major events (e.g., sea salt, natural secondary PM formation from terpenes). Nationally, it has been estimated that wildfire smoke contributes from 10–20% of primary $PM_{2.5}$ emissions per year, and intercontinental transport contributes 0.05 to 0.15 $\mu g/m^3$ to annual average $PM_{2.5}$ concentrations in the U.S., but that this contribution varies by region and season. On average, natural sources, including soil dust and sea salt, have been estimated to account for approximately 10% of U.S. urban $PM_{2.5}$ (Section 2.5.4).

### 1.2.1.6    Summary

Since the 2009 PM ISA there are new developments and observations in the characterization of ambient PM. For $PM_{2.5}$, these include observations of a steep decline in $SO_2$ precursor concentrations, replacement of sulfate with organic matter as the greatest contributor to $PM_{2.5}$ mass in many locations in the eastern U.S., and a substantial decrease in national average $PM_{2.5}$ concentration. A large body of new research has also refined the overall understanding of SOA formation processes. Improvements in CTM methods have resulted in demonstrable improvements in the prediction of seasonal variation and long-term changes in $PM_{2.5}$. Extensive new network monitoring for $PM_{10-2.5}$ has greatly increased the amount of data available for assessing relative amounts of $PM_{2.5}$ and $PM_{10-2.5}$, showing that $PM_{10-2.5}$ as a fraction of $PM_{10}$ has increased in the eastern U.S. at the same time as sulfate and $PM_{2.5}$ have decreased, and that in many western locations the contribution of $PM_{10-2.5}$ to $PM_{10}$ exceeds the contribution of $PM_{2.5}$ to $PM_{10}$. This new monitoring effort has further informed the understanding of seasonal and regional differences in $PM_{10-2.5}$ concentrations. Recent studies focusing on UFPs, largely support observations in the 2009 PM ISA, but new instrumentation for measuring particles as small as 1 nm and the initiation of

00196507

long-term monitoring in a few U.S. locations will help facilitate future research. However, network data are still sparse, and there is still far less information regarding patterns of spatial and temporal variability of UFPs compared with $PM_{2.5}$ or $PM_{10-2.5}$. Differences in monitoring methods and the lack of a consistent definition also make comparison of UFP data difficult between different field studies or methods.

### 1.2.2    Assessment of Human Exposure

Findings from the recent PM exposure assessment literature build on evidence presented in the 2009 PM ISA, which found that spatial variability of $PM_{10-2.5}$ and UFP at micro-to-neighborhood scales was greater than that of $PM_{2.5}$. Additionally, it concluded that primary $PM_{2.5}$ components, such as elemental carbon (EC), showed greater spatial variability than $PM_{2.5}$ components like $NO_3^-$ or $SO_4^{2-}$ that are produced through atmospheric chemical reactions. Regional variability in PM composition was also noted and thought to result from differences among sources in different parts of the country. Models, such as land use regression (LUR), were discussed as tools intended to characterize spatially variable components or size fractions, but limitations in the ability of LUR to adequately capture spatial variability were identified in several papers reviewed. Additionally, variability in the PM size distribution, PM composition, and infiltration were identified across regions as factors that could influence individual exposure to PM. Unmeasured variability in ambient PM concentration, size fractions, and composition were noted to result in potential uncertainty in estimates of exposures and health effect estimates. The recent literature has advanced the state of exposure science by presenting innovative methodologies to estimate PM exposure, detailing new and existing measurement and modeling methods, and further informing the influence of exposure measurement error due to new and existing exposure estimation methods on associations between PM and health effects reported in epidemiologic studies.

New evidence supports older findings that appropriate surrogates for exposure may depend on PM size distribution, because spatial variability in PM concentrations varies with particle size (Section 3.4.3.2). Multiple techniques have recently been developed or improved on to assign PM exposures in epidemiologic studies. These methods include personal monitors, data averaging across monitors, interpolation methods, LUR models, spatiotemporal models, CTMs, dispersion models, microenvironmental models, and satellite measurements (Section 3.3). Fixed-site monitors also continue to be used frequently to estimate exposure. Each method has strengths and limitations. Accordingly, errors and uncertainties in the exposure assessment methods can add bias and uncertainty to the associations reported in epidemiologic studies on the health effects of PM exposure.

Ambient PM data from individual sites continue to be used widely in health studies as a surrogate for PM exposure because these fixed-site monitors provide a continuous record of ambient PM concentrations over many years (Section 3.3.1.1). For $PM_{2.5}$, the concentration profile tends to be more homogeneous across the urban or neighborhood scale; as a result, ambient concentrations estimated at fixed-site monitors may reflect exposures. However, the higher degree of spatial variability in ambient

00196508

$PM_{10-2.5}$ and UFP across an urban area may not be captured by a fixed-site monitor. Thus, uncharacterized variability in a time series of exposures across space, resulting from use of fixed-site monitoring data, in a time-series epidemiologic study of $PM_{10-2.5}$ or UFP exposure may attenuate health effect estimates (Section 3.4.5.1). For long-term exposure studies, bias may occur in either direction depending on whether the fixed-site monitor is over- or underestimating ambient $PM_{10-2.5}$ or UFP exposure for the population of interest (Section 3.4.5.2). In all study types, use of fixed-site monitoring ambient $PM_{10-2.5}$ or UFP concentrations in lieu of the true exposure is expected to widen confidence intervals beyond what would be obtained if the true exposure were used. Personal monitors directly measure PM exposure, but they produce a relatively limited data set, making them most suitable for panel epidemiologic studies (Section 3.4.5.1.2). Without accompanying geographic positioning system (GPS) or time-activity diary data, it is impossible to distinguish ambient PM exposure from exposure to PM of nonambient origin in these studies.

Models of PM concentration can be used to develop exposure surrogates for individuals and large populations when personal exposure measurements are unavailable (Section 3.3.2). Recent developments have been made in spatiotemporal modeling techniques, which typically combine universal kriging with variables describing land use, population characteristics, emissions, and geographic features (Section 3.3.2.3). GIS-based spatiotemporal models of concentration that are used as exposure surrogates have produced out-of-sample cross validation (i.e., out-of-sample $R^2 > 0.8$) for $PM_{2.5}$ and its components, some of which have more spatially varying concentration fields than $PM_{2.5}$ mass concentration. Overly smoothed exposure surfaces from spatiotemporal models have been shown to bias the health effect estimate towards the null (i.e., underestimating the true health effect association) with decreased probability that the confidence intervals contain the true health effect association, particularly when the actual spatial variability is much higher than what is represented by the model (Section 3.4.5.2). Bias correction and bootstrap calculation of standard errors have been shown to improve estimation of the health effect association from spatiotemporal models when the exposure estimates have a classical-like error structure. A study of $PM_{2.5}$ mass and components, including EC, OC, Si, and S, where the exposure model errors had a Berkson structure, did not exhibit improvement of the health effect estimate when bootstrap simulation of the standard error was applied. When the exposure estimates have a Berkson-like error structure, health effect estimates are expected to improve only when model covariates are chosen so that the statistical distribution of the modeled exposures is close to the distribution of the true exposures.

Recent developments have been made for mechanistic models, such as dispersion models and CTMs, to simulate the transport, dispersion, and (in the case of CTMs) atmospheric chemistry of ambient PM (Section 3.3.2.4). Hybrid approaches to combine exposure predictions from CTMs with those from fixed-site monitoring data or dispersion models have grown since the 2009 PM ISA. CTMs are limited in their spatial resolution, which is typically at length scales of 4 or 12 km (and sometimes down to 1 km). Data fusion techniques merge CTMs with dispersion model results or fixed-site monitoring data. They are designed to estimate spatial variability of exposures at the subgrid scale, typically through a hierarchical modeling framework. These models have good cross validation and have the potential to reduce exposure

SECTION 1.2: From Emissions Sources to Exposure to PM

00196509

measurement error and resulting bias and uncertainty in health effect estimates reported in epidemiologic studies of long-term exposure to PM, even for spatially varying size fractions and components.

Several advancements in data fusion techniques have been made since the 2009 PM ISA to merge aerosol optical depth (AOD) observations from satellite images with surface-level PM measurements from fixed-site monitors (Section 3.3.3). Regression models have been developed to calibrate the AOD observations to surface measurements of $PM_{2.5}$, and $PM_{2.5}$ concentrations have then been estimated from those models in locations where surface measurements are unavailable. Land use or other geographical variables incorporated in these models has been shown to improve cross validation and reduce error in estimates of exposures and increasing the number of monitors used to fit the model has reduced bias and uncertainty in the exposure estimates. Hence, hybrid modeling approaches combining satellite data with fixed-site monitoring data and LUR or spatiotemporal modeling results have the potential to reduce bias and uncertainty in health effect estimates reported in epidemiologic studies of short- and long-term exposure to $PM_{2.5}$. Satellite data techniques have not typically been applied to model spatially variable UFP, $PM_{10-2.5}$, or $PM_{2.5}$ component concentration fields. Epidemiologic studies in which PM exposure is derived from a hybrid satellite-LUR model have reported larger magnitude health effect estimates with increasing spatial resolution (i.e., dividing the spatial domain into many smaller areas in which concentration is modeled) of the concentration surfaces. If the health effect estimate derived from the hybrid model was shown by cross validation to be more accurate than a low-resolution model, then this finding suggests that low spatial resolution (i.e., a spatial domain with a small number of large areas in which concentration is modeled) of the PM exposure surface may bias the health effect estimate towards the null, resulting in an underestimation of the true health effect association in a long-term exposure study (Section 3.4.5.2).

Among the methods evaluated within this ISA, only personal monitoring and microenvironmental modeling can estimate indoor exposure to ambient PM (Section 3.3.1.2). These measurements can be used for calculation of the infiltration factor ($F_{inf}$), which describes the penetration of PM from outdoors to indoors for a given air exchange rate and particle deposition rate, to understand indoor exposure to ambient PM. As particles cross the envelope of a building or vehicle, some deposit on surfaces around cracks or openings to produce an $F_{inf} < 1$ (Section 3.4.1.1). As described in the 2009 PM ISA, $F_{inf}$ varies with season, window opening, building age, wind speed and particle size distribution (with $F_{inf}$ lower for $PM_{10-2.5}$ compared with $PM_{2.5}$). Recent studies have reported lower $F_{inf}$ for UFP compared with $F_{inf}$ for $PM_{2.5}$, potentially reflecting diffusion-driven surface deposition losses for UFP during the infiltration process. In a study of the influence of exposure estimates on health effect estimates in a time-series epidemiologic study of PM exposure, use of a fixed-site monitor instead of a microenvironmental model that accounted for infiltration produced considerably attenuated health effect estimates (Section 3.4.5.1). Infiltration of PM through a building envelope may change the temporal variability of the indoor PM concentration time series, resulting in reduced correlation between the health effect of interest and the estimated exposure. In a study examining the influence of modeled exposures on health effect estimates associated with long-term average PM exposure, simulating indoor concentrations produced unbiased

SECTION 1.2: From Emissions Sources to Exposure to PM
1-15

00196510

health effect estimates. Furthermore, the health effect estimate was biased towards the null with inflated confidence intervals after omitting a term for infiltration in an LUR or spatiotemporal model. Bias towards the null leads to underestimation of the true health effect association (Section 3.4.5.2).

Exposure to copollutants may result in some confounding of the PM health effect estimate if exposure to the copollutants and their relationships to the health effect of interest are both correlated with PM exposure (Section 3.4.3). Median correlations of 24-hour ambient $PM_{2.5}$ with concentrations of some ambient gases (CO, $NO_2$, $O_3$) from the U.S. EPA Air Quality System (AQS) during 2013−2015 were as high as Pearson $R = 0.5$, although correlation varied with season (highest for $O_3$ in summer and for CO and $NO_2$ in winter). The upper end of the distribution of correlations approached one for these gases. Copollutant correlation data for short-term concentration measurements from the literature since the 2009 PM ISA were consistent with the AQS data. For $PM_{10-2.5}$, median correlations of 24-hour ambient concentrations during the same time period were as high as Pearson $R = 0.4$ but with upper correlations typically below Pearson $R = 0.7−0.8$. Median correlations between $PM_{2.5}$ and $PM_{10-2.5}$ ranged between 0.2 and 0.5, with higher values in summer and fall. Data for UFP correlations were very limited but indicate correlations as high as Pearson $R = 0.5$ for $NO_2$ and NOx. Sites with moderate to strong correlations ($R > 0.4$) may introduce a greater degree of confounding into epidemiologic results, depending on the relationship between the copollutants and the health effect of interest.

Recent epidemiologic studies of the health effects of PM exposure have examined potential associations between these health effects and exposure to PM components (Section 3.4.4). An examination of the composition of $PM_{2.5}$ using data from AQS found that the highest Pearson correlations between $PM_{2.5}$ mass and $PM_{2.5}$ component concentrations occurred for OC, $SO_4^{2-}$, EC, and $NO_3^-$. A large percentage of $PM_{2.5}$ mass concentration is a product of atmospheric chemistry. The recent peer-reviewed literature showed high correlations of $PM_{2.5}$ mass concentrations with concentrations of secondary $SO_4^{2-}$ and $NO_3^-$ as well as primary V and Zn. Similarly, high correlations between the quasi-ultrafine $PM_{0.25}$ and V were observed in recent studies for $PM_{0.25}$ concentrations, and correlations near Pearson $R = 1$ during the winter support the notion that heating oil combustion plays a role in these associations. For $PM_{10-2.5}$, the largest correlation was for Si, possibly in dust. Median correlations reported from AQS and the literature for $PM_{10-2.5}$ with all other $PM_{10-2.5}$ components were Pearson $R < 0.5$, indicating that $PM_{10-2.5}$ is not strongly associated with combustion. Generally, $PM_{2.5}$ components reflect the secondary nature of their production, the $PM_{0.25}$ components reflect combustion, and $PM_{10-2.5}$ components reflect mechanical generation.

In summary, exposure error tends to underestimate health effects associations in epidemiologic studies of PM exposure, although bias in either direction can occur. There are new developments in assessment of PM exposure, including hybrid spatiotemporal models that incorporate satellite observations of AOD, land use variables, surface monitoring data from FRMs, and/or CTMs. Improvements in spatial resolution of the $PM_{2.5}$ concentration surface have reduced bias and uncertainty in health effects estimates. However, high correlations with some gaseous copollutants require evaluating

SECTION 1.2: From Emissions Sources to Exposure to PM

00196511

the effect of confounding on health effects estimates, using two-pollutant models to ascertain robustness of epidemiologic study results. $PM_{10-2.5}$ and UFP concentrations tend to be more spatially variable than $PM_{2.5}$ concentrations, and data are either unavailable or less often available to fit or validate hybrid models for those size fractions. Thus, there is typically less uncertainty in health effect estimates derived from both monitored and modeled exposure estimates for $PM_{2.5}$ than for $PM_{10-2.5}$ and UFP.

## 1.3     Dosimetry of PM

Particle dosimetry refers to deposition, translocation, clearance, and retention of particles and their components within the respiratory tract and extrapulmonary tissues. The dose from inhaled particles deposited and retained in the respiratory tract is governed by several factors. These factors include exposure concentration and duration, activity and breathing conditions (e.g., nasal vs. oronasal route and minute ventilation), and particle properties (e.g., particle size, hygroscopicity, and solubility in airway fluids and cellular components). Basic information related to the mechanisms of particle deposition and clearance and the influence of disease severity on these mechanisms has not changed over the last several PM NAAQS reviews. Compared with prior reviews, species similarities and differences in the amount of inhaled PM reaching the lower respiratory tract are now better understood and quantified. Additionally, some older literature that was not included in prior reviews, shows differences in route of breathing in humans as a function of age and sex. New data on particle translocation across the olfactory mucosa into the brain and from the alveolar epithelium into the blood also now allows for improved estimates of the importance of these processes in humans.

To be deposited in the respiratory tract, particles need to first be inhaled. Inhalability refers to the fraction of particles that can enter the upper respiratory tract (i.e., the head) during inhalation and is dependent on the aerodynamic diameter of the particle ($d_{ae}$). A commonly used occupational criterion of particle inhalability in humans based on the $d_{ae}$ of particles, predicts that as $d_{ae}$ increases from 1–10 μm, inhalability decreases from ~97 to ~77%, plateauing at 50% for particles ~40 μm in diameter (Section 4.1.5). The occupational criterion is for relatively high wind speeds (>1 m/s). In calm air, inhalability decreases toward zero with increasing $d_{ae}$ above about 20 μm for nasal and 30 μm for oral breathing. There is evidence for much lower particle inhalability in infants than adults. In rodents, inhalability decreases more rapidly than in humans, from 80 to 44%, as $d_{ae}$ of particles increases from 2.5 to 10 μm especially for faster breathing rates. Inhalability and nasal deposition are particularly important considerations affecting how much PM makes it into the lower respiratory tract of rodents relative to humans (Section 4.1.6).

Route of breathing, breathing pattern (volume and rate), and particle size are among the factors affecting the amount of PM that enters the body and may subsequently deposit in the respiratory tract. With increasing physical activity, there is an increase in minute ventilation and a shift from nasal to oronasal breathing, and depending on the size fraction of PM inhaled, potentially greater PM penetration

SECTION 1.3: Dosimetry of PM

00196512

into the lower respiratory tract (i.e., the lungs). Even at rest, differences have been observed in the fraction of oral versus nasal breathing by age, sex, disease status, and body mass index (Section 4.1.3). Children inhale a larger fraction of air through their mouth than adults, and males tend to inhale a larger fraction of air through their mouth than females (across all ages). Individuals with allergies or upper respiratory infections experience increased nasal resistance, and thus, an increased fraction of oral breathing. Obesity, especially in boys, may also contribute to increased nasal resistance and an increased oral fraction of breathing relative to normal weight children. Due to their increased amount of oral breathing, these individuals are expected to have greater PM penetration into the lower respiratory tract than healthy, normal weight adults. Children are also expected to have a greater intake dose of PM per body mass than adults. Route of breathing is instrumental in determining the amount of PM inhaled and also affects the size of particles that can reach the lower respiratory tract. In humans, of particles reaching the lower respiratory tract is greater when a larger fraction of the breath enters the mouth (Figure 4-3). In contrast, rodents are obligatory nasal breathers and only a small percentage of larger particles (i.e., >3 μm) reaches the lower respiratory tract (Figure 4-4).

Particle deposition in the respiratory tract occurs predominantly by diffusion, impaction, and sedimentation (Section 4.2). Total respiratory tract particle deposition can reach nearly 100% in humans for particles smaller than approximately 0.01 μm (via diffusion) and greater than 10 μm (via sedimentation and impaction), but deposition is minimal for particles between 0.3 to 0.7 μm. The nose and mouth represent the first line of defense against particles depositing in the lower respiratory tract, with roughly 100% of particles 10 μm or greater depositing in the human nose. Interspecies differences in the inhalability and nasal deposition of particles has also been shown to affect the size of particles that can enter the respiratory tract and the percentage of particles deposited in various regions. While larger particles tend to deposit in the nose in humans, in rodents almost 100% of particles >5 μm are deposited in the nose. Additionally, oronasal breathing in humans contributes to greater penetration of coarse particles into the lower respiratory tract, whereas rats breath only nasally. There are also differences between children and adults in terms of breathing patterns and ventilation, indicating that children may receive a higher dose per lung surface area of ambient PM in the lower respiratory tract. Respiratory disease can lead to differences in both total deposition and deposition patterns relative to the disease-free lung. In general, the PM dose rate is increased by lung disease and depends on the severity of and type of disease.

For any given particle size, the pattern of poorly soluble particle deposition influences clearance by partitioning deposited material between regions of the respiratory tract (Section 4.3). While particles depositing in the mouth are generally swallowed or removed by expectoration, particles deposited in the posterior nasal passages or tracheobronchial (TB) airways are moved by mucociliary transport towards the nasopharynx and swallowed. In the alveolar region, clearance occurs mainly via macrophage phagocytosis. Clearance is more rapid in rodents than humans and has been shown to decrease with age beyond adulthood. Human studies have shown that ultrafine carbon particles do not rapidly or significantly translocate from the lungs into the circulation (Section 4.3.3.2). However, a new human

SECTION 1.3: Dosimetry of PM

00196513

study has demonstrated some translocation of nano-sized gold particles from the lungs into circulation. The finding of material in the blood in this new human study, but not prior human studies may, in part, be a matter of an increased signal to noise afforded in this new methodology and/or an indication that there is a difference in particle translocation from the lung depending on the inhaled particle type. Animal studies using poorly soluble nano-sized gold and iridium (Ir) particles have provided more extensive evidence of translocation into blood and secondary organs. The estimated urinary elimination by 24 hours post-inhalation of the gold nanoparticles is nearly identical between humans and rats. Soluble materials deposited in the respiratory tract can enter the blood more rapidly than insoluble materials. Recent evidence across species indicates that particles of varying composition and solubility that are less than 200 nm diameter can also translocate to the brain via the olfactory nerve.

There is a dosimetric basis for several particle sampling conventions used to quantify airborne PM concentrations. The U.S. EPA has size-selective sampling conventions for fine particles which is represented by $PM_{2.5}$ while $PM_{10}$ is the indicator used for the purposes of regulating the thoracic coarse particles (i.e., the inhalable particles that remain if $PM_{2.5}$ particles are removed from a sample of $PM_{10}$; aka $PM_{10-2.5}$). $PM_{2.5}$ is not well representative (nor was it intended to be) of the occupational definition of respirable particles which has a 50% cutpoint at 4 versus 2.5 μm for the $PM_{2.5}$ sampler (Figure 4-2). The selection of $PM_{2.5}$ for the NAAQS was mainly to delineate the atmospheric fine (combustion derived, aggregates, acid condensates, secondary aerosols) and coarse (crustal, soil-derived dusts) PM modes and for consistency with community epidemiologic health studies reporting various health effects associated with $PM_{2.5}$. The selection of $PM_{2.5}$ was not based on dosimetric considerations as was the case for the respirable particle sampler convention. Although the respirable sampling convention has a dosimetric basis, it is reflective of the total PM mass concentration to which the alveolar region may be exposed and not reflective of the PM mass deposition or dose. $PM_{10}$ is often referred to as the thoracic fraction of inhalable particles. There is an occupational sampling convention for thoracic particles and like $PM_{10}$ has a 50% cutpoint at about 10 μm (Figure 4-2). However, the fraction of inhaled 10 μm particles reaching the thorax is <20% for most activity levels and breathing habits. When breathing completely through the mouth, the fraction of inhaled 10 μm particles reaching the thorax approaches 40%. Thus, using a 50% cutpoint at 10 μm provides a conservative (protective) overestimate of thoracic particles.

## 1.4    Evaluation of the Health Effects of PM

This ISA evaluates relationships between short-term and long-term exposures to PM (i.e., $PM_{2.5}$, $PM_{10-2.5}$, and UFPs) and an array of health effects described in epidemiologic, controlled human exposure, and animal toxicological studies. In assessing the overall evidence, the strengths and limitations of individual studies were evaluated based on scientific considerations detailed in the Appendix. Short-term exposures are defined as those with durations of hours up to 1 month, with most studies examining effects related to exposures in the range of 24 hours to 1 week. Long-term exposures are defined as those with durations of more than 1 month to years. As detailed in the Preface, the evaluation

00196514

of the health effects evidence focuses on exposures conducted at concentrations of PM that are relevant to the range of human exposures across ambient microenvironments (up to 2 mg/m$^3$, which is one to two orders of magnitude above ambient concentrations), and studies that (1) include a composite measure of PM[41] or (2) apply some approach to assess the direct effect of a specific PM size-fraction when the exposure of interest is a source-based mixture (e.g., diesel exhaust, gasoline exhaust, wood smoke).

The subsequent sections and accompanying table (Table 1-2) summarize the key evidence that informs the causality determinations for relationships between PM exposure and health effects, specifically those relationships where it was determined that a *causal* or *likely to be causal relationship* exists (Table 1-1). These causality determinations draw from evidence related to the biological plausibility of PM-related health effects and the broader health effects evidence described in detail in Chapter 5–Chapter 11, as well as information on dosimetry in Chapter 4 and exposure assessment in Chapter 3. Those relationships between PM and health effects where it was concluded that the evidence supported a causality determination of *suggestive of, but not sufficient to infer, a causal relationship* or *inadequate to infer the presence or absence of a causal relationship* are noted in Table 1-4, but more fully discussed in the respective health effects chapters.

**Table 1-1    *Causal* and *likely to be causal* causality determinations for short- and long-term PM$_{2.5}$ exposure.**

| Size Fraction | Health Effects Category | Exposure Duration | Causality Determination | Section |
|---|---|---|---|---|
| PM$_{2.5}$ | Respiratory | Short-term | Likely to be causal | 1.4.1.1.1 |
| | | Long-term | Likely to be causal | 1.4.1.1.2 |
| | Cardiovascular | Short-term | Causal | 1.4.1.2.1 |
| | | Long-term | Causal | 1.4.1.2.2 |
| | Nervous system | Long-term | Likely to be causal | 1.4.1.3.1 |
| | Cancer | Long-term | Likely to be causal | 1.4.1.4.1 |
| | Mortality | Short-term | Causal | 1.4.1.5.1 |
| | | Long-term | Causal | 1.4.1.5.2 |

PM$_{2.5}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 µm.

---

[41] Composite measures of PM may include mass, volume, surface area, or number concentration.

SECTION 1.4: Evaluation of the Health Effects of PM
1-20

00196515

### 1.4.1 Health Effects of $PM_{2.5}$

Substantial scientific evidence exists across disciplines (i.e., animal toxicology, controlled human exposure, and epidemiology) showing that both short- and long-term $PM_{2.5}$ exposure can result in a range of health effects, from changes in circulating biomarkers to mortality. However, the strength of the $PM_{2.5}$ exposure–health effects relationship varies depending on the exposure duration (i.e., short- or long-term) and broad health effects category (e.g., cardiovascular effects, respiratory effects) examined. Across the broad health effects categories examined, the evidence supporting biological plausibility varies, but generally includes modulation of the autonomic nervous system and inflammation as part of the pathways leading to overt health effects. Discussions of subsequent events that could occur due to deposition of inhaled $PM_{2.5}$ in the respiratory tract are detailed in the biological plausibility sections of each health chapter and summarized in the following sections.

#### 1.4.1.1 Respiratory Effects

Recent scientific evidence continues to support the conclusion of the 2009 PM ISA that there is a *likely to be causal relationship* between both short- and long-term $PM_{2.5}$ exposure and respiratory effects. These causality determinations are based on the consistency of findings within disciplines; the coherence of evidence across disciplines, including epidemiologic, and animal toxicological studies, with more limited evidence from controlled human exposure studies; and the evidence supporting biologically plausible pathways for respiratory effects, such as asthma exacerbation, development of asthma, chronic obstructive pulmonary disease (COPD) exacerbation, and respiratory mortality.

##### 1.4.1.1.1 Respiratory Effects Associated with Short-Term $PM_{2.5}$ Exposure

Epidemiologic studies provide strong evidence for overt respiratory effects, including respiratory-related emergency department (ED) visits and hospital admissions and respiratory mortality associated with short-term $PM_{2.5}$ exposure, with coherence provided by some evidence of respiratory effects from experimental studies. Collectively this evidence supports the conclusion of the 2009 PM ISA that there is a *likely to be causal relationship* between short-term $PM_{2.5}$ exposure and respiratory effects (Table 1-2). This conclusion is based on multiple recent epidemiologic studies demonstrating generally consistent, positive associations with ED visits and hospital admissions for asthma, COPD, and combined respiratory-related diseases, as well as with respiratory mortality. Evidence from animal toxicological studies, although limited, is supportive of and provides biological plausibility for the associations observed in the epidemiologic studies related to exacerbation of asthma and COPD as well as respiratory infection.

00196516

Recent epidemiologic studies continue to provide strong evidence for a relationship between short-term $PM_{2.5}$ exposure and several respiratory-related endpoints, including asthma exacerbation (Section 5.1.2.1), COPD exacerbation (Section 5.1.4.1), and combined respiratory-related diseases (Section 5.1.6), particularly from studies examining ED visits and hospital admissions. The consistent positive associations between short-term $PM_{2.5}$ exposure and asthma and COPD ED visits and hospital admissions across studies that used different approaches to control for the potential confounding effects of weather (e.g., temperature) are supported by epidemiologic studies demonstrating associations with other respiratory-related effects, such as symptoms and medication use that are indicative of asthma and COPD exacerbations (Section 5.1.2.2 and Section 5.1.4.2). The collective body of epidemiologic evidence for asthma exacerbation is more consistent in children than in adults. Epidemiologic studies examining the relationship between short-term $PM_{2.5}$ exposure and respiratory mortality provide evidence of consistent positive associations, indicating a continuum of effects from morbidity to mortality (Section 5.1.9).

Building off the studies evaluated in the 2009 PM ISA, recent epidemiologic studies expand the assessment of potential copollutant confounding. There is some evidence that $PM_{2.5}$ associations with asthma exacerbation, combined respiratory-related diseases, and respiratory mortality remain relatively unchanged in copollutant models with gaseous pollutants (i.e., ●₃, $NO_2$, $SO_2$, with more limited evidence for CO) and other particle sizes (i.e., $PM_{10-2.5}$; Section 5.1.10.1). The uncertainty as to whether there is an independent effect of $PM_{2.5}$ on respiratory health, is partially addressed by findings from animal toxicological studies.

Animal toxicological studies of short-term $PM_{2.5}$ exposure provide coherence and biological plausibility for asthma and COPD exacerbations by demonstrating asthma-related responses in an animal model of allergic airways disease and enhanced lung injury and inflammation in an animal model of COPD (Section 5.1.2.4.4 and Section 5.1.4.4.3). There is also a broad body of animal toxicological studies examining respiratory effects due to short-term $PM_{2.5}$ exposure, but most of this evidence is from studies conducted in healthy animals, and therefore, does not provide coherence with the results of epidemiologic studies examining effects in people with asthma or COPD. This evidence base also provides consistent evidence for respiratory irritant effects; limited evidence for altered host defense, greater susceptibility to bacterial infection, and allergic sensitization; and some evidence for pulmonary injury, inflammation, and oxidant stress. Controlled human exposure studies conducted in people with asthma or COPD provide minimal evidence of effects due to short-term $PM_{2.5}$ exposure, such as decrements in lung function and pulmonary inflammation. These studies are limited in terms of endpoints evaluated and the size and health status of study subjects.

### 1.4.1.1.2     Respiratory Effects Associated with Long-Term $PM_{2.5}$ Exposure

Epidemiologic studies provide strong evidence for effects on lung development, with additional evidence for the development of asthma in children due to long-term $PM_{2.5}$ exposure. Evidence from animal toxicological studies, although limited, is supportive of and provides biological plausibility for the

SECTION 1.4: Evaluation of the Health Effects of PM

00196517

associations reported in epidemiologic studies related to lung development and the development of asthma. There is also epidemiologic evidence supporting a decline in lung function in adults in response to long-term $PM_{2.5}$ exposure. Collectively this evidence supports the conclusions of the 2009 PM ISA that there is a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and respiratory effects (Table 1-2).

Recent epidemiologic studies continue to support an association between long-term $PM_{2.5}$ exposure and several respiratory-related endpoints in children and adults. In children, studies in multiple cohorts provide strong evidence for decrements in lung function growth (Section 5.2.2.1.1). Robust and persistent effects were observed across study locations, exposure assessment methods, and time periods. An animal toxicological study demonstrating impaired lung development resulting from pre- and postnatal $PM_{2.5}$ exposure provides biological plausibility for these findings (Section 5.2.2.1.2). Results of prospective cohort studies in children also provide some evidence for asthma development in children and are supported by other studies examining asthma prevalence in children, childhood wheeze, and pulmonary inflammation (Section 5.2.3). Biological plausibility is provided by an animal toxicological study of long-term $PM_{2.5}$ exposure demonstrating the development of an allergic phenotype and increase in airway responsiveness (Section 5.2.3.3.2). There is limited evidence of increased bronchitic symptoms and hospitalization in children with asthma in relation to long-term $PM_{2.5}$ exposure (Section 5.2.7). In adults, long-term $PM_{2.5}$ exposure was found to be associated with accelerating lung function decline (Section 5.2.2.2.2). Consistent evidence was observed for respiratory mortality and cause-specific respiratory mortality for COPD and respiratory infection (Section 5.2.10), providing evidence of a continuum of effects in response to long-term $PM_{2.5}$ exposure.

Only a few recent epidemiologic studies have further examined potential copollutant confounding. There is some evidence that $PM_{2.5}$ associations with respiratory mortality remained robust in models with some gaseous pollutants (Section 5.2.10); however, there is limited assessment of potential copollutant confounding when examining respiratory morbidity outcomes. The uncertainty related to the independence of $PM_{2.5}$ effects is partially addressed by findings of animal toxicological studies. Long-term exposure to $PM_{2.5}$ resulted in oxidative stress, inflammation, and morphologic changes in both upper and lower airways (Section 5.2.8), in addition to the asthma-related and lung development-related effects mentioned above. Epidemiologic studies examining the effects of declining $PM_{2.5}$ concentrations provide additional support for a relationship between long-term $PM_{2.5}$ exposure and respiratory health by demonstrating improvements in lung function growth and bronchitic symptoms in children, and improvement in lung function in adults in association with declining $PM_{2.5}$ concentrations (Section 5.2.11). However, the limited examination of copollutant confounding in studies of declining $PM_{2.5}$ concentrations is a notable uncertainty given the corresponding decline in other pollutants over the time period of the evaluated studies.

SECTION 1.4: Evaluation of the Health Effects of PM
1-23

00196518

### 1.4.1.2    Cardiovascular Effects

Consistent with the conclusions of the 2009 PM ISA, more recently published scientific evidence further strengthens the conclusion that there is a *causal relationship* between both short- and long-term $PM_{2.5}$ exposure and cardiovascular effects. These causality determinations are based on the consistency of findings within disciplines; coherence among evidence from controlled human exposure, epidemiologic, and animal toxicological studies; and evidence supporting biologically plausible pathways for cardiovascular effects, such as reduced myocardial blood flow, altered vascular reactivity, myocardial infarctions, and cardiovascular mortality.

#### 1.4.1.2.1    Cardiovascular Effects Associated with Short-Term $PM_{2.5}$ Exposure

Strong evidence from epidemiologic studies demonstrating associations between cardiovascular ED visits and hospital admissions in combination with evidence for $PM_{2.5}$-induced cardiovascular effects from controlled human exposure and animal toxicological studies confirms and extends the conclusion of a *causal relationship* between short-term $PM_{2.5}$ exposure and cardiovascular effects from the 2009 PM ISA (Table 1-2). This conclusion is based on multiple epidemiologic studies demonstrating associations with cardiovascular effects such as ischemic heart disease (IHD)- and heart failure (HF)-related ED visits and hospital admissions, as well as cardiovascular mortality. The epidemiologic evidence is supported by experimental studies demonstrating endothelial dysfunction, changes in blood pressure (BP), and alterations in heart function in response to short-term $PM_{2.5}$ exposure. Additional evidence from epidemiologic, controlled human exposure, and animal toxicological studies also provides ample evidence of biologically plausible pathways by which short-term exposure to $PM_{2.5}$ can result in overt cardiovascular effects.

Consistent with the 2009 PM ISA, the strongest evidence comes from epidemiologic studies that reported consistent positive associations between short-term $PM_{2.5}$ exposure and cardiovascular-related ED visits and hospital admissions particularly for IHD (Section 6.1.2.1) and HF (Section 6.1.3.1), as well as cardiovascular-related mortality (Section 6.1.9) across studies that used different approaches to control for the potential confounding effects of weather (e.g., temperature). While associations remain relatively unchanged across the copollutants evaluated, the evidence was especially consistent for air pollutants that are not typically associated with traffic (i.e., ozone, $SO_2$, $PM_{10-2.5}$). In some instances, associations in copollutant models were attenuated, but this was only observed for the traffic-related pollutants (i.e., $NO_2$, CO), which generally had higher correlations with $PM_{2.5}$ than other copollutants. This recent evidence from copollutant analyses generally indicates that the associations observed between short-term $PM_{2.5}$ exposure and cardiovascular effects are not artifacts due to confounding by another air pollutant (Section 6.1.14.1). These epidemiologic studies reduce a key uncertainty identified in the 2009 PM ISA by providing evidence that gaseous pollutants are not likely to confound the $PM_{2.5}$-cardiovascular effects relationship.

00196519

The independence of $PM_{2.5}$ effects is further addressed by findings of recent controlled human exposure and animal toxicological studies. The most consistent evidence from controlled human exposure studies is for a $PM_{2.5}$ effect on endothelial function (Section 6.1.13). Multiple recent controlled human exposure studies reported that $PM_{2.5}$ impaired some measure of vessel dilation following reactive hyperemia or pharmacological challenge relative to filtered air. Given the relationship between endothelial function and BP, these results are coherent with multiple controlled human exposure studies that reported changes in BP following short-term $PM_{2.5}$ CAPs exposure (Section 6.1.6.3). However, these results are inconsistent with some controlled human exposure studies from previous reviews that did not find changes in endothelial function or BP. The results of more recent controlled human exposure studies are also coherent with evidence from animal toxicological studies demonstrating endothelial dysfunction and changes in BP or the renin angiotensin system following short-term $PM_{2.5}$ exposure (Section 6.1.13.3; Section 6.1.6.4). Moreover, changes in endothelial function and BP reported in recent experimental studies are consistent with epidemiologic studies reporting associations between short-term $PM_{2.5}$ exposure and IHD, as well as with limited epidemiologic panel study evidence of associations with BP. In addition, animal toxicological studies demonstrating that short-term $PM_{2.5}$ exposure results in decreased cardiac contractility and changes in left ventricular pressure are coherent with epidemiologic studies reporting associations between short-term $PM_{2.5}$ exposure and HF.

Collectively, the evidence from controlled human exposure, animal toxicological, and epidemiologic panel studies provide a biologically plausible pathway by which short-term $PM_{2.5}$ exposure could result in cardiovascular effects such as those leading to an ED visit, hospital admission, or mortality. This proposed pathway (Section 6.1.1) begins with pulmonary inflammation and/or activation of sensory nerves in the respiratory track and progresses to autonomic nervous system imbalance and/or systemic inflammation that can potentially affect cardiovascular endpoints such as endothelial function, HRV, hemostasis, and/or BP. Changes in the aforementioned cardiovascular endpoints may then lead to the development of arrhythmia, thrombosis, and/or acute myocardial ischemia, potentially resulting in outcomes such as myocardial infarction, IHD, HF, and possibly death.

Overall, across the scientific disciplines, recent studies extend and support the previous evidence for a continuum of cardiovascular-related health effects following short-term exposure to $PM_{2.5}$. These effects range from relatively modest increases in biomarkers related to inflammation, to subclinical cardiovascular endpoints such as endothelial dysfunction, the overt outcomes of ED visits and hospital admissions, specifically for IHD and HF, and ultimately cardiovascular-related mortality.

### 1.4.1.2.2 Cardiovascular Effects Associated with Long-Term $PM_{2.5}$ Exposure

Multiple recent and previously available epidemiologic studies that extensively control for potential confounders provide strong evidence of positive associations with cardiovascular mortality, which in combination with supporting evidence from recent studies examining cardiovascular morbidity

SECTION 1.4: Evaluation of the Health Effects of PM
1-25

00196520

reaffirms the conclusion of a *causal relationship* between long-term $PM_{2.5}$ exposure and cardiovascular effects in the 2009 PM ISA (Table 1-2). This conclusion is based on recent U.S. and Canadian cohort studies demonstrating consistent, positive associations between long-term $PM_{2.5}$ exposure and cardiovascular mortality, with more limited evidence from studies examining long-term $PM_{2.5}$ exposure and cardiovascular morbidity.

Epidemiologic studies consisting of U.S.-based cohorts and subsequent analyses of these cohorts, provided the basis of the conclusions in the 2009 PM ISA. These studies, in combination with recent cohort studies, continue to demonstrate consistent, positive associations and support a strong relationship between long-term $PM_{2.5}$ exposure and cardiovascular mortality. The results of these recent cohort studies are consistent across various spatial extents, exposure assessment techniques, and statistical techniques in locations where mean annual average concentrations are near or below 12 µg/m³ (Section 6.2.10).

The body of literature examining the relationship between long-term $PM_{2.5}$ exposure and cardiovascular morbidity has greatly expanded since the 2009 PM ISA. Recent epidemiologic studies examining cardiovascular morbidity endpoints consist of several large U.S. cohort studies each focusing on populations with distinct demographic characteristics (e.g., postmenopausal women, male doctors, etc.) and extensive consideration of potential confounders. These studies have reported heterogeneous results, with several studies that adjusted for important confounders, including socioeconomic status (SES), reporting positive associations for cardiovascular morbidity endpoints. The strong associations reported between long-term $PM_{2.5}$ exposure and coronary events (e.g., coronary heart disease [CHD] and stroke) among postmenopausal women in the Women's Health Initiative (WHI) cohort, highlighted in 2009 PM ISA, were strengthened in an extended analysis that considered individual and neighborhood-level SES (Section 6.2.3; Section 6.2.10). Recent analyses of other cohorts of women (i.e., Nurses' Health Study, California Teachers Study) that were comparable to WHI in that they considered menopausal status or hormone replacement therapy did not show consistent positive associations with CHD, myocardial infarction, or stroke. Longitudinal studies demonstrated that changes in the progression of atherosclerosis in relation to long-term exposure to $PM_{2.5}$ were variable across cohorts and found to depend, in part, on the vascular bed in which atherosclerosis was evaluated (Section 6.2.4.1). However, within a study focusing on the progression of atherosclerosis in a healthy population, the Multi-Ethnic Study of Atherosclerosis and Air Pollution (MESA-Air), an association was observed between long-term $PM_{2.5}$ exposure and coronary artery calcification (CAC), which is a strong predictor of CHD (Section 6.2.4). A small number of studies reported positive associations between long-term $PM_{2.5}$ exposure and HF, BP changes, and hypertension. Longitudinal epidemiologic analyses also supported the observation of positive associations with markers of systemic inflammation, coagulation, and endothelial dysfunction. These HF studies are coherent with animal toxicological studies demonstrating decreased contractility and cardiac output and increased coronary artery wall thickness following long-term $PM_{2.5}$ exposure (Section 6.2.4.2). Moreover, animal toxicological studies finding a relationship between long-term exposure to $PM_{2.5}$ and changes in BP in rats and mice are coherent with epidemiologic studies reporting positive associations between long-term exposure to $PM_{2.5}$ and

SECTION 1.4: Evaluation of the Health Effects of PM

1-26

00196521

hypertension. Similarly, evidence of atherosclerotic plaque progression in a genetically susceptible mouse model is consistent with epidemiologic studies reporting associations between atherosclerosis and long-term $PM_{2.5}$ exposure.

The current body of evidence also reduces uncertainties identified in the 2009 PM ISA related to potential copollutant confounding and the shape of the concentration-response relationship for CVD effects following long-term $PM_{2.5}$ exposure. Generally, most of the $PM_{2.5}$ effect estimates relating long-term $PM_{2.5}$ exposure to cardiovascular mortality remained relatively unchanged or increased in copollutant models adjusted for $O_3$, $NO_2$, $SO_2$, and $PM_{10-2.5}$ (Section 6.2.15). In addition, most of the results from analyses examining the C-R function for cardiovascular mortality supported a linear, no-threshold relationship for cardiovascular mortality, especially at mean annual $PM_{2.5}$ concentrations $\leq 12\ \mu g/m^3$ (Section 6.2.10). Some studies reported that the slope of the C-R curve tended to be steeper at lower concentrations, especially for IHD mortality, suggesting a supralinear C-R relationship. A limited number of cardiovascular morbidity studies examined the shape of the C-R relationship and generally reported a steeper C-R curve at lower concentrations (starting at $\sim 10\ \mu g/m^3$) with the slope of the C-R curve decreasing at higher $PM_{2.5}$ concentrations (Section 6.2.16).

Evidence from animal toxicological and epidemiologic studies also provides biologically plausible pathways by which long-term $PM_{2.5}$ exposure could lead to cardiovascular effect such as CHD, stroke, and CVD-related mortality (Section 6.2.1). These pathways initially involve autonomic nervous system changes and/or systemic inflammation that can potentially effect endpoints related to vascular function, altered hemostasis, hypertension, atherosclerotic plaque progression, and arrhythmia. Changes in cardiovascular endpoints such as these may then lead to IHD, HF, and possibly death.

Overall, there is consistent evidence from multiple epidemiologic studies that long-term exposure to $PM_{2.5}$ is associated with cardiovascular mortality. Associations with CHD, stroke, and atherosclerosis progression were observed in several recent epidemiologic studies providing coherence for $PM_{2.5}$-related cardiovascular mortality. Results from copollutant models generally support the independence of $=PM_{2.5}$ associations. Additional evidence of the direct effect of $PM_{2.5}$ on the cardiovascular system is provided by experimental studies in animals demonstrating effects including atherosclerosis plaque progression and changes in cardiac contractility and BP.

### 1.4.1.3    Nervous System Effects

#### 1.4.1.3.1    Nervous System Effects Associated with Long-Term $PM_{2.5}$ Exposure

The 2009 PM ISA evaluated a small number of animal toxicological studies pertaining to the effects of long-term exposures to $PM_{2.5}$ on the nervous system. Since the 2009 PM ISA, the literature base has greatly expanded with recent studies providing new information that strengthens the lines of evidence

SECTION 1.4: Evaluation of the Health Effects of PM

1-27

00196522

indicating that long-term $PM_{2.5}$ exposure may lead to effects on the brain that are associated with neurodegeneration (i.e., neuroinflammation and reductions in brain volume), as well as cognitive effects in older adults (Table 1-2). Animal toxicological studies provide evidence for a range of nervous system effects including neuroinflammation and oxidative stress, neurodegeneration, cognitive effects, and effects on neurodevelopment. Although the epidemiologic evidence is more limited in terms of the number of studies conducted, multiple studies generally support associations between long-term $PM_{2.5}$ exposure and changes in brain morphology, cognitive decrements, and dementia in adult populations. The consistency and coherence of the evidence across disciplines as it relates to region-specific brain inflammation, morphologic changes in the brain, cognitive effects, and dementia in adult populations supports that there is a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and nervous system effects. Thus, the expanded evidence base allows for this first-time, a causality determination for long-term $PM_{2.5}$ exposure and nervous system effects.

There is strong evidence for biologically plausible pathways that may underlie nervous system effects resulting from long-term exposure to $PM_{2.5}$. Studies demonstrate modulation of the autonomic nervous system leading to downstream consequences including cardiovascular effects (Section 6.2.1). In addition, the pathway involving neuroinflammation in specific regions of the brain (i.e., the hippocampus, cerebral cortex and hypothalamus) and morphologic changes in the brain indicative of neurodegeneration, is well substantiated and coherent across animal toxicological and epidemiologic studies (Section 8.2.3, Section 8.2.4). Specifically, morphologic changes induced in the hippocampus of animals were accompanied by impaired learning and memory and there is consistent evidence from multiple epidemiologic studies that long-term $PM_{2.5}$ exposure is associated with reduced cognitive function (Section 8.2.5). Further, the presence of early markers of Alzheimer's disease pathology was demonstrated in animals following long-term exposure to $PM_{2.5}$ CAPs, which is consistent with a small number of epidemiologic studies that reported positive associations with neurodegenerative changes in the brain (i.e., decreased brain volume) and Alzheimer's disease or all-cause dementia (Section 8.2.6). Although the loss of dopaminergic neurons in the substantia nigra, which is a hallmark of Parkinson's disease, was demonstrated in animals (Section 8.2.4), epidemiologic studies do not report associations with Parkinson's disease (Section 8.2.6). Overall, the lack of consideration of copollutant confounding introduces some uncertainty in the interpretation of the epidemiologic studies but this uncertainty is addressed, in part, by the direct evidence of effects provided by animal toxicological studies.

In addition to the findings described above, which are mostly relevant to adults, several recent studies of neurodevelopmental effects in children have also been conducted. Positive associations between long-term exposure to $PM_{2.5}$ during the prenatal period and autism spectrum disorder (ASD) were consistently observed across multiple epidemiologic studies (Section 8.2.7.2). However, several studies of performance on tests of cognitive function provided little support for an association. Overall, these epidemiologic studies of developmental effects are limited due to their lack of control for potential confounding by copollutants, the small number of studies, and uncertainty regarding critical exposure windows. A study in animals that found inflammatory and morphologic changes in the corpus collosum

SECTION 1.4: Evaluation of the Health Effects of PM
1-28

00196523

and hippocampus, as well as ventriculomegaly in young animals following prenatal exposure to $PM_{2.5}$ CAPs provides initial evidence indicating a potential biologically plausible pathway for a relationship between $PM_{2.5}$ and ASD.

### 1.4.1.4    Cancer

#### 1.4.1.4.1        Cancer Associated with Long-Term $PM_{2.5}$ Exposure

Experimental and epidemiologic evidence indicating genotoxicity, epigenetic effects (e.g., DNA methylation), and increased carcinogenic potential due to $PM_{2.5}$ exposure, along with strong epidemiologic evidence for increases in lung cancer incidence and mortality, supports a *likely to be causal relationship* between long-term $PM_{2.5}$ exposure and cancer (Table 1-2). This causality determination represents a change from the *suggestive of a causal relationship*[42] determination reported in the 2009 PM ISA. The evidence base underlying this conclusion encompasses the decades of research on whole PM exposures and more recent research focusing specifically on $PM_{2.5}$.

$PM_{2.5}$ exhibits various characteristics of carcinogens, as shown in studies demonstrating genotoxic effects (e.g., DNA damage), epigenetic alterations, oxidative stress, and electrophilicity. The examination of the role of $PM_{2.5}$ in cancer development has often focused on whether whole PM, not specific size fractions, has mutagenic properties and whether exposure to whole PM results in genotoxicity or carcinogenicity. Additionally, it has been well characterized that some components of $PM_{2.5}$, specifically hexavalent chromium, nickel, arsenic, and PAHs are known human carcinogens. Extensive analyses of $PM_{2.5}$ and $PM_{2.5}$ extracts in the Ames *Salmonella*/mammalian-microsome mutagenicity assay demonstrate that $PM_{2.5}$ contains mutagenic agents (Section 10.2.2.1). Additional in vitro and in vivo toxicological studies indicate the potential for $PM_{2.5}$ exposure to result in DNA damage, which is supported by limited human evidence (Section 10.2.2.2). Some studies have also demonstrated that $PM_{2.5}$ exposure can result in cytogenetic effects, specifically micronuclei formation and chromosomal aberrations (Section 10.2.2.3), as well as differential expression of genes potentially relevant to genotoxicity or other aspects of cancer pathogenesis (Section 10.2.2.4). Although inconsistently examined across studies, changes in cellular and molecular markers of genotoxicity and epigenetic alterations, which may lead to genomic instability, are demonstrated in response to $PM_{2.5}$ exposure. Further, the carcinogenic potential of $PM_{2.5}$ was demonstrated in an animal toxicological study in which chronic inhalation enhanced tumor formation that was initiated by exposure to urethane. (Section 10.2.4). Additionally, recent epidemiologic studies encompassing multiple cohorts that are diverse in terms of both geographic coverage and population characteristics have provided evidence of primarily consistent positive associations between long-term $PM_{2.5}$ exposure and lung cancer incidence

---

[42] Since the 2009 PM ISA, the causality determination language has been updated and this category is now stated as *suggestive of, but not sufficient to infer, a causal relationship.*

SECTION 1.4: Evaluation of the Health Effects of PM

1-29

00196524

and mortality, particularly in never smokers (Section 10.2.5.1). Experimental and epidemiologic evidence of genotoxicity, epigenetic effects, and carcinogenic potential provides biological plausibility for epidemiologic results of lung cancer incidence and mortality. Although evaluated in a limited number of studies, the assessment of potential copollutant confounding, particularly with $O_3$, indicates that $PM_{2.5}$ associations with lung cancer incidence and mortality are relatively unchanged in copollutant models (Section 10.2.5.1.3). There is limited evidence that long-term $PM_{2.5}$ exposure is associated with cancers in other organ systems; however, there is initial evidence that $PM_{2.5}$ exposure may reduce survival in individuals with cancer.

### 1.4.1.5    Mortality

Consistent with the conclusions of the 2009 PM ISA, evidence from recently published studies reaffirms and further strengthens that there is a *causal relationship* between both short- and long-term $PM_{2.5}$ exposure and total mortality. These causality determinations are based on the consistency of findings across a large body of epidemiologic studies. Evidence from controlled human exposure, epidemiologic, and animal toxicological studies of respiratory and cardiovascular morbidity also provides coherence, as well as biological plausibility. Together, the consistency and coherence in the evidence collectively support a continuum of effects by which short- and long-term $PM_{2.5}$ exposure could result in mortality.

#### 1.4.1.5.1    Mortality Associated with Short-Term PM₂.₅ Exposure

Strong epidemiologic evidence from recent and previously available studies examining total (nonaccidental) mortality in combination with evidence for cause-specific respiratory and cardiovascular mortality continues to support the conclusion of the 2009 PM ISA that there is a *causal relationship* between short-term $PM_{2.5}$ exposure and total (nonaccidental) mortality (Table 1-2). This conclusion is based on multiple recent multicity studies conducted in the U.S., Canada, Europe, and Asia that continue to provide evidence of consistent, positive associations between short-term $PM_{2.5}$ and total mortality, across studies that used different approaches to control for the potential confounding effects of weather (e.g., temperature). In addition, there is evidence of biological plausibility for cause-specific mortality and ultimately total mortality as demonstrated by the consistent and coherent evidence across scientific disciplines for cardiovascular morbidity, particularly ischemic events and HF (Chapter 6), and respiratory morbidity, with the strongest evidence coming from studies of exacerbations of COPD and asthma (Chapter 5).

Recent multicity studies add to the body of evidence evaluated in the 2009 PM ISA and continue to support a positive association between short-term $PM_{2.5}$ exposure and total mortality with percentage increases in mortality ranging from 0.19−2.80% at lags of 0 to 1 day in studies in which mean 24-hour

00196525

avg concentrations were primarily <20 μg/m³ (Figure 11-1; Table 11-1). The positive associations observed across studies reflect traditional analyses using ambient monitors as well as analyses conducted in both urban and rural locations that use new exposure assignment techniques and rely on multiple sources of $PM_{2.5}$ data (e.g., ambient monitors, statistical models, and satellite data). Whereas the analysis of potential copollutant confounding was limited to single city studies and studies of $PM_{10}$ in the 2009 PM ISA, recent multicity studies conducted in Europe and Asia indicate that $PM_{2.5}$-mortality associations are relatively unchanged in copollutant models with gaseous pollutants and $PM_{10-2.5}$ (Section 11.1.4). These results from copollutant models further support an independent effect of $PM_{2.5}$ on mortality. The associations reported for total mortality are also supported by analyses demonstrating increases in cause-specific mortality, specifically for cardiovascular and respiratory mortality which comprise ~33 and ~9%, respectively, of total mortality [NHLBI (2017); Figure 11-2]. The consistent and coherent evidence across scientific disciplines for cardiovascular morbidity, particularly ischemic events and HF (Chapter 6), and to a lesser degree for respiratory morbidity, with the strongest evidence for exacerbations of COPD and asthma (Chapter 5), provide biological plausibility for cause-specific mortality and ultimately total mortality. The relationship between short-term $PM_{2.5}$ exposure and total mortality is additionally supported by analyses of the concentration-response (C-R) relationship. Although alternatives to linearity have not been systematically evaluated, recent mortality studies continue to support a linear, no-threshold C-R relationship (Section 11.1.10).

### 1.4.1.5.2    Mortality Associated with Long-Term PM$_{2.5}$ Exposure

Strong epidemiologic evidence from recent and previously available cohorts in the U.S., Canada, and Europe continues to support the conclusion of the 2009 PM ISA that there is a *causal relationship* between long-term $PM_{2.5}$ exposure and total mortality (Table 1-2). This conclusion is based on the evaluation of multiple cohorts that continue to provide evidence of consistent, positive associations, across studies that controlled for a range of individual- and ecological covariates, such as smoking status and SES. Additional evidence indicating coherence of effects across scientific disciplines for cardiovascular and respiratory morbidity and metabolic disease provides biological plausibility for cause-specific mortality and supports a *causal relationship* with total mortality.

Additional reanalyses and extensions of the American Cancer Society (ACS) and Harvard Six Cities (HSC) cohorts as well as new cohorts consisting of Medicare participants, people that live in Canada, or people employed in a specific job (e.g., teacher, nurse, etc.) provide further evidence of positive associations between long-term $PM_{2.5}$ exposure and total mortality, particularly in areas with annual mean concentrations <20 μg/m³, and in some cases below 12 μg/m³ (Figure 11-17 and Figure 11-18). Across studies, positive associations were consistently observed regardless of the exposure assignment approach employed, with some studies relying on ambient monitors while others using modeled or remote sensing data or hybrid methods that combine two or more data sources. Recent studies have conducted analyses to examine potential copollutant confounding and indicate that associations

SECTION 1.4: Evaluation of the Health Effects of PM
1-31

00196526

between long-term $PM_{2.5}$ exposure and total mortality are relatively unchanged in copollutant models, particularly for $O_3$, with fewer studies examining $NO_2$, and $PM_{10-2.5}$ (Section 11.2.3; Figure 11-20, Figure 11-21). The evidence for total mortality is further supported by analyses of cause-specific mortality, which report positive associations with cardiovascular, respiratory, and lung cancer mortality. Biological plausibility for mortality due to longterm $PM_{2.5}$ exposure is provided by the coherence of effects across scientific disciplines for cardiovascular morbidity, particularly for CHD, stroke and atherosclerosis, and for respiratory morbidity, particularly for the development of COPD. Recent studies extensively examined the C-R relationship between long-term $PM_{2.5}$ exposure and total mortality, specifically in several U.S. and Canadian cohorts, and collectively continue to support a linear, no-threshold C-R relationship (Section 11.2.4; Table 11-7).

A recent series of studies has evaluated the relationship between long-term exposure to $PM_{2.5}$ and mortality by examining the temporal trends in $PM_{2.5}$ concentrations to test the hypothesis that decreases in $PM_{2.5}$ concentrations are associated with increases in life expectancy (Section 11.2.2.5). These studies reported that decreases in longterm $PM_{2.5}$ concentrations were associated with an increase in life expectancy across the U.S. for the multiple time periods examined.

00196527

**Table 1-2    Key evidence contributing to *causal* and *likely to be causal* causality determinations for PM$_{2.5}$ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM$_{2.5}$ Concentrations Associated with Effects |
|---|---|---|
| | **Respiratory Effects and Short-Term PM$_{2.5}$ Exposure (Section 5.1): Likely to be Causal Relationship** | |
| | *No Change in Causality Determination from the 2009 PM ISA. New Evidence Further Supports the Previous Determination.* | |
| Section 5.1.12<br>Table 5-18 | Epidemiologic evidence, consisting mainly of ED visits and hospital admissions, strongly supports a relationship with asthma exacerbation, COPD exacerbation, and combinations of respiratory-related diseases. Evidence for associations with respiratory symptoms and medication use are coherent with other findings for asthma and COPD exacerbation. Some epidemiologic studies examined copollutant confounding and reported that results are robust in models with gaseous pollutants (i.e., O$_3$, NO$_2$, SO$_2$, and with more limited evidence for CO) and other particle sizes (i.e., PM$_{10-2.5}$), especially for asthma exacerbation, combinations of respiratory-related ED visits and hospital admissions, and respiratory mortality. There is a large body of experimental evidence demonstrating respiratory effects due to short-term PM$_{2.5}$ exposure. These experimental studies provide evidence for biologically plausible pathways by which PM$_{2.5}$ exposure could cause a respiratory effect. Specifically, animal toxicological studies provide biological plausibility for asthma exacerbation, COPD exacerbation, and respiratory infection with some evidence of an independent effect of PM$_{2.5}$ on respiratory endpoints. Controlled human exposure studies provide minimal evidence of respiratory effects such as altered lung function and pulmonary inflammation. Consistent positive associations with respiratory mortality provide evidence of a continuum of effects. | Mean ambient concentrations from epidemiologic studies for:<br><br>*Hospital admissions and ED visits for asthma, COPD, respiratory infections, and combinations of respiratory-related diseases:*<br>U.S. and Canada: 4.7–24.6 µg/m³<br>Europe: 8.8–27.7 µg/m³<br>Asia: 11.8–69.9 µg/m³<br><br>*Respiratory mortality:*<br>U.S. and Canada: 7.9–19.9 µg/m³<br>Europe: 8.0–27.7 µg/m³<br>Asia: 11.8–69.9 µg/m³<br><br>Concentrations from animal toxicological studies for:<br><br>*Allergic airway disease:*<br>442–596 µg/m³<br>COPD: 171–1,200 µg/m³<br><br>*Altered host defense:*<br>100–350 µg/m³ |

SECTION I.4: Evaluation of the Health Effects of PM

1-33

JA2950

00196528

**Table 1-2 (Continued): Key evidence contributing to *causal and likely to be causal* causality determinations for PM₂.₅ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM₂.₅ Concentrations Associated with Effects |
|---|---|---|
| | **Respiratory Effects and Long-Term PM₂.₅ Exposure (Section 5.2): Likely to be Causal Relationship** | |
| | *No Change in Causality Determination from the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | |
| Section 5.2.13<br>Table 5-27 | Epidemiologic evidence strongly supports a relationship with decrements in lung function growth in children. Additional epidemiologic evidence supports a relationship with asthma development in children, increased bronchitic symptoms in children with asthma, acceleration of lung function decline in adults, and respiratory mortality, including cause-specific respiratory mortality for COPD and respiratory infection. Some epidemiologic studies examined copollutant confounding and reported that results are robust in models with O₃, NO₂, and CO, especially for respiratory mortality. There is limited experimental evidence for respiratory effects from long-term PM₂.₅ exposure. However, animal toxicological studies provide biological plausibility for decrements in lung function and asthma development in children, and they reduce the uncertainty regarding the independent effect of PM₂.₅ for these endpoints. Animal toxicological studies also provide evidence for a wide variety of other subclinical effects, such as oxidative stress, inflammation, and morphologic changes. Epidemiologic studies examining the effects of declining PM₂.₅ concentrations strengthen the relationship between long-term PM₂.₅ exposure and respiratory health by demonstrating improvements in lung function growth and reduced bronchitic symptoms in children and improved lung function in adults as a result of lower PM₂.₅ concentrations. However, these studies have a limited examination of copollutant confounding, which is a notable uncertainty because concentrations of other pollutants have also declined. | Mean ambient concentrations from epidemiologic studies for:<br><br>*Decrement in lung function growth:*<br>6–28 μg/m³<br><br>*Asthma development in children:*<br>5.2–16.5 μg/m³<br><br>*Bronchitic symptoms in children with asthma:*<br>9.9–13.8 μg/m³<br><br>*Accelerated lung function decline in adults:*<br>9.5–17.8 μg/m³<br><br>*Respiratory mortality:*<br>6.3–23.6 μg/m³<br><br>Concentrations from animal toxicological studies for:<br><br>*Impaired lung development:*<br>16.8 μg/m³<br><br>*Development of allergic airway disease:*<br>100 μg/m³ |

00196529

**Table 1-2 (Continued): Key evidence contributing to *causal* and *likely to be causal* causality determinations for PM₂.₅ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM₂.₅ Concentrations Associated with Effects |
|---|---|---|
| | **Cardiovascular Effects and Short-Term PM₂.₅ Exposure (Section 6.1): Causal Relationship** | |
| | *No Change in Causality Determination from the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | |
| Section 6.1.16<br>Table 6-34 | There is strong evidence for coherence of effects across scientific disciplines and biological plausibility for a range of cardiovascular effects in response to short-term PM₂.₅ exposure. Consistent epidemiologic evidence from multiple studies at relevant PM₂.₅ concentrations provide evidence of increases in ED visits and hospital admissions for IHD and HF, as well as cardiovascular mortality in multicity studies conducted in the U.S., Canada, Europe, and Asia. These associations remain positive, but in some cases are reduced with larger uncertainty estimates, in copollutant models with gaseous pollutants. Controlled human exposure studies provide coherence and consistent evidence for changes in various measures of endothelial dysfunction and generally consistent evidence of changes in BP. These controlled human exposure studies are consistent with animal toxicological studies also demonstrating endothelial dysfunction, as well as changes in BP and the renin-angiotensin system. In addition, animal toxicological studies demonstrating that short-term PM₂.₅ exposure results in decreased cardiac contractility and left ventricular pressure are coherent with epidemiologic studies reporting associations between short-term PM₂.₅ exposure and HF. | Mean ambient concentrations from epidemiologic studies for:<br>IHD: 5.8–18.6 µg/m³<br>HF: 5.8–18.0 µg/m³<br>Concentrations from controlled human exposure studies:<br>24–325 µg/m³ for 2 h<br>Concentrations from animal toxicological studies:<br>178–190 µg/m³ |

JA2952

**Table 1-2 (Continued): Key evidence contributing to *causal* and *likely to be causal* causality determinations for PM₂.₅ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM₂.₅ Concentrations Associated with Effects |
|---|---|---|
| | **Cardiovascular Effects and Long-Term PM₂.₅ Exposure (Section 6.2): Causal Relationship** | |
| | *No Change in Causality Determination from the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | |
| Section 6.2.18<br>Table 6-54 | Multiple epidemiologic studies continue to provide evidence of consistent, positive associations between long-term PM₂.₅ exposure and cardiovascular mortality at lower ambient concentrations. The cardiovascular mortality associations were observed across different exposure assignment and statistical methods and were relatively unchanged in copollutant models with both gaseous (i.e., O₃, NO₂, SO₂) and particulate (i.e., PM₁₀₋₂.₅) pollutants. The evidence for cardiovascular mortality is supported by a smaller body of epidemiologic studies that further explored associations between long-term PM₂.₅ exposure and cardiovascular morbidity. These studies reported some evidence for increased risk of PM₂.₅-related MI and stroke, specifically in individuals with a pre-existing cardiovascular disease or diabetes. Recent epidemiologic studies also present evidence for an effect of long-term PM₂.₅ exposure on subclinical features of cardiovascular morbidity, particularly progression of atherosclerosis as reflected by associations with CAC, with more limited evidence for other measures, such as cIMT. Key evidence from animal toxicological studies includes consistent evidence for changes in BP, as well as some evidence for decreases in measures of heart function (e.g., contractility and cardiac output) and cardiac remodeling. Moreover, as in the previous review, there is also some additional evidence for atherosclerotic plaque progression in a genetically susceptible mouse model. | Mean ambient concentrations from epidemiologic studies for:<br><br>*Cardiovascular mortality:*<br>4.1–17.9 μg/m³<br><br>*Coronary events:*<br>13.4 μg/m³<br><br>*CAC:*<br>14.2 μg/m³<br><br>*CHD and stroke (in those with pre-existing disease):*<br>13.4–23.9 μg/m³<br><br>Concentrations from animal toxicological studies for:<br><br>*BP:*<br>83–375 μg/m³ (up to 15 weeks) |

**Table 1-2 (Continued): Key evidence contributing to *causal* and *likely to be causal* causality determinations for PM2.5 exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM2.5 Concentrations Associated with Effects |
|---|---|---|
| **Nervous System Effects and Long-Term PM2.5 Exposure (Section 8.2): Likely to be Causal Relationship** | | |
| *Not Evaluated in the 2009 PM ISA: New Evidence Showing Brain Inflammation and Oxidative Stress, Neurodegeneration, Cognitive Effects, and Neurodevelopmental Effects.* | | |
| Section 8.2.9<br>Table 8-20 | There is evidence that long-term exposure to PM2.5 can modulate the autonomic nervous system leading to downstream consequences, including cardiovascular effects (Section 6.2.1). A second pathway involving neuroinflammation and morphologic changes in the brain indicative of neurodegeneration is well substantiated and coherent across animal toxicological and epidemiologic studies. This combination of evidence supports PM2.5-related reductions in brain volume and cognitive effects in older adults. The evidence relating to Parkinson's disease, and neurodevelopmental effects was more limited. Consideration of copollutant confounding was generally lacking in the epidemiologic studies, but the uncertainty in interpreting the study findings was partly addressed by the direct evidence of effects provided by animal toxicological studies. | Mean annual concentrations from epidemiologic studies for:<br>*Brain volume:*<br>11.1–12.2 μg/m³<br>*Cognition:*<br>8.5 (5-yr avg)–14.9 μg/m³<br>*Autism:*<br>14.0–19.6 μg/m³<br><br>Concentrations from animal toxicological studies for:<br>*Brain inflammation/oxidative stress:*<br>65.7–441.7 μg/m³<br>*Neurodegenerative changes:*<br>94.4 μg/m³<br>*Neurodevelopment:*<br>92.7 μg/m³ |

SECTION I.4: Evaluation of the Health Effects of PM

1-37

JA2954

**Table 1-2 (Continued): Key evidence contributing to *causal* and *likely to be causal* causality determinations for PM$_{2.5}$ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM$_{2.5}$ Concentrations Associated with Effects |
|---|---|---|
| | **Cancer and Long-Term PM$_{2.5}$ Exposure (Section 10.2): Likely to be Causal Relationship** | |
| | *Change in Causality Determination From the 2009 PM ISA (Suggestive of a Causal Relationship) Due to Increased Evidence of Genotoxicity, Carcinogenicity, and Epigenetic Effects for PM$_{2.5}$ and Lung Cancer Incidence and Mortality.* | |
| Section 10.2.7<br>Table 10-8 | Primarily positive associations from multiple epidemiologic studies reporting increases in the risk of lung cancer incidence and mortality. This evidence is supported by analyses focusing on never smokers and limited evidence of associations with histological subtypes of lung cancer found in never smokers. Across studies that examined lung cancer incidence and mortality, potential confounding by smoking status and exposure to SHS was adequately controlled. A limited number of studies examined potential copollutant confounding, but associations were relatively unchanged in models with O$_3$ with more limited assessment of other gaseous pollutants and particle size fractions. Experimental and epidemiologic studies provide evidence for a relationship between PM$_{2.5}$ exposure and genotoxicity, epigenetic effects, and carcinogenic potential. Uncertainties exist due to the lack of consistency in specific cancer-related biomarkers associated with PM$_{2.5}$ exposure across both experimental and epidemiologic studies; however, PM$_{2.5}$ exhibits several characteristics of carcinogens. This provides biological plausibility for PM$_{2.5}$ exposure contributing to cancer development. Additionally, there is limited evidence of cancer occurring in other organ systems, but there is some evidence that PM$_{2.5}$ exposure may detrimentally affect survival from any type of cancer. | Mean annual concentrations from epidemiologic studies for:<br><br>*Lung cancer incidence and mortality:*<br><br>U.S. and Canada:<br>6.3–23.6 µg/m$^3$<br><br>Europe:<br>6.6–31.0 µg/m$^3$<br><br>Asia:<br>33.7 µg/m$^3$<br><br>Concentrations from animal toxicological studies for:<br><br>*Carcinogenic potential:*<br>17.66 µg/m$^3$ |

**Table 1-2 (Continued): Key evidence contributing to *causal* and *likely to be causal* causality determinations for PM₂.₅ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM₂.₅ Concentrations Associated with Effects |
|---|---|---|
| **Total Mortality and Short-Term PM₂.₅ Exposure (Section 11.1): Causal Relationship** | | |
| *No Change in Causality Determination From the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | | |
| Section 11.1.12<br>Table 11-4 | There is consistent epidemiologic evidence from multiple multicity studies conducted in the U.S., Canada, Europe, and Asia for increases in total (nonaccidental) mortality at ambient concentrations, often below 20 μg/m³. The associations observed were relatively unchanged in copollutant models with gaseous pollutants and PM₁₀₋₂.₅, which is consistent with copollutant analyses for cardiovascular and respiratory mortality, but copollutant analyses were limited to studies conducted in Europe and Asia. Biological plausibility for the epidemiologic evidence, particularly for ischemic events and HF, while support for biological plausibility is more limited from the respiratory morbidity evidence, with the strongest evidence for exacerbations of COPD and asthma. Although alternatives to linearity have not been systematically evaluated, recent mortality studies continue to support a linear, no-threshold C-R relationship. | Mean 24-h avg concentrations from epidemiologic studies for:<br><br>*Total mortality:*<br>U.S. and Canada:<br>4.37–17.97 μg/m³<br><br>Europe:<br>13–27.7 μg/m³<br><br>Asia:<br>11.8–69.9 μg/m³ |

00196534

**Table 1-2 (Continued): Key evidence contributing to *causal and likely to be causal* causality determinations for PM₂.₅ exposure and health effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Health Effect Category[a] and Causality Determination | PM₂.₅ Concentrations Associated with Effects |
|---|---|---|
| **Total Mortality and Long-Term PM₂.₅ Exposure (Section 11.2): Causal Relationship** | | |
| *No Change in Causality Determination From the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | | |
| Section 11.2.7<br>Table 11-8 | There is consistent epidemiologic evidence from multiple studies reporting increases in the risk of total (nonaccidental) mortality from extended follow-ups of the ACS cohort and HSC cohort, as well as multiple studies focusing on a Medicare cohort, Canadian cohorts, and North American employment cohorts. The consistent increases in total mortality are observed across different exposure metrics based on ambient measurements, models, remote sensing, or hybrid methods that combine two or more of these methods, providing additional support for the mortality associations due to long-term PM₂.₅ exposure reported in the 2009 PM ISA that relied on exposure metrics from ambient monitors. The consistent epidemiologic evidence for total mortality is supported by positive associations for cardiovascular, respiratory, and lung cancer mortality. Biological plausibility for total mortality is provided by the strong cardiovascular morbidity evidence, particularly for CHD, stroke, and atherosclerosis, while there is more limited evidence for development of COPD. Extensive epidemiologic evidence provides additional support for a linear, no-threshold concentration-response (C-R) relationship. A recent series of studies demonstrates that decreases in long-term PM₂.₅ concentrations were associated with an increase in life expectancy across the U.S. for multiple time periods examined. | Mean annual concentrations from epidemiologic studies for:<br>*Total mortality:*<br>ACS/HSC cohorts:<br>11.4–23.6 μg/m³<br>Medicare cohort:<br>8.12–12.0 μg/m³<br>Canadian cohorts:<br>8.7–9.1 μg/m³<br>Employment cohorts:<br>12.7-17.0 μg/m³ |

ACS = American Cancer Society; avg = average; BP = blood pressure; CAC = coronary artery calcification; CHD = coronary heart disease; cIMT = carotid intima-media thickness; CO = carbon monoxide; COPD = chronic obstructive pulmonary disease; C-R = concentration-response; h = hour; HF = high frequency; HSC = Harvard Six Cities; IHD = ischemic heart disease; μg/m³ = micrograms per cubic meter; MI = myocardial infarction; $NO_2$ = nitrogen dioxide; $O_3$ = ozone; PM₂.₅ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 μm; PM₁₀₋₂.₅ = particulate matter with a nominal mean aerodynamic diameter greater than 2.5 μm and less than or equal to 10 μm; SHS = secondhand smoke; $SO_2$ = sulfur dioxide.

[a]A large spectrum of outcomes is evaluated as part of a broad health effect category including physiological measures (e.g., airway responsiveness, lung function), clinical outcomes (e.g., respiratory symptoms, hospital admissions), and cause-specific mortality. Total mortality includes all nonaccidental causes of mortality and is informed by the nature of the evidence for the spectrum of morbidity effects (e.g., respiratory, cardiovascular) that can lead to mortality. The sections and tables referenced include a detailed discussion of the available evidence that informed the causality determinations.

SECTION I.4: Evaluation of the Health Effects of PM

00196535

### 1.4.2   Health Effects of PM$_{10-2.5}$

At the completion of the 2009 PM ISA, substantial uncertainties remained in the assessment of health effects due to short- and long-term PM$_{10-2.5}$ exposures (U.S. EPA, 2009). In experimental studies, uncertainties existed because of differences in nasal deposition between humans and rodent. Since inhaled PM$_{10-2.5}$ does not reach the lower respiratory tract in rodents, animal toxicological studies relied on intratracheal instillation to assess health effects (see Figure 4-4). In epidemiologic studies the main uncertainty was due to the reliance on different methods of varying quality to estimate PM$_{10-2.5}$ concentrations across studies (e.g., direct measurement through dichotomous samplers, difference between collocated PM$_{10}$ and PM$_{2.5}$ monitors, difference between countywide average PM$_{10}$ and PM$_{2.5}$ when monitors were not collocated). Systematic comparisons to examine the spatial and temporal correlations in PM$_{10-2.5}$ concentrations between methods have not been conducted; therefore, each method may contribute to different degrees of exposure measurement error. Limited availability of data and higher spatial variability of PM$_{10-2.5}$ compared with PM$_{2.5}$ also contributed to uncertainty about the representativeness of PM$_{10-2.5}$ concentrations as a surrogate for exposure.

Recent epidemiologic and experimental studies continue to examine the relationship between short- and long-term PM$_{10-2.5}$ exposure and health effects; however, the uncertainties in the evidence identified in the 2009 PM ISA have, to date, still not been addressed. Specifically, within the epidemiologic studies, there is evidence of positive associations across the various health effects evaluated, but the methods used to estimate PM$_{10-2.5}$ concentrations and subsequently assign exposures to PM$_{10-2.5}$ have not been systematically evaluated in the peer-reviewed literature (see Section 3.3.1.1). Overall, this lack of evaluation contributes to uncertainty with respect to the spatial and temporal correlations in PM$_{10-2.5}$ concentrations across methods, which may add to uncertainties in PM$_{10-2.5}$ exposure surrogates (see Section 2.5.1.2.3). Evidence from experimental studies in humans combined with evidence from epidemiologic panel studies and limited evidence from animal toxicological studies continues to support biologically plausible pathways by which PM$_{10-2.5}$ could impart a variety of health effects. Overall, uncertainties in the evidence regarding biological plausibility for health effects related to PM$_{10-2.5}$ exposure and in the methods used to assign PM$_{10-2.5}$ exposure in epidemiologic studies contributed to causality determinations of *suggestive of, but not sufficient to infer, a causal relationship* or *inadequate to infer the presence or absence of a causal relationship* (Table 1-4).

### 1.4.3   Health Effects of UFPs

At the completion of the 2009 PM ISA, relatively few studies had examined the health effects attributed to short- and long-term UFP exposures. Across broad health categories there was limited and often inconsistent evidence of effects. There was some evidence of cardiovascular and respiratory effects due to UFP CAPs from controlled human exposure and animal toxicological studies, with more evidence

SECTION 1.4: Evaluation of the Health Effects of PM
1-41

00196536

from studies of diesel exhaust. However, in the diesel exhaust studies it was not possible to determine whether the effect observed was due to UFPs, gaseous components, or a combination of the two. Additionally, there were broader uncertainties that spanned atmospheric chemistry, exposure assessment, and epidemiology due to limited information on: (1) the spatial and temporal variability in UFP concentrations; (2) the lack of a UFP monitoring network in the U.S.; and (3) insufficient data on the composition of UFPs. The uncertainties associated with monitoring UFPs are inherent in epidemiologic studies because most studies rely on a single monitor to estimate UFP exposure.

Recent studies have further explored the relationship between short- and long-term UFP exposure and health effects; however, the assessment of study results across experimental and epidemiologic studies is complicated by the size distribution examined in each discipline and the nonuniformity in the exposure metric examined (i.e., the particle size range and indicators (e.g., particle number concentration [NC], surface area concentration [SC], and mass concentration [MC]); see Preface). Specifically, experimental studies include size ranges up to 200 nm or higher. Epidemiologic studies often focus on various size ranges below 100 nm. However, if an epidemiologic study is focusing on NC it can include larger particle sizes, but it has been shown that 67−90% of NC represents particles <100 nm (Section 2.4.3.1).

Although there is some evidence of positive but imprecise associations across epidemiologic studies examining a range of health effects (e.g., cardiovascular and respiratory effects, and mortality), study results are difficult to interpret. This difficulty arises because most of the studies rely on a single monitor, which is inadequate, as shown in some monitoring campaigns that demonstrate a high degree of spatial variability in UFP concentrations and the fact the size distribution of UFPs changes with distance from a source (Section 2.5.1). As noted above, examining coherence and biological plausibility of UFP-related health effects is complicated by the larger size distribution of UFPs examined in experimental studies compared with the size distribution examined in epidemiologic studies. However, animal toxicological studies provide emerging evidence for nervous system effects resulting from short- and long-term UFP exposure, including brain inflammation and oxidative stress, morphologic changes, behavioral, and neurodevelopmental effects.

Based on the overarching uncertainties and inconsistency across studies in the characterization of UFP with respect to size distribution and exposure metric, across most health effects categories the collective evidence contributed to causality determinations that did not exceed *suggestive of, but not sufficient to infer, a causal relationship* (Table 1-4).

## 1.5    Policy-Relevant Considerations

In the process of evaluating the current state of the science with respect to the effect of short- and long-term PM exposure on health, studies were identified that conducted analyses focused on addressing

00196537

some of the main policy-relevant questions of this review, as detailed in the PM IRP (U.S. EPA, 2016), such as:

- Is there new evidence aimed at disentangling the effect of PM from the complex air pollution mixture to inform a direct effect of PM on health, specifically the assessment of potential copollutant confounding?

- Is there new evidence to inform the current indicators (i.e., $PM_{2.5}$ for fine particles and $PM_{10}$ for thoracic coarse particles), averaging times (i.e., 24-hour avg, annual average), and levels of the PM NAAQS?

- Is there new evidence on the shape of the C-R relationship and whether a threshold hold exists between PM exposure and various health outcomes (e.g., mortality, hospital admissions, etc.), especially for concentrations near or below the levels of the current PM NAAQS?

- Is there new evidence that individual PM component(s) or source(s) (e.g., industrial facilities, roads, atmospheric formation), are more strongly associated with health effects than PM mass, particularly for health effects for which there is sufficient evidence of a strong relationship (e.g., cardiovascular effects, mortality) with PM exposure?

- Is there new evidence indicating that specific populations or lifestages are at increased risk of a PM-related health effect compared with a referent population?

The following sections summarize the evidence that can inform consideration of these policy-relevant questions, specifically: potential copollutant confounding (Section 1.5.1), timing of effects (Section 1.5.2), C-R relationship (Section 1.5.3), PM components and sources (Section 1.5.4), and populations potentially at increased risk of a PM-related health effect (Section 1.5.5).

### 1.5.1    Potential Copollutant Confounding

Recent studies further evaluated the potential confounding effects of copollutants, both gaseous and particulate, on the relationship between short- and long-term $PM_{2.5}$ exposure and health effects. These studies build upon the evidence detailed in the 2009 PM ISA and continue to provide evidence indicating that associations with $PM_{2.5}$ are relatively unchanged in copollutant models. Evidence from epidemiologic studies, in combination with experimental studies detailed in subsequent chapters (i.e., Respiratory Effects—Chapter 5 and Cardiovascular Effects—Chapter 6) that examined exposure to PM (e.g., CAPs, resuspended PM, and whole mixtures in the presence and absence of a particle trap), demonstrate a direct effect of PM on health.

#### 1.5.1.1    Short-Term $PM_{2.5}$ Exposure

Building upon the studies evaluated in the 2009 PM ISA, recent epidemiologic studies have further examined whether copollutants confound associations between short-term $PM_{2.5}$ exposure and respiratory and cardiovascular effects and mortality. These studies continue to demonstrate that

SECTION 1.5: Policy-Relevant Considerations

00196538

$PM_{2.5}$-associations are relatively unchanged in copollutant models with both gaseous (i.e., $O_3$, $NO_2$, $SO_2$, and CO) and particulate (i.e., $PM_{10-2.5}$) pollutants.

The examination of potential copollutant confounding on the relationship between short-term $PM_{2.5}$ exposure and respiratory effects has been assessed most extensively through studies examining respiratory-related ED visits and hospital admissions, particularly for asthma, with more limited assessments of COPD and respiratory infection, and studies examining respiratory mortality (Section 5.1.10.1). Correlations between $PM_{2.5}$ and gaseous and particulate pollutants varied across studies, with low to moderate correlations (i.e., <0.7) observed for $NO_2$, $SO_2$, CO, and $PM_{10-2.5}$, and correlations spanning from low to high for $O_3$. Across the studies that assessed copollutant confounding, $O_3$ was most commonly examined, followed by $NO_2$, , and $PM_{2.5}$ results were relatively unchanged in copollutant models. Although fewer studies focused on $SO_2$ and CO, the results from copollutant analyses were consistent with studies evaluated in the 2009 PM ISA, indicating that results are relatively unchanged in copollutant models. Recent studies that examined $PM_{10-2.5}$ further expand upon the initial results detailed in the 2009 PM ISA, and although results are consistent with observations from analyses of gaseous pollutants, there is greater uncertainty in these results due to the different methods employed across studies to estimate $PM_{10-2.5}$ concentrations.

For cardiovascular effects, moderate to strong correlations were reported for $NO_2$ and CO, with low to moderate correlations for $O_3$, $SO_2$, and $PM_{10-2.5}$. Across studies of various cardiovascular-related ED visits and hospital admissions and cardiovascular mortality, results were relatively unchanged in copollutant models, but there were some instances of the attenuation of the $PM_{2.5}$ association in models with $NO_2$ and CO (Section 6.1.14.1). Overall, there was no observed difference in the trend or pattern of copollutant model results across cardiovascular endpoints (e.g., aggregate CVD endpoints, IHD, HF, cardiovascular mortality). However, the few instances of attenuation were with traffic-related pollutants (i.e., $NO_2$, CO), which generally had higher correlations with $PM_{2.5}$ than the other copollutants. As a result, it is difficult to distinguish whether the instances of observed attenuation in $PM_{2.5}$ associations are due to confounding or collinearity with other pollutants.

Most epidemiologic studies that examined the potential confounding effects of copollutants focused on respiratory and cardiovascular effects; only a few focused on mortality (Section 11.1.4). Recent multicity studies conducted in Europe and Asia support the results from single- and multicity studies examined in the 2004 PM AQCD and 2009 PM ISA that reported limited evidence of confounding by copollutants. Across studies examining both gaseous and particulate (i.e., $PM_{10-2.5}$) pollutants, low to moderate correlations were reported with $PM_{2.5}$. Associations with $PM_{2.5}$ were relatively unchanged in copollutant models across the various study locations examined.

In addition to conducting traditional copollutant analyses, epidemiologic studies of respiratory (Section 5.1.10.1.1) and cardiovascular (Section 6.1.14.1.1) effects have also examined the role of PM within the broader air pollution mixture. These studies do not inform whether PM is independently associated with a respiratory effect, but they can assess whether days with higher $PM_{2.5}$ concentrations are

SECTION 1.5: Policy-Relevant Considerations

1-44

00196539

more closely related to health effects. Studies of respiratory effects demonstrate that days when the air pollution mixture has high $PM_{2.5}$ concentrations often represent the days with the largest associations (in terms of magnitude) with a respiratory effect. Additionally, results indicate that risk estimates for a mixture are often similar, but in some cases larger, than those reported for $PM_{2.5}$ alone. However, for cardiovascular effects in general, the evidence neither consistently or coherently indicate a stronger or weaker effect of combined exposure to $PM_{2.5}$ and another pollutant compared to exposure to $PM_{2.5}$ and other pollutants alone.

### 1.5.1.2     Long-Term PM₂.₅ Exposure

Epidemiologic studies focusing on long-term $PM_{2.5}$ exposure and health effects have traditionally provided a more limited assessment of the potential confounding effects of copollutants on $PM_{2.5}$ associations. Recent studies that provide an assessment of copollutant confounding directly address a previously identified uncertainty in the scientific evidence.

Across the health effects evaluated within this ISA, relatively few studies examined the potential confounding effects of copollutants on the relationship between long-term $PM_{2.5}$ exposure and respiratory (Section 5.2.13), cardiovascular (Section 6.2.18), and cancer (Section 10.2.7), with a general lack of studies of assessing the role of copollutant confounding on observed associations with nervous system effects (Section 8.2.9). These studies often did not examine the full suite of gaseous pollutants but tended to focus on traffic-related pollutants (i.e., $NO_2$, $NO_X$, and CO) and $O_3$, with some studies also examining $PM_{10-2.5}$. Across studies, low to moderate correlations (i.e., $r < 0.7$) were often observed between copollutants and $PM_{2.5}$. Collectively, studies that examined the potential confounding effects of copollutants on the $PM_{2.5}$ association with respiratory (i.e., lung function and asthma development) and cardiovascular effects (i.e., cardiovascular mortality), along with lung cancer incidence and mortality, reported associations that were relatively unchanged in copollutant models, but these assessments were conducted in a limited number of studies.

Several studies of long-term $PM_{2.5}$ exposure and mortality examined potential copollutant confounding. Within studies that examined the potential confounding effects of copollutants on the relationship between long-term $PM_{2.5}$ exposure and mortality, the most extensive analyses occurred for $O_3$, with a limited number of studies examining $NO_2$, $SO_2$, $PM_{10-2.5}$, and benzene. Studies that examined $O_3$ reported correlations that were generally moderate (ranging from $r = 0.49-0.73$), with a few studies reporting weak correlations ($r < 0.4$). Overall, associations remained relatively unchanged in copollutant models for total (nonaccidental) mortality, cardiovascular, and respiratory mortality (Figure 11-18). Studies focusing on copollutant models with $NO_2$, $PM_{10-2.5}$, $SO_2$, and benzene were examined in individual studies, and across these studies the $PM_{2.5}$-mortality association was relatively unchanged (Figure 11-19).

SECTION 1.5: Policy-Relevant Considerations

00196540

### 1.5.2      Timing of Effects

An important question to address when evaluating the scientific evidence demonstrating health effects due to short-term $PM_{2.5}$ exposure is the timing of observed effects. Studies have attempted to address this question through two primary avenues: (1) examining various averaging times of the exposure metric used to represent short-term $PM_{2.5}$ exposure to determine whether $PM_{2.5}$ concentrations averaged over time periods other than 24 hours are more closely associated with health effects and (2) assessing whether the relationship between exposure and effect is biologically plausible by examining the lag days over which associations are observed.

#### 1.5.2.1      Averaging Time

Most epidemiologic studies that examined the relationship between short-term $PM_{2.5}$ exposures and health effects relied primarily on an exposure metric averaged over 24-hours. Some recent studies, focusing on respiratory and cardiovascular effects and mortality, have examined whether there is evidence that subdaily exposure metrics are more closely related to health effects than the traditional 24-hour avg metric.

Epidemiologic studies that examined both respiratory-related ED visits and hospital admissions, as well as subclinical markers of respiratory effects, explored associations with subdaily exposure metrics (Section 5.1.10.5). In studies of respiratory-related ED visits and hospital admissions, positive associations were not consistently observed with subdaily exposure metrics, and often there was no information on spatiotemporal variability of the subdaily metrics. Additionally, in a study that examined multiple subdaily averaging times and compared them with the 24-hour avg exposure metric, there was no difference in associations across metrics, but this result was limited to a single study location. Panel studies also examined subdaily exposure metrics through personal monitoring, but associations were not consistently observed at shorter averaging times for markers of pulmonary inflammation and changes in lung function.

A more limited number of studies examined subdaily exposure metrics and cardiovascular effects (Section 6.1.14.3). Studies of ST elevation, myocardial infarction, out-of-hospital cardiac arrest, and cerebrovascular disease ED visits and hospital admissions reported positive associations with subdaily exposure metrics, but the magnitude of the association tended to be larger when averaging over multiple hours up to 1 day (i.e., 24-hour avg). These studies provide evidence that continues to support the use of a 24-hour avg exposure metric.

A few studies examined subdaily $PM_{2.5}$ exposure metrics and associations with mortality, focusing on comparisons between the 24-hour avg and an hourly peak exposure metric (Section 11.1.8.2). In these studies, positive associations were reported for both the 24-hour avg and hourly peak exposure metric, with the association often slightly larger in magnitude for the 24-hour avg metric. Collectively, the

SECTION 1.5: Policy-Relevant Considerations

00196541

available evidence does not indicate that subdaily averaging periods for $PM_{2.5}$ are more closely associated with health effects than the 24-hour avg exposure metric.

### 1.5.2.2    Lag Structure of Associations

Often epidemiologic studies examined associations between short-term $PM_{2.5}$ exposure and health effects over a series of single-day lags, multiday lags, or by selecting lags a priori. Recent studies have expanded the assessment of examining the timing of effects by systematically examining lag days by focusing on whether there is evidence of an immediate (e.g., lag 0–1 days), delayed (e.g., lag 2–5 days), or prolonged (e.g., lag 0–5 days) effect of PM on health.

Epidemiologic studies of respiratory effects have primarily focused on examining the lag structure of associations for respiratory related ED visits and hospital admissions, with most studies examining asthma exacerbation with a more limited assessment for COPD exacerbation and respiratory infection (Section 5.1.10.3). Across the studies that examined asthma, COPD, respiratory infections, and combinations of respiratory-related diseases, the strongest association reported, in terms of magnitude and precision, is generally within a few days after exposure, but there is some evidence demonstrating the potential for a prolonged effect of $PM_{2.5}$ (i.e., lags ranging from 0–5 days). Recent studies of respiratory mortality provide additional insight on the lag structure of associations for respiratory-related effects due to short-term $PM_{2.5}$ exposure. Studies of respiratory mortality tend to support more immediate $PM_{2.5}$ effects (i.e., lags of 0 to 2 days), but initial evidence of stronger associations, in terms of magnitude and precision, at lags of 0–5 days. Collectively, the studies of respiratory morbidity and mortality that conducted systematic evaluations of $PM_{2.5}$ associations across a range of lags provide evidence of effects within the range of 0–5 days after exposure.

As with respiratory effects, the majority of epidemiologic studies examining the lag structure of associations for cardiovascular effects focus on ED visits and hospital admissions. Studies of ED visits and hospital admissions of IHD, MI, and cardiovascular-related outcomes reported stronger associations for multiday lags, but these effects tended to be in the range of 0–1 or 0–2 days. When examining cerebrovascular disease, there was no evidence of an association at any of the lag days examined; however, when focusing on specific stroke types, particularly ischemic stroke, there was evidence of immediate effects at lags of 0 and 1 day, which is consistent with other cardiovascular outcomes. The immediate effects of $PM_{2.5}$ on cardiovascular morbidity outcomes, specifically those related to ischemic events, are consistent with the lag structure of associations observed in studies of cardiovascular mortality that report immediate effects (i.e., lag 0–1 day). There is some evidence indicating $PM_{2.5}$-cardviovascular mortality associations with exposures over longer durations, but this is not supported by studies examining single-day lags that encompass the same number of days.

An evaluation of recent epidemiologic studies of short-term $PM_{2.5}$ exposure and mortality found that studies either conducted analyses of single-day lags over many days or various iterations of multiday

SECTION 1.5: Policy-Relevant Considerations

1-47

00196542

lags (e.g., 0–1, 0–2, 0–3, etc.; Section 11.1.8.1). Across studies, associations were largest in terms of magnitude and precision for total (nonaccidental) mortality at lags of 0 to 1 day, but there is some evidence that associations remain positive at multiday lags up to 0–4 days. The combination of the multi- and single-day lag analyses provides further support of an immediate effect of short-term $PM_{2.5}$ exposure on mortality.

### 1.5.3     Concentration-Response Relationship

In assessing the relationship between short- and long-term PM exposure and health effects, an important consideration is whether the relationship is linear across the full range of ambient concentrations and whether there is a threshold concentration below which there is no evidence of an effect. As detailed in the 2004 AQCD and 2009 PM ISA, conducting C-R and threshold analyses is challenging because of the "(1) limited range of available concentration levels (i.e., sparse data at the low and high end); (2) heterogeneity of (at-risk) populations (between cities); and (3) influence of measurement error" (U.S. EPA, 2004). Recent studies that focus on the shape of the C-R curve expand upon the health effects evaluated in previous reviews and continue to provide evidence of a linear, no-threshold relationship between both short- and long-term $PM_{2.5}$ exposure and several respiratory and cardiovascular effects, and mortality. Some recent evidence indicates a steeper slope (i.e., supralinear curve) at lower concentrations for some outcomes (i.e., long-term $PM_{2.5}$ exposure and mortality). Cutpoint analyses that focus on whether risk changes at different concentration ranges provide some evidence of nonlinearity, specifically in the relationship between short-term $PM_{2.5}$ exposure and respiratory-related ED visits and hospital admissions. Although recent studies have used many different statistical methods to examine the shape of the C-R relationship and generally provide evidence for a linear, no-threshold relationship, many of these studies have not systematically evaluated alternatives to a linear relationship.

### 1.5.3.1     Short-Term Exposure

Recent epidemiologic studies that examined the C-R relationship between short-term $PM_{2.5}$ exposure and health are limited to studies of respiratory-related ED visits and hospital admissions (Section 5.1.10.6), and mortality (Section 11.1.10). Across studies that examined respiratory effects, different analytical methods have been employed to examine the C-R relationship, either explicitly examining the shape of the C-R curve and whether there is evidence of linearity across the full range of $PM_{2.5}$ concentrations, or through cutpoint analyses that examine whether the risk of a $PM_{2.5}$-related respiratory effect changes within specified ranges of $PM_{2.5}$ concentrations. These studies primarily focused on asthma ED visits and hospital admissions, with some studies examining combinations of respiratory-related ED visits and hospital admissions. Studies that focused on the shape of the C-R curve provide initial evidence of a linear relationship for short-term $PM_{2.5}$ exposure and both respiratory disease and asthma ED visits and hospital admissions, with less certainty at concentrations below 10 $\mu g/m^3$.

SECTION 1.5: Policy-Relevant Considerations

1-48

00196543

However, cutpoint analyses provide some initial evidence indicating nonlinearity in the relationship (i.e., larger risk estimates at various quintiles when compared with the lowest quintile) between short-term $PM_{2.5}$ exposure and asthma ED visits and hospital admissions.

Studies that examined the C-R relationship for short-term PM exposure and mortality were initially limited to those focusing on $PM_{10}$. Recent epidemiologic studies focus on $PM_{2.5}$ and specifically the shape of the C-R curve at the low end of the $PM_{2.5}$ concentration distribution. Evidence from U.S. studies conducted at lower $PM_{2.5}$ concentrations compared with other countries, provide evidence indicating a linear relationship at concentrations as low as 5 µg/m³. The observations from C-R analyses are further supported by cutpoint analyses examining associations at different $PM_{2.5}$ concentrations, as well as analyses that reported no evidence of a threshold. Overall, recent studies focusing on short-term $PM_{2.5}$ exposure and mortality support a linear, n o-threshold relationship at ambient $PM_{2.5}$ concentrations lower than those evaluated in the 2009 PM ISA.

### 1.5.3.2    Long-Term Exposure

The most extensive analyses of the C-R relationship between long-term PM exposure and a health effect have generally been for $PM_{2.5}$ and mortality. Recent studies further expand and provide new insights on the relationship between long-term $PM_{2.5}$ exposure and mortality and provide initial examinations of the C-R relationship for respiratory and cardiovascular effects, as well as for lung cancer incidence and mortality.

Although the C-R relationship for long-term $PM_{2.5}$ exposure has not been assessed for most health effects, it has been extensively examined in studies of mortality (Section 11.2.4). Across studies, a variety of statistical methods have been used to assess whether there is evidence of deviations in linearity. Studies have also conducted cutpoint analyses that focus on examining risk at specific ambient concentrations (Table 11-7). These studies report results that generally support a linear, no-threshold relationship for total (nonaccidental) mortality, especially at lower ambient $PM_{2.5}$ concentrations, with confidence in the linear relationship as low as 5−8 µg/m³ in some studies. Additionally, there is initial evidence indicating that the slope of the C-R curve may be steeper (supralinear) at lower concentrations for cardiovascular mortality.

Few epidemiologic studies have examined the C-R relationship for long-term $PM_{2.5}$ exposure and respiratory effects (Section 5.2.3.1.2). The ones that do have focused on asthma incidence and childhood wheeze. Studies of asthma incidence that examine the shape of the C-R curve and whether risk changes at different quartiles of $PM_{2.5}$ concentrations do not find any evidence of deviations in linearity and monotonically increasing risk, respectively. In an initial study of childhood wheeze, specifically repeated wheeze events, there is evidence of a linear C-R relationship with confidence in the linear relationship at long-term $PM_{2.5}$ concentrations as low as 10 to 12 µg/m³.

SECTION 1.5: Policy-Relevant Considerations

00196544

A limited number of studies report initial assessments of the C-R relationship for long-term $PM_{2.5}$ concentrations and cardiovascular effects, specifically IHD incidence, CAC, and hypertension (Section 6.2.16). For IHD incidence, there was evidence of a linear C-R relationship at concentrations below 15 μg/m³, which is consistent with the shape of the curve when compared with the full range of $PM_{2.5}$ concentrations. Analyses of the relationship between long-term $PM_{2.5}$ exposure and CAC indicate both linear and nonlinear relationships, while there is preliminary evidence of a linear relationship between long-term $PM_{2.5}$ exposure and incidence of hypertension. A few studies that examined the relationship between long-term $PM_{2.5}$ exposure and lung cancer incidence and mortality also examined the shape of the C-R curve by assessing its linearity and conducting cutpoint and threshold analyses (Section 10.2.5.1.4). These collective assessments provide initial evidence supporting a no-threshold, linear relationship across the range of $PM_{2.5}$ concentrations observed in the U.S., with confidence in a linear relationship as low as 5–10 μg/m³ in some studies.

### 1.5.4    PM Components and Sources

Building on the initial evaluation conducted in the 2004 PM AQCD, the 2009 PM ISA formally evaluated the relationship between exposures to PM components and sources and health effects. This evaluation found that many components and sources representative of combustion-related activities (e.g., motor vehicle emissions, coal combustion, oil burning, vegetative burning) are associated with a range of health effects. The 2009 PM ISA, therefore, concluded that "many [components] of PM can be linked with differing health effects and the evidence is not yet sufficient to allow differentiation of those components or sources that are more closely related to specific health outcomes."

Building upon the evaluation of PM sources and components in the 2009 PM ISA, and as detailed in the Preface, this PM ISA systematically evaluated whether specific PM components or sources are more strongly associated with health effects than PM mass by focusing on those studies that: (1) included a composite metric of PM (e.g., mass of $PM_{2.5}$ and/or $PM_{10-2.5}$, or in the case of ultrafine particles [UFP] mass, particle number, etc.) and PM components; (2) applied some approach to assess the particle effect (e.g., particle trap) of a mixture; or (3) conducted formal statistical analyses to identify source-based exposures (see Preface). Overall, these criteria allow for a thorough evaluation of whether there is evidence that an individual component(s) and/or source(s) is more closely related to health effects than PM mass. Across the health effects categories evaluated in this ISA, most studies that examine PM sources and components focus on $PM_{2.5}$. Thus, the following sections summarize the current state of the science on $PM_{2.5}$ components and sources for those health effects categories for which it was concluded that there is a *causal* or *likely to be causal relationship*. Details on the $PM_{2.5}$ components and sources evidence relevant to other health effects categories (e.g., Reproductive and Developmental Effects) are covered in subsequent health chapters of this ISA.

SECTION 1.5: Policy-Relevant Considerations

00196545

Overall, recent studies continue to demonstrate that many $PM_{2.5}$ components and sources are associated with health effects ranging from subclinical (e.g., changes in heart function, such as HRV, or circulating biomarkers) to the more overt (i.e., ED visits, hospital admissions, and mortality). The results of these studies confirm and further support the conclusion of the 2009 PM ISA that many $PM_{2.5}$ components and sources are associated with many health effects and that the evidence does not indicate that any one source or component is consistently more strongly related with health effects than $PM_{2.5}$ mass.

### 1.5.4.1    Respiratory Effects

The examination of $PM_{2.5}$ components and sources and respiratory effects was limited to epidemiologic studies (Section 5.1.11). Epidemiologic studies that examined the relationship between respiratory health effects and short-term exposure to both $PM_{2.5}$ mass (n = 113) and $PM_{2.5}$ components, primarily focus on the components nitrate (n = 29), sulfate (n = 40), OC (n = 50), and EC/BC (n = 95). Across these studies, the health effects examined range from inflammation and changes in lung function to respiratory-related ED visits and hospital admissions. When examining the pattern of associations for individual $PM_{2.5}$ components with those observed for $PM_{2.5}$ mass, all the components examined (i.e., evaluated in at least three studies) were positively associated with a respiratory effect in at least a few studies (Section 5.1.11.7). For EC/BC, the most extensively examined $PM_{2.5}$ component, many studies reported positive associations, but some studies also reported results indicating no association, which is consistent with the pattern of associations for $PM_{2.5}$ mass.

A more limited number of studies examined associations between long-term $PM_{2.5}$ components exposure and respiratory effects (Section 5.2.12). Similar to short-term exposure studies, most long-term exposure studies focused on EC/BC and did not observe a pattern of associations with respiratory effects different from that observed for $PM_{2.5}$ mass. Collectively, positive associations were observed in studies examining short- and long-term $PM_{2.5}$ component exposure and respiratory effects, but there is no evidence that any one component is more strongly associated with respiratory effects than $PM_{2.5}$ mass.

Few studies examined the relationship between $PM_{2.5}$ sources and respiratory health effects. Through analyses in which $PM_{2.5}$ components were apportioned into source factors, positive associations were reported for several respiratory effects, particularly asthma exacerbation, and sources representative of combustion-related activities, such as traffic and biomass burning. No recent studies examined long-term exposure to $PM_{2.5}$ sources and respiratory effects.

### 1.5.4.2    Cardiovascular Effects

Both epidemiologic and experimental studies examined the relationship between exposure to $PM_{2.5}$ component and sources and cardiovascular effects (Section 6.1.15). In short-term exposure studies,

SECTION 1.5: Policy-Relevant Considerations

1-51

00196546

the epidemiologic evidence focuses on studies examining cardiovascular-related ED visits and hospital admissions, with only a few studies examining other cardiovascular effects. Similar to respiratory effects studies, the cardiovascular effects studies that examined both $PM_{2.5}$ mass and components (n = 14), focused most extensively on EC (n = 12), OC (n = 10), sulfate (n = 9), and nitrate (n = 9). Across all components examined, most were positively associated with cardiovascular-related ED visits and hospital admissions in at least one study (Section 6.1.15). Although EC was positively associated with cardiovascular-related ED visits and hospital admissions in many of the studies evaluated, it was not possible to tell whether EC was independently associated or a marker of exposure to $PM_{2.5}$ mass.

Few studies examined long-term exposure to $PM_{2.5}$ components and cardiovascular effects, and those that did were consistent with the long-term exposure and respiratory effects studies that primarily focused on EC/BC (Section 6.2.17). These studies did not provide evidence that any one component is more strongly associated with a cardiovascular effect. Collectively, studies examining short- and long-term $PM_{2.5}$ components exposure continue to support that there is no evidence that any one component is more strongly associated with a cardiovascular effect than $PM_{2.5}$ mass.

Epidemiologic and animal toxicological studies conducted source-based analyses using mathematical methods to apportion $PM_{2.5}$ components into source factors (Section 6.1.15.6 and Section 6.1.15.8). Epidemiologic studies focused on cardiovascular-related ED visits and hospital admissions and reported positive associations with sources representative of combustion-related activities (e.g., industrial combustion, traffic), with more limited evidence for wildfires. Animal toxicological studies, which focused on markers of heart function (e.g., HR, HRV), reported associations with a variety of source categories, but the associations were dependent on the location of the study (i.e., where the $PM_{2.5}$ CAPs were collected). Additional studies focusing on long-term exposures to $PM_{2.5}$ sources were fewer, with epidemiologic studies only examining traffic sources and animal toxicological studies reporting associations between a number of sources and various cardiovascular effects.

### 1.5.4.3    Mortality

Epidemiologic studies that examined associations with $PM_{2.5}$ components and sources and mortality have primarily focused on examining short- and long-term exposures to components (Section 11.1.11 and Section 11.2.6). Both short- and long-term exposure studies reported consistent, positive associations with $PM_{2.5}$ mass across all studies that also examined a component. Although the respiratory and cardiovascular effects studies focused mainly on EC/BC, the studies of mortality did not examine any one component disproportionately to the others. Of the $PM_{2.5}$ components examined, each were found to be positively associated with mortality in at least a few studies, but overall one component was not found to be as consistently associated with mortality as $PM_{2.5}$ mass.

Compared with the 2009 PM ISA, in which most epidemiologic studies of mortality conducted formal source apportionment analyses, recent studies have focused more exclusively on $PM_{2.5}$

SECTION 1.5: Policy-Relevant Considerations

1-52

00196547

components. Of the limited number of studies that examined associations between short- and long-term source exposures and mortality, positive associations were observed for those sources representative of combustion-related activities, including traffic, coal, and vegetative fires.

### 1.5.5 Populations and Lifestages at Potentially Increased Risk of a PM-Related Health Effect

An important consideration in evaluating the scientific evidence for PM, and in determining the extent to which the NAAQS provides public health protection, is whether specific populations or lifestages are at increased risk of a PM-related health effect. As detailed in the preceding sections of this chapter and in subsequent chapters of this ISA, a large body of evidence shows that health effects related to PM exposure, particularly $PM_{2.5}$ exposure, occur across populations with diverse characteristics (e.g., children, older adults, people with pre-existing cardiovascular diseases, etc.). Although this larger body of evidence provides information on the causal nature of the relationship between PM exposure and health effects, this section focuses on answering the following question:

*Are there specific populations and lifestages at increased risk of a PM-related health effect, compared to a reference population? That is, is the magnitude of effect or exposure greater for some populations or lifestages compared to a reference population, where applicable?*

The evaluation of populations and lifestages potentially at increased risk builds off the approach used in the 2009 PM ISA and involves application of a framework detailed in the 2013 $O_3$ ISA to characterize the evidence informing whether a population or lifestage is at increased risk (U.S. EPA, 2013). The focus of this evaluation is on determining the extent to which specific factors may increase the risk of a PM-related health effect in a population or lifestage relative to a reference population, where applicable. Importantly, this evaluation builds on the conclusions drawn elsewhere in the ISA, taking into consideration the relationship between exposure to PM and health effects. As detailed in the Preamble to the ISAs (U.S. EPA, 2015), the evaluation of the evidence includes (1) epidemiologic studies that conducted stratified analyses, (2) evidence from animal toxicological studies using animal models of disease and epidemiologic or controlled human exposure studies conducted in specific populations (e.g., lung function growth in children, people with mild asthma), (3) information on the dosimetry of PM within the body, and (4) consideration of information on differential exposure to PM within a population or lifestage. Overall, the framework allows for a transparent characterization of the collective body of evidence to draw conclusions on the degree to which the scientific evidence indicates that a specific population or lifestage is at increased risk of a PM-related health effect (Table 12-1).

Based on the causality determinations briefly summarized within this chapter, and more fully detailed in subsequent chapters, the strongest evidence indicating an effect of short- and long-term PM exposure on health is for $PM_{2.5}$ and the broad health categories of respiratory and cardiovascular effects, nervous system effects, cancer, and mortality. Thus, the assessment of populations and lifestages

SECTION 1.5: Policy-Relevant Considerations

00196548

potentially at increased risk of a PM$_{2.5}$-related health effect primarily focuses on studies that form the basis of these causality determinations that also conducted analyses to inform whether there is differential risk in a specific population or lifestage. In evaluating studies, several factors can influence the ability to observe an association, including, but not limited to, publication bias (i.e., not reporting null findings when examining evidence of differential risk), variability in how indicators or metrics are defined across studies (e.g., socioeconomic status, obesity, age), and variability in the population as a whole, particularly with respect to behavioral differences, biological differences (e.g., obese vs. nonobese), and adherence to treatment for pre-existing diseases.

Of the factors evaluated (see Table 12-3 for a full list), children and race were the only factors for which it was concluded that "*adequate evidence*" was available indicating that people of a specific lifestage and race are at increased risk of PM$_{2.5}$-related health effects (Section 12.5.1.1 and Section 12.5.4). Although stratified analyses do not indicate a difference in the risk of PM-related health effects between children and adults, there is strong evidence from studies focusing on children that demonstrate health effects only observable in growing children that attributed to PM$_{2.5}$ exposure. Specifically, recent epidemiologic studies of long-term PM$_{2.5}$ exposure have provided strong evidence of impaired lung function growth with additional evidence of decrements in lung function and the development of asthma. These longitudinal epidemiologic studies are consistent with and extend the evidence that was available in the 2009 PM ISA demonstrating health effects in children due to long-term PM$_{2.5}$ exposure. The conclusion of "*adequate evidence*" for race was based on studies that examined whether there was evidence of increased risk for PM$_{2.5}$-related health effects as well as studies that examined differential exposure by race. Multiple studies reported that nonwhite populations across different geographical regions are exposed to higher PM$_{2.5}$ concentrations and were at increased risk for PM$_{2.5}$-related mortality, particularly due to long-term exposure. Collectively, the combination of evidence demonstrates that nonwhite populations are at greater risk for both PM$_{2.5}$-related health effects and PM$_{2.5}$ exposure than are whites.

There is "*suggestive evidence*" that populations with pre-existing cardiovascular (Section 12.3.1) or respiratory (Section 12.3.5) disease, those that are overweight or obese (Section 12.3.3), those with particular genetic variants (Section 12.4), those that are of low SES (Section 12.5.3), and those who are current or former smokers (Section 12.6.1) are at increased risk for PM$_{2.5}$-related health effects. Epidemiologic studies that conducted analyses stratified by pre-existing cardiovascular disease tended to focus on hypertension, one of the most easily measurable cardiovascular conditions, and did not consistently indicate increased risk for several outcomes examined (e.g., mortality, stroke, BP). However, the strong evidence supporting a *causal relationship* between short- and long-term PM$_{2.5}$ exposure and cardiovascular effects, which includes cardiovascular-related mortality and ischemic heart disease (Section 6.1.16 and Section 6.2.18) indicates that individuals with underlying cardiovascular conditions related to these serious outcomes may be at increased risk of a PM$_{2.5}$-related health effect. Similarly, there are few studies that evaluated whether there is evidence of increased risk of a PM$_{2.5}$-related health effect between people with pre-existing asthma (Section 12.3.5) and COPD (Section 12.3.5) compared with

SECTION 1.5: Policy-Relevant Considerations

00196549

people that do not have a pre-existing respiratory disease. However, epidemiologic studies, particularly those studies examining short-term $PM_{2.5}$ exposure and asthma or COPD ED visits and hospital admissions report generally consistent positive associations (Section 5.1.2.1 and Section 5.1.4.1), which represent exacerbations that are only possible in people with asthma or COPD. Therefore, there is limited evidence to support that people with pre-existing respiratory diseases, specifically asthma or COPD, are at increased risk for a $PM_{2.5}$-related health effect, but there is generally consistent evidence demonstrating these populations experience health effects due to a $PM_{2.5}$ exposure.

Studies that examined whether being obese or overweight increased the risk of a $PM_{2.5}$-related health effect, reported evidence of increased risk for mortality associated with long-term exposures to $PM_{2.5}$, but inconsistent evidence was found for subclinical cardiovascular outcomes, when comparing obese or overweight individuals with normal weight individuals. However, the evaluation of studies focusing on differences in risk by weight were complicated by the different definitions of obesity used across studies.

The examination of whether specific genetic characteristics dictate increased risk of a $PM_{2.5}$-related health effect involved studies of genetic variants. Across the large number of genetic variants examined there is a consistent trend for increased risk of respiratory and cardiovascular effects associated with $PM_{2.5}$ exposure across gene variants involved in the glutathione transferase pathway. These results are consistent with underlying mechanisms that provide biological plausibility for $PM_{2.5}$-related health effects and have shown that oxidative stress is an early response to $PM_{2.5}$ exposure.

Epidemiologic studies have examined several measures of SES (e.g., income level, educational attainment, etc.) in assessing whether populations are at increased risk of a $PM_{2.5}$-related health effect. In studies examining both differential exposure as well as increased risk of health effects, there is some evidence that low SES populations are more likely to have higher $PM_{2.5}$ exposures and that low SES populations, as measured by metrics for income, are at increased risk of $PM_{2.5}$-related mortality when compared with populations defined as higher SES. Finally, there is some epidemiologic evidence from studies examining long-term $PM_{2.5}$ exposure and lung cancer incidence and mortality, as well as total mortality, that people who currently smoke or were former smokers may be at increased risk of a $PM_{2.5}$-related health effect compared with never smokers.

For the remaining factors evaluated, "*inadequate evidence*" exists to determine whether having diabetes (Section 12.3.2), being in an older life stage (i.e., older adults; Section 12.5.1.2), residential location (including proximity to source and urban residence; Section 12.5.5), sex (Section 12.5.2), or diet (Section 12.6.2) increase the risk of $PM_{2.5}$-related health effects. Across these factors there is either limited assessment of differential risk or exposure (i.e., residential location, diet), or inconsistency in results across studies to support evidence of increased risk of a $PM_{2.5}$-related health effect (i.e., diabetes and sex). Instead, the inconsistency in the evidence makes the determination of disproportionately increased risk more difficult. For example, for older adults (Section 12.5.1.2) there is a relatively small number of studies that examined whether there is evidence of differential risk between age groups. In the

SECTION 1.5: Policy-Relevant Considerations

1-55

00196550

evaluation of these studies there is limited evidence indicating that older adults are at increased risk of $PM_{2.5}$-related health effects compared with other age ranges; however, epidemiologic studies focusing only on older adults demonstrate associations with respiratory-related ED visits and hospital admissions with additional, but more limited, evidence of subclinical cardiovascular effects from epidemiologic panel studies and controlled human exposure studies.

## 1.6    Welfare Effects of PM

Whereas the evaluation of the evidence for PM exposures and health effects are specific to exposure duration (i.e., short- and long-term) and PM size fraction (i.e., $PM_{2.5}$, $PM_{10-2.5}$, and UFP), the evaluation of the evidence for welfare effects focuses generally on whether there is a *causal relationship* between PM and visibility impairment, climate effects, and effects on materials. As detailed below, the evidence continues to support a *causal relationship* between PM and visibility impairment (Section 1.6.1), climate effects (Section 1.6.2), and materials effects (Section 1.6.3).

### 1.6.1    Visibility Impairment

It is well known that light extinction from pollution is primarily due to $PM_{2.5}$, resulting in this ISA concluding there is a *causal relationship* between PM and visibility impairment, which is consistent with the conclusions of the 2009 PM ISA (Table 1-3). This conclusion is based on additional characterization of the effect of PM size and composition on light extinction.

The relationship between PM and light extinction has been well documented (Section 13.2.2). Although reconstruction of light extinction is best achieved with detailed information on the size and composition of PM measurements, empirical relationships between light extinction of PM components are more practical and have been successfully evaluated and widely used (Section 13.2.3). Light extinction has been found to vary depending on the available PM species monitoring data, with light extinction efficiencies varying by a factor of 10 between species. Additionally, the variation in PM species by region and season, as well as urban and rural location, can affect light extinction. The steep decline in $PM_{2.5}$ sulfate of $-4.6\%$ per year in rural areas and $-6.2\%$ per year in urban areas from $2002-2012$ (Section 1.2.1) has affected the apportionment of light extinction among $PM_{2.5}$ species. Although $PM_{2.5}$ sulfate is still responsible for more light extinction than any other single species, visibility in many areas has improved, and a smaller and less seasonally variable fraction of light extinction can be attributed to $PM_{2.5}$ sulfate, with an increasing share due to nitrate and organic matter (Section 13.2.4).

00196551

## 1.6.2    Climate Effects

Substantial evidence indicates that PM affects the radiative forcing of the climate system, both through direct scattering and absorption of radiation, and indirectly, by altering cloud properties, resulting in the conclusion that there is a *causal relationship* between PM and climate effects, which is consistent with the conclusions of the 2009 PM ISA (Table 1-3). This conclusion is based on multiple recent studies that have strengthened the evidence for the effects of PM on radiative forcing and have improved the characterization of major sources of uncertainty in estimating PM climate effects, including the indirect radiative forcing effects associated with PM-cloud interactions, and the additional climate effects and feedbacks involving atmospheric circulation and the hydrologic cycle resulting from PM effects on radiative forcing.

Because of these radiative effects, the net effect of PM has been to cool the planet over the last century, masking some of the effects of greenhouse gases on warming (Section 13.3.3). The decrease in PM concentrations in many developed countries over the last few decades has likely contributed to the recent shift toward "global brightening," which may in turn have helped drive rapid warming in North American and Europe because this greenhouse gas warming was unmasked (Section 13.3.6). In developing countries in Asia, by contrast, there has been an increase in PM concentrations over the last several decades, but the associated radiative forcing effects are highly uncertain, due to uncertainties in emissions estimates and the lack of accurate information on the proportion of reflecting versus absorbing species. Although uncertainties in the relationship between PM and climate effects have been further studied and characterized since the 2009 PM ISA, there are still substantial uncertainties with respect to key processes linking PM and climate, specifically the interaction between clouds and aerosols. This is because of the small scale of PM-relevant cloud microphysical processes compared with the coarse resolution of state-of-the-art models, and because of the complex cascade of indirect effects and feedbacks in the climate system that result from a given initial radiative perturbation caused by PM.

## 1.6.3    Materials Effects

Multiple recent studies further characterize soiling and corrosion processes associated with PM and add to the body of evidence of PM damage to materials. Approaches to quantify pollutant exposure corresponding to perceived soiling and damage continue to indicate that deposition can result in increased cleaning and maintenance costs and reduced usefulness of soiled material. The combination of this evidence results in the conclusion that there is a *causal relationship* between PM and effects on materials, which is consistent with the conclusions of the 2009 PM ISA (Table 1-3).

Assessments of the relationship between PM and effects on materials have often focused on quantitative assessments including the development of dose-response relationships and application of damage functions to stone used for historic monuments and buildings. Recent studies provide additional

SECTION 1.6: Welfare Effects of PM

1-57

00196552

information on understanding soiling and corrosion process for glass and metals and have allowed for the development of new dose-response curves (Section 13.4.3), particularly for glass, as well as new damage functions for materials (Section 13.4.4). Additional evidence demonstrates that atmospheric soiling can affect energy costs and climate control, energy consumption of large buildings, and the efficiency of photovoltaic systems (Section 13.4.2).

**Table 1-3      Key evidence contributing to *causal* causality determinations for PM exposure and welfare effects evaluated in the Integrated Science Assessment for Particulate Matter.**

| Key Evidence | Welfare Effect Category[a] and Causality Determination |
|---|---|
| **Visibility Impairment and PM Exposure (Section 13.2): Causal Relationship** | |
| *No Change in Causality Determination From the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | |
| Section 13.2.6 | Visibility impairment by atmospheric PM, with the strongest effects in the size range from 0.1 to 1.0 μm. is supported by numerous studies summarized in the 1969 PM AQCD (NAPCA, 1969), although the relationship between PM and atmospheric visibility impairment was well established decades earlier. Additional studies supporting the relationship have been described in subsequent documents, and additional new evidence is based on extensive simultaneous network measurements of $PM_{2.5}$ and light extinction. |
| **Climate Effects and PM Exposure (Section 13.3): Causal Relationship** | |
| *No Change in Causality Determination From the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | |
| Section 13.3.9 | Effects of PM on radiative forcing of the climate system through both absorption and scattering of radiation directly, as well as through indirect effects involving interactions between PM and cloud droplets, with corresponding effects on temperature, precipitation, and atmospheric circulation, is supported by numerous observational and modeling studies. Research since the 2009 PM ISA (U.S. EPA, 2009) has improved understanding of climate-relevant aerosol properties and processes, as well as characterized key sources of uncertainty in estimating PM climate effects, particularly with respect to PM-cloud interactions. |
| **Materials Effects and PM Exposure (Section 13.4): Causal Relationship** | |
| *No Change in Causality Determination From the 2009 PM ISA; New Evidence Further Supports the Previous Determination.* | |
| Section 13.4.5 | Both soiling and corrosion associated with PM contribute to materials damage (U.S. EPA, 2009, 2004, 1982). Deposition of PM can physically affect materials by promoting or accelerating the corrosion of metals, by degrading paints, and by deteriorating building materials such as stone, concrete, and marble. Further characterization of PM effects on glass and metals, along with quantitative dose-response relationships and damage functions for stone and other materials lend additional support to the causal relationship in the 2009 PM ISA. Recent evidence shows that deposition of PM reduces energy efficiency of photovoltaic systems. |

AQCD = Air Quality Criteria Document: PM = particulate matter.
[a]The sections referenced include a detailed discussion of the available evidence that informed the causality determinations.

SECTION 1.6: Welfare Effects of PM

00196553

## 1.7    Summary of Causality Determinations for Health and Welfare Effects

The preceding sections of this chapter focused on summarizing the key evidence that formed the basis for causality determinations within this ISA. Figure 1-1 and Figure 1-2 detail the causality determinations for each of the exposure duration and health or welfare effects categories evaluated in this ISA and note whether these conclusions differ from those presented in the 2009 PM ISA.

There is extensive scientific evidence that demonstrates health and welfare effects from exposure to PM. In assessing the older and more recent evidence, the U.S. EPA characterizes the key strengths and remaining limitations of this evidence. In the process of assessing the evidence across studies and scientific disciplines and ultimately forming causality determinations, the U.S. EPA takes into consideration multiple aspects that build upon the Hill Criteria (Hill, 1965) and include, but are not limited to, consistency in findings, coherence of findings, and evidence of biological plausibility [see U.S. EPA (2015)]. As documented by the extensive evaluation of evidence throughout the subsequent chapters of this ISA, the U.S. EPA carefully considers uncertainties in the evidence, and the extent to which recent studies have addressed or reduced uncertainties from previous assessments, as well as the strength of the evidence. Uncertainties considered in the epidemiologic evidence, for example, include the potential for confounding by copollutants or covarying factors (e.g., temporal trends and weather in short-term exposure studies, and individual-level and ecological factors in long-term exposure studies) and exposure error. The U.S. EPA also evaluates many other important considerations (not uncertainties), such as coherence of evidence from animal and human studies, evaluation of different PM components, heterogeneity of risk estimates, and the shape of C-R relationships. All of these uncertainties and considerations are evaluated along with the degree to which chance, confounding, and other biases affect interpretation of the scientific evidence in the process of drawing scientific conclusions and making causality determinations. Where there is clear evidence linking PM with health and welfare effects with minimal remaining uncertainties, the U.S. EPA concludes there is a *causal* or *likely to be causal* relationship (Section P.3, Table P-2).

00196554

| HUMAN HEALTH EFFECTS | | | | | |
|---|---|---|---|---|---|
| | | ISA | Final PM ISA | | |
| | | Indicator | PM$_{2.5}$ | PM$_{10-2.5}$ | UFP |
| Respiratory | | Short-term exposure | | | |
| | | Long-term exposure | | | |
| Cardiovascular | | Short-term exposure | | | |
| | | Long-term exposure | | ▲ | |
| Metabolic | | Short-term exposure | * | * | * |
| | | Long-term exposure | * | * | * |
| Nervous System | | Short-term exposure | ▲ | | ▲ |
| | | Long-term exposure | * | * | * |
| Reproductive | Male/Female Reproduction and Fertility | Long-term exposure | | | |
| | Pregnancy and Birth Outcomes | | | | |
| Cancer | | Long-term exposure | ▲ | ▲ | |
| Mortality | | Short-term exposure | | | |
| | | Long-term exposure | | ▲ | |

Causal  Likely causal  Suggestive  Inadequate

* = no evidence to evaluate in 2009 PM ISA

▲ = change in causality determination from 2009 PM ISA

PM = particulate matter; PM$_{2.5}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 µm; PM$_{10-2.5}$ = particulate matter with a nominal mean aerodynamic diameter greater than 2.5 µm and less than or equal to 10 µm; UFP = ultrafine particles.

Note: Those health effect categories for specific exposure durations and size fractions where an asterisk is present indicate the first time studies were available to evaluate evidence and assess the causal nature of relationships between PM exposure and the health effect category of interest. Table P-2 provides a description of each of the five causality determinations and the types of scientific evidence that is considered for each category.

**Figure 1-1     Summary of causality determinations for health effect categories for the PM ISA.**

SECTION 1.7: Summary of Causality Determinations for Health and Welfare Effects

1-60

00196555

### 1.7.1 Health Effects Evidence: Key Findings

A large body of scientific evidence spanning many decades clearly demonstrates that there are health effects attributable to both short- and long-term PM exposure, with the strongest evidence for a relationship between some health effects and $PM_{2.5}$. Generally, for most health effects and exposures to $PM_{10-2.5}$ and UFPs, there are more limitations and uncertainties across scientific disciplines (i.e., atmospheric chemistry, exposure science, and both epidemiology and experimental sciences), complicating the interpretation of the evidence. The collective body of evidence for each of the PM size fraction, exposure, and health effect category combinations evaluated in this ISA was carefully considered and assessed, including the inherent strengths, limitations, and uncertainties in the overall body of evidence such as the available methods, models, and data used within and across studies, resulting in the causality determinations detailed in Figure 1-1. By identifying the strengths and limitations in the evidence, this ISA may help to prioritize research efforts to support future PM NAAQS reviews. Examples of the key findings that support the health effects causality determinations include:

#### 1.7.1.1 *Causal* and *Likely to be Causal* Relationship

##### 1.7.1.1.1 Epidemiologic Evidence

**$PM_{2.5}$**

- There are many epidemiologic studies conducted in diverse geographic locations, that include different population demographics, use a variety of exposure assignment techniques, and include different approaches and covariates to control for potential confounders that continue to report consistent positive associations between short- and long-term $PM_{2.5}$ exposure and various health effects. This evidence is consistent with the large body of epidemiologic studies reporting positive $PM_{2.5}$ associations with respiratory and cardiovascular effects, and mortality and in some cases strengthens and extends the evidence base.

- Recent epidemiology studies incorporate new $PM_{2.5}$ exposure assignment methods that use several sources of available data (i.e., satellite observations, model predictions, and ambient monitors). These methods are well validated by $PM_{2.5}$ monitors in areas with moderate to high population density and better allow for the inclusion of less urban areas. Although fewer monitors are available for model validation in sparsely populated rural areas than in urban areas, $PM_{2.5}$ concentrations are typically lower and more spatially homogeneous in rural areas, resulting in the need for fewer validation sites.

- Each of the exposure assignment methods used in short- and long-term $PM_{2.5}$ exposure epidemiologic studies have inherent strengths and limitations and vary in the degree to which they contribute bias and uncertainty to health effects estimates. Exposure errors most often underestimate associations with health effects in short- and long-term $PM_{2.5}$ exposure studies (i.e., health effect associations are even larger than estimated). However, in long-term $PM_{2.5}$ exposure studies, associations with health effects can be overestimated, specifically when the exposure model has low spatial resolution and underestimates $PM_{2.5}$ exposures.

SECTION 1.7: Summary of Causality Determinations for Health and Welfare Effects

I-61

00196556

### 1.7.1.1.2    Experimental Evidence

**PM$_{2.5}$**

- The large number of animal toxicological and controlled human exposure studies conducted since the 2009 PM ISA provide coherence with (i.e., an indication of an effect across different scientific disciplines) and biological plausibility for effects observed in epidemiologic studies of short- or long-term PM$_{2.5}$ exposure. Although experimental studies are conducted at PM concentrations higher than those often observed in ambient environments (e.g., concentrated ambient particle [CAP] exposures 10−15-fold higher), this practice is consistent with the design of experimental studies used in chemical and pharmacological risk assessments.

### 1.7.1.1.3    Policy-Relevant Considerations

- The expansion in the number of experimental studies, both animal toxicological and controlled human exposure, using CAP exposures provides evidence of a direct effect of PM exposure on various health effects.

- The PM$_{2.5}$ experimental studies together with epidemiologic studies showing that associations remain relatively unchanged in copollutant analyses provide evidence for an independent effect of PM$_{2.5}$. This addresses a key uncertainty identified in the 2009 PM ISA.

- Examination of the C-R relationship has primarily been conducted for short- and long-term PM$_{2.5}$ exposure and mortality, with a more limited number of analyses examining cardiovascular morbidity effects. Across recent studies that used a variety of statistical methods to examine potential deviations in linearity, evidence continues to support a linear, no-threshold C-R relationship, but with less certainty in the shape of the curve at lower concentrations (i.e., below about 8 $\mu$g/m$^3$). Additionally, recent evidence from studies of long-term PM$_{2.5}$ exposure and cardiovascular mortality indicate that the C-R curve may be steeper (i.e., supralinear) at lower concentrations.

- Multicity epidemiologic studies, particularly those examining short-term PM$_{2.5}$ exposure and mortality, continue to report evidence of heterogeneity in the magnitude and precision of risk estimates across cities. However, recent studies indicate that the observed heterogeneity in risk estimates is not due solely to differences in the composition of PM$_{2.5}$, as was hypothesized in the 2009 PM ISA, but also reflects city-specific exposure conditions (e.g., housing and commuting characteristics).

- The combination of evidence spanning atmospheric chemistry, experimental studies, and epidemiologic studies continues to support that a multitude of PM$_{2.5}$ components and a diverse array of sources are associated with a variety of health effects. Although the composition of ambient PM$_{2.5}$ has changed over time, the evidence does not indicate that any one source or component is more strongly related with health effects than PM$_{2.5}$ mass.

00196557

### 1.7.1.2　*Suggestive of, but not Sufficient to Infer, a Causal Relationship*

#### 1.7.1.2.1　Epidemiologic Evidence

**$PM_{2.5}$**

- Recent epidemiologic studies examining short- or long-term $PM_{2.5}$ exposure and various health effects report inconsistent evidence of an association or there are relatively few studies focusing on the health effect of interest.

- Additionally, recent studies provide a limited assessment of potential copollutant confounding for some health effects.

**$PM_{10-2.5}$**

- Recent epidemiologic studies continue to examine associations between short- or long-term $PM_{10-2.5}$ exposure and various health effects, and report generally positive associations (i.e., not all results are positive). However, many of these studies are conducted in locations outside of the U.S. Additionally, the overall interpretation of results across studies is complicated by the use of different methods to estimate $PM_{10-2.5}$ concentrations because the design of the $PM_{10-2.5}$ FRM was not finalized until 2006 and routine $PM_{10-2.5}$ monitoring with the FRM was not instituted until 2011.

  - $PM_{10-2.5}$ concentrations are more spatially variable than $PM_{2.5}$. Although some $PM_{10-2.5}$ data are available across the nation, micro- to neighborhood-scale data are not widely available, adding uncertainty to the interpretation of results from epidemiologic studies, especially for long-term exposure studies that rely on spatial contrasts to examine associations with health effects.

**UFP**

- There are a limited number of epidemiologic studies examining short-term UFP exposure and health effects, with some providing initial evidence of positive associations. However, it is difficult to assess the results across studies because of the different size ranges of UFPs examined and the exposure metrics used (i.e., particle number concentration, surface area concentration, mass concentration).

  - Because no national monitoring network is in place to measure UFP concentrations, there is limited information on the spatial and temporal variability of UFP concentrations within the U.S. It has however been reported that UFPs vary more over space than $PM_{2.5}$. Thus, the use of one monitor in most epidemiologic studies to estimate UFP concentrations may not adequately capture population exposure to UFPs.

  - There is a difference in the size range of UFPs examined in epidemiologic studies (0.1 μm and less) and experimental studies (i.e., up to 0.3 μm). This difference adds uncertainty to the evaluation of coherence between effects observed in experimental and epidemiologic studies. Furthermore, the spatial and temporal variability in UFP

SECTION 1.7: Summary of Causality Determinations for Health and Welfare Effects

00196558

concentrations, as well as in population exposures to UFPs, add uncertainty to epidemiologic findings.

### 1.7.1.2.2     Experimental Evidence

#### $PM_{2.5}$ and $PM_{10-2.5}$

- Animal toxicological and controlled human exposure studies provide limited, and in some instances inconsistent, evidence of effects from short- or long-term $PM_{2.5}$ and $PM_{10-2.5}$ exposure. As a result, there is limited coherence with results from epidemiologic studies and limited evidence indicating biologically plausible pathways by which effects could occur.

#### UFP

- There is strong and consistent animal toxicological evidence linking long-term UFP exposure to nervous system effects. This evidence is supported by dosimetric studies in animals showing that particles can translocate out of the respiratory tract into the brain via the olfactory nerve, however, it is unclear whether this translocation occurs in humans as well as in animals. There is also uncertainty surrounding other mechanisms and the degree to which particles translocate from the respiratory tract to the brain. However, translocation of particles to the brain may not be required for UFP-related nervous system effects.

- For all health effect categories, animal toxicological and controlled human exposure studies provide limited, and in some instances inconsistent, evidence of effects due to short- or long-term UFP exposure and contribute to limited coherence and biological plausibility for some health effects categories.

---

### 1.7.1.3     *Inadequate to Infer the Presence or Absence of a Causal Relationship*

#### 1.7.1.3.1     Epidemiologic Evidence

#### $PM_{10-2.5}$ and UFPs

- Depending on the health effect, few or no epidemiologic studies examined the relationship between short- and long-term $PM_{10-2.5}$ or UFP exposures and various health effects. These studies often include single-city analyses that were conducted over short study durations. As noted previously, (1) for studies examining $PM_{10-2.5}$, the methods used to estimate $PM_{10-2.5}$ concentrations across studies vary, and it is unclear how well correlated concentrations are spatially and temporally across methods; and (2) for UFP studies, there is inconsistency in the size ranges examined across studies and the exposure metric used, which prevents a thorough comparison of results across studies.

00196559

**1.7.1.3.2**     **Experimental Evidence**

**$PM_{10-2.5}$ and UFPs**

- Depending on the health effect, few or no experimental studies examined the relationship between short- and long-term $PM_{10-2.5}$ or UFP exposures and various health effects. The few studies conducted provide inconsistent evidence of effects due to $PM_{10-2.5}$ or UFP exposures. Thus, there is limited to no evidence to support coherence of effects across multiple lines of evidence and limited to no evidence of biologically plausible pathways that could elicit an effect.



PM = particulate matter.

**Figure 1-2**     **Summary of causality determinations for nonecological welfare effects for the PM ISA.**

### 1.7.2    Welfare Effects Evidence: Key Findings

A large body of scientific evidence spanning many decades also demonstrates there are welfare effects attributed to PM. Examples of the key findings that support the welfare effects causality determinations detailed in Figure 1-2 include:

- Recent studies further confirm evidence from previous assessments supporting the strong relationship between PM and the nonecological welfare effects of visibility impairment, effects on the climate, and materials damage.
- For visibility impairment and materials damage there is extensive evidence demonstrating the relationship between PM and light extinction and PM effects on stone, respectively.

SECTION 1.7: Summary of Causality Determinations for Health and Welfare Effects

00196560

- While there is substantial evidence indicating that PM affects the climate system, specifically through radiative forcing, there are still substantial uncertainties in key processes, such as the interactions between clouds and aerosols and the indirect effects and feedbacks in the climate system due to the radiative effect of PM.

### 1.7.3    Comparison of Causality Determinations from 2009 PM ISA and Current PM ISA

Table 1-4 presents a side-by-side comparison of all causality determinations presented in this ISA and the 2009 PM ISA for each of the health and welfare effects categories evaluated in subsequent chapters.

**Table 1-4    Health and welfare effects causality determinations from the 2009 and current Integrated Science Assessment for Particulate Matter.**

| Summary of Causality Determinations | | |
| --- | --- | --- |
| Size Fraction | 2009 PM ISA | Current PM ISA |
| *Chapter 5. Respiratory Effects* | | |
| **Short-Term Exposure** | | |
| $PM_{2.5}$ | Likely to be causal | Likely to be causal |
| $PM_{10-2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| UFP | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| **Long-Term Exposure** | | |
| $PM_{2.5}$ | Likely to be causal | Likely to be causal |
| $PM_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Inadequate |
| *Chapter 6. Cardiovascular Effects* | | |
| **Short-Term Exposure** | | |
| $PM_{2.5}$ | Causal | Causal |
| $PM_{10-2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| UFP | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |

00196561

**Table 1-4 (Continued): Causality determinations from the 2009 PM ISA and the current PM ISA for the health and welfare effects categories evaluated.**

| Summary of Causality Determinations | | |
|---|---|---|
| **Size Fraction** | **2009 PM ISA** | **Current PM ISA** |
| **Long-Term Exposure** | | |
| $PM_{2.5}$ | Causal | Causal |
| $PM_{10-2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |
| UFP | Inadequate | Inadequate |
| *Chapter 7. Metabolic Effects* | | |
| **Short-Term Exposure** | | |
| $PM_{2.5}$ | — | Suggestive of, but not sufficient to infer |
| $PM_{10-2.5}$ | — | Inadequate |
| UFP | — | Inadequate |
| **Long-Term Exposure** | | |
| $PM_{2.5}$ | --- | Suggestive of, but not sufficient to infer |
| $PM_{10-2.5}$ | --- | Suggestive of, but not sufficient to infer |
| UFP | --- | Inadequate |
| *Chapter 8. Nervous System Effects* | | |
| **Short-Term Exposure** | | |
| $PM_{2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |
| $PM_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Suggestive of, but not sufficient to infer |
| **Long-Term Exposure** | | |
| $PM_{2.5}$ | --- | Likely to be causal |
| $PM_{10-2.5}$ | --- | Suggestive of, but not sufficient to infer |
| UFP | --- | Suggestive of, but not sufficient to infer |
| *Chapter 9. Reproductive and Developmental Effects* | | |
| **Male and Female Reproduction and Fertility** | | |
| $PM_{2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |

SECTION 1.7: Summary of Causality Determinations for Health and Welfare Effects

00196562

**Table 1-4 (Continued): Causality determinations from the 2009 PM ISA and the current PM ISA for the health and welfare effects categories evaluated.**

| Summary of Causality Determinations | | |
|---|---|---|
| **Size Fraction** | **2009 PM ISA** | **Current PM ISA** |
| $PM_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Inadequate |
| **Pregnancy and Birth Outcomes** | | |
| $PM_{2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| $PM_{10-2.5}$ | Inadequate | Inadequate |
| UFP | Inadequate | Inadequate |
| *Chapter 10. Cancer* | | |
| $PM_{2.5}$ | Suggestive of, but not sufficient to infer | Likely to be causal |
| $PM_{10-2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |
| UFP | Inadequate | Inadequate |
| *Chapter 11. Mortality* | | |
| **Short-Term Exposure** | | |
| $PM_{2.5}$ | Causal | Causal |
| $PM_{10-2.5}$ | Suggestive of, but not sufficient to infer | Suggestive of, but not sufficient to infer |
| UFP | Inadequate | Inadequate |
| **Long-Term Exposure** | | |
| $PM_{2.5}$ | Causal | Causal |
| $PM_{10-2.5}$ | Inadequate | Suggestive of, but not sufficient to infer |
| UFP | Inadequate | Inadequate |
| *Chapter 13. Welfare Effects* | | |
| Climate | Causal | Causal |
| Visibility | Causal | Causal |

00196563

### Table 1-4 (Continued): Causality determinations from the 2009 PM ISA and the current PM ISA for the health and welfare effects categories evaluated.

| Summary of Causality Determinations | | |
|---|---|---|
| **Size Fraction** | **2009 PM ISA** | **Current PM ISA** |
| Materials damage | Causal | Causal |

$PM_{2.5}$ = particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 µm; $PM_{10-2.5}$ = particulate matter with a nominal mean aerodynamic diameter greater than 2.5 µm and less than or equal to 10 µm; UFP = ultrafine particles.

Note: The 2009 PM ISA made causality determinations for the broad category of "Reproductive and Developmental Effects." Causality determinations for 2009 represent this broad category and not specifically for "Male and Female Reproduction and Fertility" and "Pregnancy and Birth Outcomes."

SECTION 1.7: Summary of Causality Determinations for Health and Welfare Effects
1-69

00196564

## 1.8    References

Hill, AB. (1965). The environment and disease: Association or causation? Proc R Soc Med 58: 295-300.

NAPCA (National Air Pollution Control Administration). (1969). Air quality criteria for particulate matter. Washington, DC.

NHLBI (National Institutes of Health, National Heart Lung and Blood Institute). (2017). NHLBI fact book, fiscal year 2012: Disease statistics. Available online at https://www.nhlbi.nih.gov/about/documents/factbook/2012/chapter4 (accessed August 23, 2017).

U.S. EPA (U.S. Environmental Protection Agency). (1982). Air quality criteria for particulate matter and sulfur oxides (final, 1982) [EPA Report]. (EPA 600/8-82/029a). Washington, DC: Environmental Criteria and Assessment Office. http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=46205.

U.S. EPA (U.S. Environmental Protection Agency). (1996). Air quality criteria for particulate matter [EPA Report]. (EPA/600/P-95/001aF-cF. 3v). Research Triangle Park, National Center for Environmental Assessment-RTP Office NC.

U.S. EPA (U.S. Environmental Protection Agency). (2004). Air quality criteria for particulate matter [EPA Report]. (EPA/600/P99/002aF-bF). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment- RTP Office. http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=87903.

U.S. EPA (U.S. Environmental Protection Agency). (2009). Integrated science assessment for particulate matter [EPA Report]. (EPA/600/R-08/139F). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment- RTP Division. http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=216546.

U.S. EPA (U.S. Environmental Protection Agency). (2013). Integrated science assessment for ozone and related photochemical oxidants [EPA Report]. (EPA/600/R-10/076F). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment-RTP Division. http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=247492.

U.S. EPA (U.S. Environmental Protection Agency). (2015). Preamble to the integrated science assessments [EPA Report]. (EPA/600/R-15/067). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, RTP Division. https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=310244.

U.S. EPA (U.S. Environmental Protection Agency). (2016). Integrated review plan for the national ambient air quality standards for particulate matter [EPA Report]. (EPA-452/R-16-005). Research Triangle Park, NC. https://yosemite.epa.gov/sab/sabproduct.nsf/0/eb862b233fbd0cde85257dda0041cb8c!OpenDocument&TableRow=2.0.

U.S. EPA (U.S. Environmental Protection Agency). (2017). EPA's report on the environment (ROE). Available online at https://cfpub.epa.gov/roe/index.cfm (accessed January 29, 2018).

U.S. EPA (U.S. Environmental Protection Agency). (2018). Integrated science assessment for oxides of nitrogen, oxides of sulfur and particulate matter ecological criteria (2nd external review draft). (EPA/600/R-18/097). Research Triangle Park, NC: U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment. http://cfint.rtpnc.epa.gov/ncea/prod/recordisplay.cfm?deid=340671.

00196565



OP·LANES MARYLAND · I-495 & I-270 Managed Lanes Study · Avoidance, Minimization, and Impacts Report

## APPENDIX B: AMERICAN LEGION BRIDGE STRIKE TEAM REPORT

00198348

00198349



# AMERICAN LEGION BRIDGE STRIKE TEAM REPORT

### April 9, 2021

*Independent Study Completed on Behalf of*
*MDOT SHA's I-495 & I-270 Managed Lanes P3 Program*

**DRAFT**
**PRE-DECISIONAL, DELIBERATIVE &**
**CONFIDENTIAL**

Jim Ruddell
*Strike Team Lead*

00198350

## TABLE OF CONTENTS

Table of Contents ........................................................................................................................ 1

List of Figures ............................................................................................................................. 2

List of Appendices ...................................................................................................................... 2

Acronyms .................................................................................................................................... 3

Introduction ............................................................................................................................... 4

Site Description ........................................................................................................................... 5

Development of the American Legion Bridge Strike Team ........................................................ 7

    Review of the DEIS Alternatives ............................................................................................. 7

    Review of the LOD .................................................................................................................. 7

Review of Base and other Options ............................................................................................. 9

    Base Option ............................................................................................................................ 9

    Top Down Construction ........................................................................................................ 12

    Base Option in 4 Phases ....................................................................................................... 17

    Cable Stayed Option ............................................................................................................. 18

    Segmental Bridge Option ..................................................................................................... 20

    Slide-in Options .................................................................................................................... 21

    Slide-in Option 3 ................................................................................................................... 22

    Slide-in Option 4 ................................................................................................................... 23

Discussion on Access ................................................................................................................ 26

    Access Findings .................................................................................................................... 26

Summary of Key Findings ......................................................................................................... 28

00198351

JA2991

## LIST OF FIGURES

Figure 1: Aerial View of the American Legion Bridge Project Site ................................................. 4
Figure 2: Environmental Features at the American Legion Bridge ................................................. 6
Figure 3: Grade difference at the southern end of the existing American Legion Bridge ........................ 13
Figure 4: Top Down Construction - Washington, NC Bypass. ........................................................ 14
Figure 5: Linn Cove Viaduct ..................................................................................... 15
Figure 6: Linn Cove Viaduct - Precast Segmental Construction Method ............................................. 16
Figure 7: Northwest Quadrant Access Road ....................................................................... 27

## LIST OF APPENDICES

Appendix 1: Strike Team Members
Appendix 2: LOD Plans
Appendix 3: LOD Impact Table
Appendix 4: Bridge Options
Appendix 5: Base Option in Two Phases
Appendix 6: Base Option in Four Phases
Appendix 7: Cable Stayed Bridge
Appendix 8: Segmental Bridge
Appendix 9: Slide-In Option 3
Appendix 10: Slide-In Option 4
Appendix 11: Strike Team Biographies

00198352

**JA2992**

## ACRONYMS

| Acronym | Definition |
|---------|------------|
| ABC | Accelerated Bridge Construction |
| ALB | American Legion Bridge |
| ALB-ST | American Legion Bridge – Strike Team |
| CIP | Cast-in-Place |
| C&O | Chesapeake and Ohio |
| DEIS | Draft Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| GEC | General Engineering Consultant |
| GWMP | George Washington Memorial Parkway |
| LOD | Limit of Disturbance |
| MDOTSHA | Maryland Department of Transportation State Highway Administration |
| MDOT | Maryland Department of Transportation |
| MLS | Managed Lanes Study |
| NE | Northeast |
| NB | Northbound |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| NW | Northwest |
| P3 | Public Private Partnership |
| SB | Southbound |
| SE | Southeast |
| SW | Southwest |
| VDOT | Virginia Department of Transportation |

00198353

JA2993

## INTRODUCTION

The existing American Legion Bridge (ALB) connects Maryland and Virginia on I-495 to the northwest of Washington, D.C. by spanning the Potomac River. See Figure 1 for an aerial view of the project site. The ALB is to be replaced as part of the I-495 & I-270 P3 Program, a historic effort to reduce congestion for millions of travelers in the National Capital Region by seeking a private sector developer to design, build, finance, operate, and maintain improvements on both I-495 and I-270. The replacement of ALB is included in the Managed Lanes Study (MLS), the first element in the P3 Program undergoing the environmental review process. The Federal Highway Administration (FHWA) is the lead federal agency and the Maryland Department of Transportation State Highway Administration (MDOT SHA) is the local project sponsor and joint lead agency for the MLS. Coordination with the Virginia Department of Transportation (VDOT) is being undertaken as portions of the ALB resides in Virginia and approach roadway tie-in is required on the Virginia side of the ALB. Replacing the ALB with a wider structure that accommodates both general purpose and managed lanes is key to improving travel along I-495. MDOT SHA engaged a General Engineering Consultant (GEC) P3 Team (herein referred to as "P3 Team") to provide multiple services, including technical engineering support for the MLS. Managing and reducing avoidable impacts to this historic and environmentally rich section of the Potomac River Gorge is essential to receiving Cooperating Agency concurrence and to the project's success.



*Figure 1: Aerial View of the American Legion Bridge Project Site (Aerial imagery courtesy of P3 Team)*

00198354

## SITE DESCRIPTION

On both shores of the Potomac River, there are National Park Service (NPS) properties: the George Washington Memorial Parkway (GWMP) runs along the south side of the Potomac river and eastward from I-495 in Virginia; and the Chesapeake and Ohio (C&O) Canal National Historical Park, which includes the C&O Canal Towpath and Plummer's Island, borders the north side of the river and is adjacent to the ALB in Maryland. Parallel to the C&O Canal Towpath is the NPS' Clara Barton Parkway. These National Parks are historic properties and contain many unique natural communities and rare species. These parks are within the Potomac Gorge Conservation Area and a partial listing of the unique resources identified within the area includes:

- Wetlands,
- Streams,
- Mature forest,
- Rare, threatened, and endangered plant species, and
- Cultural resources.

The NPS manages the Potomac Gorge Conservation Area, a 15-mile long riparian corridor along the Potomac River running downstream from Great Falls, which is northwest (upstream) of the ALB. This biologically diverse area contains at least 30 distinct natural vegetation communities that support numerous rare plant and animal species[1]. A survey for state and federally listed plant species within the Potomac River Gorge in the project area identified seven (7) threatened and endangered plant species, including some populations with thousands of individuals. Within the project area, the Potomac River Gorge is characterized by mixed hardwood forest with trees ranging from 5 to 59 inches diameter at breast height. The project area also includes emergent and forested wetlands and streams. Of particular concern is Plummer's Island, which lies east of the existing bridge on the Maryland shore. See Figure 2 for an aerial view of the environmental features in the vicinity of Plummer's Island. The island has been the primary research station and headquarters of the Washington Biologists' Field Club, established in 1884. The Field Club has catalogued the island's resources and monitored its flora and fauna changes over time.

The C&O Canal National Historical Park, the GWMP and the Clara Barton Parkway are National Register of Historic Places (NRHP) listed properties, subject to protection under Section 106 of the National Historic Preservation Act and Section 4(f) of the U.S. Department of Transportation Act. Various cultural and natural features within the project Limit of Disturbance (LOD) contribute to the historic significance of the parks. Additionally, there are NRHP-eligible archaeological properties, both precontact and historic era, within the park boundaries and project LOD that are also subject to consideration under Section 106 and Section 4(f). In Maryland, these include four environmental sites and a likely historic quarry within the C&O Canal NHP. In Virginia, the Dead Run Ridges Archaeological District is partially within the LOD at the George Washington Memorial Parkway to the east of the ALB.

---

[1] The Nature Conservancy 2005

American Legion Bridge Strike Team Report                                                      Page 5

00198355



*Figure 2: Environmental Features at the American Legion Bridge (Note that the LOD in this graphic is from December 8, 2020; see "Review of the LOD" for additional information).*

Along with the historic and environmentally rich features of the Potomac River Gorge area, steep topography; shallow, hard rock throughout; and significant rock outcrops all contribute to constrained access and significant challenges for construction. In addition, there are seriously degraded stormwater outfalls in the southwest and northeast quadrants that require extensive reconstruction. Further, the fact that this reach of the Potomac River is not navigable, prevents barges launched outside the project area from delivering equipment or materials to the site for construction. There is also a 35' fluctuation in river flow heights between normal ebb flows and a 25-year storm event that introduces commercial and environmental risks for working on and proximate to the river. These considerable site constraints are set within the I-495 corridor, an area in which traffic congestion of monumental proportions precludes reliable travel during daytime hours and affords only limited durations during late night and early morning hours to use limited space on the existing bridge as a construction work zone.

00198356

## DEVELOPMENT OF THE AMERICAN LEGION BRIDGE STRIKE TEAM

In 2020, MDOT SHA and its P3 Team completed and released the Draft Environmental Impact Statement (DEIS), which outlined impacts and assumptions for the entirety of the MLS. In response to comments from the NPS, regulatory agencies and the public on the DEIS, as well as the inherent complexities of the site, MDOT SHA recognized that an outside group of national and local experts may provide valuable insight with a fresh perspective. MDOT SHA intended that the group, comprised of FHWA, MDOT SHA and consultant members, could potentially benefit the MLS by investigating alternative bridge design and construction techniques to reduce, minimize and avoid impacts within the constrained project site. To that end, the P3 Team convened an expert panel, the ALB Strike Team[2] (ALB-ST), charged with the mission

> to develop and evaluate alternatives for the replacement of the American Legion Bridge (ALB) to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the C&O Canal National Historic Park and George Washington Memorial Parkway (GWMP) units of the National Park Service (NPS).

On January 7, 2021, the ALB-ST began its investigation and worked over the following weeks to explore alternative design solutions, project phasing options, site access solutions, and the potential use of specialty construction techniques. The ALB-ST presented its findings to the NPS on February 8, 2021 as part of the P3 NEPA Team's MLS update.

### Review of the DEIS Alternatives

The ALB-ST initially focused its effort on the DEIS alternatives that included a suspension bridge, a tunnel, a double deck bridge, and an alignment that departed significantly from the existing corridor. Of the first three alternatives, the ALB-ST agreed with the DEIS findings that these options were impractical. The fourth alternative of an alignment that significantly departed from the existing bridge location was not reviewed as it was deemed outside the scope of the ALB-ST.

### Review of the LOD

The P3 Team provided the ALB-ST with a history of the LOD. Refer to APPENDIX 2 to see the DEIS LOD in blue, the LOD reduction in yellow that was presented to with the NPS at a meeting on December 8, 2020, and the February 2021 LOD reduction in red that was independently recommended by the P3 Team and the ALB-ST as a result of site access studies. For this report, the "Base LOD" is defined as the DEIS LOD, including the reduction from the December 8, 2020 discussion (herein referred to as the "December Discussion") with the NPS and the reduction from February 2021 from site access. The P3 Team established the Base LOD so that it would reasonably accommodate a "Base Option", which is defined as a conventional replacement structure that could be constructed in two (2) phases on the existing bridge centerline with the assumption of access via trestles and causeways.

One operational consequence of the change between the DEIS LOD and the Base LOD is that the DEIS LOD accommodates continuous, north-south trestles running on both sides of the bridge. The December Discussion with the NPS that reduced the LOD to minimize impact to Plummer's Island precludes a

---

[2] ALB Strike Team expert panel members are included in APPENDIX 1.

00198357

continuous north-south trestle on the east side of the bridge. While not fatal, it would be advantageous to accommodate a continuous trestle on both the west and east sides of the existing bridge. With the December Discussion, a builder could only construct a discontinuous trestle on the east side. For this reason, the ALB-ST also considered a westerly shift of the new bridge centerline, so that impacts to Plummer's Island could be avoided while also affording builders the options of a continuous north-south trestle on both the west and east sides. Note that the shift would also impact the proposed replacement bridges at the Clara Barton Parkway interchange; however, this interchange was not studied as part of the Strike Team's study. The assumed construction sequence for the Base Option is still viable with the December Discussion LOD reduction, although it would likely add a few months to the schedule and perhaps another $5-15M to the project cost due to reduced efficiency as compared with the DEIS LOD.

00198358

## REVIEW OF BASE AND OTHER OPTIONS

The ALB-ST first affirmed the viability of the Base Option, and then explored other strategies for potentially further reducing the LOD. These strategies included top-down construction, alternate phasing of the Base Option, and alternate bridge types, while also considering access requirements for all options. See APPENDIX 4 for an overview comparison of the bridge type options, which include 1) conventional structure, 2) cable stayed, 3) cast-in-place segmental, 4) and a conventional structure that utilized Accelerated Bridge Construction (ABC) techniques and is slid into place. Variations of these options for alignment and phasing to further insulate Plummer's Island from impacts were also considered.

While construction cost and duration were not governing criteria, these aspects were included for each of the options in relative terms. On February 8, 2021, the ALB-ST presented its findings to the NPS as part of the MLS update presentation that included discussions of the Baltimore/Washington Parkway and George Washington Parkway in addition to the ALB. The following summarizes the options presented at this meeting.

### Base Option[3]

The Base Option assumes that conventional construction techniques will be employed to construct the new ALB with the same centerline as the existing ALB, while maintaining the reduced LOD to minimize impacts at Plummer's Island by eliminating a complete north-south trestle on the east side of the bridge. The construction sequence for Phase 1 of the Base Option assumes construction of the outboard halves of the NB and SB bridges while traffic is maintained on the existing bridge with minimal impact. Upon completion of the outboard halves of the NB and SB bridges, the current five (5) lanes of traffic in each direction would then divert onto the newly constructed elements, temporarily in 11' wide lanes. With traffic removed from the existing bridge, Phase 2 provides for demolition of the existing bridge superstructures, construction of the new inboard NB and SB bridge elements, and final configuration of traffic into the ultimate local and express lane system.

Of note for the Base Option construction sequence is that the proposed piers can be offset from the existing piers such that the proposed piers could be constructed in their entirety prior to the superstructure construction. This is described more fully under the "Pier Construction" section which follows.

The Base Option features a common bridge type that many local contractors could construct, therefore competition and cost would be favorable. Other benefits include retention of a centerline alignment, the opportunity to advance the complete substructure for the ultimate structure in Phase I, the possibility of using a portion of the existing bridge deck to construct most of the inboard superstructures, and a two-phase solution. Disadvantages include the need to mobilize equipment on both sides of the existing bridge during Phase 1, the slightly increased inefficiency of a discontinuous trestle on the east side of the ALB, and the difficulty in demolishing the existing bridge and constructing the inboard structures in between two structures that would be carrying live traffic.

---

[3] See APPENDIX 5

00198359

JA2999

The Base Option envisions that a contractor would construct the bridge using traditional methods and components. This would entail drilled shaft or spread footing foundations founded on rock, cast-in-place concrete piers, fabricated high-strength steel plate girders, and a cast-in-place concrete bridge deck. River access for construction cranes, excavators and haul trucks would be accomplished with rock causeways and steel-framed, timber-decked trestles typically supported on steel pipe columns that would be founded on spread footings or socketed into rock. Material storage on this limited site would be provided by one or more floating barges, assembled from interlocked, floating components that are delivered by truck[4]. The barges would be maneuvered with winches, with winch cables connected to mooring piles at the edges of the river. The ALB-ST agrees that these assumptions are representative of typical construction techniques used for bridge replacement projects on non-navigable waterways.

After reviewing and agreeing that causeways and trestles could be used as well as material storage on barges, the ALB-ST then sought to affirm the viability of the critical construction operations of foundation and pier construction, setting girders, demolition of the existing structure, deck placement, and LOD considerations for the Base Option. Note that the ALB-ST approached these reviews with the understanding that they would be applicable to other bridge construction options as well.

*Foundation Construction*
Soil borings from the existing bridge and the existing foundation design indicates that hard, competent rock is shallow at this site. It suggests that driven piles are not appropriate. As foundation elements that are subject to river scour, some method of anchoring foundations into rock is required. This suggests that either spread footings anchored into rock in flood zones or drilled shafts are the preferred foundation types. The equipment needed for either of these solutions can be mobilized and used without heroic measures. One consideration that must be made for the specialized equipment that installs casings for large diameter, drilled shafts[5] is a stable platform that is designed to resist the tremendous torque that these machines generate. A circular coffer dam filled with sand is a typical drilled shaft platform for water foundations, and this could be constructed at this site if large diameter drilled shaft foundations are selected.

*Pier Construction*
New piers could be constructed with cast-in-place (CIP) concrete within formwork or with precast hollow concrete elements that would be filled with concrete upon assembly in place. Aerial access to construct all the new piers would be "in the clear" during Phase 1 construction of the outboard portions of the NB and SB bridges. It is also possible for the contractor to progress with the new foundations and piers beneath the existing bridge with traffic on it.[6] While not unprecedented, this advanced foundation and pier construction would constrain equipment selection for those proposed piers which are located under the existing structure due to reduced vertical clearances. Specifically, this would narrow the possible equipment choices for drilled shafts and preclude full use of cranes for setting pier formwork and placing pier concrete. Low-headroom drill rigs with smaller diameter capabilities, use of the existing bridge girders for rigging reinforcing steel, jack-up forms, and concrete pumping via hoses would enable this work. Another disadvantage of this approach is that the new piers must be protected from damage during

---

[4] The trade name for this system is "Flexifloat". See: https://www.flexifloat.com/
[5] "Oscillators" and "Rotators"
[6] The slide-in options are unique in that advance construction of all of the proposed piers, prior to the removal of the existing bridge superstructure, is essential.

00198360

demolition of the existing bridge. Pier construction is viable for the Base Option in either Phase 1 or Phase 2.

### Setting Girders

Under this Base Option, setting girders is one of the more challenging activities.  The ALB-ST considered how this could be done within the proposed Base LOD to validate the assumed impact area.

For Phase 1, cranes working at the river level could execute a two-crane pick from delivery trucks spotted on the shoulders of the existing bridges. This would be done during late evening and early morning single or dual lane closures. This method works well for the new structure's girder lines closest to the existing roadway. As more girders are set, however, the crane reach becomes problematic.  One option would be to cast a portion of the new deck from abutment to abutment and then use the new deck to stage cranes for setting the remaining girders.  While viable, this approach would essentially add another phase to the duration of construction.  A more likely scenario is for the contractor to use a rolling system in which all the girders are picked and set on the edge closest to the existing bridge. With a pair of girder lines bolted together with cross frames, the girder set can be slid on rollers[7] to the designated location, jacked up to remove the rollers and then set down onto their permanent position. This sequence would continue until all girders in Phase 1 have been set, connecting adjacent girder lines with cross frames as they are rolled into place.

For Phase 2, picking girders off the existing structures with cranes spotted below is problematic because the crane angles will be acute. As with the Phase 1 solution, rollers could be used. Alternatively, the Phase 2 superstructure could be constructed linearly from each abutment.  Lastly, the contractor could elect to preserve part of the existing superstructure deck as a work platform to build a portion of the new inside bridges.  This last approach would introduce two demolition phases, but it would greatly facilitate access and enable much more work from the top and out of traffic. Regardless of the option chosen, there is no fatal flaw to the viability of the Base Option for setting girders.

### Demolition

Under Phase 2, the existing bridge would be demolished while traffic is traveling on either side on the new bridges that were constructed in Phase 1. Access from the top is convenient to employ standard methods such as diamond saw cutting, slab lifters and hoe rams, and to truck out the debris.  Similarly, steel girder sections could be picked from the top and hauled out at street level. The most difficult aspect would be removing the old piers.  The P3 Team contemplated diamond wire sawing the piers into blocks that are light enough to haul out of the steep project grades from below.  The ALB-ST agrees that this is viable approach as well as a best practice to minimize particle debris given the environmental sensitive.  Lastly, the existing piers could be demolished following the completion of the proposed bridge construction. This would accelerate the opening of the Express lanes but would add cost and time to the construction contract because of the inefficiency caused by poorer access and reduced vertical clearances. It is assumed that the old bridge foundations could remain in place one foot below grade, in accordance with MDOT SHA requirements.  While it is possible to substantially remove them to a greater depth below grade, the impacts and costs would be significant.

---

[7] The trade name is "Hilman Rollers". See: https://hilmanrollers.com/

00198361

*Deck Placement*

In Phase 1, deck forms and reinforcing steel can be staged from below, from barges. Deck concrete could be pumped from the existing bridge deck or from below, depending on the duration of the placement. Phase 2 deck construction would progress similarly to Phase 1. Night-time work-zone setups for concrete deck placements are an option as is using a linear progression, with each newly constructed deck serving as the staging area for the next span.

*Base Option Finding*

The Base Option and the Base LOD are viable. In the sections that follow for Base Option in Four Phases, the Cable Stayed Option, the Cast-in-Place Segmental[8] Option, and the Slide in Options, only the elements and work processes that deviate from the Base Option are noted. In other words, if foundation construction, pier construction, setting girders, demolition and deck placement are identical to those of an option described previously in the report, the reader will be referred to the appropriate option description. See the section on "Access" for a discussion on the imperative for a high-quality access road, which is needed for all options.

<u>Top Down Construction</u>

*Use of Existing Bridge*

While confirming that the Base Option is viable, the ALB-ST investigated the possibility of using the existing bridge as a work platform for constructing the new bridge as part of a "top down" construction method. This method is a typical approach for creating a work zone on bridges without shoulders, like the ALB, so that the median barrier is removed, and traffic is squeezed into lanes that are narrower than the standard 12' width. The ALB is unusual in that its northbound (NB) and southbound (SB) lanes are at different elevations for approximately one third of the length of the bridge, starting from its southern end. In fact, this difference in grade is approximately 8' at the Virginia abutment, as can be seen in Figure 3, making it impossible to use the existing bridge for top down construction because traffic cannot be shifted across the median for its entire length.

---

[8] The slide-in options are unique in that advance construction of all the proposed piers, prior to the removal of the existing bridge superstructure, is essential.

00198362



*Figure 3: Grade difference at the southern end of the existing American Legion Bridge (looking north from the Virginia approach in the NB lanes) (Image from Google Street View, January 2021)*

The extreme difference in grades between the two traffic directions also prohibits any scheme to use the existing bridge as a continuous work zone. This means that use of the existing bridge for construction and material deliveries is constrained to limited hours when traffic volumes are lighter, when a temporary lane closure can be implemented. This notional work window could be a 6-hour period (e.g., 10:30 PM to 4:30 AM) that must include the time to place and remove the lane closure during each shift.[9] The combination of space and time constraints precludes the use of the existing bridge for "top down" construction. Accordingly, the ALB-ST shifted its focus to other top down methods that include construction methods using a gantry, pre-cast segmental, and cast-in-place segmental, and the cable stayed bridge type.

Two extant examples of the "top down" construction method are the Washington, NC bypass and the Linn Cove Viaduct along the Blue Ridge Parkway, which feature gantry and pre-cast segmental methods, respectively.

### Gantry – Washington, NC Bypass, Custom Linear Gantry
The Washington, NC bypass traverses shallow waterways and wetlands for most of its length. Environmental concerns for ground and wetland disturbance drove the builder to a novel, "top down" solution, the heart of which was a custom fabricated gantry (see Figure 4). The gantry travelled linearly and extended ahead of the previously constructed bridge elements to drive piles, set precast pile caps, and set bridge girders so that trailing crews could cast the concrete CIP bridge decks, all while minimizing impacts to the environmental resources below.

---

[9] These closures could be one (1) lane or two (2) lanes, depending on the working space needed. Also, "Zip Barrier" could be accommodated against the existing parapets for this purpose, in concert with moderate lane width reductions and restriping on the existing NB and SB bridges.

00198363



*Figure 4: Top Down Construction - Washington, NC Bypass. (Photo courtesy of Flatiron Construction)*

This method was ideally suited to the Washington, NC site conditions for which precast concrete piles were the ideal foundation elements and the low-clearance, long bridge with short spans afforded a short vertical reach for the gantry, the cost of which was offset due to the economies of scale for such an expensive device. In contrast, the ALB site has shallow rock, a significant vertical height, is relatively short in length, and has extremely limited room on the approaches to accommodate a gantry. ALB foundations will be either spread footings on rock or drilled piers, both of which require ground access to the foundation locations for construction. Based on these factors, the ALB-ST determined that the gantry method for top down construction is not viable.

### Pre-Cast Concrete Segmental – Linn Cove Viaduct
The Linn Cove Viaduct is a crowning achievement for its light environmental footprint and context-sensitive appearance. Sinuously winding along mountain vistas, the roadway looks a part of the landscape (Figure 5).



*Figure 5: Linn Cove Viaduct[10]*

At the time construction began in 1983, the precast concrete segmental method was novel in this country. Bridge elements ("segments") were fabricated off site and trucked to the project, lifted into place, and then connected with high strength steel cables that were tensioned to lock each new segment to the previous one. *Figure 6* shows the project under construction, with a bridge mounted stiff leg derrick lifting a segment for placement. The project description on the NPS website offers the following description about the top down method:

> *The viaduct was constructed from the top down to minimize disturbance to the natural environment. This method eliminated the need for a "pioneer road" and heavy equipment on the ground. The only construction that occurred at ground level was the drilling of foundations for the seven permanent piers, on which the Viaduct rests. Exposed rock was covered to prevent staining from concrete, epoxy, or grout. Tinted with iron oxide, the concrete blends in with the existing rock outcroppings. The only trees cut were those directly beneath the superstructure.[11]*

As with the gantry method, it is important to compare the ALB site conditions with other sites that have successfully used the pre-cast concrete segmental method. The Linn Cove Viaduct was constructed entirely on land with enough industrial land proximate to the site to cast and store bridge segments. There

---

[10] *https://www.nps.gov/blri/learn/historyculture/linn-cove-viaduct.htm*
[11] *https://www.nps.gov/blri/learn/historyculture/linn-cove-viaduct.htm*

00198365

was a reliable-travel-time transport route to deliver segments, and the new structure was small (2-lane) so that it enabled reasonably sized transport and lifting equipment to handle the segments.



*Figure 6: Linn Cove Viaduct - Precast Segmental Construction Method*

In contrast to the Linn Cove Viaduct, the ALB includes a river crossing, necessitating trestle and causeway construction to access the foundations. (See also in this report the discussion on construction access). This means that even light-footprint foundation drilling equipment, as was used on the Linn Cove Viaduct, would need trestles and causeways for access. In addition, the new ALB NB bridge is more than 140' wide and the SB bridge is approximately 125' wide; each bridge carries eight (8) lanes of traffic with full shoulders and a shared use path on the NB bridge. Even if designed in narrower elements, precast

American Legion Bridge Strike Team Report                                                                Page 16

segments for the new ALB would be simply too large and too heavy to transport to the site. While the ALB-ST concluded that a precast segmental solution is not viable for the ALB based on site-specific considerations, it did explore the site appropriate option of a Cast-in-Place Segmental bridge that is discussed later in this report.

### Findings for the Use of Top Down Construction Methods using the Existing Bridge, Gantries and Precast Segmental

In consideration of these three proven, top down methods, the ALB-ST concluded that none are applicable to the ALB project site. In addition, the ALB-ST concluded that it is not feasible to construct the new ALB structure without accessing the Potomac River over land and without a LOD that extends both eastward and westward from the existing bridge. In exploring other top down methods, the ALB-ST considered and included the Cable Stayed Option and the Cast-in-Place Segmental Option, which are addressed under their respective and following sections in this report.

### Base Option in 4 Phases

The Base Option assumes two (2) phases of construction and requires that trestles are constructed parallel to and east of the existing bridge, with a discontinuity to avoid Plummer's Island. The ALB-ST investigated an approach that would reduce the LOD even more by eliminating all trestles on the east side. This can be accomplished by adding two (2) more phases to the construction sequence, as illustrated in APPENDIX 6.

The design elements and construction techniques described for the Base Option in two (2) phases are completely applicable to the Base Option in four (4) phases. The primary difference is the work sequence, specifically of the NB structure construction and the demolition of the existing bridge. The Base Option in four (4) phases starts Phase 1 with the construction of the SB general purpose lane (outboard) structure only. Existing SB traffic is then shifted to the new SB outboard structure and existing NB traffic is shifted to the existing bridge SB lanes. In Phase 2, the existing NB bridge is used as a work platform to construct the new NB general purpose lane (outboard) structure[12]. During Phase 3, the newly constructed NB outboard structure is used as a work platform to demolish the existing NB lanes and construct the new NB express lane (inboard) structure. NB traffic is then shifted onto the NB outboard bridge. For Phase 4, the newly constructed NB inboard bridge is used as a work platform to demolish the existing SB bridge and construct the new SB express lane (inboard) bridge. The fully completed structure is then opened to express lane and general-purpose traffic.

### Foundation Construction
Foundation construction is identical to that described in the Base Option.

### Pier Construction
Pier construction is identical to that described in the Base Option.

### Girder Setting and Deck Placement
The Base Option in Four Phases provides greater opportunity to use the existing and new structures to set girders and construct decks from the top.

---

[12] This allows for foundation concrete placement, pier construction, girder setting and deck construction to progress from the top. The technique is repeated in later phases as well.

American Legion Bridge Strike Team Report            Page 17

00198367

*Demolition*

The Base Option in Four Phases requires more phases for demolition, which increases cost and time as compared with the Base Option.

*LOD*

This option offers the smallest LOD of all options considered, including the Base Option, by eliminating the use of trestles on the east side of the existing bridge. As with the Base Option, this option would create shadow effects on Plummer's Island. Significant construction access impacts on Plummer's Island, however, are avoided.

*Base Option Four Phases Finding*

This four-phase approach is viable, and it further reduces the LOD relative to the Base Option. This approach also retains a centerline alignment, simplifies material delivery, eases access, provides for additional material storage and affords more working days by virtue of working from the top at concrete surfaces versus in the river gorge, which is subject to flooding. The disadvantages are that there are lost efficiencies resulting from multiple demolition stages, extended construction time for two (2) additional phases, and significantly higher costs for additional changes to the approach roadways to accommodate traffic shifts. Refer to APPENDIX 4 for a comparison of the relative cost, schedule, aesthetics and LOD impacts.

<u>Cable Stayed Option</u>

Cable stayed bridges are typically constructed using a top down cantilever method, working outward from pier towers, and placing one (1) cable and section of deck in each direction at a time. See APPENDIX 7 for a graphical description of this option.

The primary advantage of the cable stayed bridge type is that it requires the fewest number of foundations of all options considered, so that the permanent ground displacement area is minimized. In addition, the bridge superstructure is constructed from the top, minimizing impacts to the vegetation below. The final structure's long spans provide reduced shade and shadow areas beneath the bridge compared to other options with more piers, increasing the likelihood of sustained vegetation growth following construction. Furthermore, each bridge tower that would rise 200' above the roadway surface would progress with a dedicated tower crane, providing a minimal footprint at the tower locations during construction. The cable stayed concept succeeds in avoiding Plummer's Island in its entirety; in addition, the impacts to residences on the Virginia shore are minimized by using a westerly alignment shift combined with a slight, easterly skew at the south abutment. The proposed bridges at the Clara Barton Parkway, as well as the ramp modifications, will be affected by a westerly shift. While reviewed for feasibility, the impacts at Clara Barton Parkway were not studied as part of the ALB-ST efforts.

One unique disadvantage is that the cable stayed bridge's vertical profile pushes roadway water runoff from the bridge toward the Clara Barton Parkway on the Maryland approach. Discussions with NPS raised a goal of preventing the new bridge water shed from adding volume to discharge in Maryland to NPS properties. In contrast, the existing bridge has a concave vertical curve that creates a low point, a "sump", for drainage that is relieved from the bridge deck through deck scuppers; this method of runoff management is not readily achievable with a cable stayed bridge so that more costly water conveyance and retention features would be needed in Maryland.

00198368

JA3008

### Foundation Construction

Cable stayed bridges are designed with towers, rather than piers, for their long spans. The towers for a cable stayed bridge at the ALB site could be located on the Maryland shore, allowing the main spans to stretch from the Maryland end of the bridge to the Virginia shoreline to connect with conventional approach spans. The tower foundations would likely be constructed with multiple drilled shafts, each on the order of 10' in diameter. Shafts of this size are not unusual and are commonly used to carry the extreme foundation loads of long-span structures. The additional foundations for the approach spans on the Virginia side of the bridge would likely require two (2) additional piers and would be constructed similar to the Base Option foundations.

### Tower (Pier) Construction

Tower configurations for cable stayed bridges can serve as a potential canvas for aesthetic treatment with a cost premium in formwork and finishes. Understanding that the cable-stayed bridge option at this location is inherently the costliest, however, the ALB-ST considered vertical, straddling towers having a rectangular cross section, which is the simplest form commonly used for the towers. A pair of tower cranes would be sufficient to handle concrete forms, rebar, and concrete placement for all five (5) of the proposed towers required across the width of the bridge. These tower cranes typically share the foundations for the permanent bridge towers, so that the permanent area needed for foundations is minimized. Construction of the piers for the conventional spans on the VA shore would be identical to the methods described for the Base Option.

In addition, the towers, which would measure approximately 11' to 17' wide, must be located outside of the roadway, so that tower widths between the NB and SB express lanes and general-purpose lanes, plus the tower width between the NB and SB bridges, cumulatively adds more than 50' in total structure width as compared with the other bridge type options. See APPENDIX 7 for the typical section, including the proposed tower locations.

### Setting Girders

Cable stayed bridge superstructures differ from the conventional bridge type described in the Base Option as cable stayed superstructures typically rely on steel frames with edge girders and floor beams that are intended for prefabrication as transportable units. One of the disadvantages of this location is that it precludes the use of massive, prefabricated deck sections as are used on sites having navigable waterways and marine access to fabricators. This means that the deck superstructure built at the Potomac River gorge site would be inefficiently "stick built" using components small and light enough for delivery by truck. The two (2) tower cranes would be supported from the ground with rough terrain cranes; some cranes will be equipped with long jibs and some with luffing booms for aerial connecting of steel framing. The tower cranes would handle the installation of stay cables, which progress with the cantilevered extension of each deck section.

### Deck Construction

Deck placement is identical to that described in the Base Option

### Demolition

The demolition of the existing bridge is identical to that described in the Base Option.

00198369

JA3009

*LOD*

The westerly centerline shift reduces the LOD on the east side relative to the Base Option so that impacts to Plummer's Island can be avoided during bridge construction. The westerly shift, combined with the greater overall cable stayed bridge width attributable to the towers, results in a larger LOD on the west side of the bridge compared to the Base Option. The shift also requires additional LOD at the Clara Barton Parkway. See APPENDIX 7.

*Cable Stayed Bridge Option Finding*

Cable stayed bridges are simply more expensive and take longer to construct than other options. In addition, not everyone may find this iconic structure appropriate for its park setting within the historic Potomac River gorge. The ALB-ST studied a cable stayed bridge with a westerly shift because a cable stayed bridge on centerline would have a greater LOD than either the conventional or segmental solutions. Regardless of its alignment, a cable stayed bridge would be the most expensive of all the bridge types considered. For the reasons described above (e.g. overall cost, construction concerns, drainage and LOD), the cable stayed bridge type is a technically viable bridge type, but not preferred for this site. Refer to APPENDIX 4 for a comparison of the relative cost, schedule, aesthetics and LOD impacts.

<u>Segmental Bridge Option</u>

The ALB-ST considered precast segmental and CIP segmental bridge types, both of which are "top down" methods. Precast segmental methods, as discussed in the Linn Cove Viaduct example, offer the advantages of improved quality by implementing a manufacturing process in controlled conditions, dramatically reducing the size of on-site staging areas, uniquely providing the "girder" and "deck" in one combined element, and the ability to complete the project faster. Local examples of precast segmental construction include the V-Piers for the new Woodrow Wilson Bridge and multiple structures for the Washington Metropolitan Area Transit Authority's Silver Line. Unfortunately, the width of the new ALB would require precast segments that are simply too heavy to transport over public roadways. Therefore, the discussion herein assumes cast in-place segmental bridge construction.

*Foundation Construction*

Because of the longer spans relative to the Base Option, this bridge type requires higher capacity foundations. The capacity could be achieved with a cluster of drilled shafts in the range of 4' to 6' in diameter, captured with a common concrete cap. As with the Base Option, scour would be a controlling design criterion for foundations in the flood zone.

*Pier Construction*

The solutions described in the Base Option are applicable. There is a slightly higher likelihood that precast concrete would be used for the piers (with cast in place infill) because post-tensioning hardware and equipment will already be on site for the bridge segments. As with the Cable Stayed Option, the Segmental Option relies on tower cranes for construction so that need for track equipment in the river gorge is less than on other options.

*Demolition*

Demolition of the existing structure is almost identical to that described in the Base Option.

00198370

*Construction*

Cast-in-place segmental methods achieve the speed, reduced staging area and girder-deck combination advantages of precast segmental methods, but without the transportation limitation that is fatal for this site. With the cast-in-place segmental method, segment forms are symmetrically set at each pier and are advanced as each segment is cast and cured, ultimately joining at mid-span with a "closure pour"[13]. Without the need to set long and heavy girders, the rigging complications associated with girders[14] are avoided with cast-in-place segmental construction. In addition, segmental structures are typically used to achieve longer spans than conventional plate girder structures, so that the concept ALB Cast-in-Place Segmental Bridge structure would have fewer than half the number of piers as the Base Option (three (3) versus seven (7)), providing a significant reduction in the area occupied by bridge foundations, reductions in shadow and shade, and reduced scour risk and construction risk as the foundations are further away from the Potomac River flows. Finally, this method results in a structure type that has been preferred for NPS sites, is suitable for use in either a two-phase or a four-phase option with a sequence and LOD reduction identical to the Base Option and Base Option in 4 Phases, respectively, and is no wider than the Base Option.

There are a few disadvantages of the Segmental Option for the ALB site related to the construction of the bridge. Fewer contractors and craftsmen have the experience in building this more technical bridge type. The specialized formwork needed for cast-in-place segmental construction is best employed on long structures on which there is an economy of scale, and this project is borderline from that perspective, resulting in the potential for unit costs to be somewhat higher than a conventional bridge type.

*LOD*

The LOD required for the Cast-in-Place Segmental Bridge Option is less than the Cable Stayed Bridge LOD on the west side of the bridge. On the east side, the impacts are reduced similarly to the Cable Stayed Bridge Option when compared to the Base Option, effectively avoiding Plummer's Island with the bridge construction.

*Segmental Option Findings*

With all factors considered, the ALB-ST believes that the Segmental Option is technically viable and potentially price-competitive with the Base Option. A segmental bridge is likely faster to construct, but not necessarily less expensive, owing to the relative rarity of the bridge type in this area (fewer contractors and craftsmen with the expertise) and the cost of the specialized equipment to build it. If constructed on centerline in two (2) phases using the Base Option sequence, it will fit within the Base LOD with impacts equivalent to the Base Option. Refer to APPENDIX 4 for a comparison of the relative cost, schedule, aesthetics and LOD impacts.

<u>Slide-in Options</u>

As part of the Federal Highway Administration's (FHWA) "Every Day Counts" initiative, FHWA has actively been encouraging and leading efforts to reduce the duration of transportation construction and maintenance projects. One of the outcomes is the concept of Accelerated Bridge Construction (ABC), which generally entails constructing significant bridge elements without disrupting traffic and then

---

[13] This is known as the "Balanced cantilever method".

[14] See "Setting Girders" under the Base Option section of this report

00198371

delivering and placing those elements in a significantly shorter period than would be required for in-place construction. ABC merits include minimal traffic disruption, enhanced safety, and enhanced quality. The "slide-in" method is an ABC technique that entails building falsework on both sides of an existing bridge. On one set of falsework an entire replacement superstructure is constructed. The other set of falsework receives the existing bridge superstructure as the new superstructure is slid onto the former alignment of the existing bridge. The projects for which this method is most advantageous are those for which conventional phasing would either create prolonged traffic delays via lane closures or would cause a lengthy detour during a complete bridge closure.

The ALB-ST considered five (5) iterations for a slide-in scheme (See APPENDIX 9) and selected Slide-in Option 3 and Slide-in Option 4 for investigation, as discussed here within.

<u>Slide-in Option 3</u>

This method envisions construction of the entire new superstructure on falsework situated west of the existing bridge. The clear advantage of this method is that it would enable opening of the new structure to traffic in the least amount of time. This is accomplished by removing bridge demolition from the critical path of construction. In addition, the new bridge type for this option would be a conventional bridge as assumed for the Base Option, plus the new structures would maintain the existing bridge centerline. The inherent advantages of ABC for quality and safety would also apply.

The major disadvantages of Slide-in Option 3 are that the footprint for the falsework is significantly larger than the Base LOD and would include impacts to Plummer's Island, the slide event would require tremendous levels of coordination and a full weekend closure of I-495 in both directions, and the loss of toll revenue due to limited traffic on the beltway during a required closure of the beltway. In addition, the new piers must be constructed beneath the existing bridge under traffic, and the existing piers must be demolished with the new structure overhead. Lastly, the demolition of the existing bridge will be less efficient than with all other options because access to remove rubble is from the river gorge rather than from the roadway surface.

*Foundation Construction*
The foundation types for a slide-in bridge will be as described in the Base Option; however, since it is mandatory to construct new foundations and piers beneath the existing bridge with traffic on it, the equipment restrictions and access constraints described in the Base Option would apply. In addition, an extensive falsework system would be required on both the east side (to receive the existing superstructure during slide out) and the west side (to stage the new superstructure before and during slide in) of the existing bridge. This falsework system would be similar to the materials and methods used for the trestles, however, there would be significantly more bracing to support the construction. The falsework, and especially the temporary bracing transverse to the river flow, would be at higher risk from debris flow damage during flood events than would the trestles: the top of falsework elevation would need to match the existing bridge bearing elevations whereas the top of trestle elevations would be considerably lower.

*Pier Construction*
Pier construction is almost identical to that described in the Base Option, but the construction must occur, in part, beneath the existing bridge prior to any demolition work while traffic remains on the existing bridge.

American Legion Bridge Strike Team Report                                    Page 22

00198372

*Setting Girders*

Girder setting will be identical to that described in the Base Option, except that the constraint of an acute crane angle during the Base Option Phase 2 is eliminated. The girders are erected on the falsework outside of the footprint of the existing bridge.

*Deck placement*

Deck placement is identical to that described in the Base Option. The deck, including parapets, is formed, cast, and hardened prior to the sliding of the new bridge.

*Demolition*

Demolition is more challenging with this option because the existing bridge superstructure will be situated to the east of its existing location and this is inconvenient for access and debris removal. Using trestles beneath the bridge that has been slid into place, the existing bridge will be demolished mostly from below, and the debris will be trucked out from below the new bridge. Temporary lane closures may be available on the outside of the proposed northbound bridge deck, but only in relatively limited windows due to heavy traffic volumes and lane closure restrictions. Refer to the discussion on access for additional information regarding the construction access road.

*LOD*

Slide-In Option 3 has the greatest LOD impact of all options considered.

*Slide-In Option 3 Findings*

This option is technically feasible and is the fastest method to open the new structure to traffic. The falsework required for its execution, however, creates an LOD impact that is considerably greater than all other options studied. For this reason, Slide-In Option 3 is no longer considered and the LOD impacts for this option are not included in the impact summary provided in APPENDIX 3. Refer to APPENDIX 4 for a comparison of the relative cost, schedule, aesthetics and LOD impacts.

Slide-in Option 4

As with Slide-in Option 3, Slide-in Option 4 envisions construction of the entire new superstructure on falsework and use of a conventional bridge as assumed for the Base Option. The difference is that the west side falsework would be large enough only to accommodate half of the new superstructure, and the slide in would progress in two (2) phases rather than a single slide event. The first phase would entail sliding out the existing bridge eastward and sliding the completed NB general purpose and express lane superstructure into the location of the existing bridge. Temporarily, the new structure would service both NB and SB traffic. After this first slide-in, the SB general purpose and express lane superstructure would be constructed on the same falsework used for the NB structure. Concurrently, the existing bridge would be demolished. Lastly, the new NB and SB structures would be slid eastward to their final alignment so that they retain the former bridge centerline.

Similar to Slide-in Option 3, Slide-in Option 4 would enable opening of the new structure to traffic in a minimal amount of time, again by removing bridge demolition from the critical path. However, Slide-in Option 4 does require additional time compared to Slide-in Option 3 due to the demolition being on the critical path for the final bridge configuration. The inherent advantages of ABC for quality and safety would also apply. Lastly, this option significantly reduces the environmental impacts on the west side of the existing bridge that are associated with Slide-in Option 3; the falsework required to support the

00198373

JA3013

existing bridge adjacent to only the proposed NB structure centered on I-495 is less than that required to support the existing bridge adjacent to the final location of the NB structure.

The major disadvantages of Slide-in Option 4 are that the footprint for the falsework would include impacts to Plummer's Island, the two (2) separate slide-in events would require tremendous levels of coordination and two (2) full weekend closures of I-495 in both directions. Also, the roadway approaches would need to be reconstructed during the 2nd slide in event, the new piers must be constructed beneath the existing bridge while under traffic, and the existing piers must be demolished with the new structure overhead.  Lastly, the demolition of the existing bridge will be less efficient than with all other options because access to remove rubble is from the river gorge rather than from the roadway surface, same as discussed in Slide-in Option 3.

A variation of Option 4 would be to incorporate a westerly shift as was considered for the Cable Stayed and Cast-in-Place Segmental options. This variation would eliminate the 2nd slide in, allow for permanent substructure construction instead of falsework to the west of the existing bridge, and would also eliminate the schedule concern of completing approach roadway reconstruction during a weekend closure since traffic could be maintained on proposed roadway outside of the existing roadway in a temporary condition after the bridge construction is complete. Due to significant impacts to private residences at the southwest quadrant, however, a westerly shift for this option was not pursued.

### Foundation Construction

The foundation types will be as described in the Base Option. As with the Slide-In Option 3, it is mandatory to construct new foundations and piers beneath the existing bridge with traffic on it.  The equipment restrictions and access constraints would apply. In addition, a significant falsework system would be required on both the east side (to receive the existing superstructure during slide out) and west side (to stage the new superstructures before and during the two slide ins) of the existing bridge.  This falsework system would be identical in type as that described for Slide-In Option 3.

### Pier Construction

Pier construction is almost identical to that described in the Base Option and in the Slide-in Option 3. Pier construction will occur in part beneath the existing structure while it is supporting traffic.  The final piers will be used to support the existing and proposed structures during slide events.

### Setting Girders

Girder setting will be identical to that described in Slide-in Option 3, except that the NB structure will be completed in one phase and the SB structure will be completed in a subsequent phase after the completion of the first slide event.

### Deck placement

Deck placement is almost identical to that described in Slide-in Option 3 except that it will be completed for the NB structure first and then for the SB structure in a subsequent phase.

### Demolition

Although similar to the demolition of Slide-in Option 3, demolition is more challenging with this option because the existing bridge superstructure will be situated to the east of its existing location and this is inconvenient for access and debris removal. In addition, the existing structure will be situated on part of

00198374

the proposed NB piers, which introduces a risk of damage to the newly constructed piers during superstructure demolition.

### LOD

This Slide-in Option 4 has a larger LOD impact area than Base Option, Base Option in Four (4) Phases, Cable Stayed Option and Cast-in-Place Segmental Option, and also impacts Plummer's Island, although to a lesser degree than Slide-in Option 3.

### Slide-in Option 4 Findings

This option is technically feasible and is the second fastest method to open the new structures to traffic, beat only by Slide-in Option 3. The falsework required for its execution, however, causes a significantly larger LOD impact area than the Base Option, Base Option in 4 Phases, Cable Stayed Option and Cast-in-Place Segmental Option. Refer to APPENDIX 4 for a comparison of the relative cost, schedule, aesthetics and LOD impacts.

00198375

JA3015

## DISCUSSION ON ACCESS

Concurrently and independently from the P3 Team's efforts, the ALB-ST explored access needs for bridge replacement. Because river access outside the project limits is untenable, leaving only land-based access options, the ALB-ST investigated the four (4) quadrants that straddle the existing bridge on the Maryland and Virginia shores. Of immediate note is that all four (4) of these quadrants feature grades exceeding 15%. Given the heavy and long loads that will characterize project deliveries, the ALB-ST recommends that a two (2) lane, 40' wide haul road be provided with a profile not exceeding 10% grade to prevent the low boy construction trailers from bottoming out on the access road profile. This drives the need to develop lesser grades by lengthening the haul road and by potentially introducing undesirable switch backs, which are problematic to navigate for longer vehicles.

The southwest (SW) quadrant on the Virginia shoreline, adjacent to Live Oak Drive, does not have the width to accommodate an appropriate haul road. In addition, this quadrant is constrained by a high-volume drainage outfall that has seriously incised and degraded the existing slope.

The southeast (SE) quadrant, also on the Virginia shoreline, is adjacent to the GWMP NPS land. While it has sufficient width for a haul road, it is characterized by massive rock outcrops that would require blasting. Furthermore, the slopes are significant enough that several switch backs would be required.

The northeast (NE) quadrant, on the east side of the ALB on the Maryland shore, is encumbered by poor connectivity with the existing roadway system. Additionally, within the area immediate to the bridge site are several environmentally sensitive features, including the Rock Run culvert, wetlands, and Plummer's Island. Moreover, this area does not have enough width to facilitate a haul road that meets a maximum of 10% grade.

The northwest (NW) quadrant on the Maryland shore is the only quadrant that has the potential for a 10% grade without heroic measures being needed. The haul road can be made possible by developing its length parallel to and south of the C&O Canal Tow Path. The access road can tie into the Clara Barton Parkway at an existing crossover, providing relatively direct access between the access road and I-495, both Northbound and Southbound.

### Access Findings

The NW quadrant alone has the potential to provide an appropriate, good quality, safe access road for construction. Having vetted this single high-quality access in the NW quadrant for all viable bridge alternatives, the ALB-ST affirms the February 2021 LOD reduction to eliminate the footprints for access in the SE and NE quadrants. A sample graphic of the access road at the NW quadrant, as proposed for the Cast-in-Place Segmental Bridge Option, is shown in Figure 7.

00198376

JA3016



*Figure 7: Northwest Quadrant Access Road*

00198377

## SUMMARY OF KEY FINDINGS

1) **The ALB-ST found three (3) options that fit within the Base LOD**. These include:
   a) the Base Option in two (2) phases,
   b) the Cast-in-Place Segmental Option on a centerline alignment, and
   c) the Base Option in four (4) phases.

2) **Zero ground impacts are not viable**. Even with "heroic measures" it is not possible to replace the existing bridge without
   a) access to the Potomac River and
   b) an LOD that extends both eastward and westward from the proposed structure.

3) **Trestles and causeways are required**. All options require temporary work trestles and causeways. As a minimum, these would be required at the following locations:
   a) running continuously north-south along the west side of the new bridge to cross the Potomac River (all options);
   b) running east-west to access the new and existing pier locations (all options). See also Finding number 6; and
   c) running discontinuously north-south along the east side of the new bridge (some options).

4) **Further reduction of Base LOD is possible**. It appears viable to reduce encroachment on Plummer's Island and further reduce the impacts on the east side of the existing bridge by either:
   a) **Shifting the new bridge centerline westward.** A western alignment shift affords both bridge construction cost and schedule benefits for all bridge types studied relative to a centerline alignment. A westerly alignment is more efficient to construct for any bridge type because of the way the construction equipment would be deployed and because it would afford easier maneuvering within the LOD for construction. The ALB-ST suggests that a centerline shift to the west would be worth about $40M in reduced bridge construction cost and would save approximately three (3)- to four (4)- months in bridge construction duration. The potential added expense for shifting the roadway approaches and adjacent Clara Barton Parkway interchange to accommodate a westerly shift, however, could quickly negate these cost and schedule benefits. In addition, the LOD impacts for the westerly alignment versus the centerline alignment are greater within the footprint of the bridge for all bridge types considered, and the LOD impacts likely would be greater still for the approaches.
   b) **Adopting the Base Option in four (4) phases to eliminate an east side trestle/causeway.** At the expense of a longer construction duration and greater construction cost relative to the Base Option in two (2) phases, it is feasible to further reduce the LOD required on the east side of the existing bridge by adding an additional two (2) phases of construction. This eliminates the use of a north-south trestle on the east side of the bridge. This four (4) phase option is viable for the Base Option bridge as well as the Cast-in-Place Segmental Bridge type.

5) **One northwest access road can serve all options**. All construction options require access along the west side of the existing bridge, spanning the Potomac River from the Maryland shore to the Virginia shore. This construction access road, which originates from the northwest quadrant, should be two (2) lanes with a total width of 40' and with a maximum profile grade of approximately 10%. Truck access to this construction access road is available from both NB and SB I-495.

6) **Aligning new piers near existing piers will reduce trestle/causeway footprint.** For all options except the Cable Stayed Bridge Option, it is advantageous to align new bridge piers sufficiently close to the

00198378

JA3018

existing piers so that east-west work trestles can access both new and existing foundations without offsets.

7) ***Retaining the existing substructure could reduce temporary impacts and costs.*** There are potential cost and environmental benefits available by retaining the existing bridge substructure.[15] This would require further study to determine the structural viability of reusing the existing piers and abutments with considerations for such items as newer design codes since the original substructure design was completed, the existing substructure condition (deterioration, etc.), scour vulnerability, and MDOT SHA's receptivity to a remediated structure that is already decades old to meet the 100 year design life requirements of the project.

---

[15] It is important to note, however, that this potential option does not avoid the access and LOD impacts listed in the Summary of Findings item #2.

American Legion Bridge Strike Team Report

Page 29

00198379