No. 24-1447

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

and

FRIENDS OF MOSES HALL, ET AL.,

*Plaintiffs,*

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

**APPELLANTS' OPENING BRIEF**

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Nanding Chen
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6165
nchen@nrdc.org

*Counsel for Appellants*
(*additional counsel listed on inside cover*)

October 7, 2024

Andrea C. Ferster
Attorney at Law
68 Beebe Pond Road
Canaan, NY 12029
(202) 669-6311
aferster@railstotrails.org

*Counsel for Appellant Maryland
Chapter of the Sierra Club*

Elizabeth S. Merritt
National Trust for Historic Preservation
600 14th Street NW, Suite 500
Washington, DC 20005
(202) 297-4133
emerritt@savingplaces.org

*Counsel for Appellant National Trust for
Historic Preservation in the United States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

GLOSSARY ............................................................................................... viii

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 4

STATEMENT OF ISSUES ........................................................................... 4

STATEMENT OF THE CASE ....................................................................... 6

I.   Statutory and regulatory background ................................................... 6

    A.   The National Environmental Policy Act ...................................... 6

    B.   Section 4(f) of the Department of Transportation Act ................. 7

II.  Factual background and procedural history ........................................ 8

    A.   The Agencies' proposed highway expansion
        would cause significant harm to public health
        and the environment .................................................................... 8

    B.   The Agencies refused to evaluate fine particulate
        matter pollution caused by expanding the highways ................. 11

    C.   The Agencies overlooked the project's air pollution
        harms to environmental justice communities ............................ 16

    D.   The Agencies rejected an alternative that would
        have avoided Plummers Island ................................................... 22

    E.   Procedural history ...................................................................... 25

SUMMARY OF ARGUMENT ..................................................................... 26

ARGUMENT ................................................................................................ 30

I.   Standard of Review ............................................................................ 30

II.   The Agencies' refusal to investigate the highway
      expansion project's PM$_{2.5}$ pollution violated NEPA ............................ 31

      A.   The Agencies arbitrarily relied upon pre-project
           PM$_{2.5}$ levels to justify their refusal to take a hard
           look at the project's PM$_{2.5}$ pollution ............................................ 32

      B.   The Agencies' other reasons for refusing to
           investigate PM$_{2.5}$ pollution were arbitrary ................................... 38

           1.   Inapplicable provisions of the Clean Air Act .................... 38

           2.   Inapplicable agency guidance ............................................ 40

III.  The Agencies failed to take a hard look at the project's
      traffic-related air pollution harm to environmental
      justice communities ................................................................................ 42

IV.   The Agencies arbitrarily rejected an alternative that
      would have avoided Plummers Island .................................................... 48

      A.   The Agencies did not apply the multi-factor
           balancing test mandated by FHWA regulations ......................... 49

      B.   The Agencies ignored relevant factors when
           rejecting the west-shift alignment ............................................. 53

V.    The Court should reverse and remand this case to the
      district court with instructions to vacate the Agencies'
      unlawful approval .................................................................................... 58

CONCLUSION ...................................................................................................... 59

CERTIFICATION OF COMPLIANCE ....................................................................... 61

# TABLE OF AUTHORITIES

## Cases

*1000 Friends of Md. v. Browner,*
    265 F.3d 216 (4th Cir. 2001) .................................................. 39

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ............................................. 41

*Barnes v. FAA,*
    865 F.3d 1266 (9th Cir. 2017) ............................................. 38

*Border Power Plant Working Grp. v. Dep't of Energy,*
    260 F. Supp. 2d 997 (S.D. Cal. 2003) .................................. 38

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ................................................... 7, 51, 57

*Defs. of Wildlife v. N.C. Dep't of Transp.,*
    762 F.3d 374 (4th Cir. 2014) ................ 7, 8, 29, 30, 31, 52, 53, 54, 57, 58

*Defs. of Wildlife v. U.S. Dep't of the Interior,*
    931 F.3d 339 (4th Cir. 2019) ............................... 48, 49, 50, 58

*Diné Citizens Against Ruining Our Env't v. Haaland,*
    59 F.4th 1016 (10th Cir. 2023) ........................................... 38

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.,*
    707 F.3d 462 (4th Cir. 2013) ......................................... 58, 59

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) .............................................. 40

*Friends of Buckingham v. State Air Pollution Control Bd.,*
    947 F.3d 68 (4th Cir. 2020) .................... 12, 15, 27, 28, 36, 37, 42, 44

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*
    844 F.3d 1095 (9th Cir. 2016) ........................................... 33

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
    951 F.3d 1217 (10th Cir. 2020) ............................................................ 59

*Jersey Heights Neighborhood Ass'n v. Glendening*,
    174 F.3d 180 (4th Cir. 1999) .............................................................. 16

*Lovo v. Miller*,
    107 F.4th 199 (4th Cir. 2024) ............................................................. 51

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................... 54

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ............................................................... 28, 30, 54

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
    677 F.3d 596 (4th Cir. 2012) ................................................. 33, 40, 48

*Nat'l Audubon Soc'y v. Dep't of Navy*,
    422 F.3d 174 (4th Cir. 2005) .............................. 7, 27, 31, 32, 35, 42, 48

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ....................................................................... 41

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ............................................................. 6, 7, 32, 33

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009) .............................................................. 33

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ..................................................... 42, 48

*Sierra Club v. FHWA*,
    No. 17-cv-1661, 2018 WL 1610304
    (D. Colo. Apr. 3, 2018) ..................................................................... 38

*Sierra Club v. W. Va. Dep't of Envtl. Prot.*,
    64 F.4th 487 (4th Cir. 2023) .............................................................. 58

*U.S. ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ................................................................. 51

*United States v. Ameren Mo.,*
    421 F. Supp. 3d 729 (E.D. Mo. 2019) ................................. 16

*United States v. Westvaco Corp.,*
    No. 00-cv-2602, 2015 WL 10323214
    (D. Md. Feb. 26, 2015) ........................................................ 31

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
    6 F.4th 1321 (D.C. Cir. 2021) .........................................42, 46

*Wild Va. v. U.S. Forest Serv.,*
    24 F.4th 915 (4th Cir. 2022)............................... 31, 35, 52, 58

*WildEarth Guardians v. Zinke,*
    368 F. Supp. 3d 41 (D.D.C. 2019) ....................................... 40

## Statutes

23 U.S.C. § 138(a)(3) ....................................................................... 7

28 U.S.C. § 1291 ............................................................................... 4

28 U.S.C. § 1331 ............................................................................... 4

42 U.S.C. §§ 4321-47 ....................................................................... 4

42 U.S.C. § 4332 ............................................................................... 6

42 U.S.C. § 4332(2)(C) ................................................................. 6, 9

42 U.S.C. § 7407(a) ........................................................................ 39

42 U.S.C. § 7410(a) ........................................................................ 39

42 U.S.C. § 7506(c)(1) .................................................................... 39

42 U.S.C. § 7506(c)(2) .................................................................... 39

42 U.S.C. § 7506(c)(5) .................................................................... 39

42 U.S.C. § 7605(c)(1)(B) ........................................................... 39

49 U.S.C. § 303(c) ...............................................................4, 7, 9

49 U.S.C. § 303(c)(1) ................................................................ 49

5 U.S.C. §§ 701-06 ..................................................................... 4

5 U.S.C. § 706(2)(A) .............................................................30, 58

Fiscal Responsibility Act of 2023,
    Pub. L. No. 118-5, § 321, 137 Stat. 10 (2023) ........................ 6

## Other Authorities

23 C.F.R. § 774.3(c)(1) .......................................................8, 49, 50

23 C.F.R. § 774.3(c)(1)(i)-(vii) ............................................... 8, 49

23 C.F.R. § 774.3(c)(1)(i) ........................................................... 54

23 C.F.R. § 774.3(c)(1)(ii) ...............................................53, 54, 55

23 C.F.R. § 774.3(c)(1)(iii) ....................................................54, 56

23 C.F.R. § 774.3(c)(1)(iv) ......................................................... 54

23 C.F.R. § 774.3(c)(1)(v) .......................................................... 54

23 C.F.R. § 774.3(c)(1)(vi) ....................................................53, 54

23 C.F.R. § 774.3(c)(1)(vii) ....................................................54, 56

23 C.F.R. § 774.7(c) .............................................................8, 51, 56

23 C.F.R. § 774.9(b) .............................................................8, 51, 56

40 C.F.R. § 50.18 ...................................................................... 13

40 C.F.R. § 1502.1 (2019) ....................................................6, 32, 33

40 C.F.R. § 1502.16 (2019) ........................................................ 33

40 C.F.R. § 1508.27(a) (2019) ........................................................ 34

62 Fed. Reg. 38,652 (July 18, 1997) .............................................. 41

73 Fed. Reg. 13,368 (Mar. 12, 2008) ........................................50, 51

77 Fed. Reg. 42,802 (July 20, 2012) ................................. 51, 55, 56

78 Fed. Reg. 3086 (Jan. 15, 2013) ................................................. 12

88 Fed. Reg. 5558 (Jan. 27, 2023) ...........................................12, 16

89 Fed. Reg. 16,202 (Mar. 6, 2024) .............................................. 13

89 Fed. Reg. 35,442 (May 1, 2024) ................................................. 6

## Other Authorities

EPA, *Near Roadway Air Pollution and Health:
    Frequently Asked Questions* (2014) ....................................11, 21

FHWA Tech. Advisory T 6640.8A § V.G.8 (1987) ....................... 41

MDOT, *Accelerate Maryland Partners Phase Public-Private
    Partnership Agreement Update* (Mar. 22, 2023) ......................... 9

Mot. to Intervene, *Kentucky v. EPA*,
    No. 24-1050 (D.C. Cir. Apr. 5, 2024),
    ECF No. 2048506 ............................................................... 14

# GLOSSARY

| | |
|---|---|
| Agencies | MDOT and FHWA |
| APA | Administrative Procedure Act |
| EIS | Environmental impact statement |
| EPA | U.S. Environmental Protection Agency |
| FEIS | Final environmental impact statement |
| FHWA | Federal Highway Administration |
| MDOT | Maryland Department of Transportation |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $PM_{2.5}$ | Fine particulate matter |
| ROD | Record of Decision |

**INTRODUCTION**

The Federal Highway Administration (FHWA) and Maryland Department of Transportation (MDOT) approved a plan to widen and add toll lanes to I-495 (the Beltway) and I-270, two major highways near Washington, D.C. The evidence in front of the Agencies—their own air quality monitoring, traffic modeling, and maps—revealed how the highway expansion project would worsen local air pollution, especially in already overburdened communities, and inflict unnecessary damage to a historic and ecologically sensitive island. Yet, for each of these harms, the Agencies offered assertions in lieu of analysis. Their failure to thoroughly investigate and candidly acknowledge the damage to health and the environment from expanding the highways deprived decisionmakers and the public of critical information necessary to evaluate this project. The Agencies thereby violated the National Environmental Policy Act (NEPA) and Section 4(f) of the Department of Transportation Act.

Widening the Beltway and I-270 would increase fine particulate matter pollution in neighborhoods near the highways. Breathing such pollution harms the lungs and heart, increasing the risk of heart attacks and even early death. Yet, the Agencies refused to investigate the project's fine particulate matter pollution or its threat to public health. Their excuse: measurements of fine

1

particulate matter taken miles from the highways did not exceed regulatory thresholds. But simply taking note of pre-project, regional air quality conditions did not satisfy the Agencies' obligation under NEPA to assess how expanding the highways would increase dangerous air pollution in communities near those highways.

The Agencies also arbitrarily concluded that environmental justice communities bordering the highways would not receive a disproportionate share of the project's air pollution. The Agencies acknowledged that traffic congestion increases air pollution from vehicles. And their traffic modeling showed that adding toll lanes to the Beltway and I-270 would worsen congestion where the toll lanes end and merge back with the general purpose lanes: in neighborhoods with high minority populations, low incomes, or both that already breathe air with disproportionately high levels of pollution. The evidence before the Agencies therefore indicated that expanding the highways would generate more air pollution in environmental justice communities than in other neighborhoods. The Agencies, however, denied what their own data showed. They concealed the project's harms to the air quality and health of environmental justice communities, contrary to NEPA's public disclosure mandate.

Finally, the Agencies failed to carefully evaluate a viable project alternative that would have avoided damaging Plummers Island. The island shelters a unique and vast array of flora and fauna. It is a world-renowned site of long-term, ongoing scientific research and is eligible for listing in the National Register of Historic Places. Widening the American Legion Bridge, which carries the Beltway over the Potomac River, would damage Plummers Island's landscape, destroy research sites, and disrupt its sensitive ecology. The Agencies' experts devised a slight design modification to the highway expansion project that would have spared Plummers Island. But the Agencies arbitrarily rejected that plan without applying the careful scrutiny required by Section 4(f) and FHWA's regulations.

The Agencies ignored, denied, and downplayed evidence of serious health and environmental harms, rather than offering the public and decisionmakers the full and fair accounting of the project's impacts that federal law requires. Appellants Maryland Chapter of the Sierra Club, National Trust for Historic Preservation, and Natural Resources Defense Council seek to hold the Agencies to these important obligations. The Agencies' approval of a major highway expansion violated both NEPA and Section 4(f), and should therefore be vacated.

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because all claims arise under federal law: NEPA, 42 U.S.C. §§ 4321-47; Section 4(f), 49 U.S.C. § 303(c); and the Administrative Procedure Act, 5 U.S.C. §§ 701-06.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court issued final judgment on March 20, 2024. JA0130. Maryland Chapter of the Sierra Club, National Trust for Historic Preservation, and Natural Resources Defense Council timely appealed on May 14. JA0132; Fed. R. App. P. 4(a)(1)(B)(ii).

# STATEMENT OF ISSUES

1.      NEPA requires agencies to investigate and disclose to the public the significant environmental impacts of their actions. FHWA and MDOT refused to analyze the impacts of fine particulate matter air pollution from their proposed expansion of two major highways because pre-project pollution levels measured at regional monitors did not exceed air quality standards. Did they violate NEPA by not investigating the project's fine particulate matter pollution or its health harms to neighborhoods near the highways?

2.      Under NEPA, agencies addressing environmental justice issues in an environmental impact statement must take a hard look at whether a project

will have a disproportionately adverse effect on minority and low-income communities. Increased traffic congestion leads to increased air pollution, and the Agencies' traffic modeling showed the project would increase congestion in environmental justice communities near the toll lanes' endpoints while relieving congestion elsewhere. Did the Agencies violate NEPA by claiming that the project's traffic-related air pollution would be distributed evenly and therefore would not harm environmental justice communities disproportionately?

3.     When there is no transportation project alternative that would avoid harms to parkland and historic properties protected by Section 4(f) of the Department of Transportation Act, FHWA must select the alternative that causes the least overall harm based on a seven-factor test set out in its regulations. Without applying that test, FHWA and MDOT rejected an alternative alignment for the American Legion Bridge that would have avoided damage to Plummers Island, a unique historic site and natural area protected by Section 4(f). Was their choice of bridge alignment arbitrary and capricious or contrary to law?

## STATEMENT OF THE CASE

### I.  Statutory and regulatory background

### A.  The National Environmental Policy Act

Under NEPA, federal agencies—and state co-leads, like MDOT—must prepare an environmental impact statement (EIS) before taking any major federal action that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C).[1] An EIS "shall provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1 (2019).[2] NEPA's requirement to prepare an EIS thereby serves two important purposes: it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and it "guarantees that the relevant information will be made available" to the public so they may play a role in the decision-making process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

---

[1] Congress recently amended NEPA, including parts of 42 U.S.C. § 4332. *See* Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023). Those amendments are immaterial to this case.

[2] The Council on Environmental Quality has revised its NEPA regulations several times since the Agencies' environmental review of the highway expansion project began. *See* 89 Fed. Reg. 35,442, 35,446-47 (May 1, 2024). All parties agree that the regulations applicable to this case are those that were in force in 2019. *See* JA0062 n.5. This brief therefore cites to the NEPA regulations in the 2019 Code of Federal Regulations.

NEPA is a procedural statute: it "merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351. Nevertheless, NEPA requires agencies to take a "hard look at an action's environmental impacts." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005) (cleaned up). A hard look demands from the agency "[a]t the least . . . a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgement of the risks that those impacts entail." *Id.*

**B.    Section 4(f) of the Department of Transportation Act**

Unlike NEPA, Section 4(f) imposes "substantive restraints" on FHWA's authority to approve transportation projects. *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 398 (4th Cir. 2014). FHWA must assign "paramount importance" to the protection of parks and historic sites. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412-13 (1971). FHWA may approve a transportation project that "use[s]" a public park or significant historic site "only if (1) there is no prudent and feasible alternative to using that land; and (2) the . . . project includes all possible planning to minimize harm to the park . . . or historic site resulting from the use." 49 U.S.C. § 303(c).[3]

---

[3] Section 4(f) is also codified at 23 U.S.C. § 138(a)(3). To avoid redundancy, this brief cites only to 49 U.S.C. § 303(c).

If there is no prudent and feasible alternative that avoids the use of all

Section 4(f) property, then FHWA must choose the alternative that "[c]auses

the least overall harm in light of the statute's preservation purpose." 23 C.F.R.

§ 774.3(c)(1). FHWA regulations require the agency to balance seven factors

when determining which alternative causes the least overall harm. *Id.*

§ 774.3(c)(1)(i)-(vii). The agency must document its consideration of these

factors in the final EIS or Record of Decision. *Id.* §§ 774.7(c), 774.9(b). "In

reviewing an agency's Section 4(f) determination, [courts] must conduct a

thorough, probing, indepth review to ensure" compliance. *Defs. of Wildlife*, 762

F.3d at 401 (cleaned up).

## II.     Factual background and procedural history

### A.     The Agencies' proposed highway expansion would cause significant harm to public health and the environment

MDOT plans to add two toll lanes in each direction to a fifteen-mile

stretch of the Beltway and I-270 from McLean, Virginia, to Gaithersburg,

Maryland. JA0137-0138; JA1109. On the Beltway, the toll lanes would run

from the Virginia side of the American Legion Bridge, over the Potomac

River, to the I-270 spur in North Bethesda, Maryland. JA0137-0138; JA1109.

The toll lanes would extend north up I-270 from the spur to the interchange

with I-370 in Gaithersburg. JA0137-0138. The toll lanes would cost at least

four-and-a-half billion dollars and take at least five years to build.[4] JA0144; JA0793.



Figure 1: I-495 & I-270 Managed Lanes Study Corridors – Selected Alternative

JA0138

MDOT's proposal to expand the interstate highways required FHWA approval. Before FHWA could approve the expansion, it needed to review the project's effects on the environment, parks, and historic sites under NEPA, *see* 42 U.S.C. § 4332(2)(C), and Section 4(f), *see* 49 U.S.C. § 303(c), among other laws. MDOT served as the co-lead agency for this review. JA0375.

---

[4] The Agencies' environmental review assumed that the highway expansion would be built and funded through a public-private partnership, where a corporation would pay for construction in exchange for the right to collect tolls for decades. JA0395; JA2602-2603. MDOT's corporate partner, however, dropped out after the Agencies approved the project, and it is now unclear how the project would be financed. *See* MDOT, *Accelerate Maryland Partners Phase Public-Private Partnership Agreement Update* (Mar. 22, 2023), https://oplanesmd.com/ampartners-agreement-update/.

The Agencies issued a draft EIS in 2020, a supplemental draft EIS in 2021, and a final EIS (FEIS) in 2022.[5] JA1868; JA1768; JA0355. FHWA approved the highway expansion in a Record of Decision (ROD) on August 25, 2022. JA0137, JA0190.

The highways thread through a dense network of communities and parks. To add four lanes to the Beltway and two to I-270,[6] MDOT would pave over 100 acres of land, eliminate more than 400 acres of forest, damage eight linear miles of streams, and take 15 acres of parks. JA0143, JA0152, JA0164; JA0478. Those new lanes would also bring more cars and trucks onto the highways, increasing traffic volumes by an average of 13 percent, or two thousand more vehicles per hour, compared to traffic volumes if the project is not constructed (the "No Build Alternative"). JA0464. More vehicles on the highways would cause more air pollution. *See* JA1489-1491 (project would

---

[5] A supplemental draft EIS was required because the Agencies initially proposed to widen almost all of the Beltway within Maryland, but, after receiving comments on the initial draft statement, the Agencies scaled back the scope of the project in the face of public opposition. *See* JA1888; JA1785, JA1790.

[6] On I-270, two of the four toll lanes would come from converting existing HOV lanes to toll lanes. JA0143.

increase mobile source air toxics compared to the No Build Alternative),

JA1501 (greenhouse gases); JA2129 (carbon monoxide); JA2533.[7]

Commenters pointed out critical gaps in the Agencies' accounting of the project's harms to the environment and public health. For instance, commenters highlighted that the Agencies refused to investigate fine particulate matter pollution and related health impacts, to assess how increasing congestion in environmental justice communities would worsen air pollution in those already overburdened neighborhoods, or to carefully evaluate an alternative that would avoid expanding the American Legion Bridge onto Plummers Island. *See, e.g.*, JA2528-2533, JA2546-2548; JA2661-2662; JA1385. FHWA approved the expansion without addressing those flaws in the Agencies' review.

## B. The Agencies refused to evaluate fine particulate matter pollution caused by expanding the highways

Particulate matter is a technical term for the "[m]ixture of solid particles and liquid droplets in the air." JA2066. Particulate matter smaller than 2.5 micrometers across (about 1/30th the diameter of a human hair) is called fine particulate matter, or $PM_{2.5}$. JA2894. Breathing $PM_{2.5}$ can damage the lungs

---

[7] *Accord* EPA, *Near Roadway Air Pollution and Health: Frequently Asked Questions* 2 (2014), https://tinyurl.com/2wrwdv9v ("Generally, the more traffic, the higher the emissions . . . .").

and the heart, aggravate asthma, and cause heart attacks and even premature death. JA2266-2267, JA2271-2272. "[A]ny amount of $PM_{2.5}$ in the system is harmful." *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020). Indeed, there is no known level below which $PM_{2.5}$ is safe. JA2529; *see also* 78 Fed. Reg. 3086, 3148 (Jan. 15, 2013) (citing EPA study "recogniz[ing] that there is no discernible population-level threshold [for $PM_{2.5}$] below which [health] effects would not occur"); *accord* 88 Fed. Reg. 5558, 5625 (Jan. 27, 2023). And any increase in $PM_{2.5}$ exposure increases health risks. JA2965 (noting evidence for "linear, no-threshold relationship" between $PM_{2.5}$ exposure and adverse health effects); 88 Fed. Reg. at 5582-83, 5625 (same); JA2271 (same).

Expanding the Beltway and I-270 would increase levels of this dangerous pollutant in neighborhoods near the highways. JA2273-2275. Motor vehicles generate $PM_{2.5}$ in three ways: tailpipe exhaust, wear and tear of brakes and tires, and dust kicked up from the road. JA2762; JA2652; JA2659. Adding lanes to the Beltway and I-270 would draw tens of thousands more vehicles onto these highways each day. JA0458. The new lanes would also bring vehicles closer to the neighborhoods bordering the highways, exposing residents, school children, and workers to higher levels of $PM_{2.5}$. JA2661-2662.

This additional pollution, moreover, would not be distributed evenly. Vehicle pollution rises as traffic congestion worsens. *See* JA0626; JA2530-2531; JA2661-2662. And the project would increase traffic congestion where the toll lanes end, pumping more $PM_{2.5}$ into low-income communities and communities of color that already breathe air with disproportionately high levels of air pollution. *Infra* 16-21.

Despite this substantial record evidence, the Agencies chose not to evaluate the highway expansion project's $PM_{2.5}$ pollution. JA0541; JA1480. They did not estimate how much $PM_{2.5}$ emissions widening the highways would cause. *See* JA0541; JA1480. Nor did they assess the harms to the health of the people who would breathe this additional pollution. *See* JA0541; JA1480. Instead, the Agencies insisted that they had no obligation to analyze the project's $PM_{2.5}$ pollution because pre-project $PM_{2.5}$ levels in the broader region fall below the National Ambient Air Quality Standards (NAAQS) set by the United States Environmental Protection Agency (EPA).[8] JA0541; JA1480.

---

[8] EPA's primary (i.e., health-based) daily NAAQS for $PM_{2.5}$ is 35 micrograms per cubic meter ($\mu g/m^3$). 40 C.F.R. § 50.18. When the Agencies issued the ROD for this project, the primary annual NAAQS was 12 $\mu g/m^3$. *See* JA2064. EPA recently lowered the primary annual NAAQS to 9 $\mu g/m^3$. 89 Fed. Reg. 16,202 (Mar. 6, 2024). The State of Maryland supported lowering the $PM_{2.5}$ NAAQS and has intervened to defend EPA's decision in the D.C. Circuit. *See*

Commenters pointed out several flaws in the Agencies' rationale. First, regardless of current $PM_{2.5}$ levels, the Agencies had an obligation to assess how the project would change those levels and the resulting health effects. JA2267. Next, the pre-project $PM_{2.5}$ levels relied upon by the Agencies were measured at air quality monitors miles away from the Beltway and I-270. JA2267-2268; JA2660; JA2073 (map depicting locations of $PM_{2.5}$ monitors). But $PM_{2.5}$ generated by vehicles concentrates within several hundred feet of roadways. JA2267-2268; JA2763-2764 (FHWA-funded study documenting higher levels of vehicle-generated $PM_{2.5}$ pollution closer to highways).[9] Therefore, the below-NAAQS $PM_{2.5}$ levels invoked by the Agencies to justify their non-analysis didn't represent $PM_{2.5}$ levels in the neighborhoods lining the Beltway and I-270—the neighborhoods that would bear the brunt of the project's $PM_{2.5}$ pollution.

In addition, the commenters pointed the Agencies to evidence documenting higher $PM_{2.5}$ levels near the highways than at the monitors located miles away. As reported in a 2015 study, an MDOT monitor 500 feet

---

Mot. to Intervene, *Kentucky v. EPA*, No. 24-1050 (D.C. Cir. Apr. 5, 2024), ECF No. 2048506.

[9] *Accord* EPA, *Near Roadway Air Pollution and Health*, *supra* n.7, at 1-2; EPA, *EJSCREEN Technical Documentation* 52-54 (2015), https://tinyurl.com/2wk2rpfc.

from the Beltway recorded $PM_{2.5}$ levels above the NAAQS.[10] JA2774; JA2273. The levels at this near-highway monitor were "consistently higher" than levels measured at regional monitors farther away from major highways. JA2774, JA2776, JA2780.

EPA data also showed that environmental justice communities near the I-270 toll lanes' northern terminus in Gaithersburg already face disproportionately high levels of concern for $PM_{2.5}$ exposure. JA1232 (environmental justice index for $PM_{2.5}$ at or above 91% for Gaithersburg block groups 7007.17-1, 7007.17-3, and 7008.16-1); JA1226 (map depicting locations of those block groups); JA1248 (map showing that Gaithersburg block groups have greatest environmental justice concern for $PM_{2.5}$ in the project corridor).

Finally, commenters criticized the Agencies for ignoring the scientific consensus that any increase in $PM_{2.5}$, even at concentrations below the NAAQS, causes serious health harms. JA2529; *Friends of Buckingham*, 947 F.3d at 92. Consequently, even if pre-project $PM_{2.5}$ levels in near-highway neighborhoods were below the NAAQS and even if increased $PM_{2.5}$ from the project wouldn't push those levels above the NAAQS, the project's $PM_{2.5}$

---

[10] The monitor was in Largo, Maryland—adjacent to a part of the Beltway that would not receive toll lanes under the final, approved project, but that was within the "study limits" for the Agencies' environmental review. JA2773-2774; JA0398-0399.

pollution would still put those breathing it at increased risk of heart attacks, aggravated asthma, and premature death. *See* 88 Fed. Reg. at 5625; *United States v. Ameren Mo.*, 421 F. Supp. 3d 729, 774 (E.D. Mo. 2019) ("[A]ny incremental increase in $PM_{2.5}$ exposure produces an incremental increased risk of mortality and other health effects in the population exposed.").

The Agencies did not dispute any of these points. They merely "acknowledged" the information submitted by commenters and remained steadfast in their refusal to conduct any analysis of the highway expansion's $PM_{2.5}$ pollution or its health harms. JA1740.

## C. The Agencies overlooked the project's air pollution harms to environmental justice communities

For decades, federal and state governments routed highways through communities of color and low-income communities. JA0609-0610. These decisions tore apart neighborhoods and exposed underserved residents to disproportionate levels of traffic-related air pollution, placing "the most adverse impacts and the fewest benefits" of the highway system on minority and low-income communities. JA0609; *see Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 195 (4th Cir. 1999) (King, J., concurring) ("As often happens with interstate highways, the route selected was through the poor area of town, not through the area where the politically powerful people live." (cleaned up)). Together with other discriminatory siting decisions that brought

industrial facilities into these communities, discriminatory highway routing created a "racially and economically segregated" landscape that persists to the present day. JA0609. The distribution of environmental justice communities in the project's surrounding area reflects this pattern: communities with "the greatest levels of [environmental justice] concern" in the area surrounding the project are concentrated along the Beltway and I-270. JA0610.

Expanding the Beltway and I-270 would exacerbate the unequal distribution of pollution by disproportionately increasing traffic-related air emissions in environmental justice communities near the toll lanes' termini. Following the Council on Environmental Quality's guidance, the Agencies defined environmental justice communities as census blocks with a percentage of non-white residents equal to or greater than the state average (49%), a median household income equal to or less than 80% of the area median income ($69,850 for a family of three), or both. JA0607-0609. They identified sixteen environmental justice communities in the project area. JA0611. Most of those environmental justice communities are clustered around the toll lanes' endpoints in Gaithersburg near the I-270 and I-370 interchange, and in North Bethesda where the Beltway and I-270 spurs meet, as shown in this map:



Figure 5-1: Environmental Justice Populations

JA1169

These communities already breathe some of the dirtiest air in Maryland in part because of their proximity to highway traffic: several low-income and minority communities in Gaithersburg near the heavily trafficked I-270 are at or above the 90th percentile in the state for environmental justice concerns relating to $PM_{2.5}$, diesel particulate matter, ozone, and traffic proximity. JA1232 (block groups 7007.17-1, 7007.17-3, and 7008.16-1). Not surprisingly, these communities also face elevated risks of developing respiratory diseases and air toxics-related cancers. JA1232.

Although the Agencies predict that the project would slightly improve average speed in the region, JA0461, their own traffic modeling showed that it would in fact worsen congestion in environmental justice communities. *See* JA2661 (noting that many "bottlenecks and congested stretches" under the project would "occur on [environmental justice] communities"). This is because expanding the highways would shift the current traffic bottleneck at the American Legion Bridge, where there are no nearby environmental justice communities, to the toll lanes' endpoints, where environmental justice communities are concentrated. *See* JA0612; JA2411 (MDOT acknowledging that "bottleneck shifts" from American Legion Bridge to toll lanes' endpoints "may take place").

Specifically, the project would create a new chokepoint near the toll lanes' northern endpoint in Gaithersburg where vehicles in the toll lanes would have to merge back with heavy traffic in the general purpose lanes, *see* JA2446, and where most of the surrounding census blocks are environmental justice communities, JA1164 (all Gaithersburg block groups in the analysis area except one are environmental justice communities). The project would also exacerbate an existing bottleneck just north of Gaithersburg—where I-270 narrows from seven lanes to two lanes—by bringing more northbound cars

more quickly to that bottleneck. *See* JA2697-2698.[11] Indeed, according to the Agencies' own data, building the toll lanes would lead to as much as a 40 mile-per-hour (mph) decrease in northbound speed during the afternoon rush hour around the I-370 interchange in Gaithersburg. JA1043 (predicting 20-40 mph decreases in speed on I-270 northbound general purpose lanes between the MD-28 and I-370 interchange from 6 pm to 7 pm).

For similar reasons, the project would worsen congestion in North Bethesda near the toll lanes' endpoints on the I-270 spurs. Compared with the No Build Alternative, traffic speeds would sometimes drop by close to 50 mph in this area under the project. JA1032 (predicting about 50 mph decrease in speed on general purpose lanes between I-270 west spur and I-270 east spur from 8 am to 10 am); JA2629 (FHWA staff noting that morning traffic on the Beltway Inner Loop would be worse than the No Build Alternative due to "the increase of demand" and "the new bottleneck" at the toll lanes' end point).

As the Agencies acknowledged, all else being equal, increased traffic congestion would bring increased emissions. JA0626 (admitting that "[r]e-occurring congestion" can "increase emissions and impact air quality");

---

[11] JA0847 (showing that I-270 northbound narrows from seven lanes to two between I-370 and MD-121); JA0855 (describing an existing bottleneck and slow traffic on I-270 northbound past I-370 during evening peak hours, as local lanes merge with express lanes and as the number of lanes decreases).

JA1805; *accord* EPA, *Near Roadway Air Pollution and Health*, *supra* 11 n.7, at 2.

Therefore, by worsening congestion near environmental justice communities

while relieving it elsewhere,[12] the project would disproportionately increase air

pollution in those environmental justice communities.

Commenters called upon the Agencies to investigate the project's

disparate traffic and air pollution impacts throughout the NEPA process. *See,*

*e.g.*, JA2617 (Maryland-National Capital Park and Planning Commission

pointing out that the project would not "eliminate congestion in the corridors"

but would instead "shift[] it from the vicinity of the [American Legion Bridge]

. . . to other areas in Maryland"); JA2661-2662. But the Agencies ignored these

comments. Nowhere in the Agencies' final environmental justice analysis did

they acknowledge the increased congestion in environmental justice

communities, let alone recognize the resulting increase in air pollution in those

communities. Instead, the Agencies claimed that the project's "traffic impacts

would not be higher or more adverse" to environmental justice populations,

---

[12] *Compare* JA1043 (20-40 mph decreases in speed on I-270 northbound general purpose lanes between the MD-28 and I-370 interchange from 6 pm to 7 pm), *and* JA1032 (decrease in speed, sometimes by close to 50 mph, on Beltway Inner Loop general purpose lanes between I-270 west spur and I-270 east spur from 8 am to 10 am), *with* JA0461 (claiming project will increase general purpose lane speeds systemwide by 4 mph), *and* JA1032 (increase in speed, sometimes by close to 40 mph, on Beltway Inner Loop general purpose lanes between Clara Barton Parkway and MD-190 from 9 am to 10 am).

and that air pollution would be "distributed along" the project corridor "regardless of [environmental justice] status." JA0629.

## D. The Agencies rejected an alternative that would have avoided Plummers Island

Just east of the American Legion Bridge, hugging the Maryland shore of the Potomac River, lies a forested, tear-shaped island, home to more than 4,000 species on just 12 acres. JA0599; JA1456; JA2994 fig. 1. Plummers Island is a biodiversity hotspot that for more than a century has lured scientists to study its multifarious flora and fauna—butterflies and bats, lichens and weasels.[13] *See* JA0599. With nearly 400 papers documenting its unique biology, Plummers Island is "the most scientifically studied island in North America." JA0599; JA1400. Since 1901 and still today, that research has been stewarded by the Washington Biologists' Field Club, a group of "influential and accomplished scientists." JA0536, JA0599. The Field Club deeded Plummers Island to the National Park Service in 1959, but conditioned that transfer both on the island being maintained as "a natural wild area" and on the Field Club

---

[13] Research on Plummers Island has identified 836 species of butterflies and moths, 5 species of bats, about 600 species of beetles, and about 900 species of vascular plants. JA1601, JA1604. Among the hundreds of research papers published about Plummers Island is a particularly famous study linking declines in lichen diversity on the island to the use of leaded gasoline in cars; that study played an important role in the decision to phase lead out of gasoline. JA1600; JA2404-2407.

retaining the right to continue their scientific research and meetings on the island. JA1438-1441. This rich history of long-term research and association with the Field Club render Plummers Island eligible for listing in the National Register of Historic Places. JA1357; JA1369. Today, Plummers Island is also part of the Chesapeake and Ohio Canal National Historical Park. JA0533.

The proposed highway expansion project would rebuild and widen the American Legion Bridge, extending it onto the western end of Plummers Island. JA0536; JA1280. Construction would destroy long-term research sites maintained by the Field Club. JA1412; JA1425; JA1748. It would also cut down trees and tear up rare, threatened, and endangered plants. JA0601, JA0684. In addition, three new bridge piers would be sunk into the island. JA0503. Those and other piers could alter the river's flow and worsen flooding and erosion on the island. JA1457; JA2705-2706; *see also* JA0310-0311 (Agencies acknowledging flood risk but deferring hydraulic study until after project approval). The expanded sixteen-lane bridge would extend over Plummers Island and cast a shadow upon rare, threatened, and endangered plants, JA0420; JA0601, further disrupting the island's "sensitive" ecology, JA0502 n.5.

An alternative was available. MDOT assembled an American Legion Bridge "Strike Team" of "national and local experts on bridge design, natural

resources, and cultural resources" whose charge was to develop project alternatives to avoid or minimize harm to parkland in the vicinity of the bridge, including Plummers Island. JA0502 & n.5. The Agencies' proposed design—the "on-center alignment"—would widen the bridge out from its current center line. JA1542; JA2999. The Strike Team concluded, however, that shifting the bridge's alignment slightly to the west was a "viable" option that would avoid Plummers Island entirely. JA1538. This "west-shift alignment" might even be cheaper and quicker to build than the Agencies' preferred on-center alignment.[14] JA3018.

The Agencies, however, rejected the west-shift alignment because they found it would use more parkland than the on-center alignment, displace one residence, and require the reconfiguration of an interchange. JA1530-1531. The Agencies did not attempt to mitigate impacts from the west-shift alignment to reduce its harm to parkland, despite doing so for the on-center alignment. *See* JA1532 (indicating that between 2021 and 2022 the Agencies reduced permanent impacts from the on-center alignment by about five acres, but reflecting no such mitigation efforts for the west-shift alignment). Nor did

---

[14] The Agencies at times referred to the west-shift alignment as a "minimally offset alignment" to distinguish it from an "entirely offset alignment"—a different alternative that would have shifted the bridge farther west and that was rejected because it would impact the Naval Surface Warfare Center Carderock Division and other properties. JA1530-1531.

the Agencies compare the ecological, scientific, or historic value of the parkland affected by the competing alignments. The on-center alignment would destroy aspects of Plummers Island that contribute to its historic significance and entitle it to protection under Section 4(f)—its active research plots, rare plants, and natural landscape. JA1748; JA0601; JA1357. The west-shift alignment, by contrast, would harm scattered fragments of parkland, including strips in the medians and along the shoulders of roads and highway ramps. JA1534. The Agencies never justified their decision to avoid these seemingly unexceptional pieces of parkland when that choice had the effect of sacrificing part of "the most scientifically studied island in North America." JA0599; JA1400.

### E.    Procedural history

In October 2022, Maryland Chapter of the Sierra Club, Friends of Moses Hall, National Trust for Historic Preservation, and Natural Resources Defense Council filed a complaint in the U.S. District Court for the District of Maryland, challenging the FEIS and ROD for the highway expansion project. JA0014. The complaint alleged, among other claims, that the Agencies' analyses of environmental and public health impacts and consideration of alternatives violated NEPA and Section 4(f), JA0051-0053, JA0056-0057, and sought vacatur of the Agencies' unlawful actions, JA0057. The parties cross-

moved for summary judgment. On March 20, 2024, the district court granted summary judgment for the Agencies on all claims. JA0130.

Maryland Chapter of the Sierra Club, National Trust for Historic Preservation, and Natural Resources Defense Council timely appealed the district court's summary judgment order. JA0132. Specifically, they appeal the district court's ruling on their claims that the Agencies violated NEPA by failing to take a hard look both at the project's $PM_{2.5}$ harms and at traffic-related air pollution in environmental justice communities, and that the Agencies violated Section 4(f) by arbitrarily rejecting an alternative that would have avoided Plummers Island.

## SUMMARY OF ARGUMENT

1.     The Agencies violated NEPA by failing to take a hard look at the project's $PM_{2.5}$ pollution. The Agencies refused to conduct any assessment of $PM_{2.5}$ pollution, despite clear evidence that widening the Beltway and I-270 would increase levels of this harmful pollutant in communities lining the highways. The Agencies never investigated how much $PM_{2.5}$ the project would generate, how that pollution would be distributed, or the consequences for public health. They thereby denied decisionmakers and the public critical information about a significant threat to public health from widening the highways.

Their failure to investigate the project's $PM_{2.5}$ pollution is not excused by the fact that pre-project $PM_{2.5}$ levels did not exceed EPA's NAAQS. The Agencies took note of regional $PM_{2.5}$ levels before the highways' expansion, but merely observing those pre-project levels did not answer the fundamental question NEPA asks: how the expansion would affect air quality and public health. Moreover, the $PM_{2.5}$ readings from regional air quality monitors located miles away from the highways do not accurately reflect pre-project $PM_{2.5}$ pollution from vehicles on the Beltway and I-270. The Agencies failed to explain why they relied upon those distant regional monitors when MDOT's own near-highway monitoring documented higher $PM_{2.5}$ levels closer to the Beltway.

This Court recently rejected an agency's attempt to use the NAAQS as an excuse to avoid its statutory duty to investigate how a project's $PM_{2.5}$ pollution would affect health in the surrounding community. *Friends of Buckingham*, 947 F.3d at 85-93. Similarly here, the Agencies did not satisfy their obligation under NEPA to thoroughly investigate and candidly acknowledge the project's $PM_{2.5}$ pollution and its threat to public health. *See Nat'l Audubon Soc'y*, 422 F.3d at 185.

2.  The Agencies also failed to take a hard look at the project's traffic-related air pollution impacts on environmental justice communities.

Undisputed record evidence showed that increased congestion would lead to increased emissions. And the Agencies' own traffic modeling indicated that the project, while slightly decreasing average congestion, would increase congestion near the toll lanes' termini, where environmental justice communities within the project area are concentrated. Taken together, the record before the Agencies suggested that the project would disproportionately increase traffic-related air pollution in environmental justice communities already overburdened by pollution.

The Agencies ignored that evidence and refused to "consider the [project's] disproportionate impact" on environmental justice communities. *See Friends of Buckingham*, 947 F.3d at 92. Instead, they claimed that the project's air pollution would be distributed equally along the project's path. This conclusion runs "counter to the evidence" and lacks support in the record. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The Agencies' failure to adequately analyze the project's air pollution harm to residents in environmental justice communities violated NEPA.

3.    The Agencies' rejection of the west-shift alignment for the American Legion Bridge violated Section 4(f). Expanding the bridge would damage Section 4(f)-protected parkland, including the historic and biodiverse Plummers Island. FHWA's regulations required the Agencies—before

approving the highway expansion project—to apply a seven-factor balancing test to select the alternative that would cause the least overall harm. The Agencies convened a panel of experts, in part, to identify design alternatives for minimizing harm to Plummers Island. That panel developed a viable alternative—the west-shift alignment—that would have avoided Plummers Island. But the Agencies dismissed their own experts' alternative and selected an on-center alignment that would cause severe damage to "the most scientifically studied island in North America."

Procedural and substantive deficiencies in the Agencies' decisionmaking rendered that choice of alternative unlawful. First, in rejecting the west-shift alignment, the Agencies did not apply the seven-factor least overall harm test mandated by FHWA regulations. They therefore failed to "follow all procedural requirements" under Section 4(f). *Defs. of Wildlife*, 762 F.3d at 401 (cleaned up). Second, FHWA's regulations demanded a comprehensive inquiry into the tradeoffs between the west-shift and on-center alignments. Instead, the Agencies offered only a limited explanation for their choice of alignment, an explanation that did not adequately address the "relevant factors" set out in FHWA's least overall harm regulations. *Id.* (cleaned up).

Because the Agencies neither applied the mandatory balancing test nor scrutinized the alignment alternatives according to the criteria prescribed in

FHWA's regulations, their rejection of the west-shift alignment was arbitrary and contrary to law.

4. Given the Agencies' significant NEPA and Section 4(f) violations, the Court should reverse the judgment below and remand with instructions that the district court apply the normal remedy and vacate the unlawful FEIS and ROD.

## ARGUMENT

### I. Standard of Review

This Court reviews the district court's grant of summary judgment de novo, "without deference to the district court's resolution of the issue." *Defs. of Wildlife*, 762 F.3d at 393 (cleaned up).

The Administrative Procedure Act (APA)'s standard of review governs claims under NEPA and Section 4(f). *Id.* Under the APA, the Court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acted arbitrarily and capriciously if it did not articulate a "rational connection between the facts found and the choice made," "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before [it]." *See State Farm Mut. Auto. Ins.*, 463 U.S. at 43 (cleaned up). The Court's review,

though narrow, "must be searching and careful." *Defs. of Wildlife*, 762 F.3d at 393 (cleaned up). The Court's review is not "a rubber stamp of agency action." *Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 926 (4th Cir. 2022) (cleaned up).

## II. The Agencies' refusal to investigate the highway expansion project's PM$_{2.5}$ pollution violated NEPA

NEPA required the Agencies to conduct a "thorough investigation" of the project's PM$_{2.5}$ pollution and offer a "a candid acknowledgement of the risks" that pollution entailed. *Nat'l Audubon Soc'y*, 422 F.3d at 185. The highway expansion project would increase PM$_{2.5}$ pollution in neighborhoods near the Beltway and I-270 by raising traffic volumes; by bringing the sources of PM$_{2.5}$ pollution (vehicle exhaust, tire and break wear and tear, and re-suspended dust) closer to the people who live, work, and go to school near these highways; and by worsening congestion (which increases vehicular emissions) in already overburdened communities. *Supra* 12-13. Any increase in PM$_{2.5}$ would risk additional, serious health harms, such as aggravated asthma, heart attacks, and death. *Supra* 11-12, 15-16; *accord United States v. Westvaco Corp.*, No. 00-cv-2602, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015) ("The majority scientific consensus, accepted by the Court, is that the harm from exposure to PM$_{2.5}$ is linear, and there is no known threshold below which PM$_{2.5}$ is not harmful to human health."). Consequently, PM$_{2.5}$ pollution from

expanding these highways should have received a "full and fair discussion" in the FEIS. 40 C.F.R. § 1502.1.

Yet, the Agencies did not conduct any investigation, let alone the "through investigation" NEPA required. *Nat'l Audubon Soc'y*, 422 F.3d at 185. They offered neither a quantitative nor qualitative estimate of the $PM_{2.5}$ pollution expanding the highways would cause. They presented no analysis of how that pollution would harm people in the densely populated fifteen-mile project corridor. Instead, contrary to NEPA's prohibition on "uninformed" decisionmaking, *Robertson*, 490 U.S. at 351, the Agencies left themselves and the public in the dark about the magnitude, distribution, and health effects of a significant project impact. Their reasons for refusing to investigate the project's $PM_{2.5}$ pollution do not justify their willful ignorance.

### A. The Agencies arbitrarily relied upon pre-project $PM_{2.5}$ levels to justify their refusal to take a hard look at the project's $PM_{2.5}$ pollution

The Agencies' primary rationale for refusing to analyze $PM_{2.5}$ pollution—that pre-project $PM_{2.5}$ levels are below the NAAQS, JA0541; JA1480—contradicts both the basic mandate of NEPA and the scientific consensus on $PM_{2.5}$.

First and foremost, the Agencies' sole reliance on pre-project $PM_{2.5}$ levels violated NEPA's most fundamental requirement: to consider the impacts of

the proposed project. NEPA's central concern is diagnosing and disclosing the "environmental impacts" of an action. 40 C.F.R. §§ 1502.1, 1502.16; *Robertson*, 490 U.S. at 348-49. But PM$_{2.5}$ levels measured between 2016 and 2018 don't speak to the project's impact. *See* JA2069, JA2071. At best, they provide a starting point for an analysis—the environmental baseline.[15] *See N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 603 (4th Cir. 2012). The Agencies should have added the project's anticipated PM$_{2.5}$ emissions to that baseline. *See Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). But the Agencies never left the starting block: they neglected to assess how expanding the highways would alter baseline PM$_{2.5}$ levels. As a result, the FEIS "sheds no light on the specific effect at issue—the environmental impact of [PM$_{2.5}$ pollution] *from this project*." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (emphasis added). This omission violated the Agencies' hard-look duty. NEPA would be a dead letter if agencies could avoid analyzing the harms from their proposed actions simply by declaring that pre-project environmental conditions are acceptable.

---

[15] Those PM$_{2.5}$ levels, however, were measured at regional monitors located too far from the Beltway and I-270 to establish an accurate baseline for PM$_{2.5}$ levels in neighborhoods near the highways. *Supra* 14-15; *infra* 34.

Moreover, the Agencies failed to explain how $PM_{2.5}$ levels measured at regional monitors miles away from the highways could obviate the need to investigate localized $PM_{2.5}$ pollution from the highway expansion. The largest increase in $PM_{2.5}$ levels from widening the highways would occur in the neighborhoods abutting the Beltway and I-270. JA2267-2268; JA2762. Therefore, the most relevant geography for the project's $PM_{2.5}$ impacts is the neighborhoods lining the highways. *See* 40 C.F.R. § 1508.27(a) (2019) (noting that the "significance" of "a site-specific action" "would usually depend upon the effects in the locale rather than in the world as a whole"). Monitors miles away from the Beltway and I-270 could not give an accurate understanding of pre-project $PM_{2.5}$ levels in neighborhoods a stone's throw away from the highways. JA2267-2268; JA2660. And they certainly did not answer the critical question posed by NEPA: how much $PM_{2.5}$ levels would increase if the highways were expanded.

The Agencies' reliance on distant air quality monitors was even more inexcusable given the record evidence indicating that $PM_{2.5}$ levels were higher near the highways. MDOT monitoring conducted just 500 feet from the Beltway and described in a 2015 peer-reviewed journal article revealed $PM_{2.5}$ concentrations that exceeded both the then-applicable NAAQS and the levels recorded at regional monitors farther from the Beltway. JA2773-2774, JA2776.

When commenters presented this study, "[t]he [Agencies] neither distinguishe[d] this evidence adequately nor provide[d] sufficient counter-evidence." *Nat'l Audubon Soc'y*, 422 F.3d at 192. Indeed, they offered no explanation at all.[16] JA1740 (merely "acknowledg[ing]" evidence submitted by commenters regarding PM$_{2.5}$).

The Agencies also ignored EPA data showing that communities within the project corridor already face some of the highest levels of environmental justice concerns for PM$_{2.5}$ in the state. JA1232, JA1248; *supra* 15. This was yet more evidence of existing harm from PM$_{2.5}$ near the Beltway and I-270 and further reason to investigate the project's contribution of additional PM$_{2.5}$ pollution. The Agencies thus acted arbitrarily by "fail[ing] to account for real-world data" from the 2015 Beltway monitoring study and EPA that called into question their unexplained reliance on PM$_{2.5}$ monitoring miles away from the highways. *Wild Va.*, 24 F.4th at 927-28.

---

[16] The district court offered its own explanation, which appeared neither in the record nor the Agencies' briefs. JA0084 n.6. It claimed that the study was "irrelevant" because the Beltway monitoring site was "not along the [project's] path." *Id.* The Agencies, however, relied exclusively upon air quality monitors that were not located along the project's path. *See* JA2073. Neither they nor the district court explained why data from these monitors were relevant, but MDOT's near-highway monitoring data described in the 2015 study were not. *See Wild Va.*, 24 F.4th at 927-28 (holding that agency arbitrarily ignored monitoring data from just outside the project boundaries).

The Agencies' assertion that pre-project, below-NAAQS levels absolved them of their obligation to investigate $PM_{2.5}$ pollution is a more extreme version of the argument this Court recently rejected in *Friends of Buckingham v. State Air Pollution Control Board*. In that case, a Virginia agency, acting under a state statute that, like NEPA, required the agency to assess project health harms, approved a new compressor station for a natural gas pipeline in a predominantly African American community. 947 F.3d at 86 (citing Va. Code Ann. § 10.1-1307(E)(1)). The agency found that the station would increase local $PM_{2.5}$ levels, but, because those levels would not exceed the NAAQS, the agency declined to assess health harms from the increased $PM_{2.5}$. *Id.* at 90-91. This Court, applying the same standards it uses when "reviewing federal administrative agency actions," held that the agency's attempt to "fall[] back" on the NAAQS was arbitrary and capricious. *Id.* at 80-82, 92. The Court explained that "even when NAAQS are not violated[,] . . . exposure to $PM_{2.5}$ will increase the risk of asthma, heart attacks, and death." *Id.* at 92. And it held that the fact that the compressor station would not drive local $PM_{2.5}$ levels above the NAAQS was not a valid reason to refuse to evaluate the project's health harms. *Id.* at 91-92. The Court thus vacated the state agency's approval for the compressor station. *Id.* at 93.

The Court should do the same here. Like in *Friends of Buckingham*, the Agencies attempt to dodge their duty to assess $PM_{2.5}$ impacts by "falling back on [the] NAAQS." *Id.* at 92. But here, FHWA and MDOT did even less to address $PM_{2.5}$ impacts than the state agency in *Friends of Buckingham*: the Agencies didn't estimate the project's $PM_{2.5}$ emissions and so don't even know whether expanding the highways would cause levels in nearby neighborhoods to exceed the NAAQS.[17] The Court should reject the Agencies' approach, for the same reasons it rejected the state agency's approach in *Friends of Buckingham*.

The district court disregarded *Friends of Buckingham*, looking instead to out-of-circuit cases, which it read as establishing "that NAAQS compliance does not necessitate further study." JA0087-0088. Those cases, however, stand for the narrower principle that NEPA requires no further analysis if an agency estimates a project's emissions of an air pollutant, adds it to background levels, and finds that the total pollution level would fall below the NAAQS. *See, e.g.,*

---

[17] As in *Friends of Buckingham*, the highway expansion project's $PM_{2.5}$ emissions also threaten disproportionate harm to the environmental justice communities "living closest to the" project. *Compare Friends of Buckingham*, 947 F.3d at 91-92, *with supra* 16-21. But again, the Agencies' failure here is worse. While the affected community in *Friends of Buckingham* reportedly had less polluted air than the state average, 947 F.3d at 79, the environmental justice communities in Gaithersburg at the toll lanes' northern terminus already breathe some of the most polluted air in the state, *supra* 18.

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1045-46 (10th Cir. 2023) (agency modeled increase in pollution levels from oil wells and compared to NAAQS); *Sierra Club v. FHWA*, No. 17-cv-1661, 2018 WL 1610304, at *4 (D. Colo. Apr. 3, 2018) (same for highway); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1020-21 (S.D. Cal. 2003) (same for power plant); *Barnes v. FAA*, 865 F.3d 1266, 1271-72 (9th Cir. 2017) (same for airport expansion). The Agencies didn't take those most basic steps to understand the project's $PM_{2.5}$ impacts. Those cases therefore provide no support for the Agencies' refusal to estimate or otherwise investigate $PM_{2.5}$ pollution from the highway expansion project.[18]

## B. The Agencies' other reasons for refusing to investigate $PM_{2.5}$ pollution were arbitrary

### 1. Inapplicable provisions of the Clean Air Act

The Agencies observed that the Clean Air Act did not require them to analyze the project's $PM_{2.5}$ pollution, JA2067; JA0541; JA1480, which, while true, is immaterial to their NEPA obligations. Under the Clean Air Act, after

---

[18] Some of those cases embrace the false proposition that exposures to below-NAAQS levels of $PM_{2.5}$ are safe, and thus are at odds with *Friends of Buckingham*. *See, e.g.*, *Sierra Club*, 2018 WL 1610304, at *7-8. They also ignore the fact that EPA does not treat the NAAQS as a threshold for harm. *See supra* 11-12. This Court need not decide whether those cases were wrongly decided, though, because the Agencies failed to satisfy even the less stringent requirement to estimate project emissions and compare them to the NAAQS.

EPA establishes NAAQS for a pollutant, states must prepare implementation plans explaining how they will achieve and maintain NAAQS for each "air quality control region" within the state. 42 U.S.C. §§ 7407(a), 7410(a). Projects located in regions currently or recently violating a NAAQS (called "non-attainment" and "maintenance" areas, respectively) cannot receive federal funding or approval unless those projects "conform" to the applicable state implementation plan. *Id.* § 7506(c)(1)-(2), (5). This conformity requirement ensures that projects in non-attainment and maintenance areas don't worsen existing violations or cause new ones. *Id.* § 7605(c)(1)(B); *1000 Friends of Md. v. Browner*, 265 F.3d 216, 220-22 (4th Cir. 2001).

The Agencies determined—correctly—that the "transportation conformity requirements pertaining to $PM_{2.5}$ do not apply for this project." JA1480. That's because $PM_{2.5}$ levels measured at regional air quality monitors were below the NAAQS, placing the air quality control region for this project (which includes Fairfax and Montgomery Counties) in attainment for $PM_{2.5}$. JA1480; JA2073. Therefore, the project did not require and did not receive a conformity determination for $PM_{2.5}$. JA2659; JA2178. Neither the Agencies nor any other regulatory body estimated or otherwise analyzed the project's $PM_{2.5}$ pollution.

The highway expansion project was subject to conformity requirements for a different pollutant—ozone—because the region is in non-attainment for that pollutant. JA1480-1481; JA2176-2177. However, since the conformity determination for ozone "does not specifically address the impacts" from the project's $PM_{2.5}$ pollution, it cannot substitute for the analysis of those impacts required by NEPA. *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022) (cleaned up).[19]

## 2. Inapplicable agency guidance

The Agencies' apparent—though unexplained—reliance on a 1987 FHWA Advisory was also misplaced. JA1480. A guidance document like the Advisory "cannot give [the Agencies] discretion to ignore NEPA's 'hard look' requirement." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 71 n.27 (D.D.C. 2019). But even if the Advisory could do so, it doesn't here. The Advisory, which offers guidelines for how FHWA should address air pollution

---

[19] Before the district court, the Agencies argued for the first time that their analysis of carbon monoxide pollution justified their refusal not to assess the project's $PM_{2.5}$ pollution. That argument appears nowhere in the record— neither in the Agencies' discussions of $PM_{2.5}$ nor carbon monoxide. *See, e.g.*, JA0541 (claiming that "no further analysis of $PM_{2.5}$ was required" because the region was in attainment); JA2076-2130 (drawing no conclusions about $PM_{2.5}$ based on carbon monoxide analysis). Their belated attempt in this litigation to link unrelated carbon monoxide modeling to their non-analysis of $PM_{2.5}$ is a post-hoc rationalization that they cannot rely upon to support their decision. *See N.C. Wildlife Fed'n*, 677 F.3d at 604.

in an EIS, doesn't even mention PM$_{2.5}$. FHWA Tech. Advisory T 6640.8A § V.G.8 (1987), https://tinyurl.com/ycym59da. This makes sense: the 1987 Advisory precedes the first PM$_{2.5}$ NAAQS by almost a decade. *See* 62 Fed. Reg. 38,652 (July 18, 1997) (setting first PM$_{2.5}$ NAAQS); JA2660. Thus, as FHWA staff recognized, relying on the Advisory to explain the Agencies' decision not to investigate PM$_{2.5}$ "doesn't make sense." JA2748. The Agencies' decision to rely on the guidance document anyway was arbitrary and capricious.

\* \* \*

The Agencies decided years before completing their environmental review that they would not assess the highway expansion project's PM$_{2.5}$ pollution or its health impacts. *See* JA2131. Apparently, no amount of public comment, *e.g.*, JA2270-2275, contrary scientific studies and EPA findings, *e.g.*, JA2529-2532, or guidance from experts the Agencies consulted, JA2738-2739, could sway them otherwise, or even motivate a substantive response. And while they purported to generally "acknowledge" the information about PM$_{2.5}$ submitted in comments, JA1740, "awareness is not itself an explanation." *Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024). The Agencies' "head-in-the-sand approach" to PM$_{2.5}$ pollution is the "antithesis" of NEPA. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017). By refusing to

conduct a "thorough investigation" and provide a "candid acknowledgment of the risks" increased $PM_{2.5}$ levels pose to the health of people living closest to the proposed highway expansion, the Agencies violated their core NEPA duty to take a hard look at the project's impacts. *Nat'l Audubon Soc'y*, 422 F.3d at 185.

### III. The Agencies failed to take a hard look at the project's traffic-related air pollution harm to environmental justice communities

As with all components of a NEPA analysis, an agency's environmental justice analysis is subject to NEPA's hard look requirement. *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017); *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330-31 (D.C. Cir. 2021) (finding agency's environmental justice analysis arbitrary and capricious because of its unduly restrictive geographical scope). The agency must take a hard look at whether "a project will have a disproportionately adverse effect on minority and low-income populations," *see Friends of Buckingham*, 947 F.3d at 87 (cleaned up), and must "adequately consider[] and disclose[]" any disproportionately adverse effects, *see Vecinos*, 6 F.4th at 1327 (cleaned up).

The Agencies' traffic modeling suggested that while expanding the highways would relieve congestion in some areas, the project would worsen congestion in some minority and low-income communities. Because increased congestion generally increases air pollution, *supra* 20-21, the Agencies' traffic

data showed that widening the highways threatened to exacerbate air pollution in environmental justice communities that already receive more than their fair share of traffic-related air emissions. This evidence showing the project's disproportionately adverse effect on environmental justice communities received no discussion in the Agencies' NEPA analysis. Instead, the Agencies downplayed the project's harms to environmental justice communities by claiming—contrary to record evidence—that the project's air pollution would be distributed evenly regardless of environmental justice status. JA0629.

Evidence before the Agencies showed that the project would disproportionately burden environmental justice communities with traffic-related air pollution. The Agencies had before them uncontroverted evidence linking increased congestion to increased emissions. *Supra* 20-21. And the Agencies' own traffic modeling indicated the project would reduce congestion near the American Legion Bridge at the expense of environmental justice communities by shifting the existing bottleneck near the bridge to the toll lanes' endpoints, where most of the minority and low-income communities in the project area are located. *Supra* 19-20.

According to the Agencies' own traffic modeling, while speeds would sometimes triple around the American Legion Bridge during morning rush hour under the project, JA1032 (significant increases in speed under the project

during morning rush hour between George Washington Memorial Parkway and Clara Barton Parkway), segments near the toll lanes' termini would experience decreases in speed during rush hours, sometimes by as much as 50 mph. *Supra* 20. The Agencies' own staff acknowledged that the project's purported congestion relief would not be "equally distributed." JA2629. They observed, for example, that the project would worsen traffic on I-270's general purpose lanes during afternoon rush hour. JA2630. They also expressed concerns about the "significant" degradation of eastbound traffic during morning rush hour on the Beltway's Inner Loop near the toll lanes' endpoints. JA2629-2630. This evidence of disparate traffic-related air pollution bears on the key question of any environmental justice analysis: the distribution of harms. *See Friends of Buckingham*, 947 F.3d at 87.

The Agencies, however, ignored that evidence in analyzing the project's environmental justice impacts. The traffic section in their environmental justice analysis touted the "uncongested conditions" on the toll lanes, JA1194, emphasized the decrease in congestion "along the majority of" the Beltway and I-270, JA1213, and only mentioned in passing that "drivers on the northbound I-270" during afternoon rush hour "may experience heavy congestion," JA1194. But they never acknowledged that *the project* would contribute to that "heavy congestion" on I-270, as demonstrated by their

modeling.[20] Nor did they disclose that most of the segments that would experience project-induced increases in congestion are located in environmental justice communities. In short, the Agencies failed to explain in their environmental justice analysis—or in any of the NEPA documents—that the project would in fact worsen congestion in environmental justice communities, even as traffic conditions improved elsewhere. And having failed to acknowledge the disparate traffic burden on environmental justice communities, they also left unexamined how that burden would translate into disparate air pollution harms.

The Agencies' error did not stop at ignoring record evidence; they also obfuscated the project's environmental justice harms through statements directly at odds with that evidence. They claimed that "all existing [general purpose] lanes" would "experience traffic improvements . . . along the corridor segments adjacent to [environmental justice] populations." JA1194. Further, they declared in the FEIS that the project's traffic-related air pollution "would be distributed" along the project corridor, "regardless of [environmental

---

[20] The Agencies in the FEIS claimed that congestion "during the [afternoon] peak period on I-270 northbound . . . would not get worse due to" the project. JA0392. But that statement is contradicted by the Agencies' traffic modeling, which showed that expanding the highways would lead to slower speeds during afternoon rush hour in this area compared with the No Build Alternative. *Supra* 19-20. FHWA's own staff acknowledged as much. *Supra* 44.

justice] status." JA0629. They never attempted to reconcile these claims with their own modeling showing a disproportionate increase of congestion in environmental justice communities, or the undisputed record evidence linking increased congestion to increased air pollution. This failure to provide a "rational connection between the facts found and the decision made" was arbitrary and capricious. *See Vecinos*, 6 F.4th at 1330 (cleaned up) (holding that agency's analysis of environmental justice impacts within two miles of the project was arbitrary in light of evidence that the project's environmental effects would extend farther).

While the record did include some analysis of air pollution, none supported the Agencies' assertion that traffic-related air pollution would be evenly distributed because none addressed the distribution of that pollution. The Agencies modeled mobile source air toxics emissions from the project as a whole, but that modeling did not predict emissions in specific locations. JA1490-1491. The ozone study was also regional in nature: it estimated whether the host of projects within the region's transportation plan—of which the highway expansion project was only one—would contribute to a violation of the ozone NAAQS. JA0789.

Contrary to what the Agencies claimed (for the first time) before the district court, their carbon monoxide modeling shed no light on the

distribution of traffic-related air pollution either. Carbon monoxide levels increase with traffic. *See* JA2095 (explaining interchanges with the "highest traffic volumes and delays" would represent locations of "peak CO concentrations"). But the Agencies designed the carbon monoxide study to understand whether, under a theoretical level of "worst-case" traffic conditions, the project area would violate the carbon monoxide NAAQS. JA2082. To do so, the Agencies did not use their actual traffic modeling; they instead assumed the same "theoretical" level of congestion for all stretches of the road. JA2104. The study therefore provided no insight into the distribution of carbon monoxide under the project.

Without any air quality analysis that incorporated their traffic modeling data, *see* JA1196 (acknowledging that the Agencies did not perform "air quality modeling at a localized level"), the Agencies had no basis to claim that air pollution from the project would affect all communities equally. Instead, the evidence before the Agencies, including their traffic modeling and record evidence linking increased congestion with increased emissions, all point to one conclusion: that expanding the highways would bring a disproportionate amount of pollutants into environmental justice communities.

By disregarding record evidence of disproportionate traffic-related air pollution in environmental justice communities, the Agencies failed to conduct

"a thorough investigation" into the project's environmental justice impacts or offer a "candid acknowledgment of the risks that those impacts entail." *Nat'l Audubon Soc'y*, 422 F.3d at 185; *see also Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 352 (4th Cir. 2019) (agency action was arbitrary and capricious because it ignored significant evidence that the agency itself had gathered). Worse, by claiming that the project's air pollution would be distributed evenly, they provided the public with "erroneous information" about a critical issue of public health and equity, *see N.C. Wildlife Fed'n*, 677 F.3d at 603, masked the project's air pollution harms to communities already overburdened with pollution, and "undermine[d] . . . informed decisionmaking," *Sierra Club*, 867 F.3d at 1368. The Agencies' failure to take a hard look at traffic-related air pollution in environmental justice communities violated NEPA.

## IV. The Agencies arbitrarily rejected an alternative that would have avoided Plummers Island

The Agencies' preferred design for the American Legion Bridge—the on-center alignment—would severely damage Plummers Island. Expanding part of a sixteen-lane bridge over the historic island and driving pilings for that bridge into the island's rocky headland would upend long-term ongoing scientific research, disrupt the island's sensitive ecology, and mar its natural landscape. JA0420; JA1357; JA1748; JA0601; JA0502-0503. An expert panel

developed a "viable" alternative that would spare this historic and biodiverse natural area by shifting the new bridge's alignment slightly to the west. JA1531, JA1538.

That west-shift alignment would, however, impact other parkland. JA1531. Faced with competing alternatives, the Agencies were legally required to select the one that caused the "least overall harm." 23 C.F.R. § 774.3(c)(1). FHWA regulations specified how they were to make that choice: a seven-factor test to identify and weigh the tradeoffs of each alternative. *Id.* § 774.3(c)(1)(i)-(vii). But the Agencies ignored that mandatory test and authorized significant damage to Plummers Island without "follow[ing] all procedural requirements" or adequately considering the "relevant factors" set out in FHWA regulations. *See Defs. of Wildlife*, 762 F.3d at 401 (cleaned up). Doing so was arbitrary and contrary to law.

## A.    The Agencies did not apply the multi-factor balancing test mandated by FHWA regulations

The Agencies could not reconstruct and widen the American Legion Bridge without impacting parkland protected by Section 4(f). *See* JA1530-1532. Because there was no "prudent and feasible alternative" that would avoid all Section 4(f) property, 49 U.S.C. § 303(c)(1); JA0388, JA0677-0680, the Agencies needed to identify and select the alternative that would cause "the

least overall harm in light of the statute's preservation purpose," 23 C.F.R. § 774.3(c)(1); *accord Defs. of Wildlife*, 762 F.3d at 400-01.

FHWA's regulations set out a seven-factor balancing test for identifying the alternative that causes the least overall harm. That test requires consideration of:

(i)      The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

(ii)      The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii)      The relative significance of each Section 4(f) property;

(iv)      The views of the official(s) with jurisdiction over each Section 4(f) property;

(v)      The degree to which each alternative meets the purpose and need for the project;

(vi)      After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii)      Substantial differences in costs among the alternatives.

23 C.F.R. § 774.3(c)(1). "The point of the analysis is a comprehensive inquiry that balances the net harm to Section 4(f) properties caused by each alternative with all other relevant concerns." 73 Fed. Reg. 13,368, 13,372 (Mar. 12, 2008). This analysis is mandatory: it "must be documented in the Section 4(f)

evaluation."[21] 23 C.F.R. § 774.7(c); *accord* 77 Fed. Reg. 42,802, 42,810 (July 20, 2012) ("FHWA is required to explain how the seven factors were compared to determine the least overall harm alternative . . . ."). And FHWA must document its Section 4(f) approval in either the FEIS or ROD. 23 C.F.R. § 774.9(b).

The Agencies failed to follow FHWA's regulations here. The Agencies chose the on-center bridge alignment and rejected the west-shift alignment without conducting the seven-factor balancing test for determining least overall harm. *See* JA1518; JA1542. Indeed, they didn't mention either alignment alternative in their Section 4(f) evaluation. *See* JA0689-0695; JA1283-1284; JA1331-1336; JA1818-1822, JA1858; JA1860-1866; JA1919-2045.

The Agencies' failure to conduct the required least overall harm analysis for the west-shift alignment is particularly glaring given that the west-shift alignment was developed by the American Legion Bridge Strike Team, an expert panel convened by the Agencies for the express purpose of developing

---

[21] In 1971, the Supreme Court held that Section 4(f) itself does not require specific, "formal findings." *Overton Park*, 401 U.S. at 417. Yet, it is axiomatic that agencies can bind themselves through their regulations. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-68 (1954); *Lovo v. Miller*, 107 F.4th 199, 212 (4th Cir. 2024). And in 2008 FHWA promulgated regulations obligating the agency to "document" aspects of its Section 4(f) analysis, including its consideration of the seven-factor least overall harm test. 73 Fed. Reg. at 13,396-97. The district court erred when it overlooked the binding nature of these regulations. *See* JA0124-0125, JA0128.

alternatives that would minimize harm to parkland, including Plummers Island. JA0502 & n.5; JA1538. The Strike Team offered the west-shift alignment as a "viable" option that would avoid Plummers Island and that might be cheaper and quicker to build than the on-center alignment. JA1538; JA3018. The Agencies evaluated other project alternatives applying FHWA's least overall harm criteria, JA1919-2045; JA0693-0695, including a tunnel under the Potomac River that would have cost $1 billion more than their preferred design, JA1926. Yet, without explanation, they failed to evaluate the expert-prepared, west-shift alignment alternative using the balancing test set out in FHWA's regulations.

The Agencies' departure from mandatory FHWA procedures was contrary to law. The Agencies must "follow[] all procedural requirements" of Section 4(f), *Defs. of Wildlife*, 762 F.3d at 401, including those established by FHWA's implementing regulations, *see Wild Va.*, 24 F.4th at 931-32 (holding that an agency's failure to follow its regulations in evaluating the environmental effects of a project was arbitrary). Their failure to apply the seven-factor balancing test for least overall harm when deciding between the on-center and west-shift alignments violated FHWA regulations and rendered their Section 4(f) evaluation unlawful.

**B.    The Agencies ignored relevant factors when rejecting the west-shift alignment**

The Agencies' error was not just procedural. Rather, it resulted in a substantively deficient evaluation of alternative bridge alignments. By shirking the seven-factor balancing test for least overall harm, the Agencies conducted only a partial analysis of only some of the least overall harm factors, while completely ignoring others. Their failure to consider all "relevant factors" was arbitrary. *See Defs. of Wildlife*, 762 F.3d at 401 (cleaned up).

The Agencies' limited rationale for rejecting the west-shift alignment did not come close to approximating the "comprehensive inquiry" required of them. 73 Fed. Reg. at 13,372. They claimed to discard the west-shift alignment because it would use more parkland than the on-center alignment, require acquisition of a single residential property, and require reconfiguration of a highway interchange. JA0503; JA1518; JA1542. These considerations are relevant to a few of the least overall harm factors. The acreage of park impacts goes to the severity of the harm to protected parkland. *See* 23 C.F.R. § 774.3(c)(1)(ii). The residential displacement is an adverse impact to a non-Section 4(f) property. *See id.* § 774.3(c)(1)(vi). And the interchange

reconfiguration affects cost. *See id.* § 774.3(c)(1)(vii).[22] But the Agencies' explanation entirely fails to address several least overall harm factors. And even if the Agencies' explanation could be construed as touching on some of the regulatory factors (something they never claimed in the record, *supra* 51), their explanation addresses those factors incompletely at best.

Indeed, the record shows that the Agencies failed to consider several "relevant factors," *Defs. of Wildlife*, 762 F.3d at 401 (cleaned up), integral to the least overall harm assessment: whether they could mitigate impacts from the west-shift alignment, the relative severity of the harm to parkland caused by the west-shift and on-center alignments, the relative significance of that parkland, and whether there would be a substantial difference in cost between the two alignments. *See* 23 C.F.R. § 774.3(c)(1)(i), (ii), (iii), (vi), (vii).[23]

*Mitigation.* The Agencies had an obligation to mitigate the west-shift alignment's adverse impacts. *See* 23 C.F.R. § 774.3(c)(1)(i), (ii), (vi). They

---

[22] In addition, the Strike Team's conclusion that the west-shift alignment was a "viable" option showed that this alternative met the project's "purpose and need." *See* 23 C.F.R. § 774.3(c)(1)(v); JA1538. The Agencies also documented "the views of the official(s) with jurisdiction over" Plummers Island—the Department of the Interior. *See id.* § 774.3(c)(1)(iv); JA0212-0213.

[23] For this reason, the district court's conclusion that the Agencies' incomplete assessment of the least overall harm factors "reasonably complied" with Section 4(f), JA0128, is wrong. As the Supreme Court has explained, an "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *State Farm*, 463 U.S. at 43).

never did. The Agencies conducted an initial comparison of harms from the on-center and west-shift alignments in March 2021. *See* JA1532. Over the course of the next year, they found ways to reduce the acreage damaged by the on-center alignment, but they never explored similar mitigation for the west-shift alignment. *See id.* Contrary to FHWA's regulations and guidance, the Agencies' comparison of acreage impacts was "skewed by over-mitigating one alternative while under-mitigating another alternative." 77 Fed. Reg. at 42,810.

*Relative Severity of Harm.* Although the Agencies tallied up the number of acres harmed by the two alignments, they never compared the "relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection." 23 C.F.R. § 774.3(c)(1)(ii). That oversight left a gaping hole in their analysis. Much of the land that would be impacted by the west-shift alignment consists of scattered strips of parkland abutting highway ramps and other roads. *See* JA1534. The record is silent as to whether there is any special ecological, scientific, historical, or recreational value to this land. By contrast, the on-center alignment would cause severe damage to ongoing scientific research, rare plants, and the natural landscape of Plummers Island—"protected activities, attributes, [and] features that qualify" the island for inclusion on the National Register of Historic Places and protection under Section 4(f). The

Agencies' narrow focus on the *amount* of land harmed by the two alternatives did not provide the detailed comparison of the character and severity of harm demanded by FHWA regulations.

*Relative Significance of Property.* Similarly, the Agencies failed to assess the "relative significance" of the Section 4(f) properties affected by the competing alignments, as required by the least overall harm regulations. 23 C.F.R. § 774.3(c)(1)(iii). Not all Section 4(f) properties are created equal. Some "are worthy of a greater degree of protection than others," especially those "that are unique or otherwise of special significance." 77 Fed. Reg. at 42,809. Plummers Island fits that mold. It is "the most scientifically studied island in North America": a biodiversity hotspot, research hub, and historic site. JA0599; *see also* JA0536; JA1438. Yet, the Agencies neither discussed the significance of the land that would be impacted by the west-shift alignment nor explained whether they viewed that land to be of comparable significance to Plummers Island.

*Substantial Differences in Cost.* Finally, the Agencies offered no analysis as to whether there are "[s]ubstantial differences in cost" between the west-shift and on-center alignments. *See* 23 C.F.R. §§ 774.3(c)(1)(vii), 774.7(c), 774.9(b). This omission contrasts with the specific cost estimates provided for other alternatives considered in their least overall harm analysis. *See, e.g.*, JA1920,

JA1926, JA2042-2045. The Strike Team found that the west-shift alignment alternative *might* save $40 million dollars and several months of construction time, but it also noted that those savings *might* be offset by the need to reconfigure the Beltway's interchange with the Clara Barton Parkway. JA3018. In the FEIS, the Agencies made no mention of the potential cost savings from the west-shift alignment. They cited the interchange work as a reason for rejecting the west-shift alignment, JA1542—perhaps because of its cost—but they never answered the question posed by FHWA's regulations: whether that alternative would be substantially more costly to build than the on-center alignment.

\* \* \*

In deciding between the west-shift and on-center alignments, both of which would harm parkland, the Agencies were faced with a choice of "paramount importance." *Overton Park*, 401 U.S. at 412-13. Yet, the Agencies' skewed and incomplete comparison of these alternatives fell far short of the methodical balancing demanded by FHWA regulations. Because they neither documented nor explained their consideration of the least overall harm factors, they failed to "follow[] all procedural requirements" of Section 4(f). *Defs. of Wildlife*, 762 F.3d at 401 (citing *Overton Park*, 401 U.S. at 417). And their rejection of the west-shift alignment alternative without considering several

"important aspect[s] of the problem" was arbitrary and capricious. *See Defs. of Wildlife*, 931 F.3d at 354-55 (cleaned up) (holding that an agency's failure to consider its action's effects on species' recovery was arbitrary where a regulation required consideration of that factor); *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 474-75 (4th Cir. 2013) (holding that an agency's failure to consider the economic feasibility of an alternative was arbitrary where a regulation required such consideration). The gaps in their rationale for rejecting the west-shift alignment indicate that their decision was not "based on a consideration of the relevant factors" and leaves this Court— and the public—unable to determine "whether the factors actually support the [Agencies'] determination." *Defs. of Wildlife*, 762 F.3d at 401 (cleaned up).

**V. The Court should reverse and remand this case to the district court with instructions to vacate the Agencies' unlawful approval**

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing agency actions challenged in petitions for review, this Court does not hesitate to vacate actions that violate APA standards. *See, e.g.*, *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 509 (4th Cir. 2023); *Wild Va.*, 24 F.4th at 920; *Defs. of Wildlife*, 931 F.3d at 345. There is no reason to depart from that default remedy here. The Court should therefore reverse the judgment below and

remand the case to the district court with instructions to vacate the FEIS and ROD. *See High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1228 (10th Cir. 2020) ("The typical remedy for an EIS in violation of NEPA is remand to the district court with instructions to vacate the agency action."); *accord Dow AgroSciences LLC*, 707 F.3d at 475 (reversing the district court's judgment, vacating the unlawful agency action, and remanding to the district court).

## CONCLUSION

The Court should reverse the judgment of the district court and remand with instructions to vacate the FEIS and ROD.

Respectfully submitted,

/s/ Jared E. Knicley
Jared Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Telephone: (202) 513-6242
Facsimile: (415) 795-4799
Email: jknicley@nrdc.org

Nanding Chen
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Telephone: (415) 875-6165
Facsimile: (415) 795-4799
Email: nchen@nrdc.org

*Counsel for Appellants Maryland Chapter*
*of the Sierra Club, National Trust for*
*Historic Preservation in the United States,*
*and Natural Resources Defense Council*


/s/ Andrea C. Ferster
Andrea C. Ferster
Attorney at Law
68 Beebe Pond Road
Canaan, NY 12029
Telephone: (202) 669-6311
Email: aferster@railstotrails.org
(signed by Jared E. Knicley with
permission from Andrea C. Ferster)

*Counsel for Appellant Maryland Chapter*
*of the Sierra Club*


/s/ Elizabeth S. Merritt
Elizabeth S. Merritt
Deputy General Counsel
National Trust for Historic Preservation
600 14th Street NW, Suite 500
Washington, DC 20005
Telephone: (202) 297-4133
Facsimile: (202) 588-6038
Email: emerritt@savingplaces.org
(signed by Jared E. Knicley with
permission from Elizabeth S. Merritt)

*Counsel for Appellant National Trust for*
*Historic Preservation in the United States*

## CERTIFICATION OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1), I certify that the foregoing brief complies with:

1.      the type-volume limitations of Rule 32(a)(7) because it contains 12,449 words, excluding the parts of the brief exempted by Rule 32(f); and

2.      the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

Consistent with Rule 30(c)(2)(B), other than the replacement of original record citations with citations to the joint appendix, related shifts in pagination, and the correction of typographical errors, this brief is identical to the page-proof opening brief filed on June 12, 2024.

/s/ Jared E. Knicley
Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
jknicley@nrdc.org

No. 24-1447

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

and

FRIENDS OF MOSES HALL, ET AL.,

*Plaintiffs,*

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

**APPELLANTS' OPENING BRIEF
STATUTORY AND REGULATORY ADDENDUM**

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Nanding Chen
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6165
nchen@nrdc.org

*Counsel for Appellants*

October 7, 2024

# ADDENDUM TABLE OF CONTENTS

**Statutes**

5 U.S.C. § 706 ........................................................................... 1

23 U.S.C. § 138 ......................................................................... 3

42 U.S.C. § 4332 ....................................................................... 8

42 U.S.C. § 7407 ..................................................................... 11

42 U.S.C. § 7410 ..................................................................... 17

49 U.S.C. § 303 ....................................................................... 26

**Regulations**

23 C.F.R. § 774.3 .................................................................... 29

23 C.F.R. § 774.7 .................................................................... 30

23 C.F.R. § 774.9 .................................................................... 31

40 C.F.R. § 50.18 .................................................................... 33

40 C.F.R. § 1502.1 (2019) ........................................................ 34

40 C.F.R. § 1502.16 (2019) ...................................................... 36

40 C.F.R. § 1508.27 (2019) ...................................................... 38



to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

#### Editorial Notes

##### AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

##### ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof,

that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is—

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same



being construed as authority for any appropriations not specifically authorized in these sections and provisions.

Subsec. (b). Pub. L. 91–605 substituted provisions preventing project approval by the Secretary unless the State or political subdivision thereof where the project is located can construct, maintain, and operate the facility, unless the Secretary has entered into an agreement with the State or political subdivision governing the financing, maintenance, and operation of the facility, and unless the Secretary has approved design standards for construction of the facility for provisions limiting authorization of appropriations under sections 131, 136, and 319(b) of this title, or any highway safety bill enacted after May 1, 1966 by preventing appropriations to carry out these sections and provisions unless they are specific as to the amount authorized and as to the fiscal year.

Subsec. (c). Pub. L. 91–605 substituted provisions defining ''parking facilities'' for provisions limiting authorization of appropriations under sections 131, 136, and 319(b) of this title, or any highway safety bill enacted after May 1, 1966 by preventing the highway trust fund from being a source of appropriation for these sections and provisions in an amount exceeding the tax imposed by section 4061(a)(2) of Title 26, if such tax was imposed at a rate of 1% plus additional amounts appropriated from the general fund to the highway trust fund for such purposes except that the total of all appropriations made from such fund to carry out these sections and provisions shall never exceed the total of all appropriations made to such fund based on the imposition of such tax plus additional amounts appropriated from the general fund to the highway trust fund for such purposes.

Subsecs. (d), (e). Pub. L. 91–605 added subsecs. (d) and (e).

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

##### EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–141 effective Oct. 1, 2012, see section 3(a) of Pub. L. 112–141, set out as an Effective and Termination Dates of 2012 Amendment note under section 101 of this title.

##### RELINQUISHMENT OF PARK-AND-RIDE LOT FACILITIES

Pub. L. 114–94, div. A, title I, §1423, Dec. 4, 2015, 129 Stat. 1425, provided that: ''A State transportation agency may relinquish park-and-ride lot facilities or portions of park-and-ride lot facilities to a local government agency for highway purposes if authorized to do so under State law if the agreement providing for the relinquishment provides that—

''(1) rights-of-way on the Interstate System will remain available for future highway improvements; and

''(2) modifications to the facilities that could impair the highway or interfere with the free and safe flow of traffic are subject to the approval of the Secretary [of Transportation].''

##### JASON'S LAW

Pub. L. 112–141, div. A, title I, §1401, July 6, 2012, 126 Stat. 554, provided that:

''(a) IN GENERAL.—It is the sense of Congress that it is a national priority to address projects under this section for the shortage of long-term parking for commercial motor vehicles on the National Highway System to improve the safety of motorized and nonmotorized users and for commercial motor vehicle operators.

''(b) ELIGIBLE PROJECTS.—Eligible projects under this section are those that—

''(1) serve the National Highway System; and

''(2) may include the following:

''(A) Constructing safety rest areas (as defined in section 120(c) of title 23, United States Code) that include parking for commercial motor vehicles.

''(B) Constructing commercial motor vehicle parking facilities adjacent to commercial truck stops and travel plazas.

''(C) Opening existing facilities to commercial motor vehicle parking, including inspection and weigh stations and park-and-ride facilities.

''(D) Promoting the availability of publicly or privately provided commercial motor vehicle parking on the National Highway System using intelligent transportation systems and other means.

''(E) Constructing turnouts along the National Highway System for commercial motor vehicles.

''(F) Making capital improvements to public commercial motor vehicle parking facilities currently closed on a seasonal basis to allow the facilities to remain open year-round.

''(G) Improving the geometric design of interchanges on the National Highway System to improve access to commercial motor vehicle parking facilities.

''(c) SURVEY AND COMPARATIVE ASSESSMENT.—

''(1) IN GENERAL.—Not later than 18 months after the date of enactment of this Act [see section 3(a), (b) of Pub. L. 112–141, set out as Effective and Termination Dates of 2012 Amendment notes under section 101 of this title], the Secretary [of Transportation], in consultation with relevant State motor carrier safety personnel, shall conduct a survey of each State—

''(A) to evaluate the capability of the State to provide adequate parking and rest facilities for commercial motor vehicles engaged in interstate transportation;

''(B) to assess the volume of commercial motor vehicle traffic in the State; and

''(C) to develop a system of metrics to measure the adequacy of commercial motor vehicle parking facilities in the State.

''(2) RESULTS.—The results of the survey under paragraph (1) shall be made available to the public on the website of the Department of Transportation.

''(3) PERIODIC UPDATES.—The Secretary shall periodically update the survey under this subsection.

''(d) ELECTRIC VEHICLE AND NATURAL GAS VEHICLE INFRASTRUCTURE.—

''(1) IN GENERAL.—Except as provided in paragraph (2), a State may establish electric vehicle charging stations or natural gas vehicle refueling stations for the use of battery-powered or natural gas-fueled trucks or other motor vehicles at any parking facility funded or authorized under this Act [see Tables for classification] or title 23, United States Code.

''(2) EXCEPTION.—Electric vehicle battery charging stations or natural gas vehicle refueling stations may not be established or supported under paragraph (1) if commercial establishments serving motor vehicle users are prohibited by section 111 of title 23, United States Code.

''(3) FUNDS.—Charging or refueling stations described in paragraph (1) shall be eligible for the same funds as are available for the parking facilities in which the stations are located.

''(e) TREATMENT OF PROJECTS.—Notwithstanding any other provision of law, projects funded through the authority provided under this section shall be treated as projects on a Federal-aid highway under chapter 1 of title 23, United States Code.''

##### TRUCK PARKING FACILITIES

Pub. L. 109–59, title I, §1305, Aug. 10, 2005, 119 Stat. 1214, which related to truck parking facilities, was repealed by Pub. L. 112–141, div. A, title I, §1519(b)(2), July 6, 2012, 126 Stat. 575.

### § 138. Preservation of parklands

(a) DECLARATION OF POLICY.—

(1) IN GENERAL.—It is the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

(2) COOPERATION AND CONSULTATION.—

(A) IN GENERAL.—The Secretary shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed.

(B) TIMELINE FOR APPROVALS.—

(i) IN GENERAL.—The Secretary shall—

(I) provide an evaluation under this section to the Secretaries described in subparagraph (A); and

(II) provide a period of 30 days for receipt of comments.

(ii) ASSUMED ACCEPTANCE.—If the Secretary does not receive comments by 15 days after the deadline under clause (i)(II), the Secretary shall assume a lack of objection and proceed with the action.

(C) EFFECT.—Nothing in subparagraph (B) affects—

(i) the requirements under—

(I) subsections (b) through (f); or

(II) the consultation process under section 306108 of title 54; or

(ii) programmatic section 4(f) evaluations, as described in regulations issued by the Secretary.

(3) REQUIREMENT.—After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project (other than any project for a Federal lands transportation facility) which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless—

(A) there is no feasible and prudent alternative to the use of the land; and

(B) the program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

(4) STUDIES.—In carrying out the national policy declared in this section the Secretary, in cooperation with the Secretary of the Interior and appropriate State and local officials, is authorized to conduct studies as to the most feasible Federal-aid routes for the movement of motor vehicular traffic through or around national parks so as to best serve the needs of the traveling public while preserving the natural beauty of these areas.

(b) DE MINIMIS IMPACTS.—

(1) REQUIREMENTS.—

(A) REQUIREMENTS FOR HISTORIC SITES.—The requirements of this section shall be considered to be satisfied with respect to an area described in paragraph (2) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area.

(B) REQUIREMENTS FOR PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—The requirements of subsection (a)(1) shall be considered to be satisfied with respect to an area described in paragraph (3) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area. The requirements of subsection (a)(2) with respect to an area described in paragraph (3) shall not include an alternatives analysis.

(C) CRITERIA.—In making any determination under this subsection, the Secretary shall consider to be part of a transportation program or project any avoidance, minimization, mitigation, or enhancement measures that are required to be implemented as a condition of approval of the transportation program or project.

(2) HISTORIC SITES.—With respect to historic sites, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, in accordance with the consultation process required under section 306108 of title 54, that—

(i) the transportation program or project will have no adverse effect on the historic site; or

(ii) there will be no historic properties affected by the transportation program or project;

(B) the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisory Council on Historic Preservation if the Council is participating in the consultation process); and

(C) the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

(3) PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—With respect to parks, recreation areas, or wildlife or waterfowl refuges, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, after public notice and opportunity for public review and comment, that the transportation program or project will not adversely affect the activities, features, and attributes of the park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section; and

(B) the finding of the Secretary has received concurrence from the officials with jurisdiction over the park, recreation area, or wildlife or waterfowl refuge.

(c) SATISFACTION OF REQUIREMENTS FOR CERTAIN HISTORIC SITES.—

(1) IN GENERAL.—The Secretary shall—

(A) align, to the maximum extent practicable, with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and section 306108 of title 54, including implementing regulations; and

(B) not later than 90 days after the date of enactment of this subsection, coordinate

with the Secretary of the Interior and the Executive Director of the Advisory Council on Historic Preservation (referred to in this subsection as the "Council") to establish procedures to satisfy the requirements described in subparagraph (A) (including regulations).

(2) AVOIDANCE ALTERNATIVE ANALYSIS.—

(A) IN GENERAL.—If, in an analysis required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), the Secretary determines that there is no feasible or prudent alternative to avoid use of a historic site, the Secretary may—

(i) include the determination of the Secretary in the analysis required under that Act;

(ii) provide a notice of the determination to—

(I) each applicable State historic preservation officer and tribal historic preservation officer;

(II) the Council, if the Council is participating in the consultation process under section 306108 of title 54; and

(III) the Secretary of the Interior; and

(iii) request from the applicable preservation officer, the Council, and the Secretary of the Interior a concurrence that the determination is sufficient to satisfy subsection (a)(1).

(B) CONCURRENCE.—If the applicable preservation officer, the Council, and the Secretary of the Interior each provide a concurrence requested under subparagraph (A)(iii), no further analysis under subsection (a)(1) shall be required.

(C) PUBLICATION.—A notice of a determination, together with each relevant concurrence to that determination, under subparagraph (A) shall—

(i) be included in the record of decision or finding of no significant impact of the Secretary; and

(ii) be posted on an appropriate Federal website by not later than 3 days after the date of receipt by the Secretary of all concurrences requested under subparagraph (A)(iii).

(3) ALIGNING HISTORICAL REVIEWS.—

(A) IN GENERAL.—If the Secretary, the applicable preservation officer, the Council, and the Secretary of the Interior concur that no feasible and prudent alternative exists as described in paragraph (2), the Secretary may provide to the applicable preservation officer, the Council, and the Secretary of the Interior notice of the intent of the Secretary to satisfy subsection (a)(2) through the consultation requirements of section 306108 of title 54.

(B) SATISFACTION OF CONDITIONS.—To satisfy subsection (a)(2), each individual described in paragraph (2)(A)(ii) shall concur in the treatment of the applicable historic site described in the memorandum of agreement or programmatic agreement developed under section 306108 of this title.

(d) REFERENCES TO PAST TRANSPORTATION ENVIRONMENTAL AUTHORITIES.—

(1) SECTION 4(F) REQUIREMENTS.—The requirements of this section are commonly referred to as section 4(f) requirements (see section 4(f) of the Department of Transportation Act (Public Law 89–670; 80 Stat. 934) as in effect before the repeal of that section).

(2) SECTION 106 REQUIREMENTS.—The requirements of section 306108 of title 54 are commonly referred to as section 106 requirements (see section 106 of the National Historic Preservation Act of 1966 (Public Law 89–665; 80 Stat. 917) as in effect before the repeal of that section).

(e) BRIDGE EXEMPTION FROM CONSIDERATION.—A common post-1945 concrete or steel bridge or culvert (as described in 77 Fed. Reg. 68790) that is exempt from individual review under section 306108 of title 54 shall be exempt from consideration under this section.

(f) RAIL AND TRANSIT.—

(1) IN GENERAL.—Improvements to, or the maintenance, rehabilitation, or operation of, railroad or rail transit lines or elements thereof that are in use or were historically used for the transportation of goods or passengers shall not be considered a use of a historic site under subsection (a), regardless of whether the railroad or rail transit line or element thereof is listed on, or eligible for listing on, the National Register of Historic Places.

(2) EXCEPTIONS.—

(A) IN GENERAL.—Paragraph (1) shall not apply to—

(i) stations; or

(ii) bridges or tunnels located on—

(I) railroad lines that have been abandoned; or

(II) transit lines that are not in use.

(B) CLARIFICATION WITH RESPECT TO CERTAIN BRIDGES AND TUNNELS.—The bridges and tunnels referred to in subparagraph (A)(ii) do not include bridges or tunnels located on railroad or transit lines—

(i) over which service has been discontinued; or

(ii) that have been railbanked or otherwise reserved for the transportation of goods or passengers.

(Added Pub. L. 89–574, §15(a), Sept. 13, 1966, 80 Stat. 771; amended Pub. L. 90–495, §18(a), Aug. 23, 1968, 82 Stat. 823; Pub. L. 94–280, title I, §124, May 5, 1976, 90 Stat. 440; Pub. L. 100–17, title I, §133(b)(10), Apr. 2, 1987, 101 Stat. 171; Pub. L. 109–59, title VI, §6009(a)(1), Aug. 10, 2005, 119 Stat. 1874; Pub. L. 112–141, div. A, title I, §1119(c)(2), July 6, 2012, 126 Stat. 492; Pub. L. 113–287, §5(f)(2), Dec. 19, 2014, 128 Stat. 3268; Pub. L. 114–94, div. A, title I, §§1301(a), 1302(a), 1303(a), title XI, §11502(a), Dec. 4, 2015, 129 Stat. 1375, 1377, 1378, 1690; Pub. L. 117–58, div. A, title I, §11316, Nov. 15, 2021, 135 Stat. 543.)

### Editorial Notes

REFERENCES IN TEXT

For the effective date of the Federal-Aid Highway Act of 1968, referred to in subsec. (a)(3), see section 37 of Pub. L. 90–495, set out as an Effective Date of 1968 Amendment note under section 101 of this title.

The National Environmental Policy Act of 1969, referred to in subsec. (c)(1)(A), (2)(A), is Pub. L. 91–190,

Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The date of enactment of this subsection, referred to in subsec. (c)(1)(B), is the date of enactment of Pub. L. 114–94, which was approved Dec. 4, 2015.

AMENDMENTS

2021—Subsec. (a)(1). Pub. L. 117–58, § 11316(4), designated first sentence of subsec. (a) as par. (1), inserted heading, and substituted "It is" for "It is declared to be".

Subsec. (a)(2). Pub. L. 117–58, § 11316(3), designated second sentence of subsec. (a) as par. (2)(A), inserted par. and subpar. headings, substituted "The Secretary" for "The Secretary of Transportation", and added subpars. (B) and (C).

Subsec. (a)(3). Pub. L. 117–58, § 11316(2), designated third sentence of subsec. (a) as par. (3) and inserted heading, inserted dash after "unless", redesignated cls. (1) and (2) within text as subpars. (A) and (B), respectively, and inserted line breaks before each subpar., and substituted "use of the land; and" for "use of such land, and" and "the program includes" for "such program includes".

Subsec. (a)(4). Pub. L. 117–58, § 11316(1), designated fourth sentence of subsec. (a) as par. (4) and inserted heading.

2015—Subsec. (c). Pub. L. 114–94, § 1301(a), added subsec. (c).

Subsec. (d). Pub. L. 114–94, § 1302(a), added subsec. (d).

Subsec. (e). Pub. L. 114–94, § 1303(a), added subsec. (e).

Subsec. (f). Pub. L. 114–94, § 11502(a), added subsec. (f).

2014—Subsec. (b)(2)(A). Pub. L. 113–287 substituted "section 306108 of title 54" for "section 106 of the National Historic Preservation Act (16 U.S.C. 470f)" in introductory provisions.

2012—Subsec. (a). Pub. L. 112–141 substituted "Federal lands transportation facility" for "park road or parkway under section 204 of this title".

2005—Pub. L. 109–59, § 6009(a)(1)(A), which directed substitution of "(a) DECLARATION OF POLICY.—It is" for "it is hereby", was executed by making the substitution for "It is hereby" to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 109–59, § 6009(a)(1)(B), added subsec. (b).

1987—Pub. L. 100–17 inserted "other than any project for a park road or parkway under section 204 of this title)" before "which requires" in third sentence.

1976—Pub. L. 94–280 authorized the Secretary, in cooperation with the Secretary of the Interior and appropriate State and local officials, to conduct studies as to the most feasible Federal-aid routes for the movement of motor vehicular traffic through or around national parks so as to best serve the needs of the traveling public while preserving the natural beauty of these areas.

1968—Pub. L. 90–495 amended section generally so as to render it identical to section 1653(f) of Title 49, Transportation, governing all programs and projects subject to the jurisdiction of the Secretary of Transportation.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2021 AMENDMENT

Amendment by Pub. L. 117–58 effective Oct. 1, 2021, see section 10003 of Pub. L. 117–58, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 2015 AMENDMENT

Amendment by Pub. L. 114–94 effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as a note under section 5313 of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–141 effective Oct. 1, 2012, see section 3(a) of Pub. L. 112–141, set out as an Effec-

tive and Termination Dates of 2012 Amendment note under section 101 of this title.

EFFECTIVE DATE OF 1968 AMENDMENT

Amendment by Pub. L. 90–495 effective Aug. 23, 1968, see section 37 of Pub. L. 90–495, set out as a note under section 101 of this title.

CLARIFICATION OF EXISTING STANDARDS

Pub. L. 109–59, title VI, § 6009(b), Aug. 10, 2005, 119 Stat. 1876, provided that:

"(1) IN GENERAL.—Not later than 1 year after the date of enactment of this Act [Aug. 10, 2005], the Secretary [of Transportation] shall (in consultation with affected agencies and interested parties) promulgate regulations that clarify the factors to be considered and the standards to be applied in determining the prudence and feasibility of alternatives under section 138 of title 23 and section 303 of title 49, United States Code.

"(2) REQUIREMENTS.—The regulations—

"(A) shall clarify the application of the legal standards to a variety of different types of transportation programs and projects depending on the circumstances of each case; and

"(B) may include, as appropriate, examples to facilitate clear and consistent interpretation by agency decisionmakers."

STUDY OF TRANSIT NEEDS IN NATIONAL PARKS AND RELATED PUBLIC LANDS

Pub. L. 105–178, title III, § 3039, June 9, 1998, 112 Stat. 393, as amended by Pub. L. 105–206, title IX, § 9009(y), July 22, 1998, 112 Stat. 862, provided that:

"(a) PURPOSES.—The purposes of this section are to encourage and promote the development of transportation systems for the betterment of the national parks and other units of the National Park System, national wildlife refuges, recreational areas, and other public lands in order to conserve natural, historical, and cultural resources and prevent adverse impact, relieve congestion, minimize transportation fuel consumption, reduce pollution (including noise and visual pollution), and enhance visitor mobility and accessibility and the visitor experience.

"(b) STUDY.—

"(1) IN GENERAL.—The Secretary, in coordination with the Secretary of the Interior, shall undertake a comprehensive study of alternative transportation needs in national parks and related public lands managed by Federal land management agencies [to] assist in carrying out the purposes described in subsection (a). The study shall be submitted to the Committee on Transportation and Infrastructure of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate not later than January 1, 2000.

"(2) STUDY ELEMENTS.—The study required by paragraph (1) shall—

"(A) identify transportation strategies that improve the management of the national parks and related public lands;

"(B) identify national parks and related public lands with existing and potential problems of adverse impact, high congestion, and pollution, or which can benefit from alternative transportation modes;

"(C) assess the feasibility of alternative transportation modes; and

"(D) identify and estimate the costs of alternative transportation modes for each of the national parks and related public lands referred to in paragraph (1).

"(3) DEFINITION.—For purposes of this subsection, the term 'Federal land management agencies' means the National Park Service, the United States Fish and Wildlife Service, and the Bureau of Land Management."

STUDY OF ALTERNATIVE TRANSPORTATION MODES IN NATIONAL PARK SYSTEM

Pub. L. 102–240, title I, § 1050, Dec. 18, 1991, 105 Stat. 2000, provided that:

"(a) IN GENERAL.—Not later than 12 months after the date of the enactment of this Act [Dec. 18, 1991], the Secretary, in consultation with the Secretary of the Interior, shall conduct and transmit to Congress a study of alternative transportation modes for use in the National Park System. In conducting such study, the Secretary shall consider (1) the economic and technical feasibility, environmental effects, projected costs and benefits as compared to the costs and benefits of existing transportation systems, and general suitability of transportation modes that would provide efficient and environmentally sound ingress to and egress from National Park lands; and (2) methods to obtain private capital for the construction of such transportation modes and related infrastructure.

"(b) FUNDING.—From sums authorized to be appropriated for park roads and parkways for fiscal year 1992, $300,000 shall be available to carry out this section."

## § 139. Efficient environmental reviews for project decisionmaking and One Federal Decision

(a) DEFINITIONS.—In this section, the following definitions apply:

(1) AGENCY.—The term "agency" means any agency, department, or other unit of Federal, State, local, or Indian tribal government.

(2) AUTHORIZATION.—The term "authorization" means any environmental license, permit, approval, finding, or other administrative decision related to the environmental review process that is required under Federal law to site, construct, or reconstruct a project.

(3) ENVIRONMENTAL DOCUMENT.—The term "environmental document" includes an environmental assessment, finding of no significant impact, notice of intent, environmental impact statement, or record of decision under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(4) ENVIRONMENTAL IMPACT STATEMENT.—The term "environmental impact statement" means the detailed statement of environmental impacts required to be prepared under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(5) ENVIRONMENTAL REVIEW PROCESS.—

(A) IN GENERAL.—The term "environmental review process" means the process for preparing for a project an environmental impact statement, environmental assessment, categorical exclusion, or other document prepared under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) INCLUSIONS.—The term "environmental review process" includes the process and schedule, including a timetable for and completion of any environmental permit, approval, review, or study required for a project under any Federal law other than the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(6) LEAD AGENCY.—The term "lead agency" means the Department of Transportation and, if applicable, any State or local governmental entity serving as a joint lead agency pursuant to this section.

(7) MAJOR PROJECT.—

(A) IN GENERAL.—The term "major project" means a project for which—

(i) multiple permits, approvals, reviews, or studies are required under a Federal law

other than the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

(ii) the project sponsor has identified the reasonable availability of funds sufficient to complete the project;

(iii) the project is not a covered project (as defined in section 41001 of the FAST Act (42 U.S.C. 4370m)); and

(iv)(I) the head of the lead agency has determined that an environmental impact statement is required; or

(II) the head of the lead agency has determined that an environmental assessment is required, and the project sponsor requests that the project be treated as a major project.

(B) CLARIFICATION.—In this section, the term "major project" does not have the same meaning as the term "major project" as described in section 106(h).

(8) MULTIMODAL PROJECT.—The term "multimodal project" means a project that requires the approval of more than 1 Department of Transportation operating administration or secretarial office.

(9) PROJECT.—

(A) IN GENERAL.—The term "project" means any highway project, public transportation capital project, or multimodal project that, if implemented as proposed by the project sponsor, would require approval by any operating administration or secretarial office within the Department of Transportation.

(B) CONSIDERATIONS.—In determining whether a project is a project under subparagraph (A), the Secretary shall take into account, if known, any sources of Federal funding or financing identified by the project sponsor, including any discretionary grant, loan, and loan guarantee programs administered by the Department of Transportation.

(10) PROJECT SPONSOR.—The term "project sponsor" means the agency or other entity, including any private or public-private entity, that seeks approval of the Secretary for a project.

(11) STATE TRANSPORTATION DEPARTMENT.—The term "State transportation department" means any statewide agency of a State with responsibility for one or more modes of transportation.

(b) APPLICABILITY.—

(1) IN GENERAL.—The project development procedures in this section are applicable to all projects, including major projects, for which an environmental impact statement is prepared under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and may be applied, as requested by a project sponsor and to the extent determined appropriate by the Secretary, to other projects for which an environmental document is prepared pursuant to such Act.

(2) FLEXIBILITY.—Any authorities granted in this section may be exercised, and any requirements established under this section may be satisfied, for a project, class of projects, or program of projects.

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

## SUBCHAPTER I—POLICIES AND GOALS

### § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§ 1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

#### EXECUTIVE DOCUMENTS

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

　(i) the environmental impact of the proposed action,

　(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

　(iii) alternatives to the proposed action,

　(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

　(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

　(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

　(ii) the responsible Federal official furnishes guidance and participates in such preparation,

　(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

　(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, §102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

### Editorial Notes

#### Amendments

1975—Par. (2)(D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

### Statutory Notes and Related Subsidiaries

Certain Commercial Space Launch Activities

Pub. L. 104–88, title IV, §401, Dec. 29, 1995, 109 Stat. 955, provided that: ''The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

''(1) the Department of the Army has issued a permit for the activity; and

''(2) the Army Corps of Engineers has found that the activity has no significant impact.''

### Executive Documents

Ex. Ord. No. 13352. Facilitation of Cooperative Conservation

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

---

[1] So in original. The period probably should be a semicolon.

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition.* As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities.* To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

　(i) facilitates cooperative conservation;

　(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

　(iii) properly accommodates local participation in Federal decisionmaking; and

　(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation.* The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision.* This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

## § 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decisionmaking in environmental reviews.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amendment note under section 5313 of Title 5, Government Organization and Employees.

## § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

## § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

## § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

## SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

## § 4341. Omitted

### Editorial Notes

#### CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

## § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze



until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7406. Interstate air quality agencies; program cost limitations

For the purpose of developing implementation plans for any interstate air quality control region designated pursuant to section 7407 of this title or of implementing section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution), the Administrator is authorized to pay, for two years, up to 100 per centum of the air quality planning program costs of any commission established under section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution) or any agency designated by the Governors of the affected States, which agency shall be capable of recommending to the Governors plans for implementation of national primary and secondary ambient air quality standards and shall include representation from the States and appropriate political subdivisions within the air quality control region. After the initial two-year period the Administrator is authorized to make grants to such agency or such commission in an amount up to three-fifths of the air quality implementation program costs of such agency or commission.

(July 14, 1955, ch. 360, title I, § 106, as added Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 490; amended Pub. L. 91–604, § 3(c), Dec. 31, 1970, 84 Stat. 1677; Pub. L. 101–549, title I, § 102(f)(2), title VIII, § 802(f), Nov. 15, 1990, 104 Stat. 2420, 2688.)

### Editorial Notes

#### Codification

Section was formerly classified to section 1857c–1 of this title.

#### Prior Provisions

A prior section 106 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

#### Amendments

1990—Pub. L. 101–549, § 102(f)(2)(A), inserted "or of implementing section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution)" after "section 7407 of this title".

Pub. L. 101–549, § 102(f)(2)(B), which directed insertion of "any commission established under section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution) or" after "program costs of", was executed by making the insertion after that phrase the first place it appeared to reflect the probable intent of Congress.

Pub. L. 101–549, § 102(f)(2)(C), which directed insertion of "or such commission" after "such agency" in last sentence, was executed by making insertion after "such agency" the first place it appeared in the last sentence to reflect the probable intent of Congress.

Pub. L. 101–549, §§ 102(f)(2)(D), 802(f), substituted "three-fifths of the air quality implementation program costs of such agency or commission" for "three-fourths of the air quality planning program costs of such agency".

1970—Pub. L. 91–604 struck out designation "(a)", substituted provisions authorizing Federal grants for the purpose of developing implementation plans and provisions requiring the designated State agency to be capable of recommending plans for implementation of national primary and secondary ambient air quality standards, for provisions authorizing Federal grants for the purpose of expediting the establishment of air quality standards and provisions requiring the designated State agency to be capable of recommending standards of air quality and plans for implementation thereof, respectively, and struck out subsec. (b) which authorized establishment of air quality planning commissions.

## § 7407. Air quality control regions

### (a) Responsibility of each State for air quality; submission of implementation plan

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

### (b) Designated regions

For purposes of developing and carrying out implementation plans under section 7410 of this title—

(1) an air quality control region designated under this section before December 31, 1970, or a region designated after such date under subsection (c), shall be an air quality control region; and

(2) the portion of such State which is not part of any such designated region shall be an air quality control region, but such portion may be subdivided by the State into two or more air quality control regions with the approval of the Administrator.

### (c) Authority of Administrator to designate regions; notification of Governors of affected States

The Administrator shall, within 90 days after December 31, 1970, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major intrastate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. The Administrator shall immediately notify the Governors of the affected States of any designation made under this subsection.

### (d) Designations

#### (1) Designations generally

##### (A) Submission by Governors of initial designations following promulgation of new or revised standards

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as—

(i) nonattainment, any area that does not meet (or that contributes to ambient

air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

(ii) attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

(iii) unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

The Administrator may not require the Governor to submit the required list sooner than 120 days after promulgating a new or revised national ambient air quality standard.

**(B) Promulgation by EPA of designations**

(i) Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

(ii) In making the promulgations required under clause (i), the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas (or portions thereof) submitted under subparagraph (A) (including to the boundaries of such areas or portions thereof). Whenever the Administrator intends to make a modification, the Administrator shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate. The Administrator shall give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto. If the Governor fails to submit the list in whole or in part, as required under subparagraph (A), the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State.

(iii) If the Governor of any State, on the Governor's own motion, under subparagraph (A), submits a list of areas (or portions thereof) in the State designated as nonattainment, attainment, or unclassifiable, the Administrator shall act on such designations in accordance with the procedures under paragraph (3) (relating to redesignation).

(iv) A designation for an area (or portion thereof) made pursuant to this subsection shall remain in effect until the area (or portion thereof) is redesignated pursuant to paragraph (3) or (4).

**(C) Designations by operation of law**

(i) Any area designated with respect to any air pollutant under the provisions of para-

graph (1)(A), (B), or (C) of this subsection (as in effect immediately before November 15, 1990) is designated, by operation of law, as a nonattainment area for such pollutant within the meaning of subparagraph (A)(i).

(ii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(E) (as in effect immediately before November 15, 1990) is designated by operation of law, as an attainment area for such pollutant within the meaning of subparagraph (A)(ii).

(iii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(D) (as in effect immediately before November 15, 1990) is designated, by operation of law, as an unclassifiable area for such pollutant within the meaning of subparagraph (A)(iii).

**(2) Publication of designations and redesignations**

(A) The Administrator shall publish a notice in the Federal Register promulgating any designation under paragraph (1) or (5), or announcing any designation under paragraph (4), or promulgating any redesignation under paragraph (3).

(B) Promulgation or announcement of a designation under paragraph (1), (4) or (5) shall not be subject to the provisions of sections 553 through 557 of title 5 (relating to notice and comment), except nothing herein shall be construed as precluding such public notice and comment whenever possible.

**(3) Redesignation**

(A) Subject to the requirements of subparagraph (E), and on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the Administrator considers appropriate, the Administrator may at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised. In issuing such notification, which shall be public, to the Governor, the Administrator shall provide such information as the Administrator may have available explaining the basis for the notice.

(B) No later than 120 days after receiving a notification under subparagraph (A), the Governor shall submit to the Administrator such redesignation, if any, of the appropriate area (or areas) or portion thereof within the State or interstate area, as the Governor considers appropriate.

(C) No later than 120 days after the date described in subparagraph (B) (or paragraph (1)(B)(iii)), the Administrator shall promulgate the redesignation, if any, of the area or portion thereof, submitted by the Governor in accordance with subparagraph (B), making such modifications as the Administrator may deem necessary, in the same manner and under the same procedure as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with subparagraph (B), a redesignation for an area

(or portion thereof) identified by the Administrator under subparagraph (A), the Administrator shall promulgate such redesignation, if any, that the Administrator deems appropriate.

(D) The Governor of any State may, on the Governor's own motion, submit to the Administrator a revised designation of any area or portion thereof within the State. Within 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation. The submission of a redesignation by a Governor shall not affect the effectiveness or enforceability of the applicable implementation plan for the State.

(E) The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless—

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D.

(F) The Administrator shall not promulgate any redesignation of any area (or portion thereof) from nonattainment to unclassifiable.

**(4) Nonattainment designations for ozone, carbon monoxide and particulate matter (PM–10)**

**(A) Ozone and carbon monoxide**

(i) Within 120 days after November 15, 1990, each Governor of each State shall submit to the Administrator a list that designates, affirms or reaffirms the designation of, or redesignates (as the case may be), all areas (or portions thereof) of the Governor's State as attainment, nonattainment, or unclassifiable with respect to the national ambient air quality standards for ozone and carbon monoxide.

(ii) No later than 120 days after the date the Governor is required to submit the list of areas (or portions thereof) required under clause (i) of this subparagraph, the Administrator shall promulgate such designations, making such modifications as the Administrator may deem necessary, in the same manner, and under the same procedure, as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with clause (i) of this subparagraph, a designation for an area (or portion

thereof), the Administrator shall promulgate the designation that the Administrator deems appropriate.

(iii) No nonattainment area may be redesignated as an attainment area under this subparagraph.

(iv) Notwithstanding paragraph (1)(C)(ii) of this subsection, if an ozone or carbon monoxide nonattainment area located within a metropolitan statistical area or consolidated metropolitan statistical area (as established by the Bureau of the Census) is classified under part D of this subchapter as a Serious, Severe, or Extreme Area, the boundaries of such area are hereby revised (on the date 45 days after such classification) by operation of law to include the entire metropolitan statistical area or consolidated metropolitan statistical area, as the case may be, unless within such 45-day period the Governor (in consultation with State and local air pollution control agencies) notifies the Administrator that additional time is necessary to evaluate the application of clause (v). Whenever a Governor has submitted such a notice to the Administrator, such boundary revision shall occur on the later of the date 8 months after such classification or 14 months after November 15, 1990, unless the Governor makes the finding referred to in clause (v), and the Administrator concurs in such finding, within such period. Except as otherwise provided in this paragraph, a boundary revision under this clause or clause (v) shall apply for purposes of any State implementation plan revision required to be submitted after November 15, 1990.

(v) Whenever the Governor of a State has submitted a notice under clause (iv), the Governor, in consultation with State and local air pollution control agencies, shall undertake a study to evaluate whether the entire metropolitan statistical area or consolidated metropolitan statistical area should be included within the nonattainment area. Whenever a Governor finds and demonstrates to the satisfaction of the Administrator, and the Administrator concurs in such finding, that with respect to a portion of a metropolitan statistical area or consolidated metropolitan statistical area, sources in the portion do not contribute significantly to violation of the national ambient air quality standard, the Administrator shall approve the Governor's request to exclude such portion from the nonattainment area. In making such finding, the Governor and the Administrator shall consider factors such as population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport.

**(B) PM–10 designations**

By operation of law, until redesignation by the Administrator pursuant to paragraph (3)—

(i) each area identified in 52 Federal Register 29383 (Aug. 7, 1987) as a Group I area (except to the extent that such identification was modified by the Administrator

before November 15, 1990) is designated nonattainment for PM–10;

(ii) any area containing a site for which air quality monitoring data show a violation of the national ambient air quality standard for PM–10 before January 1, 1989 (as determined under part 50, appendix K of title 40 of the Code of Federal Regulations) is hereby designated nonattainment for PM–10; and

(iii) each area not described in clause (i) or (ii) is hereby designated unclassifiable for PM–10.

Any designation for particulate matter (measured in terms of total suspended particulates) that the Administrator promulgated pursuant to this subsection (as in effect immediately before November 15, 1990) shall remain in effect for purposes of implementing the maximum allowable increases in concentrations of particulate matter (measured in terms of total suspended particulates) pursuant to section 7473(b) of this title, until the Administrator determines that such designation is no longer necessary for that purpose.

**(5) Designations for lead**

The Administrator may, in the Administrator's discretion at any time the Administrator deems appropriate, require a State to designate areas (or portions thereof) with respect to the national ambient air quality standard for lead in effect as of November 15, 1990, in accordance with the procedures under subparagraphs (A) and (B) of paragraph (1), except that in applying subparagraph (B)(i) of paragraph (1) the phrase ''2 years from the date of promulgation of the new or revised national ambient air quality standard'' shall be replaced by the phrase ''1 year from the date the Administrator notifies the State of the requirement to designate areas with respect to the standard for lead''.

**(6) Designations**

**(A) Submission**

Notwithstanding any other provision of law, not later than February 15, 2004, the Governor of each State shall submit designations referred to in paragraph (1) for the July 1997 PM$_{2.5}$ national ambient air quality standards for each area within the State, based on air quality monitoring data collected in accordance with any applicable Federal reference methods for the relevant areas.

**(B) Promulgation**

Notwithstanding any other provision of law, not later than December 31, 2004, the Administrator shall, consistent with paragraph (1), promulgate the designations referred to in subparagraph (A) for each area of each State for the July 1997 PM$_{2.5}$ national ambient air quality standards.

**(7) Implementation plan for regional haze**

**(A) In general**

Notwithstanding any other provision of law, not later than 3 years after the date on which the Administrator promulgates the designations referred to in paragraph (6)(B) for a State, the State shall submit, for the entire State, the State implementation plan revisions to meet the requirements promulgated by the Administrator under section 7492(e)(1) of this title (referred to in this paragraph as ''regional haze requirements'').

**(B) No preclusion of other provisions**

Nothing in this paragraph precludes the implementation of the agreements and recommendations stemming from the Grand Canyon Visibility Transport Commission Report dated June 1996, including the submission of State implementation plan revisions by the States of Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, or Wyoming by December 31, 2003, for implementation of regional haze requirements applicable to those States.

**(e) Redesignation of air quality control regions**

(1) Except as otherwise provided in paragraph (2), the Governor of each State is authorized, with the approval of the Administrator, to redesignate from time to time the air quality control regions within such State for purposes of efficient and effective air quality management. Upon such redesignation, the list under subsection (d) shall be modified accordingly.

(2) In the case of an air quality control region in a State, or part of such region, which the Administrator finds may significantly affect air pollution concentrations in another State, the Governor of the State in which such region, or part of a region, is located may redesignate from time to time the boundaries of so much of such air quality control region as is located within such State only with the approval of the Administrator and with the consent of all Governors of all States which the Administrator determines may be significantly affected.

(3) No compliance date extension granted under section 7413(d)(5)[1] of this title (relating to coal conversion) shall cease to be effective by reason of the regional limitation provided in section 7413(d)(5)[1] of this title if the violation of such limitation is due solely to a redesignation of a region under this subsection.

(July 14, 1955, ch. 360, title I, § 107, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1678; amended Pub. L. 95–95, title I, § 103, Aug. 7, 1977, 91 Stat. 687; Pub. L. 101–549, title I, § 101(a), Nov. 15, 1990, 104 Stat. 2399; Pub. L. 108–199, div. G, title IV, § 425(a), Jan. 23, 2004, 118 Stat. 417.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 7413 of this title, referred to in subsec. (e)(3), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsec. (d) of section 7413 no longer relates to final compliance orders.

#### CODIFICATION

Section was formerly classified to section 1857c–2 of this title.

---

[1] See References in Text note below.

PRIOR PROVISIONS

A prior section 107 of act July 14, 1955, as added Nov. 21, 1967, Pub. L. 90–148, § 2, 81 Stat. 490, related to air quality control regions and was classified to section 1857c–2 of this title, prior to repeal by Pub. L. 91–604.

Another prior section 107 of act July 14, 1955, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 399, was renumbered section 111 by Pub. L. 90–148 and is classified to section 7411 of this title.

AMENDMENTS

2004—Subsec. (d)(6), (7). Pub. L. 108–199 added pars. (6) and (7).

1990—Subsec. (d). Pub. L. 101–549 amended subsec. (d) generally, substituting present provisions for provisions which required States to submit lists of regions not in compliance on Aug. 7, 1977, with certain air quality standards to be submitted to the Administrator, and which authorized States to revise and resubmit such lists from time to time.

1977—Subsecs. (d), (e). Pub. L. 95–95 added subsecs. (d) and (e).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

OZONE AND PARTICULATE MATTER STANDARDS

Pub. L. 108–199, div. G, title IV, § 425(b), Jan. 23, 2004, 118 Stat. 417, provided that: "Except as provided in paragraphs (6) and (7) of section 107(d) of the Clean Air Act [subsec. (d)(6), (7) of this section] (as added by subsection (a)), section 6101, subsections (a) and (b) of section 6102, and section 6105 of the Transportation Equity Act for the 21st Century [Pub. L. 105–178] (42 U.S.C. 7407 note; 112 Stat. 463), as in effect on the day before the date of enactment of this Act [Jan. 23, 2004], shall remain in effect.''

Pub. L. 105–178, title VI, June 9, 1998, 112 Stat. 463, as amended by Pub. L. 109–59, title VI, § 6012(a), Aug. 10, 2005, 119 Stat. 1882, provided that:

"SEC. 6101. FINDINGS AND PURPOSE.

"(a) The Congress finds that—

"(1) there is a lack of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$, in the United States and the States should receive full funding for the monitoring efforts;

"(2) such data would provide a basis for designating areas as attainment or nonattainment for any $PM_{2.5}$ national ambient air quality standards pursuant to the standards promulgated in July 1997;

"(3) the President of the United States directed the Administrator of the Environmental Protection Agency (referred to in this title as the 'Administrator') in a memorandum dated July 16, 1997, to complete the next periodic review of the particulate matter national ambient air quality standards by July 2002 in order to determine 'whether to revise or maintain the standards';

"(4) the Administrator has stated that 3 years of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$ and performed in accordance with any applicable Federal reference methods, is appropriate for designating areas as attainment or nonattainment pursuant to the July 1997 promulgated standards; and

"(5) the Administrator has acknowledged that in drawing boundaries for attainment and nonattainment areas for the July 1997 ozone national air quality standards, Governors would benefit from considering implementation guidance from EPA on drawing area boundaries.

"(b) The purposes of this title are—

"(1) to ensure that 3 years of air quality monitoring data regarding fine particle levels are gathered for use in the determination of area attainment or nonattainment designations respecting any $PM_{2.5}$ national ambient air quality standards;

"(2) to ensure that the Governors have adequate time to consider implementation guidance from EPA on drawing area boundaries prior to submitting area designations respecting the July 1997 ozone national ambient air quality standards;

"(3) to ensure that the schedule for implementation of the July 1997 revisions of the ambient air quality standards for particulate matter and the schedule for the Environmental Protection Agency's visibility regulations related to regional haze are consistent with the timetable for implementation of such particulate matter standards as set forth in the President's Implementation Memorandum dated July 16, 1997.

"SEC. 6102. PARTICULATE MATTER MONITORING PROGRAM.

"(a) Through grants under section 103 of the Clean Air Act [42 U.S.C. 7403] the Administrator of the Environmental Protection Agency shall use appropriated funds no later than fiscal year 2000 to fund 100 percent of the cost of the establishment, purchase, operation and maintenance of a $PM_{2.5}$ monitoring network necessary to implement the national ambient air quality standards for $PM_{2.5}$ under section 109 of the Clean Air Act [42 U.S.C. 7409]. This implementation shall not result in a diversion or reprogramming of funds from other Federal, State or local Clean Air Act activities. Any funds previously diverted or reprogrammed from section 105 Clean Air Act [42 U.S.C. 7405] grants for $PM_{2.5}$ monitors must be restored to State or local air programs in fiscal year 1999.

"(b) EPA and the States, consistent with their respective authorities under the Clean Air Act [42 U.S.C. 7401 et seq.], shall ensure that the national network (designated in subsection (a)) which consists of the $PM_{2.5}$ monitors necessary to implement the national ambient air quality standards is established by December 31, 1999.

"(c)(1) The Governors shall be required to submit designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 $PM_{2.5}$ national ambient air quality standard within 1 year after receipt of 3 years of air quality monitoring data performed in accordance with any applicable Federal reference methods for the relevant areas. Only data from the monitoring network designated in subsection (a) and other Federal reference method $PM_{2.5}$ monitors shall be considered for such designations. Nothing in the previous sentence shall be construed as affecting the Governor's authority to designate an area initially as nonattainment, and the Administrator's authority to promulgate the designation of an area as nonattainment, under section 107(d)(1) of the Clean Air Act, based on its contribution to ambient air quality in a nearby nonattainment area.

"(2) For any area designated as nonattainment for the July 1997 $PM_{2.5}$ national ambient air quality standard in accordance with the schedule set forth in this section, notwithstanding the time limit prescribed in paragraph (2) of section 169B(e) of the Clean Air Act [42 U.S.C. 7492(e)(2)], the Administrator shall require State implementation plan revisions referred to in such paragraph (2) to be submitted at the same time as State implementation plan revisions referred to in section 172 of the Clean Air Act [42 U.S.C. 7502] implementing the revised national ambient air quality standard for fine particulate matter are required to be submitted. For any area designated as attainment or unclassifiable for such standard, the Administrator shall require the State implementation plan revisions referred to in such paragraph (2) to be submitted 1 year after the area has been so designated. The preceding provisions of this paragraph shall not preclude the implementation of the agreements and recommendations set forth in the Grand Canyon Visibility Transport Commission Report dated June 1996.

''(d) The Administrator shall promulgate the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 PM$_{2.5}$ national ambient air quality standard by the earlier of 1 year after the initial designations required under subsection (c)(1) are required to be submitted or December 31, 2005.

''(e) FIELD STUDY.—Not later than 2 years after the date of enactment of the SAFETEA–LU [Aug. 10, 2005], the Administrator shall—

''(1) conduct a field study of the ability of the PM$_{2.5}$ Federal Reference Method to differentiate those particles that are larger than 2.5 micrometers in diameter;

''(2) develop a Federal reference method to measure directly particles that are larger than 2.5 micrometers in diameter without reliance on subtracting from coarse particle measurements those particles that are equal to or smaller than 2.5 micrometers in diameter;

''(3) develop a method of measuring the composition of coarse particles; and

''(4) submit a report on the study and responsibilities of the Administrator under paragraphs (1) through (3) to—

''(A) the Committee on Energy and Commerce of the House of Representatives; and

''(B) the Committee on Environment and Public Works of the Senate.

''SEC. 6103. OZONE DESIGNATION REQUIREMENTS.

''(a) The Governors shall be required to submit the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] within 2 years following the promulgation of the July 1997 ozone national ambient air quality standards.

''(b) The Administrator shall promulgate final designations no later than 1 year after the designations required under subsection (a) are required to be submitted.

''SEC. 6104. ADDITIONAL PROVISIONS.

''Nothing in sections 6101 through 6103 shall be construed by the Administrator of Environmental Protection Agency or any court, State, or person to affect any pending litigation or to be a ratification of the ozone or PM$_{2.5}$ standards.''

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

§ 7408. Air quality criteria and control techniques

(a) Air pollutant list; publication and revision by Administrator; issuance of air quality criteria for air pollutants

(1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant—

(A) emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;

(B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

(C) for which air quality criteria had not been issued before December 31, 1970 but for which he plans to issue air quality criteria under this section.

(2) The Administrator shall issue air quality criteria for an air pollutant within 12 months after he has included such pollutant in a list under paragraph (1). Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities. The criteria for an air pollutant, to the extent practicable, shall include information on—

(A) those variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects on public health or welfare of such air pollutant;

(B) the types of air pollutants which, when present in the atmosphere, may interact with such pollutant to produce an adverse effect on public health or welfare; and

(C) any known or anticipated adverse effects on welfare.

(b) Issuance by Administrator of information on air pollution control techniques; standing consulting committees for air pollutants; establishment; membership

(1) Simultaneously with the issuance of criteria under subsection (a), the Administrator shall, after consultation with appropriate advisory committees and Federal departments and agencies, issue to the States and appropriate air pollution control agencies information on air pollution control techniques, which information shall include data relating to the cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology. Such information shall include such data as are available on available technology and alternative methods of prevention and control of air pollution. Such information shall also include data on alternative fuels, processes, and operating methods which will result in elimination or significant reduction of emissions.

(2) In order to assist in the development of information on pollution control techniques, the



other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, §817, Nov. 15, 1990, 104 Stat. 2697, provided that:

‘‘(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

‘‘(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

‘‘(2) estimate welfare and environmental costs incurred as a result of such effects;

‘‘(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

‘‘(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

‘‘(5) estimate the costs and other impacts of meeting secondary standards; and

‘‘(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

‘‘(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

‘‘(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

‘‘(3) There are authorized to be appropriated such sums as are necessary to carry out this section.’’

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollut-

ant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional

agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, §101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, §101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

---

[1] See References in Text note below.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term ''indirect source'' means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term ''indirect source review program'' means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term ''transportation control measure'' does not include any measure which is an ''indirect source review program''.

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term ''parking surcharge regulation'' means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term ''management of parking supply'' shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term ''preferential bus/carpool lane'' shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing

which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title, as in effect before August 7, 1977, or section 7413(d)[1] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title as in effect before August 7, 1977, or under section 7413(d)[1] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d)[1] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3); no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding

of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[2] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, § 110, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, § 4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§ 107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, § 14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, § 3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§ 101(b)–(d), 102(h), 107(c), 108(d), title IV, § 412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

**Editorial Notes**

REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§ 791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

[2] So in original. Probably should be followed by a comma.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (i), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, § 107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, § 101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, § 101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, § 101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, § 101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, § 101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, § 102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, § 101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, § 101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

Subsec. (c)(4). Pub. L. 101–549, §101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, §101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, §101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, §101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, §412, inserted "or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, §101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, §101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, §101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, §107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, §108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, §108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(i) in the case of a plan" for "(A)(i) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, §108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, §108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, §108(a)(4), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, §108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, §14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, §108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, §108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, §14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, §108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, §108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, §108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, §14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, §108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, §14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, §108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, §108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, §108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, §108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, §107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, §108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, §107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, §14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, §108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, §14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, §108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 §14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, §108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, §4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, §4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

## Statutory Notes and Related Subsidiaries

#### Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### Pending Actions and Proceedings

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official

duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, § 16, Dec. 31, 1970, 84 Stat. 1713, provided that:

‘‘(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

‘‘(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

‘‘(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter].’’

FEDERAL ENERGY ADMINISTRATOR

‘‘Federal Energy Administrator’’, for purposes of this chapter, to mean Administrator of Federal Energy Ad-

ministration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term ‘‘standard of performance’’ means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term ‘‘new source’’ means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term ‘‘stationary source’’ means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term ‘‘modification’’ means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term ‘‘owner or operator’’ means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term ‘‘existing source’’ means any stationary source other than a new source.

(7) The term ‘‘technological system of continuous emission reduction’’ means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1]

---

[1] See References in Text note below.



**Editorial Notes**

AMENDMENTS

1995—Subsec. (a). Pub. L. 104–88 substituted ''13101'' for ''10101a''.

1994—Subsec. (b). Pub. L. 103–272 substituted ''This subtitle and chapters 221 and 315 of this title'' for ''Subtitle I and chapter 31 of subtitle II of this title and the Department of Transportation Act (49 App. U.S.C. 1651 et seq.)''.

1991—Subsec. (d). Pub. L. 102–240, §1036(a), added subsec. (d).

Subsec. (e). Pub. L. 102–240, §5001, added subsec. (e).

1984—Subsec. (b). Pub. L. 98–216 substituted ''49 App. U.S.C.'' for ''49 U.S.C.''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 1301 of this title.

EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by section 1036(a) of Pub. L. 102–240 effective Dec. 18, 1991, and applicable to funds authorized to be appropriated or made available after Sept. 30, 1991, and, with certain exceptions, not applicable to funds appropriated or made available on or before Sept. 30, 1991, see section 1100 of Pub. L. 102–240, set out as a note under section 104 of Title 23, Highways.

## § 303. Policy on lands, wildlife and waterfowl refuges, and historic sites

(a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

(b) The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States, in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands crossed by transportation activities or facilities.

(c) APPROVAL OF PROGRAMS AND PROJECTS.—Subject to subsections (d) and (h), the Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 [1] of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

(d) DE MINIMIS IMPACTS.—

(1) REQUIREMENTS.—

(A) REQUIREMENTS FOR HISTORIC SITES.—The requirements of this section shall be considered to be satisfied with respect to an area described in paragraph (2) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area.

(B) REQUIREMENTS FOR PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—The requirements of subsection (c)(1) shall be considered to be satisfied with respect to an area described in paragraph (3) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area. The requirements of subsection (c)(2) with respect to an area described in paragraph (3) shall not include an alternatives analysis.

(C) CRITERIA.—In making any determination under this subsection, the Secretary shall consider to be part of a transportation program or project any avoidance, minimization, mitigation, or enhancement measures that are required to be implemented as a condition of approval of the transportation program or project.

(2) HISTORIC SITES.—With respect to historic sites, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, in accordance with the consultation process required under section 306108 of title 54, United States Code,[2] that—

(i) the transportation program or project will have no adverse effect on the historic site; or

(ii) there will be no historic properties affected by the transportation program or project;

(B) the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisory Council on Historic Preservation if the Council is participating in the consultation process); and

(C) the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

(3) PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—With respect to parks, recreation areas, or wildlife or waterfowl refuges, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, after public notice and opportunity for public review and comment, that the transportation program or project will not adversely affect the activities, features, and attributes of the park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section; and

(B) the finding of the Secretary has received concurrence from the officials with jurisdiction over the park, recreation area, or wildlife or waterfowl refuge.

(e) SATISFACTION OF REQUIREMENTS FOR CERTAIN HISTORIC SITES.—

---

[1] See References in Text note below.

[2] So in original. The words '', United States Code'' probably should not appear.

(1) IN GENERAL.—The Secretary shall—

(A) align, to the maximum extent practicable, the requirements of this section with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and section 306108 of title 54, including implementing regulations; and

(B) not later than 90 days after the date of enactment of this subsection, coordinate with the Secretary of the Interior and the Executive Director of the Advisory Council on Historic Preservation (referred to in this subsection as the ''Council'') to establish procedures to satisfy the requirements described in subparagraph (A) (including regulations).

(2) AVOIDANCE ALTERNATIVE ANALYSIS.—

(A) IN GENERAL.—If, in an analysis required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), the Secretary determines that there is no feasible or prudent alternative to avoid use of a historic site, the Secretary may—

(i) include the determination of the Secretary in the analysis required under that Act;

(ii) provide a notice of the determination to—

(I) each applicable State historic preservation officer and tribal historic preservation officer;

(II) the Council, if the Council is participating in the consultation process under section 306108 of title 54; and

(III) the Secretary of the Interior; and

(iii) request from the applicable preservation officer, the Council, and the Secretary of the Interior a concurrence that the determination is sufficient to satisfy subsection (c)(1).

(B) CONCURRENCE.—If the applicable preservation officer, the Council, and the Secretary of the Interior each provide a concurrence requested under subparagraph (A)(iii), no further analysis under subsection (c)(1) shall be required.

(C) PUBLICATION.—A notice of a determination, together with each relevant concurrence to that determination, under subparagraph (A) shall—

(i) be included in the record of decision or finding of no significant impact of the Secretary; and

(ii) be posted on an appropriate Federal website by not later than 3 days after the date of receipt by the Secretary of all concurrences requested under subparagraph (A)(iii).

(3) ALIGNING HISTORICAL REVIEWS.—

(A) IN GENERAL.—If the Secretary, the applicable preservation officer, the Council, and the Secretary of the Interior concur that no feasible and prudent alternative exists as described in paragraph (2), the Secretary may provide to the applicable preservation officer, the Council, and the Secretary of the Interior notice of the intent of the Secretary to satisfy subsection (c)(2) through the consultation requirements of section 306108 of title 54.

(B) SATISFACTION OF CONDITIONS.—To satisfy subsection (c)(2), the applicable preservation officer, the Council, and the Secretary of the Interior shall concur in the treatment of the applicable historic site described in the memorandum of agreement or programmatic agreement developed under section 306108 of title 54.

(f) REFERENCES TO PAST TRANSPORTATION ENVIRONMENTAL AUTHORITIES.—

(1) SECTION 4(f) REQUIREMENTS.—The requirements of this section are commonly referred to as section 4(f) requirements (see section 4(f) of the Department of Transportation Act (Public Law 89–670; 80 Stat. 934) as in effect before the repeal of that section).

(2) SECTION 106 REQUIREMENTS.—The requirements of section 306108 of title 54 are commonly referred to as section 106 requirements (see section 106 of the National Historic Preservation Act of 1966 (Public Law 89–665; 80 Stat. 917) as in effect before the repeal of that section).

(g) BRIDGE EXEMPTION FROM CONSIDERATION.—A common post-1945 concrete or steel bridge or culvert (as described in 77 Fed. Reg. 68790) that is exempt from individual review under section 306108 of title 54 shall be exempt from consideration under this section.

(h) RAIL AND TRANSIT.—

(1) IN GENERAL.—Improvements to, or the maintenance, rehabilitation, or operation of, railroad or rail transit lines or elements thereof that are in use or were historically used for the transportation of goods or passengers shall not be considered a use of a historic site under subsection (c), regardless of whether the railroad or rail transit line or element thereof is listed on, or eligible for listing on, the National Register of Historic Places.

(2) EXCEPTIONS.—

(A) IN GENERAL.—Paragraph (1) shall not apply to—

(i) stations; or

(ii) bridges or tunnels located on—

(I) railroad lines that have been abandoned; or

(II) transit lines that are not in use.

(B) CLARIFICATION WITH RESPECT TO CERTAIN BRIDGES AND TUNNELS.—The bridges and tunnels referred to in subparagraph (A)(ii) do not include bridges or tunnels located on railroad or transit lines—

(i) over which service has been discontinued; or

(ii) that have been railbanked or otherwise reserved for the transportation of goods or passengers.

(Pub. L. 97–449, § 1(b), Jan. 12, 1983, 96 Stat. 2419; Pub. L. 100–17, title I, § 133(d), Apr. 2, 1987, 101 Stat. 173; Pub. L. 109–59, title VI, § 6009(a)(2), Aug. 10, 2005, 119 Stat. 1875; Pub. L. 113–287, § 5(p), Dec. 19, 2014, 128 Stat. 3272; Pub. L. 114–94, div. A, title I, §§ 1301(b), 1302(b), 1303(b), title XI, § 11502(b), Dec. 4, 2015, 129 Stat. 1376, 1378, 1690.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 303(a) ......... | 49:1651(b)(2). | Oct. 15, 1966, Pub. L. 89–670, § 2(b)(2), 80 Stat. 931. |

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| | 49:1653(f) (1st sentence). | Oct. 15, 1966, Pub. L. 89–670, §4(f), 80 Stat. 934; restated Aug. 23, 1968, Pub. L. 90–495, §18(b), 82 Stat. 824. |
| 303(b) .......... | 49:1653(f) (2d sentence). | |
| 303(c) .......... | 49:1653(f) (less 1st, 2d sentences). | |

In subsection (a), the words "hereby declared to be" before "the policy" are omitted as surplus. The words "of the United States Government" are substituted for "national" for clarity and consistency.

In subsection (b), the words "crossed by transportation activities or facilities" are substituted for "traversed" for clarity.

In subsection (c), before clause (1), the words "After August 23, 1968" after "Secretary" are omitted as executed. The word "transportation" is inserted before "program" for clarity. In clause (2), the words "or project" are added for consistency.

**Editorial Notes**

REFERENCES IN TEXT

Section 204 of title 23, referred to in subsec. (c), was repealed and a new section 204 enacted by Pub. L. 112–141, div. A, title I, §1119(a), July 6, 2012, 126 Stat. 473, 489.

The National Environmental Policy Act of 1969, referred to in subsec. (e)(1)(A), (2)(A), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The date of enactment of this subsection, referred to in subsec. (e)(1)(B), is the date of enactment of Pub. L. 114–94, which was approved Dec. 4, 2015.

AMENDMENTS

2015—Subsec. (c). Pub. L. 114–94, §11502(b)(1), substituted "subsections (d) and (h)" for "subsection (d)".

Subsec. (e). Pub. L. 114–94, §1301(b), added subsec. (e).

Subsec. (f). Pub. L. 114–94, §1302(b), added subsec. (f).

Subsec. (g). Pub. L. 114–94, §1303(b), added subsec. (g).

Subsec. (h). Pub. L. 114–94, §11502(b)(2), added subsec. (h).

2014—Subsec. (d)(2)(A). Pub. L. 113–287 substituted "section 306108 of title 54, United States Code" for "section 106 of the National Historic Preservation Act (16 U.S.C. 470f)" in introductory provisions.

2005—Subsec. (c). Pub. L. 109–59, §6009(a)(2)(A), inserted heading and substituted "Subject to subsection (d), the Secretary" for "The Secretary" in introductory provisions.

Subsec. (d). Pub. L. 109–59, §6009(a)(2)(B), added subsec. (d).

1987—Subsec. (c). Pub. L. 100–17 inserted "(other than any project for a park road or parkway under section 204 of title 23)" after "program or project".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2015 AMENDMENT

Amendment by Pub. L. 114–94 effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as a note under section 5313 of Title 5, Government Organization and Employees.

TREATMENT OF MILITARY FLIGHT OPERATIONS

Pub. L. 105–85, div. A, title X, §1079, Nov. 18, 1997, 111 Stat. 1916, provided that: "No military flight operation (including a military training flight), or designation of airspace for such an operation, may be treated as a transportation program or project for purposes of section 303(c) of title 49, United States Code."

## § 303a. Development of water transportation

(a) POLICY.—It is the policy of Congress—

(1) to promote, encourage, and develop water transportation, service, and facilities for the commerce of the United States; and

(2) to foster and preserve rail and water transportation.

(b) DEFINITION.—In this section, "inland waterway" includes the Great Lakes.

(c) REQUIREMENTS.—The Secretary of Transportation shall—

(1) investigate the types of vessels suitable for different classes of inland waterways to promote, encourage, and develop inland waterway transportation facilities for the commerce of the United States;

(2) investigate water terminals, both for inland waterway traffic and for through traffic by water and rail, including the necessary docks, warehouses, and equipment, and investigate railroad spurs and switches connecting with those water terminals, to develop the types most appropriate for different locations and for transferring passengers or property between water carriers and rail carriers more expeditiously and economically;

(3) consult with communities, cities, and towns about the location of water terminals, and cooperate with them in preparing plans for terminal facilities;

(4) investigate the existing status of water transportation on the different inland waterways of the United States to learn the extent to which—

(A) the waterways are being used to their capacity and are meeting the demands of traffic; and

(B) water carriers using those waterways are interchanging traffic with rail carriers;

(5) investigate other matters that may promote and encourage inland water transportation; and

(6) compile, publish, and distribute information about transportation on inland waterways that the Secretary considers useful to the commercial interests of the United States.

(Pub. L. 103–272, §4(j)(6)(A), July 5, 1994, 108 Stat. 1366.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 303a .......... | 49 App.:142. | Feb. 28, 1920, ch. 91, §500, 41 Stat. 499; Aug. 6, 1981, Pub. L. 97–31, §12(9), 95 Stat. 154. |

Section 4(j)(6)(A) amends 49:ch. 3 by restating 49 App.:142 as section 303a because the provision more appropriately belongs in chapter 3.

In subsection (a)(2), the words "in full vigor both" are omitted as surplus.

In subsection (b), the words "be construed to" are omitted as surplus.

In subsection (c)(1), the word "appropriate" is omitted as surplus. The word "vessels" is substituted for "boats" for consistency in the revised title and with other titles of the United States Code.

In subsection (c)(2), the words "the subject of", "apparatus", "appliances in connection therewith", and "or interchange" are omitted as surplus.

In subsection (c)(3), the words "appropriate" and "suitable" are omitted as surplus.

774.15  Constructive use determinations.
774.17  Definitions.

AUTHORITY: 23 U.S.C. 103(c), 109(h), 138, 325, 326, 327 and 204(h)(2); 49 U.S.C. 303; Section 6009 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (Pub. L. 109–59, Aug. 10, 2005, 119 Stat. 1144); 49 CFR 1.81 and 1.91; and, Pub. L. 114–94, 129 Stat. 1312, Sections 1303 and 11502.

SOURCE: 73 FR 13395, Mar. 12, 2008, unless otherwise noted.

## § 774.1  Purpose.

The purpose of this part is to implement 23 U.S.C. 138 and 49 U.S.C. 303, which were originally enacted as Section 4(f) of the Department of Transportation Act of 1966 and are still commonly referred to as "Section 4(f)."

## § 774.3  Section 4(f) approvals.

The Administration may not approve the use, as defined in § 774.17, of Section 4(f) property unless a determination is made under paragraph (a) or (b) of this section.

(a) The Administration determines that:

(1) There is no feasible and prudent avoidance alternative, as defined in § 774.17, to the use of land from the property; and

(2) The action includes all possible planning, as defined in § 774.17, to minimize harm to the property resulting from such use; or

(b) The Administration determines that the use of the property, including any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures) committed to by the applicant, will have a *de minimis* impact, as defined in § 774.17, on the property.

(c) If the analysis in paragraph (a)(1) of this section concludes that there is no feasible and prudent avoidance alternative, then the Administration may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that:

(1) Causes the least overall harm in light of the statute's preservation purpose. The least overall harm is determined by balancing the following factors:

(i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

(ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii) The relative significance of each Section 4(f) property;

(iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

(v) The degree to which each alternative meets the purpose and need for the project;

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

(2) The alternative selected must include all possible planning, as defined in § 774.17, to minimize harm to Section 4(f) property.

(d) Programmatic Section 4(f) evaluations are a time-saving procedural alternative to preparing individual Section 4(f) evaluations under paragraph (a) of this section for certain minor uses of Section 4(f) property. Programmatic Section 4(f) evaluations are developed by the Administration based on experience with a specific set of conditions that includes project type, degree of use and impact, and evaluation of avoidance alternatives.[1] An approved programmatic Section 4(f) evaluation may be relied upon to cover a particular project only if the specific conditions in the programmatic evaluation are met

(1) The determination whether a programmatic Section 4(f) evaluation applies to the use of a specific Section 4(f) property shall be documented as specified in the applicable programmatic Section 4(f) evaluation.

(2) The Administration may develop additional programmatic Section 4(f) evaluations. Proposed new or revised programmatic Section 4(f) evaluations will be coordinated with the Department of Interior, Department of Agriculture, and Department of Housing

---

[1] FHWA Section 4(f) Programmatic Evaluations can be found at *www.environment.fhwa.dot.gov/4f/4fnationwideevals.asp.*



and Urban Development, and published in the FEDERAL REGISTER for comment prior to being finalized. New or revised programmatic Section 4(f) evaluations shall be reviewed for legal sufficiency and approved by the Headquarters Office of the Administration.

(e) The coordination requirements in §774.5 must be completed before the Administration may make Section 4(f) approvals under this section. Requirements for the documentation and timing of Section 4(f) approvals are located in §§774.7 and 774.9, respectively.

[73 FR 13395, Mar. 12, 2008, as amended at 73 FR 31610, June 3, 2008; 83 FR 54506, Oct. 29, 2018]

### § 774.5 Coordination.

(a) Prior to making Section 4(f) approvals under §774.3(a), the Section 4(f) evaluation shall be provided for coordination and comment to the official(s) with jurisdiction over the Section 4(f) resource and to the Department of the Interior, and as appropriate to the Department of Agriculture and the Department of Housing and Urban Development. The Administration shall provide a minimum of 45 days for receipt of comments. If comments are not received within 15 days after the comment deadline, the Administration may assume a lack of objection and proceed with the action.

(b) Prior to making de minimis impact determinations under §774.3(b), the following coordination shall be undertaken:

(1) For historic properties:

(i) The consulting parties identified in accordance with 36 CFR part 800 must be consulted; and

(ii) The Administration must receive written concurrence from the pertinent State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THPO), and from the Advisory Council on Historic Preservation (ACHP) if participating in the consultation process, in a finding of "no adverse effect" or "no historic properties affected" in accordance with 36 CFR part 800. The Administration shall inform these officials of its intent to make a de minimis impact determination based on their concurrence in the finding of "no adverse effect" or "no historic properties affected."

(iii) Public notice and comment, beyond that required by 36 CFR part 800, is not required.

(2) For parks, recreation areas, and wildlife and waterfowl refuges:

(i) Public notice and an opportunity for public review and comment concerning the effects on the protected activities, features, or attributes of the property must be provided. This requirement can be satisfied in conjunction with other public involvement procedures, such as a comment period provided on a NEPA document.

(ii) The Administration shall inform the official(s) with jurisdiction of its intent to make a de minimis impact finding. Following an opportunity for public review and comment as described in paragraph (b)(2)(i) of this section, the official(s) with jurisdiction over the Section 4(f) resource must concur in writing that the project will not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. This concurrence may be combined with other comments on the project provided by the official(s).

(c) The application of a programmatic Section 4(f) evaluation to the use of a specific Section 4(f) property under §774.3(d)(1) shall be coordinated as specified in the applicable programmatic Section 4(f) evaluation.

(d) When Federal encumbrances on Section 4(f) property are identified, coordination with the appropriate Federal agency is required to ascertain the agency's position on the proposed impact, as well as to determine if any other Federal requirements may apply to converting the Section 4(f) land to a different function. Any such requirements must be satisfied, independent of the Section 4(f) approval.

### § 774.7 Documentation.

(a) A Section 4(f) evaluation prepared under §774.3(a) shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property.

(b) A de minimis impact determination under §774.3(b) shall include sufficient supporting documentation to

030



demonstrate that the impacts, after avoidance, minimization, mitigation, or enhancement measures are taken into account, are *de minimis* as defined in § 774.17; and that the coordination required in § 774.5(b) has been completed.

(c) If there is no feasible and prudent avoidance alternative the Administration may approve only the alternative that causes the least overall harm in accordance with § 774.3(c). This analysis must be documented in the Section 4(f) evaluation.

(d) The Administration shall review all Section 4(f) approvals under §§ 774.3(a) and 774.3(c) for legal sufficiency.

(e) A Section 4(f) approval may involve different levels of detail where the Section 4(f) involvement is addressed in a tiered EIS under § 771.111(g) of this chapter.

(1) When the first-tier, broad-scale EIS is prepared, the detailed information necessary to complete the Section 4(f) approval may not be available at that stage in the development of the action. In such cases, the documentation should address the potential impacts that a proposed action will have on Section 4(f) property and whether those impacts could have a bearing on the decision to be made. A preliminary Section 4(f) approval may be made at this time as to whether the impacts resulting from the use of a Section 4(f) property are *de minimis* or whether there are feasible and prudent avoidance alternatives. This preliminary approval shall include all possible planning to minimize harm to the extent that the level of detail available at the first-tier EIS stage allows. It is recognized that such planning at this stage may be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage. This preliminary Section 4(f) approval is then incorporated into the first-tier EIS.

(2) The Section 4(f) approval will be finalized in the second-tier study. If no new Section 4(f) use, other than a *de minimis* impact, is identified in the second-tier study and if all possible planning to minimize harm has occurred, then the second-tier Section 4(f) approval may finalize the preliminary approval by reference to the first-tier documentation. Re-evaluation of the preliminary Section 4(f) approval is only needed to the extent that new or more detailed information available at the second-tier stage raises new Section 4(f) concerns not already considered.

(3) The final Section 4(f) approval may be made in the second-tier CE, EA, final EIS, ROD or FONSI.

(f) In accordance with §§ 771.105(a) and 771.133 of this chapter, the documentation supporting a Section 4(f) approval should be included in the EIS, EA, or for a project classified as a CE, in a separate document. If the Section 4(f) documentation cannot be included in the NEPA document, then it shall be presented in a separate document. The Section 4(f) documentation shall be developed by the applicant in cooperation with the Administration.

## § 774.9  Timing.

(a) The potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study.

(b) Except as provided in paragraph (c) of this section, for actions processed with EISs the Administration will make the Section 4(f) approval either in the final EIS or in the ROD. Where the Section 4(f) approval is documented in the final EIS, the Administration will summarize the basis for its Section 4(f) approval in the ROD. Actions requiring the use of Section 4(f) property, and proposed to be processed with a FONSI or classified as a CE, shall not proceed until notification by the Administration of Section 4(f) approval.

(c) After the CE, FONSI, or ROD has been processed, a separate Section 4(f) approval will be required, except as provided in § 774.13, if:

(1) A proposed modification of the alignment or design would require the use of Section 4(f) property; or

(2) The Administration determines that Section 4(f) applies to the use of a property; or

(3) A proposed modification of the alignment, design, or measures to minimize harm (after the original Section

4(f) approval) would result in a substantial increase in the amount of Section 4(f) property used, a substantial increase in the adverse impacts to Section 4(f) property, or a substantial reduction in the measures to minimize harm.

(d) A separate Section 4(f) approval required under paragraph (c) of this section will not necessarily require the preparation of a new or supplemental NEPA document. If a new or supplemental NEPA document is also required under § 771.130 of this chapter, then it should include the documentation supporting the separate Section 4(f) approval. Where a separate Section 4(f) approval is required, any activity not directly affected by the separate Section 4(f) approval can proceed during the analysis, consistent with § 771.130(f) of this chapter.

(e) Section 4(f) may apply to archeological sites discovered during construction, as set forth in § 774.11(f). In such cases, the Section 4(f) process will be expedited and any required evaluation of feasible and prudent avoidance alternatives will take account of the level of investment already made. The review process, including the consultation with other agencies, will be shortened as appropriate.

### § 774.11 Applicability.

(a) The Administration will determine the applicability of Section 4(f) in accordance with this part.

(b) When another Federal agency is the Federal lead agency for the NEPA process, the Administration shall make any required Section 4(f) approvals unless the Federal lead agency is another U.S. DOT agency.

(c) Consideration under Section 4(f) is not required when the official(s) with jurisdiction over a park, recreation area, or wildlife and waterfowl refuge determine that the property, considered in its entirety, is not significant. In the absence of such a determination, the Section 4(f) property will be presumed to be significant. The Administration will review a determination that a park, recreation area, or wildlife and waterfowl refuge is not significant to assure its reasonableness.

(d) Where Federal lands or other public land holdings (e.g., State forests) are administered under statutes permitting management for multiple uses, and, in fact, are managed for multiple uses, Section 4(f) applies only to those portions of such lands which function for, or are designated in the plans of the administering agency as being for, significant park, recreation, or wildlife and waterfowl refuge purposes. The determination of which lands so function or are so designated, and the significance of those lands, shall be made by the official(s) with jurisdiction over the Section 4(f) resource. The Administration will review this determination to assure its reasonableness.

(e) In determining the applicability of Section 4(f) to historic sites, the Administration, in cooperation with the applicant, will consult with the official(s) with jurisdiction to identify all properties on or eligible for the National Register of Historic Places (National Register). The Section 4(f) requirements apply to historic sites on or eligible for the National Register unless the Administration determines that an exception under § 774.13 applies.

(1) The Section 4(f) requirements apply only to historic sites on or eligible for the National Register unless the Administration determines that the application of Section 4(f) is otherwise appropriate.

(2) The Interstate System is not considered to be a historic site subject to Section 4(f), with the exception of those individual elements of the Interstate System formally identified by FHWA for Section 4(f) protection on the basis of national or exceptional historic significance.

(f) Section 4(f) applies to all archeological sites on or eligible for inclusion on the National Register, including those discovered during construction, except as set forth in § 774.13(b).

(g) Section 4(f) applies to those portions of federally designated Wild and Scenic Rivers that are otherwise eligible as historic sites, or that are publicly owned and function as, or are designated in a management plan as, a significant park, recreation area, or wildlife and waterfowl refuge. All other applicable requirements of the Wild and Scenic Rivers Act, 16 U.S.C. 1271–1287, must be satisfied, independent of the Section 4(f) approval.

(c) The level of the standard shall be measured by a reference method based on appendix A or A–1 of this part, or by a Federal Equivalent Method (FEM) designated in accordance with part 53 of this chapter.

[75 FR 35592, June 22, 2010]

## § 50.18 National primary ambient air quality standards for PM₂.₅.

(a) The national primary ambient air quality standards for $PM_{2.5}$ are 12.0 micrograms per cubic meter ($\mu g/m^3$) annual arithmetic mean concentration and 35 $\mu g/m^3$ 24-hour average concentration measured in the ambient air as $PM_{2.5}$ (particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers) by either:

(1) A reference method based on appendix L to this part and designated in accordance with part 53 of this chapter; or

(2) An equivalent method designated in accordance with part 53 of this chapter.

(b) The primary annual $PM_{2.5}$ standard is met when the annual arithmetic mean concentration, as determined in accordance with appendix N of this part, is less than or equal to 12.0 $\mu g/m^3$.

(c) The primary 24-hour $PM_{2.5}$ standard is met when the 98th percentile 24-hour concentration, as determined in accordance with appendix N of this part, is less than or equal to 35 $\mu g/m^3$.

[78 FR 3277, Jan. 15, 2013]

## § 50.19 National primary and secondary ambient air quality standards for ozone.

(a) The level of the national 8-hour primary ambient air quality standard for ozone ($O_3$) is 0.070 parts per million (ppm), daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(b) The 8-hour primary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

(c) The level of the national secondary ambient air quality standard for $O_3$ is 0.070 ppm, daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(d) The 8-hour secondary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

[80 FR 65452, Oct. 26, 2015]

APPENDIX A–1 TO PART 50—REFERENCE MEASUREMENT PRINCIPLE AND CALIBRATION PROCEDURE FOR THE MEASUREMENT OF SULFUR DIOXIDE IN THE ATMOSPHERE (ULTRAVIOLET FLUORESCENCE METHOD)

### 1.0 APPLICABILITY

1.1 This ultraviolet fluorescence (UVF) method provides a measurement of the concentration of sulfur dioxide ($SO_2$) in ambient air for determining compliance with the national primary and secondary ambient air quality standards for sulfur oxides (sulfur dioxide) as specified in § 50.4, § 50.5, and § 50.17 of this chapter. The method is applicable to the measurement of ambient $SO_2$ concentrations using continuous (real-time) sampling. Additional quality assurance procedures and guidance are provided in part 58, appendix A, of this chapter and in Reference 3.

### 2.0 PRINCIPLE

2.1 This reference method is based on automated measurement of the intensity of the characteristic fluorescence released by $SO_2$ in an ambient air sample contained in a measurement cell of an analyzer when the air sample is irradiated by ultraviolet (UV) light passed through the cell. The fluorescent light released by the $SO_2$ is also in the ultraviolet region, but at longer wavelengths than the excitation light. Typically, optimum instrumental measurement of $SO_2$ concentrations is obtained with an excitation wavelength in a band between approximately 190 to 230 nm, and measurement of the $SO_2$ fluorescence in a broad band around 320 nm, but these wavelengths are not necessarily



action, or if significant new cir-
cumstances or information arise which
bear on the proposal or its impacts.

### § 1501.8  Time limits.

Although the Council has decided
that prescribed universal time limits
for the entire NEPA process are too in-
flexible, Federal agencies are encour-
aged to set time limits appropriate to
individual actions (consistent with the
time intervals required by § 1506.10).
When multiple agencies are involved
the reference to agency below means
lead agency.

(a) The agency shall set time limits
if an applicant for the proposed action
requests them: *Provided*, That the lim-
its are consistent with the purposes of
NEPA and other essential consider-
ations of national policy.

(b) The agency may:

(1) Consider the following factors in
determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic tech-
niques.

(iv) Degree of public need for the pro-
posed action, including the con-
sequences of delay.

(v) Number of persons and agencies
affected.

(vi) Degree to which relevant infor-
mation is known and if not known the
time required for obtaining it.

(vii) Degree to which the action is
controversial.

(viii) Other time limits imposed on
the agency by law, regulations, or ex-
ecutive order.

(2) Set overall time limits or limits
for each constituent part of the NEPA
process, which may include:

(i) Decision on whether to prepare an
environmental impact statement (if
not already decided).

(ii) Determination of the scope of the
environmental impact statement.

(iii) Preparation of the draft environ-
mental impact statement.

(iv) Review of any comments on the
draft environmental impact statement
from the public and agencies.

(v) Preparation of the final environ-
mental impact statement.

(vi) Review of any comments on the
final environmental impact statement.

(vii) Decision on the action based in
part on the environmental impact
statement.

(3) Designate a person (such as the
project manager or a person in the
agency's office with NEPA responsibil-
ities) to expedite the NEPA process.

(c) State or local agencies or mem-
bers of the public may request a Fed-
eral Agency to set time limits.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1   Purpose.
1502.2   Implementation.
1502.3   Statutory requirements for state-
ments.
1502.4   Major Federal actions requiring the
preparation of environmental impact
statements.
1502.5   Timing.
1502.6   Interdisciplinary preparation.
1502.7   Page limits.
1502.8   Writing.
1502.9   Draft, final, and supplemental state-
ments.
1502.10   Recommended format.
1502.11   Cover sheet.
1502.12   Summary.
1502.13   Purpose and need.
1502.14   Alternatives including the proposed
action.
1502.15   Affected environment.
1502.16   Environmental consequences.
1502.17   List of preparers.
1502.18   Appendix.
1502.19   Circulation of the environmental im-
pact statement.
1502.20   Tiering.
1502.21   Incorporation by reference.
1502.22   Incomplete or unavailable informa-
tion.
1502.23   Cost-benefit analysis.
1502.24   Methodology and scientific accu-
racy.
1502.25   Environmental review and consulta-
tion requirements.

AUTHORITY: NEPA, the Environmental
Quality Improvement Act of 1970, as amend-
ed (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean
Air Act, as amended (42 U.S.C. 7609), and E.O.
11514 (Mar. 5, 1970, as amended by E.O. 11991,
May 24, 1977).

SOURCE: 43 FR 55994, Nov. 29, 1978, unless
otherwise noted.

### § 1502.1  Purpose.

The primary purpose of an environ-
mental impact statement is to serve as
an action-forcing device to insure that
the policies and goals defined in the

Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

## § 1502.2  Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

## § 1502.3  Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report.

On proposals (§ 1508.23).

For legislation and (§ 1508.17).

Other major Federal actions (§ 1508.18).

Significantly (§ 1508.27).

Affecting (§§ 1508.3, 1508.8).

The quality of the human environment (§ 1508.14).

## § 1502.4  Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such



among alternatives). The summary will normally not exceed 15 pages.

### § 1502.13 Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

### § 1502.14 Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

### § 1502.15 Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data

and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16 Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

## § 1502.17 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

## § 1502.18 Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

## § 1502.19 Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

## § 1502.20 Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

## § 1502.21 Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material



consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

## § 1508.26 Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

## § 1508.27 Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

## § 1508.28 Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement