No. 24-1447

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,
*Plaintiffs-Appellants*,

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,
*Defendants-Appellee*s.

Appeal from the U.S. District Court for the District of Maryland
No. 22-cv-02597-DKC (Hon. Deborah K. Chasanow)

**FEDERAL APPELLEES' RESPONSE BRIEF**

TODD KIM
*Assistant Attorney General*
JOHN EMAD ARBAB
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ...................................................................................... vii

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 4

STATEMENT OF THE ISSUES ......................................................... 4

STATEMENT OF THE CASE ............................................................. 5

    A.    The National Environmental Policy Act ............................... 5

    B.    Clean Air Act .......................................................................... 6

    C.    Section 4(f) of the Department of the Transportation Act .................. 9

    D.    Consideration of communities with environmental justice concerns .. 9

    E.    Factual background ............................................................. 10

    F.    Procedural history .............................................................. 18

SUMMARY OF ARGUMENT ........................................................... 20

STANDARD OF REVIEW ................................................................ 23

ARGUMENT .................................................................................... 24

I.    The Agencies adequately considered $PM_{2.5}$ pollution, satisfying NEPA's hard look requirement ....................................................... 24

II.    The Agencies took the requisite hard look at the Project's impacts on communities with environmental justice concerns. ..................... 33

III.    The Agencies reasonably rejected a west-shift alignment of the American Legion Bridge. ............................................................. 41

i

IV.    Vacatur is not warranted. ................................................................ 45

CONCLUSION ..................................................................................... 47

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal v. Nuclear Regulatory Commission*,
 988 F.2d 146 (D.C. Cir. 1993)......................................................46

*Barnes v. FAA*,
 865 F.3d 1266 (9th Cir. 2017)......................................................28

*Bienestar de la Comunidad Costera v. FERC*,
 6 F.4th 1321 (D.C. Cir. 2021) .....................................................46

*Border Power Plant Working Group v. Department of Energy*,
 260 F. Supp. 2d 997 (S.D. Cal. 2003) .........................................29

*Diné Citizens Against Ruining Our Environment v. Haaland*,
 59 F.4th 1016 (10th Cir. 2023).....................................................29

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971) ............................................................. 24, 42

*Coalition for Advancement of Regional Transportation v. Federal Highway Administration*,
 959 F. Supp. 2d 982 (W.D. Ky. 2013) ..........................................28

*Communities Against Runway Expansion, Inc. v. FAA*,
 355 F.3d 678 (D.C. Cir. 2004).....................................................10

*Defenders of Wildlife v. North Carolina Department of Transportation*,
 762 F.3d 374 (4th Cir. 2014) .......................................................24

*Friends of Back Bay v. U.S. Army Corps of Engineers*,
 681 F.3d 581 (4th Cir. 2012) .......................................................23

*Friends of Buckingham v. State Air Pollution Control Board*,
 947 F.3d 68 (4th Cir. 2020) .........................................................30

*Holly Hill Farm Corp. v. United States*,
 447 F.3d 258 (4th Cir. 2006) .......................................................23

*Hughes River Watershed Conservancy v. Johnson*,
 165 F.3d 283 (4th Cir. 1999) .......................................................23

iii

*Latin Americans for Social and Economic Development. v. Administrator of Federal Highway Administration,*
  756 F.3d 447 (6th Cir. 2014) ................................................................10

*Marsh v. Oregon Natural Resources Council,*
  490 U.S. 360 (1989) ..............................................................................5

*Mirant Potomac River, LLC v. State Air Pollution Control Board,*
  No. CL07-2933, 2008 WL 6745388 (Va. Cir. Mar. 13, 2008) ............30

*Mississippi v. EPA,*
  744 F.3d 1334 (D.C. Cir. 2013)............................................................29

*Ohio Valley Environmental Coalition Inc. v. U.S. Army Corps of Engineers,*
  828 F.3d 316 (4th Cir. 2016) ................................................................23

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ..............................................................................5

*Sierra Club v. Federal Highway Administration,*
  715 F. Supp. 2d 721 (S.D. Tex. 2010)..................................................30

*Sierra Club v. Federal Highway Administration,*
  No. 17-CV-1661, 2018 WL 1610304 (D. Colo. Apr. 3, 2018) ............28

*Sierra Club v. State Water Control Board,*
  898 F.3d 383 (4th Cir. 2018) ................................................................24

*Sierra Club v. U.S. Department of Transportation,*
  310 F. Supp. 2d 1168 (D. Nev. 2004) ..................................................28

*Sierra Club v. United States Army Corps of Engineers,*
  909 F.3d 635 (4th Cir. 2018) ................................................................46

*Town of Weymouths v. Massachusetts Department of Environmental Protection,*
  961 F.3d 34 (1st Cir.)............................................................................30

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,*
  435 U.S. 519 (1978) ..............................................................................44

**Statutes**

5 U.S.C. §§ 701-706 ................................................................................4

23 U.S.C. § 138(a) ..................................................................................9

28 U.S.C. § 1291 .....................................................................................4

28 U.S.C. § 1331 .....................................................................................4

42 U.S.C. § 4321 .....................................................................................4

42 U.S.C. § 4332(2)(C) ..........................................................................6

42 U.S.C. § 7401(b)(1) ...........................................................................6

42 U.S.C. § 7407(d) ................................................................................7

42 U.S.C. § 7409(b)(1) ....................................................................... 6, 29

42 U.S.C. § 7410(a) ................................................................................7

42 U.S.C. § 7506(c)(1)(B)(i) .............................................................. 7, 31

42 U.S.C. § 7506(c)(5) ....................................................................... 8, 31

49 U.S.C. § 301 .......................................................................................4

49 U.S.C. § 303(c) ..................................................................................9

Va. Code Ann. § 10.1-1307(E) .............................................................30

**Regulations and Administrative Materials**

23 C.F.R. § 774.3(c)(1) ..........................................................................9

23 C.F.R. § 774.3(c)(1)(vii) ..................................................................45

23 C.F.R. § 774.7(c) ..............................................................................42

23 C.F.R. § 774.9(b) ..............................................................................42

40 C.F.R. § 93.101 ..................................................................................8

40 C.F.R. § 93.116(a) ....................................................................8

40 C.F.R. § 93.123(b)(1) ..............................................................8

40 C.F.R. § 1502.16(a) .................................................................5

40 C.F.R. § 1502.16(b) .................................................................5

40 C.F.R. § 1508.25(c) .................................................................5

40 C.F.R. § 1508.27(b)(7) ............................................................5

88 Fed. Reg. 25,251 (Apr. 26, 2023). ...........................................9

88 Fed. Reg. 5558 (Jan. 27, 2023) ..........................................6, 29

62 Fed. Reg. 38,652 (July 18, 1997)..............................................6

59 Fed. Reg. 7629 (Feb. 11, 1994).. ............................................10

43 Fed. Reg. 55,978 (Nov. 29, 1978) ............................................5

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CO | Carbon Monoxide |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EJ | Environmental Justice |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| MDOT | Maryland Department of Transportation |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $PM_{2.5}$ | Particulate matter with diameter equal or less than 2.5 micrometers |
| ROD | Record of Decision |
| SDEIS | Supplemental Draft Environmental Impact Statement |

**INTRODUCTION**

As anyone who has driven in the area is painfully well aware, traffic in the Beltway area outside the Nation's capital is among the worst in the United States. This problem is not going away; indeed, given that rapid expected population growth and new jobs in the region are expected, it will likely only get worse without action. To address the problem, the Federal Highway Administration (FHWA) and Maryland Department of Transportation (MDOT) (collectively, the Agencies) initiated the Managed Lanes Study (Study or Project) more than six years ago. Following years of environmental review under the National Environmental Policy Act (NEPA)—including a draft Environmental Impact Statement (EIS), a supplemental draft EIS, and a final EIS that included twenty-one final, updated analyses, and studied seven alternatives in detail—FHWA approved the challenged Project in a 2022 Record of Decision (ROD). The Project would add two high-occupancy managed lanes in each direction in a fifteen-mile stretch between McLean, Virginia and Gaithersburg, Maryland.

Appellants Maryland Chapter of the Sierra Club *et al.* (collectively, Plaintiffs[1]) brought this suit challenging the Agencies' years-long review. In a thorough

---

[1] The Northern Virginia Citizens Association and Friends of Moses Hall, who were also plaintiffs below, did not appeal. We use the term Plaintiffs to refer to Appellants.

1

opinion, the district court granted summary judgment to the Agencies. That decision was correct and this Court should affirm.

On appeal, Plaintiffs raise three issues. First, Plaintiffs argue that the Agencies violated NEPA by not investigating the Project's contribution to Particulate Matter 2.5 ($PM_{2.5}$) pollution. This argument plainly lacks merit. The Environmental Protection Agency (EPA) sets National Ambient Air Quality Standards (NAAQS) for pollutants, including $PM_{2.5}$, and it is required to set those standards at a level that will "protect the public health" with "an adequate margin of safety." It is undisputed that the region is in compliance with the NAAQS standard for $PM_{2.5}$ and, under the Clean Air Act and its implementing regulations, no additional analysis was required for new projects in the region. For that reason alone, this argument fails.

Nonetheless, the Agencies did more than what was required. They conducted localized carbon monoxide modeling as a proxy for transportation emissions and found that, even using very conservative assumptions, none of the studied alternatives would cause or contribute to a violation of the carbon monoxide NAAQS or even come close to doing so; indeed, carbon monoxide emissions at the most congested point of the Project area are expected to *decline* considerably between 2025 and 2040. Similarly, analysis conducted by a regional planning board—analysis FHWA ensured accounted for the Project—concluded that all planned projects will not cause or contribute to a violation of the relevant NAAQS through the year 2045.

Second, Plaintiffs challenge the Agencies' environmental justice analysis. The Agencies extensively studied such impacts. Plaintiffs fault that analysis in just one respect, contending that the Project will worsen congestion in certain parts of communities with environmental justice concerns, and resultingly increase air pollution. But the Agencies studied that issue and explained that the Project would result in traffic *improvements* "along the corridor segments adjacent to [environmental justice] populations," and that conclusion finds ample support in the record. And the record makes clear that the Project will not meaningfully increase air pollution, in communities with environmental justice concerns or otherwise.

Finally, Plaintiffs fault the Agencies for rejecting a particular proposal for rebuilding the American Legion Bridge that would have avoided Plummers Island, an ecologically sensitive area. The Agencies' assembled a "Strike Team" of national and local experts, and asked the Team to investigate techniques to minimize impacts to natural, cultural, and parkland resources. As a result of the Strike Team's efforts, the Preferred Alternative will impact only 0.28 acres of Plummers Island, and only a small fraction of those impacts will be permanent. Plaintiffs' suggested alternative would impact *more* park acreage, and would displace at least one residence. The Agencies' rejection of this alternative was anything but arbitrary and capricious.

The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

(a)    The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal statutes, including NEPA, 42 U.S.C. § 4321 *et seq.*, the Department of Transportation Act, 49 U.S.C. § 301 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

(b)    The district court's judgment was final because it resolved all claims against all defendants. This Court has appellate jurisdiction under 28 U.S.C. § 1291

(c)    The district court entered judgment on March 20, 2024. JA0130. Plaintiffs filed a notice of appeal on May 14, 2024. JA0132. The appeal is timely.

## STATEMENT OF THE ISSUES

1.    Whether the Agencies adequately investigated $PM_{2.5}$ pollution, where it is undisputed that the Project area is in attainment for $PM_{2.5}$, and where extensive record evidence nonetheless showed that the Project would not cause or contribute to a violation of the NAAQS.

2.    Whether the Agencies took the required hard look at environmental justice concerns, where the Agencies considered impacts of the Project on a comprehensive range of characteristics, concluding, among other things, that the Project would not have a disproportionately high or adverse effect on the communities with environment justice concerns, would result in traffic improvements, and would not worsen congestion.

3.    Whether the Agencies acted contrary to law or arbitrarily and capriciously in not adopting an alternative to re-align the American Legion Bridge onto other portions of National Park Service property.

## STATEMENT OF THE CASE

### A.    The National Environmental Policy Act

"NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). But it is "well settled that NEPA itself does not mandate particular results." *Id.* NEPA's requirements are merely procedural and the statute does not require that an agency "achieve particular substantive environmental results." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). Instead, NEPA only obligates the agency to inform the public and decisionmakers of its analysis after taking a hard look at the likely effects of its proposed action. *Robertson*, 490 U.S. at 350. This includes analyzing the action's potential direct, indirect, and cumulative impacts. 40 C.F.R. §§ 1502.16(a), 1502.16(b), 1508.25(c), 1508.27(b)(7).[2] If the agency is proposing a "major [f]ederal action[]" that will "significantly affect[]

---

[2] The Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 1978. 43 Fed. Reg. 55,978 (Nov. 29, 1978). CEQ amended those regulations effective September 14, 2020. We cite to the pre-2020 regulations because the NEPA process for the Project began in 2019 and the Agencies thus applied the pre-2020 regulations.

the quality of the human environment," NEPA requires that the agency prepare an EIS. 42 U.S.C. § 4332(2)(C).

## B.    Clean Air Act

Congress enacted the Clean Air Act to, among other reasons, "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The Act requires the EPA to set NAAQS, including primary (health-based) standards "the attainment and maintenance of which in the judgment of the Administrator [of the EPA], based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health." *Id.* § 7409(b)(1). The EPA has accordingly established NAAQS for multiple pollutants including, as relevant to this case, particulate matter[3] having a diameter equal to or less than 2.5 micrometers ($PM_{2.5}$). The EPA must set the standards "at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety." 88 Fed. Reg. 5558, 5564 (Jan. 27, 2023); 42 U.S.C. § 7409(b)(1). Among other pollutants, EPA has established separate NAAQS for CO, ozone, and $PM_{2.5}$.

---

[3] "Particulate matter is the generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes." 62 Fed. Reg. 38,652, 38,653 (July 18, 1997).

Once EPA promulgates a new or revised NAAQS, EPA and states must act to attain and maintain that standard. EPA is required to designate all areas of the country as "attainment," "nonattainment," or "unclassifiable" with respect to each NAAQS. 42 U.S.C. § 7407(d). EPA bases these designations on data collected from air quality monitors situated throughout the country, along with other factors and forms of analysis. *Id*. § 7619. A region's attainment status is fundamental to how potential activities must be evaluated. The Clean Air Act provides that federal agencies cannot license, permit, approve, or finance any activity that does not conform to an approved or promulgated state implementation plan, which includes a requirement that the activity will not "cause or contribute to any new violation of any" NAAQS "in any area," "increase the frequency or severity of any existing violation," or "delay timely attainment of any standard or any required emission reductions or other milestones in any area." 42 U.S.C. § 7506(c)(1)(B).[4] But the Act further provides that this requirement "shall apply only with respect to" "a nonattainment area and each pollutant for which the area is designated as a nonattainment area" and "an area that was designated as a nonattainment area but that was later redesignated by the Administrator [of EPA] as an attainment area and that is required to develop a

---

[4] A state implementation plan, generally speaking, is a plan prepared by a state and submitted for the EPA's approval that provides for implementation, maintenance and enforcement of the air quality standards EPA sets. *See* 42 U.S.C. § 7410(a).

maintenance plan under section 7505a of this title with respect to the specific pollutant for which the area was designated nonattainment." *Id.* § 7506(c)(5).

Similarly, the Clean Air Act's implementing regulations mandate a "hot-spot analysis" for projects under certain circumstances. Hot-spot analysis involves "an estimation of likely future localized CO, $PM_{10}$, and/or $PM_{2.5}$ pollutant concentrations and a comparison of those concentrations to the" NAAQS, and "assesses impacts on a scale smaller than the entire nonattainment or maintenance area, including, for example, congested roadway intersections and highways or transit terminals." 40 C.F.R. § 93.101. A CO hot-spot analysis is required for non-exempt FHWA/FTA projects in CO nonattainment and maintenance areas, and a PM hot-spot analysis is required for only some non-exempt FHWA/FTA projects in $PM_{10}$ and $PM_{2.5}$ nonattainment and maintenance areas: the regulations provide that an agency need not provide hot-spot analysis in $PM_{2.5}$ nonattainment areas for "FHWA/FTA projects that are not" a local air quality concern. *Id.* §§ 93.116(a), 93.123(b)(1). EPA has specifically recognized that new HOV lanes projects that do not involve a "a significant number of diesel vehicles" or "a significant increase in the number of diesel vehicles" typically would not need a $PM_{2.5}$ hot-spot analysis. EPA, Near Roadway Air Pollution and Health: Frequently Asked Questions 2 (2018), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100UKQS.pdf.

In this case, it is undisputed that Montgomery County, Maryland and Fairfax County, Virginia (where the Preferred Alternative is located) are attainment areas for $PM_{2.5}$. JA0084.

### C.    Section 4(f) of the Department of the Transportation Act

Section 4(f) applies to highway projects that "requir[e] the use of publicly owned land of a public park . . . or land of an historic site of national, State, or local significance . . ." 49 U.S.C. § 303(c); *accord* 23 U.S.C. § 138(a). FHWA may approve projects that make more than a de minimis "use" of those resources only where "(1) there is no prudent and feasible alternative" and (2) "the program or project includes all possible planning to minimize harm to the . . . [resource] resulting from the use." 49 U.S.C. § 303(c). If there are no feasible and prudent alternatives to using Section 4(f) property, the Secretary may select only the alternative that "[c]auses the least overall harm in light of [Section 4(f)'s] preservation purpose." 23 C.F.R. § 774.3(c)(1).

### D.    Consideration of communities with environmental justice concerns

Executive Order 12898[5] directs that "each Federal agency shall make achieving environmental justice [EJ] part of its mission by identifying and addressing, as

---

[5] A new executive order concerning environmental justice was signed in April 2023 but the relevant agency actions in this case occurred prior to that order. *See* 88 Fed. Reg. 25,251 (Apr. 26, 2023).

appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations" within the area affected. 59 Fed. Reg. 7629, 7629 (Feb. 11, 1994).

The Order does not "create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person" and likewise does not "create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with" the order. *Id.* at 7632-33. But courts have concluded that they may evaluate an agency's consideration of EJ issues under the APA's "arbitrary and capricious" standard, at least where the agency includes EJ analysis in its NEPA evaluation. *See, e.g.*, *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 688 (D.C. Cir. 2004). And although Executive Order 12898 directs agencies to consider EJ impacts, "the FHWA is not required to select an alternative with the least environmental justice impact." *Latin Americans for Social and Economic Development. v. Administrator of Federal Highway Administration*, 756 F.3d 447, 476 (6th Cir. 2014).

### E.    Factual background

#### 1.    The I-495 and I-270 Managed Lanes Study

FHWA and MDOT began the Managed Lanes Study in early 2018 in an effort to address the severe traffic congestion in the Capital area. JA0375. The National

Capital Region is the most congested region in the nation based on annual delay and congestion per auto commuter. JA0138. The State of Maryland as a whole experiences the second longest commuting times in the nation. JA0138. And I-495 and I-270 in Maryland in particular are the two most heavily traveled freeways in the National Capital Region. JA0138. I-495 has been at or over capacity during peak hours since the late 1980s, and I-270 has been since the late 1990s. JA0752. The problem has dramatically worsened since then. The hours of peak congestion on I-495 and I-270 have increased to 10 and 7 hours a day, respectively. JA0752.

Traffic volume is expected to only increase over time. The Washington Metropolitan area continues to experience significant population growth, and the populations of Montgomery County and Prince Georges County in Maryland are expected to grow considerably between now and 2045. JA0138 (noting "that between 2020 and 2045, the population of these counties will further increase approximately 16.3 percent and 7.9 percent, respectively"). Similarly, projections of long-term growth indicate that there will be an additional one million jobs in the region by 2045, which will continue to create growth in travel demand even in an era of increased telework and remote work. JA0752.

The scope of the Study extends on I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, ending just west of MD 5 in Prince George's County, Maryland. JA0137. Along that stretch is the American Legion

Bridge, which carries I-495 across the Potomac River between Montgomery County, Maryland and Fairfax County, Virginia. The Preferred Alternative as well as all the other action alternatives includes full replacement of that bridge. "The existing bridge is nearly 60 years old and would need to be replaced sometime over the next few decades regardless of the Study." JA1899.

### 2. The DEIS

Planning for the Project began in early 2018 with the publication of a Notice of Intent to develop an EIS. JA0375. The MDOT is the co-lead agency and local project sponsor. JA0375. But because the Project is federally funded, it must comply with NEPA and other applicable statutes.

At the beginning of the NEPA process, the Agencies invited eight federal, state, and local agencies to be cooperating agencies and twenty additional agencies to be participating agencies. Over the course of the NEPA process, the Agencies collaborated regularly with these additional entities, holding nearly 300 office and field agency meetings from 2018 through early 2022. JA0375. The Agencies also engaged extensively with the public, holding 16 public workshops, 7 public hearings, and approximately 200 meetings with individual and business stakeholders. JA0375.

The Agencies published a draft EIS (DEIS) on July 10, 2020. Based on previous studies and input during the NEPA scoping process, the DEIS developed 15

preliminary alternatives for further review. JA0411-0412. The Agencies then screened each alternative by evaluating the extent to which each alternative met (or did not meet) the six major elements of the Study's purpose and need. Those six major elements are: engineering considerations (including accommodating existing traffic and traffic growth, as well as improving trip reliability), accommodating homeland security, improving the movement of goods and services, enhancing multimodal mobility and connectivity, financial viability, and environmental considerations. JA0414. Based on this analysis, seven alternatives were retained for further study. JA0415. The Agencies initially provided 90 days for public comment on the DEIS—twice the minimum required—and then extended the comment period by another 30 days. JA0168.

### 3.    The Preferred Alternative and SDEIS

In January 2021, Alternative 9 was announced as MDOT's preferred alternative. JA0158. That alternative would have created two managed lanes (i.e., lanes that require a toll to use, the amount of which fluctuates depending on demand) in each direction, on I-495 from the George Washington Memorial Parkway in Virginia all the way to Maryland Route 5 in Prince George's County, as well as on I-270 from I-495 to I-370, a total length of 48 miles. JA0415. Following additional evaluation of public input, the Agencies identified a revised preferred alternative (Preferred Alternative) extending only from the GW Parkway to Maryland Route 187 on I-495

and from I-495 to I-370 on I-270; as revised, the Preferred Alternative extends 15 miles, and adds two high-occupancy toll managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of Maryland 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of Maryland 187 to I-270. JA1801.

The Preferred Alternative includes other elements besides these additional lanes. These include free bus transit usage of the managed toll lanes "to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that connect to activity and economic centers." JA0429. Existing bike and pedestrian routes that will be affected by the Project will be replaced or upgraded. JA0429. The Agencies also committed to constructing a new pedestrian and bicycle lane across the American Legion Bridge. JA0446.

The Preferred Alternative also proposes replacing the American Legion Bridge. After publishing the DEIS, the Agencies consulted with the National Park Service, which requested that MDOT reassess the bridge design and limits of disturbance "to limit impacts to NPS land and its natural and cultural resources." JA0502. One of those resources is Plummers Island, which is part of the Chesapeake and Ohio Canal National Historic Park, and is "a recognized ecologically sensitive and [National Register of Historic Places]-eligible historic property." JA0502. To address the Park Service's concerns, the Agencies assembled a "Strike Team" of

14

national and local experts, and asked the Team to investigate "alternative bridge de-
signs and construction techniques that could be employed to reduce, minimize, and
avoid impacts to natural, cultural, and parkland resources around the [American Le-
gion Bridge]." JA0440.

The Agencies investigated three potential roadway alignments for replace-
ment of the bridge: (1) an "east shift alignment" that would construct a new bridge
to the east of the existing bridge; (2) a "west shift alignment" that would construct a
new bridge to the west of the existing bridge; and (3) an "on-center alignment" that
would construct a new bridge on the existing alignment. The Strike Team concluded
that both the west shift and on-center alignments were viable, and the Agencies ul-
timately chose the on-center alignment for the Preferred Alternative.[6] The Strike
Team's work resulted in significant reduction of impacts to Plummers Island, with
less than 0.1 acres of permanent impact in the Final EIS. JA0669.

On October 1, 2021, the Agencies published a supplemental draft EIS
(SDEIS), primarily to consider new information concerning the Preferred Alterna-
tive. The SDEIS updated "measures to avoid, minimize, and mitigate potential en-
vironmental effects, where applicable," JA1789, including avoiding and signifi-

---

[6] The Agencies concluded that the east shift alignment "would . . . impact Plummers
Island and other [Section 4(f)] property more than would be acceptable and is not
feasible." JA1531.

cantly reducing property, community, historic, natural resources and parkland impacts, as well as avoiding all residential and business displacements. The Agencies provided a 60-day comment period for the SDEIS, which they later extended by 15 days. JA0375.

### 4.     The Final EIS and ROD

On June 17, 2022, the Final EIS (FEIS) was published. JA0376. The FEIS comprises 481 pages. In addition, twenty-one final technical reports collectively spanning thousands of additional pages support the FEIS, including a Final Traffic Analysis Technical Report, Final Community Effects Assessment & Environmental Justice Technical Report, Final Air Quality Technical Report, Final Indirect and Cumulative Effects Technical Report, Final Avoidance, Minimization, and Impacts Report, Final Public Involvement and Agency Coordination Technical Report, and Responses to DEIS and SDEIS Comments. *See* JA0379. Because the FEIS is voluminous, we summarize only those aspects of the FEIS that are directly relevant to this appeal.

As to $PM_{2.5}$ emissions, the FEIS explained that the "Air Quality analysis study area (i.e., Montgomery County and Fairfax County) is in an attainment area for $PM_{2.5}$" and that "therefore, transportation conformity requirements pertaining to $PM_{2.5}$ do not apply for this Project and no further analysis of $PM_{2.5}$ was required." JA0541. Nonetheless, the FEIS explained that MDOT analyzed carbon monoxide

16

(CO) emissions from affected intersections and interchanges "for informational purposes since CO is a proxy for transportation emissions . . . ." JA0789. "The result of that analysis demonstrates that the worst-case interchanges and intersections for each Build Alternative . . . , using very conservative assumptions, would not cause or contribute to a violation of the CO NAAQS within the study area." JA0789; *see also infra* pp. 39-41 (discussing parameters and results of this study further).

Similarly, the Metropolitan Washington Council of Governments' Transportation Planning Board studied the long range outlook for ozone NAAQS compliance of all planned projects in the area, including the Project at issue in this case, through the year 2045. JA0541. FHWA ensured that the correct design concept and scope of the Project were in the analysis. JA2399-2401, 2402-2403, 2750. As the FEIS noted, the study showed that all planned projects "will not cause or contribute to a new violation . . . of the [ozone] NAAQS established by" the EPA. JA0653.

As to EJ impacts, the Agencies followed an extensive process for identifying communities with environmental justice concerns and analyzing whether the Project would cause any disproportionately high and adverse effects on those communities. JA0604-638; *see also infra* pp. 33-36 (discussing the Agencies' EJ analysis further).

The ROD was issued on August 25, 2022, and adopted the Preferred Alternative. JA0190. The ROD concluded, among other things, that "[t]he final decision balances the need for safe, fast and efficient transportation and public services with

17

the goal of avoiding, minimizing, or mitigating adverse environmental and community effects." JA0137.

### F.    Procedural history

Plaintiffs filed this lawsuit in October 2022, challenging the FEIS and the ROD for the Project. The parties cross-moved for summary judgment based on the administrative record and, on March 20, 2024, the district court issued a 68-page opinion granting summary judgment to the Agencies on all claims. JA0062.

As relevant here, the district court rejected Plaintiffs' argument that the Agencies violated NEPA by failing to take a sufficiently hard look at localized health harms from $PM_{2.5}$ emissions. JA0083-0090. The district court noted that there is no dispute that Montgomery and Fairfax counties are in attainment area for $PM_{2.5}$, that the Clean Air Act would not forbid the Preferred Alternative, and that there is no procedural requirement that an agency must conduct a localized air quality analysis in an attainment area. JA0084-0085. Given these considerations and because the NAAQS are required to be set at a level that protects the public health with an adequate margin of safety, "the court defer[red] to the Agencies' methodological discretion in using regional NAAQS to evaluate the Toll Lane Project's $PM_{2.5}$ emissions impacts." JA0086.

The district court further noted that the Agencies conducted localized CO emissions analysis as a proxy for transportation emissions, and concluded that the

18

Project would not cause new air quality violations. JA0089. The court rejected Plaintiffs' argument that CO is not a proper proxy for transportation emissions, noting that this argument simply reflected Plaintiffs' "disagreement with the *scientific merit* of using CO as a proxy for PM$_{2.5}$" and instead "defer[ring] to the Agencies' expertise." JA0090.

The district court next rejected Plaintiffs' argument that the Agencies failed to take a hard look at evidence purportedly showing that the Preferred Alternative would disproportionately increase air pollution in communities with environmental justice concerns. Although Plaintiffs argued that the Preferred Alternative would disproportionately increase congestion (and consequently, air pollution) in those communities, the district court noted that "Plaintiffs mischaracterize the administrative record," which shows that the Preferred Alternative would lead to faster travel speeds systemwide and that congestion issues would not get worse due to implementing the Preferred Alternative. JA0093-0094. By contrast, under the "No Build" alternative, as the Agencies noted "'[i]ncreased traffic congestion . . . would contribute to increased overflow congestion on the local road network[,] . . . result[ing] in increased response times for emergency services and increased travel times to community facilities[.]" JA0094 (quoting JA1190) (alterations supplied by court).

Finally, as relevant here, the district court rejected Plaintiffs' argument that the Agencies violated Section 4(f) by opting against the west shift alignment for the

American Legion Bridge's reconstruction. JA0126-0128. Because the administrative record shows that the Agencies "undertook all possible planning to minimize the Preferred Alternative's harm to natural and cultural resources as well as residential communities while reducing costs," the district court declined to "'fly speck' the Agencies' least overall harm analysis." JA0128.[7]

## SUMMARY OF ARGUMENT

I.     The Agencies adequately considered $PM_{2.5}$ pollution-related impacts under NEPA. It is undisputed that the Project is located in an attainment area for $PM_{2.5}$, that the Clean Air Act does not require, in attainment areas, analysis of whether a new FHWA/FTA project will cause or contribute to a new NAAQS violation, and that under the Clean Air Act's implementing regulations, localized hot-spot $PM_{2.5}$ analysis was not required for the Project. The Agencies nonetheless did more than was legally required, conducting additional analysis to evaluate the Project's air quality effects. Plaintiffs also appear to assert—without squarely arguing—that compliance with an applicable NAAQS is not sufficient for NEPA purposes, but that argument is contrary to numerous cases (cases that Plaintiffs unsuccessfully attempt to distinguish), the Clean Air Act, and common sense. Plaintiffs also rely on a 2015 study in an attempt to undermine the Agencies' analysis but that study—

---

[7] The district court also rejected other arguments asserted by Plaintiffs, JA0100-0112, 0114-0123, which Plaintiffs have abandoned on appeal.

which examined obsolete data outside the Project area and in any event found no correlation between $PM_{2.5}$ levels and traffic volumes—does not support their arguments.

II.     The Agencies conducted a robust EJ analysis that fully complied with NEPA. The Agencies identified minority race, ethnicity, and low-income populations along the entire study corridor, reviewed existing environmental and community conditions for populations with environmental justice concerns, conducted extensive outreach, and identified adverse and beneficial effects of the Project on those communities, ultimately concluding that *non-EJ* communities would bear the majority of quantifiable impacts for various resources (overwhelmingly so with respect to several resources). Plaintiffs contend that the Project will increase traffic congestion near communities with environmental justice concerns, thus increasing air pollution. But although Plaintiffs cherry-pick data showing a projected decrease in speed for certain narrow periods during rush hour, the Agencies considered this same evidence and explained that, on the whole, preexisting congestion would not get worse due to implementation of the Project. And in any event, the record affirmatively refutes Plaintiffs' claim that the Project will significantly worsen air pollution in communities with environmental justice concerns. The Agencies extensively studied CO emissions from the Project and found that—even at the most congested point of the Project, and even using modeling deliberately designed to overestimate

21

emissions—emissions will *decline* between now and 2040, and will not come close to violating the applicable CO NAAQS.

III.    The Agencies reasonably rejected Plaintiffs' proposed alternative for the American Legion Bridge, the west shift alignment, that would have avoided Plummers Island entirely. The on-center alignment the Agencies chose will affect less Section 4(f) land. Unlike Plaintiffs' preferred choice, the on-center alignment would not require re-configuration of the Clara Barton Parkway, and would not require residential displacement. And as a result of the Strike Team's efforts, the on-center alignment will involve less than 0.1 acres of permanent impacts to Plummers Island. Plaintiffs fault the Agencies for not separately addressing each of the seven regulatory factors for determining which alternative among those that use Section 4(f) property causes the least overall harm, but neither Section 4(f) nor the regulations themselves require this rote exercise, especially in this context. And Plaintiffs' substantive objections to the Agencies' analysis lack merit, and certainly do not show that the Agencies' choice was arbitrary and capricious.

IV.    The Court should affirm. If it does not, it should at most remand without vacatur for the Agencies to prepare any additional analysis or explanation that might be needed.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Resolution Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 587 (4th Cir. 2012)

Under APA standards, "a court will set aside an agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ohio Valley Environmental Coalition Inc. v. U.S. Army Corps of Engineers*, 828 F.3d 316, 321 (4th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)). Agency action is arbitrary and capricious only where "the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287-88 (4th Cir. 1999) (citation omitted). The court reviews only "whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 263 (4th Cir. 2006) (internal quotations and citations omitted). "Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, a reviewing court must generally be at

its most deferential." *Sierra Club v. State Water Control Board*, 898 F.3d 383, 403 (4th Cir. 2018) (cleaned up).

Similarly, as to Section 4(f), although courts "must conduct a 'thorough, probing, in depth review' to ensure that the Secretary's determination complies with Section 4(f)'s requirements," *Defenders of Wildlife v. North Carolina Department of Transportation*, 762 F.3d 374, 401(4th Cir. 2014) (quotation marks omitted), the agency's Section 4(f) determination "is entitled to a presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

## ARGUMENT

## I. The Agencies adequately considered PM$_{2.5}$ pollution, satisfying NEPA's hard look requirement.

Plaintiffs' initial argument on appeal is that the Agencies' purported "refusal to investigate the highway expansion project's PM$_{2.5}$ pollution violated NEPA." Plaintiffs' Br. 31. As noted above, the EPA sets NAAQS for criteria pollutants, including PM$_{2.5}$, and the Project area is in attainment for PM$_{2.5}$. And here, the Agencies conducted localized CO modeling as a proxy for transportation emissions (including PM$_{2.5}$), modeling which showed that—even "using very conservative assumptions"—"the worst-case interchanges and intersections for each Build Alternative . . . would not cause or contribute to a violation of the CO NAAQS within the study area." JA0789.

How then can Plaintiffs possibly contend that the Agencies failed to adequately investigate $PM_{2.5}$ emissions? Plaintiffs' most significant assertion is that the Agencies simply did not consider the Project's contribution to $PM_{2.5}$ pollution. Plaintiffs just repeat—literally over and over again—that all the Agencies did was examine pre-Project $PM_{2.5}$ levels, with the implication being that the Agencies have no idea (and did not bother to investigate) how the Project would affect that status quo. Plaintiffs' Br. 32 ("The Agencies arbitrarily relied upon pre-project $PM_{2.5}$ levels…"); *id.* ("[T]he Agencies' sole reliance on pre-project $PM_{2.5}$ levels violated NEPA's most fundamental requirement: to consider the impacts of the proposed project."); *id.* at 33 ("But $PM_{2.5}$ levels measured between 2016 and 2018 don't speak to the project's impact."); *id.* at 33 ("[T]he Agencies never left the starting block: they neglected to assess how expanding the highways would alter baseline $PM_{2.5}$ levels."); *id.* ("NEPA would be a dead letter if agencies could avoid analyzing the harms from their proposed actions simply by declaring that pre-project environmental conditions are acceptable."); *id.* at 36; *id.* at 38.

Similarly, Plaintiffs acknowledge the many cases holding that NAAQS compliance satisfies an agency's hard look obligations under NEPA. And they do not squarely argue that those cases were wrongly decided. Instead, they attempt to distinguish them, asserting that these cases "stand for the narrower principle that NEPA requires no further analysis if an agency estimates a project's emissions of an air

25

pollutant, adds it to background levels, and finds that the total pollution level would fall below the NAAQS," *id.* at 37, which they claim the Agencies did not do here.

This entire line of argument is clearly wrong. Plaintiffs attempt to dismiss the CO proxy study in a footnote, contending that the Agencies' "attempt in this litigation to link unrelated carbon monoxide modeling to their non-analysis of $PM_{2.5}$ is a post-hoc rationalization that they cannot rely upon to support their decision." Plaintiffs' Br. 40 n.19. This is flatly contrary to the administrative record. The FEIS, after noting that the region was in an attainment area for $PM_{2.5}$ explained that the MDOT nonetheless analyzed CO "since CO is a proxy for transportation emissions . . . ." JA0789. Indeed, below Plaintiffs *challenged* the Agencies' conclusion that CO was a proper proxy for $PM_{2.5}$, but the district court rejected that argument, JA0090, and Plaintiffs have not renewed it on appeal. This is plainly not a post hoc explanation. The Agencies' use of CO as a proxy for transportation emissions was also reasonable in this context.[8] To be sure, CO and $PM_{2.5}$ are different pollutants and an area can be in attainment for CO but not $PM_{2.5}$. But both are, at bottom, pollutants Plaintiffs contend will result from increased congestion; and as discussed in the next section, the study showed not only that the Project will not come close to causing a violation

---

[8] As Plaintiffs do not raise any Clean Air Act challenge, this brief does not speak to or take any position on what analysis would be required or permissible under the Clean Air Act, including with respect both to transportation emissions generally and to regulation of $PM_{2.5}$.

of the relevant CO NAAQS, but also that CO levels will *decline dramatically* under the Preferred Alternative from 2025 to 2040.

That is not all. As noted above, *see supra* p. 17, the Metropolitan Washington Council of Governments' Transportation Planning Board regional conformity analysis showed that all planned projects, including the Project challenged here, would not cause or contribute to the violation of the ozone NAAQS through the year 2045. JA0653. The ROD thus similarly explained because the Project "is included in the conforming long-range plan, it is not anticipated that the Selected Alternative, which is included in the updated Air Quality Conformity analysis, would cause new air quality violations, worsen existing violations, delay timely attainment of the relevant NAAQS." JA0173. In this case, the relevant NAAQS is ozone (not $PM_{2.5}$) because the region is in nonattainment for ozone. Accordingly, that study focused on ozone, and it underscores that this Project is not expected to delay attainment of or cause any new violations of the applicable NAAQS.

Given that there is no evidence (or even a plausible theory) that the Project will cause a violation of the $PM_{2.5}$ NAAQS, Plaintiffs' principal legal argument appears to be (or at least *could only be*) that compliance with the NAAQS is not itself sufficient to comply with NEPA. *See* Plaintiffs' Br. 12 (contending that there is no known level below which $PM_{2.5}$ is safe). But Plaintiffs do not squarely press this argument, and for good reason: "[T]he case law is nearly unanimous that federal

agencies may rely on NAAQS compliance to conclude that human health will not be seriously affected by a transportation project." *Sierra Club v. Federal Highway Administration*, No. 17-CV-1661, 2018 WL 1610304, at *7 (D. Colo. Apr. 3, 2018); *see also Barnes v. FAA*, 865 F.3d 1266, 1273 (9th Cir. 2017) ("It was appropriate for the FAA to defer to the [relevant NAAQS] on the factual question of what level of airborne lead is safe for children."); *Coalition for Advancement of Regional Transportation v. Federal Highway Administration*, 959 F. Supp. 2d 982, 1012-13 (W.D. Ky. 2013) (holding that "performing and completing the conformity analyses described in the CAA satisfies Defendants' hard look requirements for air quality issues under NEPA"), *aff'd*, 576 F. App'x 477 (6th Cir. 2014); *Sierra Club v. U.S. Department of Transportation*, 310 F. Supp. 2d 1168, 1202 (D. Nev. 2004) (explaining that "EPA is statutorily commanded to set NAAQS at a level sufficient to protect human health" so the Department of Transportation did "not act arbitrarily and capriciously by relying on the prevailing NAAQS standard EPA has set" (citation omitted)).

Those decisions are correct. Plaintiffs, without squarely arguing that those cases are wrong, contend that the cases "embrace the false proposition that exposures to below-NAAQS levels of $PM_{2.5}$ are safe." Plaintiffs' Br. 38 n.18. But although the Clean Air Act does not require the EPA to set the NAAQS at a zero-risk level, *see*

*Mississippi v. EPA*, 744 F.3d 1334, 1351 (D.C. Cir. 2013), EPA must set the standards "at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety." 88 Fed. Reg. 5558, 5564 (Jan. 27, 2023); 42 U.S.C. § 7409(b)(1).

More broadly, although Plaintiffs insist that "[i]napplicable provisions of the Clean Air Act" are "immaterial to [the Agencies'] NEPA obligations," Plaintiffs' Br. 38 (emphasis omitted), compliance with a substantive law—in which Congress addressed the *exact issue* Plaintiffs raise—is obviously relevant to whether an agency has satisfied its hard look obligations under NEPA. *See Diné Citizens Against Ruining Our Environment v. Haaland*, 59 F.4th 1016, 1046 (10th Cir. 2023) ("Comparison to standards set by administrative bodies to determine whether healthy levels of pollutants would be exceeded constitutes a hard look at the health impacts of drilling.") As the cases addressing the interaction between the NAAQS and NEPA recognize, "[i]f ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health." *Border Power Plant Working Group v. Department of Energy*, 260 F. Supp. 2d 997, 1020-21 (S.D. Cal. 2003). And at the very least, it is not *arbitrary and capricious* "to consider air pollution issues through the same framework used by the EPA to enforce

the Clean Air Act." *Sierra Club v. Federal Highway Administration*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010), *aff'd*, 435 F. App'x 368 (5th Cir. 2011).

This Court's decision in *Friends of Buckingham v. State Air Pollution Control Board*, 947 F.3d 68 (4th Cir. 2020), on which Plaintiffs rely, does not support Plaintiffs' argument. *Friends of Buckingham* is not a NEPA case. It does not even cite or reference NEPA. *Buckingham* instead involved an EJ analysis, under Virginia state law, of emissions from a compressor station. The statute at issue there outlines the powers and duties of the Virginia Air Pollution Control Board, and vests "the Board with broad authority 'to control . . . all sources of air pollution in the Commonwealth.'" *Mirant Potomac River, LLC v. State Air Pollution Control Board*, No. CL07-2933, 2008 WL 6745388, at * 3 (Va. Cir. Mar. 13, 2008). When exercising that broad authority, Virginia law mandates specific findings the Board must make, Va. Code Ann. § 10.1-1307(E), which includes consideration of EJ. *Friends of Buckingham*, 947 F.3d at 87.

This Court in that case found the Board failed to give "any explanation" as to the specific, localized findings required under Virginia law, and reliance on the NAAQS could not overcome those failings. *Id.* at 89. Notably, the First Circuit, in determining compliance with Massachusetts EJ requirements, rejected reliance on *Buckingham* while describing it as "easily distinguishable." *Town of Weymouth, Massachusetts v. Massachusetts Department of Environmental Protection*, 961 F.3d

30

34, 55 (1st Cir.), *on rehearing*, 973 F.3d 143 (1st Cir. 2020); *see also id.* ("Virginia's EJ requirements are not Massachusetts's EJ requirements. A violation of the former, even on similar facts, would not necessarily be a violation of the latter."). Similarly here, whatever mandates Virginia state law imposes on its agencies has no bearing on a federal agency's compliance with NEPA. And since it is not a NEPA case, *Buckingham* did not discuss—let alone suggest that it was departing from—the many cases holding that NAAQS compliance satisfies an agency's hard look obligations related to air quality issues under NEPA. Again, EPA is *required* to set the relevant standards at levels adequate to protect public health, with an adequate margin of safety.

Plaintiffs also fault the Agencies for relying on the Clean Air Act monitoring system rather than conducting localized analysis of $PM_{2.5}$ pollution from the highway expansion. Plaintiffs' Br. 34. As a threshold matter, this demand is simply unreasonable because to require such analysis under NEPA would be contrary to the basic regulatory regime created by the Clean Air Act. As noted, that Act provides, among other things, that a new proposed activity satisfy a requirement that the activity will not "cause or contribute to any new violation of any" NAAQS "in any area," 42 U.S.C. § 7506(c)(1)(B)(i), but then provides that this requirement "shall apply only with respect to" particular pollutants in particular types areas. *Id.* § 7506(c)(5). Plaintiffs do not dispute that these Clean Air Act requirements do not apply with respect

to $PM_{2.5}$ in the relevant areas. And the Clean Air Act's implementing regulations provide that localized PM hot-spot analysis is only required in PM nonattainment or maintenance areas and even there only for certain types of projects (which would not include this Project). *See supra* p.8. In any event, here the Agencies did conduct localized CO modeling as a proxy for transportation emissions (including $PM_{2.5}$) and found that none of the studied alternatives (including the Preferred Alternative) would cause or contribute to a violation of the CO NAAQS. *See supra* pp. 16-17.

Finally, Plaintiffs contend that a 2015 study reported that "an MDOT monitor 500 feet from the Beltway recorded $PM_{2.5}$ levels above the NAAQS." Plaintiffs' Br. 14-15. The district court went so far as to describe Plaintiffs' reliance on this study as "misleading," JA0084, and for good reason. That study examined data from 2009 to 2012 and does not reflect current emissions control technology. JA2772. The monitors studied were in Largo, Maryland, which is not along the Preferred Alternative's path. JA2772; *see also* Plaintiffs' Br. 15 n.10 (acknowledging this).[9] Putting both of these points aside, the study in fact undermines Plaintiffs' arguments; it concluded that no direct correlation between $PM_{2.5}$ concentrations and "traffic volumes

---

[9] The district court noted this point, JA0084 which Plaintiffs characterize as "[t]he district court offer[ing] its own explanation, which appeared neither in the record nor the Agencies' briefs," Plaintiffs' Br. 35 n.16. This is wrong. The United States' briefing below noted, among other criticisms, that the study "was not conducted along the Preferred Alternate path—the monitors studied were in Largo, Maryland, 'miles away from the project' studied here." JA0061.

. . . or speeds was found in the collected data." JA2780. The Agencies adequately

considered PM$_{2.5}$ pollution from the Project.[10]

## II. The Agencies took the requisite hard look at the Project's impacts on communities with environmental justice concerns.

Plaintiffs fare no better in their challenge to the Agencies' EJ analysis. That

analysis was, by any fair standard, robust. The FEIS's summary of the Agencies' EJ

analysis comprises more than 30 pages, *see* JA0604-0638, and is supported by a

comprehensive technical report devoted to evaluating the Project's community ef-

fects and analyzing its implications for communities with environmental justice con-

cerns, JA1099-1224. As these sources indicate, the Agencies' EJ analysis lasted sev-

eral years, and followed several steps.

First, the Agencies identified minority race and ethnicity populations, as well

as low-income populations, along the 48-mile Study corridor. The Agencies con-

ducted an EJ analysis of the 66 Census block groups along the affected area, consid-

ering race/ethnicity as well as income; the Agencies then used supplemental data

such as English-speaking status, subsidized housing locations, distribution of Sup-

plemental Nutrition Assistance Program benefits, and students receiving free/re-

duced-price lunches to identify additional communities with environmental justice

---

[10] Because the Agencies' consideration of PM$_{2.5}$ pollution satisfied NEPA's hard look requirement and went well beyond the requirements imposed by the Clean Air Act's regulatory regime, Plaintiffs' discussion of the Agencies' purported reliance on a 1987 Advisory is irrelevant. *See* Plaintiffs' Br. 40-41.

concerns. JA0604-0613. The Agencies ultimately identified 16 of the 66 census block groups as such communities. JA0610.

The Agencies next undertook a thorough review of demographic data to determine existing environmental and community conditions of the populations with environmental justice concerns. *See* JA0606. This included analysis of several environmental indicators, including $PM_{2.5}$, for the identified populations. *See* JA0613.

The Agencies then conducted extensive outreach to ensure "meaningful involvement in EJ populations." *See* JA0606. Outreach during the DEIS comment period included flyers in English, Spanish, Amharic, and French to around 200 affordable housing complexes, schools, and places of worship along the study corridors, as well as Spanish language ads in multiple publications; outreach during the SDEIS hearing and comment period included newspaper ads, online ads (including online ads targeting African American and Hispanic adults likely to own a home and commute over 20 miles daily using I-270 or I-495), Spanish language radio ads, and flyer outreach to various housing complexes, advisory boards, and other community groups. JA0620-0622

Finally, the Agencies identified adverse or beneficial effects to populations with environmental justice concerns under the No Build and Preferred Alternative. JA0606. The No Build Alternative "could result in increased overflow congestion

34

on the local road network" which "could result in increased response times for emergency services and increased travel times to community facilities." JA0626. The Preferred Alternative, by contrast, "would address existing and long-term traffic growth including improvement to the local roadway network, increased trip reliability, enhanced multimodal connectivity and mobility and additional travel options." JA0626.

As part of its comparative analysis, the Agencies determined that non-EJ communities would bear the majority of quantifiable impacts for various resources (and for some resources, the overwhelming majority of quantifiable impacts). Specifically, the following percentages of impacts would fall on non-EJ communities: (1) 91 percent of impacted properties and 85 percent of impacted property acreage; (2) 100 percent of impacted community facility properties and acreage; (3) 90 percent of impacted Section 4(f) properties and 98 percent of impacted Section 4(f) property acreage; (4) 58 percent of the low-risk, 93 percent of the moderate-risk, and 82 percent of the high-risk sites of hazardous materials concern; (5) 95 percent of impacts to wetlands, 83 percent of impacts to wetland buffers, 84 to 91 percent of impacts to waters, 77 percent of impacts to tree canopy, and 89 percent of impacts to floodplains. JA0635. The Agencies also determined that "[t]he types of impacts caused by the Preferred Alternative would not differ between EJ populations and non-EJ populations." JA0635. Based on all of this analysis, the Agencies determined that "a

35

disproportionately high and adverse impact would not occur to the EJ Analysis Area populations under the Preferred Alternative." JA0636.

In response to all this, Plaintiffs' critique is limited. They do not challenge the Agencies' identification of populations with environmental justice concerns, their determination of existing environmental and community conditions for such populations, or their outreach efforts. And they focus on only one metric of the Agencies' impacts analysis: traffic. Plaintiffs' Br. 42-44. Specifically, Plaintiffs contend that "the project would worsen congestion in some minority and low-income communities" and that, "[b]ecause increased congestion generally increases air pollution," "the project would disproportionately burden environmental justice communities with traffic-related air pollution." *Id.* This argument lacks merit for multiple reasons.

Initially, Plaintiffs' contention that the Project will lead to increased congestion in communities with environmental justice concerns is baseless. The Agencies identified such communities as those "located primarily along the I-270 Y-Split and I-270 in the Potomac, North Bethesda, Gaithersburg, and Rockville EJ Analysis Area Communities." JA1193. To determine travel impacts proximal to those communities, the Agencies considered travel time and speed data for both the managed and general purpose lanes along I-270 Northbound from I-495 to I-370 and I-270 Southbound from I-370 to I-495. JA1193-1194. As to the managed lanes, the Agencies determined "that drivers would experience uncongested conditions in the AM

and PM peak hours along all of I-495 and I-270 in the study corridors." JA1194. And "[s]hould use of the [managed] lanes not be a feasible economic choice for drivers from EJ populations, all existing [general purpose] lanes would remain free and would also experience traffic improvements under the Preferred Alternative in 2045 along the corridor segments adjacent to EJ populations identified above." JA1194; *see also* JA1194 (noting generally uncongested traffic conditions under the Preferred Alternative in the general purpose lanes from I-270 Northbound from I-495 to I-370 and I-270 Southbound from I-370 to I-495).

Plaintiffs point to a projected decrease in speed for a single hour in the general purpose lanes around one interchange in Gaithersburg, and for two hours in the general purpose lanes between the I-270 west spur and I-270 east spur. Plaintiffs' Br. 19-20. This is a thin reed. The Agencies explained that "[c]ongestion would still be present during the PM peak period on I-270 northbound and the I-495 inner loop . . . due to downstream bottlenecks outside of the [Project] limits," and that preexisting congestion because of these bottlenecks "would not get worse due to implementing the [Project]." JA0392. By contrast, the Agencies explained in their EJ analysis that "increased traffic congestion under the No Build Alternative would contribute to increased overflow congestion on the local road network," "increased response times for emergency services and increased travel times to community facilities, especially during peak travel periods." JA1190.

More fundamentally, Plaintiffs fail to connect the alleged congestion they (wrongly) contend will occur as a result of the Project with increased air pollution near the identified communities with environmental justice concerns. As noted above, even Plaintiffs' preferred 2015 study—which is inapposite for other reasons—found that no direct correlation between $PM_{2.5}$ concentrations and "traffic volumes . . . or speeds was found in the collected data." JA2780. Plaintiffs cite a portion of the FEIS for the proposition that "all else being equal, increased traffic congestion would bring increased emissions," Plaintiffs' Br. 20, but the excerpt they cite simply notes that "[r]e-occurring congestion results in vehicles idling for extended periods which *can* increase emissions and affect air quality." JA0626 (emphasis added). The FEIS made this comment in the context of discussing "[e]xisting congestion on I-495 and I-270" which "occurs for periods of ten to seven hours per day, respectively" (and which the no-build alternative would of course do nothing to address). JA0626. This statement certainly does not support Plaintiffs' argument that any decrease in speed in general purpose lanes in a few narrow slices of the Project at specific times of day will lead to meaningful or disproportionate increases in emissions concentrations in identified communities with environmental justice concerns.

In any event, the record is clear on this point because the Agencies specifically studied this issue. Although not required by the Clean Air Act or NEPA, *see supra* pp. 28-30, "potential impacts for CO were still analyzed for transparency under

NEPA for affected intersections and interchanges impacted by the Study," JA2076, and the Agencies determined that the Project would not result in a violation of the CO NAAQS *anywhere* along the corridor.

Plaintiffs fault that study for using "a theoretical level of 'worst-case' traffic conditions" rather than "actual traffic modeling." Plaintiffs' Br. 47. This criticism is not sound. As part of that study, the Agencies first identified "all signalized intersections and interchanges that were likely significantly impacted by the Study." JA2077. The Agencies developed traffic forecasts for each projected traffic conditions at each intersection for the years 2016, 2025, and 2040 for each screened alternative and the no-build alternative, measuring AM and PM peak traffic levels of service (LOS), volume, and delay. JA2077. The Agencies "ranked" the top 20 intersections by traffic volume, and identified the three worst-case intersections ranked by LOS and the higher of the peak AM or PM volumes for all Screened Alternatives. JA2077. The Agencies then analyzed CO emissions for those three worst intersections using a conservative approach which "is designed to *overestimate* CO emissions of the Study and produce *worst-case* results from the air quality/dispersion modeling." JA2083 (emphases added).

The Agencies subsequently generated 1-hour and 8-hour CO hot-spot analysis for the worst-case interchange and intersection locations. The resulting maximum one-hour and eight-hour CO concentrations at the *very most* congested intersection

affected by the Project even "using very conservative assumptions" were both significantly below the NAAQS (and both projected to *decline* from 2025 to 2040). The peak 1-hour CO concentration was 7.3 parts per million (ppm) in 2025 and 4.3 ppm in 2040, compared to the 1-hour CO NAAQS of 35 ppm. JA2128. FHWA's advisory states that, "[a]s long as the total predicted 1-hour CO concentration is less than 9 ppm," as it was here, "no separate 8-hour analysis is necessary." FHWA Tech. Advisory T 6640.8A § V.G.8 (1987), https://tinyurl.com/ycym59da. Nonetheless, the Agencies conducted a separate 8-hour analysis and the peak 8-hour CO concentration was 4.6 ppm in 2025 and 2.5 ppm in 2040, compared to the 8-hour CO NAAQS of 9 ppm. JA2128.

Simply put, the CO emissions study—which the Agencies had no obligation to conduct in the first place—showed that even at the very worst intersection and even using modeling designed to overestimate emissions, CO emissions will be dramatically lower than the CO NAAQS and will decline over time. Even if this does not involve the specific "localized" analysis Plaintiffs might prefer, such worst-case modeling is obviously reasonable. If the very most congested area would not experience a NAAQS violation (or come close to doing so) even under deliberately conservative assumptions, "it can reasonably be assumed that the alternatives would not cause or contribute to a violation of the CO NAAQS at any location throughout the study corridor," JA2082, whether in EJ or non-EJ communities. There is simply no

basis for Plaintiffs' claim that the Agencies "fail[ed] to take a hard look at traffic-related air pollution in environmental justice communities." Plaintiffs' Br. 48. This argument fails.

### III. The Agencies reasonably rejected a west-shift alignment of the American Legion Bridge.

Plaintiffs' final argument is that the Agencies acted arbitrarily and capriciously and violated Section 4(f) by rejecting the west-shift alignment for the American Legion Bridge that would have avoided Plummers Island entirely. Plaintiffs' Br. 48-58. This argument likewise lacks merit.

On its face, the Agencies provided reasonable explanations for rejecting the west-shift alignment. The Agencies determined that the west shift alignment would impact more Section 4(f) land than the on-center alignment, would require re-configuration of the Clara Barton Parkway interchange (which the on-center alignment would not), and would result in residential displacement (which the on-center alignment also would not). JA0503. The on-center alignment would also result in fewer impacts to trees, wetlands, and forest canopy. JA1532.

By contrast, the FEIS recognized the significance of impacted Section 4(f) properties, including Plummers Island. JA0536. The Agencies assembled a Strike Team for the purpose of minimizing the impacts of the Bridge reconstruction to natural, cultural, and parkland resources. *See supra* pp. 14-15. As a result of the Strike Team's efforts, "the on-center alignment "will result in approximately 0.28 acres of

impacts to the Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact." JA0777. And indeed, although the National Park Service initiated the Strike Team process by asking the Agencies to take steps to limit impacts to Park Service land, the Department of Interior (on behalf of the Park Service) subsequently did not object to the Agencies' rejection of the west-shift alignment. JA0213.

Plaintiffs primarily allege a procedural error. FHWA's regulations prescribe a seven-factor test for determining which alternative among those that use Section 4(f) property causes the least overall harm. 23 C.F.R. § 774.3(c)(1)(i)-(vii). Plaintiffs assert that the Agencies were required to show their work by comparing the west-shift and on-center alignment across all seven factors. Plaintiffs' Br. 51-52. But neither Section 4(f) or the regulations require any such exercise. As to Section 4(f) itself, Plaintiffs acknowledge that "[i]n 1971, the Supreme Court held that Section 4(f) itself does not require specific, 'formal findings.'" Plaintiffs' Br. 51 n.21 (quoting *Overton Park*, 401 U.S. at 417). But contrary to Plaintiffs' argument, FHWA's regulations also do not require Plaintiffs' box-checking exercise. The regulation requires only that FHWA's least-overall-harm analysis "be documented in the Section 4(f) evaluation." 23 C.F.R. § 774.7(c).; *see also* 23 C.F.R. § 774.9(b) (similarly requiring agency to "summarize the basis for its Section 4(f) approval"). This does not

require "formal" findings at all, let alone rote recitation and analysis of all seven factors.

Moreover, the Agencies made and documented the requisite determination here. The Agencies explained that a comparison of the two options "determined that the on-center alignment would impact the least amount of total [Section 4(f)] land; would not require re-configuration of the Clara Barton Parkway interchange; and would not require residential displacement, as the west shift alignment would." JA1542. And the Agencies further quantified the west shift and on-center alignments' impacts on Section 4(f) parks, individual trees within park boundaries, and natural resources. JA1532.

It would be particularly inappropriate to require Plaintiffs' formulaic standard in this context. The Agencies *did* separately address each of the seven regulatory factors in their analysis of each build alternative, along with the Preferred Alternative. JA1332. But it is unreasonable to require an agency to treat every viable engineering shift considered when attempting to minimize harm to Section 4(f) properties as a separate "alternative" requiring separate, written analysis of each of the seven factors. If that were required, presumably every viable alignment adjustment that shifted potential impacts from one property to another—for dozens of Section 4(f) properties along the entire 15-mile corridor—would have to be fully analyzed

43

under that standard. This would be both unworkable and flout the principle that under NEPA an agency need only consider a reasonable range of project alternatives, not every project option "conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551 (1978).

Plaintiffs also raise a few substantive objections to the Agencies' 4(f) analysis, all of which lack merit—and certainly do not show that the Agencies' determination was arbitrary and capricious. Plaintiffs contend that the Agencies narrowly focused on the amount of land affected as opposed to the severity of harm, and failed to assess the relative significance of Plummers Island versus lands affected by the west-shift alignment. Plaintiffs' Br. 55. But although it is surely highly relevant that the west shift alignment would permanently impact *more* protected park acreage, JA0689, the Agencies did not narrowly focus on that point. They also noted that the west shift alignment would require re-configuration of the Clara Barton Parkway interchange, would require residential take, and would result in more impacts to trees, wetlands, and forest canopy. *See supra* p. 41. And the Agencies did not ignore the importance of Plummers Island. They assembled a Strike Team specifically for the purpose of minimizing impacts to it and other Park Service land. As a result, the impacts of the on-center alignment to Plummers Island, while perhaps arguably more than de minimis, are far from severe—again, the on-center alignment would cause less than 0.1 acres of permanent impacts to the Island. *See* JA0777.

Plaintiffs also accuse the Agencies of ignoring cost considerations. Plaintiffs' Br. 56. But the regulation requires consideration only of "[s]ubstantial differences in costs among the alternatives." 23 C.F.R. § 774.3(c)(1)(vii). Here, although the Strike Team stated that the west shift alignment might save up to $40 million, this estimate omitted, among other things, re-configuration of the Clara Barton interchange. The Strike Team itself noted that "[t]he potential added expense for shifting the roadway approaches and adjacent Clara Barton parkway interchange to accommodate a westerly shift . . . could *quickly negate* these cost and schedule benefits." JA3018 (emphasis added). Plaintiffs' speculation is not a basis for setting aside the Agencies' well-reasoned determination.[11]

## IV.  Vacatur is not warranted.

The Court should affirm. However, if the Court concludes that the Agencies erred, it should not grant Plaintiffs' request for vacatur. Rather, it should remand to the Agencies without vacatur. In deciding whether to vacate, courts consider "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that

---

[11] Plaintiffs also criticize the Agencies for failing to mitigate the west shift alignment's adverse impacts. Plaintiffs' Br. 54-55. But as Plaintiffs themselves note, *see* Plaintiffs' Br. 24 n.14, the west-shift alignment the Agencies rejected was itself not the only west shift alignment proposal. The Agencies previously rejected an entirely offset westerly alignment "due to unacceptable impacts to the Naval Surface Warfare Center Carderock Division property[.]" JA1530.

may itself be changed." *Allied-Signal v. Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citations and quotations omitted). Courts should remand without vacatur when it is "reasonably likely that on remand the [agency] can redress its failure of explanation . . . while reaching the same result." *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021).

Although this Court has not formally adopted the *Allied-Signal* approach, *see Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635, 655 (4th Cir. 2018), vacatur would be unwarranted here under any reasonable standard. The FEIS and ROD were massive undertakings involving years of study. Plaintiffs, however, fault the Agencies on only three relatively narrow grounds. The first of those grounds ($PM_{2.5}$ pollution), involves a topic the Agencies unquestionably considered and which complied with the Clean Air Act's requirements. *See supra* pp. 24-33. The second involves a single slice of the Agencies' extensive EJ analysis involving traffic-related pollution, and is based on Plaintiffs' analysis of traffic on just a few intersections, on just a couple hours of the day. *Id.* at 37. The third involves the alignment of one bridge within a 15-mile Project, concerns permanent impacts of less than 0.1 acres that the Agencies fully accounted for, and involves primarily formulaic procedural objections. *Id.* at 42-46. For reasons previously discussed, the Agencies committed no error on these topics in the first place. But even if this Court concludes otherwise, these asserted errors do not warrant vacatur of this exhaustively

studied project. At the very least, since the district court had no occasion to consider

remedial questions, this Court should remand to the district court for consideration

of the appropriate remedy in light of any error the Court identifies.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Andrew M. Bernie*
TODD KIM
*Assistant Attorney General*
JOHN EMAD ARBAB
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

October 15, 2024
DJ# 90-1-4-16918

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, using Microsoft Word.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as enlarged by the Court's order of August 23, 2024, because it contains 10,798 words, excluding the parts of the brief exempted under Fed. R. App. P. 32(f).

*/s/ Andrew Bernie*
Andrew Bernie

*Counsel for Federal Appellees*

# ADDENDUM

Administrative Procedure Act
    5 U.S.C. § 704 (excerpts) .................................................................1a
    5 U.S.C. § 706..............................................................................1a

National Environmental Policy Act
    42 U.S.C. § 4321............................................................................2a
    42 U.S.C. § 4332 (excerpts) .........................................................2a

Clean Air Act
    42 U.S.C. § 7407 (excerpts) .........................................................3a
    42 U.S.C. § 7409 (excerpts) .........................................................3a
    42 U.S.C. § 7410 (excerpts) .........................................................4a
    42 U.S.C. § 7506 (excerpts) .........................................................5a

Department of Transportation Act
    49 U.S.C. § 303 (excerpts) ...........................................................7a

Clean Air Act Regulations
    40 C.F.R. § 93.101 (excerpts)........................................................8a
    40 C.F.R. § 93.116 (excerpts)........................................................8a
    40 C.F.R. § 93.123 (excerpts)........................................................8a

Department of Transportation Act Regulations
    23 C.F.R. § 774.3 (excerpts).......................................................10a
    40 C.F.R. § 774.7 (excerpts).......................................................11a
    40 C.F.R. § 774.9 (excerpts).......................................................11a

# Administrative Procedure Act

## 5 U.S.C. § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. . . .

## 5 U.S.C. § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## National Environmental Policy Act

### 42 U.S.C. § 4321. Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

### 42 U.S.C. § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

. . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

. . . .

**Clean Air Act**

**42 U.S.C. § 7407. Air quality control regions**

. . . .

**(d) Designations**

**(1) Designations generally**

**(A)** Submission by Governors of initial designations following promulgation of new or revised standards

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as--

**(i)** nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

**(ii)** attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

**(iii)** unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

. . . .

**42 U.S.C. § 7409. National primary and secondary ambient air quality standards**

. . . .

**(b) Protection of public health and welfare**

**(1)** National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

**(2)** Any national secondary ambient air quality standard prescribed under subsection (a) shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

. . . .

## 42 U.S.C. § 7410. State implementation plans for national primary and secondary ambient air quality standards

**(a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems**

**(1)** Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

**42 U.S.C. § 7506. Limitations on certain Federal assistance**

. . . .

**(c) Activities not conforming to approved or promulgated plans**

**(1)** No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of Title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means--

    **(A)** conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

    **(B)** that such activities will not--

        **(i)** cause or contribute to any new violation of any standard in any area;

        **(ii)** increase the frequency or severity of any existing violation of any standard in any area; or

        **(iii)** delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

    The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

. . . .

**(5) Applicability**

This subsection shall apply only with respect to--

**(A)** a nonattainment area and each pollutant for which the area is designated as a nonattainment area; and

**(B)** an area that was designated as a nonattainment area but that was later redesignated by the Administrator as an attainment area and that is required to develop a maintenance plan under section 7505a of this title with respect to the specific pollutant for which the area was designated nonattainment.

. . . .

6a

**Department of Transportation Act**

**49 U.S.C.  § 303. Policy on lands, wildlife and waterfowl refuges, and historic sites**

    . . . .

**(c) Approval of programs and projects.--**Subject to subsections (d) and (h), the Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 2041 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if--

    **(1)** there is no prudent and feasible alternative to using that land; and

    **(2)** the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

    . . . .

## Clean Air Act Regulations

### 40 C.F.R. § 93.101 Definitions.

. . . .

Hot-spot analysis is an estimation of likely future localized CO, $PM_{10}$, and/or $PM_{2.5}$ pollutant concentrations and a comparison of those concentrations to the national ambient air quality standards. Hot-spot analysis assesses impacts on a scale smaller than the entire nonattainment or maintenance area, including, for example, congested roadway intersections and highways or transit terminals, and uses an air quality dispersion model to determine the effects of emissions on air quality.

. . . .

### 40 C.F.R. § 93.116 Criteria and procedures: Localized CO, PM10, and PM2.5 violations (hot-spots).

(a) This paragraph applies at all times. The FHWA/FTA project must not cause or contribute to any new localized CO, $PM_{10}$, and/or $PM_{2.5}$ violations, increase the frequency or severity of any existing CO, $PM_{10}$, and/or $PM_{2.5}$ violations, or delay timely attainment of any NAAQS or any required interim emission reductions or other milestones in CO, $PM_{10}$, and PM2.5 nonattainment and maintenance areas. This criterion is satisfied without a hot-spot analysis in $PM_{10}$ and $PM_{2.5}$ nonattainment and maintenance areas for FHWA/FTA projects that are not identified in § 93.123(b)(1). This criterion is satisfied for all other FHWA/FTA projects in CO, $PM_{10}$ and $PM_{2.5}$ nonattainment and maintenance areas if it is demonstrated that during the time frame of the transportation plan no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project, and the project has been included in a regional emissions analysis that meets applicable §§ 93.118 and/or 93.119 requirements. The demonstration must be performed according to the consultation requirements of § 93.105(c)(1)(i) and the methodology requirements of § 93.123.

. . . .

### 40 C.F.R. § 93.123 Procedures for determining localized CO, PM10, and PM2.5 concentrations (hot-spot analysis).

8a

. . . .

(b) $PM_{10}$ and $PM_{2.5}$ hot-spot analyses.

(1) The hot-spot demonstration required by § 93.116 must be based on quantitative analysis methods for the following types of projects:

(i) New highway projects that have a significant number of diesel vehicles, and expanded highway projects that have a significant increase in the number of diesel vehicles;

(ii) Projects affecting intersections that are at Level-of-Service D, E, or F with a significant number of diesel vehicles, or those that will change to Level-of-Service D, E, or F because of increased traffic volumes from a significant number of diesel vehicles related to the project;

(iii) New bus and rail terminals and transfer points that have a significant number of diesel vehicles congregating at a single location;

(iv) Expanded bus and rail terminals and transfer points that significantly increase the number of diesel vehicles congregating at a single location; and

(v) Projects in or affecting locations, areas, or categories of sites which are identified in the PM10 or PM2.5 applicable implementation plan or implementation plan submission, as appropriate, as sites of violation or possible violation.

. . . .

## Department of Transportation Act Regulations

### 23 C.F.R. § 774.3 Section 4(f) approvals.

The Administration may not approve the use, as defined in § 774.17, of Section 4(f) property unless a determination is made under paragraph (a) or (b) of this section.

(a) The Administration determines that:

> (1) There is no feasible and prudent avoidance alternative, as defined in § 774.17, to the use of land from the property; and

> (2) The action includes all possible planning, as defined in § 774.17, to minimize harm to the property resulting from such use; or

(b) The Administration determines that the use of the property, including any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures) committed to by the applicant, will have a de minimis impact, as defined in § 774.17, on the property.

(c) If the analysis in paragraph (a)(1) of this section concludes that there is no feasible and prudent avoidance alternative, then the Administration may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that:

> (1) Causes the least overall harm in light of the statute's preservation purpose. The least overall harm is determined by balancing the following factors:

> (i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

> (ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

> (iii) The relative significance of each Section 4(f) property;

> (iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

10a

(v) The degree to which each alternative meets the purpose and need for the project;

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

. . . .

**23 C.F.R. § 774.7 Documentation.**

. . . .

(c) If there is no feasible and prudent avoidance alternative the Administration may approve only the alternative that causes the least overall harm in accordance with § 774.3(c). This analysis must be documented in the Section 4(f) evaluation.

. . . .

**23 C.F.R. § 774.9 Timing.**

. . . .

(b) Except as provided in paragraph (c) of this section, for actions processed with EISs the Administration will make the Section 4(f) approval either in the final EIS or in the ROD. Where the Section 4(f) approval is documented in the final EIS, the Administration will summarize the basis for its Section 4(f) approval in the ROD. Actions requiring the use of Section 4(f) property, and proposed to be processed with a FONSI or classified as a CE, shall not proceed until notification by the Administration of Section 4(f) approval.

. . . .