_____

No. 24-1447

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**MARYLAND CHAPTER OF THE SIERRA CLUB, *et al.*,**

*Plaintiffs-Appellants,*

**v.**

**FEDERAL HIGHWAY ADMINISTRATION, *et al.*,**

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(Deborah K. Chasanow, District Judge)

_____

**STATE APPELLEES' RESPONSE BRIEF**

_____

ANTHONY G. BROWN
Attorney General of Maryland

FRED R. WAGNER
JAY C. JOHNSON
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
frwagner@venable.com
jcjohnson@venable.com

*Assistant Counsel to the
Attorney General of Maryland*

LINDA M. DEVUONO
Deputy Principal Counsel
Office of the Attorney General
707 N. Calvert St., 4th Floor
Baltimore, Maryland 21202
(410) 530-9783
ldevuono@mdot.maryland.gov

*Attorneys for State Appellees*

October 15, 2024

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................... iii

JURISDICTIONAL STATEMENT .......................................................1

ISSUES PRESENTED FOR REVIEW ...................................................1

STATEMENT OF THE CASE...............................................................2

SUMMARY OF ARGUMENT ............................................................10

ARGUMENT .....................................................................................12

I.     THE STANDARD OF REVIEW IS WHETHER THE AGENCIES' ACTIONS WERE ARBITRARY AND CAPRICIOUS OR CONTRARY TO LAW. ..................................12

II.    THE AGENCIES' ANALYSIS OF THE PROJECT'S POTENTIAL IMPACT ON AIR QUALITY MET THE STANDARDS SET BY NEPA AND THE CLEAN AIR ACT...............................................................................................15

      A.     NEPA Allows MDOT to Account for the Project's Compliance With EPA's $PM_{2.5}$ Standards.............................................15

      B.     MDOT Explicitly Disclosed the Potential Effects of Increased Vehicle Emissions. ..............................................19

      C.     MDOT Used Carbon Monoxide Modeling to Evaluate Local Emissions..............................................................20

III.   MDOT TOOK A HARD LOOK AT ENVIRONMENTAL JUSTICE ISSUES AND HAD A RATIONAL BASIS FOR CONCLUDING THAT THE PROJECT WOULD NOT HAVE A DISPROPORTIONATELY HIGH AND ADVERSE EFFECT ON UNDERSERVED COMMUNITIES. .......................................................22

      A.     MDOT's Outreach to Environmental Justice Communities Was Extensive, Valuable, and Consistent with the Environmental Justice Executive Order.......................................................23

B.   The Project Will Not Worsen Traffic in Vulnerable Communities. ...................................................................24

IV.  The Work of MDOT's Inter-Agency Team Gave it a Rational Basis for Concluding That its Chosen American Legion Bridge Alignment Met Section 4(f)'s "All Possible Planning" Requirement. ..................................................................27

A.   The Agencies Followed Section 4(f)'s Planning Procedures. ............27

B.   The Agencies' Preferred Bridge Alignment Satisfies Section 4(f)'s Least Overall Harm Test. ..........................................................30

CONCLUSION .........................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Blaustein & Reich, Inc. v. Buckles*,
  365 F.3d 281 (4th Cir. 2004) ...............................................................10, 13, 31

*Border Power Plant Working Grp. v. Department of Energy*,
  260 F. Supp. 2d 997 (S.D. Cal. 2003).................................................................18

*Citizens To Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)..............................................................................................29

*Defenders of Wildlife v. North Carolina Dep't of Transp.*,
  762 F.3d 374 (4th Cir. 2014) ......................................... 11, 12, 13, 14, 15, 19, 30

*Defenders of Wildlife v. United States Dep't of Interior*,
  931 F.3d 339 (4th Cir. 2019) ...............................................................10, 13, 14

*Department of Transp. v. Public Citizen*,
  541 U.S. 752 (2004)..............................................................................................17

*Environmental Defense Center v. Bureau of Ocean Energy Management*,
  36 F.4th 850 (9th Cir. 2022) ...............................................................................17

*Friends of the Back Bay v. Army Corps of Eng'rs*,
  681 F.3d 581 (4th Cir. 2012) ...............................................................................15

*Friends of Buckingham v. State Air Pollution Control Bd.*,
  947 F.3d 68 (4th Cir. 2020) ............................................................................16, 18

*Hickory Neighborhood Def. League v. Skinner*,
  910 F.2d 159 (4th Cir. 1990) ..........................................................................12, 29

*Maryland Chapter of the Sierra Club v. FHWA*,
  Civ. No. DKC 22-2597, 2024 WL 1194382 (D. Md. Mar. 20, 2024).................9

*National Audubon Soc. v. Department of Navy*,
  422 F.3d 174 (4th Cir. 2005) ...............................................14, 15, 17, 21

*North Carolina v. TVA*,
  615 F.3d 291 (4th Cir. 2010) ...............................................................................16

*Ohio Valley Env't. Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) ...............................................................13

*Sierra Club v. Federal Highway Admin.*,
   No. 17-cv-1661-WJM-MEH, 2018 WL 1610304 (D. Colo. Apr. 3,
   2018) ...................................................................................................17

*Webster v. Department of Agric.*,
   685 F.3d 411 (4th Cir. 2012) .................................. 11, 13, 14, 17, 19, 20, 25, 27

*Whitman v. American Trucking Ass'ns*,
   531 U.S. 457 (2001)..............................................................................16

## Statutes

5 U.S.C. § 706(2)(A)................................................................................13

23 U.S.C. § 138 .......................................................................................13

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

42 U.S.C. § 4321 .....................................................................................13

42 U.S.C. § 7407(d)(1)(A)........................................................................16

42 U.S.C. § 7408 .....................................................................................15

42 U.S.C. § 7409(b)(1)..............................................................................16

49 U.S.C. § 303 ..................................................................................13, 27

Va. Code Ann. § 10.1–1307(E) .................................................................18

## Regulations

23 C.F.R. § 774.3(c)........................................................................28, 29, 30

23 C.F.R. § 774.7(c)..................................................................................30

40 C.F.R. § 93.101 ...................................................................................17

40 C.F.R. § 93.116 ...................................................................................17

iv

73 Fed. Reg. 13368 (Mar. 12, 2008)............................................29, 31, 32

Exec. Order 12898 ...........................................................................22

Exec. Order 14096 ...........................................................................22

FHWA 2012 EJ Order 6640.23A.......................................................26

## JURISDICTIONAL STATEMENT

Because all the claims in this case arose under federal law, the district court had jurisdiction under 28 U.S.C. § 1331.  Appellants timely noticed an appeal from the district court's March 20, 2024 final judgment, giving this Court jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Did the Maryland Department of Transportation satisfy the National Environmental Policy Act's rule of reason when it considered and disclosed the effects of fine particulate matter emissions from the managed lanes project, including the fact that the region currently meets federal air quality standards, and the project will not change that?

2.      Did the Maryland Department of Transportation take a hard look at environmental justice issues and rationally conclude that the managed lanes project will not have a disproportionately high and adverse effect on underserved communities, when it conducted extensive outreach to those communities and evaluated and disclosed the project's overall effect on them?

3.      Did the Maryland Department of Transportation have a rational basis for concluding that its chosen alignment for the American Legion Bridge would comply with the "all possible planning requirement" in Section 4(f) of the Department of Transportation Act when an inter-agency team found that the chosen

alignment affected the fewest acres of protected property and had the smallest impacts on other resources?

## STATEMENT OF THE CASE

This case involves a proposal to add new, managed-access lanes to a 15-mile stretch of Interstate 495 and Interstate 270 in Maryland's Washington, D.C. suburbs. (J.A. 137.)  That proposal underwent a thorough environmental review that included Draft, Supplemental Draft, and Final Environmental Impact Statements (EIS), and more than six months of public comment.  Appellants now challenge the adequacy of this environmental review on three narrow points: localized particular matter emissions, environmental justice, and impacts to one specific protected parkland.

### Traffic Congestion and Managed Lanes

Relief from the hours of daily congestion on the major interstates and adjacent local roads in the Maryland-Washington, D.C. area is critical to the region's way of life.  People who cannot afford to be late for their jobs get stuck.  Parents who need to pick up their children from daycare face delays.  Students who are headed to school miss class.  Time-critical deliveries run late.  Crashes are more frequent, and emergency vehicles respond more slowly.  And at the rate the region is growing, these problems will only get worse.  (*See* J.A. 400-403.)

Recognizing that no single project can end the region's traffic congestion, the State of Maryland, along with other governments in the Metropolitan Washington,

D.C. region, developed a number of approaches to improving traffic flow, from which the Metropolitan Washington Council of Governments' Transportation Planning Board approved ten regional traffic relief concepts for further study. (J.A. 139.) Those concepts included both transit projects meant to reduce highway demand and congestion-relief projects meant to increase highway efficiency. (J.A. 139.) One of the projects on the Planning Board's list is the "managed lanes" project at issue in this case. (J.A. 139.)

Managed lanes are special restricted-access highway lanes that are separated from general-purpose lanes. (J.A. 382.) To drive in these managed lanes, most single-occupancy vehicles have to pay a toll. (J.A. 154.) That toll increases when traffic in the general-purpose lanes increases. (J.A. 154.) High-occupancy vehicles like carpools and buses are encouraged by giving them no-toll passage.[1] In these ways, the number of vehicles in the managed lanes stays lower, enabling traffic in the managed lanes to keep moving freely. (J.A. 154.) Such managed lanes already exist—and have proven helpful—in many places, including around most of I-495 in Virginia. (*See* J.A. 449.) In fact, Virginia is already in the process of extending its managed lanes to the Maryland border, where they would connect with the managed lanes at issue here. (J.A. 449.)

---

[1] Because of this feature, managed lanes are sometimes called "high-occupancy toll lanes."

3

Adding managed lanes to I-495 and I-270 in Maryland will make travel easier and give people more, and better, choices. If they ride the bus or carpool, they can choose to use the managed lanes for free. (J.A. 141; J.A. 405.) If they are alone and on a tight timeframe, they can choose to pay to use the managed lanes. (J.A. 405.) And if they choose to use transit, they will have an easier time reaching a station. (J.A. 141; J.A. 405.) Meanwhile, people who choose to stay in the free general-purpose lanes will also face less traffic. (J.A. 405.)

**The Managed Lanes Environmental Review**

MDOT and the Federal Highway Administration (FHWA) began their environmental review of managed lanes on I-495 and I-270 by documenting the region's need to:

- accommodate existing traffic and long-term traffic growth;

- enhance trip reliability;

- provide more roadway travel choices;

- improve movement of goods and services; and

- accommodate homeland security.

(J.A. 399; *see also* J.A. 1909.) Responding to those needs, the agencies defined the managed lanes' purpose as "address[ing] congestion, improv[ing] trip reliability on I-495 and I-270 . . . and enhanc[ing] existing and planned multimodal mobility and connectivity." (J.A. 399.) The agencies then selected a set of seven alternatives

4

with this purpose and need in mind and reviewed those alternatives in a Draft EIS. (*See* J.A. 412-416.)

When the Draft EIS was released in July 2020, the agencies collected public comments for four months. (J.A. 375.) Because this comment period coincided with the COVID-19 pandemic, MDOT used every tool it had—and some that it invented—to ensure effective public engagement. Those tools included social media advertisements, in-person and virtual meetings, and modular libraries throughout the study area that made document-review safe. (J.A. 719-732.) In the end, people reported that MDOT's efforts had made it easier for them to see and comment on the Draft EIS than ever before. (J.A. 162.)

After reviewing the Draft EIS comments, MDOT recommended adding two managed lanes in each direction for almost the entirety of I-495 in Maryland, as well as two managed lanes in each direction for about ten miles on I-270. (J.A. 415; J.A. 158.) In response to comments on this draft, MDOT and FHWA went back, kept listening, and resumed coordination with other agencies and stakeholders. (J.A. 417.) That continued consultative process eventually led the agencies to make a new recommendation that limited the managed lanes to the portion of I-495 from the American Legion Bridge to the I-270 interchange. (J.A. 417.) The rest of I-495, as shown in the map below, was removed from the project.



(J.A. 138.)

With a new preferred alternative, the agencies published a Supplemental Draft EIS. They collected public comments again, this time for 60 days. Based on those comments and their continued consultation with other stakeholders, the agencies further reduced the project's environmental impacts, including on Plummers Island, which under the preferred alternative will permanently lose less than one tenth of an acre. (J.A. 672.) Other environmental improvements included reduced impacts to parks, wetlands, waterways, floodplains, and forest canopies. (J.A. 164.)

The 450-page Final EIS, published in June 2022, summarizes both the benefits and the potential impacts of the managed lanes project. To provide more detail, MDOT prepared over a dozen technical reports, spanning thousands of pages, on

topics like traffic, environmental justice, and air quality.  *See, e.g.*, AR.5136-5617 (FEIS environmental justice technical report); AR.14323-14573 (FEIS air quality technical report); AR.5618-5702 (final Section 4(f) evaluation).  These reports were published with each of the three iterations of the EIS, and they too included new information as the review process moved forward.

While FHWA was the federal lead agency during the environmental review process, Maryland's citizens, its environmental resources, and its transportation plan are directly at issue.  Maryland thus made sure that the Final EIS included the necessary analyses and addressed the potential impacts.  Indeed, Maryland welcomed FHWA's scrutiny, as well as the valuable contributions of the other federal and state environmental resource agencies.  (J.A. 2163 (agency coordination plan).)[2]

**FHWA's Record of Decision**

Before making a final decision, FHWA independently assessed the environmental review, including the underlying technical analyses.  (J.A. 137.) Together, MDOT and FHWA "considered all the alternatives, information, analyses, and objections" to the project.  (J.A. 189.)  After "a balanced consideration of the

---

[2] *See also, e.g.*, AR.55855, AR.55930, AR.56563, AR.57883, AR.58440, AR.117460, AR.119296 (select agendas and notes from FHWA meetings); AR.55844, AR.55881, AR.56583, AR.59935, AR.61422, AR.64813, AR.141810 (select interagency working group notes and presentations).

need for safe and efficient transportation," as well as the project's "social, economic, and environmental effects," FHWA issued a Record of Decision approving the managed lanes project. (J.A. 189-190.) That Record of Decision contained a substantial list of mitigation measures and commitments agreed to by MDOT. Those commitments include MDOT's agreement to use the approval to enter into detailed design and engineering that will further reduce impacts to adjacent communities and environmental and historic resources, in particular Plummers' Island. (J.A. 195.) MDOT also committed to a robust public communication program during construction, with special focus on environmental justice communities. (J.A. 206-207.)

**Proceedings in the District Court**

Appellants and other plaintiffs separately sued to stop the managed lanes project in the U.S. District Court for the District of Maryland. Three of their arguments in the district court are relevant here. First, even though the agencies' analysis of the project's $PM_{2.5}$ emissions went beyond what was required by NEPA and the Clean Air Act, Appellants argued that the agencies should have done more. Second, despite the agencies' outreach to and analysis of effects on minority and low-income communities, Appellants argued that their environmental justice work was insufficient. Third, in the face of a report from a "strike team" study that specifically considered the project's plan to replace the American Legion Bridge,

8

Appellants argued that the project would illegally damage a portion of a protected park known as Plummers Island.  The two cases were consolidated, and the parties cross-moved for summary judgment.  The district court ruled for the agencies on every point.  *Maryland Chapter of the Sierra Club v. FHWA*, Civ. No. DKC 22-2597, 2024 WL 1194382 (D. Md. Mar. 20, 2024) (included in the joint appendix at J.A. 62.)

To start, the district court found that, because nothing in the Clean Air Act requires "a localized air quality analysis in an attainment area," it would "defer[] to the Agencies' methodological discretion" to consider EPA's air quality standards in reaching conclusions about the project's environmental impact.  (J.A. 85-86.)  But the court also found that the agencies "thoroughly investigated" the project's PM$_{2.5}$ emissions, "supported their conclusions with scientific evidence, and rationally explained the conclusions from their chosen methodologies."  (J.A. 90.)

The district court similarly endorsed the agencies' environmental justice analysis.  On that issue, the court concluded that Appellants had "mischaracterize[d] the administrative record" by ignoring the contents of the agencies' technical report.  (J.A. 93.)  When the technical report was properly accounted for, it showed that the agencies took "a hard look at pre-existing and projected traffic and pollution impacts" in environmental justice communities.  (J.A. 100.)

Finally, the district court approved the agencies' Section 4(f) "least overall harm" analysis for Plummers Island.  As the court explained, the agencies' "strike team" analysis recognized that Appellants' preferred "west-shift" alignment would avoid effects on Plummers Island, but at the cost of greater effects on other protected property, as well as "displacement of a residential property."  (J.A. 126.)  Taken together with all the other work the agencies did, the district court concluded that they had "reasonably complied with Section 4(f)" when they chose the on-center alignment for the American Legion Bridge.  (J.A. 128.)

Appellants timely appealed.

## SUMMARY OF ARGUMENT

Appellants' claims are brought under the Administrative Procedure Act (APA), which allows reversal only if the agencies' decision was arbitrary and capricious or contrary to law.  *Defenders of Wildlife v. United States Dep't of Interior*, 931 F.3d 339, 345 (4th Cir. 2019).  The deferential standard of review under the APA effectively creates "a presumption in favor of finding the agency action valid"; to overcome that presumption, Appellants must show that the agencies failed to consider "the relevant factors" or made "a clear error of judgment."  *Id.*  As long as the agencies had a "rational basis" for their decision, it should be upheld.  *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 291 (4th Cir. 2004).

10

When MDOT considered the project's PM$_{2.5}$ emissions, it started in the obvious place: EPA's PM$_{2.5}$ air quality standards.  Because the region's air quality does not violate the PM$_{2.5}$ standard, MDOT asked whether the project would change that fact.  Everyone agrees that it would not.  MDOT nevertheless went further, using a model to show that air quality will not degrade, even at the busiest interchanges.  Under this Court's "totality of the circumstances approach" to reviewing Environmental Impact Statements, *see Defenders of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014), MDOT's PM$_{2.5}$ analysis was not arbitrary and capricious.

Appellants' environmental justice arguments are similarly flawed.  They ignore MDOT's outreach to vulnerable communities during the environmental review process, which culminated in an entire technical report devoted to environmental justice issues.  *See* AR.5136.  Nor do they mention that the managed lanes will increase traffic throughput on I-495 and I-270, thereby reducing congestion on the secondary roads within these communities and giving the people who live there more and easier travel options.  Appellants' narrow focus on traffic speeds at certain locations and certain times of day misses this bigger picture.  NEPA's "holistic view" does not let project opponents use such microscale points "to reject the agency's decision" on the project as a whole.  *Webster v. Department of Agric.*, 685 F.3d 411, 422, 425 (4th Cir. 2012).

11

Finally, Appellants claim that the agencies misapplied FHWA's "least overall harm" requirement when they chose a bridge alignment that permanently impacts 0.1 acres on Plummers Island, a protected park. Here again, the agencies devoted an entire technical report to Section 4(f) issues. *See* AR.5168-5702. That report shows that they considered the factors relevant to the least overall harm analysis, even if their consideration was not framed the way Appellants wanted. Section 4(f) analysis does not require agencies to use magic words. *Hickory Neighborhood Def. League v. Skinner*, 910 F.2d 159, 162 (4th Cir. 1990). And on the merits, the agencies' conclusion that an alignment with fewer acres of parkland impacts had the least overall harm under Section 4(f) was hardly arbitrary and capricious. *See Defenders of Wildlife*, 762 F.3d at 401.

For all these reasons, the agencies' decision approving the managed lanes project should be upheld.

## ARGUMENT

## I.    THE STANDARD OF REVIEW IS WHETHER THE AGENCIES' ACTIONS WERE ARBITRARY AND CAPRICIOUS OR CONTRARY TO LAW.

Appellants claim that the agencies' decision approving the managed lanes project violates both the National Environmental Policy Act and Section 4(f) of the

Department of Transportation Act of 1966.[3]  Those statutes, however, do not contain their own causes of action.  As a result, Appellants must bring their NEPA and Section 4(f) claims under the Administrative Procedure Act.  *Defenders of Wildlife*, 762 F.3d at 393; *see* Appellants' Br. 30.

The APA authorizes courts to "hold unlawful and set aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In practice, this standard is "highly deferential," requiring only that the agency have a "rational basis" for its decision. *Blaustein & Reich*, 365 F.3d at 291.  And while a court must be "searching and careful" when it looks for this "rational basis," *Webster*, 685 F.3d at 422, if the court finds that "the agency has examined the relevant data and articulated a satisfactory explanation for its action," that action must be upheld.  *Defenders of Wildlife*, 931 F.3d at 345.  As a result of this deferential standard, courts start their review with "a presumption in favor of finding the agency action valid." *Id.* (quoting *Ohio Valley Env't. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).

As it applies to NEPA, the arbitrary and capricious standard translates into a "pragmatic judgment" about whether the agency's environmental review meets

---

[3] NEPA is codified at 42 U.S.C. § 4321, *et seq.*  Section 4(f)—so named in reference to its location in the 1966 Act—is codified in two places: 23 U.S.C. § 138 and 49 U.S.C. § 303.  *Defenders of Wildlife*, 762 F.3d at 398 n.13.  Following Appellants' convention, MDOT will cite only to Title 49. *See* Appellants' Br. 7 n.3.

NEPA's twin goals of "informed decision-making and informed public participation." *Webster*, 685 F.3d at 421. Since NEPA is a procedural statute, requiring only that an agency take a "hard look" at the environmental effects of its actions, courts cannot "use review of an agency's environmental analysis as a guise for second-guessing substantive decisions." *National Audubon Soc. v. Department of Navy*, 422 F.3d 174, 184-85 (4th Cir. 2005). Thus, Courts must ask only whether the agency made a "thorough investigation" and "candid acknowledgement" of environmental effects; they "may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." *Id.* at 185-86. Straying from this "holistic view of what the agency has done," *id.* at 186, would invite courts to reject an agency's environmental review for "trivial inadequacies," thereby "impermissibly intrud[ing] into its decisionmaking prerogative," *Webster*, 685 F.3d at 425.

Section 4(f), unlike NEPA, "imposes substantive restraints on an agency's action." *Defenders of Wildlife*, 762 F.3d at 398. That said, review under the APA means that the agency's substantive decision can be overturned in court only if it is arbitrary and capricious or contrary to law. *Id.* at 401. If the agency considered the "relevant factors" and can explain why those factors support its decision, that decision should be affirmed. *Id.*; *see Defenders of Wildlife*, 931 F.3d at 345 (holding

14

that APA review involves ensuring "that the agency has examined the relevant data and articulated a satisfactory explanation for its action").

This Court's review of the district court's decision is de novo. *Defenders of Wildlife*, 762 F.3d at 393 (quoting *Friends of the Back Bay v. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).

## II. THE AGENCIES' ANALYSIS OF THE PROJECT'S POTENTIAL IMPACT ON AIR QUALITY MET THE STANDARDS SET BY NEPA AND THE CLEAN AIR ACT.

Appellants' lead argument is that MDOT and the FHWA failed to investigate and acknowledge impacts from project-related $PM_{2.5}$ air pollution. Appellants' Br. 31-32. They claim that MDOT's environmental review failed to disclose how $PM_{2.5}$ can cause serious health problems and failed to consider the project's $PM_{2.5}$ emissions. But that claim is wrong on both the law and the facts.

### A. NEPA Allows MDOT to Account for the Project's Compliance With EPA's $PM_{2.5}$ Standards.

Appellants start their $PM_{2.5}$ legal argument with the undisputed general premise that NEPA requires agencies to thoroughly investigate and candidly acknowledge environmental harms. Appellants' Br. 31-32 (citing *National Audubon*, 422 F.3d at 185). They are less clear, though, about what specific kind of investigation and disclosure they think would satisfy that standard.

Under the Clean Air Act, EPA sets national ambient air quality standards (NAAQS) for certain pollutants, including $PM_{2.5}$. *See* 42 U.S.C. § 7408; (J.A. 83).

15

Those standards must be set at a level that will "protect the public health" with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1); *see Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001) (explaining how EPA's air quality standards work). EPA's standards "protect not only average healthy individuals, but also 'sensitive citizens'—children, for example, or people with asthma, emphysema, or other conditions rendering them particularly vulnerable to air pollution." *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 74 (4th Cir. 2020) (quoting *North Carolina v. TVA*, 615 F.3d 291, 310 (4th Cir. 2010)).

When a region meets EPA's public-health-based air quality standards for a given pollutant, it is said to be in "attainment." 42 U.S.C. § 7407(d)(1)(A). When a region fails to meet EPA's standards, it is in "non-attainment." *Id.* Appellants agree that the relevant counties here are in attainment for PM$_{2.5}$. Appellants' Br. 39; (J.A. 84). As a result, Appellants have never argued that the Clean Air Act forbids the managed lanes project. (J.A. 85.)

What Appellants *do* argue is that MDOT should have calculated "the PM$_{2.5}$ levels in the neighborhoods lining [I-495] and I-270" where the managed lanes would be added. Appellants' Br. 14. The Clean Air Act sometimes does require a localized air pollution investigation—known as a "hot spot" analysis—but only when a region is in "non-attainment." A region is in "non-attainment" when its levels of a particular pollutant are so high that they exceed EPA's health-protective

standards. *See* 40 C.F.R. §§ 93.101, 93.116. When a region is in attainment for a given pollutant, as everyone agrees the region here is, no "hot spot" analysis is necessary under the Clean Air Act. *See id.* So, by arguing for a localized PM$_{2.5}$ analysis under NEPA, Appellants are asking for what amounts to a "hot spot" analysis even when the Clean Air Act does not require one.

Appellants' effort to ignore the Clean Air Act's distinction between air quality attainment and non-attainment makes little sense under NEPA's "rule of reason." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004). Under the rule of reason, "a court reviewing an EIS for NEPA compliance must take a holistic view of what the agency has done to assess environmental impact." *National Audubon*, 422 F.3d at 186. And because the court's ultimate decision under NEPA is "pragmatic," *Webster*, 685 F.3d at 421, reliance on a NAAQS standard set "to protect human health with a reasonable margin of error" is an entirely rational part of describing a project's environmental impact.[4] *See Sierra Club v. Federal Highway Admin.*, No. 17-cv-1661-WJM-MEH, 2018 WL 1610304, at *7 (D. Colo. Apr. 3,

---

[4] The Ninth Circuit addressed a different issue in *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850 (9th Cir. 2022). *See* Appellants' Br. 40. There, the court held that NEPA does not allow an agency to conclude that a project's impacts are insignificant based on the assumption that they would be mitigated by a general permit issued by another agency for other projects. *Environmental Def. Ctr.*, 36 F.4th at 874. Here, by contrast, no third-party action is necessary to mitigate the project's impacts because the region is *already* in conformity with EPA's air quality standards, and the NEPA study concludes that nothing about the project will change that.

2018); *Border Power Plant Working Grp. v. Department of Energy*, 260 F. Supp. 2d 997, 1020-21 (S.D. Cal. 2003).

FHWA guidance confirms the reasonableness of relying on Clean Air Act compliance for NEPA purposes. It says that "microscale" carbon monoxide analysis is "unnecessary" when combined project and background concentrations are "well below" EPA standards. FHWA, Guidance for Preparing and Processing Envt. and Section 4(f) Documents, Technical Advisory T 6640.8A (Oct. 30, 1987).[5] True, that guidance does not mention $PM_{2.5}$ because it issued before EPA had imposed standards for $PM_{2.5}$. *See* Appellants' Br. 40-41. But the principle is the same: If a pollutant meets EPA's air quality standards, no "microscale" analysis is necessary under NEPA.

*Friends of Buckingham* is not to the contrary. That case, as Appellants admit, did not involve NEPA. Appellants' Br. 36. It was instead a petition for review under the Natural Gas Act that was "governed by a complex intertwining of local, state, and federal laws and regulations." *Friends of Buckingham*, 947 F.3d at 72, 80. One of those governing laws was a Virginia statute that demanded consideration of "[t]he character and degree of injury to" a predominately African-American community. *Id.* at 86 (quoting Va. Code Ann. § 10.1-1307(E)). That specific state requirement

---

[5] https://www.environment.fhwa.dot.gov/legislation/nepa/guidance_preparing_env_documents.aspx.

18

would be "rendered meaningless," the Court held, if it could be met by compliance with federal air quality standards—which themselves allowed states to impose stricter requirements, as Virginia had. *Id.* at 74-75, 93.

Unlike the stricter state law in *Friends of Buckingham*, NEPA calls for a "totality of the circumstances approach" that looks at an EIS's "entire analysis." *Defenders of Wildlife*, 762 F.3d at 396. Thus, in the NEPA context, citing regional compliance with EPA's $PM_{2.5}$ standards as a key point in the EIS's air quality analysis was not an "attempt to fall back on the NAAQS," as Appellants claim. Appellants' Br. 36 (internal quotation marks and brackets omitted). It was a reasonable, "pragmatic judgment," *Webster*, 685 F.3d at 421, that harmonized NEPA and the Clean Air Act.

## B.   MDOT Explicitly Disclosed the Potential Effects of Increased Vehicle Emissions.

Turning to the facts, MDOT *did* disclose the potential air quality effects from the managed lanes project, including the effects of $PM_{2.5}$. The EIS describes the sources and potential health effects of the pollutants regulated by the Clean Air Act, including $PM_{2.5}$. (J.A. 2065-2066.) The EIS also acknowledges that the project would cause an increase in airborne pollutants—again including $PM_{2.5}$. (J.A. 788.) And the EIS explains that $PM_{2.5}$ can harm human health. (J.A. 788.) The EIS appendix even discusses the relationship between increased vehicle traffic and air

19

quality.  (J.A. 1507-1508.)[6]  All these disclosures are part of the "holistic view of what the agency has done to assess environmental impact."  *Webster*, 685 F.3d at 422.

It is not true, as Appellants claim, that the agencies never considered "how expanding the highways would alter baseline $PM_{2.5}$ levels."  Appellants' Br. 33.  The Transportation Planning Board conducted a regional conformity analysis to assess whether the combined emissions from all the projects planned for the entire region through 2045—*including the managed lanes project*—would violate EPA's air quality standards.  That analysis showed that the cumulative project emissions would not "cause new air quality violations, worsen existing conditions, or delay timely attainment of the relevant NAAQS."  (J.A. 541; *see* J.A. 89.)

### C.    MDOT Used Carbon Monoxide Modeling to Evaluate  Local Emissions.

Another part of the "holistic view" taken here was the additional localized carbon monoxide study that MDOT performed.  MDOT used carbon monoxide because carbon monoxide is a good "proxy for transportation emissions."  (J.A. 2065.)  In other words, what is true for carbon monoxide should also be true for $PM_{2.5}$.  (J.A. 2065.)

---

[6] The district court recognized and relied on the disclosures in the Draft EIS, which also addresses the effects of $PM_{2.5}$.  (J.A. 88-89.)

MDOT's study modeled emissions at the busiest project intersections and interchanges, including the I-270 interchange with I-370 that Appellants highlight in their brief.[7]  *See* Appellants' Br. 17, 20, 21 n.12.  The study's modeling also "conservatively assumed worst-case conditions," which led to "overestimating the emissions results." (J.A. 2128.)  Still, the models showed that localized, microscale carbon monoxide impacts would be well below EPA's air quality standards during peak one- and eight-hour timeframes.  (J.A. 2128.)  For the I-270 interchange with I-370, the models showed that carbon monoxide emissions would be lower than they are today.  (J.A. 2129 (showing concentrations at interchange IC.36).)  The record thus belies Appellants' claim that the agencies did not consider localized impacts as part of the "hard look"—the "thorough investigation" and "candid acknowledgement" of impacts—that they engaged in under NEPA.  *See National Audubon*, 422 F.3d at 185.[8]

---

[7] Appellants separately claim that the agencies should have addressed a 2015 study that used a "near-highway monitor" to measure $PM_{2.5}$ levels.  Appellants' Br. 15.  But the worst-case assumptions in the agencies' carbon monoxide model accomplish the same end.

[8] The use of this model to show that the managed lanes project will reduce localized air emissions is not a "post-hoc rationalization," as Appellants claim. Appellants' Br. 40 n.19.  The record reflects that the carbon monoxide modeling was an important part of the agencies' environmental review.  The whole reason it was done was to provide more information about localized air quality effects—an issue that was a focus of the agencies' NEPA analysis and the parties' briefing below. (J.A. 2065.)

21

\*     \*     \*

As the district court aptly summarized, the agencies "thoroughly investigated" the project's $PM_{2.5}$ emissions, "supported their conclusions with scientific evidence, and rationally explained the conclusions from their chosen methodologies." (J.A. 90.) MDOT's review of $PM_{2.5}$ impacts was thus nowhere close to arbitrary and capricious.

## III. MDOT Took a Hard Look at Environmental Justice Issues and Had a Rational Basis for Concluding That the Project Would Not Have a Disproportionately High and Adverse Effect on Underserved Communities.

Appellants' second set of claims invoke a 1994 executive order on environmental justice, which instructs federal agencies to determine whether their actions "have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations." Exec. Order 12898 § 3-302(a).[9] MDOT and FHWA thoroughly complied with that order, starting with outreach that identified minority and low-income communities and documented any impacts on them. (J.A. 620-626.) Using all that was learned during those outreach efforts, MDOT's experts prepared a special environmental justice technical report.

---

[9] The executive order that applied here was number 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (Feb. 11, 1994). A new executive order on environmental justice has been issued since then, but it did not yet exist when the agencies made their decision here. *See* Exec. Order 14096, Revitalizing Our Nation's Commitment to Envt. Justice for All (Apr. 21, 2023).

*See* AR.5136-5617.   The agencies concluded, based on all the evidence, that the managed lanes project would not have a disproportionately high and adverse impact on environmental justice communities.  (J.A. 1220-1221; J.A. 178.)

### A.    MDOT's Outreach to Environmental Justice Communities Was Extensive, Valuable, and Consistent with the Environmental Justice Executive Order.

The foundation of MDOT's environmental justice analysis was its extensive outreach to potentially affected communities.  As the EIS acknowledged, interstate highways have historically created "the most adverse impacts and the fewest benefits" for vulnerable communities.   (J.A. 609.)   Such practices "further concentrat[ed] poverty and expos[ed] remaining residents to the environmental and public health effects associated with traffic proximity."  (J.A. 610.)  The EIS kept these "pre-existing burdens" in view when it analyzed environmental justice impacts from the managed lanes project.  (J.A. 604-638); *see* AR.5136-5617 (technical report on environmental justice issues).

MDOT spent extra time engaging environmental justice communities.  *See* (J.A. 609-610; J.A. 1161.)  That engagement included special efforts to "ensur[e] minority and low-income communities" had information about impacts.  (J.A. 168-169; J.A. 620-626 (describing special outreach efforts).)   For example, MDOT mailed flyers in five languages to affordable housing complexes, schools, and places of worship; translated and distributed hard copies of the EIS executive summary;

23

and held "community 'pop-up' events" where it could hear directly from community members.  (J.A. 780-781; J.A. 169.)  MDOT also set up satellite trailers with COVID quarantine precautions in underserved communities to assure that all had safe access to both paper and electronic copies of the Draft EIS and its many technical reports, as well as access to the project website.  (J.A. 719-720.)  Through these special engagement efforts, MDOT learned environmental justice communities' priorities, including "improved sidewalks and bicycle facilities, better lighting, and traffic calming measures" near highways.  (J.A. 169; J.A. 206-207.)  MDOT responded to these priorities by incorporating them into the project, thus benefitting the communities in exactly the ways that the communities wanted.  (J.A. 169; J.A. 1194.)

### B.    The Project Will Not Worsen Traffic in Vulnerable Communities.

Appellants' environmental justice arguments hinge on their claim that "the project would worsen congestion in some minority and low-income communities." Appellants' Br. 42.  Specifically, Appellants argue that the agencies' traffic models show congestion during "rush hours" that would decrease traffic speeds at the project endpoints, where some environmental justice communities are located.  Appellants' Br. 43-44.  This same congestion, they say, would increase "air pollution harms" in some environmental justice communities.  Appellants' Br. 45.

Like their PM$_{2.5}$ claims, Appellants' environmental justice arguments fail to take a "holistic view" of the managed lanes project's impacts. *See Webster*, 685 F.3d at 422. As the EIS discloses, traffic impacts are not disproportionately high or adverse when considered in the context of the road system as a whole. Just because one part of that system experiences congestion at one time of day does not mean impacts are disproportionate. Nor is congestion the sole measure of traffic impacts. Even with increased congestion, the addition of managed lanes will improve vehicle throughput, which measures the sheer number of vehicles that can pass by a given point in a set amount of time. The data show that, even during the most congested times of day, more people will move more efficiently on both I-495 and I-270. (J.A. 995-998.) That increased throughput means that more vehicles are using the interstates, thereby reducing the traffic burden on nearby local roads. (J.A. 994; *see* J.A. 1194 (describing how "direct access" to managed lanes can "benefit" disadvantaged communities).)

Where those local roads are in environmental justice communities, the reduced traffic will also have air quality benefits. Indeed, as the district court observed, a broader quantitative assessment showed that mobile source air toxics "are expected to significantly decline . . . when compared to existing conditions." (J.A. 94-95 (quoting J.A. 1196; ellipsis in original).) And because the agencies "incorporated preexisting pollution burdens" when they were identifying

25

environmental justice communities, their environmental justice analysis also accounted for the cumulative effects of air emissions on vulnerable communities. (J.A. 96-97, J.A. 100.)

Other benefits will also accrue to environmental justice communities from the managed lanes project. To start, MDOT's analysis of total trip times—a more practical way of looking at transportation effects—shows that 76% of trip pairs in the general-purpose lanes will be faster, by an average of eight minutes. (J.A. 188-189.) Trips in the new managed lanes will be faster still. Those faster speeds will benefit people who use buses, carpools, and vanpools, which can drive in the managed lanes for free. (J.A. 149-150.)

Under FHWA guidance, the agencies properly included these "offsetting benefits" when considering whether the managed lanes project would have disproportionate effects on environmental justice communities. *See* FHWA 2012 EJ Order 6640.23A at 7.[10] The overall effect of the project on all environmental justice communities is not disproportionately high and adverse. (J.A. 178.) Indeed, the agencies' environmental justice technical report showed that non-environmental justice communities would bear nearly all the increased risks associated with traffic proximity, including 91% of the impacted properties, 100% of impacted community facilities, and 95% of impacted wetlands. (J.A. 635.) Taking a "holistic view" of

---

[10] https://www.fhwa.dot.gov/legsregs/directives/orders/664023a.pdf.

26

the effects on environmental justice communities, *Webster*, 685 F.3d at 422, the agencies properly concluded that traffic from the managed lanes project would affect all areas equally, "regardless of [environmental justice] status."  (J.A. 629.)

IV.  **THE WORK OF MDOT'S INTER-AGENCY TEAM GAVE IT A RATIONAL BASIS FOR CONCLUDING THAT ITS CHOSEN AMERICAN LEGION BRIDGE ALIGNMENT MET SECTION 4(F)'S "ALL POSSIBLE PLANNING" REQUIREMENT.**

Appellants' final point involves Plummers Island, a natural and scientific research area that is one small part of the far larger C&O Canal National Historical Park.  According to Appellants, the replacement of the American Legion Bridge will "severely damage Plummers Island" in violation of Section 4(f) and FHWA's implementing rules.  Appellants' Br. 48-49.  Appellants never mention—but do not dispute—that there is less than a tenth of an acre of permanent impacts to the island. (J.A. 176.)  Nor do they deny that MDOT committed to seeking, through detailed design approval, engineering innovation to further reduce or avoid impacts to Plummers Island.  (*See* J.A. 195.)  In any case, the agencies met Section 4(f)'s procedural and substantive requirements.

A.    **The Agencies Followed Section 4(f)'s Planning Procedures.**

Appellants admit that the American Legion Bridge cannot be widened without affecting parkland protected by Section 4(f).  Appellants' Br. 49-50.  Since such effects could not be avoided, Section 4(f) required the agencies to "include all possible planning to minimize harm" to the protected properties.   49 U.S.C.

§ 303(c)(2).   As interpreted by FHWA's rules, that statutory language requires choosing the bridge-widening alternative that causes "the least overall harm in light of the statute's preservation purpose."  23 C.F.R. § 774.3(c).  To help decide which alternative does the "least overall harm," FHWA's rules contain a seven-factor "balancing" test.  *Id.* § 774.3(c)(1).

The National Park Service is steward of the C&O Canal National Historical Park of which the Washington Biologists' Field Club on Plummers Island is one part.  The larger park—all of which is protected under Section 4(f)—exists on both sides of the current American Legion Bridge.  Recognizing the inevitable Section 4(f) implications of a new bridge, the agencies formed an American Legion Bridge "Strike Team" to compare design and construction options and minimize harm to protected resources.  *See* (J.A. 503.)  This strike team allowed the agencies to account for the National Park Service's desire to minimize total acreage impacts (J.A. 1538; J.A. 2740); the actual acreage affected by the preferred alignment and the west-shift alignment (J.A. 689); the changes that the west-shift alignment would require to another parkland road interchange (J.A. 690); and the loss of a private residence that only the west-shift alignment would require (J.A. 503).  This planning work was aimed at minimizing harm to Section 4(f) properties unavoidably affected by the new bridge.

28

Appellants focus not on the statute's "least overall harm" requirement but on the claim that the agencies did not check every box in the FHWA's seven-factor "balancing" test. Appellants' Br. 49-50 (citing 23 C.F.R. § 774.3(c)(1)). But as shown throughout the environmental review record, the agencies *did* perform that analysis. (*See, e.g.*, J.A. 502-503; J.A. 689-692.) And as FHWA explained when it promulgated the relevant rule, "[h]ow the various factors listed in paragraph 774.3(c)(1) are balanced and weighed in a given instance is within the discretion of FHWA and [Federal Transit Administration], and is subject to the facts and circumstances of the particular project and Section 4(f) properties involved." 73 Fed. Reg. 13368, 13372 (Mar. 12, 2008). This discretionary exercise does not demand mathematical precision or require the agency to use special terms. *Hickory Neighborhood*, 910 F.2d at 162.

Despite the agencies' "balancing" discretion under FHWA's rule, Appellants argue that the agencies rejected a "viable" alignment—known as the "west-shift alignment"—without sufficiently explaining how they applied the seven-factor balancing test. Appellants' Br. 51. FHWA, though, is not required explain the relative weight it gave to each of seven factors when making its discretionary "least overall harm" finding. Indeed, as Appellants admit, the U.S. Supreme Court "held that Section 4(f) itself does not require specific, 'formal findings.'" Appellants' Br. 51 (quoting *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 417 (1971)).

29

Against that backdrop, the rule's instruction for the agency to "document[]" its balancing of the factors, 23 C.F.R. § 774.7(c), should not be read to require the "formal findings" that the Supreme Court held were not necessary. The district court was right: "the administrative record shows that the agencies were aware of" the seven factors "and undertook all possible planning to minimize" harm to protected properties. (J.A. 128.) Section 4(f) demands nothing more.

### B. The Agencies' Preferred Bridge Alignment Satisfies Section 4(f)'s Least Overall Harm Test.

Appellants substantive argument has no more merit than their procedural one. They admit that the agencies rejected the west-shift alignment because "it would use more parkland than the [preferred] on-center alignment, require acquisition of a single residential property, and require reconfiguration of a highway interchange." Appellants' Br. 53 (citing J.A. 503, J.A. 1518, and J.A. 1542). They further admit that "[t]hese considerations are relevant to a few of the least overall harm factors." Appellants' Br. 53. Their only argument is that if the agencies had tried harder to mitigate harm from the west-shift alignment, and appreciated how valuable Plummers Island really is, they would have reached a different conclusion. Appellants' Br. 54-56. But this argument ignores the "overall" rule in the balancing test, 23 C.F.R. § 774.3(c)(1) (emphasis added), as well as the arbitrary and capricious standard of review that applies to Section 4(f) decisions, *Defenders of Wildlife*, 762 F.3d at 401.

When considering whether the agencies' Section 4(f) conclusions were arbitrary and capricious—that is, "whether a rational basis exists for [their] decision," *Blaustein & Reich*, 365 F.3d at 291—the facts matter. *See* 73 Fed. Reg. at 13372 (explaining that the balancing of factors depends on "the facts and circumstances of the particular project"). It matters, first and foremost, that Plummers Island will experience fewer than 0.1 acres of permanent impacts, as shown in this enlarged map from the record (J.A. 1280 (Section 4(f) Evaluation at 23)):



On the map, the effects of the bridge replacement on Plummers Island (labeled "Washington Biologists' Field Club") is the triangle on the left side of the island, which is highlighted in yellow. The highlighted triangle amounts to fewer than 0.1 acres.

31

Shifting the bridge to the west (to the left on the map) might eliminate the 0.1-acre impact to Plummers Island, but it would multiply impacts to other protected properties.  *See*  (J.A. 1532 (table comparing acreage impacts).)  As FHWA explained, the "least *overall* harm" rule applies "the settled principle" that "Section 4(f) does not preclude [FHWA] from selecting any alternative from among those with substantially equal harm."  73 Fed. Reg. at 13371 (emphasis added).  Thus, given the minimal permanent effects to Plummers Island and the other facts in the record, the agencies' conclusion that using the existing bridge alignment would have the least overall harm was not arbitrary and capricious.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Linda M. DeVuono
LINDA M. DEVUONO
Deputy Principal Counsel
Office of the Attorney General
707 N. Calvert St., 4th Floor
Baltimore, Maryland 21202
Tel: (410) 530-9783
ldevuono@mdot.maryland.gov

*Attorneys for State Appellees*

32

_____/s/_____

Fred R. Wagner
Jay C. Johnson
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 344-4000
Fax: (202) 344-8300
frwagner@venable.com
jcjohnson@venable.com

*Assistant Counsel to the Attorney General of Maryland*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6880 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14.

/s/    Jay C. Johnson
Attorney for State Appellees

# STATUTORY AND REGULATORY ADDENDUM

5 U.S.C. § 706…………………………………………………………………………1a

42 U.S.C. § 4321…………………………………………………………………………1a

42 U.S.C. § 7409(b)(1)……………………………………………………………2a

49 U.S.C. § 303(c)…………………………………………………………………...2a

23 C.F.R. § 774.3(c)………………………………………………………………3a

23 C.F.R. § 774.7(c)………………………………………………………………3a

**5 U.S.C. § 706**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or immunity;

(C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)     without observance of procedure required by law;

(E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.


**42 U.S.C. § 4321**

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

**42 U.S.C. § 7407(d)(1)(A)**

(d)    Designations

(1)    Designations generally

(A)    Submission by Governors of initial designations following promulgation of new or revised standards

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as--

(i)    nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

(ii)    attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

(iii)    unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

**42 U.S.C. § 7409(b)(1)**

(b)    Protection of public health and welfare

(1)    National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

**49 U.S.C. § 303(c)**

(c)    Approval of programs and projects.--Subject to subsections (d) and (h), the Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 2041 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national,

2a

State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if--

(1)    there is no prudent and feasible alternative to using that land; and

(2)    the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

## 23 C.F.R. § 774.3(c)

(c)    If the analysis in paragraph (a)(1) of this section concludes that there is no feasible and prudent avoidance alternative, then the Administration may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that:

(1)    Causes the least overall harm in light of the statute's preservation purpose. The least overall harm is determined by balancing the following factors:

(i)    The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

(ii)    The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii)    The relative significance of each Section 4(f) property;

(iv)    The views of the official(s) with jurisdiction over each Section 4(f) property;

(v)    The degree to which each alternative meets the purpose and need for the project;

(vi)    After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii)    Substantial differences in costs among the alternatives.

## 23 C.F.R. § 774.7(c)

(c) If there is no feasible and prudent avoidance alternative the Administration may approve only the alternative that causes the least overall harm in accordance with § 774.3(c). This analysis must be documented in the Section 4(f) evaluation.

3a