No. 24-1447

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

and

FRIENDS OF MOSES HALL, ET AL.,

*Plaintiffs,*

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

---

### APPELLANTS' REPLY BRIEF

---

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Nanding Chen
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6165
nchen@nrdc.org

*Counsel for Appellants*
(*additional counsel listed on inside cover*)

October 15, 2024

Andrea C. Ferster
Attorney at Law
68 Beebe Pond Road
Canaan, NY 12029
(202) 669-6311
aferster@railstotrails.org

*Counsel for Appellant Maryland
Chapter of the Sierra Club*

Elizabeth S. Merritt
National Trust for Historic Preservation
600 14th Street NW, Suite 500
Washington, DC 20005
(202) 297-4133
emerritt@savingplaces.org

*Counsel for Appellant National Trust for
Historic Preservation in the United States*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................... iii

GLOSSARY ................................................................................ vii

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................... 2

I.    The Agencies failed to take a hard look at the project's
      PM$_{2.5}$ pollution .......................................................... 2

      A.    The Agencies did not investigate the project's
            PM$_{2.5}$ pollution ............................................. 3

      B.    The Agencies' reliance on pre-project NAAQS
            compliance did not constitute a hard look at the
            project's PM$_{2.5}$ pollution ................................ 5

      C.    The Agencies' analysis of other pollutants did
            not constitute a hard look at the project's PM$_{2.5}$
            pollution ........................................................... 10

II.   The Agencies failed to take a hard look at the project's
      traffic-related air pollution harm to environmental
      justice communities ......................................................... 14

      A.    The Agencies continue to ignore evidence
            showing the project's disparate traffic burdens in
            environmental justice communities ...................... 15

      B.    The Agencies continue to ignore the unequal
            distribution of the project's traffic-related air
            pollution ........................................................... 17

III.  The Agencies arbitrarily rejected an alternative that
      would have avoided Plummers Island .............................. 20

i

A.    The Agencies failed to apply and document the seven-factor balancing test mandated by FHWA regulations ................................................................. 21

B.    The Agencies' rejection of the west-shift alignment was arbitrary ........................................... 24

IV.   Vacatur is the default and appropriate remedy ................................... 27

CONCLUSION ....................................................................... 30

CERTIFICATION OF COMPLIANCE ...................................... 32

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) ............................................................ 27

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ........................................................ 28

*Anderson v. Evans*,
  371 F.3d 475 (9th Cir. 2004) .............................................................. 19

*Appalachian Voices v. U.S. Dep't of Interior*,
  25 F.4th 259 (4th Cir. 2022) ............................................................... 11

*Calcutt v. FDIC*,
  598 U.S. 623 (2023) ............................................................................ 24

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
  449 F.2d 1109 (D.C. Cir. 1971) ................................................... 6, 7, 8

*Coalition for Advancement of Reg'l Transp. v. FHWA*,
  959 F. Supp. 2d 982 (W.D. Ky. 2013) ................................................ 9

*Defs. of Wildlife v. N.C. Dep't of Transp.*,
  762 F.3d 374 (4th Cir. 2014) ................................................... 21, 24, 27

*Defs. of Wildlife v. U.S. Dep't of the Interior*,
  931 F.3d 339 (4th Cir. 2019) .............................................................. 20

*Diné Citizens Against Ruining Our Env't v. Haaland*,
  59 F.4th 1016 (10th Cir. 2023) ............................................................ 8

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
  707 F.3d 462 (4th Cir. 2013) ......................................................... 22, 30

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) ....................................................... 6, 7, 30

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018).....................................................................7

*Friends of Buckingham v. State Air Pollution Control Bd.,*
    947 F.3d 68 (4th Cir. 2020)..............................9, 10, 16, 19

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*
    844 F.3d 1095 (9th Cir. 2016)...............................................6

*Hickory Neighborhood Def. League v. Skinner,*
    893 F.2d 58 (4th Cir. 1990)...................................................24

*High Country Conservation Advocs. v. U.S. Forest Serv.,*
    951 F.3d 1217 (10th Cir. 2020).........................................30

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.,*
    677 F.3d 596 (4th Cir. 2012).........................................4, 12

*N.J. Conservation Found. v. FERC,*
    111 F.4th 42 (D.C. Cir. 2024)......................................23, 29

*Nat'l Audubon Soc'y v. Dep't of Navy,*
    422 F.3d 174 (4th Cir. 2005)...........................2, 8, 10, 14

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998).............................................3

*Ohio v. EPA,* 144 S. Ct. 2040 (2024)..........................................22

*Ore. Nat. Desert Ass'n v. Bureau of Land Mgmt.,*
    625 F.3d 1092 (9th Cir. 2010).............................................11

*Ore. Nat. Res. Council Fund v. Goodman,*
    505 F.3d 884 (9th Cir. 2007)...............................................15

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015)...............................................28

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
    588 F.3d 718 (9th Cir. 2009)...........................................4, 5

iv

*Sierra Club v. FHWA*,
   715 F. Supp. 2d 721 (S.D. Tex. 2010) .................................................... 8

*Sierra Club v. U.S. Dep't of Transp.*,
   310 F. Supp. 2d 1168 (D. Nev. 2004) ..................................................... 9

*Standing Rock Sioux Tribe v. U.S. States Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ............................................................ 30

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
   6 F.4th 1321 (D.C. Cir. 2021) ............................................................... 28

*Webster v. USDA*,
    685 F.3d 411 (4th Cir. 2012) ............................................................... 19

*Wild Va. v. U.S. Forest Serv.*,
   24 F.4th 915 (4th Cir. 2022) .................................................................. 4

**Statutes**

Va. Code Ann. § 10.1-1307(E) (2020) ......................................................... 9

**Rules and Regulations**

23 C.F.R. § 774.3(c) .....................................................20, 23, 24, 25, 26

23 C.F.R. § 774.7(c) ...............................................................20, 21

40 C.F.R. § 50.8 ......................................................................... 12

40 C.F.R. § 50.8(a) ...................................................................... 16

40 C.F.R. § 50.11(b) ..................................................................... 16

40 C.F.R. § 50.18 ........................................................................ 12

40 C.F.R. § 1502.1 (2019) ............................................................... 2

40 C.F.R. § 1502.24 (2019) ............................................................. 11

40 C.F.R. § 1508.27(a) (2019) ......................................................... 10

40 C.F.R. § 1508.27(b) (2019) ................................................................ 6, 10

77 Fed. Reg. 42,802 (July 20, 2012) ...................................................22, 23

**Other Authorities**

EPA, *Near Roadway Air Pollution and Health: Frequently Asked Questions* (2018) ................................................................ 17

EPA, *Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM$_{2.5}$ and PM$_{10}$ Nonattainment and Maintenance Areas* (2010) ........................................................ 12

EPA, *Using MOVES2014 in Project-Level Carbon Monoxide Analyses* (2015) ................................................................ 12

American Heritage Dictionary of the English Language (5th ed. 2011) ................................................................ 22

Webster's Third New International Dictionary (1981) ................................... 22

## GLOSSARY

| | |
|---|---|
| Agencies | MDOT and FHWA |
| EPA | U.S. Environmental Protection Agency |
| FEIS | Final environmental impact statement |
| FHWA | Federal Highway Administration |
| MDOT | Maryland Department of Transportation |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $PM_{2.5}$ | Fine particulate matter |

## INTRODUCTION

Federal law requires that agencies thoroughly assess and candidly disclose a project's damage to health, ecosystems, and historic sites before deciding whether to approve that project. Bedrock principles of administrative law further require that agencies consider all relevant factors, reasonably explain their decisions, and support their conclusions with record evidence.

The Agencies violated these fundamental duties when approving their plan to expand and add toll lanes to fifteen miles of I-495 (the Beltway) and I-270 near Washington, D.C. They refused to assess the project's contribution to a dangerous air pollutant, reached conclusions about environmental justice impacts that run counter to record evidence, and greenlit a new bridge design that would damage a historic island without weighing all relevant factors.

The Agencies' briefs double down on these failures. They continue to ignore inconvenient facts, rely on inapposite analyses, and disregard the requirements of various federal laws. The Agencies fell short of the reasoned decisionmaking required by the Administrative Procedure Act. And their violations of the National Environmental Policy Act (NEPA) and Section 4(f) of the Department of Transportation Act obscured the project's harms from decisionmakers and the public alike. The Court should vacate the project's unlawful approvals.

## ARGUMENT

**I. The Agencies failed to take a hard look at the project's PM$_{2.5}$ pollution**

Plaintiffs' opening brief showed that the Federal Highway Administration (FHWA) and Maryland Department of Transportation (MDOT) failed to take a hard look at the project's fine particulate matter (PM$_{2.5}$) impacts. Opening Br. 31-42. In response, the Agencies do not dispute that PM$_{2.5}$ is a pernicious pollutant that causes serious health harms, including heart attacks and early deaths, even at low levels. *Id.* at 11-12, 15-16. Nor do they dispute that any additional PM$_{2.5}$ in the air increases the risks of those harms. *Id.* at 15-16, 31. And they do not dispute that NEPA required them to conduct a "thorough investigation" of the project's PM$_{2.5}$ pollution and offer "a candid acknowledgment of the risks" that pollution entailed. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005).

The Agencies nonetheless fail to identify anywhere in the record where they assessed how much PM$_{2.5}$ pollution the project would create or how that pollution would affect surrounding neighborhoods. Their excuses for skipping this important analysis—that regional PM$_{2.5}$ levels years earlier met air quality standards, and that they evaluated other, less dangerous, air pollutants—are no substitute for the "full and fair discussion" of PM$_{2.5}$ impacts that NEPA required. 40 C.F.R. § 1502.1 (2019).

## A.    The Agencies did not investigate the project's PM$_{2.5}$ pollution

The Agencies' failures under NEPA are straightforward: they did not investigate how much PM$_{2.5}$ pollution the project would cause. Nor did they disclose the health risks from that pollution. Opening Br. 32-34.

While FHWA decries the "implication … that the Agencies have no idea (and did not bother to investigate)" how much the project would increase PM$_{2.5}$ pollution, FHWA Resp. 25, neither FHWA nor MDOT identify anywhere in the record where they answered that essential question. Instead, the Agencies concluded that because pre-project PM$_{2.5}$ levels met EPA's National Ambient Air Quality Standards (NAAQS), "no further analysis of PM$_{2.5}$ was required." JA0541. This approach violated NEPA's central charge: to consider and disclose impacts *from the proposed project*. Opening Br. 34. Plaintiffs "repeat" this point throughout their opening brief, *see* FHWA Resp. 25, because it is the fundamental flaw in the Agencies' approach.

The general references to PM$_{2.5}$ in the Agencies' NEPA documents do not satisfy their NEPA obligations. *Contra* MDOT Resp. 19. The mere disclosure that PM$_{2.5}$ can harm human health, *see id.* (citing JA2065-2066), is a "[g]eneral statement[] about 'possible effects' and 'some risk'" that does not alone "constitute a 'hard look'" under NEPA, *see Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). Such information,

while relevant, doesn't answer the specific question NEPA asks: what are the PM$_{2.5}$ impacts "from this project"? *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009). Answering that question required assessing how much PM$_{2.5}$ pollution the project would cause and what that would mean for public health—exactly what the Agencies failed to do.

FHWA's critique of the 2015 study does not help them either. *Contra* FHWA Resp. 32-33. That study confirmed that PM$_{2.5}$ levels were elevated— and even exceeded the NAAQS—along another stretch of the Beltway. Opening Br. 34. The study thus called into question the Agencies' reliance on air quality data from monitors miles from the highways. *Id.* The Agencies never explained in their NEPA documents why those distant monitors reflected pre-project levels near the highways. *See id.* at 35. Their failure to do so or otherwise address the 2015 study violated NEPA. *See Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 927-28 (4th Cir. 2022) (agency violated NEPA by "fail[ing] to account for real-world data" that contradicted agency modeling). Their post hoc critiques of the 2015 study are untimely.[1] *See N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 604 (4th Cir. 2012).

---

[1] They are also arbitrary. Each critique about the 2015 study—that the data are years old, and from monitors miles from the project, FHWA Resp. 32-33— also applies to the regional monitoring data the Agencies used.

4

In any event, those pre-project monitoring data provided, at best, only the starting point for a NEPA impacts analysis: the environmental baseline. Opening Br. 33. To assess *this project's* impacts, the Agencies needed to add the project's $PM_{2.5}$ pollution to those baseline levels. *Id.* (citing cases). The Agencies do not dispute that they never took that step. The final environmental impact statement (FEIS) therefore "sheds no light on the specific effect at issue—the environmental impact of [$PM_{2.5}$ pollution] *from this project*." *S. Fork Band Council*, 588 F.3d at 726 (emphasis added). This failure violated the Agencies' hard-look duty.

### B. The Agencies' reliance on pre-project NAAQS compliance did not constitute a hard look at the project's $PM_{2.5}$ pollution

Unable to show that they assessed the project's $PM_{2.5}$ impacts, the Agencies argue that the region's pre-project compliance with the $PM_{2.5}$ NAAQS meant that no project-specific $PM_{2.5}$ analysis was required. FHWA Resp. 27-31; MDOT Resp. 16-19. Plaintiffs have explained why this is wrong. Opening Br. 32-34, 36-38. The Agencies' arguments to the contrary fall short.

At bottom, the Agencies' reliance on pre-project NAAQS compliance fails for the same reasons described above: *pre-existing* pollution doesn't account for the highway expansion's *future* pollution. *Supra* 3-5. Pre-project NAAQS compliance is—at best—the baseline to which the project's impacts must be added. Far from following a "rule of reason," MDOT Resp. 17, the

Agencies arbitrarily ignored the most important part of the problem: the pollution *from the project*.

The Agencies' theory that pre-project NAAQS compliance excuses NEPA analysis rests on a "misunderstanding of the nature of NEPA and its relationship to 'substantive' environmental laws such as the Clean Air Act." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1103 (9th Cir. 2016). The Agencies are right that compliance with a substantive law—including a NAAQS—is "relevant" under NEPA.[2] FHWA Resp. 29. But there are limits to when compliance alone can *satisfy* an agency's hard-look obligations. The substantive law must "specifically address the impacts of the project at issue." *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022) (cleaned up). And even then, compliance doesn't necessarily mean related impacts are insignificant and can be ignored under NEPA. *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971); *see* 40 C.F.R. § 1508.27(b)(10) (2019) (listing threatened violation of environmental laws as one factor relevant to an impact's "severity").

---

[2] The Clean Air Act provisions plaintiffs consider "immaterial," *see* FHWA Resp. 29, are the conformity requirements that the Agencies admit "do not apply" to the project's $PM_{2.5}$ pollution, Opening Br. 39 (quoting JA1480).

The Agencies' approach fails at the first step: regional, pre-project NAAQS compliance doesn't "specifically address" the highway expansion project's $PM_{2.5}$ impacts. *Envtl. Def. Ctr.*, 36 F.4th at 874. That NAAQS are intended to protect people, *see* MDOT Resp. 16, isn't enough. Pre-project NAAQS compliance doesn't reflect baseline $PM_{2.5}$ levels near the highways. Opening Br. 34-35. And—more importantly—it doesn't account for how much the project would increase those local $PM_{2.5}$ levels.[3] *Id.* at 32-33. Because of this mismatch, the Agencies' conclusion that pre-project NAAQS compliance meant "no further analysis of $PM_{2.5}$ was required," JA0541, is the type of "abdication of NEPA authority to the standards of other agencies" that *Calvert Cliffs* rejected. *See* 449 F.2d at 1122-23.

NEPA's hard-look requirement, moreover, does not contradict the Clean Air Act. *Contra* FHWA Resp. 31-32. Both NEPA and the Clean Air Act are entitled to full effect absent an "irreconcilable statutory conflict." *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510-11 (2018). There is no conflict here. The Clean Air Act's requirement that *certain* projects undergo (and pass) specific "hot-spot" air quality analyses, *see* FHWA Resp. 32, can coexist with NEPA's

---

[3] The project would increase local $PM_{2.5}$ levels along the highways by both increasing traffic volume and moving that traffic closer to neighboring communities. Opening Br. 12.

general mandate that *all* projects' air quality impacts receive a hard look.[4] Indeed, the requirements serve different purposes: the Clean Air Act dictates whether a project *can be approved*, Opening Br. 39, while NEPA ensures that agencies (and the public) know enough about a project's impacts to decide whether it *should be approved, see Nat'l Audubon Soc'y*, 422 F.3d at 184; *Calvert Cliffs*, 449 F.2d at 1123.

Accepting the Agencies' theory, on the other hand, would allow the government to ignore projects' contributions to $PM_{2.5}$ and other NAAQS pollutants, like lead and nitrogen oxides. The government would never need to assess and disclose the local impacts of those pollutants from a project—no matter how drastically the project would increase emissions—as long as the region complied with the NAAQS before the project was built. This would render NEPA a dead letter. *See* Opening Br. 33.

The "nearly unanimous" cases the Agencies tout, *see* FHWA Resp. 27-28, underscore the flaw in the Agencies' theory.[5] As plaintiffs have explained

---

[4] While a Clean Air Act "hot-spot" analysis for $PM_{2.5}$ could satisfy NEPA, plaintiffs do not contend that NEPA mandated that approach. *Contra* MDOT Resp. 17. NEPA doesn't require "any particular methodologies." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043 (10th Cir. 2023). But it also doesn't allow agencies "to ignore the impacts … when there are methods for analyzing those impacts." *Id.* That's what the Agencies did here.
[5] The only case that arguably endorses the Agencies' theory, *see Sierra Club v. FHWA*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010), is wrong for the reasons explained *supra* 5-8.

8

(and the Agencies ignore), the decisionmakers in those cases did not rely on
*pre-project* NAAQS compliance. Opening Br. 37-38. They did more: they
modeled the projects' emissions, added them to pre-project pollution levels,
and found that the combined levels wouldn't exceed the NAAQS. *Id.*
(addressing four of the cases FHWA cites); *see Coalition for Advancement of Reg'l
Transp. v. FHWA*, 959 F. Supp. 2d 982, 1013 (W.D. Ky. 2013) (same approach
for highway project).[6] These decisions do not support the Agencies' approach,
because the Agencies never modeled the project's $PM_{2.5}$ pollution, much less
added it to baseline levels so it could be compared to the NAAQS. Opening Br.
38; *supra* 3-5.

The Agencies' attempts to distinguish this Court's decision in *Friends of
Buckingham v. State Air Pollution Control Board*, 947 F.3d 68 (4th Cir. 2020), fail
as well. To be sure, *Friends of Buckingham* "is not a NEPA case." FHWA Resp.
30. But NEPA and the Virginia statute at issue in *Friends of Buckingham* are
analogous. Both require consideration of health impacts and the characteristics
of the local community before approving a project. *Compare* Va. Code Ann.
§ 10.1-1307(E)(1), (3) (2020) (requiring agency to "consider" the "character

---

[6] *Sierra Club v. U.S. Department of Transportation*, 310 F. Supp. 2d 1168 (D. Nev.
2004), is inapposite. The court there found that, as of January 2000, FHWA
lacked the information and modeling needed to make "meaningful findings"
about "project-specific" $PM_{2.5}$ impacts. *Id.* at 1188. Decades later, that's no
longer the case.

and degree" of health harms and the activity's "suitability" to its location), *with* 40 C.F.R. § 1508.27(a), (b)(2) (2019) (requiring agency to consider the local "context" for "site-specific actions" as well as "[t]he degree to which the proposed action affects public health"). And neither statute limits an agency's "broad authority" to approve or reject a project once the required analysis is complete. FHWA Resp. 30; *see Nat'l Audubon Soc'y*, 422 F.3d at 184. Applying the Virginia statute, this Court held that the agency's decision to "fall[] back on NAAQS" compliance rather than confront the project's local health impacts was arbitrary. *Friends of Buckingham*, 947 F.3d at 92.

The Agencies committed the same error. *See* Opening Br. 37. They provide no persuasive reason that *Friends of Buckingham*'s rationale shouldn't apply here as well. That the Agencies further compounded the error in *Friends of Buckingham* by refusing to even determine how much the project would increase local PM$_{2.5}$ levels only confirms that their analysis fell short of NEPA's hard-look mandate and the standards for reasoned decisionmaking.

## C.   The Agencies' analysis of other pollutants did not constitute a hard look at the project's PM$_{2.5}$ pollution

The Agencies also insist that analyses of different air pollutants excused their failure to assess the project's PM$_{2.5}$ impacts. FHWA Resp. 26-27; MDOT Resp. 20-21. Again, the Agencies are wrong.

10

The conformity finding for ozone is irrelevant. *Contra* FHWA Resp. 27; MDOT Resp. 20. The Agencies do not explain how a study that "focused on ozone," FHWA Resp. 27, and didn't consider the project's $PM_{2.5}$ impacts, *see* Opening Br. 39, somehow excused them from taking a hard look at $PM_{2.5}$ impacts. Air pollutants—and their impacts—are not interchangeable. *See* JA2065-2066. The Agencies' reliance on the ozone conformity finding is arbitrary. Opening Br. 39-40.

The Agencies' reliance on their carbon monoxide analysis, *see* FHWA Resp. 26-27; MDOT Resp. 20-21, fares no better. This post hoc rationale is not properly before the Court. Opening Br. 40 n.19. NEPA requires agencies to "identify any methodologies used." 40 C.F.R. § 1502.24 (2019). Yet, aside from stating (without explanation) that carbon monoxide is "a proxy for transportation emissions," JA0789, the FEIS "never says that it is relying on" the carbon monoxide analysis to assess $PM_{2.5}$ impacts, *see Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 274 (4th Cir. 2022).

Indeed, the only conclusion the FEIS drew from the carbon monoxide analysis was that the project wouldn't cause violations of the *carbon monoxide* NAAQS. JA0789. This makes sense: the Agencies "never purported to have developed … a proxy methodology" for $PM_{2.5}$. *Ore. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010). Instead, they "firmly

11

maintained that" they "need not address" $PM_{2.5}$ impacts, *see id.*, because regional, pre-project levels met the NAAQS, *e.g.*, JA0173; JA0541; JA1480; JA2067; JA2131. The Agencies' after-the-fact insistence that their carbon monoxide analysis also addressed $PM_{2.5}$ impacts is a post hoc rationalization that this Court cannot accept. *See N.C. Wildlife Fed'n*, 677 F.3d at 604.

In any event, the Agencies' belated reliance on the carbon monoxide study is also arbitrary. The Agencies claimed to follow EPA guidance about carbon monoxide modeling, JA2077 n.23, but that same guidance says that different methods apply to $PM_{2.5}$.[7] For good reason. Unlike carbon monoxide, a large portion of vehicle $PM_{2.5}$ emissions come from non-exhaust sources like tire and brake wear.[8] *See* JA2652; JA2659. The pollutants are also subject to different standards, covering different time frames. *Compare* 40 C.F.R. § 50.8 (carbon monoxide), with *id.* § 50.18 ($PM_{2.5}$). And they have different health impacts, with $PM_{2.5}$ "about 50 times more damaging to public health." JA2266-2267. The Agencies' carbon monoxide analysis didn't account for these important differences.

---

[7] *See* EPA, *Using MOVES2014 in Project-Level Carbon Monoxide Analyses* 2 (2015), https://tinyurl.com/an8598fh.

[8] Proper $PM_{2.5}$ modeling thus "always" includes "exhaust, brake wear, and tire wear emissions." EPA, *Transportation Conformity Guidance for Quantitative Hot-spot Analyses in $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas* 13 (2010), https://tinyurl.com/4hvvzsv9. The Agencies considered only exhaust ("running" and "crankcase") emissions for carbon monoxide. JA2096.

But even taken at face value, the carbon monoxide results confirm that the Agencies needed to investigate the project's $PM_{2.5}$ impacts. The analysis showed that expanding the highways would increase—and in some cases double—carbon monoxide levels compared to the no-build scenario.[9] *See* JA2129. If "what is true for carbon monoxide should also be true for $PM_{2.5}$," *see* MDOT Resp. 20, then worst-case $PM_{2.5}$ levels near the highways would increase to levels far above the annual $PM_{2.5}$ NAAQS. *See* JA2071 (showing regional, pre-project $PM_{2.5}$ levels compared to the then-current NAAQS). This only further illustrates why the Agencies needed to assess and disclose the project's actual $PM_{2.5}$ impacts.

Finally, MDOT's continued reliance on a 1987 FHWA Advisory is unavailing. That guidance document—which doesn't mention $PM_{2.5}$—is irrelevant. Opening Br. 40-41. But even if the Advisory's "principle[s]" for carbon monoxide applied to $PM_{2.5}$, *see* MDOT Resp. 18, it still wouldn't support the Agencies' approach. As MDOT concedes, the Advisory allows agencies to skip a localized carbon monoxide analysis only if they conclude that "combined project and background concentrations are well below" the

---

[9] The record belies MDOT's suggestion that the project would "reduce localized air emissions." MDOT Resp. 21 n.8. The carbon monoxide analysis showed that, for all locations considered, the project would increase carbon monoxide pollution compared to the "no-build" scenario. JA2129-2130.

NAAQS. *Id.* (cleaned up). The Agencies, however, never made that finding for PM$_{2.5}$. Nor could they, when they took no steps to determine how much PM$_{2.5}$ pollution the project would cause.

* * *

The Agencies failed to conduct a "thorough investigation" of the project's PM$_{2.5}$ pollution and provide a "candid acknowledgment of the risks" that pollution would pose to the people living closest to the highway expansion. *See Nat'l Audubon Soc'y*, 422 F.3d at 185. The Agencies' willful ignorance about the impacts of this dangerous pollutant violated NEPA.

## II.     The Agencies failed to take a hard look at the project's traffic-related air pollution harm to environmental justice communities

The Agencies misled the public by claiming that air pollution would be distributed evenly, with no disparate impacts on environmental justice communities. Opening Br. 42-48. That assertion contradicts undisputed record evidence, which shows the project would shift traffic bottlenecks during rush hours from an area with few environmental justice communities to the toll lanes' termini in Gaithersburg and North Bethesda, where environmental justice communities are clustered. *Id.* at 19-20.

The Agencies' briefs do not mention—let alone substantiate—their erroneous assertion that traffic-related pollution would be evenly distributed. They instead try to minimize increased traffic—and related air pollution—in

14

environmental justice communities as insignificant or irrelevant. FHWA Resp.
37; MDOT Resp. 25. And they spend pages on non-sequiturs: community
outreach, the project's other purported benefits, and harms unrelated to air
pollution. FHWA Resp. 33-35; MDOT Resp. 23-24, 26. None of these
arguments can cure the Agencies' failure to take a hard look at the project's
disparate traffic-related air pollution in environmental justice communities.

### A.    The Agencies continue to ignore evidence showing the project's disparate traffic burdens in environmental justice communities

The Agencies do not seriously dispute that the project would worsen
traffic during rush hours near environmental justice communities. *See* FHWA
Resp. 37; MDOT Resp. 25. And for good reason, as the record is clear on that
point. Opening Br. 18-20. While FHWA cites statements that traffic "would
not get worse" at the toll lanes' end points under the project, FHWA Resp. 38,
such "generalized, conclusory assertions"—especially when contradicted by
the record—cannot satisfy NEPA. *Ore. Nat. Res. Council Fund v. Goodman*, 505
F.3d 884, 893 (9th Cir. 2007).

Unable to show that traffic would not increase disproportionately in
environmental justice communities, the Agencies try to minimize the
significance of that increase. Those arguments fail too.

The Agencies' suggestion that any degradation in traffic would be
negligible because the worst decreases in speed near environmental justice

communities would last no more than a few hours each day, FHWA Resp. 37;
MDOT Resp. 25, is misleading. The congestion's true duration is unknown
because the Agencies stopped their rush-hour traffic models at 10 am and 7
pm, *see, e.g.*, JA1032; JA1043, when congestion was worst for environmental
justice communities, Opening Br. 19-20.[10] Further, the Agencies ignore that
the reductions in speed would be severe, *id.* at 43-44, and that even short-term
exposure to traffic-related pollution can have serious health consequences, *see*
JA2977 (causal relationship between acute $PM_{2.5}$ exposure and cardiovascular
effects and premature death); 40 C.F.R. §§ 50.8(a)(2) (one-hour standard for
carbon monoxide), 50.11(b) (same for nitrogen dioxide).

    The Agencies' reliance on system-wide traffic improvements is also
misplaced. FHWA Resp. 21; MDOT Resp. 25-26. It is true that the modeling
predicts minor improvements for average traffic conditions. S*ee* JA0461 (four
mile-per-hour average speed increase). But assessing a project's environmental
justice impacts requires evaluating the distribution of harms, not system-wide
averages. Opening Br. 44; *see Friends of Buckingham*, 947 F.3d at 91-92. Here,
record evidence shows that improvements in average traffic would come at the
expense of environmental justice communities. Opening Br. 19-20. The

---

[10] Commenters urged the Agencies to extend their modeling to show when
rush-hour congestion would clear under the project. JA2446-2447. The
Agencies refused.

Agencies' reliance on average improvements therefore cannot support their conclusion that all communities along the project would experience the same amount of traffic-related air pollution.

### B. The Agencies continue to ignore the unequal distribution of the project's traffic-related air pollution

The Agencies' attempts to minimize the pollution burdens from increased traffic in environmental justice communities fare no better.

FHWA's remarkable claim that increased congestion cannot be linked to increased air pollution, FHWA Resp. 38, lacks record support. The relationship between traffic and air pollution is well established. Opening Br. 10-11. EPA has explained that more traffic generally means higher emissions, with congestion and stop-and-go movement increasing pollution.[11] Studies—including ones sponsored by FHWA and MDOT—show elevated air pollution near roadways. *See* JA2763-2764; JA2780. And—as FHWA acknowledges—the FEIS notes the relationship between recurring congestion and increased emissions when discussing existing congestion on the Beltway and I-270. FHWA Resp. 38 (citing JA0626). That relationship applies equally to congestion under the project.

---

[11] EPA, *Near Roadway Air Pollution and Health: Frequently Asked Questions* 2 (2018), https://tinyurl.com/2wrwdv9v.

The Agencies' methodology for analyzing carbon monoxide emissions also confirms that relationship. As FHWA explains, the Agencies limited their analysis of "maximum" carbon monoxide under the project to the intersections and interchanges with "the very most congest[ion]." *Id.* at 40. This reflects the fact that carbon monoxide emissions "generally increase with decreasing vehicle speed" and increasing traffic volume. JA1805; *see also* JA2082.

The Agencies' carbon monoxide analysis did not, however, address the project's air pollution harms to environmental justice communities. *Contra* FHWA Resp. 38-41. That analysis did not evaluate the distribution of carbon monoxide (much less other air pollutants) from the project based on predicted traffic conditions. Opening Br. 47. Having used their traffic modeling to select *which* intersections to analyze, FHWA Resp. 39, the Agencies applied the same, theoretical level of congestion to all stretches of road when modeling carbon monoxide pollution, *see* JA2104. That counterfactual assumption of uniform congestion rendered the carbon monoxide results useless for assessing whether the project would pollute some communities more than others. Opening Br. 47.

At best, the carbon monoxide analysis indicates that the project would not cause "a violation of the [carbon monoxide] NAAQS" anywhere along the highways. FHWA Resp. 40. But that conclusion doesn't address localized

18

impacts from other traffic-related pollutants—including PM$_{2.5}$. *Supra* 11-12.

The Agencies cannot "simply fall[] back on … NAAQS" compliance *for a single air pollutant* to meet their obligation to analyze the risk of disparate air pollution impacts in environmental justice communities. *See Friends of Buckingham*, 947 F.3d at 93. This is especially true when, taken at face value, the carbon monoxide modeling suggests the project would substantially increase air pollution compared to the no-build scenario. *Supra* 13.

Adopting a "holistic view" cannot excuse the Agencies' failures to take a hard look at the project's distribution of air pollution. *Contra* MDOT Resp. 25 (quoting *Webster v. USDA*, 685 F.3d 411, 422 (4th Cir. 2012)). Focusing on a project's "holistic" impacts often—like here—masks environmental injustices worsened by disparate impacts. The Agencies' failures also are not trivial missteps: they kept the public in the dark about a key issue of equity and public health. Opening Br. 47-48. Page counts cannot make up for the gaps in the Agencies' analysis. *Contra* FHWA Resp. 33. For "girth is not a measure of … analytical soundness" under NEPA. *Anderson v. Evans*, 371 F.3d 475, 494 (9th Cir. 2004). Nor is the amount of outreach conducted. *Contra* MDOT Resp. 23-24. Community engagement is integral to achieving environmental justice, but it is only as useful as the information disseminated. Finally, the Agencies' recitation of other purported benefits of the project, MDOT Resp. 26, and a

tally of other impacts, FHWA Resp. 35, cannot satisfy their duty to take a hard

look at the project's air pollution harms to environmental justice communities.

*　*　*

The Agencies misled the public by claiming that the project's traffic-

related air pollution would be distributed evenly, an assertion that "runs

counter to available evidence." *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931

F.3d 339, 355 (4th Cir. 2019). The Agencies still haven't identified record

support for that conclusion, but instead have compounded their errors by

dismissing these risks as concerning "a few narrow slices" of the project,

FHWA Resp. 38, that happen to overlap with environmental justice

communities. Their focus on the project "as a whole," MDOT Resp. 25,

obscures environmental justice harms. The Agencies' failure to take a hard

look at the project's traffic-related air pollution impacts to environmental

justice communities violated NEPA.

## III. The Agencies arbitrarily rejected an alternative that would have avoided Plummers Island

FHWA regulations required the Agencies to select the project alternative

that "[c]auses the least overall harm in light of [Section 4(f)]'s preservation

purpose" by applying and documenting a seven-factor balancing test. 23

C.F.R. §§ 774.3(c)(1), 774.7(c). The Agencies did not follow these

requirements when they rejected a slight west-shift alignment for the American

Legion Bridge that would have avoided the historic Plummers Island. Opening
Br. 48-58. The Agencies attempt to defend their failures by ignoring the plain
language of FHWA regulations and by cobbling together scattered record
statements that do not address, let alone balance, all the required least overall
harm factors. FHWA Resp. 42-44; MDOT Resp. 27-29. Their arguments lack
merit.

> **A.**  **The Agencies failed to apply and document the seven-factor balancing test mandated by FHWA regulations**

The Agencies rejected the west-shift alignment without applying and
documenting the required least overall harm balancing test. Opening Br. 51-52.
No excuses can justify their failure to "follow[] all procedural requirements" in
FHWA's regulations. *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 401
(4th Cir. 2014).

The Agencies insist that FHWA's regulations did not require written
findings. FHWA Resp. 42-43; MDOT Resp. 29-30. Not so. The regulations
state that the least overall harm "analysis must be documented in the Section
4(f) evaluation." 23 C.F.R. § 774.7(c). The ordinary meaning of "documented"
requires written findings. To "document" is to "support (an assertion or claim,

for example) with evidence or decisive information."[12] Consistent with this definition, FHWA's Section 4(f) Policy Paper instructs that the documentation must "*explain how the seven factors were compared* to determine the least overall harm alternative."[13] 77 Fed. Reg. 42,802, 42,810 (July 20, 2012) (emphasis added). Merely being "'aware of' the seven factors," MDOT Resp. 30 (quoting JA0128), is therefore insufficient. *See Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024) ("[A]wareness is not itself an explanation."). The Agencies' claims that they were not required to explain how they weighed the balancing factors would "effectively read[] out the explicit requirement" to document their analysis. *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 474-75 (4th Cir. 2013).

The record does not support FHWA's alternative assertion that the Agencies did "document" the least overall harm analysis for the bridge alignments. *See* FHWA Resp. 43. The Agencies' scattered references to the west-shift alignment in the record, *see id.* (citing JA1532, JA1542), are not enough. "[S]imply pointing to evidence in the record" without showing their "reasoning" is "insufficient balancing." *N.J. Conservation Found. v. FERC*, 111

---

[12] American Heritage Dictionary of the English Language (5th ed. 2011), https://tinyurl.com/bubkzxn6; *see also* Webster's Third New International Dictionary 666 (1981).
[13] Indeed, the Agencies provided that detailed analysis for other "location specific" alternatives, *see* JA1919-2022, just not the west-shift alignment.

F.4th 42, 63 (D.C. Cir. 2024). And, even by FHWA's account, those statements concern only a few of the seven factors the Agencies had to consider: impacts (in acreage) to Section 4(f) properties and cost (an interchange reconfiguration).[14] FHWA Resp. 43.

Finally, FHWA's argument that not every design modification warrants a full seven-factor analysis, FHWA Resp. 43-44, does not help them. FHWA's Section 4(f) Policy Paper explains that least overall harm analysis requires the "comparison of all factors ... for all the alternatives." 77 Fed. Reg. at 42,810 (interpreting 23 C.F.R. § 774.3(c)). But even if a minute "engineering shift" may not require a formal analysis, FHWA Resp. 43, the west-shift alignment isn't a trivial lane modification. It is an alternative that would avoid a world-famous Section 4(f) property with significant historic and scientific values, *see* JA1438; Opening Br. 22-23, and that was developed by the Agencies' own expert "Strike Team" convened "to reduce overall acreage impacts" to parkland, JA0502. The Agencies' failure to apply the seven-factor balancing test and to document their findings before selecting the bridge alignment rendered their Section 4(f) evaluation unlawful.

---

[14] While the Agencies reference the west-shift alignment's potential displacement of one home, FHWA Resp. 43, they never explain how it is relevant under the least overall harm standard, given that private homes are not a "resource" under 23 C.F.R. § 774.3(c)(1)(vi).

B.      **The Agencies' rejection of the west-shift alignment was arbitrary**

Formal balancing aside, the Agencies also failed to consider all seven factors under the least overall harm test. Opening Br. 53-54. Agencies must base their actions on a consideration of "all relevant factors." *Calcutt v. FDIC*, 598 U.S. 623, 628-29 (2023) (cleaned up). Decisions under Section 4(f) are no exception. *Def. of Wildlife*, 762 F.3d at 401; *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 61 (4th Cir. 1990). Here, FHWA regulations supplied the relevant factors for the least overall harm analysis. 23 C.F.R. § 774.3(c)(1). The Agencies arbitrarily ignored several factors when rejecting the west-shift alignment. Opening Br. 54-57. Their briefs say nothing about those factors.

The Agencies still fail to explain how they evaluated the "relative significance" of Plummers Island. Opening Br. 56. The mere recognition of the "importance of Plummers Island," FHWA Resp. 44, is insufficient: the Agencies had to compare the island's significance to the significance of parkland that would be impacted by the west-shift alignment. 23 C.F.R. § 774.3(c)(1)(iii). Specifically, they needed to weigh the "character-defining feature[s]" of Plummers Island, *see* JA0536, against the significance of a few acres—consisting largely of medians and strips of land along existing roads—within the 19,000-acre, 184-mile-long C&O Canal National Historic Park, *see* JA1278-1280; Opening Br. 56. And they needed to do so "in light of [Section

24

4(f)'s] preservation purpose." 23 C.F.R. § 774.3(c)(1). The Agencies' narrow focus on the acreage of parkland impacted flouted the requirement to consider the parklands' "relative significance."[15]

The comparison of acreage harmed similarly does not fulfill the Agencies' duty to assess the "relative severity" of that harm. 23 C.F.R. § 774.3(c)(1)(ii). The Agencies downplay the harm to Plummers Island from the on-center alignment by focusing solely on the footprint of the on-island bridge piers. *See* FHWA Resp. 44; MDOT Resp. 31. But this ignores the other ways the on-center alignment would threaten the island's "sensitive" ecology, JA0502 n.5, which has "evolve[d] naturally and organically for over a century," JA2640. For example, construction would damage the historic island's character-defining features, including long-term research plots and its natural landscape. JA0536, JA0599; JA1748; JA2639-2640. The shadow from the expanded bridge would harm rare, threatened, and endangered plants on

---

[15] The establishment of the Strike Team did not fulfill that obligation either. *Contra* FHWA Resp. 44. The Strike Team's mission was to develop bridge design alternatives to "reduce overall acreage impacts" to nearby parkland. JA0502. The Strike Team was not asked to—and did not claim to—evaluate the significance of those resources or otherwise apply the least overall harm balancing test. *See* JA3018-3019. Nor could it have: the Strike Team presented its findings six months *before* the official eligibility determination for Plummers Island, which identified the island's specific areas of significance. JA0776-0777; *see* JA2635-2641.

the island. JA0601.[16] And the new piers would worsen flooding and erosion. JA1457. The Agencies never assessed the severity of harm that the on-center alignment would cause to the island, let alone compared it to the severity of harm that the west-shift alignment would cause to other Section 4(f) properties. Opening Br. 55-56.

The Agencies also haven't identified any record evidence that they considered whether the west-shift alignment's impacts could be mitigated. 23 C.F.R. § 774.3(c)(1)(i), (vi). Having explored mitigation for the on-center alignment, the Agencies did not search for similar mitigation for the west-shift alignment. Opening Br. 54-55. That lopsided analysis exacerbated the Agencies' failure to consider the "relative severity of the remaining harm, *after mitigation*, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection." 23 C.F.R. § 774.3(c)(1)(ii) (emphasis added).

Finally, the Agencies could not have weighed any "[s]ubstantial differences in cost" because they never developed the relevant information. *Id.* § 774.3(c)(1)(vii); *contra* FHWA Resp. 45. While the Strike Team predicted

---

[16] The Agencies ignored this shadow when calculating the acreage of impacts to Plummers Island, *see* JA1532-1535, despite elsewhere acknowledging that those impacts would likely be permanent, JA0601.

that the cost of reconfiguring the Clara Barton interchange *could* offset the $40 million in savings on bridge construction under the west-shift alignment, *see* FHWA Resp. 45, this possible offset does not signify that the west-shift alignment would cost more, much less that any cost difference would be "substantial," Opening Br. 56-57.

* * *

FHWA regulations required the Agencies to select the alternative for the American Legion Bridge that would cause "the least overall harm" based on a documented balancing of seven factors. The Agencies did not do that. Because the Agencies failed to "follow[] all procedural requirements" and to consider all "relevant factors," their rejection of the west-shift alignment was arbitrary and capricious. *Defs. of Wildlife*, 762 F.3d at 401.

## IV.    Vacatur is the default and appropriate remedy

Vacatur is the default remedy for unlawful agency action, which this Court applies as a matter of course and should apply here too. Opening Br. 58-59. FHWA requests a lesser remedy—remand without vacatur—which it acknowledges this Court has never embraced. FHWA Resp. 45-46. Even if the Court entertains FHWA's request, it is still the Agencies' burden to show that vacatur is not warranted. *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018).

27

The Agencies have not carried that burden. MDOT has conceded the issue by not briefing remedy at all. FHWA's single paragraph arguing against vacatur falls short. *See* FHWA Resp. 46-47.

FHWA does not argue that vacating the project approvals would be disruptive. Nor could they. This is not a case where vacatur risks more environmental harm than leaving the approvals in place. *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). Nor is it one where the "egg has been scrambled, and it is too late to reverse course." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110-11 (D.C. Cir. 2014) (cleaned up). Indeed, the Agencies have made little progress since approving the project in summer 2022. Their corporate partner that was going pay for construction backed out. Opening Br. 9 n.4. And there has been no public indication that MDOT has otherwise secured the billions of dollars needed to move the project forward. *See* JA0395. As a result, the "five or six years" of construction for the project have not started, s*ee* JA0653, and the project's purported benefits remain many years away. Vacatur would not "needlessly disrupt completion of the project[]," *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021), because the project hasn't even gotten off the ground.

It is also "far from clear" that the Agencies would approve the same project after correcting the serious flaws in their analysis. *See N.J. Conservation Found.*, 111 F.4th at 64. The Agencies approved the project based on an assumption that a private company would pay to build the toll lanes and operate them for fifty years. They did so without taking a hard look at the project's emissions of a dangerous air pollutant into neighboring communities, *supra* Part I, or the project's disparate air pollution impacts on environmental justice communities, *supra* Part II. And they greenlit a design for a sixteen-lane bridge that would harm a world-renowned historic site, without undertaking the analysis required by FHWA regulations to ensure that the design would cause the least overall harm to protected lands. *Supra* Part III.

Vacatur will ensure that the Agencies adequately consider these serious issues (among any others they may need to reconsider based on changed circumstances[17]) before making a new decision about the project's fate. Only through vacatur can the Court ensure that NEPA and Section 4(f)'s action-forcing purposes—to ensure that agencies are fully informed *before* approving a project—are satisfied. *See Standing Rock Sioux Tribe v. U.S. States Army Corps of*

---

[17] For instance, the annual NAAQS for PM$_{2.5}$ is significantly stronger now than it was when the Agencies approved the project. Opening Br. 13 n.8.

*Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) (noting that refusing to vacate following a NEPA violation "would vitiate the statute" (cleaned up)).

The Court should therefore apply the normal remedy and vacate the unlawful project approvals, either directly, *see Dow AgroSciences*, 707 F.3d at 475; *Envtl. Def. Ctr.*, 36 F.4th at 882, or by remanding to the district court with instructions to vacate, *see High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1229 (10th Cir. 2020).

## CONCLUSION

The Court should reverse the judgment of the district court and vacate the FEIS and Record of Decision.


Respectfully submitted,

/s/ Jared E. Knicley
Jared Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Telephone: (202) 513-6242
Facsimile: (415) 795-4799
Email: jknicley@nrdc.org

Nanding Chen
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Telephone: (415) 875-6165
Facsimile: (415) 795-4799

Email: nchen@nrdc.org

*Counsel for Appellants Maryland Chapter
of the Sierra Club, National Trust for
Historic Preservation in the United States,
and Natural Resources Defense Council*


/s/ Andrea C. Ferster
Andrea C. Ferster
Attorney at Law
68 Beebe Pond Road
Canaan, NY 12029
Telephone: (202) 669-6311
Email: aferster@railstotrails.org
(signed by Jared E. Knicley with
permission from Andrea C. Ferster)

*Counsel for Appellant Maryland Chapter
of the Sierra Club*


/s/ Elizabeth S. Merritt
Elizabeth S. Merritt
Deputy General Counsel
National Trust for Historic Preservation
600 14th Street NW, Suite 500
Washington, DC 20005
Telephone: (202) 297-4133
Facsimile: (202) 588-6038
Email: emerritt@savingplaces.org
(signed by Jared E. Knicley with
permission from Elizabeth S. Merritt)

*Counsel for Appellant National Trust for
Historic Preservation in the United States*

## CERTIFICATION OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1), I certify that the foregoing brief complies with:

1.    the type-volume limitations of Rule 32(a)(7) because it contains 6,493 words, excluding the parts of the brief exempted by Rule 32(f); and

2.    the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

/s/ Jared E. Knicley
Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
jknicley@nrdc.org

No. 24-1447

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MARYLAND CHAPTER OF THE SIERRA CLUB, ET AL.,

*Plaintiffs-Appellants*,

and

FRIENDS OF MOSES HALL, ET AL.,

*Plaintiffs,*

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Maryland
No. 22-cv-02597-DKC

APPELLANTS' REPLY BRIEF
STATUTORY AND REGULATORY ADDENDUM

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Nanding Chen
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6165
nchen@nrdc.org

*Counsel for Appellants*

October 15, 2024

# ADDENDUM TABLE OF CONTENTS

**Statutes**

Va. Code Ann. § 10.1-1307 (2020) (excerpt) ................................................. 001

**Regulations**

23 C.F.R. § 774.3 ........................................................................ 002

23 C.F.R. § 774.7 ........................................................................ 004

40 C.F.R. § 50.8 ......................................................................... 006

40 C.F.R. § 50.11 ........................................................................ 007

40 C.F.R. § 50.18 ........................................................................ 008

40 C.F.R. § 1502.1 (2019) ................................................................ 009

40 C.F.R. § 1502.24 (2019) ............................................................... 011

40 C.F.R. § 1508.27 (2019) ............................................................... 012

Va. Code Ann. § 10.1–1307 (2020)

* * *

(E) The Board in making regulations and in approving variances, control programs, or permits, and the courts in granting injunctive relief under the provisions of this chapter, shall consider facts and circumstances relevant to the reasonableness of the activity involved and the regulations proposed to control it, including:

1. The character and degree of injury to, or interference with, safety, health, or the reasonable use of property which is caused or threatened to be caused;

2. The social and economic value of the activity involved;

3. The suitability of the activity to the area in which it is located; and

4. The scientific and economic practicality of reducing or eliminating the discharge resulting from such activity.

* * *

774.15  Constructive use determinations.
774.17  Definitions.

AUTHORITY: 23 U.S.C. 103(c), 109(h), 138, 325, 326, 327 and 204(h)(2); 49 U.S.C. 303; Section 6009 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (Pub. L. 109–59, Aug. 10, 2005, 119 Stat. 1144); 49 CFR 1.81 and 1.91; and, Pub. L. 114–94, 129 Stat. 1312, Sections 1303 and 11502.

SOURCE: 73 FR 13395, Mar. 12, 2008, unless otherwise noted.

§ 774.1  Purpose.

The purpose of this part is to implement 23 U.S.C. 138 and 49 U.S.C. 303, which were originally enacted as Section 4(f) of the Department of Transportation Act of 1966 and are still commonly referred to as "Section 4(f)."

§ 774.3  Section 4(f) approvals.

The Administration may not approve the use, as defined in § 774.17, of Section 4(f) property unless a determination is made under paragraph (a) or (b) of this section.

(a) The Administration determines that:

(1) There is no feasible and prudent avoidance alternative, as defined in § 774.17, to the use of land from the property; and

(2) The action includes all possible planning, as defined in § 774.17, to minimize harm to the property resulting from such use; or

(b) The Administration determines that the use of the property, including any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures) committed to by the applicant, will have a *de minimis* impact, as defined in § 774.17, on the property.

(c) If the analysis in paragraph (a)(1) of this section concludes that there is no feasible and prudent avoidance alternative, then the Administration may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that:

(1) Causes the least overall harm in light of the statute's preservation purpose. The least overall harm is determined by balancing the following factors:

(i) The ability to mitigate adverse impacts to each Section 4(f) property

(including any measures that result in benefits to the property);

(ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii) The relative significance of each Section 4(f) property;

(iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

(v) The degree to which each alternative meets the purpose and need for the project;

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

(2) The alternative selected must include all possible planning, as defined in § 774.17, to minimize harm to Section 4(f) property.

(d) Programmatic Section 4(f) evaluations are a time-saving procedural alternative to preparing individual Section 4(f) evaluations under paragraph (a) of this section for certain minor uses of Section 4(f) property. Programmatic Section 4(f) evaluations are developed by the Administration based on experience with a specific set of conditions that includes project type, degree of use and impact, and evaluation of avoidance alternatives.[1] An approved programmatic Section 4(f) evaluation may be relied upon to cover a particular project only if the specific conditions in the programmatic evaluation are met

(1) The determination whether a programmatic Section 4(f) evaluation applies to the use of a specific Section 4(f) property shall be documented as specified in the applicable programmatic Section 4(f) evaluation.

(2) The Administration may develop additional programmatic Section 4(f) evaluations. Proposed new or revised programmatic Section 4(f) evaluations will be coordinated with the Department of Interior, Department of Agriculture, and Department of Housing

---

[1] FHWA Section 4(f) Programmatic Evaluations can be found at *www.environment.fhwa.dot.gov/4f/4fnationwideevals.asp.*

576

**Federal Highway Administration, DOT**  §774.7

and Urban Development, and published in the FEDERAL REGISTER for comment prior to being finalized. New or revised programmatic Section 4(f) evaluations shall be reviewed for legal sufficiency and approved by the Headquarters Office of the Administration.

(e) The coordination requirements in §774.5 must be completed before the Administration may make Section 4(f) approvals under this section. Requirements for the documentation and timing of Section 4(f) approvals are located in §§774.7 and 774.9, respectively.

[73 FR 13395, Mar. 12, 2008, as amended at 73 FR 31610, June 3, 2008; 83 FR 54506, Oct. 29, 2018]

**§774.5  Coordination.**

(a) Prior to making Section 4(f) approvals under §774.3(a), the Section 4(f) evaluation shall be provided for coordination and comment to the official(s) with jurisdiction over the Section 4(f) resource and to the Department of the Interior, and as appropriate to the Department of Agriculture and the Department of Housing and Urban Development. The Administration shall provide a minimum of 45 days for receipt of comments. If comments are not received within 15 days after the comment deadline, the Administration may assume a lack of objection and proceed with the action.

(b) Prior to making *de minimis* impact determinations under §774.3(b), the following coordination shall be undertaken:

(1) For historic properties:

(i) The consulting parties identified in accordance with 36 CFR part 800 must be consulted; and

(ii) The Administration must receive written concurrence from the pertinent State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THPO), and from the Advisory Council on Historic Preservation (ACHP) if participating in the consultation process, in a finding of "no adverse effect" or "no historic properties affected" in accordance with 36 CFR part 800. The Administration shall inform these officials of its intent to make a *de minimis* impact determination based on their concurrence in the finding of "no adverse effect" or "no historic properties affected."

(iii) Public notice and comment, beyond that required by 36 CFR part 800, is not required.

(2) For parks, recreation areas, and wildlife and waterfowl refuges:

(i) Public notice and an opportunity for public review and comment concerning the effects on the protected activities, features, or attributes of the property must be provided. This requirement can be satisfied in conjunction with other public involvement procedures, such as a comment period provided on a NEPA document.

(ii) The Administration shall inform the official(s) with jurisdiction of its intent to make a *de minimis* impact finding. Following an opportunity for public review and comment as described in paragraph (b)(2)(i) of this section, the official(s) with jurisdiction over the Section 4(f) resource must concur in writing that the project will not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. This concurrence may be combined with other comments on the project provided by the official(s).

(c) The application of a programmatic Section 4(f) evaluation to the use of a specific Section 4(f) property under §774.3(d)(1) shall be coordinated as specified in the applicable programmatic Section 4(f) evaluation.

(d) When Federal encumbrances on Section 4(f) property are identified, coordination with the appropriate Federal agency is required to ascertain the agency's position on the proposed impact, as well as to determine if any other Federal requirements may apply to converting the Section 4(f) land to a different function. Any such requirements must be satisfied, independent of the Section 4(f) approval.

**§774.7  Documentation.**

(a) A Section 4(f) evaluation prepared under §774.3(a) shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property.

(b) A *de minimis* impact determination under §774.3(b) shall include sufficient supporting documentation to

577

**Federal Highway Administration, DOT**    **§ 774.7**

and Urban Development, and published in the FEDERAL REGISTER for comment prior to being finalized. New or revised programmatic Section 4(f) evaluations shall be reviewed for legal sufficiency and approved by the Headquarters Office of the Administration.

(e) The coordination requirements in §774.5 must be completed before the Administration may make Section 4(f) approvals under this section. Requirements for the documentation and timing of Section 4(f) approvals are located in §§774.7 and 774.9, respectively.

[73 FR 13395, Mar. 12, 2008, as amended at 73 FR 31610, June 3, 2008; 83 FR 54506, Oct. 29, 2018]

### § 774.5 Coordination.

(a) Prior to making Section 4(f) approvals under §774.3(a), the Section 4(f) evaluation shall be provided for coordination and comment to the official(s) with jurisdiction over the Section 4(f) resource and to the Department of the Interior, and as appropriate to the Department of Agriculture and the Department of Housing and Urban Development. The Administration shall provide a minimum of 45 days for receipt of comments. If comments are not received within 15 days after the comment deadline, the Administration may assume a lack of objection and proceed with the action.

(b) Prior to making *de minimis* impact determinations under §774.3(b), the following coordination shall be undertaken:

(1) For historic properties:

(i) The consulting parties identified in accordance with 36 CFR part 800 must be consulted; and

(ii) The Administration must receive written concurrence from the pertinent State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THPO), and from the Advisory Council on Historic Preservation (ACHP) if participating in the consultation process, in a finding of ''no adverse effect'' or ''no historic properties affected'' in accordance with 36 CFR part 800. The Administration shall inform these officials of its intent to make a *de minimis* impact determination based on their concurrence in the finding of ''no adverse effect'' or ''no historic properties affected.''

(iii) Public notice and comment, beyond that required by 36 CFR part 800, is not required.

(2) For parks, recreation areas, and wildlife and waterfowl refuges:

(i) Public notice and an opportunity for public review and comment concerning the effects on the protected activities, features, or attributes of the property must be provided. This requirement can be satisfied in conjunction with other public involvement procedures, such as a comment period provided on a NEPA document.

(ii) The Administration shall inform the official(s) with jurisdiction of its intent to make a *de minimis* impact finding. Following an opportunity for public review and comment as described in paragraph (b)(2)(i) of this section, the official(s) with jurisdiction over the Section 4(f) resource must concur in writing that the project will not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. This concurrence may be combined with other comments on the project provided by the official(s).

(c) The application of a programmatic Section 4(f) evaluation to the use of a specific Section 4(f) property under §774.3(d)(1) shall be coordinated as specified in the applicable programmatic Section 4(f) evaluation.

(d) When Federal encumbrances on Section 4(f) property are identified, coordination with the appropriate Federal agency is required to ascertain the agency's position on the proposed impact, as well as to determine if any other Federal requirements may apply to converting the Section 4(f) land to a different function. Any such requirements must be satisfied, independent of the Section 4(f) approval.

### § 774.7 Documentation.

(a) A Section 4(f) evaluation prepared under §774.3(a) shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property.

(b) A *de minimis* impact determination under §774.3(b) shall include sufficient supporting documentation to

577

demonstrate that the impacts, after avoidance, minimization, mitigation, or enhancement measures are taken into account, are *de minimis* as defined in § 774.17; and that the coordination required in § 774.5(b) has been completed.

(c) If there is no feasible and prudent avoidance alternative the Administration may approve only the alternative that causes the least overall harm in accordance with § 774.3(c). This analysis must be documented in the Section 4(f) evaluation.

(d) The Administration shall review all Section 4(f) approvals under §§ 774.3(a) and 774.3(c) for legal sufficiency.

(e) A Section 4(f) approval may involve different levels of detail where the Section 4(f) involvement is addressed in a tiered EIS under § 771.111(g) of this chapter.

(1) When the first-tier, broad-scale EIS is prepared, the detailed information necessary to complete the Section 4(f) approval may not be available at that stage in the development of the action. In such cases, the documentation should address the potential impacts that a proposed action will have on Section 4(f) property and whether those impacts could have a bearing on the decision to be made. A preliminary Section 4(f) approval may be made at this time as to whether the impacts resulting from the use of a Section 4(f) property are *de minimis* or whether there are feasible and prudent avoidance alternatives. This preliminary approval shall include all possible planning to minimize harm to the extent that the level of detail available at the first-tier EIS stage allows. It is recognized that such planning at this stage may be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage. This preliminary Section 4(f) approval is then incorporated into the first-tier EIS.

(2) The Section 4(f) approval will be finalized in the second-tier study. If no new Section 4(f) use, other than a *de minimis* impact, is identified in the second-tier study and if all possible planning to minimize harm has occurred, then the second-tier Section 4(f) ap-

proval may finalize the preliminary approval by reference to the first-tier documentation. Re-evaluation of the preliminary Section 4(f) approval is only needed to the extent that new or more detailed information available at the second-tier stage raises new Section 4(f) concerns not already considered.

(3) The final Section 4(f) approval may be made in the second-tier CE, EA, final EIS, ROD or FONSI.

(f) In accordance with §§ 771.105(a) and 771.133 of this chapter, the documentation supporting a Section 4(f) approval should be included in the EIS, EA, or for a project classified as a CE, in a separate document. If the Section 4(f) documentation cannot be included in the NEPA document, then it shall be presented in a separate document. The Section 4(f) documentation shall be developed by the applicant in cooperation with the Administration.

## § 774.9 Timing.

(a) The potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study.

(b) Except as provided in paragraph (c) of this section, for actions processed with EISs the Administration will make the Section 4(f) approval either in the final EIS or in the ROD. Where the Section 4(f) approval is documented in the final EIS, the Administration will summarize the basis for its Section 4(f) approval in the ROD. Actions requiring the use of Section 4(f) property, and proposed to be processed with a FONSI or classified as a CE, shall not proceed until notification by the Administration of Section 4(f) approval.

(c) After the CE, FONSI, or ROD has been processed, a separate Section 4(f) approval will be required, except as provided in § 774.13, if:

(1) A proposed modification of the alignment or design would require the use of Section 4(f) property; or

(2) The Administration determines that Section 4(f) applies to the use of a property; or

(3) A proposed modification of the alignment, design, or measures to minimize harm (after the original Section

**Environmental Protection Agency**   §50.10

### §50.7 National primary and secondary ambient air quality standards for PM₂.₅.

(a) The national primary and secondary ambient air quality standards for particulate matter are 15.0 micrograms per cubic meter (µg/m³) annual arithmetic mean concentration, and 65 µg/m³ 24-hour average concentration measured in the ambient air as $PM_{2.5}$ (particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers) by either:

(1) A reference method based on appendix L of this part and designated in accordance with part 53 of this chapter; or

(2) An equivalent method designated in accordance with part 53 of this chapter.

(b) The annual primary and secondary $PM_{2.5}$ standards are met when the annual arithmetic mean concentration, as determined in accordance with appendix N of this part, is less than or equal to 15.0 micrograms per cubic meter.

(c) The 24-hour primary and secondary $PM_{2.5}$ standards are met when the 98th percentile 24-hour concentration, as determined in accordance with appendix N of this part, is less than or equal to 65 micrograms per cubic meter.

[62 FR 38711, July 18, 1997, as amended at 69 FR 45595, July 30, 2004]

### §50.8 National primary ambient air quality standards for carbon monoxide.

(a) The national primary ambient air quality standards for carbon monoxide are:

(1) 9 parts per million (10 milligrams per cubic meter) for an 8-hour average concentration not to be exceeded more than once per year and

(2) 35 parts per million (40 milligrams per cubic meter) for a 1-hour average concentration not to be exceeded more than once per year.

(b) The levels of carbon monoxide in the ambient air shall be measured by:

(1) A reference method based on appendix C and designated in accordance with part 53 of this chapter, or

(2) An equivalent method designated in accordance with part 53 of this chapter.

(c) An 8-hour average shall be considered valid if at least 75 percent of the hourly average for the 8-hour period are available. In the event that only six (or seven) hourly averages are available, the 8-hour average shall be computed on the basis of the hours available using six (or seven) as the divisor.

(d) When summarizing data for comparision with the standards, averages shall be stated to one decimal place. Comparison of the data with the levels of the standards in parts per million shall be made in terms of integers with fractional parts of 0.5 or greater rounding up.

[50 FR 37501, Sept. 13, 1985]

### §50.9 National 1-hour primary and secondary ambient air quality standards for ozone.

(a) The level of the national 1-hour primary and secondary ambient air quality standards for ozone measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter, is 0.12 parts per million (235 µg/m³). The standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 parts per million (235 µg/m³) is equal to or less than 1, as determined by appendix H to this part.

(b) The 1-hour standards set forth in this section will remain applicable to all areas notwithstanding the promulgation of 8-hour ozone standards under §50.10. The 1-hour NAAQS set forth in paragraph (a) of this section will no longer apply to an area one year after the effective date of the designation of that area for the 8-hour ozone NAAQS pursuant to section 107 of the Clean Air Act. Area designations and classifications with respect to the 1-hour standards are codified in 40 CFR part 81.

[62 FR 38894, July 18, 1997, as amended at 65 FR 45200, July 20, 2000; 68 FR 38163, June 26, 2003, 69 FR 23996, Apr. 30, 2004; 77 FR 28441, May 14, 2012]

### §50.10 National 8-hour primary and secondary ambient air quality standards for ozone.

(a) The level of the national 8-hour primary and secondary ambient air quality standards for ozone, measured

9

by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter, is 0.08 parts per million (ppm), daily maximum 8-hour average.

(b) The 8-hour primary and secondary ozone ambient air quality standards are met at an ambient air quality monitoring site when the average of the annual fourth-highest daily maximum 8-hour average ozone concentration is less than or equal to 0.08 ppm, as determined in accordance with appendix I to this part.

(c) Until the effective date of the final Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements Rule (final SIP Requirements Rule) to be codified at 40 CFR 51.1100 *et seq.*, the 1997 ozone NAAQS set forth in this section will continue in effect, notwithstanding the promulgation of the 2008 ozone NAAQS under §50.15. The 1997 ozone NAAQS set forth in this section will no longer apply upon the effective date of the final SIP Requirements Rule. For purposes of the anti-backsliding requirements of §51.1105, §51.165 and Appendix S to part 51, the area designations and classifications with respect to the revoked 1997 ozone NAAQS are codified in 40 CFR part 81.

[62 FR 38894, July 18, 1997, as amended at 77 FR 30170, May 21, 2012; 80 FR 12312, Mar. 6, 2015]

§ 50.11 National primary and secondary ambient air quality standards for oxides of nitrogen (with nitrogen dioxide as the indicator).

(a) The level of the national primary annual ambient air quality standard for oxides of nitrogen is 53 parts per billion (ppb, which is 1 part in 1,000,000,000), annual average concentration, measured in the ambient air as nitrogen dioxide.

(b) The level of the national primary 1-hour ambient air quality standard for oxides of nitrogen is 100 ppb, 1-hour average concentration, measured in the ambient air as nitrogen dioxide.

(c) The level of the national secondary ambient air quality standard for nitrogen dioxide is 0.053 parts per million (100 micrograms per cubic

meter), annual arithmetic mean concentration.

(d) The levels of the standards shall be measured by:

(1) A reference method based on appendix F to this part; or

(2) By a Federal equivalent method (FEM) designated in accordance with part 53 of this chapter.

(e) The annual primary standard is met when the annual average concentration in a calendar year is less than or equal to 53 ppb, as determined in accordance with appendix S of this part for the annual standard.

(f) The 1-hour primary standard is met when the three-year average of the annual 98th percentile of the daily maximum 1-hour average concentration is less than or equal to 100 ppb, as determined in accordance with appendix S of this part for the 1-hour standard.

(g) The secondary standard is attained when the annual arithmetic mean concentration in a calendar year is less than or equal to 0.053 ppm, rounded to three decimal places (fractional parts equal to or greater than 0.0005 ppm must be rounded up). To demonstrate attainment, an annual mean must be based upon hourly data that are at least 75 percent complete or upon data derived from manual methods that are at least 75 percent complete for the scheduled sampling days in each calendar quarter.

[75 FR 6531, Feb. 9, 2010]

§ 50.12 National primary and secondary ambient air quality standards for lead.

(a) National primary and secondary ambient air quality standards for lead and its compounds, measured as elemental lead by a reference method based on appendix G to this part, or by an equivalent method, are: 1.5 micrograms per cubic meter, maximum arithmetic mean averaged over a calendar quarter.

(b) The standards set forth in this section will remain applicable to all areas notwithstanding the promulgation of lead national ambient air quality standards (NAAQS) in §50.16. The lead NAAQS set forth in this section will no longer apply to an area one

(c) The level of the standard shall be measured by a reference method based on appendix A or A–1 of this part, or by a Federal Equivalent Method (FEM) designated in accordance with part 53 of this chapter.

[75 FR 35592, June 22, 2010]

**§ 50.18 National primary ambient air quality standards for PM$_{2.5}$.**

(a) The national primary ambient air quality standards for PM$_{2.5}$ are 12.0 micrograms per cubic meter (μg/m³) annual arithmetic mean concentration and 35 μg/m³ 24-hour average concentration measured in the ambient air as PM$_{2.5}$ (particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers) by either:

(1) A reference method based on appendix L to this part and designated in accordance with part 53 of this chapter; or

(2) An equivalent method designated in accordance with part 53 of this chapter.

(b) The primary annual PM$_{2.5}$ standard is met when the annual arithmetic mean concentration, as determined in accordance with appendix N of this part, is less than or equal to 12.0 μg/m³.

(c) The primary 24-hour PM$_{2.5}$ standard is met when the 98th percentile 24-hour concentration, as determined in accordance with appendix N of this part, is less than or equal to 35 μg/m³.

[78 FR 3277, Jan. 15, 2013]

**§ 50.19 National primary and secondary ambient air quality standards for ozone.**

(a) The level of the national 8-hour primary ambient air quality standard for ozone (O$_3$) is 0.070 parts per million (ppm), daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(b) The 8-hour primary O$_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average O$_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

(c) The level of the national secondary ambient air quality standard for O$_3$ is 0.070 ppm, daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(d) The 8-hour secondary O$_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average O$_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

[80 FR 65452, Oct. 26, 2015]

APPENDIX A–1 TO PART 50—REFERENCE MEASUREMENT PRINCIPLE AND CALIBRATION PROCEDURE FOR THE MEASUREMENT OF SULFUR DIOXIDE IN THE ATMOSPHERE (ULTRAVIOLET FLUORESCENCE METHOD)

1.0 APPLICABILITY

1.1 This ultraviolet fluorescence (UVF) method provides a measurement of the concentration of sulfur dioxide (SO$_2$) in ambient air for determining compliance with the national primary and secondary ambient air quality standards for sulfur oxides (sulfur dioxide) as specified in § 50.4, § 50.5, and § 50.17 of this chapter. The method is applicable to the measurement of ambient SO$_2$ concentrations using continuous (real-time) sampling. Additional quality assurance procedures and guidance are provided in part 58, appendix A, of this chapter and in Reference 3.

2.0 PRINCIPLE

2.1 This reference method is based on automated measurement of the intensity of the characteristic fluorescence released by SO$_2$ in an ambient air sample contained in a measurement cell of an analyzer when the air sample is irradiated by ultraviolet (UV) light passed through the cell. The fluorescent light released by the SO$_2$ is also in the ultraviolet region, but at longer wavelengths than the excitation light. Typically, optimum instrumental measurement of SO$_2$ concentrations is obtained with an excitation wavelength in a band between approximately 190 to 230 nm, and measurement of the SO$_2$ fluorescence in a broad band around 320 nm, but these wavelengths are not necessarily

**Council on Environmental Quality**                              **§ 1502.1**

action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

**§ 1501.8  Time limits.**

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by § 1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: *Provided*, That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

(1) Consider the following factors in determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic techniques.

(iv) Degree of public need for the proposed action, including the consequences of delay.

(v) Number of persons and agencies affected.

(vi) Degree to which relevant information is known and if not known the time required for obtaining it.

(vii) Degree to which the action is controversial.

(viii) Other time limits imposed on the agency by law, regulations, or executive order.

(2) Set overall time limits or limits for each constituent part of the NEPA process, which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).

(ii) Determination of the scope of the environmental impact statement.

(iii) Preparation of the draft environmental impact statement.

(iv) Review of any comments on the draft environmental impact statement from the public and agencies.

(v) Preparation of the final environmental impact statement.

(vi) Review of any comments on the final environmental impact statement.

(vii) Decision on the action based in part on the environmental impact statement.

(3) Designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(c) State or local agencies or members of the public may request a Federal Agency to set time limits.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1   Purpose.
1502.2   Implementation.
1502.3   Statutory requirements for statements.
1502.4   Major Federal actions requiring the preparation of environmental impact statements.
1502.5   Timing.
1502.6   Interdisciplinary preparation.
1502.7   Page limits.
1502.8   Writing.
1502.9   Draft, final, and supplemental statements.
1502.10   Recommended format.
1502.11   Cover sheet.
1502.12   Summary.
1502.13   Purpose and need.
1502.14   Alternatives including the proposed action.
1502.15   Affected environment.
1502.16   Environmental consequences.
1502.17   List of preparers.
1502.18   Appendix.
1502.19   Circulation of the environmental impact statement.
1502.20   Tiering.
1502.21   Incorporation by reference.
1502.22   Incomplete or unavailable information.
1502.23   Cost-benefit analysis.
1502.24   Methodology and scientific accuracy.
1502.25   Environmental review and consultation requirements.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

**§ 1502.1  Purpose.**

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the

473

Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

### § 1502.2  Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

### § 1502.3  Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report.

On proposals (§ 1508.23).

For legislation and (§ 1508.17).

Other major Federal actions (§ 1508.18).

Significantly (§ 1508.27).

Affecting (§§ 1508.3, 1508.8).

The quality of the human environment (§ 1508.14).

### § 1502.4  Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such

474

**Council on Environmental Quality**   **§ 1502.24**

may be incorporated by reference un-
less it is reasonably available for in-
spection by potentially interested per-
sons within the time allowed for com-
ment. Material based on proprietary
data which is itself not available for re-
view and comment shall not be incor-
porated by reference.

**§ 1502.22  Incomplete or unavailable in-
formation.**

When an agency is evaluating reason-
ably foreseeable significant adverse ef-
fects on the human environment in an
environmental impact statement and
there is incomplete or unavailable in-
formation, the agency shall always
make clear that such information is
lacking.

(a) If the incomplete information rel-
evant to reasonably foreseeable signifi-
cant adverse impacts is essential to a
reasoned choice among alternatives
and the overall costs of obtaining it are
not exorbitant, the agency shall in-
clude the information in the environ-
mental impact statement.

(b) If the information relevant to rea-
sonably foreseeable significant adverse
impacts cannot be obtained because
the overall costs of obtaining it are ex-
orbitant or the means to obtain it are
not known, the agency shall include
within the environmental impact
statement:

(1) A statement that such informa-
tion is incomplete or unavailable; (2) a
statement of the relevance of the in-
complete or unavailable information to
evaluating reasonably foreseeable sig-
nificant adverse impacts on the human
environment; (3) a summary of existing
credible scientific evidence which is
relevant to evaluating the reasonably
foreseeable significant adverse impacts
on the human environment, and (4) the
agency's evaluation of such impacts
based upon theoretical approaches or
research methods generally accepted in
the scientific community. For the pur-
poses of this section, ''reasonably fore-
seeable'' includes impacts which have
catastrophic consequences, even if
their probability of occurrence is low,
provided that the analysis of the im-
pacts is supported by credible scientific
evidence, is not based on pure conjec-
ture, and is within the rule of reason.

(c) The amended regulation will be
applicable to all environmental impact
statements for which a Notice of Intent
(40 CFR 1508.22) is published in the FED-
ERAL REGISTER on or after May 27, 1986.
For environmental impact statements
in progress, agencies may choose to
comply with the requirements of either
the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

**§ 1502.23  Cost-benefit analysis.**

If a cost-benefit analysis relevant to
the choice among environmentally dif-
ferent alternatives is being considered
for the proposed action, it shall be in-
corporated by reference or appended to
the statement as an aid in evaluating
the environmental consequences. To
assess the adequacy of compliance with
section 102(2)(B) of the Act the state-
ment shall, when a cost-benefit anal-
ysis is prepared, discuss the relation-
ship between that analysis and any
analyses of unquantified environ-
mental impacts, values, and amenities.
For purposes of complying with the
Act, the weighing of the merits and
drawbacks of the various alternatives
need not be displayed in a monetary
cost-benefit analysis and should not be
when there are important qualitative
considerations. In any event, an envi-
ronmental impact statement should at
least indicate those considerations, in-
cluding factors not related to environ-
mental quality, which are likely to be
relevant and important to a decision.

**§ 1502.24  Methodology and scientific
accuracy.**

Agencies shall insure the professional
integrity, including scientific integ-
rity, of the discussions and analyses in
environmental impact statements.
They shall identify any methodologies
used and shall make explicit reference
by footnote to the scientific and other
sources relied upon for conclusions in
the statement. An agency may place
discussion of methodology in an appen-
dix.

479

consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

### § 1508.26  Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

### § 1508.27  Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### § 1508.28  Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement